**Table A1-5.**

U.S. Geological Survey 2002 assessment of undiscovered conventional and continuous resource assessment units within the Uinta-Piceance Basin Province and Uncompahgre Study Area.

| | Assessment Unit Name | Estimated Undiscovered Resources for 95 Percent, 5 Percent, and the Mean Case Probabilities of Occurrence for the Uinta-Piceance Basin Province | | | | | | | | | % of Assessment Unit Lying Within Field Office | Estimated Undiscovered Resources for 95 Percent, 5 Percent, and the Mean Case Probabilities of Occurrence for the Uncompahgre Field Office area [1] | | | | | | | | |
| | | Oil (MMBO) | | | Gas (BCFG) | | | NGL (MMBNGL) | | | | Oil (MMBO) | | | Gas (BCFG) | | | NGL (MMBNGL) | | |
| | | 95% | 5% | Mean | 95% | 5% | Mean | 95% | 5% | Mean | | 95% | 5% | Mean | 95% | 5% | Mean | 95% | 5% | Mean |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Conventional Resources** | Paleozoic/Mesozoic Conventional Oil and Gas Assessment Unit | 2.65 | 11.55 | 6.29 | 16.53 | 97.99 | 49.93 | 0.51 | 3.44 | 1.65 | 11.77 | 0.31 | 1.36 | 0.74 | 1.95 | 11.53 | 5.88 | 0.06 | 0.40 | 0.19 |
| | Mesaverde Sandstone Gas | N/A | N/A | N/A | 17.91 | 140.12 | 66.41 | 0.13 | 1.18 | 0.53 | 5.31 | 0.00 | 0.00 | 0.00 | 0.95 | 7.44 | 3.53 | 0.01 | 0.06 | 0.03 |
| | Hanging Wall | 1.75 | 8.37 | 4.47 | 10.95 | 52.94 | 28.15 | 0.33 | 1.87 | 0.94 | 0.00004 | 0.000001 | 0.000003 | 0.000002 | 0.000004 | 0.000020 | 0.000011 | 0.000000 | 0.000001 | 0.000000 |
| | **Total Undiscovered Conventional Resource** | **4.41** | **19.92** | **10.76** | **28.86** | **193.06** | **94.56** | **0.46** | **3.05** | **1.47** | N/A | **0.31** | **1.36** | **0.74** | **2.90** | **18.97** | **9.40** | **0.07** | **0.47** | **0.22** |
| **Continuous Resources** | Mesaverde TPS Piceance Basin Continuous Gas | N/A | N/A | N/A | 1,902.23 | 4,594.01 | 3,064.27 | 5.00 | 15.09 | 9.19 | 0.16 | N/A | N/A | N/A | 3.04 | 7.35 | 4.90 | 0.01 | 0.02 | 0.01 |
| | Uinta-Piceance Transitional and Migrated Gas | N/A | N/A | N/A | 1,429.61 | 2,124.11 | 1,755.26 | 0.74 | 5.31 | 2.37 | 8.61 | N/A | N/A | N/A | 123.09 | 182.89 | 151.13 | 0.06 | 0.46 | 0.20 |
| | Piceance Basin Transitional Gas | N/A | N/A | N/A | 161.74 | 500.33 | 301.73 | 0.29 | 1.07 | 0.60 | 7.28 | N/A | N/A | N/A | 11.77 | 36.42 | 21.97 | 0.02 | 0.08 | 0.04 |
| | Mancos/Mowry TPS Piceance Basin Continuous Gas | N/A | N/A | N/A | 649.30 | 3,296.86 | 1,652.90 | 0.60 | 3.45 | 1.65 | 4.50 | N/A | N/A | N/A | 29.22 | 148.36 | 74.38 | 0.03 | 0.16 | 0.07 |
| | Mesaverde Group Coal-bed Gas | N/A | N/A | N/A | 138.72 | 749.54 | 367.77 | N/A | N/A | N/A | 12.80 | N/A | N/A | N/A | 17.76 | 95.94 | 47.07 | N/A | N/A | N/A |
| | **Total Undiscovered Continuous Resource** | **0.00** | **0.00** | **0.00** | **4,281.60** | **11,264.85** | **7,141.93** | **6.63** | **24.92** | **13.81** | N/A | **0.00** | **0.00** | **0.00** | **184.88** | **470.96** | **299.45** | **0.12** | **0.71** | **0.34** |
| | **Total Undiscovered Resource** | **4.41** | **19.92** | **10.76** | **4,310.46** | **11,457.91** | **7,236.49** | **7.09** | **27.97** | **15.28** | N/A | **0.31** | **1.36** | **0.74** | **187.78** | **489.93** | **308.85** | **0.19** | **1.18** | **0.56** |

MMBO = Million Barrels of Oil

BCFG = Billion Cubic Feet of Gas

NGL = Natural Gas Liquids

MMBNGL = Million Barrels of Natural Gas Liquids

N/A = Not Applicable

[1] Potential resource is assumed to be evenly distributed across each play area or assessment unit.

Data from U.S. Geological Survey Uinta-Piceance Assessment Team (

BLM

# United States Department of the Interior
# Bureau of Land Management

---

## Environmental Assessment
## DOI-BLM-CO-S050-2011-0036 EA

---

### September 2012

## Oak Mesa Coal Exploration License

---

**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**
**Phone: (970) 240-5300**



BLM_0018761

# Table of Contents

BACKGROUND/INTRODUCTION .......................................................................................... 2
PURPOSE AND NEED FOR THE ACTION ............................................................................ 4
ISSUES AND CONCERNS: ........................................................................................................ 4
DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES ....................................... 4
    **Proposed Action** ................................................................................................................. 4
    **Schedule and Timing** ........................................................................................................ 5
    **Access** ................................................................................................................................... 6
    **Staging and Storage** ........................................................................................................... 6
    **Site Clearing** ....................................................................................................................... 6
    **Drilling Activities** .............................................................................................................. 8
    **Equipment and Personnel** .............................................................................................. 12
    **Storm Water Control** ...................................................................................................... 12
    **Site Maintenance** ............................................................................................................. 12
    **Reclamation** ..................................................................................................................... 13
    **Noxious Weed Management** ............................................................................................ 16
    **Coordination** .................................................................................................................... 17
    **Design Features** ............................................................................................................... 17
    **No Action Alternative** ..................................................................................................... 19
    **Alternatives Considered But Eliminated From Detailed Analysis** ............................ 19
SCOPING, PUBLIC COMMENT AND ISSUES .................................................................... 19
AFFECTED ENVIRONMENT, ENVIRONMENTAL CONSEQUENCES and MITIGATION
MEASURES ................................................................................................................................ 21
    **AIR QUALITY** ................................................................................................................. 23
        Affected Environment ..................................................................................................... 23
        Environmental Consequences/Mitigation: ..................................................................... 23
    **AREAS OF CRITICAL ENVIRONMENTAL CONCERN** ............................................. 26
    **WILDERNESS and LANDS WITH WILDERNESS CHARACTERISTICS** ................. 26
    **WILD AND SCENIC RIVERS** ...................................................................................... 27
    **CULTURAL RESOURCES** ............................................................................................. 27
        Affected Environment ..................................................................................................... 27
        Environmental Consequences/Mitigation: ..................................................................... 28
    **NATIVE AMERICAN RELIGIOUS CONCERNS** ........................................................ 28
    **FARMLANDS, PRIME AND UNIQUE** ......................................................................... 28
        Affected Environment ..................................................................................................... 28
        Environmental Consequences/Mitigation ...................................................................... 29
    **SOILS (includes a finding on Standard 1)** ..................................................................... 29
        Affected Environment ..................................................................................................... 29
        Environmental Consequences/Mitigation: ..................................................................... 33
    **VEGETATION (includes a finding on Standard 3)** ...................................................... 34
        Affected Environment ..................................................................................................... 34
        Environmental Consequences/Mitigation ...................................................................... 42
    **INVASIVE, NON-NATIVE SPECIES (includes a finding on Standard 3)** ..................... 44
        Affected Environment ..................................................................................................... 44

BLM_0018762

Environmental Consequences/Mitigation ............................................................................ 44
**THREATENED, ENDANGERED, AND SENSITIVE SPECIES (includes a finding on Standard 4) ........................................................................................................................ 45**
    Affected Environment: ........................................................................................................ 45
    Environmental Consequences/Mitigation ............................................................................ 54
**BIRDS (Birds of Conservation Concern of the UFO, Migratory, and Raptors) ............. 58**
    Affected Environment .......................................................................................................... 58
    Environmental Consequences/Mitigation ............................................................................ 62
**WILDLIFE, TERRESTRIAL (includes a finding on Standard 3) .................................... 64**
    Affected Environment .......................................................................................................... 64
    Environmental Consequences/Mitigation ............................................................................ 66
**WILDLIFE, AQUATIC (includes a finding on Standard 3) ............................................. 68**
    Affected Environment .......................................................................................................... 68
    Environmental Consequences/Mitigation ............................................................................ 68
**WETLANDS & RIPARIAN ZONES (includes a finding on Standard 2) .......................... 69**
    Affected Environment .......................................................................................................... 69
    Environmental Consequences/Mitigation: ........................................................................... 70
**FLOODPLAINS ................................................................................................................... 71**
    Affected Environment .......................................................................................................... 71
    Environmental Consequences/Mitigation: ........................................................................... 71
**SURFACE WATER QUANTITY ........................................................................................ 72**
    Affected Environment .......................................................................................................... 72
    Environmental Consequences/Mitigation ............................................................................ 72
**SURFACE WATER QUALITY (includes a finding on Standard 5) ................................. 73**
    Affected Environment .......................................................................................................... 73
    Environmental Consequences/Mitigation ............................................................................ 75
**GROUND WATER QUANTITY ........................................................................................ 78**
    Geologic Framework ........................................................................................................... 78
    Affected Environment .......................................................................................................... 78
    Environmental Consequences/Mitigation ............................................................................ 79
**GROUND WATER QUALITY (includes a finding on Standard 5) .................................. 79**
    Affected Environment .......................................................................................................... 79
    Environmental Consequences/Mitigation ............................................................................ 80
**WASTES, HAZARDOUS OR SOLID ................................................................................. 81**
    Affected Environment .......................................................................................................... 81
    Environmental Consequences/Mitigation ............................................................................ 81
**ENVIRONMENTAL JUSTICE ........................................................................................... 82**
    Affected Environment .......................................................................................................... 82
    Environmental Consequences/Mitigation ............................................................................ 82
**ACCESS AND TRANSPORTATION ................................................................................. 82**
    Affected Environment .......................................................................................................... 82
    Environmental Consequences/Mitigation ............................................................................ 83
**REALTY AUTHORIZATIONS ........................................................................................... 85**
    Affected Environment .......................................................................................................... 85
    Environmental Consequences/Mitigation ............................................................................ 85
**RANGELAND MANAGEMENT ......................................................................................... 85**
    Affected Environment .......................................................................................................... 85

BLM_0018763

Environmental Consequences/Mitigation ........................................................................ 86
**FIRE** ....................................................................................................................................... **86**
Affected Environment..................................................................................................... 86
Environmental Consequences/Mitigation ........................................................................ 87
**WATER SUPPLY/WATER RIGHTS** ................................................................................ **87**
Affected Environment..................................................................................................... 87
Environmental Consequences/Mitigation ........................................................................ 88
**NOISE** .................................................................................................................................... **88**
Affected Environment..................................................................................................... 88
Environmental Consequences/Mitigation ........................................................................ 89
**RECREATION** .................................................................................................................... **89**
Affected Environment..................................................................................................... 89
Environmental Consequences/Mitigation ........................................................................ 90
**VISUAL RESOURCES** ....................................................................................................... **90**
Affected Environment..................................................................................................... 90
Environmental Consequences/Mitigation ........................................................................ 90
**GEOLOGY AND MINERALS**............................................................................................ **91**
Affected Environment..................................................................................................... 91
Environmental Consequences/Mitigation ........................................................................ 92
**SOCIO-ECONOMICS** ......................................................................................................... **92**
Affected Environment..................................................................................................... 92
Environmental Consequences/Mitigation ........................................................................ 93
**CADASTRAL SURVEY, LAW ENFORCEMENT, FOREST MANAGEMENT, PALEONTOLOGY** ............................................................................................................. **94**
CUMULATIVE IMPACTS SUMMARY .................................................................................... 94
**Cumulative Impacts/Effects**................................................................................................ **94**
**Past Actions** ........................................................................................................................... **94**
**Present Actions**...................................................................................................................... **95**
Mining................................................................................................................................ 95
Oil and Gas Leasing........................................................................................................... 96
**Reasonably Foreseeable Future Actions**............................................................................ **96**
PERSONS/AGENCIES CONSULTED ....................................................................................... 98
LIST OF PREPARERS............................................................................................................... 99
REFERENCES ......................................................................................................................... 100
Appendix A. Noxious Weed Management Plan ..............................................................................
Appendix B. Design Features for Coal Exploration License COC-74911 .....................................
Appendix C. Scoping Comment Summary......................................................................................
Appendix D. Preliminary EA Public Comment Summary ..............................................................
Appendix E. MSDS for Foamer/DeFoamer....................................................................................

BLM_0018764

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**

# ENVIRONMENTAL ASSESSMENT

NUMBER: DOI-BLM-CO-S050-2011-0036

CASEFILE/PROJECT NUMBER:  COC74911

PROJECT NAME:  Oak Mesa Coal Exploration License

PLANNING UNIT:   Planning Unit 1

LEGAL DESCRIPTION:

| Township 13 South, Range 92 West, 6th P.M. | Township 13 South, Range 93 West, 6th P.M. |
|---|---|
| Sec 7, Lots 13-20 | Sec 9, Lots 9-16 |
| Sec 8, S/2 | Sec 10, Lots 9-16 |
| Sec 9, S/2 | Sec 11, Lots 9-16 |
| Sec 15, Lots 13, 18, 19, and 22 | Sec 12, Lots 9-16 |
| Sec 16, All | Sec 13, All |
| Sec 17, All | Sec 14, All |
| Sec 18, All | Sec 15, Lots 1-10, 14-15 |
| Sec 19, All | Sec 16, Lots 1-4 |
| Sec 20, All | Sec 23, Lots 1-15 |
| Sec 21, All | Sec 24, All |
| Sec 22, Lots 4, 5, 12, and 13 | Sec 25, All |
| Sec 28, Lots 2-7 | Sec 26, Lots 1-15 |
| Sec 29, All | Sec 35, All |
| Sec 30, Lots 5-18 | Sec36, Lots 1-8, 11-14 |

APPLICANT:
Oxbow Mining, LLC
P.O. Box 535
3737 Highway 133
Somerset, CO 81434

BLM_0018765

# BACKGROUND/INTRODUCTION

The Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) currently manages several active federal coal leases related to three coal mines located in the valley of the North Fork of the Gunnison River near Paonia, Colorado. Bowie No. 2, West Elk, and Elk Creek are actively producing longwall coal mines, with a total annual output of nearly 15 million tons. While each mining operation controls coal reserves with a mix of federal and fee and/or state coal, about 90 percent of local production is federal (BLM 2011a). Table 1 below shows mining companies, mines, and typical yearly coal production for each mine.

**Table 1. BLM UFO Coal Resources**

| Company Name | Mine Name | Annual Average Coal Production (tons) (2006 – 2011)* |
|---|---|---|
| Bowie Resources, LLC | Bowie No. 2 | 2,808,556 |
| Mountain Coal Company | West Elk | 5,721,944 |
| Oxbow Mining, LLC | Elk Creek | 4,378,814 |
| | **Total** | **12,909,314** |

*Periods end September 30, 2011
(BLM 2011b)

Coal exploration drilling is needed to determine seam reserve availability for possible leasing and development of a new underground coal mine in Delta County. The proposed Oak Mesa exploration area is located in Delta County to the west of the Orchard Valley Mine, a.k.a. the Bowie No. 1 Mine (see Figure 1). The exploration drilling is proposed to confirm the quality, quantity, and extent of the coal within this area. The proposed Oak Mesa project extends from the western edge of the Bowie Mine holdings westward across the mesa to the Leroux Creek area, encompassing about 13,873 acres, north of Hotchkiss. The area does not reach into the Grand Mesa National Forest. The Oak Mesa Project is adjacent to existing coal leases in an area of known coal reserves (see Figure 1).

The North Fork Valley is a historical coal mining area. More than 744 million recoverable tons of coal is present in the North Fork Valley according to a 2000 USGS report (USGS 2000). The project area has mixed public and private surface and mineral ownership. Most of the project area is in private surface ownership, with BLM-held mineral (subsurface) ownership (this is called "split estate"). In split estate situations, the surface and subsurface rights (such as the right to develop minerals) for a piece of land are owned by different parties. Separation of mineral and surface ownership rights is a result of some of the early homesteading laws including the Stock Raising Homestead Act (Act of December 29, 1916 (39 Stat. 862)), in which homesteaders were granted the surface rights and the federal government retained the mineral rights. Mineral rights are considered dominant, meaning that they take precedence over other property rights, including those associated with surface ownership. However, the mineral owner must show due regard for the interests of the surface estate owner, and occupy only those portions of the surface that are reasonably necessary to develop the mineral estate (BLM 2011a).

BLM_0018766



## Oak Mesa Exploration Project

— **Exploration Boundary**
▭ **Active Coal Lease**
▨ **Pending Coal Lease**
— **Bowie #1 Mine**

— **Stream/Lake**
— **Highway/Road**

Data Source: CDOT; Oxbow Mining, LLC

0   1   2 Miles

N

### Figure 1
### Project Location

Prepared for: BLM.
File: 5057 - Figure 1 EA.mxd (WH)
August 2012

Portions of this document include intellectual property of ESRI and its licensors and are used herein under license. Copyright © 2011 ESRI and its licensors. All rights reserved.

BLM_0018767

# PURPOSE AND NEED FOR THE ACTION

On May 6, 2011, pursuant to regulations in 43 CFR 3410.2-1, Oxbow Mining, LLC (Oxbow) submitted a Federal Coal Exploration License application to the Colorado State Director of the BLM. The BLM is charged with administration of the mineral estate on these federal lands, and is required, by law, to consider leasing federally-owned minerals for economic recovery.

The BLM's purpose for the action is to decide whether, and under which provisions, to approve the application for exploration drilling in the 13,873 acre project area made up of BLM and private surface that overlies federal coal, or to reject the proposal.   The BLM's need for the action is to respond to an application to explore the coal deposits in accordance with National Environmental Policy Act (NEPA), the Mineral Leasing Act (MLA), as amended by the Federal Coal Leasing Amendments Act (FCLAA) of 1976, and the Federal Land Policy and Management Act (FLPMA) of 1976.

# ISSUES AND CONCERNS:

1. Surface Water Quality and Quantity
2. Ground Water Quality and Quantity
3. Water Supply/Water Rights
4. Traffic
5. Air Quality
6. Wildlife Impacts
7. Socio-economic Effects (beneficial and detrimental)

# DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES

## *Proposed Action*

Oxbow proposes to drill 43 exploration drill holes (see Figure 2) on private and federal lands into federal subsurface holdings. The drill holes would be completed from small (0.50 acre) drill pads, and would be drilled to a depth of 220 to 2,249 feet, depending on the location of each drill hole (see Table 3). The entire exploration area covers about 13,873 acres, and mostly temporary surface disturbances from road and pad construction would occur on about 33.5 acres. Most drilling locations would not require grading/leveling a pad site; however, occupancy disturbance is anticipated for all pads. Therefore, disturbance from pad creation and occupation is expected to be about 21.5 acres. Of the 43 proposed drill holes, 10 would require construction of a pad to create level ground for drilling (about 5.0 acres). Occupation (no grading) would occur on all the remaining drill pads (about 16.5 acres) (see Table 3). Activities needed to complete the exploration project include access roads, staging and storage areas, limited clearing and leveling of areas for drilling equipment (for only 10 of the drill holes), completing exploratory drill holes, site maintenance, and reclamation activities. Existing access roads would be used wherever possible. New disturbance from temporary road construction is anticipated to be 2.5 acres on BLM and 9.5 acres on private surface for a total of 12 acres (see Table 2). Wherever possible, existing ground disturbance would be used for drilling sites, and construction activities would be limited to clearing of brush and removal of rocks and large boulders. Prior to construction, the limits of construction disturbance areas along the access road routes and pad locations would be clearly defined. These limits would be staked and flagged. All construction activities would be

4

BLM_0018768

confined to these areas.  Stakes and flagging would be removed when construction and restoration are completed.

Appendix A is the Noxious Weed Management Plan, which must be followed.

Appendix B are requirements for the coal exploration license, which is a summary of the narrative below.

**Table 2. Access Roads Length and Temporary Surface Disturbance and Occupation.**

| Type of access | BLM surface (length in miles) | BLM surface (acres) | Private surface (length in miles) | Private surface (acres) |
|---|---|---|---|---|
| **Surface occupation** | | | | |
| Drive-in access on existing roads (as-is) | 5.5 | | 24.3 | |
| Drive-in access on existing roads/2-tracks to be improved | 0.4 | 0.7* | 1 | 1.7* |
| *Subtotal* | 5.9 | 0.7* | 25.3 | 1.7* |
| **Surface disturbance** | | | | |
| New temporary access roads | 1.5 | 2.5 | 5.6 | 9.5 |
| *Subtotal* | 1.5 | 2.5 | 5.6 | 9.5 |
| *Total* | 7.4 | 3.2* | 30.9 | 11.2* |

*Columns may not sum correctly due to minor rounding errors.*
*\*Surface occupation calculations are based on a maximum width of 14 feet.  There would be minimal new disturbance on existing roads to be used or improved for project purposes. Existing roads have varying widths of existing disturbance.  Acres shown for existing roads in Table 2 represent occupied area.*

### Schedule and Timing

Exploration activities could expect to begin with issuance of the license and would be completed within two years after authorization.  Road construction and any pad leveling required would occur in advance of drilling activities.  Roads would be constructed a minimum of one week ahead of drilling activities.

Drilling work in the exploration area would be completed with one or two drill rigs (typically two).  Each rig would have two crews working 24 hours per day, on 10 or 12-hour shifts. Drilling typically would take approximately two to three days per pad, but may take longer depending upon drill hole competency and the thickness of the upper alluvium layer.  The sections that follow provide more details about each part of the exploration project (also see Figure 2).

5

### Access

There are many existing ranch access roads throughout the project area.  Some roads may require maintenance such as grading, drainage ditch repair, and graveling.  Where there are no existing roads and slopes and natural obstacles do not allow cross-country driving/travel, new temporary roads would be constructed.  New roads would have a driving surface about 12 feet wide, and a total disturbance width of about 14 feet.  Specifically, the following design features would apply to new access roads:

- Existing access roads would be used wherever possible to reach the drilling locations.
- New roads and other linear facilities would be located and constructed to follow the contour of the landform or to mimic lines in the vegetation (avoiding straight roads and steep slopes).
- Road beds would be a maximum of 14 feet wide.
- Cutting and filling, and crowning and ditching, of temporary roads would be kept to the minimum necessary.

### Staging and Storage

The 7X/Bear Ranch LEX property would serve as a casting and laydown area.  Other storage, including equipment and supply storage, would occur along new temporary access roads or at drill locations within the designated areas.  All storage would occur away from public access areas.

### Site Clearing

Clearing and grading would be needed for new access roads and nine of the pad locations. Where possible, areas of existing disturbance would be used.  All of the pad sites would require clearing of brush and removal of rocks and large boulders.  Of the 43 drilling locations, ten are anticipated to require grading to establish a level pad site (drill holes 14, 21R, 22, 25, 33, 36, 37, 39, 41, and 44).  Clearing and grading would be accomplished using bulldozers, road graders or other standard earth-moving equipment.  The topsoil component (up to 12 inches, where present) would be salvaged for use in reclamation activities.  In many areas, surface rock is present and topsoil salvage would be limited.  Drill pads that require grading would have a surface area of about 0.50 acres (about 180 feet by 120 feet).  Drill pads not requiring grading would have a surface occupation and clearing area of no greater than 0.50 acre.

BLM_0018770



Oak Mesa Exploration Project

Figure 2
Proposed Action

BLM_0018771

*Drilling Activities*

Exploratory drilling would use a truck-based, self-leveling rotary drill rig with about a 53 foot mast (fully extended) and with a base dimension of about 10 by 10 feet (see Photo 1). The drill rig is equivalent in size and capability to those used to drill deep water wells. Bore holes would be drilled using 8 ¾ inch rotary bit to a depth of up to 200 feet, depending upon ground conditions and the ultimate depth of the hole at each location. A steel surface casing would be installed and cemented in place. A 6 ¼ inch rotary bit would be used to drill the borehole to a preselected depth above the target coal seam (see Table 3); depth ranges from 220 to 2,249 feet (see Table 3). A 3-inch core barrel and bit would be used to recover a core from the coal seam and portions of the rock material above and below the coal seam. The cores would provide information about the depth, quality, and extent of the coal within the project area.



**Photo 1. Photo of representative drilling operations on natural surface.**

In order to obtain discrete representative samples, bore holes would be drilled to the extent possible with air, air-water, air-foam, or water as the circulation medium. In some cases it may be difficult to keep boreholes open, and maintain sample integrity. In those situations, a lubricating bentonite-based mud would be used. The muds used in these instances would not contain metallic compounds. It is estimated that approximately 10 percent of the boreholes may require the use of a mud circulation medium during a portion of the drilling (see attached Appendix E for Material Safety Data Sheets (MSDS) for drilling supplements).

It is estimated that approximately 3,000 to 4,000 gallons of water would be used for each borehole under normal drilling conditions (0.528 acre foot of water total for all 43 boreholes). Water would be delivered to each borehole site by a tanker truck designed to haul water. A cuttings pit to hold soil and rock material removed from the borehole would be excavated with a

8

backhoe within the pad area. The pit would be approximately 20 feet in length, 8 feet in width, and 8 feet deep (47 cubic yards each). All drilling locations would require construction of a pit for cuttings and containment of produced water (both water injected during air drilling and any water produced from the formation). If drilling mud is required to maintain hole stability and/or circulation, a portable mixing tank would be used to mix and contain the drilling mud. It is anticipated that ten percent of the excavation holes may require drilling mud. Handling of the drill cuttings would include retaining the cuttings near the drill hole, so that they can either be put back into the drill hole after drilling is complete, or pushed into the cuttings pit. Reclamation of the cuttings pits is described in the *Reclamation* section below.

Oxbow may complete several of these exploration holes as ground water monitoring wells, in preparation for base line monitoring. Identification of specific boreholes to be completed as ground water monitoring wells has not been finished. Any boreholes selected to be completed as monitoring wells would be completed in accordance with the guidelines agreed to by the BLM for monitoring wells and meet monitoring well completion rules of the Colorado Division of Water Resources.

Because nighttime drilling activities would be conducted, lighting would be required. Lighting would consist of one or two "tower" lights near the top of the drill rig at a height of about 50 feet, and portable lighting units on the ground to allow drillers to monitor drill cuttings and review the drill cores. Ground lighting units would be aimed at work areas. For safety reasons, lighting cannot be artificially shielded, but natural topographic and vegetative shielding would be considered in light placement.

Noise levels from drilling operations would be about 85 decibels (dB), which does not require hearing protection for workers. The small rig used for exploratory drilling would produce less noise than the large rigs used for drilling oil and gas wells. For comparison, the following are noise limits established by the schedule to Division 7 of the Motor Vehicle Act Regulations:

- Light Duty 83 dB
- Heavy Duty Gasoline 88 dB
- Motorcycles 91 dB
- Heavy Duty Diesel 93 dB

BLM_0018773

Table 3.  Drill Pad disturbance area.

| Drill hole ID | Depth of drill hole | Total temporary impacts (acres) | BLM temporary surface disturbance (acres)* | | Private temporary surface disturbance (acres)* | |
|---|---|---|---|---|---|---|
| | | | Road | Pad | Road | Pad |
| OM-YR-02 | 1856 | 0.70 | | | 0.20 | 0.50 (O) |
| OM-YR-03R | 1193 | 0.70 | 0.20 | 0.50 (O) | | |
| OM-YR-04R | 829 | 1.22 | 0.72 | 0.50 (O) | | |
| OM-YR-05 | 429 | 0.65 | | | 0.15 | 0.50 (O) |
| OM-YR-06 | 654 | 1.24 | | | 0.74 | 0.50 (O) |
| OM-YR-07R | 635 | 0.82 | 0.32 | 0.50 (O) | | |
| OM-YR-08 | 1887 | 1.33 | | | 0.83 | 0.50 (O) |
| OM-YR-09 | 725 | 0.57 | | | 0.07 | 0.50 (O) |
| OM-YR-10 | 1245 | 0.55 | | | 0.05 | 0.50 (O) |
| OM-YR-11R | 1108 | 0.55 | | | 0.05 | 0.50 (O) |
| OM-YR-12 | 1261 | 0.21 | | | 0.86 | 0.50 (O) |
| OM-YR-13 | 1832 | 0.50 | | | 0.00 | 0.50 (O) |
| OM-YR-14 | 1510 | 0.54 | | | 0.04 | 0.50 (G) |
| OM-YR-15R | 597 | 1.45 | 0.95 | 0.50 (O) | | |
| OM-YR-16 | 2203 | 0.50 | | | 0.00 | 0.50 (O) |
| OM-YR-17 | 1645 | 0.50 | | | 0.00 | 0.50 (O) |
| OM-YR-18 | 2234 | 1.75 | | | 1.25 | 0.50 (O) |
| OM-YR-19 | 212 | 0.50 | | | 0.00 | 0.50 (O) |
| OM-YR-20 | 932 | 0.60 | | | 0.10 | 0.50 (O) |
| OM-YR-21R | 1298 | 0.73 | 0.23 | 0.50 (G) | | |
| OM-YR-22 | 1098 | 0.81 | | | 0.31 | 0.50 (G) |
| OM-YR-23R | 814 | 0.85 | 0.35 | 0.50 (O) | | |
| OM-YR-24 | 1451 | 0.89 | | | 0.39 | 0.50 (O) |

10

BLM_0018774

| Drill hole ID | Depth of drill hole | Total temporary impacts (acres) | BLM temporary surface disturbance (acres)* | | Private temporary surface disturbance (acres)* | |
|---|---|---|---|---|---|---|
| | | | Road | Pad | Road | Pad |
| OM-YR-25 | 773 | 0.56 | | | 0.06 | 0.50 (G) |
| OM-YR-26 | 1400 | 1.28 | | | 0.78 | 0.50 (O) |
| OM-YR-27 | 831 | 0.53 | | | 0.03 | 0.50 (O) |
| OM-YR-28 | 474 | 1.15 | | | 0.65 | 0.50 (O) |
| OM-YR-29 | 427 | 0.62 | | | 0.12 | 0.50 (O) |
| OM-YR-30 | 1719 | 0.50 | | | 0.00 | 0.50 (O) |
| OM-YR-31 | 1967 | 0.92 | | | 0.42 | 0.50 (O) |
| OM-YR-32 | 2117 | 0.58 | | | 0.08 | 0.50 (O) |
| OM-YR-33 | 1634 | 0.50 | | | 0.00 | 0.50 (G) |
| OM-YR-34 | 970 | 1.32 | | | 0.82 | 0.50 (O) |
| OM-YR-35 | 1379 | 0.68 | | | 0.18 | 0.50 (O) |
| OM-YR-36 | 1524 | 0.94 | | | 0.44 | 0.50 (G) |
| OM-YR-37 | 1240 | 0.78 | | | 0.28 | 0.50 (G) |
| OM-YR-38 | 1867 | 0.80 | | | 0.30 | 0.50 (O) |
| OM-YR-39 | 904 | 0.66 | | | 0.16 | 0.50 (G) |
| OM-YR-40 | 862 | 0.50 | 0.00 | 0.50 (O) | | |
| OM-YR-41 | 1677 | 0.50 | | | 0.00 | 0.50 (G) |
| OM-YR-42 | 1271 | 0.84 | | | 0.34 | 0.50 (O) |
| OM-YR-43 | 2249 | 0.55 | | | 0.05 | 0.50 (O) |
| OM-YR-44 | 1137 | 0.50 | | | 0.00 | 0.50 (G) |
| **Total** | | 33.50 ac | 3.2 ac | 3.50 ac | 9.5 ac | 18.00 ac |

*For pads:  (O) = Surface occupation and clearing only; (G/Shaded) = Graded disturbance

11

BLM_0018775

### Equipment and Personnel

The following personnel and equipment would be required to complete exploration activities:

- Bulldozer (1) and Excavator (1) for clearing, excavating, moving, and grading; personnel about 2 people;
- Grader (1) for clearing, moving small amounts of soil and finish grading; personnel 1;
- Drilling rig (1 or 2); personnel about 5 to 7 people;
- Carpool pickup (1 for each rig crew) to transport drilling staff;
- E-log truck (1) and equipment for digital logging of bore holes; personnel 1 to 2 people;
- Delivery trucks and semi-trucks for delivery of water tanks, and other bulk construction items; about 1-2 personnel per delivery; about 2 trips per day;
- Water Truck for dust suppression (1); personnel 1; and
- Pick-up trucks and SUVs with flatbed trailers (1) for small equipment transport; personnel 1.

### Storm Water Control

For locations that require construction of a drill pad, the pad would be graded so that any water runs toward the cuttings pit. Either silt fencing or straw wattles would be placed to contain storm water runoff within the pad area. For locations that do not require construction/leveling of a pad, silt fencing or straw wattles would be used as needed to prevent storm water runoff from leaving the drilling operations area.

### Site Maintenance

During drilling, Oxbow would control dust from drilling and related activities, divert and control both natural runoff from disturbed areas and fluid loss from drilling, and would cleanup any trash or debris. A water truck would be used to apply water to access roads, as needed, to control dust. A maximum of about 0.4 acre-foot of water is anticipated to be required for fugitive dust suppression, depending on seasonal climate conditions. Waste construction materials and rubbish from all construction areas would be collected, hauled away, and disposed of in an approved manner. All waste and food-related trash would be stored in a vehicle during the day and disposed of off-site prior to the vehicle returning to the project area. No on-site food or trash storage would occur. Where fences must be cut for gate installation or other construction activities, prior to gate cutting, the brace posts would be installed and wires attached in order to maintain adjacent wire tension. Any fence damaged during construction would be repaired immediately. Gates, where required, would be installed in accordance with landowner and BLM agreements, and would be maintained in good working order. All new or existing gates would remain closed and locked at all times except when attended or unless otherwise directed by the landowner.

All drilling equipment would be provided with fire extinguishers and shovels for fighting small fires, if necessary. Drilling crews would be equipped and trained to fight small equipment fires and the crews also would be provided with the phone number for the Montrose Inter-Agency fire dispatch (970-249-1010). Crews will be informed that they could report any fires that they can see from their vantage point.

Spark arresters would be required for equipment generating sparks, including ATVs and chainsaws. Smoking would be allowed during construction activities only in designated safe-smoking areas. Common sense practices regarding heat/spark sources, particularly in dry

12

BLM_0018776

conditions, would be followed.  Parking hot vehicles on dry shrubs would not be allowed, and other logical avoidance practices would be followed.

### Reclamation

Upon completion of drilling and related activities, all drill holes would be backfilled, sealed and abandoned. During drilling, fluid return would be monitored to identify the depth and extent of any water-producing zones.  Upon abandonment, in accordance with Drill Hole Plugging Procedures agreed to by BLM and the Colorado Division of Reclamation, Mining, and Safety (CDRMS), bentonite chips or bentonite plug gel or similar seal would be established in the bottom of the hole, extending to within ten feet of the surface. A cement plug would be set in the hole ten (10) feet below the ground to within three (3) feet of the surface. Accumulations of drill cuttings would be buried in the excavated pit (see Photo 2).  If drilling mud (bentonite) is required for the drilling of a borehole, the mud will be mixed and contained in a portable steel container.  After drilling, any remaining drilling mud will be used along with newly mixed drilling mud, if additional volume is required, in the well abandonment process.  The Colorado Department of Natural Resources requires all boreholes be abandoned according to State regulations.  Part of the abandonment process includes the use of bentonite mud to seal the borehole.  At no time during the drilling and well abandonment process will any bentonite mud be placed in the cuttings pit.



**Photo 2.  Example of a Drill Site 1 year after Reclamation.**

As mentioned previously, Oxbow may complete several of the exploration holes as ground water monitoring wells, in preparation for base line monitoring required for permit submission. Identification of specific drill holes to be completed as ground water monitoring wells would occur once initial meetings with the CDRMS have occurred.  Drill holes selected to be completed as monitoring wells would be completed in accordance with the guidelines agreed to

BLM_0018777

by the BLM and CDRMS for monitoring wells.  Once monitoring is no longer required, these wells would be abandoned as described above.

The following design features would apply to road reclamation:

- Interim reclamation would include partially revegetating road shoulders in order to reduce the amount of bare ground created during construction and drilling activities.
- The new road segments would be reclaimed to their original contour and rough texture in order to match the "texture" of the surrounding landscape, and revegetated in accordance with BLM direction, and using a BLM-approved seed mix.

All trash and debris would be removed from drill sites for disposal.  Excavations, including pits, would be backfilled.  Any drilling mud left in the portable mixing tank after the borehole is completed would be used along with additional bentonite in the hole abandonment process.  The pits may be temporarily fenced and allowed to dry before backfilling with previously excavated material.  The excavated material would be returned to the pits in such a manner as to approximate the original soil profile, particularly as related to the near-surface soils or top soil. During backfilling, the material would be mixed and compacted as it is replaced, by running the equipment over the backfilled area during placement of successive lifts.  Following backfilling, disturbance areas would be graded to their approximate original contour or to a natural looking configuration that blends with the surrounding topography and the original surface drainage reestablished.  Any salvaged topsoil materials would be re-spread onto the regraded surface and reseeding of the areas (pads and roads – unless the landowner requests the roads remain) would take place using the following seed mixture.  Seed mixes would be adapted to specific landowner requests.  A metal post with tag would be placed in the vicinity of the hole as a permanent marker.

**Table 4.  Seed Mix for Project Area**

| Seed Mix for Oakbrush Zone (Source:  BLM – UFO) | | | | |
|---|---|---|---|---|
| Common Name | Scientific Name | % of mix | PLS | No./Acre |
| Western wheat grass var. Arriba | *Pascopyrum smithii* var. *arriba* | 12 | 8.0 | 0.96 |
| Slender wheatgrass var. San Luis | *Elymus trachycaulus* var. *san luis* | 12 | 5.5 | 0.66 |
| Mountain brome var. Bromar | *Ceratochloa carinata* var. *bromar* | 12 | 12.5 | 1.5 |
| Big bluegrass var. Sherman | *Poa ampla* var. *sherman* | 12 | 1.5 | 0.18 |
| Bottlebrush squirreltail | *Elymus elymoides* | 12 | 8.0 | 0.96 |
| Canada wildrye | *Elymus canadensis* | 12 | 7.0 | 0.94 |
| American vetch | *Vicia americana* | 6 | 10.0 | 0.6 |
| Rocky Mountain penstemon | *Penstemon strictus* | 6 | 1.5 | 0.09 |
| Western Yarrow | *Achillea lanulosa* | 6 | 1.0 | 0.06 |
| Total application rate for incorporated seed | | | 5.95 | |
| Seed applications will be doubled if aerial broadcast methods are used | | | | |

14

Seeding would take place in the fall or early spring.  Monitoring of re-seeding efforts would occur for two or three field seasons to determine stand success, re-seeding requirements and control of any noxious weeds.  If success is not reached (as defined below), in three field seasons, re-seeding will take place.  On previous projects, Oxbow has found this period of time is adequate for reclamation; however, Oxbow is committed to monitoring until success criteria have been met (see bullet list below).  A temporary perimeter fence would be placed around reclaimed areas to prevent disturbance by cattle and elk.

Reclamation Success criteria:

- Vegetation cover in disturbed areas would be at least 70 percent of the vegetation cover in adjoining undisturbed areas.  For example, if nearby undisturbed areas have approximately 75 percent vegetation cover, the reclamation success criteria would be 52.5 percent total vegetation cover.
- Vegetation cover would be comprised of species included in the seed mix (see Table 4) and other desirable species found in the surrounding area.
- Vegetation patchiness is acceptable, as long as there are no contiguous bare areas greater than about 3 feet by 3 feet (about 9 square feet).

Reclamation Success criteria for sage grouse occupied and potential habitat areas:

- Vegetation cover in disturbed areas would meet at a minimum 75 percent of Gunnison sage grouse Rangewide Conservation plan guidelines for breeding habitat (Table 1 in RCP, pg H-6; Gunnison Sage Grouse Rangewide Steering Committee  2005) within three growing seasons.  Reseeding would be required if vegetation cover does not achieve the 75 percent of guidelines.
- Seed mixes would be designed using only native species with the intent to establish 10 to 30 percent native grass cover on arid sites and 20 to 40 percent on mesic sites.  Native forbs would be included in the mix with the intent of establishing 5 to 15 percent cover on arid sites and 20 to 40 percent on mesic sites.  Tall forbs in addition to those listed in Table 4 would be added to the seed mix for disturbance in occupied and potential sage-grouse habitat (including the following drill locations and associated roads: OM-YR-03R, OM-YR-04R, OM-YR-05, OM-YR-06, OM-YR-19, OM-YR-23R, OM-YR-24, OM-YR-28, OM-YR-29, OM-YR-07R, OM-YR-11R, OM-YR-12, OM-YR-17, OM-YR-26, OM-YR-27, and OM-YR-34) based on seed availability and on-going vegetation studies, and would be approved by BLM and other surface owners in advance of seeding activities.

15

**Table 5. Gunnison Sage Grouse Breeding Habitat Guidelines**

| Vegetation Variable | Gunnison sage-grouse | |
| --- | --- | --- |
| | Arid [a] | Mesic [a] |
| Sagebrush Canopy [b] % | 15 - 25 | 10 – 20 |
| Non-sagebrush Canopy [d] % | 5 - 15 | 5 – 15 |
| Total Shrub Canopy [b] % | 20 - 40 | 15 – 35 |
| Sagebrush Height cm (inches) | 25 – 50 (9.8 – 19.7) | 30 – 50 (11.8 – 19.7) |
| Grass Cover [b] % | 10 - 30 | 20 – 40 |
| Forb Cover [c] % | 5 - 15 | 20 – 40 |
| Grass Height [d] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) |
| Forb Height [d] cm (inches) | 5 – 10 (2.0 – 3.9) | 5 – 15 (2.0 – 5.9) |

[a] Arid or mesic communities are as defined by Winward (2004).

[b] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).

[c] Understory cover measured according to Daubenmire (1959).

[d] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

***Noxious Weed Management***

Oxbow has developed a Noxious Weed Management Plan for the control of weeds in new disturbance areas (see Appendix A). The following Best Management Practices (BMPs) that prevent the spread of noxious weeds would be followed (Partners Against Weeds Action Plan for BLM).

- Clean equipment to remove weed seeds prior to use onsite;
- Monitor and spray/perform weed control as necessary.
- The operator and the operator's contractors will disinfect heavy equipment, hand tools, boots and any other equipment used previously in a river, lake, pond, or wetland, by routinely cleaning equipment using 140° water and high-pressure sprayers to remove dirt, mud and foreign debris before equipment is brought on-site.
- The operator and the operator's contractors will clean trucks and equipment at wash-stations in nearby towns or at the contractor's yard (off-site) to ensure that all equipment and vehicles shall be clean of all dirt and debris that can harbor weed seed.
- Monitoring and control of noxious or invasive weeds attempting to establish within the project boundaries throughout the construction and production phases should be performed in coordination with routine maintenance activities and in accordance with state law.
- The Operator will monitor for and control noxious or invasive weeds throughout the construction and production phases. Mandatory noxious weed control is required on the pads, drill holes, and access roads used by the lessee/operator for the life of the project.

16

- Application of pesticides and herbicides on public lands will conform to BLM regulations and state laws.
- To prevent the entry of hazardous substances into surface waters:
    - Chemical treatments within the riparian areas shall be applied by hand and shall be applied only to specific targets.
    - Leave a 25-foot buffer along surface waters when chemicals are being applied through ground application with power equipment.
    - Always refer to chemical label instructions for additional guidance on use near water and required buffer zones.
    - To enhance effectiveness and prevent transport into streams, apply chemicals during appropriate weather conditions (generally calm and dry) and during the optimum time for control of the target pest or weed.

### Coordination

Oxbow is committed to coordinating with landowners, including meeting with domestic and irrigation water providers and Town of Hotchkiss representatives, to address concerns about water supply facilities and provide requested information. Oxbow has committed to posting the work schedule on their website (http://oakmesaproject.com) and will make a press announcement regarding start of work.

### Design Features

In addition to measures described in the previous sections, the following design features have been incorporated into the proposed action to minimize resource impacts:

- Clearances/survey, including cultural resource surveys and biological resource surveys, would be completed for drill hole and access road locations that were not reviewed in Fall 2011 because of lack of right-of-access prior to any ground disturbing activities.
- Refueling of equipment would not occur within 200 feet of live water.
- Any lubricant, oil or grease, or fuel spills shall be reported immediately to the BLM hazardous material coordinator. Any spills would be removed from the spill area as quickly as possible and disposed of appropriately off-site. Any spills will be cleaned to the authorized officer's satisfaction using standard hazmat procedures.
- The point of access (where applicable) would be blocked as directed to prevent motorized use of a reclaimed road. To discourage access and use of reclaimed areas, natural barriers and signs would be placed near the point of entry where project roads have been reclaimed. The BLM would approve barrier locations and techniques.
- A red-tailed hawk nest located just south of West Reservoir and within ¼ mile of the OM-02 site, would be monitored for nesting activity during construction. If the nest is active, construction and drilling operations would be put off until the young have fledged. This would eliminate the chances of the nest being impacted.
- If project timing would include construction during the migratory bird nesting time frame for the project area (generally through July 15), potential impacts and modifications to project schedule needed to comply with the Migratory Bird Treaty Act would be discussed with BLM prior to exploration activities. Monitoring for migratory birds would occur if Oxbow wishes to proceed during the nesting season. If monitoring results in positive active nest data, appropriate avoidance buffers would be developed in coordination with BLM based on species and site-specific conditions.

BLM_0018781

- Activity would take place after Elk calving season in mid-June.
- All waste and food-related trash would be stored in a vehicle during the day and disposed of off-site prior to the vehicle returning to the project area.  No on-site food or trash storage would occur.
- For drilling sites where development of a pad is necessary, the topsoil would be stockpiled, and either silt fencing or straw wattles would be placed around the stockpile.
- Straw wattles would be used to minimize erosion until the disturbances are revegetated.
- During and after drilling, the drill site would be fenced to keep animals out of the site to prevent damage to stormwater BMPs and newly revegetated areas.  Oxbow is negotiating with individual landowners regarding the type of fence installed for reclamation purposes; electric fencing with solar panels to provide power have been used in the past and are proposed.  Oxbow would be responsible for fence installation, monitoring and removal.
- Where bentonite is used, portable mixing tanks would contain all bentonite.  It would not be placed in the cuttings pit.
- BLM is actively pursuing a more definitive identification of grouse species. Mitigation for sage grouse will not be implemented until and only if species identification verifies that there are sage grouse (Gunnison or Greater) on Oak Mesa.  If sage grouse are verified on Oak Mesa, all work will cease immediately.  BLM would approve continued work only after a discussion of the current situation and the implementation of the following mitigation.
    - No surface disturbing activities are permitted between April 15 and August 30 within occupied and potential habitat.
    - Should lek locations be found in the future, additional restrictions would include no surface disturbing activities from March 15 through May 31 within 0.6 miles of the edge of a lek.
    - Vegetation cover in areas disturbed by exploration activities would be seeded with a grouse friendly native seed mix.  Within three growing seasons, reclamation in these areas would meet, at a minimum 75 percent of, Gunnison sage grouse Rangewide Conservation plan guidelines for breeding habitat (Table 1 in RCP, pg H-6; Gunnison Sage Grouse Steering Committee 2005).  Repeated reseeding would be required if vegetation cover does not achieve the 75 percent of guidelines within three growing seasons.
    - Seed mixes would be designed using only native species with the intent to establish 10 to 30 percent native grass cover on arid sites and 20 to 40 percent on mesic sites.  Native forbs would be included in the mix with the intent of establishing 5 to 15 percent cover on arid sites and 20 to 40 percent on mesic sites.
- Existing rights-of-way and ditches will be avoided to the extent possible.  If they cannot be avoided, caution will be taken to ensure no damage to the facility or disruption of use occurs.  As necessary, right-of-way holder(s) will be contacted to coordinate activities that may influence their facilities.

BLM_0018782

### No Action Alternative

The No Action Alternative means that the proposed action would not take place. In the case of an exploration license request, this would mean that a request for license to explore would be denied or rejected; the BLM would not grant an exploration license for the exploratory drilling.

### Alternatives Considered But Eliminated From Detailed Analysis

No other alternatives have been proposed to respond to unresolved conflicts concerning alternative uses of available resources. Design Features have been incorporated into the Proposed Action to resolve impact concerns.

## SCOPING, PUBLIC COMMENT AND ISSUES

Public scoping comments were solicited via a letter dated September 19, 2011, that was mailed to the appropriate agencies, specific interested parties, and to the general public. The letter was also posted on the BLM Uncompahgre website. Information regarding the exploration proposal was made available for public review after September 19, 2011, through legal notices published in the Delta County Independent. In addition there were announcements of the public scoping period in The Daily Sentinel in Grand Junction. Public comments were received through October 24, 2011. All comment letters were reviewed and considered in the development of the EA.

A total of 394 comment letters were received during the public scoping period. The scoping comments generally fall into five categories, with specific comments listed in Appendix C. Comments received were categorized and coded. Comments were coded once for each letter (i.e., if a comment was made several times in one letter, it was counted once for purposes of the summary). In general, comments focused on traffic, water, natural resources, real estate/quality of life, and socioeconomic issues. Subcategories for each comment type also were developed (see Appendix C).

Issues identified in comment letters were separated into two relevance categories; key and non-key issues. Key issues are those that could be directly or indirectly caused by implementing the proposed action, coal exploration activities on Oak Mesa. Non-key issues fall into three types; those that are 1) not relevant to the proposed action, 2) outside of the scope of the proposed action (i.e., related to future coal mining or other activities), or that are 3) already determined by existing laws or regulations. Appendix C shows the page and section where key issues were addressed in the Preliminary EA.

On May 14, 2012, the Preliminary EA was made available for a 30-day public review and comment period. Comments received during public comment period are listed in Appendix D and details regarding the comment period are detailed in the *Persons/Agencies Consulted* section. A total of 226 comment letters were received during the public comment period on the Preliminary EA. All comment letters were reviewed and considered in the revision of the EA.

Public comment on the preliminary EA generally fall into eight categories, with specific comments listed in Appendix D.

Major changes from the preliminary EA are the addition of an emissions inventory under the Air Quality section, and a discussion of sage grouse in the Threatened, Endangered and Sensitive Species section. Design features on the proposed action were also added for sage grouse.

19

<u>PLAN CONFORMANCE REVIEW:</u>  The Proposed Action is subject to and has been reviewed for conformance with the following plan (43 CFR 1610.5-3, BLM 1617.3):

>  <u>Name of Plan</u>: Uncompahgre Basin RMP

>  <u>Date Approved</u>:  July 26, 1989, as amended

>  <u>Decision Number/Page</u>:  Mineral Resources Decision, Coal Management, page 31, Record of Decision (ROD)

>  <u>Decision Language</u>:  Management Units 1, 3, 4, 7, 8, and 16 are acceptable for further leasing consideration with no special restrictions.

The Proposed Action Alternative is consistent with current land management planning for the proposed Coal Exploration License.

Other relevant laws, regulations, policies, program guidance, and permitting requirements include:

**Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended**

The BLM manages its minerals program under guidance given in the Mining and Minerals Policy Act of 1970, which states (in part) that it "is the continuing policy of the federal government in the national interest to foster and encourage private enterprise in…(the) development of economically sound and stable domestic mining minerals and mineral reclamation industries…(and) the orderly and economic development of domestic mineral resources…"  Further, federal mineral leasing follows the Mineral Leasing Act of 1920 as amended by the Federal Coal Leasing Amendments Act of 1976 (MLA) and specific procedures set forth in 43 CFR 3432.  Exploration licenses specifically are regulated under 43 CFR 3410.

**Federal Land Policy and Management Act of 1976, as amended**

The Federal Land Policy and Management Act (FLPMA) was enacted in 1976.  FLPMA laid out specific land management guidance for BLM-managed lands, and repealed the Homestead Act (meaning public lands remaining were to be retained in public control).  FLPMA formalized the concepts of managing public lands for multiple use and sustained yield, authorized management of special resource areas (Areas of Critical Environmental Concern, or ACEC's), provided guidance for rangeland and grazing management, and provided support for minerals leasing and development.

**Surface Mining Control and Reclamation Act of 1977**

The Surface Mining Control and Reclamation Act of 1977 (SMCRA) created the Office of Surface Mining Reclamation and Enforcement (OSM) in the United States Department of the Interior.  The CDRMS developed Colorado's permanent regulatory program, which is approved by OSM and authorizes CDRMS to regulate surface coal mining operations and the surface effects of underground coal mining on private and state lands within the State of Colorado.

BLM_0018784

**Standards for Public Land Health**

In January 1997, Colorado Bureau of Land Management (BLM) approved the Standards for Public Land Health. Standards describe conditions needed to sustain public land health and relate to all uses of the public lands. A finding for each standard will be made in the environmental analysis section of this EA.

**Table 6. Standards for Public Land Health**

| Standard | Definition/Statement |
|---|---|
| #1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff. |
| #2 Riparian Systems | Riparian systems associated with both running and standing water, function properly and have the ability to recover from major surface disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly. |
| #3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| #4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities. |
| #5 Water Quality | The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands would achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act. |

# AFFECTED ENVIRONMENT, ENVIRONMENTAL CONSEQUENCES and MITIGATION MEASURES

This section provides a description of the human and natural environmental resources that could be affected by the Proposed Action and presents comparative analyses of the direct, indirect and cumulative effects on the environment.

Cumulative impacts of the proposed action are shown in the analysis of each element. A description of the past, present, and reasonably foreseeable actions is at the end of this section.

Elements specified by statute, regulation, executive order, or the Standards for Public Land Health are described and analyzed in this section, as well other elements. Those that could be impacted are brought forward for analysis. Any element not affected by the proposed action or no action alternatives is not analyzed in this document; the reason for no impact is stated.

21

**Table 7. Specified Elements**

| Element | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Air Quality | | | X |
| Areas of Critical Environmental Concern | X | | |
| Wilderness and Lands with Wilderness Characteristics | X | | |
| Wild and Scenic Rivers | X | | |
| Cultural | | | X |
| Native American Religious Concerns | X | | |
| Farmlands, Prime/Unique | | | X |
| Soils | | | X |
| Vegetation | | | X |
| Invasive, Non-native Species | | | X |
| Threatened and Endangered Species | | | X |
| Migratory Birds | | | X |
| Wildlife, Terrestrial | | | X |
| Wildlife, Aquatic | | | X |
| Wetlands & Riparian Zones | | | X |
| Floodplains | | | X |
| Water Quality, Surface and Ground | | | X |
| Wastes, Hazardous or Solid | | | X |
| Environmental Justice | | | X |
| Access | | | X |
| Transportation | | | X |
| Cadastral Survey | X | | |
| Realty Authorizations | | X | |
| Rangeland Management | | | X |
| Forest Management | X | | |
| Fire | | | X |
| Hydrology/Water Rights | | | X |
| Noise | | | X |
| Recreation | | | X |
| Visual Resources | | | X |
| Geology and Minerals | | | X |
| Paleontology | X | | |
| Law Enforcement | X | | |
| Socio-Economics | | | X |

BLM_0018786

## *AIR QUALITY*

### Affected Environment

Based on a review of the U.S. Environmental Protection Agency (EPA) reported non-attainment areas (EPA 2011), the project area is in an attainment area for all reported state and federal air quality standards. There are no non-attainment areas in Delta County or any of its adjoining counties. The Proposed Action is outside a 10-mile radius of any special designation airsheds or non-attainment areas. Non-attainment areas have air pollution levels that persistently exceed the national ambient air quality (NAAQ) standards and are tracked and documented by the EPA. Projects that could impact special designation areas and non-attainment areas may require special consideration from the air quality regulatory agencies of Colorado Department of Public Health and Environment (CDPHE) and the EPA. Special designation airsheds include wilderness areas and national parks. The closest Class I airsheds to the project area include the West Elks Wilderness (located about 25 miles southeast of the project area), and the Black Canyon of the Gunnison National Park (located about 25 miles southwest of the project area).

### Environmental Consequences/Mitigation:

### Proposed Action

Construction of drill pads and access roads would result in minor short-term impacts to air quality. Increases to both criteria and non-criteria pollutants could occur due to use of equipment with combustion engines and soil disturbing activities. Criteria pollutants are those for which NAAQ standards have been set; non-criteria pollutants do not have set NAAQ standards. Criteria pollutants are from combustion engines, and include carbon monoxide, ozone, nitrogen dioxide, and sulfur dioxide. Non-criteria pollutants include nitric oxide, air toxics such as benzene, and suspended particulates. Exceedence of NAAQ pollutant standards occurs in urban areas, with high vehicle concentrations, and where climate conditions induce trapped air and reduced air flow, such as temperature inversions. Only about 8 project-specific vehicles would be on-site (within the 13,873 acre project area) at any one time (see Equipment and Personnel section). The vehicles would not be concentrated, but instead would be completing different operations at different locations. Vehicles include both heavy-and light-duty trucks and engines with no other existing emission sources. For these reasons, increases in criteria and non-criteria pollutants would be unlikely to result in an exceedance of any hourly, 8-hour average, or daily NAAQ standards or Colorado ambient air quality (CAAQ) standards.

Fugitive dust from soil disturbing activities such as road and drill pad construction could result in an increase in suspended particulates; however, use of a water truck to control dust would mitigate this impact. Drill pads and roads would be reclaimed after exploration drilling operations are completed to minimize impacts from fugitive dust. All impacts to air quality would be minor, short-term and temporary.

An emissions inventory was prepared to show the amounts of $SO_2$, $PM_{10}$, $PM_{2.5}$, CO, $NO_x$, $VOC_s$, $CO_2$, $CH_4$, and $N_2O^c$ that are likely to be emitted during the Proposed Action. See Table 8. With respect to both the criteria ($SO_2$, $PM_{10}$, $PM_{2.5}$, CO, $NO_x$, and VOCs) and greenhouse gas ($CO_2$, $CH_4$, and $N_2O$) emissions, the levels emitted on an annualized basis are not significant and do not warrant any further analysis when considered against regional emissions (specific source categories) and recent monitoring data. Delta County emissions from the most recent EPA

23

National Emissions Inventory (NEI – 2008) have been included to provide additional context for the reader.

24

BLM_0018788

**Table 8.  Emissions Inventory**

| Oak Mesa Exploration Emissions Inventory | | Pollutants (Tons) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Emissions Generating Activity | Emissions Year | $SO_2$ | $PM_{10}$ | $PM_{2.5}$ | CO | $NO_x$ | VOCs | $CO_2$ | $CH_4$ | $N_2O$ |
| *Access Road Construction* | | | | | | | | | | |
| Fugitive Dust | 2012 | NA | 5.837 | 0.584 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment (exhaust) | 2012 | 0.008 | 0.046 | 0.044 | 0.320 | 0.425 | 0.057 | 27.565 | 0.002 | 0.001 |
| On-Road Vehicles (exhaust) | 2012 | 0.000 | 0.005 | 0.004 | 0.075 | 0.076 | 0.008 | 13.798 | 0.000 | 0.000 |
| Fugitive Dust | 2013 | NA | 4.203 | 0.420 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment (exhaust) | 2013 | 0.006 | 0.033 | 0.032 | 0.232 | 0.308 | 0.041 | 19.953 | 0.001 | 0.001 |
| On-Road Vehicles (exhaust) | 2013 | 0.000 | 0.004 | 0.003 | 0.054 | 0.055 | 0.006 | 9.935 | 0.000 | 0.000 |
| *Well Pad Construction* | | | | | | | | | | |
| Fugitive Dust | 2012 | NA | 5.837 | 0.584 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment (exhaust) | 2012 | 0.054 | 0.294 | 0.285 | 2.059 | 2.737 | 0.365 | 177.492 | 0.010 | 0.005 |
| On-Road Vehicles (exhaust) | 2012 | 0.000 | 0.003 | 0.002 | 0.037 | 0.038 | 0.004 | 6.899 | 0.000 | 0.000 |
| Fugitive Dust | 2013 | NA | 5.837 | 0.584 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment (exhaust) | 2013 | 0.039 | 0.212 | 0.206 | 1.483 | 1.971 | 0.263 | 127.794 | 0.007 | 0.003 |
| On-Road Vehicles (exhaust) | 2013 | 0.000 | 0.002 | 0.002 | 0.027 | 0.027 | 0.003 | 4.967 | 0.000 | 0.000 |
| *Drilling* | | | | | | | | | | |
| Fugitive Dust | 2012 | NA | 4.841 | 0.580 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment (exhaust) | 2012 | 0.076 | 0.036 | 0.035 | 0.404 | 2.023 | 0.083 | 246.819 | 0.014 | 0.006 |
| On-Road Vehicles (exhaust) | 2012 | 0.000 | 0.003 | 0.002 | 0.037 | 0.038 | 0.004 | 6.899 | 0.000 | 0.000 |
| Fugitive Dust | 2013 | NA | 3.485 | 0.418 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment (exhaust) | 2013 | 0.054 | 0.026 | 0.025 | 0.291 | 1.456 | 0.060 | 177.710 | 0.010 | 0.004 |
| On-Road Vehicles (exhaust) | 2013 | 0.000 | 0.000 | 0.000 | 0.003 | 0.003 | 0.000 | 0.497 | 0.000 | 0.000 |
| *Reclaimation* | | | | | | | | | | |
| Fugitive Dust | 2012 | NA | 0.093 | 0.009 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment & On-Road (exhaust) | 2012 | 0.040 | 0.296 | 0.286 | 2.069 | 2.763 | 0.367 | 180.739 | 0.010 | 0.005 |
| Fugitive Dust | 2013 | NA | 0.067 | 0.006 | NA | NA | NA | NA | NA | NA |
| Heavy Costruction Equipment & On-Road (exhaust) | 2013 | 0.029 | 0.213 | 0.206 | 1.489 | 1.990 | 0.264 | 130.132 | 0.007 | 0.003 |
| **Total Emissions 2012** | | **0.180** | **17.291** | **2.416** | **5.002** | **8.101** | **0.887** | **660.211** | **0.036** | **0.016** |
| **Total Emissions 2013** | | **0.129** | **14.082** | **1.902** | **3.578** | **5.810** | **0.637** | **470.987** | **0.026** | **0.012** |
| **Delta County Emissions** (EPA 2008 NEI) | | | | | | | | | | |
| Fugitive Dust | | NA | 1,160.16 | 208.20 | NA | NA | NA | NA | NA | NA |
| Mobile Sources (On-Road and Non-Road Sources) | | 23.31 | 58.96 | 51.48 | 4,805.06 | 906.03 | 577.59 | 180,076 | 9.21 | 1.65 |

BLM_0018789

**Cumulative Impacts**

For Air Quality, the cumulative impacts analysis area is defined as the North Fork Valley within Delta County, including the eastern portion of the county. The Proposed Action would result in minor, short-term air quality impacts. Oil and gas exploration, operation and development could result in similar air quality impacts to the project area. Cumulatively, air quality impacts are expected to be minor. All anticipated air quality impacts would be short-term and minimal.

**No Action Alternative**

Under the No Action alternative, there would be no project-related air quality impacts.

## *AREAS OF CRITICAL ENVIRONMENTAL CONCERN*

Areas of Critical Environmental Concern (ACEC) are identified by the BLM through its resource management planning process to protect or manage sensitive resource values. ACECs may be designated to protect historic, cultural, visual, natural, and/or biological resources, systems, or processes. There are no ACECs near the project area. The nearest existing ACEC is Needle Rock, located about 17 miles southeast of the project area. The Adobe Badlands ACEC is located about 20 miles west of the project area. Because no ACECs are in or near the project area, there would be no impacts to this resource and it is not evaluated or discussed further.

## *WILDERNESS and LANDS WITH WILDERNESS CHARACTERISTICS*

There are not any designated Wilderness Areas or Wilderness Study Areas within or adjacent to the project area.

Through FLPMA (Sec. 201 and 202) of 1976, Congress directed the BLM to maintain an inventory of the lands under its jurisdiction that possess "wilderness characteristics." Each BLM office maintains an inventory of lands with wilderness characteristics, updating it as necessary. The characteristics are:

A. Size – generally 5,000 acres or greater that do not have mechanically constructed and maintained roads. Smaller areas that share a boundary with existing wilderness or wilderness study areas of 5,000 acres or greater may also be considered to have adequate size.
B. Naturalness – lands must appear to have been affected primarily by the forces of nature, and people's work must be substantially unnoticeable.
C. Outstanding opportunities for solitude, or primitive and unconfined type of recreation:
  a. Solitude – visitors can feel alone, secluded and isolated from the sights and sounds of other people.
  b. Primitive and unconfined recreation – the use of the area is primarily through non-motorized or non-mechanical means with no or minimal recreation facilities.
D. Supplemental values – the area contains ecological, geological, or other features of scientific, educational, scenic, or historical value.

For an area to possess wilderness characteristics it must meet A, B and C. D is optional.

BLM surface ownership lands within the Uncompahgre Field Office were inventoried for wilderness characteristics in 2010 through 2011. No lands possessing wilderness characteristics

BLM_0018790

were found on BLM-managed lands within, or adjacent to the area of this proposed project. Because no lands with wilderness characteristics are in or near the project area, there would be no impacts to this resource and it is not evaluated or discussed further.

## WILD AND SCENIC RIVERS

Congress authorized the National Wild and Scenic Rivers (WSR) Act in 1968 to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations.  The purpose of the Act was to allow for special management or protection of those free-flowing rivers with "outstandingly remarkable value", including scenic, recreational, geologic, fish, wildlife, cultural, historic, vegetation, or other similar value (such as paleontological).  A value must also be unique, rare, or exemplary, as well as significant within a defined region of comparison.

Only Congress or (under certain circumstances) the Secretary of the Interior may designate a river for inclusion in the WSR system.  The UFO completed an inventory and analysis of waters within the Uncompahgre Planning Area for WSR values and characteristics in 2010 (BLM 2010) as part of its resource management planning process.  There are not any waters eligible for wild and scenic river designation in or near the project area.  There would be not be impacts to this resource and it is not evaluated or discussed further.

## CULTURAL RESOURCES

### Affected Environment

Eleven cultural resources have been previously documented within the study area.  These include six historic sites, four prehistoric isolates, and one prehistoric site.  Only one of these previously recorded resources intersects areas of proposed drill hole locations or access roads (Overland Ditch – 5DT.650).  Six of these sites represent historic activity on Oak Mesa and consist of ditch, mining, and homestead/ranching activities.  The remaining five resources are prehistoric and consist of a single open lithic scatter and four isolates.

In addition, a Class III field survey was conducted for the 43 proposed drill hole locations and approximately 9 miles of new or improved access roads to identify unknown cultural resources within the area of potential effect (about 7 miles could not be surveyed due to lack of right-of-entry from the landowner; these roads would be surveyed prior to surface disturbance).  Each drill hole location was surveyed with a 1-acre buffer and a 100-foot corridor was surveyed for each access road.  The survey resulted in the documentation of four segments of irrigation systems, including a lateral of the Overland Ditch (5DT.650.1) and three localized, unnamed ditches (Robbins et al. 2011).  The Overland Ditch has been preliminarily determined not eligible for listing on the National Register of Historic Places (NRHP) and the three newly documented ditches are recommended not eligible for listing on the NRHP.  BLM has reviewed these recommendations and finds that the four historic ditch segments are ineligible for nomination to the NRHP.  The Colorado SHPO has been informed of these determinations on March 1, 2012 and has returned no comments.  No further SHPO consultation is required.

27

**Environmental Consequences/Mitigation:**

## Proposed Action

There were eleven cultural properties identified within the project area during the field evaluations for this project.  Of these properties, 7 are isolated finds and thus ineligible for nomination to the National Register of Historic Places.  The remaining four sites are all historic ditch segments evaluated as Not Eligible for nomination.

Because the four newly documented ditch segments and previously recorded ditches are active or may become active in the future, avoidance is necessary to maintain current or future operation, regardless of NRHP significance.  Since all four cultural resources have been determined or are recommended not eligible for listing on the NRHP, no further work or mitigation is necessary.

## Cumulative Impacts

The Proposed Action would not result in impacts to eligible cultural resources.  Therefore, no cumulative impacts would occur.

## No Action Alternative

Without the project, no new exploration drilling would take place to affect potential cultural properties.

## *NATIVE AMERICAN RELIGIOUS CONCERNS*

There are no known Native American religious concerns in the project area.

## *FARMLANDS, PRIME AND UNIQUE*

Prime and other important farmlands are categorized, designated, and regulated by the U.S. Department of Agriculture (USDA) and the Natural Resource Conservation Service (NRCS) under the Farmland Protection Policy Act.  Farmlands can fall into one of four categories:  Prime farmland (which may be qualified by a number of sub-classifications), Farmland of statewide importance, Farmland of local importance, or Farmland of unique importance.  Farmland of unique importance is identified based on its use for the production of specific high value food and fiber crops.  Characteristics of these soils include the adequacy of its moisture supply to sustain those crops, and other favorable factors including:  soil quality, growing season, temperature, humidity, air drainage, elevation, aspect, or other conditions, and such as nearness to market.  Farmlands of statewide importance are those that "economically produce high yields of crops when treated and managed according to acceptable farming methods.  Some may produce as high a yield as prime farmlands if conditions are favorable.  In some states, additional farmlands of statewide importance may include tracts of land that have been designated for agriculture by state law."  The NRCS is tasked to coordinate on any federal actions that could affect the production of crops on designated farmlands.

## Affected Environment

Two soil types categorized as Farmland of Statewide Importance are within the project boundaries—Cerro loam (soil map unit #21) and Delson loam (soil map unit # 32).  These soils

28

have very limited distribution within the project area, and most are not currently cultivated. Some areas have been subdivided and are not currently used for agricultural purposes.

**Table 9.  Soils Classified as Farmland of Statewide Importance**

| Soil Type, map unit, and description | Acres within proposed exploration boundary | Percentage of Project area | Erosion and Rutting Hazard |
|---|---|---|---|
| Cerro loam (#21), 6 to 12 percent slopes | 246.7 | 1.8 | Slight (wind) to moderate to high (water) |
| Delson loam (#32), 3 to 12 percent slopes | 316.8 | 2.3 | Slight (wind) to moderate (water) |

Source:  USDA 2008

## Environmental Consequences/Mitigation

### Proposed Action

OM-YR-21, OM-YR-40, OM-YR-09 and portions of their access roads appear to intersect the two soils classified as farmland of statewide importance.  Impacts from exploration activities would be minor and temporary; in addition, the lands under this classification do not appear to meet the required characteristics for farmland of statewide importance.  These units currently are uncultivated meadows, uncultivated open space, or hayfields.

### Cumulative Impacts

The Proposed Action would result in minor, short-term impacts to soils classified as farmland of statewide importance.  Existing and future oil and gas exploration, operation and development on existing and proposed lease areas could result in similar impacts in the project vicinity.  Cumulatively, farmland impacts are expected to be minor.  All anticipated cumulative impacts would be short-term and minimal.

### No Action Alternative

Under the No Action alternative, there would be no project-related impacts to soils classified as farmland of statewide importance.

## *SOILS (includes a finding on Standard 1)*

### Affected Environment

According to the North Fork Landscape Health Assessment (LHA), all soils around the project area meet the Standard 1 Rating for soils (Table 10) and do not exhibit soil loss problems. In addition, there are no sites near the project area with runoff drainage problems (BLM 2007). The most abundant soils in the project area (accounting for about 72% of the surface area) are

BLM_0018793

Delson stony loam and Delson very stony loam.  These soils have slight (wind) to moderate (water) erosion and rutting hazard.  Soil types (USDA 1981) present in the project area include:

**Delson loam, 3 to 12 percent slopes(#32)** – Delson loam is deep and well drained.  It is on fans and mesas and is formed in stony alluvium.  The hazard of water erosion is high and is slight from wind.  Most of these soils are used for irrigated crops, mainly pasture, small grains, and alfalfa.

**Cerro loam, 6 to 12 percent slopes (#21)** – Cerro loam is well drained and deep.  It is formed on glacial outwash and old landslides and is found on mountain sides, terraces, and alluvial fans.  The hazard of erosion is slight from wind and moderate to high from water.  It is used for livestock and wildlife grazing and if irrigated, it can be used for crops.

**Cerro stony loam, 10 to 35 percent slopes (#22)** – This soil is deep and well drained.  It is formed in old landslide deposits and glacial outwash and is on terraces, alluvial fans, and mountain side slopes.  The hazard from wind erosion in slight, but is high from water erosion.  Cerro stony loam is primarily used for recreational purposes and livestock and wildlife grazing.

**Ascalon sandy loam, 3 to 10 percent slopes (#8)** – Ascalon sandy loam is a formed in colluviums and alluvium derived from sandstone and is on fans and uplands.  It is well drained and deep.  The hazard from wind erosion is slight to moderate and erosion from water is moderate to high.  Ascalon can be used for irrigated crops, grazing of wildlife and livestock, and recreational purposes.

**Delson very stony loam, 20 to 60 percent slopes (#34)** – Delson very stony loam is deep and well drained soil.  It is found on mountain side slopes and is derived from stony alluvium and colluviums.  The erosion hazard from wind is slight and moderated from water.  This soil is primarily used for recreational purposes and limited wildlife and livestock grazing.

**Torriorthents-Rock outcrop, sandstone, complex (#75)** – This soil consists of Rock outcrop and moderately steep to very steep soils on the side slopes of mesas, uplands, and pediments.  For Torriorthents, the hazard of erosion is lessened by the stony surface.  Torriorthents-Rock is typically used for wildlife cover/habitat and recreational purposes.

**Delson stony loam, 3 to 20 percent slopes (#33)** – This soil is well drained and deep.  It is found on fans and mesas and is formed in stony alluvium.  The hazard of erosion from water is moderate and from wind is slight.  Delson stony loam is used for limited wildlife and livestock grazing and recreational purposes.

**Cochetopa stony loam, 10 to 40 percent slopes (#25)** – Cochetopa stony loam is deep and well drained.  It is drived from landslide deposits and alluvium and is found on the side slopes of mountains and valleys.  The hazard of wind erosion is slight and is moderate to high from water erosion.  This soil is typically used for recreational purposes and limited livestock and wildlife grazing.

**Beenom-Absarokee association, 20 to 60 percent slopes (#13)** – These soils are hilly to very steep.  Beenom is shallow well drained soils Absarokee is also well drained and overlies bedrock.  The hazard of erosion from wind for both of these soils is slight, and moderate to high for water.  Beenom soil is often used for winter range or mule deer and at high elevations, elk.  Absarokee soil is used for wildlife and livestock grazing and for recreational purposes.

30

BLM_0018794

**Saraton-Agua Fria complex, 20 to 50 percent slopes (#70)** –   These soils are moderately steep to very steep and are found on side slopes of benches, terraces, and mesas.  The hazard of erosion from water is moderate to high and slight from wind.  Saraton and Agua Fria are both deep and well drained, derived from basalt, and formed in cobbly, stony outwash alluvium.  These soils are used for recreational purposes and limited livestock and wildlife grazing.

**Work loam, 6 to 12 percent slopes (#82)** – Work loam is deep and well drained soil found on uplands, in depressions, and on alluvial fans.  It is formed in "reworked material that was weathered from sandstone."  The hazard of erosion from water is high and slight from wind. This soil is mainly used for livestock and wildlife grazing and recreational purposes; however, it can be irrigated and used for crops, primarily hay, small grains, and pasture.

**Absarokee-Work loams, 6 to 25 percent slopes (#2)** – Absarokee-Work loams are on valley sides and uplands and are moderately sloping to moderately steep.  Both soils are deep and well drained and formed from weather sandstone.  The hazard of erosion for Absarokee is moderate for water and slight for wind.  Work is also slight for wind, but high for water.  This complex is primarily used for wildlife and livestock grazing and recreation.

**Midway-Gaynor silty clay loams, 10 to 40 percent slopes (56)** – These soils are hilly, steep, and strongly sloping.  Midway soil is shallow and well drained and is formed in weathered silty calcareous shale.  Gaynor soil is moderately deep and well drained and is also formed in silty calcareous shale.  The hazard of erosion for both soils is slight for wind and high for water. Midway-Gaynor soils are used for livestock and wildlife grazing and recreational purposes.

31

BLM_0018795

**Table 10.  Soil Resources in the Proposed Exploration Area**

| Soil Type, map unit, and description | Acres within proposed exploration boundary | Percentage of Project area | Erosion and Rutting Hazard |
|---|---|---|---|
| Beenom-Absarokee association (#13), 20 to 60 percent slopes | 266.6 | 1.9% | Slight (wind) to moderate to high (water) |
| Cerro stony loam (#22), 10 to 35 percent slopes | 1240.0 | 8.9% | Slight (wind) to high (water) |
| Delson loam (#32), 3 to 12 percent slopes | 316.8 | 2.3% | Slight (wind) to high (water) |
| Cerro loam (#21), 6 to 12 percent slopes | 246.7 | 1.8% | Slight (wind) to moderate to high (water) |
| Ascalon sandy loam (#8), 3 to 10 percent slopes | 0.4 | 0.0% | Slight to moderate (wind) to moderate to high (water) |
| Delson very stony loam (#34), 20 to 60 percent slopes | 5008.1 | 36.2% | Slight (wind) to moderate (water) |
| Torriorthents-Rock outcrop, sandstone, complex (#75) | 513.8 | 3.7% | Moderate (water) |
| Delson stony loam (#33), 3 to 20 percent slopes | 4978.3 | 35.9% | Slight (wind) to moderate (water) |
| Cochetopa stony loam(#25), 10 to 40 percent slopes | 681.6 | 4.9% | Slight (wind) to moderate to high (water) |
| Saraton-Agua Fria complex (#70), 20 to 50 percent slopes | 549.1 | 4.0% | Slight (wind) to moderate to high (water) |
| Work loam (#82), 6 to 12 percent slopes | 33.1 | 0.2% | Slight (wind) to high (water) |
| Absarokee-Work loams (#2), 6 to 25 percent slopes | 20.2 | 0.2% | Slight to moderate (wind) to moderate to high (water) |
| Midway-Gaynor, silty clay loams (56), 10 to 40 percent slopes | 18.4 | 0.1% | Slight (wind) to high (water) |

Source:  USDA 2008

Note:  Cerro loam (#21) and Delson loam (#32) are described in Table 9.

32

**Environmental Consequences/Mitigation:**

### Proposed Action

The proposed action would include surface-disturbing activities such as access road construction and drill pad construction. About 32.9 acres of total temporary disturbance is anticipated from the proposed action, including about 21.5 acres for graded/occupied drill pad locations and 11.4 acres for construction of new access roads. Drill site occupation and construction of cuttings pits at each drilling location would also have direct soil disturbance. Drilling and transport activities would occur primarily in the Delson Stony Loam and Delson Very Stony Loam soil types. These soil types have slight to moderate erosion hazard. Soil compaction due to drilling activities would reduce aeration, permeability, and water-holding capacities of soils on the access roads and the drilling sites. Erosion control measures, including silt logs and berms, would be used to minimize soil erosion. These measures would limit stormwater flows off disturbed areas. Reclamation activities, as described in the proposed action, would take place as soon as possible after drilling is completed. Each drilling location, including cuttings pits and access roads, would be restored to near-original topographic position and re-seeded. The combination of temporary erosion control measures and rapid reclamation implementation would minimize soil impacts. Sites would be monitored to ensure adequate revegetation occurs to avoid or limit soil loss.

Due to the healthy vegetation and soils with low erosion risk, along with erosion control measures incorporated in the Proposed Action, soil erosion and impacts to soil productivity following reclamation would be minimal.

### Cumulative Impacts

The Leroux Creek basin (including Dever Creek and Cow Creek), Jay Creek basin, and West Roatcap Creek basin were considered the cumulative effects analysis area. The Proposed Action would result in minor, temporary impacts to soils. Oil and gas exploration, operation and development on existing and future leases could result in similar impacts to soils in the project vicinity, from drill pad and access road disturbance. Cumulatively, impacts to soils are expected to be minor. With mitigation, including erosion control measures and revegetation/reclamation activities, all anticipated soil impacts would be minimal, and temporary.

### No Action Alternative

Without the project, there would be no project-related effects to soils.

### Finding on the Public Land Health Standard for upland soils

According to the North Fork LHA, all soils around the project area meet the Standard 1 Rating for soils and do not exhibit soil loss problems. In addition, there are no sites near the project area with runoff drainage problems. There are some sites that are lacking soil protection due to lack of vegetation and bare soil exposure along the western edge of the project area (BLM 2007). With mitigation, including revegetation of drill pads and access roads, this action is unlikely to reduce the productivity of soils impacted by surface disturbing activities.

BLM_0018797

## *VEGETATION (includes a finding on Standard 3)*

Upland vegetation communities are discussed in the section below.  Open water, wetlands, and riparian areas are discussed in the Wetland and Riparian Zones section.

## Affected Environment

Within the project area there are large expanses of mature and over-mature (also called decadent, or old) Gambel's oak/mountain shrub habitat. This habitat type makes up about 80 percent of habitat within the project area, with Pinyon-Juniper-Oak the second most common habitat type (about 7 percent) with large stands at lower elevations along the southern border of the project area.  Small open meadows are scattered throughout the project area.  There are aspen stands along the northern border of the exploration area that extend to the north.  There are also a few small aspen pockets found at higher elevations.  Riparian habitat is found in perennial drainages in the project area (see Figure 3 for vegetation map).

**Table 81.  Vegetation in Project Area**

| Vegetation Description | Area (Acres) | Area (Percent) |
|---|---|---|
| Gambel's Oak - Mountain Shrub[1] | 11,290.1 | 81.4% |
| Pinyon-Juniper – Gambel's Oak | 970.6 | 7.0% |
| Pinyon-Juniper | 658.7 | 4.7% |
| Meadow | 277.8 | 2.0% |
| Cottonwood/Riparian | 136.9 | 1.0% |
| Riparian | 38.5 | 0.3% |
| Aspen | 468.5 | 3.4% |
| West Reservoir | 32.0 | 0.2% |
| *Total* | 13,873.0 | 100.00 |

[1] includes pockets of Wyoming and Basin big sagebrush.

34



Oak Mesa Exploration Project

- Aspen
- Gambel Oak Mountain Shrub/Sagebrush
- Meadow
- Pinyon Juniper
- Pinyon Juniper Gambel Oak
- Riparian
- • Drill Hole Location
- — Road
- ▬ Exploration Boundary

0  2,500  5,000 feet

Figure 3
Vegetation Communities

Prepared for: BLM
File: 5057 - Figure 3 EA.mxd (WH)
August 2012

Portions of this document include intellectual property of ESRI and its licensors and are used herein under license. Copyright © 2011 ESRI and its licensors. All rights reserved.

BLM_0018799

**Gambel's oak – Mountain shrub vegetation type**

The Gambel's oak-mountain shrub vegetation community is dominant across the project area and occurs on ridge slopes, along drainages, and over level to moderately rolling terrain.  This type accounts for approximately 81 percent of the vegetation in the area.  In some areas, near-pure stands of Gambel's oak dominate slopes, drainages, and some areas on top of Oak Mesa.  Where the community occurs in larger meadows and along drainages, there is a variety of other shrub species that are co- or sub-dominant depending upon growing conditions.  Other shrubs that occur in slightly more moist areas include snowberry (*Symphoricarpos oreophilus* or *S. rotundifolius*) and serviceberry (*Amelanchier alnifolia*).  The dominant shrub species is Gambel's oak.  Toward the south end of Oak Mesa on the benches below approximately 7,800 feet, stands of Wyoming big sagebrush (*Artemesia tridentata wyomingensis*) with isolated occurrences of Basin big sagebrush (*Artemesia tridentata tridentata*) are found interspersed in the Gambel's oak vegetation type.  These areas of sagebrush are typically no more than a few acres in size.  In more moist areas, chokecherry (*Prunus virginiana*) is also found.  Small, sub-dominant aspen (*Populus tremuloides*) are found in wetter areas where the chokecherry community borders the aspen community.



Photo 3.  Typical Gambel's oak-mountain shrub community on Oak Mesa.

**Pinyon-Juniper vegetation type**

Two pinyon-juniper vegetation types are found in the project area.  The pinyon-juniper woodland is dominated by Utah juniper (*Juniperus osteosperma*), with Colorado pinyon (*Pinus edulis*) in some areas along the south edge of Oak Mesa.  In this area, a few Rocky Mountain juniper (*Juniperus scopulorum*) are also present.  There is typically a sparse and variable understory that may contain remnant shrubs such as Wyoming big sagebrush, birchleaf mountain mahogany (*Cercocarpus montanus*), bitterbrush (*Purshia stansburiana*), siltbush (*Zuckia brandegeei*), snakeweed, potato cactus (*Opuntia fragilis*), muttongrass (*Poa fendleriana*), and bottlebrush squirreltail (*Elymus elymoides*).

BLM_0018800



**Photo 4.  Pinyon-juniper vegetation type on south face of Oak Mesa.**

With increasing elevation, Utah juniper and Colorado pinyon drop out of the community and Gambel's oak and mountain shrubs dominate the vegetation.  In both these communities where there are openings between the typically dense shrub canopies, or in areas where the canopy is well above the ground surface, a productive understory of forbs and grasses exists.  Commonly found species are elk sedge (*Carex geyeri*), Letterman's needlegrass (*Acnatherum lettermanii*), Kentucky bluegrass (*Poa pratensis*), muttongrass, Sandberg bluegrass (*Poa secunda*), bottlebrush squirreltail, western wheatgrass (*Pascopyrum smithii*), and nodding brome (*Bromus anomalus*).  Forbs are numerous with many species.  The most widespread and dominant include western yarrow (*Achilleamille folium*), lupine (*Lupinus* spp.), western sweetcicily (*Osmorhiza occidentalis*), southern ligusticum (*Ligusticum porteri*), biscuitroot (*Lomatium dissectum*), and aspen peavine (*Lathyrus lanzwertii*).

BLM_0018801



**Photo 5.  Transition from pinyon-juniper to Gambel's oak-mountain shrub on south end of Oak Mesa.**



**Photo 6.  Gambel's oak-mountain shrub with pockets of sagebrush and scattered pinyon-juniper; view to west near south end of Oak Mesa.**

**Aspen vegetation type**

Aspen stands occur at elevations greater than 8,800 feet near the northern edge of the project area and beyond, especially at the heads of drainages.  This vegetation type inhabits more moist areas on all slopes in these northern, higher elevation areas.  It mixes with most of the other vegetation types on site and has a more open, highly productive understory.  The dominant tree species is aspen.  Common understory species include Woods rose (*Rosa woodsii*), snowberry,

BLM_0018802

chokecherry, mountain brome (*Bromus marginatus*), elk sedge, white- flowered peavine, Fendler meadow-rue (*Thalictrum fendleri*), and American vetch (*Vicia americans*).

At somewhat lower elevations in small mesic drainages associated with the larger drainages, there are small pockets of aspen vegetation.  In most cases, there are only a few aspen and many of these are dying out.  The aspen understory typically contains snowberry and sometimes black chokecherry or willows with a very productive understory of the grasses and forbs.



**Photo 7.  Stands of mature aspen; view up West Roatcap Creek near the north border of the project area.**



**Photo 8.  View of aspen stand that has been logged and is regenerating.**

BLM_0018803

**Riparian vegetative community**

Within the broad category of riparian vegetation are several distinct plant communities. The most common riparian community is dominated by narrowleaf cottonwood (*Populus angustifolia*) and distinguished by various associated shrubs, forbs and grasses. The cottonwood vegetation community is generally limited to the lower reaches of the Jay, West Roatcap, and Leroux Creek drainages at elevations below approximately 8,800 feet. As shown on Figure 3, the cottonwood community ends at higher elevations in Jay and West Roatcap drainages.

Riparian zones occur along project area drainages and are characterized by comparatively narrow vegetation communities requiring wetter growing conditions than the surrounding uplands. Riparian zones occur in a very narrow band along the drainages and, in most cases, are no more than one or two trees wide (50 to 200 feet). There is a limited amount of understory associated with the cottonwoods. There are some pockets of willows scattered along the bottoms.



**Photo 9. View of cottonwoods along West Roatcap Creek and representative of cottonwoods along Jay Creek. Hillsides are dominated by Gambel's oak-mountain shrub.**

40



**Photo 10. Riparian zone along Dever Creek.**

In other drainages, such as Dever Creek, there are some small pockets of aspen and willows. These pockets are usually very small, not over 50 to 100 feet wide and 200 to 300 feet long, and found only in the bottom of the drainages.

The boundaries of riparian zones are limited in width by the steep topography associated with drainage systems. These zones may or may not include a recognized wetland component. A variety of tree species are usually associated with the riparian zones of the project area and, where occurring, the shrub component is denser than in the surrounding uplands due to soil moisture conditions.

**Meadow vegetative community**

Scattered across the project area, the meadow vegetation community is associated primarily with nearly level to moderately sloping sites on a variety of aspects and elevations. This community occurs as small natural clearings within other vegetation types, revegetated development disturbances, and heavily grazed meadows often associated with developed stockponds. Dominant vegetation includes a variety of native and introduced herbaceous species. Native species present include wheatgrasses (*Agropyron* sp.), bluegrasses (*Poa* sp.), needlegrasses (*Stipa* sp.), and a variety of penstemons (*Penstemon* sp.), as well as rushes (*Juncus* sp.) and spikerushes (*Eleocharis* sp.) bordering stock pond margins. Introduced species present include smooth brome (*Bromus inermis*), orchard grass (*Dactylis glomerata*), and mountain timothy (*Phleum alpinum*).

On the western portion of the project area there are some irrigated and seeded meadow areas that receive a limited amount of irrigation. Species include orchard grass, brome, and mountain timothy. At the north edge of the project area, overflow from the Overland Ditch occurs during the spring of some years which benefits the grasses in this area. Lower on the property, a limited amount of water is diverted from the Wakefield Ditch to supplement naturally occurring moisture in the spring and early summer. However, most of the water taken from the ditch is

41

BLM_0018805

used to insure that stock ponds are filled to provide water for cattle during the summer and early fall.



**Photo 11.  Meadow on west end of project area.**

## Environmental Consequences/Mitigation

### Proposed Action

Under the proposed action, there would be impacts to vegetation communities from new road and drill pad construction.  In addition to direct impacts to vegetation communities from clearing and grading, there would be indirect impacts from deposition of fugitive dust, increased risk of exotic species/noxious weed introduction, introduction of new genetic strains from re-seeding efforts, and change in age class and successional pattern in revegetation areas.

Design features have been incorporated into the proposed action to avoid and minimize impacts to the extent possible.  The proposed roads and drill pads have been oriented to minimize clearing and disturbance, and take advantage of topography and vegetation gaps.  Only 10 of the proposed drilling locations would require construction of a graded pad; the other locations would require only minor clearing and removal of large rocks.  This use of surface occupation only rather than grading would ensure rapid revegetation due to limited soil disturbance.  Dust suppression using application of water to roads, pad locations, and soil stockpile locations would minimize fugitive dust.  Implementation of a weed management plan to minimize risk of introduction, monitor disturbed and occupied areas (including existing roads used as access), and control existing and new noxious weed populations would limit impacts from weed spread.  Proposed reclamation measures would ensure that all impacts would be temporary, unless the landowner requests that new roads remain.  Revegetation is not always successful; therefore the sites would be monitored until revegetation success criteria have been met.  All new roads and all drill pads would be revegetated as described in the *Proposed Action* section.  Table 92 quantifies impacts to the vegetation communities, from both drill pad and road

42

construction.  In summary, the overall impacts from the proposed project on vegetation communities are minor and represent about 0.3 percent of the project area.

**Table 92.  Vegetation Community Clearing Impacts from the Proposed Action (roads and pads).**

| Vegetation Community | Temporary Impacts, BLM surface (acres) | | Temporary Impacts, Private surface (acres) | |
|---|---|---|---|---|
| Vegetation Community | Temporary Impacts, pads (acres) | Temporary Impacts, roads (acres) | Temporary Impacts, pads (acres) | Temporary Impacts, roads (acres) |
| Gambel's Oak-Mountain Shrub | 0.5 | 3.9 | 4.5 | 12.7 |
| Pinyon-Juniper-Gambel's Oak | 0.0 | 0.5 | 0.0 | 1.1 |
| Pinyon-Juniper | 0.0 | 0.0 | 0.0 | 0.0 |
| Meadow | 0.0 | 1.6 | 0.0 | 2.4 |
| Cottonwood-Riparian | 0.0 | 0.0 | 0.0 | 0.0 |
| Riparian | 0.0 | 0.0 | 0.0 | 0.1 |
| Aspen | 0.0 | 0.0 | 0.0 | 1.2 |
| Total | 0.5 | 6.0 | 4.5 | 17.6 |

Note:  Acres may not sum due to minor rounding errors.  Surface disturbance/grading only.

## Cumulative Impacts

The Leroux Creek basin (including Dever Creek and Cow Creek), Jay Creek basin, and West Roatcap Creek basin were considered the cumulative effects analysis area for vegetation.  The Proposed Action would result in minor, temporary impacts to vegetation communities.  Some impacts on successional stage of vegetation may be long-term (20 to 30 years); this would occur primarily in shrub/tree areas.  Oil and gas exploration, operation and development and coal lease modifications in the cumulative effects analysis area could result in similar impacts in the project vicinity.  Cumulatively, impacts to vegetation communities are expected to be minor.  With mitigation, including dust suppression, erosion control measures, implementation of a weed management plan and revegetation/reclamation activities, all anticipated impacts would be minimal, and temporary.

## No Action Alternative

Without the project, there would be no project-related effects to vegetation communities on Oak Mesa.

BLM_0018807

## Finding on the Public Land Health Standard for plant and animal communities

(partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species)

According to the North Fork LHA, the southern portion of the project area is classified as "meeting with problems" the Standard 3 Rating for Healthy Biotic Communities. All other areas are either uplands or are meeting the Standard. There are no sites around the project area that have plant diversity problems, however, there are several sites, primarily on the east and west boundaries of the project area that have cool season perennial grass problems and low perennial forb cover. Just one site on the south-western edge of the project area has both warm season perennial grass problems and pinyon-juniper invasion and pinyon decline problems (BLM 2007).

There are several sites on the south west edge of the project area where the shrubs are moderately to seriously hedged and there are sites on all but the north edge of the project area that exhibit plants in low vigor (BLM 2007).

The Proposed Action would not change the Standard 3 Rating for the project area. Some areas could see an improvement in the vegetative communities with reclamation following the exploration, and shrub clearing could have a beneficial effect on herbaceous vegetation.

### *INVASIVE, NON-NATIVE SPECIES* (includes a finding on Standard 3)

### Affected Environment

A total of fifteen species observed within the Oak Mesa Vegetation Inventory Area are listed on the Noxious Weed List of the Colorado Department of Agriculture. Of these, none are A listed or designated for eradication. Eleven are B listed or designated to stop the spread of the species (Russian knapweed; *Acroptilon repens*; Downy brome, *Anisantha tectorum*; Canada thistle, *Breea arvensis*; Hoary cress, *Cardaria chalepensis*; Musk thistle, *Carduus nutans*; Bull thistle, *Cirsium vulgare*; Field bindweed, *Convolvulus arvensis*; Houndstongue, *Cynoglossum officinale*; Quackgrass, *Elytrigia repens*; Oxeye daisy, *Leucanthemum vulgare*; Scentless chamomile, *Tripleurospermum inodorata*). Four are C listed or designated for management plans to support local governing bodies in effective integrated weed management on private and public lands (Chicory, *Cichorium intybus*; Redstem filaree, *Erodium cicutarium*; Bulbous bluegrass, *Poa bulbosa*; Common mullein, *Verbascum thapsus*). Other observed species in or near the project area include hoary cress (*Cardaria draba*), Russian knapweed (*Centaurea repens*), and Perennial pepperweed (*Lepidium latifolium*). Yellow starthistle (*Centaurea solstitialis*) is known to occur near the east edge of the project area. Non-county listed weeds present in the project that are invasive include horehound (*Marrubium vulgare*), and cocklebur (*Xanthium strumarium*). The existing weeds in the project area could be a result of landowner activities, grazing, transport of cattle and other equipment access.

### Environmental Consequences/Mitigation

### Proposed Action

The proposed project would result in ground-disturbing activities or occupation on 32.9 acres during construction of new access roads and drill pads. During construction and reclamation, the disturbed areas would be open for noxious weed establishment and potential spread onto adjacent lands. Additional existing road areas would be occupied by vehicles, though the ground would not be disturbed by grading. Equipment used for construction and drilling can introduce

44

and spread new weed species that currently are not established. The species mentioned above are typically aggressive and highly competitive with more desirable species. New roads and pad disturbance were minimized during project design by using existing roads, and using flat topographic areas as much as possible for drilling. Using this approach, only 10 pads would require grading. Other design features including prompt reclamation of disturbed areas, monitoring and weed control following the project, washing equipment prior to use in the project area, and following the Weed Management Plan (see Appendix A) would help avoid the introduction and spread of weeds.

## Cumulative Impacts

The Leroux Creek basin (including Dever Creek and Cow Creek), Jay Creek basin, and West Roatcap Creek basin were considered the cumulative effects analysis area for noxious weeds. The Proposed Action would result in increased risk for spread of noxious weeds. Oil and gas exploration, operation and development, coal lease modifications on adjacent lands, recreation activities, and livestock grazing could also result in the spread of noxious weeds. However, with design features for the proposed action and similar requirements for oil and gas operations, the impact is anticipated to be minimal.

## No Action Alternative

Without the project, there would be no project-related effects to invasive, non-native species on Oak Mesa. Existing weed infestations likely would continue.

## Finding on the Public Land Health Standard for plant and animal communities (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Vegetation)

There are only two sites in the exploration area that present potential "exotic" plant problems in undisturbed areas. One is on the eastern edge and the other is on the southern edge of the project area. There is one site on the southwest edge of the exploration area that, according to the North Fork LHA has significant cheatgrass cover. There are minor patches of noxious weeds scattered around the boundary of the project area with one significant infestation located along the northeastern edge of the project area (BLM 2007). Although the species are not identified in the North Fork LHA, most common weeds in the project vicinity are identified as Russian knapweed, hoary cress, tamarisk, and Canada thistle (BLM 2007).

The Proposed Action would not change the Standard 3 Rating for the project area. Weed management and reclamation could have a beneficial effect.

## THREATENED, ENDANGERED, AND SENSITIVE SPECIES (includes a finding on Standard 4)

### Affected Environment:
#### Federal and State

No terrestrial threatened and endangered (T & E) wildlife or plant species listed by the U.S. Fish & Wildlife Service (FWS) or Colorado Parks and Wildlife (CPW) were observed during habitat and wildlife surveys (Table 103). Occupied and suitable habitat in the exploration area is lacking for all of the T&E listed species, including plants. Habitat for sensitive species was surveyed and no occurrences or suitable habitat for Rocky Mountain Thistle, Tiger Beardtongue,

BLM_0018809

or Colorado Hookless Cactus were identified. The only listed fish species are found downstream in the Gunnison and Colorado Rivers. There is no suitable habitat for yellow-billed cuckoo in the proposed exploration area (see further explanation below). Prior to 2012 there were no records of sage grouse being observed on Oak Mesa. In June of 2012 a small flock of what is thought to be sage grouse was observed by BLM employees in Gambel's oak/sagebrush habitat near the south end of the mesa.

The paragraphs that follow provide a description of the species in Table 103.

Table 103.  Federal and State Threatened, Endangered, and Candidate Species

| Species | Status | Habitat Present | Species Present |
|---|---|---|---|
| Canada lynx | FT,SE | No | No |
| Black-footed ferret | FE,SE | No | No |
| North American Wolverine | FE,SE | No | No |
| Greenback cutthroat | FT | No | No |
| Colorado pikeminnow | FE, ST | No | No |
| Humpback chub | FE, ST | No | No |
| Razorback sucker | FE, SE | No | No |
| Bonytail chub | FE, SE | No | No |
| Yellow-billed cuckoo | FC, SC | No | No |
| Gunnison sage grouse | FC, SC | Yes | Undetermined |

FE - Federal Endangered            SE - State Endangered
FT - Federal Threatened            ST - State Threatened
FC - Federal Candidate Species      SC - State Species of Concern
Source:  FWS 2011

**Canada lynx**
The project area is not located within or near any mapped lynx habitat (USFS 2011b). The CPW lynx data base does not show that any lynx have been observed within miles of the area since lynx were first reintroduced into the state. Under the Southern Rockies Lynx Amendment guidelines aspen is classified as secondary habitat. However, aspen stands that would fit this classification are found at the northern edge of the exploration area. Some of these stands have been logged and in others there are existing roads. In five years of winter habitat and track surveys conducted by Monarch on Grand Mesa and near the West Elk Wilderness in similar aspen habitat, it was found that suitable prey base for lynx is lacking. The only predator tracks found in these areas were those of coyotes and these were few in number. The only prey tracks were a very limited number of rodents (Monarch 2011).

**Black-footed ferret**
There is no black-footed ferret habitat in the project area. Their primary prey, white-tailed prairie dogs are known to occur in Delta County, but none are in or near the Oak Mesa area

46

BLM_0018810

(Monarch 2011). Black-footed ferret are also assumed to be extirpated from the Uncompahgre Field Office (UFO) management area.

**North American wolverine**

There is no wolverine habitat in the project area. The nearest areas where there could potentially be wolverine habitat are in the West Elk Wilderness Area which is miles from the project area (Monarch 2011).

**Greenback cutthroat trout**

Greenback cutthroats are known to occur in Leroux Creek. However, surveys conducted by the CPW and USFS show that these fish are all found upstream from the project area on the Grand Mesa National Forest (Dare 2011).

**Endangered Fish**

Four federally listed endangered species (Colorado pikeminnow, humpback chub, bonytail chub, and razorback sucker) occur in offsite areas including the Gunnison and Colorado Rivers. These four species of fish occur in warm water habitats downstream of the project area in the Gunnison and Colorado Rivers. None of these species of fish are known or expected to occur in the project area. However, water depletions associated with this type of project are known to affect these species.

In May 2008, BLM prepared a Programmatic Biological Assessment (PBA) that addresses water depletion activities associated with BLM's fluid minerals program in the Colorado River Basin in Colorado. In response to BLM's PBA, the FWS issued and Programmatic Biological Opinion (PBO)(ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions from the Colorado River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail chub, or razorback sucker, and that BLM water depletions are not likely to destroy or adversely modify designated critical habitat. The PBO addresses water depletions associated with fluid minerals development on BLM lands, including water used for well drilling, hydrostatic testing of pipelines and dust abatement on roads. The PBO includes reasonable and prudent alternatives developed by the FWS which allow BLM to authorize oil and gas wells that result in water depletion while avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification of their critical habitat. As a reasonable and prudent alternative in the PBO, FWS authorized BLM to solicit a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) in the amount equal to the average annual acre-feet (ac-ft) depleted by fluid minerals activities on BLM lands (Monarch 2011).

This project would result in a one-time depletion of approximately one acre-foot to the Gunnison and Colorado river systems from water used for drilling and dust control. The FWS has determined any amount of water depletion in the Upper Colorado River will jeopardize the continued existence of the four listed Colorado River fishes. Therefore, the depletion of one acre-foot of water would result in a may affect, likely to adversely affect to the four listed Colorado River fishes. However, as discussed above, the BLM has completed a programmatic consultation covering small water depletions associated with well drilling activities (Biological Opinion Ref # (PBO) (ES/GJ-6-CO-08-F-0006). The scope of this PBO encompasses the proposed action.

**Yellow-billed Cuckoo**

Although there are cottonwoods along Jay, West Roatcap, and Leroux creeks, these are

BLM_0018811

narrow stringers and do not provide suitable nesting habitat for the yellow-billed cuckoo. Overall, nesting habitat for these birds is lacking in the project area. They have been found in large cottonwood gallery forests along the North Fork of the Gunnison River, about 4 miles south of the project area (BLM 2007). There is a slight chance that a yellow-billed cuckoo might be found in the stringers in lower portions of the drainages (Monarch 2011).

**Sage grouse**

Gunnison sage grouse (GUSG) are Candidate species under the Endangered Species Act. A proposed listing decision is expected to occur in December 2012. The Gunnison Sage-grouse Rangewide Conservation Plan (RCP)(GSRSC 2005[1]) provides guidance for the management of Gunnison sage grouse, definitions of seasonal habitat requirements (GSRSC 2005, p26-31) and provides mapping of Occupied and Potentially Suitable habitat throughout the known range of the species. Generally, life history for sage grouse is composed of various seasons: breeding habitat (leks, pre-laying, nesting, early brood-rearing), Summer-Fall habitat and Winter habitat. Breeding activity begins with strutting, which occurs from mid-March through late May. Some research indicates that 70-80% of nests often occur within 2 miles of an active lek, but female grouse have been documented moving as far as 15-20 miles from a lek to nest (GSRSC 2005, p23). Sage grouse nests are typically shallow bowls lined with leaves, feathers and small twigs placed on the ground at the base of a live sagebrush bush. Hatching begins around mid-May and usually ends by July, beginning early brood-rearing. Chicks are precocial and leave the nest with the hen shortly after hatching and move through habitats in search of food (insects, forbs) and cover. Food and cover are key factors for chick and juvenile survival. During this time period, grouse have been known move up to 6 miles from nesting to brood-rearing habitats, and some populations of Gunnison sage grouse utilize mountain shrub habitats for brood-rearing and Summer habitat. Summer-Fall (late June-October) habitats are composed of a greater variety of and more mesic habitats. From mid-September into October sage grouse prefer areas with more dense sagebrush and late green succulent forbs. During the winter months, sage grouse are totally dependent on sagebrush for food and shelter.

A small flock of grouse was observed by BLM employees at the southern end of Oak Mesa in June 2012. One of the BLM employees has seen Gunnison sage grouse in the past and was very sure that the grouse seen were sage grouse and not blue grouse. Since this is a new area for sage grouse occupation, shortly after the report, biologists from BLM, Crawford Sage Grouse Working Group, and Colorado Parks and Wildlife (CPW) cooperated to make several visits to the area to investigate the report (See Project Record for Field Notes). During those visits a nest and egg shell fragments were found by CPW employees in the same habitat a short distance from the sighting location. Additionally, what is thought to be sage grouse droppings were found in the general area by both CPW and BLM employees. No additional grouse were seen during these visits. The professional opinion of experienced Gunnison sage grouse biologists was that the nest, eggshell and droppings found in the area had the characteristics of Gunnison sage grouse and not that of blue grouse. CPW Grouse Technicians Mike Jackson and Kristina Barker "found a grouse nest at the base of a sagebrush plant, and recovered some egg shell fragments… . The nest seemed indicative of a GUSG nest." CPW biologist Nathan Seward "compared the eggshell fragments to pictures of an intact GUSG egg collected in early April from the Gunnison Basin and found the size, markings, and coloration almost identical." After visiting the Oak Mesa area,

---

[1] Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado

BLM_0018812

Jim Garner (CPW Habitat Biologist) and Nathan Seward "felt that the site had good potential for GUSG to use it, but in very limited numbers."

It is not known whether there is a lek or leks on Oak Mesa. Usually sage grouse nest within 4 miles of lek areas. However, it could be that the nesting bird bred on a lek in the Crawford area and moved to Oak Mesa to nest. Moving distances of several miles from a lek to nest site is not uncommon. The nearest known leks and viable populations of these birds are in the Crawford area approximately 18 miles south of the project area (BLM 2007). CPW mapped historic range for Gunnison sage grouse reaches as far north as Wakefield Mesa, greater than 2 miles southeast of the project area.

There are small areas of sagebrush within Gambel's oak mapped habitat on the large benches near the south end of the mesa. These birds typically require large areas of continuous sage brush for nesting and brood rearing. The small pockets of sagebrush found in the project area may not be highly suitable but, based on what is thought to be a few adult birds observed and a nest located, appear to be used for nesting and brood rearing. These pockets of sagebrush are found where there are larger shrubs and in some cases pinyon-juniper that could be used as hunting perches by raptors. This could have an effect on use of the area for leking activity. Those areas that provide suitable conditions for lek sites are very limited on Oak Mesa. Some of these sites were checked for droppings, feathers or other evidence of use for leks, but none were found.

Further to the north on the Mesa at higher elevations sagebrush habitat diminishes until it comprises a few scattered shrubs above 8,000 feet. This could have an effect on use of these higher areas by sage grouse for nesting and brood rearing due to lack of cover and forage. However, from radio telemetry studies, Crawford area sage grouse with young are known to utilize Gambel's oak mountain shrub habitat (where sagebrush is generally lacking) during brood rearing, utilizing available forbs and insects. On Oak Mesa between the Jay and Leroux Creek drainages the area is dominated by Gambel's oak habitat, but due to soil conditions and heavy grazing the area lacks a grass-forb component considered to be necessary for brood rearing. This likely reduces the chances of higher elevation on that portion of the mesa being used by the hens and broods. On the portion of Oak Mesa between the Jay and Roatcap drainages the sagebrush extends to near the 8,400 foot contour and overall cover and forage conditions necessary for these birds appears to be better.

Before this reported sighting, the Oak Mesa area had not had any recent evidence of sage grouse occupation, so was not included in the mapping effort at the time the Rangewide Conservation Plan (RCP) was developed. RCP Occupied Habitat is defined as "areas of suitable habitat known to be used by GUSG within the last 10 years from the date of mapping" and RCP Potentially Suitable Habitat is defined as "unoccupied habitats that could be suitable for occupation of sage-grouse if practical restoration were applied" (GSRSC 2005, p 54). Should sage grouse occupancy be confirmed on Oak Mesa, in order to better apply the RCP guidelines, preliminary Occupied and Potential habitat was mapped by BLM in a Geographic Information Systems (GIS) process. This GIS analysis was based on the locations of the grouse sign on Oak Mesa, the local knowledge of habitats used by the closest known population of sage grouse (Crawford), habitat definitions from the RCP, vegetation data[2] and aerial imagery[3] to map potential habitat in the Oak Mesa Area should sage grouse occupation be verified. Vegetation data was assessed

---

[2] Colorado Veg-25m layer: T:\CO\GIS\gisdata\field_offices\ufo\vegetation
[3] Colorado NAIP 2011: ImageService://166.2.126.235/Imagery/1_Meter/Region_2/ Colorado_NAIP_2011

BLM_0018813

focusing on areas mapped as sagebrush and mountain shrub and appeared to be more open sagebrush/mountain shrub cover. Two habitat patches were identified in the area. The habitat patch that contained the locations of the grouse sign were labeled Occupied and the other portion was labeled Potential until such time that more information may determine otherwise. Occupied and Potential Habitats are shown in Figure 4.

Evaluations of the grouse species identity are still under investigation through field verification and genetic analysis of the eggshell, scat and feathers found. Genetic analysis is being conducted by a Dr. Sara Oyler-McCance, Research Geneticist at the USGS Molecular Ecology Lab where they have been involved in several Gunnison and Greater sage grouse genetics research projects[4]. Preliminary results on scat where inconclusive due to degradation of the genetic material. Analysis is underway for the eggshell and feather samples.

---

[4] http://www.fort.usgs.gov/MEL/Research.asp; http://www.fort.usgs.gov/MEL/products.asp

BLM_0018814



**Oak Mesa Exploration Project**

- Drill Hole Location

Subsurface Mineral Right

Federal Minerals Including Coal

Private Minerals

Exploration Boundary

Bureau of Land Management

Private

Likely Occupied Sage Grouse Habitat

Likely Potential Sage Grouse Habitat

Stream/Lake

Highway/Road

2-Track Road

New Road

**Figure 4**
**Sage Grouse Habitat**

Prepared for: BLM
File: 5057 - Figure 4 EA.mxd (WH)
August 2012

0    2,500    5,000 feet

N

BLM_0018815

**BLM Sensitive Species of the UFO**

The BLM lists a total of 43 terrestrial vertebrates, fish, invertebrates and plant species which occur, potentially occur, or habitat for which occurs in the UFO area.  A review of information on these species shows that only six terrestrial vertebrates, one amphibian, and one fish are known to occur or have suitable habitat in the project area (see Table 114).  There is no suitable habitat for any sensitive plant species in the project area (Monarch 2011; BLM 2007).

**Table 114.  BLM Sensitive Species of the UFO Potentially Occurring in the Project Area**

| Species | Habitat Present | Species Present |
|---|---|---|
| **Terrestrial vertebrates** | | |
| Spotted bat | Yes | Unknown |
| Fringed myotis bat | Yes | Unknown |
| Townsend's big-eared bat | Yes | Unknown |
| Bald eagle | Forging habitat only | Unknown |
| American peregrine falcon | No nesting habitat | Yes |
| Brewer's sparrow | Yes | Yes |
| **Amphibians** | | |
| Northern leopard frog | Yes | Yes |
| **Fish** | | |
| Bluehead sucker | Yes | Yes |

Source:  Monarch 2011; BLM 2007

**Spotted bat**

The spotted bat can be found in many western states and provinces, but its distribution is quite patchy, likely due to its dependence on large, isolated cliffs for roosting.  In localities where such habitat is abundant (e.g., the Grand Canyon), spotted bats are believed to be moderately common.  However, given the scarcity of suitable habitat, range-wide abundance is still thought to be fairly low.  This, combined with unknown population trends, a suite of potential threats, and lack of basic life history data contribute to a broad level of conservation concern (Luce and Keinath 2007).

Suitable roosting sites are a critical habitat component, the availability of which can determine population sizes and distributions (Humphrey 1975, Kunz 1982, Adams 2003, Fitzgerald et al. 1994). Maternity roosts, diurnal roosts, nocturnal roosts, and winter hibernacula must be considered for all bats.

The main threats to the persistence of spotted bat populations are loss or reduction in value of wet meadows and other foraging areas, at least at a local scale.  Such impacts could result from over-grazing by livestock, water diversion, or changes in land use such as conversion of native habitats to tilled cropland.

No spotted bat occurrence has been formally documented within the proposed project area. No cliffs or rock walls, which this species requires for roosting, occur in the project area, which further reduces chances that any spotted bats roosts occur in the project area (Garrison 2011). Spotted bats have been confirmed within the Gunnison gorge.  They are also known to make

52

daily foraging trips in excess of 35 miles one way from roost sites to access higher elevation meadows for foraging (Rabe,M.J. et al 1998). Spotted bats could use the area for foraging or travel-ways to reach higher elevation foraging areas.

**Townsend's big-eared bat**

Because of its narrow roosting preferences, local distribution of Townsend's big-eared bat tends to be restricted by the presence of suitable roosting habitat (i.e., primarily caves and mines, abandoned buildings, and large tree hollows) (Gruver and Keinath 2006). Suitable foraging habitat may be present, however suitable roosting habitat is lacking within the proposed project area. There are records of Townsend's big-eared bats for Delta County, but none have been formally documented in the project area (Garrison 2011). Townsend's big-eared bats could use the area for foraging or travel ways to reach higher elevation foraging areas.

**Fringed myotis**

Throughout their range, fringed myotis use caves, mines, and buildings as maternity colonies, solitary day and night roosts, and hibernacula (Keinath 2004).

Fringed myotis are gleaners, foraging close to the plant canopy. They commonly forage around the edges to forests and within shrub communities such as Gambel's oak. Suitable roosting habitat is present in Gambel's oak in the project area (Adams 2003). Fringed myotis bats have not been formally documented in the project area (Garrison 2011), but are likely to be present for both roosting and foraging.

**Bald eagle**

No occurrence of the bald eagle has been formally documented within the proposed project area. However, they potentially could forage in the project area for carrion (winter killed animals). During wildlife surveys in the Oak Mesa area over the last three years no bald eagles have been observed. The nearest known bald eagle activity is along the North Fork of the Gunnison River. Suitable nesting and reproductive habitat for the bald eagle is found along the river, but is not present in the proposed project area. Bald eagles do winter along the North Fork of the Gunnison River and in the winter possibly make foraging flights through the area searching for carrion. Winter range is documented south of the project area. Winter roost habitat for the bald eagle is not present within the project area (Monarch 2011; BLM 2007).

**Peregrine falcon**

One peregrine falcon was observed foraging in the area during spring surveys in 2011. This is the only occasion that a peregrine has been observed in the area. However, there have been numerous sightings of peregrines in the North Fork Valley and there is a known nest site several miles to the east in Dove Gulch. Suitable cliff nesting habitat for this species is lacking in the project area. Known peregrine falcon areas occur on the Grand Mesa National Forest greater than 10 miles north of the project area (Monarch 2011; BLM 2007).

**Brewer's Sparrow**

This species prefers rabbitbrush and sagebrush habitat (Kingery 1998). There are a few small stands of sagebrush that could provide suitable habitat for this species along the southern portion of the project area (Monarch 2011). A few Brewer's sparrows were observed during spring wildlife surveys conducted in the area by Monarch in 2012.

**Northern leopard frog**

Northern leopard frogs were observed at two ponds found at higher elevations in the project area during the spring-summer 2012 wildlife surveys. The northern leopard frog prefers the banks and shallow portions of marshes, wet meadows, ponds, lakes, and streams particularly

BLM_0018817

where rooted aquatic vegetation is present (Hammerson 1999). There is suitable northern leopard frog habitat along drainages and at other stock ponds in the project area (Monarch 201).

**Colorado River cutthroat trout**
Suitable habitat for the Colorado River cutthroat trout does not occur within the project area. This fish may occur in Leroux Creek north of the exploration boundary in the Grand Mesa National Forest, greater than 3 miles north of the project area (Monarch 2011).

**Bluehead sucker**
This species is known to occur in streams in the North Fork Valley (Speas 2010). However, during stream sampling conducted by the BLM in 2007 below the confluence of Leroux and Dever creeks no bluehead suckers were found (Fresques 2011).

## Environmental Consequences/Mitigation

### Proposed Action
**Federally Threatened and Endangered Species**
**Canada lynx**
There would be no additional disturbance of the older aspen stands in this area during road building associated with the exploration program. It would be necessary to build one short section of road to the OM-18 drill site through an aspen stand that has been logged and is regenerating. This stand would not be considered lynx habitat. The OM-18 drill site would be constructed in Gambel's oak-mountain shrub habitat. Based on the above information, it has been determined that the project would have no effect on Canada lynx.

**Black-footed ferret**
There is no habitat for the black-footed ferret in the project area, and the project would have no effect on this species.

**North American wolverine**
There is no habitat for the wolverine in the project area, and the project would have no effect on this species.

**Greenback cutthroat trout**
There is no habitat for the greenback cutthroat trout in the project area, and habitat for the species in Leroux Creek is greater than 3 miles upstream of the project area on the Grand Mesa National Forest. The project would have no effect on this species.

**Endangered Fish**
This project would result in a one-time depletion of approximately one acre-foot to the Gunnison and Colorado River systems. The FWS has determined any amount of water depletion in the Upper Colorado River will jeopardize the continued existence of the four listed Colorado River fishes. Therefore, the depletion of one acre-foot of water would result in a may affect, likely to adversely affect to the four listed Colorado River fishes. However, as discussed previously, the BLM has completed a programmatic consultation covering small water depletions associated with well drilling activities (Biological Opinion Ref # (PBO) (ES/GJ-6-CO-08-F-0006) such as the proposed action.

**Yellow-billed Cuckoo**
There is no habitat for the yellow-billed cuckoo in the project area, and habitat for the species along the North fork of the Gunnison River is greater than 3 miles south of the project area. The project would have no effect on this species.

54

BLM_0018818

**Sage grouse**

As described above in the Affected Environment section, with the potential discovery of sage grouse within the project area, tentative occupied and potential sage grouse habitat has been mapped along the southern portions of Oak Mesa within the project area. These areas are limited to those lands on top of the Mesa where there are suitable conditions for sage grouse nesting and brood rearing. There is no suitable habitat within the pinyon-juniper vegetation type found on the faces of Oak Mesa. Currently the identity of the grouse species is undetermined, but is likely Gunnison sage grouse based on professional opinion. BLM is actively pursuing a more definitive identification of species through ongoing genetic analysis of grouse sign, and plans to conduct lek surveys in Spring 2013. It is not the responsibility of the operator to determine species.

To reduce potential impacts to nesting and brood rearing activities on the mesa, BLM will use Adaptive Management procedures (43 CFR 46.145), and the following design features would be implemented only if and when species identification verifies that they are Gunnison or Greater sage grouse.

- No surface disturbing activities are permitted between <u>April 15 and August 30</u> within occupied and potential habitat.

- Should lek locations be found in the future, additional restrictions would include no surface disturbing activities from <u>March 15 through May 31</u> within 0.6 miles of the edge of a lek.

- Vegetation cover in areas disturbed by exploration activities would be seeded with a grouse friendly native seed mix. Within three growing seasons, reclamation in these areas would meet, at a minimum 75 percent of, Gunnison sage grouse Rangewide Conservation plan guidelines for breeding habitat (Table 1 in RCP, pg H-6; Gunnison Sage Grouse Steering Committee 2005). Repeated reseeding would be required if vegetation cover does achieve the 75 percent of guidelines within three growing seasons.

- Seed mixes would be designed using only native species with the intent to establish 10 to 30 percent native grass cover on arid sites and 20 to 40 percent on mesic sites. Native forbs would be included in the mix with the intent of establishing 5 to 15 percent cover on arid sites and 20 to 40 percent on mesic sites.

These design features will not be implemented until such time that species identification verifies Gunnison or Greater sage grouse on Oak Mesa. At the time of implementation of these design features, within what is thought to be sage grouse habitat, 3.41 acres (9 drill holes) of occupied and 2.36 acres (7 drill holes) of potential habitat would be modified by the proposed action. Anticipated disturbance for each exploration hole would be 0.50 acre or less in size. Given the above design features, activities from the project would have no impact to sage grouse.

**BLM Sensitive Species**

The purpose of this section is to analyze the effects of the proposed project, to determine if the proposed activities are likely to cause a loss of viability or a trend toward Federal listing under the Endangered Species Act for any of these species.

BLM_0018819

**Spotted bat**

No spotted bat occurrence has been formally documented within the proposed project area, but the area may be used as foraging habitat. No cliffs or rock walls occur in the project area, which further reduces changes that any spotted bats could be affected. Activities from the project (especially night-time) may cause individual bats to avoid an area for a short term, but should have no long term effects to reproduction or populations. Activities from the project would have no impact to the spotted bat populations.

**Townsend's big-eared bat**

Suitable roosting habitat for the Townsend's big-eared bat is lacking near the proposed activities, and suitable foraging habitat is limited or lacking. No Townsend's big-eared bat occurrence has been formally documented within the proposed project area. Activities from the project (especially night-time) may cause individual bats to avoid an area for a short term, but should have no long term effects to reproduction or populations.

**Fringed myotis**

The fringed myotis has not been formally documented in the project area. Suitable foraging and roosting habitat occurs, but given the large expanses of foraging habitat and small amount of disturbance it is doubtful there would be any impact to these bats as a result of the exploration drilling activities. Activities from the project (especially night-time) may cause individual bats to avoid an area for a short term, but should have no long term effects to reproduction or populations. Activities from the project would have no impact to the fringed myotis populations.

**Bald eagle**

The bald eagle has not been formally documented in the project area. No suitable nesting or winter roost site habitat for the bald eagle is present in the project area. The bald eagle may forage in the project area for carrion during the winter months, but impacts from drilling activities would be minimal. Activities from the project may cause individuals to avoid an area for a short term during drilling activities, but would not have long term effects to reproduction or populations. Activities from the project would have no impact to the bald eagle populations.

**Peregrine falcon**

Peregrine may occasionally forage in the project area. There is no suitable cliff nesting habitat, and the nearest known nest site is several miles east of the proposed project activities. Activities from the project may cause individuals to avoid an area for a short term during drilling activities, but would not have long term effects to reproduction or populations. Activities from the project would have no impact to the peregrine falcon populations.

**Brewer's sparrow**

Disturbance to the limited sagebrush habitat present in the project area would be minor. There could be minor impacts to the Brewer's sparrow if construction activities occur between May 1 and July 15 and no impact if work is conducted outside of this time frame. Preconstruction surveys would be conducted if disturbance to sagebrush habitat is expected between May 1 and July 15. Exploration activities would have minimal impact on Brewer's sparrow if construction occurs outside of the nesting period or if the Brewer's sparrows are determined not to be present in the vicinity of the site. Activities may adversely affect individuals, but are not likely to result in a loss of viability in the project area, nor cause a trend towards federal listing or a loss of species viability.

56

**Northern leopard frog**

Direct impacts on northern leopard frogs could possibly occur if sediment enters water bodies where they are present. However, leopard frogs are found in ponds used by livestock where turbidity is often high. With proposed erosion control mitigation measures potential indirect effects on this species would be minimized. Activities may adversely affect individuals, but not likely to result in a loss of viability in the project area, nor cause a trend towards federal listing or a loss of species viability.

**Bluehead sucker**

This species is known to occur in Leroux Creek. All drilling activity associated with exploration operations would occur greater than 0.50 mile from Leroux Creek. Leroux Creek Road and other existing ranch roads would be used and no new crossings of Leroux Creek would be allowed. Sediment control measures, in addition to distance from the stream, would prevent impacts to stream water quality. The small areas of disturbance, location of construction activity and implementation of sediment control measures minimize the chances that silt would reach the stream.

The small areas of disturbance and location of construction activity and proposed sediment control measures minimizes the chances that these fish would be impacted. Exploration activities may adversely affect individuals, but are not likely to result in a loss of viability on the Planning area, nor cause a trend towards federal listing or a loss of species viability.

## Cumulative Impacts

The Leroux Creek basin (including Dever Creek and Cow Creek), Jay Creek basin, and West Roatcap Creek basin were considered the cumulative effects analysis area for listed and sensitive species. The Proposed Action, including design features detailed previously, would not result in impacts to any federally listed species (ESA). Additionally, there would be no cumulative effects to ESA-listed species. For three BLM species of concern (Brewer's sparrow, northern leopard frog, and bluehead sucker), a determination of "no effect" has been made for project activities.

Cumulative impacts from other activities that are reasonably foreseeable include continued oil and gas exploration, drilling, and operation which would result in access roads and small (5 to 7 acre) pad sites that would increase vegetation disturbance, and ongoing grazing impacts. While existing and proposed oil and gas leases occur in the project vicinity, few wells have been drilled and even fewer have been completed. Production is very limited in the identified cumulative impacts analysis area. Without substantial changes to the oil and gas economy or extraction technology, the low existing level of exploration and drilling is likely to continue. Given the small project impacts and low level of anticipated impacts from reasonably foreseeable actions, impacts to populations of the three BLM species of concern are unlikely. With the design features incorporated into the proposed action and similar measures required of oil and gas development, habitat impacts would not threaten any populations of Brewer's sparrow, northern leopard frog, and bluehead sucker that inhabit the cumulative effects analysis area.

## No Action Alternative

Without the project, there would be no project-related effects to any federally listed species, or BLM species of concern.

BLM_0018821

## Finding on the Public Land Health Standard for Threatened & Endangered species:

Based on the North Fork Land Health Assessment, there is no habitat for threatened and endangered species in the project area. The southern edge of the project area is adjacent to the northern edge of potential Bald Eagle Winter Range (BLM 2007). All areas surrounding the project area are meeting Standard 4 Special Status Species (BLM 2007). The proposed project would not change the ability of the project area to meet Standard 4.

## BIRDS (Birds of Conservation Concern of the UFO, Migratory, and Raptors)

### Affected Environment

#### Birds of conservation concern of the UFO

The U.S. Fish and Wildlife Service list of Birds of Conservation Concern was used as to complete this analysis (FWS 2008, Table 15, p.32, BCR 16 [Southern Rockies/Colorado Plateau]). The USFWS (FWS 2008) lists 26 bird species as occurring in the UFO district. Of these, habitat is lacking in the project area for all but 8 species (Table 125; Monarch 2011).

**Table 125. Birds of Conservation Concern of the UFO**

| Species | Habitat Present | Species Present |
|---|---|---|
| Golden eagle | Foraging only | Yes |
| Peregrine falcon | Foraging only | Yes |
| Prairie falcon | Foraging only | Yes |
| Lewis' woodpecker | Yes | Yes |
| Gray vireo | Yes | Yes |
| Pinyon jay | Yes | Yes |
| Juniper titmouse | Yes | Yes |
| Brewer's sparrow | Yes | Yes |

Source: FWS 2008.

The golden eagle, peregrine falcon and prairie falcon are known to forage in the area. There are some cottonwood trees along Leroux Creek within the project area that could be utilized by golden eagles for nesting. However, there are no records of golden eagles nesting in that area or in any other cottonwood stands in or near the project area. Golden Eagle nest sites occur both east and west of the project area, in cliff habitat (BLM 2007). There is no suitable nesting habitat for peregrine or prairie falcons in the project area (Monarch 2011).

There are other Species of Conservation Concern (SCC) that utilize other habitat types in the project area. These include the Lewis' woodpecker, gray vireo, pinyon jay, and juniper titmouse. The Lewis' woodpecker is known to nest in riparian habitat and sometimes in pinyon-juniper. The gray vireo, pinyon jay and juniper titmouse are known to nest in pinyon-juniper. These birds may also forage in the Gambel's oak-mountain shrub habitat (Monarch 2011).

The Brewer's sparrow is known to nest in sagebrush stands in the North Fork Valley. There are small pockets of sagebrush in the Gambel's oak-mountain shrub habitat in the project area these birds could utilize. These pockets are few in number and small in size which limits the number of these birds that might use the sagebrush stands for nesting (Monarch 2011). A few of

58

BLM_0018822

these birds were observed during wildlife surveys conducted in spring and early summer of 2012.

**Raptors**

During surveys conducted in September 2011 and spring and early summer of 2012 all suitable nesting habitat, which included aspen, cottonwood and pinyon-juniper was checked. Areas surveyed included the delineated exploration area and in some cases, areas outside the delineated area when suitable raptor nesting habitat was within ¼ mile of a proposed drill site or access road. Also taken into consideration were vegetation and topographic conditions that would preclude a nest site from being observed from a drill site. There are also a few aspen stands in the area that are dying out and do not provide suitable nesting conditions for raptors. Declining aspen stands and the lack of use by nesting raptors in these stands has been commonly observed over the last few years during surveys in the North Fork Valley (Monarch 2011).

Only one active nest (red-tailed hawk) known to be active in 2010 and 2011 was again active in 2012. This nest is located just south of West Reservoir. The remnants of two nests of unknown species were located in small aspen stand stringers at the north end of the West Roatcap Creek drainage. None were found in larger mature aspen stands (Monarch 2011).

Aspen logging has occurred in the area in the past and there are some regenerating stands that are very dense and do not provide suitable conditions for raptor nesting. It will be a number of years before aspen in these stands grow to sufficient size to be used by raptors (Monarch 2011).

No surveys were conducted for raptor nests in Gambel's oak-mountain shrub habitat, as this vegetation community does not provide suitable nest habitat (Monarch 2011).

Raptors observed during the September 2011 and spring and early summer of 2012 surveys included golden eagle, sharp-shinned hawk, Cooper's hawk, red-tailed hawk, American kestrel, and American peregrine falcon. During prior wildlife surveys in the area in the spring of 2010 and 2011 prairie falcons and northern harriers were observed flying over the area (Monarch 2012).

Golden eagles were observed flying over the area at a level and pattern that indicated they were foraging. These birds were observed in 2010, 2011 and 2012 (Monarch 2012).

Prairie falcons were observed on two occasions in 2010 and 2011 flying over the area. These appeared to be migrants moving through the area. There are no suitable nest sites for these birds in the project area (Monarch 2011).

**Migratory birds**

Plant communities within the analysis area provide habitats for a variety of migratory bird species. A variety of migratory bird species use habitat in the project area for nesting, particularly the Gambel's oak-mountain shrub community. Those birds that have been observed in this habitat type in the North Fork Valley are shown on Table 16. This species list is based upon observations within this habitat type at other projects in the North Fork Valley over the past ten years (Monarch 2011). Only those species which are known to or may nest in this habitat type within the project area are shown on the list.

59

BLM_0018823

**Table 16.  Observed Bird Species during spring and early summer wildlife surveys in Gambel Oak-Mountain Shrub Habitat**

| | |
|---|---|
| Mourning dove | Orange-crowned warbler |
| Great horned owl | Virginia's warbler |
| Broad-tail hummingbird | Yellow warbler |
| Black-chinned hummingbird | MacGillivary's warbler |
| Olive-sided flycatcher | Western tanager |
| Dusky flycatcher | Black-headed grosbeak |
| Loggerhead shrike | Lazuli bunting |
| Plumbeous vireo | Green-tailed towhee |
| Warbling vireo | Spotted towhee |
| Western scrub-jay | Chipping sparrow |
| Black-billed magpie | Brewer's sparrow |
| Black-capped chickadee | Vesper sparrow |
| White-breasted nuthatch | Lark sparrow |
| House wren | Gray-headed junco |
| Blue-gray gnatcatcher | Brewer's blackbird |
| Hermit thrush | Brown-headed cowbird |
| American robin | Pine siskin |

In addition to the species listed on Table 16 there are numerous other migratory species that would be expected to be found in those habitat types in the project area.  Those species known to occur, or could occur in the habitat types found in the project area are shown on Table 17.  This species list has also been compiled from surveys conducted for other projects in the North Fork Valley over the last 10 years.  Some of these birds were observed during the September 2011 surveys in the project area.

BLM_0018824

**Table 17.  Bird Species Observed in Habitat other than Gambel's Oak-Mountain Shrub in the Project Area\***

| | | |
|---|---|---|
| Western grebe | Flycatcher spp. | Mountain bluebird |
| Great blue heron | Olive-sided flycatcher | Townsend's solitare |
| Mallard | Western wood peewee | Ruby-crowned kinglet |
| Blue winged teal | Dusky flycatcher | Lewis's woodpecker |
| Cinnamon teal | Loggerhead shrike | Swainson's thrush |
| Green winged teal | Plumbeous vireo | Hermit thrush |
| Ring-necked duck | Warbling vireo | American robin |
| Turkey vulture | Gray vireo | Gray catbird |
| Golden eagle | Gray jay | Orange-crowned warbler |
| Bald eagle | Stellar's jay | Virginia's warbler |
| Northern harrier | Western scrub-jay | Yellow warbler |
| Sharp-shinned hawk | Downy woodpecker | Yellow-rumped warbler |
| Cooper's hawk | Black-billed magpie | MacGillivary's warbler |
| Red-tailed hawk | American crow | Common yellow throat |
| Swainson's hawk | Common raven | Wilson's warbler |
| American kestrel | Tree swallow | Western tanager |
| Peregrine falcon | Violet-green swallow | Black-headed grosbeak |
| Prairie falcon | Purple martin | Lazuli bunting |
| Willet | Black-capped chickadee | Green-tailed towhee |
| Spotted sandpiper | Mountain chickadee | Cedar waxwing |
| Dusky grouse | Plain titmouse | Spotted towhee |
| Merriam's turkey | Bushtit | Chipping sparrow |
| Mourning dove | Red-breasted nuthatch | Brewer's sparrow |
| Great Horned owl | White-breasted nuthatch | Gray-headed junco |
| Northern pygmy owl | House wren | Brewer's blackbird |
| Long eared owl | Blue-gray gnatcatcher | Brown-headed cowbird |
| Common nighthawk | Hairy woodpecker | Cassin's finch |
| Broad-tail hummingbird | Northern flicker | Pine siskin |
| Black-chinned hummingbird | Red-naped sapsucker | |

\*Bird species that have been observed during surveys at this and other project sites with similar habitat types over the last ten years in the North Fork Valley

BLM_0018825

## Environmental Consequences/Mitigation

## Proposed Action

**Birds of Conservation Concern**

No pinyon-juniper habitat that could be used by these birds would be lost as a result of road or drill pad construction. These birds may also forage in the Gambel's oak-mountain shrub habitat. When considering the large expanses of Gambel's oak-mountain shrub habitat in the project area (13,873 acres), the temporary loss of about 32.9 acres for road and pad construction would not be expected to have an effect on activities by these birds in the area. The temporary habitat loss represents about 0.3 percent of total habitat in the project area.

*Golden eagle*

Golden eagles were observed flying over the area at a level and pattern that indicated they were foraging. These birds were observed in 2010, 2011 and 2012 (Monarch 2012). Activities from the project may cause individuals to avoid an area for a short term during drilling activities, but would not have long term effects to reproduction or populations. Activities from the project would have no impact to the golden eagle populations.

*Peregrine falcon*

Peregrine may occasionally forage in the project area. There is no suitable cliff nesting habitat, and the nearest known nest site is several miles east of the proposed project activities. Activities from the project may cause individuals to avoid an area for a short term during drilling activities, but would not have long term effects to reproduction or populations. Activities from the project would have no effect to the peregrine falcon populations.

*Prairie Falcon*

Prairie falcons were observed on two occasions in 2010 and 2011 flying over the area. These appeared to be migrants moving through the area. There are no suitable nest sites for these birds in the project area (Monarch 2011). Activities from the project would have no effect to the prairie falcon populations.

*Lewis' Woodpecker*

Lewis' woodpeckers are commonly observed nesting in aspen stands around West Reservoir and in cottonwoods along Jay and Roatcap Creeks. There are no drill sites located in areas where suitable nesting and foraging habitat would be affected. Activities associated with exploration would have no effect on Lewis' woodpecker populations.

*Gray Vireo*

A gray vireo was observed on one occasion in pinyon-juniper on the south face of Oak Mesa. No suitable habitat for these birds would be disturbed during operations associated with exploration activities. Activities associated with exploration would have no effect on gray vireo populations.

*Pinyon Jay*

A pinyon jay was observed on one occasion in pinyon-juniper on the west face of Oak Mesa. No suitable habitat for these birds would be disturbed during operations associated with exploration activities. Activities associated with exploration would have no effect on pinyon jay populations.

BLM_0018826

*Juniper titmouse*

These birds were observed on occasion in pinyon-juniper habitat on the south end of Oak Mesa. No suitable habitat for these birds would be disturbed during operations associated with exploration activities. Activities associated with exploration would have no effect on juniper titmouse populations.

*Brewer's sparrow*

Disturbance to the limited sagebrush habitat present in the project area would be minor. There could be minor impacts to individual Brewer's sparrow if construction activities occur between May 1 and July 15 and no impact if work is conducted outside of this time frame. Activities associated with exploration would have no effect on Brewer's sparrow populations.

**Raptors**

For all but three drill sites and access roads (OM-02, OM-14 and OM-16 ) suitable raptor nesting habitat is either more than ¼ mile from the site or in those cases where it is closer than ¼ mile, the habitat is shielded from the site by either topographic or vegetative relief. The red-tailed hawk nest (2010, 2011, 2012) is located just south of West Reservoir and within ¼ mile of the OM-02 site. However, this nest site is over a ridge and in a large aspen stand that precludes the nest from being observed from the drill site. Red-tailed hawks nesting within 100 yards of active mining operations have been observed at numerous mines over the years (Monarch 2011), so it is unlikely the construction and drilling operations would disturb nesting activities at this nest if it is active. If the nest were active, construction and drilling operations could be put off until the young have fledged. This would eliminate the chances of the nest being impacted.

There is no suitable golden eagle nesting sites within $^1/_2$ mile of any proposed drill sites or access roads. The nearest known active golden eagle nest sites are several miles from the exploration area.

Two American kestrel nests were located during the spring and early summer 2012 wildlife surveys. Both nests were in cavities in dead aspen trees. Neither of these nests are located within 0.25 mile of any drill site.

**Migratory birds**

If construction and drilling activities for projects occur between May 1 and July 15 migratory bird nesting could be affected. During an average spring, conditions are too wet to allow for construction activities to occur before June 15. If work commences between June 15 and July 15, nesting migratory birds could be affected. If project timing includes construction during the migratory bird nesting time frame for the project area (generally through July 15), potential impacts and modifications to the project schedule needed to comply with the Migratory Bird Treaty Act would be discussed with BLM prior to exploration activities. Monitoring for migratory birds would occur if Oxbow wishes to proceed during the nesting season. If monitoring results in positive active nest data, appropriate avoidance buffers would be developed in coordination with BLM based on species and site-specific conditions.

If work commences after the July 15, migratory birds will have finished nesting and the young will have fledged. BLM has determined that disturbing nesting habitat after that time would not result in more than minimal impacts to migratory birds. Currently, construction of roads and pads and drilling operations are expected to start during the fall of 2012 and be completed during the winter. Thus, exploration activities may adversely affect individuals, but have no effect on migratory bird populations.

63

## Cumulative Impacts

The Leroux Creek basin (including Dever Creek and Cow Creek), Jay Creek basin, and West Roatcap Creek basin were considered the cumulative effects analysis area for the various categories of bird species.  The Proposed Action would result in temporary increased risk for disturbance to birds of conservation concern, raptors, and migratory birds.

Cumulative impacts from other activities that are reasonably foreseeable would be similar in nature to those associated with the proposed action.  Ongoing grazing impacts likely would continue, and oil and gas exploration, drilling, and operation would result in access roads and small (5 to 7 acre) pad sites that would increase vegetation disturbance.   While existing and proposed leases occur in the project vicinity, few wells have been drilled and even fewer have been completed.  Production is very limited in the identified cumulative impacts analysis area.  Without substantial changes to the oil and gas economy or extraction technology, the low existing level of exploration and drilling is likely to continue.  Given the small project impacts and low level of anticipated impacts from reasonably foreseeable actions, impacts to migratory bird populations and reproductive success are unlikely.  With the design features incorporated into the proposed action habitat impacts would not threaten bird populations that inhabit the cumulative effects analysis area.  With mitigation for the proposed action and similar requirements for oil and gas operations, the increased risk is anticipated to be minimal.

## No Action Alternative

Without the project, there would be no project-related effects to birds of conservation concern, raptors, or migratory birds.

## *WILDLIFE, TERRESTRIAL (includes a finding on Standard 3)*

## Affected Environment

### Big Game

Elk, mule deer, and black bear are commonly observed in the study area.  There are also suitable conditions in the area for mountain lions.

A review of CPW mapping shows the area as elk winter and summer range and mule deer summer range.  Lower elevations in the project area are identified as mule deer winter range.  Elk populations within the project area move seasonally to and from higher to lower elevation habitat.  Shifts in distribution and habitat use patterns occur as a result of migration in response to snow cover.  In deep snow winters the elk move off Oak Mesa into the valley, and habitat along the North Fork Gunnison River and adjoining agricultural lands.  During milder winters when there is less snow, some animals do winter on the mesa (Madariaga 2011; Morris 2011).  During a winter 2012 survey (January 18), limited elk tracks were encountered in the project area.  Except for a few scattered tracks all evidence of recent elk activity was encountered at lower elevations on the southern end of Oak Mesa in Gambel oak-mountain shrub habitat.

No elk production areas have been identified in the project area by the CPW. Good elk calving habitat is found at higher elevations on the foot of Grand Mesa.  There are some aspen stands (both mature and regenerating after logging) at the northern boundary of the exploration area that could be considered potentially suitable elk production/calving habitat.  However, it will be a number of years before the regenerating stands are mature enough to provide suitable elk calving habitat. At other projects in the North Fork Valley over the last 10 years, Monarch

BLM_0018828

has found that with few exceptions elk migrate through the lower elevation oak-scrub areas to aspen habitat at higher elevations to calve.

During the September 2011 surveys, a few elk were observed in mountain shrub and aspen habitat in the study area. Other evidence of recent elk activity in the area was minimal indicating that use during that period of the year is low (Monarch 2011). During the spring of 2012 wildlife surveys only a few elk were observed in the project area. All these observations were made a higher elevations. No elk were observed after cattle were moved into the area for grazing starting the middle of May. Evidence of elk use (sign; defined as indication of browsing and pellets) were observed during the spring 2012 survey, however, the sign appeared to be several months old and no fresh sign was observed. Visual evidence was sparse and indicated low elk usage in the winter months and no usage in late spring.

Observations made during the spring of 2010 and 2011 and well as September 2011 indicate that mule deer numbers and habitat use are similar to what has been observed in similar habitat at mining operations in the valley over the years. Wintering deer tend to move off the top of Oak Mesa to lower elevations in the valley to winter and return in the spring after snowmelt. This is the pattern for deer seasonal habitat use throughout the North Fork Valley (Monarch 2011). Although production areas are not mapped by CPW in the project area, fawning likely occurs in the Gambel's oak habitat.

Bears are common in the area. Habitat and forage are not limiting to these animals here or elsewhere in the North Fork Valley (Monarch 2011).

There is suitable mountain lion habitat in the area and these animals are known to occur on and around the exploration area. These animals are very secretive, and the chance of an encounter with one of them is very remote. One or more lions may be in the area at any time during the year (Monarch 2011).

Turkeys are another game species found in the area. Most of these birds were observed in Gambel's oak-mountain shrub habitat at lower elevations. None were observed in areas where exploration activities are planned.

**Other Wildlife**

There are numerous other species of wildlife found in the project area. Some of the species are found in specific habitat types whereas others are generalists and are found throughout the area. Some of the generalist species are coyotes, red fox, porcupine, golden mantled ground squirrels, chipmunks and various other small mammals.

Migratory and non-migratory birds are commonly observed in the area. Species observed and numbers observed are a function of the season, habitat type and conditions (see Table 15 and Table 16).

No bats were observed during the surveys, but it must be assumed they utilize habitat in the project area. Bats, being nocturnal species, are cryptic and difficult to determine if they are present in an area or not. More common species that may occur would include California myotis, western small-footed myotis, little brown bat, silver-haired bat, and big brown bat.

Ampibians and reptiles observed in the project area included northern leopard frog, western terrestrial garter snake, bullsnake, collared lizard and short horned lizard. The northern leopard frog was discussed previously in the document. Western terrestrial garter snakes were found at several locations in different habitat types in the project area. One bull snake was observed in Gambel's oak-mountain shrub habitat. One collard lizard was found in pinyon-juniper

65

BLM_0018829

dominated habitat at the southern end of Oak Mesa. A short horned lizard was observed in Gambel's oak-mountain shrub habitat near the south end of Oak Mesa.

## Environmental Consequences/Mitigation

## Proposed Action

### Big Game

When evaluating potential effects on big game habitat use from proposed development activities two things must be considered; (1) numbers of animals that might use the area for winter or transition range and (2) total amount of habitat available. Deer and elk numbers are low from spring through fall in the project area. In the winter, most deer and elk are found lower in elevation in the North Fork Valley.

With several thousand acres of suitable habitat and only approximately 31 acres to be disturbed there is little chance that elk wintering activity or foraging habitat would be affected. The small disturbance footprint also means that chances of elk that move through or remain in the area from late spring through fall being disturbed are minimal. In addition, elk in the area have habituated to human activity over time which further minimizes the chances of these animals being affected. This habituation to human activity has been observed while conducting wildlife surveys at the three mines in the North Fork Valley. At all these operations, elk are commonly observed throughout the areas where exploration and methane drainage well operations are ongoing. Well monitoring operations throughout the year at these mines have not affected elk habitat use.

Only one drill site (OM-18) is in a potentially suitable elk production/calving area. However, this site is near an area that was logged a number of years ago and the aspens need to mature more before conditions would be considered highly suitable for elk calving habitat. If exploration activities were to commence in the fall of 2012 and be completed by late winter there would be no issues with elk calving in the area. If drilling does not commence before the middle of June 2013, this will be after the elk calving season. Drilling would even come later in those areas such as the aspen stands where conditions would be too wet for road and pad construction until late June or early July. Delaying activity at this site (OM-18) until the first of July would eliminate any potential impacts to elk calving.

Of the total estimated acres of disturbance that would occur during construction, more than 80% would occur in Gambel's oak-mountain shrub habitat. When considering total amount of year around habitat in the area available to elk, loss of a very small amount of habitat is unlikely to adversely affect elk. In the short term, which is from the time of initial disturbance to two growing seasons after reclamation and revegetation, habitat is only affected for three years. In the long term over ten years of observations by Monarch of other reclaimed drill sites at existing mines in the North Fork Valley have shown there is a positive benefit to elk and other wildlife. Elk take advantage of the grasses and forbs on the revegetated sites selecting for these areas over other undisturbed areas. No mature aspen habitat that is utilized by elk would be lost during road and drill site construction.

Given the large expanses of potential fawning habitat in the region, the small area of disturbance associated with the exploration operations, and timing of those activities, the potential for adverse effect to individual deer or the deer population is minimal.

66

BLM_0018830

The presence of human activity associated with the exploration operations is not anticipated to affect bear activities in the area. It would be important that food waste is rigidly controlled around the drilling operations to prevent the bears from becoming habituated to human food. Design features have been incorporated into the proposed action, requiring that all waste and food-related trash would be stored in a vehicle during the day and disposed of off-site prior to the vehicle returning to the project area. No on-site food or trash storage would occur.

There is suitable mountain lion habitat in the area and these animals are known to occur on and around the exploration area. These animals are very secretive, and the chance of an encounter with one of these animals is very remote. One or more lions may be in the area at any time during the year, but there is little chance exploration operations would affect their activities.

**Other Wildlife**

Effects to other wildlife species in the project area would be minimal. Small portions of habitat (usually less than 0.50 acre) would be disturbed during road and pad construction. Some species may be displaced from some habitats for the duration of the disturbance activity. For many species, even smaller species such as rodents, disturbance activities may not make them move to other habitats. Additionally, human disturbance activities in the area may cause some wildlife to alter their habitat use patterns. These patterns may be as simple as an animal moving a short distance away when there is human activity, then moving back when the activity ceases and the humans leave. In other cases the animals may move away during the day, but return to use the area at night when there is no activity. Activities may have impacts to some individuals, but should have no long term impacts to populations.

## Cumulative Impacts

Cumulative impacts for terrestrial wildlife and bird species would be similar to those described in Threatened Endangers and Senstive Species and Birds sections above. The entire North Fork Valley was considered the cumulative effects analysis area for big game species. These are wide-ranging species that use multiple watersheds and migrate widely throughout the valley. The Proposed Action could potentially result in a very minor and temporary increased risk for disturbance to big game activities. However, observations by Monarch over the years in the North Fork Valley and at other mining projects in western Colorado have shown that elk readily habituate to mining activity and are not displaced or disturbed by these activities. Elk continue to use the habitat around the ongoing operations. Therefore, the Proposed Action would result in temporary increased risk for disturbance to big game and other individual terrestrial wildlife species' activities, but there would be no effect to species populations.

Cumulative impacts from other activities that are reasonably foreseeable would be similar in nature to those associated with the proposed action. Ongoing grazing impacts likely would continue and have more of an influence on habitat condition and use by wildlife than activities associated with the exploration program. Oil and gas exploration, drilling, and operation would result in access roads and small (5 to 7 acre) pad sites that would increase vegetation disturbance. While existing and proposed leases occur in the project vicinity, few wells have been drilled and even fewer have been completed. Production is very limited in the identified cumulative impacts analysis area. Without substantial changes to the oil and gas economy or extraction technology, the low existing level of exploration and drilling is likely to continue. With overall limited temporary habitat disturbance from proposed action and low level of anticipated impacts from reasonably foreseeable actions, cumulative impacts to big game would be minimal. With the

67

BLM_0018831

design features incorporated into the proposed action habitat impacts may affect individual terrestrial wildlife species, including big games, but would not adversely impact species populations that inhabit the cumulative effects analysis area.

## No Action Alternative

Without the project, there would be no project-related effects to terrestrial wildlife.

## Finding on the Public Land Health Standard for plant and animal communities

**(partial, see also Vegetation; Invasive, Non-native Species; and Wildlife, Aquatic)**

Only 3 drilling locations are proposed within areas identified as elk winter concentration areas by CPW. As much as possible, these locations would be drilled when impacts to elk are minimal or when elk are not present in the vicinity (i.e., outside of migration or concentration periods). According to the North Fork LHA, the project area does not provide suitable habitat for mule deer or elk severe winter or winter concentration (BLM 2007). Some evidence of overall big game range is present. In addition, there are no biodiversity focal areas in the project area (BLM 2007). All areas surrounding the project area are meeting Standard 3, plant and animal communities (BLM 2007). Under the proposed action, with reclamation activities as proposed, the project area would continue to meet Standard 3.

## *WILDLIFE, AQUATIC (includes a finding on Standard 3)*

### Affected Environment

**Amphibians**

There are bodies of water including West Reservoir, some spring fed ponds, and streams and ditches that are capable of supporting northern leopard frogs (discussed in the *BLM Sensitive Species* section) and chorus frogs. Northern leopard frogs have commonly been observed at perennial ponds and other water bodies at similar elevations throughout the North Fork Valley (Monarch 2011).

**Fisheries**

The only stream that supports viable fisheries in the project area is Leroux Creek. Jay and Roatcap Creeks are perennial water sources, but are very small and not capable of supporting fisheries. The other drainages in the project area dry up during normal conditions during some portion of the year (Monarch 2011).

### Environmental Consequences/Mitigation

### Proposed Action

There would be no disturbance to Leroux Creek, West Reservoir, or natural/constructed ponds during construction or drilling operations. Drilling locations have been located outside of aquatic habitat. Existing access roads that cross aquatic resources would not require improvement to allow drilling access; however, maintenance of existing features including culverts and low water crossings would be completed as needed. No culverts have been specifically identified for replacement. There would be no new disturbance to aquatic resources from the Proposed Action. Stormwater management mitigation/design features outlined in the

BLM_0018832

*Surface Water Quantity* section of the EA would be protective of aquatic resources, including fisheries. There would be no impacts to aquatic species from proposed activities.

## Cumulative Impacts

The Proposed Action would not result in impacts to aquatic habitat; therefore there would be no cumulative impacts to this resource. There are no anticipated effects to aquatic resources.

## No Action Alternative

Without the project, there would be no project-related effects to aquatic wildlife.

## Finding on the Public Land Health Standard for plant and animal communities (partial, see also Vegetation; Wildlife, Terrestrial; and Invasive, Non-native Species)

The southern portion of the project area is classified as "meeting with problems" the Standard 3 Rating for Healthy Biotic Communities. Low perennial forb problems were identified at several locations in the southern edge of the proposed exploration area (BLM 2007). Vegetation studies conducted by Monarch in the spring and summer of 2012 have also shown a very low forb component in much of the project area. There would be no project-related impacts to aquatic resources, and therefore no change to the public land health standard. Also see findings on Standard 2 and 5, as discussed in the *Wetlands and Riparian Zones* Section below, and in the *Surface Water Quality* Section.

## WETLANDS & RIPARIAN ZONES (includes a finding on Standard 2)

### Affected Environment

Wetlands and riparian areas are limited within the project area. Riparian areas, including cottonwood riparian zones, were identified as part of the vegetation community mapping effort. Riparian areas are concentrated along perennial and intermittent drainages in the project area, as well as the borders of ditches, reservoirs and stock ponds. Along these water features, wetland/upland transition zones are typically narrow to abrupt as a function of channel topography found in this area. Wetlands exist outside of these drainages along stock ponds, reservoirs, and seeps/springs in the project area. Existing impacts to wetlands and riparian areas include existing ranch access roads with culverts or low-water crossings, agricultural activities such as stock ponds that dam drainages, and cattle/sheep grazing (Monarch 2011).

### Seeps, Springs, and Stockponds

Seeps and springs are naturally occurring and are primarily associated with sandstone outcrops at lower elevations along slopes in the larger drainages. Recharge comes from direct precipitation or snowmelt infiltration. Seeps and springs on steeper slopes support small pockets of aspen along with a variety of grasses and forbs. Aspen typically provide a tree component where one exists, though this species is not a consistent indicator of wetland seep or spring conditions.

69



**Photo 12.  Spring fed stock pond on west side of Oak Mesa.**

Stock ponds are man-made features which are filled either by flow from springs, overland runoff, or water taken from the Wakefield or Overland ditches.  On the top of Oak Mesa, stock ponds dry out in the summer and dryland grasses and forbs found throughout the area grow immediately adjacent to the high water line.  A few ponds found off the top of Oak Mesa have a narrow bank fringe around the stock pond depressions.  The fringe is dominated primarily by spikerush and rush species.  Other species such as small-winged sedge (*Carex microptera*), clustered field sedge (*Carex praegracilis*), northwest cinquefoil (*Potentilla* sp.), and a variety of buttercups (*Ranunculus* sp.) may also be present.  A wetland shrub or tree stratum is rare, presumably as a direct result of animal use and/or soil compaction from earthwork by dozers or other equipment.

**Wetlands**

Wetlands occur along constructed stock ponds and the Wakefield Ditch.  Most drainages in the project area are intermittent and only have water in them during spring runoff or during heavy rain events that may occur in the summer.  Other drainages in the project area are ephemeral and only carry water during precipitation events.  None of these drainages support wetland conditions.  Additional information regarding wetlands and riparian areas is in that section.

## Environmental Consequences/Mitigation:

### Proposed Action

Under the proposed action, no impacts to wetlands or riparian areas would occur.  Surface disturbing activities have been located in a manner that would avoid impacts.  No new roads or road improvements crossing wetlands or riparian areas are proposed.  No drilling locations would be within wetlands or riparian areas.  Although not anticipated, depending on conditions during drilling it may be necessary to improve culverts or low water crossings on existing routes to avoid downstream impacts.  Where culverts or low water crossings are poorly constructed,

70

undersized, or in need of maintenance (i.e., are inducing erosion or have been trampled by livestock), those features would be maintained within the footprint of the existing disturbance. Mitigation/design features to help eliminate impacts to wetlands/riparian zones include:

- New ground disturbing activities would avoid water features such as drainages and reservoirs;
- Sediment control, as identified in the stormwater management plan, would be used as necessary in areas with soil disturbing activities such as grading.
- No new access roads would cross wetlands or riparian areas.

## Cumulative Impacts

Because there would be no impacts to wetlands or riparian resources under the proposed action, there would be no cumulative impacts.

## No Action Alternative

Under the no action alternative, there would be no project-related effects to wetlands or riparian areas.

## Finding on the Public Land Health Standard for riparian systems

According to the North Fork LHA, the project area meets the Standard 2 Rating for riparian areas. Inadequate vegetation and species without strong rooting capabilities were noted in the LHA as problems along lower Jay Creek, outside of the exploration area (BLM 2007). The Proposed Action would not change the ability of the project area to meet the Standard 2 Rating for riparian areas.

## *FLOODPLAINS*

## Affected Environment

The Federal Emergency Management Agency (FEMA) is responsible for mapping floodplains and floodways. Floodplains along the Project Area's watercourses are managed in accordance with Executive Order 11988 – Floodplain Management. Floodplains along lower order streams have no delineated floodplains, but are commonly considered to include the extent of the riparian zone bordering the channel, in reaches that are not incised. Floodplains are narrow in the project area due to steep terrain. Riparian areas were mapped in the Project Area along Leroux Creek, Cow Creek, Dever Creek, Jay Creek, and West Roatcap Creek, and are shown on the vegetation map (see Figure 3); these can be considered an estimate of the floodplain. The primary benefit of floodplains is to dissipate floodwater energy and attenuate the magnitude of high flows. Other benefits include sustaining healthy riparian plant communities, and recharging alluvial ground water systems.

## Environmental Consequences/Mitigation:

## Proposed Action

No drilling activities would occur within the floodplains. Under the proposed action existing ranch access roads would be used during exploration activities and would cross some

BLM_0018835

riparian/floodplain areas; however, no new access roads would be constructed in riparian areas or floodplains, and no new impacts would occur to riparian/floodplain areas.

## Cumulative Impacts

There would be no impacts to floodplains from the proposed action; therefore there would be no cumulative effects.

## No Action Alternative

Under the no action alternative, there would be no project-related effects to floodplains.

## *SURFACE WATER QUANTITY*

### Affected Environment

Streams located within the project area include Leroux Creek, Dever Creek, Jay Creek, West Roatcap Creek, Short Draw, Love Gulch, and Cow Creek. Leroux Creek is a perennial stream whose flows were measured just west of Hotchkiss by the USGS from 1976 to 1996 (EarthInfo 2010). The highest average monthly flow of 112 cfs occurred in May, with the second highest flows occurring in April and June. A maximum creek flow of 256 cfs occurred in June 1995. High flows occur during the period of snowmelt runoff from the Grand Mesa. The lowest average monthly flows of about 10 cfs occurred during December through March, and the lowest measured flow was less than 1 cfs. The USGS description of the flow measurement site is that the natural flow is affected by upstream diversions and irrigation return flows, and that most of the flow after June is irrigation return flows. Other streams in the project area are known to flow only intermittently due to snowmelt or storm runoff and as a result of irrigation return flows.

The project area is a ground water discharge area, expressed as springs that discharge either perennially or intermittently, typically at the contact between bedrock and alluvial or colluvial deposits and/or within incised drainages. There are numerous springs in and near the project area. Springs discharging from the Mancos shale or fractured bedrock generally produce between 1 and 30 gpm (Cordilleran 2002). Two springs located in Long Draw, a tributary to West Roatcap Creek, have been monitored for many years; these springs have flows that have ranged from being dry to about 35 gpm (Bowie 2011). There is one reservoir, West Reservoir, located near the north end of the project area, which is supplied entirely or nearly entirely by surface runoff, much of which is collected via feeder ditches (Hughes 2011). There are numerous ponds, some natural and some manmade, located within the project area and some outside the project area near the north boundary of the inclusion area. Some of the ponds are spring-fed and may also collect runoff, and some are supplied just by surface runoff.

### Environmental Consequences/Mitigation

### Proposed Action

The water used for drilling would be bought or leased from West Reservoir and/or another nearby agricultural water right owner. The area of disturbance at each drill hole, as well as staging and storage areas, would be located at least 200 feet from any active stream channel, flowing spring, lake, wetlands and irrigation features. During drilling, storm water would be routed around disturbed areas, so the natural flow of runoff to a stream may be slightly altered. Because the well would be sealed within the unconsolidated sediments (typically to a depth of

BLM_0018836

200 feet), if the drill hole produces water, it would be bedrock ground water, not shallow ground water that discharges as springs. No water used in drilling would be allowed to flow towards any natural drainage, but would be stored in the drill hole mud pit or other drill hole pits. Water stored in the pits would either evaporate or seep into ground water, which, if the pit were located near a steep slope, may express itself temporarily as a seep downgradient from the pit until the pit became as dry as the surrounding soils. It is not expected that the drilling exploration program would measurably change surface water availability or affect streamflows, spring flows, or the amount of water stored in nearby reservoirs or ponds.

There is no proposed mitigation for surface water quantity/flow effects for the exploratory drilling program because no adverse effects are expected.

## Cumulative Impacts

There would be no impacts to water quantity from the proposed action; therefore there would be no cumulative effects.

## No Action Alternative

Under the no action alternative, there would be no project-related effects to availability of water for streams, springs, and stored water bodies on and downstream of Oak Mesa.

## *SURFACE WATER QUALITY (includes a finding on Standard 5)*

## Affected Environment

The Colorado Water Quality Control Commission (WQCC) has adopted water use classifications for streams, lakes and reservoirs that identify the uses to be protected on a stream segment or in a lake or reservoir, and adopted numerical standards for specific water quality parameters to protect these uses (CDPHE 2012). With a few exceptions, all of the streams in and near the project area are listed in Segment 4 or 5 of the North Fork of the Gunnison River basin and are classified for the following uses:

- Aquatic Life Cold 1 (waters that currently are capable of sustaining a wide variety of cold water biota, including sensitive species, or could sustain such biota but for correctable water quality conditions; waters are considered capable of sustaining such biota where physical habitat, water flows or levels, and water quality conditions result in no substantial impairment of the abundance and diversity of species)
- Recreation P (waters have the potential to be used for primary contact recreation)
- Water Supply (waters are suitable or intended to become suitable for potable water supplies; after receiving standard treatment (defined as coagulation, flocculation, sedimentation, filtration, and disinfection with chlorine or its equivalent) these waters will meet Colorado drinking water regulations)
- Agriculture (waters are suitable or intended to become suitable for irrigation of crops usually grown in Colorado and are not hazardous as drinking water for livestock).

All of the streams in Segments 4 and 5 must be maintained and protected at their existing water quality unless it is determined by the state that allowing lower water quality is necessary to accommodate important economic or social development in the area. No degradation is allowed unless deemed appropriate following an antidegradation review by the Colorado Department of Public Health and Environment (CDPHE 2011). All of the lakes and reservoirs in and near the

73

BLM_0018837

project area not located on national forest lands, as well as Love Gulch, Cow Creek, and Dever Creek, are listed in Segment 6b of the North Fork of the Gunnison River basin, and are designated Use Protected. These are poorer quality waters that the state has determined do not warrant the special protection provided by the antidegradation review process. These streams, lakes and reservoirs are classified for the following uses:

- Aquatic Life Warm 2 (waters not capable of sustaining a wide variety of warm water biota, including sensitive species, due to physical habitat, water flows or levels, or uncorrectable water quality conditions that result in substantial impairment of the abundance and diversity of species)
- Recreation P
- Water Supply
- Agriculture.

The non-attainment of water quality standards is reported every two years in Colorado's 303(d) list (CDPHE 2010). Stream segments, lakes, or reservoirs on the 303(d) list are considered impaired for one or more water quality parameters and a Total Maximum Daily Load (TMDL) effort will need to occur to resolve the impairment. The EPA defines TMDL as a calculation of the maximum amount of a pollutant that a water body can receive and still meet water quality standards, and an allocation of that amount to the pollutant's sources. The mainstems of Leroux Creek, Jay Creek and Short Draw, and the mainstem and tributaries of Roatcap Creek are on Colorado's 2010 303(d) list for selenium. A TMDL for the Gunnison Basin, including the North Fork Gunnison River basin, was completed in November 2010 (CDPHE 2010). The TMDL assessment stated that point sources such as wastewater treatment plants and gravel operations are a source of selenium to streams, and that an important pathway by which selenium is introduced into surface water within the Gunnison Basin is associated with irrigation within the basin. Seepage from irrigation canals, particularly when unlined, and deep percolation of irrigation waters dissolve selenium from Mancos shale derived soils as well as from the underlying parent material. Other pathways include surface runoff of irrigation water, whether associated with agriculture or urban land uses. Annual loads from the North Fork Gunnison River total 3,124 pounds annually. The TMDL assessment has calculated a total selenium load reduction for Jay Creek of 75 percent, a 78 percent reduction in Short Draw, and monthly load reductions of 39 to 72 percent in Leroux Creek to meet the selenium standard in each creek (CDPHE 2010).

Water quality samples have been collected by the Colorado Water Quality Control Division (WQCD), U.S. Geological Survey (USGS), Bowie Resources and its predecessors, and Gunnison Energy during the past 20 years from Leroux Creek, Dever Creek, Jay Creek, Roatcap Creek, and Short Draw (WQCD 2011, EarthInfo 2008, Bowie Resources 2011, Oxbow 2011a). In general, the water quality of the creeks is good near the north end of the project area at higher elevations, and is of poorer quality south of the project area near Hotchkiss. There are likely two sources of poorer water quality in the lower reaches of the creeks: irrigation return flows and the Mancos shale, which crops out on the southern slopes of Oak Mesa and is the source of the selenium in surface waters. Stream water quality can generally be characterized as calcium/magnesium-bicarbonate water. At all locations, the water is alkaline, with a pH of 8 to 8.6. An example of the change in water quality from higher to lower elevations is specific conductivity, a measure of dissolved solids content, in Leroux Creek. At a location slightly north of the project area, the specific conductivity in Leroux Creek was measured at less than 100 μS/cm, at a point below the confluence with Dever Creek it was measured at about 300 μS/cm,

74

BLM_0018838

and just west of Hotchkiss it was measured at greater than 1,000 µS/cm. In general, metal concentrations are low in project area creeks except for selenium. In upper Leroux Creek, the dissolved selenium concentration was measured at less than 1 µg/L, but near Hotchkiss, selenium concentrations in the creek averaged about 6 µg/L. In Dever Creek, the total iron concentration was elevated, the dissolved selenium concentration was slightly elevated, and specific conductivity was about 1,000 µS/cm. Nitrogen concentrations were low in Leroux and Dever Creeks. The average sulfate concentration in Leroux Creek at Hotchkiss was 280 mg/L, and the water was extremely hard (average of 475 mg/L). Water quality data for Jay and Roatcap Creeks are available only at Highway 133, not at higher elevations in the project area. Both creeks have similar water quality to Leroux Creek at Hotchkiss: very hard, high specific conductivity, low nitrogen concentrations, low metal concentrations except for dissolved selenium, and elevated total iron concentrations in Roatcap Creek. Short Draw in Hotchkiss also has high specific conductivity and dissolved selenium concentrations.

Springs and ponds in and near the area of proposed coal exploration were also sampled by Gunnison Energy for water quality between 2002 and 2010 (Oxbow 2011b). Two springs in Long Draw, a tributary of West Roatcap Creek within the project area, were sampled for many years by Bowie Resources, LLC and its predecessors (Bowie 2011). West Reservoir was sampled, as were ponds north of West Reservoir within or just north of the project area. The water quality of the reservoir and ponds was good. The water was slightly alkaline, with generally low metal, nitrogen, and sulfate concentrations, and specific conductivities averaging 110 µS/cm. Spring-fed ponds had an average specific conductivity of about 245 µS/cm. There were elevated total iron concentrations in West Reservoir and in one spring-fed pond. Spring water quality was quite variable, probably due to varying contributions from shallow and deeper ground water and variability in the unconsolidated sediments from which the springs flow (alluvium and colluvium). In addition, water quality varies depending on the flow of the spring at different times of the year. Specific conductivities ranged from less than 100 to more than 7,000 µS/cm, and sulfate concentrations ranged from 2 to more than 4,000 mg/L. The spring water was neutral to slightly alkaline (pH of 7 to 7.8), some nitrate concentrations were elevated, and some total aluminum, total iron, and total selenium concentrations were high in different springs. One of the springs in Long Draw have water that is somewhat alkaline, and sometimes has elevated calcium, bicarbonate, sodium and sulfate concentrations. Specific conductivity averages about 700 µS/cm in both springs.

## Environmental Consequences/Mitigation

## Proposed Action

Prior to constructing new roads, drill pads, or beginning drilling, Oxbow would need to obtain a construction stormwater permit from the Colorado Water Quality Control Division. As part of the permit, Oxbow would need to prepare a stormwater management plan (SWMP) for the project, which would include:

- A designated SWMP Administrator who would be on-site during construction activities
- Descriptions of structural and non-structural Best Management Practices (BMPs) for erosion and sediment control within disturbed areas, and prevention of pollutant laden water from flowing off of disturbed areas
- A list of all possible pollutant sources

BLM_0018839

- A description of good housekeeping practices to be used to keep construction areas as neat and clean as possible
- Preventive maintenance and spill response procedures
- A description of materials handling and storage procedures
- A schedule and description of inspections and maintenance of BMPs
- Methods for record keeping and documentation of BMP inspections and repairs
- A description of final stabilization after completion of drilling at each drill hole locations and for roads that would no longer be used.

The SMWP would need to be kept on-site, be available for any site inspectors, and all on-site Oxbow employees would need to be familiar with and follow the requirements of the SWUMP.

The drill holes would be drilled approximately 200 feet from the ground surface through unconsolidated sediments into underlying bedrock and would be secured with steel casing cemented into place. This would prevent the leakage of any water from the drill hole to nearby shallow water resources, such as springs, creek channels or stored water bodies. Up to 4,000 gallons of water, delivered by water truck to each drill hole, would be used during drilling. All wet cuttings, drilling mud, or water produced from the drill hole would be stored in a shallow pit near the drill hole. No water from the drill hole would be allowed to drain away from the drill hole, the pit, or any of the area disturbed by the drilling activities. All natural runoff from snowmelt or storm events would be routed around the disturbed areas at each drill site with the use of berms. The berms would also serve to keep all runoff within the disturbed area from flowing out of the disturbance area. Rerouted stormwater would be prevented from creating erosion with the use of stormwater BMPs such as temporary diversion dikes, swales, or sediment entrapment facilities such as straw wattles or silt fences). It is not expected that much water would be produced from the exploratory boreholes, but if more water were produced than could be used or stored at the site pit, the water would be pumped out of the hole into a water truck, then used elsewhere for drilling other boreholes, or stored in other borehole pits. For drilling sites where development of a pad is necessary, the topsoil would be stockpiled, and either silt fencing or straw wattles would be placed around the stockpile. Straw wattles would be used to minimize erosion until the pad is revegetated. During and after drilling, the drill site would be fenced to keep animals out of the site to prevent damage to stormwater BMPs and newly revegetated areas.

The drill holes may need drilling supplements to improve circulation to bring the cuttings to the surface. The foamer and defoamer compounds would be the only chemicals used during drilling, with the exception of fuel, oil and grease used in the trucks and drilling equipment. Any spills of fuel, oil or grease would be removed from the spill area as quickly as possible and disposed of appropriately off-site. The MSDS provided for the foaming agent "F-485" states that the product contains one hazardous ingredient, isopropanol, which is approximately 10 percent of the foaming agent by weight. The MSDS for the defoamer "DF-104" states that there is one hazardous ingredient in the product, which is methanol, of which the percent weight in the defoamer is confidential. Both MSDSs state "prevent flow/discharge into lakes, ponds, streams, waterways or public water supplies." The foaming agent would be used down hole, and would be sent via pipeline along with drilling cuttings and any drilling mud to the pit. The defoamer would be used in the pit, if needed, to prevent any foaming over the top of the pit. Oxbow estimates that between 1.5 and 6 gallons of the foamer may be used in each drill hole. Assuming a use of 6 gallons of foamer, mixed with 4,000 gallons of water, the percent of isopropanol in the water mixture pumped from the drill hole to the pit would be 0.015 percent. Oxbow estimates

76

that between 0.3 and 1.2 gallons of the defoamer may be used in each pit. Assuming a use of 1.2 gallons of defoamer, mixed with 4,000 gallons of water, the percent of methanol in water in the pit (assuming a worst case of 85 percent methanol by weight) would be 0.025 percent. The concentrations of isopropanol and methanol in the drill hole and in the pit would be very dilute, so it is expected that any seepage of water from the pit would not cause adverse environmental effects. The site Health and Safety Manager would ensure that the drilling crew handling the foaming agent and defoamer would be familiar with the MSDSs, would follow the transport and storage recommendations, would use the recommended personal protection equipment to prevent any adverse health effects, would make all efforts to prevent spills, would follow the spill control and disposal procedures described in the MSDSs if a spill occurred, and would prevent any of the foaming agent or defoamer from entering nearby surface water or public water supplies.

With no movement of surface water from the disturbed area at each borehole, no leakage of water from the borehole, immediate cleanup of any spills, and minimal and very careful use of the foamer and defoamer products, it is not expected that the water quality of streams, springs, stored water, and water supply ditches or pipelines would be affected by drilling. Water would be used for dust suppression, but would not be applied at rates causing runoff from disturbed areas or roads. Additional erosion from roads due to increased use during drilling activities might occur; the project manager and/or SWMP Administrator would inspect the roads at least every two weeks. If additional erosion along roadways were observed by Oxbow, property owners, or the BLM during use of the roads during exploration, Oxbow would repair the road and use BMPs, if needed, to prevent runoff of sediment-laden water from the road to nearby stream channels or surface water bodies.

There is no proposed mitigation for water quality effects, other than implementation of best management practices per the stormwater management plan, because no adverse effects from the exploratory drilling program are expected. Regular inspections of the active drill sites and roads in use during the drilling program should prevent any drilling activity from causing more than a very temporary, quickly repairable water quality problem that would not reach and measurably affect the quality of streams, springs, ditches, pipelines, or stored water bodies in and near the project area.

## Cumulative Impacts

There would be no impacts to water quality from the proposed action; therefore there would be no cumulative effects.

## No Action Alternative

Under the no action alternative, there would be no project-related effects to water quality.

## Finding on the Public Land Health Standard for Water Quality

Stream segments 5 and 6b of the North Fork of the Gunnison River basin currently do not meet state standards for selenium impairment. The source of contamination is the Mancos shale and irrigation of private lands over the Mancos shale, which increases the rate of selenium loading to surface water bodies. This problem is outside the control of BLM management. As such, implementation of the proposed action or no action alternative would not alter the current finding.

BLM_0018841

## *GROUND WATER QUANTITY*

### Geologic Framework

The proposed exploration area is located in the southern edge of the Piceance Basin of Western Colorado (Hettinger et al., 2004). The area is underlain by coal-bearing strata in several of the Cretaceous formations, the most significant of which economically is coal in the Upper Cretaceous Mesaverde Formation. Of particular interest in the proposed exploration area are coal beds stratigraphically above the Rollins Sandstone Member of the Measverde Formation.

The bedrock formations exposed at the surface in the proposed exploration area are the Upper Cretaceous Mancos Shale and Mesaverde Formation. The marine Mancos Shale is a dark brown to gray nonresistant clay shale with minor thin interbedded resistant sandstone, calcareous shale and sandstone, and locally thin limestones. The Mancos Shale has a maximum thickness in this region of 4,000 to 5,000 feet thick (Hail 1972a and b). The Mancos Shale is exposed at the surface between the valley of the North Fork of the Gunnison River and elevations of about 7,000 to 7,400 feet.

The Mesaverde Formation, and specifically the Rollins Sandstone Member, conformably overlies the Mancos Shale. The Rollins Sandstone is composed of light gray to white cliff forming sandstone, interbedded with carbonaceous shale and coal with a maximum thickness in the area of about 160 feet. Overlying the Rollin Sandstone are medium-grained sandstones and gray shales and commercially important coal beds near its base (Hail 1972a and b).

Unconsolidated or surficial geologic deposits that overlie the Cretaceous bedrock formations include Holocene Alluvium, Holocene Alluvial terrace gravels, Holocene Landslide and mudflow deposits, and Upper Pleistocene High Level alluvial gravels. The Holocene or Recent alluvium is limited to the lowest reaches of Leroux Creek up to an elevation of about 6,000 feet. Refer to Hail (1972a and b) for the location and distribution of these unconsolidated deposits. The High-level alluvial gravels generally consist of basalt boulders derived from volcanic flows capping Grand Mesa and are probably mostly a result of glacial outwash (Hail 1972a and b).

### Affected Environment

There is limited information regarding the occurrence of ground water within the proposed exploration area. The lack of data is most likely the result of limited ground water development in the area due to the overall poor ground water resources and the regional dependency on surface water sources.

In general, the low permeability marine Mancos Shale does not produce ground water at economic rates, and what is available is typically of poor quality. The thin sandstone interbeds within the Mancos Shale have been reported to yield ground water at usable rates and quality, but their extent is limited (Galloway 1980). The sandstone layers within the Mesaverde Formation, including the Rollins Sandstone Member can produce ground water, but production rates are generally low due to the well cemented, and therefore, low permeability sands. Fractures within the sandstone units may account for some of the available ground water. Because of limited ground water development in the Mesaverde in this area, there is little information concerning the occurrence of ground water.

The surficial materials (High-level gravels and colluvium) that occur in the proposed exploration area probably contain and transmit most of the ground water in the proposed exploration area. Because of their generally higher permeability, compared to the bedrock

BLM_0018842

formations, these unconsolidated materials receive some amount of recharge from precipitation and transmit ground water down gradient (downhill). Springs may occur at the downhill end or toe of any particular deposit. An inventory of wells in the vicinity of the proposed exploration area indicate there are several wells located along Leroux Creek near the north boundary of the proposed exploration area (Oxbow 2011b). It is presumed that these wells are screened in one of the High-level gravel units mapped along the creek. However, it is possible that one or more of these wells is also screened in a sandstone of the Mesaverde Formation below the gravels.

## Environmental Consequences/Mitigation

## Proposed Action

It is highly unlikely that the proposed action would affect ground water resources in the proposed exploration area. The exploration wells may produce limited quantities of ground water during drilling, but after the well is completed, the borehole would either be plugged and abandoned or would be completed as a monitoring well. In either case, Oxbow would be required to use procedures required by the Colorado Division of Water Resources. Depending on the depth to the coal at each location, the upper portion of the borehole (up to 200 feet in some cases) would be cased and cemented to provide both borehole stability and isolation of shallow water-bearing zones (if any) from the rest of the borehole.

There would be no permanent use of ground water during the exploration program. Other than temporary production of ground water during drilling, if encountered, all other water use would be from other sources, and delivered by truck.

## Cumulative Impacts

There would be no impacts to ground water quantity from the proposed action; therefore there would be no cumulative effects.

## No Action Alternative

Under the no action alternative, there would be no project-related effects to ground water quantity.

## *GROUND WATER QUALITY (includes a finding on Standard 5)*

## Affected Environment

Water quality data from the various geologic units in the vicinity of the proposed exploration area are limited due to minor ground water development and use in the area. However, some data exist from wells and springs that are mostly located outside of the proposed exploration area (Oxbow 2011b). Where ground water quality data are available from the Mancos Shale, the quality is typically poor with total dissolved solids (TDS) concentrations greater than 1,000 mg/L, most of which is due to high calcium, sodium, and sulfate (Galloway 1980). Mancos Shale ground water also typically contains high concentrations of iron and manganese. Although a geologic or drill log is not available, one well located southwest of the proposed exploration area may be screened in the Mancos Shale and produces sodium sulfate water with a TDS concentration of about 1,000 mg/L. Because this well is located along Dever Creek, it may represent a mixture of water sources.

BLM_0018843

Other wells in the vicinity of the proposed exploration area appear to be screened in either High-level gravels or a combination of the gravels and underlying sandstone beds within the Mesaverde Formation. As described in the previous section, this group of wells is located along Leroux Creek at the north boundary of the proposed exploration area or outside of the area to the north. Water quality data from these wells indicate that ground water in this area is generally of good quality, with TDS values of less than 500 mg/L. The ground water in these wells is either sodium or calcium bicarbonate water.

## Environmental Consequences/Mitigation

### Proposed Action

The proposed action is not expected to affect ground water quality within and adjacent to the proposed exploration area. The proposed action does not include the use of any chemicals or compounds that could adversely affect ground water. Drilling fluids would be limited to air, air-water, air-water, and air-foam, and limited use of standard drilling muds (composed primarily of clay). The characteristics of the foamer and defoamer are discussed in more detail in the Surface Water Quality Section. The exploration drilling does not include the use of any procedures where chemicals would be injected into the borehole under sufficient pressure to force these fluids into any water bearing zone for any reason. The drilling fluids would be used for circulation purposes only to remove drill cuttings from the hole and lubricate the drill bit and core barrel. The drilling materials have a limited lifespan in the environment, and are regularly used to drill drinking water wells without impacting water quality.

As described in the previous sections, upon completion of each borehole, the borehole would be either plugged and abandoned or completed as a monitoring well using procedures required by the Colorado Division of Water Resources.

If ground water is produced during the drilling of a borehole, the water would accumulate in shallow pits and would be allowed to evaporate and/or seep into the surface materials. Given the likely quality of this water (as described previously) and the limited volume of the produced water, it is unlikely that this water would negatively affect ground water resources of the area. No drill holes are proposed near known springs.

Other than drilling fluids, chemicals or materials used during the exploration program would include typical petroleum based materials, such as lubricating oils and fuels. The volume of fuels and lubricating oils at the site at any one time would be limited to vehicle fuel tanks and crankcases and would not include large volume storage. If a fuel spill were to occur, Oxbow would be required to immediately clean up the material, including affected soils, and remove from the site. With the limited volume of onsite fuels and immediate removal, the impact to ground water quality would be limited to the immediate area around the spill.

### Cumulative Impacts

There would be no impacts to ground water quality from the proposed action; therefore, there would be no cumulative effects.

### No Action Alternative

Under the no action alternative, there would be no project-related effects to ground water quality.

BLM_0018844

**Finding on the Public Land Health Standard for water quality**

BLM's Land Health Assessment did not identify any specific ground water issues in this area. The assessment acknowledged that ground water resources are limited to unconsolidated deposits, such as alluvium and colluvium and the ground water in the Mesa Verde Formation flows down dip to the north out of the North Fork Valley. Springs which discharge within the Land Health Assessment area generally have good water quality. The proposed exploration action will not likely affect the existing sources of ground water.

## *WASTES, HAZARDOUS OR SOLID*

### Affected Environment

There are no known hazardous or other solid waste in the vicinity of the proposed project activities. No hazardous materials are known to have been used, stored, or disposed of at sites in the project area. The project area has been used historically for grazing and ranching, and no industrial activity other than small-scale coal mining has occurred.

### Environmental Consequences/Mitigation

### Proposed Action

The Proposed Action would use regulated materials, and generate solid waste. Equipment and materials used onsite during drilling include combustion engines that require fuel, oils, antifreeze, and other fluids to operate; and there is some risk of these fluids. Accidents and mechanical breakdowns are a possibility. The drill rig(s) may require drilling fluids to complete exploration holes. The *Water Quality, Surface* section above describes the foamer/defoamer agents that are anticipated to be used on-site. The MSDS for these agents is included in Appendix E.

As described in the *Water Quality, Surface* section, a SWMP would be prepared to maintain a safe workplace and prevent and minimize releases of hazardous materials. Additional measures for management and containment of hazardous materials is described in the *Water Quality, Surface* section, including cuttings, drilling mud, produced water, and handling of the foaming agent and defoamer. The proposed measures would minimize the risk associated with hazardous or other solid waste, and no adverse impacts are anticipated.

### Cumulative Impacts

The Proposed Action is not expected to increase risk from hazardous or other solid waste. Oil and gas exploration, operation and development could result in use of similar materials (foamer/defoamer agents) in the project area; however, those operations would use similar avoidance and minimization measure to reduce the risk from hazardous or other solid waste. Cumulatively, impacts are expected to be minimal. Use of drilling fluids and combustion engines associated with the exploration activities would be short-term and temporary.

### No Action Alternative

Under the No Action alternative, there would be no project-related hazardous materials impacts.

BLM_0018845

# *ENVIRONMENTAL JUSTICE*

## Affected Environment

Executive Order 12898, signed on February 11, 1994, directs federal agencies to make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high adverse human health or environmental effects of its activities on minority and low-income populations. Environmental Justice involves fair treatment, which means that no group of people, including a racial, ethnic, or socio-economic group, should bear a disproportionate share of negative environmental consequences resulting from a federal action.

US Census Bureau summary data for Delta County (Census 2011) does not indicate that there are ethnic groups or communities or low income populations in the upper drainage of the North Fork of the Gunnison River or in adjacent portions of Delta County that may be affected by the proposed action. The Hispanic community has the largest minority population in Delta County, at 14.0 percent. African Americans, American Indians and Pacific Islanders account for approximately two percent of the Delta County population (Census 2011). 13.9 percent of the population in Delta County is below the poverty level compared with 12.9 percent in Colorado as a whole (Census 2011).

## Environmental Consequences/Mitigation

## Proposed Action

The proposed action to conduct exploratory drilling on the proposed exploration area is not expected to negatively or disproportionately impact minority or low income populations.

## Cumulative Impacts

There would be no environmental justice impacts from the proposed action; therefore there would be no cumulative effects.

## No Action Alternative

Under the No Action alternative, there would be no project-related disproportionate negative effects to minority and low-income populations.

# *ACCESS AND TRANSPORTATION*

## Affected Environment

General access to the proposed exploration area is from two directions—from the west off of 3100 Road (Leroux Creek Road) and Oak Mesa Road, and from the east off of Steven's Gulch Road (FS Rd 701; see Figure 1). Primary access to the project area is on private lands and private ranch roads. There is no existing public access to the exploration area, other than Oak Mesa Rd. There is an extensive network of private roads within the exploration area that is used for ranching and other private access. The Oak Mesa Road is the only public access to the project area.

BLM_0018846

Within the project area, 3100 Road and Oak Mesa Road (up to the gate onto private property) are County Roads, maintained by Delta County. The Steven's Gulch Road on the east side of the project area is maintained by Delta County via "Schedule A" arrangements with the USFS.

Traffic data for Leroux Creek Road and Steven's Gulch Road was obtained from the Delta County Engineering Department (Kalenak personal communication 2011). According to Mr. Kalenak, use of these roads is highly seasonal, with peak use occurring during hunting season in the Fall. Dates for traffic count collection were not available, but likely were completed during the summer months. Counts near the highway on Leroux Creek Rd are significantly higher than those further north. There are many homes, residences, and orchard operations on Rogers Mesa that are destinations for vehicle traffic. North of Redlands Mesa Road there are fewer residences. Traffic in this vicinity is attributable to residences and access to recreational opportunities in the Forest north of the project area. Firewood cutting in the Forest is an additional use that contributes to traffic north of Redlands Mesa Road.

Posted speed limits on Leroux Creek Road are 45 mph between Highway 92 and the end of pavement, and 30 mph in unpaved sections of road (north of the Redlands Mesa Road).

Use of Oak Mesa Road east of Leroux Creek Road is limited. Occasional mountain biking or hiking use may occur on this road. However, because there are no recreation facilities or destinations on Oak Mesa, use is mostly limited to area residents.

**Table 18.  Traffic Counts on Leroux Creek and Steven's Gulch roads.**

| Road | Location | Year | Vehicle Count (trips per day) |
|------|----------|------|-------------------------------|
| Leroux Creek Rd (3100 Rd) | Immediately north of Highway | 2002 | 1187 |
| Leroux Creek Rd (3100 Rd) | Immediately north of Highway | 2005 | 1843 |
| Leroux Creek Rd (3100 Rd) | ½ mile north of Highway | 2007 | 1102 |
| Leroux Creek Rd (3100 Rd) | North of Redlands Mesa Rd (North Rd) | 2002 | 53 |
| Leroux Creek Rd (3100 Rd) | North of Redlands Mesa Rd (North Rd) | 2007 | 59 |
| Steven's Gulch Rd (FS 701) | Immediately north of Highway | 2002 | 120 |
| Steven's Gulch Rd (FS 701) | Immediately north of Highway | 2005 | 176 |
| Steven's Gulch Rd (FS 701) | South of Johnson Rd | 2002 | 65 |

Source: Kalenak 2011.

## Environmental Consequences/Mitigation

### Proposed Action

Personnel and equipment would use both Leroux Creek Rd and Steven's Gulch Rd to access the proposed exploration area. Most equipment would be transported to the project area and would remain on-site until the drilling activities are completed. Transport for a bulldozer,

83

BLM_0018847

excavator, grader and one or two drilling rigs would be required, and would be a one-time transport. An e-log truck and delivery trucks would access the project area intermittently, and are anticipated to account for about 2 vehicle trips per day during the project duration. All loading/unloading activities would take place either at the staging area on the 7X Ranch, or on drill pads/access roads. Additional vehicles, including pick-up trucks (some with flatbed trailers) and SUVs would be needed for personnel and small equipment transport, and are anticipated to account for 3 to 5 vehicle trips per day. A total of about 5 to 8 vehicle trips per day, mostly for crew transport, are anticipated during exploration activities. A carpool plan is in place to transport drilling crews and minimize vehicle traffic on area roads.

The proposed project would result in a minor, temporary increase in traffic on Leroux Creek Rd and Steven's Gulch Rd. The magnitude of increase would vary by location along the roads, and would vary by season. Based on available data, traffic on Leroux Creek Rd south of Redlands Mesa Rd would increase by about 1 percent, and north of Redlands Mesa Road would increase by about 15 percent during the exploration activities. North of Redlands Mesa Rd, traffic counts drop from about 1,100 vehicle trips per day to only 59, which results in a higher percentage of increased traffic. Traffic on Steven's Gulch Rd would increase by about 5 to 12 percent, depending on location along the road. The increase would be temporary, would occur during spring through fall, and for a maximum of 2 years.

All traffic related to exploration activities would be required to comply with posted speed limits.

Occasional recreational and landowner use of Oak Mesa Rd could be affected by increased traffic. Actual use of the road is unknown, but the Oak Mesa area does not offer any formal recreation facilities on BLM lands and use is likely very low. The area provides opportunities for hunting, hiking, and horseback riding. Traffic resulting from the proposed project could temporarily impact recreation and landowner use on Oak Mesa Rd.

No new BLM access routes for public use would be created as a result of the proposed project. All new access roads constructed on BLM would be reclaimed and revegetated. All new access roads constructed on private land would be reclaimed and revegetated, unless private landowners request that improved or constructed roads remain.

## Cumulative Impacts

Oil and gas activities on active leases in the project vicinity could also result in increased traffic on Leroux Creek Rd and Steven's Gulch Rd. Specific proposed drilling operations have not been identified. Increased traffic from oil and gas operations would be temporary.

## No Action Alternative

Under the No Action alternative, there would be no project-related effects to access or transportation.

BLM_0018848

## *REALTY AUTHORIZATIONS*

### Affected Environment

Various right-of-way authorizations are present within the project area.  Typical rights-of-way authorizations within this area could include powerlines, telephone lines, access roads to private land, pipelines, ditches and irrigation facilities.

### Environmental Consequences/Mitigation

### Proposed Action

Existing rights-of-way will be avoided to the extent possible.  If they cannot be avoided, caution will be taken to ensure no damage to the facility or disruption of use occurs.  As necessary, right-of-way holder(s) will be contacted to coordinate activities that may influence their facilities.  Oxbow will obtain permits from the county for use of or work inside county road rights-of-way.  Coal companies are not required to obtain a right-of-way from BLM for activities on Federal surface within their exploration area.

### Cumulative Impacts

There should be no cumulative impacts to existing rights-of-way and no new rights-of-way are required for this project.

### No Action Alternative

Under the No Action alternative, there would be no effects to existing rights-of-way.

## *RANGELAND MANAGEMENT*

### Affected Environment

Several grazing allotments are managed on BLM and private lands within the project vicinity.  A total of 14,157 acres (12,765 BLM-owned and 987 private-owned) are managed for cattle grazing (some grazing allotments overlap the exploration boundary; therefore the total acreage is greater than the exploration extent).  An Animal Unit Month (AUM) is defined as the amount of forage needed to sustain one cow, five sheep, or five goats for a month.  Allotments are summarized in Table 19below.  All allotments in the project area are authorized for cattle. The West Roatcap allotment is authorized for summer use (mid-June through mid-October); the other allotments are authorized for spring and/or fall use.

BLM_0018849

**Table 19.Grazing Allotments in the Project Area.**

| Allotment number and name | Total Acres (public/private) | Actual Active AUMs | Status |
|---|---|---|---|
| Oak Mesa #14506 | 1,375 (735/640) | 51 | Active |
| Overland #14511 | 507 (160/347) | 30 | Active |
| Roatcap-Jay Creek #14507 | 9,955 (9,955/0) | 955 | Active |
| Leroux #14550 | 2,000 (2,000/0) | 32 | Active |
| West Roatcap #14510 | 320 (320/0) | 88 | Active |
| Total | 14,157 (12,765/987) | 1,156 | |

## Environmental Consequences/Mitigation

### Proposed Action

Effects to rangeland resources and management would be minor and temporary. Traffic from exploration activities would be minimal and are not likely to affect grazing cattle or range movement. Temporary impacts from construction of new roads and pads would be minimal. Reclaimed areas would be temporarily fenced to exclude grazing until vegetation has reestablished. Oxbow is negotiating with individual landowners regarding the type of fence installed for reclamation purposes; electric fencing with solar panels to provide power have been used in the past and are proposed. Oxbow would be responsible for fence installation, monitoring and removal.

### Cumulative Impacts

The cumulative impact analysis area for grazing was defined as the 14,157 acres of grazing allotments that overlap with the proposed exploration boundaries. About 0.2 percent of the cumulative impact analysis area would be temporarily affected by the proposed action. Any future oil and gas development would have similar effects to grazing in the vicinity of the project; however those effects would be long-term due to the long lifespan of oil and gas wells. Existing mine leases (Bowie No. 1 Mine, a.k.a. Orchard Valley Mine) to the east of the proposed exploration area could be developed further, but surface impacts would be limited. Cumulative effects to rangeland would be minimal.

### No Action Alternative

Under the No Action alternative, there would be no project-related effects to rangeland resources or management.

### *FIRE*

### Affected Environment

Hot, dry conditions are normal during the summer months within the project area, contributing to a moderate fire risk. Portions of the project area have heavy oak-mountain shrub

86

cover, which contributes to fire risk.  There are no known recent fires in the project area, but one major fire has occurred in pinyon-juniper dominated areas to the southeast (Wake Fire in 1994).

## Environmental Consequences/Mitigation

## Proposed Action

The Proposed Action is not expected to increase the risk of fire, or to affect the rate, duration, frequency of future fires.  All drilling equipment would be provided with fire extinguishers and shovels for fighting small fires, if necessary.  Drilling crews would be equipped and trained to fight small fires.  Spark arresters would be required for equipment generating sparks, including ATVs and chainsaws.  Smoking would be allowed during construction activities only in designated safe-smoking areas.  Common sense practices regarding heat/spark sources, particularly in dry conditions, would be followed.  Avoiding parking hot vehicles on dry shrubs and other logical avoidance practices would be followed.  Drilling crews would have access to telephones to contact the necessary fire officials if a fire occurred, or if one were observed in the project vicinity.  Minor brush clearing for road and pad construction could provide a minor, immeasurable benefit by removing excess fuel.

## Cumulative Impacts

The Proposed Action is not expected to increase fire risk; therefore there would be no cumulative impacts.

## No Action Alternative

Under the No Action alternative, there would be no project-related effects to fire hazards or management.

## *WATER SUPPLY/WATER RIGHTS*

## Affected Environment

There are numerous surface water direct diversion and storage rights listed by the Colorado Division of Water Resources whose sources are within or near the project area, and no wells near the project area (CDSS 2011).  According to landowner Nick Hughes, water supply on Oak Mesa is reliable, although during the 2002 to 2003 drought, water was in short supply (Hughes 2011).  Surface rights include diversions from Leroux Creek, Jay Creek, and Roatcap Creek, storage within the watersheds of these three creeks, and diversions and storage from numerous springs.  The majority of the rights are for irrigation or stock water.  The largest storage right is 454.5 acre-feet per year in West Reservoir, which was constructed in 1905 (CDSS 2011).  Hunt Reservoir, with a storage right for 124 acre-feet per year, is also within the project area.  Many of the stock ponds are very old, small, not decreed, and were constructed to capture runoff.  The largest spring, based on decreed diversion rate, is the Hanson Spring, located in alluvium near Dever Creek near the project area.  The decree for Hanson Spring is for 135 gpm, and the decree states that the spring cannot physically provide the original request for a right for 225 gpm.  Various ditches are used to collect water for storage and/or to route water for irrigation purposes.  One of these is the Roberts Stucker Ditch, first constructed in 1896, that diverts water in the Roatcap Creek drainage (CDSS 2011).  The Wakefield Ditch is not a decreed ditch, but is a delivery ditch for water from West Reservoir to several farms (Schmucker 2011).

87

Stucker Mesa Water Company has the right to divert water for domestic purposes from two springs in the West Roatcap Creek watershed within the project area. The company has a pipeline to deliver water to its 21 taps. Other water providers in the area, including Sunshine Mesa Domestic Water Company, Domestic Pipeline, and Pitkin Mesa Domestic Water, divert water either north and above the project area, or east or west of the project area from drainages that are entirely outside of the project area. The Town of Hotchkiss and Rogers Mesa Domestic get their water directly from Leroux Creek at the Highline Ditch headgate. Hanson Mesa gets its water from the Town of Hotchkiss after filtration.

## Environmental Consequences/Mitigation

### Proposed Action

Before beginning any exploratory drilling or building of new roads, Oxbow would coordinate with any water providers concerned about possible effects to their water supply. If needed, drill sites, disturbance areas, and roads would be moved to prevent any effects to the water supply sources and/or infrastructure of any water supply providers. All actions necessary to prevent harm or injury to any existing water rights, and/or water supply diversion and storage structures would be taken. Water used for drilling would be obtained by purchase or lease of a nearby water supply that is available for use. Although these measures should prevent any damage to existing water rights and water users, if a water supply is temporarily disrupted, such as due to accidental rupture of a water pipeline or ditch, Oxbow would provide a temporary clean alternate water source to that user.

### Cumulative Impacts

Temporary water use is a cumulative effect of both the proposed action and other reasonably foreseeable activities in the project area. Neither oil and gas operations, nor the Proposed Action, would negatively impact existing water rights in the project area.

### No Action Alternative

Without the project, there would be no effects to water rights and water supply on and downstream of Oak Mesa other than those currently occurring due to existing land and water uses.

## *NOISE*

### Affected Environment

The project area setting is rural, with limited background noise. Engine noise is limited to access by landowners via truck and ATV. Some existing oil and gas exploration activities have caused occasional short-term, temporary increases in noise in the vicinity of the project. There are several residences along the west side of the proposed exploration area.

Colorado Noise Statutes (25-12-103) provide the following maximum noise limits that apply to a distance of 25 feet from a property line:

BLM_0018852

**Table 20.  Maximum Noise Limits**

| Zone | 7:00 am to next 7:00 pm | 7:00 pm to next 7:00 am |
|------|-------------------------|-------------------------|
| Residential | 55 db (A) | 50 db (A) |
| Commercial | 60 db (A) | 55 db (A) |
| Light Industrial | 70 db (A) | 65 db (A) |
| Industrial | 80 db (A) | 75 db (A) |

Construction projects are subject to the maximum permissible noise levels specified for industrial zones.

## Environmental Consequences/Mitigation

### Proposed Action

Noise from the proposed action would be short-term and temporary, and isolated to the proposed pad and road construction and drilling activities.  Noise levels from drilling operations are anticipated to be about 85 dba at the drill pad, a noise level that does not require hearing protection for workers. Noise levels will be in compliance with state and federal standards.  Noise levels for compliance with state limits are measured at 25 feet from the property line.  Noise sources would be attenuated by dense vegetation cover and topography at most locations, and are greater than about 1,000 feet from any permanent residence.  Sound impacts from drilling and construction would be minimal and temporary.  Impacts would not exceed state statutes.

### Cumulative Impacts

The Proposed Action would result in minor, short-term noise impacts that are not anticipated to exceed state statutes.  Cumulatively, noise impacts are expected to be minor due to the topography and dense vegetation in the project area.  All anticipated noise impacts would be short-term, minimal, and temporary.

### No Action Alternative

Under the No Action alternative, there would be no project-related noise impacts.

## *RECREATION*

### Affected Environment

There are no public recreation facilities within the project area.  Intermittent use of Oak Mesa Road for hiking and mountain biking may occur.  Limited recreation destinations occur north of the project area in the National Forest, and include unimproved campgrounds, fishing areas along Leroux Creek, and informal hiking trails, and access to several small reservoirs (Bailey Reservoir, Goodenough Reservoir, and other small reservoirs).  No motorized boating is permitted.  Big game and small game hunting are common on private land in the project area.

BLM_0018853

## Environmental Consequences/Mitigation

### Proposed Action

Temporary impacts to recreation use of the project area are anticipated from exploration activities. A minor, temporary increase in traffic on 3100 Rd, Steven's Gulch Rd and Oak Mesa Rd would not disrupt existing recreation uses. No new recreation uses are proposed as part of the Proposed Action. Exploration activities could affect the hunting season for up to two years. Oxbow has developed agreements with individual landowners, some of which include timing restrictions to avoid hunting impacts.

### Cumulative Impacts

The Proposed Action is not expected to impact recreation; therefore there would be no cumulative impacts.

### No Action Alternative

Under the No Action alternative, there would be no project-related recreation impacts.

## *VISUAL RESOURCES*

### Affected Environment

BLM completed a Visual Resource Inventory for the project area in September 2009 (BLM 2009). The proposed affected area falls within Class III in the inventory. Class III objective is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape. The proposed exploration project is in the Stevens Gulch Scenic Quality rating unit, which was evaluated for landscape character and scored on a scale of A (highest scenic quality) to C (lowest scenic quality). The Stevens Gulch unit was scored as B, or medium rated. Variability in landform (hills, ridges and outcrops), vegetation (patchiness and variable vegetation types and shapes), and structural interest were noted. The primary sensitive viewing area would be from 3100 Rd/Leroux Creek Rd. The visual character of the project area is defined as "Foothills…covered in dense vegetation with meadow breaks. The landform is rolling and varied with a few rock formations poking out, and drainages leading through and down to the valley below. Vegetation is dense with meadow openings: aspens, pinyon/juniper, conifers, and sage" (BLM 2009).

Existing nighttime lighting is limited to scattered residences and outbuildings in the project area.

## Environmental Consequences/Mitigation

### Proposed Action

Most of the proposed activities would not be visible from Leroux Creek Rd or Steven's Gulch Rd, the primary public access roads near the project area, due to topographic barriers and dense vegetation. Use of existing roads and limited creation of drill pads would minimize visual impacts. New roads and pads have been positioned to minimize vegetation clearing, and all

90

disturbance would be temporary.  In addition, most drill sites would not require grading a formal pad area, and disturbance would be limited to brush clearing and rock removal.  Disturbed areas would be returned to their previous topographic position (including replacing rocks that were moved during clearing operations) and reseeded as soon as possible (within 1 to 6 months) following drilling.  The proposed action would not result in permanent facilities that would be visible from public access routes.  There may be minor, short-term impacts to the visual character of the landscape that would result from access road and drill pad construction.  Visual modifications would be consistent with existing land uses in the project area, including ranching and grazing.  The Class III objective of partial retention would be maintained within the project area.  There would be no permanent facilities visible within the project area.

Nighttime drilling activities would be conducted, and lighting would be required for safe nighttime operations.  Lighting would consist of one or two "tower" lights near the top of the drill rig at a height of about 50 feet, and portable lighting units on the ground would allow drillers to monitor drill cuttings and review drill cores.  Depending on the number of drill rigs used (one or two), nighttime drilling would add one or two light sources during drilling operations.  Light sources would be attenuated by dense vegetation cover and topography at most locations.  Impacts from lighting would be minimal and temporary.

## Cumulative Impacts

The Proposed Action would result in minor, short-term visual impacts.  Oil and gas exploration, operation and development could result in impacts to the visual character of the landscape in and surrounding the project area.  Dispersed residential development also could change the visual character of the landscape, and is unregulated.  Cumulatively, visual impacts are expected to be minor due to the topography and dense vegetation in the project area, and the limited amount of use on area roads with views toward the project area.

## No Action Alternative

Under the No Action alternative, there would be no project-related visual resource impacts.

## *GEOLOGY AND MINERALS*

### Affected Environment

The proposed exploration area is located in the southern edge of the Piceance Basin of Western Colorado (Hettinger et al., 2004).  The area is underlain by coal-bearing strata in several of the Cretaceous formations, the most significant of which economically is coal in the Upper Cretaceous Mesaverde Formation.  Of particular interest in the proposed exploration area are coal beds stratigraphically above the Rollins Sandstone Member of the Measverde Formation.

The bedrock formations exposed at the surface in the proposed exploration area are the Upper Cretaceous Mancos Shale and Mesaverde Formation.  The marine Mancos Shale is a dark brown to gray nonresistant clay shale with minor thin interbedded resistant sandstone, calcareous shale and sandstone, and locally thin limestones.  The Mancos Shale has a maximum thickness in this region of 4,000 to 5,000 feet thick (Hail 1972a and b).  The Mancos Shale is exposed at the surface between the valley of the North Fork of the Gunnison River and elevations of about 7,000 to 7,400 feet.

91

BLM_0018855

The Mesaverde Formation, and specifically the Rollins Sandstone Member, conformably overlies the Mancos Shale.  The Rollins Sandstone is composed of light gray to white cliff forming sandstone, interbedded with carbonaceous shale and coal with a maximum thickness in the area of about 160 feet.  Overlying the Rollin Sandstone are medium-grained sandstones and gray shales and commercially important coal beds near its base (Hail 1972a and b).

Unconsolidated or surficial geologic deposits that overlie the Cretaceous bedrock formations include Holocene Alluvium, Holocene Alluvial terrace gravels, Holocene Landslide and mudflow deposits, and Upper Pleistocene High Level alluvial gravels.  The Holocene or Recent alluvium is limited to the lowest reaches of Leroux Creek up to an elevation of about 6,000 feet.  Refer to Hail (1972a and b) for the location and distribution of these unconsolidated deposits.  The High-level alluvial gravels generally consist of basalt boulders derived from volcanic flows capping Grand Mesa and are probably mostly a result of glacial outwash (Hail 1972a and b).

Within the proposed exploration area, there is only one mapped fault.  The northwest trending fault appears to have normal displacement (south side down) and is located within the Mesaverde and possibly the overlying Wasatch formations.  The mapped trace of the fault is about 2 miles long.  The general dip of the bedrock formations is slightly to the north (into the Piceance Basin) at 2 to 4 degrees.

## Environmental Consequences/Mitigation

### Proposed Action

The purpose of the proposed action is to provide geologic information regarding the coal reserves that underlie the project area.

### Cumulative Impacts

There would be no negative impacts from the Proposed Action; therefore there would be no adverse cumulative impacts.

### No Action Alternative

Under the No Action alternative, there would be no project-related geology impacts.

## *SOCIO-ECONOMICS*

### Affected Environment

The area of influence for the social and economic elements of this EA is Delta County in west central Colorado. Delta County is the area of influence for the population and demographic component because the majority of employees at the coal mining facilities and their families live within the communities in its jurisdiction.

The cumulative impact area is Delta County. Baseline data for Delta County in the area of influence includes population and demographic data as well as current business and economic statistics information.  The information in this section was obtained from the US Bureau of the Census based on the 2000 census and 2009 Census Bureau data (Census 2011). Additional information was obtained from the Colorado Department of Local Affairs (CDOLA) State Demography Office (2012).

92

## Population

Table 21presents basic population and demographic information for Delta County and the State of Colorado.

**Table 21.  Population by Category, 2000 and 2009, Delta County and the State of Colorado**

| Population | Delta County | Colorado |
|---|---|---|
| 2000 | 27,834 | 4,302,015 |
| 2009 | 31,322 | 5,024,748 |
| % Change | 12.5% | 16.8% |
| Male (2008) | 49.8% | 50.4% |
| Female (2008) | 50.2% | 49.6% |
| Under 5 years | 5.8% | 7.3% |
| Under 18 years | 21.4% | 24.4% |
| 65 years and over | 19.9% | 10.3% |
| % Minority (2008) | 16.4% | 29% |
| % Below poverty (2008) | 12.1% | 11.2% |
| Source: US Census Bureau, 2008a. | | |

Delta County comprises 1,142 square miles with 24.4 people per square mile and a total population of 31,322 people in 2009. Delta County grew by almost 12.5 percent between 2000 and 2009. According to CDOLA, Delta County grew slower than the state but faster than the nation between 1970 and 2000, with an annual average growth rate of 2.7 percent. The median age in Delta County is 42.3 years with 21.4 percent of the population being under the age of 18 and almost 20 percent being 65 years or older. According to census data, over 80 percent of the people age 25 and older in Delta County have graduated from high school and just over 17 percent have graduated from college.

The Town of Delta is the largest town in Delta County with a 2000 population of 6,400, an increase of 75 percent since 1990. Other communities in the county include Cedaredge (2000 population of 1,854), Crawford (2000 population of 366), Hotchkiss (2000 population of 968), Orchard City (2000 population of 2,880), and Paonia (2000 population of 1,497). The 2009 US Census reports that there were 13,391 housing units in Delta County that housed 11,058 households, indicating a vacancy rate of approximately 17 percent. Only 3.7 percent of the vacant houses are classified as seasonal, recreational, or for occasional use. Approximately 8 percent of rental units were classified as vacant. There were 2.43 persons per household. Delta County had a home ownership rate of 77.5 percent in 2000, well above the state average of 67 percent.  The median value of an owner occupied housing unit was $115,500, well below the state average of $166,600.

## Environmental Consequences/Mitigation

## Proposed Action

A minor temporary increase in jobs could result from the proposed action.  Approximately 15 to 25 seasonal positions, lasting up to two years, could potentially be anticipated by the proposed action.  This small increase in employment will have a similarly small effect on the local economy, slightly increasing income and employment through indirect and induced effects.

93

The scale of development, both in terms of number of workers, as well as acreage of disturbance, is unlikely to produce significant economic costs, due to impacts on local infrastructure, grazing, recreation, hunting, or dust levels. Any economic costs to these or other factors is likely to be minimal.

## Cumulative Impacts

The Proposed Action would result in a minor, temporary increase in employment in Delta County during exploration activities. If oil and gas exploration activities occur in or near the project area, they also could provide employment. Coal lease modifications and new leases in the project area would provide continued employment to miners at the affected mines.

## No Action Alternative

Under the No Action alternative, there would be no project-related socio-economic impacts.

## *CADASTRAL SURVEY, LAW ENFORCEMENT, FOREST MANAGEMENT, PALEONTOLOGY*

Cadastral survey and law enforcement are not applicable to this project and are not analyzed. There are not any forest management units or paleontological resources in the project area, and are not analyzed.

# CUMULATIVE IMPACTS SUMMARY

Cumulative impacts are the environmental impacts that could result from the implementation of the Proposed Action, when added to the impacts from all other past, present, and reasonably foreseeable activities, regardless of who is conducting such activities. Cumulative impacts can result from individually minor, but collectively significant, actions taking place over a period of time. The cumulative effects analysis considers the geographic scope of the cumulative effects and past, present, and reasonably foreseeable actions.

## *Cumulative Impacts/Effects*

Cumulative impacts for each element or resource are discussed within each of the sections. Impacts resulting from the proposed coal exploration could add incrementally to impacts from other activities discussed below, resulting in a low-level increase in noise, human presence, soil erosion, invasive weeds, vegetation loss or conversion, and slight temporary decrease in access. Cumulative impacts associated with coal mining activities in the area were analyzed in greater detail in the Uncompahgre Basin Resource Management Plan, Environmental Impact Statement (BLM 1988) as well as the North Fork Coal EIS (BLM 2000).

## *Past Actions*

The primary existing (past) disturbances within the cumulative impacts area is associated with mining, oil and gas, livestock grazing, and residential/agricultural development.

Historic mining activities over the past century include the following:

- Hawks Nest Mine;
- Oliver Mine No. 1 and No. 2;

94

BLM_0018858

- Bear Mine No. 1, No. 2, and No. 3;
- Edwards Mine;
- USS Steel Mine;
- Blue Ribbon Mine;
- King Mine;
- Farmers Mine;
- Oxbow Sanborn Creek;
- Bowie No. 1 Mine
- Mt. Gunnison Mine

Past oil and gas activity within the area has included coal-bed methane wells and conventional gas wells. Existing leases occur throughout the area.  There are about 55 permitted wells within about 10 miles of the project area, and 17 of those are within 5 miles of the proposed project's exploration boundary.  Many of these wells were completed greater than 30 years ago, and no longer produce (many were not completed and never produced).  In the past 10 years, there has been an increase in oil and gas activities.  About 14 of the wells within 10 miles of the project area were drilled and/or completed within the last 10 years.  Many of the recent wells were drilled about 8 miles northeast of the project area in the Hubbard Creek drainage.  Another cluster of activity is about 5 miles northwest of the project area in the Surface Creek drainage near Cedaredge.  Three wells were drilled (2 completed) about 10 miles northwest of the project area along Highway 65.  Three additional wells were drilled along the northern edge of the exploration boundary between 2003 and 2010.

## *Present Actions*

Present actions include mining, oil and gas activity, livestock grazing, and residential/ agricultural development.

## Mining

Three mines, Bowie No. 2, West Elk, and Elk Creek, are currently active.  In addition, Bowie No. 1 is permitted, but idle; it is permitted for a production rate of 1.5 million tons per year. When active, it operated as a room-and-pillar mine and hauled its coal to the Bowie No. 1 loadout near Paonia.  Bowie No. 2 was opened in 1997 as a room-and-pillar mine but converted to a longwall system in late 1999.  It is located northeast of Paonia with a loadout northeast of Paonia.  There are 14,543 acres permitted in the combined permits of the Bowie No. 1 and No. 2 accessed by the Bowie No. 2 mine.  The Elk Creek Mine is a longwall operation north of Somerset, with a loadout immediately north of Somerset.  There are 13,429 acres permitted.  The West Elk Mine is a longwall operation located south and east of Somerset with a loadout about 1 mile east of Somerset. There are 17,155 acres permitted.

The North Fork Branch of the Union Pacific Railroad operates exclusively to serve these coal mines. This line branches from the main line in Grand Junction and passes through Delta, Hotchkiss, Paonia, and Somerset.

## Recent Approved Actions

- **Elk Creek Tract 5.**  Oxbow has been issued a 157-acre lease modification adjacent to their existing Federal coal lease.   No new surface facilities would be required for this lease

BLM_0018859

modification.

- **Elk Creek Lease-by-Application**. Oxbow has been issued a 786-acre lease adjacent to their existing Federal coal lease. Surface disturbance would be temporary, and would be limited to approximately 5.63 acres for gob vent boreholes, associated temporary drill pads, and light-use roads.
- **West Elk E Seam Mine Plan.** Mountain Coal Company (West Elk Mine) applied to construct, operate, and reclaim up to 159 E Seam methane drainage well (MDWs) sites that would support 171 individual MDWs, and use or construction of approximately 26.1 miles of roads within the GMUG.

The following table contains recent production data for the three coal mines in the North Fork Valley.

**Table 22. Raw Coal Production – North Fork Valley – BLM-UFO**

| Average based on: | Bowie No. 2 | Elk Creek | West Elk | Totals |
|---|---|---|---|---|
| 5 Year | 2,808,556 | 4,378,814 | 5,721,944 | 12,909,314 |
| 1 Year | 1,873,357 | 3,495,575 | 6,499,048 | 11,867,980 |
| Periods end Sept. 30, 2011 | | | | |

NOTE: The total yearly production is expected to remain about the same -- between 12 and 13 million tons. Each of these mining operations control coal reserves with a mix of Federal and fee coal; however, 90 percent or more of local production is Federal. As mining progresses, only Federal coal will be available in the reserve base.

## Oil and Gas Leasing

Oil and gas exploration and operations are ongoing and proposed throughout the North Fork Valley. There are approximately 418,469 total acres of Federal oil and gas mineral estate within the cumulative impacts area. Approximately 124,192 unleased acres are within inventoried roadless areas. Overall, there are approximately 173,646 acres currently leased. This includes 54,580 acres of inventoried roadless areas which were leased prior to implementation of the USFS roadless rule. If these pre-2001 leases expire and are subsequently leased again, they will have surface use restrictions for whatever roadless rule may be in place. Approximately 120,631 acres of Federal oil and gas mineral estate remains available for nomination to be leased at this time. Drilling activities for oil and gas require specialized equipment (including drilling rigs and fracturing equipment), access roads, and constructed drill pads (normally 3 to 5 acres for single-well pads).

## *Reasonably Foreseeable Future Actions*

Underground coal mining is expected to continue in the North Fork Valley. In addition to existing coal leasing and exploration activities, other pending actions include:

- **West Elk.** On August 2, 2012, the GMUG issued a Record of Decision (ROD) on its FEIS analyzing two lease modifications (COC-1362 and COC-67232) applied for by Mountain Coal Company, and in the ROD consented to BLM to issue two lease modifications adjacent to each other and to current leases to the south within the GMUG. BLM's decision is pending. It would add approximately 1,700 acres to the West Elk Mine, of which an estimated 73 acres will be actively disturbed for the remaining life of the mine. More information is available at http://www.fs.fed.us/nepa/fs-usda-pop.php/?project=32459.

- **Bowie No. 2.** Bowie applied for two lease modifications adjacent to current leases to the

96

BLM_0018860

north under private and public lands.  They add approximately 502 acres, and temporary surface disturbances from road and pad construction would occur on about 16.6 acres.  All surface disturbance would be reclaimed soon after the related mining activities are completed.  On August 14, 2012, the BLM posted a final EA, Decision Record, and FONSI for a 30-day appeal period.  The EA is available at: DOI-BLM-CO-S050-2012-0001 EA.

Additional actions including coal lease modifications and new coal lease applications could be expected in the North Fork Valley.  These factors may affect how long mining would continue in this area; however, it is likely that mining would continue for another decade at a minimum.

It is difficult to forecast future oil and gas development within the cumulative impact areas.  The area is seeing an increase in development which exceeds the past average.  Activity increases are due to changes in technology for the drilling and development of the conventional mancos shale wells and wells used to capture methane from coal mines.  It is estimated that the area will average 20 new wells per year (assumes at least 2 wells per pad – 10 new pads per year).  This will then create approximately 68 acres of new disturbance per year from oil and gas development.

SG Interests I, Ltd (SG) has proposed a 150 gas well Master Development Plan (MDP) to develop mineral leases they hold within the Bull Mountain Unit located approximately 10 miles northeast of Oak Mesa in Gunnison County, Colorado.  SG is proposing approximately 41 individual well pads and associated infrastructure.  Approximately 50 percent of the wells are targeting coalbed methane production and the other 50 percent will be exploring other potentially productive natural gas zones encountered by drilling into other geologic zones in the area of the Bull Mountain Unit.  The preliminary EA was made available for public review and comment on March 23, 2012.  Analysis of the MDP is continuing.

Oil and Gas lease sale:  The BLM is currently developing an EA regarding the nominations to lease nearly 30,000 acres of federal oil and gas mineral estate which were scheduled to be included in the Colorado BLM August 2012 Quarterly Lease Sale.  A decision was made to defer pending further analysis.  Approximately 22,000 acres of the nominations lie within the cumulative impacts area of this EA.

Other past, present and reasonably foreseeable development activities in the area include fruit orchards and vineyards, ranching, water storage and irrigation, transmission lines, residential developments, recreation, and forest treatments (e.g. controlled burning and logging). Fruit orchards along the valley floor and low mesas have historically been important to the local economy.  More recently, vineyards have expanded into the area. Sheep and cattle are grazed in pastureland around Paonia and Hotchkiss and also at higher elevations during the summer. There are a number of water storage reservoirs and canals around the North Fork Valley to serve agriculture and domestic uses. Western Area Power Administration operates the Curecanti-Rifle 230/345 kV transmission line that parallels Terror Creek.  In recent years, the area around the communities of Paonia, Hotchkiss, Crawford, and Delta has been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State Highway 133. There is little developed recreation in the area, but the area is widely used for dispersed recreational activities such as hunting, four-wheeling, hiking, picnicking, horseback riding, snowmobiling, and sight-seeing. Timber sales have been fairly limited in the area.

BLM_0018861

If BLM authorizes the requested coal exploration license, a separate action would be required to authorize a coal lease. The proposed exploration activities would allow Oxbow to determine whether an economically viable coal reserve is present in the project area, and then apply for a coal lease. Coal lease issuance would require BLM to conduct a separate NEPA analysis. A subsequent analysis would analyze the effects of the lease, including the proposed plan for coal extraction. The coal lease process is competitive, which means Oxbow might not be the lease recipient.

## PERSONS/AGENCIES CONSULTED

Public scoping comments were solicited via a letter dated September 19, 2011, that was mailed to the appropriate agencies, specific interested parties, and to the general public. The letter was also posted on the BLM UFO website. Information regarding the exploration proposal was made available for public review after September 19, 2011, through legal notices published in the Delta County Independent. In addition there were announcements of the public scoping period in The Daily Sentinel in Grand Junction. Public comments were received through October 24, 2011. 394 comment letters were received. All comment letters were reviewed and considered in the development of the EA (see Appendix C).

Public comments regarding the Preliminary EA were solicited via a letter dated May 14, 2012, that was mailed to the appropriate agencies, specific interested parties, and to the general public. The letter was also posted on the BLM UFO website. Information regarding the exploration proposal, including the Preliminary EA, was made available for public review and comment from May 14, 2012, through June 13, 2012, through legal notices published in the Delta County Independent. In addition, there were announcements of the public scoping period in The Daily Sentinel in Grand Junction. Public comments were received through June 13, 2012. 226 comment letters were received. All comment letters were reviewed and considered in the revision of the EA (see Appendix D).

BLM_0018862

# LIST OF PREPARERS

| BLM Staff | | |
|---|---|---|
| **Name** | **Title** | **Area of Responsibility** |
| Amanda Clements | Ecologist | Wetlands and riparian |
| Alan Kraus | Hazmat Specialist | Waste, hazardous or solid |
| Bruce Krickbaum | NEPA Coordinator | NEPA review and compliance; Environmental justice |
| Chad Meister | Natural Resource Specialist | Air Quality |
| David Epstein | Economist | Socio-economics |
| Jedd Sondergard | Hydrologist | Air Quality; Farmlands (Prime and Unique); Floodplains; Water Quality, Surface and Ground; Soils; Hydrology / Water Rights |
| Edd Franz | Resource Specialist | Wild and Scenic rivers |
| Julie Jackson | Outdoor Recreation Planner | Wilderness; Recreation; Visual Resources; Transportation |
| Glade Hadden | Archaeologist | Cultural Resources; Native American Religious Concerns; Paleontology |
| Lynae Rogers | Range Specialist | Invasive, Non-Native Species; Vegetation |
| Melissa Siders | Wildlife Biologist | ACEC; Migratory Birds; Threatened, Endangered, and Sensitive Species; Wildlife, Aquatic; Wildlife, Terrestrial |
| Dan Huisjen | Fire Specialist | Fire |
| Ken Holsinger | Fuels Specialist | Forest Management |
| Rob Ernst | Geologist | Geology and Minerals |
| Linda Reed | Realty Specialist | Access; Realty Authorizations |
| Desty Dyer | Mining Engineer | Minerals |
| 3rd Party NEPA Consultant Staff | | |
| **Name** | **Title** | **Area of Responsibility** |
| Aleta Powers, ERO | Environmental Scientist/Natural Resource Specialist | Project manager |
| Barbara Galloway, ERO | Hydrologist | Surface water and water rights |
| Michael Galloway, ERO | Hydrogeologist | Ground water and geology |
| Jennifer McLeland, ERO | Technical Editor | Technical editing |
| John Monarch, Monarch& Assoc. | Wildlife Biologist | Wildlife and habitat condition studies/surveys with emphasis on T&E and Sensitive species |

BLM_0018863

# REFERENCES

Adams, R.A. 2003. Bats of the Rocky Mountain West. University Press of Colorado.

Bowie Resources, LLC. 2011. Water Quality and Flow Data for Two Springs (31 and 32) in Long Draw, west edge of S. 16, T. 13S, R. 92 W. Personal communication with Art Etter, Engineer, Bowie Resources, LLC.

Bureau of Land Management (BLM). 2000. Final Environmental Impact Statement, North Fork Coal, Delta and Gunnison Counties, Colorado.

Bureau of Land Management (BLM). 2007. North Fork Land Health Assessment 2006 – 2007.

Bureau of Land Management (BLM). 2009. Uncompahgre Field Office: Visual Resource Management. Available: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/visual_resource_management.html. Last accessed: December26, 2011.

Bureau of Land Management (BLM). 2010a. FINAL WILD AND SCENIC RIVER ELIGIBILITY REPORT FOR THE BLM UNCOMPAHGRE PLANNING AREA. June. Available: http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%2007121 0.pdf. Last accessed: September 7, 2011.

Bureau of Land Management (BLM). 2011a. Uncompahgre Field Office: Energy and Mineral Resources. Available: http://www.blm.gov/co/st/en/fo/ufo/solids_and_fluids.html. Last accessed: September 7, 2011.

Bureau of Land Management (BLM). 2011b. Uncompahgre Field Office: Energy and Mineral Resources, Active Federal Coal Leasing. Available: http://www.blm.gov/co/st/en/fo/ufo/solids_and_fluids/CoalLeasing.html. Last accessed: September 7, 2011.

Canfield, R.H. 1941. Application of the line interception method in sampling range vegetation. J. Forestry 39:388-394.

Colorado Department of Agriculture. 2010. Noxious Weed List. Available: http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1174084048733. Last accessed: December 28, 2011.

Colorado Department of Public Health and Environment (CDPHE), Water Quality Control Commission. 2012. Regulation No. 35: Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins. Effective January 1, 2012.

Colorado Department of Public Health and Environment (CDPHE), Water Quality Control Commission. 2011. Regulation No. 31: The Basic Standards and Methodologies for Surface Water. Effective January 1, 2011.

Colorado Department of Public Health and Environment (CDPHE), Water Quality Control Commission. 2010. Regulation No. 93: Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List. Effective April 30, 2010.

100

BLM_0018864

Colorado Water Quality Control Division (WQCD). 2011. Water quality data for Segments 5 and 6a of the North Fork of the Gunnison River Basin. Personal communication with Robert Hillegas, Physical Sciences Researcher/Scientist, Environmental Data Unit, WQCD.

Colorado's Decision Support Systems (CDSS). 2011. Water Rights for Division 4, Gunnison River Basin, North Fork and Tributaries. Available: http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx. Last accessed: November 2011.

Colorado Department of Local Affairs. 2012. State Demography Office. Available: http://www.colorado.gov/cs/Satellite/DOLA-Main/CBON/1251590805419. Last accessed: July 31, 2012.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28: 967-985.

Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. College of Natural Resources Experiment Station Bulletin 80, Moscow, Idaho, USA. Available: http://sagemap.wr.usgs.gov/docs/grouse_habitat_book.pdf. Last accessed: July 31, 2012.

Cordilleran Compliance Services, Inc. (Cordilleran). 2002. Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado. Prepared for Gunnison Energy Corporation, Denver, CO. June 10, 2002.

Dare, Matt. 2011. Fisheries Biologist. USFS GMUG. Personal communications concerning listed fish species in Leroux Creek.

Daubenmire, R. F. 1959. A canopy-coverage method of vegetation analysis. Northwest Science 33:43-64.

Delta County Noxious Weed Management Plan. 2010. Available: http://www.deltacounty.com/DocumentCenter/Home/View/1013. Last accessed: July 31, 2012.

EarthInfo Inc. 2008. U.S. Geological Survey Quality of Surface Water, West 1 (includes Colorado). Huntington Beach, CA.

EarthInfo Inc. 2010. U.S. Geological Survey Daily Values, West 1 (includes Colorado). Huntington Beach, CA.

Environmental Protection Agency (EPA). 2011. Currently Designated Nonattainment Areas for All Criteria Pollutants. Available: http://epa.gov/oaqps001/greenbk/ancl.html. Last accessed: December 21.

Fitzgerald, J.P., C.A. Meany, and D.M. Armstrong. 1994. Mammals of Colorado. Denver Museum of Natural History and University Press of Colorado, Niwot.

Fresques, Tom. 2011. BLM West Slope Fish Biologist, Silt Colorado. Leroux Creek stream survey report. September, 2007.

Galloway, Michael J. 1980. Hydrogeologic and Geothermal Investigation of Pagosa Springs, Colorado.Colorado Geological Survey.Special Publication 10.

Garrison, Dennis. Wildlife Biologist. USFS Paonia Ranger Distrist. Per. Comm. 2011. With John Monarch. Bat activity in the North Fork of the Gunnison Valley.

101

BLM_0018865

Gruver, J.C. and D.A. Keinath.  2006.  Townsend's Big-eared Bat (Corynorhinus townsendii): a technical conservation assessment USDA Forest Service, Rocky Mountain Region.

Gunnison Sage-grouse Rangewide Steering Committee.  2005.  Gunnison Sage-grouse Rangewide Conservation Plan.  Colorado Division of Wildlife, Denver, Colorado, USA. Available: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/Birds/Pages/GunnisonConsPlan. aspx.  Last accessed:  July 2012.

Hail, W. J.  1972a.  Reconnaissance geologic map of the Cedaredge Area, Delta County, Colorado.  Washington, D.C.  U.S. Geological Survey Map I-697.

Hail, W. J.  1972a.  Reconnaissance geologic map of the Hotchkiss area, Delta and Montrose Counties, Colorado.  Washington, D.C. : U.S. Geological Survey Map I-698.

Hammerson, G.  1999.  Amphibians and Reptiles in Colorado.  Colorado Division of Wildlife.

Hettinger, R., L. Roberts, and M. Kirschbaum. 2004. Coal Resources and Coal Resource Potential. In: Bankey, V, Editor. Resource Potential and Geology of the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests and Vicinity, Colorado.U.S. Geological Survey Bulletin 2213-M.

Hughes, Nick.  2011.  Personal communication regarding water rights/water supply on Oak Mesa.

Humphrey, S.R.  1975.  Nursery roosts and  community diversity of Nearctic bats.  J. Mammal. 56:321-346.

Kalenak, B.  2011.  Personal communication between Bob Kalenak, Delta County Engineer, and Aleta Powers, ERO Resources Corp.  December 28.

Keinath, D.A. 2004. Fringed Myotis (Myotis thysanodes): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region.

Kingery, H.E.  1998.  Colorado Breeding Bird Atlas.  Colorado Bird Atlas Partnership and the Colorado Division of Wildlife.

Kunz, T.H.  1982.  Roosting ecology.  In: Kunz T.H. (ed) Ecology of bats.  Plenum Press, New York.

Luce, R.J. and D. Keinath. 2007. Spotted Bat (Euderma maculatum): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region.

Madariaga, K, Colorado Parks & Wildlife.  2011.  Personal communications concerning elk and other wildlife activity in the Oak Mesa project area.

Monarch, J.  2011.  OXBOW MINING, LLC OAK MESA EXPLORATION PROJECT HABITAT AND WILDLIFE STUDIES.  Completed by John Monarch, Monarch and Associates.

Monarch, J.  2012.  Personal communication with Aleta Powers, ERO Resources.

Morris, R.  Colorado  Parks& Wildlife.  2011.  Personal communications concerning wildlife and habitat use in the Oak Mesa project area.

BLM_0018866

Oxbow Mining LLC (Oxbow). 2011a. Water Quality Data for the Oak Mesa Exploration Area, Collected by Gunnison Energy. Personal communication with Steve Weist, Manager Special Projects.

Oxbow Mining LLC.2011b (Oxbow).Ground Water Wells in the Oak Mesa Exploration Area. Personal communication with Steve Weist, Manager Special Projects.

Rabe, M. J., M. S. Siders, C. R. Miller, T. K. Snow. 1998. Long foraging distance for a spotted bat (Euderma maculatum) in northern Arizona. The Southwestern Naturalist 43(2):266-269.

Robbins, Jesse, Ian Crosser, Jenny Engleman, and Sean Larmore. 2011. Class III Cultural Resource Inventory Oak Mesa Coal Development Project Environmental Assessment of Proposed Drill Locations and Access Roads. Prepared by ERO Resources Corporation for Oxbow Mining, LLC. December.

Schmucker, Paul. 2011. Water Commissioner for Leroux Creek/Oak Mesa, Colorado Division of Water Resources, Division 4, Water District 40. Personal communication regarding water rights/water supply on and near Oak Mesa.

Siders, Missy. 2011. Wildlife Biologist. BLM Uncompahgre Field Office. Personal communications 2011 with John Monarch. Provided lists of BLM Sensitive Species and Bird Species of Conservation Concern and other input on BLM policies concerning energy development and wildlife on BLM lands.

Speas, Clay. 2010. Personal Commuications concerning listed fish species in small stream tributaries of the North Fork of the Gunnison River in the North Fork Valley.

U. S. Fish and Wildlife Service (FWS). 2008. Birds of Conservation Concern. Available: http://library.fws.gov/Bird_Publications/BCC2008.pdf. Last accessed: July 31, 2012.

U. S. Fish and Wildlife Service (FWS). 2011. Current list of federally listed Threatened and Endangered and candidate species species. Letter dated October 4.

U. S. Fish and Wildlife Service (FWS). 2008. Programmatic Biological Opinion (PBO)(ES/GJ-6-CO-08-F-0006) December 19, 2008, on water depletions in the North Fork Drainage that may affect endangered fish and their habitat in the Colorado River Basin.

U.S. Forest Service (USFS). 2011a. EA, Federal Coal Lease COC-61357 Modification, Tract 5. Available: http://www.fs.fed.us/nepa/project_content.php?project=34307. Last accessed: July 31, 2012.

U.S. Forest Service (USFS). 2011b. Lynx Analysis Unit mapping for those units in the North Fork Valley.

United States Census Bureau (Census). 2011. QuickFacts. Available: http://quickfacts.census.gov/qfd/states/08/08029.html. Last accessed: December 19, 2011.

United States Department of Agriculture (USDA). 1981. Soil Survey of Paonia Are, Colorado: Parts of Delta, Gunnison, and Montrose Counties.

United States Department of Agriculture (USDA). 2008. Natural Resources Conservation Service Metadata. Available: http://datagateway.nrcs.usda.gov/GDGOrder.aspx. Last accessed: December 2011.

BLM_0018867

United States Geological Survey (USGS).  2000.  Geologic Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah; Edited by M.A. Kirschbaum, L.N.R. Roberts, and L.R.H. Biewick; U.S. Geological Survey Professional Paper 1625–B*.

Winward, A. H. 2004. Sagebrush of Colorado: taxonomy, distribution, ecology, and management. Denver: Colorado Division of Wildlife.

104

BLM_0018868

# Appendix A.  Noxious Weed Management Plan

This weed control plan is concerned with the control of a wide variety of noxious weeds, thistles, etc. located on mine disturbance areas.

The Delta County Noxious Weed website (Delta County Noxious Weed Management Plan 2010) and personnel have been consulted regarding a Noxious Weed Program.  Disturbed areas, topsoil stockpiles and reclaimed/seeded areas could be invaded by the following noxious weed species with control afforded by the described techniques:

- Musk, Scotch Thistles; Burdock, Houndstongue, Tamarisk, Puncturevine—Controlled by Banvel/2,4,-D mixture, Curtail or Redeem herbicides and non-ionic surfactant applied in spring or early summer.

- Canada thistle, Russian, diffuse and spotted knapweeds, yellow toadflax and oxeye daisy, bindweed—controlled by Curtail or Redeem or Tordon herbicides and surfactant applied in spring or fall.

- White top—controlled by Escort or Telar herbicides with surfactant in the spring.

- Leafy spurge—controlled by Tordon in spring or early summer.

Contractors may apply the herbicides.  Procedures to be followed include but are not limited to the following:

- Pesticide use proposals (PUP) will be acquired from the BLM prior to treating noxious weeds. A pesticide application record (PAR) will be submitted to BLM within two weeks of treatment.

- The herbicides and surfactant will be applied in accordance with the individual label requirements using a hand held or backpack or pickup/ATV mounted sprayer.  Care will be taken to avoid drift onto desirable species and to avoid spraying in windy conditions.

- Oxbow will maintain records of herbicide use on the property for inspection by CDRMS personnel.  The weed control records will document the location where weed control was performed, the type of weed control employed and the date when the weed control was performed.

- As part of its Annual Reclamation Report, Oxbow will summarize its weed control activities for the year and submit a copy to BLM.

Other mechanical or biological means of weed control such as discing, shoveling and insects may also be employed to control weeds on disturbed areas.

A-1

BLM_0018869

# Appendix B.  Design Features for Coal Exploration License COC-74911

**Drill Pads**
- Wherever possible, existing ground disturbance would be used for drilling sites, and construction activities would be limited to clearing of brush and removal of rocks and large boulders.
- Prior to construction, the limits of construction disturbance areas along the access road routes and pad locations would be clearly defined.
    - These limits would be staked and flagged.
    - All construction activities would be confined to these areas.
        - Stakes and flagging would be removed when construction and restoration are completed.

**Access**
- Existing access roads would be used wherever possible to reach the drilling locations.
- New roads and other linear facilities would be located and constructed to follow the contour of the landform or to mimic lines in the vegetation (avoiding straight roads and steep slopes).
- Road beds would be a maximum of 14 feet wide.
- Cutting and filling, and crowning and ditching, of temporary roads would be kept to the minimum necessary.

**Staging**
- The 7X/Bear Ranch LEX property would serve as a casting and laydown area.
- Other storage, including equipment and supply storage, would occur along new temporary access roads or at drill locations within the designated areas.
- All storage would occur away from public access areas.

**Site Clearing**
- Where possible, areas of existing disturbance would be used
- Clearing and grading would be accomplished using bulldozers, road graders or other standard earth-moving equipment.
- The topsoil component (up to 12 inches, where present) would be salvaged for use in reclamation activities.
    - In many areas, surface rock is present and topsoil salvage would be limited.
- Drill pads that require grading would have a surface area of about 0.50 acres (about 180 feet by 120 feet).
- Drill pads not requiring grading would have a surface occupation and clearing area of no greater than 0.50 acre.

BLM_0018870

**Drilling Activities**

- Exploratory drilling would use a truck-based, self-leveling rotary drill rig with about a 53 foot mast (fully extended) and with a base dimension of about 10 by 10 feet.

- The drill rig is equivalent in size and capability to those used to drill deep water wells.

- Bore holes would be drilled using 8 ¾ inch rotary bit to a depth of up to 200 feet, depending upon ground conditions and the ultimate depth of the hole at each location.

- A steel surface casing would be installed and cemented in place. A 6 ¼ inch rotary bit would be used to drill the borehole to a preselected depth above the target coal seam.

- A 3-inch core barrel and bit would be used to recover a core from the coal seam and portions of the rock material above and below the coal seam.

- Bore holes would be drilled to the extent possible with air, air-water, air-foam, or water as the circulation medium.

- A lubricating bentonite-based mud would be used in holes that are difficult to keep open.
    - The muds used in these instances would not contain metallic compounds.

- Approximately 3,000 to 4,000 gallons of water would be used for each borehole under normal drilling conditions (0.528 acre foot of water total for all 43 boreholes).

- Water would be delivered to each borehole site by a tanker truck designed to haul water. A cuttings pit to hold soil and rock material removed from the borehole would be excavated with a backhoe within the pad area.

- The pit would be approximately 20 feet in length, 8 feet in width, and 8 feet deep (47 cubic yards each).

- All drilling locations would require construction of a pit for cuttings and containment of produced water (both water injected during air drilling and any water produced from the formation).

- If drilling mud is required to maintain hole stability and/or circulation, a portable mixing tank would be used to mix and contain the drilling mud.

- Where bentonite is used, portable mixing tanks would contain all bentonite. It would not be placed in the cuttings pit.

**Lighting**

- Lighting would consist of one or two "tower" lights near the top of the drill rig at a height of about 50 feet, and portable lighting units on the ground to allow drillers to monitor drill cuttings and review the drill cores.

- Ground lighting units would be aimed at work areas.

- For safety reasons, lighting cannot be artificially shielded, but natural topographic and vegetative shielding would be considered in light placement.

BLM_0018871

**Noise**

- Noise levels from drilling operations would be about 85 decibels (dB), which does not require hearing protection for workers. Noise levels will be in compliance with state and federal standards.

**Equipment and Personnel**

- The following personnel and equipment would be required to complete exploration activities
  - Bulldozer (1) and Excavator (1) for clearing, excavating, moving, and grading; personnel about 2 people;
  - Grader (1) for clearing, moving small amounts of soil and finish grading; personnel 1;
  - Drilling rig (1 or 2); personnel about 5 to 7 people;
  - Carpool pickup (1 for each rig crew) to transport drilling staff;
  - E-log truck (1) and equipment for digital logging of bore holes; personnel 1 to 2 people;
  - Delivery trucks and semi trucks for delivery of water tanks, and other bulk construction items; about 1-2 personnel per delivery; about 2 trips per day;
  - Water Truck for dust suppression (1); personnel 1; and
  - Pick-up trucks and SUVs with flatbed trailers (1) for small equipment transport; personnel 1.

**Storm Water Control**

- For locations that require construction of a drill pad, the pad would be graded so that any water runs toward the cuttings pit.
- Either silt fencing or straw wattles would be placed to contain storm water runoff within the pad area.
- For locations that do not require construction/leveling of a pad, silt fencing or straw wattles would be used as needed to prevent storm water runoff from leaving the drilling operations area.

**Site Maintenance**

- Oxbow would control dust from drilling and related activities, divert and control both natural runoff from disturbed areas and fluid loss from drilling, and would clean up any trash or debris.
- A maximum of about 0.4 acre-foot of water is anticipated to be required for fugitive dust suppression, depending on seasonal climate conditions.
  - A water truck would be used to apply water to access roads, as needed, to control dust.
- Waste construction materials and rubbish from all construction areas would be collected, hauled away, and disposed of in an approved manner.
- Food-related trash would be stored inside contractor vehicles and removed daily.

B-3

BLM_0018872

- If necessary, bear-proof trash containers would be provided.
- Where fences must be cut for gate installation or other construction activities, prior to gate cutting, the brace posts would be installed and wires attached in order to maintain adjacent wire tension.
- Any fence damaged during construction would be repaired immediately.
- Gates, where required, would be installed in accordance with landowner and BLM agreements, and would be maintained in good working order.
- All new or existing gates would remain closed and locked at all times except when attended or unless otherwise directed by the landowner.

**Fire Prevention**
- All drilling equipment would be provided with fire extinguishers and shovels for fighting small fires, if necessary.
- Drilling crews would be equipped and trained to fight small fires.
- Spark arresters would be required for equipment generating sparks, including ATVs and chainsaws.
- Smoking would be allowed during construction activities only in designated safe-smoking areas.
- Common sense practices regarding heat/spark sources, particularly in dry conditions, would be followed.
- Parking hot vehicles on dry shrubs would not be allowed, and other logical avoidance practices would be followed.

**Reclamation – Bore Hole**
- All drill holes would be backfilled, sealed and abandoned.
- During drilling, fluid return would be monitored to identify the depth and extent of any water producing zones. Upon abandonment, in accordance with Drill Hole Plugging Procedures agreed to by BLM and CDRMS, bentonite chips or bentonite plug gel or similar seal would be established in the bottom of the hole, extending to within ten feet of the surface.
- A cement plug would be set in the hole ten (10) feet below the ground to within three (3) feet of the surface.
- Accumulations of drill cuttings would be buried in the excavated pit.
- Part of the abandonment process includes the use of bentonite mud to seal the borehole.
- At no time during the drilling and well abandonment process will any bentonite mud be placed in the cuttings pit.
- Several of the exploration holes may be completed as ground water monitoring wells, in preparation for base line monitoring required for permit submission.
  - Identification of specific drill holes to be completed as ground water monitoring wells would occur once initial meetings with the CDRMS have occurred. Drill holes selected to be completed as monitoring wells would be

B-4

completed in accordance with the guidelines agreed to by the BLM and CDRMS for monitoring wells.

  o  Once monitoring is no longer required, these wells would be abandoned in the same manner as the original bore holes.

- A metal post with tag would be placed in the vicinity of the hole as a permanent marker.

## Reclamation – Roads

- Interim reclamation would include partially revegetating road shoulders in order to reduce the amount of bare ground created during construction and drilling activities.

- The new road segments would be reclaimed to their original contour and rough texture in order to match the "texture" of the surrounding landscape, and revegetated in accordance with BLM direction, and using a BLM-approved seed mix.

## Reclamation – Pits

- Any drilling mud left in the portable mixing tank after the borehole is completed would be used along with additional bentonite in the hole abandonment process.

- The pits may be temporarily fenced and allowed to dry before backfilling with previously excavated material.

- The excavated material would be returned to the pits in such a manner as to approximate the original soil profile, particularly as related to the near-surface soils or top soil.

- During backfilling, the material would be mixed and compacted as it is replaced by running the equipment over the backfilled area during placement of successive lifts.

- Following backfilling, disturbance areas would be graded to their approximate original configuration or to a natural looking configuration that blends with the surrounding topography and the original surface drainage reestablished.

## Reclamation – General

- All trash and debris would be removed from drill sites for disposal. Excavations, including pits, would be backfilled.

- Any salvaged topsoil materials would be re-spread onto the regraded surface and reseeding of the areas (pads and roads – unless the landowner requests the roads remain) would take place using the pre-determined seed mixture.

## Reclamation – Re-seeding

- Seeding would take place in the fall or early spring.

- A temporary perimeter fence would be placed around reclaimed areas to prevent disturbance by cattle and elk.

- Monitoring of re-seeding efforts would occur for two or three field seasons to determine stand success, re-seeding requirements and control of any noxious weeds. Reclamation Success criteria:

  o  Vegetation cover in disturbed areas would be at least 70 percent of the vegetation cover in adjoining undisturbed areas. For example, if nearby undisturbed areas have approximately 75 percent vegetation cover, the reclamation success criteria would be 52.5 percent total vegetation cover.

B-5

BLM_0018874

- o Vegetation cover would be comprised of species included in the seed mix and other desirable species found in the surrounding area.
- o Vegetation patchiness is acceptable, as long as there are no contiguous bare areas greater than about 3 feet by 3 feet (about 9 square feet).

- Reclamation Success criteria for sage grouse (See sage grouse section below).

**Noxious Weed Management**

- Clean equipment to remove weed seeds prior to use onsite;
- Monitor and spray/perform weed control as necessary.
- The operator and the operator's contractors will disinfect heavy equipment, hand tools, boots and any other equipment used previously in a river, lake, pond, or wetland, by routinely cleaning equipment using 140° water and high-pressure sprayers to remove dirt, mud and foreign debris before equipment is brought on-site.
- The operator and the operator's contractors will clean trucks and equipment at wash-stations in nearby towns or at the contractor's yard (off-site) to ensure that all equipment and vehicles shall be clean of all dirt and debris that can harbor weed seed.
- Monitoring and control of noxious or invasive weeds attempting to establish within the project boundaries throughout the construction and production phases should be performed in coordination with routine maintenance activities and in accordance with state law.
- The Operator will monitor for and control noxious or invasive weeds throughout the construction and production phases. Mandatory noxious weed control is required on the pads, drill holes, and access roads used by the lessee/operator for the life of the project.
- Application of pesticides and herbicides on public lands will conform to BLM and state laws.
- To prevent the entry of hazardous substances into surface waters:
  - o Chemical treatments within the riparian areas shall be applied by hand and shall be applied only to specific targets.
  - o Leave a 25-foot buffer along surface waters when chemicals are being applied through ground application with power equipment.
  - o Always refer to chemical label instructions for additional guidance on use near water and required buffer zones.
  - o To enhance effectiveness and prevent transport into streams, apply chemicals during appropriate weather conditions (generally calm and dry) and during the optimum time for control of the target pest or weed.

**Coordination**

- Coordination with landowners, including meeting with domestic and irrigation water providers and Town of Hotchkiss representatives, to address concerns about water supply facilities and provide requested information; posting the work schedule on

BLM_0018875

Oxbow's website (http://oakmesaproject.com) and will make a press announcement regarding start of work.

- Existing rights-of-way and ditches will be avoided to the extent possible. If they cannot be avoided, caution will be taken to ensure no damage to the facility or disruption of use occurs. As necessary, right-of-way holder(s) will be contacted to coordinate activities that may influence their facilities.

**Sage grouse**

BLM is actively pursuing a more definitive identification of species. If that identification verifies that they are Gunnison or Greater sage grouse, the following design features would be implemented to reduce impacts to nesting and brood rearing activities on the project area.

- No surface disturbing activities are permitted between <u>April 15 and August 30</u> within occupied and potential habitat.

- Should lek locations be found in the future, additional restrictions would include no surface disturbing activities from <u>March 15 through May 31</u> within 0.6 miles of the edge of a lek.

- Vegetation cover in areas disturbed by exploration activities would be seeded with a grouse friendly native seed mix. Vegetation cover in disturbed areas would meet at a minimum 75 percent of Gunnison sage grouse Rangewide Conservation plan guidelines for breeding habitat (Table 1 in RCP, pg H-6; Gunnison Sage Grouse Rangewide Steering Committee 2005) within three growing seasons. Reseeding would be required if vegetation cover does not achieve the 75 percent of guidelines.

- Seed mixes would be designed using only native species with the intent to establish 10 to 30 percent native grass cover on arid sites and 20 to 40 percent on mesic sites. Native forbs would be included in the mix with the intent of establishing 5 to 15 percent cover on arid sites and 20 to 40 percent on mesic sites. Tall forbs in addition to those listed in Table 4 would be added to the seed mix for disturbance in occupied and potential sage-grouse habitat (including the following drill locations and associated roads: OM-YR-03R, OM-YR-04R, OM-YR-05, OM-YR-06, OM-YR-19, OM-YR-23R, OM-YR-24, OM-YR-28, OM-YR-29, OM-YR-07R, OM-YR-11R, OM-YR-12, OM-YR-17, OM-YR-26, OM-YR-27, and OM-YR-34) based on seed availability and on-going vegetation studies, and would be approved by BLM and other surface owners in advance of seeding activities.

**General Design Features**

- Clearances/survey, including cultural resource surveys and biological resource surveys, would be completed for drill hole and access road locations that were not reviewed in Fall 2011 because of lack of right-of-access prior to any ground disturbing activities.

- Refueling of equipment would not occur within 200 feet of live water.

- Any lubricant, oil or grease, or fuel spills shall be reported immediately to the BLM. Any spills would be removed from the spill area as quickly as possible and disposed of appropriately off-site. Any spills will be cleaned to the authorized officer's satisfaction using standard hazmat procedures.

BLM_0018876

- The point of access (where applicable) would be blocked as directed to prevent motorized use of a reclaimed road. To discourage access and use of reclaimed areas, natural barriers and signs would be placed near the point of entry where project roads have been reclaimed. The BLM would approve barrier locations and techniques.

- A red-tailed hawk nest located just south of West Reservoir and within ¼ mile of the OM-02 site, would be monitored for nesting activity during construction. If the nest is active, construction and drilling operations could be put off until the young have fledged. This would eliminate the chances of the nest being impacted.

- If project timing would include construction during the migratory bird nesting time frame for the project area (generally through July 15), potential impacts and modifications to project schedule needed to comply with the Migratory Bird Treaty Act would be discussed with BLM prior to exploration activities. Monitoring for migratory birds would occur if Oxbow wishes to proceed during the nesting season. If monitoring results in positive active nest data, appropriate avoidance buffers would be developed in coordination with BLM based on species and site-specific conditions.

- For drilling sites where development of a pad is necessary, the topsoil would be stockpiled, and either silt fencing or straw wattles would be placed around the stockpile.

- Straw wattles would be used to minimize erosion until the disturbances are revegetated.

- During and after drilling, the drill site would be fenced to keep animals out of the site to prevent damage to stormwater BMPs and newly revegetated areas. Oxbow is negotiating with individual landowners regarding the type of fence installed for reclamation purposes; electric fencing with solar panels to provide power have been used in the past and are proposed. Oxbow would be responsible for fence installation, monitoring and removal.

BLM_0018877

# Appendix C.  Scoping Comment Summary

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed* | Key/non-key issue; notes |
|---|---|---|---|---|
| **1** | **Traffic** | | | |
| 1a | Wear and tear on public roads | 10 | Access/ Transportation | Key issue |
| 1b | Public safety concerns (speed and volume of traffic) | 8 | Access/ Transportation | Key issue |
| 1c | Dust and noise | 3 | Air Quality, Noise | Key issue |
| 1d | Hazardous spills | 1 | Wastes, Solid or Hazardous | Key issue |
| 1e | General increase in traffic/heavy equipment | 5 | Access/ Transportation | Key issue |
| **2** | **Water** | | | |
| 2a | Degradation in water quality (including erosion/sedimentation) and reduction in quantity (domestic, municipal and agricultural) | 12 | Water quality, surface; Water quantity, surface; Water Supply/ Water Rights | Key issue |
| 2b | Damage to water supply facilities | 1 | Water Supply/ Water Rights | Key issue |
| 2c | Stream crossing impacts | 2 | Water quality, surface | Key issue |
| 2d | Toxicity impacts of fracking fluids | 1 | | Non-key, not relevant; drilling activities would not include fracking. Fracking is associated specifically with oil and gas operations. |
| **3** | **Landscape/Natural Resources** | | | |
| 3a | Visual impact | 4 | Visual Resources | Key issue |
| 3b | Deforestation | 3 | Vegetation | Key issue |
| 3c | Vegetation impacts and reclamation | 7 | Vegetation | Key issue |
| 3d | Hazardous waste, trash, and debris | 6 | Wastes, Solid or Hazardous | Key issue |
| 3e | Increased fire danger | 3 | Fire | Key issue |
| 3f | Air pollution/quality and | 8 | Air Quality | Key issue |

BLM_0018878

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed* | Key/non-key issue; notes |
|---|---|---|---|---|
| | soil pollution. | | | |
| 3g | Potential increase in Noxious/Exotic Weeds | 2 | Invasive, Non-native Species | Key issue |
| 3h | Impacts to wildlife and sensitive natural habitats (including habitat fragmentation) | 11 | Threatened and Endangered Species; Migratory Birds; Wildlife, Terrestrial and Wildlife, Aquatic | Key issue |
| 4 | **Real Estate and Quality of life** | | | |
| 4a | Devaluation of property | 3 | | Non-key; exploration activities and associated impacts would be short-term and temporary. |
| 4b | Damage to private land | 2 | | Non-key; Oxbow must enter into landowner agreements for use of land surface for operations related to exploration. Conditions of access, including reclamation would be negotiated with private landowners, a process outside of the scope of this EA. |
| 4c | Conservation easements | 8 | | Non-key; Oxbow must enter into landowner agreements for use of land surface including those with existing conservation easements, a process outside of the scope of this EA. |
| 4d | Noise and light pollution | 8 | Noise; Visual Resources | Key issue |
| 4e | Degradation of agricultural land | 4 | Farmlands, Prime/Unique | Key issue |

C-2

BLM_0018879

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed* | Key/non-key issue; notes |
|---|---|---|---|---|
| **5** | **Socioeconomics** | | | |
| 5a | More jobs/Long term work | 233 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| 5b | Tax revenue and support for schools, roads, other social infrastructure, and non-profit organizations | 152 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| 5c | Revenue for local economy | 205 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| 5e | Oxbow's high wages | 2 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| **6** | **Coal** | | | |
| 6a | Quality of coal | 254 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal |

C-3

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed* | Key/non-key issue; notes |
|---|---|---|---|---|
| | | | | reserves. |
| 6b | Energy independence | 93 | | Non-key; this EA evaluates exploration activities only |
| 6c | Affordable energy | 8 | | Non-key; this EA evaluates exploration activities only |
| 6d | Demand for coal energy | 39 | | Non-key; this EA evaluates exploration activities only |
| 7 | **General** | | | |
| 7a | Concerns about adequacy of NEPA analysis | 1 | | Non-key; the NEPA process is being completed in compliance with state and federal laws and regulations. |
| 7b | Timing and intensive nature of NEPA process | 11 | | Non-key; the NEPA process is being completed in compliance with state and federal laws and regulations. |
| 7c | Modern coal mining technology makes mining safer and more efficient. | 2 | | Non-key; this EA evaluates exploration activities only |
| 7d | BLM must analyze the cumulative effects of the August 2011 North Fork Valley Oil and Gas Lease Sale Nomination | 1 | | Non-key; The EA is in progress for the Oil and Gas Lease sale, which is being deferred to a later date. The potential oil and gas lease sale is considered in the cumulative impacts. |

BLM_0018881

# Appendix D.  Preliminary EA Public Comment Summary

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| 1 | **Traffic** | | | |
| 1a | Wear and tear on public roads | 2 | | Due to the low volume of project-related traffic on County roads and highways, impacts are not anticipated.  Most equipment would be transported to the project area and would remain on-site until the drilling activities are completed.  A total of about 5 to 8 vehicle trips per day, mostly for crew transport, are anticipated during exploration activities. Oxbow has committed to continue to work with the Delta County Road and Bridge Department during operations and has enterend into an MOU with the County. |
| 1b | Public safety concerns (speed and volume of traffic) | | | No comments/NA |
| 1c | Dust and noise | 2 | Access and Transportation | Addition of traffic during the project would be low, as noted in the EA.  Most equipment would be transported to the project area and would remain on-site until the drilling activities are completed.  A total of about 5 to 8 vehicle trips per day, mostly for crew transport, are anticipated during exploration activities.  Also see 1e. |
| 1d | Hazardous spills | 1 | | Refueling of equipment would not occur within 200 feet of live water. Any lubricant, oil or grease, or fuel spills would be reported immediately to the BLM hazardous material coordinator. |

D-1

BLM_0018882

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | Any spills would be removed from the spill area as quickly as possible and disposed of appropriately off-site. Any spills will be cleaned to the authorized officer's satisfaction using standard hazmat procedures. Also see 2a. |
| 1e | General increase in traffic/heavy equipment<br>• Notify Town of Hotchkiss regarding oversized equipment<br>• time restrictions to limit amount of traffic and noise associated with "Jake brakes"<br>• Where would carpooling location be? | 2 | Coordination; Access and Transportation | Oxbow is committed to coordination with local agencies and landowners. Notification of the Town of Hotchkiss regarding timing of oversized equipment has been added to the *Coordination* section in the Proposed Action description. Due to the small amount of traffic associated with the project, as well as the types of vehicles using Leroux Creek and Steven's Gulch roads, there are no plans to restrict timing of access. Most of the vehicles associated with the project will not be of sufficient size to be equipped with "Jake brakes", which are a type of "compression release" engine brake used by large diesel trucks. Water trucks and equipment delivery trucks may have compression release engine brakes. Equipment delivery is anticipated to take place during a single compressed timeframe, and then the equipment would remain on-site until construction is complete. Oxbow would coordinate with their contractors to recommend that the use of "Jake brakes" be limited; however, due to safety issues, use of "Jake brakes" cannot be prohibited. Carpooling would occur at the |

D-2

BLM_0018883

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | Roger's Mesa Community house at 3100 Road and Highway 92, at the hotel where contractors are staying, or at local business locations. |
| **2** | **Water** | | | |
| 2a | Concerns about degradation in water quality (including erosion/sedimentation) and reduction in quantity (domestic, municipal and agricultural)<br>• Setbacks need to be increased from 200 feet.<br>• Fire danger increases risk to water quality | 4 | | As noted in Oxbow's Plan of Development, Oxbow is committed to protecting water quality with best management practices that have been incorporated into the Proposed Action. Setbacks of 200 feet for the drillholes is for the entire drillhole pad site, as well as staging and storage areas, and would include not only stream channels, springs, or lakes, but also wetlands and irrigation features. No water would be allowed to run off of the pad site, staging and storage areas, or any other disturbed areas at each drilling site, and all natural runoff would be routed around disturbed areas. Known drinking water wells are not located near the proposed drillholes, and little water is expected to be produced from the exploration holes. Equipment and materials used to drill the exploratory wells would be similar to those used to drill wells for drinking water, which include bentonite clay and foaming/defoaming agents. The exploration drilling does not include the use of any procedures where chemicals would be injected into the borehole under sufficient pressure to force these fluids into any water bearing zone for any reason. The drilling materials have a limited lifespan |

BLM_0018884

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | in the environment, and are safe to use for drinking water wells. They would not have a negative impact on water resources in or near the project area. Given that the likelihood of adversely affecting surface or ground water as a result of drilling the exploratory drillholes is very small, a setback of at least 200 feet is adequate. Please see comment code 3e for fire-related issues. |
| 2b | Damage to water supply facilities • Coordinate with water companies and well owners • Thorough inventory of water sources/system and baseline testing | 1 | Proposed Action; Coordination | Oxbow has expressed its commitment to coordination with water companies with facilities in the project area. Coordination with the Town of Hotchkiss Director of Public Works has been added to the *Coordination* section in the Proposed Action description. The EA presents information regarding surface and ground water resources in the project area, including baseline water quality information. Also please see 2a. As noted in the EA, Oxbow may complete several of the exploration holes as ground water monitoring wells. Identification of specific boreholes to be completed as ground water monitoring wells has not been finished. Any boreholes selected to be completed as monitoring wells would be completed in accordance with the guidelines agreed to by the BLM for monitoring wells and meet monitoring well completion rules of the Colorado Division of Water Resources. |

D-4

BLM_0018885

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| 2c | Stream crossing impacts | 1 | | Also see 3l. |
| 2d | Toxicity impacts of fracking fluids | | | No comments/NA |
| 2e | What happens in drought years where there is just not enough water? | 2 | Water Supply/Water Rights | Water would only be needed during drilling, as noted in the EA. Water used for drilling would be obtained by purchase or lease of a nearby water supply that is available for use, from willing sellers. |
| 3 | **Landscape/Natural Resources** | | | |
| 3a | Visual impact<br>• Lack of adequate reclamation. | 2 | | Exploration operations are subject to state and federal bonding for reclamation. BLM lands are subject to BLM review for reclamation success. BLM and State representatives will inspect each reclaimed location. Oxbow has committed via surface use agreements to work with a 3rd Party Contractor to "evaluate and prepare an annual report on the status of the reclaimed surfaces on the landowners affected property." The surface use agreements have been developed with each individual landowner. Also see 3c. |
| 3b | Deforestation | | | No Comments/NA |
| 3c | Vegetation impacts and reclamation<br>• What measures are in place to guarantee that Oxbow actually completes reclamation?<br>• Consider additional seed | 2 | | Oxbow exploration operations are subject to state and federal bonding for reclamation (in essence, the reclamation activities are double-bonded). In addition, the company has developed surface use agreements with individual landowners to address their particular concerns. BLM lands are subject to BLM review for |

BLM_0018886

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | mixes specific to the 6 vegetation types<br>• Consider collecting native seeds | | | reclamation success. BLM and State representatives will inspect each reclaimed location. Oxbow will complete annual monitoring for private lands. 75% of the drill sites won't require a pad, and revegetation will occur more quickly on those. Oxbow has committed to installing electric fence to preclude elk and livestock damage to revegetation areas.<br>Regarding seed mixes, the proposed seed mix meets the BLM standard. Oxbow is working with landowners to adapt seed mixes to site-specific conditions as desired. Commercially available local seed has been found to be adequate in other reclamation activities in the region. |
| 3d | Hazardous waste, trash, and debris | | | No comments/NA |
| 3e | Increased fire danger<br>• Fire at that location would increase danger of flooding in Hotchkiss<br>• Should get input from Fire Dist., USFS, and BLM fire experts. | 3 | Proposed Action | BLM understands the urgency of fire prevention and speedy notification particularly this year when conditions are extremely hot and dry. An edit has been made to the EA; "Drilling crews would be equipped and trained to fight small equipment fires and the crews also would be provided with the phone number for the Montrose Inter-Agency fire dispatch (970-249-1010). Crews will be informed that they should report any fires they can see from their vantage point." Oxbow also is coordinating with the |
| 3f | Air pollution/quality and soil pollution. | 1 | Proposed Action; Air Quality | A complete list of personnel and equipment is provided in the Proposed Action of the EA. Additional information on |

BLM_0018887

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | specific equipment and emissions will be analyzed. (See Air Quality section for Emissions Inventory).Specific vintage and make/model information is not available. It is anticipated that light- and heavy- duty gasoline and diesel engines will be used during the exploration. Vehicles will be similar in make and model to ranch, farming, and recreational vehicles currently in use in the project area. As noted in the EA, only about 8 project-specific vehicles would be on-site (within the 13,873 acre project area) at any one time. The vehicles would not be concentrated, but instead would be completing different operations at different locations. Vehicles include both heavy-and light-duty trucks and engines with no other existing emission sources. NAAQS exceedence of the PM10 standard has occurred in rural areas in Wyoming and Utah due to fugitive dust from large exposed unreclaimed areas and high winds. Less than 33 acres would be occupied or disturbed and would be revegetated as soon as possible after drilling activities are complete. |
| 3g | Potential increase in Noxious/Exotic Weeds | | | No comments/NA |
| 3h | Impacts to wildlife and sensitive natural habitats (inc. habitat fragmentation) • Consider impacts | 2 | | Thank you for your comment. The proposed action would temporarily disturb a small percentage of total habitat in the project area, and would use existing disturbance as much as |

BLM_0018888

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | to sensitive plant species | | | possible.  Wildlife would temporarily avoid disturbed areas during construction and reclamation.<br>Habitat for sensitive species was surveyed and no occurrences or suitable habitat for Rocky Mountain Thistle, Tiger Beardtongue, or Colorado Hookless Cactus were identified. |
| 3i | Positive impacts/results of project (i.e. Oxbow has history of controlling noxious weeds within and adjacent to project areas and has good reclamation record). | 22 | | Thank you for your comment. |
| 3j | Small size of project area | 117 | | Thank you for your comment. |
| 3k | Delta County has no non-attainment areas even though it has already experienced over 100 years of mining. | 6 | Air Quality | Thank you for your comment. |
| 3l | Discharge of dredged or fill material in waters of the U.S., including road crossings, would need to be reviewed by the Corps. | 1 | Wetland and Riparian Zones | It is anticipated that most of the crossings of waters of the U.S. would remain as is, or require minor maintenance using the same fill footprint, technology, and technique.  It is anticipated that most of the crossings would be maintenance exemptions.  Oxbow will coordinate with the U.S. Army Corps of Engineers regarding the location and nature of the crossings. |
| 4 | **Real Estate and Quality of life** | | | |
| 4a | Devaluation of | | | No comments/NA |

D-8

BLM_0018889

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | property | | | |
| 4b | Damage to private land | | | No comments/NA |
| 4c | Conservation easements • Should not be written off as non-key. | 2 | | The term, "non-key" has been removed from the EA for this issue. BLM understands that conservation easements are in place on many of the parcels. Oxbow has coordinated directly with landowners to ensure their satisfaction with proposed exploration activities. Black Canyon Regional Land Trust is working in cooperation with landowners and Oxbow to effectively mitigate and reclaim disturbances. Oxbow has committed via surface use agreements to work with a 3rd Party Contractor to "evaluate and prepare an annual report on the status of the reclaimed surfaces on the landowners affected property." The surface use agreements have been, or will be, developed with each individual landowner before drilling activities begin. |
| 4d | Noise and light pollution | 2 | Appendix B; Design Features | The Exploration activity in the proposed action is exempt from Delta County Specific Development Regulations per communication from the Delta County Planning Department. Because only two drill rigs would be operating at any one time during nighttime shifts, only two overhead lights would be visible temporarily during project operations. The lights would be downcast and positioned at a height of about 50 feet. It is unlikely given the types of lights used for this type of drilling that |

D-9

BLM_0018890

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | the drill rig lights would be discernible from ranch or residence lights in the project area. The rigs used for exploration are much different than the oil and gas rigs that have been in the Oak Mesa area and are much smaller, lower to the ground, and less visible due to the smaller number of lights. In addition, the two rigs with lights would be in the project area only temporarily—during drilling—and would not be onsite during reclamation activities. |
| 4e | Degradation of agricultural land and/or uses | 2 | Farmlands, Prime and Unique | Impacts to agriculture from the proposed action would be limited to short-term, temporary increases in traffic. Please see responses 1a and 1c. The terms "prime and unique farmland" refer to a soil-based characteristic. While there are soils categorized as "Farmland of Statewide importance" within the exploration area, these do not meet the use criteria for prime and unique farmlands. |
| 4f | Violates Stoney Creek Ranch CC&R (Pad 42) | 1 | | The primary concern of residents is traffic impacts to the subdivision road. To avoid traffic impacts to residents of Stoney Creek Ranch, the pad access/traffic would not use the subdivision road. |
| 5 | **Socioeconomics** | | | |

BLM_0018891

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| 5a | More jobs/Long term work | 103 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| 5b | Tax revenue and support for schools, roads, other social infrastructure, and non-profit organizations | 27 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| 5c | Revenue for local economy | 133 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| 5d | Oxbow's high wages | 3 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves, and the economic viability of coal resource extraction. |
| **6** | **Coal** | | | |
| 6a | Quality of coal and recoverable amount | 36 | | Non-key; this EA evaluates exploration activities only. Exploration activities would determine quality and quantity of coal reserves. |
| 6b | Energy independence | 13 | | Non-key; this EA evaluates exploration activities only |
| 6c | Affordable energy | 3 | | Non-key; this EA evaluates exploration activities only |
| 6d | Demand for coal energy | 2 | | Non-key; this EA evaluates exploration activities only |
| **7** | **General** | | | |

BLM_0018892

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| 7a | Concerns about adequacy of NEPA analysis | | | No comments/NA |
| 7b | Timing and intensive nature of NEPA process | | | No comments/NA |
| 7c | Modern coal mining technology makes mining safer and more efficient. | | | No comments/NA |
| 7d | BLM has not addressed future coal mining as a reasonably foreseeable impact. | 1 | | There is no decision document for the potential coal lease/mining plan action and it is therefore not reasonably foreseeable at this time.  If exploration activities result in a finding of economically viable coal reserves, an additional NEPA document would be completed. |
| 7e | EA appears thorough; good mitigation strategies; minor and temporary impacts only; if mine goes forward after exploration, more studies will be done. | 164 | | Thank you for your comment. |
| 7f | EA is just for exploration; drilling now will prevent surface disturbance later, resource inventory; mining act 1970. Exploration will help determine Valley's options. | 162 | | Thank you for your comment. |
| 7g | Oxbow will need to follow same restrictions as Delta County | 2 | | Per communication from the Delta County Planning Department, the Specific Development Regulations do not |

D-12

BLM_0018893

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | Residents (i.e. lighting and noise restrictions). From the Delta County Specific Development Regulations -- "Development shall not interfere with normal operation of existing agricultural activities" -- | | | apply to exploratory drilling for coal. |
| 7h | Oxbow should be required to release a project schedule to inform residents on when and how Oxbow is working. | 1 | Coordination | Oxbow has committed to posting the work schedule on their website (http://oakmesaproject.com) and will make a press announcement regarding start of work. |
| 7i | Oxbow should provide inspection reports, reclamation reports, and completion reports and diagrams to local entities that request them | 2 | Coordination | BLM recommends that the Town of Hotchkiss and Delta County contact Steve Weist directly with this request. |
| **8** | **Alternatives or Options that vary from the proposed action** | | | |
| 8a | BLM is not obligated to approve the proposed exploration plan and has not required mitigation | 1 | | BLM has required many mitigation-type measures (design features) be added to the proposed action to develop a reasonable action alternative that addresses substantive environmental concerns raised during scoping. BLM requested that Oxbow adjust drill locations, restrict access road length, restrict equipment and personnel |

BLM_0018894

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | to the minimum required to reduce impacts, as well as other measures.  In addition, mitigation requirements for sage-grouse have been added.  BLM did not approve the exploration plan as originally proposed, and clearly understands its obligations under relevant laws, regulations, policies, program guidance, and permitting requirements. |
| 8b | Consideration of alternatives; consider 0.50 the number of bore holes | 1 | | The proposed number and distribution of exploration wells is consistent with industry standards and is necessary given the natural variability in coal quality and seam thickness.  Exploration well density is about 320 acres per well.  Although the area is adjacent to known reserves and some small-scale mining has occurred, more information is needed to determine if it is economically feasible to mine the coal reserve.  New mining technology such as long-wall mining methods require a particular seam depth and coal quality; if those characteristics are not met in the Oak Mesa area, mining may not be practicable. |
| 8c | Consideration of alternatives; consider different distribution of boreholes on private vs federal land | 1 | | As currently proposed, there are 7 proposed exploration wells on BLM surface (16%) and 36 on private surface (84%).  This compares to the total landownership breakdown in the proposed exploration area of 32% BLM and 68% private.  The distribution on BLM/private is based on the orientation of BLM land on steep slopes and on the edges of the exploration area, not |

BLM_0018895

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | | | | conducive to access. There are more existing access roads on private lands than on BLM land, and these would be used to minimize disturbance. Also see response to 8b. |
| 8d | Consideration of alternatives; consider avoiding lands with conservation easements | 1 | | BLM understands that conservation easements are in place on many of the parcels; however because this is private land with private easements, Oxbow has coordinated directly with landowners to ensure their satisfaction with proposed exploration activities. Oxbow has committed via surface use agreements to work with a 3rd Party Contractor to "evaluate and prepare an annual report on the status of the reclaimed surfaces on the landowners affected property." The surface use agreements have been or will be developed with each individual landowner. |
| 8e | Consideration of alternatives; consider eliminating OM_YR_42 | 1 | | If/when OM_YR_42 is drilled, Oxbow would coordinate with the landowners regarding timing. Access to the drill location would avoid using the subdivision road system. Also see response to 8b and 8d. |
| 8f | Consideration of alternatives; consider prohibiting surface-disturbing activities within ¼ mile of the channels of ephemeral, intermittent, and perennial streams, or within ¼ mile of | 1 | | BLM will require that drilling operations be conducted at least 200 feet from live water. Activities related to the Proposed Action must comply with Federal Regulations (specifically the U.S. Army Corps of Engineers) regarding wetlands and other waters of the U.S. This edit has been incorporated as a Design Feature for the Proposed Action in the EA. |

BLM_0018896

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | the outer margins of riparian and wetland areas | | | |
| 8g | Consideration of alternatives <br> • Consider prohibiting surface-disturbing activities within ¼ mile of any occupied structure | 1 | | Occupied structures are limited to private land in the project area. Placement of pads and roads on private lands, and their proximity to occupied or unoccupied structures, is at the landowner's discretion. |
| 8h | Consideration of alternatives; consider prohibiting surface-disturbing activities on steep slopes (>30%) | 1 | | Several pad/road locations on steep slopes were eliminated or moved during preliminary review by BLM. About ¼ of the pad locations (10 of 43) are currently proposed on slopes of about 30%. Due to the distribution of steep topography in the project area and the need for data that is somewhat evenly distributed through the exploration area, those drilling locations cannot be eliminated. Placement of pads and roads on steep slopes has been coordinated with survey crews to result in the least amount of new surface disturbance possible. |
| 8i | Consideration of alternatives; consider prohibiting surface-disturbing activities within ½ mile of any raptor nest site | | | A red-tailed hawk nest located just south of West Reservoir and within ¼ mile of the OM-02 site, would be monitored for nesting activity during construction. If the nest is active, construction and drilling operations at OM-02 could be put off until the young have fledged. |
| 8j | Consideration of alternatives; consider prohibiting | 1 | | Only 3 drilling locations are proposed within areas identified as elk winter concentration areas by CPW. As much as possible, |

BLM_0018897

| Comment # | Comment | Number of specific comment | EA Section where issue is addressed | Response |
|---|---|---|---|---|
| | surface-disturbing activities within ¼ mile of elk winter concentration areas as defined by CPW | | | these locations would be drilled when impacts to elk are minimal or when elk are not present in the vicinity (i.e., outside of migration or concentration periods). |
| 8j | Consideration of alternatives; consider prohibiting surface-disturbing activities on any private property where that property is subject to a conservation easement. | 1 | | Conservation easements on private properties within the project area do not prohibit exploration drilling activities. Because this is private land with private easements, Oxbow has coordinated directly with landowners to ensure their satisfaction with proposed exploration activities. Oxbow has committed via surface use agreements to work with a 3rd Party Contractor to "evaluate and prepare and annual report on the status of the reclaimed surfaces on the landowners affected property." The surface use agreements have been developed with each individual landowner. Landowners are coordinating individually with the Black Canyon Regional Land Trust and Oxbow. In a letter dated June 13, 2012, the Black Canyon Regional Land Trust expressed satisfaction with the ongoing dialogue regarding mitigation and reclamation measures. |

BLM_0018898

# Appendix E.  MSDS for Foamer/DeFoamer

BLM_0018899

# Bachman Drilling & Production Specialties, Inc.

| 2220 S. Prospect | Emergency Response: 800-535-5053 |
|---|---|
| Oklahoma City, OK  73143 | Information: 405-677-8296 |

# MATERIAL SAFETY DATA SHEET

## 1. Chemical Identification

| Product: | **F-485** |
|---|---|
| General Description: | Foaming Agent |
| Chemical Family: | Blend |
| Revision Date: | January 4, 2012 |
| Primary Hazard: | Combustible Liquid |

| Hazard Rating | | Rating Scale |
|---|---|---|
| Health | 2 | 4 = Extreme |
| Fire | 2 | 3 = High |
| Reactivity | 0 | 2 = Moderate |
| Personal Protection | B | 1 = Slight |
| | | 0 = Insignificant |

## 2. Hazardous Ingredients

Our hazard evaluation has identified the following chemical ingredient(s) as hazardous. One or more component is being claimed as a trade secret under OSHA's Hazard Communication Rule, 29 CFR 1910.1200. Consult section 14 for the nature of the hazard(s).

| Ingredient(s) | CAS Number | Approximate Wt. % |
|---|---|---|
| Isopropanol | 67-63-0 | 10 |

## 3. Handling Precautions

**DANGER!** Combustible Liquid. May cause irritation to skin and eyes. Prolonged inhalation of vapor may be harmful. Do not use, store, spill or pour near heat, sparks or open flame. Keep container closed when not in use. Use with adequate ventilation. Do not take internally. Avoid prolonged or repeated breathing of vapor. Avoid contact with skin, eyes or clothing. Empty containers may contain residual product. Do not reuse container unless properly reconditioned.

## 4. First Aid Information

**EYES:** Remove victim from exposure and into fresh air. Immediately flush with water for at least 15 minutes while holding eyelids open. Call a physician at once.

**SKIN:** Remove contaminated clothing. Immediately wash exposed area with soap and water for at least 15 minutes. For a large splash flood body under a shower. Call a physician at once. Launder clothes before reuse.

**INGESTION:** Do not induce vomiting. Give water. Call a physician at once. If possible, do not leave victim unattended.

**INHALATION:** Remove to fresh air. If breathing is difficult, administer oxygen. Treat symptoms. Keep victim warm and quiet. Seek immediate medical attention.

**CAUTION:** If unconscious, having trouble breathing or in convulsions, do not induce vomiting or give water.

**F-485**                                          Revision Date: January 4, 2012
**Material Safety Data Sheet**                                        Page 2 of 6

**Note To Physicians**
Based on individual reactions of the patient, the physician's judgment should be used to control symptoms and clinical condition.

---

## 5.  Health Effects Information

**Primary Route(s) Of Exposure:**  Eye, Inhalation, Skin

**Eye Contact:**    Irritating to the eyes with possible permanent damage depending on the length of exposure and on the first aid action given.  Symptoms may include stinging, tearing, redness and swelling.

**Skin Contact:**    Can cause mild to severe skin irritation depending on the length of exposure and on the first aid action given. Symptoms may include redness and burning.   Can cause allergic contact dermatitis in susceptible individuals.

**Ingestion:**    Ingestion of this product may cause central nervous system depression, abdominal distress, with nausea, vomiting and diarrhea probable depending on the first aid action given.

**Inhalation:**    Prolonged inhalation of mist or vapor in excess of the recommended exposure limits can be harmful, causing nausea, irritation, dizziness, light-headedness, vomiting, fatigue, headache or unconsciousness depending on the length of exposure and the first aid action given.

**Symptoms
Of Exposure:**    **ACUTE:** A review of available data does not identify any symptoms from exposure not previously mentioned.

**CHRONIC:** Prolonged skin contact can cause dry skin and defatting resulting in irritation and dermatitis.  See Section 6 for additional information.

**Aggravation Of Existing Conditions:**   A review of available data does not identify any worsening of existing conditions.

---

## 6. Toxicological Information

**Toxicity Studies**

This product contains isopropanol.  In concentrated form, this chemical has been reported in one animal study to be fetotoxic at levels of 2.5% in drinking water.   No tetratogenic effects were, or have been reported.  There are no reports of adverse reproductive effects in humans exposed to this chemical.

---

## 7. Physical & Chemical Properties

| | | | |
|---|---|---|---|
| **Appearance:** | Clear, Amber Liquid | **Pour Point:** | $0^{\circ}$F |
| **Odor:** | Alcohol | **Initial** | |
| **Specific Gravity:** | 1.020 | **Boiling Point:** | 180 $^{\circ}$F |
| **Density:** | 8.50 | **Flash Point:** | 53 $^{\circ}$F TCC |
| **pH (neat):** | 8.0 - 8.5 | **Vapor Pressure:** | 31.2 mm HG @ 100 $^{\circ}$F |
| **Viscosity:** | ~25 cst @ 100$^{\circ}$F | **Vapor Density:** | > 1.0 (Air = 1.0) |
| **Solubility:** | Water Soluble | **Evaporation Rate:** | 1.7 (Butyl Acetate = 1.0) |

**Note:**  These physical properties are typical values for this product and not specifications.

**F-485**                                              Revision Date: January 4, 2012
**Material Safety Data Sheet**                          Page 3 of 6

---

| **8. Fire & Explosion Information** |
|---|

| Flash Point: | 53°F |
|---|---|
| Lower Explosive Limit: | 2.0% |
| Upper Explosive Limit: | 12.0% |

**Extinguishing Media:**     Based on NFPA guide, use water fog, dry chemical, foam, carbon dioxide or other extinguishing agent suitable for Class B fires.  Use water to cool containers exposed to fire.  For large fires, use water spray or fog, thoroughly drench the burning material.

**Unusual Fire And Explosion Hazards:**  May evolve CO, $CO_2$ and/or $NO_x$ under fire conditions.  Containers exposed in a fire should be cooled with water to prevent vapor pressure buildup leading to rupture.

---

| **9. Reactivity Information** |
|---|

**Incompatibility:** Avoid contact with strong oxidizers (eg. chlorine, peroxides, chromates, nitric acid, perchlorates, concentrated oxygen, permanganates) which can generate heat, fires, explosions and the release of toxic fumes.

**Thermal Decomposition Products:**  In the event of combustion CO, $CO_2$ and/or $NO_x$ may be formed.  Do not breathe smoke or fumes.  Wear suitable protective equipment.

---

| **10. Personal Protection Equipment** |
|---|

**Respiratory Protection:**  Respiratory protection is not normally needed under typical use and handling conditions.  If it is possible to generate significant levels of vapors, mists or smoke, a NIOSH approved or equivalent respirator is recommended.  For large spills, entry into large tanks,  vessels or enclosed small spaces  with  inadequate  ventilation,  a  positive  pressure,  self-contained  breathing  apparatus  is recommended.

**Ventilation:**  General ventilation is recommended.  Additionally, local exhaust ventilation is recommended where vapors, mists or aerosols may be released.

**Protective Equipment:**     Wear impermeable gloves, boots, apron and face shield with chemical splash goggles.  A full slicker suit is recommended if gross exposure is possible.

The availability of an eye wash fountain and safety shower are recommended.  If clothing is contaminated, remove clothing and thoroughly wash the affected area.  Launder contaminated clothing before reuse.

---

| **11. Spill & Disposal Information** |
|---|

**In case of transportation accident, call the emergency response phone number:  800-535-5053**

**Spill Control And Recovery:**
**Small Spills:**     Contain with absorbent material, such as clay, soil or any commercially available absorbent.  Shovel reclaimed liquid and absorbent into recovery or salvage drums for disposal.  Refer to CERCLA in Section 14.

**F-485**
**Material Safety Data Sheet**

Revision Date: January 4, 2012
Page 4 of 6

---

| **11. Spill & Disposal Information** (continued) |
|---|

**Large Spills:**    Dike and prevent further movement and reclaim into recovery or salvage drums or tank truck for disposal.   Refer to CERCLA in Section 14.

For large indoor spills, evacuate employees and ventilate area.   Eliminate all sources of spark or flame. Those responsible for control and recovery should wear the protective equipment specified in Section 10. Ventilate area and evacuate employees from exposure if the airborne concentration exceeds the TLV.  Refer to Section 14.

Prevent flow/discharge into lakes, ponds, streams, waterways or public water supplies.

**Disposal:**        If this product becomes a waste, it meets the criteria of a hazardous waste as defined under the Resources Conservation and Recovery Act (RCRA) 40 CFR 261.  Hazardous Waste D001.

As a hazardous liquid waste, it must be solidified with stabilizing agents (such as sand, fly ash, or cement) so that no free liquid remains before disposal to a licensed industrial waste landfill (Hazardous Waste Treatment, Storage and Disposal facility).  A hazardous liquid waste can also be incinerated in accordance with local, state and federal regulations.

---

| **12. Environmental Information** |
|---|

If released into the environment, see CERCLA in  Section 14.

---

| **13. Transportation Information** |
|---|

The proper shipping name and/or hazard class for this product may vary according to packaging, properties and mode of transportation.  Typical proper shipping names for this product are:

| | |
|---|---|
| **Drums & Pails:** | Not D.O.T. Regulated |
| **Totes & Bulk:** | Combustible Liquid, N.O.S. |
| **UN/ID Number:** | NA-1993 |
| **Hazard Class:** | 3, Combustible Liquid |
| **Packing Group:** | III |
| **Flash Point:** | 53°F |
| **Hazardous Components:** | Isopropanol |
| **RQ lbs:** | None |
| **RQ Component(s):** | None |

---

| **14. Regulatory Information** |
|---|

The following regulations apply to this product:

**Federal Regulations:**

**OSHA's Hazard Communication Rule, 219 CFR 1910.1200:**
Based on our hazard evaluation, the following ingredients in this product are hazardous and the reasons are shown below.

Isopropanol  – Flammable

---

| **14. Regulatory Information**  (continued from page 4) |
|---|

Isopropanol = TWA 400 ppm, STEL 500 ppm          ACGIH/TLV

Isopropanol = TWA 400 ppm, STEL 500 ppm          OSHA/PEL

**CERCLA/Superfund, 40 CFR 117, 302:**
This product does not contain any Reportable Quantity (RQ) substance.

**SARA/Superfund Amendments And Reauthorization Act Of 1986**
(Title III) – Sections 302, 311, 312 and 313:

**Section 302 – Extremely Hazardous Substance (40 CFR 355):**
This product does not contain ingredients listed in Appendix A and B as an Extremely Hazardous Substance

**Section 311 and 312 – Material Safety Data Sheet Requirements (40 CFR 370):**
Our hazard evaluation has found this product to be hazardous.  The product should be reported under the following EPA hazard categories.

| | |
|---|---|
| ***** | Immediate (acute) health hazard |
| | Delayed (chronic) health hazard |
| ***** | Fire hazard |
| | Sudden release of pressure hazard |
| | Reactive hazard |
| ***** | Indicates Primary Hazards |

Under SARA 311 and 312, the EPA has established threshold quantities for the reporting of a hazardous chemical.  The current thresholds are:  500 pounds or the threshold planning quantity (TPQ), whichever is lower, for extremely hazardous substances and 10,000 pounds for all other hazardous chemicals.

**Section 313 – List Of Toxic Chemicals (40 CFR 372):**
This product contains the following ingredient(s), (with CAS# and % range) which appear(s) on the List Of Toxic Chemicals:

              None

**Toxic Substance Control Act (TSCA) (40 CFR 710):**
The chemical ingredients in this product are on the 8 (b) inventory list.

**Resource Conservation Recovery Act (RCRA), 40 CFR 261 Subpart C & D:**
Consult Section 11 for RCRA classification.

**Federal Water Pollution Control Act, Clean Water Act, 40 CFR 401.15** (formerly Sec. 307), **40 CFR 116**, (formerly Sec. 311):

None of the ingredients of this product are specifically listed.

**F-485**
**Material Safety Data Sheet**

Revision Date: January 4, 2012
Page 6 of 6

---

**14. Regulatory Information**   (continued from page 5)

**Clean Air Act, Sec 111 (40 CFR60), Sec 112 (40 CFR 61, 1990 Amendments), Sec 611 (40 CFR 82, Class I and II Ozone Depleting Substances):**

This product contains the following ingredients covered by the Clean Air Act:

        Isopropanol – Section 111

**State Regulations:**

**California Proposition 65:**
This product does not contain any chemicals which require warning under California Proposition 65.

**Michigan Critical Materials:**
This product does not contain any ingredients listed on the Michigan Critical Materials Register.

**State Right To Know Laws:**
This product is regulated in those states using the TLV for isopropanol as a criteria for listing.

---

**15. User's Responsibility**

The information accumulated herein is believed to be accurate based on the information provided, although no guarantee or warranty, either expressed or implied is made as to the accuracy or completeness of this information, whether originating with this company or not.  Recipients are advised to confirm in advance of need that the information is correct, applicable and suitable to their circumstances.  The conditions or methods of handling, storage, use and disposal of the product and container are beyond our control and may be beyond our knowledge.  For this and other reasons, we do not assume responsibility and expressly disclaim liability for loss, damage or expense arising out of or in any way connected with the handling, storage or use of this information or product.   If the product is used as a component in another product, this information may not be applicable.

Prepared By:     L.V. Robertson
Original Date:    February 20,2003

## Bachman Drilling & Production Specialties, Inc.

| | |
|---|---|
| 2220 S. Prospect | Emergency Response: 800-535-5053 |
| Oklahoma City, OK  73143 | Information: 405-677-8296 |

# MATERIAL SAFETY DATA SHEET

### 1. Chemical Identification

| Product: | **DF-104** |
|---|---|
| General Description: | Defoamer |
| Chemical Family: | Blend |
| Revision Date: | January 4, 2012 |
| Primary Hazard: | Flammable Liquid |
| | RQ Component |

| Hazard Rating | | Rating Scale |
|---|---|---|
| Health | 2 | 4 = Extreme |
| Fire | 3 | 3 = High |
| Reactivity | 0 | 2 = Moderate |
| Personal Protection | B | 1 = Slight |
| | | 0 = Insignificant |

### 2. Hazardous Ingredients

Our hazard evaluation has identified the following chemical ingredient(s) as hazardous.  One or more component is being claimed as a trade secret under OSHA's Hazard Communication Rule, 29 CFR 1910.1200.  Consult section 14 for the nature of the hazard(s).

| Ingredient(s) | CAS Number | Approximate Wt. % |
|---|---|---|
| Methanol | 67-56-1 | Confidential |

### 3. Handling Precautions

**DANGER!**  Flammable Liquid.  Contains methanol. May cause blindness if swallowed. May be harmful if inhaled.  Do not use, store, spill or pour near heat, sparks or open flame.  Keep container closed when not in use.  Use with adequate ventilation.  Do not take internally.  Avoid prolonged or repeated breathing of vapor. Avoid contact with skin, eyes or clothing.  Empty containers may contain residual product.  Do not reuse container unless properly reconditioned.

### 4. First Aid Information

| EYES: | Remove victim from exposure and into fresh air.  Immediately flush with water for at least 15 minutes while holding eyelids open.  Call a physician at once. |
|---|---|
| SKIN: | Remove contaminated clothing.  Immediately wash exposed area with soap and water for at least 15 minutes.  For a large splash flood body under a shower.  Call a physician at once.  Launder clothes before reuse. |
| INGESTION: | If victim is conscious and alert, induce vomiting by giving syrup of ipecac or by gently stimulating victim's uvula.  Give water.  Call a physician at once.  If victim is drowsy or unconscious, do not induce vomiting or give anything by mouth; place victim on the left side with the head down.  If possible, do not leave victim unattended. |
| INHALATION: | Remove to fresh air.  If breathing is difficult, administer oxygen.  Treat symptoms.  Keep victim warm and quiet.  Seek immediate medical attention. |
| CAUTION: | If unconscious, having trouble breathing or in convulsions, do not induce vomiting or give water. |

BLM_0018906

**DF-104**                                           Revision Date: January 4, 2012
**Material Safety Data Sheet**                                      Page 2 of 6

**Note To Physicians**
This product contains methanol. Ethanol decreases the metabolism of methanol to toxic metabolites. Ethanol should be administered as soon as possible in cases of severe poisoning. If ethanol therapy is indicated, administer a loaded dose of 7.6 to 10 mL of 10% ETOH in D5W over 30 – 60 minutes. Maintenance dose of 1.4 mL/Kg/Hr of 10% ETOH, to achieve a 100 to 130 mg/dL blood ETOH level during ethanol therapy. (If charcoal is administered, ethanol should be administered intravenously and not orally.)

---

| **5.  Health Effects Information** |
| --- |

**Primary Route(s) Of Exposure:**  Eye, Ingestion, Inhalation, Skin

**Eye Contact:**    Irritating to the eyes with possible permanent damage depending on the length of exposure and on the first aid action given.  Symptoms may include stinging, tearing, redness and swelling.

**Skin Contact:**    Irritating to the skin. Symptoms may include redness and burning.  Skin adsorption possible, but harmful effects are not expected from this route of exposure under normal conditions of handling and use.  Can cause allergic contact dermatitis in susceptible individuals.

**Ingestion:**    Can cause blindness due to methanol.  Ingestion of this product will also cause sever abdominal distress, with nausea, vomiting and diarrhea probable depending on the first aid action given. See note to physician, above.

**Inhalation:**    Prolonged inhalation of mist or vapor in excess of the recommended exposure limits can be harmful, causing nausea, irritation, dizziness, light-headedness, vomiting, fatigue, headache or unconsciousness depending on the length of exposure and the first aid action given.

**Symptoms
Of Exposure:**    A review of available data does not identify any symptoms from exposure not previously mentioned.

**Aggravation Of Existing Conditions:**  A review of available data does not identify any worsening of existing conditions.

---

| **6. Toxicological Information** |
| --- |

**Toxicity Studies:**  No toxicity studies have been conducted on this product.  However, this product contains methanol.  Ingestion of methanol, even in small amounts, can cause blindness and death.  This material is not listed as a carcinogen by IARC, NTP or OSHA.

---

| **7. Physical & Chemical Properties** |
| --- |

| | | | |
| --- | --- | --- | --- |
| **Appearance:** | Clear Liquid | **Pour Point:** | -30°F |
| **Odor:** | Alcohol | **Initial** | |
| **Specific Gravity:** | 0.802 | **Boiling Point:** | 147 °F |
| **Density:** | 6.69 | **Flash Point:** | 54 °F TCC |
| **pH (neat):** | 7.0 – 8.5 | **Vapor Pressure:** | 96 mm HG @ 100 °F |
| **Viscosity:** | 4 cst @ 100°F | **Vapor Density:** | > 1.0 (Air = 1.0) |
| **Solubility:** | Water Soluble | **Evaporation Rate:** | 3.5 (Butyl Acetate = 1.0) |

**Note:**  These physical properties are typical values for this product and not specifications.

BLM_0018907

**DF-104**                                          Revision Date: January 4, 2012
**Material Safety Data Sheet**                                          Page 3 of 6

---

| **8. Fire & Explosion Information** |
|---|

**Flash Point:**              54°F
**Lower Explosive Limit:**     2.0%
**Upper Explosive Limit:**     36.0%

**Extinguishing Media:**    Based on NFPA guide, use water fog, dry chemical, foam, carbon dioxide or other extinguishing agent suitable for Class B fires.  Use water to cool containers exposed to fire.  For large fires, use water spray or fog, thoroughly drench the burning material.

**Unusual Fire And Explosion Hazards:**  May evolve CO, $CO_2$ and/or $NO_x$ under fire conditions.  Containers exposed in a fire should be cooled with water to prevent vapor pressure buildup leading to rupture.

---

| **9. Reactivity Information** |
|---|

**Incompatibility:** Avoid contact with strong oxidizers (eg. chlorine, peroxides, chromates, nitric acid, perchlorates, concentrated oxygen, permanganates) which can generate heat, fires, explosions and the release of toxic fumes.

**Thermal Decomposition Products:**  In the event of combustion CO, $CO_2$ and/or $NO_x$ may be formed.  Do not breathe smoke or fumes.  Wear suitable protective equipment.

---

| **10. Personal Protection Equipment** |
|---|

**Respiratory Protection:**  If it is possible to generate significant levels of vapors or mists, a NIOSH approved or equivalent respirator is recommended.  For large spills, entry into large tanks,  vessels or enclosed small spaces with inadequate ventilation, a positive pressure, self-contained breathing apparatus is recommended.

**Ventilation:**  General ventilation is recommended.  Additionally, local exhaust ventilation is recommended where vapors, mists or aerosols may be released.

**Protective Equipment:**    Wear impermeable gloves, boots, apron and face shield with chemical splash goggles.  A full slicker suit is recommended if gross exposure is possible.

The availability of an eye wash fountain and safety shower are recommended.  If clothing is contaminated, remove clothing and thoroughly wash the affected area.  Launder contaminated clothing before reuse.

---

| **11. Spill & Disposal Information** |
|---|

**In case of transportation accident, call the emergency response phone number:  800-535-5053**

**Spill Control And Recovery:**
**Small Spills:**    Contain with absorbent material, such as clay, soil or any commercially available absorbent.  Shovel reclaimed liquid and absorbent into recovery or salvage drums for disposal.  Refer to CERCLA in Section 14.

BLM_0018908

**DF-104**                                          Revision Date: January 4, 2012
**Material Safety Data Sheet**                                          Page 4 of 6

---

**11. Spill & Disposal Information**   (continued)

**Large Spills:**   Dike and prevent further movement and reclaim into recovery or salvage drums or tank truck for disposal.   Refer to CERCLA in Section 14.

For large indoor spills, evacuate employees and ventilate area.   Eliminate all sources of spark or flame. Those responsible for control and recovery should wear the protective equipment specified in Section 10. Ventilate area and evacuate employees from exposure if the airborne concentration exceeds the TLV.  Refer to Section 14.

Prevent flow/discharge into lakes, ponds, streams, waterways or public water supplies.

**Disposal:**       If this product becomes a waste, it meets the criteria of a hazardous waste as defined under the Resources Conservation and Recovery Act (RCRA) 40 CFR 261.  Hazardous Waste D001.

As a hazardous liquid waste, it must be solidified with stabilizing agents (such as sand, fly ash, or cement) so that no free liquid remains before disposal to a licensed industrial waste landfill (Hazardous Waste Treatment, Storage and Disposal facility).  A hazardous liquid waste can also be incinerated in accordance with local, state and federal regulations.

---

**12. Environmental Information**

If released into the environment, see CERCLA in  Section 14.

---

**13. Transportation Information**

The proper shipping name and/or hazard class for this product may vary according to packaging, properties and mode of transportation.  Typical proper shipping names for this product are:

| | |
|---|---|
| **All Transportation Modes:** | Flammable Liquid,  N.O.S. |
| **UN/ID Number:** | UN-1993 |
| **Hazard Class:** | 3, Flammable Liquid |
| **Packing Group:** | III |
| **Flash Point:** | 54°F |
| **Hazardous Components:** | Methanol |
| **RQ lbs:** | 7,540 |
| **RQ Component(s):** | Methanol |

---

**14. Regulatory Information**

The following regulations apply to this product:

**Federal Regulations:**

**OSHA's Hazard Communication Rule, 219 CFR 1910.1200:**
Based on our hazard evaluation, the following ingredients in this product are hazardous and the reasons are shown below.

> Methanol  – Flammable, Systemic effects (refer to Section 5)

**DF-104**
**Material Safety Data Sheet**

Revision Date: January 4, 2012
Page 5 of 6

---

**14. Regulatory Information** (continued from page 4)

Methanol = TWA 200 ppm, STEL 250 ppm          ACGIH/TLV

Methanol = TWA 200 ppm, STEL 250 ppm          OSHA/PEL

**CERCLA/Superfund, 40 CFR 117, 302:**
This product contains methanol, a Reportable Quantity (RQ) substance. If 7,540 pounds of this product is notification to the NATIONAL RESPONSE CENTER, WASHINGTON, D.C., is required at 1-800-424-8802.

**SARA/Superfund Amendments And Reauthorization Act Of 1986**
(Title III) – Sections 302, 311, 312 and 313:

**Section 302 – Extremely Hazardous Substance (40 CFR 355):**
This product does not contain ingredients listed in Appendix A and B as an Extremely Hazardous Substance

**Section 311 and 312 – Material Safety Data Sheet Requirements (40 CFR 370):**
Our hazard evaluation has found this product to be hazardous. The product should be reported under the following EPA hazard categories.

| | |
|---|---|
| ***** | Immediate (acute) health hazard |
| | Delayed (chronic) health hazard |
| ***** | Fire |
| | Sudden Release Of Pressure |
| | Reactive |
| ***** | Indicates Primary Hazards |

Under SARA 311 and 312, the EPA has established threshold quantities for the reporting of a hazardous chemical. The current thresholds are: 500 pounds or the threshold planning quantity (TPQ), whichever is lower, for extremely hazardous substances and 10,000 pounds for all other hazardous chemicals.

**Section 313 – List Of Toxic Chemicals (40 CFR 372):**
This product contains the following ingredient(s), (with CAS# and % range) which appear(s) on the List Of Toxic Chemicals:

Methanol     67-56-1                    Confidential

**Toxic Substance Control Act (TSCA) (40 CFR 710):**
The chemical ingredients in this product are on the 8 (b) inventory list.

**Resource Conservation Recovery Act (RCRA), 40 CFR 261 Subpart C & D:**
Consult Section 11 for RCRA classification.

**Federal Water Pollution Control Act, Clean Water Act, 40 CFR 401.15** (formerly Sec. 307), **40 CFR 116**, (formerly Sec. 311):

None of the ingredients of this product are specifically listed.

BLM_0018910

**DF-104**                                      Revision Date: January **4**, 2012
**Material Safety Data Sheet**                                      Page 6 of 6

---

**14. Regulatory Information**   (continued from page 5)

**Clean Air Act, Sec 111 (40 CFR60), Sec 112 (40 CFR 61, 1990 Amendments), Sec 611 (40 CFR 82, Class I and II Ozone Depleting Substances):**

None of the ingredients of this product are covered by the Clean Air Act.

**State Regulations:**

**California Proposition 65:**
This product does not contain any chemicals which require warning under California Proposition 65.

**Michigan Critical Materials:**
This product does not contain any ingredients listed on the Michigan Critical Materials Register.

**State Right To Know Laws:**
This product is regulated in those states using the TLV for methanol as a criteria for listing.

---

**15. User's Responsibility**

The information accumulated herein is believed to be accurate based on the information provided, although no guarantee or warranty, either expressed or implied is made as to the accuracy or completeness of this information, whether originating with this company or not.  Recipients are advised to confirm in advance of need that the information is correct, applicable and suitable to their circumstances.  The conditions or methods of handling, storage, use and disposal of the product and container are beyond our control and may be beyond our knowledge.  For this and other reasons, we do not assume responsibility and expressly disclaim liability for loss, damage or expense arising out of or in any way connected with the handling, storage or use of this information or product.   If the product is used as a component in another product, this information may not be applicable.

Prepared By:      L.V. Robertson
Original Date:     January 22, 2003

BLM_0018911

Form 1221-2
(June 1969)



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

| Release |
| --- |
| **6-129** |

| Date |
| --- |
| **03/15/2012** |

Subject
   **6310—Conducting Wilderness Characteristics Inventory on BLM Lands (Public)**

1. **Explanation of Materials Transmitted:**  This manual contains the Bureau of Land Management's (BLM) policy and guidance for conducting wilderness characteristics inventories under Section 201 of the Federal Land Policy and Management Act of 1976 (FLPMA).  This policy does not address Wilderness areas designated by Congress or Wilderness Study Areas (WSAs) pending before Congress.

2. **Reports Required:  None**

3. **Materials Superseded:  This manual supersedes BLM Manual Section 6301**

4. **Filing Instructions:  File as directed below**

        **REMOVE**           **INSERT**

        **All 6301 (Rel. 6-126**    6310
        **(Total 29 Sheets)**    **(Total: 31 Sheets)**

        /s/
        **Robert V. Abbey**
        **Director**

BLM_0018912

TC-1

# 6310-CONDUCTING WILDERNESS CHARACTERISTICS INVENTORY ON BLM LANDS

## Table of Contents

.01 Purpose

.02 Objective

.03 Authority

.04 Responsibilities

.05 References

.06 Policy

      A.  Maintaining the Inventory

      B.  Wilderness Characteristics Inventory Process

      C.  Wilderness Characteristics

.07 Glossary

.08 Acronyms

Appendices
      A.  Permanent Documentation File
      B.  Inventory Area Evaluation
      C.  Route Analysis
      D.  Photo Log

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                         Date:  03/15/2012

BLM_0018913

TC-1

BLM_0018914

1

# 6310-CONDUCTING WILDERNESS CHARACTERISTICS INVENTORY ON BLM LANDS

**.01 <u>Purpose</u>.**   This policy contains the Bureau of Land Management's (BLM) guidance and general procedures for conducting wilderness characteristics inventories under Section 201 of the Federal Land Policy and Management Act of 1976 (FLPMA) and supersedes all previous guidance on this topic. Managing the wilderness resource is part of the BLM's multiple use mission. Lands with wilderness characteristics provide a range of uses and benefits in addition to their value as settings for solitude or primitive and unconfined recreation. This policy does not address Wilderness areas designated by Congress or Wilderness Study Areas (WSAs) pending before Congress.

**.02 <u>Objective</u>.** This Manual establishes BLM policy for identifying lands with wilderness characteristics.

**.03 <u>Authority</u>.**   Principal authorities affecting the inventory of public lands for wilderness characteristics are:

    A.  FLPMA, 43 U.S.C. 1701 *et seq.*, exclusive of 43 U.S.C. 1782.

    B.  Wilderness Act of 1964, 16 U.S.C. 1131, *et seq.*

**.04 <u>Responsibilities</u>.**

    A.  <u>The Director shall</u>:

        1.  Coordinate with State Directors in conducting wilderness characteristics inventories.

    B.  <u>State Directors shall</u>:

        1.  Implement policy and provide statewide program coordination and guidance for conducting wilderness characteristics inventories.

        2.  Provide program development, technical management assistance, and support to District and Field Offices as required for conducting lands with wilderness characteristics inventory.

    C.  <u>District Managers and Field Managers shall</u>:

        1.  Review and document relevant data, including citizen-submitted information, for conducting and maintaining the wilderness characteristics inventory on a continuing basis.

        2.  Determine and document which inventory areas or portions of inventory areas possess or lack wilderness characteristics.

        3.  Maintain a permanent documentation file for inventoried areas.

        4.  Coordinate with other Federal agencies in conducting wilderness characteristics inventories.

BLM_0018915

2

.05 **References.**  Principal references for this Manual are:

    A.  FLPMA, 43 U.S.C. 1701, *et seq.*

    B.  Wilderness Act, 16 U.S.C. 1131 *et seq.*

    C.  BLM Regulations, 43 CFR Part 1600.

.06 **Policy.**

    A.  **Maintaining the Inventory.** Section 201 of FLPMA requires the BLM to maintain on a continuing basis an inventory of all public lands and their resources and other values, which includes wilderness characteristics. It also provides that the preparation and maintenance of the inventory shall not, of itself, change or prevent change of the management or use of public lands. Regardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands. In some circumstances conditions relating to wilderness characteristics may have changed over time, and an area that was once determined to lack wilderness characteristics may now possess them. The BLM will determine when it is necessary to update its wilderness characteristics inventory. Under the following circumstances, the BLM will consider whether to update a wilderness characteristics inventory or conduct a wilderness characteristics inventory for the first time:

        1.  The public or the BLM identifies wilderness characteristics as an issue during the National Environmental Policy Act (NEPA) process.

        2.  The BLM is undertaking a land use planning process.

        3.  The BLM has new information concerning resource conditions, including wilderness characteristics information submitted by the public that meets the BLM's minimum standard described in the Wilderness Characteristics Inventory Process section of this policy.

        4.  A project that may impact wilderness characteristics is undergoing NEPA analysis.

        5.  The BLM acquires additional lands.

    There also may be other circumstances in which BLM will find it appropriate to update its wilderness characteristics inventory.

    The primary function of an inventory is to determine the presence or absence of wilderness characteristics. Keeping an inventory current requires gathering information and ensuring that all inventories have permanent files. It is essential that an adequate record of the inventory and subsequent updates be maintained to ensure proper documentation of inventory findings, including relevant narratives, maps, photographs, new information, and any other relevant information.

BLM MANUAL                                Rel. No. 6-129
Supersedes Rel. 6-126                     Date:  03/15/2012

BLM_0018916

3

B. **Wilderness Characteristics Inventory Process.** A wilderness characteristics inventory is the process of determining the presence or absence of wilderness characteristics. The BLM must document existing conditions as opposed to potential future conditions. The BLM may conduct the inventory using available information (e.g., existing maps, photos, records related to range projects, monitoring data) and will field check the information as necessary. This wilderness characteristics inventory process directive does not mean that the BLM must conduct a completely new inventory and disregard the inventory information that it already has for a particular area. Rather, the BLM must ensure that its inventory is maintained.

1. Documentation and Minimum Standards for Review of New Information.

   a. When new information regarding wilderness characteristics is received, the BLM will document the submitted materials including:

      i. date of submission;

      ii. name of proponent;

      iii. name of proposal and/or area identified by the proponent;

      iv. BLM District(s) and Field Office(s) affected;

      v. type of material submitted (e.g., narrative, map, photo); and

      vi. whether or not the public information meets the minimum standard for further review by the BLM.

   b. The minimum standard that new information must meet in order for the BLM to consider the information during a wilderness characteristics inventory process requires a submission of the following information to the BLM:

      i. a map of sufficient detail to determine specific boundaries of the area in question;

      ii. a detailed narrative that describes the wilderness characteristics of the area and documents how that information substantially differs from the information in the BLM inventory of the area's wilderness characteristics; and

      iii. photographic documentation.

2. Evaluation of New Information.

   When new information regarding wilderness characteristics meets the minimum standard for further review, as soon as practicable, the BLM shall evaluate the information regarding the validity of proposed boundaries of the area(s), the existence of wilderness inventory roads and other boundary features, the size of the

BLM_0018917

area(s), and the presence or absence of wilderness characteristics. This evaluation may be based on relevant information available in the office (prior BLM inventories, interdisciplinary team knowledge, aerial photographs, field observations, maps, etc.). Field checking may also be needed. The BLM will compare existing data with the submitted information, determine if the conclusion reached in previous BLM inventories remains valid, determine whether the area qualifies as lands with wilderness characteristics, and document its findings. The BLM will document the rationale for the findings, make the findings available to the public, and retain a record of the evaluation and the findings as evidence of the BLM's consideration.

3. Identification of Lands Requiring Inventory.

    a. Identification of a specific area where inventory is needed requires a combined review of existing land status and available route inventory data. Where acquired lands are inventoried, the area inventoried may be larger than the acquired lands because of the need to look at contiguous roadless Federal lands.

    b. Each area will be assigned a unique identifier using a two-letter state code, office code, and an inventory area number, e.g. NV-030-051. Where possible, numbers assigned should build on the original inventory.

    c. The Permanent Documentation File for each area will be updated or developed as appropriate (Appendix A).

    d. Split estate lands are excluded from the requirements for wilderness characteristics inventory.

4. Completing the Inventory.

    a. Necessary forms for each area will be completed (see Appendix B: Inventory Area Evaluation, Appendix C: Route Analysis, and Appendix D: Photo Log). The forms in Appendices B, C, and D should be adequate for most wilderness characteristics inventories, but minor modifications may be made to meet Field Office needs as long as primary criteria and definitions remain unchanged. In order to complete the inventory, District or Field Managers must document wilderness characteristics inventories according to attached Appendices A-D as applicable.

C. **Wilderness Characteristics.**

1. Wilderness Characteristics Inventory Unit Boundary Delineation. The boundary of the wilderness characteristics inventory unit must be established. Where possible, BLM offices should use existing wilderness characteristics inventory units for maintaining the inventory. The boundary is generally based on the presence of wilderness inventory roads (see Appendix C to determine if a route meets the

BLM MANUAL                                                    Rel. No. 6-129
Supersedes Rel. 6-126                                          Date:  03/15/2012

BLM_0018918

wilderness inventory road definition), and can also be based on property lines between lands in Federal ownership and other ownerships or developed rights of way. Other inventory unit boundaries may occasionally be identified.

2. <u>Analysis of Wilderness Characteristics</u>. The inventory will evaluate wilderness characteristics as defined in Section 2(c) of the Wilderness Act and incorporated in FLPMA. In order for an area to qualify as lands with wilderness characteristics, it must possess sufficient size, naturalness, and outstanding opportunities for either solitude or primitive and unconfined recreation. In addition, it may also possess supplemental values. There may be some circumstances under which an inventory of the entire area is not required. For example, if a proposed project would only cross a small corner of an inventory unit and would be confined to previously disturbed land that is an unnatural condition, a full inventory may not be necessary.

    a. <u>Size</u>.

        i. Determine if the size criteria will be satisfied for areas by meeting one of the following situations and circumstances:

            1) Roadless areas with over 5,000 acres of contiguous BLM lands. State or private lands are not included in making this acreage determination.

            2) Roadless areas of less than 5,000 acres of contiguous BLM lands where any one of the following apply:

                a) They are contiguous with lands which have been formally determined to have wilderness or potential wilderness values, or any Federal lands managed for the protection of wilderness characteristics. Such lands include:

                    (1) designated Wilderness,

                    (2) BLM Wilderness Study Areas,

                    (3) U.S. Fish and Wildlife Service areas Proposed for Wilderness Designation,

                    (4) U.S. Forest Service (FS) Wilderness Study Areas or areas of Recommended Wilderness, and

                    (5) National Park Service (NPS) areas Recommended or Proposed for Designation.

                They do not include NPS areas merely considered "Eligible for Wilderness Study," nor do they include FS Roadless Areas unless they

BLM_0018919

6

are also designated as "Recommended Wilderness" through a Forest Plan Revision.

b) It is demonstrated that the area is of sufficient size as to make practicable its preservation and use in an unimpaired condition.

c) Any roadless island of the public lands.

ii. Determine whether or not at least one of the size criteria are met by lands within the inventory unit and document in writing the rationale for arriving at this determination.

Note: If an inventory area does not meet at least one of the size criteria, it does not contain wilderness characteristics. Further inventory activity to document naturalness, outstanding opportunities for solitude or a primitive and unconfmed type of recreation, and supplemental values is unnecessary. The findings must be documented.

b.  <u>Naturalness</u>.

i. Affected Primarily by the Forces of Nature. Determine if the area appears to be in a natural condition.

1) The area must appear to have been affected primarily by the forces of nature, and any work of human beings must be substantially unnoticeable. Examples of human-made features that may be considered substantially unnoticeable in certain cases are: trails, trail signs, bridges, fire breaks, pit toilets, fisheries enhancement facilities, fire rings, historic properties, archaeological resources, hitching posts, snow gauges, water quantity and quality measuring devices, research monitoring markers and devices, minor radio repeater sites, air quality monitoring devices, fencing, spring developments, barely visible linear disturbances, and stock ponds.

ii. Describing Human Impacts. Document noticeable human impacts within the area. If several minor impacts exist, summarize their cumulative effect on the area's degree of apparent naturalness.

1) The review of human impacts will assess the presence or absence of apparent naturalness (i.e., do the works of humans appear to be substantially unnoticeable to the average visitor?). There is an important difference between an area's natural integrity and its apparent naturalness as explained below.

a) Natural integrity refers to the presence or absence of ecosystems that are relatively unaffected by modern human activities.

BLM MANUAL                                     Rel. No. 6-129
Supersedes Rel. 6-126                          Date:  03/15/2012

BLM_0018920

7

    b)  Apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems.

   2)  Caution should be used in assessing the effect of relatively minor human impacts on naturalness. Some human works are acceptable so long as they are substantially unnoticeable. Avoid an overly strict approach to assessing naturalness. For example, the presence of a water trough is a relatively minor human impact on naturalness, and may be considered substantially unnoticeable.

  iii.  Outside Human Impacts. Human impacts outside the area will not normally be considered in assessing naturalness of an area. If, however, a major outside impact exists, it should be noted in the overall inventory area description and evaluated for its direct effects on the area.

  iv.  Determination and Documentation. Determine whether or not the naturalness criterion is met and document in writing the rationale for arriving at the determination.

Note: If an inventory area does not meet the naturalness criterion, it does not contain wilderness characteristics. Further inventory activity to document outstanding opportunities for solitude or a primitive and unconfined type of recreation or supplemental values is unnecessary. Document the findings.

c.  <u>Outstanding Opportunities for Solitude or a Primitive and Unconfined Type of Recreation</u>. Determine if the area has outstanding opportunities for solitude or a primitive and unconfined type of recreation. The word "or" in this sentence means that an area only has to possess one or the other. The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics. In most cases, the two opportunities can be expected to go hand-in-hand. An outstanding opportunity for solitude, however, may be present in an area offering only limited primitive recreation potential. Also, an area may be so attractive for primitive recreation that it would be difficult to maintain an opportunity for solitude.

Each area must be assessed on its own merits or in combination with any contiguous lands described in the Analysis of Wilderness Characteristics section of this policy as to whether an outstanding opportunity exists. Do not disqualify an area based on a finding that outstanding opportunities exist in only a portion of the area. Do not compare the lands in question with other parcels. Do not use any type of rating system or scale—whether numerical, alphabetical, or qualitative— in making the assessment. Use professional judgment in determining whether

BLM_0018921

outstanding opportunities exist in each area and document in writing the rationale for arriving at the determination.

i.  Solitude. Determine whether or not the area has outstanding opportunities for solitude.

   1)  In making this determination, consider factors that influence solitude only as they affect a visitor's opportunity to avoid the sights, sounds, and evidence of other people in the area. Only consider the impacts of sights and sounds from outside the inventory area on the opportunity for solitude if these impacts are pervasive and omnipresent.

   2)  Factors or elements influencing solitude may include size, configuration, topographic and vegetative screening, and ability of the visitor to find seclusion. It is the combination of these and similar elements upon which an overall solitude determination will be made. It may be difficult, for example, to avoid the sights and sounds of people in some areas unless the area is relatively large. Outstanding opportunities for solitude can be found in areas lacking vegetation or topographic screening. A small area could also provide opportunities for solitude if, due to topography or vegetation, visitors can screen themselves from one another.

ii.  Primitive and Unconfined Recreation.

   1)  Determine whether or not the area offers an outstanding opportunity for a primitive and unconfined type of recreation. In making this determination, consider those activities that provide dispersed, undeveloped recreation which do not require facilities, motor vehicles, motorized equipment, or mechanized transport.

   2)  Some examples of primitive and unconfined types of recreation include hiking; backpacking; fishing; hunting; spelunking; horseback riding; climbing; river running; cross-country skiing; snowshoeing; dog sledding; photography; bird watching; canoeing; kayaking; sailing; and sightseeing for botanical, zoological, or geological features.

   3)  An area may possess outstanding opportunities for a primitive and unconfined type of recreation through either the diversity in primitive and unconfined recreational activities possible in the area or the outstanding quality of one opportunity. Other factors to consider include:

      a)  Present visitor use of an area is not necessary in evaluating this criterion. Determine whether an outstanding opportunity is present, regardless of the amount of use.

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                          Date:  03/15/2012

BLM_0018922

9

    b) A trail system or convenient access is not essential for an outstanding opportunity for primitive and unconfined recreation. The absence of these facilities may increase opportunities for primitive and unconfined recreation.

    c) The presence of water is not essential for an outstanding primitive recreation opportunity.

    d) The presence of "challenge" and "risk" are appropriate considerations, but not essential for an outstanding primitive recreation opportunity to exist in an area.

Note: If an inventory area does not meet the solitude criterion and does not meet the primitive and unconfined recreation criterion, it does not contain wilderness characteristics. Further inventory activities to document supplemental values are unnecessary. If the area meets the primitive recreation and/or solitude criteria as well as the size and naturalness criteria, it does contain wilderness characteristics. Document in writing the rationale for arriving at the determination.

    d. <u>Supplemental Values</u>. If size, naturalness, and outstanding opportunities criteria are met, then determine if the area contains ecological, geological, or other features of scientific, educational, scenic, or historical value. Supplemental values are not required to be present in order for an area to be identified as lands with wilderness characteristics, but their presence should be documented where they exist.

3. <u>Boundary Delineation</u>. Define the area with wilderness characteristics to exclude wilderness inventory roads and other substantially noticeable human-caused impacts (Appendix C provides a framework for determining whether a route is a road for the purposes of wilderness characteristics inventory). Minor impacts rarely require an adjustment. Where there are several minor impacts, they should be evaluated for their cumulative effect on an area's apparent naturalness. The defined area of lands with wilderness characteristics must meet the previously described criteria for size, naturalness, and outstanding opportunities for solitude or primitive and unconfined recreation.

    a. Lands located between individual human impacts should not be automatically excluded from the area.

    b. When establishing the boundary, do not create a setback or buffer from the physical edge of the imprint of man.

    c. Developed rights-of-way (ROW) are treated like other impacts, and the boundary should be drawn to exclude those ROWs.

BLM_0018923

d. Undeveloped ROWs and similar undeveloped possessory interests (e.g., mineral leases) are not treated as impacts to wilderness characteristics because these rights may never be developed.

e. An area can have wilderness characteristics even though every acre within the area may not meet all the criteria. The boundary should be determined largely on the basis of wilderness inventory roads and naturalness rather than being constricted on the basis of opportunity for solitude or primitive and unconfined recreation. The location of boundaries should primarily be set to exclude the unnatural portions of the area.

Note: Inventory areas that meet the size, naturalness, and the outstanding solitude and/or the outstanding primitive and unconfined recreation criteria are lands with wilderness characteristics.

.07 **Glossary**.

Following are definitions for terms used in this policy. Also see definitions for terms used in Section 103 of FLPMA, BLM planning regulations at 43 CFR 1601.0-5, the wilderness regulations at 43 CFR 6301.5, and the Wilderness Act. This glossary does not supersede those definitions or those in other laws or regulations.

Apparent Naturalness: See naturalness.

Boundaries: Inventory unit boundaries are normally formed by wilderness inventory roads, property lines, developed rights-of-way, or other substantially noticeable imprints of human activity. Dead-end roads (i.e., "cherry stem roads") may extend into the unit and are excluded from the unit, which will modify the unit boundary.

Contiguous: Lands or legal subdivisions having a common boundary. Lands either bisected by wilderness inventory roads or having only a common corner are not contiguous. A checkerboard land pattern does not contain contiguous lands.

Island: An area of land surrounded by water.

Land Use Plan: A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of the FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. As used in this policy, Land Use Plan also includes Integrated Activity Plans used in the National Petroleum Reserve – Alaska.

Naturalness: The degree to which an area generally appears to have been affected primarily by the forces of nature with the imprint of people's work substantially unnoticeable. It is not synonymous with "natural integrity."

BLM_0018924

<u>Natural Integrity</u>: The presence of ecosystems that are relatively unaffected by modern human activities.

<u>Opportunity</u>: A situation or condition favorable for attainment of a goal.

<u>Outstanding</u>: 1. Standing out among others of its kind; conspicuous; prominent; 2. Superior to others of its kind; distinguished; excellent.

<u>Primitive and Unconfined Recreation</u>: Non-motorized, non-mechanized (except as provided by law), and undeveloped types of recreational activities.

<u>Primitive Route</u>: Any transportation linear feature located within areas that have been identified as having wilderness characteristics and not meeting the wilderness inventory road definition.

<u>Road</u>: For the purpose of inventorying wilderness characteristics only, the BLM will continue to base the "road" definition on FLPMA's legislative history. The language below is from the House of Representatives Committee Report 94-1163, page 17, dated May 15, 1976, on what became FLPMA.

"The word 'roadless' refers to the absence of roads that have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road."

The BLM will refer to routes that meet the above definition as wilderness inventory roads. The BLM previously adopted and will continue to use sub-definitions of certain words and phrases in the BLM wilderness inventory road definition stated above. Routes that have been improved and maintained by mechanical means to insure relatively regular and continuous use are wilderness inventory roads.

    a. <u>Improved and maintained</u> – Actions taken physically by people to keep the road open to vehicle traffic. "Improved" does not necessarily mean formal construction. "Maintained" does not necessarily mean annual maintenance.

    b. <u>Mechanical means</u> – Use of hand or power machinery or tools.

    c. <u>Relatively regular and continuous use</u> – Vehicular use that has occurred and will continue to occur on a relatively regular basis. Examples are: access roads for equipment to maintain a stock water tank or other established water sources; access roads to maintained recreation sites or facilities; or access roads to mining claims.

A route that was established or has been maintained solely by the passage of vehicles would not be considered a road for the purposes of wilderness inventory, even if it is used on a relatively regular and continuous basis. Vehicle routes constructed by mechanical means but that are no longer being maintained by mechanical methods are not wilderness inventory roads. Sole use of hands and feet to move rocks or dirt without the use of tools or machinery does not meet the definition of "mechanical means." Wilderness inventory roads need not be "maintained" on a

BLM MANUAL                                                     Rel. No. 6-129
Supersedes Rel. 6-126                              Date:  03/15/2012

BLM_0018925

regular basis but rather "maintained" when road conditions warrant actions to keep it in a usable condition. A dead-end (cherry-stem) road can form the boundary of an inventory area and does not by itself disqualify an area from being considered "roadless."

A route, or a segment of a route, which was mechanically improved to permit the passage of vehicles, but which to date has not needed any further mechanical improvement or maintenance to facilitate the relatively regular and continuous passage of vehicles, can be a road in those circumstances where the road would be maintained if the need were to arise.

While the purpose of a route is not a deciding factor to consider in determining whether a route is a road for wilderness inventory purposes, it does provide context in which to consider the criteria for a road determination. For example, the purpose of the route provides context when the BLM considers whether maintenance of the route insures relatively regular and continuous use and whether maintenance, that may so far have been unnecessary to insure the use, would occur when the need arises.

Route: Roads, primitive roads, and trails that are part of the transportation system.

Setback: A buffer or border, including "zone of influence."

Solitude: The state of being alone or remote from others; isolation. A lonely or secluded place.

Supplemental Values: Ecological, geological, or other features of scientific, educational, scenic, or historical value. These values may be present in an area with wilderness characteristics, but they are not required.

Transportation System: The transportation systems represent the sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized and approved as part of the BLM's transportation network.

Untrammeled: Unhindered and free from modern human control or manipulation.

Wilderness: An area defined in Section 2(c) of the Wilderness Act, and included in the National Wilderness Preservation System.

Wilderness Characteristics: These attributes include the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include supplemental values. Lands with wilderness characteristics are those lands that have been inventoried and determined by the BLM to contain wilderness characteristics as defined in section 2(c) of the Wilderness Act.

Wilderness Inventory Road: See road.

Wilderness Study Area: Areas with wilderness characteristics identified and designated through the inventory and study processes authorized by Section 603 of FLPMA, and, prior to 2003, through the planning process authorized by Section 202 of FLPMA.

BLM MANUAL                                          Rel. No. 6-129
Supersedes Rel. 6-126                               Date:  03/15/2012

BLM_0018926

13

.08 **Acronyms.**

BLM – Bureau of Land Management
CFR – Code of Federal Regulations
FLPMA – Federal Land Policy and Management Act of 1976
FS – U.S. Forest Service
NEPA – National Environmental Policy Act of 1969
NPS – National Park Service
ROW – Right-of-way
U.S.C. – United States Code
WSA – Wilderness Study Area

BLM MANUAL                              Rel. No. 6-129
Supersedes Rel. 6-126                   Date:  03/15/2012

BLM_0018927

Appendix A, Page 1

## WILDERNESS CHARACTERISTICS INVENTORY

## APPENDIX A – PERMANENT DOCUMENTATION FILE

The permanent documentation file should include the following:

1.     **Inventory Area Evaluation**: Appendix B.

2.     **Route Analysis:** Appendix C.

3.     **Inventory Maps:** Inventory maps used in conducting and documenting findings of wilderness characteristics inventories must be retained. Maps should depict the area's unique identifier, boundary, and any photo points.

4.     **Photo Documentation:** Documentation could include a descriptive log and photographs (Appendix D).

5.     **Supporting Documentation:** Include additional notes, forms, and documents.

BLM_0018928

Appendix B, Page 1

## WILDERNESS CHARACTERISTICS INVENTORY
## APPENDIX B – INVENTORY AREA EVALUATION

**Evaluation of Current Conditions:**

1)  Document and review any existing BLM wilderness characteristics inventory findings on file regarding the presence or absence of individual wilderness characteristics, using Form 1, below.

2)  Consider relevant information regarding current conditions available in the office. Identify and describe any changes to the existing inventory information.  Use interdisciplinary team knowledge, aerial photographs, field observations, maps, etc. and document the findings on Form 2, below.  Document current conditions regarding wilderness characteristics, as opposed to potential future conditions.

Conduct field reviews as necessary to verify information and to ascertain current conditions. Reach conclusions on current conditions including boundaries, size of areas and presence or absence of wilderness characteristics. Fully explain the basis for each conclusion on Form 2, including any critical differences between BLM and citizen information.

Document the findings regarding current conditions for each inventoried area. Describe how the present conditions are similar to, or have changed from, the conditions documented in the original wilderness characteristics inventory. Document the findings on Form 2 for each inventory area. Cite to or attach data considered, including photographs, maps, GIS layers, field trip notes, project files, etc.

BLM MANUAL                                      Rel. No. 6-129
Supersedes Rel. 6-126                           Date:  03/15/2012

BLM_0018929

Appendix B, Page 2

**FORM 1**

**Documentation of BLM Wilderness Characteristics Inventory Findings from Previons Inventory on Record**

1.  **Is there existing BLM wilderness characteristics inventory information on all or part of this area?**

**No** _____(Go to Form 2)**Yes** _____ (If yes, and if more than one area is within the area, list the unique identifiers for those areas.):

**a) Inventory Source:** _____

**b) Inventory Area Unique Identifier(s):**_____

**c) Map Name(s)/Number(s):**_____

**d) BLM District(s)/Field Office(s):**_____

2.  **BLM Inventory Findings on Record:**

Existing inventory information regarding wilderness characteristics (if more than one BLM inventory area is associated with the area, list each area and answer each question individually for each inventory area):
Inventory Source: _____

| Area Unique Identifier | Sufficient Size? Yes/No (acres) | Naturalness? Yes/No | Ontstanding Solitude? Yes/No | Outstanding Primitive & Unconfined Recreation? Yes/No | Supplemental Values? Yes/No |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

BLM MANUAL                                  Rel. No. 6-129
Supersedes Rel. 6-126                        Date:  03/15/2012

Appendix B, Page 2

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                         Date:  03/15/2012

BLM_0018931

**FORM 2**

**Current Conditions: Presence or Absence of Wilderness Characteristics**

Area Unique Identifier_____   Acreage_____
(If the inventory area consists of subunits, list the acreage of each and evaluate each separately).

In completing steps (1)-(5), use additional space as necessary.

(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below),

        Yes _____        No _____
Note: If "No" is checked the area does not have wilderness characteristics; check "NA" for the remaining questions below.

Description (describe the boundaries of the area--wilderness inventory roads, property lines, etc.):_____

_____

_____

_____

_____

(2) Does the area appear to be natural?
        Yes _____        No_____        N/A_____
Note: If "No" is checked the area does not have wilderness characteristics; check "NA" for the remaining questions below.

Description (include land ownership, location, topography, vegetation, and summary of major human uses/activities):_____

_____

_____

_____

_____

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                         Date:  03/15/2012

Appendix B, Page 3

(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?

Yes _____        No _____        N/A_____

BLM MANUAL                                  Rel. No. 6-129
Supersedes Rel. 6-126                       Date:  03/15/2012

BLM_0018933

Appendix B, Page 4

Description (describe the area's outstanding opportunities for solitude):

_____

_____

_____

_____

_____

(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?

Yes _____       No _____       N/A_____

Note: If "No" is checked for both 3 and 4 the area does not have wilderness characteristics; check "NA" for question 5.

Description (describe the area's outstanding opportunities for primitive and unconfined

recreation): _____

_____

_____

_____

_____

(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic or historical value)?

Yes _____       No _____       N/A_____

Description: _____

_____

_____

_____

_____

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                          Date:  03/15/2012

BLM_0018934

Appendix B, Page 5

## Summary of Analysis[*]

**Area Unique Identifier:** _____

**Summary**

Results of analysis:

(Note: explain the inventory findings for the entirety of the inventory unit.  When wilderness characteristics have been identified in an area that is smaller than the size of the total inventory unit, explain why certain portions of the inventory unit are not included within the lands with wilderness characteristics (e.g. the inventory found that certain parts lacked naturalness).

1. Does the area meet any of the size requirements? ___ Yes        ___ No

2. Does the area appear to be natural?                        ___ Yes        ___ No   ___ N/A

3.  Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?                                                   ___ Yes        ___ No        ___ N/A

4.  Does the area have supplemental values?         ___ Yes        ___ No        ___ N/A

Check one:

___ The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.

___ The area does not have wilderness characteristics.

**Prepared by (team members):**

_____

_____

_____

_____

_____

**(Name, Title, Date)**

**Reviewed by (District or Field Manager):**

_____

[*] This form documents information that constitutes an inventory finding on wilderness characteristics.  It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.

BLM MANUAL                                                    Rel. No. 6-129
Supersedes Rel. 6-126                                  Date:  03/15/2012

BLM_0018935

Appendix B, Page 5

**Name:** _____       **Title:** _____

**Date:** _____

BLM_0018936

## WILDERNESS CHARACTERISTICS INVENTORY

### APPENDIX C – ROUTE ANALYSIS[1]

*(Factors to consider when determining whether a route is a road[2] for wilderness characteristics inventory purposes.)*

Wilderness Characteristics Inventory Area Unique Identifier: _____

Route or Route Segment[3] Name and/or Identifier: _____
(Include Transportation Plan Identifier, if known, and include route number supplied by citizen information, when available.)

I.    LOCATION:  Refer to attached map _____ and BLM corporate data (GIS).  List photo point references (where applicable) or reference attached photo log:

Describe: _____

_____

_____

_____

_____

II.    ROUTE CONTEXT

    A. Current Purpose[4] (if any) of Route:  (Examples: Rangeland/Livestock Improvements (stock tank, developed spring, reservoir, fence, corral), Inholdings (ranch, farmhouse), Mine

---

[1] This form documents information that constitutes an inventory finding on wilderness characteristics.  It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.

[2] Road: An access route which has been improved and maintained by mechanical means to insure relatively regular and continuous use.  A way maintained solely by the passage of vehicles does not constitute a road.

    a. Improved and maintained – Actions taken physically by people to keep the road open to vehicle traffic.  "Improved" does not necessarily mean formal construction.  "Maintained" does not necessarily mean annual maintenance.

    b. Mechanical means – Use of hand or power machinery or tools.

    c. Relatively regular and continuous use – Vehicular use that has occurred and will continue to occur on a relatively regular basis.  Examples are: access roads for equipment to maintain a stock water tank or other established water sources, access roads to maintained recreation sites or facilities, or access roads to mining claims.

[3] If a portion of a route is found to meet the wilderness inventory road criteria (see Part III) and the remainder does not meet these criteria (e.g., a cherrystem road with a primitive route continuing beyond a certain point), identify each segment and explain the rationale for the separate findings under pertinent criteria.

BLM MANUAL                                               Rel. No. 6-129
Supersedes Rel. 6-126                                  Date:  03/15/2012

Appendix C, Page 2

Site, Concentrated Use Site (camp site), Recreation, Utilities (transmission line, telephone, pipeline), Administrative (project maintenance, communication site, vegetation treatment)).

Describe: _____

_____

_____

_____

_____

   B. Right-of-Way (ROW):

   1. Is there a ROW associated with this route?
   Yes ____ No ____ Unknown ____

   2. If yes, what is the stated purpose of the ROW? _____
_____

   3. Is the ROW still being used for this purpose?
   Yes ____ No ____ Unknown or N/A ____

   Explain:_____
_____

**III. WILDERNESS INVENTORY ROAD CRITERIA**

   A. Evidence of construction or improvement using mechanical means:
   Yes ____ (if either A.1 *or* A.2 is checked "yes" below) No ____ (if both A.1 *and* A.2 are checked "no" below)

   1. Construction:  (Is there evidence that the route or route segment was originally constructed using mechanical means?)  Yes ____ No ____

Examples:  Paved___ Bladed___ Graveled___ Roadside Berms___ Cut/Fill___ Other___

Describe: _____

---

[4] The purpose of a route is not a deciding factor in determining whether a route is a road for wilderness characteristics inventory purposes.  The purpose of a route does provide context for factors on which such a determination may be based, particularly the question of whether maintenance of the route ensures relatively regular and continuous use.  The purpose also helps to determine whether maintenance that may so far have been unnecessary to ensure such use would be approved by BLM when the need arises.

BLM MANUAL                                        Rel. No. 6-129
Supersedes Rel. 6-126                             Date:  03/15/2012

Appendix C, Page 2

_____

_____

BLM_0018939

Appendix C, Page 3

_____

_____

     2.  Improvements:  (Is there evidence of improvements using mechanical means to facilitate access?)  Yes _____ No _____   If "yes":  by Hand Tools _____ by Machine _____

Examples:  Culverts____ Hardened Stream Crossings____ Bridges____ Drainage____ Barriers____ Other____

Describe: _____

_____

_____

_____

_____

   B.  Maintenance:  (Is there evidence of maintenance that would ensure *relatively* regular and continuous use?):  Yes ____ (if either B.1 *or* B.2 is checked "yes" below) No ____ (if both B.1 *and* B.2 are checked "no" below)

     1.  Is there Evidence or Documentation of Maintenance using hand tools or machinery?  Yes _____ No _____   If "yes":  by Hand Tools _____ by Machine _____

Explain: _____

_____

_____

_____

_____

     2.  If the route or route segment is in good[5] condition, but there is no evidence of maintenance, would mechanical maintenance with hand tools or machines be approved by BLM to meet the purpose(s) of the route in the event this route became impassable?   Yes _____ No _____

Explain: _____

_____

_____

[5]  Good condition would be a condition that ensures regular and continuous use relative to the purposes of the route. Consider whether the route can be clearly followed in the field over its entire course and whether all or any portion of the route contains any impediments to travel.

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                          Date:  03/15/2012

BLM_0018940

Appendix C, Page 2

BLM_0018941

Appendix C, Page 4

_____

_____

C. Relatively regular and continuous use:  (Does the route or route segment ensure relatively regular and continuous use?)  Yes \_\_\_\_ No \_\_\_\_

Describe evidence (e.g., direct, vehicles or vehicle tracks observed, or indirect, evidence of use associated with purpose of the route such as maintenance of facility that route accesses) and other rationale for whether use has occurred and will continue to occur on a *relatively* regular basis (i.e., regular and continuous use relative to the purpose(s) of the route).[6]

_____

_____

_____

_____

_____

## IV.   CONCLUSION:

Does the route or route segment[7] meet the definition of a wilderness inventory road (i.e., are items III.A *and* III.B *and* III.C all checked yes)?

Yes \_\_\_\_ = Wilderness Inventory Road         No \_\_\_\_ = Not a road for wilderness inventory purposes

Explanation[8]:  _____

_____

_____

_____

_____

Evaluator(s):  _____     Date:  _____

---

[6]  Include estimate of travel rates for the stated purposes, e.g., trips/day or week or month or season or year or even multiple years in some facility maintenance cases.

[7] If part of the route meets the wilderness inventory road definition and the remainder does not, describe the segment meeting the definition and any remaining portion not meeting the definition and why.

[8] Describe and explain rationale for any discrepancies with citizen proposals.

BLM MANUAL                                    Rel. No. 6-129
Supersedes Rel. 6-126                          Date:  03/15/2012

BLM_0018942

Appendix D, Page 1

**WILDERNESS CHARACTERISTICS INVENTORY**

**APPENDIX D – PHOTO LOG**

Photographer(s): _____

Inventory Area Unique Identifier _____

| Date | Frame # | Camera Direction | Description | GPS/UTM Location | Town-ship | Range | Sec. | Photo Point # |
|------|---------|------------------|-------------|------------------|-----------|-------|------|---------------|
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |
|      |         |                  |             |                  |           |       |      |               |

**United States Department of the Interior**

**Bureau of Land Management**

**Environmental Assessment**
**for the**

**Elk Creek Mine, North East Lease Modification, Tract 5, D-Seam**

Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, Colorado 81401

**DOI-BLM-CO-150-2012-18-EA**

**March 2012**



BLM_0018944

# Table of Contents

Chapter 1 – Introduction .................................................................................................................. 2

  1.1 Identifying Information............................................................................................................ 2

  1.2 Background ............................................................................................................................. 2

  1.3 Purpose and Need for the Proposed Action ........................................................................... 3

  1.4 Land Use Plan Conformance .................................................................................................. 3

  1.5 Other Related NEPA Documents............................................................................................ 4

  1.6 Public Scoping ....................................................................................................................... 4

Chapter 2 – Proposed Action and Alternatives ............................................................................... 8

  2.1 Proposed Action..................................................................................................................... 8

  2.2 No Action Alternative............................................................................................................. 8

  2.3 Alternatives Considered but Eliminated from Detailed Analysis........................................... 8

Chapter 3- Affected Environment, Environmental Consequences, and Mitigation Measures ................ 11

  3.1 Air Quality ........................................................................................................................... 13

    3.1.1 Climate Change............................................................................................................. 34

  3.2 Socioeconomics ................................................................................................................... 35

    3.2.1 Environmental Justice.................................................................................................... 37

Chapter 4 - Interdisciplinary Review ............................................................................................. 47

Chapter 5 – References ................................................................................................................... 48

Appendices..................................................................................................................................... 53

  Appendix A........................................................................................................................... 54

  Appendix B........................................................................................................................... 60

  Appendix C........................................................................................................................... 68

  Appendix D........................................................................................................................... 72

BLM_0018945

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**

**ENVIRONMENTAL ASSESSMENT**

# Chapter 1 – Introduction

## 1.1 Identifying Information

**NUMBER:** DOI-BLM-CO-150-2012-18-EA

**CASEFILE/PROJECT NUMBER:** COC-61357

**PROJECT NAME:** Elk Creek Mine, North East Lease Modification, Tract 5, D-Seam

**LEGAL DESCRIPTION:**

T. 12 S., R. 90 W., 6th P.M.

sec. 32, lots 18, 21, and 23, and N½NE¼;

sec. 33, lots 22 and 23.

Containing approximately 158.79 acres

**APPLICANT:**    Oxbow Mining, LLC

## 1.2 Background

Currently, Oxbow Mining, LLC (OMLLC) operates the Elk Creek Mine, which is an underground longwall coal mine just north of the town of Somerset, Colorado (**Figure 1**). Coal mining has been conducted in the North Fork Valley for over 100 years. The Elk Creek Mine has been in operation since 2002, and is capable of producing approximately 5,000,000 tons of coal annually.

An application was filed by OMLLC to the Bureau of Land Management (BLM), Colorado State Office to modify federal coal lease COC61357 by adding approximately 158.79 acres. The lease modification application will be processed according to procedures set forth in 43 CFR 3432.

The application contains National Forest System (NFS) surface lands managed by the United States Department of Agriculture Forest Service, Grand Mesa, Uncompahgre, and Gunnison National Forests (USFS – Forest Service, GMUG). The coal estate is administered by the BLM Uncompahgre Field Office (UFO). The application was made to prevent bypass of federal coal reserves and to revert to a mine plan layout previously approved by the Mine Health and Safety Administration (MSHA).  The proposed lease modification is located in portions of Sections 32 and 33, T.12S., R.90W., 6th PM, in

BLM_0018946

Gunnison County (approximately 3 miles north of Somerset, Colorado). The USFS GMUG, prepared an Environmental Assessment (EA), Federal Coal Lease COC-61357 Modification, Tract 5 (USFS EA 2011) pursuant to the National Environmental Policy Act (NEPA), to analyze surface impacts related to the coal lease modification and came to a Finding of No Significant Impacts (FONSI). On August 3, 2011, the Forest Service prepared a Decision Record providing consent to the BLM to lease the coal. The decision was appealed on November 7, 2011, but was affirmed by the Acting Regional Forester. On November 30, 2011 the Regional Forester, R2 forwarded the consent to lease along with certain stipulations to protect surface resources to the BLM Colorado State Office. The BLM is preparing this EA to evaluate the impacts of issuing the coal lease modification.

The BLM is required, by law, to consider leasing federally-owned minerals for economic recovery. With respect to lands managed by the USFS, the agency considers consenting to the BLM leasing coal reserves underlying lands under its jurisdiction, and prescribes stipulations for the protection of non-mineral resources. In this instance, the USFS has consented to BLM modifying OMLLC's existing federal coal lease COC-61357 by adding approximately 158.79 acres to it. The USFS has identified needed stipulations from the parent lease (COC-61357) to protect non-coal (surface) resources (See Appendix A, and USFS EA 2011). This lease modification is distinguishable from other recent coal lease actions in the North Fork Valley in that the only potential surface disturbance will be as a result of subsidence (i.e., the land surface lowered as a result of mining).

Note the decision to lease these lands is a necessary requisite for mining, but is not in itself the enabling action that will allow mining. The most detailed analysis prior to mine development would occur after the lease is issued, when the lessee files an application for a surface mining permit and mining plan approval, supported by extensive mining and reclamation plans.

## 1.3 Purpose and Need for the Proposed Action

The Proponent, OMLCC has applied for a coal lease modification to the federal coal lease COC-61357, immediately adjacent to the existing Elk Creek mine so that OMLCC can continue to supply and sell compliant and super-complaint coal. This EA is being prepared in response to the request by OMLCC for this coal lease modification.

**Purpose:**

The BLM purpose is to decide whether to lease the coal as applied for, reject the application, or modify the proposed lease tract in response to the application to modify the federal coal lease COC-61357.

**Need:**

The BLM need is to respond to a request to modify an existing lease in accordance with the NEPA, the Mineral Leasing Act (MLA) of 1920, as amended by the Federal Coal Leasing Amendments Act (FCLAA) of 1976, and the Federal Land Policy and Management Act (FLPMA) of 1976.

## 1.4 Land Use Plan Conformance

The Proposed Action is subject to, and has been reviewed for, conformance with the BLM Unsuitability Criteria for coal leasing (**Appendix B**), and with the following Resource Management Plan (RMP) (43 CFR 1610.5-3, 1617.3):

BLM_0018947

**Name of Plan:**                     Uncompahgre Basin RMP

**Date Approved:**                July 26, 1989, as amended

Results: The RMP determined that the areas subject to the proposed lease modification application were to be managed for both existing and potential coal development. The area is acceptable for coal development and coal production, and such coal activities could occur without conflicting with other land uses described in the RMP (BLM 1989). The RMP made provisions for coal leasing subject to the application of the 20 Coal Unsuitability Criteria (as established in 43 CFR 3461). Federal coal lands not meeting the standards required by each criterion are determined to be unsuitable for coal leasing. A number of criteria have exemptions and exceptions, and the application of these exemptions and exceptions may allow certain types of coal mining.

The Proposed Action Alternative is consistent with current land management planning for the proposed lease modification.

## 1.5 Other Related NEPA Documents

This EA tiers to relevant prior analysis in the project area:

- 2000, USDA FS and BLM. Environmental Impact Statement for the Iron Point Exploration License, the Iron Point Coal Lease Tract and the Elk Creek Coal Lease Tract (a.k.a., "North Fork Coal EIS") and Record of Decision. March 30, 2000.

Additionally, this EA incorporates by reference the USFS EA that evaluates the modification in question on the existing federal coal lease COC-61357:

- 2011, USDA FS Environmental Assessment for Federal Coal Lease COC-61357 Modification, Tract 5

## 1.6 Public Scoping

The USFS GMUG issued a Notice of Opportunity to Comment in the Grand Junction Daily Sentinel (newspaper of record) and Delta County Independent (courtesy copy) on December 22, 2010 for a 30 day public comment period. In addition, USFS consulted with Colorado Division of Wildlife, other federal and state agencies and sent scoping letters to approximately 186 groups, individuals and agencies. The USFS received 295 comment letters (293 containing substantive comments) in response to the proposed action.

The analysis of the key issues raised by the comments from the public, other agencies, and the interdisciplinary team, are addressed in the USFS EA (USDA FS 2011). This BLM EA incorporates by reference the USFS analysis of the surface impacts as related to the key issues identified in public scoping (see USFS EA 2011). This BLM EA focuses on the leasing decision and analyzes the impacts to air and socioeconomics as related to the key issues concerning these resources that were raised in the USFS public scoping process.

4

BLM_0018948

The key issues identified for the air resource are:

- Analyze air quality direct, indirect and cumulative impacts and emissions including: NAAQS, Prevention of Significant Deterioration (PSD) Class I & II airsheds, and visibility in Class I areas, ozone, $NO_X$, $SO_2$, $PM_{2.5}$ and $PM_{10}$ compliance to correct averaging standard.
- Disclose and analyze the impacts of GHG emissions and climate change including release of C02 caused by the burning of coal that is mined.
- Address and analyze a range of reasonable alternatives and/or the effectiveness of mitigation measures related to methane release and climate change. Continued mining of coal at the Elk Creek Mine and Federal Coal Lease COC-61357 will provide compliant and super-compliant coal to help meet air quality standards at power generation facilities throughout the nation.
- Agencies must demonstrate compliance with the Clean Air Act.
- Consider requiring OMLLC to purchase carbon credits.

The key issue identified concerning socioeconomics is:

- Disclose the effects of mining the lease modification on local economies.

5

BLM_0018949

**Figure 1    General Location of Proposed Modification**



Figure 1
General Location
Of Project Area

6

**Figure 2         Detailed Map of Proposed Modification**



BLM_0018951

# Chapter 2 – Proposed Action and Alternatives

## 2.1 Proposed Action

The proposed action is to modify OMLLC's existing federal coal lease COC-61357 by adding approximately 158.79 acres under direction of the Energy Policy Act of 2005. No additional surface facilities are anticipated to mine these D seam reserves. Access to the lease modification is expected to take place from the existing D seam reserves on the parent lease and other previously added tracts. Coal would be extracted by underground longwall mining methods. Recoverable coal in the lease modification, based upon the two most recent unapproved Elk Creek Mine Plans prepared by OMLLC, is estimated to be approximately 35,000 tons and the lease modification would facilitate safer and more logical mining of 0.52 million tons of previously leased reserves on the parent coal lease (see Appendix D).

## 2.2 No Action Alternative

In accordance with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations, which require a No Action Alternative be presented in all environmental analyses in order to serve as a "base line" or "benchmark" from which to compare all proposed "action" alternatives, the No Action Alternative is analyzed in this EA. Under the No Action Alternative, the modification would not be approved. As a result, Federal coal reserves within the North East Lease Modification, Tract 5 would not be recovered and would, therefore, be bypassed. Production at the Elk Creek Mine would eventually cease once coal reserves under existing leases were mined.

## 2.3 Alternatives Considered but Eliminated from Detailed Analysis

If an alternative is considered during the environmental analysis process, but the agency decides not to analyze the alternative in detail, the agency must identify those alternatives and briefly explain why they were eliminated from detailed analysis (40 CFR 1502.14). An action alternative may be eliminated from detailed analysis if:

- it is ineffective (does not respond to the Purpose and Need for the Proposed Action);

- it is technically or economically infeasible (considering whether implementation of the alternative is likely, given past and current practice and technology);

- it is inconsistent with the basic policy objectives for the management of the area [such as, not in conformance with the Resource Management Plan (RMP)];

- its implementation is remote or speculative;

- it is substantially similar in design to an alternative that is analyzed; and/or

- it would result in substantially similar impacts to an alternative that is analyzed.

Alternatives specific to this EA that were considered, but that will not be analyzed in detail, are discussed below.

8

BLM_0018952

**Coal Mine Methane Capture**

An alternative analyzing the capture of coal mine methane (CMM or methane) was considered; however, the alternative was not carried through the entire analysis process. The alternative was eliminated from detailed analysis due to the additional environmental impacts associated with methane capture, as well as with the economic infeasibility associated with the infrastructure required for methane capture, as explained below.

The development and implementation of technologies for mitigating the release of methane is economically and technically difficult. Gunnison Energy Corporation (GEC), an affiliate of OMLLC, evaluated the technical capability and potential for uses of methane recovered from the Elk Creek Mine. (Initial assessments of these options were for the Sanborn Creek Mine in 2001.) GEC owns substantial oil and gas rights in the North Fork Valley, including rights overlying the Sanborn Creek and Elk Creek Mine properties. GEC also owns certain natural gas gathering systems in the North Fork Valley, which could potentially be used for the delivery of recovered methane to market, if such an option were pursued.

From 2003 through 2005, testing of the Sanborn Creek Mine gob vent boreholes (GVBs) was approved by the BLM and the Colorado Division of Minerals and Geology (now the Colorado Division of Reclamation, Mining and Safety) in order to determine the quality and quantity of methane gas generated from the sealed coal mine workings. Analysis indicated that the levels of contaminants in the gas (including carbon dioxide, oxygen, and nitrogen) were treatable, but that the cost of treating the gas (to pipeline quality standards), the cost of gas compression, and the unavailability of access to existing pipeline systems were prohibitive for delivery of the gas. In 2007, OMLLC and Vessels Coal Gas (Vessels) evaluated the potential of generating electricity by utilizing vented CMM from the sealed Sanborn Creek Mine (in cooperation with local electric cooperatives). That assessment concluded that poor project economics, a number of regulatory impediments, and complex energy agreements made the option of generating electricity for sale infeasible.

During 2010, GEC evaluated the option for potential pipeline gathering and transportation routes for delivery of any gas collected to market. Several potential pipeline routes were considered. Proposed routes varied from the creation of 7 miles of new roads within USFS roadless areas, to the creation of 11 miles of new roads that would impact a myriad of surface ownership/management parcels. All routes involved obtaining permits from multiple government agencies, obtaining right-of-way (ROW) agreements with some combination of surface owners/managers, and final design and construction. The alternative analyzing methane capture would require access in an area with a complex property ownership pattern (with impacts for up to 17 individual surface owners). Additionally, the time that it would take to exercise that option would go beyond the timeframe it would take to mine the proposed lease tract. Since this mining project would be an addition to an existing mine, uninterrupted mining would need to take place for this project to be economically viable.

In 2011, GEC submitted letters to BLM wherein they state they are entering into an agreement with Vessels Coal Gas, Inc. to allow the capture of methane from lands within the boundaries of its leases which are currently being vented as part of the mining operations conducted by OMLLC. The agreement resulted in the formation of North Fork Energy, LLC. North Fork Energy is currently working to implement a project to use the insitu CMM capture infrastructure OMLLC uses within the mine itself to combust the CMM and generate electricity for sale. The project calls for the initial

9

BLM_0018953

installation of three internal combustion engines/generator sets, and an enclosed hi-temperature flaring system capable of handling any excess CMM produced by the insitu system, that cannot be handled by the proposed engine configuration or to safely "dispose" of the methane during any potential upset conditions encountered while running or servicing the engines. As stated by a Vessels Coal Gas, Inc. representative, the primary difference in the economics between this project and the one evaluated in 2007 is that the power purchasing customer is specifically interested in purchasing the energy derived from CMM produced from an active coal mine vs. a closed mine. As such, the customer is willing to pay a premium for the energy produced which helps to offset the project costs and ultimately makes the economics work.

It is important to note that while the project does have a potential impact on the proposed action, and is discussed below in sufficient detail to quantify any potential impacts with respect to CMM emissions rates from the mine as a whole, the project is not a part of the proposed action alternatives, and will not be evaluated under NEPA. The electrical generating project is being initiated by North Fork Energy LLC, and is independent of government authority/oversight under the provisions of the current OMLLCs leasing contracts.

The level of analysis provided to BLM, as summarized above, provided the agency with adequate information to determine that an alternative analyzing CMM capture from GVBs is not economically feasible. CMM capture infrastructure would include more miles of road and pipeline construction and surface disturbance than would be allowed under the Proposed Action Alternative. Additionally, the USFS stipulations that would be included in the lease modification explicitly prohibit surface occupancy in the lease modification area. The surface impacts for the capture of methane included multiple private surface property owners; between 7 and 11 additional miles of road and pipeline construction (with potential impacts to USFS roadless areas), on a project with a timeline of approximately 1 year. Due to the economic and technical infeasibility, and the increased potential for environmental impacts, the alternative for capturing GVB hole sources of CMM was not considered a viable alternative for the COC-61357, tract 5 lease modification, and was eliminated from detailed analysis.

**Methane Flaring**

An alternative analyzing the flaring of CMM from ventilation air methane (VAM) and GBVs was also considered and eliminated from detailed analysis.

In underground coal mining, methane is released into the mine workings during extraction. Mine Safety and Health Administration (MSHA) regulations require methane to be diluted in the ventilation air and then vented to the atmosphere, known as (VAM), for the safety of the mine workers.

With respect to VAM, flaring does not appear to be a technologically feasible option due to the high volume of air flow and dilute concentrations of methane. The Elk Creek mine vents approximately 1,000,000 cubic feet of air a minute from its two mine shafts. Any option to control VAM through flaring would result in additional undesirable air impacts from the combustion of make-up fuel that would be required to operate the flare and fully oxidize methane within the VAM stream. Any proposed flaring system intended for use at a coal mine in the U.S. would need to be approved by the Mine Safety and Health Administration (MSHA). MSHA would need to conduct a thorough review of the proposed flaring system in order to establish the requirements for the system. It is not likely that a thorough review, and approval, would occur prior to the development and operation of the mine expansion. Any

10

centralized flaring system conceptualized for GVB methane destruction, would not be feasible given the capture infrastructure issues cited above.  Similarly, a decentralized or distributed faring system would be cost prohibitive to install and maintain.

In 2007 Vessels Coal Gas, Inc. studied OMLLC's VAM emissions to determine if a Regenerative Thermal Oxidation (RTO) system was technically and economically feasible.  According to Vessels, the engineering required and associated footprint the facility would occupy, given the configuration of the mine vent shafts and available space adjacent to them, made the project economically infeasible.  Vessel's also cited technical concerns from potential plugging and fouling of the RTO capture media due to mine vent particulate matter that would increase the engineering requirements and add to the projects overall operating and maintenance costs.

The level of analysis provided to BLM, as summarized above, provided the agency with adequate information to determine that an alternative analyzing CMM flaring and RTO destruction of the VAM for the Elk Creek mine is not a viable alternative for the tract 5 lease modification, and so it was eliminated from further detailed analysis in this EA.

## Chapter 3- Affected Environment, Environmental Consequences, and Mitigation Measures

This EA incorporates by reference the analysis of surface impacts from the August 3, 2011 USFS EA, Federal Coal Lease COC-61357 Modification, Tract 5.  The focus of this section is to examine how the alternatives may impact the air resource and socioeconomics of the region in the UFO. This section discusses and reviews the current conditions/elements of relevant resources, as specified by law, statute, regulation, Executive Order (EO), policy, or guideline, followed by a discussion of potential environmental impacts and proposed mitigation measures.

| Resource/Issue | N/A or Not Present | Applicable or Present, No Impact | Applicable & Present and Brought Forward for Analysis | Rationale for No Impact |
|---|---|---|---|---|
| Air Resources | | | X | |
| Areas of Critical Environmental Concern | X | | | |
| Environmental Justice | | | X | |
| Cultural Resources | X | | | |
| Flood Plains | X | | | |
| Fluid Minerals | X | | | |
| Forest Management | X | | | |

11

| Resource/Issue | N/A or Not Present | Applicable or Present, No Impact | Applicable & Present and Brought Forward for Analysis | Rationale for No Impact |
|---|---|---|---|---|
| Hydrology/Ground | X | | | |
| Hydrology/Surface | X | | | |
| Invasive/Non-Native Species | X | | | |
| Lands with Wilderness Characteristics | X | | | |
| Native American Religious Concerns | X | | | |
| Migratory Birds | X | | | |
| Paleontology | X | | | |
| Prime and Unique Farmland | X | | | |
| Range Management | X | | | |
| Realty Authorizations | X | | | |
| Recreation/Transportation | X | | | |
| Socioeconomics | | | X | |
| Soils | X | | | |
| Solid Minerals | X | | | |
| T&E and Sensitive Animals | X | | | |
| T&E and Sensitive Plants | X | | | |
| Upland Vegetation | X | | | |
| Visual Resources | X | | | |
| Wastes, Hazardous or Solid | X | | | |
| Water Quality - Surface | X | | | |
| Wetlands/Riparian Zones | X | | | |
| Wild and Scenic Rivers | X | | | |

12

BLM_0018956

| Resource/Issue | N/A or Not Present | Applicable or Present, No Impact | Applicable & Present and Brought Forward for Analysis | Rationale for No Impact |
|---|---|---|---|---|
| Wild Horse & Burro Mgmt | X | | | |
| Wilderness Study Areas | X | | | |
| Wildlife – Aquatic | X | | | |
| Wildlife – Terrestrial | X | | | |

**Environmental Impact Analysis**

The following types of impacts are included in the evaluation of potential environmental impacts (all possible impacts are not described and, unless otherwise stated, impacts described in this chapter are assumed to be adverse). Comparison of impacts is intended to provide an impartial assessment to help inform the decision-maker and the public. The impact analysis does not imply or assign a value or numerical ranking to impacts. Actions resulting in adverse impacts to one resource may impart a beneficial impact to other resources. In general, adverse impacts described in this chapter are considered important if they result from, or relate to, the implementation of any of the alternatives. These impacts are defined as follows:

- **direct impacts --** impacts that are caused by the action, and that occur at the same time and in the same general location as the action.

- **indirect impacts --** impacts that occur at a different time or in a different location than the action to which the impacts are related.

- **short- or long-term impacts --** When applicable, the short-term or long-term aspects of impacts are described. For the purposes of this EA, short-term impacts occur during or after the activity or action and may continue for up to 2 years. Long-term impacts occur beyond the first 2 years.

## 3.1 Air Quality

### Scope of Analysis

It is within this context of the above identified alternatives that the remainder of the section focuses on the following items:
- Affected Environment
- Regulatory Framework
- Direct and Indirect Emissions
- Air Quality Impact Analysis
- Mitigation
- Cumulative Impacts Analysis

BLM_0018957

Note: The analysis in this section will tier to, or Incorporate by Reference (IBR), when appropriate, existing sections of "framework documents" where an applicable agency review of an affected resource has already been satisfactorily accomplished. Planning personnel at the BLM COSO have reviewed the documents outlined below in table 3.1, and with respect to the scope of the proposed action's potential effects on air quality (and any alternatives carried forward), finds them sufficient, and incorporates them by reference herein. Should deficiencies exist in any IBR analysis, the BLM will supplement with an appropriate qualitative and/or quantitative discussion where sufficient data and resources exist to provide such analysis.

**Table 3.1 Documents IBR for Air Quality Analysis**

| Title (Document Type) | Publication Year | Public domain (Link) |
|---|---|---|
| Iron Point Creek Coal Lease Tract, Elk Creek Coal Lease Tract, Iron Point Coal Exploration License – **(FEIS)** | 2000 | Not posted online. Paper copy available at Uncompaghre Field Office. |
| Federal Coal Lease COC-61357 Modification, Tract 5 – **(EA)** | 2011 | http://www.fs.fed.us/nepa/fs-usda-pop.php/?project=34307 |

**Affected Environment**

Implementation of the Proposed Action Alternative would result in emissions of criteria pollutants, hazardous air pollutants (HAPs), and greenhouse gases (GHGs). Fugitive particulate matter would be emitted when vehicles associated with the mining activities travel on existing dirt roads or overland access routes. Emissions of particulate matter would be generated from processing equipment, material handling transfer points, storage piles, rail load-out locations, and mine ventilation shafts. Air quality would also continue to be impacted by fuel combustion sources, such as the engine exhaust emissions from locomotives, mobile material handling equipment, personnel transport equipment, and stationary internal combustion engines.

Air quality in the region, which is generally made up of smaller towns, usually located in fairly broad river valleys, is affected by multiple activities currently conducted within the area. The facility is located near the boundaries of Delta and Gunnison Counties, and so it's reasonable to conclude that indirect and cumulative effects for the area would be influenced in the near field by sources of emissions within each county's respective emissions inventory. Activities occurring within the region that affect air quality include stationary facilities such as coal mining and subsequent coal mining operations (e.g., loading), concrete mix plants, gravel pits, lime storage facilities, natural-gas fired electrical generating plants, natural gas dehydration facilities, landfills, etc. Portable source examples include facilities such as gravel crushers, associated processing equipment, and asphalt plants. Mobile sources of emissions within the region would include highway or on-road vehicles, and off-road vehicles such as construction related equipment (dozers, loaders, backhoes, etc.) and recreational vehicles (snowmobiles, ATVs, and dirt bikes). Smoke from grass and forest fires represent area source emissions that can have an impact air quality.

14

**Regulatory Framework**

The Clean Air Act (CAA), which was last amended in 1990, requires the Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) (40 CFR part 50) for criteria pollutants.  Criteria pollutants are air contaminants that are commonly emitted from the majority of emissions sources and include carbon monoxide (CO), lead (Pb), sulfur dioxide ($SO_2$), particulate matter smaller than 10 & 2.5 microns ($PM_{10}$ & $PM_{2.5}$), ozone ($O_3$), and nitrogen dioxide ($NO_2$).
The CAA established 2 types of NAAQS:

- Primary standards:  – Primary standards set limits in order to protect public health, including the health of "sensitive" populations (such as asthmatics, children, and the elderly).
- Secondary standards:   – Secondary standards set limits in order to protect public welfare, including protection against decreased visibility, and damage to animals, crops, vegetation, and buildings.

The EPA regularly reviews the NAAQS (every five years) to ensure that the latest science on health effects, risk assessment, and observable data such as incidence rates are evaluated in order to re-propose any NAAQS to a lower limit if the data supports the finding.

The Colorado Air Pollution Control Commission, by means of an approved State Implementation Plan (SIP) and/or delegation by EPA, can establish state ambient air quality standards for any criteria pollutant that is at least as stringent as, or more so, than the federal standards.  Ambient air quality standards must not be exceeded in areas where the general public has access.  Table 3.2 lists the federal and state ambient air quality standards.

15

BLM_0018959

## Table 3.2, Ambient Air Quality Standards[1]

| Pollutant [final rule cite] | | Primary/ Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| CarbonMonoxide [76 FR 54294, Aug 31, 2011] | | primary | 8-hour | 9 ppm | Not to be exceeded more than once per year |
| | | | 1-hour | 35 ppm | |
| Lead [73 FR 66964, Nov 12, 2008] | | primary and secondary | Rolling 3 month average | 0.15 µg/m$^3$ [2] | Not to be exceeded |
| Nitrogen Dioxide [75 FR 6474, Feb 9, 2010] [61 FR 52852, Oct 8, 1996] | | primary | 1-hour | 100 ppb | 98th percentile, averaged over 3 years |
| | | primary and secondary | Annual | 53 ppb [3] | Annual Mean |
| Ozone [73 FR 16436, Mar 27, 2008] | | primary and secondary | 8-hour | 0.075 ppm [4] | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| Particle Pollution [71 FR 61144, Oct 17, 2006] | PM$_{2.5}$ | primary and secondary | Annual | 15 µg/m$^3$ | annual mean, averaged over 3 years |
| | | | 24-hour | 35 µg/m$^3$ | 98th percentile, averaged over 3 years |
| | PM$_{10}$ | primary and secondary | 24-hour | 150 µg/m$^3$ | Not to be exceeded more than once per year on average over 3 years |
| Sulfur Dioxide [75 FR 35520, Jun 22, 2010] [38 FR 25678, Sept 14, 1973] | | primary | 1-hour | 75 ppb [5] | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | primary | Annual | 0.03 ppm [6] | Arithmetic Average |
| | | secondary | 3-hour | 0.5 ppm | Not to be exceeded more than once per year |

**(1)** National Ambient Air Quality Standards (EPA, Oct. 2011)
**(2)** Final rule signed October 15, 2008.  The 1978 lead standard (1.5 µg/m3 as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standard are approved.
**(3)** The official level of the annual NO2 standard is 0.053 ppm, equal to 53 ppb, which is shown here for the purpose of clearer comparison to the 1-hour standard.
**(4)** Final rule signed March 12, 2008.  The 1997 ozone standard (0.08 ppm, annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years) and related implementation rules remain in place.  In 1997, EPA revoked the 1-hour ozone standard (0.12 ppm, not to be exceeded more than once per year) in all areas, although some areas have continued obligations under that standard ("anti-backsliding").  The 1-hour ozone standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is less than or equal to 1.
**(5)** Final rule signed June 2, 2010.  The 1971 annual and 24-hour SO$_2$ standards were revoked in that same rulemaking.  However, these standards remain in effect until one year after an area is designated for the 2010 standard, except in areas designated nonattainment for the 1971 standards, where the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standard are approved. (b) The 1997 standard—and the implementation rules for that standard—will remain in place for implementation purposes as EPA undertakes rulemaking to address the transition from the 1997 ozone standard to the 2008 ozone standard. (c) EPA is in the process of reconsidering these standards (set in March 2008).
**(6)** Colorado Primary Standard

**NOTE:**  Air quality in the Delta and Gunnison County Air Sheds currently meets all NAAQS & CAAQS.

BLM_0018960

**Emissions Source Classifications & Regulatory Authority**

Emissions sources are generally regulated according to their type and classification. Essentially all emissions sources fall into two broad categories, stationary and mobile.

Stationary sources are generally non-moving, fixed-site producers of pollution such as power plants, chemical plants, oil refineries, manufacturing facilities, and other industrial facilities. This source class can also cover certain types of portable sources. Stationary facilities emit air pollutants via process vents or stacks (point sources) or by fugitive releases (emissions that do not pass through a process vent or stack). Stationary sources are also classified as major and minor. A major source is one that emits, or has the potential to emit, a regulated air pollutant in quantities above a defined threshold. Stationary sources that are not major are considered minor or area sources. A stationary source that takes federally enforceable limits on production, consumptions rates, or emissions to avoid major source status are called synthetic minors. The Colorado Department of Health and Environment (CDPHE), Air Pollution Control Division (APCD) has authority under their approved SIP, or by EPA delegation, to regulate and issue Air Permits for stationary sources of pollution in Colorado.

Mobile sources include any air pollution that is emitted by motor vehicles, engines, and equipment that can be moved from one location to another (typically under their own power). Due to the large number of sources, which includes cars, trucks, buses, construction equipment, lawn and garden equipment, aircraft, watercraft, motorcycles, etc., and their ability to move from one location to another, mobile sources are regulated differently than stationary sources. In general EPA and other federal entities retain authority to set emissions standards for these sources depending on their type (on-road or off-road) and class (light duty, heavy duty, horse power rating, weight, fuel types, etc.). Mobile sources are not regulated by the state (an exception being California) unless they are covered under an applicable SIP specific to a non-attainment or maintenance area.

### Criteria Pollutants

Of all the criteria pollutants, only ground level ozone and secondary formation $PM_{2.5}$, also known as condensable particulate matter, are not directly emitted by emissions sources. Ozone is chemically formed in the atmosphere via interactions of oxides of nitrogen ($NO_X$) and volatile organic compounds (VOCs) in the presence of sunlight and under certain meteorological conditions ($NO_X$ and VOCs are Ozone precursors). Ozone formation and prediction is complex, generally results from a combination of significant quantities of VOCs and $NO_X$ emissions from various sources within a region, and has the potential to be transported across long ranges. Therefore, it is typically not appropriate to assess potential ozone impacts of a single project on potential regional ozone formation and transport. However, the State assesses potential ozone impacts from its authorizing activities on a regional basis when an adequate amount of data is available and where such analysis has been deemed appropriate. For this reason (inappropriate scale of analysis), ozone will not be further addressed in this document beyond the related precursor discussions.

The EPA defines $PM_{2.5}$ as particulate matter with an aerodynamic diameter less than or equal to 2.5 microns in size. According to the EPA the chemical composition of $PM_{2.5}$ is characterized in terms of five major components that comprise the mass of pollutant. In the West, organic carbon (OC) is generally the largest estimated component of $PM_{2.5}$ by mass. Primary emissions of $PM_{2.5}$ are generally from combustion processes with fireplaces and woodstoves being important contributors to OC. A

17

minority component of $PM_{2.5}$ is made up of crustal elements (i.e. fugitive dust). Secondary $PM_{2.5}$ will not be addressed in more detail than a general discussion of particulates due to the current lack of available technical methods and facility data to apply such analysis (see EPA's March 23, 2010 guidance memorandum "Modeling Procedures for Demonstrating compliance with $PM_{2.5}$ NAAQS").

## Hazardous Air Pollutants

Toxic air pollutants, also known as hazardous air pollutants (HAPs), are those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. The majority of HAPs originate from stationary sources (factories, refineries, power plants) and mobile sources (e.g., cars, trucks, buses), as well as indoor sources (building materials and cleaning solvents). No ambient air quality standards exist for HAPs, instead emissions of these pollutants are regulated by a variety of laws that target the specific source class and industrial sectors for stationary, mobile, and product use/formulations. The majority of HAPs emitted from OMLLC's operations are the result of the on-road and non-road vehicle use.

## Green House Gases

Gases that trap heat in the atmosphere are often called GHGs, and include carbon dioxide ($CO_2$), methane ($CH_4$), Nitrous Oxide ($N_2O$), and several fluorinated species of gases such as hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. Carbon dioxide is emitted from the combustion of fossil fuels (oil, natural gas, and coal), solid waste, trees and wood products, and also as a result of other chemical reactions (e.g., manufacture of cement). Methane is emitted during the production and transport of coal, natural gas, and oil. Methane also results from livestock and other agricultural practices and by the decay of organic waste in municipal solid waste landfills. Nitrous oxide is emitted during agricultural and industrial activities, as well as during combustion of fossil fuels and solid waste. Fluorinated gases are powerful GHGs that are emitted from a variety of industrial processes and are often used as substitutes for ozone-depleting substances (i.e., chlorofluorocarbon s, hydrochlorofluorocarbon s, and halons).

All of the different gases have various capacities to trap heat in the atmosphere, which are known as global warming potentials (GWPs). Carbon dioxide has a GWP of 1, and so for the purposes of analysis of GHGs, GWP is generally standardized to a carbon dioxide equivalent ($CO_2e$), or the equivalent amount of $CO_2$ mass the GHG would represent.

As with the HAPs, ambient air quality standards do not exist for GHGs. In its Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act, the EPA determined that GHGs are air pollutants subject to regulation under the CAA. The most recent rules promulgated to regulate the emissions and the industries responsible are the Mandatory Reporting Rule (74 FR 56260) and the Tailoring Rule (70 FR 31514). Under EPA GHG Mandatory Reporting Rule, Underground Coal Mines subject to the rule are required to report emissions in accordance with the requirements of Subpart FF. Under the provisions of the Tailoring Rule (step 2 – July 2011) a facility would be subject to PSD permitting if it has the potential to emit GHGs in excess of 100,000 tons per year of $CO_2e$ equivalent and 100/250 tons per year of GHGs on a mass basis. For existing facilities this review would take place during any subsequent modifications to the facility (CDPHE's anticipated implementation strategy).

18

The EPA is also planning to develop stationary source GHG emissions reduction rules (New Source Performance Standards) that could mandate substantial reductions in U.S. greenhouse gas emissions. Alternatively, Congress may develop cap-and-trade legislation as another means to reduce GHG emissions. Consequently, a GHG emissions calculation for coal burned at a power plant is likely to be increasingly regulated in the near future. The first EPA regulation to limit emissions of GHGs imposed carbon dioxide emission standards on light-duty vehicles, including passenger cars and light trucks (GPO 2010e). As of February 2011, the EPA had not set GHG emission standards for stationary sources (such as compressor stations); however, the EPA is gathering detailed GHG emission data from thousands of facilities throughout the U.S., and will use the data in order to develop an improved national GHG inventory, as well as to establish future GHG emission control regulations.

### Black Carbon

Black carbon is a by-product of incomplete combustion of fossil fuels, biofuels, and biomass. It can be emitted when coal is burned, as well as through tailpipe emissions from engines that use diesel fuel (such as diesel trucks and locomotives). Black carbon, therefore, is a likely by-product that will be emitted from haul trucks used during coal mining operations. Black carbon emissions from diesel tailpipe emissions are largely dependent upon the composition of the diesel fuel, and not upon the type of engine used. Black carbon is an unregulated pollutant; however, the EPA does regulate diesel fuel quality, such that, in recent years diesel fuel quality has been improved.

Black carbon is not emitted from the coal when it is being mined, but is likely to occur when the coal is combusted. Black carbon emissions associated with coal combustion occur at the facility where the coal is being burned, not where it is being mined.

It is a component of the anthropogenic global warming phenomenon, and acts to warm the earth's atmosphere by reducing the ability to reflect sunlight (albedo). It is the second highest contributor to global warming however; it is very short-lived, staying in the atmosphere only a few days to a few weeks. This analysis did not quantify indirect emissions of black carbon associated with the coal's combustion because: the BLM does not have information regarding the specific operational parameters and firing practices at facilities that may burn the coal (in order to produce electricity) which could greatly affect production volumes/rates of black carbon emissions and therefore it would not be practical to estimate emissions with such limited information; black carbon is not limited in existing air emissions permits where OMLLC coal is known or suspected of being consumed and limited guidance exists in speciating fractions of $PM_{2.5}$ that may represent black carbon if such emissions were limited in the faculties' permits to be able to estimate the black carbon fraction; and finally, most coal-fired power plants employ emission control devices (such as baghouses and cyclone separators) that would be capable of reducing black carbon emissions, therefore it is unlikely that black carbon emissions from coal-fired power plants would be a significant issue.

### Classes of Airsheds and Prevention of Significant Deterioration (PSD)

Classes of airsheds (any geographical area that defines the class boundary) are categorized as either Attainment, an area where the air does not exceed NAAQS specified concentrations of a criteria pollutant, or Nonattainment, an area where the air does exceed NAAQS specified concentrations of a criteria pollutant. Two additional subset categories of attainment exist for those areas where a formal designations has not been made, i.e. Attainment/Unclassifiable (generally rural, or natural areas), and for

19

areas where previous violations of the NAAQS have been documented, but pollution concentrations no longer exceed NAAQS concentrations, i.e. Attainment/Maintenance areas. Further, for all geographical regions are assigned a priority Class (1, 2, or 3) which describes how much degradation to the existing air quality is allowed to occur within the area under the (PSD) permitting rules. Class I areas are areas of special national or regional natural, scenic, recreational, or historic value, and essentially allow very little degradation in air quality, while Class 2 areas allow for reasonable industrial/economic expansion. There are currently no Class 3 areas defined in Colorado. The closest Federal/State mandatory Class 1 areas located near the proposed action alternative  area is the West Elk Wilderness Area (approx. 7 miles south-southeast), Maroon Bells-Snowmass (approx. 14 miles north-northeast), and the Black Canyon of the Gunnison National Park (approx. 25 miles southwest of Somerset, Colorado).

For an area that is in attainment for the NAAQS and CAAQS, the CAA provides specific criteria for stationary sources to allow for economic growth under the PSD permitting rules (40 CFR 52.21 or 40 CFR 51.166 for SIP approved Rules). Major PSD sources are required to provide an analysis to ensure their emissions in conjunction with other applicable emissions increases and decreases will not cause or contribute to a violation of any applicable NAAQS or PSD increment. A PSD increment is the amount of pollution an area is allowed to increase while preventing air quality in the airshed from deteriorating to the level set by the NAAQS. The NAAQS is a maximum allowable concentration "ceiling", while a PSD increment is the maximum allowable increase in concentration that is allowed to occur above a baseline concentration for a pollutant. The baseline concentration is defined for each pollutant and, in general, is defined as the ambient concentration existing at the time that the first complete PSD permit application affecting the area is submitted. Significant deterioration is said to occur when the amount of new pollution would exceed the applicable PSD increment. Under no circumstance can the air quality of the airshed deteriorate beyond the concentration allowed by the applicable NAAQS. In addition, the analysis required for permitting must include impacts to surface waters, soils, vegetation, and visibility (also known as air quality related values (AQRVs)) caused by any increase in emissions, and from associated growth. Associated growth is industrial, commercial, and residential growth that will occur in the area due to the source. Where a PSD source is located near a Class 1 airshed (within 50km) the AQRVs thresholds set by the applicable Class 1 controlling agency (Federal Land Manager) must be assessed to determine if an adverse impact on the area is likely to occur.

If a nonattainment designation takes effect for any criteria pollutant, the state will have three years to develop implementation plans outlining how areas will attain and maintain the NAAQS by reducing air pollutant emissions contributing to the violation. Further, any new major stationary source or major modification to a stationary source that emits a nonattainment pollutant in the designated area would be required to offset new or modified emissions sources in a ratio of greater than 1:1. Offset emission or emissions credits would be required to be obtained from within the designated nonattainment area.

**Emissions Inventory**

The proposed action alternative will produce direct and indirect emissions of the above identified pollutants from both stationary and mobile sources at the facility. As stated in the proposed action alternative, and no action alternative, emissions rates or intensities would not increase under either alternative and therefore the emissions inventory can reasonably be expected to be the same for each alternative based on the fact that production rates would not increase under either scenario. No reasonable foreseeable increases in emissions authorizations are anticipated by the implementation of any alternative.

20

**Direct Emissions**

With the exception of particulate matter (TSP & $PM_{10}$) all of the directly emitted criteria pollutants originating for the mine's operations are from fuel combustion sources, such as mobile mining equipment and stationary emergency generators.   HAPs and GHGs are also emitted from fuel combustion sources, albeit in de minimis amounts.  The overwhelming majority of the Elk Creek mine GHG emissions are the result of ventilation and methane drainage systems that are installed to reduce the combustion potential of the mines underground atmosphere. The systems at the OMLLC mine consist of VAM, GVB methane, and a pipeline drainage network infrastructure that collects and delivers methane from the mine.

The majority of $PM_{10}$ emissions in the area are from miscellaneous sources which are mainly fugitive dust sources rather than stack emissions or internal engine combustion sources.  Fugitive emissions are those not caught by a capture system and are often due to equipment leaks, earth moving/quarrying, equipment and vehicles traveling on paved and unpaved roads, and windblown disturbances.
Stationary sources (including any area and fugitive emissions) at the Elk Creek mine are regulated by CDPHE and are authorized by APCD permit number 98GU0812 (modification 5) where applicable. The permit provides limitations and requirements to limit potential emissions from the site to below major source thresholds for certain criteria pollutants.  Therefore, the source is classified as a minor source and is not subject to the PSD rule requirements for permitting at this time.   Some stationary equipment at the site is covered by New Source Performance Standard (NSPS) subpart Y, which specifies emissions standards for coal preparation plants (see permit condition 13).  Under the SIP PSD rules the site is covered under one of the 28 named source categories (AQCR 3, Part D, Section II.A.24.e) which requires inclusion of any fugitive emissions related to the coal process operations  -in the site's potential to emit calculations for major source determination.  The latest revisions made to the permit were issued prior to the implementation of the SIP rules for GHG permitting, and therefore the permit does not cover GHG emissions (including methane) from the mine.  Stationary sources of direct emissions at the Elk Creek mine and within the lease area include the following:

•       Material Handling Conveyors
•       Mine Ventilation Shafts
•       Internal Combustion Engine
•       Fuel Storage Tanks
•       Material Processing Screens
•       Material Processing Crushers
•       Surface Operations (fugitive PM)
•       Misc. Facility Heating Equipment
•       Methane Drainage Wells (MDW) (continuing activity only, not part of current action)
•       MDW Land Disturbance (fugitive PM, continuing activity only, not part of current action)

For sources listed above where emissions limits are not explicitly expressed in an activity authorizing permit or where not considered de minimis, emissions profiles were either tiered from existing framework documents where an appropriate and applicable analysis was already performed, or they were estimated in accordance with the methods and assumptions outlined in Appendix C.  Stationary source emissions and any applicable reference citations are provided in Table 3.3 below.

21

BLM_0018965

HAP emissions from stationary sources are considered de minimis. For the purposes of disclosing impacts from the alternatives proposed, insufficient data and analysis exists to determine if any portion of the MDW emissions would be considered a hazardous air pollutant. Of the sources identified above, only the fuel tanks, internal combustion engine, and miscellaneous heating equipment would generate HAP emissions. Because of the limited use or the exempt status of the identified units, expected cumulative HAP emissions from these sources would be on the order of pounds per year, and therefore will not be analyzed any further in this document.

Mobile sources at the facility include underground mining equipment, listed under source classification code (SCC) 2270009010, and aboveground construction equipment identified under SCC 2270002000, as well as light duty gasoline trucks. The underground mining mobile sources are specialized, industry specific equipment designed to function in the unique environment of an underground mine, while the aboveground sources would be heavy construction equipment used for material handling, stockpile management, and drilling.

With respect to generating an emissions inventory for the mobile sources at the site, insufficient data was available to develop equipment specific, or fleet based emissions that would correspond to the authorized production rates. A detailed analysis for each mobile source would have to be developed to include equipment specifications such as age, horse power, and the type of equipment, as well as operational parameters such as the hours per year each piece of equipment was used, or the exact amount of fuel the source consumed, the average loading factor, average work cycles per hour, vehicle miles travelled, etc. The level of detail required to provide a speciated source specific emissions inventory for each mobile source at the Elk Creek mine is beyond the scope of the analysis required for this EA.

To provide acceptable emissions estimates and to fully disclose expected direct emissions from the facilities' mobile sources, BLM used the EPA's Nonroad model (2008a) to generate SCC specific emissions factors (grams per horsepower-hour) for the Delta and Gunnison County based equipment inventories for the year 2000. The year 2000 inventory was chosen to be reasonably conservative, with respect to the fleet's overall state of control technology integration that would be expected to increase as the inventory equipment ages and is replaced with newer and better controlled sources. To estimate emissions from the sources, BLM staff had to determine a reasonable thermal efficiency (TE) for the SCC groups in order to estimate the total horsepower-hours the annual fuel use would provide to the equipment. This was necessary because the emissions factors derived from the Nonroad model already account for the overall TE of the equipment, as well as some of the other variables, such as deterioration factors, loading factors, etc. The $CO_2$ emission factor was used to estimate the TE because the model does not rely on a particular control technology, engine class, or equipment type for derivation, and instead calculates the $CO_2$ emissions rates based on the in-use brake specific fuel consumption (BSFC - reported as pounds of fuel per horsepower-hour), which is essentially static across all horsepower classes for all model years. Example TE and total horsepower-hour calculations and applicable references are provided in Appendix A along with the emissions estimate calculations for the data provided in table 3.3 below.

For the light duty gasoline trucks (LDGT), BLM staff used the corporate average fuel efficiency (CAFE) mileage standards for the model year (MY) 2004 to estimate total vehicle miles travelled (VMT) from the fuel use data that was provided by the mine. The VMT data was then multiplied by the pollutant specific emissions factors for MY 2004 LDGT to derive emissions. 2004 was chosen to be conservative

22

and to reflect the fact that gasoline engines do not last as long as typical diesel powered equipment used at similar rates. Example emissions estimates and applicable references are provided in Appendix A.

MDW installation and the associated foreseeable land disturbance were adequately covered under the referenced Forest Service EA, which essentially stated that no surface occupancy was allowed with this particular action. However, in accordance with the currently approved mine plan this activity would continue in authorized areas. Sources of emissions would include construction equipment, drilling equipment, and fugitive dust from disturbed surfaces. Mobile source emissions from this activity are adequately reflected in the inventory below since this activity is ongoing at present. The Elk Creek mine currently maintains a fugitive dust control plan that is enforceable under state rules, which would include provisions for minimizing fugitive dust on MDW access routes during travel and their construction. Methane emissions from this activity require reporting to EPA under the previously mentioned Mandatory Reporting Rules.

BLM_0018967

**Table 3.3 Direct Criteria and GHG Emissions from Stationary and Mobile Sources (2011)**

| Stationary Sources | AIRS ID | PM | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggregates / Mine Vents / Fugitives (98GU0812) | 10 - 22, 24 – 31 | 173.97 | 73.30 | 73.30[1] | NA | NA | NA | NA | NA | NA | NA |
| Diesel Storage Tanks (XA) | 09 | NA | NA | NA | 7.99[2] | NA | NA | NA | NA | NA | NA |
| Internal Combustion Engine (98GU0812) | 21 | 0.02 | 0.02 | 0.02 | 0.04 | 0.35 | 0.65 | 0.00 | 70.95 | 0.00 | ND |
| Methane Sources | NA | NA | NA | NA | NA | NA | NA | NA | ND | 56,721[4] | NA |
| Mics. Heating Equipment | NA | 1.18 | 0.94 | 0.94 | 0.01 | 0.08 | 0.17 | 0.03 | 177.59 | 0.00 | 0.00 |
| Mobile Sources[3] | SCC | PM | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Underground Mining Equipment | 2270009000 | 2.74 | 2.74 | 2.66 | 4.20 | 16.22 | 19.27 | 0.26 | 1,217.69 | 0.06 | 0.03 |
| Surface Mining Equipment | 2270002036 2270002051 2270002060 2270002069 2270002033 | 1.67 | 1.67 | 1.62 | 2.04 | 10.81 | 23.11 | 0.36 | 1,681.56 | 0.03 | 0.04 |
| Gasoline Trucks | LDGT | 0.050 | 0.050 | 0.046 | 0.077 | 1.113 | 0.115 | 0.037 | 164.624 | ND | ND |
| **Total Direct Emissions (tons)** | | **179.63** | **78.72** | **78.59** | **14.36** | **28.57** | **43.32** | **0.69** | **3,312.41** | **56,721.09** | **0.07** |

24

BLM_0018968

1   All PM10 assumed to be PM2.5, site specific data is not known.

2   Emissions based on APEN exemption threshold in attainment area (< 2.0 tpy) x 4 tanks.

3   Mobile sources emissions are for exhaust only.

4   The $CO_2$e of the methane gas is approximately 1,191,141 tons.

### Indirect Emissions

Electrical energy consumed at the Elk Creek mine can reasonably be expected to produce emissions from the supplying source, unless that source is some form of renewable energy. It is possible to provide rough estimates of emissions from mine electricity consumption if the annual energy consumption and supplier data is known, however the consumption information is not available to the BLM at this time.

Train emissions from hauling the mined and processed coal were accurately quantified in the original EIS prepared for the mine and are discussed further under Potential Impacts Analysis for Criteria Pollutants below. The analysis tiers to the referenced EIS in support of the rail emissions discussion. Rail hauling emissions would continue under the proposed action alternative.

Combustion of the mined and processed coal will produce all of the emissions outlined under Black Carbon above. According to the U.S. Energy Information Administration (2009), nearly 94 percent of all coal consumed in the U.S. during 2009 was used in the generation of electric power. Because of this, it can reasonably be assumed that the coal will be shipped to a coal-fired power plant. It would be possible to provide a quantification of Criteria, GHG, and HAP emissions associated with the burning of the mined coal at a specific facility; however, the types and location of the facilities the coal might be processed and consumed in is speculative and not foreseeable. The contractual agreements between the coal fired power plant and the coal supply company are outside the scope of this analysis, and the BLM does not determine at which facilities the coal is used. Different emissions control devices on a power plant could greatly affect the amount of Criteria, HAP and GHG emissions that are released into the atmosphere. For example, a power plant that is equipped with selective catalytic reduction or practices $CO_2$ capture would ultimately release much smaller quantities of $NO_X$ and $CO_2$ than a power plant lacking such controls.

Even though the BLM cannot reasonably say where the coal is ultimately going to be burned, it is still possible to do emissions calculations to estimate the associated $CO_2$ emissions from the combustion of the coal. The specific information required, i.e. the number of tons of coal produced per year from the mine, and the heat content or carbon content of that coal in British thermal units (BTUs) or % weight per ton, is known for the proposed lease tract. However since the type of facility the coal might be processed in (i.e., the control efficiency of the facility) is speculative; calculations were made using average numbers for U.S. facilities. Therefore the emissions calculation does not represent an accurate estimate of potential GHG emissions from this specific project. That said, assuming the Proposed Action Alternative would potentially generate 5.0 million tons of high-quality low-sulfur supercompliant bituminous coal per year, with an average heat content of 24.2 million (BTUs) per ton, nearly 12.12 million metric tons of carbon dioxide equivalent ($CO_2$e) would be emitted. This amount represents nearly 10.14 percent of all $CO_2$e emissions in Colorado during 2007, nearly 0.18 percent of all $CO_2$e emissions in the U.S. during 2007, and nearly 0.05 percent of global $CO_2$ emissions during 2007 (CAIT-US 2011). These calculations are based upon default emission factors for stationary combustion in the Energy Industries (IPCC 2006), assuming no other use of the coal and

25

complete total combustion, and therefore represent a conservative overestimate of potential GHG emissions.

Ultimately, any near or far field impacts associated with most of the indirect emissions sources identified above will ultimately receive analysis (and most likely permitting) from their respective regulatory agencies, so this action should not cause or contribute to the likeliness, frequency, or severity of any detrimental impacts at the respective sources.

**Air Quality Impacts**

The airshed in the proposed action alternative area (Western Counties) is currently designated as attainment for all criteria pollutants.  The attainment status for pollutants in the project area is determined by monitoring levels of criteria pollutants for which NAAQS and CAAQS apply.  The attainment designation means that no violations of any ambient air quality standard have been documented in the area.  The airshed around the proposed action alternative area is also identified as a Class 2 airshed, which allows for reasonable economic growth.  Table 3.4 below provides a listing of the most recently available emissions inventory made by CDPHE for the Delta and Gunnison County emissions sources.

**Pollution Monitoring**

Grand Junction is the only large city in the area, and the only location that monitors for CO and air toxics on the western slope.  In 2008, Rifle, Palisade, and Cortez began monitoring for ozone.  The other Western County locations monitor only for particulates.  They are located in Delta, Durango, Parachute, and Telluride.  Currently, there are four gaseous pollutant monitors and 11 particulate monitors in the Western Counties area.  There are one CO, three $O_3$, eight $PM_{10}$, and three $PM_{2.5}$ monitoring sites.  $PM_{10}$ data have been collected in Colorado since 1985; however, the samplers were modified in 1987 to conform to the requirements of the new standard.  Therefore, available trend data is only valid back to 1987.  Since 1988, the state has had at least one monitor exceed the level of the 24-hour $PM_{10}$ standard (150 µg/m) every year except 2004.  Monitoring for $PM_{2.5}$ in Colorado began with the establishment of sites in Denver, Grand Junction, Steamboat Springs, Colorado Springs, Greeley, Fort Collins, Platteville, Boulder, Longmont, and Elbert County in 1999.  Additional sites were established nearly every month until full implementation of the base network was achieved in July of 1999.  In 2004, there were 20 $PM_{2.5}$ monitoring sites in Colorado.  Thirteen of the 20 sites were selected based on the population of the metropolitan statistical areas.  This is a federal selection criterion that was developed to protect the public health in the highest population centers. In addition, there were seven special-purpose monitoring (SPM) sites.  These sites were selected due to historically elevated concentrations of $PM_{10}$ or because citizens or local governments had concerns of possible high $PM_{2.5}$ concentrations in their communities.  All SPM sites were removed as of December 31, 2006 due to the low concentrations of $PM_{2.5}$ measured and a lack of funding.

Because the Elk Creek Mine is primarily a source of $PM_{10}$ emissions, only the recent monitoring data for particulate matter is shown below.  The regional monitoring data for both ozone and carbon monoxide suggests the air quality at the monitored locations is easily attaining the national standards, and therefore was not included in the values table below.  More so than other pollutants, $PM_{10}$ is a localized pollutant where concentrations vary considerably.  Thus, local averages and maximum concentrations of $PM_{10}$ are more meaningful than averages covering large regions or the entire state.

26

The data below is presented for qualitative purposes only.

With respect to $PM_{2.5}$, the available monitoring data for the region suggests continued attainment of the standard. Because of the limited $PM_{2.5}$ emissions from the site (actual crustal element fractions verses assumed $PM_{10}$ equivalency), $PM_{2.5}$ emissions are not expected to pose any significant impacts to area air quality.

**Table 3.4 Western County Gaseous, Particulate, and Meteorological Monitors in Operation for 2010**

| County | Location | CO | SO$_2$ | NO$_x$ | O$_3$ | PM$_{10}$ | PM$_{2.5}$ | Met |
|---|---|---|---|---|---|---|---|---|
| Delta | Delta - Health Dept 560 Dodge St. | | | | | X3 | | |
| Garfield | Rifle - Health Dept 195 W. 14th Ave. | | | | X | | | |
| | Rifle - Henry Building 144 E. 3 | | | | | X3 / H | H | |
| | Parachute - Elem. School 100 E. 2 | | | | | X3 | | |
| La Plata | Durango - River City Hall 1235 Camino del Rio | | | | | X3 | | |
| Mesa | Grand Junction - Pitkin 645¼ Pitkin Ave. | X | | | | H | | X |
| | Grand Junction - Powell 650 South Ave. | | | | | X3 | X3 / H | |
| | Palisade Water Treatment 865 Rapid Creek Rd. | | | | X | | | X |
| | Clifton - Hwy. 141 & D Rd. | | | | | X3 | | |
| Montezuma | Cortez - Health Dept 106 W. North Ave. | | | | X | | X6 | |
| San Miguel | Telluride - 333 W. Colorado Ave. | | | | | X3 | | |

(Xn) – Filter Sample Continued; n=frequency in days, (H) – Hourly particulate

BLM_0018971

**Table 3.5  Western County Monitored Particulate Matter Values for NAAQS**

| County | Location | PM$_{10}$ | | | PM$_{2.5}$ | |
|---|---|---|---|---|---|---|
| | | Annual[1] | 24 Hour | 3 Yr. Ave. Ex. | Annual | 24 Hour |
| Delta | Delta - Health Dept 560 Dodge St. | 23.4 | 125 | 0 | | |
| Garfield | Rifle - Henry Building 144 E. 3 | 25.5 | 59 | 0 | < 3 yrs Data | < 3 yrs Data |
| | Parachute - Elem. School 100 E. 2 | 22.5 | 125 | 0 | | |
| La Plata | Durango - River City Hall 1235 Camino del Rio | 24.8 | 320 | 6.1 | | |
| Mesa | Grand Junction - Pitkin 645¼ Pitkin Ave. | 26.8 | 171 | 1 | | |
| | Grand Junction - Powell 650 South Ave. | 22.9 | 155 | 0 | 9.3 | 34.5 |
| | Clifton - Hwy. 141 & D Rd. | 23 | 189 | 3 | | |
| Montezuma | Cortez - Health Dept 106 W. North Ave. | | | | < 3 yrs Data | < 3 yrs Data |
| San Miguel | Telluride - 333 W. Colorado Ave. | 19.9 | 354 | 3.1 | | |

[1] Annual standard rescinded.

28

BLM_0018972

**Table 3.6  Delta and Gunnison County Emissions Inventory (CDPHE 2008)**

| Source Type | Inventory Pollutants | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CO | | NO$_2$ | | SO$_2$ | | PM$_{10}$ | | VOC | | BEN | |
| | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta |
| Vehicles: | 3,830.83 | 5,027.39 | 537.35 | 745.32 | 3.95 | 5.80 | 21.50 | 30.95 | 365.69 | 461.62 | 11.49 | 14.53 |
| Road Dust: | ND | ND | ND | ND | ND | ND | 1,229.75 | 961.00 | ND | ND | ND | ND |
| Non-Road: | 2,097.71 | 1,206.47 | 275.42 | 248.62 | 0.84 | 0.77 | 39.32 | 27.57 | 664.81 | 270.94 | 16.57 | 7.22 |
| Wood burning: | 1,115.69 | 2,254.55 | 15.09 | 30.50 | 2.34 | 4.73 | 154.58 | 312.36 | 215.74 | 435.96 | 9.17 | 18.52 |
| Point Source: | 38.06 | 0.86 | 36.05 | 6.09 | 0.92 | 0.19 | 215.46 | 378.17 | 60.71 | 17.27 | 1.10 | 0.13 |
| Railroad: | 8.22 | 22.14 | 83.43 | 224.75 | 4.75 | 12.80 | 2.07 | 5.58 | 3.11 | 8.37 | 0.01 | 0.02 |
| Aircraft: | 121.58 | 288.03 | 4.17 | 1.56 | 0.48 | 0.24 | 2.33 | 5.67 | 9.39 | 27.07 | 0.22 | 0.65 |
| Forest/Ag. Fires: | 3,389.85 | 1,051.06 | 89.51 | 34.90 | 28.64 | 7.88 | 469.02 | 130.29 | 218.40 | 61.39 | 16.42 | 4.62 |
| Solvents: | ND | ND | ND | ND | ND | ND | ND | ND | 57.25 | 116.38 | ND | ND |
| Agricultural Tilling: | ND | ND | ND | ND | ND | ND | 0.79 | 270.88 | ND | ND | ND | ND |
| Structure Fires: | 0.93 | 1.91 | 0.02 | 0.04 | ND | ND | 0.17 | 0.34 | 0.17 | 0.35 | ND | ND |
| Surface Coating: | ND | ND | ND | ND | ND | ND | ND | ND | 52.22 | 89.46 | ND | ND |
| Restaurants: | 1.44 | 2.94 | 0.01 | 0.02 | 0.01 | 0.02 | 3.88 | 7.93 | 3.59 | 7.33 | 0.06 | 0.13 |
| Biogenic: | 2,681.08 | 2,040.81 | 192.99 | 232.53 | ND | ND | ND | ND | 20,474.30 | 16,546.90 | ND | ND |
| Oil Gas Point: | 131.56 | ND | 147.24 | ND | 0.07 | ND | 0.97 | ND | 84.79 | ND | 2.81 | ND |
| Oil Gas Area: | 23.23 | 4.97 | 20.36 | 0.11 | 0.44 | ND | 2.21 | 367.98 | 54.92 | 0.57 | ND | ND |
| Combustion: | 29.73 | 231.14 | 19.55 | 47.37 | 1.82 | 15.18 | 0.62 | 0.00 | 1.81 | 9.91 | 0.00 | 0.00 |
| Tank Trucks: | ND | ND | ND | ND | ND | ND | ND | ND | 0.29 | 0.33 | 0.00 | 0.00 |
| Refueling: | ND | ND | ND | ND | ND | ND | ND | ND | 10.77 | 14.55 | 0.11 | 0.15 |
| Portables: | ND | ND | ND | ND | ND | ND | ND | ND | 15.03 | 10.49 | 0.05 | 0.03 |
| Construction: | ND | ND | ND | ND | ND | ND | 400.97 | ND | ND | ND | ND | ND |
| Pesticides: | ND | ND | ND | ND | ND | ND | ND | ND | 13.48 | 27.52 | ND | ND |
| **Totals (tons):** | **13,469.91** | **12,132.27** | **1,421.20** | **1,571.84** | **44.28** | **47.61** | **2,543.65** | **2,498.73** | **22,306.46** | **18,106.41** | **58.01** | **46.00** |

ND = No Data

BLM_0018973

**Table 3.7 Mesa County Emissions Inventory (tons), Total Emissions (CDPHE 2008)[1]**

| CO | NO$_2$ | SO$_2$ | PM$_{10}$ | VOC | BEN |
|---|---|---|---|---|---|
| 40,688 | 9,048 | 2,879 | 8,050 | 39,828 | 161 |

[1] Provided for illustration purposes only.

**Potential Impacts Analysis for Criteria Pollutants**

A detailed air quality assessment, including modeling, of the original mine was conducted as part of the environmental analysis for the Elk Creek Coal Lease Tract in 2000. (See Final Environmental Impact Statement Iron Point Exploration License; Iron Point Coal Lease Tract; Elk Creek Coal Lease Tract Delta and Gunnison Counties, Colorado, USFS and BLM 2000.) In this Final EIS (FEIS), an air quality assessment was completed for the original Elk Creek mine, which is permitted by the State to produce up to 5.0 million tons of coal and coal-refuse annually. The proposed action alternative analyzed in this EA is an expansion of that original mine. As stated previously, the proposed action is to continue mining operations into an additional area. That is, the action would not constitute adding additional production to previously authorized limits or increasing mining intensity.

The air quality analysis conducted for the original mine included an emissions inventory and modeling analysis. That emissions inventory quantifies PM$_{10}$, NO$_X$, and SO$_2$ emissions. The modeling analysis also includes a visibility impacts assessment in the West Elk Wilderness Area as well as an atmospheric deposition impacts assessment. Emissions that were calculated and modeled included tailpipe emissions from mining equipment, haul trucks, and locomotives (railway emissions). The results of that detailed impact assessment predicted no significant impacts to air quality as a result of authorizing the proposed action.

The equipment used for the mine expansion will be the same equipment that is being used in the current mining operations. Therefore, the air quality impacts associated with the proposed mine expansion can be presumed to be equal to, or less than, impacts predicted in the original air quality impact assessment. The air quality assessment for this EA tiers to that original assessment. Additionally, given the age of the original assessment, and the useful life of most of the equipment, it can be reasonably expected that some of the equipment has been replaced by newer models, which would have the effect of reducing equipment emissions based on the regulatory requirements placed on newer nonroad engines.

As related to railway emissions, due to more stringent regulations since the North Fork Coal EIS was written, the EPA predicted that, on a nationwide average, NO$_X$ emissions from locomotives in the year 2010 would be about 40 percent less than emissions compared to 1999 levels (North Fork Coal EIS, page 3-7). The North Fork Coal EIS air quality impact analysis, which relied on emissions factors for 1999, determined NO$_X$ emissions to be insignificant; therefore, it can be presumed that NO$_X$ emissions associated with current use of trains is actually lower than previously modeled levels.

With respect to potential ozone formation, the county level analysis of the emissions inventory suggests the region is potentially NO$_X$ limited. Therefore, to effectively limit any potential for ozone formation due to area emissions, controls should focus on controlling NO$_X$ emissions. By continuing to limit the minor reaction species, ozone formation potential from area emissions

BLM_0018974

should remain small. The Elk Creek mine is not a significant source of VOC emissions (the photochemical reactivity potential of methane in the troposphere is considered negligible (40 C.F.R. 51.100 (s))), and therefore OMLLC's operations are not expected to contribute to any regional ozone formation potential.

CDPHE also requested OMLLC to perform near field modeling in support of recent modifications made to incorporate several construction permits into a single permit and for the implementation of the CMM to energy initiative discussed above. APCD has stated it considers the mine and energy production equipment a single source, and as such modeling was conducted that included the mining operations, and the proposed energy production equipment. The modeling protocol, which included cumulative impacts from the adjacent West Elk Mine's operations, was approved by CDPHE prior to running the model (AERMOD). The modeled pollutants included $PM_{10}$, $PM_{2.5}$, CO, and $NO_2$. The modeling results did not predict any significant impacts to ambient air quality.

**Potential Impacts Analysis for Greenhouse Gas Pollutants**

According to the U.S. Global Change Research Program (2009), global warming is unequivocal, and the global warming that has occurred over the past 50 years is primarily human-caused. Standardized protocols designed to measure factors that may contribute to climate change, and to quantify climatic impacts, are presently unavailable. As a consequence, impact assessment of specific impacts related to anthropogenic activities on global climate change cannot be accurately estimated. Moreover, specific levels of significance have not yet been established by regulatory agencies. Therefore, climate change analysis for the purpose of this EA within this air quality section is limited to accounting for GHG emissions changes that would contribute incrementally to climate change. Qualitative and quantitative evaluations of potential contributing factors are included where appropriate and practicable.

Methane associated with coal seams and the surrounding rock would be liberated during the mining process, as well as during the subsequent fracturing of the overburden, which occurs as the gob area (the portion of coal panels that have already been mined) is allowed to collapse. In order to protect the health and safety of miners working underground, explosive gases would be removed from the mine via a ventilation system as well as through GVBs drilled into the gob area. GVBs would be drilled to about 10 to 50 feet above the target coal seam about 1 year before mining operations begin (where surface stipulations do not otherwise prohibit occupancy). As the longwall mining passes under the GVB, the strata around the GVB would fracture and liberate methane. GVBs would actively pump mine atmosphere (including methane) to the surface. The GVB pumps are fueled by methane from the gob. The process of fracturing and liberation of methane would continue as the mined area collapses behind the mining operation, and the GVBs continue to pump methane from the gob. Both the ventilation system and the GVBs would release methane directly into the atmosphere. This would result in varying levels of methane release, based upon the relative concentration of methane in the mine air and overburden. Because methane emission rates are roughly correlated with coal production rates, and because coal production from the Elk Creek mine is expected to be consistent with current production rates, the rate of methane emission is not expected to differ greatly from current emission rates, which based on EPA estimates, are believed to be approximately 7.4 million cubic feet per day.

31

BLM_0018975

Approximately 10.5 percent of U.S. emissions of methane come from underground coal mining activities (EPA 2008). Based upon the ―Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2008‖ (EPA Publication 430-R-10-006), April 15, 2010, total coal mining related methane emissions in 2008 were 6.76 tg (teragrams=one million metric tons), and total GHG emissions were 6,956.8 tg $CO_2$ equivalent. Estimated total methane emissions for the proposed action alternative are 1.19 million tons of $CO_2$ equivalent or 0.0171 percent of the total calculated $CO_2$ equivalent emissions (1.23 to 6,957) for the U.S. in 2008. Based upon this analysis (limited to GHG emissions), the calculated GHG emissions associated with the proposed action alternative are negligible relative to any potential impacts on the global scale. If the calculated GHG emissions were compared with the global figures (2005 $CO_2$ equivalent emissions of 26,544tg, ―World Development Report 2010: Development and Climate Change, World Bank, 2010), the relative significance of the impact to the global climate would further decrease.

The implementation of the Proposed Action Alternative is estimated to contribute 1.19 million tons of GHG equivalent annually, with that being about 0.0171 percent of total U.S. contribution. Regardless of the accuracy of emission estimates, predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time. As such, the controversy is to what extent GHG emissions resulting from continued mining may contribute to global climate change, as well as the accompanying changes to natural systems, cannot be quantified or predicted. The degree to which any observable changes can, or would be, attributable to the Proposed Action Alternative cannot be reasonably predicted at this time.

**Mitigation (Criteria Emissions)**

Mitigation measures and emissions controls would be implemented to reduce particulate matter/fugitive dust emissions during ongoing production activities. Fugitive emissions from all vehicles traveling on non-paved surfaces during all project phases would be controlled utilizing appropriate dust suppression measures applied to the non-paved roads. Storage piles would be watered as necessary to limit wind erosion potential and reduce fugitive emissions. Most coal transfer points and processing activities during coal production would be enclosed and, therefore, limit fugitive particulate matter emissions.

The OMLLC would continue to comply with their APCD issued air emissions permit provisions, and any other regulatory requirements their Elk Creek mine is subject to, now or in the near future (GHG emissions reductions, methane capture, New Source Performance Standards, etc.).

Potential mitigation measures to decrease project impacts to global warming during production and operation include:
•       Use of alternative fuel in production and operation equipment,
•       Use of local building materials, and
•       Recycling of demolished construction material.

**Mitigation (Greenhouse Gas Emissions)**

With regard to production activities at the mine, methane liberation from the mine may be reduced through mine planning, sealing previously mined areas, and degasification efforts. Methane drainage systems, consisting of vertical and horizontal boreholes could reduce methane

BLM_0018976

gas emissions from the un-mined reserve. This can reduce mine ventilation emissions when the coal is mined. Degasification procedures can only be developed as experience is gained during future mining.

Additionally, BLM proposes to include new stipulations to identify applied mitigation opportunities to reduce any projected or potential environmental impacts. The BLM provides lease stipulations to protect natural resources where appropriate for any leasing action that is authorized. Therefore, the following stipulated terms and conditions will be applied to the OMLLC lease.

BUREAU OF LAND MANAGEMENT SPECIAL COAL LEASE STIPULATIONS AND FORM 3400-12 COAL LEASE

The BLM will attach the following special stipulations to any mine permit issued under the Proposed Action.

In addition to observing the general obligations and standards of performance set out in the current regulations, the lessee shall comply with and be bound by the following special stipulations:

- OMLLC will be required to evaluate the technical and economic feasibility of converting or using CMM, a gas resource, that will be released to the atmosphere by the mine ventilation systems not currently covered (VAM and GVB) under its proposed methane to energy control project. The stipulation requires that an analysis is carried out to show whether or not any potential mitigation alternative is economically feasible and protective to the health, safety, and lives of the miners.
- OMLLC will be required to prepare and submit to BLM annual reports of the evaluations. The annual report shall include at a minimum an investigation for adoption and implementation of all current CMM control technologies being employed at any working mine. The annual reports must explicitly differentiate the circumstances where the successful implementation of any control methods/technology would not be workable at the Elk Creek mine where it can be shown that the lives and safety of the miners can be provided for.
- Any options for control that are discounted for economic infeasibility shall provide a detailed cost/benefit and payback analysis (if applicable) to demonstrate why the option was eliminated.
- Within 18 months of startup of the CMM to energy project, OMLLC will submit to MSHA for approval for its design of the enclosed flaring system. Engineering specifications, as built drawings, standard operating and maintenance procedures, and all safety system monitoring and calibration procedures shall be submitted to the BLM Colorado State Office for review and records retention. All correspondence between OMLLC and MSHA shall cc BLM so we may maintain records of the approval.
- Options for mitigating methane releases that are deemed economically feasible and protective to the life, health, and safety of the miners will be implemented as part of future lease additions through additional environmental analysis.

Note: Currently there are not feasible control alternatives that are economical and provide for the health and safety of the mine workers with respect to the VAM and GVB emissions.
These stipulations are also imposed upon the lessee's agents and employees. The failure or refusal of any of these persons to comply with these stipulations shall be deemed a failure of the

33

BLM_0018977

lessee to comply with the terms of the lease. The lessee shall require his agents, contractors, and subcontractors involved in activities concerning this lease to include these stipulations in the contracts between and among them. These stipulations may be revised or amended, in writing, by the mutual consent of the lessor and the lessee at any time to adjust to changed conditions or to correct an oversight.

As discussed above OMLLC has recently implemented a CMM to energy conversion project that will capture methane via an insitu drainage network infrastructure and combust the gases in stationary engine/generator sets. According to Vessels Coal Gas, Inc. the initial system design calls for the installation of three 1 MW generator sets. The quantity and average methane content of the insitu gas collection and delivery system is not known, but the engines will be capable of combusting methane concentrations down to 20% by volume. BLM estimates that potential greenhouse gas reductions from the implementation of the project will be approximately 87%. The potential range in mass emissions reductions on a $CO_2$e basis are from 84.2 to 168.5 thousand tons per year. Details and assumptions for the emissions estimates are provided in Appendix A.

**No Action Alternative**

Under the No Action Alternative, mining of the Elk Creek modification tract would not be permitted. Current levels of methane liberation, and emissions associated with the existing mine plan, would continue until mining is completed. The facility would continue to comply with their APCD issued air emissions permit provisions, and any other regulatory requirements the facility is subject to, now or in the near future (GHG emissions reductions, methane capture, New Source Performance Standards, etc...). Methane emission associated with proposed mining of the Elk Creek lease tract modification would not occur.

### 3.1.1 Climate Change

Continued mining, operation of mine surface facilities, and associated vehicle traffic, would result in minor cumulative contributions to the release of GHGs into the atmosphere. The mining, processing, and shipping of coal from the Elk Creek mine, and from other mines in the area, would contribute to GHG emissions through carbon fuels used in mining (including fuel consumed by heavy equipment and stationary machinery), electricity used on site, methane released from mined coal, and rail transport of the coal. The use of the coal after it is mined has not been determined at this time; however, almost all of the coal that would be mined from the Elk Creek mine would be used by coal-fired power plants in order to generate electricity. This also results in the production of GHGs. The Elk Creek lease modification would make an additional area of the coal seam that is being mined available for mining, and would extend the life of mine by approximately two days to three weeks (See Appendix D). Coal production would be consistent with current production rates. Release of GHGs would remain about the same as current rates.

#### No Action Alternative

Under the No Action Alternative, mining of the Elk Creek Tract 5 modification area would not be permitted. Current levels of methane liberation, and emissions associated with the existing mine plan, would continue until mining is completed. Methane emission associated with proposed mining of the Elk Creek lease tract modification would not occur.

BLM_0018978

## 3.2 Socioeconomics

**Affected Environment**

The analysis area for the proposed lease modification includes Delta and Gunnison Counties. Currently, the Elk Creek mine employs 325 employees, and a majority of these employees, as well as their families, live in communities in Delta County. Gunnison County is also included in this analysis because the lease modification is located within its jurisdiction. Both Counties receive tax and other revenues as a result of the Elk Creek mine operations. No major change in direct employment is anticipated at the Elk Creek mine in conjunction with the proposed action, assuming annual production is consistent.

**Population**

Table 3.8 presents basic population and demographic information for Delta and Gunnison Counties, and for the State of Colorado.

| Table 3.8<br>Population by Category, 2000 and 2010,<br>Delta and Gunnison Counties and the State of Colorado | | | |
|---|---|---|---|
| **Population** | **Delta County** | **Gunnison County** | **Colorado** |
| 2000 | 27,834 | 13,956 | 4,302,015 |
| 2010 | 30,952 | 15,324 | 5,029,196 |
| **% Change** | **11.2 %** | **9.8 %** | **16.9 %** |
| Male (2010) | 50.4 % | 54.2 % | 50.1 % |
| Female (2010) | 49.6 % | 45.8 % | 49.9 % |
| Under 5 years | 5.7 % | 5.6 % | 7.3 % |
| Under 18 years | 22.1 % | 18.1 % | 24.4 % |
| 65 years and over | 20.2 % | 8.8 % | 10.9 % |
| % Minority (2010) | 17.0 % | 10.9 % | 30 % |
| % Below poverty (2010) | 12.1 % | 13.9 % | 12.6 % |

Source: http://quickfacts.census.gov/qfd/states/08/08051.html, see Reference Section: U.S. Census Bureau 2011.

The majority of the workforce for the Elk Creek mine, and for supporting businesses, is located within the cities and towns in Delta County. Delta County, which comprises approximately 1,142 square miles, has approximately 24.4 people per square mile and a total population of 30,952 (as of 2010). Between the years of 2000 and 2010, Delta County grew by almost 9 percent. According to the Sonoran Institute (2004), Delta County grew slower than the State of Colorado; however, the County grew faster than the Nation between the years of 1970 and 2000, with an annual average growth rate of 2.7 percent. The median age in Delta County is 42.3 years, with

35

BLM_0018979

21.4 percent of the population being under the age of 18; and almost 20 percent of the population being 65 years or older. More than 80 percent of the people age 25 and older in Delta County have graduated from High School, and just over 17 percent have graduated from College (U.S. Census Bureau 2011).

The Town of Delta is the largest town in Delta County. In 2000, the town had a population of approximately 6,400, which was an increase of 75 percent from 1990. Other communities in the County include Cedaredge (with a 2000 population of 1,854); Crawford (with a 2000 population of 366); Hotchkiss (with a 2000 population of 968); Orchard City (with a 2000 population of 2,880); and Paonia (with a 2000 population of 1,497) (U.S. Census Bureau 2000).

In 2009, the U.S. Census Bureau reported that there were 13,391 housing units in Delta County that housed 11,058 households, indicating a vacancy rate of approximately 17 percent. Only 3.7 percent of the vacant houses are classified as seasonal, recreational, or for occasional use. Approximately 8 percent of rental units were classified as vacant. There were approximately 2.43 persons per household. In 2000, Delta County had a home ownership rate of 77.5 percent, which was well above the State average of 67 percent. The median value of an owner-occupied housing unit was $115,500, which was well below the State average of $166,600 (U.S. Census Bureau 2001).

**Local Economic Impact**

The analysis area for the proposed action, in relation to economic resources, includes Delta and Gunnison Counties. Most of the personnel employed directly at the Elk Creek mine live in Delta County, and most of the businesses and services that provide indirect support to the mine are in Delta County. The indirect businesses that provide support services to the Elk Creek mine operations include shipping companies, railroad and rail services, power generating companies, delivery services, and general supply companies and services. Delta County receives the indirect financial benefit and tax revenue from the indirect businesses that support the mine, and the tax base from the workers, and their families, that reside in the County.

The Elk Creek mine, the location of the proposed action, is in Gunnison County. Gunnison County receives approximately $1.1 million annually in tax revenues as the result of the coal mining operations at the Elk Creek mine. Mining companies are the largest property tax revenue sources for Gunnison County. Gunnison County has identified the areas surrounding the coal mines as the *North Fork Valley Coal Resource Special Area.*

In 2009, Delta and Gunnison Counties, taken together, supported approximately 25,316 full- and part-time jobs, which was an increase of 16,804 jobs from 1970. In Gunnison County, approximately 600 of its 9,004 wage and salary jobs are in the mining sector, which was an increase of 285 jobs from 1970. In 2000, mining employment in Delta County was not reported in U.S. Census Bureau documents because the data was suppressed for confidentiality reasons (Sonoran Institute 2004). In 2009, the unemployment rate in Gunnison County was 4.9 percent, which was much lower than the Statewide average of 8.4 percent for the same period. During the same period, the Delta County unemployment rate of 7 percent was also lower than the Statewide average. (Source: http://www.bls.gov/lau/laucntycur14.txt; see Reference Section: U.S. Bureau of Labor Statistics 2011).

In 2004, the Elk Creek mine employed approximately 325 full- and part-time workers, with an annual payroll of approximately $32 million. The North Fork mines spent up to $100 million in

36

2006 locally for materials, supplies, and services; and royalty and tax payments for Elk Creek mine totaled approximately $35 million. Total direct economic benefits associated with the North Fork mines exceed $60 million annually.

### 3.2.1 Environmental Justice

Executive Order (EO) 12898 (February 11, 1994), Federal Actions to Address Environmental Justice in Minority and Low-Income Populations was executed in order to avoid a disproportionate placement of adverse (negative) environmental, economic, social, and/or health impacts resulting from Federal actions and policies on minority and low-income populations. Low-income populations are households where the people live below the subsistence or poverty level, as defined by local, States, and/or by the Federal government. The EO also directs Federal agencies to avoid making decisions that discriminate against these communities. Environmental justice means that, to the greatest extent practicable and permitted by law:

- populations are provided the opportunity to comment before decisions are rendered on; and
- populations are allowed to share in the benefits of, are not excluded from, and are not affected in a disproportionately high and adverse manner by government programs and activities affecting human health or the environment.

Analysis for the proposed action requires the identification of minority and low-income populations that may be affected by any of the alternatives. The area of influence for environmental justice for the proposed action is Delta County, Colorado, where the majority of Elk Creek mine workers, and their families, live. Demographic information on ethnicity, race, and economic status is provided in this section as the baseline against which potential impacts can be identified and analyzed.

**Identification of Minority and Low-Income Populations**

For purposes of this analysis, minority and low-income populations are defined as follows:

- **Minority Populations --** Minority populations are persons of Hispanic or Latino origin of any race; Blacks or African Americans; Native American Indians or Alaska Natives; Asians; and Native Hawaiian and other Pacific Islanders.
- **Low-Income Populations --** Low-income populations are persons living below the poverty level. In 2000, the poverty weighted average threshold for a family of 4 was $17,603, and $8,794 for an unrelated individual. Estimates of these two populations were then developed in order to determine if environmental justice populations exist in Delta County (see Table 3.8).

In 2009, Delta County had a population of 31,322 persons, of which approximately 5,137 (16.4 percent) were minorities; and approximately 3,790 (12.1 percent) were living below the poverty level. Minority populations were lower in Delta County than in the State of Colorado; the low-income population in Delta County was higher than for the State of Colorado. The Council on Environmental Quality (CEQ) identifies minority and low income groups as Environmental Justice populations when either:

1. the population of the affected area exceeds 50 %, or

BLM_0018981

2.  the population percentage in the affected area is meaningfully greater (generally, taken as being at least 10 percent more) than the population percentage in the general population of the region or State.

Neither the minority population percentage nor the low-income population percentage meets the CEQ guidelines. As a result, it is assumed that no Environmental Justice populations exist within the area of influence; therefore, no impact analysis is required.

**Protection of Children**

EO 13045 (April 21, 1997), Protection of Children from Environmental Health Risks and Safety Risks, recognizes a growing body of scientific knowledge that demonstrates that children may suffer disproportionately from environmental health risks and safety risks. These risks arise because:

- children's bodily systems are not fully developed;

- children eat, drink, and breathe more in proportion to their body weight that adults;

- children's size and weight may diminish protection from standard safety features; and

- children's behavior patterns may make them more susceptible to accidents.

Based upon these factors, the President directed each Federal agency to make it a high priority to identify and assess environmental health risks and safety risks that may disproportionately affect (impact) children. The President also directed each Federal agency to ensure that its policies, programs, activities, and standards address disproportionate risks to children that result from environmental health risks or safety risks.

In relation to the proposed action, children are seldom present at the coal mining facilities at the Elk Creek mine. On occasions where children are present, OMLLC has taken, and will continue to take, precautions for the safety of children. This includes such precautions as fencing, limitations on access to certain areas, and provision of adult supervision; therefore, no additional impact analysis is required.

**Environmental Impacts Analysis**

**The No Action Alternative**

Under the No Action Alternative, the Elk Creek mine coal lease modification would be rejected; therefore, the coal included in the modification under the proposed action (approximately 35,000 tons of recoverable coal on the lease modification and 0.52 million tons on the parent lease) would not be mined and the economic and fiscal benefits associated with mining that coal would not be realized by the State or by the Federal government. Currently, approved mining operations and associated economic benefits would continue on the existing Elk Creek mine leases; however, these operations would cease earlier than they would if the proposed action were approved; and approximately 35,000 tons of coal would be permanently bypassed. Job losses, including those directly associated with the mine operations as well as those associated with secondary jobs supported by the mine, would occur following the cessation of operations. The reductions in jobs and associated salaries, local expenditures, and royalty and tax payments

38

BLM_0018982

would not be realized until after the reserves are depleted. The revenue (taxes and royalties) generated from the sale of the coal from the lease modification would be lost.

**The Proposed Alternative**

Under the proposed action, the Elk Creek mine would continue mining operations using the existing workforce, equipment, and facilities. There would be no new or added employment at the Elk Creek mine and no additional demand for housing or municipal services would be anticipated. Mining operations would be extended throughout the period required in order to mine recoverable coal reserves in the D-Seam.

BLM estimates that the D Seam coal in the lease modification would be mined interspersed with coal from existing leases from about 2012 to 2013 and some variations to these timeframes may occur based on permitting, unforeseen mining or geologic circumstances, coal contract variability, etc. This extension of mining operations would also extend the annual payroll, local expenditures, and taxes and royalty payments for approximately 2 days to 3 weeks beyond currently permitted reserves. The direct economic benefits associated with continued mining at the Elk Creek mine would equal approximately $1.1 million per month, which equates to approximately $73,000-$825,000 for the 2 day to 3 week life of mine extension. The BLM receives annual payments from coal lease holders based upon rents at not less than $3.00 per acre. The rental rates are specified in the lease. Royalty payments are 8 percent of the value of the coal removed from an underground mine (43 CFR 3473).

Royalties from the Federal coal are distributed in the following way:

- 50 % returns to the Federal treasury in the General Fund;

- 50 % returns to the State where the coal was mined, with a portion of that percentage being returned to the County where the coal was mined.

In Colorado, those funds are managed by the State Department of Local Affairs in the Energy Impact Fund. These monies are distributed on a grant-like basis to Counties affected by energy resource development for community benefit projects.

**Cumulative Impacts**

The geographic scope is focused on the North Fork Valley from east of the town of Delta, north to the Mesa/Delta County line, east to the Pitkin County boundary, then south and west along the watershed for the North Fork of the Gunnison River. This area is approximately 566,700 acres in total with National Forest being 57% (322,400 acres), BLM 11% (61,150 acres), and private land 32% (182,150 acres). A portion of the private land has the mineral estate reserved to the United States in the patents.

**Past Actions.** The primary existing (past) disturbances are associated with mining, oil and gas, livestock grazing, and residential/agricultural development.

Historic mining activities over the past century include the following:
- Hawks Nest Mine;
- Oliver Mine No. 1 and No. 2;
- Bear Mine No. 1, No. 2, and No. 3;

BLM_0018983

- Edwards Mine;
- USS Steel Mine;
- Blue Ribbon Mine;
- King Mine;
- Farmers Mine;
- Oxbow Sanborn Creek; and
- Bowie No. 1 Mine (a.k.a. Orchard Valley Mine).

Over the last century, there has been noticeable subsidence in a number of areas above the historic mines. However, there has been no known damage to overlying resources or to structures attributable to this subsidence. Subsidence may have aggravated or contributed to some landslide movements, but this is difficult to identify given the pre-mining instability of many areas of the valley.

Past oil and gas activity within the region has included coal-bed methane wells and conventional gas wells. The wells within the North Fork Valley area include:
- 56 total wells drilled.  25 are on private surface/private minerals; 11 are split-estate wells (private surface, federal minerals); 20 are on U.S. Forest Service surface; and no wells are on BLM surface.
- 20 wells are producing, 31 are capable of producing but are shut-in, and 5 are temporarily abandoned.

**Present Actions.**  Present actions are focused on mining, oil and gas, livestock grazing, and residential/ agricultural development.

<u>Mining</u>
The following table contains recent production data for the three coal mines in the North Fork Valley.

**Raw Coal Production - North Fork Valley - BLM-UFO**
**1-Year Averages**

| Average based on: | Bowie No. 2 | Elk Creek | West Elk | Totals (NF) |
|---|---|---|---|---|
| 5 Year | 2,808,556 | 4,378,814 | 5,721,944 | 12,909,314 |
| 1 Year | 1,873,357 | 3,495,575 | 6,499,048 | 11,867,980 |
| Periods end Sept. 30, 2011 | | | | |

NOTE: The total yearly production for the North Fork Valley is expected to remain about the same between 12 and 13 million tons.  Each of these mining operations control coal reserves with a mix of Federal and fee coal; however, 90 percent or more of local production is Federal. As mining progresses, only Federal coal will be available in the reserve base.

- Bowie No. 2 Mine was opened in 1997 as a room-and-pillar mine but converted to a longwall system in late 1999.  It is located northeast of Paonia and is operated by Bowie Resources, LLC with a loadout northeast of Paonia.  A coal lease modification to lease COC-036955 for 160 acres was issued on January 21, 2011 for the Bowie No. 2 Mine. There are 14,543 acres permitted in the combined permits of the Bowie No. 1 and No. 2 Mines accessed by the Bowie No. 2 mine.
- The Elk Creek Mine is a longwall operation north of Somerset, operated by Oxbow Mining, LLC, with a loadout immediately north of Somerset. There are 13,429 acres permitted.

40

- The West Elk Mine is a longwall operation located south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There are 17,155 acres permitted and the mine is about the 7th largest underground longwall coal mine in the U.S.

The North Fork Branch of the Union Pacific Railroad operates exclusively to serve these coal mines. This line branches from the main line in Grand Junction and passes through Delta, Hotchkiss, Paonia, and Somerset.

Oil and Gas Leasing

There are approximately 418,469 total acres of federal oil and gas mineral estate within the cumulative impacts area. Overall, there are 173,646 acres currently leased. This includes 54,580 acres of inventoried roadless areas which were leased prior to implementation of the USFS roadless rule. If these pre-2001 leases expire and are subsequently leased again, they will have surface use restrictions for whatever roadless rule may be in place. Approximately 124,192 unleased acres are within inventoried roadless areas which, due to on-going litigation, may have surface use restrictions related to road building if ever nominated for leasing. Approximately 120,631 acres of Federal oil and gas mineral estate remains available for nomination to be leased at this time.

Other

Historically, fruit orchards along the valley floor and low mesas have been important to the local Paonia economy. More recently, vineyards have replaced some orchards in the area.

- Sheep and cattle are grazed in pastureland around Paonia and also at higher elevations near the mining operations during the summer.
- There are a number of water storage reservoirs and canals around the North Fork Valley to serve agriculture and domestic uses.
- WAPA operates the Curecanti-Rifle 230/345 kV transmission line that parallels Terror Creek.
- Residential developments in the area around the communities of Paonia, Hotchkiss, Crawford, and Delta have been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State Highway 133.
- There is little developed recreation in the area; however, the area is widely used for dispersed recreational activities, such as hunting, four-wheeling, hiking, picnicking, horseback riding, bicycling, snowmobiling, and sight-seeing.
- Forest treatments timber sales have been limited in the area.

**Reasonably Foreseeable Future Actions.** Underground coal mining would continue in the North Fork Valley. In addition to existing coal leasing and exploration activities, the following are reasonably foreseeable future actions:

- Oxbow Mining, LLC (Elk Creek Mine) applied for both a 786-acre lease by application with surface disturbance of approximately 5.63 acres on public lands.
- Mountain Coal Company (West Elk Mine) applied to construct, operate, and reclaim up to 159 E-Seam methane drainage well (MDWs) sites that would support 171 individual MDWs, and use or construction of approximately 26.1 miles of roads within the GMUG are in the final process of approval. Also, two lease modifications adjacent to each other and to current leases to the south within the GMUG are being processed and are in the final stages of NEPA analysis. They would add approximately 1,700 acres to the West

41

BLM_0018985

Elk Mine, of which an estimated 73 acres will be actively disturbed for the remaining life of the mine.

- Oxbow Mining, LLC (Oak Mesa Project – coal exploration license) - a proposal to drill 43 exploration drill holes on private and federal lands into federal subsurface holdings. The entire exploration area covers about 13,873 acres, and temporary surface disturbances from road and pad construction would occur on about 32.86 acres.
- Bowie Resources, LLC (Bowie No. 2 Mine) applied for two lease modifications adjacent to current leases to the north under private and public lands and are in the first stages of NEPA analysis. They would add approximately 505 acres, and temporary surface disturbances from road and pad construction would occur on about 16.6 acres.

Additional actions including coal lease modifications and new coal lease applications could be expected in the North Fork Valley. These factors may affect how long mining would continue in this area; however, it is likely that mining would continue for another decade, if not more.

Pending oil and gas activity includes 22 total permits.
- 9 shale well permits;
- 8 coal-bed methane wells; and
- 5 coal mine methane wells.

It is difficult to forecast future oil and gas development within the cumulative impact assessment region. The area is seeing an increase in development which exceeds the past average. Activity increases are due to changes in technology for the drilling and development of the conventional mancos shale wells and wells used to capture methane from coal mines. It is estimated that the area will average 20 new wells per year (assumes at least 2 wells per pad – 10 new pads per year). This will then create approximately 68 acres (estimating 6.8 acres per pad) of new disturbance per year from oil and gas development.

SG Interests I, Ltd (SG) has proposed a 150 gas well Master Development Plan to develop mineral leases they hold within the Bull Mountain Unit located in Gunnison County, Colorado. SG is proposing to drill and produce 150 wells and associated infrastructure. Approximately 50% of the wells are targeting coalbed methane production and the other 50% will be exploring other potentially productive natural gas zones encountered by drilling into other geologic zones in the area of the Bull Mountain Unit.

August 2012 Oil and Gas lease sale: The BLM has prepared a draft EA regarding the nomination to lease nearly 30,000 acres of federal oil and gas mineral estate to be included in the Colorado BLM August 2012 Quarterly Lease Sale. 22,000 acres of the proposed nominations lie within the North Fork Valley.

Gunnison Energy Corp. has filed Applications for Permits to Drill (APDs) for two oil & gas wells within the Deadman Gulch Unit located in Gunnison County, Colorado. The BLM is currently analyzing the proposal.

**Air Quality**

### Reasonably Foreseeable Cumulative Actions

The West Elk and Bowie lease modifications, like the Elk Creek mine modification, is a continuing action that was analyzed for the original mines, and included an emissions inventory

BLM_0018986

and modeling analysis. That emissions inventory quantifies $PM_{10}$, $NO_X$, and $SO_2$ emissions. The modeling analysis also includes a visibility impacts assessment in the West Elk Wilderness Area as well as an atmospheric deposition impacts assessment. Emissions that were calculated and modeled included tailpipe emissions from mining equipment, haul trucks, and locomotives (railway emissions). The results of that detailed impact assessment predicted no significant impacts to air quality as a result of authorizing the mines listed above in the assessment. Further, West Elk recently submitted air emissions modeling to APCD to incorporate modified operations at their coal processing plant into their APCD authorized permit. The modeling included emissions for the Elk Creek mine for a cumulative analysis. The modeling results predicted no significant impact to ambient air quality.

BLM is currently drafting an EA to address the impacts of the Oak Mesa project. Cumulative impacts for that action will address the other actions occurring within the area of influence.
Although public interest has been expressed in the upcoming August 2012 lease sale, no reasonably foreseeable cumulative actions can be determined at this time with respect to any quantities or spatial densities/locations of potential oil and gas wells and no timeline for development can be established, which is highly dependent on economic factors such as supply, demand, and current and projected natural gas prices. Therefore no emissions estimates can be made to predict any potential impacts to air quality at this time.

With respect to the oil and gas projects, they are in various phases of the environmental analysis and yet to be determined are the specific impacts, or the cumulative potential with existing authorizations in the area. However, when it is accomplished the analysis will include the cumulative impact from the mine lease authorizations located in the area. The actions can reasonably be expected to increase emissions of criteria pollutants during a short term construction phase, and then produce longer term impacts that will be specific to any associated equipment configurations, required controls, and operational parameters, that are not yet foreseeable.

The lease modifications for the Elk Creek Mine would not authorize mining operations. The EA evaluates the potential impacts of mining the Elk Creek Mine, because mining is a logical consequence of issuing a lease modification for continued operation of the mine. The EA assesses the cumulative impact on the environment which results from the continued operation of the proposed modifications when added to other past, present, and reasonably foreseeable future actions that would add to the impact of the proposed action.

The site-specific impacts analyzed in this EA are based on the assumption that if the lease modifications are issued, and mining would continue at the same production rate under the current mine operations plan. We further assume that the applicant would be the lessee, and the lease would be permitted as an extension of their current mining operations. An assumption of continued mining operations is that coal mining will proceed in accordance with all permit conditions. In addition, it is also assumed the mined coal will be sold to coal users in response to forecasts of demand for this coal. Historically these users have been electric utilities in the United States, although there is potential for sales outside the U.S. This coal market is open and competitive, and users can buy from the most cost effective suppliers that meet their needs.

The cumulative impacts to air quality in the Elk Creek mine area would primarily result in emissions of particulate matter, $NO_X$, and $SO_2$ from current and future mining of coal. Mining activities related to air emissions are permitted by the APCD of the CDPHE. The State imposes

43

permitting limits and control measures in order to limit emissions of NAAQS pollutants. The State develops air quality attainment and maintenance plans in order to keep Colorado in compliance with the Federal NAAQS. Therefore, cumulative impacts are not anticipated to exceed NAAQS, or to push the region into non-attainment for any NAAQS, and would result in no net change.

Furthermore, a detailed air quality assessment, including modeling, of the original mine was conducted as part of the environmental analysis for the Elk Creek Coal Lease Tract in 2000. (See Final Environmental Impact Statement Iron Point Exploration License; Iron Point Coal Lease Tract; Elk Creek Coal Lease Tract Delta and Gunnison Counties, Colorado, USFS and BLM2000.) The APCD also ensures limits are consistent with the NAAQS by requiring air quality modeling where appropriate.

The air quality analysis conducted for the original mine included an emissions inventory and modeling analysis. That emissions inventory quantifies $PM_{10}$, $NO_X$, and $SO_2$ emissions. The modeling analysis also includes a visibility impacts assessment in the West Elk Wilderness Area as well as an atmospheric deposition impacts assessment. Emissions that were calculated and modeled included tailpipe emissions from mining equipment, haul trucks, and locomotives (railway emissions). The results of that detailed impact assessment predicted no significant impacts to air quality as a result of authorizing the Elk Creek mine. In 2010, APCD required the facility to model permitted emissions for a coal processing plant modification to ensure compliance with the NAAQS was preserved. The model did not predict any significant impacts to the area air quality.

The proposed expansion of the mine would become part of a permitted 5.0 million tons of coal annually, and the emissions generating equipment used is assumed to be slightly newer than equipment analyzed for the Elk Creek Coal Lease Tract in 2000. Therefore, the air quality impacts associated with the proposed mine expansion can be presumed to be equal to, or less than, impacts predicted in the original air quality impact assessment.

The BLM estimated the amount of GHG emissions that could be attributed to coal production as a result of the proposed lease modifications, as well as from the forecast coal production from all three coal mines in the North Fork Valley. Coal production for the operating mines in the North Fork Valley as reported to the BLM:

- Coal Production and Methane Liberation at the Elk Creek Mine (OMLLC): 1,200,000 tons of $CO_2$ equivalent released per year based on on-going mine activities.
- Coal Production and Methane Liberation from the West Elk Mine: 1,230,000 tons of $CO_2$ equivalent released per year based on on-going mine activities.
- Coal production and Methane Liberation at the Bowie No. 2 Mine: 320,000 tons of $CO_2$ equivalent released per year based on on-going mine activities.

The BLM assumed that the majority of the coal produced was used for coal fired electric generation as part of the total U.S. use of coal for electric generation. Policies regulating specific levels of significance have not yet been established for GHG emissions. Given the state of the science, it is not possible to associate specific actions with the specific global impacts such as potential climate effects. Since there are no tools available to quantify incremental climate changes associated with these GHG emissions, the analysis cannot reach conclusions as to the extent or significance of the emissions on global climate. The potential impacts of climate change represent the cumulative aggregation of all worldwide GHG emissions.

44

BLM_0018988

**Socioeconomics**

Currently, the Uncompahgre Field Office (UFO) of the Colorado BLM manages several active Federal coal leases related to the 3 coal mines located in the North Fork Valley: the West Elk mine (operated by Mountain Coal Company, Inc.), the Elk Creek mine (operated by Oxbow Mining, LLC), and the Bowie #2 mine (operated by Bowie Resources). These mines are actively producing longwall coal mines, with a total annual output of just under 15 million tons. (Sources: http://games.historycolorado. org/RIPsigns/ show_markertext.asp?id=816, see Reference Section: History Colorado. 2011. When Coal was King.; BLM 2009; BLM 2010.)

In 2011, the Elk Creek mine produced 3,007,055 tons of coal, the Bowie #2 mine produced 2,235,055 tons of coal, and the West Elk mine produced 6,042,021 tons of coal. This is a total of 11,284,131 short tons of coal, which was 41.7 percent of Colorado's coal production in 2011. The Elk Creek mine is the 18th largest underground coal mine in the United States. The total permitted acreages for the Somerset coal field mines are 45,118.

Each of these mining operations control coal reserves with a mix of Federal and fee and/or State coal; however, approximately 90 percent of local production is Federal. As mining progresses, only Federal coal will be available in the reserve base. Some Federal coal leases have a 5 percent royalty (due to difficult geologic and engineering conditions); however, most of the coal is mined at an 8 percent royalty rate. The resulting revenue to the Federal treasury from coal production within the UFO approaches $25 million each year. Half of that revenue is returned to the State of Colorado. (Source: http://www.blm. gov/co/st/en/fo/ufo/solids_and_ fluids.html, see Reference Section: BLM 2011.)

The existing coal production from mines operating on Federal leases within the North Fork Valley produce compliant and super-compliant coal. This means that coal quality meets or exceeds Clean Air Act standards for clean-burning coal (compliant coal contains between 1.0 and 1.2 pounds of sulfur dioxide per million Btu; super-compliant coal contains less than 1.0 pound of sulfur dioxide per million Btu). Colorado is second only to Illinois in bituminous coal reserves; however, it is the leader in bituminous compliant coal reserves (Cappa et al. 2007).

According to the Energy Institute of America's 2010 Annual Energy Outlook with Projections from 2008 to 2035, the demand for low-sulfur bituminous and sub-bituminous coal from the Rocky Mountain Region is likely to increase annually by 0.2 percent and 0.7 percent, respectively (U.S. Department of Energy (DOE) 2010). This is the type of coal produced in the Somerset coal field. The DOE projects that, on a Btu basis, 60 percent of domestic coal production will originate from States west of the Mississippi River in 2035, which is up from 50 percent in 2008. This is due to lower prices for western mining operations and the low sulfur content of western coals (BLM 2010).

Forecasts predict that 5 percent to 10 percent of coal reserves in the Somerset coal field will be recovered over the next 10 years to 15 years. Even though demand for coal is projected to increase, yearly production at the mines in the Somerset coal field is likely to remain close to the existing rate of approximately 12 million to 13 million tons per year due to several limiting factors. One limiting factor to the amount of coal produced is the capacity of the railway line or spur off of the main line in Delta, operated by Union Pacific, which hauls the coal. This spur's sole purpose is to support the 3 mines in the Somerset area; however, mine production is directly

BLM_0018989

related to the number of coal trains that can move in and out of the one-way valley (Cappa et al. 2007). Currently, due to train availability, it is unlikely that the rail line could support an increase in mine production. Typically, each train set contains 105 cars, each carrying roughly 108 tons per car, which is a total of 11,400 tons of coal per train (Kiger 2010). This is an average of 2.84 trains per day leaving the valley. Other limiting factors to production include physical bottlenecks at the mine facilities (such as conveyor and train load-out capacities), as well as the amount of coal that can be stockpiled at the individual mine sites. (Sources: http://games. historycolorado.org/RIPsigns/_show_markertext.asp?id=816, see Reference Section: History Colorado. 2011. When Coal was King.; BLM 2009; BLM 2010.)

On a cumulative analysis basis, the Elk Creek mine, as well as the other two underground coal mines operating in the North Fork Valley, have a considerable impact on the local economy. Approximately 1,028 coal miners are employed directly by the 3 mines, and an additional 1,748 people in the local area derive their employment from the miner's income, as well as from the purchases of supplies by the mines themselves. The Elk Creek mine is responsible for approximately one-third of this overall effect, and the proposed lease modification will allow the mine to continue operations for 3 additional weeks. If the lease modification were not approved, and not offered for sale, nearly 1,000 people in the local area would lose their employment 3 weeks sooner than they otherwise would.

Continued operation of the coal mines in the North Fork Valley provides a direct beneficial impact to the local economy. Impacts to businesses that do not depend upon the direct business from resource extraction are more difficult to measure. There may be minor impacts resulting from the continued mining of non-renewable resources in the North Fork Valley. The impacts would be temporary, consistent within the timeframe of the mining operations. Additional negative impacts can be due to the continued release of GHGs from the coal mining operations.

46

BLM_0018990

# Chapter 4 - Interdisciplinary Review

The following BLM personnel have contributed to, and have reviewed, this EA:

| Name | Title | Area of Responsibility |
|------|-------|------------------------|
| Chad Meister | Air Quality Specialist | Air Quality, Climate |
| David Epstein | Socioeconomics Specialist | Socioeconomics |
| Desty Dyer | Mining Engineer | Solid Mineral Leasing |
| Christina Reed | NEPA Coordinator | |

47

# Chapter 5 – References

Bassett, Robert A., James A. Holtkamp, and Rebecca Ryon. 2009. U.S. Laws and Policies Regarding Capturing Methane Gas. Paper presented at the 2009 U.S. Coal Mine Methane Conference, Boulder, Colorado. 23 pages. [Web page] located at http://www.hollandhart.com/articles/Capturing_Methane_Gas_White_Paper.pdf. Accessed 12/01/2009.

Bureau of Land Management (BLM). 1988. Uncompahgre Basin Proposed Resource Management Plan and Final Environmental Impact Statement, September 1988. 196 pages.

BLM. 2005. Little Snake Resource Management Plan, Analysis of the Management Situation. April 2005.

BLM. 2007. North Fork Land Health Assessment, 2006-2007. Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado. 110 pages.

BLM. 2009. Guidelines for Assessment and Mitigation of Potential Impacts to Paleontological Resources. Instructional Handbook 2009-011. 19 pages.

BLM. 2009b. Red Cliff mine Draft Environmental Impact Statement. [Web Page]. Located at: http://www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/red_cliff_mine/documents.html. Last accessed May 14, 2009.

Colorado Department of Public Health and Environment (CDPHE). 2008. Colorado Air Quality Control Commission Report to the Public 2007-2008. 60 pages.

Colorado Division of Wildlife (CDOW). 2003. Colorado Vegetation Classification Project. Located at: http://ndis.nrel.colostate.edu/ftp/index.html Last accessed 1/27/2009.

Colorado Division of Wildlife (CDOW). 2009. Natural Diversity Information Source. [Web Page]. Located at: http://ndis.nrel.colostate.edu/ftp/data/sam/meta/lynx.html. Last accessed: April 10, 2009.

Environmental Protection Agency (EPA). 2009. NAAQS, [Web Page] Located at: http://epa.gov/air/criteria.html. Accessed December 11, 2009.

Environmental Protection Agency (EPA). 2010. "Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2008" (EPA Publication 430-R-10-006), April 15,2010)

Environmental Protection Agency (EPA) 2008 "Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002 – 2006" revised January 2009.

Federal Emergency Management Agency (FEMA). 1989. Flood Insurance Rate Map, Gunnison County, Colorado (Unincorporated Areas). Community Panel Numbers 080078 275 B, 080078 125 B, and 080078 235 B. September 29, 2008.

Grand River Institute (GRI). 2005. Class III Cultural Resource Inventory of the Block Clearance Area for the Oxbow Mining LLC Project in Delta and Gunnison Counties, Colorado. August 26, 2005. 27 pages.

BLM_0018992

Intergovernmental Panel on Climate Change (IPCC). 2007. Climate Change 2007: Synthesis Report. Adopted at the IPCC Plenary XXVII, Valencia, Spain, 12-17 November, 2007. 52 pages.

Kingery, Hugh E., ed. 1998. Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership and Colorado Division of Wildlife, Denver. 636 pages.

Lucas, S.G. 1998. Fossil Mammals and the Paleocene/Eocene Series Boundary in Europe, North America, and Asia. *In* Late Paleocene-Early Eocene Climatic and Biotic Events in the Marine and Terrestrial Records, Marie-Pierre Aubry, M-P., Lucas, S.G., and Berggren, W.A., (eds.). Columbia University Press, New York.

Monarch & Associates and Michael Ward Outdoors. 2005. Oxbow Mining, LLC, Elk Creek mine Block Clearance Project. August, 2005. 38 pages.

Monarch & Associates and Michael Ward Outdoors. 2006. Oxbow Mining, LLC, Elk Creek mine Habitat and wildlife Studies. June, 2006.

Monarch & Associates and Michael Ward Outdoors. 2008. Oxbow Mining, LLC, Elk Creek mine 2008 Exploration Project Habitat and Wildlife Studies. June, 2008. 22 pages.

Natural Resources Conservation Service (NRCS). 2008. Custom Soil Resource Report for Paonia Area, Colorado, Parts of Delta, Gunnison and Montrose Counties: Oxbow ECET EA. Accessed from NRCS Web Soil Survey on December 11, 2008. Available at http://websoilsurvey.nrcs.usda.gov

Oxbow Mining, LLC. (OMLLC). 2007. 2007 Annual Hydrology Report. Prepared for CDRMS Permit C-81-022.

Ritter Jr. B. 2007. Colorado Climate Action Plan: A strategy to Address Global Warming. November, 2007. 35 pages.

Rocky Mountain Bird Observatory (RMBO). 2008. Surveys for Western Yellow-billed Cuckoos on Lands Managed by the Uncompahgre Field Office of the Bureau of Land Management in Western Colorado. Rocky Mountain Bird Observatory, Tech. Report #R-YBCU-BLM-08-1, Brighton, Colorado. October, 2008. 21 pages.

Saunders, S., C. Montgomery, T. Easley and T. Spencer. 2008. Hotter and Drier: The West's Changed Climate. Natural Resources Defense Council and The Rocky Mountain Climate Organization. March, 2008. 64 pages.

Singer, S. Fred, de. 2008. Nature, Not Human Activity, Rules the Climate: Summary for Policymakers of the Report of the Nongovernmental International Panel on Climate Change, Chicago, IL. The Heartland Institute.

United States Census Bureau. 2008a. Fact Sheet: Delta County, Colorado. Available at: http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=05000US08 029&_geoContext=01000US%7C04000US08%7C05000US08029&_street=&_county=d elta+county&_cityTown=delta+county&_state=04000US08&_zip=&_lang=en&_sse=on &ActiveGeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=050&_submenuId=factsheet_1 &ds_name=ACS_2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anull& _keyword=&_industry= Last accessed: 1/27/2009.

BLM_0018993

United States Census Bureau. 2008b. Fact Sheet: Gunnison County, Colorado. Available at: http://factfinder.census.gov/servlet/SAFFFacts?_event=Search&geo_id=05000US08029 &_geoContext=01000US%7C04000US08%7C05000US08029&_street=&_county=gunn ison+county&_cityTown=gunnison+county&_state=04000US08&_zip=&_lang=en&_ss e=on&ActiveGeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=050&_submenuId=factshe et_1&ds_name=ACS_2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anu ll&_keyword=&_industry=&show_2003_tab=&redirect=Y Last accessed: 1/27/2009.

United States Census Bureau. 2009. U.S. Census Bureau American Fact Finder Web Site, Data Sets, Quick Tables, Census Tract 9639, Gunnison County, Colorado. [Web Page]. http://factfinder.census.gov. Accessed April 9, 2009.

United States Department of Energy (DOE) and BLM. 2008. Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal Land in the 11 Western States (DOE/EIS-0386). Appendix N: Potential Fossil Yield Classifications (PFYC) for Geologic Formations Intersecting Proposed Corridors under the proposed action by State. November 2008.

United States Environmental Protection Agency (EPA). 2008. Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002-2006. September, 2008. EPA 430-K-04-003. 207 pages.

United States Forest Service (USFS). 2008. Environmental Assessment, Federal Coal Lease COC-61357 Modification, Tract 4, Paonia Ranger District, Grand Mesa, Uncompahgre and Gunnison National Forests, Gunnison County, Colorado. August 2008. 108 pages.

United States Forest Service (USFS) and BLM. 2000. Final Environmental Impact Statement, Iron Point Exploration License, Iron Point Coal Lease Tract, Elk Creek Coal Lease Tract, Delta and Gunnison Counties, Colorado, February 2000.

United States Fish and Wildlife Service (USFWS). 2005. Final Biological Opinion for the Oxbow Mining Company and Town of Somerset Water Augmentation Project, Delta County, Colorado. May 12, 2005.

USFWS. 2008a. Endangered, Threatened, Proposed and Candidate Species, Colorado Counties, February 2008. 14 pages.

USFWS. 2008b. Birds of Conservation Concern 2008. Division of Migratory Bird Management, Arlington, Virginia. 87 pages. [Online version available at http://www.fws.gov/migratorybirds/reports/BCC2008/BCC2008m.pdf; accessed ]

United States Global Change Research Program. 2009. Reports and Assessments, USGCRP Scientific Assessments, Key Findings. [Web Page] located at: http://globalchange.gov/publications/reports/scientific-assessments/us-impacts/key-findings. Accessed 6/22/2009.

Zimmerman, G., C. O'Brady and B. Hurlbutt. 2006. Climate Change: Modeling a Waremer Rockies and Assessing the Implications. In The 2006 Colorado College State of the Rockies Report Card. April, 2006. 136 pages.

BLM_0018994