Added References

Climate Analysis Indicators Tool (CAIT-US). 2011. Version 4.0. World Resources Institute, Washington, DC. Accessed on March 28, 2011 from < http://cait.wri.org/>

Intergovernmental Panel on Climate Change (IPCC). 2006 IPCC Guidelines for National Greenhouse Gas Inventories, Volume 2 – Energy. Table 2.2 Default Emission Factors for Stationary Combustion in the Energy Industries. ISBN 4-88788-032-4. Accessed on March 28, 2011 from < http://www.ipcc-nggip.iges.or.jp/public/2006gl/index.html>

U.S. Energy Information Administration. 2009. Annual Energy Review 2009. Table 7.3 Coal Consumption by Sector, Selected Years, 1949-2009. DOE/EIA-0384(2009). August 2009. Accessed on March 28, 2011 from < http://www.eia.doe.gov/aer/>

Socioeconomic References

BLM. 2009. *Combined Geologic and Engineering Report (GER) and Maximum Economic Recovery Report (MER) for Coal Lease Modifications (COC1362 & COC67232).* U.S. Department of the Interior, Bureau of Land Management. Washington, D.C.

BLM. 2010. Coal Resource and Development Potential Report. U.S. Department of the Interior, Bureau of Land Management. Uncompahgre Field Office. Montrose, Colorado. Prepared for the Uncompahgre Field Office by Buckhorn Geotech (Montrose, Colorado).

BLM. 2011. Uncompahgre Field Office Energy and Mineral Resources. BLM Website: http://www.blm.gov/co/st/en/fo/ufo/solids_and_fluids.html. U.S. Department of the Interior, Bureau of Land Management. Washington, D.C.

Cappa, J.A., G. Young, J.R. Burnell, C. Carroll and B. Widmann. 2007. Colorado Mineral and Energy Industry Activities, 2006. Colorado Geological Survey IS-75. Colorado Geological Survey. Denver, Colorado.

CDRMS. 2010b. Monthly Coal Summary Reports. Available on the Internet at: http://mining.state.co.us/Coal%20Reports.htm. Colorado Division of Reclamation Mining and Safety. Denver, Colorado.

DOE. 2010. Energy Information Administration Annual Energy Outlook, 2010. Available on the Internet at: http://www.eia.doe.gov/oiaf/aeo/page/overview.html. U.S. Department of Energy. Washington, D.C.

History Colorado. 2011. When Coal was King. Website: http://games.historycolorado.org/RIP signs/ show_markertext.asp?id=816.

Kiger, J. 2010. Personal communication between Laurie Brandt, Buckhorn Geotech, and Jim Kiger, Oxbow Mining, LLC. February 18, 2010.

BLM_0018995

Sonoran Institute.   2004.   Population, Employment, Earnings, and Personal Income Trends. Sonoran Institute, Economic Profiling System: Gunnison County and Delta County, Colorado.

U.S. Bureau of Labor Statistics (BLS).   2011.   Labor Force Data by County.   BLM Website: http://www.bls.gov/lau/laucntycur14.txt.   U.S. Bureau of Labor Statistics.   Washington, D.C.

U.S. Census Bureau. 2006. Colorado Quickfacts: State of Colorado and Delta County.   U.S. Census Bureau Website:   http://quickfacts.census.gov/qfd/states/08/08029.html.   U.S. Census Bureau.   Washington, D.C.

U.S. Census Bureau.   2011.   Gunnison County, Colorado.   U.S. Census Bureau Website: http://quickfacts.census.gov/qfd/states/08/08051.html.   U.S.   Census   Bureau. Washington, D.C.

USDA FS.   2006. Coal Resource and Development Potential Report: Grand Mesa, Uncompahgre, and Gunnison National Forests. U.S. Department of Agriculture, U.S. Forest Service.   Grand Mesa, Uncompahgre, and Gunnison National Forests. Delta, Colorado.

BLM_0018996

# **<u>Appendices</u>**

53

BLM_0018997

# Appendix A

**Forest Service Stipulations for COC-61357**

BLM_0018998

COC-61357, Stipulations for Tract 5 Modification for the Protection of Surface Resources

***Cultural and Paleontological Resources***

1) Prior to any surface disturbing activities, including subsidence, the lessee shall conduct a cultural resources survey and paleontological assessment of all previously unsurveyed areas that will be directly impacted by operations under this lease. The survey shall be an intensive field inventory of cultural, historical, and archaeological values, including, but not limited to, any and all objects of antiquity, historic or prehistoric ruins and artifacts, or other specimens of scientific interest. If the paleontological assessment demonstrates a need for a site specific inventory, this survey will also be performed.

    (a) Surveys shall be conducted by a qualified professional cultural or paleontological resources specialist approved in advance by the Uncompahgre Field Office Manager or the Paonia District Ranger. A report on the survey and recommendations for protecting any identified cultural or paleontological resources shall be submitted to the Uncompahgre Field Office Manager or the Paonia District Ranger. After review and approval of the report, surface disturbing operations may be further conditioned with the imposition of additional stipulations for protection of the identified cultural or paleontological resources.

    (b) The cost of the cultural or paleontological resources survey, the report, and any measures to protect cultural or paleontological resources identified thereby shall be borne by the lessee. All identified items shall remain the property of the appropriate surface owner, but the United States reserves its right and obligation under applicable law to take action necessary to protect, preserve, or acquire such items.

    (c) If any items or features of historical, cultural or archaeological value are discovered during lease operations, the lessee shall immediately notify the Uncompahgre Field Office Manager or the Paonia District Ranger and shall not disturb such items or features until the Uncompahgre Field Office Manager issues instructions. If the lessee is ordered to take measures to protect any items or features of historical, cultural or archaeological value discovered during lease operations, the cost of the measures shall be borne by the lessor and such items and features shall remain under the jurisdiction of the United States.

    (d) The cost of conducting the inventory, preparing the reports and carrying out mitigating measures shall be borne by the lessee. Of particular concern in this lease area are un-inventoried cultural resource sites associated with rock overhangs and escarpments.

**Threatened and Endangered Species**

2) If there is reason to believe that new individuals or populations of Threatened or Endangered, or Sensitive (TES) species of plants or animals, or migratory bird species of high Federal interest occur in the area, the lessee shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted inventory shall be conducted by a qualified specialist and a report of findings will be prepared. A plan will be prepared making

55

BLM_0018999

recommendations for the protection of these species or action necessary to mitigate the disturbance. The cost of conducting the inventory, preparing reports and carrying out mitigating measures shall be borne by the lessee.

**Birds/ Raptors**

3) To protect and preserve breeding and nesting habitat for the Loggerhead shrike, and other Neo-tropical birds, disturbances in sagebrush, Gambel oak stands, and riparian areas will be avoided to the extent practicable.

4) No surface disturbance or facilities will be located in occupied Southwest willow flycatcher habitat. Prior to any planned disturbance within riparian habitats on the lease, the lessee must: (i) Survey the area of the proposed disturbance for suitable Southwest willow flycatcher habitat, and survey all suitable habitat for the presence of the species. All habitat and species surveys must be in accordance with the accepted U.S. Fish and wildlife Service (USFWS) protocol; (ii) Provide the results of all surveys to the USFWS, the Uncompahgre Field Office of BLM and the Paonia Ranger District of the USFS; (iii) If suitable habitat or individuals are located in the area, consultation with the USFWS will be required to determine suitable conservation measures to prevent a "taken under section 9 of the Endangered Species Act. Conservation measures may include avoidance of the occupied habitat, establishment of a buffer zone and seasonal restriction around occupied habitat, or others developed for the specific site. In accordance with current protocol, surveys for the presence of the species are valid for only one year.

5) With respect to bald or golden eagle nests which may be established on the lease during the life of the project, the following shall apply: (i) No new permanent surface facilities or disturbances shall be located within a 1-mile-radius buffer zone around each bald or golden eagle nest site. (ii) No above ground activities will be allowed within a 1 mile radius buffer zone around each active eagle nest site from November 15 to July 30 for bald eagles, and around each active golden eagle nest site from February 1 to July 15. (iii) Any proposed surface facilities, disturbances or activities (noted above) in, or adjacent to, these buffer zones will require approval from the BLM or USFS on a site-specific basis, after consultation with the USFWS.

6) With respect to bald eagle winter roost sites or concentration areas which may become established on the lease during the life of the project, the following special stipulation shall apply: (i) No above ground activities will be allowed within a *1/4* mile radius of winter roosts between November 15 and March 15; development may be permitted at other periods. If periodic visits are required within the buffer zone after development, activity should be restricted to the hours of 10 am and 2 pm from November 15 through March 15.

BLM_0019000

7) With respect to other raptors (except American Kestrel) which may occur or become established on the lease during the life of the project, the following special stipulation shall apply: (i) Conduct surveys for nesting raptors on the lease tract prior to development of any surface facilities. No surface activities will be allowed within 1 mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by BLM or USFS on a site specific basis.

**Big Game Winter Range**

8) With respect to mule deer and elk crucial winter rage that may be established by Colorado Division of Wildlife (CDOW) on BLM managed lands on the lease during the life of the project, the following shall apply: (i) Coal related facilities and surface disturbances except subsidence will be authorized in the review area only if no practical alternatives exist. The BLM will co-ordinate with the CDOW to determine the type and extent of allowable variances. Coal exploration, facility construction, and major scheduled maintenance will not be authorized within these crucial winter ranges from December 1 through April 30. All unavoidable surface disturbances within these crucial winter ranges during these times will require approval of the authorized officer.

**Water**

9) Lessee shall replace, in a manner consistent with state law, the water supply of any owner of a vested water right which is proximately injured as a result of the mining activities.

10) Lessee, will conduct an inventory of all existing water sources (including gain/loss analyses on Elk, Bear and Hubbard Creeks) adjacent to, originating on or flowing over the lease tract (including state adjudicated water rights, stock ponds, springs, etc.) which may be impacted by subsequent mining activities. At a minimum, this inventory will include: the water right holder, location, source, amount of decree, beneficial use, current and historical flow, (including seasonal/annual variation), and the appropriation and adjudication dates, In addition to the water inventory, the lessee shall be required to establish a water resource monitoring program to locate, measure and quantify the progressive and final effects of underground mining activities on the water resources potentially affected by mining. Monitoring of water resources would continue until a determination is made by the CDMG that there would be no injury to water resources.

11) Lessee shall formulate a water replacement plan to replace the possible loss of water resulting from mining activity of the lease. The water replacement plan will include all existing water sources, including those presently adjudicated and historically put to beneficial use in the Elk Creek, Bear Creek, and Hubbard Creek drainages. The water replacement plan for each respective drainage shall be developed after consultation with affected water right users and federal and state authorities, and shall be approved by state authorities before mining in the particular drainage. At a minimum, the water replacement plan will require, upon injury, replacement of wat2r of suitable quality and water right seniority to provide for

BLM_0019001

all existing uses (including sources supporting livestock and ecosystem, and other land uses as authorized by 36 CFR 251) and be delivered to existing points of diversion in a timely manner. As part of each water replacement plan, the lessee shall demonstrate its legal and physical ability to implement said plan. A source of replacement water may include, but is not limited to, the transfer of water rights, an augmentation plan, a long term water use lease, or compensatory storage.

12) Fueling and lubricating vehicles are prohibited within 100 feet of streams and wetlands. No fuel storage is allowed within 500 feet of any water bodies.

**Subsidence**

13) A pillar stability analysis shall be used to design chain and barrier pillars for long term structural integrity where needed to protect surface resources.

**Wetland, Floodplain or Riparian**

14) No surface occupancy or use is allowed on the lands defined as a wetland, floodplain or riparian area.

**Forest Service Surface Improvements**

15) Existing Forest Service owned or permitted surface improvements will need to be protected, restored or replaced to provide for continuance of current land uses.

**Dust Control**

16) Lessee shall provide for the suppression and control of fugitive dust on roads used by the lessee.

**Surface Resources**

17) Lessee shall be required to perform a study to secure adequate baseline data to quantify existing surface resources on and adjacent to the lease area. Existing data may be used if such data are adequate for the intended purposes. The study shall be adequate to locate, quantify and demonstrate the interrelationship of the geology, topography, surface hydrology, soils, vegetation and wildlife. Baseline data will be established so that future programs of observation can be incorporated at regular intervals for comparison.

18) Lessee shall be required to establish a monitoring system to locate, measure, and quantify the progressive and final effects of underground mining activities on the topographic surface, subsurface and surface hydrology, soils and vegetation. The monitoring system shall utilize techniques which will provide a continuing record of change over time and an analytical method for location and measurement of a number of points over the lease area.

**Surface Uses**

19) The licensee/permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the

58

rights and regulations must be complied with for (a) all use and occupancy of the NFS prior to approval of a permit/operation plan by the Secretary of the Interior, (b)uses of all existing improvements, such as Forest Development Roads, within and outside the area licensed, permitted or leased by the Secretary of the Interior, and (c) use and occupancy of the NFS not authorized by a permit/operating plan approved by the Secretary of the Interior.

**Colorado River Fish**

20) In the future, if water used for mine related activities exceeds a depletion amount previously consulted upon by the GMUG, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin.

**Surface Occupancy (Roadless)**

21) No surface occupancy is allowed for exploration, methane drainage, or ventilation and/or escape shafts in the modification area.

**Riparian Zones-only applicable on lease modification**

22) A 1/8 mile buffer zone (660 ft.) Will be protected on either side of the riparian zones (or a buffer zone may be established in accordance with the surface management agency guidelines). No surface disturbances, except surface subsidence, will be permitted within these buffer zones.

**Roadless (Lease Notice)**

23) All or part of the land included in COC-61357 and subsequent modifications, are in the Springhouse Park Inventoried Roadless Area (IRA) and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any road may be proposed on the lease.  Locations of any proposed surface use will be verified for relationship to IRA boundaries using site-specific maps if/when surface operations are proposed.

BLM_0019003

# Appendix B

**Unsuitability Criteria Analysis and Report**

BLM_0019004

# UNSUITABILTY ANALYSIS AND REPORT
## Federal Coal Lease and Modification COC-61357, Modification 5
*Description of the Federal Lands Involved*

This unsuitability analysis and report has been prepared to comply with regulations at 43 CFR 3461 for Federal Coal Lease COC-61357 Modification 5, 156 acres of federal coal lands described as:

T. 12 S., R. 90 W., 6th P.M.

sec. 32, lots 18, 21, and 23, and N½NE¼;
sec. 33, lots 22 and 23.
Containing approximately 158.79 acres more or less.

This lease modification application was brought forward by Oxbow Mining, LLC (Oxbow) to prevent bypass of federal coal reserves both within the existing lease and the lease modification. The modification is contiguous with and lies immediately east and north of federal coal lease COC-61357. The coal in this lease modification would be accessed and recovered by underground longwall mining methods from OMLLC's existing Elk Creek mine. The lease modification application contains National Forest System (NFS) surface lands managed by the Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG; approximately 156 acres). The coal estate is administered by the Bureau of Land Management.

As a first step in this analysis, the preliminary mining plan submitted by the applicant was examined in order to identify areas in which the proposed underground mining operation would produce surface effects, including where the zone of influence from subsidence may extend beyond the lease modification boundaries. Areas identified as likely to be affected by subsidence were delineated as having surface effects. For this lease modification the zone of influence is primarily lands within the modification area. Based on a 25 degree angle of draw with approximately 2500 feet of overburden, there would be little if any detectable subsidence on the surface.

This analysis and report was prepared consistent with the unsuitability criteria published in 43 CFR 3461. The unsuitability criteria were applied individually to the area being considered, and areas identified as having surface effects as applicable. Each criterion was applied individually, then after all criteria had been applied, the exemptions of each criterion found to be applicable were then examined; thirdly a determination was made if the exceptions to each criterion were applicable. Exceptions to certain criteria allow areas to be considered further even though they have been determined to be unsuitable. These exceptions to the criteria are noted when applied.

*Analysis of the Unsuitability Criteria*
*Criterion 1*

All Federal Lands included in the following land systems or categories shall be considered unsuitable: National Park System, National Wildlife Refuge System, National System of Trails, National Wilderness Preservation System, National Wild and Scenic Rivers System, National Recreation Areas, lands acquired with money derived from the Land and Water Conservation Fund, National Forests, and Federal lands in incorporated cities, towns, and villages. Exceptions: (i) A lease may be issued within the boundaries of any National Forest if the Secretary finds no significant recreational, timber, economic or other values which may be incompatible with the lease; and (A) surface operations and impacts are incident to an

61

underground coal mine, or (B ) where the Secretary of Agriculture determines, with respect to lands which do not have significant forest cover within those National Forests west of the 100th Meridian, that surface mining may be in compliance with the Multiple-Use Sustained-Yield Act of 1960, the Federal Coal Leasing Amendments Act of 1976 and the Surface Mining Control Act of 1977.

Analysis: The lands described in this lease modification were proclaimed National Forest on June 5, 1905 and are within the Gunnison National Forest. Management direction for coal resources are listed in the Amended Land and Resource Management Plan (LRMP), Grand Mesa, Uncompahgre and Gunnison National Forests-General Direction on pages III-62 through III-70.

The LRMP allows for multiple use management on the lands in the lease modification, which are principally managed for aspen management, however management includes wood fiber, wildlife habitat, livestock grazing, motorized and non-motorized recreation and vegetation treatment. The LRMP does not identify any significant recreational, timber, economic or other values that would be incompatible with the lease. No significant forest cover is present.

In addition, OMLLC has indicated that there are no foreseeable surface operations anticipated within the modification area. Therefore, for reasons stated above, the exception can apply to this criterion.

*Criterion 2*

Federal lands that are within rights-of-way or easements or within surface leases for residential, commercial, industrial, or other public purposes, on federally owned surface shall be considered unsuitable.

Exceptions: A lease may be issued, and mining operations approved, in such areas if the surface management agency determines that (i) all or certain types of coal development (e.g. , underground mining) will not interfere with the purpose of the right-of-way or easement, or (ii) the right-of-way or easement was granted for mining purposes, or (iii) the right-of-way or easement was issued for a purpose for which it is not being used, or (iv) the parties involved in the right-of-way or easement agree, in writing, to leasing or (v) it is impractical to exclude such areas due to the location of coal and method of mining and such areas or uses can be protected through appropriate stipulations.

Analysis: There are no rights-of-way, easements, or surface leases for residential, commercial, industrial, or other public purposes within the review area.

*Criterion 3*

Federal lands affected by section 522 (e) (4) and (5) of the Surface Mining Control and Reclamation Act of 1977 shall be considered unsuitable. This includes lands within 100 feet of the outside line of the right-of-way of a public road, or within 100 feet of a cemetery, or within 300 feet of any public building, school, church, community or institutional building or public park, or within 300 feet of an occupied dwelling.

Exceptions: A lease may be issued for lands (i) used as mine access roads or haulage roads that join the right-of-way for a public road, (ii) for which the Office of Surface Mining Reclamation and Enforcement has issued a permit to have public roads relocated, (iii) if, after public notice and opportunity for public hearing in the locality, a written finding is made by the Authorized Officer that the interests of the public and the landowners affected by mining within 100 feet of a public road will be protected, or (iv) for which owners of occupied dwellings have given written permission to mine within 300 feet of their buildings.

BLM_0019006

Analysis: No public roads, cemeteries, occupied dwellings, public buildings, schools, churches, community or institutional buildings exist within this area.

*Criterion 4*

Federal lands designated as wilderness study areas shall be considered unsuitable while under review by the Administration and Congress for possible wilderness designation. For any federal land which is to be leased or mined prior to completion of the wilderness inventory by the surface management agency, the environmental assessment or impact statement on the lease sale or mine plan shall consider whether the land possesses the characteristics of a wilderness study area. If the finding is affirmative, the land shall be considered unsuitable, unless issuance of noncompetitive coal leases and mining on leases is authorized under the Wilderness Act and the Federal Land Policy and Management Act of 1976.

Analysis: No lands within the review area are designated as Wilderness Study Areas. The current LRMP manages these lands for multiple uses (see Criterion 1). Wilderness characteristics for these lands were evaluated by the GMUG in 2005. These lands did not meet the criteria for wilderness characteristics.

These lands are within the Springhouse Park Inventoried Roadless area, and under Secretary's IM-1042-155, this project was consulted on according to current USFS guidance.

*Criterion 5*

Scenic federal lands designated by visual resource management analysis as Class I (an area of outstanding scenic quality or high visual sensitivity) but not currently on the National Register of Natural Landmarks shall be considered unsuitable. A lease may be issued if the surface management agency determines that surface coal mining operations will not significantly diminish or adversely affect the scenic quality of the designated area.

Analysis: No lands within the review area are designated as visual resource management Class I areas.

*Criterion 6*

Federal lands under permit by the surface management agency, and being used for scientific studies involving food or fiber production, natural resources, or technology demonstrations and experiments shall be considered unsuitable for the duration of the study, demonstration, or experiment except where mining could be conducted in such a way as to enhance or not jeopardize the purposes of the study, as determined by the surface management agency, or where the principal scientific use or agency give written concurrence to all or certain methods of mining.

Analysis: No lands within the review area are under permit for scientific study.

*Criterion 7*

All publicly owned places on federal lands which are included in the National Register of Historic Places shall be considered unsuitable. This shall include any areas that the surface management agency determines, after consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Officer, are necessary to protect the inherent values of the property that made it eligible for listing in the National Register.

Analysis: No publicly owned places on federal or fee lands within the review area are included in the National Register of Historic Places.

*Criterion 8*

Federal lands designated as natural areas or as National Natural Landmarks shall be considered unsuitable.

63

Analysis: No lands within the review area are designated as natural areas or as National Natural Landmarks.

*Criterion 9*

Federally designated critical habitat for listed threatened or endangered plant and animal species, and habitat proposed to be designated as critical for listed threatened or endangered plant and animal species or species proposed for listing, and habitat for Federal threatened or endangered species which is determined by the Fish and Wildlife Service and the surface management agency to be of essential value and where the presence of threatened and endangered species has been scientifically documented, shall be considered unsuitable.

Analysis: The activity associated with this lease modification does not contain any proposed surface disturbance other than a negligible amount of subsidence. As a result no destruction or modification of critical habitat for federally listed threatened and endangered or candidate plant or animal species (USFWS, 2011) will occur.

*Criterion 10*

Federal lands containing habitat determined to be critical or essential for plant and animal species listed by a state pursuant to state law as endangered or threatened shall be considered unsuitable.

Exceptions: A lease may be issued and mining operations approved if, after consultation with the state, the surface management agency determines that the species will not be adversely affected by all or certain stipulated methods of coal mining.

Analysis: There is no suitable habitat within the lease modification area for any State threatened or endangered species (USFWS, 2011). Therefore, for reasons stated above, the exception can apply to this criterion.

*Criterion 11*

A bald or golden eagle nest site on federal lands that is determined to be active, and an appropriate buffer zone of land around a nest site shall be considered unsuitable. Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones. Buffer zones shall be determined in consultation with the Fish and Wildlife Service.

Exceptions: A lease may be issued if (1) it can be conditioned in such a way, either in manner or period of operation, that eagles will not be disturbed during the breeding season, or (2) the surface management agency, with the concurrence of the Fish and Wildlife Service, determines that the golden eagle nest(s) will not be moved, or (3) buffer zones may be decreased if the surface management agency determines that the active eagle nests will not be adversely affected.

Analysis: There are no known golden eagle or bald eagle nests, roost sites, within the lease modification area.

Underground coal mining and nesting bald or golden eagles are compatible on the same tract of land unless surface facilities or surface disturbances cause nest-site abandonment. Present guidelines used by the CDOW are:

| Golden eagle: No surface occupancy beyond historic levels within ¼ mile radius of active golden eagle nests (CDOW 2008). |
| Seasonal restriction to human encroachment within ½ mile radius of active nests from December 15 through July 15 (CDOW 2008). |

No surface facilities are expected within the lease modification area. Other than a negligible amount of subsidence, no surface disturbances are expected.

Therefore, for reasons stated above, the exception can apply to this criterion.

BLM_0019008

*Criterion 12*
Bald and golden eagle roost and concentration areas on federal lands used during migration and wintering shall be considered unsuitable.
Analysis: No bald or golden eagle roost sites or concentration areas are known to exist on federal lands within the review area.

*Criterion 13*
Federal lands containing a falcon (excluding kestrel) cliff nesting site with an active nest and buffer zone of federal land around the nest site shall be considered unsuitable. Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones. Buffer zones shall be determined in consultation with the Fish and Wildlife Service.
Exceptions: A lease may be issued where the surface management agency, after consultation with the Fish and Wildlife Service, determines that all or certain stipulated methods of coal mining will not adversely affect the falcon habitat during the periods when such habitat is used by falcons.
Analysis: There are no known peregrine or prairie falcon nest sites in the lease modification area. However, suitable nesting cliffs exist in the area, and surveys for peregrines will need to occur in this area. Lease stipulations on the parent lease require raptor surveys:
-Conduct surveys for nesting raptors on the lease tract prior to development of any surface facilities. No surface activities will be allowed within a ½ mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the BLM or USFS on a site specific basis.
These stipulations will apply to the lease modification area.
Therefore, for reasons stated above, the exception can apply to this criterion.

*Criterion 14*
Federal lands which are high priority habitat for migratory bird species of high federal interest, on a regional or national basis, as determined jointly by the surface management agency and the Fish and Wildlife Service, shall be considered unsuitable.
Analysis: No surface disturbance is proposed for this lease addition therefore no habitat alteration or destruction will occur which would compromise high priority habitat for migratory bird species.

*Criterion 15*
Federal lands which the surface management agency and the state jointly agree are habitat for resident species of fish, wildlife and plants of high interest to the state and which are essential for maintaining these priority wildlife and plant species shall be considered unsuitable. Examples of such lands which serve a critical function for the species involved include: (i) active dancing and strutting grounds for sage grouse, sharp-tailed grouse, and prairie chicken, (ii) winter ranges crucial for deer, antelope, and elk, (iii) migration corridor for elk, and (iv) extremes of range for plant species.
Exception: A lease may be issued if, after consultation with the state, the surface management agency determines that all or certain stipulated methods of coal mining will not have a significant long-term impact on the species being protected.
Analysis: As stated, no surface disturbance is proposed as a result of this lease addition so no critical habitat that supports fish, wildlife or plants of high interest to the state will be impacted. In addition, no crucial habitat for wildlife has been identified in the lease modification area (CDOW GIS).

BLM_0019009

*Criterion 16*
Federal lands in riverine, coastal, and special floodplains (100-year recurrence interval) on which the surface management agency determines that mining could not be undertaken without substantial threat of loss or life or property shall be considered unsuitable for all or certain stipulated methods of coal mining.
Analysis: The lands within the lease modification area are not within a riverine, coastal or special floodplain.

*Criterion 17*
Federal lands which have been committed by the surface management agency to use as municipal watersheds shall be considered unsuitable.
Analysis: None of the lands in the proposed lease tract are within a municipal watershed.

*Criterion 18*
Federal Lands with National Resource Waters, as identified by states in their water quality management plans, and a buffer zone of federal lands ¼ mile from the outer edge of the far banks of the water, shall be considered unsuitable.
Analysis: None of the lands in the proposed lease tract are identified as a National Resource Water.

*Criterion 19*
Federal lands identified by the surface management agency, in consultation with the state in which they are located, as alluvial valley floors according to the definition in Subpart 3400.0-5(a) of this title, the standards of 30 CFR Part 822, the final alluvial floor guidelines of the Office of Surface Mining Reclamation and Enforcement when published, and approved state programs under the Surface Mining Control and Reclamation Act of 1977, where mining would interrupt, discontinue, or preclude farming, shall be considered unsuitable. Additionally, when mining federal land outside an alluvial valley floor would materially damage the quantity of quality of water in the surface or underground water systems that would supply alluvial valley floors, the land shall be considered unsuitable.
Analysis: The application lands are not within an alluvial valley floor, but such lands drain into the North Fork Gunnison River, along which, both surface irrigated and potentially irrigable sites exist. Within the lease modification boundary, no water facilities (reservoirs, ditches, diversions) exist.
During subsidence, changes in ground slope and creation of tension cracks can alter surface hydrology and soil erosion processes. Increased surface erosion, debris flows and disruption of drainage pattern and flow in streams have been documented (Sidle, et al. 2000) in some cases. Effects to stream channels include (1) increase in lengths of cascades and to a lesser extent glides; (2) increases in pool length, numbers and volumes; (3) increase in median particle diameter of bed sediment in pools; and (4) some constriction in channel geometry. The magnitude of these effects varies depending upon the amount and location of subsidence. Locally, increased sediment delivery could affect water quality in Elk Creek (e.g. increased sediment load). This section of Elk Creek already receives large amounts of sediment from the erosive soils in the vicinity during normal precipitation and runoff so effects of increased sedimentation may not be quantifiable beyond baseline levels.
Only a negligible, unobservable amount of subsidence is predicted to occur within the lease modification area. Increased surface erosion, changes to stream morphology and possible disruption of stream flows could occur, but is unlikely. Again, since this portion of Elk Creek is ephemeral, and it already receives large amounts of sediment from natural processes,

66

BLM_0019010

quantification of additional effects from sedimentation beyond baseline is difficult. The magnitude and duration of predicted effects depends upon the amount and location of subsidence features.

Although material damage to the quality and quantity of water arising on or flowing over the proposed lease modification is possible, because of the reason listed above, this is not anticipated, and would be hard to separate from natural processes that are currently affecting water quality/quantity.

Therefore, for reasons stated above, the exception can apply to this criterion.

***Criterion 20***

Federal lands in a state to which is applicable a criterion (i) proposed by the state or Indian tribe located in the planning area, and (ii) adopted by rulemaking by the Secretary, shall be considered unsuitable.

Analysis: This criterion is not presently in effect in the State of Colorado.

67

# Appendix C

## Example Calculations

### 1.)   Horsepower-hour Calculations for Underground Mobile Sources

**Known Parameters:**

1.) OMLLC annual diesel fuel use 258,218 (42% Under, 58% Surface) gal        *source:   OMLLC
2.) The average density of the diesel fuel is 7.1 lb/gal                              *source:   LSD MSDS
3.) The LHV based energy density of the diesel fuel is 18,500 btu/gal          *source:   Ave. of literature
4.) Conversion: btu/hp-hr = 2,544.43                                                  *source:   Common conversion
5.) $CO_2$ EF = 642.323 g $CO_2$/hp-hr                                              *source:   EPA Nonroad (2008a)
6.) Carbon content of diesel fuel = 2,778 g C/gal                                 *source:   40 CFR 600.113
7.) $CO_2$ : C Molecular Weight  Ratio = 44/12 = 3.667 (unit less)           *source:   Periodic Table

**Calculate Parameters** (Underground Equipment Example)**:**

1.) Total Available Energy of fuel =
    108,451 gal  x  7.1 lb/gal   x  18,500 btu/lb                  =        14,265.16 MMbtu

2.) Energy Converter to HP (Energy IN) =
    14,265,160,000 btu  /  2544.43 btu/hp-hr                      =        5,606,419.01 hp-hr

3.) Convert $CO_2$ EF of Diesel Fuel to C EF =
    642.323 g $CO_2$/hp-hr  x  $3.667^{-1}$                        =        175.179 g C/hp-hr

4.) Derived hp-hr/gal of fuel from know Carbon Content of fuel =
    2,778 g C/gal   /  175.179 g C/hp-hr                          =        15.858 hp-hr/gal

5.) Derived hp-hr from fuel use (Energy Out) =
    15.858 hp-hr/gal   x  108,451 gal                            =        **1,719,828.37 hp-hr**

6.) TE = Energy Out  / Energy IN   x  100% =
    1,719,828.37 hp-hr  /  5,606,419.01 hp-hr  x  100%          =        **30.68%**

**Conclusions:**

The Thermal Efficiency of the underground equipment is approximately 30.68% based on the EPA Model data for $CO_2$. Although low for typical diesel engines based on the literature, it is realistic for working engines where hp is developed at various RMPs (based on loading and work cycles).  Further the EPA Model takes this into account when developing the EFs (see Nonroad Technical Document NR009d "Exhaust and Crankcase Emission factors for Nonroad Engine Modeling – Compression- Ignition").  All emissions estimates are based on the EPA Nonroad Model emissions factors and the total hp-hrs derived in calculated parameter 5 for each equipment class, i.e. underground or surface.

### 2.)   Example Emissions Calculations for Diesel Mobile Sources

**General Equation for all Emissions:**

BLM_0019012

Emissions (tons) = Total hp-hr (Energy Out[1]) x NR $EF_E$ g/hp-hr x $453.6^{-1}$ g/lb x $2000^{-1}$ lb/ton

Where:

$EF_E$ = Either the Underground or Surface Equipment Emissions Factor

[1] For N2O, substitute (Energy In).  EF based on fuel use only.

## A.) For $N_2O$ (surface)
8,788,185.82 hp-hr  x  0.005 g/hp-hr  x  $453.6^{-1}$ g/lb  x  $2000^{-1}$ lb/ton        =        0.048 tons

## B.) $NO_X$ (underground)
7,929,026.54 hp-hr  x  10.163 g/hp-hr  x  $453.6^{-1}$ g/lb  x  $2000^{-1}$ lb/ton        =        88.82 tons

## 3.)    Example Emissions Calculations for Gasoline Mobile Sources

### Known Parameters:

1.) OMLLC annual unleaded fuel use 16.824 gal                        *source:  OMLLC
2.) 2004 CAFE for LDGT = 20.7 miles per gallon (mpg)              *source:  NHTSA (2004)
3.) Emissions Factors (grams per vehicle mile traveled (g/VMT) are from 2003 IERA Mobile Source Emissions Tables 4.5, 4.6, 4.7, & 4.50
4.) Gasoline carbon content per gallon = 2,421 g C/gal              *source:  EPA 420-F-05-001, 2005
5.) $CO_2$ : C Molecular Weight  Ratio = 44/12 = 3.667 (unit less)      *source:  Periodic Table

### Calculate Parameters:

1.) Total Vehicle Miles Traveled (theoretical) =
       16,824 gal   x  20.7 mpg                                          =        348,257 miles

2.) $CO_2$ Emissions Factor =
       16,824 gal  x  2,421 g C/gal   x  3.667   x  $348,257^{-1}$ miles        =        428.84 g/VMT

### General Equation for all Emissions:

Emissions (tons) = Total Annual Fuel Use (gal)  x  CAFE (mi/gal)  x  EF g/mi  x  $453.6^{-1}$ g/lb  x  $2000^{-1}$ lb/ton

## A.) CO
16,824 gal   x  20.7 mi/gal  x  2.9 g/mi  x  $453.6^{-1}$ g/lb  x  $2000^{-1}$ lb/ton        =        1.113 tons

## B.) $CO_2$
16,824 gal   x  20.7 mi/gal  x  428.84 g/mi  x  $453.6^{-1}$ g/lb  x  $2000^{-1}$ lb/ton        =        164.62 tons

## 4.)    Emissions Avoidance Calculations for CMM Energy Project

### Known Parameters:

69

BLM_0019013

1.) Potential max power output = 3MW      *source:   OMLLC

2.) Average SI RICE engine efficiency range = 20 – 40%    *source:   Available Literature

3.) $CO_2$ : $CH_4$ Molecular Weight Ratio = 44.01/16.04 = 2.744 (unit less)    *source:   Periodic Table

4.) Engines designed to combust down to 20% $CH_4$    *source:   Vessels, Inc.
Conversation

5.) 1MW = 3.412 MMbtu    *source:   Common conversion

6.) CMM density @ stp = 0.042 lb/cf    *source:   $CH_4$ MSDS

## Assumptions:

1.) The engines combust 80% of the gas from the insitu collection system (i.e. 80% of the gas is above the minimum 20% methane concentration).

2.) 20% of the gas is flared.

3.) The engines produce the maximum power as rated (project economics drive assumption).

4.) CMM energy density = Natural gas density (1020 btu/scf)

5.) All calculations done @ stp conditions

## Calculate Parameters:

1.) Total energy required from gas combusted in engines @ 20% efficiency =
3MW  x  3.412MMbtu/MW  x  (100/20) Eff. Factor  x  8760 hrs/yr  =  448,336.8 MMbtu/yr

2.) Total energy required from gas combusted in engines @ 40% efficiency =
3MW  x  3.412MMbtu/MW  x  (100/40) Eff. Factor  x  8760 hrs/yr  =  224,168.4 MMbtu/yr

3.) Minimum CMM energy density (20% methane concentration) =
1020 btu/scf  x  20%          =  204 btu/scf CMM

4.) Minimum CMM gas required (@ max energy density, engine rating) =
$224,168.4 \times 10^6$ btu  x  $1020^{-1}$ btu/scf     =  219.8 MMscf

5.) Maximum CMM gas required (@ min energy density, engine rating) =
$448,336.8 \times 10^6$ btu/MMbtu  x  $204^{-1}$ btu/scf     =  2,197.8 MMscf

6.) Original $CO_2e$ of combusted methane (@ min energy density, engine rating) =
2,197.8 MMscf  x  $10^6$ scf/MMscf  x  20% $CH_4$  x  0.042 lb/scf  x  $2000^{-1}$ lb/ton  x  21 GWP
=  193,846 tons $CO_2e$

7.) Original $CO_2e$ of combusted methane (@ max energy density, engine rating) =
219.8 MMscf  x  $10^6$ scf/MMscf  x  100% CH4  x  0.042 lb/scf  x  $2000^{-1}$ lb/ton  x  21 GWP
=  96,932 tons $CO_2e$

8.) Reduced $CO_2$ emissions (@ min energy density, engine rating) =
2,197.8 MMscf  x  $10^6$ scf/MMscf  x  20% $CH_4$  x  0.042 lb/scf  x  2.744  x  $2000^{-1}$ lb/ton
=  25,329 tons $CO_2$

9.) Reduced $CO_2$ emissions (@ max energy density, engine rating) =
219.8 MMscf  x  $10^6$ scf/MMscf  x  100% CH4  x  0.042 lb/scf  x  2.744  x  $2000^{-1}$ ln/ton
=  12,666 tons $CO_2$

10.) Relative Reduction in GHG =
25,329 tons $CO_2$ / 193,846 tons $CO_2e$       =  87%
12,666 tons $CO_2$ / 96,932 tons $CO_2e$       =  87%

BLM_0019014

11.) Range of GHG Reductions ($CO_2$ basis)=

$\qquad$ 193,846 tons $CO_2e$ - 25,329 tons $CO_2$ (high) $\qquad$ = $\quad$ 168,517 tons

$\qquad$ 96,932 tons $CO_2e$ - 12,666 tons $CO_2$ (low) $\qquad$ = $\qquad$ 84,266 $\quad$ tons

## Table A.1 EPA Nonroad Emissions Factors (g/hp-hr)

| Equipment Type | SCC | PM | $PM_{10}$ | $PM_{2.5}$ | $NMOG^2$ | CO | $NO_X$ | $SO_2$ | $CO_2$ | $CH_4^3$ | $N_2O^4$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Underground Mining Equipment | 2270009000 | 1.446 | 1.446 | 1.403 | 2.216 | 8.555 | 10.163 | 0.138 | 642.323 | 0.034 | 0.005 |
| Surface Mining Equipment[1] | 2270002036 2270002051 2270002060 2270002069 2270002033 | 0.535 | 0.535 | 0.519 | 0.652 | 3.458 | 7.393 | 0.116 | 537.869 | 0.010 | 0.005 |
| Passenger Vehicles[5] | LDGT | 0.13 | 0.13 | 0.12 | 0.20 | 2.90 | 0.30 | 0.096 | 428.84 | ND | ND |

[1] Emissions factors from listed SCC equipment was averaged together to produce a composite emissions factor to represent likely equipment present at the facility. The individual equipment emissions did not statistically vary significantly, with the exception of the bore/drill rigs, within the model results. However, the drilling and boring equipment is not expected to be as heavily used as the other surface equipment, and therefore a straight average of all the emissions factors was used to develop the composite factor (conservative) vs. a weighted average which would have considered area equipment population data. Data was not available for site fleet data to produce a facility specific weighted average.

[2] NMOG (Non-Methane Organic Gases) used to represent potentially reactive VOC species that may participate in ground level Ozone formation. NMOG is the sum of crankcase and exhaust emissions.

[3] CH4 is represented from TOG (Total Organic Gases) – NMOG. CH4 is the sum of crankcase and exhaust emissions.

[4] N2O factor derived from EPA Climate Leaders GHG Inventory Protocol (EPA430-K-08-004) Direct Emissions from Mobile Combustion Sources, Appendix A, Table A-6. N2O factor reported as 0.08 g/kg of fuel combusted. Factor was converted to g/hp-hr based on calculated hp-hr from total annual fuel use (Example TE Calculation).

[5] Passenger vehicle emissions factors are in grams per vehicle mile traveled (g/VMT).

BLM_0019015

## Appendix D

**COMBINED GEOLOGIC AND ENGINEERING REPORT (GER) AND MAXIMUM ECONOMIC RECOVERY REPORT (MER)**

72

BLM_0019016

# COMBINED GEOLOGIC AND ENGINEERING REPORT (GER) AND MAXIMUM ECONOMIC RECOVERY REPORT (MER)

for
Coal Lease by Application dated June 3, 2010
applied for by
Oxbow Mining, LLC
*Federal Coal Lease COC61357, Tract 5*
T. 12 S. R. 90 W., 6th P.M.
by
Desty Dyer
Mining Engineer
August 2010, Revised March 2011, 2nd Revision May 2011

**Location**

The legal description of the fifth Elk Creek tract modification area (ECM5) is as follows:

T. 12 S., R. 90 W., 6th P.M.

sec. 32, lots 18, 21, and 23, and N½NE¼;
sec. 33, lots 22 and 23.
Containing approximately 158.79 acres more or less.

Area for the delineated tract totals approximately 158.79 acres more or less.
Note: Hereafter the tract area will be referred to as the ECM5.
The surface acres of the ECM5 are managed by the Grand Mesa Uncompahgre Gunnison USFS.
The ECM5 is located within Gunnison County on the north side of both the North Fork of the Gunnison River and State Highway 133. The ECM5 is adjacent to a portion of the existing Elk Creek lease COC61357 to the west. The ECM5 encompasses about 157 acres of BLM managed mineral estate approximately 2miles northeast of Somerset, Colorado. The ECM5 is on the east side of the upper reaches of Elk Creek. OML has applied for the D-Seam reserves within the ECM5, and the tract will allow extending both development of mains to the north-northeast and gateroads west of the north mains; thereby increasing recovery of known federal coal reserves.

**Stratigraphy**

GENERAL - The ECM5 is located in the Somerset coal field on the North Fork of the Gunnison River. The formations in the area of the ECM5 dip N-NE about 3.5 degrees. The sediments underlying the tract are of Cretaceous and Tertiary age and are described in descending order.

The Ruby (Wasatch) formation overlies the Mesa Verde formation and consists of red and buff shales, red sandstones, and red to grey conglomerates. It can be 1600 feet thick. The Mesa Verde formation contains four members. The top member is called the Barren member, can be 1500 ft. thick, and is composed predominately of buff lenticular sandstones. The Paonia member lies below the Barren member, contains two coal horizons, and ranges from 300 to 500 ft. thick. The top portion of this member is a lenticular cliff forming sandstone which can occur at slightly different stratigraphic horizons. The

73

Bowie member is the lower coal bearing member and ranges from 270 to 350 ft. thick. It is composed predominately of grey shale and contains several coal beds in three coal horizons. The top of the member is marked by a massive buff sandstone 90 ft. thick. The Rollins sandstone member lies below the Bowie, is a massive cliff-forming buff-white sandstone 120 to 200 ft. thick, and serves as the most persistent marker horizon in the area. The Rollins clearly defines the lower limit of coal occurrences in the area. Below the Rollins Sandstone member of the Mesa Verde is the Mancos Shale formation which is approximately 4000 ft. thick. The upper portion of the formation which is exposed in the area is composed of grey marine shales and minor buff sandstones.

*Coal Beds*

BLM reviewed existing coal resources in all the seams in the tract but found none were mineable except those applied for in the D-Seam although B-Seam reserves might be modified into the tract if future economics allow. The A & C seams are thin, and the A, B, and C-Seams are under 2,700' to 3,200' overburden. The E and F seams were inconsistent in thickness and quality and not included in the modification.

D-seam This coal seam averages about 12 ft. thick but has an average 11 ft. of mineable horizon thickness, which includes from 0' – 0.5' of parting. The recoverable coal is classified high volatile Bituminous. Its average location is about 350 feet above the Rollins sandstone. The seam varies in thickness from 6' to 16' but within the ECM5 it ranges from 10' to 12'. Although the D-Seam is known to split in some areas, no split is projected within the ECM5 which is generally an Area of greater thickness where the D-Seam has little or no interburden and actually appears as a uniform seam. The recoverable reserves for ECM5 based on mains development (and no LW block recovery) are calculated to be 35,000 tons. Overburden on the D-Seam in the tract ranges from 2,500' (on the south side) to just over 3,000' (on the north side), and averages about 2,500'. Although this high overburden has greater ground stresses associated with it, the BLM criteria of coal recovery calculations considers development of north mains and part of one gateroad in the southern portion of the ECM5 at a mining height of 10' (SEE ESTIMATED RECOVERY STARTING ON PAGE 6).

*Coal Quality*

Analysis of the D-Seam 2006 – 2009 market sales is shown in the following table as Short Proximate Analysis:

As Received Dry Basis
% Moisture 8.09 XXXXX
% Ash 9.60 10.45
% Sulfur 0.44 0.47
BTU/lb 11,954 13,006

Projected coal quality for the ECM5 is expected to be similar as existing quality being extracted from the Elk Creek mine. The seam has exhibited some roof failure dilution where development occurs; therefore the development coal mined from the ECM5 could be of lesser quality but will be blended with higher quality longwall coal before being sold.

*Mining Factors*

METHOD CONSTRAINTS -The amount of overburden (mentioned above) necessitates underground mining, and for OML that method is restricted to the longwall method of mining due to their commitment to employ it in all their mining ventures. OML would use continuous miner equipment on the ECM5 to develop an extension of their north mains then turn gate roads west-northwest to adequately develop for one longwall block on their existing lease.

*Production Factors*

BLM_0019018

EXISTING- Short Term Schedule - Production to meet the market demand is supplied by two active development sections operating on two 8 hr. shifts per day, 7 day per week schedule that total 1400 to 1450 operating shifts per year. The single longwall production unit will work a single 8 hr. shift per day 7 day per week schedule and could total 320 to 350 shifts per year.

Production Data - The existing Elk Creek mine operation extracts coal entirely within the D-Seam to the south-southwest of the ECM5. OML successfully mines coal using continuous miners to develop five-entry mains and three-entry gate roads. Development is ahead of longwall mining; therefore, the ECM5 would be developed ahead of final mining from the longwall blocks and the last longwall mining west of the mains could take place on the ECM5. With longwall operations in place, the mine would be capable of producing up to 6 million tons per year

Mining Equipment - The following is a list of major equipment used by OML and is typical for underground longwall operations:

• Continuous Miners 3

• Roof Bolters 4

• Shuttle Cars 9

• Utility Scoops 3

• Utility Haulers 3

• Utility Mantrips 6

• Shield Puller 1

• 60" Belt Drives 8

• Shield Hauler 2

• Shearer (JOY) 1

• Face Shields & Pans 206 (built by M.T.A.)

• Main Mine Fan 2

Life of Mine - The BLM calculated recoverable reserves based on the OML mine plan layout as of the date of the application including those existing in the fee and federal holdings being accessed by the Elk Creek mine were approximately 18.15 million tons and would provide 3 - 4 years of life at the projected longwall production rates. It should be noted that slightly less than 16.5 million tons of those reserves are under greater than 2000 ft. of overburden and have proven to be difficult to recover. In February of 2011 a ground failure event caused a change in mine plans from placing one LW block directly next to the previous one to developing single LW blocks with barrier pillars separating them. This resulted in the loss of mineable reserves (coal being left in the barrier pillars and diminishing the mine plan by 1 LW block) that amounted to a loss of about 3.13 million tons, leaving the recoverable reserves as of the date of the application at 15.02 million tons.

Manpower - The manpower level averages about 320.

PROJECTED with ECM5- Short Term Schedule - OML management has no plans to increase production rates beyond that level anticipated from the longwall operation. Mining conducted in the Elk Creek mine would extract federal coal through development and final mining of the ECM5 then produce exclusively from fee coal for about 4 months.

Production Data - The operation has portal and shafts into the D-Seam on fee coal property near the existing surface facilities now being used by OML. Production would remain within the D-Seam for the life-of-mine. Panel geometry for the ECM5 would incorporate north mains then gateroads and longwall blocks approximately west-northwest. Production could

75

vary but is expected to be about 5 million tons per year and go no lower than 4 million tons per year or no higher than 7 million tons per year.

Mining Equipment - Longwall mining equipment would continue to be employed. (SEE LIST ABOVE)

Life of Mine - The ECM5 would add very little to the life of the mine; however recovery on the final LW block would be enhanced since it could be developed at the full 880' width. The actual operating time spent on the ECM5 could last about 1 year. North mains development in the Elk Creek mine could begin on the ECM5 by the first quarter in 2012. The development of mains and a partial gateroad could proceed across the ECM5 to the north and west with final longwall mining occurring as early as the end of 2013. Additional recoverable reserves on the existing lease afforded because of development on the ECM5 would be about 0.52 million tons and with the ECM recoverable reserves of 35,000 added, the total mine reserve would be 15.575 million tons as of the date of the application.

Manpower - Levels are projected to remain about the same.

### Surface Facilities

The existing surface coal handling facilities of the OML Elk Creek mine are capable of handling longwall mining production. They are located at Somerset on state highway 133, and would serve the needs of the operation even with additional coal leased as proposed in the ECM5 as applied for by OML.

### Transportation

The existing surface transportation infrastructure at the Elk Creek mine would serve the mining needs of the operation even with the addition of the ECM5. The belt structure used to deliver coal from the Elk Creek mine working faces to the surface coal handling facility would be used in the easterly extent of the mine. The existing train load-out tipple would be employed for that same purpose during the life-of-mine on the ECM5.

### Estimated Recovery

The D-Seam recovery within the ECM5 should approximate calculated recovery using a BLM north mains and gateroad projection north and west across the ECM5 with 1830 tons per acre-ft., 9' of excavation (Development height will be minimized in high overburden to allow greater pillar stability), and considering the following:

1. 100% of recovery on longwall block portion.
2. 31% of recovery on the combination of the mains and development portion.
3. About 100 acres of northern portion of ECM5 likely beyond mineable recovery due to high overburden.

BLM calculates a recoverable reserve for the ECM5 to be 35,000 tons.

### Potential Markets

Coal markets supplied by production from the ECM5 are expected to be somewhat the same as those historically supplied by OML with production from the Elk Creek mine. The operation primarily supplies coal for American electrical power generation used by the public. The approximate breakdown of market destinations for the coal is shown below:

1. Electric Utilities 80 - 85%
2. Cement & Lime Manufacturing 12 - 16%
3. Other Manufacturing 3 - 5%

### Maximum Economic Recovery Determintation

The ECM5 OML applied for has been determined by availability of mineable coal containing about 7 acres projected to be mined but also with about 150 acreswhere D-Seam under high overburdenmay become mineable if economics allow. It is located in such a way as to allow the OML planned Elk Creek mine projections the most efficient access to federal coal

76

BLM_0019020

using existing north mains. It enhances the value of the OML existing federal coal holdings. Although a neighboring coal company (Bowie Resources, Ltd.) has a federal coal lease in coal reserves to the west of the OML holdings, they do not have any interest in the ECM5; therefore, the ECM5 application is not likely to generate competitive bidding. It is entirely unlikely that a third party would deem the coal resource in the ECM5 either substantial or valuable enough for them to initiate new surface and underground facilities.

It has been determined by BLM that Maximum Economic Recovery (MER) of the ECM5 can be achieved by underground mining using the longwall method of mining as described above.

BLM_0019021

Form 1221-2
(June 1969)



| | UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT MANUAL TRANSMITTAL SHEET | Release 6-130 |
|---|---|---|
| | | Date 03/15/2012 |

**Subject**
   **6320—Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process (Public)**

---

**Explanation of Materials Transmitted:** This manual contains the Bureau of Land Management's (BLM) policy and guidance for considering lands with wilderness characteristics in the Bureau of Land Management's (BLM) land use planning process under the Federal Land Policy and Management Act of 1976 (FLPMA) and other applicable law and supersedes all previous guidance on this topic. It does not address or affect policy related to Congressionally-designated Wilderness or existing Wilderness Study Areas (WSAs) pending before Congress.

1.  **Reports Required:  None**

2.  **Materials Superseded:  This manual supersedes BLM Manual Sections 6302 and 6303**

4.  **Filing Instructions:  File as directed below**

| REMOVE | INSERT |
|---|---|
| **All 6302 (Rel. 6-127) (Total 14 Sheets)** | **6320** |
| **All 6303  (Rel. 6-128) (Total 8 Sheets)** | **(Total 8 Sheets)** |

/s/
**Robert V. Abbey**
**Director**

BLM_0019022

TC-1

# 6320 MANUAL-CONSIDERING LANDS WITH WILDERNESS CHARACTERISTICS IN THE BLM LAND USE PLANNING PROCESS

## Table of Contents

.01 Purpose

.02 Objective

.03 Authority

.04 Responsibilities

.05 References

.06 Policy

.07 Glossary

.08 Acronyms

BLM MANUAL
Supersedes Rel. 6-127 & 6-128

Rel. No. 6-130
Date:  03/15/2012

BLM_0019023

# 6320 MANUAL-CONSIDERING LANDS WITH WILDERNESS CHARACTERISTICS IN THE BLM LAND USE PLANNING PROCESS

**.01 Purpose.** This policy outlines general procedures for considering lands with wilderness characteristics in the Bureau of Land Management's (BLM) land use planning process under the Federal Land Policy and Management Act of 1976 (FLPMA) and other applicable law and supersedes all previous guidance on this topic. It does not address or affect policy related to Congressionally-designated Wilderness or existing Wilderness Study Areas (WSAs) pending before Congress.

**.02 Objective.** This Manual establishes BLM policy on considering lands with wilderness characteristics in land use plans and land use plan amendments or revisions.

**.03 Authority.** Principal authorities affecting the consideration of lands with wilderness characteristics in the planning process are:

   A.  FLPMA, 43 U.S.C. 1701 *et seq.*, exclusive of 43 U.S.C. 1782.

   B.  Wilderness Act of 1964, 16 U.S.C. 1131 *et seq.*

   C.  National Environmental Policy Act of 1969, 42 U.S.C. 4321 *et seq.* (NEPA).

   D.  Naval Petroleum Reserves Production Act of 1976, 42 U.S.C. 6501 *et seq.* (NPRPA).

   E.  Alaska National Interest Lands Conservation Act (ANILCA), Section 1320, 43 U.S.C. 1784.

   F.  Oregon and California Lands Act of 1937, 43 U.S.C. 1181a-1181j.

   G.  Council on Environmental Quality (CEQ) Regulations, 40 CFR 1500-1508.

   H.  BLM Regulations, 43 CFR Part 1600, 43 CFR Part 2360.

   I.  Department of the Interior (DOI) NEPA Regulations, 43 CFR Part 46.

**.04 Responsibilities.**

   A.  The BLM Director shall:

      1.  Coordinate with State Directors on considering and, as warranted, protecting lands with wilderness characteristics in land use plans.

   B.  State Directors shall:

      1.  Implement policy and provide statewide program coordination and guidance for the consideration of lands with wilderness characteristics inventories and, as warranted, the protection of lands with wilderness characteristics in land use plans.

BLM_0019024

2. Provide program development, technical management assistance, and support to District and Field Offices to ensure lands with wilderness characteristics and potential resource conflicts are adequately analyzed.

C. <u>District Managers and Field Managers shall</u>:

1. Update and maintain the wilderness inventory for lands within the planning area consistent with BLM wilderness characteristics inventory guidance.

2. Ensure that wilderness characteristics inventories are considered and that, as warranted, lands with wilderness characteristics are protected in a manner consistent with this manual in BLM planning processes.

**.05 References.** Principal references for these instructions are:

A. FLPMA, 43 U.S.C. 1701 *et seq.*

B. Wilderness Act, 16 U.S.C. 1131 *et seq.*

C. NEPA, 42 U.S.C. 4321 *et seq.*

D. NPRPA, 42 U.S.C. 6501 *et seq.*

E. Oregon and California Lands Act of 1937 (O&C Lands Act), 43 U.S.C. 1181a.

F. ANILCA Section 1320, 43 U.S.C. 1784.

G. CEQ Regulations, 40 CFR 1500-1508.

H. BLM Regulations, 43 CFR Part 1600.

I. BLM Handbook H-1601-1, Land Use Planning.

J. DOI NEPA Regulations, 43 CFR Part 46.

**.06 Policy.** Managing the wilderness resource is part of the BLM's multiple use mission. Consistent with FLPMA and other applicable authorities, the BLM will consider the wilderness characteristics of public lands when undertaking land use planning. The BLM will use the land use planning process to determine how to manage lands with wilderness characteristics as part of the BLM's multiple-use mandate. The BLM will consider a full range of alternatives for such lands when conducting land use planning. The BLM will analyze the effects of (1) plan alternatives on lands with wilderness characteristics and (2) management of lands with wilderness characteristics on other resources and resource uses.

In some circumstances, consideration of management alternatives for lands with wilderness characteristics may be outside the scope of a particular planning process (as dictated by the statement of purpose and need for the planning effort). For example, a targeted amendment to address a specific project or proposal may not in all circumstances require consideration of an alternative that would protect wilderness characteristics. In these situations, the NEPA document

BLM_0019025

associated with the plan amendment must still analyze effects of the alternatives on lands with wilderness characteristics.

The process described in this policy shall be integrated into land use plans in order to ensure that lands with wilderness characteristics and their management are adequately evaluated in an environmental analysis.

A. **Procedures for Considering Lands with Wilderness Characteristics in Land Use Planning.** The BLM will evaluate lands with wilderness characteristics through the land use planning process. When such lands are present, the BLM will examine options for managing these lands and determine the most appropriate land use allocations for them. Considering wilderness characteristics in the land use planning process may result in several outcomes, including, but not limited to: (1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; (2) emphasizing other multiple uses while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics; (3) the protection of wilderness characteristics as a priority over other multiple uses. The BLM will continue to engage cooperating agencies, the public, and other interested parties in the land use planning process as it relates to the management of lands with wilderness characteristics.

1. Factors for Consideration of Lands with Wilderness Characteristics. Consider and document the wilderness characteristics for each area identified as possessing wilderness characteristics through the inventory described in Manual 6310.

   a. Manageability. Consider and document whether the lands can be effectively managed to protect their wilderness characteristics. Consider whether boundary modification of the area would improve manageability. Manageability may vary depending on the planning alternative.

      i. General. The BLM must determine how lands with wilderness characteristics will be managed over the life of the plan, based on present knowledge of the resources, ongoing uses, and valid existing rights in the area.

      ii. Documenting Land Status. Document the land status and mineral ownership of lands with wilderness characteristics. Subsurface rights in an area owned by a party other than the Federal government may limit the BLM's ability to protect wilderness characteristics on the surface.

      iii. Access to State or Private Inholdings. In addressing manageability, assess the potential impact of providing access to non-Federal inholdings.

      iv. External Impacts. The fact that incompatible activities or uses can be seen or heard from areas possessing wilderness characteristics should not be a determining factor when analyzing the manageability of such areas unless these impacts are pervasive and omnipresent.

      v. Other Statutory Requirements. Some lands managed by the BLM are subject to specific additional statutory requirements (e.g., the National Petroleum Reserve Production Act (NPRPA) and the Oregon and California (O&C)

BLM_0019026

Lands Act). Consider those requirements where appropriate in determining manageability of lands with wilderness characteristics.

   b. Resource Values and Uses. Consider and document the extent to which other resource values and uses of lands with wilderness characteristics would be forgone or adversely affected if the wilderness characteristics are protected. Consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics. Consider the following:

      i. Presence of Other Resources. The degree to which other resources or uses are present in the area with wilderness characteristics;

      ii. Development Potential. The potential for further development or use of the other resources on the lands with wilderness characteristics;

      iii. Resource Availability. The degree to which other resources or uses are present on other public and private lands outside the area containing wilderness characteristics;

      iv. Economic Importance. Local, regional, or traditional (e.g. Tribal) economic value of various resources on the lands with wilderness characteristics and the potential to enhance the economic importance by protecting the lands with wilderness characteristics; and

      v. Compatibility with Protection. The degree to which use or development of each resource is compatible with or conflicts with management of the area to protect wilderness characteristics.

   c. Congressional Release of WSAs. Periodically, Congress considers a WSA for Wilderness designation. When Congress decides not to designate a WSA or a portion of a WSA as Wilderness and releases that WSA from FLPMA Section 603's non-impairment standard, the BLM shall take into serious consideration the Congressional action—as well as any changed circumstances—in the BLM's subsequent land use planning decisions for the released land. Document the basis for the BLM land use planning decisions regarding the management of the released land.

2. Land Use Planning Process. Additional information is included in the Land Use Planning Handbook H-1601-1.

   a. Preparation Plan. The preparation plan provides the foundation for the entire planning process. The preparation plan should also identify the skills, data/meta-data, budget, and interim tasks (such as completing or updating the wilderness characteristics inventory) necessary to address the issues through the planning process.

      i. Issue Identification. Planning issues include disputes or controversies about existing and potential land and resource allocations, levels of resource use, development, and protection opportunities for consideration in the preparation

BLM_0019027

of the land use plan. Identify whether lands with wilderness characteristics are a planning issue to be addressed and any associated management concerns.

    ii.   Planning Criteria. Planning criteria guide development of the plan by helping define the decision space. Identify preliminary planning criteria related to wilderness characteristics management, including plan parameters, constraints, or existing planning decisions that will be carried forward.

    iii.  Data Needs. The preparation plan should identify the information or data needed to resolve issues or to perform the requisite analysis. Identify existing lands with wilderness characteristics-related data sources, such as prior wilderness inventories and new inventory information provided by external sources. Identify data gaps and other information necessary to address lands with wilderness characteristics, such as completion of a new wilderness characteristics inventory pursuant to BLM Manual 6310.

    iv.  Budget. Identify labor and operation support costs necessary to obtain skilled personnel, inventory information, and other data to address lands with wilderness characteristics through the planning process. Include indirect costs and an allocation of support labor and operations costs. Include the land records and other documentation expenses.

  b.  Scoping. The Notice of Intent should include lands with wilderness characteristics if they are a planning issue to be addressed. The Notice of Intent should also identify any lands with wilderness characteristics-related preliminary planning criteria. Initiate government-to-government consultation with Tribes potentially affected by planning decisions regarding such lands. In the Scoping Report, summarize comments related to wilderness characteristics received during the formal scoping period and describe any additional wilderness characteristics-related issues from internal or external scoping meetings.

  c.  Analysis of the Management Situation (AMS). The AMS provides the basis for formulating reasonable alternatives and can begin as soon as the planning project is approved. Where lands with wilderness characteristics have been identified in an inventory, describe current management direction relating to such lands from existing planning documents. Prepare an area profile for lands with wilderness characteristics that describes their locations and current trends and levels of other resource uses and activities in those areas. Incorporate the analysis and documentation performed under the Factors for Consideration of Lands with Wilderness Characteristics section of this policy regarding the quality, manageability, and other resource values and uses of such areas. Identify management opportunities to respond to identified issues.

  d.  Resource Considerations and Formulation of Alternatives. BLM's multiple-use mission includes, where appropriate, preservation and protection of public lands in their natural condition. The concept of multiple-use management as defined in FLPMA also includes the use of some land for less than all of the resources. Where lands with wilderness characteristics have been identified through the

BLM_0019028

inventory process, the NEPA document used to support the land use plan (or land use plan amendment or revision) decision shall contain a full range of reasonable alternatives to provide a basis for comparing impacts to wilderness characteristics and to other resource values or uses. Lands with wilderness characteristics must be delineated as discrete units to which management prescriptions may be applied.

Each alternative should include management actions and allowable uses and restrictions designed to achieve the desired outcomes (goals and objectives) of the land use plan. An alternative that protects lands with wilderness characteristics must contain management actions to achieve protection. Examples of land use plan decisions that could protect lands with wilderness characteristics include, but are not limited to, the following:

i.  Recommend withdrawal from mineral entry.

ii.  Close to leasing or allow leasing only with no surface occupancy with no exceptions, waivers, or modifications.

iii.  Designate as right-of-way exclusion areas.

iv.  Close to construction of new roads.

v.  Designate as closed to motor vehicle use, as limited to motor vehicle use on designated routes, or as limited to mechanized use on designated routes.

vi.  Close to mineral material sales.

vii.  Exclude or restrict with conditions for certain commercial uses or other activities (e.g., commercial or personal-use wood-cutting permits).

viii.  Designate as Visual Resource Management Class I or II.

ix.  Restrict construction of new structures and facilities unrelated to the preservation or enhancement of wilderness characteristics or necessary for the management of uses allowed under the land use plan.

x.  Retain public lands in Federal ownership.

Note: In developing management actions and allowable uses for land use plans in Alaska, the BLM should take into account the relevant management provisions of the Alaska National Interest Lands Conservation Act (ANILCA).

Management actions pertaining to lands with wilderness characteristics should be placed in a "Lands with Wilderness Characteristics" subheading under the Resources section of planning documents.

In areas where the management decision is not to protect wilderness characteristics, consider measures to minimize impacts on those characteristics.

e.  Affected Environment. In the NEPA document used to support the planning decision, describe the inventory process, summarize any information received from the public, and incorporate inventory information by reference. The NEPA document should include a brief description of each land with wilderness characteristics, including a map delineating the boundaries of each such area and the acreage. Also describe the existing administrative designations, land use allocations, uses, management actions, and mitigation measures that are currently in place.

f.  Environmental Consequences. In the NEPA document used to reach the planning decision, describe the direct, indirect, and cumulative effects of (1) various alternatives on lands with wilderness characteristics and (2) managing to protect lands with wilderness characteristics on other affected resources.

The extent to which managing to protect the wilderness characteristics affects a particular resource or use will vary from area to area, depending on a number of factors, including:

i.  The degree to which use or development of the resource is compatible with or conflicts with protection of wilderness characteristics.

ii.  The degree to which protection of wilderness characteristics enhances other multiple use benefits on or near the management area such as recreational opportunities, protection of watersheds, wildlife habitat, natural plant communities, cultural resources, scenic quality, and similar natural values.

g.  Final Planning Decision. In making the final planning decision regarding management of lands with wilderness characteristics, consider both the resources that would be forgone or adversely affected, and the resources that would benefit under each alternative. As with any planning decision, document the reasons for its determination regarding management of lands with wilderness characteristics.

BLM_0019030



BLM > Energy > Oil and Gas

Print Page

## Onshore Oil and Gas Orders/Notices to Lessees

**National**
⊞ What We Do
⊞ Visit Us
⊞ Information Center
⊞ Get Involved
⊞ Our Offices/Centers
⊞ Contact Us

Search

Welcome to the BLM website for Onshore Oil and Gas Orders and Notices to Lessees. This website provides access to current Onshore Oil and Gas Orders and Notices to Lessees. The Orders contain the requirements necessary for operations (production, exploration, development) of oil and gas resources on all Federal and Indian onshore oil and gas leases (other than those of the Osage Tribe), including leases where the surface is managed by the U.S. Forest Service.

**Onshore Oil and Gas Order No. 1, Approval of Operations:** Provides standards and requirements for submitting and processing of "Notice of Staking (NOS), Application for Permit to Drill (APD) and related operations.

**Onshore Oil and Gas Order No. 2, Drilling Operations:** This Order details the Bureau's uniform national standards for the minimum levels of performance expected from lessees and operators when conducting drilling operations and for abandonment immediately following drilling. The purpose also is to identify the enforcement actions that will result when violations of the minimum standards are found, and when those violations are not abated in a timely manner.

**Onshore Oil and Gas Order No. 3, Site Security:** The purpose of this Order is to implement and supplement the regulations in 43 CFR 3162.7-1 and 3162.7-5. This Order establishes the minimum standards for site security by providing a system for production accountability and covers the use of seals, by-passes around meters, self-inspection, transporters' documentation, reporting of incidents of unauthorized removal or mishandling of oil and condensate, facility diagrams, recordkeeping, and site security plans.

**Onshore Oil and Gas Order No. 4, Measurement of Oil:** The purpose of this Order is to establish requirements and minimum standards for the measurement of oil, and to provide standard operating practices for lease oil storage and handling facilities, by the methods authorized in 43 CFR 3162.7-2, i.e., measurement by tank gauging, positive displacement metering, or other methods acceptable to the authorized officer. Proper oil measurement ensures that the Federal Government and Indian mineral owners receive the royalties due, as specified in the governing oil and gas leases.

**Onshore Oil and Gas Order No. 5, Measurement of Gas:** The purpose of this Order is to establish requirements and minimum standards for the measurement of gas by the methods authorized in 43 CFR 3162.7-3, i.e., measurement by orifice meter or other methods acceptable to the authorized officer. Proper gas measurement ensures that the Federal Government, the general public, State Governments which share in the proceeds, and Indian mineral owners receive the royalties due, as specified in the governing oil and gas leases.

**Onshore Oil and Gas Order No. 6, Hydrogen Sulfide Operations:** The purpose of this Order is to protect public health and safety and those personnel essential to maintaining control of the well. This Order identifies the Bureau of Land Management's uniform national requirements and minimum standards of performance expected from operators when conducting operations involving oil or gas that is known or could reasonably be expected to contain hydrogen sulfide ($H_2S$) or which results in the emission of sulfur dioxide ($SO_2$) as a result of flaring $H_2S$.

**Onshore Oil and Gas Order No. 7, Disposal of Produced Water:** The purpose of this Order is to specify informational and procedural requirements for submittal of an application for the disposal of produced water, and the design, construction and maintenance requirements for pits as well as the minimum standards necessary to satisfy the requirements and procedures for seeking a variance from the minimum standards.

**Notice to Lessee 3A, Reporting of Undesirable Events:** The purpose of this NTL is to specify informational and procedural requirements for report all spills, discharges, or other undesirable events.

**Notice to Lessee 4A, Royalty or Compensation for Oil and Gas Lost:** The purpose of this NTL is to specify when royalty or compensation is due on oil or gas that is avoidable lost.

**Links**

Inspection and Enforcement
Inspection Forms
Well Information Systems
Onshore Oil and Gas Operations - 43 CFR 3160

Last updated: 06-05-2012

Form 1221-2
(June 1969)



## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT

| Release |
| --- |
| 6-136 |

| Date |
| --- |
| 7/13/2012 |

### MANUAL TRANSMITTAL SHEET

Subject

6400 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management (Public)

1. <u>Explanation of Material Transmitted</u>: This release transmits a revised Wild and Scenic Rivers Manual, which replaces Manual 8351, Release 8-61. This manual revision provides policy, direction, and guidance for the identification, evaluation, planning, and management of eligible and suitable wild and scenic rivers and the management of designated components of the National Wild and Scenic Rivers System.

This revised manual provides the line manager and program staff professional with policies and program guidance for conducting wild and scenic rivers studies within the land use planning process, environmental analysis, and legislative reporting and provides other related information. It also sets forth requirements for designated rivers, as well as river segments determined eligible or suitable for inclusion in the National Wild and Scenic Rivers System. It also expands upon the U.S. Department of the Interior - U.S. Department of Agriculture (USDI-USDA) Final Revised Guidelines for Eligibility, Classification, and Management of River Areas (47 FR 39454).

2. <u>Reports Required</u>: Wild and scenic river study reports associated with transmittal documents as required by Congress.

3. <u>Material Superseded</u>: The material superseded by this release is listed under "REMOVE" below. No other directives are superseded.

4. <u>Filing Instructions</u>: File as directed below.

REMOVE
All of 8351 (Rel. 8-61)
(Total 63 sheets)

INSERT
All of 6400
(Total 85 sheets)

*/s/Mike Pool*

Acting Director,
Bureau of Land Management

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

**Table of Contents**

**CHAPTER 1. OVERVIEW** ................................................................................. 1-1
1.1  PURPOSE ...........................................................................................................1-1
1.2  OBJECTIVES ......................................................................................................1-1
1.3  RELEVANT AUTHORITIES...............................................................................1-1
1.4  RESPONSIBILITY ..............................................................................................1-2
1.5  REFERENCES .....................................................................................................1-6
1.6  POLICY...............................................................................................................1-7
1.7  FILE AND RECORDS MAINTENANCE ............................................................1-8
1.8  DATA STANDARDS AND MANAGEMENT....................................................1-9
1.9  PROGRAM RELATIONSHIPS...........................................................................1-9

**CHAPTER 2. IDENTIFICATION OF STUDY RIVERS** ................................. 2-1
2.1  ROLE OF LAND USE PLANNING IN THE RIVER STUDY PROCESS ..................2-1
2.2  ESTABLISHING STUDY RIVER TERMINI AND AREA BOUNDARIES...............2-2

**CHAPTER 3. EVALUATION OF STUDY RIVERS**........................................ 3-1
3.1  ELIGIBILITY ......................................................................................................3-1
3.2  INELIGIBLE RIVERS .........................................................................................3-5
3.3  CLASSIFICATION..............................................................................................3-5
3.4  SUITABILITY ....................................................................................................3-5
3.5  MANAGEMENT OF ELIGIBLE AND SUITABLE RIVERS AS DETERMINED THROUGH
BLM-IDENTIFIED STUDY OR CONGRESSIONALLY AUTHORIZED STUDY............................3-8
3.6  MANAGEMENT GUIDELINES FOR ELIGIBLE AND SUITABLE RIVERS AS DETERMINED
THROUGH BLM-IDENTIFIED STUDY OR CONGRESSIONALLY AUTHORIZED STUDY............3-9
3.7  LAND USE PLAN GUIDANCE .......................................................................3-13
3.8  DETERMINATIONS OF IMPACTS UNDER SECTION 7(B) OF THE WSRA......................3-13
3.9  MONITORING FREE FLOW, WATER QUALITY, AND OUTSTANDINGLY REMARKABLE
VALUES..................................................................................................................3-15

**CHAPTER 4. THE STUDY PROCESS**............................................................. 4-1
4.1  WILD AND SCENIC RIVER STUDY IN THE LAND USE PLAN ........................4-1
4.2  WILD AND SCENIC RIVER SUITABILITY STUDY AND PROGRAMMATIC LAND
USE PLAN AMENDMENT......................................................................................4-2
4.3  JOINT STUDY.....................................................................................................4-4

**CHAPTER 5. THE REVIEW AND APPROVAL PROCESS OF A WILD AND SCENIC
RIVER STUDY REPORT** ................................................................................... 5-1
5.1  BUREAU OF LAND MANAGEMENT-IDENTIFIED STUDY ..............................5-1
5.2  CONGRESSIONALLY AUTHORIZED STUDY...................................................5-1

**CHAPTER 6. DESIGNATION**............................................................................ 6-1

BLM_0019033

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

**CHAPTER 7. MANAGING DESIGNATED WILD AND SCENIC RIVERS ............... 7-1**

7.1  BOUNDARY ESTABLISHMENT AND CLASSIFICATION .................................................7-1

7.2  COMPREHENSIVE RIVER MANAGEMENT PLANS ........................................................7-2

7.3  STATE-ADMINISTERED, FEDERALLY DESIGNATED RIVERS UNDER
SECTION 2(a)(ii) ................................................................................................................ 7-3

7.4  MANAGEMENT OF ACTIVITIES ON FEDERAL LANDS PRIOR TO COMPLETION
OF THE CRMP ....................................................................................................................7-3

7.5  MANAGEMENT GUIDELINES FOR ACTIVITIES ON DESIGNATED RIVERS.....................7-3

7.6  FEDERAL RESERVED WATER RIGHT .........................................................................7-9

7.7  WATER QUALITY..................................................................................................... 7-9

7.8  VISITOR USE AND CAPACITY ...................................................................................7-9

7.9  DETERMINATIONS OF IMPACTS UNDER SECTION 7(A) OF THE WSRA.....................7-14


GLOSSARY OF TERMS ....................................................................................................G-1

ILLUSTRATION 1 – SAMPLE FORMAT OF DOCUMENTATION OF ELIGIBILITY ...................... I-1

ILLUSTRATION 2 – CLASSIFICATION CRITERIA FOR WILD, SCENIC, AND RECREATIONAL
RIVER AREAS ................................................................................................................ I-3

ILLUSTRATION 3 – SECTION 7 EVALUATION PROCEDURE UNDER "DIRECT AND
ADVERSE" ..................................................................................................................... I-5

ILLUSTRATION 4 – SECTION 7 EVALUATION PROCEDURE UNDER "INVADE THE
AREA OR DIMINISH" ...................................................................................................... I-8

ILLUSTRATION 5 – SUMMARY INFORMATION DOCUMENT ............................................. I-10

ILLUSTRATION 6 – SAMPLE TRANSMITTAL LETTER....................................................... I-13

ILLUSTRATION 7 – MONITORING STRATEGY ................................................................. I-16

ILLUSTRATION 8 – SAMPLE WSR BOUNDARY TRANSMITTAL DOCUMENTS .................... I-23

ILLUSTRATION 9 – KEY ELEMENTS OF A COMPREHENSIVE RIVER MANAGEMENT PLAN . I-28

BLM_0019034

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

## Chapter 1.  Overview

### 1.1  Purpose

This manual contains the Bureau of Land Management's (BLM's) policy and program direction
for the identification, evaluation, and management of eligible and suitable wild and scenic rivers
(WSRs) and the management of designated components of the National Wild and Scenic Rivers
System (National System). This program guidance is provided to fulfill obligations contained in
the Wild and Scenic Rivers Act (WSRA) of 1968, as amended, and other relevant laws and
policies. Eligible and suitable WSRs are managed by the BLM's National Landscape
Conservation System (NLCS) where the river is located inside an NLCS unit, and eligible and
suitable rivers are managed by the BLM's Assistant Director, Natural Resources and Planning,
where the river is located outside an NLCS unit. Designated WSRs are managed by the BLM's
NLCS. This manual provides policy and program guidance for WSRs consistent with the NLCS
mission of conserving, protecting, and restoring nationally significant landscapes recognized for
their outstanding cultural, ecological, and scientific values.

### 1.2  Objectives

The objectives of this guidance are to:

1.  Comply with the WSRA, subject to valid existing rights, by protecting and enhancing the
    free-flowing condition, water quality, and outstandingly remarkable values of each
    designated WSR.

2.  Comply with the WSRA and the Federal Land Policy and Management Act (FLPMA),
    subject to valid existing rights, by identifying, evaluating, and managing potential
    additions to the National System.

3.  Develop and consider management alternatives during the land use planning process and
    during project- and activity-level analysis that would protect and, where feasible, enhance
    the free-flowing condition, water quality, and outstandingly remarkable values of BLM-
    identified eligible and suitable rivers.

4.  Protect the free-flowing condition, water quality, and outstandingly remarkable values of
    congressionally authorized study rivers in accordance with the WSRA and FLPMA.

### 1.3  Relevant Authorities

1.  National Historic Preservation Act of 1966 (16 U.S.C. 470)

2.  Wild and Scenic Rivers Act of 1968, as amended (16 U.S.C. 1271-1287)

3.  National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*)

4.  Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act) (33 U.S.C.
    1251 *et seq.*)

BLM_0019035

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

5.   Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*)

6.   Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1701 *et seq.*)

7.   Archaeological Resources Protection Act of 1979 (16 U.S.C. 470)

8.   Alaska National Interest Lands Conservation Act of 1980 (16 U.S.C. 3101 *et seq.*)

9.   Federal Lands Recreation Enhancement Act of 2004 (16 U.S.C. 6804)

10.  Omnibus Public Land Management Act of 2009 (16 U.S.C. 7201-7203)

11.  Title 43 CFR Subpart 1610.4-9 – Monitoring and Evaluation

12.  Title 43 CFR Subpart 8351 - Designated National Areas

13.  1982 U.S. Department of the Interior - U.S. Department of Agriculture Final Revised
     Guidelines for Eligibility, Classification, and Management of River Areas (Interagency
     Guidelines) (47 FR 39454)

1.4  Responsibility

A.   *The Director, Bureau of Land Management, and the Deputy Directors, Bureau of Land
Management*, through the Assistant Director, National Landscape Conservation System and
Community Partnerships, for all designated WSRs and for eligible and suitable river segments
located inside NLCS units; or through the Assistant Director, Renewable Resources and
Planning, for all eligible and suitable river segments located outside NLCS units, are responsible
for:

1.   Ensuring compliance with the WSRA by establishing policy and guidance for the
     BLM's WSR program.

2.   Directing fiscal resources related to the evaluation and management of potential WSRs
     and to the administration and management of designated WSRs.

3.   Recommending, through the land use planning process to the Secretary of the Interior,
     rivers for inclusion in the National System and coordinating with BLM State Directors,
     field offices, other agencies, and other entities in submitting this recommendation.

4.   Developing and maintaining relationships with tribal governments, other Federal
     agencies, state and local governments, national-level partnership organizations, other
     nonprofit groups, and the general public interested in the management of designated
     rivers or the inventory, evaluation, and management of potential additions to the
     National System.

BLM_0019036

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-3

5. Transmitting, within 1 year of designation, a map and detailed boundary description for each designated WSR, as required by statute, to the President of the Senate and to the Speaker of the House of Representatives.

6. Ensuring adherence to proper delegations of authority related to decisions, actions, and policies concerning designated WSRs.

7. Ensuring compliance with the National Environmental Policy Act (NEPA), Council on Environmental Quality regulations, and the Department of the Interior's NEPA regulations in environmental assessments (EAs) and environmental impact statements (EISs), as required.

B. *State Directors* are responsible for:

1. Ensuring compliance with the WSRA and other relevant law and policy.

2. Implementing policy and providing statewide program coordination and guidance for WSRs and for identifying, evaluating, managing, and monitoring eligible and suitable WSRs and lands that border upon or are adjacent to any such river.

3. Providing program development, technical management assistance, and funding support to field offices to ensure WSR studies and protective management are addressed during the development of land use plans and subsequent implementation.

4. Submitting WSR recommendations resulting from congressionally authorized studies and agency-initiated studies to the Director.

5. In accordance with Section 7 of the WSRA, making determinations regarding the impacts of proposed water resources projects on congressionally authorized study rivers and on designated WSRs when projects are proposed by another Federal agency or where another Federal agency is providing assistance (by loan, grant, license or otherwise) for such project (Federal assisting agency). This responsibility may be delegated.

6. Forwarding determinations regarding water resources projects, pursuant to Section 7 of the WSRA, to the Federal agency proposing the project or to the Federal assisting agency.

7. Developing and maintaining relationships with tribal governments, other Federal agencies, state and local governments, local private landowners, stakeholder groups, friends groups and other nonprofit organizations, and the general public concerned with the management of designated rivers or the inventory, evaluation, and management of potential additions to the National System.

8. Ensuring compliance with NEPA, Council on Environmental Quality regulations, and the Department of the Interior's NEPA regulations in EAs and EISs, as required.

BLM_0019037

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-4

9. Where applicable or necessary, preparing memorandums of understanding and/or interagency agreements in order to facilitate WSR resource assessments, studies, or management activities.

10. Consulting and/or providing technical assistance, with states and/or private entities, for studies outside BLM-administered jurisdiction on state and/or private lands when requested and where the BLM has substantial management jurisdiction along a river (e.g., state-initiated Section 2(a)(ii) studies or where private lands are interspersed along a river).

11. Working cooperatively with the Environmental Protection Agency and state water quality agencies to establish baseline conditions, identify water-quality related issues, and develop a strategy to improve or protect water quality.

12. Ensuring proper case recordation by the state office (e.g., files, maps, boundary descriptions, Federal Register notices, reports concerning any cadastral surveys, management plans, WSR studies, and/or implementing actions).

C.   *District and Field Managers* are responsible for:

1. Implementing policy for the BLM's WSR program.

2. Identifying and evaluating river segments for eligibility, tentative classification, suitability, and management.

3. Developing and implementing land use plans and the associated comprehensive river management plans (CRMPs) for all congressionally designated WSRs.

4. Ensuring direction is included in each land use plan to protect and enhance segments of state-administered (WSRA Section 2(a)(ii)), WSRs.

5. Taking action respecting management policies, regulations, contracts, and plans affecting BLM lands that border upon or are adjacent to state-administered rivers pursuant to Section 2(a)(ii) of the WSRA, as may be necessary to protect such rivers in accordance with the purposes of the WSRA.

6. Considering management decisions affecting eligible rivers that would protect and/or enhance free-flowing condition, water quality, and identified outstandingly remarkable values until suitability can be determined through the land use planning process.

7. Considering management decisions affecting suitable rivers that would protect and/or enhance free-flowing condition, water quality, and outstandingly remarkable values.

BLM_0019038

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-5

8. Making determinations regarding the impacts of proposed water resources projects, in accordance with Section 7 of the WSRA, on designated WSRs and congressionally authorized study rivers, where the project is initiated by the BLM and a Federal assisting agency is not involved.

9. Developing and maintaining relationships with tribal governments, other Federal agencies, state and local governments, local private landowners, stakeholder groups, friends groups and other nonprofit organizations, and the general public concerned with the management of designated rivers or the inventory, evaluation, and management of potential additions to the National System.

10. Compiling monitoring reports and submitting summaries to the respective state office for all designated WSRs, documenting the protection of free-flowing condition, water quality, and outstandingly remarkable values. District and Field Managers are also responsible for providing the same reports to the respective state office for all congressionally authorized study rivers until they are designated or released by Congress and all eligible and suitable rivers until a finding of ineligibility or nonsuitability is made.

11. Managing all designated WSRs so as to protect and enhance the free-flowing condition, water quality, and identified outstandingly remarkable values.

12. Managing all congressionally authorized study rivers and the lands that border upon or adjacent to them so as to protect the free-flowing condition, water quality, and identified outstandingly remarkable values.

13. Advising the State Director on historic or new water uses that may impact the Federal reserved water right or that may impact outstandingly remarkable values.

14. Describing, for designated rivers, the dependency of outstandingly remarkable values on water quantity (flow) and establishing baseline water quantity conditions, identifying water quantity-related issues, and developing a strategy to protect flow-dependent values, including filing a claim for the Federal reserved water right associated with the WSR.

15. Providing detailed boundary descriptions, maps, and CRMPs for WSRs, as required by statute, to the District Manager, State Director, Director, or Congress, where applicable; supporting proper case recordation (e.g., files, maps, boundary descriptions, Federal Register notices, reports concerning any cadastral surveys, management plans, WSR studies, and/or implementing actions); and ensuring each designated river segment has an official administrative boundary and legal description with a corresponding map.

16. Ensuring management requirements, including any proposed acquisition of lands or interest in lands within the boundary of any designated WSR, are included in the appropriate budgetary and planning documents in order to effectively carry out the purposes of the WSRA and the BLM's stewardship of any designated rivers.

BLM_0019039

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-6

## 1.5  References

1. Departmental Manual, Part 235, Chapter 1, General Program Delegation, Director, Bureau of Land Management – Part 1.1C
2. Departmental Manual, Part 516, National Environmental Policy Act of 1969
3. Departmental Manual, Part 710, National Rivers and Trails Systems
4. BLM Manual Section 1270 – Records Administration
5. BLM Manual Section 1601 – Land Use Planning
6. BLM Manual Section 2930 – Recreation Permits and Fees
7. BLM Manual Section 4180 – Land Health
8. BLM Manual Section 6120 – Congressionally Required Maps and Legal Boundary Descriptions for National Landscape Conservation System Designations
9. BLM Manual Section 6720 – Aquatic Resource Management
10. BLM Manual Sections 8100-8170 – Cultural Resources Management
11. BLM Manual Section 8270 – Paleontological Resource Management
12. BLM Manual Section 8320 – Planning for Recreation and Visitor Services
13. BLM Manual Section 8323 – Recreation Project Planning
14. BLM Manual Section 8400 – Visual Resource Management
15. BLM Manual Section 8561 – Wilderness Management Plans
16. BLM Manual Section 9011 – Chemical Pest Control
17. BLM Manual Section 9014 – Control Use of Biological Control Agents of Pests on Public Lands
18. BLM Manual Section 9015 – Integrated Weed Management
19. BLM Manual Section 9160 – Mapping Sciences
20. BLM Handbook H-1601-1 – Land Use Planning Handbook
21. BLM Handbook H-1740-2 – Integrated Vegetation Management

BLM_0019040

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-7

22.  BLM Handbook H-1790-1 – National Environmental Policy Act

23.  BLM Handbook H-2930-1 – Recreation Permit Administration

24.  BLM Handbook H-8120-1 – Guidelines for Conducting Tribal Consultation

25.  BLM Handbook H-8270-1 – General Procedural Guidance for Paleontological Resource Management

26.  BLM Handbook H-8410-1 – Visual Resource Inventory

27.  In addition to the aforementioned authorities and references, managers are encouraged to consult the technical guidance provided by the Interagency Wild and Scenic Rivers Coordinating Council (Interagency Council). The Interagency Council consists of representatives from the four Federal river-administering agencies (Bureau of Land Management, U.S. Fish and Wildlife Service, U.S. Forest Service, and National Park Service) and has the overriding goal of improving interagency coordination in the implementation of the WSRA. The Interagency Council has published a number of technical papers that managers should consult when implementing all requirements of the WSRA.

1.6   Policy

The BLM is committed to carrying out the provisions of the WSRA and related laws and policies and, therefore, will:

1.  Identify all rivers on BLM-administered lands that possess free-flowing condition and outstandingly remarkable values and therefore may have potential for addition to the National System. Rivers appearing on lists compiled by other public agencies or organizations with demonstrated expertise in identifying potential WSRs will be considered.

2.  Evaluate BLM-identified and congressionally authorized study rivers for their eligibility and suitability for WSR designation.

3.  Complete baseline inventories for eligible and suitable rivers as they are identified. In the cases of designated rivers, these inventories will be completed as near as possible to the time of designation if not previously completed. The inventories will include information relevant to the free-flowing condition, water quality, and identified outstandingly remarkable values.

4.  Assign a tentative classification (wild, scenic, or recreational) for river segments that are eligible for inclusion within the National System.

BLM_0019041

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-8

5. Consider management decisions through project-level review that would protect and/or enhance the free-flowing condition, water quality, and identified outstandingly remarkable values of eligible rivers until suitability can be determined through land use planning.

6. Consider management decisions through land use planning that would protect and/or enhance the free-flowing condition, water quality, and outstandingly remarkable values of suitable rivers until Congress designates the river as a component of the National System or releases the river for other uses.

7. Manage designated WSRs to protect and enhance the free-flowing condition, water quality, and outstandingly remarkable values according to Section 10(a) of the WSRA.

8. Manage congressionally authorized study rivers as required by the WSRA, including Section 7(b), water resources projects; Section 8(b), land disposition; Section 9(b), mining and mineral leasing; and Section 12(a), management policies.

9. Monitor the effectiveness of management decisions for designated WSRs, congressionally authorized study rivers, and rivers identified as eligible or suitable by the BLM, including, but not limited to, those decisions that protect and enhance free-flowing condition, water quality and outstandingly remarkable values.

10. Make determinations regarding the impacts of proposed water resource projects, in accordance with Section 7 of the WSRA, on designated WSRs and congressionally authorized study rivers.

11. Coordinate and consult with tribal, other Federal, state, and local agencies, as well as interested citizens, groups, and organizations concerned with the inventory, evaluation, and management of potential additions to the National System (guidance provided in BLM Land Use Planning Handbook H-1601-1 and BLM Handbook H-8120-1 Guidelines for Conducting Tribal Consultation). This interaction and public involvement are critical, as rivers, due to their linear nature, often cross jurisdictional boundaries. Efforts will be taken to involve any affected or concerned party at all stages of the WSR process.

12. Submit recommendations resulting from agency-initiated studies and studies authorized by Congress to the Secretary of the Interior on potential additions to the National System.

## 1.7  File and Records Maintenance

State and field offices will create and maintain case files for WSRs, river segment evaluations, as well as eligibility and suitability determinations, in accordance with BLM Manual Section 1270 - Records Administration. Recordkeeping requirements are also mandated by Executive Orders 12866 and 13353, the Paperwork Reduction Act (44 U.S.C. 3501), and the guidelines of the BLM Paperwork Management System. Case files will include records such as management plans, eligibility determinations, suitability reports with related material, monitoring reports, and maps with boundaries and descriptions, as appropriate.

BLM_0019042

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

1-9

1.8   Data Standards and Management

All offices must use the NLCS data standards when developing, amending, or maintaining electronic datasets for designated WSRs and eligible or suitable WSRs. River data collection will comply with the approved Department of the Interior data management system, Ground Transportation Linear Feature Database, NLCS data standards, Recreation Management Information System, and other data management policies, including those addressing sensitive cultural resources data.

1.9   Program Relationships

The BLM's resource programs are highly interdependent and require coordinated resource management. Managers and program staff are often required to initiate and coordinate with many resource programs, supporting staff, and other agencies involved with WSR planning and management. Managing rivers effectively across jurisdictions requires interdisciplinary and multiresource analysis. Planning efforts for designated rivers, and for rivers that are being studied as potential additions to the National System, must be carried out in coordination with other resource programs to ensure that the actions of other programs are not adversely affecting WSR management objectives. Planning for rivers within overlapping designations must be consistent with the expressed administrative purpose(s) or the existing designation (e.g., wilderness area, national monument, etc.). In areas where the river designation overlaps with other existing designations, the most restrictive provisions providing protection of the river values will apply unless otherwise stated in the enabling legislation.

BLM_0019043

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

2-1

**Chapter 2.   Identification of Study Rivers**
An overview of the WSR study process is outlined below. More information about each step in
the process is provided in this chapter and subsequent chapters of this manual.

1.  Rivers are identified for study for possible inclusion in the National System by one of two
    means: (1) identification by Congress under Section 5(a) of the WSRA directing a Federal
    agency to study a river or (2) identification for study by the Secretary of the Interior
    (known as BLM-identified study rivers) under Section 5(d)(1) of the WSR.

2.  The evaluation of a river(s) for possible inclusion in the National System follows a three-
    step process: (1) determination of eligibility, (2) tentative classification (wild, scenic, or
    recreational), and (3) determination of suitability.

3.  The BLM will prepare a detailed study report for all rivers congressionally authorized for
    study and for all other rivers identified by the BLM through its public planning processes
    as potential additions to the National System. The purpose of the report is to document the
    BLM's analysis and conclusions on the suitability of eligible rivers for designation as
    components of the National System.

4.  BLM-initiated and congressionally authorized study river reports will be forwarded to the
    Secretary of the Interior or Congress through appropriate channels.

5.  Rivers are designated as part of the National System as specified in the WSRA through (1)
    an act of Congress or (2) the Secretary of the Interior. Designated rivers are managed by
    one of four Federal agencies: the BLM, U.S. Fish and Wildlife Service, USDA Forest
    Service, and National Park Service. Secretarially designated rivers require an act of the
    legislature of the state or states through which a river flows and subsequent application by
    the Governor(s) of the concerned state(s) to the Secretary of the Interior.

2.1  Role of Land Use Planning in the Study River Process
The WSRA defines a river as "a flowing body of water or estuary or a section, portion, or
tributary thereof, including rivers, streams, creeks, runs, kills, rills, and small lakes." Sources for
identifying the significance of river-related values include the Nationwide Rivers Inventory;
internal agency inventories and state river assessments; identification by tribal governments and
other Federal, state, or local agencies; and the public. If a systematic evaluation of eligible rivers
or a comprehensive administrative unit-wide suitability study has been previously completed and
documented, additional assessment and study through the land use planning process need only be
done if: (1) the documentation no longer exists or is incomplete or outdated; (2) changed
circumstances warrant additional review of eligibility (e.g., a new outstandingly remarkable
value, see chapter 3.1E); (3) there is a change in the suitability factors (see chapter 3.4A); or (4)
the authorized officer (Field or District Manager) decides to evaluate suitability for one or more
eligible rivers in the land use planning process. Land use plans should address whether existing
evaluations of eligible rivers or suitability studies will be revisited.

BLM_0019044

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

2-2

2.2   Establishing Study River Termini and Area Boundaries

To identify the beginning and ending points of the study river, consider the entire river system including the interrelationship between tributaries and the mainstem and their associated ecosystems. At a minimum, a river study area should include the length of the identified river segment and ¼ mile in width ( ½ mile for rivers identified in Alaska by the Alaska National Interest Lands Conservation Act of 1980) from the ordinary high water mark on each side of the river. Boundaries may include adjacent areas needed to protect the resources or facilitate management of the river area. This is particularly true of those resources identified as outstandingly remarkable. An example of an expanded boundary would be to extend the study river boundary to the top of the ridge, to the edge of the floodplain, or to include the confluence area of a tributary stream. Where adjacent Federal or state agencies are involved, close coordination is needed to establish a uniform approach to any proposed boundaries for contiguous river segments. Managers are encouraged to consult the Interagency Council's technical paper, "The Wild and Scenic River Study Process." This and other technical materials are available on the council website, www.rivers.gov.

BLM_0019045

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

**Chapter 3.   Evaluation of Study Rivers**
The evaluation of a river(s) for possible inclusion in the National System follows a three-step process: (1) determination of eligibility, (2) tentative classification (wild, scenic, or recreational), and (3) determination of suitability.

3.1  Eligibility
The eligibility of a river for potential inclusion in the National System is determined by applying the following inventory criteria from the WSRA (further described in the Interagency Guidelines). The inventory criteria are: the river must be free flowing and, with its adjacent land area, possess one or more outstandingly remarkable values. No other factors are considered in determining the eligibility of a river. The determination of eligibility is part of the inventory process and does not require a decision or approval document. A sample format of the documentation of eligibility is provided in Illustration 1. Jurisdictional and management constraints are not considered when determining a river's eligibility for designation as a WSR. These types of issues are addressed in the suitability phase of WSR studies. The BLM does not have the authority to evaluate the presence, absence, or quality of values that occur on private lands. However, the boundary of that river may include private lands. In such cases, eligibility determinations should only consider the presence of values on BLM-administered lands and related waters.

A.  *Segments.* In order to determine eligibility and assign a tentative classification (see chapter 3.3), it may be necessary to divide a study river into segments. In defining segment termini, consider: (1) obvious changes in land status or ownership; (2) changes in river condition, such as the presence of dams and reservoirs; (3) significant changes in types or amounts of development; and (4) the presence of important resource values. There is no standard established for segment length. A river segment should be long enough to enable the protection of the outstandingly remarkable values if the area were managed as a wild, scenic, or recreational river.

B.  *Free flowing.* Section 16(b) of the WSRA defines free flowing as "existing or flowing in a natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." The existence of low dams, diversion works, or other minor structures does not automatically render a segment ineligible for designation. A determination of eligibility is not dependent on the river being "naturally flowing" (i.e., flowing without any manmade upstream or downstream manipulation). The Interagency Guidelines state, "The fact that a river segment may flow between large impoundments will not necessarily preclude its designation. Such segments may qualify if conditions within the segment meet the eligibility criteria."

BLM_0019046

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-2

C.  *Flows.* There are no specific requirements concerning minimum flows for an eligible segment. Flows are considered sufficient for eligibility if they sustain or complement the outstandingly remarkable values for which the river would be designated. Rivers with intermittent flows exist within the National System, and rivers representative of desert ecosystems having outstanding ecological or other values should be considered. A river need not be "boatable or floatable" in order to be eligible. As a general rule, the segment should contain regular and predictable flows (even though intermittent, seasonal, or interrupted). This flow should derive from naturally occurring circumstances (e.g., aquifer discharge, seasonal melting from snow or ice, normal precipitation, or instream flow from spillways or upstream facilities). Caution is advised in applying the free-flow criterion to water courses that only flow during flash floods or unpredictable events. The segment should not be ephemeral (flow lasting only a few days per year in direct response to precipitation). Evaluation of flows should focus on normal water years, with consideration of drought or wet years during the inventory.

D.  *Outstandingly Remarkable Values.* In order to be eligible for inclusion into the National System, the river, and its adjacent land area, must have one or more outstandingly remarkable values. A variety of methods can be used to determine whether certain river-related values are so unique, rare, or exemplary as to make them outstandingly remarkable. The determination that a river area contains outstanding values is a professional judgment on the part of an interdisciplinary team, based on objective analysis. The output of the team's analysis should include written documentation of values and why they are important and should also consider the following parameters:

1.  In order to be assessed as outstandingly remarkable, a river-related value must be a unique, rare, or exemplary feature that is exceptional at a comparative regional or national scale. A unique or rare river-related value is one that would be a conspicuous example of that value from among a number of similar examples that are themselves uncommon or extraordinary.

2.  The interdisciplinary team must identify the area of consideration that will serve as the basis for meaningful comparative analysis. This area of consideration is not fixed and may vary by resource; it may be all BLM-administered lands within a state, a portion of a state, or an appropriately scaled physiographic or hydrologic unit. Once the area of consideration is identified, a river's values can then be analyzed.

3.  While the spectrum of resources that may be considered is broad, all features considered should be directly river related. That is, they should: (1) be located in the river or on its immediate shorelands (within ¼ mile on either side of the river), (2) contribute substantially to the functioning of the river ecosystem, and/or (3) owe their location or existence to the presence of the river.

4.  Additional guidance on this issue is contained in a technical report by the Interagency Council at www.rivers.gov, entitled "The Wild and Scenic River Study Process," December 1999.

BLM MANUAL

Rel. 6-136
7/13/2012

BLM_0019047

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-3

E. *Eligibility Criteria.* The following eligibility criteria for outstandingly remarkable values are offered to foster greater consistency within the agency and with other Federal river-administering agencies. The criteria are illustrative and not all inclusive. These criteria may be modified to make them more meaningful in the area of comparison, and additional criteria may be included.

1. *Scenery.* The landscape elements of landform, vegetation, water, color, and related factors result in notable or exemplary visual features and/or attractions. The BLM Visual Resource Inventory Handbook, H-8410-1, may be used in assessing visual quality and in evaluating the extent of development upon scenic values. The rating area must be scenic quality "A" as defined in the BLM Visual Resource Inventory Handbook. When analyzing scenic values, additional factors, such as seasonal variations in vegetation, scale of cultural modifications, and the length of time negative intrusions are viewed, may be considered. Scenery and visual attractions may be highly diverse along the majority of the river or river segment.

2. *Recreation.* Recreational opportunities within the subject river corridor are, or have the potential to be, popular enough to attract visitors from throughout or beyond the region of comparison or are unique or rare within the region. River-related opportunities include, but are not limited to, sightseeing, interpretation, wildlife observation, camping, photography, hiking, fishing, hunting, and boating. Such a recreational opportunity may be an outstandingly remarkable value without the underlying recreational resource being an outstandingly remarkable value (e.g., fishing may be an outstandingly remarkable value without the fish species being an outstandingly remarkable value). The river may provide settings for national or regional usage or competitive events.

3. *Geology.* The river area contains one or more examples of a geologic feature, process, or phenomenon that is unique or rare within the region of comparison. The feature(s) may be in an unusually active stage of development, represent a "textbook" example, and/or represent a unique or rare combination of geologic features (erosional, volcanic, glacial, or other geologic features).

4. *Fish.* Fish values include either indigenous fish populations or habitat or a combination of these river-related conditions.

   i. *Populations.* The river is nationally or regionally an important producer of indigenous resident and/or anadromous fish species. Of particular significance is the presence of wild stocks and/or Federal or state listed or candidate, threatened, endangered, or BLM sensitive species. Diversity of species is an important consideration and could, in itself, lead to a determination that it is an outstandingly remarkable value.

BLM MANUAL

Rel. 6-136
7/13/2012

BLM_0019048

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-4

    ii. *Habitat*. The river provides exceptionally high-quality habitat for fish species indigenous to the region of comparison. Of particular significance is habitat for wild stocks and/or Federal or state listed or candidate, threatened, endangered, or BLM sensitive species. Diversity of habitat is an important consideration and could, in itself, lead to a determination that it is an outstandingly remarkable value.

5. *Wildlife*. Wildlife values include either terrestrial or aquatic wildlife populations or habitat or a combination of these conditions.

    i. *Populations*. The river, or area within the river corridor, contains nationally or regionally important populations of indigenous wildlife species dependent on the river environment. Of particular significance are species considered to be unique to the area and/or populations of Federal or state listed or candidate, threatened, endangered, or BLM sensitive species. Diversity of species is an important consideration and could, in itself, lead to a determination that it is an outstandingly remarkable value.

    ii. *Habitat*. The river, or area within the river corridor, provides exceptionally high-quality habitat for wildlife of national or regional significance and/or may provide unique habitat or a critical link in habitat conditions for Federal or state listed or candidate, threatened, endangered, or BLM sensitive species. Contiguous habitat conditions are such that the biological needs of the species are met. Diversity of habitat is an important consideration and could, in itself, lead to a determination that it is an outstandingly remarkable value.

6. *Historical*. The river, or area within the river corridor, has scientific value or contains a rare or outstanding example of a district, site, building, or structure that is associated with an event, person, or distinctive style. Likely candidates include sites that are eligible for the National Register of Historic Places at the national level or have been designated a national historic landmark by the Secretary of the Interior

7. *Cultural*. The river, or area within the river corridor, contains rare or outstanding examples of historic or prehistoric locations of human activity, occupation, or use, including locations of traditional cultural or religious importance to specified social and/or cultural groups. Likely candidates might include a unique plant procurement site of contemporary significance.

8. *Other Values*. While no specific national evaluation guidelines have been developed for the "other similar values" category, assessments of additional river-related values consistent with the foregoing guidance may be developed as part of the eligibility process, including, but not limited to, hydrological and paleontological resources or scientific study opportunities. By way of example, the following evaluation guidelines describe possible river-related botanical resources:

BLM_0019049

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-5

> i. *Botany.* The area within the river corridor contains riparian communities that are ranked critically imperiled by state-based natural heritage programs. Alternatively, the river contains exemplary examples, in terms of health, resilience, species diversity, and age diversity, of more common riparian communities. The river corridor may also contain exemplary and rare types of ecological refugia (palm oases) or vegetation habitats (hanging gardens or rare soil types) that support river-related species. The river may also contain river-related plant species that are listed as threatened or endangered by the U.S. Fish and Wildlife Service or appear on the BLM's sensitive species list.

## 3.2 Ineligible Rivers

1. *Congressionally Authorized Study.* If a congressionally authorized study river under Section 5(a) of the WSRA is found to be ineligible, the study report should describe the basis for the ineligibility finding. The study report should be submitted to the Assistant Director of the National Landscape Conservation System and Community Partnerships, Washington Office. The Assistant Director will prepare it for submittal to the BLM Director for review and subsequent delivery to the Secretary. The Secretary of the Interior will publish a notice in the Federal Register of the final ineligibility finding.

2. *Bureau of Land Management-Identified Study.* The study of rivers identified by the BLM under Section 5(d)(1) of the WSRA may be discontinued upon a finding of ineligibility. The results of this finding of ineligibility should be retained as part of the inventory record for future consideration in land use planning (see section 4.2 for additional information). The ineligibility finding should be mentioned in the Federal Register notice for the approved land use plan. A separate Federal Register notice is not required.

## 3.3 Classification

The tentative classification of a river found to be eligible is based on the condition of the river and the adjacent lands as they exist at the time of the study. The WSRA specifies and defines three classification categories for eligible rivers: wild, scenic, and recreational. The Interagency Guidelines for classification criteria for wild, scenic, and recreational river areas are found in Illustration 2. Determining a tentative classification also establishes a guideline for management until either a suitability determination or designation decision is reached. For this reason, it is very important to document the factors that led to the tentative classification in the eligibility determination.

## 3.4 Suitability

Each eligible river segment must be further evaluated to determine whether it is suitable for inclusion in the National System. The suitability analysis provides the basis for determining which rivers to recommend to Congress as potential additions to the National System. The following questions should be addressed when evaluating suitability:

1. Should the river's free-flowing condition, water quality, and outstandingly remarkable values be protected, or are one or more other uses important enough to warrant doing otherwise?

BLM_0019050

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-6

2.  Will the river's free-flowing condition, water quality, and outstandingly remarkable values be protected through designation?

3.  Is designation the best method for protecting the river corridor?

4.  Is there a demonstrated commitment to protect the river by any non-Federal entities that may be partially responsible for implementing protective management?

In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered. In most cases, the BLM will assess river suitability in the land use planning process, including a plan amendment if necessary (e.g., a statewide rivers evaluation, which would amend respective land use plans). This determination includes documentation of the tentative classification of the appropriate segment(s) (wild, scenic, and/or recreational).

A.  *Basis for Suitability.* The following factors will be considered and, as appropriate, documented in the suitability analysis as a basis for the suitability determination of each river:

1.  Characteristics that do, or do not, make the area a worthy addition to the National System. These characteristics (free flow and outstandingly remarkable values) are described in the WSRA and may include additional factors.

2.  The current status of land ownership and use in the area.

3.  The reasonably foreseeable potential uses of the land and water that would be enhanced, foreclosed, or curtailed if the area were included in the National System.

4.  The Federal agency that will administer the area should it be added to the National System.

5.  The extent to which the agency proposes that administration of the river, including the costs thereof, is shared by state and local agencies.

6.  The estimated cost to the United States of acquiring necessary lands or interests in land within the corridor, as well as the cost of administering the area should it be added to the National System.

7.  A determination of the extent that other Federal agencies, the state, or its political subdivisions might participate in the preservation and administration of the river should it be proposed for inclusion in the National System.

8.  An evaluation of local zoning and other land use controls in protecting the river's outstandingly remarkable values and preventing incompatible development.

BLM_0019051

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-7

9. The state/local government's capacity to manage and protect the outstandingly remarkable values on non-Federal lands. This factor requires an evaluation of the river protection mechanisms available through the authority of state and local governments. Such mechanisms may include, for example, statewide programs related to population growth management, vegetation management, water quantity or quality, or protection of river-related values such as open space and historic areas.

10. The existing support or opposition of designation. Assessment of this factor will define the political context. The interest in designation or nondesignation by Federal agencies; state, local, and tribal governments; national and local publics; and the state's congressional delegation should be considered.

11. The consistency of designation with other agency plans, programs, and policies in meeting regional objectives. Designation may help or impede the goals of tribal governments or other Federal, state, or local agencies. For example, designation of a river may contribute to state or regional protection objectives for fish and wildlife resources. Similarly, adding a river that includes a scarce recreation activity or setting to the National System may help meet statewide recreation goals. Designation might, however, limit irrigation and/or flood control measures in a manner inconsistent with regional socioeconomic goals.

12. The contribution to river system or basin integrity. This factor reflects the benefits of a "systems" approach (e.g., expanding the designated portion of a river in the National System or developing a legislative proposal for an entire river system—headwaters to mouth—or watershed). Numerous benefits may result from managing an entire river or watershed, including the ability to design a holistic protection strategy in partnership with other agencies and the public.

13. The potential for water resources development. Identify any proposed water resource projects that may be foregone, as designation may limit development of water resources projects as diverse as irrigation and flood control measures, hydropower facilities, dredging, diversion, bridge construction, and channelization.

BLM_0019052

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-8

3.5 Management of Eligible and Suitable Rivers as Determined Through BLM-Identified Study or Congressionally Authorized Study

To the extent possible under existing legal authorities (e.g., FLPMA, Clean Water Act, Endangered Species Act, and Archaeological Resources Protection Act), the BLM's policy goal for eligible and suitable rivers is to manage their free-flowing condition, water quality, tentative classification, and any outstandingly remarkable values to assure a decision on suitability can be made for eligible rivers; or in the case of suitable rivers, until Congress designates the river or releases it for other uses. To that end, the BLM has broad discretionary authority, on a case-by-case basis through project-level decisionmaking and the NEPA processes, not to impact river values or make decisions that might lead to a determination of ineligibility or nonsuitability. In the case of congressionally authorized study rivers, the BLM's policy goal is to implement the management direction provided in the WSRA, including Section 7(b), water resources projects; Section 8(b), land disposition; Section 9(b), mining and mineral leasing; and Section 12(a), management policies.

   A.   *Discretionary Actions*. Whenever a proposed action may adversely impact or be inconsistent with identified WSR values (free-flowing condition, water quality, tentative classification, and outstandingly remarkable values) or whenever a discretionary action may change the tentative classification (i.e., from a wild river area to a scenic river area or a scenic river area to a recreational river area) of a river determined to be eligible for inclusion into the National System, the NEPA analysis for such actions will have the following characteristics:

   1.   If the NEPA document for the proposed action is an EA, the BLM will provide at least a 30-day public comment period. The decision record for the proposed action should be prepared and signed at the field office. Prior to signature, a copy of the supporting documentation will be forwarded to the applicable State Director for review.

   2.   Subject to valid existing rights and program-specific regulations, the BLM should consider an alternative that would delay approval of the proposed action pending a suitability determination through the BLM planning process, including a plan amendment.

   B.   *Authorization of Projects and Activities within Eligible or Suitable River Corridors*. An authorized officer may approve the action if the NEPA document demonstrates that:

   1.   The free-flowing condition of the identified river will not be altered by the construction or development of stream impoundments, diversions, or other water resources projects.

   2.   Outstandingly remarkable values of the identified river area will be protected.

BLM_0019053

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-9

3. For all congressionally authorized study rivers, classification will be maintained as inventoried until the study report is received by Congress and for the protection period specified in the WSRA, even if the study report recommends managing the river at a less restrictive class (such as from wild to scenic or scenic to recreational). For all BLM-identified eligible and suitable rivers, the BLM must consider an alternative in the NEPA document for the proposed activity that would maintain the tentative classification until a suitability determination is made.

3.6   Management Guidelines for Eligible and Suitable Rivers as Determined Through BLM Identified Study or Congressionally Authorized Study

The following guidelines must be considered by the authorized officer when analyzing site-specific projects and activities on BLM-administered lands within the river corridor or on lands that are adjacent to or border eligible or suitable rivers. The authorized officer should also consider applying these guidelines where the BLM holds an interest on non-Federal lands, such as rights acquired through scenic or access easements to protect river values. The guidelines should be continued until a land use plan decision is made on the future use of the river and adjacent lands. Congressionally authorized study rivers will be protected, as directed in the WSRA. For these study rivers, the protection period is 3 years from the date the study report is transmitted to Congress. This protection period is not dependent on the study outcome regarding the eligibility or suitability of the candidate river.

A.  *Minerals*

1.  *Wild, Scenic, and Recreational*

    i.  *Locatable*. Subject to valid existing rights, the minerals in any Federal lands that constitute the bed or bank or are situated within ¼ mile of the bank of any river listed under Section 5(a) are withdrawn from all forms of appropriation under the mining laws, for the time periods specified in Section 7(b) of the WSRA. See Section 9(b) of the WSRA. Mining activity on a Section 5(a) study river on properly located claims existing at the time Congress authorized the study may still be allowed. Existing or new mining activity on a BLM-identified study river are allowed and will be conducted in a manner that minimizes surface disturbance, sedimentation and pollution, and visual impairment. The BLM identification of a study river does not withdraw the lands from appropriation under the mining law.

    ii. *Leasable*. New leases, licenses, and permits under mineral leasing laws may be made, but consideration should be given to applying conditions necessary to protect the values of the river corridor in the event it is subsequently included in the National System. Existing leases, licenses, and permits may be renewed, but consideration should be given to applying conditions necessary to protect the values of the river corridor upon renewal.

BLM_0019054

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-10

    iii.  *Saleable*. For river segments tentatively classified as wild, new disposal of saleable mineral material or the extension or renewal of existing contracts should be avoided to the greatest extent possible to protect river values. For river segments tentatively classified as scenic or recreational, disposal of saleable mineral material is allowed, but consideration should be given to applying conditions necessary to protect values for which the river may be included in the National System.

B.  *Transportation System*

    1.  *Wild*. New roads and airfields are not generally compatible with this classification. A few existing roads leading to the boundary of the river corridor may be acceptable. New trail construction should generally be designed for nonmotorized uses. However, consider allowing limited motorized uses and unobtrusive bridges that are compatible with identified values.

    2.  *Scenic*. New roads and railroads may be allowed to parallel the river for short segments or bridge the river if such construction fully protects river values (including the river's free-flowing condition). Bridge crossings and river access are allowed. New trail construction or airfields should be compatible with and fully protect identified values.

    3.  *Recreational*. Consider permitting new roads and railroads that parallel the river if such construction fully protects river values (including the river's free-flowing condition). Bridge crossings and river access are allowed. Consider new trail construction or airfields that are compatible with and fully protect identified values.

C.  *Authorization of Rights-of-Way*

    1.  *Wild, Scenic, and Recreational*. For BLM-identified eligible and suitable rivers, the BLM should consider exercising its discretion to deny applications for right-of-way grants if the BLM determines through appropriate environmental analysis that the right-of-way proposal is not compatible with the river's classification and the protection and enhancement of river values. Where the right-of-way proposal is found to be compatible, additional or new facilities should be located, to the greatest extent possible, to share, parallel, or adjoin an existing right-of-way. For congressionally authorized study rivers, see chapter 7.5D for guidance. Any portion of a utility proposal that has the potential to affect the river's free-flowing condition will be evaluated as a water resources project (see chapter 3.6J).

D.  *Recreation Development*

BLM_0019055

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-11

1. *Wild.* Major public-use areas, such as large campgrounds, interpretive centers, or administrative headquarters, should be located outside the river corridor. Minimum facilities may be provided in keeping with the essentially primitive condition. If sanitation and convenience facilities are necessary, they should be located at access points or a sufficient distance from the river bank so that they are not visible from the river. Such facilities should be located and developed in a manner that maintains or improves water quality and other identified river values. Any portion of a recreation restoration or enhancement project that has the potential to affect the river's free-flowing condition (e.g., a whitewater park for kayakers) will be evaluated as a water resources project (see chapter 3.6J).

2. *Scenic.* Public-use facilities, such as moderate-size campgrounds, simple sanitation and convenience facilities, public information centers, administrative sites, and river access developments, are allowed within the river corridor. All facilities should be located and designed to harmonize with the natural and cultural settings, protect identified river values including water quality, and be screened from view from the river to the extent possible. Any portion of a recreation restoration or enhancement project that has the potential to affect the river's free-flowing condition (e.g., a whitewater park for kayakers) will be evaluated as a water resources project (see chapter 3.6J).

3. *Recreational.* Recreation, administrative, and river access facilities may be located in close proximity to the river. However, recreational classification does not require extensive recreation development. All facilities should be located and designed to harmonize with the natural and cultural settings, protect identified river values including water quality, and be screened from view from the river to the extent possible. Any portion of a recreation restoration or enhancement project that has the potential to affect the river's free-flowing condition (e.g., a whitewater park for kayakers) will be evaluated as a water resources project (see chapter 3.6J).

E. *Motorized Travel*

1. *Wild, Scenic, and Recreational.* Motorized and mechanized travel on land or water may be permitted, prohibited, or restricted to protect the river values.

F. *Wildlife and Fish Projects*

1. *Wild.* Construction of minor structures and vegetation management to protect and enhance wildlife and fish habitat should harmonize with the area's essentially primitive condition and should fully protect identified river values. Any portion of a wildlife or fisheries restoration or enhancement project that has the potential to affect the river's free-flowing condition will be evaluated as a water resources project (see chapter 3.6J).

BLM_0019056

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-12

2. *Scenic.* Construction of structures and vegetation management to protect and enhance wildlife and fish habitat should harmonize with the area's largely undeveloped condition and fully protect identified river values. Any portion of a wildlife or fisheries restoration or enhancement project that has the potential to affect the free-flowing condition will be evaluated as a water resources project (see chapter 3.6J).

3. *Recreational.* Construction of structures and vegetation management to protect and enhance wildlife and fish habitat should fully protect identified river values. Any portion of a wildlife or fisheries restoration or enhancement project that has the potential to affect the river's free-flowing condition will be evaluated as a water resources project (see chapter 3.6J).

G. *Vegetation Management*

1. *Wild.* Cutting or eradication of trees and other vegetation is not consistent with the wild classification except under the following circumstances: (1) when needed in association with a primitive recreation experience, such as to clear trails; (2) to protect users or the environment, including the use of wildfire suppression; and (3) when vegetation is an invasive species and managed in accordance with chapter 3.6I1. In addition, prescribed fire and wildland fire may be used to restore or maintain habitat for threatened, endangered, or sensitive species and/or restore the historic range of variability.

2. *Scenic and Recreational.* The authorized officer may consider a range of vegetation management and timber harvest actions that are designed to protect, restore, or enhance the river environment, including the long-term scenic condition.

H. *Livestock Grazing*

1. *Wild, Scenic, and Recreational.* Domestic livestock grazing should be managed to protect identified river values. Existing structures may be maintained. Any new facilities to facilitate livestock management should be unobtrusive so as to maintain the values for which a river was found eligible or suitable.

I. *Invasive Species Management*

1. *Wild, Scenic, and Recreational.* The spread of terrestrial and aquatic invasive species should be prevented and controlled, consistent with direction in the land use plan, other authorities, and available funding. A full range of manual and chemical prevention and control methods may be used, consistent with direction in the land use plan; BLM Manual Sections 9011, 9014, and 9015; BLM Handbook 1740-2; and other approved Federal direction. Chemical treatment must be carefully evaluated so as not to adversely affect water quality and outstandingly remarkable values.

BLM_0019057

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-13

J. *Water Resources and Hydroelectric Power Projects.*

1. *Wild, Scenic, and Recreational.* For congressionally authorized study rivers, see chapter 3.8 for guidance on the determination of impacts under Section 7(b) of the WSRA. The WSRA does not explicitly address hydroelectric facilities or other federally assisted water resources projects that have the potential to affect BLM-identified eligible or suitable rivers. However, the BLM should, within its authority, consider protecting the river values that make the river eligible or suitable (as previously discussed in chapter 3.5) through the CRMP and activity-level NEPA analysis. If a river is listed in the Nationwide Rivers Inventory, the Federal agency involved with the proposed action must consult with the land-managing agency in an attempt to avoid or mitigate adverse effects.

K. *Withdrawal from Public Land Laws*

1. *Wild, Scenic, and Recreational.* Public (Federal) lands within ¼ mile of a congressionally authorized (WSRA Section 5(a)) study river are withdrawn from entry, sale, or other disposition under the public land laws of the United States pursuant to Section 8(b) of the WSRA.

3.7   Land Use Plan Guidance

The management guidelines specified in chapter 3.6 are not intended to be simply repeated in land use plans. Rather, the land use plan should apply these guidelines to the specific river. A plan should include the following: (1) guidance to ensure that authorized officers consider river management guidelines (see chapter 3.6) when implementing the plan through authorizing projects and activities and (2) the desired conditions, objectives, and suitability of areas to be used in the design of projects and activities. See chapter 4 for a discussion of land use planning and the river study process.

3.8   Determinations of Impacts Under Section 7(b) of the WSRA

This guidance presents methods to evaluate the effects of proposed water resources projects for congressionally authorized study rivers.

A. *Section 7(b) of the WSRA states in part:* The Federal Power Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act, as amended, on or directly affecting any river which is listed in section 5, subsection (a), of this Act, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval.

B. *Water Resources Projects Within a Congressionally Authorized Study River Corridor*

BLM_0019058

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-14

1. *New Hydroelectric Facilities (Licensed by the Federal Energy Regulatory Commission (FERC)).* Section 7(b) of the WSRA prohibits FERC from issuing a license or exemption for a hydroelectric project if the proposed project is on or directly affecting a study river designated under Section 5(a) of the WSRA. This moratorium is in effect during the study and for 3 years after the President sends the report and recommendations for the river to Congress. If Congress designates the river during this 3-year period, the protection becomes permanent unless the act designating the river states otherwise. The study agency is responsible for the determination that a proposed project is on or directly affecting the study river.

2. *Other Proposed Federally Assisted Water Resources Projects (Licensed by an Agency Other than FERC).* Unlike new FERC-licensed projects, which are prohibited if they are "on or directly affecting" a congressionally authorized study river, other federally assisted water resources projects are prohibited only if they would have a "direct and adverse effect" on free-flowing condition, water quality, or outstandingly remarkable values. Examples of projects that would likely be subject to this standard include, but are not limited to, dams, water diversion projects, fisheries habitat and watershed restoration/enhancement projects, bridge and other roadway construction/reconstruction projects, bank stabilization projects, channelization projects, levee construction, recreation facilities such as boat ramps and fishing piers, and activities that require a permit under Section 404 of the Clean Water Act from the Army Corps of Engineers (ACOE). This standard also applies to relicensing of a hydropower project in the rare instances in which the project existed at the date of a river's congressional authorization as a study river. Refer to Illustration 3 for the evaluation procedure under "direct and adverse effect."

C. *Water Resources Projects Below or Above a Congressionally Authorized Study River Corridor or On a Stream Tributary to the Study River.* Pursuant to Section 7(b) of the WSRA, licensing of or assistance to water resources projects that are below or above a congressionally authorized study river, or on a stream tributary to the congressionally authorized study river, will be evaluated as to whether the project will invade the area or diminish river values that were present on the date of designation of the river for study. Projects located downstream, upstream, or on a stream tributary to a congressionally authorized study river that are most likely to affect its scenery, recreation, fish, or wildlife values include dams, upstream diversions, and projects that can be seen from the designated WSR. Refer to Illustration 4 for the evaluation procedure under "invade the area or diminish."

D. *Proposed Water Resources Projects on BLM-Identified, 5(d)(1) Study Rivers.* The BLM should, within its authority, consider protecting the river values that make the river eligible or suitable (as previously discussed in chapter 3.5) through the land use plan and activity-level NEPA analysis. If a river is listed in the Nationwide Rivers Inventory, the Federal agency involved with the proposed action must consult with the land-managing agency in an attempt to avoid or mitigate adverse effects.

BLM_0019059

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

3-15

E.   *NEPA and Coordination with a Proponent/Regulating Agency.* An environmental analysis is not required for a WSRA Section 7 determination of water resource project impacts. Rather, the Federal official proposing or permitting the project typically includes in their environmental and/or permitting processes an analysis of what, if any, impact the proposal would have on a potential WSR. However, the BLM should consider participating as a cooperating agency with the proponent agency. The BLM is responsible for conducting the Section 7 analysis and making a determination under the statute. The Section 7 determination is signed and transmitted to the proposing/permitting agency by the State Director.

3.9   Monitoring Free Flow, Water Quality, and Outstandingly Remarkable Values
Congressionally authorized and BLM-identified study rivers should be monitored to evaluate whether the free-flowing condition, water quality, and outstandingly remarkable values are being maintained (see Illustration 7). The regulations in 43 CFR 1610.4-9 require that land use plans establish intervals and standards for monitoring and evaluations based on the sensitivity of the resource decisions involved. This monitoring should conform to guidance provided in the BLM Land Use Planning Handbook H-1601-1 and any subsequent guidance. The authorized officer should submit a report summarizing this monitoring to the respective state office where it will be maintained in the case file.

BLM_0019060

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

4-1

**Chapter 4.  The Study Process**
The BLM will prepare a detailed study report for all rivers congressionally authorized for study
and for all other rivers identified by the BLM as potential additions to the National System
through its public planning process. The BLM may employ a variety of planning approaches,
including a land use plan or programmatic plan amendment, depending on timing and available
information and resources.

4.1  Wild and Scenic River Study in the Land Use Plan
The purpose of the study report is to document the BLM's analysis and conclusions on the
suitability of eligible rivers for designation as components of the National System. The study
report should address all rivers that possess free-flowing condition and outstandingly remarkable
values, flowing wholly or partially on BLM-administered lands as identified in the Nationwide
Rivers Inventory and by other sources. The study report will also document the finding of
ineligibility or eligibility and the river's tentative classification. Congressionally authorized
studies may be included in the land use plan only when the plan revision and specified river
study period are compatible. Otherwise, a programmatic plan amendment should be prepared.
The study must meet the specific statutory requirements (see chapter 4.2) and make a
determination of the river's suitability for designation. The land use plan decision may find a
river either suitable or nonsuitable.

A.  *Existing Evaluations.* If a systematic evaluation of eligible rivers or a comprehensive
administrative unit-wide suitability study has been previously completed and documented,
additional assessment and study through the land use planning process need only be done if: (1)
the documentation no longer exists or is incomplete or outdated; (2) changed circumstances
warrant additional review of eligibility (e.g., a new outstandingly remarkable value, see chapter
3.1E); (3) there is a change in the suitability factors (see chapter 3.4A); or (4) the authorized
officer (Field or District Manager) decides to evaluate suitability for one or more eligible rivers
in the land use planning process. Land use plans should address whether existing evaluations of
eligible rivers or suitability studies will be revisited.

B.  *Wild and Scenic River Suitability Study in the Land Use Plan.* During the WSR suitability
study conducted through the land use planning process, the EIS should address suitability factors
and alternatives or options related to WSR recommendations. The EIS should discuss the
existing conditions regarding eligible river segments and likely environmental consequences of
the proposed management under each alternative on the identified river values and other
resources and resource uses. The analysis should evaluate impacts on outstandingly remarkable
values for a suitable or nonsuitable finding. Refer to section 4.2A through 4.2G for further
guidance on analyzing WSR suitability determinations in a land use plan.

1.  Prepare the draft and proposed land use plan and accompanying respective draft and
final NEPA document in accordance with applicable policy.

BLM MANUAL                                                                    Rel. 6-136
                                                                             7/13/2012

BLM_0019061

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

4-2

2. Use the following statement in the plan approval document: This administrative determination will receive further review and possible modification before potential recommendation by the Director of the Bureau of Land Management to the Secretary of the Interior, by the Secretary to the President of the United States, and by the President to Congress. Congress has the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.

3. Implementation of the plan is not dependent on final resolution of the WSR recommendation.

C. *Contents of the Wild and Scenic River EIS Appendix.* The land use plan EIS should contain a single appendix for all rivers studied. This appendix should be self-contained so that, given a final decision to forward a recommendation to Congress, it can be extracted to support any legislative proposal. (See chapter 5.1.A for additional detail concerning information to be sent to Congress.) Within the appendix, there should be separate river narratives for each eligible river or river system and a detailed map of the river corridor. The detailed river narrative is a summary of the pertinent information related to eligibility, classification, and suitability factors. Refer to Illustration 5 for the contents of this summary information document. Should the authorized officer decide that previous WSR studies are still sufficient (see chapter 4.1A), this should also be documented in the appendix.

4.2  Wild and Scenic River Suitability Study and Programmatic Land Use Plan Amendment
When a WSR suitability study is needed or when Congress mandates a study with a due date not compatible with the BLM's regular land use planning schedule, a separate study report and programmatic plan amendment may be prepared. When a BLM office manages more than one river designated by Congress for study or otherwise identified as eligible, the authorized officer may combine study of such rivers into a comprehensive, unit-wide study report as long as this approach meets congressionally mandated deadlines and specific statutory requirements (see chapter 5.2). The combined study report/plan amendment and applicable NEPA document needs to meet the content and format requirements of the study report and planning and NEPA regulations and should follow the same requirements as for an individual river. The administrative unit conducting the analysis needs to ensure review by other agencies, the Governor of the involved state(s), tribes, and the public. The Interagency Guidelines describe how the required information should be presented in the study report. The study report/plan amendment should:

1. Describe the programmatic, as opposed to site-specific, nature of the study report/plan amendment.

2. Explain the roles of the BLM, Secretary of the Interior, and Congress in the study process, including whether the river study was directed by Congress or identified by the BLM in the land use planning process.

3. Explain the concept of a combined study report/applicable NEPA document, following the guidance in BLM Handbook H-1790-1 for preparation of the NEPA document.

BLM_0019062

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

4-3

A.  *Purpose and Need for Action - Chapter I.* In this chapter, state the purpose and need for the proposed action, which in this context, will be to determine suitability or nonsuitability for addition to the National System, in accordance with the WSRA.

B.  *Description of Area - Chapter II.* This chapter is an overall description of the affected environment of the river corridor and the surrounding area. Provide the status of land ownership and use in the area, a brief description of the regional setting, and clear and detailed maps and illustrations that show the area covered by the report. Describe as specifically as possible any existing and potential developments, such as water resource projects, roads, or private land use.

C.  *Findings of Eligibility and Classification - Chapter III.* Summarize the eligibility determination to provide a clear and concise description of the river and its immediate environment. This chapter should focus on the river's free-flowing condition and outstandingly remarkable values. Describe any unique, rare, or exemplary values the river may have (see chapter 3.1E). The description of river values should enable persons who have never seen the river to understand whether the river has outstanding values worthy of protection. Tentative classification should be based on the situation existing at the present time. It should not anticipate expected development or other changes along the river corridor; this is an aspect of evaluating suitability documented in chapters IV and V. The criteria listed in the Interagency Guidelines are presented in Illustration 2.

D.  *Alternatives - Chapter IV.* The suitability of the river for designation will be evaluated in a series of alternative actions. Alternatives must reflect pertinent issues and opportunities, while meeting the purpose and need of the proposal (except the no action alternative).

1.  The type and range of alternatives to consider will vary depending on the affected environment, issues, and opportunities associated with each specific river. However, every study report/applicable NEPA document must present an array of alternatives broad enough to encompass all reasonable proposals for use of the river area.

2.  If the emphasis of the alternative is to protect the outstandingly remarkable values by means other than designation, describe any plan components needed, including guidelines. In all alternatives, include such guidelines as integral parts of the alternative.

3.  Study reports should consider a reasonable range of alternatives that shall, at a minimum, include: (1) no action alternative (required), (2) national designation of all eligible segments of the river, and (3) nonsuitable. Additional alternatives that managers should be encouraged to consider may include, but not be limited to, the following: (1) an alternative that maintains interim management according to the tentative classification, (2) protection of eligible segments by means other than national designation, and (3) designation of some eligible segments. An alternative may also include a recommendation of eligible segment(s) at a less restrictive classification (e.g., scenic to recreational) to allow a specific resource activity.

BLM_0019063

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

4-4

E.  *Environmental Consequences - Chapter V.* This chapter analyzes the environmental effects on river values and presents, by alternative, the reasonably foreseeable potential uses of the land and water that would be enhanced, foreclosed, or curtailed by each alternative. Include an estimate of the kinds and amounts of public use that can be accommodated without long-term or irreversible impacts on the values of the river area. Refer to chapter 3.4 for additional detail. These principles and measures will provide the basis for a management plan, should congressional designation of the river corridor occur.

F.  *Distribution of the Report – Chapter VI.* Follow the guidance in BLM Handbook H-1790-1 for the preparation of this chapter.

G.  *List of Preparers – Chapter VII.* Follow the guidance in BLM Handbook H-1790-1 for the preparation of this chapter.

4.3  Joint Study

Where a BLM-identified river touches only a small part of BLM-administered lands, the lead responsibility for studying the river could rest with either another Federal agency or the state, depending on which agency has jurisdiction over the largest portion of the lands involved. In this situation, the authorized officer should: (1) Contact the other Federal and/or state agency to determine if or when they plan to study the river, and/or invite the agency or state to participate in a joint study as a cooperating agency for the river either as part of the land management planning process or as a separate study report. (2) If the responsible agency or state declines to study the river or if its study schedule does not coincide with the BLM land use planning process, consider management actions for site-specific activities that would protect the river and adjacent lands of the river segment(s) on BLM lands as per chapter 3.5. (3) Proceed to assess the segment's suitability on its own merits only if the river segment that extends into the BLM-administered lands would make a viable addition to the National System without the remainder of the river.

BLM MANUAL

Rel. 6-136
7/13/2012

BLM_0019064

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

5-1

**Chapter 5.  The Review and Approval Process of a Wild and Scenic River Study Report**
The procedure for review and approval of the combined WSR study report/applicable planning and NEPA document varies depending on whether the study was initiated by the BLM or directed by Congress. For a BLM-initiated study in which no eligible river is recommended as suitable for inclusion in the National System, the study is concluded with the land use plan record of decision. For a congressionally authorized study in which an eligible river is not recommended as suitable for inclusion in the National System, the study should follow the entire process outlined in chapter 5.2, except proposed legislation would not be prepared. For studies in which the BLM recommends a river segment as suitable for designation into the National System, follow the procedures in chapters 5.1 and 5.2.

5.1   Bureau of Land Management-Identified Study

A.   *Agency Recommendation.* Through the land use planning process, the BLM will make a recommendation to the Secretary on whether a river should be designated for inclusion into the National System. State Directors will forward the suitability recommendation package to the Director. The recommendation package should include the WSR appendix and river study included in the EIS and documented in the record of decision. The State Director will also work with the Assistant Director, Communications, Washington Office, to submit a draft legislative proposal that includes the summary information document (see Illustration 5), a draft transmittal letter from the Secretary of the Interior to Congress, and any other supporting documents. Refer to Illustration 6 and adapt the transmittal letter for a BLM-identified study. The State Director will also forward the recommendation package to the Director who can then send it to the Department of the Interior. The Department will send it to the Office of Management and Budget. Review and approval of the legislative proposal follows the same steps beginning with the last sentence of chapter 5.2C for congressionally authorized studies, except the Secretary of the Interior transmits the recommendation to Congress. Following congressional action, the plan may require amendment if the action taken by Congress is different than that described in the plan.

B.   *Nonagency Recommendation.* There are two other possible options for designation that are not initiated by the BLM. These are: (1) the Governor of the respective state petitions the Secretary of the Interior, after enactment of state legislation to protect the applicable river(s), for designation under Section 2(a)(ii) of the WSRA; and (2) members of the Congress can introduce legislation for designation by amending Section 3(a) of the WSRA.

5.2   Congressionally Authorized Study
A congressionally authorized WSR study may be conducted in the land use planning process or through a separate study/programmatic plan amendment process.

A.   *Study Report and Applicable NEPA Document.* The authorized officer will prepare the study report and NEPA document for a congressionally authorized WSR study.

1.   The State Director will send two copies of the preliminary recommendation package to the Director, who will review and authorize the approval to print or request to make changes.

BLM MANUAL                                                                                        Rel. 6-136
                                                                                                      7/13/2012

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

5-2

2.  When the recommendation package is printed, the State Director should
    transmit 10 copies to the Director. Where river segments are located inside NLCS units,
    the Assistant Director, National Landscape Conservation System and Community
    Partnerships, Washington Office, will prepare the transmittal letter. Where river
    segments are located outside NLCS units, the Assistant Director, Renewable Resources
    and Planning, will prepare the transmittal letter. The transmittal letter is from the
    Secretary to the heads of the following agencies for a 90-day review as required in the
    WSRA:

    i.    Secretary of Agriculture.

    ii.   Secretary of the Army.

    iii.  Chairman of the Federal Energy Regulatory Commission.

    iv.   Head of any other affected Federal department or agency.

    v.    Governor of the state where the river is located (unless the Federal government
          already owns, or has been authorized to purchase, the area within the proposed
          boundaries).

B.  *Affected Federal Agencies Notice and Comment.* The Assistant Director, National
Landscape Conservation System and Community Partnerships, or, if appropriate, the Assistant
Director, Natural Resources and Planning, Washington Office, is responsible for sending any
comments received from the other Federal/state officials through the State Director to the
administrative unit conducting the analysis. This unit will respond to these and other comments
received on the draft recommendation package/study report, prepare a preliminary final
recommendation package/study report, and send two copies upon State Director concurrence
back to the appropriate Assistant Director, Washington Office. Upon the Director's approval, the
responsible administrative unit will print the final study report/applicable NEPA document.

C.  *Approval Process.* After printing the final study report/applicable NEPA document, the
State Director will: (1) Prepare a summary information document highlighting key information
about the study river, including a map showing the segments recommended for designation. See
Illustration 5 and adapt for a separate study. (2) Prepare a draft transmittal letter from the
President to Congress (see Illustration 6). This letter serves as a decision document. The State
Director should also send 10 copies of the study report/applicable NEPA document to the
appropriate Assistant Director (see section 5.2A2) for background and Office of Management
and Budget coordination.

BLM_0019066

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

5-3

D. *Office of Management and Budget Coordination*

1. The Assistant Director for Communications will work with the State Director in preparation of an administration legislative proposal for the designation(s) recommended in the study report. This proposal is in the form of an amendment to the WSRA. The administration legislative proposal and supporting documentation will be transmitted to the Secretary of the Interior with a cover letter for transmittal to the Office of Management and Budget.

2. The Office of Management and Budget coordinates the final review with other Federal agencies, and recommended changes resulting from this interagency review are usually incorporated into the transmittal letter or wording of the administration legislative proposal. Occasionally, where significant changes occur, it may be necessary to revise the study report/applicable NEPA document.

3. When the Office of Management and Budget review is complete, the President may sign and forward the transmittal letter and legislative proposal, including the study report/applicable NEPA document, to Congress. Copies of the study report/applicable NEPA document and the transmittal letter will be then distributed to the public by the responsible administrative unit. The proposal will then await legislative action by Congress.

BLM_0019067

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

6-1

**Chapter 6.  Designation**

Rivers are designated as part of the National System as specified in the WSRA through (1) an act of Congress or (2) the Secretary of the Interior. Designated rivers are managed by one of four Federal agencies: the BLM, U.S. Fish and Wildlife Service, USDA Forest Service, and National Park Service. Secretarially designated rivers require an act of the legislature of the state or states through which a river flows and subsequent application by the Governor(s) of the concerned state(s) to the Secretary of the Interior.

BLM_0019068

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-1

**Chapter 7.   Managing Designated Wild and Scenic Rivers**

The WSRA establishes a method for providing Federal protection for certain free-flowing rivers and preserves them and their immediate environments for the use and enjoyment of present and future generations. In accordance with Section 10(a) of the WSRA, "Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archaeologic, and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area."

7.1   Boundary Establishment and Classification

Section 3(b) of the WSRA requires the agency charged with administration of each component of the National System, in this case the BLM, to establish a detailed boundary for each congressionally designated component of the National System within 1 year from the date of the river's designation. This perimeter boundary description should be delineated so as to best protect the river's outstandingly remarkable values within the acreage limitation specified in this section or the designating law and is subject to NEPA analysis. The boundary, comprised of a map and narrative legal description, defines the area that will receive the greatest effort in resource protection and the area in which lands and interest in lands may be acquired for WSR purposes. The WSR boundary does not provide the BLM any authority to regulate non-Federal lands. BLM Manual Section 6120 provides detailed guidance for this process.

A.   For congressionally designated WSRs, Section 3(c) of the WSRA requires maps of all boundaries, descriptions of classification(s), if necessary, and any subsequent boundary amendments to be publically available in the Washington Office and in locations convenient to the designated river. Prior to establishment of the detailed river boundaries, Section 4(d) of the WSRA specifies an interim boundary of ¼ mile from the ordinary high water mark on either side of the river, with the exception of rivers designated in Alaska by the Alaska National Interest Lands Conservation Act of 1980, in which case the interim boundary is ½ mile from the ordinary high water mark. Land below the ordinary high water mark and islands are within the designated area, but note that the definition "from the ordinary high water mark" used in Sections 3(b) and 4(d) of the WSRA means that acreage in the bed of the river and island acreage do not count toward the total corridor acreage, unless the island is permanent with land above the ordinary high water mark.

B.   In some instances, Congress will specify the boundaries for a river in the designating legislation, either by a map or specific perimeter description. These congressionally identified rivers still require a map and narrative legal description.

C.   For congressionally designated WSRs, Section 3(b) of the WSRA directs the river-administering agency to determine which classification best fits the river or various segments (see chapter 3.3), unless classification(s) are prescribed in the designating law. The BLM will administer a WSR in its classification (wild, scenic, or recreational) through the development of the CRMP, establishing standards relative to in-corridor uses.

BLM_0019069

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-2

D.   A notice of the availability of the boundary and, if necessary, classification(s) must be published in the Federal Register. A letter transmitting the boundary and classification is forwarded to the President of the Senate and Speaker of the House. The boundary and classification does not become effective until 90 days after the transmittal letter (see Illustration 8) is forwarded to Congress, as indicated in Section 3(b) of the WSRA.

E.   To ensure activities on adjoining Federal and non-Federal lands do not harm river values, a Management of Land Boundaries Plan should be developed and include, at a minimum, (1) an inventory of the boundary's condition, (2) a Geographic Coordinate Database reliability diagram, (3) identification of high-risk boundary segments with an antiquated survey or no survey, and (4) a boundary monitoring strategy. The BLM may approve transactions and commercial projects on adjoining Federal lands up to the boundary. Prior to the approval of a transaction or commercial project, the portion of the boundary affected should have an official survey and be marked to BLM standards.

F.   When a WSR is jointly administered by the BLM and another Federal agency, specifically the National Park Service, U.S. Fish and Wildlife Service, or U.S. Forest Service, the agencies should prepare and transmit the boundary map and legal description jointly, and determine a Washington Office lead agency for transmitting the boundary package to Congress.

G.   When amending an existing WSR boundary, follow the same process for developing a WSR boundary.

7.2   Comprehensive River Management Plans
Section 3(d)(1) of the WSRA requires that a CRMP be prepared to provide for the management and protection of river values. The plan should be prepared, with appropriate NEPA analysis, after consultation with state and local governments and interested publics, within 3 full fiscal years after the date of designation. CRMPs will be submitted to the State Director for review prior to being finalized. Notices of availability of such plans will be published in the Federal Register. See Illustration 9 for an outline of CRMP key elements.

A.   The WSRA provides specific direction concerning a CRMP. The plan should:

1.   Describe the existing resource conditions, including a detailed description of the outstandingly remarkable values.

2.   Define the goals and desired conditions for protecting river values.

3.   Address development of lands and facilities.

4.   Address use capacities.

5.   Address water quality issues and instream flow requirements.

6.   Reflect a collaborative approach, recognizing the responsibilities of and opportunities for partnership with all stakeholders.

BLM_0019070

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-3

7.  Identify resources and resource conditions that may require compliance with Section 106 of the National Historic Preservation Act or Section 7 of the Endangered Species Act.

8.  Identify regulatory authorities of other agencies related to river values.

9.  Include a monitoring strategy to maintain desired conditions (see Illustration 7).

B.   The CRMP should also describe valid existing rights and evaluate activities that were occurring on Federal lands (such as grazing or recreation), as necessary, to determine the effectiveness of management strategies for protecting and enhancing river values. The CRMP will establish a positive trajectory for any value that was in a degraded condition on or after the date of the river's designation.

C.   Where a river crosses more than one state, involved BLM State Directors should jointly prepare and approve the management plan. In addition, a lead state office should be designated when more than one state office is involved.

7.3   State-Administered, Federally Designated Rivers Under Section 2(a)(ii)
There is no Federal river plan required for state-administered, federally designated rivers. However, the BLM's land use plans should include all direction necessary to protect and enhance segments of WSRA Section 2(a)(ii) rivers flowing on BLM-administered public lands and, specifically, their free-flowing condition, water quality, and outstandingly remarkable values.

7.4   Management of Activities on Federal Lands Prior to Completion of the CRMP
Prior to completion of the CRMP, proposed projects and new decisions (e.g., issuance of a special use permit) on designated river corridors will be evaluated through the NEPA process to ensure they protect and enhance river values (free-flowing condition, water quality, and outstandingly remarkable values). The necessary evaluation framework for a proposed project includes a detailed description of the existing river values. Absent this information, it may not be possible to evaluate the effects of an activity relative to the protection and enhancement standard of Section 10(a) of the WSRA. Previous eligibility findings and other predesignation studies may provide adequate detail. Management guidelines are provided in chapter 7.5.

7.5   Management Guidelines for Activities on Designated Rivers
The responsible official must ensure activities on Federal lands meet the protection and enhancement standard set forth in the WSRA. This may include actions outside the river corridor that have the potential to impact outstandingly remarkable values. The following guidelines are based on explicit direction in the WSRA and interpretation provided in the Interagency Guidelines on how best to achieve the protection and enhancement standard by activity and classification. The following guidelines should be considered when developing CRMPs for designated rivers and incorporated where appropriate. These guidelines should also be considered for site-specific activities affecting designated rivers prior to CRMP approval.

BLM_0019071

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-4

A. *Minerals*

1. *Wild.* Subject to valid existing rights, the minerals in Federal lands within the bed or banks or situated within ¼ mile of the bank of any designated wild river are withdrawn from appropriation under the mining and mineral leasing laws in Sections 9(a) and 15(2) of the WSRA. The respective state office will note the withdrawal on the Master Title Plat. Existing valid claims or leases within the river boundary remain in effect, and activities may be allowed, subject to regulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment. Reasonable access to mining claims and mineral leases will be permitted. Subject to valid existing rights, mining claimants may only obtain title to the mineral deposits and such rights to the surface and surface resources as are reasonably required for prospecting or mining.

2. *Scenic and Recreational.* Federal lands within the boundaries of designated river areas classified as scenic or recreational are not withdrawn under the WSRA from the mining and mineral leasing laws. Filing new mining claims or mineral leases is allowed but is subject to reasonable access and regulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment. Subject to valid existing rights, mining claimants may only obtain title to the mineral deposits and such rights to the surface and surface resources as are reasonably required for prospecting or mining.

B. *Transportation System*

1. *Wild.* New roads are not generally compatible with this classification. A few existing roads leading to the boundary of the river corridor may be acceptable. New trail construction should generally be designed for nonmotorized uses. However, limited motorized uses that are compatible with identified values and unobtrusive trail bridges may be allowed. In order to protect and enhance river values, the BLM should consider restrictions or prohibitions of new airfields if such development is proposed.

2. *Scenic.* New roads and railroads are permitted to parallel the river for short segments or bridge the river if such construction fully protects river values (including the river's free-flowing condition). Bridge crossings and river access are allowed. New trail construction or airfields must be compatible with and fully protect identified values.

3. *Recreational.* New roads and railroads are permitted to parallel the river if such construction fully protects river values (including the river's free-flowing condition). Bridge crossings and river access are allowed. New trail construction or airfields must be compatible with and fully protect identified values.

C. *Motorized Travel*

1. *Wild, Scenic, and Recreational.* Motorized and mechanized travel on land or water may be permitted, restricted, or prohibited to protect river values.

BLM_0019072

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-5

D.  *Authorization of Rights-of-Way and Designation of Utility Corridors*

1.  *Wild, Scenic, and Recreational.* To the greatest extent possible, the BLM will avoid authorizing new rights-of-way within the WSR boundary. The BLM will, through appropriate land use planning processes and project-level reviews, exercise its discretion to deny applications for right-of-way grants in WSRs if the BLM determines through appropriate environmental analysis that the right-of-way proposal is not compatible with the river's classification and the protection and enhancement of river values.

2.  To the greatest extent possible, the BLM will avoid designating or using transportation or utility corridors within a WSR boundary. Consistent with applicable law, the BLM will, when developing or revising land use plans that include a WSR, consider designating the WSR boundary as an exclusion or avoidance area and relocating any existing designated transportation and utility corridors outside the boundaries of the WSR. The BLM will not designate a new transportation or utility corridor in a WSR boundary if the BLM determines that the proposed corridor will not be compatible with the river's classification and the protection and enhancement of river values.

3.  When processing a new right-of-way application, the BLM will consider routing or locating the right-of-way outside the WSR boundary, and the BLM will determine consistency of the right-of-way with the river's classification, protection and enhancement of river values, and consistency with the WSR's management plan. If a new right-of-way is authorized in a WSR boundary, consistent with 43 CFR Parts 2800 and 2880 and to the greatest extent possible, the right-of-way must share, parallel, or adjoin an existing right-of-way.

4.  When processing an application for renewal of an existing right-of-way, consistent with 43 CFR 2807.22(a) and policy, the BLM will consider new, additional, or modified terms and conditions to maintain the classification and protect and enhance the river values.

5.  Any portion of a new proposal or upgrades or changes to existing structures that have the potential to affect the river's free-flowing condition will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

6.  When processing a new proposal or upgrades or changes to existing structures, BLM costs associated with describing, locating, mapping, or marking the right-of-way boundaries are considered direct costs and should be included in all cost recovery determinations.

7.  During the application process for a right-of-way through a WSR boundary, internal notification requirements are as follows:

BLM_0019073

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-6

   i.  The state office will notify the NLCS Directorate (WO-400) if an application is received or if, at any time during the process, an alternative to route or site a right-of-way through or in a WSR boundary is considered.

   ii.  The State Director will brief the BLM Director prior to:

      a.  The release of a DEIS that includes a preferred alternative that proposes a right-of-way through a WSR boundary.

      b.  The release of a final EIS that includes a preferred alternative that proposes to locate a right-of-way through a WSR boundary.

      c.  The authorization of a right-of-way through a WSR boundary.

E.  *Recreation Development*

1.  *Wild.* Major public-use areas, such as large campgrounds, interpretive centers, or administrative headquarters, should be located outside the river corridor. Minimum facilities may be provided in keeping with the essentially primitive condition. If sanitation and convenience facilities are necessary, they should be located at access points or a sufficient distance from the river bank so that they are not visible from the river. Such facilities should be located and developed in a manner that maintains or improves water quality and other identified river values. Any portion of a recreation restoration or enhancement project that has the potential to affect the river's free-flowing condition (e.g., a whitewater park for kayakers) will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

2.  *Scenic.* Public-use facilities, such as moderate-size campgrounds, simple sanitation and convenience facilities, public information centers, administrative sites, and river access developments, are allowed within the river corridor. All facilities will be located and designed to harmonize with the natural and cultural settings, protect identified river values, and be screened from view from the river to the extent possible. Any portion of a recreation restoration or enhancement project that has the potential to affect the river's free-flowing condition (e.g., a whitewater park for kayakers) will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

3.  *Recreational.* Recreation, administrative, and river access facilities may be located in close proximity to the river. However, recreational classification does not require extensive recreation development. All facilities will be located and designed to harmonize with the natural and cultural settings, protect identified river values including water quality, and be screened from view from the river to the extent possible. Any portion of a recreation restoration or enhancement project that has the potential to affect the river's free-flowing condition (e.g., a whitewater park for kayakers) will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

BLM_0019074

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-7

F.  *Wildlife and Fish Projects*

1.  *Wild.* Construction of minor structures and vegetation management to protect and enhance wildlife and fish habitat should harmonize with the area's essentially primitive character and fully protect identified river values. Any portion of a wildlife or fisheries restoration or enhancement project that has the potential to affect the river's free-flowing condition will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

2.  *Scenic.* Construction of structures and vegetation management to protect and enhance wildlife and fish habitat should harmonize with the area's largely undeveloped character and fully protect identified river values. Any portion of a wildlife or fisheries restoration or enhancement project that has the potential to affect the river's free-flowing condition will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

3.  *Recreational.* Construction of structures and vegetation management to protect and enhance wildlife and fish habitat should fully protect identified river values. Any portion of a wildlife or fisheries restoration or enhancement project that has the potential to affect the river's free-flowing condition will be evaluated as a water resources project. See chapter 7.9 for evaluation procedures.

G.  *Vegetation Management*

1.  *Wild.* Cutting or eradication of trees and other vegetation is not permitted except under the following circumstances: when needed in association with a primitive recreation experience, such as to clear trails; to protect users or the environment, including the use of wildfire suppression; or when vegetation is an invasive species and managed in accordance with chapter 7.5J1.

2.  *Scenic and Recreational.* A range of vegetation management and timber harvest practices are allowed, provided that these practices are designed to protect, restore, or enhance the river environment, including the long-term scenic character.

H.  *Fire Management*

1.  *Wild, Scenic, and Recreational.* Wildland fire use and prescribed fire may be used to restore or maintain habitat for threatened, endangered, or sensitive species; restore or maintain ecological conditions; and/or meet desired conditions of the CRMP. Management and suppression activities will be carried out in a manner consistent with direction in the CRMP and compatible with the management of contiguous Federal lands.

BLM_0019075

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-8

I. *Livestock Grazing*

    1. *Wild, Scenic, and Recreational.* Domestic livestock grazing may continue as long as such practice does not conflict with the protection and enhancement of river values. Existing structures may generally be maintained. New structures may be developed to facilitate livestock management, consistent with direction in the CRMP and the area's classification.

J. *Invasive Species Management*

    1. *Wild, Scenic, and Recreational.* The spread of terrestrial and aquatic invasive species should be prevented and controlled, consistent with direction in the CRMP and other authorities. A full range of manual and chemical prevention and control methods may be used, consistent with direction in the CRMP; BLM Manual Sections 9011, 9014, and 9015; BLM Handbook 1740-2; and other approved Federal direction. Chemical treatment must be carefully evaluated so as not to adversely affect water quality.

K. *Water Resources Projects*

    1. *Wild, Scenic, and Recreational.* See chapter 7.9, Determinations of Impacts Under Section 7(a) of the WSRA.

L. *Signage*

    1. *Wild, Scenic, and Recreational.* Signs should use the National System logo to identify a river as part of the National System. Placement of signs should be consistent with classification and direction in the CRMP or related sign plan. Boundary signage must be located within 1 foot of the wild, scenic, and recreational boundaries. It is prohibited to install boundary signage on an approximate or set back line.

M. *Withdrawal from Public Land Laws*

    1. *Wild, Scenic, and Recreational.* Public (Federal) lands within the authorized boundary of a designated component of the National System are withdrawn from entry, sale, or other disposition under the public land laws of the United States pursuant to Section 8(a) of the WSRA.

BLM_0019076

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-9

N.  *Acquisition*

1.  *Wild, Scenic, and Recreational.* Pursuant to Section 6(a)(1) of the WSRA, the BLM may acquire lands and interest in lands within the boundary of any component of the National System that is designated by Congress under Section 3(a) to protect river values and achieve other purposes of the WSRA. The BLM may not acquire fee title to more than an average of 100 acres per river mile within the corridor (i.e., approximately 50 acres from either side of the river bank). There is no acreage limitation for an easement, however, if the river is within the boundaries of an NLCS unit. Nothing in the WSRA precludes the acquisition of lands via other Federal agency authorities or laws within the boundaries of that administering unit. If 50 percent or more of the river corridor acreage is in public ownership (Federal, state, local), this acquisition can only be on a willing seller-buyer basis.

7.6   Federal Reserved Water Right

Section 13(c) of the WSRA creates a Federal reserved water right for each WSR at the time of designation. The reservation is for the minimum amount of water necessary to achieve the purposes of the WSRA. The CRMP should include a detailed description of outstandingly remarkable values, including the importance of instream flow in maintaining these values, and should identify appropriate actions to protect and manage the timing, location, and quantity of water necessary to support the identified outstandingly remarkable values.

7.7   Water Quality

The BLM should work cooperatively with the U.S. Environmental Protection Agency, the U.S. Geologic Survey, and state water quality agencies in addressing water quality concerns in WSRs. Cooperation requires active participation by the BLM in evaluation of existing water quality, identification of water quality-related issues, and development of the often long-term strategies necessary to address water quality-related problems. Management activities proposed within the river corridor should establish a strategy for improving any value that was in a degraded condition.

7.8   Visitor Use and Capacity

Section 3(d)(1) of the WSRA requires a CRMP to address user capacities. User or visitor capacity is the maximum quantity of visitor use that a river corridor can sustain while still allowing for the protection of river values. Visitor capacities address the amount and type of use compatible with the desired conditions and other management direction in a CRMP and are established for both the entire river corridor as well as for individual sites, areas, and/or activities. Deriving a meaningful numerical capacity is a useful tool for visitor use management (e.g., monitoring changes in use patterns). However, managers must recognize that the amount of visitor use is only one of many factors that influences impact and may be less important than other variables, such as the behavior of users or how and where use is distributed.

A.  *Components of the CRMP*. The CRMP should:

1.  Include specific, measurable limits on use.

BLM MANUAL                                                                 Rel. 6-136
                                                                           7/13/2012

BLM_0019077

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

2. Discuss the maximum number of people that can be accommodated in a river corridor.

3. Make an explicit tie between the kinds and amounts of visitor and other public use (e.g., recreation events, commercial services, and noncommercial group use) and the protection and enhancement of outstandingly remarkable values.

4. Make an explicit tie between the location and size of facilities in the river corridor and the protection and enhancement of outstandingly remarkable values.

5. Describe an actual level of visitor use that will not adversely impact or degrade outstandingly remarkable values.

6. Specify an appropriate quantity of use based on an analysis of resource values and desired conditions, not necessarily previous or current use levels.

7. Include proactive rather than reactive measures, such as measures to trigger management actions before negative impacts to river values occurs.

8. Schedule periodic and ongoing studies to determine whether the quantity and mixture of use leads to adverse impact on the resource values of the river area.

B. *Visitor Use Permits.* The BLM has general authority under FLPMA and the Federal Lands Recreation Enhancement Act to require and enforce permits and fees for the use of river segments under its management. The BLM has, pursuant to that authority, developed regulations that require permits for all commercial users, and if necessary, noncommercial users who float past at least one shoreline mile of BLM land (see BLM Handbook H-2930-1 – Recreation Permit Administration).

C. *Determining Visitor Capacity.* The process for deriving a numerical visitor capacity involves identifying goals, objectives, desired conditions, and indicators and standards and is part of the CRMP process. It requires monitoring and evaluating the factors that influence impacts of concern and identifying the entire suite of visitor management actions to be taken. In addition to visitor capacity, the BLM is required to apply other visitor use management tools and practices to protect river values in a proactive and adaptive manner (indicators and standards, management actions, monitoring, etc.) Determining visitor capacity involves the following steps:

1. Describe the river's free-flowing condition and water quality, and define its outstandingly remarkable values.

   i. Establish baseline conditions of river values (e.g., free flow, water quality, and outstandingly remarkable values) at the time of designation, and describe current conditions in relation to the baseline conditions.

   ii. Include specific descriptions of the kinds and amounts of visitor and other public uses, locations and size of facilities, and their relationship to the river values.

BLM_0019078

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-11

   iii. Identify measurable indicators/attributes to describe the existing conditions of the values to be protected and enhanced as they relate to recreation and other public uses.

2. Identify desired resource and social conditions for river values.

   i. Desired conditions should integrate recreational and other public uses.

   ii. Identify measurable indicators/attributes to describe the desired conditions of the values to be protected and enhanced and the relationship to river values.

   iii. Define analysis area(s) that can be analyzed and managed as individual units and that are able to have a common set of standards.

   iv. Identify the needs for action by comparing existing and desired conditions.

3. Establish management standards for each river value based on indicators to measure success at achieving desired resource and social conditions.

   i. This requires analysis of the relationships between resource conditions and recreation and public uses and provides the framework for setting the thresholds for short-term and long-term management actions that may need to be taken to protect values.

   ii. Highlight standards designed to prevent or reduce negative impacts to river values and those that are designed to enhance river values.

4. Identify the kinds of visitor use and other public use that can be received in the river corridor to meet standards and desired resource and social conditions.

   i. Consider existing river values and potential resource and social conditions, but do not limit consideration of kinds of uses to only existing uses.

   ii. Characterize kinds of allowable uses rather than developing laundry lists of specific uses that are not allowable.

5. Identify a measureable amount of visitor and other public use that each analysis area can receive to meet standards and desired resource and social conditions.

6. Make an explicit tie between the kinds and amounts of visitor use, the location and size of facilities, and the protection and enhancement of river values.

7. Estimate the maximum number of people that can be received in the entire river corridor without adversely impacting the river values.

   i. These estimates should reflect an appropriate quantity of use based on an analysis of river values and desired conditions, not necessarily based on previous or current use levels.

BLM_0019079

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-12

ii. The information needed to support an informed decision on the maximum number of people that can be received in the river corridor during the planning period for the CRMP is guided by Council on Environmental Quality regulations for NEPA. Use the best available science needed to support the decision being made. This can include, but is not limited to, existing data, modeling of future scenarios, panels of experts—including local knowledge experts, professional judgment, and social surveys.

iii. Identify an appropriate level of public participation and collaboration for gathering and sharing information about capacities and relationship to river values to ensure the evaluation and decisionmaking process is understood and well documented.

8. Identify thresholds/conditions when management actions will need to be taken to meet management standards (see chapter 7.8C3) and to provide for the protection of river values.

i. Thresholds must be set that are triggered before negative impacts occur to the river values.

9. Identify a range of specific management actions and/or mitigation measures that would be taken under specific conditions to meet management standards.

i. Management actions must be triggered at levels that will ensure the management standard is not violated.

ii. Identify and decide upon those actions ripe for decision or reasonably foreseeable for the life of the plan to ensure river values are protected.

10. Establish a program of monitoring and ongoing study to ensure the quantity and mixture of visitor use does not adversely affect river values, and adapt management actions accordingly. Include a description of the process for adjusting capacities that is commensurate with the complexity, scope, and precision of the capacity decision in the plan. Types of new information that may trigger an adjustment include, but are not limited to:

i. Results of monitoring indicators and standards.

ii. Identification of more appropriate indicators and standards for outstandingly remarkable values.

iii. Clarification of the relationship between the level of use and outstandingly remarkable values.

iv. Changes in visitor use patterns that could affect outstandingly remarkable values.

v. Changes in original assumptions, such as management actions to be taken.

BLM_0019080

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-13

D. *Variability and Flexibility in Determining Capacities.* Across the National System, there is a wide spectrum of situations, ranging from rivers where current use levels are near, at, or even exceed capacity, to rivers where current use is far from capacity and is unlikely to reach, much less exceed, capacity in the foreseeable future of the CRMP. A river with a wide range of recreation activities and multiple access points, or a river with very high levels of use, will require a more detailed analysis and involved decisionmaking process than a river that is entirely in wilderness with limited access. Flexibility in your approach to establishing capacities will help ensure that capacities are developed and interpreted in a manner that is appropriate for the river in question.

1. A WSR at, near, or above capacities being considered as a part of a CRMP may include a variety of required management actions to meet the standards established to protect river values. These may include translating the capacity estimate into a use limit or allocation system that may be triggered if other management actions are insufficient. It is important that CRMPs describe actions, or conditions for taking action, that are proactive rather than reactive, to ensure that river values are not degraded before remedial actions are triggered. Decisions about capacities could have immediate and important consequences for both visitor access and protection of river values. Therefore, substantial investment of time, resources, and funding is more likely to be needed to determine appropriate capacities for these rivers. Because visitor use on these rivers is at, near, or above capacities that can be received, informed decisions are more likely to need science and monitoring information that will have a high predictive confidence level. Moreover, for these rivers with high use levels, other visitor use management decisions that influence capacities will often have already been made (e.g., restricting parking, restricting number of launches per day). Consequently, if the CRMP decisions related to capacity are likely to result in immediate or reasonably foreseeable major changes in the current kinds or amounts of uses, there should be a relatively high level of scientific certainty that the capacities and actions to manage those capacities are appropriate. For those rivers that are at or near capacity, it is especially critical that the decision process and the actions that would be triggered to support them are passed on an appropriate level of public involvement, notice, and comment and that they are transparent and well documented.

BLM_0019081

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-14

2. Where current use is well below capacities established or being considered in a CRMP, capacities must still be determined, and these capacities are management decisions in the plan. However, the same degree of resource or funding investment to gather information needed to support decisions about capacity is not necessary or appropriate. If outstandingly remarkable values are not threatened, meeting standards related to capacities are less likely to trigger immediate changes to visitor access for protection of outstandingly remarkable values. Confidence levels for predictions based on science and monitoring are not likely to need to be as accurate in this context because visitor use in the river area is not anywhere near capacity. In these cases, there may be less immediate or urgent conditions that would trigger management actions. Also, less regulatory management actions that influence capacities may be available options to consider. CRMPs for these rivers should recognize these facts, as well as the need to adjust capacities if necessary as new information becomes available or as use patterns change.

3. The CRMP should reflect an approach that is commensurate with the complexity, scope, and confidence level/certainty of the capacity decisions. The level of environmental analysis under NEPA that is required for capacity adjustments will depend on the scope of the capacity decision in the CRMP and the degree to which the adjustment affects the quality of the human environment.

7.9  Determinations of Impacts Under Section 7(a) of the WSRA
Section 7(a) of the WSRA directs the BLM on behalf of the Secretary of the Interior to evaluate proposed water resources projects that have the potential to affect a WSR for which the BLM is charged with administration. A determination of impacts is also necessary for state-administered rivers under Section 2(a)(ii) of the WSRA. The BLM is responsible for impact determinations in cases where Section 2(a)(ii) rivers flow on BLM-administered lands and where the proposed project has the potential to impact river values on BLM-administered lands or related waters.

A.  *Section 7(a) of the WSRA.* Section 7(a) of the WSRA states in part: "The Federal Power Commission [FERC] shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act, as amended, on or directly affecting any river which is designated in section 3 of this Act as a component of the national wild and scenic rivers system or which is hereafter designated for inclusion in that system, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic, or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic Rivers System."

B.  *Water Resources Projects Within a Congressionally Designated Wild and Scenic River Corridor*

BLM_0019082

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

7-15

1.  *New Hydroelectric Facilities (Licensed by FERC).* Construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project work licensed by FERC under Part I of the Federal Power Act is prohibited under Section 7(a) of the WSRA. This includes projects and project works within the designated river corridor licensed or exempted from licensing by FERC. No evaluation procedure is required.

2.  *Other Proposed Federally Assisted Projects (Licensed by an Agency Other than FERC).* Any federally assisted construction activity proposed within the bed or banks of a designated WSR is subject to review under the "direct and adverse effects" standard under Section 7(a) of the WSRA. This includes projects proposed by the river-administering agency or projects proposed for construction or assisted by another Federal agency and within the bed or banks of the designated WSR. This standard also applies to relicensing a hydropower project in a rare instance in which the project existed at the date of a river's designation. Refer to Illustration 3 for the evaluation procedure.

C.  *Water Resources Projects Below or Above a Designated Wild and Scenic River Corridor or On a Stream Tributary to the Designated Wild and Scenic River Corridor.* Any federally assisted construction activity proposed within the bed or banks downstream, upstream, or on a stream tributary to the designated WSR corridor is subject to review under the "invade the area or unreasonably diminish" standard. Application of this standard requires a nexus between the project and the designated WSR. Projects, such as dams, upstream diversions, and projects that can be seen from the designated WSR, are most likely to affect its scenery, recreation, fish, or wildlife values. Refer to Illustration 4 for the evaluation procedure.

D.  *NEPA and Coordination with a Proponent/Regulating Agency.* A separate environmental document is not required for a Section 7(a) determination under the WSRA. Rather, the Federal official proposing or permitting the project typically includes analysis of what, if any, impact the proposal would have on a designated WSR in their respective environmental and/or permitting processes. The river-administering agency is responsible for conducting the Section 7(a) analysis and making a determination under the appropriate standard of the statute. The Section 7 determination will be signed by the State Director and transmitted to the proposing/permitting agency. For a water resources project proposed by the BLM, the Section 7 analysis should be documented in, or appended to, the environmental analysis. Consistent with the WSRA, the BLM may not implement or consent to implementation of a water resources project constructed or assisted by another Federal agency if such project is found to have adverse effects under the appropriate standard. Compensating for an adverse impact by improving resource conditions elsewhere or minimizing an adverse effect so that it is smaller but still adverse is not sufficient to allow the project to proceed.

BLM_0019083

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

G-1

**Glossary of Terms**

**-C-**

*classification.* The process where rivers are segmented according to the criteria and classes
established in Section 2(b) of the Wild and Scenic Rivers Act. These classifications are based on
an analysis of the present level of development within the stream corridor at the time the
inventory was completed. These classifications also control the level of development that may
occur within a stream corridor, once a stream is determined eligible or suitable and a
classification is assigned. The classifications are:

1. *recreational*: rivers or sections of rivers that are readily accessible by road or railroad
   and that may have some development along their shorelines and may have undergone
   some impoundments or diversion in the past.

2. *scenic*: rivers or sections of rivers free of impoundments, with shorelines or
   watersheds still largely undeveloped but accessible in places by roads.

3. *wild*: rivers or sections of rivers free of impoundments and generally inaccessible
   except by trails, with watersheds or shorelines essentially primitive and waters
   unpolluted.

*comprehensive river management plan.* A plan required by Section 3(d)(1) of the Wild and
Scenic Rivers Act "…to provide protection for river values…" This plan must address: resource
protection, development of lands and facilities, user capacities, and other management practices
necessary or desirable to achieve the purposes of the Wild and Scenic Rivers Act.

**-D-**

*diversion structures.* A collective term for all works (weirs or diversion dams, head regulators,
upstream and downstream river training works, and their appurtenant structures) required to
divert or control river flows.

**-E-**

*eligible river.* A river or river segment found to meet criteria found in Sections 1(b) and 2(b) of
the Wild and Scenic Rivers Act of being free flowing and possessing one or more outstandingly
remarkable value.

BLM_0019084

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

G-2

-F-

*Federal assistance.* Any assistance by an authorizing agency before, during, or after construction. Such assistance may include, but is not limited to, a license, preliminary permit, permit, or other authorization granted by the Federal Energy Regulatory Commission; and a license, permit, or other authorization granted by the Department of the Army's Army Corps of Engineers pursuant to the Rivers and Harbors Act and Section 404 of the Clean Water Act. Assistance also includes Federal funding of projects, such as state highway proposals.

*Federal reserved water right.* An expressed reservation of water necessary to achieve the purposes of the Wild and Scenic Rivers Act. The quantity of the water right is the amount sufficient to carry out the purposes of the act. Section 13(c) of the Wild and Scenic Rivers Act states, "Designation of any stream or portion thereof as a national wild, scenic or recreational river area will not be construed as a reservation of the waters of such streams for purposes other than those specified in this Act, or in quantities greater than necessary to accomplish these purposes."

*free flowing.* Existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway (Section 16(b) of the Wild and Scenic Rivers Act). Designation of a wild and scenic river is not dependent on the river being "naturally flowing," (i.e., flowing without any manmade upstream or downstream manipulation). The presence of impoundments above and/or below the segment (including those which may regulate flow regimes within the segment) and existing minor dams or diversion structures within the study area do not necessarily render a river segment noneligible. There are segments in the National System that are downstream from major dams or located between dams.

-I-

*impoundment.* A body of water confined by a dam, dike, floodgate, or other artificial barrier.

-N-

*National Landscape Conservation System.* The lands within the BLM managed to conserve, protect, and restore nationally significant landscapes recognized for their outstanding cultural, ecological, and scientific values. Areas within the National Landscape Conservation System include national monuments, national conservation areas, outstanding natural areas, forest reserves, cooperative management and protection areas, wilderness, wilderness study areas, designated wild and scenic rivers, national scenic and historic trails, and conservation lands of the California desert.

*National System.* National Wild and Scenic Rivers System, which includes all rivers designated by Congress under Section 3(a) or added by the Secretary of Interior through Section 2(a)(ii) of the Wild and Scenic Rivers Act.

BLM_0019085

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

G-3

*National Wild and Scenic Rivers System.* A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values and are preserved in a free-flowing condition.

*Nationwide Rivers Inventory (NRI).* A listing of more than 3,400 free-flowing river segments in the United States that are believed to possess one or more outstandingly remarkable natural or cultural values judged to be of more than local or regional significance. All Federal agencies, as part of ongoing planning, management, and environmental review activities, must assess whether rivers on their lands that are identified in the NRI are suitable for inclusion in the National System. Until this determination is made, all Federal agencies must seek to avoid or mitigate actions that would adversely affect one or more NRI segments.

-O-

*outstandingly remarkable values.* Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act: "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values." Other values that may be considered include, but are not limited to, ecological, biological or botanical, paleontological, hydrological, traditional cultural uses, water quality, and scientific values. The Wild and Scenic Rivers Act does not further define outstandingly remarkable values. Agency resource professionals develop and interpret criteria in evaluating river values (unique, rare, or exemplary) based on professional judgment on a regional, physiographic, or geographic comparative basis.

-R-

*river corridor.* That portion of a river area authorized either by Congress or an agency for study and its immediate environment comprising a minimum area extending at least ¼ mile (½ mile in Alaska) from each bank. For designated rivers, the river corridor includes the river and adjacent land within the authorized boundary.

-S-

*study report.* The report on the suitability or nonsuitability of a river for inclusion in the National System, which Sections 4(a) and 5(a) of the Wild and Scenic Rivers Act require the Secretary of the Interior, or the Secretary of Agriculture, or both jointly to prepare and submit to the President. The President transmits the report with his or her recommendation(s) to Congress.

*study river.* Rivers identified for study by Congress under Section 5(a) of the Wild and Scenic Rivers Act or identified for study by the Secretary of Agriculture or the Secretary of the Interior (BLM-identified study rivers) under Section 5(d)(1) of the act. These rivers will be studied under the provisions of Section 4 of the Wild and Scenic Rivers Act.

*suitable river.* An eligible river segment found through administrative study to meet the criteria for designation as a component of the National System, as specified in Section 4(a) of the Wild and Scenic Rivers Act.

BLM_0019086

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

G-4

-V-

*visitor capacity.* Visitor capacity is defined in the CRMP and is the actual level of visitor use that
will not adversely impact the free-flowing condition, water quality, or outstandingly remarkable
values of designated rivers. Visitor capacity is established for the river, river segment, sites,
areas, and/or activities.

-W-

*water resource projects.* Any dam, water conduit, reservoir, powerhouse, transmission line,
or other project under the Federal Power Act or other construction of developments that would
affect the free-flowing condition of a wild and scenic or congressionally authorized study river.
In addition to projects licensed by the Federal Energy Regulatory Commission, water resources
projects may also include dams, water diversion projects, fisheries habitat and watershed
restoration/enhancement projects, bridges and other roadway construction/reconstruction
projects, bank stabilization projects, channelization projects, levee construction, recreation
facilities such as boat ramps and fishing piers, and activities that require a 404 permit from the
Army Corps of Engineers.

*wild and scenic river values.* The purposes for which wild and scenic rivers are added to the
National System as explicated in Section 1(b) of the Wild and Scenic Rivers Act. They include
the river's free-flowing condition, water quality, and outstandingly remarkable values. Section
7(a) and 10(a) of the Wild and Scenic Rivers Act make reference to these collective values.

*wild and scenic study river.* Rivers identified for study by Congress under Section 5(a) of
the Wild and Scenic Rivers Act or identified for study by the Secretary of Agriculture or the
Secretary of the Interior under Section 5(d)(1) of the Wild and Scenic Rivers Act. These rivers
will be studied under the provisions of Section 4 of the Wild and Scenic Rivers Act.

BLM_0019087

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-1

**Illustration 1 – Sample Format of Documentation of Eligibility**
(See chapter 3.1)

## *Crooked Creek – Segment Above Fish Barrier*

| Free Flowing | Outstandingly Remarkable Values | | | | | | | | Tentative Classification | | | Total Segment Length (Miles) | BLM Segment Length (Miles) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Scenic | Recreation | Geological | Fish | Wildlife | Historic | Cultural | Other | Wild | Scenic | Recreational | | |
| Yes | X | X | | X | | | X | | X | | | 6.3 | 1.59 |

**River Segment Location and General Description:** Located in Carbon County, Crooked Creek originates in the southern portion of the Pryor Mountains within the Custer National Forest. In a 1992 Forest Plan amendment, the Custer National Forest determined Crooked Creek as eligible for wild and scenic river study with cultural, fisheries, geologic, and scenic values being outstandingly remarkable. At the forest boundary Crooked Creek flows onto BLM-administered lands for 3 miles before entering private lands. This 3-mile reach on BLM land was segmented at a fish barrier which is located close to the middle of the reach. The Crooked Creek – Above Fish Barrier segment is shown on Map 3, page 22.

**Reasons for Tentative Classification:** This segment has been tentatively classified as wild. This segment is entirely within the Burnt Timber Canyon Wilderness Study Area (WSA) and has motorized public access to within less than ¼ mile of the canyon rim. It is free of impoundments, and the shoreline is undeveloped and primitive. There is little evidence of livestock grazing. There are no improvements or evidence of humans.

**Description of Outstandingly Remarkable Values:**

**Scenic Values:** This segment flows through the Burnt Timber Canyon WSA and is rated as Class I for visual resource management. The current management objective is to maintain the existing condition of the landscape. The deeply incised Crooked Creek Canyon cuts through several hundred feet of the Pryor Mountain limestone strata. The combination of the dense riparian vegetation along Crooked Creek and the steep talus slopes of the canyon walls offer unique and outstandingly remarkable scenery.

**Recreational Values:** The Pryor Mountains offer a unique combination of resource values that attract local, regional, and national visitors. This segment offers access to opportunities including fishing for a genetically pure strain of Yellowstone cutthroat trout, hiking in a pristine riparian canyon, viewing Pryor Mountain wild horses at one of their limited watering sources, and exploring for caves and bats in the canyon's limestone walls.

BLM_0019088

Case No. 1:20-cv-02484-MSK   Document 31-7   filed 04/27/21   USDC Colorado   pg 95 of 399

**Fish Values:** The Crooked Creek – Above Fish Barrier segment supports a population of Yellowstone cutthroat trout (YCT) (*Oncorhynchus clarkii bouvieri*) that has been designated a "core population" by the Interstate YCT Coordination Team. A core population is one that exhibits no hybridization and is essentially a genetically pure strain. These pure strain YCT are very valuable in that they can be used to enhance other YCT populations or establish new populations in suitable waters. These fish values are recognized nationally by the fisheries community. The ecological impact of losing a pure strain species is significant in itself. YCT are listed as a species of concern by Montana Fish, Wildlife, and Parks and are listed as a federally sensitive species by the BLM and U.S. Forest Service. The fish barrier at the downstream end of the segment will maintain the genetic purity of this YCT population. Adjacent land uses have had little effect on this segment because the segment is within the wilderness study area. The fish habitat is in good condition. High canyon walls, rock armoring, and limited access combine to provide a setting that is primitive in nature. Although there is public motorized access to within ¼ mile of the canyon bottom, visitors must hike in. The presence of the core population of YCT in Crooked Creek combined with the isolated, primitive setting of the canyon meets the criteria of an outstandingly remarkable value.

**Cultural Values:** The Crooked Creek – Above Fish Barrier segment has a landscape with significant archaeological properties. The Demijohn Flat Archaeological District was listed on the National Register of Historic Places in 1974 as District #74001092 (24CB478). The Demijohn Flat Archaeological District retains archaeologically intact remnants of protohistoric period Crow tipi habitation. The size and relatively pristine nature of the site warrants protection. Beyond the registered archaeological district, other sites include the petroglyphs (24CB205) and other nearby sites (additional tipi rings), which possibly could be considered elements in a broad landscape associated with the archaeological district. Studies and evaluations for nearby sites are needed to extend the district to a landscape designation. This district should be redefined, avoided, and protected. This segment of the Crooked Creek Demijohn Flat Archaeological District retains unique qualities of outstanding scientific value on at least a regional level.

BLM_0019089

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-3

**Illustration 2 – Classification Criteria for Wild, Scenic, and Recreational River Areas**
(See chapters 3.3 and 4.2C)

| ATTRIBUTE | WILD | SCENIC | RECREATIONAL |
|---|---|---|---|
| Water Resource Development | Free of impoundment. | Free of impoundment. | Some existing impoundment or diversion. |
| | | | The existence of low dams, diversions, or other modifications of the waterway is acceptable, provided the waterway remains generally natural and riverine in appearance. |
| Shoreline Development | Essentially primitive. Little or no evidence of human activity. | Largely primitive and undeveloped. No substantial evidence of human activity. | Some development. Substantial evidence of human activity. |
| | The presence of a few inconspicuous structures, particularly those of historic or cultural value, is acceptable. | The presence of small communities or dispersed dwellings or farm structures is acceptable. | The presence of extensive residential development and a few commercial structures is acceptable. |
| | A limited amount of domestic livestock grazing or hay production is acceptable. | The presence of grazing, hay production, or row crops is acceptable. | Lands may have been developed for the full range of agricultural and forestry uses. |

BLM_0019090

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-4

| ATTRIBUTE | WILD | SCENIC | RECREATIONAL |
|---|---|---|---|
| Shoreline Development (continued) | Little or no evidence of past timber harvest. No ongoing timber harvest. | Evidence of past or ongoing timber harvest is acceptable, provided the forest appears natural from the riverbank. | May show evidence of past and ongoing timber harvest. |
| Accessibility | Generally inaccessible except by trail. | Accessible in places by road. | Readily accessible by road or railroad. |
|  | No roads, railroads, or other provision for vehicular travel within the river area. A few existing roads leading to the boundary of the area are acceptable. | Roads may occasionally reach or bridge the river. The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable. | The existence of parallel roads or railroads on one or both banks as well as bridge crossings and other river access points is acceptable. |
| Water Quality | Meets or exceeds criteria or federally approved state standards for aesthetics, for propagation of fish and wildlife normally adapted to the habitat of the river, and for primary contact recreation (swimming) except where exceeded by natural conditions. | No criteria are prescribed by the Wild and Scenic Rivers Act. The Federal Water Pollution Control Act Amendments of 1972 have made it a national goal that all waters of the United States are made fishable and swimmable. Therefore, rivers will not be precluded from scenic or recreational classification because of poor water quality at the time of their study, provided a water quality improvement plan exists or is being developed in compliance with applicable Federal and state laws. | |

BLM_0019091

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-5

**Illustration 3 – Section 7 Evaluation Procedure Under "Direct and Adverse"**
(See chapters 3.8B2 and 7.9B2)

Use the following evaluation procedure under the direct and adverse effects standard for projects licensed by the Federal Energy Regulatory Commission or other federally assisted projects inside the designated river or congressionally authorized (5(a) of the Wild and Scenic Rivers Act) study river corridor (Section 7(b) of the Wild and Scenic Rivers Act).

The following questions should be considered in a typical analysis under this standard. The scope of the evaluation should be consistent with the magnitude and complexity of the proposed activity. The resulting analysis may be documented in a few pages or a much lengthier product, as required.

1. **Define the Proposed Activity.** Describe the proposed activity in terms of the:
    a. Project proponent(s).
    b. Purpose/need for the project.
    c. Geographic location of the project (include a map).
    d. Duration of the proposed activities.
    e. Magnitude/extent of the proposed activities.
    f. Relationship to past and future management activities.

2. **Describe How the Proposed Activity Will Directly Alter Within-Channel Conditions**. Address the magnitude and spatial extent of the effects the proposed activity will have on within-channel attributes. Give special attention to changes in features that would affect the outstandingly remarkable values. Describe:
    a. The position of the proposed activity relative to the streambed and streambanks.
    b. Any likely resulting changes in:
        (1) Active channel location.
        (2) Channel geometry (cross-sectional shape, width/depth characteristics).
        (3) Channel slope (rate or nature of vertical drop).
        (4) Channel form (straight, meandering, or braided).
        (5) Relevant water quality parameters (turbidity, temperature, nutrient availability).
        (6) Navigation of the river.

3. **Describe How the Proposed Activity Will Directly Alter Riparian and/or Floodplain Conditions.** Address the magnitude and spatial extent of the effects the proposed activity will have on riparian/floodplain attributes. Give special attention to changes in features that would affect the outstandingly remarkable values. Describe:
    a. The position of the proposed activity relative to the riparian area and floodplain.
    b. Any likely resulting changes in:
        (1) Vegetation composition, age structure, quantity, or vigor.
        (2) Relevant soil properties such as compaction or percent of bare ground.
        (3) Relevant floodplain properties such as width, roughness, bank stability, or susceptibility to erosion.

BLM_0019092

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-6

4. **Describe How the Proposed Activity Will Directly Alter Upland Conditions.** Address the magnitude and spatial extent of the effects the proposed activity will have on upland attributes. Give special attention to changes in features that would affect the outstandingly remarkable values. Describe:

    a. The position of the proposed activity relative to the uplands.
    b. Any likely resulting changes in:
        (1) Vegetation composition, age structure, quantity, or vigor.
        (2) Relevant soil properties such as compaction or percent of bare ground.
        (3) Relevant hydrologic properties such as drainage patterns or the condition of surface and subsurface flows.
    c. Potential changes in upland conditions that would influence archaeological, cultural, or other identified significant resource values.

5. **Evaluate and Describe How Changes in Onsite Conditions Can/Will Alter Existing Hydrologic or Biologic Processes.** Evaluate potential changes in hydrologic and biologic processes by quantifying, qualifying, and/or modeling the likely effects of the proposed activity on:

    a. The ability of the channel to change course, re-occupy former segments, or inundate its floodplain.
    b. Streambank erosion potential, sediment routing and deposition, or debris loading.
    c. The amount or timing of flow in the channel.
    d. Existing flow patterns.
    e. Surface and subsurface flow characteristics.
    f. Flood storage (detention storage).
    g. Aggradation/degradation of the channel.
    h. Biological processes such as:
        (1) Reproduction, vigor, growth, and/or succession of streamside vegetation.
        (2) Nutrient cycling.
        (3) Fish spawning and/or rearing success.
        (4) Riparian-dependent avian species needs.
        (5) Invasion by invasive and noxious species.
        (6) Amphibian/invertebrate needs.
        (7) Species composition (diversity).

6. **Estimate the Magnitude and Spatial Extent of Potential Offsite Changes.** Address potential offsite, or indirect, effects of the proposed activity, acknowledging any uncertainties.

    a. Consider and document:
        (1) Changes that influence other parts of the river system.
        (2) The range of circumstances under which offsite changes might occur (for example, as may be related to flow frequency).
        (3) The likelihood that predicted changes will be realized.
    b. Specify processes involved, such as hydrologic and sedimentation, and the movement of nutrients.

BLM MANUAL

Rel. 6-136
7/13/2012

BLM_0019093

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-7

7. **Define the Time Scale that Steps 3-6 are Likely to Occur.** Review steps 3-6, looking independently at the element of time. Define and document the time scale the effects will occur.

8. **Compare Project Analyses to Management Goals.** Based on the analysis of steps 3-7, identify and document project effects on achievement, or timing of achievement, of management goals and objectives relative to free flow, water quality, riparian area and floodplain conditions, outstandingly remarkable values, and river classification.

9. **Make the Section 7 Determination.** Based on the analysis of steps 3-8, document:
   a. The effects of the proposed activity on the river's free-flowing condition, including identification of any proposed measures to minimize those effects.
   b. The effects of the proposed activity on the river's water quality.
   c. Any effects on the outstandingly remarkable values for which the river was designated.
   d. The responsible official should make a conclusion as to whether the project as proposed will result in "direct and adverse effects" to the values for which the river was added to the National Wild and Scenic Rivers System.

BLM_0019094

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-8

**Illustration 4 – Section 7 Evaluation Procedure Under "Invade the Area or Diminish"**
(See chapters 3.8C and 7.9C)

This outline format should be followed for an evaluation procedure under the "invade or diminish standard" for projects licensed by the Federal Energy Regulatory Commission or other federally assisted projects outside the designated river corridor or congressionally authorized, Section 5(a), study river corridor.

The evaluation procedure for this standard does not lend itself to a common series of questions as developed for the direct and adverse effects standard (Illustration 3). Rather, the evaluation should be focused on describing the potential of the proposed project to either invade the designated river or diminish the scenic, recreational, fish, or wildlife values. The following text provides an outline for documenting the determination and, importantly, identifies the questions to consider in evaluating the magnitude of the effects.

**SUGGESTED OUTLINE FOR DETERMINATION:**

    **Introduction:** Briefly describe the project and attributes of the designated river (clearly identify the outstandingly remarkable values).

    **Section 7(a) or 7(b) Requirement:** Describe the standard. Include the following text.

        Section 7(a) of the Wild and Scenic Rivers Act provides a specific standard for review of developments below or above a designated river or on a stream tributary to a designated river. Such developments may occur as long as the project "will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area as of the date of designation . . ." This standard applies to projects outside the river corridor but on the same river or a tributary.

        Section 7(b) of the Wild and Scenic Rivers Act provides a specific standard for review of developments below or above a congressionally authorized study river corridor, or on a stream tributary to the study river. Such developments may occur as long as the project "will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation . . ." This standard applies to projects outside the river corridor but on the same river or a tributary.

    (Relate the project location to the river.)

    The initial question to be addressed is whether or not the proposed project invades the designated river or congressionally authorized study river. The term invade is defined as encroachment or intrusion upon. If the project is determined to invade the designated river or congressionally authorized study river, the proponent should be advised to develop measures to eliminate this unacceptable effect.

BLM_0019095

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-9

If the proposed project does not invade the designated river or congressionally authorized study river, the next question to be answered, relative to the standard in Sections 7(a) or 7(b), is whether or not the proposed project will "unreasonable diminish" any of the specified values for a designated river or "diminish" the specified values of a congressionally authorized study river. Specifically, does the proposed project cause diminution of the scenic, recreational, fish, or wildlife values of the river? A project with long-term, positive benefits that greatly outweigh very short-term diminishment of stated values may be determined acceptable.

**Rationale for Determination:** Identify the document that provides the basis for the evaluation. For hydroelectric proposals, the application is the basis for the preliminary Section 7 determination, reserving the right for further evaluation based on the results of subsequent environmental analysis. For a nonhydroelectric project, this document is the proposing agency or the BLM's environmental document (when the project is proposed by the BLM). Also include, if appropriate, that staff specialists utilized available additional data as described in an accompanying Section 7 report.

**Determination:** Describe the findings as to whether the proposed project will invade the area or diminish the four identified values: scenic, recreational, fish, and wildlife. If the finding is that the proposed project will invade the area or diminish any of the four specified values, identify recommendations to reduce adverse effects to within acceptable levels, if possible.

**Signature:** Of the responsible official.

**Section 7 Report:** Include, as appropriate, a report that provides the detailed discussion of the potential effects that led to the conclusions summarized in the determination.

BLM_0019096

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-10

**Illustration 5 – Summary Information Document**
(See chapters 4.1C, 5.1A, and 5.2C)

The following template describes the organization and content of the summary information
document, an essential element of the land use plan wild and scenic river appendix. This detailed
river narrative is a synopsis of the pertinent information related to eligibility, classification, and
suitability of a specific river evaluated in the land management plan revision process.

STUDY AREA SUMMARY - Provide locational information and include a map.

Name of River: xxxx

Location: Describe the entire length studied, for instance, from its headwaters to confluence with
xx. Additionally, describe each segment, such as:

  Segment x - Define termini (including legal description, as necessary). Indicate river miles.

River Mileage: Indicate the entire miles of river studied and portion determined to be eligible.

  Studied: xx miles
  Eligible: xx miles

ELIGIBILITY - Include determination of river's free flow and whether it possesses one or more
outstandingly remarkable values.

Determination of Free Flow: Describe the assessment of the river's free flow, by segment, if
necessary.

Determination of Outstandingly Remarkable Values: Summarize the individual resource findings
by listing the values identified as an outstandingly remarkable value with a brief rationale (see
chapter 3.1E).

CLASSIFICATION - Detail the inventoried classification. Describe the basis for the
classification of each river segment; for example, the level of development from criteria provided
in the Interagency Guidelines (see Illustration 2).

SUITABILITY REPORT - Comprised of two parts: an objective description of attributes of the
river corridor and a subjective evaluation of "suitability factors."

Description: Provide narrative that objectively describes the following aspects of the river
corridor.

Land Ownership and Land Uses: This section should include the estimated number of acres in
the river corridor by ownership. The accompanying narrative should also provide relevant detail
on the ownership pattern. For a complicated ownership pattern, it may be useful to include a
description of ownership by river mile, such as:

BLM MANUAL                                                            Rel. 6-136
                                                                     7/13/2012

BLM_0019097

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-11

| River Mile | Ownership |
|------------|-----------|
| 0 - 1 | State Parks Campground (320 acres) |
| 1 - 3 | Private land south (20-acre lot size) |
| | BLM north (900 acres) |
| 3 - 5 | Pine Meadows Subdivision (1-acre lot size) |

Describe existing and potential land uses based on county zoning/state regulations, as applicable.

Mineral and Energy Resource Activities: Indicate existing locatable, saleable and leasable mineral and energy resources development. In addition, the narrative should include an evaluation of the potential for locatable, saleable, and leasable mineral and energy resources.

Water Resources Development: Describe the existing construction that affects the river's free-flowing condition (such as diversions, conveyance facilities, and rip-rap). Importantly, this section should also describe the potential of the river area to be used for hydroelectric power production (as evidenced by historical and current preliminary Federal Energy Regulatory Commission permits or license applications).

Transportation, Facilities, and Other Developments: Provide a description of the transportation system within the river corridor. This should include the jurisdiction/ownership of roads. Describe also the trail system and Federal and private facilities and other developments.

Recreation Activities: Describe existing and potential recreation uses. Consider developed, dispersed, and trail use on Federal and other ownerships.

Other Resource Activities: Describe the existing and potential uses of the river corridor other than recreation uses. This section may include, but is not limited to, timber harvest, livestock grazing, farming, and so on across all ownerships.

Special Areas: Discuss any special areas within the river corridor. Examples include, but are not limited to, wilderness, national recreation areas, scenic byways, archeological sites/districts, research natural areas, and state-designated waterways. Enough detail should be provided for the reader to understand the intent and authorities associated with a particular designation.

Socioeconomic Environment: Describe the general socioeconomic setting of the river corridor. This section might include reference to local communities' population structure and economic base.

Current Administration and Funding Needs if Designated: List the current administering agencies (such as the BLM, county, tribes, and so on). Also, include an estimate of the general administration and operation and maintenance costs on an annual basis.

Suitability Factor Assessment: Summarize the detailed evaluation of suitability factors (see chapter 3.4).

BLM_0019098

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-12

LAND USE PLAN ALTERNATIVES - Briefly describe how a particular river was evaluated by summarizing the plan alternatives.

SUITABILITY DETERMINATION FOR THE APPROVED PLAN - Describe the rationale for the suitability determination.

BLM_0019099

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-13

**Illustration 6 – Sample Transmittal Letter**
(See chapters 5.1A and 5.2C)

Honorable (name)
President of the Senate
S-212 Capitol
Washington, D.C.  20510

Dear Mr. President (or Mr. Speaker):

I take pleasure in transmitting the enclosed study findings and report for the Middle Fork of the
Missouri River. Also enclosed is draft legislation "To amend the Wild and Scenic Rivers Act to
designate a segment of the Middle Fork of the Missouri River in the State of Montana as a
component of the National Wild and Scenic Rivers System, and for other purposes."

The Omnibus Public Land Management Act of 2009 (P.L. 111-287) directed the study of the
Middle Fork of the Missouri River for possible designation into the National Wild and Scenic
Rivers System. Based on the analysis documented in the enclosed *Final Environmental Impact
Statement and Study Report for the Middle Fork of the Missouri River*, the Department of the
Interior supports the designation of this river and recommends introduction and enactment of the
draft bill to preserve its free-flowing condition and outstandingly remarkable fisheries, scenery,
geologic features, and whitewater recreation.

The Middle Fork of the Missouri River is located in southwestern Montana, approximately 45
miles from the city of Butte. A 42.2-mile segment is recommended for designation, from the
headwaters of the Middle Fork of the Missouri River in the Centennial Mountains to the White
Bear Creek confluence. The segment of the Middle Fork of the Missouri River downstream to
Elk Creek (12 miles) is an existing component of the National Wild and Scenic Rivers System.

The designated segment, which flows entirely through private lands, was added to the National
Wild and Scenic Rivers System to protect and enhance the same outstandingly remarkable values
identified in the upriver study process. Management activities on lands within the study corridor,
and throughout the basin, influence the instream values of the study segment and the designated
segment of the river. Adding the study segment, which was expanded to include the upstream
headwaters, to the National Wild and Scenic Rivers System would result in the entire, free-
flowing portion of the Middle Fork of the Missouri being administered as a system in partnership
with local, state, and Federal agencies.

Of the 42.2 miles of the Middle Fork of the Missouri recommended for designation, 7.1 miles in
the Red Stone Wilderness Study Area (managed by the Bureau of Land Management) would be
classified as wild, with the remaining 35.1 miles classified as scenic. The river segment
extending from the boundary of the Butte District Bureau of Land Management downstream to
the confluence of White Bear Creek (17.6 miles) is a mix of private, State of Montana, and
Bureau of Land Management lands. This segment is currently managed under a Cooperative
Management Agreement between Montana Fish, Wildlife, and Parks and the Bureau of Land
Management. In compliance with the Wild and Scenic Rivers Act and to provide for the

BLM_0019100

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-14

protection of the river-related outstandingly remarkable values, the recommended boundary for this segment averages ¼ mile from the ordinary high water mark on each side of the river. This proposed river corridor would include approximately 13,500 acres, of which 12,425 acres are managed by the Bureau of Land Management, 316 acres are State of Montana lands, and 763 acres are private lands.

Other alternatives considered in the Middle Fork of the Missouri study report include:

> Alternative 1 – No action.

> Alternative 2 – Manage the river by increasing enforcement of existing laws. As part of this increased enforcement, explore the opportunity for expanding the existing Cooperative Management Agreement between Montana Fish, Wildlife, and Parks and the Bureau of Land Management to include all river segments above Elk Creek.

> Alternative 3 – Designate the entire 42.2 miles as a component of the National Wild and Scenic Rivers System. Management would be implemented by a committee composed of the Bureau of Land Management, Broken Bow County, and State of Montana.

> Alternative 4 – Designate the entire 42.2 miles as a component of the National Wild and Scenic Rivers System. Manage the river using a comprehensive program of Federal acquisition to enhance river corridor resources and provide significantly more recreation opportunities with management implemented by the Bureau of Land Management.

The intent of designating the recommended segments would be to maintain the condition of the Middle Fork of the Missouri River and its immediate shorelines close to the way it appears today. Long-term protection of significant river corridor resources, including rural lifestyle and local economy, would be provided through existing regulation (with increased enforcement and interagency coordination) supplemented by limited purchase of scenic easements or fee title to lands from willing sellers.

Designation of the Middle Fork of the Missouri River would not have a significant effect on other resource values in the area. There are no proposed water resource developments, mining claims, or current mineral leases on the recommended section of this river. Potential timber harvest would not be significantly reduced. Recreational use in the river corridors is expected to increase slightly because of improved public access. Designation would also support continuation of agricultural practices on private lands.

A high level of public and other agency involvement was a key part of the study process and led to agreement on the recommendation of the designation of the Middle Fork of the Missouri River as a component of the National Wild and Scenic Rivers System. For example, the Middle Fork of the Missouri Stakeholders Group, comprised of local landowners, industry representatives, and recreationists, provided input to Broken Bow County during the study process. The Broken Bow County Board of Commissioners supports the designation of the entire Middle Fork of the Missouri River.

BLM MANUAL

Rel. 6-136
7/13/2012

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-15

The outstanding natural, scenic, and recreational values of the recommended segment of the Middle Fork of the Missouri River are unique and irreplaceable resources. Adding this 42.2-mile segment to the existing Middle Fork of the Missouri Wild and Scenic River would provide the best protection of the river and its immediate environment.

The Office of Management and Budget advises that there is no objection to the presentation of this proposed legislation from the standpoint of the Administration's program.

A similar letter is being sent to the Speaker of the House of Representatives.

Sincerely,

Enclosures

BLM_0019102

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-16

**Illustration 7 - Monitoring Strategy**
(See chapters 3.9 and 7.2A9)

**Background**
The Wild and Scenic Rivers Act (WSRA) established a national system to protect the free-flowing condition; water quality; and outstanding natural, cultural, and recreational values of selected rivers and river segments. Rivers are protected by:

- *Identifying Values* (Section 1(b)) - The values for which wild and scenic rivers (WSRs) are added to the National System are made explicit in this section: specifically, a river's free-flowing condition, water quality, and outstandingly remarkable values.

- *Establishing Classification* (Section 3(b)) - The classification system describes the land and riverine condition in existence at the date of the river's designation. To be "administered" in a class means defining the river's initial landscape condition and, through development of the comprehensive river management plan (CRMP), establishing standards relative to future in-corridor land-use decisions.

- *Developing a CRMP* (Sections 3(d)(1) and 3(d)(2)) - The CRMP must address:
  - Resource protection
  - Development of lands and facilities
  - User capacities
  - Other management practices necessary or desirable to achieve the purposes of the WSRA

  Section 3(d)(1) allows the CRMP to be coordinated with and incorporated into a river-administering agency's resource management plan. The CRMP for rivers designated on or after January 1, 1986, is to be completed within 3 full fiscal years after the date of designation with a notice of completion and availability published in the Federal Register. For rivers designated before this date, Section 3(d)(2) requires development of a CRMP in conformance with Section 3(d)(1) for all rivers in the National System, providing 10 years for its update through the planning processes of river-administering agencies.

The WSRA provides specific protective measures to maintain the river's free-flowing condition, water quality, and outstandingly remarkable values:

- *Water Resources Projects* (Section 7(a)) - Through this section, Congress expressed the clear intent to protect river values from the harmful effects of water resources projects (i.e., hydropower projects licensed under Part I of the Federal Power Act or projects that affect the free-flowing condition of the designated river).

- *Water Quality and Quantity (Sections 1(b), 12(c), 13(b)-(d))* - The WSRA creates a national river system, making protection of water quality and quantity among its principal provisions.

BLM_0019103

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-17

- *Management Direction* (Section 10(a)) - This section is interpreted as a nondegradation and enhancement policy for all rivers, regardless of classification. "Each component will be managed to protect and enhance the values for which the river was designated, while providing for public recreation and resource uses that do not adversely impact or degrade those values" (Interagency Guidelines).

**Monitoring**
Regular monitoring is essential to protecting river-related values. Develop and implement a monitoring strategy to address visitor use and to protect the river's free-flowing condition, water quality and quantity, and outstandingly remarkable values.

*Preserve free-flowing condition* - Establish a baseline inventory of existing water resources projects from which to assess future project proposals.

*Water Quality and Quantity* – Understanding the baseline water quality and quantity of a designated river is an essential aspect of determining the extent to which future management actions may protect and/or enhance these river values. The objective of baseline water quality measurements is the characterization of the condition and variability of the water in the river at designation. Measurements should focus on physical and biological factors sufficient to quantify conditions. Information about water quality is essential to developing a strategy that protects identified parameters of water quality, consistent with appropriate standards from the Clean Water Act.

The objective in gathering flow information is the development of flow hydrographs for stations along the river. These flow hydrographs, developed throughout the water year and including as many years as possible, are basic to an understanding of how other resource values are affected by flows. Information about water quantity (flows) is essential to developing a strategy that protects the riparian area, water-dependent outstandingly remarkable values, and riverine processes (channel maintenance).

Develop a water quality and quantity monitoring strategy that:
- Defines the water-related outstandingly remarkable values to be protected and their baseline condition
- Identifies potential threats and protection opportunities
- Includes the protection measures to be implemented

*Protect and Enhance River Values* – Establish baseline conditions of outstandingly remarkable values and other resource values from which to identify potential threats and opportunities for enhancement. Elements of the monitoring strategy may include, but are not limited to, the composition and condition of:
- Riparian and upland vegetation
- Rare, unique, sensitive, and threatened or endangered plant habitat and species
- Fish and wildlife habitat and species
- Historic and cultural resources
- Scenic integrity (landscape character)

BLM_0019104

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-18

- Recreation use and facility/area conditions

*Address Visitor Use* – Whether or not recreation is an outstandingly remarkable value, the WSRA requires the administering agency to manage visitor use to protect values, including addressing user capacity.

**Proposed Monitoring Matrix**
The following matrix is intended to be included in a separate section of the CRMP. A single matrix may be developed for the entire river, or separate matrices may be created for specific segments, depending on the river's length and the complexity of the management issues.

| VALUE | KEY INDICATOR | STANDARD TO MEET | ACTION IF NOT MET | SAMPLING PROCEDURE AND FREQUENCY | RESPONSIBLE AGENCY |
|-------|---------------|------------------|-------------------|----------------------------------|--------------------|
|       |               |                  |                   |                                  |                    |
|       |               |                  |                   |                                  |                    |
|       |               |                  |                   |                                  |                    |
|       |               |                  |                   |                                  |                    |
|       |               |                  |                   |                                  |                    |

**DATA ENTRY INSTRUCTIONS**:

<u>VALUE</u>
Enter the value for which you are monitoring to establish a baseline or evaluate trends. Entries include:
- Free-flowing condition
- An outstandingly remarkable value, including but not limited to:
  - Scenery
  - Recreation
  - Geology
  - Fish
  - Wildlife
  - Historic
  - Cultural
  - Traditional cultural use
  - Botany
  - Ecology
  - Hydrology
  - Paleontology
- Water quality
- Water quantity

BLM_0019105

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-19

KEY INDICATOR
Enter the indicator that will be used to evaluate changes to the value you have identified. An indicator is a specific variable that singly or in combination defines resource or social conditions.

STANDARD TO MEET
Enter the standard that will be used to evaluate the condition of the resource. Standards are the quantitative or highly specific measures associated with an indicator and should be sensitive enough to identify unacceptable trends prior to violating the nondegradation and enhancement standard of Section 10(a).

ACTION IF NOT MET
Enter the specific management action(s) that will be taken if the monitoring condition of the resource is not within the acceptable standard. This action should be of sufficient rigor to resolve the identified problem.

SAMPLING PROCEDURE AND FREQUENCY
Enter information on the method that will be used to assess the condition of the resource. Include the specific name of the protocol, if applicable, and also document the monitoring frequency (e.g., monthly, annually).

RESPONSIBLE AGENCY
Enter the name of the agency, or agencies, that are responsible for conducting the monitoring.

BLM_0019106

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-20

EXAMPLE:

| VALUE | KEY INDICATOR | STANDARD TO MEET | ACTION IF NOT MET | SAMPLING PROCEDURE AND FREQUENCY | RESPONSIBLE AGENCY |
|---|---|---|---|---|---|
| Fish | Quality and quantity of spawning gravel | Locate spawning areas and measure substrate size composition.<br><br>Maintain desired quality and quantity of spawning gravel established during baseline monitoring. | Identify cause of degradation to quality and quantity of spawning gravel and mitigate impact. | Conduct substrate sampling annually to detect increased sedimentation | Montana Fish, Wildlife, and Parks |
| Recreational | Trail erosion and damage to trailside vegetation | Maintain trails to established standards. | Increase trail maintenance frequency.<br><br>Reconstruct/relocate trails to reduce trail braiding. | Monitor one-third of in-corridor trail miles annually. | Bureau of Land Management |
| Water Quality | Temperature | Temperature levels meet or exceed state water quality standards | Determine if cause is attributable to human activity; if yes, conduct remedial action(s) to meet state standards. | Monitor summer temperatures with continuous recording temperature device. | State Department of Environmental Quality |

BLM MANUAL

Rel. 6-136
7/13/2012

BLM_0019107

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-21

**Example Values and Key Indicators**

SCENERY
- Alteration of landform, vegetation, or river condition inconsistent with visual quality objectives within the viewshed as seen from the river and high-use areas

RECREATION
- Developed recreation area capacity and site availability
- Quality of experience
- Trail erosion and damage to trailside vegetation
- Number of visitor encounters with other boaters on the river
- Congestion and crowding at launch sites
- User conflicts and safety issues (e.g., room to maneuver at rapids)
- Impacts from dispersed recreation activities to riparian vegetation and function (e.g., soil stability, vegetative loss, tree damage, fire rings, human waste, litter, streambank damage).

FISH
- Fish species composition
- Quality and quantity of spawning gravels
- Rearing habitat and pool quality
- Presence of large woody material
- Streambank stability and vegetative cover
- Macroinvertebrate community structure

WILDLIFE
- Presence of river-related species
- Quality, quantity, and combination of habitat type
- River corridor use by bald eagle, osprey, goshawk, and spotted owl

HISTORIC AND CULTURAL
- Site integrity

BOTANY
- Integrity of plant communities/rare species viability
- Populations of invasive plant species
- Number of flowering threatened and endangered plant species

BLM MANUAL

Rel. 6-136
7/13/2012

BLM_0019108

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-22

ECOLOGY
- Amount of riparian habitat and wetlands
- Species diversity
- Proper functioning of riparian vegetation as indicated by vegetative and streambank condition
- Proper functioning of upland vegetation as indicated by forest structure and species composition

WATER QUALITY
- Dissolved oxygen
- pH
- Temperature
- Turbidity
- Presence of *E.Coli*
- Nitrates and nitrites
- Phosphorus

WATER QUANTITY
- Flow rates – daily, monthly, and yearly averages
- Flood frequency and magnitude
- Drought frequency and magnitude
- Recurrence interval for target flow rates that are critical to support outstandingly remarkable values
- Groundwater elevations in alluvial aquifers adjacent to stream
- Relationship between groundwater levels and streamflow rates

BLM_0019109

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-23

**Illustration 8 – Sample WSR Boundary Transmittal Documents**
(See chapter 7.1D)

| **USDA** | **United States Department of Agriculture** | **Forest Service** | **Washington Office** | **1400 Independence Avenue, SW Washington, DC  20250** |
|---|---|---|---|---|

---

**File Code:** 2300
**Date:** September 19, 2011

The Honorable Joseph R. Biden, Jr.
President of the Senate
Room S-212
The Capitol
Washington, DC  20510

Dear Mr. President:

In accordance with Section 3(b) of the Wild and Scenic Rivers Act (82 Stat. 906 as amended; 16 U.S.C. 1274), we are pleased to forward the detailed boundary for the North Fork Crooked Wild and Scenic River in Oregon added to the National Wild and Scenic Rivers System by Public Law 100-557, October 28, 1988. The river is administered by the Ochoco National Forest and Prineville District of the Bureau of Land Management.

This boundary description is the result of extensive public involvement that occurred during preparation of its river management plan (*Decision Notice and Finding of No Significant Impact, North Fork Crooked Wild and Scenic River Management Plan Environmental Assessment, March 19, 1993*).

The boundary description corrects a minor error in the division between segments C and D. This more accurate description does not change congressional intent or the miles in each classification. Rather, this boundary description makes segment C coincide with the Ochoco National Forest boundary that is at the south section line of Section 16, Township 15 South and Range 22 East W.M., and less than ½ mile below Lame Dog Creek.

A similar letter is being sent to the Honorable John Boehner, Speaker of the House.

Sincerely,

JOEL D. HOLTROP
Deputy Chief, National Forest System

cc:  The Honorable Ron Wyden, The Honorable Jeff Merkley, The Honorable Jeff Bingaman, The Honorable Lisa Murkowski, The Honorable Doc Hastings, The Honorable Edward J. Markey, The Honorable Greg Walden


**Caring for the Land and Serving People**   Printed on Recycled Paper 

BLM_0019110

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-24

 **United States
Department of
Agriculture** **Forest
Service** **Washington
Office** **1400 Independence Avenue, SW
Washington, DC  20250**

---

**File Code:** 2300
**Date:**  September 19, 2011

The Honorable John Boehner
House of Representatives
Office of the Speaker
H-232 The Capitol
Washington, DC  20515

Dear Mr. Speaker:

In accordance with Section 3(b) of the Wild and Scenic Rivers Act (82 Stat. 906 as amended; 16 U.S.C. 1274), we are pleased to forward the detailed boundary for the North Fork Crooked Wild and Scenic River in Oregon added to the National Wild and Scenic Rivers System by Public Law 100-557, October 28, 1988. The river is administered by the Ochoco National Forest and Prineville District of the Bureau of Land Management.

This boundary description is the result of extensive public involvement that occurred during preparation of its river management plan (*Decision Notice and Finding of No Significant Impact, North Fork Crooked Wild and Scenic River Management Plan Environmental Assessment, March 19, 1993*).

The boundary description corrects a minor error in the division between segments C and D. This more accurate description does not change congressional intent or the miles in each classification. Rather, this boundary description makes segment C coincide with the Ochoco National Forest boundary that is at the south section line of Section 16, Township 15 South and Range 22 East W.M., and less than ½ mile below Lame Dog Creek.

A similar letter is being sent to the Honorable Joseph R. Biden, Jr., President of the Senate.

Sincerely,

JOEL D. HOLTROP
Deputy Chief, National Forest System

cc:  The Honorable Ron Wyden, The Honorable Jeff Merkley, The Honorable Jeff Bingaman, The Honorable Lisa Murkowski, The Honorable Doc Hastings, The Honorable Edward J. Markey, The Honorable Greg Walden

 **Caring for the Land and Serving People** Printed on Recycled Paper 

BLM_0019111

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-25



| **United States Department of Agriculture** | **Forest Service** | **Pacific Northwest Region** | **333 SW First Avenue (97204) PO Box 3623 Portland, OR 97208-3623 503-808-2468** |
|---|---|---|---|

File Code:  2350/1010
Date:        September 27, 2011

Mr. Raymond Mosley
Director
Office of the Federal Register (NF)
National Archives and Records Administration
800 North Capital Street, NW., Suite 700
Washington, DC 20001

Dear Mr. Mosley:

This is to certify that the file furnished with the Notice of Availability concerning the Boundary

Establishment for the North Fork Crooked National Wild and Scenic River, Ochoco National

Forest (3410-11-P) is a true copy of the original signed document.

Sincerely,

*/s/ Claire Lavendel*

CLAIRE LAVENDEL
Director, Recreation, Lands, and Mineral Resources

Enclosure

cc:  Chris Dent, Cdent



**Caring for the Land and Serving People**

Printed on Recycled Paper



BLM MANUAL

Rel. 6-136
7/13/2012

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-26

(3410-11-P)

**DEPARTMENT OF AGRICULTURE**

Forest Service

Boundary Establishment for North Fork Crooked National Wild and Scenic River, Ochoco
National Forest, Crook County, Oregon State

**AGENCY:** Forest Service, USDA

**ACTION:** Notice of availability

-----------------------------------------------------------------------------------------------------------

**SUMMARY:** In accordance with Section 3(b) of the Wild and Scenic Rivers Act, the

USDA Forest Service, Washington Office, is transmitting the final boundary of the North Fork

Crooked National Wild and Scenic River to Congress.

**FOR FURTHER INFORMATION CONTACT:** Information may be obtained by

contacting the following offices: Ochoco National Forest, P.O. Box 490, Prineville, Oregon

97754, (541) 416-6500; or Bureau of Land Management, Prineville District, 3050 NE Third

Street, Prineville, Oregon 97754, (541) 447-4115.

**SUPPLEMENTARY INFORMATION:** The North Fork Crooked Wild and Scenic River

boundary is available for review at the following offices: USDA Forest Service, Recreation,

Yates Building, 14th and Independence Avenues S.W., Washington, DC 20024; USDA Forest

Service, Pacific Northwest Region, 333 SW First Avenue, Portland, Oregon 97208-3623;

Ochoco National Forest, P.O. Box 490, Prineville, Oregon 97754, 541-416-6500; or DOI Bureau

of Land Management, National Landscape Conservation System, 20 M Street SE, Washington,

DC 20036, (202) 912-7179; DOI Bureau of Land Management, Oregon State Office, 333 SW

BLM MANUAL                                                                    Rel. 6-136
                                                                             7/13/2012

BLM_0019113

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-27

First Avenue, Portland, Oregon 97208; and Bureau of Land Management, Prineville District,

3050 NE Third Street, Prineville, Oregon 97754, (541) 447-4115.

The Omnibus Oregon Wild and Scenic Rivers Act of 1988 (Pub. L. 100-557) of   October 28,

1988, designated the North Fork Crooked River, Oregon, as a National Wild and Scenic River, to

be administered by the Secretary of Agriculture.  As specified by law, the boundary will not be

effective until ninety (90) days after Congress receives the transmittal.

_____           _____

Regional Director of Lands                        Date

BLM_0019114

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-28

**Illustration 9 - Key Elements of a Comprehensive River Management Plan**
(See chapter 7.2)

The following outline is not a suggested table of contents for a comprehensive river management
plan. Rather, it identifies the key elements specific to river planning that should be developed
within the context of the BLM's planning framework and under the National Environmental
Policy Act (NEPA). Further, the outline purposely does not include components specific to the
NEPA process (e.g., description of issues, alternatives, environmental consequences, or decision
document).

**Description of River Setting and Resource Values**
- Regional river setting
- Description of river corridor (by resource)
  - Basic hydrology
  - Type/amount of recreation use (private and commercial)
  - Type/amount of other permitted uses (e.g., livestock grazing, mineral
    activities)
- Land ownership and land-use description
- Outstandingly remarkable values (sufficiently detailed to serve as a baseline for desired
  management direction and monitoring)
- River classification
- Landscape condition (description of existing development level by segment)

**Planning Context (Coordination with Others)**
- Legislative direction specific to the river
- Relationship to other Federal regulatory agencies
- Relationship to tribal governments
- Relationship to other Federal, state, and local government plans
- Relationship to other regional coordinating bodies

**Management Direction**
- Goals and desired future conditions
- Standards and guidelines by resource
- River corridor boundary
- Principles for land acquisition (as appropriate)

**Management Actions**
This section includes the criteria developed to guide subsequent site-specific agency decisions
and a description of probable management actions, including the objectives/intent of an action.
For example, this section might include criteria for evaluating proposed river events conducted
under agency special-use authorization or, based on management direction, describe priority
areas for restoration and likely treatments. This section should also include the general process
through which the Federal reserve water right will be quantified, adjudicated, and protected.

BLM_0019115

6400 – WILD AND SCENIC RIVERS – POLICY AND PROGRAM DIRECTION FOR
IDENTIFICATION, EVALUATION, PLANNING, AND MANAGEMENT

I-29

**Monitoring Strategy**
- Standards
- Indicators for management actions
- Process (intensity, frequency, personnel needs, and other costs)

**Potential Appendix Material**
- Annotated Wild and Scenic Rivers Act and river-specific enabling legislation
- Resources assessment (outstandingly remarkable values)
- Documented inventory information (e.g., water quality)
- Instream flow studies
- Visitor capacity studies
- Water resources project evaluation process
- State/local regulation specific to protecting resource values
- Management of Land Boundaries Plan

BLM_0019116

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

MANUAL TRANSMITTAL SHEET

| Release |
| 6-133 |
| Date |
| 07/13/2012 |

Subject

6250 –National Scenic and Historic Trail Administration (Public)

1. <u>Explanation of Material Transmitted</u>: This release transmits the second of three manuals in the National Trails System manual series (BLM Manuals 8353, 6250, and 6260/6270). This manual addresses specific functions delegated to the BLM from the Secretary of the Interior pursuant to the National Trails System Act. Specifically, this manual describes how to conduct National Scenic or Historic Trail Feasibility Studies, how to administer a National Scenic or Historic Trail upon designation by Congress, and the responsibilities of National Scenic or Historic Trail Administrators. This manual also identifies data and records management requirements.

2. <u>Reports Required</u>: None.

3. <u>Material Superseded</u>: None.

4. <u>Filing Instructions</u>: File as directed below.

REMOVE
None

INSERT
6250
(Total 40 sheets)

/s/ Mike Pool
Acting Director,
Bureau of Land Management

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

## Table of Contents

**CHAPTER 1. OVERVIEW** ................................................................................................... 1-1

1.1 PURPOSE ..................................................................................................................... 1-1

1.2 OBJECTIVES ................................................................................................................ 1-2

1.3 AUTHORITY ................................................................................................................ 1-3

1.4 RESPONSIBILITY .......................................................................................................... 1-3

1.5 REFERENCES ............................................................................................................... 1-6

1.6 POLICY ....................................................................................................................... 1-7

    A.  STATEMENT OF PROGRAMMATIC POLICY ............................................................. 1-7

    B.  NATIONAL TRAIL FEASIBILITY STUDY ................................................................. 1-12

    C.  NATIONAL TRAIL ACTIVATION ........................................................................... 1-13

    D.  NATIONAL TRAIL ADMINISTRATION .................................................................... 1-13

        1. NATIONAL TRAIL ADMINISTRATOR ..................................................................... 1-13

        2. NATIONAL TRAIL INVENTORY AND MONITORING ................................................. 1-18

        3. TRAILWIDE COMPREHENSIVE PLANNING ............................................................. 1-19

        4.  TRAILWIDE COMPREHENSIVE PLAN IMPLEMENTATION ......................................... 1-24

1.7 FILE AND RECORDS MAINTENANCE ........................................................................... 1-24

1.8 DATA STANDARDS AND MANAGEMENT ..................................................................... 1-25


GLOSSARY OF TERMS ...................................................................................................... G-1

APPENDIX 1 – NATIONAL TRAILS AND CORRESPONDING ADMINISTERING AGENCIES ............ A-1

APPENDIX 2 – NATIONAL TRAIL DESIGNATION PROCESS ...................................................... A-2

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-1

## Chapter 1.  Overview

National Scenic and Historic Trails (National Trails) are authorized and designated only by Act of Congress.  Congress may authorize the BLM, through the Secretary, as the agency most likely to administer a designated trail, to make studies for the purpose of determining the feasibility and desirability of designating other trails as National Scenic or National Historic Trails (National Trail Feasibility Study).

The Secretary charged with National Trail administration following congressional designation of a trail executes requirements under the National Trails System Act (NTSA), which may include establishing an advisory council for each trail, completing a trailwide Comprehensive Plan, and leading efforts to develop the trail in coordination with land managing agencies. National Trail administration responsibilities are fulfilled as directed in the NTSA in coordination with tribes; other National Trail Administrators; National Trail managing agencies (including all BLM public land managers along the congressionally designated National Trail); other Federal, state, and local government agencies; private and nonprofit organizations; willing landowners; land users; and individuals (herein referred to as tribes, affected agencies, willing landowners, partners, and interested parties).

One of the purposes of the NTSA is to encourage public/private partnerships as a founding principle. Interested publics or grassroots organizations work on, help identify the location of, and assist in managing a subject trail along with the agencies responsible for administration and management of the trail area.

1.1  Purpose

   A.   This manual is provided to fulfill the requirements of and achieve the policy and purposes set forth in the NTSA in concert with other supporting laws and policies, including:

   1.  Establishing trails within scenic areas and along historic travel routes of the Nation, often remotely located, to provide for the ever-increasing outdoor recreation needs of an expanding population, and to promote the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas, and historic resources of the Nation.

   2.  Providing the means for attaining these objectives by instituting a national system of recreation, scenic, and historic trails, and by prescribing the methods by which, and standards according to which, additional components may be added to the system (see BLM Manual 8353 for National Recreation, Water, and Connecting and Side Trails policy).

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-2

3.  Encouraging and assisting volunteer citizen involvement in planning, development, maintenance, and management, where appropriate, of trails.

B.   This manual provides the Bureau of Land Management (BLM) policy and program guidance on administering congressionally designated National Trails as assigned by the Department of the Interior within the National Landscape Conservation System (NLCS) and  this manual describes the BLM's roles, responsibilities, agency interrelationships, and policy requirements for National Trail Administrators.

C.   This manual provides the BLM policy and program guidance conducting National Scenic or Historic Trail Feasibility Studies, and for initiating official notification of the designation of a National Trail including the BLM's responsibility for administration and management of the trail (commonly referred to as "activation" of a designated Trail).

1.2   Objectives

1.  Comply with the requirements of the NTSA, trail enabling legislation, and other laws and policies and provide methods, standards, and training for achieving National Trail purposes.

2.  Administer National Trails as components of the National Trails System within the organizational structure of the BLM's NLCS.

3.  Safeguard the nature and purposes of designated National Trails through effective trailwide leadership for inventory, monitoring, planning, administration, management, land or easement acquisition, protection, development, maintenance, training, and operations (stewardship responsibilities).

4.  Encourage National Trail managers to conserve, protect, and restore National Trails.

5.  Encourage trail managers to provide for the enjoyment and appreciation of the resources, qualities, values, and associated settings and primary use or uses for which a National Trail was designated.

6.  Encourage trail managers to provide for the enjoyment and appreciation of the resources, qualities, values, and associated settings and primary uses within the National Trail Right-of-Way.

BLM MANUAL

Rel. 6-133
Date:  07/13/2012

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-3

7. Administer the diverse network of designated trails and associated National Trail Rights-of-Way by encouraging and assisting volunteer citizen, community, and partnership involvement.

8. Develop and maintain relationships, and collaborate and coordinate with tribes, affected agencies, willing landowners, partners, and interested parties.

9. Establish agency requirements for conducting National Trail Feasibility Studies and activating National Trail responsibilities upon designation.

1.3    Authority

1.    National Trails System Act of 1968, as amended (16 U.S.C. 1241-1251)

2.    Federal Land Policy and Management Act (FLPMA) of 1976, as amended (43 U.S.C. 1701 *et seq.*)

3.    Omnibus Public Land Management Act of 2009 (16 U.S.C. 7201-7203)

4.    National Historic Preservation Act of 1966, as amended (16 U.S.C. 470)

5.    National Environmental Policy Act (NEPA) of 1969, as amended (42 U.S.C. 4321 *et seq.*)

6.    Historic Sites Act of 1935, as amended (16 U.S.C. 461-467)

7.    Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460I-4 through 460I-11)

8.    Federal Advisory Committee Act of 1972, as amended (5 U.S.C. Appendix 2 1-16)

9.    Department of Transportation Act of 1966, as amended (49 U.S.C. 1653(f))

1.4    Responsibility

A.    *The Director, Bureau of Land Management*, through the Assistant Director, National Landscape Conservation System and Community Partnerships, is responsible for:

1. Developing the budget and establishing policy to effectively administer National Trails.

2. Coordinating the National Trails budget and policy with other BLM programs and other Federal agencies.

BLM MANUAL                                                                                  Rel. 6-133
                                                                                              Date:  07/13/2012

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-4

3. Developing and maintaining relationships, and collaborating and coordinating with tribes, affected agencies, willing landowners, partners, and interested parties, and participating on the Federal Interagency Council on Trails.

4. Coordinating with other Interior agencies when the Department of the Interior is identified as responsible for administering a trail in the trail enabling legislation.

5. Selecting a lead state for National Trail administration, based on a preponderance of miles and/or the location of National Trail infrastructure, upon notification from the Department that the BLM is charged with National Trail administration.

6. Issuing an Instruction Memorandum that describes the administration responsibilities and policy requirements for the appropriate BLM State Office as Trail Administrator.

7. Directing Washington and State Office review of the trailwide Comprehensive Plan when the BLM is assigned National Trail administration responsibilities (trailwide Comprehensive Plan requirements, derived from NTSA authorities, are not met through the completion of FLPMA Section 202 land use plans. See BLM Manual 6260/6270, FLPMA Section 202 land use planning requirements for National Trails).

8. Coordinating National Trails System annual reports; congressionally or agency-required reports; and reports on National Trail program areas, such as performance, budget, partnership endeavors, workload accomplishments, and operations issues.

9. Providing effective trailwide leadership for National Trail stewardship responsibilities.

10. Implementing Federal Trail Data Standards and providing geospatial and tabular data stewardship and support.

11. If assigned by the Department, conducting National Trail Feasibility Studies, delegating primary responsibility for the study to specific State Office(s), and requesting assistance from the National Operations Center.

B. *State Directors* are responsible for:

1. Implementing budget and policy direction and providing statewide and/or multistate program coordination for administering National Trails.

2. Developing and maintaining relationships, and collaborating and coordinating with tribes, affected agencies, willing landowners, partners, and interested parties.

BLM_0019122

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-5

3. Providing National Trail Administrator and line officer leadership when National Trail administration is assigned to the BLM, including selection of a State Office employee, or qualified delegated staff, to serve as the National Trail Administrator to fulfill National Trail administration responsibilities.

4. Providing administrative and programmatic support to the National Trail Administrator at the State Office, or if delegated, to the Field Office.

5. Jointly serving as National Trail Administrator with another Federal agency when assigned, establishing an equitable operational agreement (e.g., a memorandum of understanding) with other administrating agencies to establish a mutually agreed upon operating framework.

6. Developing trailwide Comprehensive Plans in coordination with tribes, affected agencies, willing landowners, partners, and interested parties; approving the trailwide Comprehensive Plans when assigned National Trail administration; and updating trailwide Comprehensive Plans as policy or resource conditions warrant.

7. Providing effective leadership for trailwide stewardship responsibilities.

8. Preparing and submitting annual reports, including National Trails System annual reports; congressionally or agency-required reports; and reports on National Trail program areas, such as performance, budget, partnership endeavors, workload accomplishments, and operations issues.

9. Assigning National Trail data steward responsibilities.

10. Establishing and maintaining National Trail serialized case files and ensuring the National Trail is recorded on the Master Title Plats.

11. Implementing Federal Trail Data Standards and providing geospatial and other database support.

12. Conducting National Trail Feasibility Studies, when assigned, in coordination with other affected BLM states and requesting assistance for such studies from the National Operations Center.

BLM_0019123

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-6

C. *District and Field Managers* are responsible for:

1. If National Trail administration is delegated, following the responsibilities of State Directors described in 1.4. B. of this manual section, assigning the designated National Trail(s) to the appropriate staff, and serving as line officer for National Trail administration.

2. Conducting roles and responsibilities consistent with the level of authority delegated to the State Office to ensure trailwide leadership and streamlined agency functionality.

1.5   References

1. Executive Order 13195, Trails for America in the 21st Century

2. Secretarial Order 3308, Management of the National Landscape Conservation System

3. Secretarial Order 3319, Establishment of a National Water Trails System

4. Departmental Manual, Part 710, National Rivers and Trails Systems

5. BLM Manual 1203, Delegation of Authority

6. BLM Manual 1601, Land Use Planning

7. BLM Manual 1626, Travel and Transportation Management

8. BLM Manual 6120, Congressionally Required Maps and Legal Boundary Descriptions for National Landscape Conservation System Designations

9. BLM Manual 6260/6270, National Scenic and Historic Trails Management

10. BLM Manual 8100, The Foundations for Managing Cultural Resources

11. BLM Manual 8320, Planning for Recreation and Visitor Services

12. BLM Manual 8353, Trail Management Areas – Secretarially Designated National Recreation, Water, and Connecting and Side Trails

13. BLM Manual 8400, Visual Resource Management

BLM_0019124

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-7

14. BLM Handbook, 1283-1, Data Administration and Management

15. BLM Handbook 1601-1, Land Use Planning

16. BLM Handbook 1790-1, National Environmental Policy Act

17. BLM Handbook 8120-1, General Procedural Guidance for Native American Consultation

18. BLM Handbook 8342-1, Travel and Transportation Management

19. BLM Handbook 9114-1, Trails

20. Federal Geographic Data Committee, Federal Trail Data Standards, FGDC-STD-017-2011

21. The National Landscape Conservation System 15-Year Strategy, 2010-2025: The Geography of Hope

22. National Scenic and Historic Trails Strategy and Work Plan, 2006

23. Trails for America: Report on the Nationwide Trails Study, 1966

24. The National Trails System Interagency Memorandum of Understanding

25. Applicable Trailwide Comprehensive Plans

1.6   Policy

   A.   *Statement of Programmatic Policy*

BLM MANUAL

Rel. 6-133
Date:  07/13/2012

BLM_0019125

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-8

1.  Once a trail is designated by Congress, the National Trail Administrator, shall identify and determine the nature and purposes of National Trails, select National Trail Rights-of-Way, and establish goals and objectives within trailwide Comprehensive Plans to safeguard the nature and purposes of assigned National Trails, provide for maximum compatible outdoor recreation potential, and protection, conservation and enjoyment of the nationally significant scenic, historic, natural, and cultural qualities of the areas and associated settings through which such trails may pass, as well as the primary use or uses of the trail.  The National Trail Administrator shall encourage and assist tribes, affected agencies, willing landowners, and interested parties in the planning, management, education, and interpretation of National Trails.  The National Trail Administrator shall provide trailwide leadership and guidance for trailwide stewardship responsibilities (see Appendix 1 for display of National Trails and corresponding administering agencies).

2.  The National Trail Right-of-Way (see glossary) is selected by the National Trail administering agency in the trailwide Comprehensive Plan and includes the area of land that is of sufficient width to encompass National Trail resources, qualities, values, and associated settings in order to further the purposes for which the trail was designated by Congress.  In selecting the right-of-way, the BLM, through the Secretary, shall include the resources, qualities, values, and associated settings, (comprised of the scenic, historic, cultural, recreation, natural, and other landscape values of the land areas through which such National Trails may pass), and the primary use or uses.

i.  *National Scenic Trails*

a.  The National Trail administrator will select the location of the National Scenic Trail Right-of-Way based on the congressionally designated route:

(1) to represent desert, marsh, grassland, mountain, canyon, river, forest, and other areas, as well as landforms that exhibit significant characteristics of the physiographic region.

(2) which best provides a continuous, sustainable, and premier trail-related experience that safeguards the nature and purposes for which the National Trail was established.

b.  The National Trail Administrator shall identify, inventory, plan for, and protect National Scenic Trail for public use and enjoyment.

BLM_0019126

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-9

   c.  Criteria for location of the National Scenic Trail Right-of-Way for a National Scenic Trail designated by Congress include the highest possible scenic value; relative freedom from intrusion; maximum retention of natural conditions, scenic and historic features, and primitive character of the trail area; sustainable trail and resource conditions; opportunities for high-quality primitive non-motorized recreation experiences, including providing, where appropriate, campsites, shelters, and related-public-use facilities and to provide continuous and sufficient public access; and avoidance of, so far as practicable, highways, motor roads, mining areas, energy transmission lines, commercial and industrial developments, range fences and improvements, private operations, and any other foreseeable activities that would be incompatible with the protection of the trail in a natural condition and use for primitive outdoor recreation experiences. In selecting the rights-of-way full consideration shall be given to minimizing the adverse effects upon the adjacent landowner or user and his operation.

  ii.  *National Historic Trails*

   a.  National Historic Trails are generally designated by Congress as a continuous route, but the established or developed National Historic Trail and selected trail right-of-way need not be located as such on the ground (see Section 3(3) NTSA, Designation of such trails or routes shall be continuous, but the established or developed trail, and the acquisition thereof, need not be continuous onsite).

   b.  In selecting the Right-of-Way for a National Historic Trail, the National Trail Administrator shall follow as closely as possible and practicable the original trails or routes of travel of national historic significance to maximize vicarious experiences and resource protection.

   c.  The National Trail Administrator shall identify, inventory, plan for, and protect high potential historic sites and high potential route segments and the historic route and historic remnants and artifacts for public use and enjoyment. High potential historic sites and high potential route segments shall be included within the selected National Trail Right-of-Way during trailwide Comprehensive Planning and/or updates.

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-10

 (1) *High potential historic sites* shall be identified and included within the trailwide Comprehensive Plan when related or in close proximity to the route and which provide opportunities to interpret the historic significance of the trail during the period of its major use. The criteria for consideration of sites as high potential historic sites include historic significance, presence of visible historic remnants, scenic quality, and relative freedom from intrusion.

 (2) *High potential route segments* shall be identified and included within the trailwide Comprehensive Plan as segments of a trail which would afford a high-quality recreation experience in a portion of the route having greater than average scenic values or affording an opportunity to vicariously share the experience of the original users of a historic route.

 d. The National Trail Administrator shall encourage National Historic Trail public land managing agencies to manage high potential historic sites and high potential route segments in a manner which protects the historic significance of the trail and the identified values.  For Federal agencies, high potential historic sites and high potential route segments are called Federal Protection Components (see glossary).

 e. National Historic Trails shall be assumed to contain properties eligible for the National Register of Historic Places, pending evaluations of the significance of specific trail sites or segments according to the National Register criteria, and may qualify as Federal Protection Components.

3. The National Trail Administrator shall identify, determine, and describe the nature and purposes of the National Trail and provide strategic direction for safeguarding the nature and purposes within the trailwide Comprehensive Plan, in coordination with participating public land managing agencies. The nature and purposes of a National Trail are the character, characteristics, and the congressional intent for a designated National Trail, including the resources, qualities, values, and associated settings of the areas through which such trails may pass; primary use or uses of a National Trail; and activities promoting the preservation of, public access to, travel within, and enjoyment and appreciation of a National Trail.

BLM_0019128

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-11

4.  The National Trail Administrator shall establish measures and recommendations through the trailwide Comprehensive Plan, in coordination with participating public land managing agencies, to guide the uses on the Trail that will not cause substantial interference with the nature and purposes of the National Trails, and the National Trail administrator shall encourage and assist National Trail managers in efforts to avoid activities incompatible with the purposes for which such trails were established.

5.  The National Trail Administrator shall encourage and assist National Trail public land managers and willing landowners to manage the National Trails and the areas through which such National Trails may pass in a manner that protects the national significance of the trails.

6.  National Trails are nationally significant by virtue of congressional designation under the NTSA.

   i.   National Scenic Trails are established to provide for maximum outdoor recreation potential, and for the conservation and enjoyment of the nationally significant scenic, historic, natural, or cultural qualities of the areas through which such trails may pass, and may be located so as to represent the landform characteristics of the physiographic regions of the nation.

   ii.  National Historic Trails follow as closely as possible and practicable the original trails or routes of travel of national historical significance, and have as their purpose the identification and protection of the historic route and its historic remnants and artifacts for public use and enjoyment.

7.  The National Trail Administrator shall encourage and assist National Trail public land managers and willing landowners to provide a premier, sustainable trail and premier trail-related experience that safeguards the nature and purposes of the National Trail.

8.  When requested by a National Trail public land managing agency, or as a cooperating agency, the National Trail Administrator will participate in the environmental review of any plan and/or activity that has the potential to cause substantial interference, incompatibility, or significant adverse impact to the National Trail.  The National Trail Administrator shall provide recommendations regarding actions to prohibit, minimize, or mitigate impacts in order to prevent substantial interference or significant adverse impact to the nature and purposes of the National Trail. Recommendations shall be documented and formally provided to the National Trail public land managing agency.

BLM_0019129

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-12

9. National Trail administration responsibilities shall be fulfilled as directed in the NTSA in cooperation with tribes, affected agencies, willing landowners, partners, and interested parties, and the National Trail Administrator shall ensure adequate public involvement in administration activities through established NEPA and planning processes.

B. *National Trail Feasibility Study*

1. The BLM shall complete National Trail Feasibility Studies or study revisions assigned to the agency by the Department of the Interior. Such studies shall be completed in accordance with the National Trail Feasibility Study requirements in Section 5(b) of the NTSA and the criteria and provisions in this manual, including:

    i. Assigning primary responsibility for the National Trail Feasibility Study to a State Office, with assistance for such studies provided by the National Operations Center.

    ii. Identifying, determining, and describing the nature and purposes of the trail within the National Trail Feasibility Study.

    iii. Including trail descriptions, maps, images, illustrations, and consideration of standards for boundary evidence certificate(s) when recommending a proposed route. The maps and descriptions shall be prepared using Federal Trail Data Standards and related national geospatial standards so the maps and descriptions can be readily used and become official upon National Trail designation.

    iv. Identifying public land areas adjacent to or along proposed trails with cultural modifications, such as features of the built environment, which support or detract from National Trail-caliber resources, qualities, values, and associated settings or the primary use or uses.

    v. Preparing the appropriate environmental document, such as an environmental assessment or environmental impact statement, for the National Trail Feasibility Study in accordance with Section 102 of NEPA.

    vi. Ensuring consultation with and encourage participation of tribes, other affected agencies, partners, and interested parties, including willing landowners and land users (see Appendix 2 for the National Trail Designation Process, including conducting the National Trail Feasibility Study).

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-13

2.   The BLM shall submit the final study to Congress through the Secretary of the Interior and recommend to the Secretary the agency or agencies best suited for the National Trail administration role under guidelines in Departmental Manual Part 710.

C.   *National Trail Activation.* Activation is the official notification required for newly designated National Trails, including program organization, delegation, transmittal of program policy requirements, and reporting. Activation is required in accordance with the responsibilities outlined in this manual at the Washington Office level (see section 1.4. A. of this manual).

D.   *National Trail Administration.*   Trailwide responsibility is assigned to the BLM or the National Park Service by the Secretary of the Interior when the Department of the Interior is named as the responsible lead in National Trail-specific legislation.  This responsibility involves trailwide coordination, guidance, technical assistance, and consultation to National Trail managers that have physical site management responsibility.  National Trail administration responsibilities are fulfilled as directed in the NTSA in coordination with tribes; other National Trail Administrators; National Trail managing agencies (including all BLM public land managers along the congressionally designated National Trail); other Federal, state, and local government agencies; private and nonprofit organizations; willing landowners; land users; and individuals.  National Trail administration includes leadership in the development of the statutorily required trailwide Comprehensive Plan, which provides strategic direction for National Trail administration and management, including identification of the nature and purposes of the National Trail and selection of the National Trail Right-of-Way.

1.   *National Trail Administrator.* The National Trail Administrator is the individual delegated the responsibility to conduct National Trail administration when the BLM or National Park Service is assigned this responsibility by the Secretary of the Interior (see National Trail Administration).  Every congressionally designated National Trail is assigned a National Trail Administrator.  The responsible agency assigns the role to an individual to perform National Trail administration duties (BLM Manual 1203, Delegation of Authority).  The individual assigned the National Trail administration role, must carry out the following responsibilities.

i.   *Advisory Council*
   a.   The National Trail Administrator shall establish and support a National Trail advisory council according to the requirements described in the NTSA or trail enabling legislation. The National Trail Administrator may use advisory councils established through FLPMA in compliance with the Federal Advisory Committee Act, provided that the NTSA and the enabling legislation advisory council requirements are met.

BLM MANUAL

Rel. 6-133
Date:  07/13/2012

BLM_0019131

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-14

ii.  *Cooperative Relationships, Agreements, and Financial Assistance*

    a.  The National Trail Administrator shall coordinate with, consult, and assist cooperating Federal, state, and local government agencies to encourage the development and implementation of provisions for compatible land practices, including guidance for stewardship responsibilities on portions of the trail located both on and off public lands, through the use of memorandums of understanding, cooperative agreements, volunteer agreements, or appropriate instruments (agreements).

    b.  The National Trail Administrator may facilitate efforts to transfer stewardship responsibilities between Federal agencies if the transfer is the most appropriate mechanism to accomplish the purposes of the NTSA. Any transfer shall occur through an agreement, must significantly enhance National Trail operations, and must support the National Trail nature and purposes.

    c.  The National Trail Administrator may initiate, enter into, and manage agreements for the purpose of fulfilling stewardship responsibilities, including cooperative agreements to grant or transfer limited financial assistance to partners to achieve National Trail purposes.

    d.  The National Trail Administrator shall encourage state and local government agencies to enter into written agreements with willing landowners, private organizations, or individuals, to promote management of the congressionally designated trail and the selected National Trail Right-of-Way, including efforts to acquire lands or interests in lands within or outside of the National Trail Right-of-Way pursuant to the Section 7 of the NTSA.

    e.  The National Trail Administrator may work with willing sellers and potential land managers to facilitate acquisition, through exchange, donation, and purchase, of lands or interests in lands within the selected National Trail Right-of-Way.

    f.  The National Trail Administrator may support willing landowners in efforts to donate or otherwise convey real property interests to qualified organizations for the conservation purpose of preserving or enhancing the resources, qualities, values, or associated settings of the National Trails.  These donations or conveyances may include public access grants, open space, scenic, or conservation easements. The National Trail Administrator may offer such support by providing:

BLM_0019132

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-15

(1) Letters of support.  Letters may support the efforts to donate or convey real property interests, and must not endorse the organization.

(2) Descriptions of how securing real property interests will help achieve the nature and purposes of the National Trail.

(3) Descriptions of why the property is important in achieving National Trail purposes.

(4) Surveys of the property.

(5) Inventories of the resources, qualities, values, and associated settings and primary use or uses of the property.

(6) Property value estimates.

(7) Case file work.

g.  The National Trail Administrator may encourage willing landowners to work with federal land managing agencies and the State Historic Preservation Officer to determine the eligibility of National Historic Trail properties and/or to nominate eligible National Historic Trail properties located on the subject lands for listing on the National Register of Historic Places.

h.  The National Trail Administrator shall initiate discussions with affected states and the political subdivisions to encourage development and implementation by such entities of appropriate measures to protect willing landowners from trespass resulting from trail use and from unreasonable personal liability and property damage caused by trail use.

i.  The National Trail Administrator may encourage and assist partner participation and provide technical assistance to willing landowners, private organizations, individuals, and volunteers in fulfilling stewardship responsibilities.

j.  The National Trail Administrator may provide education and training to tribes, public land managing agencies, partners, and volunteers on methods of National Trail stewardship.

BLM_0019133

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-16

   k.  The National Trail Administrator may provide Federal facilities, equipment, tools, and technical equipment to volunteers and volunteer organizations to achieve National Trail purposes through cooperative agreements.

   l.  The National Trail Administrator may provide for resource conservation, protection, and restoration by developing trailwide interagency guidelines and regulations, as conditions warrant and in cooperation with agency partners.

iii.  *Certification for National Historic Trails.* The National Trail Administrator shall establish a voluntary National Trail certification program to officially recognize trail resources, qualities, values, and associated settings on non-Federal lands (state and local government and private) in cooperation with willing landowners. In addition to the requirements identified in Section 3 of the NTSA, the National Trail Administrator shall:

   a.  Describe the certification process, requirements, and criteria for certification within the trailwide Comprehensive Plan, or reference a nationally approved process.

   b.  Certify non-Federal segments that meet the National Historic Trail criteria established in a Feasibility Study pursuant to Section 5(b) of the NTSA, and other supplemental criteria in the trailwide Comprehensive Plan, through voluntary, nonbinding, and written certification agreements.

   c.  Offer technical assistance for the certified property including site conservation, protection, restoration, planning, design and development, visitor use management, research, and marking with signs.  If warranted, the National Trail Administrator may offer limited funding assistance, in accordance with applicable law.

   d.  Include a statement in the certified property file which describes how the segment meets the National Historic Trail criteria and other criteria identified in the trailwide Comprehensive Plan.

iv.  *Interpretation, Education, and Uniform Trail Marking.* In addition to the requirements in Sections 3, 5, and 7 of the NTSA and in a manner that will not substantially interfere with the nature and purposes of the trail, the National Trail Administrator shall facilitate trail interpretation and uniform trail marking and signing programs.

BLM_0019134

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-17

a. The National Trail Administrator shall provide planning, design, production assistance, and trailwide consistency for National Trail interpretation and education, and the National Trail Administrator shall proactively share National Trail information with the public.

b. In coordination with affected trail interests, the National Trail Administrator shall establish a distinctive uniform mark for each National Trail under administration pursuant to Section 7(c) of the NTSA (see glossary) and protect the mark as a Federal insignia under 18 U.S.C. 701. The design, lettering, format, installation, and maintenance of these markers shall conform to National Trails System standards used by Federal agencies that administer and manage National Trails.

c. The National Trail Administrator shall coordinate with the National Trail public land managing agency to ensure trail markers and signage on Federal lands are erected and maintained according to agency standards. Where trails cross non-Federal lands, uniform trail markers and signs shall be provided, installed, and maintained in accordance with written agreements with willing landowners. Uniform trail markers and signs must not be used or placed as property boundary identifiers.

d. For National Historic Trails, the National Trail Administrator shall coordinate the uniform trailwide marking and signing process for not only the National Historic Trail, but also existing parallel public roads and auto tour routes, to facilitate retracement of and commemorate the historic route.

e. The National Trail Administrator, where necessary, may provide guidance to public land managing agencies and willing landowners in signing the boundaries of the National Trails. All property boundary markings will be to agency standards.

v. *Studies, Reports, and Funding*

a. The National Trail Administrator may prepare special studies and documentation for National Trails, and may conduct National Trail-related research projects.

b. The National Trail Administrator shall prepare and submit annual reports, including National Trails System annual reports; congressionally or agency-required reports; and reports on National Trail program areas, such as performance, budget, partnership endeavors, workload accomplishments, and operations issues.

BLM_0019135

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-18

    c.  The National Trail Administrator shall implement standard agency program procedures by identifying, requesting, managing, and accounting for the necessary funding needed to administer each National Trail to meet performance standards.

  vi.  *Official Map*

    a.  The National Trail Administrator shall maintain the official map and descriptions of the congressionally designated trail, in accordance with this policy, and the National Trail Administrator shall make the map available for public inspection as directed in the enabling legislation.

    b.  The National Trail Administrator shall maintain a map and descriptions of the selected National Trail Right-of-Way or any substantial relocation, after publication in the Federal Register.  Maps of minor relocations may be maintained by the National Trail Administrator.

    c.  Copies of the official map of the congressionally designated trail and National Trail Right-of-Way map(s) shall be provided to affected National Trail public land managing agencies for use in land use planning and management.

    d.  Duplicate copies of the official map and description shall be provided to the BLM Eastern States Office.

2.  *National Trail Inventory and Monitoring*

    i.  As part of the trailwide Comprehensive Planning process, National Trail Administrator shall identify, list, and map high potential historic sites and high potential route segments of National Historic Trails.

   ii.  The National Trail Administrator, to the extent practicable, shall conduct a viewshed analysis in cooperation with land managing agencies to inform the selection of the required National Trail Right-of-Way for the trailwide Comprehensive Plan. Refer to BLM Manual 6260/6270 for inventory and monitoring processes.

  iii.  The National Trail Administrator shall encourage and assist tribes, affected agencies, willing landowners, partners, and interested parties by providing guidance and entering into agreements regarding inventory, monitoring, and data or database management for National Trail or National Trail resources, qualities, values, and associated settings and the primary use or uses.

BLM_0019136

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-19

iv.  The National Trail Administrator shall assist land managing agencies in assessing land status, identifying opportunities to improve connectivity and manageability, and facilitating sufficient access to and transportation along the National Trails.

v.  The National Trail Administrator shall encourage public land managing agencies to use the Federal Trail Data Standards, and related national geospatial standards, during the inventory and monitoring process, and shall encourage land managing agencies to document inventory and monitoring data according to policy standards.

3.  *Trailwide Comprehensive Planning*

i.  The National Trail Administrator shall lead the interagency effort to develop, or update, as policy or resource conditions warrant, the statutorily required trailwide Comprehensive Plan, public participation, and accompanying environmental document, following the requirements of NEPA and Section 5 of the NTSA (see special requirements for Continental Divide National Scenic Trail, NTSA Sections 5(e) and 5(f)).

ii.  Upon designation of a trail by Congress, the National Trail Administrator shall incorporate the nature and purposes (see glossary) description, and a description of the characteristics that make the proposed trail worthy, including the national historic significance, of National Trail designation from the National Trail Feasibility Study into the trailwide Comprehensive Plan.

iii.  The National Trail Administrator shall incorporate management decisions regarding protection, sufficient access, transportation, and land or easement acquisition planning and criteria into the trailwide Comprehensive Plan. The Comprehensive Plan shall include consideration of the protection of the nature and purposes of the National Trail and the resources, qualities, values, and associated settings and primary use or uses; consistency with regulations and policy; and improvement of National Trail connectivity and/or manageability.

BLM_0019137

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-20

iv.   The National Trail Administrator shall select a National Trail Right-of-Way in the trailwide Comprehensive Plan based on the general route location designated by Congress and the best available resource data.  The selection of the National Trail Right-of-Way shall be in conformance with the Statement of Programmatic Policy described in this manual and shall be consistent with the nature and purposes of the National Trail. The location and width of such National Trail Rights-of-Way across Federal lands under the jurisdiction of another Federal agency shall be by agreement with the affected agencies. In selecting the National Trail Right-of-Way for trail purposes, the National Trail Administrator shall obtain the advice and assistance of tribes, affected agencies, willing landowners, partners, and interested parties.

a.   The selected National Trail Right-of-Way boundary may encompass all lands that contain National Trail resources, qualities, values, and associated settings. In selecting the rights-of-way full consideration shall be given to minimizing the adverse effects upon the adjacent landowner or user and this operation.  While private lands may be included within the selected National Trail Right-of-Way, they are not subject to Federal management, and reasonable access must be provided. The National Trail Administrator may identify high value land areas within the selected National Trail Right-of-Way on private lands, and plan to work with any willing landowners, through agreement, for use of private lands for trail purposes. Development and management of each segment of the National Trails System shall be designed to harmonize with and complement any established multiple-use plans for that specific area in order to insure continued maximum benefits from the land.

b.   The National Trail Administrator shall ensure the National Historic Trail Right-of-Way and the Continental Divide National Scenic Trail (see NTSA Sections 5(e) and 5(f)) includes all high potential historic sites and high potential route segments.

c.   After selection of the National Trail Right-of-Way in the approved trailwide Comprehensive Plan, the BLM shall publish notice of the availability of appropriate maps or descriptions in the Federal Register.

d.   If the National Trail Right-of-Way was not selected in an existing trailwide Comprehensive Plan, the National Trail Administrator shall revise or update the trailwide Comprehensive Plan to incorporate a selected National Trail Right-of-Way and publish notice of the availability of appropriate maps or descriptions in the Federal Register.

BLM_0019138

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-21

e.  The National Trail Administrator shall follow the specific requirements identified in Sections 5 and 7 of the NTSA, and consider the following when selecting the National Trail Right-of-Way:

(1)  The National Trail Feasibility Study Reports, enabling legislation, legislative history, or other relevant documentation.

(2)  The presence of the resources, qualities, and values and primary use or uses for which the National Trail was designated, as well as cultural modifications that may add to or detract from the National Trail.

(3)  The capability to develop and manage each segment, and the capability to design the National Trail Right-of-Way in a manner that harmonizes and complements, to the extent practicable, established multiple-use plans for the specific area, to ensure continued maximum benefits from the land.

(4)  The compatibility of National Trail management with proposed, potential, and current uses of the land.

(5)  Input from other agencies, adjacent landowners, and stakeholder interests.

(6)  Potential adverse impacts upon adjacent landowners, users, or operations.

(7)  For National Historic Trails, the National Trail Rights-of-way:

(i)  Need not be continuous.

(ii)  May encompass, if part of the congressionally designated route, high potential historic sites and high potential route segments as satellite areas that are separated from the primary corridor. Satellite areas may include landmark features observed by early travelers or similar circumstances that warrant inclusion and protection.

(8)  Criteria and/or considerations for National Trail Right-of-Way relocations include land acquisition, easements, or exchanges, and other manageability factors.

BLM_0019139

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-22

v.   The National Trail Administrator shall, within the trailwide Comprehensive Plan and with the concurrence of the head of the Federal agency that has jurisdiction over the lands involved, identify considerations for the relocation of the selected National Trail, including:

a.   What constitutes major and minor relocation of the National Trail;

b.   Protection of related at-risk cultural or natural resources.

c.   Recognition that a substantial relocation of the National Trail Right-of-Way shall be through an Act of Congress.

d.   Allowance for minor trail relocations, such as for resource protection (see BLM Manual 6260/6270, planning section), that may be facilitated through agency land use planning in consultation with tribes, affected agencies, willing landowners, partners, and interested parties.

e.   Determination that relocation is necessary to safeguard the nature and purposes of the National Trail.

f.   A determination that the relocation is necessary to  promote a sound National Trail management program, in accordance with established multiple-use principles, provided, that a substantial relocation of the rights-of-way for such trail shall be by Act of Congress

vi.   The National Trail Administrator shall identify and map the selected National Trail Right-of-Way in the trailwide Comprehensive Plan, including the identified high potential historic sites and high potential route segments; and prepare the National Trail Right-of-Way map and description for the required Federal Register notice.

vii.   The National Trail Administrator shall address National Trail administration-level functions in the trailwide Comprehensive Plan.

viii.   The National Trail Administrator shall, within the trailwide Comprehensive Plan and with the concurrence of the head of the Federal agency that has jurisdiction over the lands involved, identify a process to determine and approve final National Scenic Trail alignments.

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-23

ix.   The National Trail Administrator shall, for National Trails, propose exemplary Connecting and Side Trails that adjoin two points along a National Trail, provide additional points of public access between or to National Trails, or provide additional single points of public access to special features along such trails, within the trailwide Comprehensive Plan, after consultation with the National Trail manager(s).  Evaluation and recommendation of Connecting and Side Trails shall occur in accordance with the provisions established in M-8353 and any supplemental guidance or instruction developed nationally.

x.   The National Trail Administrator shall, for National Historic Trails, identify through the Comprehensive National Trail planning process auto tour routes within the trailwide Comprehensive Plan to retrace and commemorate the historic route, to the extent practicable.  Auto tour routes shall normally be restricted to existing all-weather roads or paved highways.  Developed trails to facilitate route retracement may also be considered to provide for maximum vicarious and resource protection.

xi.   The National Trail Administrator shall publish the notice of availability of the selected National Trail Right-of-Way maps and descriptions in the Federal Register concurrently with the draft and final trailwide Comprehensive Plan and NEPA document. The authorizing officer for the Federal Register notice is the State Director with delegated National Trail administration responsibilities.

xii.   The trailwide Comprehensive Plan may be updated based on new information discovered by the National Trail Administrator or provided to the National Trail Administrator by public land managing agencies, landowners, or the public such as the following:

   a.   For National Scenic Trails, the trailwide Comprehensive Plan may be updated based on optimal route location reviews, relocation of the National Trail Right-of-Way, subsequent selection of the deferred National Trail Right-of-Way, acquisition of key properties, or other purposes.

   b.   For National Historic Trails, the trailwide Comprehensive Plan may be updated based on data regarding high potential historic sites, high potential route segments, National Register eligible properties, acquisition of key properties, relocation of the National Trail Right-of-Way, or for other purposes.

      (1)   Federal Protection Component recommendations determined through public land managing agency inventories must be considered and updated in the trailwide Comprehensive Plan.

BLM MANUAL

Rel. 6-133
Date:  07/13/2012

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-24

4. *Trailwide Comprehensive Plan Implementation*

i. The National Trail Administrator shall implement the trailwide Comprehensive Plan, in consultation and coordination with public land managing agencies, interested stakeholders, and willing landowners.

ii. The National Trail Administrator shall work with National Trail public land managing agencies, interested stakeholders, and willing landowners on the incorporation of trailwide Comprehensive Plan provisions into agency land use plans, to the extent possible, and if not already incorporated. Trailwide Comprehensive Plan provisions include management objectives for the selected National Trail Right-of-Way, descriptions of high potential historic sites and high potential route segments, and non-Federal certified site or segment objectives.

1.7   File and Records Maintenance

A. National Trail Administrators must establish and maintain National Trail serialized case files according to this manual and BLM Manual 6120, as applicable. Recordkeeping requirements are mandated by Executive Orders 12866 and 13353, the Paperwork Reduction Act (44 U.S.C. 3501), and the guidelines of the BLM Paperwork Schedule program. The serialized case file shall contain:

1. The official map depicting the congressionally designated trail, a map depicting the selected National Trail Right-of-Way, including boundaries and descriptions, any subsequent change to the selected National Trail Right-of-Way, and any designated Connecting or Side Trails associated with the National Trail.

2. A copy of the NTSA; National Trail-specific enabling legislation; legislative history; the National Trail Feasibility Study; any historic context study and report; National Register eligible, nominated, and listed property information, including completed Multiple Property Documentation Forms; a list and map of high potential historic sites and high potential route segments; the trailwide Comprehensive Plan, including applicable plan updates or revisions, and subsequent implementation plans; and pertinent trail inventory and monitoring data.

3. For the selected National Trail Right-of-Way, either a determination that a boundary evidence review is not required signed by the Authorized Officer, or the appropriate Standards for Boundary Evidence Certificate(s) signed by the State Office Chief Cadastral Surveyor.

BLM_0019142

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-25

4. Detailed information related to the designation and stewardship responsibilities of the National Trails, including agreements.

5. Documentation regarding administration issues associated with the selected National Trail Right-of-Way.

6. Documentation regarding the rationale for recommending National Trail relocation.

B. After a National Trail Right-of-Way is established through the trailwide Comprehensive Plans, the selected National Trail Right-of-Way shall be portrayed on the Geographic Coordinate Data Base.

C. The following maps shall be available for public inspection in the affected BLM offices: the official map depicting the congressionally designated trail, maps of the National Trail Right-of-Way selected through the trailwide Comprehensive Plan, and maps of subsequent relocations.

D. Agency reports shall be prepared and submitted annually, including National Trails System annual reports; congressionally or agency-required reports; and reports on National Trail program areas, such as performance, budget, partnership endeavors, workload accomplishments, and operations issues.

1.8  Data Standards and Management

1. National Trail data stewards shall coordinate data collection, ensure National Trail data are documented in databases, compile and maintain the National Trail serialized case file, and ensure the National Trail is recorded to the Master Title Plats, as applicable.

2. Trail data and data collection, including maps, shall comply with Department of the Interior data management systems, Federal Trail Data Standards, related national geospatial standards, and other data management policies, including those addressing sensitive cultural resources data. Data management shall be consistent with standards outlined in national programmatic agreements, state protocol agreements, and state data sharing agreements.

BLM_0019143

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

1-26

3.  The National Trail Administrator shall conduct uniform mapping through an approved database to manage and track National Trail information related to National Trail Rights-of-Way inventory and monitoring, planning, land status, acquisition of lands or interests in lands, and similar information. The mapping and database shall document National Trail attributes and/or the resources, qualities, values, and associated settings, and primary use or uses, as required by this policy, by other BLM programs, and by interagency applications developed through the Federal Interagency Council on Trails. The BLM shall manage and analyze data, including maps, property records, historic research, and maintenance schedules.

4.  The National Trail Administrator shall share data with various agencies, organizations, partners, and the public according to data sharing agreements and established protocol.

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-1

## Glossary of Terms

### -A-

*activation.*  Term used to initiate official field notification of the designation of a National Trail and/or the National Trail administration role, as assigned, under with the National Trails System Act. Term usage is consistent with the National Park Service.

*associated settings.* The geographic extent of the resources, qualities, and values or landscape elements within the surrounding environment that influence the trail experience and contribute to resource protection.  Settings associated with a National Scenic or Historic Trail include scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape components (see resources, qualities, and values).

*avoid.* Subject to valid existing rights, agency action taken to the greatest extent possible to prohibit, deny, minimize, or mitigate activities on public lands that are incompatible with National Trail purposes under the National Trails System Act (see compatible and incompatible activities).

### -C-

*certification.* The administrative process whereby nonfederally owned properties along National Historic Trails are identified and recognized by the trail administering agency for the historical and/or thematic association with one or more National Historic Trails through signed certification agreement. Certified properties may be eligible for the National Register.

*certification agreement.* A nonbinding agreement between the trail administering agency and one or more partners, including state and/or local government or private land owners. The agreement formalizes a good-faith arrangement to work together toward common purposes for the National Historic Trail, such as conserving, protecting, restoring, and interpreting a historic property.

*compatible activities.* Allowable uses and management actions on public lands that harmonize, or have been minimized or mitigated in order to harmonize, with the National Trail nature and purposes.

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-2

*Comprehensive Plan.* Statutorily required plan providing strategic direction and guidance for the future administration and management of a congressionally designated National Scenic or Historic Trail.  The plan includes identification of the nature and purposes, goals and objectives, high potential sites and high potential segments (historic trails), and the selection of the National Trail Right-of-Way.

*congressionally designated trail route.* Route designated by Congress as the National Trail.  It is depicted on the official map or National Trail Feasibility Study referenced in the National Scenic or Historic Trail enabling legislation. For National Historic Trails, this is the NHT 1 attribute in the Federal Trail Data Standards (see reference section).

*Connecting Trail.* Secretarially designated trails that complement National Recreation, Scenic, or Historic Trails by providing additional points of public access between such trails or connecting to such trails (See Side Trail).

-F-

*Federal Interagency Council on Trails.* A longstanding interagency working group (since 1969, and reestablished by Executive Order 13195 in 2001) operating under an interagency memorandum of understanding with core membership composed of the Department of the Interior, BLM, National Park Service, and Fish and Wildlife Service; the United States Department of Agriculture, Forest Service; the United States Department of Transportation, Federal Highway Administration; and the United States Department of the Army, United States Army Corp of Engineers. The Council's mission is to share information with agency and nonprofit partners, coordinate program decisions, and make policy recommendations among all appropriate Federal agencies to foster the development of America's National Trails System.

*Federal Protection Component.* As described in Section 3 and 12 of the National Trails System Act, selected high potential historic sites and high potential route segments and other land- and water-based components of a designated National Historic Trail located on federally owned land which meet the National Historic Trail criteria listed in the National Trails System Act and are identified in trailwide Comprehensive Plans, Resource Management Plans, and implementation plans.

*Federal Trail Data Standards.* A core set of standardized trail data attributes with corresponding definitions and values applicable to tabular and spatial data, approved by the Federal Geographic Data Committee on September 30, 2011. The standards are applicable to all trails, including National Scenic and Historic Trails, managed by the U.S. Forest Service, National Park Service, U.S. Fish and Wildlife Service, and BLM.

BLM_0019146

Case No. 1:20-cv-02484-MSK   Document 31-7   filed 04/27/21   USDC Colorado   pg 153 of 399

## -H-

*high potential historic site.* Historic sites related to the route or sites in close proximity thereto which provide opportunity to interpret the historic significance of the trail during the period of its major use. The criteria for consideration of sites as high potential historic sites include historic significance, presence of visible historic remnants, scenic quality, and relative freedom from intrusion. High potential historic sites are assumed to contain remnants, artifacts, and other properties eligible for the National Register of Historic Places, pending evaluation.  Under the National Trails System Act, high potential historic sites located on federally owned land are referred to as Federal Protection Components.

*high potential route segment.* Segments of a trail which would afford a high-quality recreation experience in a portion of the route having greater than average scenic values or affording an opportunity to vicariously share the experience of the original users of a historic route. National Historic Trail high potential route segments are assumed to contain remnants, artifacts, and other properties eligible for the National Register of Historic Places, pending evaluation.  Under the National Trails System Act, high potential route segments located on federally owned land are referred to as Federal Protection Components.

*historic context study and report.*  In-depth documentary research on the historic sites and trail segments focused on the period of use.  Documents trail resource research, identification, location, assessment, and evaluation. The information contained in the report is used for planning and is a precursor to the National Register nomination process.

*historic route.* Trail location where historic events are known to have occurred as evidenced by historic remnants or artifacts or through research and subsequent identification. For National Historic Trails, this is the NHT 2 attribute in the Federal Trail Data Standards (see reference section).

## -I-

*identification.* For both National Trail administration and management, the requirement to identify, document, and evaluate National Trail resources, qualities, values, and associated settings, and the primary use or uses, which support the nature and purposes of National Trail designation (see inventory section).

*incompatible use.* An activity that hinders or obstructs the nature and purposes of a designated National Trail (see substantial interference).

BLM_0019147

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-4

-M-

*major relocation.* A significant change in the location of the designated National Trail that would substantially depart from the Congressional route, established National Trail Right-of-Way, or Management Corridor, requiring an Act of Congress.

*Management Corridor.* See National Trail Management Corridor.

*maximum compatible outdoor recreation potential.* A criterion for determining the location of a National Scenic Trail. The recreation potential is tempered by the capacity of the area to sustain such use.

*Multiple Property Documentation Form.* The National Register of Historic Places Multiple Property Documentation Form (NPS 10-900-b) nominates groups of related significant properties for listing on the National Register. The form serves as a basis for evaluating the National Register eligibility of related properties. When nominated and listed in the National Register of Historic Places, the Multiple Property Documentation Form, together with individual registration forms, constitutes a multiple property submission.

-N-

*National Historic Landmark.* Nationally significant historic places designated by the Secretary of the Interior that  possess exceptional value or quality in illustrating or interpreting the heritage of the United States (see National Historic Landmark criteria).

*National Historic Landmark criteria.* A set of criteria used to evaluate the national significance of a property pursuant to the Historic Sites Act of 1935 and the National Historic Preservation Act  (see National Park Service Cultural Resources National Register Bulletin, How to Prepare National Historic Landmark Nominations).

*National Historic Trail.* A congressionally designated trail that is an extended, long-distance trail, not necessarily managed as continuous, that follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a National Historic Trail is the identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment.  A National Historic Trail is managed to conserve, protect, and restore the nationally significant resources, qualities, values, and associated settings of the areas through which such trails may pass, including the primary use or uses of the trail.

BLM_0019148

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-5

*National Historic Trail criteria.* Criteria, established in Section 5(b) of the National Trails System Act which must be addressed within the National Historic Trail Feasibility Study in order for a trail to be considered for designation.

*National Recreation Trail.* Trail designated by the Secretary of the Interior, or delegated officer, through a standardized process, including a recommendation and nomination by the BLM. National Recreation Trails provide a variety of compatible outdoor recreation uses in or reasonably accessible to urban areas or high-use areas.

*National Register eligible.* Includes properties both formally determined as eligible for inclusion in the National Register by the Secretary of the Interior and all other significant properties that meet National Register listing criteria. This includes any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior.

*National Register of Historic Places.* The National Register is the official Federal list of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. National Register properties have significance to the history of the communities, states, or the Nation.

*National Scenic Trail.* A congressionally designated trail that is a continuous and uninterrupted extended, long-distance trail so located as to provide for maximum outdoor recreation potential and for the conservation and enjoyment of the nationally significant resources, qualities, values, and associated settings and the primary use or uses of the areas through which such trails may pass. National Scenic Trails may be located so as to represent desert, marsh, grassland, mountain, canyon, river, forest, and other areas, as well as landforms that exhibit significant characteristics of the physiographic regions of the Nation.

*National Trail.* For purposes of this manual, National Trail refers only to congressionally designated National Scenic or Historic Trails.

BLM_0019149

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-6

*National Trail Administration.*  Trailwide responsibility assigned to the BLM or National Park Service by the Secretary of the Interior when the Department of the Interior is named as the responsible lead in National Trail-specific legislation (see National Trail Administrator).  The responsibility involves trailwide coordination, guidance, technical assistance, and consultation to National Trail managers that have physical site management responsibility.  National Trail administration responsibilities are fulfilled as directed in the NTSA in coordination with tribes; other National Trail Administrators; National Trail managing agencies (including all BLM public land managers along the congressionally designated National Trail); other Federal, state, and local government agencies; private and nonprofit organizations; willing landowners; land users; and individuals (tribes, affected agencies, willing landowners, partners, and interested parties).  National Trail administration includes leadership in the development of the statutorily required trailwide Comprehensive Plan, which provides strategic direction for National Trail administration and management, including identification of the nature and purposes of the National Trail and selection of the National Trail Right-of-Way.

*National Trail Administrator.*  Individual delegated the responsibility to conduct National Trail administration when the BLM or National Park Service is assigned this responsibility by the Secretary of the Interior (see National Trail Administration).  The responsible agency assigns the role to an individual to perform National Trail administration duties (BLM Manual 1203, Delegation of Authority).

*National Trail advisory council.*  Council established to advise the Secretary that is charged with the administration of the National Trail with respect to matters relating to the trail, including the selection of a National Trail Right-of-Way in the trailwide Comprehensive Plan, standards for the erection and maintenance of markers along the trail, and the administration of the trail.

*National Trail Feasibility Study.*  Study authorized through an Act of Congress to determine the feasibility and desirability of designating a trail route as a National Scenic or Historic Trail.

*National Trail Inventory.*  The official record and the process used in developing the record of National Trail resources, qualities, values, and associated settings and the primary use or uses.

*National Trail Management Corridor.*  Administrative designation or allocation, established through the land use planning process, pursuant to Section 202 of Federal Land Policy and Management Act and Section 7(a)(2) of the National Trails System Act ("rights-of-way") for a public land area of sufficient width within which to encompass National Trail resources, qualities, values, and associated settings and primary use or uses that are present or to be restored.

BLM MANUAL

Rel. 6-133
Date:  07/13/2012

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-7

*National Trail manager.* The agency, landowner, or interest (see certification) with the authority and/or responsibility for decisionmaking for lands under its jurisdiction. Also, the official responsible for land and water management of trail-related resources.

*National Trail Right(s)-of-Way.* Term used in Section 7(a)(2) of the National Trails System Act to describe the corridor selected by the National Trail administering agency in the trailwide Comprehensive Plan and which includes the area of land that is of sufficient width to encompass National Trail resources, qualities, values, and associated settings.  The National Trail Right-of-Way, in the context of the National Trails System Act, differs from a Federal Land Policy and Management Act (FLPMA) Title V Right-of-Way, which is a grant issued pursuant to FLPMA authorities. It becomes a primary consideration in designating the National Trail Management Corridor in a Resource Management Plan.  See also National Trail Management Corridor.

*National Trails inventory standards.* The standards the BLM must meet as it conducts National Trail inventories, assessments, and documentation of National Trail resources, qualities, values, and associated settings and primary use or uses in the management role.

*National Trails management standard.* The standards the BLM must meet as it manages the National Trail resources, qualities, values, and associated settings, and primary use or uses.

*National Trails monitoring standards.*  The standards the BLM must meet as it monitors National Trail inventories; resources, qualities, values, and associated settings and primary use or uses; effectiveness of implementation of Resource Management Plan decisions; projects within the National Trail Management Corridor; and acquired lands.

*National Trails planning standards.* The standards the BLM must meet as it conducts land use planning to establish the National Trail Management Corridor and to address all programs and uses within the management corridor.

*National Trails System.* Congressionally authorized system of trails recognized through the authority of the National Trails System Act, containing National Scenic and Historic Trails, National Recreation Trails, Connecting and Side Trails, and authorities applied to rail-trails.

*National Trails System Act.*  Public Law 90-543, as amended and codified in 16 U.S.C. 1241-1251, which establishes the National Trails System.

BLM MANUAL

Rel. 6-133
Date:  07/13/2012

BLM_0019151

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-8

*nature and purposes.*  The term used to describe the character, characteristics, and congressional intent for a designated National Trail, including the resources, qualities, values, and associated settings of the areas through which such trails may pass; primary use or uses of a National Trail; and activities promoting the preservation of, public access to, travel within, and enjoyment and appreciation of National Trails.

-P-

*primary use or uses.* Authorized mode or modes of travel, and/or activities identified in the National Trails System Act, enabling legislation, or legislative history, through the trailwide Comprehensive Plan or approved Resource Management Plan, which promotes the preservation of, public access to, travel within, and enjoyment and appreciation of National Trails.

-R-

*resources, qualities, and values.* The significant scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape areas through which such trails may pass as identified in the National Trails System Act (see associated settings).

*Right(s)-of-way.*  See National Trail Right(s)-of-Way.

-S-

*Side Trail.* Secretarially designated trails that complement National Recreation, Scenic, or Historic Trails by providing additional single points of public access to special features along such trails (see Connecting Trail).

*stewardship responsibilities.* As National Trail Administrator or National Trail manager, agency obligations to conduct inventory, monitoring, planning, administration, management, land or easement acquisition, protection, development, maintenance, training, and operations of the National Trails.  These responsibilities may be conducted in partnership with tribes, affected agencies, willing landowners, partners, and interested parties.

*substantial interference.* Determination that an activity or use will hinder or obstruct the nature and purposes of a designated National Trail (see nature and purposes).

BLM_0019152

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

G-9

-T-

*trail segment*. Distinct sections of a trail, categorized based on similar trail conditions, management goals and objectives, manageability, settings, ownership patterns, presence of high potential route segments, National Register eligible properties, and landscape-scale control points or trail access points.

-U-

*uniform marker*. A distinctive symbol or logo used to mark and officially represent each National Trail, developed and monitored by the National Trail administering agency.

BLM_0019153

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

A-1

**Appendix 1 – National Trails and Corresponding Administering Agencies\***
(See chapter 1.6A1)

| NAME OF NATIONAL TRAIL | NATIONAL TRAIL ADMINISTRATOR |
|---|---|
| Arizona National Scenic Trail | U.S. Forest Service |
| Continental Divide National Scenic Trail | U.S. Forest Service |
| Pacific Crest National Scenic Trail | U.S. Forest Service |
| Pacific Northwest National Scenic Trail | U.S. Forest Service |
| Potomac Heritage National Scenic Trail | National Park Service |
| California National Historic Trail | National Park Service |
| El Camino Real de Tierra Adentro National Historic Trail | BLM and National Park Service |
| Iditarod National Historic Trail | BLM |
| Juan Bautista de Anza National Historic Trail | National Park Service |
| Lewis and Clark National Historic Trail | National Park Service |
| Mormon Pioneer National Historic Trail | National Park Service |
| Nez Perce National Historic Trail | U.S. Forest Service |
| Old Spanish National Historic Trail | BLM and National Park Service |
| Oregon National Historic Trail | National Park Service |
| Pony Express National Historic Trail | National Park Service |
| Washington-Rochambeau Revolutionary Route National Historic Trail | National Park Service |

\*This list includes only those National Trails where the BLM has administration or management responsibility.

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

A-2

**Appendix 2 – National Trail Designation Process**
(See chapter 1.6B1)

National Scenic and Historic Trails are authorized and designated only by Act of Congress. Congress may authorize the BLM, through the Secretary, to make studies for the purpose of determining the feasibility and desirability of designating other trails as National Scenic or National Historic Trails (National Trail Feasibility Study).

One of the purposes of the NTSA is to encourage public/private partnerships as a founding principle.  Interested publics or grassroots organizations work on, help identify the location of, and assist in managing a subject trail along with the agencies responsible for management of the trail area.  The BLM is not directed or specifically authorized under the NTSA to identify potential National Scenic or Historic Trails for inclusion in the National Trails System through the land use planning process.

1.  An Act of Congress, through the NTSA, directs that a National Trail Feasibility Study be conducted, and assigns a Department to conduct the study.

2.  A National Trail Feasibility Study is developed by an assigned agency, including consultation and participation by interested tribes, other affected agencies, willing landowners, partners, and interested parties, which may or may not recommend the trail as suitable for designation.

3.  If the National Trail Feasibility Study recommends a trail as suitable for designation, an Act of Congress is required to designate the trail as a National Scenic or Historic Trail and include the trail under Section 5(a) of the NTSA.

4.  Once designated by Congress, a trailwide Comprehensive Plan is developed by the National Trail administering agency in coordination with National Trail managing agencies.  The trailwide Comprehensive Plan provides strategic direction and establishes the nature and purposes for the National Trail, and a National Trail Right-of-Way is selected.

5.  After designation, as National Trail manager, the BLM conducts inventories under FLPMA and NTSA authorities; addresses the National Trail through the land use planning process, including the establishment of the National Trail Management Corridors; and manages the National Trail in coordination with the National Trail administering agency (might be the BLM, if assigned) and tribes, other agencies, partners, and interested parties.

6250 – NATIONAL SCENIC AND HISTORIC TRAIL ADMINISTRATION

A-3

6. Special provisions in the enabling legislation, such as for the Old Spanish National Historic Trail, or subsequent congressionally authorized National Trail Feasibility Studies for trail segments associated with an existing congressionally designated National Trail may result in the addition of designated trail miles.  Other special circumstances can always apply.

This process takes anywhere from 6 to 15 years.  Because of the need for two rounds of congressional action, a trail is most likely to succeed in this process if there is a strong, well organized, citizen-based organization at work on behalf of the trail.

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

Form 1221-2
(June 1969)



|  | UNITED STATES | Release |
|---|---|---|
|  | DEPARTMENT OF THE INTERIOR | 8-83 |
|  | BUREAU OF LAND MANAGEMENT | |
|  |  | Date |
|  | MANUAL TRANSMITTAL SHEET | 07/13/2012 |

Subject

8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails (Public)

1. <u>Explanation of Material Transmitted</u>: This release transmits one of three manuals in the National Trails System manual series (BLM Manuals 8353, 6250, and 6260/6270).  This manual addresses secretarially designated National Recreation Trails (including the National Water Trails) and Connecting and Side Trails, including requirements for cooperative relationships; trail marking; identifying, evaluating and recommending trails; nominating trails through the submission of application packages; and data and records management.

2. <u>Reports Required</u>: None.

3. <u>Material Superseded</u>: M-1626 Travel and Transportation Manual Section .06 A. 2. C., regarding the requirement to address all National Recreation Trails in resource management plans; H-8342-1 Travel and Transportation Handbook, Section IV. E. i. regarding the requirement to address all National Recreation Trails in resource management plans; H-1601-1 Land Use Planning Handbook Appendix C, III. B. 6, regarding National Recreation Trails (03/11/05); and Washington Office Instruction Memorandum 2008-069, "Addressing National Recreation Trails in the Land Use Planning Process."

4. <u>Filing Instructions</u>: File as directed below.

REMOVE                        INSERT
None                          8353
                              (Total:  18 Sheets)


                              /S/ Mike Pool
                              Acting Director
                              Bureau of Land Management


BLM MANUAL                                            Rel. 8-83
                                                     07/13/2012

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

## Table of Contents

**CHAPTER 1.  OVERVIEW** ...............................................................................1-1

1.1 PURPOSE ........................................................................................... 1-1

1.2 OBJECTIVES ..................................................................................... 1-1

1.3 AUTHORITY ...................................................................................... 1-1

1.4 RESPONSIBILITY............................................................................... 1-2

1.5 REFERENCES ..................................................................................... 1-3

1.6 POLICY ............................................................................................. 1-4

    A.  *Purposes of Trails* ...................................................................... 1-4

    B.  *Statements of Programmatic Policy* .............................................. 1-4

    C.  *Cooperative Relationships* ............................................................ 1-4

    D.  *Trail Marking* ............................................................................ 1-4

    E.  *Nominating National Recreation Trails and Connecting and Side Trails for designation by the Secretary of the Interior* ................................................ 1-4

1.7 FILE AND RECORDS MAINTENANCE ..................................................... 1-11

1.8 DATA STANDARDS AND MANAGEMENT ................................................ 1-11

GLOSSARY OF TERMS ........................................................................... G-1

BLM_0019158

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-1

## Chapter 1.  Overview

### 1.1  Purpose

1.  This manual is provided to guide the Bureau of Land Management (BLM) in fulfilling the requirements and purposes set forth in the National Trails System Act (NTSA), in concert with other supporting laws and policies.

2.  This manual provides the BLM policy and program guidance for the identification, evaluation, and recommendation of qualifying trails to the Secretary for designation.

3.  This manual provides the BLM with guidance on the preparation of application packages to nominate recommended trails for secretarial designation as National Recreation Trails (including National Water Trails) and Connecting and Side Trails, all of which are components of the National Trails System.

### 1.2  Objectives

1.  Comply with the requirements of the NTSA and other laws and policies.

2.  Provide a variety of outdoor recreation uses in or reasonably accessible to urban areas or high-use areas.

3.  Identify, evaluate, and recommend National Recreation Trails and Connecting and Side Trails as components of the National Trails System.

4.  Prepare application packages through which recommended trails are nominated for secretarial designation.

5.  Promote the preservation of public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation.

6.  Manage the diverse network of nationally designated trails by encouraging and assisting volunteer citizen, community, and partnership involvement.

### 1.3  Authority

1.  National Trails System Act of 1968, as amended (16 U.S.C. 1241-1251)

2.  Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1701 *et seq.*)

BLM_0019159

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-2

3.   National Environmental Policy Act (NEPA) of 1969, as amended (42 U.S.C. 4321 *et seq.*)

## 1.4   Responsibility

A.   *The Director, Bureau of Land Management,* through the Assistant Director, Renewable Resources and Planning, are responsible for:

1.   Establishing policy to support the identification, evaluation, recommendation, nomination, and management of National Recreation Trails and Connecting and Side Trails.

2.   Coordinating National Recreation Trails and Connecting and Side Trails budget and policy development and implementation with other BLM programs.

3.   Developing and maintaining relationships with tribes; other Federal, state, and local agencies; private and nonprofit organizations; partners; willing landowners; land users; and individuals (tribes, affected agencies, partners, and interested parties).

4.   Reviewing application packages nominating recommended trails for designation by the Secretary as National Recreation Trails and Connecting and Side Trails, and approving and submitting these packages to the Secretary.

5.   Maintaining a list of designated National Recreation Trails and Connecting and Side Trails within the BLM.

B.   *State Directors* are responsible for:

1.   Developing and implementing budget and policy direction and providing statewide program coordination for National Recreation Trails and Connecting and Side Trails.

2.   Developing and maintaining relationships with tribes, affected agencies, partners, and interested parties.

3.   Reviewing application packages nominating trails for designation by the Secretary as National Recreation Trails and Connecting and Side Trails, and  if the State Director approves, submitting these packages to the Assistant Director, Renewable Resources and Planning with a concurrence/endorsement letter.

4.   Maintaining a list of designated National Recreation Trails and Connecting and Side Trails within the state.

BLM_0019160

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-3

   C.  *District and Field Managers* are responsible for:

     1.  Identifying budget and policy needs and implementing budget and policy direction.

     2.  Developing and maintaining relationships with tribes, affected agencies, partners, and interested parties.

     3.  Identifying, evaluating, and recommending trails for designation as National Recreation Trails or Connecting and Side Trails through a land use planning process; an implementation-level planning process (e.g., travel management plan, trailwide Comprehensive Plan, recreation area management plan); or a stand-alone recommendation process with associated NEPA to support the final designation decision by the Secretary.

     4.  Providing appropriate opportunities for public participation as part of the identification, evaluation, and recommendation process.

     5.  Submitting the application package that contains the nomination of a recommended trail for designation by the Secretary to the State Director.

     6.  Maintaining a list of designated National Recreation Trails and Connecting and Side Trails within the Field Office.

1.5  References

     1.  Executive Order 13195, Trails for America in the 21st Century

     2.  Secretarial Order 3319, Establishment of a National Water Trails System

     3.  BLM Manual 1203, Delegation of Authority

     4.  BLM Manual 1601, Land Use Planning

     5.  BLM Manual 1626, Travel and Transportation Management

     6.  BLM Manual 6120, Congressionally Required Maps and Legal Boundary Descriptions for National Landscape Conservation System Designation

BLM_0019161

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-4

7.  BLM Manual 6250, National Scenic and Historic Trail Administration

8.  BLM Manual 6260/6270, National Scenic and Historic Trail Management

9.  BLM Manual 8320, Planning for Recreation and Visitor Services

10. BLM Handbook 1601-1, Land Use Planning

11. BLM Handbook 1790-1, National Environmental Policy Act

12. BLM Handbook 8342-1, Travel and Transportation Management

13. BLM Handbook 9114-1, Trails

14. Trails for America: Report on the Nationwide Trails Study, 1966

15. The National Trails System Interagency Memorandum of Understanding

1.6  Policy

A.  Purposes of Trails

National Recreation and Water Trails and Connecting and Side Trails have as their purpose:

1.  *National Recreation Trails* provide a variety of compatible outdoor recreation uses in or reasonably accessible to urban areas or high-use areas and must meet the NTSA criteria and any supplementary criteria that the Secretary of the Interior may prescribe.

2.  *National Water Trails* provide exemplary and high-quality outdoor recreational experiences and a network of public access points connecting people, places, and communities along waterways, including stretches of river, lake, shoreline, bay, stream, estuary, ocean, canal, or any combination of waterway. National Water Trails are components of the National Trails System, and are established as a class of National Recreation Trails, pursuant to the National Trails System Act.  Such trails are considered in a National Water Trails System.

BLM_0019162

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-5

3. *Connecting Trails* complement designated National Recreation, Scenic, or Historic Trails by providing additional points of public access between or connecting to such trails, and for National Scenic and Historic Trails, Connecting Trails support, and do not detract from, the resources, qualities, values, and associated settings and the primary use or uses.

4. *Side Trails* complement designated National Recreation, Scenic, or Historic Trails by providing additional single points of public access to special features along such trails, and for National Scenic and Historic Trails, Side Trails support, and do not detract from, the resources, qualities, values, and associated settings and the primary use or uses.

B. *Statements of Programmatic Policy*

1. National Recreation Trails and Connecting and Side Trails are designated by the Secretary of the Interior (or the Secretary of Agriculture, as delegated to the Regional Forester, where lands administered by USDA are involved). The BLM will identify, evaluate, and recommend trails for designation through a land use planning process; an implementation-level planning process (e.g., travel management plan, trailwide Comprehensive Plan, recreation area management plan); or a stand- alone recommendation process that includes a NEPA analysis to support the Secretary's final designation decision.  As part of the identification, evaluation, and recommendation process, the BLM will provide appropriate opportunities for public participation. If a trail is analyzed through a land use planning or implementation-level planning process, the BLM will evaluate and make a recommendation on the trail(s) at issue through the associated NEPA analysis.  The applicable decision document for the land use plan or implementation-level plan must make clear that the recommendation is not a decision.  If a trail is analyzed through a stand-alone recommendation process/NEPA analysis, the Secretary's decision on the trail's designation, as documented within the letter of designation, will be supported by the NEPA analysis.  In all cases, the BLM's identification, evaluation and recommendation are neither protestable nor appealable decisions.  Once a trail is recommended for designation, the BLM will prepare an application package which will nominate the recommended trail to the Secretary for designation (see the nomination criteria listed in section 1.6. D. 1. of this manual.) The ultimate designation decision, made by the Secretary, is final agency action.

2. Recommended trails must conform to the management objectives set forth in the existing land use plan.  Where an existing land use plan identifies a trail and/or

BLM_0019163

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-6

related areas for recreation purposes and where said trail or area meets the nomination criteria set forth below, no new planning is necessary. The BLM may conduct a stand-alone recommendation with associated NEPA analysis to support a Secretarial decision on designation. The BLM will provide appropriate opportunities for public participation to support the nomination of that trail and/or related area for designation. If the existing management objectives within the land use plan conflict with the recommendation, then a plan amendment is necessary.

3. BLM National Scenic or Historic Trail Administrators, after consultation with the land managing agency, may identify, evaluate, and recommend Connecting or Side Trails through the trailwide Comprehensive Plan and may submit their recommendation(s) to the Secretary or delegated designee, through an application package for trails that meet the nomination criteria (see BLM Manual 6250, National Scenic and Historic Trail Administration).

4. Once designated by the Secretary, the BLM shall manage National Recreation Trails and Connecting and Side Trails in accordance with the NTSA and other applicable laws, in addition to the governing land use plan and the Best Management Practices listed in Section 1.6 D. 3 of this manual. In addition, Connecting and Side Trails shall be managed in a manner that complements the adjoining National Recreation, Scenic, or Historic Trails and the BLM will continue to provide public access points to or connections between such trails and/or continue to provide access to special features along such trails.

5. For National Recreation or Connecting or Side Trails that adjoin designated National Scenic or Historic Trails, access must support, and not detract from, the nature and purposes; resources, qualities, values, and associated settings; the primary use or uses; and must not introduce an incompatible use. For National Historic Trails, if a waterway serves an access purpose with the same primary historic use or uses as the trail to which it connects, Connecting or Side Trail designation may be recommended and nominated. Waterways are not normally designated as Connecting or Side Trails. Consultation with the National Scenic or Historic Trail administering agency (see BLM Manual 6250) is required.

B. *Cooperative Relationships*

1. The BLM shall coordinate with tribes and Federal, state, local governments, and willing private landowners to encourage and assist the development and implementation of provisions for compatible land practices on portions of the trail located both on and off public lands through use of cooperative agreements.

BLM MANUAL

Rel. 8-83
07/13/2012

Case No. 1:20-cv-02484-MSK   Document 31-7   filed 04/27/21   USDC Colorado   pg 171 of
399

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-7

2. The BLM may provide volunteers and volunteer organizations with education and training.

3. The BLM may develop stewardship programs to organize and supervise volunteer trail management efforts for trails that are components of the National Trails System or for trails that could qualify for designation as components of the National Trails System.

C. *Trail Marking*

1. The BLM shall mark the National Recreation Trails and Connecting and Side Trails with signs to facilitate identification and navigation, using the official uniform marker.

2. The BLM shall identify and provide public information regarding the National Scenic or Historic Trail to which the Connecting or Side Trail provides access, and for Side Trails, the BLM shall identify and provide information regarding the special features along such trails.

3. Trail markers and signs must not be used or placed as property boundary identifiers.

D. *Nominating National Recreation Trails and Connecting and Side Trails for designation by the Secretary of the Interior.*

1. *Identification and Evaluation Requirements.* The BLM will identify and evaluate potential National Recreation Trails and Connecting and Side Trails through a land use planning process, an activity-level planning process (e.g., travel management plan, trail-wide Comprehensive Plan, recreation area management plan) or a stand-alone recommendation process that includes NEPA analysis to support the Secretary's final designation decision.   As part of the identification, evaluation, and recommendation process, the BLM will provide appropriate opportunities for public participation.  Recommended trails are nominated to be designated through an application based on the following nomination criteria:

   i.  Nominated National Recreation Trails must provide a variety of compatible outdoor recreation uses in or reasonably accessible to urban or high-use areas. Nominated Connecting and Side Trails must complement National Recreation, Scenic, or Historic Trails by providing public access points to or connections between such trails or access to special features along such trails.

BLM_0019165

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-8

For connections to or between National Scenic or Historic Trail segments, this access must support the resources, qualities, values, and associated settings and the primary use or uses.

ii.    National Recreation Trails and Connecting and Side Trails may be located on public lands.  A nominated trail located on public lands must be available for public use as set forth in the applicable the land use plan.  When no federal land acquisition is involved, National Recreation Trails and Connecting or Side trails may be located across lands administered by interstate, state, or local governmental agencies with their consent or on privately owned lands with the written consent of the landowners.  If located across lands administered by interstate, state, or local government or on privately owned lands, the governing entity or landowner will provide a written statement that the trail will be available for public use and enjoyment for a minimum of 10 consecutive years after designation.

iii.   A nominated trail must meet the intent of the best management practices described in 1.6 D. 3 of this manual.

iv.    A nominated trail must have been designed, constructed, and maintained according to best management practices, in keeping with the trail's identified uses. The trail may pass through a variety of locations if the trail design is in accordance with planned trail use and reasonably provides for public safety.

v.     A trail must be in compliance with applicable land use plans and environmental laws prior to nomination.

vi.    Recorded deeds or agreements for public access rights must be in place with all landowners, state or private, whose property or interest in property the trail crosses.

vii.   Roads and trails suitable for passenger car travel are not eligible for National Recreation Trail designation.

viii.  Proposed Connecting and Side Trails that adjoin, connect to, or provide access to special features along National Scenic or Historic Trails must support the resources, qualities, values, and associated settings and the primary use or uses.

BLM MANUAL                                                        Rel. 8-83
                                                                07/13/2012

BLM_0019166

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-9

ix.   Connecting and Side Trails may be established, designated, and marked as
components of National Recreation, Scenic, or Historic Trails. Trail management
corridors are not required for National Recreation or Connecting and Side Trails,
but may be encompassed by a National Scenic or Historic Trail Management
Corridor to support management purposes.

x.   Benefits of designation may include secretarial recognition, signs and marking,
and entry into a publicly accessible database.

xi.   In situations of mixed ownership, the BLM shall conduct an adequate review of
boundary evidence and ensure recorded deeds for public access rights or
agreements are in place with all state or private landowners whose property or
interest in property, the trail may cross.

2.   *Application Requirements.*   The BLM shall prepare and submit an application
package to nominate a recommended trail for designation by the Secretary as a
National Recreation Trail or Connecting or Side Trail to the Washington Office
within the yearly established timeframes.  The BLM shall meet all requirements
shown in the Department of the Interior application materials package (see
www.nps.gov), including:

i.   A recommendation statement from the Field Manager and the National
Landscape Conservation System unit manager, as applicable.

ii.   The land use plan NEPA analysis; activity-level plan NEPA analysis; or
stand-alone recommendation that includes a NEPA analysis, prepared to
support the Secretary's final designation decision.

iii.   The name, location, and length of the trail; a map of sufficient scale that
clearly depicts the trail and land status; directions to the trail; the
congressional district(s) in which the trail is located; a description of land
uses; valid existing rights; and supporting photographs or images.

iv.   The history of the trail, such as date of initial construction; purpose;
significance in local, regional, or national events; and other notable
information.

v.   A description of the trail, trail resources, and features, and for Connecting
and Side Trails, a description of the resources, qualities, values, and

BLM_0019167

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-10

associated settings and primary use or uses of the National Scenic or Historic Trail to which the trail connects.

vi.   Management direction for the trail, including resource protection, safety, maintenance, regulations, signing, and recreation facilities.

vii.   An estimate of annual maintenance costs.

viii.   A statement from the applicable land use plan providing for public access and management of the area/trail that is being recommended and nominated for designation.

ix.   A description of how the best management practices described in Section 1.6. D.3. of this manual will be applied when projects are proposed within the trail once designated.

x.   A State Director-signed letter of concurrence/endorsement of the recommendation by the Field and NLCS managers for the trail shall accompany the application package.  The application package shall be forwarded to the Division Chief, Recreation and Visitor Services, for consideration and submission to the Secretary.  If a recommended trail connects to designated National Scenic or Historic Trails, or are contained within other units of the National Landscape Conservation System, the application package must be surnamed by the Division Chief, National Landscape Conservation System.

3.   *Best Management Practices for Designated Recreation Trails, and Connecting or Side Trails.*  Once a trail is designated by the Secretary as a National Recreational, Water, Connecting or Side Trail, the following categories of best management practices (BMPs) should be considered during evaluation of any project proposal to ensure the BLM maintains high-quality outdoor recreation experiences:

i.   Recreation Opportunities

a.   The trail route has established public access points that accommodate a diversity of trip lengths and provide access to a variety of opportunities for recreation and education.

(1)   Public access points shall be maintained to policy standards.

BLM_0019168

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-11

    (2)   Recreation and education opportunities shall be consistent with approved uses of the trail.

ii.   Education

   a.   The trail users are provided with opportunities to learn about the value of natural resources, cultural heritage, and outdoor skills and ethics.

      (1)   Recreation and education opportunities shall be provided through onsite and offsite interpretation programs and outreach.

      (2)   Education programs shall incorporate natural resource, visitor skill and safety, and outdoor ethics messages.

iii.   Conservation

   a.   The trail provides opportunities for communities to develop and implement strategies that enhance and restore the health of the local waterways, trails, and surrounding lands.

      (1)   Coordination with communities, tribes, affected agencies, partners, and interested parties shall occur to achieve healthy waterways, trails, and surrounding lands goals and objectives.

iv.   Community Support

   a.   Local communities provide support and advocacy for the maintenance and stewardship of the trail.

      (1)   Efforts of local communities to build capacity for the stewardship of the trail will be supported.

      (2)   Support of partnership and volunteer efforts will be provided.

v.   Public Information

   a.   The local, regional, and national public shall be provided with accessible and understandable trail information, including details for identifying access and trail routes; cultural, historic, recreation, and natural features; hazards; and water quality.

BLM_0019169

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-12

    b.   The trail shall be promoted to the community and a broad national audience.

  vi.  Trail Maintenance

    a.   There is demonstrated ability to support routine and long-term maintenance investments on the trail.

    b.   Facilities associated with the trail are designed, constructed, and maintained incorporating sustainability principles.

  vii. Planning

    a.   Maintain a trail plan that describes a vision, desired future conditions, and strategies to strengthen best management practices.

       (1)   Trail plans shall be developed in coordination with tribes, affected agencies, partners, and interested parties.

## 1.7   File and Records Maintenance

A.  A case file will be established for each designated National Recreation, Water, or Connecting or Side Trail.  Offices administering or managing Connecting or Side Trails that adjoin or connect to National Scenic or Historic Trails must incorporate Connecting and Side Trail records into the corresponding National Scenic and Historic Trail serialized case files (see BLM Manual Sections 6250 and 6260/6270) and BLM Manual Section 6120. Recordkeeping requirements are mandated by Executive Orders 12866 and 13353, the Paperwork Reduction Act (44 U.S.C. 3501), and the guidelines of the BLM Paperwork Schedule program. The case file shall include:

    1.   A map of the National Recreation, Water, or Connecting and Side Trails.

    2.   The portrayal on the Geographic Coordinate Data Base.

    3.   A copy of the land use plan or activity-level plan and supporting NEPA documentation that includes the BLM's recommendation or the stand-alone NEPA analysis prepared to support the Secretary's final designation decision.

    4.   A copy of the recommendation statement, State Director concurrence/endorsement letter, and application package.

BLM_0019170

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-13

5. A copy of the secretarial designation of the trail.

1.8  Data Standards and Management

1. Each BLM State Office shall identify a National Recreation Trail or Connecting and Side Trail data steward. Data stewards shall coordinate data collection and ensure National Recreation Trail or Connecting and Side Trail data are documented in BLM or other approved, including geospatial standards and LR2000, databases, and is noted to the Master Title Plats, as applicable.

2. Trail data and data collection shall comply with Department of the Interior data management systems and the Federal Trail Data Standards.

3. The BLM shall share data with various agencies, organizations, partners, and the public according to data sharing agreements and established protocol.

BLM_0019171

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-14

## Glossary of Terms

### -A-

*associated settings.* The geographic extent of the resources, qualities, and values or landscape elements within the surrounding environment that influence the trail experience and contribute to resource protection. Settings associated with a National Scenic or Historic Trail include scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape components (see resources, qualities, and values).

### -C-

*Comprehensive Plan.* Statutorily required plan providing strategic direction and guidance for the future administration and management of a congressionally designated National Scenic or Historic Trail. The plan includes identification of the nature and purposes, goals and objectives, high potential sites and high potential segments (historic trails), and the selection of the National Trail Right-of-Way.

*Connecting Trail.* Secretarially designated trails that complement National Recreation, Scenic, or Historic Trails by providing additional points of public access between such trails or connecting to such trails (see Side Trail).

### -I-

*incompatible use.* An activity that hinders or obstructs the nature and purposes of a designated National Trail.

### -N-

*National Historic Trail.* A congressionally designated trail that is an extended, long-distance trail, not necessarily managed as continuous, that follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a National Historic Trail is the identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment. A National Historic Trail is managed to conserve, protect, and restore the nationally significant resources, qualities, values, and associated settings of the areas through which such trails may pass, including the primary use or uses of the trail.

BLM_0019172

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-15

*National Recreation Trail.* Trail designated by the Secretary of the Interior or delegated officer, through a standardized process, including a recommendation and nomination by the BLM. National Recreation Trails provide a variety of compatible outdoor recreation uses in or reasonably accessible to urban areas or high-use areas.

*National Scenic Trail.* A congressionally designated trail that is a continuous and uninterrupted extended, long-distance trail so located as to provide for maximum outdoor recreation potential and for the conservation and enjoyment of the nationally significant resources, qualities, values, and associated settings and the primary use or uses of the areas through which such trails may pass. National Scenic Trails may be located so as to represent desert, marsh, grassland, mountain, canyon, river, forest, and other areas, as well as landforms that exhibit significant characteristics of the physiographic regions of the Nation.

*National Trails System.* Congressionally authorized system of trails recognized through the authority of the National Trails System Act, containing National Scenic and Historic Trails, National Recreation Trails, Connecting and Side Trails, and authorities applied to rail-trails.

*National Trails System Act.* Public Law 90-543, as amended and codified in 16 U.S.C. 1241-1251, which establishes the National Trails System.

*National Water Trail.* Recreational routes with a network of public access points connecting people, places, and communities to the waterways, including stretches of river, lake, shoreline, bay, stream, estuary, ocean, canal, or any combination of waterway, that have been designated, mapped, and publicly identified with the intent to provide high-quality outdoor recreational experiences.

*National Water Trails System.* A distinctive system, established by Secretarial Order 3319, Establishment of a National Water Trails System, that connects Americans to the Nation's waterways and strengthens the conservation and restoration of those waterways by becoming a catalyst for protecting and restoring the health of local waterways and surrounding lands and by establishing a community that mentors and promotes the development of water trails. The National Water Trails System is a subset of National Recreation Trails, as defined by the National Trails System Act.

*nature and purposes.* The term used to describe the character, characteristics, and congressional intent for a designated National Trail, including the resources, qualities, values, and associated settings of the areas through which such trails may pass; primary use or uses of a National Trail; and activities promoting the preservation of, public access

BLM_0019173

BLM Manual 8353 – Trail Management Areas – Secretarially Designated
National Recreation, Water, and Connecting and Side Trails

1-16

to, travel within, and enjoyment and appreciation of National Trails.

-P-

*primary use or uses.* Authorized mode or modes of travel, and/or activities identified in the National Trails System Act, enabling legislation, or legislative history, through the trailwide Comprehensive Plan or approved Resource Management Plan, which promotes the preservation of, public access to, travel within, and enjoyment and appreciation of National Trails.

-R-

*resources, qualities, and values.* The significant scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape areas through which such trails may pass as identified in the National Trails System Act (see associated settings).

-S-

*Side Trail.* Secretarially designated trails that complement National Recreation, Scenic, or Historic Trails by providing additional single points of public access to special features along such trails (see Connecting Trail).

BLM_0019174

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

MANUAL TRANSMITTAL SHEET

| Release | 6-139 |
| Date | 09/14/2012 |

Subject

6280 – Management of National Scenic and Historic Trails and Trails Under Study or
Recommended as Suitable for Congressional Designation (Public)

1. <u>Explanation of Material Transmitted</u>: This manual release corrects the subject function code
   of this manual from 6260 to Manual 6280, Management of National Scenic and Historic
   Trails and Trails Under Study or Recommended as Suitable for Congressional Designation
   (Public). The draft version of this manual was released in Instruction Memorandum 2012-
   114 (I) as the 6260/6270 National Scenic and Historic Trails Management Manual.

   This manual is one of three manuals in the National Trails System manual series (BLM
   Manuals 8353, 6250, and 6280). The 6280 manual provides the line manager and program
   staff professionals with policies for the management of National Scenic and Historic Trails.
   Specifically, this manual identifies requirements for the management of trails undergoing
   National Trail Feasibility Study; trails that are recommended as suitable for National Trail
   designation through the National Trail Feasibility Study; inventory, planning, management,
   and monitoring of designated National Scenic and Historic Trails; and data and records
   management requirements for National Scenic and Historic Trails.

2. <u>Reports Required</u>: Resource Management Planning schedule and annual reports.

3. <u>Material Superseded</u>: H-1601-1 Land Use Planning Handbook, Appendix C, IIIA 1, 2, and 3,
   regarding National Scenic and Historic Trails (03/11/05), and manual release number 6-137.

4. <u>Filing Instructions</u>: File as directed below.

REMOVE                              INSERT
All of 6260                         6280
(Total 102 sheets)                  (Total 101 sheets)

*/s/ Carl Rountree*

Assistant Director,
National Landscape Conservation System
   and Community Partnerships
Bureau of Land Management

BLM_0019175

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

| Release |
|---|
| 6-137 |

| Date |
|---|
| 8/16/2012 |

MANUAL TRANSMITTAL SHEET

Subject
6260/6270 – Management of National Scenic and Historic Trails and Trails Under Study or Recommended as Suitable for Congressional Designation (Public)

1. <u>Explanation of Material Transmitted</u>: This release transmits one of three manuals in the National Trails System manual series (BLM Manuals 8353, 6250, and 6260/6270). This manual provides the line manager and program staff professionals with policies for the management of National Scenic and Historic Trails. Specifically, this manual identifies requirements for the management of trails undergoing National Trail Feasibility Study; trails that are recommended as suitable for National Trail designation through the National Trail Feasibility Study; inventory, planning, management, and monitoring of designated National Scenic and Historic Trails; and data and records management requirements for National Scenic and Historic Trails.

2. <u>Reports Required</u>: Planning schedule and annual reports.

3. <u>Material Superseded</u>: H-1601-1 Land Use Planning Handbook, Appendix C, IIIA 1, 2, and 3, regarding National Scenic and Historic Trails (03/11/05).

4. <u>Filing Instructions</u>: File as directed below.

REMOVE
None

INSERT
6260/6270
(Total 102 sheets)

*/s/ Mike Pool*

Acting Director,
Bureau of Land Management

BLM_0019176

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

**Table of Contents**

**CHAPTER 1. OVERVIEW** ...................................................................................................1-1

    A. NATIONAL TRAIL DESIGNATION PROCESS.............................................................1-1
    B. TRAILWIDE COMPREHENSIVE PLAN ......................................................................1-2
    C. BLM TRAIL MANAGEMENT...................................................................................1-2
    D. KEY TERMS USED IN THIS MANUAL .....................................................................1-3
1.1 PURPOSE.....................................................................................................................1-9
1.2 OBJECTIVES ...............................................................................................................1-10
1.3 RELEVANT AUTHORITIES ..........................................................................................1-10
1.4 RESPONSIBILITY.........................................................................................................1-11
1.5 REFERENCES ..............................................................................................................1-13
1.6 POLICY ......................................................................................................................1-15
    A. STATEMENT OF PROGRAMMATIC POLICY .............................................................1-15
1.7 FILE AND RECORDS MAINTENANCE ..........................................................................1-23
1.8 DATA STANDARDS AND MANAGEMENT ...................................................................1-25

**CHAPTER 2. MANAGEMENT OF TRAILS UNDER NATIONAL TRAIL
FEASIBILITY STUDY AND TRAILS RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION, BUT NOT YET DESIGNATED** ...................2-1

2.1 IDENTIFICATION AND DOCUMENTATION OF TRAILS UNDER NATIONAL TRAIL
    FEASIBILITY STUDY AND TRAILS RECOMMENDED AS SUITABLE FOR
    CONGRESSIONAL DESIGNATION.................................................................................2-1
2.2 LAND USE PLANNING CONSIDERATIONS FOR TRAILS UNDER STUDY AND TRAILS
    RECOMMENDED AS SUITABLE FOR DESIGNATION......................................................2-1
2.3 SITE-SPECIFIC/IMPLEMENTATION-LEVEL MANAGEMENT OF TRAILS UNDER NATIONAL
    TRAIL FEASIBILITY STUDY AND TRAILS RECOMMENDED AS SUITABLE FOR
    CONGRESSIONAL DESIGNATION.................................................................................2-2
2.4 PROTOCOL FOR PROPOSED ACTIONS WHICH MAY AFFECT TRAILS UNDER NATIONAL
    TRAIL FEASIBILITY STUDY AND TRAILS RECOMMENDED AS SUITABLE FOR NATIONAL
    TRAIL DESIGNATION ..................................................................................................2-3

**CHAPTER 3. CONGRESSIONALLY DESIGNATED NATIONAL TRAILS -
INVENTORY**...................................................................................................................3-1

3.1 GENERAL REQUIREMENTS ..........................................................................................3-1
3.2 DATA DOCUMENTATION AND STANDARDS..................................................................3-1
3.3 COORDINATION OF THE NATIONAL TRAIL INVENTORY AND DATA SHARING ...............3-2
3.4 INITIATING THE NATIONAL TRAIL INVENTORY PROCESS .............................................3-3
3.5 CONDUCTING THE NATIONAL TRAIL INVENTORY .......................................................3-4

BLM_0019177

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3.6 ASSESSMENT AND USE OF THE NATIONAL TRAIL INVENTORY ...................................3-10

**CHAPTER 4. CONGRESSIONALLY DESIGNATED NATIONAL TRAILS - LAND USE PLANNING..........................................................................................................4-1**
4.1 GENERAL REQUIREMENTS .........................................................................................4-1
   A. ADDRESSING DESIGNATED NATIONAL TRAILS THROUGH LAND USE PLANNING ......4-1
   B. RELATIONSHIP BETWEEN THE NATIONAL TRAIL RIGHT-OF-WAY IN THE TRAILWIDE COMPREHENSIVE PLAN AND THE NATIONAL TRAIL MANAGEMENT CORRIDOR IN THE RESOURCE MANAGEMENT PLAN AND ASSOCIATED PROVISIONS ..............................4-1
   C. RESOURCE MANAGEMENT PLAN CONSISTENCY WITH OTHER CONGRESSIONALLY, PRESIDENTIALLY, OR ADMINISTRATIVELY DESIGNATED AREAS ..............................4-2
   D. COORDINATION REQUIREMENTS FOR DESIGNATED NATIONAL TRAILS ....................4-2
4.2 REQUIREMENTS FOR DESIGNATED NATIONAL TRAILS IN LAND USE PLANNING ..........4-3
   A. ANALYSIS OF THE MANAGEMENT SITUATION ...........................................................4-3
   B. AFFECTED ENVIRONMENT ......................................................................................4-3
   C. DEVELOPMENT OF DESIGNATED NATIONAL TRAIL GOALS AND OBJECTIVES............4-4
   D. NATIONAL TRAIL MANAGEMENT CORRIDOR ALTERNATIVE FORMULATION AND ANALYSIS ...............................................................................................................4-5
   E. TRAIL MANAGEMENT GUIDANCE BY RESOURCE PROGRAM ......................................4-7
      1. SCENIC AND VISUAL RESOURCES......................................................................4-7
      2. CULTURAL AND HISTORIC RESOURCES ............................................................4-9
      3. RECREATION AND VISITOR SERVICES ............................................................4-10
      4. TRAVEL AND TRANSPORTATION MANAGEMENT .............................................4-10
      5. LANDS AND REALTY.....................................................................................4-14
      6. MINERALS ....................................................................................................4-16
      7. LIVESTOCK GRAZING....................................................................................4-18
      8. FORESTRY ...................................................................................................4-18
      9. WILDLAND FIRE AND FUELS MANAGEMENT...................................................4-18
4.3 ENVIRONMENTAL CONSEQUENCES OF PLANNING DECISIONS ON DESIGNATED NATIONAL TRAILS AND THE APPROVED RESOURCE MANAGEMENT PLAN ..................................4-19

**CHAPTER 5. CONGRESSIONALLY DESIGNATED NATIONAL TRAILS - MANAGEMENT....................................................................................................5-1**
5.1 DESIGNATED NATIONAL TRAIL ACTIVATION ............................................................5-1
5.2 GENERAL REQUIREMENTS ........................................................................................5-1
5.3 PROTOCOL FOR PROPOSED ACTIONS WHICH MAY ADVERSELY IMPACT DESIGNATED NATIONAL TRAILS .....................................................................................................5-2
   A. UPON RECEIPT OF A PROPOSED ACTION ..................................................................5-2
   B. DETERMINING THE SCOPE OF ANALYSIS ..................................................................5-2

BLM_0019178

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

C. NOTIFICATION REQUIREMENTS ..............................................................................5-3
5.4 IMPLEMENTATION-LEVEL PLANNING FOR DESIGNATED NATIONAL TRAILS ................5-4
5.5 NATIONAL TRAIL SITE-SPECIFIC MANAGEMENT CONSIDERATIONS ............................5-8
5.6 NATIONAL TRAIL STEWARDSHIP PROGRAM FOR DESIGNATED NATIONAL TRAILS.....5-12

**CHAPTER 6. CONGRESSIONALLY DESIGNATED NATIONAL TRAILS -
MONITORING ...........................................................................................................6-1**
6.1 DESIGNATED NATIONAL TRAIL MONITORING ...........................................................6-1
6.2 DATA DOCUMENTATION STANDARDS AND COORDINATION OF MONITORING AND DATA
SHARING ..................................................................................................................6-2

GLOSSARY OF TERMS................................................................................................. G-1

APPENDIX 1 – DESIGN FEATURES AND BEST MANAGEMENT PRACTICES FOR NATIONAL
TRAILS AND ASSOCIATED RESOURCES ............................................................. A-1
APPENDIX 2 – FEDERAL TRAIL DATA STANDARDS TRAIL FUNDAMENTALS ........................... A-2
APPENDIX 3 – FEDERAL TRAIL DATA STANDARDS NATIONAL SCENIC AND HISTORIC TRAILS
MANAGEMENT CORRIDOR CONCEPT ................................................................. A-3
APPENDIX 4 – FEDERAL TRAIL DATA STANDARDS NATIONAL HISTORIC TRAIL
CONDITION CATEGORIES ................................................................................... A-4
APPENDIX 5 – FEDERAL TRAIL DATA STANDARDS NATIONAL TRAIL
MANAGEMENT CLASSES..................................................................................... A-5

ILLUSTRATION 1 – NATIONAL TRAIL ADMINISTRATION AND STATE MANAGEMENT
COORDINATION ASSIGNMENTS............................................................................ I-1
ILLUSTRATION 2 – RECOMMENDED DATA DICTIONARY ATTRIBUTES FOR LINE FEATURES...... I-2
ILLUSTRATION 3 – RECOMMENDED DATA DICTIONARY ATTRIBUTES FOR POINT FEATURES.... I-3

BLM_0019179

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-1

## Chapter 1.  Overview

### A.  National Trail Designation Process

Under the provisions of the National Trails System Act of 1968 (NTSA), two acts of Congress are normally required before a trail is designated as a National Scenic or National Historic Trail (National Trail). First, Congress acts to authorize a National Trail Feasibility Study (trail study), pursuant to the NTSA Section 5(b) and (c). This authorization includes assigning the responsibility for conducting the study to either the Secretary of Agriculture or the Interior. The authorized Secretary then assigns the study to the Federal agency most likely to administer the trail (interagency trailwide leadership – see National Trail administration under item D.5 of this chapter) in the event it is designated as a National Trail by Congress. Whether an agency is assigned to study or administer the trail is based on a preponderance of trail miles on lands managed by that agency. The study is then conducted by the assigned Federal agency in accordance with the direction in the NTSA Section 5(b), the trail study authorizing legislation, and other applicable laws and regulations, in consultation with interested tribes, affected agencies, willing landowners, partners, and interested parties. The National Trail Feasibility Study is transmitted to Congress as set forth in Section 5(b) of the NTSA.

If the study recommends the trail as "suitable" for congressional designation as a National Trail, Congress may act a second time to designate the trail. If designated by Congress, the NTSA Section 5(a) is amended, adding the trail as a component of the National Trails System.

There can be exceptions to this process. For example, the Arizona National Scenic Trail was designated without a National Trail Feasibility Study, and the Pacific Northwest National Scenic Trail was designated despite a non-suitable finding.

Following designation, the assigned Secretary issues an activation memorandum, assigning the trail administration responsibility to the agency with a preponderance of miles. Thus, when Congress designates a National Trail where the majority of Federal trail miles fall on BLM-managed public lands, the Secretary will typically assign the National Trail administration responsibility to the BLM. As of 2012, the BLM is responsible for serving in the National Trail administration role (interagency trailwide leadership) for the Iditarod National Historic Trail in Alaska, and shares this role with the National Park Service for the Old Spanish and El Camino Real de Tierra Adentro National Historic Trails. Agency requirements related to the National Trail designation process and administration responsibilities are outlined in BLM Manual 6250, National Scenic and Historic Trail Administration (Manual 6250). Additional guidance is provided in Departmental Manual 710, National Rivers and Trails Systems.

BLM_0019180

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-2

When BLM public land miles are involved, regardless of whether the Secretary assigns National Trail administration to the BLM, the BLM Director transmits the appropriate Secretary's activation memorandum to the field as a BLM activation memorandum, notifying the BLM of the designation, the National Trail administration assignment (BLM, NPS, or USFS), and, if the BLM, the lead State Office assigned the National Trail administration role. The BLM activation memorandum includes a copy of the Secretary's activation memorandum, the enabling legislation, and references to the applicable National Trail policy(ies).

B.  Trailwide Comprehensive Plan

Once designated, a statutorily required trailwide Comprehensive Plan (NTSA Sec. 5(e)(f)) is developed by the assigned National Trail administering agency in coordination with local land managers, such as the BLM, referred in this manual as a National Trail managing agency. The trailwide Comprehensive Plan is required to provide a plan for the acquisition, management, development, and use of the trail, including but not limited to specific objectives and practices to be observed in the management of the trail; an acquisition or protection plan; and general and site-specific development plans. The Comprehensive Plan also includes selection of a National Trail Right-of-Way, and a description of the nature and purposes of the National Trail. Where applicable, the trailwide Comprehensive Plan will be used to guide the BLM's Resource Management Plan development and implementation level planning in accordance with this policy. For more guidance on preparation of a trailwide Comprehensive Plan, see Manual 6250.

C.  BLM Trail Management

While a trail is undergoing a National Trail Feasibility Study process or when a trail has been recommended as suitable for designation and Congress has not yet acted to designate the trail, the BLM manages the values, characteristics, and settings of the trail in accordance with Federal Land Policy Management Act of 1976, as amended (FLPMA). This policy provides guidance on management during this time, which can vary greatly in duration, before Congress acts.

After Congressional designation, the BLM conducts an inventory of designated trails under FLPMA and NTSA authorities; addresses the National Trail through the land use planning process, including the establishment of the National Trail Management Corridor; and manages and monitors the National Trail in coordination with the National Trail administering agency (which might be the BLM, if assigned), tribes, other agencies, partners, and interested parties. Note that the BLM is not directed or specifically authorized under the NTSA to identify potential National Trails for inclusion in the National Trails System through the land use planning process.

BLM_0019181

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-3

Special provisions regarding the management of designated trails may be set forth in the enabling legislation, (e.g. the Continental Divide National Scenic Trail or the Old Spanish National Historic Trail), or subsequent congressionally authorized National Trail Feasibility Studies for trail segments associated with an existing Congressionally designated National Trail, and may result in the addition of designated trail miles.

The National Trail designation process takes anywhere from 6 to 15 years. In enacting the NTSA, Congress recognized "the valuable contributions that volunteers and private, nonprofit trail groups have made to the development and maintenance of the Nation's trails. In recognition of these contributions, it is further the purpose of …[the NTSA]… to encourage and assist volunteer citizen involvement in the planning, development, and management, where appropriate of trails" NTSA Sec. 2(c). As such, interested publics or grassroots organizations work on, help identify the location of, and assist in managing a subject trail along with the agencies responsible for management of the trail area.

Due to the length of time the designation process entails, clear policy direction is needed during the interim period between Congress's first action recommending study and Congress's second action of designating the trail.

In sum, this manual describes the statutory requirements and policy guidance for managing trails under study and trails recommended as suitable, including the requirements and goals for such trails during the land use planning process. This manual also describes the statutory requirements and policy guidance for the management of designated trails, including those related to inventory, land use planning, management, and monitoring. This manual is formatted to provide guidance to managers based on what stage the trail is in as it relates to the National Trail designation process, and for congressionally designated National Trails, in the order of the steps of the land use planning process.

    D.  Key Terms Used in This Manual

The following key terms and concepts are provided to ensure understanding of the policy described in this manual. Many of these terms are repeated in the glossary. See companion policy Manual 6250.

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-4

1. <u>National Scenic Trail</u>. A continuous, long-distance trail located on the ground by the land-managing agency along the congressionally designated route, in coordination with the trail administering agency. A National Scenic Trail provides maximum compatible outdoor recreation opportunity and conservation and enjoyment of the nationally significant scenic, historic, natural, and cultural resources, qualities, values, and associated settings and the primary use or uses of the areas through which such trails may pass. National Scenic Trails represent desert, marsh, grassland, mountain, canyon, river, forest, and other areas, as well as landforms that exhibit significant characteristics of the physiographic regions of the Nation. National Scenic Trails include the tread, or the trail path, and the trail setting which is included within the National Trail Management Corridor. National Scenic Trails may contain water sources or structures which are designed to support and provide for the safety of travelers along the trail.

2. <u>National Historic Trail</u>. An extended, long-distance trail designated by Congress that is not necessarily managed as continuous but follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a National Historic Trail is the identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment. A National Historic Trail is managed to recognize the nationally significant resources, qualities, values, and associated settings of the areas through which such trails may pass, including the primary use or uses of the trail. Federal Protection Components associated with the National Historic Trail, including high potential historic sites, high potential route segments, and auto tour routes are identified by the National Trail administering agency through the trailwide Comprehensive Plan. Properties eligible for the National Register of Historic Places, which may also be Federal Protection Components, may be identified along the National Historic Trail, including segments of the National Historic Trail.

3. <u>National Trail Segment</u>. Individual sections of a National Trail which, in combination, comprise the entire National Trail. Each segment of a National Trail may contain unique features or landforms, and variable resources, qualities, values, or associated settings.

4. <u>National Trail Feasibility Study</u>. Study authorized through an Act of Congress to determine the feasibility and desirability of designating a trail route as a National Trail. The completed study, including recommendations as to the suitability of trail designation, is submitted to Congress.

BLM_0019183

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-5

5. <u>National Trail Administration</u>. Trailwide responsibility is assigned to the BLM or National Park Service by the Secretary of the Interior when the Department of the Interior (or USFS, Department of Agriculture) is named as the responsible lead in National Trail-specific legislation. The responsibility involves trailwide coordination, guidance, technical assistance, and consultation with the on-the-ground National Trail managers that have physical site management responsibility. National Trail administration responsibilities are fulfilled as directed in the NTSA in coordination with tribes; other National Trail administering agencies; National Trail managing agencies (including all BLM public land managers along the congressionally designated National Trail); other Federal, state, and local government agencies; private and nonprofit organizations; willing landowners; land users; and individuals (tribes, affected agencies, willing landowners, partners, and interested parties). National Trail administration includes leadership in the development of the statutorily required trailwide Comprehensive Plan, which provides strategic direction for National Trail administration and management, including identification of the nature and purposes of the National Trail and selection of the National Trail Right-of-Way.

6. <u>National Trail Administrator</u>. The National Trail administering agency assigns the National Trail administration role to an individual referred to as a "National Trail Administrator". Each National Trail is assigned a National Trail Administrator. The National Trail Administrator reports to the associated BLM State Director, USFS Regional Forester, or NPS Regional Director, or other line officer, as delegated.

7. <u>National Trail Manager</u>. The on-the-ground land managing agency, landowner, or interest with the authority and/or responsibility for decisionmaking for lands under its jurisdiction. Also, the official responsible for land and water management of trail-related resources. The BLM, as National Trail manager, inventories the National Trail resources, qualities, values, and associated settings, and the primary use or use(s); establishes the National Trail Management Corridor through the land use planning process; manages resources and uses in a manner that will not substantially interfere with the nature and purposes of the National Trail; makes efforts to avoid incompatible activities; and monitors the National Trail.

BLM_0019184

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-6

8.  Trailwide Comprehensive Plan. Plan required by NTSA providing strategic direction and guidance for the future administration and management of a congressionally designated National Trail. The plan includes identification of the nature and purposes, goals and objectives, high potential sites and high potential segments (historic trails), and the selection of the National Trail Right-of-Way. The trailwide Comprehensive Plan does not make land use allocations and does not direct the actions of National Trail managers. The National Trail administering agency encourages and assists, but does not direct, agencies and willing landowners to achieve the strategic direction outlined within the trailwide Comprehensive Plan.

9.  Resource Management Plan. Land use plans which govern BLM administered public lands, as required by Section 202 of FLPMA, and developed through the planning and environmental review process outlined in 43 CFR 1600 and 40 CFR 1500. The BLM may consider the strategic direction, the nature and purposes, and the National Trail Right-of-Way described within the trailwide Comprehensive Plan within the Resource Management Plan through the NEPA process.

10. National Trail Right-of-Way. Term used in Section 7(a)(2) of the NTSA to describe the area selected by the National Trail administering agency in the trailwide Comprehensive Plan and which includes the area of land that is of sufficient width to encompass National Trail resources, qualities, values, and associated settings, and the primary use or uses. National Trail Right-of-Ways identified in the trailwide Comprehensive Plan are not BLM land use allocations because the NTSA does not transfer management responsibility to the National Trail administering agency. The National Trail Right-of-Way becomes a key consideration in designating the National Trail Management Corridor in a Resource Management Plan. The National Trail Right-of-Way, in the context of the NTSA, differs from a Federal Land Policy and Management Act (FLPMA) Title V right-of-way, which the BLM is authorized to grant pursuant to FLPMA authorities.

BLM_0019185

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-7

11. <u>National Trail Management Corridor</u>. Allocation established through the land use planning process, pursuant to Section 202 of FLPMA and Section 7(a)(2) of the NTSA ("rights-of-way") for a public land area of sufficient width to encompass National Trail resources, qualities, values, and associated settings and the primary use or uses that are present or to be restored. To determine the width of the National Trail Management Corridor, the BLM conducts an inventory and analyzes the National Trail Right-of-Way as a key consideration. The location and management of the National Trail Management Corridor is governed by FLPMA. The BLM uses the term "corridor" to refer to the area of public land surrounding the National Trail "Right-of-Way" which is described in section 7(a)(2) of the NTSA. The term "corridor" is used to reduce confusion between the National Trail Rights-of-Way and FLPMA Title V rights-of-way.

12. <u>Relationship between the National Trail Right-of-Way and National Trail Management Corridor</u>. The terms, National Trail Right-of-Way and National Trail Management Corridor, are both used to describe the area of land that encompasses the designated National Trail and the resources, qualities, values, and associated settings and the primary use or uses of the National Trail. The selection of the National Trail Right-of-Way for the entire trail is the responsibility of the National Trail administering agency in the trailwide Comprehensive Plan, but is not a land use decision. The establishment of the National Trail Management Corridor is a land use allocation decision made through the Resource Management Plan, which is the responsibility of the National Trail management agency by Field Office jurisdiction along segments of the trail. Selection of the National Trail Management Corridor is guided by the strategic direction provided in the trailwide Comprehensive Plan and the inventory of the resources, qualities, values, and associated settings and the primary use or uses.

13. <u>High Potential Historic Site (NTSA Sec. 12(1))</u>. The term "high potential historic sites" means those historic sites related to the route or sites in close proximity thereto, which provide opportunity to interpret the historic significance of the trail during the period of its major use. Criteria for consideration as high potential sites include historic significance, presence of visible historic remnants, scenic quality, and relative freedom from intrusion. Under the NTSA, high potential historic sites located on federally owned land are referred to as Federal Protection Components.

BLM_0019186

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-8

14. <u>High Potential Route Segment (NTSA Section 12(2))</u>. The term "high potential route segments" includes those segments of a trail which would afford high quality recreation experience, such as in a portion of the route having greater than average scenic values or affording an opportunity to vicariously share the experience of the original users of a historic route. Under the NTSA, high potential route segments located on federally owned land are referred to as Federal Protection Components.

15. <u>Federal Protection Component</u>. As described in Section 3 and 12 of the NTSA, selected high potential historic sites and high potential route segments and other land- and water-based components of a designated National Historic Trail located on federally owned land which meet the National Historic Trail criteria listed in the National Trails System Act and are identified in trailwide Comprehensive Plans, Resource Management Plans, and implementation plans.

16. <u>National Register of Historic Places</u>. The official Federal list of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. National Register properties have significance to the history of the communities, states, or the Nation.

17. <u>National Register Eligible</u>. Includes properties both formally determined as eligible for inclusion in the National Register by the Secretary of the Interior and all other significant properties that meet National Register listing criteria. This includes any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior.

18. <u>Auto Tour Route</u>. Those roads that parallel the National Historic Trail and provide opportunities to commemorate the historic route as an alternate experience. These opportunities may occur inside or outside the National Trail Management Corridor. Auto tour route opportunities may include access to National Historic Trail high potential historic sites and high potential route segments located on BLM public and, other participating agency land, or lands of willing landowners. Auto tour routes are normally restricted to existing all-weather roads or paved highways and may be limited to specific use conditions.

BLM_0019187

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-9

19. <u>Selecting a National Trail Right-of-Way</u>. Pursuant to Section 7(a)(2) of the NTSA, the National Trail administering agency is responsible for selecting the National Trail Right-of-Way and publishing a Notice of Availability of maps and descriptions in the Federal Register. Selection of the National Trail Right-of-Way is conducted with consideration of minimizing adverse effects on adjacent landowners or users and operations. In selecting the National Trail Right-of-Way, the National Trail administering agency obtains the advice and assistance of the states, local governments, private organizations, and landowners and land users concerned. The selection of the location and width of the National Trail Right-of-Way on lands under the jurisdiction of another Federal agency is made by agreement between agencies. Then National Trail administering agency recommends the National Trail Right-of-Way to the National Trail managing agency. The BLM, as National Trail managing agency, considers the recommended National Trail Right-of-Way through the land use planning process, as appropriate.

20. <u>Locating National Trails</u>. After Congress designates a National Trail and identifies the general location or "route" of the National Trail based on the National Trail Feasibility Study, the National Trail administering and managing agencies conduct an inventory(ies) to obtain more complete data for planning and management purposes. For National Scenic Trails, it might include finding optimal or alternate trail locations, and for National Historic Trails, this includes the identification of the physical locations, remnants, and artifacts where history actually occurred. Based on inventory and the recommended National Trail Right-of-Way, the National Trail managing agency further identifies the physical location of the National Trail and the National Trail Management Corridor. Major relocation of the National Trail Right-of-Way requires an act of Congress.

1.1 Purpose

1. This manual is provided to fulfill the requirements of and achieve the policy and purposes set forth in the NTSA and FLPMA, and other applicable laws and policies.

2. This manual provides the Bureau of Land Management (BLM) policy and program guidance on managing trails under study, trails recommended as suitable, and Congressionally designated National Scenic and Historic Trails (National Trails) as part of the National Landscape Conservation System (NLCS). This manual describes the BLM's roles, responsibilities, agency interrelationships, and policy requirements as National Trail Manager.

3. This manual describes the BLM's inventory, planning, management, and monitoring policies for National Trails.

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-10

4. This manual must be used in conjunction with the BLM Manual 6250, National Scenic and Historic Trail Administration and other related program policies. This manual does not restate those policies.

## 1.2   Objectives

1. Comply with the requirements of the NTSA; FLPMA; trail enabling legislation; and other laws, regulations, and policies.

2. Provide the methods, standards, and training for achieving National Trail purposes.

3. Manage trails that are under study and trails that are recommended as suitable through the National Trail Feasibility Study process, pursuant to FLPMA.

4. Manage designated National Trails as components of the National Trails System and the BLM's NLCS.

5. Manage the diverse network of designated trails and National Trail Management Corridors by encouraging and assisting volunteer citizen, community, and partnership involvement.

6. Manage the nationally significant scenic, historic, cultural, recreation, natural, and other landscape values (resources, qualities, values, and associated settings) and the primary use or uses (see glossary) for which the National Trails were designated.

7. Address the nature and purposes of designated National Trails through effective inventory, planning, management, and monitoring.

8. Develop and maintain relationships, and collaborate and coordinate with tribes; assigned National Trail Administrators; other Federal, state, and local agencies; private and nonprofit organizations; partners; landowners; land users; and individuals (tribes, affected agencies, partners, and interested parties) regarding management of National Trails.

## 1.3   Relevant Authorities

1. National Trails System Act (NTSA) of 1968, as amended (16 U.S.C. 1241-1251)

2. Federal Land Policy and Management Act (FLPMA) of 1976, as amended (43 U.S.C. *et seq.*)

3. Omnibus Public Land Management Act of 2009 (16 U.S.C. 7201-7203)

4. National Historic Preservation Act (NHPA) of 1966, as amended (16 U.S.C. 470)

5. National Environmental Policy Act (NEPA) of 1969, as amended (42 U.S.C. 4321 *et seq.*)

BLM_0019189

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-11

6.  Historic Sites Act of 1935, as amended (16 U.S.C. 461-467)

7.  Archaeological Resources Protection Act of 1979, as amended (16 U.S.C. 470aa *et. seq.*)

8.  Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460I-4 through 460I-11)

9.  Federal Advisory Committee Act of 1972, as amended (5 U.S.C. Appendix 2 1-16)

10.  Department of Transportation Act of 1966, as amended (49 U.S.C. 1653(f))

1.4  Responsibility

A.  *The Director, Bureau of Land Management,* through the Assistant Director, National Landscape Conservation System and Community Partnerships, is responsible for:

1.  Developing the budget and establishing policy to support the management of National Trails and the enjoyment and appreciation of the resources, qualities, values, and associated settings and the primary use or uses for which the National Trails were designated.

2.  Coordinating National Trails budget and policy development and implementation with other BLM programs.

3.  Developing and maintaining relationships at the national level, including collaborating and coordinating with tribes, affected agencies, partners, and interested parties; and participating on the Federal Interagency Council on Trails regarding administration and management of National Trails.

4.  Assigning a BLM lead state office the responsibility to coordinate management of designated trails across jurisdictional boundaries (see Illustration 1), maintaining an official National Trails Program Lead list, and upon designation, formally activating BLM National Trail management responsibilities through an instruction memorandum.

5.  Directing review and data support of BLM-related National Trail Feasibility Studies, trailwide Comprehensive Plans, and land use plans addressing National Trails.

6.  Setting funding priorities for the acquisition of lands or interests in lands for the protection of designated National Trail resources, qualities, values, and associated settings, as identified through the Bureau's standard prioritization process.

7.  Establishing and maintaining National Trail case files.

8.  Implementing the Federal Geographic Data Committee-approved Federal Trail Data Standards (FTDS) and providing geospatial and other database support.

BLM_0019190

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-12

B.  *State Directors* are responsible for:

1.  Implementing the budget; developing policy direction; and providing statewide program coordination for managing National Trails, including assigning National Trails Program Lead responsibilities and data steward responsibilities, maintaining trailwide management coordination responsibilities for assigned trails (see Illustration 1), including entering into formal state or interstate agreements, and maintaining an official statewide National Trails Program Lead list.

2.  Coordinating National Trails budget and policy development and implementation with other BLM programs.

3.  Developing and maintaining relationships, and collaborating and coordinating with the National Trail administering agency during environmental review of proposed actions affecting National Trails, and during the land use planning process, in accordance with this policy.

4.  Directing or conducting review and data support of National Trail Feasibility Studies and trailwide Comprehensive Plans, as appropriate, and recommending or approving trailwide Comprehensive Plans, where BLM lands are involved or when the BLM serves as the National Trail administering agency, in accordance with this policy.

5.  Ensuring that National Trails are addressed within BLM Resource Management Plans; National Trail Management Corridors are established through the land use planning process; National Trail Management Corridors are compatible across Field Office jurisdictions; and activities within the National Trail Management Corridors are conducted in accordance with the NTSA, FLPMA, national and state policies and guidance, and Resource Management Plans.

6.  Identifying priorities and requesting funding for acquisition of lands or interests in lands from willing sellers in order to further the purposes for which a National Trail is designated, consistent with other BLM resource programs, using the national prioritization process.

7.  Establishing and maintaining National Trail serialized case files in accordance with this policy.

8.  Implementing FTDS and maintaining the National Trail geospatial and other data and databases.

C.  *District and Field Managers* are responsible for:

1.  Implementing and coordinating National Trail budget and policy implementation, including coordination with other BLM programs.

BLM_0019191

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-13

2. Assigning and providing program coordination and management for National Trails, including National Trails Program Lead responsibilities and data steward responsibilities, and maintaining any trailwide management coordination responsibilities for assigned trails.

3. Developing and maintaining relationships and collaborating and coordinating with tribes, affected agencies, partners, and interested parties, regarding management of National Trails, and the National Trail administering agency (when requested).

4. Inventorying and monitoring National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail.

5. Establishing National Trail Management Corridors through the land use planning process, and incorporating management actions for National Trails in accordance with applicable laws and policy.

6. Ensuring that activities within National Trail Management Corridors are conducted in accordance with FLPMA, the NTSA, the BLM budget and related policies, and Resource Management Plans, including the consideration of guidance contained in the trailwide Comprehensive Plan.

7. Ensuring efforts are made to manage National Trail resources on shared trail boundaries in accordance with applicable laws and in a manner compatible with the respective landowners and management entities and in coordination with tribes, affected agencies, partners, and interested parties.

8. Acquiring lands or interests in lands from willing sellers, as appropriate and consistent with policy direction established by the Director, to further the purposes for which a National Trail is designated, consistent with other BLM resource programs.

9. Establishing and maintaining National Trail serialized case files in accordance with this policy.

10. Implementing FTDS and providing geospatial and other database support.

1.5 References

1. Executive Order 13195, Trails for America in the 21st Century

2. Secretarial Order 3308, Management of the National Landscape Conservation System

3. Secretarial Order 3319, Establishment of a National Water Trails System

4. Departmental Manual, Part 301, Chapter 5, Partnership Policy

BLM_0019192

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-14

5. Departmental Manual, Part 710, National Rivers and Trails Systems

6. BLM Manual 1203, Delegation of Authority

7. BLM Manual 1601, Land Use Planning

8. BLM Manual 1626, Travel and Transportation Management

9. BLM Manual 6120, Congressionally Required Maps and Legal Boundary Descriptions for National Landscape Conservation System Designations

10. BLM Manual 6250, National Scenic and Historic Trail Administration

11. BLM Manual 8100, The Foundations for Managing Cultural Resources

12. BLM Manual 8110, Identifying and Evaluating Cultural Resources

13. BLM Manual 8120, Tribal Consultation Under Cultural Resource Authorities

14. BLM Manual 8140, Protecting Cultural Resources

15. BLM Manual 8320, Planning for Recreation and Visitor Services

16. BLM Manual 8353, Trail Management Areas – Secretarially Designated National Recreation, Water, and Connecting and Side Trails

17. BLM Manual 8400, Visual Resource Management

18. BLM Handbook, 1283-1, Data Administration and Management

19. BLM Handbook 1601-1, Land Use Planning

20. BLM Handbook 1790-1, National Environmental Policy Act

21. BLM Handbook 2100-1, Acquisition

22. BLM Handbook 8120-1, General Procedural Guidance for Native American Consultation

23. BLM Handbook 8342-1, Travel and Transportation Management

24. BLM Handbook 8410-1, Visual Resource Inventory

25. BLM Handbook 8431-1, Visual Resource Contrast Rating

26. BLM Handbook 9114-1, Trails

BLM_0019193

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-15

27. BLM, Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development, The Gold Book

28. BLM Technical Reference 9113-1, Travel and Transportation Management: Planning and Conducting Route Inventories

29. Bureau of Land Management 2007 Collaboration Desk Guide

30. BLM publication, Knowing Your Nonprofit Partners: A Desk Guide for Federal Employees

31. Federal Geographic Data Committee, Federal Trail Data Standards, FGDC-STD-017-2011

32. The National Landscape Conservation System 15-Year Strategy, 2010-2025: The Geography of Hope

33. National Scenic and Historic Trails Strategy and Work Plan, 2006

34. Trails for America: Report on the Nationwide Trails Study, 1966

35. The National Trails System Interagency Memorandum of Understanding, 06-SU-11132424-196

36. Applicable Trailwide Comprehensive Plans

1.6   Policy

  A.   Statement of Programmatic Policy

    1.   *Principal Laws, Purposes, and Provisions.*

      i.   Trails under study, and trails recommended as suitable, as well as congressionally designated National Trails, are managed as public lands under FLPMA and other applicable laws. Congress' Declaration of Policy provision in FLPMA states that "it is the policy of the United States that the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." FLPMA Sec. 102 (a)(8).

BLM_0019194

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-16

FLPMA also provides that the BLM "shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under Section 202 of this Act when they are available, except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." FLPMA Sec. 302(a).

ii.  In 2009, the Omnibus Public Lands Management Act (OPLMA) was signed into law, and established the National Landscape Conservation System (NLCS or System) "[i]n order to conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." OPLMA (Sec. 2002(a)). Areas including congressionally designated National Scenic and Historic Trails are components of the System. The BLM manages the System "(1) in accordance with any applicable law (including regulations) relating to any component of the system… and (2) in a manner that protects the values for which the components of the system were designated." OPLMA Sec. 2002(c).

iii.  Congress' Statement of Policy provision in the National Trails System Act of 1968 states that "[i]n order to provide for the ever-increasing outdoor recreation needs of an expanding population and in order to promote the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation, trails should be established (i) primarily, near the urban areas of the Nation, and (ii) secondarily, within scenic areas and along historic travel routes of the Nation which are often more remotely located." NTSA Sec. 2(a). A stated purpose of the NTSA "is to provides the means for attaining these objectives by instituting a national system of recreation, scenic and historic trails, by designating the Appalachian Trail and the Pacific Crest Trail as the initial components of that system, and by prescribing the methods by which, and standards according to which, additional components may be added to the system." NTSA Sec. 2(b).

The NTSA's Statement of Policy also provides that "the Congress recognizes the valuable contributions that volunteers and private, nonprofit trail groups have made to the development and maintenance of the Nation's trails. In recognition of these contributions, it is further the purpose of the NTSA to encourage and assist volunteer citizen involvement in the planning, development, maintenance, and management, where appropriate, of trails." NTSA Sec. 2(c).

2.  *Management Standard for Trails not yet Congressionally Designated that are under National Trail Feasibility Study (trails under study) or that have been Recommended as Suitable for Congressional Designation through a National Trails Feasibility Study (trails recommended as suitable).*

BLM_0019195

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-17

    i.    Through the land use planning and associated NEPA processes, for trails under study or for trails recommended as suitable, the BLM shall consider management actions and alternatives that maintain the values, characteristics, and settings of trails under study and trails recommended as suitable, pursuant to FLPMA (see Chapter 2 of this manual).

    ii.    In evaluating a proposed action on or along a trail under study or along a trail recommended as suitable, the BLM shall consider alternatives to the proposed action that avoid adverse impacts to the values, characteristics, and settings of such trails (see Chapter 2 of this manual).

3.   *Management Standard for Congressionally Designated National Scenic and Historic Trails (National Trails).*

    i.    *Nature and Purposes.* To the greatest extent possible, the BLM shall manage National Trails so as to safeguard the nature and purposes of the trail and in a manner that protects the values for which the components of the System were designated, recognizing the nationally significant scenic, historic, cultural, recreation, natural, and other landscape values (hereinafter referred to as resources, qualities, values, and associated settings) of the public land areas through which such National Trails may pass, and the primary trail use or uses.

        The BLM will effectively manage National Trails by conducting stewardship responsibilities which include inventory, planning, management, and monitoring, including land or easement acquisition, protection, development, maintenance, training, and operations.

    ii.    *Substantial Interference and Avoidance of Incompatible Activities.* As set forth in Section 7(c) of the NTSA, "National scenic or national historic trails may contain campsites, shelters, and related-public-use facilities. Other uses along the trail, which will not substantially interfere with the nature and purposes of the trail, may be permitted by the Secretary responsible for administration of the trail. Reasonable efforts shall be made to provide sufficient access opportunities to such trails and, to the extent practicable, efforts shall be made to avoid activities incompatible with the purpose for which such trails were established." NTSA Sec. 7(c).

        Through the land use planning and NEPA processes for proposed actions on National Trails, the BLM may permit uses that will not substantially interfere with the nature and purposes of the National Trails. To the extent practicable, the BLM shall make efforts to avoid activities that are incompatible with the purposes for which such trails were established. NTSA Sec. 7(c). As such, subject to valid existing rights, the BLM may, through the appropriate NEPA analysis, approve, reject, deny, prohibit, minimize, and/or mitigate proposed actions.

BLM_0019196

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-18

a.  As part of the NEPA analysis for the proposed action, the BLM will evaluate whether the proposed action would substantially interfere with or be incompatible with the nature and purposes of a National Trail (hinders or obstructs), and will consider the following:

(1)  *For all National Trails*:

(i)  The extent to which the proposed action would affect the BLM's ability to effectively manage the nature and purposes of the trail, trail resources, qualities, values, uses (including public access and enjoyment) and associated settings.

(ii)  The extent to which a proposed action would require a major relocation of the National Trail Management Corridor in order to provide for the conservation and enjoyment of the nationally significant resources, qualities, values, and associated settings of the areas through which such trails may pass, or the primary use or uses of the trail.

(2)  *For National Scenic Trails*:

(i)  The extent to which the proposed action would affect the purposes for which the trail was designated.

(ii)  The extent to which the proposed action would result in long-term or permanent disruption to the continuous nature of the trail.

(iii)  The extent to which the proposed action would affect opportunities for maximum outdoor recreation potential.

(iv)  The extent to which the proposed action would affect the conservation or enjoyment of resources, qualities, values, and associated settings of the areas through which such trails may pass, including noteworthy characteristics or landforms of the region.

(3)  *For National Historic Trails*:

(i)  The extent to which the proposed action would affect the characteristics that made the trail worthy of designation.

(ii)  The extent to which the proposed action would affect the Federal Protection Components, including high-potential historic sites or high potential route segments located on public land.

BLM_0019197

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-19

(iii)  The extent to which the proposed action would affect designated National Historic Trail properties, including remnants and artifacts from the associated period of use that may be eligible or listed on the National Register and/or determined by the National Trail administering agency to qualify as possible high potential historic sites or high potential route segments.

(iv)  The extent to which the proposed action would limit the agency's ability to manage the trail for the purpose of identifying and protecting the historic route and its historic remnants and artifacts for public use and enjoyment, including interpretation, education, appreciation, and vicarious experiences.

iii.  *Inventory.* The BLM shall conduct and maintain a standardized inventory of the trail-related resources, qualities, values, and associated settings and the primary use or uses that support the nature and purposes of the National Trail. The inventory will be used in order to establish a National Trail Management Corridor through the land use planning process. Until such time as a National Trail Management Corridor is established through the Resource Management Plan in accordance with this policy, an inventory shall be conducted for proposed actions within the National Trail viewshed. Inventory results inform future NEPA analyses for land use plans and for proposed actions by identifying the area of potential adverse impact, including the resources, qualities, values and associated settings and the primary use or uses present in that area.

iv.  *Land Use Planning.* Through the land use planning process, the BLM shall establish a National Trail Management Corridor for a public land area of sufficient width to encompass National Trail resources, qualities, values, and associated settings and the primary use or uses that are present or to be restored. Through the land use planning process, the BLM shall establish allowable uses, management actions, and necessary restrictions for the National Trail Management Corridor; and coordinate with and consider all BLM resource programs and uses within the National Trail Management Corridor to achieve National Trail goals and objectives.

v.  *Management.* In the management and stewardship of National Trails and National Trail Management Corridors, the BLM will encourage, assist, and establish cooperative relationships, partnerships, and stakeholder involvement to increase efficiencies, improve awareness and communication, promote consistency, and expand participation in the management of the National Trails. The BLM will manage National Trails in coordination with tribes, the National Trail administering agency, affected agencies, willing landowners, partners, and interested parties.

a.  The BLM will consider the following National Trail characteristics in National Trail management:

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-20

(1)  *National Scenic Trails*

(i)  Desert, marsh, grassland, mountain, canyon, river, forest, and other areas, as well as landforms that exhibit significant characteristics of the physiographic region.

(ii)  Sustainable and premier trail-related opportunities.

(iii)  The highest possible scenic value.

(iv)  Relative freedom from intrusion.

(v)  Natural conditions, scenic and historic features, and the primitive character of the trail area.

(vi)  Sustainable trail and resource conditions.

(vii)  Opportunities for high–quality, primitive nonmotorized recreation experiences, including providing, where appropriate, campsites, shelters, and related public use facilities and continuous and sufficient public access.

(viii)  Avoidance, insofar as practicable, of highways, motor roads, mineral rich areas, energy transmission lines, commercial and industrial developments, range fences and improvements, private operations, and any other foreseeable activities that do not substantially interfere with the nature and purposes and are compatible with National Trail purposes.

(ix)  Human health and safety.

(2)  *National Historic Trails*

(i)  The original trails or routes of travel of national historic significance to maximize vicarious experiences and provide resource protection.

(ii)  Historic route and its historic remnants and artifacts for public use and enjoyment.

(iii)  Sustainable and premier trail-related opportunities.

(iv)  Selected land and water-based components, not necessarily continuous on the ground.

BLM_0019199

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-21

(v) Federal Protection Components (selected land and water based components of a historic trail on federally owned lands which meet national historic trail criteria established in the NTSA), including high potential historic sites and high potential route segments.

   (a) *High potential historic sites:* opportunities to interpret the historic significance of the trail during its period of major use and to identify and protect (NTSA Section 3(a)(3)) the visible historic remnants and scenic quality and to provide relative freedom from intrusion (NTSA Sec. 12(1)).

   (b) *High potential route segments:* opportunities for afford high-quality recreation experiences, identify, and protect (NTSA Sec. 3(a)(3)) the scenic integrity of the trail setting, and afford opportunities for vicarious experiences (NTSA Sec. 12(2)).

   (c) Opportunities for a developed trail to meet objectives.

(vi) Properties potentially eligible for the National Register of Historic Places.

(vii) Human health and safety.

b. *FLPMA Rights-of-Way.* The Secretary, through the BLM, "may grant easements and rights-of-way upon, over, under, across, or along any component of the National Trails System in accordance with the laws applicable to…[the BLM public lands]…[p]rovided [t]hat any conditions contained in such easements and rights-of-way shall be related to the policy and purposes of… [the National Trails Systems Act]." NTSA Sec. 9(a). To the greatest extent possible, for National Scenic and Historic Trails, the BLM shall consider locating proposed rights-of-way outside of Federal Protection Components, high potential historic sites, high potential route segments, and for National Scenic Trails, to areas of comparative disturbance, in accordance with this policy. The BLM may approve proposed rights-of-way, subject to terms and conditions that are related to the policy and purposes of the NTSA. Through the NEPA process for proposed rights-of-way, the BLM may permit rights-of-way that will not substantially interfere with National Trail purposes, and shall make efforts, to the extent practicable, to avoid rights-of-way that would be incompatible with the purposes for which the National Trail was established, in accordance with law and this policy.

c. *Environmental Review Process*

BLM_0019200

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-22

(1) As congressionally designated components of the NLCS and National Trails System, a categorical exclusion may be used only when the proposed action serves the nature and purposes of the National Trail and it can be clearly demonstrated and documented that the proposed action has no adverse effect upon the resources, qualities, values, and associated settings and the primary use or uses, unless another provision of law applies (43 CFR 46.215).

(2) As part of the NEPA analysis for a land use plan that includes a National Trail(s) within the planning area, and for any implementation-level activities proposed along a National Trail or within a National Trail Management Corridor, the BLM shall:

(i) For each alternative, describe and analyze the potential impacts to the nature and purposes of the National Trail, and the National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail.

(ii) Describe the impacts to the national significance of National Trails, based on NHPA National Historic Landmark criteria and other NTSA criteria, as well as impacts to the significance of properties that are eligible or listed on the National Register, as applicable.

(iii) Ensure adequate public involvement in the BLM's management activities through the NEPA, land use planning, and/or other applicable processes. If the NEPA analysis includes an EA, the BLM will provide at least 30 days public notice prior to the decision.

(iv) Coordinate with the National Trail administering agency during the environmental review and land use planning processes, regarding the establishment of the National Trail Management Corridor.

(v) To the greatest extent possible, consider opportunities for mitigation to a level commensurate with the adverse impact to the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses of the National Trail.

(vi) Include the following in the Decision Record or Record of Decision:

(a) Whether the proposed action will substantially interfere or will be incompatible with the nature and purposes of the National Trail, including the resources, qualities, values or associated settings or the primary use or uses.

BLM_0019201

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-23

(b) A description of the action taken to authorize or deny an activity or the application of any best management practices or mitigation measures.

d. *Mitigation*. For National Trails, mitigation means to eliminate or moderate, to the greatest extent possible, intensity and duration of the adverse impact to the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses of the National Trail from incompatible multiple-use activities.

(1) Mitigation includes rectifying, reducing, or eliminating the impact over time and/or compensating for the impact by replacing or providing substitute resources or environments.

(2) Onsite mitigation and design considerations can include moving the project location, minimizing the scale, camouflaging the proposed activity with visual screening techniques, or similar actions.

(3) Priority for mitigation should occur onsite first; secondly, in the general National Trail region; and lastly within the state (for multi-state National Trails) where the project is being proposed. Regardless of physical location, mitigation of project impacts must benefit the National Trail and should remain within the National Trail Management Corridor. Where onsite mitigation (along the National Trail) cannot adequately compensate for the adverse impact, offsite mitigation may include consideration of monetary compensation for public lands along the National Trail, and should be analyzed, incorporated, and carried out in accordance with all applicable laws and policies.

e. *Monitoring*. The BLM shall monitor the conditions of National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail on public lands or interests in lands; the effects of decision implementation; and in order to identify new and emerging issues.

1.7  File and Records Maintenance

A.  Offices managing National Trails must establish and maintain National Trail serialized case files in accordance with this manual and BLM Manual Section 6120. Recordkeeping requirements are mandated by Executive Orders 12866 and 13353, the Paperwork Reduction Act (44 U.S.C. 3501), and the guidelines of the BLM Paperwork Schedule program. The serialized case file shall, as practicable, contain:

BLM_0019202

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-24

1. The official map depicting the congressionally designated trail, the National Trail Right-of-Way, the National Trail Management Corridor, including boundaries and descriptions, and any subsequent amendments to the National Trail Right-of-Way or National Trail Management Corridor, portraying, at a minimum, the responsible office area of jurisdiction.

2. For the National Trail Management Corridor, either a determination that a boundary evidence review is not required signed by the Authorized Officer, or the appropriate Standards for Boundary Evidence Certificate(s) signed by the State Office Chief Cadastral Surveyor.

3. A copy of the NTSA; National Trail-specific enabling legislation; legislative history; National Trail Feasibility Study; any Historic Context Study and Report; National Register eligible and listed property information including completed Multiple Property Documentation Forms; Federal Protection Component information, including high potential historic sites and high potential route segments; the trailwide Comprehensive Plan, Resource Management Plan, and subsequent implementation plans; all trail inventory and monitoring data; relevant activation memorandums; and memorandums of understanding or agreements.

4. Detailed information related to the designation and stewardship responsibilities of the National Trail.

5. Documentation regarding management issues associated with the National Trail or the National Trail Management Corridor.

6. Documentation regarding the rationale for recommending National Trail relocation within the corridor, including applicable plan amendments.

B.   After the National Trail Management Corridor is established through the planning process, the National Trail Management Corridor shall be portrayed on the Master Title Plats and on the Geographic Coordinate Database.

C.   The following maps shall be available for public inspection in the affected BLM offices: the official map depicting the congressionally designated trail, maps of the National Trail Management Corridor established in the Resource Management Plan, and any subsequent National Trail Management Corridor amendments, portraying, at a minimum, the responsible office area of jurisdiction.

D.   Public Land Statistics, stewardship asset reports, Department of the Interior strategic plan performance measures, program elements and workload measures, other trail reports, and lists maintained by National Trail Program Leads may be used to report designated National Trails program and planning status, issues, opportunities, and accomplishments.

BLM_0019203

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

1-25

1.8   Data Standards and Management

A.   National Trail Program Leads, staff, and data stewards should coordinate data collection, ensure National Trail data are documented in BLM corporate databases, including geospatial standards and LR2000, compile and maintain the National Trail case file, and ensure the National Trail is portrayed on the Master Title Plats.

B.   Trail data and data collection, including maps, must comply with the Department of the Interior data management systems, FTDS, related national BLM geospatial standards, NLCS data standards, and other data standards and management policies, including those addressing sensitive cultural resources data. Data management will be consistent with standards outlined in national programmatic agreements, state protocol agreements, and state data sharing agreements, including BLM-State Historic Preservation Officer (SHPO) cultural resources data sharing partnerships and agreements to share SHPO digital data of inventory and resources, consistent with SHPO standards and BLM-SHPO protocols.

C.   The BLM should establish uniform mapping through an associated database or system to manage and track National Trail information related to the management corridor, inventory, planning, monitoring, land status, acquisition of lands or interests in lands, and similar information. The mapping and database should document National Trail resources, qualities, values, and associated settings as required by this policy, by other BLM programs, and by interagency applications developed through the Federal Interagency Council on Trails. The BLM will manage and analyze data, including maps, property records, historic research, and maintenance schedules.

D.   The BLM will share data with various agencies, organizations, partners, and the public in accordance with policy standards, data sharing agreements, and established protocol.

BLM_0019204

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

2-1

**Chapter 2.  Management of Trails Under National Trail Feasibility Study and Trails Recommended as Suitable for Congressional Designation, but Not Yet Designated**

This chapter outlines BLM inventory, land use planning considerations, management provisions, and protocol for proposed actions which may affect trails under National Trail Feasibility Study (trails under study) and trails recommended as suitable for National Trail designation (trails recommended as suitable) through the National Trail Feasibility Study. Policy for conducting National Trail Feasibility Studies is found in BLM Manual 6250, National Scenic and Historic Trail Administration.

2.1   Identification and Documentation of Trails Under National Trail Feasibility Study and Trails Recommended as Suitable for Congressional Designation

A.  The BLM will maintain a list of trails that have been authorized by Congress which are under study and trails that have undergone the study process and are either recommended as suitable or not suitable.

B.  The BLM is encouraged to identify and document trails under study and trails recommended as suitable using the protocols outlined in Chapter 3 of this manual (Congressionally Designated National Trails-Inventory). The information will be maintained and updated in a case file and data management systems. This information may be collected or analyzed for management purposes as the BLM makes land use planning and implementation-level decisions.

2.2     Land Use Planning Considerations for Trails Under Study and Trails Recommended as Suitable for Designation

A.  Field Offices shall conduct a land use plan evaluation (see BLM Handbook H-1601-1) to determine if significant trail values, characteristics, and settings for which the trail was identified for study, are appropriately managed.

B.  Land use planning decisions for trails under study and trails recommended as suitable should take into account the significant trail values, characteristics, and settings so as to not compromise potential future congressional action to designate these trails as National Trails. The land use plan that includes such trails within the planning area will:

1.  Identify and document the trail under study and the study trail route(s) and the trail and trail route(s) recommended as suitable, using the protocols outlined in the inventory chapter of this manual (Chapter 3).

2.  Identify goals and objectives for trails under study and for trails recommended as suitable.

3.  Consider the following in the formulation and analysis of alternatives:

BLM_0019205

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

2-2

    i.  Management of the values, characteristics, and settings and the purposes for which a trail is being studied or has been recommended as suitable.

    ii.  Retention of public lands under study or recommended as suitable in public land ownership.

    iii.  Methods to avoid adverse impacts to the trail tread or trace and setting, including minimizing or mitigating techniques and the development and application of best management practices.

    iv.  Closure or restriction of areas to maintain the trail under study or the recommended trail.

4.  Consider appropriate management actions in accordance with BLM's multiple use mandate for the trail in the event it is found unsuitable or in the event it is not designated as a National Trail, including potential management of the area as a different special management area, or for uses other than trail purposes.

5.  Identification of the need for future planning should designation occur.

2.3  Site-Specific/Implementation-Level Management of Trails Under National Trail Feasibility Study and Trails Recommended as Suitable for Congressional Designation

    A.  For site specific implementation level decisions, the BLM may consider, as part of the authorization of a proposed activity along a trail under study or recommended as suitable, imposing best management practices (BMPs) (see examples in Appendix 1) for specific uses in order to maintain the values, characteristics, and settings for which the trail is being studied or for which the trail was recommended as suitable. The BLM may consider including monitoring, proactive trail conservation and/or protection project work, and use of design features that minimize adverse impacts from proposed activities. The BMPs will be analyzed through the NEPA analysis that accompanies the decision on the proposed activity.

    B.  The BLM should consider, where appropriate and pursuant to the applicable laws and regulations and policies that apply, use of temporary closures to restrict the use of public lands and resources to maintain the values, characteristics, and settings of the trail under study or the trail recommended as suitable. Closures shall follow all BLM regulatory requirements, including environmental review, timeframe and extent of closure, approval, and public notification (e.g. 43 CFR 8341.2 and 43 CFR 8364.1).

    C.  The BLM may encourage and assist partners, volunteers, and volunteer organizations in planning, developing, maintaining, and managing trails under study and trails recommended as suitable. Volunteer project work may occur after the partners or volunteers have received any required training, after approval of any necessary agreements between the BLM and the partner or volunteer(s), and after project work has been analyzed and approved by the BLM. Volunteer projects should:

BLM_0019206

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

2-3

1. Be coordinated across offices and jurisdictions to ensure compatibility.

2. Be in conformance with the Resource Management Plan.

3. Serve an identified resource need.

4. Not detract from the values, characteristics, and settings for which the trail is being studied or has been identified as suitable.

D.  While the BLM does not identify trails that may qualify for designation, the BLM may provide information and technical assistance to partners (NTSA Sec. 11(b)(1)) on trails.  Any such information or assistance shall occur according to agency policies and processes. The BLM does not advocate for or against either directly or through partners any proposed legislative designations. The BLM State Public Affairs Office and WO Legislative Affairs should be informed of any potential Congressional designations.

E.  Requests for reporting will be followed in accordance with the standards outlined in section 1.7 File and Records Maintenance of this manual.

2.4  Protocol for Proposed Actions which May Affect Trails Under National Trail Feasibility Study and Trails Recommended as Suitable for National Trail Designation

A.  The BLM Field and/or State Office National Trail Program Lead shall coordinate with the assigned National Trail Feasibility Study agency to request information that may be used during the environmental review process for proposed actions along trails under study or trails recommended as suitable.

B.  The BLM Field and/or State Office National Trail Program Lead shall coordinate with the proposed project lead and affected BLM resource programs to identify National Trail and other resource program requirements, such as cultural resource inventory and consultation requirements.

C.  The NEPA analysis for the proposed action will consider existing data, including data from the completed National Trail Feasibility Study, data provided to the BLM by the agency conducting the National Trail Feasibility Study, or additional data collected as necessary for alternative formulation and analysis. In evaluating whether to approve the proposed action, the NEPA analysis, will:

1. Describe the values, characteristics, and settings of trails under study and trails recommended as suitable in the affected environment section of the NEPA document.

2. Analyze and describe any impacts of the proposed action on the values, characteristics, and settings of trails under study or trails recommended as suitable.

BLM_0019207

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

2-4

3. Consider an alternative that would avoid adverse impacts to the values, characteristics, and settings of the trail under study or recommended as suitable and/or incorporate and consider applying design features (see examples in Appendix 1) to avoid adverse impacts.

D. When the proposed action is anticipated to have a significant adverse impact, there must be coordination between the BLM State Office and the assigned National Trail Feasibility Study agency office. If the anticipated significant adverse impact cannot be avoided, the BLM State Office must contact the BLM Washington Office so that coordination with the study agency headquarters office can be initiated.

BLM_0019208

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-1

**Chapter 3.  Congressionally Designated National Trails - Inventory**

This chapter outlines BLM requirements for inventory and assessment of designated National Trails. The affected BLM Field Offices, upon designation of a National Trail by Congress, conducts and assesses a field inventory of the National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail for the public land areas through which such trails may pass. This chapter outlines inventory by individual landscape element, including scenic, historic, cultural, recreation, natural, and other landscape elements, and the assessment of that inventory for National Trail purposes.

3.1   General Requirements

The BLM shall:

A.   Conduct an inventory in accordance with FLPMA Section 201 and the NTSA, National Trail policy, resource program policy, Federal Trail Data Standards (FTDS), related national geospatial standards, and route inventory standards.

B.  Use the inventory to make informed decisions regarding proposed uses within National Trail areas, to identify opportunities to safeguard the nature and purposes of National Trails, and to allocate the resources, qualities, values, and associated settings and the primary use or uses of the trail during land use planning (NTSA and FLPMA).

C.   Use the inventory to establish a National Trail Management Corridor through the land use planning process.

D.   Conduct inventory within the National Trail viewshed to identify the area of potential adverse impact for proposed actions, until such time as a National Trail Management Corridor is established.

E.  Recommend to the National Trail administering agency for inclusion in the trailwide Comprehensive Plan, data regarding Federal Protection Components (land and water based components of a historic trail), including high potential historic sites and high potential route segments, identified or discovered through the inventory process.

3.2   Data Documentation and Standards

To the greatest extent practicable, the BLM shall:

A.   Document the inventory in accordance with National Trail policy; resource program policy, requirements, and standards; Federal Trail Data Standards (FTDS); related national geospatial standards; route inventory standards; and other formally established Department and BLM data standards.

BLM_0019209

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-2

B.   Map the inventory for each landscape element, using geographic information system (GIS) technology at a consistent scale. Include maps and descriptions of the inventory findings in the serialized National Trail case files.

C.   Collect the data using the following standards:

1.   Metadata collected for all inventory data, including photographs.

2.   Data collected in formats that are compatible with BLM nationally approved GIS configurations.

3.   Data formats consistent across resource programs, including scale and horizontal accuracy levels, to the greatest extent practicable.

4.   Geospatial data including attribute information and metadata.

5.   Global Positioning System (GPS) data including data dictionary attributes for line and point features found in Illustration 2 and 3. In addition, for significant historic properties that may be eligible for the National Register, include:

   i.   GIS data from previously recorded sites found through a records search.

   ii.   Data from archival and data searches, including previously inventoried areas and areas with a high probability of containing trail-related resources that have retained historic integrity.

3.3   Coordination of the National Trail Inventory and Data Sharing

The BLM will coordinate the trail inventory on an ongoing basis across offices and states to ensure consistency and information sharing. The National Trail inventory will be conducted in coordination with the National Trail administering agency and in cooperation with tribes, affected agencies, partners, and interested parties in accordance with policy, agreements, and protocol. To the greatest extent practicable, the BLM:

A.   Should establish a system or database to share National Trail inventory data across BLM offices and states, as practicable. The information shared will, in part, help inform the BLM of extent of aggregate trailwide influences, both protective and surface disturbing, to the National Trail and the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses.

B.   Will coordinate, as practicable, inventory efforts with tribes, affected agencies, partners and interests, SHPOs, and the Advisory Council on Historic Preservation to maximize efficiencies. The inventory shall be conducted in accordance with protocol agreements, and in a manner that is compatible with confidentiality provisions in the National Historic Preservation Act and Archaeological Resources Protection Act.

BLM_0019210

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-3

C.   Should report National Trail inventory results relating to identification of potential National Register-eligible resources in a digital format consistent with the BLM-SHPO cultural resources data sharing partnership for the relevant state.

D.   May offer technical training and/or limited financial support to improve capacity, in accordance with applicable law, to tribes, affected agencies, partners, or interested parties who are interested in participating in National Trail inventory (NTSA Sec. 7(a)(1)(B), 11(b)(1), and 11(c)).

3.4   Initiating the National Trail Inventory Process

To the greatest extent practicable, the BLM shall:

A.   Divide public land areas undergoing a National Trail inventory into inventory analysis units by National Trail segment, and depict on a map. An inventory analysis unit is a polygon encompassing discrete segments of the National Trail, and the associated viewshed, based on similar conditions. National Trail segments are individual sections of a National Trail which, in combination, comprise the entire National Trail. The boundaries should follow natural or manmade landscape features.

   1.   For National Scenic Trails, inventory analysis unit boundaries should be based on distinct trail segments, breaks in landform, jurisdictional boundaries, or manmade features such as roads.

   2.   For National Historic Trails, inventory analysis unit boundaries should be based on distinct high potential historic sites and high potential route segments or groupings of sites and segments, jurisdictional boundaries, distinct trail segments, breaks in landform, or manmade features such as roads.

B.   Conduct a viewshed analysis for each inventory analysis unit to determine landscape features that are seen, seldom seen, and not seen from the National Trail. The extent of the viewshed analyzed may be limited by site-specific conditions, including cultural and landscape modifications, land status, and topography. The foreground, middle ground, and background of the viewshed from the National Trail must be identified. The viewshed will be determined through the aid of a computer-based visibility analysis from specific inventory observation points (IOP). Inventory observation points will be located:

   1.   At existing recreation and interpretive developments and at critical points that reflect how a trail visitor interacts with the trail, including developed areas and natural features such as overlook points, access points, trailheads, switchbacks and resting places, pullouts, natural topographic breaks, major landforms, and changes in landscape form.

   2.   At areas with sensitive resources, qualities, values, and associated settings.

BLM_0019211

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-4

3.   At regularly spaced intervals along the National Trail tread, trace, and/or management corridor to ensure no gaps in the viewshed analysis.

4.   For National Historic Trails, inventory observation points will be identified for National Trail-related National Register eligible and listed properties; other significant historic trail-related features such as river crossings, graves, and inscription sites; high potential historic sites and high potential route segments; auto tour routes; and trails that facilitate public access and opportunities for vicarious experiences (potential connecting or side trails.  See BLM Manual 8353).

C.   Baseline information should be compiled from, but not limited to, the National Trail Feasibility Study, trailwide Comprehensive Plan, Resource Management Plan, historic context study and reports, and Field Office resource program data to determine what information is known about the National Trail conditions; trail resources, qualities, values, and associated settings; and the primary use or uses of the trail and to determine what gaps in data remain. Inventory should be conducted to obtain additional data to supplement existing baseline data and to obtain an accurate depiction of National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail in the trail area.

D.   The inventory should capture data about developments, facilities, and landscape or cultural modifications, within the National Trail area that may support or adversely impact National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail.

3.5   Conducting the National Trail Inventory

A.   All National Trail landscape elements for each National Trail segment within the National Trail inventory analysis unit must be inventoried, and the baseline condition of individual resources, qualities, and values and associated settings should be recorded. The associated settings are determined for each inventory analysis unit, based on the resources, qualities, and values present.

B.   The inventory record will include the inventory analysis unit boundary, location of high potential historic sites, high potential route segments, cutoffs, variants, braided routes, the trail tread or trace, distance zones, viewsheds, resource settings, setting variables, landscape-defining characteristics, landscape features, other applicable resources associated with the trail or that support National Trail purposes, and a record of negative findings, as applicable. The inventory also identifies existing compatible and incompatible land uses and valid existing rights on public lands.

C.   Inventory will be conducted and documented in a manner sufficient to determine potential National Register eligibility, to support statements of eligibility for listing on the National Register, to nominate properties for listing on the National Register, as practicable, and to consider other resource program-specific designations through the land use planning process, such as areas of critical environmental concern or recreation management areas, as warranted.

BLM_0019212

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-5

D.   The BLM will inventory each National Scenic and Historic Trail in accordance with the FTDS National Trail fundamentals (see Appendix 2). In addition, the BLM will inventory each National Historic Trail in accordance with the FTDS National Historic Trail condition categories (see Appendix 4 and 5).

1. The FTDS National Trail fundamentals addresses the physical condition and any existing uses of the National Trail area, including the four trail fundamentals of trail type, trail class, managed use, and designed use (see Appendix 2).

2. The FTDS National Historic Trail condition categories include documentation of the historic location and the presence or lack of visible trail remnants and/or artifacts that provide evidence of the historic route (see Appendices 4 and 5).

E.   To the greatest extent practicable, the inventory shall be conducted for each of the following landscape elements. National Trail resources, qualities, and values, and the primary use or uses for each landscape element must be inventoried and assessed prior to determining the extent of the associated settings. The inventory of the associated settings is based on the documentation of resources, qualities, and values, and the primary use or uses.

1. *Scenic Resources, Qualities, and Values, and the Primary Use or Uses.* The scenic resources, qualities, and values, and the primary use or uses inventory includes:

   i.   A viewshed analysis (computer based-modeling), including a scenic quality analysis, a sensitivity-level analysis, and a delineation of distance zones for scenic values, and documentation of the elements of the landscape that are seen, seldom seen, and not seen from the National Trail, including the foreground, middle ground, and background of the viewshed of the National Trail.

   ii.  Documentation of the primary use or uses within the viewshed that support the nature and purposes of the National Trail and characteristic landscape.

2. *Scenic Setting.* The scenic settings are the geographic extent of the visual landscape elements that influence the trail experience and contribute to resource protection. The scenic inventory includes:

   i.   A description of the overall landscape character, existing visual conditions, and a scenic quality analysis using the BLM's visual resource management program policy.

   ii.  For National Scenic Trails only, identify significant scenic or high visual qualities of the area through which such trails may pass.

   iii. For National Historic Trails only, identify areas with high scenic quality that support the nature and purposes and/or relative freedom from intrusion within and adjacent to high potential historic sites and high potential route segments.

BLM_0019213

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-6

3. *Historic and Cultural Resources, Qualities, and Values, and the Primary Use or Uses.* The historic and cultural resources, qualities, and values, and primary use or uses inventory includes (see BLM Manual Section 8110):

 i. Minimum standard cultural resources program and specific state-required historic and cultural resource inventory, including consultation with tribes to obtain data regarding properties of traditional cultural or religious importance. Determinations should be made for National Trail-related historic properties regarding eligibility for nomination to the National Register or possible high potential historic sites or high potential route segments.

 ii. For all National Trails, the historic and cultural resource inventory should include a cultural resource program Class I existing information inventory to determine presence of nationally, regionally, and locally significant National Trail-related historic resources and to determine the quality of existing inventory data. For significant properties identified through the Class I inventory, the BLM should conduct a cultural resource program Class III intensive field inventory to locate and verify nationally, regionally, and locally significant National Trail-related cultural properties that may be eligible for the National Register. For vast unsurveyed areas, the BLM may conduct a cultural resources Class II probabilistic field survey to characterize the probable density, diversity, and distribution of significant cultural properties, followed by a Class III inventory in selected locations. The need for and nature of additional research to identify resources should be determined in consultation with the SHPO.

 iii. For National Historic Trails only, a comprehensive field inventory should be conducted to identify, locate, and verify high potential historic sites and high potential route segments. The inventory may include the location of high potential historic sites or high potential route segments. In addition to these minimum requirements, Field Offices may employ additional information gathering techniques, including:

   a. Reconnaissance survey.

   b. Subsurface probing.

   c. Test excavation.

   d. Predictive modeling.

   e. Remote sensing, such as radar or light detection and ranging (LiDAR), or use of other technology.

 iv. Information from the National Trail administering agency or trail groups, associations, and other interested parties.

BLM_0019214

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-7

    v.  Historic context studies or reports, including cultural and historic resource data of the National Scenic Trail area, and National Historic Trail-related cultural and historic resource data.

   vi.  Documentation of the historic and cultural primary use or uses that occur within the viewshed, including National Trail-related scientific uses, historic interpretation, protection, and recovery.

4.  *Historic and Cultural Settings.* The historic and cultural settings are the geographic extent of the historic and/or cultural landscape elements that influence the actual and vicarious trail experiences. The historic and cultural settings inventory includes:

    i.  *For all National Trails*:

      a.  The historic character or character-defining qualities of the trail, including the sum of all visual aspects, features, materials, and spaces associated with the history of the cultural landscape.

   ii.  *For National Historic Trails*:

      a.  The surroundings and viewsheds of the high potential historic sites and segments, including elements that complement, support, or otherwise corroborate the period of historic significance for the trail and those elements that do not fit the period of trail significance or are otherwise visually intrusive.

      b.  The existing condition of the historic landscape, including descriptions of elements that support or contribute to the historic character; and those that detract from or do not contribute to the historic landscape because they are not compatible in look and feel with the historic use, or because they do not date to the period of historic significance, or both.

      c.  Contributing landscape features may include historic trail modifications or engineering features constructed by the original trail users.

5.  *Recreation, including Travel Management Opportunities, Resources, Qualities, and Values, and the Primary Use or Uses.* The recreation resources, qualities, and values, and the primary use or uses recreation inventory includes:

    i.  Identification of current recreation demand and visitor data, such as:

      a.  Visitor use trends and/or the amount of visitors/visits.

      b.  The types of visitors.

      c.  Where visitors are coming from.

BLM_0019215

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-8

    d.  The types of activities in which visitors participate.

    e.  The National Trail-related primary use or uses.

    f.  What the participants and affected communities want from National Trail resources.

    g.  The existing economic benefits of tourism.

ii.  Identification of current supply, including what other service providers (to include business and nonprofit organizations) are currently doing to achieve National Trail objectives and what management practices are employed by other agencies to achieve National Trail purposes.

iii. Existing National Trail-related recreation infrastructure, including education and interpretive developments, and other recreation developments.

iv. For National Scenic Trails only, opportunities for maximum outdoor recreation potential, consistent with the nature and purposes of the National Trail.

v.  For National Historic Trails only, identification of recreation use or interpretive or educational opportunities includes:

    a.  High potential historic sites and high potential route segments.

    b.  Opportunities for public use and enjoyment.

    c.  Opportunities for vicarious experiences.

    d.  FTDS category NHT3 (see appendices 4 and 5) recreation and/or interpretive trails, roads, or sites, including those assisting with potential auto tour routes and connections to specific trail sites and segments.

vi.  Cultural modifications, including those that are National Trail related, and other developments and facilities inventoried to a level of detail sufficient to determine potential effect within the inventory analysis unit.

vii.  Travel systems inventoried in accordance with BLM route inventory standards and include classification of routes as roads, primitive roads or routes, or trails.

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-9

    viii.  Access, connectivity, and manageability opportunities, including potential Connecting and Side Trails (see BLM Manual 8353). Each identified access, connectivity, and manageability opportunity will include a map and description of the opportunity, the National Trail purposes served if the opportunity is pursued, constraints, and any other pertinent conditions. Sufficient access for private landowners will be identified, as warranted.

6.  *Recreation Settings.* The recreation settings are the geographic extent of the recreation landscape elements that influence the trail experience. The recreation settings inventory includes:

    i.  Identification of physical, social, and operational recreation settings in accordance with the Recreation Opportunity Spectrum and recreation setting characteristics (see BLM Manual 8320, Planning for Recreation and Visitor Services).

7.  *Natural (including Biological, Geological, and Scientific) Resources, Qualities, and Values, and the Primary Use or Uses.* The natural resources, qualities, and values, and the primary use or uses inventory includes:

    i.  Resource program inventory for those resources identified as supporting or promoting the National Trail nature and purposes or recreation experiences, including vicarious experiences for National Historic Trails. Inventory follows the minimum inventory requirements for each BLM resource program to the greatest extent practicable, and may include:

        a.  Forest or rangeland health inventory.

        b.  Noxious or invasive species inventory.

        c.  Threatened and endangered species inventory.

        d.  Habitat inventory.

        e.  Soil, vegetation, water, air, or riparian resource inventory.

    ii.  *For National Scenic Trails only*:

        a.  The physical representation of desert, marsh, grassland, mountain, canyon, river, forest or other areas.

        b.  Landforms that exhibit significant characteristics of the physiographic regions of the area.

BLM_0019217

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-10

    iii. For National Historic Trails only, landscape-defining National Trail-related characteristics immediately surrounding and within the viewshed of high potential historic sites and high potential route segments or satellite areas, such as landmarks or landscape features identified by the original trail users.

    iv. Other natural resource qualities or National Trail-related primary use or uses.

8. *Natural (including Biological, Geological, and Scientific) Settings.* The natural settings are the geographic extent of the natural landscape elements that influence the trail experience and contribute to resource protection. The natural settings inventory includes:

    i. Landscape-defining characteristics, including prominent or distinctive aspects, qualities, and characteristics of the landscape.

    ii. For National Scenic Trails only, the extent of the landscape settings that represent desert, marsh, grassland, mountain, canyon, river, and forest areas.

9. *Other Landscape Elements.* Other landscape elements are considered within the viewshed of the National Trail that support or detract from the trail experience. The inventory of other uses and the features or settings of other landscape elements in the trail area includes:

    i. Developments, facilities, and landscape modifications (cultural modifications) within the National Trail area, such as a seeding project, wind farm, campground, or communication site, including the purpose and uses of and extent of the cultural modification.

    ii. Existing land uses and valid existing rights. The uses and rights should be documented, including case file or reference numbers and a description of the right or use (e.g., its term and extent), and the right or use depicted on a georeferenced map.

    iii. Surface, subsurface, and other interests in land ownership identified within each inventory analysis unit. The interests in land ownership type noted, and the land ownership portrayed on a map.

    iv. Other setting variables within the viewshed, including sights, sounds, smells, and other experiences that may impact trail experiences.

3.6   Assessment and Use of the National Trail Inventory

    A.   Upon completion and to the greatest extent practicable, the results of the National Trail inventory are combined and assessed to describe and portray the overall condition, presence, and extent of the National Trail resources, qualities, values, and associated settings by the BLM at the Field Office, including:

BLM MANUAL                                                 Rel. 6-139
Supersedes Rel. 6-137                                  09/14/2012

BLM_0019218

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-11

1. Evaluation of the quality and extent of the identified resources, both individually and cumulatively, and the level to which the resources support the nature and purposes of the National Trail.

2. Evaluation of the quality and extent of the identified resources, both individually and cumulatively, to the level which supports National Trail characteristics:

    i. For National Scenic Trails, each landscape element, or resource, quality, value, and associated setting, identified through the inventory will be assessed to determine how the landscape element supports or detracts from the characteristics of the National Scenic Trail, including:

        a. The presence of unique landforms and the degree to which the landform exhibits significant characteristics of the physiographic region.

        b. Sustainable and premier trail-related opportunities.

        c. High scenic values.

        d. Relative freedom from intrusion.

        e. Natural conditions, scenic and historic features, and primitive character of the trail area.

        f. Sustainable trail and resource conditions.

        g. Opportunities for high–quality, primitive nonmotorized recreation experiences, including capability to provide campsites, shelters, and related public use facilities and continuous and sufficient public access.

        h. Absence of highways, motor roads, mineral rich areas, energy transmission lines, commercial and industrial developments, range fences and improvements, private operations, and any other foreseeable activities.

        i. Human health and safety.

    ii. For National Historic Trails, each landscape element identified through the inventory will be assessed to determine how the landscape element supports or detracts from the characteristics of the National Historic Trail, including:

        a. The presence and intactness of the original trails or routes of travel of national historic significance.

        b. The presence and intactness of the historic route and historic remnants and artifacts.

BLM_0019219

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

3-12

    c.  Sustainable and premier trail-related opportunities.

    d.  Selected land and water-based components.

    e.  Opportunities to maximize vicarious experiences and resource protection.

    f.  Presence of Federal Protection Components, including high potential historic sites and high potential route segments.

      (1)  *High potential historic sites:* opportunities to interpret the historic significance of the trail during its period of major use and to identify and protect (NTSA Section 3(a)(3)) the visible historic remnants and scenic quality and to provide relative freedom from intrusion (NTSA Sec. 12(1)).

      (2)  *High potential route segments:* opportunities for afford high-quality recreation experiences, identify, and protect (NTSA Section 3(a)(3)) the scenic integrity of the trail setting, and afford opportunities for vicarious experiences (NTSA Section 12(2)).

    g.  Opportunities for a developed trail to meet objectives.

    h.  Properties potentially eligible for the National Register of Historic Places.

    i.  Human health and safety.

3.  The Field Office will brief the State Office regarding inventory findings, and the State Office should brief the BLM Washington Office on general findings.

4.  Data regarding possible Federal Protection Components, including high potential historic sites and high potential route segments identified through the inventory process, after assessment, will be recommended to the National Trail administering agency for inclusion within updates to the trailwide Comprehensive Plan.

BLM_0019220

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-1

## Chapter 4.   Congressionally Designated National Trails - Land Use Planning

This chapter outlines BLM land use planning requirements for congressionally designated National Trails and the National Trail Management Corridor. Through the land use planning process, where a designated trail is within the planning area, the BLM establishes National Trail Management Corridor, and will set forth allocation decisions, management actions, and necessary restrictions for resources and resource uses within that National Trail Management Corridor in order to effectively manage the nature and purposes of National Trail and the resources, qualities, values, and associated settings and the primary use or uses.

### 4.1   General Requirements

A.   *Addressing Designated National Trails through Land Use Planning*

1. As soon as practical after activation, the BLM must address designated National Trails through the land use planning process.

2. Designated National Trails may be addressed through a land use plan amendment, or a Statewide Trail Management Plan or a programmatic multi-state effort which amends applicable Resource Management Plans.

3. Regardless of the type of land use planning process undertaken, the BLM shall establish a National Trail Management Corridor(s) and identify management goals, objectives, and actions for each designated National Trail.

4. National Trails shall be clearly identified as a specific resource or discipline, in its own unique section throughout the various chapters of the Resource Management Plan - not contained within and across multiple disciplines.

5. Resource Management Plan decisions should be compatible across BLM jurisdictions, as applicable, to provide for trailwide management consistency.

B.   *Relationship between the National Trail Right-of-Way in the Trailwide Comprehensive Plan and the National Trail Management Corridor in the Resource Management Plan and Associated Provisions*

BLM_0019221

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-2

1. As set forth in Section 5(e) of the NTSA, the trailwide Comprehensive Plan addresses the nature and purposes and the plan for the acquisition, management, development, and use of the trail. The National Trail Right-of-Way is addressed in the trailwide Comprehensive Plan, and/or Federal Register notice (see Manual 6250, National Scenic and Historic Trail Administration). The National Trail Right-of-Way includes the area of land that is of sufficient width to encompass National Trail resources, qualities, values, and associated settings and the primary use or uses. The National Trail nature and purposes and the National Trail Right-of-Way are key considerations in establishing the National Trail Management Corridor in a Resource Management Plan.

2. The BLM shall include consideration of, as appropriate, the following from the Trailwide Comprehensive Plan into the land use plan that addresses the National Trail: the nature and purposes of the National Trail; the National Trail Right of Way; the Federal Protection Components, including high potential historic sites and high potential route segments; and other key provisions. See the special provision for the Continental Divide National Scenic Trail in the NTSA Sections 5(e) and 5(f) regarding high potential historic sites and high potential route segments.

C. *Resource Management Plan Consistency with Other Congressionally, Presidentially, or Administratively Designated Areas*

1. Where multiple NLCS designations overlap, the BLM must comply with all applicable statutes. The more protective management requirements will likely apply, subject to evaluation on a case by case basis. For example, where designated Wilderness overlaps with a designated National Historic Trail, no motorized vehicles or equipment may be used in the area of overlap unless they are the minimum necessary to administer the area for the purpose of the Wilderness Act.

2. Within these areas, the BLM shall support the nature and purposes of the designated National Trail pursuant to the NTSA and as a unit of the National Landscape Conservation System.

D. *Coordination Requirements for Designated National Trails*

1. Under Section 2(c) of the NTSA, the BLM shall proactively encourage and assist involvement by tribes, affected agencies, partners, and interested parties.

2. The BLM, as the trail managing agency, shall coordinate with the National Trail administering agency. The National Trail administering agency or other affected Federal agencies may serve as cooperating agencies in the land use planning/NEPA processes.

BLM_0019222

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-3

3. When National Trails cross state or Field Office boundaries, the BLM shall coordinate with other BLM offices and jurisdictions to ensure compatible land use planning decisions.

## 4.2 Requirements for Designated National Trails in Land Use Planning

A. *Analysis of the Management Situation.* As part of the "analysis of the management situation" (see 43 CFR § 1610.4-4) the BLM shall:

1. Review and summarize management direction from the National Trail enabling legislation, and should consider any relevant legislative history provisions (in consultation with the Office of the Solicitor), and applicable direction contained in the trailwide Comprehensive Plan.

2. Conduct a National Trails program review and evaluation of Resource Management Plan decisions to determine:

   i. To what extent National Trails are addressed in support of the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses in the trail area.

   ii. To what extent authorized actions have adversely affected the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses of the National Trail.

B. *Affected Environment*

1. The BLM shall include a description of the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses. This information may be found within the National Trail-enabling legislation, National Trail Feasibility Study, the trailwide Comprehensive Plan, and the National Trail inventory.

2. If the trailwide Comprehensive Plan is silent on the nature and purposes, the affected State Office(s) shall coordinate with the National Trail administering agency to identify, establish, and describe the National Trail nature and purposes for the Resource Management Plan.

3. The BLM shall include information and data regarding the National Trail Right-of-Way selected by the trail administering agency. This also includes, for National Historic Trails, high potential historic sites, high potential route segments, auto tour route, National Register eligible properties that support the significance of the trail, and other potential Federal Protection Components.

BLM_0019223

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-4

C.   *Development of Designated National Trail Goals and Objectives.* Goals and objectives for the National Trail shall be identified based on the NTSA, enabling legislation, legislative history (in consultation with the Office of the Solicitor), the nature and purposes of the trail, supporting information from the National Trail Feasibility Study, trailwide Comprehensive Plan, and National Trail inventory. The nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses will be clearly described. At a minimum, the following goals and objectives should be considered for National Trails:

1.   *For all National Trails*

   i.   Safeguard the nature and purposes; and conserve, protect, and restore the National Trail resources, qualities, values, and associated settings and the primary use or uses.

   ii.   Provide premier trail visitor experiences for public benefit.

   iii.   Maximize opportunities for shared National Trail stewardship.

   iv.   Reduce the potential for uses that substantially interfere with the nature and purposes of the National Trail (see Chapter 1, 1.6 Statement of Programmatic Policy).

   v.   Avoidance of activities that are incompatible with the purposes for which the National Trail was established (see Chapter 1, 1.6 Statement of Programmatic Policy).

2.   *For National Scenic Trails*

   i.   Provide for maximum compatible outdoor recreation potential.

   ii.   Maintain the continuous nature of the National Scenic Trails.

   iii.   Maintain the special environments and landforms that support trail visitor experiences.

3.   *For National Historic Trails*

   i.   Identify and manage the historic route and historic remnants and artifacts for public use, enjoyment, and vicarious trail experiences.

   ii.   Identify and manage high potential historic sites or high potential route segments, including the recommendation of additional Federal Protection Components.

   iii.   Other goals and objectives may include:

      a.   To restore altered landscapes to an identified trail-era condition.

BLM_0019224

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-5

    b.  To conserve, protect, and restore landscape elements that are evocative of the period of use to the extent allowed by law.

4.  National Trail management objectives will be established for each trail segment. National Trail management objectives should describe the desired future condition for that segment, with consideration for how that segment relates to the entire National Trail.

D.  *National Trail Management Corridor Alternative Formulation and Analysis*

1.  A National Trail Management Corridor is a land use plan allocation which is based on the Section 7(a)(2) of the National Trails System Act "rights-of-way" selected in the trailwide Comprehensive Plan. The National Trail Management Corridor for the trail includes a public land area of sufficient width within which to encompass National Trail resources, qualities, values, and associated settings and the primary use or uses that are present or to be restored.

2.  The National Trail Management Corridor shall be of sufficient width to constitute a manageable administrative unit that is identifiable on the ground, in consideration of the following:

    i.  Congressionally designated National Trail route; the nature and purposes of the National Trail; the selected National Trail Right-of-Way recommended by the trail administering agency in the trailwide Comprehensive Plan; the inventory of National Trail resources, qualities, values, and associated settings and the primary use or uses; proposed or existing land uses; valid existing rights; surface, subsurface, and other interests in land; land tenure; and relevant resource assessments or information.

    ii.  For all National Trails, the National Trail Management Corridor alternatives should consider:

        a.  Including all public lands and interests in lands containing resources, qualities, values, and associated settings and the primary use or uses that support the nature and purposes of the National Trail.

        b.  Including other Federal lands, state trust lands, private lands, and/or other interests in lands, including split estate, that contain National Trail resources, qualities, values, and associated settings and the primary use or uses. Although these lands may be included within the management corridor, they are not and shall not be subject to BLM management. Interested landowners may voluntarily elect to participate in National Trail management on private or state lands through a cooperative agreement or other instrument with the BLM.

BLM_0019225

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-6

c.   Minimizing the adverse impacts, to the extent practicable, on adjacent landowners, users, and operations.

d.   Opportunities to harmonize with and complement any established multiple-use plans for that specific area in order to insure continued maximum benefits from the land, while minimizing conflict.

e.   The potential of reasonably foreseeable development for multiple-use activities within the National Trail Management Corridor including scale, visibility, and duration with regard to National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail.

f.   Including recommendations for National Recreation Trails, including National Water Trails, and Connecting and/or Side Trails (see BLM Manual 8353) within the National Trail Management Corridor.

g.   Compatibility across Field Office and state jurisdictional boundaries.

iii.   A National Scenic Trail Management Corridor should be located to avoid, insofar as practicable, highways, motor roads, mineral rich areas, power transmission lines, commercial and industrial developments, range fences and improvements, private operations, and any other foreseeable activities that would be incompatible with the purposes of the trail, the natural condition, and use for outdoor recreation. Width or location may vary across alternatives to avoid these cultural modifications and include the consideration of the National Trail criteria listed in 1.6.

iv.   For National Historic Trails, the management corridor need not be continuous through the planning area. A National Historic Trail Management Corridor will include Federal Protection Components, including the high potential historic sites and high potential route segments identified in the trailwide Comprehensive Plan. The corridor will include those areas that meet the criteria established in the NTSA; the designated route that contains evidence of history, including artifacts and remnants; National Register eligible and/or listed properties; and proposed supporting development actions or uses, such as access trails, overlooks, and interpretive sites. As a special provision, National Register eligible properties inventoried but not yet assessed may be included as part of the National Historic Trail Management Corridor if determined likely to contain significant cultural resources from the period of use. The National Historic Trail Management Corridor need not be continuous and may encompass high potential historic sites and high potential route segments as satellite areas for landmark features observed by early travelers or similar circumstances that clearly warrant separation.

3.   In establishing the boundaries of the National Trail Management Corridor, the BLM field offices must consider the following:

BLM_0019226

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-7

    i. The width of the National Trail Management Corridor, based on the presence of the resources, qualities, values, and associated settings and the primary use or uses. The BLM may consider different sizes or configurations of land within the National Trail Management Corridor through the alternative development and analysis process; however, all National Trail resources, qualities, values, and associated settings must be contained within the National Trail Management Corridor.

    ii. The National Trail Management Corridor boundary should be based on the associated natural or manmade physical landscape features in the following order of precedence: ridgelines, rivers, washes, and toe-of-the-slope (where well-defined as in desert environments); turning points, such as peaks, buttes, and geologic features; roads, primitive roads or routes, and railroads; and lines of the Public Land Survey System. Measures, such as footage, mileage, and contour intervals, shall be discouraged. If certainty in location of a corridor boundary may become an issue (e.g., in a case of a flat or ill-defined ridgeline bordering an incompatible land status or usage), then lines of the Public Land Survey System should be considered.

    iii. National Trail management corridor boundaries should be compatible with neighboring BLM Field Offices and other National Trail land managers and should edge-match, where possible.

    iv. The National Trail Management Corridor boundary shall be described and delineated in accordance with BLM mapping policies, and prepared for referencing as the proposed and final National Trail Management Corridor(s) in the Federal Register notices required for the draft and final Resource Management Plan.

4. To the greatest extent possible, during the land use planning process, utility corridors, energy development zones, and exclusion areas for solar, wind, oil and gas, and similar types of uses should be considered simultaneously with the establishment of the National Trail Management Corridor to ensure National Trail protections and energy development objectives are compatible.

    E. *Trail Management Guidance by Resource Program.* To the greatest extent possible, the BLM will consider the following guidance when making resource-specific decisions, subject to valid existing rights, within the National Trail Management Corridor allocation:

1. *Scenic and Visual Resources.* The land use plan and associated NEPA analysis should consider the following management decisions for scenic and visual resources for National Trails:

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-8

i.  Designating visual resource management (VRM) classes based on the National
Trail visual resource inventory and based on the desired future condition of
National Trail resources, qualities, values, and associated settings and the primary
use or uses of the areas through which such trails may pass. To retain or improve
the integrity of the associated settings and scenic values for which the National
Trail was designated, the BLM should consider establishing VRM classes at the
most protective level practicable to meet National Trail scenery management
objectives. As stated in M8400 Visual Resource Management, .06 A.2. "Visual
management objectives (classes) are developed through the RMP process for all
Bureau lands. The approved VRM objectives shall result from, and conform with,
the resource allocation decisions made in RMP's."

   a.  VRM Class I or II designation for National Scenic Trails, where not adversely
   impacted by existing cultural modifications; and National Historic Trail
   Federal Protection Components, including high potential historic sites; high
   potential route segments; and other qualifying areas.

   b.  Designating other significant National Historic Trail properties that may be
   eligible or listed on the National Register from the period of use as VRM
   Class I and II within the management corridor. These properties may include
   the National Historic Trail tread or trace, areas that support the nature and
   purposes, associated settings, sites developed for National Trail interpretation,
   and National Trail-related recreation access trails or sites.

ii.  Whether the National Trail Management Corridor should be classified as VRM
Class III or classes which are more visually protective, to retain or improve the
existing visual setting of the areas along a National Trail where permanent
cultural modifications currently exist.

In assigning VRM classifications, describe how activities managed to this scenic
level support the nature and purposes of the National Trail and how uses are
managed to avoid visual conflict. This requirement also applies to areas where a
proposed VRM Class III may extend beyond the boundary of the National Trail
Management Corridor, so as not to diminish the National Trail visual setting. The
influence that the visual setting has on the National Trail is not to be undervalued.

BLM_0019228

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-9

For those areas along a National Trail that inventory at a VRI Class IV but are devoid of permanent cultural modifications, alternatives should consider classification as VRM Class III or classes which are more visually protective, to retain or improve the existing visual setting. VRM Class IV should not be considered for use within National Trail Management Corridor as "The objective of Class IV is to provide for management activities which require major modifications of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention" (BLM Manual 8400, Visual Resource Management, and BLM Manual H-8410-1, Visual Resource Inventory).

iii.  The maintenance of naturally appearing landscapes that are associated with the National Scenic or Historic Trail, regardless of scenic quality rating, to provide premier recreation experience opportunities.

2.  *Cultural and Historic Resources.* The land use plan and associated NEPA analysis should consider the following management decisions for cultural and historic resources for National Trails:

i.  The identification, preservation, and protection of significant cultural resources and significant historic properties that support the nature and purposes of the National Trail.

ii.  The significant National Historic Trail properties from the period of use that may be eligible or listed on the National Register within the management corridor.

iii.  Where cultural use allocations are made for cultural properties, sites, and settings along a National Trail, the "discharged from use" management allocation should not be considered when the property supports the nature and purposes of the National Trail.

iv. How historic settings, and those characteristics which support the historic setting, can be managed in a manner that supports the nature and purposes of the National Trail.

v. The establishment of priorities for identified, specific geographic areas within the National Trail corridor for additional National Trail-related cultural and historic resource inventory and evaluation.

vi. The nomination of significant National Trail-related properties that qualify for listing on the National Register in accordance with National Register criteria, and, where appropriate, National Historic Landmarks.

BLM_0019229

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-10

3. *Recreation and Visitor Services.* The land use plan and associated NEPA analysis should consider the following management decisions for recreation and visitor services for National Trails:

    i.  Designating recreation management areas within the National Trail Management Corridor where needed to effectively manage the National Trail. Each recreation management area should be of sufficient size to provide for effective National Trail-related recreation management. Recreation management area boundaries may differ from the National Trail Management Corridor boundaries. Recreation management areas should be designated for areas within the National Trail Management Corridor to:

        a.  Delineate visitor use areas and to direct use to areas within the National Trail Management Corridor and to provide for National Trail-specific recreation activities, experiences, benefits, and recreation setting characteristics.

        b.  Maintain National Trail-related activities and associated qualities and conditions and provide recreation management commensurate with other resource programs and uses.

    ii.  Emphasizing high-quality recreation opportunities; relative freedom from intrusion; opportunities for vicarious experiences; and conservation, protection, and restoration of National Trail resources, qualities, values, and associated settings.

    iii. Establishing the desired recreation setting characteristics for the National Trail Management Corridor based on the Recreation Opportunity Spectrum/recreation setting characteristics inventory (see BLM Manual 8320, Planning for Recreation and Visitor Services), regardless of designation as recreation management area(s).

    iv. Establishing the process and guiding principles for determining visitor capacity for sites, areas, and/or certain activities within the National Trail Management Corridor. The actual establishment of visitor capacity will occur at the implementation planning level.

4. *Travel and Transportation Management.* The land use plan and associated NEPA analysis should consider the following management decisions for travel and transportation management for National Trails:

    i.  Designating areas as open, limited, and closed in accordance with the provisions of the NTSA and the policy provided within this manual for National Scenic and/or Historic Trails.

BLM_0019230

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-11

ii.  Establishing travel management area(s) for the National Trail Management
Corridor based on site-specific resource conditions and land use plan goals and
objectives and to ensure continuity of travel systems. Travel management areas
may extend to adjacent public lands beyond the National Trail Management
Corridor.

iii.  Establishing route designations, where feasible, including identification of
specific roads, primitive roads, and trails, consistent with BLM travel and
transportation management policies. If route designation is deferred to the
implementation-level plan, then the Resource Management Plan shall prioritize
travel management area(s) that encompass the National Trail Management
Corridor to be the first travel management area(s) to complete a travel
management plan within the planning area.

iv.  BLM should consider closing, re-routing, and/or rehabilitating routes that do not
meet National Trail goals and objectives.

v.  The National Trail primary use or uses will be identified within each travel
management area.

vi.  *National Scenic Trails.* The BLM must consider closure of National Scenic Trails
to motorized use through the land use planning process, following Section 7 (c) of
the NTSA, the regulations at 43 CFR 8351.1-1), and the enabling legislation for
specific trails, such as the Continental Divide National Scenic Trail. Motorized
use on roads may be allowed only if certain regulatory exceptions are met. The
BLM shall address the following within the Resource Management Plan when
designating areas as open, limited, and closed, or establishing route designations,
as applicable:

a.  National Scenic Trails should be managed primarily for foot travel. Other
forms of travel may be allowed in accordance with applicable law, policy, and
guidance in the trailwide Comprehensive Plan.

b.  National Scenic Trails are normally closed to motorized vehicle use. No one
shall operate a motorized vehicle along a National Scenic Trail except when
necessary to meet emergencies; where the authorized officer determines that
the adjacent landowners and land users have a need for reasonable access; or
on roads that are designated segment of the trails and are posted as open to
motorized vehicles (see NTSA Section 7(c) and 43 CFR 8351.1-1).

BLM_0019231

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-12

c.   To the greatest extent possible, roads under the BLM's jurisdiction (BLM Manual 1626 travel management definition) will not be used as segments of National Scenic Trails. Coordination with the National Trail administering agency must occur prior to any decision to use a road for National Scenic Trail purposes. For places where roads must be used as designated segments, they must be posted as "open to motorized use" to the applicable standard (see 43 CFR 8351.1-1) and "measures taken to ensure visitor safety." This measure is emphasized for the Continental Divide National Scenic Trail per the regulations promulgated at 43 CFR 8351.1-1 by the Secretary based on the enabling legislation for this trail.

d.   If necessary, through the land use planning process, primitive roads (BLM Manual 1626 transportation linear features definition) may serve as National Scenic Trail segments for safety or resource protection, after consultation with the National Trail administering agency, on an interim basis until a nonmotorized trail segment is either available or constructed and if the motorized use does not cause adverse impacts. Primitive roads may not be used as National Scenic Trail segments for the purposes of convenience in satisfying the requirement for a continuous trail or regarding funding concerns. A quality visitor experience must remain a primary objective. Plan decisions using primitive roads must state the reason, timeframe for use, measures the agency will take to assure a quality experience, and plans for future construction. For places where roads must be used as National Scenic Trail segments, they must be posted as "open to motorized use" (43 CFR 8351.1-1).

e.   For roads and primitive roads under the BLM's jurisdiction (BLM Manual 1626 travel management policy definition) that are designated segments of the Continental Divide National Scenic Trail, motorized use may continue where it was allowed on designated segments at the time of designation, as long as it was authorized through the land use planning process. If a proposed use will substantially interfere with the nature and purposes of the trail, it may not be permitted.

f.   Because National Scenic Trails are designated and managed primarily for non-motorized uses and because BLM Backcountry Byways are designated and managed for motorized vehicle use, National Scenic Trails should not be designated as BLM Backcountry Byways.

g.   The Resource Management Plan should establish considerations for the relocation of National Scenic Trail segments. A substantial relocation of the National Trail Right-of-Way shall be by Act of Congress accordance with section 7(b) of the NTSA. Considerations may include:

(1)   Maintaining the nature and purposes of the National Trail.

BLM_0019232

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-13

(2)   Improved public access.

(3)   Addressing or improving public health and safety.

(4)   Achieving resource conservation or protection requirements or needs.

(5)   Improved setting quality, including scenic, recreation, and natural areas.

(6)   Improved sustainability of the trail.

(7)   Suitable water sources.

(8)   Reduced conflict with motorized use.

(9)   Reasonable separation from residential, commercial, and industrial development that could impair the desired experience of the trail visitor.

(10)  Improved manageability based on land status.

vii. *National Historic Trails.* BLM should consider limiting motorized use on National Historic Trails through the land use planning process. The Resource Management Plan will also include monitoring requirements and should consider the following:

a.   Whether motorized use on roads or primitive roads or routes under the BLM's jurisdiction (BLM travel management policy definition) was allowed on the National Trail at the time of designation.

b.   Whether to incorporate auto tour routes from the trailwide Comprehensive Plan. The BLM may recommend alterations or additional routes to the National Trail administering agency as a result of planning.

c.   Consider whether Backcountry Byway Type I and II designations may be used to direct visitor use and to support auto route identification and management for National Historic Trails. Any proposed Backcountry Byway designation must be similar in nature to the designated National Trail, must support the nature and purposes, and not promote or introduce incompatible uses.

viii. The BLM, in coordination with the National Trail administering agency, may identify and recommend Connecting and Side Trail designations for routes that would adjoin two points along a National Trail, or that provide additional points of public access between National Trails. Proposed Connecting and Side Trails may be located within or outside the National Trail Management Corridor (see BLM Manual 8353).

BLM_0019233

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-14

ix. Consider appropriateness of transportation infrastructure for commodity programs within the National Trail Management Corridor.

5.  *Lands and Realty.* The land use plan and associated NEPA analysis should consider the following management decisions for lands and realty decisions for National Trails:

   i.   Including only those actions necessary to achieve National Trail purposes and objectives, such as:

       a.   Identifying sufficient access needs to and/or along the National Trail and the National Trail Management Corridor, including:

           (1) lands needed to connect National Scenic Trail segments or complete the National Scenic Trail Management Corridor, and

           (2) lands needed to access to high potential historic sites and high potential route segments.

       b.   Identifying acquisition needs for lands and/or interests in lands, through purchase, easements acquisition, and exchange. Priorities for acquisition include those private lands offered by willing sellers within the National Trail Management Corridor and lands needed to connect National Trails.

           (1) Pursuant to NTSA Section 7(g), direct Federal acquisition for National Historic Trail purposes is limited to those areas indicated by the National Trail Feasibility Study report or the trailwide Comprehensive Plan as high potential historic sites and high potential route segments.

           (2) If there is a willing seller, the legal description of lands identified for acquisition should be included within the Resource Management Plan.

       c.   Identifying lands that contain National Trail resources, qualities, values, or associated settings that should be prioritized for withdrawal, subject to valid existing rights.

           (1) The Resource Management Plan should identify recommended withdrawal areas, including the legal description and a map of such lands.

           (2) Non-Federal lands which would be petitioned for withdrawal, if acquired, should be identified.

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-15

d.   Reviewing areas currently withdrawn to determine compatibility with the goals and objectives of the National Trail. Based on the review, the BLM may propose to extend or relinquish the area withdrawals. The Resource Management Plan should identify how lands would be managed if any withdrawal is relinquished for areas within the National Trail Management Corridor in accordance with 43 CFR 2300 and BLM land use planning policies.

e.   Retention of public lands within a National Trail Management Corridor in accordance with Section 203 of FLPMA, as classified in accordance with 43 CFR 2420, and ensure public lands within the National Trail Management Corridor are not contained on Resource Management Plan disposal lists.

f.   Identifying whether to make lands within the National Trail Management Corridor available for Recreation and Public Purposes Act sales or leases in accordance with Section 212 of FLPMA.

g.   Identifying and prioritizing public lands within the National Trail Management Corridor which require a cadastral survey.

ii.   The BLM will identify and prioritize National Trail Management Corridor lands actions. Prioritization will occur in a manner commensurate with other resource programs. The BLM should identify:

a.   Circumstances under which use or development of lands within the National Trail Management Corridor may be granted.

b.   Stipulations, and terms and conditions for uses within the National Trail Management Corridor, including best management practices identified in Appendix 1.

c.   Considerations for evaluating proposals and granting authorization for foreseeable or temporary use and development, including those for removal and site restoration once the use terminates. Siting of support infrastructure such as access roads or routes, monitoring facilities, communications sites, testing equipment and staging areas for commodity programs is discouraged within the National Trail Management Corridor.

d.   The BLM should identify FLPMA Title V right-of-way avoidance and exclusion areas within the National Trail Management Corridor. Locations for right-of-way crossings, terms and conditions for construction and maintenance, revegetation requirements, and locations of ancillary facilities should be identified within the National Trail Management Corridor through the land use planning process.

BLM_0019235

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-16

(1) The Secretary, through the BLM, "may grant easements and rights-of-way upon, over, under, across, or along any component of the national trails system in accordance with the laws applicable to…[the BLM public lands]…[p]rovided, [t]hat any conditions contained in such easements and rights-of-way shall be related to the policy and purposes of" the NTSA. NTSA Sec. 9(a).

(2) Through the land use planning process, and in order to further the purposes of the National Trails, when the BLM determines which lands may be suitable for transportation, utility, or other FLPMA Title V rights-of-way corridors in an area that includes a National Trail, the BLM should consider designating such corridors in areas where existing transmission lines, pipelines, highways, and improved areas are located; comparably disturbed areas; or the area of least potential adverse impact.

(3) The BLM should consider locating transportation, utility, or other FLPMA Title V rights-of-way locations in a manner which avoids Federal Protection Components, including high potential historic sites and high potential route segments.

(4) The BLM should consider establishing areas that contain Federal Protection Components, including high potential historic sites and high potential route segments, as exclusion areas or closed to development.

6. *Minerals.* The land use plan and associated NEPA analysis should consider the following for minerals management decisions for National Trails:

i. In accordance with 43 CFR 3400.2, coal leases shall not be issued on Federal lands within the National System of Trails. Lands within the National System of Trails are unsuitable, subject to valid existing rights, for all or certain stipulated methods of coal mining involving surface coal mining operations. 43 CFR 3461.0-7; 43 CFR 3461.5; 43 CFR 3461.1. BLM should assess whether lands within the National System of Trails are unsuitable for coal mining pursuant to 43 CFR 3461.5(a). In accordance with 43 CFR 3461.1, Federal lands with coal deposits that would be mined by underground mining methods shall not be assessed as unsuitable where there would be no surface coal mining operations.

BLM_0019236

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-17

ii.   In accordance with BLM Handbook 1601-1, Appendix C., Section II, part G, H, I, J, and K; and Section 204 of FLPMA, in the land use plan the BLM should consider whether to identify the following areas to be recommended for closure (through a withdrawal) to mineral entry, leasing, and mineral material sales: the National Trail tread or trace; National Historic Trail high potential historic sites and high potential route segments; sites developed for National Trail-related interpretation; National Trail-related recreation sites; and other areas where it has been determined that National Trail-related resources, qualities, values, and associated settings and the primary use or uses would be lost due to mineral exploration and development or cannot be adequately protected with even the most restrictive plans of operations.

iii.   The BLM should consider whether other areas within the National Trail Management Corridor may be designated closed to leasing, or open to leasing subject to constraints required to achieve National Trail purposes, goals, and objectives. These constraints may include timing limitations, seasonal and controlled surface use restrictions, and no-surface-occupancy stipulations. In evaluating potential leasing constraints, consider the following:

   a.   Lease stipulations necessary to achieve National Trail objectives should be established for areas identified as open to leasing.

   b.   Circumstances for granting exceptions, waivers, or modifications to lease stipulations, and associated documentation and public notification requirements, should be identified in the Resource Management Plan.

iv.   The Resource Management Plan will identify if and to what extent constraints for new leases identified within the Resource Management Plan will apply to areas currently under lease within the National Trail Management Corridor (BLM H-1601-1, Appendix C, section H), subject to valid existing rights.

v.   The Resource Management Plan will identify the long-term objectives for reclamation of areas within the National Trail Management Corridor which are currently under development. These long-term objectives will guide reclamation prior to abandonment, subject to valid existing rights.

vi.   The BLM will identify terms required to maintain the nature and purposes of the National Trails and to manage National Trails and the National Trail Management Corridor resources, qualities, values, and associated settings and the primary use or uses.

vii.   The BLM will identify locations within the National Trail Management Corridor that are closed to mineral materials sale and disposal.

BLM_0019237

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-18

7. *Livestock Grazing.* Livestock management decisions on National Trails or within the National Trail Management Corridor including determination of forage allocations, grazing systems, range improvements, season of use, and stocking rates, will be designed to ensure compatibility with National Trail objectives and should consider:

   i.  Design of range improvements to ensure a low level of contrast with the characteristic landscape.

   ii. Design of range improvements to prevent adverse impact to the recreation experience and trail conservation, including water sources, fencing, stock driveways, and salting areas.

   iii. Placement of range improvements outside the National Trail Management Corridor.

8. *Forestry.* Any harvest, reforestation, and forest development allocation decisions on National Trails or within the National Trail Management Corridor should consider National Trail management objectives; and design criteria to ensure compatibility with resources, qualities, values, and associated setting and the primary use or uses, including addressing the characteristic landscape, mimicking landscape-level patterns and features, and minimizing potential impacts to the recreation experience.

9. *Wildland Fire and Fuels Management.* Decisions regarding fire and fuels management on Trails should consider the National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail.

   i.  Fire management allocation decisions will include consideration of avoiding the following priority areas:

       a.  The National Trail tread or trace.

       b.  National Historic Trail high potential historic sites and high potential route segments.

       c.  National Register eligible and listed sites.

       d.  Sites developed for National Trail-related interpretation.

       e.  National Trail-related recreation sites and built environment.

   ii. The Resource Management Plan should identify areas within the National Trail Management Corridor where wildland fire management uses may be allowed, under what conditions, and in what locations. Suppression tactics and fuels management decisions should avoid impacts to National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail.

BLM_0019238

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

4-19

    iii.  Should fire and/or fire suppression activities adversely affect National Trail resources, qualities, values, or associated settings, National Trails will be included as part of fire stabilization and rehabilitation efforts.

  10.  Alternatives shall describe how management decisions within the National Trail Management Corridor will help achieve the goals and objectives for the National Trail.

4.3 Environmental Consequences of Planning Decisions on Designated National Trails and the Approved Resource Management Plan

A.  For each alternative, the analysis of environmental consequences shall address how the land use planning decisions will achieve:

  1.  The nature and purposes of the National Trail.

  2.  National Trail resources, qualities, values, and associated settings.

  3.  National Trail primary use or uses.

  4.  The National Trail from the cumulative or trailwide perspective.

B.  The Record of Decision that accompanies the approved plan shall describe the planning decisions for the National Trail and the National Trail Management Corridor.

C.  National Trail Management Corridor descriptions and maps shall be prepared and referenced in the Draft, Proposed, and Approved Resource Management Plan, in accordance with BLM Manual 6120 and agency National Trail standards and processes for inclusion in the respective Federal Register notices. The reference in the Federal Register shall include key information on the prepared and available maps, boundaries, and descriptions.

BLM_0019239

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-1

## Chapter 5.  Congressionally Designated National Trails - Management

This chapter outlines BLM guidance for the management of National Trails, including activation; protocol for proposed actions within designated National Trails areas; implementation-level planning for designated National Trails; and National Trail stewardship program responsibilities.

5.1 Designated National Trail Activation

Activation is the official notification to BLM field offices that Congress has designated a new National Scenic or Historic Trail. The activation memorandum promotes awareness of the designation, and includes a copy of the enabling legislation, status of any trail administration delegations, and reference to program policy requirements. The Washington Office will issue the activation memorandum to the State, District, and Field Office levels in accordance with the responsibilities outlined in Chapter 1 of this manual.

5.2   General Requirements

   A.  The BLM shall, when required by the BLM Washington Office, prepare and submit annual reports to specified standards, including National Trails System annual reports; congressionally or agency required reports; and National Trail program management reports, such as performance, budget, partnership endeavors, workload accomplishments, and operations issues, pursuant to the National Trails System Memorandum of Understanding, 06-SU-11132424-196, BLM programmatic requirements, and in accordance with the provisions in Section 1.7 File and Records Maintenance of this manual.

   B.  The BLM shall implement standard agency program procedures to identify, manage, and account for funding provided to meet performance and management objectives for each National Trail.

   C.  As soon as practical after activation, the BLM shall establish a National Trail Management Corridor through the land use planning process (see chapters 3 and 4 of this manual). Until such time that the National Trail is addressed in a Resource Management Plan, the trail shall be managed, as appropriate, in accordance with the designating legislation and according to the policy, procedures, and protocols outlined in this manual.

   D.  The BLM shall provide notice to the public, interested parties, and/or affiliated organizations of unauthorized actions which affect the National Trail. The BLM shall take appropriate action in accordance with applicable law and regulations to address unauthorized actions.

   E.  The BLM shall participate with the National Trail administering agency in the development of the trailwide Comprehensive Plan, including providing data about National Trail and public land resources in the trail area, participating in the development of strategic direction for the National Trail, and reviewing the trailwide Comprehensive Plan prior to completion.

BLM_0019240

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-2

5.3   Protocol for Proposed Actions which May Adversely Impact Designated National Trails

A.   *Upon Receipt of a Proposed Action*

1.   Where a proposed action is found to be inconsistent with the purpose for which the National Trail was designated, the BLM shall consider rejecting applications for proposed projects or denying approval of the action pursuant to FLPMA, the NTSA, and other applicable law and policy.

2.   The BLM may not permit proposed uses along National Trails which will substantially interfere with the nature and purposes of the trail, and the BLM shall make efforts, to the extent practicable, to avoid authorizing activities that are incompatible with the purposes for which such trails were established (see Chapter 1.6 Statement of Programmatic Policy).

3.   If the BLM chooses not to defer analysis of a proposed action, the BLM shall follow the applicable procedures and protocols outlined in this manual.

B.   *Determining the Scope of Analysis*

1.   The BLM shall consider the significance of the Congressional designation as a National Trail (P.L. 90-543), as a unit of the NLCS (P.L.111-11), and public and private contributions and volunteer efforts along a National Trail when evaluating whether to approve a proposed action along the designated trail. The BLM shall manage the National Trails and the areas through which such National Trails may pass in a manner that recognizes the national significance of the trails and the individual or collective significance of National Historic Trail Federal Protection Components, including high potential historic sites and high potential route segments. The national significance of National Trails must be considered in the local, regional, and national context under the NTSA and NHPA, as applicable.

2.   If a National Trail Management Corridor has not been established in a land use plan, the BLM should undertake the following:

   i.   A viewshed analysis to evaluate whether the proposed action is contained within the viewshed.

   ii.  If within the viewshed, and likely to cause adverse impact, a BLM National Trail inventory and assessment is required, and should be broad enough to be able to identify reasonable alternative project locations with potentially less or no adverse impact. Upon inventory, the area of potential adverse impact shall be delineated, encompassing the resources, qualities, values and associated settings and the primary use or uses identified.

BLM_0019241

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-3

    iii. The BLM will identify, within the area of potential adverse impact, any adverse impacts to the nature and purposes; resources, qualities, values, and associated settings; and the primary use or uses for the affected environment, alternative formulation and analysis, and environmental consequences (see chapter 3 of this manual).

    iv. The BLM shall consider alternatives which support National Trail purposes in accordance with this policy. The BLM will consider alternatives which direct the proposed project outside the area of potential adverse impact or to a comparably disturbed or culturally modified area, such as areas already containing transmission lines, pipelines, highways, or improved roads.

3. Where National Trails have been addressed through land use planning process in accordance with Chapter 4 of this policy, the National Trail Management Corridor shall serve as the area of consideration for the purposes of the NEPA analysis, and alternatives must be consistent with the Resource Management Plan. Note: in determining land use plan conformance for proposed projects with established National Trail VRM classes, the term key observation point (KOP) replaces the term inventory observation point (IOP); however, the policy in section 3.4. B. 1-4 of this manual still applies.

C. *Notification Requirements*

1. For projects that may adversely impact the National Trail, the National Trail Administrator, the BLM State Office National Trail lead, or leads (for multistate proposed actions and trails); and a primary National Trail partner organization representative (in accordance with applicable law) will be invited to attend pre-authorization or pre-application meetings, as applicable.

2. Notice shall be provided through the Field Manager to the affected Deputy State Directors and the NLCS Division Chief of any proposed action, within the viewshed of the National Trail prior to establishment or within the established National Trail Management Corridor, that has the potential to substantially interfere with the nature and purposes, or constitute an incompatible activity (see Chapter 1, 1.6 Statement of Programmatic Policy), to the level that may cause significant adverse impact to the nature and purposes; resources, qualities, values or associated settings; or the primary use or uses of a designated National Trail.

3. The BLM will provide appropriate public notice pursuant to NEPA for the proposed action. If the NEPA analysis includes an EA, the BLM will provide at least 30 days public notice prior to making a decision.

BLM_0019242

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-4

4.  If there is a finding of significant impact in the Environmental Assessment, the BLM Director and NLCS Assistant Director shall be briefed by the State Director 30 days prior to the release of the Draft Environmental Impact Statement and the Record of Decision.

5.4  Implementation-Level Planning for Designated National Trails

A.  The BLM may develop implementation plans, consistent the Resource Management Plan and the NTSA, for National Trails at the BLM field office or statewide level. Implementation plans may consider multiple resources. Implementation plans, if developed, should carry forward provisions of the Resource Management Plan (or comparable land use plan level document, e.g. Statewide trail plan, programmatic multi-state amendment effort) and trailwide Comprehensive Plan.

1.  National Trail implementation plans should include management direction for any remaining inventory needs, operations, interpretation and education, signing and uniform marking, visitor capacity, science and research, travel management, development, monitoring, and site-specific management needs to achieve Resource Management Plan goals and objectives for the National Trail.

2.  Implementation actions, where feasible, should be planned in coordination with tribes, affected agencies, willing landowners, partners, and interested parties to coordinate BLM and other entities' National Trail operations to ensure consistency, maximize efficiencies, and share resources and other support as needed. This planning will direct on-the-ground management actions and projects necessary to implement the land use and will identify and encourage collaborative and partnership opportunities to support National Trail operations and programming.

3.  Operational needs should be included within the implementation plan.

i.  Operational needs should include the actions and projects that the BLM may undertake to achieve National Trail management purposes, and prioritize those actions and projects. National Trail operational needs may be addressed for timeframes covering one or multiple years. Operational needs should be reviewed annually to ensure needs are accurately reflected and remain current prior to commitment of resources. Operational needs should address the following:

a.  Priorities for inventory, monitoring, research, and other data collection activities.

b.  Infrastructure and other development projects.

c.  Maintenance activities.

d.  Outreach, training, interpretation, and education activities.

BLM_0019243

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-5

    e. Partnership and volunteer efforts, including associated capacity-building activities.

    f. Discussion of supplementary rules, emergency actions, and other regulatory actions that may be needed.

    g. Updating databases.

    h. Priorities to acquire lands or interests in lands to achieve National Trail purposes.

4. Prioritized acquisition needs should be included within the implementation plan.

    i. The BLM should include realty actions, such as acquiring lands or easements, under a willing seller policy. The BLM may acquire, from willing landowners or other parties, lands and access to lands that contain or improve National Trail resources, qualities, values, and/or associated settings or the primary use or uses through donation, exchange, purchase, or other methods.

        a. Lands within the management corridor shall be acquired in fee, if possible, and if necessary, to assure use of the lands for the purposes which they are acquired.

        b. The authority of the Federal Government to acquire fee title may be limited by the National Trail-enabling legislation.

        c. For National Historic Trails, direct Federal land acquisition for trail purposes shall be limited to areas identified as high potential historic sites and high potential route segments within the associated National Trail Management Corridor.

        d. The BLM is authorized to acquire whole tracts notwithstanding the parts of such tracts that may lie outside the area of the National Trail-related acquisition.

        e. The BLM will consider state and local government National Trail priorities for the acquisition of lands and other real property rights when developing and submitting land acquisition priorities during the BLM's national prioritization process.

5. Interpretation and education program actions should be included within the implementation plan.

    i. Interpretation provisions from any trailwide interpretation plan developed by the National Trail administering agency.

BLM_0019244

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-6

    ii.  The BLM will provide and enhance National Trail experience opportunities through the development of interpretive, education, and outreach programs for visitors, and as these opportunities are provided, will protect cultural, historic, and natural resources that are sensitive to visitor use.

    iii.  The BLM will provide interpretive information for enjoyment of trail visitors. The BLM will interpret the historic and other aspects of the trail to protect and enhance understanding, enjoyment, and appreciation of National Trails.

    iv.  Interpretation must be related to the nature and purpose of the National Trail.

    v.  The BLM may provide National Trail interpretation to the public, at the lowest possible cost, emphasizing site-specific National Trail resources, qualities, values, and associated settings and the primary use or uses. The BLM will enter into agreements with the state and other stakeholders which provides for shared responsibility in maintaining National Trail interpretive sites.

    vi.  For National Scenic Trails, the interpretation should consider addressing the resources, qualities, values, and associated settings and the primary use or uses of the areas through which such trails may pass.

    vii.  For National Historic Trails, the interpretation should consider addressing the historic significance of the trail; the visible historic remnants; high potential historic sites; high potential route segments; and other resources, qualities, values, and associated settings and the primary use or uses. Interpretation should emphasize specific sites along the trail, focusing on place and event-based history.

    viii.  The BLM will ensure that interpretation programs share a consistent message, design, and maintenance standard along the National Trail and are coordinated with the National Trail administering agency to the extent necessary.

    ix.  The BLM should consider use of off-site interpretation and collaboration with gateway communities to reduce impacts to National Trail settings.

    x.  The BLM may participate in providing, placing, and maintaining markers and interpretation on non-public lands in accordance with written agreements with willing landowners.

6. National Trail signing needs should be included within the implementation plan.

    i.  The BLM will provide navigational signing and other information for the safety of trail visitors and to protect resources.

BLM_0019245

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-7

ii. The BLM will maintain a continuous and marked National Scenic Trail route on public lands to maintain trail identity, to the extent practicable.

iii. Signing needs will incorporate provisions from any trailwide sign plan developed by the National Trail administering agency.

iv. Signing considerations include the types and locations of signs required for navigation, education, interpretation, and enforcement, and must incorporate the NTSA required uniform markers.

v. The BLM, for National Historic Trails, will mark and maintain auto tour routes identified within the Resource Management Plan, and/or identified within the trailwide Comprehensive Plan, in coordination with the National Trail administering agency.

vi. The BLM may include non-public land signing needs in the sign plan in accordance with written cooperative agreements.

vii. Any surveyed boundary signage must be located within 1 foot of any boundary. It is prohibited to install surveyed boundary signage on an approximate or set-back line.

7. Where road, primitive road, and trail travel management designations are not made in the land use plan, they should be addressed within the implementation plan, or within Field Office travel management plans and should meet all required process and product requirements as described in the BLM's travel and transportation management policies.

i. Travel management objectives should be established for all routes within the National Trail Management Corridor. Route management objectives will describe the intended purpose of the route in providing access and/or recreational outcomes to support the National Trail; will concisely describe the management intention for the route, including clearly defined activity types, modes of travel, and seasons or times for allowable access or other limitations; and will describe any design, operations, and maintenance (see Appendix 5).

ii. Individual routes may be identified to support:

a. Sound resource management.

b. Public access needs.

c. Development opportunities, including interpretation, trailheads, campsites, and water sources.

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-8

    d.   For National Historic Trails, the opportunity to vicariously share the experience of the original users of a historic route.

  iii.   Motorized vehicle use is prohibited for National Scenic Trails; however, some specific regulatory and legislative exceptions may apply. Motorized vehicle use may be limited or prohibited on National Historic Trails (see Section 7(c) of the NTSA and 43 CFR 8351.1).

    a.   National Scenic Trails are closed to motorized use. Motorized use on roads may be allowed if certain criteria are met.

    b.   Motorized use may be allowed along National Historic Trails, and must be monitored.

    c.   Agreements may be established to further describe sufficient or reasonable access considerations, including access agreements with willing landowners to provide access across non-public lands to or along National Trails.

5.5   National Trail Site-Specific Management Considerations

A.   The following National Trail management considerations assist the BLM in the management of the National Trail on the ground/at the site-specific level. Proposed management actions must undergo a NEPA analysis, and must include public involvement, in accordance with this manual.

  1.   Campsites, shelters, and related-public-use facilities may be contained on National Scenic or Historic Trails.

  2.   Reasonable efforts shall be made to provide sufficient access opportunities to such trails, and reasonable access for adjacent landowners.

  3.   The BLM discourages competitive or commercial recreation uses along the National Trail unless the proposal clearly demonstrates that the use does not substantially interfere with the nature and purposes of the National Trail, is compatible (see Chapter 1, 1.6 Statement of Programmatic Policy), and the proposal serves an identified trail resource or trail visitor services need.

  4.   The BLM may remove impediments in managing the National Trails such as unnecessary physical structures and barriers to use or access that do not enhance National Trail resources, qualities, values, or associated settings or the primary use or uses, as practicable.

BLM_0019247

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-9

5.  The primary National Trail use or uses takes precedence over other discretionary trail uses. Types of discretionary uses include bicycling, cross-country skiing, day hiking, equestrian activities, jogging, trail biking, back packing, snowmobiling, surface and underwater activities, and vehicle use. Accessibility for individuals with disabilities is prescribed by law and regulation.

6.  Where necessary, notice may be provided to permittees or lease operators of the presence of a congressionally designated National Trail and the BLM's responsibility not to permit uses along trails that would substantially interfere with the nature and purposes of the trail, and also to make efforts to avoid activities incompatible with the purposes for which trails were established, to the extent practicable, while respecting valid existing rights.

7.  The BLM may incorporate design features and best management practices for National Trails as described in Appendix 1 to guide project implementation within the National Trail Management Corridor, as applicable.

8.  The BLM will conduct lands actions according to the following guidance and in accordance with NEPA:

    i.  Public lands and realty actions within the National Trail Management Corridor will be considered in accordance with Section 203 of FLPMA, Section 212 of FLPMA, and 43 CFR 2420.

    ii.  The BLM will consider, for lands or interests in lands acquired for National Trail purposes and those lands under formal agreement, management of those lands or interests in lands in a manner consistent with adjacent public lands within the National Trail Management Corridor.

    iii.  In accordance with the provisions on "exchanges" in FLPMA and associated regulations, when the U.S. accepts title to lands through an exchange that are within a National Trail, those lands "shall immediately be reserved for and become a part of the unit or area [e.g., the National Trail] within which they are located, without further action by the Secretary, and shall thereafter be managed in accordance with all laws, rules, and regulations, [and land use plans] applicable to such unit or area [e.g., FLPMA and the NTSA]." FLPMA Sec. 206(c), 43 CFR 2200.0-6(f).

    iv.  Non-Federal lands which meet National Trail policy withdrawal requirements and which are acquired by exchange or purchase may be petitioned for withdrawal pursuant to 43 CFR 2310 concurrently with the acquisition process. If petitioned for withdrawal, the BLM shall describe both the acquisition and segregation of those non-federal lands within the planning and environmental review.

BLM_0019248

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-10

v.  Pursuant to FLPMA Section 203(a), the Secretary does not have the authority to sell a tract of public lands where such tracts are units within the National Trails System. Furthermore, where public lands are conveyed by the Secretary, through the BLM, pursuant to the public land laws (e.g., a sale or exchange under FLPMA), the Secretary, through the BLM, may reserve a right-of-way for National Trail(s) that are located within that conveyance to the extent necessary and pursuant to the NTSA. Specifically NTSA Section 7 (h)(2) states "Whenever the Secretary of the Interior makes any conveyance of land under any of the public land laws, he may reserve a right-of-way for trails to the extent he deems necessary to carry out the purposes of this Act."

The NTSA Section 7(h)(2) reservation of a right-of-way for National Trails in a conveyance instrument (patent) is different from a FLPMA Title V right-of-way and is more akin to an easement. The Secretary may exercise his authority under NTSA Section 7(h)(2) (to reserve a right-of-way for trails upon a conveyance of land under the public land laws) even where the applicable land use plan identifies the area as available for disposal but has not addressed the presence of a National Trail in the area. When such a reservation is made, the following should be considered:

a.  For National Scenic Trails, the optimal trail route, as certified by the National Trail administering agency; segments with high scenic values; segments containing high quality primitive outdoor recreation opportunities; and critical public access points and/or routes.

b.  For National Historic Trails, high potential historic sites and high potential route segments, identified National Register eligible historic properties from the period of use; segments and/or areas critical to providing a vicarious experience; and critical public access points, developed trails, and/or routes.

9.  Wildland fire rehabilitation efforts, including funding requests, may identify National Trail stabilization, rehabilitation, and restoration needs.

10.  Major relocation of a National Trail shall occur only through an Act of Congress under the NTSA. The BLM may relocate the National Trail if the relocation is minor, and implemented in accordance with considerations identified in the Resource Management Plan and in conformance with any considerations or coordination requirements identified in the trailwide Comprehensive Plan.

BLM_0019249

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-11

11. The BLM will not relinquish management jurisdiction of National Trail units to other Federal agencies; however, specific stewardship responsibilities, such as trail maintenance, may be transferred to other Federal agencies to improve efficiency and must occur through agreements. Management jurisdiction relinquished, or having the appearance of having been relinquished, prior to release of this policy will be remanded. Agreements regarding transferred stewardship responsibilities will ensure law enforcement responsibility is clear. The BLM may accept National Trail management jurisdiction or stewardship responsibility for other Federal lands through the appropriate process. Any transfer of stewardship responsibilities from the BLM and any transfer of management jurisdiction responsibilities to the BLM must include the following in the transfer documentation:

    i. The specific lands and National Trail segment, including a map and description.

    ii. Terms and conditions of the transfer.

    iii. Defined maintenance and management responsibilities for the BLM.

    iv. Specific requirements and responsibilities for private land easements.

    v. The timeframe for the transfer.

    vi. A statement that the management of the transferred segment is subject to the laws, regulations, and policies of the BLM, if so intended.

    vii. Specified law enforcement responsibilities.

    viii. A description of any exceptions.

    ix. Requirements for a periodic review of the agreement.

    x. An agreement termination clause.

12. The BLM may issue temporary closures and/or supplementary rules subject to the applicable regulations and policies; and may promulgate and/or revise regulations (NTSA Section 7(i)) which govern the use, protection, management, development, and administration of the National Trail on public lands.

13. Except for designated protected components of National Historic Trails, no land or sites located along a designated National Historic Trail or along the Continental Divide National Scenic Trail is subject to the provisions of section 4(f) of the Department of Transportation Act (49 U.S.C. 1653(f)) unless such land or site is deemed to be of historical significance under appropriate historical site criteria such as those for the National Register.

BLM_0019250

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-12

14.  For additional detail on management provisions, refer to NTSA.

5.6  National Trail Stewardship Program for Designated National Trails

A.  The BLM should conduct stewardship responsibilities to meet defined National Trail goals and objectives through development of a National Trail stewardship program. A National Trail stewardship program may:

1.  Build stewardship capacity for partnerships and volunteers.

2.  Coordinate, develop, and provide partner and volunteer training.

3.  Educate communities and public land visitors through outreach and programs such as A Trail to Every Classroom.

4.  Expand funding capabilities through grants, cost-share, transportation, and other programs

5.  Identify and provide project and collaborative opportunities to partners and volunteers, in accordance with applicable law and policy, including projects to:

   i.   Manage the National Trail.

   ii.   Share education and outreach material.

   iii.   Engage youth and families in National Trail experiences.

   iv.   Develop and maintain National Trail-related infrastructure.

   v.   Acquire lands or interests in lands to achieve National Trail purposes.

   vi.   Employment opportunities for youth, veterans, and other key segments of the public sector.

B.  The BLM will actively seek and recruit partners, volunteers, and other stakeholder involvement in fulfilling National Trail purposes, including developing and implementing a robust outreach program targeted at youth, communities, state and local government, National Trail interests, environmental stewardship interests, and historic preservation interests.

1.  The BLM will pursue partnerships with organizations having missions that overlap with agency National Trail objectives, and may support partner organizations as they organize, establish, and operate to support the BLM and National Trail purposes. Partner organizations may include, but are not limited to, National Trail clubs, organizations, friends groups, and cooperating associations.

BLM_0019251

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-13

2. The BLM will encourage the participation of qualified youth conservation or service corps in stewardship responsibilities, including construction and maintenance of trails, and other trail-related projects such as trail inventory including obtaining baseline condition information, monitoring, planning, protection, development, operations, and education.

3. The BLM will provide and foster opportunities for increased citizen volunteer engagement in achieving National Trail purposes and will proactively introduce citizens to the National Trails and the National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail. For each state and for each National Trail, the BLM may promote opportunities for:

   i. An adopt-a-trail program.

   ii. National Trails Day, National Public Lands Day, and Earth Day projects and activities.

   iii. Hands on the Land National Trail sites, Project Archaeology, a Trail to Every Classroom and other education programs with curricula focusing on National Trails.

C. The BLM will strive to build capacity and leverage resources for the purpose of fulfilling stewardship responsibilities for each National Trail by establishing mutually supportive partnerships which are formalized through cooperative or other appropriate agreements. Supportive partnerships at the national, state, regional, and local level are encouraged. Trailwide agreements are effected by the lead state.

1. The BLM will actively pursue written cooperative and/or other appropriate agreements with partners to mutually establish partnership purposes, objectives, priorities, roles, responsibilities, operating procedures, strategies, agreement timeframes, and reporting requirements.

2. The BLM may provide limited financial assistance (NTSA Section 7 (h)(1)), as resources are available and in accordance with applicable law, to partners through financial assistance agreements, including cooperative agreements, and will promote the use of matching funding aid programs to maximize and leverage resources to achieve National Trail purposes.

3. The BLM will encourage state and local government efforts to enter into voluntary written cooperative and/or other cooperative agreements with landowners, private organizations, or individuals, which could lead to securing the necessary real property rights in a National Trail Management Corridor and assist with subsequent management. The BLM may assist these efforts through, but not limited to:

BLM_0019252

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-14

    i.   Letters of support. Letters may support the efforts to donate money or convey real property interests and must not endorse the organization.

    ii.  Surveys of the property.

    iii. Property value estimates.

    iv.  Case file work.

    v.   Descriptions of how securing real property rights will help achieve the nature and purposes of the National Trail.

    vi.  Descriptions of why the property is important in achieving National Trail purposes.

4. Inventory of the resources, qualities, values, and associated settings and the primary use or uses of the property.

5. The BLM may work with willing landowners in voluntary efforts to establish land practices on private property within or adjacent to the National Trail Management Corridor.

D.   The BLM may develop a training program addressing the policies and stewardship responsibilities for National Trails, and for trails that may qualify for designation as components of the National Trail System.

1. The training program may be made available to partners, volunteers, and other stakeholders and interests. The training program will incorporate BLM policy and safety requirements for fulfilling stewardship responsibilities; education regarding the NTSA and National Trail visitor ethics; and specific National Trail goals, objectives, and priorities. All stewardship responsibilities must occur in accordance with National Trail land use and implementation plans and other BLM policy.

2. The BLM may provide training to qualified partners and volunteers to help the BLM fulfill National Trail stewardship responsibilities.

3. The BLM may cooperate with other National Trail agencies to establish training opportunities and standards to ensure consistency across the National Trails System.

4. The BLM may provide technical assistance and guidance to tribes, affected agencies, partners, and interested parties to enhance the capabilities of these stakeholders to execute stewardship responsibilities. All technical assistance and guidance will occur in accordance with agency policy standards, and at the professional level, where required, such as for archaeology education and training.

BLM_0019253

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-15

5. In accordance with Section 11 (c) of the NTSA, the BLM may make available appropriate BLM facilities, equipment, tools, and technical assistance to volunteers, volunteer organizations, and other qualified partners and interests, subject to applicable restrictions, in order to fulfill stewardship responsibilities (see also Section 5.5 C.2. of this manual).

E. The BLM may develop, expand, and maintain a National Trail science and research program in coordination with the National Trail administering agency, other partners, and interested parties.

1. The BLM will encourage participation in the development and implementation of National Trail-related research projects with tribes, affected agencies, partners, and interested parties. The BLM will ensure that the results of these research projects are made available for the purposes of promoting knowledge and discovery, refining research methods, and developing best management practices for the conservation, protection, and restoration of the National Trails. Examples of research projects include:

  i. Conducting historic context studies.

  ii. Conducting cultural resource stabilization projects.

  iii. Conducting oral histories.

  iv. Determining the influence of migration on settlement patterns of the United States.

  v. Quantifying native and invasive species distribution along National Trail routes.

  vi. Quantifying heritage or recreational tourism impacts on rural communities.

  vii. Quantifying social, economic, and/or biological impacts from long distance trail recreation uses.

  viii. Determining visitor satisfaction with National Trail-related recreation opportunities.

  ix. Determining appreciation and comprehension of American History by National Trail visitors.

  x. Determining the impact on visitors from on-site and off-site National Trail-related interpretation and education programs and related efforts.

  xi. Determining use of National Trail Management Corridors as wildlife migration corridors, use, or concentration areas.

BLM_0019254

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

5-16

xii.  Determining sociocultural trends in resource use.

xiii. Other topics that support the nature and purposes or the resources, qualities, values, or associated settings and the primary use or uses of the National Trail.

BLM_0019255

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

6-1

## Chapter 6. Congressionally Designated National Trails - Monitoring

This chapter outlines BLM considerations for monitoring National Trails. The BLM monitors National Trail resources, qualities, values, and associated settings and the primary use or uses of the trail on public lands or interests in lands, the effects of management actions, and to identify new and emerging issues. Monitoring efforts are coordinated across BLM offices and states to ensure consistency and information sharing. The monitoring of National Trails contributes to workload and performance measure reporting and accountability.

6.1   Designated National Trail Monitoring

To the greatest extent practicable:

A.   The BLM will monitor the changes to baseline conditions of National Trail resources, qualities, values, and associated settings and the primary use or uses that have been identified through inventory as supporting the nature and purposes of the National Trail.

B.   The BLM will monitor the impacts that Resource Management Plan implementation and other approved projects have on National Trail resources, qualities, values, and associated settings and the primary use or uses, including determining the effectiveness of design features, project stipulations, and mitigation measures on a regular basis as the Resource Management Plan and projects are implemented.

C.   The BLM shall monitor resource uses or surface disturbing activities that occur along the National Trail.

D.   The BLM will monitor acquired lands and interests in lands to ensure those values for which they were acquired are actively protected.

E.   The BLM will monitor visitor use and associated visitor capacities as part of the BLM visitor use monitoring program.

F.   The BLM will ensure monitoring is prioritized and occurs regularly and systematically, as feasible.

G.   The BLM will use appropriate monitoring data to determine if management practices are effective or require modification.

H.   When monitoring results demonstrate that actions taken to minimize and mitigate adverse impacts are not effective, management techniques may be adjusted through adaptive management.

I.   The BLM shall coordinate, as practicable, monitoring efforts with tribes, affected agencies, partners, interested parties, SHPOs, and the Advisory Council on Historic Preservation to maximize efficiencies.

BLM_0019256

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

6-2

J.   Where tribes, other agencies, partners, or interested parties are interested in participating in National Trail monitoring, the BLM may offer technical training and/or limited financial support, in accordance with applicable law, to improve capacity.

6.2   Data Documentation Standards and Coordination of Monitoring and Data Sharing

A.   The BLM shall document all monitoring efforts in accordance with the data and documentation standards described in this manual. The BLM shall use FTDS and other formally established data standards during the monitoring process.

B.   National Trail monitoring forms will include the following provisions:

1.   National Trail name.

2.   Resource name.

3.   Date.

4.   Name of person conducting monitoring and position or affiliation.

5.   Management corridor site and/or segment location monitored, including general description and legal description or GPS coordinate.

6.   Acreage and/or mileage monitored.

7.   General observations.

8.   Uses and activities observed.

9.   National Trail condition, including specific resources, qualities, values, and associated settings and the primary use or uses of the trail.

10. Photographic evidence of National Trail condition.

11. Potential incident of substantial interference, incompatible activities, or adverse impacts (see Chapter 1, 1.6 Statement of Programmatic Policy).

12. Summary and recommendation to Field Manager.

BLM_0019257

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

6-3

C.   All incidents of substantial interference, incompatible activities, or adverse impacts shall be reported to the Field Manager and resolved through the appropriate administrative or legal process. The BLM will coordinate with the National Trail administering agency on substantive incidents to seek input regarding options for resolution. Efforts to resolve incidents of substantial interference or adverse impacts shall be documented in the case file. For substantial interference, incompatible activities, or adverse impacts, the following, at a minimum, shall be documented within the monitoring section of the serialized case file:

1.   National Trail name.

2.   Resource name.

3.   Date.

4.   Name of person reporting the incident and position or affiliation.

5.   Management corridor site and/or segment location where the incident occurred, including general description and legal description or GPS coordinate.

6.   Acreage and/or mileage affected.

7.   General observations.

8.   Uses and activities observed.

9.   Evidence of new disturbance observed.

10. Photographic evidence of the disturbance or activity.

11. Level of interference to the nature and purposes caused by the uses and activities.

12. Impacts to specific resource, quality, or value or associated trail setting.

13. Any mitigation measures used to immediately reduce or avoid adverse impacts to resources.

14. Proposed mitigation measures or resolution to interference.

15. Summary and recommendation to Field Manager.

BLM_0019258

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

6-4

D.   When monitoring results demonstrate that the Resource Management Plan decisions are not effective in achieving National Trail policy requirements or Resource Management Plan objectives, the land use plan decisions should be amended or implementation actions adjusted, subject to valid existing rights, as warranted.

E.   Data may be shared with tribes, affected agencies, partners, and interested parties in accordance with formally established data sharing agreements and protocols.

BLM_0019259

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-1

**Glossary of Terms**

-A-

*activation.* Term used to initiate official field notification of the designation of a National Trail and/or the National Trail administration role, as assigned, under the National Trails System Act. Term usage is consistent with the National Park Service.

*associated settings.* The geographic extent of the resources, qualities, and values or landscape elements within the surrounding environment that influence the trail experience and contribute to resource protection. Settings associated with a National Scenic or Historic Trail include scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape elements (see resources, qualities, and values).

*auto tour route.* Those roads that parallel the National Historic Trail and provide opportunities to commemorate the historic route as an alternate experience. These opportunities may occur inside or outside the National Trail Management Corridor. Auto tour route opportunities may include access to National Historic Trail high potential historic sites and high potential route segments located on BLM public and, other participating agency land, or lands of willing landowners. Auto tour routes shall normally be restricted to existing all-weather roads or paved highways and may be limited to specific use conditions.

*avoid.* Subject to valid existing rights, agency action taken pursuant to applicable law, to the greatest extent possible to prohibit, deny, minimize, or mitigate activities on public lands that are incompatible with National Trail purposes under the National Trails System Act (see compatible and incompatible activities).

-C-

*certification.* The administrative process whereby nonfederally owned properties along National Historic Trails are identified and recognized by the trail administering agency for the historical and/or thematic association with one or more National Historic Trails through signed certification agreement. Certified properties may be eligible for the National Register.

*certification agreement.* A nonbinding agreement between the trail administering agency and one or more partners, including state and/or local government or private land owners. The agreement formalizes a good-faith arrangement to work together toward common purposes for the National Historic Trail, such as conserving, protecting, restoring, and interpreting a historic property.

*compatible activities.* Allowable uses and management actions on public lands that harmonize, or have been minimized or mitigated in order to harmonize, with the National Trail nature and purposes.

BLM_0019260

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-2

*Comprehensive Plan.* Statutorily required plan providing strategic direction and guidance for the future administration and management of a congressionally designated National Scenic or Historic Trail. The plan includes identification of the nature and purposes, goals and objectives, high potential sites and high potential segments (historic trails), and the selection of the National Trail Right-of-Way.

*congressionally designated trail route.* General route designated by Congress as the National Trail. It is depicted on the official map or National Trail Feasibility Study referenced in the National Scenic or Historic Trail enabling legislation. For National Historic Trails, this is the NHT 1 attribute in the Federal Trail Data Standards (see reference section of this manual).

*Connecting Trail.* Secretarially designated trails that complement National Recreation, Scenic, or Historic Trails by providing additional points of public access between such trails or connecting to such trails (see Side Trail).

-E-

*edge-matching.* The process of matching National Trail Management Corridor boundaries across BLM jurisdictions, ensuring compatibility in an identifiable and manageable boundary. Includes ensuring allowable uses, management actions, and necessary restrictions within the National Trail Management Corridor at Field Office boundaries are compatible across jurisdictions to seamlessly achieve National Trail objectives.

-F-

*Federal Interagency Council on Trails.* A longstanding interagency working group (since 1969, and reestablished by Executive Order 13195 in 2001) operating under an interagency memorandum of understanding with core membership composed of the Department of the Interior, BLM, National Park Service, and Fish and Wildlife Service; the United States Department of Agriculture, Forest Service; the United States Department of Transportation, Federal Highway Administration; and the United States Department of the Army, United States Army Corp of Engineers. The Council's mission is to share information with agency and nonprofit partners, coordinate program decisions, and make policy recommendations among all appropriate Federal agencies to foster the development of America's National Trails System.

*Federal Protection Component.* As described in Section 3 and 12 of the National Trails System Act, selected high potential historic sites and high potential route segments and other land- and water-based components of a designated National Historic Trail located on federally owned land which meet the National Historic Trail criteria listed in the National Trails System Act and are identified in trailwide Comprehensive Plans, Resource Management Plans, and implementation plans.

BLM_0019261

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR CONGRESSIONAL DESIGNATION (P)

G-3

*Federal Trail Data Standards.* A core set of standardized trail data attributes with corresponding definitions and values applicable to tabular and spatial data, approved by the Federal Geographic Data Committee on September 30, 2011. The standards are applicable to all trails, including National Scenic and Historic Trails, managed by the U.S. Forest Service, National Park Service, U.S. Fish and Wildlife Service, and BLM.

-H-

*high potential historic site.* Historic sites related to the route or sites in close proximity thereto which provide opportunity to interpret the historic significance of the trail during the period of its major use. The criteria for consideration of sites as high potential historic sites include historic significance, presence of visible historic remnants, scenic quality, and relative freedom from intrusion. High potential historic sites are assumed to contain remnants, artifacts, and other properties eligible for the National Register of Historic Places, pending evaluation. Under the National Trails System Act, high potential historic sites located on federally owned land are referred to as Federal Protection Components.

*high potential route segment.* Segments of a trail which would afford a high-quality recreation experience in a portion of the route having greater than average scenic values or affording an opportunity to vicariously share the experience of the original users of a historic route. National Historic Trail high potential route segments are assumed to contain remnants, artifacts, and other properties eligible for the National Register of Historic Places, pending evaluation. Under the National Trails System Act, high potential route segments located on federally owned land are referred to as Federal Protection Components.

*historic context study and report.* In-depth documentary research on the historic sites and trail segments focused on the period of use. Documents trail resource research, identification, location, assessment, and evaluation. The information contained in the report is used for planning and is a precursor to the National Register nomination process.

*historic route.* Trail location where historic events are known to have occurred as evidenced by historic remnants or artifacts or through research and subsequent identification. For National Historic Trails, this is the NHT 2 attribute in the Federal Trail Data Standards (see reference section of this manual).

-I-

*identification.* For both National Trail administration and management, the requirement to identify, document, and evaluate National Trail resources, qualities, values, and associated settings, and the primary use or uses, which support the nature and purposes of National Trail designation (see inventory section of this manual).

*incompatible use.* An activity that affects (hinders or obstructs) the nature and purposes of a designated National Trail (see substantial interference).

BLM MANUAL
Supersedes Rel. 6-137

Rel. 6-139
09/14/2012

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-4

-M-

*major relocation.* A significant change in the location of the designated National Trail that would substantially depart from the Congressional route, established National Trail Right-of-Way, or Management Corridor, requiring an Act of Congress.

*Management Corridor.* See National Trail Management Corridor.

*maximum compatible outdoor recreation potential.* A criterion for determining the location of a National Scenic Trail. The recreation potential is tempered by the capacity of the area to sustain such use.

*Multiple Property Documentation Form.* The National Register of Historic Places Multiple Property Documentation Form (NPS 10-900-b) nominates groups of related significant properties for listing on the National Register. The form serves as a basis for evaluating the National Register eligibility of related properties. When nominated and listed in the National Register of Historic Places, the Multiple Property Documentation Form, together with individual registration forms, constitutes a multiple property submission.

-N-

*National Historic Landmark.* Nationally significant historic places designated by the Secretary of the Interior that possess exceptional value or quality in illustrating or interpreting the heritage of the United States (see National Historic Landmark criteria).

*National Historic Landmark criteria.* A set of criteria used to evaluate the national significance of a property pursuant to the Historic Sites Act of 1935 and the National Historic Preservation Act (see National Park Service Cultural Resources National Register Bulletin, How to Prepare National Historic Landmark Nominations).

*National Historic Trail.* A congressionally designated trail that is an extended, long-distance trail, not necessarily managed as continuous, that follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a National Historic Trail is the identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment. A National Historic Trail is managed in a manner to protect the nationally significant resources, qualities, values, and associated settings of the areas through which such trails may pass, including the primary use or uses of the trail.

*National Historic Trail criteria.* Criteria, established in Section 5(b) of the National Trails System Act which must be addressed within the National Historic Trail Feasibility Study in order for a trail to be considered for designation.

BLM_0019263

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-5

*National Recreation Trail.* Trail designated by the Secretary of the Interior, or delegated officer, through a standardized process, including a recommendation and nomination by the BLM. National Recreation Trails provide a variety of compatible outdoor recreation uses in or reasonably accessible to urban areas or high-use areas.

*National Register eligible.* Includes properties both formally determined as eligible for inclusion in the National Register by the Secretary of the Interior and all other significant properties that meet National Register listing criteria. This includes any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior.

*National Register of Historic Places.* The National Register is the official Federal list of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. National Register properties have significance to the history of the communities, states, or the Nation.

*National Scenic Trail.* A congressionally designated trail that is a continuous and uninterrupted extended, long-distance trail so located as to provide for maximum outdoor recreation potential and for the conservation and enjoyment of the nationally significant resources, qualities, values, and associated settings and the primary use or uses of the areas through which such trails may pass. National Scenic Trails may be located so as to represent desert, marsh, grassland, mountain, canyon, river, forest, and other areas, as well as landforms that exhibit significant characteristics of the physiographic regions of the Nation.

*National Trail.* For purposes of this manual, National Trail refers only to congressionally designated National Scenic or Historic Trails.

*National Trail Administration.* Trailwide responsibility assigned to the BLM or National Park Service by the Secretary of the Interior when the Department of the Interior is named as the responsible lead in National Trail-specific legislation (see National Trail Administrator). The responsibility involves trailwide coordination, guidance, technical assistance, and consultation with National Trail managers that have physical site management responsibility National Trail administration responsibilities are fulfilled as directed in the NTSA in coordination with tribes; other National Trail Administrators; National Trail managing agencies (including all BLM public land managers along the congressionally designated National Trail); other Federal, state, and local government agencies; private and nonprofit organizations; willing landowners; land users; and individuals (tribes, affected agencies, willing landowners, partners, and interested parties). National Trail administration includes leadership in the development of the statutorily required trailwide Comprehensive Plan, which provides strategic direction for National Trail administration and management, including identification of the nature and purposes of the National Trail and selection of the National Trail Right-of-Way.

BLM_0019264

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-6

*National Trail Administrator.* Individual delegated the responsibility to conduct National Trail administration when the BLM or National Park Service is assigned this responsibility by the Secretary of the Interior (see National Trail Administration). The responsible agency assigns the role to an individual to perform National Trail administration duties (BLM Manual 1203, Delegation of Authority).

*National Trail advisory council.* Council established to advise the Secretary that is charged with the administration of the National Trail with respect to matters relating to the trail, including the selection of a National Trail Right-of-Way in the trailwide Comprehensive Plan, standards for the erection and maintenance of markers along the trail, and the administration of the trail.

*National Trail Feasibility Study.* Study authorized through an Act of Congress to determine the feasibility and desirability of designating a trail route as a National Scenic or Historic Trail.

*National Trail Inventory.* The official record and the process used in developing the record of National Trail resources, qualities, values, and associated settings and the primary use or uses.

*National Trail Management Corridor.* Allocation established through the land use planning process, pursuant to Section 202 of Federal Land Policy and Management Act and Section 7(a)(2) of the National Trails System Act ("rights-of-way") for a public land area of sufficient width within which to encompass National Trail resources, qualities, values, and associated settings and the primary use or uses that are present or to be restored.

*National Trail manager.* The agency, landowner, or interest (see certification) with the authority and/or responsibility for decisionmaking for lands under its jurisdiction. Also, the official responsible for land and water management of trail-related resources.

*National Trail Right(s)-of-Way.* Term used in Section 7(a)(2) of the National Trails System Act to describe the corridor selected by the National Trail administering agency in the trailwide Comprehensive Plan and which includes the area of land that is of sufficient width to encompass National Trail resources, qualities, values, and associated settings. The National Trail Right-of-Way, in the context of the National Trails System Act, differs from a Federal Land Policy and Management Act (FLPMA) Title V right-of-way, which is a grant issued pursuant to FLPMA authorities. It becomes a key consideration in establishing the National Trail Management Corridor in a Resource Management Plan. See also National Trail Management Corridor.

*National Trails inventory standards.* The standards the BLM must meet as it conducts National Trail inventory, assessments, and documentation of National Trail resources, qualities, values, and associated settings and the primary use or uses in the management role.

*National Trails management standards.* The standards the BLM must meet as it manages the National Trail resources, qualities, values, and associated settings, and the primary use or uses.

BLM_0019265

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-7

*National Trails monitoring standards.* The standards the BLM must meet as it monitors National Trail inventory; resources, qualities, values, and associated settings and the primary use or uses; effectiveness of implementation of Resource Management Plan decisions; projects within the National Trail Management Corridor; and acquired lands.

*National Trails planning standards.* The standards the BLM must meet as it conducts land use planning to establish the National Trail Management Corridor and to address all programs and uses within the management corridor.

*National Trails Program Lead.* Individual assigned by the Director, State Director, or Field Manager the responsibility to provide coordination and information-sharing, effect trailwide management, and manage operational issues for National Trails, including communication with the National Trail Administrator, other BLM National Trails Program Leads, and associated trail organizations.

*National Trails System.* Congressionally authorized system of trails recognized through the authority of the National Trails System Act, containing National Scenic and Historic Trails, National Recreation Trails, Connecting and Side Trails, and authorities applied to rail-trails.

*National Trails System Act.* Public Law 90-543, as amended and codified in 16 U.S.C. 1241-1251, which establishes the National Trails System.

*nature and purposes.* The term used to describe the character, characteristics, and congressional intent for a designated National Trail, including the resources, qualities, values, and associated settings of the areas through which such trails may pass; the primary use or uses of a National Trail; and activities promoting the preservation of, public access to, travel within, and enjoyment and appreciation of National Trails.

-P-

*primary use or uses.* Authorized mode or modes of travel, and/or activities identified in the National Trails System Act, enabling legislation, or legislative history, through the trailwide Comprehensive Plan or approved Resource Management Plan.

-R-

*resources, qualities, and values.* The significant scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape areas through which such trails may pass as identified in the National Trails System Act (see associated settings).

*Right(s)-of-way.* See National Trail Right(s)-of-Way.

BLM_0019266

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

G-8

-S-

*Side Trail.* Secretarially designated trails that complement National Recreation, Scenic, or Historic Trails by providing additional single points of public access to special features along such trails (see Connecting Trail).

*Statewide Trail Management Plan.* State-level Resource Management Plan amendment that establishes a National Trail Management Corridor and allowable uses, management actions, and necessary restrictions for resources and resource uses within the management corridor.

*stewardship responsibilities.* As National Trail Administrator or National Trail Manager, agency obligations to conduct inventory, monitoring, planning, administration, management, land or easement acquisition, protection, development, maintenance, training, and operations of the National Trails. These responsibilities may be conducted in partnership with tribes, affected agencies, willing landowners, partners, and interested parties.

*substantial interference.* Determination that an activity or use affects (hinders or obstructs) the nature and purposes of a designated National Trail (see nature and purposes).

-T-

*trail segment.* Distinct sections of a trail, categorized based on similar trail conditions, management goals and objectives, manageability, settings, ownership patterns, presence of high potential route segments, National Register eligible properties, and landscape-scale control points or trail access points.

-U-

*uniform marker.* A distinctive symbol or logo used to mark and officially represent each National Trail, developed and monitored by the National Trail administering agency.

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-1

**Appendix 1 - Design Features and Best Management Practices for
National Trails and Associated Resources**

1. Use best science and technology to achieve objectives.
2. Projects proposed within the National Trail Management Corridor will be designed and located in a manner that is compatible with trail purposes.
3. Minimize visual contrast of project through use of project design such as use of low profile buildings; siting using the natural topography to hide or screen development; reducing the aerial extent of impact by clustering developments; use of vegetative screening; mimicking the line, form, and texture of the surrounding landscape; painting infrastructure, using colors that camouflage the development and prevent glare; and other techniques developed to address the site specific conditions.
4. Use of native plant species within the National Trail Management Corridor.
5. Weed prevention and treatment, including early detection and rapid response.
6. Avoid the use of dye, restrict administrative vehicle travel off of designated routes to minimize spread of exotic and invasive species within the National Trail Management Corridor, and consider alternate treatment methods such as use of backpack sprayer.
7. Locate wild horse and burro gather sites outside of the National Trail Management Corridor.
8. Avoid locating non-commercial woodcutting areas within National Trail Management Corridor.
9. Location, design, and rehabilitation of access routes for harvest purposes and forest projects.
10. Use of selective harvesting to minimize disruption to the characteristic landscape.
11. Avoid creation of new livestock trails within the National Trail Management Corridor.
12. Herd livestock at designated National Trail crossings.
13. Limit use of salt and developed water sources to specifically defined areas to reduce visual impacts and control livestock distribution.
14. Herd livestock instead of using fences or use removable electrical fences.
15. Remove fences where they are no longer needed.
16. Design livestock developments to be visually harmonious with the National Trail setting.
17. Locate temporary facilities, including water troughs and sheep wagons, in a manner that minimizes contrast with the characteristic landscape.
18. The BLM may establish visitor use capacity at sites, areas, and/or in certain activities within the National Trail Management Corridor, based on the monitoring and assessment of impacts including the visitor experience.
19. Use snow cover and frozen ground to armor trail segments against traffic associated with proposed activity.
20. Avoid bulldozer use, or using the National Trail as a fireline, and other similar measures, during fire suppression.

BLM_0019268

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-2

**Appendix 2 – Federal Trail Data Standards Trail Fundamentals**
(See inventory chapter of this manual)

Federal Trail Data Standards
Federal Geographic Data Committee

---

**FTDS - Trail Fundamentals**

**Trail Type** – Reflects the predominant trail surface and general mode of travel accommodated by a trail.
- Standard/Terra Trail
- Snow Trail
- Water Trail

**Trail Class** – Prescribed scale of trail development for a trail, representing its intended design and management standards.
- Trail Class 1: Minimally Developed
- Trail Class 2: Moderately Developed
- Trail Class 3: Developed
- Trail Class 4: Highly Developed
- Trail Class 5: Fully Developed

**Managed Use** – mode of travel that is actively managed and appropriate on a trail, based on its design and management.

**Designed Use** – the managed use of a trail that requires the most demanding design, construction, and maintenance parameters and that, in conjunction with the applicable Trail Class, determines which Design Parameters or technical specifications will apply to a trail.

---

BLM_0019269

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-3

**Appendix 3 – Federal Trail Data Standards National Scenic and Historic Trails
Management Corridor Concept**
(see inventory chapter of this manual)

Federal Trail Data Standards
Federal Geographic Data Committee

| Trail Code | Trail Category |
|---|---|
| NST | National Scenic Trail (Congressionally Designated) |
| NHT1 Designated Route | Route(s) congressionally designated as the National Historic Trail |
| NHT2 Heritage Resources | NHT associated heritage resources (routes and/or sites) |
| NHT3 Recreation and/or Interpretive Trail/Road/Sites | NHT associated recreation or interpretive route and/or sites |

BLM_0019270

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-4

**Appendix 4 – Federal Trail Data Standards National Historic Trail Condition Categories**
(See inventory chapter of this manual)

Federal Trail Data Standards
Federal Geographic Data Committee

| FTDS – NHT Condition Category | Description |
| --- | --- |
| NHT I - Location Verified, Evident, and Unaltered | The trail route is accurately located and verified from written and cartographic records, terrain limitations, and/or archaeological evidence. The visible trail remnant retains the essence of its original character that relates to the historic period for which the trail was designated and shows no evidence of having been either impacted by subsequent uses or altered by other improvements. |
| NHT II - Location Verified and Evident with Minor Alteration | The trail route is accurately located and verified from written and cartographic records, terrain limitations, and/or archaeological evidence. The visible trail remnant retains the essence of its character that relates to the historic period for which the trail was designated, but shows minor evidence of alteration by subsequent use, development, or natural events. |
| NHT III - Location Verified with Little Remaining Evidence | The trail routes is accurately located and verified from written and cartographic records, terrain limitations, and/or some archaeological evidence. Due to weathering, erosion, vegetative succession, development, etc., trail traces are insignificant, although some evidence remains (e.g. wagon wheel impact evidence such as rust, grooved, or polished rocks). |
| NHT IV - Location Verified and Permanently Altered | The trail route's location is verified from written and cartographic records, or by terrain limitations, although little or no archaeological evidence remains. The trail has been permanently altered or obliterated by human-caused or natural events, leaving no evidence of its original appearance. |
| NHT V - Location Approximate or Not Verified | The trail route's location cannot be accurately verified from written or cartographic records, or archaeological evidence. The trail is either so obliterated or unverifiable that its location is only approximately known. |
| NHT VI - Location Verified with Historic Reconstruction | The trail route is accurately located and verified from written and cartographic records, terrain limitations, and/or archaeological evidence. The trail segment has been deliberately reconstructed, at its original location, to appear as it did during the period of maximum historic importance. |

BLM_0019271

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-5

**Appendix 5 – Federal Trail Data Standards National Trail Management Classes**
(See planning chapter of this manual)

| Trail Attributes | Trail Class 1 Minimally Developed | Trail Class 2 Moderately Developed | Trail Class 3 Developed | Trail Class 4 Highly Developed | Trail Class 5 Fully Developed |
|---|---|---|---|---|---|
| **Tread & Traffic Flow** | • Tread intermittent and often indistinct. <br>• May require route finding. <br>• Single lane, with no allowances constructed for passing. <br>• Predominantly native materials. | • Tread continuous and discernible, but narrow and rough. <br>• Single lane, with minor allowances constructed for passing. <br>• Typically native materials. | • Tread continuous and obvious. <br>• Single lane, with allowances constructed for passing where required by traffic volume in places where there is no reasonable opportunity to pass. <br>• Native or imported materials. | • Tread wide and relatively smooth, with few irregularities. <br>• Single lane, with allowances constructed for passing where required by traffic volume in places where there is no reasonable opportunity to pass. <br>• Double lane where traffic volume is high and passing is frequent. <br>• Native or imported materials. <br>• May be hardened. | • Tread wide, firm, stable, and generally uniform. <br>• Single lane, with frequent turnouts where traffic volume is low to moderate. <br>• Double lane where traffic volume is moderate to high. <br>• Commonly hardened with asphalt or other imported material. |
| **Obstacles** | • Obstacles common, naturally occurring, often substantial, and intended to provide increased challenge. <br>• Narrow passages; brush, steep grades, rocks and logs present. | • Obstacles may be common, substantial, and intended to provide increased challenge. <br>• Blockages cleared to define route and protect resources. <br>• Vegetation may encroach into trailway. | • Obstacles may be common, but not substantial or intended to provide challenge. <br>• Vegetation cleared outside of trailway. | • Obstacles infrequent and insubstantial. <br>• Vegetation cleared outside of trailway. | • Obstacles not present. <br>• Grades typically < 8%. |

BLM_0019272

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-6

| Constructed Features & Trail Elements | • Structures minimal to nonexistent.<br>• Drainage typically provided without structures.<br>• Natural fords.<br>• Typically no bridges. | • Structures of limited size, scale, and quantity; typically constructed of native materials.<br>• Structures adequate to protect trail infrastructure and resources.<br>• Natural fords.<br>• Bridges as needed for resource protection and appropriate access. | • Structures may be common and substantial; constructed of imported or native materials.<br>• Natural or constructed fords.<br>• Bridges as needed for resource protection and appropriate access. | • Structures frequent and substantial; typically constructed of imported materials.<br>• Constructed or natural fords.<br>• Bridges as needed for resource protection and user convenience.<br>• Trailside amenities may be present. | • Structures frequent or continuous; typically constructed of imported materials.<br>• May include bridges, boardwalks, curbs, handrails, trailside amenities, and similar features. |
|---|---|---|---|---|---|
| Signs[2] | • Route identification signing limited to junctions.<br>• Route markers present when trail location is not evident.<br>• Regulatory and resource protection signing infrequent.<br>• Destination signing, unless required, generally not present.<br>• Information and interpretive signing generally not present. | • Route identification signing limited to junctions.<br>• Route markers present when trail location is not evident.<br>• Regulatory and resource protection signing infrequent.<br>• Destination signing typically infrequent outside wilderness areas; generally not present in wilderness areas.<br>• Information and interpretive signing uncommon. | • Route identification signing at junctions and as needed for user reassurance.<br>• Route markers as needed for user reassurance.<br>• Regulatory and resource protection signing may be common.<br>• Destination signing likely outside of wilderness; generally not present in wilderness areas.<br>• Information and interpretive signs may be present outside of wilderness. | • Route identification signing at junctions and as needed for user reassurance.<br>• Route markers as needed for user reassurance.<br>• Regulatory and resource protection signing common.<br>• Destination signing common outside of wilderness; generally not present in wilderness areas.<br>• Information and interpretive signs may be common outside wilderness areas.<br>• Accessibility information likely displayed at trailhead. | • Route identification signing at junctions and for user reassurance.<br>• Route markers as needed for user reassurance.<br>• Regulatory and resource protection signing common.<br>• Destination signing common.<br>• Information and interpretive signs common.<br>• Accessibility information likely displayed at trailhead. |

BLM_0019273

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

A-7

| Typical Recreation Environs & Experience[3] | • Natural and unmodified.<br>• ROS: Typically Primitive to Roaded Natural.<br>• WROS: Typically Primitive to Semi-Primitive. | • Natural and essentially unmodified.<br>• ROS: Typically Primitive to Roaded Natural.<br>• WROS: Typically Primitive to Semi-Primitive. | • Natural and primarily unmodified.<br>• ROS: Typically Primitive to Roaded Natural.<br>• WROS: Typically Semi-Primitive to Transition. | • May be modified.<br>• ROS: Typically Semi-Primitive to Rural<br>• WROS: Typically Portal or Transition. | • May be highly modified.<br>• Commonly associated with visitor centers or high-use recreation sites.<br>• ROS: Typically Roaded Natural to Urban.<br>• Generally not present in wilderness areas. |
|---|---|---|---|---|---|

BLM_0019274

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

I-1

**Illustration 1 - National Trail Administration and State Management
Coordination Assignments**
(See overview chapter of this manual)

| Name of Trail | National Trail Location | National Trail Administering Agency | BLM State Management Coordination |
|---|---|---|---|
| Arizona National Scenic Trail | Arizona | U.S. Forest Service | Arizona |
| California National Historic Trail | California, Idaho, Nevada, Oregon, Utah, Wyoming | National Park Service | Nevada |
| Continental Divide National Scenic Trail | Colorado, Idaho, Montana, New Mexico, Wyoming | U.S. Forest Service | New Mexico |
| El Camino Real de Tierra Adentro National Historic Trail | New Mexico | BLM – New Mexico National Park Service | New Mexico |
| Iditarod National Historic Trail | Alaska | BLM - Alaska | Alaska |
| Juan Bautista de Anza National Historic Trail | Arizona, California | National Park Service | Arizona |
| Lewis and Clark National Historic Trail | Idaho, Montana | National Park Service | Montana |
| Mormon Pioneer National Historic Trail | Wyoming | National Park Service | Wyoming |
| Nez Perce National Historic Trail | Idaho, Montana, Wyoming | U.S. Forest Service | Idaho |
| Old Spanish National Historic Trail | Arizona, California, Colorado, Nevada, New Mexico, Utah | BLM - Utah National Park Service | Utah |
| Oregon National Historic Trail | Idaho, Oregon, Wyoming | National Park Service | Oregon |
| Pacific Crest National Scenic Trail | California, Oregon | U.S. Forest Service | California |
| Pacific Northwest National Scenic Trail | Washington | U.S. Forest Service | Oregon |
| Pony Express National Historic Trail | Nevada, Utah, Wyoming | National Park Service | Utah |
| Potomac Heritage National Scenic Trail | Maryland, Virginia | National Park Service | Eastern States |
| Washington-Rochambeau Revolutionary Route National Historic Trail | Virginia | National Park Service | Eastern States |

BLM_0019275

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

I-2

**Illustration 2 - Recommended Data Dictionary Attributes for Line Features**
(see inventory chapter of this manual)

| Name | Description |
|------|-------------|
| Unique_ID | Abbreviation of the associated trail name combined with the OBJECTID # and date recorded; not pertinent to line features; used as a place holder from FTDS ("National Trail Designation"), each trail has its own unique identifier in the FTDS |
| Trail_Name | Name of the trail or the segment name, i.e Hudspeth's Cutoff/California Trail |
| Other_Trail | Used for additional description of trail segment when necessary |
| Trail_Cond_Cat | Classification categories based on condition and level of preservation needed, i.e. Unaltered, Used, Verified, Altered, and Approximate |
| Environment | Type of environment. Create a "pick list" for the area to be inventoried, e.g. in AZ, it would be "desert, transition, alpine" etc. |
| Environ_De | Additional description of environmental conditions, when necessary. 20 characters or less. |
| Veg_1 | The dominant plant type for the area. Create pick list, using scientific or common names |
| Veg_2 | The second most common plant type for the area. Create pick list. |
| Veg_3 | The third most common plant type for the area. Create pick list. |
| Veg_Des | Additional description of vegetation, if necessary. Create pick list. |
| Direct_Imp | Presence or absence of direct impacts (Yes/No) |
| Direct_1 | The main source of a direct impact for the trail segment, if present |
| Direct_2 | The secondary source of a direct impact for the trail segment, if present. Pick list, e.g. "road, erosion, livestock developments, water catchments" etc. |
| Direct_3 | The tertiary source of a direct impact for the trail segment, if present. Create pick list. |
| Direct_Des | A quick description of the direct impacts |
| Indirect_I | Presence or absence of indirect impacts (Yes/No) |
| Indirect_1 | The main source of an indirect impact for the trail segment, if present |
| Distance_1 | The impacts approximate distance from the trail |
| Indirect_2 | The secondary source of an indirect impact for the trail segment, if present |
| Distance_2 | The impacts approximate distance from the trail |
| Indirect_3 | The tertiary source of an indirect impact for the trail segment, if present |
| Distance_3 | The impacts approximate distance from the trail |
| Indirect_D | A quick description of the indirect impacts |
| Date_Recorded | The date the data was collected |
| Recorder | The name of the person recording the data |
| Comments | Additional comments necessary for description |
| Comments | Additional comments necessary for description. Less than 30 characters |
| Corridor | NHT 1, NHT 2, NHT 3, NST, Undetermined |
| Trail Surface | Pick list from FTDS, e.g. "gravel, asphalt", etc. |
| Photo Points | Include direction, number from digital camera; designate "landscape" or "signage" etc. |

BLM_0019276

6280 – MANAGEMENT OF NATIONAL SCENIC AND HISTORIC TRAILS
AND TRAILS UNDER STUDY OR RECOMMENDED AS SUITABLE FOR
CONGRESSIONAL DESIGNATION (P)

I-3

**Illustration 3 - Recommended Data Dictionary Attributes for Point Features**
(see monitoring chapter of this manual)

| Name | Description |
|------|-------------|
| Unique_ID | Abbreviation of the associated trail name combined with the OBJECTID # and date recorded. From FTDS. |
| Assoc_Trail | Name of the trail or the segment name, i.e. Hudspeth's Cutoff/California Trail |
| Other_Trail | Used for additional description of trail segment when necessary |
| Features | Type of the artifact or trail marker. Use pick list, e.g. "cultural site, campsite, mine, reinforced tread, scenic overlook", etc. |
| Feat_Des | Description of the feature |
| Direct_Imp | Presence or absence of direct impacts (Yes/No) |
| Direct_1 | The main source of a direct impact for the associated trail segment, if present. Use pick list. |
| Direct_2 | The secondary source of a direct impact for the associated trail segment, if present. Use pick list. |
| Direct_3 | The tertiary source of a direct impact for the associated trail segment, if present.  Use pick list. |
| Indirect_I | Presence or absence of indirect impacts (Yes/No) |
| Indirect_1 | The main source of an indirect impact for the associated trail segment, if present. Use pick list. |
| Distance_1 | The impacts approximate distance from the trail |
| Indirect_2 | The secondary source of an indirect impact for the associated trail segment, if present. Use pick list. |
| Distance_2 | The impacts approximate distance from the trail |
| Indirect_3 | The tertiary source of an indirect impact for the associated trail segment, if present. Use pick list. |
| Distance_3 | The impacts approximate distance from the trail |
| Date_Recorded | The date the data was collected |
| Recorder | The name of the person recording the data |
| Comments | Any additional comments needed to facilitate descriptions of diagnostic artifacts. Limit to 30 characters. |
| Photo_Point "sign" "landscape" | The name of the associated photos with that particular feature. Get number from digital camera; use cardinal directions. |
| Hotlink | The address location of each photo to facilitate hyperlinking. |

BLM_0019277

**Zoe Ghali**

| | |
|---|---|
| **From:** | Dyer, Desty D <ddyer@blm.gov> |
| **Sent:** | Tuesday, July 10, 2012 1:39 PM |
| **To:** | Zoe Ghali |
| **Cc:** | McColm, Matthew R; Epstein, David A |
| **Subject:** | RE: Coal info for RMP socioeconomic impacts analysis |

See response below. (I apologize for the late response – I mistakenly thought your first email was coming from a student of CMU – not from EMPSi)

1) Estimate of the tons of coal mined in the planning area, ideally by county.
Delta County: Ranges from 2 to 5 million projected to be about 3.2million for 2012 – all federal coal. [Bowie No. 2 Mine – longwall mine]
Gunnison County: Ranges from 8 to 11 million – projected to be 9.9 million for 2012 – small fraction of fee coal. [Elk Creek Mine & West Elk Mine – both longwall mines]
Montrose County: Ranges from 0.3 to 0.4 million – projected to be 0.4 for 2012 – all fee coal, with no leased federal coal "yet". [New Horizon Mine – surface mine]
2) Estimate of the average cost per ton to mine coal (based on industry standards). This information will need to be provided by BLM staff in the CSO, namely Matt McColm and/or David Epstein (they are both cc'd on this email).

---

**From:** Zoe Ghali [mailto:zoe.ghali@empsi.com]
**Sent:** Tuesday, July 10, 2012 9:39 AM
**To:** Dyer, Desty D
**Subject:** FW: Coal info for RMP socioeconomic impacts analysis

Hi Desty,

I thought it may be helpful for me to re-send you the email related to my inquiry for coal economic contributions, below, and as noted on my recent voicemail. If you could take a minute to take a look at the request below and call or email me when you have a moment that would be great. We are trying to make some progress on the socioeconomic analysis and need some info to proceed for coal analysis.

Appreciate your help,

**Zoe Ghali**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO 80301
tel:  303-447-7160     fax:  866-625-0707
www.EMPSi.com     Twitter: EMPSInc     Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*

Denver     Portland     Reno     San Francisco     Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

---

**From:** Zoe Ghali
**Sent:** Monday, June 04, 2012 1:31 PM

1

**To:** 'ddyer@blm.gov'
**Subject:** Coal info for RMP socioeconomic impacts analysis

Hi Desty,

Hope that you are doing well. I am working with Colorado Mesa University to collect data for socioeconomic impacts analysis for the RMP. One component for this section is economic estimates/modeling to determine the impacts to the local economy for certain key resources, such as minerals and energy. As such, I am trying to determine get some estimates for coal mining in the planning area. We are looking for the following info to start:

1) Estimate of the tons of coal mined in the planning area, ideally by county.
2) Estimate of the average cost per ton to mine coal (based on industry standards). Not sure if this is a number that you might have an estimate for or if there is a significant difference between mining operations.

Could you please let me know if you have the above info, or if it is something you'd be able to find? Alternatively, if the above is not available, we could utilize dollar value for which the mined coal is sold. Once we have determined if we can get info for above, then we'll need to determine the effects that the RMP would have on production (i.e. determine the effects of withdrawal and of various stipulations on mining costs). I can talk with you further about this later.

Please let me know if this info is available, and feel free to contact me with any questions. I'll give you a call to check in too.

Thanks for your help,

**Zoe Ghali**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO 80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com      Twitter: EMPSInc      Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S*

Denver      Portland      Reno      San Francisco      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0019279

## Zoe Ghali

| | |
|---|---|
| **From:** | Dyer, Desty D <ddyer@blm.gov> |
| **Sent:** | Wednesday, July 25, 2012 11:44 AM |
| **To:** | Zoe Ghali |
| **Cc:** | Pfifer, Teresa A |
| **Subject:** | RE: Follow-up coal questions for socioeconomic analysis |

**See imbedded text below.**

**From:** Zoe Ghali [mailto:zoe.ghali@empsi.com]
**Sent:** Thursday, July 19, 2012 3:19 PM
**To:** Dyer, Desty D
**Cc:** Lauren Zielinski
**Subject:** RE: Follow-up coal questions for socioeconomic analysis

Thanks Desty,

I've contacting the SO for cost/ton info as suggested. I do have a few follow up questions for you as detailed below. The key points for which we still need input are underlined. Please provide input on these points if possible.

It may be helpful for you to understand how the data we are asking for is being used; coal production (tons) and cost to produce ($/ton) are representing local economic inputs. This information is input into an economic model which will then tell us economic output and employment figures due to the mining activity in this coal field. As such, we are basically trying to determine how BLM management might affect tons of coal produced or cost to produce for all alternatives.

Regarding the **Somerset Coal Field**, based on the analysis in Ch 4 minerals section there are differing amounts of acres that will be closed to mining for the action alternatives:. Alternative B: 19% closed to mining (potential economic impact?)  **Very little to no economic impact because areas of closure have no to low potential for mining for next 20 years.**

Alternative C: 8% closed to mining (potential economic impact?)  **Very little to no economic impact (same logic as in Alt B)**
Alternative D: 2% closed to mining (minimal impact) **Virtually no economic impact.**

With the size of the coal field and the amount of available land on USFS land, do you foresee these closures having an impact on coal production (and subsequently, economic output?) Assuming these closures *do* have an impact on production, we are hoping for a foreseeable coal output scenario for each alternative (e.g., Alt B will reduce coal production by 19% between 2025 and 2032). I am hoping that overlay of the closed acres on the potential coal resource could allow you to make such a prediction, but if you feel you cannot make this type of prediction, then a qualitative scenario for each alternative is also very helpful.

Regarding the **Nucla-Naturita Coal Field**, because the operations are currently occurring on private lands, this coal filed will not be included in our analysis in the same manner as the Somerset mines, but rather in the cumulative impacts analysis. As you noted, we are assuming the SSR and TL restrictions are de-facto closures on any future expansion onto BLM lands. Based on the SSR and TL stipulations as described in Ch 4, it appears that under all action alternatives, surface mining operations on BLM lands would not be an economically viable option:

Alternative B: 100% closed to mining due to SSR and TL        **Completely eliminates the coal mine and Nucla power plant that relies on the coal production.  The New Horizons Mine is operated by Western Fuels-**

1

**Colorado, ALLC. You will need to find out from them the economic impact of closing both operations. It won't be small.**

Alternative C: (at least) 90% closed to mining due to SSR and TL        **Same as Alt B.**

Alternative D: 100% closed to mining due to SSR and TL        **Same as Alt B.**

Assuming that, we can include an analysis of the loss of future economic contributions due to these "closures". Do you think it would be appropriate to include an analysis on potential income lost for the later part of the RMP period (i.e. 2020-2030) based on a conservative interpretation of the need to expand onto BLM land before the end of the decade?  We could use the assumption that current levels of coal production would continue if not restricted by these closures (based on the analysis in the RFD) to run the analysis if you think that this is appropriate.

I've tried to simplify our questions, but please don't hesitate to call if you need more info or don't understand our data needs.

Thanks again for your time.

**Zoe Ghali**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO 80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com       Twitter: EMPSInc      Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S*

Denver      Portland      Reno      San Francisco      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Dyer, Desty D [mailto:ddyer@blm.gov]
**Sent:** Wednesday, July 18, 2012 6:06 PM
**To:** Zoe Ghali
**Cc:** Epstein, David A; Beecham, Charlie F
**Subject:** RE: Follow-up coal questions for socioeconomic analysis

**See below. I have "answered" your questions in text the same color as this text.**

Desty Dyer
BLM UFO Mining Engineer
970-240-5302

**From:** Zoe Ghali [mailto:zoe.ghali@empsi.com]
**Sent:** Thursday, July 12, 2012 2:20 PM
**To:** Dyer, Desty D
**Cc:** Lauren Zielinski; Jennifer Whitaker
**Subject:** Follow-up coal questions for socioeconomic analysis

Hi Desty,

In follow-up to our previous requests for coal data, we have some additional information and question for review related to the socioeconomic impacts of coal development. Could you please review the assumptions below for accuracy and see if you are able to answer our questions or direct us to someone else who might be able to? **You will need help from others to get a handle on mining costs (see "Data Needs" below).**

2

Our information is based on review of Chapter 4 section on Energy and Minerals, the Coal Resource and Development Potential Report, and the notes from Coal and Fluid Minerals Potential presentation in June 2011 (attended by Jennifer Whitaker). The following are our assumptions and related questions:

**Assumption 1.** The coal resources at Tongue Mesa are heavily faulted with no rail access to the area, making it economically unviable to mine in the next 20 years. Since this is the current situation of this resource area, it will have no impact on the socioeconomics of the area and no further analysis will be performed. **Yes.**

**Assumption 2.** The coal resources at Grand Mesa have limited potential, but are less economically viable due to low coal quality and transportation constraints. This area would most likely only be mined when the resources at Somerset are exhausted, which is not forecast to happen in the next 20 years. As such, it will be assumed that Grand Mesa will not be mined in the next 20 years. Since this is the current situation of this resource area, it will have no impact on the socioeconomics of the area and no further analysis will be performed. **Yes.**

**Assumption 3.** The mining operations at Somerset produce high quality coal and utilize subsurface mining techniques, specifically longwall mining. It is estimated that the output from the three active mines within this coal field will produce between 12 to 18 million tons of coal each year for the next 20 years. Due to transportation constraints, this amount will remain fairly constant over this time period.

> *Question 1*: Alternatives B, C, and D propose various amounts of acreages in the Somerset coal field to be closed to mining. Will these closures impact the subsurface development in this area (i.e. reduce the level of extraction) If so, can we quantify the level of impacts by Alternative? **Yes we can quantify. Would need to take some time to overlay the closed acres on the potential coal resource and determine how great the potential might be.  I expect this exercise would not be too difficult.**

**Assumption 4.** The mining operations at the Nucla-Naturita coal field are currently on private land extracting private minerals, and utilize surface mining techniques. It produces about 350,000-400,000 tons of coal annually, and all of the coal mined from this location goes to a private power plant in the local area. Since this is a private operation and will not be affected by changes in public land management, the socioeconomic impact from this area will not be included in our models.  **I don't believe the power plant is a private operation – I expect it is a public utility??**

> *Question 2:* It has been predicted that the existing private operation could deplete their coal resources by 2014, and that there are viable coal resources in the surrounding area to continue mining at the current rate for the next 20 years. If this private operation does expand and continues surface coal mining, does the BLM anticipate any expansion onto BLM lands in the future? **Yes.** If so, will the TL and SSR stipulations proposed in Alternatives B, C, and D prevent this from happening? (If this is the case, the prevention of the reasonably foreseen development will be analyzed in the cumulative write up of the Ch. 4 socioeconomic section.)  **As I commented in the file "75 empsi chapt 4 minerals 20120625.docx" in Table 2 (Quantitative Impacts on Coal Leasing) on page 9  "An SSR and TL is tantamount to making it unsuitable for leasing. SSR's are for drill hole pads or other small sized surface disturbances, not entire acres having potential to be strip mined." And on page 10 I commented, "Would you really expect a surface mining operation to simply stop for a season due to a timing limitation?"**
>
> **– During scoping for the RMP and in correspondence and meetings with BLM since, the current fee mine operator has shown interest in exploring and mining the federal Nucla-Naturita (Dakota) coal resources while letting BLM know that they fully expect to expand onto federal coal before the end of this decade. Unless I misunderstand the alternatives, and the TL and SSR, we have basically ignored that information and rendered strip mining impossible by applying SSR and TL.**

Please review these assumptions to confirm they portray an accurate representation of the future of coal mining in the area. Also, any clarification on the questions would be greatly appreciated.

BLM_0019282

**Additional Data Needs:** (these may need to be forwarded to Matt and/or David at the CSO) – **Yes they do need to be forwarded to these gentlemen, although Matt will be retired on 7/27 so Charlie Beecham should also be informed of your needs, therefore he is copied on this reply.**

- Approximate cost to mine one ton of coal at Somerset using longwall mining techniques
- Approximate cost to mine one ton of coal at Nucla-Naturita using surface mining techniques
- If site specific numbers are not available, average numbers for the state for each mining technique would be helpful as well

Thank for your time, and appreciate your help.

Please feel free to give me a call if you need any questions.

**Zoe Ghali**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO 80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com       Twitter: EMPSInc       Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*

Denver        Portland        Reno        San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0019283

U.S. DEPARTMENT OF THE INTERIOR **BUREAU OF LAND MANAGEMENT**
**National**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

December 20, 2012

In Reply Refer To:
8340, 8341, 8342,
8358, 9100 (250) P

EMS TRANSMISSION 12/27/2012
Instruction Memorandum No. 2013-035
Expires: 09/30/2014

To: All Washington Office and Field Office Officials
   Attention: State, District, and Field Office Program Leaders
including Recreation, National Landscape Conservation System,
Planning, and Law Enforcement
   Officers

From: Acting Director

Subject: Requirements for Processing and Approving Temporary Public
Land Closure and Restriction Orders.

**Program Areas:** Recreation, National Landscape Conservation System,
Planning, and Law Enforcement.

**Purpose:** This Instruction Memorandum (IM) establishes policy and procedures
related to processing, reviewing, and implementing temporary closure or
temporary restriction orders on Bureau of Land Management-managed public
lands. This is necessary to ensure that proper authorities are used and *Federal
Register* notices are approved and published in a timely manner.

**Policy/Action:** All state and field offices must process closure and restriction
orders in accordance with the policies and procedures contained in this
guidance. States may develop supplemental procedures to implement this
guidance as necessary.

1. **Temporary Closures and Restrictions Using 43 CFR subpart 8364
(Closures and Restrictions); 43 CFR subpart 8351 (Designated
National Area); 43 CFR subpart 6302 (Use of Wilderness Areas,
Prohibited Acts, and Penalties)**

Temporary closure or restriction orders under these authorities are enacted at the discretion of the authorized officer to resolve management conflicts and protect persons, property, and public lands and resources. A closure or restriction order should be considered only after other management strategies and alternatives have been explored including, but not limited to, increased law enforcement, cooperative efforts with local governments and organizations, engineering (e.g., fencing, barriers, or trail improvements), education, and outreach. The duration of temporary closure or restriction orders should be limited to 24 months or less; however, certain situations may require longer closures and/or iterative temporary closures.

### 2. Temporary Closures Mandated by 43 CFR subpart 8341 (Conditions of Use)

Under 43 CFR 8341.2(a), the Bureau of Land Management (BLM) is required to immediately close affected areas when off-highway vehicles (OHV) "are causing or will cause considerable adverse effect upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources…" Though compliance with the National Environmental Policy Act (NEPA) is required in advance of a closure action under 43 CFR 8341.2(a), use of the Categorical Exclusion that provides for temporary road or trail closures (516 DM 11.9 (G)(3)) can often be employed to satisfy this requirement. See the discussion in Section 4 on NEPA compliance.

Managers are encouraged to take action to correct developing OHV problems well in advance of confronting the "considerable adverse effects" that trigger the closure requirement under 43 CFR 8341.2. In many circumstances, managers are aware of OHV problems well in advance of confronting a "considerable adverse effect," and can take timely actions to reduce the impacts of OHV use or conduct a NEPA analysis with public participation before it becomes necessary to close or restrict under this authority.

### 3. Duration and Scope of Temporary Closures or Restrictions

Temporary closures or restrictions should be implemented for the shortest time and in the smallest area necessary to protect resources, public health, and safety. Temporary closures or restrictions must generally be limited to 24 months or less in duration. This policy is necessary to ensure that temporary closures or restrictions do not become de facto permanent closures or restrictions without public involvement or without a defined time frame for resolution. Where a solution to the issues that necessitated a closure or restriction can be found, but will take longer than 24 months to resolve, (e.g., via a long-term planning decision), managers should issue new temporary closure or restriction orders in accordance with this IM before the original order expires.

In circumstances where a manager knows in advance that a temporary closure

BLM_0019285

Case No. 1:20-cv-02484-MSK Document 31-7 filed 04/27/21 USDC Colorado pg 292 of

must remain in effect longer than 24 months in order to effectively resolve an issue, (e.g., mandatory soil stability/re-vegetation requirements) the manager may provide a rationale and justification for an alternative duration for the closure or restriction in the closure order, the *Federal Register* Notice, and the associated briefing package submitted to the Washington Office (WO) for review and approval.

In special cases (e.g., pending litigation) it may be necessary to indefinitely extend temporary closures established before the issuance of this policy that are still in effect. In such circumstances, field offices should consult the WO for further direction.

BLM_0019286

## Closures and Restrictions Longer Than 24 Months

Closures and restrictions that are longer than 24 months in duration generally must be accomplished through the land use planning/land use plan amendment process, which includes a NEPA analysis. Permanent closures must always be accomplished through the land use planning process.

## 4. NEPA Compliance

Compliance with NEPA is generally required prior to the BLM closing or restricting the use of the public lands. (See below for discussion of emergency situations/alternative arrangements.)

Compliance with NEPA in the context of temporary closures may include:
- Categorical Exclusions (e.g., 516 DM 11.9 (G)(3), for temporary road or trail closure).
- Environmental Assessments.
- Environmental Impact Statements (i.e., specific closure decisions adopted in a completed Resource Management Plan).

A Determination of NEPA Adequacy (DNA) can also be used to document that the contemplated action has been adequately covered in an existing NEPA document.

## Emergency Actions
In the event of an emergency, immediate actions, such as a closure or restriction of uses of the public lands, must be taken to prevent or reduce risk to public health or safety, property, or important resources. The Council on Environmental Quality (CEQ) regulations (40 CFR 1506.11) provides that in an emergency, "alternative arrangements" may be established to comply with NEPA. Alternative arrangements do not waive the requirement to comply with NEPA, but establish an alternative means for compliance. Alternative arrangements are limited to the actions necessary to control the immediate effects of the emergency. For actions that cannot be categorically excluded, the decision maker must contact the Branch Chief, Planning (WO-210) to determine how NEPA requirements will be met.

The BLM NEPA handbook (H-1790-1, Section 2.3) defines the following actions as typical emergency actions:

- Cleanup of a hazardous material spill.
- Fire suppression activities related to ongoing wildland fires.
- Emergency stabilization actions following wildland fires or other disasters.

Emergencies are unforeseen events of such severity that they require immediate action to avoid dire consequences. Typical closures and restrictions imposed in

BLM_0019287

Case No. 1:20-cv-02484-MSK Document 31-7 filed 04/27/21 USDC Colorado pg 294 of
399

response to known or planned events occurring on public lands, or
long-occurring activities such as target shooting, OHV use, camping, or parking,
for example, are not usually considered emergencies. A *Federal Register* Notice
drafted for a temporary closure should not be referred to as an "emergency
closure."
Attachment 1 has additional direction for Planning and NEPA considerations.

BLM_0019288

### 5. Authorities

Attachment 2 includes a list of appropriate authorities available to temporarily close and restrict specified uses on public lands, the requirements for NEPA compliance, and the requirements for publication and posting of the order.

### 6. State and Washington Office Review for Publication of *Federal Register* Notices

All notices of temporary closure and restriction under 43 CFR subpart 8364, 43 CFR subpart 6302, 43 CFR subpart 8351, or section 8341.2 must be approved by the state director before submission to the WO.  Once a manager decides to temporarily close or restrict uses, all supporting information must be immediately prepared and sent to the state office.  The state office should send the package to the WO in a timely manner.  The WO will file the notice for publication in the *Federal Register.*  As noted below, timely filing of the *Federal Register* Notice can affect the enforceability of the closure.  For closures or restrictions that can be reasonably foreseen, (e.g., a closure for an annual event such as the Reno Air Races), field offices are encouraged to obtain necessary approvals through state offices and forward required materials to the WO at least 3 months before the order is intended to take effect.  Where possible, renewal of temporary closures or restrictions should also be initiated at least 3 months before the original order is scheduled to expire.

Closure and restriction orders submitted for review and approval must be accompanied by a briefing paper, maps, aerial, or other photographs showing geographic areas and affected resources, along with other supporting documentation that would help reviewers understand the need for the action

### 7. Procedures and Effective Date of *Federal Register* Notices.

Generally, a closure order is only effective upon publication of the order in the *Federal Register*.  However, in extraordinary situations, the order (signed by the authorized officer) may be effective at an earlier date.  For example, where a person is cited for a violation of a closure or restriction order prior to the date of publication in the *Federal Register* but was aware of the order, the order may be effective against that person.  However, efforts to enforce a closure or restriction before the order is published in the *Federal Register* could risk dismissal of the citation if contested.  It is suggested that the BLM Field Office contact the Office of the Solicitor for further guidance on this issue.

See Attachments 2 and 3 for more information on the topic of effective dates and publication requirements, and for *Federal Register* Notice procedures for closure and restriction orders.

BLM_0019289

### 8. Memorandum of Understanding Obligations and Coordination with the Federal Land Hunting, Fishing, and Shooting Sports Roundtable

Closure and restriction orders that may affect hunting access, shooting sport activities, or the discharge of firearms must comply with the Federal Land Hunting, Fishing and Shooting Sports Roundtable Memorandum of Understanding (MOU). This MOU requires notification of the action to shooting organizations and alerts them of opportunities for public involvement.

**Timeframe:**  This policy is effective immediately.

**Budget Impact:**  None.

**Background:**  As resource uses and demands for public access have increased, so has the need for the BLM to temporarily close or restrict areas to certain uses in order to protect resources, public health, and safety. However, it is important that closure and restriction orders are established only after other management strategies and alternatives have been explored, and it is determined that a closure or restriction order is necessary. Closures and restrictions must be established in accordance with applicable authorities, and the Department of the Interior and BLM policies and procedures.

**Manuals/Handbook Sections Affected:**  None.

**Coordination:**  Development of this policy was coordinated with the Renewable Resources and Planning Directorate, National Landscape Conservation System and Community Partnerships Directorate, the Division of Decision Support, Planning and NEPA, the Office of the Solicitor, the Office of Law Enforcement and Security, and the Division of Regulatory Affairs.

**Contact:**  Any questions or concerns may be directed to Frank Jenks, Recreation and Visitor Services Division (WO-250) at 208-373-3993, or by e-mail at Frank_Jenks@blm.gov.


Signed by:                                      Authenticated by:
Janine Velasco                                  Ambyr Fowler
Acting Director                                 Division of IRM
Governance, WO-560


3 Attachments
  1 – Planning and Environmental Policy Act Considerations (2 pp)

BLM_0019290

2 – Authorities and Purposes for Temporary Closures, Recreation and NLCS (1 p)

3 – Template for Federal Register Closure Notices (6 pp)

BLM_0019291

## Planning and National Environmental Policy Act Considerations

Addressing Temporary Off-Highway Vehicle Closures Under the Authority of 43 CFR 8341.2 in National Environmental Policy Act Documents

Resource Management Plans (RMP), where possible and necessary, should address the need to temporarily close or restrict the use of public lands that are open to off-highway vehicle (OHV) use, where such use is causing or will cause considerable adverse effects to resources. See 43 CFR 8341.2.

All RMP and all Travel Management Plans (TMP) at a minimum shall include the following statement in accordance with 43 CFR 8341.2 with regard to OHV use:

"Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence."

The above statement should be included in the RMP or TMP, which should also describe as specifically as possible the resources, uses, situations, and locations likely to be adversely affected by OHV use. The statement should be included in the section that sets forth the decisions common to all alternatives. If analyzed appropriately, temporary closures and restrictions considered under this process will not require further National Environmental Policy Act (NEPA) analysis and can be processed with a Determination of NEPA Adequacy when implementation of temporary OHV closures or restrictions are required.

Emergency Circumstances

When remedial action in response to an emergency situation will result in significant environmental consequences (positive or negative environmental consequences), the agency may seek alternative arrangements for NEPA compliance under 40 CFR 1506.11. In those circumstances, the BLM is required to consult with the Council on Environmental Quality (CEQ) prior to taking the action and the remedial action must be narrowly limited to whatever is necessary to control the immediate impacts of the emergency. The CEQ regulation provides the following:

"Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the federal agency taking the action should consult with the CEQ about alternative arrangements. Agencies and the CEQ will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review."

[40 CFR 1506.11, Emergencies]

Attachment 1-1

BLM_0019292

While the regulation recognizes the need to react to emergencies, it is only when the action to remedy the situation will result in significant environmental consequences that CEQ regulations allow for limited circumvention of traditional NEPA review. As stated in the regulation, "Other actions remain subject to NEPA review." The elements of NEPA review will include:

1. A brief statement of the factual circumstances giving rise to the agency's need to intervene in the public's use of the public lands,
2. An explanation of the agency's authority to intervene,
3. Identification of the issue/problem in the vernacular of "purpose and need,"
4. Development of alternative remedial actions,
5. A description of the affected environment, and
6. Identification and discussion of the environmental consequences associated with each remedial action, followed by
7. A finding of insignificant environmental consequences associated with the selected alternative or the issuance of a record of decision.

Attachment 1-2

BLM_0019293

## Authorities and Purposes for Temporary Closures, Recreation and the National Landscape Conservation System

| Authority | Purpose | Applies to | NEPA Required? | Publication and Posting Requirements |
|---|---|---|---|---|
| 43 CFR 8364.1 Closure or Restriction Order | Protect persons, property, and public lands and resources | Areas and uses/activities identified | Yes | Publish notice of the order in the *Federal Register*; post the order on site; and post the order at local BLM Office pursuant to the regulations. |
| 43 CFR 8341.2 Off-Road Vehicle (ORV) Special Rules | Immediately close to ORV use when ORVs are causing considerable adverse effects. | ORV use in areas identified | Yes* | Publish notice of the order in the *Federal Register*; post the order on site; and post the order at local BLM Office pursuant to the regulations. |
| 43 CFR 8351.2-1 Wild & Scenic Rivers | Carry out the intent of the Wild and Scenic Rivers Act | Lands and surface waters areas identified within boundary of Wild and Scenic River | Yes | Publish notice of the order in the *Federal Register*; post the order on site; and post the order at local BLM Office pursuant to the regulations. |
| 43 CFR 6302.19 Designated Wilderness Areas | Carry out the intent of the Wilderness Act | Lands or waters within the boundaries of a designated Wilderness Area | Yes | Publish notice of the order in the *Federal Register*; post the order on site; and post the order at local BLM Office pursuant to the regulations. |

*Consult with Washington Office, Division of Decision Support, Planning and National Environmental Policy Act (WO-210) if use of this regulatory provision, in response to off-road vehicle use, is believed to require use of the alternative arrangements provision of the National Environmental Policy Act (40 CFR 1506.11.)

Attachment 2

# Closure Notice Procedures and Template

## Internal Review Process for Closures

All temporary closures and restrictions (generally less than 24 months) and corresponding *Federal Register* Notices require state director and Washington Office (WO) approval. In general, closures or restrictions go into effect upon publication of the order in the *Federal Register*. However, in certain situations, the order (signed by the authorized officer) may be effective at an earlier date. For example, where a person is cited for a violation of a closure order prior to the date of publication in the *Federal Register*, but was aware of the order, the closure order may be effective against that person. It is suggested that the Bureau of Land Management (BLM) Field Office contact the Office of the Solicitor for further guidance on this issue.

Temporary Closure and Restriction notices are first submitted from the field office to the State Office External Affairs Office. Once reviewed by the State Law Enforcement Office and approved by the state director it is forwarded to the WO for review and clearance. The BLM Director's Office has final clearance authority for Temporary Closure and Restriction notices, which are normally reviewed by the Assistant Director for Renewable Resources and Planning (AD-200), the Assistant Director for National Landscape System and Community Partnerships (AD-170), Law Enforcement and Security (WO-120), the Department of the Interior (DOI) Solicitor's Office, and the Executive Secretariat before publication in the *Federal Register*.

When sending notices to the WO for review and clearance, please include in each package three original signed copies of the notice, a compact disk with a copy of the notice attached, a briefing paper and a cover letter to the *Federal Register* verifying that the disk attached to the notice contains a true copy of the original.

You must send all Temporary and Closure Restriction notices by **overnight mail** or FedEx to:

Bureau of Land Management
Division of Regulatory Affairs
Attn: Division Chief
20 M Street, S.E., Suite PO 6134
Washington, DC 20003

## Template for Federal Register Closure Notices

**Note:** This template is only for temporary closures under section 8364.1 and contains some words and phrases in brackets. These words and phrases should be included in your *Federal Register Notice* as they are written in the template. For example, "[INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER]" should appear in the *Federal Register* Notice exactly as presented in the template. This template also contains some words and phrases that are in a bold italic font, such as, "***Billing Code.***" In each such instance, you must substitute the information appropriate for the particular closure, follow the italicized instructions or choose between the italicized alternatives shown, and use an appropriate font (regular or bold).

Attachment 3-1

*Billing Code, with the letter "P" added,*
*to signify that you are using a disk*
*(for example, "4310-DN-P")*

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

[Internal Accounting # (for example, "[UT-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-JS-DNF9-24-1A]")

**Notice of Temporary Closure [or Restrictions (if appropriate)] on Public Lands in County, State**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of Temporary Closure (or Notice of Temporary Restrictions (if appropriate))

**SUMMARY:** Notice is hereby given that a closure (or Restriction of uses (if applicable)) is in effect on public lands administered by the Name of Field Office, Bureau of Land Management (BLM).

**DATES:** This Temporary Closure [or Restrictions (if appropriate)] will be in effect from [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER] to [Insert Ending Date].

**FOR FURTHER INFORMATION CONTACT:** (Insert Name, Field Manager (or other title), Address, and Phone Number.) Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1-800-877-8339 to contact the above individual during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individuals. You will receive a reply during normal hours.

Attachment 3-2

BLM_0019296

**SUPPLEMENTARY INFORMATION:**  This Temporary Closure (or Restriction (if appropriate)) affects public lands at (Insert popular name of location, if Available in County, State).  The legal description of the affected public lands is (Insert Legal Description).

The Temporary Closure (or Restriction) is necessary because (Insert Rationale for Closure or Restriction).

The BLM will post closure signs at main entry points to this area. This closure or restriction order will be posted in the (Insert Name of Local Office).  Maps of the affected area and other documents associated with this closure are available at (Insert E-mail Address and/or Street Address (as appropriate) for Pertinent Field Office or State Office.  (Whenever possible, specifically identify other documents, such as Resource Management Plans and Environmental Assessments that are relevant.)  Under the authority of Section 303(a) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1733(a)), 43 CFR 8360.0-7, and 43 CFR 8364.1, the BLM will enforce the following rule(s) within (Insert Popular Name of the Area to be Closed).

(Insert applicable rules, e.g., You must not use motorized vehicles in the closed area). The following persons are exempt from this order:  Federal, state, and local officers and employees in the performance of their official duties; members of organized rescue or fire-fighting forces in the performance of their official duties; and persons with written authorization from the BLM.

Attachment 3-3

Any person who violates the above rule(s) and/or restriction(s) may be tried before a United States Magistrate and fined no more than $1,000, imprisoned for no more than 12 months, or both. Such violations may also be subject to the enhanced fines provided for by 18 U.S.C. 3571.

(Name and Title)

AUTHORITY: 43 CFR section 8364.1 (could also be 43 CFR sections 8351, 8341, or 6302, depending on facts.)

Attachment 3-4

BLM_0019298

**Briefing Paper Format**

**[Use 12 point/Times New Roman Font]**

1. State Office

Identify the State Office responsible for the notice.

2. What is the title of this notice?

Please use the title exactly as it appears in the notice.

3. What are the key issues raised by the underlying decision documents for this notice?

Describe key resource conflicts, legal, land and resource management, or other issues of concern to the BLM, the public, interested groups, cooperators, and partners. Provide brief historical background if important to understanding the context for addressing these issues and concerns. A summary statement outlining the purpose of the underlying action or decision is sufficient.

4. Who are the primary users affected by or parties interested in the underlying decisions or actions? What are their concerns?

Explain who is interested in the underlying decisions and actions, and what the BLM has done to address their concerns or issues. How have we engaged them in the planning or decision-making process? Describe what BLM is doing to ensure these entities receive information related to this notice. Is the information available to the public on the internet, and if so, where?

5. Is tribal consultation appropriate under E.O. 13175 or other authorities? Will the proposed action potentially impact tribes or tribal lands, or generate their interest? If so, what consultation or other communication/outreach are you planning?

If applicable, state what tribes are affected, what consultation has taken place or will take place, and what the BLM has done or will do to address tribal concerns or issues.

6. Will this notice be controversial?

Whether the answer is "yes" or "no", explain why. The BLM offices, as a matter of practice, work very effectively with the public, partners, and groups to resolve controversial issues prior to publication. The purpose of this information is to alert headquarters, including Assistant Secretary Land and Minerals Management and the Secretary's Office, to criticisms and concerns that you have heard or that they are likely to hear from Members of Congress, Governors, the media, partners, and others, and to **communicate success stories**, in correspondence and discussion with these entities.

7. What will the underlying decision or action change? (summarize changes to policy, management practices, allowable uses, differences between draft and final, etc.)

Provide a summary description of the changes, if any, the BLM is proposing through the underlying decision or action in a way we manage the land or resources, or implement management practices.

Attachment 3-5

BLM_0019299

What are we proposing to do that is different from the past? Summarize what, if any, uses of the land have been limited or expanded, and why.

8. Will this notice need communication materials, e.g., press release or a Communications Plan?  If so, enclose these materials with the notice package.  If there is likely to be media, Congressional, or external group interest, have you identified appropriate communication materials?  Include a disk and hard copy of any materials developed, e.g., draft press release, Communications Plan, etc., with the notice package.

9. What are the reasons for the timing of the notice and the consequence, if any, of delaying or canceling the release?

In answering this question, identify, as applicable:

Statutory requirements;

Court mandate;

Public or Congressional interest;

Any adverse impacts or safety concerns, etc., that cannot be addressed without this notice;

Other timing implications; and

The date, if any, by which the notice must be published.

10.  How has this action been analyzed under the National Environmental Policy Act (NEPA)?

Is this notice categorically excluded?  Please cite any NEPA analysis that has already been completed on this order or restriction contemplated in the Notice, i.e., Categorical Exclusion, Environmental Assessment, or Environmental Impact Statement.

11.  Is there any additional pertinent, descriptive information that reviewers need to know or would increase understanding?

For example, are the notice and the underlying decision or action the first steps in a series that directly relates to a specific action such as a renewable energy or Resource Management Plan, or is the notice part of a group or notices being submitted on the same issue?

Also, if there is supplemental information **already developed or that could easily be prepared, or updated** that will help the reviewer understand the issues and proposals, please include it in the notice package, e.g., maps, current PowerPoint presentation, etc.  Inclusion of this additional information will expedite the notice review and approval process.

12.  List the name and position of the people who have prepared, reviewed, and approved the notice and the underlying decisions and documents.

Attachment 3-6

**John Grant**

| | |
|---|---|
| **From:** | Pipkin, Christopher P <Cpipkin@blm.gov> |
| **Sent:** | Wednesday, May 02, 2012 2:12 PM |
| **To:** | John Grant |
| **Subject:** | RE: Grand Junction OHV questions |

John,

My best estimate for an overall average speed would be 15 miles per hour, but that's considering all vehicle types. Motorcycles are faster than ATVs, ATVs are faster than 4x4s, etc.

Chris Pipkin
Outdoor Recreation Planner
BLM, Grand Junction Field Office
2815 H Road
Grand Junction, CO 81506
970-244-3024
cpipkin@blm.gov

**From:** John Grant [mailto:jgrant@environcorp.com]
**Sent:** Wednesday, May 02, 2012 2:53 PM
**To:** Pipkin, Christopher P
**Subject:** RE: Grand Junction OHV questions

Chris,

Thank you very much for providing the OHV updates. Your assumption is correct, we aren't interested in mountain bikes, only motorized OHVs. I had a one more question:

1. Can you provide a generalized average speed of travel for the OHVs? I know that speed varies considerably depending on operator, conditions, and terrain, but I need your best estimate for all operations in the Grand Junction area, or an estimate for the route(s) captured by each counter location.

Thanks again,
-John
_____

John Grant
Senior Associate
ENVIRON International Corporation
773 San Marin Drive, Suite 2115
Novato, CA 94998
Tel:  415.899.0706
Fax: 415.899.0707
Email: jgrant@environcorp.com
www.environcorp.com

**From:** Pipkin, Christopher P [mailto:Cpipkin@blm.gov]
**Sent:** Wednesday, May 02, 2012 1:40 PM
**To:** John Grant
**Subject:** RE: Grand Junction OHV questions

John,

1

I've attached the updated spreadsheet with my best guesses regarding your counter data queries.  Please see the notes I added in a few of the cells.  I made the assumption that we're not looking at data for mountain bikes, right?

Let me know if you need additional clarification.

Chris Pipkin
Outdoor Recreation Planner
BLM, Grand Junction Field Office
2815 H Road
Grand Junction, CO 81506
970-244-3024
cpipkin@blm.gov

---

**From:** John Grant [mailto:jgrant@environcorp.com]
**Sent:** Tuesday, May 01, 2012 11:34 AM
**To:** 'cpipkin@blm.gov'
**Subject:** Grand Junction OHV questions

Chris,

I have provided in the attached file a list of questions related to the counter data that we discussed earlier in rows 16:25 of the attached spreadsheet.  I have added information for the first three routes based on our conversation. The orange highlighted cells are those for which I'm requesting your input.  If you could provide them by COB tomorrow as you mentioned that would be much appreciated.  Please call me if you have any questions.

Thanks again,
John

_____

John Grant
Senior Associate
ENVIRON International Corporation
773 San Marin Drive, Suite 2115
Novato, CA 94998
Tel:  415.899.0706
Fax: 415.899.0707
Email: jgrant@environcorp.com
www.environcorp.com

_____

---

This message contains information that may be confidential, privileged or otherwise protected by law from disclosure. It is intended for the exclusive use of the Addressee(s). Unless you are the addressee or authorized agent of the addressee, you may not review, copy, distribute or disclose to anyone the message or any information contained within. If you have received this message in error, please contact the sender by electronic reply to email@environcorp.com and immediately delete all copies of the message.

---

This message contains information that may be confidential, privileged or otherwise protected by law from disclosure. It is intended for the exclusive use of the Addressee(s). Unless you are the addressee or authorized agent of the addressee, you may not review, copy, distribute or disclose to anyone the message or any

BLM_0019302

information contained within. If you have received this message in error, please contact the sender by electronic reply to email@environcorp.com and immediately delete all copies of the message.

BLM_0019303

# Visitation by year (Adjusted counter data plus professional judgement estimates)

| | 18 Road South | 18 Road North | 27 1/4 Rd | Shooting Range | 29 Rd | Tabeguache - Monument Rd. | Tabeguache - Rough Canyon |
|---|---|---|---|---|---|---|---|
| 2003 | 46,338 | 66,720 | 112,181 | no data | 113,879 | 26,841 | 4,764 |
| 2004 | 52,603 | 91,583 | 110,410 | no data | 105,418 | 27,658 | 4,210 |
| 2005 | 45,980 | 90,000 | 119,169 | no data | 110,814 | 28,906 | 4,358 |
| 2006 | 54,235 | 88,860 | 122,583 | no data | 109,855 | 29,756 | 4,834 |
| 2007 | 55,763 | 15,733 | 126,261 | 30,000 | 120,000 | 39,000 | 5,157 |
| 2008 | 59,140 | 27,025 | 130,049 | 31,200 | 124,000 | 49,453 | 5,260 |
| 2009 | 62,097 | 23,931 | 133,950 | 32,448 | 126,000 | 55,882 | 5,365 |
| 2010 | 65,046 | 18,356 | 135,000 | 33,746 | 130,811 | 65,708 | 5,472 |
| Area | NFD SRMA | | North Desert OHV Area | The Ranges ERMA | North Desert OHV Area | Bang's Canyon SRMA - Lunch Loops | Bang's Canyon SRMA - Area 4 and 5 (Third Flats Shared Trails) |

| Air Resources Development RMP Questions | 18 Road South | 18 Road North | 27 1/4 Rd | Shooting Range | 29 Rd | Tabeguache - Monument Rd. | Tabeguache - Rough Canyon |
|---|---|---|---|---|---|---|---|
| 1. OHV trips for this site captured elsewhere (if so, no need to answer remaining questions)? | N | Y | N | N | N | N | N |
| 2.  Counters related to OHV trips (if answer is "no", no need to answer remaining questions)? | Y | | Y | N | Y | N | Y |
| 3. Counters tracks vehicle, OHV, or counts of both together? | vehicles | | vehicles | | Both | | OHV |
| 4. Estimate of the percent of counter traffic related to OHVs. | 20% | | 60% | | 75% | | 80% |
| 5. Estimate of the number of OHVs per count. | 1 | | 1 | | 1 | | 1 |
| 6. Estimate of the miles per OHV per visit. | 10 | | 20 | | 30 | | 20 |
| 7. Estimate of the percent of OHVs by type: | | | | | | | |
| *ATVs | 60% | | | | 30% | | 40% |
| *MC | 40% | | 60% | | 60% | | 10% |
| *Other - 4X4s, rock crawlers,dune buggies | 0% | | 10% | | 10% | | 50% |

**Other Information**

Fraction of activity captured in above counter data:                    65% to 70% based on entry points and trails being captured

**Alternative Scenarios**

A          assume same growth trend as from 2003 to 2010
B          flat from 2010 resulting from reduced miles of routes and more use of existing routes
C          -15 to -20% change over 5 years due to fewer route     30%
D          assume same growth trend as from 2003 to 2010

BLM_0019304

| Mica Mine Trailhead | Billings Canyon | 3rd Flats | 4.2 Road Gateway | The Palisade | John Brown Canyon | Niche Road | Forest Service 19.5 Road |
|---|---|---|---|---|---|---|---|
| 5,383 | no data | no data | no data | no data | no data | no data | no data |
| 5,789 | 1,864 | no data | no data | no data | no data | no data | no data |
| 6,000 | 5,960 | no data | no data | no data | no data | no data | no data |
| 6,500 | 4,964 | no data | no data | no data | no data | no data | no data |
| 7,788 | 5,063 | no data | no data | no data | no data | no data | no data |
| 8,777 | 5,165 | 814 | 3,665 | 263 | 9,459 | 1588 | 821 |
| 9,455 | 5,268 | 13,832 | 3,714 | 296 | 8,516 | 1959 | 1305 |
| 10,051 | 5,926 | 4,103 | 4,380 | 300 | 8,533 | 2000 | 1250 |
| Bang's Canyon SRMA - RMZ 3 | Bang's Canyon SRMA - RMZ 4 - Jeeps | | Dolores River Canyon SRMA | | Dolores River Canyon SRMA | Dolores River Canyon SRMA - RMZ 4 | |

| Mica Mine Trailhead | Billings Canyon | 3rd Flats | 4.2 Road Gateway | The Palisade | John Brown Canyon | Niche Road | Forest Service 19.5 Road |
|---|---|---|---|---|---|---|---|
| Y | N | Y | N | N | N | N | N |
| | Y | | Y | Y | N | Y | Y |
| | OHV | | both | OHV | | Both | Both |
| | 95% | | 15% | 20% | | 50% | 50% |
| | 1 | | 1 | 1 | | 1 | 1 |
| | 2 | | 25 | 1 | | 40 | 40 |
| | | | | | | | |
| | 5% | | 25% | 60% | | 70% | 70% |
| | 0% | | 15% | 0% | | 20% | 20% |
| | 95% | | 60% | 40% | | 10% | 10% |

BLM_0019305



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7210
www.co.bl m.gov



AUG 30 2012

In Reply Refer To:
1610 (CON05000)

Dear Reader:

Enclosed for your review and comment is the Draft Resource Management Plan Amendment/Draft Environmental Impact Statement (Draft RMPA/EIS) for the Bureau of Land Management Colorado (BLM) White River Field Office (WRFO). The BLM prepared this document in consultation with cooperating agencies, and in accordance with the National Environmental Policy Act of 1969, as amended, the Federal Land Policy and Management Act of 1976, as amended, implementing regulations, the BLM 's Land Use Planning Handbook (H-1601-1), and other applicable law and policy.

The WRFO Planning Area consists of approximately 2.7 million acres of BLM, National Park Service, U.S. Forest Service, state, and private lands located in northwestern Colorado, primarily in Rio Blanco County, with additional tracts located in Garfield and Moffat counties. Within the WRFO Planning Area, the BLM administers about 1.5 million surface acres and 2.2 million acres of federal oil and gas minerals (subsurface) estate. The purpose of this Amendment to the 1997 White River Resource Management Plan (RMP) is to provide effective management direction for public lands administered by the WRFO, and direction that permits oil and gas exploration and development in excess of levels evaluated in the 1997 White River RMP.

The Oil and Gas Development Draft RMPA/EIS and supporting information are available on the WRFO website at: http://www.blm.gov/co/st/en/fo/wrfo.html.

The BLM encourages the public to provide information and comments pertaining to the analysis presented in the Draft RMPA/EIS. We are particularly interested in feedback concerning the adequacy and accuracy of the proposed alternatives, the analysis of their respective management decisions, and any new information that would help the BLM as it develops the plan. In developing the Proposed RMPA/Final EIS, which is the next phase of the planning process, the decision maker may select various management decisions from each of the alternatives analyzed in the Draft RMPA/EIS for the purpose of creating a management strategy that best meets the needs of the resources and values in this area under the BLM multiple use and sustained yield mandate. As a member of the public, your timely comments on the Oil and Gas Development Draft RMPA/EIS will help formulate the Proposed RMPA/Final EIS. Comments will be accepted for ninety (90) calendar days following the Environmental Protection Agency's (EPA) publication of its Notice of Availability in the Federal Register. The BLM can best utilize your comments and resource information submissions if received within the review period.

Comments may be submitted electronically at: Colorado_WROGEIS@blm.gov.

2

Comments may also be submitted by mail to:

Oil & Gas Draft RMPA/EIS Comments
Bureau of Land Management White River Field Office
220 East Market Street
Meeker, CO 81641

To facilitate analysis of comments and information submitted, we strongly encourage you to submit comments in an electronic format.

Your review and comments on the content of this document are critical to the success of this planning effort. If you wish to submit comments on the Draft RMPA/EIS, we request that you make your comments as specific as possible. Comments will be more helpful if they include suggested changes, sources, or methodologies, and reference to a section or page number. Comments containing only opinion or preferences will be considered and included as part of the decision making process, although they will not receive a formal response from the BLM.

Before including your address, phone number, email address, or other personal identifying information in your comment, be advised that your entire comment - including your personal identifying information- may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

Public meetings to provide an overview of the document, respond to questions, and take public comments will be announced by local media, website, and/or public mailings at least 15 days in advance.

Copies of the Draft RMPA/EIS have been sent to affected Federal, state and local government agencies. Copies of the Draft RMPA/EIS are available for public inspection at the Meeker Public Library, Rifle Public Library, the Craig Public Library, and the Rangely Public Library. Copies are also available for public inspection at the following BLM locations:

| | |
|---|---|
| Bureau of Land Management<br>Colorado State Office<br>2850 Youngfield Street<br>Lakewood, CO 80215 | Bureau of Land Management<br>White River Field Office<br>220 East Market Street<br>Meeker, CO 81641 |
| Bureau of Land Management<br>Grand Junction Field Office<br>2815 H Road<br>Grand Junction, CO 81506 | Bureau of Land Management<br>Little Snake Field Office<br>455 Emerson Street<br>Craig, CO 81625 |
| Bureau of Land Management<br>Colorado River Valley Field Office<br>2300 River Frontage Road<br>Silt, CO 81652 | Bureau of Land Management<br>Kremmling Field Office<br>2103 East Park Avenue<br>Kremmling, CO 80459 |

BLM_0019307

3

Thank you for your continued interest in the Oil and Gas Development Draft RMPA/EIS. We appreciate the information and suggestions you contribute to the planning process. For additional information or clarification regarding this document or the planning process, please contact Heather Sauls, Planning and Environmental Coordinator, telephone (970) 878-3855; address 220 East Market Street, Meeker, CO 81641; email hsauls@blm.gov.

Sincerely,

Helen M. Hankins
State Director

BLM_0019308

# Draft
# Resource Management Plan Amendment
# and Environmental Impact Statement
# White River Field Office Oil and Gas Development

**Lead Agency:** U.S. Department of the Interior, Bureau of Land Management

**Type of Action:** Administrative

**Jurisdiction:** Portions of Rio Blanco, Garfield, and Moffat Counties, Colorado

**Abstract:** This Draft Resource Management Plan Amendment/Environmental Impact Statement (RMPA/EIS) for Oil and Gas Development describes and analyzes alternatives for the planning and management of public lands and resources administered by the Bureau of Land Management (BLM), White River Field Office (WRFO).

Four alternatives for the RMPA are considered in this Draft RMPA/EIS. Alternative A is a continuation of current management goals, objectives, and direction specified in the 1997 White River RMP; however, the analysis updates the 20-year development projection from the 1997 White River RMP to reflect the 2007 Reasonable Foreseeable Development (RFD) scenario. Resources and resource programs analyzed development projection of up to 550 multiple well pads with an associated long-term disturbance of 6,600 acres. Alternative B evaluates limiting the duration and overall extent of development activities, through a managed development approach, in order to maintain existing resource conditions throughout all phases of development. The BLM would apply additional management actions to further protect the environment for these resources. Implementation of Alternative B could result in up to 1,100 well pads. Associated surface disturbance resulting from this level of development would total 13,200 acres. Alternative C emphasizes short-term use of the environment, also with a managed development approach emphasizing the maintenance and enhancement of long-term community function and ecological integrity. This alternative projects development of up to 1,800 well pads with an associated surface disturbance totaling 21,600 acres. The management focus of Alternative D is the development of oil and gas resources, with an emphasis on the production of oil and gas resources under the environmental protection for other resources afforded by applicable laws, regulations, and BLM policy. Implementation of Alternative D is assumed to result in up to 2,556 new well pads with an associated surface disturbance of approximately 30,700 acres. The preferred alternative (Alternative C) is not a final agency decision; it is an indication of the agency's preliminary preference because it reflects the best combination of decisions to achieve BLM goals and policies, meets the purpose and need, addresses the key planning issues, and considers the recommendations of cooperating agencies and BLM specialists.

When completed, the RMPA will provide a set of comprehensive, long-range decisions for: (1) managing resources throughout the Planning Area and (2) identifying allowable uses on the public land surface and federal mineral estate administered by the BLM. Comments are accepted for 90 days following the date the U.S. Environmental Protection Agency publishes the Notice of Availability for this Draft RMPA/EIS in the Federal Register. Comments should be submitted electronically to Colorado_WROGEIS@blm.gov

**For Further Information Contact:** Heather Sauls – Planning and Environmental Coordinator
Bureau of Land Management, White River Field Office
220 East Market Street
Meeker, CO 81641
(970) 878-3855

BLM_0019309

*This page intentionally left blank*

BLM_0019310

**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**Colorado State Office**
**Northwest Colorado District**
**White River Field Office**

DRAFT
RESOURCE MANAGEMENT PLAN AMENDMENT
AND ENVIRONMENTAL IMPACT STATEMENT
FOR OIL AND GAS DEVELOPMENT

Recommended by:

Kent E. Walter
Field Manager

Approved by:

Helen Hankins
State Director

*This page intentionally left blank.*

BLM_0019312

# Table of Contents for Volumes

**VOLUME 1**

Executive Summary

| | |
|---|---|
| Chapter 1 | Purpose and Need for Action |
| Chapter 2 | Alternatives |
| Chapter 3 | Affected Environment |
| Chapter 5 | Consultation and Coordination |
| Chapter 6 | Acronyms, Glossary and References |

**VOLUME 2**

| | |
|---|---|
| Chapter 4 | Environmental Consequences |

**VOLUME 3**

| | |
|---|---|
| Appendix A | Oil and Gas Leasing Stipulations and Lease Notices |
| Appendix B | Best Management Practices and Conditions of Approval |
| Appendix C | Hazardous Materials Management Plan |
| Appendix D | Surface Reclamation Plan |
| Appendix E | Threshold and Temporal Analysis |
| Appendix F | Air Quality Impacts |
| Appendix G | Social and Economic Analysis Technical Report |
| Appendix H | Oil and Gas Operations in the White River Field Office |
| Appendix I | Master Leasing Plans |
| Appendix J | Air Resources Management Plan |

BLM_0019313

*Table of Contents*

*This page intentionally left blank*

BLM_0019314



# Executive Summary

Public Lands USA: Use, Share, Appreciate

BLM_0019315

BLM_0019316

# EXECUTIVE SUMMARY

## ES.1   Introduction

The Bureau of Land Management (BLM) White River Field Office (WRFO) has prepared this Oil and Gas Development Draft Resource Management Plan Amendment and Environmental Impact Statement (RMPA/EIS) to evaluate and amend, if necessary, the current management decisions for oil and gas resources within the WRFO Planning Area. The current management decisions for oil and gas resources are described in the White River Record of Decision (ROD) and Approved Resource Management Plan (approved July 1, 1997), as amended (1997 White River RMP).

This Draft RMPA/EIS was prepared using BLM's planning regulations (43 Code of Federal Regulations [CFR] Part 1600) and guidance issued under the authority of the Federal Land Policy and Management Act (FLPMA) of 1976. Section 102 of the FLPMA sets forth the policy for periodically projecting the present and future use of public lands and their resources through the use of a planning process. Sections 201 and 202 of the FLPMA are the statutory authorities for land use plans prepared by BLM. The associated EIS meets the requirements of the National Environmental Policy Act (NEPA), the Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 CFR Parts 1500-1508), Department of the Interior (DOI) Implementation of the National Environmental Policy Act of 1969 Final Rule (43 CFR Part 46), and the requirements of BLM's *NEPA Handbook 1790-1* (BLM 2008) and *Land Use Planning Handbook H-1601-1* (BLM 2005).

Resource management plans are land use plans that establish goals and objectives for resource management and guide land management actions, which are based on the principles of multiple use and sustained yield. Occasionally, decisions on how the land is managed need to be revised or amended to respond to new, intensified, or changed uses on public lands, prompting an RMP revision or amendment. There has been a substantial increase in oil and gas activity (i.e., exploration and development) in the WRFO Planning Area in recent years, which is a trend that is expected to continue for the foreseeable future. Since 1997, the combination of new technology and greater demand for natural gas has stimulated interest, by the energy industry, in developing the extensive natural gas resources in the region, including the Piceance Basin.

The WRFO Planning Area for this Draft RMPA/EIS includes all lands, regardless of surface management or ownership, within the WRFO geographic boundary. The WRFO Planning Area includes approximately 2.7 million acres of BLM, National Park Service (NPS), U.S. Forest Service (USFS), state, and private lands located in northwestern Colorado, primarily in Rio Blanco County, with additional tracts located in Garfield and Moffat counties. Within the WRFO Planning Area, the BLM administers approximately 1.5 million surface acres and 2.2 million acres of federal oil and gas minerals (subsurface) estate. Management decisions made as a result of this RMPA/EIS process will apply only to BLM-administered lands in the WRFO Planning Area.

## ES.2   Purpose and Need

The FLPMA of 1976 requires the BLM to "develop, maintain, and when appropriate, revise land use plans…" (43 United States Code [USC] §1712). The BLM has proposed that an amendment to the 1997 White River RMP be prepared to evaluate changing conditions in the WRFO Planning Area that have raised new issues and concerns since approval of the 1997 White River RMP. The CEQ regulations (40 CFR 1502.13) require an EIS to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." Chapter 1 (Purpose and Need) provides additional details regarding the context and framework for establishing and evaluating the reasonable range of alternatives presented in this document.

BLM_0019317

---

*Executive Summary*

## ES.2.1    Purpose

The BLM must establish guidance, objectives, policies, and management actions for lands and resources under the jurisdiction of the WRFO, while maintaining the valid existing rights and other obligations already established, and to guide decision making for future site-specific actions. This includes establishing appropriate goals, objectives, management actions, priorities, and procedures to manage the projected increase in oil and gas activity in relation to other resources within the WRFO Planning Area.

The purpose of this Amendment to the 1997 White River RMP is to provide effective management direction for public lands administered by the WRFO, and direction that permits oil and gas exploration and development in excess of levels evaluated in the 1997 White River RMP. Many elements of the 1997 White River RMP are adequate and remain valid, and the BLM intends to carry these management decisions forward. This Draft RMPA/EIS will incorporate, by reference, the current decisions from the various WRFO implementation plans and the 1997 White River RMP and amendments. Decisions may be evaluated and revised as necessary to reflect changing conditions; however, any major changes in management would require more detailed NEPA analysis.

## ES.2.2    Need

The Energy Policy and Conservation Act (EPCA) Reauthorization of 2000 directed the DOI to produce a scientific inventory of oil and gas resources and reserves underlying federal lands. The resulting EPCA inventory identified the Uinta-Piceance Basin (Colorado and Utah) as one of five sub-basins in the continental United States with large resources of undeveloped oil and gas energy potential. In addition to the EPCA inventory, development of interstate transportation pipelines and improved drilling technology has also influenced increases in exploration, development, and production of oil and gas resources in the WRFO Planning Area.

The BLM has determined that the level of oil and gas activities evaluated in the 1997 White River RMP has increased substantially. The 1997 White River RMP projected and analyzed an Reasonable Foreseeable Development (RFD) Scenario of 1,100 potential oil and gas wells that would encompass ten acres of disturbance per well (including roads and pipelines) developed over a 20-year period at a rate of approximately 55 single well pads per year (BLM 1996). The 1997 RFD Scenario also projected that nearly two-thirds of the oil and gas development activity would take place in the Douglas Creek Arch south of Rangely, Colorado, with the remaining activity dispersed throughout the rest of the WRFO Planning Area. While this projection has been fairly accurate for the activity south of Rangely, there has been a substantial increase in natural gas exploration and development in the Mesaverde Play Area (MPA), located generally within the Piceance Creek Basin in the central portion of the WRFO Planning Area.

An updated RFD Scenario was prepared in 2007 as a result of the changing conditions in oil and gas development to present a 20-year forecast of drilling activity on federal, state, and private lands within WRFO boundaries (BLM 2007). The 2007 RFD Scenario projected the potential need for the construction of between 550 and 2,556 well pads, averaging eight drilled wells per pad, over a 20-year period (2009 through 2028), with the majority of development occurring in the Piceance Creek Basin of the WRFO Planning Area. Based on the 2007 RFD Scenario and increasing permit applications since 2001, there is a need to update the 1997 White River RMP to reflect the 2007 RFD Scenario findings.

---

BLM_0019318

These reasons emphasize the changing conditions in the WRFO Planning Area and the BLM has identified the need to manage the potential impacts of the projected increase in oil and gas activity in relation to other resources within the WRFO Planning Area and the BLM's mission of multiple use and sustained yield. Therefore, the BLM has determined that an amendment to the 1997 White River RMP is required.

## ES.3   Public Involvement

The BLM's decision-making process is conducted in accordance with the requirements of the CEQ regulations implementing NEPA, and the DOI and BLM policies and procedures implementing NEPA. The NEPA and the associated regulatory and policy framework require federal agencies to involve interested public in their decision-making.

In accordance with CEQ scoping guidance, BLM provided opportunities for public involvement as an integral part of amending the 1997 White River RMP and preparing this EIS. The intent of the scoping process is to provide an opportunity for the public, tribes, other government agencies, and interest groups to participate in the planning process and to identify planning issues to be addressed by alternatives or analyzed in the EIS.

Publication of the Notice of Intent (NOI) on June 14, 2006 announced BLM's intention to amend the 1997 White River RMP (BLM 1997) and prepare an EIS. Formal agency and public scoping for the Draft RMPA/EIS took place from June 14, 2006 to September 30, 2006. Public scoping meetings were held on September 12, 13, and 14, 2006 in Meeker, Rangely, and Rifle, Colorado, respectively. The BLM organized the meetings in an open-house format, with a formal presentation made by the WRFO Field Manager. The BLM provided a newsletter, maps of the WRFO Planning Area, and comment forms at each scoping meeting. The BLM encouraged attendees to provide written comments. The BLM considered all issues identified during the scoping period, the established planning criteria, and resource management goals and objectives in formulating the alternatives.

Public participation will continue throughout the remainder of the planning process. During the public comment period, BLM will host public meetings on this Draft RMPA/EIS to provide a forum for the introduction of this Draft RMPA/EIS and to solicit comments. In addition, members of the public will have the opportunity to comment on the content of this Draft RMPA/EIS during the 90-day public comment period. The BLM will consider all comments received, and prepare a Final RMPA/EIS which will contain, and respond to, substantive comments received on this Draft RMPA/EIS during the public comment period.

## ES.4   Planning Issues

In its planning process, the BLM uses the concept of issues and unresolved conflicts, as presented in the NEPA regulations. Issues may include demands for resources, as well as concerns and conflicts, associated with balancing a mix of multiple uses, or unresolved conflicts associated with past, present, and future management of public lands or resources. As part of the scoping process, the BLM solicited comments and concerns from the public, organizations, tribes, and federal, state, and local agencies, as well as from BLM specialists. Issues identified from comments obtained during the scoping for the Draft RMPA/EIS were organized into the following two categories:

- Issues within the scope of the EIS and used to develop alternatives or otherwise addressed in the EIS through the NEPA process.

BLM_0019319

- Issues outside the scope of the EIS that could require policy, regulatory, or administrative actions.

In addition to the issues identified during scoping, other resource and use issues are identified in the BLM Land Use Planning Handbook (2005). All of these issues were considered in developing the alternatives brought forward in this RMPA/EIS.

The issues identified during scoping were grouped into six broad topics. The issues within each topic that were identified as being within the scope of the RMPA/EIS are summarized below.

**Topic 1: Natural Resources**

- Air Quality
    - Would an effective air quality monitoring program be established?
    - Would nearby Class I Wilderness Areas and National Parks be affected?
    - What are the cumulative effects to air quality of the proposed oil and gas development?
- Water Quality
    - How would produced water be handled and disposed?
    - Would sufficient fresh water be available for oil and gas production?
    - Could subsurface releases of gases and drilling fluids result in migration of these materials along fault lines to groundwater or surface waters?
    - Would fracturing fluids result in a decline in water quality?
    - How would oil and gas development be managed to reduce impacts to wetlands, surface water, and groundwater?
- Vegetation
    - How should vegetation, noxious weeds, and riparian areas be managed to achieve healthy forest and rangelands while providing for livestock grazing and habitat for fish and wildlife?
- Fish, Wildlife, and Special Status Species
    - How would impacts to greater sage-grouse, Colorado River cutthroat trout, and other special status species be managed?
    - Would fragmentation of wildlife and habitat be avoided, and would fawning/calving habitat corridors be protected?
    - Would BLM restrict activities in certain areas during certain times of year to avoid negative impact to breeding or nesting birds or wintering populations of big game?
- Would the wild horse population be protected from effects of oil and gas development?
- How should development be managed to maintain, enhance, or protect wilderness characteristics?

**Topic 2: Heritage Resources Management**

- How would cultural resources, archaeological sites, and historical sites be protected and conserved?

**Topic 3: Management of Human Activities and Uses**

BLM_0019320

*Executive Summary*

- Recreation Management
  - How would oil and gas development impact hunting, primitive recreation such as hiking, camping, and wildlife viewing, and other out-of-state visitor experiences?
  - Would areas open to drilling still be open to public recreational use?
  - Would BLM designate Special Recreation Management Areas (SRMAs)?
- Rangeland Management
  - How would oil and gas development impact vegetation and grazing for livestock and wildlife?
- Land and Realty, Utility Corridors, Rights-of-Way, and Withdrawals
  - Would stipulations be applied to individual sites rather than as a mandatory condition of all leases?

**Topic 4: Transportation and Access Management**

- How would oil and gas development impact traffic in the area?
- Would new and existing roads and trails be maintained or improved?
- Would new oil and gas access roads be open to use by off-road vehicles?
- What best management practices (BMPs) would be implemented to avoid and/or minimize impacts to sensitive (e.g., streams and riparian areas) resources?
- What steps would be taken to evaluate proposed construction or improvement of roads for impacts to the transportation network and to the environment?

**Topic 5: Management for Aesthetic and Social Values**

- Social and Economic Values
  - What methods or models would BLM use to evaluate the social and economic benefits and costs of the proposed oil and gas development?
- Visual Resource Management
  - Would the existing character of the landscape be preserved, including unique backcountry landscapes?
  - How would BLM address light pollution, regional haze, and the degradation of viewsheds, including the viewshed from Dinosaur National Monument?

**Topic 6: Integration of Management with other Agency Plans**

- Will coordination and consistency with county land use plans, emergency services, state resource management plans, and other Federal Plans and Guidance be considered?

Additional details regarding these issues and issues that are either outside the scope of this EIS or that could require policy, regulatory, or administrative actions are provided in Chapter 1 (Purpose and Need). Additional details on public involvement are presented in Chapter 5 (Consultation and Coordination).

## ES.5   Alternatives

Federal agencies are directed to develop and assess reasonable alternatives that meet the purpose and need for agency action in an EIS. The CEQ regulations for implementing NEPA direct federal agencies to "rigorously explore and objectively evaluate all reasonable alternatives, and for

BLM_0019321

alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated" (40 CFR Part 1502.14 (a)). Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and use common sense, rather than alternatives that are simply desirable from the standpoint of the proponent. The CEQ regulations also direct federal agencies to include a No Action Alternative (40 CFR Part 1502.14 (d)). The alternatives are summarized below. Detailed discussion of these alternatives is presented in Chapter 2 (Alternatives).

## ES.5.1    Alternative A – No Action

The management focus for Alternative A is the current management goals, objectives, and direction as specified in the 1997 White River RMP; however, the analysis updates the 20-year development projection from the 1997 White River RMP to reflect the current rate of about 220 new drilling permits per year with modifications through plan maintenance consistent with 43 CFR 1610.5-4 guidance. The alternative continues current allowable uses and management actions for resources and resource programs under the levels and locations of future oil and gas development projected in the 2007 RFD Scenario.

Implementation of Alternative A is assumed to result in up to 4,603 new wells on 550 new well pads and approximately 6,600 acres of associated disturbance from well pads, roads, and other facilities (i.e., gas plants, pipelines, and other infrastructure) during the 20-year period of analysis.

## ES.5.2    Alternative B

This alternative emphasizes conservation and protection of other resources and resource uses, concurrently with oil and gas production. The implementation of Alternative B would limit the duration and overall extent of development activities in order to maintain existing resource conditions throughout all phases of development (i.e., from initial construction through post-production). The BLM would apply additional management actions to further protect the environment for these resources.

The managed development approach utilized under Alternative B is a significant distinction from Alternative A. A key element of the managed development approach evaluated under this Alternative is limiting the spatial extent of surface disturbance. The overall vision for a managed development approach described for this alternative would be to cluster, collocate, and consolidate surface facilities and other ground disturbing activities to manage the acute or collective degree of effects from the proposed development. Limitations would be achieved in part by managing the extent of big game seasonal range subjected to cumulative adverse behavioral effects (e.g., harassment, avoidance) attributable to oil and gas activities. The managed development approach offers operator incentives for concentrated development. This approach includes establishing big game and sage-grouse thresholds, for cumulative adverse behavior effects, to be applied by each Game Management Unit (GMU), as defined by Colorado Parks and Wildlife (CPW), and by leaseholder (e.g., a threshold of a certain percentage of big game crucial winter range occurring within a leaseholding). Under Alternative B, the goal would be to manage big game habitat utility and suitability to sustain at least 90 percent of CPW long-term population objectives throughout active development.

Implementation of Alternative B is assumed to result in up to 9,191 new oil and gas wells on 1,100 new well pads and 13,200 acres of associated disturbance from well pads, road and other facilities during the 20-year period of analysis.

BLM_0019322

## ES.5.3  Alternative C (Preferred Alternative)

Alternative C emphasizes short-term use of the environment (i.e., in the construction/development phase) and the maintenance and enhancement of long-term community function and ecological integrity (from initial construction to post-production). The management focus for Alternative C is similar to Alternative B; however, Alternative C places management emphasis on maintaining long-term community function and ecosystem integrity. For example, disturbance thresholds for acute effects (i.e., short-term impacts associated with well construction, drilling, and completion) under this alternative would be higher, and more exceptions and modifications to lease stipulations may be granted compared to Alternative B.

Under Alternative C, the BLM's management goal for big game habitat would be to manage big game habitat utility and suitability to sustain at least 70 percent (versus 90 percent in Alternative B) of CPW's long-term population objective throughout active development. All seasonal big game ranges within the WRFO would be subject to timing limitations that could extend up to 90 days (versus 120 days in Alternative B) within established windows. Timing limitations would be applied through conditions of approvals (COAs) for existing leases and through stipulations on new leases. Similar to Alternative B, exceptions to timing limitations would be offered contingent on development remaining within the thresholds for acute and collective cumulative adverse behavior effects (evaluated by total leaseholdings within a GMU).

Implementation of Alternative C is assumed to result in up to 15,042 new oil and gas wells on 1,800 new well pads and 21,600 acres of associated disturbance from well pads, roads and other facilities during the 20-year period of analysis.

## ES.5.4  Alternative D

The management focus of Alternative D is the development of oil and gas resources. Management under Alternative D emphasizes the production of oil and gas resources under the environmental protection for other resources afforded by applicable laws, regulations, and BLM policy. The BLM would not apply management actions to provide environmental protection for other resources other than what is consistent with applicable laws and policy (e.g., Clean Air Act regulations, Section 7 of the Endangered Species Act [ESA], National Pollutant Discharge Elimination System [NPDES] guidelines).

Implementation of Alternative D is assumed to result in up to 21,200 new oil and gas wells on 2,556 new well pads and about 30,700 acres of associated disturbance from well pads, roads and other facilities during the 20-year period of analysis.

# ES.6  Affected Environment

Detailed description of the affected environment within the WRFO Planning Area is presented in Chapter 3 (Affected Environment). The WRFO administrative office is located in the town of Meeker in northwestern Colorado. The BLM WRFO-administered public lands include all but a small portion of Rio Blanco County, with additional tracts located in northern Garfield County and southern Moffat County.

Rio Blanco, Moffat, and Garfield counties were established between the late 1800s and early 1900s in response to resource extraction booms. Today, energy development, resource extraction, agriculture, and recreation remain important to Rio Blanco County. Energy development, tourism,

ranching, and farming are the main industries of Garfield County. Agriculture and mining are the main industries in Moffat County.

The WRFO administers livestock grazing for cattle, sheep, and horses on approximately 1,954,100 acres. Soils and vegetation in the WRFO Planning Area generally provide rangeland suitable for year-round cattle and sheep grazing at lower elevations; however, supplemental feeding is often required, especially at higher elevations.

Several federally listed wildlife species may occur in the WRFO Planning Area, including black-footed ferret, Canada lynx, and four Colorado River fish species. Critical habitat for the four Colorado River fish species is present in the WRFO Planning Area. In addition, elk, mule deer, pronghorn, black bear, mountain lion, white-tailed prairie dog, and many bird species occur in the WRFO Planning Area.

There are various authorizations to use public surface for leases, permits, and easements within the WRFO Planning Area. Mineral resources in the WRFO Planning Area include leasable (e.g., oil and gas, geothermal, coal, sodium and oil shale), locatable (e.g., uranium), and salable minerals (e.g., sand and gravel). Oil and gas wells are common throughout Rio Blanco County excluding the White River National Forest. Extending 10 miles west from the Town of Rangely, there is extensive oil and gas development. Oil shale resources are located in Rio Blanco and Garfield counties. Areas identified as suitable for coal leasing are located in the northwestern and northeastern portion of Rio Blanco County.

Recreational activities in the WRFO Planning Area are varied and include hunting, fishing (cold and warm water), boating (open canoeing and rafting), camping, hiking, backpacking, mountain biking, and off-highway vehicle (OHV) use. The White River Extensive Recreation Management Area (ERMA) supports elk, mule deer, coyote, bear, and mountain lion hunting. Hunting is the most prominent recreational use and occurs throughout the WRFO Planning Area.

Steady population growth, especially around Rangely and Meeker, has placed an increasing recreational demand on adjacent undeveloped public lands as visitors and nearby residents seek a diversity of recreational opportunities. Colorado's population has grown significantly in the past 10 years, and an increasing number of people are living near or seeking undeveloped public land for recreational use. In addition, Colorado remains a popular destination for tourists, especially those seeking experiences in an undeveloped setting. As a result, public lands administered by the BLM are absorbing increasing recreational use.

## ES.7    Environmental Consequences

Detailed descriptions of impacts of the four alternatives are provided in Chapter 4 (Environmental Consequences), along with a discussion of the cumulative impacts, irretrievable and irreversible commitments of resources, and unavoidable adverse impacts of the alternatives.

Implementation of Alternative A would result in the fewest number of wells (4,603) and well pads (550), the least surface disturbance (6,600 acres), and the lowest density of disturbance in the Mesaverde Play Area. Impacts from surface disturbance and well development would generally be lower under this alternative due to the smaller scale of development. Impacts from road wear and tear, such as erosion and disturbance to wildlife, would also be lower due to the lower number of truck trips required. Wildlife impacts would be managed in part with timing limitation stipulations, which could prolong development on a well pad, increase the total number of truck trips, and extend

BLM_0019324

impacts associated with surface disturbance. Under Alternative A, social and economic conditions would not change as a result of proposed oil and gas development.

Compared to Alternative A, Alternative B would have more wells (9,191) and well pads (1,100), more surface disturbance (13,200 acres), and a higher density of disturbance in the Mesaverde Play Area. Overall resource impacts would be higher than Alternative A due to the larger scale of development. Some reduction in impacts, such as to wildlife, would be achieved by implementing stricter management restrictions and expanding lease stipulation areas. The largest extent of no surface occupancy (NSO) lease stipulations would be established under this alternative. Impacts from road wear and tear would be higher than Alternative A because more truck trips would be required. Wildlife impacts would be managed using timing limitation stipulations and voluntary acute and collective development thresholds on big game seasonal range. The thresholds would promote clustered development, which could increase impacts related to surface disturbance in development zones, but in the short term, would also keep more surface areas free of disturbance. Compliance with the threshold concept would also promote timely, successful reclamation, allowing surface areas to more rapidly recover their pre-disturbance condition. Compared to Alternatives A and B, Alternative C would have more wells (15,042) and well pads (1,800), more surface disturbance (21,600 acres), and a higher density of disturbance in the Mesaverde Play Area. Overall resource impacts, including impacts from surface disturbance, for oil and gas activities, would be higher than Alternatives A and B due to the larger scale of development. Alternative C would have management actions and lease stipulations that reduce impacts similar in scope to Alternative B, but less restrictive. Impacts from road wear and tear would also be higher than Alternatives A and B because more truck trips would be required. Wildlife impacts would be managed using timing limitation stipulations and voluntary acute and collective development thresholds on big game seasonal range. The thresholds would be higher than Alternative B, and thus would do less to maintain existing conditions. Alternative D would have the largest number of wells (21,200) and well pads (2,556), the most surface disturbance (30,672 acres), and the highest density of disturbance in the Mesaverde Play Area. Overall resource impacts, including impacts to wildlife, would be highest under this alternative due to the scale of development. Alternative D would also have the highest number of truck trips, resulting in the highest level of impacts from road wear and tear. Management restrictions and lease stipulations would be similar to Alternative A, or in some cases, Alternative C. Wildlife impacts would be managed in part with timing limitation stipulations, which could prolong disturbance on a pad, increase the total number of truck trips, and extend water resource impacts from development.

## ES.8   Preferred Alternative

Alternative C was selected by the BLM as the preferred alternative based on examination of the following factors:

- Balance of use and protection of resources
- Extent of the environmental impacts

This alternative was chosen because it best resolves the major issues while providing for common ground among conflicting opinions as well as multiple uses of public lands in a sustainable fashion. However it is important to note that identification of a preferred alternative does not constitute a commitment or decision in principle, and there is no requirement to select the preferred alternative in the Record of Decision. Various parts of separate alternatives that are analyzed in the draft can also be "mixed and matched" to develop a complete alternative in the Final EIS.

BLM_0019325

## ES.9   Next Steps

The comment period on this Draft RMPA/EIS will be 90 days following publication of the BLM's Notice of Availability (NOA) in the Federal Register. After comments are received they will be evaluated. Substantive comments could lead to changes in one or more of the alternatives, or in the analysis of environmental consequences. A Proposed RMPA and Final Environmental Impact Statement (FEIS) will then be completed and released for a review period. If protests are received on the Proposed RMPA/FEIS, they will be reviewed and addressed by the Director of the BLM before a ROD and Approved Plan is released.

## ES.10  References

Bureau of Land Management (BLM). 1996. White River Resource Area Proposed Resource Management Plan and Final Environmental Impact Statement. U.S. Department of the Interior. U.S. Department of the Interior. BLM White River Field Office, Meeker, CO. June.

BLM. 1997. White River Record of Decision and Approved Resource Management Plan. U.S. Department of the Interior. BLM White River Field Office, Meeker, CO. July.

BLM. 2005. Land Use Planning Handbook. BLM Handbook H-1601-1. March 11.

BLM. 2007. Reasonable Foreseeable Development Scenario for Oil and Gas Activities in the BLM White River Field Office: Rio Blanco, Moffat, and Garfield Counties, Colorado. September 10.

BLM. 2008. National Environmental Policy Act Handbook. BLM Handbook H-1790-1. January 2008.

BLM_0019326

BLM

Chapter 1

# Purpose and Need for Action



Public Lands USA: Use, Share, Appreciate

BLM_0019327

BLM_0019328

**CHAPTER 1 PURPOSE AND NEED FOR ACTION** ....................................................1-1

1.1    Introduction and Background ..........................................................................1-1
       1.1.1    Description of the White River Field Office Planning Area.............................1-1

1.2    Purpose and Need for the Resource Management Plan Amendment ....................1-3
       1.2.1    Purpose of the Action.....................................................................1-3
       1.2.2    Need for the Action .......................................................................1-3

1.3    Planning Process.........................................................................................1-4
       1.3.1    Nine-Step Planning Process ............................................................1-4
       1.3.2    Resource Management Plan Amendment Implementation ...................1-7

1.4    Scoping and Identification of Issues...............................................................1-8
       1.4.1    Scoping Process ..........................................................................1-8
       1.4.2    Issues Identified for Consideration ..................................................1-8
       1.4.3    Issues Addressed Through Policy, Regulatory, or Administrative
                Actions .....................................................................................1-10
       1.4.4    Issues that were Considered but Not Further Analyzed ....................1-11
       1.4.5    Planning Criteria and Legislative Constraints..................................1-12
       1.4.6    Relevant Statutes, Limitations, and Guidelines ...............................1-13
       1.4.7    Other Related Plans ....................................................................1-14
       1.4.8    Master Leasing Plans ..................................................................1-15

1.5    Alternatives Considered but Not Carried Forward for Detailed Analysis........................1-15
       1.5.1    Current Management using 1997 Reasonable Foreseeable Development
                Scenario....................................................................................1-15
       1.5.2    Phased Development in the Piceance Basin.....................................1-15
       1.5.3    Single Well Pads .........................................................................1-16
       1.5.4    Reduced or Limited Pace of Oil and Gas Drilling ............................1-17
       1.5.5    Limit on Number of Well Pads or Wells .........................................1-17
       1.5.6    Limiting Cumulative Total Surface Disturbance ...............................1-17
       1.5.7    Greater Sage-Grouse National Technical Team Report Alternative.................1-18

**List of Tables**

Table 1-1    Surface and Subsurface Management Status in the WRFO Planning Area..............1-2
Table 1-2    Plans Relevant to the WRFO Oil and Gas Development Draft RMPA/EIS............1-14

**List of Figures**

Figure 1-1    Nine Step Planning Process ................................................................... 1-5

**List of Maps**

Map 1-1    White River Field Office Planning Area
Map 1-2    Oil and Gas Leased and Non-Leased Areas in the White River Field Office Planning
           Area
Map 1-3    Surface Geology and Major Tectonic/Physiographic Features
Map 1-4    Oil and Gas Potential, Mesaverde Play Area

BLM_0019329

*This page intentionally left blank*

BLM_0019330

# CHAPTER 1
# PURPOSE AND NEED FOR ACTION

## 1.1   Introduction and Background

The Bureau of Land Management (BLM) White River Field Office (WRFO) has prepared this Draft Resource Management Plan Amendment and Environmental Impact Statement (RMPA/EIS) for Oil and Gas Development to evaluate and amend, if necessary, the current management decisions for oil and gas resources within the WRFO Planning Area. The current management decisions for oil and gas resources are described in the White River Record of Decision and Approved Resource Management Plan (approved July 1, 1997), as amended (referred to as the 1997 White River RMP) (BLM 1997a).

Resource Management Plans (RMPs) are land use plans that establish goals and objectives for resource management and guide land management actions, which are based on the principles of multiple use and sustained yield. Occasionally, decisions on how the land is managed need to be revised or amended to respond to new, intensified, or changed uses on public land, prompting an RMP revision or amendment. There has been a substantial increase in oil and gas activity (i.e., exploration and development) in the WRFO Planning Area (Map 1-1) in recent years, which is a trend that is expected to continue for the foreseeable future. Since 1997, the combination of new technology and demand for natural gas has stimulated interest by the energy industry in developing the extensive natural gas resources in the region, including the Piceance Basin. In addition, three new interstate pipelines and multiple regional pipelines have been completed or are in the process of being completed in the northern Piceance Basin, which would allow gas and gas products to be transported to markets in other regions. In response to these factors, the WRFO has proposed an amendment to the current RMP and an associated EIS which evaluates the effectiveness of management in achieving resource goals and objectives related to the projected increase in oil and gas development.

This RMPA/EIS was prepared using BLM's planning regulations (43 Code of Federal Regulations [CFR] Part 1600) and guidance issued under the authority of the Federal Land Policy and Management Act (FLPMA) of 1976. Section 102 of the FLPMA sets forth the policy for periodically projecting the present and future use of public lands and their resources through the use of a planning process. Sections 201 and 202 of the FLPMA are the statutory authorities for land use plans prepared by the BLM. The associated EIS is included in this document to meet the requirements of the National Environmental Policy Act (NEPA), the Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 CFR Parts 1500-1508), Department of the Interior (DOI) Implementation of the National Environmental Policy Act of 1969 Final Rule (43 CFR Part 46), and the requirements of BLM's NEPA Handbook 1790-1 (BLM 2008a) and Land Use Planning Handbook H-1601-1 (BLM 2005a).

### 1.1.1   Description of the White River Field Office Planning Area

The WRFO Planning Area for the RMPA/EIS includes all lands, regardless of surface management or ownership, within the WRFO boundary shown in Map 1-1. The WRFO Planning Area includes approximately 2.7 million acres of BLM, National Park Service (NPS), U.S. Forest Service (FS), state, and private lands located in northwestern Colorado, primarily in Rio Blanco County, with additional tracts located in Garfield and Moffat counties. The WRFO administrative office is located in the town of Meeker in northwestern Colorado.

BLM_0019331

Within the WRFO Planning Area, the BLM administers approximately 1.5 million surface acres and 2.2 million acres of federal oil and gas minerals (subsurface) estate. Management decisions made as a result of this RMPA/EIS process would apply only to BLM-administered lands in the WRFO Planning Area (Map 1-1). Table 1-1 presents a summary of land ownership status (including split estate) as well as BLM surface and subsurface land ownership within the WRFO Planning Area.

Approximately 73 percent of federal lands available for oil and gas leasing within the WRFO Planning Area have been leased, including 92 percent of the leasable acres within the Mesaverde Play Area (MPA) (Map 1-2). Decisions adopted at the conclusion of the RMPA/EIS process, would apply to new leasing decisions. Lease stipulations on existing oil and gas leases disclosed in the 1997 White River RMP would continue to apply to these leases. New or additional surface protective measures equivalent to the lease stipulations identified in this RMPA/EIS process may be applied as Conditions of Approval (COAs) to existing leases at the time of Application for Permit to Drill (APD) approval. Map 1-2 displays leased and non-leased areas in the WRFO Planning Area.

### Table 1-1. Surface and Subsurface Management Status in the WRFO Planning Area

| Surface Manager/Owner | Rio Blanco County (acres) | Moffat County (acres) | Garfield County (acres) | Total Acres |
|---|---|---|---|---|
| **Surface** | | | | |
| Federal: BLM | 1,151,100 | 232,700 | 74,300[1] | 1,458,100[2] [1997 White River RMP: 1,455,900] |
| Federal: NPS – Dinosaur National Monument | 0 | 71,500 | 0 | 71,500 |
| Federal: FS – White River National Forest | 246,900 | 0 | 129,200 | 376,100 |
| State: Colorado Parks and Wildlife, Colorado State Parks, Colorado State Land Board | 44,400 | 19,800 | 300 | 64,500 |
| County | 200 | 0 | 0 | 200 |
| Private | 480,500 | 99,800 | 124,900 | 705,200 |
| **TOTAL** | **1,923,100** | **423,700** | **328,700** | **2,675,600** |
| **Subsurface – Federal Oil and Gas Mineral Estate** | | | | |
| Federal surface/Federal oil and gas minerals | 1,398,100 | 303,800 | 203,500 | 1,905,400 |
| State surface/Federal oil and gas minerals | 16,700 | 0 | 0 | 16,700 |
| County surface/Federal oil and gas minerals | 200 | 0 | 0 | 200 |
| Private surface/Federal oil and gas minerals | 195,400 | 48,400 | 60,000 | 303,800[2] [1997 White River RMP: 349,300] |
| **TOTAL** | **1,610,400** | **352,200** | **263,500** | **2,226,100** |

SOURCE: BLM 2006a; BLM 2008b.

NOTES:

Sums may not equal totals due to rounding of individual cells. Acreages have been rounded to the nearest 100 acres.

[1] The total acreage in Garfield County managed by the BLM includes 4,010 acres formerly managed by the Department of Energy (Naval Oil Shale Reserve).

[2] Current total adjusted for sales and exchanges.

BLM_0019332

## 1.2   Purpose and Need for the Resource Management Plan Amendment

The FLPMA of 1976 requires that the BLM "develop, maintain, and when appropriate, revise land use plans…" (43 United States Code [USC]§1712). The BLM has proposed to amend the 1997 White River RMP be prepared to evaluate changing conditions in the WRFO Planning Area that have raised new issues and concerns since approval of the 1997 White River RMP. The CEQ regulations (40 CFR 1502.13) require an EIS to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." This chapter provides the context and framework for establishing and evaluating a reasonable range of alternatives, which are described in Chapter 2 of this document.

### 1.2.1  Purpose of the Action

The purpose of this Amendment to the 1997 White River RMP is to provide effective management direction for public lands administered by the WRFO, and direction that permits oil and gas exploration and development in excess of levels evaluated in the 1997 White River RMP. The BLM management decisions at the WRFO will continue to be based upon the approved 1997 White River RMP until such time that decisions are amended through RMP amendments and/or revisions. During the development of the Draft RMPA/EIS, the BLM reviewed the decisions contained in the 1997 White River RMP. Many elements of the 1997 White River RMP are adequate and remain valid; there will be no changes to those management decisions. Only those management decisions specifically identified in the Record of Decision will supersede existing management decisions in the 1997 White River RMP.

The BLM must establish guidance, objectives, policies, and management actions for lands and resources under the jurisdiction of the WRFO, in accordance with valid existing rights, obligations, and to guide decision making for future site-specific actions. Decisions may be evaluated and revised as necessary to reflect changing conditions; however, any major changes in management would require additional NEPA analysis, as described in Section 1.3.2.

### 1.2.2  Need for the Action

The BLM has determined that the level of oil and gas activities evaluated in the 1997 White River RMP has increased substantially. The BLM has determined it needs to update the 1997 White River RMP to reflect a greater Reasonable Foreseeable Development (RFD) Scenario developed in 2007, and an increase in APDs since 2001. This would include establishing appropriate goals, objectives, management actions, priorities, and procedures to manage the projected increase in oil and gas activity in relation to other resources within the WRFO Planning Area and to address the potential environmental and socioeconomic impacts of the predicted oil and gas development.

The Energy Policy and Conservation Act (EPCA) Reauthorization of 2000 directed the DOI to produce a scientific inventory of oil and gas resources and reserves underlying federal lands. The resulting EPCA inventory identified the Uinta-Piceance Basin (Colorado and Utah) as one of five sub-basins in the continental United States with large resources of undeveloped oil and gas energy potential. In addition to the EPCA inventory, oil and gas prices changes, development of interstate transportation pipelines, and improved drilling technology have also influenced increases in exploration, development, and production of oil and gas resources in the WRFO Planning Area.

The 1997 White River RMP projected and analyzed an RFD Scenario of 1,100 potential oil and gas wells that would encompass 10 acres of disturbance per well (including roads and pipelines)

BLM_0019333

developed at a rate of approximately 55 single well pads per year, totaling 1,100 single well pads for a 20-year period (1997 through 2017). Disturbance was estimated to be approximately 11,000 acres over a 20-year period. The 1997 RFD Scenario also projected that nearly two-thirds of the oil and gas development activity would take place in the Douglas Creek Arch south of Rangely, Colorado, with the remaining activity dispersed throughout the rest of the WRFO Planning Area. While this projection has been fairly accurate for the activity south of Rangely, there has been a substantial increase in natural gas exploration and development in the MPA, located generally within the Piceance Creek Basin in the central portion of the WRFO Planning Area (Map 1-3 and Map 1-4) (BLM 1996).

An updated RFD Scenario was prepared in 2007 as a result of the changing conditions in oil and gas development to present a 20-year forecast of drilling activity on federal, state, and private lands within WRFO boundaries (BLM 2007). The 2007 RFD Scenario for potential oil and gas development activities in the WRFO Planning Area projected the potential need for the construction of between 550 and 2,556 multiple well pads, averaging eight drilled wells per pad, over a 20-year period (2009 through 2028), with the majority of development occurring in the Piceance Creek Basin of the WRFO Planning Area. Disturbance is estimated to range from 6,725 to 31,257 acres with an average of approximately 12 acres of total disturbance per well pad (including roads and pipelines) (BLM 2007). The 2007 RFD Scenario predicts an increase in oil and gas activities above the level evaluated in the 1997 White River RMP.

The 2007 RFD Scenario emphasizes the changing conditions in the WRFO Planning Area and the BLM has identified the need to manage the potential impacts of the projected increase in oil and gas activity in relation to other resources within the WRFO Planning Area and the BLM's mission of multiple use and sustained yield. Therefore, the BLM has determined that it will amend the 1997 White River RMP.

## 1.3   Planning Process

The NEPA requires federal agencies to prepare an EIS for a major federal action significantly affecting the quality of the human environment. The environmental analysis of alternatives and the proposed RMPA are as part of the resource management planning process to develop the proposed RMPA and related EIS which are published as a single document called the WRFO Oil and Gas Development Draft RMPA/EIS. This EIS analyzes the impacts of four alternatives, including the No Action Alternative (current management). The CEQ regulations direct that an EIS explore and objectively evaluate a range of reasonable alternatives, including the Proposed Action and a No Action Alternative, and describe any alternatives considered, but eliminated from detailed analysis with the rationale for elimination (40 CFR 1502.14 (a)). Each action alternative represents different management decisions that fulfill the purpose and need, address unresolved conflicts related to the proposed action, and include relevant mitigation measures to avoid or minimize impacts associated with oil and gas development.

### 1.3.1  Nine-Step Planning Process

When developing or amending an RMP, the BLM uses a nine-step planning process (Figure 1-1) identified in 43 CFR 1600 and the BLM Land Use Planning Handbook (BLM 2005a). Here, the BLM is amending the 1997 White River RMP to address current and projected oil and gas activity in the WRFO Planning Area. The steps in the nine-step planning process are the same for developing a plan amendment as they are for developing an RMP. The BLM manages federal land under principles of multiple use and sustained yield, consistent with laws, regulations, and policies

BLM_0019334

governing the administration of public land, in consultation and coordination with other federal agencies, Native American tribes, state and local governments, and the views of the general public.

## Figure 1-1. Nine Step Planning Process



The following is a brief description of each step in the nine-step planning process:

As depicted in Figure 1-1, the planning process is issue-driven (**Step 1**). The BLM used the public scoping process (a collaborative public involvement process) to identify issues to be addressed in the planning process relevant to projected increases of oil and gas activity to direct the amendment of the 1997 White River RMP (Scoping Report [BLM 2007a]). Issues are described in more detail in Section 1.4. The public scoping process was also used to introduce the public to the preliminary planning criteria, which defined the scope of the Draft RMPA/EIS (**Step 2**).

As appropriate, the BLM collected data to address planning issues and to fill data gaps identified during public scoping (**Step 3**). Using these data, planning issues, and planning criteria, the BLM conducted **Step 4**, Analysis of the Management Situation (AMS), to describe current management (i.e., No Action Alternative) and identify management opportunities for addressing the planning

BLM_0019335

issues (Analysis of the Management Situation [BLM 2007b]). Management opportunities identified in the AMS were used to help formulate alternatives.

The results of the first four steps of the nine-step planning process clarified the Purpose and Need and identified issues that would need to be addressed in this Draft RMPA/EIS.

During alternatives formulation (**Step 5**), the BLM collaborated with cooperating agencies, federal agency partners, and a subgroup of the Northwest Resource Advisory Council (NWRAC). The NWRAC is one of three Resource Advisory Councils (RAC) in Colorado appointed by the Secretary of the Interior to represent constituent public land users on public land management issues and to gain their input on draft alternative themes, and management goals and objectives (desired outcomes) identified by the BLM for resources and resource uses in the WRFO Planning Area. The desired outcomes:

- Were developed to address the identified planning issues;
- Were guided by the planning criteria (identified in Step 2); and
- Incorporated BLM's management concerns and opportunities that were identified in the AMS (BLM 2007b).

Based on input received from cooperating agencies and federal agency partners on the draft alternative themes and desired outcomes, the BLM developed the preliminary draft alternatives. These alternatives include a broad range of management actions and allowable uses that are anticipated to achieve the goals and objectives. The alternatives represent a reasonable range of options for managing resources and resource uses within the WRFO Planning Area. Chapter 2 of this document further describes and summarizes the alternatives screening process and the No Action and action alternatives carried forward throughout the NEPA process. Tables 2-1 through 2-21 present a comparison of the alternatives and associated management actions.

The Draft RMPA/EIS includes an analysis of the direct, indirect, and cumulative impacts of each alternative in Chapter 4 (**Step 6**). With input from cooperating agencies, federal agency partners, the NWRAC, and the BLM resource specialists, and in consideration of planning issues, planning criteria, and the impacts of alternatives, the BLM has the discretion to select an alternative in its entirety (Alternatives A, B, C, or D) or to combine aspects of the various alternatives presented in this Draft RMPA/EIS (**Step 7**). The BLM has identified and recommends that, Alternative C is the Preferred Alternative.

**Step 8** of the land use planning process (Selection of the RMPA), would occur following receipt and consideration of public comments on the Draft RMPA/EIS. Agencies and the public would have the opportunity to comment during a 90-day period that starts after the Notice of Availability (NOA) is published in the Federal Register. The BLM Deciding Official would evaluate the comments received and select and recommend to the State Director, for supervisory review and publication, a Proposed RMPA and Final EIS. After supervisory review of the Proposed RMPA, the State Director shall publish the plan and file the related EIS with the Environmental Protection Agency (EPA) according to the EPA's filing guidelines. (76 Fed. Reg. 2681 [January 14, 2011]). During **Step 9**, Monitoring and Evaluation, the BLM would implement the Approved RMPA, and using established intervals and standards, as appropriate, would monitor and evaluate how well the plan is guiding the WRFO towards the desired resource conditions within the WRFO Planning Area. Most plan amendment decisions and various plans contained within the plan amendment NEPA analysis (e.g., Monitoring Plan, Reclamation Plan) are effective upon signing of the decision document (i.e., Record of Decision). Implementation decisions are put into effect by developing an

BLM_0019336

Implementation Plan that provides the details for on-the-ground action, describes the process for implementation of the planning decisions, and evaluates the effectiveness of those decisions.

## 1.3.2  Resource Management Plan Amendment Implementation

Planning and decision-making for the management of BLM-administered lands is a tiered, ongoing process. Documents produced during each successive tier are progressively more detailed in terms of their identification of specific measures to be undertaken and potential impacts. Tiering narrows the scope of the subsequent analysis, and focuses on issues that are important for decision-making. The subsequent plans could require additional public review and environmental compliance documentation. Planning documents include the 1997 White River RMP, which provides an overall vision of the future (goals and objectives) and includes measurable steps, anticipated management actions, and allowable uses to achieve that vision. The 1997 White River RMP has been amended through the implementation of several Amendment documents (as listed below) which provide current management direction and include additional management actions and allowable uses:

- Oil Shale Withdrawal Revocation/RMP Amendment (CO-GJFO-01-81-EA), 2001
- Wilson Creek Transportation Plan Amendment to the White River RMP (CO-110-2004-032-EA), 2004
- West Douglas Herd Area Amendment to the White River RMP (CO-WRFO-05-083-EA), 2007
- Record of Decision for Approval of Portions of the Roan Plateau RMP Amendment and EIS, 2007[1]
- Record of Decision and Resource Management Plan Amendments for Geothermal Leasing in the Western United States, 2008
- Record of Decision for the Designation of Areas of Critical Environmental Concern for the Roan Plateau Resource Management Plan Amendment and Environmental Impact Statement, 2008[1]
- Approved Resource Management Plan Amendments/Record of Decision for Oil Shale and Tar Sands Resources to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic EIS, 2008
- Approved Resource Management Plan Amendments/Record of Decision for Designation of Energy Corridors on Bureau of Land Management-Administered Lands in the 11 Western States, 2009 (commonly referred to as the West-wide Energy Corridor (WWEC) EIS)

The proposed RMPA, tiers to the 1997 White River RMP to provide guidance and actions for oil and gas management decisions. Upon approval of the RMPA, subsequent implementation decisions would be carried out by developing activity-level or project-level plans that reflect the RMPA's management direction. Planning analysis would be conducted, which involves a process of using appropriate environmental resource data and NEPA analysis to provide a basis for decisions in areas not yet covered by the 1997 White River RMP or RMPA/EIS.

The BLM will develop an implementation plan for this RMPA/EIS and meet annually to coordinate with cooperating agencies, and federal, state, local and tribal partners. The annual coordination meeting would include an update on implementation of the RMPA, foreseeable activities for the

---

[1] The Oil and Gas Development RMPA/EIS will not amend or change the decisions made within the Roan Plateau RMP Amendment.

BLM_0019337

upcoming year, and opportunities for continued cooperation. Additional coordination meetings may be held, as needed.

## *1.4  Scoping and Identification of Issues*

### 1.4.1  Scoping Process

The BLM conducted an early and open public scoping process to identify issues associated with resource demand and multiple use management for consideration in this Draft RMPA/EIS. The process began with the publication of the Notice of Intent in the Federal Register on June 14, 2006 (Vol. 71, No. 114, Page 34388). As part of the scoping process, the BLM solicited comments and concerns from the public, non-government organizations, tribal governments, and federal, state, and local agencies, as well as from BLM specialists (Final Scoping Report [BLM 2007a]). The BLM's Land Use Planning Handbook defines planning issues as "…disputes or controversies about existing and potential land and resource allocations, levels of resource use, production, and related management practices" (BLM 2005a). The BLM's planning regulations (43 CFR Part 1610.4-1) state that "the identification of issues shall also comply with the scoping process required by the CEQ regulations." NEPA regulations require the BLM to review the issues and determine which are significant, and to narrow the discussion of issues in the EIS prepared for the RMPA. Issues identified from comments obtained during the scoping for this Draft RMPA/EIS were organized into the following categories:

- Issues within the scope of the EIS and used to develop alternatives or otherwise addressed in the EIS through the NEPA process.

- Issues outside the scope of the EIS or that could require policy, regulatory, or administrative actions.

Important issues to be addressed in the RMPA/EIS were identified by the public and the agencies during the scoping process. For a detailed description of the scoping process and the issues identified during scoping, please refer to the Final Scoping Report (BLM 2007a). The Final Scoping Report is available for review on the WRFO planning web page at: http://www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/white_river/documents.html.

During scoping, the public and agencies expressed concerns about the scope of the decision to be made through the NEPA process. The public wanted to ensure that the NEPA planning process is open and clearly understood. Questions were raised about the nature and the extent of the planned oil and gas exploration and development. The purpose of this document is to describe the environmental consequences and the decisions regarding oil and gas development to be made by the BLM.

In addition to the issues identified during scoping, other resource and use issues are identified in the BLM Land Use Planning Handbook (BLM 2005a). All of these issues were considered in developing the alternatives brought forward in this RMPA/EIS.

### 1.4.2  Issues Identified for Consideration

In its Final Scoping Report (BLM 2007a), the BLM grouped the issues identified during scoping into six broad topics. The issues within each topic the BLM identified as being within the scope of the RMPA/EIS are summarized below.

BLM_0019338

---

**Chapter 1 – Purpose and Need for Action**

**Topic 1: Natural Resources**

- Air Quality
  - Would an effective air quality monitoring program be established?
  - Would nearby Clean Air Act Class I Wilderness Areas and National Parks be affected?
  - What are the cumulative effects to air quality of the proposed oil and gas development?

- Water Quality
  - How would produced water be handled and disposed?
  - Would sufficient fresh water be available for oil and gas production?
  - Could subsurface releases of gases and drilling fluids result in migration of these materials along fault lines to groundwater or surface waters?
  - Would fracturing fluids result in a decline in water quality?
  - How would oil and gas development be managed to reduce impacts to wetlands, surface water, and groundwater?

- Vegetation
  - How should vegetation, noxious weeds, and riparian areas be managed to achieve healthy forests and rangelands while providing for livestock grazing and habitat for fish and wildlife?

- Fish, Wildlife, and Special Status Species
  - How would impacts to greater sage-grouse, Colorado River cutthroat trout, and other special status species be managed?
  - Would fragmentation of wildlife and habitat be avoided, and would fawning/calving habitat corridors be protected?
  - Would the BLM restrict activities in certain areas during certain times of year to avoid negative impacts to breeding or nesting birds or wintering populations of big game?

- Would the wild horse population be protected from adverse effects of oil and gas development?

- How should development be managed to maintain, enhance, or protect wilderness characteristics?

**Topic 2: Heritage Resources Management**

- How would cultural resources, archaeological sites, and historical sites be protected and conserved?

**Topic 3: Management of Human Activities and Uses**

- Recreation Management
  - How would oil and gas development impact hunting, primitive recreation such as hiking, camping, and wildlife viewing, and other out-of-state visitor experiences?
  - Would areas open to drilling still be open to public recreational use?
  - Would the BLM designate Special Recreation Management Areas (SRMAs)?

BLM_0019339

- Rangeland Management
  - How would oil and gas development impact vegetation and grazing for livestock and wildlife?
- Land and Realty, Utility Corridors, Rights-of-Way (ROWs), and Withdrawals
  - Would stipulations be applied to individual sites rather than as a mandatory condition of all leases?

**Topic 4: Transportation and Access Management**

- How would oil and gas development impact traffic in the area?
- Would new and existing roads and trails be maintained or improved?
- Would new oil and gas access roads be open to use by off-road vehicles?
- What best management practices (BMPs) would be implemented to avoid and/or minimize impacts to sensitive (e.g., streams and riparian areas) resources?
- What steps would be taken to evaluate proposed construction or improvement of roads for impacts to the transportation network and to the environment?

**Topic 5: Management for Aesthetic and Social Values**

- Social and Economic Values
  - What methods or models would the BLM use to evaluate the social and economic benefits and costs of the proposed oil and gas development?
- Visual Resource Management
  - Would the existing character of the landscape be preserved, including unique backcountry landscapes?
  - How would the BLM address light pollution, regional haze, and the degradation of viewsheds, including the viewshed from Dinosaur National Monument?

**Topic 6: Integration of Management with other Agency Plans**

- Would coordination and consistency with county land use plans, emergency services, state resource management plans, and other Federal Plans and Guidance be considered?

## 1.4.3  Issues Addressed Through Policy, Regulatory, or Administrative Actions

Policy or administrative actions include those actions that are implemented by the BLM because they are standard operating procedure, because federal law requires them, or because they are BLM policy. They are issues that are eliminated from detailed analysis in this planning effort. Administrative actions do not require a planning decision to implement because they are a requirement of federal law or BLM policy. The following issues raised during scoping are already addressed by administrative actions:

- Compliance with existing laws and policies (e.g., FLPMA, NEPA, Endangered Species Act, American Antiquities Act, Clean Air Act, Clean Water Act, Colorado River Basin Salinity Control Act, and the National Historic Preservation Act).

BLM_0019340

- Application of the Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management addresses, among other issues, the allocation of forage for grazing animals and wildlife, the numbers of livestock, and changes in grazing management practices.

- Education and coordination for volunteers and citizens to better understand fragile resources.

- Consistency of decision-making with existing federal, tribal, state, and local plans and policies, recognizing that decisions must be made in conformance with relevant laws, regulations, and BLM management policies.

- Management and protection of cultural resources, which includes up-to-date inventories, non-disclosure of sensitive sites, nomination and listing of cultural sites for the National Register of Historic Places, and Native American consultation.

- Management of the WRFO's six existing Wilderness Study Areas (WSAs) (approximately 82,800 acres) under the Interim Management Policy (IMP) for Lands Under Wilderness Review (BLM Manual H-8550-1; BLM 1995). These WSAs are statutorily required (pursuant to FLPMA Section 603(c)) to be managed to protect their suitability for Congressional designation into the National Wilderness Preservation System (NWPS).

- Completion of inventory of riparian and wetland areas and the use of monitoring and mitigation to help protect these resources.

- Continuing work on a comprehensive sign system and maps for recreational and other users.

- Administration of existing mineral leases, permits, and other authorized uses.

- Use of valid existing rights.

- Monitoring wildlife and biodiversity.

- Monitoring air quality.

- Eligibility standards for specially designated areas.

- Protection of threatened, endangered, or sensitive species, including formal consultation with the U.S. Fish and Wildlife Service on Graham's beardtongue, Dudley Bluffs bladderpod, and Dudley Bluffs twinpod.

- Implementation of a comprehensive travel management plan, including consideration of off-road vehicle use, a detailed closure and restoration schedule, and a monitoring system for road and trail maintenance and development.

- Coordination with local, state, and federal agencies, and tribal governments.

- Cooperation with user groups, interested stakeholders, and the public.

## 1.4.4  Issues that were Considered but Not Further Analyzed

Consistent with the purpose of this action, issues addressed in this RMPA/EIS are those that deal specifically with an increase in oil and gas exploration, development and production, and the potential effects of that increase on other resource uses and values within the WRFO Planning Area. Resource outcomes and management actions were evaluated for all resources in the context of an increase in oil and gas development. Other topics that could be relevant to other planning issues within the WRFO Planning Area are not addressed in this RMPA/EIS. Examples of issues or topics not addressed in this RMPA/EIS include, but are not limited to:

BLM_0019341

- Activities and uses beyond the jurisdiction of the BLM.
- Changing existing laws, policies, and regulations.
- Revisions to decisions on the acreage of lands available for oil and gas leasing.
- Designation of new Wilderness or Wilderness Study Area (WSA) designations.
- Designation of new Areas of Critical Environmental Concern (ACECs) or other special designations.
- Change or elimination of grazing allotments.
- Revision to allowable uses or management actions for resources not related to oil and gas activities (e.g., travel management decisions to designate roads and trails only).
- Inclusion of land tenure adjustments.
- Considering alternative energy sources (wind and solar energy) as substitutes for activities related to mineral development.
- Lands owned by the State of Colorado and managed by the State Board of Land Commissioners are not covered by this plan.

## 1.4.5 Planning Criteria and Legislative Constraints

Public scoping involved the introduction of preliminary planning criteria to the public for comment. The BLM Land Use Planning Handbook defines planning criteria as guiding development of the planning document by "…helping define the decision space (or the "sideboards" that define the scope of the planning effort); they are generally based upon applicable laws, Director and State Director guidance, and the results of public and governmental participation (43 CFR 1610.4-2)." Planning criteria influence all aspects of the planning process, including inventory and data collection, developing planning issues to be addressed, formulating alternatives, estimating impacts, and selecting the Preferred Alternative. In conjunction with the planning issues, planning criteria ensure that the planning process is focused and incorporates appropriate analyses. The criteria also help to guide the selection of the Preferred Alternative and implementation of the plan and are used as a basis for evaluating the responsiveness of the planning options.

Planning criteria used in this RMPA/EIS are:

- The plan will be in compliance with the FLPMA (43 USC§1701 et seq.), as it pertains to BLM lands. Actions comply with all relevant laws, regulations, executive orders, and BLM policies and guidance.
- The plan will establish the guidance upon which the WRFO will rely on to manage the lands and resources under its jurisdiction.
- The planning process will incorporate analyses documented in this RMPA/EIS in accordance with NEPA.
- Actions must be reasonable and achievable and allow for flexibility where appropriate (e.g., adaptive management).
- Actions will be considered using an interdisciplinary approach.
- The planning team commits to work cooperatively with federal agencies; tribal, state, and local governments; and affected and interested public parties. A process of collaborative public involvement and participation will continue throughout this planning effort.
- The RMPA/EIS will recognize valid existing rights related to the use of the public land.

BLM_0019342

- The process will involve government-to-government coordination and consultation with Native American tribal governments, as required, and provide strategies for protection of cultural resources on public land.
- The BLM will consider the compatibility of its decisions with existing plans and policies of adjacent federal, tribal, state, and local lands (while recognizing that decisions must be made in conformance with relevant laws, regulations, and BLM management policies).

## 1.4.6  Relevant Statutes, Limitations, and Guidelines

The BLM's planning process (as described in 43 CFR 1600) is authorized and mandated through the laws described below.

The **Federal Land Policy and Management Act of 1976** (FLPMA) states that the BLM "shall, with public involvement…develop, maintain, and when appropriate, revise land use plans" (43 USC 35§1712[a]). In addition to federal direction for planning, FLPMA declares the policy of the U.S. concerning the management of federally owned land administered by the BLM. Key to this management policy is the direction that the BLM "shall manage the public lands under principles of multiple use and sustained yield, in accordance with the [developed] land use plans" (43 USC 35§732[a]). The commitment to multiple use does not mean that all land will be open for all uses. Some uses may be excluded on some land to protect specific resource values or uses, as directed by FLPMA (43 USC 35§1712[c][3]). Any such exclusion; however, will be based on laws or regulations or be determined through a planning process subject to public involvement. In writing and revising land use plans, FLPMA also directs the BLM to coordinate land use activities with the planning and management of other federal departments and agencies, state, and local governments, and American Indian tribes. This coordination; however, is limited "to the extent [the planning and management of other organizations remains] consistent with the laws governing the administration of the public lands" (43 USC 35§1712[c][9]).

In the **National Environmental Policy Act of 1969** (NEPA), Congress directs "all agencies of the Federal Government…[to]…utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment" (42 USC 55§4332[2A]). Because the development of a new and/or revised or amended RMP could cause impacts on the environment, NEPA regulations require the analysis and disclosure of potential environmental impacts in the form of an EIS. This EIS examines a range of alternatives to resolve the issues in question. Alternatives are designed to represent complete, but alternative, means of satisfying the identified purpose of and need for the EIS and of resolving the issues. The WRFO RMPA/EIS is being prepared using the best available information.

The **Mineral Leasing Act of 1920**, as amended, gives the BLM the responsibility for oil and gas leasing on about 564 million acres of BLM, national forest, and other federal lands, as well as state and private surface lands where mineral rights have been retained by the federal government. As such, the BLM reviews and approves permits and licenses from companies to explore, develop, and produce oil and gas resources on both federal and Native American lands. The BLM is also responsible for inspection and enforcement of oil, gas, and other development operations to ensure that lessees and operators comply with the lease requirements and BLM's regulations.

In addition to these acts, management of public land and resources is authorized and directed through several resource-specific and resource use-specific laws, regulations, and executive orders. The direction from these laws, regulations, and executive orders is refined and made department-

BLM_0019343

and bureau-specific through agency documents such as Instruction Memoranda (IM), Information Bulletins (IB), manuals, and handbooks.

## 1.4.7  Other Related Plans

The BLM planning policies require that the BLM review approved or adopted resource plans of other federal, state, local, and tribal governments and, where practicable, be consistent with those plans. Table 1-2 identifies plans that are relevant to the management of land and resources that apply to this RMPA/EIS process. Many of the Comprehensive Plans listed below include relevant land use, economic, and socioeconomic elements and guidance.

**Table 1-2. Plans Relevant to the WRFO Oil and Gas Development Draft RMPA/EIS**

| Local Plans | |
| --- | --- |
| • Town of Meeker Comprehensive Plan (Updated September 2005) | • Town of Rangely Comprehensive Plan 2004 to 2024: "Rangely: Building on Diverse Opportunities from Scenic Settings and Resource Wealth" (July 20, 2004) |
| • Glenwood Springs Comprehensive Plan (March 2011) | • City of Rifle Comprehensive Plan (November 2009) |

| County Plans | |
| --- | --- |
| • Rio Blanco County Master Plan (adopted January 13, 2011) | • Garfield County Comprehensive Plan 2030 Update (adopted November 10, 2010) |
| • Moffat County/City of Craig Master Plan (dated April 2003; adopted June 3, 2003) | • Moffat County Land Use Plan: Chapter One (adopted September 2001) |

| State Plans | |
| --- | --- |
| • Colorado Division of Wildlife (CDOW) Strategic Plan 2010-2020 (September 10, 2009) | • Colorado State Land Board guidance documents: |
| • Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans, Coordinated by CDOW (November 2, 2006) | • Oil and Gas and Solid Mineral Leasing, Policy No. 2003-01 (Amended Date: April 18, 2003); Management of Mineral Activities on Stewardship Trust Properties, Policy No. 2002-03 (December 20, 2002); Guidelines - Colorado Oil and Gas Leases (August 17, 1999) |

| Federal Plans | |
| --- | --- |
| • Approved Resource Management Plan Amendments/Record of Decision for Oil Shale and Tar Sands Resources to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic Environmental Impact Statement (November 2008) | • Approved Resource Management Plan Amendments/Record of Decision for Designation of Energy Corridors on Bureau of Land Management-Administered Lands in the 11 Western States (January 2009) |
| • Record of Decision – Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments (December 2005) | • Supplement to the Draft Programmatic Environmental Impact Statement for Solar Energy Development in Six Southwestern States (October 2011) |
| • White River National Forest Land and Resource Management Plan, Final Environmental Impact Statement and Record of Decision (2002 Revision) | • White River National Forest Air Resource Management Plan (January 2009) |
| • Record of Decision White River National Forest Travel Management Plan (March 2011) | • Little Snake Record of Decision and Approved Resource Management Plan (October 2011) |
| • Little Snake Field Office, Draft Additional Air Quality Assessment to Support the Draft Resource Management Plan Revision/Environmental Impact Statement (September 2008) | • Glenwood Springs Resource Area Oil and Gas Leasing and Development Record of Decision and Resource Management Plan Amendment (March 1999) |
| • Grand Junction Resource Area Resource Management Plan and Record of Decision (January 1987) | • BLM Vernal Field Office Record of Decision and Approved Resource Management Plan (October 2008) |
| • Draft Resource Management Plan and Draft Environmental Impact Statement for the Colorado River Valley Field Office, Colorado (September 2011) | • Dinosaur National Monument General Management Plan (1986) |

BLM_0019344

### 1.4.8  Master Leasing Plans

The Master Leasing Plan (MLP) concept, introduced in Washington Office Leasing Reform Instruction Memorandum (IM) 2010-117 (BLM 2010), promotes a proactive approach to planning for oil and gas development. Generally, the BLM uses RMPs to make oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values. However, additional planning, analysis, and decision-making may be necessary prior to oil and gas leasing because of changing circumstances, updated policies, and new information. Because the WRFO began this planning process in 2006 and had prepared the majority of the document prior to the adoption of WO-IM-2010-117, Master Leasing Plans are discussed in Appendix I. Appendix I provides an overview of the two external MLP proposals and discusses how, since the focus of this amendment is oil and gas development, the alternatives analyzed capture, in detail, the requirements of an MLP for the entire resource area.

## 1.5  *Alternatives Considered but Not Carried Forward for Detailed Analysis*

The following alternatives were considered as possible management approaches but were eliminated from detailed analysis because the BLM determined that they either did not meet the purpose and need for the RMPA/EIS (see Section 1.2), or were not practical or feasible alternatives due to technical, economic, and legal and policy considerations. These alternatives include: (1) Current Management using 1997 RFD Scenario, (2) Phased Development in the Piceance Basin, (3) Single Well Pads, (4) Reduced or Limited Pace of Oil and Gas Drilling, (5) Limit on Number of Well Pads or Wells, and (6) Limiting Cumulative Total Surface Disturbance.

The specific rationale for dismissing each from further consideration is described below.

### 1.5.1  Current Management using 1997 Reasonable Foreseeable Development Scenario

The BLM considered an alternative that reflected the continuation of current management under the projections for oil and gas activity presented in the 1997 RFD Scenario. However, the BLM determined that such an alternative would not meet the purpose and need for the RMPA/EIS, which is, in part, to address the substantial changing oil and gas resource conditions in the WRFO Planning Area and the need to manage the impacts of the projected increase in oil and gas activity in relation to other resources within the WRFO Planning Area (see Section 2.1.1.3 for a description of the BLM's 2007 RFD Scenario [BLM 2007]). For the purpose of this analysis, the newly developed 2007 RFD Scenario will replace the 1997 RFD Scenario for all alternatives including the No Action Alternative.

### 1.5.2  Phased Development in the Piceance Basin

The BLM considered applying the concepts for "phased development" of oil and gas resources that were considered in the Roan Plateau RMPA (BLM 2007c) as an alternative to addressing the duration, intensity, and extent of development activity in the Piceance Basin. Traditionally, "phased development" refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while resting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed. The phased development approach evaluated in the Roan Plateau RMPA (BLM 2007c) included: (1) restricting drilling operations to prescribed geographical development areas at any one time and

BLM_0019345

prohibiting shifting operations to the next development area until reclamation is complete; and (2) limiting total surface disturbance at any one time to a specific acreage. After further consideration, the BLM determined that phased development was not feasible for the WRFO Oil and Gas Draft RMPA/EIS, since the majority of acres within the Planning Area are already leased; it would not meet the purpose and need (see Section 1.2).

Restricting drilling operations to prescribed development areas based on geography would have limited effectiveness in managing the impacts of the projected increase in oil and gas activity in relation to management objectives for other resources, as resource conditions vary across the WRFO Planning Area. Further, restricting drilling operations to prescribed geographical development areas could cause delays in the production of energy resources. In the WRFO Planning Area (and different from the Roan Plateau Planning Area), 80 percent of leasable acres are already leased, including 93 percent of leasable acres with high oil and gas occurrence potential. If only a limited number of wells were allowed to be drilled each year, some lessees would be prevented from developing their lease even as they were paying rental fees on the acreage they are leasing. Also, if more than one party leases an area and only a limited number of wells were allowed during a given timeframe, the BLM would have the responsibility for choosing which lessee could drill. The BLM would also have the responsibility for deciding which areas to develop first. Establishing criteria for making such decisions would be difficult because the BLM would have to prioritize some resources or resource uses over others, which could conflict with the BLM's mandate of multiple use.

Phased development would also cause delays in production of energy resources, and would not respond to supply and demand economics. As a result of phased development, gas production might occur slowly enough so that the pipeline companies might find it not economically feasible to build the infrastructure needed to transport gas to market.

Under a phased development approach based on geographical development areas, the number and miles of roads and the amount of infrastructure could also increase if developed and sized for each phase as compared to a party's entire leaseholding. Roads, support facilities, and pipelines might also be better planned and sited as part of an area-wide development plan.

Although the BLM eliminated this phased development alternative from detailed analysis based on the rationale presented above, key elements of Alternatives B and C are a "managed development" approach (described in Chapter 2) for addressing the duration, intensity, and extent of development activity in the Piceance Basin. Although still aimed at limiting spatial disturbance, the managed development approach differs from the traditional "phased development" approach in that limitation of the spatial extent of surface disturbance is achieved by managing the extent of impacts to sensitive wildlife habitats rather than limiting total surface disturbance to a specific geographic area, or specific acreage regardless of habitat or terrain. Further, reclamation of a particular wildlife habitat, rather than a geographic area, is used as the criterion for removing acres of habitat from the disturbance threshold computation.

## 1.5.3  Single Well Pads

The BLM considered an alternative that would evaluate the impacts of the use of (only) single well pads, as was considered in the 1997 White River RMP (BLM 1997a). However, information obtained from oil and gas operators in updating the 2007 RFD Scenario (BLM 2007) indicated most oil and gas companies plan to implement technology for multi-well drilling from each well pad, as this has become economically feasible. Federal regulations (43 CFR §3160) require lessees to attain maximum economic recovery of the leased resource. The regulations also requires the operator to

BLM_0019346

exercise due care and diligence to assure that leasehold operations do not result in undue damage to surface or subsurface resources or surface improvements. Therefore, an alternative based on single well pads was dropped from detailed analysis as it would not meet the economic criteria of the federal regulations or reduce impacts.

## 1.5.4  Reduced or Limited Pace of Oil and Gas Drilling

The BLM considered an alternative to set or control the pace of oil and gas development but determined, through a review of the federal regulations, that the holders of federal oil and gas leases have the right to develop those leases; consequently, it was dropped from detailed analysis as it does not meet the purpose and need in terms of responding to the changing conditions (i.e., the projected increase in oil and gas activity) within the WRFO Planning Area. 43 CFR §3160.1-2 states "the lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, and dispose of all the leased resource in a leasehold." The 43 CFR §3160 regulations also require lessees to attain maximum economic recovery of the leased resource, and for leaseholders to conduct their operations in a manner that prevents undue and unnecessary impact. It is not possible at a planning level to determine whether a lease would actually be developed, and if it is what well spacing or level of development would be necessary to achieve the requisite maximum economic recovery of the oil and gas resource. Well spacing can vary from development area to development area. The pace of development would vary significantly between these scenarios. Pace of development, including reduced or limited rates of development, would be more appropriately projected and evaluated in project- or field-specific NEPA analysis.

## 1.5.5  Limit on Number of Well Pads or Wells

As stated in the previous section, federal regulations state that the holders of federal oil and gas leases have the right to develop those leases; consequently, this alternative was dropped from detailed analysis due to policy considerations. 43 CFR §3160.1-2 states "the lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, and dispose of all the leased resource in a leasehold." The 43 CFR §3160 regulations also require lessees to attain maximum economic recovery of the leased resource. The number of well pads or wells would be more appropriately projected and evaluated in project- or field-specific NEPA analysis. Instead of limiting the number of wells or well pads, Alternatives B and C apply thresholds that could ultimately limit the number of wells or well pads that are developed.

## 1.5.6  Limiting Cumulative Total Surface Disturbance

The BLM considered an alternative that would limit the total acreage of surface disturbance associated with oil and gas activities at any one time. However, such an alternative would be difficult to apply equitably and monitor across the WRFO Planning Area, and would have limited effectiveness in achieving management objectives, as resource conditions vary throughout the planning area. The BLM would have to decide which areas to develop at any given time. In an area with multiple lessees, the BLM would also have to choose which lessee could drill at any given time, which could conflict with granted lease rights. This alternative is not consistent with the BLM's oil and gas leasing policies and regulations and could restrict the economic development of leases. Instead of limiting cumulative total surface disturbance, Alternatives B and C apply thresholds which may ultimately limit the number of acres that are disturbed.

BLM_0019347

### 1.5.7  Greater Sage-Grouse National Technical Team Report Alternative

The BLM published a Notice of Intent in the Federal Register on December 9, 2011, initiating a range-wide planning process that would analyze the National Technical Team Report Alternative in detail. The BLM Northwest Colorado District Office is in the process of completing an Environmental Impact Statement and possible Plan Amendment that will consider and analyze this alternative in detail, and will address BLM-managed lands in the White River Field Office planning area. The Oil and Gas Development RMP Amendment does address management of greater sage-grouse but only in the context of decisions related to oil and gas development. The National Technical Team (NTT) Report presented guidance related to the fluid minerals program but also to wide range of programs including travel and transportation management, recreation, lands and realty, range, wild horses, solid minerals, locatable minerals, salable minerals, vegetation treatments, and fire management. Addressing changes to other programs besides fluid minerals and the creation of special designations is outside the scope of this planning effort. Further, the BLM is not making allocation decisions related to areas open or closed to oil and gas leasing during this planning effort. Therefore, the Greater Sage Grouse NTT Report Alternative has been considered but eliminated from detailed analysis for this planning process.

BLM_0019348

BLM

## Chapter 2
# Alternatives



Public Lands USA: Use, Share, Appreciate

BLM_0019349

BLM_0019350

**CHAPTER 2 ALTERNATIVES**........................................................................................**2-1**

2.1    Introduction .................................................................................................................2-1

2.2    Alternatives Development...........................................................................................2-2
       2.2.1    Alternative Components.................................................................................2-3
              2.2.1.1    Management Goals and Objectives........................................2-3
              2.2.1.2    Allowable Uses and Management Actions .............................2-3
              2.2.1.3    Reasonable Foreseeable Development Scenario....................2-4

2.3    Alternatives Analyzed in Detail .................................................................................2-4
       2.3.1    Management Guidance Common to All Alternatives .............................2-6
              2.3.1.1    Reclamation ........................................................................2-6
              2.3.1.2    Best Management Practices and Conservation Measures .......2-6
              2.3.1.3    Colorado Standards for Public Land Health .........................2-7
              2.3.1.4    Management Goals ...............................................................2-7
              2.3.1.5    Management Objectives.........................................................2-7
              2.3.1.6    Allowable Uses and Management Actions .............................2-7
              2.3.1.7    Resource Management and Monitoring Protocol ...................2-7
       2.3.2    Alternative A (No Action Alternative)...............................................2-8
              2.3.2.1    Other Management Actions Considered ................................2-9
       2.3.3    Alternative B ...................................................................................2-11
              2.3.3.1    Managed Development Approach.........................................2-11
              2.3.3.2    Other Management Actions Considered in Alternative B ...................2-15
       2.3.4    Alternative C (Preferred Alternative)..................................................2-18
              2.3.4.1    Managed Development Approach.........................................2-19
              2.3.4.2    Other Management Actions Considered in Alternative C ...................2-20
       2.3.5    Alternative D ...................................................................................2-23
              2.3.5.1    Other Management Actions Considered .............................2-24

2.4    Comparison of Alternatives......................................................................................2-26
       2.4.1    Comparison of Alternatives List of Tables .......................................2-27

BLM_0019351

**Chapter 2 – Alternatives**

## List of Tables

Table 2-1   Comparison of Alternatives – Air and Atmospheric Values ........................ Table 2-1-1

Table 2-2   Comparison of Alternatives – Soil and Water Resources ............................ Table 2-2-1

Table 2-3   Comparison of Alternatives – Vegetation .................................................... Table 2-3-1

Table 2-4   Comparison of Alternatives – Fish and Wildlife – Big Game ..................... Table2 -4-1

Table 2-5   Comparison of Alternatives – Fish and Wildlife – Raptors ......................... Table 2-5-1

Table 2-6   Comparison of Alternatives – Fish and Wildlife – Grouse .......................... Table 2-6-1

Table 2-7   Comparison of Alternatives – Fish and Wildlife – Migratory Birds ............ Table 2-7-1

Table 2-8   Comparison of Alternatives – Fish and Wildlife – Fish ............................... Table 2-8-1

Table 2-9   Comparison of Alternatives – Special Status Animal Species ...................... Table 2-9-1

Table 2-10   Comparison of Alternatives – Special Status Plant Species ....................... Table 2-10-1

Table 2-11   Comparison of Alternatives – Wild Horse Management ............................ Table 2-11-1

Table 2-12   Comparison of Alternatives – Cultural Resources ..................................... Table 2-12-1

Table 2-13   Comparison of Alternatives – Paleontological Resources ......................... Table 2-13-1

Table 2-14   Comparison of Alternatives – Visual Resources ........................................ Table 2-14-1

Table 2-15   Comparison of Alternatives – Forestry and Woodland Products ............... Table 2-15-1

Table 2-16   Comparison of Alternatives – Livestock Grazing ...................................... Table 2-16-1

Table 2-17   Comparison of Alternatives – Minerals .................................................... Table 2-17-1

Table 2-18   Comparison of Alternatives – Recreation ................................................. Table 2-18-1

Table 2-19   Comparison of Alternatives – Comprehensive Trails and Travel
             Management ................................................................................................ Table 2-19-1

Table 2-20   Comparison of Alternatives – Lands and Realty ....................................... Table 2-20-1

Table 2-21   Comparison of Alternatives – Special Designations ................................. Table 2-21-1

Table 2-22   Comparison of Alternatives – Non-WSA Lands with Wilderness
             Characteristics ........................................................................................... Table 2-22-1

Table 2-23   Consolidated Acreages by Alternative ...................................................... Table 2-23-1

## List of Figures

Figure 2-1   Hypothetical Development Activity ................................................................. 2-13

## List of Maps

Map 2-1   Alternative A

Map 2-2   Alternative B

Map 2-3   Alternative C

Map 2-4   Alternative D

BLM_0019352

# CHAPTER 2
# ALTERNATIVES

## 2.1   Introduction

Chapter 2 describes the four alternatives evaluated in detail in the Oil and Gas Development RMPA/EIS, which includes the No Action Alternative (Alternative A) and three action alternatives (Alternatives B, C, and D). Section 2.1 describes how the alternatives were developed. The four alternatives are described in detail in Section 2.2 and are depicted on maps provided at the end of this Chapter. A comparison of the four alternatives is presented in Section 2.3 with extensive detailed side-by-side comparisons provided in Tables 2-1 through 2-22. The alternatives that were considered but eliminated from detailed analysis are described in Chapter 1, Purpose and Need for Action. Those alternatives were eliminated because the BLM determined that their proposed management approach did not meet the purpose and need for the Draft RMPA/EIS or were not feasible due to technical, legal, or policy considerations.

In this EIS, the BLM has developed and assessed reasonable alternatives that meet the purpose and need identified in Chapter 1. During this process, the BLM explored and objectively evaluated reasonable alternatives, and according to 40 CFR Part 1502.14 (a), explained why certain alternatives were eliminated from detailed study. It is the BLM's position that the presented alternatives use sound and prudent judgment and are feasible from a technical and economic standpoint. In addition to the action alternatives, 40 CFR Part 1502.14 (d) directs federal agencies to include a No Action Alternative. The No Action Alternative is the only alternative that does not need to respond to the purpose and need for the action. Alternatives are not management decisions; conversely alternatives represent a reasonable approach to manage resources and resource uses. The action alternatives presented in this EIS reflect a range of development and management use, and resource protections. The alternatives are responsive to issues identified during the scoping period to meet established planning criteria (outlined in Chapter 1), and provide resource management goals and objectives. All alternatives are intended to minimize adverse impacts on physical, biological, and socioeconomic resources from oil and gas development while providing for a level of resource use and development consistent with current laws, regulations, and BLM policies.

Analysis of each alternative has been reviewed and has guided the BLM in selecting Alternative C as the Preferred Alternative (40 CFR Part 1502.14 (e)). As part of the planning process, the public is invited to comment on this Draft RMPA/EIS. When commenting on this draft document, the reader may choose to address entire alternatives only, such as the Preferred Alternative C, or various elements of any of the alternatives. The BLM will consider all comments received, and prepare a Final RMPA/EIS, followed by the Proposed RMPA and Record of Decision (ROD). The ROD will contain the decisions that will guide future management of lands administered by the WRFO. For this final document, the BLM has the discretion to select an alternative in its entirety and any accompanying mitigation measures, or to combine aspects of the various alternatives presented in this Draft RMPA/EIS.

Acreages presented have been calculated using Geographic Information System (GIS) data provided by the BLM; the results differ from both the 1997 White River RMP and 2007 RFD Scenario due to advancement of GIS technology, refinement in the precision of the mapping of various datasets over time, and variations in the selection of data sets utilized for calculations.

BLM_0019353

## 2.2   Alternatives Development

The BLM used several sources of input, including existing decisions in the 1997 White River RMP and the 2007 RFD scenario to develop alternatives. Early in the process, the BLM established a list of preliminary planning criteria (Preparation Plan Analysis [BLM 2006a]; see Section 1.4.1) and preliminary management concerns. Then, the public scoping process, conducted from June 14, 2006 to September 30, 2006, provided an opportunity for interested members of the public and local governments, as well as other resource and land management agencies, to comment on the planning process and/or management concerns. From the comments received, the BLM identified the key planning issues to be addressed in the Draft RMPA/EIS. After the issues had been identified and documented in the Scoping Report (BLM 2007a), the BLM prepared the Analysis of the Management Situation (BLM 2007b). The Analysis of the Management Situation provides a profile of resources and resource uses in the WRFO Planning Area, a description of the existing management situation as it pertains to the oil and gas program, and an analysis of the opportunities to modify the existing management situation to best respond to the changing conditions in the WRFO Planning Area. After this analysis, the BLM further developed the preliminary planning criteria identified in the Preparation Plan Analysis based on the planning issues identified through the public scoping process and consistent with the BLM's resource management concerns and opportunities identified in the Analysis of the Management Situation. This process enabled the BLM to identify planning challenges facing WRFO in developing preliminary alternatives. These planning challenges include:

- Developing alternatives that consider and evaluate a broad range of foreseeable oil and gas development scenarios (e.g., between 550 and 2,556 well pads, with an average of eight wells per pad, projected in the 2007 RFD Scenario [BLM 2007]).

- Managing the intensity ("how much"), extent ("where"), and timing ("when") of impacts from increased development.

- While considering the following:

  - The high percentage of federal mineral estate already leased in the WRFO Planning Area (i.e., 73 percent of leasable acres in the WRFO Planning Area are leased, including 92 percent of leasable acres within the MPA).

  - Terms of existing leases could be inadequate to afford sufficient resource protection and management considering increased projections for the intensity and extent of development.

  - The potential for significant impacts from the anticipated level of oil and gas development (e.g., wildlife habitat, air and water quality, regional economy).

The BLM conducted a series of three work sessions to develop preliminary alternatives with an Interdisciplinary (ID) Team comprised of BLM staff, local and state cooperating agencies, and federal agency partners. During the initial work session, the BLM introduced themes for four preliminary alternatives (Alternatives A, B, C, and D) that addressed the issues and planning challenges identified through the BLM's preplanning and public scoping. Then, the BLM presented the preliminary concepts for a management scenario of each preliminary alternative for discussion and input.

During the second work session, the BLM presented the preliminary alternative themes that had been refined based on ID Team input received during the first work session. The BLM also introduced draft management goals and objectives and overall management approach characteristics

BLM_0019354

in each of the preliminary alternatives for key resources and resource uses. ID Team members were given the opportunity to review and provide comments on draft goals and objectives and the preliminary alternatives. The BLM refined the preliminary alternatives based on comments received.

A third work session was held to review the BLM responses to ID Team comments and to present the four draft alternatives to be considered in detail in the Draft RMPA/EIS. Throughout the process, the ID Team identified and discussed other alternatives (i.e., management options) that were considered possible management approaches to resolving resource management issues and conflicts. These options, discussed in detail in Section 1.5, were eliminated from further analysis because the BLM determined that they either did not meet the purpose and need for the RMPA or were not feasible due to technical, legal, and policy considerations.

## 2.2.1  Alternative Components

The alternatives described in this chapter represent a range of management options to address the key issues (presented in Chapter 1), and to manage resources and resource uses to achieve resource management goals in light of the projected increase in oil and gas development in the WRFO Planning Area. Each alternative comprises: (1) management goals and objectives and (2) allowable uses and management actions.

### 2.2.1.1  Management Goals and Objectives

As part of the land use planning process, the BLM, with input from relevant agencies and the public, identifies desired outcomes expressed in terms of specific goals and objectives for resources and resource uses. Desired outcomes are the future conditions expected to be produced by implementation of identified management actions. Goals and objectives provide overarching direction for BLM's actions in most effectively meeting legal mandates, numerous regulatory responsibilities, national policy, and other resource or social needs. Management goals are broad statements of desired outcome, but are generally not measurable. An example of such a management goal would be to preserve and protect cultural and historic resources to ensure those resources are available for appropriate uses by present and future generations.

Management objectives identify more specific desired outcomes for resources, and should include a measurable or quantifiable component and an established timeframe for achievement, if possible. Objectives are anticipated to achieve the stated management goals. An example of such a management objective would be to reduce imminent threats to cultural and historic resources from natural or human-caused deterioration or potential conflict with oil and gas activities.

### 2.2.1.2  Allowable Uses and Management Actions

The four alternatives are distinguished by the type and degree of constraints described as allowable uses and management actions undertaken to achieve the desired outcomes. Allowable uses identify surface lands and federal subsurface oil and gas mineral estate where uses are allowed, including any protective measures that would be needed to meet desired outcomes, and could exclude certain land uses to protect resource values. For example, protective measures that are consistent with the mineral rights granted by the lease could be imposed on the location of access roads, well sites, and facility sites or on the timing of geophysical exploration, well drilling, or other operations. Allowable uses could result from lease stipulations (e.g., lands open to leasing with a no surface occupancy [NSO] stipulation), Conditions of Approval (COA) from the surface management agency's review and environmental analysis of the proposed operations, Notices to Lessees, Onshore Orders, or regulations.

BLM_0019355

This Draft RMPA/EIS does not revise oil and gas leasing decisions made in the 1997 White River RMP. Rather, the alternatives presented consider additional allowable uses through COAs applied to existing leases or lease stipulations that could be applied to newly leased lands or other land use authorizations pursuant to this RMPA/EIS. For some allowable uses considered in the alternatives, the BLM may offer exceptions, waivers, modifications, or suspensions as appropriate to achieve desired outcomes and comply with management actions (see Appendix A).

Management actions represent the actions anticipated to achieve desired outcomes. These actions include proactive measures or limitations intended to guide day-to-day activities occurring on public land (e.g., limiting vehicle use on BLM vehicle access networks in areas of concentrated development to that directly associated with oil and gas development, production, and maintenance).

### 2.2.1.3   Reasonable Foreseeable Development Scenario

In 2007 the BLM prepared an updated RFD Scenario (BLM 2007) to project the maximum levels and types of industry activity, and the associated surface disturbance that could occur on all land ownerships in the WRFO Planning Area (see discussion of BLM's update of the 1997 RFD Scenario in Section 1.2.2). More specifically, the 2007 RFD Scenario considers the number of well pads and estimates acres of surface disturbance for the unconstrained (baseline) scenario that is not limited by the number of drilling rigs available, natural gas prices, or other conditions that could otherwise constrain development.

The WRFO's unconstrained 2007 RFD Scenario is based on two key assumptions: (1) all potentially productive areas, except those areas designated as closed to leasing by law, regulation, or executive order, are open to leasing and development; and (2) only standard lease terms and conditions would be imposed, affording minimum protections to other important resource values. In conjunction with land use constraints (e.g., NSO stipulations), management actions, and BLM expertise, the 2007 RFD Scenario was also used to project the approximate number of wells, well pads, and surface disturbance that could be developed under the constrained scenarios for each alternative. The 2007 RFD Scenario assumes approximately 12 acres of total disturbance (including roads and pipelines) per well pad. Together, the allowable uses, management actions, and 2007 RFD Scenario form the basis of the impact analysis of alternatives considered in the Draft RMPA/EIS (presented in Chapter 4).

## 2.3   *Alternatives Analyzed in Detail*

This section summarizes the four alternatives analyzed in detail in this Draft RMPA/EIS. These alternatives present a range of reasonable management actions that were analyzed to assist decision-makers and the public in understanding the potential environmental consequences of each alternative. The four alternatives are:

- Alternative A (No Action Alternative) – Management under this alternative would retain the current management goals, objectives, and direction specified in the 1997 White River RMP. However, it updates the 20-year development projection from the 1997 White River RMP to reflect the rate of about 220 new drilling permits per year. Resources and resource programs would be analyzed at a level of development projected in the 2007 RFD Scenario (BLM 2007) of up to 550 well pads with an associated long-term disturbance of 6,600 acres. (Well pads in all four alternatives are assumed to average eight wells per pad.)

- Alternative B – This alternative evaluates limiting the duration and overall extent of development activities to maintain existing resource conditions throughout all phases of

BLM_0019356

development. It emphasizes conservation and protection of other resources and resource uses, concurrently with oil and gas production. Implementation of Alternative B could result in up to 1,100 well pads. Associated surface disturbance resulting from this level of development would total 13,200 acres. The BLM would encourage clustered development and prompt reclamation by offering exceptions to wildlife timing limitations if disturbance associated with development remained within defined thresholds.

- Alternative C (Preferred Alternative) – This alternative emphasizes the short-term use of the environment while maintaining and enhancing long-term community function and ecological integrity. Disturbance thresholds would be higher and more exceptions and modifications to lease stipulations could be granted compared to Alternative B. This alternative projects development of up to 1,800 well pads with an associated surface disturbance totaling 21,600 acres.

- Alternative D – Management under this alternative would include emphasizing the production of oil and gas resources. Development would still occur under the environmental protection afforded by applicable laws, regulations, and BLM policy. Implementation of Alternative D is assumed to result in up to 2,556 new well pads with an associated surface disturbance of approximately 30,700 acres.

Additional environmental analyses would be conducted, as appropriate, for project- and site-specific actions proposed in the geographic area currently defined as the WRFO Planning Area. However, the site-specific evaluations would be facilitated by the planning and programmatic evaluation of impacts disclosed in the Final EIS supporting the ROD and approved RMPA.

Although the assumptions regarding the level of development associated with the alternatives represent reasonable projections of what could occur, actual development may vary significantly from the projections presented due to the large number of variables involved (e.g., number of wells, rate of drilling of wells, viability of directional drilling, the price of natural gas). For example, development intensity would vary based on management actions and requirements under each alternative considered in this Draft RMPA/EIS. Alternatively, technological improvements could allow for a higher average number of wells per pad. Regardless of the alternative adopted in the approved ROD, existing lease stipulations attached to existing oil and gas leases would continue to apply to those leases. New or additional lease stipulations would apply only to lands leased pursuant to the Final RMPA/EIS and ROD.

The BLM would require specific lease stipulations, best management practices (BMPs), and COAs that would protect other important resource values. The BLM could apply mitigation measures to surface use activities associated with existing land use authorizations as a COA for an APD. New lease stipulations resulting from the ROD and approved RMPA could be applied to other types of land uses and management actions (i.e., other than oil and gas leases) in order to maintain or achieve desired resource conditions. Also, lease suspensions could be used as a tool by the BLM as an incentive to operators to proactively manage drilling activities and operations.

Tables 2-1 through 2-22 present the goals and objectives developed for each alternative and a comparison of allowable uses and management actions for each alternative by resource. Maps 2-1 through 2-4 depict the major management elements of each alternative. In some cases, the BLM had not made a decision or identified a management action for a resource or resource use in the 1997 White River RMP. In these cases, "no similar action" is identified for the No Action Alternative in Tables 2-1 through 2-22. The following subsections highlight the major components of each alternative.

BLM_0019357

## 2.3.1  Management Guidance Common to All Alternatives

This section describes the management goals, objectives and actions for resource conditions and programs, and decisions that would apply to WRFO management under all alternatives, including reclamation, BMPs, and Colorado Standards for Public Land Health. Tables 2-1 through 2-22 detail the proposed actions, and each table includes: (1) continuing management goals; (2) continuing management objectives; and (3) allowable uses and management actions common to all alternatives, which are discretionary actions or decisions carried forward from the 1997 White River RMP that would be implemented under each alternative. Additional information on applicable laws, policy and Legal Authorities and Mandates, are found in the Management Situation Analysis, available online (http://www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/white_river/documents.html) or at the WRFO. Wilderness Study Areas (WSAs) and Harper's Corner Road (totaling 83,300 acres) would remain closed to leasing under all alternatives.

### 2.3.1.1  Reclamation

For all alternatives, the BLM has developed a standards-based reclamation plan (Appendix D) as required by Onshore Oil and Gas Order Number 1 (issued under 43 CFR 3160; BLM 2007d). In addition to final reclamation, the WRFO Surface Reclamation Plan is intended to complement current reclamation guidance found in the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (Gold Book; DOI and USDA 2007). The WRFO Surface Reclamation Plan describes two distinct phases of interim reclamation—Phase I and Phase II. Phase I reclamation occurs immediately after road and pad construction is completed, and includes the stabilization and protection of soil resources from erosion and proper storage of topsoil so that it remains viable and available for redistribution during later stages of reclamation. Phase II reclamation involves recontouring the site to the minimum necessary area (e.g., the working surface of a well pad). Both phases of reclamation emphasize the establishment of desired vegetation to minimize soil erosion, limit noxious weed establishment, allow for successional processes, and provide specified components of wildlife habitat over the productive life of the well pad. Final reclamation is the last phase described in the WRFO Surface Reclamation Plan, and calls for restoration of the entire site to its original landform. In general, a well site must be recontoured to its original contour or a contour that blends with the surrounding landform. Stockpiled topsoil must be evenly redistributed, and the site must be revegetated to achieve final reclamation. The WRFO Surface Reclamation Plan includes implementation timeframes and standards (i.e., success criteria) that must be met in order for Phase I or Phase II reclamation and final reclamation to be deemed successful. All surface disturbing activities related to oil and gas exploration and development on BLM-administered lands would be subject to reclamation standards included in the WRFO Surface Reclamation Plan.

### 2.3.1.2  Best Management Practices and Conservation Measures

For all alternatives, the BLM would apply and use BMPs and conservation measures (Appendix B), as needed in specific situations, to ensure adequate protection of resource values. BMPs and conservation measures could be applied as a COA at the time of permitting of oil and gas drilling or related operations or other activities and could include a variety of measures to minimize impacts over the short- or long-term, including timing limitations or avoidance areas for land use authorizations. All alternatives would require the use of multiple well placements.

BLM_0019358

### 2.3.1.3   Colorado Standards for Public Land Health

Under all alternatives, the BLM would continue to monitor and assess public land health in accordance with the Colorado Standards for Public Land Health (BLM 1997b). Standards of land health are an expression of levels of physical and biological condition or degree of function required for healthy and sustainable lands.

### 2.3.1.4   Management Goals

Management goals were defined for each resource and resource use category that the BLM must address in the planning process. The management goals for each resource management category and land use program are presented in Tables 2-1 through 2-22. Management goals are typically focused on maintaining, improving, and enhancing existing resource conditions, avoiding adverse impacts, and complying with applicable state and federal standards and regulations. Establishing management goals aids the BLM in developing management objectives, and allowable uses and management actions.

There are 17 resource, or resource use, categories with management goals that are the same across all alternatives. These resources, or resource use, categories with common management goals are found in the Comparison of Alternative Tables 2-1 through 2-22. The management goals common to all alternatives are listed first under the Management Goals section and apply to the four alternatives for each of the prospective resource.

### 2.3.1.5   Management Objectives

Management objectives provide a guideline for developing management actions. There are 14 resources or resource use categories that include management objectives that are the same across all alternatives. These resources, or resource use, categories with common management objectives are found in the Comparison of Alternative Tables 2-1 through 2-22. The management objectives common to all alternatives are listed first under each of the Management Objectives sections and apply to the four alternatives for each prospective resource when appropriate.

### 2.3.1.6   Allowable Uses and Management Actions

Allowable uses identify surface lands and federal subsurface oil and gas mineral estate where uses are allowed, including any restrictions that would be needed to meet desired outcomes, and could exclude certain land uses to protect resource values. Allowable uses and management actions that are applicable or common to all alternatives are listed in the Comparison of Alternative Tables 2-1 through 2-22. Common allowable uses and management action are listed first under each resource section.

### 2.3.1.7   Resource Management and Monitoring Protocol

A timely, cost-effective, scientifically valid, and publicly accepted approach to monitoring the effectiveness of land management decisions and practices was desired as part of the RMPA. To meet this need, the BLM, in collaboration with Colorado State University, and with input from the U.S. Geological Survey, developed BLM Technical Note 439 (Boone et al. 2011), which proposes a resource management and monitoring protocol (RMMP) for a semiarid landscape with extensive oil and gas potential. Once all phases are complete, the RMMP will include specific protocols and models for using remote sensing, other geospatial technologies; and fieldwork as an integrated monitoring approach; a series of metrics judged by experts as likely to reflect important changes in landscapes over time; and a means to report the results of the RMMP to the public, to operators, and within the BLM.

BLM_0019359

The RMMP itself is not a decision-making tool but it is rather a means to inform decisions by providing an integrated approach to monitoring and a mechanism to understand the effects of decision making. The RMMP proposes specific monitoring needs to meet its objectives, but also provides a framework for considering all other resource-specific monitoring (e.g., water quality, air quality, reclamation success) so that management decisions can be evaluated from an interdisciplinary perspective on a landscape scale. The RMMP is intended to be dynamic and both metrics and protocols for data collection may change over time without additional land use planning or NEPA.

Implementation of the RMMP will occur in phases. While there are over 30 proposed metrics presented in BLM Technical Note 439, the WRFO will initially focus on the subset of these metrics that provide the most efficient and effective way to inventory, monitor, and report surface disturbance and reclamation activities and to understand the landscape condition and trend. In addition to any RMMP specific metrics, the WRFO will also focus on the six core indicators of the BLM's Assessment, Inventory, and Monitoring Strategy (AIM) as described in BLM Technical Note 440 (MacKinnon et al. 2011). These six core indicators are recommended wherever the BLM implements quantitative vegetation and soil monitoring and include the amount of bare ground, vegetation composition, the presence and cover of nonnative invasive plant species, the presence and cover of plant species of management concern, vegetation height, and the proportion of soil surface in large intercanopy gaps.

To fully integrate the RMMP into daily workflows, the BLM is working with USGS Fort Collins Science Center to create a data management system (DMS) for the WRFO similar to other web-based tracking systems developed in Wyoming (e.g., the Jonah Infill DMS). The DMS will provide an interface for management and specialist review of development activities (including surface disturbance and reclamation efforts, which can be viewed spatially and tracked vial reports), related monitoring, and described effects. Further, the DMS will provide a mechanism for sharing condition and trend metrics within the BLM and with interested stakeholders and the public, simultaneously.

The Land Use Planning Handbook directs that plans should be periodically evaluated (at a minimum every 5 years). Evaluation is the process of reviewing the land use plan and determining whether decisions and NEPA analysis are still valid and whether the plan is being implemented. Specifically, plans are evaluated to determine if: 1) decisions remain relevant to current issues, 2) decisions are effective in achieving (or making progress toward achieving) desired outcomes, 3) any decisions that need to be revised, 4) decisions that need to be dropped from further consideration, and 5) any areas that require new decisions. Data collected as part of the RMMP will help to inform the plan evaluation.

## 2.3.2 Alternative A (No Action Alternative)

Alternative A (Map 2-1) represents the No Action Alternative detailed in Tables 2-1 through 2-22. The management focus for Alternative A is the current management goals, objectives, and direction as specified in the 1997 White River RMP with modifications through plan maintenance consistent with 43 CFR 1610.5-4. The alternative also continues current allowable uses and management actions for resources and resource programs under the levels and locations of future oil and gas development projected in the 2007 RFD Scenario (BLM 2007).

Under Alternative A, approximately 1,240,500 acres of BLM oil and gas federal mineral estate are identified as open to leasing and subject to lease stipulations (see Appendix A), including NSO (157,100 acres) stipulations, Controlled Surface Use (CSU) (583,900 acres) stipulations and timing

BLM_0019360

limitations (1,006,500 acres). (Timing limitations may overlap CSU and NSO areas so the individual stipulations will not sum to the total acres open to leasing.) Implementation of Alternative A is assumed to result in up to 4,603 new wells on 550 new well pads and approximately 6,600 acres of associated disturbance from well pads, roads, and other facilities (i.e., gas plants, pipelines, and other infrastructure) during the 20-year period of analysis.

The following discussion presents the management actions, implemented under Alternative A, by key resource. A complete list of management goals, objectives, and actions intended to minimize impacts on the physical, biological, and socioeconomic resources is found in the Comparison of Alternatives Tables 2-1 through 2-22; Alternative A.

### 2.3.2.1   Other Management Actions Considered

#### Air and Atmospheric Values

Emissions would reflect development of 550 well pads (approximately 4,603 wells). Operators would be required to achieve at least 50 percent reduction from uncontrolled fugitive dust emissions by using watering or other control measures on collector, resource, and local roads.

#### Soil and Water Resources

Fragile soils on slopes greater than 35 percent and saline soils derived from Mancos Shale would be managed with a CSU stipulation on oil and gas leasing. Surface discharge of produced water that meets state standards for water quality would be allowed if the required NPDES are obtained. In addition, evaporation facilities for the disposal of produced water would be considered with mitigation on a case-by-case basis. Further, operators would be required to manage oil and gas activities in a manner that retains upland health (as defined by Colorado Standards for Public Land Health for Uplands, Standard 1).

#### Vegetation

The management goal for plant communities would be to maintain healthy, diverse, and sustainable rangeland and woodland plant communities. Also, the goal for noxious and invasive weeds would be to manage noxious weeds so they cause no further negative environmental, aesthetic, or economic impacts. Surface disturbing activities would be avoided in priority riparian habitats, unless environmental analysis determined that (1) the proposed activity would not degrade or forestall attainment of proper functioning condition of the riparian area; or (2) impacts could be mitigated to meet minimum objectives for the system. Management of riparian areas and wetlands would be based on the rating system for riparian areas as identified in the 1997 White River RMP.

#### Fish and Wildlife – Big Game

The BLM's management goal for big game wildlife habitat would be to continue sustaining big game populations at a level commensurate with multiple-use objectives and the population objectives of the Colorado Division of Wildlife (CPW). The acute effects (a definition of acute versus collective effects is provided in Section 2.2.3.1) of well construction and development on big game habitat would be reduced through application of timing limitations on acute disturbance. Exceptions, waivers, or modifications may be granted, as described in Appendix A. The BLM could also apply timing limitations to surface use activities associated with existing land use authorizations as a COA. No offsite compensatory mitigation for disturbance of big game habitat would be required under this alternative.

BLM_0019361

---

*Chapter 2 – Alternatives*

Road abandonments and seasonal closures during periods of animal occupation would be used as management tools, to the extent practical, to limit effective road densities to an average maximum 1.5 miles of road per square mile on big game critical habitats and 3 miles of road per square mile on remaining big game ranges.

<u>**Fish and Wildlife – Raptors**</u>

The management goal for raptor habitat is to maintain the short-term utility and promote the continued long-term development and availability of suitable raptor habitats, including prey base, nest sites, and other special habitat features necessary to help stabilize or allow increases in regional raptor populations.

<u>**Fish and Wildlife – Grouse**</u>

The management goal for sage-grouse habitat would be to restore, maintain or expand native sage-grouse populations at levels commensurate with objectives set by CPW. The management objectives would achieve this goal by reducing disruption of important seasonal-use activities associated with grouse production and recruitment. Management actions for sage-grouse include prohibition of surface occupation and surface disturbing and disruptive activities within 1/4 mile of active and inactive lek sites (as directed in the 1997 White River RMP and reflected in existing lease stipulations). An active lek or strutting ground site shows evidence of use by displaying males in the last five years and an inactive lek shows evidence of use within the last 10 years. Exceptions, waivers, or modifications may be granted (see Appendix A). The BLM could apply this mitigation measure to surface use activities associated with existing land use authorizations as a COA. In addition, timing limitations would be applied to surface disturbing use activities in sage-grouse winter concentration areas, and in nesting habitat if 10 percent or more of suitable nesting habitat associated with an individual lek would be adversely influenced.

Surface occupation and long-term conversion or adverse modification of suitable sage-grouse habitat would be avoided, as described in Table 2-6. Vegetation treatment widths would generally not be allowed to exceed 200 feet. Treatment areas should be interspersed with equal or larger intervals of suitable cover. Cumulative adverse manipulations would not be allowed to exceed 10 percent of suitable nesting habitat within 2 miles of a lek. Disruptive surface use activities would be prohibited during the seasonal use periods identified: (1) December 16 through March 15 in winter concentration areas; and (2) April 15 through July 7 in nesting habitat if 10 percent or more of suitable nesting habitat associated with an individual lek is adversely influenced.

<u>**Livestock Grazing**</u>

The BLM would use mitigation to minimize cumulative impacts of other resource uses to livestock grazing (including reduction in operation capabilities and production performance). Under this alternative, the BLM would not apply any specific management actions aimed at adjusting oil and gas activities to allow for continued implementation of existing grazing permits or leases, and would not make any recommendations for compensatory mitigation when oil and gas activities preclude effective implementation of a grazing plan.

<u>**Lands and Realty**</u>

Land use authorizations (e.g., right-of-way grants, leases, and permits) would be considered on a case-by-case basis but denied in areas where a land use (or uses) would be excluded, with the exception of short-term land use permits involving no development, and projects that are consistent with management objectives for the area. The BLM would continue to designate major right-of-way corridors on public lands that would meet public, industry, and environmental needs.

BLM_0019362

## 2.3.3  Alternative B

The implementation of Alternative B (Map 2-2) would limit the duration and overall extent of development activities in order to maintain existing resource conditions throughout all phases of development (i.e., from initial construction through post-production). The management focus for Alternative B is the conservation and protection of other resource uses while allowing for continued production of oil and gas resources. The BLM would apply additional management actions to further protect the environment for these resources. The BLM would have the discretion to modify surface operations to change or add specific mitigation measures when supported by scientific analysis. All mitigation/conservation measures not already required as lease stipulations or COAs would be analyzed in a site-specific NEPA document, and be incorporated, as appropriate, into COAs of the permit, plan of development, and/or other use authorization.

Under Alternative B approximately 1,696,000 acres of BLM oil and gas federal mineral estate are identified as open to leasing and subject to lease stipulations (see Appendix A), including NSO (757,200 acres) stipulations, CSU (296,300 acres) stipulations and timing limitations (1,696,000 acres). Implementation of Alternative B is assumed to result in up to 9,191 new oil and gas wells on 1,100 new well pads and 13,200 acres of associated disturbance from well pads, road and other facilities during the 20-year period of analysis.

The BLM considered issues identified during the scoping period, the established planning criteria, and resource management goals and objectives in formulating this alternative. The following discussion presents the management actions by key resource. A complete list of management goals, objectives, and actions intended to minimize impacts on the physical, biological, and socioeconomic resources is found in the Comparison of Alternatives Tables 2-1 through 2-22; Alternative B.

### 2.3.3.1  Managed Development Approach

The managed development approach utilized under Alternatives B is a significant distinction from Alternative A. A key element of the managed development approach evaluated under this Alternative is limiting the spatial extent of surface disturbance. Limitations would be achieved in part by managing the extent of big game seasonal range subjected to cumulative adverse behavioral effects (e.g., harassment, avoidance) attributable to oil and gas activities. The managed development approach offers operator incentives for concentrated development. This approach includes establishing big game and sage-grouse thresholds for cumulative adverse behavior effects to be applied by each Game Management Unit (GMU), as defined by CPW, and by leaseholder (e.g., a threshold of a certain percentage of big game crucial winter range occurring within a leaseholding).

The overall vision for a managed development approach described for this alternative would be to cluster, co-locate, and consolidate surface facilities and other ground disturbing activities to manage the acute or collective degree of effects (defined below) from the proposed development. This would result in:

- Reduced behavioral impacts on wildlife by limiting the overall extent and duration of development activities and applying closely monitored reclamation that maintains community function and ecological integrity in the short- and long-term;

- Localizing surface disturbance and gaining economy of scale in infrastructure (e.g., limiting temporal and spatial extent of areas with increased sedimentation; indirect reduction in fugitive dust by improving dust-control effectiveness; ability to apply controls on sedimentation/air-borne particulates throughout the development field);

BLM_0019363

---

*Chapter 2 – Alternatives*

---

- More focused, timely, and complete reclamation;

- Increased efficiency in mutual BLM and industry monitoring;

- Improved ability to develop and apply effective mitigation for impacts to air, water, and soil;

- Improved ability to quantify impacts that could degrade water quality; and

- Greater ability to avoid conflicts with recreation experience.

**Fish and Wildlife – Big Game**

Under Alternative B, the BLM's management goal for big game habitat would be to manage big game habitat utility and suitability to sustain at least 90 percent of CPW's long-term population objective throughout active development. In the managed development approach, all behavioral effects would be defined as either acute or collective effects as follows:

- Acute effects are characterized by concentrated, intensive activity associated with construction, drilling, and completion. The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations, buffered by approximately 660 feet on winter ranges and approximately 1,300 feet on summer ranges. The area of acute effects would be exempted from timing limitations as long as the thresholds for collective and acute effects are met. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations.

- Collective effects are characterized by development-related activities up until the time that reclamation begins, including access roads; well pads not fully constructed or reclaimed to interim standards; and wells receiving frequent visitation (i.e., an average greater than seven vehicle trips per week). The area of collective effects would be defined as the footprint of the development-related activities surrounded by a buffer of approximately 660 feet on winter ranges and approximately 1,300 feet on summer ranges. Access or other features and facilities used in common would be pro-rated for each operator.

BLM_0019364

Figure 2-1, Hypothetical Development Activity, provides a scenario for illustrating the concept of acute and collective effects using Alternative B thresholds. Under this scenario, the disturbance buffers for acute and collective effects are shown.

**Figure 2-1. Hypothetical Development Activity**



Thresholds for cumulative adverse behavior effects would differ for acute and collective effects. If the extent of disturbance associated with an oil and gas operator's activities remained under established thresholds, seasonal wildlife stipulations for big game crucial winter range and other sensitive big game habitats would be excepted within the acute effect area portion of the leaseholding, thereby allowing industry the flexibility to continue development as long as resource objectives are met. Adverse effects that exceed established thresholds for cumulative adverse behavioral effects would nullify the timing limitation exception and subject all leaseholding development to timing limitations, as applied through established lease stipulations or COAs. Reclamation would be used as the criterion for removing acreage from the threshold computation. More specifically, pads would need to be successfully reclaimed to interim standards and activity at the site must be reduced to low frequency, maintenance mode. Other activities, such as evaluation of project-specific effects, monitoring, and enforcement under the managed development approach, would be outlined as per guidance in the BLM Technical Note 439 (Boone et. al 2011).

All seasonal big game ranges within the WRFO would be subject to timing limitations that could extend to up to 120 days on defined big game ranges within established windows (presented in

BLM_0019365

*Chapter 2 – Alternatives*

Table 2-4). Timing limitations would be applied through COAs for existing leases and through stipulations on new leases. Timing limitations were developed based on adaptive management and the BLM's professional judgment, and in coordination with CPW and other land management agencies. However, exceptions to timing limitations would be offered contingent on development remaining within the following thresholds in Alternative C for acute and collective cumulative adverse behavioral effects (evaluated by total leaseholdings and by company within a GMU):

- Thresholds for acute effects
    - 10 percent of deer winter range
    - 10 percent of deer severe winter range
    - 10 percent of deer summer range
    - 10 percent of deer winter concentration areas
    - 5 percent of deer severe winter range/winter concentration areas
    - 0 percent of CPW defined Restricted Development Areas.
- Thresholds for collective effects
    - 20 percent of deer winter range
    - 20 percent of deer severe winter range
    - 20 percent of deer summer range
    - 20 percent of deer winter concentration areas
    - 10 percent of deer severe winter range/winter concentration areas

Threshold limits may be incrementally adjusted by the BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring.

In addition to the above, collective effects on big game habitat in areas defined by CPW as Restricted Development Areas would be limited to 5 percent with no allowance for acute effects during the period of animal occupation. Restricted Development Areas are those geographic areas that offer high value as big game habitat (as determined by CPW) or those that must remain relatively free of development influences to serve as experimental controls for long-term population or effects monitoring (e.g., North Ridge, Yellow Creek, and Story-Sprague Gulch).

**Fish and Wildlife – Grouse**

The managed development approach would also be applied to sage-grouse habitat under Alternative B. The overarching management goal for sage-grouse would be to restore, maintain, or enhance habitat conditions and features conducive to the maintenance or expansion of native grouse population abundance and distribution, as in Alternative A. In addition, there would be an added management goal to maintain or expand the number of greater sage-grouse lek complexes (as defined by Western Association of Fish and Wildlife Agencies [WAFWA]) in each identified population within the WRFO Planning Area. Based on the total federally administered lease or unit holdings within a defined sage-grouse population area, the extent of sage-grouse habitat subject to cumulative adverse habitat and behavioral effects (i.e., reduced habitat extent/continuity, harassment/avoidance) attributable to oil and gas development would not be allowed to exceed the following thresholds:

BLM_0019366

- 10 percent of occupied habitat mapped as showing evidence of occupation in the last five years within 4 miles of active or inactive leks.

- 20 percent of sage-steppe communities used solely for winter functions or occupied habitat greater than 4 miles from an active or inactive lek.

- 25 percent of suitable (but unoccupied) habitat within 4 miles of an active or inactive lek.

- Any land base identified as critical to any given sage-grouse subcomplex (as defined by CPW) would be subject to additional conservation measures in an effort to retain an effective source population of grouse in the subcomplex. These measures could include (but would not be limited to) well pad density limits, strict development schedules and timeframes, and facility siting that could involve moves (i.e., of surface disturbing activities) of more than approximately 660 feet. Additional conservation measures could be applied as COA at the time of permitting of oil and gas drilling or related operations or other activities.

For sage-grouse habitat, the extent of adverse behavioral effects is defined as collective development activity buffered by approximately 660 feet, in addition to any habitat parcels that become physically or behaviorally isolated by development features and are unavailable for effective use by sage-grouse (e.g., barriers to movement). Cumulative development-related effects that exceed any of the thresholds would nullify the threshold allowance and, thereby, subject all lease development to timing limitations as applied through lease stipulations or COA that exceed 60 days (i.e., nesting/early brood functions—April 1 through July 15; winter use areas—December 1 through March 15). For effectiveness in achieving management objectives for sage-grouse, the BLM would encourage the voluntary application of this strategy to sage-grouse habitat on private holdings. Acreage on fee land holdings below the occupied habitat threshold that are considered by CPW to be of comparable or higher sage-grouse value could be substituted for federally-administered acreage with the approval of the WRFO Authorized Officer.

In addition to the threshold criteria for cumulative adverse behavior effects described above, surface occupation and long-term conversion or adverse modification of suitable sage-grouse habitat (as described in Table 2-6) would be limited to 2 percent of that habitat available within a leaseholding.

## 2.3.3.2   Other Management Actions Considered in Alternative B

### Air and Atmospheric Values

Alternative B includes more stringent emission controls than Alternative A. Some of these stringent emission controls reflect existing state and federal regulations that would be implemented earlier than would otherwise be required, particularly with regard to emissions from drill rig and compressor engines. Other controls included in Alternative B involve a variety of control techniques to reduce fugitive dust and carbon monoxide (CO), nitrogen oxides ($NO_x$), volatile organic compounds (VOC), hazardous air pollutants (HAP), and greenhouse gas (GHG) emissions. Alternative B requires state-of-the-art emission controls such as green completion technology and glycol dehydrators with 90 percent reductions in emissions. Both of these technologies achieve very large reductions in VOC, HAP, and GHG emissions. A listing of emission controls specific to Alternative B is found in Table 2-1.

### Soil and Water Resources

Surface discharge of produced water would not be allowed under Alternative B; rather, injection of produced water from federal oil and gas leases would be required. Evaporation facilities for the disposal of produced water would not be allowed from federal oil and gas leases. Further,

BLM_0019367

Alternative B includes avoidance or exclusion of surface disturbing activities on saline soils and steep slopes to reduce disturbance in these areas and shift disturbance to less sensitive ground. Surface disturbing activities would be prohibited in the following areas: (1) mapped 100-year flood plains; (2) areas within 500 feet of perennial waters, springs, wells, and wetland/riparian areas; and (3) areas within 100 feet from the inner gorge of ephemeral channels. In addition, all potentially impacting land use activities would be denied in priority riparian habitats (see Map 3-2 Land Cover Types).

Areas of concentrated development (resulting from operator election to comply with voluntary thresholds for cumulative adverse behavior effects) would require implementation of: (1) produced water piping infrastructure to transport water to off-site treatment and disposal locations; (2) water supply piping infrastructure to support drilling and construction activities; and (3) detailed planning for access roads in specific geographic areas, incorporating the use of existing pipeline corridors and roadways for new pipelines (see Table 2-2).

## Vegetation

The goal of Alternative B would be to manage vegetation communities to restore, maintain, or enhance vegetation community health, composition, and diversity to benefit multiple resources and their uses (consistent with ecological site potential) in areas with oil and gas activities. Also, the goal for managing noxious and invasive weeds would be to incorporate weed prevention and control measures into all phases of oil and gas activities to stop or reduce the spread of noxious and invasive plant species (see Table 2-3).

The BLM would require interim and final reclamation for oil and gas activities under Alternative B. The success criteria for interim and final reclamation would be 100 percent basal vegetation cover of the desired plant community (DPC), as defined by the ecological site description or in the absence of such, would have a minimum of 30 percent basal vegetative cover or 90 percent foliar cover. In areas already leased, a program would be developed in cooperation with current leaseholders to apply, where appropriate, the most current reclamation standards and practices to existing well pads, roads, and pipelines in annual increments that would allow for completed interim or final reclamation of active and inactive right-of-way corridors, and producing or plugged and abandoned wells and access roads within 20 years.

## Fish and Wildlife – Big Game

Similar to the No Action Alternative (Alternative A), road abandonment and use limitations under Alternative B would be used to limit effective road densities in the long-term to an average maximum 1.5 miles of road per square mile in higher value big game habitat (i.e., defined severe winter range, severe winter range/winter concentration areas, and summer ranges) and 3 miles of road per square mile on other big game ranges (see Table 2-4). In addition, vehicle use on BLM vehicle access networks (including existing roads, trails, and ways) in areas of concentrated development would be temporarily limited, where logistically practicable, to that associated directly with oil and gas development, production, and maintenance.

Big game habitat enhancement/compensation practices to help offset forage losses and cause advantageous shifts in animal distribution (i.e., away from concentrated development areas) would remain consistent with the maintenance of climax or disclimax vegetation extent and community-specific successional perturbation rates (e.g., fire-return intervals).

BLM_0019368

*Chapter 2 – Alternatives*

Wildlife movement corridors defined by CPW, modified siting of surface facilities and application of activity restrictions (i.e., up to 60-day activity deferment) would be used as a management tool to secure big game movement between and within seasonal ranges. There is no similar action under Alternatives A.

Off-site mitigation would be required for any surface disturbance at a rate of 3 acres of mitigation for each acre of habitat disturbed. A mitigation fund would be established to receive industry contributions for wildlife-specific mitigation projects. Contributions would be carried over from one government fiscal year to the next. Federal mineral estate within all CPW State Wildlife Areas (SWAs) would be open to oil and gas leasing with an NSO stipulation. On existing land use authorizations, COA that emulate the intent of these stipulations would be applied to the extent allowable (i.e., consistent with rights granted on existing leases).

**Fish and Wildlife – Raptors**

The management goal is to maintain the short-term utility and promote the continued long-term development and availability of suitable raptor habitats, including prey base, nest sites, and other special habitat features necessary to allow increases in regional raptor populations, where appropriate (see Table 2-5).

**Fish and Wildlife – Grouse**

The management objectives for sage-grouse habitat include maintaining the utility of occupied grouse habitats, and to work in cooperation with industry to plan development that would confine activity to discrete geographic areas with simple and common access requirements in order to: (1) reduce the areal extent of occupied habitat subjected to acute disturbance during the period of use; and (2) minimize the long-term influences on potential habitat that, with restoration work, could allow expansion of sage-grouse distribution and compensate for reductions in the extent of suitable habitat (see Table 2-6). Special management and operation plans would be required in defined sage-grouse population areas identified by CPW to establish protocols to authorize exceptions or modifications to activity or surface use restrictions. These plans would be developed jointly by the BLM, CPW, and the leaseholder. Also, surface occupation and surface disturbing activities within 0.6 mile of active and inactive leks would be prohibited, with narrow criteria for exception or modification (see Appendix A). If existing facilities are located within 0.6 mile of such leks, alternate access routes would be devised and/or surface facilities removed to the extent practicable within five years of approval of the ROD for this RMPA/EIS. On existing land use authorizations, COAs that provide the same level of protection as these stipulations would be applied to the extent allowable (i.e., consistent with rights granted on existing leases).

Unless qualifying for an exception by working within the disturbance threshold criteria (as described in Section 2.3.3.1), surface disturbing and disruptive activities would be prohibited from January 1 through March 15 in winter concentration areas for sage-grouse, and April 15 through July 7 within suitable nesting/early brood habitat occurring within 4 miles of active and inactive leks, or in defined habitat parcels greater than 4 miles from leks that have supported nest/early brood functions within the five previous years. The BLM would also use lease notices as a tool for notifying operators of management actions that mimic lease stipulations (e.g., greater than approximately 660 feet; greater than 60-day activity deferrals).

The BLM would defer oil and gas leasing decisions on about 96,100 acres of sage-grouse habitat north of U. S. Highway (US) 40 (Blue Mountain) until the effects of oil and gas development on sage-grouse behavior and habitat utility in this area are sufficiently understood to manage energy

BLM_0019369

development in a manner that would, with a reasonable level of certainty, maintain viable populations of grouse in the long term.

Under this alternative, protocols and criteria for lessees would be established to implement compensatory mitigation to offset reductions in sage-grouse habitat capacity. In coordination with CPW and industry, an adaptive method (based on monitoring) would be developed and implemented to quantify direct and indirect effects on sage-grouse as the basis for applying compensatory mitigation to achieve or maintain long-term population objectives.

**Livestock Grazing**

Under this managed development approach, the BLM would actively facilitate voluntary collaboration between oil and gas operators and grazing permittees to mitigate economic impacts to grazers, and provide flexibility in management of livestock grazing on allotments temporarily affected by oil and gas development activities. Under this alternative, the BLM would encourage compensatory mitigation by oil and gas operators when oil and gas activities preclude effective implementation of a grazing plan, commensurate with the impact on the livestock operation (see Table 2-16).

**Lands and Realty**

No new pipeline corridors would be established under Alternative B (DOE and BLM 2008). Upgrades to existing pipelines would be permitted in existing right-of-ways when pipeline capacity is not available. Pipeline construction would not be allowed from December 1 through April 30 (see Table 2-20).

## 2.3.4 Alternative C (Preferred Alternative)

Alternative C (Map 2-3) emphasizes short-term use of the environment (i.e., in the construction/development phase) and the maintenance and enhancement of long-term community function and ecological integrity (from initial construction to post-production). The management focus for Alternative C is similar to Alternative B (conservation and protection of other resource uses while allowing for continued production of oil and gas resources); however, Alternative C places management emphasis on maintaining long-term community function and ecosystem integrity. For example, disturbance thresholds for acute effects (i.e., short-term impacts associated with well construction, drilling, and completion) under this alternative would be higher, and more exceptions and modifications to lease stipulations may be granted. The BLM's ability to add or change mitigation measures would be the same as Alternative B.

Alternative C identifies approximately 1,696,000 acres of BLM oil and gas federal mineral estate open to leasing and subject to lease stipulations (see Appendix A), including NSO (387,600 acres) stipulations, CSU (400,400 acres) stipulations and timing limitations (1,696,000 acres). Implementation of Alternative C is assumed to result in up to 15,042 new oil and gas wells on 1,800 new well pads and 21,600 acres of associated disturbance from well pads, roads and other facilities during the 20-year period of analysis.

The BLM considered issues identified during the scoping period, the established planning criteria, and resource management goals and objectives in formulating this alternative. The following discussion presents the management actions by key resource. A complete list of management goals, objectives, and actions intended to minimize impacts on the physical, biological, and socioeconomic resources is found in the Comparison of Alternatives Tables 2-1 through 2-22; Alternative C.

BLM_0019370

*Chapter 2 – Alternatives*

### 2.3.4.1   Managed Development Approach

**Fish and Wildlife – Big Game**

Alternative C is similar to Alternative B in that both alternatives include development thresholds. Under Alternative C, the BLM's management goal for big game habitat would be to manage big game habitat utility and suitability to sustain at least 70 percent (versus 90 percent in Alternative B) of CPW's long-term population objective throughout active development. All seasonal big game ranges within the WRFO would be subject to timing limitations that could extend up to 90 days (versus 120 days in Alternative B) within established windows (presented in Table 2-4). Timing limitations would be applied through COAs for existing leases and through stipulations on new leases. Similar to Alternative B, exceptions to timing limitations would be offered contingent on development remaining within the following thresholds for acute and collective cumulative adverse behavior effects (evaluated by total leaseholdings within a GMU):

- Acute effects
    - 25 percent of deer winter range
    - 25 percent of deer severe winter range
    - 25 percent of deer summer range
    - 25 percent of deer winter concentration areas
    - 10 percent of deer severe winter range/winter concentration areas
- Collective effects
    - 25 percent of deer winter range
    - 25 percent of deer severe winter range
    - 25 percent of deer summer range
    - 25 percent of deer winter concentration areas
    - 20 percent of deer severe winter range/winter concentration areas

The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations, buffered by approximately 660 feet on all seasonal ranges. As mentioned above, disturbance thresholds for acute effects (i.e., short-term impacts associated with well construction, drilling, and completion) under this alternative would be higher, potentially increasing the extent of short-term impacts to resources and resource uses in some cases. As was noted under Alternative B, threshold limits could be incrementally adjusted by the BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring.

Similar to Alternative B, collective effects in areas defined by CPW as Restricted Development Areas would be limited to 5 percent; however, allowance for acute effects during the period of animal occupation may be granted under this alternative.

**Fish and Wildlife – Grouse**

The managed development approach described in Alternative B would be applied to the Northwest Colorado greater sage-grouse population under Alternative C; however, more liberal provisions would be applied to the Piceance-Parachute-Roan (PPR) greater sage-grouse population (see

BLM_0019371

Table 2-6). For the PPR population, the extent of sage-grouse habitat subject to cumulative adverse habitat and behavioral effects (e.g., reduced habitat extent/continuity, harassment/avoidance) attributable to oil and gas development would not exceed the following thresholds:

- 20 percent of occupied habitat mapped as showing evidence of occupation in the last five years within 4 miles of active or inactive leks (subject to concurrence of CPW).

- 25 percent of suitable but unoccupied habitat within 4 miles of an active or inactive lek or occupied habitat greater than 4 miles from an active or inactive lek.

- Any land base identified as critical to any given sage-grouse subcomplex (defined by CPW) would be subject to additional conservation measures in an effort to retain an effective source population of grouse in the subcomplex. These measures include, but would not be limited to, well pad density limits, strict development schedules and timeframes, and facility siting that could involve moves of more than approximately 660 feet.

For the PPR greater sage-grouse population, the extent of adverse behavioral effects is defined by collective development activity buffered by approximately 330 feet, (versus approximately 660 feet in Alternative B) in addition to any habitat parcels that become physically or behaviorally isolated by development features and are unavailable for effective use by sage-grouse. Cumulative development-related effects that exceed either threshold would nullify the threshold allowance and, thereby, subject all lease development to timing limitations as applied through lease stipulations or COAs that exceed 60 days (i.e., nesting/early brood functions, April 15 through July 7; winter use areas, January 1 through March 15).

As under Alternative B, the BLM would encourage the voluntary application of this strategy to sage-grouse habitat on private holdings. Acreage on fee land holdings below the occupied habitat threshold that are considered by CPW to be of comparable or higher sage-grouse value could be substituted for federally administered acreage with the approval of the WRFO Authorized Officer.

Under Alternative C, surface occupation and long-term conversion or adverse modification of the following sage-grouse habitats would be avoided in (rather than limited to 2 percent as in Alternative B): (1) sagebrush-dominated stands with less than or equal to 35 percent canopy, less than or equal to 30 inches in height, and less than or equal to 4 miles from a lek; or (2) any sagebrush-dominated stand on slopes less than or equal to 20 percent in defined winter use areas or stands showing evidence of winter use.

### 2.3.4.2   Other Management Actions Considered in Alternative C

#### Air and Atmospheric Values

The air quality management goals for Alternative C are the same as those described in Alternative B. Alternative C (and Alternative B) considers more stringent air emission controls than Alternative A. Some of these stringent emission controls reflect existing state and federal regulations that would be implemented earlier than would otherwise be required, particularly with regard to emissions from drill rig and compressor engines. Other controls included in Alternative C (as under Alternatives B) involve a variety of control techniques to reduce fugitive dust and CO, $NO_x$, VOC, HAP, and GHG emissions. Alternative C would require that VOC emissions from new glycol dehydrators be reduced by achieving at least 90 percent control of VOC emissions. A listing of emission controls specific to Alternative C is found in Table 2-1.

BLM_0019372

**Chapter 2 – Alternatives**

**Soil and Water Resources**

Surface discharge of produced water would not be approved for new projects (see Table 2-2). Existing surface discharges, approved under previous land use plans or authorizations, would be allowed to continue as long as they do not change or exceed water volumes or water quality specified during approval or cause excessive erosion with discharge of the produced waters. Evaporation facilities for the disposal of produced water would not be approved on public lands. Surface disturbing activities would be avoided and would require mitigation (rather than prohibited as in Alternative B) in the following areas: (1) mapped 100-year flood plains; (2) areas located within 500 feet of perennial waters, springs, wells, and wetland/riparian areas; and (3) areas located within 100 feet from the inner gorge of ephemeral channels.

**Vegetation**

The management goal for Alternative C (as under Alternative B), would be to manage vegetation communities to restore, maintain, or enhance vegetation community health, composition, and diversity to benefit multiple resources and their uses (consistent with site potential) in areas with oil and gas activities. The BLM would require interim and final reclamation for oil and gas activities under both Alternative C and Alternative B (see Table 2-3). However, the success criteria for interim and final reclamation would vary between these alternatives.

The success criteria for interim and final reclamation under this alternative would be 80 percent basal vegetation cover (compared to 100 percent in Alternative B) of the DPC, as defined by the ecological site or in the absence of such, a default DPC would have a minimum of 20 percent basal vegetative cover or 70 percent foliar cover. As under Alternative B, a program would be developed in cooperation with current leaseholders to apply to areas already leased, where appropriate, the most current reclamation standards and practices to existing well pads, roads, and pipelines in annual increments that would allow for completed interim or final reclamation of active and inactive right-of-way corridors, producing or plugged and abandoned wells, and access roads within 20 years.

**Fish and Wildlife – Big Game**

As under Alternative C, the management goal would be to provide habitat of sufficient utility and suitability to sustain at least 70 percent of CPW's long-term big game population objectives throughout active development (see Table 2-4). Road abandonment and use limitations would be used to limit effective road densities to an average maximum 1.5 miles of road per square mile in higher value big game habitat and 3 miles of road per square mile on other big game ranges. In areas of concentrated development, vehicle use on BLM vehicle access networks (including existing roads, trails, and ways) would be temporarily limited, where logistically practicable, to that associated directly with oil and gas development, production, and maintenance.

Under this alternative (as under Alternative B ), big game habitat enhancement/compensation practices to help offset forage losses and to shift animal distribution away from concentrated development areas would remain consistent with the maintenance of climax or disclimax vegetation extent (or those guidelines established in the RMPA) and community-specific successional perturbation rates (e.g., fire-return intervals).

As under Alternative B, modified siting of surface facilities and application of activity restrictions (i.e., up to 60-day activity deferment) under Alternative C would be used as a management tool in wildlife movement corridors defined by CPW to secure big game movement between and within seasonal ranges.

BLM_0019373

Under Alternative C, protocols and criteria for lessees, cooperating agencies, or affected stakeholders would be established to implement compensatory mitigation to offset reductions in big game habitat capacity. In coordination with the CPW and industry, an adaptive method (based on monitoring) would be developed and implemented to quantify direct and indirect effects on big game as the basis for applying compensatory mitigation to achieve or maintain long-term population objectives.

Federal mineral estate within the Oak Ridge, Square S Summer Range unit of Piceance Creek, and Jensen SWAs would be open to oil and gas leasing with an NSO stipulation. On existing land use authorizations, COAs that reflect the intent of these stipulations would be applied to the extent allowable.

## Fish and Wildlife – Raptors

The management goal is to maintain the short-term utility and promote the continued long-term development and availability of suitable raptor habitats, including prey base, nest sites, and other special habitat features necessary to maintain regional raptor populations (see Table 2-5).

## Fish and Wildlife – Grouse

The BLM management objective for sage-grouse habitat would remain very similar to Alternative B, except that the BLM would limit overall reductions in habitat utility (rather than maintain) of occupied grouse habitats and maintain effective continuity of ridgeline habitats (particularly in the PPR greater sage-grouse population area). Surface occupation and surface disturbing activities within 0.6 mile of active and inactive lek strutting grounds would be avoided under Alternative C (see Table 2-6). The BLM would seek leaseholder cooperation in developing plans for existing facilities within 0.6 mile of such leks that minimize disruption of sage-grouse lek functions and, where detrimental, removing or modifying surface facilities. In instances where habitat modification within 0.6 mile is unavoidable, disruption of lek activity would be reduced by applying one or more of the following COAs:

- Locating facilities or features beyond line-of-sight.

- Imposing a timing limitation from March 1 to May 15.

- Imposing daily limitations that allow disturbance from two hours after sunrise to sunset, with restrictions most stringently applied during the period two hours before and after sunrise. This measure would be applied only as a last resort or for activity deemed minor and temporary.

Similar to Alternative B, surface disturbing and disruptive activities would be prohibited from January 1 through March 15 in winter concentration areas, and April 15 through July 7 within suitable nesting/early brood habitat occurring within 4 miles of active and inactive leks or in defined habitat parcels greater than 4 miles from leks that have supported nest/early brood functions within the five previous years, unless qualifying for an exception by working within the disturbance threshold criteria (as described in Section 2.3.3.1).

Under Alternative C (and Alternative B), the BLM would defer oil and gas leasing decisions on about 96,100 acres of sage-grouse habitat north of U.S. 40 (Blue Mountain) until the effects of oil and gas development on sage-grouse behavior and habitat utility in this area are sufficiently understood to manage energy development in a manner that would, with a reasonable level of certainty, maintain viable populations of grouse in the long-term.

BLM_0019374

**Livestock Grazing**

The BLM would actively pursue opportunities to facilitate voluntary collaboration between oil and gas operators and grazing permittees to provide flexibility in management of livestock grazing on allotments temporarily impacted by oil and gas development activities, and to enhance reclamation success. Under Alternative C (as under Alternative B), compensatory mitigation by oil and gas operators commensurate with the impact on the livestock operation could be recommended when oil and gas activities preclude effective implementation of a grazing plan (see Table 2-16).

**Lands and Realty**

New pipeline corridors would be established only when the capacities of existing pipeline corridors (including energy corridors established by the West-Wide Energy Corridor Programmatic EIS) have been exhausted (see Table 2-20). There would be a seasonal restriction on construction of pipelines (as in Alternative B) and companies would be encouraged to request smaller right-of-way widths for pipeline installation, as well as placing pipelines under newly constructed roads.

Areas of concentrated development (resulting from operator decisions to comply with voluntary development thresholds) would encourage implementation of: (1) produced water piping infrastructure to transport water to off-site treatment and disposal locations; (2) water supply piping infrastructure to support drilling and construction activities; and (3) detailed access road plans for specific geographic areas, incorporating the use of existing pipeline corridors and roadways for new pipelines. However, implementation of such infrastructure and plans would not be a requirement.

**Special Designations**

The management goal of Alternative C, as in Alternative B, is to protect the integrity of unique resource values, preserve historical significance, and provide opportunity for other uses, where appropriate for WSAs and ACECs (see Table 2-21).

## 2.3.5 Alternative D

Alternative D (Map 2-4) emphasizes the production of oil and gas resources under the environmental protection for other resources afforded by applicable laws, regulations, and BLM policy. The management focus of Alternative D is the development of oil and gas resources. The BLM would not apply management actions to provide environmental protection for other resources other than what is consistent with applicable laws and policy (e.g., Clean Air Act regulations, Section 7 of the Endangered Species Act [ESA], National Pollutant Discharge Elimination System [NPDES] guidelines). The BLM's ability to add or change mitigation measures would be the same as Alternative B.

Alternative D identifies 1,251,200 acres of BLM oil and gas federal mineral estate open to leasing and subject to lease stipulations (see Appendix A), including NSO (257,100 acres) stipulations, CSU (469,300 acres) stipulations and timing limitations (1,002,100 acres). Implementation of Alternative D is assumed to result in up to 21,200 new oil and gas wells on 2,556 new well pads and about 30,700 acres of associated disturbance from well pads, roads and other facilities during the 20-year period of analysis.

The BLM considered issues identified during the scoping period, the established planning criteria, and resource management goals and objectives in formulating this alternative. The following discussion presents the management actions by key resource. A complete list of management goals, objectives, and actions intended to minimize impacts on the physical, biological, and socioeconomic resources is found in the Comparison of Alternatives Tables 2-1 through 2-22; Alternative D.

BLM_0019375

### 2.3.5.1   Other Management Actions Considered

<u>Air and Atmospheric Values</u>

Alternative D requires the same air emission controls as described under Alternative B. These are more stringent than air emission controls described under Alternative A. A listing of emission controls specific to Alternatives B and D is found in Table 2-1. Under Alternative D, at least 50 percent of gas compression at compressor stations would be powered by electric motors.

<u>Soil and Water Resources</u>

Surface discharge of produced water that meets state standards for water quality would be allowed (see Table 2-2). Individual projects would be considered on a site-specific basis. However, surface discharge of produced water that results in a conversion of ephemeral to perennial or intermittent stream systems would not be approved. Surface disturbing activities would subject to a CSU stipulation in the following areas: (1) mapped 100-year flood plains; (2) areas located within 500 feet of perennial waters, springs, wells, and wetland/riparian areas; and (3) areas located within 100 feet from the inner gorge of ephemeral channels. As under Alternative A, landslide areas, as identified in United States Department of Agriculture (USDA) Soil Conservation Survey (SCS) Order III Soil Surveys, would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas. Surface disturbing activities would also be avoided in areas with identified saline soils. These areas would be open to leasing with a CSU stipulation that would require operators to consider the stability and productivity of these soils in surface use plans. In addition, natural slopes greater than or equal to 50 percent would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas.

<u>Vegetation</u>

The management goal for Alternative D (as well as Alternative B and C) is to manage vegetation communities to restore, maintain, or enhance vegetation community health, composition, and diversity to benefit multiple resources and their uses (consistent with ecological site potential) in areas with oil and gas activities. The success criteria for final reclamation under Alternative D would be 60 percent basal vegetation cover of the DPC, as defined by the ecological site or in the absence of an appropriate ecological site description, a default DPC would have a minimum of 5 percent basal vegetative cover or 40 percent foliar cover (see Table 2-3).

Surface disturbing activities would be avoided in priority riparian habitats, unless environmental analysis determined that: (1) the proposed activity would not degrade or forestall attainment of proper functioning condition of the riparian area; and (2) if the riparian areas could not be avoided, impacts could be mitigated to meet minimum objectives for the system.

<u>Fish and Wildlife – Big Game</u>

The management goal for big game habitat would be to provide habitat of sufficient utility and suitability to sustain at least 50 percent of CPW's long-term big game population objectives throughout active development (see Table 2-4). As under Alternative A, the acute effects of well construction and development on big game habitat would be reduced through application of timing limitations on acute disturbance under this alternative. Exceptions may be granted, as presented in Appendix A. The BLM could apply timing limitations to surface use activities associated with existing land use authorizations as a COA.

BLM_0019376

Specific management actions to manage collective effects in CPW Restricted Development Areas or surface disturbance of CPW SWAs would not be applied. Additionally, modified siting of surface facilities and application of activity restrictions in CPW wildlife movement corridors would not be used as a management tool under this alternative.

Big game habitat enhancement/compensation practices to help offset forage losses and effect advantageous shifts in animal distribution (i.e., away from concentrated development areas) would remain consistent with the maintenance of climax or disclimax vegetation extent (or those guidelines established in the RMPA) and community-specific successional perturbation rates (e.g., fire-return intervals), as under Alternatives B and C. However, no offsite compensatory mitigation for disturbance of big game habitat would be pursued.

No management actions for limiting effective road densities or vehicle use on BLM vehicle access networks would be applied under this alternative.

**Fish and Wildlife – Raptors**

The management goal for raptors under Alternative D would be complying with laws, regulations, policies such as the Migratory Bird Treaty Act (MBTA), Bald and Golden Eagle Protection Act (BGEPA), the ESA, and BLM policies for sensitive species (see Table 2-5).

**Fish and Wildlife – Grouse**

The management goal for sage-grouse under Alternative D would be the same as Alternative B with the exception of the PPR greater sage-grouse population, which would be managed to maintain a minimum 50 percent of the most current population objectives established by CPW or as delegated to the local working groups and a minimum 50 percent of the most current distribution in terms of the number of lek complexes (see Table 2-6). Similar to Alternative A, surface occupation and long-term conversion or adverse modification of sage-grouse habitat would be avoided as described in Table 2-6. A management objective for sage-grouse habitat under Alternative D would be to reduce disruption of important seasonal-use activities associated with grouse production and recruitment, similar to Alternative A.

Surface occupation and surface disturbing activities would be prohibited within 1/4 mile of active and inactive lek sites as under Alternative A. Exceptions, waivers, or modifications may be granted (see Appendix A). Surface disturbing and disruptive activities would be prohibited during the seasonal use periods identified: (1) January 15 through March 15 in winter concentration areas; and (2) April 15 through June 15 in suitable nesting/early brood habitat within 4 miles of an active lek.

**Livestock Grazing**

The management goal for Alternative D would be to manage oil and gas activities in a manner that minimizes adverse effects on livestock grazing operations and maintains rangeland health. As in Alternative C, affected allotments (portions or whole) could be closed throughout the period of intensive oil and gas development if oil and gas activity increases to a level where the two activities are incompatible (see Table 2-16).

**Lands and Realty**

Similar to Alternative C, new pipeline corridors would be established only when the capacities of existing pipeline corridors have been exhausted (see Table 2-20).

BLM_0019377

## 2.4   Comparison of Alternatives

A detailed comparison of alternatives is presented in Tables 2-1 through 2-22. In order to guide the reader in reviewing the Draft RMPA/EIS, each land use planning decision under each resource or resource program heading is given a record number to assist the reader in commenting on specific decisions considered in the alternative scenarios. It should be noted that not all resources or resource uses presented in Chapter 3 (Affected Environment) or Chapter 4 (Environmental Consequences) of this Draft RMPA/EIS are included in Tables 2-1 through 2-22. This is because revision of some decisions and management actions included in the 1997 White River RMP do not relate to an increase in oil and gas exploration, development, and production, or the potential effects of that increase on other resources or resource uses, and, thus, are beyond the scope of this Draft RMPA/EIS.

Table 2-23 at the end of this chapter provides a comparison of acreages affected by management actions for each alternative by table and record number. The environmental consequences of allowable uses and management actions proposed under each alternative are analyzed in Chapter 4.

BLM_0019378

## 2.4.1  Comparison of Alternatives List of Tables

Table 2-1        Comparison of Alternatives – Air and Atmospheric Values

Table 2-2        Comparison of Alternatives – Soil and Water Resources

Table 2-3        Comparison of Alternatives – Vegetation

Table 2-4        Comparison of Alternatives – Fish and Wildlife – Big Game

Table 2-5        Comparison of Alternatives – Fish and Wildlife – Raptors

Table 2-6        Comparison of Alternatives – Fish and Wildlife – Grouse

Table 2-7        Comparison of Alternatives – Fish and Wildlife – Migratory Birds

Table 2-8        Comparison of Alternatives – Fish and Wildlife – Fish

Table 2-9        Comparison of Alternatives – Special Status Animal Species

Table 2-10       Comparison of Alternatives – Special Status Plant Species

Table 2-11       Comparison of Alternatives – Wild Horse Management

Table 2-12       Comparison of Alternatives – Cultural Resources

Table 2-13       Comparison of Alternatives – Paleontological Resources

Table 2-14       Comparison of Alternatives – Visual Resources

Table 2-15       Comparison of Alternatives – Forestry and Woodland Products

Table 2-16       Comparison of Alternatives – Livestock Grazing

Table 2-17       Comparison of Alternatives – Minerals

Table 2-18       Comparison of Alternatives – Recreation

Table 2-19       Comparison of Alternatives – Comprehensive Trails and Travel Management

Table 2-20       Comparison of Alternatives – Lands and Realty

Table 2-21       Comparison of Alternatives – Special Designations

Table 2-22       Comparison of Alternatives – Non-WSA Lands with Wilderness Characteristics

Table 2-23       Consolidated Acreages by Alternative

BLM_0019379

*This page intentionally left blank*

BLM_0019380

**Table 2-1. Comparison of Alternatives – Air and Atmospheric Values**

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| | **Management Goals** | | | |
| 1 | Manage oil and gas activities to comply with all applicable local, state, tribal, and federal laws, regulations, standards, and implementation plans. | | | |
| 2 | Manage oil and gas activities to protect air quality and, within the scope of the BLM's authority, minimize emissions that cause or contribute to violations of air quality standards or that negatively impact air quality-related values (AQRVs) (e.g., acid deposition, visibility). | | | |
| 3 | Manage oil and gas activities to minimize emissions of greenhouse gases. | | | |
| | **Management Objectives** | | | |
| 4 | No similar objective. | Intensify air quality monitoring within the WRFO. | | |
| 5 | The BLM actions shall be implemented in a manner to minimize impacts. | Efforts taken to manage oil and gas activities to allow for minor increases in emissions output, while not causing or contributing to any violations of ambient air quality standards. | Efforts taken to manage oil and gas activities to allow for moderate increases in emissions output, while not causing or contributing to any violations of ambient air quality standards. | Manage oil and gas activities to meet ambient air quality standards. |
| | **Allowable Uses and Management Actions** | | | |
| 6 | No similar action. | | | At least 50 percent of gas compression at compressor stations would be powered by electric motors. Any new electricity transmission lines would be buried underground in existing rights-of-way. |
| 7 | Collector and local roads would be required to achieve at least 50 percent reduction from uncontrolled fugitive dust emissions by using watering or other control measures. | In the MPA, proper road design, construction, and surfacing on collector and local roads (see BLM Manual Section 9113) would be required to achieve at least 84 percent reduction from uncontrolled fugitive dust emissions (using a combination of gravel, chemical suppression, watering, or other control measures). Collector and local roads in planning units other than the MPA would be required to achieve at least 50 percent fugitive dust control effectiveness. | | |

BLM_0019381

**Table 2-1. Comparison of Alternatives – Air and Atmospheric Values**

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 8 | Resource roads would be required to achieve at least 50 percent reduction from uncontrolled fugitive dust emissions by using watering or other control measures. | In the MPA, proper road design, construction, and surfacing on resource roads (see BLM Manual Section 9113) would be required to achieve at least 80 percent reduction from uncontrolled fugitive dust emissions (using a combination of chemical suppression, watering, or other control measures). Resource roads in planning units other than the MPA would be required to achieve at least 50 percent fugitive dust control effectiveness. | | |
| 9 | Venting would be allowed in accordance with Notice to Lessees (NTL-4A). | Well completions and recompletions would require use of green completion technology unless the need for an exemption could be documented. During well completions that do not use green completion technology, flaring of natural gas would be required. Venting of natural gas would not be allowed, except during emergency situations. | | |
| 10 | During construction activities, watering of construction areas and associated resource roads would be required. In addition, fugitive dust control plans would be required. | In addition to fugitive dust control plan implementation, construction sites and resource roads would be treated with water and/or a chemical dust suppressant during construction and drilling activities so that no dust plume is visible from construction sites or behind vehicles. All vehicles would abide by company or public speed restrictions. At construction sites, interim reclamation would be required within two years. | | |
| 11 | Glycol dehydrators, condensate and produced water tanks, and other VOC emission sources would be required to meet applicable Colorado Department of Public Health and Environment (CDPHE), Air Quality Control Commission (AQCC), and U.S. Environmental Protection Agency (EPA) emission standards. | Emission controls would be required for glycol dehydrators, condensate tanks, and produced water tanks, without regard to the location of the equipment or the quantity of uncontrolled VOC emissions from the equipment. The VOC emissions from glycol dehydrators would be reduced by at least 90 percent from uncontrolled emission levels, while VOC emissions from condensate tanks and produced water tanks would be reduced by at least 95 percent from uncontrolled emission levels. | | |
| 12 | No similar action. | In coordination with the CDPHE, EPA, FS, NPS, local county agencies, and oil and gas industry, expand air quality monitoring efforts within the WRFO, particularly for ozone. There are two new air quality monitors within the WRFO (one in Meeker and one in Rangely); the BLM will seek funding to continue operation of these monitors for a minimum of three years after the ROD is signed. | | |
| 13 | Emissions would reflect development of 550 well pads (approximately 4,603 wells). | Emissions would reflect development of 1,100 well pads (approximately 9,191 wells). | Emissions would reflect development of 1,800 well pads (approximately 15,042 wells). | Emissions would reflect development of 2,556 well pads (approximately 21,200 wells). |

*Table 2-1 — 2*                              *Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*

BLM_0019382

### Table 2-1. Comparison of Alternatives – Air and Atmospheric Values

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 14 | Drill rig engines and fracturing (frac) pump engines would meet EPA requirements. | Within 1 year of the ROD, all new and existing drill rig and frac pump engines would be required to meet EPA Tier 4 Nonroad Diesel Engine Emission Standards or meet equivalent emission standards, regardless of when they begin operation in the WRFO. | Within 1 year of the ROD, all new and existing drill rig and frac pump engines would be required to meet EPA Tier 2 Nonroad Diesel Engine Emission Standards or meet equivalent emission standards. By 2015, all new and existing drill rig engines would meet EPA generator set Tier 4 (or more stringent) emission standards. Additional protection measures may be implemented to meet emission standards[1] based upon future modeling conducted under Appendix J, Air Resources Management Plan, of this RMPA/EIS. | Same as Alternative B. |
| 15 | Engines at field compression facilities would be required to meet applicable CDPHE, AQCC regulations and EPA emission standards. | New and existing natural gas-fired reciprocating internal combustion engines at field compression facilities would be required to meet CDPHE, AQCC Regulation No. 7 emission standards for new and relocated engines, regardless of when the engines begin operation in the WRFO. Compliance with applicable EPA emission standards for all types of engines would also be required. | New engines (and engines relocated into the WRFO) at field compression facilities would be required to meet CDPHE, AQCC Regulation No. 7 emission standards for new and relocated engines. Compliance with applicable EPA emission standards for all types of engines would also be required. | Same as Alternative B. |

BLM_0019383

### Table 2-1. Comparison of Alternatives – Air and Atmospheric Values

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 16 | Forty percent of well pads would use three-phase gathering systems to transport natural gas, condensate, and produced water to consolidated facilities where dehydration, temporary tank storage, and truck loading would occur. | Ninety percent of well pads would use three-phase gathering systems to transport natural gas, condensate, and produced water to consolidated facilities where dehydration, temporary tank storage, and truck loading would occur. | Eighty percent of well pads would use three-phase gathering systems to transport natural gas, condensate, and produced water to consolidated facilities where dehydration, temporary tank storage, and truck loading would occur. Within five years of signing of the ROD, all multi-well pads would be required to use three-phase gathering systems and consolidated facilities. | Same as Alternative B. |
| 17 | Produced water evaporation ponds at gas plants would achieve at least 90 percent VOC control effectiveness through the use of VOC removal prior to water discharge to the pond, oil/water separation, air stripping/sparging combined with carbon adsorption and thermal oxidation, or other VOC control strategies. | | | |
| 18 | No similar action. | Manage Air Resources within the Planning Area in accordance with the Air Resources Management Plan in Appendix J. | | |

[1] 38958 Federal Register / Vol. 69, No. 124 / Tuesday, June 29, 2004

*Table 2-1 — 4*

*Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*

BLM_0019384

## Table 2-2. Comparison of Alternatives – Soil and Water Resources

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| **Management Goals** | | | | |
| 1 | Maintain or improve surface and groundwater quantity and quality consistent with applicable state and federal standards and regulations. | | | |
| 2 | Prevent, control, or remediate sources and causes of pollution on federal lands in cooperation with other federal, local, and state agencies and private entities. | | | |
| 3 | Minimize or control elevated levels of salt and sediment contribution from federal lands to river systems in the Planning Area. | | | |
| 4 | Maintain or improve soil productivity, including retention of topsoil quality and reestablishing soil capability, potential, and functionality when disturbed. | | | |
| **Management Objectives** | | | | |
| 5 | Manage surface land use with oil and gas activities to maintain the timing, magnitude, and duration of peak, high, and low flows by minimizing surface disturbance, erosion, and sedimentation of streams. | | | |
| 6 | Manage oil and gas activities to maintain the hydrologic and water quality conditions needed to support riparian and wetland areas; water quality standards; stream channel integrity; minimize levels of salt and sediment loading in watersheds; and complement meeting or achieving Colorado Standards for Public Land Health. | | | |
| 7 | Maintain surface and groundwater quality to achieve or exceed standards promulgated by the State Water Quality Control Commission. | | | |
| 8 | Manage oil and gas activities to maintain soil quality and reestablishing soil function when disturbed. | | | |
| **Allowable Uses and Management Actions** | | | | |
| 9 | Fragile soils on slopes greater than 35 percent and saline soils derived from Mancos Shale, as identified in the 1997 White River RMP and updated with better mapping (385,000 acres), would be managed with a CSU stipulation on oil and gas leasing (see Appendix A). | No similar action. | | Same as Alternative A. |

BLM_0019385

## Table 2-2. Comparison of Alternatives – Soil and Water Resources

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 10 | When topsoil is stockpiled on slopes exceeding 5 percent, construct a berm or trench below the stockpile. | Require a temporary protective surface treatment on all disturbed areas not required for operation and on soil piles immediately after the road and pad construction is completed. Surface treatments would vary depending on the local site conditions and changes in erosion control technology, but may include mulch, matting, netting, and/or tackifiers. This requirement would be added as a Lease Notice (LN) to leases and applied as a COA for new authorizations. | | Stockpiled soil must have erosion control measures implemented to keep soil on the location (such as silt fences, wattles, or other measures). This requirement would be added as a LN to leases and applied as a COA for new authorizations. |
| 11 | Approval of APDs and project planning would consider surface and groundwater source water protection zones for public water supplies. | Development in designated surface and groundwater source water protection zones for public water supplies would require a plan that addresses drinking water sources. This requirement would be added as a LN to leases and applied as a COA for new authorizations. | | Same as Alternative A. |
| 12 | No similar action. | Surface occupancy would not be allowed in the following areas: (1) mapped 100-year floodplain (22,100 acres); (2) areas within 500 feet of perennial waters, springs, wells, and wetland/riparian areas (55,300 acres); and (3) areas 100 feet from the inner gorge of ephemeral channels. Surface occupancy would be granted if an environmental analysis showed water resources would not be impacted or when the land-use authorization holder or lease holder and the BLM have arrived at acceptable plan for mitigation of anticipated impacts. The area within wetlands and ephemeral channels would be identified during site-specific analysis. | A CSU stipulation would be applied to oil and gas leases and land use authorizations to avoid the following areas: (1) mapped 100-year floodplain; (2) areas within 500 feet from perennial waters, springs, wells, and wetland/riparian areas; and (3) areas 100 feet from the inner gorge of ephemeral channels. With existing leases or renewed authorizations, COAs would be applied to approvals to protect surface water resources in these areas.<br><br>The area within mapped 100-year floodplain comprises 22,100 acres. Areas within 500 feet of perennial waters, springs, wells, and wetland/riparian areas comprise 55,300 acres. Wetlands and ephemeral channels would be identified during site-specific analysis. | |

*Table 2-2 – 2*

*Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*

BLM_0019386

### Table 2-2. Comparison of Alternatives – Soil and Water Resources

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 13 | Surface discharge of produced water that meets state standards for water quality would be allowed. Individual projects would be considered on a site-specific basis. | Surface discharge of produced water that meets state standards for water quality would not be allowed. Injection of produced water from federal oil and gas leases would be required. This requirement would be added as an LN to leases and applied as a COA for new authorizations. | Surface discharge of produced water that meets state standards for water quality would not be approved for new projects. Existing surface discharges, approved under previous land use plans or authorizations, would be allowed to continue as long as they do not change or exceed water volumes or water quality specified during approval. This requirement would be added as an LN to leases and applied as a COA for new authorizations. | Surface discharge of produced water that meets state standards for water quality would be allowed. Individual projects would be considered on a site-specific basis. Surface discharge of produced water that results in a conversion of ephemeral to perennial or intermittent stream systems would not be approved. This requirement would be added as an LN to leases and applied as a COA for new authorizations. |
| 14 | Operators would be required to manage oil and gas activities in a manner that retains upland health (as defined by Colorado Standards for Public Land Health for Uplands, Standard 1 [BLM 1997b]). | Operators would be required to manage oil and gas activities in a manner that does not allow negative impacts on upland health (as defined by indicators for Colorado Standards for Public Land Health for Uplands, Standard 1 [BLM 1997b]). | Operators would be required to manage oil and gas activities in a manner that limits and/or reduces negative impacts on upland health (as defined by indicators for Colorado Standards for Public Land Health for Uplands, Standard 1 [BLM 1997b]). | Same as Alternative A. |
| 15 | Landslide areas (as identified in USDA SCS Order III Soil Surveys) would be open to oil and gas leasing with an NSO stipulation (38,600 acres). An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas (see Appendix A). | Areas within 100 feet of mapped landslide areas would be open to oil and gas leasing with an NSO stipulation (46,400 acres). An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas. | Areas within 50 feet of mapped landslide areas would be open to oil and gas leasing with an NSO stipulation (42,500 acres). An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas. | Same as Alternative A. |

BLM_0019387

## Table 2-2. Comparison of Alternatives – Soil and Water Resources

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 16 | No similar action. | Areas within 100 feet of saline soils (i.e., greater than 8 mmhos/cm) as defined by the Natural Resource Conservation Service (NRCS),with the exception of the Coal Oil Basin exemption area north of Rangely, would be open to leasing with an NSO stipulation (45,300 acres). | Areas with identified saline soils, with the exception of the Coal Oil Basin exemption area north of Rangely, would be open to leasing with an NSO stipulation (34,100 acres). | Identified saline soils would be open to leasing with a CSU stipulation that would require operators to consider the stability and productivity of these soils in surface use plans (45,700 acres). |
| 17 | No similar action. | Natural slopes greater than or equal to 25 percent but less than 35 percent would be open to oil and gas leasing with a CSU stipulation (279,900 acres). A CSU stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas that are associated with oil and gas development. Natural slopes greater than or equal to 35 percent would be open to oil and gas leasing with an NSO stipulation (353,000 acres, this acreage also includes slopes greater than 50 percent). An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases associated with oil and gas development in these areas. Surface | Natural slopes greater than or equal to 35 percent but less than 50 percent would be open to oil and gas leasing with a CSU stipulation (238,700 acres). A CSU stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas that are associated with oil and gas development. Natural slopes greater than or equal to 50 percent would be open to oil and gas leasing with an NSO stipulation (114,300 acres). An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases associated with oil and gas development in these areas. Surface occupancy would be granted if an environmental analysis showed that | Natural slopes greater than or equal to 50 percent would be open to oil and gas leasing with an NSO stipulation (114,300 acres). Land use authorizations, permits, and leases associated with oil and gas development in areas on slopes greater than 50 percent would be excluded. Surface occupancy would be granted if an environmental analysis showed that they would not impact the features identified or when the land-use authorization holder or a lease holder and the BLM have arrived at acceptable plan for mitigation of anticipated impacts. |

*Table 2-2 – 4*

BLM_0019388

## Table 2-2. Comparison of Alternatives – Soil and Water Resources

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| | | occupancy would be granted if an environmental analysis showed that they would not impact the features identified or when the land-use authorization holder or a lease holder and the BLM have arrived at acceptable plan for mitigation of anticipated impacts. | they would not impact the features identified or when the land-use authorization holder or a lease holder and the BLM have arrived at acceptable plan for mitigation of anticipated impacts. | |
| 18 | Produced water piping would be analyzed when operators propose it. | Encourage, through planning, the implementation of produced water piping infrastructure to transport water to off-site treatment and disposal locations. | | Same as Alternative A. |
| 19 | Fresh and/or recycled water piping for use in construction, drilling, and completion activities would be analyzed when the operators propose it. | Encourage, through planning, the implementation of water piping infrastructure to support construction, drilling, and completion activities. | | Same as Alternative A. |
| 20 | Locations of access roads (collector and local) would be determined and analyzed during project approvals. | Encourage, through planning, the implementation of detailed access road plans for specific geographic areas. | | Same as Alternative A. |
| 21 | The use of existing pipeline corridors and roads are requested and may be required depending on site-specific analysis. | Encourage, through planning, the use of existing pipeline corridors and roadways for new pipelines. | | Same as Alternative A. |
| 22 | Use of evaporation facilities for the disposal of produced water would be evaluated on a case-by-case basis. | Use of evaporation facilities for the disposal of produced water from federal leases would not be allowed. This requirement would be added as a LN to leases and applied as a COA for new authorizations. | Use of evaporation facilities for disposal of produced water would not be allowed on public lands. This requirement would be added as LN to leases and applied as a COA for new authorizations. | Same as Alternative A. |

BLM_0019389

*Chapter 2 – Alternatives*

## Table 2-2. Comparison of Alternatives – Soil and Water Resources

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 23 | No similar action. | Areas within 1/2 mile of groundwater public water supply wells for the town of Dinosaur, Dinosaur National Monument Headquarters, the town of Massadona, the town of Meeker and the primary protection area that includes the primary aquifer for Meeker would be open to oil and gas leasing with an NSO stipulation. | No similar action. | |
| 24 | No similar action. | Areas within 500 feet of impaired stream segments in the MPA including; Duck Creek tributary to Yellow Creek, Yellow Creek from Barcus Creek to the White River, Piceance Creek from Willow Creek to Hunter Creek, Piceance Creek from Ryan Gulch to the White River, and Black Sulphur Creek within the Mesaverde play area would be open to oil and gas leasing with an NSO stipulation. | No similar action. | |

*Table 2-2 – 6*

*Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*

BLM_0019390

*Chapter 2 – Alternatives*

### Table 2-3. Comparison of Alternatives – Vegetation

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| **Management Goals** | | | | |
| **Plant Communities** | | | | |
| 1 | Maintain the proper ecosystem function necessary to achieve DPC in areas with oil and gas activities. | | | |
| 2 | Assess sites to identify weed establishment risks, analyze potential treatment of sites at high-risk of weed establishment/spread, and identify prevention practices. | | | |
| 3 | Maintain healthy, diverse, and sustainable rangeland and woodland plant communities. | Manage vegetation communities to restore, maintain, or enhance vegetation community health, composition, and diversity to benefit multiple resources and their uses (consistent with ecological site potential). | | |
| **Riparian Areas and Wetlands** | | | | |
| 4 | Ensure that riparian areas and wetlands on BLM-administered lands are in or making progress toward, Proper Functioning Condition | | | |
| **Noxious and Invasive Weeds** | | | | |
| 5 | Manage noxious weeds so they cause no further negative environmental, aesthetic, or economic impacts. | Incorporate weed prevention and control measures into all phases of oil and gas activities to stop or reduce the spread of noxious and invasive plant species. | | |
| **Management Objectives** | | | | |
| **Plant Communities** | | | | |
| 6 | No similar objective. | Manage oil and gas activities to maintain, restore, and enhance upland vegetation communities, riparian areas, and wetlands to facilitate meeting or progressing toward meeting Colorado Standards for Public Land Health and DPC. | | |
| 7 | No similar objective. | Maintain, restore, and enhance vegetation communities to facilitate a healthy mix of successional stages in areas with oil and gas activities (consistent with ecological site potential). | | |
| 8 | No similar objective. | Protect the ecological integrity of unique plant communities. | | |
| **Riparian Areas and Wetlands** | | | | |
| 9 | Manage oil and gas activities for maintenance, restoration, and enhancement of riparian areas and wetlands to facilitate meeting or progressing toward meeting Colorado Standards for Public Land Health through achievement of Proper Functioning Condition. | | | |

BLM_0019391

*Chapter 2 – Alternatives*

### Table 2-3. Comparison of Alternatives – Vegetation

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| **Noxious and Invasive Weeds** | | | | |
| 10 | No similar objective. | Control the spread of noxious and invasive weeds associated with oil and gas activities by using appropriate management actions (eradicate, contain, suppress). Involve appropriate partners (local, county, state, federal, and public land users) to facilitate timely and successful completion of each action. | | |
| **Allowable Uses and Management Actions** | | | | |
| **Plant Communities** | | | | |
| 11 | The following are areas with CSU stipulations used in order to maintain the distribution, conditions, and functional capacity of deciduous browse, and aspen communities integral to high priority big game and dusky grouse (formerly known as blue grouse) habitats: aspen communities, serviceberry, chokecherry communities, and Blue Mountain deciduous browse. Prior to authorizing activities in this area, the Applicant would be required to submit a plan of development that would demonstrate that: (1) associations have been avoided to the extent possible; (2) special reclamation measures or design features would promote accelerated recovery of and establishment of desirable plant community components; (3) the potential or capacity of the area to support viable, self-sustaining aspen, serviceberry, and chokecherry communities has not been diminished; and (4) involvement of community derived values are mitigated through project life commensurate with projected impacts. Surface disturbance or occupation within aspen, serviceberry, and chokecherry communities may be prohibited. | | | |
| 12 | Proposed activities would be analyzed to determine whether the objectives for the particular plant community affected could be met if the activity were approved. If plant community objectives could not be met, the BLM could deny the request or could require specific mitigation measures for the activity to ensure that plant community objectives are met. | | | |
| 13 | The use of native or non-native plant species for reclamation would be addressed in site-specific project analysis. | All surface disturbing activities related to oil and gas exploration and development on BLM-administered lands would be subject to reclamation standards included in the WRFO Surface Reclamation Plan. Reclamation is dynamic and the WRFO Surface Reclamation Plan will be revised through time to incorporate updated reclamation practices. | | |
| 14 | No similar action. | The BLM would require final reclamation as well as long term maintenance of rights-of-way as defined in the WRFO Surface Reclamation Plan (see Appendix D). | | |
| 15 | No similar action. | The BLM would require reclamation that would result in a functioning vegetation community, established on the reclaimed site, that is capable of persisting on the site without continued intervention and would allow for successional processes progressing toward a healthy mid-seral or late-seral community. An exception could be granted for wildlife habitat areas where a specific cover type/seral stage is needed. | | The BLM would require interim and final reclamation that achieves DPC through the use of prescribed seed mixes. |

*Table 2-3 – 2*

*Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*

BLM_0019392

### Table 2-3. Comparison of Alternatives – Vegetation

| Record Number | Alternative A | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| 16 | In selected areas, vegetation may be disturbed by permitted surface-disturbing activities or would be manipulated to achieve an improved ecological condition of plant communities and/or improved forage production. | In areas where a pinyon-juniper component has expanded into previous fire-disclimax (mid-seral) shrublands or is invading other ecological sites or sites degraded by cheatgrass domination, the BLM would utilize vegetation removal associated with oil and gas activities and related infrastructure combined with tailored reclamation to achieve specific management objectives. | Same as Alternative A. | |
| 17 | Only native plant species would be used for reseeding disturbed areas within the Blue Mountain/Moosehead geographic reference area (GRA), WSA, and ACECs. Native plants species would be encouraged in the remainder of the resource areas for reseeding disturbed areas that are not threatened by establishment of exotic or noxious plant species. Naturalized plant species would be allowed for reseeding on at-risk and unhealthy rangelands and grazable woodlands. | Only native plant species would be used for reseeding disturbed areas within the Blue Mountain/Moosehead GRA and all WSAs and ACECs. Site-specific reclamation plans would be developed based on ecological site, DPC, and ecological integrity of the surrounding community. The BLM would require the use of native plant materials and seeds in all reclamation activities unless the use of non-native, non-invasive, introduced plant species would benefit the ecological integrity of the site. | Same as Alternative A. | |
| 18 | Acceptable DPCs would be managed in ecological status of late-seral or healthy mid-seral for all rangeland plant communities. An exception could be granted for wildlife habitat areas where a specific cover type is needed. The required cover type in such wildlife habitat areas would be the DPC. The | Acceptable DPCs would be managed to achieve an ecological status of late-seral or healthy mid-seral for all rangeland plant communities. Interim and final reclamation for oil and gas activities would have success criteria of 100 percent potential foliar cover and/or potential basal cover must be at least | Acceptable DPCs would be managed to achieve an ecological status of late-seral or healthy mid-seral for all rangeland plant communities. Interim and final reclamation for oil and gas activities would have success criteria of 80 percent potential foliar cover and/or potential basal cover must be at least | Acceptable DPCs would be managed to achieve an ecological status of late-seral or healthy mid-seral for all rangeland plant communities. Interim and final reclamation for oil and gas activities would have success criteria of 60 percent potential foliar cover and/or potential basal cover of the DPC. In |

*Table 2-3 – 3*

BLM_0019393