*Chapter 3 – Affected Environment*

### Public Finance

This section describes Rio Blanco County revenues, and issues facing local governments regarding provision of public services.

### County Revenues

In 2007, intergovernmental revenues were the largest single category of Rio Blanco County receipts. Intergovernmental revenues are primarily mineral leasing and severance tax funds that are distributed to the county based on the amount of drilling activity and location of employees. County pass-through funds (funds from state sources) for road and bridge and human services are also included in this category (Rio Blanco County 2008).

Impact fees (a charge levied on new development, including new gas wells, in order to recover the capital costs associated with servicing new growth) is a relatively new taxing vehicle that was first applied in part of 2007. As a result, impact fee revenue is expected to rise rapidly in 2008 (Rio Blanco County 2008).

**Figure 3-6. Rio Blanco County -- 2007 Estimated and 2008 Proposed Total Revenues by Source**



SOURCE: Rio Blanco County Budgets for years 2007 and 2008.

As shown in Figure 3-6, revenue from use tax, which is a form of excise tax applied on certain building materials and equipment imported to Rio Blanco County for use within the county, is budgeted to decrease 60 percent in 2008. This loss is attributable to a dispute over the applicability of use tax to certain natural gas production equipment, which is currently being contested in the state court system (Rio Blanco County 2008).

Property tax revenue, the second largest revenue category for the county, is dependent on the assessed value of land and personal property, assessment percentages that are dictated by state law, and the mill levy amount applied for each service entity. In Colorado, the value of natural gas and oil production, along with the value of gas field collection, processing, and transmission facilities, is subject to ad valorem taxes (property taxes) levied by the affected jurisdictions. Total assessed valuation on taxable property in Rio Blanco County has increased sharply over the past several

BLM_0019664

years, primarily due to the increased natural gas activity in the region. Conversely, the assessed value for agricultural land has decreased, reflecting the county's shift away from agricultural applications (Rio Blanco County 2008). In 2008, the county was anticipating sharp increases in property tax revenues, mostly because of increased oil and gas drilling activity and increased reserve values.

**County Expenditures and Services**
As shown in Figure 3-7, Rio Blanco County's largest expenditures are for public works, a category that is predominantly road maintenance and repair. The majority of additional general fund revenues expected in 2008 would be applied to expanded public works projects, although as noted below, virtually all service categories are expected to see some expenditure increases. The county's capital expenditure fund, which is separate from the general fund, accounts for most street expansion and highway improvement expenditures.

### Figure 3-7. Rio Blanco County -- 2007 Estimated and 2008 Proposed Total Expenditures by Function



SOURCE: Rio Blanco County, 2007 and 2008 Budgets.

According to interviews with county staff and policy makers, Rio Blanco County's expenditures are largely associated with servicing local residents and the local oil and gas activity. Despite modest growth in full-time residents, pressure on county infrastructure and services has grown significantly with drilling activity, and associated traffic and commuting workers. The county also cites "inflationary pressures in salaries and benefits" as a contributing cause to increased expenditures. Salary and benefit expenses increased 30 percent between 2006 and 2007, and the 2008 budget forecast a 13 percent increase from 2007 costs (Rio Blanco County 2008). The county also

BLM_0019665

expressed difficulty in finding and retaining qualified county workers, who are often lured away to higher-waged jobs in the private sector (Joos 2008).

**Issues Facing Local Governments**
A recent study conducted by BBC for the AGNC and the DOLA included a summary of issues facing local governments related to service provision in northwestern Colorado (BBC 2008a). This study was intended to facilitate state and local consensus on the nature and magnitude of socioeconomic issues in anticipation of increased energy development activity in the region, as well as prospective oil shale development. Interviews conducted with Rio Blanco County, Meeker, and Rangely staff for this RMPA/EIS confirms that the following issues remain important:

- Municipal growth capacity and related financial support are key issues in Garfield, Rio Blanco, and Moffat counties.

- Accommodating growth in this region is unusually challenging.

- Future natural resource values are highly uncertain, but critical in determining Rio Blanco County tax revenues and service delivery demands.

- Natural gas drilling and extraction activity produces high volumes of traffic in an area with limited road system capacity; this represents a challenging financial situation.

- Housing and worker shortages restrict community development options.

- Funding and timing of critical capital infrastructure, such as roads, water, sewer, and community amenities, are the area's primary fiscal challenges.

- The lag-time between infrastructure need and tax revenue exacerbates funding problems.

- Uncertainty undermines infrastructure investment strategies.

- Resource derived property taxes would increase substantially if new wells come online.

- Federal royalties and severance tax revenue production from northwestern Colorado would grow rapidly as resource extraction increases, but distribution of revenues to northwestern Colorado is uncertain.

- Local ability and willingness to expand self-funding capacity is uneven.

**Influence of BLM Lands and Policies**
The WRFO of the BLM manages approximately 1.2 million acres of land within Rio Blanco County, or approximately 44 percent of the county's 2.7 million acres. In addition, the BLM manages approximately 232,000 acres of Rio Blanco County split-estate lands, where the federal government controls subsurface mineral rights including oil and gas. The FS manages an additional 247,000 acres in Rio Blanco County. Although the FS manages fewer acres in Rio Blanco County than the BLM, the FS lands include a large share of the public lands with high scenic resource values and high economic value for hunting, fishing, and recreation.

The BLM properties represent the majority of county lands with high oil and gas and mineral values Because of this property and mineral concentration, BLM management policy decisions are critical to the local economy and to governmental revenues. Resource development on public lands is the primary economic opportunity that could produce significant employment and residential growth in the future.

As discussed previously in this section, assuming market conditions and regulatory conditions are attractive, and the BLM allows additional leasing and development of public lands, local job

BLM_0019666

*Chapter 3 – Affected Environment*

creation and population growth would follow. County revenues are also very sensitive to resource development pace and patterns and thus BLM decisions. Specifically, development of mineral resources on BLM lands would influence production of state severance taxes, federal mineral leasing and bonus revenues, and county revenues from property taxes on mineral development. These revenue sources and the distribution of tax proceeds are described below.

**Severance Taxes**

Severance taxes are imposed by the State of Colorado on the extraction of non-renewable natural resources from both public and private property. Tax revenue is intended to offset the losses associated with the removal of the state's natural resource.

For oil and natural gas, annual severance taxes are based on gross income produced by all wells except "stripper wells" (those producing less than 15 barrels of crude oil or 90,000 cubic feet of gas per year on average). Calculations method of severance taxes in Colorado is presented in Figure 3-8. Certain production costs, which include transportation, processing and manufacturing costs, are deducted from gross revenue to account for the costs to move the gas from the point of severance (the wellhead; where valuation is supposed to occur) to the point of valuation (usually a regional gas gathering hub). The resultant value is then multiplied by a variable tax rate to determine gross severance tax due. Taxpayers may credit 87.5 percent of ad valorem property taxes paid to local governments on oil and gas production (not including taxes related to stripper wells or taxes on buildings, improvements and equipment) to determine the net severance tax due.[2]

### Figure 3-8. Calculation of Severance Taxes, Colorado



SOURCE: BBC Research & Consulting.

**Severance Tax Revenue Distribution**

Once collected, severance taxes are distributed through a complex state process. As presented in Figure 3-9, Colorado's severance tax revenues are first split 50-50 between State Trust Fund and the Local Impact Fund. The State Trust Fund provides funding for Water Conservation and Department of Natural Resources operations. The Local Impact Fund gives 70 percent (85 percent prior to 2008) of its collections to a local government grant program that awards funding through a competitive process. The other 30 percent is directly distributed to local governments (15 percent prior to 2008). It should be noted that Federal Mineral Leasing funds (revenues from leasing of federal lands within the state) also accrue to the Local Impact Fund, thus total available funds are more than the severance tax distributions.

This direct distribution to local governments is based on energy employee residency and is designed to offset additional public service and infrastructure costs in areas where these workers live. This distribution translates to a per-resident-employee payment made to a jurisdiction in which industry-specific qualified employees reside. Per capita formulas differentiate between the types of natural

---

[2] This credit is designed to eliminate the disincentive to invest in counties/jurisdictions with high property taxes.

BLM_0019667

resource employees; thus, certain industries, such as natural gas extraction, generate more revenue per qualified worker than other industries.

### Figure 3-9. Colorado Severance Tax Distribution, 2008



SOURCE: Colorado Department of Local Affairs.

### Federal Mineral Lease (FML) Revenue

The Office of Natural Resources Revenue (ONRR) of the U.S. Department of the Interior (DOI) collects mineral lease revenues from the leasing of federal lands used for mineral extraction. Of the total FML revenue collected, the federal government retains approximately half of the revenue and half is returned to the state from which the revenue originated. Each state distributes FML revenue using different methodologies.

**FML Tax Rates**

For oil and natural gas operations, gross FML revenue is based on three components:

- Rent of $1.50 per acre annually for the first five years and $2.00 per acre annually thereafter.

- Royalties of 12.5 percent of the revenue generated from mineral extraction on these federal lands.

- Bonuses paid by companies to obtain mineral leases, based on a competitive bidding process.

**FML Revenue Distribution**

Colorado's share of FML receipts are distributed within the state based on a complex formula. Generally, rents, royalties, and interest earnings on the same are allocated in the following manner:

- 48.3 percent of all state mineral lease rent and royalty receipts are sent to the State Education Fund (to fund K-12 education), up to $65 million in FY 2009 – FY 2011, and growing at four percent per year thereafter. Any amounts greater than the upper limit flow to the Higher Education Capital Fund.

BLM_0019668

- Ten percent of all state mineral lease rent and royalty receipts are sent to the Colorado Water Conservation Board, up to $13 million in FY 2009, and growing at four percent per year thereafter. Any amounts greater than the upper limit flow to the Higher Education Capital Fund.

- 41.4 percent of all state mineral lease rent and royalty receipts are sent to the Division of Local Affairs, which then distributes half of the total amount received to a grant program, designed to provide assistance with offsetting community impacts due to mining, and the remaining half directly to the counties and municipalities originating the FML revenue or providing residence to energy employees.

Bonus payments are allocated separately from rents and royalties, in the following manner:

- 50 percent of all state mineral lease bonus payments are allocated to two separate higher education trust funds: the "Revenues Fund" and the "Maintenance and Reserve Fund". The Revenues Fund receives the first $50 million of bonus payments to pay debt service on outstanding higher education certificates of participation. The Maintenance and Reserve Fund receives 50 percent of any bonus payment allocations greater than $50 million. These funds are designated for controlled maintenance on higher education facilities and other purposes.

- The remaining 50 percent of state mineral lease bonus payments are allocated to the Local Government Permanent Fund, which is designed to accumulate excess funds in trust for distribution in years during which FML revenues decline by 10 percent or more from the preceding year.

**Property Taxes**

As described previously in this section, property taxes, particularly taxes on mineral reserves, are the largest source of governmental revenues for Rio Blanco County and the local school and hospital district. In Colorado, the value of natural gas and oil production, along with the value of gas field collection, processing, and transmission facilities, is subject to ad valorem taxes (property taxes) levied by the affected jurisdictions. Valuation of mineral resources and production is a complicated process accommodating changing resource values and certain deductions and allowances for costs of production. Property tax revenue flows typically lag mineral production by two years and the uncertainty of mineral values over time introduces a high level of uncertainty in property tax projections.

## Environmental Justice

Executive Order 12898 requires all federal agencies to address disproportionately high and adverse human health or environmental effects of its programs, policies, and activities, on minority populations and low-income populations. Where the impacts of a proposed federal action could involve such populations, an analysis of the potential for disproportionate impacts and meaningful community outreach and public involvement is required.

The BLM does not manage environmental justice resources; rather, it manages public lands and the resources and uses that occur on them. No specific management issues or concerns related to environmental justice have been identified to date, including during the scoping process.

### Minority Populations

BLM IM 2002-164, "Guidance to Address Environmental Justice in Land Use Plans and Related NEPA Documents," provides policy and guidance for addressing environmental justice in BLM

BLM_0019669

land use planning (BLM 2002). Instruction Memorandum 2002-164 defines minority persons as "Black/African American, Hispanic, Asian and Pacific Islander, American Indian, Eskimo, Aleut, and other non-white persons." Furthermore, IM 2002-164 indicates that an area should be considered to contain a minority population where either the minority population of the affected area exceeds 50 percent, or the percentage of minority population in the affected area is meaningfully greater than the percentage in the general population.

Race and ethnicity is discussed in Section 3.10.1 above. Table 3-47 analyzes the minority population of Rio Blanco County, Meeker, Rangely, Garfield County, and Rifle, according to data from the 2000 Census. None of these areas are disproportionately high in minorities, as the table shows. In 2000, minorities were a very low percentage of the population of Rio Blanco County and its sub-areas, compared to the Colorado's overall average of 25 percent minorities. Even in absolute terms, Rio Blanco County had few minority residents in 2000 - just 136 individuals. In the county's Census Block-Group 2 (in Census Tract 9511) which defines a geographical area where most of the county's natural gas drilling has occurred recently and could occur in the future, minorities were only 4 percent of the population in 2000. Rifle, which has grown because of recent energy development, had 8.5 percent minorities in 2000, compared to 19 percent in Garfield County. Recent growth trends, which include both resort-related and energy-related growth, have increased Garfield County's minority representation to near the Colorado average.

**Table 3-47. Percentages of Minorities in the State of Colorado, Rio Blanco and Garfield Counties, and Selected Areas**

|  | Minority Persons in 2000 as Percent of Total Population | Percentage Points Above/Below the State Average |
|---|---|---|
| Colorado | 25.5 | NA[1] |
| Rio Blanco County | 7.4 | -18.1 |
| Meeker CCD[2] | 6.1 | -19.4 |
| Block Group 2 (Census Tract 9511) | 4.0 | -21.5 |
| Meeker | 6.1 | -19.4 |
| Rangely | 8.3 | -17.2 |
| Garfield County | 19.0 | -6.5 |
| Rifle | 8.5 | -17.0 |

SOURCE: U.S. Census Bureau 2006a.
NOTES:
[1] NA =not applicable.
[2] CCD=Census County Division

## Low-Income Populations

Personal income and poverty are addressed in Section 3.10.1 above. With respect to low-income populations, IM 2002-164 indicates that low-income populations can be identified according to poverty thresholds published by the U.S. Census Bureau. In addition, the IM notes that "when considering these definitions, it is important to recognize that some low-income and minority populations may comprise transitory users of the public lands and thus not associated with a particular geographic area."

The CEQ guidance for environmental justice analysis under NEPA defines a "low-income population" as "either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group

BLM_0019670

experiences common conditions of environmental exposure or effect" (CEQ 1997). Although CEQ guidance does not provide a quantitative threshold (e.g., a specific percentage of persons in poverty) for determining whether a population should be considered a low-income population, typically the percent of persons in poverty in the study area is compared to that in a comparison area such as the state. Quantitative criteria for what constitutes a low-income population are not specified in BLM, CEQ, or EPA guidance.

Table 3-48 shows the percentage of persons in poverty in Rio Blanco County, its communities and some places nearby. According to the 2000 Census, persons in poverty comprise 10.7 percent of the Meeker Census County Division (CCD), which comprises the eastern half of the county. This is 1.4 percentage points higher than the overall rate for the State of Colorado. However, the area that excludes the Town of Meeker is closer to the state- and county-wide averages.

**Table 3-48. Percentages of Persons in Poverty in the State of Colorado, Rio Blanco and Garfield Counties, and Selected Areas**

|  | Persons in Poverty in 1999 as Percent of Total Population | Percentage Points Above/Below the State Average |
|---|---|---|
| Colorado | 9.3 | - |
| Rio Blanco County[1] | 9.6 | 0.3 |
| Meeker CCD | 10.7 | 1.4 |
| Meeker Town | 11.4 | 2.1 |
| Remainder of Meeker CCD | 9.5 | 0.2 |
| Rangely CCD | 8.1 | -1.2 |
| Rangely Town | 9.8 | 0.5 |
| Remainder of Rangely CCD | 0.7 | -8.6 |
| Garfield County | 7.5 | -1.8 |
| Rifle CCD | 6.9 | -2.4 |
| Rifle City | 7.4 | -1.9 |
| Remainder of Rifle CCD | 7.8 | -1.5 |

SOURCE: U.S. Census Bureau 2006b.

NOTE:

[1] Data on poverty status are not available for small areas like Rio Blanco County Census Block Group 2 (Tract 9511).

**Native American Religious and Cultural Concern**

American Indians inhabited the study area for thousands of years before European contact. American Indians used the region for hunting, fishing, and collecting plant foods, as well as for religious ceremonies and burial of the dead.

In compliance with the American Indian Religious Freedom Act of 1978, National Historic Preservation Act of 1966, Archaeological Resources Protection Act of 1979, Native American Graves Protection and Repatriation Act of 1990, as well as other Executive and Secretarial Orders, BLM has initiated consultation with Native American Tribes. This consultation is intended to assist BLM in identifying and designing management for significant religious or cultural locations or properties (traditional cultural properties); to understand tribal concerns; to identify public land places, resources, uses, and values that are important to the tribes and/or tribal members (including traditional values and traditional use areas); and to identify land management procedures that conflict with Native Americans' religious observances. In November 2006, BLM sent letters to the

BLM_0019671

Northern Ute Tribe, Shoshone Tribe (Eastern Band), Southern Ute Indian Tribe, and Ute Mountain Ute Tribe to initiate consultation. To date, Native American entities have not identified traditional use areas or traditional cultural properties in the study area. The BLM will continue to consult with the tribes, as directed by BLM Manual 8120, Tribal Consultation Under Cultural Resource Authorities, and BLM Handbook H-8120-1, Guidelines for Conducting Tribal Consultation.

## 3.10.2  Public Health and Safety

The BLM's Hazard Management and Resource Restoration Program (HMRRP) objective is to maintain compliance with all applicable laws, regulations, and directives. This objective is achieved by minimizing risks from hazards on public lands and from hazards at BLM-owned or operated facilities, including all hazards not covered under hazardous substances regulations such as physical, geologic, and biologic hazards. The BLM's HMRRP also works to remediate public lands contaminated and restoring natural resources injured by releases of hazardous substances and petroleum products. In addition, the HMRRP works to reduce costs and liabilities through:

- By pursuing potentially responsible parties for contamination of public lands;
- Conducting efficient and effective assessment, investigation, and remediation action;
- Identifying environmental concerns associated with acquisition and disposal of real property;
- Ensuring that BLM-owned or operated facilities are in compliance with environmental laws; and
- Establishing partnerships with States, counties, communities, other Federal agencies and the private sector to prevent pollution by integrating effective environmental management into all BLM activities, authorizations, and business practices.

Activities resulting in health and safety concerns within the Planning Area primarily encompass landslides, proposed and existing industrial hazards, increased vehicular traffic, firearms accidents near oil and gas facilities during hunting season and by casual firearms use such as target shooting, natural events such as range fires, and the release of hazardous and solid wastes.

### Hazardous Materials and Wastes

Within the study analysis area, the majority of hazardous material events are the result of spills associated with the exploration and production of oil and gas, and illegal dumping of solid waste. Releases occur at relatively low levels of occurrence and the BLM investigates them as they are discovered to determine the need for immediate cleanup or other long-term remediation actions. This often involves working with the EPA, CDPHE, and potentially responsible parties to fund and expedite the cleanup of hazardous sites and disposal activities that result from recreational use and industrial activities, such as oil and gas development.

Oil and gas development can generate a number of wastes that may be determined to be hazardous materials. However, EPA has exempted most of the waste which in intrinsic to the exploration and by oil and natural gas exploration and production that have an intrinsic association is exempted from regulation as hazardous wastes under Subtitle C of the Resource Conservation and Recovery Act (RCRA). This exemption applies to drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal energy. Although they are relieved from regulation as hazardous wastes, the exemption does not mean these wastes could not present a hazard to human health and the environment if improperly managed.

BLM_0019672

*Chapter 3 – Affected Environment*

Oils and additives are used during well development, and well debris is produced during the process. Additives contained in mud systems used during drilling are often kept in sacks or drums at the sites. Natural gas transportation occurs through a network of pipelines buried 36 to 48 inches deep. Use of 6- to 8 inch-diameter pipelines is common from the well sites, but pipelines ranging from 24 to 36 inches in diameter are more typical for interstate transportation (BLM 2006a).

Management of hazardous materials, substances, and waste (including storage, transportation, and spills) would be conducted in compliance with 29 CFR 1910 (Occupational Safety and Health Standards [OSHS]), 49 CFR 100-185 (Pipeline and Hazardous Materials Safety Administration [PHMSA], DOT), 40 CFR 100-400 (Protection of the Environment, EPA), Comprehensive Environmental Response Compensation and Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA), Toxic Substances Control Act, CWA, and other federal and state regulations and policies regarding hazardous materials management. In addition, CERCLA and RCRA exemptions could apply to waste by-products of oil well development and these waste streams would be managed accordingly.

Rio Blanco County does not have a dedicated hazardous materials response team and must rely on agencies in Glenwood Springs, Craig, and Grand Junction for assistance.

**Pipeline and Utilities Hazards**

Within the analysis area pipeline and utility hazards exist and are associated with areas containing surface or near surface pipelines as well as a number of pre-existing overhead power lines. There are also a number of pre-exiting pipelines which have been exposed due to the proximity of the pipeline to stream systems.

Colorado utilizes a one call preconstruction hotline which identifies any existing pipelines prior to digging or surface disturbance. In areas containing surface or near-surface pipelines, individuals could be exposed to hazardous materials if there were a leak or a failure. The risk of leak or failure could be higher in the vicinity of road crossings or areas likely to be disturbed by road maintenance activities. Compliance with signing requirements for pipeline ROWs and posting markers at frequent intervals along the pipelines would reduce the likelihood of pipeline ruptures caused by excavation equipment. The remoteness of many projects and the low level of anticipated non-project-related construction and excavation would reduce the risk to public health and safety.

BLM_0019673

*This page intentionally left blank*

BLM_0019674



## Legend

**BLM WRFO Planning Area**
- Gauging Stations
- Artesian well
- Spring
- Well
- Proper Functioning Condition
- Funtioning at Risk
- Non-Functional
- No PFC Assessment
- High Priority Stream
- Perennial
- Intermittent
- Mesaverde Play Area
- Watershed

- Colorado Headwaters
- Colorado Headwaters-Plateau
- Lower Green-Diamond
- Lower White
- Lower Yampa
- Parachute-Roan
- Piceance-Yellow
- Upper Green-Flaming Gorge Reservoir
- Upper White
- Upper Yampa
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

Projection: UTM Zone 13N, NAD27 Datum

Data Sources: BLM, CDOT, USGS, CO NDIS, URS

**U.S. Department of the Interior**
**Bureau of Land Management**

**Map 3-1**
**Major Streams, Watersheds, and Proper Functioning Condition Assessments**

BLM_0019675



U.S. Department of the Interior
Bureau of Land Management

**Map 3-2**
**Land Cover Types**



U.S. Department of the Interior
Bureau of Land Management

Map 3-3
Fisheries, Fragile Watersheds, Impaired Waters, and Waters on the M&E List

BLM_0019677



**Legend**
- BLM WRFO Planning Area
- Summer Range
- Concentration Area
- Highway Crossing
- Migration Corridor
- Migration Pattern
- Game Management Unit (GMU)
- Mesaverde Play Area
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway

Projection: UTM Zone 13N, NAD27 Datum.

Data Sources: BLM, CDOT, USGS, CO NDIS, URS

NOTE: CO NDIS data is from 2007

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

U.S. Department of the Interior
Bureau of Land Management

**Map 3-4**
**Mule Deer Summer Habitats**

BLM_0019678



Map 3-5
Mule Deer Winter Habitats

U.S. Department of the Interior
Bureau of Land Management

BLM_0019679



Map 3-6
Elk Summer Habitats

U.S. Department of the Interior
Bureau of Land Management

BLM_0019680



Legend

- BLM WRFO Planning Area
- Winter Range
- Severe Winter Range
- Winter Concentration Area
- Game Management Unit (GMU)
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway

Projection: UTM Zone 13N, NAD27 Datum.
Data Sources: BLM, CDOT, USGS, CO NDIS, URS
NOTE: CO NDIS data is from 2007

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

U.S. Department of the Interior
Bureau of Land Management

Map 3-7
Elk Winter Habitats

BLM_0019681



Map 3-8
Pronghorn Habitat

U.S. Department of the Interior
Bureau of Land Management

BLM_0019682



Legend

BLM WRFO Planning Area
Black-footed Ferret
Reintroduction Area - 2006
White-tailed Prairie Dog
Habitat - 2006

Columbian Sharp-tailed Grouse - 2009
Overall Range
Winter Range
Production Area

Canada Lynx - 2009
Denning
Winter
Other

Bald Eagle - 2007
Nest Site
Roost Site
Winter Concentration
City or Town
County Boundary
Highway or County Road
Interstate Highway

Projection: UTM Zone 13N, NAD27 Datum.
Data Sources: BLM, CDOT, USGS,
CO NDIS, URS

U.S. Department of the Interior
Bureau of Land Management

Map 3-9
Selected Special Status Wildlife Species

BLM_0019683



Legend
- BLM WRFO Planning Area
- Overall Range
- Winter Range
- Severe Winter Range
- Brood Area
- Game Management Unit (GMU)
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway

Projection: UTM Zone 13N, NAD27 Datum
Data Sources: BLM, CDOT, USGS, CO NDIS, URS
NOTE: CO NDIS data is from 2006

U.S. Department of the Interior
Bureau of Land Management

Map 3-10
Greater Sage Grouse Habitats

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

BLM_0019684



Map 3-11
Wild Horse

U.S. Department of the Interior
Bureau of Land Management

BLM_0019685



U.S. Department of the Interior
Bureau of Land Management

**Map 3-12**
**Fire Regime Condition Classes**



Map 3-13
Livestock Grazing Allotments

U.S. Department of the Interior
Bureau of Land Management

BLM_0019687



U.S. Department of the Interior
Bureau of Land Management

## Map 3-14
## Federal Oil and Gas Mineral Estate and Surface Management



**U.S. Department of the Interior**
Bureau of Land Management

**Map 3-15**
Oil Shale Lease Area, Sodium Lease Area, Multimineral Lease Area, and Coal Field Areas

BLM_0019689

9.9.94



Legend
- BLM WRFO Planning Area

Off-Highway Vehicle Areas
- Open, proposed for 'limited to existing roads, ways and trails' pending completion of the WRFO Travel Management Plan
- Limited to Existing Routes
- Limited to Designated Routes
- Closed Seasonally, 8/15-11/30;
- Limited to Existing Routes, 12/1-8/14
- Closed Seasonally, 8/15-11/30
- Closed
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway

**U.S. Department of the Interior**
Bureau of Land Management

**Map 3-16**
Travel Management Designations

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

BLM_0019690



**Legend**
- BLM WRFO Planning Area
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway
- 2009 WWEC Amendment Corridors
- 1997 White River RMP Corridors

Projection: UTM Zone 13N, NAD27 Datum.
Data Sources: BLM, CDOT, USGS, CO NDIS, URS

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

U.S. Department of the Interior
Bureau of Land Management

**Map 3-17**
**Realty Corridors**

BLM_0019691



**Legend**
- BLM WRFO Planning Area
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway
- National Monument
- Wilderness Study Area
- Wilderness Area
- Area of Critical Environmental Concern
- Canyon Pintado National Historic District
- Scenic Byways

Projection: UTM Zone 13N, NAD27 Datum.
Data Sources: BLM, CDOT, USGS, CO NDIS, URS

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

U.S. Department of the Interior
Bureau of Land Management

**Map 3-18**
**Special Designations**

BLM_0019692



U.S. Department of the Interior
Bureau of Land Management

Map 3-19
Potential Non-WSA Lands with Wilderness Characteristics



Legend
- BLM WRFO Planning Area
- City or Town
- County Boundary
- Highway or County Road
- Interstate Highway
- VRM Class I
- VRM Class II
- VRM Class III
- VRM Class IV

Projection: UTM Zone 13N, NAD27 Datum

Data Sources: BLM, CDOT, USGS, CO NDIS, URS

No warranty is made by the Bureau of Land Management (BLM) for the use of this map for purposes not intended by BLM, or to the accuracy, reliability, or completeness of the information shown. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.

U.S. Department of the Interior
Bureau of Land Management

Map 3-20
Visual Resource Management Areas

BLM_0019694



BLM_0019695



Chapter 4

# Environmental Consequences

Public Lands USA: Use, Share, Appreciate

BLM_0019696

BLM_0019697

**CHAPTER 4 ENVIRONMENTAL CONSEQUENCES ....................................................... 4-1**

4.1 Introduction ...................................................................................................................... 4-1
    4.1.1 Impact Analysis Terminology .................................................................................. 4-1
    4.1.2 Impact Analysis Methodology and Assumptions .................................................... 4-2

4.2 Physical Resources ......................................................................................................... 4-12
    4.2.1 Air and Atmospheric Values .................................................................................. 4-12
        4.2.1.1 Impacts Common to All .................................................................... 4-22
        4.2.1.2 Alternative A .................................................................................... 4-25
        4.2.1.3 Alternative B .................................................................................... 4-32
        4.2.1.4 Alternative C .................................................................................... 4-38
        4.2.1.5 Alternative D .................................................................................... 4-43
        4.2.1.6 Irreversible and Irretrievable Commitment of Resources ................ 4-48
        4.2.1.7 Unavoidable Adverse Impacts .......................................................... 4-48
        4.2.1.8 Relationship Between Local Short-Term Uses and Long-Term
                 Productivity ...................................................................................... 4-48
    4.2.2 Summary of Project Air Quality Impacts ............................................................... 4-49
    4.2.3 Geology ................................................................................................................ 4-50
        4.2.3.1 Impacts Common to All Alternatives ................................................ 4-50
        4.2.3.2 Alternative A .................................................................................... 4-51
        4.2.3.3 Alternative B .................................................................................... 4-53
        4.2.3.4 Alternative C .................................................................................... 4-55
        4.2.3.5 Alternative D .................................................................................... 4-58
        4.2.3.6 Irreversible and Irretrievable Commitment of Resources ................ 4-60
        4.2.3.7 Unavoidable Adverse Impacts .......................................................... 4-60
        4.2.3.8 Relationship Between Local Short-Term Uses and Long-Term
                 Productivity ...................................................................................... 4-60
    4.2.4 Soil Resources ...................................................................................................... 4-60
        4.2.4.1 Impacts Common to All Alternatives ................................................ 4-62
        4.2.4.2 Alternative A .................................................................................... 4-68
        4.2.4.3 Alternative B .................................................................................... 4-72
        4.2.4.4 Alternative C .................................................................................... 4-79
        4.2.4.5 Alternative D .................................................................................... 4-85
        4.2.4.6 Irreversible and Irretrievable Commitment of Resources ................ 4-89
        4.2.4.7 Unavoidable Adverse Impacts .......................................................... 4-90
        4.2.4.8 Relationship Between Local Short-Term Uses and Long-Term
                 Productivity ...................................................................................... 4-90
    4.2.5 Water Resources ................................................................................................... 4-90
        4.2.5.1 Impacts Common to All Alternatives ................................................ 4-92
        4.2.5.2 Alternative A .................................................................................. 4-102
        4.2.5.3 Alternative B .................................................................................. 4-111
        4.2.5.4 Alternative C .................................................................................. 4-118
        4.2.5.5 Alternative D .................................................................................. 4-123
        4.2.5.6 Irreversible and Irretrievable Commitment of Resources .............. 4-127
        4.2.5.7 Unavoidable Adverse Impacts ........................................................ 4-128
        4.2.5.8 Relationship Between Local Short-Term Uses and Long-Term
                 Productivity .................................................................................... 4-129

4.3 Biological Resources ..................................................................................................... 4-129
    4.3.1 Vegetation ........................................................................................................... 4-129
        4.3.1.1 Impacts Common to All Alternatives .............................................. 4-130
        4.3.1.2 Alternative A .................................................................................. 4-134

BLM_0019698

4.3.1.3    Alternative B .............................................................. 4-139
4.3.1.4    Alternative C .............................................................. 4-147
4.3.1.5    Alternative D .............................................................. 4-158
4.3.1.6    Irreversible and Irretrievable Commitment of Resources ............. 4-168
4.3.1.7    Unavoidable Adverse Impacts ........................................... 4-168
4.3.1.8    Relationship Between Local Short-Term Uses and Long-Term
           Productivity ............................................................. 4-169
4.3.2    Fish and Wildlife ................................................................. 4-169
4.3.2.1    Impacts Common to All Alternatives .................................... 4-170
4.3.2.2    Alternative A .............................................................. 4-184
4.3.2.3    Alternative B .............................................................. 4-191
4.3.2.4    Alternative C .............................................................. 4-200
4.3.2.5    Alternative D .............................................................. 4-206
4.3.2.6    Irreversible and Irretrievable Commitment of Resources ............. 4-212
4.3.2.7    Unavoidable Adverse Impacts ........................................... 4-213
4.3.2.8    Relationship Between Local Short-Term Uses and Long-Term
           Productivity ............................................................. 4-213
4.3.3    Special Status Species - Animals ............................................... 4-214
4.3.3.2    Alternative A .............................................................. 4-223
4.3.3.3    Alternative B .............................................................. 4-226
4.3.3.4    Alternative C .............................................................. 4-229
4.3.3.5    Alternative D .............................................................. 4-231
4.3.3.6    Irreversible and Irretrievable Commitment of Resources ............. 4-233
4.3.3.7    Unavoidable Adverse Impacts ........................................... 4-234
4.3.3.8    Relationship Between Local Short-Term Uses and Long-Term
           Productivity ............................................................. 4-234
4.3.4    Special Status Species - Plants ................................................ 4-234
4.3.4.1    Impacts Common to All Alternatives .................................... 4-236
4.3.4.2    Alternative A .............................................................. 4-238
4.3.4.3    Alternative B .............................................................. 4-239
4.3.4.4    Alternative C .............................................................. 4-241
4.3.4.5    Alternative D .............................................................. 4-244
4.3.4.6    Irreversible and Irretrievable Commitment of Resources ............. 4-246
4.3.4.7    Unavoidable Adverse Impacts ........................................... 4-246
4.3.4.8    Relationship Between Local Short-Term Uses and Long-Term
           Productivity ............................................................. 4-246
4.4    Wild Horse Management ................................................................. 4-246
4.4.1    Impacts Common to All Alternatives ............................................. 4-247
4.4.2    Alternative A ...................................................................... 4-249
4.4.3    Alternative B ...................................................................... 4-251
4.4.4    Alternative C ...................................................................... 4-252
4.4.5    Alternative D ...................................................................... 4-254
4.4.6    Irreversible and Irretrievable Commitment of Resources ....................... 4-255
4.4.7    Unavoidable Adverse Impacts ..................................................... 4-255
4.4.8    Relationship Between Local Short-Term Uses and Long-Term Productivity .... 4-256
4.5    Wildland Fire Ecology and Management .................................................. 4-256
4.5.1    Impacts Common to All Alternatives ............................................. 4-257
4.5.2    Alternative A ...................................................................... 4-259
4.5.3    Alternative B ...................................................................... 4-261
4.5.4    Alternative C ...................................................................... 4-262

*Chapter 4 – Environmental Consequences*

|  |  |  |  |
|---|---|---|---|
| 4.5.5 | Alternative D | 4-264 |
| 4.5.6 | Irreversible and Irretrievable Commitment of Resources | 4-266 |
| 4.5.7 | Unavoidable Adverse Impacts | 4-266 |
| 4.5.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-266 |

4.6   Heritage and Visual Resources ........................................................................ 4-266
    4.6.1   Cultural Resources ............................................................................ 4-266
        4.6.1.1   Impacts Common to All Alternatives ................................. 4-268
        4.6.1.2   Alternative A ..................................................................... 4-270
        4.6.1.3   Alternative B ..................................................................... 4-274
        4.6.1.4   Alternative C ..................................................................... 4-278
        4.6.1.5   Alternative D ..................................................................... 4-282
        4.6.1.6   Irreversible and Irretrievable Commitment of Resources ............ 4-284
        4.6.1.7   Unavoidable Adverse Impacts ........................................... 4-284
        4.6.1.8   Relationship Between Local Short-Term Uses and Long-Term Productivity .......................................................................... 4-284
    4.6.2   Paleontological Resources .................................................................. 4-284
        4.6.2.1   Impacts Common to All Alternatives ................................. 4-286
        4.6.2.2   Alternative A ..................................................................... 4-288
        4.6.2.3   Alternative B ..................................................................... 4-289
        4.6.2.4   Alternative C ..................................................................... 4-291
        4.6.2.5   Alternative D ..................................................................... 4-292
        4.6.2.6   Irreversible and Irretrievable Commitment of Resources ............ 4-293
        4.6.2.7   Unavoidable Adverse Impacts ........................................... 4-294
        4.6.2.8   Relationship Between Local Short-Term Uses and Long-Term Productivity .......................................................................... 4-294
    4.6.3   Visual Resources ............................................................................... 4-294
        4.6.3.1   Impacts Common to All Alternatives ................................. 4-295
        4.6.3.2   Alternative A ..................................................................... 4-297
        4.6.3.3   Alternative B ..................................................................... 4-300
        4.6.3.4   Alternative C ..................................................................... 4-303
        4.6.3.5   Alternative D ..................................................................... 4-305
        4.6.3.6   Irreversible and Irretrievable Commitment of Resources ............ 4-307
        4.6.3.7   Unavoidable Adverse Impacts ........................................... 4-307
        4.6.3.8   Relationship Between Local Short-Term Uses and Long-Term Productivity .......................................................................... 4-307

4.7   Resource Uses ................................................................................................. 4-307
    4.7.1   Forestry and Woodland Products ....................................................... 4-307
        4.7.1.1   Impacts Common to All Alternatives ................................. 4-309
        4.7.1.2   Alternative A ..................................................................... 4-311
        4.7.1.3   Alternative B ..................................................................... 4-313
        4.7.1.4   Alternative C ..................................................................... 4-315
        4.7.1.5   Alternative D ..................................................................... 4-318
        4.7.1.6   Irreversible and Irretrievable Commitment of Resources ............ 4-321
        4.7.1.7   Unavoidable Adverse Impacts ........................................... 4-321
        4.7.1.8   Relationship Between Local Short-Term Uses and Long-Term Productivity .......................................................................... 4-321
    4.7.2   Livestock Grazing ............................................................................. 4-321
        4.7.2.1   Impacts Common to All Alternatives ................................. 4-323
        4.7.2.2   Alternative A ..................................................................... 4-330
        4.7.2.3   Alternative B ..................................................................... 4-332

BLM_0019700

| | | | |
|---|---|---|---|
| | 4.7.2.4 | Alternative C | 4-335 |
| | 4.7.2.5 | Alternative D | 4-337 |
| | 4.7.2.6 | Irreversible and Irretrievable Commitment of Resources | 4-338 |
| | 4.7.2.7 | Unavoidable Adverse Impacts | 4-338 |
| | 4.7.2.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-339 |
| 4.7.3 | Minerals | | 4-339 |
| | 4.7.3.1 | Impacts Common to All Alternatives | 4-340 |
| | 4.7.3.2 | Alternative A | 4-342 |
| | 4.7.3.3 | Alternative B | 4-345 |
| | 4.7.3.4 | Alternative C | 4-350 |
| | 4.7.3.5 | Alternative D | 4-354 |
| | 4.7.3.6 | Irreversible and Irretrievable Commitment of Resources | 4-357 |
| | 4.7.3.7 | Unavoidable Adverse Impacts | 4-357 |
| | 4.7.3.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-357 |
| 4.7.4 | Recreation | | 4-357 |
| | 4.7.4.1 | Impacts Common to All Alternatives | 4-358 |
| | 4.7.4.2 | Alternative A | 4-360 |
| | 4.7.4.3 | Alternative B | 4-362 |
| | 4.7.4.4 | Alternative C | 4-365 |
| | 4.7.4.5 | Alternative D | 4-367 |
| | 4.7.4.6 | Irreversible and Irretrievable Commitment of Resources | 4-370 |
| | 4.7.4.7 | Unavoidable Adverse Impacts | 4-370 |
| | 4.7.4.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-370 |
| 4.7.5 | Comprehensive Trails and Travel Management | | 4-370 |
| | 4.7.5.1 | Impacts Common to All Alternatives | 4-371 |
| | 4.7.5.2 | Alternative A | 4-372 |
| | 4.7.5.3 | Alternative B | 4-372 |
| | 4.7.5.4 | Alternative C | 4-373 |
| | 4.7.5.5 | Alternative D | 4-374 |
| | 4.7.5.6 | Irreversible and Irretrievable Commitment of Resources | 4-375 |
| | 4.7.5.7 | Unavoidable Adverse Impacts | 4-375 |
| | 4.7.5.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-375 |
| 4.7.6 | Lands and Realty | | 4-375 |
| | 4.7.6.1 | Impacts Common to All Alternatives | 4-377 |
| | 4.7.6.2 | Alternative A | 4-379 |
| | 4.7.6.3 | Alternative B | 4-380 |
| | 4.7.6.4 | Alternative C | 4-384 |
| | 4.7.6.5 | Alternative D | 4-388 |
| | 4.7.6.6 | Irreversible and Irretrievable Commitment of Resources | 4-392 |
| | 4.7.6.7 | Unavoidable Adverse Impacts | 4-392 |
| | 4.7.6.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-392 |
| 4.8 | Special Designations | | 4-393 |
| 4.8.1 | Impacts Common to All Alternatives | | 4-395 |
| 4.8.2 | Alternative A | | 4-398 |
| 4.8.3 | Alternative B | | 4-399 |
| 4.8.4 | Alternative C | | 4-401 |

BLM_0019701

| | | |
|---|---|---|
| 4.8.5 | Alternative D | 4-403 |
| 4.8.6 | Irreversible and Irretrievable Commitment of Resources | 4-405 |
| 4.8.7 | Unavoidable Adverse Impacts | 4-406 |
| 4.8.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-406 |
| 4.9 | Non WSA Lands with Wilderness Characteristics | 4-407 |
| 4.9.1 | Impacts Common to All Alternatives | 4-407 |
| 4.9.2 | Alternative A | 4-407 |
| 4.9.3 | Alternative B | 4-408 |
| 4.9.4 | Alternative C | 4-410 |
| 4.9.5 | Alternative D | 4-411 |
| 4.9.6 | Irreversible and Irretrievable Commitment of Resources | 4-412 |
| 4.9.7 | Unavoidable Adverse Impacts | 4-412 |
| 4.9.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-412 |
| 4.10 | Socioeconomic Resources | 4-413 |
| 4.10.1 | Social, Economic and Environmental Justice | 4-413 |
| 4.10.1.1 | Impacts Common to All Alternatives | 4-418 |
| 4.10.1.2 | Alternative A | 4-419 |
| 4.10.1.3 | Alternative B | 4-426 |
| 4.10.1.4 | Alternative C | 4-435 |
| 4.10.1.5 | Alternative D | 4-444 |
| 4.10.1.6 | Irreversible and Irretrievable Commitment of Resources | 4-452 |
| 4.10.1.7 | Unavoidable Adverse Impacts | 4-452 |
| 4.10.1.8 | Relationship between Local Short-Term Uses and Long-Term Productivity | 4-452 |
| 4.10.2 | Public Health and Safety | 4-452 |
| 4.10.2.1 | Impacts Common to All Alternatives | 4-454 |
| 4.10.2.2 | Alternative A | 4-456 |
| 4.10.2.3 | Alternative B | 4-457 |
| 4.10.2.4 | Alternative C | 4-458 |
| 4.10.2.5 | Alternative D | 4-459 |
| 4.10.2.6 | Irreversible and Irretrievable Commitment of Resources | 4-460 |
| 4.10.2.7 | Unavoidable Adverse Impacts | 4-460 |
| 4.10.2.8 | Relationship Between Local Short-Term Uses and Long-Term Productivity | 4-461 |
| 4.11 | Cumulative Impacts | 4-461 |
| 4.11.1 | Cumulative Analysis Methodology | 4-461 |
| 4.11.2 | Past, Present, and Reasonably Foreseeable Future Actions | 4-462 |
| 4.11.3 | Cumulative Impacts by Resource Category | 4-466 |
| 4.11.3.1 | Air and Atmospheric Values | 4-466 |
| 4.11.3.2 | Geology | 4-480 |
| 4.11.3.3 | Soil Resources | 4-480 |
| 4.11.3.4 | Water Resources | 4-481 |
| 4.11.3.5 | Vegetation | 4-484 |
| 4.11.3.6 | Fish and Wildlife | 4-484 |
| 4.11.3.7 | Special Status Animal Species | 4-485 |
| 4.11.3.8 | Special Status Plant Species | 4-487 |
| 4.11.3.9 | Wild Horses | 4-488 |
| 4.11.3.10 | Wildland Fire Ecology and Management | 4-488 |
| 4.11.3.11 | Cultural Resources | 4-489 |
| 4.11.3.12 | Paleontological Resources | 4-490 |

BLM_0019702

4.11.3.13   Visual Resources ............................................................... 4-490
4.11.3.14   Forestry and Woodland Products.................................... 4-491
4.11.3.15   Livestock Grazing............................................................. 4-492
4.11.3.16   Minerals.............................................................................. 4-492
4.11.3.17   Recreation........................................................................... 4-493
4.11.3.18   Comprehensive Trails and Travel Management............ 4-494
4.11.3.19   Lands and Realty .............................................................. 4-494
4.11.3.20   Special Designations......................................................... 4-495
4.11.3.21   Non-WSA Lands with Wilderness Characteristics........ 4-496
4.11.3.22   Socioeconomic Resources ................................................ 4-497
4.11.3.23   Public Health and Safety ................................................. 4-504

## List of Tables

Table 4-1. Types of Impacts.......................................................................................... 4-1
Table 4-2. Approximate Average Surface Disturbance in Acres Per Well Pad .............. 4-4
Table 4-3. Miles of Routes Potentially Developed for Oil and Gas Activity for Alternatives
          A through D............................................................................................... 4-4
Table 4-4. Estimated Annual Vehicle Round Trips per Well During Drilling and
          Completion ............................................................................................... 4-4
Table 4-5. Estimated Annual Vehicle Round Trips per Well Pad During Construction and
          Production................................................................................................ 4-5
Table 4-6. Acres Managed with Condition of Approval and Lease Stipulation for
          Alternatives A through D in the Mineral Estate ...................................... 4-6
Table 4-7. Cumulative Oil and Gas Surface Disturbance and Un-reclaimed Acres in the
          MPA at Year 20......................................................................................... 4-11
Table 4-8. Resource Categories Used to Analyze the Distribution of Surface Disturbance for
          Five Key Resources ................................................................................. 4-11
Table 4-9. Comparison of Greenhouse Gas Emissions from Fossil Fuel Combustion ................. 4-15
Table 4-10. Analyzed Pollutants, Sources, and Analysis Methods ................................. 4-17
Table 4-11. Models, Pollutants, and Assessed Impacts................................................... 4-18
Table 4-12. Estimated Maximum Annual Emissions from Oil and Gas Development, All
          Alternatives, BLM Project Only.............................................................. 4-21
Table 4-13. Maximum Annual Project Oil and Gas Greenhouse Gas Emissions, All
          Alternatives............................................................................................... 4-23
Table 4-14. 2028 Alternative A Planning Area GHG Emissions.................................... 4-25
Table 4-15. Alternative A Maximum Annual GHG Emission Comparisons.................... 4-25
Table 4-16. 2028 Alternative A Planning Area Emissions.............................................. 4-28
Table 4-17. Alternative A Criteria Pollutant Near Field Predicted Concentrations ..................... 4-29
Table 4-18. Alternative A Visibility Impacts................................................................... 4-32
Table 4-19. 2028 Alternative B Planning Area GHG Emissions.................................... 4-33
Table 4-20. Alternative B Maximum Annual GHG Emission Comparisons.................... 4-34
Table 4-21. 2028 Alternative B Planning Area Emissions.............................................. 4-36
Table 4-22. Alternative B Visibility Impacts................................................................... 4-38
Table 4-23. 2028 Alternative C Planning Area GHG Emissions.................................... 4-39
Table 4-24. Alternative C Maximum Annual GHG Emission Comparisons.................... 4-39

BLM_0019703

*Chapter 4 – Environmental Consequences*

Table 4-25. 2028 Alternative C Planning Area Emissions ................................................................ 4-41
Table 4-26. Alternative C Visibility Impacts ................................................................................... 4-43
Table 4-27. 2028 Alternative D Planning Area GHG Emissions ..................................................... 4-44
Table 4-28. Alternative D Maximum Annual GHG Emission Comparisons ..................................... 4-44
Table 4-29. 2028 Alternative D Planning Area BLM Emissions ..................................................... 4-46
Table 4-30. Alternative D Visibility Impacts ................................................................................... 4-47
Table 4-31. Estimated Number of Well Pads and Associated Surface Disturbance within the
              Mesaverde Play Area for Alternative A ................................................................... 4-52
Table 4-32. Estimated Number of Well Pads and Associated Surface Disturbance within the
              Mesaverde Play Area for Alternative B ................................................................... 4-54
Table 4-33. Estimated Number of Well Pads and Associated Surface Disturbance within the
              Mesaverde Play Area for Alternative C ................................................................... 4-56
Table 4-34. Estimated Number of Well Pads and Associated Surface Disturbance within the
              Mesaverde Play Area for Alternative D ................................................................... 4-59
Table 4-35. Estimated Surface Disturbance by Soil Class for Alternative A ................................... 4-69
Table 4-36. Estimated Average Truck Round Trips at Year 20 for Alternative A ........................... 4-70
Table 4-37. Estimated Surface Disturbance by Soil Class for Alternative B ................................... 4-73
Table 4-38. Estimated Average Truck Round Trips at Year 20 for Alternative B ........................... 4-75
Table 4-39. Estimated Surface Disturbance by Soil Class for Alternative C ................................... 4-80
Table 4-40. Estimated Average Truck Round Trips at Year 20 for Alternative C ........................... 4-82
Table 4-41. Estimated Surface Disturbance by Soil Class for Alternative D ................................... 4-86
Table 4-42. Estimated Average Truck Round Trips at Year 20 for Alternative D ........................... 4-88
Table 4-43. Estimated Surface Disturbance by Watershed for Alternative A ................................ 4-104
Table 4-44. Estimated Surface Disturbance by Watershed for Alternative B ................................ 4-112
Table 4-45. Estimated Surface Disturbance by Watershed for Alternative C ................................ 4-119
Table 4-46. Estimated Surface Disturbance by Watershed for Alternative D ................................ 4-124
Table 4-47. Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative A .................................................................................... 4-135
Table 4-48. Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative B .................................................................................... 4-141
Table 4-49. Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative C .................................................................................... 4-149
Table 4-50. Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative D .................................................................................... 4-160
Table 4-51. Representative Migratory Birds Associated with the MPA Vegetation
              Communities Most Influenced by Disturbance ...................................................... 4-181
Table 4-52. Estimated Surface Disturbance at Year 20 on Mule Deer Ranges in the MPA
              By Alternative .................................................................................................... 4-185
Table 4-53. Equivalent Acres of MPA Habitat Loss (Indirect) Associated with Big Game
              Avoidance .......................................................................................................... 4-186
Table 4-54. Alternative A -- Development Effects on Migratory Bird Nesting Habitat .............. 4-191
Table 4-55. Alternative B -- Development Effects on Migratory Bird Nesting Habitat .............. 4-199
Table 4-56. Alternative C -- Development Effects on Migratory Bird Nesting Habitat .............. 4-205
Table 4-57. Alternative D -- Development Effects on Migratory Bird Nesting Habitat .............. 4-210
Table 4-58. Proportion of Migratory Bird Nest Habitat Protected from Disturbance via
              Timing Limitations ............................................................................................. 4-212

BLM_0019704

*Chapter 4 – Environmental Consequences*

Table 4-59. Alternative A Acres of COA Stipulations in Wild Horse Herd Management
Areas ....................................................................................................................... 4-249

Table 4-60. Alternative B Acres of COA and Lease Stipulations in Wild Horse Herd
Management Areas .................................................................................................. 4-251

Table 4-61. Alternative C Acres of COA and Lease Stipulations in Wild Horse Herd
Management Areas .................................................................................................. 4-253

Table 4-62. Alternative D Acres of COA Stipulations in Wild Horse Herd Management
Areas ....................................................................................................................... 4-254

Table 4-63. Lease Stipulations in Cultural Resource Areas, Alternative A ............................... 4-271

Table 4-64. Lease Stipulations in Cultural Resource Areas, Alternative B ............................... 4-274

Table 4-65. Lease Stipulations in Cultural Resource Areas, Alternative C ............................... 4-279

Table 4-66. Lease Stipulations in Cultural Resource Areas, Alternative D ............................... 4-282

Table 4-67. Acres of Oil and Gas Stipulations in Leased and Non Leased Forest and
Woodlands for Alternative A ................................................................................. 4-312

Table 4-68. Acres of Oil and Gas Stipulations in Leased and Unleased Forest and
Woodlands for Alternative B .................................................................................. 4-314

Table 4-69. Acres of Oil and Gas Stipulations in Leased and Unleased Forest and
Woodlands for Alternative C ................................................................................. 4-317

Table 4-70. Estimated Number of Well Pads in Forest and Woodlands in the Mesaverde
Play Area by Alternative over the 20-Year Planning Period ................................. 4-319

Table 4-71. Acres of Oil and Gas Stipulations in Leased and Unleased Forest and
Woodlands for Alternative D ................................................................................. 4-320

Table 4-72. Disturbed and Reclaimed Acres and Associated AUM Losses throughout
Planning Area ......................................................................................................... 4-323

Table 4-73. Allotments within Mesaverde Play Area ................................................................ 4-325

Table 4-74. Acres of Leasing Stipulations Under Alternative A ............................................... 4-343

Table 4-75. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil
Shale Development Under Alternative A ................................................................ 4-343

Table 4-76. Estimated Number of Well Pads and Associated Surface Disturbance within
Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative A ...... 4-344

Table 4-77. Acres of Leasing Stipulations Under Alternative B ............................................... 4-346

Table 4-78. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil
Shale Development Under Alternative B ................................................................ 4-348

Table 4-79. Estimated Number of Well Pads and Associated Surface Disturbance within
Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative B ...... 4-349

Table 4-80. Acres of Leasing Stipulations Under Alternative C ............................................... 4-351

Table 4-81. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil
Shale Development Under Alternative C ................................................................ 4-352

Table 4-82. Estimated Number of Well Pads and Associated Surface Disturbance within
Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative C ...... 4-353

Table 4-83. Acres of Leasing Stipulations Under Alternative D ............................................... 4-354

Table 4-84. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil
Shale Development Under Alternative D ................................................................ 4-355

Table 4-85. Estimated Number of Well Pads and Associated Surface Disturbance within
Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative D ...... 4-356

Table 4-86. Acres of ACECs Closed to Oil and Gas Leasing under all Alternatives ................. 4-396

Table 4-87. Alternative A Acres Managed with CSU and NSO Stipulations within ACECs ...... 4-398

BLM_0019705

Table 4-88. Alternative B Acres Managed with CSU  and NSO Stipulations within ACECs ..... 4-400
Table 4-89. Alternative C Acres Managed with CSU  and NSO Stipulations within ACECs ..... 4-402
Table 4-90. Alternative D Acres Managed with CSU  and NSO Stipulations within ACECs ..... 4-405
Table 4-91. Percent Leased of Potential Lands with Wilderness Characteristics Polygons by
        Year 2016. ................................................................................................................... 4-409
Table 4-92. Energy-related Activity and Employment (Alternative A) ...................................... 4-422
Table 4-93. Agricultural Sector Effects (Alternative A) ............................................................. 4-423
Table 4-94. Energy Associated Revenue Projections (Alternative A) ........................................ 4-424
Table 4-95. Energy-related Activity and Employment (Alternative B) ...................................... 4-429
Table 4-96. Agricultural Sector Effects (Alternative B) ............................................................. 4-430
Table 4-97. Hunting Sector Effects (Alternative B) .................................................................... 4-431
Table 4-98. Energy-Associated Revenue Projections (Alternative B) ........................................ 4-432
Table 4-99. Energy-related Activity and Employment  (Alternative C) ..................................... 4-438
Table 4-100. Agricultural Sector Effects (Alternative C) ........................................................... 4-439
Table 4-101. Hunting Sector Effects (Alternative C) .................................................................. 4-440
Table 4-102. Energy-Associated Revenue Projections (Alternative C) ...................................... 4-440
Table 4-103. Energy-related Activity and Employment (Alternative D) .................................... 4-446
Table 4-104. Energy-Associated Revenue Projections (Alternative D) ...................................... 4-447
Table 4-105. Energy-Associated Revenue Projections (Alternative D) ...................................... 4-448
Table 4-106. Colorado Department of Transportation  Regional Transportation Priorities ......... 4-466
Table 4-107. 2028 Estimated Cumulative Emissions for Each Alternative ................................ 4-468
Table 4-108. Alternative A Cumulative Visibility Impacts ........................................................ 4-472
Table 4-109. Alternative B Cumulative Visibility Impacts ......................................................... 4-473
Table 4-110. Alternative C Cumulative Visibility Impacts ......................................................... 4-475
Table 4-111. Alternative D Cumulative Visibility Impacts ........................................................ 4-476

BLM_0019706

*Chapter 4 – Environmental Consequences*

## List of Figures

Figure 4-1   Projected Well Pad Development for Alternatives B and C during the 20-yr Planning Period ......................................................................................................... 4-7

Figure 4-2   Cumulative Acute and Collective Effects for Mule Deer Range in GMU 22 Administrative Unit Lease-Holdings, Alternative B ................................................ 4-8

Figure 4-3   Cumulative Acute and Collective Effects for Mule Deer Range in GMU 22 Administrative Unit Lease-Holdings, Alternative C .................................................. 4-9

Figure 4-4   Cumulative Oil and Gas Surface Disturbance in the MPA after Successful Interim Reclamation ........................................................................................... 4-10

Figure 4-5   Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Category during the 20-yr Planning Period under Alternatives A and B ................ 4-74

Figure 4-6   Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Category during the 20-yr Planning Period under Alternatives A, B, and C .......... 4-81

Figure 4-7   Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Category during the 20-yr Planning Period under Alternatives A, B, C, and D...... 4-87

Figure 4-8   Percent Land Area of Each Watershed in the MPA ............................................. 4-103

Figure 4-9   Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Community during the 20-yr Planning Period .................................... 4-140

Figure 4-10  Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Community during the 20-yr Planning Period .................................... 4-151

Figure 4-11  Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Community during the 20-yr Planning Period .................................... 4-162

Figure 4-12  Projected Employment and Population Effects in the PSSA  (Alternative A) ...... 4-420

Figure 4-13  Projected Employment and Population Effects in the SSSA  (Alternative A) ...... 4-421

Figure 4-14  Projected Employment and Population Effects in the PSSA (Alternative B) ....... 4-427

Figure 4-15  Projected Employment and Population Effects in the SSSA (Alternative B) ....... 4-428

Figure 4-16  Projected Employment and Population Effects in the PSSA (Alternative C) ....... 4-436

Figure 4-17  Projected Employment and Population Effects in the SSSA (Alternative C) ....... 4-437

Figure 4-18  Projected Employment and Population Effects in the PSSA (Alternative D) ....... 4-444

Figure 4-19  Projected Employment and Population Effects in the SSSA (Alternative D) ....... 4-445

Figure 4-20  Projected Non-Energy Economic Base Jobs in the PSSA, 2010 and 2030 .......... 4-498

Figure 4-21  Projected Non-Energy Economic Base Jobs in the SSSA, 2010 and 2030 .......... 4-498

Figure 4-22  Projected Future PSSA Population including Cumulative Effects ...................... 4-499

Figure 4-23  Projected Future SSSA Population including Cumulative Effects (Colorado counties only) ..................................................................................................... 4-501

Figure 4-24  Predicted Shares of the Cumulative Population in the PSSA Dependent on Cumulative Employment for three Key Economic Drivers, 2010 Estimates and 2030 Projection by Alternative ....................................................................... 4-503

BLM_0019707

# CHAPTER 4
# ENVIRONMENTAL CONSEQUENCES

## *4.1   Introduction*

This chapter describes environmental consequences that could result from implementing any of, or any part of, the four alternatives described in Chapter 2, and forms the scientific and analytic basis for comparing alternatives. The potential consequences of each alternative are described in this chapter as impacts using the same order of resource topics (i.e., Physical Resources, Biological Resources, Wild Horse Management, Wildland Fire Ecology and Management, etc.) presented in Chapter 3. The parallel organization of Chapters 3 and 4 allows the reader to compare baseline resource conditions (Chapter 3) to potential impacts (Chapter 4) for the same resources. Discussions of irreversible and irretrievable commitment of resources, unavoidable adverse impacts, and the relationship between local short-term uses and long-term productivity conclude the analysis of each resource topic.

The depth and breadth of the impact analyses presented in this chapter are commensurate with the level of detail presented in Chapter 3, and with the availability and/or quality of data necessary to assess impacts. Potential impacts considered in this chapter include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, and health impacts whether direct, indirect, or cumulative, as required by 40 CFR 1508.8.

The baseline used for determining the potential impacts is the current resource condition described in Chapter 3. The discussion of environmental consequences for each resource topic begins with a brief definition of what is considered an impact for the resource.

## 4.1.1   Impact Analysis Terminology

The impact analysis focuses on identifying types of impacts and estimating their potential significance based on context, intensity, and duration. This chapter uses the terms "impacts" and "effects" interchangeably, and the terms "increase" and "decrease" are used for comparison purposes. Table 4-1 lists other terms used to describe impacts. Direct and indirect impacts to resources and methodology used to determine impacts are discussed in Sections 4.2 through 4.10. Cumulative impacts and methodology used in the cumulative analysis are discussed in Section 4.11.

**Table 4-1. Types of Impacts**

| Type | Description |
|---|---|
| Direct Impacts | Direct impacts are those effects "…which are caused by the action and occur at the same time and place." |
| Indirect Impacts | Indirect impacts are those effects "…which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on water and air and other natural systems, including ecosystems." |
| Cumulative Impacts | Council on Environmental Quality regulations define cumulative impact as "…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or nonfederal) or person undertakes such other actions." |

SOURCE: BLM National Environmental Policy Act Handbook H1790-1-2008-1.

BLM_0019708

Impacts for each resource have been evaluated within the framework of applicable indicators and attributes. Indicators are defined as structural and/or functional components of the resource. They are the physical characteristics used in the resource evaluation. For example, in the case of soil resources, indicators include soil stability and soil productivity. Attributes are the measures that are used to qualify and quantify resource indicators. They provide a benchmark of the health or function of one or more indicators for a resource. An attribute could be a physical or chemical measurement, or a visual observation. For soil resources, an attribute of soil stability would be the presence or absence of soil erosion features. Attributes like erosion features and bare ground are directly observable and provide a qualitative indication of the resource function.

Context relates to environmental circumstances at the location of the impact and in the immediate vicinity, affected interests, and the locality. Intensity refers to the severity or extent of the impact or magnitude of change from existing conditions. For example, the impact analysis considers unique characteristics of the geographic area such as proximity to historic or cultural resources, wetlands, or ecologically critical areas. Duration refers to the permanence and longevity of the impacts, and is depicted as short-term or long-term. Short-term is defined as anticipated to begin and end within the first three years after the action is implemented. Long-term is defined as lasting beyond three years to the end of or beyond the 20-year planning timeframe addressed in the RMPA. For ease of reading, impacts presented are direct, broad (occurring within the larger Planning Area), and long-term, unless otherwise noted as indirect, localized, or short-term or temporary. Effects can be both beneficial and adverse. As impacts could be perceived as beneficial (positive) or adverse (negative) by different readers, these descriptors were not used to define impacts.

## 4.1.2   Impact Analysis Methodology and Assumptions

A NEPA impact analysis is a process used to evaluate and describe the cause-and-effect relations for resources and resource uses that could be affected by an Agency's proposal. Impact analyses use an interdisciplinary approach, and the disciplines of the preparers are appropriate to the scope of the analysis. Detailed impact analyses and conclusions by resource and resource use are based on the planning team's expertise and knowledge of resources and the project area; reviews of existing literature; information obtained from the BLM professionals, other agencies, interest groups, and concerned citizens; and issues raised by the public during scoping (see discussion in Chapter 1, Section 1.4). Impacts on resources and resource uses are analyzed and discussed in an amount of detail that is commensurate with resource issues and concerns identified throughout the planning process. Geographic Information System analyses and data from field investigations were used to quantify effects where possible; however, in the absence of quantitative data, best professional judgment was used. At times, impacts are described using ranges of potential impacts or in qualitative terms.

The analysis focuses on impacts that could eventually result in on-the-ground changes on BLM-administered surface estate and mineral estate during the 20-year planning horizon. Impacts for some resources or resource uses could be confined to the BLM-administered surface estate (such as recreation and OHV use), whereas others could apply to all mineral estate (such as energy and minerals and requirements to protect resources such as Special Status Species and cultural resources from such activity).

Assumptions are made in the analysis concerning level of land use activity, resource condition, and resource response. Potential impacts and their significance are determined based on these assumptions. The following general assumptions were used in the analysis. Resource-specific assumptions are presented under each resource topic.

BLM_0019709

*Chapter 4 – Environmental Consequences*

- For impact analysis, it has been assumed that standard practices, BMPs and conservation measures (see Appendix B) would be implemented. Use of BMPs and conservation measures would be implemented at the discretion of the WRFO on a project-specific basis, depending on the specific characteristics of the project area and the types of disturbance being proposed. Use of BMPs and conservation measures may not be appropriate to implement in all cases.

- An oil and gas lease grants the lessee the "right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits" in the leased lands, subject to the terms and conditions incorporated in the lease (BLM Form 3100-11, Lease for Oil and Gas).

- Under all alternatives, appropriate threatened and endangered species surveys would be conducted, where applicable, during the appropriate season.

- Provisions in leases that expressly provide Secretarial authority (Department of the Interior [DOI]) to deny or restrict development in whole or in part would depend on an opinion provided by the FWS regarding impacts to endangered or threatened species or habitats of plants and animals that are listed or proposed for listing. If the FWS concludes that the development likely would jeopardize the continued existence of any endangered or threatened plant or animal species, then the development could be denied in whole or in part.

- For impact analysis, it has been assumed that past and present actions encompassed within the description of existing conditions in Chapter 3, Affected Environment, have been included.

- For impact analysis, it has been assumed that after the RMPA has been implemented, water resource indicators and attributes would continue to be assessed using data from monitoring sites and ongoing watershed studies.

The following regulatory guidance provided the framework for the analysis:

- The Tenth Circuit Court of Appeals in Sierra Club vs. Peterson (717 F.2d 1409, 1983) found that "on land leased without an NSO [no surface occupancy] stipulation, the U.S. Department of the Interior (USDOI) cannot deny the permit to drill…once the land is leased the DOI [Department of the Interior] no longer has the authority to preclude surface-disturbing activities even if the environmental impact of such activity is significant. The Department can only impose mitigation upon a lessee who pursues surface-disturbing exploration and/or drilling activities." The court goes on to say "notwithstanding the assurance that a later site-specific environmental analysis would be made, in issuing these leases the DOI has made an irrevocable commitment to allow some surface-disturbing activities, including drilling and road building."

The number of well pads projected during each year of the planning period was used to estimate the surface disturbance area for oil and gas development, a figure that provides the basis for calculating acute and collective effects. The approximate surface disturbance associated with each well pad is assumed to be 12 acres (Table 4-2). This includes the area required for the well pad, storage tanks, resource roads to an individual well pad, pipelines and utilities, and other facilities.

Based on the 2007 RFD Scenario, Air Resources Technical Support Document (ARTSD [URS 2011]), and Appendix E (Threshold and Temporal Analysis), Table 4-2 gives approximate average surface disturbance in acres, assumed for each well pad before reclamation and remaining surface disturbance after successful interim reclamation.

BLM_0019710

*Chapter 4 – Environmental Consequences*

### Table 4-2. Approximate Average Surface Disturbance in Acres Per Well Pad

| Facility Type | Initial Surface Disturbance (Acres) | Remaining after Interim Reclamation (Acres) |
|---|---|---|
| Well pad | 7.25 | 1.25 |
| Compressor stations | 1 | 1 |
| Local and resource roads | 1.75 | 1.75 |
| Pipelines and other utilities | 1 | 0 |
| Other facilities | 1 | 1 |
| **Total Acres** | **12** | **5** |

Assumptions are made for the impact analysis regarding roads developed for oil and gas activity. Table 4-3 shows the total surface disturbance in miles assumed for the development of local roads, resource roads, and pipelines and other utilities that could occur under each alternative. These values were calculated based on the assumptions in Appendix E, Threshold and Temporal Analysis.

### Table 4-3. Miles of Routes Potentially Developed for Oil and Gas Activity for Alternatives A through D

| Facility Type | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Local Road | 215 | 430 | 705 | 1,000 |
| Resource Road | 180 | 360 | 590 | 840 |
| Utility Lines[1] | 285 | 565 | 925 | 1,300 |

NOTE:
[1] Includes transmission lines, oil and gas pipelines, and other utilities.

Air quality emissions estimates for the Planning Area include assumptions regarding the number of round trips made by vehicles during the exploration, drilling, construction, and production phases (see URS 2011). Table 4-4 and Table 4-5 present the anticipated annual number of round trips by light and heavy vehicles that could occur in association with oil and gas exploration and development. Vehicles were classified as heavy if their gross vehicle weight was 8,000 pounds or more and light if their weight was less than 8,000 pounds. The estimated number of round trips during drilling and completion/testing are per well and the estimated number of round trips by light and heavy vehicles during construction, drill rig transport, and production is for each well pad.

### Table 4-4. Estimated Annual Vehicle Round Trips per Well During Drilling and Completion

| | Light Trucks | Heavy Trucks |
|---|---|---|
| Drilling | 104 | 48[1] |
| Well Completion | 30 | 266 |
| **Total** | **134** | **314** |

SOURCE: Air Resources Technical Support Document, Appendix A pages A-10, A-12, A-16, and A-18; WRFO Emissions Inventory, 2011.
NOTE:
[1] Includes water for drilling (ARTSD page A-10).

BLM_0019711

**Table 4-5. Estimated Annual Vehicle Round Trips
per Well Pad During Construction and Production**

|  | Light Trucks | Heavy Trucks |
|---|---|---|
| Well Pad/Road Construction | 22 | 65 |
| Drill Rig Transportation | 0 | 35[1] |
| Production | 365 | 1,155[2] |
| **Total** | **387** | **1,255** |

SOURCE: Air Resources Technical Support Document, Appendix A pages A-7, A-10, and A-31;
WRFO Emissions Inventory, 2011.

NOTES:

[1]Does not include water used for drilling (ARTSD page A-10).

[2]Includes water trucks and condensate tankers.

## Incomplete or Unavailable Information

The best available information, pertinent to the decisions to be made in the Draft RMPA/EIS, was used to develop and evaluate alternatives. As is always the case when developing management actions for a wide range of resources, not all information that might be desired was available. The primary effect of unavailable information is the inability to quantify certain impacts. Where quantification was not possible, impacts have been described in qualitative terms. The CEQ Regulations provide direction on how to proceed with the preparation of an EIS when information is incomplete or unavailable:

"If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement: (1) a statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason" (Title 40 CFR Subpart 1502.22 b).

A range of data types and qualities for resources in the Planning Area was available for the analysis of the impacts of the management actions contained in the four alternatives presented in Chapter 2. Since the alternatives contain primarily programmatic management, the question of data completeness and quality is less important than would be the case for site-specific actions. Information that was generally unavailable was the specific locations of future well pads, compressor stations, and gas plants.

## Impact Analysis Overview

The BLM-administered federal minerals occur beneath the surface estate managed by the BLM, as well as beneath surface estate within state or private jurisdiction (known as split-estate lands). The 598,700 acre MPA represents about one-third of the WRFO 1,779,200 acre mineral estate and is

*Chapter 4 – Environmental Consequences*

where 95 percent of development is anticipated. Table 4-6 lists the leased and unleased federal oil and gas mineral estate acreage under each alternative in the WRFO and MPA.

The Chapter 4 acres represent the most restrictive COAs or lease stipulations that would apply for each alternative. These were used for the threshold and temporal analysis where a holistic evaluation of potential disturbance was needed through the WRFO Planning Area or the MPA. The Chapter 2 acres include areas where NSO, CSU, and TL lease stipulations or COAs coincide under an individual management action.

Table 4-6 shows the Chapter 4 acres that represent the intersection of stipulations from all management actions and are based on the most restrictive COA or lease stipulation that would apply if no exceptions were granted. Differences in the acreage calculations used in this analysis are approximate projections for comparison and analytic purposes in preparing this EIS.

### Table 4-6. Acres Managed with Condition of Approval and Lease Stipulation for Alternatives A through D in the Mineral Estate

| | Closed | | No Surface Occupancy | | Controlled Surface Use | | Timing Limitation Stipulation [1] | | Open | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA |
| **Alternative A** | | | | | | | | | | |
| Leased | 9,700 | 0 | 114,100 | 60,200 | 417,800 | 131,300 | 379,900 | 172,800 | 367,500 | 193,500 |
| Unleased | 73,600 | 0 | 43,000 | 4,000 | 166,100 | 15,400 | 119,600 | 12,400 | 88,000 | 6,300 |
| **Total** | **83,300** | **0** | **157,100** | **64,200** | **583,900** | **146,700** | **499,500** | **185,200** | **455,500** | **199,800** |
| **Alternative B** | | | | | | | | | | |
| Leased | 9,700 | 0 | 550,700 | 219,900 | 218,800 | 70,900 | 509,800 | 267,000 | 0 | 0 |
| Unleased | 73,600 | 0 | 206,500 | 20,600 | 77,500 | 5,800 | 132,600 | 11,700 | 0 | 0 |
| **Total** | **83,300** | **0** | **757,200** | **240,500** | **296,300** | **76,700** | **642,400** | **278,700** | **0** | **0** |
| **Alternative C** | | | | | | | | | | |
| Leased | 9,700 | 0 | 277,100 | 133,800 | 288,300 | 78,500 | 713,900 | 345,400 | 0 | 0 |
| Unleased | 73,600 | 0 | 110,500 | 14,900 | 112,100 | 6,400 | 194,100 | 16,800 | 0 | 0 |
| **Total** | **83,300** | **0** | **387,600** | **148,700** | **400,400** | **84,900** | **908,000** | **362,200** | **0** | **0** |
| **Alternative D** | | | | | | | | | | |
| Leased | 9,700 | 0 | 185,800 | 88,800 | 335,100 | 94,200 | 397,000 | 187,000 | 361,400 | 187,700 |
| Unleased | 73,600 | 0 | 71,300 | 5,800 | 134,200 | 10,400 | 127,800 | 15,900 | 83,400 | 6,000 |
| **Total** | **83,300** | **0** | **257,100** | **94,600** | **469,300** | **104,600** | **524,800** | **202,900** | **444,800** | **193,700** |

SOURCE: BLM GIS data 2009.

NOTES:

Acreage calculations used in this analysis are approximate values, used for comparison and analytic purposes in preparing this EIS. Because of rounding, numbers presented in the table may not exactly add to the total presented.

[1] Timing limitation numbers represent acres that would be subject to timing limitations only. However, areas managed with NSO or CSU stipulations may also be subject to timing limitations as an additional lease stipulation or COA.

The NSO, CSU, and TL stipulations discussed in this document apply to oil and gas development. No oil and gas surface facilities would be allowed on leases subject to NSO stipulations unless the BLM grants exception waiver, or modification of the stipulation. Exception, waiver, and modification criteria are described in Tables 2-1 through 2-22 and Appendix A (Oil and Gas Leasing Stipulations and Lease Notices). In areas managed with a CSU stipulation, surface occupancy or use would be restricted or prohibited unless the BLM and the oil and gas operator

BLM_0019713

could arrive at an acceptable plan for mitigating anticipated impacts. A CSU stipulation is used for operating guidance, not as a substitute for an NSO stipulation or other lease stipulations. Finally, TL stipulations place restrictions on when oil and gas development activities could occur throughout the year. The stipulations are designed to protect wildlife migration and reproduction, and could require operators to suspend development activities in wildlife habitat during parts of the year when development could influence wildlife behavior.

<u>Threshold Analysis</u>

Impacts have been analyzed quantitatively using the threshold analysis developed for this RMPA. The threshold analysis described herein was used to evaluate acute and collective effects on big game based on a forecasted allocation of oil and gas well pads by GMU, lease-holding, and seasonal use. A detailed description of the threshold analysis protocol is provided in Appendix E. The analysis methodology is only applicable to Alternatives B and C since the management approaches for Alternatives A and D do not incorporate the threshold concept. The allocation model used in the analysis was based on current trends in oil and gas development and BLM management practices. Figure 4-1 shows the number of well pads projected per year based on the allocation model for Alternatives B and C.

**Figure 4-1. Projected Well Pad Development for Alternatives B and C during the 20-yr Planning Period**



The next step of the threshold analysis was to assign the area of surface disturbance associated with each well pad (i.e., 12 acres) to mule deer range within oil and gas leasing areas of each GMU. To estimate acute and collective effects, a buffer was applied to each well pad that varied in size depending on the alternative and mule deer range type found at the assigned location. The buffer for mule deer winter range was set at 660 feet, and the buffer for summer range varied by alternative between 1,300 feet for Alternative B to 660 feet for Alternative C. The area contained within each

BLM_0019714

*Chapter 4 – Environmental Consequences*

buffer zone was then added to the 12 acre well pad footprint to calculate the area of acute and collective effects on a per well pad basis.

For each year of the planning period, acute and collective effects were summed and then standardized to a percentage by dividing the effect in acres by the total area available per seasonal use area. Acute effects were assumed to occur during the period of well pad development when construction and drilling are conducted. Collective effects were assumed to accumulate from initial development on a well pad until successful interim reclamation activities are achieved. For Alternatives B and C, the period of acute effects from a well pad was assumed to last 2 years and the period of collective effects was assumed to last 5 years.

Figures 4-2 and 4-3 show cumulative acute and collective effects projected during each year of the planning period for Alternatives B and C, respectively. During the planning period, development under Alternative B is not projected to exceed the 10 percent acute threshold, nor is it projected to exceed the 20 percent collective threshold for mule deer range. The same is true for acute effects under Alternative C, which remain below the 25 percent acute threshold during the entire planning period. However, collective effects would exceed the 25 percent collective threshold starting in Year 16 of the planning period and continuing through Year 20. (The thresholds for Alternatives B and C are defined in Table 2-4 Record 12.) Exceeding the collective threshold for Alternative C would trigger TL stipulations for big game that would create concurrent effects on other resources. These concurrent effects are discussed by resource throughout Chapter 4. Other impacts from implementing the threshold concept are also discussed in the Alternatives B and C subsections of each resource analysis.

**Figure 4-2. Cumulative Acute and Collective Effects for Mule Deer Range in GMU 22 Administrative Unit Lease-Holdings, Alternative B**



BLM_0019715

**Figure 4-3. Cumulative Acute and Collective Effects for Mule Deer Range
in GMU 22 Administrative Unit Lease-Holdings, Alternative C**



## Temporal Analysis

The temporal (i.e., relating to time) analysis developed for this RMPA provided an additional quantitative method for projecting and analyzing surface disturbance impacts over the 20-year planning period. A detailed description of the temporal analysis methodology is included in Appendix E. The key metric for the temporal analysis was total surface disturbance projected both before and after successful Phase II interim reclamation. Surface disturbance projections were based on an assumed 12 acres of disturbance per well pad and the same forecasted allocation of well pads used in the threshold analysis. The forecasted allocation was also extended to Alternatives A and D since the temporal analysis is broadly applicable to all four alternatives. Acute and collective effects were not an important metric in the temporal analysis.

To account for reclamation in the temporal analysis, a portion of each well pad was considered reclaimed once Phase II interim reclamation was successfully completed at the end of a well pad development cycle. At the end of interim reclamation, it was assumed that 5 acres of each 12-acre well pad (including ancillary facilities) would remain in service throughout the well production phase, thus the reclaimed acreage is 7 acres per well pad (including ancillary facilities).

For Alternatives B and C, the development cycle was assumed to last two years followed by three years of interim reclamation (five years total). For Alternatives A and D, the development cycle was assumed to require three years since TL stipulations could be in effect that would extend the development cycle by an additional year. The reclamation period was still assumed to require three

BLM_0019716

years, for a total duration of six years between initial development and successful interim reclamation.

Table 4-7 and Figure 4-4 summarize results of the temporal analysis for the MPA. The figure shows cumulative disturbance after Phase II interim reclamation for Years 1 through 20 of the planning period. It is evident from the figure that surface disturbance increases in a linear fashion during the first five to six years of the planning period (depending on the alternative) before well pads initiated in Year 1 start to complete interim reclamation. In later years, surface disturbance from new well pads is moderated somewhat by surface disturbance from previous years that has met reclamation success criteria. The rate of increase once this "reclamation offset" begins in Year 6 for Alternatives B and C and Year 7 for Alternatives A and D is not linear because it depends both on an increasing rate of development and an increasing rate of reclamation.

Table 4-7 portrays total cumulative surface disturbance in the MPA during the 20-year planning period, as well as the total un-reclaimed acreage remaining at Year 20. Under Alternative A, total surface disturbance in the MPA would amount to 6,300 acres after 20 years of development. Of this total, approximately 2,200 acres (or 34 percent) would be reclaimed by Year 20, leaving 4,100 acres of un-reclaimed surface disturbance at the end of the planning period. The percent of reclaimed acres at Year 20 varies by alternative, but would be highest under Alternative B and lowest under Alternative D.

**Figure 4-4. Cumulative Oil and Gas Surface Disturbance in the MPA after Successful Interim Reclamation**



BLM_0019717

*Chapter 4 – Environmental Consequences*

### Table 4-7. Cumulative Oil and Gas Surface Disturbance and Un-reclaimed Acres in the MPA at Year 20

| Description | Units | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Assumed number of well pads in the MPA | --- | 523 | 1,045 | 1,710 | 2,428 |
| Surface disturbance per well pad | Acres | 12 | 12 | 12 | 12 |
| Total surface disturbance in MPA during the 20-yr planning period | Acres | 6,300 | 12,500 | 20,500 | 29,100 |
| Un-reclaimed surface disturbance area in the MPA at end of 20-yr planning period after interim reclamation | Acres | 4,100 | 7,400 | 12,800 | 19,800 |
| Un-reclaimed surface disturbance area in MPA for facility occupation | Acres | 2,600 | 5,200 | 8,600 | 12,100 |

Impacts related to the temporal analysis surface disturbance and reclamation estimates are discussed for individual resources in Sections 4.2 through 4.10. Additionally, resource-specific analyses have been performed for soil, water, vegetation, big game, and energy and minerals to evaluate how projected oil and gas surface disturbance could be distributed in the MPA among important resource categories for these five resources. The resource-specific analyses were based on the fundamental assumptions that few, if any, exceptions would be granted to NSO stipulations, and that most development would be concentrated in areas available for surface occupancy. The analyses relied on the Chapter 4 acres with NSO stipulations given highest priority among the different stipulation types (this is reasonable because no acres in the MPA would be closed under any alternative [Table 4-6]). To complete the analyses, surface disturbance was distributed with a uniform density across areas available for surface occupancy, and then intersected with important land categories for each of the five resources. The step-by-step analysis methodology has been described in greater detail in Appendix E.

The resource categories used in the resource-specific analyses are summarized in Table 4-8. Focusing on these resource categories enabled a comparison of how different soil classes, watersheds, vegetation types, mule deer ranges, and mineral lease areas would be impacted by projected oil and gas development. Results of the analyses are discussed in the individual resource sections (i.e., Sections 4.2 through 4.10). In most cases, impacts from the resource-specific analyses relate directly to the resource analyzed, however, an effort was made to apply the results to evaluate impacts to other resources and resource uses. For example, the analysis for vegetation can also be used to discuss impacts to forestry and woodland products and livestock grazing.

### Table 4-8. Resource Categories Used to Analyze the Distribution of Surface Disturbance for Five Key Resources

| Resource | Resource Categories |
|---|---|
| Soil | Fragile soils on slopes greater than 35 percent; Saline soils |
| Water | Watersheds (based on 8-digit hydrologic unit codes) |
| Vegetation | Vegetation land cover |
| Mule Deer Range | Summer range, winter range, severe winter range, and winter concentration areas for mule deer |
| Energy and Minerals | Oil shale lease areas; Oil shale research, development, and demonstration tracts; Multi-mineral zone; Sodium lease areas |

BLM_0019718

## 4.2   Physical Resources

### 4.2.1   Air and Atmospheric Values

The air and atmospheric values analysis addresses several types of impacts associated with air pollutant emissions; climate change, air quality, and air quality related values. Potential contributions to climate change impacts are associated with greenhouse gas emissions and biological carbon sink, while potential air quality impacts are associated with emissions of criteria and hazardous air pollutants. The climate change and air quality analyses describe impacts that could occur due to projected levels of oil and gas development in the Planning Area based on the goals and objectives outlined for air quality resources in Table 2-1. The climate change and air quality impact assessments focus on the differences between management actions and impacts associated with each alternative. Detailed assessment information is included in the Air Resources Technical Support Document for the White River Oil and Gas Resource Management Plan Amendment and Environmental Impact Statement (URS 2011). The BLM has developed an Air Resources Management Plan in response to the assessment results and the plan is included in Appendix J.

This analysis is based on a conservative analysis of impacts associated with GHG emissions, HAP, and maximum criteria air pollutant. Maximum emissions are expected to occur in 2028, when the greatest number of emission sources would be operating and construction of new oil and gas facilities would peak. The air and atmospheric values impact analysis does not include a temporal analysis because, climate change and air quality impacts in years preceding 2028 would be less than the impacts described in this section and in the air and atmospheric values cumulative impacts section.

**Climate Change and Greenhouse Gas**

<u>Methods and Assumptions</u>

Climate change analyses are comprised of several factors, including greenhouse gas emissions (including carbon dioxide, methane, and nitrous oxide) and concentrations, land use management practices, and surface albedo (a measure of how strongly a surface reflects light from light sources such as the sun). Decreased albedo (e.g., due to melting snow and ice) means that more light (and heat) is absorbed by the earth's surface.

The tools necessary to quantify the incremental climatic impacts of greenhouse gas emissions associated with specific activities are presently unavailable. That is, the current state of the science allows us to calculate potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, it does not allow us to analyze or predict how global or regional climate systems may be affected by a particular activity, such as a natural gas development field. Currently, the BLM does not have an established mechanism to accurately predict the effect of resource management-level decisions from the planning effort on global climate change. Consequently, the climate change analysis for this RMPA accounts for and discloses factors that may contribute to global climate change. Qualitative and quantitative evaluations of potential contributing factors within the Planning Area are included where appropriate and practicable. Quantification of greenhouse gas emissions is the most significant climate change factor assessed in this analysis; hence potential GHG emissions resulting from activities analyzed in each alternative were quantified. In order to put those GHG emission calculations into context for the public and the decision maker, a relative comparison of GHG emissions across sectors is provided. Due to the

BLM_0019719

global nature of GHG emissions, potential impacts to climate and the environment are described qualitatively in the Climate Change Cumulative Impacts Section.

Additionally, there are numerous methodologies for calculating biological carbon sequestration. Depending on the methodology used, estimates of biologically stored or removed carbon can vary greatly. Because there is not yet a single, generally accepted standard for estimating biological carbon sinks and removals, the analysis for this RMPA qualitatively discusses potential biological carbon changes to due to the BLM's activities and authorized uses.

This section describes the potential contributions of GHGs associated with management actions in the RMPA alternatives to climate change. Existing climatic conditions are described in Chapter 3.

The following assumptions are central to this analysis.

- The assessment of climate changing pollutant emissions and climate change is in its formative phase, so it is not yet possible to know with confidence the net impact on climate.

- The lack of scientific tools to predict potential global climatic changes resulting from localized GHG emissions limits the ability to quantify potential future climate change impacts for each alternative.

- Climate change is a global phenomenon in which larger changes in global greenhouse gas emissions are likely to have greater study area resource impacts than smaller changes in local greenhouse gas emissions.

- Future Federal or state legislative and regulatory actions to reduce greenhouse gas emissions were not considered when estimating GHGs in this analysis. If future regulations limit greenhouse gas emissions, the GHG emissions calculated in this analysis could be grossly overestimated.

- In the future, as tools improve for predicting climate changes due to resource management, the BLM may be able to reevaluate decisions made as part of this planning process and to adjust management accordingly.

- The climate change analysis is based on the most conservative combination of GHG emissions that could occur due to the expected greatest well drilling activity, well pad and road construction activity, and operation of active wells and supporting oil and gas facilities. Maximum GHG emissions are expected to occur in 2028. Should new regulations applicable to the assumptions used in this analysis be implemented before 2028, the GHG emission calculations would be overestimated.

Information that was unavailable for the climate change impact analysis includes the lack of scientific tools and models that can accurately predict potential climatic changes due to incremental GHG emissions increases within a localized area, such as the Planning Area.

### Greenhouse Gas Emissions Regulation and Trends

The oil and gas industry has been reducing greenhouse gas emissions voluntarily, even as natural gas production has increased. According to the EPA, annual methane emissions have declined by 33.1 million metric tons (26 percent) since 1990. This decline is due to improvements in technology and management practices and to replacing old equipment (EPA 2010a).

The EPA is in the early stages of regulating greenhouse gases as air pollutants under the Clean Air Act. In its Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section

*Chapter 4 – Environmental Consequences*

202(a) of the Clean Air Act, the EPA determined that greenhouse gases are air pollutants subject to regulation under the Clean Air Act. The EPA is regulating carbon dioxide, methane, nitrous oxide, sulfur hexafluoride, hydrofluorocarbons, and perfluorocarbons. In addition, aggregate greenhouse gas emissions are regulated in terms of carbon dioxide equivalent ($CO_2e$) emissions. The first EPA regulation to limit emissions of greenhouse gases imposed carbon dioxide emission standards on light-duty vehicles, including passenger cars and light trucks (GPO 2010). As of February 2011, the EPA had not set greenhouse gas emission limits for stationary sources, such as compressor stations. However, the EPA is gathering detailed greenhouse gas emission data from thousands of facilities throughout the United States and will use the data to develop an improved national greenhouse gas inventory and to inform future greenhouse gas emission control regulations. In 2010, many facilities across the United States began estimating greenhouse gas emissions in accordance with the EPA's "Greenhouse Gas Mandatory Reporting Rule" and reported annual greenhouse gas emissions beginning on March 31, 2011. Many oil and gas facilities began estimating greenhouse gas emissions in 2011 and will submit their first annual greenhouse gas emission reports on March 31, 2012, in accordance with Subpart W of 40 CFR, Part 98.

Beginning in 2011, greenhouse gas emissions from some facilities will become subject to federal air quality permitting programs, such as the Title V Operating Permit Program and the PSD Program. Historically, greenhouse gas emissions were not measured by facilities under these programs and air quality permits did not address greenhouse gases. However, the EPA and state and local air quality permitting agencies will begin reviewing greenhouse gas emissions under these programs in accordance with EPA's "Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule" (GPO 2010d). This review may lead to more accurate estimates of greenhouse gas emissions from these facilities and may prompt greenhouse gas emission monitoring in some cases.

Based largely on greenhouse gas emission data submitted under the "Greenhouse Gas Mandatory Reporting Rule," the EPA plans to develop stationary source greenhouse gas emissions reduction rules that could mandate substantial reductions in U.S. greenhouse gas emissions. Alternatively, Congress may develop other legislation to reduce greenhouse gas emissions. Future EPA-mandated greenhouse gas emission reductions from oil and gas sources were not considered in this climate change impacts analysis; consequently, this climate change impact analysis overestimate future greenhouse gas emissions associated with WRFO Planning Area activities.

### Greenhouse Gas Emission Reduction Due to Fossil Fuel Substitution

Combustion of natural gas produces fewer greenhouse gas emissions than combustion of most other fossil fuels. Consequently, natural gas may displace coal and oil as companies modify operations to reduce greenhouse gas emissions from power generation, heaters, boilers, vehicles, and other combustion sources. Table 4-9 provides a comparison of natural gas and other fossil fuel combustion emissions. In terms of greenhouse gas emissions per million British thermal units (MMBtu) of heat input, natural gas replacement would reduce greenhouse gas emissions from current coal-burning sources by approximately 44 percent and would reduce greenhouse gas emissions from petroleum-fueled sources by approximately 25 to 28 percent.

BLM_0019721

**Table 4-9. Comparison of Greenhouse Gas Emissions
from Fossil Fuel Combustion**

| Fuel | Emissions (kg/MMBtu) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| Natural gas | 53.02 | 0.001 | 0.0001 | 53.07 |
| Coal[1] | 94.38 | 0.011 | 0.0016 | 95.11 |
| Diesel fuel | 73.25 | 0.003 | 0.0006 | 73.50 |
| Gasoline | 70.22 | 0.003 | 0.0006 | 70.47 |

SOURCE: 40 CFR Part 98, Subpart C, Tables C-1 and C-2 (GPO 2010b).
NOTES:
[1]The coal $CO_2$ emission factor is based on a mixture of coal types and represents coal used in electricity generation.
The range of coal $CO_2$ emissions factors is 93.4 to 103.54 kg/MMBtu.
kg = kilogram

To the extent that economics, natural gas availability, and regulatory requirements encourage natural gas replacement of coal or petroleum, global greenhouse gas emissions could be reduced by increased production of natural gas. For example, the U.S. Energy Information Administration (EIA) predicts that fuel switching would prompt an 83 percent increase in electric power sector natural gas consumption from 2009 to 2030 (EIA 2009).

While natural gas would displace some fossil fuels, renewable energy is expected to replace some natural gas use in a variety of applications, such as home heating and electric power generation. The EIA predicts that total natural gas consumption in the United States would fall by 14 percent from 2009 to 2030 (EIA 2009). If natural gas consumption decreases, natural gas production in the WRFO may be less than the levels of development included in one or more of the alternatives within this analysis.

**Air Quality**

<u>Methods and Assumptions</u>

Quantitative and qualitative analyses were used to evaluate the impact of management alternatives on air resources. A number of indicators, attributes, and assumptions have been defined for this analysis. The following five indicators were selected to analyze the effects of the alternatives on air quality:

- Predicted ambient concentrations of criteria air pollutants and HAPs in and/or near the Planning Area for comparison to the National Ambient Air Quality Standards (NAAQS), Colorado Ambient Air Quality Standards, and other health-based thresholds;

- Predicted criteria pollutant concentration increases for comparison to established Prevention of Significant Deterioration (PSD) increments;

- Predicted visibility changes in nearby Class I areas, sensitive Class II areas, and selected Colorado scenic views;

- Predicted sulfur and nitrogen deposition rates in the above Class I and sensitive Class II areas; and

- Predicted changes in lake chemistry based on acid neutralizing capacity at specific lakes listed in the Modeling Protocol (URS 2007a).

BLM_0019722

*Chapter 4 – Environmental Consequences*

In Federal Class I areas, air quality related values (AQRVs) including visibility are protected under the Clean Air Act. This study includes five federally mandated Class I areas: Flat Tops Wilderness, Eagle's Nest Wilderness, Maroon Bells-Snowmass Wilderness, Mt. Zirkel Wilderness, and Arches National Park (NP) which were selected due to their close proximity to the Planning Area. Class II areas are not mandated for special protection under the Clean Air Act for AQRVs, however, state and Tribal, federal agencies with responsibility for protecting and managing air quality resources may identify additional areas as "sensitive Class II" and request that BLM analyze impacts in these areas. The CDPHE Air Pollution Control Division (APCD) requested inclusion of Dinosaur National Monument (NM), Colorado NM, and five locations with Colorado-designated scenic views (Big Mountain, Mountain of the Holy Cross Overlook, Holy Cross Wilderness, Rabbit's Ear Trail Overlook, and Roan Cliffs Overlook).

Attributes are the measures that are used to qualify and quantify resource indicators. An attribute may be a physical or chemical measurement, a predicted concentration, or a predicted air quality impact, such as visibility. Attributes for air quality include:

- Air pollutant concentrations;
- Deposition of sulfur and nitrogen;
- Acid Neutralizing Capacity (ANC) at sensitive lakes; and
- Visibility.

The air quality impact analysis is based on the following assumptions:

- Air quality within the Planning Area would be affected by source activity and associated emissions occurring within and outside of the Planning Area.
- The air quality analysis is based on the most conservative combination of emissions that could occur due to the expected greatest well drilling activity, well pad and road construction activity, and operation of active wells and supporting oil and gas facilities. Maximum emissions are expected to occur in 2028.

In addition to the assumptions listed above, the ARTSD (URS 2011) includes additional activity, equipment, and emission control assumptions associated with emission calculations for criteria air pollutants, HAPs, and GHGs. Specific air pollutants included in this analysis, their primary sources, and analysis methods are summarized in Table 4-10.

Assumptions and parameters used in modeling to predict future-year pollutant concentrations are based on information contained in the Air Quality Impact Assessment Protocol (URS 2007a) and the Ozone Modeling Protocol (URS 2007b) for the Draft RMPA/EIS, as well as information included in the ARTSD. The protocols were prepared with input from the BLM, EPA Region 8, the FS, the NPS Air Resources Division, and the CDPHE APCD.

The analysis is based on the available monitoring data; however, there is a lack of nearby ambient air quality monitoring data for many criteria pollutants including CO, $NO_2$, $PM_{10}$, $PM_{2.5}$, and $SO_2$. In addition, the analysis does not speculate about the potential effects of future nonattainment area designations affecting the Planning Area or other portions of Colorado that could prompt additional CDPHE restrictions on criteria pollutant emissions. The air quality within the planning area is in attainment for all pollutants and there are no portions of the planning area that are expected to be designated non-attainment in the near future.

**Table 4-10. Analyzed Pollutants, Sources, and Analysis Methods**

| Pollutant | Primary Sources | Analysis Method |
|---|---|---|
| **Criteria Air Pollutants** | | |
| Carbon monoxide (CO) | Combustion sources | NAAQS, CAAQS |
| Nitrogen dioxide (NO$_2$) | Combustion sources | NAAQS, CAAQS, PSD Increments |
| Lead | Not emitted by sources in quantities sufficient to cause concern | None [1] |
| Ozone | Not emitted directly by sources, but formed via atmospheric reactions between nitrogen oxides (NO$_X$) and volatile organic compounds (VOCs). Sources of these pollutants include combustion from point and mobile sources, and gas treatment, processing, venting, and leaking sources. | NAAQS, CAAQS |
| Particulate matter with a diameter less than or equal to 10 microns (PM$_{10}$) | Fugitive dust<br>Combustion sources | NAAQS, CAAQS, PSD Increments |
| Particulate matter with a diameter less than or equal to 2.5 microns (PM$_{2.5}$) | Fugitive dust<br>Combustion sources | NAAQS, CAAQS |
| Sulfur dioxide (SO$_2$) | Combustion sources | NAAQS, CAAQS, PSD Increments |
| **Hazardous Air Pollutants (HAPs)** | Combustion sources<br>Natural gas venting and leaks<br>Gas treatment and processing equipment | Risk Analysis |

NOTE:

[1] Due to the use of non-leaded gasoline and the absence of any non-de minimis sources of lead emissions, lead impacts were not modeled in this analysis.

**Methodology**

For non-GHG pollutants, the expected changes in ambient concentrations are predicted by one or more EPA-approved models. Air quality modeling was performed using three primary models: American Meteorological Society/Environmental Protection Agency Regulatory Model Improvement Committee's Dispersion Model (AERMOD), California Puff Model (CALPUFF), and Comprehensive Air Quality Model with Extensions (CAMx). Each of these models shown in Table 4-11 is approved by EPA and is suited to its specific task in predicting ambient pollutant concentrations for certain types of pollutants and modeling situations. AERMOD, CALPUFF, and CAMx meteorological data and modeling methodologies are described in more detail within the ARTSD (URS 2011).

BLM_0019724

**Table 4-11. Models, Pollutants, and Assessed Impacts**

| Model | Model Type | Pollutants Modeled | Analyzed Impacts |
|---|---|---|---|
| AERMOD | Near-Field | CO, $NO_2$, $PM_{10}$, $PM_{2.5}$, $SO_2$ | NAAQS, CAAQS |
| | | $NO_2$, $PM_{10}$, $SO_2$ | PSD Class I and Class II Increment Consumption (non-regulatory) |
| | | HAPs | HAP Toxicity and Carcinogenic Risk |
| CALPUFF | Far-Field | $NO_2$, CO, $PM_{10}$, $PM_{2.5}$, $SO_2$ | NAAQS, CAAQS |
| | | $NO_2$, $PM_{10}$, $SO_2$ | PSD Class I and Class II Increment Consumption |
| | | Elemental Carbon, Organic Carbon, Soils, $PM_{10}$, $PM_{2.5}$, $HNO_3$, $NO_2$, $NO_3$, $SO_2$, $SO_4$ | Class I Visibility (includes sensitive Class II areas) |
| | | Total Sulfur Total Nitrogen | Deposition |
| | | Acid Neutralizing Capacity | Lake Chemistry |
| CAMx | Far-Field | Ozone | NAAQS, CAAQS |

AERMOD, an EPA guideline model, was used to predict localized concentrations of carbon monoxide CO, $NO_2$, $PM_{10}$, $PM_{2.5}$, and $SO_2$ for comparison to NAAQS and CAAQS. In addition, six hazardous air pollutants and diesel particulate matter were modeled and compared to relevant health-based thresholds. Hazardous air pollutants are toxic and/or carcinogenic air pollutants that are regulated by EPA. Although not modeled, greenhouse gas emissions, including $CO_2$, methane ($CH_4$), and nitrous oxide ($N_2O$), were calculated in the emissions inventory.

To determine impacts, predicted total concentrations are compared to federal and state air quality standards. Federal standards include EPA's NAAQS, which set criteria pollutant concentrations to protect human health and the environment. Similarly, Colorado state standards (CAAQS) have been set. Predicted total ambient concentrations below the NAAQS and CAAQS are considered to be protective of human health and the environment.

Predictions of increased concentrations indicate some deterioration in air quality that could be assessed in terms of the relative magnitude of the pollutant concentration increase compared to the PSD increment. The EPA set PSD increments to prevent excessive air quality deterioration within areas that have good air quality and attain the NAAQS. This analysis uses prevention of Significant Deterioration (PSD) increments only for disclosure and comparison purposes. Under the Clean Air Act, PSD applies to new major stationary sources or major modifications at existing sources for pollutants where the area the source is located is in attainment or unclassifiable with the NAAQS. In this analysis, thousands of individual emission sources are included in the emissions inventories developed for each alternative. Most of these sources are not meet the definition of major stationary source and PSD increments are not applicable to the cumulative impact of these individual minor sources. However, comparisons to PSD increments from estimated oil and gas development activities within the planning area are included for disclosure purposes.

Because NAAQS and CAAQS do not exist for HAPs, predicted concentrations are compared to different sets of toxicity and cancer risk thresholds. Short-term 1-hour maximum HAP predicted concentrations are compared to Reference Exposure Levels (RELs) (EPA 2005b) or Immediately Dangerous to Life and Health divided by 10 (IDLH/10, EPA 2005a) reference concentrations. Predicted annual average HAP concentrations are compared to Reference Concentrations for Chronic Inhalation (RfCs), (EPA 2005b). An RfC is defined by EPA as the daily inhalation concentration at which no long-term adverse health effects are expected. Incremental cancer risk due to predicted increases in ambient concentrations is determined for benzene and formaldehyde

BLM_0019725

based on two types of analyses, one for the maximally exposed individual (MEI) and one for the most likely exposure (MLE).

Ozone concentrations were predicted using the CAMx model. Ozone is formed in the atmosphere by chemical reactions involving a variety of pollutants, particularly VOCs and $NO_x$. Ozone modeling was performed using cumulative emissions and results were compared to the current ozone standard of 0.075 parts per million (ppm). The EPA has proposed to set a lower ozone standard in the range of 0.060 to 0.070 ppm. This analysis compares modeled ozone concentrations to the current 0.075 ppm ozone standard.

Two months April and July, were selected for future year base case and Alternatives modeling. As described below, these two months were selected because they exhibit historically high ozone concentrations. It is important to note, however, that in the time since the model episodes were selected and the subsequent analysis performed, information has come to light regarding the phenomena of springtime intrusion of stratospheric ozone at high elevation monitoring sites. Each year in the springtime, and most specifically during the month of April, it is relatively common for ozone that is present in the upper atmosphere (the stratosphere) to 'intrude' or break through to the ground level. The ozone that intrudes is not attributable to activities occurring on the ground; yet it is common to have higher monitored ozone values during the month of April due to this phenomenon. The April episode was selected as an episode because of the historically higher monitored values during that month. Since it is now believed that the highest monitored values in April may partially be attributable to stratospheric intrusion and that the CAMx model may not adequately model this natural phenomenon, it is likely that ozone predictions in this analysis during the month of April may not adequately predict total ozone concentrations on days with stratospheric intrusion. The July model predictions are considered more representative of potential ozone formation associated with local and regional activities than the April results. The model predictions for the month of April include impacts due to stratospheric intrusions and are likely overestimated or not directly attributable to impacts from oil and gas activities. The April results are included for comparison purposes only.

As of March 30, 2011, the Denver metropolitan area is the only location within the 4 kilometer domain (which includes nearly all of Colorado) that is currently designated as ozone nonattainment. In addition to the 4 kilometer domain, a 12 kilometer and 36 kilometer domain were modeled (see Appendix F, Map F-1). The 12 kilometer domain included Colorado and all or part of multiple nearby states, while the 36 kilometer domain included the 48 contiguous United States. Ozone modeling for April and July was performed for a 2006 base case year and for a 2028 future year, when alternative emissions are predicted to be at their peak.

Ozone concentrations were predicted at locations where ozone monitors were operating during 2006. The ozone monitors closest to the Planning Area are (1) the Ripple Creek Pass monitor located in the Planning Area, (2) the Sunlight Mountain monitor located south of the Planning Area, and (3) the Gothic monitor located south of the Sunlight Mountain monitor (see Appendix F, Map F-2).

Ozone concentrations predicted by the model were analyzed by comparing calculated ozone future design values (DVFs) at ozone monitor locations within and adjacent to the Planning Area to the ozone NAAQS. This calculation is performed using a relative response factor (RRF), which is a ratio of the future 8-hour daily maximum concentration predicted near an ozone monitor to the baseline (i.e., 2006) 8-hour concentration predicted for the monitor. In this analysis, separate RRFs

BLM_0019726

are calculated for the April and July episodes. DVFs are calculated at each monitor location by multiplying the 2006 monitored ozone concentration by the RRF.

In the following descriptions of ozone concentration impacts, photochemical modeling results are summarized and compared among the alternatives. Due to the complexity of ozone modeling, readers are encouraged to review the detailed ozone analysis information contained in the ARTSD (URS 2011).

AQRVs were assessed at federally mandated Class I areas and at sensitive Class II areas identified by CDPHE and federal land managers. The following assessments were performed:

**Deposition**. Rates of nitrogen (N) and sulfur (S) deposition were predicted and compared to the Deposition Analysis Threshold and Level of Concern at each of the following modeled Class I and sensitive Class II areas.

*Class I areas:* Arches NP, Eagles Nest Wilderness, Flat Tops Wilderness, Maroon Bells-Snowmass Wilderness, Mount Zirkel Wilderness, and West Elk Wilderness.

*Sensitive Class II areas:* Colorado NM and Dinosaur NM.

**Lake Chemistry**. Predicted lake ANC changes were compared to the Limit of Acceptable Change (LAC) at each of the following seven lakes included in the modeling analysis. For most lakes listed below, the LAC is up to 10 percent change from the baseline ANC (FS 1998). However, since Upper Ned Wilson Lake has low ANC (less than 25 microequivalents per liter [$\mu$eq/l]), the LAC is 0-<1 microequivalent per liter change from baseline ANC (FS 1998).

*Lakes:* Avalanche Lake, Moon Lake, Ned Wilson Lake, Seven Lakes, Summit Lake, Trappers Lake, and Upper Ned Wilson Lake.

**Visibility.** Visibility changes were assessed at nearby Class I areas as well as at sensitive Class II areas and at the following five scenic views: Big Mountain View, Holy Cross View, Holy Cross Wilderness View, Rabbit's Ear View, and Roan Cliffs View. Visibility impacts are not evaluated against an enforceable standard. Instead, they are assessed in terms of the number of days in which visibility changes are predicted to equal or exceed a threshold level, as calculated in accordance with the Federal Land Managers' Air Quality Related Values Workgroup (FLAG) Phase I Report (FLAG 2000).

Federal Land Managers (FLMs) evaluate visibility impacts by comparing the number of days of predicted impacts above certain deciview thresholds. A dv is a unit used to describe haziness and a 1-dv increase in haziness is often described as a "just noticeable change" in visual perception roughly corresponding to a 10-percent increase in light "extinction." A single point source of air pollutant emissions that result in an impact greater than 0.5 dv is considered to contribute to regional haze visibility impairment. A single source's emissions that result in a 1.0 dv change is considered to cause visibility impairment.

Visibility impacts from multiple point, area, and mobile sources have been evaluated as a "single" project for this RMPA analysis. Visibility methods and thresholds have not been developed to directly evaluate impacts for this type of analysis. However, in the absence of representative methodologies and thresholds, visibility data reported in this document provide the number of days in which a visibility change from estimated natural visibility conditions is predicted to equal or exceed 0.5 dv or 1.0 dv. The ARTSD describes multiple visibility change analysis methodologies

BLM_0019727

*Chapter 4 – Environmental Consequences*

and reports predicted visibility changes for 0.5 and 1.0 dv thresholds for each methodology for each of three years (URS 2011).

Significant air quality impacts would occur if project activities are predicted to cause one or more of the following conditions:

- Exceedance of primary or secondary NAAQS or CAAQS;
- Concentrations of hazardous air pollutants or other toxic air pollutants above designated thresholds;
- An increase in cancer risk of more than one additional person in 1-100 million based on the most likely exposure;
- Changes in nitrogen or sulfur deposition exceeding the Level of Concern;
- Changes in lake acid neutralizing capacity above the Limit of Acceptable Change; and
- Visibility impacts that equal or exceed 0.5 dv or 1.0 dv change at Class I area for project impacts.

Table 4-12 compares emissions from each of the four alternatives. While alternative A would have the least amount of overall oil and gas development activity, Alternative B would have the second least amount of development activity, but would also have stringent emission control requirements. Alternative D would have the greatest oil and gas development activity, and would have very similar requirements as B. Alternative C also has similar, but in some cases somewhat less stringent, requirements. Refer to Chapter 2, Table 2-1, for a summary comparison of management actions by alternative.

**Table 4-12. Estimated Maximum Annual Emissions from Oil and Gas Development, All Alternatives, BLM Project Only**

| Pollutant | Maximum Emissions, Tons per Year | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| CO | 4,016 | 7,249 | 11,611 | 10,626 |
| $NO_x$ | 2,181 | 3,710 | 5,835 | 5,284 |
| $PM_{10}$ | 4,174 | 984 | 2,234 | 2,257 |
| $PM_{2.5}$ | 512 | 227 | 401 | 450 |
| $SO_2$ | 8 | 15 | 24 | 32 |
| VOC | 17,052 | 9,611 | 14,604 | 17,092 |
| Benzene | 248 | 164 | 239 | 314 |
| Ethylbenzene | 2 | 4 | 5 | 6 |
| Formaldehyde | 186 | 371 | 619 | 434 |
| Hexane | 430 | 429 | 673 | 920 |
| Toluene | 201 | 216 | 309 | 400 |
| Xylenes | 97 | 122 | 179 | 235 |

BLM_0019728

#### 4.2.1.1 Impacts Common to All

#### 4.2.1.1.1 Climate Change and Greenhouse Gas

EPA estimates that national greenhouse gas emissions in 2006 were 6,801,812,000 metric tons $CO_2e$ (EPA 2008). National greenhouse gas emissions in 2006 represented a 14 percent increase from estimated 1990 national greenhouse gas emissions (5,964,166,000 metric tons $CO_2e$). EPA categorized the major economic sectors contributing to U.S. emissions of greenhouse gas compounds as:

- Electric power generation (34.5 percent);
- Transportation (28.6 percent);
- Industrial processes (19.9 percent);
- Agriculture (7.7 percent);
- Commercial land uses (5.7 percent); and
- Residential land uses (3.6 percent).

The primary activities that generate greenhouse gas emissions within the Planning Area are construction and operation of oil and gas activities and facilities. Other greenhouse gas emission sources include: wildfires and prescribed burns; highway and off-highway vehicle travel and OHV use; construction and operation of mineral development projects; and livestock grazing. Potential GHG emissions from other sources were not included in this analysis because this RMPA is specifically for oil and gas activities, and because GHG emissions from other sources were deemed to have negligible impacts on climate change.

**Impacts from Oil and Gas Development**

Oil and gas activities affect climate change by increasing GHG emissions. However, some emissions could be prevented or restricted through the use of emission control methods, changes in equipment, and/or changes in operational practices. Climate change management actions included in the alternatives specify emission control methods that decrease emissions from certain types of emission sources on a unit-production basis (Table 2-1 Record 11).

Climate change could be affected by increased GHG emissions associated with oil and gas activities. The three most commonly emitted GHGs from oil and natural gas sources are $CO_2$, $CH_4$, and $N_2O$. Total GHG emissions are often stated in terms of carbon dioxide equivalent ($CO_2e$), which aggregates multiple GHG emissions and weights them by their global warming potential. GHGs are primarily emitted as fugitive emissions from natural gas production, gas venting during well completion, and engine exhaust emissions from gas compression and production heaters. Other GHGs, such as sulfur hexafluoride, hydrofluorocarbons, and perfluorocarbons, are not generally emitted by oil and gas activities and are not included in this analysis. GHG emissions associated with oil and gas activity that occur outside of the Planning Area are not included in alternative emissions inventories. For example, GHG emissions from electricity generation at power plants outside the study area are not included in this analysis. Climate change is also affected by GHG emissions from many other anthropogenic and natural processes, changes to the natural carbon cycle (including the biological carbon sequestration), and changes to radiative forces and reflectivity. GHGs in the atmosphere have a sustained climatic impact over different time scales. For example, emissions of $CO_2$ could influence climate for more than 100 years.

BLM_0019729

**Impacts from Management Actions**

Oil and gas activities may affect climate change by increasing GHG emissions. However, some emissions could be prevented or restricted through the use of emission control methods, changes in equipment, and/or changes in operational practices. Climate change management actions included in the alternatives specify emission control methods that decrease emissions from certain types of emission sources on a unit-production basis (Table 2-1 Record 11). Management actions implemented to reduce other air pollutants also have the co-benefit of reducing GHGs in many cases.

Climate change management actions common to all alternatives would reduce GHG emissions to the extent that federal and state regulations would require GHG emission reductions and associated strategies, such as energy efficiency or renewable energy mandates or programs. In addition, some management actions for other resources would increase GHG emissions due to increased vehicle use or reduce climate change impacts by preserving vegetation and old growth forest that remove $CO_2$ from the atmosphere.

Although not modeled, greenhouse gas emissions, including $CO_2$, $CH_4$, and $N_2O$, were calculated in the emissions inventory. Table 4-13 compares greenhouse gas emissions for each of the four alternatives. Alternative C would have the greatest greenhouse gas emissions, while Alternatives A and B would have the least activity and lowest emissions. While Alternative D has the greatest amount of oil and gas activity, and also has a requirement that at least 50 percent of gas compression at compressor stations would be powered by electric motors. This management action has the potential to greatly reduce the GHG emissions from Alternative D attributable to oil and gas activities within the planning area and transfer them to a power source where GHG emissions can be better controlled or minimized.

### Table 4-13. Maximum Annual Project Oil and Gas Greenhouse Gas Emissions, All Alternatives

| Pollutant | Emissions (mtpy) | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| **Individual Greenhouse Gas** | | | | |
| $CO_2$ | 1,466,747 | 2,283,233 | 3,381,118 | 2,732,504 |
| $CH_4$ | 38,982 | 59,271 | 88,692 | 109,618 |
| $N_2O$ | 10 | 16 | 25 | 20 |
| **$CO_2$e of Each Greenhouse Gas** | | | | |
| $CO_2$ | 1,466,747 | 2,283,233 | 3,381,118 | 2,732,504 |
| $CH_4$ | 818,618 | 1,244,689 | 1,862,528 | 2,301,982 |
| $N_2O$ | 3,100 | 5,073 | 7,891 | 6,200 |
| **Total $CO_2$e for all Greenhouse Gases** | **2,288,465** | **3,532,995** | **5,251,537** | **5,040,686** |

NOTE:
mtpy = metric tons per year

**Reclamation**

Reclamation could increase and/or decrease GHG emissions and concentrations. Reclamation activities involving operation of vehicles and other combustion equipment would increase GHG emissions. However, carbon sequestration by plants growing on previously disturbed land would reduce atmospheric $CO_2$ concentrations.

BLM_0019730

#### 4.2.1.1.2   Air Quality

**Impacts from Oil and Gas Development**

Oil and gas activities affect air quality by increasing air pollutant emissions. Air quality impacts include changes in air pollutant concentrations that could affect human health and the natural environment (e.g., plants, soils, and wildlife). Criteria air pollutant and HAP emissions generally increase as oil and gas activity increases. However, some emissions could be prevented or restricted through the use of emission control methods, changes in equipment, and/or changes in operational practices. Air quality management actions that specify emission control methods would decrease emissions from certain types of emission sources on an emission unit basis. In other words, while total emissions could increase due to increased activity levels, air quality management actions would reduce emissions from individual units of emission sources.

Oil and gas emission sources primarily include the following:

- Combustion emissions from engines such as drill rig engines, compressor engines, construction equipment, and motor vehicle engines;

- Combustion emissions from flared natural gas or VOCs;

- Fugitive natural gas, VOC, and HAP emissions from well venting, gas treatment and processing, and equipment leaks; and

- Fugitive dust emissions from construction activity land disturbance, wind erosion, and vehicular traffic on unpaved roads.

**Impacts from Management Actions**

Assessment of the BLM's management actions related to air quality compliance with existing federal and state emission control requirements for all alternatives.

Emission changes and air quality impacts associated with management actions to protect other resources were generally not quantifiable and are described qualitatively. Air quality impacts due to management actions associated with other resources and resource uses would primarily affect particulate matter and vehicle exhaust emissions. The largest emission sources would be due to oil and gas activity (Table 2-1 Record 13) which were included in the emission inventories and air quality modeling. The emission changes and air quality impacts due to non-air management actions would be relatively small in comparison to air management actions and actual concentrations would be less than modeled concentrations. Actions that were not modeled, but would reduce emissions and improve air quality are listed below.

- Impose surface restrictions to reduce soil erosion from slopes (Table 2-2 Record 17);

- Impose limitations on motorized vehicle access (Table 2-19 Record 7); and

- Impose requirements to preserve old growth forest and avoid woodland clearing (Table 2-15 Records 7 and 9).

Finally, some non-air management actions would not change total emissions, but could recommend changes to oil and gas facility locations which could potentially concentrate emissions within certain geographic areas or during certain times of year. For example, NSO stipulation restrictions could prompt greater facility concentrations in some areas outside NSO stipulations (Table 2-6 Record 18). However, due to the lack of knowledge concerning exact locations of well pads and other facilities, the air quality assessment did not attempt to revise modeled emission source

BLM_0019731

locations to reflect NSO stipulation areas associated with the alternatives. Furthermore, the effects of wildlife timing restrictions (e.g., Table 2-4 Record 12) were not modeled due to the uncertainty associated with the proportion of activities that could be subject to timing restrictions. Timing restrictions for wildlife protection could cause greater emissions during non-restricted timeframes and could potentially cause greater pollutant concentrations during certain times of year.

**Reclamation**

Under all alternatives, implementing reclamation activities as discussed in Appendix D would reduce particulate emissions by revegetating disturbed areas. Reclamation requirements would vary among the alternatives and are discussed under each alternative.

### 4.2.1.2    Alternative A

### 4.2.1.2.1   Climate and Greenhouse Gas

**Impacts from Oil and Gas Development**

Alternative A GHG emissions reflect a total development of up to 4,603 gas wells and associated equipment and activities (Table 2-1 Record 13). GHG emissions are included in Table 4-14 and reflect maximum annual emissions in 2028.

**Table 4-14. 2028 Alternative A Planning Area GHG Emissions**

| Pollutant | Alternative A Emissions (mtpy) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| Individual GHG | 1,466,747 | 38,982 | 10 | **NA** |
| $CO_2e$ of Each GHG and Total $CO_2e$ | 1,466,747 | 818,618 | 3,100 | **2,288,465** |

NOTES:
mtpy = metric tons per year
NA = not applicable

Greenhouse gas emissions are provided in terms of metric tons per year (mtpy) for each individual greenhouse gas and in terms of $CO_2e$ for each individual greenhouse gas and for combined greenhouse gases. The relative magnitude of Alternative A GHG emissions can be assessed by comparing these emissions to other GHG emission inventories. As shown in Table 4-15, GHG emission increases associated with Alternative A would be approximately 1.8 percent of the 2007 Colorado state GHG emission inventory and would be approximately 0.03 percent of the 2008 U.S. GHG emission inventory, based on $CO_2e$ given in million ($10^6$) metric tons per year (mtpy). In terms of the total U.S. emission inventory for natural gas systems, Alternative A emission increases would be approximately 1.8 percent of U.S. natural gas sector GHG emissions.

**Table 4-15. Alternative A Maximum Annual GHG Emission Comparisons**

| Inventory Description | $CO_2e$ Emissions ($10^6$ mtpy) | Alternative A Percentage of Inventory |
|---|---|---|
| **State Inventories (Year 2007)** [1] | | |
| Colorado | 124 | 1.8% |
| Utah | 80 | 2.9% |
| Wyoming | 90 | 2.5% |

BLM_0019732

*Chapter 4 – Environmental Consequences*

**Table 4-15. Alternative A Maximum Annual GHG Emission Comparisons**

| Inventory Description | $CO_2e$ Emissions ($10^6$ mtpy) | Alternative A Percentage of Inventory |
|---|---|---|
| **U.S. Inventories (Year 2008)** [2] | | |
| Total U.S. GHG | 6,957 | 0.03% |
| U.S. Natural Gas Systems | 126 | 1.8% |
| U.S. Coal Mining | 68 | 3.4% |
| U.S. Landfills | 126 | 1.8% |
| U.S. Fossil Fuel Combustion | 5,573 | 0.04% |

NOTES:

[1] World Resources Institute (WRI) 2010.

[2] Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2008 (EPA 2010a).

mtpy = metric tons per year

It is not possible at this time to determine whether GHG emissions that would result from the emission assumptions associated with Alternative A would cause a significant impact. The global biological and atmospheric carbon cycles are complex and interdependent upon each other, and it is not possible at this time to determine the impact that GHG emissions from Alternative A may or may not have to global climate change. Consequently it is not possible to determine whether the impact could potentially be significant. However, based on the GHG emission sources included in this analysis, Alternative A has a greater GHG emission impact on a gas-production basis than the other alternatives. For every 1 million standard cubic feet (MMscf) of natural gas production, 5.25 metric tons (mt) of $CO_2e$ could be emitted by oil and gas activities included in Alternative A emissions.

**Impacts from Management Actions**

Alternative A climate change management actions would not differ from the climate change management actions common to all alternatives. Management actions for other resources would increase GHG emissions due to increase vehicle and equipment use and/or reduce climate change impacts by preserving vegetation and old growth forest that remove $CO_2$ from the atmosphere. Alternative A management actions require compliance with federal and state air quality regulations so that future greenhouse gas reduction requirements imposed by the EPA or the CDPHE would decrease Alternative A greenhouse gas emissions and may reduce climate change impacts.

**Reclamation**

Reclamation could increase and/or decrease GHG emissions and concentrations. Reclamation activities involving operation of vehicles and other combustion equipment would increase GHG emissions. However, carbon sequestration by plants growing on previously disturbed land would reduce atmospheric $CO_2$ concentrations.

### 4.2.1.2.2   Air Quality Alternative A

**Impacts from Oil and Gas Development**

Alternative A emissions reflect development of up to 4,603 gas wells and associated equipment and activities (Table 2-1 Record 13). Alternative A emissions are summarized in Table 4-16 and reflect maximum annual emissions in 2028 from activities authorized on BLM lands. Emissions calculations and potential air impacts were developed for this alternative using the following key assumptions (refer to ARTSD Appendix A, for a complete description):

BLM_0019733

- Maximum emissions year occurs in 2028;

- 263 wells drilled per year using 24 drill rigs;

- 4,603 producing wells, 8 compressor stations, and 3 gas treatment facilities would be operational;

- Drill rigs and frac (hydraulic fracturing) engines will be powered by Tier IV generator sets (by year 2019) that meet emission standards specified in 69 FR 38930, June 29, 2004;

- All natural gas fired compressor engines;

- Well completion gas is vented to the atmosphere or flared (50 percent vented and 50 percent flared with 95 percent control); and

- Percentage of gas collection and treatment facilities assumed to be consolidated or centralized is 40 percent.

**Impacts from Management Actions**

The air quality management objective under Alternative A is to limit air quality degradation in the resource area by ensuring that the BLM land-use activities are in compliance with Federal, state, and local laws and regulations. Air quality management objectives and actions under Alternative A emphasize coordination with local, state, and federal air quality management agencies to ensure compliance with regulatory programs. In addition, air quality management actions would:

- Require watering and implementation of fugitive dust control plans during construction activities (Table 2-1 Record 10).

- Require at least 50 percent fugitive dust control on collector, local, and resource roads (Table 2-1 Records 7 and 8).

- Require at least 90 percent VOC control on produced water evaporation ponds at gas plants by using VOC removal technologies prior to discharge to the pond such as oil/water separation, air sparging/stripping combined with carbon adsorption and thermal oxidation, or other VOC control strategies. (Table 2-1 Record 17).

- Require the use of a three-phase gathering systems at 40 percent of well pads to transport natural gas, condensate, and produced water to consolidated facilities where dehydration, temporary tank storage, and truck loading would occur (Table 2-1 Record 16).

Facility consolidation has positive and negative air quality impacts. The use of three-phase gathering systems would reduce vehicle miles traveled, thereby decreasing total vehicle exhaust and fugitive dust emissions. However, facility consolidation has the potential to concentrate emissions within smaller geographic areas. The localized impact of more concentrated emission sources can be reduced through more stringent emission control. Although Alternative A emission controls are less stringent than those for Alternatives B, C, and D, aggregated facility emissions from more and larger equipment (such as tanks and glycol dehydrators) at individual consolidated facilities are more likely to trigger CDPHE air quality permitting and additional emission control. CDPHE has low emission reporting and permitting thresholds and requires stringent emission control on oil and gas sources with more than de minimus capacities and emissions. Due to greater emission control, use of consolidated facilities may decrease total emissions from stationary oil and gas sources.

Alternative A management actions for other resources that would improve air quality by reducing emissions include imposing surface restrictions to reduce soil erosion from slopes (Table 2-2 Records 9 and 15).

BLM_0019734

*Chapter 4 – Environmental Consequences*

Descriptions of oil and gas activity, air quality management actions, emission control levels, and emission calculations are provided in the ARTSD (URS 2011). Estimated maximum annual emissions from oil and gas development under Alternative A are summarized in Table 4-16, based on year 2028, which is expected to have the greatest annual emissions of each pollutant. In addition to criteria pollutants, emissions of six hazardous air pollutants were quantified, including benzene, ethylbenzene, formaldehyde, hexane, toluene, and xylene. The combination of benzene, toluene, ethylbenzene, and xylene are sometimes referred to as BTEX. Hexane and BTEX are emitted from oil and gas operations and from engine exhaust. Formaldehyde is also emitted from engine exhaust.

**Table 4-16. 2028 Alternative A Planning Area Emissions**

| Pollutant | Alternative A Emissions (tpy) |
|---|---|
| **Criteria Pollutants** | |
| CO | 4,016 |
| $NO_x$ | 2,181 |
| $PM_{10}$ | 4,174 |
| $PM_{2.5}$ | 512 |
| $SO_2$ | 8 |
| VOCs | 17,052 |
| **Hazardous Air Pollutants** | |
| Benzene | 248 |
| Ethylbenzene | 2 |
| Formaldehyde | 186 |
| Hexane | 430 |
| Toluene | 201 |
| Xylene | 97 |

NOTE:

tpy = short tons per year

**Near-field Comparisons to Non-ozone NAAQS and CAAQS.** Alternative A predicted concentrations for non-ozone pollutants (CO, $NO_2$, $PM_{10}$, $PM_{2.5}$, and $SO_2$) would be below the NAAQS for each of the modeled pollutants and averaging times with the exception of 1-hour $NO_2$, as shown in Table 4-17. The near-field predicted concentrations are based on a conservative multi-facility scenario involving four closely spaced well pads and a compressor station within a one square mile area. Because the scenario is based on Alternative A emission control parameters (the least stringent) and assumes use of Tier 2 drill rig engines, this modeling scenario includes greater $NO_2$ emissions than will likely occur at most facilities constructed in the future. For example, Tier 4 drill rig engines and low $NO_x$-emitting compressor engines will be required due to federal and state regulations, as well as applicable the BLM management actions.

BLM_0019735

*Chapter 4 – Environmental Consequences*

## Table 4-17. Alternative A Criteria Pollutant Near Field Predicted Concentrations

| Criteria Pollutant | Average Period | Year | Concentration (µg/m³, [ppm]) | | | Ambient Standard (µg/m³, [ppm]) | | Percent of NAAQS |
|---|---|---|---|---|---|---|---|---|
| | | | Modeled | Back-ground | Total [1] | NAAQS | CAAQS | |
| CO | 1-hour | 2001 | 1177.07 | 4,656 | **5,833 [5.104]** | 40,000 [35] | 40,000 [35] | 15 |
| | 8-hour | 2002 | 280.15 | 2,328 | **2,608 [2.282]** | 10,000 [9] | 10,000 [9] | 26 |
| $NO_2$ | 1-hour | All | 165.01 | 32.08[2] | **197.09[2], [3] [0.0875]** | 189 [0.100] | NA | 104 |
| | Annual | 2001 | 10.73 | 30.6 | **41.33 [0.0219]** | 100 [0.053] | 100 [0.053] | 41 |
| $PM_{10}$ | 24-hour | 2003 | 74.79 | 56 | **130.79 [NA]** | 150 [NA] | 150 [NA] | 87 |
| | Annual | 2003 | 1.18 | 30 | **31.18 [NA]** | Revoked | 50 [NA] | NA |
| $PM_{2.5}$ | 24-hour | All | 5.17 | 24 | **29.17[3] [NA]** | 35 [NA] | NA | 83 |
| | Annual | 2001 | 0.49 | 9 | **9.49 [NA]** | 15 [NA] | NA | 63 |
| $SO_2$ | 1-hour [4] | All | 6.91 | 80.82 | **87.73[3] [0.0337]** | 196 [0.075] | NA | 45 |
| | 3-hour [5] | 2002 | 5.58 | 66.6 | **72.18 [0.0278]** | 1,300 [0.5] | 700 [0.27] | 6 |
| | 24-hour [6] | 2003 | 2.02 | 34.6 | **36.62 [0.0141]** | 365 [0.14] | NA | 10 |
| | Annual [6] | 2001 | 0.43 | 5.3 | **5.73 [0.0022]** | 80 [0.30] | NA | 7 |

NOTES:

µg/m³ = micrograms per cubic meter

NA = not applicable

ppm = parts per million

[1] For short-term (non-annual) averaging times, compliance with the CO, $PM_{10}$, and $SO_2$ NAAQS is based on the highest-second-highest (H2H) short-term concentration, while compliance with the short-term $PM_{2.5}$ and $NO_2$ NAAQS is based on the highest 3-year average eighth-highest short-term concentration. Short-term modeled concentrations reported here are highest-second-highest for CO, $PM_{10}$, and $SO_2$, and highest-eighth-highest for $PM_{2.5}$ and $NO_2$. Annual (long-term) modeled concentrations are highest concentrations which are required for an annual average NAAQS compliance demonstration.

[2] The 1-hour $NO_2$ background concentration of 32.08 (consistent with the CALPUFF analysis) was added to the modeled concentration.

[3] Due to 1-hour $NO_2$, 24-hour $PM_{2.5}$, and 1-hour $SO_2$ NAAQS standard formats that use a three-year average to determine compliance, only one total concentration is reported for the three-year modeling period.

[4] The new 1-hour $SO_2$ standard became effective on August 23, 2010. To comply with the 1-hour $SO_2$ standard, the three-year average of the annual 99th percentile of the 1-hour daily maximum concentration must be less than or equal to 195.5 µg/m³ (75 ppb).

[5] As of August 23, 2010, this standard transitioned from a primary standard (protecting human health) to a secondary standard (protecting environment) at the federal level. However, state air quality agencies have discretion to continue enforcing this standard as a primary standard. The 3-hour standard would become obsolete at the federal level once attainment/ nonattainment designations under the new 1-hour $SO_2$ standard are promulgated by EPA.

[6] The 24-hour and annual standard would become obsolete at the federal level once attainment/nonattainment designations under the new 1-hour $SO_2$ standard are promulgated by EPA.

BLM_0019736

*Chapter 4 – Environmental Consequences*

**Near-field Comparisons to HAP Thresholds.** One-hour predicted HAP concentrations would be below health-based standards, including the RELs and IDLH/10 thresholds, as shown in Table F-1 of Appendix F. In addition, annual predicted HAP concentrations would be below the RfCs (Table F-2). For benzene, predicted incremental cancer risks would be less than 10 in one million for the MLE and less than 30 in one million for the MEI (Table F-3). Incremental formaldehyde cancer risks are predicted to be approximately 0.00003 per million for the MLE and 0.0001 per million for the MEI. Based on the Superfund National Oil and Hazardous Substances Pollution Contingency Plan, a cancer risk range of 1 in a million to 100 in a million ($10^{-6}$ to $10^{-4}$ risk) is generally acceptable (EPA 1990).

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Far-field pollutant concentrations were estimated using CALPUFF modeling, which is described in the ARTSD (URS 2011). Thousands of receptors were modeled within and beyond the WRFO oil and gas development area. Class I receptors were modeled in Arches National Park, Eagles Nest Wilderness Area, Flat Tops Wilderness Area, Maroon Bells-Snowmass Wilderness Area, and Mount Zirkel Wilderness Area. Class II (gridded) receptors were modeled within and beyond the major oil and gas development areas, as well as within the West Elk Wilderness Area (a Class I area), Colorado National Monument (sensitive Class II area), and Dinosaur National Monument (sensitive Class II area). In addition to predicting non-ozone criteria pollutant concentrations, modeling was performed to predict nitrogen and sulfur deposition, changes in acid neutralizing capacity conditions at selected wilderness area lakes, and visibility changes in Class I and sensitive Class II areas. The modeling results can be summarized as follows.

- As shown in Tables F-4 through F-15 of Appendix F, Alternative A predicted concentrations for non-ozone criteria air pollutants would be below the NAAQS for each of the modeled pollutants and averaging times. Depending on the federal or state standard, averaging time, and receptor group, maximum total modeled concentrations would vary from 5 percent to 87 percent of the NAAQS and CAAQS.

- Incremental increases in $PM_{10}$ concentrations are predicted to be less than PSD increment criteria for annual average concentrations at Class I and identified sensitive Class II areas. Incremental increases are predicted to be above the 24-hour increment criteria at some gridded Class II locations.

- Total nitrogen deposition at Class I and sensitive Class II areas would be above the Deposition Analysis Threshold (DAT) at two locations and below the critical load Level of Concern (LOC) at all locations. Total sulfur deposition would be below the DAT and critical load LOC at all locations.

- Predicted changes in acid neutralizing capacity at Avalanche Lake, Moon Lake, Ned Wilson Lake, Seven Lakes, Summit Lake, and Trappers Lake would be below the Limit of Acceptable Change.

**Far-field Comparisons to PSD Increments.** Alternative A impacts are predicted to be below PSD Class I and Class II increments at all modeled receptors for $NO_2$ annual, $PM_{2.5}$ 24-hour and annual, $SO_2$ 3-hour, 24-hour, and annual, and $PM_{10}$ annual. Predicted concentration increases for $NO_2$ $PM_{2.5}$ and $SO_2$ from all BLM project sources for all averaging times, would vary from 1 percent to 87 percent of the increments. Predicted concentration increases for $PM_{10}$ from all BLM project sources ranges from less than 1 percent to 47 percent for the annual increment. Predicted concentration increases for $PM_{10}$ from all BLM project sources range from less than 1 percent to 112 percent for the 24-hour increment. Impacts above the $PM_{10}$ 24-hour increment occur in very limited locations within the modeling domain and can be attributed to high surface disturbing

BLM_0019737

operations (i.e. mining). It is important to note that these results include impacts from several potential major sources and multiple minor and area sources and are useful as a comparative metric in terms of comparing the magnitude of the whole project to a single major source. If the BLM authorizes a plan of development that includes the construction or modification of a major stationary source, a formal increment consumption analysis would be conducted (see Tables F-5 through F-7 and F-11 through F-13 in Appendix F).

**Far-field Ozone Comparison to NAAQS and CAAQS.** Based on modeling results at ozone monitoring locations operating in 2006, ozone impacts attributable to Alternative A emissions would not be expected to cause or contribute to violations of the ozone NAAQS. See further explanation in Section 5.0 of the ARTSD (URS 2011).

**Deposition.** Predicted Alternative A deposition analysis indicates that N and S deposition rates would be below the Levels of Concern at modeled Class I and sensitive Class II areas (Tables F-16 and F-17). Predicted deposition would vary from 50 to 90 percent of the Level of Concern for nitrogen and from 13 to 17 percent for sulfur. Annual predicted Alternative A deposition rates were also compared to Deposition Analysis Thresholds, below which many FLMs consider N and S deposition rates to be negligible. Alternative A nitrogen deposition Project impacts would be less than Deposition Analysis Thresholds at all Class I and sensitive Class II areas except for the Flat Tops Wilderness and Dinosaur NM. For sulfur deposition, Alternative A impacts would be less than these thresholds at each modeled deposition location. Consequently, Alternative A sulfur deposition impacts are expected to be negligible at each Class I and sensitive Class II area, while nitrogen deposition impacts are expected to be negligible at most areas and would not exceed the Level of Concern at any area.

**Lake Chemistry.** Predicted Alternative A cumulative lake ANC changes would be below the LAC at all seven modeled lakes (Table F-18 of Appendix F), varying from 0.1 to 1.9 percent depending on the lake. Since Upper Ned Wilson Lake is characterized as an extremely sensitive lake with a background ANC value of less than 25 μeq/l, the LAC is not measured as a percentage, but rather as a change of less than 1 μeq/l. Based on Upper Ned Wilson Lake volume, the LAC is equivalent to approximately 21.2 equivalents (eq). Impacts at Upper Ned Wilson are predicted to be 1.7 eq, which is less than the LAC.

**Visibility.** Visibility impacts are assessed by predicting pollutant concentrations and calculating their effect on changes to visibility impairment. The predicted visibility results are calculated in terms of deciviews (dv) and impacts are analyzed in terms of changes in dv over time. A 1.0 dv change in visibility is a small but perceptible scenic change that is approximately equal to a 10 percent change in the light extinction coefficient. A single point source of air pollutant emissions that result in an impact greater than 0.5 dv is considered to contribute to regional haze visibility impairment. A single source's emissions that result in a 1.0 dv change is considered to cause visibility impairment. Visibility impacts from both the WRFO oil and gas sources and cumulative sources were evaluated to determine the number of days in a year that changes in visibility were predicted to be above the 0.5 and the 1.0 dv thresholds at each Class I area and identified sensitive Class II area. The ARTSD describes visibility change analysis methodologies and provides visibility results for both the 0.5 and 1.0 dv thresholds for WRFO oil and gas impacts (URS 2011).

Three visibility impact prediction calculation methods were used in conjunction with three years of modeling data. Table 4-18 summarizes the maximum number of days with visibility impacts based on the FLAG 2000 methodology. Complete results for multiple years and methodologies are provided in Tables F-19 through F-22 of Appendix F and in Appendices G and H of the ARTSD

BLM_0019738

(URS 2011). Under Alternative A, the maximum number of days at any Class I area with predicted visibility changes greater than or equal to 0.5 dv would be 11 days at the Flat Tops Wilderness; all other Class I areas are predicted to have 4 or fewer days of visibility change at or above 0.5 dv. Although not required to be modeled or disclosed under the Clean Air Act, visibility results are also shown for sensitive Class II areas and scenic views.

**Table 4-18. Alternative A Visibility Impacts**

| Class I Areas | Maximum Number of Days with Visibility Change | | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with Visibility Change | |
|---|---|---|---|---|---|
| | ≥0.5 dv | ≥1.0 dv | | ≥0.5 dv | ≥1.0 dv |
| Arches NP | 0 | 0 | Colorado NM | 3 | 1 |
| Eagles Nest Wilderness | 1 | 0 | Dinosaur NM | 59 | 8 |
| Flat Tops Wilderness | 11 | 2 | Big Mountain View | 27 | 7 |
| Maroon Bells-Snowmass Wilderness | 1 | 0 | Holy Cross View | 0 | 0 |
| Mount Zirkel Wilderness | 4 | 0 | Holy Cross Wilderness View | 0 | 0 |
| | | | Rabbit's Ear View | 2 | 0 |
| | | | Roan Cliffs View | 14 | 4 |

NOTE:
dv = deciview

### Reclamation

Alternative A reclamation requirements would include multiple vegetation management actions to preserve and restore vegetation. These actions would decrease wind erosion and particulate emissions, which would improve air quality (Table 2-3 Multiple Records).

### 4.2.1.3    Alternative B

### 4.2.1.3.1    Climate and Greenhouse Gas

#### Impacts from Oil and Gas Development

Emissions for Alternative B reflect development of up to 9,191 gas wells and associated equipment and activities (Table 2-1 Record 13). Emissions for Alternative B are summarized in Table 4-19 and reflect maximum annual emissions in 2028. Alternative B GHG emissions exceed Alternative A emissions. Detailed information for the Alternative B emission inventory is provided in the ARTSD (URS 2011).

#### Impacts from Management Actions

The following Alternative B management actions would reduce GHG emissions.

- Use Tier 4 engines (or cleaner engines) for all drill rig and frac pump engines to reduce emissions of $CO_2$ and $N_2O$ (Table 2-1 Record 14).

- Use green completion techniques for new wells to reduce emissions of $CH_4$, unless an exemption is granted (Table 2-1 Record 9).

- Glycol dehydrators would achieve at least 90 percent VOC emission reduction from uncontrolled emissions; this would also reduce $CH_4$ emissions (Table 2-1 Record 11).

BLM_0019739

*Chapter 4 – Environmental Consequences*

- Condensate tanks and produced water tanks would achieve at least 95 percent VOC emission reduction from uncontrolled emissions; this would also reduce $CH_4$ emissions (Table 2-1 Record 11).

- Natural gas, condensate, and produced water would be piped to consolidated facilities in order to reduce vehicle exhaust emissions of $CO_2$ and $N_2O$ (Table 2-1 Record 16).

Management actions for other resources would increase GHG emissions due to increased vehicle and equipment use and/or reduce climate change impacts by preserving vegetation and old growth forest that remove $CO_2$ from the atmosphere.

**Table 4-19. 2028 Alternative B Planning Area GHG Emissions**

| Pollutant | Alternative B Emissions (mtpy) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| Individual GHG | 2,283,233 | 59,271 | 16 | **NA** |
| $CO_2e$ of Each GHG and Total $CO_2e$ | 2,283,233 | 1,244,689 | 5,073 | **3,532,995** |
| Alternative B $CO_2e$ Increase (Decrease) from Alternative A | 56% | 52% | 64% | **54%** |

NOTES:
mtpy = metric tons per year
NA = not applicable

Future GHG-reduction requirements imposed by the EPA and/or the CDPHE could further decrease Alternative B GHG emissions and could reduce climate change impacts.

It is not possible at this time to determine whether GHG emissions that would result from the emission assumptions associated with Alternative A would cause a significant impact. The global biological and atmospheric carbon cycles are complex and interdependent upon each other, and it is not possible at this time to determine the impact that GHG emissions from Alternative A, may or may not have to global climate change. However, a relative comparison shows that, in terms of total $CO_2e$, GHG emissions under Alternative B would be approximately 54 percent greater than those for Alternative A. Consequently, Alternative B climate change impacts would likely be greater than those for Alternative A. However, Alternative B unit-production $CO_2e$ emissions are estimated to be 4.05 mt of $CO_2e$ per MMscf, which would be approximately 23 percent less than Alternative A.

As shown in Table 4-20, GHG emission increases associated with Alternative B would be approximately 2.8 percent of the 2007 Colorado state GHG emission inventory and would be approximately 0.05 percent of the 2008 U.S. GHG emission inventory, based on $CO_2e$ given in million mtpy. In terms of the total U.S. emission inventory for natural gas systems, Alternative B emission increases would be approximately 2.8 percent of U.S. natural gas sector GHG emissions.

BLM_0019740

**Table 4-20. Alternative B Maximum Annual GHG Emission Comparisons**

| Inventory Description | CO₂e Emissions (10⁶ mtpy) | Alternative B Percentage of Inventory |
|---|---|---|
| **State Inventories (Year 2007)[1]** | | |
| Colorado | 124 | 2.8% |
| Utah | 80 | 4.4% |
| Wyoming | 90 | 3.9% |
| **U.S. Inventories (Year 2008)[2]** | | |
| Total U.S. GHG | 6,957 | 0.05% |
| U.S. Natural Gas Systems | 126 | 2.8% |
| U.S. Coal Mining | 68 | 5.2% |
| U.S. Landfills | 126 | 2.8% |
| U.S. Fossil Fuel Combustion | 5,573 | 0.06% |

NOTES:
[1] WRI 2010.
[2] Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2008 (EPA 2010a).
mtpy = metric tons per year

## Reclamation

Reclamation could increase and/or decrease GHG emissions and concentrations. Reclamation activities involving operation of vehicles and other combustion equipment would increase GHG emissions. However, carbon sequestration by plants growing on previously disturbed land would reduce atmospheric $CO_2$ concentrations.

### 4.2.1.3.2 Air Quality Alternative B

**Impacts from Oil and Gas Development**

Alternative B emissions reflect development of up to 9,191 gas wells and associated equipment and activities (Table 2-1 Record 13). These emissions are summarized in Table 4-21 and reflect maximum annual emissions in 2028 from activities authorized on BLM lands. Alternative B emissions exceed Alternative A emissions for all pollutants except for PM10, PM2.5, VOCs, benzene, and hexane. Decreases in Alternative B emissions would be due to emission reductions associated with Alternative B air quality management actions that are greater than emission increases associated with increased oil and gas activity. Emissions calculations and potential air impacts were developed for this alternative using the following key assumptions (refer to ARTSD Appendix A, for a complete description):

- Maximum emissions year occurs in 2028;

- 666 wells drilled per year using 47 drill rigs;

- 9,191 producing wells, 15 compressor stations, and 3 gas treatment facilities would be operational;

- Drill rigs and frac (hydraulic fracturing) engines will be powered by Tier IV generator sets that meet emission standards specified in 69 FR 38930, June 29, 2004;

- All natural gas fired compressor engines;

- Well completion gas is controlled through the use of closed loop processes (i.e. "green completions") for 95 percent of wells; and

BLM_0019741

- Percentage of gas collection and treatment facilities assumed to be consolidated or centralized is 90 percent.

**Impacts from Management Actions**

The air quality management objective under Alternative B is to limit air quality degradation in the resource area by ensuring that the BLM land-use activities are in compliance with Federal, state, and local laws and regulations. Air quality management objectives and actions under Alternative B emphasize coordination with local, state, and federal air quality management agencies to ensure compliance with regulatory programs. In addition, air quality management objectives to intensify air quality monitoring as well as to allow for minor increases in current emissions while maintaining compliance with all applicable legal standards. In addition, the following Alternative B air quality management actions would reduce criteria air pollutant and HAP emissions.

- Apply water and/or chemical dust suppression to reduce fugitive dust ($PM_{10}$ and $PM_{2.5}$) emissions at construction sites and on resource roads, avoid fugitive dust plumes, implement speed restrictions on construction roads, and reclaim disturbed areas within two years (Table 2-1 Record 10).

- Reduce fugitive dust emissions on resourced roads by at least 80 percent from uncontrolled levels in the Mesaverde Play Area and by at least 50 percent in other areas (Table 2-1 Record 8).

- Reduce fugitive dust emissions on local roads by at least 84 percent from uncontrolled levels in the Mesaverde Play Area and by at least 50 percent in other areas (Table 2-1 Record 7).

- Use Tier 4 engines (or cleaner engines) for all drill rig and frac pump engines to reduce emissions of nitrogen oxides ($NO_x$), $PM_{10}$, $PM_{2.5}$, and VOCs (Table 2-1 Record 14).

- Use green completion techniques for new wells to reduce emissions of VOCs and HAPs, unless an exemption is granted (Table 2-1 Record 9).

- Glycol dehydrators would achieve at least 90 percent VOC emission reduction from uncontrolled emissions (Table 2-1 Record 11).

- Condensate tanks and produced water tanks would achieve at least 95 percent VOC emission reduction from uncontrolled emissions (Table 2-1 Record 11).

- Use three-phase gathering at 90 percent of well pads to pipe natural gas, condensate, and produced water to consolidated facilities in order to reduce vehicle fugitive dust and exhaust emissions (Table 2-1 Record 16).

- Evaporation ponds at gas plants would achieve at least 90 percent VOC emission reduction from uncontrolled emissions (Table 2-1 Record 17).

Facility consolidation has positive and negative air quality impacts. The use of three-phase gathering systems would reduce vehicle miles traveled, thereby decreasing total vehicle exhaust and fugitive dust emissions. In addition, consolidation is expected to result in reduced emissions of VOCs due to fewer condensate and produced water storage tanks and ponds, and fewer equipment vents and leaks. However, facility consolidation has the potential to concentrate some emissions within smaller geographic areas. For example a centralized tank battery may result in more localized VOC emissions than several smaller tanks dispersed over a number of well pads. The localized impact of more concentrated emission sources can be reduced through more efficient or stringent emission control. Alternative B emission controls are at least as stringent as CDPHE oil and gas stationary source emission controls and are applied regardless of equipment capacities or emissions.

BLM_0019742

In addition, CDPHE emission reporting and permitting requirements would apply to each consolidated facility with emissions above state-mandated thresholds.

Non-air Alternative B management actions that would improve air quality by reducing emissions include:

- Imposing surface restrictions to reduce soil erosion from slopes and landslide areas (Table 2-2 Records 15 and 17); and

- Prohibiting public vehicle access to well access roads (Table 2-4 Record 14, Table 2-19 Record 8).

### Table 4-21. 2028 Alternative B Planning Area Emissions

| Pollutant | Emissions (tpy) | | |
|---|---|---|---|
| | Alternative A | Alternative B | Alternative B Increase From Alternative A (Decrease) |
| **Criteria Pollutants** | | | |
| CO | 4,016 | 7,249 | 3,233 |
| NO$_x$ | 2,181 | 3,710 | 1,529 |
| PM$_{10}$ | 4,174 | 984 | (3,190) |
| PM$_{2.5}$ | 512 | 227 | (285) |
| SO2 | 8 | 15 | 7 |
| VOCs | 17,052 | 9,611 | (7,441) |
| **Hazardous Air Pollutants** | | | |
| Benzene | 248 | 164 | (84) |
| Ethylbenzene | 2 | 4 | 2 |
| Formaldehyde | 186 | 371 | 185 |
| Hexane | 430 | 429 | (1) |
| Toluene | 201 | 216 | 15 |
| Xylene | 97 | 122 | 25 |

NOTE:
tpy = short tons per year

**Near-field Comparisons to Non-ozone NAAQS and CAAQS.** In order to be conservative, the Alternative B near-field criteria pollutant analysis was based on Alternative A maximum emission rates. This approach approximated maximum emission rates that could occur early in the life of the project due to use of older high-emitting equipment and cases in which operations or equipment could qualify for emission control exemptions. Consequently, the Alternative A near-field criteria pollutant and HAP impacts likely overestimates Alternative B impacts.

**Near-field Comparisons to HAP Thresholds.** In order to be conservative, the Alternative B near-field HAP analysis was based on Alternative A maximum emission rates. Consequently, the Alternative A near-field criteria pollutant and HAP impacts likely over-estimate Alternative B impacts.

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Alternative B concentrations at Class II receptors (where the greatest concentrations occur) would be slightly greater than Alternative A concentrations for non-particulate pollutants and are substantially less than

BLM_0019743

*Chapter 4 – Environmental Consequences*

Alternative A for $PM_{10}$ and $PM_{2.5}$ due to better fugitive dust controls included with Alternative B. Compared to the other alternatives, Alternative B would have the greatest predicted concentrations at Class II areas for 1-hour CO concentrations. Depending on the federal or state standard, averaging time, and receptor group, maximum total predicted Alternative B non-ozone criteria pollutant concentrations would vary from approximately 5 to 73 percent of the NAAQS and CAAQS for all pollutants and averaging times.

**Far-field Comparisons to PSD Increments.** Alternative B concentrations at Class II receptors would be slightly greater than Alternative A concentrations for non-particulate pollutants and substantially less than Alternative A for $PM_{10}$ and $PM_{2.5}$ due to fugitive dust controls. Predicted Alternative B concentrations would vary from less than 1 percent to 35 percent of the PSD increments (see Tables F-5 through F-7 and F-11 through F-13 provide detailed results).

**Far-field Ozone Comparison to NAAQS and CAAQS.** Alternative B ozone impacts would be similar to those for Alternative A.

**Deposition.** Predicted Alternative B deposition analysis indicates that N and S deposition would be slightly greater than Alternative A deposition, but still would be below the Levels of Concern at modeled Class I and sensitive Class II areas (Tables F-16 and F-17 of Appendix F). Predicted deposition would vary from 50 to 90 percent of the Level of Concern for nitrogen and from 13 to 17 percent for sulfur. Based on Deposition Analysis Thresholds, three Class I areas (Flat Tops Wilderness, Maroon Bells-Snowmass Wilderness, and Mount Zirkel Wilderness) and one sensitive Class II area (Dinosaur NM) would have N deposition that would be considered to be more than a negligible impact. For all modeled areas, S deposition would be considered to be negligible.

**Lake Chemistry.** Predicted Alternative B lake ANC changes would be slightly greater than Alternative A impacts and would be below the LAC at all seven modeled lakes (Table F-18 of Appendix F). Predicted ANC changes at six of the lakes vary from 0.2 to 2.9 percent depending on the lake. Since Upper Ned Wilson Lake is characterized as an extremely sensitive lake with a background ANC value of less than 25 µeq/l, the LAC is not measured as a percentage, but rather as a change of less than 1 µeq/l. Based on Upper Ned Wilson Lake volume, the LAC is equivalent to approximately 21.2 eq. Impacts at Upper Ned Wilson are predicted to be 2.6 eq, which is less than the LAC.

**Visibility.** Table 4-22 summarizes visibility impacts in terms of visibility changes from estimated natural conditions using the FLAG 2000 methodology. Under Alternative B, the maximum number of days at any Class I area with predicted oil and gas related visibility changes greater than or equal to 0.5 dv would be 19 days at the Flat Tops Wilderness, which is 8 more days than the maximum number of days predicted for Alternative A. Positive numbers in parentheses indicate an increase in the number of days with visibility changes greater than or equal to 0.5 dv or greater than or equal to 1.0 dv for Alternative B compared to Alternative A. Although not required to be modeled or disclosed under the Clean Air Act, results are also shown for sensitive Class II areas and scenic views. Complete results for multiple years and methodologies are provided in Tables F-19 through F-22 of Appendix F and in Appendices G and H of the ARTSD (URS 2011).

BLM_0019744

**Table 4-22. Alternative B Visibility Impacts**

| Class I Areas | Maximum Number of Days with Visibility Change[1] | | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with Visibility Change[1] | |
|---|---|---|---|---|---|
| | ≥0.5 dv | ≥1.0 dv | | ≥0.5 dv | ≥1.0 dv |
| Arches NP | 2 (+2) | 0 | Colorado NM | 6 (+3) | 3 (+2) |
| Eagles Nest Wilderness | 2 (+1) | 0 | Dinosaur NM | 50 (-9) | 14 (+6) |
| Flat Tops Wilderness | 19 (+8) | 5 (+3) | Big Mountain View | 30 (+3) | 10 (+3) |
| Maroon Bells-Snowmass Wilderness | 7 (+6) | 0 | Holy Cross View | 0 | 0 |
| Mount Zirkel Wilderness | 7 (+3) | 3 (+3) | Holy Cross Wilderness View | 0 | 0 |
| | | | Rabbit's Ear View | 3 (+1) | 2 (+2) |
| | | | Roan Cliffs View | 20 (+6) | 4 (+4) |

NOTES:

[1] Positive numbers in parentheses indicate an increase in the number of days with visibility changes ≥0.5 or ≥1.0 dv for Alternative B compared to Alternative A.

dv = deciview

## Reclamation

Alternative B reclamation requirements are more stringent than those for Alternative A and would include multiple vegetation management actions to preserve and restore vegetation. These actions would decrease wind erosion and particulate emissions, which would improve air quality (Table 2-3 Multiple Records, Table 2-10 Record 11; Table 2-17 Record 11).

### 4.2.1.4    Alternative C

### 4.2.1.4.1   Climate and Greenhouse Gas

## Impacts from Oil and Gas Development

Alternative C GHG emissions reflect development of up 15,042 gas wells and associated equipment and activities (Table 2-1 Record 13). These emissions are summarized in Table 4-23 and reflect maximum annual emissions in 2028. Alternative C GHG emissions would exceed Alternative A emissions for all GHG pollutants. Detailed information for the Alternative C emission inventory is provided in the ARTSD (URS 2011).

## Impacts from Management Actions

Alternative C climate change management actions would be identical to Alternative B management actions, with the exception that Alternative C would require use of three-phase gathering at 80 percent of well pads to transport natural gas, condensate, and produced water to consolidated facilities, rather than 90 percent required under Alternative B.

Management actions for other resources would increase GHG emissions due to increased vehicle and equipment use and/or reduce climate change impacts by preserving vegetation and old growth forest that remove $CO_2$ from the atmosphere.

BLM_0019745

**Table 4-23. 2028 Alternative C Planning Area GHG Emissions**

| Pollutant | Alternative C Emissions (mtpy) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| Individual GHG | 3,381,118 | 88,692 | 25 | NA |
| $CO_2e$ of Each GHG and Total $CO_2$ | 3,381,118 | 1,862,528 | 7,891 | 5,251,537 |
| Alternative C $CO_2e$ Increase (Decrease) From Alternative A | 131% | 128% | 155% | 129% |
| Alternative C $CO_2e$ Increase (Decrease) From Alternative B | 48% | 50% | 56% | 49% |

NOTES:
mtpy = metric tons per year
NA = not applicable

It is not possible at this time to determine whether GHG emissions that would result from the emission assumptions associated with Alternative A would cause a significant impact. The global biological and atmospheric carbon cycles are complex and interdependent upon each other, and it is not possible at this time to determine the impact that GHG emissions from Alternative A, may or may not have to global climate change. However, a relative comparison shows that, in terms of $CO_2e$, Alternative C GHG emissions would be approximately 129 percent greater than Alternative A GHG emissions and 49 percent greater than Alternative B emissions. Consequently, Alternative C climate change impacts would likely be greater than those for Alternative A or B. Unit-production $CO_2e$ emissions for Alternative C are estimated to be 3.61 mt of $CO_2e$ per MMscf, which would be approximately 31 percent less than Alternative A and 11 percent less than Alternative B.

As shown in Table 4-24, GHG emission increases associated with Alternative C would be approximately 4.2 percent of the 2007 Colorado state GHG emission inventory and approximately 0.08 percent of the 2008 U.S. GHG emission inventory, based on $CO_2e$ given in million mtpy. In terms of the total U.S. emission inventory for natural gas systems, Alternative C emission increases would represent approximately 4.2 percent of U.S. natural gas sector GHG emissions.

**Table 4-24. Alternative C Maximum Annual GHG Emission Comparisons**

| Inventory Description | $CO_2e$ Emissions ($10^6$ mtpy) | Alternative C Percentage of Inventory |
|---|---|---|
| **State Inventories (Year 2007)** [1] | | |
| Colorado | 124 | 4.2% |
| Utah | 80 | 6.6% |
| Wyoming | 90 | 5.8% |
| **U.S. Inventories (Year 2008)** [2] | | |
| Total U.S. GHG | 6,957 | 0.08% |
| U.S. Natural Gas Systems | 126 | 4.2% |
| U.S. Coal Mining | 68 | 7.7% |
| U.S. Landfills | 126 | 4.2% |
| U.S. Fossil Fuel Combustion | 5,573 | 0.09% |

NOTES:
[1] WRI 2010.
[2] Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2008 (EPA 2010a).
mtpy = metric tons per year

BLM_0019746

<u>**Reclamation**</u>

Reclamation could increase and/or decrease GHG emissions and concentrations. Reclamation activities involving operation of vehicles and other combustion equipment would increase GHG emissions. However, carbon sequestration by plants growing on previously disturbed land would reduce atmospheric $CO_2$ concentrations.

### 4.2.1.4.2   Air Quality Alternative C

<u>**Impacts from Oil and Gas Development**</u>

Alternative C emissions reflect development of up to 15,042 gas wells and associated equipment and activities (Table 2-1 Record 13). These emissions are summarized in Table 4-25 and reflect maximum annual emissions in 2028 from activities authorized on BLM lands. Alternative C emissions would exceed Alternative A emissions for all pollutants except for $PM_{10}$, $PM_{2.5}$, VOCs, and benzene. For these pollutants, emission reductions associated with Alternative C air quality management actions are greater than emission increases associated with increased oil and gas activity. Emissions calculations and potential air impacts were developed for this alternative using the following key assumptions (refer to ARTSD Appendix A, for a complete description):

- Maximum emissions year occurs in 2028;

- 1,194 wells drilled per year using 77 drill rigs;

- 15,042 producing wells, 25 compressor stations, and 3 gas treatment facilities would be operational;

- Drill rigs and frac (hydraulic fracturing) engines will be powered by Tier IV generator sets that meet emission standards specified in 69 FR 38930, June 29, 2004;

- All natural gas fired compressor engines;

- Well completion gas is controlled through the use of closed loop processes (i.e. "green completions") for 95 percent of wells; and

- Percentage of gas collection and treatment facilities assumed to be consolidated or centralized is 80 percent.

<u>**Impacts from Management Actions**</u>

Alternative C air quality management actions would be similar to those for Alternative B with the following exceptions:

- Eighty percent of well pads would use three-phase gathering systems to transport natural gas, condensate, and produced water to consolidated facilities where dehydration, temporary tank storage, and truck loading would occur (Table 2-1 Record 16).

- Within 1 year of the ROD, all new and existing drill rig and frac pump engines would be required to meet EPA Tier 2 Nonroad Diesel Engine Emission Standards or meet equivalent emission standards. By 2015, all new and existing drill rig engines would meet EPA generator set Tier 4 (or more stringent) emission standards based upon future modeling conducted under Appendix J, Air Resources Management Plan, of this RMPA/EIS (Table 2-1 Record 14).

Facility consolidation has positive and negative air quality impacts. The use of three-phase gathering systems would reduce vehicle miles traveled, thereby decreasing total vehicle exhaust and fugitive dust emissions. However, facility consolidation has the potential to concentrate emissions

BLM_0019747

within smaller geographic areas. The localized impact of more concentrated emission sources can be reduced through more stringent emission control. Alternative C emission controls are at least as stringent as CDPHE oil and gas stationary source emission controls and are applied regardless of equipment capacities or emissions. In addition, CDPHE emission reporting and permitting requirements would apply to each consolidated facility with emissions above state-mandated thresholds. Review by CDPHE would ensure that emissions from consolidated facilities would not exceed ambient standards.

Non-air Alternative C management actions that would have a co-benefit of improving air quality by reducing emissions include:

- Imposing surface restrictions to reduce soil erosion from slopes and landslide areas (Table 2-2 Records 15 and 17).
- Prohibiting public vehicle access to well access roads (Table 2-4 Record 14; Table 2-19 Record 8).

### Table 4-25. 2028 Alternative C Planning Area Emissions

| Pollutant | Emissions (tpy) | | |
|---|---|---|---|
| | Alternative A | Alternative C | Alternative C Increase From Alternative A (Decrease) |
| **Criteria Pollutants** | | | |
| CO | 4,016 | 11,611 | 7,595 |
| NO$_x$ | 2,181 | 5,835 | 3,654 |
| PM$_{10}$ | 4,174 | 2,234 | (1,940) |
| PM$_{2.5}$ | 512 | 401 | (111) |
| SO$_2$ | 8 | 24 | 16 |
| VOCs | 17,052 | 14,604 | (2,448) |
| **Hazardous Air Pollutants** | | | |
| Benzene | 248 | 239 | (9) |
| Ethylbenzene | 2 | 5 | 3 |
| Formaldehyde | 186 | 619 | 433 |
| Hexane | 430 | 673 | 243 |
| Toluene | 201 | 309 | 108 |
| Xylene | 97 | 179 | 82 |

NOTE:
tpy = short tons per year

**Near-field Comparisons to Non-ozone NAAQS and CAAQS.** In order to be conservative, the Alternative C near-field criteria pollutant analysis was based on Alternative A maximum emission rates. This approach approximated maximum emission rates that could occur early in the life of the project due to use of older high-emitting equipment and cases in which operations or equipment could qualify for emission control exemptions. Consequently, the Alternative A assumptions for near-field criteria pollutant and HAP impacts likely over-estimate Alternative C impacts.

**Near-field Comparisons to HAP Thresholds.** In order to be conservative, the Alternative C near-field HAP analysis was based on Alternative A maximum emission rates. Consequently, the Alternative A assumptions for near-field criteria pollutant and HAP impacts likely over-estimate Alternative C impacts.

BLM_0019748

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Alternative C concentrations at Class II receptors (where the greatest concentrations occur) would be greater than Alternative A concentrations for non-particulate pollutants and substantially less than Alternative A for $PM_{10}$ and $PM_{2.5}$ due to fugitive dust controls. Compared to the other alternatives, Alternative C would have the greatest predicted concentrations at Class II areas for CO (8-hour), $NO_2$, and $SO_2$ (all averaging times except annual). Alternative C does not require electrification of 50 percent or more of compressor engines and consequently has greater emissions of some combustion related pollutants than Alternative D. Depending on the federal or state standard, averaging time, and receptor group, maximum total predicted concentrations would vary from approximately 5 to 75 percent of the NAAQS and CAAQS for all pollutants and averaging times.

**Far-field Comparisons to PSD Increments.** Except for the $PM_{10}$ 24-hour modeling average, maximum predicted Alternative C non-ozone criteria pollutant concentrations would be greater than those for Alternatives A and B. Predicted Alternative C non-ozone concentrations would vary from less than 1 percent to 87 percent of the PSD increments. Tables F-5 through F-7 and F-11 through F-13 provide detailed results.

**Far-field Ozone Comparison to NAAQS and CAAQS.** Ozone impacts attributable to Alternative C would be similar to those for Alternatives A and B. In some cases, predicted ozone concentration increases associated with Alternative C would have a slightly greater geographic extent and in some cases a slightly greater magnitude than those for Alternatives A and B.

**Deposition.** As shown in Tables F-16 and F-17 of Appendix F, predicted Alternative C deposition analysis indicates that N and S deposition rates would be greater than Alternative A deposition rates. However, the incremental increase in deposition would be small compared to background concentrations. Alternative C deposition rates would be below the Levels of Concern at modeled Class I and sensitive Class II areas. Predicted deposition would vary from 50 to 90 percent of the Level of Concern for nitrogen and from 13 to 17 percent for sulfur. Based on Deposition Analysis Thresholds, four Class I areas (Eagles Nest Wilderness, Flat Tops Wilderness, Maroon Bells-Snowmass Wilderness, and Mount Zirkel Wilderness) and one sensitive Class II area (Dinosaur NM) would have N deposition that would be considered to be more than a negligible impact. For all modeled areas, S deposition would be considered to be negligible.

**Lake Chemistry.** As shown in Table F-18 of Appendix F, predicted Alternative C lake ANC changes would be slightly greater than Alternative A and Alternative B impacts, but would remain below the LAC at all seven modeled lakes. Predicted ANC changes at six of the lakes would vary from 0.3 to 4.6 percent depending on the lake. Since Upper Ned Wilson Lake is characterized as an extremely sensitive lake with a background ANC value of less than 25 µeq/l, the LAC is not measured as a percentage, but rather as a change of less than 1 µeq/l. Based on Upper Ned Wilson Lake volume, the LAC is equivalent to approximately 21.2 eq. Impacts at Upper Ned Wilson Lake are predicted to be 4.1 eq, which is less than the LAC.

**Visibility.** Table 4-26 summarizes visibility impacts in terms of visibility changes from estimated natural conditions using the FLAG 2000 methodology. Under Alternative C, the maximum number of days at any Class I area with predicted oil and gas related visibility changes greater than or equal to 0.5 dv would be 34 days at the Flat Tops Wilderness, which would be 23 more days than the maximum number of days predicted for Alternative A and 15 more days than the number of days predicted for Alternative B for the same year. Complete results for multiple years and methodologies are provided in Tables F-19 through F-22 of Appendix F and in Appendices G and H of the ARTSD (URS 2011).

BLM_0019749

**Table 4-26. Alternative C Visibility Impacts**

| Class I Areas | Maximum Number of Days with Visibility Change[1] | | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with Visibility Change[1] | |
|---|---|---|---|---|---|
| | ≥0.5 dv | ≥1.0 dv | | ≥0.5 dv | ≥1.0 dv |
| Arches NP | 4 (+4) | 2 (+2) | Colorado NM | 13 (+10) | 4 (+3) |
| Eagles Nest Wilderness | 10 (+9) | 1 (+1) | Dinosaur NM | 101 (+42) | 35 (+28) |
| Flat Tops Wilderness | 34 (+23) | 10 (+8) | Big Mountain View | 57 (+30) | 22 (+15) |
| Maroon Bells-Snowmass Wilderness | 11 (+10) | 3 (+3) | Holy Cross View | 4 (+4) | 0 |
| Mount Zirkel Wilderness | 15 (+11) | 5 (+5) | Holy Cross Wilderness View | 3 (+3) | 0 |
| | | | Rabbit's Ear View | 11 (+9) | 3 (+3) |
| | | | Roan Cliffs View | 37 (+23) | 16 (+12) |

NOTES:

[1] Positive numbers in parentheses indicate an increase in the number of days with visibility changes ≥0.5 or ≥1.0 dv for Alternative C compared to Alternative A.

dv = deciview

## Reclamation

Alternative C reclamation requirements are generally similar to those for Alternative B and more stringent than those for Alternative A. Alternative C reclamation requirements would include multiple vegetation management actions to preserve and restore vegetation. These actions would decrease wind erosion and particulate emissions, which would improve air quality (Table 2-3 Multiple Records; Table 2-10 Record 11; Table 2-17 Record 11).

### 4.2.1.5   Alternative D

### 4.2.1.5.1   Climate and Greenhouse Gas

**Impacts from Oil and Gas Development**

Alternative D GHG emissions reflect development of up to 21,200 gas wells and associated equipment and activities (Table 2-1 Record 13). These emissions are summarized in Table 4-27 and reflect maximum annual emissions in 2028. Alternative D GHG emissions would exceed Alternative A and Alternative B emissions for all GHG pollutants. However, Alternative D GHG emissions would be less than Alternative C GHG emissions for all pollutants except $CH_4$. Detailed information for the Alternative D emission inventory is provided in the ARTSD (URS 2011).

**Impacts from Management Actions**

Alternative D air quality management actions would be identical to Alternative B management actions, with the exception that Alternative D would include one additional air quality management action. Under Alternative D, at least 50 percent of the compression at compressor stations would be powered by electricity that is transmitted to this equipment (Table 2-1 Record 6). By eliminating a large portion of fuel combustion at compressor stations, pollutant emissions would be reduced. GHG emissions from electricity generation outside the Planning Area are not included in the Alternative D GHG emission inventory.

Management actions for other resources would increase GHG emissions due to increased vehicle and equipment use and/or reduce climate change impacts by preserving vegetation that removes $CO_2$ from the atmosphere.

BLM_0019750

Chapter 4 – Environmental Consequences

**Table 4-27. 2028 Alternative D Planning Area GHG Emissions**

| Pollutant | Alternative D Emissions (mtpy) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| Individual GHG | 2,732,504 | 109,618 | 20 | NA |
| $CO_2e$ of Each GHG and Total $CO_2e$ | 2,732,504 | 2,301,982 | 6,200 | 5,040,686 |
| Alternative D $CO_2e$ Increase (Decrease) from Alternative A | 86% | 181% | 100% | 120% |
| Alternative D $CO_2e$ Increase (Decrease) from Alternative B | 20% | 85% | 22% | 43% |
| Alternative D $CO_2e$ Increase (Decrease) from Alternative C | -19% | 24% | -21% | -4% |

NOTES:
mtpy = metric tons per year
NA = not applicable

It is not possible at this time to determine whether GHG emissions that would result from the emission assumptions associated with Alternative A would cause a significant impact. The global biological and atmospheric carbon cycles are complex and interdependent upon each other, and it is not possible at this time to determine the impact that GHG emissions from Alternative A may or may not have to global climate change. However, a relative comparison shows that, in terms of total $CO_2e$, GHG emissions under Alternative D would be approximately 120 percent greater than those for Alternative A, 43 percent greater than Alternative B, and 4 percent less than Alternative C. Consequently, Alternative D climate change impacts would likely be greater than those for Alternative A or B, and less than those for Alternative C. In contrast, Alternative D unit-production $CO_2e$ emissions are estimated to be 2.48 mt of $CO_2e$ per MMscf, which would be approximately 53 percent less than Alternative A, and also less than Alternatives B and C.

As shown in Table 4-28, GHG emission increases associated with Alternative D would be approximately 4.1 percent of the 2007 Colorado state GHG emission inventory and would be approximately 0.07 percent of the 2008 U.S. GHG emission inventory, based on $CO_2e$ given in million mtpy. In terms of the total U.S. emission inventory for natural gas systems, Alternative D emission increases would represent approximately 4.0 percent of U.S. natural gas sector GHG emissions.

**Table 4-28. Alternative D Maximum Annual GHG Emission Comparisons**

| Inventory Description | $CO_2e$ Emissions ($10^6$ mtpy) | Alternative D Percentage of Inventory |
|---|---|---|
| **State Inventories (Year 2007)[1]** | | |
| Colorado | 124 | 4.1% |
| Utah | 80 | 6.3% |
| Wyoming | 90 | 5.6% |
| **U.S. Inventories (Year 2008)[2]** | | |
| Total U.S. GHG | 6,957 | 0.07% |
| U.S. Natural Gas Systems | 126 | 4.0% |
| U.S. Coal Mining | 68 | 7.4% |
| U.S. Landfills | 126 | 4.0% |
| U.S. Fossil Fuel Combustion | 5,573 | 0.09% |

NOTES:
mtpy = metric tons per year
[1] WRI 2010.
[2] Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2008 (EPA 2010a).

BLM_0019751

**Reclamation**

Reclamation could increase and/or decrease GHG emissions and concentrations. Reclamation activities involving operation of vehicles and other combustion equipment would increase GHG emissions. However, carbon sequestration by plants growing on previously disturbed land would reduce atmospheric $CO_2$ concentrations.

### 4.2.1.5.2   Air Quality Alternative D

**Impacts from Oil and Gas Development**

Alternative D emissions reflect development of up to 21,200 gas wells and associated equipment and activities (Table 2-1 Record 13). These emissions are summarized in Table 4-29 and reflect maximum annual emissions in 2028 from activities authorized on BLM lands. Alternative D emissions would exceed Alternative A emissions for all pollutants except for $PM_{10}$ and $PM_{2.5}$. For particulate pollutants, emission reductions associated with Alternative D fugitive dust controls would be greater than emission increases associated with increased oil and gas activity. Emissions calculations and potential air impacts were developed for this alternative using the following key assumptions (refer to ARTSD Appendix A, for a complete description):

- Maximum emissions year occurs in 2028;
- 1,661 wells drilled per year using 108 drill rigs;
- 21,200 producing wells, 35 compressor stations, and 4 gas treatment facilities would be operational;
- Drill rigs and frac (hydraulic fracturing) engines will be powered by Tier IV generator sets that meet emission standards specified in 69 FR 38930, June 29, 2004;
- 50 percent of compressor engines will be electrified and 50 percent natural gas fired compressor engines;
- Well completion gas is controlled through the use of closed loop processes (i.e. "green completions") for 95 percent of wells; and
- Percentage of gas collection and treatment facilities assumed to be consolidated or centralized is 90 percent.

**Impacts from Management Actions**

Alternative D air quality management actions would be identical to Alternative B management actions, with one exception. Alternative D would require that at least 50 percent of the compression at compressor stations be powered by electricity that is transmitted to this equipment (Table 2-1 Record 6). By eliminating a large portion of fuel combustion at compressor stations, pollutant emissions would be reduced.

Non-air Alternative D management actions that would improve air quality by reducing emissions include imposing surface restrictions to reduce soil erosion from slopes and landslide areas (Table 2-2 Records 9 and 15).

BLM_0019752

**Table 4-29. 2028 Alternative D Planning Area BLM Emissions**

| Pollutant | Emissions (tpy) | | |
|---|---|---|---|
| | Alternative A | Alternative D | Alternative D Increase From Alternative A (Decrease) |
| **Criteria Pollutants** | | | |
| CO | 4,016 | 10,626 | 6,610 |
| $NO_x$ | 2,181 | 5,284 | 3,103 |
| $PM_{10}$ | 4,174 | 2,257 | (1,917) |
| $PM_{2.5}$ | 512 | 450 | (62) |
| $SO_2$ | 8 | 32 | 24 |
| VOCs | 17,052 | 17,092 | 40 |
| **Hazardous Air Pollutants** | | | |
| Benzene | 248 | 314 | 66 |
| Ethylbenzene | 2 | 6 | 4 |
| Formaldehyde | 186 | 434 | 248 |
| Hexane | 430 | 920 | 490 |
| Toluene | 201 | 400 | 199 |
| Xylene | 97 | 235 | 138 |

NOTE:

tpy = short tons per year

**Near-field Comparisons to Non-ozone NAAQS and CAAQS.** In order to be conservative, the Alternative D near-field criteria pollutant analysis was based on Alternative A maximum emission rates. This approach approximated maximum emission rates that could occur early in the life of the project due to use of older high-emitting equipment and cases in which operations or equipment could qualify for emission control exemptions. Consequently, the Alternative A assumptions for near-field criteria pollutant and HAP impacts likely over-estimate Alternative D impacts.

**Near-field Comparisons to HAP Thresholds.** In order to be conservative, the Alternative D near-field HAP analysis was based on Alternative A maximum emission rates. Consequently, the Alternative A assumptions for near-field criteria pollutant and HAP impacts likely over-estimate Alternative D impacts.

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Alternative D concentrations at Class II receptors (where the greatest concentrations occur) would be greater than Alternative A concentrations for non-particulate pollutants and substantially less than Alternative A for $PM_{10}$ and $PM_{2.5}$ due to Alternative D fugitive dust control management actions. Alternative D would have the greatest predicted concentration at Class II areas for the annual $SO_2$ averaging time. Depending on the federal or state standard, averaging time, and receptor group, maximum total predicted non-ozone criteria pollutant concentrations would vary from approximately 9 to 75 percent of the NAAQS and CAAQS for all pollutants and averaging times.

**Far-field Comparisons to PSD Increments.** Maximum predicted Alternative D non-ozone criteria pollutant concentrations would be greater than those for Alternative A (with the exception of $PM_{10}$ concentrations) and greater than Alternative B concentrations. Alternative D concentrations would be less than Alternative C concentrations. Predicted Alternative D non-ozone concentrations would vary from less than 1 percent to 80 percent of the PSD increments (Tables F-4 through F-15 provides detailed results).

BLM_0019753

*Chapter 4 – Environmental Consequences*

**Far-field Ozone Comparison to NAAQS and CAAQS.** Ozone impacts attributable to Alternative D would be similar to Alternatives A, B, and C. In some cases, predicted ozone concentration increases associated with Alternative D would have a slightly greater geographic extent and in some cases a slightly greater magnitude than Alternatives A, B, and C.

**Deposition.** The Alternative D deposition analysis indicates that N and S deposition rates would be greater than Alternative A deposition rates (Tables F-16 and F-17 of Appendix F). However, the incremental increase in deposition due to this alternative would be small compared to background concentrations. Alternative D deposition rates would be below the Levels of Concern at modeled Class I and sensitive Class II areas. Predicted deposition would vary from 50 to 90 percent of the Level of Concern for nitrogen and from 13 to 17 percent for sulfur. Based on Deposition Analysis Thresholds, four Class I areas (Eagles Nest Wilderness, Flat Tops Wilderness, Maroon Bells-Snowmass Wilderness, and Mount Zirkel Wilderness) and one sensitive Class II area (Dinosaur NM) would have N deposition that would be considered to be more than a negligible impact. For all modeled areas, S deposition would be considered to be negligible.

**Lake Chemistry.** Predicted Alternative D lake ANC changes would be slightly greater than Alternative A and Alternative B impacts and would be less than Alternative C impacts (Table F-18 of Appendix F). At all seven lakes ANC changes are predicted to be less than the LAC. Predicted ANC changes at the six lakes would vary from 0.3 to 4.1 percent depending on the lake. Since Upper Ned Wilson Lake is characterized as an extremely sensitive lake with a background ANC value of less than 25 µeq/l, the LAC is not measured as a percentage, but rather as a change of less than 1 µeq/l. Based on Upper Ned Wilson Lake volume, the LAC is equivalent to approximately 21.2 eq. Impacts at Upper Ned Wilson are predicted to be 3.6 eq, which is less than the LAC.

**Visibility.** Table 4-30 summarizes visibility impacts in terms of visibility changes from estimated natural conditions using the FLAG 2000 methodology. Under Alternative D, the maximum number of days at any Class I area with predicted oil and gas related visibility changes ≥0.5 dv would be 32 days at the Flat Tops Wilderness, which would be 24 more days than the maximum number of days predicted for Alternative A, 13 more days than Alternative B, and 2 days less than Alternative C. Complete results for multiple years and methodologies are provided in Tables F-19 through F-22 of Appendix F and in Appendices G and H in the ARTSD (URS 2011).

#### Table 4-30. Alternative D Visibility Impacts

| Class I Areas | Maximum Number of Days with Visibility Change[1] | | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with Visibility Change[1] | |
|---|---|---|---|---|---|
| | ≥0.5 dv | ≥1.0 dv | | ≥0.5 dv | ≥1.0 dv |
| Arches NP | 4 (+4) | 0 | Colorado NM | 13 (+10) | 3 (+2) |
| Eagles Nest Wilderness | 8 (+7) | 1 (+1) | Dinosaur NM | 103 (+44) | 35 (+28) |
| Flat Tops Wilderness | 32 (+24) | 10 (+8) | Big Mountain View | 54 (+27) | 21 (+14) |
| Maroon Bells-Snowmass Wilderness | 11 (+10) | 3 (+3) | Holy Cross View | 1 (+1) | 0 |
| Mount Zirkel Wilderness | 12 (+8) | 5 (+5) | Holy Cross Wilderness View | 2 (+2) | 0 |
| | | | Rabbit's Ear View | 8 (+6) | 3 (+3) |
| | | | Roan Cliffs View | 34 (+20) | 17 (+13) |

NOTES:

dv = deciview

[1] Positive numbers in parentheses indicate an increase in the number of days with visibility changes ≥0.5 or ≥1.0 dv for Alternative D compared to Alternative A

BLM_0019754

<u>Reclamation</u>

Alternative D reclamation requirements are generally similar to those for Alternatives B and C and more stringent than those for Alternative A. Alternative D reclamation requirements would include multiple vegetation management actions to preserve and restore vegetation. These actions would decrease wind erosion and particulate emissions, which would improve air quality (Table 2-3 Multiple Records; Table 2-17 Record 11).

### 4.2.1.6   Irreversible and Irretrievable Commitment of Resources

<u>Climate and Greenhouse Gas</u>

Increased GHG emissions, particularly emissions of GHGs with long atmospheric lifetimes, could potentially cause an irreversible change in climate. Scientists who study climate change do not agree on a threshold at which irreversible climate change could potentially occur. Because climate change is a global phenomenon, global atmospheric GHG concentrations would determine the likelihood of irreversible climate change.

<u>Air Quality</u>

Emissions associated with oil and gas development would decrease over time and may have lesser impacts on deposition and chemical degradation. Consequently, emissions of criteria pollutants and HAPs generally would not cause irreversible or irretrievable air resource losses.

### 4.2.1.7   Unavoidable Adverse Impacts

<u>Climate and Greenhouse Gas</u>

Increases in GHG concentrations due to the addition of equipment and increased activity within the Planning Area would be unavoidable. Although some GHG emissions could be restricted through the use of emission controls, these controls would not prevent all emissions. Increased emissions due to increased oil and gas development could sometimes be mitigated through the replacement of older high-emitting equipment with newer equipment and through operational changes that reduce existing emissions.

<u>Air Quality</u>

Increases in some air pollutant concentrations due to the addition of equipment and increased activity within the Planning Area would be unavoidable. Although many types of emissions could be restricted through the use of emission controls, these controls would not prevent all emissions. Increased emissions due to increased oil and gas development could sometimes be mitigated through the replacement of older high-emitting equipment with newer equipment and through operational changes that reduce existing emissions.

### 4.2.1.8   Relationship Between Local Short-Term Uses and Long-Term Productivity

<u>Climate and Greenhouse Gas</u>

In some cases, short-term increases in GHG emissions could improve long-term productivity and reduce long-term emissions. For example, construction of infrastructure, such as pipelines for condensate and produced water, could increase short-term vehicle exhaust emissions associated with construction activity, while decreasing long-term GHG emissions due to fewer vehicle trips needed to transport these liquids during the many years that they are produced. Consolidation of tanks, heaters, and other equipment at central locations could also reduce emissions by enabling installation of GHG emission controls that could achieve greater emission reductions at lower cost. Equipment consolidation could also decrease vehicle exhaust emissions due to the centralized

BLM_0019755

location of equipment. Short-term emissions associated with transporting green completion equipment to and from drilling sites would reduce GHG emissions by capturing gases that would otherwise have been vented of flared.

**Air Quality**

In some cases, short-term increases in pollutant emissions could improve long-term productivity and reduce long-term emissions. For example, construction of infrastructure, such as pipelines for condensate and produced water, could increase short-term particulate and vehicle exhaust emissions associated with construction activity, while decreasing long-term emissions due to fewer vehicle trips needed to transport these liquids during the many years that they are produced. Consolidation of tanks, heaters, and other equipment at central locations could also reduce emissions by enabling installation of emission controls that could achieve greater emission reductions at lower cost. Equipment consolidation could also decrease vehicle miles traveled, fugitive dust, and exhaust emissions due to the centralized location of equipment. Short-term emissions associated with transporting green completion equipment to and from drilling sites would reduce VOC emissions by capturing gases that would otherwise have been vented of flared.

## 4.2.2   Summary of Project Air Quality Impacts

The results of this analysis indicate that air quality impacts, while noticeable, are below all NAAQS and CAAQS for all criteria pollutants for all alternatives. Modeled impacts for hazardous air pollutants are predicted to be below reference exposure levels, reference concentrations for chronic inhalation, and carcinogenic risk acceptable levels. Modeled impacts for criteria pollutant PSD increments were below all increments for all alternatives except for $PM_{10}$ 24-hour averaging time for Alternative A. Modeled impacts for atmospheric deposition to terrestrial surfaces were predicted to be below deposition analysis thresholds and critical loads for nitrogen and sulfur deposition for all alternatives. Modeled impacts for atmospheric deposition to sensitive lakes were predicted to be below levels of concern for all alternatives. Modeled impacts for visibility impairment to Class I areas were predicted to range from 0 days (Alternative A) to 10 days (Alternative C) of visibility impairment greater than 1.0 dv in the maximum emissions year and 1 day to 34 days greater than 0.5 dv.

Alternative A, with the lowest level of development analyzed, results in the lowest predicted impacts for most criteria pollutants for all alternatives except for the highest predicted impacts for particulate matter including modeled impacts slightly above the PSD $PM_{10}$ 24-hour increment. This is most likely attributable to the least stringent controls for fugitive dust and drill rig engines. Alternative B, results in the second lowest impact levels for all criteria pollutants except particulate matter for which it has the lowest impacts of the four alternatives. This is due to the lower development levels than Alternatives C and D and stricter emission controls than Alternative A. Alternative C includes the second highest development levels, but has less stringent emission controls than Alternative D, and therefore predicted impacts are highest for Alternative C for almost all estimated criteria. Alternative D includes the highest development levels and has the highest predicted impacts for all criteria (except for particulate matter). Alternative D predicted impacts are higher than Alternatives A and B but lower than Alternative C for most criteria due to the increased emission controls prescribed for this alternative. Due to the many assumptions included in the analysis and the conservative nature of the modeling, these predictions may or may not indicate actual impacts from future development.

Predictions of pollutant concentrations approaching the NAAQS may indicate the need for additional ambient monitoring data, refined modeling, and/or consideration of additional mitigation

BLM_0019756

measures including reducing the pace of development. Comprehensive air resources management within the planning area includes tracking emissions from permitted and authorized activities, conducting air monitoring of pollutants of concern, and conducting future modeling to predict trends in impacts. All agencies involved in the authorizing of emission generating activities and agencies involved in the protection of air resources must work collaboratively to closely track future changes in air quality, determine impacts, and reduce emissions before issuing permits and authorizations. In order to respond to changing conditions in air quality within the Planning Area over the life of the RMPA, the BLM has developed an Air Resources Management Plan (Appendix J) which includes commitments for managing air resources within its authority.

Refer to Section 4.11.3.1 for a discussion of cumulative impacts.

## 4.2.3    Geology

Impacts to geological resources occur from natural weathering, erosion and surface-disturbing activities, which generally leads to the physical destruction or damage of geological formations. Although erosion is a geologic process, impacts from erosion are discussed in greater detail in Section 4.2.4 Soil Resources.

The following indicators were used to analyze the effects of the alternatives on geological resources:

- Geologic hazards (e.g., slumps, landslides, rock falls); and
- Erosion.

Attributes of these indicators include the area and distribution of surface disturbance.

The analysis is based on the following assumptions:

- Impacts to geological resources would occur from both surface activities (e.g., construction of well pads and roads, cut slopes) and subsurface activities (e.g., drilling).
- The Planning Area is within Seismic Risk Zone 1, which is considered low seismic risk. It is unlikely that any management actions proposed would impact the seismic risk of the Planning Area.

Under all alternatives, geological resource impacts would not be anticipated by implementing management actions for air quality, cultural, paleontological, wild horse management, visual resources, livestock grazing, and forestry and woodland products.

### 4.2.3.1    Impacts Common to All Alternatives

**Impacts from Oil and Gas**

Impacts to geological resources could result from oil and gas activities. Surface disturbing activities are associated with well pad, pipeline, utility, road, and facility construction, while subsurface impacts occur from drilling and completion of oil and gas wells. Surface disturbing activities that create steep slopes or that are located in areas of instability associated with naturally occurring inter-bedded resistant and erodible layers of exposed geologic formations that could promote geologic hazards such as slumps, landslides, and rock falls. Sub-surface formations could be impacted by drilling through the geologic formations above the targeted formation and subsequent fracturing of the targeted formation to enhance production recovery.

BLM_0019757

Indirectly, oil and gas development could concentrate or redirect the locations of recreation use, populations of wildlife or wild horse to other parts of the Planning Area which could result in localized erosion.

**Impacts from Management Actions**

Impacts from management decisions associated with soil and water resources, vegetation, fish and wildlife, and energy and mineral resources could result in direct and indirect impacts on geology.

The 83,300 acres (5 percent) of federal mineral estate currently closed to mineral leasing would remain closed. No surface or subsurface disturbances from oil and gas development would occur in the closed areas (Table 2-17 Record 7). Managing areas as open to oil and gas exploration and development with an NSO stipulation (Table 2-17 Record 18) would typically move site locations for oil and gas activities away from these areas. Site relocation would not necessarily reduce overall surface disturbance, and could cause a beneficial or detrimental impact to geological resources depending on the difference in the geologic setting between the sites. Allowing exceptions in areas managed with an NSO stipulation would increase the area available for surface disturbance. Soil, water, and vegetation management actions that prevent or minimize soil erosion could decrease degradation of surficial geological resources and the potential for geologic hazards.

Managing 497,900 acres as weed-free zones (Table 2-3 Record 22) could help retain existing vegetation conditions and reduce erosion. Meeting Colorado Standards for Public Land Health and Guidelines for soil and water management (Table 2-2 Record 14), maintaining acceptable desired plant communities (Table 2-3 Record 18), and preserving essential wildlife habitat areas would reduce erosion and retain existing geological resources.

**Reclamation**

Successful reclamation of disturbed areas, as described in the Surface Reclamation Plan (Appendix D), would promote the reestablishment of vegetation which would minimize soil erosion and could decrease degradation of geological resources and the potential for geologic hazards.

### 4.2.3.2   Alternative A

**Impacts from Oil and Gas Development**

Alternative A proposes to develop 550 well pads and accommodating approximately 4,603 wells in the Planning Area (Table 2-1 Record 13). This would result in surface disturbance of approximately 6,600 acres. Surface disturbance including pipelines and resource and local roads to support oil and gas activities could result in erosion. Requiring operators to use existing pipeline corridors and roads for additional utility locations would reduce the extent of surface disturbance and reduce the potential for localized geologic hazards (Table 2-2 Record 21).

Drilling/reserve pits, storage pits, and evaporation ponds would be allowed under this alternative (Table 2-2 Record 22 and Table 2-17 Record 20). These features are excavated into the subsurface and could impact geologic formations if they encounter shallow bedrock. Potential impacts include weathering and erosion of the exposed bedrock formations.

**Impacts from Management Actions**

Managing 157,100 acres, or 9 percent of the mineral estate available for leasing (Table 4-6) in the Planning Area with an NSO stipulation, would reduce surface disturbance from oil and gas exploration and development in these areas.

BLM_0019758

*Chapter 4 – Environmental Consequences*

Results of the temporal analysis performed in the MPA for Alternative A are shown in Table 4-31 and also discussed in Appendix E. The analysis results shown are not specific to a single resource. Line 6 of the table presents the total number of oil and gas well pads that would likely be developed in the MPA as 523. Based on the analysis results, 6,300 acres of surface disturbance are estimated during the 20-year planning period, which is 1.2 percent of the 533,200 acres available for surface occupancy. This estimate is based on an even distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations).

The construction of 523 well pads in the MPA would potentially increase the risk of geologic hazards such as slumps, landslides, and rock falls in areas with steep terrain. The types of impacts that would occur to geologic resources from surface disturbing activities would be the same as described above in Section 4.2.3.1, Impacts Common to All Alternatives. Geologic hazards would be less severe in areas with low erosion potential and in gently sloping terrain.

**Table 4-31. Estimated Number of Well Pads and Associated Surface Disturbance within the Mesaverde Play Area for Alternative A**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) |
|---|---|---|---|
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 |
| 2 | Percent of Land Area in the MPA | % | 100 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 65,500 |
| 4 | Area Available for Surface Occupancy | Acres | 533,200 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 89 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,300 |
| 8 | Percent of Acres Available for Surface Occupancy in the MPA Developed During 20-yr Planning Period [5] | % | 1.2 |

NOTES:
[1] The line-by-line analysis methodology is described in Appendix E.
[2] NSO stipulations areas for MPA are for all resources. NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Appendix A for exception, modification, and waiver criteria.
[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.
[4] Assumed that each well pad would require 12 acres of surface disturbance rounded to the nearest 100.
[5] Represents the ratio of estimated surface disturbance to acres available for surface occupancy within the MPA.

There are 38,600 acres delineated with an NSO stipulation for area susceptible to mud sliding (Table 2-2 Record 15) in the Planning Area. This NSO stipulation in conjunction with the CSU stipulation on 385,000 acres of fragile soils on slopes greater than 35 percent, and saline soils (Table 2-2 Record 9) requires engineered construction/reclamation plans to include erosion control measures and restoration of soil productivity. An indirect result of these plans would be reduced risk of geologic hazards in areas with the highest potential for geologic instability. Impacts from NSO stipulations for other resources would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives.

Management actions to avoid priority riparian areas and require remedial mitigation for authorized surface-disturbing activities would limit erosion and help retain geological resources in these areas (Table 2-3 Records 20 and 21). Maintaining or improving bank, channel, and flood plain processes

BLM_0019759

associated with critical habitat for candidate or special status, threatened or endangered fishes of the Upper Colorado River Basin could reduce erosion in localized areas and indirectly reduce potential for geologic hazards near streams (Table 2-9 Record 17). Allowing surface discharge of produced water that meets state water quality standards could increase erosion in localized areas, which could result in localized degradation of geological resources (Table 2-2 Record 13).

### Reclamation

Rehabilitation goals for Alternative A would move the condition of the disturbed sites toward original site conditions.

#### 4.2.3.3    Alternative B

#### Impacts from Oil and Gas Development

Alternative B proposes to develop 1,100 well pads and accommodating 9,191 wells in the Planning Area (Table 2-1 Record 13). The resulting surface disturbance would be approximately 13,200 acres. This could expand the extent of localized erosion and the potential for geologic hazards and, depending on the concentration of development, could increase the redirected recreational activities, wildlife populations, or wild horses to other parts of the Planning Area in comparison to Alternative A.

Increasing the amount of pipelines, resource roads, and local roads would increase the extent of surface disturbance from support infrastructure in proportion to the number of well pads compared to Alternative A. The use of existing pipeline corridors and roadways for new pipelines (Table 2-2 Record 21) and encouraging requests for smaller pipeline ROW widths with pipeline placement underneath newly construed roads (Table 2-20 Record 9) could proportionally reduce the extent of new surface disturbance and reduce the potential for localized geologic hazards. In addition, requiring the injection of produced water could reduce localized surface erosion and reduce the potential for geologic hazards in localized areas relative to the allowance of surface discharge in Alternative A (Table 2-2 Record 13).

Under alternative B, the BLM would not allow the use of drilling and reserve pits (Table 2-17 Record 20). As a result, excavated pits would be replaced with tanks or other aboveground structures, which could expand well pad footprints in some cases and increase the area of surface disturbance. However, without pit excavations, more sub-soil would be left in place, which would prevent underlying bedrock formations from being exposed to weathering and erosion.

#### Impacts from Management Actions

Managing 757,200 acres (Table 4-6) with an NSO stipulation reduces the area where surface disturbance from oil and gas activities could occur by 39 percent compared to Alternative A.

Results of the temporal analysis performed for Alternative B are shown in Table 4-32. Line 6 of the table presents the total number of oil and gas well pads that would likely be developed in the MPA as 1,045. This estimate is based on an even distribution of well pads across areas open to development with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations). Based on the analysis results, 12,500 acres of surface disturbance are estimated during the 20-year planning period, which is 3.5 percent of the 355,900 acres available without an NSO stipulation.

The construction of 1,045 well pads in the MPA could potentially increase the risk of geologic hazards. The types of impacts that would occur to geological resources from surface disturbing

BLM_0019760

activities would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives. Potential for geologic hazards would be less severe in areas with low erosion potential in gently sloping terrain. Alternative B (12,500 acres) would have double the surface disturbance in the MPA compared to Alternative A (6,300 acres) due to the higher number of well pads constructed.

**Table 4-32. Estimated Number of Well Pads and Associated Surface Disturbance within the Mesaverde Play Area for Alternative B**

| Line[(1)] | Description | Units | Mesaverde Play Area (MPA) |
|---|---|---|---|
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 |
| 2 | Percent of Land Area in the MPA | % | 100 |
| 3 | NSO Stipulation Areas in the MPA[(2)] | Acres | 242,800 |
| 4 | Area Available for Surface Occupancy | Acres | 355,900 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 60 |
| 6 | Estimated Number of Well Pads[(3)] | --- | 1,045 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[(4)] | Acres | 12,500 |
| 8 | Percent of Acres Available for Surface Occupancy in the MPA Developed During 20-yr Planning Period[(5)] | % | 3.5 |

NOTES:
[(1)] The line-by-line analysis methodology is described in Appendix E.
[(2)] NSO stipulations areas for MPA are for all resources. NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.
[(3)] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.
[(4)] Assumed that each well pad would require 12 acres of surface disturbance rounded to the nearest 100.
[(5)] Represents the ratio of estimated surface disturbance to acres available for surface occupancy within the MPA.

There are 46,400 acres delineated with an NSO stipulation for areas with potential for landslides (Table 2-2 Record 15), 353,000 acres delineated with an NSO stipulation for natural slopes greater than 35 percent (Table 2-2 Record 17), and 45,300 acres delineated with an NSO stipulation for saline soils (Table 2-2 Record 16). These NSO stipulations in conjunction with 279,900 acres delineated with a CSU stipulation for slopes greater than or equal to 25 percent and less than 35 percent (Table 2-2 Record 17) would result in a reduced risk of geologic hazards in areas with potential for geologic instability in comparison to Alternative A. Due to the increase in surface disturbance and decrease in the area available for surface occupancy, this alternative could result in a greater density of oil and gas exploration and development activities in areas available for surface occupancy relative to Alternative A. Impacts from NSO stipulations for other resources would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives.

Moving site locations for oil and gas infrastructure to avoid NSO stipulation areas, or altering the timing of when surface disturbance occurs would not reduce overall surface disturbance, and could cause a beneficial or detrimental impact to geological resources depending on the difference between the geologic conditions at the initial site versus the shifted site. Maintaining or improving bank, channel, and flood plain processes associated with critical habitat for candidate or special status, threatened or endangered fishes of the Upper Colorado River Basin would have the same types of impacts as Alternative A (Table 2-9 Record 17).

Well pads would be required to conform to the topography, (Table 2-17 Record 19). Implementation could reduce the risk of geologic hazards by decreasing the amount of cut/fill for

BLM_0019761

pad construction. In addition, operators would be required to develop a Concentrated Development Plan (CDP) (Table 2-17 Record 12) to reduce cumulative effects to resources and reduce erosion, which could reduce the risk of geologic hazards relative to Alternative A.

In the 53,200 acres that are identified by CPW as Restricted Development Areas, limiting the amount of area that is collectively affected could alter where surface disturbance occurs (Table 2-4 Record 13). In addition, requiring special operation and management plans to authorize exceptions or modifications to activity or surface use restrictions in CPW defined sage-grouse population areas could reduce surface disturbance and erosion in localized areas (Table 2-6 Record 9).

Under Alternative B, acute and collective effects for big game range increase over the 20-year planning period due to pad and well development. Threshold management would promote progression from development to reclamation and encourage operators to cluster development, which could reduce the duration, extent, and degree of disturbance related impacts (Appendix E).

**Reclamation**

It is anticipated that interim reclamation would be accelerated under Alternative B due to the management actions associated with big game thresholds for collective and acute effects (see Appendix E and Table 2-4 Record 12). With the threshold concept, interim reclamation could achieve success criteria one year earlier than Alternative A since exceptions would be granted to timing limitation stipulations to allow year-round drilling on big game range if acute and collective effects remained below the threshold. Thus, big game thresholds could focus surface disturbance in certain areas as well as encourage timely reclamation. This could expedite the establishment of vegetation, reduce potential loss or damage to geological resources, and reduce the potential for geologic hazards in localized areas relative to Alternative A and D.

### 4.2.3.4    Alternative C

**Impacts from Oil and Gas Development**

Alternative C proposed to develop 1,800 well pads accommodating 15,042 wells in the Planning Area (Table 2-1 Record 13). This would result in the disturbance of approximately 21,600 acres which is an increase of acreage in direct portions to Alternatives A and B. The increased oil and gas activity would have more potential than Alternatives A and B to redirect recreation, wildlife populations, or wild horses to less developed portions of the Planning Area. This could increase the extent of localized erosion and the potential for geologic hazards compared to Alternatives A and B.

Proportionally increasing the amount of pipeline, and resource and local roads would increase the extent of surface disturbance from support infrastructure. The use of existing pipeline corridors and roadways for new pipelines (Table 2-2 Record 21) and encouraging requests for smaller pipeline ROW widths with pipeline placement underneath newly constructed roads (Table 2-20 Record 9) could proportionally reduce the extent of new surface disturbance and reduce the potential for localized geologic hazards relative to Alternative A, but to the same extent as Alternative B (Table 2-2 Record 21).

The BLM would discourage the use of drilling and reserve pits (Table 2-17 Record 20). Excavated pits would be replaced with tanks or other aboveground structures. This could result in larger well pads; but overall, more soil would be left in place since the reserve pits would not need to be excavated. This would help prevent underlying bedrock formations from being exposed to weathering and erosion to a greater extent than Alternative A, but less than Alternative B, which would not allow the use of pits.

BLM_0019762

Requiring new projects to inject produced water rather than discharging it to the surface (but continuing approved discharge volumes at existing development sites) could increase localized erosion relative to Alternative B, and is anticipated to result in impacts similar to Alternative A (Table 2-2 Record 13).

**Impacts from Management Actions**

Managing 387,500 acres with an NSO stipulation reduces the area where surface disturbances could occur by 15 percent in comparison to Alternative A and increase the available area by 39 percent compared to Alternative B.

Results of the temporal analysis performed for Alternative C are shown in Table 4-33. Line 6 of the table presents the total number of oil and gas well pads that would likely be developed in the MPA as 1,710. This estimate is based on an even distribution of well pads across areas open to development with stipulations that do not preclude surface disturbance (i.e., CSU stipulations or TL stipulations). Based on the analysis results, 20,500 acres of surface disturbance are estimated during the 20-year planning period, which is 3.4 percent of the 447,800 acres available for surface occupancy.

The construction of 1,710 well pads in the MPA would potentially increase the risk of geologic hazards. The types of impacts that would occur to geological resources from surface disturbing activities would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives. Geologic hazards would be less severe in areas with low erosion potential and in gently sloping terrain. Alternative C (20,500 acres) would have a greater impact from surface disturbance in the MPA compared to Alternative B (12,500 acres) and Alternative A (6,300 acres) due to the higher number of well pads constructed.

**Table 4-33. Estimated Number of Well Pads and Associated Surface Disturbance within the Mesaverde Play Area for Alternative C**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) |
|---|---|---|---|
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 |
| 2 | Percent of Land Area in the MPA | % | 100 |
| 3 | NSO Stipulation Areas in the MPA[2] | Acres | 150,900 |
| 4 | Area Available for Surface Occupancy | Acres | 447,800 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 75 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[4] | Acres | 20,500 |
| 8 | Percent of Area Available for Surface Occupancy in the MPA Developed During 20-yr Planning Period[5] | % | 4.6 |

NOTES:
[1] The line-by-line analysis methodology is described in Appendix E.
[2] NSO stipulations areas for MPA are for all resources. NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Appendix A for exception, modification, and waiver criteria.
[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.
[4] Assumed that each well pad would require 12 acres of surface disturbance rounded to nearest 100.
[5] Represents the ratio of estimated surface disturbance to acres available for surface occupancy within the MPA.

BLM_0019763

In the Planning Area there are 42,500 acres delineated with an NSO stipulation for potential landslide (Table 2-2 Record 15), 114,300 acres delineated with an NSO stipulation for natural slopes greater than 50 percent (Table 2-2 Record 17), and 33,900 acres delineated with an NSO for saline soil (Table 2-2 Record 16). These NSO stipulations in conjunction with the CSU stipulation on 238,700 acres for natural slopes greater than or equal to 35 percent and less that 50 percent (Table 2-2 Record 17) requiring engineered construction/reclamation plans that include erosion control measures and restoration of soil productivity, would result in a reduced risk of geologic hazards in areas that have high potential for geologic instability.

In the Planning Area the BLM mineral estate managed with an NSO stipulation would increase by 230,400 acres compared to Alternative A and would decrease by 369,700 acres compared to Alternative B. Due to the increase in surface disturbance this alternative could result in a greater density of oil and gas exploration and development activities in areas available for surface occupancy relative to both Alternatives A and B. Impacts from NSO stipulations for other resources would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives. Allowing exceptions in areas managed with an NSO stipulation could result in surface disturbance from oil and gas activities and localized erosion and increased potential for geologic hazards in these areas relative to Alternative B.

Avoiding surface-disturbing activities in riparian or wetland habitats and implementing mitigation immediately following surface disturbance (Table 2-3 Records 20 and 21) could also help to reduce localized erosion by maintaining geological resources within riparian or wetland habitats.

Limiting the collective and acute impacts on the 53,200 acres identified by the CPW as Restricted Development Areas (Table 2-4 Record 13) could alter where surface disturbance occurs, as under Alternative B. Requiring special operation and management plans to authorize exceptions or modifications to activity or surface use restrictions in CPW defined sage-grouse population areas would have the same impacts as Alternative B (Table 2-6 Record 9).

Under Alternative C, collective effects increase during the 20-year planning period at a more rapid rate than Alternative B due to the higher number of well pads developed (Figures 4-2 and 4-3). The collective development threshold could be exceeded after year 16, resulting in resumed enforcement of timing limitation stipulations on big game range. The enforcement of timing limitation stipulations would delay interim reclamation on well pads initiated during the last five years of the planning period. This is due to the shorter drilling season which could require a three-year drilling period compared to the shorter two-year period needed with year-round drilling. As a result, this could increase the amount of disturbance related impacts compared to Alternative B by allowing erosion from exposed geologic formations in un-reclaimed areas over a longer period of time (Appendix E).

<u>Reclamation</u>

As in Alternative B, it is anticipated that reclamation would be accelerated under Alternative C due to implementation of the threshold concept for big game (Table 2-4 Record 12). However, the change could be less pronounced due to higher threshold levels for collective and acute effects and higher levels of development. The threshold concept would still expedite the establishment of vegetation compared to Alternatives A and D and could reduce the potential for geologic hazards in localized areas.

BLM_0019764

#### 4.2.3.5    Alternative D

**Impacts from Oil and Gas Development**

Alternative D proposes to develop 2,556 well pads accommodating 21,200 wells (Table 2-1 Record 13). This would result in the disturbance of approximately 30,700 acres which is an increase in direct portions to Alternatives A, B and C. The increased oil and gas development has the highest amount of surface disturbance and the most potential to redirect concentration of recreation, wildlife populations, or wild horses to less developed or less active portions of the Planning Area. This could indirectly increase the erosion in the areas affected by the redirected activities and animal concentration. Surface disturbing activities due to oil and gas development would increase the extent of localized erosion and the potential for geologic hazards compared to Alternatives A, B, and C.

Increasing the length of pipelines and resource and local roads would increase the areal effects of surface disturbance associated with oil and gas infrastructure. Requiring operators to use existing pipeline corridors and roads for additional utility locations would reduce the extent of surface disturbance and potential for localized geologic hazards (Table 2-2 Record 21). Allowing surface discharge of produced water meeting state standards could result in more localized erosion relative to Alternatives B and C (Table 2-2 Record 13).

Drilling reserve pits, storage pits, and evaporation ponds would be allowed under this alternative (Table 2-2 Record 22, Table 2-17 Record 20) and could impact geologic formations similar to Alternative A but to a greater extent due to the increased development in Alternative D.

**Impacts from Management Actions**

Managing 257,100 acres (Table 4-6) with an NSO stipulation reduces the area where surface disturbance from oil and gas activities could occur by 6 percent relative to Alternative A and increase the available area by 53 percent and 10 percent compared to Alternative B and C respectively.

Results of the temporal analysis performed for Alternative D are shown in Table 4-34. Line 6 of the table presents the total number of oil and gas well pads that would likely be developed in the MPA as 2,428. This estimate is based on an even distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations). Based on the analysis results, 29,100 acres of surface disturbance are estimated during the 20-year planning period, which is 5.8 percent of the 502,100 acres available for surface occupancy.

The construction of 2,428 well pads in the MPA would potentially increase the risk of geologic hazards such as landslides and rock falls. The types of impacts that would occur to geological resources from surface disturbing activities would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives. Geologic hazards would be less severe in areas with low erosion potential in gently sloping terrain. Alternative D (29,100 acres) would have a greater impact from surface disturbance than Alternative C (20,500 acres), Alternative B (12,500 acres), or Alternative A (6,300 acres) due to the higher number of well pads constructed.

BLM_0019765

**Table 4-34. Estimated Number of Well Pads and Associated Surface Disturbance within the Mesaverde Play Area for Alternative D**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) |
|---|---|---|---|
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 |
| 2 | Percent of Land Area in the MPA | % | 100 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 96,600 |
| 4 | Area Available for Surface Occupancy | Acres | 502,100 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 84 |
| 6 | Estimated Number of Well Pads [3] | --- | 2,428 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[4] | Acres | 29,100 |
| 8 | Percent of Area Available for Surface Occupancy in the MPA Developed During 20-yr Planning Period[5] | % | 4.9 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulations areas for MPA are for all resources. NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance to acres available for surface occupancy within the MPA.

In the Planning Area there are 38,600 acres delineated with an NSO stipulation for potential landslides (Table 2-2 Record 15), 114,300 acres delineated with an NSO stipulation for natural slopes greater than or equal to 50 percent (Table 2-2 Record 17). These NSO stipulations in conjunction with CSU stipulations on 382,700 acres for areas with fragile soils on slopes greater than 35 percent, and saline soils (Table 2-2 Record 9), and an additional 45,700 acres for areas with saline soils (Table 2-2 Record 16) and would result in a reduced risk of geologic hazards in areas that have the highest potential for geologic instability similar to Alternative A. Impacts from NSO stipulations for other resources would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives.

In the Planning Area, the BLM mineral estate managed with an NSO stipulation would increase by 99,900 acres compared to Alternative A and would decrease by 500,200 acres 130,500 acres compared to Alternatives B and C respectively. Due to the increase in the surface disturbance this alternative would have the greatest density of oil and gas activities in areas available for surface occupancy relative to all alternatives. Allowing exceptions in areas managed with an NSO stipulation could result in lowering the density of activities to be comparable to Alternative C. Impacts from NSO stipulations for other resources would be the same as described in Section 4.2.3.1, Impacts Common to All Alternatives. Management actions to avoid riparian areas and require remedial mitigation for authorized surface-disturbing activities would have the same impacts as Alternative A (Table 2-3 Records 20 and 21).

<u>Reclamation</u>

Under alternative D the area to be reclaimed would be the greatest of all alternatives due to the increased number of well pads. Implementation of TL stipulations would increase the time frame from pad construction to successful interim reclamation as compared to Alternatives B and C.

BLM_0019766

### 4.2.3.6    Irreversible and Irretrievable Commitment of Resources

Geological resources are nonrenewable and disturbance could irrevocably alter or destroy geological features on the landscape. The effect of erosion in relation to surface disturbance due to oil and gas exploration and development has potential for irreversible changes to surficial geologic resources. Irreversible impacts due to drilling are directly proportional to the number of well pads and associated infrastructure constructed. Irreversible impacts would be the least under Alternative A with the potential for 4,603 wells on 550 well pads in the Planning Area, and the most under Alternative D with 21,200 wells on 2,556 potential well pads.

### 4.2.3.7    Unavoidable Adverse Impacts

Surface disturbance for oil and gas development could expose shallow bedrock formations previously buried beneath soil horizons. Weathering and erosion of these exposed layers represent an unavoidable adverse impact. The degree of impacts for each alternative would be proportional to the number of well pads constructed and the associated area of disturbance.

### 4.2.3.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Not applicable.

## 4.2.4    Soil Resources

This impact analysis is based on the management goals and objectives outlined for soil resources in Table 2-2. The analysis assesses the extent to which these goals and objectives could be met under Alternatives A, B, C, and D. It also focuses on relative changes to soil indicators that could occur due to surface disturbance from oil and gas development.

The analysis uses qualitative and quantitative variables to assess impacts. A number of indicators, attributes, and assumptions have been defined for the analysis. The following four indicators were selected to analyze the effects of the alternatives on soil resources: (1) soil stability, (2) soil productivity, (3) hydrologic function, and (4) biotic integrity. These indicators are based on standards for rangeland health outlined in the BLM Technical Reference 1734-6 (BLM 2005). Soils should exhibit indicators that are appropriated to soil type, climate, landform, and geologic processes.

Attributes are the measures that are used to qualify and quantify resource indicators. An attribute could be a physical or chemical measurement, or a visual observation of the resource. Attributes for soil include:

- Extent of surface and soil disturbance;
- Disturbance area of fragile soils on slopes greater than 35 percent (i.e., fragile soils) (refer to definition in Chapter 3);
- Percentage of bare ground;
- Acreage of successful soil reclamation;
- Physical and chemical properties of soils;
- Extent and quality of biological soils crusts;
- Presence of soil erosion features;

BLM_0019767

- Increases in erosion and/or aggregation of soil due to approved oil and gas development; and

- Increased salt deposition in surface soil or in the root zone of native plants due to poor reclamation.

The impact analysis is based on the following assumptions:

- Impacts to soil resources would depend on the relative productivity and stability of soils;

- Soil characteristics such as chemical composition, texture, depth of horizons, organic content, and other factors from the County Soil Surveys are predictive of compaction, erosion hazard rating, and other direct and indirect impacts to soils (Soil Survey 1993);

- Soil productivity would be maintained by limiting surface disturbance to the minimum necessary to accomplish the orderly development of Federal minerals and by retaining vegetative cover and leaving soil undisturbed when possible;

- Erosion is naturally occurring and dependent on soil conditions, geology and climate. Erosion beyond natural or background conditions is termed accelerated erosion. Accelerated erosion can result in onsite impacts, such as loss of soil productivity, and offsite impacts, such as sedimentation;

- Erosion can be estimated based on the acres of surface disturbance, soil type, topography and slope using Disturbed WEPP as outline in section 3.2.3 under the erosion heading. A basic erosion rate for short-term (before reclamation and for un-reclaimed surface disturbance) and long-term (after successful reclamation) for surface disturbance associated with oil and gas developments were calculated for the MPA for comparison by alternative. Based on Disturbed WEPP model runs on May 23, 2012 these rates for mean annual sediment rates are 0.08 tons/acre for short-term and 0.02 tons/acre for long term disturbance. These erosion rates are at least +/- 50 percent of actual erosion rates (BLM, 2012);

- Water erosion, runoff, and sediment delivery to streams are interrelated. For example, increases in runoff result in increased sheet, rill, and gully erosion, which results in increased soil instability;

- Wind erosion can reduce the stability and productivity of soils, deliver sediment to streams as well as have major impacts on air quality. Wind erosion may be expected wherever the surface soil has fine particles, in saline soils and where the soil surface is loose, dry or bare; and when topographic features are oriented with the prevailing wind direction (Lyle 1977);

- Where surface disturbance occurs, construction practices would be managed to limit accelerated erosion. For example, erosion would be minimized by properly constructing and grading well pads, roads, and drainage features. Proper soil handling procedures, soil stabilizing practices and good reclamation would be used to maintain soil productivity;

- As required by the CDPHE and the Clean Water Act, construction projects would have BMPs implemented for managing stormwater. These BMPs manage stormwater moving onto construction areas as well as managing surface run off generated from construction sites. In some cases, implementation of these BMPs would result in additional surface disturbance, but when they are properly designed and constructed, they should reduce soil instability and maintain hydrologic function and reduce sediment transportation off construction sites;

BLM_0019768

- Disturbance on saline, fine-grained soils in arid environments can result in soil compaction, salts concentrated at the soil surface, dust generation, loss of vegetation, and can appreciably change soil properties for water retention, infiltration capacities and subsequent vegetative growth and productivity;

- In general, saline soils are difficult to reclaim after surface disturbance and may be less stable than soils that are not saline. This is because saline soils adversely affect the growth of plants by changing soil cohesion and stability and making it more difficult for plants to absorb and use soil moisture;

- The effect on soil resources attributed to any one disturbance or series of disturbances would be influenced by soil characteristics, timing and degree of disturbance, existing vegetative cover, timing and amount of precipitation, the slope, aspect, and other physical characteristics;

- Disturbed areas are generally characterized by a loss in heterogeneity in vegetation and soil structure and function (Minnick et al. In Review), regardless of construction practices;

- Where present in the natural landscape, soil organisms such as biological soil crusts, fungi, and bacteria may be a significant factor in stabilizing soils, making nutrients available to plants, establishing vegetation and reducing erosion. Biological soil crusts often play a decisive role in the success of vegetation retention and/or the production of soil nutrients (Rosentreter et al. 2007); and

- For the temporal analysis (Appendix E), each well pad (and associated infrastructure) was assumed to require a five-acre production footprint. Based on this assumption, 7 of the 12 surface disturbance acres required per pad (or approximately 60 percent) would be reclaimed during Phase II interim reclamation.

To estimate acres of surface disturbance that could occur across fragile and saline soils, a temporal analysis methodology (see Appendix E for detailed description) was developed that takes into account projected levels of development, leasing stipulations, and management actions for each alternative. These soil categories were selected to determine how management actions might impact soils that are less stable or more difficult to reclaim, for descriptions of these soil categories refer to definitions in Chapter 3.

## 4.2.4.1    Impacts Common to All Alternatives

### Impacts from Oil and Gas Development

Direct impacts from surface-disturbing activities associated with oil and gas development would cause soil compaction, reduce vegetation cover, reduce topsoil viability, reduce soil stability, reduce soil productivity, change hydrologic function, and may alter the biotic integrity of soils. Vegetation clearing, topsoil removal, topsoil storage and excavations to build well pads, build production facilities, access roads and install pipelines increases the potential for soil losses from areas of disturbance due to wind and water erosion. Matherne (2006) found increased soil loss from well pad locations compared to undisturbed sites, and confirmed that roads and well pads provide conditions that increase erosion. Losses of soil due to accelerated erosion are more pronounced during construction, drilling, and development of infrastructure such as local roads, resource roads, and pipelines. Construction equipment and the use of roads and well pads results in soil compaction, which affects the physical properties of soils by reducing the pore space in soils and infiltration capacity. Reduced infiltration changes the hydrologic function of soils and directly increases runoff from compacted soils which can cause accelerated soil erosion in down-slope areas. Compaction

BLM_0019769

also affects soil and vegetative productivity by restricting root growth, damaging biological soil crusts, reducing soil aeration and nutrient cycling.

Removing vegetation makes soil particles subject to erosion and transportation by the wind or water. Where vegetation is cleared for oil and gas development, rain splash erosion from soils would increase due to the loss of canopy cover. Bare soil (no vegetation cover) is expected to increase over the next 20 years under all alternatives. Rain splash erosion can change the physical properties of bare soils at the surface by eroding and re-depositing small soil particles such as clay or silt forming a crust on the soil surface. This crust that can occur due to the deposition of these fine particles in surface pores and would en reduce infiltration and increase surface runoff. Vegetation clearing methods include bucking trees by hand using chainsaws, shredding vegetation using heavy equipment, pushing trees and brush over with heavy equipment, and combinations of these practices. Soils would be disturbed and possibly negatively impacted by removing vegetation.

Vegetation material is often mixed with topsoil during storage and reclamation and would change soil nutrient characteristics, having a positive or negative effect on the success of reclamation activities. Fine soil particles, especially in arid regions, with sparse vegetation cover are subject to aerosolizing or becoming wind-born and stored topsoil can often be lost without efforts to stabilize topsoil surfaces.

Topsoil removal during construction would mix soil horizons and would change the physical properties of soil horizons were plants acquire nutrients and water. When topsoils are removed, stored and replaced before reclamation activities they can lose the physical structure, nutrient content and viable seed source that make these soils valuable for vegetation establishment. In general, topsoils perform better that are aerated either by having shallow topsoil piles or by periodic mixing. Topsoils generally decline in quality the longer they are stored. Standard topsoil handling practices for the WRFO are described in Appendix D and include the physical protection from disturbance by placing a sign that identifies topsoil and protecting the topsoil surface with mulch, erosion fabric and/or seeding.

Topsoil would generally by stored for up to a month for pipeline installation. Similarly, access roads would have topsoil re-spread and stabilized in the cut/fill slopes and borrow areas within a few months of disturbance, stabilization of the surface of the topsoil for these short storage periods would not be necessary. Well pads would have topsoil stored during construction and drilling phases and then re-spread during interim Phase II reclamation. Less temporary field wide infrastructure, such as compressors, would have the topsoil re-spread on cut and fill slopes outside the area of operation after construction of the site is completed (Appendix D). During abandonment and final reclamation of facilities and well pads would include the removal and short-term storage of topsoil. Soil would be stored and then respread once the earthwork to match the subsoils to the surrounding topography is completed and soils are prepared for seeding. Soil preparation prior to topsoil spreading typically involves decompacting using ripping or pitting to create surface roughness and improve infiltration (Appendix D). After sites are re-contoured, topsoil is re-spread for final reclamation and seeding.

Excavation of subsoils (soils below the topsoil) for pad construction, access road construction, pit construction and pipeline installation would mix soil horizons and change the physical properties of soils. Subsoil structure can be critical for long-term restoration of successful development of the vegetation on disturbed sites, especially for the establishment of perennials, shrubs and trees which use subsoils for groundwater availability, root development and nutrients. For most construction projects, excavation is done in a first out last in philosophy to maintain soil structure. However, due

BLM_0019770

*Chapter 4 – Environmental Consequences*

to the physical disturbance of these soils during excavation and storage, the physical properties of subsoils and soil mixing occurs. In addition to soil mixing there are times were projects require the selective removal of soil particle size classes, such fines that are sometimes used for pipeline bedding or course material which is sometimes used for erosion control. Removal of this material, when it occurs, would change the physical structure of subsoils.

Natural Gas well drilling produces cuttings, which are the waste rock that comes to the surface suspended in drilling fluids. Surface casings holes are typically drilled down to below useable aquifers. Surface casings are a steel pipe string of a bigger diameter that pipe string that is run to the production zone. Cement is forced into the annulus (or space between) the surface casing and drilled hole. This surface casing and cement is designed to protect freshwater aquifers. The production drill hole is then drilled within this surface casing and would also have portions of this well bore cemented off. The surface casing hole is a larger diameter hole than the production hole, it produces more cuttings per foot and generally the highest volume of cuttings per well bore. For multiple well pads, these cuttings would be dried and processed during drilling operations using filters or shakers and machines that use centripetal acceleration. Cuttings would be disposed of in multiple-use pits, drilling pits and/or cuttings pits which are excavated for this purpose below the pad surface. Cuttings may also be disposed of in the cut of the pad excavation below the reclaimed soil surface. Depending on the pad design, cutting disposal is likely to result in excess subsoil during interim and final reclamation, and could result in difficulties in restoring the original landform of pad sites. When this occurs, final reclamation would require creating a landform that approximates and blends in with the surrounding landform. Depending on the final design proposed in the reclamation plan for final abandonment, cuttings disposal could change the stability and hydrologic function of the soils on some reclaimed sites.

Cuttings may contain trace chemical additives used during the drilling process that have adsorbed to the surface of the cuttings that can contaminate soils if they leach and concentrate in surrounding subsoils. Amendments may be added to cuttings to improve bioremediation of hydrocarbons or change the chemical or physical properties to achieve regulatory requirements for disposal. Cuttings material would be tested before disposal and must pass regulatory requirements and minimum concentrations promulgated by COGCC regulation (COGCC 1991). Cuttings are disposed of with three to four feet of clean fill above them, but if cuttings are exposed at the surface due to accelerated erosion or poor handling, they are likely to be nutrient poor and would have consequences for soil stability and soil productivity during reclamation. In some cases drill cuttings would also be transported for offsite disposal, particularly when they do not meet state standards for onsite disposal.

Oil and gas development would likely result in contamination of surface and subsurface soils in some locations due to unintentional leaks or spills from construction equipment, storage tanks production equipment and if these spills occurred they would affect the productivity of soils. Spills and leaks once detected would be cleaned up by removing contaminated soil and replacing it with clean soil or by bioremediation onsite. This would occur depending on the volume of the spill, under direction of the CDPHE and the BLM when on BLM administered lands. Productivity of soils would be compromised until cleanup and reclamation efforts are successful.

Generally, well pads and access roads built across steep terrain would result in more surface disturbance compared to similar densities of development on flatter terrain. This is due to more cut and fills on well pads and facilities, longer roads with more switchbacks to meet grade and more complex drainage systems to deal with stormwater. New oil and gas local and resource roads would

BLM_0019771

concentrate overland flow and increase soil loss in localized areas, impacts would generally increase with the miles of new roads proposed and the amount of use these roads would get.

Additional direct impacts from surface disturbance from oil and gas development would remove or bury Biological Soil Crusts (BSCs) which can be important for maintaining soil stability, organic matter, and nutrient content at some sites. BSCs are well adapted to severe growing conditions, but are poorly adapted to the types of disturbances (e.g., compression, removal, and burial) that would occur during oil and gas development. As areas used for oil and gas development are reclaimed it is likely that BSCs would eventually recolonize sites. Their success in recolonizing sites would be in proportion to the success of topsoil savings and any reduction in the amount of initial disturbance. Saving and replacing topsoil may allow BSCs to repopulate a site; however, the viability of topsoil piles after storage for this purpose and factors that determine success are not well known. It is likely that BSC would decrease overall in amount and diversity in the areas disturbed by oil and gas development for hundreds of years.

Indirect impacts from natural gas development would include changes in the hydrologic function of soils on a landscape scale can increase the peak flow of storm events. This higher volume of surface runoff over shorter time periods would reduce soil stability, on hillsides, in channels, areas prone to landslides and other areas with sensitive or fragile soils. The new construction of access roads on soils would increase accessibility to areas that are currently only accessible by foot or horse which may increase vehicle use for recreation in the Planning Area. Increased recreational vehicle use would have the indirect impact of increased user created routes and would likely result in additional soil disturbance, erosion and lost soil productivity in some areas. Impacts would be more pronounced if the increased development corresponds to fragile soils, saline soils or steep slopes.

Other potential impacts to soils that would occur from location siting (i.e., scouting and surveying), constructing well pads, pipelines, ancillary facilities, and new local and resource roads include:

- Reduced surface cover (e.g., stabilizing vegetation, organic litter, rocks, and soil crusts), displaced soils, and increase soil compaction in localized areas would occur from OHV and other vehicle use during siting of oil and gas surface facilities;

- Removal/damage of existing native vegetation and surface litter during construction activities, would increase rain splash erosion and change physical and chemical properties of soils that are important for germination;

- Loss and/or reduction of subsurface biological components such as macro- and microorganisms including bacteria, fungus, nematodes from damage during soil storage or soil mixing;

- Mixing of topsoil horizons with higher salinity sub-horizons, thus increasing topsoil salinity;

- Mixing of subsoils with topsoils that may result in less nutrients in soils near the surface and changes in the physical characteristics of soils in the root zone of vegetation;

- Loss of unique subsoil physical characteristics such as fractured shale layers and continuous sandstone lenses that may be broken up during excavation;

- Changing the texture and amount of rock on the surface and in exposed topsoil due to mixing the subsoil during construction activities;

- Exposure of vulnerable subsurface soil profiles; and

- Increased potential for invasive or noxious plant invasion, which could reduce soil stability and productivity.

BLM_0019772

**Impacts from Management Actions**

Dust suppression on access roads would be required under all alternatives to reduce fugitive dust emissions (Table 2-1 Records 7 and 8). Dust production and consequently the use of dust suppressants are required during construction and drilling activities, especially during construction of roads, pads, and pipelines. Fresh water is used primarily as a dust suppressant during construction and drilling phases. Chloride salts and/or synthetic compounds would be applied to roads for dust control in some cases and are more likely to be used on local and collector roads that receive regular traffic. The effectiveness of dust suppressants, consequently the amount of effort to meet a particular standard is not well known.

In general, NSO stipulations that reduce surface disturbance in localized areas to protect specific resources would have the effect of shifting disturbances to areas outside the NSO stipulation area and would not reduce overall disturbance. These NSO stipulation areas can have a positive or negative result for soil resources depending on the slopes and soils in the NSO stipulation area as compared to the areas surrounding the NSO stipulation area. Impacts to various resources would be described in site specific environmental analysis during approval site specific action in which the benefits and detriments for individual sites would be considered for soils. Siting, onsites and location criteria is typically used to move well pads, roads and other infrastructure to locations with the least amount and types of impacts.

Establishing NSO stipulations in 3,600 acres, with 3,100 acres in the MPA with remnant vegetation associations (Table 2-3 Record 27) would help prevent soil impacts in these localized areas, but would not reduce overall surface disturbance since the disturbance would be shifted to adjacent areas to access minerals beneath the remnant vegetation.

Applying CSU stipulations adjacent to cutthroat trout habitat (11,900 acres within the MPA) would help maintain soil stability by requiring special design measures to reduce accelerated soil erosion and maintain the hydrologic function of soils near trout-inhabited streams (Table 2-9 Record 19).

Managing oil and gas development to retain upland health for livestock grazing by maintaining or enhancing a healthy rangeland vegetative composition would indirectly improve the productivity and cover for soil resources (Table 2-16 Record 6). Effective grazing management (temporarily excluding livestock from reclaimed areas with fences and cattle guards) in areas of oil and gas activities would assist vegetation reclamation efforts and indirectly benefit soil resources by improved canopy cover, litter and stability during reclamation.

Maintaining the closure of 83,300 acres to oil and gas development within the Wilderness Study Areas (WSAs) and the National Park Service's Harper's Corner Road withdrawal, would maintain soil stability, hydrologic function, and biotic integrity by limiting surface disturbance within these areas (Table 2-17 Record 7). Most of these areas are outside the MPA and are expected to receive little interest for new wells even if they were open for development.

Managing ACECs as open to oil and gas leasing with NSO stipulations would likely reduce surface disturbance within the ACEC boundaries, but could potentially increase surface use on the boundaries of the ACEC to access minerals (Table 2-21 Record 13). ACECs with NSO stipulations have exceptions and waiver criteria to allow development in some cases with the implementation of design features to protect the designated resource. These NSO stipulation areas may or may not result in more protection of soil resources overall since the same amount of overall disturbance would occur, just in different locations. Other ACECs (White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek) would be open to oil and gas leasing with CSU

BLM_0019773

stipulations (Table 2-21 Record 14) that would require planning development to protect the unique resources in these areas.

Managing oil and gas development with an NSO stipulation around small areas such as raptor nests, sage-grouse strutting grounds, old-growth tree stands and cultural sites would move site locations for oil and gas facilities away from these areas, would not reduce overall surface disturbance, and could cause a positive or negative impact to soils depending on the relative value and stability of soils at each site. For example, moving a resource road from a ridge to a side slope to avoid a ridge-top old-growth tree stand or prime sage-grouse habitat would generally create more soil impacts from the road, because a road along a side slope would result in cut and fill slopes and would likely be more susceptible to accelerated erosion and soil losses than a road constructed along a ridge top. Alternatively, if a cultural site or raptor nest NSO stipulation area moves a well pad location from a steep site with poor soils and to a flatter site with better soils, the well pad is likely to have a smaller overall disturbance and reclamation would be more successful, thus resulting in fewer impacts for soils. Site specific environmental analysis would evaluate these types of impacts and the tradeoffs that often occur between resources.

**Reclamation**

Implementing Phase I and Phase II Interim Reclamation and Final Reclamation activities in accordance with the standards and timeframes outlined in the WRFO Surface Reclamation Plan in Appendix D would improve soil stability by reestablishing natural slopes and re-vegetating disturbed areas to achieve DPCs. Desired Plant Communities typically have more structure and canopy cover then undesired plant communities (e.g., cheatgrass dominated) and would contain vegetation species that have more developed root systems that help stabilize soils. Practices outlined in Appendix D would reduce accelerated soil erosion and improve or maintain soil productivity by minimizing the time that bare soil is exposed and increasing the amount and improve the timing of reclamation activities. The extent and persistence of soil resource impacts from oil and gas development would be determined by the success of engineering practices designed by the operators such as BMPs for storm water and erosion control, and also the reclamation efforts described in Appendix D. Reclamation success depends on the amount of surface disturbance, quantity and quality of topsoil salvaged, stockpile and/or redistribution methods in disturbed areas, precipitation, soil type, and moisture availability. Where properly implemented, erosion control measures and storm water management for well pads and other disturbance areas would help retain soil and promote successful reclamation. Monitoring and evaluation would be conducted to mitigate soil impacts and identify the success or failure of individual sites and practices as described in the WRFO Surface Reclamation Plan (Appendix D).

Replacement of salvaged topsoil and recruitment from adjacent sites would allow BSCs to return to or colonize sites post-disturbance. Full recovery of biological soil crusts is a slow process. For example, on the Colorado Plateau, cyanobacteria, green algae, and gelatinous lichens can return to disturbed areas within 50 years but late colonizers may not occur for 500 years, however in the Northern Great Basin the full succession of recovery can take 125 years (Belnap et al. 2001). The return of lichen species and mosses is thought to require even longer, perhaps on the order of hundreds of years in the Northern Great Basin. Recovery rates for BSCs are also highly sensitive to environmental factors such as effective precipitation. Limiting the size and extent of disturbed areas increases the rate of recovery, provided that there is a nearby source of biological soil components (i.e., inoculums) that could be transported to the site via water, air, and/or animals. Saving and replacing topsoil also allows for inoculums to repopulate a site; however, the amount of inoculums needed, viability after storage in a topsoil pile, and other factors that determine success are not well known. Soil organisms such as bacteria and fungus are likely to recover within 25 years in soil types

BLM_0019774

found within the MPA. Hoelzle (2010) found that in study plots where soil organisms were removed by fumigation in the Piceance Creek area, the ecosystem recovery was initially slowed, but soil organisms were able to recover within 25 years. Consequently, it is likely that oil and gas development would decrease the overall extent and diversity of biological soil crusts in areas of surface disturbance for some time into the future, but other soil organisms would recover 25 years after reclamation activities.

Oil and gas development in most cases would occur on public rangelands used for livestock grazing. These two land uses have been and could continue to be compatible. However, in areas disturbed by oil and gas development, grazing could reduce the success of interim and final reclamation by removing new vegetation before it is well-established. Livestock could also preferentially consume grass and forb species that form root masses that hold soil in place. If these species are prematurely removed, soil impacts from runoff and rain splash erosion would increase and annual weedy species may invade reclaimed sites. Excluding livestock from disturbed areas would typically increase the success of reclamation and reduce soil impacts. In general, fences and other measures to exclude livestock would be removed when reclamation efforts are successful and at the time of final abandonment.

A large portion of the Planning Area (497,900 acres) would be managed as a weed-free zone to prevent the spread of weeds by construction equipment (Table 2-3 Record 22). In all areas weed treatments would be planned for and needed during all phases of construction, drilling and production (Appendix D). Where noxious or invasive weeds are present, they would likely be controlled prior to reclamation (with the exception of weedy species dominance). Reclamation plans would require the submittal of weed treatments planned and be subject to approval by the BLM before surface disturbance is approved (Appendix D). When effective, weed treatment and prevention of weed spreading is likely to improve the health and stability of vegetation communities, thereby indirectly improving soil stability, decreasing erosion, improving soil moisture retention, and would increase the success of reclamation efforts.

### 4.2.4.2    Alternative A

**Impacts from Oil and Gas Development**

Under Alternative A, oil and gas development would occur on saline soils and fragile soils throughout the Planning Area. Results of the soil temporal analysis performed for Alternative A are shown in Table 4-35. The temporal analysis results (line 6) indicate that of the 523 well pads projected in the MPA, 103 could be constructed on fragile soils, and two well pads could be constructed in saline soil areas. These estimates are based on assuming a uniform distribution of well pads across areas open to development with standard lease terms. Based on the analysis results, fragile soils would potentially receive about one-fifth of total well pads in the MPA. Saline soils would potentially receive a smaller number of well pads because these soils occupy only 0.3 percent of the MPA (2,000 acres).

The construction of 523 well pads under Alternative A in the MPA would disrupt soil stability, productivity, hydrologic function, and biotic integrity on approximately 6,300 acres (Table 4-35 Line 7). The types of soil impacts that would occur are the same as described in Section 4.2.4.1, Impacts Common to All Alternatives. Soil stability impacts would be less severe for soils with low erosion potential in gently sloping areas. Impacts would be greater across the 1,200 acres of fragile soils and 24 acres of saline soils where oil and gas well pads could be constructed (Table 4-35 Line 7), primarily because these soils are susceptible to erosion and difficult to reclaim once disturbed. Long-term, the lack of stabilizing vegetation on these soils would extend the period of

BLM_0019775

Chapter 4 – Environmental Consequences

increased erosion from un-reclaimed well pads. In this area saline soils are associated with Mancos shale outcrops or lithology in the Mesaverde formation and can typically have higher than normal amounts of trace elements such as selenium.

**Table 4-35. Estimated Surface Disturbance by Soil Class for Alternative A**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Fragile Soils on Slopes Greater than 35%[6] | Saline Soils[6] |
|---------|-------------|-------|---------------------------|---------------------------------------------|-----------------|
| 1 | Land Area in the MPA | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulations Areas in the MPA[2] | Acres | 65,500 | 17,100 | 305 |
| 4 | Area Available for Surface Occupancy | Acres | 533,200 | 104,800 | 1,700 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 89 | 20 | 0.3 |
| 6 | Estimated Number of Well Pads[3] | --- | 525 | 105 | 2 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period[4] | Acres | 6,300 | 1,200 | 24 |
| 8 | Percent of Soil Feature within the MPA Developed during 20-year Planning Period[5] | % | 1.1 | 1.0 | 1.2 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO Stipulations Areas for MPA are for all resources. NSO Stipulations Areas for soil classes are only for identified soil class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

[6] Refer to Chapter 3 Soil Resources for a definition of this soil type.

Table 4-36 shows the average number of truck trips expected per year under Alternative A. These figures are based on the average number of wells and pads constructed per year, and the average number of truck trips required to serve a well or pad during construction, rig transport, drilling, completion, and production.

On acres of the MPA subject to TL stipulations (427,500 acres), an estimated three mobilizations and demobilizations for a typical drilling scenario could be required on some pads due to the shorter amount of time available for drilling on an annual basis. Multiple drill rig moves are estimated to increase the number of heavy truck trips for drill rig transport within the MPA by two additional mobilizations above what is shown in Table 4-36. As the total number of truck trips and drill rig relocations increase roads experience greater wear and tear. Based on the assumptions in Table 4-36, increased heavy truck traffic from two additional drill rig moves for the BLM mineral estate would impact an additional 22 miles of roads per well pad or for comparison to Table 4-36, a total of 11,500 miles of roads used, compared to if there were no additional rig moves, based on vehicle use assumptions. Exceptions to TL stipulations can be granted depending on site specific conditions, regional wildlife plans, or goals; not all pads are impacted to the same degree by TL stipulations under Alternative A.

BLM_0019776

*Chapter 4 – Environmental Consequences*

When additional rig moves are needed to accommodate TL stipulations, accelerated soil erosion would increase along roads due to additional road use from heavy trucks and needed road maintenance activities to accommodate this increased traffic. Increasing road use from heavy trucks requires additional drainage features (culverts, wing ditches) and potentially wider travel ways increasing the disturbance foot print of roads. Additional maintenance activities needed to accommodate more traffic would result in more and prolonged disturbance in borrow areas, more compaction on the road surface and drainage problems. Combining these activities would indirectly impact soils by creating more disturbance, compaction and accelerated erosion on and adjacent to roads used for rig moves.

### Table 4-36. Estimated Average Truck Round Trips at Year 20 for Alternative A

|  | BLM Mineral Estate (Including MPA) | | Mesaverde Play Area (MPA) | |
|---|---|---|---|---|
|  | Light Trucks | Heavy Trucks | Light Trucks | Heavy Trucks |
| Well Pad/Road Construction | 900 | 2,700 | 860 | 2,500 |
| Drill Rig Transport | 0 | 1,400 | 0 | 1,400 |
| Drilling | 34,100 | 15,700 | 32,400 | 15,000 |
| Well Completion/Testing | 9,800 | 87,200 | 9,300 | 82,900 |
| Production | 128,600 | 406,700 | 122,200 | 386,300 |
| Annual Trips (Alt. A) | 173,400 | 513,800 | 164,800 | 488,100 |

SOURCE: BLM WRFO and Final Air Resources Technical Support Document (URS 2011).

Assumptions:

1) Truck trips for construction, rig transport, and production were calculated based on the expected number of new pads in Year 20 = 41 for BLM Mineral Estate (See Appendix E).

2) Truck trips for drilling and completion/testing were calculated based on the expected number of new wells in Year 20 = 41 pads x 8 wells = 328 for BLM Mineral Estate.

3) Trucks were considered heavy if they weighed over 8,000 pounds or light if they weighed 8,000 pounds or less.

4) During production, it was assumed that use of three-phase gathering reduced all truck trips by 90% and that it would be used on 40% of all pads. Only light duty vehicle travel on local roads is shown.

5) To get total vehicle miles traveled - use the above round trips per year with a distance of 10 miles for local roads and 0.8 mile for resource roads.

6) Well pad construction, drill rig transport, drilling, and well completion calculations are based on number of new wells and pads in year 20. Production calculations are based on cumulative number of pads in production at year 20.

Drilling/reserve pits, storage pits, and evaporation ponds would be allowed under this alternative. These features are excavated into the subsurface and could cause soil losses, additional disturbance and mixing of soil horizons. Soil excavated for storage pits and evaporation ponds either have balanced cut and fills, are stabilized on-site using erosion control measures, or redistributed/ relocated off-site. Storage pits and evaporation ponds remain open longer than drilling and reserve pits if they receive produced water from multiple well sources or are used to service multiple well sites during drilling. Longer pit life creates more opportunities for accelerated erosion on soils stored adjacent to the pit, reduces the productivity of soils used for reclamation and increases the potential for pit failure and leaks.

### Impacts from Management Actions

Air quality management actions would require a 50 percent decrease in fugitive dust production from collector, local, and resource roads used for oil and gas development (Table 2-1 Records 7 and 8). Potential soil impacts from the use of chemical dust suppressants to meet this goal would be the same as described in Impacts Common to All Alternatives.

BLM_0019777

Three-phase gathering systems expected under current management at 40 percent of well pads (209 out of 523) to transport natural gas, condensate, and produced water to consolidated facilities where dehydration and temporary tank storage would occur as opposed to 80 to 90 percent in Alternatives B and C (Table 2-1 Record 16). The footprint during interim reclamation for individual pads is likely to be larger under this alternative. The implementation of three-phase gathering systems generally reduces the production facility footprint needed after interim reclamation by reducing the need for some of the storage tanks and production equipment otherwise necessary for individual well pads. However, there is additional disturbance needed to accommodate field-wide infrastructure, since separation would not occur on individual well pads. Three-phase gathering under this alternative is expected to reduce truck traffic during the production phase by 90 percent per well pad. For comparison to Table 4-36, without three-phase gathering the truck trips during production would have been 207,600 trips as compared to 128,600 trips for light and heavy duty trucks with three-phase gathering.

Soil resources would be preserved in landscapes susceptible to accelerated erosion by applying CSU stipulations in fragile soils and NSO stipulations for landslide-prone areas (Table 2-2 Records 9 and 15). Fragile soils are soils listed as highly or severely erodible by wind or water by the NRCS soil surveys or in areas with soil texture characteristics that make soils prone to erosion (such as soils with less than 20 inches to bedrock), soils with an erosion potential rated as poor or a high indicated by an erosion potential factor (K) greater than 0.32, and where these soils are also located on natural slopes greater than 35 percent. Applying CSU stipulations to limit disturbance of fragile soils (Appendix A) would help maintain fragile soils by encouraging planning or design measures to limit accelerated erosion, by shifting disturbance to less-sensitive areas, and/or by requiring engineering/reclamation plans for disturbance. Fragile soils are a subset of soils on slopes greater than 35 percent; therefore, there is more potential disturbance that would be allowed under Alternative A for soils on steep natural slopes not included in the fragile soils (see the fragile soils entry in the Glossary) as compared to Alternatives B and C. Also, although some saline soils are included in the fragile soils not all the saline soils have CSU or NSO stipulations, as they do in Alternatives B-D.

Applying NSO stipulations on oil and gas development in landslide-prone areas across 38,600 acres of mineral estate (including 1,700 acres of the MPA) would help preserve soil resources by limiting surface disturbance in erosion-prone areas (Table 2-2 Record 15). Managing oil and gas development to retain existing rangeland health and locating new pipelines and local and resource roads within existing right-of-way corridors would also reduce surface disturbance and soil erosion.

This alternative does not provide protections for landscapes that may be susceptible to accelerated erosion such as steep natural slopes, saline soils, water features or flood plains not included in fragile soils or landslide potential soil definitions (Table 2-2 Records 12, 16, and 17). Impacts in these landscapes can be expected under this alternative without the protections afforded by other alternatives (379,700 acres of these other protected areas over the Planning Area). However, only Alternative B has a CSU stipulation for slopes between 25 percent and 35 percent (292,900 acres for the Planning Area). Consequently, under this alternative 87,000 acres of soils in the Planning Area that may be unstable or sensitive to disturbance and protected with a CSU stipulation or NSO stipulation for soil or water resources under Alternatives B and C.

Surface-disturbing activities would be avoided in priority riparian habitat (Table 2-3 Record 20). Oil and gas development would be managed with an NSO stipulation on 20,900 acres surrounding raptor nest sites (Table 2-5 Record 11) and 3,600 acres surrounding sage-grouse strutting grounds (i.e., leks) (Table 2-6 Record 18). These NSO and CSU stipulations designed to protect other

BLM_0019778

resources would help maintain soil stability of the affected areas. However, since the total acreage of disturbance for this alternative is expected to be the same, these stipulations would shift surface disturbance and oil and gas facilities to adjacent areas that may or may not have more stable soils.

Timing limitation stipulations on oil and gas development are already in place across 1,006,500 acres to protect wildlife (Table 2-17 Record 18). These limitations would apply in different areas and at different times for big game, raptors, and sage-grouse. In general, TL stipulations would prolong drilling operations and increase truck trips for drill rig moves on multi-well pads as drill rigs annually mobilize and demobilize from pads to avoid drilling during restricted time periods. Where increased drill rig moves occur, soil reclamation would be delayed, which could increase long-term soil impacts from accelerated erosion and decreased reclamation success.

A positive impact of TL stipulations for soil resources is these stipulations typically correspond to periods when soils are saturated in the winter and early spring and restricting gas development activities during these time periods may reduce soil impacts, by shifting activities to times of the year when soils are dry and stable.

## Reclamation

During drilling, excavated topsoil would be impacted as it is stored on-site. Although the WRFO currently requires berms or trenches around topsoil piles on slopes exceeding 5 percent (Table 2-2 Record 10), these measures create additional surface disturbance and do not protect the integrity of topsoil piles.

Surface disturbance subject to TL stipulations under Alternative A could be as high as 6,300 acres. When topsoil is stored for longer periods of time, greater losses of soil productivity would occur. Following this logic, reductions in topsoil productivity would be higher where well pads are constructed when TL stipulations are imposed due to the longer drilling period and consequently longer topsoil storage times (estimated as three years instead of two years under this alternative). Also since interim reclamation could be delayed in these areas by one year, the soil productivity that would occur due to spreading the topsoil and seeding for interim reclamation during this year would not occur.

Livestock would not necessarily be excluded from well pad and pipeline reclamation areas under this alternative (Table 2-16 Record 12). Livestock grazing, where it is not excluded by fences would affect the success of reclamation and increase accelerated soil erosion by allowing grazing before vegetation has been fully established. Where oil and gas activity conflicts with grazing operations, allotment management plans could be adjusted to change the season of use, reduce stocking levels, or decrease animal unit months (Table 2-16 Record 13), which would reduce grazing impacts overall, and would indirectly promote successful reclamation and reduce soil loss, but would be an ineffective method for reducing grazing on specific sites.

### 4.2.4.3    Alternative B

#### Impacts from Oil and Gas Development

The soil temporal analysis performed for Alternative B shows that an estimated 1,045 well pads would be constructed in the MPA (twice that of Alternative A). The 1,045 well pads would result in 12,500 acres of surface disturbance from oil and gas development (Table 4-37 Lines 6 and 7).

The disturbance acreage in Table 4-7 for the MPA at end of the 20 year planning horizon was selected to estimate annual erosion rates for comparison by alternative. Total un-reclaimed surface

BLM_0019779

is estimated at 7,400 acres and total successful reclamation is estimated at 5,100 acres. Therefore, at the end of 20 years assuming un-reclaimed disturbance would have an erosion rate similar to the short-term erosion rate of 0.08 tons/acre and successful reclamation would have long-term mean annual erosion rate of 0.02 tons per acre, the total erosion rate for the MPA for accelerated erosion due to oil and gas development at end of the 20 year planning horizon would be 690 tons/year for Alternative B as compared to 370 tons/year for Alternative A. Better and more site specific modeling of erosion rates will be done on a project level if significant impacts are anticipated.

The NSO stipulations established for natural slopes greater than 35 percent would prevent development on 121,800 acres of fragile soils within the MPA (Table 4-37 Line 3). Alternative B also establishes NSO stipulations within 100 feet of saline soils for 45,300 acres in the Planning Area (Table 2-2 Record 16) and 2,600 acres in the MPA. The majority of saline soils in the Planning Area are outside the MPA (96 percent), and areas are expected to experience only 5 percent of the oil and gas development being analyzed.

### Table 4-37. Estimated Surface Disturbance by Soil Class for Alternative B

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Fragile Soils on Slopes Greater than 35%[6] | Saline Soils[6] |
|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulations Areas in the MPA[2] | Acres | 242,800 | 121,800 | 2,000 |
| 4 | Area Available for Surface Occupancy | Acres | 355,900 | 115 | 0 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 60 | 0 | 0 |
| 6 | Estimated Number of Well Pads[3] | --- | 1,045 | 0 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period[4] | Acres | 12,500 | 0 | 0 |
| 8 | Percent of Soil Feature within the MPA Developed during 20-year Planning Period[5] | % | 2.1 | 0.0 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO Stipulations Areas for MPA are for all resources. NSO Stipulations Areas for soil classes are only for identified soil class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

[6] Refer to Chapter 3 Soil Resources for a definition of this soil type.

Because all the areas with fragile soils identified in Alternative A are located on natural slopes greater than 35 percent, the NSO stipulations for natural slopes would limit oil and gas facilities on these erosion-prone soils and soil stability would be maintained for 176,300 more acres than under Alternative A. However, impacts to soil stability and biotic integrity from surface disturbance would be greater due to the increased amount of oil and gas development estimated for this alternative. This concept is illustrated on Figure 4-5, which compares the estimated acres of surface disturbance developed in the MPA under Alternative A with the estimated acres of surface disturbance under Alternative B. The graph shows that surface disturbance in the MPA Area under Alternative B (12,500 acres) would be double the surface disturbance under Alternative A (6,300 acres). The

BLM_0019780

graph and Tables 4-35 and 4-37 also show that the estimated acres of surface disturbance on fragile and saline soils in the MPA would be zero under Alternative B compared to about 1,200 acres for fragile soils and 24 acres for saline soils under Alternative A.

**Figure 4-5. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Category during the 20-yr Planning Period under Alternatives A and B**



Table 4-38 displays the average number of truck trips expected per year under Alternative B, and includes the total truck trips expected per year under Alternative A for comparison. Due to the more extensive use of field infrastructure to accommodate three phase gathering heavy and light truck trips are reduced significantly per well pad as compared to Alternative A. Although Alternative B has twice the well pads and wells, truck trips are expected to be significantly less. For the MPA three phase gathering is expected to result in 1.15 million miles of truck trips saved as compared to the amount of development approved with the TL stipulations described for Alternative A. As the total number of vehicle miles traveled on access roads decreases, the resource roads experience decreased wear and tear and accelerated erosion, which would reduce impacts to soil stability and productivity. Saving truck trips during production is significant for soil resources since many of these service trips must occur regularly regardless of the weather and season. Road impacts are generally greater in wet conditions which are more likely during the early spring snowmelt and summer afternoon thunderstorms.

BLM_0019781

**Table 4-38. Estimated Average Truck Round Trips at Year 20 for Alternative B**

|  | Mineral Estate (includes MPA) | | Mesaverde Play Area (MPA) | |
| --- | --- | --- | --- | --- |
|  | Light Trucks | Heavy Trucks | Light Trucks | Heavy Trucks |
| Well Pad/Road Construction | 1,500 | 4,500 | 1,400 | 4,300 |
| Drill Rig Transport | 0 | 2,400 | 0 | 2,300 |
| Drilling | 57,400 | 26,500 | 54,500 | 25,200 |
| Well Completion/Testing | 16,600 | 146,800 | 15,700 | 139,500 |
| Production | 76,800 | 241,900 | 72,900 | 229,800 |
| Annual Trips (Alt. B) | 152,300 | 422,100 | 144,700 | 401,000 |
| Annual Trips (Alt. A) | 173,400 | 513,800 | 164,800 | 488,100 |

SOURCE: BLM WRFO and Final Air Resources Technical Support Document (URS 2011).

Assumptions:

1) Truck trips for construction, rig transport, and production were calculated based on the expected number of new pads in Year 20 = 69 for BLM Mineral Estate (See Appendix E).

2) Truck trips for drilling and completion/testing were calculated based on the expected number of new wells in Year 20 = 69 pads x 8 wells = 552 for BLM Mineral Estate.

3) Trucks were considered heavy if they weighed over 8,000 pounds or light if they weighed 8,000 pounds or less.

4) During production, it was assumed that use of three-phase gathering reduced all truck trips by 90% and that it would be used on 90% of all pads. Only light duty vehicle travel on local roads is shown.

5) Local and resource roads are used to the same extent. To get total vehicle miles traveled - use the above trips per year with a distance of 10 miles for local roads and 0.8 miles for resource roads.

6) Well pad construction, drill rig transport, drilling, and well completion calculations are based on number of new wells and pads in year 20. Production calculations are based on cumulative number of pads in production at year 20.

The use of water transport systems during drilling and well completion/testing to comply with voluntary implementation of development thresholds (Table 2-2 Record 19), and the use of three-phase gathering systems for 90 percent of well pads during production (Table 2-1 Record 16) to transport water to a consolidated facility, would result in a reduction in over a million vehicle miles traveled. With consolidated water facilities, more of these truck trips would be limited to local and collector roads, and the total number of truck trips to well pads over resource roads would be reduced. There are two benefits to soil resources from this scenario; first, resource roads can be maintained at a more primitive standard, and secondly design and maintenance can be focused on local and collector roads. Less road use and more primitive standards for resource roads allows for fewer disturbances to be maintained during production and consequently generally improves soil productivity along roads and likely reduces accelerated erosion from and adjacent to access roads.

<u>**Impacts from Management Actions**</u>

Requiring an 84 percent reduction in fugitive dust for collector and local roads and 80 percent for resource roads in the MPA could necessitate extensive use of chemical dust suppressants (Table 2-1 Records 7 and 8). Increased use of chemical dust suppressants for road maintenance could indirectly damage soil and vegetation in localized areas due to overspray of chemicals or movement of chemical dust suppressants off the road surface. A study in Colorado evaluated application of magnesium chloride dust suppressants and observed moderate damage to vegetation in localized areas that was attributable to the use of these dust suppressants (Goodrich et al. 2008). If vegetation is damaged near roadways, this would decrease soil stability in these areas and could lead to accelerated erosion. However, using dust suppressants correctly and achieving better standards for road construction and maintenance to reduce dust generated from road surfaces would improve road stability and function, and likely reduce accelerated erosion of soils on and near road surfaces.

BLM_0019782

Implementation of three-phase gathering systems would be expected at 90 percent of well pads (990 out of 1,100) (Table 2-1 Record 16). Increased three-phase gathering under this alternative allows a larger amount of individual well pads to be reclaimed and thereby improve overall soil productivity and soil stability for access roads as discussed earlier.

Under Alternative B, management actions for soil would establish NSO stipulations within 100 feet of mapped landslide-prone areas (46,400 acres of mineral estate, 2,300 acres in the MPA) and on slopes greater than 35 percent (353,000 acres of mineral estate, 124,200 acres in the MPA) (Table 2-2 Records 15 and 17). Avoiding surface disturbance in these areas maintains existing soil characteristics in areas near soils prone to landslides. This 100 foot buffer around the landslide prone areas reduces impacts from pads or roads changing the groundwater hydrology, increasing surface disturbance or other indirect impacts that may destabilize these soils.

Establishing NSO stipulations on 32,100 acres of land in the MPA within mapped 100 year flood plains and within 500 feet of perennial streams, springs, wells, and wetland/riparian areas would help maintain soil stability in these areas (Table 2-2 Record 12). These NSO stipulations would reduce the total area in the MPA available for surface disturbance with slopes less than 25 percent from 366,300 to 334,200 acres, a reduction of nearly 9 percent compared to Alternative A. This reduction in potential areas for locating well pads and other infrastructure could result in higher density of surface disturbance on slopes less than 25 percent, or could shift development onto slopes between 25 and 35 percent, which would be managed with CSU stipulations (292,900 acres of mineral estate with 105,400 acres in the MPA). The CSU stipulations for the 25 and 35 percent slope range would require special design measures that would help protect soils by limiting erosion from concentrated runoff. In general, the soils around water features are more prone to accelerated erosion and have higher soil productivity. Overall excluding occupancy in these areas is likely to benefit soil resources by moving disturbance to more stable and less productive soils and it is unlikely that a 9 percent decrease of NSO stipulations in these areas would shift disturbance to less stable soils.

Surface-disturbing activities would also be prohibited in priority riparian/wetland habitat, which would similarly reduce surface disturbance in localized areas relative to Alternative A (Table 2-3 Record 20). These management actions would move site locations for oil and gas infrastructure away from these resources, would not reduce overall surface disturbance, and could produce a positive or negative impact to soils depending on the relative value and stability of soil between the original and shifted location.

Alternative B would use the threshold concept to manage new oil and gas development (Table 2-4 Record 12). In each GMU, operators would be required to keep disturbance and disruptive activities below a certain threshold to remain exempt from TL stipulations. In big game (elk) winter range (which makes up 88 percent of the MPA), TL stipulations would limit construction and drilling to seven months per year without compliance with the threshold concept. In the absence of TL stipulations due to the compliance with the threshold concept, year-round drilling would be allowed. In general year-round drilling would decrease the time between initial disturbance and interim reclamation on pads (as described above, absence of TL stipulation is likely to mean an average of two years of drilling per pad compared to three years with the additional drill rig moves to accommodate TL stipulations). Accelerated reclamation made possible due to shortened drilling times on multi-well pads is likely to help improve soil stability and reduce accelerated erosion over time and for individual pads.

BLM_0019783

Compliance with the threshold concept (Table 2-4 Record 12) could lead to more shared oil and gas facilities. If many well pads were simultaneously drilled in one area, local and resource roads would be shared and fewer local or collector roads would be needed to access the development zone, which could decrease the cumulative area of surface disturbance and the impact on soil resources. However, the threshold approach could also lead to higher density development in some locations, which could increase the severity of soil impacts within concentrated development zones.

Managing 18,900 acres of state wildlife areas, 79,500 acres near raptor nest sites (Table 2-5 Record 11), and 17,400 acres near sage-grouse leks (Table 2-6 Record 18) with an NSO stipulation would typically move site locations for oil and gas infrastructure away from these areas, would not reduce overall surface disturbance, and could produce a positive or negative impact to soils depending on the relative value and stability of soil between the original and shifted location. Many of the state wildlife areas in the MPA are located along streams (Piceance Creek, Yellow Creek, and Dry Fork of the Piceance) and are continuous areas.

Similar to Alternative A, CSU stipulations on oil and gas development under Alternative B would apply in areas of Colorado River cutthroat trout habitat. However, additional emphasis would be placed on managing 11,900 acres of trout habitat along portions of Black Sulphur Creek in the MPA (Table 2-9 Record 20). As a result, this alternative would do more to maintain soil stability than Alternative A by applying CSU stipulations over a larger area. Since Black Sulphur Creek is expected to be in the middle of an area of high development potential soils resources in this are very likely to benefit from this action by improve designs, reclamation practices and reducing disturbance.

Exclusion areas for new ROW authorizations would be expanded to include occupied, suitable, and potential habitat for federally listed plant species, which creates larger ROW exclusion areas and reduces surface disturbance and impacts on soil resources in localized areas compared to Alternative A (Table 2-10 Record 13). Since total surface disturbance is the same with this management action this decision would shift the ROW to another area that may have negative or positive impacts on soils depending on the relative stability of the soils on routes.

With respect to grazing (Table 2-16), Alternative B would likely be the most effective approach for maintaining soil stability and hydrologic function, because it allows for compensatory mitigation and opportunities to facilitate voluntary collaboration between oil and gas operators and grazing permittees. These management tools are likely to provide flexibility in management of livestock grazing on allotments temporarily impacted by oil and gas development activities and to enhance reclamation success, thereby indirectly improving soil productivity. Oil and gas operators would be required under Alternative B to excluded livestock from oil and gas well pads and related surface disturbance areas (Table 2-16 Record 11). Livestock would also be excluded from linear ROWs (i.e., roads, pipelines, and utility lines) until reclamation efforts are successful, which could help restore vegetation and stabilize soils by removing grazing impacts during the establishment of reclamation vegetation.

Since digging pits would not be allowed (Table 2-17 Record 20), excavated pits would be replaced with tanks or other aboveground structures, which could expand well pad footprints in some cases and increase the area of surface disturbance. However, without pit excavations, more soil would be left in place and less soil would need to be stored since soil would not need to be stored for closing the pit. Not allowing cuttings pits would require the removal of cuttings off the pad and more vehicle traffic or the disposal of cuttings on the pad surface which could result in these cuttings being closer to the reclaimed surface and potentially more surface disturbance for cuttings

BLM_0019784

management. Evaporation ponds would not be allowed for produced water disposal (Table 2-17 Record 10), which could decrease surface disturbance and reduce impacts on soil hydrologic function. Requiring Concentrated Development Plans (CDPs) for oil and gas activities could result in changing the location of pads and other infrastructure to avoid or mitigate impacts in fragile and saline soil areas (Table 2-17 Record 12). This would help maintain existing soil characteristics more than Alternative A, which would not require CDPs.

To protect other mineral resources, NSO stipulations for oil and gas activities would be established on oil shale research and development tracts and on sodium and multi-mineral leases (Table 2-17 Records 21 and 22). Although these NSO stipulations would minimize surface disturbance related to oil and gas development, there would still be surface disturbance associated with oil shale research and development and sodium and multi-mineral activities in these areas. These NSO stipulations could lead to positive or negative impacts to soils depending on the relative surface disturbance of shale research and development and sodium and multi-mineral activities versus oil and gas activities.

Special recreation management areas would be developed and managed for oil and gas development with an NSO stipulation, which includes three areas outside of Meeker (Table 2-18 Record 5). Although these special management areas are located outside the MPA, in the portion of the Planning Area where only 5 percent of oil and gas development is expected to occur, it still has oil and gas potential. At 7,700 acres, the special management areas would represent one of the larger contiguous areas of NSO stipulations in the Planning Area. Thus, the NSO stipulation would help maintain existing soil characteristics in these special management areas by shifting disturbance away from the restricted area, but still could increase development outside the special management areas.

To prevent an increase in vehicle traffic, newly constructed local and resource roads would be restricted to approved oil and gas activities and would be unavailable for public vehicular access (Table 2-19 Records 7 and 13). This could help reduce OHV use in areas adjacent to new oil and gas roads. Limiting both on-road and off-road vehicle use on these new roads would help retain soil by reducing wear and tear and accelerated erosion from road surfaces and adjacent areas and would likely result in less new user created routes.

<u>Reclamation</u>

Although Alternative B has twice the number of well pads as Alternative A, soil impacts from surface disturbance would be mitigated somewhat if interim reclamation occurs more quickly with year-round drilling. Year-round drilling would be possible if exceptions to TL stipulations were granted with voluntary implementation of development thresholds. With the exception to TL stipulations, development of a multi-well pad is estimated to require a two-year development cycle per well pad, as compared to a three-year development cycle per well pad for Alternative A.

Additional erosion control measures would be required under this alternative, including protective surface treatments on disturbed areas and soil storage areas such as mulch, matting, netting, or tackifiers (Table 2-2 Record 10). These measures would aid in soil retention. Also, operators choosing to comply with voluntary development thresholds would be encouraged to use existing corridors for new pipelines in areas of concentrated development. Consolidating pipelines into existing corridors would reduce the extent of new surface disturbance and reduce surface disturbance by using a portion of existing pipeline corridors for new construction.

BLM_0019785

Requiring success criteria of 100 percent foliar cover and 50 percent basal cover of the DPC for interim and final reclamation for oil and gas activities would likely improve soil stability and reduce erosion in those areas subject to interim and final reclamation (Table 2-3 Record 18). In contrast, Alternative A does not include a specified percentage for success criteria, Alternative C has an 80 percent foliar cover and 25 percent basal cover criterion and Alternative D has a 60 percent foliar cover and 5 percent basal cover. Assuming this percentage is an adequate surrogate for vegetation canopy cover, good root mass structure, and soil surface stability; impacts on soil resources should decrease with a higher success criterion. How much of a difference in impacts for soil resources with a success criterion of 100 percent as opposed to 80 percent is difficult to determine, since vegetation composition (DPC) would be different for each site based on the rangeland plant communities, topography and soils.

#### 4.2.4.4   Alternative C

**Impacts from Oil and Gas Development**

The soil temporal analysis performed for Alternative C shows that an estimated 1,710 well pads would be constructed in the MPA, resulting in 20,500 acres of surface disturbance (Table 4-39 Lines 6 and 7). The disturbance acreage in Table 4-7 for the MPA at end of the 20 year planning horizon was selected to estimate annual erosion rates for comparison by alternative. Total un-reclaimed surface is estimated at 12,800 acres and total successful reclamation is estimated at 7,700 acres. Therefore, at the end of 20 years assuming un-reclaimed disturbance would have an erosion rate similar to the short-term erosion rate of 0.08 tons/acre and successful reclamation would have long-term mean annual erosion rate of 0.02 tons per acre, the total erosion rate for the MPA for accelerated erosion due to oil and gas development at end of the 20 year planning horizon would be 1,180 tons/year for Alternative C as compared to 690 tons/year for Alternative B. Better and more site specific modeling of erosion rates will be done on a project level if significant impacts are anticipated.

Alternative C would have NSO stipulations on slopes greater than 50 percent and CSU stipulations for soils on slopes between 35 and 50 percent. Alternative B has NSO stipulations for all slopes above 35 percent and CSU stipulations for soils between 25 and 35 percent. This change in management could allow occupancy of half the fragile soils in the MPA (61,300 acres, Table 4-39 Line 4), and allowing an estimated 234 well pads and 2,800 acres of surface disturbance on these soils (Table 4-39 Lines 6 and 7). However, slopes 35-50 percent would be managed as avoidance areas and would require mitigation for disturbance in these areas and avoidance of these slopes when possible.

Alternative C requires NSO stipulations on saline soils (2,000 acres in the MPA, Table 4-39 Line 1). By doing so, oil and gas surface disturbance would essentially be precluded in saline soil areas, with the exception of Coal Oil Basin north of Rangely were there is historical and current oil and gas development on saline soils that form from calcareous shales. Calcareous shales have accumulations of calcium and magnesium carbonate and are difficult to reclaim. The formation of these soils corresponds to Mancos Shale outcrops and valley bottoms downstream from Mancos Shale or gypsum layers, mostly found outside the MPA. These calcareous shales may have higher amounts of trace elements, such as selenium, that can be transported in ground and surface waters with soil particles or by being dissolved in surface runoff. This NSO is more applicable to the estimated 5 percent of wells (90 single well pads) that are expected outside the MPA. For this more dispersed development saline soil can typically be avoided by considering the location of surface disturbance.

BLM_0019786

## Chapter 4 – Environmental Consequences

Figure 4-6 compares the estimated acres of surface disturbance in the MPA under Alternative C with the estimated acres of surface disturbance in the MPA under Alternatives A and B. The estimated acres of surface disturbance in the MPA under Alternative C are 60 percent higher than under Alternative B, corresponding directly to the increase in well pads. Soil impacts for Alternative C would be greater due to a larger area of surface disturbance. Direct soil impacts include reductions in soil stability, productivity, hydrologic function, and biotic integrity. Alternative C has the highest impact on fragile soils; an estimated 2,800 acres would be disturbed, compared to 1,200 acres for Alternative A and zero acres for Alternative B.

### Table 4-39. Estimated Surface Disturbance by Soil Class for Alternative C

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Fragile Soils on Slopes Greater than 35%[6] | Saline Soils [6] |
|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulations Areas in the MPA [2] | Acres | 150,900 | 60,600 | 2,000 |
| 4 | Area Available for Surface Occupancy | Acres | 447,800 | 61,300 | 0 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 14 | 0 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 | 234 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period [4] | Acres | 20,500 | 2,800 | 0 |
| 8 | Percent of Soil Feature within the MPA developed during 20-year Planning Period [5] | % | 3.4 | 2.3 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO Stipulations Areas for MPA are for all resources. NSO Stipulations Areas for soil classes are only for identified soil class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

[6] Refer to Chapter 3 Soil Resources for a definition of this soil type.

BLM_0019787

**Figure 4-6. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Category during the 20-yr Planning Period under Alternatives A, B, and C**



Table 4-40 displays the average number of truck trips expected per year under Alternative C, and includes the total truck trips expected per year under Alternatives A and B for comparison. Similar to Alternative B, using water transport systems during drilling and well completion/testing and three-phase gathering systems during production to transport water to a consolidated facility would result in a less vehicle miles traveled on resource roads, with a commensurate reduction in wear and tear and accelerated erosion. Although water pipelines are a voluntary compliance feature for concentrated development areas (Table 2-2 Records 18 and 19), many operators are already installing infrastructure and implementing water delivery systems not just for handling produced water but also for transporting water needed during drilling operations.

Heavy vehicle miles traveled on resource roads during the production phase would be reduced by a factor of three (URS 2011), on a per well pad basis, compared to Alternative A. Reducing traffic during the production phase can benefit soil resources by allowing for a lower road design standard during this time of development (i.e., during the 30 – 50 years of production) and lead to less maintenance being needed to maintain road conditions. An example of a lower road design standard is is an inslope/outslope design instead of a crowned and ditch design, the inslope/outslope design requires less disturbance since borrow ditches are not needed on both sides of the road

BLM_0019788

*Chapter 4 – Environmental Consequences*

### Table 4-40. Estimated Average Truck Round Trips at Year 20 for Alternative C

| | Mineral Estate (includes MPA) | | Mesaverde Play Area (MPA) | |
|---|---|---|---|---|
| | Light Trucks | Heavy Trucks | Light Trucks | Heavy Trucks |
| Well Pad/Road Construction | 3,100 | 9,000 | 2,900 | 8,600 |
| Drill Rig Transport | 0 | 4,900 | 0 | 4,600 |
| Drilling | 115,600 | 53,400 | 109,900 | 50,700 |
| Well Completion/Testing | 33,400 | 295,800 | 31,700 | 281,000 |
| Production | 184,700 | 582,800 | 175,400 | 553,700 |
| Annual Trips (Alt. C) | 336,700 | 945,900 | 319,900 | 898,600 |
| Annual Trips (Alt. B) | 152,300 | 422,100 | 144,700 | 401,000 |
| Annual Trips (Alt. A) | 173,400 | 513,800 | 164,800 | 488,100 |

SOURCE: BLM WRFO and Final Air Resources Technical Support Document (URS 2011).

Assumptions:

1) Truck trips for construction, rig transport, and production were calculated based on the expected number of new pads in Year 20 = 139 for the BLM Mineral Estate (See Appendix E).

2) Truck trips for drilling and completion/testing were calculated based on the expected number of new wells in Year 20 = 139 pads x 8 wells = 1,112 for the BLM Mineral Estate.

3) Trucks were considered heavy if they weighed over 8,000 pounds or light if they weighed 8,000 pounds or less.

4) During production, it was assumed that use of three-phase gathering reduced all truck trips by 90% and that it would be used on 80% of all pads. Only light duty vehicle travel on local roads is shown.

5) Local and resource roads are used to the same extent. To get total vehicle miles traveled - use the above trips per year with a distance of 10 miles for local roads and 0.8 mile for resource roads.

6) Well pad construction, drill rig transport, drilling, and well completion calculations are based on number of new wells and pads in year 20. Production calculations are based on cumulative number of pads in production at year 20.

Evaporation ponds would be prohibited on the BLM-administered surface estate (Table 2-17 Record 10), which would reduce soil impacts from surface disturbance and salt precipitation in localized areas. Also under this alternative, the BLM would discourage the use of drilling and reserve pits (Table 2-17 Record 20). Excavated pits would be replaced with tanks or other aboveground structures. This could result in larger well pads, but overall, more soil would be left in place and less soil would need to be stored since drilling and reserve pits would not need to be excavated, and soil would not need to be stored for closing these pits. Closed loop drilling (no pits) typically results in a large pad surface but a smaller disturbance footprint.

**Impacts from Management Actions**

Soil surface protection measures would be required in all disturbed areas (Table 2-2 Record 10) as in Alternative B. Surface treatments would vary depending on the local site conditions and changes in erosion control technology, but may include mulch, matting, netting, and/or tackifiers. These treatments are commonly applied on steep slopes and topsoil piles, but requiring them on all disturbed areas would likely improve soil stability and improve reclamation success as compared to Alternatives A or D.

Areas within mapped 100-year flood plains and within 500 feet of perennial streams, springs, wells, and wetland/riparian zones would be open to oil and gas leasing with a CSU stipulation (Table 2-2 Record 12). Applying CSU stipulations in these areas could help mitigate accelerated soil erosion through design modification or by shifting facilities away from erosion-prone areas.

BLM_0019789

NSO stipulations would encompass lands within 50 feet of mapped landslide-prone areas (Table 2-2 Record 15). This is less than the 100 foot buffer specified in Alternative B, and allows development in closer proximity to landslide prone-areas. Two potential impacts could result from having surface disturbance near landslide areas: increasing surface runoff above the landslide area and potentially undermining the toe of the landslide areas. Both impacts decrease slope stability and may cause additional landslides from these areas.

Alternative C precludes oil and gas surface disturbance on saline soils, but the exclusionary 100 foot buffer established around these features under Alternative B would be eliminated (Table 2-2 Record 16). This would decrease the total NSO stipulation area for saline soils from 45,300 acres to 34,100 acres, and from 2,600 acres to 2,000 acres in the MPA. Decreasing the area of NSO stipulations and removing buffers on development would increase surface disturbance impacts in areas surrounding saline soils. Saline soils are difficult to reclaim and may be less stable. Surface disturbance approved within in the 100 foot buffer above saline soils may concentrate surface runoff and result in more accelerated erosion in saline soils.

Slopes greater than 50 percent would be managed with NSO stipulations (Table 2-2 Record 17) as discussed under Alternative B. Controlled surface use stipulations would apply on slopes between 35 and 50 percent (238,700 acres of mineral estate with 88,800 acres in the MPA), where they are managed as NSO stipulations under Alternative B. Managing this slope range with CSU stipulations rather than NSO stipulations B may result in more surface disturbance and consequently accelerated erosion. However, CSU stipulations would require BMPs and other mitigation for surface disturbance hence many of the direct impact would be mitigated. With the diversity of conditions in this slope range in terms of soil types and vegetation as well as the engineering practices available it is likely impacts under a CSU in this slope category can be mitigated by application of BMPs. Impacts in the slope range of 35 to 50 percent are likely to result in minor and localized areas were engineering or reclamation practices fail, and overall impacts on steep natural slopes would be similar to Alternative B.

Operators choosing to comply with voluntary development thresholds would be encouraged to use existing corridors for new pipelines in areas of concentrated development (Table 2-2 Record 21). The effects of this management action would be similar to Alternative B which encourages the use of existing corridors.

Alternative C allows some surface-disturbing activities in riparian/wetland habitats (Table 2-3 Record 20). This could create more soil impacts from surface disturbance, which could increase impacts on soil resources in these riparian/wetland habitats compared to Alternative B.

Similar to Alternative B, the threshold concept would be used to manage new oil and gas development (Table 2-4 Record 12). In each GMU, each oil and gas operator would be required to keep disturbance and disruptive activities below a certain threshold to remain exempt from TL stipulations. Impacts on soil from the threshold concept would be similar to Alternative B, except that Alternative C establishes higher thresholds for development allowing more surface disturbance for construction of oil and gas roads and pads, resulting in greater soil impacts, including loss of soil productivity and hydrologic function. Surface disturbance under Alternative C could still be less than that under a scenario with TL stipulations if the threshold concept leads to more shared facilities, and if year-round drilling shortened pad lives and accelerates interim reclamation.

In the MPA, NSO stipulations would apply across 5,000 acres of state wildlife areas (Table 2-4 Record 16) and 22,600 acres near raptor nest sites (Table 2-5 Record 11). The NSO stipulation area

BLM_0019790

for sage-grouse leks under Alternative B (11,600 acres in the MPA) would become an avoidance area under Alternative C. In addition, more exceptions to the avoidance COA would be allowed (Table 2-6 Record 18). Allowing more development near these areas that are valuable for wildlife would likely reduce impacts to soils over those expected in Alternative B, by allowing more flexibility when siting of locations and roads in areas with better soil stability and hydrologic function. The CSU stipulations established for trout habitat along portions of Black Sulphur Creek (11,900 acres in the MPA) would be the same as Alternative B (Table 2-9 Record 20) and would have the same impact on soils.

Alternative C includes a management action that allows grazing allotments (portions or whole) to be closed during periods of intensive oil and gas development when the two uses are found to be incompatible (Table 2-16 Record 8). Grazing modifications when siting oil and gas facilities, such as limited fencing, adding cattle guards, and avoiding range improvements would occur under all alternatives and would likely be used to make uses compatible. Any closures would be temporary until grazing and oil and gas development could be made compatible. Incompatibility between these surface uses would occur when an allotment is in danger of not meeting land health standards (BLM 1996). This management action is different from the management action under Alternative B which adjusts oil and gas activities to accommodate grazing. Regardless of these decisions land health standards must be met for both uses of public lands. Impacts to soils could change in nature and location depending on the management alternative implemented but would likely be the same.

Oil and gas operators would be encouraged, but not required as for Alternative B, to build new well pads with an adapted footprint configuration (Table 2-17 Record 19). Although current management allows for the modification of well pad designs to fit topography which is an adapted footprint, this management action requires topography to be one of the prime considerations for well pad design. In general, this action would likely reduce soil impacts from runoff and accelerated erosion by limiting cut-and-fill areas on the ground surface.

Managing oil and gas development with a CSU stipulation in the three special management areas (7,700 acres) could increase the potential for surface disturbance and impacts on soil resources within the special management areas as compared to Alternative B (which applies an NSO stipulation), but would have less impacts than under Alternative A and D where there is no CSU stipulation (Table 2-18 Record 5).

## Reclamation

This alternative would allow more than three times the number of well pads compared to Alternative A (1,710 vs. 523 in the MPA). Impacts from individual well pads could be slightly reduced if interim reclamation is accelerated by allowing year-round drilling though granting exceptions to timing limitations. Similar to Alternative B, year-round drilling would be possible if exceptions to TL stipulations were granted with voluntary implementation of development thresholds. Development thresholds would allow for an estimated two-year development cycle per well pad, as compared to a three-year development cycle per well pad for Alternative A.

Requiring success criteria of 80 percent (versus 100 percent for Alternative B) foliar cover and 25 percent basal cover as opposed to 50 percent for Alternative B of the DPC for interim and final reclamation for oil and gas activities would improve soil stability and reduce erosion in those areas subject to interim and final reclamation (Table 2-3 Record 18), but the improvements would be less effective than Alternative B due to the lower success criteria.

BLM_0019791

### 4.2.4.5    Alternative D

__Impacts from Oil and Gas Development__

The soil temporal analysis performed for Alternative D shows that an estimated 2,428 well pads would be constructed in the MPA, resulting in 29,100 acres of surface disturbance (Table 4-41 Lines 6 and 7). The disturbance acreage in Table 4-7 for the MPA at end of the 20 year planning horizon was selected to estimate annual erosion rates for comparison by alternative. Total un-reclaimed surface is estimated at 19,800 acres and total successful reclamation is estimated at 9,300 acres. Therefore, at the end of 20 years assuming un-reclaimed disturbance would have an erosion rate similar to the short-term erosion rate of 0.08 tons/acre and successful reclamation would have long-term mean annual erosion rate of 0.02 tons per acre, the total erosion rate for the MPA for accelerated erosion due to oil and gas development at end of the 20 year planning horizon would be 1,770 tons/year for Alternative D as compared to 1,180 tons/year for Alternative C and 690 tons/year for Alternative A. Better and more site specific modeling of erosion rates will be done on a project level if significant impacts are anticipated.

Surface occupancy would be allowed on over 60 percent of fragile soil areas in the MPA (75,700 out of 121,900 acres, Table 4-41 Lines 4 and 1). With more development and fewer restrictions on surface occupancy (only NSO stipulations on slopes greater than 50 percent) compared to Alternative B (NSO stipulations on slopes greater than 35 percent and CSU stipulations on slopes between 25 and 35 percent) and Alternative C (NSO stipulations on slopes greater than 50 percent and CSU stipulations on slopes greater than 35 percent), it is estimated that 367 well pads would be constructed on fragile soils (Table 4-41 Line 6). This number of pads corresponds to 4,400 acres of surface disturbance (Table 4-41 Line 7). Under Alternative D, saline soils would be managed with CSU stipulations rather than NSO stipulations. However, NSO stipulations would still occur across 300 acres of saline soils due to management actions for other resources (Table 4-41 Line 3). The overall result is that up to 8 well pads could be constructed in saline soil areas, resulting in 100 acres of surface disturbance (Table 4-41 Lines 6 and 7).

Figure 4-7 compares the estimated acres of surface disturbance in the MPA Alternative D with estimated acres of surface disturbance under Alternatives A, B, and C. It is evident from the graph that the estimated acres of surface disturbance related to oil and gas development activities would be highest under Alternative D (29,100 acres), an approximately 40 percent increase in estimated acres of surface disturbance over Alternative C (20,500 acres). Impacts to fragile soils and saline soils would also be highest under Alternative D, both due to the number of well pads and because of the reduction in NSO stipulations to protect soils.

BLM_0019792

**Table 4-41. Estimated Surface Disturbance by Soil Class for Alternative D**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Fragile Soils on Slopes Greater than 35%[6] | Saline Soils[6] |
|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulations Areas in the MPA[2] | Acres | 96,600 | 46,300 | 300 |
| 4 | Area Available for Surface Occupancy | Acres | 502,100 | 75,700 | 1,700 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 15 | 0.3 |
| 6 | Estimated Number of Well Pads[3] | --- | 2,428 | 367 | 8 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period [4] | Acres | 29,100 | 4,400 | 100 |
| 8 | Percent of Soil Feature within the MPA developed during 20-year Planning Period[5] | % | 4.9 | 3.6 | 4.7 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO Stipulations Areas for MPA are for all resources. NSO Stipulations Areas for soil classes are only for identified soil class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

[6] Refer to Chapter 3 Soil Resources for a definition of this soil type.

BLM_0019793

**Figure 4-7. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Category during the 20-yr Planning Period under Alternatives A, B, C, and D**



Table 4-42 displays the average number of truck trips expected per year under Alternative D, and includes the total truck trips expected per year under Alternatives A, B, and C for comparison. Comparing the totals for Alternatives C and D reveals that anticipated truck traffic for Alternative D would be approximately 19 percent higher than Alternative C. Each truck trip has the potential to increase accelerated soil erosion and fugitive dust emissions from road surfaces. Due to multiple drill rig moves (an estimated three mobilizations and demobilizations for a typical drilling scenario) that could be required on the 202,900 acres of the MPA subject to TL stipulations, the number of truck trips for drill rig transport within the MPA are estimated to increase by 8,498 heavy truck trips (for two additional mobilizations) above what is shown in Table 4-42. As the total number of truck trips and rig mobilizations increases, roads experience greater wear and tear, and accelerated erosion from the road surface increases. Accelerated soil erosion would also increase in adjacent areas due to road maintenance activities and enhanced runoff from the road surface.

BLM_0019794

### Table 4-42. Estimated Average Truck Round Trips at Year 20 for Alternative D

| | Mineral Estate | | Mesaverde Play Area (MPA) | |
|---|---|---|---|---|
| | Light Trucks | Heavy Trucks | Light Trucks | Heavy Trucks |
| Well Pad/Road Construction | 4,700 | 14,000 | 4,500 | 13,300 |
| Drill Rig Transport | 0 | 7,525 | 0 | 7,100 |
| Drilling | 178,880 | 82,600 | 169,900 | 78,400 |
| Well Completion/Testing | 51,600 | 457,500 | 49,000 | 434,600 |
| Production | 178,500 | 562,500 | 169,600 | 534,400 |
| Annual Trips (Alt. D) | 413,800 | 1,124,100 | 393,100 | 1,067,900 |
| Annual Trips (Alt. C) | 336,700 | 945,900 | 319,900 | 898,600 |
| Annual Trips (Alt. B) | 152,300 | 422,100 | 144,700 | 401,000 |
| Annual Trips (Alt. A) | 173,400 | 513,800 | 164,800 | 488,100 |

SOURCE: BLM WRFO and Final Air Resources Technical Support Document (URS 2011).

Assumptions:

1) Truck trips for construction, rig transport, and production were calculated based on the expected number of new pads in Year 20 = 215 for the BLM Mineral Estate (See Appendix E).
2) Truck trips for drilling and completion/testing were calculated based on the expected number of new wells in Year 20 = 215 pads x 8 wells = 1,720 for the BLM Mineral Estate.
3) Trucks were considered heavy if they weighed over 8,000 pounds or light if they weighed 8,000 pounds or less.
4) During production, it was assumed that use of three-phase gathering reduced all truck trips by 90% and that it would be used on 90% of all pads. Only light duty vehicle travel on local roads is shown.
5) Local and resource roads are used to the same extent. To get total vehicle miles traveled - use the above trips per year with a distance of 10 miles for local roads and 0.8 miles for resource roads.
6) Well pad construction, drill rig transport, drilling, and well completion calculations are based on number of new wells and pads in year 20. Production calculations are based on cumulative number of pads in production at year 20.

Alternative D would not allow evaporation ponds on public lands. The impact of this management action would be the same as Alternative C. Drilling and reserve pits, however, would be allowed under this alternative and could create soil impacts similar to Alternative A. Cuttings pits would be allowed under this alternative. Cuttings pits allow for cuttings disposal farther below the reclaimed surface benefiting soil resources by allowing more natural undisturbed soil to be replaced in the root zone during reclamation. COGCC requirement requires a minimum of 3 feet of natural soil below the surface during reclamation that would be required under all alternatives.

### Impacts from Management Actions

The management action for natural slopes is similar to Alternative C, except there would not be any CSU stipulations for slopes greater than 35 percent (Table 2-2 Record 17). This change in management could result in more surface disturbance on slopes below 50 percent and more soil impacts. However, fragile soils as defined in the 1997 White River RMP (i.e., a subset of slopes above 35 percent based on soil characteristics, 382,700 acres) would still have a CSU stipulation applied. Saline soils would be managed with CSU stipulation rather than NSO stipulations as discussed above. Other management decisions for soil are the same as Alternative A, and would result in similar types of impacts. Impacts to soil stability, productivity, hydrologic function, and biotic integrity would be greater than Alternative A due to the increased level of surface disturbance (2,556 well pads compared to 550 under Alternative A).

Similar to Alternative C, areas within 100-year flood plains and within 500 feet of perennial streams, springs, wells, and wetland/riparian zones would be open to oil and gas leasing with a CSU

BLM_0019795

stipulation (Table 2-2 Record 12). The impact on soil for this management action would be the same as Alternative C.

Conditions of approval to minimize fish habitat deterioration would apply only to the BLM sensitive aquatic species, and no requirements would be established to restore aquatic habitat impacted by oil and gas development (Table 2-8 Records 3 and 4). As a result, surface disturbance could increase relative to Alternatives B and C, with a corresponding increase in soil impacts. Controlled surface use stipulations would not apply to cutthroat trout habitat along portions of Black Sulphur Creek (Table 2-9 Record 20). Without the CSU stipulations in Alternative B and C, soils near the creek would be subject to greater impacts under Alternative D.

Closing grazing allotments (portions or whole) during periods of intensive oil and gas development and placing limits on grazing, especially in areas disturbed from oil and gas, would have the same impacts as Alternative C (Table 2-16 Record 8).

Decreasing the area managed as open to oil and gas development with an NSO stipulation to 6,200 acres in two special management areas outside the town of Meeker could increase the area of surface disturbance and impacts on soil resources compared to Alternatives B and C (Table 2-18 Record 5).

**Reclamation**

Requiring success criteria for interim and final reclamation of 60 percent for foliar cover (versus 80 percent for Alternative C) and 5 percent for basal cover of the DPC may in some cases be below what would have been expected in the past to assure successful reclamation efforts. For example, if the DPC was 50 percent foliar cover for a site and only 60 percent of this was needed, the site may only need 30 percent foliar cover to be deemed successful. This percentage of foliar cover may not be sufficient to protect soils from rain splash erosion and in many cases a basal cover of 5 percent would not be effective in reducing surface runoff. Topsoil productivity losses could occur with TL stipulations due to delays in interim reclamation if multiple seasons are required for all the wells on the well pad as described in Alternative A.

Implementing reclamation measures under Alternative D would have similar impacts on soil resources as those under Alternative A. Unlike Alternatives B and C, Alternative D does not contain a requirement for adapted footprint configuration to match the topography of the surrounding landscape, to reduce reclamation needs (e.g., fewer cut/fill areas) (Table 2-17 Record 19).

### 4.2.4.6    Irreversible and Irretrievable Commitment of Resources

Soil forms slowly from weathering of underlying rock layers. It could take many years for disturbed areas to regain their previous productivity and function, especially where native soils contained biological soil crusts, mosses, or lichens. Extensive modification and/or damage to biological soil crusts could be permanent, but full recovery may require 50 to 100 years. Permanent soil losses would also occur where aboveground facilities are constructed that would be in place longer than 50 years, such as natural gas processing plants.

Soil mixing could cause irreversible impacts to stratified soil horizons. These impacts would be mitigated by limiting excavation depths and by segregating soils during construction.

BLM_0019796

#### 4.2.4.7     Unavoidable Adverse Impacts

The increased human presence required for oil and gas development and increased wildfire ignition sources from construction and operational equipment is likely under all alternatives, but increased human presence could also shorten the detection and response times when wildfires do occur. If oil and gas development changes natural fire return intervals, wildfires may be more intense in the future. Wildfires include the destruction of vegetative cover by wildfires decreases soil stability, productivity, and hydrologic function in local areas for short periods (2-10 years after the wildfires). These impacts to soil resources would be largely unavoidable and could occur regardless of which management alternative is implemented.

#### 4.2.4.8     Relationship Between Local Short-Term Uses and Long-Term Productivity

Proper reclamation should be designed to restore soil productivity by establishing vegetation that would provide soil stability and initiate a return to a condition and vegetation communities that could be expected from the ecological site where the surface disturbance occurs. However, the return of soil conditions to pre-disturbance function is not likely to occur for 50 years or more after final reclamation in most areas. In some cases, the characteristics of pre-disturbance soils would not be restored by reclamation.

### 4.2.5   Water Resources

This section presents potential impacts on water resources from management actions based on the management goals and objectives outlined for water resources in Table 2-2. The analysis focuses on relative changes to water quality and water availability that could occur due to oil and gas development. Activities that disturb the land surface, decrease vegetation cover, or otherwise alter land surface cover could affect water quality and water availability (BLM 1997).

The analysis uses qualitative and quantitative variables to assess impacts. A number of indicators, attributes, and assumptions have been defined for the analysis. Potential water resource impacts are described for each alternative in the context of relevant indicators and attributes. Indicators are defined as structural and/or functional components of the resource. They are the physical characteristics that are used in the resource evaluation.

The indicators selected to analyze effects of the alternatives on water resources were:

- availability;
- quality of water to support native plant and animal populations;
- increased peak flows compared to base flows; and
- the availability of water to meet water rights and uses.

Attributes of these indicators include:

- Streamflow measurements in relation to base flow, peak flow, and average daily flows from historical records at the BLM and USGS gaging stations;
- Water quality measurements in comparison with historical records and past water quality studies;
- Listing or potential listing of waters on the Colorado's Section 303(d) list as a result of the BLM-permitted development activities;

BLM_0019797

- Monitoring to detect changes in stream channel structure and form, or water quality changes that results in a loss of function due to hydrologic, chemical and/or geomorphic processes no longer maintaining habitat, water quality characteristics, and natural disturbance regimes necessary for ecosystem integrity (Wohl 2005);

- Water quality samples or analyses that show the contamination of a public water supply or a household/domestic private water supply by oil and gas development activities permitted by the BLM;

- Groundwater spring inventories and evaluation of gaining reaches of surface waters; and

- Groundwater quality and water level measurements assessed through monitoring of groundwater wells completed in aquifers of interest.

The impact analysis is based on the following assumptions:

- Federal law and state law define numeric water quality standards that are protective of aquatic environments and classified water uses;

- Surface disturbance for oil and gas development could degrade water quality by increasing sediment deposition in streams;

- Increased water use for oil and gas development could lower streamflows and impact aquatic environments;

- Effective stormwater management would reduce the erosion and flooding potential from storm events. Operators would employ BMPs to manage runoff, run-on, and stabilize areas during construction, drilling, and production activities using effective stormwater BMPs (EPA 2008a);

- Public water supplies will be protected through the implementation of the Safe Drinking Water Act by CDPHE and the EPA, the BLM will support mitigations required by the Act on the BLM's permitted oil and gas development (CDPHE 2012a);

- Short- and long-term changes in streamflow occur naturally due to drought, heavy rainfall events, or periodic climate variations (e.g., El Niño), and long-term climate change. Streamflow impacts from other causes are difficult to separate from impacts driven by oil and gas development; and

- Current groundwater and surface water quality monitoring programs in the Planning Area would be continued. This monitoring includes support of USGS streamflow measurement sites, the BLM streamflow measurement sites, precipitation measurement, measuring electrical conductivity, water quality sampling, groundwater monitoring network, spring inventories and other efforts.

To estimate acres of surface disturbance that could occur in different watersheds within the MPA, a temporal analysis methodology (see Appendix E for a detailed description) was developed that takes into account projected levels of development, leasing stipulations, and management actions for each alternative. For the temporal analysis, each well pad was assumed to require a 5 acre production footprint (including associated infrastructure). Based on this assumption, 7 of the 12 surface disturbance acres required per pad (or approximately 60 percent) would be reclaimed during Phase II interim reclamation.

BLM_0019798

#### 4.2.5.1    Impacts Common to All Alternatives

**Impacts from Oil and Gas Development**

Oil and gas development affects water resources through the disturbance of topography, drainage features, soils, and vegetation. These changes can alter watershed function and entrain soil particles in surface runoff, increase surface runoff, decrease infiltration and thereby increase peak flows and sediment loading downstream. Matherne (2006) found increased sediment production from well pad locations, and confirmed that roads and well pads can provide conditions for focusing runoff and increasing erosion. Based on field observations, the author found that roads on side slopes facilitate erosion in three ways: (1) by cutting across and collecting runoff from previously established drainages, (2) by providing focal points for erosion, and (3) by creating conduits for sediment transport. Once mobilized, particles of eroded sediment are transported in rills and gullies that occur in relation to storm events. Some of this sediment would be temporarily stored in drainage bottoms and on hillsides, and a portion would be stabilized by vegetation. This stored sediment can be remobilized during storm events and move in flood flows to stream channels. Drainages that receive increased peak runoff may further incise (i.e., cut into) otherwise stable slopes, further increasing downstream sediment loads. Increased sedimentation in stream channels may affect surface water uses such as stock watering, irrigation, and drinking water supplies. Sediment can also decrease the value of aquatic habitats for wildlife especially those that rely on a rocky substrate (stream bottom) such as macroinvertebrates and cold water fish. Dissolved solids can move into surface and groundwaters and be transported from eroded soils in a similar way as sediment. Sediment and dissolved solids can include trace elements such as selenium eroded from surface soils.

Increases in upland erosion rates modify watershed and riparian function. Watersheds with ephemeral streams, arroyos, washes, and gullies may be greater contributors to nonpoint sediment loads than perennial channels with wetland and riparian vegetation because of their abundance on a landscape, lower vegetative cover and poor soils (Smith et al. 1993). Water quality impacts from surface disturbance in riparian areas would be pronounced since these areas are adjacent to water bodies. Pulses of eroded sediment and salt loads are flushed by storm events and may be deposited in wetland and riparian areas. Wetlands and riparian areas can act as filters to trap sediment, and commonly accumulate sediment in slower-flowing stream environments, but can be overwhelmed if sedimentation outpaces vegetation. If surface-disturbing activities dramatically increase the amount of sediment available for transport, the capacity of sediment deltas, in-channel storage and wetlands to assimilate (i.e., incorporate) the additional sediment may be exceeded. This deposited sediment may remain unvegetated and be washed into surface water bodies such as rivers and lakes during high flows. Increased sediment can destabilize stream channels downstream resulting in changes in channel form and erosion.

Soil disturbance from the construction of well pads, access roads, and pipelines can reduce the stability of soils resulting in erosion that can entrain soils, salts and trace elements in surface runoff. Soil compaction during construction and use of roads and well pads can increase surface runoff, overland flow, and water ponding. Stormwater flow can mobilize solids and salts during storm events and concentrate them in low spots in the watershed or where water velocities slow. Flood events can then re-dissolve or re-entrain solids from these areas and move them to perennial waters. Facilities constructed near surface waters are more likely to impact water quality due to the shorter travel distance for the salts and sediment and more direct impacts by changes in drainage and runoff characteristics.

Sediment yield is strongly correlated with surface runoff. Annual sediment loads for the White River were estimated in Water Quality and Sediment Transport Characteristics in Kenney Reservoir

BLM_0019799

## Chapter 4 – Environmental Consequences

(Tobin and Hollowed 1990). This study concluded that total sediment retention by Kenny Reservoir is 91-98 percent of sediment loads from the White River. Annual sediment loads above Kenny Reservoir were measured during relatively high flow years of 1983-1987 and ranged from 391,000 to 1,570,000 tons per year. Sediment loads are measured as total suspended solids (TSS), but sediment can also move as bedload (not suspended in the water column). Turbidity or the amount of light blocked by a water quality sample can be related to TSS. The Chapter 3, Water Resources section shows values for TSS and turbidity recorded for the area (Table 3-11), but since these values can vary greatly with streamflow they are not the best indicators for changes in upland erosion.

The dissolved salt or the salinity of water is measured in terms of total dissolved solids (TDS) in milligrams per liter (mg/L) or as electrical conductivity (EC). In most surface waters TDS varies from as low as only a few hundred mg/L to as much as 3,000 mg/L. There is typically a linear relationship between TDS and EC, which is a measure of waters ability to conduct electricity. Salinity is often reported in micro Siemens per cm ($\mu$S/cm) and TDS is typically 2/3 of EC values. The Bureau of Reclamation (2011) estimated that 47 percent of the salinity in the Colorado River System is from natural sources. Saline springs, erosion of saline geologic formations, and runoff all contribute to this background salinity. Irrigation, reservoir evaporation, and municipal and industrial sources make up the balance of the salinity in the Colorado River System. The CDPHE has established salinity standards for the Colorado River Basin, but has not established standards for salinity or suspended solids for the White River.

Salinity of surface waters may increase below areas of surface disturbance on saline soils. Soils high in the trace element selenium are typically associated with Mancos Shale outcrops which also form saline soils. Mancos shale has long been identified as a source of salinity and selenium in ground and surface water (BLM 2005d). All stream segments in the White River Basin that are listed on the 303(d) listed of impaired waters due to selenium are associated with Mancos Shale outcrops, but selenium may be present in the lithology of other formations.

Selenium, of concern for aquatic life, gained more prominence in 1997 when the Colorado State Water Quality Control Commission (WQCC) revised chronic aquatic-life criterion for dissolved selenium from 17 $\mu$g/L down to 4.6 $\mu$g/L. There are two reaches in the White River (Segment 9d and Segment 10b) that are listed on the 303(d) list adopted for Colorado in 2012 for impaired waters or the monitoring and evaluation list for selenium (Section 3.2.4). These segments include Sulphur Creek, Flag Creek and Coal Creek which are tributaries to the White River near Meeker, Colorado (CDPHE-WQCC 2012b). These drainages are tributaries to the White River and are outside the area of high oil and gas potential (the MPA).

Another watershed in the analysis area with Mancos shale outcrops and saline soils is Stinking Water Creek near Rangely which has been identified as a Fragile Watershed (Map 3-3) in the 1997 White River RMP. Stinking Water Creek watershed and has a historical oil development called the Weber Sand Unit. Stinking Water Creek is an ephemeral system and only flows during storm events so sampling is difficult. The well density in this area is relatively high. According to COGCC, there are currently about 1,500 existing and historical wells in the Weber Sand Unit. Assuming 6.7 acres of disturbance per well, there may be as much as 10,000 acres of past disturbance within the Weber Sand Unit. This would be the majority of the land area (54 percent) within the Weber Sand Unit. However, 6.7 acres/well may be an over estimate of actual disturbance within this field since many of the wells are in interim or final reclamation. The Weber Sand Unit comprises about a third of the area of Stinking Water Creek in the lower portion near the White River. Therefore an estimated 20-30 percent of the watershed is disturbed to accommodate oil and gas development.

BLM_0019800

## Chapter 4 – Environmental Consequences

Stinking Water Creek is outside the MPA and only a portion of the new wells (5 percent) are expected in this area. New wells will continue to be drilled into the future in the Weber Sand Unit and maintenance, such as pipeline replacement and repair, will continue through the life of the project. The Coal Oil Basin area corresponds to the Weber Sand Unit and is not included in the fragile or saline soil management actions (see the soils section), due to the high density of historic wells.

There is some data available for the White River below Stinking Water Creek, an average TDS value 477 mg/L based on 81 samples was measure at the USGS streamflow site number 09306395 located on the White River near the Colorado state line in Utah. A limited amount of data is also available for selenium from USGS streamflow site number 09306500 on the White River near Watson, Utah located about 20 miles down from the border with Colorado. Based on 69 samples the average selenium concentration was 1.0 µg/L (micrograms/Liter) and the maximum value measured was 4 µg/L. Both of these values are below the chronic standard for selenium in Colorado. Additional sampling in Stinking Water Creek and the White River below Stinking Water Creek would help determine if this watershed contributes to selenium and salinity levels in the White River. Based on current information it is unknown if Stinking Water Creek is a significant source of selenium or salinity to the White River.

A regional USGS analysis, partly funded by the BLM, of surface water quality in the Piceance Structural Basin from 1959-2009 looked for trends in water quality data in the White, Lower Colorado and Gunnison River Basins (Thomas et al. in print). Of the three sites that were available in the White River Basin, selenium concentrations in surface waters did not show upward trends between 1991 and 2009. Instead, a downward trend in selenium concentrations was shown for the White River below Boise Creek, near Rangely (09306290), and at two other sites along Piceance Creek (Piceance Creek below Ryan Gulch (09306200) and Piceance Creek at White River (09306222). Based on these results is no reason to believe selenium concentrations are increasing in the White River.

Dissolved solids (TDS) are likely to increase due to disturbance in saline soils. The trend analysis for the White River Basin is more complicated for this parameter in the USGS regional analysis. The White River below Meeker and the White River above Coal Creek both showed decreasing trends for dissolved solids from 1990 to 2009. Piceance Creek at White River showed an upward trend from 2003 to 2009 and a downward trend between 1990 and 2003, where Piceance Creek at Ryan Gulch and Yellow Creek showed a downward trend for the entire period of 1990 to 2009. Both Corral Gulch near Rangely and White River below Boise Creek showed an upward trend in the 1990s and a downward trend in the 2000s. Dissolved solid concentrations have had a downward trend at all the sites in the latest period of trend analysis, thus indicating improving water quality for salinity in the White River Basin.

Less than 1/2 percent of the MPA has saline soils and Mancos Shale outcrops are not present within the MPA. Corral Creek a tributary to Yellow Creek was removed from the 2012 303(d) list for selenium, but was listed in the past. So there may be unknown lithologies or groundwater in the MPA that have trace amounts of selenium. Saline soils in the MPA are usually a result of groundwater inputs to surface water systems and saline springs. Impacts from oil and gas development to 303(d) listed stream segments or future listings of stream segments for selenium because of oil and gas activities is unlikely since the majority of soils identified as high in selenium are outside the MPA. Oil and gas development may increase salinity in surface waters, but due to the high natural sources it is unlikely that it would be differentiated from these background conditions.

BLM_0019801

Sulphur Creek, Flag Creek, Beaver Creek, the North Fork and the South Fork tributaries to the White River near and above Meeker are classified for "water supply" to establish numerical criteria protective domestic water supplies (CDPHE 2012a). Domestic water supplies are surface waters that are suitable or intended to become suitable for potable water supplies. After receiving standard treatment (defined as coagulation, flocculation, sedimentation, filtration, and disinfection with chlorine or its equivalent) waters identified a domestic water supplies should meet Colorado drinking water standards. Portions of the White River from the headwaters to the Rangely input are protected for water supplies (White River Basin Segments 7, 12, and 21) and East and West Douglas Creek are protected for water supplies (White River Basin Segment 23). No sections of Piceance Creek or Yellow Creek watersheds within the MPA are protected for water supplies (CDPHE 2012a). The portion of the MPA that drains to the south into the Colorado River is protected for water supplies or contributes to segments classified for domestic water supplies (Lower Colorado River Basin Segments 4a, 8, 11a).

A portion of West Evacuation Creek (or Wash) and the main stem of Douglas Creek from the confluence of East and West Douglas Creek to the White River are listed on the 2012 303(d) list for sediment/siltation. Not enough suspended sediment data was available to conduct a trend analysis on Douglas Creek for the USGS regional analysis. There is oil and gas development and infrastructure in these reaches and in the watersheds that contribute to these reaches. However, only a small portion of the MPA (headwaters of East Douglas) drains into these watersheds. Of the new development, 5 percent of the wells are expected to be outside of the MPA and only a small portion of those wells are likely to impact these reaches. Since the 1998 listing these segments have been low on the priority list with no specific cause of the impairment is identified. Impacts from oil and gas development to these segments would be similar to the impacts common to all and will be in proportion to the total well numbers considered for each alternative.

The 2012 impaired waters and the monitoring and evaluation list includes five new listings for aquatic life (CDPHE-WQCC 2012b). These listings (4 on the list of impaired and one on the monitoring and evaluation list) are based macroinvertebrate sampling that were below index reference conditions expected for streams within Colorado. To be on the impaired list means that the biological community metrics reflect a condition that is much less than the expected, according to Policy Statement 10-1 for determining aquatic life use attainment (CDPHE-WQCC 2010). Duck Creek a tributary to Yellow Creek was added to monitoring and evaluation list and Yellow Creek from Barcus Creek to the confluence with the White River were added to the impaired waters list for 2012 for aquatic life. Piceance Creek from Ryan Gulch to the confluence with the White River and Black Sulphur Creek were provisionally added for aquatic life. Two segments (Yellow Creek and Piceance Creek from Willow to Hunter Creek) were added for total recoverable iron and Rio Blanco Reservoir (off channel reservoir near along the White River above Piceance Creek) was added for pH. These waters are all within the MPA and have the potential to be impacted by oil and gas development.

Yellow Creek below Barcus Creek has relatively no anthropomorphic impacts, besides cattle grazing and dispersed recreation. It may be that the input of salts and metals from natural springs is responsible for impairment. There are two naturally occurring spring systems that are locally significant and have been inventoried by the BLM in 2011 (Lambert and Stinking Springs). Conductivity values measured at Sinking Springs were in excess of 4,000 $\mu$S/cm. These springs may be a natural or background source of iron and salts and may also be responsible for reducing the index values of the biological communities in this reach. The salinity of Yellow Creek linearly increases between Barcus Creek and the confluence with the White River. The BLM monitoring of this segment in 2010 and 2011 found conductivity values of 2,800 $\mu$S/cm to above 4,000 $\mu$S/cm.

BLM_0019802

The pattern of increases in conductivity corresponding to groundwater inputs can also be seen from temperature and discharge measurements collected during the survey. Spikes in conductivity generally coincided with changes in temperature or streamflow.

Stream segments provisionally listed as impaired as well as those on the monitoring and evaluation list will require additional data collection since not enough water quality data was available for CDPHE to determine a specific cause of impairment. In general, accelerated erosion due to oil and gas development can contribute higher sediment loads to surface waters downstream that can have impacts to aquatic life habitat. Changes in water quality are also a potential stressor to aquatic life habitat and could occur due to spills or leaks, freshwater use, or other factors that may directly impact water quality in surface waters.

The BLM has been conducting monitoring activities in Black Sulphur, Piceance and Yellow Creek measuring streamflow, temperature, conductivity and sampling water quality since 2008. Additional sampling by the BLM of macroinvertebrate communities will likely occur over the next few years to support CDPHE's efforts to identify specific stressors to the aquatic life in these segments. As described earlier, regional trend analysis on the White River and Piceance Creek has indicated downward trends in water quality parameters that may affect aquatic life listings (TSS, TDS and selenium concentrations). Long-term trends indicated a positive trend in water quality for aquatic life in most stream segments impacted by the MPA (Thomas et al. in print).

Oil and gas development can impact surface water and groundwater wells used for domestic and public water supplies by unintentional contamination of groundwater due to drilling, completion, or hydraulic fracturing operations and leaks and spills on the surface associated with the use, transportation, and storage of liquids associated with production or chemicals used for oil and gas development. Surface disturbance may also lead to erosion and increase naturally occurring constituents such as iron, arsenic, selenium, fluoride, and other elements with implications for domestic water supplies. Any spill, leak, or contamination would be addressed through permitting and in coordination with COGCC, CDPHE, and other state permitting agencies with direct responsibilities under the Clean Water and Safe Drinking Water Acts. Monitoring outlined in Chapter 3 associated with surface and groundwater would provide a way to assess baseline conditions and anticipate potential problems associated with oil and gas development. These monitoring efforts focus on Piceance and Yellow creek within the MPA and the White River above and below these tributaries.

New local and resource roads from oil and gas development have the potential to intersect shallow groundwater and alter channel and flood plain characteristics at drainage crossings. The BLM's policy requires that drainage crossings be designed to pass the 10-year peak flow (this peak flow amount is the water flow that could be expected in the biggest storm event that would occur on average every 10 years) without erosion and pass the 25-year storm without failing. Less common storms such as a 50 or 100 year storm event would generate peak water flows that would likely cause culverts and other drainage features to fail in some locations during the planning period. These drainage crossings would be replaced when lost in a flood.

When there is not an all-weather surface on local and resource roads, and they are used during times when the soil is saturated, vehicles can dig wheel ruts that render road shape and drainage road design ineffective. All weather surfaces on most roads means putting in gravel, cobble and/or roadbase to build the travel way into a stable surface with the ability to shed water during a storm. Vehicle ruts and road design failures are especially likely in areas with steep slopes and/or saline or clayey soils. In areas with steep topography, local and resource roads would generally be longer due

BLM_0019803

to switchbacks needed to maintain a grade acceptable for trucks. More switchbacks on roads typically increases the potential for soil erosion and impacts to hill-slope hydrology. As a result, impacts would be expected to be greater the steeper the topography. In addition, OHV use during siting of oil and gas facilities (i.e., scouting and surveying) would reduce surface cover and soil stability in localized areas, leading to increased erosion and sediment loading in adjacent streams. Increased vehicle use due to oil and gas development is likely to result in increased erosion and higher sediment and salt loading downstream.

Groundwater quality could also be impacted by oil and gas development. Surface casing for wells developed in the MPA are typically drilled and cemented below the top of the Wasatch Formation. Cementing means that cement is pumped between the surface casing and the annulus or open space between the well bore and the casing. The surface casing and cementing practices are designed to maintain the integrity and function of aquifer zones in the Uinta and Green River formations. Once the surface casing is set, the producing well bore is drilled inside the surface casing to the depth of the production zones, the lowest of which is the total depth of the well. In the case of the MPA these production zones are typically multiple coal layers within the Mesaverde formation. The production casing is cemented wherever groundwater flow is expected and often up to the cementing for the surface casing. If a surface or production casing or cement fails there is potential for contamination of waters in the Uinta and/or Green River aquifers from completion and hydraulic fracturing fluids. Failed well bores may also become a pathway for more saline aquifers to cross-contaminate freshwater groundwater zones by more saline waters and natural gas.

Impacts to groundwater could occur due to surface spills, loss of drilling fluids, and loss of completion and hydraulic fracturing fluids into groundwater during the drilling and completion activities. Types of chemical additives used in drilling, completion, and hydraulic fracturing activities may include acids, alcohols, hydrocarbons, thickening agents, lubricants, and other additives that are operator and location specific. Concentrations of these additives also vary considerably and are not always known since different mixtures can be used for different purposes even in the same well bore. These chemicals would be used and, in some cases, stored on well pads. Loss of drilling fluids may occur at any time in the drilling process due to changes in porosity or other properties of the rock being drilled through for both the surface casing and the production hole. When this occurs, drilling fluids may be introduced into the surrounding formations which could include freshwater aquifers. Completion and hydraulic fracturing force fluids into the production zones. A portion of these fluids are retrieved and can be reused in other wells. With proper drilling and completion practices, mixing of groundwater from different horizons and subsequent contamination of groundwater resources would be unlikely. Should this occur, impacts would be most likely in the sandstones of the Uinta formation, and/or the upper and lower aquifers of the Green River formation.

Monitoring in these formations would likely detect systematic impacts. The BLM has established and collected baseline data in five dedicated groundwater monitoring wells: one drilled by the BLM and USGS in the Uinta (T2S R98W Sec. 24), two existing USGS monitoring wells completed to the upper aquifer of the Parachute member of the Green River formation, and two existing monitoring wells completed to the lower aquifer of the Parachute member of the Green River formation. The network is being expanded to include a total of 15 monitoring wells within the MPA. Parameters that would detect hydrocarbons and known chemicals associated with oil and gas development have been measured and results will be released in USGS reports and be publically available. Parameter lists or analyses would expand as necessary to identify potential impacts to groundwater resources.

BLM_0019804

Other possible sources of groundwater and surface water contamination include oil and gas waste materials that are brought to the surface, including produced water and condensate. Spills of conventional natural gas condensate or produced water stored in aboveground tanks and/or pits could flow into groundwater or surface water. Operators are required to have secondary containment around all tanks. Secondary containment could use impermeable liners and compacted earthen berms and are designed to contain 110 percent of the largest tank in the containment areas. Spills could still occur due to failure of secondary containment. Spills could also occur during the truck transport, loading, and unloading of condensate and other waste materials. Transporting fluid wastes by pipeline would reduce the risk of groundwater and surface water contamination from spills.

All alternatives include using Class II injection wells to dispose of produced water and left-over drilling, completion, and hydraulic fracturing fluids. These fluids are classified as exploration and production wastes ("E&P wastes") from oil and gas operations. If injection wells are connected to faults there is the potential to contaminate shallower aquifers or even surface waters with injected fluids. Class II injection wells are regulated by COGCC and are required to have a well integrity test before injection. Injection well permits typically require a pressure and/or volume limits to avoid migration of fluids out of the targeted formations. Target formations by definition of Class II well permitting contain groundwater with hydrocarbons (former producing formations) or have salinity levels or other water quality features that would make them unsuitable for a future use. Current target formations within the MPA include the Mesaverde, Wasatch, and Ohio formations and potentially other formations depending on the location and properties of the receiving formation.

Freshwater withdrawals to support oil and gas development directly from surface waters can contribute contaminants due to inadequate cleaning and rinsing of hoses, tanks and trucks that may also be used to transport other fluids and produced water. This impact is likely to reduce as dedicated water infrastructure is developed, such as pumps, pipelines and storage facilities.

Oil and gas development could also impact freshwater availability. Water would be required during development to support construction, drilling, hydrostatic testing, and dust abatement. Currently most of these uses are supplied from surface water sources. An estimate of water use by well has been established based on figures received from different oil and gas operators. Based on the deep target formations in the MPA, and accounting for limited water re-use and recycling, the estimate for the Planning Area was 2.62 acre-feet per well (BLM 2008c). Water use estimates are reported by the number of wells that are spudded in a Fiscal Year (FY). For FY 2009 the estimates were 292 wells and 765 acre-feet of water use. This equates to about two percent of the water used for irrigation based on estimates of irrigation withdrawals in the White River Basin (State of Colorado 2010). Increasing industrial water use would not likely impact flows in the White River, but could become substantial in Piceance and Yellow Creek watersheds when streamflows are low.

Increased surface water withdrawals could also impact surface water quality. As described in Chapter 3, Piceance and Yellow creeks receive groundwater inputs with relatively high concentrations of total dissolved solid (TDS) concentrations. This can be seen by the high mean TDS values of 1,160 mg/L for Piceance Creek, 2,770 mg/L for Yellow Creek compared to the low TDS mean values of 354 mg/L for the White River below Meeker (Table 3-11). Surface water TDS concentrations in Piceance and Yellow Creek would likely increase if increased water use from oil and gas development reduced the amount of freshwater available to these creeks available for dilution of groundwater sources. Increased TDS due to freshwater use is more likely in Piceance Creek, in the reach from the Alkali Flats area to the confluence with the White River as shown in baseline characterization studies in Piceance Creek (Ortiz 2002). The White River has also been

BLM_0019805

*Chapter 4 – Environmental Consequences*

shown to increase in salt and sediment loading due to natural sources, including groundwater inputs from the White River Dome area and saline soils near Meeker and Rangely. Impacts from these natural salinity sources could be more pronounced with higher freshwater usage from the White River.

A portion of freshwater for oil and gas development could come from groundwater wells installed in stream alluvium, the Uinta Formation, and/or the Parachute Creek Member of the Green River formation. Extensive groundwater withdrawals from water supply wells have the potential to impact the flow of natural springs as well as the gaining reaches of surface water bodies. Freshwater use from surface and groundwater sources may reduce base flows and could change water tables in alluvial aquifers reducing the quality and extent of aquatic habitat and wetland/riparian areas. This impact is most likely to occur in the riparian areas along the lower portions of Yellow and Piceance Creek and would be proportional to the number of wells considered under each alternative. If these conditions continued, it is likely that other water users (including the BLM) would exert their rights for diversion and beneficial use. Increased demand for water in the White River could shift industrial freshwater sources to outside the White River Basin. New water sources would likely make use of existing water rights, but new water rights may also be developed in areas available for appropriation to supply freshwater for oil and gas development.

**<u>Impacts from Management Actions</u>**

In general, NSO stipulations from management actions of other resources such as soils, vegetation, wildlife, forestry, and cultural resources that reduce and restrict surface disturbance in localized areas would have the effect of shifting disturbances to areas outside of where the NSO stipulation applies. These shifts would not reduce the anticipated overall disturbance from oil and gas development, but shift impacts to different locations within a watershed or maybe to a different watershed. Applying an NSO stipulation to areas such as a raptor nests, sage-grouse leks, landslide areas, steep slopes, or cultural sites could cause a beneficial or detrimental impact to water quality depending on the relative value of the area to water resources compared to the area from which the disturbance was moved. Small changes in location to accommodate NSO areas can often be implemented with no change to impacts or small design changes during onsite visits.

Siting and location criteria during onsite visits with the oil and gas operator is typically used to move well pads, roads, and other infrastructure to locations with the least amount and types of impacts. Impacts to various resources are assessed in a NEPA document during approval of site specific actions in which the benefits and detriments for specific sites would be considered for water resources along with other resources. The amount of NSO stipulations varies by alternative with the highest in Alternative B. Alternative B is more likely to have resource conflicts although these resource conflicts would occur to some degree under all alternatives. For example, if a resource road is moved from a ridge to a side slope to avoid an old-growth stand or sage-grouse habitat, the new road location could impact shallow groundwater by intercepting the water table and concentrating groundwater flow at the surface more than the original location. If the new road location is selected after site-specific NEPA review, it may require additional engineering features to avoid a greater impact to surface runoff. Even with better engineering the new road location on the side slope may have more impacts to water resources as compared to the original location, but it would avoid the old growth stand or sage-grouse habitat.

Dust suppression would be required under all alternatives to reduce fugitive dust emissions (Table 2-1 Records 7 and 8). There would likely be increased use of water as a dust suppressant especially during construction of roads, pads, and pipelines. Water needs for dust suppression would peak during hot, dry periods of the year. Some of this water would likely come from groundwater

BLM_0019806

*Chapter 4 – Environmental Consequences*

and surface water sources. This could reduce the availability of freshwater for other uses, and in some cases could contribute to reduced streamflows.

In areas with heavy road traffic, dust suppression requirements would necessitate increased maintenance and more frequent use of chemical agents, including chloride salts and/or synthetic compounds. Synthetic products for dust suppression are mostly long-chained polymers that work best when blended with the top two to four inches of roadway material, followed by compaction of the road surface. Increased use of chemical dust suppressants for road maintenance could indirectly damage soil and vegetation in localized areas due to overspray of chemicals or movement of chemical dust suppressants off the road surface, as described in Section 4.2.4.3. Loss of vegetation near the application site could indirectly impact surface water quality by increasing soil erosion.

On a regional level, surface water quality could be impacted by $NO_x$ and sulfur oxides ($SO_x$) gases emitted from drilling and construction equipment. The emission of these pollutants would occur due to venting, gas processing, construction, and drilling activities associated with oil and gas extraction (Table 2-1 Records 9, 11, and 13-16). These gases react with hydrogen and oxygen in atmospheric water vapor to form nitric acid and sulfuric acid, respectively. As these acids are introduced into lakes and streams downwind of the emissions site, they impact water quality by decreasing pH, which can have impacts on aquatic life and also mobilize metals that may otherwise not be dissolved in the water column.

The implementation of three-phase gathering systems could reduce the production facility footprint needed after interim reclamation by reducing the need for storage tanks on individual well pads (Table 2-1 Record 16). This would allow a larger area of the well pad to be reclaimed, reducing the potential for erosion and water quality impacts due to in-stream sediment loading. Three-phase gathering systems at well pads to transport natural gas, condensate, and produced water to consolidated facilities where dehydration, temporary tank storage, and truck loading would occur would also reduce the number of truck trips to individual pad locations, which would indirectly maintain surface water quality by decreasing the potential for erosion.

Where noxious or invasive weeds are present, they would be controlled prior to reclamation. A portion of the Planning Area (497,900 acres) would be managed as a weed-free zone to prevent the spread of weeds by construction equipment (Table 2-3 Record 22). In this zone cleaning and the management of activities that might spread weeds would be required. By reducing the spread of weeds in these "weed-free zones" this management action is likely to improve the health and stability of vegetation communities, improve soil stability, decrease erosion, improve soil moisture retention, and increase the success of reclamation efforts. In doing so, management actions for weed control would indirectly help maintain watershed function. Establishing NSO stipulations in 3,600 acres, with 3,100 acres in the MPA with remnant vegetation associations (Table 2-3 Record 27) would help prevent soil impacts in these localized areas, but would not reduce overall surface disturbance since the disturbance would be shifted to adjacent areas to access minerals beneath the remnant vegetation.

Establishing CSU stipulations adjacent to cutthroat trout habitat (Table 2-9 Record 19) could help avoid water quality impacts by limiting surface disturbance in sensitive areas and requiring special design measures to reduce erosion and sediment loading in streams. Management actions to maintain river bank, channel, and flood plains that would be applied in areas of important fish habitat would help preserve channel structure and maintain water quality. Applying CSU stipulations adjacent to cutthroat trout habitat (11,900 acres within the MPA) could help avoid water quality impacts by requiring special design measures to reduce erosion near trout-inhabited streams

BLM_0019807

(Table 2-9 Record 19). Acquisition of instream flow water rights by the Colorado Water Conservation Board to maintain aquatic habitat for cold water fisheries or to maintain wetland and riparian features would help maintain natural flow regimes and is likely to benefit water resources (Table 2-9 Record 25).

Maintaining the closure of 83,300 acres of WSA to oil and gas development would help maintain water quality in the WSAs by limiting surface disturbance and soil erosion (Table 2-21 Record 9). Managing 28,900 acres of ACECs as open to oil and gas leasing with NSO stipulations would likely reduce surface disturbance within the ACEC boundaries, but could increase surface disturbance outside of the ACEC (Table 2-21 Record 13). ACECs with NSO stipulations would have exceptions to protect the designated resource, but could or could not result in more protection of water resources. Other ACECs (White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek) would be open to oil and gas leasing with CSU stipulations, which could limit water quality impacts by reducing erosion in fragile soil areas.

## Reclamation

Oil and gas development is regulated as a temporary use, and development areas would be reclaimed during final well abandonment. Typically this involves plugging and abandoning wells, closing pipelines, and reclaiming oil and gas resource roads that did not exist prior to development. It could take many years for natural vegetation to move back into reclaimed areas and for successional processes to begin. Disturbed areas may not regain their previous hydrologic condition until a similar, pre-disturbance mosaic of grass/forbs, shrubland, and woodlands become established.

Reclamation plans would be submitted by operators as part of APDs, ROW applications, and Notices for Final Abandonment (Appendix D). These reclamation plans would need to describe the methods used to achieve successful reclamation and would include details such as weed control, seeding, soil preparation and other details needed to reduce erosion and achieve successful reclamation. Appendix D describes the features that would be included in these reclamation plans and gives guidance on the types of practices that would be required for successful reclamation. Poor vegetation communities typically have more bare ground and can lead to the establishment of weedy annuals that do not have the root masses that stabilize soils, hence sediment and salt production from areas with poor vegetation is more likely and indirect impacts to water quality and quantity is greater. Practices described in Appendix D are likely to improve reclamation success. Successful implementation of reclamation plans would indirectly reduce impacts from surface disturbance by recovering watershed function in terms of surface runoff and sediment and salt loading.

Ground cover and basal cover are most relevant to erosion potential and increased surface runoff, since they measure materials situated directly on the soil surface. Ground cover includes vegetation, rocks, gravel, litter, and biological soil crusts. The percentage of rock and bareground can determine the amount of surface runoff and erosion off a site during a storm event, a typical threshold value would be when these components exceed 50 percent of the total ground cover. Basal cover is the percentage of vegetation cover that extends into the soil surface and is a good indicator of erosion protection within many ecological systems.

Appendix D specifies success criteria to define the goals and requirements for interim and final reclamation. These success criteria are for basal cover. These success criteria describe a vegetated end state that is likely to be stable, diverse and sustainable. This type of vegetation community is likely to result in forbs, brush and trees establishing themselves more quickly and completely on the

BLM_0019808

site. Stems and structure from this type of vegetation would reduce rain splash erosion that can initiate rill formation and concentrate surface runoff. Stable vegetation can also increase infiltration by decreasing the velocity of surface runoff and of course vegetation can use and store soil moisture; thereby reducing peak flows during storm events and improving watershed function.

Although not required for reclamation, perennial forbs, brush, and trees are generally more effective at reducing rain splash erosion, and provide structure on the soil surface that could reduce the energy of surface runoff. In a study of 23 watersheds, Anderson (1975) found that conversion of a steep forest and brush lands to grassland increased sediment yields by a factor of 5. Although an extreme case, the study shows that not all vegetation influences the hydrologic system in the same way. Where reclamation is successful, sagebrush and other brush regeneration would eventually occur; however, many areas would not return to pre-disturbance function until 30 to 50 years or longer after final reclamation. Until that time, surface runoff would likely be higher, and streams would generally have higher peak flows and lower baseflow conditions. Many of the wildlife habitat measures include incentives to improve the structure of vegetation in such a way that would be beneficial to water resources. For example, requiring planting of shrubs and perennials to improve wildlife habitat would generally result in reclaimed areas with more effective groundcover for reducing surface runoff.

Oil and gas development in most cases would occur on public rangelands used for livestock grazing. These two land uses have been and could continue to be compatible. However, in areas disturbed by oil and gas development, grazing could reduce the success of interim and final reclamation by removing new vegetation before it is well-established. Livestock could also preferentially consume grass and forb species that form root masses to hold soil in place. If these species are prematurely removed, water quality impacts from surface runoff and rain splash erosion would increase. Thus, excluding livestock from reclamation areas would increase the success of reclamation and reduce water quality impacts.

### 4.2.5.2    Alternative A

<u>Impacts from Oil and Gas Development</u>

During the planning period, drilling of Mesaverde natural gas wells is projected to account for 95 percent of future oil and gas activity. It is expected that these wells would be drilled from pads located in watershed areas that overlap the MPA (Map 3-1). Based on current APD submissions, it is estimated that 550 well multi-well pads would be constructed under this alterative and 523 would be built within the MPA during the planning period. Results of the watershed temporal analysis performed for Alternative A are displayed in Table 4-43. Lines 1 and 2 of the table show that the majority of the MPA (84.1 percent) is in the Piceance-Yellow Creek watersheds. The remainder of the MPA is divided between the Upper White River, Lower White River, Parachute-Roan Creek, and the Colorado River-Headwaters Plateau watershed as illustrated on the table and Figure 4-8.

BLM_0019809