*Chapter 4 – Environmental Consequences*

**Figure 4-8. Percent Land Area of Each Watershed in the MPA**



Aside from occupying the largest land area in the MPA, the Piceance-Yellow Creek watershed also comprises 86 percent of the total area available for surface occupancy (Table 4-43 Line 5). As a result, most oil and gas development, or 448 out of 523 total well pads (Table 4-43 Line 6) is projected to occur in this watershed. The new well pads would result in approximately 5,400 acres of surface disturbance before reclamation (Table 4-43 Line 7). This disturbance has the potential to impact surface water bodies by contributing to increased sediment and salt loads to Piceance and Yellow creeks. Resulting water quality impacts from these increased sediment and salt loads could be especially pronounced in impaired and high priority stream segments. Currently, there are not any impaired stream segments within Piceance or Yellow creeks listed on the Colorado's Section 303(d) list of Impaired Waters and Monitoring and Evaluation List for excess sediment or salt (CDPHE WQCC 2012b). Ryan Gulch, which is a tributary to Piceance Creek, is on the list for *E. coli* (Segment 16). Depending on the amount and placement of future oil and gas facilities, new water quality impairments for sediment or salt could occur in streams that previously met water quality standards.

BLM_0019810

**Table 4-43. Estimated Surface Disturbance by Watershed for Alternative A**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA[2] | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA[3] | Acres | 65,500 | 0 | 14,300 | 2,300 | 45,900 | 1,600 |
| 4 | Area Available for Surface Occupancy | Acres | 533,200 | 64 | 13,800 | 28,800 | 200 | 33,900 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 89 | 0 | 2.6 | 5.4 | 85.6 | 6.4 |
| 6 | Estimated Number of Well Pads[4] | --- | 523 | 0 | 14 | 28 | 448 | 33 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period[5] | Acres | 6,300 | 0 | 200 | 300 | 5,400 | 400 |
| 8 | Percent of Watershed within the MPA Developed During 20-year Planning Period[6] | % | --- | 0 | 0.6 | 1.1 | 1.1 | 1.1 |
| 9 | Percent of Land Area Developed During 20-year Planning Period based on Total Watershed Area in the WRFO | % | --- | 0 | 0.02 | 1.0 | 1.0 | 0.1 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] The area of the MPA calculated from the watershed dataset is slightly smaller than the known area of the MPA (598,700 acres) due to rounding errors in the GIS data intersections.

[3] NSO stipulations areas for the MPA are for all resources. NSO stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Appendix A for exception, modification, and waiver criteria.

[4] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[5] Assumed that each well pad would require 12 acres of surface disturbance.

[6] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

Table 4-43 also shows that although the Lower White River watershed comprises 4.7 percent of the MPA (Line 2), it contains 2.6 percent of the total land area available for surface occupancy (Line 5). This suggests that less oil and gas development would occur in the Lower White River watershed than other watersheds in the MPA. Map 3-1 also shows that there are numerous groundwater springs in the Lower White River watershed along the western boundary of the MPA. Shifting development away from these springs could help maintain shallow groundwater quality by limiting the potential for accidental spills of chemicals and oil and gas waste products. Although the Upper White River watershed would also see substantial development in the MPA (400 acres of surface disturbance), the portion of the watershed outside the MPA is much larger and consequently reduces the overall density of disturbance in this watershed.

*Chapter 4 – Environmental Consequences*

Line 9 of Table 4-43 shows the percent of land area developed in the MPA in proportion to the total area of each watershed in the WRFO. The percentages indicate that on the scale of the Planning Area, the most concentrated development would occur in Piceance-Yellow Creek and Parachute-Roan Creek watersheds. This result is not unexpected since the portion of both watersheds in the Planning Area is almost entirely within the MPA (Map 3-1) where 95 percent of development would occur. Although the Upper White River watershed would also see development in the MPA (400 acres of surface disturbance), the portion of the watershed outside the MPA is much larger and consequently reduces the overall density of disturbance.

Assuming a freshwater use volume of 2.62 acre-feet per well with limited reuse and recycling of freshwater, 12,060 acre-feet of freshwater would be used during the planning period for drilling, completion, hydraulic fracturing, construction and dust abatement. This freshwater would come primarily from the White River and its tributaries.

As discussed in the soils impact section, truck traffic associated with oil and gas development would be lowest under Alternative B (due to reductions associated with three-phase gathering). Alternative A would apply TL stipulations for drilling and would not allow year-round drilling. To fully drill a pad, an estimated three mobilizations would be required for a typical drilling scenario with TL stipulations. The number of heavy truck trips required to transport drill rigs to and from well pads (mobilizations) is assumed to be 1,400 if there were no TL stipulations (Table 4-36). However, with the TL stipulations under Alternative A, the number of heavy truck trips needed for mobilizations within the MPA would be 4,200 round trips. As the number of truck trips increases for drilling operations, roads would experience greater wear and tear and also emission of dust. Sedimentation, erosion, and runoff from road surfaces would increase in proportion to higher truck travel. The eroded sediment transported to water bodies by wind and water would impact water quality.

<u>Impacts from Management Actions</u>

Air quality management actions would require a 50 percent decrease in fugitive dust production from collector, local, and resource roads used for oil and gas development (Table 2-1 Records 7 and 8). Freshwater use for dust suppression could contribute to decreasing streamflows on federal lands, leaving less water available for other uses. Chemical dust suppressants could reduce surface water quality in streams near roadway drainage features if used over a long time period or misapplied.

Three-phase gathering systems would be expected under current management at 40 percent of well pads (220 out of 550) to transport natural gas, condensate, and produced water to consolidated facilities where dehydration and temporary tank storage would occur (Table 2-1 Record 16). Construction of centralized facilities and additional infrastructure (e.g., pipelines) for three-phase gathering systems would generate surface disturbance. Assuming an average 32-foot wide pipeline corridor, which includes a potential maintenance road along the pipeline (Appendix E), the pipeline corridor would disturb approximately 4 acres for each mile of pipeline constructed. However, implementation of three-phased gathering would reduce truck traffic to individual well pads and reduce road maintenance, helping to maintain existing water quality.

Well pads without three-phased gathering require separators (separates water and condensate from gas using heat) and tank batteries that store condensate and produced water. The interim reclamation footprint for wells with three-phase gathering could be considerably smaller, sometimes only requiring the well heads and monitoring equipment on the pad surface to be vegetation free. Since the interim reclamation footprint is in place for 30 to 50 years during production this could be a substantial improvement in terms of vegetation and watershed function on these well pad sites. Road use and road maintenance activities can also be reduced on well pads that have three-phased

BLM_0019812

*Chapter 4 – Environmental Consequences*

gathering and with remote monitoring vehicle use on access roads can be dropped to periodic inspection trips using light trucks. The area within the anchors(needed for well maintenance with drill rigs) typically needs to be flat, but can be vegetated if heavy truck travel is reduced or eliminated with three-phase gathering.

Applying CSU stipulations on 382,700 acres of mineral estate (including 122,000 acres of the MPA) to limit disturbance of fragile soils could help maintain water quality by encouraging planning or design measures to reduce erosion, by shifting disturbance to less-sensitive areas, and/or by requiring engineering/reclamation plans for disturbance on these soils (Table 2-2 Record 9). Fragile soils are a subset of the 35 percent and greater slopes described in Alternatives B, C, and D. Topsoil or the upper soil layers is stored on construction sites until interim or final reclamation. Under Alternative A berms or trenches would be required around topsoil piles on slopes exceeding 5 percent (Table 2-2 Record 10); these measures create additional surface disturbance to accommodate the berms and trenches, and do not protect the surface integrity of topsoil piles from wind and water erosion as well as the mulch, matting, netting and/or tackifiers with seeding required under Alternatives B and C.

Designated surface and groundwater source water protection zones for public water supplies would have a lease notice applied under Alternatives B and C that would require a plan that addresses the protection of drinking water sources (Table 2-2 Record 11). No plan would be required under this alternative. However, public and domestic water supplies would still be considered under this alternative in the NEPA process. This alternative is likely to have the least impacts on public and domestic water supplies since it assumes the least number of wells.

Buffers around water features would not be managed using CSU or NSO stipulations, under Alternative A (Table 2-2 Record 12). This would remove the avoidance of these areas for facility placement and would result in direct impacts to water features in some cases. Buffers around water features can also serve to filter indirect impacts that occur outside the buffers by leaving undisturbed soil and vegetation which reduces surface runoff and filters sediment, nutrient, and other pollutant loads. Buffers remove or reduce direct impacts to water resources within the buffer areas, by restricting placement or requiring avoidance and mitigation. The NSO stipulation buffers around water features under Alternative B would remove direct impacts from oil and gas development and would reduce the indirect impact from areas outside the buffers. Alternatives C and D would manage these areas with CSU stipulations and would require avoidance or additional design measures to manage oil and gas activities for the protection of the water resources identified (streams, lakes, wells, and springs).

Since Alternative A does not recognize buffers around water features it is likely to have increased impacts on a per well basis to water resources as compared to Alternatives B to D. Alternative A would allow direct impacts in buffer areas from surface disturbance, increasing the potential for accidental spills, increased risk of drilling related contamination, pit leaks, or indirect impacts from roads and drainage problems. With portions of Black Sulphur, Yellow and Piceance Creek listed on the 303(d) list for impaired water bodies it is more likely that infrastructure could be located adjacent to these waterways and there will be less mitigation of potential impacts to these impaired waters. Sediment loads and pollutants that could be associated with development in these buffers are not likely to improve the impairment of the biological community associated with these stream segments.

There are no public water supplies that obtain drinking water from groundwater within the MPA, however there are many wells that are permitted for domestic and household water supplies. Many

BLM_0019813

of these wells were drilled to support facilities for energy development but the majority of these wells are used to supply ranch homes along Piceance Creek with domestic and household water. Under Alternative A there is no buffer around these wells to protect them from potential impacts from oil and gas development. Under Alternative B areas within 500 feet of these wells would be a NSO and under Alternatives C and D areas within 500 feet of these wells would be an avoidance area for oil and gas development (Table 2-2 Record 12). The 500 foot buffer on perennial waters would not protect the surface water intake for the town of Rangely under this alternative and there would be no requirement for planning to protect designated water supplies in lease development plans. Unintended water quality impacts from oil and gas development to domestic and public water supplies would be the most likely under this alternative, due to this lack of protection.

Surface discharge that meets state standards for water quality would be approved on a site specific basis under this alternative (Table 2-2 Record 13). Allowing surface discharge of produced water would increase the persistence of streamflow and change natural water quality conditions. Increased flows in stream channels can accelerate down-cutting and erosion. Water quality of effluent discharged from treatment facilities for produced water would meet NPDES permit conditions determined by the State of Colorado to meet water quality classifications and beneficial uses of the receiving waters. The water quality of the effluent may not necessarily be equal to or better than the water quality of the receiving waters. Discharge of treated or untreated produced water would likely change the water quality of the receiving waters and may have impacts to water quality downstream by increasing the capacity of the stream to carry sediment or salt, changing the temperature, pH or other physical parameters that influence the amount of dissolved, suspended or bedload fractions of metals, trace elements, sediment and nutrients. Changes in water quality are likely to positively or adversely impact aquatic life in receiving waters.

When an ephemeral or intermittent stream receives perennial discharges (change in the persistence of flow), the stream channel would adjust to the new flow conditions by vertical and/or lateral cutting. Vertical cutting can create headcut features (abrupt drops in the streambed that migrate upstream). Lateral adjustments in stream channels typically destabilize stream banks on the incised outer bank of meander bends and can result in destabilized vegetation and bank sloughing. Vertical and lateral stream channel adjustments would likely result in erosion and increased sediment loads below surface discharge outfalls. As channels become more incised, sediment would be eroded or dissolved into surface water and carried downstream, which could impair surface water quality. This increased in-channel erosion would increase sediment and/or salt loads downstream depending on the channel adjustments that occur and the water quality of the discharged water. The combination of increased sediment and salt loading from erosion, the fraction of surface discharge relative to native flow, and the water quality of discharged water would change water quality characteristics downstream.

Approved surface discharges that meet state standards would still have impacts to water resources and federal lands. For example, when produced water is discharged to ephemeral drainages with low state standards for water quality, such as Yellow Creek (classified as Warm 2 and listed on the 303(d) list of impaired waters for Aquatic Life), water quality changes in Yellow Creek would be allowed by the permit. The warm designation means the classification standards are protective of aquatic life normally found in waters where the summer weekly average temperatures frequently exceed 20 degrees Celsius and these waters are not capable of sustaining a wide variety of warm water biota. As can be seen in Table 3-11 the mean salinity of Yellow Creek near the confluence with the White River is 2,770 mg/L. The quality of treated produced water may have a lower or higher concentration of dissolved salts and depending on the volume of the discharges could change the salinity characteristics of Yellow Creek while still maintaining state classifications.

BLM_0019814

Changes in water quality characteristics may have a negative impact to plants and animals that have established themselves in these aquatic habitats. Changes in water quality may have positive impacts to the use of receiving waters for stock watering and may improve the suitability of the White River as a drinking water source downstream, however these impacts are not likely to be measurable. The policy of the BLM describes injection of produced water as the preferred method of disposal (Onshore Order #7). Surface discharge under Alternatives A, C, and D would require treatment of produced water before discharge to meet water quality classifications due to high amounts of salts and some trace metals in the Mesaverde formation. Typical produced water from the Mesaverde formation is high in sodium (3,000 to 8,000 mg/L), high in dissolved solids (10,000-18,000 mg/L), and has trace metals such as barium. Typical water treatment techniques would include reverse osmosis, filtration, and ion exchange. Typically treatment systems produce a brine solution (about ¼ of the total volume) as a waste product and would be injected in a Class II disposal well. The injection of produced water that has been used for drilling, completion, and hydraulic fracturing would occur under all alternatives and both this fluid and the brine from treatment systems may have very high dissolve solids (40,000 to 60,000 mg/L), contain additives from drilling, completion, and hydraulic fracturing in addition to hydrocarbons from the production zones. Impacts from Class II Injection wells to dispose of these fluids would be similar to those described in Impacts Common to All Alternatives.

Managing oil and gas development to retain upland health (Table 2-2 Record 14) would require additional BMPs to be employed when oil and gas activities result in rilling, gullying, and soil instability which are indicators for problems with upland health. When problems occur with reclamation or road and pad construction that results in erosion features, this management action would require operators to fix the cause of the problem in order to retain Colorado Standards for Public Land Health. Under this alternative only direct impacts from oil and gas development would be considered. Alternatives B, C and D allow for indirect impacts to be addressed and can use oil and gas development to fix existing problems with upland health. For example, under Alternative C drainage features along an existing access road could be improved with new authorizations to reduce overall negative watershed impacts.

Applying NSO stipulations on oil and gas development in landslide-prone areas across 38,600 acres of mineral estate (including 1,700 acres of the MPA) would help maintain water quality by limiting surface disturbance in erosion-prone areas (Table 2-2 Record 15). This management action would also help maintain surface runoff characteristics by retaining vegetation on these steep and unstable areas. Landslide areas often correspond to spring locations and this NSO stipulation would likely afford some protection from direct impacts to these groundwater features

There would not be any protection of saline soils under Alternative A (Table 2-2 Record 16), other than saline soils that are included within fragile soils (Table 2-2 Record 9). While the majority of saline soils are outside the MPA, runoff from these areas have led to listings of stream segments on the 303d list of impaired waters. For example, increased selenium loading from Mancos Shale outcrops has led both Sulphur and Flag Creeks to the listing of impaired. The soils analysis indicates that two multi-well pads might be built in saline soils within the MPA. Only 5 percent of the oil and gas development is expected outside of the MPA where the majority of saline soils (96 percent) occur. Where development outside the MPA corresponds to saline soils, salt loads to surface waters could increase. Alternative A assumes that 27 well pads may be constructed outside the MPA in coalbed gas plays and conventional oil plays. There are no coalbed or conventional oil or gas plays within Sulphur Creek or Flag Creek, which are listed as impaired. Stream segments listed as impaired waters on 303(d) list for aquatic life could be impacted from increased suspended sediment loads. Suspended sediment loads can increase with oil and gas development due to soil

BLM_0019815

disturbance and changes in surface runoff characteristics. The MPA had seen increasing oil and gas development from 2000 to the present that is similar to the rate of development analyzed for Alternative A. USGS conducted a regional trend analysis that will be published this year (Thomas et al. in press). Suspended sediment should indicate upward trends for suspended sediment if this rate of oil and gas development has resulted in a measurable increase in suspended sediment in surface waters. Suspended sediment concentrations at Piceance Creek at White River did show an increasing trend from 2003-2009, but a decreasing trend was shown from 1990-2003. The USGS site on Piceance Creek at Ryan Gulch showed a decreasing trend for the full study period 1990-2009. All other sites that had enough data in the White River Basin showed decreasing trends for suspended sediment, these included the Yellow Creek site and several sites on the White River, therefore increased development in the area has not led to measureable increases in suspended sediment concentrations for the sites analyzed, instead most of the sites showed a downward trend for TSS during this period of increased development (2003-2009).

This does not mean suspended sediment concentrations could not increase with the level of oil and gas development analyzed under alternatives B, C and D. Only that at the current rate of development they are not likely to show up in regional trend analysis. Increased suspended sediment loads are still more likely to occur with increased well numbers due to increased erosion and changes to surface runoff characteristics from well pad and road construction. Under all alternatives operators are required to control stormwater runoff and therefore it is likely sediment would be contained on construction sites to the maximum extent possible. It may be that these stormwater control measures are effective in reducing TSS concentrations in receiving waters, or it may be that natural variability is masking impacts from oil and gas development.

Evaporation facilities for the disposal of produced water could be allowed on federal lands and for the disposal of produced water from federal leases (Table 2-2 Record 22). Evaporation facilities used for the disposal of produced water would result in surface disturbance on federal lands, the potential for evaporation ponds leaking into shallow groundwater and salt build-up on adjacent soils due to overspray from misters. During winter conditions evaporation rates are reduced and which could reduce the volume of produced water that could be disposed of using evaporation. Injection wells would likely be used to make up this seasonal difference, or water would be stored through the winter until evaporation increases in the warmer months. Salts left after evaporation would need to be disposed of, possibly by injecting concentrated brines, or as solids in landfills.

Avoiding surface-disturbing activities in priority riparian habitats would help maintain groundwater and surface water quality, and could reduce the magnitude of flood events (Table 2-3 Record 20). Authorized surface-disturbing activities found to be negatively affecting riparian or wetland habitats would be addressed through mitigation or by relocating the facility (Table 2-3 Record 21). Riparian vegetation plays an important role in the health of streams. During flood events riparian areas slow water velocities and often are areas of deposition for sediment. Riparian areas serve as a filter for upland sources of nutrients, sediment and other contaminants. Protection of these riparian areas is likely to directly benefit water resources by improving water quality.

Making recommendations to the Colorado Water Conservation Board for instream flow until water rights for BLM-administered surface estate cold water fisheries would help maintain minimum in-stream flows (Table 2-8 Record 5). Minimum in-stream flows are important for maintaining water quality, flow regimes, and aquatic health in streams.

Under Alternative A, 3,600 acres of remnant vegetation associations on mineral estate would be subject to NSO stipulations. Habitat for federally listed special status plant species and the

BLM_0019816

BLM-sensitive plants would be subject to NSO stipulations as well (Table 2-10 Records 15 and 16). This would result in an additional 1,400 acres of NSO stipulations in the MPA. These management actions would help maintain surface water quality by reducing disturbance within the NSO stipulation areas, but would also increase surface disturbance from oil and gas activities outside the NSO stipulation areas.

Drilling/reserve pits, storage pits, and evaporation ponds would be allowed under this alternative (Table 17 Records 10 and 20). Fluids stored in pits have the potential to contaminate shallow aquifers via leaks in the liner, releases, and/or spills. Multi-use pits can contain produced water (water removed from the producing formation with the gas) or left-over drilling, completion, and hydraulic fracturing fluids. If these fluids are released on the surface or into groundwater, it could degrade ground and surface water quality. The construction of evaporation ponds are sometimes used for the disposal of produced water and would require surface disturbance that could modify surface hydrology or increase erosion around ponds and other infrastructure needed for their maintenance and access, such as roads and water treatment equipment. These facilities often incorporate misters to enhance evaporation and can result in the concentration of salts on soil surfaces due to over spray. Should this occur, salt would be available for transportation to surface waters during storm events and could degrade water quality in surface and groundwater.

The total NSO stipulations under this alternative would be 157,100 acres (Table 2-17 Record 18). Large NSO stipulations can move disturbance out of protected locations, but since total surface disturbance would remain the same; these large NSO stipulations areas would most likely shift oil and gas development to other areas that may or may not be advantageous or beneficial to water resources. Smaller NSO stipulations typically require minor adjustments to specific actions and can be accommodated on onsites and during planning. These adjustments may or may not benefit water resources depending on the change in design or location to accommodate the NSO stipulations. The CSU stipulation areas (583,900 acres) typically are avoidance areas for ROWs and may contain measures to mitigate potential impacts through design changes. The types of changes would be determined through site specific planning.

Timing limitation stipulations on oil and gas development are already in place across 1,006,500 acres to protect wildlife (Table 2-17 Record 18). These limitations would apply in different areas and at different times for big game, raptors, and sage-grouse. In general, timing limitation stipulations would prolong drilling operations and increase truck trips for drill rig moves on multi-well pads as drill rigs repeatedly mobilize and demobilize from a pad to avoid drilling during restricted time periods, as described above. Where this occurs, interim reclamation would be delayed and additional truck trips would be required to fully drill a pad. Delaying interim reclamation and increased truck travel can both increase erosion and in-stream sediment loading, as development areas remain in a state of prolonged disturbance and roads require more maintenance.

## Reclamation

Standards for successful reclamation would not have a percentage requirement for desired plant communities (Table 2-3 Record 18), but would have some goals for seral state and value for wildlife. Having no specific requirement for vegetated cover would make the desired vegetated state for reclamation less certain under this alternative and would also likely reduce operators' incentive to bring about reclamation quickly. Alternatives B, C and D all have a numeric cover requirement for desired plant community and are more likely to lead to concrete steps to achieving reclamation success more quickly. The longer reclamation takes and the poorer the quality of interim and final reclamation is likely to have indirect impacts to water resources in terms of additional surface runoff, erosion, and ultimately higher sediment and salt loads.

BLM_0019817

Livestock would not necessarily be excluded from well pad and pipeline reclamation areas under this alternative (Table 2-16 Records 11 and 12). This could affect the success of reclamation and increase soil erosion by allowing grazing before vegetation has been fully reestablished. Additional disturbance would occur to build fences to exclude livestock. Where oil and gas activity conflicts with grazing operations, allotment management plans could be adjusted to change the season of use, reduce stocking levels, or decrease AUMs (Table 2-16 Record 13). Rangeland projects could also be implemented to meet resource objectives and Public Land Health Standards. These grazing management actions would prevent further increases in soil erosion and reduce water quality impacts.

### 4.2.5.3    Alternative B

#### Impacts from Oil and Gas Development

Results of the temporal analysis for Alternative B are displayed in Table 4-44. The results show that like Alternative A, the vast majority of area available for surface occupancy is in the Piceance-Yellow Creek watershed (88 percent Line 5). This suggests that future oil and gas development would be concentrated in the Piceance-Yellow Creek watersheds under Alternative B. Of the remaining area not managed with NSO stipulations, 6.9 percent is in the Upper White River watershed and 5.1 percent is in the Parachute-Roan, Lower White, and Colorado Headwaters-Plateau. This suggests that future oil and gas development would be concentrated in the Piceance-Yellow Creek and Upper White River watersheds. Of the 1,045 well pads projected in the MPA, 992 could occur in these two watersheds, resulting in 11,900 acres of new surface disturbance (Lines 6 and 7). Overall, the number of well pads in the MPA would be twice that of Alternative A. The types of surface disturbance impacts would be the same as described for Alternative A, but the magnitude of impacts would be higher. The potential for water quality impairments in streams such as Yellow Creek could increase compared to Alternative A due to higher loads of eroded sediment from increased surface disturbance. In addition, average streamflows could decrease with higher freshwater use in the Piceance-Yellow Creek watersheds to support well drilling, completion, and construction activities.

Freshwater use would increase from an estimated 12,060 acre-feet in Alternative A to 24,080 acre-feet during the planning period under Alternative B. Actual freshwater use may decrease with better water reuse and recycling that better pipeline and storage infrastructure for freshwater anticipated under this Alternative.

Concentrating oil and gas activities in the two largest watersheds of the MPA would effectively shift development away from the smaller Parachute-Roan Creek, Lower White River, and Colorado Headwaters-Plateau. For example, although overall development in the MPA would double between Alternatives A and B, the number of well pads constructed in the Lower White River watershed would increase by 7 percent from 14 to 15 well pads (Tables 4-43 and 4-44). Likewise, the number of well pads constructed in the Parachute-Roan Creek watershed would increase by 36 percent from 28 to 38 well pads. The effect of higher overall development under Alternative B would be moderated by the greater extent of NSO stipulations in these watersheds.

Line 9 of Table 4-44 shows the percent of land area developed in the MPA in proportion to the total area of each watershed in the WRFO. Overall, the Piceance-Yellow Creek and Parachute-Roan Creek watersheds would have a higher density of development since the portion of these watersheds in the Planning Area is almost entirely within the MPA (Map 3-1). At 1.4 percent, the development density projected for the Parachute-Roan Creek watershed is similar to Alternative A, whereas

BLM_0019818

*Chapter 4 – Environmental Consequences*

development density in the Piceance-Yellow Creek watersheds could be two times higher than Alternative A due to the greater number of well pads.

Within the MPA, the area east of Piceance Creek that has a high concentration of groundwater springs (Map 3-1) would largely be managed with NSO stipulations (Map 2-2). Restrictions on surface occupancy that limit development activities in this area could help maintain spring flow as well as shallow groundwater quality, especially buffers around spring features. These springs would be preserved more effectively under Alternative B because Alternative A includes fewer NSO stipulations east of Piceance Creek (Map 2-1).

### Table 4-44. Estimated Surface Disturbance by Watershed for Alternative B

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA[2] | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA[3] | Acres | 242,800 | 12 | 22,800 | 18,300 | 188,300 | 11,000 |
| 4 | Area Available for Surface Occupancy | Acres | 355,900 | 52 | 5,200 | 12,800 | 312,800 | 24,500 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 60 | 0 | 1.5 | 3.6 | 88 | 6.9 |
| 6 | Estimated Number[4] | --- | 1,045 | 0 | 15 | 38 | 920 | 72 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period[5] | Acres | 12,500 | 0 | 180 | 500 | 11,000 | 900 |
| 8 | Percent of Watershed within the MPA Developed During 20-year Planning Period[6] | % | -- | 0 | 0.6 | 1.5 | 2.2 | 2.4 |

BLM_0019819

**Table 4-44. Estimated Surface Disturbance by Watershed for Alternative B**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---------|-------------|-------|---------------------------|----------------------------|-------------|----------------|-----------------|-------------|
| 9 | Percent of Land Area Developed During 20-year Planning Period based on Total Watershed Area in the WRFO | % | --- | 0 | 0.02 | 1.4 | 2.1 | 0.3 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] The area of the MPA calculated from the watershed dataset is slightly smaller than the known area of the MPA (598,700 acres) due to rounding errors in the GIS data intersections.

[3] NSO stipulations areas for the MPA are for all resources. NSO Stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Appendix A for exception, modification, and waiver criteria.

[4] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[5] Assumed that each well pad would require 12 acres of surface disturbance.

[6] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

As discussed in the soils impact section, well drilling associated with oil and gas development could be twice that of Alternative A, but heavy truck trips would be less than expected under Alternative A (Table 4-36). This alternative would allow for year-round drilling on multi-well pads and would reduce heavy truck traffic for drill rig moves. The soils impact section displays the average number of truck trips expected per year under Alternative B, and includes the total truck trips expected per year under Alternative A for comparison (Table 4-38). The use of water transport systems to comply with voluntary implementation of development thresholds (Table 2-2 Record 19), and the use of three-phase gathering systems for 90 percent of well pads during production (Table 2-1 Record 16), would result in a reduction in vehicle miles traveled on a per well pad basis compared to Alternative A. With consolidated water facilities, more truck trips would be limited to local roads, and the total number of truck trips to well pads over resource roads would be reduced. In the air quality assessment (URS 2011), it is estimated that the heavy vehicle miles traveled on resource roads would be reduced by a factor of six, on a per well pad basis, for the production phase as compared to Alternative A.

Due to year-round drilling and the more extensive use of field infrastructure to transport water and accommodate three phase gathering, heavy and light truck trips are reduced considerably per well pad under Alternative B as compared to Alternative A. Although, Alternative B has twice the well pads and wells, truck trips are expected to be considerably less due to the increased use of these practices. As the total number of vehicle miles traveled on resource roads decreases, the resource roads would experience decreased wear and tear and erosion, helping to maintain surface water quality.

**Impacts from Management Actions**

Requiring an 84 percent reduction in fugitive dust for collector and local roads and 80 percent for resource roads under Alternative B in the MPA could reduce the amount of windborne dust deposited in streams compared to Alternative A (Table 2-1 Records 7 and 8).

BLM_0019820

Impacts for dust abatement measures needed to achieve this reduction would be similar as those described in Alternative A, but an important increase in dust abatement activities would likely be required to meet this standard. Additional impacts would include more gravel hauling, freshwater use and potentially more use of chemical dust abatement techniques. Requiring engines used in the drilling process to meet more stringent emissions requirements could result in fewer $NO_x$ and $SO_x$ emissions, which would reduce impacts on water quality compared to Alternative A (Table 2-1 Record 14). $NO_x$ and $SO_x$ emissions have indirect impacts to mountain lakes by increasing the acidification of these systems due to atmospheric deposition.

Implementation of three-phase gathering systems would be expected at 90 percent of well pads (990 out of 1,100) (Table 2-1 Record 16). Shared infrastructure for three–phase gathering would result in less area on individual well pads needed for production due to the removal of excess tanks. This would increase the area available for interim reclamation on well pads. Since interim reclamation is in place during the 30-50 years of production maximizing this area as opposed to bare ground would help maintain water quality in more areas than Alternative A.

Designated surface and groundwater source water protection zones for public water supplies would have a lease notice applied that would require a plan that addresses the protection of drinking water sources (Table 2-2 Record 11). Surface and groundwater protection zones for Rangely and Meeker above the Rangely intake on the White River below Taylor Draw Dam constitute the majority of land area above this point. A drinking water plan would allow oil and gas operators and the BLM to identify specific mitigation and BMPs that would protect public water supplies.

Under Alternative B, management actions for soil would establish NSO stipulations in several different areas, including areas within 100 feet of mapped landslide-prone locations (46,400 acres of mineral estate, 2,300 acres in the MPA), within 100 feet of saline soils (45,300 acres of mineral estate, 2,600 acres in the MPA), and on slopes greater than 35 percent (353,000 acres of mineral estate, 124,200 acres in the MPA) (Table 2-2 Records 15, 16, and 17). Surface disturbance in areas in landslide areas, saline soils and/or with steep slopes is more likely to increase sediment and salt loads in nearby streams and increase surface runoff. This is because the complexity of construction (more cut and fill) and less stable and less productive soils, makes BMPs less effective for controlling surface runoff and reduces the success of reclamation efforts. Thus, NSO stipulations established under Alternative B that shift surface disturbance away from landslide areas, steep slopes, and saline soils would reduce indirect impacts water quality impacts from erosion, improve reclamation success, and reduce changes in surface runoff characteristics that can increase peak flood flows in streams.

Establishing NSO stipulations on 77,400 acres of land in the field office and 32,100 acres of land in the MPA within 100 year flood plains and within 500 feet of perennial streams, springs, wells, and wetland/riparian areas would help maintain surface water quality by limiting surface disturbance immediately adjacent to these water features (Table 2-2 Record 12). Buffers around water features reduce direct impacts that can occur in these areas due to surface disturbance and can also reduce indirect impacts from development in the surrounding terrain by acting as a filter for sediment and nutrients and reducing the velocity of surface runoff before water runs into stream channels or other water features. Domestic and household wells in the MPA are used to provide drinking water to residents in the MPA and for oil and gas facilities. Oil and gas wells within 500 feet of these domestic water wells would be have a NSO stipulation, which would likely reduce the potential impact of surface leaks or spills. Domestic and household wells are best protected with proper drilling practices, since impacts from failures in well integrity or fluid losses during drilling as described in Impacts Common to All Alternatives could occur for wells outside this 500 feet area.

BLM_0019821

*Chapter 4 – Environmental Consequences*

Under Alternative B, all areas within 500 feet of perennial waters, wetlands, public and domestic/household water wells, and springs would be managed with NSO stipulations (Table 2-2 Record 12). These areas correspond to protection areas for public and domestic water supplies and this alternative would provide the most protection for public water supplies. The 500 foot buffer on perennial waters would include the internal and intermediate public water buffer for the surface water intake for the town of Rangely which would be a NSO stipulation for oil and gas actions (300 acres of oil and gas Federal mineral estate, all outside the MPA). Mitigations may include drilling practices such as pit-less drilling, stormwater containment, reduction of surface disturbance and other measures that would have indirect benefits to public water supplies. COGCC recognizes a ½ mile external buffer around to protect surface public water supplies. This buffer includes about 2,700 acres of additional oil and gas Federal mineral estate for the protection of Rangely water supply. Rule 317B would require sampling and mitigation of drilling practices in external buffer, designed to reduce the risk of contaminating these surface water features. Unintended water quality impacts from oil and gas development to domestic and public water supplies would be least likely under this alternative.

Ephemeral stream channels would also be protected under this alternative with a 100 foot buffer with NSO stipulations. These channels are typically incised and in areas with poor soils and high erosion rates. Not allowing surface disturbance for oil and gas facilities in these areas is likely to benefit water quality downstream by reducing non-point sources of sediment and salts. Buffers around water resource features allow for the use of vegetation to buffer upslope impacts such as increased surface runoff and erosion.

Alternative B would have an NSO stipulation on 35 percent or greater slopes, limiting the siting of oil and gas infrastructure on these steep slopes. The CSU stipulations for the 25 to 35 percent slope range would require avoidance or special design measures that would help protect soil and water resources by limiting erosion and concentrated runoff. Less impacts from the same disturbance can be expected from development that is shifted to slopes below 25 percent since there is less cut and fill needed for roads and pads and soils are generally more stable. Development on slopes between 25 and 35 percent is easier to mitigate than development on slopes that are greater than 35 percent. It is likely that this CSU stipulation that requires avoidance and mitigation if the area cannot be avoided would be adequate to address additional concentration in these areas. Impacts to water resources such as increased surface runoff and sediment/salt loading due to oil and gas development on steep slopes would be least under this alternative.

This alternative would not allow surface discharge of produced water (Table 2-2 Record 13). Alternatives A, C, and D would allow surface discharge in some locations. As discussed previously, surface discharges that meet State of Colorado water classification standards may still impact surface waters by changing the water quality and streamflow characteristics of stream channels. Not allowing surface discharge of produced water would avoid impacting aquatic life adapted to current water quality conditions and would avoid stream channel erosion that would occur with changes in the persistence of flow.

Evaporation would not be an acceptable disposal method for produced water from federal leases under Alternative B (Table 2-2 Record 22). No evaporation ponds would be built to accept produced water from federal leases and the impacts described in Alternative A would not occur. Since surface discharge would also not be allowed, injection of produced water would occur at the greatest rate under this alternative. Impacts from water injection would be similar to those described in the impacts common to all. Increased volumes of produced water due to higher well numbers would lead to more injection wells but may not result in more impacts to groundwater since most of

BLM_0019822

the constituents of concern would still be injected in brines left over after using produced water for use in drilling, completion, and hydraulic fracturing activities.

Surface-disturbing activities would be prohibited in priority riparian/wetland habitat under Alternative B (Table 2-3 Record 20). Any pre-existing disturbance areas that are negatively affecting riparian or wetland habitats would be required to relocate outside priority riparian habitats and restore the proper functioning condition of the riparian or wetland areas (Table 2-3 Record 21). These measures would help preserve the nutrient-absorbing capacity of wetlands and riparian areas and the ability to attenuate flood flows as compared to Alternative A. Most of the priority riparian habitats are contained within the 500 foot NSO stipulation buffers around all riparian/wetland features (Table 2-2 Record 12), under this alternative.

Alternative B would use the threshold concept to manage new oil and gas development (Table 2-4 Record 12). In each GMU, operators would be required to keep disturbance and disruptive activities below a certain threshold to remain exempt from timing limitation stipulations. Timing limitation stipulations could typically limit construction and drilling to seven months per year. In the absence of timing limitation stipulations, year-round drilling would be allowed, which could decrease the time between initial disturbance and interim reclamation on individual well pads. Accelerated reclamation made possible due to shortened drilling times on multi-well pads could indirectly improve or maintain surface water quality by improving soil stability and reducing erosion over time. Compliance with the threshold concept (Table 2-4 Record 12) could also lead to more shared oil and gas facilities. If many well pads were simultaneously drilled in one area, local and resource roads would be shared and fewer roads would be needed to access the development zone, which could decrease the cumulative area of surface disturbance and reduce water quality impacts. However, the threshold approach could also lead to higher density development, which could increase the degree of stream sediment loading in concentrated development areas.

The BLM would also work with oil and gas leaseholders to restore fisheries and impacted aquatic habitat (Table 2-8 Record 4). Such measures could include removing channel obstructions that inhibit fish passage, or reclaiming unlined pits built into stream valley alluvium. Water quality and aquatic communities could be improved by removing channel obstructions. Lining or removing reserve pits near stream channels could also help reduce water quality impacts from past and current oil and gas development.

Under Alternative B, 5,700 acres of state wildlife areas in the MPA would be managed with NSO stipulations (Table 2-4 Record 16). Many of the state wildlife areas in the MPA are continuous areas located along streams such as Piceance Creek and Yellow Creek. The continuity of these features and proximity to surface water would help maintain water quality where the NSO stipulations are in place.

Similar to Alternative A, CSU stipulations on oil and gas development would apply in areas of Colorado River cutthroat trout habitat. However, additional emphasis would be placed on managing 2,700 acres of trout habitat along the BLM-administered portions of Black Sulphur Creek in the MPA (Table 2-9 Record 20). Black Sulphur Creek is a major tributary to Piceance Creek, is listed as perennial and provides substantial year-round flow to Piceance Creek. The public section of Black Sulphur Creek supports a diversity of fish habitat and is monitored by the BLM which has sought an instream water right to protect the flows and habitat through this section. Adding this area to the other trout habitat areas would be a considerable benefit to water resources allowing mitigation to protect the current water quality characteristics that support this coldwater habitat located within the MPA. Applying COAs to protect aquatic habitat in the Black Sulphur Creek watershed and other

BLM_0019823

areas subject to protections for cutthroat trout habitat would improve water resources by changing locations or design specifications of oil and gas infrastructure in order to preserve the water and flow characteristics of these areas (Table 2-9 Records 22-24).

Requiring Concentrated Development Plans for oil and gas activities could result in changing the location of pads and other infrastructure to avoid or mitigate impacts in fragile soil or water resource areas (Table 2-17 Record 12). This would help maintain existing water quality characteristics more than Alternative A, which would not require CDPs.

Excavated pits to support drilling, completion, and hydraulic fracturing activities would not be allowed (Table 2-17 Record 20) and pits would likely be replaced with tanks or other aboveground structures. Using tanks may expand well pad and support facilities footprints in some cases. However, without pit excavations, more soil would be left in place and less soil would need to be stored, hence this management action is not likely to increase surface disturbance to support drilling activities. Standard practices include the use of liners on pits and in the case of storage of produced water leak detection systems can be required. However, even with these precautions pit leaks have occurred in the MPA. Geological features in the Uinta outcrop, specifically marlstones that have very high vertical transmissivity rates have had pit leaks in recent years. These marlstones and fractured shale systems can move water quickly for longer distances than what is typically expected in groundwater systems. Thus impacts to surface and groundwater systems can occur more quickly with higher concentrations then conventional groundwater systems. Disallowing reserve pits would also help prevent drilling fluids from infiltrating into the subsurface and contaminating shallow groundwater and surface waters from pit failures or leaks, but failures and leaks can and do occur with tanks as well.

To protect other mineral resources, NSO stipulations for oil and gas activities would be established on oil shale research and development tracts and on sodium and multi-mineral leases (Table 2-17 Records 21 and 22). Although these NSO stipulations would minimize surface disturbance related to oil and gas development, there would still be surface disturbance associated with oil shale research and development and sodium and multi-mineral extraction activities. These NSO stipulations could lead to beneficial or detrimental impacts to water quality depending on the relative surface disturbance of shale research and development and sodium and multi-mineral activities versus oil and gas activities.

For recreation the special management areas outside of the town of Meeker (Table 2-18 Record 5), would be managed for oil and gas development with NSO stipulations. The special management areas are located outside the MPA, but still have some oil and gas potential. At 7,700 acres, these special management areas would represent one of the larger contiguous areas of NSO stipulations in the Planning Area. Thus, NSO stipulations would help maintain existing surface water quality in these special management areas by shifting disturbance away from the restricted area. A portion of these special management areas drains into Sulfur Creek (White River Basin Segment 9d) that is on the impaired list for selenium.

To prevent an increase in vehicle traffic, newly constructed local and resource roads would be restricted to approved oil and gas activities and would be unavailable for public vehicular access (Table 2-19 Records 7 and 13). This could help reduce OHV use in areas adjacent to new local and resource roads. Limiting both on-road and off-road vehicle use on these new roads would help maintain surface water quality by reducing wear and tear and erosion from road surfaces and adjacent areas.

BLM_0019824

*Chapter 4 – Environmental Consequences*

**Reclamation**

Although Alternative B has twice the number of well pads as Alternative A, water quality impacts from reclamation of surface disturbance would not likely be twice that of Alternative A. For example, interim reclamation could be completed more quickly because of year-round drilling and areas of steep slope and poor soils would not be disturbed under this alternative due to NSO stipulations. Management actions under Alternative B are likely to improve the success of reclamation by shifting disturbance away from landslides, poor soils and water resources. Negative impacts on a per well basis are expected to be less under Alternative B as compared to Alternative A.

The development of multi-well pads is estimated to require a two-year development cycle per well pad, as compared to a three-year development cycle per well pad for Alternative A with timing limitations. Interim reclamation is likely to occur more quickly under this alternative and this would make reclamation more successful. Reclamation success criteria for basal cover would the highest under this alternative and it is likely this will reduce the amount of sediment and surface runoff generated areas that have been reclaimed.

Additional erosion control measures would be required under this alternative, including protective surface treatments on disturbed areas and soil storage areas such as mulch, matting, netting, or tackifiers (Table 2-2 Record 10). These measures would help maintain surface water quality by limiting off-site transport of soil and sediment. Also, operators choosing to comply with voluntary development thresholds would use existing corridors for new pipelines in areas of concentrated development, which could limit the extent of new surface disturbance and help maintain water quality.

Operators would be required to place long-term facilities on the resource road side of a pad (Table 2-17 Record 8), and final abandonment of resource roads and wells would be required to meet current reclamation standards (Table 2-17 Record 9). New well pads would require an adapted footprint configuration to match surrounding topography, which would result in fewer cut-and-fill areas that contribute to sediment loading via increased runoff and soil erosion (Table 2-17 Record 19). These management actions would increase the extent and effectiveness of interim and final reclamation and improve surface water quality over time.

Oil and gas operators would be required under this alternative to restrict livestock from oil and gas well pads and related surface disturbance areas. Livestock would also be restricted from linear rights-of-way (i.e., roads, pipelines, and utility lines) until reclamation efforts are successful, which could help restore vegetation and stabilize soils, thereby reducing water quality impacts.

### 4.2.5.4    Alternative C

**Impacts from Oil and Gas Development**

Results of the temporal analysis for Alternative C are displayed in Table 4-45. The total number of well pads in the MPA would increase from 1,045 under Alternative B to 1,710 under Alternative C. However, the distribution of well pads among different watersheds would remain proportionally similar. Development would be concentrated in the Piceance-Yellow Creek and Upper White River watersheds, and shifted away from the Lower White River, Parachute-Roan Creek, and Colorado Headwaters-Plateau. The Piceance-Yellow Creek and Upper White River watersheds would receive 19,300 acres of surface disturbance from 1,605 new well pads (Lines 6 and 7). Altogether, the number of well pads constructed in the MPA (1,710) would be more than three times greater than Alternative A. The types of water quality impacts from development would be the same as

BLM_0019825

described for Alternatives A and B. Of course the degree of impacts would be higher due to increased development. Surface water quality in stream segments such as Yellow Creek, which has been on the 303 (d) list of impaired steam segments in the past, could be especially vulnerable to impacts. In addition, streamflows in the Piceance-Yellow Creek watershed would likely decrease due to increasing oil and gas demands for freshwater. The decrease in flows would likely be greater than under Alternatives A or B due to the higher level of development.

Freshwater use would be an estimated 39,410 acre-feet over the planning period for Alternative C and is in direct proportion to the number of wells expected to be drilled under this alternative. This freshwater use is likely to be an over estimate based on improved water management infrastructure such as dedicated pumping, storage and piping that will allow the more efficient reuse and recycling of freshwater.

As shown on Maps 2-2 and 2-3, and Tables 4-44 and 4-45, the area and extent of NSO stipulations in the Lower White River watershed would be similar to Alternative B, offering similar protections to groundwater springs and high priority streams such as Soldier Creek. In contrast to Alternative B, fewer NSO stipulations would be in place east of Piceance Creek (Map 2-3). As surface disturbance increased in this area, it could result in greater disruption to nearby groundwater springs (Map 3-1), with potential impacts to spring flow and shallow groundwater quality. These impacts would also be greater than Alternative B (despite the smaller NSO stipulation area established under that alternative) since Alternative C would have more wells and pads.

Line 9 of Table 4-45 shows the percent of land area developed in the MPA in proportion to the total area of each watershed in the WRFO. Overall, the Piceance-Yellow Creek and Parachute-Roan Creek watersheds would have the greatest density of development in the Planning Area since these watersheds are mostly contained within the MPA. Although locally concentrated, oil and gas development in the Upper White River watershed would be reduced on the field office scale since most of the watershed is located outside the MPA.

### Table 4-45. Estimated Surface Disturbance by Watershed for Alternative C

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA[2] | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA[3] | Acres | 150,900 | 10 | 21,600 | 10,300 | 111,500 | 5,200 |
| 4 | Area Available for Surface Occupancy | Acres | 447,800 | 54 | 6,400 | 20,800 | 389,600 | 30,300 |

BLM_0019826

*Chapter 4 – Environmental Consequences*

**Table 4-45. Estimated Surface Disturbance by Watershed for Alternative C**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 75 | 0 | 1.4 | 4.7 | 87.1 | 6.8 |
| 6 | Estimated Number of Well Pads[4] | --- | 1,710 | 0 | 25 | 80 | 1,489 | 116 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period [5] | Acres | 20,500 | 0 | 300 | 1,000 | 17,900 | 1,400 |
| 8 | Percent of Watershed within the MPA Developed During 20-year Planning Period [6] | % | --- | 0 | 1.1 | 3.1 | 3.6 | 3.9 |
| 9 | Percent of Land Area Developed During 20-year Planning Period based on Total Watershed Area in the WRFO | % | --- | 0 | 0.04 | 3.0 | 3.4 | 0.5 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] The area of the MPA calculated from the watershed dataset is slightly smaller than the known area of the MPA (598,700 acres) due to rounding errors in the GIS data intersections.

[3] NSO stipulations areas for the MPA are for all resources. NSO Stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Appendix A for exception, modification, and waiver criteria.

[4] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[5] Assumed that each well pad would require 12 acres of surface disturbance.

[6] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

As discussed in the soils impact section, anticipated truck traffic for Alternative C would be approximately 60 percent higher than Alternative B (Table 4-40). This would increase surface water impacts from truck traffic, such as in-stream sediment loading. It would also increase local and

BLM_0019827

resource road use, which could lead to increased runoff and erosion in areas down-slope from these roads.

## Impacts from Management Actions

Management actions for emissions and dust control would be the same under Alternative C as described in Alternative B, although impacts would increase in proportion to the well pad and well number increases (Table 2-1 Records 7-12). Three-phase gathering systems would be expected at 80 percent of well pads (1,440 out of 1,800) under Alternative C (Table 2-1 Record 16). Shared infrastructure for three-phase gathering would result in less area on individual well pads needed for production due to the removal of excess tanks and would increase the area available for interim reclamation. Implementation of three-phased gathering would also reduce large truck traffic to individual well pads and reduce road maintenance, helping to maintain water quality in more areas than Alternative A but fewer areas than Alternative B. It is estimated that the heavy vehicle miles traveled on resource roads during the production phase would be reduced by a factor of three (URS 2011), on a per well pad basis, compared to Alternative A. As the total number of vehicle miles traveled on resource roads decreases, the roads would experience decreased wear and tear and erosion, helping to reduce erosion and maintain surface water quality.

Designated surface and groundwater source water protection zones for public water supplies would have a lease notice applied that would require a plan that addresses the protection of drinking water sources (Table 2-2 Record 11). Surface and groundwater protection zones for Rangely and Meeker above the Rangely intake on the White River below Taylor Draw Dam constitute the majority of land area above this point. A drinking water plan would allow oil and gas operators and the BLM to identify specific mitigation and BMPs that would protect public water supplies.

Areas within 100-year flood plains and within 500 feet of perennial streams, springs, wells, and wetland/riparian zones would be open to oil and gas leasing with a CSU stipulation (Table 2-2 Record 12). Applying this CSU stipulation in these areas could help mitigate water quality impacts through design modification or by shifting facilities away from water bodies and erosion-prone areas.

Under Alternative C, existing, permitted surface discharges would be allowed to continue as long as they met water quality standards and did not exceed specified flow volumes, but surface discharge for new projects would be prohibited (Table 2-2 Record 13). Increases in streamflow, channel erosion and changes of water quality would continue to occur from permitted surface discharges, but would be prevented from occurring in new locations. Impacts from the injection of produced water as well as used drilling, completion, and hydraulic fracturing fluids in Class II wells would be similar to those described in Impacts Common to All Alternatives. This alternative would likely result in the greatest number of injection wells for disposing of produced water. The majority of injection wells would likely be converted producing wells or are co-located on pads with producing wells, so increasing the number of injection wells would not necessarily increase the amount of surface disturbance to accommodate higher injection rates.

An NSO stipulation would encompass lands within 50 feet of mapped landslide-prone areas (Table 2-2 Record 15). This is less than the 100 foot buffer specified in Alternative B, and could allow development in closer proximity to landslide prone areas. Two potential impacts could result from having surface disturbance near landslide areas: increasing runoff above the landslide area and potentially undermining the toe of the landslide area. Either impact could lead to mass wasting and soil erosion. Increasing soil erosion could lead to higher surface water concentrations of dissolved and suspended sediment.

BLM_0019828

Similar to Alternative B, using water transport systems during drilling and well completion/testing and three-phase gathering systems during production to transport water to a consolidated facility (Table 2-2 Records 18 and 19), would reduce vehicle miles traveled on resource roads, with a commensurate reduction in wear and tear and erosion. These management actions would also help maintain existing water quality by mitigating the risk of produced water spills or leaks that could occur during truck transport. Although water pipelines are a voluntary compliance feature for concentrated development areas many operators are already installing infrastructure and implementing water delivery systems not just for handling produced water, but also for transporting water needed during drilling, completion, and hydraulic fracturing operations.

Evaporation ponds for produced water disposal would not be allowed on the BLM-administered public land (Table 2-2 Record 22). This management action would afford less protection for water quality than Alternative B since produced water could still be disposed of in evaporation ponds on private lands. However, impacts from these types of facilities as described in Alternative A would not occur on public land.

Alternative C would manage saline soils with an NSO stipulation but without the 100 foot buffer (Table 2-2 Record 16). This would decrease the total NSO stipulation area for saline soils from 45,300 acres to 34,100 acres, and from 2,600 acres to 2,000 acres in the MPA. Since saline soils are less than 0.5 percent of the MPA it is unlikely alter the placement of well pads in the MPA.

Alternative C would establish an NSO stipulation on slopes greater than 50 percent (114,300 acres of mineral estate with 35,400 acres in the MPA) and manage slopes between 35 and 50 percent with a CSU stipulation for 238,700 acres of mineral estate and with 88,800 acres in the MPA (Table 2-2 Record 17). Managing this slope range with a CSU stipulation rather than an NSO stipulation as prescribed by Alternative C could result in more surface disturbance in these areas. The CSU stipulation for steep slopes includes avoidance during planning and the application of BMPs and design measures to reduce impacts to soil and water resources. If these areas are avoided and design measures are successfully applied, impacts due to development in these areas may be similar to those expected with the application of an NSO stipulation in these same areas under Alternative B.

Similar to Alternative B, the threshold concept would be used to manage new oil and gas development (Table 2-4 Record 12). In each GMU, oil and gas operators would be required to keep disturbance and disruptive activities below a certain threshold to remain exempt from timing limitation stipulations. Impacts on water from the threshold concept would be the same as Alternative B, except that Alternative C establishes higher thresholds for development which would allow more surface disturbance from construction of oil and gas local and resource roads and well pads. This would result in greater water quality impacts as sediment was transported down slope and deposited in stream channels. Cumulative surface disturbance under Alternative C could still be less than under a scenario with timing limitation stipulations if the threshold concept leads to more shared facilities, and if year-round drilling shortens pad lives and accelerates interim reclamation.

Mitigation applied as COAs to minimize aquatic habitat deterioration would apply only in native aquatic communities, and restorative measures and agreements to meet in-streamflow requirements would only be pursued for the BLM sensitive fish species (Table 2-8 Records 3, 4, and 5). Impacts would be similar to those described in Alternative B. The CSU stipulation established for trout habitat along portions of Black Sulphur Creek (12,000 acres in the MPA) would be the same as Alternative B (Table 2-9 Record 20) and would have the same impact on surface water quality.

BLM_0019829

Alternative C includes a management action that allows grazing allotments (portions or whole) to be closed during periods of intensive oil and gas development (Table 2-16 Record 8). The closures would be temporary until grazing and oil and gas development could be made compatible. Incompatibility between these surface uses would occur when an allotment is in danger of not meeting land health standards (BLM 1997b). This management action is different from the management action under Alternative B that would, for the most part, adjust oil and gas activities to accommodate grazing. Although to some degree grazing modifications, such as limited fencing, adding cattle guards, and avoiding range improvements, would occur under all alternatives, the management decision under Alternative C would prioritize livestock grazing. Regardless of these decisions land health standards must be met for both uses of public lands, and thus impacts to water quality and quantity from soil erosion and enhanced runoff could change in nature and location, but not substance, depending on the management alternative implemented.

Discouraging the use of drilling and reserve pits (Table 2-17 Record 20) and replacing excavated pits with tanks or other aboveground structures could help reduce water quality impacts from drilling fluid leaks or spills. Tanks may still leak or spill, but should provide more opportunities for detection and mitigation compared to pits. Since some operators may still choose to use reserve pits, management under Alternative C would likely result in more potential water quality impacts compared to Alternative B.

Oil and gas development with a CSU stipulation would be allowed in the three special management areas (Table 2-18 Record 5) outside of Meeker. Since these special management areas are outside the MPA concentrated development is not expected in this area. Single well pads and exploration drilling is most likely and the CSU stipulations would likely reduce impacts to soil and water resources to benefit recreational values in these special management areas.

<u>Reclamation</u>

Reclamation standards for desired plant communities would be less (100 to 80 percent), but would still improve reclamation substantially as compared to Alternative A (Table 2-3 Record 18). Alternative C anticipates more than three times the number of well pads compared to Alternative A (Table 2-1 Record 13). Oil and gas operators would be encouraged to build new pads with an adapted footprint configuration (Table 2-17 Record 19). This would reduce water quality impacts from runoff and soil erosion, but would be less substantial than for Alternative B because adapted footprint configurations would be encouraged rather than required. No surface occupancy stipulations and CSU stipulations on leases to protect saline soils, steep slopes, landslide areas, and buffers around water features would protect water resources from oil and gas development to some degree. Many of the areas that have NSO stipulations in Alternative B would be managed with CSU stipulations under this alternative. The CSU stipulations are first avoidance of these areas for facilities location and secondly as mitigation of impacts to soils and water. Similar to Alternative B, year-round drilling would be managed through the threshold concept, leading to an estimated two-year development cycle per well pad, as compared to a three-year development cycle per well pad for Alternative A.

#### 4.2.5.5   Alternative D

<u>Impacts from Oil and Gas Development</u>

Results of the temporal analysis for Alternative D are displayed in Table 4-46. The results show that 85.7 percent of the area available for surface occupancy in the MPA occurs in the Piceance-Yellow Creek watersheds, 6.4 percent is in the Upper White River watershed, and 5.5 percent is in the Parachute-Roan Creek watershed (Line 5). Since these values are higher than the percent of land

BLM_0019830

*Chapter 4 – Environmental Consequences*

occupied by each watershed in the MPA (i.e., Line 5 greater than Line 2), it is likely that these areas would experience higher density development compared to the Lower White River and the Colorado Headwaters-Plateau. Altogether, the Piceance-Yellow Creek, Upper White River, and Parachute-Roan Creek watersheds are projected to have 2,370 new well pads and 28,400 acres of surface disturbance (Lines 6 and 7). This level of development is approximately 4.5 times greater than Alternative A and would result in the largest frequency and distribution of water quality impacts among the four alternatives. The types of impacts would be the same as described for Alternatives A, B, and C, as well as Impacts Common to All Alternatives (Section 4.2.5.1).

Assuming a freshwater use volume of 2.62 acre-feet per well with limited water reuse and recycling, an estimated 55,540 acre-feet of freshwater would be used over the planning period for drilling, completions, hydraulic fracturing, construction and for dust abatement. Freshwater is expected to come from surface and groundwater sources within the Yellow Creek, Piceance Creek and White River watersheds. The use of water per well is likely to decrease throughout the planning period due to the development of water management infrastructure such as pumps, storage and pipelines that will make freshwater reuse and recycling more common, but this rate of decreased use is difficult to predict.

Similar to Alternatives A, B, and C, NSO stipulations established under Alternative D would shift the focus of development outside the Lower White River watershed. This watershed is projected to receive 2.4 percent of new well pads (Table 4-46 Line 6) despite occupying 4.7 percent of the MPA (Table 4-46 Line 2). The decrease in development density in the Lower White River watershed would help maintain existing groundwater and surface water quality, especially in the northwestern MPA where large NSO stipulation areas would be in effect (Map 2-4). Map 2-4 also shows that few NSO stipulations would be in place in the southwestern part of the MPA where it coincides with the Lower White River drainage.

Line 9 of Table 4-46 shows the percent of land area developed in the MPA in proportion to the total area of each watershed in the WRFO. Overall, the Piceance-Yellow Creek and Parachute-Roan Creek watersheds would have the greatest development density in the Planning Area since these watersheds are mostly contained within the MPA. Although locally concentrated, oil and gas development in the Upper White River watershed would be reduced on the field office scale since most of the watershed is located outside the MPA planning unit.

### Table 4-46. Estimated Surface Disturbance by Watershed for Alternative D

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA[2] | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA[3] | Acres | 96,600 | 3 | 16,100 | 3,700 | 71,500 | 3,400 |
| 4 | Area Available for Surface Occupancy | Acres | 502,100 | 61 | 12,000 | 27,400 | 429,600 | 32,200 |

BLM_0019831

**Table 4-46. Estimated Surface Disturbance by Watershed for Alternative D**

| Line[(1)] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 84 | 0 | 2.4 | 5.5 | 85.7 | 6.4 |
| 6 | Estimated Number of Well Pads[(4)] | --- | 2,428 | 0 | 58 | 133 | 2,081 | 156 |
| 7 | Estimated Area of Surface Disturbance During the 20-year Planning Period[(5)] | Acres | 29,100 | 0 | 700 | 1,600 | 25,000 | 1,900 |
| 8 | Percent of Watershed within the MPA Developed During 20-year Planning Period[(6)] | % | --- | 0 | 2.5 | 5.1 | 5.0 | 5.3 |
| 9 | Percent of Land Area Developed During 20-year Planning Period based on Total Watershed Area in the WRFO | % | --- | 0 | 0.08 | 4.9 | 4.8 | 0.7 |

NOTES:

[(1)] The line-by-line analysis methodology is described in Appendix E.

[(2)] The area of the MPA calculated from the watershed dataset is slightly smaller than the known area of the MPA (598,700 acres) due to rounding errors in the GIS data intersections.

[(3)] NSO stipulations areas for the MPA are for all resources. NSO Stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Appendix A for exception, modification, and waiver criteria.

[(4)] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[(5)] Assumed that each well pad would require 12 acres of surface disturbance.

[(6)] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

As discussed in the soils impact section, truck traffic associated with oil and gas development would be highest under Alternative D (Table 4-42). The baseline number of heavy truck trips required to transport drill rigs to and from well pads under Alternative D is assumed to be 7,525 in the absence of timing limitation stipulations (Table 4-42). However, on 203,000 acres of the MPA subject to timing limitation stipulations, an estimated three mobilizations and demobilizations for a typical drilling scenario could be required due to the shorter amount of time available for drilling on an annual basis. The need for multiple drill rig moves could potentially triple the number of heavy truck trips needed for drill rig transport within the MPA from the baseline of 7,100 to a total of 21,300 round trips. As the total number of truck trips and drill rig relocations increases, roads would experience greater wear and tear, and dust emissions, sediment erosion, and runoff from road

BLM_0019832

surfaces would increase. The eroded dust and sediment would impact water quality if it is deposited in surface water bodies.

**Impacts from Management Actions**

Alternatives B and C require erosion control measures on all disturbed areas. In contrast, Alternative D only requires erosion control for soil stockpiles (Table 2-2 Record 10). These measures would be more effective on an individual well pad basis for soil retention than Alternative A (which only requires them when topsoil is stockpiled on slopes exceeding 5 percent). However, it should be noted that the number of well pads under Alternative D is four times the well pads expected under Alternative A.

Designated surface and groundwater source water protection zones for public water supplies would have a lease notice applied under Alternative B and C that would require a plan that addresses the protection of drinking water sources (Table 2-2 Record 11). No plan would be required under this alternative. However, public and domestic water supplies would still be considered under this alternative in the NEPA process. This alternative is likely to have the most impacts on public and domestic water supplies since it assumes the highest amount of wells and well pads and there would be a CSU and not a NSO stipulation on buffer areas for water features (Table 2-2 Record 12).

Alternative D would allow surface discharge of produced water, but would not allow surface discharge into ephemeral drainages (Table 2-2 Record 14). This would reduce erosional impacts from surface discharge due to changes in changes in the persistence of streamflow. However, changes in water quality from surface discharges would still occur and some erosional impacts would still occur depending on the local conditions and volume of surface discharge that would occur. Discharge effluent would be required to meet water quality standards.

The management action for natural slopes under Alternative D is similar to Alternative C, except there would not be a CSU stipulation for slopes less than 50 percent (Table 2-2 Record 17). This change in management could result in more surface disturbance on slopes below 50 percent and more surface water quality impacts from sediment loading. However, fragile soils as defined in the 1997 White River RMP (i.e., a subset of slopes above 35 percent based on soil characteristics, 382,700 acres) would still be managed with a CSU stipulation. Saline soils would be managed with a CSU stipulation rather than an NSO stipulation as discussed above. In saline soil areas, surface disturbance impacts would be greatest under Alternative D, next under Alternative A, then next under Alternative C, and least under Alternative B. Other management decisions for soil are the same as Alternative A, and would result in similar types of impacts. However, water quality impacts from soil erosion and runoff would still be greater than Alternative A due to the higher level of development under Alternative D.

The management approach for vegetation and special status plants incorporates concepts from Alternatives A and B, and would have the same impacts where management actions are identical (Table 2-3 and Table 2-10). Surface-disturbing activities would generally be avoided in priority riparian habitat (with some exceptions possible), and authorized surface disturbance found to be negatively affecting riparian zones would be addressed through mitigation or by relocating the facility (Table 2-3 Record 21). These measures would help maintain water quality by limiting soil erosion adjacent to surface water, but would be less effective at limiting/mitigating disturbance than Alternatives B and C. Weed control measures would apply to fewer areas than Alternative B, and would not be as effective at limiting in-stream sediment loading as a result.

BLM_0019833

Mitigation, applied as COAs to minimize habitat deterioration would apply only to the BLM sensitive aquatic species, and no requirements would be established to restore aquatic habitat impacted by oil and gas development (Table 2-8 Records 3 and 4). As a result, oil and gas development near surface water bodies could increase under Alternative D relative to Alternatives B and C, with a corresponding increase in water quality impacts. A CSU stipulation would not apply to cutthroat trout habitat along portions of Black Sulphur Creek. Without the CSU stipulation, Black Sulphur Creek would be subject to greater impacts than under Alternatives B and C where the stipulation would be in place.

Closing grazing allotments (portions or whole) during periods of intensive oil and gas development and placing limits on grazing, especially in areas disturbed from oil and gas development, would have the same impacts as Alternative C (Table 2-16 Record 8).

Drilling and reserve pits would also be allowed under this alternative, which would have the same impact on water resources as Alternative A (Table 2-17 Record 20).

The management action for the recreation special management areas is similar to Alternative B except that the area managed with an NSO stipulation would decrease to 6,200 acres. Within these special management areas, this could result in more water quality impacts from surface disturbance compared to Alternatives B and C (Table 2-18 Record 5).

## Reclamation

Reclamation standards for desired plant communities would be the least under this alternative (50 percent) (Table 2-3 Record 18). Only 50 percent of the basal cover of the DPC for the site would be required to consider reclamation successful. If the DPC for a reclaimed site is 60 percent basal cover due to local soil and vegetation conditions, acceptable reclamation would be 30 percent basal cover. Although there is not good information available for what minimum basal cover could be expected to provide soil stability on all soil types, it is the most possible under this alternative to have reclamation success standards below what would be considered successful under Alternative A. Operators would still need to keep BMPs in place for stormwater until they met requirements for ground cover specified by CDPHE. However, this alternative would still result the highest potential for increased erosion and surface runoff from reclaimed sites due to these low basal cover success standards.

Alternative D anticipates almost 4.5 times the number of well pads compared to Alternative A (Table 2-1 Record 13). Unlike Alternatives B and C, Alternative D does not contain a requirement for adapted footprint configurations to match the topography of the surrounding landscape, to reduce reclamation needs (e.g., fewer cut/fill areas) (Table 2-17 Record 19).

### 4.2.5.6    Irreversible and Irretrievable Commitment of Resources

The potential for irreversible or irretrievable impacts to groundwater resources is higher than for surface water resources. This is due to the difficulty in assessing or detecting impacts to groundwater. Groundwater monitoring in key aquifers could detect contaminants before they became irreversible or irretrievable in order to change drilling or injection practices that introduce contaminants. Monitoring of groundwater has been initiated by the BLM in conjunction with the USGS in the Planning Area. The monitoring includes 15 dedicated groundwater monitoring wells with quarterly sampling to establish a baseline, periodic sampling of about five more wells, spring inventories, and surveys. This monitoring effort focuses on aquifers in the Uinta Formation and the upper and lower aquifer or the A and B groove, above and below the mahogany shales in the Green

BLM_0019834

River Formation. Much of the groundwater flow in the Piceance Basin occurs in these formations contributes to streamflows and springs.

Groundwater and surface water monitoring focused on the MPA has been initiated according to a regional framework developed by the USGS (McMahon et al. 2007). The BLM has also funded and participated in a regional water data repository and monitoring effort that has resulted in a surface water report and a groundwater report (Thomas and McMahon, in press) that assembles data from a wide variety of sources to evaluate regional surface and groundwater conditions in the Piceance Structural Basin. This effort will continue and through the sponsorship of research that includes domestic wells in other parts of Colorado with similar oil and gas development, potential contamination issues that a systematic problem would hopefully be identified before an irreversible impact occurs to ground or surface waters.

The Safe Drinking Water Act presumes that aquifers are Underground Sources of Drinking Water (USDW), unless they are specifically exempted or if they have been shown to fall outside the definition of USDW (e.g., over 10,000 mg/L total dissolved solids or from a mineral producing zone). Freshwater aquifers such as these may be contaminated by brines from deeper formations, leaks from pits, pipelines and tanks, drilling fluids, completion fluids, and/or hydraulic fracturing fluids. These aquifers could potentially be rendered unusable for drinking water or other uses if the contamination is severe. Extensive groundwater contamination would be difficult to treat due to the prohibitively-high cost of removing salt and other pollutants from groundwater. Groundwater in formations that are targeted for Class II injection wells are by definition not suitable for drinking water or other uses, therefore are not USDWs due to high salinity or since they are former oil and gas production zones. Injection zones would be degraded by injecting oil and gas derived waste such as produced water and used drilling, completion, and hydraulic fracturing fluids.

Finally, groundwater pumped for water use or water produced with oil and gas from aquifers that receive little or no recharge would be permanently lost from these groundwater systems. Such groundwater depletions would effectively be irreversible and irretrievable.

## 4.2.5.7    Unavoidable Adverse Impacts

Variations in perennial streamflows may be unavoidable due to continued water use associated with water development, population growth and/or new commercial or industrial uses. Drought and other natural climate variations could place additional constraints on water availability, and could reduce the amount of water available for future beneficial uses and aquatic habitats. In the short-term, impacts to surface water supplies would be the most severe during a prolonged drought, but the availability of groundwater could also be affected. Freshwater use will be proportional to the number of wells drilled during the planning period. The availability of water for this industrial use could be limited during severe drought, especially from surface water sources in Piceance and Yellow Creek. If water resources become limited it is likely that oil and gas operators would seek to use existing water rights in other basins or would look to the lower part of the White River Basin or other areas to appropriate additional water. There is the potential for adverse impacts from additional water development in areas outside the MPA to meet the needs of oil and gas development in the MPA.

Changes in pressure in natural gas producing zones due to development activities, especially in coal beds, mobilizes natural gas. This natural gas could migrate up natural faults and porous formations and could contaminate shallow aquifers, drinking and stock wells, and in some cases lead to surface methane seeps that could damage or kill vegetation. The MPA is not likely to have this occur due to its depth in the basin (10,000 to 15,000 feet), however where oil and gas development is shallower

BLM_0019835

(less than 5,000 feet) natural gas migration is more likely. Only 5 percent of the development is expected in these shallower formations outside the MPA.

The increased human presence required for oil and gas development and increased ignition sources from construction and operational equipment is likely to add anthropogenic ignition sources, but increased human presence could also shorten the detection and response times when wildfires do occur. The destruction of vegetative cover by wildfires would lead to increased soil erosion and sediment loading in streams. These impacts would be largely unavoidable and could occur regardless of which management alternative is implemented.

### 4.2.5.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Surface water sediment loads would likely increase as oil and gas development removed anchoring vegetation. These water quality impacts would be most intense during the construction, drilling, and well completion phases. The development process would remove mature vegetation communities that would be replaced with early- and mid-seral vegetation types during reclamation. Studies have shown that early seral communities may not be as effective at reducing soil erosion. For example, in a study of 23 watersheds, Anderson (1975) found that conversion of a steep forest and brush lands to grassland increased sediment yields by a factor of five.

Surface water sediment loads would increase as oil and gas development removed anchoring vegetation. These water quality impacts would be most intense during the construction, drilling, and well completion phases. The development process would remove mature vegetation communities that would be replaced with early- and mid-seral vegetation types during reclamation. Studies have shown that early seral communities may not be as effective at reducing soil erosion. For example, in a study of 23 watersheds, Anderson (1975) found that conversion of a steep forest and brush lands to grassland increased sediment yields by a factor of five. Many areas would not return to pre-disturbance function until 30 to 50 years or longer after reclamation. Several researchers have found that runoff accelerates rapidly below 60 percent vegetative cover (NRCS 1997). The characteristics of pre-disturbance hill-slope hydrology and sediment production on a landscape level in the MPA would be impacted by reclaiming areas to an early serial vegetation assemblage.

Until the hydrologic function and sediment production in these areas return it is likely that surface runoff would be higher, and streams would generally have higher peak flows, lower baseflow conditions, and increases in total dissolved and suspended solids. Current levels of development (analyzed as Alternative A) have not shown any significant trends in total dissolved or suspended solids in the White River Basin.

## *4.3   Biological Resources*

### 4.3.1   Vegetation

This section addresses the potential impacts of oil and gas development on the vegetation land cover types defined in Section 3.3.1 and associated potential for establishment and spread of noxious and invasive weeds. The analysis focuses on management actions (described in Chapter 2, Tables 2-1 through 2-21) that could result in physical disturbance to vegetation communities; that limit activities and, thereby, reduce surface disturbance in an area; or that attempt to restore resources to the desired conditions through reclamation of disturbed areas. Oil and gas activities and management actions have the potential to directly remove or indirectly disturb vegetation resulting in reduced or lost structure, function, or diversity within a given vegetation community. Some management actions could either facilitate the establishment or improvement of vegetation

BLM_0019836

communities. The analysis used quantitative and qualitative variables to assess the effects. A number of indicators, attributes, and assumptions were used for the analysis. The following four indicators have been selected to analyze the effects of the alternatives on vegetation:

- Vegetation community species distribution, composition and/or structure;
- Noxious and/or invasive weed species location and extent;
- Functional condition rating of riparian and wetland areas; and
- Ecological health of rangelands.

The attributes of the four indicators are:

- Change in the distribution of land cover types and vegetation communities;
- Change in composition and/or structure of vegetation communities;
- Change in noxious and invasive weed species distribution, extent, and/or composition (i.e., introduction of novel noxious species);
- Change in number of miles of streams in each functional rating class; and
- Change in management to ensure that Public Land Health Standards are met.

The analysis is based upon the following assumptions:

- Approximately 95 percent of the disturbance from oil and gas development would occur within the MPA; mostly within the woodland and shrubland communities of this area.
- Surface disturbance increases the likelihood of the introduction and spread of noxious and invasive weed species in the Planning Area.
- The total amount of new surface disturbance associated with an alternative is an index of potential impacts from noxious and invasive weed species. The larger the surface disturbance extent, the higher the potential affects to vegetation communities from noxious and invasive weeds species.
- Weed management would be carried out in coordination with the appropriate entities including the County Weed Supervisor, weed and pest control districts, agencies, industry, and adjacent land owners.
- Noxious and invasive weed species would be less likely to invade undisturbed and healthy natural vegetation communities.
- Surface disturbance generally increases the potential for accelerated soil erosion, surface runoff, loss of topsoil, changes in water routing, and loss of vegetation, which could lead to degradation of riparian and wetland areas.
- Reclamation, mitigation, and weed control efforts would be successful in the long-term.
- Climatic fluctuation would continue to influence the health and productivity of vegetation communities on an annual basis.

### 4.3.1.1    Impacts Common to All Alternatives

<u>Impacts from Oil and Gas Development</u>

The following discussion focuses on the MPA since 95 percent of the expected oil and gas development is likely to occur in this area. Outside of the MPA, effects to vegetation communities

BLM_0019837

would be similar to those within the MPA, though at a much lower intensity. It is assumed that on average 12 acres of surface disturbance would be associated with each well pad, pipelines, and ancillary facilities (see Chapter 2 and Section 4.1). Surface-disturbing activities from oil and gas development (e.g., well pads, access roads, power lines, and pipelines) would be similar across alternatives, but would vary in the overall number of acres impacted and the timing and distribution of disturbance and reclamation. Reclamation would occur on approximately 60 percent of the disturbed area associated with every well pad throughout the Planning Area.

Surface disturbance from oil and gas development would directly impact vegetation communities through vegetation removal and mechanical damage to plants. Plant community composition, species diversity, and the relative occurrence of structural stages of those communities would be affected directly by oil and gas development under all alternatives. Indirect impacts of surface disturbance on vegetation could include soil compaction, erosion, changes in hydrology, and encroachment by noxious weeds and invasive plant species. These indirect impacts could affect recovery or reclamation of vegetation communities following disturbance. Surface disturbance and removal of existing vegetation could indirectly increase opportunities for the establishment and subsequent spread of noxious or invasive weeds. This could in turn reduce diversity, production, desirable plant cover, and overall ecological health of vegetation communities. Decreased ecological health would make vegetation communities less resistant to drought, fire, insect pests, non-native species invasion, and other natural disturbances or stressors. Implementation of any alternative would result in the disturbance of relatively low percentages of any plant species, plant community, or structural stage.

A temporal analysis was conducted for the MPA to assess plant community acres potentially affected by surface disturbance and the results of this analysis are displayed in a table under each alternative. These estimates are based on a uniform distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations and timing limitation stipulations). As shown in the temporal analysis tables, across all alternatives mountain shrub, sagebrush, and pinyon/juniper woodland plant communities could receive about 24, 25, and 40 percent of the total well pads in the MPA, respectively because they comprise 24, 25, and 40 percent of the total area available for surface occupancy (Table 4-47 Line 2). These three vegetation communities are called out because of their dominance in the MPA, not because of their relative importance. Other vegetation communities could receive a smaller proportion of well pads because they occupy less of the MPA or have more NSO stipulations associated with them.

In each temporal analysis table acreages for NSO stipulation areas include areas, which due to proximity are effectively an NSO stipulation, even though the area has not been identified as such. An example of an effective NSO stipulation area would be a valley bottom that is too narrow to construct a well pad without extending onto adjacent steep slopes that fall under an NSO stipulation. No surface occupancy stipulations vary by alternative however application of NSO stipulations for oil and gas development under all alternatives would help retain existing vegetation, reduce opportunities for the establishment of noxious weeds and invasive plant species, and reduce influences to the current functioning conditions of riparian areas and wetlands in those areas. Exceptions, modifications, or waivers also vary by alternative but if applied, could allow surface disturbance to occur (see Appendix A). Where NSO stipulations are enforced (no exceptions, modifications, or waivers are granted), disturbance would then be shifted to other nearby areas resulting in different impacts to vegetation resources that could be greater or less depending on the site conditions.

BLM_0019838

**Chapter 4 – Environmental Consequences**

Oil and gas related roads (local roads and resource roads) could have an impact on vegetation beyond the acreage of disturbance due to fugitive dust generated from vehicle travel and then depositing on vegetation within approximately 300 feet of the edges of roads. Estimations of the acres of vegetation that could be effected by dust are discussed for each alternative based on estimated miles of local and collector roads (Table 4-3). Plant health and vigor would be reduced due to disrupted photosynthesis caused by dust accumulation on leaf surfaces. Construction and use of roads and pads would also lead to soil compaction, increased erosion, and the potential for spread of noxious and invasive weeds. Different management actions under each alternative would reduce the overall effects of dust to vegetation. Pipelines or other utility rights-of ways would be permitted on public land, and would result in short-term surface disturbance and damage to vegetation in localized areas. Where concentrated development occurs over large areas, surface-disturbing activities could affect the overall health of the plant communities.

**Impacts from Management Actions**

The effects of management actions on upland vegetation communities would vary widely, depending on the type of soil, annual precipitation, topography, and plant community reproductive characteristics. Across the alternatives, application of NSO stipulations for oil and gas development would help retain existing vegetation diversity and species composition, successional states and distribution patterns in those areas. Similarly, where applied, NSO stipulations would reduce opportunities for the establishment of noxious weeds and invasive plant species, and reduce influences to the current functioning conditions of riparian areas and wetlands however; where identified, exceptions, modifications, or waivers could be applied, allowing surface disturbance to occur (see Appendix A). Where NSO stipulations are enforced, the development action would generally be shifted to other nearby areas resulting in different impacts to vegetation resources that could be greater or less depending on the site and resource values. Controlled surface use stipulations would have minimal influence on vegetation resources as those stipulations generally only result in additional siting or design requirements for oil and gas development activities so vegetation at those sites would still be removed. Because of this lack of influence, management actions for CSU stipulations are not discussed further.

Management actions that would minimize or prevent disturbance on fragile soils, landslide prone areas, and slopes would shift development to areas that are less prone to erosion and are more easily reclaimed. Best management practices and conservation measures for surface-disturbing activities based on site conditions would be applied under all alternatives to minimize impacts to vegetation resources (Appendix B). These actions would hasten vegetation recovery; contribute to controlling or reducing invasive plants and noxious weeds, and aide in meeting Public Land Health Standards. Management actions common to all alternatives that influence vegetation resources are:

- Analysis to assure that plant community objectives could be met with approval of the proposed activity (Table 2-3 Record 12);

- Project and site-specific analysis to determine plant species for use in reclamation (Table 2-3 Record 13);

- Tailor reclamation to improve ecological condition or achieve specific management objectives (Table 2-3 Record 16);

- Maintain ecological integrity within the Blue Mountain/Moosehead Geographic Reference Area, WSAs, and ACECs by requiring the use of native plant species for reclamation (Table 2-3 Record 17);

BLM_0019839

- Manage all rangeland plant communities to achieve DPCs in late-seral or healthy mid-seral ecological status (Table 2-3 Record 18);

- Maintenance of weed-free zones with weed management emphasis and requirements for special conditions on use authorizations (Table 2-3 Record 22);

- Manage all RVAs as open to oil and gas leasing with NSO stipulations, where exceptions could be granted (see Appendix A) (Table 2-3 Record 27);

- Avoidance of the Texas-Missouri-Evacuation Creek areas for major new infrastructure (Table 2-12 Record 8) and application of NSO stipulations in the Duck Creek Wickiup Village (Table 2-12 Record 9);

- Application of administrative actions to direct livestock use to meet land health objectives, including adjustments in livestock grazing use (Table 2-16 Records 6 and 7); and

- Continued closure of all WSAs and the National Park Service's Harpers' Corner Road withdrawal to oil and gas leasing with no exceptions possible (Table 2-17 Record 7 and Table 2-21 Record 9).

## Reclamation

An important difference between alternatives would be that under Alternative A there would be no specific reclamation plan other than what is required by Onshore Order No. 1, regulation, and the general requirements outlined in the 1997 White River RMP. There would be no defined criteria for releasing reclaimed sites and success would be based solely on the DPC. Reclamation under Alternatives B, C, and D would be applied using the requirements, guidance, and recommendations outlined in the WRFO Surface Reclamation Plan though success criteria for vegetation cover and composition would vary by alternative. The Surface Reclamation Plan was developed by the WRFO and has been reviewed by reclamation ecologists from Colorado State University, CPW, and private industry. The document was also reviewed by the NWRAC and subcommittee. The purpose of this document is to provide guidance on how to optimize reclamation success, establish clear success criteria, and defines the measures BLM will use for determining success. Short-term losses of vegetation associated with oil and gas development would be reduced when reclamation actions reestablish vegetation capable of progressing toward the desired plant community on areas not needed for production activities. Adequate reestablishment of desirable vegetation to return the utility of reclaimed areas would generally occur by the sixth (Alternatives B and C) or seventh (Alternative A and D) year after a site was originally disturbed. Over the long-term, reclamation of sites previously in degraded condition would improve plant community cover, composition, structure, and ecological function toward the site potential or identified desired conditions.

Under Alternatives B, C, and D reclamation plans would outline the following components: surface and site conditions prior to disturbance; construction practices, weed management; monitoring; interim reclamation; final reclamation; and long-term maintenance plans for roads, pipelines, power lines and facilities (Appendix D). A reclamation status report would be prepared for each site and submitted annually to the WRFO until it is determined that reclamation of the site has met all required objectives of that particular reclamation phase and could also identify and require additional monitoring and reseeding efforts (Table 2-3 Record 26). The WRFO Surface Reclamation Plan, Appendix D, includes timeframes, success criteria, requirements for reclamation, and details on reporting and seed mixes. Reclamation actions would increase the initial cost to operators but by stabilizing disturbed sites and establishing desirable vegetation, environmental impacts would be reduced and future corrective measures and weed control costs would be reduced.

BLM_0019840

*Chapter 4 – Environmental Consequences*

#### 4.3.1.2    Alternative A

**Impacts from Oil and Gas Development**

Direct and indirect effects on vegetation communities from surface disturbing activities associated with oil and gas development would be as described above in the Impacts from Oil and Gas Development (Common to All) section. Alternative A includes oil and gas exploration and development of approximately 550 well pads throughout the Planning Area resulting in 6,600 acres of disturbance over the 20-year planning period (Table 2-1 Record 13).

Under Alternative A there would be 1,240,500 acres of the BLM federal oil and gas mineral estate open to oil and gas leasing subject to lease stipulations (Table 2-17 Record 18). Managing 157,100 acres of the Planning Area with NSO stipulations would help retain existing vegetation, reduce opportunities for the establishment of noxious weeds and invasive plant species, and sustain the current functioning conditions of riparian areas and wetlands in those areas (Table 2-17 Record 18). Surface disturbance would be allowed in some NSO areas with application of exceptions, modifications, or waivers. Management of oil and gas development activities would be required to be done in a manner that retains upland health (Table 2-2 Record 14). Alternative A would have the least total acres of surface disturbance of all alternatives. Compared to the other alternatives reclamation requirements under Alternative A would be less stringent and would lack defined or measurable success criteria increasing potential for less desirable plant community cover and composition on reclaimed sites.

Specific to the MPA, Alternative A includes oil and gas exploration and development of approximately 523 well pads with associated roads, pipelines and infrastructure in the MPA over the 20 year planning period (Table 4-47 Line 6). Within the MPA, there would be a total of 530,500 acres available for surface occupancy (Table 4-47 Line 4). This alternative has the fewest NSO stipulations to limit where development could occur. The lower number of well pads and the higher number of acres available for surface occupancy proposed under Alternative A relative to the other alternatives would result in more dispersed development in the areas of the MPA that are available for surface occupancy. In those areas open for development there would be an average of one pad every 1,000 acres. A factor of dispersed development would be more miles of local and collector roads per pad and associated dust production.

A temporal analysis was conducted for the MPA to assess plant community acres potentially affected by surface disturbance and the results of this analysis for Alternative A are displayed in Table 4-47. Within the MPA an estimated 6,300 acres of land would be disturbed over the 20 year planning period for the development of 523 well pads (Table 4-47 Lines 6 and 7). Of those areas of specific plant communities available to be developed, disturbance would range from 0.9 to 1.1 percent (Table 4-47 Line 8). Under this alternative approximately 2,200 acres would be reclaimed reducing the overall vegetation loss to around 4,100 acres. An additional 1,500 acres would be reclaimed throughout the seven years following the 20-year planning period, further reducing the vegetation loss.

*Chapter 4 – Environmental Consequences*

**Table 4-47. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative A**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grass-lands | Grease-wood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sage-brush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25.2 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA [2] | Acres | 68,200 | 1,200 | 2,300 | 3,000 | 2,000 | 1,000 | 14,900 | 28,200 | 170 | 14,800 | 600 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 530,500 | 16,200 | 7,100 | 10,500 | 12,900 | 5,400 | 127,200 | 211,100 | 490 | 136,200 | 3,400 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 89 | 93 | 76 | 77 | 86 | 85 | 90 | 88 | 73 | 90 | 83 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 | 16 | 7 | 10 | 13 | 5 | 125 | 208 | 0.6 | 134 | 3 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,300 | 192 | 84 | 120 | 156 | 60 | 1,500 | 2,496 | 0 | 1,608 | 36 |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period [5] | % | 1.0 | 1.1 | 0.9 | 0.9 | 1.0 | 1.0 | 1.1 | 1.0 | 0.9 | 1.1 | 1.0 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulation areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0019842

**Chapter 4 – Environmental Consequences**

Of the 523 well pads projected in the MPA, approximately 134 well pads could be constructed in sagebrush communities, 208 in pinyon/juniper woodland, 125 in the mountain shrub communities, and 16 or less in each of the other vegetation communities (Table 4-47 Line 6). Several management actions requiring avoidance would result in zero well pads being constructed in riparian or wetland communities. Surface disturbance from oil and gas development estimated during the 20-year planning period in each vegetation community would range from 0 acre (riparian and wetlands) to nearly 2,500 acres (pinyon/juniper), if all the well pads were developed (Table 4-47 Line 7).

Fugitive dust from construction sites or generated by vehicles traveling on an estimated 300 miles of local and collector roads (Table 4-3) has potential to reduce the health and vigor of vegetation on approximately 21,800 acres of vegetation. Management actions described in the Impacts from Management Actions section below would influence where the disturbance figures described in Table 4-47 would occur within most vegetation communities.

**Impacts from Management Actions**

Under Alternative A, the following NSO stipulations would shift where development occurs and would reduce or prevent impacts to vegetation in these areas.

- On approximately 38,600 acres of landslide areas (Table 2-2 Record 15);

- On 31,600 acres near raptor (including bald eagle) nests (Table 2-5 Record 11 and Table 2-9 Record 28) and 360 acres in bald eagle roosting areas (Table 2-9 Record 29) unless exceptions, modifications or waivers were granted (Appendix A);

- In areas with known (occupied) and potential habitat of federally listed and candidate (proposed) threatened or endangered plant species (Table 2-10 Record 15) (48,800 acres); and

- In areas with BLM sensitive plants (10,800 acres) including qualifying areas mapped in the future (Table 2-10 Record 16).

There would be approximately 21,800 acres of vegetation within 300 feet of construction sites or roads that could be affected by fugitive dust. Management actions designed to reduce impacts, to the health and vigor of vegetation from dust, or particulates from evaporation of produced water on vegetation are described below. Collector, local, and resource roads throughout the Planning Area, including the MPA would be required to achieve at least 50 percent reductions in fugitive dust emissions using watering or other control measures (Table 2-1 Records 7 and 8). Prohibiting off road motorized vehicle travel in ACECs established for T&E plant resources (Table 2-10 Record 9) and requiring road abandonments and seasonal closures to achieve site specific road density objectives (Table 2-4 Record 7) and would reduce dust production in these areas. Requiring three phased gathering systems during production on 40 percent of well pads would reduce truck trips reducing fugitive dust production and its effects on vegetation (Table 2-1 Record 16). Evaporation facilities would be approved and mitigated on a case by case basis (Table 2-2 Record 22) however, particulate matter, including salts, from evaporation of produced water could deposit on surrounding vegetation causing negative impacts.

Management actions would be applied to minimize impacts to riparian and wetland areas. Riparian and wetland area management would be as described under the 1997 White River RMP (Table 2-3 Record 19). Surface-disturbing activities would be avoided in priority riparian habitats unless environmental analysis determined that the proposed activity would not degrade or forestall attainment of proper functioning condition of the riparian area, and if the riparian areas could not be

BLM_0019843

## Chapter 4 – Environmental Consequences

avoided, impacts could be mitigated to meet minimum objectives for the system (Table 2-3 Record 20). Surface disturbing activities found to be negatively affecting riparian or wetland habitat could require remedial mitigation or relocation outside of the high and medium priority riparian habitat upon (Table 2-3 Record 21). Allowing surface discharge of produced water that meets state standards for water quality could allow increased flow in perennial systems or allow in temporary establishment of riparian vegetation in ephemeral or intermittent channels that otherwise lacked adequate moisture to sustain obligate vegetation (Table 2-2 Record 13). Similarly pursuit of water rights to meet minimum in-stream flow requirements of public land cold water fisheries (Table 2-8 Record 5 and Table 2-9 Record 25) would benefit riparian and wetland systems.

Management actions would be applied to ensure the ecological health of rangelands. Operators would be required to manage oil and gas activities in a manner that retains upland health as defined by Colorado Standards for Public Land Health for Uplands, Standard 1 (Table 2-2 Record 14) and ensures appropriate habitat components for identified big game objectives (Table 2-4 Record 1). Allotment management and/or permitted AUMs would be adjusted where oil and gas activity conflicts with grazing operations, Public Health Standards, and rangeland management objectives (Table 2-16 Record 13) which could help to restore or maintain ecological health and could contribute to controlling or reducing invasive plants and noxious weeds. Thus, the combination of grazing and oil and gas development would not preclude maintenance of Public Land Health Standards. Other than emphasized weed management in identified weed-free zones there are no specific management actions for noxious or invasive weed control under this alternative.

Where other NSO stipulations do not apply, management actions including avoiding long-term seral or type conversions of aspen, Douglas fir, spruce fir, and deciduous shrub communities to the extent practicable during oil and gas activities would maintain the composition and seral stage of these communities (Table 2-4 Record 17; Table 2-6 Record 15). Where aspen forest and mountain shrub communities would not be covered by an NSO stipulation (Table 2-15 Record 10), those north of Highway 64 (Blue Mountain/Moosehead GRA) would still be covered by a CSU stipulation and would be avoided to the extent possible and mitigated to reduce impacts and promote accelerated recovery of establishment of desirable plant community components (Table 2-3 Record 11). Relocating project facilities by 660 feet to avoid long-term reduction or deterioration in the extent or continuity of aspen, spruce fir, Douglas fir, or mature pinyon/juniper woodland communities would help maintain these vegetation communities (Table 2-5 Record 8).

Clearing of commercial woodlands attributable to oil and gas activities would be limited to 450 acres per decade (Table 2-15 Record 9) and older forest stands would be managed to preserve existing old growth (Table 2-15 Record 7). This could reduce the extent of surface disturbance and indirectly maintain these existing vegetation communities and control the spread of noxious and invasive plant species in these areas. Together these management actions would reduce the vegetation disturbance and associated impacts in aspen, Douglas-fir, spruce-fir, deciduous shrub communities, and older forest stands.

To meet identified wildlife objectives several management actions would be applied to vegetation disturbance related to oil and gas development. In sagebrush communities, cumulative vegetation disturbance in suitable sage-grouse nest habitat or within 2 miles of a lek would be limited to no more than 10 percent and disturbances could not exceed 200 feet in width (Table 2-6 Record 16). Restricting treatment of sagebrush in big game winter ranges (Table 2-4 Record 4) and avoiding sage-grouse habitat with specified components (Table 2-6 Record 17) would reduce the likelihood of surface occupancy, long term conversion or adverse modification in these plant communities.

BLM_0019844

Occupied sage-grouse ranges and brood ranges may be subject to specific reclamation measures to re-establish identified sagebrush plant community components (Table 2-6 Records 20 and 21) which could potentially help more fully restore these communities.

Management actions for ACECs that have known and potential habitat for federal listed, proposed, candidate and the BLM sensitive plant species, would limit motorized travel to designated roads and trails; undesignated roads or trails would be abandoned and reclaimed (Table 2-10 Record 9). These actions would limit to a minor extent vegetation disturbances in these areas. Identified conservation measures such as special rehabilitation/revegetation measures (Table 2-9 Record 15) and vegetation management actions for specific wildlife habitat areas (Table 2-9 Record 11) could also be applied, indirectly benefiting vegetation communities in these areas.

Applying COAs to land use authorizations, permits, and leases to mitigate impacts on visual resources (Table 2-14 Record 3) could reduce surface disturbance and maintain existing vegetation conditions and plant communities. Additional ROW corridors could be designated on public lands (Table 2-20 Record 7) allowing additional linear disturbance within the Planning Area but new communication sites would be limited to existing sites (Table 2-20 Record 4).

### Reclamation

Reclamation would be required such that identified plant community objectives would be met (Table 2-3 Record 12) but there would be no specific management action requiring specific reclamation or establishing specific success criteria as there would be under the other alternatives (Table 2-3 Record 15). Under this alternative throughout the Planning Area approximately 2,300 acres would be reclaimed by the end of year 20. Within the MPA the total possible disturbance would be 6,300 acres with reclamation occurring on 2,200 acres by year 20, reducing the vegetation loss to around 4,100 acres. Adequate reestablishment of desirable vegetation to return the utility of reclaimed areas would generally be expected by the seventh year after a site was originally disturbed (Table 4-7). Reclamation success would not have a minimum success criteria percentage for cover or composition but would be expected to achieve a stable DPC in relation to site potential or specified wildlife habitat objectives (Table 2-3 Record 18). There would be no requirements for quantitative measures to determine success or for reporting reclamation status as there would be under the other alternatives.

The use of non-native naturalized plant species would be limited to at-risk and unhealthy sites (Table 2-3 Record 17) or to cases where the effects of using non-local native species have been evaluated and mitigated (Table 2-21 Record-17). The ecological integrity of reclaimed sites could be reduced over the long term if aggressive non-native naturalized plant species are used for reclamation such as in the following areas: outside of special designation areas (Table 2-3 Record 17), within special management areas (Table 2-21 Record 17), and within remnant vegetation associations (Table 2-3 Record 29).

Stipulations that impose timing limitations for construction, drilling, and completion (Table 2-4 Record 12, Table 2-9 Record 30) could extend the timeframe before Phase II reclamation could be implemented, increasing the opportunity for noxious and invasive weeds to establish on the site. Special reclamation measures would be applied when disturbance occurs in aspen, Douglas-fir, spruce-fir, and deciduous shrub communities (Table 2-4 Record 17 and Table 2-6 Record 15), where necessary to restore sage-grouse habitat (Table 2-6 Record 1 and Table 2-6 Record 20), areas with mapped prairie dog towns (Table 2-9 Record 15), or areas with identified visual resource concerns (Table 2-14 Record 3) potentially increasing the complexity or cost of reclamation in these areas.

BLM_0019845

No specific management actions for prevention, control, or treatment of noxious weeds and invasive plants are proposed under Alternative A, however maintaining weed-free zones (common to all alternatives), applying reclamation measures, and other management actions specific to other resources to reduce surface disturbance, would reduce the establishment and spread of weeds.

### 4.3.1.3   Alternative B

**Impacts from Oil and Gas Development**

Direct and indirect effects on vegetation communities from surface-disturbing activities associated with oil and gas development would be similar to those described in the Impacts from Oil and Gas Development (Common to All) section and Alternative A, but impacts would increase relative to Alternative A due to the increased surface disturbance expected in association with the increased number of proposed well pads. Alternative B includes oil and gas exploration and development of approximately 1,100 well pads (Table 2-1 Record 13) resulting in 13,200 acres of disturbance over the 20-year planning period. This represents approximately 550 more pads and 6,600 acres more surface disturbance compared to Alternative A resulting in more cumulative disturbance under Alternative B. Conversely, more stringent reclamation requirements and management actions, discussed in the Impacts from Management Actions section below, would reduce the impacts from each surface disturbance to a greater extent than Alternative A.

Throughout out the entire Planning Area impacts from limiting surface disturbance would be similar to Alternative A, except under Alternative B, the number of acres managed with NSO stipulations increases to 757,200 acres in the Planning Area (Table 2-17 Record 18) and would prevent surface development on 600,100 more acres of land base compared to Alternative A.

Specific to the MPA Alternative B includes oil and gas exploration and development of approximately 1,045 well pads with associated roads, pipelines and infrastructure in the MPA over the 20 year planning period (Table 4-48 Line 6). Under Alternative B more NSO stipulations and effective NSO stipulation areas would apply reducing the number of acres in the MPA where surface disturbance could be permitted to 284,600 acres (Table 4-48 Line 4), a reduction of approximately 30 percent of the available land base as compared to Alternative A. In those areas open to development there would be an average of one pad on every 340 acres, compared to one pad to every 1,000 acres under Alternative A resulting in a denser distribution of well pads in some vegetation communities relative to Alternative A, if all planned development occurs. Surface disturbance activities that impact vegetation would be allowed in some areas when exceptions, modifications, or waivers (fewer than under Alternative A) to NSO stipulations are applied and in areas with CSU stipulation provisions as discussed below.

A temporal analysis was conducted for the MPA to assess plant community acres potentially affected by surface disturbance and the results of this analysis for Alternative B are displayed in Table 4-48. An estimated 12,500 acres (Table 4-48 Line 7) of land would be disturbed over the 20-year planning period for the development of 1,045 well pads (Table 4-48 Line 6). Surface disturbance from oil and gas development estimated during the 20 year planning period in each vegetation community would range from 48 acres (salt desert plant community) up to 500 5,500 acres (pinyon/juniper), with surface disturbance twice that of Alternative A (Table 4-48 Line 7) if all the well pads were developed. Approximately 5,200 acres would be reclaimed during the 20-year planning period reducing the overall vegetation loss within the MPA to around 5,120 acres. An additional 2,200 acres would be reclaimed throughout the six years following the 20-year planning period further reducing vegetation loss.

BLM_0019846

---

**Chapter 4 – Environmental Consequences**

---

Of the 1,045 well pads projected in the MPA, 351 of them could be constructed in sagebrush plant communities, 455 in pinyon/juniper woodlands, 200 in mountain shrub communities, and 17 or less in each of the other vegetation communities (Table 4-48 Line 6). The number of well pads constructed would increase for most vegetation communities over that of Alternative A, with the number of pads in the three plant communities listed above nearly doubling. Table 4-48 indicates that one well pad would be constructed in riparian and wetland communities resulting in 1.1 percent disturbance of riparian vegetation class. This is a product of the proportional spatial analysis process. Surface disturbance would not be allowed in priority riparian and wetland communities based on a stipulation specific to Alternative B (Table 2-3 Record 20). This alternative has the most NSO stipulations to limit where development could occur. The higher number of well pads and the lower number of acres available for surface occupancy would result in less disbursed development in the areas of the MPA that are available for surface occupancy. In those areas open for development there would be an average of one pad for every 343 acres. A factor of the clustered development would be fewer miles of roads per pad, reducing associated dust production.

Surface disturbance by vegetation community over the 20-year planning period is depicted for Alternatives A and B in Figure 4-9 and depicts the overall increase in surface disturbance in each vegetation community for Alternative B compared to Alternative A. No surface occupancy stipulations under Alternative B reduce the area available for surface occupancy across all plant communities. The proportion of each plant community available for development within the MPA that could be developed during the 20-year planning period would range from 0.1 to 2.8 percent (Table 4-48 Line 8).

**Figure 4-9. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Community during the 20-yr Planning Period**



BLM_0019847

*Chapter 4 – Environmental Consequences*

### Table 4-48. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative B

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grass-lands | Grease-wood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sage-brush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25.2 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA[2] | Acres | 314,100 | 16,400 | 9,200 | 11,800 | 10,200 | 4,800 | 87,600 | 115,400 | 500 | 55,300 | 2,900 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 284,600 | 1,000 | 200 | 1,700 | 4,700 | 1,600 | 54,500 | 123,900 | 164 | 95,700 | 1,100 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 48 | 5 | 2 | 13 | 31 | 25 | 38 | 52 | 25 | 63 | 28 |
| 6 | Estimated Number of Well Pads[3] | --- | 1,045 | 3 | 1 | 6 | 17 | 6 | 200 | 455 | 1 | 351 | 4 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[4] | Acres | 12,500 | 36 | 12 | 72 | 204 | 72 | 2,400 | 5,460 | 12 | 4,212 | 48 |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period[5] | % | 2.1 | 0.2 | 0.1 | 0.6 | 1.4 | 1.1 | 1.7 | 2.3 | 1.1 | 2.8 | 1.2 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulation areas and effective NSO areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total available land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0019848

## Chapter 4 – Environmental Consequences

Fugitive dust from construction sites or generated by vehicles traveling on an estimated 800 miles of local and collector roads (Table 4-3) has potential to reduce the health and vigor of vegetation on approximately 58,200 acres of vegetation. Management actions described in the Impacts from Management Actions section below would influence where the disturbance occurs within most vegetation communities.

**Impacts from Management Actions**

Approximately 53,200 acres has been defined by the CPW as Restricted Development Areas. These areas are in the North Ridge, Yellow Creek and Sprague Gulch areas where development would only be allowed below defined thresholds (Table 2-4 Record 13) effectively reducing overall vegetation disturbance in those areas. No surface occupancy stipulations would reduce the opportunity for noxious weeds to establish and retain the functional condition of riparian/wetland vegetation in affected areas. Alternative A has no comparable measure. In general, NSO stipulations, especially those for soil and water resources would result in more development occurring in pinyon/juniper and sagebrush plant communities. Wide ridge tops, broad gently sloped valley bottoms and areas with slopes less than 35 percent would be the main areas where development could occur. Management actions that would minimize or prevent disturbance on fragile soils, landslide prone areas, and slopes greater than 35 percent would focus development in areas that are less prone to erosion and are more easily reclaimed. Development in these areas would potentially reduce reclamation costs and some longer-term impacts to vegetation resources. The following NSO stipulations would apply:

- Within 100 year flood plains, 500 feet of perennial water sources and riparian/wetland areas, or 100 feet of ephemeral channels (Table 2-2 Record 12);

- Within 100 feet of mapped landslide prone areas, including 49,800 acres (Table 2-2 Record 15), (Appendix A);

- Except for Coal Oil Basin, within 100 feet from mapped saline soils including 45,300 acres (Table 2-2 Record 16);

- Non-linear land use authorizations on 279,900 acres where natural slopes are greater than or equal to 35 percent (Table 2-2 Record 17);

- Priority riparian/wetland habitats (Table 2-3 Record 20);

- Remnant vegetation associations (630 acres) including ponderosa pine stands and unique or ecologically intact sagebrush communities (Table 2-3 Record 28);

- Federal mineral estate within all SWAs, totaling 15,900 acres (Table 2-4 Record 16);

- Within 1/8 mile of functional raptor nest sites or near active nest sites (Table 2-5 Record 11);

- Within 0.6 mile of sage-grouse lek sites encompassing 17,400 acres (Table 2-6 Record 18);

- 1,100 acres of 100 year flood plain on the White River below Rio Blanco Lake identified as critical or occupied habitat for federally listed fish species (Table 2-9 Record 18);

- Within 1/4 mile of functional nests of federally endangered, threatened, proposed, or candidate raptor species; or within 330 feet of abandoned bald eagle nests (Table 2-9 Record 28);

- Within 1/4 mile of bald eagle critical night roosts (Table 2-9 Record 29);

- Within 660 feet of occupied, suitable, and potential habitat for federally listed proposed or candidate plant species (Table 2-10 Record 15);

## Chapter 4 – Environmental Consequences

- Habitat for the BLM sensitive plants (Table 2-10 Record 16) including a 330 foot buffer;

- Within and adjacent to Mellen Hill cultural sites (360 acres) (Table 2-12 Record 13);

- Areas with Douglas-fir and aspen where slopes are greater than 25 percent (Table 2-15 Record 10);

- Lands managed as old growth (forest/woodland) and with high potential for old growth (Table 2-15 Record 12);

- The Meeker Special Recreation Management Area (Table 2-18 Record 5); and

- Areas identified as having wilderness characteristics, until a final determination is made during an RMP revision (Table 2-22 Record 7).

Under Alternative B there would be more than 2.5 times the number of miles of roads compared to Alternative A (Table 4-3). There would be approximately 58,200 acres of vegetation within 300 feet of construction sites or roads compared to 21,800 acres under Alternative A. Management actions designed to reduce impacts to the health and vigor of vegetation from dust or particulates from evaporation of produced water on vegetation are described below. Specific measures would reduce the potential for particulates from evaporation of produced water to effect vegetation are also described below. Outside of the MPA, fugitive dust control requirements would be the same as Alternative A. Within the MPA fugitive dust control requirements would increase to an 84 percent reduction for local and collector roads and an 80 percent reduction for resource roads (Table 2-1 Records 7 and 8). For areas within 330 feet of occupied, suitable, and/or potential habitat for special status plant species (Table 2-10 Record 17) an 80 percent reduction in fugitive dust would benefit other associated vegetation. Alternative A has no similar protective measure. In addition to the dust reduction measures required in Alternative A control methods would be required to prevent dust plumes (Table 2-1 Record 10), further controlling the amount of dust potentially affecting vegetation. Under this alternative evaporation of produced water would not be acceptable for disposing of produced water (Table 2-2 Record 22) and the BLM would prohibit evaporation ponds and or misters, for the disposal of produced water, on public land (Table 2-17 Record 10). Both of these actions would reduce the potential for particulates other than dust to affect vegetation.

Limiting use of oil and gas access roads to administrative use only (Table 2-19 Records 8 and 13) would slightly reduce dust production in those areas. Numbers of truck trips would be reduced with the requirement that ninety percent of well pads use three phase gathering systems (Table 2-1 Record 16), compared to 40 percent under Alternative A. Encouraging operators to pipe produced water and water to support construction, drilling and completion activities (Table 2-2 Records 18 and 19) could further reduce the number of truck trips per pad and associated dust production. Vegetation in, and within 660 feet of occupied, suitable, or potential habitat for special status plant species both inside and outside of ACECs would benefit from management actions that limit or preclude disturbance or vehicular travel (Table 2-10 Records 9 and 10), whereas under Alternative A this protection would only apply within ACECs. Management actions for lands with wilderness characteristics designed to retain that resource value (Table 2-22 Records 8, 9, 10, 11, and 12) would indirectly benefit vegetation resources by reducing disturbances in those areas.

Under this alternative there would be more management actions in place to prevent or reduce impacts to riparian systems compared to Alternative A. Reprioritization of riparian systems (Table 2-3 Record 19) would prevent surface and vegetation disturbance in priority riparian/wetland habitats (Table 2-3 Record 20), whereas under Alternative A, under some conditions disturbance could occur. Under Alternative B facilities or ROWs would be moved to avoid direct involvement of riparian systems (Table 2-7 Record 5) providing further protection to vegetation in these areas.

BLM_0019850

*Chapter 4 – Environmental Consequences*

Disallowing surface discharge of produced water that meets state standards for water quality (Table 2-3 Record 13) would eliminate a potential opportunity to supplement flows in affected perennial riparian systems or to allow temporary establishment of riparian vegetation in ephemeral drainages that currently lack adequate moisture to sustain obligate vegetation. More development restrictions (Table 2-2 Record 12) would apply and more definitive corrective actions would be required when surface disturbance negatively effects any riparian or wetland habitat compared to Alternative A (Table 2-3 Record 21). Application of COAs, specialized reclamation techniques, and restorative measures to promote and accelerate establishment of ground cover, and enhance vegetation expression would help restore vegetation in aquatic systems (Table 2-8 Records 3 and 4 and Table 2-9 Records 22, 23, and 24). Alternative A has no similar measures. Under Alternative B vegetation in riparian settings would benefit from the pursuit of agreements to increase stream flows (Table 2-8 Record 5 and Table 2-9 Record 25) compared to Alternative A that would only require meeting minimum flow requirements. Overall, application of these management actions would reduce impacts to priority and non-priority riparian areas to a greater degree than under Alternative A and would ensure that the functional condition of the riparian and wetland areas would be maintained.

Management actions would be applied to ensure the ecological health of rangelands. Operators would be required to manage oil and gas activities in a manner that does not allow negative impacts on upland health (as defined by Colorado Standards for Public Land Health for Uplands, Standard 1 (Table 2-2 Record 14). This would promote a higher degree of rangeland health than under Alternative A which only requires management that retains upland health. Under this alternative adjustments to oil and gas activities would be considered where oil and gas activity conflicts with grazing operations, and rangeland management objectives in terms of Public Land Health Standards, whereas under Alternative A, adjustments to ensure land health would be to allotment management and/or permitted AUMs (Table 2-16 Record 13). Management practices including habitat enhancement practices, restoration treatments (Table 2-4 Record 5), and off-site mitigation (Table 2-4 Record 15) could reduce impacts to ecological health under Alternative B where Alternative A has no such measures. Requiring the use of native seed for all reclamation (Table 2-3 Record 17) would benefit the ecological health of rangelands.

In ACECs (Table 2-21 Record 17) and RVAs (Table 2-3 Record 29) reclamation would require the use of locally collected seed or genetic stock to a greater extent than Alternative A. The use of sterile hybrids or sterile annual seral grasses is not addressed in Alternative A but would generally not be allowed (Table 2-3 Record 25) in Alternative B which would better retain the integrity and species composition of seeded sites. The BLM could utilize vegetation removal associated with oil and gas development and tailored reclamation to achieve numerous specific management objectives related to plant community improvement (Table 2-3 Record 16) not just to improve forage production as in Alternative A. Reclaiming redundant or unnecessary access roads (Table 2-19 Record 9) or other oil and gas features (Table 2-19 Record 10) would reduce overall disturbance to a minor degree. Alternative A has no similar requirements. These actions would aide in retaining the integrity and health of native plant communities and reduce the establishment of noxious or invasive weeds to a greater extent than Alternative A.

Where Alternative A would require special reclamation measures to be applied where disturbance is permitted in key vegetation types (e.g., Douglas-fir, Aspen, chokecherry, and mature pinyon/juniper and Gambel oak plant communities), under Alternative B any such areas would be aggressively avoided to the extent practical (Table 2-4 Record 17, Table 2-5 Record 8, Table 2-6 Record 15, Table 2-7 Record 5, and Table 2-15 Records 6 and 8) or where unavoidable, would require special reclamation COAs tied to identified management objectives (Table 2-6 Record 15). These

BLM_0019851

management actions would maintain the composition and seral stage of these communities to a greater degree than Alternative A. Relocating project facilities by 656 feet to avoid long-term reduction or deterioration in the extent or continuity of aspen, spruce fir, Douglas fir, or mature pinyon/juniper woodland communities (Table 2-5 Record 8) would help maintain these vegetation communities, the same as Alternative A.

Clearing of commercial woodlands attributable to oil and gas development would primarily be conducted in early and mid-seral areas and would be capped at 2,600 acres per decade (Table 2-15 Record 9); an increase of 2,150 acres per decade over that of Alternative A. This management action would help preserve the older age class woodlands which would indirectly maintain these vegetation communities over a larger area than Alternative A. An additional 600 acres along Yellow Creek and 960 acres east of the Duck Creek ACEC of habitat associated with special status plant species would benefit from additional stipulations and protections (Table 2-10 Record 13). These management actions would all reduce disturbance in the listed vegetation communities and reduce the spread of noxious weeds but would shift disturbance to other nearby, generally mountain shrub and sagebrush, plant communities.

Special restoration emphasis including adapted seed mixes, practices to accelerate plant community recovery, and habitat avoidance (Table 2-10 Record 9) or enhancement/compensation (Table 2-6 Records 6, 8, 13, 14, 19, 20, and 21) would be applied in greater sage-grouse habitat areas effectively protecting or expediting the return of function to those vegetation communities to a greater degree than under Alternative A. Additionally, varying disturbance caps (Table 2-6 Record 16) with buffers and avoidance measures would limit overall disturbance to vegetation in sage-grouse habitat areas to a greater extent than Alternative A. Unlike Alternative A there would be no special onsite rehabilitation/ revegetation measures required during lease development in areas with mapped prairie dog towns (Table 2-9 Record 15) but vegetation in these areas would be protected from the NSO stipulation addressed above (Table 2-9 Record 11).

Special stipulations or COAs, which could include vegetation treatments or reclamation actions, to protect visual resources would be extended beyond those identified in Alternative A to include areas surrounding communities (Table 2-14 Record 3) such as the special management areas (Table 2-18 Record 5), effectively protecting vegetation within those areas, protecting more overall vegetation than Alternative A. Under all alternatives Canyon Pintado NHD would be managed as an avoidance area for major new rights-of-way (Table 2-12 Record 5), which would maintain existing vegetation communities in those localized areas. Restricting oil and gas development within 1,000 feet of rock art or standing architecture such as cabins, rock structures, or standing wickiups could reduce surface disturbance and indirectly retain the existing quality of vegetation communities in those localized areas (Table 2-12 Record 17). Alternative A has no similar measures.

Re-routing a portion of the Designated Colorow-Greasewood Corridor for buried linear facilities would exclude the rugged Colorow segment and replace it with the gentler Crooked Wash segment shifting where associated disturbance could occur (Table 2-20 Record 5). Vegetation communities in these areas are similar. Encouraging smaller ROW widths (Table 2-20 Record 9) could on a project specific basis potentially reduce vegetation disturbance and reduce acres vulnerable to weed establishment. Prohibiting designation of new pipeline corridors (Table 2-20 Record 7) would reduce the potential for additional surface disturbance in these vegetation communities and would help retain existing seral condition; no such management action is proposed for any other alternative.

BLM_0019852

**Chapter 4 – Environmental Consequences**

**Reclamation**

Management actions related to vegetation would require reclamation that results in a functioning plant community that is capable of persisting on the reclaimed site without continued intervention to allow for successional processes progressing toward the identified climax community (Table 2-3 Record 15) decreasing long-term impacts to vegetation where Alternative A has no similar action. Of the possible 13,200 acres of disturbance throughout the Planning Area associated with this alternative approximately 5,400 acres would be reclaimed reducing the overall vegetation loss to around 7,800 acres. Within the MPA the total possible disturbance would be 12,500 acres with reclamation occurring on 5,400 acres reducing the vegetation loss to 7,200 acres at year 20. Reclamation success criteria would be based on site specific cover and composition data. Vegetation data gathered using the Assessment Inventory, and Monitoring (AIM) protocol (BLM TN 440) would provide clear, consistent measures for determining the DPC for reclamation success.

Reclamation would be required to achieve success criteria of 100 percent potential foliar cover and/or potential basal cover must be at least 50 percent of the DPC. In the absence of specified DPC data, the default minimum potential foliar cover must be 90 percent and/or potential basal cover must be 30 percent. Vegetative cover values for woodland or shrubland sites are based on the capability of those sites in an herbaceous state. The resulting plant community must contain at least five desirable plant species, at least three of which must be a forb or shrub, each comprising at least 5 percent relative cover. No one species may exceed 70 percent relative cover in the resulting plant community to ensure that site species diversity is achieved. (Table 2-3 Record 18, Appendix D) whereas there would be no specific reclamation success criteria set for Alternative A.

The more stringent success criteria would likely increase initial reclamation costs to operators. It would also increase the potential for natural succession of vegetation toward diverse stable plant communities over Alternative A and provide for a quantitative approach to measuring reclamation success as opposed to the qualitative methods described for Alternative A. Following the intent of Revised Onshore Order No. 1 regarding reclamation requirements (Table 2-17 Record 9) including final reclamation of abandoned wells and access roads (Table 2-17 Record 11), requiring Concentrated Development Plans (Table 2-17 Record 12) and where permitted, year round drilling, would all promote more timely and effective reclamation allowing adequate reestablishment of desirable vegetation to return the utility of reclaimed areas by generally the sixth year after a site was originally disturbed (Table 4-4); one year sooner than the timeframe expected under Alternative A. Adhering to disturbance thresholds in GMUs and sage-grouse habitat would allow for continuous drilling and could localize surface disturbance and decrease the time between initial disturbance and initiation of interim reclamation (Table 2-4 Record 12; Table 2-6 Record 16).

Excluding livestock from oil and gas related disturbances (Table 2-16 Records 11 and 12) would improve reclamation success by preventing grazing stress to young plants as they establish. Requiring pad footprints be adapted to match topography (Table 2-17 Record 19) and requiring long-term facilities to be situated on the access-road side of the pad (Table 2-17 Record 8) would all improve reclamation by allowing larger extents of pads to be revegetated for the duration of the production phase. Additional special soil reclamation actions would be applied in areas of suitable habitat for special status plant species under this alternative (Table 2-10 Record 11) to expedite the return of late seral vegetation conditions. In areas identified as having wilderness characteristics, reclamation actions could include establishment of woody vegetation (Table 2-22 Record 12). This management action would accelerate seral progression where applied. Under this alternative, application of additional reclamation activities would promote improved conditions for succession of vegetation communities toward the PNC or the DPC compared to the other alternatives and

BLM_0019853

*Chapter 4 – Environmental Consequences*

would provide a better approach to measuring reclamation success than the qualitative methods for Alternative A (Table 2-3 Record 26).

Several management actions for noxious weeds and invasive plants are proposed specifically for Alternative B and would provide more stringent and effective weed management and control than Alternative A through requirements for weed inventories, weed management plans, vehicle and equipment washing, and the use of weed free seed and mulches (Table 2-3 Record 24). Additionally noxious weeds on the Colorado Department of Agriculture's State Weed List A would be eliminated; noxious weeds on the Colorado Department of Agriculture's State Weed B and C Lists would be controlled; and the spread of invasive species within the permitted area of direct and indirect use would be controlled and prevented (Table 2-3 Record 24). Noxious weeds would be controlled to reduce their presence to a level that would not impair revegetation efforts (Table 2-3 Record 23). Prioritization of weed treatment and control methods (Table 2-10 Record 8) would improve weed control in areas associated with special status plants. In addition, several COAs would be attached to land use authorizations, which would reduce the establishment and spread of noxious weeds and invasive plants during surface disturbing activities and reclamation. Under Alternative B application of the most current reclamation standards and practices to existing leases (Table 2-4 Record 9) and the application of more stringent requirements associated with reclamation, weed control, and requiring special revegetation measures would all improve the success of revegetation efforts by reducing the establishment of noxious and or invasive weeds. Overall, application of these measures would result in better ecological site conditions for vegetation communities and better recovery from disturbances relative to Alternative A. These measures would likely also increase the initial cost and complexity of reclamation but would likely reduce future weed treatment costs.

### 4.3.1.4   Alternative C

**Impacts from Oil and Gas Development**

Direct and indirect effects on vegetation communities from surface-disturbing activities associated with oil and gas development would be similar to those described above in the Impacts from Oil and Gas Development (Common to All) section but would increase relative to Alternatives A and B due to the increased surface disturbance expected in association with the higher number of well pads anticipated. Alternative C includes oil and gas exploration and development of approximately 1,800 well pads throughout the Planning Area (Table 2-1 Record 13) resulting in 21,600 acres of disturbance over the 20-year planning period. This represents over three times the number of pads of Alternative A, and about 1.6 times that of Alternative B. Impacts to vegetation would increase relative to Alternatives A and B due to the increased surface disturbance with the expected higher number of well pads.

Throughout the Planning Area effects of limiting surface disturbance through application of NSO stipulations would be similar to Alternatives A and B and would shift impacts to areas that are not protected by surface use stipulations. Under Alternative C the number of acres in the Planning Area managed with NSO stipulations would be 387,600 acres (Table 2-17 Record 18) and would restrict development on 230,500 more acres compared to Alternative A and 369,600 acres less compared to Alternative B. Management actions to reduce surface impacts are less stringent under Alternative C than those of Alternative B but more restrictive than those of Alternative A and are discussed in the Impacts from Management Actions section below.

Specific to the MPA, Alternative C includes oil and gas exploration and development of approximately 1,710 well pads with associated roads, pipelines and infrastructure in the MPA over

BLM_0019854

**Chapter 4 – Environmental Consequences**

the 20 year planning period (Table 4-49 Line 6). No surface occupancy stipulations and effective NSO stipulation areas would result in a total of 406,000 acres of the MPA being available for surface disturbance (Table 4-49 Line 4). This is 16 percent fewer acres available where development could occur compared to Alternative A and 26 percent more than Alternative B. In those areas open to development there would be an average of one pad every 261 acres compared to every 340 acres under Alternative B and every 1,017 acres under Alternative A.

A temporal analysis was conducted to assess plant community acres potentially affected by surface disturbance and the results of that temporal analysis for Alternative C are displayed in Table 4-49. An estimated 20,500 acres (Table 4-49 Line 7) of land would be disturbed over the 20-year planning period for the development of 1,710 well pads (Table 4-49 Line 6). Surface disturbance from oil and gas development within the MPA estimated during the 20-year planning period in each vegetation community would range from 12 acres (riparian and wetlands) to 8,900 acres (pinyon/juniper), with potential surface disturbance being three times that of Alternative A and 1.6 times that of Alternative B if all the well pads were developed. Approximately 7,700 acres would be reclaimed during the 20-year planning period reducing the overall vegetation loss to around 12,800 acres. An additional 4,300 acres would be reclaimed throughout the six years following the 20-year planning period further reducing vegetation loss.

Of the projected well pads in the MPA, 496 could be constructed in sagebrush communities, 743 in pinyon/juniper woodlands, 378 in the mountain shrub communities, and 38 or less in each of the other vegetation communities (Table 4-49 Line 6). The number of well pads constructed would increase from that of both Alternatives A and B for each of the vegetation communities. Table 4-49 indicates that one well pad would be constructed in riparian and wetland areas, which would be an increase over Alternatives A and B. However, surface-disturbing activities would be avoided in riparian and wetland areas if the action would degrade the condition of these communities.

Surface disturbance by vegetation community over the 20-year planning period is depicted for Alternatives A through C in Figure 4-10 and shows the overall increase of surface disturbance in each vegetation community for Alternative C relative to Alternatives B and A. The proportion of each plant community available for development within the MPA that could be developed during the 20-year planning period would range from 3.9 (sagebrush) to 40.1 percent (conifer) (Table 4-49 Line 8). There are fewer acres of every plant community available for development than under Alternative A. Conversely, with the exception of conifer plant communities, there are more acres available for development in all plant communities than under Alternative B, indicating fewer management actions to limit development in these areas.

Fugitive dust from construction sites or generated by vehicles traveling on an estimated 1,300 miles of local and collector roads (Table 4-3) has potential to reduce the health and vigor of vegetation on approximately 94,550 acres of vegetation. Management actions described in the Impacts from Management Actions section below would influence where the disturbance occurs within most vegetation communities. Surface disturbance would be allowed in some areas with exceptions, modifications, or waivers to NSO stipulations and in areas open with standard stipulations or CSU stipulation provisions as discussed below.

Chapter 4 – Environmental Consequences

**Table 4-49. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative C**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grasslands | Greasewood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sagebrush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Alternative C | | | | | | | |
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA [2] | Acres | 192,700 | 16,300 | 9,300 | 8,800 | 5,800 | 2,200 | 52,500 | 62,900 | 380 | 33,200 | 1,400 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 406,000 | 1,100 | 143 | 4,700 | 9,100 | 4,200 | 89,600 | 176,400 | 283 | 117,700 | 2,600 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 68 | 6.2 | 1.5 | 34.7 | 61.4 | 65.4 | 63.1 | 73.7 | 42.6 | 78 | 64.9 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 | 5 | 1 | 20 | 38 | 18 | 378 | 743 | 1 | 496 | 11 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 20,500 | 60 | 12 | 240 | 456 | 216 | 4,536 | 8,916 | 12 | 5,952 | 132 |

BLM_0019856

**Table 4-49. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative C**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Alternative C** | | | | | | | | | | |
| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grasslands | Greasewood | Mountain Shrub | Pinyon/Juniper | Riparian and Wetlands | Sagebrush | Salt Desert |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period [5] | % | 3.4 | 0.3 | 0.1 | 1.8 | 3.1 | 3.3 | 3.2 | 3.7 | 2.23 | 3.9 | 3.3 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulation areas and effective NSO areas for MPA are for all resources. NSO stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total available land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0019857

Under Alternative C there would also be 1,697,500 acres of the BLM federal oil and gas mineral estate open to oil and gas leasing (Table 2-17 Record 18) subject to similar but generally less stringent lease stipulations compared to Alternative B. No surface occupancy stipulations would apply on approximately 387,600 acres, which is about half as many acres as in Alternative B but still three times more acres than Alternative A. Under Alternative C there are more exceptions, modifications, or waivers (Appendix A) that could be applied, allowing surface disturbance to occur. Overall, the management of oil and gas development activities under Alternative C would need to limit development to reduce negative impacts to upland health (Table 2-2 Record 14). This is less stringent than Alternative B but generally more restrictive than Alternatives A and D that would allow negative impacts as long as upland health is largely retained.

**Figure 4-10. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Community during the 20-yr Planning Period**



**Impacts from Management Actions**

Restricted Development Areas as defined by the CPW would apply to 36,700 acres in the North Ridge and Yellow Creek areas only; the 16,500 acres in Sprague Gulch area included in Alternative B would not be covered by this restriction (Table 2-4 Record 13) and Alternative A has no comparable measure. As with Alternative B, NSO stipulations would retain existing vegetation, reduce the opportunity for noxious weeds to establish, and retain the functional condition of riparian/wetland vegetation in affected areas. Similarly NSO stipulations, especially those for soil

*Chapter 4 – Environmental Consequences*

and water resources would shift disturbances to pinyon/juniper and sagebrush plant communities though to a lesser extent because development could be permitted on steeper slopes as described below. Development would still be likely on broad ridge tops, and wide valley bottoms. The following NSO stipulations would apply:

- Landslide-prone areas would be a 50 foot buffer compared to a 100 foot buffer under Alternative B (Table 2-2 Record 15);

- Except for Coal Oil Basin, on 45,300 acres of saline soils (Table 2-2 Record 16) unless an exception or modification was granted, this NSO lacks the 100 foot buffer included in Alternative B;

- Non-linear land use authorizations on 123,300 acres where natural slopes are greater than or equal to 50 percent (Table 2-2 Record 17) unless an exception, modification or waiver was granted opening up approximately 252,000 more acres than Alternative B on slopes between 35 and 50 percent;

- Remnant vegetation associations (630 acres) including ponderosa pine stands and unique or ecologically intact sagebrush communities (Table 2-3 Record 28) unless an exception modification or waiver was granted, identical to Alternative B;

- Federal mineral estate within the Oak Ridge, Square S Summer Range unit of Piceance Creek and Jensen SWAs (Table 2-4 Record 16) unless an exception, modification, or waiver was granted, where all SWAs were protected under Alternative B, a difference of 700 acres;

- Within 1/8 mile of functional nest sites or near active nest sites of raptors that are not special status species, encompassing 57,000 acres less than Alternative B, and as for Alternative B exceptions, modifications, or waivers could be granted (Table 2-5 Record 11);

- Within 0.6 mile of sage-grouse lek sites encompassing 17,300 acres but under this alternative exceptions could be granted with identified COAs (Table 2-6 Record 18);

- Within 100 year flood plain on the White River below Rio Blanco Lake (1,100 acres) of identified as critical or occupied habitat for federally listed fish species (Table 2-9 Record 18), exceptions could be granted;

- Within 1/4 mile of functional nests of federally endangered, threatened, proposed, or candidate raptor species or within 330 feet of abandoned bald eagle nests (Table 2-9 Record 28), unlike Alternative B exceptions could be granted;

- Within 1/4 mile of bald eagle critical night roosts (Table 2-9 Record 29), unlike Alternative B exceptions could be granted;

- Occupied, suitable, and potential habitat for federally listed proposed or candidate plant species (Table 2-10 Record 15) where geography and other resource concerns allow with an additional 660 foot buffer, unlike Alternative B, including future surveyed habitat, exceptions could be granted;

- Habitat for the BLM sensitive plants (Table 2-10 Record 16) including a 330 foot buffer, unlike Alternative B exceptions could be granted;

- Thornburgh/Battle of Milk Creek cultural site area (Table 2-12 Record 12), identical to Alternative B;

- Approximately 360 acres within and adjacent to Mellen Hill cultural sites (Table 2-12 Record 13) identical to Alternative B; and

BLM_0019859

- Douglas-fir and aspen where slopes are greater than 25 percent (Table 2-15 Record 10) unless an exception was granted.

Under Alternative C the following areas would have surface use stipulations but to varying lesser degrees of protection than under Alternative B. Where identified, lands with wilderness characteristics would have several management actions (Table 2-22 Record 6-11) to help retain supplemental values. Vegetation resources would generally benefit from these management actions that reduce impacts to wilderness characteristics. There would be no surface use restrictions for fragile soils on slopes greater than 35 percent, approximately 382,700 acres, as would be required under the other alternatives (Table 2-2 Record 9). Disturbance could be permitted on approximately 77,400 acres of land identified as 100 year flood plains or within 500 feet of perennial water sources and riparian/wetland areas or within 100 feet of ephemeral channels with CSU stipulations applied compared to being NSO areas under Alternative B (Table 2-2 Record 12). Similar to Alternative A, surface disturbing activities would be avoided in riparian and wetland habitats rather than prohibited (Table 2-3 Record 20). Areas with old growth forest and woodland stands would be avoidance areas (Table 2-15 Record 7) versus exclusion areas under Alternative B. Additionally lands managed as old growth (forest/woodland) and with high potential for old growth would be CSU stipulation (Table 2-15 Record 12) compared to an NSO stipulation under Alternative B. The three special management areas encompassing approximately 7,700 acres would be available to oil and gas leasing with a CSU stipulation (Table 2-18 Record 5). Controlled Surface Use stipulations would have minimal influence on protecting vegetation resources as those stipulations generally only result in additional siting or design requirements for oil and gas development activities so vegetation at those sites would still be removed.

Under Alternative C there would be 1.5 times the number of miles of roads compared to Alternative B and more than four times the number of miles of roads compared to Alternative A (Table 4-3). There would be approximately 96,600 acres of vegetation within 300 feet of construction sites or roads compared to 58,200 acres for Alternative B and 21,800 acres for Alternatives A. Management actions designed to directly reduce amount of dust produced, indirectly reducing its impacts to the health and vigor of vegetation are similar to those described in Alternative B. The following measures are the same as Alternative B: Outside of the MPA fugitive dust control requirements would be the same as Alternative A. Within the MPA fugitive dust control requirements would increase to an 84 percent reduction for local and collector roads and an 80 percent reduction for resource roads (Table 2-1 Records 7 and 8). For areas within 330 feet of occupied, suitable, and/or potential habitat for special status plant species an 80 percent reduction in fugitive dust would benefit associated vegetation where Alternative A would have no such measure (Table 2-10 Record 17). In addition to the dust reduction measures required in Alternative A, control methods would be required to prevent dust plumes, further controlling the amount of dust potentially affecting vegetation (Table 2-1 Record 10). Limiting use of oil and gas access roads to administrative use only would slightly reduce dust production in those areas (Table 2-19 Records 8 and 13). Evaporation facilities for disposal of produced water would not be permitted on public lands reducing the potential for particulates other than dust to affect vegetation (Table 2-2 Record 22 and Table 2-17 Record 10). Encouraging piping of produced water and water to support construction, drilling and completion activities (Table 2-2 Records 18 and 19) could further reduce the number of truck trips per pad and associated dust production. Vegetation in, and within 660 feet of occupied, suitable, or potential habitat for special status plant species both inside and outside of ACECs would benefit from management actions that limit or preclude disturbance or vehicular travel (Table 2-10 Records 9 and 10), whereas under Alternative A this protection would only apply within ACECs.

BLM_0019860

*Chapter 4 – Environmental Consequences*

Under Alternative C the numbers of truck trips would be reduced with the requirement that eighty percent of well pads use three phase gathering systems (Table 2-1 Record 16), compared to 90 percent under Alternative B and 40 percent under Alternative A. Overall management actions under this alternative would result reductions in the production and accumulation of fugitive dust and its potential impacts to vegetation health and vigor to a greater degree than Alternative A but less than Alternative B. Where the number of miles of roads would be 1.5 times that of Alternative B, the effects on vegetation from dust would be expected to be greater.

Management actions would minimize impacts to riparian systems to a lesser extent than Alternative B but to a greater extent than Alternative A, where under some conditions disturbance could occur. Riparian systems would be reprioritized according to risk factors associated with oil and gas activities, as under Alternative B (Table 2-3 Record 19) and would be avoided through application of management actions, as described below. Local or collector roads could potentially be constructed in these areas to support oil and gas activities; however, management actions would preclude negative impacts to riparian and wetland areas. Under this alternative, with application of CSU stipulations, disturbance could be permitted in places where it could affect vegetation associated with riparian/wetland settings (Table 2-2 Record 12) compared to Alternative B where those areas would fall under NSO stipulations. Under Alternative C facilities or ROWs would be moved to minimize direct involvement of riparian systems (Table 2-7 Record 5), where under Alternative B direct involvement would be avoided. Disallowing surface discharge of produced water that meets state standards for water quality for new projects (Table 2-3 Record 13) would eliminate a potential opportunity to supplement flows in affected perennial riparian systems or to allow temporary establishment of riparian vegetation in ephemeral drainages that currently lack adequate moisture to sustain riparian vegetation. Surface-disturbing activities would be avoided in priority riparian habitats, unless activities would not degrade or forestall attainment of the proper functioning condition of these areas, whereas they would not be allowed under Alternative B and could be allowed under some conditions under Alternative A (Table 2-3 Record 20). Relocation of surface disturbing activities outside wetland habitat would be required if such activities were found to be negatively affecting riparian or wetland habitat only if mitigation does not effectively minimize impacts (Table 2-3 Record 21).

Similar though to a lesser extent than Alternative B, application of COAs, specialized reclamation techniques, and restorative measures to promote and accelerate establishment of ground cover, and enhance vegetation expression would help restore vegetation in aquatic systems (Table 2-8 Records 3 and 4 and Table 2-9 Records 22, 23, and 24) where Alternative A has no similar measures. Under Alternative C vegetation in riparian settings would benefit from the pursuit of agreements to increase stream flows (Table 2-8 Record 5 and Table 2-9 Record 25) but again to a lesser extent than Alternative B. Alternative A would only require meeting minimum flow requirements. Overall, application of these management actions under Alternative C would reduce impacts to riparian areas to a greater degree than under Alternative A but to a lesser degree than under Alternative B. The management actions would still ensure the maintenance of functional condition of the riparian and wetland areas.

Management actions would be applied to ensure the ecological health of rangelands. Operators would be required to manage oil and gas activities in a manner that limits and/or reduces negative impacts on upland health as defined by Colorado Standards for Public Land Health for Uplands, Standard 1 (Table 2-2 Record 14). This would promote a higher degree of rangeland health than under Alternative A, but a lesser degree than Alternative B where negative impacts would not be allowed. Allotment management and/or permitted AUMs would be adjusted where oil and gas activity conflicts with grazing operations, Public Land Health Standards, and rangeland

BLM_0019861

*Chapter 4 – Environmental Consequences*

management objectives (Table 2-16 Record 13), as under Alternative A. Thus, allotment management, rather than oil and gas development (as under Alternative B), would be adjusted to prevent conflicts or negative effects to rangeland resources. Management actions regarding communication site rights-of-way could result in greater disturbance to vegetation over Alternatives A and B if development of new commercial communication facilities increases based on a need to improve public safety and information transfer (Table 2-20 Record 4).

The following management actions are common to Alternatives B and C. Management practices including habitat enhancement practices, restoration treatments (Table 2-4 Record 5), and off-site mitigation (Table 2-4 Record 15) could be used to help reduce impacts to ecological health. Alternative A has no such measures. Native seed would be required in all reclamation unless otherwise specified (Table 2-3 Record 17) In ACECs (Table 2-21 Record 17) and RVAs (Table 2-3 Record 29) reclamation would require the use of locally collected seed or genetic stock to a greater extent than Alternative A. The use of sterile hybrids or sterile annual cereal grasses is not addressed in Alternative A but would generally not be allowed (Table 2-3 Record 25) which would better retain the integrity and species composition of seeded sites. The BLM could utilize vegetation removal associated with oil and gas development and tailored reclamation to achieve numerous specific management objectives related to plant community improvement (Table 2-3 Record 16) to a greater extent than Alternative A. Reclaiming redundant or unnecessary access roads (Table 2-19 Record 9) or other oil and gas features (Table 2-19 Record 10) would reduce overall disturbance to a minor degree. Alternative A has no similar requirements. These actions would aide in retaining or restoring the integrity and health of native plant communities to a greater extent than Alternative A but to a lesser extent than Alternative B.

Maintaining the extent and continuity of aspen, Douglas fir, spruce fir, arborescent stands of Gambel oak and deciduous shrub communities through relocation of oil and gas related surface disturbance (Table 2-4 Record 17) would maintain composition and seral stage of these communities more than Alternative A but to a lesser extent than Alternative B. Relocating project facilities by 656 feet to avoid long-term seral or type conversion, reduction, deterioration in the extent or continuity of aspen, spruce-fir, Douglas fir, or mature pinyon/juniper woodland communities (Table 2-5 Record 8 and Table 2-6 Record 15) would help maintain these vegetation communities, as under Alternatives A and B. Facility and ROW siting could be adjusted slightly to minimize impacts to high value habitats (aspen, conifer, riparian, mature pinyon/juniper, and sagebrush (Table 2-7 Record 5), which could indirectly benefit these vegetation communities, but to a lesser degree than Alternative B. As in Alternative B, vegetation in mature pinyon/juniper woodland communities and existing old growth forest and woodlands stands would be preserved when proposed new pipelines through these areas would be required to be located within previously disturbed areas (Table 2-15 Record 6). Alternative A has no such action.

Clearing of commercial woodlands for oil and gas activities would be limited to 4,200 acres per decade (Table 2-15 Record 9), nearly twice the amount under Alternative B and nearly ten times that of Alternative A. Management of old-growth areas and areas with high potential for old-growth characteristics with a CSU stipulation (Table 2-15 Record 12) would reduce disturbance and/or retain old-growth characteristics relative to Alternative A, but would be less restrictive than Alternative B. Exceptions could be granted to NSO stipulations in areas with Douglas fir and aspen on slopes greater than 25 percent (Table 2-15 Record 10), potentially allowing more disturbance in these communities than under Alternative B. Unless exceptions were granted, ROWs granted in old growth forest and woodland stands would be required to stay within a 25-foot ROW (Table 2-15 Record 11), whereas no similar management action is required for the other alternatives.

BLM_0019862

**Chapter 4 – Environmental Consequences**

Special restoration emphasis including adapted seed mixes, practices to accelerate plant community recovery, and habitat avoidance (Table 2-10 Record 9) or enhancement/compensation (Table 2-6 Records 6, 8, 13, 14, 19, 20, and 21) would be applied in greater sage-grouse habitat areas effectively protecting or expediting the return of function to those vegetation communities similar to under Alternative B and to a greater degree than under Alternative A. Restricting surface occupancy and long-term conversion of sagebrush stands with greater than 50 percent canopy (Table 2-6 Record 17), and avoiding occupancy or removal of sagebrush cover within 660 feet of sage-grouse brood-rearing areas (Table 2-6 Record 19) would protect this vegetation community to a greater degree than Alternative A but to a lesser extent than Alternative B. Similar to Alternative A, lease development within mapped prairie dog towns would require special on-site revegetation measures or off-site habitat enhancement projects that would benefit vegetation resources (Table 2-9 Record 15), where Alternative B has no similar measure.

As under Alternative B stipulations or COAs, which could include vegetation treatments or reclamation actions to protect visual resources, would include areas surrounding communities as in Alternative B (Table 2-14 Record 3). Designating 7,700 acres in the three special management areas (Table 2-18 Record 5) would result in similar impacts to vegetation in localized areas as described for Alternative B, except that these acres available for leasing would be open to oil and gas development with an CSU stipulation (Table 2-18 Record 5) as opposed to an NSO stipulation. This could result in more surface disturbance and associated impacts to vegetation than under Alternative B. Impacts of managing the White River ERMA would be the same as for Alternative B (Table 2-18 Record 4). Under all alternatives Canyon Pintado NHD would be managed as an avoidance area for major new rights-of-way (Table 2-12 Record 4), which would maintain existing vegetation communities in those localized areas. Restriction of oil and gas development within 750 feet of rock art or standing architecture (Table 2-18 Record 5) could reduce surface disturbance and indirectly retain the existing quality of vegetation communities, but to a lesser degree than for Alternative B (1,000-foot restrictions), where Alternative A has no similar action.

As in Alternative B, a portion of the Designated Colorow-Greasewood Corridor for buried linear facilities would be re-routed Table 2-20 Record 5) but any overall effects to vegetation would remain. New pipeline corridors could be considered (Table 2-20 Record 7) potentially allowing more surface disturbance than under Alternative B that prohibits new pipeline corridors. Smaller ROW widths would still be encouraged (Table 2-20 Record 9) but placing pipelines under roadways (Table 2-20 Record 9) would likely occur to a lesser extent than Alternative B resulting in potentially increased areas of vegetation disturbance.

<u>Reclamation</u>

Management actions requiring reclamation would be the same as that proposed for Alternative B (Table 2-17 Records 9, 11, and 12) and would all promote more timely and effective reclamation. These actions would provide for adequate reestablishment of desirable vegetation to return the utility of sites (Table 2-3 Record 15) by generally the sixth year after a site was originally disturbed (Table 4-7); one year sooner than the timeframe expected under Alternative A and with more likelihood of success decreasing long-term impacts to vegetation similar to Alternative B. As under Alternative B reclamation success criteria would be based on site specific cover and composition data. Vegetation data gathered using the Assessment Inventory, and Monitoring (AIM) protocol (BLM TN 440) would provide clear, consistent measures for determining the DPC for reclamation success.

The number of acres requiring reclamation due to oil and gas development would be nearly twice that of Alternative B due to the increased number of well pads. Of the possible 21,600 acres of

BLM_0019863

*Chapter 4 – Environmental Consequences*

disturbance throughout the Planning Area associated with this alternative approximately 8,200 acres would be reclaimed reducing the overall vegetation loss to around 13,400 acres. Within the MPA the total possible disturbance would be 20,520 acres with reclamation occurring by year 20 on nearly 7,700 acres, reducing vegetation loss to 8,550 acres at year 20. Reclamation success criteria would be less stringent than under Alternative B but would still be based on cover and composition of the DPC as defined by the ecological site or in relation to the seed mix applied (Table 2-3 Record 18). Reclamation would be required to achieve success criteria of 80 percent potential foliar cover and/or potential basal cover must be at least 25 percent of the DPC. In the absence of specified DPC data, the default minimum potential foliar cover must be 70 percent and/or potential basal cover must be 20 percent. Vegetative cover values for woodland or shrubland sites are based on the capability of those sites in an herbaceous state. The resulting plant community must contain at least five desirable plant species, at least two of which must be a forb or shrub, each comprising at least 3 percent relative cover. No one species may exceed 70 percent relative cover in the resulting plant community to ensure that site species diversity is achieved. Similar to Alternative B the success criteria would result in increased potential for natural succession of vegetation communities over Alternative A and provide a quantifiable approach to measuring reclamation success rather than the qualitative methods described for Alternative A. Allowing success at a lower percentage of identified cover and composition would likely result in reclamation being deemed successful more often or possibly sooner than under Alternative B.

Application of additional reclamation activities (Table 2-10 Record 11 and Table 2-22 Record 12) would promote improved conditions for natural succession of vegetation communities in areas with special status plant species or lands with wilderness characteristics compared to Alternative A, and would be similar to that of Alternative B. Like Alternative B, Concentrated Development Plans would be required (Table 2-17 Record 12) and interim reclamation would be accelerated due to the big game and sage-grouse management actions (Table 2-4 Record 12; Table 2-6 Record 16), but to a lesser degree due to higher threshold levels for collective and acute effects.

Reclamation success would be improved as in Alternative B by excluding livestock from oil and gas related disturbances (Table 2-16 Records 11 and 12) and requiring that long-term facilities be situated on the access-road side of the pad (Table 2-17 Record 8). Benefits of adapted pad footprint configurations to both established vegetation and reclamation areas would be less than under Alternative B because this modification would only be encouraged instead of required (Table 2-17 Record 19). As under B special soil reclamation actions would be applied in areas of suitable habitat for special status plant species (Table 2-10 Record 11), to expedite the return of late seral vegetation conditions. Reclamation success would be quantitatively measured and reported the same as in Alternative B (Table 2-3 Record 26). Overall, the application of these reclamation measures would promote improved conditions for succession of vegetation communities toward the PNC or the DPC compared to Alternative A but to a lesser extent than under Alternative B.

The same management actions for prevention, treatment, and control of noxious weeds and invasive plants proposed for Alternative B would apply to Alternative C (Table 2-3 Records 23 and 24 and Table 2-4 Record 9) and would reduce the establishment and spread of noxious and invasive weeds during surface disturbing activities and improve the success of revegetation efforts to a greater extent than compared Alternative A that has no similar actions. Areas associated with Special Status plants would benefit from improved, prioritized weed treatment and control practices the same as in Alternative B (Table 2-10 Record 8). Similar to Alternative B, well access roads would generally be unavailable for public vehicular access but could be exceptions could be considered on a case-by-case basis (Table 2-19 Record 12), which could allow for more vehicle access and could increase the possibility of weed introduction/spread. Overall, weed control measures required in Alternative

BLM_0019864

C would result in better ecological site conditions for vegetation communities and better recovery from disturbances relative to Alternative A and similar to Alternative B. Initial costs and complexity of reclamation would likely be higher but would likely reduce the costs of future weed treatments.

### 4.3.1.5     Alternative D

**Impacts from Oil and Gas Development**

Direct and indirect effects on vegetation communities from surface-disturbing activities associated with oil and gas development would be similar to those described above in the Impacts from Oil and Gas Development (Common to All) section but impacts would be highest under this alternative due to increased number of proposed well pads and associated surface disturbance. Alternative D includes oil and gas exploration and development of approximately 2,556 well pads throughout the Planning Area resulting in approximately 30,700 acres of disturbance over the 20-year planning period. This represents 4.6 times the number of pads of Alternative A, about 2.3 times the number of pads of Alternative B and 1.4 times the number of pads of Alternative C and would result in increased impacts to vegetation resources.

Throughout the Planning Area impacts from limiting surface disturbance would be similar to the other alternatives, except that the areas with NSO stipulations would be less (Table 2-17 Record 18). The areas managed with NSO stipulations (257,100 acres) would be decreased relative to Alternatives B and C but increased relative to Alternative A. Where development is allowed to occur, disturbance to vegetation would be greatest under Alternative D due to the increased number of well pads anticipated. Management actions to reduce surface impacts are less stringent than those of Alternative B and C and are similar to those of Alternative A with some exceptions where they are more restrictive; and are discussed in the Impacts from Management Actions section below. As with the other alternatives, where surface use stipulations are applied impacts to vegetation resources from oil and gas development would shift to areas not protected by such surface use stipulations.

Specific to the MPA, Alternative D includes oil and gas exploration and development of approximately 2,428 well pads with associated roads, pipelines, and infrastructure in the MPA over the 20 year planning period (Table 4-7). Fewer NSO stipulations and effective NSO stipulations would apply, resulting in a total of 469,200 acres of the MPA (Table 4-50 Line 4) being available for surface disturbance. Under Alternative D there would be 6 percent fewer acres than Alternative A, 41 percent more acres than Alternative B and 12 percent more acres than Alternative C available where development could occur. If all planned development occurs the distribution of pads would be denser in areas available for development than under any of the other alternatives. In those areas open to development there could be an average of one pad every 206 acres compared to every 261 acres under Alternative C, every 340 acres under Alternative B, and every 1,000 acres under Alternative A. Denser development would result in a lower average number of miles of road for each well pad.

Results of the vegetation temporal analysis to assess plant community acres potentially affected by surface disturbance for Alternative D are displayed in Table 4-50. An estimated 29,100 acres (Table 4-50 Line 7) of land would be disturbed over the 20-year planning period for the development of 2,428 well pads (Table 4-50 Line 6). Surface disturbance from oil and gas development within the MPA estimated during the 20-year planning period in each vegetation community would range from 24 acres (riparian and wetlands) to 11,900 acres (pinyon/juniper), with surface disturbance being 4.6 times that of Alternative A, 2.3 times that of Alternative B, and 1.4 times that of Alternative C; Table 4-50 Line 7) if all the well pads were developed.

BLM_0019865

Approximately 9,400 acres would be reclaimed during the 20-year planning period reducing the overall vegetation loss to around 12,140 acres. An additional 7,640 acres would be reclaimed in the seven years following the 20-year planning period further reducing vegetation losses.

Of the projected well pads, 666 could be constructed in sagebrush shrub communities, 989 in pinyon/juniper woodlands, 567 acres in the mountain shrub communities, and 68 or less in each of the other vegetation communities (Table 4-50 Line 6). The number of well pads constructed would increase from that of Alternatives A, B, and C for all of the vegetation communities. Table 4-50 indicates approximately two well pads would be constructed in riparian and wetland communities, which would be an increase over the other alternatives. However, surface- disturbing activities would be avoided in riparian and wetland areas if the action would degrade the condition of these communities.

Surface disturbance by vegetation community over the 20-year planning period is depicted for Alternatives A through D in Figure 4-11 and shows the overall increase of surface disturbance in each vegetation community for Alternative D relative to Alternatives C, B, and A. The proportion of each plant community available for development within the MPA that could be developed during the 20-year planning period would range from 5.3 (sagebrush) to 1.6 percent (conifer) (Table 4-50 Line 8). There are fewer acres of every plant community available for development than under Alternative A. Relative to Alternatives B and C there are more acres available for development in all plant communities than under indicating fewer management actions to limit development.

BLM_0019866

*Chapter 4 – Environmental Consequences*

**Table 4-50. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative D**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grasslands | Greasewood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sagebrush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25.2 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA[2] | Acres | 129,500 | 4,300 | 6,900 | 8,400 | 4,000 | 1,300 | 32,600 | 48,200 | 320 | 22,300 | 1,200 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 469,200 | 13,100 | 2,500 | 5,100 | 10,900 | 5,100 | 109,500 | 191,100 | 340 | 128,700 | 2,800 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 78 | 76 | 27 | 38 | 73 | 79 | 77 | 80 | 51 | 85 | 70 |
| 6 | Estimated Number of Well Pads[3] | --- | 2,428 | 68 | 13 | 27 | 56 | 26 | 567 | 989 | 2 | 666 | 15 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[4] | Acres | 29,100 | 816 | 156 | 324 | 672 | 312 | 6,804 | 11,868 | 24 | 7,992 | 180 |

BLM_0019867

*Chapter 4 – Environmental Consequences*

## Table 4-50. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative D

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grasslands | Greasewood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sagebrush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period[5] | % | 4.9 | 4.7 | 1.6 | 2.4 | 4.5 | 4.9 | 4.8 | 5.0 | 3.2 | 5.3 | 4.4 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulation areas and effective NSO areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total available land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0019868

**Figure 4-11. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Community during the 20-yr Planning Period**



Fugitive dust from construction sites or generated by vehicles traveling on an estimated 1,800 miles of local and collector roads (Table 4-3) has potential to reduce the health and vigor of vegetation on approximately 130,900 acres of vegetation. Management actions described in the Impacts from Management Actions section below would influence where the disturbance occurs within most vegetation communities. Surface disturbance activities that impact vegetation would be allowed in some areas with exceptions, modifications, or waivers to NSO stipulations and in areas open with standard stipulations or CSU stipulation provisions as discussed below.

Under Alternative D there would be 1,251,200 acres of the BLM federal oil and gas mineral estate open to oil and gas leasing (Table 2-17 Record 18) subject to lease stipulations similar to Alternative A but generally less stringent than Alternatives B and C. There would be approximately 257,100 acres where NSO stipulations would apply, which would be approximately half as many acres Alternative C, one-third that of Alternative B but half again more than Alternative A. As under Alternative A, management of oil and gas development activities would be required to be done in a manner that retains upland health rather than as under Alternative B, where management would be required such that development does not allow negative impacts to upland health; or under Alternative C that limits or reduces negative impacts to upland health (Table 2-2 Record 14).

BLM_0019869

<u>**Impacts from Management Actions**</u>

As with the other alternatives, where NSO stipulations are applied for oil and gas development existing vegetation would be retained, opportunity for spread of noxious weeds would be reduced, and the current functional status of riparian and wetland areas would be retained. Where exceptions, modifications and waivers to NSO stipulations are granted vegetation disturbance could occur. Where enforced, NSO stipulations would shift where the disturbance occurs resulting in different impacts to vegetation resources. The following NSO stipulations would apply:

- Landslide-prone areas would be the same as in Alternative A; there would not be a 100 foot buffer for these areas as identified for Alternative B nor a 50 foot buffer as identified for Alternative C (Table 2-2 Record 15);

- Natural slopes greater than or equal to 50 percent on 114,300 acres (Table 2-2 Record 17), which is the same as Alternative C, opening up approximately 238,700 more acres than Alternative B on slopes between 35 and 50 percent, where Alternative A has no similar action;

- Remnant vegetation associations including ponderosa pine stands and unique or ecologically intact sagebrush communities (Table 2-3 Records 27 and 28), which is the same as Alternatives B and C, unless an exception modification or waiver was granted;

- As with Alternatives B and C, within the 100 year floodplain on the White River below Rio Blanco Lake (1,100 acres) of identified as critical or occupied habitat for federally listed fish species (Table 2-9 Record 18), but exceptions could be granted, where under Alternative B no exceptions could be granted and Alternative A has no similar action;

- On, and within an additional 660 foot buffer of, occupied, suitable, and potential habitat for federally listed proposed or candidate plant species including future surveyed habitat (Table 2-10 Record 15) and unlike Alternatives B and C, when applying the buffer there would be no consideration to geography or other resource concerns, and exceptions could be granted; and

- On habitat for the BLM sensitive plants (Table 2-10 Record 16), unlike Alternatives B and C that include 330 foot buffers and like Alternative C where exceptions could be granted.

Under Alternative D there would be nearly 1.5 times the number of miles of roads compared to Alternative C, over 2 times the number of miles compared to Alternative B, and 6 times the number of miles compared to Alternative A (Table 4-3). There would be approximately 130,900 acres of vegetation within 300 feet of construction sites or roads compared to 96,600 acres for Alternative C, 58,200 acres for Alternative B and 21,800 acres for Alternatives A. Where identified, lands with wilderness characteristics would have several management actions (Table 2-22 Record 6-10) to help retain that value. Vegetation resources would generally benefit from these management actions that reduce impacts to wilderness characteristics.

Management actions designed to reduce the amount of dust produced and indirectly reducing impacts to the health and vigor of vegetation are similar to those described for Alternatives B and C and are as follows: (1) Outside of the MPA fugitive dust control requirements would be the same as Alternative A. (2) Within the MPA fugitive dust control requirements would increase to an 84 percent reduction for local and collector roads and an 80 percent reduction for resource roads (Table 2-1 Records 7 and 8), which is the same as under Alternatives B and C. Alternative A has no similar protective measures. (3) Similarly control measures would be required to prevent dust plumes, further controlling the amount of dust potentially affecting vegetation (Table 2-1 Record 10). (4) For areas within 330 feet of occupied, suitable, and/or potential habitat for special

BLM_0019870

*Chapter 4 – Environmental Consequence*

status plant species at least a 50 percent reduction in fugitive dust would benefit associated vegetation but to a lesser extent than Alternatives B and C that required at least an 80 percent reduction in those areas (Table 2-10 Record 17). Alternative A has no such measures.

There would be no action limiting use of oil and gas access roads to administrative use only (Table 2-19 Records 8 and 13) as under Alternatives B and C. New linear ROWs in identified areas with wilderness character would be required to minimize impacts to that resource value, likely providing some immeasurable benefit to vegetation resources (Table 2-22 Record 11). Evaporation facilities could be allowed with mitigation on a case by case basis (Table 2-2 Record 22). Both actions would result in some potential localized affects to vegetation. Construction and use of evaporation ponds and or misters for disposal of produced water would not be permitted on public lands (Table 2-17 Record 10) reducing the potential for particulates other than dust to affect vegetation. As under alternative A, piping of produced water and water to support construction, drilling and completion activities (Table 2-2 Records 18 and 19) that could further reduce the number of truck trips per pad and associated dust production would only occur when operators chose to propose it, where both measures would be encouraged under Alternatives B and C. As under Alternatives B and C vegetation in suitable, or potential habitat for special status plant species both inside and outside of ACECs would benefit from management actions that limit or preclude disturbance or vehicular travel (Table 2-10 Record 9), whereas under Alternative A this protection would only apply within ACECs. This alternative lacks the 660 foot buffer to these areas that would apply under Alternatives B and C (Table 2-10 Record 10). Alternative A has no similar action.

Similar to Alternative B, the relative numbers of truck trips would be reduced with the requirement that ninety percent of well pads use three phase gathering systems (Table 2-1 Record 16), compared to 80 percent under Alternative C and 40 percent under Alternative A. Overall management actions under this alternative would result reductions in the production and accumulation of fugitive dust and its potential impacts to vegetation health and vigor. However because this alternative has the highest number of miles of roads the effects on vegetation from dust would be expected to be greatest too regardless of the control measures.

Similar to Alternative C, with application of CSU stipulations, disturbance could be permitted where it could affect vegetation associated with riparian/wetland settings (Table 2-2 Record 12) compared to Alternative B where those areas would fall under NSO stipulations and Alternative A that has no similar action. Riparian systems would be reprioritized according to risk factors associated with oil and gas activities, as under Alternatives B and C (Table 2-3 Record 19) and would be avoided through application of management actions which could result in development being shifted outside of the riparian area. As under Alternative A, there would be some conditions where disturbance could occur in riparian/wetland areas (Table 2-3 Record 20). Similar to Alternative A, allowing surface discharge of produced water that meets state standards for water quality for new projects (Table 2-3 Record 13) would provide opportunities to supplement flows in affected perennial riparian systems. Under Alternative D disallowing surface discharge that would convert ephemeral streams to intermittent or ephemeral would result in lost opportunity for allowing temporary establishment of riparian vegetation in drainages that currently lack adequate moisture to sustain obligate riparian vegetation. There are no management actions that would result in pursuit of acquisition of water rights to meet minimum in-stream flows as under Alternative A or to increase stream flows as under Alternatives B and C (Table 2-8 Record 5 and Table 2-9 Record 25), reducing opportunity to sustain or improve vegetation associated with riparian and wetland systems.

Surface-disturbing activities would be avoided in priority riparian habitats unless environmental analysis determined that the proposed activity would not degrade or prevent attainment of proper

BLM_0019871

functioning condition of the riparian area, and if the riparian areas could not be avoided, impacts could be mitigated to meet minimum objectives for the system (Table 2-3 Record 20). Where surface disturbance negatively affects riparian or wetland habitat remedial mitigation or relocation outside of the high and medium priority riparian habitat could be required (Table 2-3 Record 21).

Similar though to a lesser degree than Alternatives B and C, is the application of COAs, specialized reclamation techniques, and restorative measures to promote and accelerate establishment of ground cover, and enhance vegetation expression, which would benefit and help restore vegetation in aquatic and associated riparian systems (Table 2-8 Record 3 and Table 2-9 Records 22 and 23). Alternative A has no similar measures. There are no management actions that would result in application of cooperative restorative measures to benefit vegetation in both riparian and upland settings as provided for under Alternatives B and C (Table 2-8 Record 4 and Table 2-9 Record 24). In addition, under Alternative D there is no management action associated with migratory birds as there is for Alternatives B and C that would result in avoiding or minimizing siting facilities or ROWs where there would direct involvement of riparian systems (Table 2-7 Record 5). Overall, while the riparian management actions for Alternative D would reduce impacts they would result in less protection to riparian habitats than Alternatives B and C, and slightly more than under Alternative A.

Management actions would be applied to ensure the ecological health of rangelands. Operators would be required to manage oil and gas activities in a manner that retains upland health (as defined by Colorado Standards for Public Land Health for Uplands, Standard 1 (Table 2-2 Record 14), as under Alternative A, which could allow a lower level of rangeland health than under Alternatives B and C. Allotment management and/or permitted AUMs would be adjusted where oil and gas activity conflicts with grazing operations, Public Land Health Standards, and rangeland management objectives (Table 2-16 Record 13), as under Alternatives A and C. Thus, allotment management, rather than oil and gas development (as under Alternative B), would be shifted to prevent forage loss, which could result in more development in rangelands than under Alternative B. Sterile hybrids or cereal grasses could be used on public lands for reclamation efforts where approved by the BLM (Table 2-3 Record 25). Use of these plants could result in a change in vegetation composition and structure in relation to the DPC. As under Alternative C management actions allowing communication site rights-of-way could result in greater disturbance to vegetation over Alternatives A and B (Table 2-20 Record 4). There would be no management action related to off-site mitigation (Table 2-4 Record 15) as for Alternatives B and C but there would be management actions to promote habitat enhancement and restoration treatments (Table 2-4 Record 5) that would benefit vegetation where alternative A has no such measures. As under Alternative A the use of native seed in reclamation activities would only be required in the Blue Mountain/Moosehead GRA, WSAs and ACECs. Otherwise the use of native seed would only be encouraged versus required under Alternatives B and C. Requirements for the use of locally collected seed for reclamation in ACECs (Table 2-21 Record 17) and RVAs (Table 2-3 Record 29) would be the same as under Alternative A. Unlike Alternatives B and C the use of sterile hybrids or sterile annual cereal grasses would be allowed for reclamation efforts where approved by the BLM (Table 2-3 Record 25) which could result in decreased integrity and species composition of seeded sites in relation to the ecological site description. As under Alternative A, in selected areas the BLM could utilize vegetation removal associated with oil and gas development to achieve specific management objectives related to plant community improvement and forage production (Table 2-3 Record 16). This management action lacks the tailored reclamation component of Alternatives B and C. There is no management action providing opportunity to reduce overall disturbance or aide in restoring integrity and health of native plant communities through actions to reclaim redundant or

BLM_0019872

unnecessary access roads (Table 2-19 Record 9) or other oil and gas features (Table 2-19 Record 10) as provided for under Alternatives B and C.

Avoiding long-term seral or type conversions of aspen, Douglas fir, spruce fir, and deciduous shrub communities to the extent practicable during oil and gas activities (Table 2-6 Record 15) would maintain composition and seral stage of these communities, as under Alternative A. Facilities could be adjusted slightly to avoid high value habitats such as aspen, conifer, pinyon/juniper, and sagebrush (Table 2-7 Record 5). These management actions for Alternative D would benefit these vegetation communities to a greater degree than Alternative A, but to a lesser degree than Alternatives B and C.

Clearing of commercial woodlands for oil and gas activities would be limited to 7,800 acres per decade (Table 2-15 Record 9). This would allow nearly twice the acres compared to Alternative C, more than three times the acres of Alternative B and seventeen times the acres of Alternatives A. Areas with Douglas fir and aspen on slopes greater than 25 percent would be open to oil and gas leasing with standard lease terms (Table 2-15 Record 10) and vegetation belonging to old-growth communities and communities with high potential for old-growth would be open to oil and gas leasing with standard lease terms (Table 2-15 Record 12). This alternative has no management actions for: avoidance of arborescent stands of Gambel oak as under Alternatives B and C (Table 2-4 Record 17); for relocation of facilities as provided under the other alternatives (Table 2-5 Record 8) to reduce long-term effects to these communities; for requiring new pipelines be located within previously disturbed areas (Table 2-15 Record 6) to preserve mature pinyon/juniper and old growth forest/woodland areas; for reducing ROW widths to less than 25 feet through old growth forest and woodland stands as under Alternative C (Table 2-15 Record 11). Habitat avoidance would not extend to the BLM sensitive species as it would under Alternatives B and C (Table 2-10 Record 9) nor would there be any special measures related to prairie dog habitat areas (Table 2-9 Record 15). Thus, disturbance to the vegetation communities discussed above would be greatest under Alternative D.

Restricting surface occupancy and long-term conversion of sagebrush stands associated with sage-grouse use would reduce disturbance in this vegetation community, as under Alternative A but buffers associated with sage-grouse leks would be half the size of those identified under Alternatives B and C (Table 2-6 Record 17). Also similar to Alternative A, there is no management action to protect and buffer areas used by sage-grouse for summer and fall brood foraging (Table 2-6 Record 19); thus disturbance to vegetation in these areas would be greatest under Alternative D.

Stipulations or COAs including vegetation treatments or reclamation actions to protect visual resources would be the same as identified for Alternatives B and C (Table 2-14 Record 3), providing more protection than under Alternative A. Impacts of managing the White River ERMA would be the same as for Alternative B (Table 2-18 Record 4). Under all alternatives Canyon Pintado NHD would be managed as an avoidance area for major new rights-of-way (Table 2-12 Record 4), which would maintain existing vegetation communities in those localized areas. Restriction of oil and gas development within 500 feet of rock art or standing architecture could reduce surface disturbance and indirectly retain the existing quality of vegetation communities, but to a lesser degree than for Alternatives B and C where 1,000-foot and 750-foot restrictions apply respectively (Table 2-18 Record 5), where Alternative A has no similar action.

Effects to vegetation of re-routing a portion of the Designated Colorow-Greasewood Corridor for buried linear facilities would be the same as for Alternatives B and C (Table 2-20 Record 5) though

BLM_0019873

any overall effects to vegetation would remain. As for Alternative C, new pipeline corridors could be considered potentially allowing more surface disturbance than under Alternative B that prohibits new pipeline corridors (Table 2-20 Record 7). There would be no management actions to encourage use of smaller ROW widths or to place pipelines under roadways as addressed under Alternatives B and C, potentially resulting in increased areas of vegetation disturbance (Table 2-20 Record 9).

<u>Reclamation</u>

Management actions related to vegetation would require reclamation that results in a functioning plant community that achieves DPC through the use of prescribed seed mixes (Table 2-3 Record 15) compared to Alternatives B and C that require more specific vegetation community criteria for reclamation, reclamation success criteria would be similar to Alternatives B and C in that it would be based on site specific cover and composition data. Vegetation data gathered using the Assessment Inventory, and Monitoring (AIM) protocol (BLM TN 440) would provide clear, consistent measures for determining the DPC for reclamation success. Alternative A has no similar action. Effects of reclamation on establishing vegetative cover, increasing species diversity and age class distribution, and improving vegetation composition and structure would be similar to the other alternatives. Overall, this alternative contains fewer modernized considerations for reclamation in terms of wildlife or plant habitats compared to Alternatives B and C (Table 2-3 Record 15, Table 2-10 Record 11) potentially allowing some negative impacts to plant communities.

Due to the increased number of well pads the associated number of acres requiring reclamation overall disturbance would be 1.5 times that of Alternative C, nearly 2.5 times that of Alternative B and more than 4 times that of Alternative A. Of the possible 30,700 acres of disturbance possible throughout the Planning Area associated with this alternative approximately 9,800 acres would be reclaimed reducing the overall vegetation loss to around 20,900 acres. Within the MPA the total possible disturbance would be 29,100 acres with reclamation occurring on 7,644 acres reducing the vegetation loss to around 12,100 at year 20. Management actions requiring reclamation would be similar to those proposed for Alternatives B and C, promoting timely and effective reclamation (Table 2-17 Records 9, 11, and 12). However, stipulations that impose timing limitations for oil and gas development activities would be the same as under alternative A (Table 2-4 Record 12, Table 2-9 Record 30) extending the timeframe before Phase II interim reclamation could be implemented. Reclamation would provide for adequate reestablishment of desirable vegetation to return the utility of sites by generally the seventh year after a site was originally disturbed (Table 4-7); similar to the timeframe expected under Alternative A (Table 2-3 Record 15).

The BLM would require final reclamation as well as long-term maintenance of ROWs as defined in the BLM's Surface Reclamation Plan (Table 2-3 Record 14), as under Alternatives B and C. Reclamation would be required to achieve success criteria of 60 percent potential foliar cover and/or potential basal cover must be at least 5 percent of the DPC. In the absence of specified DPC data, the default minimum potential foliar cover must be 40 percent and/or potential basal cover must be 5 percent. Vegetative cover values for woodland or shrubland sites are based on the capability of those sites in an herbaceous state. The resulting plant community must contain at least five desirable plant species, at least one of which must be a forb or shrub, each comprising at least 2 percent relative cover. No one species may exceed 70 percent relative cover in the resulting plant community to ensure that site species diversity is achieved., These criteria are less stringent than those required under Alternatives B and C (Table 2-3 Record 18). The lower success criteria could potentially result in reclaimed vegetation communities that are not as stable or representative of pre-development communities compared to Alternatives B and C. The defined success criteria of Alternative D would increase the potential for natural succession of vegetation communities over Alternative A and provide a better approach to measuring reclamation success than the qualitative

BLM_0019874

methods for Alternative A. Determining success at a lower percentage of identified cover and composition would likely result in reclamation being deemed successful more often or possibly sooner than under Alternatives B and C. Similar to Alternative A there would be no additional reclamation activities to promote improved conditions for natural succession of vegetation communities in areas with special status plant species as would be the case under Alternatives B and C (Table 2-10 Record 11).

With the exception of areas managed for sage-grouse (Table 2-6 Record 16), stipulations that impose timing limitations for construction, drilling, and completion (Table 2-4 Record 12, Table 2-9 Record 30) could extend the timeframe before Phase II reclamation can be implemented similar to Alternative A. Where implementation of reclamation is delayed there would be an increased opportunity for weeds to establish. Excluding livestock from oil and gas related disturbances after initial surface disturbance would be voluntary under this alternative where it would be required under Alternatives B and C and there is no similar action for Alternative A (Table 2-16 Records 11 and 12). The extent of area available for interim reclamation would be maximized as in Alternatives B and C due to the requirement for situating long-term facilities on the access-road side of pads (Table 2-17 Record 8). There would be no requirement or encouragement to use adapted pad footprint configurations to reduce overall disturbance as there would be in Alternatives B and C respectively (Table 2-17 Record 19). Overall, the application of the reclamation measures for this alternative would promote better conditions for succession of vegetation communities toward the PNC or the DPC compared to Alternative A but less so compared to Alternatives B and C.

The management actions for noxious weeds and invasive plants proposed for Alternative D would be the same as Alternatives B and C, except that the COAs attached to land use authorizations would be less stringent (Table 2-3 Records 23 and 24). Weed management would be more stringent than Alternative A and could lead to improved conditions in reclaimed areas reducing the establishment and spread of noxious and invasive weeds to a greater extent than Alternative A that lacks similar management actions. As for Alternatives B and C, areas associated with Special Status plants would benefit from improved, prioritized weed treatment and control practices (Table 2-10 Record 8). As under Alternative A there are no management actions to encourage the use of current reclamation practices on long-term existing disturbances (Table 2-4 Record 9) or to limit public vehicle use on well access roads as are proposed in Alternatives B and C (Table 2-19 Record 12). Overall, weed control measures required in Alternative D would result in better ecological site conditions for vegetation communities and better recovery from disturbances relative to Alternative A but are less stringent than those outlined for Alternatives B and C. Initial costs and complexity of reclamation would likely be higher than for Alternative A. Increased expected disturbance levels would result in greater risk of proliferation of noxious and invasive weed species above the other alternatives.

### 4.3.1.6    Irreversible and Irretrievable Commitment of Resources

If features associated with oil and gas facilities, such as roads, become permanent, then there would be localized irreversible or irretrievable commitments of vegetation resources.

### 4.3.1.7    Unavoidable Adverse Impacts

Unavoidable adverse impacts would vary by alternative with greater impacts from alternatives with more development and fewer restrictions. Surface disturbance from oil and gas exploration and development would result in unavoidable short-term losses of native vegetation. The amount of vegetation loss would be comparable to the number of acres disturbed and would vary by alternative for the level of oil and gas development. Under every alternative, reclamation actions would reduce

BLM_0019875

overall vegetation losses by close to sixty percent. Under every alternative, reclamation actions would reduce overall vegetation losses by close to sixty percent. Alternative D would have the greatest unavoidable adverse effects to vegetation communities from the potential of developing 2,556 well pads in the Planning Area. Although Alternative A would have the greatest acres managed as open to oil and gas exploration and development, it would have the lowest number of potential well pads.

### 4.3.1.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Impacts from localized short-term uses on long-term vegetation community productivity would vary by alternative with greater impacts from alternatives with more development and fewer restrictions. A loss of native vegetation productivity from oil and gas development would most likely be in areas of concentrated oil and gas development. The extent of impacts to long-term productivity would vary depending on the intensity of the local short-term use. After disturbance, most native vegetation communities would not recover to pre-disturbance levels until decades after reclamation efforts have been successful and are complete.

## 4.3.2    Fish and Wildlife

This section describes the potential impacts to fish and wildlife resources from management actions for resources and resource uses among the proposed alternatives. The analysis was based on the existing conditions for fish and wildlife resources that were described in Chapter 3. The impacts focused on relative changes to fish and wildlife habitat, populations, and established behaviors that could occur as a result of surface use or behavioral disturbances (e.g., truck traffic, human activities, or noise) that are associated with development of the federal oil and gas mineral estate. Impact analysis in this section focuses on key biological resources that include big game populations and seasonal habitats (emphasizing mule deer), breeding populations of raptors and migratory birds, habitats for special status species, and habitat for aquatic species.

Potential impacts to fish and wildlife resources were analyzed and described for each alternative in the context of relevant indicators and attributes. The indicators and attributes formed the basis for both a quantitative and qualitative assessment of impacts.

Impacts were evaluated using the following five indicators:

- Big game seasonal habitats (winter range, winter concentration areas, severe winter range, and summer range for elk, mule deer, and pronghorn antelope) with strong emphasis on mule deer;
- Aquatic and riparian habitat;
- Wildlife populations, including, but not limited to, big game, breeding populations of raptors and migratory birds; and BLM-sensitive and native fish populations;
- Woodland and shrub habitats used by big game, raptors, and migratory birds; and
- Size and distribution of populations of special status species (raptors, migratory birds, and sage-grouse).

The attributes of the five indicators are:

- Availability and utility of big game habitats, considering direct and indirect impacts and reclamation;

BLM_0019876

- Distribution and movement patterns of big game and migratory birds, particularly in response to such factors as proximity to roads, unreclaimed ground disturbance, and focal points of activity (e.g., pad and well development, pipeline installation);

- Big game populations relative to CPW long-term population objectives;

- Extent of habitat for woodland nesting raptors including distribution and abundance of sensitive raptor species;

- Condition and trend of aquatic habitat, and distribution of fish; and

- Number and status of greater sage-grouse lek complexes; and area, quality, and continuity of greater sage-grouse seasonal habitats.

The analysis is based on the following assumptions:

- Areas not affected by development would continue to provide habitat for the existing species and populations of wildlife;

- Direct habitat loss would continue until successful reclamation is achieved, or in most cases, until woody vegetation structure has redeveloped. Indirect impacts on habitat would occur from wildlife avoidance of areas of human activity and subsequent disuse of forage and cover resources that would continue for the duration of the activity. Lower disturbance levels would persist as residual chronic effects over the life of the wells and access roads;

- Management pertaining to the control of pollutants (e.g., air, water) would be compliant with federal and state laws and regulations;

- The relative importance of impacts on habitat would vary depending on the type of habitat involved, its quality, and its location – including distance from disturbance, topography, and vegetation. However, for the purposes of analysis, each acre of seasonal big game habitat is regarded as having equal habitat value;

- The BLM would continue to manage wildlife habitat, and CPW would continue to manage wildlife populations, with emphasis on sage-grouse and big game. The BLM would also continue to emphasize management of special status species, including BLM-sensitive animals, raptors, and FWS-designated Birds of Conservation Concern; and

- Minimum in-streamflow appropriations assigned to the CPW would be adhered to.

Decisions for cultural resources, paleontology, wild horses, and visual resources are not anticipated to measurably influence fish and wildlife resources.

## 4.3.2.1   Impacts Common to All Alternatives

### 4.3.2.1.1   Wildlife Impact Overview including Big Game

<u>Impacts from Oil and Gas Development</u>

**Habitat Loss and Modification**

Shrubland and woodland clearing and facility occupation would result in longer term modification or loss of woody vegetation as a source of wildlife forage or cover that would persist from about 20 years in mountain big sagebrush sites to 150-200 years in pinyon/juniper woodlands. Interim (pad) and final (pipeline) reclamation applied to surface disturbances would not generally be expected to regain useful shrubland character over the life of the plan, but would be capable of serving as a source of herbaceous forage and cover in the short term. In every seasonal range, the presence of early seral (interim/final reclaimed) sites that provide greater horizontal and vertical

BLM_0019877

ground cover or more diverse structural or flowering forms, may serve important functional roles to all animal groups, including overwinter cover for non-hibernating small mammals, substrate for invertebrate prey of migratory birds and grouse, and supplemental sources of nutritious herbaceous forage for big game. The functional value of interspersed early seral sites would depend on animal use/avoidance patterns. It is assumed that reclamation applied to cross-country utility corridors and on the margins of pads and roads where vehicle use is controlled or otherwise shielded would remain useful in supplementing big game seasonal diets. In the longer term, reclamation practices are expected, in varying degrees, to establish herbaceous communities that complement successional advance to former shrubland or woodland character.

Each alternative would involve the creation of numerous 5-15 acre shrubland and woodland clearings attributable to development of infrastructure (roads, pads, and pipelines) and vegetation treatments intended to mitigate, predominantly, declines in the availability or utility of big game forage. Although the lag time in vegetation development and successional advance would vary depending on treatment type, the duration of surface use, and reclamation timeframes, these vegetation modifications would, sooner or later, superficially mimic the size and pattern of natural disturbances (e.g., small wildfire events). Proposed development in every alternative would markedly increase the number of clearings presently being created by wildfire in the 1-20 acre class. Over the last decade (2000-2010), 40 wildfires in the 1-20 acre size class have burned in the MPA. Based on the assumptions used in this document, an additional 262 (7 times current frequency) to 1,200 (30 times current frequency) clearings of this size would be created in the MPA every decade, not including vegetation treatments that would be intentionally applied to mitigate big game forage loss. For example, a joint CPW-industry big game research project presently investigating whether landscape-level forage enhancement treatments are effective at offsetting development effects on mule deer would involve the clearing of about 1,200 acres of woodlands in various successional states. Considering the 39,000-acre study area, these treatments involve about 5 percent of total woodland extent and about 10 percent of those woodlands on slopes less than 25 percent. Depending on alternative, this acreage is 2-5 times that projected to be modified by development.

The tendency for development related disturbances to avoid slopes greater than 25 percent, particularly at lower pad densities made possible by directional drilling technologies, would likely prove consistent among all alternatives. Although these slopes constraints and the absolute extent of NSO stipulations and effective NSO stipulations, represents a relative measure of a land base reserved from development (and supporting certain wildlife-related values), its distribution and arrangement are equally important determinants in realizing those benefits, particularly for species, like big game and raptors, that require large landscapes across space and time.

**Indirect Habitat Loss and Avoidance**

Demonstrated widely for big game since the 1970's (Rost and Bailey 1979) and more precisely defined with GPS technology (e.g., Preisler et al. 2006) is the tendency for animals to avoid human disturbance, which is most commonly associated with the use of access roads and trails. Avoidance and displacement response to activities associated with oil and gas development has been demonstrated for migratory birds (Inglefinger and Anderson 2004) and greater sage-grouse (Holloran 2005), as well.

Vehicle traffic that supports well development and production is thought to represent the most broadly influential component of oil and gas activity in the MPA. Road-related effects on wildlife vary as a function of frequency and duration of use and the density of the road network across affected habitats. Producing fields within the MPA consistently require about 2 to 2.5 miles of improved all-weather access road per square mile. Based on the BLM-mapped roads in the MPA

BLM_0019878

area, current overall road density on BLM lands is about 2.6 miles per square mile. Although it is standard practice to upgrade existing 2-tracks roads to well sites (which limits increases in road density), improved access not only supports traffic attributable to gas development, but increases the frequency and duration of public use.

Drilling multiple wells on pads is capable of reducing the area of surface disturbance per well drilled, but commensurate reductions in road density is not universally achieved in the MPA due to topographic considerations. It is estimated that nearly 50 percent of the land area in the MPA is arranged in narrow ridge and valley series that constrain pad and road siting, such that multi-well pads offer little, if any, advantage in reducing road density.

In an effort to reduce surface disturbance needed for pad construction, infrastructure is typically sited on milder slopes, which are those sites most productive and efficiently exploited by grazing animals. For example, a recent development plan for a relatively small project area with narrow ridge and valley terrain common across much of MPA involved surface disturbance amounting to 13 percent of the overall project area, but that acreage assumed 40 percent of the project area's slopes less than 12 percent and 21 percent of the slopes from 12-25 percent (North Hatch Gulch Project [DOI-BLM-CO-110-2010-0200-EA]). Throughout the MPA it is projected that the proportion of woodland cleared on 0-12 percent slopes would be 4 times the overall proportion of woodland involvement.

The WRFO's wildlife management and impact strategies expressed in this document are based on the premise that behavioral avoidance of activities directly or indirectly associated with natural gas development in the MPA would exert the most pervasive and substantive influences on wildlife populations. The consequences of those impacts (primarily elevated energetic costs and disuse of available resources) would be a function of an animal's behavioral response to disturbance and the duration and expanse of that exposure, but all can have important implications in influencing fitness and performance (e.g., survival, reproduction) at the individual and population level. The utility of affected habitat would be expected to be largely regained once activity levels subside and assuming secondary activity (e.g., recreation) is controlled.

Under these circumstances, the priorities for habitat management are presumed to be best guided by a philosophy of: (1) abbreviating the duration and reducing the areal extent of those areas where habitat utility has been reduced or forfeited due to animal avoidance of human activity that is directly or indirectly (e.g., recreation) attributable to natural gas development and (2) reestablishing habitat (vegetation) removed and altered by development or establishing a successional trajectory that would culminate in restored habitat.

**The Issue of Fragmentation**

Fragmentation, as frequently interpreted and in the context of natural gas development, is the dividing of and reduction in habitat patches via facility installation and surface occupation. The implication is that once a habitat patch is reduced in size or separated from adjoining habitat by surface disturbance, its utility as wildlife habitat is impaired until former character is gained decades or centuries later. The term "fragmentation" has become a catch-phrase that is used to describe virtually all anthropogenic influences on wildlife habitat, and does not clearly differentiate the effects of habitat loss from configurations of habitat that elicit species-specific population responses. Evidence to date suggests that the effects of direct and indirect habitat loss are universally negative and generally outweigh the effects of fragmentation per se (Fahrig 2003).

BLM_0019879

Although development patterns in the MPA would fragment habitats structurally, in terms of functional connectivity, there is little to suggest that proposed development patterns would create persistent and absolute barriers to animal movement or reduce the landscape-level availability of habitat sufficient to elicit species area-effects or inbreeding depression (Taylor et al. 2006). Considering those species and species-groups that inhabit the WRFO and the MPA specifically, the only exception to this statement appears to potentially lie with the greater sage-grouse and perhaps certain small mammals (see below). Even though there is compelling evidence to suggest that animals avoid development activities and, perhaps to a lesser extent, facilities and features (Harju et al. 2010), the scale and distribution of habitat intrusions/conversions in any alternative would not be expected to substantially diminish the availability or utility of suitable or matrix habitat at the landscape level or the ability of animals to move through or around these features to adjoining habitats. If features such as roads and pipeline corridors do not pose impervious barriers to animal movement, structural fragments can be considered functionally joined (Fahrig 1997).

In most landscapes the total area of suitable habitat is of greater importance than its spatial arrangement (Andrén 1994, Taylor et al. 2006). Vegetation in the MPA is believed to represent what McIntyre and Hobbs (1999) refer to as a variegated landscape, where the general pattern, distribution, and availability of habitat has not been radically altered and its overall extent is likely within the historic range of variability. Human activity and animals' avoidance response to development is expected to reduce the former utility and effective availability of forage and cover resources, which would be expected to ultimately prompt density-dependent population adjustment (i.e., primarily nutrition and its ultimate influence on demographic performance). It is expected that direct and indirect resource loss attributable to natural gas development in the WRFO would, at any given time, impose population impacts more or less proportional to the extent of habitat adversely modified or influenced on a species-specific basis.

**Small Mammal Effects**

Gas development's influence on small mammal populations, at least in the short term, is expected to be primarily confined to on-site mortality and direct habitat loss attributable to facility occupation and vegetation clearing.

Effects may be more pronounced on slopes less than 25 percent, but in most avian/small mammal communities, steeper adjacent slopes of similar type would be expected to support similar community composition, but at lower abundance. Though not optimal habitat, these contiguous habitats may be expected to provide a large and persistent reservoir of source animals for reoccupation of adjoining ridgeline positions.

Due to the relatively small areal extent of actual surface occupation and the large intervening matrix of undisturbed lands, it is considered unlikely that infrastructure extent or patterns would elicit widespread species-area effects or (for most species) impose barriers (e.g., roads) that preclude occasional and sufficient levels of genetic interchange. WRFO's practice of prescribing the redistribution of large woody debris on reclaimed pipeline corridors (and discouraging the subsequent development of the ROW for vehicle travel) is, among other purposes, intended to provide cover for more secure small mammal movements and moderate the width and contrast in foreign substrate that must be crossed. These assumptions are tempered by the possibility that certain species may rarely, if ever, cross barren roadbeds. Several studies suggest that frequency of vehicle use and road width and substrate have little influence on the propensity of certain species, such as prairie voles, to cross (Swihart and Slade 1984; McGregor et al. 2008). Conversely, Adams and Geis (1983) found across the continent, voles and mice were consistently among those species most often killed when attempting to cross interstate highways, implying a capacity to cross. The

BLM_0019880

expanse of continuous habitat usually available on either side of a ridge (with typical ridgeline pattern of development) and its present ability to support robust populations of small mammals would likely mask declining population fitness for extended periods of time. Ostensibly, viable populations of small mammals would be maintained in large patches of habitat adjoining disturbed lands for the 40-50 years until a well pad and its access was abandoned and reclaimed.

**Impacts from Management Actions**

Certain siting and avoidance mechanisms, particularly those arranged linearly with broad buffers (e.g., Table 2-2 Record 12, Table 2-10 Record 15), may narrow opportunities for locating facilities more advantageous for wildlife. For example, in many circumstances across the MPA, inflexible adherence to development restrictions within 500 feet of perennial waters or 100 feet of ephemeral channels in concert with practical or imposed constraints on adjacent steep slopes would relegate pad development to ridgeline locations. Besides concentrating development where certain wildlife values are exclusively confined to ridgeline habitats (e.g., PPR sage-grouse population), this situation would tend to increase the length of road necessary to access pads, increase area-specific road densities and reduce the effective distance between roads (developed roads on adjoining ridge and valley), expand the influence of activity-related disturbance (big game), and involve steeper slopes more prone to erosional processes and less amenable to interim reclamation (fish and others), and increase intrusions into upland communities that are typically intact and in better ecological condition than bottomland communities that often have understories dominated by invasive annuals or non-native grasses.

### 4.3.2.1.2   Raptors

**Impacts from Oil and Gas Development**

**Direct Effects**

Cliff-nesting buteos, falcons, and eagles are not normally subject to actions that adversely alter the nest substrate or character of the surrounding habitat. The most prevalent habitat-related risk attending fluid minerals development in the WRFO would extend primarily to woodland nesting species (i.e., accipiters, owls) where the clearing of pinyon/juniper woodlands can alter nest stand conformation or the character of the surrounding habitat for centuries. Because redevelopment of canopy structure suitable for raptor nesting is prolonged (e.g., 150 plus years), reductions in the suitable habitat base can accumulate rapidly at the landscape level. Although NSO stipulations applied to known nest sites are effective in maintaining the essential character of nest stands, these measures generally focus on the relatively short term distribution of individual nests and cannot normally be relied on to accommodate long term shifts in the distribution of new nests or habitat selected for new territories. Considering the widespread remission of wildfire over the past century, particularly as expressed by conifer encroachment and first-generation woodland stands in former disclimax shrubland communities, it is considered likely that fluctuations in overall woodland extent of 5-10 percent over the life of the plan are within the natural range of variability and are not likely to prompt strong declines in reproduction or compromise population viability for any raptor species in the MPA.

Other resource-generated NSO stipulations that are expansive would reserve woodlands for continued use by nesting raptors, but with no greater efficacy than lands remaining available for, but undeveloped for fluid minerals. The WRFO's monitoring efforts (unpublished) suggest that woodland nesting species, primarily Cooper's hawk and long-eared owl, nest at comparable densities in areas that are not presently influenced by mineral development and in existing fields that support levels of infrastructure similar to those expected within the alternatives (i.e., 3 pads per

section). Although it is recognized that reproductive performance could be reduced under circumstances of concentrated development activity, it would seem unlikely that these effects would impair the long term viability of woodland raptor populations in the MPA.

In all alternatives, most-current raptor protection guidelines would be incorporated into the design and operation of above-ground electric and fluid storage facilities. These measures would strictly minimize the number of raptors exposed to electrocution and line-strike, and virtually preclude incidents of drowning and contact with potentially toxic fluids.

**Indirect effects**

Raptors as a group and eagles in particular are birds afforded protection under the Migratory Bird Treaty Act and Bald and Golden Eagle Protection Act that traditionally receive pronounced management attention due to their relatively low abundance (high trophic level) and reproductive potential. Raptors are considered to be among those birds most susceptible to reproductive failure caused by human activities.

A combination of NSO and TL stipulations are applied in each alternative. These devices, at a minimum, are intended to prevent disruption of ongoing nest efforts, including development-induced absences of the adult birds sufficient to jeopardize egg or nestling survival from malnourishment, exposure, or predation. These buffers are applied to nest sites discovered during project-specific surveys as COAs. Complementary siting criteria are available in each alternative that, whether intended specifically for raptors or not, aid in reducing the involvement of habitat better suited for current or future woodland raptor nesting function.

Timing limitation stipulations are applied as circular buffers to distance potentially disruptive activities from ongoing nest efforts sufficient to satisfy the disturbance tolerance of the species. No surface occupancy stipulations are also applied as circular buffers to functional nest sites (i.e., not necessarily active). This measure is intended to maintain the integrity and availability of woodland stands suitable for woodland raptor nesting functions. This strategy allows for periodic abandonment and reoccupation of suitable nest stands by breeding pairs and, particularly since redevelopment of suitably mature canopy requires 150 or more years, prevents the progressive "ratcheting-down" of habitat capable of supporting raptor nesting use in the future.

Raptor nest surveys are required prior to project implementation in those areas potentially influenced by proposed development activities. Information on functional nest sites found in the course of survey are used as the basis for developing siting alternatives or applying timing limitations that reduce the risk of nest activity disruptions that could result in reproductive failure or compromising the long-term utility of nest habitat.

Clearing of woodland and mountain shrub canopies would increase foraging habitat available primarily to buteo hawks, prairie falcon, and eagles. The utility of this acreage would be made available almost immediately in the case of reclaimed pipeline ROWs, within a decade for interim reclamation, and would ultimately (e.g., 4-5 decades) extend to abandoned pads and access roads subject to final reclamation.

Raptor nest sites and nesting habitat outside the MPA would be subject to the same NSO and TL stipulation provisions and siting considerations discussed by alternative below. Depending on the alternative, development activity would progress at the rate of 2-7 well pad locations per year dispersed across the WRFO's remaining acres of federal estate. Habitat loss and modification would be diminutive, and only at the most local scale (e.g., higher density coal bed plays) would

BLM_0019882

development have potential to exert discernible influence on habitat utility capable of suppressing the abundance or performance of the breeding population.

### 4.3.2.1.3   Grouse

<u>Direct Effects</u>

Greater sage-grouse and their response to oil and gas development activity has been the subject of much study and management attention over the last decade, and has, in part, prompted the recent (March 2010) FWS finding that the range-wide listing of greater sage-grouse as threatened or endangered is warranted, but presently precluded due to higher priority listing actions. Although cause and effect relationships have not been firmly established and the pattern and density of development varies widely among these studies, the implications have remained consistent, that is: oil and gas development activity and its infrastructure exert influences on sage-grouse behavior and demographics at distances up to 4 miles, prompting declines in lek persistence and male attendance, yearling and adult hen survival, and nest initiation rates and eliciting strong avoidance response in yearling age classes, nesting/brooding hens, and wintering birds.

Most sage-grouse research has used various measures of lek use to infer population responses in sage-grouse subjected to development-related disturbances. Without exception, this work documents increased rates of lek inactivity and declining male attendance in response to increased frequency (vehicle use), intensity (well density), duration, and proximity of development activity and infrastructure (Doherty 2008; Lyon and Anderson 2003; Walker et al. 2007; Harju et al. 2010; Holloran 2005).

Although adult sage-grouse exhibit strong fidelity to nesting areas, there are strong indications that infrastructure and activity avoidance by and reduced survival of sage-grouse, particularly in yearling age-classes, drives declines in sage-grouse populations subjected to development activity.

Doherty (2008) found impacts to sage-grouse lek persistence and attendance increase with development intensity and proximity. At well densities (as a measure of development activity) of 1-3 per section, rates of lek inactivity were twice that of background levels and bird abundance at remaining leks declined 30-55 percent. Rates of lek inactivity increased 2-5 times at well densities of 4-8 per section. Influences became undetectable at distances of 2 miles or more. Doherty (2008) considered development activity at intensities of 1 or less wells per section in sage-grouse habitat compatible with the conservation of sage-grouse populations. Proposed well densities throughout the MPA are expected to vary from 16 to 24 wells (on 2 to 3 well pads) per section.

Hollaran et al. (2010) demonstrated marked avoidance of all development infrastructures by yearling male sage-grouse. The disparity between leks that recruited fewer males than expected (e.g., within 1.4 miles of drilling and 0.6 mile of producing pads and access) and more than expected (e.g., beyond 2.3 miles of drilling and 1.2 miles of producing pads and roads) indicates yearling male dispersal—an interpretation consistent with their finding two radio-marked yearling males establishing on leks inside development boundaries versus 22 that established on leks outside development boundaries. Roads had an indiscernible influence on male lek attendance at distances exceeding 1.6 miles. Fewer (approximately 40 percent) yearling hens tended to select nest sites within 0.6 miles of infrastructure than expected. Survival estimates for yearling males and females raised in areas influence by development (at least one producing well or 0.6 mile of road within one mile of its natal nest) were 44 and 30 percent lower than controls.

Holloran (2005) believed that annual declines of 20-60 percent in male lek attendance were well explained by reduced recruitment of yearling males reacting to increasing well density (greater than

BLM_0019883

15 wells within 3 miles), road density (greater than 0.7 miles per square mile), and entrenchment within development (wells located in more than 2 cardinal directions from the lek).

Considering time-lag effects of 2-10 years, Harju et al. (2010) found evidence for declining lek attendance at low infrastructure density (1-2 pads per square mile). Although the temporal and numerical response to disturbance in different populations was variable, their work suggested that limiting pad density and abbreviating the duration of disturbance are key to maintaining populations.

**Noise**

Noise has been implicated as an important determinant in prompting declines in male lek attendance. Hollaran (2005) found leks within 3 miles of drilling activity experienced significantly greater rates of decline than controls, but this effect was asymmetric and primarily affected leks positioned downwind of drilling activity. Male attendance on leks upwind of activity did not change relative to controls.

Decibels (dBA) are the most common metric used for measuring and comparing sound and represent the relative intensity of sound scaled to the range of human hearing. Based on WRFO's limited experience using decibel meters and attempting to distinguish anthropogenic sound from ambient levels, these values may not and probably do not fully explain characteristics of sound to which birds respond.

The issue of noise and its influence on sage-grouse is recognized in Table 2-6 Record 7. Although not explicit in Alternative A, the remaining alternatives would institutionalize WRFO's ongoing efforts to reduce noise levels emanating from equipment and facilities (e.g., siting considerations, installation of noise suppression devices).

**Avoidance of Roads-Indirect Habitat Loss**

Many attributes of road networks (i.e., road density, frequency of use, and timing of use) appear to adversely influence affected populations (Hollaran 2005, Wyoming Wildlife Consultants 2009). Hollaran (2005) found road densities that exceeded 0.7 miles per square mile within 2 miles of a lek caused progressive declines in average annual lek attendance from 15 percent (0.7 to 1 mile per square mile) to 56 percent at 1.7 miles per square mile. As a point of reference, average all-weather road density presently required for field development in the MPA is about 2-2.5 miles per square mile. Birds less consistently avoided producing pads that incorporated fluids gathering systems, which implies that sage-grouse may also be sensitive to the frequency of vehicle use (Wyoming Wildlife Consultants, 2009). On leks within 1 mile of main access roads, male attendance declined 35 percent when used early in the morning during the strutting period, but declined by 11 percent in the absence of traffic (Hollaran 2005). Male lek attendance declined 13 percent and up to 60 percent when vehicle use frequency exceeded 50 axles per day.

Although Walker et al. (2007) suggests that seldom-used two-tracks do not appear to influence lek persistence, the results from Carpenter et al. (2010) implied that wintering sage-grouse are half as likely to select habitat within 990-1,320 feet of two-track trails—a response that represents a substantial indirect form of habitat loss.

Lyon and Anderson (2003) found 75 percent of hens associated with a roadside lek selected nest sites greater than 1.8 miles from the lek, compared to 9 percent of hens associated with undisturbed leks. This level of avoidance translates to a 73 percent reduction in the utility of nesting habitat within nearly 2 miles of roads bearing relatively light (less than 12 vehicle trips/day) use.

BLM_0019884

Concern for the loss, modification, or avoidance of habitat attributable to development is particularly noteworthy on ranges where available habitat is naturally limited. The utility of sagebrush stands for seasonal sage-grouse use can be severely constrained by sagebrush character, slope, terrain roughness, and snow depth to the point that, ultimately, little supports meaningful occupancy. Beck (1977) found only 50 percent of lands with an extensive sagebrush-dominated landscape sustained winter use, and 80 percent of that use took place on 7 percent of that area.

### Refuge Areas

Because attempts at transplanting grouse to restore extirpated populations have met with no demonstrable success (Doherty 2008), retaining viable populations of existing stock is a strong imperative. The results of Doherty (2008) and Doherty et al. (2010) indicate that clustered development patterns that provide nesting areas relatively free of development disturbance may hold promise in maintaining small, viable population segments in heavily developed landscapes.

With the notable exception of marginal salt-desert sage-grouse habitats encompassed by an NSO intended to protect black-footed ferret habitat (Alternative B, Table 2-9 Record 15), NSO stipulations designed explicitly for sage-grouse and those that are likely to complement the reservation of larger blocks of habitat encompass between 1 and 14 percent of the sage-grouse habitat base and cannot be expected to play an effective role in sage-grouse conservation.

### Impacts from Oil and Gas Development

The PPR sage-grouse population has been in decline since at least 1977 when Colorado Parks and Wildlife (Krager 1977) documented 25 active leks. Twenty years later, Hagen (1999) found 9 leks active. The development of natural gas on these ranges has the potential to impinge heavily on sage-grouse habitats and behaviors and contribute substantially to this decline.

Habitat potentially suited for occupation by sage-grouse in the MPA occurs in physically fragmented patterns, due not only to topographic and edaphic variability, but as a function of successional status and deciduous shrub expression in those vegetation communities. Hagen (1999) found sage-grouse distribution in Piceance Basin to be highly clustered, implying that the availability of suitable habitat was, too, clustered.

Due to the peculiar configuration of habitat in the MPA, the PPR population of sage-grouse is believed to be particularly vulnerable to development-related effects, regardless of alternative. The characteristic pattern of the sage-grouse habitat in the MPA is such that each parcel of ridgeline habitat (generally 400-1,000 feet in width) is separated from adjacent ridgeline habitats by 1,000-3,000 foot intervals of habitat unsuited for occupation or ground movement. Habitat potentially suited for use by PPR sage-grouse comprises only 16 percent of the mapped overall range. Although this pattern moderates at lower elevations where ridgeline habitats broaden, bird distribution tends to be confined to higher elevations (greater than 7,400 feet in east, greater than 7,700 feet in west) and modeled habitat at lower elevations supports few birds.

The requirements for infrastructure siting and the configuration of sage-grouse habitat on federal estate within the PPR are such that each ridgeline would eventually host an upgraded access and an adjacent pipeline corridor (e.g., 60-80 feet wide). These corridors typically bisect a narrow, linear habitat patch that, besides the direct and longer-term removal or modification of sagebrush canopies, becomes wholly or largely exposed to traffic-related influences. At intervals along the ridge, constructed pads themselves can straddle and occupy much of the ridgeline crests. Although adult birds, including nesting hens, fly between ridgeline habitats, it is probable that ridgeline pinch-points impede ground movements of young broods. Regardless of the pad's position along the

BLM_0019885

## Chapter 4 – Environmental Consequences

length of the ridge, the physical and behavioral influences of pad and road activities may interrupt both elevational shifts toward more mesic, higher elevation brood habitats, as well as deter access to resources available along the ridgeline axis. The circumstances in the MPA are such that dispersal and avoidance buffers documented from recent research cannot be accommodated with dispersed or random development patterns. Based on the BLM's incomplete road and trail mapping, about 50 percent of the modeled PPR sage-grouse habitat lies within 330 feet; about 70 percent within 660 feet; and about 80 percent within 990 feet of an existing road or trail. Close contact with development activity would almost certainly prompt avoidance response in yearlings, but with a severely confined habitat base, the effects of that response are uncertain.

A development strategy that limits well pad density to 1 per square mile has gained some support as a level of development that may be compatible with the maintenance of coincident sage-grouse populations. This strategy is not considered appropriate for use in the MPA because of the habitat configuration described above. Retrospective analysis of lek attendance by Harju et al. (2010) detected declines in lek attendance at infrastructure density of 1 pad per square mile in a number of Wyoming fields. As an exercise to demonstrate potential effects of 1 pad per square mile on PPR populations, 40 sections of land were delineated on the Barnes Ridge complex in the southeast corner of the MPA. Forty well pad sites were randomly located in traditionally favored ridgeline positions separated by at least 1,220 feet. At a development rate of 4 pads per year and with roads buffered at 330 feet, active drilling and production access assumed 75 percent of modeled habitat available within 330 feet of the road within 5 years. At full build-out, 52 and 65 percent of all available habitat in the delineated area was situated within 330 and 660 feet of development infrastructure, respectively. Reducing the rate of development to 2 pads per year over the same time frame resulted in modest (25 percent) deferrals in habitat involvement within 330 feet of roads, but by the end of the planning period, habitat involvement would be identical.

Manipulating the availability of leases to create larger tracts of land remaining relatively free of development influences is not a viable option in the MPA since 86 percent of the mineral estate beneath mapped overall range is presently leased and most held by production. It appears likely that conventional development practices applied to PPR sage-grouse habitats, regardless of alternative, would result in the extirpation of the PPR population within the life of the plan. Although extraordinary efforts to avoid involvement of sage-grouse habitat are being considered, for example, fitting pads in narrow valley bottoms that are functionally disconnected from occupied ridgeline habitats, these ideas may be thwarted by contradictory regulatory provisions of, for example, the Clean Water Act, or strict adherence to resource avoidance measures (e.g., Table 2-2 Record 12 and Table 2-3 Records 20 and 21).

Transplanting of grouse to restore extirpated populations has had no demonstrable success (Doherty 2008) and highlights the importance of maintaining, at a minimum, stocks of birds that can be expected to persist through the period of development at current distribution. Absent the means to avoid exposing habitat and birds to development activity and in order for it to remain plausible for birds to persist with some semblance of current distribution, development regimes may need to be employed that confine both the spatial and temporal aspects of development. Efforts to abbreviate the duration of activity to a timescale that does not exceed the average lifespan of high-fidelity breeding adults may provide for sufficient production and recruitment of young that develop fidelity to natal areas and help circumvent the pronounced effects of yearling avoidance and dispersal.

The Meeker sage-grouse population area encompasses about 50,000 acres in the area outside the MPA. Federal mineral estate underlies about 15,500 acres (31 percent) of all mapped range, but

BLM_0019886

*Chapter 4 – Environmental Consequence*

estate associated with habitats currently supporting grouse use (north of the White River and across the north flank of LO7 Hill) are limited to about 460 acres in 7 parcels (less than 4 percent). The largest parcel, about 300 acres, consists primarily of private agricultural lands, but supports consistent use by this remnant flock of birds. The BLM surface that presently supports habitat potentially suited for this population of sage-grouse is limited to about 300 acres. None of the federal estate in the Meeker sage-grouse area is currently leased for oil and gas mineral development. Considering the current distribution of birds and the extent and pattern of federal estate within that area, it appears that federal mineral management would be inconsequential in the overall conservation of this population, but there are several instances where lease development could contribute substantially to adverse behavioral effects and indirect habitat loss.

The Northwest Colorado sage-grouse population area is composed of several distinct segments that differ widely in character for sage-grouse. The Blue Mountain portion of this population (higher elevation sagebrush communities north of U.S. 40) represents WRFO's largest continuous block of suitable and occupied sage-grouse habitat. This segment encompasses about 66,000 acres of suitable habitat, about 77 percent of which is associated with federal mineral estate and the BLM-administered surface. Although there is no active development in this area, about 34 percent of the federal acreage is currently leased for oil and gas development.

The remaining segments of the Northwest Colorado population area in the WRFO consist of: (1) isolated and sporadically occupied parcels in the Douglas Creek drainage south of the White River; (2) extremely small and insular groups of birds along and probably once connected by habitats along the White River valley; (3) a sparsely populated southern extension of the larger Sagebrush Draw population located in the adjoining Little Snake Field Office; and (4) most notably, an expansive low elevation salt-desert complex extending west from Pinyon Ridge along the U.S. 40 corridor and south to the White River. This area supports limited year-round occupation by sage-grouse, but these xeric habitats, whose ground cover is often dominated by invasive annuals weeds, are considered marginal in their support of nesting and brood-rearing functions. The breeding population in the western half of this area (west of Massadona) had begun to collapse prior to the mid-1970s and this trend continued through the 1980s. The only remaining lek is located on the far eastern end of the area. In those areas occupied or formerly occupied by sage-grouse in these areas, there are two existing oil field developments (Rangely and Elk Springs) as well as relatively dispersed natural gas development south of the White River (primarily in the Douglas Creek drainage). These long established developments have remained relatively static over the last 20 years and either have no connection with sage-grouse habitat or are not known to have influenced sage-grouse habitat or populations. These segments of the Northwest Colorado population area collectively encompass about 106,000 federally administered acres that has potential to support sage-grouse; 61 percent of which is currently leased.

### 4.3.2.1.4   Migratory Birds

#### Direct Effects on Habitat and Survival

Vegetation communities projected to be disturbed are prorated to that land base that remains available discounting designated NSO stipulations and those areas where, in practice, facility siting is normally avoided (i.e., slopes greater than 25 percent, forest types, riparian/wetlands). In all alternatives, 95 to 97 percent of surface disturbance is expected to occur in 3 major vegetation complexes: pinyon/juniper, upland big sagebrush, and mountain shrub; discussion is generally limited to those types (Table 4-51). Disturbance in vegetation communities that are avoided in practice (e.g., coniferous forest, aspen, riparian/wetland) or that are minor in extent and distribution (grassland, salt scrub) would be minimal. The bottomland sagebrush/greasewood community is

Chapter 4 – Environmental Consequences

small in extent, but represents a distinct habitat association that interfaces extensively with the major vegetation communities and, due to its narrow confinement in, is more susceptible to substantive development influence.

Based on direct impacts and the distribution of access in the MPA, ridge top and bottomland sagebrush communities are likely to be those subjected most to physical disturbances. Slope constraints and traditional development patterns would tend to leave relatively large blocks of contiguous mountain shrub and pinyon/juniper woodland habitats intact throughout the MPA.

Except for ground-nesting birds (e.g., western meadowlark, vesper sparrow), there would be little effective redevelopment of nesting substrate for woodland or shrubland associates over the life of the plan. Most shrubland and woodland sites subject to interim and final reclamation would, however, tend to initially become colonized by adapted forms of big sagebrush. In each alternative, there is potential to redevelop 40-50 percent more sagebrush-based acreage than that which was removed for development. Canopies that may serve as nest substrate would be expected to develop in the decade or two following the end of the planning period.

### Table 4-51. Representative Migratory Birds Associated with the MPA Vegetation Communities Most Influenced by Disturbance

| Vegetation Community | Species | BLM Sensitive | FWS Bird of Conservation Concern (Southern Rockies / Colorado Plateau Northern Rockies Regions) | Rocky Mountain Bird Observatory (Partners in Flight Priority Status) |
|---|---|---|---|---|
| Pinyon/juniper | Pinyon jay | -- | X | X |
| | Juniper titmouse | -- | X | X |
| | Cassin's finch | -- | X | -- |
| | Black-throated gray warbler | -- | -- | X |
| | Gray flycatcher | -- | -- | X |
| Big Sagebrush | Brewer's sparrow | X | X | X |
| | Green-tailed towhee | -- | -- | X |
| | Sage thrasher | -- | -- | X |
| | Vesper sparrow | -- | -- | -- |
| | Western meadowlark | -- | -- | -- |
| Mountain Shrub | Virginia's warbler | -- | -- | X |
| | Dusky flycatcher | -- | -- | X |
| | Orange-crowned warbler | -- | -- | -- |
| | MacGillivray's warbler | -- | -- | -- |
| | Black-headed grosbeak | -- | -- | -- |

It is suspected that in the case of the WRFO's deciduous shrubland and woodland communities, habitat conversions would remain within the range of natural variability, but development-related treatments (including big game forage mitigation efforts) may contribute cumulatively to conversion rates that exceed historical disturbance regimes for these communities with prolonged redevelopment timeframes (e.g., woodlands). Under these circumstances, treatments would shift long-term age distribution downward and reduce the extent and distribution of communities that are

BLM_0019888

more structurally complex and mature. It is normally accepted that the capacity of a community to support a rich and diverse fauna increases with increasing structural complexity and plant species diversity. Faunal diversity and richness are generally greatest during later and more mature seral states with well-developed multiple vegetation layers (including ground cover). Complementary or explicit siting criteria provided in each alternative would be capable in varying degrees of reducing involvement (both adverse modification and disruptive activity) of habitat supporting more rich and abundant avian populations (e.g., mature woodland).

In those situations where livestock use is restricted or confined to periods outside the growing season, successfully reclaimed disturbances are expected to provide nesting habitat for several ground-nesting birds in the short term, including western meadowlark, vesper and lark sparrow, and gray-headed junco.

Fluid storage, whether in earthen pits or tanks, presents a potential hazard for birds. Birds exposed to fluids that are toxic, compromise the insulative properties of a birds plumage, or pose a drowning risk are at risk of mortality in violation of the MBTA. In all alternatives, operators are required to prevent migratory bird use of or access to such fluids until the location is abandoned and reclaimed (Table 2-7 Record 4).

### Indirect Effects on Habitat Utility

Although the response is species-specific, migratory birds tend to avoid siting nests in close proximity to disturbance. Inglefinger and Anderson (2004) found the nesting density of sagebrush-associated birds was reduced by 40-60 percent within 330 feet of roads accessing natural gas fields in Wyoming with as few as 10 vehicle trips per day. Although similar response would be expected in other open shrubland habitats, this influence is likely moderated across much of the MPA where intervening foliar or topographic screening would attenuate aural and visual cues (Helldin 2003; Reijnen 2006). Recent work from Wyoming gas fields (Gilbert and Chalfoun 2011) documents 10-20 percent declines in the abundance of certain sagebrush obligates (i.e., sage and Brewer's sparrow) in developed natural gas fields at well densities of 8 $km^2$ (average rate of decline approximately 0.3 individuals per each well/$km^2$), which are comparable to MPA well density assumptions of 16-24 wells per section. The ultimate fate of birds displaced by development activity is not known, but it is likely that suitable habitats are generally at capacity and these birds must occupy suboptimal habitats to fulfill nesting functions. Reproductive success and recruitment would be assumed to be substantially lower in these situations. Conversely, there is no strong evidence to suggest that habitats vacated by birds intolerant of disturbance would not regain much of their former utility once intense activity subsides, particularly where traffic volumes are very low (e.g., one vehicle trip per day) and affected acreage is contiguous with large tracts of intact and largely unaffected source habitat (Riffell et al. 1996).

Due to the mobility of birds, the limited proportion of habitat physically disturbed over the life of the plan, and the remaining pattern and distribution of habitat available for nesting (particularly once intensive development phases are complete), narrow corridors of unsuitable or matrix habitat separating large tracts of intact habitat are not expected to constitute barriers to movement within or between habitat parcels. Although larger blocks of mature habitat in general would be expected to support a richer and more abundant avian community, less optimal or compromised habitats that adjoin or separate higher value habitats (matrix habitats) can generally be expected to be occupied by a full complement of associated species at lesser density.

Impacts to WRFO migratory bird breeding populations are expected to result in population declines directly proportional to the extent of habitat adversely modified at any given time (i.e., no declines

BLM_0019889

attributable to area-effects), which would include acreage influenced by ongoing development and the accumulation of habitat acreage that has been adversely modified and whose utility continues to be affected by production and maintenance activity (see Tables 4-54, 4-55, 4-56, and 4-57).

These tables project the degree of direct and indirect reductions in the capacity of migratory bird nest habitat. Avoidance-based declines in habitat capacity are based loosely on the work of Inglefinger and Anderson (2004) and Gilbert and Chalfoun (2011), and are thought to provide reasonable comparisons of effective habitat loss attributable to each development alternative. Reductions in habitat capacity during affected nest seasons were assessed by applying a reduction factor (predicated on intensity and frequency of activity) to an area within 330 feet of the development footprint as follows: first incursion coincident with nest season, 75 percent; ongoing well development, 50 percent; production prior to successful interim reclamation, 35 percent; post-reclamation production without fluids gathering system, 20 percent; post-reclamation production with fluids gathering system, 10 percent. It is recognized that intervening topography and taller shrubland forms (e.g., serviceberry and oakbrush) and woodland vegetation may moderate the influence of development activity on breeding bird activity.

Consolidated blocks of NSO and TL stipulations that are extensive and applied coincident with the primary migratory bird nesting season (e.g., big game summer range, sage-grouse nesting habitat) would be effective in allowing nesting activity to progress undisturbed across large landscapes. These circumstances would defer disruption of nesting activity attributable to initial vegetation clearing and construction across 40 percent of the MPA's upland sagebrush communities and over 90 percent of its mountain shrub communities. This effect would not alter long-term community-based effects projected for each alternative.

Migratory bird nesting habitat outside the MPA would be subject to the same management provisions and siting considerations discussed by alternative below. These management prescriptions (Table 2-7 Records 5 and 6) are explicit in their application to habitats outside the MPA that support species of management concern, especially saltbush (sage sparrow) and juniper-black sagebrush (gray vireo) associations. The only notable exception to the management suite presented below involves the expansive NSO applied to prairie dog habitats in Alternative B. This single NSO stipulation encompasses nearly 241,000 acres and would reserve from development influences roughly 90 percent of the sage sparrow habitat and 65 and 85 percent of the higher density sage thrasher and loggerhead shrike habitat available in the WRFO.

Depending on alternative, development activity would progress at the rate of 2-7 well pad locations per year and involve a total of 27 to 128 locations over the 20 year planning window (outside of the MPA). It is presumed that these locations would be primarily single well pads subject to updated reclamation standards. Much of this development would be expected to represent infill to existing fields that would have little further influence on the extent or utility of affected migratory bird habitats. In general, migratory bird habitat loss and modification outside the MPA would be diminutive, and only at the most local scale (e.g., higher density coal bed plays) would development have potential to exert discernible influence on the utility of nest habitat capable of suppressing the abundance or performance of the breeding population.

### 4.3.2.1.5   Aquatic Wildlife

Aquatic wildlife is discussed in the Section 4.3.3 Special Status Animals.

BLM_0019890

### 4.3.2.2    Alternative A

### 4.3.2.2.1   Big Game

#### Direct Habitat Loss and Modification

By Year 20, about 0.4 percent of big game habitat in the MPA would be occupied by facilities and possess no utility as forage and cover until final abandonment and reclamation. This figure represents a rough average applied across all seasonal ranges (see Table 4-52 for a breakdown of seasonal range involvement).

Reclamation that would have potential to effectively offset herbaceous forage values lost to occupation would be applied to 3,700 acres (approximately 0.6 percent of each seasonal range), but the development of ground cover comparable or superior to big game forage value prior to disturbance would likely amount to 50 percent or less of that acreage.

Current reclamation practices do not incorporate consistent and well-defined success standards, and reclamation efforts are often represented by a persistent herbaceous ground cover that is inferior to intact native vegetation communities in terms of wildlife-oriented nutrition, composition, structure, and temporal availability (i.e., staggered phenology). Based on 2009 NAIP imagery, there are few instances in the MPA where older single-well pads (5-7 acres) display reclaimed acreage that comprises more than 50 percent of the original disturbed surface. Remaining pads in the MPA, and particularly multi-well pads, typically show little, if any, disturbed acreage successfully reclaimed (i.e., less than 10 percent overall). It is estimated that 50 percent or more of the reclamation presently applied to pipeline, pad, and storm water control features fails to perform as a beneficial source of wildlife forage and cover and can include large fractions of invasive annual weeds or aggressive introduced grasses that suppress successional shrubland processes and eventually supplant native vegetation forms, especially forbs and shrubs.

.

BLM_0019891

**Table 4-52. Estimated Surface Disturbance at Year 20 on Mule Deer Ranges in the MPA By Alternative**

| Mule Deer Range | % Federal Estate In MPA | Alternative A | | | Alternative B | | | Alternative C | | | Alternative D | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Surface Disturbance (Acres) | Acres Out Of Production | Reclaimed Acres | Total Surface Disturbance (Acres) | Acres Out Of Production | Reclaimed Acres | Total Surface Disturbance Year | Acres Out Of Production | Reclaimed Acres | Total Surface Disturbance (Acres) | Acres Out Of Production | Reclaimed Acres |
| Severe Winter Range | 22 | 1,400 | 575 | 805 | 2,800 | 1,200 | 1,600 | 4,500 | 1,900 | 2,600 | 6,400 | 2,700 | 3,700 |
| Summer Range | 23 | 1,400 | 6,000 | 840 | 2,900 | 1,200 | 1,700 | 4,700 | 2.000 | 2,800 | 6,700 | 2,800 | 3,900 |
| Critical Winter Range | 0.9 | 56 | 24 | 33 | 115 | 47 | 66 | 185 | 77 | 110 | 262 | 110 | 155 |
| Winter Concentration Area | 0.2 | 13 | 5 | 7 | 25 | 10 | 15 | 41 | 17 | 24 | 58 | 24 | 34 |
| Winter Range | 54 | 3,400 | 1,400 | 2,000 | 6,800 | 2,800 | 4,000 | 11,100 | 4,600 | 6,500 | 15,700 | 6,600 | 9,200 |
| **Total acres** | --- | **6,269** | **8,004** | **3,685** | **12,640** | **5,257** | **7,381** | **20,526** | **6,596** | **12,034** | **29,120** | **12,234** | **16,989** |
| % of range out of production | --- | --- | 0.4 | --- | --- | 0.9 | --- | --- | 1.4 | --- | --- | 2.0 | --- |
| % of range in reclamation | --- | --- | --- | 0.6 | --- | --- | 1.2 | --- | --- | 2.0 | --- | --- | 2.9 |

SOURCE: BLM GIS data.

BLM_0019892

*Chapter 4 – Environmental Consequences*

**Indirect Effects**

Based on various assumptions used in the proposed action, oil and gas development associated with this alternative would ultimately be distributed across about 20 percent of the federal estate within the MPA. By Year 20, development activity associated with Alternative A would result in indirect habitat loss (avoidance and disuse of adjacent habitat) equivalent to a projected 53,000 acres (Table 4-53) or about 9 percent of the MPA. This value is calculated based on the following assumptions:

- Habitat within 660 feet of the pad and associated access would be strongly influenced during pad and well development.

- Avoidance effects would subside in this affected area as pad activity declines to production and maintenance levels, but activity would remain influenced by frequent transport of produced fluids by truck and unregulated public use unrelated to fluid mineral operations. Incorporation of liquid gathering systems would be expected to conform to assumptions listed in Table 2-1 Record 16.

- The value represents the maximum rate of development at years 19 and 20 and accounts for the entire accumulation of producing pads.

Total effective habitat loss (direct and indirect) at the end of project life is estimated to involve about 10 percent of the big game habitat available in the MPA.

**Table 4-53. Equivalent Acres of MPA Habitat Loss (Indirect) Associated with Big Game Avoidance**

| Alternative | Projected Habitat Acres With Reduced Utility Attributable To Well Development Activity | | Projected Habitat Acres With Reduced Utility Attributable To Well Production Activity | | Projected Cumulative Reduction In Habitat Utility |
|---|---|---|---|---|---|
| | Acres at Year 20 | % MPA | Acres at Year 20 | % MPA | Proportion of MPA, Year 20 (%) |
| A[1] | 12,500 | 2 | 40,600 | 7 | 9 |
| B | 21,100 | 4 | 54,300 | 9 | 13 |
| C | 42,200 | 7 | 91,200 | 15 | 22 |
| D[1] | 65,100 | 11 | 184,100 | 31 | 42 |

NOTES:
Using multi-phase gathering assumptions in Table 2-1(16) and, for lack of better estimates on the reduced indirect influences attributable to liquids gathering systems (LGS), using Sawyer et al. (2009a), where the area influenced by winter drilling was 3-8.4 times greater than that associated with producing pads not using LGS systems (43% reduction or 57% of effect) and using LGS systems (65% reduction or 35% of effect).
[1]No credit was given for LGS systems in Alternatives A and D due to lack of road restrictions.

In this alternative, timing limitation stipulations (Table 2-4 Record 12) would continue to be applied to the summer ranges and most-important deer winter ranges (i.e., severe winter ranges) in the MPA. Although the use of traditional stipulations (e.g., timing limitations and no surface occupancy) have been widely criticized, recent research (Holloran 2005, Holloran et al. 2010, Wyoming Wildlife Consultants, 2009) demonstrates that those measures formerly adopted and espoused by BLM, State Wildlife Agencies, and FWS are capable of reducing impacts associated with avoidance. Conversely, the research indicates that traditional stipulations have not been effective at reducing cumulative development activity at the landscape level sufficient to stem progressive declines in populations subjected to pervasive or prolonged development activity.

BLM_0019893

Application of timing limitations to federal estate would be capable of substantially reducing disruption of seasonal big game use on about 65 percent of the MPA deer summer ranges and 30 percent of all winter ranges (86 percent of all severe winter ranges). However, application of TL stipulations would eliminate the exercise of year-round drilling on summer and important winter ranges, extend development timeframes in any given area by an estimated 50 percent, and triple heavy vehicle traffic associated with rig moves. It would also encourage the current practice of shifting development activity from ranges that carry timing limitations (e.g., summer and severe winter ranges) to adjacent winter ranges that do not carry restrictions. Although individual developments occurring on general winter ranges are likely to affect fewer numbers of animals per unit area, the pervasive nature of development at projected levels would make the practice counterproductive by exaggerating the distribution of development activity on federally-administered winter range and winter concentration areas, and fee lands that comprise 72 percent of all winter ranges and 35 percent of summer ranges in the MPA. Similarly, expansive elk production area as currently mapped in the MPA would allow big game summer use functions a 90-day respite from development pressures (Table 2-4 Record 12), but would exaggerate the subsequent use of 126,000 acres of higher elevation deer winter range (roughly above 7,000 feet; 37 percent of MPA winter range) by developments that had been deferred the previous summer.

Timing limitations on elk production areas and big game summer ranges would accommodate all summer use functions for elk over the 3-month interval of May 15 to August 15. Activity restrictions would not be explicitly applied to elk winter use areas, but 24 percent of elk winter range in the MPA is coincident with deer severe winter ranges where activity is restricted through the entire winter use period (December 1-April 31).

This alternative includes no road management objectives that would aid in reducing avoidance response or indirect forms of habitat loss (e.g., Table 2-19 Record 7), but would rely on long-term access abandonment provisions in Onshore Order #1 and the current road density objectives (Table 2-4 Record 7) which limit the density, but not the use properties of roads on the BLM surface. Neither of these measures would substantially reduce road-related effects on big game over the life of the project.

Timing limitation provisions would not be applied in consideration of big game movements between or among seasonal ranges. It is expected that development associated with this alternative would follow current trends in remaining confined primarily to ridgeline positions, and operating in an increasingly sedentary and quiet manner with less frequent well pad visitation during production. It is considered unlikely that the density, intensity, or extent of developments associated with this alternative would have potential to interfere substantially with seasonal range movements. Conditions of approvals that allow activity deferral for 60 days remain available for use in site-specific situations (e.g., large linear pipeline projects).

In areas outside of the MPA, it is assumed that proposed development would be limited to an average of 1 or 2 single-well pads per year (27 over the life of the plan) in locations primarily associated with established fields in GMU 21 and the Rangely Oil Field. Direct and indirect impacts attributable to this development would be localized and diminutive across extensive big game ranges. Conditions of Approval that limit well development activities to timeframes outside important summer range and severe winter range periods would be effective in minimizing effects to discountable levels. Based on the location of existing fields, it is likely that most development would take place in deer winter concentration areas, with lesser activity in winter and severe winter range.

BLM_0019894

Total surface disturbance outside the Rangely Oil Field would amount to about 260 acres by Year 20 with about 60 percent of that subject to interim reclamation. Assuming all disturbances would take place on deer winter concentration areas, total habitat modification over the 20 year life of the plan would involve about 0.25 percent of GMU 21 winter concentration areas. Reductions in habitat utility associated with avoidance of active drilling and the accumulation of production activity (same criteria as applied in MPA) would not be expected to exceed one percent of the more important winter ranges in GMU 21 (winter concentration, severe and critical winter ranges) through the life of the plan.

Development in the Rangely Oil Field would continue to take place among Coal Oil Basin's small (50-70 head) resident herd of pronghorn. This population of pronghorn has occupied the Field on a year-round basis for several decades and has developed marked tolerance for the Field's routine development and production activities. It is expected that continuation of small scale and localized development in the Rangely Oil Field would remain innocuous to the resident and thoroughly acclimated pronghorn population in Coal Oil Basin.

### 4.3.2.2.2   Raptors

Based on acreage remaining available outside practical slope constraints and NSO stipulations, pinyon/juniper woodlands cleared for development (2,400 acres) are projected to involve about 1 percent of the MPA's woodland base and 2 percent of the base best suited for woodland raptor nesting (i.e., woodlands less than 25 percent slope). Woodland management constraints (e.g., Table 2-15 Record 9) would further cap clearing of commercial woodlands to a total of 900 acres or about 0.7 percent of that habitat base over the life of the plan. The siting criteria that allows for facility relocation to reduce diminishment or deterioration of raptor nest habitat (e.g., Table 2-5 Records 8 and 10) help in minimizing long-term adverse modification of woodland or forest canopies that may serve as future nest habitat.

In this alternative, low, open shrubland as foraging habitat for buteo hawks and eagles (less than 25 percent slope) lost to facility occupation would be generally offset (0.4 percent gain) by former deciduous shrublands and woodlands that have been cleared and reclaimed.

As applied to species that are most commonly encountered in the MPA (i.e., Cooper's and red-tailed hawks and long-eared owls) and are not managed as special status, the long-established 1/8 mile NSO stipulation and 1/4 mile TL stipulation prescriptions (Table 2-5 Record 11) have, in WRFO's experience, provided lateral separation sufficient to avoid diminished reproduction (e.g., site abandonments, prolonged absence of brooding or incubating birds) and have been effective in maintaining the integrity of identified nest substrate and, where appropriate, the associated woodland stand for subsequent nesting function. However, in practice, it was occasionally necessary to augment these smaller buffers (justified through NEPA analysis) to provide more comfortable levels of separation in the case of golden eagles and prairie falcons. Similarly, nests of raptors that are regarded as having special status (i.e., bald eagle, northern goshawk, peregrine falcon, and ferruginous hawk) are afforded expanded 1/4 mile NSO stipulation and 1/2 mile TL stipulation buffers that have generally been effective (Table 2-9 Records 28, 29, and 30) in the context of conventional oil and gas development practices. These buffers are considered minimum levels of protection for species of high management concern and generally offer little latitude for inadvertent non-compliance, individual birds especially intolerant of disturbance, or sensitization from cumulative or particularly disruptive episodes. Although these buffer dimensions have tended to provide adequate levels of protection in the past, the more expansive surface disturbance and longer-duration drilling activities associated with modern drilling and completion activities would elevate the potential risk of adverse nest disruption and may occasionally risk violating the

BLM_0019895

provisions of, for example, the Bald and Golden Eagle Protection Act, which prohibits activities that substantially interferes with normal reproductive activities and causes or is likely to cause a loss of productivity.

### 4.3.2.2.3   Grouse

Although the use of traditional stipulations have been widely criticized, recent research (Holloran 2005, Holloran et al. 2010, Wyoming Wildlife Consultants, 2009) demonstrates that those measures formerly adopted and espoused by the BLM, State Wildlife Agencies, and FWS (i.e., NSO and TL stipulations addressed below) are capable of reducing impacts associated with avoidance, but based on current understandings, not to the degree necessary to stem progressive declines in populations subjected to pervasive or prolonged development activity.

The current NSO stipulation (Table 2-6 Record 18) established around leks is 1/4 mile. Although intended only to maintain the character of habitat in the immediate vicinity of the lek, including daytime loafing areas for males, current literature suggests that this buffer may be insufficiently sized to maintain the integrity of these sites (Colorado Greater Sage-Grouse Steering Committee, 2007). Holloran (2005) found the number of males attending leks within 0.8 mile of field access roads declined at an average annual rate of 35 percent. Since timing limitations applicable to nest habitat beyond the 1/4 mile buffer would not apply until 15 April, vehicle activity could be authorized to take place in close proximity to active leks (just outside 1/4 mile) for at least the first two weeks of reproductive display and breeding (Hagen 1999) and probably exaggerate declines in male lek attendance.

The timing limitation stipulation intended to reduce disruption of ongoing nest efforts (Table 2-6 Record 10) is applied to suitable nest habitat within 2 miles of a lek. Again, current understandings of sage-grouse biology suggest that this buffer generally encompasses about 50 percent of nesting—leaving half the nesting attempts subject to disturbance and increased levels of disturbance-induced avoidance and mortality (e.g., risking nest failure and brood displacement to increasingly smaller and less optimal habitat patches). Based on Holloran's (2005) work, yearling hens affected by development tend to nest two miles or more from infrastructure. It follows that TL stipulation protection is extended most to high-fidelity adult hens that are prone to decline by attrition, but deemphasizes promoting recruitment from dispersing yearling hens that form the basis for future colonization and population longevity. Because nest densities and susceptibility to predation decrease the further birds nest from a lek, birds nesting at greater distances from a lek are thought to enjoy greater nesting success and may be another factor having important implications in population persistence (Holloran 2005).

Moreover, based on CPW wing analysis (1977-1994) from the Piceance Basin, the timing limitation end-date of July 7 allows for about 75 percent of the hatch to progress without disturbance in about 90 percent of years, but alternately, exposes 25 percent or less of nesting attempts to disruption in about 1 out of 2 years.

With known weaknesses in the efficacy of traditional stipulations and no express mechanism for managing development intensity or distribution, it is likely that substantial proportions of PPR sage-grouse habitat would be influenced by MPA development. Equitably distributed, about 30 percent of the alternative's 523 pads would be located on PPR overall sage-grouse range (157 pads or about one pad every two sections). At this pad density, it is expected that over the life of the plan about 40 percent of suitable sage-grouse habitat on federal estate would lie within 330 feet of infrastructure and it is likely that at least 75 percent of available habitat would be influenced by development activity (i.e., within a minimum 660-990 feet). This figure does not account for

BLM_0019789

development likely to occur across 30 percent of overall range overlying private mineral estate. Furthermore, because the current distribution of PPR sage-grouse in the MPA is concentrated in about 40 percent of the mapped overall range, the risk of elevated development rates (approaching one pad per section) within occupied sage-grouse habitat is substantial (see discussion above). Although the rate of development (seven-eight pads per year) and sage-grouse attrition over plan life would likely be gradual, it is likely that declining trends would continue and plausibly lead to the eventual extirpation of the population.

Although sage-grouse broods are attracted to open meadow types that offer succulent broadleaf vegetation (Hagen 1999) and enhanced invertebrate prey populations, interim and final reclamation, as currently practiced, does not figure prominently in providing alternate suitable sources of forage or cover (see Big game discussion). Further, considering the demonstrated avoidance of vehicle activity, two-tracks, and anthropogenic edges by sage-grouse (Carpenter et al. 2010, Holloran 2005), the unauthorized, but nearly routine development and uncontrolled use of two-track trails along pipeline rights-of-way (i.e., no management prescribed in Table 2-4 Record 8) detracts substantially from potential forage benefits and habitat utility derived from successful reclamation.

### Fluid Mineral Development Outside the MPA

There would be little projected development in sage-grouse habitat outside the MPA (i.e., 3 pads over 20 years). Conventional TL stipulations and NSO stipulations, siting considerations, and 660 feet moves would likely be sufficient to avoid important habitat features and seasonal activities associated with reproductive and winter use functions. Assuming that these projections are accurate, it is unlikely that fluid mineral development taking place in developed fields or at extremely low densities in fringe areas (Doherty 2008) would have any marked influence on the abundance or persistence of sage-grouse populations outside the MPA.

### 4.3.2.2.4   Migratory Birds

Total projected surface disturbance over the 20-year planning period would be 6,300 acres, including 1-2 percent of each major vegetation community in the MPA as nesting habitat for associated migratory birds (Table 4-54). At any given time, well development activity (prior to successful interim or final reclamation) would be expected to reduce the effective utility of adjacent nesting habitat equivalent to an additional 1-3 percent of those habitats' base (Table 4-54). By the time all wells projected to be drilled in this alternative were completed, the collective reduction of suitable shrubland and woodland nesting habitat and indirect habitat loss attributable to residual production and maintenance activity would reduce the effective utility of those nesting habitats available in the MPA by 3-6 percent (Table 4-54).

In the absence of any effort to restrict vegetation clearing, construction, or drilling during the migratory bird nesting season, on average, between 4-5 pads would be developed per year during the core nesting season (May 15 to July 15); direct disruption of ongoing nest efforts would extend to about 53 acres.

Big sagebrush habitats used for nesting by the BLM-sensitive Brewer's sparrow would be reduced (cleared for or occupied by development) by 2,500 acres (about 1.6 percent of MPA sagebrush base) over the life of the plan. Facility occupation would preclude vegetation recovery on 865 acres of former sagebrush habitat through and beyond the life of the plan (approximately 0.6 percent of former sagebrush base in MPA). Ultimately, adapted forms of sagebrush would colonize up to 3,500 reclaimed acres of former sagebrush, mountain shrub, and pinyon/juniper woodlands within

BLM_0019897

15-20 years after the life of the plan for a net gain over the foreseeable future of 1,100 acres (0.7 percent increase over former base).

**Table 4-54. Alternative A -- Development Effects on Migratory Bird Nesting Habitat**

| Vegetation Community | Direct Habitat Loss (Loss Of Habitat Suitability) | | | Indirect Habitat Loss (Reduction In Nest Habitat Capacity) | | | | | | |
| | At Year 20 | | | At Any Given Time [1] | | Residual [2] | | Long Term Direct and Residual [3] | |
| | Current MPA Acreage | Projected Acreage Disturbed | % of Base | Acres | % of Base | Acres | % of Base | Acres | % of Base |
|---|---|---|---|---|---|---|---|---|---|
| Mountain Shrub | 142,100 | 1,200 | 0.8 | 1,992 | 1.4 | 2,878 | 2.0 | 4,065 | 2.9 |
| Upland Sagebrush | 151,000 | 2,300 | 1.6 | 3,879 | 2.6 | 5,604 | 3.7 | 7,948 | 5.3 |
| Basin Big Sagebrush-Greasewood | 6,400 | 108 | 1.7 | 210 | 3.3 | 303 | 4.7 | 411 | 6.4 |
| Pinyon/juniper | 239,300 | 2,400 | 1.0 | 3,984 | 1.7 | 5,755 | 2.4 | 8,159 | 3.4 |
| Overall, all types | 598,700 | 6,300 | 1.0 | 10,484 | 1.8 | 15,146 | 2.5 | 21422 | 3.6 |

NOTES:
[1] Pad Activity Prior To Successful Reclamation
[2] Production Phase After Successful Reclamation
[3] End Of Projected Development

#### 4.3.2.2.5   Aquatic Wildlife

Refer to Section 4.3.3.2 for discussion on impacts to aquatic wildlife.

### 4.3.2.3   Alternative B

#### 4.3.2.3.1   Big Game

**Alternative B and C - Threshold Concept**

The compromise inherent to realizing resource benefits offered by modern drilling technologies (lower density surface disturbance) is prolonged and commonly year-round well development activity. Traditional application of seasonal activity restrictions on important big game ranges is intended to limit animal exposure to the most acute forms of disruption, but interrupts continuous drilling regimens and degrades the economic incentives for drilling large numbers of wells from a single location. It is also expected that there would be strong pressure from industry to except, and weakened support from other state and federal partners to apply, timing limitations in order to realize pad drilling benefits and economies. As new developments are initiated and established developments enlarge, the trend toward drilling large numbers of wells from a single location on a year-round basis would impose progressively on the utility of big game seasonal ranges. Reducing the number of pads and limiting the distribution and intensity of activity associated with development is widely recognized as paramount in maintaining the utility of these ranges in supporting objective levels of big game.

BLM_0019898

**Chapter 4 – Environmental Consequences**

In the absence of efforts to constrain or manage the distribution of activity in space and time, the behavioral influences associated with the development and production of 1,045 to 1,710 multi-well pads in the MPA would become pervasive. As discussed in Alterative A, traditional forms of timing limitations applied to habitats considered most important would promote a situation where continuous and intensive development activity would take place across extensive seasonal ranges that lie intermediate to late winter severe winter ranges and high-elevation summer ranges (i.e., distribution during fall and spring transitions and early to mid-winter months) and subject big game populations to strong behavioral influences from at least August 15 – December 15 and the month of May. Vehicular access would, by necessity, continue to traverse restricted regions to gain access to areas free of restrictions.

The application of activity thresholds is intended to allow for managed development across the landscape in spite of having a large percentage of the federal estate presently leased (93 percent) in the MPA and many of those leases held by production (would not expire nor be reissued with updated lease stipulations). In practice, it accepts that behavioral impacts to wildlife would occur, rather than presuming that stipulations or compensatory mitigation can substantially offset impacts. It doesn't concern the intensity of area-specific activity, but is intended to confine the most intrusive impacts to a predetermined percentage of the land base at any given time. The concept of clustering disturbance to reduce behavioral influences on wildlife has a theoretical foundation that suggests that patterns of disturbance are stronger determinants of cumulative effects than the density of those disturbances, particularly for species that avoid and are displaced by disturbance (Theobald et al. 1997). A different version of the concept is also being used for development of the Pinedale Anticline in Wyoming (i.e., core development area partitioned into 5 sub-areas, each having prescribed limits on the distribution and extent of year-round drilling/completion activity).

The threshold concept would allow for increasingly intense and year-round development in clustered patterns, but would not prescribe where or at what density development would occur. The leaseholder would have the prerogative of abiding by the thresholds and having big game timing limitations excepted, or conducting development outside the threshold allowances and abiding by traditional timing limitations. The exception criteria would not preempt timing limitations designed to protect special status or federally protected species, including raptor and greater sage-grouse. Ongoing deer research by CPW in the Piceance Basin is intended to establish the distributional and physiological response of mule deer to gas development in the MPA and is expected to furnish information that would allow adjustments to the thresholds that help maintain big game populations that meet the CPW's long-term objectives for affected GMUs.

The acreage ultimately affected by development is open to much speculation, but based on application of the thresholds, the area subject to acute forms of disturbance as well as those activities that take place prior to routine production activity (e.g., well testing, installation of production facilities, pit closures, reclamation) would ostensibly not exceed threshold values.

Additional explanatory information related to the threshold concept can be found in Chapter 2, Section 2.3.3.1.

### Direct Habitat Loss and Modification (Alternative B)

By Year 20, about 0.9 percent of big game habitat in the MPA would be occupied by facilities and possess no utility as forage and cover until final abandonment and reclamation (see Table 4-52 for a breakdown of seasonal range involvement).

BLM_0019899

*Chapter 4 – Environmental Consequences*

Proposed reclamation practices and success standards would accelerate the restoration of lands disturbed by development and establish a set of success criteria that provide for consistent reclamation objectives that incorporate wildlife-related forage and cover considerations and serve as the foundation for successional processes that would eventually restore habitat functions lost to development. Reclamation that would have potential to effectively offset herbaceous forage values lost to occupation would be applied to 7,300 acres (approximately 1.2 percent of each seasonal range).

The compensatory mitigation measure installed within this alternative (Table 2-4 Record 15) would require forage enhancement treatments equivalent to about 37,600 acres over the life of the plan (about 1,900 acres annually). Based on the current big game management philosophies, it is likely that pinyon/juniper woodlands, pinyon and juniper regeneration encroaching Wyoming big sagebrush types, big sagebrush valleys, and deciduous shrublands would be most often targeted for treatment. Although impossible to forecast the pattern or proportion of vegetation ultimately treated, it is likely that the treatments would contribute to reductions in the MPA's woodland base and modify its age structure (substantially on slopes less than 25 percent), while increasing the extent (approximately 6 percent increase) and dispersion of early successional shrubland acreage available in the MPA. Increasing the availability and distribution of forage widely across the MPA through mandatory compensation would add to comparable responses gained through enhanced interim reclamation, and would be expected to aid in improving the nutritional plane of big game and offsetting increased energetic demands placed on animals subject to development activity. Forage enhancements on winter ranges would probably be limited primarily to herbaceous response through the life of the plan (elk year-round; spring and fall deer use), with broader utility gained as a winter forage base for deer (shrubs) in the decades following the end of plan life.

**Indirect Effects**

Oil and gas development proposed in Alternative B (1,045 multi-well pads) would be expected to be distributed across 40 percent of the federal estate within the MPA. By Year 20, the level and distribution of development activity would result in indirect forms of habitat loss (avoidance and disuse of adjacent habitat) equivalent to a projected 75,400 acres (Table 4-53) or about 13 percent of big game habitat within the MPA. This value is calculated based on the same assumptions as in Alternative A. Total effective habitat loss at the end of project life is estimated to involve about 15 percent of the big game habitat available in the MPA.

This alternative proposes the establishment of timing limitations for all big game ranges in the MPA that are of sufficient duration (minimum 3-5 months) to effectively capture the primary period of occupation. Application of timing limitations across all big game seasonal ranges would provide a default device to substantially reduce disruption of seasonal big game use and would discourage the current practice of shifting development activity from ranges that carry timing limitations to winter ranges that have not been afforded these measures. Universal application across the MPA would also serve as an incentive to participate in activity thresholds established for this alternative.

Thresholds developed for Alternative B would limit acute influences attributable to high intensity oil and gas development (e.g., year-long vegetation clearing, pad construction, drilling, completion) to 10 percent of each seasonal range within individual GMUs except those ranges categorized by CPW as critical winter range (i.e., severe winter ranges that support animal densities qualifying as winter concentration areas) where the threshold limit would be 5 percent. Activity associated with previously developed pads that have not met reclamation success criteria or that may, for other reasons, require visitation at levels exceeding an average of once per day would be considered a collective effect. The total area influenced by collective and acute effects would be limited to

BLM_0019900

20 percent of each seasonal range by GMU (10 percent on critical winter range). It is understood that those pads in production that meet the reclamation success criteria would accumulate across the landscape, continue to require low levels of routine maintenance, and persist in eliciting avoidance response. However, this base-level activity is dismissed within the threshold calculations because, in a practical sense, it is the end objective for the life of the field and presumably cannot be further reduced with foreseeable technology. There is sufficient evidence in the literature to suggest that low intensity, predictable activity is tolerated by most wildlife groups (Webb et al. 2011, Frederick 1991, Walker et al. 2007) such that effective habitat loss, under the circumstances, represents the smallest practical level of impact.

Additional threshold values would be applied to areas that are needed to remain relatively free of disturbances attributable to development to provide effective experimental controls for big game studies now being conducted by CPW. Acute forms of disturbance (e.g., construction, drilling, and completions) would not be allowed in these areas during the period of occupation and collective forms of impact would be limited to 5 percent of each seasonal range represented in the lease holding. Application of these criteria would be temporary and adapted to current research needs.

An important corollary to the threshold limits are provisions that require effective vehicle limitations on pad access networks (Table 2-4 Record 14, Table 2-19 Records 8 and 9) and powerline/pipeline right-of-ways (Table 2-4 Record 8). This management would restrict use of pad access roads exclusively to that necessary for well production and maintenance services. Absent exception criteria, traffic frequency would be most effectively reduced and capable of being accurately monitored as information to gauge threshold compliance.

With the application of BMPs, particularly liquid gathering systems, and access management that complements reductions in the frequency of road use, the extent of indirect habitat loss attributable to vehicle activity in areas affected by development would be reduced by up to 28 percent (compared to not use three-phase gathering systems).

Although development would be expected to intensify locally across the MPA, pad density would likely be similar in any area of development regardless of alternative. The likelihood of development substantially impeding seasonal range transition to the point of altering traditional range occupation in the MPA is considered low, especially under the assumption that 90 percent of that development would be using fluids gathering systems that would reduce truck traffic during the decades-long production phase by 90 percent. However, activity restrictions would be available in the alternative to remedy localized or emerging problems.

## Deer-Elk Relationships

Seasonal ranges of deer and elk are roughly coincident in the MPA. Deer are the big game species of highest management concern in the Piceance Basin, and their seasonal ranges are used in this analysis as a surrogate for elk since the threshold calculations cannot readily accommodate range overlap.

Deer summer ranges in the MPA (as devised for threshold analysis) encompass 56 percent of elk summer/production area habitat delineated in the MPA, but captures 77 percent of that elk range above 7,500 feet. Summer elk use below 7,500 feet in the Piceance Basin is believed to be localized and involves relatively few animals. All elk summer concentration areas defined for elk are encompassed by deer summer range. Although there is essentially no severe winter range mapped for elk in Piceance, about 26 percent of elk winter concentration areas are coincident with deer severe winter ranges; the remaining 74 percent are synchronous with deer general winter range

BLM_0019901

(53 percent) and deer summer range. Explicit timing limitations would not be available to apply to important elk seasonal ranges that are not coincident with deer, but the exception criteria would allow for adjustments in the 90 to 120-day TL stipulation windows in consideration of coincident elk use. These allowances would be capable of capturing much of the typical 4-5 month seasonal use span.

## Development Outside of MPA

Proposed development outside the MPA is expected to average 2-3 single-well pads per year (55 over the life of the plan) in locations primarily associated with established fields in GMU 21 and the Rangely Oil Field. Direct and indirect impacts attributable to this development would continue to be localized, relatively minor in scale, and occur principally in GMU 21 deer winter concentration areas. Although the threshold standards would apply to areas outside the MPA, applying Conditions of Approval that limit well development activities to timeframes outside the period of occupation is expected to remain a viable management option, since many previously developed fields would probably not satisfy the reclamation criterion of the threshold standard.

Total surface disturbance outside the Rangely Oil Field would amount to about 528 acres by Year 20 with about 60 percent of that subject to interim reclamation standards presented above. Assuming all disturbances would take place on deer winter concentration areas, total habitat modification over the 20 year life of the plan would involve about 0.6 percent of GMU 21 winter concentration areas. Reductions in habitat utility associated with avoidance of active drilling and the accumulation of production activity (same criteria as applied in MPA) would not be expected to exceed 2 percent of the more important winter ranges in GMU 21 (winter concentration, severe and critical winter ranges) through the life of the plan.

Expansive tracts of NSO stipulations, attributable primarily to that proposed to maintain black-footed ferret habitat, would reserve from development 87 percent of all pronghorn winter habitat in the WRFO. Coincident big game timing limitations would defer winter developments across another 11 percent of pronghorn winter range. These NSO stipulations would also preclude development effects from 87 percent of the habitat base supporting summer use on the U.S. 40 corridor and Sagebrush Draw/Crooked Wash area. The proposed sage-grouse core area deferral (Table 2-6 Record 12) would temporarily preclude development activity on pronghorn summer ranges across Blue Mountain (about 30 percent of overall range in WRFO). In the longer term, proposed sage-grouse threshold provisions may either limit direct and indirect disturbances of pronghorn summer habitat to about 10 percent on Blue Mountain or involve the application of timing limitations that would defer activities disruptive to pronghorn reproductive activities across 72 percent of the Blue Mountain pronghorn ranges. Development in the Rangely Oil Field (approximately 11 wells over 20 years) would continue to be inconsequential to the resident pronghorn population in Coal Oil Basin.

### 4.3.2.3.2   Raptors Alternative B

Based on the same criteria used in Alternative A, pinyon/juniper woodlands cleared for development (5,000 acres) are projected to involve about 2.1 percent of the MPA woodland base and 4 percent of the base best suited for woodland raptor nesting (i.e., woodlands less than 25 percent slope).

Woodland management constraints (e.g., Table 2-15 Record 9) would limit the clearing of woodlands at comparable levels (5,200 acres) over the life of the plan and would complement woodland raptor management objectives by emphasizing retention of mature and old growth

BLM_0019902

components best suited for nesting. A number of siting criteria allow for facility relocation to reduce diminishment or deterioration of woodlands as raptor nest habitat. In certain instances, raptor-specific management criteria (i.e., Table 2-5 Record 10) have been reduced in extent (from 1/2 to 1/4 mile buffers), but complementary landscape-level woodland community management (e.g., Table 2-15 Record 12) provides comparable levels of consideration. Conferring emphasis on the retention of mature woodlands and all forest types as high value migratory bird habitats (i.e., Table 2-7 Record 5) would also contribute to minimizing long-term adverse modification of woodland or forest canopies that may serve as near-term or future nest and foraging habitat.

Conversely, more expansive and rigid application of NSO provisions (i.e., no exception or modification criteria) associated with channels (22,100 acres to 55,300 acres; Table 2-2 Record 12) and special status plants (78,700 acres to 91,400 acres; Table 2-10 Records 15 and 16) may be expected to frequently contradict these objectives by increasing the emphasis on locating pads in upland habitats inhabited by woodland raptors and limiting flexibility in locating disturbances to avoid higher-value woodland habitat. No surface occupancy stipulation application that precludes pad development along drainages would necessitate lengthy duplicate access and alternate pads located along adjoining ridgelines. Similarly, broad inviolate buffers applied to potential and suitable special status plant habitats would require access routing and pad locations that would regularly subordinate woodland management objectives and compromise associated wildlife values. Although unable to model this influence, it is anticipated that that these provisions would widely aggravate the adverse modification of, and intensity of development activity in, woodland habitat across of the MPA.

In this alternative, low, open shrubland as foraging habitat for buteos and eagles (less than 25 percent slope) lost to facility occupation would be generally offset (0.8 percent gain) by former deciduous shrublands and woodlands that have been cleared and reclaimed.

Larger radii buffers applied to TL stipulation and NSO stipulation buffers would elevate protection of individual nest sites to risk-free levels. This alternative would generally adopt CPW and/or FWS raptor buffer guidelines of 1/8-mile NSO stipulation and ¼-mile TL stipulation buffers for most species of owl, 1/4-mile NSO stipulation and 1/2 mile TL stipulation buffers for the bulk of common raptor species, including burrowing, pygmy, and flammulated owl and 0.5-mile NSO and 0.5 to 1-mile (ferruginous hawk, none in MPA) TL buffers to most raptors of higher management concern (Table 2-5 Record 11 and Table 2-9 Records 28 and 30). In contrast to current management, these expanded NSO stipulations and TL stipulations provide double the lateral separation and quadruple the area subjected to restricted use. In practice, these buffers as applied to the most frequently encountered raptors in the MPA (i.e., Cooper's hawk, long-eared owl, red-tailed hawk) would provide nest site and activity protection at levels generally comparable to Alternative A, but would likely require WRFO to more frequently document modifications to the stipulation in cases where buffers could be appropriately reduced without jeopardizing the success of ongoing or subsequent nest efforts. Larger diameter buffers applied to raptors of higher management concern, especially the eagles and goshawk, would be instrumental in providing reliable protection to species that, at this time, warrant heightened management attention. Larger NSO stipulation buffers would also provide a redundant means to reserve adjacent or contiguous woodland habitat that is suitable for near-term or future occupation by nesting woodland raptors (i.e., duplicating the intent of Table 2-5 Record 10, but see discussion above) or in the case of burrowing owl and ferruginous hawk, augment the expansive NSO associated with white-tailed prairie dog distribution (Table 2-9 Record 15).

BLM_0019903

### 4.3.2.3.3   Grouse Alternative B

In the absence of constraint, about 2,700 wells on 314 pads are projected to be developed on sage-grouse range in the MPA. Over the life of the plan, pad density would average about 1 pad per section and progress at a rate of about 16 pads per year over the life of the plan. This development rate would be similar, on average, to the lesser rate presented in the Common to All exercise above. Active drilling and production access would be expected to severely compromise the utility (within 330 feet of roads) on about one-third of all available habitat on federal estate within 5 years. At full build-out, it is estimated that at least 70-80 percent of all available habitat (within 660 to 990 feet of infrastructure) would be heavily influenced by development activity.

Thresholds, similar in purpose and applications as those presented for big game, are proposed in this alternative to provide a framework to limit both the extent and distribution of development activity and a means to provide a continuum of areas relatively and temporarily free of development influences (Table 2-6 Record 16). The basis for the 200-meter disturbance buffer is carried forward from big game avoidance response. These buffers, normally used to help quantify the extent of habitat where avoidance response is likely (indirect habitat loss), are loosely applied to represent acute avoidance response in sage-grouse as well, but the buffer metrics are intended only as a means to measure and index the distribution and extent of development, not to literally quantify the effects of disturbance. In fact, the 200 meter buffer does not accurately represent the reported avoidance response of sage grouse to development infrastructure. Recent research suggests the birds' avoid various forms of development activity and infrastructure at minimum distances of 0.25 mile (Carpenter et al. 2010) and extending to 2 or more miles (Holloran 2010, Lyon and Anderson 2003). However, in simulations, the 200-meter buffer appeared to remain reasonably scaled and appropriate for use in the case of grouse since declining buffer radii reduces the allowable degree of development dispersion and increases the need for infrastructure proximity to make efficient use of threshold allowances.

Due to the current status of PPR sage-grouse, special consideration would be extended to sage-grouse population centers identified in cooperation with the CPW (Table 2-6 Record 9). Although the efficacy of this strategy is unproven, the strategy would ostensibly limit cumulative adverse influences (primarily those activities that prompt behavioral avoidance) within 4 miles of a lek to 10 percent of presently occupied habitats and 25 percent of unoccupied habitats that are suited for use (or capable of being restored for use) as sage-grouse populations disperse from development or expand with recovery. Further provisions would limit adverse influences on occupied habitats that are more distant from a lek to 20 percent. In a similar vein, it is considered imperative to acknowledge formerly occupied habitat associated with inactive lek locations since they represent the relatively recent (within last 40 years) distribution of populations (Holloran and Anderson 2005). Highlighting lek-associated habitats for management provides a means for determining whether installation of infrastructure would impair the long-term utility of associated habitat that would otherwise remain available to allow for population recovery (i.e., preventing the "ratcheting-down" effect when populations are in decline and contracting).

In practice, it is estimated that the 10 percent threshold limit on nesting habitat may confine active development of ridgeline habitats to a single ridge in larger leaseholds. Limitations on the rate of ridgeline developments would be expected to substantially extend development timeframes. As discussed in the "Impacts Common to All Alternatives", innovative pad and infrastructure designs and resource trade-offs (e.g., riparian and perennial channel systems) may be necessary to successfully achieve conservation objectives in the face of development. It is acknowledged that, in coordination with CPW and other affected interests, threshold values and measures may be refined

BLM_0019904

consistent with the results of relevant research or accepted understandings of sage-grouse biology (Table 2-6 Record 14).

In consideration of the limited availability of habitats in the MPA (discussed above), this alternative would also implement a provision that limits long term conversions or adverse modifications of habitat to 2 percent within a lease-holding (Table 2-6 Record 17). Narrow allowance for direct loss or deleterious modification of sagebrush habitat would help avoid problems associated with increasingly concentrated bird use of a diminishing habitat base, such as inflated nest densities or concentrated brood use that may enhance detection and mortality by grouse predators (Holloran and Anderson 2005).

Developments that are not bound by the threshold limits (e.g., interstate transmission pipelines or powerlines) or do not operate with year-round drilling exceptions would be subject to more traditional timing limitations and no-surface-occupancy provisions (Table 2-6 Records 10 and 18), enhanced sage-grouse oriented reclamation requirements (Table 2-6 Records 8 and 16) and access restrictions (e.g., Table 2-4 Record 8, Table 2-19 Record 7). These stipulations would be applied to areas more recently recognized as functionally important to sage-grouse (e.g., 0.6 mile lek NSO, nest TL within 4 miles of a lek). The TL stipulation timeframes on these measures are altered slightly from those currently used. Based on CPW wing analysis (1977-1994) from the Piceance Basin, the timing limitation end-date of July 15 allows for about 75 percent of the hatch to progress without disturbance in all years, and limits exposing 25 percent or less of nesting attempts to disruption to about 1 year in 3.

## Fluid Mineral Development Outside the MPA

There would be little projected development in sage-grouse habitat outside the MPA (i.e., 6 pads over 20 years). The Meeker population areas would be subject to identical threshold allowances as discussed in the MPA, but it is anticipated that much of this development (at least through plan life) would take place as single-well pads and operators would likely not opt (or not qualify) for year-round drilling exceptions. Timing limitations and NSO stipulations (Table 2-6 Records 10 and 18), surface use limitations and siting considerations (Table 2-6 Record 17), and enhanced sage-grouse oriented reclamation requirements (Table 2-6 Records 8 and 16) would likely be sufficient to avoid important habitat features and seasonal activities associated with reproductive and winter use functions on federally-administered lands.

The Northwest Colorado population area would be subject to the same provisions, however, an NSO stipulation proposed in this alternative for the maintenance of prairie dog systems (Table 2-9 Record 15) would disallow surface disturbance in virtually all (greater than 95 percent) habitats capable of supporting sage-grouse along the U.S. 40 corridor. Those areas not captured by the prairie dog habitat buffers are largely in peripheral locations that are no longer known to support sage-grouse (i.e., Stedman Mesa, Boise Creek/Hammond Draw, and lower Red Wash).

Leasing actions within the Blue Mountain segment of the Northwest Colorado population would be deferred until such time that novel management strategies being widely deployed in Colorado and Wyoming convincingly demonstrate that fluid minerals can be developed consistent with the long term maintenance and conservation of coincident populations of sage-grouse. Deferral would relieve this population segment from a degree of short-term risk (i.e., 48 percent of deferral area presently available for development, including 20 percent in private mineral estate) that may attend inaccurate development projections by the BLM or failure of contemporary grouse management ideas to successfully achieve long-term sage-grouse conservation and recovery. This segment of the Northwest Colorado population segment represents about 30 percent of the collective habitat

BLM_0019905

*Chapter 4 – Environmental Consequences*

potentially suited for sage-grouse in WRFO, but likely supports more than half the sage-grouse inhabiting the WRFO.

Assuming that development projections are accurate, and considering the management prescriptions composing this alternative, there is little likelihood that fluid mineral development of federal estate would have any marked influence on the abundance or persistence of sage-grouse populations outside the MPA.

### 4.3.2.3.4   Migratory Birds Alternative B

Total projected surface disturbance over the 20-year planning period would be 12,500 acres, including 1-3 percent of each major vegetation community in the MPA as nesting habitat for associated migratory birds (Table 4-55). At any given time, well development activity (prior to successful interim or final reclamation) would be expected to reduce the effective utility of adjacent nesting habitat equivalent to an additional 2-4 percent of those habitats' base (Table 4-55). By the time all wells projected to be drilled in this alternative were completed, the collective reduction of suitable shrubland and woodland nesting habitat and indirect habitat loss attributable to residual production and maintenance activity would reduce the effective utility of those nesting habitats available in the MPA by 4-9 percent (Table 4-55).

Brewer's sparrow nesting habitat would be reduced by 5,100 acres over the life of the plan (3.2 percent of MPA base). Long-term loss attributable to facility occupation would involve 2,100 acres (1.4 percent of base), but sagebrush colonization of reclaimed non-sagebrush communities would yield net gains in the availability of sagebrush nesting habitat of up to 2,100 acres or an increase of 1.3 percent over the former base.

**Table 4-55. Alternative B -- Development Effects on Migratory Bird Nesting Habitat**

| Vegetation Community | Direct Habitat Loss (Loss Of Habitat Suitability) | | | Indirect Habitat Loss (Reduction In Nest Habitat Capacity) | | | | | | |
| | At Year 20 | | | At Any Given Time [1] | | Residual [2] | | Long Term Direct And Residual [3] | |
| | Current MPA Acreage | Projected Acreage Disturbed | % of Base | Acres | % of Base | Acres | % of Base | Acres | % of Base |
|---|---|---|---|---|---|---|---|---|---|
| Mountain Shrub | 142,100 | 2,200 | 1.5 | 2,793 | 2.0 | 3,537 | 2.5 | 5,723 | 4.0 |
| Upland Sagebrush | 151,000 | 5,000 | 3.3 | 6,573 | 4.4 | 8,322 | 5.5 | 13,293 | 8.8 |
| Basin Big Sagebrush-Greasewood | 6,400 | 83 | 1.3 | 115 | 1.8 | 146 | 2.3 | 229 | 3.5 |
| Pinyon/juniper | 239,300 | 5,000 | 2.1 | 6,573 | 2.7 | 8,322 | 3.5 | 13,283 | 5.6 |
| Overall, all types | 598,700 | 12,500 | 2.1 | 16,432 | 2.7 | 20,806 | 3.5 | 33,346 | 5.6 |

NOTES:
[1] Pad Activity Prior To Successful Reclamation
[2] Production Phase After Successful Reclamation
[3] End Of Projected Development

BLM_0019906

This alternative includes a siting constraint that requires avoiding identified habitat associations that support disproportionately rich and abundant migratory bird communities by merit of increased structural and vegetation complexity (Table 2-7 Record 5). This measure would not necessarily reduce the acreage involved under each habitat category, but would be capable of substantially reducing the long-term modification of more optimal nesting habitat offered by mature stands of pinyon/juniper and Gambel oak, aspen and coniferous forests, and well-developed big sagebrush communities throughout the MPA. In practice, siting refinements (i.e., realigning or moving proposed facilities) would confine surface disturbance, as much as practicable, to younger woodland stands, conifer-encroached shrublands, habitats with degraded understories, habitats in closer proximity to existing forms of disturbance, and the margins of habitat parcels. These moves would be site-specific and negotiated with the operator during on-site inspections.

Timing limitations (Table 2-7 Record 6) consistent with strict interpretations of the MBTA would be applied across the Field Office to those development activities that have the greatest likelihood of physically or behaviorally compromising the success of ongoing nest efforts (e.g., vegetation clearing and pad/road construction activities, well drilling and completion, and utility installations). Broad application of TL stipulations would be effective in preventing development-induced nest failures and localized declines in annual production, but they are expected to have only modest influence on migratory bird populations in the MPA (see discussion in Alternative D, Section 4.3.2.5.4). Efforts designed to protect current-year nest production efforts may be nearly discountable relative to the scale of decline attending more expansive and persistent forms of direct and indirect habitat loss (see discussion in Alternative D, Section 4.3.2.5.4). Efforts to reduce levels of direct and indirect disturbance on habitats that support richer avian communities (Table 2-7 Record 5) is considered a more effective means of minimizing declines in migratory bird breeding abundance and distribution in the WRFO.

Although impossible to forecast its influence on acreage used for migratory bird nesting, clustering of development (via threshold compliance) would be expected to substantially reduce the extent of those nest habitats whose utility would be adversely affected by development activity, especially by reducing the required network of collector roads. Vehicle use on a system of shared access would remain relatively high over the life of a field and, accumulating through time, would be the largest contributor to behavioral disturbances that reduce breeding bird density in adjacent habitat. By Year 20, the collector road system is expected to account for 45-50 percent of habitat rendered effectively unavailable for migratory bird nesting. Because development-related avian impacts appear to intensify with increasing road use (Gilbert and Chalfoun 2011), management that reduces the frequency of vehicle use on oil and gas access roads during the nesting season would complement efforts to reduce the accumulation of residual activity-avoidance effects (e.g., Table 2-4 Record 14, Table 2-19 Records 8, 11, and 13).

### 4.3.2.3.5   Aquatic Wildlife Alternative B

Refer to Section 4.3.3.3 for discussion on impacts to aquatic wildlife for Alternative B.

### 4.3.2.4      Alternative C

### 4.3.2.4.1   Big Game

#### Direct Habitat Loss and Modification

By Year 20, about 1.4 percent of big game habitat in the MPA would be occupied by facilities and possess no utility as forage and cover until final abandonment and reclamation (see Table 4-52 for a breakdown of seasonal range involvement).

BLM_0019907

Similar to Alternative B, proposed reclamation practices and success standards would accelerate the restoration of lands disturbed by development and serve as the foundation for successional processes that would eventually restore habitat functions lost to development. Reclamation that would have potential to effectively offset herbaceous forage values lost to occupation would be applied to 12,000 acres (approximately 2.0 percent of each seasonal range).

There would be no explicit requirement to implement compensatory mitigation to bolster big game forage availability in this alternative. However, it is assumed that the BLM would continue to participate in land treatments through various intra- and intergovernmental programs (e.g., 1298 Rule Wildlife Mitigation Plans, Habitat Partnership Program, Fuels Management) that would remain consistent with the BLM-authorized vegetation and habitat objectives and effectively offset forage reductions attributable to oil and gas development.

**Indirect Effects**

Oil and gas development proposed in Alternative C (1,710 multi-well pads) would be expected to be distributed across 66 percent of the federal estate within the MPA. By Year 20, the level and distribution of development activity would result in indirect forms of habitat loss (avoidance and disuse of adjacent habitat) equivalent to a projected 133,300 acres (Table 4-53) or about 22 percent of big game habitat within the MPA. Total effective habitat loss at the end of project life is estimated to involve about 25 percent of the big game habitat available in the MPA.

Similar in intent to that discussed in Alternative B, this alternative proposes the establishment of timing limitations for all big game ranges in the MPA. Timeframes allowed in this alternative are shorter in duration and are considered sufficient (2 to 4 months) to capture only that occupation period of greatest concern (e.g., animal density, physiological status). Timing limitations would be 30 days shorter (25 percent) across most seasonal ranges, but 60 days shorter (50 percent) on designated winter concentration areas. Although abbreviated restrictions would elevate the risk of exposing animals to serious energetic challenges at inappropriate times, it is assumed that most development in the MPA would opt to operate within the thresholds, and disturbance reprieves afforded by timing limitations would probably not be relied upon widely to reduce animal effects.

Thresholds developed for Alternative C (see discussion in Alternative B) would limit influences attributable to high intensity oil and gas development to 25 percent of most seasonal ranges within individual GMUs. The threshold limit would be 10 percent on ranges categorized by CPW as critical winter range. The total area influenced by collective and acute effects would be limited to 25 percent of each seasonal range by GMU (20 percent on critical winter range).

Similar to Alternative B, additional threshold values would be applied to areas that are needed as experimental controls for ongoing big game studies. Collective forms of impact would be limited to 5 percent of each seasonal range, however, limited allowances for acute forms of disturbance (e.g., construction, drilling, and completions) may be considered during the period of animal occupation, as long as this disturbance remains consistent with research needs. Application of these criteria would be temporary and adapted to current research need.

Similar to Alternative B, this alternative also incorporates access restrictions that complement the threshold provision; however, this version would provide certain latitude in considering exceptions. Relaxing access restrictions to concerns not expressly associated with well production and maintenance would likely complicate compliance and compromise the intended effect on big game (Cole et al. 1997; Rowland et al. 2005).

BLM_0019908

With the application of BMPs, particularly liquid gathering systems and access management that complements reductions in the frequency of road use, the extent of indirect habitat loss attributable to vehicle activity in areas affected by development would be reduced by up to 23 percent (compared to not use three-phase gathering systems).

Similar to the discussion in Alternative B, the likelihood of proposed development patterns substantially impeding seasonal range transition is considered low and activity restrictions would be available in the alternative to remedy localized problems.

**Deer-Elk Relationships**

The relationship between elk and deer ranges and coincidence of timing limitations would be the same as discussed in Alternative B. Explicit timing limitations would not be available to apply to important elk seasonal ranges that are not coincident with deer, but the exception criteria would allow for adjustments in 90-day TL stipulation windows in consideration of coincident elk use.

Proposed development outside the MPA is expected to average 4-5 single-well pads per year (90 over the life of the plan) in locations and manners similar to those described in Alternative B.

Total surface disturbance outside the Rangely Oil Field would amount to about 864 acres by Year 20 with about 60 percent of that subject to interim reclamation. Total habitat modification over the 20 year life of the plan would involve about 1 percent of GMU 21 winter concentration areas. Reductions in habitat utility associated with avoidance of active drilling and the accumulation of production activity (same criteria as applied in MPA) would not be expected to exceed 3 percent of the more important winter ranges in GMU 21 (winter concentration, severe and critical winter ranges) through the life of the plan.

Although unlikely that pronghorn ranges outside the Rangely Oil Field would be subject to substantive development pressure, this alternative provides coincident big game timing limitations that would serve to defer disturbances for up to 90 days across 70 percent of the WRFO pronghorn winter range during the winter months. The proposed sage-grouse core area deferral (Table 2-6 Record 12) would temporarily preclude development activity on pronghorn summer ranges across Blue Mountain (about 30 percent of overall range in WRFO).

In the longer term, compliance with the proposed sage-grouse threshold provisions would limit direct and indirect disturbances of pronghorn habitat (summer and winter use) to about 10 percent on Blue Mountain and Sagebrush Draw and about 25 percent for the U.S. 40 corridor. Decisions to operate outside the threshold criteria would invoke application of timing limitations that would defer activities disruptive to pronghorn reproductive activities across 72 percent of the Blue Mountain and 90 percent of the Sagebrush Draw/Crooked Wash pronghorn habitats. There would be little reliable application of timing limitations corresponding to pronghorn summer range use along the U.S. 40 corridor, but site-specific 60-day deferrals remain available for those instances where summer use functions may be seriously compromised by development activity. Development in the Rangely Oil Field (approximately 18 wells over 20 years) would continue to be inconsequential to the resident pronghorn population in Coal Oil Basin.

## 4.3.2.4.2   Raptors Alternative C

Pinyon/juniper woodlands cleared for development (8,100 acres) are projected to involve about 3 percent of the MPA woodland base and about 7 percent of the base best suited for woodland raptor nesting (i.e., woodlands less than 25 percent slope).

BLM_0019909

*Chapter 4 – Environmental Consequences*

Woodland management constraints (e.g., Table 2-15 Record 9) would limit the clearing of woodlands at comparable levels (8,400 acres) over the life of the plan and would, as in Alternative B, complement woodland raptor management objectives by emphasizing retention of mature and old growth components best suited for nesting.

Similar to Alternative B, the siting criteria that allows for facility relocation to reduce diminishment or deterioration of raptor nest habitat (e.g., Table 2-5 Records 8 and 10 and Table 2-15 Record 12) and conferring emphasis on the retention of mature woodlands and all forest types as high value migratory bird habitats (i.e., Table 2-7 Record 5) would, to a large degree, remain available to minimize long-term adverse modification of woodland or forest canopies that may serve as near-term or future nest and foraging habitat.

No surface occupancy and CSU stipulation provisions established in this alternative for channels (Table 2-2 Record 12) and special status plants (Table 2-10 Records 15 and 16) are applied with exception and modification criteria that allow little more effective latitude in application than in Alternative B. In a similar fashion, these resource protection constraints would be expected to frequently contravene woodland management objectives by increasing the emphasis on locating pads in upland habitats inhabited by woodland raptors and limiting flexibility in locating disturbances to avoid higher-value woodland habitat. As in Alternative B, it is anticipated that that these provisions would widely aggravate the adverse modification of, and intensity of development activity in, woodland habitat across of the MPA area.

Low, open shrubland as foraging habitat for buteos and eagles (less than 25 percent slope) lost to facility occupation would be generally offset (1.2 percent gain) by former deciduous shrublands and woodlands that have been cleared and reclaimed.

As applied to species that are most commonly encountered in the MPA (i.e., Cooper's and red-tailed hawks and long-eared owls) and are not managed as special status, the long-established 1/8 mile NSO stipulation and 1/4 mile TL stipulation prescriptions (Table 2-5 Record 11) have, in WRFO's experience, provided lateral separation sufficient to avoid diminished reproduction (e.g., site abandonments, prolonged absence of brooding or incubating birds) and have been effective in maintaining the integrity of identified nest substrate and, where appropriate, the associated woodland stand for subsequent nesting function. Nests of raptors with elevated status (i.e., golden and bald eagle, northern goshawk, prairie and peregrine falcon, burrowing owl (none in MPA), and ferruginous hawk (none in MPA) are afforded expanded 1/4 mile NSO and 1/2 to 1 mile TL stipulation buffers (Tables 2-9 Records 28, 29, and 30). These buffers are considered minimum levels of protection for species of high management concern and generally offer little latitude for inadvertent non-compliance, individual birds especially intolerant of disturbance, or sensitization from cumulative or particularly disruptive episodes. Although these buffer dimensions have tended to provide adequate levels of protection in the past, the more expansive surface disturbance and longer-duration drilling activities associated with modern drilling and completion activities would elevate the potential risk of adverse nest disruption and may occasionally risk violating the provisions of, for example, the Bald and Golden Eagle Protection Act, which prohibits activities that substantially interferes with normal reproductive activities and causes or is likely to cause a loss of productivity.

### 4.3.2.4.3   Grouse Alternative C

In the absence of constraint, about 4,500 wells on 513 pads are projected to be developed on sage-grouse range in the MPA. Over the life of the plan, pad density would average about 2 pads per section and progress at a rate of about 26 pads per year over the life of the plan. Active drilling

BLM_0019910

*Chapter 4 – Environmental Consequences*

and production access would be expected to severely compromise the utility (within 330 feet of roads) on about 75 percent of all available habitat on federal estate within 5 years. At full build-out, it is estimated that at least 70-80 percent of all available habitat (within 660 to 990 feet of infrastructure) would be heavily influenced by development activity.

Sage-grouse habitat thresholds, similar to those discussed in Alternative B are also proposed in this alternative (Table 2-6 Record 16). Although some of the same complementary provisions would apply (e.g., special management consideration for habitat identified by CPW, Table 2-6 Record 9) the criteria for evaluating and implementing this version are designed to allow for increased development activity. This strategy would ostensibly limit cumulative adverse influences (primarily those activities that prompt behavioral avoidance) within 4 miles of a lek to 20 percent of occupied habitats and 25 percent of unoccupied habitats that are suited for use (or capable of being restored for use) as sage-grouse populations disperse from development or expand with recovery. Further provisions would limit adverse influences on occupied habitats that are more distant from a lek to 25 percent. Similar to the reasoning provided in Alternative B, management prescriptions would be extended to habitat associated with both active and inactive leks.

In practice, it is estimated that the 20 percent threshold limit on nesting habitat (about 600 acres, based on habitat within 330 feet of infrastructure) may confine active development of ridgeline habitats to one or two ridges in larger leaseholds. As discussed in Alternative B, limitations on the rate of ridgeline developments would be expected to substantially extend development timeframes and innovative infrastructure designs and resource trade-offs may be necessary to successfully achieve conservation objectives in the face of development. It is acknowledged that, in coordination with CPW and other affected interests, threshold values and measures may be refined consistent with the results of relevant research or accepted understandings of sage-grouse biology (Table 2-6 Record 14).

Although there is no prescribed limit for long-term habitat occupation or modification proposed in this alternative, the current emphasis on sage-grouse habitat management would be expected to lend strong impetus to the avoidance of identified habitats (Table 2-6 Record 17) via siting considerations and COAs developed for individual NEPA analyses.

Developments that are not bound by the threshold limits (e.g., interstate transmission pipelines or powerlines) or do not operate with year-round drilling exceptions would be subject to more traditional timing limitations and no-surface-occupancy provisions (Table 2-6 Records 10 and 18), enhanced sage-grouse oriented reclamation requirements (Table 2-6 Records 8 and 16), and access restrictions (e.g., Table 2-4 Record 8, Table 2-19 Record 7). These stipulations would be applied to areas more recently recognized as functionally important to sage-grouse (i.e., 0.6 mile lek NSO stipulation, nest TL stipulation within 4 miles of a lek). Timing limitation stipulation timeframes would be the same as those discussed in Alternative A and would allow about 75 percent of the hatch to progress without disturbance in about 90 percent of years, but alternately, expose 25 percent or less of nesting attempts to disruption in about half (55 percent) of years.

Projected fluid mineral development in sage-grouse habitat outside the MPA would be similar to that discussed in Alternative B (i.e., 9 pads over 20 years). The Meeker and Northwest Colorado population areas would continue to be subject to threshold allowances as discussed for the MPA. Timing limitation stipulations and NSO stipulations (Table 2-6 Records 10 and 18), surface use limitations and siting considerations (Table 2-6 Record 17), and enhanced sage-grouse oriented reclamation requirements (Table 2-6 Records 8 and 16) would likely be sufficient to avoid important habitat features and seasonal activities associated with reproductive and winter use

BLM_0019911

functions. Leasing actions within the Blue Mountain segment of the Northwest Colorado population would continue to be deferred for the same reasons discussed in Alternative B.

Assuming that these projections are accurate, it is unlikely that fluid mineral development taking place in developed fields or at very low densities in fringe areas (Doherty 2008) would have any marked influence on the abundance or persistence of sage-grouse populations outside the MPA.

### 4.3.2.4.4   Migratory Birds Alternative C

Total projected surface disturbance over the 20-year planning period would be 20,500 acres, including 3-5 percent of each major vegetation community in the MPA as nesting habitat for associated migratory birds (Table 4-56). At any given time, well development activity (prior to successful interim or final reclamation) would be expected to reduce the effective utility of adjacent nesting habitat equivalent to an additional 5-7 percent of those habitats' base (Table 4-56). By the time all wells projected to be drilled in this alternative were completed, the collective reduction of suitable shrubland and woodland nesting habitat and indirect habitat loss attributable to residual production and maintenance activity would reduce the effective utility of those nesting habitats available in the MPA by 7-15 percent (Table 4-56).

**Table 4-56. Alternative C -- Development Effects on Migratory Bird Nesting Habitat**

| Vegetation Community | Direct Habitat Loss (Loss Of Habitat Suitability) | | | Indirect Habitat Loss (Reduction In Nest Habitat Capacity) | | | | | | |
| | At Year 20 | | | At Any Given Time [1] | | Residual [2] | | Long Term Direct and Residual [3] | |
| | Current MPA Acreage | Projected Acreage Disturbed | % of Base | Acres | % of Base | Acres | % of Base | Acres | % of Base |
|---|---|---|---|---|---|---|---|---|---|
| Mountain Shrub | 142,100 | 3,600 | 2.6 | 5,200 | 3.7 | 6,700 | 4.7 | 10,300 | 7.3 |
| Upland Sagebrush | 151,000 | 7,800 | 5.2 | 11,000 | 7.3 | 14,100 | 9.3 | 21,900 | 14.5 |
| Basin Big Sagebrush-Greasewood | 6,400 | 300 | 4.8 | 400 | 6.7 | 600 | 8.6 | 8,700 | 13.4 |
| Pinyon/juniper | 239,300 | 8,100 | 3.4 | 11,300 | 4.7 | 14,500 | 6.1 | 22,600 | 9.4 |
| Overall, all types | 598,700 | 20,500 | 3.4 | 28,900 | 4.8 | 37,100 | 6.2 | 57,700 | 9.6 |

NOTES:
[1] Pad Activity Prior To Successful Reclamation
[2] Production Phase After Successful Reclamation
[3] End Of Projected Development

Brewer's sparrow nesting habitat would be reduced by 8,100 acres over the life of the plan (5.1 percent of MPA base). Long-term loss attributable to facility occupation would involve 3,400 acres (2.2 percent of base), but sagebrush colonization of reclaimed non-sagebrush communities would yield net gains in the availability of sagebrush nesting habitat of up to 3,500 acres or an increase of 2.2 percent over the former base.

This alternative includes a version of the siting constraint proposed in Alternative B (Table 2-7 Record 5) that allows for more balanced consideration in minimizing the involvement and long term diminishment of high quality nesting habitats. This measure would remain effective in reducing the

BLM_0019912

long-term modification of more optimal nesting habitat across the MPA by emphasizing occupation of nesting habitats that support lesser breeding bird abundance and richness.

Timing limitation stipulations (Table 2-7 Record 6) would be applied to those development activities that necessarily involve priority migratory bird nesting habitats identified in Table 2-7 Record 5. The WRFO suspects that timing limitations stipulations would be applied on up to 50 percent of the pinyon/juniper woodlands and upland sagebrush habitats available for development in the MPA. This measure provides more latitude in application than in Alternative B and would tend to encourage facility siting that avoids involvement of priority nesting habitats. Similar to Alternative B and as discussed in Alternative D, this measure is expected to have modest, and perhaps discountable, influence on migratory bird populations in the MPA.

The WRFO believes this conservation strategy is consistent with the guidance provided in Sec. 3(e)(9) of Executive Order 13186 (Responsibilities of Federal Agencies to Protect Migratory Birds) and the Memorandum of Understanding between the BLM and FWS (4/12/2010) Section VII. F, G that requires the BLM to identify those actions where take may have a measurable negative effect on migratory bird populations and ensure measures are developed to minimize, reduce, or avoid unintentional take.

The influence of clustered development would be similar to that discussed in Alternative B.

### 4.3.2.4.5   Aquatic Wildlife Alternative C

Refer to Section 4.3.3.4 for discussion on impacts to aquatic wildlife for Alternative C.

### 4.3.2.5     Alternative D

### 4.3.2.5.1   Big Game

**Direct Habitat Loss and Modification**

By Year 20, about 2 percent of big game habitat in the MPA would be occupied by facilities and possess no utility as forage and cover until final abandonment and reclamation (see Table 4-52 for a breakdown of seasonal range involvement).

Similar to Alternative B and C, proposed reclamation practices and success standards would accelerate the restoration of lands disturbed by development and serve as the foundation for successional processes that would eventually restore habitat functions lost to development. Reclamation that would have potential to effectively offset herbaceous forage values lost to occupation would be applied to 17,000 acres (approximately 2.9 percent of each seasonal range).

The BLM would continue to participate in land treatments through various intra- and intergovernmental programs that would contribute to offsetting physical forage losses attributable to oil and gas development.

**Indirect Effects**

Oil and gas development proposed in Alternative C (2,428 multi-well pads) would be expected to be distributed across 92 percent of the federal estate within the MPA. By Year 20, the level and distribution of development activity would result in indirect forms of habitat loss (avoidance and disuse of adjacent habitat) equivalent to a projected 249,300 acres (Table 4-53) or about 42 percent of big game habitat within the MPA. Total effective habitat loss at the end of project life is estimated to involve about 44 percent of the big game habitat available in the MPA.

BLM_0019913

## Chapter 4 – Environmental Consequences

Timing limitations stipulations (Table 2-4 Record 12) identical in scope and intent to Alternative A would be applied to the summer ranges and most-important deer winter ranges (i.e., severe winter ranges) in the MPA. However, under this alternative, the entire MPA would be broadly entrenched in development influences and TL stipulations applied to most-disruptive development phases would become progressively less influential in reducing indirect forms of habitat loss (i.e., 11 percent reduction in habitat utility from active development, 31 percent from wells in production in Year 20).

The ramifications of TL stipulation applications on the exercise of year-round drilling, traffic frequency, and distribution of development would be similar to Alternative A, but would involve 4-5 times the scale of development.

This alternative also includes no road management measures that would aid in reducing avoidance response or indirect forms of habitat loss (e.g., Table 2-19 Record 7), but would rely on long-term access abandonment provisions in Onshore Order #1 which cannot, by themselves, substantially reduce road-related effects on big game over the life of the project.

Timing limitation stipulation provisions would not be applied in consideration of big game movements between or among seasonal ranges. Although development would involve the entire MPA, the density and area-specific intensity of development would likely be similar among all alternatives and it is considered unlikely that development would have potential to drastically interfere with seasonal range movements. Condition of Approval that allow activity deferral for 60 days remain available for use in site-specific situations (e.g., large linear pipeline projects).

Proposed development outside the MPA is expected to average 6-7 single-well pads per year (128 over the life of the plan) in locations primarily associated with established fields in GMU 21 and the Rangely Oil Field.

Total surface disturbance outside the Rangely Oil Field would amount to about 1,200 acres by Year 20 with about 60 percent of that subject to interim reclamation. Assuming all disturbances would take place on deer winter concentration areas, total habitat modification over the 20 year life of the plan would involve about 1.3 percent of GMU 21 winter concentration areas. Reductions in habitat utility associated with avoidance of active drilling and the accumulation of production activity (same criteria as applied in MPA) would not exceed 4 percent of the more important GMU 21 winter ranges (winter concentration, severe and critical winter ranges) through the life of the plan.

This alternative would provide big game timing limitations (Table 2-4 Record 12) that would defer disturbances over the entire winter period on all pronghorn severe winter range, about 65 percent of the winter concentration areas, and 73 percent of general winter range outside the Rangely Field. Much of the habitat supporting pronghorn birthing and fawn-rearing activity outside the Rangely Field and U.S. 40 corridor (about 35 percent of overall range in WRFO) would be subject to sage-grouse nesting stipulations that would effectively defer development to timeframes outside the reproductive period (i.e., 72 percent of Blue Mountain, 90 percent of Sagebrush Draw/Crooked Wash). There would be no reliable application of timing limitations corresponding to pronghorn summer range use along the U.S. 40 corridor, but site-specific 60-day deferrals remain available for those instances where summer use functions may be seriously compromised by development activity. Development in the Rangely Oil Field (approximately 26 wells over 20 years) would continue to be of little consequence to the resident pronghorn population in Coal Oil Basin.

BLM_0019914

#### 4.3.2.5.2   Raptors

Pinyon/juniper woodlands cleared for development (11,200 acres) are projected to involve about 5 percent of the MPA woodland base and about 9 percent of the base best suited for woodland raptor nesting (i.e., woodlands less than 25 percent slope). Woodland management objectives (e.g., Table 2-15 Record 9) would diverge from any alignment with woodland raptor management objectives and would explicitly fail to emphasize retention of mature and old growth components best suited for nesting.

Siting criteria that aid in reducing the diminishment or deterioration of woodlands as raptor nest habitats are largely absent in this alternative. Although the rigid application of CSU stipulations established for channels (Table 2-2 Record 12) would continue to shunt development activity into habitats better suited for woodland raptor nesting functions, NSO and CSU stipulation provisions established for special status plants (Table 2-10 Records 15 and 16) are applied with exception and modification criteria that allow considerations that may accommodate ecologically-relevant woodland habitat management concerns.

In this alternative, low, open shrubland as foraging habitat for buteos and eagles (less than 25 percent slope) lost to facility occupation would be modestly offset (2.4 percent gain) by former deciduous shrublands and woodlands that have been cleared and reclaimed.

No surface occupancy stipulations and TL stipulation prescriptions (Table 2-5 Record 11) would be the same as those presented in Alternative A. These conditions would continue to provide separation sufficient to avoid diminished reproduction consistent with the MBTA and would remain effective in maintaining the integrity of identified nest substrate and immediate woodland stands for subsequent nesting function. However, with no explicit consideration of longer-term or landscape-level woodland management as variously provided for in Alternatives A-C, NSO stipulations are capable of sustaining only short term trends in the availability of suitable woodland habitat. Absent siting criteria that consider retention of woodlands contiguous with nest stands or those that do bear no evidence of raptor nesting, extant evidence of raptor nesting would be the only basis for reserving nest habitat in the immediate vicinity of the nest (up to 31 acres). Subsequent canopy modifications in outlying stands would result in the progressive decline in the availability of woodland stands capable of serving future raptor nest functions. Due to protracted timeframes involved with the redevelopment of suitable nest habitat, incremental reductions in woodland stands suited for subsequent nesting use would accumulate over long periods of time and would be expected to contribute substantially to the diminished availability of suitable nest habitat and the capacity of MPA woodlands to support former woodland raptor populations.

#### 4.3.2.5.3   Grouse

Sage-grouse management thresholds would not be applied to the MPA. Overall sage-grouse range associated with the PPR population area would be subject to the development of 2-3 pads per section at a rate of about 36 pads per year (about 728 pads). This projected development would involve 5 times the number of pads and development rates on an order of magnitude greater than those discussed for Alternative A.

Provisions for avoiding the long term loss or modification of important sagebrush stands as nesting, or winter use functions would be the same as Alternative A. These measures would target similar stand characteristics, but with the important distinction that their application would be confined to suitable sagebrush stands within 2 miles of a lek or sites with evidence of seasonal occupation. As discussed earlier, this application would generally deemphasize consideration of yearling hens that

BLM_0019915

have dispersed far from nest areas subject to disturbances and would not extend management to habitats that may form the basis for population expansion and recovery.

The TL and NSO stipulations used under current management (Alternative A) would be used in this alternative. The 1/4 mile lek buffer would render the same effect as discussed in Alternative A. Although the nesting TL stipulation would be applied to the more robust complement of habitats capable of supporting nest functions (within 4 miles of a lek), the timeframes would be abbreviated to a 60 day period (April 15 – June 15) and apply only to active leks. As discussed in Alternative B, basing stipulation application on active leks associated with populations in decline progressively reduces consideration of habitat available for population expansion, much less recovery. The abbreviated timeframe would restrain development through the early portion of the nest and early brood period and allow about half the nesting attempts to progress through hatch in half the years. Twenty-five percent or more of nesting attempts would be subjected to development-related disturbances 9 out of 10 years.

With no mechanism for managing development intensity or distribution or the subsequent use of access (e.g., Table 2-19 Record 7), development pressures are expected to be simultaneous across the entire PPR range and persist at high levels through plan life and beyond. Behavioral responses to development would overwhelm any efforts to offset impacts via habitat enhancement or restoration. Maintenance of the PPR sage-grouse population at this level of development and under these prescriptions would be untenable and extirpation would be rapid. There is no precedent for reestablishing populations of sage-grouse once extirpated (Doherty 2008).

### Fluid Mineral Development Outside the MPA

Projected development in sage-grouse habitat outside the MPA would remain small, but would be double that discussed in Alternative B (i.e., 13 pads over 20 years). The Meeker and entire Northwest Colorado population areas would be subject to threshold allowances as discussed for the MPA in Alternative B (Table 2-6 Record 16), but based on current RMPA assumptions, it is likely that single-well fringe developments would not require TL stipulation exceptions offered by threshold compliance.

The NSO stipulation (Table 2-6 Record 18) applied to reproductive functions would remain at former (Alternative A) buffer standards (1/4 mile NSO). The TL stipulation buffer (Table 2-6 Record 10) would be expanded to a 4 mile radius, but the timeframe would be shortened to 60 days. The reduced levels of protection afforded by these criteria are discussed in the MPA section above.

Although pad density would probably remain low and/or localized, development's influence on the Northwest Colorado or Meeker populations would be contingent solely on the unpredictable geographic relationship of development to important grouse habitat and use functions. The risk of disproportionately high levels of adverse behavioral effects would be most pronounced in the context of leks that are singularly large or sole contributors to the support of a population (e.g., Meeker and certain segments of the Northwest Colorado population areas) or habitat parcels that support concentrated winter, nesting, or brood-rearing use (e.g., Beck 1977). Further, this alternative would apply no defined surface use limitations or siting considerations to important seasonal use habitats.

There is no feasible means of predicting how sage-grouse populations would be influenced under this alternative, but it is likely that this alternative's management measures would be incapable of averting strong behavioral responses or long term adverse modification of important habitat parcels in the event locally concentrated development were to intersect occupied habitat. The sage-grouse

management measures associated with this alternative would not be capable of conserving populations subjected to levels of development that substantially exceed RMPA projections (i.e., if more than five percent of the development were to occur outside of the MPA).

## 4.3.2.5.4   Migratory Birds

Total projected surface disturbance over the 20-year planning period would be 29,100 acres, including 4-8 percent of each major vegetation community in the MPA as nesting habitat for associated migratory birds (Table 4-57). At any given time, well development activity (prior to successful interim or final reclamation) would be expected to reduce the effective utility of adjacent nesting habitat equivalent to an additional 7-13 percent of those habitats' base (Table 4-57). By the time all wells projected to be drilled in this alternative were completed, the collective reduction of suitable shrubland and woodland nesting habitat and indirect habitat loss attributable to residual production and maintenance activity would reduce the effective utility of those nesting habitats available in the MPA by 10-20 percent (Table 4-57).

**Table 4-57. Alternative D -- Development Effects on Migratory Bird Nesting Habitat**

| Vegetation Community | Direct Habitat Loss (Loss Of Habitat Suitability) | | | Indirect Habitat Loss (Reduction In Nest Habitat Capacity) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | At Year 20 | | | At Any Given Time [1] | | Residual [2] | | Long Term Direct and Residual [3] | |
| | Current MPA Acreage | Projected Acreage Disturbed | % of Base | Acres | % of Base | Acres | % of Base | Acres | % of Base |
| Mountain Shrub | 142,100 | 5,468 | 3.8 | 9,247 | 6.5 | 9,185 | 6.5 | 14,653 | 10.3 |
| Upland Sagebrush | 151,000 | 10,933 | 7.2 | 18,495 | 12.2 | 18,370 | 12.2 | 29,303 | 19.4 |
| Basin Big Sagebrush-Greasewood | 6,400 | 485 | 7.5 | 827 | 12.8 | 822 | 12.8 | 1,307 | 20.3 |
| Pinyon/juniper | 239,300 | 11,207 | 4.7 | 18,495 | 7.7 | 18,370 | 7.7 | 29,577 | 12.4 |
| Overall, all types | 598,700 | 29,136 | 4.9 | 48,671 | 8.1 | 48,341 | 8.1 | 77,477 | 12.9 |

NOTES:
[1] Pad Activity Prior To Successful Reclamation
[2] Production Phase After Successful Reclamation
[3] End Of Projected Development

Brewer's sparrow nesting habitat would be reduced by 11,400 acres over the life of the plan (7.3 percent of MPA base). Long-term loss attributable to facility occupation would involve 4,800 acres (3.1 percent of base), but sagebrush colonization of reclaimed non-sagebrush communities would yield net gains in the availability of sagebrush nesting habitat of up to 5,000 acres or an increase of 3.2 percent over the former state.

Siting constraints would be applied to habitats that support birds of higher conservation status. In most cases, these habitats would be similar in scope to those explicitly identified in Alternatives B and C. Long term conversion of higher value habitats can often be avoided or substantially minimized by realigning or moving proposed facilities to younger woodland stands, conifer-encroached shrublands, habitats with degraded understories, habitats in closer proximity to existing

BLM_0019917

## Chapter 4 – Environmental Consequences

forms of disturbance, and the margins of habitat parcels. These moves are site-specific and are normally negotiated with the operator during on-site inspections.

There would be no efforts extended to cluster development and there would be no management emphasis on reducing the frequency or pattern of use on well access roads (Table 2-19 Records 8, 9, and 13; Table 2-4 Record 14) or utility corridors (Table 2-4 Record 8). Any benefits that may result from less expansive or shorter duration disturbances discussed in Alternative B and C would not be enjoyed, and there would be no reasonable prospects for regaining comparable utility of migratory bird breeding habitats adjacent to development infrastructure until final abandonment.

In Alternative D, WRFO would advocate for avoiding disturbance of priority habitats during the nest season where practicable, but would emphasize avoiding or reducing long term modification or occupation of habitats that support richer and more abundant avian communities (Table 2-7 Record 5) as the more effective and practical strategy in conserving breeding populations of migratory bird populations in the MPA. These habitats tend to support more specialized species that are often regarded with special management concern (e.g., BLM-sensitive, FWS Birds of Conservation Concern [BOCC]) and, once disturbed, require many decades to centuries to redevelop former habitat character.

Because migratory birds are relatively abundant and well-distributed across the WRFO during the nesting season, it is considered practically impossible for surface disturbances associated with oil and gas development to successfully avoid ongoing nest attempts from May 15 through July 15. It is estimated that most shrubland and woodland habitats in the MPA support overall nest densities in the range of 0.5-1 per acre. Vegetation clearing or nest disturbance is not expected to affect adult birds, whether breeding or non-breeding. Direct or indirect disturbances that are capable of destroying the nest or lead to the mortality of eggs or dependent young represent the loss of a single reproductive attempt that may, on average, recruit 0.25 to 0.5 bird into the subsequent breeding season (assuming 50 percent nest success; 50 percent fledging success; 25 percent survival of hatching year birds, derived from various species' accounts in The Birds of North America Online, http://bna.birds.cornell.edu). On an annual basis, direct disturbances of occupied nesting habitat in each alternative (excluding Alternative B where timing limitations would be universally applied) represent about 0.5 percent of the productive capacity lost to indirect influences during the same timeframe (Table 4-58). Alternatively, facility occupation or adverse modification of habitat (clearing of shrubland or woodland types), no matter when conducted, eliminates the potential of that habitat to recruit birds into the population for a minimum 1-2 decades and more than a century for mature woodland associates. Displacement to adjoining or alternate habitats is not considered a realistic mechanism that compensates for these reproductive losses since it is: (1) unlikely that better quality nest habitats normally have capacity to accommodate the establishment of additional territories, and (2) occupation of suboptimal habitats likely constitutes populations with demographics that do not contribute meaningfully to a species annual recruitment (e.g., sink habitats).

BLM_0019918

**Table 4-58. Proportion of Migratory Bird Nest Habitat Protected
from Disturbance via Timing Limitations**

| Alternative | Average Pads Developed In MPA During Nest Season | | Average Effective Habitat Loss Any Given Year (Pre-Reclamation)[1] | | Annual Direct Nest Season Disturbance Relative to Annual Indirect Disturbance[2] |
|---|---|---|---|---|---|
| | Number | Acreage | Acreage | % of MPA | Percent |
| A | 4.4 | 53 | 10,484 | 1.8 | 0.51 |
| B | 0.0 | 0 | 16,432 | 2.7 | NA[3] |
| C | 14.5 | 174[4] | 28,862 | 4.8 | 0.60 |
| D | 20.6 | 248 | 48,671 | 8.1 | 0.51 |

NOTES:

[1] Based on average annual number of pads developed. Calculated as the sum of nest habitat (acres) disturbed by active development during the nest season, nest habitat subject to ongoing development disturbance initiated prior to the subsequent nest season, and disturbance attributable to the accumulation of producing pads that have not achieved successful reclamation. Values do not account for accumulation of residual effects attributable to producing reclaimed pads or adverse habitat modification.

[2] Proportion of habitat where nest activity would be protected by a timing limitation relative to indirect reduction in habitat capacity attributable to activity avoidance (i.e., this table's column 3 divided by column 4).

[3] This relationship not applicable to Alternative B, which would not allow for surface disturbance during the nesting season. In the absence of a timing limitation, annual direct disturbance would equal about 0.66% of annual indirect disturbance.

[4] Alternative C would not allow surface disturbance in priority habitats during the nest season, but this conservative calculation assumes that timing limitations may prompt the relocation of many projected pads to adjacent non-priority habitats.

#### 4.3.2.5.5   Aquatic Wildlife Alternative D

Refer to Section 4.3.3.5 for discussion on impacts to aquatic wildlife for Alternative D.

### 4.3.2.6   Irreversible and Irretrievable Commitment of Resources

Surface disturbances in areas dominated by woody vegetation would not experience recovery to pre-disturbance states for 50 to 500 years or more beyond the life of oil and gas development and reclamation efforts. Thus, habitats, traditional use areas, and wildlife populations would be modified beyond the life of this plan. Surface disturbance in areas dominated by woody vegetation would be classified as an irreversible effect, since the habitats cannot be replaced within a reasonable timeframe.

The decisions in Alternatives B and C and the low level of oil and gas development in Alternative A would allow for reversible impacts and should avoid irretrievable effects to fish and wildlife resources. The implementation of Alternative D, with its relaxed standards and higher levels of oil and gas development, could result in irreversible changes to populations and irretrievable changes to fish and wildlife habitat on mineral estate in the MPA.

Implementing the proposed management actions in any of the alternatives could potentially result in a loss of the PPR sage-grouse population, which would be an irretrievable impact. Alternatives A and D pose the most risk, because current research indicates that traditional forms of avoiding impacts have been ineffective at preventing declines. The improved methods that limit development of roads and set TL stipulations and threshold levels of disturbance under Alternatives B and C would be more likely to prevent population declines.

BLM_0019919

### 4.3.2.7    Unavoidable Adverse Impacts

Management actions under all alternatives could result in short-term losses of fish and wildlife habitat resulting from increased localized soil erosion and vegetation damage or loss. Ground-disturbing activities could result in the greatest potential for impacts to long-term productivity. Application of BMPs and stipulations applied to developed areas could minimize the effects to the existing fish and wildlife habitats for short-term disturbances.

Under all alternatives there is the potential for an unavoidable loss or degradation of fish and wildlife habitats, or changes in behavior from oil and gas development. Permanent conversion of areas to other uses such as utility corridors would decrease the relative abundance of wildlife species and reduce habitat values in the affected areas. Oil and gas development and the necessary associated infrastructure would be mitigated to the extent possible to minimize fragmentation of habitats and to avoid the most important fish and wildlife habitats, but losses would occur, whichever alternative is selected.

The decisions in Alternatives B and C and the low level of oil and gas development in Alternative A would allow for fewer unavoidable adverse impacts. However, implementation of Alternative D, with its relaxed standards and higher levels of oil and gas development, could result in more unavoidable impacts to populations and habitat of fish and wildlife on the mineral estate in the Planning Area.

Impacts to the Parachute-Piceance-Roan Plateau population of sage-grouse are unavoidable because oil and gas development under any development scenario in Alternatives A, B, C, or D is likely to decrease, degrade, and divide essential habitats in this area.

### 4.3.2.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Local short-term uses for oil and gas activities could affect productivity of wildlife populations and habitat from surface disturbance. These would vary according to the level and duration of ground disturbance and other forms of disturbance, by the size of the area affected, and the quality and quantity of available habitat in an area. In the long-term, the areas of reclamation under Alternatives B, C, and D would reduce the loss of wildlife habitat productivity. Implementing thresholds for oil and gas development under Alternatives B and C could reduce the short-term loss of wildlife habitat productivity by concentrating development and helping maintain productivity. Alternative A would result in full recovery of species habitats, but could require more time for recovery than Alternative B or Alternative C. Alternative D may not reach the established wildlife habitat objectives in the long-term. Disturbances from human activity along roads from exploration and development of oil and gas resources would alter behavior of big game and other wildlife and would cause displacement, but some use could recover through adaptation and habituation of individuals within populations. Disruptive activities could result in long-term loss of the Parachute-Piceance-Roan population of sage-grouse.

## 4.3.3    Special Status Species - Animals

This analysis focuses on impacts from disturbances resulting from management actions to the populations and habitats of Special Status Species of animals, including federally-listed species, the BLM-sensitive species and State-listed species. Federal protections and the BLM policies that protect threatened, endangered, and sensitive species were considered as methods for reducing the potential impacts from permitted activities. Although data on known locations and habitats within the Planning Area are available, the data are neither complete nor comprehensive for all Special Status Species known to occur or for potential habitat that could exist in the Planning Area. Known habitat locations and potential Special Status Species habitat locations that could occur in other portions of the Planning Area were considered in the analysis. For that reason, some impacts are discussed in more general terms than others.

The analysis used qualitative and quantitative variables to assess the effects. The quantitative analysis of impacts to special status animal species was determined using acres of specific impacted vegetation types, and special habitat features for all alternatives within the WRFO. Wolverine, grey wolf, boreal toad, and Mexican spotted owl, were not included in the analysis due to the low probability of persistent occurrence in the WRFO.

A number of indicators, attributes, and assumptions were used for the qualitative analysis. The two indicators selected to analyze the effects of the alternatives on special status animal species are:

- Habitats and populations of federally-listed threatened and endangered animal species; and
- Habitats and populations of other special status animal species.

The attributes of the two indicators are:

- Size and distribution of populations of threatened and endangered species;
- Size and distribution of populations of special status species, including:
  - o   Number and distribution of bald eagle winter roosts; and
- Extent, distribution, and quality of occupied and suitable habitat for long-term maintenance of special status animal species, including:
  - o   Area of occupied white-tailed prairie dog colonies; and
  - o   Distribution of fish and amphibians.

The analysis is based on the following assumptions:

- Federally-listed animal species of principal importance include black-footed ferret, Canada lynx, and upper Colorado River fish. Federally-listed species would be protected both by requirements for ESA Section 7 consultation and the BLM management actions.
- Other sensitive animal species of importance include white-tailed prairie dog, greater sage-grouse, Brewers sparrow, sensitive amphibians (northern leopard frog, Great Basin spadefoot), reptiles (midget faded rattlesnake), sensitive bats (fringed myotis, Townsend's big-eared bat), sensitive fishes (Colorado River cutthroat trout, flannelmouth, roundtail chub, bluehead sucker, and mountain sucker), and sensitive raptor species (bald eagle, northern goshawk, ferruginous hawk, peregrine falcon, burrowing owl). These are protected as BLM-sensitive species, and also, in some cases, as state-listed threatened and endangered species or species of special concern.

BLM_0019921

- Special status species could be affected by direct and indirect effects of management actions on listed species and/or critical habitat, and interrelated and interdependent activities.

- Where they overlap, management actions associated with protecting wildlife habitats directly benefits special status species.

- The BLM would continue to emphasize management of federally-listed and other special status species.

- Current monitoring of special status species and their habitat would be continued or expanded.

- Decisions for cultural resources, paleontology, visual resources, wild horse management and recreation would have little or no effect on special status animal species under all alternatives, except where these impose potential constraints on wildlife-oriented siting options. Protection of remnant vegetation associations would have little or no effect on special status animals, because of the small area that the remnant vegetation associations occupy.

A number of special status animals are discussed briefly below because of very limited spatial or temporal distribution on WRFO-administered lands, widespread but dispersed distribution, and/or management applied to other species or species-groups extend comparable types of levels of effect to those cohabiting species.

Impact evaluations for several BLM-sensitive animals are discussed in the context of their respective species-groups, including Brewer's sparrow (Migratory Birds, e.g., Section 4.3.2.1.4) and ferruginous hawk, peregrine falcon, northern goshawk, and burrowing owl (Raptors, e.g., Section 4.3.2.1.2) and greater sage-grouse (Grouse, e.g., Section 4.3.2.1.3). A number of BLM-sensitive animals that occur in the WRFO do not receive further address because they are strict migrants that occur briefly, if at all, on the BLM-administered lands (i.e., Barrow's goldeneye, black tern, long-billed curlew, white-faced ibis) or based on few documented occurrences, are apparently peripheral in the WRFO (i.e., big free-tailed bat, mountain plover, milk snake).

**Greater Sandhill Crane, Columbian Sharp-Tailed Grouse**
Greater sandhill crane have nested with increasing frequency in the upper White River valley since first appearing as breeders in about 1995, but current and future involvement with the BLM-administered lands is expected to remain spare (e.g., 1 known nest site on the BLM in-holding within the White River National Forest).

Although Columbian sharp-tailed grouse have been documented sporadically in the WRFO since 1954, more recent reports and CPW telemetry work have documented increasing regular dispersal of birds to the south in the Danforth Hills along the WRFO boundary and the upper White River valley, east of Meeker. This native grouse is not specifically addressed in the current RMP (Alternative A) and, to date, there is one known lek and relatively limited production area habitats (about 1500 acres of split-estate) in the WRFO on which to base management prescriptions. It is suspected that additional pioneering populations will be documented in the near future, although they will likely remain outside the MPA on predominantly split-estate lands where the BLM administers about 50 percent of the mineral estate (see discussion for Meeker Greater Sage-grouse population area, Section 4.3.2.1.3 "Impacts from Oil and Gas Development") and where there may be limited prospects for fluid mineral development over the life of the plan.

The potential range and character of fluid mineral influences on Columbian sharp-tailed grouse would closely parallel those discussed for greater sage-grouse (Section 4.3.2.1.3 and Alternative-

## Chapter 4 – Environmental Consequences

specific discussions). Particularly on split-estate lands where subsequent land use remains the prerogative of the surface owner, it is appropriate that the BLM focus its management attention on reducing behavioral impacts attributable to oil and gas development. Traditional management considered minimally effective for maintaining Columbian sharp-tailed grouse populations by CPW involves reducing disruptive influences on reproductive functions (i.e., applying 0.4 mile NSO buffers on leks and TLs on nesting habitat within 1.25 mile of leks) and important winter use areas (i.e., TL application). Stipulations that address these issues would be available for potential use in Alternatives B, C, and D.

Under current management (Alternative A), the identification of sharp-tailed grouse habitat and activity functions would prompt the development of site-specific Conditions of Approval that attempt to mimic these protection devices, since standard 200-meter avoidance and 60-day activity deferrals would likely provide measures insufficient to maintain these functions or promote establishment of extralimital populations.

Regardless of alternative, pad density is expected to remain low and/or localized (projected 3-13 pads outside the MPA over plan life) and development's influence on those ranges likely to be occupied by sharp-tailed grouse would be contingent on the unpredictable geographic relationship of development to important grouse habitat and use functions. The risk of disproportionately high levels of adverse behavioral effects would increase as a function of the number of pads or wells developed on federal estate (lowest at Alternative A levels, highest in Alternative D) and would be most pronounced under circumstances where affected leks are singularly large or sole contributors to the support of a population or where affected habitat supports concentrated winter or nesting use.

### Yellow-billed Cuckoo, River Otter

Although specific habitat requirements of yellow-billed cuckoo and river otter may differ markedly from those species discussed in greater detail, they rely principally on resources derived from the same system associated with the mainstem of the White River. Although the BLM management is of limited consequence in overall riverine management above Taylor Draw dam (12 percent downstream/3 percent upstream of Rio Blanco Lake), those alternative management prescriptions and their influence on fluid mineral development presented in the Endangered Colorado River Fishes and Bald Eagle sections would have similar consequences on these species and/or their habitat.

### Townsend's Big-eared Bat, Spotted Bat, and Fringed Myotis

The distribution, abundance, and habitat preference of bats in the WRFO is incompletely understood. Abundant and widely available rock outcrops and mature stands of pinyon/juniper, particularly in close association with perennial waters, are believed to represent the vast majority of roosting and foraging habitat for broadly dispersed summer populations. In this sense, the effects of fluid mineral development as modified by alternative management actions would influence bat roosting and foraging habitat in a manner and at levels comparable to those discussions presented for Raptors and Migratory Birds (mature pinyon/juniper woodland effects) and the various sections that involve riparian and aquatic management (i.e., Endangered Colorado River fishes, Bald Eagle, and BLM Sensitive Aquatic Wildlife). Rock outcrops are rarely involved in the development of fluid minerals and their availability and utility as bat roosts are not expected to be influenced to any substantive degree.

There is a single site in the WRFO that is suspected of serving as a maternity roost for several species, including a small number of Townsend's big-eared bat. This site has been protected from incidental disturbance and is being monitored by the BLM. Conflicting land use proposals would

BLM_0019923

remain subject to seasonal timing limitations and avoidance buffers of at least 660 feet applied as site-specific COAs.

**Great Basin Spadefoot and Midget Faded Rattlesnake**

The midget faded rattlesnake is believed to be more abundant and widely distributed than its two known occurrences south of Rangely would indicate, and WRFO has initiated efforts to better define their relative abundance and distribution. At the present time, COAs are developed and applied on a site-specific basis to survey for their occurrence prior to surface disturbance, avoid habitat features ostensibly suited as hibernacula/maternity sites by up to 660 feet, and manage access systems (e.g., gating) to reduce the risk of direct mortality.

Similarly, recent evidence of Great Basin spadefoot is limited to a single site south of the White River and near the Utah border. Regardless of alternative, minimum 660 foot avoidance buffers, access management, and special reclamation prescriptions would remain available as a means of circumventing direct and indirect impacts to this and subsequently discovered breeding sites.

**BLM Sensitive Aquatic Wildlife**

**Colorado River Cutthroat Trout, Flannelmouth Sucker, Mountain Sucker, and/or Northern Leopard Frog**

Normally the distribution of CRCT and other native fish tend to be mutually exclusive, but where native fish or amphibians occur together with CRCT or Colorado pikeminnow, the management and measures applied to these stream reaches would be expected to affect native and BLM-sensitive fish and amphibians in a comparable manner. The implications of management on CRCT reaches are not reiterated in this section.

Amphibian distribution tends to be somewhat more expansive than fish distribution, both in stream systems and as small discrete off-channel habitats (e.g., stock ponds and upland wetlands) that cannot be accurately enumerated by areal or stream-mile metrics. Stream systems that are occupied solely by northern leopard frog and off-channel habitats would be subject to the same considerations as that applied to stream-borne values.

Regardless of alternative, the current suite of State and federal regulatory processes regulating the potential for off-site sediment and contaminant delivery are expected to remain capable of reducing the risk of indirect damage to these aquatic habitats from well development to levels that would not compromise the integrity of downstream habitats.

### 4.3.3.1.1 Impacts Common to All Alternatives

**Black-footed Ferret/White-tailed Prairie Dog**

The MPA encompasses no habitat suitable for occupation by black-footed ferret. Prairie dogs are represented by perhaps 2 remnant remains of historic colonies that are widely separated, isolated, and comprise less than 10 acres per site.

**Canada Lynx**

The BLM administers very little potential lynx habitat and the likelihood of developing fluid mineral resources on those parcels over the life of this plan is remote. There is no lynx habitat within the MPA. Defined Lynx Analysis Units have been generated to encompass lynx habitat of all ownerships at a scale that promotes lynx conservation. Although Canada lynx are known to have

BLM_0019924

traversed and made short-term use of lands outside the defined LAU, lynx management is intended to apply to better-suited habitats within designated LAUs.

Alternative A relies on case-by-case impact analysis and mitigation development derived through ESA Section 7 consultation. Under development assumptions established for this document, project-specific analyses and conditions developed in concert with the FS, CPW, and FWS are expected to remain an appropriate device with which to prevent any substantive deterioration of important lynx habitats in the LAUs associated with development of the BLM surface or non-federal split estate.

The remaining alternatives reflect management recommendations established in the Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000). Management decisions would restrict use of well access roads, prohibit the use of over-the-snow machines, and promote reclamation that complements and restores affected lynx and snowshoe hare habitat (Table 2-9 Records 32-34). Fluid mineral development on the BLM-administered lands would not be allowed to contribute disproportionately to FS management thresholds established within an individual lynx analysis unit (Table 2-9 Record 35).

Alternative B would require that development avoid occupation or adverse modification of important lynx habitat features and components and would require that infrastructure (e.g., roads, pipelines, and powerlines) be sited in a manner that would not compromise the utility of those habitats through the operational life of the facility. Although avoiding direct habitat involvement would remain the management objective in Alternatives C and D, there would be more latitude provided in tolerating shorter-term or minor intrusions from infrastructure that may be capable of displacing localized denning or winter use functions.

### Endangered Upper Colorado River Fish

#### Colorado pikeminnow, Bonytail, Humpback Chub, and Razorback Sucker

In May 2008, the BLM prepared a Programmatic Biological Assessment (PBA) (BLM 2008c) that addressed water depleting activities associated with the BLM's fluid minerals program in the Colorado River Basin in Colorado. This assessment addressed water used for dust abatement, well drilling and completions, and hydrostatic testing of pipelines associated with field gathering systems. The analysis incorporated a WRFO-projected average annual water depletion of 3,230 acre-feet attributable to the development of 18,475 wells drilled over 15 years; a value considered mid-range for alternatives addressed in this RMPA. Development of each well in WRFO was calculated to require an average of 2.62 acre-feet of fresh water. This figure is expected to decline over time as BMPs involving water recycling and treatment are more fully integrated into standard drilling and completions operations.

The PBA concluded that water depletions authorized by the BLM for its fluid mineral program were likely to result in adverse modification of critical habitat for the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker because the primary constituent elements and the functioning of the critical habitat units would be altered in the following manner: (1) Water, a primary constituent element, would be affected by further reducing the flows in critical habitat that are needed for endangered fishes breeding, feeding, and sheltering. Reduction in flows would also affect water quality by reducing dilution of contaminants, (2) Physical habitat, a primary constituent element, would be affected by reduction in flows by reducing important habitat such as spawning bars, backwaters, and inundated flood plains, and (3) Biological environment, a primary constituent element, would be affected by the increase in nonnative fishes due to altered flow regimes.

The BLM recognized that further reductions in flow increase the likelihood of water quality concerns (dilution factor) and are likely to contribute to adverse modifications of the channel's functional structure. Altered flow regimes attributable to depletions can reduce the availability (frequency and duration of access) of important channel and flood plain features for foraging and forage production, have important influences on the maintenance and continued availability of important bank and flood plain features, and promote conditions that favor the proliferation of competitive introduced fish.

In response to the BLM's PBA, the FWS issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that the BLM water depletions from the Colorado River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, or razorback sucker, and that the BLM water depletions are not likely to destroy or adversely modify designated critical habitat. Water use attributable to proposed oil and gas development (4.4 cubic feet per second) was generally expected to result in modest flow reductions in the White River (3 percent of baseflow, 0.3 percent of spring flow). These reductions are not expected to have measurable effect on pikeminnow populations in the White River except during exceptionally dry years when fish passage through shallow riffle areas may be temporarily interrupted.

A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin was initiated in January 1988. The Recovery Program serves as the reasonable and prudent alternative to avoid jeopardy and provide recovery to the endangered fishes by depletions from the Colorado River Basin. The PBO includes reasonable and prudent alternatives developed by the FWS which allow the BLM to authorize oil and gas wells that result in water depletion while avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification of their critical habitat. As a reasonable and prudent alternative in the PBO, FWS authorized the BLM to solicit a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) in the amount equal to the average annual acre-feet depleted by fluid minerals activities on BLM lands.

As a means of minimizing the potential for impacting these fish in the course of pumping water directly from the river in designated Critical Habitat, the following conservation measures are to be added to all fluid mineral actions that may involve direct removal of water from potentially occupied reaches of the White River as a COA prior to commencement of development activity. (It should be noted that the White River in Colorado is not known to support any spawning activity or young-of-year nursery areas.)

1. To avoid entrainment, pump from off-channel locations not directly connected to the mainstem rivers where possible.

2. If the pump head must be located in the river channel where larval fish are known to occur, the following measures apply:

   a. Do not situate the pump in a low-flow or no-flow area as these habitats tend to concentrate larval fishes. Instead place the pump into fast moving/riffle habitat;

   b. Limit the amount of pumping, to the greatest extent possible, during that period of the year when larval fish may be present (June 1 to August 15); and

   c. Avoid pumping, to the greatest extent possible; during the pre-dawn hours (two hours prior to sunrise) as larval fish drift studies indicate that this is a period of greatest daily activity.

BLM_0019926

*Chapter 4 – Environmental Consequences*

3.  Screen all pump intakes with ¼ inch or finer mesh material.

4.  Report any fish impinged on any intake screens to the Fish and Wildlife Service or CPW.

Increased levels of development would increase the potential for leaks or spills from oil or gas wells and pipelines and increase sediments entering the White River system. Spills (e.g., oil, condensate, produced water) of sufficient concentration (from pipelines, trucks, or wells) that enter the river at or above critical habitat is likely to have a direct effect on endangered Colorado River fishes. Oil pollution can affect endangered fishes in the following ways: asphyxiation, ecological impacts due to destruction of food organisms, chronic toxicity resulting in reduced resistance to infection and other stresses, and interference with behavioral patterns.

The BLM has regional hazard materials response plans to deal with oil and gas leaks and oil and gas companies have contingency plans in place regarding leaks or spills. However, the absence of automatic shutoff valves for natural gas pipelines that cross the White River's critical habitat has been identified as a potential threat to endangered Colorado River fishes.

Increased turbidity resulting from cumulative emissions of fugitive sediment is an inevitable consequence of increased road density and increased surface disturbance attributable to well pad construction and pipeline installation. Although it is assumed that these fish have adapted to turbid waters and this tolerance may serve as a form of concealment for young fish and provide an important competitive advantage over introduced populations of nonnative fish, sediment loads that exceed the capacity of the system to efficiently transport or incorporate have potential to destabilize bank and channel features and adversely modify channel substrates. Considering the number of federal and State regulations that require fugitive sediment be managed and contained on site (e.g., COGCC Rules, BLM Onshore Orders) it is unlikely that sediment sufficient to degrade downstream aquatic habitats would be generated regardless of alternative.

Individual actions that may affect critical habitat or fish populations would prompt ESA Section 7 consultation with the FWS and result in the development of conservation actions that would prevent substantive adverse direct and indirect influences.

## Special Status Fish of the White River

### Including Colorado Pikeminnow and BLM-sensitive Roundtail Chub and Bluehead Sucker

The BLM management decisions contribute, but have little effective influence on overall management of the White River and its aquatic habitats, particularly upstream of Kenney Reservoir. The BLM administers about 7 percent of the surface and mineral estate along the banks (i.e., miles) of the White River above Kenney Reservoir. These holding are represented by numerous (49), small (average length 820 feet), and primarily land-locked tracts that are scattered along 93 miles of river channel. The BLM administration is more prominent on the 35 river miles below Taylor Draw dam where the BLM administers about 23 percent of the channel miles. These parcels tend to be longer (approximately 1,640 feet average) and publicly-accessible. Overall, the extent of the BLM administered riverine habitat is generally insufficient to exert substantive influence on overall riparian and aquatic function or condition.

Similar to the land patterns above, the BLM administers about 5 percent (81 acres in 15 tracts) of the White River's 100-year flood plain as designated Critical Habitat for the Colorado pikeminnow within the MPA. The BLM administration of the 100-year flood plain is more prevalent, but continues to be limited (8 percent) on the remainder of designated critical habitat that extends downriver of the MPA.

BLM_0019927

*Chapter 4 – Environmental Consequences*

**BLM-Sensitive Aquatic Wildlife**

**Colorado River Cutthroat Trout**

There are two stream systems within the MPA that support a self-sustaining trout fishery: Black Sulphur Creek and Trapper Creek. The current RMP recognizes Black Sulphur Creek as a cutthroat trout fishery, but one that was not specifically identified as important for Colorado River cutthroat trout (CRCT) conservation and recovery. The BLM administers about 30 percent (3 valley miles) of Black Sulphur Creek currently supporting trout; largely in a single mid-system segment. Black Sulphur Creek is presently regarded as a "Conservation Population" (Hirsch et al. 2006) which, by definition, is considered important in the context of overall CRCT conservation. These fish are suspected to be hybridized but warranted conservation status due to unique life history traits and ecological characteristics in spite of hybridization.

Regardless of alternative, the efficacy of any management measures intended to minimize or avoid direct or indirect influences of channel features or conditions is largely dependent on the distribution and proportion of the BLM-administered lands on the channel and in the watershed. The BLM administers about 25 percent (21 percent surface, 4 percent split estate) of the total watershed contributing to this reach, but importantly, has no influence on a minimum 8 miles of contributing upstream channels and 94 percent of the headwater watershed (6 percent mineral estate).

Trapper Creek (a 5.5 mile headwater tributary of East Middle Fork of Parachute Creek) is wholly administered by the BLM, but the channel frequently alternates between the CRVFO and WRFO administrative boundary. Unified management for this system was developed through the CRVFO Roan Plateau RMP Amendment and stream parcels within the WRFO will be managed consistent with these decisions. Areas within 500 feet of the outer perimeter of Trapper Creek's riparian expression are subject to a CSU stipulation which provides for special design modification or relocations of greater than 660 feet as a means of preventing surface use proposals from impacting hydrologic and fisheries values.

The southern margin of the MPA encompasses about 21,000 acres of the BLM-administered surface and mineral estate in the Brush and Clear Creek drainages that eventually drain to the CRCT fishery in Roan Creek, about 10 miles downstream of the nearest WRFO parcel. Another 12,000 acres of federal mineral estate lies across the headwaters of the Parachute watershed that directly involve Trapper Creek, a CRCT fishery, and indirectly contributes to downstream trout fisheries in the Parachute complex. Regardless of alternative, the current suite of State and federal regulatory processes regulating the potential for off-site sediment and contaminant delivery are expected to remain capable of reducing the risk of indirect damage to these aquatic habitats from well development in contributing positions within the watershed.

Outside the MPA, Colorado cutthroat trout occur in two widely different situations outside the MPA. The WRFO administers a number of streams that provide only peripheral support to the larger CRCT fishery, namely: Big Beaver Creek, North Fork of the White River, and Bitter Creek, of which, the BLM administers 6, 7, and 2 percent of these channels, respectively. Although it is unlikely that development would occur in these areas over the life of the plan, in each case, management entails application of the CRCT CSU stipulation (Table 2-9 Record 19, see MPA Alternative B and C discussion) and management guidance that prescribes fisheries-oriented reclamation efforts (Table 2-9 Record 23). Relative to the length of habitable fisheries, the BLM administration would have little effective influence on overall aquatic habitat conditions associated with these systems.

BLM_0019928

Conversely, the WRFO manages a substantial proportion of the East Douglas Creek watershed which encompasses about 39 total miles of occupied or potentially occupied CRCT fishery. The BLM surface and mineral estate accounts for about 52 percent and an additional 27 percent of that stream length capable of supporting trout, respectively. Management applied to this system would be the same in every alternative, involving both the application of the CRCT CSU stipulation and management emphasis derived from the East Douglas Creek ACEC (i.e., existing CSU stipulation applicable to riparian and aquatic communities, among others). This ACEC was established through the 1997 White River RMP as a means of coordinating all land uses in a manner compatible with or complementary to maintenance or enhancement of CRCT fishery conditions.

Regardless of alternative, little development activity is expected to occur outside the MPA and less yet in those watersheds that support CRCT (e.g., on average less than 1 pad per year over the life of the plan). Siting and reclamation consideration provided through the CRCT CSU stipulation, the East Douglas ACEC CSU stipulation, and complementary riparian and channel avoidance measures (e.g., Table 2-2 Record 12, Table 2-3 Record 20) would be fully capable of reducing projected oil and gas development effects to discountable levels with respect to CRCT habitats.

**Flannelmouth Sucker, Mountain Sucker, and/or Northern Leopard Frog**

With two notable exceptions, the BLM-administered holding of streams in the MPA that support BLM-sensitive aquatic vertebrates are limited in distribution and extent such that management applied to those parcels is generally of minor consequence to the overall integrity or function of the system. The BLM administers the surface and mineral estate on about 83 percent of the 7 stream miles presently inhabited by fish in lower Yellow Creek and about 21 percent of up to 7 valley miles thought capable of supporting northern leopard frogs. Although surface estate is limited to about 14 percent of the mainstem of Fawn Creek, the BLM mineral administration extends to about 57 percent of its length. Application of BLM-derived surface management prescriptions to split estate, particularly when the surface owner is an energy company, is often discretionary and not universally effective. The lower portions of Black Sulphur Creek are similarly divided, with the BLM surface and mineral estate comprising 1 and 13 percent of the land base, respectively. The BLM administers about 9 percent of the remaining systems that support native fish in the MPA (i.e., Piceance Creek, Willow Creek, and the Dry Fork of Piceance). All of the systems named above support, singly or in combination, BLM-sensitive flannelmouth sucker, mountain sucker, and/or northern leopard frog.

Given the circumstances of land ownership discussed above, the BLM management would be capable of influencing aquatic conditions in lower Yellow Creek and Fawn Creek (about 13 percent of habitats available in the MPA), but are not expected to exert substantive influence on the remaining MPA stream systems that support BLM-sensitive aquatic species.

Because virtually all non-CRCT fisheries in the MPA support BLM-sensitive species, there are relatively subtle differences between alternatives in terms of emphasis and application (Table 2-9 Records 22 and 23). Management in each alterative is contingent on the development of site-specific COAs that are applied in concert with other riparian and water resource considerations to minimize or prevent deterioration of riparian channel and aquatic conditions.

Outside the MPA, the BLM administration of aquatic habitats supporting vertebrate forms is more substantive, and with the exception of the White River above Rio Blanco Lake (6 percent ownership), the BLM administers an estimated 82 percent of waters occupied permanently or seasonally (intermittent reaches of Crooked Wash and Douglas Creek) by fish and amphibians.

BLM_0019929

Regardless of alternative, little development activity is expected to occur outside the MPA (e.g., on average less than 1 pad per year over the life of the plan). Siting and reclamation consideration provided through the various aquatic and riparian management measures would be fully capable of reducing projected oil and gas development effects to discountable levels within these systems.

### 4.3.3.2    Alternative A

**Bald Eagles**

No surface occupancy stipulations and TL stipulations are applied to that area within 1/4 mile and ½ mile of identified bald eagle nests and nocturnal roosts, respectively. Although used infrequently, these buffers have provided adequate spatial and temporal isolation to prevent flushing or extended absence of adult birds and the premature fledging of young. By definition, nesting dates can be extended to accommodate late nesting attempts (until fledging of young). Exception and modification criteria would allow land uses with no reasonable potential to disrupt ongoing or subsequent reproductive or roosting activity and would provide WRFO the opportunity to weigh the consequences of alternate siting (e.g., higher quality private lands). The CSU stipulation (Table 2-9 Record 26) generally disallows uses that are inconsistent with the long term maintenance of riverine cottonwood communities, including the flood plain processes that promote successful reproduction and recruitment of cottonwood trees as bald eagle nest, roost, and perch substrate. This stipulation and the land use decision to avoid priority riparian habitats (Table 2-3 Record 20) have remained effective in avoiding oil and gas-related occupancy and adverse modification of flood plain features on federal surface.

**Black-footed Ferret/White-tailed Prairie Dog**

Current management direction for reintroduced black-footed ferret and their white-tailed prairie dog prey base was developed through several inter-related documents (examples listed below) that culminated in "A Cooperative Plan for Black-Footed Ferret Reimtroduction and Management" (Ferret Management Plan).

- Establishment of a Nonessential Experimental Population of Black-footed Ferrets in Northwestern Colorado and Northeastern Utah; Final Rule (Federal Register Volume 63, No. 190, Oct. 1, 1998, pages 52824-52841.

- Environmental Assessment, Black-footed ferret reintroduction in northwestern Colorado and northeastern Utah (August 14, 1998; prepared by the U.S. Fish and Wildlife Service, Region 6, in cooperation with the BLM Craig District, Colorado, the BLM Vernal District, Utah, Colorado Division of Wildlife, and Utah Division of Wildlife Resources).

- "A Cooperative Plan for Black-footed Ferret Reintroduction and Management–Wolf Creek and Coyote Basin Management Areas, Moffat and Rio Blanco Counties, Colorado" (October 2001; prepared by the Wolf Creek Work Group in association with the Colorado Division of Wildlife, Bureau of Land Management, and the U.S. Fish and Wildlife Service).

This management approach was intended to apply to WRFO's two delineated ferret management areas (Wolf Creek and Coyote Basin), but promotes consideration of ferrets and their habitat in prairie dog complexes throughout the WRFO. The two management areas encompass about 38,000 acres of prairie dog habitat or about 45 percent of all prairie dog habitat in the WRFO. The Management Plan and its prescriptions were developed by a stakeholder group that included State and local governments, industry, and private citizens. Management installed through this document remains consistent with the intent of the Final Rule, compatible with the White River RMP, and garnered the conditional support of Moffat and Rio Blanco Counties and the State of Colorado

BLM_0019930

through Colorado Revised Statute 33-2-105.6, which authorized efforts to reestablish a self-sustaining black-footed ferret population in the WRFO.

Based on the Ferret Management Plan, fluid mineral development taking place in the ferret management areas would be subject to COAs, but conditions imposed on mineral development activity are to be the minimum necessary to prevent disruption of ferret reproductive efforts, avoid reasonable likelihood of injury or mortality to ferret, and maintain the utility and capacity of the habitat available for ferrets within the Management Area. It was agreed by all parties that the collective effects of mitigation would not rise to the level of significantly detracting from lease development rights.

Under current management, mineral development and utility installation would be designed to avoid or, where unavoidable, minimize adverse influence of ferret/prairie dog habitat. Where adverse impacts are unavoidable, cooperatively designed equal and in-kind replacement of prairie dog habitat may be developed and applied as a Condition of Approval. Although mitigation efforts would be largely voluntary, facility design and operation may be subject to daily or seasonal activity limitations and siting modifications to avoid injuring ferrets or compromising reproductive efforts in instances where reliable evidence of risk is established.

These management prescriptions are represented in stipulation CSU-09 (Table 2-9 Records 11 and 15, Appendix A) and LN-7 (Appendix A), which are applied to leases encompassed by the ferret management areas. This management format was, and continues to be, considered adequate to achieve ferret recovery objectives in the WRFO, although there has been no opportunity to apply these measures in a practical situation (i.e., no development activity in the management areas since the plan's inception).

Fluid mineral development outside the ferret management areas are not subject to habitat compensation measures, but operators are encouraged to conduct newly authorized operations in a manner that reduces the risk of adversely affecting ferrets and their habitat, including reducing the involvement of prairie dog burrow systems and avoiding their reproductive periods. Voluntary application of timing limitations and relocation of facilities and infrastructure have been well accepted by operators on federal estate outside the management areas (e.g., Rangely Oil Field). These techniques are considered effective in reducing involvement of occupied prairie dog habitat and maintaining prairie dog occupation of developed areas.

Although there continues to be no empirical studies that evaluate the long or short term effects of oil and gas development on white-tailed prairie dogs, habitat loss, behavioral avoidance, and direct mortality likely have negative effects on individuals and local populations (FWS 2010). Conversely, some of the most robust and resilient prairie dog colonies in the WRFO (e.g., Rangely Oil Field) and surrounding regions are situated among concentrated oil and gas developments. The FWS (2010) found that available evidence does not indicate that oil and gas development, as currently practiced and managed, poses a significant threat to the white-tailed prairie dog as a species now or in the foreseeable future.

## Special Status Fish of the White River

### Including Colorado Pikeminnow and BLM-Sensitive Roundtail Chub and Bluehead Sucker

The CSU stipulation applied to White River ACEC (Table 2-21 Record 14) generally disallows surface disturbance of unique plant communities and is intended to prevent surface use that detracts from the proper functioning condition of riverine riparian associations. In addition, the White

BLM_0019931

River's narrow-leaf and Fremont cottonwood communities are also subject to a CSU stipulation (Table 2-9 Record 26) designed to avoid the involvement of cottonwood stands and maintain those flood plain areas and processes necessary to maintain regeneration and the continued availability of these trees (as components of bald eagle habitat). These stipulations and the land use decision to avoid priority riparian habitats (Table 2-3 Record 20; basis for up to 660 feet moves) have remained effective in avoiding oil and gas-related occupancy and adverse modification of flood plain features on federal surface.

## BLM-Sensitive Aquatic Wildlife

### Colorado River Cutthroat Trout

Management of this aquatic system is currently based on the development of site-specific COAs that are guided by RMP decisions that call for the avoidance of priority riparian areas or, when appropriate, special reclamation and siting criteria that allow for development compatible with maintenance of riparian and aquatic habitat values. Oil and gas-related infrastructure is currently limited to two recent 4-acre pads on an isolated downstream parcel and two 0.6-acre historic (ca. 1957) pads situated on the largest block of the BLM-administered channel. Current management has been adequate to contend with former (single-well) drilling technologies and has remained largely successful at preventing direct involvement of channel features and substantive delivery of fugitive sediment to the fisheries. Case-by-case avoidance and mitigation strategies may continue to be adequate in managing more modern multi-well developments in a manner compatible with the maintenance of aquatic habitat values, but due to the confined nature of the valley it is unlikely that more than two pads of modern dimension could be located within the BLM-administered reach without physically involving the channel. Project-specific environmental analysis in response to APD submittal would remain an inefficient means for informing operators or lessees in advance of aquatic habitat issues associated with Black Sulphur Creek and its role as a CRCT Conservation Population. The current suite of State and federal regulatory processes regulating the potential for off-site sediment and contaminant delivery are expected to remain capable of reducing the risk of indirect damage to these aquatic habitats from well development in contributing positions within the watershed.

### Flannelmouth Sucker, Mountain Sucker, and/or Northern Leopard Frog

Current riparian avoidance policy (Table 2-3 Record 20) extends to about 181 miles or about 47 percent of all perennial stream systems in the MPA and encompasses the estimated 17 miles of the BLM-administered stream courses that support BLM-sensitive fish and the northern leopard frog.

Management of these aquatic habitats is currently based on the development of site-specific COAs that call for the avoidance of priority riparian areas or, when appropriate, require special reclamation and siting criteria that allow for development compatible with maintenance of riparian and aquatic habitat values. Oil and gas-related infrastructure is present on all of these systems at relatively low densities. Current management has been adequate to contend with past development and has remained largely successful at preventing direct involvement of channel features and substantive delivery of fugitive sediment to adjacent or downstream fisheries. It is expected that case-by-case avoidance and mitigation strategies may continue to be adequate in managing relatively modest projected increases in development.

Current riparian avoidance policy (Table 2-3 Record 20) extends to 203 miles or about 21 percent of all perennial stream systems outside the MPA and encompasses an estimated 43 miles of the BLM-administered stream courses that support native and BLM-sensitive fish and northern leopard frog.

BLM_0019932

Under current riparian and aquatic resource management priorities and under light development pressure (less than 10 wells over plan life), this management strategy can be expected to provide sufficient direction and priority to effectively avoid adverse influences on riparian, wetland, and aquatic habitats.

### 4.3.3.3    Alternative B

**Bald Eagles**

No surface occupancy stipulations and TL stipulations would be applied without exception to that area within 1/4 mile and 1/2 mile of functional bald eagle nests and nocturnal roosts, respectively. These buffers conform to FWS and CPW guidelines and provide adequate spatial and temporal isolation to prevent flushing or extended absence of adult birds and the premature fledging of young. Timing limitation stipulation dates applied to nesting would be extended by 2 weeks from current dates (July 31), but would continue to accommodate late nesting attempts similar to Alternative A. Timing limitation stipulations applied to winter roosts would be shortened 4 weeks from current timeframes; these TL would also be applied to lands within 1/4 mile of identified hunting perches. These abbreviated timeframes conform to CPW and FWS timing criteria for roost and winter habitat occupancy and remove an undue restriction policy. Limiting activity near favored hunting perches would be expected to maintain advantageous foraging efficiency of individual eagles and reduce intermittent energy demands associated with flights prompted by disturbances. The NSO stipulation protection would also be extended to the immediate area (330 feet) around abandoned bald eagle nests as substrate that retains potential to support alternate nests. Although inviolate NSO stipulations offer rigorous protection on federally administered lands, the federal land base along the river is not extensive or continuous and there remains the risk that federal lands may be circumvented to involve riverine habitat on majority private lands with the possibility of involving more extensive or higher quality bald eagle habitat.

Many of the aforementioned measures would be redundant within a proposed NSO stipulation applied to designated Colorado pikeminnow critical habitat (i.e., 100-year flood plain of the White River below Rio Blanco Lake). Collectively, these measures would apply to about 14 percent of the flood plain acreage available below Rio Blanco Lake. The prescriptions above would continue to pertain to riverine habitats upstream of Rio Blanco Lake and apply to about 1 percent of all available flood plain acreage in that reach.

A slightly modified and updated CSU stipulation that is virtually identical to that in Alternative A (Table 2-9 Record 26) would be applied to those riverine habitats along the White River that generally disallows uses that are inconsistent with the long term maintenance of riverine cottonwood communities, including the flood plain processes that promote successful reproduction and recruitment of cottonwood trees as bald eagle nest, roost, and perch substrate.

A supplemental provision (Table 2-9 Record 31) would prohibit the felling of larger native trees within 100 feet of the river's edge and would prohibit any activity that may kill perch trees or impede use of foraging areas. The WRFO believes that the current CSU stipulation language fully accommodates the concerns involving the continuous availability and development of roost, perch, and nest substrate. The implications of the supplemental measure may include the unintended consequence of impeding the effective treatment of noxious weeds (potential for affecting individual intermingled trees with persistent chemicals) and potential future management of gallery forests to encourage the development of dominant spreading canopies that may better serve bald eagle nest or roost function.

BLM_0019933

These stipulations and the proposed land use decisions that prohibit surface disturbing activity in priority riparian habitats (Table 2-3 Record 20) and establishes an inviolate NSO stipulation on the 100-year flood plain of the White River below Rio Blanco Lake (Table 2-9 Record 18, critical habitat for Colorado pikeminnow) would provide essentially complete protection of riverine bald eagle habitats and special use features on federally-administered acreage. These measures, however, are not considered risk-free. The caveat concerning strict application contradicting the intent of the provisions applies in this circumstance as well since federal estate comprises a minor fraction of the entire river corridor (about 8 percent of total mainstem 100-year flood plain acreage) and riverine cottonwood habitats (about 6 percent of total cottonwood acres) along the White River.

## Black-footed Ferret/White-tailed Prairie Dog

This alternative represents conservative management of surface use to promote recovery of black-footed ferret. This management approach would be a strong departure from those principles and measures established by the stakeholder group and the intent and spirit of the Final Rule for the Establishment of a Nonessential Experimental Population of Black-footed Ferrets in Northwestern Colorado and Northeastern Utah.

The most prominent management action in this alternative would involve the application of an inviolate NSO stipulation (Table 2-9 Record 15) within 1/2 mile of any current or formerly occupied prairie dog habitat. This stipulation would extend to about 209,000 acres outside the boundary of the exempted Rangely Oil Field. This action would disallow surface disturbance and habitat loss and modification attributable to fluid mineral development on about 86 percent of the prairie dog habitat available in the WRFO. Timing limitations (e.g., March 1 through July 1) applied to temporary surface activity (Table 2-9 Records 10 and 13) would prevent disruption of prairie dogs and black-footed ferret during their breeding season and through the period of dependent young.

This alternative would establish an additional management area that straddles the Moffat and Rio Blanco County line and borders neighboring Utah (Snake John). The management area would represent a logical 6,000-acre contiguous extension to a ferret management area currently established in Utah. This land base would, then, be available for the actual release and retention of ferrets and would enhance the consistency and priority of ferret management across State lines. This management area encompasses about 2,200 acres of prairie dog habitat and would increase the proportion of habitat encompassed by designated ferret management areas from 45 percent to 48 percent of those available in the WRFO.

Vehicle use on the BLM surface within the ferret management areas (about 54,300 acres) would be limited to designated roads and trails (Table 2-9 Record 14). This management option would be available to help offset or avoid localized indirect impacts associated with increased recreation use, especially off-road vehicle use and prairie dog shooting, which often attend expanded mineral development activity. Current road density in the management areas is within the thresholds prescribed in the current ferret management plan (1.5 miles per square mile), which limits prairie dog habitat exposed to shooting pressure from a road to about 30 percent. In certain instances, localized shooting activity can substantially reduce the abundance of the prairie dog prey source in the immediate vicinity of a ferret litter, reducing that litter's prospects for survival from the nutritional standpoint and, with the need to search more widely for prey, increased above-ground exposure to predation.

Collectively, this alternative would nearly eliminate risk potential to ferret recovery that may be attributable to future fluid mineral development by disallowing physical sources of habitat loss or

BLM_0019934

*Chapter 4 – Environmental Consequences*

degradation and substantially reducing behavioral influences associated with well development. These measures would ostensibly promote the expansion of ferrets to suitable prairie dog habitat beyond the borders of the management areas. However, because one of the major criteria for selecting management areas is their greater demonstrated or inherent capacity to support high densities of prairie dog, the relative contribution of the remaining 52 percent of prairie dog habitats would be of lesser consequence. The contribution of these measures in furthering black-footed ferret recovery in the WRFO is expected to be small. It is arguable whether they would have any substantive influence in elevating ferret survival and recruitment or influencing the fluctuation in prairie dog abundance and distribution in the WRFO, where over the past 35 years and through the past 10 years of ferret recovery efforts, the principal determinant has remained periodic bouts of epizootic disease.

## Special Status Fish of the White River, including Colorado Pikeminnow and BLM-Sensitive Roundtail Chub and Bluehead Sucker

A no-exception NSO stipulation would be applied to pikeminnow critical habitat (Table 2-9 Record 18) that would effectively preclude any oil and gas development activity on federal estate within the 100-year flood plain through the MPA (5 percent of available habitat base) and downriver to Utah (about 7 percent of available base). A complementary objective would require that all surface uses be conditioned to maintain or improve channel and riparian processes in designated critical habitat. Because the federal land base is not extensive or continuous, application of this NSO stipulation would have limited influence on the protection of overall riverine resources within the MPA, since developments may tend to skirt federal estate and continue to involve riverine habitat on adjacent private lands. The potential development of federal estate upriver from Rio Blanco Lake would be managed with a NSO stipulation applied to riparian/wetland habitat on federal estate (Table 2-3 Record 20) and complementary land use direction that would allow for the site-specific development of COAs that effectively contend with project-related insults to aquatic systems (Table 2-9 Record 22) and require enhanced reclamation to abbreviate and reduce fugitive sediment discharge (Table 2-9 Record 23). These measures would provide an effective means to reduce federal contribution to long-term river system damage or deterioration of aquatic habitats that support the White River's entire native and special status fish community to discountable levels.

## BLM-Sensitive Aquatic Wildlife

### Colorado River Cutthroat Trout

The current CSU stipulation applied to CRCT fisheries throughout the WRFO (except Trapper Creek) would be applied to the BLM-administered portions of Black Sulphur Creek (Table 2-9 Record 20). The CSU stipulation requires that the proposed action be conditioned so as to not compromise important constituents of aquatic habitat. Depending on the calculated risk, the operator may be required to monitor for changes in specific parameters and would be required to remedy adverse shifts or changes in aquatic habitat conditions attributable to the authorized action. These objectives apply to occupied habitats as well as contributing perennial and intermittent tributaries and explicitly apply to the following parameters:

- Stream gradient,
- Sediment accumulation,
- Channel sinuosity,
- Channel width:depth ratios,

BLM_0019935

- Water temperature,
- Vegetation-derived stream shading (invertebrate source, water temperature), and
- Water quality.

More intensive and specialized reclamation efforts (Table 2-9 Record 23) would be applied as COAs in those instances where authorized use risks channel degradation (e.g., sediment contributions). Riparian and channel-related NSO stipulations (Table 2-2 Record 12 and Table 2-3 Record 20) provide redundant consideration of this system and, especially as applied to this narrow valley, complements maintenance of habitat conditions favorable to the fishery. The CSU stipulation would provide fishery-oriented guidance in siting and reclamation considerations in those instances where NSO stipulations are excepted or modified and would also apply to surface uses that are located in upland positions, but remain capable of exerting influence on Black Sulphur Creek (e.g., sediment delivery).

These measures would persist in having relatively localized influence on aquatic habitat conditions given the circumstances of land ownership discussed above.

### Flannelmouth Sucker, Mountain Sucker, and/or Northern Leopard Frog

Management objectives designed to prevent or, where necessary, minimize adverse influences on aquatic and riparian habitats (Table 2-9 Record 22) would be applied to all lotic and lentic systems in the MPA (i.e., about 181 miles or about 47 percent of all perennial stream systems in the MPA). These aquatic habitat considerations would complement Riparian (Table 2-3 Record 20) and Soil and Water Resources (Table 2-2 Record 12) NSO stipulations and would provide fishery-oriented guidance in siting and reclamation considerations in those instances where NSO stipulations are excepted or modified. These objectives would also apply to surface uses that are located in upland positions, but remain capable of exerting influence on occupied reaches (e.g., sediment delivery). More intensive and specialized reclamation efforts (Table 2-9 Record 23) would be applied as COAs in those instances where authorized use risks channel degradation (e.g., sediment contributions).

Aquatic habitat objectives would be applied to all lotic and lentic systems outside the MPA (same application as in Alternative A above). As discussed for the MPA in Alternative B, these management objectives would tend to complement Riparian (Table 2-3 Record 20) and Soil and Water Resources (Table 2-2 Record 12) NSO stipulations by helping to guide management prescriptions in those instances when NSO stipulation exceptions are granted.

#### 4.3.3.4    Alternative C

<u>Bald Eagles</u>

Alternative C would generally adopt the same management prescriptions as Alternative B, but the 0.25 mile radius NSO stipulation would not be applied to bald eagle hunting perches and there would be no explicit measure prohibiting the felling of trees along the river. Felling of cottonwood trees along the river corridor is not a common practice in the WRFO and is not recognized as an imminent concern, particularly in the context of oil and gas development. WRFO appreciates the intent of the perch provision in the context of winter energetics, but considers the measure superfluous since perch substrate along the White River is widely distributed, its use by eagles appears opportunistic, and about 94 percent of mapped cottonwood substrate is privately owned and managed. Exception and modification criteria within the NSO stipulation and TL conditions allow for land uses with no reasonable potential to disrupt ongoing or subsequent reproductive or roosting

BLM_0019936

activity and would provide the WRFO the opportunity to weigh the consequences of alternate siting
(e.g., avoiding higher quality private lands).

### Black-footed Ferret/White-tailed Prairie Dog

This alternative would formally adopt management prescribed in the ferret management plan
prepared in 2001 by the local Wolf Creek work group, "A Cooperative Plan for Black-footed Ferret
Reintroduction and Management–Wolf Creek and Coyote Basin Management Areas, Moffat and
Rio Blanco Counties, Colorado." This management strategy (Table 2-9 Record 11) would be
essentially identical (i.e., updated with management plan language) to that presented in Alternative
A, but featured management would be extended to the proposed Snake John Reef management area
addition (see discussion in Alternative B). A management measure (Table 2-9 Record 14) in this
alternative specifically addresses road and access management concerns (i.e., designated roads and
trails as discussed in Alternative B) and establishes benchmarks for timing limitations, both of
which are management features broached in the Ferret Management Plan.

This alternative upholds the cooperative understandings that fostered the reintroduction of ferrets in
the WRFO as an Experimental Nonessential population and remains consistent with the intent and
spirit of the Final Rule, the existing ferret management plan, and State statute. The management
presented in this alternative is considered sufficient and appropriately scaled to manage fluid
mineral development in a manner that is not an impediment to or incompatible with ferret and
prairie dog population and habitat management objectives.

### Special Status Fish of the White River, including Colorado Pikeminnow and BLM-Sensitive Roundtail Chub and Bluehead Sucker

Management attention provided pikeminnow habitat in this alternative would be similar to
Alternative B. A modified NSO stipulation with exception criteria (Table 2-9 Record 18) would be
applied to designated critical habitat on federal estate that addresses specific aquatic habitat issues,
including the avoidance of special fishery habitats and management of potential contamination
(e.g., installation of emergency shut-off valves and development of spill contingency plans) as a
precursor to ESA Section 7 consultation. Similar to Alternative B, land use direction allowing the
development of COAs that effectively contend with insults to aquatic systems (Table 2-9
Records 17 and 22), provide enhanced reclamation to reduce fugitive sediment discharge (Table 2-9
Record 23) and require riparian avoidance (Table 2-3 Record 20) are considered sufficient to protect
important habitat components of the fisheries from direct disturbance, contaminant entry, and
adverse modification of channel/flood plain processes. These measures would provide an effective
means to reduce federal contribution to long-term river system damage or deterioration of aquatic
habitats that support the White River's entire native and special status fish community to
discountable levels.

### BLM-Sensitive Aquatic Wildlife

#### Colorado River Cutthroat Trout

Identical to Alternative B, the CSU stipulation applied to CRCT fisheries throughout the WRFO
would be applied to the BLM-administered portions of Black Sulphur Creek (Table 2-9 Record 20).
Collectively, the application of this CSU stipulation in conjunction with avoidance criteria
established for Soil and Water and Riparian resources (Table 2-2 Record 12 and Table 2-3
Record 20) would provide a level of resource prioritization and fishery protection for Black Sulphur
Creek comparable to Alternative B. Although CSU stipulations are generally not as stringent as
NSO stipulations in preventing disturbance of terraces adjacent to channels, they also provide a
degree of management flexibility in allowing certain uses that are, or can be conditioned to be,

BLM_0019937

compatible with riparian or aquatic values. There are a number of examples in the WRFO where pads have been constructed in close proximity to perennial channels and, with appropriate considerations for pad design and reclamation-derived soil stability, show no evidence of contributing to elevated sediment delivery to the system in the short or long term. Fixed-distance separation of pads and drainages as buffers, particularly when the uplands are connected to the adjoining channel system by high gradient gullies, may not substantially reduce the likelihood of sediment delivery or accidental releases reaching the channel of interest. Inviolate buffers that involve much of the valley floor can encourage involvement of hillside slopes that are more prone to long-term erosional processes and less amenable to successful reclamation.

Sediments specifically attributable to past oil and gas developments have not been implicated as sources deleterious to the Black Sulphur fishery. Risks involving inadvertent off-pad release of toxic substances are considered low (as discussed in Alternative A above). Recent COGCC regulations and improved reclamation attention by the BLM (Table 2-3 Record 18, Table 2-9 Record 23) are expected to limit fugitive sediment attributable to oil and gas development to rates that will be undetectable from background levels.

**Flannelmouth Sucker, Mountain Sucker, and/or Northern Leopard Frog**
Aquatic habitat management objectives (Table 2-9 Records 22 and 23) would be applied to all the BLM administered aquatic habitats supporting fish and amphibians in the MPA (i.e., 17 miles or about 19 percent of all perennial stream systems in the MPA). The remaining systems that contribute to these fisheries would be managed in accordance with avoidance criteria established in Riparian (Table 2-3 Record 20) and Soil and Water Resources (Table 2-2 Record 12) CSU stipulation provisions.

Collectively, these measures would be expected to provide a level of resource prioritization and protection comparable to Alternative B. Although CSU stipulations are generally not as stringent as NSO stipulations in preventing disturbance of terraces adjacent to channels, they also provide a degree of management flexibility in allowing certain uses that are, or can be conditioned to be, compatible with or even complementary to riparian or aquatic values (see discussion in Colorado River cutthroat trout, Alternative C).

Aquatic habitat objectives would be applied more narrowly to those systems that support native aquatic communities (i.e., 43 miles or about 45 percent of all perennial stream systems in the MPA that support native or BLM-sensitive aquatic vertebrates). The remaining systems that contribute to these fisheries would be managed in accordance with avoidance criteria established in Riparian/Wetland and Water Resources CSU stipulation provisions.

### 4.3.3.5    Alternative D

<u>Bald Eagles</u>

NSO and TL stipulations would be applied in a manner identical to Alternative A and would provide effective protection of near-term bald eagle reproductive and roost functions and activities. This alternative would not include a CSU stipulation designed to maintain cottonwood communities in the long term as bald eagle habitat. Outside of identified nest and roost features subject to NSO stipulations, the riparian avoidance provision (Table 2-3 Record 20) would not be expected to extend fully to the maintenance of mature or developing cottonwoods that may have subsequent utility as bald eagle habitat because avoidance would be predicated on Proper Functioning Condition criteria rather than the availability of mature tree structure. The CSU stipulation applied to perennial systems (Table 2-2 Record 12) would generally require avoidance of surface activity

BLM_0019938

within 100-year flood plains, but again, exception and modification allowances are based on water quality parameters and physical flood plain function rather than vegetation expression useful as wildlife habitat.

### Black-footed Ferret/White-tailed Prairie Dog

The effect of this alternative on ferret and prairie dog management would be similar to Alternative A, with featured management (Table 2-9 Record 11) confined to the existing two management areas and the means to regulate the distribution of motorized vehicle use clouded by a prescription that promotes continued use of established road networks (Table 2-9 Record 14). Although timing limitation benchmarks are provided for the prairie dog prey base in this alternative (Table 2-9 Record 10), the timeframes would be generally limited to only the most critical breeding period during the month of March.

Although reasonable protections would be extended to the Snake John area regardless of designation as a management area (e.g., preventing mortality and reproductive disruptions), failure to expand the CSU stipulation provisions to this area would establish disparate management policies for ferrets that are trading freely among prairie dog towns that straddle the Colorado-Utah border. It is conceivable that differing management philosophies may degrade Utah's ability to achieve area-specific ferret management objectives.

Overall, this alternative would remain consistent with the existing ferret management plan and final rule, but weakens management opportunities that, when necessary, could be relied on to better protect ferret reproductive efforts, promote recruitment (e.g., access management), and hasten the achievement of recovery objectives.

### Special Status Fish of the White River, including Colorado Pikeminnow and BLM-Sensitive Roundtail Chub and Bluehead Sucker

Management specifically developed for special status fish in the White River would be the same as Alternative C (Table 2-9 Records 17 and 18). Complementary management of contributing systems (Table 2-9 Records 22 and 23), in the context of the White River's fishery, would be essentially the same as Alternative C. Collectively, this alternative's management would provide levels of control comparable to Alternative C and would reduce the risk of federal fluid mineral development contributing to substantive long-term damage to riverine system to discountable levels.

### BLM-Sensitive Aquatic Wildlife

### Colorado River Cutthroat Trout

The CRCT CSU stipulation (Table 2-9 Record 19) would not be applied to Black Sulphur Creek and explicit commitments by the operator/lease-holder to monitor or remedy adverse direct and indirect effects on specifically identified aquatic habitat components would not be required. Because CRCT are expected to remain a high profile management concern through the life of this plan, the management decisions allowing for the development of site-specific COAs to prevent or minimize unavoidable deterioration of systems that support BLM-sensitive species (Table 2-9 Records 22 and 23) would help extend priority to conditional avoidance measures more generally applied via CSU stipulation for riparian communities and channel features (Table 2-2 Record 12, Table 2-3 Record 20). Although management prescriptions provided in this alternative would likely be sufficient to avoid major insults to the fishery, the persistent presence and long term accumulation of minor or chronic effects attributable to heavy development pressures are more likely to stall system improvement and the contribution of Black Sulphur Creek to CRCT recovery.

BLM_0019939

**Flannelmouth Sucker, Mountain Sucker, and/or Northern Leopard Frog**

Because virtually all fisheries in the MPA support BLM-sensitive species the management applied to aquatic habitats would be similar to Alternative C in extent and nature.

The management decisions allowing for the development of site-specific COAs to prevent or minimize unavoidable deterioration of systems that support BLM-sensitive species (Table 2-9 Records 22 and 23) would help extend priority to conditional avoidance measures more generally applied via CSU stipulation for riparian communities and channel features (Table 2-2 Record 12, Table 2-3 Record 20). Although management prescriptions provided in this alternative would likely be sufficient to avoid major insults to the BLM-administered aquatic habitats, the persistent presence and long term accumulation of direct and chronic effects attributable to heavy development pressures are more likely to measurably influence habitat quality during active development phases.

Aquatic habitat management emphasis would not be applied to the Douglas Creek mainstem and lower portions of East and West Douglas Creeks that are known to consistently support only the native speckled dace. Management direction provided in Table 2-9 Records 22 and 23 would apply to 5 miles or an estimated 10 percent of the systems that support BLM-sensitive aquatic vertebrates outside the MPA. The remaining systems that contribute to these fisheries would be managed in accordance with avoidance criteria established in Riparian/Wetland and Water Resources CSU stipulation provisions.

### 4.3.3.6    Irreversible and Irretrievable Commitment of Resources

As discussed in Section 4.2.5.1, surface water depletions of approximately 2.62 acre-feet per well or greater would be expected. Under Alternative D, this would amount to roughly 52,800 acre-feet of depletion within the Planning Area over the 20-year planning period, or an average of 2,543 acre-feet per year. The majority of water volume would be extracted for well construction, but would also occur for ongoing dust abatement. Most dewatering is anticipated within the Piceance-Yellow Creek watershed which contains a large number of the BLM fisheries and ephemeral streams (Maps 3-1 and 3-3, respectively).

Impacts to aquatic organisms could result from direct loss of surface water flow; increased interstitial flow, greater diurnal temperature fluctuations, higher evapotranspiration rates, or ponding due to reduced stream flows; or from degradation in water quality from increased concentrations of TDS or salts.

Impacts from dewatering are dependent on three variables: the extracted volume, the timing of each extraction (relative to the season and/or other extractions), and the magnitude of normal flows within the stream or drainage. In years with normal or higher precipitation, low or moderate dewatering would constitute a temporary impact within perennial streams, but could have greater long-term impacts on ephemeral and intermittent streams and their dependent organisms.

In years of extended drought or other environmental conditions that could impact the ability of the watershed to recover a normal flow regime, intermittent or ephemeral drainages could be irreversibly impacted resulting in irretrievable changes for aquatic organisms. Impacts outside of prolonged direct loss of surface water flow are unlikely to permanently affect adjacent riparian vegetation, due to gradients within drainage areas; however, once impacted, these areas could experience conversion resulting in irreversible changes in wildlife use.

Irreversible or irretrievable impacts are not likely to occur for other species.

BLM_0019940

### 4.3.3.7     Unavoidable Adverse Impacts

Impacts to woodland-associated special status species would be unavoidable because development is allowed in these habitats under all the alternatives. Impacts would be least in Alternatives A or B but greatest in Alternative D.

### 4.3.3.8     Relationship Between Local Short-Term Uses and Long-Term Productivity

Federally-listed animals, including black-footed ferret, Canada lynx, and upper Colorado River fish would be protected by the BLM proposed management actions that are, when and where necessary, augmented by conservation measures derived from Section 7 consultations with the FWS. For the BLM-sensitive species, losses of mature woodlands and sage steppe would result in long-term losses of habitat from short-term oil and gas production. Clearing of mature woodlands would require protracted timeframes for canopy redevelopment and could affect the distribution of Northern goshawk. The level of effects would be greatest under Alternative D because the amount of clearing would be the greatest (7,800 acres per decade), and there would be no requirement to locate in early to mid-seral areas as in Alternatives B and C. New pipelines in mature woodlands and old growth would not be required to be located in previously disturbed ROWs under Alternative D as in Alternatives B and C.

Development scenarios under Alternative A and the greater protective measures under Alternative B would result in fewer short-term losses and could regain long-term productivity more rapidly, whereas the greater disturbance and lower reclamation standards in Alternative C could result in longer recovery times. Under Alternative D, the reclamation standards and high development could result in the longest recovery times for special status species habitats and populations.

## 4.3.4     Special Status Species - Plants

This analysis focuses on impacts to Special Status Species of plants as a result of management actions proposed in each alternative that cause changes in the condition of their habitats. Special status plant species are those listed (threatened or endangered) or in candidate or proposed status by the FWS under the federal Endangered Species Act and those placed on the BLM Colorado State Director's Sensitive Species List. Federal candidates and their habitats are managed as Bureau sensitive species. The BLM may coordinate with State natural heritage programs to develop conservation strategies and to mitigate threats to rare plants that are not designated BLM special status species. Federal protections and the BLM policies that protect threatened, endangered, and sensitive species were considered as methods for reducing the potential impacts from permitted activities. Known and potential habitat locations for special status species were considered in the analysis; however, the potential for special status species to occur outside these areas was also considered. As a result, some impacts are discussed in more general terms than others.

The quantitative analysis of representational impacts to special status plant species (temporal analysis) was determined using acres of specific impacted vegetation types, fragile soils, and water resources for all alternatives within the MPA. Ninety-five percent of oil and gas development during the planning period would occur in the MPA; consequently, the temporal analysis focuses on estimating surface disturbance on the BLM mineral estate within this area. The methodology and assumptions used in the temporal analysis are described in Appendix E.

For purposes of the temporal analyses, impacts to acres of wetland/riparian habitat and fragile soils on slopes over 35 percent were used. Special status plant species were grouped by habitat requirements within these areas. There are also special status plant species where habitat

requirements are on slopes less than 35 percent. A subset of these areas occurs in vegetation communities such as pinyon juniper and sagebrush bottoms. Impacts to these communities are discussed in the Vegetation 4.3.1 section. All management actions such as NSO and CSU stipulations will also apply to these areas with slopes less than 35 percent. Data was not available for species with multiple habitat overlap such as Rollins and tufted cryptanth, Ephedra buckwheat, and Debris and Duchene milkvetch.

For the qualitative analysis, a number of indicators, attributes, and assumptions were used for the analysis. The two indicators selected to analyze the effects of the alternatives on special status plant species are:

- Habitats and populations of federally-listed threatened and endangered plant species; and
- Habitats and populations of other special status plant species.

The attributes of the two indicators are:

- Size and distribution of populations of special status plant species;
- Extent, distribution, and quality of occupied and suitable habitat for long-term maintenance of special status plant species; and
- Continuity and fragmentation of occupied and suitable habitat for special status plant species and for their pollinators.

The analysis is based on the following assumptions:

- Special status species would be affected by direct and indirect effects of management actions on listed species and/or critical, occupied, or suitable habitat, and interrelated and interdependent activities.
- Surface disturbance resulting from oil and gas activity would mostly occur in the MPA. Surface disturbance from mechanized activities could result in direct loss or damage to special status plants and their habitats, except where there are NSO stipulations or other measures preventing direct impacts.
- Indirect impacts of surface disturbance would include accelerated erosion, increased runoff, and changes in water routing on disturbed areas, and introduction or spread of noxious weeds. Reclamation, stormwater management, and weed management would reduce the potential for indirect impacts.
- Indirect impacts would also occur from dust generated from nearby oil and gas activities and from loss of habitat for pollinators. Buffer zones with NSO stipulations would reduce potential indirect effects from dust and loss of pollinator habitat.
- Where they overlap with occupied or suitable habitat for special status species, management actions that preclude or restrict development would help to protect special status plant species and their habitat from surface disturbance.
- All surface-disturbing activities would require reclamation. Special reclamation techniques would be needed in some special status plant habitats such as shale areas.
- Climatic fluctuation would continue to affect the size, health, and distribution of special status plant species populations.

BLM_0019942

- The BLM would continue to emphasize management of federally-listed and other special status species for stable or increasing populations and for availability of suitable habitat for recovery and for maintaining or increasing population size.

- Current monitoring of special status species and their habitat would be continued or expanded.

- Although data on known locations and habitats within the Planning Area are available, the data are neither complete nor comprehensive for all special status species known to occur or for potential habitat that could exist in the Planning Area.

- Riparian and wetland areas are unlikely to occur on slopes greater than 35 percent with fragile soils.

Most decisions for other resources would have little or no effect on special status plant species. This includes decisions for cultural resources, paleontology, wildlife, special status animal species, wild horses, and visual resources. Most decisions relating to air emissions, except those related to number of facilities and dust control, would not directly affect special status plant species.

### 4.3.4.1    Impacts Common to All Alternatives

#### Impacts from Oil and Gas Development

For all alternatives, any activities that may affect federally listed species would be subject to consultation with the FWS under Section 7 of the ESA. If adverse effects are likely, the BLM will propose conservation measures, often with advice from the FWS, which would be applied as COAs. If, during the formal consultation process, either negative impacts, jeopardy of the species, or destruction or adverse modification of critical habitat is likely, the FWS would identify reasonable and prudent alternatives that would avoid negative impacts or the likelihood of jeopardy to the species in the Biological Opinion.

Surface-disturbing activities and herbicide application are considered the primary means by which direct impacts would occur from oil and gas activities. These direct impacts could lead to loss or degradation of suitable habitat for special status plant species.

Indirect impacts to special status plants would arise from actions that compromise the protection of special status plants, or that change habitats in a way that make them unsuitable for future colonization. Indirect impacts could occur from sources such as fugitive dust or changes in pollinator habitat. Fugitive dust could have adverse effects on gas exchange, water budgets, productivity and reproduction of plants (Farmer 1993; Padgett et al. 2007; Sharifi et al. 1997), and could adversely affect pollinators by clogging their respiratory system (Tepedino 2009).

#### Impacts from Management Actions

Requirements for pre-construction surveys in occupied, suitable, and potential habitat for federally listed, proposed, and candidate species would provide information that could help to prevent or minimize direct disturbance to habitats of these species (Table 2-10 Record 7). Based on the results of the plant survey, Section 7 consultation with the FWS may be necessary, and appropriate conservation measures may be required to avoid or minimize impacts on federally listed species. Typically, section 7 consultation would be required prior to surface disturbing and similar activities within occupied habitat for federally listed.

Effects from surface-disturbing activities, such as mechanized clearing or earth moving for well pad or road construction, are unlikely to occur in occupied habitat for federally listed species. Managing

BLM_0019943

oil and gas development as open with an NSO stipulation would prevent or minimize direct disturbance to occupied habitat of federally listed plant species (Table 2-10 Record 15). In addition, motorized vehicle traffic would be restricted to existing routes in occupied habitat for federally listed plant species (Table 2-10 Record 9). Occupied habitat for federally listed plants species would also be exclusion areas for ROW authorizations (Table 2-10 Record 12).

Because of the specific restrictions on direct effects to special status plants under all alternatives, most of the NSO stipulations from other resources would provide no additional protection. The NSO stipulations do not necessarily coincide with occupied or suitable special status plant species habitat, except for NSO stipulations applied in ACECs that are specifically established to protect special status plants. Applying NSO stipulations in the Dudley Bluffs, Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, Raven Ridge, South Cathedral Bluffs, Deer Gulch, Ryan Gulch, and Duck Creek ACECs would limit surface disturbance and help to maintain the connectivity and quality of habitats for special status plant species in those areas (Table 2-21 Record 13).

The only special status plant species that could occur along streams and rivers is Ute ladies'-tresses orchid, which has potential habitat but is not confirmed in the Planning Area. Also, most of the potential habitat for this plant species within the Planning Area is on private land. The following decisions would help to retain potential habitat of this species, if it is present:

- Minimizing or controlling salt and sediment contribution to river systems in the Planning Area would limit impacts to potential Ute ladies'-tresses habitat (Table 2-2 Records 9 and 16).
- Managing surface land use with oil and gas activities to minimize surface disturbance, erosion, and sedimentation of streams would limit impacts to potential Ute ladies'-tresses habitat.

<u>Reclamation</u>

Decisions relating to reclamation, vegetation management, and noxious/invasive species would help to retain existing conditions for special status plants by helping to maintain and restore natural and stable vegetation communities.

Maintaining weed-free areas on 497,900 acres of the Planning Area would help to maintain habitat conditions for special status plants occurring in those areas and prevent indirect impacts from increases in noxious weeds and invasive plant species (Table 2-3 Record 22). Maintaining Colorado Standards for Public Land Health (BLM 2007b) would help to maintain existing habitat for special status plants and reduce the potential for increases in noxious weeds and invasive species (Table 2-2 Record 14).

Only native plant species would be used for reseeding disturbed areas in ACECs, and the use of native plants for reclamation would be evaluated in site-specific project analysis for other areas. These decisions would help to prevent indirect impacts to special status plant species habitats by reducing the likelihood of establishing invasive plant species in these habitats (Table 2-3 Records 13 and 17).

All rangeland plant communities would be managed to have acceptable DPCs in late seral or healthy mid-seral status. In addition, the BLM could deny the request or require specific mitigation measures for surface-disturbing activities if the activities conflict with plant community objectives

BLM_0019944

which would help to maintain pollinator habitat and reduce the potential for noxious and invasive species to spread into special status plant species habitat (Table 2-3 Record 18).

### 4.3.4.2    Alternative A

**Impacts from Oil and Gas Development**

Implementation of Alternative A is predicted to result in development of oil and gas wells on 523 well pads in the MPA, and infrastructure that would cause surface disturbance of 6,300 acres in the MPA (Table 4-31). This has the potential to disturb habitat and affect populations of special status plant species or indirectly decrease pollinator habitat in the Planning Area.

The results of the temporal analysis show that under Alternative A, approximately 1,200 acres of special status species habitat would be impacted (Tables 4.2.3-1 and 4.3.1-1). Specific impacts include:

- Approximately 1,200 acres of fragile soils on slopes greater than 35 percent with habitat for Dudley Bluffs twinpod, Dudley Bluffs bladderpod, White River beardtongue, Graham's beardtongue, Utah gentian, Piceance bladderpod, Cathedral Bluffs meadow-rue, and ligulate feverfew, and

- Minimal wetland/riparian areas (7 acres) with potential habitat for Ute ladies'-tresses orchid. (Narrowleaf evening primrose is found in seasonally wet areas but occurs outside of the MPA in the northwest region of the Planning Area.)

The greatest amount of impacts would occur on fragile soils, impacting the greatest number of special status species.

**Impacts from Management Actions**

An NSO stipulation would be applied to oil and gas development in areas with known (occupied) and potential habitat for federally-listed and candidate plant species. Exceptions could be granted for federal or candidate plant species if the results of surveys and analysis indicated that they would not be impacted from the oil and gas activities (Table 2-10 Record 15). The NSO stipulation would protect most populations and habitat from surface disturbance and habitat loss, but impacts that degrade habitat from fugitive dust or indirectly result in the degradation or loss of pollinator habitat could occur because development is permissible to the limit of the habitat.

The NSO stipulations would also be applied in occupied habitat for the BLM sensitive plant species but exceptions could be granted. No surface occupancy stipulations would protect most populations of BLM-sensitive plants from direct impacts, but the potential for exceptions and lack of protected buffer zones could result in degradation or loss of special status plant habitat or indirect loss or degradation of pollinator habitat. In addition, this alternative would allow ground-disturbing activities in suitable but unoccupied habitat for the BLM sensitive species, which could result in the loss or degradation of habitat and maintenance of populations (Table 2-10 Record 16).

All known (occupied) habitats of federally-listed species would be exclusion areas for new ROW authorizations. This would protect habitat for listed and candidate species, and indirectly would also help to reduce the potential for intrusion of noxious and invasive plant species. There would be no protection against these same impacts for the BLM sensitive plant species (Table 2-10 Record 12).

BLM_0019945

**Reclamation**

Promptly reclaiming disturbed sites would help to limit the spread of noxious weeds and invasive plant species that could compromise the quality of special status plant habitats. The requirement for permanent restoration of disturbed areas to their original site conditions and productive capability would provide a high standard for rehabilitating specific sites to the unique habitat adaptations of special status plant species. Requiring native plants for reclamation in ACECs and WSAs would help to maintain habitat conditions for special status plants in these areas. Encouraging but not requiring their use elsewhere in the Planning Area and allowing the use of naturalized species for reclamation on unhealthy or at-risk rangeland could cause changes in plant communities that would affect the suitability of special status species and pollinator habitats (Table 2-3 Record 17).

The use of subjective criteria for reclamation success could potentially result in uneven reclamation success of special status plant and pollinator habitats (Table 2-3 Record 18).

Local and resource roads would be required to have at least 50 percent dust reduction by design, and watering and dust suppression plans would be required. This would help to reduce potential impacts to photosynthetic capability, vigor, and health of special status plant species and pollinator host plants growing near unpaved roads (Table 2-1 Records 7 and 8).

### 4.3.4.3    Alternative B

**Impacts from Oil and Gas Development**

Implementation of Alternative B is predicted to result in development of oil and gas wells on 1,045 well pads in the MPA, and infrastructure that would cause surface disturbance of 12,500 acres in the MPA (Table 4-32). This alternative is predicted to result in twice as much oil and gas development as Alternative A. This would increase the potential for surface disturbance over a larger area under Alternative B and could create greater disturbance-related impacts to special status plant and pollinator habitats relative to Alternative A.

The results of the temporal analysis show that under Alternative B, a total of 10 acres of special status plant species habitat would be impacted (Tables 4-37 and 4-48). Specific impacts include:

- Approximately 10 acres of wetland/riparian areas with potential habitat for Ute ladies'-tresses orchid, and
- Zero acres of fragile soils on slopes greater than 35 percent.

Impacts to special status plant species would be practically eliminated under Alternative B (approximately 10 acres of disturbance). Approximately 10 acres of surface disturbance could occur in the MPA but that would only affect potential habitat for Ute ladies'-tresses orchid; the species itself has not yet been documented to occur within the Planning Area.

**Impacts from Management Actions**

Alternative B would provide a higher level of protection from surface disturbance than Alternative A by having more comprehensive disturbance controls in special status plant and pollinator habitats. Applying an NSO stipulation within 660 feet of occupied, suitable, and potential habitat for federally listed, proposed, and candidate species would reduce surface disturbance and increase the area of protection over a larger area compared to Alternative A (Table 2-10 Record 15). Using an NSO stipulation for suitable habitat of special status species would maintain the existing habitat base to a greater degree than is provided for in Alternative A (Table 2-10 Records 15 and 16).

BLM_0019946

In addition to protecting occupied habitat of the BLM-sensitive species as in Alternative A, Alternative B would also protect suitable and potential habitat and would include a 330-foot buffer zone around habitat areas (Table 2-10 Record 16). This alternative would help to preserve habitat conditions for the BLM-sensitive species to a greater degree than Alternative A.

No exceptions could be granted for these NSO stipulations (Table 2-10 Records 15 and 16) under Alternative B so direct impacts to special status plant species would be eliminated.

Under Alternatives B and C, indirect impacts to federally listed, proposed, and candidate species and associated habitat would be minimized by additional COAs that would be applied within the plant consideration area (i.e., 1,970 feet) of the affected plants occupied habitat. Potential mitigation may include: 1) adjusting the location of the disturbance outside of the life history buffer, 2) use of multiple dust abatement measures, 3) using signs or fencing to reduce human disturbance, 4) requiring construction to occur outside of the blooming season by delaying the project by more than 60 days, 5) using more forbs in the reclamation seed mix, 6) in reclamation of the site, replace the soil and sub-soil layers to the pre-disturbance order of soil horizons, 7) using an independent third-party contractor to provide general project oversight and compliance monitoring, and 8) Non-native or invasive species monitoring and control. These measures may also be applied to projects near suitable habitat that may hold special value or to provide protection to suitable habitat that may allow for species' expansion (Table 2-10 Record 18).

As in Alternative A, all occupied habitat of federally listed plants would be exclusion areas for new ROW authorizations. In addition, habitat for proposed species would also be exclusion areas to avoid further impact to the species to merit federal listing. The exclusion areas for federally listed and proposed species would include a 330 foot buffer. Managing suitable and potential habitat for listed and candidate species as avoidance areas for ROWs would help to preserve habitat conditions, maintain pollinator habitat, and reduce the potential for weed infestations for more species and for more types of habitat than Alternative A (Table 2-10 Record 12).

Off-road motorized vehicle travel used to support oil and gas exploration and development activities (including using OHVs for pre-construction surveys) would be restricted to existing routes within a 660-foot buffer around occupied, suitable, or potential habitat of federally listed, proposed, and candidate species. Off-road motorized vehicle travel for oil and gas activities within 330 feet of occupied BLM-sensitive species habitat would be limited to existing routes (Table 2-10 Record 10). Additionally, roads or trails within occupied, suitable, and potential habitat for special status plant that are not designated for use will be abandoned and reclaimed. Off road motorized vehicle travel, including using OHVs for surveys, would be prohibited in these areas (Table 2-10 Record 9). These decisions would minimize habitat loss and degradation for special status plants and pollinators and would help to limit fugitive dust on special status plants.

Important federally-listed plant populations are also known to occur outside of ACECs designated to protect them. Management of threatened, endangered and sensitive plant species would be emphasized through lease stipulations, COAs, and BMPs for special status plant habitats in areas with concentrated populations occur outside of these ACECs (600 acres along Yellow Creek, 960 acres east of the Duck Creek ACEC, 300 acres east of the Dudley Bluffs ACEC, and 150 acres north of the Duck Creek ACEC on Pinto Mesa). This would better preserve habitat from surface disturbances for populations of the Dudley Bluffs bladderpod and Dudley Bluffs twinpod compared to Alternative A (Table 2-10 Record 13).

BLM_0019947

Applying an NSO stipulation on 100-year flood plains, areas within 500 feet from perennial waters, and in other areas that are potential habitat for Ute ladies'-tresses would protect potential habitat for this threatened species (Table 2-2 Record 12).

Requiring control of 80 percent of fugitive dust within 330 feet of occupied, suitable, and potential special status plant species habitat would help to limit impacts from fugitive dust (Table 2-10 Record 17).

<u>Reclamation</u>

Requiring reclamation to replicate the existing soil profile and subsoil dynamics would allow the reclaimed site to function as suitable habitat and indirectly would allow possible re-occupation of these sites by special status species (Table 2-10 Record 11).

Control of noxious weeds under Alternative B, C, and D would be a priority in occupied and suitable special status plant habitats. Under the WRFO's Integrated Weed Management Plan, manual treatment would be preferred over chemical treatments in special status plant habitat. These decisions would help to control noxious species and to maintain habitat integrity for these species (Table 2-10 Record 8).

Alternative B has a success criterion for interim and final reclamation that potential foliar cover must be at least 100 percent cover of the DPC and/or potential basal cover must be at least 50 percent of the DPC, based on the ecological site (Table 2-3 Record 18). In the absence of an appropriate ecological site description a default DPC would have a minimum of 90 percent potential foliar cover and/or 30 percent potential basal cover, with the BLM consideration to site conditions (i.e., elevation, slope, aspect) and would conserve the potential of the site to produce vegetation on a sustainable basis and meet the Colorado Standards for Public Land Health. Additionally, the resulting plant community must contain at least five desirable plant species, at least three of which must be a forb or shrub, each comprising at least 5 percent relative cover. No one species may exceed 60 percent relative cover in the resulting plant community to ensure that species diversity on the site is achieved (Table 2-3 Record 18). These requirements would help to restore a diverse and functioning plant community that is capable of supporting special status plant species. Controlling noxious weed infestations prior to reclamation efforts would improve the success of reseeding or revegetation efforts. Requiring interim and final reclamation in ROWs as well as long-term maintenance, so that reclamation would result in a functioning and sustaining plant community, would help to restore conditions for special status plants in ROWs (Table 2-3 Record 14). Indirectly these vegetation decisions also would help maintain pollinator habitat and reduce the potential for invasive species to spread into special status plant species habitat.

Using only native plants for reclamation, unless non-native species would benefit ecological integrity, would help to restore the function of habitats for special status plants and pollinators. This would provide better potential for special status species and pollinators to reoccupy habitats than under Alternative A. Indirectly this would help limit the possibility of unwanted infestations of introduced plant species in special status plant habitats compared to Alternative A (Table 2-3 Records 13 and 17).

#### 4.3.4.4    Alternative C

<u>Impacts from Oil and Gas Development</u>

Implementation of Alternative C is predicted to result in development of oil and gas wells on 1,710 well pads in the MPA, and infrastructure that would cause surface disturbance of 20,500 acres in the

BLM_0019948

MPA (Table 4-33). Implementation of Alternative C would result in the development of 60 percent more wells, well pads, and disturbance acreage from support infrastructure than Alternative B.

The results of the temporal analysis show that under Alternative C, a total of 2,800 acres of special status plant species habitat would be impacted (Tables 4-39 and 4-49). Specific impacts include:

- Approximately 2,800 acres of fragile soils on slopes greater than 35 percent with potential habitat for Dudley Bluffs twinpod, Dudley Bluffs bladderpod, White River beardtongue, Graham's beardtongue, Utah gentian, Piceance bladderpod, Cathedral Bluffs meadow-rue, and ligulate feverfew, and

- Approximately 23 acres of wetland/riparian areas with potential habitat for Ute ladies'-tresses orchid.

Impacts to special status plant species would be greater under Alternative C (2,800 acres) than Alternatives A (1,200 acres) and B (10 acres). Impacts to both wetland/riparian habitats and habitats associated with fragile soils on slopes greater than 35 percent would be double that of Alternative A.

**Impacts from Management Actions**

Like Alternative B, Alternative C provides for the application of an NSO stipulation within 660 feet of occupied and suitable habitat for federally listed, proposed, and candidate species. However, Alternative C only applies the NSO stipulation to potential habitat itself and does not protect buffer areas around potential habitat (Table 2-10 Record 15), which could lead to additional indirect impacts within potential habitat. Another important distinction between Alternatives B and C is that under Alternative C, exceptions may be granted to the NSO stipulation (see Appendix A). Occupied habitat would have additional protection within a 330 foot NSO stipulation buffer, with limited exceptions. This buffer provides an area of protection surrounding occupied habitat of federally listed species only allowing actions that result in a concurrence of "no effect" or beneficial effect after Section 7 consultation. Alternative C would still provide similar levels of protection to occupied habitat within 330 – 660 feet and suitable habitat within 660 feet but the ability to grant exceptions would allow for consideration of projects that may have insignificant, discountable, or wholly beneficial effects (as defined under ESA Section 7 implementing regulations) and would allow the BLM to consider impacts to other resources when making decisions on locations for oil and gas well pads and other infrastructure.

For the BLM sensitive species, Alternative C would provide for NSO stipulations within 330 feet of occupied and suitable habitat. However, unlike Alternative B, there would be no NSO stipulation applied to potential habitat for the BLM sensitive species (Table 2-10 Record 16). Similar to federally listed plant species, Alternative C would also provide for exceptions to this stipulation when it can be demonstrated that the activity would not cause adverse impacts or would have negligible impacts to occupied and suitable habitat. As for federally listed plants, this would allow the BLM to protect the BLM sensitive plant species while also having the flexibility to consider other resources when making decisions.

Alternative C includes many of the same management actions as Alternative B, including:

- Treatment of noxious weeds (Table 2-10 Record 8);
- Restrictions on motorized vehicles (Table 2-10 Records 9 and 10);
- Limiting maintenance of ROWs to existing disturbance (Table 2-10 Record 14);
- Special reclamation requirements (Table 2-10 Record 11);

BLM_0019949

*Chapter 4 – Environmental Consequences*

- Exclusion and avoidance areas for ROWs (Table 2-10 Record 12);

- Emphasizing management of plants along Yellow Creek, east of the Duck Creek ACEC, east of the Dudley Bluffs ACEC, and north of Duck Creek ACEC on Pinto Mesa (Table 2-10 Record 13);

- Control of fugitive dust (Table 2-10 Record 17); and

- Additional mitigation requirements within the plant consideration area (i.e., 1,970 feet) of federally listed species (Table 2-10 Record 18).

Under Alternative C, a CSU stipulation would be applied on 100-year flood plains, within 500 feet from perennial waters, and in other areas that are potential habitat for Ute ladies'-tresses and narrowleaf evening primrose (Table 2-2 Record 12). Although this decision is less protective than the NSO stipulation in Alternative B, there would be little practical difference between alternatives because Ute ladies'-tresses is not known to occur in the Planning Area and narrowleaf evening primrose occurs outside of the MPA.

## Reclamation

Most decisions for reclamation, vegetation management, and noxious weeds that could affect special status plants under Alternative C would be the same as Alternative B and would provide better protection than Alternative A.

Reclamation requirements specific to special status plant habitats would be the same as Alternative B (Table 2-10 Record 11). Requirements for noxious weeds would be the same as Alternative B, which would provide better protection against adverse habitat changes resulting from noxious weeds and invasive species than Alternative A (Table 2-10 Record 8).

Alternative C has a success criterion for interim and final reclamation that potential foliar cover must be at least 80 percent cover of the DPC and/or potential basal cover must be at least 25 percent of the DPC, based on the ecological site (Table 2-3 Record 18). In the absence of an appropriate ecological site description a default DPC would have a minimum of 70 percent potential foliar cover and/or 20 percent potential basal cover, with the BLM consideration to site conditions (i.e., elevation, slope, aspect) and would conserve the potential of the site to produce vegetation on a sustainable basis and meet the Colorado Standards for Public Land Health. This could have a greater potential for spreading noxious weeds and invasive plants than Alternative B, but this could be more adaptable to site-specific needs than Alternatives A or B and could better accommodate the habitat requirements and special adaptations of special status plant species than Alternative A. Like Alternative B, Alternative C has similar composition requirements so that the resulting plant community must contain at least five desirable plant species, at least two of which must be a forb or shrub, each comprising at least 3 percent relative cover. No one species may exceed 60 percent relative cover in the resulting plant community to ensure that site species diversity is achieved (Table 2-3 Record 18). These requirements would help to restore a diverse and functioning plant community that is capable of supporting special status plant species.

Final reclamation required for rights-of-way and reclamation success criteria would have the same impacts as Alternative B. Requirements for use of native plants in reclamation and specific reclamation requirements for suitable habitat of federally listed species would be the same as Alternative B (Table 2-3 Record 17 and Table 2-10 Record 11).

BLM_0019950

*Chapter 4 – Environmental Consequences*

#### 4.3.4.5    Alternative D

**Impacts from Oil and Gas Development**

Implementation of Alternative D is predicted to result in development of oil and gas wells on 2,428 well pads in the MPA, and infrastructure that would cause surface disturbance of 29,100 acres in the MPA (Table 4-34). Under Alternative D, the direct and indirect effects of oil and gas development would be similar to those described in Alternatives A, B, and C, but the effects would occur over a greater total cumulative area relative to the other alternatives (40 percent greater compared to Alternative C) because more wells, well pads, and support infrastructure are anticipated.

The results of the temporal analysis show that under Alternative D, a total of 4,400 acres of special status plant species habitat would be impacted in the MPA (Tables 4-41 and 4-50). Specific impacts include:

- Approximately 4,400 acres of fragile soils on slopes greater than 35 percent with habitat for Dudley Bluffs twinpod, Dudley Bluffs bladderpod, White River beardtongue, Graham's beardtongue, Utah gentian, Piceance bladderpod, Cathedral Bluffs meadow-rue, and ligulate feverfew, and

- Approximately 30 acres of wetland/riparian areas with habitat for Ute ladies'-tresses orchid.

Impacts to special status plant species would be the greatest under Alternative D (4,400 acres) compared to Alternative C (2,800 acres), Alternative A (1,200 acres), or Alternative B (10 acres).

**Impacts from Management Actions**

Like Alternatives B and C, Alternative D prioritizes the treatment of noxious weeds in occupied and suitable special status plant species habitat (Table 2-10 Record 8).

Alternative D would also restrict motorized vehicle travel in support of oil and gas development to existing routes but only within occupied, potential, and suitable habitat for federally listed, proposed, or candidate species. There would be no restrictions motorized vehicle travel within habitat for the BLM sensitive species as under Alternatives B and C (Table 2-10 Record 9). Alternative D would limit travel for oil and gas activities with 660 feet of occupied, potential, and suitable habitat for federally listed, proposed, or candidate species. However, Alternative D would not limit motorized vehicle travel within 330 feet of occupied BLM-sensitive species habitat, like in Alternatives B and C. Alternative D would provide less protection for the BLM sensitive plants than Alternatives B and C but more than Alternative A (which only restricts travel within ACECs for federally listed plants).

Like Alternatives B and C, occupied habitat for federally listed and proposed plant species would remain exclusion areas for ROW authorizations and suitable habitat for listed and candidate plants would remain avoidance areas. However, potential habitat for listed and candidate plants would be open areas for ROW authorizations (Table 2-10 Record 12).

Alternative D would have the same NSO stipulations for occupied habitat for federally listed, proposed and candidate species as Alternatives B and C. However, there would be no protection for suitable or potential habitat and exceptions could be granted (Table 2-10 Record 15). This decision would provide less protection against indirect impacts than Alternatives B and C, but more than Alternative A.

BLM_0019951

*Chapter 4 – Environmental Consequences*

Under the other alternatives, habitat for the BLM sensitive species is protected to some degree (e.g., ranges from occupied to potential; with and without 330 feet buffers) by NSO stipulations. Under Alternative D occupied habitat of the BLM sensitive species would be managed with a CSU stipulation which would require special design, construction, and implementation measures including possibly relocating operations more than 660 feet (Table 2-10 Record 16). Exceptions would be granted if it was demonstrated that the proposed activity would not cause adverse impacts or would have negligible impacts. Alternative D provides protection for the BLM sensitive plants but emphasizes use of mitigation measures (e.g., dust control, timing of construction, etc.) rather than denying surface occupancy around habitat. Alternative D would provide less protection for the BLM sensitive plants than the other alternatives and could result in more indirect impacts.

Alternative D would require control of 50 percent of fugitive dust within 330 feet of occupied, suitable, and potential habitat for federally listed, proposed, or candidate species (Table 2-10 Record 17). Requiring control of fugitive dust would decrease indirect impacts to these plants more so than Alternative A (no similar action) but to a lesser degree than Alternatives B and C (require 80 percent control).

Additional COAs would not be used to mitigate impacts within the plant consideration area of federally proposed or candidate species (Table 2-10 Record 18). While there is no similar action listed for Alternative D, in practice, additional COAs would still likely be applied within the plant consideration area of federally listed species as these types of mitigation measures would be developed during the Section 7 consultation process.

## Reclamation

There would be no reclamation requirements to replicate soil horizons and subsoil dynamics for federally listed, proposed, and candidate species' habitat (Table 2-10 Record 11). The success criteria of 60 percent potential foliar cover of the DPC and/or 5 percent potential basal vegetation cover of the DPC based on the ecological site. In the absence of such, the default DPC would have a minimum of 40 percent potential foliar cover and/or 5 percent basal vegetative cover which would be easier to achieve than the criteria in Alternatives B and C. However, the relaxed standard could result in more bare ground and less diversity in reclaimed areas compared to undisturbed vegetation. Indirectly, this could increase the potential for spread of noxious weeds and invasive plant species or degrade the habitat of pollinators compared to Alternatives B and C (Table 2-3 Record 18). Like Alternative B and C, Alternative D has similar composition requirements so that the resulting plant community must contain at least five desirable plant species, at least one of which must be a forb or shrub, each comprising at least 2 percent relative cover. No one species may exceed 70 percent relative cover in the resulting plant community to ensure that site species diversity is achieved. These requirements would help to restore a diverse and functioning plant community that is capable of supporting special status plant species (Table 2-3 Record 18).

The use of native plants for reclamation would be the same as Alternative A. Use of native plants would be encouraged in all areas but naturalized plant species could be used, which would increase the potential for occurrence of unwanted introduced plant species in special status plant habitats compared to Alternatives B and C (Table 2-3 Record 17).

Alternative D would have fewer requirements for noxious weed management than Alternatives B and C, but more than Alternative A. Weeds would be required to be eliminated or controlled, but there would be no specific requirements for monitoring. Operators would be required to use weed-free mulches but would not be required to ensure all products (e.g., materials from gravel pits and

BLM_0019952

quarries) were weed-free. These reduced requirements would increase the potential for adverse indirect effects to habitats of special status plant species and their pollinators (Table 2-3 Record 24).

### 4.3.4.6    Irreversible and Irretrievable Commitment of Resources

Implementing the proposed management actions would not result in irreversible or irretrievable impacts to special status plant species. The decisions to protect or reclaim habitat from surface disturbances and noxious weeds should adequately prevent irreversible or irretrievable impacts to special status plant species.

### 4.3.4.7    Unavoidable Adverse Impacts

Implementation of the management actions would protect endangered plant species from direct disturbance. Indirect impacts that degrade pollinator habitat or habitat for special status plants species could occur from dust and air emissions. Unavoidable adverse impacts could occur to pollinator habitats under Alternative A, where these are not addressed (i.e., fewer buffers), or Alternative D, where relaxed standards for protection and reclamation could lead to degradation or loss of these habitats. Likewise, by not including as many decisions to protect the BLM-sensitive species or Colorado Natural Heritage Program (CNHP) G1, G2, and G3 species, Alternatives A or D could lead to degradation or loss of habitat for these species.

### 4.3.4.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Habitat and populations of endangered species and other special status species would be protected under all alternatives, but the degree of protection would vary. Under Alternatives A and D, there could be some conflict between short-term uses and long-term productivity, because relaxed reclamation standards could promote the spread of noxious weeds or invasive plants. This could reduce the suitability of special status plant habitats and habitats of their pollinators. Also, protections from surface disturbances around these habitats would be smaller and could permit disturbances to special status plant and pollinator habitats.

## 4.4    Wild Horse Management

This analysis considers, by alternative, the ecological issues that affect rangeland health and habitat used by wild horses and the wild and roaming nature of wild horses within the Piceance East Douglas Herd Management Area.

The wild horse analysis used quantitative and qualitative variables to assess the effects. A number of indicators, attributes, and assumptions were used for the analysis. The following three indicators have been selected to analyze the effects of the alternatives on wild horse management:

- Herd health and demographics;
- Habitat health in the HMA; and
- Wild and free-roaming nature of wild horses.

The attributes of the three indicators are:

- Trends in population size;
- Trends in distribution, location, or the free-roaming nature of wild horses;
- Demographic structure of herds; and

BLM_0019953

Chapter 4 – Environmental Consequences

- Range condition measurements including ecological health of vegetation and species composition.

The analysis is based on the following assumptions:

- Wild horses would continue to be managed at appropriate management levels in the HMA using various management techniques such as conducting wild horse gathers of excess wild horses and possibly the use of fertility control;

- Wild horse populations would fluctuate based on range condition and forage available due to events such as drought, wildland fires, or overgrazing; and

- Range improvement projects within the HMA would be designed to incorporate features for the management of free-roaming wild horses.

## 4.4.1   Impacts Common to All Alternatives

### Impacts from Oil and Gas Development

Surface disturbance from areas managed as open to oil and gas exploration and development with standard lease terms and conditions in the HMA could degrade vegetation and cover and reduce the quality and quantity of water and forage for wild horses on about 46,000 acres. Oil and gas development could lead to wild horses using different congregation areas and different sources of forage, water, and range within the HMA. If the change in use patterns coincides with sensitive cultural or paleontological resources, then wild horses could degrade or damage those resources, which would be an indirect impact from oil and gas development.

The CSU stipulation for fragile soils on slopes greater than 35 percent could indirectly help to maintain conditions for wild horses by maintaining soil productivity and reducing erosion. This could help retain the amount of plant cover and forage available for wild horses and would help to limit sediment loads in sources of fresh water. The CSU stipulation on saline soils derived from Mancos Shale would reduce surface disturbance on about two-thirds of the range within the HMA used by wild horses (Table 2-2 Record 9). This would help to maintain forage conditions and sources of fresh water by limiting salt contribution to streams and soils down slope of these areas.

Fugitive dust emissions from collector and local roads and construction and drilling activities would have a localized impact on vegetation through the accumulation of dust particles on plant surfaces (Table 2-1 Record 7). This could alter photosynthetic rates and result in localized reductions in the amount of forage available for wild horses.

### Impacts from Management Actions

Direct impacts to wild horses result from surface-disturbing activities that affect habitat or behavior. Surface disturbance could result from vegetation removal, mechanical damage to soil, and other activities (e.g., human activity, fencing, or noise) that would alter habitat conditions for wild horses. Surface disturbances could degrade forage, subdivide larger areas of habitat into smaller ones, or create barriers in useable habitat. The spread and growth of noxious weeds and other invasive plant pests would indirectly impact wild horses and could decrease the quality or quantity of forage or habitat. These plant pests could possibly spread to areas beyond the disturbance. Oil and gas development and supporting infrastructure would create surface disturbances that could cause these types of direct and indirect impacts to wild horses.

BLM_0019954

**Chapter 4 – Environmental Consequences**

Disturbances from noise and human activity would result in temporary, short-term displacement of bands of wild horses, but normal use and behavior patterns typically resume after a period of habituation, if forage and water resources are not lost to oil and gas development in conjunction with these temporary disturbances. Habituation to humans in areas with oil and gas development could increase to the degree that wild horses lose their "wildness" in the HMA. Surface disturbance impacts to wild horse habitat in sagebrush and woodland areas would be long-term in nature due to the time necessary for re-growth after reclamation of the disturbed areas.

Avoiding surface disturbance or occupation within chokecherry, aspen, and serviceberry vegetation communities (Table 2-3 Record 11) would indirectly help prevent deterioration of rangeland productivity and promote sustainable forage quality and quantity for wild horses. Managing livestock grazing to meet Colorado Standards for Public Land Health (BLM 2007b) and using the results of rangeland monitoring (Table 2-16- Record 7) to make adjustments to allotments would help to maintain plant cover and water resources in the HMA. Indirectly, these management actions would help retain forage, water, and cover resources for wild horses, which also would help to sustain the population and distribution of wild horses.

Maintaining weed-free areas on 497,900 acres would reduce the types and numbers of invasive plant species than could compete with native plants in this area (Table 2-3 Record 22). Indirectly, this could limit the introduction of plants that are unpalatable to wild horses and could help to maintain overall forage conditions on about half of the HMA. Chemical application to control invasive plants would involve the BLM-approved herbicides only and would occur outside the foaling period (BLM 2007). The Final PEIS Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States limits herbicide use to only certain chemicals in HMAs and limits the timeframes in which these could be applied to avoid the foaling months (BLM 2007).

Under all alternatives, the BLM would use a Lease Notice to notify operators that intensive development activities may be delayed for a 60-day period during the spring foaling period (between March 1 and June 15). Also, the lessee may be required to perform special conservation measures within the HMA including:

- Habitat improvement projects in adjacent areas if development displaces wild horses from critical habitat;

- Replacing disturbed watering areas with an equal source of water, having equal utility; and

- Providing for unrestricted movement of wild horses between summer and winter ranges (Table 2-11 Record 9).

The decision whether or not to apply the 60-day timing delay or to require special conservation measures will be made during a site-specific environmental analysis of a proposed project that considers whether these actions are needed to protect wild horses.

<u>Reclamation</u>

Successful reclamation efforts could help to maintain forage and cover for wild horses. The encouragement of the use of native plant species for reclamation could help to retain the characteristics of existing habitat and help maintain palatable forage and potentially enhance the available cover (Table 2-3 Record 29).

BLM_0019955

## 4.4.2   Alternative A

**Impacts from Oil and Gas Development**

Under Alternative A, oil and gas development could affect wild horse populations and habitats in the MPA. Under Alternative A, the results of the temporal analysis for vegetation indicate that an estimated 523 oil and gas well pads would be constructed in the MPA, resulting in 6,300 acres of surface disturbance during the 20-year Planning Period (Table 4-47). Approximately 1.2 percent of all vegetation communities within the MPA would be developed over the 20-year Planning Period (Table 4-47 Line 8). These estimates are based on a uniform distribution of well pads across areas that are open to development with standard lease terms and conditions, TL stipulations, or CSU stipulations. Surface disturbance associated with the construction of oil and gas wells in the MPA could affect 1.1 percent of all vegetation communities and indirectly reduce the quality of habitat and forage resources for wild horses in localized areas.

The area in the HMA potentially affected by surface disturbance (i.e., not managed with NSO stipulations) is approximately 160,000 acres (Table 4-59). Surface disturbance from oil and gas activities could reduce the quality of habitat, decrease forage resources, and alter the distribution of wild horses in the portion of the HMA that falls within the MPA.

**Table 4-59. Alternative A Acres of COA Stipulations in Wild Horse Herd Management Areas**

| Herd Management Area | Oil and Gas Condition of Approval or Stipulation | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Controlled Surface Use | | No Surface Occupancy | | Open | | Timing Limitation | |
| | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA |
| **Leased** | | | | | | | | |
| Piceance East Douglas HMA | 42,600 | 18,400 | 17,800 | 15,000 | 58,700 | 45,100 | 46,300 | 29,900 |
| **Unleased** | | | | | | | | |
| Piceance East Douglas HMA | 5,000 | 4,300 | 800 | 800 | 2,400 | 2,400 | 4,900 | 3,400 |
| **Total** | **47,600** | **22,700** | **18,600** | **15,800** | **61,100** | **47,500** | **51,200** | **33,300** |

SOURCE: BLM 2009.
NOTES:
Because of rounding, values presented in table may not appear to exactly add up to totals.
COA   =   Condition(s) of Approval
HMA   =   Herd Management Area
MPA   =   Mesaverde Play Area

Timing limitation stipulations established in elk production areas (May 15-June 30) and mule deer severe winter range (December 1-April 30; Table 2-4 Record 12) could indirectly help to reduce behavior-related disturbances to wild horses caused by human activities associated with oil and gas development on about 51,200 acres in the HMA and about 33,300 acres of the part of the HMA within the MPA (Table 4-59). This could indirectly help to reduce stress on mares giving birth during the foaling period and could aid in maintaining seasonal movements and use patterns during the winter and spring by suspending oil and gas development during these sensitive periods.

Under Alternative A, NSO stipulations would indirectly help to retain existing habitat and forage conditions on 18,600 acres of mineral estate (about 10 percent) within the entire HMA. Applying

BLM_0019956

**Chapter 4 – Environmental Consequences**

NSO stipulations indirectly would help to preserve habitat and forage conditions for wild horses on about 13 percent (15,800 acres) of the HMA that falls within the MPA (Table 4-59). Maintaining forage and habitat would help to maintain the distribution and health of the wild horse herd within the HMA.

**Impacts from Management Actions**

Surface discharge of produced water could degrade fresh water sources for wild horses and reduce the palatability of localized vegetation near haul roads (Table 2-2 Record 13). Also, wild horses could drink from pits that are not fenced or covered, which could cause potential health risks from ingesting contaminated water. Also, foals and colts could become trapped in pits that have deep, muddy bottoms. Over time, this could decrease the size or alter the demographics of the wild horse band.

Reducing fugitive dust generated on collector and local roads by 50 percent could locally reduce accumulation of dust on plants that serve as forage for wild horses (Table 2-1 Record 7). Requirements for soil and water management to retain upland health (Colorado Standards for Public Land Health) would help to maintain forage, cover, and sources of fresh water for wild horses.

Comprehensive weed management in the HMA and immediate reclamation on a case-by-case basis as determined by the Authorized Officer would help to reduce the proliferation of noxious weeds and would foster better retention of palatable native plants for wild horses and aid the preservation of the ecological integrity of the HMA (Table 2-3 Record 22). Reduction or elimination of noxious weeds could improve forage conditions for wild horses by preserving the high-quality forage plants preferred by wild horses that could be outcompeted by noxious weeds and other invasive plant species. Over time this would help maintain existing distribution and use patterns of wild horses within the HMA.

Restoring disturbed areas to meet the original site conditions and productive capacity would help to retain existing sources of forage and cover for wild horses. This could indirectly help retain existing use patterns of wild horses in the HMA.

Decisions that impose limits on road development and the use of these roads for oil and gas development would indirectly limit the areas that are disturbed by human activity and surface disturbances (Table 2-4 Record 7). These decisions would help to protect movement patterns, habitat and forage areas for wild horses in the HMA. However, the designation of additional major ROW corridors on public lands to meet public, industry, and environmental needs could increase areas of surface disturbance, which would reduce the available habitat and the quantity and quality of forage for wild horses.

**Reclamation**

Imposing COAs to require that sites be reclaimed to their original condition, requiring reclamation to be within the acceptable range for DPCs, manipulation of areas to improve ecological conditions, and reclaiming abandoned roads would improve habitat and forage conditions within the HMA.

The limited use of naturalized plant species in special cases such as at-risk and unhealthy rangelands and grazable woodlands (Table 2-3 Record 17) would help to limit the spread of noxious weed infestations and indirectly maintain the forage base for wild horses, where these are coincident with oil and gas development. Where these types of range lands are separate from oil and gas development, the naturalized plant species could help indirectly to augment or increase the forage base for wild horses in the HMA.

BLM_0019957

## 4.4.3    Alternative B

**Impacts from Oil and Gas Development**

Under Alternative B, the results of the vegetation temporal analysis indicate that an estimated 1,045 oil and gas well pads would be constructed in the MPA, resulting in 12,500 acres of surface disturbance, and disturb 3.5 percent of all vegetation communities over the 20-year planning period (Table 4-48 Lines 6, 7, and 8). This could increase the extent of surface disturbance in all vegetation communities and indirectly increase impacts on wild horse habitat and decrease forage resources compared to Alternative A (1.1 percent).

Under Alternative B, the area managed with CSU stipulations would decrease to 31,500 acres within the entire HMA and would decrease to 12,600 acres in the part of the HMA within the MPA (Table 4-60). This would reduce surface disturbance relative to Alternative A (as more areas are managed with NSO stipulations), which would better retain habitat, forage, and water resources for wild horses and help to preserve the size and demographic composition of the wild horse herds within the HMA to a greater degree than Alternative A.

### Table 4-60. Alternative B Acres of COA and Lease Stipulations in Wild Horse Herd Management Areas

| Herd Management Area | Oil and Gas Condition of Approval or Lease Stipulation | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Controlled Surface Use | | No Surface Occupancy | | Timing Limitation | |
| | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA |
| **Leased** | | | | | | |
| Piceance East Douglas HMA | 28,800 | 10,600 | 54,900 | 35,200 | 81,700 | 62,700 |
| **Unleased** | | | | | | |
| Piceance East Douglas HMA | 2,700 | 2,000 | 5,000 | 4,500 | 5,400 | 4,200 |
| **Total** | **31,500** | **12,600** | **59,900** | **39,700** | **87,100** | **66,900** |

SOURCE: BLM 2009.
NOTE:
Because of rounding, values presented in table may not appear to exactly add up to totals.

Under Alternative B, increasing the size of the area managed as open with an NSO stipulation to 59,900 acres within the HMA overall and 39,700 acres within the part of the HMA in the MPA would reduce surface disturbance in a substantially larger area than Alternative A. The NSO stipulations would increase the area of non-disturbance by 41,300 acres in the HMA overall and 23,800 acres in the part of the HMA within the MPA, both of which are larger than Alternative A. Indirectly, this could better preserve existing forage, water sources, habitat, and behavior patterns for wild horses to a greater degree than Alternative A (Table 4-60).

Timing limitation stipulations for big game and grouse (Table 2-4 Record 12) could include up 87,100 acres of the HMA overall and about 67,000 acres in the part of the HMA within the MPA. This could increase the area of TL stipulations by 35,900 acres in the HMA overall and 33, 700 acres in the part of the HMA within the MPA, both of which could be substantially higher than Alternative A (Table 4-60). Compared to Alternative A, this could indirectly help to reduce stress further on mares giving birth during the foaling period and could aid in maintaining seasonal movements and use patterns during the winter and spring by suspending oil and gas development during these sensitive periods.

BLM_0019958

### Impacts from Management Actions

Management actions encouraging pipelines for produced water (Table 2-2 Record 18) and managing disturbance levels based on seral state (Table 2-3 Record 18) could increase surface disturbance in some areas with wild horses. But the effects would be greatly reduced relative to any of the other alternatives because road travel would be substantially decreased by increasing the co-location of infrastructure, and updated standards for reclamation would better replicate existing conditions in the Planning Area than in Alternative A.

Limiting public access to oil and gas resource roads, encouraging the co-location of resource roads and pipelines, and closing or reclaiming unneeded oil and gas resource roads would limit the proliferation of available resource roads. These decisions would limit the spread of vehicle-related disturbances related to oil and gas development, operation, and abandonment activities. Indirectly, these decisions could help to limit behavior-related disturbances and changes to historic movement patterns of wild horses to a greater degree than Alternative A.

Oil and gas operators voluntarily using the threshold concept rather than TL stipulations for big game could help concentrate development and encourage the use of more well pads and shared facilities (Table 2-4 Record 12). Indirectly, this could help to preserve habitat, sources of water and forage, natural behaviors, and seasonal movements of the wild horses within the HMA by maintaining more undeveloped land between developed areas.

### Reclamation

Specific reclamation decisions that could impact wild horses are associated with management decisions for livestock grazing, vegetation, and big game. Direct exclusion of livestock and indirect exclusion of wild horses from reclamation sites in the short-term, and stronger weed control stipulations in these areas, would better ensure the successful reclamation of disturbed sites to the desired condition (Table 2-16 Record 11). These decisions could aid in indirectly preserving or restoring forage and use patterns of wild horses in the long-term, but in the short-term could restrict forage use or the free roaming nature of wild horses in the HMA. Providing supplemental forage plants for wildlife as part of interim reclamation (Table 2-4 Record 11) could indirectly help offset the related effects of behavioral stress and forage loss to wild horses associated with surface disturbance and other disturbances related to oil and gas development. These decisions would improve conditions for wild horses in the HMA compared to Alternative A by either reclaiming or retaining the existing use of areas.

## 4.4.4   Alternative C

### Impacts from Oil and Gas Development

Under Alternative C, the results of the vegetation temporal analysis indicate that an estimated 1,710 oil and gas wells would be constructed in the MPA, resulting in 20,500 acres of surface disturbance. Approximately 4.6 percent of all vegetation communities would be disturbed over the 20-year planning period (Table 4-49 Lines 6, 7, and 8). This could increase the extent of surface disturbance in all vegetation communities and indirectly increase impacts on wild horse habitat and forage resources compared to Alternatives A and B.

Under Alternative C, areas managed with CSU stipulations would include about 31,900 acres of the HMA and about 10,800 acres of the area in common with the HMA and the MPA (Table 4-61). This would be less than in Alternative A (47,600 acres), but about the same as Alternative B (31,500 acres) for the HMA overall. This could reduce surface disturbance relative to Alternative A

BLM_0019959

but the surface disturbance would be similar to Alternative B. As a result, Alternative C would better retain habitat, forage, and water resources for wild horses and help to preserve the size and demographic composition of the wild horse herds within the HMA to a greater degree than Alternative A but only slightly more than Alternative B.

**Table 4-61. Alternative C Acres of COA and Lease Stipulations in Wild Horse Herd Management Areas**

| Herd Management Area | Oil and Gas Condition of Approval or Lease Stipulation | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Controlled Surface Use | | No Surface Occupancy | | Timing Limitation | |
| | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA |
| **Leased** | | | | | | |
| Piceance East Douglas HMA | 29,300 | 8,900 | 32,100 | 24,800 | 104,000 | 74,800 |
| **Unleased** | | | | | | |
| Piceance East Douglas HMA | 2,600 | 1,900 | 2,900 | 2,800 | 7,600 | 6,100 |
| **Total** | **31,900** | **10,800** | **35,000** | **27,600** | **111,600** | **80,900** |

SOURCE: BLM 2009.
NOTE:
Because of rounding, values presented in table may not appear to exactly add up to totals.

Under Alternative C, the total area of NSO stipulations would include about 35,000 acres of the overall HMA and about 27,600 acres of the area in common with the HMA and MPA. In the HMA overall, this represents a decrease of 25,000 acres compared to Alternative B and an increase of 16,400 acres compared to Alternative A. In the part of the HMA in common with the MPA, this represents a decrease of 12,100 acres compared to Alternative B and an increase of 11,800 acres compared to Alternative A. The indirect impacts that could preserve habitat, forage, sources of water, and herd demographics for wild horses would be less than Alternative B but greater than Alternative A (Table 4-61).

In contrast, the area where TL stipulations for grouse and big game could be implemented could increase for Alternative C, relative to both Alternatives A and B (Table 2-4 Record 12). Table 4-61 represents the most restrictive lease stipulations (i.e., NSO trumps CSU which trumps TL). Since there is a decrease in the acreage of NSO stipulations in Alternative C compared to Alternative B, there is an increase in the area only managed with a TL stipulation under Alternative C compared to Alternative B. While NSO stipulations would preclude surface disturbing activities that may impact wild horses, management of surface disturbing activities with TL stipulations would still provide a means to reduce impacts to wild horses during sensitive times of the year (e.g., foaling). These stipulations could potentially reduce behavior-related disturbances to wild horses to a greater degree than Alternatives A.

<u>Impacts from Management Actions</u>

Oil and gas developers may be less able to implement voluntary use of threshold levels of disturbance in seasonal big-game habitats under Alternative C, due to the greater amount of development. Indirectly, this could result in more of the HMA being subject to localized timing restrictions and less shared development during some years than Alternative B which may impact seasonal movements of wild horses. However, general disturbance should remain at levels that do not affect wild horse distribution and use patterns in the vicinity of oil and gas development.

BLM_0019960

*Chapter 4 – Environmental Consequences*

**Reclamation**

Decreasing the reclamation success criteria to 80 percent of cover and composition of the DPC (Table 2-3 Record 18) could allow noxious weeds to spread compared to Alternative B. Continuing to require interim reclamation, requiring strict weed control measures for oil and gas developers, and using livestock fencing in reclamation sites during the first three years would have the same impact as Alternative B. Indirectly, these reclamation measures could aid in retaining or restoring use patterns of the wild horses by preserving the preferred forage sites and cover conditions to a greater extent than Alternative A.

## 4.4.5    Alternative D

**Impacts from Oil and Gas Development**

Under Alternative D, the results of the temporal analysis indicate that an estimated 2,428 oil and gas wells would be constructed in the MPA, resulting in 29,100 acres of surface disturbance. Approximately 5.8 percent of all vegetation communities would be developed over the 20-year planning period (Table 4-50). Alternative D contains the greatest number of oil and gas well pads, acres of surface disturbance, and the most development in all vegetation communities. This could increase the impacts on wild horse habitat and forage resources compared to all alternatives.

Areas managed with CSU stipulations or as open with standard stipulations would include about 99,100 acres of the HMA and about 63,200 acres of the area in common with the HMA and the MPA (Table 4-62). In the overall HMA, this would be 9,600 acres less than in Alternative A, 67,600 acres greater than Alternative B, and 67,200 acres greater than Alternative C. In the part of the HMA within the MPA, this would be 7,000 acres less than Alternative A, 50,600 acres greater than Alternative B, and 52,400 acres greater than Alternative C. Since these areas would not preclude surface disturbing activities or limit the time of year when they could occur, the disturbance related impacts to wild horses in the HMA would be greater than Alternative B or Alternative C but less than Alternative A.

### Table 4-62. Alternative D Acres of COA Stipulations in Wild Horse Herd Management Areas

| Herd Management Area | Oil and Gas Condition of Approval or Stipulation | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Controlled Surface Use | | No Surface Occupancy | | Open | | Timing Limitation | |
| | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA |
| **Leased** | | | | | | | | |
| Piceance East Douglas HMA | 31,900 | 10,200 | 23,000 | 17,400 | 61,800 | 48,300 | 48,700 | 32,600 |
| **Unleased** | | | | | | | | |
| Piceance East Douglas HMA | 3,100 | 2,400 | 1,700 | 1,600 | 2,300 | 2,300 | 6,000 | 4,500 |
| **Total** | **35,000** | **12,600** | **24,700** | **19,000** | **64,100** | **50,600** | **54,700** | **37,100** |

SOURCE: BLM 2009.
NOTE:
Because of rounding, values presented in table may not appear to exactly add up to totals.

The total area of NSO stipulations would include about 24,700 acres of the overall HMA and about 19,000 acres of the area in common with the HMA and MPA. In the overall HMA, this would be 6,100 acres greater than in Alternative A, 35,200 acres less than Alternative B, and 10,300 acres less

BLM_0019961

than Alternative C. In the part of the HMA within the MPA, this would be 3,200 acres greater than Alternative A, 20,700 acres less than Alternative B, and 8,600 acres less than Alternative C. Consequently, the potential to reduce disturbance to wild horse habitat would be less than Alternative B or Alternative C but slightly greater than Alternative A.

Under Alternative D, the total area of TL stipulations would include about 54,700 acres of mineral estate of the overall HMA and about 37,100 acres of area in common with the HMA and MPA (Table 4-62). In the overall HMA, this would be 3,500 acres greater than in Alternative A, 32,400 acres less than Alternative B, and 56,900 acres less than Alternative C. In the part of the HMA within the MPA, this would be 3,800 acres greater than Alternative A, 29,800 acres less than Alternative B, and 43,800 acres less than Alternative C. The potential to reduce behavior-related disturbance to wild horses under Alternative D would be less than Alternative B or Alternative C but slightly greater than Alternative A. Similar to Alternative A, there would be no option to avoid TL stipulations through the use of voluntary compliance with threshold limits to disturbance.

**Impacts from Management Actions**

Impacts from management actions would be the same as those described under Impacts Common to all Alternatives.

**Reclamation**

Decreasing the success criteria for reclamation to reach 60 percent of cover and composition of the DPC and having fewer weed control requirements for oil and gas developers (Table 2-3 Record 18) could increase the likelihood of spreading noxious weeds under Alternative D compared to Alternatives A, B, and C. The proposed greater use of non-native plants for reclamation and not using livestock fencing to exclude cattle and wild horses from reclamation sites could lead to longer periods to reach success criteria and could increase potential to spread invasive plants and noxious weeds compared to Alternatives A, B, and C. Combined with the higher amount of oil and gas development, Alternative D reclamation efforts would do less to restore forage for wild horses compared to Alternatives A, B, and C.

## 4.4.6    Irreversible and Irretrievable Commitment of Resources

Construction of well pads, roads, evaporation ponds, fenced areas and other surface disturbing or exclusionary structures would remove acreage from forage production until reclaimed. The loss of forage would be irretrievable in disturbed areas until vegetation communities were restored and fences removed under Alternatives A, B, and C. Decisions to mitigate disturbance impacts should offset the level of oil and gas development under these three alternatives. However, the potential loss of current use patterns of wild horses could be irretrievable under Alternative D, due to the high level of oil and gas development and relaxed mitigation standards.

## 4.4.7    Unavoidable Adverse Impacts

Some short-term reduction in forage would be unavoidable. The amount of forage loss would be comparable to the number of acres disturbed for oil and gas development in each alternative. Forage losses could potentially indirectly lead to smaller bands, change the demographic structure within the herd, and/or alter the distribution of use areas in the Planning Area.

Adverse impacts to wild horses could be avoidable under Alternatives A, B, and C, because decisions to mitigate disturbance impacts should offset the level of oil and gas development. Due to

BLM_0019962

the high level of oil and gas development and relaxed mitigation standards under Alternative D the adverse impacts that result from forage losses or displacement of the bands within the herd could be unavoidable.

## 4.4.8 Relationship Between Local Short-Term Uses and Long-Term Productivity

Conflicts between wild horses and oil and gas development would most likely occur in areas of concentrated oil and gas development, in the part of the HMA that coincides with the MPA. Short-term development of oil and gas resources should not lead to long-term reductions in the productivity of wild horse habitat and populations under Alternatives A and B, because the mitigation measures should adequately offset the level of development. These impacts could potentially be greater under Alternative C due to the greater amount of oil and gas development and slightly relaxed mitigation standards; however, productive wild horse ranges should return in the long-term.

Under Alternative D, long-term productivity of wild horse habitat and populations potentially could be lost, due to this alternative having the highest level of oil and gas development and most relaxed mitigation standards. Alternative D would result in the highest potential for loss of forage areas, and could indirectly lead to smaller bands of wild horses. Recovery of forage, and the size and distribution of wild horses may not occur until decades after restoration and recovery efforts have been successful.

## *4.5 Wildland Fire Ecology and Management*

This impact analysis section assesses the extent to which wildland fire management could be impacted with respect to management actions, stipulations, and COAs for oil and gas development under Alternatives A, B, C, and D. Impacts to wildland fire management were analyzed according to factors that could alter the existing wildland fire regime condition class (FRCC) or change the ability to conduct wildland fire management activities within the Planning Area.

The analysis used quantitative and qualitative variables to assess the potential impacts. A number of indicators, attributes, and assumptions were used for the analysis. The following two indicators were selected to analyze the effects of the alternatives on Wildland Fire Ecology and Management:

- Wildland Urban Interface Areas; and
- Area of each FRCC in the Planning Area.

Attributes are the values that are used to qualify and quantify resource indicators. An attribute is a property, measurement, or observable state of the resource. The following attributes of the two indicators are:

- Change to FRCC.
- Amount, location, and types of values at risk:
  - Human life and property;
  - Natural and cultural resources; and
  - Other public lands (federal lands not administered by the BLM and state-owned land).
- Amount, location, and types of hazards on the landscape.

BLM_0019963

The analysis is based on the following assumptions:

- Acres in FRCC 1 would remain in FRCC 1 during the 20-year analysis period.

- Acres treated to "move toward FRCC 2 or FRCC 1" were considered effectively moved into that FRCC for analysis purposes.

- FRCC 2 and 3 were used to represent moderate and high hazard/risk, respectively, for analysis purposes.

- Wildland fire management goals could be achieved while still meeting other management action requirements.

- Budget and staffing level would be sufficient to achieve treatment goals.

- For qualitative impact analysis, actions and objectives for other resources would override wildland fire management goals unless otherwise specified.

- Oil, natural gas, pipelines, transmission lines, and other structures associated with well pads represent hazards to wildland firefighters.

- To estimate acres of surface disturbance that could occur across the Planning Area, a temporal analysis model (see Appendix E for detailed description) was developed that accounts for projected levels of development, leasing stipulations, and management actions for each alternative.

Impacts to wildland fire management could come from decisions in a number of other resources, resource uses, and special designations that change the amount of surface disturbance, affect the natural vegetation, or change hazards in the Planning Area. Specific decisions are not described for NSO stipulations; rather, these are discussed in terms of total acres. Wild horses, paleontological resources, and visual resources do not have decisions that affect wildland fire management. The discussion of the impacts analysis is organized by impacts from oil and gas development, management actions, and reclamation according to the alternatives.

## 4.5.1   Impacts Common to All Alternatives

### Impacts from Oil and Gas Development

Oil and gas development could impact wildland fire in a number of ways. Areas open to oil and gas leasing would have increased potential for construction of oil and gas facilities, which could increase the potential ignition sources for wildland fires and could increase the number and locations of potential hazards to wildland firefighters. Surface disturbance that removes vegetation for oil and gas development could move an area further from the desired FRCC. Support facilities and structures in areas with oil and gas development would have a higher need for suppression and actions to defend life and property. The increase need for suppression actions could inhibit the potential for a natural mosaic burn or could reduce the ability to use prescribed fire as a management tool. Suppression of wildland fire and the reduced ability to use prescribed fire could lead to increased fuel loading. Increased fuel loading could increase potential for higher intensity wildland fires that could alter wildland fire suppression tactics and could pose potentially greater safety risks to firefighters or could create potentially greater risks to cultural resources, natural resources, human life, and property. Changes to wildland fire management would increase during the 20-year planning period in relation to the steady increase in the area disturbed by oil and gas development and occupied by oil and gas development infrastructure.

BLM_0019964

**Chapter 4 – Environmental Consequences**

New local and resource roads for oil and gas development would have differing impacts to wildland fire management. The construction of additional local and resource roads could enable greater access and improved response time to wildland fires. This could have the indirect impact of potentially reducing the safety risks that wildland firefighters experience while travelling to remote areas to fight wildland fires where hiking through unburned vegetation over terrain would normally occur. However, a larger road network could increase the potential for human ignition sources across a wider area, which could potentially increase the fire return interval. A larger road network would also break-up fuel loads by creating barriers, which could have the indirect impact of limiting the size of potential ignitions.

**Impacts from Management Actions**

The FRCC could change from the current reference class by increasing or decreasing the fuel load or by increasing or decreasing the likelihood of ignitions compared to the historical range. Management actions for other resources or resource uses could limit the BLM in its use of prescribed fire as a management tool or could change the ability of the BLM to suppress wildland fires. Wildland fire suppression would continue to limit the loss of human life and property damage in the wildland urban interface. Wildland fire suppression also would reduce the potential for damage to oil and gas facilities. Suppression would help to protect natural and cultural resources and other public lands throughout the Planning Area.

Dust suppression would be required for oil and gas development under all alternatives to reduce dust emissions (Table 2-1 Records 7 and 8). Dust suppression would help to maintain air quality standards and would help to retain opportunities for prescribed wildland fire by reducing $PM_{10}$. Smoke from wildland fires falls into the $PM_{10}$ category, and limiting large particulate emissions from oil and gas development and operations would put fewer constraints on the use of prescribed fire as a management tool to improve FRCCs in the Planning Area.

Implementation of three-phase gathering systems could reduce the need for storage tanks containing flammable liquids on individual well pads (Table 2-1 Record 16). This would reduce some safety risks to wildland firefighters in the Planning Area and would help to retain the capabilities of suppressing unwanted ignitions.

Administrative actions to ensure effective livestock grazing management (Table 2-16 Record 16) in areas with oil and gas development would help to preserve historic fuel loads and could help to achieve the desired FRCCs in the Planning Area.

Managing vegetation in other ways would help wildland fire management in the Planning Area. Maintaining weed-free zones on approximately 497,900 acres (Table 2-3 Record 22) would limit the possibilities of oil construction equipment and other vehicles associated with oil and gas development to spread exotic vegetation. Weedy and exotic plant species could increase fuel loads and change vegetation patterns that could increase the frequency and intensity of wildland fires in some areas. Xeric shrub lands and woodlands with a sparse, discontinuous understory would be the most susceptible vegetation types in the Planning Area. Higher fuel loads and more frequent fires could move weed infested areas further from the desired FRCC, and intense wildland fires pose a greater risk to wildland firefighters. By controlling the spread of weeds FRCCs would be preserved or improved and wildland fire risks would be limited. Maintaining the closure of 83,300 acres of WSA to oil and gas development (Table 2-21 Record 9) would help maintain the existing fuel loads in vegetation communities, which would help to maintain the existing FRCCs and the natural fire return frequency. These management actions would allow wildland fires in these areas to burn more

4-258

*Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*

BLM_0019965

naturally and could lead to a more natural mosaic burn pattern that breaks up continuous fuels and reduces the likelihood of catastrophic wildland fires.

Areas managed with CSU stipulations or NSO stipulations could improve wildland fire management in the Planning Area. Controlled surface use stipulations could limit hazards to firefighters by limiting or directing the development of oil and gas infrastructure in sensitive areas. The NSO stipulations would limit surface disturbance in other sensitive areas, which could help to maintain the current or desired FRCC. Managing 28,900 acres of ACECs as open to oil and gas leasing with NSO stipulations would help to maintain the current FRCCs within the ACEC boundaries (Table 2-21 Record 13). Other ACECs (White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek) would be open to oil and gas leasing with CSU stipulations, which could limit wildland firefighter hazards such as suspended transmission lines and underground pipelines on those landscapes. However, areas managed with a CSU stipulation or an NSO stipulation could shift ROW development and potential wildland firefighter hazards to other areas such as steeper slopes. Steeper slopes could pose a greater risk to wildland firefighters and could limit the ability to suppress wildland fires around oil and gas development.

Limiting cumulative treatment of suitable sagebrush forage types on deer winter ranges and pronghorn overall ranges to limit forage reductions (Table 2-4 Record 4) would help to retain the structure and fuel loads in treated areas. Restricting the type of treated sagebrush habitats to suboptimal stands and excess cover types in severe winter range for deer and winter range for pronghorn (Table 2-4 Record 4) would help to preserve native vegetation patterns and fuel loads on 242,000 acres within the Planning Area. Collectively, these decisions would help to preserve the FRCCs and the fire frequency patterns in these areas.

### Reclamation

Implementing Phase I and Phase II Interim Reclamation and Final Reclamation activities in accordance with the standards and timeframes outlined in Appendix D would reestablish natural slopes and re-vegetate disturbed areas to achieve DPCs. Reclaimed vegetation would typically move FRCCs to a Class I or Class II, but the original site conditions and natural fire return frequency would not return during the interim periods due to the lack of woody vegetation. Reclamation would take decades or centuries to return the DPCs dominated by woody vegetation at the original state prior to surface disturbing activities. Reclaimed plant communities would persist in the long-term to resemble a grass-shrub complex in its early seral state or a post burn condition. The FRCC would remain in Class I or Class II after final reclamation, and the reclaimed areas would continue to differ from the original reference state with predominantly herbaceous fuel and little woody fuel. This state would persist in the long-term, which could intensify, change the behavior, and increase return rate of wildland fires in those areas.

## 4.5.2   Alternative A

### Impacts from Oil and Gas Development

Under Alternative A, oil and gas development could affect wildland fire resources in the Planning Area but especially in the MPA. Results of the vegetation temporal analysis performed for Alternative A are shown in Table 4-47 (Vegetation Resources). These estimates are based on a uniform distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU, TL stipulations). The construction of 523 well pads in the MPA has the potential to disturb 6,300 acres, with most of the development occurring in woodlands, forests, and shrublands (Table 4-47). The

BLM_0019966

*Chapter 4 – Environmental Consequences*

majority of disturbed acres would occur in pinyon/juniper woodland (2,500 acres) and sagebrush shrubland (1,600 acres) (Table 4-47). Surface disturbance in the MPA would involve about 1.2 percent of the total acres, with about 1.2 percent of pinyon/juniper woodland being disturbed and about 1.2 percent of sagebrush shrublands being disturbed (Table 4-47). The types of impacts to wildland fire from oil and gas development related surface disturbance would be the same as those described in Section 4.5.1 (Impacts Common to All Alternatives). Developing 550 well pads in the Planning Area and approximately 4,603 wells (Table 2-1 Record 13) under Alternative A could create approximately 395 miles of roads to well pads, which could increase access and need for suppression of wildland fires as well as increase the potential for human-caused ignitions in these areas. This could increase the fire return rate, and further move FRCCs from the desired state in the Planning Area. Vapor and particulate emissions from this projected level of development could limit opportunities to implement prescribed wildland fire in the Planning Area as is described in Section 4.5.1 (Impacts Common to All Alternatives).

## Impacts from Management Actions

Air quality management actions would require a 50 percent decrease in fugitive dust production from collector, local, and resource roads used for oil and gas development (Table 2-1 Records 7 and 8). Reducing fugitive dust production would provide more opportunities for prescribed wildland fires as a management tool to help maintain or improve FRCCs in the Planning Area as is described in Section 4.5.1 (Impacts Common to All Alternatives).

Three-phase gathering systems would be expected under current management at 40 percent of the well pads (220 of 550 well pads) to transport natural gas, condensate, and produced water to consolidated facilities where dehydration and temporary tank storage would occur (Table 2-1 Record 16). Construction of centralized facilities and additional infrastructure (e.g., pipelines) for three-phase gathering systems would generate surface disturbance that could move FRCCs further from the desired condition, where approximately 4 acres would be disturbed for each mile of pipeline with potential maintenance road (Appendix E). However, implementation of three-phased gathering would reduce truck traffic and decrease potential human-caused ignitions and also would reduce the potential hazards to wildland firefighters by reducing hazardous facilities in the Planning Area.

The NSO stipulations would be applied to oil and gas development in a number of decisions. Areas with NSO stipulations would total 157,100 acres under Alternative A (Table 2-17 Record 18). Applying NSO stipulations would help to maintain the current FRCCs by retaining the existing vegetation and would limit wildland fire risks by limiting development infrastructure and surface disturbance.

Requesting or, in some instances, requiring new development to use existing roads and pipeline corridors (Table 2-2 Records 20 and 21) to preserve soil resources could serve to consolidate some oil and gas development. This decision could limit some hazards to wildland firefighters and could reduce the potential for human-caused ignition that could start wildland fires that could harm natural and cultural resources.

## Reclamation

Under Alternative A, livestock would not be excluded from well pad and pipeline reclamation areas. This could affect the success of reclamation and prolong the time that reclaimed sites remain outside of the desired FRCC. Where oil and gas activity conflicts with grazing operations, allotment management plans could be adjusted to change the season of use, reduce stocking levels, or decrease AUMs (Table 2-16 Record 13), which could help to retain the existing plant cover and

BLM_0019967

help to retain existing FRCCs or move toward the desired FRCCs in the Planning Area. Also, conversion from forests, woodlands, and shrublands to a grass-shrub complex after final reclamation could have the indirect impact of intensifying, changing the behavior, and increasing the return rate of wildland fires in those areas due to increased fine fuels.

## 4.5.3   Alternative B

**Impacts from Oil and Gas Development**

The types of impacts to wildland fire from oil and gas development surface disturbance would be the same as those described in Section 4.5.1 (Impacts Common to All Alternatives), but the magnitude would increase in Alternative B compared to Alternative A. The vegetation temporal analysis performed for Alternative B shows that an estimated 1,045 well pads would be constructed in the MPA (twice that of Alternative A). The 1,045 well pads would result in 12,500 acres of surface disturbance from oil and gas development primarily in woodlands, forests, and shrublands (Table 4-48). As in Alternative A, pinyon/juniper woodland and sagebrush shrubland would have the highest acreages of disturbance, but disturbance would increase to 5,000 acres in pinyon/juniper woodlands (compared to 2,500 acres in Alternative A) and to 3,200 acres in sagebrush shrublands (compared to 1,600 acres in Alternative A). Conversion from forests, woodlands, and shrublands to a grass-shrub complex after final reclamation could have the indirect impact of intensifying, changing the behavior, and increasing the return rate of wildland fires over a larger area than under Alternative A.

Developing 1,100 well pads and approximately 9,191 wells (Table 2-1 Record 13) could create 790 miles of roads in the Planning Area. Increasing the number of roads could increase the area where motorized vehicle travel occurs relative to Alternative A (550 well pads; 4,603 wells; 395 miles) of roads. This increased amount of oil and gas development could increase access for wildland firefighters to wildland fires but would increase the need for suppression and the potential for human-caused ignitions; all of which could move FRCCs further from the desired state compared to Alternative A. Vapor and particulate emissions from this projected level of development could limit opportunities to implement prescribed fire as well as limit options to manage wildland fires in the Planning Area as is described in Section 4.5.1 (Impacts Common to All Alternatives).

**Impacts from Management Actions**

Requiring an 84 percent reduction in fugitive dust for collector and local roads and 80 percent for resource roads in the MPA (Table 2-1 Records 7 and 8) could reduce fugitive dust emissions under Alternative B compared to Alternative A, which could help with implementing prescribed fire management compared to Alternative A. Prohibition of venting practices and requirements for emission control technologies (Table 2-1 Records 9, 11, 14, and 15) would reduce emissions on a "per well" basis relative to Alternative A; however, the overall effect of Alternative B on large diameter ($PM_{10}$) and small diameter ($PM_{2.5}$) emissions in the Planning Area is not clear. Opportunities to manage wildland fires could be limited for the same reasons discussed under Impacts Common to All Alternatives, because the overall number of wells in the Planning Area could increase to 9,191, which could increase vapor and particulate emissions. The additional wells could offset the advantage of emission control actions.

Implementation of three-phase gathering systems would be expected at 90 percent of well pads (990 out of 1,100; Table 2-1 Record 16). Shared infrastructure for three-phase gathering would allow for the removal of storage tanks and would reduce truck traffic to individual well pads. Having fewer

BLM_0019968

tanks would reduce hazards to wildland firefighters and less truck traffic could reduce the possibility of human sources of ignition. This could reduce the need for full suppression and could improve the ability to maintain existing FRCCs in the Planning Area compared to Alternative A.

Managing 757,200 acres of oil and gas development with NSO stipulations to protect sensitive resources in the Planning Area would be more than five times the acres with NSO stipulations under Alternative A (157,100) (Table 2-17 Record 18). The area preserving FRCCs and limiting wildland fire hazards would be about twice that of Alternative A, but the nature of the impacts would not differ from those described in Alternative A and the Impacts Common to all Alternatives section.

A number of new weed management strategies would be implemented under Alternative B (Table 2-3 Record 24). Implementing more weed management COAs for oil and gas operators (Table 2-3 Record 24) would help to limit the proliferation of weeds in the Planning Area, which would help to maintain or improve the FRCCs in the Planning Area to a greater degree than under Alternative A.

Complying with voluntary thresholds in-lieu of TL stipulations in big-game habitat (Table 2-4 Record 12) could concentrate development and increase the clustering of oil and gas infrastructure, well pads, and resource roads. This would create larger areas without firefighter hazards and could maintain the current suppression needs over a larger area. As a result, this decision enables better wildland fire management to maintain or improve FRCCs in the Planning Area.

Preventing public access on resource roads and complete abandonment of unneeded resource roads (Table 2-4 Record 14) would help to limit human sources of ignition in the Planning Area. Limiting unwanted ignitions could help to maintain the natural fire frequency and desired FRCCs in the Planning Area.

<u>Reclamation</u>

Reclamation as part of oil and gas development and operations under Alternative B would be more defined and would better address specific issues than Alternative A (Table 2-3 Record 18). Requiring success criteria of 100 percent cover and composition of the DPC for interim and final reclamation for oil and gas activities would result in reclaimed areas resembling that of the native reference vegetation in an early successional state (Table 2-3 Record 18). The FRCC in reclaimed areas would shift to a Class I or Class II, but the behavior, return rate, and intensity of potential wildland fires would continue to differ from those in the native reference vegetation. In contrast, Alternative A does not include a specified percentage for success criteria.

Oil and gas operators would be required under this alternative to restrict livestock from oil and gas well pads and related surface disturbance areas subject to reclamation. Livestock would also be restricted from linear ROWs (i.e., roads, pipelines, and utility lines) until reclamation efforts are successful, which could help establish DPCs and to meet desired FRCCs to a greater degree than under Alternative A.

## 4.5.4 Alternative C

<u>Impacts from Oil and Gas Development</u>

The types of impacts to wildland fire from oil and gas development surface disturbance would be the same as those described in Section 4.5.1 (Impacts Common to All Alternatives), but the magnitude would increase in Alternative C compared to Alternatives A and B. The temporal analysis for vegetation under Alternative C shows that an estimated 1,710 well pads would be

BLM_0019969

constructed in the MPA, resulting in 20,500 acres of surface disturbance, with development primarily in woodlands, forests, and shrublands (Table 4-49). As in Alternative A and B, pinyon/juniper woodland and sagebrush shrubland would have the highest acreages of disturbance, but disturbance would increase to 8,200 acres in pinyon/juniper (3.2 times that of Alternative A and 1.6 times that of Alternative B) and to 5,200 acres in sagebrush shrublands (3.3 times that of Alternative A and 1.6 times that of Alternative B). Also, conversion from forests, woodlands, and shrublands to a grass-shrub complex after final reclamation could have the indirect impact of intensifying, changing the behavior, and increasing the return rate of wildland fires over a greater area than Alternative A or Alternative B.

Under Alternative C, the total development scenario for the Planning Area could result in 1,800 well pads (approximately 15,042 wells; Table 2-1 Record 13), which could create 1,295 miles of roads. This level of development could increase motorized vehicle travel compared to Alternative A (550 well pads, 4,603 wells, 395 miles of roads), and Alternative B (1,100 well pads; 9,191 wells; 790 miles of roads). This increased amount of oil and gas development could increase access of wildland firefighters to wildland fires compared to Alternatives A and B. However, this development scenario would increase both the need for suppression and the potential for human-caused ignitions; both of which could move FRCCs further from the desired state compared to Alternative A and Alternative B. Vapor and particulate emissions from this projected level of development could further limit the opportunities to implement prescribed fire and the management of wildland fires in the Planning Area as is described in Section 4.5.1 (Impacts Common to All Alternatives).

Prohibition of venting practices and requirements for emission control technologies as well as fugitive dust suppression levels would be similar to the standards under Alternative B (Table 2-1 Records 9, 11, 14, and 15). The overall effect of reducing emissions and fugitive dust on a per well basis but increasing the number of wells is not yet known because the location of well pads has not been determined. Total emissions could increase given the greater amount of oil and gas development compared to Alternative A and B, which could further restrict the ability to use prescribed fire to maintain or improve FRCCs in the Planning Area compared to Alternatives A and B.

## Impacts from Management Actions

Impacts on wildland fire management from the threshold concept (Table 2-4 Record 12) would be the same as Alternative B, except that Alternative C establishes higher thresholds for development, which would allow more surface disturbance from construction of oil and gas local and resource roads and pads. This could result in greater wildland fire impacts, including more vegetation removal and further movement away from the desired FRCCs. Cumulative surface disturbance, and the effect on FRCCS, under Alternative C could still be less than that under a scenario with TL stipulations if the threshold concept leads to more shared facilities and concentrated development of oil and gas resource roads.

Implementation of three-phase gathering systems would be expected at 80 percent of well pads (1,440 out of 1,800; Table 2-1 Record 16). The types of impacts to wildland fire management would not differ compared to Alternatives A and B. However, development of more tanks due to the lower standard (80 percent versus 90 percent) and the higher level of development would increase the hazards to wildland firefighters and would increase the possibility of human sources of ignition. This could result in a greater need for full suppression and could reduce the ability to maintain existing FRCCs in the Planning Area compared to Alternatives A and B.

BLM_0019970

Managing 387,600 acres with NSO stipulations would be higher under Alternative C than Alternative A (157,100 acres) and lower than Alternative B (757,200 acres; Table 2-17 Record 18). Overall, the NSO stipulations in Alternative C would help to retain existing FRCCs and the amount, location, and types of values at risk in the Planning Area to a greater extent than Alternative A and a lesser extent than Alternative B.

The same new weed management strategies would be implemented under Alternative C that would be proposed for Alternative B (Table 2-3 Record 24). The outcome of limiting weeds that helps to maintain FRCCs would be the same as Alternative B, which would be greater than Alternative A.

### Reclamation

Requiring success criteria of 80 percent (versus 100 percent for Alternative B) cover and composition of the DPC for interim and final reclamation for oil and gas activities would improve vegetation cover in disturbed areas (Table 2-3 Record 18), but the improvements would be less effective than Alternative B due to the lower success criteria. Reclaimed vegetation could differ more from the native reference state, with the result of patterns and timing of natural wildland fires differing more from those under Alternative B. The reclaimed vegetation could be closer to the desired FRCC and reference state than under Alternative A, where no reclamation success criteria were defined.

The requirement of oil and gas operators to restrict livestock from oil and gas well pads and related surface disturbance areas and linear ROWs until reclamation efforts are successful would be the same as Alternative B. The impact to wildland fire management would not differ from Alternative B, which could help establish DPCs and to meet desired FRCCs to a greater degree than under Alternative A (livestock restriction not necessarily implemented).

## 4.5.5   Alternative D

### Impacts from Oil and Gas Development

The types of impacts to wildland fire from oil and gas development surface disturbance would be the same as those described in Section 4.5.1 (Impacts Common to All Alternatives), but the magnitude would increase in Alternative D compared to Alternatives A, B, and C. The temporal analysis for vegetation under Alternative D shows that an estimated 2,428 well pads would be constructed in the MPA, resulting in 29,100 acres of surface disturbance, with development primarily in woodlands, forests, and shrublands (Table 4-50). As in Alternative A, B, and C, pinyon/juniper woodland and sagebrush shrubland would have the highest acreages of disturbance, but disturbance would increase to 11,600 acres in pinyon/juniper (4.7 times that of Alternative A, 2.3 times that of Alternative B, and 1.4 times that of Alternative C) and to 7,300 acres in sagebrush shrublands (4.6 times that of Alternative A, 2.3 times that of Alternative B, and 1.4 times that of Alternative C). Also, conversion from forests, woodlands, and shrublands to a grass-shrub complex after final reclamation could have the indirect impact of intensifying, changing the behavior, and increasing the return rate of wildland fires over a greater area than Alternatives A, B, or C.

Under Alternative D, the total development scenario for the Planning Area could result in 2,556 well pads (approximately 21,200 wells; Table 2-1 Record 13), which could create 1,840 miles of roads. This level of development could increase access for motorized vehicle travel compared to Alternative A (550 well pads; 4,603 wells; 395 miles) of roads, Alternative B (1,100 well pads; 9,191 wells; 790 miles) of roads, and Alternative C (1,800 well pads; 15,042 wells; 1,295 miles) of roads. This increased amount of oil and gas development could increase access of wildland

BLM_0019971

firefighters to wildland fires compared to Alternatives A, B, and C. However, this development scenario would increase the need for suppression and the potential for human-caused ignitions; all of which could move FRCCs further from the desired state compared to the other alternatives. Vapor and particulate emissions from this projected level of development could further limit the opportunities to implement prescribed fire and manage wildland fires in the Planning Area as is described in Section 4.5.1 (Impacts Common to All Alternatives).

**Impacts from Management Actions**

This alternative would not include resource road abandonments and seasonal resource road closures that would be implemented under Alternatives B and C. Not having a decision is the same as Alternative A. The type of impact to wildland fire management would be the same as Alternative A, in which unwanted human-sourced ignitions would not be limited. However, the likelihood of human-sourced ignitions would be greater than Alternative A, because the proliferation of resource roads would be more than three times greater than Alternative A.

Managing 257,100 acres with NSO stipulations would be more than under Alternative D than Alternative A (157,100 acres) but less than Alternative B (757,200 acres) and Alternative C (387,600 acres) (Table 2-17 Record 18). Overall, the NSO stipulations in Alternative D would help to better preserve existing FRCCs and the amount, location, and types of values at risk in the Planning Area to a greater extent than Alternative A but not compared to Alternatives B and C.

Fewer new weed management strategies would be implemented under Alternative D compared to those that would be proposed for Alternative B and C (Table 2-3 Record 24). The possibility of limiting weeds would be reduced, which would reduce the possibility to retain existing FRCCs compared to Alternatives B and C. However, weeds could be better managed and FRCCs could be less affected compared to Alternative A, which had the fewest weed management strategies (Table 2-3 Record 24).

**Reclamation**

Requiring success criteria of 60 percent (versus 100 percent for Alternative B and 80 percent for Alternative C) cover and composition of the DPC for interim and final reclamation for oil and gas activities would aid in reestablishment of vegetation at disturbed sites (Table 2-3 Record 18), but the improvements would be less effective than Alternative B and Alternative C due to the lower success criteria and higher amount of oil and gas development. Because reclaimed vegetation could differ more from the native reference state to a greater degree than under Alternative B or Alternative C, the resulting timing and pattern of wildland fires could differ from the desired condition to a greater degree than under Alternative B or Alternative C. The resulting conditions could still be closer to reference conditions than under Alternative A, where no reclamation success criteria were defined.

Under Alternative D (like Alternative A), livestock would not necessarily be excluded from well pad and pipeline reclamation areas. This could affect the success of reclamation and prolong the time of that reclaimed sites remain outside of the desired FRCC compared to Alternatives B and C. The overall impact would be greater than Alternative A because of the much larger amount of development proposed under this alternative.

BLM_0019972

## 4.5.6    Irreversible and Irretrievable Commitment of Resources

The proliferation of oil and gas infrastructure could place greater risks to human life, natural resource value, and cultural resource values in the Planning Area. Where unwanted ignitions occur and spread to undisturbed areas, natural and cultural resource values could be irreversibly and irretrievably lost. Any loss of human lives lost due to the higher risks associated with the suppression of wildland fires around oil and gas infrastructure would present an irreversible and irretrievable loss. The possibility of irreversible and irretrievable loss of these values would be smallest in Alternative A (550 well pads; 4,603 wells; 395 miles of roads) and would increase in Alternative B (1,100 well pads; 9,191 wells; 790 miles of roads) and Alternative C (1,800 well pads; 15,042 wells; 1,295 miles of roads). The greatest potential for irreversible and irretrievable loss would be in Alternative D with 2,556 well pads; approximately 21,200 wells and 1,840 miles of roads.

## 4.5.7    Unavoidable Adverse Impacts

Alternatives A or B would be unlikely to have unavoidable adverse impacts to prescribed fire or the management of wildland fires. This is due to the lower level of development in Alternative A and the strict standards for emissions, reclamation, and dust suppression under Alternative B. Alternative C, with a higher level of oil and gas development and lower reclamation success criteria, could result in unavoidable adverse impacts that could limit the BLM's ability to manage wildland fires or implement prescribed fire as management tools to a greater degree when compared to Alternatives A or B. Oil and gas development under Alternative C also could result in a greater need to suppress wildland fires and could increase hazards to resource values from oil and gas infrastructure. Alternative D would likely incur adverse impacts due to it having the highest level of development and the lowest reclamation standards. Conditions under Alternative D could further reduce the BLM's ability to use prescribed fire and manage wildland fires which could require higher suppression needs to protect human life, structures, and other resources. FRCCs could move to a less desirable level in some areas of high development in Alternative C, and could be larger in extent under Alternative D.

Emissions from wildland fires and prescribed wildland fire would continue regardless of the alternative selected. Oil and gas development could limit the use of wildland fire and prescribed fire as management tools in order to maintain air quality. This could alter the location and extent of prescribed fire use under all alternatives but could be greatest under Alternative D because of the high level of development compared to other alternatives.

## 4.5.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

There are no anticipated effects under any of the alternatives related to short-term uses versus long-term productivity.

# 4.6    Heritage and Visual Resources

## 4.6.1    Cultural Resources

Cultural resources include artifacts, features, and structures that provide evidence of past human activity in an area. These are generally fragile, nonrenewable, and susceptible to damage from surface-disturbing activities. Included within the general class of cultural resources are historic

BLM_0019973

properties, which are defined at 36 CFR 800.16(l)(1) as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places [NRHP]." Impacts on historic properties were analyzed based on the BLM's current understanding of the distribution of historic properties in the Planning Area (BLM 2008).

This analysis considers the potential for oil and gas development and the management actions described in Chapter 2 to have direct or indirect effects on known historic properties in the Planning Area. The number and kinds of historic properties that could be affected by management actions is directly correlated with the degree, nature, and quantity of surface-disturbing activities. To ensure preservation of specific historic properties, further analyses will be required at the implementation level following site-specific cultural resource inventories.

The analysis uses quantitative and qualitative indicators and attributes to assess impacts. The following two indicators have been selected to analyze the effects of the alternatives on cultural resources management:

- Extent to which a management action changes the potential for erosion or other natural processes that could affect historic properties or Native American traditional use or religious practices.

- Extent to which an action alters the setting of historic properties or Native American traditional use or religious practices.

The attributes of the two indicators are:

- Acres of surface-disturbing activities;

- Removal of structural features;

- Increased access or human activity; and

- Historic properties of cultural and religious significance and sacred areas attributes, including solitude, and views of the surrounding area.

Impacts on historic properties are assessed by applying the criteria of adverse effect as defined at 36 CFR 800.5(a): "An adverse effect is found when an action may alter, directly or indirectly, the characteristics of a historic property that qualify the property for inclusion in the National Register [of Historic Places] in a manner that would diminish the integrity of the property's location, design, setting, workmanship, feeling, or association. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." The criteria of adverse effect also provide a general framework for identifying and determining the context and intensity of potential impacts on other categories of cultural resources or historic properties of cultural and religious significance and sacred areas, if these are present. Impacts to historic properties, historic properties of cultural and religious significance and sacred areas from surface-disturbing activities could occur primarily at the time the initial surface disturbance occurs. The projected acres for short-term surface disturbance are used to quantify impacts to historic properties (Table 4-7). Assessment of effects involving Native American or other traditional community, cultural, or religious practices or resources also requires focused consultation with the affected group(s).

BLM_0019974

**Chapter 4 – Environmental Consequences**

The analysis of historic properties is based on the following assumptions:

- Historic properties could continue to be found throughout the Planning Area, given the long history of occupation and the non-random distribution of critical resources (food, water, shelter, and raw materials for tools).

- Historic properties are more likely to be found on shallow slopes (less than 10 percent) and close to reliable water sources (less than 550 feet).

- Historic properties in the Planning Area have been buried, destroyed, or altered by natural agents (erosion and deposition) and human activity. Such disturbance from natural and human agents is likely to continue.

- The effects of oil and gas exploration or development activities on historic properties could be mitigated in accordance with the protocol set forth in the BLM's National Cultural Programmatic Agreement (1997).

- Federal undertakings and unauthorized uses have the potential to cause irreversible disturbance and damage to non-renewable historic properties. The BLM could continue to mitigate impacts to these resources from authorized uses through project avoidance, redesign, and, if necessary, data recovery investigations, in accordance with the BLM Manual 8100.

- Operators must submit proposals for any site-specific project that would require the BLM approval. Additional site-specific NEPA analyses and a Section 106 review will be conducted on these individual projects. The BLM will complete comprehensive identification (e.g., field inventory), evaluation, protection, and mitigation following the pertinent laws, regulations, and policies.

- The BLM does not approve any ground-disturbing activities that may affect any historic properties, sacred landscapes, and/or resources protected under the NHPA, American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, Executive Order 13007, or other statutes and executive orders until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized, or mitigated.

- The BLM will continue to implement government-to-government consultation with tribes on a case-by-case basis for site-specific proposals which would help determine other issues of concern, including but not limited to access rights, disruptions of cultural practices, impacts on visual resources important to the tribes, and impacts on subsistence resources. It should be noted that even when consultation and an extensive inventory or data collection occur, not all impacts on tribally sensitive resources can be fully mitigated.

To estimate acres of surface disturbance that could occur to cultural resources, a temporal analysis methodology (see Appendix E for detailed description) was developed that takes into account project levels of development, leasing stipulations, and management actions for each alternative.

### 4.6.1.1   Impacts Common to All Alternatives

**Impacts from Oil and Gas Development**

The greatest effects to historic properties could occur from surface disturbance in any area not managed with an NSO stipulation. Surface disturbance associated with oil and gas exploration and development includes the construction of well pads, pipelines, utility corridors, local and resource

roads, and facilities. These activities could damage or destroy historic properties through associated surface disturbance by altering the setting or by increasing the amount or area where human activities and/or access could occur. In addition, these activities could degrade historic properties of cultural and religious significance and sacred areas by removing vegetation or altering the landscape surrounding the site.

Oil and gas exploration and development could indirectly alter the location or concentration of recreational use, livestock, or wild horses. This could result in highly localized erosion and consequent damage to historic properties in these areas. Surveys conducted by permitted consultants to evaluate oil and gas development sites for the presence of historic properties could help reduce impacts to any properties identified during the survey. If historic properties are identified and affected, measures could be applied to mitigate impacts. Mitigation measures include avoidance (project relocation or redesign), or treatment through scientific data recovery methods (e.g., surface collection, subsurface testing, and/or excavation). Areas where oil and gas development is proposed to occur could indirectly increase the knowledge of historic properties in the Planning Area. However, areas where data recovery is required would result in a loss of all or portions of *in situ* historic properties.

The construction of well pads, pipelines, utility corridors, roads, and facilities could indirectly increase the potential for unauthorized collection or vandalism of historic properties by increasing the area where human activity and/or access could occur. Increased human activity could degrade the setting of historic properties of cultural and religious significance and sacred areas by reducing the opportunity for solitude. The unauthorized collection of historic properties or damage could continue if these areas remain accessible after final reclamation is completed. However, limiting access on local and resource roads in areas with historic properties could help to minimize such impacts.

## Impacts from Management Actions

Managing aspen, chokecherry, and serviceberry vegetation communities with CSU stipulations could reduce erosion in localized areas, and could indirectly help retain existing historic properties, settings, and historic properties of cultural and religious significance and sacred areas (Table 2-3 Record 11).

Managing known historic properties with an NSO stipulation, such as the 3-acre Wickiup Village within the Duck Creek ACEC, would help maintain the value of cultural resources within the property site (Table 2-12 Record 9). However, the NSO stipulation for mineral estate overlapping with remnant vegetation associations (3,600 acres) could potentially shift disturbance to areas with higher cultural resource potential (Table 2-3 Record 27).

Managing Canyon Pintado NHD as an avoidance area for ROWs could result in shifting the location of surface disturbance to areas where ROWs could be located (Table 2-12 Record 5). This could help maintain the value of historic properties, the setting, and historic properties of cultural and religious significance and sacred areas within Canyon Pintado NHD, but it could also result in greater effects to historic properties and historic properties of cultural and religious significance and sacred areas in other areas.

Soil, water, and vegetation management actions that prevent or minimize erosion of fragile and saline soils help preserve historic properties and the landscape surrounding historic properties of cultural and religious significance and sacred areas. Areas where erosion occurs could result in the localized loss of historic properties and could indirectly result in degrading the setting or the

BLM_0019976

landscape surrounding historic properties of cultural and religious significance and sacred areas in highly localized areas. However, the accumulation of sediment in down-slope areas could help maintain the value of historic properties in the receiving areas.

Under all alternatives, the WSAs would remain closed to oil and gas leasing and development. Approximately 2,600 acres of the Texas-Missouri-Evacuation Creeks cultural area lies within the Oil Spring Mountain WSA and is closed to development. About 1,100 acres of the closed area was leased prior to the 1997 White River RMP and these leases are either held by production or are part of a Unit or Communization Agreement. If the leases were to be relinquished, they would not be re-issued.

### Reclamation

Management actions that minimize the potential for unplanned wildland fires or that reduce suppression activities, including the 497,000 acres managed as weed-free zones could indirectly protect historic properties and help retain the existing landscape surrounding historic properties of cultural and religious significance and sacred areas (Table 2-3 Record 22). Wildland fire-suppression activities (e.g., construction of fire lines and/or roads) could disturb soil and vegetation and indirectly dislodge or damage historic properties and temporarily reduce solitude at historic properties of cultural and religious significance and sacred areas.

Implementing interim and final reclamation as defined in the WRFO Surface Reclamation Plan (Appendix D) could improve ecological site conditions and reduce erosion. Best management practices to reduce erosion could reduce the potential loss or damage to historic properties and cultural resources settings (Appendix B). This could indirectly help retain existing historic properties, cultural resource settings, and the landscapes surrounding historic properties of cultural and religious significance and sacred areas in localized areas.

### 4.6.1.2    Alternative A

#### Impacts from Oil and Gas Development

Surface disturbance associated with the development of 550 well pads and 4,603 wells in Alternative A could increase the need for mitigation, degrade the settings, and increase human activity and/or access in localized areas. Oil and gas development could also degrade historic properties of cultural and religious significance and sacred areas by reducing the opportunity for solitude. In addition, potentially developing 395 miles of resource and collector roads to support oil and gas activities could increase human activity and/or access to areas containing historic properties. Surface disturbance for approximately 285 miles of pipelines, or facilities developed to support oil and gas activities, could result in erosion and increased human activity and/or access. This could result in a loss of historic properties, degrade settings, and increase human activity and/or access in areas where oil and gas development was located. Increased human activity could also degrade historic properties of cultural and religious significance and sacred areas by reducing the opportunity for solitude in the areas surrounding well pads and facilities.

#### Impacts from Management Actions

An NSO will provide a greater level of protection to cultural resources than other management options (e.g., CSU stipulations or standard terms and conditions). Approximately 157,100 (9 percent) of the federal mineral estate in the planning area is managed with an NSO stipulation under Alternative A (Table 2-17 Record 18). Development activities in the remaining area would increase human activity and/or access and could affect historic properties and their setting. Within Canyon Pintado NHD, approximately 400 acres are managed with NSO stipulations with the

BLM_0019977

remaining acres managed with CSU stipulations (Table 4-63). Within the Texas-Missouri-Evacuation Creek cultural area, approximately 18,800 acres are managed with CSU stipulations with the remaining acres being managed as closed or with an NSO stipulation. Controlled surface use stipulations could help protect these historic properties by requiring design measures to limit or mitigate impacts. However, impacts from surface disturbance would still be greater than if development was avoided completely in these areas.

### Table 4-63. Lease Stipulations in Cultural Resource Areas, Alternative A

| Area | Open | No Surface Occupancy | Controlled Surface Use | Timing Limitations | Closed |
|---|---|---|---|---|---|
| **Leased** | | | | | |
| Canyon Pintado NHD | 0 | 400 | 13,700 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 500 | 16,100 | 0 | 1,100 |
| **Unleased** | | | | | |
| Canyon Pintado NHD | 0 | 0 | 1,900 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 0 | 2,700 | 0 | 1,500 |
| **Total** | **0** | **900** | **34,400** | **0** | **2,600** |

SOURCE: BLM GIS.

Requiring the relocation of permitted land-use activities within one-quarter mile of functional raptor nest sites and restricting surface disturbance within one-quarter mile of active and inactive leks in Alternative A could alter the location of oil and gas development (Table 2-5 Record 10 and Table 2-6 Record 18). In addition, restricting surface occupancy within one-eighth mile of identified raptor nests could alter where oil and gas development occurs on 20,900 acres (Table 2-5 Record 11). Managing areas to meet VRM Class I and II sensitive landscapes (Canyon Pintado NHD and scenic byways) could also alter the location of oil and gas development activities (Table 2-14 Record 3). These management actions could indirectly help maintain the value of existing historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas. At the same time, however, they could simply shift development to other areas, impact other historic properties, and degrade those landscapes and settings.

Meeting Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (Table 2-16 Record 6) and maintaining acceptable DPCs (Table 2-3 Record 1), including wildlife habitat areas, could help limit erosion to existing rates and indirectly help retain historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas. Avoiding seral or type conversions in vegetation communities of aspen, Douglas-fir, and deciduous shrubs could help retain existing vegetation community conditions and reduce erosion (Table 2-4 Record 17). Maintaining or improving bank, channel, and flood plain processes associated with critical habitat for listed fish of the Upper Colorado River Basin could reduce erosion (Table 2-9 Record 17). This could indirectly help retain existing historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas in localized areas.

Limiting the road density to 1.5 miles per square mile on big-game critical habitat could reduce the potential for increased human activity and/or access and could indirectly reduce roads developed to support oil and gas activities (Table 2-4 Record 7).

**Chapter 4 – Environmental Consequences**

Under Alternatives B, C and D, a LN would be applied to all new minerals leases notifying prospective lessee's that a class III Cultural Resources inventory would be required prior to surface disturbing activities. Lessee's would also be notified by the LN that they may be required to do data recovery mitigation or any development activities they propose on the lease (Table 2-12 Record 18). This LN would provide prospective lessee's additional information that could influence a decision to lease parcels for development. To streamline operations, the LN would make clear legal requirements that must be met to prevent any potential confusion during lease development.

Under Alternatives B, C and D (Table 2-12 Record 11) mineral material sales would not be allowed in Canyon Pintado NHD. Prohibiting mineral sales provides the best opportunities to protect the scenic and visual qualities associated with the rock art sites and their settings from degradation as a result of fugitive dust from quarrying operations. In addition, SH 139 which parallels Canyon Pintado NHD is a part of the Dinosaur Diamond National Scenic Byway; the visual setting of Canyon Pintado NHD is one of the values for which this portion of the byway was nominated. Prohibiting mineral material sales would protect the scenic and visual qualities of Canyon Pintado NHD by avoiding alteration of artificial contrasts in land and line forms left by quarried areas. Protecting the scenic and recreational values within the Canyon Pintado NHD is in agreement with the BLM goal of enhancing heritage tourism recreational opportunities. Alternative A provides very limited or no opportunities to protect those values within the district.

Under Alternatives B, C, and D the view shed area around the Thornburgh/Battle of Milk Creek site, listed on the NRHP, would be an avoidance area (Table 2-12 Record 12) for major new ROWs such as power lines, pipelines or roads, to provide protection to the visual setting and cultural resources of one of the last battle grounds of the 19th century conflicts between Europeans and Native Americans. This avoidance area would bring the WRFO RMPA into agreement with our neighboring LSFO RMP. An analysis of the area around the listed site boundaries by the National Park Service (Scott 2008) attempted to delineate the visual and contextual area of the entire battle and not just the parcel listed on the NRHP. Protecting the viewshed provides an opportunity to protect the overall visual setting of the area in which the battle occurred for appreciation by future generations. This designation would also be in keeping with the BLMs national goal of encouraging and supporting heritage tourism. Alternative A does not provide any protection for the site or its visual setting nor does it support heritage tourism.

Under Alternatives B, C, and D a CSU stipulation would be applied to surface disturbing activities with land use authorizations, permits and leases issued in these areas. For existing land use authorizations, COAs that reflect the intent of these stipulations would be applied to the extent allowable (Table 2-12 Record 13). These CSU stipulations would provide the tools necessary to protect the scenic and visual qualities of the larger battlefield area identified by the National Park Service (Scott 2008) that is outside the boundaries of the site as mapped for the NRHP. Measures would include, but no be limited to using terrain to mask development from the observation point of the battlefield proper, or use using blend elements of development to match the background using selected paint colors to reduce the impacts to the visual settings of the area. Alternative A does not provide any protection to the visual characteristics that make the area important to visitors.

Under Alternative A, federal mineral estate under the Thornburgh/Battle of Milk Creek site and the surrounding viewshed would be open to oil and gas leasing subject to consultation with the Colorado SHPO and the ACHP. The majority of both the surface (98 percent) and the mineral estate (92 percent) are private property, thus the BLM has limited ability to determine where surface activities could within the site. Under Alternative A, there are no management actions designed to

BLM_0019979

mitigate impacts to the viewshed on BLM lands other than what may be developed on a case-by-case basis during consultation with the Colorado SHPO.

Under Alternatives B, C and D an area of 360 acres north of SH 64 on Mellen Hill would have a NSO stipulation to protect sensitive cultural resources (Table 2-12 Record 14). The area has a very high concentration of cultural resources. The proposed area is adjacent to and visible from SH 64 which is part of the Dinosaur Diamond National Scenic Byway. The area has sandy soils that can contain many buried features and sites plus rock exposures that do contain prehistoric rock art and rock shelters.

The NSO stipulation will provide the BLM with the opportunity to protect rock art sites, associated rock shelters, and any subsurface remains not visible from the surface that may be of importance to Native American groups. The NSO stipulation provides the opportunity to encourage Heritage Recreation Tourism and preserve an example of Native American works of art for future generations more completely than Alternative A.

Under Alternatives B, C, and D a CRPP will be developed within five years of the RMPA/EIS ROD (Table 2-12 Record 15). Canyon Pintado NHD is recognized as an important area with one of Colorado's highest concentrations of Native American rock art for many decades. The designation of the district was the first national recognition of the historic importance of the area. In 2002 SH 139 and the route through Canyon Pintado NHD was designated as part of the Dinosaur Diamond Scenic Byway, a national designation. The scenic byway and the Canyon Pintado NHD have become a major component of the heritage recreation tourism industry in northwestern Colorado and northeastern Utah.

As population, heritage tourism and development continues in the region a comprehensive district specific management plan is needed to manage the district to preserve the qualities that make it significant. A comprehensive plan will ensure that the BLM has tools necessary to protect the rock art and other cultural resources in the district. It will also provide tools to ensure the scenic and visual properties that make the district unique are not unnecessarily impaired by development. Alternative A provides no such opportunities or tools and could result in the continued piecemeal, incremental degradation of the qualities that make the district important.

Under Alternatives B, C and D a CRPP will be developed within six years the signing of the RMPA/EIS ROD for Dragon Trail/Douglas Arch area south of Rangely Colorado (Table 2-12 Record 16). The Dragon Trail/Douglas Arch area south of Rangely, Colorado, has a very high known concentration of rock art and other cultural resources and is seeing an increase in tourism activity from mountain biking to heritage tourism visits. In the past the area was also an area of intensive energy development activity. Depending on new developments in well drilling technologies there could be a renewed interest in energy development in the future. These developments could pose a threat of damage or destruction to the cultural resources in the area.

Development of a CRPP with provisions for monitoring resource conditions and an interpretive program for selected rock art sites provides the BLM with the option to more fully balance land uses while providing for enhanced preservation of cultural resources and enhanced heritage tourism experience.

<u>Reclamation</u>

Management actions to reclaim disturbed sites to original conditions could reduce erosion. This could indirectly help maintain the value of historic properties, settings, and the landscape

BLM_0019980

surrounding historic properties of cultural and religious significance and sacred areas in areas adjacent to disturbed areas. In addition, restoring vegetation disturbed by permitted activities to improve ecological conditions could also reduce the potential for erosion and damage to historic properties found in these areas.

### 4.6.1.3    Alternative B

**Impacts from Oil and Gas Development**

Increasing the number of well pads in Alternative B to 1,100 and wells to 9,191 could increase the need for mitigation and could degrade the settings and landscapes surrounding historic properties of cultural and religious significance and sacred areas in localized areas compared to Alternative A (550 well pads and 4,603 wells, an increase of 100 percent for well pads and 99.7 percent increase for wells). Increasing resource and collector roads to 790 miles and pipelines to 565 miles compared to 395 miles (99.7 percent increase) of roads and 285 miles (100 percent increase) of pipelines under Alternative A could increase surface disturbance associated with oil and gas development. This could increase the extent of surface disturbance and the potential loss of historic properties, degrade settings over a greater area, and increase human activity and/or access compared to Alternative A. In addition, the increase in the number of well pads, wells, and associated facilities could degrade more historic properties of cultural and religious significance and sacred areas relative to Alternative A. Impacts from Management Actions

More areas would be managed with NSO stipulations under Alternative B (757,200 acres) than under Alternative A (157,100 acres) which could maintain a greater amount of historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas by decreasing the area where surface disturbance could occur (Table 2-17 Record 18). As under Alternative A, both Canyon Pintado NHD and the Texas-Missouri-Evacuation Creeks area would continue to be managed under various NSO and CSU stipulations; although there would be a 30 percent increase in the areas managed by NSO stipulations (Table 4-64).

**Table 4-64. Lease Stipulations in Cultural Resource Areas, Alternative B**

| Area | Open | No Surface Occupancy | Controlled Surface Use | Timing Limitations[1] | Closed |
|---|---|---|---|---|---|
| **Leased** | | | | | |
| Canyon Pintado NHD | 0 | 6,400 | 7,700 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 5,000 | 11,600 | 0 | 1,100 |
| **Unleased** | | | | | |
| Canyon Pintado NHD | 0 | 700 | 1,200 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 800 | 1,900 | 0 | 1,500 |
| **Total** | **0** | **12,900** | **22,400** | **0** | **2,600** |

SOURCE: BLM GIS.

NOTE:

[1]The most restrictive stipulations are shown. Timing limitations are not shown since all of Canyon Pintado NHD and the Texas-Missouri-Evacuation Creek area would be managed by various NSO and CSU stipulations.

The BLM would require oil and gas operators to use an adapted footprint configuration to match the topography of the surrounding landscape which would reduce the overall cut and fill during well pad construction (Table 2-17 Record 19). Reducing disturbance from construction such as cut and fill areas could reduce the overall area of disturbance and directly or indirectly help retain historic properties, settings, and landscapes surrounding historic properties of cultural and religious

BLM_0019981

*Chapter 4 – Environmental Consequences*

significance and sacred areas. However, requiring well pads to conform to landscape terrain could result in well pads being located in more level areas where historic properties, settings and historic properties of cultural and religious significance and sacred areas could be more commonly found and could directly or indirectly result in more historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas being impacted.

Impacts from restricting oil and gas development in Alternative B could be similar to Alternative A, except that management actions increase the areas with NSO stipulations to 757,200 acres (45 percent of the mineral estate compared to 9 percent under Alternative A; Table 2-17 Record 18). This includes 46,400 acres within 100 feet of landslide-prone areas and 45,300 acres of saline soil areas (Table 2-2 Records 15 and 16). In addition, deferring leasing on 96,100 acres of sage-grouse habitat (Table 2-6 Record 12) and voluntary compliance with thresholds for big game (Table 2-4 Record 12) could also result in concentrating surface disturbance from oil and gas development activities.

These management actions could reduce the need for mitigation and help maintain the value of historic properties, settings, and the landscapes surrounding historic properties of cultural and religious significance and sacred areas. This could reduce human activity and/or access and help retain solitude at a greater number of historic properties of cultural and religious significance and sacred areas in Alternative B compared to Alternative A. However, increasing the area managed with an NSO stipulation could concentrate development activities in areas with CSU stipulations or TL stipulations.

Establishing NSO stipulations on 32,100 acres of land in the MPA within 100-year flood plains and within 500 feet of perennial streams, springs, wells, and wetland/riparian areas (Table 2-2 Record 12) would reduce the total area in the MPA available for surface disturbance. Management actions for other resources would restrict the area available for surface occupancy in the MPA by an additional 14,100 acres (leaving 355,900 acres managed with CSU stipulations or TL stipulations). Based on the temporal analysis for Alternative B, it is estimated that up to 12,500 acres of surface disturbance would occur in the area available for surface occupancy. Concentrating development in flat-lying areas could disproportionately impact historic properties since these features are more likely to occur on shallow slopes. However, the management action limiting surface occupancy within 500 feet of water features could lessen the impact to a degree as cultural resources are also typically found near dependable water sources. Overall, impacts on undiscovered historic properties would likely be greater for Alternative B than Alternative A since that alternative would have less development and fewer restrictions on development in steeply sloping areas.

Requiring injection of produced water and encouraging the use of existing pipeline corridors and roads for additional pipelines (Table 2-2 Records 13 and 21) could reduce the extent of surface disturbance associated with oil and gas development, reduce the need for mitigations, and reduce human activity and/or access relative to Alternative A. In addition, requiring operators to develop a Concentrated Development Plan to reduce cumulative effects to resources could result in reducing the extent of surface disturbance (Table 2-17 Record 12). This could indirectly help maintain the value of historic properties, settings, and landscapes surrounding Native America religious sites relative to Alternative A.

Alternatives B, C, and D would increase the areas identified as areas of primary concern for the protection of visual qualities to include areas surrounding communities and the Thornburgh/Battle of Milk Creek viewshed (Table 2-14 Record 3). Although this could indirectly help retain a greater

BLM_0019982

number of historic properties, settings, and the landscapes surrounding historic properties of cultural and religious significance and sacred areas, it could also shift development to other areas, impact other historic properties, and degrade the surrounding landscapes and settings.

Managing 110 acres of federal mineral estate in the Thornburgh/Battle of Milk Creek site with an NSO stipulation (Table 2-12 Record 13) under Alternative B would protect approximately 11 percent of the total site area from surface impacts associated with oil and gas development of federal minerals. While an NSO stipulation precludes surface occupation, it does not preclude development of the mineral resource via directional drilling from outside of the site boundary. The only way to preclude directional drilling from occurring underneath the site would be to close the site to oil and gas leasing; allocation decisions regarding areas open or closed to leasing are outside of the scope of this planning effort (see Section 1.4.4). In addition, the BLM would manage the site as an exclusion area for land use authorizations (Table 2-20 Record 10). However, the exclusion area would only apply to about 25 acres of BLM-managed surface (approximately 2 percent of the total site area) and the BLM would have no influence on other types of activities that may impact the site on private property.

Under Alternative B, the BLM would manage the viewshed surrounding the Thornburgh/Battle of Milk Creek site with a CSU stipulation (Table 2-12 Record 13). The CSU-18 stipulation would minimize impacts to the viewshed by requiring mitigation measures such as relocation of surface activities by more than 660 feet limiting access to existing roads and trails, and limiting surface disturbance to certain seasons of the year. The CSU stipulation may also require modifications of the project design related to visual impacts (e.g., height restrictions and visual resource management techniques including painting or camouflage) as well as mitigation measures designed to reduce noise. Moving locations to be out of view could potentially result in impacts to previously unknown cultural resources. Managing areas as special management areas (Table 2-18 Record 5) could concentrate recreation use, which could indirectly impact historic properties and degrade the settings and solitude at historic properties of cultural and religious significance and sacred areas from surface disturbance in localized areas. Indirectly, special management areas could increase human activity in localized areas, the potential for vandalism of historic properties, and the loss of solitude at historic properties of cultural and religious significance and sacred areas compared to Alternative A. However, monitoring in special management areas could reduce the potential for localized damage to historic properties and settings, if this resulted in changes where recreation activities occur.

Managing areas within a buffer (660 feet for federally listed or 330 feet for BLM sensitive) of habitat for special status plant species (Table 2-10 Records 15 and 16) could reduce surface disturbance and help maintain the value of a greater number of historic properties, settings, and the landscapes surrounding historic properties of cultural and religious significance and sacred areas in this area compared to Alternative A. In addition, restricting surface occupancy within 1/8 to 1/4 mile of identified raptor nests could reduce surface disturbance on 76,800 acres (Table 2-5 Record 11). This could indirectly help maintain the value of existing historic properties and settings, reduce human activity and need for mitigation activities, and retain solitude at historic properties of cultural and religious significance and sacred areas in these areas relative to Alternative A.

In the 53,200 acres that are identified by CPW as Restricted Development Areas, limiting the collective and acute impacts could alter the occurrence of surface disturbance (Table 2-4 Record 13). Avoiding areas of specific vegetation communities, riparian areas, and sensitive wildlife habitats could reduce surface disturbance in localized areas. In addition, requiring the relocation of oil and gas developments negatively affecting riparian or wetland habitat and restoring

BLM_0019983

the primary functioning condition could help reduce localized erosion (Table 2-3 Record 21). This could help maintain the value of historic properties and settings and reduce human activity and/or access within these areas, but it could also increase surface disturbance associated with oil and gas development in other areas relative to Alternative A.

The BLM-administered lands along portions of Black Sulphur Creek would be managed as Colorado River cutthroat trout recovery waters with a CSU stipulation (Table 2-9 Record 20). This could alter the location of oil and gas development and help maintain the value of historic properties and settings in these areas.

Not granting exceptions for oil and gas development in areas with special status wildlife (Table 2-9 Records 15, 28, and 29) and plant species (Table 2-10 Records 15 and 16) would reduce surface disturbance and indirectly help retain a greater number of historic properties settings, and solitude at historic properties of cultural and religious significance and sacred areas in localized areas.

Voluntary compliance with big game thresholds for acute and collective impacts could result in operators clustering development to keep impacts below the thresholds and reducing the extent of roads and pipelines (Table 2-4 Record 12). Consolidating infrastructure and reducing the number and/or length of pipelines, utility corridors, roads, and facilities could reduce the need for mitigation compared to Alternative A and could reduce the potential increase in access. Concentrating oil and gas development could indirectly increase the intensity of disturbance to historic properties, settings, and human activity and/or access in localized areas where oil and gas development could be located relative to Alternative A. This could also decrease solitude at historic properties of cultural and religious significance and sacred areas relative to Alternative A.

If potential non-WSA lands with wilderness characteristics parcels are found to have the identified characteristics after inventory and are managed to protect those characteristics under Alternative B there is a potential to protect historic properties that might be present in the identified parcels. If parcels are found to not have the requisite characteristics after inventory and are dropped from consideration there may still be some level of protection for cultural resources in those parcels due to other resource factors that restrict or prevent development (e.g., slope, ACECs).

Under Alternative B development would be restricted within 1,000 feet of rock art or standing architecture such as cabins, rock structures or standing wickiups (Table 2-12 Record 17). The threat to cultural resources from extremely low frequency vibrations such as earth quakes is well known. However the long term threat to cultural resources from vibrations at low but higher frequencies from development related activities, including vibrations from compressor and construction equipment engines, pose an as yet undocumented and studied threat in the area. The provisions for a 1,000 foot buffer between fragile cultural resources and monitoring of the effects of development provides the BLM with the most protection possible for fragile, sensitive and perhaps some of the most important cultural resources in the field office. This is more protection than is provided in Alternatives A, C and D. Alternative A provides the least amount of protection to sensitive cultural resources.

### Reclamation

Oil and gas operators would be required to build new pads with an adapted footprint configuration (Table 2-17 Record 19). This would reduce soil impacts from runoff and erosion by limiting cut-and-fill areas on the ground surface, the reduction in soil erosion would be greater than under Alternative A, which has no equivalent requirement.

BLM_0019984

*Chapter 4 – Environmental Consequences*

Although Alternative B has twice the number of well pads as Alternative A, impacts to historic properties could be mitigated if interim reclamation occurs more quickly with year-round drilling. With the exception of TL stipulations, development of a well pad is estimated to require a two-year development cycle per well pad, as compared to a three-year development cycle per well pad for Alternative A. These actions could indirectly help maintain the value of historic properties, settings, and the landscape surrounding historic properties of cultural and religious significance and sacred areas in areas adjacent to disturbed areas. Restoring vegetation disturbed by permitted activities to improve ecological conditions could also reduce the potential for erosion and diminish impacts to historic properties. Maintaining acceptable DPCs for all rangeland types and a reclamation standard of 100 percent cover could reduce erosion and help retain historic properties and settings. In addition, requiring reclamation that results in establishing a functioning vegetation community on reclaimed sites could also reduce the potential for erosion. This could indirectly reduce the loss of historic properties, settings, and the landscapes surrounding historic properties of cultural and religious significance and sacred areas in localized areas from erosion relative to Alternative A, where no percent cover is required to meet reclamation requirements.

### 4.6.1.4    Alternative C

#### Impacts from Oil and Gas Development

Increasing the number of well pads in Alternative C to 1,800 and wells to 15,042 could greatly increase the need for mitigation and degrade settings in localized areas compared to Alternative A (550 well pads and 4,603 wells) and Alternative B (1,100 well pads and 9,191 wells). Increasing resource and collector roads to 1,295 miles and pipelines to 925 miles could increase surface disturbance associated with oil and gas development compared to Alternative A (395 miles of roads and 385 miles of pipelines) and Alternative B (790 miles of roads and 565 miles of pipelines; Table 4-3). This could increase the potential for damage to historic properties, diminish settings, degrade the landscapes surrounding historic properties of cultural and religious significance and sacred areas, and increase the need for mitigation efforts relative to Alternatives A and B.

#### Impacts from Management Actions

Alternative C would decrease the acreage managed with NSO stipulations (387,600 acres) compared to Alternative B (757,200 acres) and would provide for exceptions from those stipulations. This could degrade historic properties, settings, landscapes surrounding historic properties of cultural and religious significance and sacred areas due to the potential for increased human activity and/or access compared to Alternative B. Approximately 5,900 acres within Canyon Pintado NHD and the Texas-Missouri-Evacuation Creeks area would be managed with NSO stipulations (Table 4-65).

Under Alternative C development would be restricted within 750 feet of rock art or standing architecture such as cabins, rock structures or standing wickiups (Table 1-12 Record 17). The threat to cultural resources from extremely low frequency vibrations such as earth quakes is well known. However the long term threat to cultural resources from vibrations at low but higher frequencies from development related activities, including vibrations from compressor and construction equipment engines, pose an as yet undocumented and studied threat in the area. The provisions for a 750 foot buffer between fragile cultural resources and monitoring of the effects of development provides the BLM with the option to provide less protections to fragile, sensitive and very important cultural resources than is possible under Alternatives B but more than is provided under Alternatives A and D. Alternative A provides the least amount of protection of sensitive cultural resources.

BLM_0019985

*Chapter 4 – Environmental Consequences*

**Table 4-65. Lease Stipulations in Cultural Resource Areas, Alternative C**

| Area | Open | No Surface Occupancy | Controlled Surface Use | Timing Limitations[1] | Closed |
|------|------|------|------|------|------|
| **Leased** | | | | | |
| Canyon Pintado NHD | 0 | 2,700 | 11,400 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 2,600 | 14,000 | 0 | 1,100 |
| **Unleased** | | | | | |
| Canyon Pintado NHD | 0 | 100 | 1,800 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 500 | 2,300 | 0 | 1,500 |
| **Total** | **0** | **5,900** | **29,500** | **0** | **2,600** |

SOURCE: BLM GIS.
NOTE:
[1] The most restrictive stipulations are shown. Timing limitations are not shown since all of Canyon Pintado NHD and the Texas-Missouri-Evacuation Creek area would be managed by various NSO and CSU stipulations.

The BLM would encourage an adapted footprint configuration to match the topography of the surrounding landscape to reduce reclamation needs (e.g., fewer cut/fill areas) for development (Table 2-17 Record 19). Reducing disturbance from construction such as cut and fill areas could reduce the overall area of disturbance and indirectly help retain historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas. Encouraging well pads to use an adapted footprint configuration to match the topography of the surrounding landscape could result in well pads being located in more level areas where historic properties, settings and historic properties of cultural and religious significance and sacred areas could be more commonly found and could result in more historic properties, settings, and landscapes surrounding historic properties of cultural and religious significance and sacred areas being directly or indirectly impacted in those areas. However, since an adapted footprint is only encouraged and not required there could be more acreage disturbed by development since fewer wells would have a smaller footprint in some areas which could directly or indirectly impact more cultural properties, settings, and historic properties of cultural and religious significance and sacred areas in more level areas.

Impacts from restricting oil and gas development in Alternative C could be similar to Alternative B, except that management actions decrease the areas with NSO stipulations to 387,600 acres (23 percent of the mineral estate compared to 45 percent under Alternative B and 9 percent under Alternative A). This includes 42,500 acres within 50 feet of landslide-prone areas and 34,100 acres of saline soil areas (Table 2-2 Records 15 and 16). This could decrease the need for mitigation activities relative to Alternative A and increase data mitigation relative to Alternative B. This reduces the area where surface disturbance from oil and gas activities could occur relative to Alternative A and increases this area relative to Alternative B, and increases the potential for recreation, wildlife populations, or wild horses to concentrate use. This could decrease the extent of surface disturbance and the potential loss of historic properties compared to Alternative A, but increase the potential loss of historic properties compared to Alternative B.

Requiring new projects to inject produced water rather than discharging it to the surface (but continuing approved discharge volumes at existing development sites) could result in localized erosion (Table 2-2 Record 13). This could help maintain the value of a greater extent of historic properties, settings, and the landscapes surrounding historic properties of cultural and religious

BLM_0019986

## Chapter 4 – Environmental Consequences

significance and sacred areas in localized areas relative to Alternative A, but could increase degradation relative to Alternative B.

Similar to Alternative B the BLM-administered lands along portions of Black Sulphur Creek would be managed as Colorado River cutthroat trout recovery waters with a CSU stipulation (Table 2-9 Record 20). This could alter the location of oil and gas development and help maintain the value of historic properties and settings in these areas.

The management action for natural slopes would create an NSO stipulation on slopes greater than or equal to 50 percent (114,300 acres) which would restrict the area available for surface occupancy (Table 2-2 Record 17). Based on the temporal analysis for Alternative C, it is estimated that up to 20,500 acres of surface disturbance would occur in the area available for surface occupancy. However, in some cases, impacts to historic properties could still be less since unlike Alternative B, surface disturbance could be distributed to slopes between 35 and 50 percent where fewer historic properties are expected. On the other hand, areas within 500 feet of water features would be managed with CSU stipulations rather than NSO stipulations as in Alternative B, possibly creating more impacts to historic properties that are clustered near reliable water sources (Table 2-2 Record 12).

Managing special status plant habitats with an NSO stipulation, but allowing exceptions (Table 2-10 Records 15 and 16), could indirectly help maintain the value of existing historic properties and settings in highly localized areas relative to Alternative A, and could result in highly localized degradation of settings and the landscapes surrounding historic properties of cultural and religious significance and sacred areas relative to Alternative B.

Granting exceptions to surface occupancy for suitable and occupied habitats for special status wildlife and plant species could result in localized surface disturbance from oil and gas development. Allowing exceptions to NSO stipulation areas containing critical or occupied habitat for federally listed fish species (Table 2-9 Record 18), and within 1/4 mile of sensitive raptor species' nests and within 330 feet of abandoned bald eagle nests (Table 2-9 Record 28), could reduce localized surface disturbance relative to Alternative A and increase localized surface disturbance relative to Alternative B. In addition, allowing exceptions in areas managed as NSO stipulation for wildlife habitat or special status plant species could increase localized surface disturbance in these areas and could reduce shifting surface disturbance to other areas relative to Alternative B. This could increase the potential for damage to historic properties, degrade settings, and affect the landscapes surrounding historic properties of cultural and religious significance and sacred areas, and increase the need for mitigation efforts relative to Alternative B.

Reducing areas identified by CPW as Restricted Development Areas to 36,700 acres decreases by 31 percent the area where surface disturbance from oil and gas exploration could be restricted compared to Alternative B (Table 2-4 Record 13). Voluntarily encouraging the use of existing pipeline corridors and roads for additional pipelines could reduce localized erosion (Table 2-2 Record 21). In addition, avoiding surface-disturbing activities in riparian or wetland habitats, and immediately implementing reclamation, could also help to indirectly maintain the value of historic properties, settings, and the landscapes surrounding historic properties of cultural and religious significance and sacred areas in these areas. This could decrease surface disturbance in other areas relative to Alternative A, where these restrictions are not included, and could increase these effects relative to Alternative B, where the area managed with an NSO stipulation or COA is greater.

BLM_0019987

Under Alternative C, a CSU stipulation would be applied to the Thornburgh/Battle of Milk Creek site and viewshed (Table 2-12 Record 13). The CSU-18 stipulation would minimize impacts to the viewshed and site by requiring mitigation measures such as relocation of surface activities by more than 660 feet, limiting access to existing roads and trails, and limiting surface disturbance to certain seasons of the year. The CSU stipulation may also require modifications of the project design related to both visual impacts and noise. Moving locations to be out of view could potentially result in impacts to previously unknown cultural resources.

In contrast to Alternative B, which would manage the Thornburgh/Battle of Milk Creek site as an exclusion area, Alternatives C and D would manage the site as an avoidance area for land use authorizations (Table 2-20 Record 10). In practice, the impacts associated with an avoidance area are likely to be the same as those associated with an exclusion area since BLM surface within the site is limited to 25 acres distributed among four distinct parcels and it is assumed that most land use authorizations could easily avoid BLM surface by locating on private surface within the site.

Voluntary compliance with wildlife thresholds under Alternative C could have the same types of impacts as under Alternative B.

If potential non-WSA lands with wilderness characteristics parcels are found to have the identified characteristics after inventory and are managed to protect those characteristics under Alternative C there is a potential to protect any historic properties that might be present in the identified parcels. However, if increased access into those parcels is allowed under Alternative C, as compared to Alternative B, there is a potential for increased impacts to any historic properties that might be present due to increased human presence and activity in the area that could result in unauthorized collection of artifacts or other disturbing activities. Under Alternative C protection of Historic Properties could be one of the values for which non-WSA lands with wilderness characteristics could be managed.

**Reclamation**

Oil and gas operators would be encouraged, but not required as for Alternative B, to build new pads with an adapted footprint configuration (Table 2-17 Record 19). This would reduce soil impacts from runoff and erosion by limiting cut-and-fill areas on the ground surface, but the reductions would likely be less than for Alternative B. This alternative would also allow more than three times the number of well pads compared to Alternative A. These impacts would greatly increase the likelihood of impacts to historic properties and indirectly diminish the value of the settings and landscapes surrounding historic properties of cultural and religious significance and sacred areas in areas adjacent to disturbed areas. Maintaining acceptable DPCs for all rangeland types and a reclamation standard of 80 percent cover, as defined by the ecological site, could reduce erosion and indirectly help maintain the value of historic properties and settings. Reducing the reclamation standard to 80 percent cover, a 10 percent reduction compared to Alternative B, combined with the increased amount of oil and gas development, could increase the areas where mitigation is required. In addition, requiring reclamation that results in establishing a functioning vegetation community on reclaimed sites could also reduce the potential for erosion. Indirectly, this could reduce the loss of historic properties and maintain settings and the landscapes surrounding historic properties of cultural and religious significance and sacred areas relative to Alternative A and increase the potential relative to Alternative B.

BLM_0019988

*Chapter 4 – Environmental Consequences*

#### 4.6.1.5     Alternative D

**Impacts from Oil and Gas Development**

In Alternative D, increasing the number of well pads to 2,556 and the number of wells to 21,200, could increase the need for mitigation and degrade settings and the landscapes surrounding Native America religious sites in localized areas compared to Alternative A (550 well pads and 4,603 wells), Alternative B (1,100 well pads and 9,191 wells), and Alternative C (1,800 and 15,042 wells). Increasing resource and collector roads to 1,840 miles and 1,300 miles of pipelines could increase surface disturbance associated with oil and gas development compared to Alternative A (395 miles of roads and 285 miles of pipelines), Alternative B (790 miles of roads and 565 miles of pipelines), and Alternative C (1,295 miles and 925 miles of pipelines). This could increase the potential for damage to historic properties, degrade settings and the landscapes surrounding historic properties of cultural and religious significance and sacred areas, and increase the need for mitigation efforts relative to Alternatives A, B, and C.

Under Alternative D development would be restricted within a buffer of 500 feet of rock art or standing architecture such as cabins, rock structures or standing wickiups (table 1-12 Record 17). The threat to cultural resources from extremely low frequency vibrations such as earth quakes is well known. However the long term threat to cultural resources from vibrations at low but higher frequencies from development related activities, including vibrations from compressor and construction equipment engines, pose an as yet undocumented and studied threat in the area. The provisions for a 500 foot buffer between fragile cultural resources and monitoring of the effects of development provides the BLM. Alternative D provides less protection to sensitive cultural resources than Alternatives B and C but more protection than Alternative A. Alternative A provides the least amount of protection to sensitive and fragile cultural resources.

**Impacts from Management Actions**

The level of anticipated development and placement of surface facilities (i.e., areas managed as open with standard lease terms or with TL stipulations) would result in the greatest effects of any alternative on historic properties, settings, and the potential for increased human activity and/or access. Within the Canyon Pintado NHD and Texas-Missouri-Evacuation Creeks areas, approximately 2,500 acres would be managed under NSO stipulations and 32,800 acres managed under CSU stipulations (see Table 4-66). This could increase the loss of historic properties from inadvertent damage or removal, degrade the settings, and affect the landscapes surrounding historic properties of cultural and religious significance and sacred areas relative to Alternatives B and C, but could be similar to Alternative A.

#### Table 4-66. Lease Stipulations in Cultural Resource Areas, Alternative D

| Area | Open | No Surface Occupancy | Controlled Surface Use | Timing Limitations | Closed |
|------|------|----------------------|------------------------|--------------------|--------|
| **Leased** | | | | | |
| Canyon Pintado NHD | 0 | 1,100 | 13,000 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 1,100 | 15,400 | 0 | 1,100 |
| **Unleased** | | | | | |
| Canyon Pintado NHD | 0 | 100 | 1,800 | 0 | 0 |
| Texas-Missouri-Evacuation Creeks Area | 0 | 200 | 2,600 | 0 | 1,500 |
| **Total** | **0** | **2,500** | **32,800** | **0** | **2,600** |

SOURCE: BLM GIS.

BLM_0019989

**Chapter 4 – Environmental Consequences**

Managing fragile soils on slopes greater than 35 percent and Mancos Shale areas with a CSU stipulation would have the same impacts as described under Alternative A (Table 2-2 Record 9). Impacts from management actions restricting surface disturbance could be similar to Alternative C, except management decisions decrease the areas managed as NSO stipulation to 257,000 acres (14 percent of the Planning Area). Landslide-prone areas would have the same management action as Alternative A but saline soil areas would be managed with a CSU stipulation (Table 2-2 Records 15 and 16). This reduces the area where surface disturbance from oil and gas activities could occur relative to Alternative A.

Similar to Alternative A, the BLM-administered lands along portions of Black Sulphur Creek would not be managed as Colorado River cutthroat trout recovery waters with a CSU stipulation (Table 2-9 Record 19). Impacts to historic properties would be the same as Alternative A under Alternative D.

Similar to Alternative C, natural slopes greater than or equal to 50 percent would be managed with an NSO stipulation (35,400 acres in the MPA) (Table 2-2 Record 17). This stipulation would restrict the area available for surface occupancy in the MPA to slopes less than 50 percent. Based on the temporal analysis for Alternative D, it is estimated that up to 29,100 acres of surface disturbance would occur in the area available for surface occupancy. In the MPA, the distribution of development would likely be similar to Alternative C, though more development would still occur in flat-lying areas due to the higher number and density of well pads. A comparison of the development distribution for Alternatives B and D is difficult since the two alternatives have very different stipulation areas and estimated levels of development. However, Alternative B would have fewer acres of disturbance within 500 feet of water features, because Alternative D only establishes CSU stipulations and not NSO stipulations in these areas (Table 2-2 Record 12). Impacts to historic properties clustered near reliable water sources would be highest under Alternative D than Alternative B or C due to higher projected numbers of well pads.

Surface discharge of produced water, which meets state standards, and does not result in the conversion of ephemeral or intermittent streams, could result in localized erosion and indirectly damage historic properties or degrade the setting in localized areas (Table 2-2 Record 13). This could result in a greater extent of localized erosion and loss of historic properties relative to Alternatives A, B, and C.

If potential non-WSA lands with wilderness characteristics parcels are found to have the identified characteristics after inventory and are managed to protect those characteristics under Alternative D there is a potential to protect any historic properties that might be present in the identified parcels. However, if increased access into those parcels is allowed under Alternative D, as compared to Alternatives B and C, there is a potential for increased impacts to any historic properties that might be present due to increased human presence and activity in the area that could result in unauthorized collection of artifacts or other disturbing activities.

Impacts to the Thornburgh/Battle of Milk Creek site and viewshed would be the same under Alternatives C and D (see Section 4.6.1.4).

<u>Reclamation</u>

Implementing the types of reclamation measures under Alternative D would have similar impacts on cultural resources as those under Alternative A. Unlike Alternatives B and C, however, Alternative D does not contain a requirement (Alternative B) or encouragement (Alternative C) for adapted footprint configuration to match the topography of the surrounding landscape and thereby reduce reclamation needs (Table 2-17 Record 19). As a result, Alternative D has a greater likelihood of

BLM_0019990

impacting historic properties and indirectly diminishing the value of the settings and landscapes surrounding historic properties of cultural and religious significance and sacred areas in areas adjacent to disturbed areas.

Maintaining acceptable DPCs for all rangeland types and a reclamation standard of 60 percent cover as defined for the ecological site could indirectly help maintain the value of historic properties and settings by reducing erosion. Reducing the reclamation standard to 70 percent, a 10 percent reduction compared to Alternative C, could increase the localized loss of historic properties and settings relative to Alternatives B and C, but could reduce the localized loss of historic properties and settings relative to Alternative A, where no percent cover requirement exists.

### 4.6.1.6    Irreversible and Irretrievable Commitment of Resources

Inventories completed before surface-disturbing activities generally could help provide for mitigation of irreversible and irretrievable impacts on identified surface historic properties and settings from permitted activities. Short-term data recovery measures could result in the irreversible and irretrievable loss of *in situ* historic properties. The potential for the loss of *in situ* historic properties and settings is proportional to the potential amount of oil and gas development. The potential amount of oil and gas development could be greatest under Alternative D, and least under Alternative A. Alternative C could have less of an irreversible and irretrievable commitment of resources than Alternative D, but more than Alternatives A and B. Alternative B could have less of an irreversible and irretrievable commitment of resources than Alternatives C and D, but more than Alternative A.

### 4.6.1.7    Unavoidable Adverse Impacts

Damage and loss of historic properties or degrading the settings could constitute an unavoidable adverse impact. Unavoidable damage to historic properties from permitted activities could occur, if resources undetected during assessments were identified during ground-disturbing activities. If historic properties are identified during ground disturbance, further disturbance could cease and mitigation could be implemented to minimize data loss. Unavoidable loss of historic properties and settings, due to a lack of information and documentation, erosion, and inadvertent damage or use, could also occur under all alternatives.

### 4.6.1.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

No impacts to historic properties are anticipated from the relationship between short-term uses and long-term productivity.

## 4.6.2    Paleontological Resources

Paleontological resources are nonrenewable and disturbance could irrevocably alter or destroy them. Impacts on paleontological resources occur from natural weathering and erosion, surface- or subsurface-disturbing activities, and theft or vandalism of fossils. In general, impacts on paleontological resources include the physical destruction or damage of geologic formations containing paleontological resources, and the resulting loss of fossilized materials and their geologic context. The value or importance of different fossil groups varies depending on the age and depositional environment of the stratigraphic unit that contains the fossils, their abundance in the record, and their degree of preservation. The potential for impact to scientifically important paleontological resources is greatest in formations with Potential Fossil Yield Classifications (PFYC) of 3, 4, or 5. Class 4 includes the Chinle, Cedar Mountain, Mowry Shale, Browns Park, and Uinta Formations; the Parachute Creek member of the Green River formation; and the Mesaverde

BLM_0019991

and Glen Canyon Groups. Class 5 includes the Morrison and Wasatch Formations. Using the PFYC system, geologic units are classified based on the relative abundance of vertebrate fossils or scientifically-significant invertebrate or plant fossils and their sensitivity to impacts, with a higher class number indicating a higher potential. The PFYC system is described briefly as follows (BLM 2007). More detailed definitions of the PFYC classes are provided in Chapter 3 of this RMPA.

- Class 1 – Very Low;
- Class 2 – Low;
- Class 3 – Moderate or Unknown;
- Class 4 – High; and
- Class 5 – Very High.

Although the location of every scientifically significant paleontological resource in the Planning Area is not known, the analysis considers the different management actions and their potential to directly or indirectly affect paleontological resources. Mitigation measures include avoidance (project relocation or redesign) and use of scientific data recovery methods. Avoidance of paleontological resources is the BLM's preferred mitigation measure for surface-disturbing activities.

The Paleontological Resources Preservation Act (PRPA) requires the BLM to manage and protect paleontological resources using scientific principles and expertise. The BLM paleontological resource management policy is to identify, evaluate, and, where appropriate, protect scientifically important paleontological resources, ensuring that proposed land uses initiated or authorized by the BLM, do not inadvertently damage or destroy these resources (BLM Manual 8270, Paleontological Resource Management). The BLM policy also requires the facilitation of appropriate scientific, educational, and recreational uses of paleontological resources, such as research and interpretation.

This analysis uses quantitative and qualitative indicators and attributes to assess impacts. The following three indicators have been selected to analyze the effects of the alternatives on paleontological resources.

- PFYC 3, 4, and 5 localities predominate in the Planning Area, but the PFYC 4 and 5 localities are the most important;
- Fossils vary in scientific value. "Scientific value" is defined as any attribute, or combination of attributes, that contribute(s) to a better understanding of paleontology, paleoecology, or science in general; and
- The level of damage to paleontological resources by increased oil and gas exploration and development and other resource activities in the Planning Area could be measured by the magnitude of loss of scientific value.

The attributes of the three indicators are:

- Increased access or activity in areas where paleontological resources are present or anticipated; and
- The location and extent of development that results in surface or subsurface disturbance.

BLM_0019992

The analysis is based on the following assumptions:

- Scientifically important vertebrate and invertebrate fossils could continue to be discovered in the Planning Area due to oil and gas exploration and development, and these discoveries are more likely in the PFYC 4 and PFYC 5 areas;

- Impacts to paleontological resources could occur from physical damage or destruction of fossils, from loss of related scientific data, and due to increased access to fossil resources by public or contractor personnel;

- Impacts to paleontological resources could occur from both surface (e.g., well pads, road construction, cut slopes) and subsurface (e.g., drilling) activities;

- Federal actions and unauthorized uses have the potential to cause irreversible disturbance and damage to non-renewable paleontological resources. The BLM would continue to mitigate impacts to these resources from authorized uses through project avoidance, redesign, and, if necessary, data recovery investigations, in accordance with BLM Manual 8270;

- Avoidance is the preferred mitigation of impacts to paleontological resources in the Planning Area. Where avoidance is not feasible, other treatment measures (e.g., documentation and recovery) could be considered;

- If avoidance would be detrimental to other resources and/or management direction, then mitigation of impacts to paleontological resources could be performed in proportion to their scientific value; and

- Identification, evaluation, and mitigation would be conducted in accordance with Federal and state regulations.

Under all alternatives, impacts on paleontological resources are not anticipated as a result of implementing management actions for air quality, wild horse management, forestry and woodland products, and livestock grazing.

### 4.6.2.1    Impacts Common to All Alternatives

#### Impacts from Oil and Gas Development

Managing areas without an NSO stipulation would result in surface and subsurface disturbance. Surface disturbance is associated with construction of well pads, pipelines, utility lines, local and resource roads, and facilities, while subsurface disturbance occurs from drilling wells. The extent of the effects on paleontological resources from surface and subsurface disturbance would depend on the depth of disturbance into bedrock and the potential for increased erosion. Surveys conducted by permitted third-party paleontologists to evaluate areas for paleontological resources could help site oil and gas development to avoid these resources. Requiring monitoring during surface-disturbing activities in PFYC 4 and PFYC 5 areas would allow for mitigation needs to be identified and implemented in areas likely to contain considerable fossils. Mitigation measures include avoidance (i.e., project relocation or redesign) and scientific data recovery methods (e.g., recordation, surface collection, subsurface testing, excavation, and recovery of fossils). These mitigation actions could increase knowledge of area paleontological resources, but could also result in a loss of *in situ* paleontological resources. During surface-disturbing activities in PFYC 3 areas, spot-checking bedrock exposures would help identify mitigation needs in those areas less likely to contain considerable fossils.

BLM_0019993

The construction of roads, pipelines, and other ancillary facilities could indirectly increase the potential for unauthorized collection or vandalism of paleontological resources. Unauthorized collection of paleontological resources or damage could continue if these areas remain accessible after final reclamation is completed. However, the designation process for roads that are developed could reduce these effects by limiting access into areas with paleontological resources.

**Impacts from Management Actions**

Continuing the closure of 83,300 acres (5 percent) of the mineral estate to oil and gas development, in the WSAs and the Harper's Corner withdrawal area, would continue to help maintain the value of paleontological resources. The elimination of oil and gas exploration and development in these areas would reduce inventories and data recovery associated with surface-disturbing developments.

Managing areas as open to oil and gas exploration and development with an NSO stipulation would reduce surface disturbance and would help maintain the value of paleontological resources in localized areas. Managing Canyon Pintado NHD as an avoidance area for ROW would result in shifting the location of surface disturbance to other areas, which would reduce the impacts upon paleontological resources in the NHD. In addition, wildlife and fisheries management actions that restrict surface disturbance to protect sensitive habitats could alter where surface-disturbing activities occur. This would help to maintain the value of paleontological resources and reduce the need for mitigation in these areas; however, it could increase the loss of *in situ* paleontological resources in other areas after activities are shifted.

Soil, water, and vegetation management actions that prevent or minimize soil erosion could protect or decrease degradation of paleontological resources. Reducing erosion would help to maintain the value of paleontological resources, especially fossils of small species, by reducing their loss from the abrasive action of eroding soils. While the erosion of soils could result in the loss of near-surface paleontological resources, the accumulation of sediment in receiving areas could help maintain the value of, but obscure, surface paleontological resources in areas where deposition occurs.

Recreational activities that increase erosion from localized surface disturbance could affect near-surface paleontological resources. These activities could also result in the inadvertent damage or removal of paleontological resources, as dispersed recreation sites usually do not undergo resource assessments or clearances before being established. Paleontological resources could be moved from their original context, damaged, destroyed, vandalized, or stolen. This could result in a localized loss of paleontological resources.

**Reclamation**

Managing 497,900 acres as weed-free zones could improve ecological site conditions and reduce erosion. Implementing interim and final reclamation, as defined in the Surface Reclamation Plan (Appendix D), would reduce erosion over time and would help to maintain the value of paleontological resources. Exceptions to reclamation standards granted by the authorizing officer could increase erosion in localized areas. This could result in a localized loss of paleontological resources if resources were not discovered during surveys conducted before surface-disturbing activities.

BLM_0019994

### 4.6.2.2    Alternative A

#### Impacts from Oil and Gas Development

Managing oil and gas leasing on 1,538,900 acres (86 percent of the total mineral estate) with CSU stipulations, TL stipulations, or standard terms and conditions could result in surface disturbance. In addition, potentially building 395 miles of resource and local roads and 285 miles of pipelines to support development of 550 well pads and 4,603 wells (Table 2-1 Record 13) could increase access to areas containing paleontological resources. Surface discharge of produced water meeting state water quality standards could increase erosion in localized areas, which could indirectly result in localized losses of paleontological resources. Surface disturbance associated with these activities could damage or destroy paleontological resources that were not discovered and mitigated prior to surface disturbance or drilling.

The temporal analysis for energy and minerals provides an indication of potential impacts to paleontological resources in the Green River formation, which has vast oil shale potential in the Planning Area. The analysis conducted for Alternative A shows that approximately 3,500 acres of surface disturbance could occur in oil shale leasing areas that coincide with the Green River formation (Table 4-76). This surface disturbance could damage paleontological resources or require data recovery in the Parachute Creek Member of the formation, which has a high occurrence of significant fossils based on its PFYC 4 classification.

Requiring operators to use existing pipeline corridors and roads for additional utility locations could reduce the extent of new surface disturbance. This could help to maintain the value of the existing paleontological resources and could reduce the need for data recovery efforts.

Meeting Colorado Standards for Public Land Health and Guidelines for soil and water management, maintaining acceptable DPCs, and preserving essential wildlife habitat areas could help limit erosion. Best management practices to control erosion could reduce potential loss or damage to paleontological resources (Appendix B).

#### Impacts from Management Actions

Managing 157,100 acres (9 percent of the mineral estate), including 38,600 acres of landslide-prone areas, with NSO stipulations, could reduce surface disturbance from oil and gas activities in these areas. Managing special status plant habitats with an NSO stipulation could indirectly help retain the value of existing paleontological resources and reduce the need for data recovery in these areas. Areas managed with NSO stipulations could also reduce the need for field survey and data recovery efforts. Managing areas with special emphasis on impacts to visual resources (e.g., Canyon Pintado NHD and Scenic Byways) could alter the location of surface-disturbing activities, which could help retain existing paleontological resources in those landscapes. Total impacts on paleontological resources would be neutral, however, because development would still occur in the areas to which activity had shifted.

Requiring the relocation of permitted land use activities within one-quarter mile of functional raptor nest sites and restricting surface disturbance within one-quarter mile of active and inactive leks could shift the occurrences of surface disturbance. In addition, restricting surface occupancy within one-eighth mile of identified raptor nests could reduce surface disturbance could help maintain the value of paleontological resources in localized areas, including the fossil record of small species. The total impact on paleontological resources would be neutral, however, because development would still occur in the areas to which activity had shifted.

BLM_0019995

**Reclamation**

Management actions to reclaim disturbed sites to original conditions, avoid riparian areas, and require remedial mitigation for authorized surface-disturbing activities could reduce erosion. This could indirectly help maintain the value of paleontological resources still present in these areas. In addition, improving vegetation and ecological conditions through disturbance from permitted activities could also reduce the potential for erosion by creating healthier plant communities. These decisions could collectively help reduce the loss of fossils that occur at or near ground surface.

Avoiding seral or type conversions in vegetation communities of aspen, Douglas fir, and deciduous shrubs could help retain existing vegetation community conditions and reduce erosion. This could indirectly help to maintain the value of existing paleontological resources and, in particular, could help to retain an intact fossil record of small species. Maintaining or improving bank, channel, and flood plain processes associated with critical habitat for candidate or special status, threatened or endangered fishes of the Upper Colorado River Basin could reduce erosion and indirectly help to preserve the value of existing paleontological resources in localized areas near streams.

### 4.6.2.3    Alternative B

**Impacts from Oil and Gas Development**

Impacts from surface disturbance to Alternative B would be similar to Alternative A, except that managing 938,800 acres (55 percent of the Planning Area) with a CSU stipulation or TL stipulation would decrease the area where surface disturbance could occur. Increasing the number of well pads to 1,100 and wells to 9,191 wells (Table 2-1 Record 13) could increase the potential for recreation, wildlife populations, or wild horses to concentrate use and result in highly localized surface disturbance. In turn, this could increase the intensity of surface and subsurface disturbance in localized areas and the potential loss of paleontological resources compared to Alternative A.

The temporal analysis for energy and minerals provides an indication of potential impacts to paleontological resources in the Green River formation, which has vast oil shale potential in the Planning Area. The analysis conducted for Alternative B shows that approximately 7,500 acres of surface disturbance could occur in oil shale leasing areas that coincide with the Green River formation (Table 4-79). This surface disturbance could damage paleontological resources or require data recovery in the Parachute Creek Member of the formation, which has a high occurrence of significant fossils based on its PFYC 4 classification. Impacts would be greater than Alternative A since only 3,500 acres of surface disturbance are expected in oil shale lease areas under that alternative.

Increasing resource and local roads to 790 miles and pipelines to 565 miles in Alternative B would increase the extent of surface disturbance from support infrastructure compared to Alternative A. This could increase the potential for damage to paleontological resources not discovered during inventories and increase the need for data recovery relative to Alternative A.

**Impacts from Management Actions**

Impacts from management actions in Alternative B would be similar to Alternative A, except management decisions increase the areas managed with NSO stipulations to 757,200 acres (45 percent of the mineral estate). This includes a 100-foot buffer for landslide-prone areas and requires that the footprint or configuration of oil and gas development match the topography. These NSO stipulations, combined with deferring leasing on 96,100 acres of sage-grouse habitat (Table 2-6 Record 12) and voluntary compliance with thresholds for big game, could increase the concentration of oil and gas exploration and development activities. Concentrating surface-

BLM_0019996

disturbing activities could indirectly increase the intensity of disturbance of paleontological resources relative to Alternative A. This could result in short-term localized erosion and loss or damage to fossils; however, interim reclamation could reduce the potential loss of paleontological resources and reduce data recovery needs in these areas relative to Alternative A.

Requiring injection of produced water and encouraging the use of existing pipeline corridors and roads for additional pipelines could reduce the need for data recovery relative to Alternative A. In addition, requiring the footprint of well pads to conform to the topography could reduce the need for cut slopes, which could reduce damage or loss of surface paleontological resources. This could help maintain the value of a greater amount of paleontological resources relative to Alternative A.

The BLM-administered lands along portions of Black Sulphur Creek would be designated as Colorado River cutthroat trout recovery waters and managed with a CSU stipulation. By helping to prevent erosion adjacent to Black Sulphur Creek, this CSU stipulation could also help maintain paleontological resources.

Emphasizing visual resource management around communities and the Thornburgh/Battle of Milk Creek viewshed would increase the areas where the location of surface-disturbing activities could be altered compared to Alternative A. Managing natural slopes greater than 35 percent with an NSO stipulation could also change the location of surface-disturbing activities relative to Alternative A and help maintain the value of existing paleontological resources in those areas.

Limiting the road density to 1.5 miles per square mile in higher-value big-game habitat in Alternative B could reduce the potential for increased access. In the 53,200 acres that are identified by CPW as Restricted Development Areas (Table 2-4 Record 13), limiting the collective and acute impacts could alter where surface disturbance occurs. Avoiding areas of specific vegetation communities, riparian areas, and sensitive wildlife habitats could reduce surface disturbance locally. In addition, requiring the relocation of surface-disturbing activities adversely affecting riparian or wetland habitat and restoring the functional condition also could help reduce localized erosion. Collectively, these decisions could help to maintain the value of paleontological resources within these areas, but could also increase surface disturbance-related loss or damage in other areas relative to Alternative A.

Not granting exceptions to surface occupancy for suitable and occupied habitats of special status wildlife and plant species could reduce surface disturbance from oil and gas activities in these areas. This could help to maintain the value of paleontological resources in localized areas. These decisions could indirectly help to maintain the value of existing paleontological resources and reduce the need for data recovery, but could also increase surface disturbance-related loss or damage in other areas relative to Alternative A.

Special management areas could concentrate recreation use and result in localized surface disturbance and the potential for vandalism. This could result in a loss of near-surface paleontological resources in Alternative B compared to Alternative A.

If potential non-WSA lands with wilderness characteristics parcels are found to have the identified characteristics after inventory and are managed to protect those characteristics under Alternative B there is a potential to protect any PFYC 4 or 5 formations, and potential scientifically noteworthy fossils that may be contained within those parcels.

BLM_0019997

<u>Reclamation</u>

Using modernized reclamation techniques could accelerate the reestablishment of vegetation, which could reduce erosion and help to maintain the value of paleontological resources over a greater extent of the mineral estate compared to Alternative A. Maintaining acceptable DPCs for all rangeland types and a reclamation standard of 100 percent cover as defined for the ecological site could reduce surface disturbance and erosion. In addition, requiring reclamation that results in establishing a functioning vegetation community on reclaimed sites could add to the reduction of surface disturbance and further reduce the potential for erosion. This could indirectly reduce the loss of paleontological resources from erosion relative to Alternative A.

### 4.6.2.4    Alternative C

<u>Impacts from Oil and Gas Development</u>

Impacts from surface disturbance to Alternative C would be similar to Alternative B, except that managing 1,308,400 acres (74 percent) with a CSU stipulation or TL stipulation would increase the area where surface disturbance could occur. In addition, increasing the number of well pads to 1,800 and wells to 15,000 could increase the potential for recreation, wildlife populations, or wild horses to concentrate use. This could increase the extent of surface disturbance, loss of paleontological resources, and need for data recovery efforts compared to Alternatives A and B.

The temporal analysis conducted for Alternative C shows that approximately 12,000 acres of surface disturbance could occur in oil shale leasing areas that coincide with the Green River Formation (Table 4-82). This surface disturbance could damage paleontological resources or require data recovery in the Parachute Creek Member of the formation, which has a high occurrence of significant fossils based on its PFYC 4 classification. Impacts to Alternative C would be greater than Alternatives A and B since only 3,500 acres and 7,500 acres of surface disturbance, respectively, are expected in oil shale lease areas under those alternatives.

Increasing resource and local roads to 1,295 miles and pipelines to 925 miles would increase the extent of surface disturbance from support infrastructure compared to Alternatives A and B. This could increase the potential for damage to paleontological resources not discovered during inventories and increase the need for data recovery relative to Alternatives A and B.

<u>Impacts from Management Actions</u>

Impacts from management actions to Alternative C would be similar to Alternative B, except management decisions decrease the areas managed with NSO stipulations to 387,600 acres (23 percent of the mineral estate), including a 50-foot buffer for landslide-prone areas. This reduces the area where surface disturbance from oil and gas activities could occur relative to Alternative A, but increases the area relative to Alternative B. Overall, the need for paleontological data recovery would still be dependent on the amount of oil and gas development allowed under each alternative, and would thus be higher under Alternative C due to the higher number of well pads compared to Alternatives A and B.

Requiring new projects to inject produced water but continuing approved discharge volumes at existing development sites could result in localized erosion. This could help maintain the value of more paleontological resources by reducing localized erosion relative to Alternative A, but could increase localized erosion relative to Alternative B.

Granting exceptions to surface occupancy for special status wildlife and plant species in suitable and occupied habitats could result in surface disturbance from oil and gas activities in these areas.

BLM_0019998

**Chapter 4 – Environmental Consequences**

Allowing exceptions to NSO stipulation areas within approximately 330 feet of abandoned bald eagle nests would reduce localized surface disturbance relative to Alternative A, but would also increase the areas where surface disturbance could occur relative to Alternative B. Collectively, these decisions could help maintain the value of more paleontological resources and reduce the localized loss of paleontological resources relative to Alternative A, but could decrease these effects relative to Alternative B.

Reducing areas identified by CPW as Restricted Development Areas to 36,700 acres (Table 2-4 Record 13) decreases the areas in which surface disturbance could be restricted compared to Alternative B. In addition, avoiding surface-disturbing activities in riparian or wetland habitats and immediately implementing reclamation could help to reduce localized erosion and help maintain the value of paleontological resources within these areas. However, surface disturbance could increase in adjacent areas outside the restricted zone.

If potential non-WSA lands with wilderness characteristics parcels are found to have the identified characteristics after inventory and are managed to protect those characteristics under Alternative C there is a potential to protect any PFYC 4 or 5 formations, and potential scientifically noteworthy fossils that may be contained within those parcels. However since some existing road maintenance and new construction could be allowed under Alternative C there is an increased potential to impact PFYC 4 or 5 formations and scientifically noteworthy fossil compared to Alternative B.

### Reclamation

Maintaining acceptable DPCs for all rangeland types and a reclamation standard of 80 percent cover as defined for the ecological site could reduce the potential for erosion relative to Alternative A, but it could increase the potential for erosion relative to Alternative B. In addition, requiring reclamation that results in establishing a functioning vegetation community on reclaimed sites could further aid in reducing the potential for erosion. This could indirectly reduce the loss of paleontological resources from erosion relative to Alternative A, but could result in highly localized loss of near-surface paleontological resources relative to Alternative B.

### 4.6.2.5    Alternative D

#### Impacts from Oil and Gas Development

Impacts from surface disturbance to Alternative D would be similar to Alternative C, except that managing 1,438,900 acres (85 percent) would be managed as open or with a CSU stipulation or TL stipulation; thus increasing the extent of where surface disturbance could occur. In addition, increasing the number of well pads to 2,556 and well pads to 21,200 could increase the potential for recreation, wildlife populations, or wild horses to concentrate use. This could increase the extent of erosion and the potential loss of paleontological resources compared to Alternatives A, B, and C.

The temporal analysis conducted for Alternative D shows that up to 16,600 acres of surface disturbance could occur in oil shale leasing areas that coincide with the Green River formation (Table 4-85). This surface disturbance could damage paleontological resources or require data recovery in the Parachute Creek Member of the formation, which has a high occurrence of significant fossils based on its PFYC 4 classification. Impacts would be greater than Alternatives A, B, and C since only 3,500 acres, 7,500 acres, and 12,000 acres of surface disturbance, respectively, are expected in oil shale lease areas under those alternatives.

Increasing resource and local roads to 1,800 miles and pipelines to 1,300 miles could increase the extent of surface disturbance. This could increase the potential for damage to paleontological

BLM_0019999

resources not discovered during inventories and the need for data recovery relative to Alternatives A, B, and C.

Surface discharge of produced water meeting state standards that does not result in the conversion of ephemeral or intermittent streams could result in localized erosion. This could increase the potential for damage to paleontological resources not discovered during inventories and increase data recovery needs relative to Alternatives A, B, and C.

**Impacts from Management Actions**

Impacts from management actions in Alternative D could be similar to Alternative C, except management decisions decrease the areas managed with NSO stipulations to 257,000 acres (15 percent of the Planning Area). This reduces the area where surface disturbance from oil and gas activities could occur relative to Alternative A, but increases the area relative to Alternatives B and C. Overall, the need for paleontological data recovery would still be dependent on the amount of oil and gas development allowed under each alternative, and would thus be highest under Alternative D due to the higher number of well pads compared to the other alternatives.

Managing natural slopes greater than or equal to 50 percent with an NSO stipulation would reduce the area where surface disturbance could be restricted relative to Alternative B. This could allow for more development in sloping areas with grades less than 50 percent, potentially resulting in greater erosion and damage to paleontological resources, or increasing the need for data recovery relative to the other alternatives.

If potential non-WSA lands with wilderness characteristics parcels are found to have the identified characteristics after inventory and are managed to protect those characteristics under Alternative D there is a potential to protect any PFYC 4 or 5 formations, and potential scientifically noteworthy fossils that may be contained within those parcels. However, since some existing road maintenance and new construction could be allowed under Alternative D there is an increased potential to impact PFYC 4 or 5 formations and scientifically noteworthy fossils compared to Alternatives B and C. In addition, due to the greater potential for new ROW construction under Alternative D compared to Alternatives B and C there would be a greater potential to impact PFYC 4 or 5 formations and potential scientifically noteworthy fossils under Alternative D.

**Reclamation**

Maintaining acceptable DPCs for all rangeland types and a reclamation standard of 60 percent cover as defined by the ecological site could reduce erosion. This could indirectly reduce the loss of paleontological resources from erosion relative to Alternative A, and could result in highly localized increases in erosion and lost paleontological resources relative to Alternatives B and C.

### 4.6.2.6    Irreversible and Irretrievable Commitment of Resources

Inventories completed before surface-disturbing activities would generally provide for mitigation of irreversible and irretrievable impacts on identified surface paleontological resources from permitted activities. However, subsurface paleontological resources could be irreversibly and irretrievably damaged and lost from activities in bedrock. Short-term data recovery (collection) measures could limit the loss of scientific values associated with the physical resources. Data recovery measures could result in the irreversible and irretrievable loss of *in situ* paleontological resources. The potential for the loss of *in situ* paleontological resources is greatest under Alternative D due to the amount of potential oil and gas development that could occur. The potential for the loss is the least under Alternative A, as this alternative has the lowest amount of potential oil and gas development.

BLM_0020000

### 4.6.2.7   Unavoidable Adverse Impacts

Unavoidable damage to paleontological resources from permitted activities could occur if resources remain undetected during and after ground-disturbing activities. If paleontological resources are identified during ground disturbance, further disturbance would cease and mitigation would be implemented to minimize data loss. Unavoidable loss of paleontological resources due to non-recognition, lack of information and documentation, erosion, and inadvertent damage or use could also occur. The potential for the loss of paleontological resources is greatest under Alternative D due to the amount of potential oil and gas development that could occur. The potential for the loss is the least under Alternative A, as this alternative has the lowest amount of potential oil and gas development.

### 4.6.2.8   Relationship Between Local Short-Term Uses and Long-Term Productivity

No impacts are anticipated to paleontological resources from the relationship between short-term uses and long-term productivity.

## 4.6.3   Visual Resources

This analysis describes how each of the four alternatives would affect the appearance of landscapes and visual resources in the Planning Area. Visual resources include the visible physical features on the landscape (e.g., land, water, vegetation, animals, structures, and other features) as well as the inherent scenic value of the BLM-administered public lands in the Planning Area. The Visual Resource Management (VRM) System helps the BLM identify scenic values, minimize visual impacts, and provides an objective process for looking at landscapes and any associated impacts.

A number of indicators, attributes, and assumptions were used for the analysis. The primary indicators of visual resources in the Planning Area are the VRM management classes identified in the 1997 White River RMP. Specific attributes of this indicator include:

- Landforms;
- Vegetation;
- Water, color;
- Adjacent scenery;
- Scarcity;
- Cultural modifications;
- Types of users;
- Amount of use;
- Public interest; and
- Distance.

The impact analysis is based on the following assumptions:

- The public would continue to value landscape appearance as a resource to be managed in the Planning Area;
- The machinery and infrastructure associated with oil and gas extraction operations would remain relatively unchanged over the life of the plan;

BLM_0020001

- Recreational use would continue to increase over the life of the plan, increasing the value of unmodified landscapes; and

- Anticipated increases in well pads under each alternative would be distributed proportionately between three areas of leasable mineral designations: (1) open with standard terms and conditions, (2) CSU stipulation areas, and (3) TL stipulation areas.

Impacts to visual resources are described in terms of magnitude and duration of man-made landscape contrast. Magnitude in this case refers to the amount of contrast visible on the landscape to the casual observer and is ranked as follows:

- None – Element is not visible or perceived;

- Weak – Element is visible but does not attract attention;

- Moderate – Element contrast begins to attract attention and begins to dominate the characteristic landscape; and

- Strong – Element contrast demands attention, will not be overlooked, and is dominant in the landscape.

Duration of impacts refers to the amount of time that landscape contrasts would be visible to the casual observer. Short-term landscape contrasts are those that would be visible for up to five years after initial appearance. Long-term landscape contrasts would continue to be visible beyond five years after initial appearance.

The estimated area of surface disturbance within the MPA during the 20-year Planning Period was determined utilizing a temporal analysis methodology for both Soils and Vegetation (see Appendix E for a detailed description). These analyses take into account projected levels of development, leasing stipulations, and management actions for each alternative. Specifically, temporal analyses for areas of fragile soils on slopes greater than 35 percent and saline soils (primarily because these soils are susceptible to erosion and difficult to reclaim once disturbed), and areas vegetated with pinyon/juniper communities (where contrasts from roads, ROWs, and well pad construction would be visually apparent and long-lasting) were used as indicators of impacts to visual resources. Road and ROW construction within pinyon/juniper communities would result in strong visible long-term contrasts in line, texture, color, and to a lesser extent, landform. Also, because fragile and saline soils are susceptible to erosion and difficult to reclaim once disturbed, the long-term lack of stabilizing vegetation on these soils would extend periods of visual disturbance in road and ROW construction areas.

### 4.6.3.1    Impacts Common to All Alternatives

<u>Impacts from Oil and Gas Development</u>

Under all alternatives where fragile and saline soil areas are not covered by an NSO stipulation, they are still covered by a CSU stipulation, and would be avoided when possible or would require engineering and/or reclamation designs to reduce impacts (Table 2-2 Record 13).

Stipulations or COAs identified as appropriate through environmental analysis for the protection of visual qualities would be applied to land use authorizations, permits, and leases, to mitigate impacts on visual resources in all VRM classes (Table 2-14 Record 3). Areas of primary concern (i.e., sensitive landscapes) include, but are not limited to:

- VRM Class I and II areas;

BLM_0020002

- Canyon Pintado NHD;
- National and State Scenic Byways;
- Areas surrounding communities; and
- Thornburgh/Battle of Milk Creek viewshed.

Designations that close mineral estates to mineral lease would indirectly limit the types of landscape contrasts that could occur on 83,300 acres of the Planning Area including WSAs and the NPS Harpers Corner Withdrawal Area (Table 2-17 Record 7). Mineral lease closures would exclude the direct landscape contrasts associated with oil, gas, and coal facility construction, operation and maintenance.

**Impacts from Management Actions**

Small diameter ($PM_{2.5}$) emissions from natural gas production wells could result in atmospheric haze that limits visibility. The magnitude of this impact would be variable and partially dependent on weather. Haze from emissions would tend to obscure vistas more during the summer when high pressure dominates than during the winter. The effects of haze on visibility could be moderate when weather patterns result in stagnant air columns. Emissions would be regulated jointly by the CDPHE and the EPA.

Fugitive dust would result in short-term, localized, and weak color contrasts where plumes become visible in the atmosphere, such as behind vehicles traveling on unpaved roads. Short-term color contrasts along roadsides where an accumulation of fugitive dust coats roadside vegetation could reduce hues of greens, yellows, and reds with a corresponding increase in browns and grays. Seasonal precipitation could diminish the amount of dust on roadside vegetation. Watering and other control methods would limit the appearance of dust to some extent but color contrasts in the atmosphere and along roadside vegetation would occasionally be visible.

If the BLM denies proposals on areas proposed for oil and gas development activities that conflict with objectives for plant community and rare plant populations, the appearance of oil and gas operations and equipment would be limited

Maintaining weed-free zones would indirectly limit the potential for exotic vegetation to cause landscape contrasts on approximately 497,900 acres (Table 2-3 Record 22).

Enhanced visibility of power lines would result in greater landscape contrasts where these features are installed. Magnitude of impact would depend on the method of installation. Conductor separation would result in direct, weak, and localized contrast in form. Physical barriers and perching deterrents at oil and gas well pads could increase the visibility of structures resulting in weak to moderate localized contrast in form.

Stipulations that limit road densities in sensitive habitat areas would limit the potential for road construction to cause form and motion contrasts and would also limit the potential for built roads to cause line contrasts and increase emissions of fugitive dust.

Off-site compensation for habitat loss could indirectly reduce landscape contrasts in areas yet to be determined if mitigation involved rehabilitation/revegetation of disturbed areas (Table 2-9 Record 15).

BLM_0020003

Acquisition of water rights to meet or exceed habitat requirements for cold water fisheries could maintain or improve scenic quality along drainages if the flow of high quality surface water is increased.

Right-of-way authorization and utility corridors would increase the appearance of linear structures such as suspended transmission lines, roads, and underground pipelines on the landscape, with the potential to reduce naturalness and weak to moderate landscape contrasts.

Establishing ROW exclusion areas and limiting motor vehicle travel to existing roads and trails in known and potential habitat for special status plants would limit the appearance of structures and linear features in special status plant areas, promoting retention of landscape appearance (Table 2-10 Record 9).

Establishing an avoidance area at the Canyon Pintado NHD and the Texas-Missouri Evacuation Creek areas would limit the potential for linear features to increase on those landscapes (Table 2-12 Records 4 and 8).

Limiting motorized vehicle use within ACECs would retain naturalness on 97,500 acres by limiting the appearance of vehicles and their associated dust plumes (Table 2-19 Record 5).

Limiting motorized vehicle use associated with oil and gas development to existing roads until a Travel Management Plan is completed would indirectly retain visual resources by preventing surface disturbance associated with cross-country motorized vehicle use (Table 2-19 Record 7).

**Reclamation**

Rangeland improvements could increase the appearance of structures such as fences, water tanks, corrals, and cattle guards on the landscape in localized areas. Rehabilitation of disturbed areas concurrent with exploration would limit appearance of surface disturbance from mineral operations. Contouring would return landscape forms to their condition before commencement of mineral operations.

Certain rangeland improvements would indirectly benefit visual resources by preventing the appearance of rangeland degradation such as excessive erosion or weed infestations that could otherwise appear as color, line, and texture contrasts. New and existing rangeland improvements such as vegetation treatments, stock ponds, fences, troughs, corrals, and other structures could directly increase form, line, and texture contrasts in localized portions of the Planning Area to the extent they are visible. Vegetation treatments would result in long-term contrasts in color, texture, and line.

Wildland fire management would continue to limit the appearance of blackened landscapes. Localized areas of line, color, and texture contrasts would appear where fire control lines are constructed. The duration of these contrasts would depend on the vegetation community's propensity to recover from such disturbances but rehabilitation of burned areas would begin to diminish these contrasts over the short-term.

### 4.6.3.2    Alternative A

**Impacts from Oil and Gas Development**

Constructing oil and gas facilities in areas managed as open with standard terms and conditions would indirectly promote the types of visual landscape contrasts associated with that industry in the

BLM_0020004

**Chapter 4 – Environmental Consequences**

Planning Area. The industrial machinery necessary for clearing vegetation, grading landforms, and drilling wells during the construction and maintenance phases of leasable mineral operations would result in direct short-term contrasts of an episodic and transient nature. Movement and activity of construction and drilling machinery would draw the observer's attention to the form and color contrasts. Construction equipment and activities would promote the appearance of traffic and dust resulting in short-term weak landscape contrasts. The actions of well pad and road construction would result in long-term contrasts in line, texture, color and to a lesser extent landform. Form and color contrasts would diminish somewhat as areas transition from construction to the operational phase, largely due to the absence of large equipment movement, and activity.

Landscape contrast in 456,700 acres of mineral estate designated open with standard terms and conditions (Table 2-17 Record 13) would be strong and long-term during operational/production phases because leased areas would harbor structures and equipment that would create contrasts in form, texture, and possibly color. Equipment likely to appear in these areas over the long term would depend on the type of leasable mineral operation but could include tanks, compressor stations, valves, pipes, vents, and enclosed control rooms. Well pads and other areas cleared of vegetation could result in localized and moderate contrasts in line, color, and texture over the long term. Roads, pipeline corridors, and other linear areas cleared of vegetation would result in strong contrasts in line, color, texture and landform leaving a visual "spider web" effect of surface disturbance over the long-term. Landscape contrasts from construction, operation, and maintenance of leasable mineral activities would be less likely to directly affect the appearance of timber areas than grasslands and shrubland areas due to COAs protecting critical habitat (Table 2-15 Record 9).

Evaporation ponds tend to draw the eye of the casual observer in this landscape. Evaporation ponds near oil and gas well pads (Table 2-2 Record 22) could increase landscape contrasts in different ways depending on the relationship of water and vegetation surrounding the water body. Surface disturbance would be visible when water levels drop below the evaporation pond's capacity and vegetation does not mask contrasts in color and texture. Color contrasts could also be visible at evaporation ponds where salts and minerals accumulate on the substrate and ponds are empty.

Production facilities could be illuminated during the night resulting in diffuse nighttime color contrasts over the long-term and minor reduction in night sky visibility and naturalness. The magnitude of these contrasts would depend on several factors including time of day, season, density, and extent of leasable mineral production facilities. Ambient light would reduce visibility of the night sky in the vicinity of oil and gas production facilities and wells (and associated 550 well-pads) if lights are installed. These effects could be minimized with installation of directional lighting, shrouds, and/ or lights with wavelengths in the blue, red, or yellow spectrums rather than white.

Designations that establish NSO stipulations on 157,100 acres of mineral estate in the Planning Area would indirectly prevent the types of direct landscape contrasts that result from construction and operation of mineral oil and gas leasing operations (Table 2-17 Record 18). Observers in NSO-designated stipulation areas could experience indirect visual contrasts attributable to leasable mineral operations related to emissions but these would likely be weak and temporary. The potential for leasable mineral operations, including oil and gas wells, associated equipment, surface disturbance, and vehicles, to appear on the landscape would remain low in the BLM-administered mineral estate designated as NSO stipulation.

Under Alternative A, where fragile and saline soil areas are not covered by an NSO stipulation, they are still covered by a CSU stipulation, and would be avoided when possible or would require engineering and/or reclamation designs to reduce impacts (Table 2-2 Record 9).

BLM_0020005

**Chapter 4 – Environmental Consequences**

The visual contrasts that could result in areas with TL stipulations (1,006,500 acres) would be similar to those described for areas designated as open with standard terms and conditions, except that construction- and completion-related contrasts (e.g., vehicles, drill rigs, traffic, motion) would not be generated by oil and gas lease operations in elk production areas between May 15 and June 30; in big game severe winter range from December 1 through April 30; in deer and elk summer range after direct and indirect impacts reach 10 percent of that available in the GMU; nor in pronghorn production areas from May 1 through June 30 (Table 2-4 Record 12). Visual contrasts from operation of leasable mineral facilities in areas with TL stipulations would be similar to those described for areas open with standard lease terms and conditions.

Under Alternative A, oil and gas development could occur on 124,000 acres (20 percent) of fragile and saline soils in the MPA (Table 4-35 Lines 1, 2). Results of the soil temporal analysis performed for Alternative A are shown in Table 4-35. Under Alternative A, oil and gas development could occur on 234,800 acres (39 percent) of pinyon/juniper communities in the MPA (Table 4-35 Lines 1 and 2). Surface disturbance for pinyon/juniper communities within the MPA are estimated at 2,500 acres and presented in Table 4-47 Line 7. There are, however, areas of overlap between fragile and saline soils and pinyon/juniper communities. Surface disturbance in fragile or saline soils and pinyon/juniper communities would result in changes in contrast, color and texture, and would be long lasting. Approximate 395 miles of roads would be constructed under Alternative A. In areas where these roads traverse the fragile and saline soils, and/or the pinyon/juniper communities, road construction would present strong visual contrasts and be readily apparent and long lasting.

<u>Impacts from Management Actions</u>

Designations that permit leasable mineral operations with CSU stipulation in 587,500 acres of mineral estate in the Planning Area would indirectly promote landscape contrasts similar to those described for areas designated as open with standard terms and conditions. However, contrasts in CSU stipulation areas could vary by location and type of contrasts depending on the types of stipulations imposed.

Stipulations that require an approved engineered construction/reclamation plan could prevent indirect visual contrasts associated with accelerated soil erosion and restoration potential on 382,700 acres of fragile soils on slopes greater than 35 percent and saline soils (Table 2-2 Record 9). Construction- and operation-related visual contrasts would be less likely near sensitive resources such as special status species plant habitats, aspen, serviceberry, and chokecherry vegetation types, black-footed ferret habitat areas, priority riparian areas, known raptor nest areas, and the Canyon Pintado NHD (Table 2-3 Record 11, Table 2-12 Record 10). Special reclamation techniques would accelerate reestablishment of vegetation resulting in contrasts of shorter duration relative to areas designated open with standard terms and conditions.

Continuing to limit motorized vehicle travel to existing roads until a Travel Management Plan is completed would indirectly contribute to retaining the integrity of visual resources by preventing surface disturbance associated with cross-country motorized vehicle use (Table 2-19 Record 7). The potential for repeated cross-country motorized vehicle travel, resulting in the appearance of newly created travel routes on the landscape would be limited by seasonal designations that restrict use to only existing roads and trails.

There would be a high potential for buried linear facilities to cause line and form contrasts within the Designated Energy Corridors. Corridors would promote an indirect retention of landscape appearance in other areas by discouraging linear structures and facilities elsewhere.

BLM_0020006

**Reclamation**

Topsoil stockpile areas in Alternative A would result in weak to moderate localized form, texture, and color contrasts which do not repeat surrounding landscape elements (Table 2-2 Record 10). Physical erosion prevention tools such as geotextile fabrics, straw bales, or coir rolls could result in weak and localized color and texture contrasts over the short term. Trenching below topsoil stockpile areas on steep slopes to prevent erosion could result in weak to moderate contrasts in landform and line (Table 2-2 Record 10).

Facility removal would eliminate the direct visual contrasts associated with well pad structures and equipment over the long term. A pulse of activity and equipment necessary to complete the removal would result in temporary strong but localized visual contrasts. After the removal phase, visual contrast would be limited to exposed surface disturbance, landform alterations, and activities associated with contouring, seeding, and planting (Appendix D). Reclamation of resource roads through the use of physical barriers could result in localized visual contrasts of variable magnitude depending on the technique employed. Using fences to close resource roads would result in weak and localized visual contrasts. Distributing rocks and woody debris in a manner that deters vehicle use would be preferable to fencing reclaimed access roads to minimize visual contrast.

Contouring would diminish operational landform contrasts, returning landforms to their original condition after construction of well pads, roads, and ponds. The machinery and movement of soil required would result in short-term localized contrasts in color, line, form, and texture. Establishing vegetation promptly on disturbed and contoured areas would diminish color and texture contrasts over the long-term.

### 4.6.3.3    Alternative B

**Impacts from Oil and Gas Development**

Managing 313,800 acres designated as CSU stipulation in Alternative B would result in landscape contrasts being similar to, but more concentrated than, those described for Alternative A. Incentives and plans to concentrate oil and gas development would increase construction, operation, and reclamation of oil and gas lease facilities in the MPA and other predicted lease areas. Construction would include the appearance of industrial machinery, traffic, dust, surface disturbance, and light. Operation would include the appearance of tanks, compressor stations, valves, pipes, vents, light, and control rooms. Construction and operation phases would occur simultaneously in concentration areas with strong form, line, color, and texture contrasts. The potential for low and moderate levels of landscape contrasts to disperse across the landscape of the Planning Area would be reduced relative to Alternative A, if mineral operators choose to stay below critical habitat thresholds by concentrating development and sharing facilities. However, leasable mineral operations would alter the character of the MPA landscape over the long-term from that of an undeveloped rangeland to more of an industrial area.

Landform alterations for well pads could be less noticeable under this alternative compared to Alternative A since well pad footprint configuration would match the topography of the surrounding landscape to a greater extent and evaporation ponds and pits would not be permitted (Table 2-17 Record 19). However landform alterations for access road and other linear disturbances (i.e., pipelines) could be more noticeable under this alternative compared to Alternative A since there would be more than twice as many permitted well pads requiring new access and pipeline facilities, except in those instances where existing corridors and roadways can be utilized (Table 2-17 Records 20-21; Table 2-20 Records 8-9).

BLM_0020007

Localized contrasts from topsoil stockpile areas would be similar to but potentially more extensive than those described under Alternative A because well pad construction areas would increase from 550 well pads to 1,100 well pads under Alternative B. The overall landscape contrasts from topsoil stockpile areas would be weak over the long-term and the increase would be localized. Surface treatments offer an opportunity to disguise topsoil stockpile areas but could increase color and texture contrasts if treatments do not match the color and texture of the surrounding landscape (Table 2-2 Record 10).

Other stipulations and COAs could modify the types of landscape contrasts at the 1,100 well pad facilities in Alternative B compared to Alternative A. Other COAs include a maximum of four pads per section to be allowed in areas identified in the 1986 Oil Shale Agreement (approximately 86,000 acres) (Table 2-17 Record 21). Surface water would not cause landscape contrasts but water piping facilities could increase form contrasts on a per well pad basis relative to Alternative A if the water piping facilities are not concealed below ground. Burying water piping facilities would conceal the water pipelines (Table 2-20 Record 9) however the surface caused from burying the linear facilities would be strong and long-term.

The effects of TL stipulations on visual resources under Alternative B would be similar to those described under Alternative A but would occur on over 1,696,000 acres of mineral estate (Table 2-17 Record 18) – an increase in acreage relative to Alternative A. The increase in acreage for Alternative B would increase the area where construction and maintenance related contrasts would cease due to critical habitat considerations. Incentives and plans to concentrate oil and gas development would increase construction, operation, and reclamation of oil and gas lease facilities in the MPA and other predicted lease areas which could periodically eliminate construction and maintenance related contrasts if mineral operators choose to stay below critical habitat thresholds by concentrating development and sharing facilities. Visual contrasts from construction and completion of leasable mineral operations in big game habitat areas would be limited to between 5 and 10 percent of each critical habitat type within the GMU (Table 2-4 Record 12). Structures and facilities would provide visible operational contrasts regardless of season though there would be no construction or maintenance activity during critical habitat periods.

The effects of NSO stipulation designations on visual resources would be similar to those described under Alternative A but would occur over more of the Planning Area because 757,200 acres of mineral estate would be designated NSO stipulation (Table 2-17 Record 18), an increase relative to Alternative A.

Light emissions from leasable mineral facility construction and operation would be visible intermittently in the Planning Area resulting in weak and temporary contrasts in color. The effects of ambient light would be limited to the vicinity of mineral lease operations. Diffuse light would be visible at night in foreground and middle ground views near leasable oil and gas exploration and development areas. Diffuse light could be noticeable in background views of up to 10 miles from areas of concentrated development, such as the MPA. In contrast to Alternative A, new evaporation ponds and surface water discharge in Alternative B would not appear on the landscape and these features would diminish across the Planning Area as operators begin to utilize other methods for disposal of wastewater (Table 2-2 Record 22).

Based on the analysis results of the soil temporal analysis performed for Alternative B, (Table 4-36 Line 7) fragile soils (on slopes greater than 35 percent) and saline soils would not be subject to surface disturbance from oil and gas development.

BLM_0020008

Under Alternative B, oil and gas development could occur on 239,800 acres (40 percent) of pinyon/juniper communities in the MPA (Table 4-48 Lines 1 and 2). Surface disturbance for pinyon/juniper communities within the MPA are estimated at 5,300 acres and presented in Table 4-48 Line 7. Although there would be no surface disturbance on fragile or saline soils, surface disturbance within pinyon/juniper communities would be more than double under Alternative B from Alternative A (5,300 acres vs. 2,500 acres).

An approximate 790 miles of roads would be constructed under Alternative B (compared to 395 miles of roads under Alternative A). In areas where these roads traverse the 5,300 acres of pinyon/juniper communities, road construction would increase visual contrasts and be strong and long lasting. Based on temporal analysis for impacts to pinyon/juniper communities within the MPA, visual impacts from road and ROW construction would be greater under Alternative B when compared to Alternative A.

Alternative B would use the threshold concept to manage new oil and gas development (Table 2-4 Record 12). In each GMU, each operator's voluntary compliance could keep disturbance and disruptive activities below a certain threshold to remain exempt from TL stipulations. Compliance with the threshold concept would lead to more shared oil and gas facilities. Under this scenario, the associated visual impacts associated with oil and gas development would be confined to a smaller overall area as compared to Alternative A.

**Impacts from Management Actions**

Fugitive dust emissions from leasable mineral facility construction and operation would occasionally become visible resulting in weak and temporary color contrasts along roads. The effect of fugitive dust on the color of the atmosphere and of roadside vegetation would be comparable to that described under Alternative A although the extent of fugitive dust would be greater for Alternative B due to an increase in the number of well pads and roads. Although there would be more traffic and surface disturbance compared to Alternative A, dust suppression actions would increase efficiency and limit the contrasts. Dust emissions could occur throughout the Planning Area due to traffic but are more likely to occur in CSU stipulation or TL stipulation areas rather than areas with NSO stipulations.

Industrial motor vehicle traffic from operational well pads to consolidated dehydration, storage, and loading facilities would increase and remain higher than that proposed under Alternative A over the long-term. Vehicle deterrents, such as gates, that preclude public motorized access to grantee/lessee ROW areas could increase form, line, color, and texture contrasts in localized areas over the long-term. Deterrents constructed of materials native to the region, colored appropriately, arranged properly, and set back a distance from roads would minimize landscape contrasts.

As with Alternative A, there would be a high potential for utility lines such as electrical transmission lines and pipelines needed for new well pad expansion and development which would cause line and form contrasts within the Designated Energy Corridors.

**Reclamation**

Reclamation phases would return the landscape's natural character incrementally over the long-term. Alternative B would alter the MPA landscape more than Alternative A by doubling the number of wells in that area.

Removal of mining equipment and structures from the landscape would return some naturalness to the landscape for the same reasons discussed under Alternative A. Reclamation could begin to

diminish landscape contrasts sooner than under Alternative A if operators voluntarily apply the most current reclamation standards and practices to existing well pads, roads, and pipelines in annual increments.

Establishing vegetation on disturbed and contoured areas would begin to diminish the appearance of surface disturbance for the same reasons discussed under Alternative A, although Alternative B would result in more overall surface disturbance than Alternative A. Establishing vegetation early in seeding and planting areas would diminish color and texture contrasts associated with surface disturbance over the long term, resulting in a localized return to naturalness. Linking reclamation success criteria to the appearance of the surrounding landscape could minimize construction and operational contrasts over the long term.

Big game habitat enhancement areas could result in weak to moderate short-term landscape contrasts in texture, color, and line that diminish as vegetation becomes established. Approximately three acres would be restored for each acre of well pad footprint so these effects could be relatively common and widespread in the Planning Area. Alternative B has almost twice the number of possible future well pads and access roads when compared to Alternative A, and it should be assumed that Alternative B would have substantially more acres of disturbance and substantially more acres of restoration over time. The extent and location of the effects could not be predicted other than to say they would likely occur in areas removed from concentrations of leasable mineral operations.

#### 4.6.3.4    Alternative C

##### Impacts from Oil and Gas Development

Produced surface water and evaporation pond areas at leasable mineral operations would result in localized areas of moderate contrasts similar to those described under Alternative A, although the extent of these contrasts would not increase as they potentially could under Alternative A. Instead, they would begin to diminish, but not as quickly as Alternative B because operators could continue to employ surface water disposal techniques until their existing permits expire (Table 2-2 Record 22).

The magnitude and types of landscape contrasts from emissions of light and dust would be similar to those described under Alternative B. Light and dust emissions would occur more frequently and over more areas than under either Alternatives A or B due to the higher number of well pads (1,800 vs. 550 and 1,100 under Alternatives A and B respectively) and traffic anticipated.

Visual contrasts in areas designated with a CSU stipulation would be similar to but more extensive than those described under Alternative B because CSU stipulation designations would total 439,200 acres of mineral estate in the Planning Area, an increase relative to Alternative B (Table 2-17 Record 18). The concentration of visual contrasts in areas designated with a CSU stipulation would be more similar to Alternative B than Alternative A because voluntary implementation of development thresholds would tend to concentrate landscape contrasts in the MPA.

The effects of TL stipulations on visual resources would be similar to those described under Alternative B, except that higher critical habitat thresholds could result in less concentrated landscape contrasts over 1,696,000 acres of mineral estate (Table 2-17 Record 18). The critical habitat thresholds proposed would have less potential to concentrate landscape contrasts compared to Alternative B but more potential for concentrations of landscape contrasts compared to

BLM_0020010

## *Chapter 4 – Environmental Consequences*

Alternative A. Structures and facilities would provide visible operational contrasts regardless of season.

The effects of applying NSO stipulations on oil and gas operations to visual resources under Alternative C would be similar to those described under Alternatives A and B but would occur over less of the Planning Area than Alternative A and more of the Planning Area than Alternative B. Under Alternative C 440,800 acres of mineral estate would be designated NSO stipulation (Table 2-17 Record 18), a decrease in acreage relative to Alternative A and an increase in acreage relative to Alternative B. While leasable mineral operations would be highly unlikely to result in any direct landscape contrasts in these areas, some temporary indirect contrasts such as fugitive dust and traffic could occasionally be noticeable, resulting in weak levels of contrast. Ambient light would be more intermittent than temporary, occurring each night over an extended period, resulting in weak levels of contrasts.

Under Alternative C, oil and gas development could occur on 124,000 acres (20 percent) of fragile and saline soils in the MPA (Table 4-39 Lines 1, 2). Table 4-39 Line 7 presents the estimated area of surface disturbance that could occur on fragile soils and saline soils during the 20-year planning period within the MPA under Alternative C. Fragile soils would potentially be subject to 2,800 acres of surface disturbance (about 14 percent of the total 20,500 acres of surface disturbance under Alternative C). Saline soils would not be subject to any disturbance under this alternative.

Under Alternative C, oil and gas development could occur on 234,800 acres (39 percent) of pinyon/juniper communities in the MPA (Table 4-49 Lines 1, 2). Surface disturbance for pinyon/juniper communities within the MPA are estimated at 8,500 acres and presented in Table 4-49 Line 7. Under Alternative C, surface disturbance within pinyon/juniper communities would be greater when compared to Alternative B by 3,200 acres (8,500 acres vs. 5,300 acres). In addition, under this alternative, there would be surface disturbance to fragile soils. Surface disturbance in fragile or saline soils and pinyon/juniper communities would result in strong changes in contrast and texture, and would be long lasting.

Approximately 1,295 miles of roads would be constructed under Alternative C (compared to 395 and 790 miles of roads under Alternatives A and B respectively). In areas where these roads traverse the 2,800 acres of fragile soils and/or 5,300 acres of pinyon/juniper communities, road construction would increase visual contrasts and be strong and long lasting. Based on temporal analysis, visual impacts from road construction would be greater under Alternative C when compared to both Alternatives A and B. Similar to Alternative B, Alternative C would use the threshold concept to manage new oil and gas development (Table 2-4 Record 12).

### Impacts from Management Actions

Restricting motorized vehicle use to existing roads and trails until completion of a Travel Management Plan would promote retention of landscape appearance for the same reasons discussed under Alternative A (Table 2-19 Record 7). Landscape contrasts that result from vehicle deterrents at grantee/lessee ROW areas would be similar to but potentially more numerous that those described under Alternative B. Deterrents constructed of materials native to the region, colored appropriately, arranged properly, and set back from main roads would minimize landscape contrasts.

The effects of utility corridor designations on landscape appearance would be the same as those described for Alternative B.

BLM_0020011

<u>Reclamation</u>

The potential for localized landform, color, and texture contrasts from soil stockpiles would be similar under Alternative C to those described under Alternative A but could be more common and extensive than either Alternatives A or B due to the higher number of well pads anticipated.

Removal of mining equipment and structures from the landscape would return some naturalness to the landscape for the same reasons discussed under Alternative A. Applying the most current reclamation techniques each year would have the same effect on diminishing landscape contrasts associated with oil and gas operations as described for Alternative B.

Contouring, seeding, and planting would diminish form, line, color, and texture contrasts associated with surface disturbance for the same reasons discussed under Alternative B.

Landscape contrasts from big game habitat enhancement would be similar to those described for Alternative B but could be more or less common on the landscape relative to Alternative B because the amount of habitat restoration would be dependent on monitoring and consultation with CPW.

### 4.6.3.5 Alternative D

<u>Impacts from Oil and Gas Development</u>

Visual contrasts in areas designated as open with standard terms and conditions would be similar to those described under Alternative A. However, the contrasts would be less extensive but potentially more concentrated because the density of leasable mineral operations would likely be higher. Areas with standard terms and conditions would total 445,600 acres of mineral estate (Table 2-17 Record 13) in the Planning Area, a decrease relative to Alternative A. Meanwhile, the number of well pads in the Planning Area under Alternative D would be expected to quadruple relative to Alternative A (2,556 vs. 550 under Alternative A), with at least some of that increase occurring in areas with standard lease terms and conditions.

Surface discharge of produced water would result in landscape contrasts similar to those described under Alternative A but these types of contrasts would be more extensive and common in portions of the Planning Area open to mineral lease with standard lease terms and conditions, CSU stipulation designations, and areas with TL stipulation (Table 2-2 Record 13).

Higher critical habitat thresholds under Alternative D could result in less-concentrated landscape contrasts related to dust and light in areas designated with TL stipulation. Light and dust emissions would occur more frequently and over more areas than under Alternatives A, B, or C.

Construction, operation, and maintenance of leasable mineral production areas would be similar to those described for Alternative A, except that the density of contrasts could be greater because areas with TL stipulation would total 1,002,100 acres, a decrease compared to Alternative A (Table 2-17 Record 18). Meanwhile, the number of well pads in the Planning Area would be expected to quadruple, up to 2,556, with at least some of that increase occurring in areas with TL stipulation. Designations with TL stipulation would decrease by 693,900 acres relative to either Alternative B or Alternative C (Table 2-17 Record 18).

The effects of NSO stipulation designations on visual resources would be similar to those described under Alternative A, but would occur over more of the Planning Area because 274,600 acres of mineral estate would be designated NSO stipulation, an increase relative to Alternative A. Indirect landscape contrasts associated with traffic, dust, and light would be more common in NSO

BLM_0020012

stipulation designated areas compared to the other alternatives due to the higher number of well pads anticipated. No surface occupancy stipulation designations would prevent the appearance of oil- and gas-related surface disturbance on fewer acres than Alternative B or Alternative C.

Similar to Alternative A, where fragile and saline soil areas are not covered by an NSO stipulation, they are still covered by a CSU stipulation, and would be avoided when possible or would require engineering and/or reclamation designs to reduce impacts (Table 2-2 Record 9).

Under Alternative D, oil and gas development could occur on 124,000 acres (20 percent) of fragile and saline soils in the MPA (Table 4-41 Lines 1, 2). Based on temporal analysis results, fragile soils would potentially be subject to 4,400 acres of surface disturbance (about 15 percent of the total 29,100 acres of surface disturbance under Alternative D). Saline soils would potentially be subject to 96 acres of surface disturbance.

Under Alternative D, oil and gas development could occur on 234,800 acres (39 percent) of pinyon/juniper communities in the MPA (Table 4-50 Lines 1, 2). Surface disturbance for pinyon/juniper communities within the MPA are estimated at 11,600 acres and presented in Table 4-50 Line 7. There are overlap areas between fragile soils (on slopes greater than 35 percent), saline soils, and pinyon/juniper communities. Under Alternative D, surface disturbance within pinyon/juniper communities (11,600 acres) would be greatest when compared to Alternatives A, B, and C (2,460, 5,300, and 8,500 acres respectively). In addition, under this alternative, there would be surface disturbance to both fragile soils on slopes greater than 35 percent and saline soils. Surface disturbance in fragile or saline soils and pinyon/juniper communities would result in changes in contrast and texture, and would be long lasting.

In addition, an approximate 1,840 miles of roads would be constructed under Alternative D (compared to 395, 790, and 1,295 miles of roads under Alternatives A, B, and C respectively). In areas where these roads traverse the 4,500 acres of fragile and saline soils and/or 11,600 acres of pinyon/juniper communities, road construction would increase visual contrasts and be strong and long lasting. Based on temporal analysis, visual impacts from road construction would be greatest under Alternative D when compared to Alternatives A, B, and C.

### Impacts from Management Actions

Visual contrasts would likely be more widespread under Alternative D than under Alternatives B and C since thresholds would not provide incentives for concentration of development. Direct visual contrasts related to oil and gas, such as the appearance of equipment and infrastructure on the landscape, would be of greater magnitude compared to Alternative A due to the greater number of well pads anticipated.

Periodically restricting motorized vehicle use to existing roads and trails until a Travel Management Plan is complete would indirectly retain landscape appearance for the same reasons discussed under Alternative A. The potential for motorized vehicles to cause visible surface disturbance would remain low but would be higher than any other alternative since there would likely be more roads associated with ROW corridors and vehicle deterrents would not be required at ROW access points.

The effects of utility corridor designations on landscape appearance would be the same as those described for Alternative B.

BLM_0020013

**Reclamation**

The potential for localized landform, color, and texture contrasts from soil stockpiles under Alternative D would be similar to those described under Alternative A but contrasts could be more common and extensive than Alternatives A, B, or C due to the higher number of well pads anticipated.

Landscape contrasts from big game habitat enhancement would be similar to those described for Alternative C but could be more common due to the higher number (2,556 under Alternative D vs. 1,800 under Alternative C) of well pads anticipated. The extent and location of the effects could not be predicted other than to say they would likely occur in areas removed from concentrations of leasable mineral operations.

### 4.6.3.6    Irreversible and Irretrievable Commitment of Resources

Implementing the proposed management actions would result in an increase in the appearance of industrial equipment in localized areas of concentrated oil and gas operations. While the location and concentration of these facilities would be variable depending on the alternative selected, the characteristic landscape would appear more industrial than natural in some areas. The potential for concentrations of industrial equipment would be greatest under Alternatives B, C, and D. The appearance of oil and gas development equipment would be an irretrievable effect on visual resources until final reclamation is complete.

### 4.6.3.7    Unavoidable Adverse Impacts

The appearance of industrial equipment during oil and gas production operations on some portion of the landscape is unavoidable. The value of visual resources is to the local economy is high. Recreational outfitters who offer hunting packages, for example, could be indirectly affected by landscape appearance. Outfitters could be displaced or otherwise limited by oil and gas operations if they seek natural landscapes for their clients' hunting opportunities in the Planning Area.

The extent, location, and timing of equipment would vary by alternative with Alternative D having the greatest potential for adverse impacts to visual resources.

### 4.6.3.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Not applicable.

## 4.7    Resource Uses

### 4.7.1    Forestry and Woodland Products

This analysis addresses potential impacts on the harvest of forest and woodland products from implementing the management actions in each alternative that place limitations or affect the quantity or quality of products on the approximately 767,500 acres of forest and woodland vegetation communities in the Planning Area. The impacts assessed could occur during the project planning period (e.g., harvest of products in association with oil and gas development activities) as well as beyond the 20-year planning period (e.g., changes in quality, seral condition, or species composition of reclaimed areas). In this analysis, "forest" refers to ponderosa pine, lodgepole pine, Douglas fir, spruce fir mix, and aspen and "woodland" refers to pinyon pine and juniper.

BLM_0020014

---

**Chapter 4 – Environmental Consequences**

---

A number of indicators, attributes, and assumptions were used for the analysis. The following three indicators were selected to analyze the effects of the alternatives on forest and woodland products:

- Quantity and quality of forest and woodland products available for harvest;

- Forest and woodland community species composition, seral stage/age class, and structure; and

- Vehicle access to areas for the harvest of forest and woodland products.

The attributes of the three indicators are:

- Changes to quantity and quality of forest and woodland products available for harvest based on acres of surface disturbance;

- Availability or exclusion of areas for commercial harvest of forest and woodland products associated with oil and gas leasing based on lease stipulations;

- Changes to species composition, seral stage, and quality of forest and woodland products after reclamation;

- Progression of forest and woodlands toward old-growth conditions; and

- Changes to vehicle access to areas for the harvest of forest and woodland products based on miles of roads developed.

The analysis is based on the following assumptions:

- Removal of woodlands for the development of oil and gas resources would continue to be treated as commercial harvest;

- Management actions that result in a reduction in acres of ponderosa pine, lodgepole pine, Douglas fir, spruce fir, and aspen would result in a reduction in areas suitable for timber harvest;

- For alternatives with a greater number of proposed well pads, an associated increase in harvest of forest and woodlands would occur;

- Management actions that restrict surface disturbance would protect forest and woodland communities and retain the availability and quality of forestry and woodland products;

- All ROWs for roads and transmission lines are assumed to be cleared of trees of saleable size over the life of the lease;

- Forest and woodland products could originate from other areas that are not dominated by forest and woodland vegetation;

- Several traditional woodland products (e.g., Christmas trees, posts, and poles) could be harvested from tree species growing on sites not classified as forest or woodland;

- Current forest health trends would continue, and climate change could affect forest health; and

- Harvest of forest and woodland products not related to oil and gas leasing could continue as allowed under the 1997 White River RMP.

---

BLM_0020015

### 4.7.1.1   Impacts Common to All Alternatives

Impacts on the harvest of forest and woodland products would be related to surface disturbance associated with oil and gas development, lease stipulations associated with resource management actions, and management decisions that reclaim ecological or resource function. Management actions that would result in surface disturbance associated with oil and gas development could increase the amount of forest and woodlands harvested. Management actions that would restrict oil and gas development could reduce the amount of forest and woodlands harvested in association with oil and gas development. Management actions that would promote reclamation would aid in the reestablishment of forest and woodlands in disturbed areas.

Under all alternatives, impacts on the harvest of forest and woodland products would not be anticipated as a result of implementing management actions for the following resources: livestock grazing, air quality, wild horses, paleontology, and visual resources.

<u>Impacts from Oil and Gas Development</u>

Surface disturbance from oil and gas development in forest and woodland areas would result in the greatest effects on the commercial harvest of forest and woodland products. The harvest of forest and woodland products associated with construction of well pads, roads, and utility corridors could result in localized improvements to forest health where overstocking and/or disease and insects are a problem. Openings created in the forest canopy from harvest or thinning could improve the size and vigor of adjacent trees retained. Conversely, the edges created by development could increase the chance of trees being uprooted or broken by wind (wind-thrown trees), which would reduce the quantity of trees available for future harvest in localized areas. This is not a factor in the woodlands where the trees are shorter and have a wider base to withstand potential wind events. Soil compaction from well pads and road development could impede regeneration of forest and woodlands and associated quantity and quality of future products for harvest. Long-term, there could be a loss of productivity of these lands from the conversion of the forest and woodland vegetation to a disturbed condition. Loss of productivity could equate to a loss of quantity and quality of forest and woodlands available for harvest and a delay of tree maturation and development of old-growth characteristics; the loss of productivity could extend far past the period of oil and gas development.

The construction of ROW corridors for oil and gas development would create roads that could provide access to forest and woodland products for harvest where previously inaccessible. Development of roads would result in a short-term increase in quantity of products commercially harvested, and where accessible to the public, could result in a long-term increase in the quantity of non-commercial traditional woodland products harvested.

Harvest of forest and woodlands during oil and gas development could occur in areas with CSU stipulations or TL stipulations, but the location and timing where harvest could take place would be altered. Controlled surface use stipulations in forest and woodland areas would allow for surface occupancy and disturbance but could restrict surface disturbance or shift where disturbance and occupancy could occur. Where a shift in the location of oil and gas development is required, and if it is shifted to non-forest and woodland areas, retention of forest and woodlands for maturation and development of old-growth characteristics and potential future harvest outside of oil and gas development could occur. Timing limitation stipulations would restrict the time of year that forest and woodland products could be harvested in association with oil and gas activities. Harvest of forest and woodland products related to oil and gas activities could resume during the open period, and thus this limitation would not reduce harvest quantities. The majority of these restrictions would

BLM_0020016

apply to woodlands as opposed to forest lands, primarily because of the small amount of forest occurring in the Planning Area (87,500 acres [4.9 percent] forest versus 680,000 acres [38.3 percent] woodland).

Maintaining the closure of approximately 47,600 acres of forests and woodlands (associated with WSAs) to oil and gas leasing could reduce the quantity of forest and woodland products harvested in the Planning Area because oil and gas leasing and the associated harvest would not be allowed (Table 2-17 Record 7). Areas managed with an NSO stipulation also would prohibit forest and woodlands from being harvested in association with oil and gas development. Forest and woodlands in areas closed to leasing and with an NSO stipulation would continue to grow and mature and would retain or could develop old-growth characteristics. Harvest of forest and woodland products not related to oil and gas development could continue in these areas.

**Impacts from Management Actions**

Management actions that would close a road, restrict vehicle use of roads, or require seasonal restrictions on use of roads in forest and woodland areas to protect wildlife and habitat for special status wildlife species would reduce access to forest and woodland products (Table 2-4 Records 7 and 14; Table 2-9 Records 14 and 32; and Table 2-19 Record 11). This could alter the amount or the timing of commercial harvest not associated with oil and gas development. Reducing road access could also impede harvest of other forest products, such as firewood collection.

Protecting and minimizing impacts to cultural resources in the Canyon Pintado NHD and Texas-Missouri-Evacuation Creek areas through CSU stipulations or COA would restrict or modify the locations where harvest of woodland products could occur. Likewise, avoidance areas for new ROWs for transmission lines, pipelines, and roads would restrict or modify those harvest locations as well (Table 2-12 Records 7 and 8). These management actions could also reduce access to woodland products in localized areas. Managing aspen communities with CSU stipulations to protect their viability and maintain their function as wildlife habitat could result in avoidance of oil and gas development in these areas and preclude associated harvest of forest products (Table 2-3 Record 11). It could also promote accelerated recovery and establishment of healthy aspen communities and help ensure the maintenance of self-sustaining aspen communities.

Management of WSAs would continue to prohibit harvest of forest and woodland resources in these areas (Table 2-21 Record 9). WSAs in the Planning Area contain approximately 47,600 acres of forests and woodlands, of which nearly 96 percent is woodland. Forest and woodlands in WSAs would continue to mature and would maintain or develop old-growth characteristics.

**Reclamation**

Reclamation of disturbed areas, as described in the WRFO Surface Reclamation Plan, would promote the long-term reestablishment of forest and woodland communities (Appendix D). Initially, however, reclamation could lead to a change in the species composition in forest and woodlands disturbed by oil and gas development. Replanting areas currently dominated by forest or woodland vegetation communities with a seed mix of grasses would change species composition which would indirectly reduce production of forest and woodland products. Reclamation of disturbed areas would initially result in early seral stages of forest and woodland communities which could indirectly reduce the quality of forest and woodland products available for harvest. Long-term, however, these areas would mature to later seral conditions and could exhibit old-growth characteristics. The time period between seeding and the establishment of forest and woodland communities that resemble the pre-disturbance communities would vary, taking more time in areas where topsoil was removed during construction (e.g., well pad, road development) and taking less time in areas where mechanical

BLM_0020017

mastication was used (e.g., transmission line clearing), due to the condition of the seed bank. Where and when livestock are excluded from reclaimed areas, establishment of forest and woodland species and the amount of time to reach pre-disturbance conditions could be accelerated.

### 4.7.1.2   Alternative A

#### Impacts from Oil and Gas Development

The greatest effect on forest and woodland product harvest quantity and quality would be from oil and gas development and limiting commercial harvest of woodlands. Surface disturbance from oil and gas development could result in harvest of commercial woodlands on a maximum of 450 acres per decade (Table 2-15 Record 9). Because of the limit on woodland harvest, the amount of oil and gas development that could occur in woodlands would be limited and the location of well pads, roads, and utility corridors would be shifted to other vegetation communities.

An estimated 95 percent of oil and gas development would be in the MPA and the majority of impacts to forest and woodland products would occur in this area. Results of the temporal analysis for vegetation indicate that of the 523 well pads projected in the MPA for Alternative A, 209 could be constructed in pinyon/juniper woodlands, 16 in aspen forest, and 7 in ponderosa pine, lodgepole pine, and spruce fir mix forest (see Section 4.3.1, Table 4-47 Line 6). These estimates are based on a uniform distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations and TL stipulations). Commercial harvest of forest and woodlands would be associated with development of these well pads and associated infrastructure. Based on the number of well pads, and assuming all pads would be developed, surface disturbance during the 20-year planning period could occur in approximately 2,500 acres of pinyon/juniper woodlands, 180 acres of aspen forest, and 100 acres of ponderosa pine, lodgepole pine, and spruce fir mix forest (Section 4.3.1, Table 4-47 Line 7). This represents 1.2, 1.1, and 1.4 percent of the MPA for these vegetation communities, respectively. Based on the commercial woodland harvest restriction per decade described above, approximately 130 of the 209 well pads projected in woodlands would need to be relocated to other vegetation communities.

The construction of ROW corridors would create roads (primarily local and resource roads) that could provide access to forest and woodland products for harvest where previously inaccessible. Approximately 395 miles of roads associated with well pads could be developed for Alternative A. Development of roads would result in a short-term increase in quantity of products commercially harvested. There would be a long-term decrease in production of forest and woodland products since roads would remain cleared of vegetation during the leasing permit and the seed bank would no longer be intact.

Impacts from development of utility corridors would also result in a short-term increase in quantity of products commercially harvested. Approximately 285 miles of pipeline would be developed for the well pads under Alternative A. The number of miles of transmission lines that would be required is unknown. Forest and woodlands could regenerate in the reclaimed pipeline corridors. However, because of disturbance to the topsoil and seed bank, natural regeneration time could be delayed and species composition could be altered long-term, and establishment of pre-disturbance species composition could be delayed. Natural regeneration in transmission line corridors would be possible since the seed bank would remain intact. Following natural regeneration, forest and woodlands would remain in an early seral condition in the pipeline and transmission line corridors due to periodic vegetation clearing associated with ROW maintenance. Indirectly this could reduce the quality of forest and woodland products available for harvest.

BLM_0020018

*Chapter 4 – Environmental Consequences*

Oil and gas COAs or lease stipulations on leased and unleased forest and woodlands for Alternative A are depicted in Table 4-67. The acres in this table show where harvest of forest and woodland products could occur (open with standard terms and conditions, CSU stipulations, and TL stipulations) and where they would be prohibited (NSO stipulation). Note that where land is under an existing lease, allowable uses would be considered through a COA, whereas for land that is currently unleased (new leases), allowable uses would be considered through a lease stipulation. Of the acres that would be managed by stipulations, 36 percent of the forest and woodland vegetation community occurs in the MPA (Table 4-67). Controlled surface use stipulations and TL stipulations under Alternative A would apply to approximately 56 percent of forest and woodland vegetation communities which would result in a shift of where or when harvest of products could occur. Of the 78,100 acres of TL stipulations in the MPA, overlapping TL stipulations for periods of 6 months or more from wildlife management actions would apply to 12,900 acres (17 percent) of forest and woodlands (Table 2-4 Record 12; Table 2-5 Record 11; and Table 2-9 Record 30). Although these limitations would not limit harvest quantities, they would further restrict when products could be harvested in association with oil and gas activities. Up to 237,570 acres of forest and woodlands would be open with standard terms and conditions.

### Table 4-67. Acres of Oil and Gas Stipulations in Leased and Non Leased Forest and Woodlands for Alternative A

| Community | Acres Managed by Oil and Gas Stipulations | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | NSO Stipulation | | CSU Stipulation | | Open with Standard Terms and Conditions | | Timing Limitation Stipulation | |
| | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area |
| **Leased (Condition of Approval)** | | | | | | | | |
| Forest | 6,900 | 2,800 | 30,200 | 12,900 | 1,500 | 820 | 15,300 | 6,300 |
| Woodland | 39,600 | 25,200 | 146,800 | 35,500 | 197,700 | 97,900 | 143,500 | 69,500 |
| **Total** | **46,500** | **28,000** | **177,000** | **48,400** | **199,200** | **98,720** | **158,800** | **75,800** |
| **Unleased (Lease Stipulation)** | | | | | | | | |
| Forest | 2,600 | 350 | 15,700 | 1,900 | 670 | 3 | 12,700 | 1,100 |
| Woodland | 6,300 | 690 | 37,800 | 1,700 | 37,700 | 3,180 | 24,900 | 1,200 |
| **Total** | **8,900** | **1040** | **53,500** | **3,600** | **38,370** | **3,183** | **37,600** | **2,300** |
| **Leased and Unleased** | | | | | | | | |
| **Total Leased & Unleased** | **55,400** | **29,040** | **230,500** | **52,000** | **237,570** | **101,900** | **196,400** | **78,100** |

SOURCE: BLM GIS data 2009.
NOTE:
Because of rounding, values presented in table may not exactly add up to totals.

### Impacts from Management Actions

Older forest stands would be managed to preserve existing old-growth (Table 2-15 Record 7) and commercial harvest of woodlands attributable to oil and gas activities, and would be limited to 450 acres per decade (Table 2-15 Record 9). These management actions would retain existing old-growth woodlands and could increase the development of old-growth characteristics in some stands.

**Reclamation**

Reclaiming areas disturbed by oil and gas development would result long-term in the reestablishment and production of forest and woodlands (Table 2-3 Records 1, 13, 17, and 29; Table 2-4 Record 17; Table 2-6 Record 15; Table 2-9 Record 26; Table 2-21 Record 17). The impacts of reclamation on the quality and type (species) of forest and woodland products available for harvest would be as discussed in Section 4.7.1.1.

### 4.7.1.3    Alternative B

**Impacts from Oil and Gas Development**

The total amount of surface disturbance from oil and gas development in the Planning Area under Alternative B would be increased to 13,200 acres from 6,600 acres under Alternative A, based on the development of 1,100 well pads (Table 2-1 Record 13). This could result in an increase in acres of forest and woodland products commercially harvested relative to Alternative A. The total acres of allowable woodland harvest would be increased to 2,500 acres per decade from 450 acres per decade under Alternative A. Due to the 2,500 acres per decade limit on commercial harvest (Table 2-15 Record 9), the locations of well pads or road and utility corridors could be shifted to other non-woodland locations, but to a lesser degree than under Alternative A. Woodlands would primarily be harvested from early or mid-seral woodland areas (Table 2-15 Record 9), which could result in a greater retention of late-seral woodlands under Alternative B compared to Alternative A. This could lead to an increase in forest and woodland stands with old-growth characteristics, but the potential for this is unknown.

Results of the temporal analysis for vegetation indicate that of the 1,045 well pads projected in the MPA for Alternative B, 418 could be constructed in pinyon/juniper woodlands, 30 in aspen forest, and 16 in ponderosa pine, lodgepole pine, and spruce fir mix forest (see Section 4.3.1, Table 4-48 Line 6). Based on the number of well pads, and assuming all pads would be developed, surface disturbance during the 20-year planning period could occur in approximately 5,000 acres of pinyon/juniper woodlands, 364 acres of aspen forest, and 196 acres of ponderosa pine, lodgepole pine, and spruce fir mix forest (Section 4.3.1, Table 4-48 Line 7). This represents 4.0, 38.5, and 100 percent of the MPA for these vegetation communities, respectively. Compared to Alternative A, the number of wells potentially developed in the pinyon/juniper woodland community for Alternative B would increase to 418 (from 209), the number of wells in the aspen community would increase to 30 (from 15), and the number of wells in the pine and spruce fir mix forest communities would increase to 16 (from 8). Based on the commercial woodland harvest restriction per decade described above, approximately 24 well pads would need to be relocated to other vegetation types.

Impacts of ROWs and utility corridors on the accessibility of forest and woodland products and associated quantity of products commercially harvested during development would be similar to those described under Alternative A. However, due to the increase in number of well pads that could be developed, there would be an increase in access and resource roads and pipeline and transmission corridors, and an associated increase in quantity of products commercially harvested in the ROW. Approximately 790 miles of roads (primarily local and resource roads) and 565 miles of pipeline would be developed for Alternative B, compared to 395 miles of roads and 285 miles of pipeline for Alternative A. Long-term impacts on productivity, seral condition, and natural regeneration of forest and woodlands in the corridors would be the same as under Alternative A, but would apply to a larger area given the increase in miles of corridors.

Oil and gas COAs or lease stipulations for Alternative B on leased and unleased forest and woodlands in the entire mineral estate and in the MPA are depicted in Table 4-68. The acres of NSO

BLM_0020020

*Chapter 4 – Environmental Consequences*

stipulations in forest and woodland communities in the Planning Area for Alternative B would increase to 308,400 acres from 55,400 acres in the Planning Area under Alternative A. This could increase the amount of forest and woodland products harvested during oil and gas development in other areas compared to Alternative A. The acres of CSU stipulation in forest and woodland communities in the Planning Area for Alternative B would decrease to 143,000 acres from 230,500 acres for Alternative A. The area where TL stipulations would apply in forest and woodland communities in the Planning Area would increase to 269,800 acres for Alternative B compared to 196,400 acres for Alternative A. Of the 116,480 acres of TL stipulations in the MPA, overlapping TL stipulations for periods of 6 months or more from wildlife management actions would apply to 19,600 acres of forest and woodlands, further restricting when products could be harvested (Table 2-4 Record 12; Table 2-5 Record 11; and Table 2-9 Records 30 and 36). This is an increase in acreage compared to the 12,900 under Alternative A, but still represents 17 percent of the area where TL stipulations would apply. No forest and woodlands would be open with standard terms and conditions, whereas up to 237,570 acres would be under Alternative A. This could result in a shift in where and/or when forest and woodland products could be harvested.

### Table 4-68. Acres of Oil and Gas Stipulations in Leased and Unleased Forest and Woodlands for Alternative B

| Community | Acres Managed by Oil and Gas Stipulations | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | NSO Stipulation | | CSU Stipulation | | Open with Standard Terms and Conditions | | Timing Limitation Stipulation | |
| | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area |
| **Leased (Condition of Approval)** | | | | | | | | |
| Forest | 44,500 | 19,600 | 2,400 | 590 | 0 | 0 | 6,900 | 2,600 |
| Woodland | 195,600 | 82,100 | 115,200 | 35,200 | 0 | 0 | 216,900 | 110,800 |
| **Total** | **240,100** | **101,700** | **117,600** | **35,790** | **0** | **0** | **223,800** | **113,400** |
| **Unleased (Lease Stipulation)** | | | | | | | | |
| Forest | 23,700 | 2,900 | 2,300 | 170 | 0 | 0 | 5,7000 | 280 |
| Woodland | 44,600 | 2,600 | 23,100 | 1,400 | 0 | 0 | 39,000 | 2,800 |
| **Total** | **68,300** | **5,500** | **25,400** | **1,570** | **0** | **0** | **96,000** | **3,080** |
| **Leased and Unleased** | | | | | | | | |
| **Total Leased & Unleased** | **308,400** | **107,200** | **143,000** | **37,360** | **0** | **0** | **269,800** | **116,480** |

SOURCE: BLM GIS data 2009.
NOTE:
Because of rounding, values presented in table may not exactly add up to totals.

Voluntary compliance with development thresholds for big game would allow the lifting of some TL stipulations in forest and woodland vegetation communities. The voluntary big game thresholds would not alter the location of forest and woodland product harvest; however, it could reduce edge effects (blowdown and breakage of trees based on exposure) if oil and gas developments were located closer together in aspen and conifer stands. This could increase the quality of forest and woodlands available for harvest in localized areas long-term, but could reduce the quantity of products harvested during oil and gas development.

BLM_0020021

**Impacts from Management Actions**

During harvest associated with oil and gas development, emphasis would be placed on retention of the larger diameter trees and those species with high potential to attain old-growth characteristics. Further, mechanical treatments would be used to promote old-growth characteristics in forests and woodlands (Table 2-15 Record 8). These treatments could improve the quality of the stands, and, depending on the treatment used and the severity of the problem, it could also impede the spread of insects and disease. Management actions for forest and woodland products would exclude the harvest of old-growth forest and woodland stands for land use authorizations, lands managed as old-growth areas would have an NSO stipulation, and new pipelines in mature and old-growth forest and woodlands would be restricted to previously authorized areas of disturbance (Table 2-15 Records 6, 7, and 12). Based on these management actions, Alternative B would result in greater retention of old-growth forest and woodlands and promotion of old-growth characteristics than Alternative A.

Harvest of areas with Douglas fir and aspen would be prohibited under an NSO stipulation when they occur on steep slopes (greater than 25 percent; Table 2-15 Record 10). Since approximately 76 percent of the forests containing these species occur on steep slopes, it would further limit harvest of products during oil and gas development in forest stands.

**Reclamation**

Impacts of reclamation from oil and gas development on the quality and type (species) of forest and woodland products available for harvest would be similar to Alternative A except that the acres to be reclaimed would be greater due to the increase in surface disturbance proposed under this alternative. Alternative B sets reclamation success criteria at 100 percent cover; that would increase the chance of reclaimed forest and woodland communities eventually resembling pre-development communities. No such success criteria would be set for Alternative A (Table 2-3 Record 18, Appendix D). The success criteria of 100 percent cover for DPCs under Alternative B and the requirement for submittal of an annual reclamation status report (Table 2-3 Record 26) would provide a better approach to measuring reclamation success than the qualitative methods for Alternative A. Weed management under Alternative B (Table 2-3 Records 22, 23, 24, and 25) would also be more stringent than under Alternative A, thus improving the success of revegetation efforts by reducing the establishment of noxious and/or invasive weed species. Exclusion of livestock from reclamation sites (Table 2-16 Records 11 and 12) and stronger weed control stipulations (Table 2-3 Records 23, 24, and 25) under Alternative B would better ensure the successful reclamation of disturbed sites to forest and woodland communities. Overall this would improve conditions for forest and woodland communities and better recovery from disturbances relative to Alternative A.

It is anticipated that interim reclamation in seasonal big game ranges would be accelerated under Alternative B due to the management actions associated with development thresholds for collective and acute effects (Appendix E and Table 2-4 Record 12). Implementation of the big-game development thresholds could localize surface disturbance as well as encourage timely reclamation. This could expedite the establishment of and allow for maturation of regenerating forest and woodlands for future harvest in localized areas.

### 4.7.1.4    Alternative C

**Impacts from Oil and Gas Development**

The total amount of surface disturbance from oil and gas development in the Planning Area under Alternative C would be increased to 21,600 acres from 6,660 acres under Alternative A and

BLM_0020022

*Chapter 4 – Environmental Consequences*

13,200 acres under Alternative B, based on the development of 1,800 well pads and associated facilities (Table 2-1 Record 13). This increase in oil and gas development could result in an increase in acres of forest and woodland products commercially harvested during oil and gas development over Alternatives A and B. The total acres of allowable woodland harvest would be increased to 4,200 acres per decade (Table 2-15 Record 9) from 450 acres per decade under Alternative A and 2,500 acres per decade under Alternative B. The increase in allowable disturbance in woodlands would result in fewer shifts in oil and gas development to non-woodland areas than under Alternatives A and B.

Results of the temporal analysis for vegetation indicate that of the 1,710 well pads projected in the MPA for Alternative C, 687 could be constructed in pinyon/juniper woodlands, 50 in aspen forest, and 12 in ponderosa pine, lodgepole pine, and spruce fir mix forest (see Section 4.3.1, Table 4-49 Line 6). Based on the number of well pads, and assuming all pads would be developed, surface disturbance during the 20-year planning period could occur in approximately 8,200 acres of pinyon/juniper woodlands, 595 acres of aspen forest, and 144 acres of ponderosa pine, lodgepole pine, and spruce fir mix forest (Section 4.3.1, Table 4-49 Line 7). This represents 4.6, 55.5, and 94.0 percent of the MPA for these vegetation communities, respectively. The number of wells potentially developed for Alternative C in the pinyon/juniper woodland community would be greater than those proposed for Alternative A (687 versus 209) and the number of wells in the aspen and ponderosa pine, lodgepole pine, and spruce fir mix forest communities would be greater than for Alternative A (50 versus 15 in aspen and 12 versus 8 in pine and spruce fir mix). The number of wells potentially developed for Alternative C in all of the forest and woodland communities would be greater than those proposed for Alternative B (687 versus 418 in pinyon/juniper, 50 versus 30 in aspen, and 12 versus 10 in pine and spruce fir). Based on the commercial woodland harvest restriction per decade described above, approximately 22 well pads would need to be relocated to other vegetation types.

Impacts of ROWs and utility corridors on the accessibility of forest and woodland products and associated quantity of products commercially harvested during development would be similar to those described under Alternatives A and B. However, there would be an increase in access and resource roads, pipeline and transmission corridors, and the quantity of products commercially harvested in the ROW. Approximately 1,295 miles of roads (primarily local and resource roads) and 925 miles of pipeline would be developed for Alternative C, compared to 395 miles of roads and 285 miles of pipeline for Alternative A and 790 miles of roads and 565 miles of pipeline for Alternative B. Long-term impacts on productivity, seral condition, and natural regeneration of forest and woodlands in the corridors would be the same as under Alternatives A and B, but would apply to a larger area given the increase in miles of corridors. This could indirectly increase the edge effects and degrade the quality of forest and woodland products relative to Alternatives A and B.

Oil and gas COAs or lease stipulations for Alternative C on leased and unleased forest and woodlands in the entire mineral estate and in the MPA are shown in Table 4-69. NSO stipulations in forest and woodland communities in the Planning Area for Alternative C would apply to 171,500 acres, an increase from 55,400 acres for Alternative A and a decrease from the 308,400 acres under Alternative B. The acres of CSU stipulation in forest and woodland communities in the Planning Area for Alternative C would decrease to 154,100 acres from 230,500 acres for Alternative A and increase from the 143,000 acres under Alternative B. The area where TL stipulations would apply in forest and woodland communities in the Planning Area would increase to 394,300 acres for Alternative C compared to 196,400 acres for Alternative A and 269,800 acres for Alternative B, and thus TL stipulations could affect when products could be harvested to a greater degree. Of the 158,930 acres of TL stipulations in the MPA, overlapping TL stipulations for

BLM_0020023

periods of 6 months or more from wildlife management actions would apply to 26,700 acres (17 percent) of forest and woodlands, further restricting when products could be harvested (Table 2-4 Record 12; Table 2-5 Record 11; and Table 2-9 Records 30 and 36). This is an increase in acreage compared to the 19,600 acres under Alternative B and 12,900 under Alternative A, but it still represents 17 percent of the area where TL stipulations would apply. No forest and woodlands would be open with standard terms and conditions, as under Alternative B, whereas up to 237,700 acres would be under Alternative A.

**Table 4-69. Acres of Oil and Gas Stipulations in Leased and Unleased Forest and Woodlands for Alternative C**

| Community | Acres Managed by Oil and Gas Stipulations | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | NSO Stipulation | | CSU Stipulation | | Open with Standard Terms and Conditions | | Timing Limitation Stipulation | |
| | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area | Mineral Estate | Mesaverde Play Area |
| **Leased (Condition of Approval)** | | | | | | | | |
| Forest | 42,100 | 18,700 | 3,700 | 1,000 | 0 | 0 | 8,100 | 3,100 |
| Woodland | 89,200 | 48,700 | 118,900 | 27,900 | 0 | 0 | 319,500 | 151,500 |
| **Total** | **131,300** | **67,400** | **122,600** | **28,900** | **0** | **0** | **327,600** | **154,600** |
| **Unleased (Lease Stipulation)** | | | | | | | | |
| Forest | 21,900 | 2,800 | 3,100 | 230 | 0 | 0 | 6,700 | 330 |
| Woodland | 18,300 | 1,500 | 28,400 | 1,300 | 0 | 0 | 60,000 | 4,000 |
| **Total** | **40,200** | **4,300** | **31,500** | **1,530** | **0** | **0** | **66,700** | **4,330** |
| **Leased and Unleased** | | | | | | | | |
| **Total Leased & Unleased** | **171,500** | **71,700** | **154,100** | **30,430** | **0** | **0** | **394,300** | **158,930** |

SOURCE: BLM GIS data 2009.
NOTE:
Because of rounding, values presented in table may not exactly add up to totals.

Exceptions could be granted for TL stipulations for raptors and Canada lynx, whereas they could not for Alternative B (Table 2-9 Records 30 and 36). Timing restrictions could be lifted in big-game areas if development remained within the thresholds which could result in shifting the location of oil and gas development and indirectly increase the quantity of forest and woodland products harvested associated with oil and gas development.

**Impacts from Management Actions**

During harvest associated with oil and gas development, silvicultural practices would be utilized to promote old-growth characteristics in woodland communities (Table 2-15 Record 8). Old-growth forest and woodland stands would be avoidance areas under Alternative C (Table 2-15 Record 7). Lands managed as old-growth areas would have CSU stipulation under Alternative C versus NSO stipulation under Alternative B (Table 2-15 Record 12). Restrictions on development of pipelines in mature and old-growth forest and woodlands would be the same as under Alternative B (Table 2-15 Record 6). Rights-of-way widths would be reduced to within 25 feet of total disturbance in old-growth forest and woodland stands (Table 2-15 Record 11); there would be no similar management action for the other alternatives. Management of forest and woodlands under Alternative C would help retain more old-growth or forest stands with old-growth characteristics than Alternative A

BLM_0020024

(which has no similar stipulations and management actions for old-growth areas) and could reduce these areas compared to Alternative B.

Harvest of Douglas fir and aspen on steep slopes would be prohibited under an NSO stipulation (Table 2-15 Record 10), as under Alternative B, but allowable exceptions under Alternative C would make this management action less restrictive on the areas where forest harvest could occur than under Alternative B, but would reduce the area where harvest could occur compared to Alternative A.

### Reclamation

Impacts from reclamation on the quality and type (species) of forest and woodland products available for harvest would be similar to Alternative B, except that the acres requiring reclamation due to oil and gas development would increase due to the increased number of well pads. Reclamation success criteria for Alternative C (80 percent cover) would be less stringent than for Alternative B (100 percent cover; Table 2-3 Record 18), thus reclaimed forest and woodland communities could be less representative of pre-development communities. The success criteria of 80 percent cover for DPCs under Alternative C and the requirement for submittal of an annual reclamation status report (Table 2-3 Record 26) would provide a better approach to measuring reclamation success than the qualitative methods for Alternative A. Weed management during reclamation would be the same as under Alternative B and more stringent than under Alternative A (Table 2-3 Records 22, 23, and 24). Exclusion of livestock from reclamation sites (Table 2-16 Records 11 and 12) and weed control stipulations (Table 2-3 Records 23, 24, and 25), as under Alternative B, would better ensure the successful reclamation of disturbed sites to forest and woodland communities relative to Alternative A. Like Alternative B, it is anticipated that interim reclamation would be accelerated under Alternative C due to the big game management actions (Table 2-4 Record 12), but to a lesser degree due to higher threshold levels for collective and acute effects.

### 4.7.1.5    Alternative D

### Impacts from Oil and Gas Development

The total amount of surface disturbance under Alternative D would be the greatest of all alternatives, at 30,700 acres (compared to 6,600, 13,200, and 21,600 acres for Alternatives A, B, and C, respectively), based on the development of 2,556 well pads and associated facilities (Table 2-1 Record 13). This could result in more acres of forest and woodland products being commercially harvested during oil and gas development than under any of the other alternatives. The total acres of allowable woodland harvest would be the greatest of all alternatives, at 7,800 acres per decade (Table 2-15 Record 9), compared to 450, 2,500, and 4,200 acres per decade for Alternatives A, B, and C, respectively. This could result in the least amount of restrictions on the locations of well pads or road and utility corridors than for the other alternatives. Clearing of woodlands would not be limited to a specific age class under Alternative D whereas under Alternatives B and C harvest would primarily occur in early or mid-seral woodland areas.

Results of the temporal analysis for vegetation indicate that of the 2,428 well pads projected in the MPA for Alternative D, 970 could be constructed in pinyon/juniper woodlands, 70 in aspen forest, and 38 in ponderosa pine, lodgepole pine, and spruce fir mix forest (Table 4-70 and Section 4.3.1, Table 4-50 Line 6). Based on the number of well pads, and assuming all pads would be developed, surface disturbance during the 20-year planning period could occur in approximately 11,600 acres of pinyon/juniper woodlands, 8845 acres of aspen forest, and 455 acres of ponderosa pine, lodgepole pine, and spruce fir mix forest (Section 4.3.1, Table 4-50 Line 7). This represents 6.1, 6.4,

BLM_0020025

and 18.3 percent of the MPA for these vegetation communities, respectively. Of all the alternatives, Alternative D would result in the greatest number of developed wells in forest and woodland communities (Table 4-70). Based on the commercial woodland harvest restriction per decade described above, all of the wells proposed in woodlands could be developed.

**Table 4-70. Estimated Number of Well Pads in Forest and Woodlands in the Mesaverde Play Area by Alternative over the 20-Year Planning Period**

| Forest and Woodland Community | Alternatives | | | |
|---|---|---|---|---|
| | A | B | C | D |
| Pinyon/Juniper | 209 | 418 | 687 | 970 |
| Aspen | 15 | 30 | 50 | 70 |
| Ponderosa Pine, Lodgepole Pine, & Spruce Fir | 8 | 16 | 12 | 38 |

SOURCE: Vegetation Temporal Analysis, Appendix E.

Impacts of ROWs and utility corridors on the accessibility of forest and woodland products and associated quantity of products commercially harvested during development would be similar to those described under Alternatives A, B, and C. However, there would be an increase in access and resource roads, pipeline and transmission corridors, and the quantity of products commercially harvested in the ROW. Approximately 1,840 miles of roads (primarily local and resource roads) and 1,300 miles of pipeline would be developed for Alternative D, an increase compared to 395 miles of roads and 285 miles of pipeline for Alternative A, 790 miles of roads and 565 miles of pipeline for Alternative B, and 1,300 miles of roads and 925 miles of pipeline for Alternative C. Long-term impacts on productivity, seral condition, and natural regeneration of forest and woodlands in the corridors would be the same as for the other alternatives, but would apply to a larger area.

Oil and gas COAs or lease stipulations for Alternative D on leased and unleased forest and woodlands in the entire mineral estate and in the MPA are depicted in Table 4-71. No surface occupancy stipulations in forest and woodland communities in the Planning Area for Alternative D would apply to 111,900 acres, an increase from 55,400 acres for Alternative A and a decrease from the 308,400 acres under Alternative B, and 171,500 acres under Alternative C. The acres of CSU stipulation in forest and woodland communities in the Planning Area for Alternative D would decrease to 183,100 acres from 230,500 acres for Alternative A and increase from the 143,000 acres under Alternative B and the 154,100 acres under Alternative C. Timing limitation stipulations would apply to 192,400 acres of forest and woodland communities in the Planning Area, which would be less than that of Alternative A (196,400 acres), Alternative B (269,800 acres), and Alternative C (394,300 acres). Of the 76,900 acres of TL stipulations in the MPA, overlapping TL stipulations for periods of 6 months or more from wildlife management actions (Table 2-4 Record 12; Table 2-5 Record 11; and Table 2-9 Records 30 and 36) would apply to 12,500 acres (16 percent) of forest and woodlands, a slight decrease from Alternative A (12,900 acres) and a large decrease from Alternatives B and C (19,600 and 26,700 acres, respectively). This would restrict the period when wood products could be harvested during oil and gas activities the least of all alternatives. Up to 232,300 acres of forest and woodlands would be open with standard terms and conditions, a slight decrease from that of Alternative A (237,570 acres), whereas no forest and woodlands would be open with standard terms and conditions under Alternatives B and C.

BLM_0020026

*Chapter 4 – Environmental Consequences*

### Table 4-71. Acres of Oil and Gas Stipulations in Leased and Unleased Forest and Woodlands for Alternative D

| Community | Acres Managed by Oil and Gas Stipulations | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | NSO Stipulation | | CSU Stipulation | | Open with Standard Terms and Conditions | | Timing Limitation Stipulation | |
| | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA | Mineral Estate | MPA |
| **Leased (Condition of Approval)** | | | | | | | | |
| Forest | 18,200 | 6,800 | 20,000 | 9,200 | 1,400 | 800 | 14,300 | 6,000 |
| Woodland | 69,400 | 34,300 | 122,700 | 29,800 | 194,300 | 95,200 | 141,300 | 68,800 |
| **Total** | **87,600** | **41,100** | **142,700** | **39,000** | **195,700** | **96,000** | **155,600** | **74,800** |
| **Unleased (Stipulation)** | | | | | | | | |
| Forest | 8,500 | 650 | 11,000 | 1,700 | 610 | 3 | 11,500 | 985 |
| Woodland | 15,800 | 1,100 | 29,500 | 1,300 | 36,000 | 3,100 | 25,400 | 1,100 |
| **Total** | **24,300** | **1,750** | **40,500** | **3,000** | **36,610** | **3,103** | **36,900** | **2,085** |
| **Leased and Unleased** | | | | | | | | |
| **Total Leased & Unleased** | **111,900** | **42,800** | **183,100** | **42,100** | **232,300** | **99,100** | **192,400** | **76,900** |

SOURCE: BLM GIS data 2009.
NOTE:
Because of rounding, values presented in table may not exactly add up to totals.

## Impacts from Management Actions

Old-growth forest and woodland stands would be avoidance areas under Alternative D, as under Alternatives B and C (Table 2-15 Record 7). Lands managed as old-growth areas would be open to oil and gas leasing with standard lease terms under Alternative D, as opposed to having CSU stipulations under Alternative C and NSO stipulations under Alternative B (Table 2-15 Record 12). Overall, because there would be fewer management actions restricting harvest of forest and woodlands in old-growth communities and none promoting the development of old-growth, Alternative D would be less protective of old-growth than Alternatives B and C. However, there would be more management actions to protect old-growth forests under Alternative D than Alternative A. Alternative D is least protective of old-growth because of the increased acreage of forest and woodlands proposed for development.

Harvest of Douglas fir and aspen on steep slopes could occur with standard lease terms under Alternative D (Table 2-15 Record 10), and thus would be less restrictive than Alternatives B and C where it would be prohibited under an NSO stipulation. Overall, because of the acres of forest and woodlands with COAs or lease stipulations (NSO, CSU, or TL stipulations) and because of the proposed management actions, there would be a greater amount of forest and woodlands available for harvest during the planning period for Alternative D than for Alternatives B and C. The amount available would be slightly smaller than that of Alternative A; however, since the restrictions on woodland harvest under Alternative D would be much less than Alternative A, a greater amount of woodland harvest could occur over the 20-year planning period.

## Reclamation

Impacts from reclamation on the quality and type (species) of forest and woodland products available for harvest would be similar to the other alternatives except that the acres to be reclaimed

BLM_0020027

would be the greatest due to the increase in surface disturbance proposed for Alternative D. Reclamation success criteria of 60 percent vegetation cover (Table 2-3 Record 18) and weed management (Table 2-3 Records 22, 23, and 24) would be less stringent than Alternatives B (100 percent vegetation cover) and C (80 percent vegetation cover), thus reclaimed forest and woodland communities under Alternative D could be less representative of pre-development vegetation communities and could have more noxious and/or invasive weed species than Alternative B and C. However, the success criteria of 60 percent cover for DPCs under Alternative D would provide a better approach to measuring reclamation success than the qualitative methods for Alternative A.

### 4.7.1.6 Irreversible and Irretrievable Commitment of Resources

Due to their renewable nature, there would be no irreversible impacts to forest and woodland products. Development of oil and gas would result in a loss of production of forest and woodland products and would represent an irretrievable commitment of these resources for the duration of the planning period plus the time required for regeneration and maturation of saleable products. The loss of potential forest and woodland product production would be greatest under Alternative D from surface disturbance from oil and gas developments. The 42 percent increase in potential surface disturbance from oil and gas development compared to Alternative C, 132 percent compared to Alternative B, and 365 percent relative to Alternative A could increase the short-term quantity of forest and woodland products harvested if oil and gas development was located in forest and woodland vegetation communities. Indirectly this could reduce the quantity of harvest available beyond the 20-year planning horizon and could decrease the quality of forest and woodland projects in localized areas.

### 4.7.1.7 Unavoidable Adverse Impacts

There would be a loss of production in forest and woodland products where oil and gas development infrastructure would be constructed. The loss of production would represent an unavoidable adverse impact. The loss in productivity would increase by alternative (starting with Alternative A), with the greatest loss occurring for Alternative D, since this alternative would result in the greatest amount of disturbance and development. The 42 percent increase in potential surface disturbance from oil and gas development relative to Alternative C, 132 percent relative to Alternative B, and 365 percent relative to Alternative A could increase the short-term quantity of forest and woodland products harvested if oil and gas development was located in forest and woodland vegetation communities. Overall, for all alternatives the impact would be less than 5 percent of the total forest and woodlands in the Planning Area.

### 4.7.1.8 Relationship Between Local Short-Term Uses and Long-Term Productivity

Short-term use (harvest) of forest and woodlands for oil and gas development could impact their long-term productivity if their use results in a reduction of forest and woodland products. Further, short-term needs for harvest associated with oil and gas production may not reflect the need or demand for harvest of these resources in the long-term.

## 4.7.2 Livestock Grazing

This analysis describes the effects on livestock grazing operations on the BLM-administered public lands in the Planning Area from the authorized uses, management actions, stipulations, and voluntary actions proposed for each alternative. While this analysis recognizes the importance of rangeland health for sustainable production of livestock forage, it does not make rangeland health determinations. Potential impacts to forage resulting from oil and gas development activities include

BLM_0020028

loss of forage and reduced palatability of vegetation adjacent to disturbance, especially roads (e.g., vegetation affected by dust). The analysis characterizes effects to livestock by considering such factors as quality and quantity of forage in terms of Animal Unit Months, water availability, livestock behavior and distribution, and rangeland health.

The analysis quantifies total cumulative surface disturbance for each alternative over the life of the plan by using assumptions for disturbance acres developed in the air quality model analysis described in the *Air Resources Technical Support Document* (URS 2011). Under those assumptions the total disturbance expected for each well pad, including access roads, pipelines, and ancillary facilities, would be 12 acres (URS 2011). The analysis quantifies cumulative reductions in AUMs for each alternative by dividing cumulative surface disturbance (acres) by a stocking rate (acres/AUM). An AUM is the amount of forage needed to sustain one cow, five sheep, or five goats for a month. The stocking rate is defined as the number of specific kinds and classes of animals grazing or using a unit of land for a specified time and it accounts for produced forage left on the range for wildlife and watershed protection (i.e., 50 percent of annual growth). The stocking rate for a given area is based on information from a combination of sources, including the Natural Resource Conservation Service, U.S. Department of Agriculture, county soil surveys, and professional judgment. Actual effects of forage loss would depend on the location of each disturbance in relation to that site's utility and availability to livestock.

Qualitative aspects of the analysis include effects on livestock distribution and avoidance behavior associated with energy development activities and the effectiveness of rangeland improvements on livestock grazing operations. The analysis addresses that reclamation would reestablish forage incrementally throughout the life of the plan. Seven acres of the disturbance associated with each well pad will be reclaimed and returned to a productive state by the end of the sixth (Alternatives B and C) or seventh (Alternatives A and D) year after the initial disturbance. A number of indicators, attributes, and assumptions were used for the analysis. The following three indicators have been selected to analyze the effects of the alternatives on livestock grazing:

- Amount and quality of forage available for livestock grazing;
- Amount/distribution of water available for livestock grazing; and
- Livestock grazing patterns.

The attributes of the three indicators are:

- Change in the amount or quality of forage available for livestock grazing;
- Change in availability of water for livestock; and
- Change in livestock grazing patterns due to development activities (i.e., distribution).

The analysis is based on the following assumptions:

- Livestock grazing would be managed to achieve the Colorado Standards for Public Land Health through implementation of the Colorado Livestock Grazing Management Guidelines.
- Effects to livestock grazing would be greater in areas where energy development is focused. It is expected that 95 percent of development will occur in the MPA, predominantly on areas with moderate slopes.
- Livestock, especially cattle, make greater use on more level areas such as valley bottoms or ridge tops, leaving steeper slopes unused or only partially used (Stoddard et al. 1975; Child 1994; Holechek et al. 1998).

BLM_0020029

- Stocking rates throughout the Planning Area are variable. For the purpose of quantifying affects to livestock from forage loss, stocking rates are assumed to range from 6 to 30 acres/AUM with the average being 18 acres/AUM. This stocking rate accounts for production of forage left on the range for wildlife and watershed protection (i.e., 50 percent of annual growth).

- Each well pad, associated road, ancillary facilities, and pipelines disturbs an average of 12 acres (URS 2011).

- Approximately 7 of the 12 acres of surface disturbance associated with each alternative would be reclaimed over the short term (i.e., Phase I and Phase II reclamation of pads and ancillary facilities, and Final reclamation of pipelines). The remainder of disturbed acreage would be reclaimed over the long-term (i.e., Final reclamation of pads and other facility sites).

- Reclamation would reestablish forage quantity and quality to at least pre-disturbance levels.

### 4.7.2.1    Impacts Common to All Alternatives

The following Table 4-72 is a summary of disturbed and reclaimed acres compared with associated AUM losses throughout the Planning Area.

**Table 4-72. Disturbed and Reclaimed Acres and Associated AUM Losses throughout Planning Area**

| Description | Units | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|
| Total assumed number of pads | --- | 550 | 1,100 | 1,800 | 2,556 |
| Assumed surface disturbance per well pad | Acres | 12 | 12 | 12 | 12 |
| Total acres disturbed during 20 year planning period | Acres | 6,600 | 13,200 | 21,600 | 30,700 |
| Total Acres reclaimed during 20 year planning period | Acres | 2,300 | 5,400 | 8,100 | 9,800 |
| Total Acres un-reclaimed during 20 year planning period | Acres | 4,300 | 7,800 | 13,500 | 20,800 |
| Estimated average [1] AUM loss after reclamation at end of 20 year planning period. | AUMs | 240 | 435 | 750 | 1,200 |
| Total reclaimed by year 26 (B&C) and year 27 (A&D) | Acres | 3,900 | 7,700 | 12,600 | 17,900 |
| Total acres un-reclaimed by year 26 (B&C) and year 27 (A&D) | Acres | 2,800 | 5,500 | 9,000 | 12,300 |
| Estimated average [1] AUM loss after reclamation at end of year 26 (B&C) and year 27 (A&D) | AUMs | 153 | 305 | 500 | 710 |

NOTE:
[1] Average of 6 acres/AUM and 30 acres/AUM = 18 acres/AUM

### Impacts from Oil and Gas Development

Across all alternatives the removal of vegetation (forage resources) will be the primary direct effect to livestock grazing. Other direct effects include damage to water sources or other range improvement projects, and disruption of trailing and herding activities. Dust deposition from construction activities and from vehicles traveling on unpaved roads could reduce forage palatability within approximately 300 feet from the edges of roads and disturbed areas. Hazards to livestock include possible injury or death due to being hit by vehicles or from ingesting toxic fluids from inadequately fenced reserve pits. Indirectly, increased noise and activity associated with oil and gas development may cause livestock to avoid areas during the period of active development (construction, drilling, completion) reducing the short-term availability of forage and water in those

BLM_0020030

areas. This displacement of livestock would cause increased grazing pressure in areas away from development activities. If oil and gas related surface disturbance results in establishment of noxious, invasive, or unpalatable weeds it would reduce the amount of palatable native forage available. The intensity of all these effects on livestock grazing would increase across the alternatives as the amount of development increases and would be influenced by the distribution of development activities. For example under Alternatives B and C, where companies choose to cluster development to avoid seasonal timing limitations, effects on livestock grazing would be greater but the spatial extent and duration of those effects would be less. Under Alternatives A and D, application of seasonal timing stipulations would result in less focused but longer duration of development actions. While it is possible to estimate average forage losses in terms of AUMs, it is not possible to quantify behavioral influences. An estimated 95 percent of the oil and gas development activities would occur in approximately 40 allotments that are entirely or partially within the MPA. These allotments are outlined in Table 4-73.

Table 4-73 provides an overview of the allotments where there is more than five percent of the allotment in the MPA. Two other allotments (Colorow and Cathedral Bluffs) were intercepted by the MPA but each had less than five percent of their acreage in the MPA so they were not included in the table. The table estimates the acres and the percent of each allotment's grazable area in the MPA that would be unreclaimed at year 20. Average estimated AUM losses can be derived from the table and is discussed in each alternative. Actual AUM losses will be determined in site specific analysis associated with each proposed development action.

Within the MPA there are approximately 420,800 acres of federal mineral estate with slopes less than 35 percent. These are the areas that are considered more suitable for livestock grazing. To estimate effects over time on livestock grazing, the temporal analysis results for vegetation (see Appendix E for a detailed description), were used. Dividing the disturbed acreage by 6 for the high stocking rate (low acres/AUM) represents the greatest potential reduction of AUMs from disturbance. Dividing the disturbed acreage by 30 for the low stocking rate (high acres/AUM) represents the lowest potential reduction of AUMs. An average of 18 acres per AUM will be used for calculations throughout this section but the high and low range of forage losses, in terms of AUMs prior to or after reclamation, can be calculated for each alternative as follows:

Acres disturbed / (30 acres/AUM low range) = AUMs lost

Acres disturbed / (6 acres/AUM high range) = AUMs lost

Reclamation would reduce the loss of AUMs as vegetation is re-established however there would be a delay of at least six (Alternatives B and C) to seven (Alternatives A and D) years from the time of construction before these areas would be available for livestock grazing use.

BLM_0020031

*Chapter 4 – Environmental Consequences*

## Table 4-73. Allotments within Mesaverde Play Area

| Allotment Name | Total[1] Acres | Total[2] Acres in MPA | % of Allot-ment in MPA | % of Overall MPA | Alt A[3] Total Grazable Acres Available for Develop-ment | Alt B[3] Total Grazable Acres Available for Develop-ment | Alt C[3] Total Grazable Acres Available for Develop-ment | Alt D[3] Total Grazable Acres Available for Develop-ment | Acres Unreclaimed at Year 20[4] | | | | % of Grazable Area Within MPA Unreclaimed at Year 20[5] | | | | Average AUMs Lost at Year 20[6] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D |
| Black Sulphur | 19,800 | 19,800 | 100 | 3.32 | 13,500 | 11,900 | 13,600 | 13,400 | 87 | 175 | 285 | 405 | 0.64 | 1.46 | 2.09 | 3.00 | 5 | 10 | 16 | 22 |
| Blacks Gulch | 28,700 | 8,200 | 28 | 1.37 | 6,100 | 4,400 | 4,900 | 6,100 | 36 | 72 | 120 | 165 | 0.59 | 1.63 | 2.39 | 2.73 | 2 | 4 | 7 | 9 |
| Boise Creek | 8,400 | 640 | 8 | 0.11 | 62 | 0 | 0 | 56 | 3 | 6 | 9 | 13 | 4.50 | 0.00 | 0.00 | 23.14 | 0 | 0 | 1 | 1 |
| Cow Creek | 12,900 | 11,400 | 89 | 1.92 | 4,100 | 3,300 | 3,700 | 4,000 | 50 | 100 | 165 | 230 | 1.21 | 3.04 | 4.40 | 5.79 | 3 | 6 | 9 | 13 |
| Davis Creek | 5,800 | 3,600 | 61 | 0.60 | 1,200 | 1,000 | 1,200 | 1,100 | 16 | 31 | 51 | 75 | 1.31 | 3.04 | 4.39 | 6.69 | 1 | 2 | 3 | 4 |
| Duck Creek | 25,300 | 24,800 | 98 | 4.16 | 9,100 | 6,200 | 6,700 | 8,900 | 110 | 220 | 355 | 505 | 1.20 | 3.48 | 5.29 | 5.66 | 6 | 12 | 20 | 28 |
| East Fork Spring Creek | 1,400 | 1,400 | 100 | 0.23 | 130 | 28 | 34 | 130 | 6 | 12 | 20 | 29 | 4.69 | 43.85 | 59.09 | 22.29 | 0 | 1 | 1 | 2 |
| Fawn Creek | 37,900 | 37,700 | 100 | 6.33 | 18,500 | 16,100 | 18,400 | 18,400 | 165 | 330 | 540 | 770 | 0.90 | 2.06 | 2.95 | 4.19 | 9 | 18 | 30 | 43 |
| Fourteen Mile | 2,970 | 1,600 | 55 | 0.28 | 845 | 740 | 820 | 780 | 7 | 14 | 24 | 34 | 0.86 | 1.95 | 2.88 | 4.31 | 0 | 1 | 1 | 2 |
| Gordon Gulch | 4,800 | 4,700 | 99 | 0.79 | 2,200 | 2,000 | 2,200 | 2,200 | 21 | 41 | 68 | 96 | 0.93 | 2.06 | 3.10 | 4.37 | 1 | 2 | 4 | 5 |
| Greasewood | 29,900 | 26,300 | 88 | 4.42 | 14,700 | 11,300 | 12,200 | 14,400 | 115 | 230 | 380 | 535 | 0.79 | 2.04 | 3.09 | 3.73 | 6 | 13 | 21 | 30 |
| Hatch Gulch | 9,400 | 9,400 | 100 | 1.58 | 5,200 | 3,500 | 4,100 | 5,100 | 41 | 83 | 135 | 190 | 0.80 | 2.37 | 3.34 | 3.74 | 2 | 5 | 8 | 11 |
| Hyberger | 1,900 | 1,200 | 64 | 0.20 | 885 | 845 | 870 | 880 | 5 | 11 | 17 | 24 | 0.60 | 1.24 | 1.98 | 2.78 | 0 | 1 | 1 | 1 |

BLM_0020032

*Chapter 4 – Environmental Consequences*

### Table 4-73. Allotments within Mesaverde Play Area

| Allotment Name | Total[1] Acres | Total[2] Acres in MPA | % of Allot-ment in MPA | % of Overall MPA | Alt A[3] Total Grazable Acres Available for Develop-ment | Alt B[3] Total Grazable Acres Available for Develop-ment | Alt C[3] Total Grazable Acres Available for Develop-ment | Alt D[3] Total Grazable Acres Available for Develop-ment | Acres Unreclaimed at Year 20[4] | | | | % of Grazable Area Within MPA Unreclaimed at Year 20[5] | | | | Average AUMs Lost at Year 20[6] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D |
| Little Hills | 34,500 | 34,500 | 100 | 5.79 | 24,000 | 16,400 | 18,000 | 23,700 | 150 | 305 | 495 | 705 | 0.63 | 1.85 | 2.75 | 2.97 | 8 | 17 | 28 | 39 |
| Little Spring Creek | 16,200 | 11,700 | 72 | 1.96 | 4,400 | 3,100 | 3,300 | 4,200 | 51 | 100 | 165 | 240 | 1.16 | 3.31 | 5.13 | 5.68 | 3 | 6 | 9 | 13 |
| Little Toms Draw | 14,300 | 10,900 | 76 | 1.83 | 8,100 | 7,100 | 7,900 | 8,100 | 48 | 96 | 160 | 220 | 0.59 | 1.34 | 1.99 | 2.74 | 3 | 5 | 9 | 12 |
| Lower Fourteen Mile | 3,900 | 3,900 | 100 | 0.65 | 2,500 | 2,100 | 2,500 | 2,500 | 17 | 34 | 56 | 79 | 0.68 | 1.59 | 2.26 | 3.21 | 1 | 2 | 3 | 4 |
| Main Dry Fork | 11,400 | 11,400 | 100 | 1.91 | 7,800 | 7,000 | 7,800 | 7,800 | 50 | 100 | 165 | 230 | 0.64 | 1.44 | 2.10 | 2.99 | 3 | 6 | 9 | 13 |
| McCarthy Gulch | 3,900 | 3,900 | 100 | 0.65 | 1,500 | 1,200 | 1,400 | 1,400 | 17 | 34 | 56 | 79 | 1.17 | 2.76 | 3.92 | 5.88 | 1 | 2 | 3 | 4 |
| McKee/ Collins | 9,600 | 9,600 | 100 | 1.61 | 4,700 | 3,000 | 3,800 | 4,700 | 42 | 84 | 140 | 195 | 0.90 | 2.80 | 3.63 | 4.17 | 2 | 5 | 8 | 11 |
| MTW | 27,500 | 27,200 | 99 | 4.57 | 14,100 | 12,600 | 13,800 | 14,000 | 120 | 240 | 390 | 555 | 0.85 | 1.90 | 2.84 | 3.96 | 7 | 13 | 22 | 31 |
| North Dry Fork | 21,500 | 20,100 | 93 | 3.37 | 7,700 | 6,600 | 7,500 | 7,700 | 88 | 175 | 290 | 410 | 1.14 | 2.68 | 3.85 | 5.29 | 5 | 10 | 16 | 23 |
| Oldland Gulch | 11,100 | 11,100 | 100 | 1.86 | 6,100 | 5,300 | 6,100 | 5,900 | 49 | 97 | 160 | 225 | 0.80 | 1.84 | 2.62 | 3.80 | 3 | 5 | 9 | 13 |
| Piceance Creek | 32,200 | 32,200 | 100 | 5.40 | 16,100 | 13,300 | 15,400 | 15,900 | 140 | 280 | 460 | 655 | 0.88 | 2.13 | 3.00 | 4.12 | 8 | 16 | 26 | 36 |
| Puckett Gulch | 3,600 | 940 | 26 | 0.16 | 670 | 630 | 660 | 660 | 4 | 8 | 14 | 19 | 0.62 | 1.31 | 2.04 | 2.92 | 0 | 0 | 1 | 1 |
| Reagles | 22,100 | 22,100 | 100 | 3.72 | 17,400 | 15,800 | 17,300 | 17,300 | 97 | 195 | 320 | 450 | 0.56 | 1.23 | 1.83 | 2.61 | 5 | 11 | 18 | 25 |

BLM_0020033

*Chapter 4 – Environmental Consequences*

## Table 4-73. Allotments within Mesaverde Play Area

| Allotment Name | Total[1] Acres | Total [2] Acres in MPA | % of Allot-ment in MPA | % of Overall MPA | Alt A[3] Total Grazable Acres Available for Develop-ment | Alt B[3] Total Grazable Acres Available for Develop-ment | Alt C[3] Total Grazable Acres Available for Develop-ment | Alt D[3] Total Grazable Acres Available for Develop-ment | Acres Unreclaimed at Year 20[4] | | | | % of Grazable Area Within MPA Unreclaimed at Year 20[5] | | | | Average AUMs Lost at Year 20[6] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D |
| Schutte Gulch | 6,100 | 6,100 | 100 | 1.03 | 3,317 | 3,000 | 3,300 | 3,200 | 27 | 54 | 88 | 125 | 0.81 | 1.79 | 2.68 | 3.91 | 1 | 3 | 5 | 7 |
| Segar Gulch | 13,600 | 11,200 | 82 | 1.89 | 6,393 | 5,600 | 6,300 | 6,200 | 49 | 99 | 160 | 230 | 0.77 | 1.76 | 2.57 | 3.69 | 3 | 5 | 9 | 13 |
| Segar Mtn | 6,000 | 5,700 | 95 | 0.96 | 3,616 | 3,200 | 3,600 | 3,500 | 25 | 50 | 82 | 115 | 0.70 | 1.56 | 2.31 | 3.31 | 1 | 3 | 5 | 6 |
| Skinner Ridge | 1,600 | 1,600 | 100 | 0.26 | 805 | 190 | 240 | 800 | 7 | 14 | 23 | 32 | 0.86 | 7.34 | 9.33 | 3.99 | 0 | 1 | 1 | 2 |
| Slash EV | 44,700 | 44,500 | 100 | 7.47 | 22,798 | 18,000 | 21,700 | 22,600 | 195 | 390 | 640 | 905 | 0.86 | 2.17 | 2.94 | 4.02 | 11 | 22 | 35 | 50 |
| Spring Creek | 40,300 | 7,500 | 19 | 1.26 | 3,157 | 2,300 | 2,500 | 3,200 | 33 | 66 | 105 | 150 | 1.04 | 2.82 | 4.28 | 4.83 | 2 | 4 | 6 | 8 |
| Square S | 79,600 | 78,800 | 99 | 13.23 | 58,812 | 46,500 | 50,200 | 58,000 | 345 | 690 | 1,100 | 1,600 | 0.59 | 1.49 | 2.25 | 2.77 | 19 | 38 | 63 | 89 |
| Thirteen Mile | 8,000 | 7,200 | 90 | 1.21 | 4,507 | 4,000 | 4,400 | 4,400 | 32 | 63 | 105 | 145 | 0.70 | 1.56 | 2.32 | 3.33 | 2 | 3 | 6 | 8 |
| Upper Fletcher Draw | 7,500 | 875 | 12 | 0.15 | 37 | 0 | 0 | 10 | 4 | 8 | 13 | 18 | 10.38 | 0.00 | 0.00 | 1,000 | 0 | 0 | 1 | 1 |
| Upper Thirteen Mile | 1,900 | 585 | 31 | 0.10 | 496 | 455 | 496 | 495 | 3 | 5 | 8 | 12 | 0.52 | 1.13 | 1.70 | 2.42 | 0 | 0 | 0 | 1 |
| West Shutta | 2,400 | 2,400 | 100 | 0.41 | 2,192 | 2,100 | 2,200 | 2,200 | 11 | 21 | 35 | 49 | 0.48 | 1.02 | 1.59 | 2.25 | 1 | 1 | 2 | 3 |
| West Stewart Gulch | 49,900 | 49,600 | 100 | 8.33 | 20,404 | 16,200 | 18,400 | 20,200 | 220 | 435 | 710 | 1,000 | 1.07 | 2.69 | 3.86 | 5.01 | 12 | 24 | 40 | 56 |

BLM_0020034

*Chapter 4 – Environmental Consequences*

## Table 4-73. Allotments within Mesaverde Play Area

| Allotment Name | Total[1] Acres | Total[2] Acres in MPA | % of Allotment in MPA | % of Overall MPA | Alt A[3] Total Grazable Acres Available for Development | Alt B[3] Total Grazable Acres Available for Development | Alt C[3] Total Grazable Acres Available for Development | Alt D[3] Total Grazable Acres Available for Development | Acres Unreclaimed at Year 20[4] | | | | % of Grazable Area Within MPA Unreclaimed at Year 20[5] | | | | Average AUMs Lost at Year 20[6] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt C | Alt D |
| Yellow Creek | 83,400 | 83,051 | 100 | 13.94 | 56,587 | 49,700 | 52,800 | 56,200 | 365 | 730 | 1,200 | 1,700 | 0.64 | 1.47 | 2.26 | 3.01 | 20 | 40 | 66 | 94 |

NOTES:

[1] This is the total of all private and public lands within this allotment.

[2] This is the total of all private and public lands in this allotment that are within the MPA.

[3] This is the total grazable acres (areas with slopes less than 35 percent) of Federal mineral estate (includes both public and private lands) that are not covered by an NSO stipulation.

[4] Acres unreclaimed is based on the assumption that 58.3 percent of the disturbance associated with each alternative will be reclaimed, e.g., under Alternative A there would be 6,276 acres disturbed so 41.6 percent (2,615 acres) would be un-reclaimed at year 20.

[5] This is the percent of grazable area disturbed within the MPA that would not have been reclaimed by year 20.

[6] Average AUM figure is calculated by dividing unreclaimed acres by stocking rate of 18 ac/AUM.

BLM_0020035

## Chapter 4 – Environmental Consequences

**Impacts from Management Actions**

Forage, water sources, and rangeland health would be retained on approximately 83,000 acres that are closed to oil and gas development across all alternatives (Table 2-17 Record 7) and in a minimum of 157,100 acres where NSO stipulations would be applied throughout the Planning Area (Table 2-17 Record 18). No surface occupancy stipulations vary by alternative but under every alternative where NSO stipulations restrict energy development on slopes, especially slopes greater than 35 percent, disturbance would be shifted to areas with gentler topography, thus coinciding with areas that are more accessible to livestock for grazing. No surface occupancy stipulations for various resources that are common to all alternatives are listed below:

- Landslide areas (Table 2-2 Record 15 – minimum of 41,500 acres);

- Remnant vegetation associations (Table 2-3 Record 27 – 3,600 acres);

- Sage-grouse leks (Table 2-6 Record 18 – minimum 3,600 acres);

- Federally listed plant species (Table 2-10 Record 15 – minimum 51,700 acres);

- Cultural (Table 2-12 Record 9 – 3 acres); and

- ACECs (Table 2-21 Record 13 – approximately 29,000 acres).

Controlled Surface Use stipulations also occur throughout the Project Area and vary in extent by alternative but could still permit surface disturbance resulting in reduced useable forage and water sources in those areas.

Oil and gas development activities and associated disturbance could require changes to allotment management to continue meeting or to make progress toward meeting/achieving the Colorado Standards for Public Land Health. Combining administrative actions for livestock management, including adjustments in numbers, season of use, and duration of grazing to meet the Colorado Standards for Public Land Health, would help promote sustainable forage production over the long term (Table 2-16 Record 6). Changes to allotment management that reduce the number of AUMs would affect livestock operations and could decrease the profitability of livestock operations by decreasing the numbers of livestock allowed to graze in the affected areas.

Monitoring rangelands and coordinating with stakeholders would provide information necessary for adaptive management (Table 2-16 Record 7). Denying proposed oil and gas development activities or requiring specific mitigation measures for the activity to ensure that plant community objectives are met (Table 2-3 Record 12) would reduce impacts to rangeland health. Requiring site-specific project analysis for seeding during reclamation (Table 2-3 Record 13) could improve reclamation success and forage resources. Managing 497,900 acres of the Planning Area as weed-free zones (Table 2-3 Record 22) would benefit forage resources by reducing the spread of noxious and invasive weeds in those areas. Nearly 500,000 acres would continue to be managed as weed-free zones where weed management would be emphasized and special measures would be taken to reduce the risk of spreading noxious and invasive plant species.

The number of truck trips associated with moving water (produced, fresh, recycled) would be reduced, though variably, under each alternative when piping is utilized (Table 2-2 Records 18 and 19) and would reduce associated effects on livestock operations. The use of three phased gathering systems (Table 2-1 Record 16) would also contribute to reducing the number of truck trips and associated dust production. Management actions across alternatives would require dust control plans (Table 2-1 Record 10) and other fugitive dust control measures (Table 2-1 Record 10). Outside of the MPA operators would be required to achieve at least 50 percent control of fugitive dust from

BLM_0020036

collector and resource roads to reduce dust production and its effect on the vegetation (Table 2-1 Records 7 and 8).

Right-of-way avoidance areas in the Canyon Pintado NHD and the Texas Missouri Evacuation Creek areas would reduce the potential for construction activities and surface disturbance to affect livestock forage amounts and availability (Table 2-12 Records 5 and 8). Though the acreage limits would vary by alternative, clearing of woodlands in association with oil and gas activities would indirectly increase forage available as woodlands are converted temporarily to grasslands (Table 2-15 Record 9).

### Reclamation Common to All

Across all alternatives rangeland plant communities would be managed to achieve DPCs in late-seral or healthy mid-seral ecological status but reclamation would have different success criteria across the alternatives (Table 2-3 Record 18). Alternatives B, C, and D would apply the reclamation measures, recommendations, requirements, and success criteria from the WRFO Surface Reclamation Plan (Appendix D) for all reclamation actions. Under Alternative A there would be no specific reclamation protocol and reclamation success would be based solely on the DPC with no defined success criteria for releasing reclaimed sites.

Regardless of the alternative, reclamation would aide in establishing desired vegetation to minimize soil erosion, inhibit noxious and invasive weed establishment, and allow for the advance of successional processes toward the desired condition. In general, reclamation, especially of pipelines, would provide temporary localized forage increases because the reclaimed plant community would usually be composed of more herbaceous species than the pre-disturbance community.

This scenario would be especially true in areas previously dominated by woody vegetation (e.g., pinyon/juniper woodlands), where reclamation would generally increase the amount of herbaceous vegetation relative to pre-disturbance conditions. Central to livestock grazing, reclamation would reduce the overall amount of forage lost in association with energy development activities. Interim reclamation would be applied to 7 acres of the 12 acres of disturbance associated with each well pad leaving approximately 5 acres un-reclaimed for the life of the pad. Across the alternatives after interim reclamation successfully re-establishes vegetation, remaining forage losses in terms of an average AUM figure would be calculated as described above with a six to seven year lag behind development.

### 4.7.2.2    Alternative A

#### Impacts from Oil and Gas Development

Direct and indirect impacts to livestock, forage, and water resources from oil and gas exploration and development would be similar those discussed above. Alternative A includes oil and gas exploration and development throughout the Planning Area of 550 well pads (approximately 4,603 wells) over the 20-year planning period (Table 2-1 Record 13). Estimating 12 acres of disturbance for each well pad (including the associated resource road, pipelines and ancillary facilities), there would be approximately 6,600 total acres of vegetation disturbance. Reclamation would reduce the loss of AUMs as vegetation is re-established on approximately 60 percent of the disturbance associated with each pad however there would be at least a 7 year delay from the time of construction before these areas would be available for livestock grazing use.

Based on the results of the temporal analysis for vegetation (Appendix E) an estimated 6,300 acres of land within the MPA (Table 4-47 Line 7) would be disturbed during the 20-year planning period

BLM_0020037

for the development of 523 well pads (Table 4-47 Line 6). Fugitive dust from construction sites or generated by vehicles traveling on an estimated 300 miles of local and resource roads (Table 4-3) has potential to reduce the health and vigor of vegetation on approximately 21,800 acres of vegetation. By the 27th year (to include the seven year lag time before reclamation would be expected to be successful), overall disturbance remaining would be 2,600 acres. Using the formula from above there would be an average of 147 AUMs of forage loss remaining after reclamation throughout the MPA.

### Impacts from Management Actions

Impacts related to management actions are similar to those common to all alternatives. The area designated as open to oil and gas development with standard lease terms and conditions under Alternative A would include 455,500 acres (Table 4-6). Managing 157,100 acres of mineral estate throughout the Planning Area as open to oil and gas development with an NSO stipulation could restrict surface disturbance and effectively eliminate the potential for oil and gas activities to directly reduce forage and water resources in these areas unless exceptions are granted. Exceptions would result in localized short-term loss of forage and could alter livestock distribution. In addition to the ACEC NSO listed above, NSO stipulations would apply to the following areas.

- Landslide areas (Table 2-2 Record 15 – 38,600 acres);

- Buffers for raptor nest sites (Table 2-5 Record 11);

- Buffers for sage-grouse lek sites (Table 2-6 Record 18); and

- Buffers for special status raptor nests (Table 2-9 Record 28).

Other than the NSO for landslide prone areas, these NSO stipulations would have minimal effect on shifting disturbance to areas that coincide with livestock grazing.

Oil and gas activities would be required to manage development in a manner that retains upland health (Table 2-2 Record 14). Where oil and gas activity conflicts with grazing operations, changes could be made to allotment management, including adjustments to permitted AUMs (Table 2-16 Record 13). Changes to allotment management that reduce the number of AUMs would affect livestock operations and could decrease the profitability of livestock operations by decreasing the numbers of livestock allowed to graze in the affected areas. Timing limitations applied to construction, drilling, and completion activities to reduce acute effects to big game species (Table 2-4 Record 12) would effectively extend the duration of those activities and the associated direct and indirect effects on livestock grazing operations.

The following management actions would reduce impacts to the health and vigor of vegetation used as forage within 300 feet of construction sites or roads (minimum of 21,800 acres), from dust or particulates. All of these actions would lessen the impacts to forage in these areas.

- Requiring road abandonments and seasonal closures to achieve site specific road density objectives (Table 2-4 Record 7);

- Prohibiting off-road motorized vehicle travel in ACECs established for T&E plant resources (Table 2-10 Record 9);

- Requiring watering of construction areas to control dust (Table 2-1 Record 10);

- Requiring three phased gathering systems during production on 40 percent of well pads (Table 2-1 Record 16); and

BLM_0020038

- Evaporation facilities would be approved and mitigated on a case by case basis to prevent or minimize particulate matter from evaporation of produced water effecting surrounding vegetation (Table 2-2 Record 22).

Reclamation under Alternative A would have no specific reclamation protocol and reclamation success would be based solely on the DPC which may reflect the ecological site description to varying degrees. There would be no specific criteria or percentage to determine when a site has been successfully reclaimed. There would be no requirement to exclude livestock from reclaimed sites to facilitate reclamation success (Table 2-16 Records 11 and 12). Seasonal timing limitations for big game (Table 2-4 Record 12) would extend timeframes for development activities, resulting in extended timeframes before interim reclamation would be implemented. The timeframe before reclamation might achieve success would be expanded with seven years being the likely minimum timeframe. Over the 20 year life of the plan approximately 2,300 acres would be reclaimed and made available for livestock grazing reducing the overall forage loss to around 4,300 acres throughout the Planning Area. Using the formula from above, cumulative loss of AUMs after reclamation under Alternative A would be between approximately 143 and 716 AUMs. Aside from the management action addressing weed-free zones, there are no specific management actions as there are under the other alternatives requiring that noxious and invasive weeds be controlled within the permitted area (Table 2-3 Record 24) or that they be controlled prior to seeding (Table 2-3 Record 23). This could impair reclamation success and would result in increased risk of weeds spreading beyond the disturbance site into the surrounding plant community and negatively affecting forage resources. Overall, Alternative A lacks some of the more detailed, specific management actions that are addressed in the other alternatives, which could result in increased risks to rangeland resources.

**Reclamation**

Reclamation activities are the same as those described in Reclamation Common to All (Section 4.7.2.1).

### 4.7.2.3    Alternative B

**Impacts from Oil and Gas Development**

Direct and indirect impacts to livestock, forage, and water resources from oil and gas exploration and development would be similar to Alternative A but potentially greater because more wells are predicted. Alternative B includes oil and gas exploration and development throughout the Planning Area of approximately 1,100 well pads (approximately 9, 191 wells) over the 20-year planning period (Table 2-1 Record 13). This represents approximately 550 more pads and 6,600 acres more surface disturbance compared to Alternative A. Estimating 12 acres of disturbance for each well pad (and associated resource road, pipelines, and ancillary facilities), there could be as much as 13,200 acres of vegetation disturbance throughout the Planning Area over the life of the plan. Reclamation of approximately 60 percent of each pad and associated disturbance would reduce the loss of AUMs as vegetation is re-established however there would be at least a six year delay from the time of construction before these areas would be available for livestock grazing use.

Based on the results of the temporal analysis for vegetation (Appendix E), the percent of vegetated land developed within the MPA increased from Alternative A to Alternative B by 1 percent (Table 4-48 Line 8). An estimated 12,600 acres (Table 4-48 Line 7) of land would be disturbed over the 20-year planning period for the development of 1,045 well pads (Table 4-48 Line 6), approximately twice as many acres as Alternative A. Fugitive dust from construction sites or generated by vehicles traveling on an estimated 800 miles of local and resource roads (Table 4-3)

BLM_0020039

has potential to reduce the health and vigor of vegetation on at least 58,200 acres of vegetation. By the 26th year (to include the six year lag time before reclamation would be expected to be successful), overall disturbance remaining would be around 5,000 acres. Using the formula from above there would be an average of 280 AUMs of forage loss remaining after reclamation throughout the MPA.

<u>Impacts from Management Actions</u>

Impacts related to management actions are similar to those common to all alternatives. Under this alternative there would be zero acres open to oil and gas development with standard lease terms and conditions compared to the 455,500 acres under Alternative A (Table 4-6). Mineral estate throughout the Planning Area managed with NSO stipulations (757,200 acres; Table 4-6) to a large extent would coincide with slopes of 35 percent or greater. Restricting energy development in these places would shift surface disturbance to gentler topography thus coinciding with areas that are accessible to livestock for grazing. The NSO stipulations that would potentially shift development into areas that coincide with livestock use include the following areas:

- Where natural slopes are greater than or equal to 35 percent (Table 2-2 Record 17) unless an exception, modification or waiver was granted (353,000 acres);

- On areas with Douglas-fir and aspen where slopes are greater than 25 percent (Table 2-15 Record 10; 63,200 acres); and

- Within 100 feet of landslide prone areas (Table 2-2 Record 15), unless exceptions or modifications were granted (46,400 acres).

The following NSO stipulations would protect soil resources, stream channels, wildlife values, and areas of special designations. These management actions would generally not influence the placement of oil and gas development in terms of shifting disturbance into areas that are more accessible for livestock grazing and would include the following areas;

- In mapped 100 year flood plains, within 500 feet of perennial water sources and riparian/wetland areas, or within 100 feet of ephemeral channels (Table 2-2 Record 12);

- Within 100 feet of saline soils, except for Coal Oil Basin (Table 2-2 Record 16);

- Areas identified as having remnant vegetation associations including ponderosa pine stands and unique or ecologically intact sagebrush communities (Table 2-3 Record 28);

- Priority riparian/wetland habitats (Table 2-3 Record 20);

- Federal mineral estate within all SWAs (Table 2-4 Record 16);

- Within 1/8 mile of functional raptor nest sites (Table 2-5 Record 11);

- Within 0.6 mile of sage-grouse lek sites (Table 2-6 Record 18);

- Within 1/2 mile of prairie-dog colonies, with the exception of Coal Oil Basin Exemption Area and the Rangely Oil Field (Table 2-9 Record 15);

- Within 330 feet of habitat for the BLM sensitive plants (Table 2-10 Record 16);

- Critical or occupied habitat for federally listed fish species on the 100 year flood plain of the White River below Rio Blanco Lake (Table 2-9 Record 18);

- Within 1/4 mile of functional nests of federally endangered, threatened, proposed, or candidate raptor species or within 330 feet of abandoned bald eagle nests (Table 2-9 Record 28);

BLM_0020040

**Chapter 4 – Environmental Consequences**

- Within 1/4 mile of bald eagle critical night roosts (Table 2-9 Record 29);

- Within 660 feet of occupied, suitable, and potential habitat for federally listed proposed or candidate plant species (Table 2-10 Record 15);

- Within and adjacent to Mellen Hill cultural sites (Table 2-12 Record 13);

- Lands managed as old growth (forest/woodland) and with high potential for old growth (Table 2-15 Record 12); and the

- Three special management areas, Anderson Gulch, LO7 Hill and 3 Mile Gulch (Table 2-18 Record 5).

Oil and gas activities would not be allowed to result in negative impacts to upland health unlike Alternative A where management would only have to retain upland health (Table 2-2 Record 14). To meet the Colorado Standards for Public Land Health, and avoid conflicts with existing grazing plans under Alternative B, adjustments to oil and gas activities would be considered to allow continued implementation of existing grazing permits/leases unlike the other alternatives where changes could be made to grazing operations (Table 2-16 Record 13).

Where companies choose to cluster development activities within acute disturbance thresholds of identified big game and sage-grouse areas (Table 2-4 Record 12 and Table 2-6 Record 16) both direct and indirect impacts to livestock would occur in more discrete areas, and would be greater, but for a shorter duration. This management action would effectively expedite implementation of reclamation because drilling and completion activities could be completed more quickly with the relaxed timing restrictions. Fencing well pads (Table 2-16 Record 11) and linear ROWs (Table 2-16 Record 12) would directly improve reclamation success by preventing grazing use while seeded plants are establishing. Fencing pads would also reduce the risk of livestock accessing hazardous materials. Noise-reduction techniques, including muffling internal combustion engines and certain compressor components, could reduce disturbance to livestock (Table 2-6 Record 7) where Alternative A has no similar action. Compensatory mitigation from oil and gas operators to livestock grazing operators commensurate with the impact to the livestock operation could reduce the impact of forage losses if oil and gas operators choose to provide such mitigation (Table 2-16 Record 9). At full development, disturbance levels would be twice that of Alternative A, however Alternative B would provide opportunity for compensation for lost grazing capacity to preserve the profitability of livestock grazing operations where Alternative A provides no possibility of compensation.

The following management actions would reduce impacts from dust and particulates to the health and vigor of vegetation used as forage within 300 feet of construction sites or roads (at least 58,200 acres):

- Reducing fugitive dust production within the MPA by 84 percent would be required under Alternative B for local and collector roads compared to a 50 percent reduction under Alternative A (Table 2-1 Record 7);

- Reducing fugitive dust production within the MPA by 80 percent would be required under Alternative B for resource roads compared to 50 percent under Alternative A (Table 2-1 Record 8);

- Requiring measures beyond watering (as in Alternative A) to control dust and prevent dust plumes (Table 2-1 Record 10);

BLM_0020041

*Chapter 4 – Environmental Consequences*

- Requiring that 90 percent of well pads use three phase gathering systems compared to a 40 percent requirement under Alternative A (Table 2-1 Record 16);

- Encouraging piping of produced water and water to support construction, drilling and completion activities, compared to Alternative A where it would only be analyzed when proposed (Table 2-2 Records 18 and 19);

- Evaporation would not be allowed for disposal of produced water (Table 2-2 Record 22 and Table 2-17 Record 10);

- Limiting or precluding disturbance within 660 feet of occupied, suitable or potential habitat for federally listed plant species and within 330 feet of habitat for special status plant species, compared with no buffer areas under Alternative A (Table 2-10 Records 15 and 16);

- Requiring an 80 percent reduction in fugitive dust within 330 feet of occupied, suitable, and/or potential habitat for special status plant species, compared to no similar action under Alternative A (Table 2-10 Record 17); and

- Limiting use of oil and gas access roads to administrative use only, where Alternative A has no similar action (Table 2-19 Records 8 and 13).

Requiring treatment of noxious weeds and or invasive annual plant species prior to seeding (Table 2-3 Record 23) would reduce the risk of noxious weeds invading existing plant communities, degrading forage resources or impairing revegetation efforts. Requiring that identified weeds be controlled within the permitted area of direct and indirect use (Table 2-3 Record 24), and its other associated COAs, would reduce the chance of weeds spreading beyond the site into the surrounding plant community and negatively affecting forage resources.

Overall, Alternative B would incorporate more detailed, specific and restrictive management actions, which could reduce risks to rangeland resources as compared to Alternative A.

**Reclamation**

Reclamation activities are the same as those common to all alternatives except meeting the 100 percent success criteria (Table 2-3 Record 18) could restore forage to pre-disturbance levels more quickly relative to Alternative A.

### 4.7.2.4    Alternative C

**Impacts from Oil and Gas Development**

Impacts from oil and gas exploration and development under Alternative C would be similar to Alternative B, except the number of well pads would increase to 1,800 (approximately 15,042 wells) (Table 2-1 Record 13). The associated disturbance for local and resource roads and support infrastructure would also increase under Alternative C to 21,600 acres, which would directly reduce the amount of forage available to livestock where surface disturbance occurs, compared to Alternatives A and B. The decrease in total cumulative forage available to livestock consumption would range from approximately 720 and 3,600 AUMs as follows:

$$720 = 21{,}600 \text{ acres} \times (1 \text{ AUM/30 acres}^{\text{low range}})$$
$$3{,}600 = 21{,}600 \text{ acres} \times (1 \text{ AUM/6 acres}^{\text{high range}})$$

The potential for direct and indirect effects to livestock grazing in areas open to oil and gas development with TL stipulations would be greater under Alternative C than under Alternatives A and B, because more wells are anticipated in Alternative C. Thresholds applied to essential wildlife

BLM_0020042

habitats under Alternative C could concentrate forage reductions and noise, which would be the same type of impacts as Alternative B.

Restricting surface disturbance through NSO stipulation designations would minimize the potential for oil and gas activities to reduce forage from surface disturbance on 387,600 acres. The potential for preservation of sources of forage and water in NSO stipulation areas would be greater under Alternative C in comparison to Alternatives A (but less than Alternative B).

The potential for direct and indirect effects to livestock grazing from oil and gas operations to occur in areas designated as CSU stipulation under Alternative C would be similar to but more extensive than those described under Alternative B because more wells are predicted and CSU stipulation designations total 400,400 acres, an increase of 104,100 acres compared to Alternative B. Areas designated as CSU stipulation under Alternative C would decrease by 183,500 acres relative to Alternative A. The potential disturbance to livestock grazing from development with CSU stipulations under Alternative C for other resources would be less than Alternative A but more than Alternative B.

Based on the results of the temporal analysis for vegetation (Appendix E), the percent of vegetated land developed within the MPA under Alternative C generally increases from Alternative A by 2.3 percent, and from Alternative B by 1.3 percent. An estimated 20,500 acres (Table 4-49 Line 7) of land (of the available 406,000 acres available for surface occupancy; Table 4-49 Line 4), including an estimated 1,710 well pads (Table 4-49 Line 6), would be disturbed over the 20-year planning period. This represents a reduction between approximately 684 and 3,420 AUMs from disturbance and an approximate 227 percent increase relative to Alternative A and an approximate 64 percent increase over Alternative B.

**Impacts from Management Actions**

As with Alternatives A and B, oil and gas development activities and associated disturbance under Alternative C could require a change to allotment management to continue meeting or making progress toward meeting the Colorado Standards for Public Land Health. Oil and gas operations and livestock grazing operations would be more likely to decrease available forage over the long term under Alternative C relative to Alternatives A or B because affected allotments (portions or whole) could be closed to livestock grazing throughout the period of intensive oil and gas development if oil and gas activity increases to a level where the two activities are incompatible. Compensatory mitigation from oil and gas operators to livestock grazing operators could offset some forage losses if oil and gas operators choose to provide such mitigation.

The greater number of wells and the higher threshold limits under Alternative C would reduce the indirect benefits of the thresholds or alternative TL stipulations on livestock operations relative to Alternatives A and B. Employment of noise reduction methods for development of oil and gas facilities under Alternative C would have the same potential to reduce livestock avoidance behavior and retain the effective availability of forage or water as Alternative B.

Excluding livestock from linear ROW corridors would have the same impact as Alternative B.

**Reclamation**

Reclamation activities are the same as those common to all alternatives as described above, except meeting the 80 percent success criteria (Table 2-3 Record 18) could restore forage to pre-disturbance levels more quickly relative to Alternative A, but slower than Alternative B.

BLM_0020043

### 4.7.2.5   Alternative D

__Impacts from Oil and Gas Development__

Impacts from oil and gas exploration and development under Alternative D would be similar to Alternative C, except the number of well pads would increase to 2,556 (Table 2-1 Record 13) resulting in an estimated 30,700 acres of surface disturbance. The increased disturbance, including the increased associated disturbance for local and resource roads and support infrastructure, would directly reduce the amount of forage available to livestock where surface disturbance occurs under Alternative D compared to Alternatives A, B, and C. AUM losses could range between 1,022 and 5,112 as follows:

$$1,022 = 30,700 \text{ acres} \times (1 \text{ AUM/30 acres}^{\text{low range}})$$
$$5,112 = 30,700 \text{ acres} \times (1 \text{ AUM/6 acres}^{\text{high range}})$$

The direct and indirect effects to livestock grazing in areas designated as open to oil and gas exploration and development with standard lease terms and conditions under Alternative D would be similar to those described under Alternative A, but the magnitude and extent of effects would likely be greater because more well pads would potentially be developed. The area designated as open to oil and gas development with standard lease terms and conditions under Alternative D would include 444,800 acres, a decrease of 10,700 acres relative to Alternative A. With potentially greater development, there would be a greater potential to alter the distribution and amount of forage available for livestock, which could change grazing patterns in affected allotments.

Restricting surface disturbance through NSO stipulation designations would decrease the potential for oil and gas activities to reduce forage through surface disturbance on 257,100 acres. The potential for direct and indirect preservation of useable forage and water as a result of NSO stipulation designations under Alternative D would be lower than Alternatives B and C, because there are more acres of NSO stipulation in those alternatives. The preservation of these resources for livestock under Alternative D would be greater than Alternative A, as Alternative A has fewer acres of NSO stipulation.

Direct and indirect forage losses could occur in areas with TL stipulations under Alternative D for the same reasons discussed under Alternative A, but the potential for forage losses would be greater because more wells are anticipated. Direct and indirect effects to livestock grazing from oil and gas operations in areas with TL stipulations under Alternative D could occur on 524,800 acres of the Planning Area. As with Alternative A, TL stipulations would temporarily eliminate the potential for livestock to avoid forage and water near noisy areas.

The types of direct and indirect effects to livestock grazing from oil and gas operations to occur in areas managed with CSU stipulations under Alternative D would be similar to those described under Alternative A, but the magnitude and extent of effects would likely be greater because more surface disturbance is expected from the increase in well pads. Areas managed by CSU stipulation under Alternative D include only 469,300 acres, a decrease of 114,600 acres relative to Alternative A, and an increase of 173,000 acres relative to Alternative B. Areas designated as CSU stipulation under Alternative D would increase by 69,000 acres relative to Alternative C. A CSU stipulation could still permit surface disturbances that could reduce useable forage and water sources, an impact under Alternative D that is comparable to Alternative C. Alternatives B and C would have a greater protective effect to these resources than Alternative D because of fewer CSU stipulation acres and lower development levels.

BLM_0020044

Based on the results of the temporal analysis for vegetation (Appendix E), the percent of vegetated land developed within the MPA under Alternative D generally increases from Alternative A by 3.8 percent, from Alternative B by 2.8 percent, and from Alternative C by 1.5 percent (Table 4-50 Line 8). An estimated 29,100 acres (Table 4-50 Line 7) of land (of the available 469,200 acres available for surface occupancy) (Table 4-50 Line 4), including an estimated 2,428 well pads (Table 4-50 Line 6), would be disturbed over the 20-year planning period. This represents a reduction between approximately 971 and 4,856 AUMs from disturbance. Compared to Alternatives A, B, and C, Alternative D would result in the most well pad development, and an approximate 365 percent increase over Alternative A, an approximate 132 percent increase over Alternative B, and an approximate 42 percent increase over Alternative C in the potential reduction of AUMs from disturbance.

**Impacts from Management Actions**

The types of effects on livestock grazing management and availability of forage under Alternative D would be similar to those described for Alternative C.

Alternative D would require the employment of noise reduction methods for development of oil and gas facilities that could adversely influence sage-grouse reproductive functions. This impact would be the same as Alternative B.

**Reclamation**

Reclamation activities are the same as those common to all alternatives except meeting the 60 percent success criteria (Table 2-3 Record 18) could restore forage to pre-disturbance levels more quickly relative to Alternative A, but slower relative to Alternatives B and C.

## 4.7.2.6    Irreversible and Irretrievable Commitment of Resources

Well pads, roads, evaporation ponds, fenced areas, and other facilities would effectively remove acreage from forage production for a period of time. The loss of forage would be irretrievable until vegetation communities were reestablished and fences removed. Some of the estimated initial surface disturbance associated with each alternative would be reclaimed over the short term (i.e., Phase I and Phase II reclamation). The remainder of disturbed acreage would be reclaimed over the long term (i.e., Final Reclamation) where a large percent of the original disturbance would be returned to forage production and would most likely be restored to at least pre-disturbance levels.

Livestock grazing should not experience irreversible or irretrievable impacts under Alternatives A, B, and C because decisions to mitigate disturbance impacts should offset the level of oil and gas development. Historic grazing patterns and established lease areas for livestock operations could be irretrievable under Alternative D due to the high level of oil and gas development and relaxed mitigation standards that could change the distribution of forage in the Planning Area.

## 4.7.2.7    Unavoidable Adverse Impacts

Some short-term reduction in forage would be unavoidable under all the alternatives. The amount of forage loss would be proportional to the number of acres disturbed from mineral operations. Reclamation would reduce the unavoidable loss of forage. At the end of the 20-year planning period, not all areas would be reclaimed; Alternative A could have the least amount of non-reclaimed area and Alternative D could have the most (due to the greater number of well pads under Alternative D). Long-term reclamation would reduce this loss of forage.

Adverse impacts to livestock grazing could be avoidable under Alternatives A, B, and C, because decisions to mitigate disturbance impacts should offset the level of oil and gas development. Due to the high level of oil and gas development and relaxed mitigation standards under Alternative D, the adverse impacts that result from forage losses or displacement of livestock from forage sites could be unavoidable. Long term, reclamation would reduce this loss of forage.

### 4.7.2.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Conflicts between ranching and oil and gas development would most likely be in areas of concentrated oil and gas development. Ranchers in areas with concentrated oil and gas development could be faced with short-term adjustments in livestock management to continue grazing livestock in these areas.

Short-term development of oil and gas resources should not lead to long-term reductions in the productivity of forage on livestock leases or substantial changes in stocking rates because the mitigation measures should adequately offset the level of development under Alternatives A, B, and C. These impacts would be greater under Alternative C (than under Alternatives A or B) due to the greater amount of oil and gas development and slightly relaxed mitigation standards, but productive livestock grazing lands should return in the long term. However, under Alternative D, long-term productivity of grazing lands and stocking rates could be lost, due to the highest level of oil and gas development and the most relaxed mitigation standards.

## 4.7.3    Minerals

Leasable minerals (oil and gas, coal, sodium, and oil shale) and salable minerals (sand and gravel) are analyzed below. No substantial development potential is foreseen for locatable minerals (e.g., uranium, gold, silver, copper, lead). The BLM studies have indicated that the Planning Area is not considered to have high potential for geothermal power development and it is assumed that there would be no impacts to geothermal energy resources or development.

This analysis uses quantitative and qualitative indicators and attributes to assess impacts. The following four indicators have been selected to analyze the effects of the alternatives on oil and gas development:

- Areas available for oil and gas exploration and development;
- Potential restrictions to oil and gas exploration and development;
- Ability to develop other minerals; and
- Cost of oil and gas development.

The attributes of these four indicators are:

**Leasable Minerals**

- Acres with COA or leasing stipulations of NSO, CSU or TL, and Open with Standard Terms and Conditions.

**Salable Minerals**

- Areas available for salable mineral exploration and development.

BLM_0020046

The analysis is based on the following assumptions:

**Leasable Minerals**

- Where an area is leased, it would be developed;

- Relocating well pads based on NSO or CSU stipulations would alter the location of well pads, but not the number developed;

- The increase in oil and gas exploration and development could result in some areas with greater drilling density than others;

- The BLM would continue to require the oil and gas operator to make a good faith effort to obtain a Surface Access Agreement from the surface owner before approving drilling operations on private land;

- Coal development would continue at approximately the current rate on existing leases;

- Additional coal leases would be issued in the area identified as available for coal leasing to compensate for mined-out coal resources;

- Sodium development would continue on existing leases;

- Existing and future oil shale Research, Development, and Demonstration leases would continue to be developed as per lease terms; and

- Geothermal resources in the Planning Area would not be developed.

**Salable Minerals**

- Sand and gravel would be needed for construction activities related to oil and gas development.

- The demand for sand and gravel, riprap, and other mineral construction materials would follow the rate of resource development in a given area. New sales areas could be requested in order to establish closer proximity to development areas.

## 4.7.3.1    Impacts Common to All Alternatives

**Impacts from Management Actions**

### 4.7.3.1.1   Leasable Minerals (Oil and gas)

In general, effects of oil and gas exploration and development depend in part on the amount of surface area made available for drilling. An estimated 93 percent of past and present disturbance for oil and gas well pads and associated facilities (e.g., gas plants or compressor stations) occur on slopes less than 25 percent. It is reasonable to assume future location of well pads and associated facilities would continue to occur in areas with slopes less than 25 percent. Any NSO or CSU stipulation encumbering lands with slopes greater than 25 percent would have little or no effect on the siting/placement of wells pads or associated facilities.

Areas without NSO stipulations would be available for surface location of oil and gas activities. Oil and gas resources located beneath NSO stipulation areas would be available and could require directional drilling depending on the bottomhole location and reservoir drainage characteristics. The economic life expectancy of an individual well in the MPA could be over 45 years (BLM 2007). However, the exact length of time required to fully recover economic oil and gas resources remains uncertain.

BLM_0020047

Construction of well pads adjacent to areas with applied NSO stipulations could be restricted depending on the configuration and location of the NSO stipulation. These NSO stipulations could indirectly create an effective NSO stipulation area where the geometry of well pads or facilities could not be sited. Isolated NSO stipulation areas of less than 7.5 acres are not included in the effective NSO. For analysis purposes the following non NSO stipulation areas were determined to have an effective NSO stipulation:

- Areas of 7.5 acres or less within a mapped NSO stipulation area;
- Aggregated NSO stipulation areas of less than 7.5 acres within 600 feet of NSO stipulation areas greater than 7.5 acres; and
- NSO stipulation areas that have a distance of less than 600 feet between the NSO stipulation boundaries.

Impacts to energy and mineral resources are generally related to the oil and gas lease stipulations or COA prescribed under each management action. Decisions that restrict development through NSO stipulations could limit development and recovery of mineral resources if the reservoirs are inaccessible by horizontal directional drilling. Surface locations of the well bores are situated near the center of a well pad (approximately 300 feet from the edges of a 7.5 acre well pad). A well pad located next to an NSO stipulation area moves the surface well bore location approximately 300 feet from the boundary of the NSO stipulation increasing the directional drilling distance to the bottomhole location by 300 feet. Current drilling technology in WRFO is capable of drilling bottomhole locations approximately 2,800 feet from the surface well bore location. Recovery of the underlying oil and gas resource would not occur if the areal extent of the NSO is such that the bottomhole location is beyond drilling capabilities. For comparative purposes in the analysis between the alternatives it is assumed no exceptions, modifications, or waivers would be granted. In general the larger the areal extent of NSO the more difficult it would be to develop the underlying oil and gas resources. No surface occupancy stipulations that require indirect routes for the access and transportation of oil and gas resources would increase the cost of development.

Controlled surface use stipulations that require relocation of mineral facilities to avoid sensitive habitat, offset losses with habitat modification, or require additional construction criteria could result in an increased cost of mineral resource recovery. Timing limitation stipulations could impact mineral resources if not enough time is allowed for development. The cost of oil and gas exploration and development could increase due to TL stipulations if multiple mobilization efforts over a prolonged amount of time are required to develop each well pad.

Best Management Practices attached as COAs that require on-the-ground surveys for vegetation, paleontology, wildlife, and/or special status species could also delay development if multiple-season surveys are required and development is not allowed to proceed until surveys are complete and reviewed by the BLM. Surveys would also increase the cost of development by requiring additional personnel and equipment for performing the surveys. Conditions of Approval with prescriptions beyond what is proposed as applicant design features included in the APD would increase the economic burden of the operator.

### 4.7.3.1.2   Solid Leasable Minerals (Coal, Sodium, Oil Shale)

Where oil and gas development occurs within areas containing other solid leasable minerals, short-term conflicts could arise when the other solid leasable minerals cannot be developed due to pipeline and associated surface infrastructure construction. Long term conflicts could be created with the placement of oil and gas wells through overlying leasable minerals. In the long term, once

*Chapter 4 – Environmental Consequences*

the oil and gas resources have been depleted and the wells abandoned (greater than 45 years), recovery of coal, sodium, and oil shale could occur. Sodium and oil shale resources are located within the MPA where 95 percent of the oil and gas development is projected to occur and coal leasing is located outside of the MPA.

Limiting the implementation of oil and gas development through a CSU stipulation (Table 2-17 Record 23) in the Deserado Coal Mine permit area and requiring the oil and gas lessee to reach an agreement with the federal coal lessee on the placement of wells or surface equipment would reduce potential resource conflicts with the existing Deserado Coal Mine.

## Reclamation

Surface reclamation or stabilization of all disturbed areas is required by Onshore Order No. 1 (BLM 2007d). This includes interim reclamation for the area of the well pad not needed for production during the economic life of the well. Additional requirements or prescriptions attached as COAs to achieve required reclamation success could initially increase the costs of oil and gas development.

### 4.7.3.2    Alternative A

**Impacts from Management Actions**

### 4.7.3.2.1    Leasable Minerals (Oil and Gas)

Alternative A would allow for 4,603 new wells on 550 new well pads (Table 2-1 Record 13), the fewest of the four alternatives and provides the lowest potential for recovery of oil and gas resources over the life of the plan. Under this alternative annual drilling and development of wells could be inadequate to maintain or efficiently utilize existing oil and gas infrastructure (e.g., gas plants and transportation pipelines).

This alternative has the most acres open to oil and gas leasing with standard lease terms and conditions and also has the lowest number of acres managed with NSO stipulations and effective NSO stipulation area (Table 4-74), making it the least restrictive alternative, and allowing oil and gas developers the most flexibility in surface locations for development of leases. In Alternative A the MPA would have 33,300 acres encumbered with NSO on lands with slopes less than 25 percent. As discussed in Section 4.7.3.1 Impacts Common to All Alternatives, 93 percent of existing disturbance for well pads and facilities are on slopes less than 25 percent. As a result the 34,800 acres of NSO stipulation areas within the MPA on slopes greater than 25 percent would have little or no effect on siting of well pads or facilities.

Alternative A has the most acres with CSU stipulations (583,900 acres Table 4-74), which could potentially require additional constraints on locations and increase costs for relocating. This alternative has the least acreage encumbered by TL stipulations; 1,006,500 acres of which 499,500 acres (Table 4-74) have no concurrent NSO stipulations or CSU stipulations. Approximately 70,000 acres (about 4 percent) within the area available for federal oil and gas leasing would have multiple TL stipulations that could restrict development activities for seven months or more.

BLM_0020049

**Table 4-74. Acres of Leasing Stipulations Under Alternative A**

| Open (with standard lease terms and conditions) | Closed | No Surface Occupancy | NSO including Effective NSO[1] | Potential Non recoverable Oil and Gas Resource[2] | Controlled Surface Use | Timing Limitations[3] |
|---|---|---|---|---|---|---|
| 455,500 | 83,300 | 157,100 | 161,900 | 14,100 | 583,900 | 499,500 |

SOURCE: BLM GIS data 2011.

NOTES:

[1] NSO area including area that does not allow typical pad configuration

[2] Area of subsurface non recoverable oil and gas resources by current technology if no exceptions to NSO are granted

[3] Timing limitation numbers represent acres that would be subject to timing limitations only. However, areas managed with NSO or CSU stipulations could also be subject to timing limitations as an additional lease stipulation or COA.

The majority of the area of potential non recoverable oil and gas resources, 9,000 acres, is attributable to an NSO stipulation for known and potential habitat for federally listed, proposed, and candidate plant species, (Table 2-10 Record 15), followed by 4,300 acres of ACECs (Table 2-21 Record 13), and 1,600 acres for Oak Ridge State Wildlife Area (Table 2-4 Record 16).

Impacts that would occur to oil and gas are the same as described in Section 4.7.3.1, Impacts Common to All Alternatives.

### 4.7.3.2.2   Solid Leasable Minerals (Coal, Sodium, Oil Shale)

Alternative A proposes the fewest number of wells and well pads throughout the life of the plan compared to the other alternatives, and thus Alternative A would have the lowest potential for conflicts between oil and gas development and other mineral resources.

Alternative A has the most acres open (available with standard lease stipulations) for oil and gas drilling and fewest acres managed with NSO stipulations in areas of coal suitability, sodium leasing, and oil shale leasing, which could increase the conflicts between those resources and oil and gas development in the short term (Table 4-75). Impacts would be similar as Section 4.7.3.1. This coupled with the lowest number of well pads and only five percent of the oil and gas activity being expected to occur outside the MPA (the available area for coal leasing exists outside the MPA), creates a low potential for conflict of oil and gas development with coal resources.

**Table 4-75. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil Shale Development Under Alternative A**

| | Open (with standard lease terms and conditions) | No Surface Occupancy | Controlled Surface Use | Timing Limitations[1] |
|---|---|---|---|---|
| Coal suitability | 16,000 | 25,200 | 48,900 | 79,800 |
| Sodium leasing | 59,400 | 4,600 | 8,400 | 20,700 |
| Oil Shale leasing | 128,500 | 38,400 | 65,200 | 105,000 |

SOURCE: BLM PEIS 2008.

NOTE:

[1] TL stipulation numbers represent acres that would be subject to TL stipulations only. However, areas managed with an NSO stipulation or a CSU stipulation could also be subject to TL stipulations as an additional lease stipulation or COA.

BLM_0020050

*Chapter 4 – Environmental Consequences*

Oil and gas development would occur within oil shale lease areas, oil shale research areas, the multi-mineral zone, and sodium lease areas (Map 3-15), as these areas fall entirely within the MPA. Results of the temporal analysis performed for Alternative A show that the construction of 523 well pads in the MPA could disrupt development of other leasable minerals (Table 4-76). Line 6 of the table presents the estimated number of well pads that could be developed in each of these areas. The temporal analysis results indicate that of the 523 well pads estimated in the MPA, 294 could be constructed in oil shale leasing areas, 1 in oil shale research areas, 148 in the sodium and multi-mineral zone, and 15 in areas with sodium leases.

These estimates are based on distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations). Based on the analysis results, the oil shale leasing area would potentially receive 56 percent of the well pads because it comprises 56 percent of the acres (298,800 acres out of 533,200 acres) available for surface occupancy in the MPA. The oil shale research areas would potentially receive less than one percent of the well pads because these areas comprise less than one percent (760 acres out of 533,200 acres) area available for surface occupancy in the MPA. The multi-mineral zone would potentially receive 28 percent of the well pads because it comprises about 28 percent (150,800 out of 533,200 acres) (Table 4-76 Line 4) of the area available for surface occupancy in the MPA. The sodium lease areas would potentially receive about 3 percent of the well pads because these areas comprise about 3 percent (14,500 acres out of 533,200 acres) of the area available for surface occupancy in the MPA. The types of impacts that would occur to solid leasable minerals are the same as described in Section 4.7.3.1, Impacts Common to All Alternatives.

**Table 4-76. Estimated Number of Well Pads and Associated Surface Disturbance within Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative A**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi-Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 | 337,200 | 800 | 164,000 | 16,600 |
| 2 | Percent of Land Area in the MPA | % | 100 | 56.0 | 0.1 | 28.0 | 2.8 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 64,100 | 38,400 | 40 | 13,200 | 2,100 |
| 4 | Area Available for Surface Occupancy | Acres | 533,200 | 298,800 | 760 | 150,800 | 14,500 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 89 | 56 | 0.1 | 28 | 2.8 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 | 294 | 1 | 148 | 14 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,276 | 3,528 | 12 | 1,776 | 168 |

**Table 4-76. Estimated Number of Well Pads and Associated Surface Disturbance within Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative A**

| | | | Alternative A | | | | |
|---|---|---|---|---|---|---|---|
| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi-Mineral Zone | Sodium Leases |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period | % | 1.1 | 1.1 | 1.5 | 1.1 | 1.0 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulations areas for MPA are for all resources. NSO stipulation areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumes that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumes that each well pad would require 12 acres of surface disturbance.

### 4.7.3.2.3   Salable Minerals

Alternative A would have the least impact to salable (sand and gravel) mineral resources because it is anticipated to have the fewest oil and gas wells. Salable minerals could be used during construction of well pads, access roads, and associated infrastructure.

<u>Reclamation</u>

Reclamation of oil and gas development associated with 4,603 wells on 550 new well pads would be similar as described in Section 4.7.3.1, Impacts Common to All Alternatives. Requiring the use of native plant species for reseeding in ACECs (Table 2-3 Record 17) and encouraging their use in other areas could cause delays in development and increase the cost of oil and gas recovery if custom-design seed mixes are hard to develop. However, within the MPA, where 95 percent of the oil and gas activity is expected to occur, the ACECs are encumbered with NSO stipulations. Since it is unlikely any surface disturbing activities would be authorized within these ACECs this requirement would have little or no effect on oil or gas recovery.

### 4.7.3.3   Alternative B

<u>Impacts from Management Actions</u>

#### 4.7.3.3.1   Leasable Minerals (Oil and Gas)

Alternative B would allow for 9,191 new oil and gas wells on 1,100 new well pads (Table 2-1 Record 13) compared to Alternative A (4,603 and 550, respectively), and would have more potential to recover oil and gas resources and optimize existing infrastructure than Alternative A.

This Alternative proposes twice as many well pads drilled throughout the life of the plan than Alternative A and places more restrictions on oil and gas development than Alternatives A, C, or D. There are no areas open with standard lease terms and conditions and Alternative B has the most acreage subject to NSO stipulations (757,200 acres) compared to any alternative (Table 4-77).

In Alternative B the MPA would have 106,200 acres encumbered with NSO on lands with slopes less than 25 percent. This is an increase of 72,900 acres or over three times compared to

BLM_0020052

Alternative A in areas typical for selection of well pad and facility site locations. As discussed in Section 4.7.3.1 Impacts Common to All Alternatives, 93 percent of existing disturbance for well pads and facilities are on slopes less than 25 percent. As a result 207,100 acres of NSO stipulations in the MPA located on slopes greater than 25 percent would have little or no effect on the siting of well pads or facilities. Alternative B also has more instances where no exceptions, waivers, or modifications to NSO stipulations or CSU stipulations would be allowed as compared to any of the other alternatives.

Alternative B would have the most acres encumbered with multiple TL stipulations of any alternative. Approximately 172,000 acres (about 10 percent) within the area available for federal oil and gas leasing would have multiple TL stipulations that could restrict development activities for seven months or more. This would have the same types of impacts as all alternatives, but would encumber about two and half times as many acres as Alternatives A and D. Management actions under Alternative B would be in general more restrictive and would have the highest economic impact to oil and gas resource recovery than any alternative.

### Table 4-77. Acres of Leasing Stipulations Under Alternative B

| Open (with standard lease terms and conditions) | Closed | No Surface Occupancy | NSO including Effective NSO[1] | Potential Non recoverable Oil and Gas Resource[2] | Controlled Surface Use | Timing Limitations[3] |
|---|---|---|---|---|---|---|
| 0 | 83,300 | 757,200 | 968,100 | 198,800 | 296,200 | 642,400 |

SOURCE: BLM GIS data 2011.

NOTES:

[1]NSO area including area that does not allow typical pad configuration.

[2]Area of subsurface non recoverable oil and gas resources by current technology if no exceptions to NSO stipulations are granted.

[3]Timing limitation numbers represent acres that would be subject to timing limitations only. However, areas managed with NSO or CSU stipulations could also be subject to timing limitations as an additional lease stipulation or COA.

Of the 198,800 acres of potential non recoverable acres of oil and gas resources, 94,400 acres are attributed to NSO stipulations for active, suitable, and inactive prairie dog colonies (Table 2-9 Record 15), 70,400 acres are attributed to NSO stipulations for non-WSA lands with wilderness characteristics (Table 2-22 Record 7) followed by 32,400 acres attributable to an NSO stipulation for occupied, suitable, and potential habitat for federally listed, proposed, and candidate plant species (Table 2-10 Record 15, 4,500 acres for State Wildlife areas (Table 2-4 Record 16), 3,100 acres of ACECs (Table 2-21 Record 13), 13,400 acres associated with landslide areas (Table 2-2 Record 15), and 10,300 acres of ACECs (Table 2-21 Record 13) 5,800 acres for State Wildlife areas (Table 2-4 Record 16). There is overlapping areas of potential non recoverable oil and gas resource attributed NSO stipulations. The largest overlap, 29,300 acres, occurs between non-WSA lands with wilderness characteristics and active, suitable, and inactive prairie dog colonies, followed by 9,000 acres of overlap between WSA lands with wilderness characteristics and occupied, suitable, and potential habitat for federally listed, proposed, and candidate plant species.

NSO stipulations applied to LWC would increase the effective NSO from 931,000 acres to 971,300 acres of the lands available for oil and gas leasing in the WRFO area. Requesting off-site mitigation for any surface disturbance at a rate of 3 acres of mitigation for each acre of big game wildlife habitat disturbed and compensatory mitigation to offset reductions in big game habitat

BLM_0020053

capacity (Table 2-4 Record 15) would impact oil and gas development by increasing the cost of development.

The purpose of the threshold concept (Table 2-4 Record 12) is to allow for year round drilling while limiting the extent of seasonal ranges subject to cumulative adverse behavioral effects on big game. This provides incentive for clustering oil and gas development to keep impacts below the thresholds and to reduce the number of discrete areas requiring reclamation. Clustering could constrain exploration by altering the extent, timing, and location of oil and gas development. However, compliance with the wildlife thresholds and allowing for year-round drilling on parcels normally subject to TL stipulations could be more cost-effective to developers as they could consolidate infrastructure, reduce the number of local and resource roads, and have fewer mobilization efforts than if they were to adhere to TL stipulations.

In concert with the threshold concept, the granting of lease suspensions for conservation of natural resources (Table 2-17 Records 15 and 16) could be beneficial to oil and gas developers, as it would allow for lease retention while the developers organize and concentrate resources to fully develop other lease holdings. Deferring oil and gas leasing decisions on 96,100 acres of sage-grouse habitat north of U.S. 40 (Table 2-6 Record 12) would impact leasable oil and gas minerals by delaying the availability of this area for oil and gas development. Deferring decisions until sage-grouse behavior and habitat utility in this area are sufficiently understood would likely be a long-term impact (Table 2-6 Record 12). However, the area north of U.S. 40 is in an area identified as having low potential for oil and gas occurrence (BLM 2007) and is not in the MPA where 95 percent of oil and gas development is expected to occur.

Not allowing the use of pits (Table 2-17 Record 20) would constrain oil and gas development and increase the cost of oil and gas recovery, as the disposal of drilling cuttings would become more complicated and could increase costs.

### 4.7.3.3.2   Solid Leasable Minerals (Coal, Sodium, Oil Shale)

Alternative B proposes twice as many well pads throughout the life of the plan as Alternative A and would have a greater potential for conflicts between oil and gas development and other mineral resources than Alternative A.

Alternative B has the most acres managed with NSO stipulations in areas of coal leasing, sodium leasing, and oil shale leasing, which could decrease the conflicts between those resources and oil and gas development in the short term (Table 4-78). The impacts to coal would be similar to Alternative A with an increase in area encumbered by the coal CSU (Table 2-17 Record 23) which would result in oil and gas development being relocated outside the area adjacent to the Deserado Mine permit area and all coal leases. An NSO precluding drilling in areas of active sodium mining (Table 2-17 Record 22) and oil shale research development and demonstration leases (Table 2-17 Record 21) would lower the potential for conflicts between oil and gas development and other solid leasable minerals.

BLM_0020054

**Table 4-78. Acres of Leasing Stipulations on Areas Suitable for
Coal, Sodium, and Oil Shale Development Under Alternative B**

|  | Open (with standard lease terms and conditions) | No Surface Occupancy | Controlled Surface Use | Timing Limitations[1] |
|---|---|---|---|---|
| Coal leasing | 0 | 85,900 | 31,300 | 52,700 |
| Sodium leasing | 0 | 19,500 | 10,200 | 63,400 |
| Oil Shale leasing | 0 | 119,400 | 36,000 | 178,100 |

SOURCE: BLM GIS data 2009.
NOTE:
[1]TL stipulation numbers represent acres that would be subject to TL stipulations only. However, areas managed with an NSO stipulation or a CSU stipulation could also be subject to TL stipulations as an additional lease stipulation or COA

Applying COAs to permits for oil and gas drilling for coal, sodium, and oil shale (Table 2-17 Records 21, 22, and 23) could potentially reduce conflicts with oil and gas development, as the oil and gas development would shift to other areas. These three areas are: (1) areas leased for coal along with the area adjacent to and south of the approved Deserado Coal Mine Permit Area, (2) areas available for sodium and multi-mineral leasing to protect the development of sodium resources throughout the Green River Formation, and (3) areas available for oil shale and multi-mineral leasing, as determined in the Oil Shale Programmatic Environmental Impact Statement (PEIS) to protect oil shale resources in the Green River Formation.

Results of the analysis performed for Alternative B show that the construction of 1,045 well pads in the MPA could disrupt development of other leasable minerals (Table 4-79). These results indicate that of the 1,045 well pads estimated to be developed in the MPA, 630 could be constructed in oil shale leasing areas, none in oil shale research areas, 371 in the sodium and multi-mineral zone, and 35 in areas with sodium leases. These estimates are based on the distribution of well pads across areas open to development with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations). Based on the analysis results, the oil shale leasing area would potentially receive 60 percent of the well pads because it comprises 60 percent of the acres (214,100 acres out of 355,900 acres) available for surface occupancy in the MPA. The sodium and multi-mineral zone would potentially receive 35 percent of the well pads because it comprises 35 percent of the acres (126,000 out of 355,900 acres) available for surface occupancy in the Mesaverde Play Area. The types of potential impacts to solid leasable minerals are the same as described in Section 4.7.3.1, Impacts Common to All Alternatives.

**Table 4-79. Estimated Number of Well Pads and Associated Surface Disturbance within Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative B**

| | | | | Alternative B | | | |
|---|---|---|---|---|---|---|---|
| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi-Mineral Zone | Sodium Leases |
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 | 337,200 | 800 | 164,000 | 16,600 |
| 2 | Percent of Land Area in the MPA | % | 100 | 57.0 | 0.1 | 28.0 | 2.8 |
| 3 | NSO Stipulation Areas in the MPA[2] | Acres | 242,800 | 123,100 | 800 | 38,000 | 4,300 |
| 4 | Area Available for Surface Occupancy | Acres | 355,900 | 214,000 | 0 | 126,000 | 12,300 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 60. | 60.0 | 0.0 | 35.0 | 3.4 |
| 6 | Estimated Number of Well Pads[3] | --- | 1,045 | 630 | 0 | 371 | 35 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[4] | Acres | 12,540 | 7,560 | 0 | 4,452 | 420 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period | % | 2.1 | 2.2 | 0.0 | 2.7 | 2.5 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulations areas for MPA are for all resources. NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumes that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumes that each well pad would require 12 acres of surface disturbance.

### 4.7.3.3.3   Salable Minerals

Alternative B would have a greater impact to the salable (sand and gravel) mineral resource than Alternative A because it proposes twice as many well pads drilled throughout the life of the plan.

<u>Reclamation</u>

Impacts from implementing reclamation activities would be greater under Alternative B as more stringent reclamation standards would be applied, which could increase costs to oil and gas developers. For example, Alternative B would require interim and final reclamation for oil and gas activities to achieve 100 percent cover and composition of the DPC (Table 2-3 Record 18). In contrast, Alternative A does not include a specified DPC percentage for success criteria, which suggests that reclamation may require more time and capital investments under Alternative B. If interim reclamation or final reclamation is not successful, it could limit year-round drilling.

Requiring the use of native plant species for reseeding in ACECs and all reclamation activities and using only locally-gathered or genetic stock from locally-gathered native species in remnant vegetation associations (Table 2-3 Records 17 and 29) would have the same types of impacts as

BLM_0020056

Alternative A. Special reclamation components or techniques prescribed, in addition to standard interim and final reclamation measures, to restore or provide supplemental forage species (Table 2-4 Record 11) could constrain development through delays or by requiring relocation of mineral facilities.

Excluding livestock from oil and gas well pads and from linear rights-of-way and related surface disturbance, including cut-and-fill slopes, until interim reclamation vegetation is successfully established (Table 2-16 Records 11 and 12) would expedite reclamation recovery, shorten the duration of oil and gas development reclamation responsibility, and indirectly could reduce costs of reclamation. In addition, situating long-term facilities on the access road side of the well pad (Table 2-17 Record 8) could also expedite interim reclamation and shorten the duration of oil and gas development reclamation responsibility, which could reduce costs of reclamation.

#### 4.7.3.4    Alternative C

**Impacts from Management Actions**

#### 4.7.3.4.1    Leasable Minerals (Oil and Gas)

Alternative C would allow for 15,042 new oil and gas wells on 1,800 new well pads compared to Alternative A (4,603 and 550, respectively) and Alternative B (9,191 and 1,100, respectively) (Table 2-1 Record 13). This Alternative would allow for more recovery of the oil and gas mineral resource than Alternatives A and B. This Alternative would enable the efficient utilization of existing infrastructure and could require additional processing and transportation systems.

Managing 387,600 acres subject to NSO stipulations (Table 4-80) under Alternative C would be more restrictive than Alternative A (157,100 acres), but less restrictive than Alternative B (757,200 acres).

In Alternative C the MPA would have 67,200 acres encumbered with NSO on slopes less than 25 percent. This is twice the acreage of Alternative A acreage and two thirds of the acreage in Alternative B. As discussed in 4.7.3.1 Impacts Common to All Alternatives, 93 percent of existing disturbance for well pads and facilities are on slopes less than 25 percent. As a result, 140,000 acres of NSO stipulations on slopes greater than 25 percent would have little or no effect on siting of well pads or facilities. Alternative C also has more instances where exceptions to lease stipulations would be allowed compared to Alternative B.

Alternative C has the same acreage as Alternative B (1,696,000 acres) encumbered by TL stipulation acres. Of this acreage 908,000 acres have no concurrent NSO or CSU. Alternative C would have the second most acres encumbered with multiple TL stipulations of all the alternatives. Approximately 154,000 acres (about 9 percent) within the area available for federal oil and gas leasing would have multiple TL stipulations that could restrict development activities for seven months or more. This would have the same types of impacts as all the alternatives, and as in Alternative B multiple TL stipulations would encumber over twice the acreage of Alternatives A and D.

Management actions under Alternative C would be in general less restrictive than Alternative B and more restrictive than Alternative A and D.

BLM_0020057

**Table 4-80. Acres of Leasing Stipulations Under Alternative C**

| Open (with standard lease terms and conditions) | Closed | No Surface Occupancy | NSO including Effective NSO[1] | Potential Nonrecoverable Oil and Gas Resources[2] | Controlled Surface Use | Timing Limitations[3] |
|---|---|---|---|---|---|---|
| 0 | 83,300 | 387,600 | 482,400 | 34,900 | 493,600 | 908,000 |

SOURCE: BLM GIS data 2009.
NOTE:
[1]NSO area including area that does not allow typical pad configuration.
[2]Area of subsurface non recoverable oil and gas resources by current technology if no exceptions to NSO stipulations are granted.
[3]Timing limitation numbers represent acres that would be subject to timing limitations only. However, areas managed with NSO or CSU stipulations could also be subject to timing limitations as an additional lease stipulation or COA.

The majority of the area of potential non recoverable oil and gas resources, 22,000 acres, is attributable to an NSO stipulation for habitat for federally listed, proposed, and candidate plant species, (Table 2-10 Record 15), followed by 4,500 acres for State Wildlife areas (Table 2-4 Record 16), 6,500 acres of ACECs (Table 2-21 Record 13), and 1,900 acres associated with landslide areas (Table 2-2 Record 15).

Requesting off-site mitigation for any surface disturbance to offset reductions in big game habitat capacity (Table 2-4 Record 15) would have the same type of impacts as Alternative B.

As in Alternative B the threshold concept (Table 2-4 Record 12) and granting lease suspensions for conservation of natural resources (Table 2-17 Records 15 and 16) would be applicable except with a higher percentage of thresholds allowed. Thresholds under Alternative C would have the same types of impacts as under Alternative B. Although the threshold percentages would increase in Alternative C the total well pads also increase and remaining below the thresholds could be more difficult.

Deferring oil and gas leasing decisions on 96,100 acres of sage-grouse habitat north of U.S. 40 (Table 2-6 Record 12) would have the same impacts as Alternative B.

### 4.7.3.4.2  Solid Leasable Minerals (Coal, Sodium, Oil Shale)

Alternative C proposes three times more well pads constructed throughout the life of the plan than Alternative A and one and one-half times more than Alternative B. This would create greater potential for conflicts between oil and gas development and other mineral resources than either of Alternatives A or B.

Alternative C has no acres open to oil and gas development with standard lease terms and conditions in areas of coal leasing, sodium leasing, and oil shale leasing. Compared to Alternative B, this alternative has half the amount of acres designated with NSO stipulations in areas of coal leasing and oil shale leasing and a third of the amount of acres designated with NSO stipulations in areas of sodium leasing Table 4-81. Under Alternative C, the conflicts between these resources could increase in the short term compared to Alternative B because of the reduced size of NSO stipulation acreage. The impacts to coal would be same as Alternative B with the exclusion of coal leases (Table 2-17 Record 23). Impacts to other solid leasable would be similar to Alternative B.

**Table 4-81. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil Shale Development Under Alternative C**

| | Open (with standard lease terms and conditions) | No Surface Occupancy | Controlled Surface Use | Timing Limitations[1] |
|---|---|---|---|---|
| Coal leasing | 0 | 45,300 | 43,900 | 80,600 |
| Sodium leasing | 0 | 7,100 | 10,500 | 75,500 |
| Oil Shale leasing | 0 | 76,000 | 41,200 | 219,900 |

SOURCE: BLM GIS data 2009.
NOTE:
[1]Timing limitation numbers represent acres that would be subject to timing limitations only. However, areas managed with NSO or CSU stipulations could also be subject to timing limitations as an additional lease stipulation or COA.

Applying COAs to permits for oil and gas drilling in two areas (Table 2-17 Records 21 and 22) would potentially reduce conflicts with oil and gas development in a larger area than Alternative A and a slightly smaller area than Alternative B, but would also have the potential for more oil and gas development than Alternatives A or B. These two areas are: (1) areas available for sodium leasing to protect the development of sodium resources throughout the Green River Formation, and (2) on oil shale leases, as determined in the Oil Shale PEIS to protect oil shale resources in the Green River Formation.

Results of analysis performed for Alternative C show that the construction of 1,710 well pads in the MPA would disrupt development of other leasable minerals (Table 4-82). These results indicate that of the 1,710 well pads estimated to be developed in the MPA, 999 could be constructed in oil shale leasing areas, none in oil shale research areas, 543 in the sodium and multi-mineral zone, and 44 in areas with sodium leases. These estimates are based on the distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations). Based on the analysis results, the oil shale leasing area would potentially receive 58 percent of the well pads because it comprises 58 percent of the acres (261,200 acres out of 447,800 acres) available for surface occupancy in the MPA. The sodium and multi-mineral zone would potentially receive 32 percent of the well pads because it comprises about 32 percent of the acres (141,900 out of 447,800 acres) available for surface occupancy in the MPA. The types of impacts that would occur to solid leasable minerals are the same as described in Section 4.7.3.1, Impacts Common to All Alternatives.

**Table 4-82. Estimated Number of Well Pads and Associated Surface Disturbance within Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative C**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi-Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| | | | Alternative C | | | | |
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 | 337,200 | 800 | 164,000 | 16,600 |
| 2 | Percent of Land Area in the MPA | % | 100 | 57.0 | 0.1 | 28.0 | 2.8 |
| 3 | NSO Stipulation Areas in the MPA[2] | Acres | 150,900 | 76,000 | 800 | 22,100 | 5,100 |
| 4 | Area Available for Surface Occupancy | Acres | 447,800 | 261,200 | 0 | 141,900 | 11,500 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 75 | 58.0 | 0.0 | 32.0 | 2.6 |
| 6 | Estimated Number of Well Pads[3] | --- | 1,710 | 999 | 0 | 543 | 44 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 20,520 | 11,988 | 0 | 6,516 | 528 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period | % | 3.4 | 3.6 | 0.0 | 4.0 | 3.2 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulations areas for MPA are for all resources. NSO stipulation areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumes that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumes that each well pad would require 12 acres of surface disturbance.

### 4.7.3.4.3   Salable Minerals

Alternative C would have a greater impact to the salable (sand and gravel) mineral resource than Alternatives A and B. Alternative C proposes three times more well pads than Alternative A throughout the life of the plan and one and one-half times more wells than Alternative B, which would create a greater need for sand and gravel resources than either Alternatives A or B.

<u>Reclamation</u>

Impacts from implementing reclamation activities would be similar to those under Alternative B. Alternative C would require interim and final reclamation for oil and gas activities to achieve 80 percent cover and composition of the DPC (Table 2-3 Record 18), which may require slightly less time and capital costs than Alternative B which has a requirement of 100 percent. If interim reclamation or final reclamation is not successful, it could limit year-round drilling, as under Alternative B.

Requiring the use of native plant species for reseeding in ACECs (Table 2-3 Record 17) would be the same as Alternative A.

BLM_0020060

### 4.7.3.5    Alternative D

**Impacts from Management Actions**

#### 4.7.3.5.1    Leasable Minerals (Oil and Gas)

Alternative D would allow for 21,200 new oil and gas wells on 2,556 new well pads (Table 2-1 Record 13), the highest number of the four alternatives, and provides the potential for near full field development of the MPA.

This Alternative proposes more than four times more well pads throughout the life of the plan than Alternative A, two times more than Alternative B, and one and one-half times more than Alternative C. The types of impacts from restrictions to oil and gas development would be similar but the size of impacts would vary. Restrictions on oil and gas activities under Alternative D are greater than Alternative A but less than Alternative B or Alternative C. Alternative D has slightly fewer acres open with standard lease terms and conditions than Alternative A and more acres subject to NSO stipulation (Table 4-83) than Alternative A (157,100 acres), but fewer than Alternatives B and C (757,200 acres and 387,600 acres, respectively).

In Alternative D the MPA would have 41,000 acres encumbered with NSO on slopes with less than 25 percent. This is an increase of 7,700 acres compared to Alternative A and a decrease of 65,200 acres and 26,200 acres of Alternatives B and C, respectively. As discussed in 4.7.3.1 Impacts Common to All Alternatives, 93 percent of existing disturbance for well pads and facilities are on slopes less than 25 percent. As a result 140,000 acres of NSO stipulations in the MPA on slopes greater than 25 percent would have little or no effect on siting of well pads or facilities.

This alternative has 1,002,100 acres encumbered by TL stipulations which are similar to Alternative A. Of this acreage 524,800 acres have no concurrent NSO or CSU stipulations. Approximately 71,100 acres (about 4 percent) similar to Alternative A, would have multiple TL stipulations that could restrict drilling activity for seven months or more during the year. These multiple TL stipulations would have similar impacts as in Alternative A, and would encumber about 101,300 and 82,800 fewer acres than Alternatives B and C, respectively.

**Table 4-83. Acres of Leasing Stipulations Under Alternative D**

| Open (with standard lease terms and conditions) | Closed | No Surface Occupancy | NSO Including Effective NSO[1] | Potential Non recoverable Oil and Gas Resources[2] | Controlled Surface Use | Timing Limitations[2] |
|---|---|---|---|---|---|---|
| 444,800 | 83,300 | 257,000 | 333,400 | 15,000 | 469,300 | 524,800 |

SOURCE: BLM GIS data 2009.

NOTES:

[1] NSO area including area that does not allow typical pad configuration

[2] Timing limitation numbers represent acres that would be subject to timing limitations only. However, areas managed with NSO or CSU stipulations could also be subject to timing limitations as an additional lease stipulation or COA.

Dust-suppression activities and emission standard requirements would increase the cost of oil and gas resource recovery as discussed under Alternatives B and C.

The majority of the area of potential non recoverable oil and gas resources, 9,700 acres, is attributable to an NSO stipulation for habitat for federally listed, proposed, and candidate plant species (Table 2-10 Record 15), followed by 4,500 acres of ACECs (Table 2-21 Record 13), and 900 acres of landslide areas (Table 2-4 Record 16).

BLM_0020061

Since there are fewer NSO stipulation acres under Alternative D, the overall impact to oil and gas development would be less than Alternative B and Alternative C.

### 4.7.3.5.2   Solid Leasable Minerals (Coal, Sodium, Oil Shale)

Alternative D acres with NSO stipulations (Table 4-84) in areas available for coal leasing, sodium leasing, and oil shale leasing is the second lowest compared to Alternative A. The number of well pads proposed for development under Alternative D (2,556 new well pads) is four and a half times the number of well pads proposed in Alternative A (550). This increase in the number of well pads could create the most potential for conflicts to occur between oil and gas development and other mineral resources. Alternative D has a CSU stipulation (Table 2-17 Record 23) which could result in oil and gas development being relocated outside the area adjacent to and within the Deserado Mine permit area. This coupled with only five percent of the oil and gas activity being expected to occur outside the MPA (the available area for coal exists outside the MPA), creates a low potential for conflict of oil and gas development with coal resources.

**Table 4-84. Acres of Leasing Stipulations on Areas Suitable for Coal, Sodium, and Oil Shale Development Under Alternative D**

| | Open (with standard lease terms and conditions) | No Surface Occupancy | Controlled Surface Use | Timing Limitations Stipulation |
|---|---|---|---|---|
| Coal leasing | 14,300 | 38,200 | 44,900 | 72,500 |
| Sodium leasing | 56,300 | 5,900 | 10,300 | 20,500 |
| Oil Shale leasing | 125,900 | 51,000 | 46,500 | 113,900 |

SOURCE: BLM GIS data 2009.

Results of the analysis performed for Alternative D show that the construction of 2,428 well pads in the MPA would disrupt development of other leasable minerals (Table 4-85). The temporal analysis results indicate that of the 2,428 well pads estimated to be developed in the MPA, 1,386 could be constructed in oil shale leasing areas, none in oil shale research areas, 719 in the sodium and multi-mineral zone, and 66 in areas with sodium leases. These estimates are based on the distribution of well pads across areas open to development with standard lease terms and conditions or managed with stipulations that do not preclude surface disturbance (i.e., CSU stipulations, TL stipulations). Based on the analysis results, the oil shale leasing area would potentially receive 57 percent of the well pads because it comprises 57 percent of the acres (286,200 acres out of 502,100 acres) available for surface occupancy in the MPA. The sodium and multi-mineral zone would potentially receive 30 percent of the well pads because it comprises about 30 percent of the acres (148,300 out of 502,100 acres) available for surface occupancy the MPA and sodium leases would receive 2.7 percent. Potential conflicts with sodium mining would be averted by precluding drilling in active sodium mining areas (Table 2-17 Record 22). The types of impacts that would occur to solid leasable minerals are similar to Section 4.7.3.1, Impacts Common to All Alternatives except with the most potential of any alternative for conflicts with solid leasable minerals due to the total number of wells allowed.

**Table 4-85. Estimated Number of Well Pads and Associated Surface Disturbance within Solid Leasable Mineral Areas in the Mesaverde Play Area for Alternative D**

| Line[1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi-Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| | | | **Alternative D** | | | | |
| 1 | Land Area in the Mesaverde Gas Play (MPA) | Acres | 598,700 | 337,200 | 800 | 164,400 | 16,600 |
| 2 | Percent of Land Area in the MPA | % | 100 | 57.0 | 0.1 | 28.0 | 2.8 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 96,600 | 51,000 | 800 | 15,600 | 3,000 |
| 4 | Area Available for Surface Occupancy | Acres | 502,100 | 286,200 | 0 | 148,300 | 13,600 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 84 | 57.0 | 0.0 | 30.0 | 2.7 |
| 6 | Estimated Number of Well Pads [3] | --- | 2,428 | 1,386 | 0 | 719 | 66 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 29,100 | 16,600 | 0 | 8,600 | 800 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period | % | 4.9 | 4.9 | 0.0 | 5.3 | 4.8 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulations areas for MPA are for all resources. NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

### 4.7.3.5.3    Salable Minerals

Alternative D would have a greater impact to the salable (sand and gravel) mineral resource than Alternatives A, B, and C. The number of wells proposed for development under Alternative D greatly exceeds the number proposed for Alternatives A, B, or C, which would create a greater need for sand and gravel resources than the other alternatives.

<u>Reclamation</u>

Reclamation standards under Alternative D are not as stringent as those under Alternatives B and C. For example, Alternative D would require interim and final reclamation for oil and gas activities to achieve 60 percent cover and composition of the DPC, compared to requirements of 100 percent and 80 percent cover and composition under Alternatives B and C, respectively (Table 2-3 Record 18). Thus, reclamation costs per well could be less than either Alternative B or Alternative C.

Requiring the use of native plant species for reseeding in ACECs (Table 2-3 Record 17) would be the same as Alternative A.

BLM_0020063

### 4.7.3.6 Irreversible and Irretrievable Commitment of Resources

Any development of mineral resources would have an irreversible and irretrievable impact to the mineral resource due to extraction. Future oil and gas development anticipated under all alternatives would result in capture of a portion of the total federal oil and gas reserves in the Planning Area. These captured resources are non-renewable and would be unavailable for extraction and use by future generations. Portions that would not be recovered during the 20-year period of analysis, given the surface and down-hole spacing assumed in the RFD Scenario, the current recovery efficiency, and the limitations on leasing and surface occupancy, would remain available for future extraction.

Coal could continue to be developed similar to the current rate; however, it is not known whether oil shale resources would be developed during the 20-year period of analysis.

It is not known to what extent the construction of 550 to 2,556 well pads under Alternatives A through D would interfere with future (post-oil and gas) development of these other mineral resources. The number of wells and the amount of deviation from the surface location in a given area could impact the ability to recover other resources. It is expected that the presence of the wells would complicate but not prevent future development.

### 4.7.3.7 Unavoidable Adverse Impacts

Restrictions to protect sensitive resources would affect the ability of operators to extract mineral resources without limitations. Restrictions could require the closing of roads or other seasonal closures which would hinder the development of mineral resources. Mitigation measures would be applied but unavoidable adverse impacts would occur under all alternatives.

### 4.7.3.8 Relationship Between Local Short-Term Uses and Long-Term Productivity

Conflicts between other leasable minerals (coal, sodium, oil shale) and oil and gas development would be focused in the MPA where other leasable minerals occur and where most of the oil and gas development is expected to occur. Once the oil and gas is removed from these areas, the other minerals would then be available for extraction.

## 4.7.4 Recreation

Recreation uses within the Planning Area include backpacking, recreational OHV use, hiking, camping, boating, sightseeing/viewing nature, hunting, fishing, mountain biking, rock climbing, shed collecting, and horseback riding among others. However big game hunting and its associated OHV use are the predominant recreational pursuits in the WRFO. Impacts on recreation primarily occur from management actions related to other resources or resource uses that result in both short and long-term elimination or reduction of recreation opportunities, or that diminish the quality of the recreation setting and experience (e.g., reduced access, displacement of recreation activities, and the reduction of opportunities for primitive and solitude oriented recreation due to the increased presence of man-made facilities).

The recreation setting is made up of the combination of physical, social, and managerial conditions that give value to a place and provide the basis for recreation. Recreational opportunities are provided by the physical qualities in nature (i.e., vegetation, landscape, scenery), social qualities (i.e., levels and types of use), and managerial qualities (i.e., regulations, policy, infrastructure development). As such, an effect on the recreational setting could occur from a variety of external pressures to any one of these three conditions. Examples include changes to: access (both motorized and non-motorized), visitor use levels, facilities, natural vegetation, landforms, currently available

BLM_0020064

*Chapter 4 – Environmental Consequences*

recreation opportunities, or acoustic setting. The recreation experience is created by a combination of the natural elements and human-controlled conditions that create the potential for recreation.

This analysis uses quantitative and qualitative indicators and attributes to assess impacts. The following indicator has been selected to analyze the effects of the alternatives on recreation and visitor services:

- Areas managed for each of the following Recreation Opportunity Spectrum classes:
  - Semi-primitive Non-motorized;
  - Semi-primitive Motorized;
  - Roaded-Natural; and
  - Rural.

The Urban and Primitive ROS classes were not delineated within the WRFO as part of the 1997 White River RMP.

Key attributes of this indicator are:

- Management actions related to other resources that could result in impacts on the recreation experience and opportunities, the recreation setting, and visitor services;
- Changes in visitor use levels and/or user conflict levels; and
- Degree of surface disturbance within the Extensive Recreation Management Area (ERMA).

The analysis is based on the following assumptions:

- Management actions that prohibit or minimize surface disturbance in certain areas would improve or retain the features that contribute to a desirable recreation setting;
- Management actions that restrict access would decrease opportunities for recreation particularly vehicle-based recreation;
- Visitor use and demand for recreational opportunities would continue to increase over the life of the plan;
- Conflicts between recreationists involved in motorized and non-motorized activities could increase with increasing use of public land; and
- Special recreation permits could increase over the life of the plan.

### 4.7.4.1    Impacts Common to All Alternatives

<u>Impacts from Oil and Gas Development</u>

Surface disturbance from oil and gas development could reduce the naturalness of the landscape, the scenic and acoustic quality of the recreation setting, and diminish the recreation experience for those seeking solitude and semi-primitive non-motorized recreation opportunities. The development of oil and gas access roads could increase the numbers of other recreationists in the area, including OHV users and hunters. This increase, particularly with respect to OHV use, could indirectly lead to an increase in undesignated, user created travel routes. The increase in different types of recreational users may also lead to an increase in the likelihood of user conflict. An increase in noise associated with the development of oil and gas wells and increased truck traffic on additional access roads could also diminish the recreation experience for those seeking solitude-based and primitive

BLM_0020065

oriented recreation opportunities. A potential positive impact from the development of additional access roads could be an increase in road-based recreation opportunities for semi-primitive motorized and roaded-natural recreation. Any surface disturbing activities that displace, or otherwise disrupt the normal distribution and movement patterns of big game wildlife, or negatively affect big game wildlife habitat, would most likely have a negative impact on the quality of hunting. Impacts to big game wildlife are discussed in detail in Section 4.3.2.

Managing oil and gas development with an NSO stipulation and not granting exceptions could maintain the existing quality of the dispersed recreation setting and the recreation experience for nonvehicle-based recreation activities. However, areas managed with an NSO stipulation could also shift oil and gas development to other areas, which would result in surface disturbance impacts similar to those described above.

Managing oil and gas development as open with a CSU stipulation would avoid sensitive resources, while allowing some degree of surface disturbance in the stipulation area. These impacts would be similar to those described above. Managing oil and gas development as open with TL stipulations to protect big game habitat could prolong development in these areas, which would potentially lead to surface disturbing impacts similar to those described above. Opportunities for vehicle-based recreation would be retained on existing roads.

Managing oil and gas development as open with standard lease terms and conditions could reduce the naturalness of the landscape, the scenic and acoustic quality of the recreation setting and diminish the recreation experience for primitive oriented non-motorized, recreation activities. The development of additional oil and gas access roads could improve access and benefit those seeking road-based motorized recreation opportunities.

**Impacts from Management Actions**

Reducing emissions associated with oil and gas development and implementing measures to control fugitive dust could reduce impacts on the scenic quality of the recreation setting (Table 2-1 Record 8).

Managing 497,900 acres as weed-free zones could reduce the spread of noxious weeds and invasive species thus helping to maintain the naturalness of the landscape and the existing scenic character of an area, thereby preserving the existing recreation setting for solitude oriented recreation (Table 2-3 Record 22). Managing remnant vegetation associations with an NSO stipulation (3,600 acres) could maintain these existing vegetation communities and indirectly contribute to maintaining the existing recreation setting (Table 2-3 Record 27). Applying the most current raptor protection guidelines and using physical barriers to prevent contact with stored fluids could indirectly retain and improve the recreation experience for wildlife viewing.

Reducing and mitigating impacts on cultural and paleontological resources would help maintain existing opportunities for viewing cultural sites and paleontological resources in localized areas. Managing the Canyon Pintado NHD and Texas-Missouri-Evacuation Creek area with a CSU stipulation and as an avoidance area for ROWs to protect cultural or paleontological resources could retain the existing recreation setting and opportunities for cultural resource viewing (Table 2-12 Record 8).

Managing 29,000 acres of ACECs with an NSO stipulation would retain the existing topography and vegetation communities and the physical and scenic qualities of the recreation setting. These

characteristics would help maintain the opportunities for both primitive and non-primitive recreation (Table 2-21 Record 13).

Keeping WSAs closed to motorized use and prohibiting activities that would impair wilderness values or suitability for eventual designation as wilderness would help to retain the existing recreation setting and provide for solitude oriented, not-motorized recreation opportunities (BLM H-8550-1). Managing ACECs as open to oil and gas leasing with an NSO stipulation could reduce surface disturbance in the ACECs and maintain the existing scenic qualities and the recreation setting within these areas (Table 2-21 Record 13).

### Reclamation

Using only native plant species to re-seed disturbed areas within the Blue Mountain/Moosehead GRA, WSAs, and ACECs (Table 2-3 Record 17) would help maintain the natural values of these areas. Access for recreationists could be limited temporarily in localized areas during reseeding.

At the end of well production, when final reclamation has begun and all structures associated with oil and gas development have been removed, the scenic quality of the recreation setting and the quality of the recreation experience would gradually return to pre-disturbance conditions.

### 4.7.4.2    Alternative A

#### Impacts from Oil and Gas Development

Under Alternative A, the results of the temporal analysis indicate that an estimated 523 oil and gas well pads would be constructed in the MPA, resulting in 6,300 acres of surface disturbance during the 20-year planning period (Appendix E). Approximately 1.2 percent of vegetation communities and 1.1 percent of mule deer range area within the MPA would be disturbed over the 20-year planning period (Appendix E). Disturbing 1.1 percent of vegetation communities in the MPA could reduce the scenic quality of the recreation setting. Disturbing 1.1 percent of mule deer range area could negatively impact the recreational hunting experience if the number and movement of mule deer decrease. Any impacts to other big game wildlife distribution and movement patterns as a result of Alternative A would also have a negative impact on the quality of hunting.

Managing 455,500 acres of the Planning Area as open to oil and gas leasing with standard lease terms and conditions could reduce the scenic quality of the recreation setting and impact the recreation experience for those seeking solitude oriented recreation opportunities since there would be fewer restrictions on development in these areas. Managing 583,900 acres of the Planning Area as open to oil and gas leasing with a CSU stipulation could result in some surface disturbance and impacts on the scenic quality of the recreation setting subsequently displacing recreationists to other areas. Opportunities for motorized-based recreation could be retained.

Applying TL stipulations on 1,006,500 acres of oil and gas development in the Planning Area to protect big game habitat could prolong the period of oil and gas development compared to areas where TL stipulations were not in effect. It is estimated that TL stipulations would extend well pad development by one year, increasing the typical development period from two years to three years. This would delay interim reclamation on a pad and could degrade the natural character of the landscape and displace recreation to other areas. When the TL stipulation expires, oil and gas development activities would occur during the open period. This could result in surface disturbance and associated impacts similar to those described in the Impacts Common to All Alternative section above. However, opportunities for motorized-based recreation would be retained. Road abandonments, seasonal closures of oil and gas resource roads during animal occupation, and

BLM_0020067

limiting road densities in big game critical habitat could reduce opportunities for road-based recreation and limit access for hunting. However, relative to the overall number of existing travel routes in the Planning Area available for road based recreation, this reduction would be considered a negligible impact. Opportunities for non-motorized recreation and the quality of the existing recreation setting would be retained.

Oil and gas development would be managed with NSO stipulations across 11 percent of mineral estate in the MPA (65,500 out of 598,700 acres, Table 4-31) where 95 percent of development is expected to occur. This could reduce surface disturbance and help retain the existing recreation setting and associated recreational experience in the MPA.

The noise and presence of vehicle traffic associated with the construction, drill rig transport, and production of 550 well pads and 4,603 wells (Table 2-1 Record 13) in the Planning Area could displace recreationists to other areas and diminish the quality of the recreation experience for those seeking primitive oriented recreation.

Section 4.10.1, Social, Economic and Environmental Justice, details the expected increase in employment and population from project alternatives. A 9 percent increase in general population within the study area, either directly or indirectly related to oil and gas development, would likely lead to a commensurate increase recreational use of BLM administered lands. An increase of 9 percent population, however, is not likely to place undue use pressure on existing BLM recreational facilities and unlikely to create conditions favorable to crowding or user conflict. Additional discussion on the effects of population growth related to oil and gas development or on the effects of other nonmarket values is described in Section 4.10.1 Social, Economic and Environmental Justice.

**Impacts from Management Actions**

The Planning Area would be managed as the White River ERMA, custodially to provide unstructured recreational opportunities (Table 2-18 Record 4). This would maintain access and opportunities for primitive and non-primitive recreation and maintain the existing recreation setting.

Managing 38,600 acres of landslide-prone areas with an NSO stipulation and 385,000 acres of fragile soils on slopes greater than 35 percent with a CSU stipulation could reduce surface disturbance in localized areas and retain the existing scenic quality of the recreation setting (Table 2-2 Records 9 and 15).

Oil and gas development activities that are found to be adversely affecting riparian and wetland habitat could require remedial mitigation or relocation of the surface-disturbing activity outside of riparian habitat (Table 2-3 Record 21). This could help retain riparian vegetation and existing water quality and quantity while indirectly maintaining the quality of the recreation setting for fishing.

Avoiding long term seral or type conversions of aspen, Douglas-fir, spruce-fir and deciduous shrub communities, and minimizing reductions in essential winter forage bases in deer winter ranges and pronghorn ranges, would help maintain existing vegetation and wildlife habitat (Table 2-4 Record 17). This could indirectly help to maintain the naturalness of the landscape and quality of the recreation setting, and maintain opportunities for primitive and non-primitive recreation, particularly hunting, in localized areas.

Managing the Piceance-East Douglas HMA for a herd of 125 to 235 wild horses to maintain an ecological balance for all plant and animal species on the range would help to retain opportunities

BLM_0020068

*Chapter 4 – Environmental Consequences*

for wild horse viewing, wildlife viewing, and other observation based recreational activities (Table 2-11 Record 8).

Applying stipulations or COAs on land use authorizations, permits, and leases to mitigate impacts on sensitive visual resource areas in VRM Class I and II areas, Canyon Pintado NHD, and national and state scenic byways could reduce surface disturbance in these areas and retain the existing recreation setting and opportunities for recreation (Table 2-14 Record 3).

Limiting the clearing of commercial woodlands to 450 acres per decade and managing older forests to preserve existing old growth would reduce surface disturbance and retain the visual qualities of the recreation setting in these areas (Table 2-19 Records 8 and 12).

Limiting communication site corridors to currently occupied sites could indirectly limit surface disturbance to existing areas and utility corridors, and would help maintain the existing recreation setting by preventing the proliferation of communication infrastructure and other utilities (Table 2-20 Record 4).

Section 4.10.1, Social, Economic and Environmental Justice, discusses the effects of oil and gas development on hunting in the study area. Since the relationship between hunting activity levels and big game heard sizes is imprecise, a linear relationship is assumed. As such, the BLM has identified the management goal of maintaining wildlife population objectives set by CPW. Under Alternative A, the objective is 100 percent. Consequently, this alternative would not be expected to lead to changes in hunting activity levels due to reductions in big game herd sizes.

<u>Reclamation</u>

Encouraging the use of native plant species to re-seed areas outside of Blue Mountain/Moosehead GRA, WSAs, and ACECs could temporarily impacts to the recreation setting and experience during the re-seeding process (Table 2-3 Record 17). However, the use of native seeds could reduce opportunities for the establishment of noxious weeds and invasive species, and improve the naturalness and scenic quality of the recreation setting and improve the recreation experience.

Managing DPCs in the ecological status of late seral or healthy mid-seral for all rangeland plant communities could reduce the potential for establishment of noxious weeds and invasive species (Table 2-3 Record 18). This could help maintain the existing vegetation and the quality of the recreation setting and experience.

### 4.7.4.3    Alternative B

<u>Impacts from Oil and Gas Development</u>

The results of the temporal analysis for Alternative B indicate that an estimated 1,045 oil and gas well pads would be constructed in the MPA, resulting in 12,500 acres of surface disturbance during the 20-year planning period (Appendix E Lines 6 and 7). Approximately 3.5 percent of vegetation communities and 2.1 percent mule deer range area would be developed over the 20-year planning period (Appendix E). This represents an increase of approximately 2.3 percent of vegetation communities and 1 percent of mule deer range area than Alternative A. Impacts to recreation from a reduced mule deer range area and increases to vegetation communities would be similar to those under Alternative A however to a slightly greater degree.

Managing 296,300 acres with a CSU stipulation could result in surface disturbance from the presence of well pads, local and resource roads, and drill rigs, and decrease the natural character of

BLM_0020069

the landscape and the quality of the physical recreation setting. This would be considerably less than that under Alternative A (583,900 acres). Development in areas managed with CSU stipulations could force recreationists to seek recreation opportunities in other areas, which could degrade the primitive oriented recreation experience. Oil and gas development could increase access for road-based recreation due to the potential increase in local and resource roads as compared to Alternative A.

Limiting the area where oil and gas development occurs through NSO stipulations on 757,200 acres under Alternative B could retain opportunities for all types of recreation and maintain the recreation setting and experience over a significantly larger area than Alternative A (157,100 acres).

The noise and presence of vehicle traffic associated with construction, drill rig transport, and production would increase compared to Alternative A due to the increase in the number of well pads (from 550 to 1,100) and wells (from 4,603 to 9,191) under Alternative B (Table 2-1 Record 13). This could reduce the quality of the recreation experience for those seeking primitive oriented recreation more so than Alternative A.

Section 4.10.1, Social, Economic and Environmental Justice, details the expected increase in employment and population from project alternatives. A 37 percent increase in general population within the study area, either directly or indirectly related to oil and gas development, would likely lead to a commensurate increase recreational use of BLM administered lands. An increase of 37 percent population is significant and should be expected to place additional use pressure on existing BLM recreational facilities and management capacity. An increase of this magnitude, without the development of additional recreational infrastructure and field office personnel, would likely begin to place a strain on existing resources and management capacity. Additional discussion on the effects of population growth related to oil and gas development or on the effects of other nonmarket values is described in Section 4.10.1 Social, Economic and Environmental Justice.

### Impacts from Management Actions

Areas within approximately 100 feet of mapped landslide-prone areas (46,400 acres) and saline soils (45,300 acres) would be open to oil and gas leasing with an NSO stipulation (Table 2-2 Records 15 and 16). The additional buffer area could indirectly reduce the extent of surface disturbance in localized areas and maintain the scenic quality of the recreation setting over a greater area than Alternative A.

The mineral estate within all CPW State Wildlife Areas would be managed with an NSO stipulation (18,900 acres) (Table 2-4 Record 16), which would eliminate surface disturbance in these areas and retain the existing recreation setting, thereby maintaining existing opportunities for hunting, fishing and other wildlife based activities. In areas defined by CPW as Restricted Development Areas (i.e., North Ridge, Yellow Creek, and Story-Sprague Gulch; approximately 53,200 acres), collective effects of oil and gas development would be limited to 5 percent and no direct acute effects from oil and gas development could occur during animal occupation. This could reduce the degree and extent of surface disturbance in the Restricted Development Areas, and reduce impacts on the landscape and help to retain the existing recreation setting.

Applying stipulations or COAs on land use authorizations, permits, and leases to mitigate impacts on sensitive visual resource areas in VRM I and II areas, Canyon Pintado NHD, scenic byways, and surrounding communities could reduce surface disturbance and help to maintain the existing recreation setting in localized areas (Table 2-14 Record 3). Subsequently, the experience for those

BLM_0020070

seeking roaded-natural, and rural types of recreation could improve compared to Alternative A, which does not apply stipulations or COAs to include surrounding communities.

Limiting the clearing of commercial woodlands associated with oil and gas development to an annual disturbance of 260 acres would essentially permit more clearing than under Alternative A, (45 acres per year). The impact on recreation of this increase could be offset by management actions that would establish old-growth forest and woodlands stands as avoidance areas for new land use authorizations (Table 2-15 Records 7 and 9). To the extent that woodlands could be preserved, it would help maintain the existing scenic quality of the localized recreation setting.

Managing approximately 7,700 acres to maintain and/or enhance the physical, social and managerial conditions associated with backcountry/middlecountry recreation setting classifications (Table 2-18 Record 5) would provide residents and visitors locations on BLM administered lands to recreate free from the sights and sounds of oil and gas development activities. These areas are currently popular recreational destinations in close proximity to the communities of Meeker and the upper White River valley of northwestern Colorado. Managing these areas with an NSO stipulation would reduce surface disturbance from oil and gas development thereby contributing to the physical, social and managerial conditions associated with backcountry/middlecountry recreation setting classifications.

Prohibiting the establishment of new ROWs outside of existing pipeline corridors under Alternative B (Table 2-20 Record 7) would reduce the extent of surface disturbance and help to maintain the existing recreation setting and opportunities for recreation more than Alternative A. Limiting communication site corridors to currently occupied sites would have the same impacts as Alternative A.

Under Alternative B, collective effects based on the threshold analysis for big game increases to 13 percent during the first seven years of development due to the number of well pads constructed. Since acute and collective development thresholds are predicted to not be exceeded in GMU 22 during the planning period, TL stipulations would not generally be enforced on big game ranges. Exceptions to the TL stipulations would promote progression from development to reclamation faster than Alternative A. The threshold concept would also encourage operators to cluster development, which could reduce the extent of disturbance related impacts on the recreation setting over the long term (Appendix E).

Section 4.10.1, Social, Economic and Environmental Justice, discusses the effects of oil and gas development on hunting in the study area. Since the relationship between hunting activity levels and big game heard sizes is imprecise, a linear relationship is assumed. As such, the BLM has identified the management goal of maintaining wildlife population objectives set by CPW. Under Alternative B, the objective is 90 percent. Consequently, this alternative would be expected to lead to a reduction of 10 percent in hunting activity levels due to commensurate reductions in big game herd sizes.

**Reclamation**

Requiring interim and final reclamation for oil and gas activities to have a success criterion of 100 percent basal vegetation cover of the DPC under Alternative B could help improve the establishment and amount of vegetation cover (Table 2-3 Record 18). This could indirectly improve the scenic quality of the recreation setting compared to Alternative A. Requiring reclamation that would result in a functioning vegetation community that is capable of persisting without continued

BLM_0020071

intervention could also improve the quality of the recreation setting and experience (Table 2-3 Record 15).

Eliminating noxious weeds on the Colorado Department of Agriculture's State Weed List A, controlling the weeds included in Lists B and C (Appendix D), and controlling invasive species would reduce the establishment of noxious and invasive species, and could indirectly improve the scenic quality of the recreation setting (Table 2-3 Record 24). Surface disturbance and impacts to the recreation setting and opportunities for recreation could occur during reclamation, but impacts would be temporary.

Requiring final reclamation of abandoned wells and resource roads to current standards (Appendix D) would restore the recreation setting over time. Overall opportunities for road-based recreation would be reduced which would present a negative impact.

### 4.7.4.4   Alternative C

**Impacts from Oil and Gas Development**

The results of the temporal analysis for Alternative C indicate that an estimated 1,710 oil and gas well pads would be constructed in the MPA, resulting in 20,500 acres of surface disturbance during the 20-year planning period (Appendix E). Approximately 4.6 percent of vegetation communities and 3.4 percent of mule deer range area would be disturbed over the 20-year planning period (Appendix E). This represents an increase in the percentage of development compared to Alternative A (1.2 percent vegetation communities, 1.1 percent mule deer range area) and Alternative B (3.5 percent vegetation communities and 2.1 percent mule deer range area). Disturbing 4.6 percent of vegetation communities and 3.4 percent of mule deer habitat in the MPA could reduce the scenic quality of the recreation setting and lead to a diminished recreation experience for those seeking a primitive or non-primitive recreation experience more than Alternatives A and B.

Managing approximately 7,700 acres to maintain and/or enhance the physical, social and managerial conditions associated with backcountry/middlecountry recreation setting classifications (Table 2-18 Record 5) would provide residents and visitors locations on BLM administered lands to recreate free from the sights and sounds of oil and gas development activities. These areas are currently popular recreational destinations in close proximity to the communities of Meeker and the upper White River Valley of northwestern Colorado. Managing these areas with a CSU stipulation would reduce surface disturbance from oil and gas development thereby contributing to the physical, social and managerial conditions associated with backcountry/middlecountry recreation setting classifications. However, managing these areas with a CSU stipulation may result in an increase in surface disturbance compared to Alternative B.

Managing 400,400 acres of the Planning Area as open to oil and gas leasing with a CSU stipulation could increase access for vehicle-based recreation due to the potential of increased access roads compared to Alternative B (296,300 acres) but still less than Alternative A (583,900 acres). Implementing NSO stipulations across 387,600 acres of the Planning Area would help maintain the scenic quality of the recreation setting over a larger area than Alternative A (157,100 acres), but to a lesser extent than Alternative B (757,200 acres) (Table 4-6).

The noise and presence of vehicle traffic associated with construction, drill rig transport, and production would increase significantly compared to Alternatives A and B due to the development of 1,800 well pads and 15,042 wells compared to Alternative A (550 and 4,603, respectively) and B (1,100 and 9,191, respectively) (Table 2-1 Record 13). This could considerably diminish the quality

BLM_0020072

of the recreation setting, thereby having a detrimental effect on those seeking a primitive oriented recreation experience more so than Alternatives A and B.

Section 4.10.1, Social, Economic and Environmental Justice, details the expected increase in employment and population from project alternatives. A 75 percent increase in general population within the study area, either directly or indirectly related to oil and gas development, would likely lead to a commensurate increase recreational use of BLM administered lands. An increase of 75 percent population is substantial and should be expected to place significant additional use pressure on existing BLM recreational facilities and management capacity. An increase of this magnitude, without the development of additional recreational infrastructure and field office personnel, would place a significant strain on existing resources and the ability of the WRFO to effectively manage recreation. Additional discussion on the effects of population growth related to oil and gas development or on the effects of other nonmarket values is described in Section 4.10.1 Social, Economic and Environmental Justice.

## Impacts from Management Actions

Managing areas within approximately 50 feet of mapped landslide-prone areas (42,500 acres) and managing saline soils (34,100 acres) with an NSO stipulation (Table 2-2 Record 15) would allow surface disturbance over a larger area than Alternative B and provide a smaller area where non-motorized primitive recreation could occur, which could thereby diminish the primitive oriented recreation experience compared to Alternative B.

Prohibiting public vehicular access on local and resource roads in big-game habitat areas could indirectly reduce impacts on the scenic quality of the recreation setting and maintain opportunities for primitive oriented recreation (Table 2-4 Record 14).

Mineral estate within the Oak Ridge, Square S Summer Range unit of Piceance Creek, and Jensen SWAs would be managed as open with an NSO stipulation (18,200 acres) (Table 2-4 Record 16), which would eliminate surface disturbance in these areas and retain the existing recreation setting, thereby maintaining existing opportunities for hunting, fishing and other wildlife based activities. The impacts of requiring modified siting of surface facilities and applying activity restrictions in wildlife movement corridors would be the same as Alternative B.

Applying stipulations or COAs on land use authorizations, permits, and leases to mitigate impacts on sensitive visual resource areas in VRM I and II areas, Canyon Pintado NHD, scenic byways, and surrounding communities would have the same impacts as Alternative B.

The clearing of commercial woodlands could increase to 4,200 acres per decade under this Alternative, which could increase localized surface disturbance impacting the quality of the recreation setting. If there was a reduction in wildlife habitat, there would be a negative impact on opportunities for hunting and other wildlife oriented recreation, more so than Alternatives A (450 acres) and B (2,600 acres) (Table 2-15 Record 9). As like Alternative B, old-growth forests would be managed as an avoidance area for new land use operations. Retaining old-growth forests could also maintain the existing recreation setting and opportunities for primitive oriented recreation (Table 2-15 Record 7).

Allowing new pipeline corridors to be established when existing corridors have been exhausted could result in additional surface disturbance and have an impact the quality of the recreation setting and reduce recreation opportunities in localized areas (Table 2-20 Record 7). Limiting

BLM_0020073

communication site corridors to currently occupied sites would have the same impacts as Alternative A.

Managing 91,400 acres of potential habitat for federally listed, proposed, and candidate species as open to oil and gas leasing with an NSO stipulation would reduce surface disturbance and maintain the recreation setting for primitive oriented recreation in these areas (Table 2-10 Record 15). However, opportunities for vehicle-based recreation in these areas would be the same as Alternative B. However, opportunities for road-based recreation outside these areas could increase due to the potential increase in the development of local and resource roads.

Section 4.10.1, Social, Economic and Environmental Justice, discusses the effects of oil and gas development on hunting in the study area. Since the relationship between hunting activity levels and big game heard sizes is imprecise, a linear relationship is assumed. As such, the BLM has identified the management goal of maintaining wildlife population objectives set by CPW. Under Alternative B, the objective is 70 percent. Consequently, this alternative would be expected to lead to a reduction of 30 percent in hunting activity levels due to commensurate reductions in big game herd sizes.

## Reclamation

Under Alternative C, requiring interim and final reclamation for oil and gas activities to have a success criterion of 80 percent basal vegetation cover of the DPC could reduce the amount of vegetation cover and increase the possibility of the establishment of noxious weeds and invasive species (Table 2-3 Record 18). This could increase impacts to the scenic quality of the recreation setting compared to Alternative B, which requires 100 percent cover, and Alternative A, which has no requirement.

Requiring reclamation that would result in a functioning vegetation community that is capable of persisting without continued intervention would have the same impacts as Alternative B (Table 2-3 Record 15). Eliminating noxious weeds on the Colorado Department of Agriculture's State Weed List A, controlling the weeds included in Lists B and C (Appendix D), and controlling invasive species (Table 2-3 Record 24) would also have the same impacts as Alternative B.

Implementing special reclamation components to provide supplemental forage species for big game and other wildlife on a case-by-case basis in addition to standard interim and final reclamation measures would have the same impacts as Alternative B (Table 2-4 Record 11).

Requiring final reclamation of abandoned local and resource roads to the standards of the Surface Reclamation Plan (Appendix D) would have the same impacts as Alternative B.

### 4.7.4.5    Alternative D

#### Impacts from Oil and Gas Development

The results of the temporal analysis for Alternative D indicate that an estimated 2,428 oil and gas well pads would be constructed in the MPA, resulting in 29,100 acres of surface disturbance during the 20-year planning period (Appendix E). Approximately 5.8 percent of vegetation communities and 4.9 percent of mule deer range area within the MPA would be developed over the planning period (Appendix E), which represents an increase in the percentage of development compared to Alternatives A (4.6 percent, vegetation communities), B (2.3 percent vegetation communities), and C (1.2 percent vegetation communities). Disturbing 5.8 percent of vegetation communities and 4.9 percent mule deer range area in the MPA could reduce the scenic quality of the recreation

BLM_0020074

setting and diminish the recreation experience for those seeking a primitive or non-primitive oriented recreation experience compared to the other alternatives.

Managing 444,800 acres as open to oil and gas leasing with standard terms and conditions could result in surface disturbance from oil and gas development activities and impact the scenic quality of the recreation setting. There may however, be additional opportunities for some types of road-based recreation due to the potential increase in local and resource roads. Impacts on the recreation experience for primitive recreation would increase compared to Alternatives B and C, which would have no areas open to leasing with standard terms and conditions, but would be slightly less than Alternative A (455,500 acres open with standard terms and conditions).

Applying TL stipulations on oil and gas development on 1,002,100 acres to protect big game habitat could prolong the period of development compared to areas where TL stipulations were not in effect. Timing limitations stipulations are estimated to extend the period of well development by one year, requiring three years to develop the well pad as opposed to two years. This would delay reclamation on a pad and could degrade the natural character of the landscape. When the TL stipulation expires, oil and gas development activities would occur during the open period. This could result in surface disturbance and reduce the quality of the recreation setting and displace recreation to other areas and reduce the recreation experience; however, opportunities for motorized-based recreation would be retained. These impacts would be similar to Alternative A.

The noise and presence of vehicle traffic associated with construction, drill rig transport, and production would increase compared to Alternatives A, B, and C due to the development of 2,556 well pads and 21,200 wells compared to Alternative A (550 and 4,603, respectively), B (1,100 and 9,191, respectively), and C (1,800 and 15,042, respectively) (Table 2-1 Record 13). This could diminish the quality of the recreation experience for those seeking primitive oriented recreation more so than the other alternatives.

Managing 6,200 acres as special management areas with an NSO stipulation would have the same impacts as Alternative B, except that the effects would occur over a smaller area (Table 2-18 Record 5).

Section 4.10.1, Social, Economic and Environmental Justice, details the expected increase in employment and population from project alternatives. A 110 percent increase in general population within the study area, either directly or indirectly related to oil and gas development, would likely lead to a commensurate increase recreational use of BLM administered lands. An increase of 110 percent population is substantial and should be expected to place significant additional use pressure on existing BLM recreational facilities and management capacity. An increase of this magnitude, without the development of additional recreational infrastructure and field office personnel, would place a significant strain on existing resources and the ability of the WRFO to effectively manage recreation. Additional discussion on the effects of population growth related to oil and gas development or on the effects of other nonmarket values is described in Section 4.10.1 Social, Economic and Environmental Justice.

**Impacts from Management Actions**

Managing landslide-prone areas (36,600 acres) with an NSO stipulation (Table 2-2 Record 15) under Alternative D would have the same impacts as Alternative A, but no buffer would be applied around landslide-prone areas, thus surface disturbance and impacts on the recreation setting and experience could occur over a larger area than Alternatives B and C. Managing 45,700 acres of saline soils with a CSU stipulation could result in an increase in surface disturbance and impact the

BLM_0020075

quality of the recreation setting more than Alternatives B and C, where saline soils would be managed with an NSO stipulation (Table 2-2 Record 16).

Alternative D does not apply the threshold concept for managing big game. As a result, oil and gas development could be spread over a wider area than Alternatives B and C, which would increase the extent of impacts on the recreation setting and displace recreationists over a larger area than the other alternatives.

Under Alternative D, increasing the area of disturbance from commercial clearing of forest and woodlands in oil and gas development areas to 7,800 acres per decade could increase surface disturbance and the quality of the recreation setting to a greater extent compared to the other alternatives (Table 2-15 Record 9). Old-growth forest and woodland stand management would be an avoidance area for oil and gas development the same impacts as Alternatives B, C and D (Table 2-15 Record 7).

Allowing new pipeline corridors to be established under Alternative D (Table 2-20 Record 7) would have the same impacts as Alternative C, but surface disturbance and impacts on the recreation setting and experience would increase compared to Alternative B, which prohibits designating new corridors. Limiting communication site corridors to currently occupied sites would have the same impacts as all other alternatives.

Limiting and controlling vehicle use on the BLM vehicle access networks to that associated directly with oil and gas development activities to protect big-game wildlife habitat (Table 2-4 Record 7) could assist in maintaining opportunities for primitive oriented recreation. Prohibiting public vehicular access on local and resource roads could reduce the opportunities for vehicle-based recreation, except when exemptions are granted.

Managing 51,700 acres of potential habitat for federally listed, proposed, and candidate species as open to oil and gas leasing with an NSO stipulation would reduce surface disturbance and maintain the recreation setting for primitive oriented recreation in these areas (Table 2-10 Record 15).

Section 4.10.1, Social, Economic and Environmental Justice, discusses the effects of oil and gas development on hunting in the study area. Since the relationship between hunting activity levels and big game heard sizes is imprecise, a linear relationship is assumed. As such, the BLM has identified the management goal of maintaining wildlife population objectives set by CPW. Under Alternative B, the objective is 50 percent. Consequently, this alternative would be expected to lead to a reduction of 50 percent in hunting activity levels due to commensurate reductions in big game herd sizes.

<u>Reclamation</u>

Requiring interim and final reclamation for oil and gas activities to have a success criterion of 60 percent basal vegetation cover of the DPC (Table 2-3 Record 18) could reduce the amount of vegetation cover and increase impacts on the recreation setting compared to Alternatives B (100 percent cover) and C (80 percent cover).

Requiring reclamation that would result in a functioning vegetation community established on the reclaimed site that is capable of persisting without continued intervention would have the same impacts on the recreation setting as Alternative B (Table 2-3 Record 15).

BLM_0020076

Eliminating noxious weeds on the Colorado Department of Agriculture's State Weed List A, controlling the weeds included in Lists B and C (Appendix D), and controlling invasive species (Table 2-3 Record 24) could reduce the establishment of noxious and invasive species and retain the existing recreation setting and experience. However, there are fewer COAs attached to this alternative compared to Alternative B, which could potentially result in a greater degree of impacts.

Implementing fewer special reclamation components to provide supplemental forage species for big game and other wildlife on a case-by-case basis (Table 2-4 Record 11) could reduce the effectiveness of reclamation and increase impacts on the recreation setting compared to Alternatives A and B.

### 4.7.4.6    Irreversible and Irretrievable Commitment of Resources

Implementation of the proposed management actions would result in surface-disturbing activities that could result in irreversible or irretrievable loss of resources, including dispersed primitive and non-primitive recreation opportunities. The potential for impacts on recreation would be greatest under Alternative D due to the high number of oil and gas wells and well pads relative to other alternatives, which could increase the degree of surface disturbance. The potential for impacts on recreation would be the least under Alternative B which reduces the extent of surface disturbance from oil and gas wells, well pads, and roads. Impacts on recreation under Alternative C would be similar to Alternative A.

### 4.7.4.7    Unavoidable Adverse Impacts

As recreation demand increases, recreation use will expand, potentially creating conflicts between recreation user types. An example of such conflicts that could occur would be when users seeking more primitive types of recreation must share dispersed recreation areas with users of motorized vehicles. In areas where oil and gas development activities would be greater, the potential for displaced users would increase.

### 4.7.4.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

In areas that have been temporarily or seasonally closed to recreation use (e.g., air quality closures, oil and gas closures, restoration projects, sensitive habitats, and utility corridors), there could be a short-term loss of recreational opportunity.

## 4.7.5    Comprehensive Trails and Travel Management

The analysis of effects on trails and travel management, including access within the Planning Area, from allocations, allowable uses, and management actions is focused on areas available for motorized travel. Impacts are determined by whether or not current access would be changed and the degree to which management would meet the goals and objectives for trails and travel management.

Planning Area access is affected by road closures, limitations, and other management actions limiting access. These include actions that could change motorized vehicle travel opportunities and access in the Planning Area. This section addresses areas that are available for motorized vehicle travel; however, the recreation aspect of OHV use (i.e., change in experience) are addressed in the recreation section. Changes in the amount of use (i.e., increased heavy truck traffic) are addressed in the soil resources section and the public health and safety section.

BLM_0020077

The analysis used qualitative and quantitative variables to assess the effects. A number of indicators, attributes, and assumption were used for the analysis. The following three indicators were selected to analyze the effects of the alternatives on comprehensive trails and travel management:

- Closed Area;

- Limited Area; and

- Designated roads, ways, and trails.

The attributes of these three indicators are:

- Changes to the transportation network.

The analysis is based on the following assumptions:

- During site-specific project planning, the BLM would assess all proposed actions for site-specific effects to avoid long-term impairment of trails and travel within the Planning Area;

- Changes to travel management, as outlined in each alternative, would be consistent with the other allocations and authorizations, allowable uses, and management actions under that particular alternative; and

- The BLM would designate roads and trails as part of subsequent travel management planning.

### 4.7.5.1   Impacts Common to All Alternatives

#### Impacts from Oil and Gas Development

Under all alternatives, local and resource roads could be available for public motorized vehicle travel except in areas designated for the protection of big game wildlife habitat. Managing oil and gas development with an NSO stipulation could shift oil and gas development and motorized vehicle travel to areas managed as open or with a CSU or TL stipulation. This could increase the concentration of oil and gas development and motorized vehicle travel in these areas. Managing 83,300 acres of the mineral estates as closed to oil and gas development (Table 2-17 Record 7) would maintain existing access for motorized vehicle travel.

Until the Travel Management Plan is completed, all motorized vehicle travel would be limited to existing roads on most of the public lands in the Planning Area. This would maintain opportunities for motorized and non-motorized vehicle travel.

#### Impacts from Management Actions

All WSAs are closed to motorized use, except for certain permitted activities, under the WRFO 1997 Record of Decision and Resource Management Plan, as well as under the BLM Manual 8550 – Interim Management Plan for Lands Under Wilderness Review.

#### Reclamation

Access for recreation could be limited temporarily in localized areas if reseeding during reclamation activities occur and roads or travelways are closed to public access.

BLM_0020078

### 4.7.5.2   Alternative A

#### Impacts from Oil and Gas Development

Developing 550 well pads and approximately 4,603 wells in the Planning Area (Table 2-1 Record 13) would create approximately 397 miles of resource and local roads to well pads and 283 miles of pipelines (including transmission lines and other utilities) (Table 4-3), which would increase access for motorized vehicle travel. The increase of traffic associated with the development of new well pads under this alternative would drastically increase the amount of heavy truck traffic on local State highways and county roads, likely leading to a deterioration of the surfacing and overall quality of the roads over time. This could place an additional burden on state and local road authorities in terms of maintenance and upkeep. The additional traffic would also likely present additional public health and safety hazards, as described in section 4.9, Public Health and Safety.

Managing approximately 455,500 acres of the mineral estate as open to oil and gas development with standard lease terms and conditions or 583,900 acres with a stipulation of CSU or 499,500 acres with a TL stipulation (Table 2-17 Record 18) would directly result in the development of new resource roads needed to access well pads which in turn could increase access for motorized travel. Seasonal road closures implemented to protect big game habitat could temporarily limit access for motorized vehicle travel in localized areas. Managing 157,078 acres of oil and gas development in the mineral estate with an NSO stipulation could result in highly localized changes in access because various exceptions, modifications and waivers under some resources would allow for roads to be developed in these NSO stipulation areas. The NSO stipulation could shift where development occurs and indirectly change where motorized vehicle access could occur.

Under Alternative A, within the MPA, the results of the temporal analysis for vegetation indicate that an estimated 523 oil and gas well pads would be constructed, resulting in 6,300 acres of surface disturbance during the 20-year planning period (Table 4-47 Lines 6 and 7). Approximately 1.1 percent of the MPA would be developed over the 20-year planning period (Table 4-47 Line 8). Developing 523 oil and gas well pads could increase the number of local and resource roads required to access well pads, which could increase access for motorized travel.

#### Impacts from Management Actions

There would be no impacts to comprehensive trails and travel management from other resource management actions under Alternative A.

#### Reclamation

There would be no impacts to roads from reclamation under Alternative A.

### 4.7.5.3   Alternative B

#### Impacts from Oil and Gas Development

Impacts under Alternative B would be similar to those under Alternative A-except to a greater degree. The development of 1,100 well pads and approximately 9,191 wells (Table 2-1 Record 13) would create 793 miles of resource and local roads and 567 miles of pipelines and other utilities (Table 4-3). Directly increasing the miles of roads would increase the area where motorized vehicle travel occurs relative to Alternative A. Impacts to maintenance and upkeep of local State highways and county roads are likely to consistently increase from the additional heavy truck traffic associated with the additional well pad development.

BLM_0020079

Managing a total of 296,200 acres of the mineral estate as open to oil and gas development with
CSU stipulations and 642,400 acres with TL stipulations (Table 2-17 Record 18) would decrease the
area where roads could be developed relative to Alternative A. However, increasing well pads to
1,100 would directly increase the number of resource roads needed to access well pads compared to
Alternative A. Managing 757,200 acres of oil and gas development with an NSO stipulation and
complying with voluntary thresholds in big-game habitat could shift development to areas with CSU
stipulations and TL stipulations. This shift in the location of development could increase the
concentration of oil and gas resource roads accessible for motorized travel in these areas. Increasing
the area managed as NSO stipulation and applying the voluntary big game thresholds could
concentrate access in areas managed with CSU stipulations and TL stipulations relative to
Alternative A.

The results of the temporal analysis for vegetation under Alternative B within the MPA indicate that
an estimated 1,045 oil and gas well pads would be constructed, resulting in 12,500 acres of surface
disturbance during the 20-year planning period (Table 4-49 Lines 6 and 7). Approximately
2.1 percent of the MPA would be developed over the 20-year planning period (Appendix E Line 8).
Increasing the number of oil and gas well pads to 1,045 would result in an increase in the miles of
local and resource roads required to access the well pads and miles of pipelines and other utilities
which could increase access for motorized travel compared to Alternative A (523 well pads).

### Impacts from Management Actions

Complying with voluntary thresholds in big-game habitat (Table 2-4 Record 12) could shift
development and increase the concentration of oil and gas resource roads accessible for motorized
travel. This could result in oil and gas developers clustering development to stay below thresholds,
which could indirectly reduce the miles of resource roads developed to support oil and gas activities
relative to Alternative A.

In areas of concentrated development, vehicle use on the BLM road networks (including existing
roads, trails, and ways), where logistically practicable, would be temporarily limited to resource
roads associated directly with oil and gas development, production, and maintenance to protect big-
game habitat (Table 2-4 Record 7). This could reduce access for motorized vehicle travel compared
to Alternative A.

### Reclamation

There would be no impacts to roads from reclamation under Alternative B.

### 4.7.5.4   Alternative C

### Impacts from Oil and Gas Development

Impacts under Alternative C would be similar to those under Alternatives A and B, except to a
significantly greater degree. The development of 1,800 well pads (approximately 15,042 wells)
would create 1,300 miles of resource and local roads and 927 miles of pipelines and other utilities
(Table 4-3) which would greatly increase access for motorized vehicle travel compared to
Alternatives A and B.

Managing a total of 400,300 acres of mineral estate with CSU stipulations and 908,000 with TL
stipulations (Table 2-17 Record 18) decrease the area where resource roads could be developed
relative to Alternative A and increase this area relative to Alternative B. However, increasing the
number of potential well pads would directly increase the number and miles of resource roads
relative to both Alternative A and B. Impacts to maintenance and upkeep of local State highways

and county roads are likely to consistently increase from the additional heavy truck traffic associated with the additional well pad development under Alternative C. The NSO stipulation areas with slope restrictions are not considered as viable for developing resource roads to support oil and gas development.

Managing 387,500 acres with NSO stipulation and applying voluntary thresholds in big game and grouse habitat (Table 2-4 Record 12) could concentrate oil and gas resource roads accessible for motorized travel in areas managed with CSU stipulations and TL stipulations but to a lesser extent than Alternative B (757,200 acres) and a greater extent than Alternative A (157,100 acres). Road abandonments and seasonal resource road closures (Table 2-4 Record 14) would be applied to protect big-game habitat which would have the same impacts as Alternative B and would reduce access for motorized vehicles compared to Alternative A.

The results of the temporal analysis for vegetation under Alternative C, within the MPA indicate that an estimated 1,710 oil and gas well pads would be constructed, resulting in 20,500 acres of surface disturbance during the 20-year planning period (Table 4-49 Lines 6 and 7). Approximately 3.4 percent of the MPA would be developed over the 20-year planning period (Table 4-49 Line 8). Increasing the number of oil and gas well pads to 1,710 would result in an increase in the miles of local and resource roads required to access the well pads and miles of pipelines and other utilities which could increase access for motorized travel compared to Alternative A (523 well pads) and B (1,045 well pads).

**Impacts from Management Actions**

Similar to Alternative B complying with voluntary thresholds in big-game habitat (Table 2-4 Record 12) would shift development and increase the concentration of oil and gas resource roads accessible for motorized travel. This could result in oil and gas developers clustering development to stay below thresholds, which could further indirectly reduce the miles of resource roads developed to support oil and gas activities relative to Alternative B.

In areas of concentrated development, vehicle use on the BLM road networks (including existing roads, trails, and ways), where logistically practicable, could be temporarily limited to resource roads associated directly with oil and gas development, production, and maintenance to protect big-game habitat (Table 2-4 Record 7). This could reduce access for motorized vehicle travel compared to Alternatives A and B.

**Reclamation**

There would be no impacts to roads from reclamation under Alternative C.

### 4.7.5.5   Alternative D

**Impacts from Oil and Gas Development**

Impacts under Alternative D would be similar to Alternative C, except to a significantly greater degree than all other alternatives. The development of 2,556 well pads (approximately 21,200 wells) could create 1,800 miles of resource and local roads and 1,300 miles of pipelines and other utilities (Table 4-3) which would increase access for motorized vehicle travel compared to all alternatives.

Managing a total of 444,800 acres of mineral estate as open to oil and gas development with standard lease terms and conditions and 469,300 acres with CSU stipulations and 524,800 acres with TL stipulations (Table 2-17 Record 18) would decrease the area where resource roads could be developed relative to Alternative A. Managing 257,000 acres of oil and gas development in the

BLM_0020081

mineral estate with an NSO stipulation could result in localized changes in access to a greater extent than Alternative A but a lesser extent than Alternatives B and C. However, increasing the number of potential well pads could indirectly increase the number and miles of resource and local roads and miles of pipelines and other utilities relative to Alternatives A, B, and C.

The results of the temporal analysis for vegetation under Alternative D, within the MPA, indicate that an estimated 2,428 oil and gas well pads would be constructed, resulting in 29,100 acres of surface disturbance during the 20-year planning period (Table 4-50 Lines 6 and 7). Approximately 4.9 percent of the MPA would be developed over the 20-year planning period (Table 4-50 Line 8). Increasing the number of oil and gas well pads to 2,428 would increase the miles of local and resource roads required to access the well pads and miles of pipelines and other utilities which could increase access for motorized travel compared to Alternative A (523 well pads), B (1,045 well pads), and C (1,710 well pads).

**Impacts from Management Actions**

There would be no impacts to comprehensive trails and travel management from the other resource management actions under Alternative D.

**Reclamation**

There would be no impacts to roads from reclamation under Alternative D.

### 4.7.5.6   Irreversible and Irretrievable Commitment of Resources

There would be no irreversible or irretrievable commitment of resources.

### 4.7.5.7   Unavoidable Adverse Impacts

Closing oil and gas resource roads to public motorized travel could result in unavoidable adverse impacts by limiting opportunities for motorized vehicle travel. Alternative A proposes the least amount of oil and gas development and the most acres managed as open to oil and gas development. However, Alternative D has the greatest amount of potential oil and gas development, which could increase opportunities for motorized vehicle travel compared to Alternatives A, B, and C.

### 4.7.5.8   Relationship Between Local Short-Term Uses and Long-Term Productivity

Resource roads developed for oil and gas activities could result in short-term use for motorized vehicle travel and would in the long-term alter the existing transportation network. However, under Alternative D, increasing the potential number of well pads could increase the miles of resource roads accessed for motorized vehicle travel. This could have the greatest effect on the short-term use of resource roads and the long-term alteration of the existing transportation network relative to Alternatives A, B, and C.

## 4.7.6   Lands and Realty

Lands and realty are considered a resource use rather than a biological resource. Impacts to lands and realty are a direct result of the emphasis of other resource programs. The discussion of the effects on lands in each alternative is limited to the effects on permitted or authorized uses, including restrictions, costs, and issuance or denial of land use authorizations.

A number of indicators, attributes, and assumptions were used for the analysis. The indicator selected to analyze the effects of the alternatives on lands and realty is:

BLM_0020082

- The BLM permitted or authorized uses.

The attributes of this indicator are:

- Location, cost of development, and design of local and resource roads, pipelines, or other utility lines that are particularly important to oil and gas developments, and non-linear facilities (e.g., gas plants, supervisory control and data acquisition [SCADA] sites).

The analysis is based on the following assumptions:

- Existing ROWs and communication sites would be managed to protect valid existing rights. The ROW holders would maintain access consistent with the terms of their grant.

- Upon renewal, existing ROWs could be modified if the changes meet the objectives of the 1997 White River RMP and this draft RMPA.

- Oil and gas lease stipulations and COAs that limit land use authorizations (e.g., ROWs, leases, and permits) to support oil and gas development would not preclude the BLM from granting land use authorizations for other purposes (not related to oil and gas).

- The demand for communication sites and ROWs would increase over the life of this plan.

- The BLM would continue to process land tenure adjustments and grant land use authorizations on a case-by-case basis.

- Land tenure designations (i.e., retention and disposal areas) and ROW avoidance and exclusion areas (for non-oil and gas projects) identified in the 1997 White River RMP would not change.

- Renewable energy would continue to be a possible interest in the area and could increase in the future based on site suitability; applications for development would be considered as they are proposed on a case-by-case basis.

- Infrastructure associated with oil and gas development (e.g., well pads, equipment, local and resource roads, pipelines, power lines, and communications facilities) would be compatible with existing ROW land uses.

- Management actions related to other resources could result in changes in opportunities to permit land use authorization in certain areas or changes to the amount of land available for land use authorizations.

- Applications for Permit to Drill would address potential conflicts between oil and gas development and other resources on a site-specific basis. Approval of permits would require analysis of the BLM's existing or future ability to grant land use authorizations within site-specific areas.

- The acreages reflect acres of the BLM oil and gas mineral estate, including State and private land within the Planning Area. Federal ROWs, however, are authorized on BLM land only.

The estimated percent of mineral surface estate that could be developed within the MPA during a 20-year planning period was determined utilizing a temporal analysis methodology for Energy and Minerals (see Appendix E for a detailed description). This analysis takes into account projected levels of development, leasing stipulations, and management actions for each alternative. The results of the Energy and Mineral temporal analysis were used to evaluate impacts from oil and gas development on lands and realty.

BLM_0020083

Under all alternatives, impacts would not be anticipated by implementing management actions for geology, wild horse management, forestry and woodland products, and livestock grazing.

### 4.7.6.1    Impacts Common to All Alternatives

<u>Impacts from Oil and Gas Development</u>

Impacts from oil and gas development, oil and gas exploration, and development activities would continue to be considered and authorized on a case-by-case basis; authorized oil and gas uses would likely preclude other incompatible land use authorizations within those areas. Areas managed with NSO or CSU stipulations could result in oil and gas developers finding alternative routes or sites for infrastructure needed to support development. This could possibly increase the number of land use authorizations in other areas.

The currently designated corridor and ROW network (which includes corridors identified in the 1997 White River RMP, the 2009 WWEC Amendment, and other ROWs) would provide opportunities for the co-location of compatible ROWs throughout the Planning Area.

Renewable energy projects could be incompatible with oil and gas activities and future development could be precluded by oil and gas activities. Future renewable energy development in the Planning Area would be evaluated on a site-specific, case-by-case basis with consideration of established oil and gas areas and oil and gas development potential.

Areas closed to leasing (83,300 acres of mineral estate in the Planning Area) indirectly limit the potential for oil and gas developments to preclude other land use authorizations not related to oil and gas (e.g., renewable energy developments, transmission lines,) in those areas. However, non-oil and gas land use authorizations are likely to be precluded from development in most of the areas closed to leasing (e.g., WSAs) by current management decisions under the 1997 White River RMP.

<u>Impacts from Management Actions</u>

Under all alternatives, impacts on lands and realty would occur from limitations on permits for land use authorizations and a possible increase in the cost of mitigation to comply with resource management goals. Management actions that limit or prohibit surface disturbance or protect cultural or paleontological resources, air quality, visual qualities, fish and wildlife, vegetative communities, and soils could increase costs for oil and gas development projects in an effort to avoid protected resources or to mitigate impacts during construction and operation. These decisions could also limit design or siting options for facilities.

Use authorizations with TL stipulations (i.e., seasonal restrictions) that would limit permitted land use activities to protect big game, sage-grouse, raptors, and other wildlife species could affect the feasibility to construct and maintain ROWs. Timing limitation stipulations would limit the time when construction of land use projects would be allowed, which could possibly delay projects or increase project costs in order to complete construction in condensed time windows. Timing limitation stipulations could also affect ROWs during project operations if they limit accessibility to sites. Seasonal restrictions could require the relocation of surface facilities; however, possible case-by-case exceptions could minimize the potential to affect placement and costs for new ROWs or amended ROWs.

Requiring a plant inventory prior to approval of activities that could potentially impact known or potential habitat for federally listed, proposed, and candidate plant species could increase project costs and potentially cause delays while inventories are completed (Table 2-10 Record 7).

BLM_0020084

The following could increase development or compliance costs or result in site-specific alignment and siting modifications:

- Decisions that impose mitigation measures to protect air quality such as dust-control measures that impose watering or other control measures on roads associated with oil and gas development (Table 2-1 Record 10);

- Stipulations to mitigate impacts to visual resources within sensitive landscapes identified as areas of primary concern for visual resources (Table 2-14 Record 3);

- Requiring all construction equipment and vehicles to be cleaned; all hay, straw, unprocessed feed, and seed to be certified weed-free; and inventories for noxious weeds in both the spring and fall within 497,900 acres managed as weed-free zones (Table 2-3 Record 22);

- Designing power lines with the most-current raptor protection and where appropriate, incorporating features that enhance conductor visibility to protect raptors and reduce the potential for line strikes (Table 2-5 Records 5 and 7);

- Monitoring surface-disturbing activities within PFYC Classes 4 and 5 areas by a qualified paleontologist (Table 2-13 Record 3); and

- Updating inventories for specific parcels identified as potential lands with wilderness characteristics prior to issuing any land use authorizations in those areas (Table 2-22 Record 3).

The WRFO would continue to classify BLM lands as open, avoidance, or exclusion areas for the permitting of land use authorizations. Under all alternatives, the following areas would be exclusion areas

The WRFO would continue to classify BLM lands as open, avoidance, or exclusion areas for the permitting of land use authorizations. Unless otherwise identified as either exclusion areas or avoidance areas, the remainder of the Planning Area would be considered open for all land use authorizations.

New ROWs would continue to be prohibited within exclusion areas. In all alternatives, the following areas would be exclusion areas for land use authorizations:

- Wilderness Study Areas;

- South Cathedral Bluffs, Raven Ridge, Black's Gulch, and Coal Draw ACECs;

- Moosehead Mountain; and

- Known (occupied) habitat for federally listed plant species (Table 2-20 Record 10).

In all alternatives, the following areas would avoidance areas for land use authorizations:

- Landslide areas;

- Lands surrounding raptor nests;

- Sage-grouse leks;

- Bald eagle roost and concentration areas;

- Deer Gulch, Lower Greasewood Creek, Dudley Bluffs, Yanks Gulch/Upper Greasewood Creek, Ryan Gulch, White River Riparian, Coal Oil Rim, Oil Spring Mountain, East Douglas Creek, and Duck Creek ACECs;

BLM_0020085

- Remnant vegetation associations;
- Occupied habitat for the BLM sensitive plant species;
- Harper's Corner Road;
- Riparian areas; and
- Canyon Pintado National Historic District (Table 2-20 Record 10).

<u>Reclamation</u>

Under all alternatives, there would be no impacts to Lands and Realty resources. Final reclamation of ROWs is required for land use authorizations on public lands. Acceptable reclamation would manage DPCs and, at a minimum, maintain an at-risk rating and a stable-to-improving trend in ecological status.

### 4.7.6.2   Alternative A

<u>Impacts from Oil and Gas Development</u>

Under Alternative A, the BLM would permit development of up to 550 well pads, which would require land use authorizations for associated facilities (pipelines, local and resource roads, and associated utilities) using the existing corridor network or would require the creation of new ROWs. The BLM would evaluate and administer major ROWs on public lands that meet public, industry, and environmental needs. The 1.0-mile-wide designated Colorow-Greasewood Corridor would accommodate buried linear facilities near the Uintah Basin Lateral and Rocky Mountain Natural Gas pipelines from Colorow Mountain to Magnolia Camp (Table 2-20 Record 5).

The estimated percent of mineral surface estate that could be developed within the MPA during a 20-year planning period for Alternative A was determined utilizing a temporal analysis methodology. Under Alternative A, the development density (or percent of the MPA that could be developed during the 20-year planning period) was determined to be 1.1 percent for the entire MPA based on an estimated 523 well pads and 6,276 acres of surface disturbance (Table 4-76). It is assumed that for each well pad, approximately 4.75 acres of disturbance (or 2,480 acres of the 6,276 acres of total surface disturbance within the MPA) will be attributed to infrastructure such as compressor stations, roads, and other facilities (Table 4-2), however not all of these features will require a ROW.

<u>Impacts from Management Actions</u>

New oil and gas related land use authorizations (e.g., for local or resource roads, pipelines, or other utility lines, leases, and permits) would be considered on a case-by-case basis but denied in exclusion areas, with the exception of short-term land use permits involving no development and projects that are consistent with management objectives for the area (Table 2-20 Record 6). In addition to those areas listed in Impacts Common to All Alternatives (Section 4.7.6.1), potential habitat for federally listed plants and both known (occupied) and potential habitat for candidate plants would be exclusion areas for new land use authorizations. Avoidance areas could restrict the placement or routing of systems or facilities, which could possibly limit access or delay energy projects (by restricting necessary pipelines and transmission lines). If these areas could not be avoided, land use authorizations may be allowed as long as impacts could be mitigated through additional design and siting requirements. This could alter locations and possibly the cost of land and realty actions related to oil and gas development. In addition to those areas listed in Impacts Common to All Alternatives (Section 4.7.6.1), Oak Ridge State Wildlife Area would also be

BLM_0020086

managed as an avoidance area for land use authorizations under Alternative A (Table 2-20 Record 10).

Timing limitation stipulations would impose seasonal restrictions on surface-disturbing ROWs on approximately 1,006,500 acres. Use authorizations with TL stipulations (i.e., seasonal restrictions) that would limit permitted land use activities to protect big game, sage-grouse, raptors, and bald eagles (special status species) could affect the feasibility to construct and maintain ROWs.

Decisions that would allow evaporation facilities for the disposal of produced water (Table 2-2 Record 22) would provide opportunities for land use authorizations since these types of facilities typically would involve produced water from off lease/off unit and would therefore require a ROW.

Communication site ROWs would be limited to currently occupied sites; however, an exception could be granted for non-commercial, private mobile, or microwave facilities by pipeline or power companies or land management entities, in support of their primary business where no existing site could be shown to meet the applicant's needs. The communication site at Moosehead Mountain would not be available for additional authorizations, which would limit land use authorizations for communication facilities in that area (Table 2-20 Record 4).

**Reclamation**

Impacts as a result of reclamation requirements would not vary by alternative for land use authorizations. Acceptable DPCs would be managed in ecological status of late-seral or healthy mid-seral for all rangeland plant communities (Table 2-3 Record 18).

### 4.7.6.3    Alternative B

**Impacts from Oil and Gas Development**

The BLM would permit development of up to twice the number of (up to 1,100) multi-well pads as allowed in Alternative A. This increased development scenario could require an increased amount of oil- and gas-related land use authorizations for associated facilities (e.g., pipelines, access roads, and associated utilities) to support development.

The estimated percent of mineral surface estate that could be developed within the MPA during a 20-year planning period for Alternative B was determined utilizing a temporal analysis methodology. Under Alternative B, the development density (or percent of the MPA that could be developed during the 20-year planning period) was determined to be 2.1 percent for the entire MPA based on an estimated 1,045 well pads and 12,540 acres of surface disturbance (Table 4-79). Of the total surface disturbance, approximately 4,960 acres will be attributed to infrastructure such as compressor stations, roads, and other facilities (Table 4-2); however not all of these features will require a ROW.

No new pipeline corridors would be established (outside of currently designated corridors) however upgrades to existing pipelines (e.g., increasing the diameter of the pipeline) would be permitted in existing ROWs when pipeline capacity is exhausted (Table 2-20 Record 7). A section of the Colorow-Greasewood corridor that starts at the intersection of SH 64 and goes north towards Colorow Mountain would be eliminated as a designated corridor since the WWEC Amendment provided an alternate northern route for this corridor (Map 3-17; Table 2-20 Record 5). These actions could result in designated corridors reaching capacity or ROWs being sited outside of designated corridors.

BLM_0020087

279 of

Facility design could be affected by encouraging companies to request smaller ROW widths for pipeline installation, as well as placing pipelines along newly constructed local and resource roads. (Table 2-20 Record 9). Well access roads would not be available for public vehicular access and no exceptions would be considered (Table 2-4 Record 14). New pipelines in mature pinyon/juniper woodland communities and existing old-growth forest and woodland stands would be required to be located within previously authorized areas of disturbance (Table 2-15 Record 6). Concentrating oil and gas activities and the associated infrastructure of pipelines and other support features would pose a challenge to authorizing non-oil and gas land uses (such as communication towers or transmission lines) within areas of concentrated oil and gas activity.

Based on the temporal analysis under Alternative B, the development density, or percent of each area that could be developed during the 20-year planning period, would be 2.1 percent for the entire MPA and based on an estimated 1,045 well pads and 12,540 acres of surface disturbance (Table 4-79 Lines 6, 7, 8). Compared to Alternative A the total development density for Alternative B would be slightly higher, from 1.1 to 2.1 percent. Under Alternative B, there would generally be more development of well pads and roads confined to a smaller available area when compared to Alternative A. Shared infrastructure (such as road and utility ROWs to the concentrated areas) would result in lower costs per well for the oil and gas companies. Other, non-oil and gas related authorizations would route around oil and gas related ROWs and could result in higher costs to the non-oil and gas related industries within the concentrated oil and gas development areas. The managed development approach associated with Alternative B would limit the spatial extent of surface disturbance associated with oil and gas activities to a greater extent than the development scenario presented in Alternative A. This approach would pose more restrictions on land use authorizations for oil and gas activities, but would continue to provide opportunities for non-oil and gas activities outside of concentrated oil and gas development areas.

**Impacts from Management Actions**

Land use authorizations (e.g., ROWs, leases, and permits) under Alternative B would be considered on a case-by-case basis but denied in exclusion areas. However, unlike Alternative A, there would be no exceptions for short-term land use permits involving no development or for projects that are consistent with management objectives for the area. In addition to the exclusion areas included in the list provided in Impacts Common to All Alternatives (Section 4.7.6.1), the Thornburgh/Battle of Milk Creek site (Table 2-20 Record 10); non-WSA lands with wilderness characteristics that have been identified for retention of their resource value (Table 2-22 Record 11) and areas within 330 feet of occupied habitat of federally listed plant species (Table 2-20 Record 10) would be managed as exclusion areas under Alternative B.

Under Alternatives B, C, and D, all areas that are included in NSO stipulations or CSU stipulations would be classified as avoidance areas for land use authorizations. In addition to those areas listed in Impacts Common to All Alternatives (Section 4.7.6.1), the following areas would be managed as avoidance areas under Alternative B:

- Within mapped 100 year floodplains; within 500 feet of perennial water sources, springs, wells, and wetland/riparian areas; and within 100 feet of ephemeral channels (Table 2-2 Record 12);

- Within 100 feet of landslide areas (Table 2-2 Record 15);

- Within 100 feet of saline soils, with the exception of Coal Oil Basin Exemption Area (Table 2-2 Record 16);

BLM_0020088

- On natural slopes greater than 25 percent (Table 2-2 Record 17);

- Within aspen communities, serviceberry, chokecherry, and Blue Mountain deciduous browse communities (Table 2-3 Record 11);

- Priority riparian/wetland habitats (Table 2-3 Record 20);

- Within ponderosa pine and sagebrush communities managed as RVAs (Table 2-3 Record 28);

- Within all CPW State Wildlife Areas (Table 2-4 Record 16);

- Within 1/8 mile to 1/2 mile of functional raptor nest sites (Table 2-5 Records 11 and Table 2-9 Record 28);

- Within 0.6 mile of sage-grouse lek sites (Table 2-6 Record 18);

- Within 0.4 mile of Columbian sharp-tailed grouse leks (Table 2-6 Record 22);

- Within 1/2 mile of prairie-dog colonies, with the exception of Coal Oil Basin Exemption Area (Table 2-9 Record 15);

- Within critical or occupied habitat for federally-listed fish species (e.g., 100-year flood plain of the White River below Rio Blanco Lake; Table 2-9 Record 18);

- Colorado River cutthroat trout habitat, including Black Sulphur Creek (Table 2-9 Records 19 and 20);

- Identified bald eagle nests, roosts, and perch habitat (Table 2-9 Record 26);

- Within 1/4 mile of functional nests of special status raptor species, within 330 feet of abandoned bald eagle nests, and within 1/4 mile of bald eagle critical night roosts (Table 2-9 Records 28 and 29);

- Suitable and potential habitat for federally listed and candidate plants (Table 2-10 Record 12);

- Within 660 feet of occupied, suitable, and potential habitat of federally listed, proposed, and candidate species (Table 2-10 Record 15);

- Within 330 feet of occupied, suitable, and potential habitat for BLM-sensitive plants (Table 2-10 Record 16);

- Texas-Missouri-Evacuation Creek cultural area (Table 2-12 Record 7);

- Within and adjacent to the Duck Creek Wickiup Village (Table 2-12 Record 9);

- The Thornburgh/Battle of Milk Creek viewshed (Table 2-12 Record 12);

- Within and adjacent to the Mellen Hill Sites (Table 2-12 Record 14);

- Areas with Douglas-fir and aspen on slopes greater that 25 percent (Table 2-15 Record 10);

- Old-growth forest and woodland stands (Table 2-15 Record 7);

- In areas available for oil shale, sodium, and multi-mineral leasing (Table 2-17 Records 21 and 22);

- In all areas leased for coal and the area adjacent to and south of the Deserado Coal Mine Permit Area (Table 2-17 Record 23); and

- Within three special management areas, Anderson Gulch, LO7 Hill, and 3 Mile Gulch (Table 2-18 Record 5).

BLM_0020089

Avoidance areas could prevent land use authorizations over an increased area from Alternative A. This extensive list of avoidance areas combined with the increased number of potential well pads requiring land use authorizations and a lack of increase in Designated Energy Corridors to accommodate growth could result in the most delays of energy supply and the highest costs of lands and realty actions associated with oil and gas development of all alternatives.

In addition, no new road construction or upgrading/improvements of existing roads would be allowed within non-WSA lands with wilderness characteristics that have been identified for retention of their resource value (Table 2-22 Record 9).

Timing limitation stipulations on 1,696,000 acres under Alternative B would impose seasonal restrictions on surface disturbing ROWs (such as local or resource roads, pipelines, or other utility lines) on approximately 689,500 more acres than Alternative A. Use authorizations with TL stipulations would limit permitted land use activities and could affect the feasibility to construct and maintain ROWs in order to protect big game, raptors, sage-grouse, migratory birds, and special status species (e.g., prairie-dog colonies, lynx denning, and bald eagles). Construction of pipelines, local and access roads, and utilities would not be allowed from December 1 through April 30, coinciding with the big game severe winter range stipulation (Table 2-4 Record 12). Timing limitation stipulations in Alternative B could result in increased delays for construction and maintenance, possibly causing increased project delays. Where seasonal restrictions limit the time available to complete activities, relocation of surface facilities could be required; however, allowing development to occur with thresholds could minimize the potential to affect placement and costs for new ROWs or amended ROWs. Thresholds that allow for clustered disturbance within GMUs and sage-grouse habitat could restrict the extent of development in certain areas, but would allow developers to be excluded from TL stipulations which would create flexibility for land use authorization location and design (Table 2-4 Record 12 and Table 2-6 Record 16).

- The following decisions to protect fish and wildlife (big game, raptors, and sage-grouse), special status species (prairie dog, black-footed ferret, and bald eagle), and cultural resources from impacts of development could result in site-specific alignment, siting modifications, facility design, and possibly increase project costs: Requiring design of utility ROWs to reduce the need for regular access (Table 2-4 Record 8);
- Requiring off-site mitigation at a rate of 3 acres of mitigation for each acre of disturbance (Table 2-4 Record 15);
- Possibly requiring surface facilities and ROW corridors to move up to 660 feet to avoid key vegetation types (Table 2-4 Record 17);
- Not allowing occupation or removal of suitable sagebrush cover within 990 feet of sage-grouse mapped brood foraging areas and wet meadow habitats (Table 2-6 Record 19);
- Requiring noise-reduction methods on compressors and gas processing facilities (Table 2-6 Record 7);
- Requiring facility and ROW siting to avoid direct involvement (i.e., surface occupancy and vegetation clearing) of those habitat associations identified as having higher value for nesting migratory birds (Table 2-7 Record 5);
- Avoiding the placement of aboveground power lines within sight of habitat showing past or recent evidence of prairie-dog occupation and installing raptor deterrents, where appropriate, on power lines within 1/4 mile of prairie dog habitat (Table 2-9 Record 8);

BLM_0020090

- Requiring the enhancement of the visibility of static lines and/or conductors with best available technology in areas of concentrated bald eagle use or movement (Table 2-9 Record 27);

- Restricting development within 1,000 feet of rock art or standing architecture (Table 2-12 Record 17); and

- Limiting maintenance of existing and planned ROWs to existing disturbance within occupied, suitable, or potential habitat for federally listed, proposed, and candidate plant species (Table 2-10 Record 14).

Under Alternatives B, C, and D, the BLM would consider acquisition, from willing landowners, of private mineral and surface estate with high black-footed ferret habitat value within ferret management areas, which could increase the amount of lands administered by the BLM (Table 2-9 Record 9).

Under Alternative B, evaporation facilities would not be allowed for disposal of produced water from federal leases, which could increase project costs (Table 2-2 Record 22). Communication site decisions would have the same impacts as Alternative A.

## Reclamation

Requiring interim and final reclamation as well as long-term maintenance of ROWs that would have success criteria of 100 percent cover and composition of the DPC as defined in the BLM's Surface Reclamation Plan (Appendix **D**) could increase project costs in comparison to other alternatives that would not require such reclamation and maintenance (Table 2-3 Record 18). An inventory of the entire project area for noxious weeds and invasive species in both the spring and fall would be required through final abandonment. Weed management plans would be prepared and implemented, noxious weeds would be eliminated or controlled, and invasive species would be controlled and prevented (Table 2-3 Record 24). A reclamation status report would be submitted annually (Table 2-3 Record 26). Reclamation activities, however, could provide the long-term benefits of more land available for non-oil and gas land use authorizations. Finally, oil and gas operators would be responsible for construction, maintenance, and removal of fencing to exclude livestock from oil and gas well pads and related surface disturbance, including cut-and-fill slopes, until interim reclamation vegetation is successfully established (a minimum of three growing seasons) (Table 2-16 Record 12). Constructing and maintaining fencing to keep livestock out of construction and reclamation areas could increase project costs for land use authorizations.

### 4.7.6.4     Alternative C

## Impacts from Oil and Gas Development

The development approach associated with Alternative C would expand the spatial extent of potential surface disturbance which could limit the area for non-oil and gas use authorizations that could be considered on lands planned for oil and gas development. The BLM would permit development of more than triple the number of multi-well pads (up to 1,800) under Alternative C as allowed in Alternative A and increase the number of well pads by more than one-third over Alternative B. This increase in well pads without expansion of energy corridors could result in corridors that reach capacity and likely could not support all linear ROWs that would be necessary to develop the maximum amount of well pads. This could result in BLM land use authorizations being sited outside of designated corridor networks; however, new pipeline corridors could be established only when the capacities of existing pipeline corridors (including energy corridors established by the WWEC Amendment) have been exhausted, or when it would enable management

BLM_0020091

objectives. This would provide flexibility to site energy corridors outside of Designated Utility Corridors.

Companies would be encouraged to request smaller ROWs widths for pipeline installation, as well as placing pipelines under newly constructed energy-associated roads; impacts that would be the same as Alternative B. Well access roads would not be available for public vehicular access although exceptions would be considered on a case-by-case basis (Table 2-4 Record 14). New pipelines in mature pinyon/juniper woodland communities and existing old-growth forest and woodland stands would be required to be located within previously authorized areas of disturbance (same as Alternative B). Requiring ROWs width to be reduced to 25 feet of total disturbance in old-growth forest and woodland stands (with exceptions) could limit the amount of lands available for ROW construction and operation (Table 2-15 Record 11). This could increase project costs, but would provide the flexibility of issuing exceptions if necessary.

Based on the temporal analysis under Alternative C, the development density would be 3.4 percent for the entire MPA based on an estimated 1,710 well pads and 20,500 acres of surface disturbance (Table 4-82 Lines 6, 7, 8). Compared to Alternative B, a higher percentage of the MPA would experience surface disturbance (from 2.1 to 3.4 percent). Of the total surface disturbance, approximately 8,120 acres will be attributed to infrastructure such as compressor stations, roads, and other facilities (Table 4-2); however not all of these features will require a ROW. Under Alternative C, there would generally be more development of well pads and roads that would be dispersed in a larger area when compared to Alternatives A and B. Shared infrastructure, such as road and utility ROWs to the concentrated areas, would result in lower costs per well for the oil and gas companies under Alternative C when compared to Alternative A. Other non-oil and gas related authorizations would route around oil and gas related ROWs and could result in higher costs to the non-oil and gas related industries.

**Impacts from Management Actions**

Land use authorizations (e.g., ROWs, leases, and permits) would be considered on a case-by-case basis but denied in exclusion areas. However, exceptions could be considered in ACECs within the footprint of existing disturbance (Table 2-20 Record 9). Unlike Alternative B, this alternative would provide flexibility in siting and permitting land use authorizations within ACECs within existing ROWs. This alternative would have the added flexibility of allowing short-term land use permits involving no development and projects that are consistent with management objectives within exclusion areas. In Alternative C, exclusion areas would be the same as those listed in Impacts Common to All Alternatives (Section 4.7.6.1) as well as areas within 330 feet of occupied habitat for federally listed plant species (Table 2-20 Record 10).

Under Alternatives B, C, and D, all areas that are included in NSO stipulations or CSU stipulations would be classified as avoidance areas for land use authorizations. Oil and gas related land use authorizations would be re-routed to avoid these areas and would have design stipulations imposed on them if development in these areas could not be avoided. In addition to those areas listed in Impacts Common to All Alternatives (Section 4.7.6.1), the following areas would be managed as avoidance areas under both Alternatives B and C:

- Within mapped 100 year floodplains; within 500 feet of perennial water sources, springs, wells, and wetland/riparian areas; and within 100 feet of ephemeral channels (Table 2-2 Record 12);

BLM_0020092

- Within aspen communities, serviceberry, chokecherry, and Blue Mountain deciduous browse communities (Table 2-3 Record 11);

- Within ponderosa pine and sagebrush communities managed as RVAs (Table 2-3 Record 28);

- Within 0.6 mile of sage-grouse lek sites (Table 2-6 Record 18);

- Within 0.4 mile of Columbian sharp-tailed grouse leks (Table 2-6 Record 22);

- Within critical or occupied habitat for federally-listed fish species (e.g., 100-year flood plain of the White River below Rio Blanco Lake; Table 2-9 Record 18);

- Colorado River cutthroat trout habitat, including Black Sulphur Creek (Table 2-9 Records 19 and 20);

- Identified bald eagle nests, roosts, and perch habitat (Table 2-9 Record 26);

- Within 1/4 mile of functional nests of special status raptor species, within 330 feet of abandoned bald eagle nests, and within 1/4 mile of bald eagle critical night roosts (Table 2-9 Records 28 and 29);

- Suitable and potential habitat for federally listed and candidate plants (Table 2-10 Record 12);

- Texas-Missouri-Evacuation Creek cultural area (Table 2-12 Record 7);

- Within and adjacent to the Duck Creek Wickiup Village (Table 2-12 Record 9);

- The Thornburgh/Battle of Milk Creek viewshed (Table 2-12 Record 12);

- Within and adjacent to the Mellen Hill Sites (Table 2-12 Record 14);

- Areas with Douglas-fir and aspen on slopes greater that 25 percent (Table 2-15 Record 10);

- Old-growth forest and woodland stands (Table 2-15 Record 7); and

- Within three special management areas, Anderson Gulch, LO7 Hill, and 3 Mile Gulch (Table 2-18 Record 5).

In addition to those areas listed above, the following areas would be managed as avoidance areas under Alternative C:

- Non-WSA lands with wilderness characteristics that have been identified for retention of their resource value (Table 2-22 Record 11);

- Within 50 feet of landslide areas (Table 2-2 Record 15);

- In areas with saline soils, with the exception of Coal Oil Basin Exemption Area (Table 2-2 Record 16);

- On natural slopes greater than 35 percent (Table 2-2 Record 17);

- Riparian/wetland habitats (Table 2-3 Record 20);

- Within the Oak Ridge, Square S Summer Range Unit of Piceance Creek, and Jensen State Wildlife Areas (Table 2-4 Record 16);

- Within 1/8 mile to 1/2 mile of functional raptor nest sites (Table 2-5 Record 11 and Table 2-9 Record 28);

- In all ferret management areas (Table 2-9 Record 11);

BLM_0020093

- Within 660 feet of occupied and suitable habitat and within potential habitat of federally listed, proposed, and candidate species (Table 2-10 Record 15);

- Within 330 feet of occupied and suitable habitat for BLM-sensitive plants (Table 2-10 Record 16);

- On oil shale leases and active sodium mining areas (Table 2-17 Records 21 and 22); and

- In the area included in the Deserado Coal Mine Permit Area as well as the area adjacent to and south of it (Table 2-17 Record 23).

Alternative C is less restrictive than Alternative B in regards to the placement of land use authorizations since non-WSA lands with wilderness characteristics (that have been identified for retention of their resource value) would be managed as avoidance areas rather than exclusion areas. In addition, many of the avoidance areas in Alternative C are similar to those in Alternative B, but encompass smaller areas (e.g., 50 feet buffer around landslide areas rather than 100 feet). However, the areas identified as avoidance and exclusion areas combined with increased well pads requiring land use authorizations could result in increased delays of energy supply and increased costs of lands and realty actions associated with oil and gas development. It would also likely concentrate oil and gas activities and the associated infrastructure of pipelines and other support features in other areas.

Use authorizations with TL stipulations would limit permitted surface-disturbing land use activities under Alternative C and could affect the feasibility to construct and maintain ROWs in order to protect the same amount (1,696,000 acres) of sensitive areas as Alternative B. Construction of pipelines and energy-associated roads and utilities would not be allowed from December 1 through April 30, coinciding with the big game severe winter range stipulation; associated impacts would be the same as Alternative B. Larger acute big game thresholds than Alternative B could permit more land use authorizations in clustered areas of GMUs to be excluded from TL stipulations, thereby allowing more development to occur without timing limitations under Alternative C than Alternative B (Table 2-4 Record 12).

Decisions to protect fish and wildlife and special status species from impacts of development could result in site-specific alignment and siting modifications. The following management actions would be the same as Alternative B:

- Requiring design of utility ROWs to reduce the need for regular access (Table 2-4 Record 8);

- Possibly requiring surface facilities and ROW corridors to move up to 660 feet to avoid key vegetation types (Table 2-4 Record 17);

- Requiring noise-reduction methods on compressors and gas processing facilities (Table 2-6 Record 7);

- Avoiding the placement of aboveground power lines within sight of habitat showing past or recent evidence of prairie-dog occupation and installing raptor deterrents, where appropriate, on power lines within 1/4 mile of prairie dog habitat (Table 2-9 Record 8);

- Requiring the enhancement of the visibility of static lines and/or conductors with best available technology in areas of concentrated bald eagle use or movement (Table 2-9 Record 27); and

- Limiting maintenance of existing and planned ROWs to existing disturbance within occupied, suitable, or potential habitat for federally listed, proposed, and candidate plant species (Table 2-10 Record 14).

BLM_0020094

*Chapter 4 – Environmental Consequences*

In addition to those management actions listed above, the following decisions to protect wildlife, special status species, and cultural resources would apply under Alternative C:

- Establishing protocols and criteria to implement compensatory mitigation to offset reductions in big game habitat capacity (Table 2-4 Record 15);

- Not allowing occupation or removal of suitable sagebrush cover within 660 feet of sage-grouse mapped brood foraging areas and wet meadow habitats (Table 2-6 Record 19);

- Requiring facility and ROW siting to minimize (rather than avoid as would be required by Alternative B) direct involvement (i.e., surface occupancy and vegetation clearing) of those habitat associations identified as having higher value for nesting migratory birds (Table 2-7 Record 5); and

- Restricting development within 750 feet of rock art or standing architecture (Table 2-12 Record 17).

In general, these management actions would be similar to Alternative B but either less restrictive or applicable to a smaller area (e.g., restricting development within 750 feet of rock art instead of within 1,000 feet).

New road construction or upgrading/improvements of existing roads in non-WSA lands with wilderness characteristics would be allowed. Whenever possible, existing roads would be maintained as a primitive road or two-track. New facilities would be considered on a case-by-case basis (Table 2-22 Records 9 and 10).

Land use authorizations for evaporation facilities to dispose of produced water on public lands would not be approved under Alternative C; this decision could increase project costs (Table 2-2 Record 22).

Applications for new commercial communication sites would be considered on a case-by-case basis if it is determined that the facility would fill a need to improve public safety and information transfer, and no other existing site would meet the applicant's needs (Table 2-20 Record 4). This decision would limit land use authorizations for communication facilities, but to a lesser degree than Alternatives A and B. As with Alternatives A and B, the site at Moosehead Mountain would not be available for additional authorizations.

<u>Reclamation</u>

Measures for addressing reclamation for Alternative C would be the same as those with Alternative B, although the goals for vegetation recovery are 80 percent for Alternative C versus 100 percent for Alternative B.

### 4.7.6.5   Alternative D

<u>Impacts from Oil and Gas Development</u>

Alternative D emphasizes the production of oil and gas and would permit the maximum spatial extent of surface disturbance among the alternatives. This alternative would provide the most opportunities and least restrictions for the BLM to permit land use authorizations associated with oil and gas development. However, the expansion of oil and gas development allowed under this alternative could decrease the surface area that could otherwise be utilized for efficient development of non-oil and gas related (e.g., renewable energy, communication site, interstate highway, or power line) land use authorizations. The BLM could permit development of the greatest number of well

BLM_0020095

pads (up to 2,556) in Alternative D. Increased development would have the largest impact on pipeline corridor capacity among all alternatives. This alternative would likely cause the largest amount of land use authorizations to be sited outside of designated corridor networks. This alternative provides flexibility for the BLM to establish new pipeline corridors when the capacities of existing pipeline corridors have been exhausted, or when it would enable management objectives, which would result in the same impacts as Alternative C. Establishment of new corridors could provide opportunities for the co-location of ROWs needed to support oil and gas development. Unlike Alternatives B and C, new pipelines in mature pinyon/juniper woodland communities and existing old-growth forest and woodland stands would not be required to be located within previously authorized areas of disturbance (Table 2-15 Record 6).

Based on the temporal analysis under Alternative D, the development density would be 4.9 percent for the entire MPA based on an estimated 2,428 well pads and 29,100 acres of surface disturbance (Table 4-85 Lines 6, 7, 8). Compared to Alternative C, the total development density for Alternative D would be higher, from 3.4 to 4.9 percent. Of the total surface disturbance, approximately 11,533 acres will be attributed to infrastructure such as compressor stations, roads, and other facilities (Table 4-2); however not all of these features will require a ROW. Under Alternative D, there would be more development of well pads and roads that would be dispersed in a larger area when compared to Alternatives A, B, and C. Shared infrastructure, such as road and utility ROWs to the concentrated areas, would result in lower costs per well for the oil and gas companies. Other non-oil and gas related authorizations would route around oil and gas related ROWs and could result in higher costs to the non-oil and gas related industries.

**Impacts from Management Actions**

Land use authorizations (e.g., ROWs, leases, and permits) would be considered on a case-by-case basis but denied in exclusion areas. However, as under Alternative C, exceptions could be considered in ACECs within the footprint of existing disturbance (Table 2-20 Record 9). Unlike Alternative B, this alternative would provide flexibility in siting and permitting land use authorizations within ACECs within existing ROWs. Alternatives C and D would have the added flexibility of allowing short-term land use permits involving no development and projects that are consistent with management objectives within exclusion areas. In Alternative D, exclusion areas would be the same as those listed in Impacts Common to All Alternatives (Section 4.7.6.1).

Under Alternatives B, C, and D, all areas that are included in NSO stipulations or CSU stipulations would be classified as avoidance areas for land use authorizations. Oil and gas related land use authorizations would be re-routed to avoid these areas and would have design stipulations imposed on them if development in these areas could not be avoided. In addition to those areas listed in Impacts Common to All Alternatives (Section 4.7.6.1), the following areas would be managed as avoidance areas under Alternatives B, C, and D:

- Within mapped 100 year floodplains; within 500 feet of perennial water sources, springs, wells, and wetland/riparian areas; and within 100 feet of ephemeral channels (Table 2-2 Record 12);
- Within aspen communities, serviceberry, chokecherry, and Blue Mountain deciduous browse communities (Table 2-3 Record 11);
- Within ponderosa pine and sagebrush communities managed as RVAs (Table 2-3 Record 28);
- Within 0.4 mile of Columbian sharp-tailed grouse leks (Table 2-6 Record 22);

BLM_0020096

- Within critical or occupied habitat for federally-listed fish species (e.g., 100-year flood plain of the White River below Rio Blanco Lake; Table 2-9 Record 18);

- Texas-Missouri-Evacuation Creek cultural area (Table 2-12 Record 7);

- Within and adjacent to the Duck Creek Wickiup Village (Table 2-12 Record 9);

- The Thornburgh/Battle of Milk Creek viewshed (Table 2-12 Record 12);

- Within and adjacent to the Mellen Hill Sites (Table 2-12 Record 14); and

- Within old-growth forest and woodland stands (Table 2-15 Record 7).

In addition to those areas listed above, the following areas would be managed as avoidance areas under both Alternatives C and D:

- On natural slopes greater than 50 percent (Table 2-2 Record 17);

- On oil shale leases and active sodium mining areas (Table 2-17 Records 21 and 22); and

- In the area included in the Deserado Coal Mine Permit Area as well as the area adjacent to and south of it (Table 2-17 Record 23).

In addition to those areas listed above, the following would be managed as avoidance areas under Alternative D:

- On fragile soils on slopes greater than 35 percent and saline soils derived from Mancos Shale (Table 2-2 Record 9);

- Within landslide areas (Table 2-2 Record 15);

- In areas with saline soils (Table 2-2 Record 16);

- Within 1/8 mile to 1/4 mile of functional raptor nest sites (Table 2-5 Record 11);

- Priority riparian/wetland habitats (Table 2-3 Record 20);

- Within 1/4 mile of sage-grouse lek sites (Table 2-6 Record 18);

- In Wolf Creek and Coyote Basin Ferret Management Areas (Table 2-9 Record 11);

- Colorado River cutthroat trout habitat, not including Black Sulphur Creek (Table 2-9 Records 19 and 20);

- Within 1/4 mile of functional nests of special status raptor species and within 1/4 mile of bald eagle critical night roosts (Table 2-9 Records 28 and 29);

- Within 660 feet of occupied habitat for federally listed, proposed, and candidate species (Table 2-10 Record 15);

- Suitable habitat for federally listed and candidate plants (Table 2-10 Record 12);

- Within occupied habitat for BLM-sensitive plants (Table 2-10 Record 16); and

- Within two special management areas, Anderson Gulch, and 3 Mile Gulch (Table 2-18 Record 5).

Alternative D is less restrictive than Alternative C in regards to the placement of land use authorizations since non-WSA lands with wilderness characteristics would be open for land use authorizations. In addition, many of the avoidance areas in Alternative D are similar to those in Alternative C, but encompass smaller areas (e.g., no buffer around landslide areas; include only occupied habitat for BLM-sensitive plants). However, the areas identified as avoidance and

BLM_0020097

exclusion areas combined with increased well pads requiring land use authorizations could result in increased delays of energy supply and increased costs of lands and realty actions associated with oil and gas development. It would also likely concentrate oil and gas activities and the associated infrastructure of pipelines and other support features in other areas.

Use authorizations with TL stipulations would limit permitted land use activities on 1,002,100 acres or approximately 693,900 acres less acres than Alternatives B and C. The other notable difference between Alternatives A and D and Alternatives B and C in regards to timing limitations is the procedure for the BLM to grant an exception. While, the area included in TL stipulations is less under Alternative D, there is less certainty for operators that they will be granted an exception to the timing limitations since it depends not only on a site specific analysis of the project but also on an evaluation of the severity of the winter (Appendix A). In contrast, Alternatives B and C would allow exceptions to timing limitations if development remains within identified thresholds; this would allow operators to plan for year-round operations in advance without any uncertainty tied to the prevailing weather conditions (Table 2-4 Record 12). As such, it is possible that Alternative D would result in more restrictions to ROW construction (associated with the exercise of lease rights) and could cause more project delays under Alternatives B and C.

Decisions to protect fish and wildlife and special status species from impacts of development could result in site-specific alignment and siting modifications, which could affect development costs. The following management actions would be the same for Alternatives B, C, and D:

- Requiring noise-reduction methods on compressors and gas processing facilities (Table 2-6 Record 7); and

- Avoiding the placement of aboveground power lines within sight of habitat showing past or recent evidence of prairie-dog occupation and installing raptor deterrents, where appropriate, on power lines within 1/4 mile of prairie dog habitat (Table 2-9 Record 8).

In addition to those management actions listed above, the following decisions to protect wildlife, special status species, and cultural resources would apply under Alternative D:

- Requiring new electrical transmission lines to be buried underground within existing ROWs (Table 2-1 Record 6);

- Requiring facility and ROW siting to minimize direct involvement (i.e., surface occupancy and vegetation clearing) of those habitats occupied by BLM-sensitive and FWS Birds of Conservation Concern (Table 2-7 Record 5); and

- Restricting development within 500 feet of rock art or standing architecture (Table 2-12 Record 17).

Alternative D would not require design of utility ROWs to eliminate the need for regular access in order to protect big game (Table 2-4 Record 8). This could allow for increased flexibility of ROW siting and decreased project costs over Alternatives B and C.

As in Alternative A, opportunities for land use authorizations would be provided by decisions that would allow evaporation facilities for the disposal of produced water on a case-by-case basis (Table 2-2 Record 22).

In areas where non-WSA lands with wilderness characteristics occur, mitigation to minimize impacts to wilderness characteristics may be required for new linear ROWs (Table 2-22 Record 11). As under Alternative C, new road construction or upgrading/improvements of existing roads in

BLM_0020098

non-WSA lands with wilderness characteristics would be allowed and construction of new facilities would be considered on a case-by-case basis (Table 2-22 Records 9 and 10).

Communication site ROWs would be considered on a case-by-case basis, which would be the same impacts as Alternative C. Moosehead Mountain would not be available for additional authorizations, which would have the same impacts as all alternatives.

<u>Reclamation</u>

Under Alternative D, requiring interim and final reclamation as well as long-term maintenance of ROWs that would have success criteria of 60 percent cover and composition of the DPC as defined in the WRFO Surface Reclamation Plan (Appendix D) could result in decreased project costs in comparison to 100 percent in Alternative B and 80 percent in Alternative C (Table 2-3 Record 18). A pre-disturbance weed inventory would be required, noxious weeds would be eliminated or controlled, and invasive species within the permitted area of use would be controlled (Table 2-3 Record 24). Alternative D could result in decreased compliance costs to developers because unlike Alternatives B and C, Alternative D would not require restorative measures to protect aquatic habitats or construction and maintenance of fencing to exclude livestock from construction and restoration areas (Table 2-16 Record 11).

## 4.7.6.6    Irreversible and Irretrievable Commitment of Resources

Implementation of the lands and realty management actions would result in ROW development and other land use authorizations. For the life of those developments and authorizations, the lands would be irreversibly and irretrievably unavailable for other land uses. However, should the developments be decommissioned and removed, the lands could be available for future land and realty transactions (or other purposes), although the uses could be more limited depending on the condition of the land (for example, if the land had been contaminated by hazardous materials).

Under Alternative D there are more possible areas that could be unavailable for other lands and realty activities than with Alternatives A, B, or C. Alternative B would present the fewest potential areas that could be unavailable for other lands and realty activities when compared to Alternative A, C, or D.

## 4.7.6.7    Unavoidable Adverse Impacts

Land use restrictions imposed to protect sensitive resources and other important values would limit the BLM from providing unrestricted opportunities for land use authorizations and ROWs throughout the decision area. These restrictions could require the closing of roads and trails, which could adversely affect holders of land use authorizations or ROWs if they could not access existing or proposed facilities for maintenance or construction. Alternative B presents the greatest potential for areas that could be unavailable for lands and realty activities due to restrictions to protect sensitive resources.

## 4.7.6.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

Does not apply to lands and realty.

BLM_0020099

## 4.8   Special Designations

Impact analysis in this section addresses the potential effects to ACECs, WSAs and National Back Country and Scenic Byways, by alternative. These special designations are described in Chapter 3 Sections 3.71 through 3.7.5 and are shown on Map 3-17. Effects on historic trails and NHDs are discussed in Section 4.6.1, Cultural Resources. Effects to the Flat Tops Wilderness and Dinosaur National Monument from air quality are discussed in Section 4.2.1, Air and Atmospheric Values.

**Areas of Critical Environmental Concern**

This analysis identifies effects of management decisions on the BLM's ability to prevent irreparable damage to the relevant and important values associated with each ACEC. In concert with the BLM guidelines, the impact analysis considers management actions that "defend or guard against damage or loss" to the relevant and important values. This includes effects to values that could be restored and those that would be irreparable during the 20-year planning period. The management actions associated with the alternatives could either degrade or retain the relevant and important values.

A number of indicators, attributes, and assumptions were used for the analysis. The two indicators selected to analyze the effects of the alternatives on ACECs are:

- Relevant and important values included in each ACEC designation; and
- Threat of irreparable harm to the relevant and important values.

The attributes of the two indicators are:

- Threatened and Endangered plant species;
- Sensitive plant species;
- Remnant vegetation communities;
- Small aspen clones;
- Spruce fir plant communities;
- Biologically diverse native plant communities;
- Genetic diversity of native plant communities;
- Riparian habitats;
- Bald eagle nest and roost habitat;
- Critical habitat for Colorado pikeminnow;
- Colorado River cutthroat trout fisheries;
- Cultural resources; and
- Paleontological resources.

BLM_0020100

**Chapter 4 – Environmental Consequences**

The analysis is based on the following assumptions:

- The BLM would continue to manage each ACEC according to the prescriptions included in the 1997 White River ROD/RMP.

- The portion of the Trapper/Northwater Creek ACEC that is within the Planning Areas would be managed according to the Roan Plateau RMP Amendment. Since impacts associated with development and BLM management actions have already been analyzed in the draft and final environmental impact statements prepared during the Roan Plateau RMP Amendment, the Trapper/Northwater Creek ACEC will not be discussed further in this section.

- All areas of an ACEC contain the relevant and important values for which an ACEC was designated.

- The designation of ACEC does not prevent appropriate land uses that are not detrimental to the unique features or values that receive special focused management or protection.

- Appropriate management plans would be developed to enhance the relevance and importance criteria, specific to the designation.

- To ensure protection, conservation, or restoration for specific ACEC relevance and importance criteria, measures for land uses (e.g., pre-development, development, and post-development) would be incorporated into management plans or would be addressed at the activity or site-specific project level.

Under all alternatives, impacts on identified relevant and important values are not anticipated because of implementing management actions for livestock grazing and fire management.

**Wilderness Study Areas**

The analysis of potential effects to WSAs considers how development activities and management actions could potentially change wilderness characteristics. The following assumptions are made:

- Under all alternatives, WSAs will continue to be managed according to the BLM Manual 8550 - Interim Management Policy (IMP) for Lands Under Wilderness Review to protect the area's identified wilderness characteristics, until such time that Congress designates them as Wilderness Areas or releases them from consideration.

- WSAs would continue to be managed to the non-impairment standard, and the BLM will not authorize activities within WSAs that would impair their suitability for designation as wilderness.

- The IMP identifies the guidelines for specific activities so as not to impair the suitability of WSAs for preservation as wilderness.

- Existing mineral leases that existed prior to October 21, 1976 (FLPMA approval date) may continue in the same manner and degree as on that date.

- Valid existing rights are recognized.

BLM_0020101

**Scenic Byways and Back Country Byways**

Areas along scenic byways and back country byways were evaluated for potential effects to the characteristics for which these areas were designated. For designation as a National Scenic Byway, the road must possess at least one of six "intrinsic qualities" defined by the Federal Highway Administration— scenic, natural, historic, cultural, archaeological, or recreational.

A number of indicators, attributes, and assumptions were used for the analysis. The one indicator selected to analyze the effects of the alternatives on scenic byways is:

- Designation as a scenic byway.

The attributes of this indicator are:

- Cultural resources;
- Paleontological resources;
- Visual resources; and
- Air quality.

The analysis is based on the following assumption:

- The BLM and other jurisdictions would continue to manage these areas for multiple uses consistent with the designation.

Under all alternatives, impacts on resources for scenic byway designation are not anticipated because of implementing management actions for the following resources, and resource uses: fire management, forestry and woodlands, livestock grazing, and lands and realty.

## 4.8.1    Impacts Common to All Alternatives

### Impacts from Oil and Gas Development

Impacts from oil and gas development on ACECs is dependent upon impacts to specific resources for which they were designated (Table 3-35) and will vary in intensity depending on the location of the ACEC and the type of resource. The Blacks Gulch, Duck Creek, Dudley Bluffs, Lower Greasewood Creek, and Ryan Gulch ACECs are located entirely within the MPA. The majority of the Yanks Gulch/Upper Greasewood Creek (98 percent) and Deer Gulch ACECs (92 percent) as well as portions of the South Cathedral Bluffs (32 percent), White River Riparian (9 percent), and East Douglas Creek ACECs (5 percent) are also located within the MPA. Since 95 percent of future development is anticipated to occur within the MPA, these ACECs would likely be most affected by oil and gas development in the absence of any management actions designed to reduce or minimize associated impacts. The ACECs within the MPA were designated primarily to protect paleontological resources, special status plant species, remnant vegetation associations, cultural resources, and habitat for bald eagles and Colorado pikeminnow. Detailed impacts analysis associated with these specific resources can be found in the following sections: 4.6.2 (paleontological resources), 4.3.4 (special status plant species), 4.3.1 (remnant vegetation associations), 4.6.1 (cultural resources), and 4.3.3 (pikeminnow).

Both the Flat Tops Trail and Dinosaur Diamond Scenic Byways are located outside of the MPA, however impacts to air quality and visual resources associated with energy development could impact both byways. Since the Dinosaur Diamond Scenic Byway is used by the public primarily to view paleontological and cultural resources, impacts to these resources would also impact the

BLM_0020102

byway. Detailed impacts analysis associated with air quality and visual resources can be found in Sections 4.2.1 and 4.6.3, respectively. Since the majority of the Flat Tops Trail Scenic Byway is located in areas with only moderate or low potential for oil and gas (Map 1-4), development in this area is not anticipated to result in adverse impacts to the overall characteristics of the area.

As oil and gas development activities are not consistent with the BLM Manual 8550 – Interim Management Policy for Lands under Wilderness Review, all WSAs are closed to future oil and gas leasing, except for Oil Spring Mountain WSA which contains mineral leases granted prior to October 21, 1976. Currently approximately 9,100 acres within Oil Spring Mountain WSA are under a Federal mineral lease. Given that 95 percent of projected oil and gas development in the WRFO is anticipated to occur in the MPA, and there are no WSAs in the MPA, it is highly unlikely that project activities outside of WSAs will impair their suitability under any of the alternatives for future designation as wilderness. One exception would be if any of the project alternatives degrades air quality to such a point that it significantly affects a WSA's naturalness, it may no longer be suitable for designation as wilderness. The Oil Spring Mountain ACEC and portions of the Moosehead Mountain ACEC coincide with WSAs (Table 4-86) and are also closed to leasing.

**Table 4-86. Acres of ACECs Closed to Oil and Gas Leasing under all Alternatives**

| Area of Critical Environmental Concern | Acres |
|---|---|
| **Leased** | |
| Oil Spring Mountain[1] | 9,700 |
| **Unleased** | |
| Moosehead Mountain[2] | 1,400 |
| Oil Spring Mountain[1] | 8,600 |
| **Total** | **19,700** |

SOURCE: BLM GIS data 2009.
NOTES:
[1] Coincides with Oil Spring Mountain WSA.
[2] Coincides with Willow Creek WSA.

## Impacts from Management Actions

There are no areas open with standard lease terms and conditions within any of the ACECs. Dudley Bluffs, Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, Raven Ridge, South Cathedral Bluffs, Deer Gulch, Ryan Gulch, Blacks Gulch, Coal Draw, Moosehead Mountain, and Duck Creek are managed with NSO stipulations under all alternatives (Table 2-21 Record 13). Managing these areas with NSO stipulations minimizes impacts to important values since exceptions would only be granted for actions that would not directly or indirectly affect the identified important values of the ACEC (NSO-54 and NSO-55).

The White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek ACECs are managed with CSU stipulations under all alternatives (Table 2-21 Record 14). Areas managed as CSU stipulation could have surface disturbance from oil and gas exploration and development. Controlled surface use stipulations would alter the site-specific location of well pads, pipelines, and roads to avoid important resources. Additionally, there may be areas within these ACECs that are protected by NSO stipulations associated with other specific resources (Appendix A). For example, remnant vegetation associations are managed with NSO stipulations regardless of which ACEC in which they occur (NSO-10 and NSO-11).

BLM_0020103

Timing limitation stipulations would alter when human activities occur and could indirectly reduce effects on plant and wildlife habitats as well as impacts to scenic byways if the timing limitations restricted activity during critical times of the year or during periods of high public use of the scenic byways.

Other management actions besides lease stipulations are also used to minimize impacts to important values. For example, limiting fugitive dust indirectly helps to improve ecological condition of vegetation communities (Table 2-1 Records 7 and 8).

Requiring power line designs that reduce raptor electrocution (Table 2-5 Record 5) and using physical barriers to prevent contact with stored fluids both reduce raptor mortality (Table 2-5 Record 6), including mortality of bald eagles.

Under all alternatives, the Raven Ridge, Coal Draw, and Blacks Gulch ACECs are managed as ROW exclusion areas, which helps to protect important paleontological resources and special status plant species located within these areas. South Cathedral Bluffs and Moosehead Mountain ACECs are also ROW exclusion areas which provide additional protection from surface disturbance associated with oil and gas infrastructure (Table 2-20 Record 10). All of the other ACECs are managed as ROW avoidance areas which means that the BLM will strive to place ROWs outside of these ACECs whenever possible. However, even if an ACEC is managed as an avoidance area, portions of that ACEC would be managed as ROW exclusion areas if there was occupied habitat for listed plant species (Table 2-20 Record 10).

Managing Canyon Pintado NHD as an avoidance area for ROWs could reduce surface disturbance and help retain the existing scenic resources adjacent to the Dinosaur Diamond Scenic Byway (Table 2-12 Record 4). In addition, COAs would be used to mitigate impacts to visual resources in all VRM classes, with the scenic byways being identified as areas of primary concern (Table 2-14 Record 3).

In the event Congress releases land from WSA designation areas within the WSA that are also under another special designation (e.g., Moosehead Mountain and Oil Spring Mountain ACECs), the land would retain the ACEC resource protections. Managing WSAs if released by Congress to meet VRM Class II objectives could allow surface-disturbing activities and result in a loss of naturalness (Table 2-21 Record 12).

<u>Reclamation</u>

Reclamation of disturbed areas (Appendix D) would improve localized resource conditions in areas where oil and gas development has occurred. Indirectly this could help retain or improve relevant and important values in ACECs. Only native plant species would be used for reseeding disturbed areas within ACECs and WSAs (Table 2-3 Record 17). If remnant vegetation associations were present within these areas, then only locally gathered native species or genetic stock from locally gathered native species would be used during reclamation (Table 2-3 Record 29). In the short term, reclamation activities in areas adjacent to the Dinosaur Diamond and Flat Tops Scenic Byways could reduce scenic qualities by increasing contrast across the landscape. However, long-term reclamation in these adjacent areas could restore scenic qualities and retain the existing designation qualities.

BLM_0020104

## 4.8.2    Alternative A

**Impacts from Management Actions**

In addition to the stipulations for specific ACECs (NSO-54 and CSU-31), Alternative A also provides additional management direction with stipulations targeted towards specific resources for which the ACECs were designated.

Under Alternative A, approximately 30,000 acres or 38 percent of ACECs open for leasing within the WRFO are managed with NSO stipulations; including 100 percent of the 5 ACECs that are located entirely within the MPA (Table 4-87). Specific resources within ACECs that are managed with NSO stipulations under Alternative A include BLM sensitive plants (NSO-10), remnant vegetation associations (NSO-10), occupied and potential habitat for listed plant species (NSO-38), the Duck Creek Wickiup Village (NSO-44), and within 1/4 mile of bald eagle nests (NSO-28) and nocturnal roosts (NSO-35).

Under Alternative A, approximately 48,900 acres or 62 percent of ACECs open for leasing within the WRFO are managed with CSU stipulations (Table 4-87), which could result in localized surface disturbance. Specific resources within ACECs that are managed with CSU stipulations include Colorado River cutthroat trout habitat (CSU-11) as well as nest, roost, and perch habitat for bald eagles (CSU-14).

Under all alternatives, occupied habitat for listed plants are managed as exclusion areas. Under Alternative A, potential habitat for listed plants are also managed as ROW exclusion areas which decreases possible sources of surface disturbance within ACECs such as the Ryan Gulch, Duck Creek, and Dudley Bluffs ACECs that would be otherwise managed as ROW avoidance areas (Table 2-20 Record 10).

Managing 5 miles as open to oil and gas development with standard lease terms and conditions and 33 miles with a CSU stipulation in areas adjacent to the Dinosaur Diamond and Flat Tops Scenic Byways could result in surface disturbance that may reduce scenic qualities and result in localized effects to designation qualities.

### Table 4-87. Alternative A Acres Managed with CSU and NSO Stipulations within ACECs

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| Leased | Blacks Gulch | 0 | 800 | 0 | 800 |
| | Coal Draw | 0 | 1,800 | NA | NA |
| | Coal Oil Rim | 100 | 0 | NA | NA |
| | Deer Gulch | 0 | 1,800 | 0 | 1,800 |
| | Duck Creek | 0 | 3,400 | 0 | 3,400 |
| | Dudley Bluffs | 0 | 1,600 | 0 | 1,600 |
| | East Douglas Creek | 29,700 | 1,200 | 1,100 | 10 |
| | Lower Greasewood Creek | 0 | 200 | 0 | 200 |
| | Moosehead Mountain | 0 | 6,300 | NA | NA |

BLM_0020105

*Chapter 4 – Environmental Consequences*

**Table 4-87. Alternative A Acres Managed with CSU
and NSO Stipulations within ACECs**

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| | Raven Ridge | 0 | 2,200 | NA | NA |
| | Ryan Gulch | 0 | 1,400 | 0 | 1,400 |
| | South Cathedral Bluffs | 0 | 800 | 0 | 300 |
| | Yanks Gulch/Upper Greasewood Creek | 0 | 2,700 | 0 | 2,500 |
| | White River Riparian | 500 | 20 | 100 | 0 |
| Unleased | Coal Oil Rim | 3,000 | 100 | NA | NA |
| | East Douglas Creek | 15,300 | 1,100 | 600 | 60 |
| | Moosehead Mountain | 0 | 1,200 | NA | NA |
| | Raven Ridge | 0 | 2,800 | NA | NA |
| | South Cathedral Bluffs | 0 | 500 | 0 | 300 |
| | White River Riparian | 300 | 20 | 0 | 0 |
| **Total** | | **48,900** | **30,000** | **1,800** | **12,300** |

SOURCE: BLM GIS data 2009.

NOTES:

Sums may not equal totals due to rounding. Only acreage for the most restrictive stipulation (Section 4.1.2) is shown for areas with overlapping lease stipulations. Oil Spring Mountain is closed to future leasing and is not included in this table.

NA = not applicable

**Reclamation**

The effects of reclamation would be the same as those described in the Common to All section.

## 4.8.3   Alternative B

**Impacts from Management Actions**

Similar to Alternative A, all of the ACECs are protected by either NSO or CSU stipulations. However, under Alternatives B, C, and D the exception criteria for these stipulations has been clarified so that it is understood that projects that have a beneficial effect on protected resources would be permitted (NSO-55 and CSU-33).

Under Alternative B, approximately 57,000 acres or 72 percent of ACECs open for leasing within the WRFO are managed with NSO stipulations (Table 4-87), which is an increase of about 27,000 acres compared to Alternative A. The list of ACECs protected by NSO-54 (Alternative A) and NSO-55 (Alternatives B, C, and D) has not changed, however under Alternative B there is an increase in NSO stipulations for specific resources present within the ACECs. While new NSO stipulations would not be added to existing leases, it is expected that COAs that capture the intent of the new NSO stipulations would be applied to individual projects when a site-specific NEPA analysis indicates such measures are required to mitigate impacts to resources.

Many of the NSO stipulations for specific resources under Alternative B provide no exception criteria, including areas within 330 feet of occupied, suitable, and potential habitat for BLM

BLM_0020106

sensitive plants (NSO-42); within 660 feet of occupied, suitable, and potential habitat for listed plant species (NSO-39); within ½ mile of bald eagle nests (NSO-29); within 330 feet of abandoned bald eagle nests (NSO-33); within ¼ mile of bald eagle critical night roosts (NSO-36); within critical habitat for pikeminnow (NSO-26); within the Duck Creek wickiup village (NSO-45); and in aspen stands on slopes greater than 25 percent (NSO-47). Due to these NSO stipulations for bald eagle habitat features and pikeminnow critical habitat, the majority of the White River Riparian ACEC would be managed under NSO stipulations in Alternative B rather than with a CSU stipulation as in Alternative A (Table 4-88) or specified in CSU-33 since NSO stipulations are more restrictive than CSU stipulations (Section 4.1.2).

The more restrictive stipulation will always apply, regardless of whether or not it is for a resource that is not listed as a reason for designating an ACEC. For example, the East Douglas Creek ACEC is protected by CSU stipulations for the ACEC as a whole (CSU-33) as well as for Colorado River cutthroat trout habitat (CSU-12). However, in practice, much of this ACEC would be managed with NSO stipulations for water resources applied within 500 feet of East Douglas Creek, Bear Park Creek, Cathedral Creek, Lake Creek, and Soldier Creek (NSO-1).

As a result, under Alternative B, approximately 22,000 acres or 28 percent of ACECs open for leasing within with WRFO would be managed with CSU stipulations, compared to 48,900 acres in Alternative A. Protections for rock art and other important cultural sites involving standing architecture would be expanded beyond Canyon Pintado NHD under CSU-20.

Under all alternatives, occupied habitat for listed plants are managed as exclusion areas. However, under Alternative B, the exclusion area is expanded to include areas within 330 feet of occupied habitat for listed plants (Table 2-20 Record 10) and there would be no exceptions granted within these areas (Table 2-20 Record 6). Management of these areas as exclusion areas and with an NSO stipulation for listed plant species (NSO-39), eliminates surface disturbance associated with oil and gas development in occupied habitat for listed plants within the Ryan Gulch, Duck Creek, and Dudley Bluffs ACECs.

Increasing the area managed with NSO stipulations to 43 miles in areas adjacent to the Dinosaur Diamond Scenic Byway would indirectly help maintain visual resources supporting the scenic byway designation compared to Alternative A.

### Table 4-88. Alternative B Acres Managed with CSU and NSO Stipulations within ACECs

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| Leased | Blacks Gulch | 0 | 800 | 0 | 800 |
| | Coal Draw | 0 | 1,800 | NA | NA |
| | Coal Oil Rim | 0 | 100 | NA | NA |
| | Deer Gulch | 0 | 1,800 | 0 | 1,800 |
| | Duck Creek | 0 | 3,400 | 0 | 3,400 |
| | Dudley Bluffs | 0 | 1,600 | 0 | 1,600 |
| | East Douglas Creek | 15,500 | 15,400 | 800 | 400 |
| | Lower Greasewood Creek | 0 | 200 | 0 | 200 |

BLM_0020107

**Table 4-88. Alternative B Acres Managed with CSU
and NSO Stipulations within ACECs**

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| | Moosehead Mountain | 0 | 6,300 | NA | NA |
| | Raven Ridge | 0 | 2,200 | NA | NA |
| | Ryan Gulch | 0 | 1,400 | 0 | 1,400 |
| | South Cathedral Bluffs | 0 | 800 | 0 | 300 |
| | Yanks Gulch/Upper Greasewood Creek | 0 | 2,700 | 0 | 2,500 |
| | White River Riparian | 10 | 500 | 1 | 70 |
| Unleased | Coal Oil Rim | 500 | 2,600 | NA | NA |
| | East Douglas Creek | 6,000 | 10,500 | 300 | 300 |
| | Moosehead Mountain | 0 | 1,200 | NA | NA |
| | Raven Ridge | 0 | 2,800 | NA | NA |
| | South Cathedral Bluffs | 0 | 500 | 0 | 300 |
| | White River Riparian | 10 | 300 | 0 | 0 |
| **Total** | | **22,000** | **57,000** | **1,100** | **13,100** |

SOURCE: BLM GIS data 2009.
NOTES:
Sums may not equal totals due to rounding. Only acreage for the most restrictive stipulation (Section 4.1.2) is shown for areas with overlapping lease stipulations. Oil Spring Mountain is closed to future leasing and is not included in this table.
NA = not applicable

## Reclamation

Requiring interim and final reclamation consistent with the BLM's Surface Reclamation Plan (Appendix D) to meet success criteria of 100 percent cover of the DPC and a composition of at least three forbs or shrubs would improve ecological conditions for Alternative B relative to Alternative A (Table 2-3 Record 18).

## 4.8.4   Alternative C

### Impacts from Management Actions

Under Alternative C, approximately 44,500 acres or 56 percent of ACECs open for leasing within the WRFO are managed with NSO stipulations, compared to 57,000 acres under Alternative B. The reduction in the area managed with NSO stipulations in combination with increased level of development projected under Alternative C (1,800 well pads and 21,600 acres of surface disturbance compared to 1,100 well pads and 13,200 acres of surface disturbance), would likely result in greater impacts to important resources and values within ACECs.

Another notable contrast to Alternative B is that, under Alternative C, all of the NSO stipulations would have exception criteria. For some resources the areas included in NSO stipulations have also been reduced compared to Alternative B. For example, areas within 330 feet of occupied and suitable habitat for BLM sensitive plants (NSO-43) and within 660 feet of occupied and suitable habitat for listed plant species (NSO-40) would be managed with NSO stipulations, but there would

BLM_0020108

*Chapter 4 – Environmental Consequences*

be no protection for potential habitat of special status plant species. Areas within ¼ mile of bald eagle nests (compared to ½ mile under Alternative B) would be managed with NSO-31.

For ACECs that are managed with an NSO stipulation and contain either listed plant species or BLM sensitive plant species (e.g., Ryan Gulch, Duck Creek, and Dudley Bluffs ACECs), the exception criteria within the ACEC is stricter than under the other stipulations for these resources. Outside of the ACECs listed in NSO-55, an exception may be granted within 330 feet of occupied and suitable potential habitat for BLM sensitive plant species if the activity would not cause "adverse impacts or have negligible impacts" (NSO-43). Outside of the ACECs, an exception may be granted within 330 to 660 feet of occupied and suitable habitat for listed plant species "if the proposed action results in insignificant (not reasonably measured/detected), discountable (extremely unlikely to occur), or wholly beneficial effects (no negative impacts)" (NSO-40). However, within ACECs, an exception to these NSO stipulations could only be granted if there is "no effect or beneficial effect to the species as a result of the proposed activities" (NSO-55).

Under Alternative C, approximately 34,500 acres or 44 percent of ACECs open for leasing within the WRFO would be managed with CSU stipulations (Table 4-89), compared to 22,000 acres under Alterative B. Riparian areas, unless listed on the 303-d list of impaired waters, would be managed with CSU stipulations (CSU-2, CSU-6) rather than NSO stipulations. Protections for rock art or important cultural sites with standing architecture would be still be expanded outside of Canyon Pintado NHD but would be limited to areas within 750 feet of these sites (CSU-21) compared to 1,000 feet under Alternative B.

Managing about 24 miles adjacent to Dinosaur Diamond Scenic Byway with an NSO stipulation would indirectly help maintain resources supporting the designation, but to a lesser degree than Alternative B (43 miles).

### Table 4-89. Alternative C Acres Managed with CSU and NSO Stipulations within ACECs

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| Leased | Blacks Gulch | 0 | 800 | 0 | 800 |
| | Coal Draw | 0 | 1,800 | NA | NA |
| | Coal Oil Rim | 50 | 50 | NA | NA |
| | Deer Gulch | 0 | 1,800 | 0 | 1,800 |
| | Duck Creek | 0 | 3,400 | 0 | 3,400 |
| | Dudley Bluffs | 0 | 1,600 | 0 | 1,600 |
| | East Douglas Creek | 22,500 | 8,400 | 900 | 300 |
| | Lower Greasewood Creek | 0 | 200 | 0 | 200 |
| | Moosehead Mountain | 0 | 6,300 | NA | NA |
| | Raven Ridge | 0 | 2,200 | NA | NA |
| | Ryan Gulch | 0 | 1,400 | 0 | 1,400 |
| | South Cathedral Bluffs | 0 | 800 | 0 | 300 |
| | Yankee Gulch/Upper Greasewood Creek | 0 | 2,700 | 0 | 2,500 |
| | White River Riparian | 50 | 500 | 2 | 70 |

BLM_0020109

**Table 4-89. Alternative C Acres Managed with CSU
and NSO Stipulations within ACECs**

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| Unleased | Coal Oil Rim | 2,300 | 800 | NA | NA |
| | East Douglas Creek | 9,500 | 7,000 | 400 | 300 |
| | Moosehead Mountain | 0 | 1,200 | NA | NA |
| | Raven Ridge | 0 | 2,800 | NA | NA |
| | South Cathedral Bluffs | 0 | 500 | 0 | 300 |
| | White River Riparian | 50 | 200 | 0 | 0 |
| **Total** | | **34,500** | **44,500** | **1,300** | **1,300** |

SOURCE: BLM GIS data 2009.
NOTES:
Sums may not equal totals due to rounding. Only acreage for the most restrictive stipulation (Section 4.1.2) is shown for areas with overlapping lease stipulations. Oil Spring Mountain is closed to future leasing and is not included in this table.
NA = not applicable

### Reclamation

Reducing the success criteria for interim and final to 80 percent cover of the DPC and to a minimum composition of two forbs or shrubs could reduce ecological conditions relative to Alternative B (Table 2-3 Record 18). However, this could improve the ecological conditions in reclaimed areas in Alternative C relative to Alternative A, which does not specify minimum cover or composition criteria.

## 4.8.5   Alternative D

### Impacts from Management Actions

Under Alternative D, approximately 39,300 acres or 50 percent of ACECs open to leasing within the WRFO would be managed with NSO stipulations (Table 4-90). While this is similar to management direction for Alternative C (44,500 acres or 56 percent), there is a substantial increase in development under Alternative D (2,556 well pads and 30,700 acres of surface disturbance compared to 1,800 well pads and 21,600 acres of surface disturbance).

This reduction in NSO stipulations within the ACECs is the result of management decisions that seek to emphasize the production of oil and gas resources (Section 2.3.5). There are no similar management actions under Alternative D for the NSO stipulations provided in Alternatives B and C for abandoned bald eagle nests or for aspen on slopes greater than 25 percent. However, functional bald eagle nests (NSO-32) and nocturnal roosts (NSO-35) would continue to be managed with NSO stipulations.

Areas within 660 feet of occupied habitat for listed plant species would be managed with an NSO stipulation (NSO-41), however there would be no similar protection for suitable or potential habitats as found under other alternatives. Exception criteria is more narrowly defined within habitat for listed plant species within ACECs (i.e., no effect for beneficial effect [NSO-55]) than within occupied habitat outside of ACECs (i.e., negligible impacts [NSO-41]).

Under Alternative D, occupied habitat for BLM sensitive plants would be managed with a CSU stipulation (CSU-16). There would be no protections for suitable and potential habitat and no buffers applied to occupied habitat as are found in NSO stipulations for BLM sensitive plants in the other alternatives (NSO-10, NSO-42, NSO-43). However, many of the ACECs that contain sensitive plants such as the Dudley Bluffs, Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, Raven Ridge, South Cathedral Bluffs, and Deer Gulch ACECs would be managed with an NSO stipulation that provides exceptions within sensitive plant habitat only in circumstances where the proposed action results in no effect or a beneficial effect (NSO-55). Under Alternative D, the BLM would give the strongest protections for habitat for sensitive plants within ACECs and use special design, construction, and implementation measures (including relocation of operations by more than 660 feet) to manage habitat outside of ACECs.

Under all alternatives, occupied habitat for listed plants are managed as exclusion areas; unlike the other alternatives, Alternative D would not expand this area (Table 2-20 Record 10). Under both Alternatives C and D, exceptions could be considered in ACECs "within the footprint of existing disturbance within existing ROWs or for short-term land use permits involving no development and projects that are consistent with management objectives" (Table 2-20 Record 6). Alternative D is the only alternative that would allow exceptions to ROW exclusion areas within ACECs if proposed disturbance was confined to the footprint of existing disturbance. This is likely necessary to accommodate the estimated 1,300 miles of utilities and 1,840 miles of roads anticipated under the Alternative D development scenario (Table 4-3), however it would likely result in increased impacts to listed plant species within the Ryan Gulch, Duck Creek, Dudley Bluffs, and Yanks Gulch/Upper Greasewood Creek ACECs due to delays associated with achieving final reclamation success criteria within existing ROWs and dust generated during construction activities.

Approximately 39,600 acres or 50 percent of ACECs open for leasing within the WRFO would be managed with CSU stipulations under Alternative D. For the most part, riparian areas would be managed with CSU stipulations (CSU-2, CSU-7), however riparian areas within the Moosehead Mountain ACEC would be managed with the NSO stipulation that includes the entire ACEC (NSO-55). Protections for rock art or important cultural sites with standing architecture would be still be expanded outside of Canyon Pintado NHD but would be limited to areas within 500 feet of these sites (CSU-21) compared to 1,000 feet under Alternative B and 750 feet under Alternative C.

Managing about 34 miles adjacent to the Dinosaur Diamond Scenic Byway with CSU stipulations could decrease the area where surface disturbance could occur compared to Alternative A, but would be less restrictive than management decisions in Alternatives B and C and could decrease the retention of resources supporting the byway designation.

BLM_0020111

**Table 4-90. Alternative D Acres Managed with CSU
and NSO Stipulations within ACECs**

| Status | ACEC | White River Planning Area Mineral Estate | | Mesaverde Play Area | |
|---|---|---|---|---|---|
| | | CSU Stipulation | NSO Stipulation | CSU Stipulation | NSO Stipulation |
| Leased | Blacks Gulch | 0 | 800 | 0 | 800 |
| | Coal Draw | 0 | 1,800 | NA | NA |
| | Coal Oil Rim | 80 | 20 | NA | NA |
| | Deer Gulch | 0 | 1,800 | 0 | 1,800 |
| | Duck Creek | 0 | 3,400 | 0 | 3,400 |
| | Dudley Bluffs | 0 | 1,600 | 0 | 1,600 |
| | East Douglas Creek | 24,900 | 6,000 | 1,000 | 100 |
| | Lower Greasewood Creek | 0 | 200 | 0 | 200 |
| | Moosehead Mountain | 0 | 6,300 | NA | NA |
| | Raven Ridge | 0 | 2,200 | NA | NA |
| | Ryan Gulch | 0 | 1,400 | 0 | 1,400 |
| | South Cathedral Bluffs | 0 | 800 | 0 | 300 |
| | Yankee Gulch/Upper Greasewood Creek | 0 | 2,700 | 0 | 2,500 |
| | White River Riparian | 100 | 500 | 2 | 100 |
| Unleased | Coal Oil Rim | 2,800 | 300 | NA | NA |
| | East Douglas Creek | 11,600 | 4,800 | 500 | 200 |
| | Moosehead Mountain | 0 | 1,200 | NA | NA |
| | Raven Ridge | 0 | 2,800 | NA | NA |
| | South Cathedral Bluffs | 0 | 500 | 0 | 300 |
| | White River Riparian | 100 | 200 | 0 | 0 |
| **Total** | | **39,600** | **39,300** | **1,500** | **12,700** |

SOURCE: BLM GIS data 2009.

NOTES:

Sums may not equal totals due to rounding. Only acreage for the most restrictive stipulation (Section 4.1.2) is shown for areas with overlapping lease stipulations. Oil Spring Mountain is closed to future leasing and is not included in this table.

NA = not applicable

**Reclamation**

Reducing the success criteria for interim and final reclamation to 60 percent cover of the DPC and a minimum composition of only one forb or shrub could reduce ecological conditions relative to Alternatives B and C (Table 2-3 Record 18). However, this could improve the ecological conditions in reclaimed areas relative to Alternative A, which does not specify minimum cover or composition criteria.

## 4.8.6    Irreversible and Irretrievable Commitment of Resources

Damage to or destruction of cultural or paleontological resources within the ACECs due to oil and gas development activities would be an irreversible and irretrievable loss. Management actions designed to prevent such loss include management of ACECs containing paleontological resources

BLM_0020112

as ROW exclusion areas and managing all ACECs with either NSO or CSU stipulations. Cultural resources such as the Duck Creek wickiup village are protected with an NSO stipulation and rock art panels are protected from vibration damage due to construction activities with CSU stipulations. Implementing the proposed management actions would result in surface-disturbing activities from oil and gas exploration and development.

Disturbance within rare plant communities such as RVAs and habitat for listed plant and animal species would result in irreversible and irretrievable losses. Additionally, disturbance in plant communities that take decades to reach mature states, such as spruce-fir and aspen, would result in impacts that would be reversible but not within the life of the plan. However, these types of impacts are not expected due to protective lease stipulations.

Under all alternatives, the areas adjacent to the Dinosaur Diamond and Flat Tops Scenic Byways could experience localized irreversible and irretrievable loss of scenic qualities. However, these impacts would be minimized with the use of COAs designed to mitigate impacts to visual resources.

There would be no irreversible and irretrievable commitment of wilderness characteristics within WSAs under any alternative.

## 4.8.7    Unavoidable Adverse Impacts

Due to application of the non-impairment standard, there would be no unavoidable adverse impacts to WSAs under any alternative. As such, there are no unavoidable adverse impacts that would result in irreparable damage to relevant and important values. In addition, under all alternatives, there would be no unavoidable adverse impacts to scenic byways or ACECs as oil and gas exploration and development could be located in areas that avoid or minimize impacts to the important resources considered in each designation.

## 4.8.8    Relationship Between Local Short-Term Uses and Long-Term Productivity

No short-term uses would be permitted if they resulted in the long-term impairment of wilderness characteristics. As such, under all alternatives there is no loss of long-term productivity due to short-term uses within WSAs.

During construction and prior to successful reclamation, there would be short-term, localized impacts to ACECs and areas adjacent to scenic byways if exceptions were granted for NSO or CSU stipulations. This is most likely to occur in the ACEC areas within the MPA that are managed with a CSU stipulation (i.e., East Douglas Creek and White River Riparian ACECs). Alternative A has the greatest acres of ACECs in the MPA managed with a CSU stipulation however, Alternative D has the greatest number of potential well pads and about half of all the ACECs open for leasing within the WRFO are managed with CSU stipulations under Alternative D. Reclamation under all alternatives would reduce the loss of genetic diversity and biological productivity.

BLM_0020113

# 4.9    Non WSA Lands with Wilderness Characteristics

This section addresses impacts from RMPA oil and gas management actions on lands with wilderness characteristics outside of existing WSAs in the WRFO. Note that lands with wilderness characteristics do not represent a special designation but merely identify lands containing characteristics typically associated with wilderness. Existing conditions concerning lands with wilderness characteristics are described in Chapter 3 Section 3.9.

Wilderness values considered in this analysis include naturalness, opportunities for solitude, and opportunities for primitive and unconfined types of recreation. Impacts identified in this section are limited to potential changes in wilderness characteristics for only the identified areas.

The following assumptions were used in the analysis:

- Thirty polygons of BLM administered lands have been identified within the WRFO as potentially containing wilderness characteristics (as identified in Chapter 3). Until such a time that a complete on-the-ground inventory can be completed, these polygons are assumed to contain wilderness characteristics and would be managed as such.

- The 30 polygons identified as potentially containing wilderness characteristics were identified because they may meet the inventory criteria per BLM manual 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands (e.g., size, naturalness and outstanding opportunities for solitude or primitive recreation).

- Impacts on lands with wilderness characteristics are analyzed based on the maintenance, enhancement, or degradation (adverse impacts) of naturalness and outstanding opportunities for solitude or primitive recreation.

- The WRFO wilderness characteristics inventory will be maintained and will be updated whenever actions are approved that could impact polygons identified as containing wilderness characteristics.

## 4.9.1    Impacts Common to All Alternatives

There would be no impacts common to all alternatives for non-WSA lands with wilderness characteristics because no lands would be managed to maintain wilderness characteristics outside WSAs in either Alternatives A or D.

## 4.9.2    Alternative A

**Impacts from Oil and Gas Development**

Under Alternative A, the BLM would not manage lands to protect wilderness characteristics outside of existing WSAs. Some wilderness characteristics may be afforded indirect protections through the application of management actions (i.e., ACECs, travel designations, VRM classifications) and allowable use decisions for other resources and resource uses (e.g., application of NSO, CSU, and TL stipulations). However, no land use planning decisions would be made specifically to protect wilderness characteristics in Alternative A. It is estimated that 550 well pads would be constructed, resulting in 6,600 acres of surface disturbance in the Planning Area. Some of this development could likely occur in identified non-WSA lands with wilderness characteristics. The noise and

BLM_0020114

presence of these developments in conjunction with access road construction, vehicle traffic associated with the construction, drill rig transport, and production of the wells are likely to change or degrade the natural character and opportunities for solitude and primitive and unconfined types of recreation throughout the life of the plan, thus removing them as lands with wilderness characteristics.

### Impacts from Management Actions

No management actions exist for non-WSA lands with wilderness characteristics under Alternative A. Consequently no impacts as a result of management actions specific to non-WSA lands with wilderness characteristics are expected. However, management actions associated with other resources in which NSO stipulations, CSU stipulations or other COAs are applied that would create conditions favorable to maintaining wilderness character (such as helping to retain naturalness or opportunities for primitive or unconfined types of recreation) could have a beneficial impact if these COAs apply to non-WSA lands with wilderness characteristics. These specific management actions are described in detail in the Recreation Section 4.7.4.2.

### Reclamation

Encouraging the use of native plant species to re-seed areas could reduce opportunities for the establishment of noxious weeds and invasive species, which could improve the overall naturalness of an area, creating conditions favorable to maintaining wilderness character or even creating new areas through remediation which could be found to have wilderness characteristics in the future.

## 4.9.3   Alternative B

### Impacts from Oil and Gas Development

Under Alternative B, non-WSA lands with wilderness characteristics may be managed to retain their resource value if the parcels are 5,000 acres in size or greater and 20 percent or less of the parcel area is encumbered by existing oil and gas leases, mineral entries, or non-compatible uses scheduled to expire by the year 2016 (Table 2-22 Record 2). Under Alternative B, the decision to manage non-WSA lands with wilderness characteristics to retain their resource value could apply special management to parcels meeting the conditions above. None of the other alternatives includes options for management of these areas as lands with wilderness characteristics. Protecting lands for their natural character and opportunities for solitude and primitive and unconfined types of recreation would result from applying specific management and setting prescriptions. An estimated 1,100 oil and gas well pads would be constructed in the Planning Area, resulting in 13,200 acres of surface disturbance during the 20-year planning period. Any potential oil and gas developments falling within identified lands with wilderness characteristics areas under Alternative B may be subject to management settings and prescriptions that would protect these resource characteristics.

Table 4-91 lists each parcel identified as potential lands with wilderness characteristics in the WRFO and shows which of these parcels would have 20 percent or less of the total area encumbered by existing oil and gas leases by the year 2016. In total, 15 parcels would meet these criteria (assuming that the on-the-ground inventory confirmed the presence of wilderness characteristics). The location of these parcels is shown on Map 3-19.

**Table 4-91. Percent Leased of Potential Lands with Wilderness Characteristics Polygons by Year 2016.**

| Polygon # | Total Acreage | Percent Leased after 2016 |
|---|---|---|
| 1 | 12,200 | 57 |
| 2[1] | 5,200 | 0 |
| 3 | 5,400 | 65 |
| 4 | 6,800 | 80 |
| 5[2,5] | 5,200 | 67 |
| 6[1] | 12,600 | 19 |
| 7 | 8,400 | 70 |
| 8[2,5] | 6,400 | 100 |
| 9[2,5] | 8,500 | 52 |
| 10 | 7,600 | 28 |
| 11[2,5] | 10,300 | 89 |
| 12[2,5] | 12,000 | 26 |
| 13[1,2] | 10,400 | 0 |
| 14[1,3] | 5,700 | 14 |
| 15 | 6,600 | 83 |
| 16[1] | 7,900 | 17 |
| 17[1,3] | 7,200 | 9 |
| 18 | 5,400 | 31 |
| 19[1] | 6,000 | 10 |
| 20[1] | 9,000 | 0 |
| 21[1] | 9,100 | 0 |
| 22[1] | 13,100 | 16 |
| 23[1] | 5,000 | 0 |
| 24[1] | 4,900 | 0 |
| 25[1] | 9,600 | 0 |
| 26[1] | 6,500 | 2 |
| 27[1] | 9,100 | 0 |
| 28 | 6,800 | 31 |
| 29[5] | 25,000 | 51 |
| 30[4] | 4,100 | 29 |

SOURCE: BLM GIS 2011.

NOTES:

[1] If the on-the-ground inventory verifies that these polygons do have wilderness characteristics, then they would be identified for retention of their resource values (Table 2-22 Record 2).

[2] These polygons are located within the MPA.

[3] Portions of these polygons are located within the MPA.

[4] Polygon 30 is adjacent to Polygon 10.

[5] Polygon has been inventoried and found to meet the criteria for possessing wilderness characteristics.

BLM_0020116

**Impacts from Management Actions**

In areas where non-WSA lands with wilderness characteristics have been identified for retention of their resource value, the following management actions would apply:

- The BLM would apply a condition of NSO until a future RMP revision is completed which addresses whether or not these areas should be open to oil and gas surface disturbance (Table 2-22 Record 7);

- Motorized or mechanized use would be allowed if necessary to protect life (e.g., helicopter life flight or OHV evacuation; Table 2-22 Record 6);

- No new road construction or upgrading/ improvements of existing roads would be allowed (Table 2-22 Record 9);

- The areas would be exclusion areas for new ROW authorizations (Table 2-22 Record 11); and

- Restoring the appearance of naturalness within lands may require the establishment of shrubs or trees (Table 2-22 Record 12).

In all non-WSA lands with wilderness characteristics, existing facilities which support oil and gas development and that are not consistent with the management of wilderness character would be removed as opportunities arise (Table 2-22 Record 10). Additionally, COAs identified as appropriate through environmental analysis may be applied for the maximum protection and restoration of wilderness characteristics (Table 2-22 Record 8).

Management actions for other resources which would apply NSO stipulations or which would otherwise help to retain opportunities for primitive and unconfined types of recreation would have a beneficial impact on non-WSA lands with wilderness characteristics as they would help to create conditions favorable to maintaining wilderness character. These specific management actions are described in detail in Section 4.7.4.3.

**Reclamation**

Impacts from reclamation activities under Alternative B would be similar to those under Alternative A.

## 4.9.4   Alternative C

**Impacts from Oil and Gas Development**

Under Alternative C non-WSA lands with wilderness characteristics would be managed to give priority to other resource values and uses but give consideration to retaining some of their wilderness characteristics, such as naturalness and/or opportunities for solitude or primitive and unconfined recreational activities (Table 2-22 Record 2). Under this alternative however, not all criteria for non-WSA lands with wilderness characteristics would be managed for, nor would any special management prescriptions be applied to help meet these criteria. This would likely result in situations where some identified parcels would be impacted by future oil and gas development and no longer qualify to be considered as lands with wilderness characteristics. Under Alternative C an estimated 1,800 oil and gas well pads would be constructed in the Planning Area, resulting in 21,600 acres of surface disturbance during the 20-year planning period. The noise and presence of these developments, in conjunction with the vehicle traffic associated with the construction, drill rig transport, and production of the wells are likely to change or degrade the natural character and

BLM_0020117

Case No. 1:20-cv-02484-MSK   Document 31-10   filed 04/27/21   USDC Colorado   pg 309 of 345

Chapter 4 – Environmental Consequences

opportunities for solitude and primitive and unconfined types of recreation throughout the life of the plan.

**Impacts from Management Actions**

Under Alternative C, management actions associated with other resources in which NSO stipulations, CSU stipulations or other COAs are applied that would create conditions favorable to maintaining wilderness character (such as helping to retain naturalness or opportunities for primitive or unconfined types of recreation) could have a beneficial impact if these COAs apply to non-WSA lands with wilderness characteristics. These specific management actions are described in detail in the Recreation Section 4.7.4.4.

Areas where non-WSA lands with wilderness characteristics have been identified for retention of their resource value would be avoidance areas for ROW authorizations (Table 2-22 Record 11).

In all non-WSA lands with wilderness characteristics, the following management actions would apply:

- Motorized or mechanized use would be allowed as necessary to protect life (e.g., helicopter life flight or OHV evacuation) or property (Table 2-22 Record 6);
- The BLM may apply a lease notice containing measures and limitations intended to maintain naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation. Examples of the measures and limitations in the lease notices may include, but are not limited to, limiting motorized access to trails and unimproved, non-maintained routes only; vegetative screening and contouring; and restrictions on woodland harvesting (Table 2-22 Record 7);
- Allowing new road construction or upgrading/improvements of existing roads but, whenever possible, roads would be maintained as a primitive road or two-track (as per the Gold Book's discussion on non-constructed roads and routes; [DOI and USDA 2007 pg. 23] Table 2-22 Record 9);
- Considering construction of new facilities on a case-by-case basis (Table 2-22 Record 10); and
- Restoring the appearance of naturalness by possibly requiring the establishment of shrubs or trees during reclamation (Table 2-22 Record 12).

**Reclamation**

Impacts from reclamation activities under Alternative C would be similar to those under Alternative A.

## 4.9.5   Alternative D

**Impacts from Oil and Gas Development**

Under Alternative D, non-WSA lands with wilderness characteristics would be managed to give priority to other uses over the protection of wilderness characteristics. In Alternative D an estimated 2,556 oil and gas well pads would be constructed in the Planning Area, resulting in 30,700 acres of surface disturbance during the 20-year planning period. This represents a considerable increase in the number of potential wells and amount of surface disturbance over the other alternatives. The noise and presence of these developments, in conjunction with the vehicle traffic associated with the construction, drill rig transport, and production of the wells are likely to change or degrade the

*Draft RMPA/EIS – August 2012*
*WRFO Oil and Gas Development*                                                                      4-411

BLM_0020118

*Chapter 4 – Environmental Consequences*

natural character and opportunities for solitude and primitive and unconfined types of recreation throughout the life of the plan.

**Impacts from Management Actions**

Impacts from management actions under Alternative D would be the same as those under Alternative C, with the exception of ROWs. Under Alternative D, in areas where non-WSA lands with wilderness characteristics occur, mitigation that would minimize impacts to wilderness character may be required on new linear ROWs.

Under Alternative D, management actions associated with other resources in which NSO stipulations, CSU stipulations or other COAs are applied that would create conditions favorable to maintaining wilderness character (such as helping to retain naturalness or opportunities for primitive or unconfined types of recreation) could have a beneficial impact if these COAs apply to non-WSA lands with wilderness characteristics. These specific management actions are described in detail in the Recreation Section 4.7.4.2.

**Reclamation**

Impacts from reclamation activities under Alternative D would be similar to those under Alternative A.

## 4.9.6 Irreversible and Irretrievable Commitment of Resources

Implementation of the proposed management actions would result in surface-disturbing activities that could result in irreversible or irretrievable loss of resources, including naturalness and/or primitive and unconfined types of recreation. The potential for impacts on non-WSA lands with wilderness characteristics would be greatest under Alternative D due to the high number of oil and gas wells and well pads relative to other alternatives, which could increase the degree of surface disturbance. The potential for impacts on non-WSA lands with wilderness characteristics would be the least under Alternative B which reduces the extent of surface disturbance from oil and gas wells, well pads, and roads. Alternative B also provides management actions which more specifically define the limitations of oil and gas development in non-WSA lands with wilderness characteristics.

## 4.9.7 Unavoidable Adverse Impacts

There are no unavoidable adverse impacts that would result in irreparable damage to relevant and important values.

## 4.9.8 Relationship Between Local Short-Term Uses and Long-Term Productivity

Under all alternatives there is no loss of long-term productivity due to short-term uses within non-WSAs with wilderness characteristics.

BLM_0020119

## *4.10  Socioeconomic Resources*

This section describes the potential effects on social and economic conditions in the socioeconomic study area from the implementation of the four proposed alternatives to manage oil and gas exploration and development in the Planning Area. As defined in Chapter 3, the socioeconomic study area consists of the primary socioeconomic study area (PSSA), which encompasses Rio Blanco County, and the secondary socioeconomic study area (SSSA), which encompasses Garfield County, Moffat County and Mesa County in Colorado and Uintah County in Utah. As described in the WRFO RFD Scenario (2007), 95 percent of future oil and gas wells are projected to be drilled in the MPA, which generally corresponds with the area known as the Piceance Basin in Rio Blanco County. Oil and gas exploration and development is expected to affect social and economic conditions in the SSSA due to workforce commuting from outside Rio Blanco County and the extensive economic interrelationships between the PSSA and the SSSA.

### 4.10.1  Social, Economic and Environmental Justice

In some cases, social effects are described in terms of effects to the quality of life. Factors that could affect quality of life include the amount and quality of available resources, such as grazing and hay land, wildlife and places to hunt, and the pace and character of community growth and development. Quality of life could also be affected by conflict over resources, which could occur in allocating BLM land among multiple uses such as grazing, habitat and resource extraction, or conflict over community development, such as whether growth should occur in towns or in the unincorporated county.

The intensity, or magnitude, of social impacts would be roughly in proportion to three indices of change, constructed specifically for this analysis. The first is the annual rate of community growth over the 20-year planning horizon for the RMPA (growth rate metric). The second is the degree of resource dependency among the community labor force and population, as measured by the percentage of the population that depends directly or indirectly on jobs in agriculture, energy, and recreation (resource dependency metric). The third is the stability of the energy industry, as measured by the ratio of "permanent" jobs in field operation and maintenance compared to temporary or rotational jobs in drilling and facilities construction (energy industry stability metric).

The environmental justice factor in quality of life is evaluated by identifying populations, communities or groups that could suffer disproportionate adverse effects and considering whether or not those groups are disadvantaged or minority populations based on the data and analyses presented in Chapter 3.

The analysis of oil and gas developing effects on social and economic conditions is based on the following indicators:

- Economic conditions in the socioeconomic study area;
- Demographic conditions in the socioeconomic area;
- Fiscal conditions within state and local governments; and
- Social conditions within the Planning Area and local communities.

BLM_0020120

**Chapter 4 – Environmental Consequences**

The analysis of oil and gas developing effects on social and economic conditions is based on the following attributes:

- Direct oil and gas-related employment;

- Direct recreation, tourism, and hunting-related employment;

- Direct agriculture employment;

- Secondary jobs related to oil and gas, recreation, tourism and hunting and agriculture;

- Total population in study area and population by location;

- Direct and indirect revenue for state and local governments resulting from the BLM-managed activities;

- Direction, magnitude and rate of change in demographic conditions;

- Change in economic conditions for "traditional" industries – agriculture, recreation/tourism and energy;

- Changes in land use; and

- Geographic concentration of land use, demographic and economic changes.

Primary assumptions upon which the social and economic analysis is based are presented below. Other assumptions are discussed throughout this section. Additional information is provided in the socioeconomic technical report (Appendix G).

- The number of wells completed in each year, under each alternative, is based on the projections developed for the air quality analysis.

- Development of ancillary oil and gas facilities (e.g., pipelines, compressor stations, gas plants) is assumed to be proportional to number of wells developed.

- Oil and gas exploration and development activity could affect agriculture due to changes in the amount of grazing land available for use by ranchers and due to potential increases in the energy-related use of private lands owned by energy companies that have historically been leased back to agricultural operators.

- Oil and gas development activity could affect hunting activity due to potential changes in the game population supported within the Planning Area and/or potential changes in the perception of the area as a hunting destination among in-state and out-of-state hunters.

- For assessing cumulative effects, projected future changes in the economic drivers in the PSSA and SSSA are based on the most recent projections developed by the Colorado State Demography Office (SDO) — except for economic activities directly or secondarily associated with oil and gas development and other activities in the Planning Area related to the BLM resource management (e.g., hunting, agriculture, tourism).

- Direct and secondary employment and demographic changes resulting from oil and gas development, changes in hunting activity levels and changes in agricultural activity (as well as cumulative economic and demographic effects from reasonably foreseeable activities) were estimated using the socioeconomic model developed for the Associated Governments of Northwest Colorado and Colorado Department of Local Affairs (DOLA) (AGNC model) in 2007-2008.

The differences in the number of wells assumed in the air quality analysis for the alternatives are assumed to include the collective effects of differences among the management actions for each

BLM_0020121

alternative in technological requirements, the TL stipulations, available acreages, and other management action requirements for oil and gas development. However, the relationship between the individual and collective management actions under each scenario and the actual number of wells that would be developed is difficult to predict. To the extent that the actual timing and magnitude of well development under any of the alternatives differs from the estimates prepared for the air quality analysis, social and economic effects would differ from the estimates presented in this section.

As discussed in Chapter 3, current residents of the PSSA have a positive attitude toward growth in general. However, there is concern over an energy industry characterized by uncertain and potentially disruptive cycles of very rapid growth and decline.

The growth rate metric is the primary indicator of potentially disruptive social impact. Previous "boomtown" case studies have identified annual population growth rates ranging from 5 percent to more than 15 percent (population doubles in less than 10 years) as being socially disruptive (Jacquet 2009:10-11). If an alternative were to cause population growth rates within this range, published observations indicate a range of potential social effects. The principal cause of disruptive social impact is a large or rapid influx of newcomers, transplanted from different social and cultural contexts and focused primarily on short-term economic opportunity, who would settle temporarily in the community. Attributes of this level of disruptive social impact include pressure on local government facilities and services; inflation of local wages and prices to the detriment of those outside the flow of new benefits; dilution of the familiarity, security and mutual support that Western communities value; and alteration of social relationships in the community for the duration of the boom. Historically, rapid growth impacts are often followed by a succeeding bust, another stressful period of re-adjustment and dissatisfaction with the quality of life in reaction to employment and population decline, a deflating economy, and shrinkage of important tax bases. Only when stability returns after a boom and bust episode do residents again begin perceiving the quality of life as satisfactory (Smith et al 2001; Brown et al 2005).

None of the WRFO RMPA management alternatives constitutes a large-scale, socially disruptive boom-bust cycle. The average annual population growth rate implied by each management alternative is below the growth rate threshold considered highly disruptive in this analysis. However, this does not eliminate the potential for growth-related social impacts occurring during the 20-year planning horizon in the PSSA. The energy industry is subject to wide growth rate fluctuations over periods of less than 20 years because of external economic circumstances. The short-term swings in activity that could occur during the overall planning horizon could cause interim boom-bust episodes where the rates of growth (and subsequent decline) exceed the 5 percent threshold. No such prediction could be made as to when or how often this kind of disruptive boom-and-bust episode could occur over 20 years or how disruptive they could be. For example, the rapid pullback in drilling activity in Rio Blanco County as resource prices declined and the national economy suddenly descended into recession in 2008 was unforeseen and households, businesses, and local governments are still adjusting to the consequences.

Sustained high levels of growth in the PSSA could also bring about "transformative" change in the nature of the area from a social standpoint. Substantial cumulative growth would affect social relations and institutions in the PSSA simply because the character of places and the composition of their populations would change. In effect, growth in the PSSA, varying in degree across the management alternatives, would initiate change that further distances communities from a rural and agricultural past. If sustained and permanent, the change would move communities farther along the path toward urbanization. Social impacts shared by residents of communities experiencing this trend

BLM_0020122

could include rising fear of crime and less openness to casual interaction with others, both of which could derive from the rising number of unfamiliar individuals. Additional social stress could come from upward pressure on the cost of living due to growth. These and other issues associated with growth, such as housing shortages, overtaxed police and fire services, and constraints on health care, education and public infrastructure, would continue to challenge leaders and their constituents. A changing quality of life could also affect the sense of place among more rooted groups in the community, leading to a sense of detachment, even alienation, from political and social affairs.

Social effects of this kind would concentrate in communities of Meeker and Rangely and especially in the ranch community along Piceance Creek. The key difference among the communities—as confirmed in recent surveys and political dialogue—is that attitudes in Rangely, after decades of close association with the energy industry, tend toward acceptance of change, while attitudes in Meeker tend toward discomfort and resistance toward an industry that has visibly altered the landscape in the Piceance Creek Basin over the past decade.

Two other metrics are presented as proxies for change and social effects that would potentially occur as the energy industry grows under the management alternatives. The first metric represents the share of the resident workforce that depends on the growing gas exploration and development industry in contrast with those who depend on the PSSA's traditional economic drivers. The PSSA's current economic and social institutions are structured around energy resources, grazing capacity, wildlife habitat, and community and recreational settings largely supplied by the BLM. Management decisions that re-allocate these economic or social institutions would potentially change the composition of the population in terms of its resource dependency.

The final metric that could serve as a proxy for social disruptions is the ratio of "permanent" jobs in the energy industry to drilling and development jobs. This measure is a proxy for the stability of the energy industry as a component of the economic base in the PSSA and as a social and economic part of its communities. Social disruption in the PSSA remains a possibility in any management alternative that is composed primarily of drilling and development activity, which is most susceptible to economic ups and downs. This economic reality becomes a social issue as households, firms and social and governmental institutions cope with the uncertainty and the economic fluctuations likely to occur over the entire 20-year life of the management alternative.

In order to develop a consistent metric for comparison among the management alternatives considered in this EIS, the study team analyzed the impact on direct and secondary agricultural employment in the PSSA by assuming direct agricultural employment is proportional to the amount of public grazing land available in the area. However, there are a number of considerations that could result in smaller or larger impacts on agricultural activity and employment than indicated by changes in grazing land alone. The maximum cumulative reduction in grazing acres does not reflect the effects of reclamation activities following well completion. At no time during the life of the plan would this amount of forage become unavailable all at once because reclamation would reestablish abandoned well pads as new pads are approved. This forage would be reestablished to the extent that reclamation activities reestablish palatable plant communities and reclamation areas are accessible to livestock.

Other considerations, however, suggest that the effects on agricultural activity and employment could be greater than indicated by changes in the amount of available grazing land. As examples, the noise, disruption and traffic associated with drilling and maintenance activities could have indirect effects on grazing on public lands beyond the areas of direct surface disturbance. Of potentially greater significance to the agricultural sector, development of additional oil and gas

BLM_0020123

wells on public lands in the Planning Area could lead to increased development of related energy facilities on private lands in river valley areas near Piceance Creek and the White River. As discussed in Chapter 3, a substantial proportion of these valley-bottom lands in the Piceance Basin are already owned by energy companies, but have historically been leased back to agricultural operators for hay production. These hay lands provide critical feed for local agriculture during the months outside of the spring and summer grazing season.

The study team has assumed that changes in future hunting activity due to energy development activity, and corresponding social and economic effects, would be proportional to changes in the big game population. The study team further assumed that the reduction in big game population would reflect the management goal that the BLM has identified for each alternative (e.g., 90 percent of the state-established population objective under Alternative B) and that this reduction would be correlated with the number of new wells developed in each year. (So the full 10 percent reduction under Alternative B would not occur until the end of the planning period, or approximately 2030.)

The study team also recognizes that the perception of the area among hunters would play an important role in determining hunting activity levels. Consequently, a range of potential effects on hunting-related jobs is presented. The lower end of the impact range assumes that only hunting activity in GMU 22 (which approximately corresponds to the MPA and the Piceance Basin and represents about 20 percent of all hunting activity in Rio Blanco County) is affected by energy development. The upper end of the impact range assumes that all hunting activity in the Planning Area is affected in proportion to the changes in big game population objectives identified by the BLM's management goal.

The indirect fiscal impacts of the WRFO alternatives are associated with the development of natural resources and the creation of new jobs and resultant new residents migrating to the SSSA and the PSSA for expanded employment opportunities. Key public revenues within the PSSA are closely tied to the value of oil and gas and the cumulative oil and gas production in the area.

The extraction of natural resources generates new resource-specific tax revenues for both state and local governments. Key resource-associated revenues are: severance taxes, federal mineral leasing charges and property taxes. The annual revenues associated with these taxes are influenced by the annual number of new wells, the productivity of wells, the location of wells and the market value of oil and gas.

The State of Colorado has instituted programs to ensure that revenues associated with resource extraction are available to those communities facing the fiscal challenges of providing public services and infrastructure for energy-related growth. The DOLA distributes funds directly to communities where energy workers live from DOLA's Employee Direct Distribution Fund. In addition, DOLA maintains an Impact Grant Program that allows energy-impacted communities the opportunity to apply for state grants and loan assistance.

The state's severance tax receipts support multiple state functions but a share of this severance tax revenue is allocated to the DOLA Direct Distribution Fund and the DOLA Grant Fund. Similarly a share of the Federal Mineral Lease revenues are allocated to the State of Colorado and a portion of these funds are also available to local governments for impact assistance.

The state's programs that distribute tax revenues based on energy worker residency would help mitigate the uncertainty associated with worker commuting decisions and ensure that revenues effectively follow workers wherever they choose to live. The state's impact grant program has the

BLM_0020124

flexibility to provide funds to the appropriate jurisdictions as worker residency choices become clear. Rio Blanco County also imposes a road impact fee, which is designed to recover the costs of road construction associated with oil and gas well development. Worker decisions regarding location of residency would influence the net fiscal effects of growth. In addition to these resource-based revenues, new households would generate the traditional sales and property taxes typically associated with residential growth.

The major issue facing local governments in terms of the indirect fiscal effects of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population and growing commuter workforce, and the challenges presented in making investment commitments given the risk and uncertainty inherent in a resource-based economy. Similar challenges confront private investors considering the development of new housing and other privately provided infrastructure in the area.

### 4.10.1.1    Impacts Common to All Alternatives

**Impacts from Oil and Gas Development**

The magnitude and pace of oil and gas development determines most of the social and economic effects that would indirectly result from the WRFO management alternatives.

*Oil and Gas Development Economic Effects.* The drilling-related oil and gas workforce would include drilling-related employees of the energy development companies operating in the area (e.g., Williams and EnCana) and subcontract workers primarily in the oil and gas and construction industries. In addition to direct jobs associated with drilling and maintaining oil and gas wells and related infrastructure, oil- and gas-related economic activity would support other secondary jobs in both the PSSA and SSSA. These jobs result from both indirect economic effects of oil and gas activity (purchases of goods and services by energy companies and their subcontractors) and induced economic effects (purchases of household goods by the employees of energy companies, subcontractors and indirectly affected firms). A relatively large proportion of secondary jobs would occur in the SSSA due to oil and gas activity in the Planning Area (within the PSSA). This reflects both the extensive commuting of oil and gas workers from outside the PSSA and the role of the larger communities in Mesa County, Garfield County, and Uintah County (Utah) in providing regional services.

Projected well development for each alternative is defined in the air quality analysis. Management decisions related to some of the other resources could affect the pace and timing of oil and gas development because of their effects on the economics of energy development. In this context, relevant resource management categories include:

- Soil and water resources;
- Vegetation;
- Fish and wildlife;
- Trails and travel management;
- Lands and realty; and
- Special status species.

BLM_0020125

**Effects on Hunting.** The collective effect of the individual management actions on the hunting resource are assumed to be reflected in the management goals the BLM has established for wildlife population objectives under each alternative. Those management goals are:

- 100 percent of the state-established (CPW) population objective under Alternative A;
- 90 percent of the state-established population objective under Alternative B;
- 70 percent of the state-established population objective under Alternative C; and
- 50 percent of the state-established population objective under Alternative D.

The relationship between hunting activity levels and big game herd sizes is imprecise. For purposes of this analysis, however, the relationship is assumed to be linear. For example, Alternative D would support only 50 percent as many hunting days as Alternative A.

**Effects on Agriculture.** In general, Alternatives A, C, and D would adjust grazing management to resolve potential conflicts with oil and gas operations, while Alternative B would adjust oil and gas activity to resolve conflicts with grazing. There are differences in the amount of grazing land and the number of AUMs that could be supported among the alternatives, which would affect the agricultural economy.

**Effects on Non-market Values.** Non-market values are associated with several of the resources managed by the BLM in the Planning Area, as well as with agricultural open space on both public and private lands. As discussed more fully in Chapter 3, non-market values include the benefits received by people from participating in recreational activities in the Planning Area, as well as the passive, or non-use benefits individuals derive from the existence of abundant wildlife, six WSAs, extensive agricultural lands with little development and other amenities in the area. The BLM management decisions that offer more protection for the following resource categories would tend to also provide more protection for non-market values and non-quantifiable recreation benefits:

- Special status species;
- Wild horses;
- Cultural resources;
- Paleontological resources;
- Visual resources; and
- Recreation resources.

### 4.10.1.2    Alternative A

#### Impacts from Oil and Gas Development

In essence, the social and economic effects of each alternative are all directly or indirectly related to oil and gas development. The BLM's management actions, and reclamation, would independently have little or no quantifiable effect on social and economic conditions. This holds true for all alternatives considered in the analysis.

**Total Employment and Population Effects.** The estimated net effect of Alternative A on employment in the PSSA and SSSA combines the new direct and secondary jobs associated with

BLM_0020126

increased oil and gas development with the projected decrease in direct and secondary jobs related to agriculture.

Within the PSSA, Alternative A is projected to lead to a net increase of 329 employed persons and 679 residents by 2030. These estimates represent a 7 percent increase in employment and a 9 percent increase in population compared to 2010 existing conditions. Figure 4-12 shows the projected changes in employment and population within the PSSA under Alternative A – compared to existing conditions – in five-year increments.

**Figure 4-12. Projected Employment and Population Effects in the PSSA (Alternative A)**



SOURCE: BBC Research & Consulting 2010.

Within the SSSA, Alternative A is projected to lead to a net increase of 562 employed persons and 1,082 residents by 2030. These estimates represent less than a 1 percent increase in SSSA employment and population compared to 2010 existing conditions. Figure 4-13 shows the projected changes in employment and population within the SSSA under Alternative A – compared to existing conditions – in five-year increments.

BLM_0020127

**Figure 4-13. Projected Employment and Population Effects in the SSSA (Alternative A)**



SOURCE: BBC Research & Consulting 2010.

**Energy-related Activity and Employment.** Under Alternative A, approximately 4,603 new wells would be developed in the Planning Area over the 20-year planning horizon. The average number of new wells per year is similar to the rate of development in 2007 when the RFD Scenario was identified. This average reflects a slightly higher rate of well development than the study team projects for 2010 (160 wells). The current (2010) development rate continues to reflect the ongoing recession affecting the oil and gas industry in Northwest Colorado. The maximum rate of well development under Alternative A is projected to occur in the final three years of the 20-year planning period, when 263 wells are projected to be developed each year.

The total number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 5,042 by 2030 under Alternative A.

The drilling-related workforce employed in the Planning Area (based on work sites) is projected to increase from about 475 workers in 2010 to about 691 workers by 2030 under Alternative A. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 655 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by almost 400 jobs over the 20-year study period.

Secondary employment in the PSSA resulting from oil and gas activity is projected to increase from 666 jobs in 2010 to 941 jobs by 2030 under Alternative A. In the SSSA, secondary employment

BLM_0020128

**Chapter 4 – Environmental Consequences**

resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs to 1,177 jobs by 2030.

Table 4-92 summarizes projected energy-related activity and employment under Alternative A from 2010 (existing conditions) through 2030.

**Table 4-92. Energy-related Activity and Employment
(Alternative A)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 208 | 219 | 241 | 263 |
| Cumulative producing wells | 2,866 | 3,364 | 3,900 | 4,464 | 5,042 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 547 | 576 | 633 | 691 |
| Maintenance jobs in PSSA | 478 | 538 | 585 | 625 | 655 |
| Total direct jobs in PSSA | 953 | 1,085 | 1,161 | 1,258 | 1,347 |
| Secondary jobs in PSSA | 666 | 758 | 811 | 880 | 941 |
| Secondary jobs in SSSA | 833 | 948 | 1,015 | 1,100 | 1,177 |

SOURCE: BBC Research & Consulting 2010.
NOTES:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

**Agricultural Activity and Employment.** The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 6,600 acres of publicly administered grazing lands could be impacted under Alternative A over the 20-year study period. This total represents 0.38 percent of the approximately 1.717 million acres of publicly-administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the MPA (roughly corresponding to the Piceance Basin), it would represent about 1.22 percent of the 588,000 acres of publicly administered grazing land in that area.

As shown in Table 4-93, the relatively small amount of grazing land that could be affected under Alternative A corresponds to a very small direct and secondary impact on agricultural employment in the PSSA under these analytical assumptions.

BLM_0020129

### Table 4-93. Agricultural Sector Effects (Alternative A)

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Maximum cumulative reduction in grazing acres** | 0 | 1,153 | 2,709 | 4,424 | 6,283 |
| **Percent of total Planning Area grazing land** | 0% | 0.08% | 0.19% | 0.31% | 0.43% |
| **Percent of total Mesa Verde Play Area grazing land** | 0% | 0.21% | 0.50% | 0.82% | 1.17% |
| **Projected effects on agricultural jobs** |  |  |  |  |  |
| Direct jobs | 0 | -0.3 | -0.8 | -1.3 | -1.9 |
| Secondary jobs | 0 | -0.2 | -0.5 | -0.9 | -1.2 |
| Total jobs | 0 | -0.6 | -1.3 | -2.2 | -3.1 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land. Actual impacts may be larger or smaller for reasons discussed in the narrative.

**Hunting and Tourism Activity and Employment.** Under Alternative A, the BLM has identified the management goal of maintaining the big game population objectives established by CPW. Consequently, this alternative would not be expected to lead to changes in hunting activity levels due to reductions in big game herd sizes.

Some anecdotal reports suggest there has been some decrease in interest in big game hunting in the Planning Area (and in Garfield County south of the Planning Area) due to hunter perceptions of extensive, energy-related industrial activity in the area. Since future oil and gas activity under Alternative A would be of a similar scale to existing conditions, effects of public perceptions on hunting activity levels would likely remain similar to existing conditions.

The results of the temporal analysis indicate that approximately 1.1 percent of the mule deer range area in the MPA would be developed over the 20-year planning period under Alternative A (Appendix E Line 8). This relatively small percentage impact is unlikely to substantially affect hunting activity, or hunting related employment, beyond the perceptual effects that could already exist in the area.

*Fiscal Effects.* Projections of oil and gas-associated state and local revenues for Alternative A are set forth in Table 4-94. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in Table 4-94. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

Under Alternative A, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $9.1 million by 2030. These funds would be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area would rise from $12.0 million to $21.2 million. Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $41.7 million by 2030.

BLM_0020130

**Table 4-94. Energy Associated Revenue Projections (Alternative A)**

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Dollars in Millions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $34.4 | $5.2 | $12.0 | $17.6 | $23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $35.3 | $5.3 | $12.3 | $18.0 | $24.3 |
| 2012 | 195 | 3,047 | 1,020 | 152,355 | $ 914.1 | $36.6 | $5.5 | $12.8 | $18.7 | $25.2 |
| 2013 | 195 | 3,151 | 1,017 | 157,534 | $ 945.2 | $37.8 | $5.7 | $13.2 | $19.3 | $26.0 |
| 2014 | 197 | 3,253 | 1,038 | 162,658 | $ 976.0 | $39.0 | $5.9 | $13.7 | $19.9 | $26.9 |
| 2015 | 208 | 3,364 | 1,085 | 168,179 | $1,009.1 | $40.4 | $6.1 | $14.1 | $20.6 | $27.8 |
| 2016 | 208 | 3,471 | 1,102 | 173,533 | $1,041.2 | $41.6 | $6.2 | $14.6 | $21.3 | $28.7 |
| 2017 | 208 | 3,575 | 1,083 | 178,727 | $1,072.4 | $42.9 | $6.4 | $15.0 | $21.9 | $29.5 |
| 2018 | 219 | 3,686 | 1,128 | 184,315 | $1,105.9 | $44.2 | $6.6 | $15.5 | $22.6 | $30.5 |
| 2019 | 219 | 3,795 | 1,145 | 189,736 | $1,138.4 | $45.5 | $6.8 | $15.9 | $23.3 | $31.4 |
| 2020 | 219 | 3,900 | 1,161 | 194,994 | $1,170.0 | $46.8 | $7.0 | $16.4 | $23.9 | $32.2 |
| 2021 | 230 | 4,013 | 1,206 | 200,644 | $1,203.9 | $48.2 | $7.2 | $16.9 | $24.6 | $33.2 |
| 2022 | 230 | 4,122 | 1,182 | 206,125 | $1,236.7 | $49.5 | $7.4 | $17.3 | $25.3 | $34.1 |
| 2023 | 241 | 4,240 | 1,227 | 211,991 | $1,271.9 | $50.9 | $7.6 | $17.8 | $26.0 | $35.0 |
| 2024 | 241 | 4,354 | 1,243 | 217,681 | $1,306.1 | $52.2 | $7.8 | $18.3 | $26.7 | $36.0 |
| 2025 | 241 | 4,464 | 1,258 | 223,201 | $1,339.2 | $53.6 | $8.0 | $18.7 | $27.4 | $36.9 |
| 2026 | 252 | 4,582 | 1,304 | 229,105 | $1,374.6 | $55.0 | $8.2 | $19.2 | $28.1 | $37.9 |
| 2027 | 252 | 4,697 | 1,273 | 234,832 | $1,409.0 | $56.4 | $8.5 | $19.7 | $28.8 | $38.8 |
| 2028 | 252 | 4,808 | 1,287 | 240,387 | $1,442.3 | $57.7 | $8.7 | $20.2 | $29.5 | $39.7 |
| 2029 | 263 | 4,927 | 1,332 | 246,325 | $1,478.0 | $59.1 | $8.9 | $20.7 | $30.2 | $40.7 |
| 2030 | 263 | 5,042 | 1,347 | 252,085 | $1,512.5 | $60.5 | $9.1 | $21.2 | $30.9 | $41.7 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
MMCF = million cubic feet

**Housing, Public Services, and Infrastructure.** It is likely that unincorporated Rio Blanco County and the towns of Meeker and Rangely— the PSSA for this analysis — would be the area most immediately and directly affected by the housing needs associated with energy development. Given the PSSA's limited housing and services capacity, portions of Garfield County could also be affected, particularly the City of Rifle and other nearby communities along the I-70 corridor.

As noted earlier, Alternative A is projected to lead to a net increase of 679 residents in the PSSA by the end of the 20-year planning horizon – corresponding to an average annual increase of about 39 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 16 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller households.

As summarized in Table 3-40, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the existing rate of housing development in the PSSA appears sufficient to accommodate the incremental population growth associated with Alternative A, although there is likely to be a need for greater development emphasis on multifamily and rental housing. When the cumulative effects

BLM_0020131

of other growth drivers are added to the incremental effects of Alternative A, there would be greater demands for new housing in the PSSA.

Since the rate of gas development under Alternative A would be similar to existing conditions, effects on public services would likely remain similar to what the PSSA is currently experiencing. As noted in Chapter 3, there was a substantial increase in police reports from the Piceance Basin between 2003 and 2007, which led to the reorganization of law enforcement services in Meeker and the county. Under Alternative A, law enforcement demands, and other public service needs, are likely to remain at levels similar to existing conditions. Meeker has already identified the need for a new grade school facility, but the relatively modest additional growth associated with Alternative A would not substantially worsen existing public school capacity issues in the PSSA.

**Social Conditions.** Within the PSSA (Rio Blanco County), Alternative A would cause an incremental population growth rate of less than 1 percent per year through 2030. This incremental growth rate caused by Alternative A is well below the growth rates likely to cause socially disruptive change. As discussed in Chapter 3, residents of the PSSA are generally supportive of economic and population growth and are generally willing to trade some desirable local characteristics for increased prosperity and the opportunities that come with change. However, a number of undesirable social effects have already been observed in the PSSA as a result of increasing energy development and growth over the past decade. As discussed in Chapter 3, some of the community's concerns include:

- Residents wanting to protect the "western way of life;"
- Maintaining acceptable levels of public service, including law enforcement, fire protection, emergency response, and boards and commissions;
- Additional strain on limited resources, including the business community;
- Temporary and transient workforces and associated social disruption;
- Housing and hotel shortages;
- Increased construction disruption;
- Concern about repercussions associated with a future "bust;"
- Desire to minimize impacts on agriculture and tourism; and
- Negative aspects of increased traffic.

The PSSA is adapting to the pace of growth experienced during the past decade. Since the projected rate of energy development, and overall population growth, under Alternative A would be similar to existing conditions, social concerns would likely diminish over the 20-year planning horizon under this Alternative.

Under Alternative A in the PSSA, 39 percent of incremental growth in the number of employed residents would come directly or indirectly from energy development by 2030, compared to 16 percent from agriculture, and 6 percent from hunting (hunting being just part of total recreation and tourism employment). This change would have little incremental effect on the overall dependency of the PSSA's labor force and population on energy industry employment, agriculture or hunting. Consequently, this alternative would tend to preserve the existing balance of interests among different population groups within the PSSA.

BLM_0020132

The energy labor force of the PSSA would continue to be roughly equally split between more temporary drilling jobs and more permanent field maintenance and operations jobs during the 20-year planning horizon. The substantial proportion of drilling jobs among oil- and gas-related jobs in the PSSA indicates that the energy industry would not become a fully stable component of the economic base during the 20-year planning horizon. The volatile attribute of the drilling sector of the energy industry is perceived by the population in communities of the PSSA as having the potential to diminish their quality of life. The validity of this concern has been reinforced by the downturn in the local gas industry over the past two years.

Overall the social indicators suggest that Alternative A would not have an impact on the quality of life of most community residents in the PSSA compared to existing conditions. Since future oil and gas activity under Alternative A would be of a similar scale to existing conditions, no change to quality of life for recreation interests would occur from effects on hunting. For ranchers along the Piceance Creek Road and its side roads, Alternative A would affect their quality of life due to traffic, noise, dust, and competition for resources on BLM land, but these effects would be similar to current conditions. Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life under Alternative A. However, groups with environmental interests would see some benefit to the quality of life in the PSSA under Alternative A because higher levels of potential development under consideration in this RMPA would be avoided.

**Non-market Values.** The number of wells projected to be developed under Alternative A (and corresponding development of other energy-related infrastructure) is relatively small compared to the other alternatives and is generally similar to the development rate under existing conditions. As noted earlier, this alternative is not expected to affect the big game population in the Planning Area. The temporal analysis indicates that approximately 1.1 percent of the vegetation communities and the mule deer range in the MPA would be developed over the 20-year planning period under Alternative A. Consequently, this alternative is likely to have little effect on recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly affected public and private lands.

**Impacts from Management Actions**

There would be no impacts to socioeconomics from other resource management actions under Alternative A.

**Reclamation**

There would be no impacts to socioeconomics from reclamation under Alternative A.

### 4.10.1.3   Alternative B

**Impacts from Oil and Gas Development**

**Total Employment and Population Effects.** The estimated net effect of Alternative B on employment and population in the PSSA and SSSA combines the projected direct and secondary jobs that would be added due to increased oil and gas development (relative to existing conditions) with the projected decrease in direct and secondary jobs related to agriculture and hunting activity.

Within the PSSA, Alternative B is projected to lead to a net increase of 1,580 employed persons and 2,868 residents by 2030. These estimates represent a 35 percent increase in employment and a 37 percent increase in population compared to 2010 existing conditions. Figure 4-14 shows the projected changes in employment and population within the PSSA under Alternative B – compared to existing conditions – in five-year increments.

**Figure 4-14. Projected Employment and Population Effects in the PSSA (Alternative B)**



SOURCE: BBC Research & Consulting 2010.

Within the SSSA, Alternative B is projected to lead to a net increase of 2,641 employed persons and 4,816 residents by 2030. These estimates represent about a 2 percent increase in SSSA employment and population compared to 2010 existing conditions. Figure 4-15 shows the projected changes in employment and population within the SSSA under Alternative B – compared to existing conditions – in five-year increments.

BLM_0020134

*Chapter 4 – Environmental Consequences*

**Figure 4-15. Projected Employment and Population Effects in the SSSA (Alternative B)**



SOURCE: BBC Research & Consulting 2010.

**Energy-related Activity and Employment.** Under Alternative B, approximately 9,191 new wells would be developed in the Planning Area over the 20-year planning horizon. The maximum rate of well development is projected to occur in the final three years of the 20-year planning period, when over 600 wells are projected to be developed each year.

The cumulative number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 8,500 by 2030 under Alternative B.

The drilling-related workforce employed in the Planning Area (based on work site, not office location) is projected to increase from about 475 workers in 2010 to about 1,671 workers by 2030 under Alternative B. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 1,105 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by more than 1,800 jobs over the 20-year study period.

Secondary employment resulting from oil and gas activity is projected to increase from 666 jobs in 2010 in the PSSA to 1,941 jobs by 2030 under Alternative B. In the SSSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs in 2010 to 2,427 jobs by 2030.

Table 4-95 summarizes projected energy-related activity and employment under Alternative B from 2010 (existing conditions) through 2030.

BLM_0020135

*Chapter 4 – Environmental Consequences*

**Table 4-95. Energy-related Activity and Employment (Alternative B)**

| | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 318 | 434 | 535 | 636 |
| Cumulative producing wells | 2,866 | 3,711 | 5,017 | 6,628 | 8,501 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 836 | 1,141 | 1,406 | 1,671 |
| Maintenance jobs in PSSA | 478 | 594 | 753 | 928 | 1,105 |
| Total direct jobs in PSSA | 953 | 1,429 | 1,893 | 2,334 | 2,777 |
| Secondary jobs in PSSA | 666 | 999 | 1,324 | 1,632 | 1,941 |
| Secondary jobs in SSSA | 833 | 1,250 | 1,655 | 2,041 | 2,427 |

SOURCE: BBC Research & Consulting 2010.
NOTES:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Relative to Alternative A, Alternative B is projected to lead to 1,430 more direct energy-related jobs and 1,000 more secondary jobs in the Planning Area (PSSA) by 2030. Alternative B is also projected to lead to 1,250 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

**Agricultural Activity and Employment.** The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 13,200 acres of publicly administered grazing lands could be impacted under Alternative B over the 20-year study period. This total represents 0.77 percent of the approximately 1.717 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the MPA (roughly corresponding to the Piceance Basin), it would represent about 2.24 percent of the 588,000 acres of publicly administered grazing land in that area.

If agricultural employment is proportional to the amount of public grazing land available in the area, the relatively small amount of grazing land that could be affected under Alternative B corresponds to a small direct and secondary impact on agricultural employment in the PSSA, as shown in Table 4-96. The projected impact on agricultural activity and employment under Alternative B would be twice as large as under Alternative A, but the estimated effect on direct and secondary employment (based on the simplified assumption of proportionality to the loss of grazing land) would be only about six jobs by 2030.

BLM_0020136

*Chapter 4 – Environmental Consequences*

**Table 4-96. Agricultural Sector Effects (Alternative B)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Maximum cumulative reduction in grazing acres | 0 | 1,676 | 4,485 | 8,048 | 12,363 |
| Percent of total Planning Area grazing land | 0% | 0.12% | 0.31% | 0.56% | 0.86% |
| Percent of total Mesa Verde Play Area grazing land | 0% | 0.31% | 0.83% | 1.49% | 2.30% |
| Projected effects on agricultural jobs |  |  |  |  |  |
| Direct jobs | 0 | -0.5 | -1.3 | -2.4 | -3.7 |
| Secondary jobs | 0 | -0.3 | -0.9 | -1.6 | -2.4 |
| Total jobs | 0 | -0.8 | -2.2 | -4.0 | -6.1 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land. Actual impacts may be larger or smaller for reasons discussed in the narrative.

With the additional well development projected in the Planning Area under Alternative B compared to Alternative A, valley-bottom hay lands currently owned by energy companies are more likely to be developed for energy-related activities than under Alternative A.

**Hunting and Tourism Activity and Employment.** Under Alternative B, the BLM has identified a management goal of maintaining 90 percent of the big game population objectives established by CPW. The maximum 10 percent reduction would occur in year 2030 when annual development would peak at 666 wells. The results of the temporal analysis indicate that approximately 2.1 percent of the mule deer range area in the MPA would be developed over the 20-year planning period under Alternative B, compared to 1.1 percent under Alternative A (Appendix E Line 8). Effects from this relatively small percentage change in mule deer range are likely to be small relative to effects that would result from the potential change in big game herd sizes.

Table 4-97 shows the estimated percentage of the CPW big game population targets maintained under Alternative B from 2010 through 2030 and the projected effects on hunting related jobs in the PSSA and the SSSA. By 2030, Alternative B is projected to result in the loss of between 4 and 22 direct and secondary hunting-related jobs in the Planning Area (PSSA) and between 3 and 14 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels.

BLM_0020137

**Table 4-97. Hunting Sector Effects (Alternative B)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Percent of CDOW target big game population | 100% | 99% | 97% | 94% | 91% |
| **Projected effects on hunting-related jobs** | | | | | |
| Direct jobs in PSSA | 0 | -1 to -4 | -2 to -8 | -2 to -11 | -3 to -15 |
| Secondary jobs in PSSA | 0 | 0 to -2 | -1 to -4 | -1 to -5 | -1 to -7 |
| Total jobs jobs in PSSA | 0 | -1 to -5 | -2 to -11 | -3 to -17 | -4 to -22 |
| Direct jobs in SSSA | 0 | 0 to -2 | -1 to -4 | -1 to -6 | -2 to -8 |
| Secondary jobs in SSSA | 0 | 0 to -1 | -1 to -3 | -1 to -5 | -1 to -6 |
| Total jobs in SSSA | 0 | -1 to -3 | -1 to -7 | -2 to -11 | -3 to -14 |

SOURCE: BBC Research & Consulting 2010.

NOTES:

PSSA is equivalent to Rio Blanco County.

SSSA includes Mesa, Moffat, Garfield and Uintah, UT counties – hunting related effects arise in Mesa and Moffat counties only.

**Fiscal Effects.** Projections of oil and gas-associated state and local revenues for Alternative B are set forth in Table 4-98. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in Table 4-98. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

BLM_0020138

*Chapter 4 – Environmental Consequences*

**Table 4-98. Energy-Associated Revenue Projections (Alternative B)**

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Dollars in Millions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $ 34.4 | $ 5.2 | $12.0 | $17.6 | $23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $ 35.3 | $ 5.3 | $12.3 | $18.0 | $24.3 |
| 2012 | 260 | 3,112 | 1,209 | 155,605 | $ 933.6 | $ 37.3 | $ 5.6 | $13.1 | $19.1 | $25.7 |
| 2013 | 275 | 3,294 | 1,250 | 164,687 | $ 988.1 | $ 39.5 | $ 5.9 | $13.8 | $20.2 | $27.2 |
| 2014 | 303 | 3,498 | 1,356 | 174,896 | $1,049.4 | $ 42.0 | $ 6.3 | $14.7 | $21.4 | $28.9 |
| 2015 | 318 | 3,711 | 1,429 | 185,549 | $1,113.3 | $ 44.5 | $ 6.7 | $15.6 | $22.7 | $30.7 |
| 2016 | 347 | 3,947 | 1,543 | 197,333 | $1,184.0 | $ 47.4 | $ 7.1 | $16.6 | $24.2 | $32.6 |
| 2017 | 361 | 4,189 | 1,577 | 209,463 | $1,256.8 | $ 50.3 | $ 7.5 | $17.6 | $25.7 | $34.6 |
| 2018 | 390 | 4,454 | 1,693 | 222,679 | $1,336.1 | $ 53.4 | $ 8.0 | $18.7 | $27.3 | $36.8 |
| 2019 | 405 | 4,725 | 1,773 | 236,249 | $1,417.5 | $ 56.7 | $ 8.5 | $19.8 | $29.0 | $39.1 |
| 2020 | 434 | 5,017 | 1,893 | 250,861 | $1,505.2 | $ 60.2 | $ 9.0 | $21.1 | $30.8 | $41.5 |
| 2021 | 448 | 5,315 | 1,975 | 265,735 | $1,594.4 | $ 63.8 | $ 9.6 | $22.3 | $32.6 | $43.9 |
| 2022 | 477 | 5,632 | 2,042 | 281,613 | $1,689.7 | $ 67.6 | $10.1 | $23.7 | $34.5 | $46.6 |
| 2023 | 491 | 5,954 | 2,124 | 297,715 | $1,786.3 | $ 71.5 | $10.7 | $25.0 | $36.5 | $49.2 |
| 2024 | 506 | 6,282 | 2,209 | 314,083 | $1,884.5 | $ 75.4 | $11.3 | $26.4 | $38.5 | $51.9 |
| 2025 | 535 | 6,628 | 2,334 | 331,411 | $1,988.5 | $ 79.5 | $11.9 | $27.8 | $40.6 | $54.8 |
| 2026 | 549 | 6,978 | 2,420 | 348,919 | $2,093.5 | $ 83.7 | $12.6 | $29.3 | $42.8 | $57.7 |
| 2027 | 578 | 7,347 | 2,474 | 367,351 | $2,204.1 | $ 88.2 | $13.2 | $30.9 | $45.0 | $60.7 |
| 2028 | 592 | 7,719 | 2,559 | 385,931 | $2,315.6 | $ 92.6 | $13.9 | $32.4 | $47.3 | $63.8 |
| 2029 | 621 | 8,108 | 2,686 | 405,403 | $2,432.4 | $ 97.3 | $14.6 | $34.1 | $49.7 | $67.0 |
| 2030 | 636 | 8,501 | 2,777 | 425,041 | $2,550.2 | $102.0 | $15.3 | $35.7 | $52.1 | $70.3 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
MMCF = million cubic feet

Under Alternative B, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $15.3 million by 2030 (compared with $9.1 million in Alternative A). These funds would be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area would rise from $12.0 to $35.7 million (compared with $21.2 million under Alternative A). Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $70.3 million by 2030 (compared with $41.7 million under Alternative A).

The major issue facing local governments in terms of the fiscal impact of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population, and the challenges presented in making investment commitments, given the risk and uncertainty inherent in a resource based economy. These issues and challenges would be somewhat greater under Alternative B than under Alternative A, given the larger increase in population projected to occur under Alternative B.

**Housing, Public Services, and Infrastructure.** Alternative B is projected to lead to a net increase of 2,868 residents in the PSSA by the end of the 20-year planning horizon – corresponding to an average annual increase of about 144 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at

## Chapter 4 – Environmental Consequences

least 58 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller households.

As summarized in Table 3-40, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the rate of housing development in the PSSA would need to approximately double to accommodate the incremental population growth associated with Alternative A. There is also likely to be a need for greater development emphasis on multifamily and rental housing. When the cumulative effects of other growth drivers are added to the incremental effects of Alternative B, there would be even greater demands for new housing in the PSSA.

Since Alternative B would increase both the rate of gas development and the rate of overall population growth relative to existing conditions, public service challenges that the PSSA is already experiencing are likely to be exacerbated. As noted in Chapter 3, there was a substantial increase in police reports from the Piceance Basin between 2003 and 2007 which has led to the reorganization of law enforcement services in Meeker and the county. Law enforcement demands, and other public service needs, are likely to further increase under Alternative B. The need for a new grade school in Meeker would become more acute, though student enrollment growth in the Rangely area would likely be welcome given the decline in that district's enrollment since 2000. Infrastructure and service delivery costs would be at least somewhat offset by rising property values, particularly the rising value of minerals and the resultant property and severance taxes. The county and school district are likely to be major revenue beneficiaries, but the towns of Meeker and Rangeley would be required to provide most new resident services with little new tax revenue. The state's mineral revenue redistribution programs would offer some revenue relief.

As also noted in Chapter 3, local governments and school districts in the PSSA have struggled to hire and retain staff due to wage competition from the energy industry. These challenges are likely to increase under Alternative B

**Social Conditions.** Alternative B would cause an incremental population growth rate in the PSSA of less than 2 percent per year through 2030 compared to less than 1 percent per year for Alternative A. The rate for Alternative B is 3 percentage points below the threshold range of socially-disruptive growth that has been observed in small, energy impacted communities. This is just the incremental effect of the alternative.

Previously identified social issues in the PSSA associated with energy-driven growth were listed in Section 4.10.3.1. While the PSSA is adapting to the pace of growth experienced during the past decade, that pace would accelerate somewhat under Alternative B. The cumulative level of population growth under Alternative B is unlikely to result in "transformative" social change (as discussed in Section 4.1.1) in the PSSA and the rate and level of growth that would result under Alternative B would likely be welcomed by many PSSA residents. However, in contrast to Alternative A, where social issues are likely to diminish over the 20-year planning period, many of the social concerns identified to date in the PSSA could continue to arise under Alternative B.

Under Alternative B in the PSSA, 53 percent of incremental growth in the number of employed residents would come directly or indirectly from energy development by 2030, compared to 13 percent from agriculture, and 4 percent from hunting (hunting being just part of total recreation and tourism employment). This change is 14 percentage points higher than under Alternative A for energy development (39 percent), 3 percentage points lower for agriculture (16 percent) and

BLM_0020140

2 percentage points lower for hunting (6 percent). These differences suggest Alternative B would cause a shift toward labor force and population dependency on employment in the energy industry in the PSSA and away from agriculture and hunting. The impact of the shift in dependency under Alternative B could be perceived by the population in communities of the PSSA as potentially improving the quality of life because of additional economic opportunities. However, the shift also could be perceived as potentially reducing quality of life because of increased exposure to volatility in the energy industry and greater competition for resources with agriculture and hunting, which embody traditional cultural values. These effects would be larger under Alternative B than Alternative A roughly in proportion to the relative change in dependency among the three kinds of livelihoods in the PSSA. The change in the mix of livelihoods under Alternative B would somewhat modify the balance of interests among different population groups within the PSSA, increasing the potential for social tensions between differing groups relative to Alternative A.

Under Alternative B, the majority of employment by the energy industry would be in drilling and development during the 20-year planning horizon. The share involved in drilling would grow over time. By 2030, 60 percent of energy jobs in the PSSA would be in drilling and 40 percent in field maintenance and operation compared to an equal split in 2010 and a roughly equal split in 2030 under Alternative A. This indicates that the energy industry would have the potential for greater instability during the 20-year planning horizon under Alternative B than under Alternative A. The volatile attribute of the drilling sector of the energy industry is likely to be perceived by the population in communities of the PSSA as having the potential to diminish their quality of life.

The prevalence of drilling jobs in the PSSA under Alternative B would be about 10 percentage points greater in 2030 than under Alternative A. A drilling-oriented industry could both increase quality of life, because of economic opportunities, and reduce quality of life, because of exposure to industry volatility. These impacts would be larger under Alternative B than Alternative A roughly in proportion to the change in prevalence of drilling jobs.

For ranchers on the Piceance Creek Road and its side roads, Alternative B would affect their quality of life due to traffic, noise, dust, and competition for resources on BLM land, much of it related to drilling activity and facilities development. The impact to ranchers would be greater from Alternative B than from Alternative A. The increase in these effects under Alternative B is indicated by the estimated change in drilling employment and the number of annual wells drilled, which are more than double the levels under Alternative A in 2030.

The impact to quality of life for recreation interests would be larger under Alternative B than for Alternative A. The impact is related to the loss of between 4 and 22 direct and secondary hunting-related jobs in the PSSA and between 3 and 14 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Recreation interests would also be impacted because of lower perceived quality of the hunting experience in the area affected by oil and gas drilling and production. This is indicated by the development of 4,600 more wells under Alternative B than Alternative A over the 20-year period.

Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life. Alternative B allows about twice as much development compared to Alternative A. However, groups with environmental interests would see some benefit to the quality

BLM_0020141

of life in the PSSA because higher levels of potential development under consideration in this RMPA would be avoided during the 20-year planning horizon.

**Non-market Values.** Compared to Alternative A, the larger number of wells that would be developed under Alternative B (along with associated infrastructure and land disturbance) implies more potential to affect recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly-affected public and private lands. The temporal analysis indicates that approximately 2.1 percent of the vegetation communities and the mule deer range in the MPA would be developed over the 20-year planning period under Alternative B, compared to 1.1 percent under Alternative A. As noted earlier, Alternative B is also expected to potentially reduce the big game population in the Planning Area by up to 10 percent by the end of the 20-year planning period and would likely affect the recreational value associated with hunting compared to Alternative A. The six WSAs in the Planning Area are not expected to be affected by energy development under Alternative B.

## Impacts from Management Actions

There would be no impacts to socioeconomics from other resource management actions under Alternative B.

## Reclamation

There would be no impacts to socioeconomics from reclamation under Alternative B.

### 4.10.1.4    Alternative C

#### Impacts from Oil and Gas Development

**Total Employment and Population Effects.** The estimated net effect of Alternative C on employment and population in the PSSA and SSSA combines the projected direct and secondary jobs that would be added due to increased oil and gas development (relative to existing conditions) with the projected decrease in direct and secondary jobs related to agriculture and hunting activity.

Within the PSSA, Alternative C is projected to lead to a net increase of 3,255 employed persons and 5,800 residents by 2030. These estimates represent a 72 percent increase in employment and a 75 percent increase in population compared to 2010 existing conditions. Figure 4-16 shows the projected changes in employment and population within the PSSA under Alternative C – compared to existing conditions – in five-year increments.

BLM_0020142

**Figure 4-16. Projected Employment and Population Effects in the PSSA (Alternative C)**



SOURCE: BBC Research & Consulting 2010.

Within the SSSA, Alternative C is projected to lead to a net increase of 5,431 employed persons and 9,285 residents by 2030. These estimates represent about a 4 percent increase in SSSA employment and population compared to 2010 existing conditions. Figure 4-17 shows the projected changes in employment and population within the SSSA under Alternative C – compared to existing conditions – in five-year increments.

BLM_0020143

**Figure 4-17. Projected Employment and Population Effects in the SSSA (Alternative C)**



SOURCE: BBC Research & Consulting 2010.

**Energy-related Activity and Employment.** Under Alternative C, approximately 15,000 new wells would be developed in the Planning Area over the 20-year planning horizon. The maximum rate of well development is projected to occur in the final three years of the 20-year planning period, when over 1,100 wells are projected to be developed each year.

The cumulative number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 12,943 by 2030 under Alternative C.

The drilling-related workforce employed in the Planning Area (based on work site, not office location) is projected to increase from about 475 workers in 2010 to about 3,017 workers by 2030 under Alternative C. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 1,683 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by about 3,750 jobs over the 20-year study period.

Secondary employment resulting from oil and gas activity is projected to increase from 666 jobs in 2010 in the PSSA to 3,286 jobs by 2030 under Alternative C. In the SSSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs in 2010 to 4,109 jobs by 2030.

BLM_0020144

*Chapter 4 – Environmental Consequences*

Table 4-99 summarizes projected energy-related activity and employment under Alternative C from 2010 (existing conditions) through 2030.

### Table 4-99. Energy-related Activity and Employment (Alternative C)

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 450 | 682 | 915 | 1,148 |
| Cumulative producing wells | 2,866 | 4,060 | 6,274 | 9,273 | 12,943 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 1,183 | 1,792 | 2,405 | 3,017 |
| Maintenance jobs in PSSA | 478 | 650 | 941 | 1,298 | 1,683 |
| Total direct jobs in PSSA | 953 | 1,832 | 2,733 | 3,703 | 4,700 |
| Secondary jobs in PSSA | 666 | 1,281 | 1,911 | 2,589 | 3,286 |
| Secondary jobs in SSSA | 833 | 1,602 | 2,390 | 3,237 | 4,109 |

SOURCE: BBC Research & Consulting 2010.
NOTES:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Relative to Alternative A, Alternative C is projected to lead to about 3,353 more direct energy-related jobs and 2,345 more secondary jobs in the Planning Area (PSSA) by 2030. Alternative C is also projected to lead to 2,932 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

Relative to Alternative B, Alternative C is projected to lead to about 1,923 more direct energy-related jobs and 1,345 more secondary jobs in the PSSA by 2030. Alternative C is also projected to lead to 1,682 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

**Agricultural Activity and Employment.** The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 21,600 acres of publicly administered grazing lands could be impacted under Alternative C over the 20-year study period. This total represents 1.26 percent of the approximately 1.717 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the MPA (roughly corresponding to the Piceance Basin), it would represent about 3.67 percent of the 588,000 acres of publicly administered grazing land in that area.

If agricultural employment is proportional to the amount of public grazing land available in the area, the relatively small amount of grazing land that could be affected under Alternative C corresponds to a small direct and secondary impact on agricultural employment in the PSSA, as shown in Table 4-100. The projected impact on agricultural activity and employment under Alternative C would be over three times as large as under Alternative A, but the estimated effect on direct and secondary employment (based on the simplified assumption of proportionality to the loss of grazing land) would be only about ten jobs by 2030.

*Chapter 4 – Environmental Consequences*

**Table 4-100. Agricultural Sector Effects (Alternative C)**

| | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Maximum cumulative reduction in grazing acres** | 0 | 2,200 | 6,471 | 12,432 | 20,080 |
| **Percent of total Planning Area grazing land** | 0% | 0.15% | 0.45% | 0.86% | 1.39% |
| **Percent of total Mesa Verde Play Area grazing land** | 0% | 0.41% | 1.20% | 2.31% | 3.73% |
| **Projected effects on agricultural jobs** | | | | | |
| Direct jobs | 0 | -0.7 | -1.9 | -3.7 | -6.0 |
| Secondary jobs | 0 | -0.4 | -1.2 | -2.4 | -3.9 |
| Total jobs | 0 | -1.1 | -3.2 | -6.1 | -9.9 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land. Actual impacts may be larger or smaller for reasons discussed in the narrative.

With the additional well development projected in the Planning Area under Alternative C compared to Alternatives A or B, valley-bottom hay lands currently owned by energy companies are more likely to be developed for energy-related activities than under those alternatives.

**Hunting and Tourism Activity and Employment.** Under Alternative C, the BLM has identified the management goal of maintaining 70 percent of the big game population objectives established by the CPW. The maximum 30 percent reduction would occur in year 2030 when annual development would peak at 1,194 wells. The results of the temporal analysis indicate that approximately 3.4 percent of the mule deer range area in the MPA would be developed over the 20-year planning period under Alternative C (compared to 1.1 percent under Alternative A). Effects from this relatively small percentage change in mule deer range are likely to be small relative to effects that would result from the potential change in big game herd sizes.

Table 4-101 shows the estimated percentage of the CPW big game population targets maintained under Alternative C from 2010 through 2030 and the projected effects on hunting-related jobs in the PSSA and the SSSA. By 2030, Alternative C is projected to result in the loss of between 13 and 67 direct and secondary hunting-related jobs in the Planning Area (PSSA) and between 9 and 43 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels.

BLM_0020146

### Table 4-101. Hunting Sector Effects (Alternative C)

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 650 | 965 | 1,282 | 1,596 |
| Cumulative producing wells | 2,866 | 4,737 | 8,037 | 12,356 | 17,550 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 1,708 | 2,536 | 3,369 | 4,194 |
| Maintenance jobs in PSSA | 478 | 758 | 1,206 | 1,730 | 2,282 |
| Total direct jobs in PSSA | 953 | 2,466 | 3,742 | 5,099 | 6,476 |
| Secondary jobs in PSSA | 666 | 1,724 | 2,616 | 3,565 | 4,528 |
| Secondary jobs in SSSA | 833 | 2,156 | 3,271 | 4,458 | 5,662 |

SOURCE: BBC Research & Consulting 2010.

**Fiscal Effects.** Projections of oil and gas-associated state and local revenues for Alternative C are set forth in Table 4-102. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in Table 4-102. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

### Table 4-102. Energy-Associated Revenue Projections (Alternative C)

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Dollars in Millions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143.315 | $ 859.9 | $ 34.4 | $ 5.2 | $12.0 | $17.6 | $ 23.7 |
| 2011 | 160 | 2,940 | 946 | 147.016 | $ 882.1 | $ 35.3 | $ 5.3 | $12.3 | $18.0 | $ 24.3 |
| 2012 | 307 | 3,159 | 1,344 | 157.955 | $ 947.7 | $ 37.9 | $ 5.7 | $13.3 | $19.4 | $ 26.1 |
| 2013 | 357 | 3,421 | 1,486 | 171.066 | $1,026.4 | $ 41.1 | $ 6.2 | $14.4 | $21.0 | $ 28.3 |
| 2014 | 403 | 3,722 | 1,655 | 186.084 | $1,116.5 | $ 44.7 | $ 6.7 | $15.6 | $22.8 | $ 30.8 |
| 2015 | 450 | 4,060 | 1,832 | 203.002 | $1,218.0 | $ 48.7 | $ 7.3 | $17.1 | $24.9 | $ 33.6 |
| 2016 | 496 | 4,434 | 2,013 | 221.712 | $1,330.3 | $ 53.2 | $ 8.0 | $18.6 | $27.2 | $ 36.6 |
| 2017 | 543 | 4,844 | 2,154 | 242.210 | $1,453.3 | $ 58.1 | $ 8.7 | $20.3 | $29.7 | $ 40.0 |
| 2018 | 589 | 5,288 | 2,341 | 264.394 | $1,586.4 | $ 63.5 | $ 9.5 | $22.2 | $32.4 | $ 43.7 |
| 2019 | 636 | 5,765 | 2,536 | 288.262 | $1,729.6 | $ 69.2 | $10.4 | $24.2 | $35.3 | $ 47.6 |
| 2020 | 682 | 6,274 | 2,733 | 313.714 | $1,882.3 | $ 75.3 | $11.3 | $26.4 | $38.5 | $ 51.9 |
| 2021 | 729 | 6,815 | 2,938 | 340.753 | $2,044.5 | $ 81.8 | $12.3 | $28.6 | $41.8 | $ 56.3 |
| 2022 | 776 | 7,387 | 3,073 | 369.330 | $2,216.0 | $ 88.6 | $13.3 | $31.0 | $45.3 | $ 61.1 |
| 2023 | 822 | 7,987 | 3,278 | 399.351 | $2,396.1 | $ 95.8 | $14.4 | $33.5 | $49.0 | $ 66.0 |
| 2024 | 869 | 8,616 | 3,490 | 430.820 | $2,584.9 | $103.4 | $15.5 | $36.2 | $52.8 | $ 71.2 |
| 2025 | 915 | 9,273 | 3,703 | 463.646 | $2,781.9 | $111.3 | $16.7 | $38.9 | $56.8 | $ 76.6 |
| 2026 | 962 | 9,957 | 3,922 | 497.836 | $2,987.0 | $119.5 | $17.9 | $41.8 | $61.0 | $ 82.3 |
| 2027 | 1,008 | 10,666 | 4,036 | 533.301 | $3,199.8 | $128.0 | $19.2 | $44.8 | $65.4 | $ 88.2 |
| 2028 | 1,055 | 11,401 | 4,255 | 570.052 | $3,420.3 | $136.8 | $20.5 | $47.9 | $69.9 | $ 94.2 |
| 2029 | 1,101 | 12,160 | 4,474 | 608.000 | $3,648.0 | $145.9 | $21.9 | $51.1 | $74.5 | $100.5 |
| 2030 | 1,148 | 12,943 | 4,700 | 647.160 | $3,883.0 | $155.3 | $23.3 | $54.4 | $79.3 | $107.0 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
MMCF = million cubic feet

BLM_0020147

Under Alternative C, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $23.3 million by 2030 (compared with $15.3 million in Alternative B and $9.1 million in Alternative A). These funds would be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area would rise from $12.0 to $54.4 million (compared with $35.7 million under Alternative B). Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $107.0 million by 2030 (compared with $70.3 million under Alternative B).

The major issue facing local governments in terms of the fiscal impact of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population, and the challenges presented in making investment commitments given the risk and uncertainty inherent in a resource-based economy. These issues and challenges would be greater under Alternative C than under Alternative B or Alternative A, given the larger increase in population projected to occur under Alternative C.

**Housing, Public Services, and Infrastructure.** Alternative C is projected to lead to a net increase of 5,800 residents in the PSSA by the end of the 20-year planning horizon – corresponding to an average annual increase of about 290 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 116 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller household s.

As summarized in Table 3-40, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the rate of housing development in the PSSA would need to substantially increase to accommodate the incremental population growth associated with Alternative C. There is also likely to be a need for greater development emphasis on multifamily and rental housing. When the cumulative effects of other growth drivers are added to the incremental effects of Alternative C, there would be even greater demands for new housing in the PSSA.

During the socioeconomic study performed for the AGNC in 2007-2008, representatives of Meeker, Rangely and other communities in the region were interviewed to estimate the ultimate buildout capacity of their communities. Those interviews suggested that Meeker could be able to ultimately house as many as 10,000 people, while Rangely could be able to house up to 7,000 residents (AGNC 2008). Since the two communities currently house about 4,500 people, it is theoretically possible that all of the new residents associated with Alternative C could be housed in Rio Blanco County municipalities. However, it is more likely that Alternative C would also increase development pressure in the unincorporated portions of Rio Blanco County and that some residents would locate in the Rifle area in Garfield County.

Since Alternative C would approximately triple the rate of gas development and the rate of energy-related population growth relative to existing conditions, public service challenges in the PSSA would increase compared to either Alternative A or Alternative B. The county has already experienced a substantial increase in law enforcement demands, particularly for calls in the Piceance Basin, and those demands and corresponding staffing requirements would likely be substantially greater under Alternative C than under Alternatives A or B. Although Rio Blanco County has yet to experience substantial increases in social service demands, the experience of neighboring Garfield County with more rapid gas development suggests those demands could

BLM_0020148

increase substantially in the Rio Blanco County under the higher development levels associated with Alternative C. In addition to the existing need for a new grade school in Meeker, the additional growth associated with Alternative C could also begin to strain capacities for other grade levels. Student enrollment growth in the Rangely area would likely be welcome given the decline in that district's enrollment since 2000.

The challenges local governments and school districts in the PSSA have already confronted in hiring and retaining staff due to wage competition from the energy industry would be greater under Alternative C than under Alternative B or Alternative A.

**Social Conditions.** Alternative C would cause an incremental population growth rate in the PSSA of less than 3 percent per year through 2030 compared to less than 1 percent per year for Alternative A. The rate for Alternative C is 2 percentage points below the threshold range of socially-disruptive growth that has been observed in small, energy-impacted communities. This is just the incremental effect of the alternative, however, and does not include the cumulative effects of other economic and population growth drivers.

Previously identified social issues in the PSSA associated with energy-driven growth were listed in Section 4.10.3.1. The PSSA is adapting to the pace of growth experienced during the past decade. While residents of the PSSA tend to be favorably disposed toward growth, the rate of development under Alternative C would be more socially "transformative" for the area than under Alternative A or Alternative B. Many of the social concerns identified to date are likely to grow under Alternative C.

Under Alternative C in the PSSA, 65 percent of incremental growth in the number of employed residents would come directly or indirectly from energy development by 2030, compared to 10 percent from agriculture, and 2 percent from hunting (hunting being just part of total recreation and tourism employment). This change is 26 percentage points higher than under Alternative A for energy development (39 percent), 6 percentage points lower for agriculture (16 percent) and 4 percentage points lower for hunting (6 percent). This indicator suggests that Alternative C would cause an additional shift toward labor force and population dependency on the energy industry and away from agriculture and hunting. The impact of the shift in dependency under Alternative C could be perceived by the population in communities of the PSSA as potentially improving quality of life because of additional economic opportunities. However, the shift also could be perceived as potentially reducing quality of life because of greater exposure to volatility in the energy industry and increased competition for resources with agriculture and hunting, which embody traditional cultural values. These effects would be larger under Alternative C than Alternatives A or B. The change in the mix of livelihoods under Alternative C would change the balance of interests among different population groups within the PSSA and the population would be increasingly dominated by individuals dependent on the energy industry. There would be greater potential for social tensions between differing groups, and between new and established residents, relative to Alternative A or Alternative B.

The majority of employment by the energy industry under Alternative C would be in drilling and development during the 20-year planning horizon. The share involved in drilling would grow over time. By 2030, 65 percent of energy jobs in the PSSA would be in drilling and 35 percent in field maintenance and operations compared to a roughly equal split under Alternative A. This indicates that the energy industry would have the potential for greater instability during the 20-year planning horizon under Alternative C than under Alternatives A or B. The volatile attribute of the drilling

BLM_0020149

sector of the energy industry is likely to be perceived by the population in communities of the PSSA as having the potential to diminish their quality of life.

The prevalence of drilling jobs in the PSSA under Alternative C would be 15 percentage points greater in 2030 than under Alternative A. A drilling-oriented industry could both increase quality of life because of economic opportunities, and reduce quality of life because of exposure to industry volatility. These impacts would be larger under Alternative C than Alternatives A or B roughly in proportion to the differences in the prevalence of drilling jobs.

For ranchers on the Piceance Creek Road and its side roads, Alternative C would affect quality of life due to traffic, noise, dust, and competition for resources on BLM land, much of it related to drilling activity and facilities development. The scale of these effects under Alternative C is indicated by the estimated drilling employment and the annual number of wells drilled by 2030, which are approximately four times the levels under Alternative A and two times the levels under Alternative B.

The impact to quality of life for recreation interests would be larger under Alternative C than for Alternative A. The impact is related to the loss of 13 and 67 direct and secondary hunting-related jobs in PSSA and between 9 and 43 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Recreation interests would also be impacted because of a lower perceived quality of the hunting experience in the area affected by oil and gas drilling and production. This is indicated by the development of 10,439 more wells under Alternative C than Alternative A over the 20-year period.

Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life. The relative magnitude of this effect corresponds to the scale of development under Alternative C compared to Alternatives A or B. Alternative C allows more than three times as much well development as Alternative A over the 20-year study period and about 50 percent more development than Alternative B. However, groups with environmental interests would see some benefit to the quality of life in the PSSA because higher levels of potential development under consideration in this RMPA would be avoided during the 20-year planning horizon.

**Non-market Values.** The larger number of wells that would be developed under Alternative C (compared to Alternatives A or B) implies more land disturbance, greater development of associated energy infrastructure and more potential to affect recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly-affected public and private lands. The temporal analysis indicates that approximately 3.4 percent of the vegetation communities and the mule deer range in the MPA would be developed over the 20-year planning period under Alternative C, compared to 1.1 percent under Alternative A. As noted earlier, Alternative C is also expected to potentially reduce the big game population in the Planning Area (relative to Alternative A or Alternative B) and affect the recreational value associated with hunting compared to those alternatives. The six WSAs in the Planning Area are not expected to be affected by energy development under Alternative C.

BLM_0020150

**Impacts from Management Actions**

There would be no impacts to socioeconomics from other resource management actions under Alternative C.

**Reclamation**

There would be no impacts to socioeconomics from reclamation under Alternative C.

### 4.10.1.5   Alternative D

**Impacts from Oil and Gas Development**

**Total Employment and Population Effects.** The estimated net effect of Alternative D on employment and population in the PSSA and SSSA combines the projected direct and secondary jobs that would be added due to increased oil and gas development (relative to existing conditions) with the projected decrease in direct and secondary jobs related to agriculture and hunting activity.

Within the PSSA, Alternative D is projected to lead to a net increase of 4,801 employed persons and 8,506 residents by 2030. These estimates represent a 106 percent increase in employment and a 110 percent increase in population compared to 2010 existing conditions. Figure 4-18 shows the projected changes in employment and population within the PSSA under Alternative D – compared to existing conditions – in five-year increments.

**Figure 4-18. Projected Employment and Population Effects in the PSSA (Alternative D)**



SOURCE: BBC Research & Consulting 2010.

Within the SSSA, Alternative D is projected to lead to a net increase of 8,007 employed persons and 14,450 residents by 2030. These estimates represent about a 6 percent increase in SSSA employment and population compared to 2010 existing conditions. Figure 4-19 shows the projected

BLM_0020151

changes in employment and population within the SSSA under Alternative D – compared to existing conditions – in five-year increments.

**Figure 4-19. Projected Employment and Population Effects in the SSSA (Alternative D)**



SOURCE: BBC Research & Consulting 2010.

**Energy-related Activity and Employment.** Under Alternative D, approximately 21,200 new wells would be developed in the Planning Area over the 20-year planning horizon. The maximum rate of well development is projected to occur in the final three years of the 20-year planning period, when over 1,500 wells are projected to be developed each year.

The cumulative number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 17,550 by 2030 under Alternative D.

The drilling-related workforce employed in the Planning Area (based on work site, not office location) is projected to increase from about 475 workers in 2010 to about 4,194 workers by 2030 under Alternative D. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 2,282 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by about 5,523 jobs over the 20-year study period.

Secondary employment resulting from oil and gas activity is projected to increase from 666 jobs in 2010 in the PSSA to 4,528 jobs by 2030 under Alternative D.  In the SSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs in

BLM_0020152

*Chapter 4 – Environmental Consequences*

2010 to 5,662 jobs by 2030. Table 4-103 summarizes projected energy-related activity and employment under Alternative D from 2010 (existing condition) through 2030.

### Table 4-103. Energy-related Activity and Employment (Alternative D)

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** |  |  |  |  |  |
| Annual new wells | 160 | 650 | 965 | 1,282 | 1,596 |
| Cumulative producing wells | 2,866 | 4,737 | 8,037 | 12,356 | 17,550 |
| **Related employment** |  |  |  |  |  |
| Drilling jobs in PSSA | 475 | 1,708 | 2,536 | 3,369 | 4,194 |
| Maintenance jobs in PSSA | 478 | 758 | 1,206 | 1,730 | 2,282 |
| Total direct jobs in PSSA | 953 | 2,466 | 3,742 | 5,099 | 6,476 |
| Secondary jobs in PSSA | 666 | 1,724 | 2,616 | 3,565 | 4,528 |
| Secondary jobs in SSSA | 833 | 2,156 | 3,271 | 4,458 | 5,662 |

SOURCE: BBC Research & Consulting 2010.
NOTES:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Relative to Alternative A, Alternative D is projected to lead to about 5,129 more direct energy-related jobs and 3,587 more secondary jobs in the Planning Area (PSSA) by 2030. Alternative D is also projected to lead to 4,485 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

Relative to Alternative B, Alternative D is projected to lead to about 3,700 more direct energy-related jobs and 2,587 more secondary jobs in the PSSA by 2030. Alternative D is also projected to lead to 3,235 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

Finally, relative to Alternative C, Alternative D is projected to lead to about 1,776 more direct energy-related jobs and 1,242 more secondary jobs in the PSSA by 2030. Alternative D is also projected to lead to 1,553 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

**Agricultural Activity and Employment.** The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 30,700 acres of publicly administered grazing lands could be impacted under Alternative D over the 20-year study period. This total represents 1.79 percent of the approximately 1.717 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the MPA (roughly corresponding to the Piceance Basin), it would represent about 5.22 percent of the 588,000 acres of publicly administered grazing land in that area.

If agricultural employment is proportional to the amount of public grazing land available in the area, the relatively small amount of grazing land that could be affected under Alternative D corresponds to a small direct and secondary impact on agricultural employment in the PSSA, as shown in Table 4-104. The projected impact on agricultural activity and employment under Alternative D

BLM_0020153

Chapter 4 – Environmental Consequences

would be over four times as large as under Alternative A, but the estimated effect on direct and secondary employment (based on the simplified assumption of proportionality to the loss of grazing land) would be only about 14 jobs by 2030 (compared to a reduction of between 3 and 10 jobs for Alternatives A, B, and C).

**Table 4-104. Energy-Associated Revenue Projections (Alternative D)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Maximum cumulative reduction in grazing acres | 0 | 3,223 | 9,306 | 17,677 | 28,333 |
| Percent of total Planning Area grazing land | 0% | 0.22% | 0.64% | 1.22% | 1.96% |
| Percent of total Mesa Verde Play Area grazing land | 0% | 0.60% | 1.73% | 3.28% | 5.26% |
| Projected effects on agricultural jobs |  |  |  |  |  |
| Direct jobs | 0 | -1.0 | -2.8 | -5.3 | -8.5 |
| Secondary jobs | 0 | -0.6 | -1.8 | -3.4 | -5.5 |
| Total jobs | 0 | -1.6 | -4.6 | -8.7 | -14.0 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land. Actual impacts may be larger or smaller for reasons discussed in the narrative.

With the additional well development projected in the Planning Area under Alternative D compared to the other alternatives, valley-bottom hay lands currently owned by energy companies are more likely to be developed for energy-related activities than under those alternatives.

**Hunting and Tourism Activity and Employment.** Under Alternative D, the BLM has identified the management goal of maintaining 50 percent of the big game population objectives established by the CPW. The maximum 50 percent reduction would occur in year 2030 when annual development would peak at 1,661 wells. The results of the temporal analysis indicate that approximately 4.9 percent of the mule deer range area in the MPA would be developed over the 20-year planning period under Alternative D (compared to 1.1 percent under Alternative A, 2.1 percent under Alternative B, and 3.4 percent under Alternative C). The effects of reducing the mule deer range area in the MPA by nearly 5 percent due to oil and gas development (along with likely concerns about hunting in proximity to these developed areas) could well have a noticeable impact on hunting activity. However, the larger effect on hunting activity would likely result from the potential change in big game herd sizes.

Table 4-105 shows the estimated percentage of the CPW big game population targets maintained under Alternative D from 2010 through 2030 and the projected effects on hunting-related jobs in the PSSA and the SSSA. By 2030, Alternative D is projected to result in the loss of between 22 and 112 direct and secondary hunting-related jobs in the Planning Area (PSSA) and between 15 and 73 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Projected hunting-related job losses under Alternative D would be higher than Alternative B (4 to 22 job losses in the PSSA and 3 to 14 job losses in the SSSA) and Alternative C (13 to 67 job losses in the PSSA and 9 to 43 job losses in the SSSA) due to the lower levels of oil and gas development allowed under these alternatives.

BLM_0020154