**Table 4-105. Energy-Associated Revenue Projections (Alternative D)**

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Dollars in Millions | | | |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $ 34.4 | $ 5.2 | $12.0 | $ 17.6 | $ 23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $ 35.3 | $ 5.3 | $12.3 | $ 18.0 | $ 24.3 |
| 2012 | 462 | 3,314 | 1,793 | 165,705 | $ 994.2 | $ 39.8 | $ 6.0 | $13.9 | $ 20.3 | $ 27.4 |
| 2013 | 524 | 3,739 | 1,975 | 186,934 | $1,121.6 | $ 44.9 | $ 6.7 | $15.7 | $ 22.9 | $ 30.9 |
| 2014 | 587 | 4,214 | 2,217 | 210,676 | $1,264.1 | $ 50.6 | $ 7.6 | $17.7 | $ 25.8 | $ 34.8 |
| 2015 | 650 | 4,737 | 2,466 | 236,856 | $1,421.1 | $ 56.8 | $ 8.5 | $19.9 | $ 29.0 | $ 39.2 |
| 2016 | 713 | 5,308 | 2,723 | 265,400 | $1,592.4 | $ 63.7 | $ 9.6 | $22.3 | $ 32.5 | $ 43.9 |
| 2017 | 776 | 5,925 | 2,928 | 296,238 | $1,777.4 | $ 71.1 | $10.7 | $24.9 | $ 36.3 | $ 49.0 |
| 2018 | 839 | 6,586 | 3,193 | 329,301 | $1,975.8 | $ 79.0 | $11.9 | $27.7 | $ 40.4 | $ 54.4 |
| 2019 | 902 | 7,290 | 3,464 | 364,522 | $2,187.1 | $ 87.5 | $13.1 | $30.6 | $ 44.7 | $ 60.3 |
| 2020 | 965 | 8,037 | 3,742 | 401,836 | $2,411.0 | $ 96.4 | $14.5 | $33.8 | $ 49.3 | $ 66.4 |
| 2021 | 1,028 | 8,824 | 4,025 | 441,181 | $2,647.1 | $105.9 | $15.9 | $37.1 | $ 54.1 | $ 72.9 |
| 2022 | 1,092 | 9,651 | 4,221 | 482,546 | $2,895.3 | $115.8 | $17.4 | $40.5 | $ 59.2 | $ 79.8 |
| 2023 | 1,154 | 10,515 | 4,505 | 525,769 | $3,154.6 | $126.2 | $18.9 | $44.2 | $ 64.5 | $ 86.9 |
| 2024 | 1,217 | 11,417 | 4,797 | 570,846 | $3,425.1 | $137.0 | $20.6 | $48.0 | $ 70.0 | $ 94.4 |
| 2025 | 1,282 | 12,356 | 5,099 | 617,821 | $3,706.9 | $148.3 | $22.2 | $51.9 | $ 75.7 | $102.1 |
| 2026 | 1,343 | 13,329 | 5,395 | 666,436 | $3,998.6 | $159.9 | $24.0 | $56.0 | $ 81.7 | $110.2 |
| 2027 | 1,407 | 14,336 | 5,561 | 716,793 | $4,300.8 | $172.0 | $25.8 | $60.2 | $ 87.9 | $118.5 |
| 2028 | 1,470 | 15,376 | 5,862 | 768,789 | $4,612.7 | $184.5 | $27.7 | $64.6 | $ 94.3 | $127.1 |
| 2029 | 1,533 | 16,448 | 6,167 | 822,376 | $4,934.3 | $197.4 | $29.6 | $69.1 | $100.8 | $135.9 |
| 2030 | 1,596 | 17,550 | 6,476 | 877,504 | $5,265.0 | $210.6 | $31.6 | $73.7 | $107.6 | $145.1 |

SOURCE: BBC Research & Consulting 2010.
NOTE:
MMCF = million cubic feet

Under Alternative D, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $31.6 million by 2030 (compared with $23.3 million in Alternative C, $15.3 million in Alternative B, and $9.1 million in Alternative A). These funds would be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area would rise from $12.0 to $73.7 million (compared with $54.4 million under Alternative C, $35.7 million under Alternative B, and $21.2 million under Alternative A). Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $145.1 million by 2030 (compared with $107.0 million under Alternative C, $70.3 million under Alternative B, and $41.7 million under Alternative A).

The major issue facing local governments in terms of the fiscal impact of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population, and the challenges presented in making investment commitments given the risk and uncertainty inherent in a resource based economy. These issues and challenges would be considerably greater under Alternative D than under Alternative C, Alternative B or Alternative A, given the larger increase in population projected to occur under Alternative D.

BLM_0020155

**Housing, Public Services, and Infrastructure.** Alternative D is projected to lead to a net increase of 8,506 residents in the PSSA by the end of the 20-year planning horizon – corresponding to an average annual increase of about 425 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 170 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller household s.

As summarized in Table 3-40, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the PSSA would need to add as many housing units each year as it did over the entire six year period from 2000 through 2006 to accommodate the incremental population growth associated with Alternative D. There is also likely to be a need for much greater development emphasis on multifamily and rental housing. As discussed later in this section, when the cumulative effects of other growth drivers are added to the incremental effects of Alternative D, there would be even greater demands for new housing in the PSSA.

As discussed earlier, the ultimate buildout capacity of Meeker was estimated at 10,000 people, and Rangely's buildout capacity was estimated at 7,000 residents, during the 2007-2008 AGNC socioeconomic study (AGNC 2008). Since the two communities currently house about 4,500 people, it is theoretically possible that all of the new residents associated with Alternative D could be housed in Rio Blanco County municipalities. However, it is much more likely that Alternative D would substantially increase development pressure in the unincorporated portions of Rio Blanco County and that a substantial portion of the growth could be shifted to the Rifle area in Garfield County.

Since the rate of gas development under Alternative D would be approximately six times the rate under existing conditions, and the incremental population effects of the alternative would more than double the county's population during the 20-year planning period, public service challenges in the PSSA under Alternative D would be substantial. Increases in staff and infrastructure for law enforcement, social services, public health and public education are likely to be needed. Local governments and school districts in the PSSA are likely to face considerable challenges in hiring staff due to wage competition from the energy industry. All of these community challenges would be greater under Alternative D than under Alternative C, and considerably greater than under Alternative B or Alternative A.

**Social Conditions.** Alternative D would cause an incremental population growth rate in the PSSA of less than 4 percent per year through 2030 compared to less than 1 percent per year for Alternative A, less than 2 percent per year for Alternative B, and less than 3 percent per year for Alternative C. The rate for Alternative D is 1 percentage point below the threshold range of socially-disruptive growth that has been observed in small, energy-impacted communities. This is just the incremental effect of the alternative, when combined with the cumulative effects of other growth drivers in the region, annual population growth could well exceed 5 percent per year.

Rapid population growth in a generally rural and sparsely populated area such as the PSSA could lead to a number of social issues. Although the area has not yet experienced the magnitude or pace of growth anticipated under Alternative D, a number of social concerns has already been identified in response to energy-driven growth over the past decade (Section 4.10.3.1). The rate of development under Alternative D would be the most "transformative" for the area of any of the

BLM_0020156

*Chapter 4 – Environmental Consequences*

alternatives. Most of the social concerns identified to date are likely to increase under Alternative D and additional social issues could well arise.

Under Alternative D in the PSSA, 71 percent of incremental growth in employed residents would come directly or indirectly from energy development by 2030, compared to 8 percent from agriculture, and 1 percent from hunting (hunting being just part of total recreation and tourism employment). This change is 32 percentage points higher than under Alternative A for energy development (39 percent), 8 percentage points lower for agriculture (16 percent) and 5 percentage points lower for hunting (6 percent). This indicator suggests that Alternative D would cause an additional shift toward labor force and population dependency on the energy industry in the PSSA and away from agriculture and hunting. The impact of the shift in dependency under Alternative D could be perceived by the population in communities of the PSSA as potentially improving their quality of life because of additional economic opportunities. However, the shift also could be perceived as potentially reducing quality of life because of greater exposure to volatility in the energy industry and increased competition for resources with agriculture and hunting, which embody traditional cultural values. These effects would be larger under Alternative D than Alternative A through Alternative C roughly in proportion to the relative changes in dependency among the three kinds of livelihoods in the PSSA. Under Alternative D, the population of the PSSA would be increasingly dominated by individuals dependent on the energy industry. There would be greater potential for social tensions between differing groups, and between new and established residents, than under Alternative A, Alternative B or Alternative C.

The majority of employment by the energy industry under Alternative D would be in drilling and development during the 20-year planning horizon. The share involved in drilling would grow over time. By 2030, 65 percent of percent of energy jobs in Rio Blanco County would be in drilling and 35 percent in field maintenance and operations compared to a roughly equal split under Alternative A. The volatile attribute of the drilling sector of the energy industry is likely to be perceived by the population in communities of the PSSA as having the potential to diminish their quality of life. With greater exposure to economic volatility due to national forces affecting the energy industry, the PSSA could experience more profound "boom and bust" cycles, and associated social disruption, under Alternative D than under the other alternatives.

The prevalence of drilling jobs in the PSSA under Alternative D would be 15 percentage points greater in 2030 than under Alternative A. A drilling-oriented industry could both, increase quality of life, because of economic opportunities, and reduce quality of life because of exposure to industry volatility. These impacts would be larger under Alternative D than Alternative A and Alternative B roughly in proportion to the change in the prevalence of drilling jobs. These impacts would be similar in Alternative D and Alternative C as both alternatives are projected to lead to comparable ratios of temporary drilling workers to more permanent maintenance and operations workers.

Overall, the social indicators suggest that Alternative D would incrementally affect the quality of life of community residents in the PSSA more than Alternatives A and B. The impact would also be larger than under Alternative C in terms of the incremental population growth rate and relative increase in labor force and population dependency on the energy industry, compared to the agriculture and hunting components of the economic base.

For ranchers on the Piceance Creek Road and its side roads, Alternative D would affect quality of life due to traffic, noise, dust, and competition for resources on BLM land, much of it related to drilling activity and facilities development. This impact from Alternative D would be greater than from Alternative A through Alternative C. The relative magnitude of these effects is indicated by

BLM_0020157

level of drilling employment and the annual number of new wells by 2030, which range from 6 times the levels projected under Alternative A to about 40 percent more than under Alternative C.

The impact to quality of life for recreation interests would be higher under Alternative D than for Alternative A through Alternative C. The impact is related to the loss of between 22 and 112 direct and secondary hunting-related jobs in the PSSA and between 15 and 73 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Recreation interests would also be impacted because of a lower perceived quality of the hunting experience in the area affected by oil and gas drilling and production. This is indicated by the development of 16,597 more wells under Alternative D than Alternative A over the 20-year period.

Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life. The magnitude of this effect likely corresponds to the scale of development under Alternative D compared to Alternative A. Alternative D allows almost six times as much well development as Alternative A. Groups with environmental interests would not see a benefit to the quality of life from Alternative D because this alternative would allow the most energy development within the full range of development under consideration by the BLM.

**Non-market Values.** Alternative D would result in the largest number of wells, and correspondingly largest amount of associated infrastructure and overall land disturbance, over the 20-year study period. Consequently, this alternative has the greatest potential to affect recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly-affected public and private lands. The temporal analysis indicates that approximately 4.9 percent of the vegetation communities and the mule deer range in the MPA would be developed over the 20-year planning period under Alternative D, compared to 1.1 percent under Alternative A. As noted earlier, Alternative D is also expected to potentially reduce the big game population in the Planning Area by as much as 50 percent by the end of the planning period (relative to Alternative A) and, consequently, could reduce the recreational value associated with big game hunting to a corresponding degree. The six WSAs in the Planning Area are not expected to be affected by energy development under Alternative D.

## Impacts from Management Actions

There would be no impacts to socioeconomics from other resource management actions under Alternative D.

## Reclamation

There would be no impacts to socioeconomics from reclamation under Alternative D.

## Environmental Justice

Executive Order 12898 requires all federal agencies to address disproportionately high and adverse human health or environmental effects of its programs, policies, and activities, on minority populations and low-income populations. Where the impacts of a proposed federal action could involve such populations, an analysis of the potential for disproportionate impacts and meaningful community outreach and public involvement is required.

BLM_0020158

*Chapter 4 – Environmental Consequences*

The BLM does not manage environmental justice resources; rather, it manages public lands and the resources and uses that occur on them. No specific management issues or concerns related to environmental justice have been identified to date, including during the scoping process.

The groups most likely to suffer adverse social or economic effects under the management alternatives considered in this EIS are members of the agricultural community in the Piceance Basin and individual's dependent on hunting activity for their livelihood. Neither of these groups appears to represent a disadvantaged community from an environmental justice standpoint.

### 4.10.1.6   Irreversible and Irretrievable Commitment of Resources

There would be no irreversible commitment of socioeconomic resources under any of the proposed alternatives. To the extent that some of the alternatives could indirectly lead to more rapid population growth and development in the PSSA (and to a lesser extent the SSSA), communities in those areas could be required to invest in additional infrastructure to serve anticipated population growth. Such investments would be an irretrievable commitment of financial resources.

### 4.10.1.7   Unavoidable Adverse Impacts

Within both the PSSA and the SSSA there are different groups (such as ranchers, recreationists, hunters and energy workers) that could have differing values and objectives concerning the use of public lands. Conflicts between these groups are likely to be exacerbated by changes such as population growth, land development and increasing energy-related activity. Adverse social impacts would be unavoidable assuming the implementation of the alternatives as described. However, communities, through local institutions, intergovernmental relationships, and linkages to energy development operators and other external institutions, could devise and implement ways to mitigate at least some of the adverse social effects during the 20-year planning horizon.

### 4.10.1.8   Relationship between Local Short-Term Uses and Long-Term Productivity

To varying degrees under the management alternatives, oil and gas development within the Planning Area would foster short-term population growth and economic development within the PSSA. The commercially viable oil and gas resources would, however, be exhausted within a finite time period. The longer-term sustainability and viability of community investments incurred to provide housing and other public services for the direct energy workforce (and the secondary workers supported by that workforce) would depend on the ability of the communities within the PSSA to diversify the local economic base over time.

## 4.10.2  Public Health and Safety

Public health and safety is an aspect of the BLM management rather than an environmental component resource. Consequently, impacts to public health and safety are a direct result of the management actions in other resource programs. The discussion of the effects on public health and safety in each alternative would be limited to the effects in areas where hazardous materials could be present due to oil and gas exploration or development activities, access to areas in terms of response time to hazardous materials releases, and vehicle traffic.

Potential health and safety effects include hazards associated with oil and gas exploration and development and operations; risks associated with vehicular travel on county, the BLM- and operator-maintained roads; firearms accidents near oil and gas facilities during hunting season and by casual firearms use such as target shooting; and natural events such as range fires. A number of

BLM_0020159

*Chapter 4 – Environmental Consequences*

indicators, attributes, and assumptions were used for the analysis. The following four indicators were selected to analyze the effects of the alternatives on public health and safety:

- A hazard to the public created through the routine transport, use, or disposal of hazardous materials;

- A hazard to the public created from changes in air quality;

- A hazard to the public created through conditions involving the increased risk of the release of hazardous materials; and

- Vehicle traffic associated with oil and gas exploration and development.

The attributes of the four indicators are:

- Number of wells and related infrastructure;

- Concentrations of $NO_x$, $SO_x$, or ozone above NAAQS levels;

- Acres where oil and gas exploration and development could occur; and

- Response time to hazardous materials incidents or vehicle accidents.

The analysis is based on the following assumptions:

- Hazardous materials and wastes are generated during oil and gas well development.

- With increased oil and gas exploration and development comes an inherent risk associated with an increase in the amount of hazardous materials generated, used, transported, and stored.

- Most of the exploration and production wastes generated during oil and gas exploration and development activities would be exempt from the Resource Conservation and Recovery Act (RCRA) hazardous waste regulations (e.g., produced water, produced oil, chemicals used for drilling and completion). Exempt waste material and debris from drilling would be classified as solid waste rather than hazardous materials because of the exemption for oil and gas exploration and development.

- Management of non-exempt hazardous materials, substances, and waste (including storage, transportation, and spills) would be conducted in compliance with 29 CFR 1910 (Occupational Safety and Health Standards), 49 CFR 100-185 (Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation), 40 CFR 100-400 (Protection of the Environment, EPA), Comprehensive Environmental Response Compensation and Liability Act, RCRA, Toxic Substances Control Act, Clean Water Act, and other federal and state regulations and policies regarding hazardous materials management.

- The BLM's Hazard Management and Resource Restoration Program would respond to all accidental surface releases of hazardous material on the BLM-administered public land. Containment and emergency cleanup actions would be implemented on sites posing a threat to the public or the environment.

- The population would continue to increase, and there would be a corresponding increase of use of public lands.

- Promotion of the areas within the Planning Area as vacation and outdoor recreational destinations by the public would continue and could potentially result in an increasing number of visitors encountering hazards on public lands.

BLM_0020160

- Vehicle traffic would increase in proportion to oil and gas exploration and development.

To estimate the potential for occupational hazards, the results of the temporal analysis methodology for Vegetation (see Appendix E for a detailed description) were used to evaluate the amount of development and subsequent potential occupation hazards in the MPA.

### 4.10.2.1    Impacts Common to All Alternatives

#### Impacts from Oil and Gas Development

**Hazardous Materials and Sites.** Drilling, field development and production activities associated with oil and gas exploration and development require use of a variety of chemicals and other materials, some of which would be classified as hazardous, including drilling muds and additives for completion and hydraulic fracturing activities. These fluids could contain various contaminants such as salts, acids, mercury, cadmium, arsenic, and hydrocarbons, among others, which, if not managed correctly, could leach into soil and directly impact groundwater quality by down-hole releases. The runoff of contaminants into surface water could impact surface water quality. Potential impacts associated with hazardous materials include human contact, inhalation or ingestion and the effects of exposure, spills, or accidental fires on soils, surface and groundwater resources, and wildlife. Development in ROWs and in designated corridors could affect public health and safety by inadvertently providing access to areas that could contain hazardous materials or authorizing surface-disturbing activity near these areas. Public health and safety would continue to be protected because site-specific authorizations or designations would not be issued in areas that would jeopardize remediation activities.

Soil or groundwater contamination could result from accidental spill or release of hazardous materials during oil and gas exploration and development, facility operations or during maintenance of the pipelines and other utilities. Spills or releases could result in contamination to soil and/or groundwater and exposure of maintenance workers and the public to hazardous materials. In the event of a hazardous materials release, Best Management Practices (BMPs) as described in Appendix C would reduce the potential for contamination and exposure of workers or the public to hazardous materials.

The risk of human contact with hazardous materials would be limited predominantly to operators and contractor employees. A Hazard Communication Program, Spill Prevention Control and Countermeasure Plans, and other mitigation measures would reduce the risk of human contact, spills, and accidental fires, and provide protocols and employee training to deal with these events should they occur (Appendix C).

Managing 83,300 acres (5 percent) of the BLM-administered lands as closed to oil and gas exploration and development would reduce occupational hazards, exposure to hazardous materials and vehicle traffic associated with oil and gas exploration and development in these areas. However, most of these areas are outside of the MPA, in which 95 percent of oil and gas exploration and development is anticipated. If WSAs were released by Congress from further consideration as Wilderness, oil and gas exploration and development activities could occur on the 9,700 acres (approximately 1 percent of the mineral estate) with existing leases. This could increase the risk of hazardous waste exposure and vehicle traffic in localized areas of the Oil Spring Mountain and Black Mountain WSAs. Managing WSAs and 18,300 acres in Oil Spring Mountain and Moosehead Mountain as closed to oil and gas exploration and development would reduce the potential for hazardous material exposure in these areas. In addition, the potential for hazardous material exposure would be reduced in areas managed with NSO stipulations. If NSO stipulations result in the concentration of oil and gas exploration and development activities in areas managed with

BLM_0020161

standard lease terms and conditions, CSU stipulations or TL stipulations, the potential for hazardous material exposure in localized areas could increase.

Hazardous material impacts would be avoided or reduced by the implementation of the mitigation measures outlined in Appendix C. Federal and state operating and reporting requirements include provisions to clean up and mitigate spills or releases of chemicals, products, or wastes. The BLM policy requires identification of the chemicals that would be used, stored, and produced during construction and operations. Hazardous Substances Management Plans would be developed and implemented by the oil and gas companies to prevent spills and illegal dumping of hazardous substances, pesticides, and wastes. It is assumed that the storage, use, and transport of these materials and the disposal of generated wastes would comply with all pertinent federal regulations.

Reclamation of areas disturbed by oil and gas exploration and development would reduce erosion, stabilize sites and improve vegetation cover. Reclamation would reduce exposure and movement of contaminated soils. Reclamation activities could also restore watershed function and indirectly help maintain water quality and reduce effects to public health.

**Pipeline and Utilities Hazards**. In areas containing surface or near-surface pipelines, individuals could be exposed to hazardous materials if there were a leak or a failure. The risk of leak or failure could be higher in the vicinity of road crossings or areas likely to be disturbed by road maintenance activities. Compliance with signing requirements for pipeline ROWs and posting markers at frequent intervals along the pipelines would reduce the likelihood of pipeline ruptures caused by excavation equipment. The remoteness of many projects and the low level of anticipated non-project-related construction and excavation would reduce the risk to public health and safety.

Routine monitoring would reduce the probability of effects to health and safety from ruptures by facilitating the prompt detection of leaks.

Managing areas as closed to oil and gas exploration and development or with NSO stipulations could shift the location of pipelines and other utilities to other areas. This could concentrate the placement of pipelines and utilities and increase the risk of hazardous materials exposure in concentrated areas. Concentrating the placement of oil and gas activities and development also could decrease the emergency response time and leak detection time, and could reduce the number or size of hazardous material releases if concentration results in additional personnel inspecting and reviewing pipelines and utilities or more quickly becoming aware of leaks, spills, releases, or emergencies.

**Occupational Hazards**. Health and safety impacts to operators, contract workers, and other public land users could result from industrial accidents. Increased oil and gas exploration and development would result in an increased potential for accidental releases and/or worker incidents. Drilling operation plans approved by the BLM would address the potential for the accidental release of hazardous materials. Adherence to relevant safety regulations by oil and gas operators and enforcement by the respective agencies would reduce the probability of accidents

The estimated oil and gas round trip traffic volume from well pad exploration and development is presented in Tables 4.1.1-2 and 4.1.1-3. The traffic volume from oil and gas vehicles on resource roads, local roads, collector roads, county road and state highways could increase the potential for accidents on roads with both public and oil- and gas-related motor vehicle traffic. Reducing fugitive dust on these roads would help maintain visibility for drivers and could indirectly reduce the potential for vehicle accidents in localized areas. The estimated vehicle round trips per well pad

BLM_0020162

during construction and production would range from 0, when no oil and gas activity is occurring, to 795 round trips for drilling and completion of a well pad.

**Other Risks and Hazards**. There could be health effects associated with air emissions from project-related vehicles, firearm accidents, natural disasters and fugitive dust from roads and from the application of dust control treatments. Fugitive dust could reduce other drivers' visibility on roads in localized areas and could increase the potential for vehicle accidents in the Planning Area.

Ozone is not directly emitted from oil and gas exploration and development activities. It is difficult to determine how much of the $NO_x$ emitted from oil and gas exploration and development activities contributes to ground-level ozone formation because ozone formation depends on many different climate variables and because there are multiple emission sources (e.g., motor vehicles emit $NO_x$). Ozone formation conditions could vary rapidly and could change from hour to hour depending upon weather and site-specific conditions. Exposure to concentrations of ozone less than the NAAQS criteria are not expected to degrade public health, including lung function decrements and increased respiratory symptoms, for either healthy or asthmatic individuals (EPA 2006).

The potential for firearms-related accidents would occur primarily during hunting season. The increased activity during drilling and field development would be likely to discourage hunting in the immediate vicinity of oil and gas exploration and development during that period. Consequently, the risk of firearms-related accidents should be minimal. During project operations, the relatively few personnel on-site would experience only highly localized risk of firearms-related accidents from recreational target shooting or hunting activities.

The risk of wildland fires could increase in areas associated with oil and gas construction activities, due to vehicle collisions, industrial development, and the presence of fuels, storage tanks, natural gas pipelines, and gas production equipment. Fire suppression equipment, fencing and netting of pits, a no-smoking policy, shutdown devices, and other safety measures typically incorporated into gas drilling and production activities would reduce the risk to public health and safety. There could be an increased risk of wildland fires ignition where construction activities place welding and other equipment in or near vegetation. Adherence to relevant safety regulations by operators and enforcement by the respective agencies would reduce the probability of wildland fires ignitions.

### 4.10.2.2   Alternative A

#### Impacts from Oil and Gas Development

**Hazardous Materials**. The development of 550 well pads to support oil and gas exploration and development could potentially result in exposure to hazardous materials. The development of approximately 283 miles of pipelines and/or utilities in these areas could also introduce hazardous materials if a failure occurred. Normal wear, corrosion, and surface disturbance during oil and gas exploration activities could rupture pipelines, resulting in localized releases of hazardous materials. Spills could occur from trucks traveling on 397 miles of local and resource roads to support oil and gas development.

The risk of hazardous materials and exposure would be reduced in areas managed with NSO stipulations.

**Occupational Hazards**. Occupational hazards are most likely to occur in the MPA where 95 percent of the oil and gas exploration and development is projected to occur. Requiring a reduction of 50 percent in fugitive dust production from resource roads used for oil and gas exploration and development through the application of water or other agents could reduce

BLM_0020163

long-term health effects for operators, oil and gas field workers and the public traveling through exploration and development areas as well as reducing air-borne particulate material and improving the regional air quality. A reduction in fugitive dust could also improve visibility and reduce the risk of traffic accidents.

Developing an average of 28 well pads (224 wells) per year under Alternative A could result in 41,484 trips by light trucks and 106,677 trips for heavy trucks on local and resource roads in the mineral estate per year (Table 4-36). This would increase traffic on commonly used roads and could increase the potential for vehicle accidents. However, requiring 40 percent of the well pads to use a three-phase gathering system to transport natural gas, condensate, and produced water to consolidated facilities where dehydration and temporary tank storage would occur could reduce the number of vehicle trips required by an unknown amount (Table 2-1 Record 16).

Based on results of the temporal analysis for vegetation (Appendix E, Attachment 1), an estimated 6,300 acres of land (of the available 530,500 acres available for surface occupancy [Table 4-47 Line 4]) would be disturbed over the 20-year planning period (Table 4-47 Line 7), which would include construction of roads and an estimated 523 well pads (Table 4-47 Line 6). A total of 1.1 percent of the vegetation within the MPA could be developed (Table 4-47 Line 8). The large area of land available for occupancy, compared to the actual 6,300 acreages estimated to be disturbed, indicates that access to well pads from local and collector roads and the associated vehicle travel would present a potential for occupational hazards.

**Impacts from Management Actions**

There would be no impacts to human health and safety from other resource management actions under Alternative A.

**Reclamation**

There would be no impacts to human health and safety from reclamation under Alternative A.

### 4.10.2.3   Alternative B

**Impacts from Oil and Gas Development**

**Hazardous Materials.** Increasing oil and gas exploration and development to 1,100 well pads for approximately 9,191 wells, 567 miles of pipelines and utilities, and 793 miles of local and resource roads would increase the potential for introduction of hazardous materials compared to Alternative A. Reducing the area managed as Open, with CSU stipulations, or with TL stipulations would reduce the area where oil and gas exploration and development occurs compared to Alternative A.

Increasing the area managed with NSO stipulations, especially the area in the MPA would reduce the risk of hazardous materials and exposure compared to Alternative A. However, this could increase development in other areas and could increase the concentration of development. Managing oil and gas exploration and development within the big game management areas could also concentrate development into smaller areas. In the long term, concentration of development activity could increase the risk of hazardous material releases in these areas. However, if this results in an increase in human presence and monitoring of facilities, it could decrease detection time for hazardous material releases or failure of pipelines or equipment compared to Alternative A.

**Occupational Hazards.** Reducing the area where surface disturbance associated with oil and gas exploration and development could occur would reduce the area where occupational hazards could occur compared to Alternative A. In addition, requiring an 80-percent reduction in fugitive dust in

BLM_0020164

the MPA could reduce long-term health effects and reduce the potential for vehicle collisions compared to Alternative A (Table 2-1 Record 8). However, increasing the number of well pads, wells, roads, and pipelines could increase the number of occupational accidents compared to Alternative A.

Developing an average of 55 well pads (440 wells) per year could result in 82,865 trips by light trucks and 213,116 trips for heavy trucks on local and resource roads in the mineral estate per year (Table 4-38). The increase in the number of round trips could increase the potential for vehicle accidents on roads with both public and oil and gas motor vehicle traffic compared to Alternative A. In addition, as the acres managed with CSU and TL stipulations is 355,600 acres (60 percent) this could further concentrate use on roads in the MPA. Concentrating motor vehicle use and increasing the number of well pads developed per year could increase the risk of vehicles accidents compared to Alternative A.

Based on results of the temporal analysis for vegetation, the percent of vegetated land developed within the MPA generally increased from Alternative A to Alternative B by 1 percent (Table 4-49 Line 8). An estimated 12,500 acres of land (of the available 355,900 acres available for surface occupancy) would be disturbed over the 20-year planning period, to include construction of roads and an estimated 1,045 well pads (Table 4-49 Lines 7, 4, 6). Compared to Alternative A, there would be more well pads constructed within less available land.

Alternative B would use the threshold concept to manage new oil and gas development (Table 2-4 Record 12). In each GMU, each operator would be required to keep disturbance and disruptive activities below a certain threshold to remain exempt from TL stipulations. Compliance with the threshold concept would lead to more shared oil and gas facilities. If many well pads were simultaneously drilled in one area, local and resource roads would also be shared. Concentrated placement of pipelines and utilities could increase the risk of hazardous materials exposure. However, concentrating the placement of oil and gas activities and development also could decrease the emergency response time and leak detection time, and could reduce the number or size of hazardous material releases if concentration would result in additional personnel inspecting pipelines and utilities and more quickly becoming aware of leaks, spills, releases, or emergencies.

**Impacts from Management Actions**

There would be no impacts to human health and safety from other resource management actions under Alternative B.

**Reclamation**

There would be no impacts to human health and safety from reclamation under Alternative B.

### 4.10.2.4   Alternative C

**Impacts from Oil and Gas Development**

**Hazardous Materials.** Increasing oil and gas exploration and development to 1,800 well pads for approximately 15,042 wells, 927 miles of pipelines and utilities, and 1,298 miles of local and resource roads would increase the potential for introduction of hazardous materials compared to Alternatives A and B. Reducing the area managed with CSU stipulations, TL stipulations or open to standard lease terms and conditions and increasing the area managed with NSO stipulations could reduce the area where oil and gas exploration and development occurs compared to Alternative A and increase this area compared to Alternative B. Compared to Alternative B, managing oil and gas exploration and development within the higher big-game management areas could also concentrate

BLM_0020165

development into a larger area compared to Alternative B. In the long term, this could increase the risk of hazardous material releases in these areas. However, if concentrated development occurs, this could decrease response time compared to Alternative A and could be similar to Alternative B.

**Occupational Hazards.** Reducing the area of the MPA managed with CSU stipulations and TL stipulations would reduce the area where occupational hazards could occur. This is a decrease in area compared to Alternative A but an increase compared to Alternative B. Increasing the number of well pads, wells and pipelines could increase the number of occupational accidents compared to both Alternatives A and B.

Developing an average of 90 well pads (720 wells) per year could result in 135,611 trips by light trucks and 348,770 trips for heavy trucks on local and resource roads in the mineral estate per year (Table 4-39). The increase in round trips could increase the potential for vehicle accidents on roads with both public and oil and gas motor vehicle traffic compared to Alternatives A and B. In addition, acres managed with a CSU stipulation and TL stipulations could further concentrate use on roads in the MPA. Concentrating motor vehicle use and increasing the number of well pads developed per year could increase the risk of vehicle accidents compared to Alternatives A and B.

Based on results of the temporal analysis for vegetation, the percent of vegetated land developed within the MPA generally increased from Alternative A by 2.3 percent, and Alternative B by 1.3 percent (Table 4-49 Line 8). An estimated 20,500 acres of land (of the available 447,800 acres available for surface occupancy) would be disturbed over the 20-year planning period, to include construction of roads and an estimated 1,710 well pads (Table 4-49 Lines 7, 4, 6). Compared to Alternative B, there would be more well pads constructed over a larger area of land available.

Similar to Alternative B, Alternative C would use the threshold concept to manage new oil and gas development (Table 2-4 Record 12). Increased concentrated placement of pipelines and utilities could increase the risk of hazardous materials exposure compared to Alternative B, due to the increased number of well pads. However, the decreased emergency response time and leak detection time, resulting from additional personnel inspecting pipelines and utilities and more quickly becoming aware of leaks, spills, releases, or emergencies would be similar to Alternative B.

<u>Impacts from Management Actions</u>

There would be no impacts to human health and safety from other resource management actions under Alternative C.

<u>Reclamation</u>

There would be no impacts to human health and safety from reclamation under Alternative C.

### 4.10.2.5    Alternative D

<u>Impacts from Oil and Gas Development</u>

**Hazardous Materials.** Increasing oil and gas exploration and development to 2,556 well pads for approximately 21,200 wells, 1,316 miles of pipelines and utilities, and 1,843 miles of local and resource roads would increase the potential for introduction of hazardous materials compared to Alternatives A, B, and C. Reducing the area managed with CSU stipulations, TL stipulations, or Open to standard lease terms and conditions would reduce the area where oil and gas exploration and development occurs compared to Alternative A and would increase this area compared to Alternatives B and C. Increasing the area managed with NSO stipulations would reduce the area with a risk of hazardous materials and exposure compared to Alternative A.

BLM_0020166

Increasing the number of well pads, wells, and pipelines could increase development in areas managed with CSU stipulations, TL stipulations, or Open with standard lease terms and conditions and increase the concentration of development compared to both Alternatives A, B, and C.

**Occupational Hazards**. Reducing the area managed with CSU stipulations, TL stipulations, or Open with standard terms and conditions to 307,600 acres (52 percent) in the MPA (see Table 4-6) would reduce the area where occupational hazards could occur compared to Alternative A. This is a decrease in the area compared to Alternative A and increase compared to Alternatives B and C. However, increasing the number of well pads, wells, and pipelines in this area could increase the number of occupational accidents compared to both Alternatives A, B, and C.

Developing an average of 128 well pads (1,024 wells) per year could result in 191,499 round trips by light trucks and 492,750 round trips for heavy trucks on local and resource roads in the mineral estate per year (Table 4-42). The increase in the number of round trips could increase the potential for vehicle accidents on roads with the public and oil and gas motor vehicle traffic compared to Alternatives A, B, and C. In addition, the high percentage of acres managed with CSU stipulations and TL stipulations could further concentrate use on roads in the MPA.

Based on results of the temporal analysis for vegetation, the percent of vegetated land developed within the MPA generally increased from Alternative A by 3.8 percent, from Alternative B by 2.8 percent, and Alternative C by 1.5 percent (Table 4-50 Line 8). An estimated 29,100 acres of land (of the available 502,100 acres available for surface occupancy) would be disturbed over the 20-year planning period, to include construction of roads and an estimated 2,428 well pads (Table 4-50 Lines 7, 4, 6). Compared to Alternatives A, B, and C, Alternative D would result in the most well pad development. Increasing the number of well pads developed over a larger dispersed area could increase the risk of occupational hazards and vehicle accidents compared to Alternatives A, B, and C.

<u>Impacts from Management Actions</u>

There would be no impacts to human health and safety from other resource management actions under Alternative D.

<u>Reclamation</u>

There would be no impacts to human health and safety from reclamation under Alternative D.

## 4.10.2.6   Irreversible and Irretrievable Commitment of Resources

There would be a potential for injuries or fatalities to workers from construction and operation of oil and gas facilities. Fatalities are irretrievable and some injuries would be irreversible depending upon the nature of the injury. Engineering controls and training and safety programs would reduce but not eliminate the potential for injuries or fatalities to workers. Alternative D has the greatest number of well pads, wells and pipelines which could result in the greatest risk to public health and safety from exposure to hazardous materials.

## 4.10.2.7   Unavoidable Adverse Impacts

No unavoidable adverse impacts to public health and safety have been identified under any alternatives.

BLM_0020167

**4.10.2.8    Relationship Between Local Short-Term Uses and Long-Term Productivity**

No potential impacts from short-term uses versus long-term productivity related to public health and safety have been identified

# *4.11  Cumulative Impacts*

As required under NEPA and the regulations implementing NEPA, this section analyzes potential cumulative impacts. Past, present, and reasonably foreseeable future actions are combined with the four RMPA alternatives within the cumulative effects study area specific to the resources for which cumulative impacts may be anticipated.

The CEQ defines cumulative impact as "the impact on the environment which results from the incremental impact of the action, decision, or project when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (40 CFR 1508.7).

## 4.11.1  Cumulative Analysis Methodology

The CEQ (1997) suggests cumulative impact analyses should focus on meaningful impacts and not exhaustively analyze all possible cumulative impacts. Because of the programmatic nature of an RMPA and cumulative assessment, the analysis tends to be broad and generalized to address potential effects that could occur from the management actions under each alternative. Consequently, the analysis in this RMPA and EIS focuses on past, present, and future actions anticipated having environmental impacts similar to the kinds of impacts identified from implementing the alternatives. The analysis assesses the magnitude of cumulative impacts by comparing the environment in its baseline condition (Chapter 3 – Affected Environment) with the expected impacts of the alternatives and other actions in the same geographic area. Three components of this definition of cumulative effects are addressed in this RMPA as follows:

- **Incremental impacts of the RMPA**. The incremental impacts of the action (i.e., the four alternatives), are described for each resource in the preceding sections of this chapter as direct, indirect, short-term, and long-term impacts.

- **Impacts from all past and present actions**. The impacts from past and present actions are captured in the baseline conditions presented in Chapter 3 (Affected Environment) as well as in the following section.

- **Reasonably foreseeable future actions**. Other reasonably foreseeable future actions are identified in the following section.

The analysis of cumulative impacts serves to place the projected incremental impacts from the proposed alternatives in the context of past, present, and future impacts. Combining the projected impacts of proposed alternatives with past, present, and future impacts necessarily involves projections and constrains analyses. Public documents prepared by federal, state, and local government agencies are the primary sources of information regarding past, present, and future actions. Speculative or uncommitted projects are not included in the projections. Analyses are limited, primarily due to incomplete documentation of all past and present impacts on private and public lands; challenges in predicting potential impacts for reasonably foreseeable future actions; the programmatic and strategic nature of proposed alternatives; the unknown nature and pace of resource uses and technological changes that could occur; and changing circumstances related to

BLM_0020168

agency priorities, policies, and the economy. These limitations are addressed through the methods and assumptions described in the following section.

Temporal boundaries used in the cumulative analysis are developed on the basis of resources of concern and actions that could contribute to an impact. The temporal scope of this analysis is the life of the RMPA, which encompasses a 20-year planning period. Spatial boundaries vary and are larger for resources that are mobile or migrate (e.g., elk populations) compared with stationary resources. Spatial boundaries were developed to facilitate the analysis and are included under the appropriate resource section heading in Section 4.11.3, Cumulative Impacts by Resource Category.

## 4.11.2 Past, Present, and Reasonably Foreseeable Future Actions

Projects and activities considered in the cumulative analysis were identified through meetings held with other agencies, cooperators, and the BLM employees with local knowledge of the area. Each was asked to provide information on the most influential past, present, or reasonably foreseeable future actions. Additional information was obtained through review of publicly available materials and websites.

The following projects and activities were identified as having the greatest likelihood to generate potential cumulative impacts when added to the RMPA alternatives in this planning document.

<u>**Past and Present Actions (1950s through 2009)**</u>

Similar management direction and resource uses occur in the adjacent the BLM Field Offices in Colorado, Wyoming, and Utah. Oil and gas exploration and development activities in counties adjoining the WRFO Planning Area contribute to the cumulative actions ongoing in the region. In particular, Rangely, Douglas Creek Arch, Elk Spring, White River Dome, and Wilson Creek are fields active with oil and gas exploration and development.

On December 12, 2008 the COGCC passed considerable changes to the rules and regulations governing the drilling, completion and operations for oil and gas production in the state. Relevant to this RMPA, the COGCC revised rules and regulations provide additional information on the assessment of impacts, mitigation, and additional opportunity for consultation with CDPHE and CPW.

Entrega Gas Pipeline LLC completed construction on a 330 mile natural gas pipeline from the Meeker Hub in Rio Blanco County, through the WRFO and Little Snake Field Office in Moffat County into Wyoming, and terminating at the Cheyenne Hub in Weld County, Colorado. In Weld County, the pipeline connects to the Rockies Express Pipeline, a 713 mile natural gas pipeline from Weld County, Colorado, to Audrain County, Missouri (Rockies Express Pipeline LLC 2009).

In response to increasing natural gas production in the Piceance Basin, Wyoming Interstate Company, Ltd. (WIC) is constructing the Piceance Basin Expansion Project. The project consists of 142 miles of a 24 inch diameter natural gas pipeline; 1,650 horsepower of compression at the Greasewood Hub located in Rio Blanco County, Colorado (a convergence point for various interstate pipelines and numerous pipeline gathering systems located in the Piceance Basin area); and metering facilities at both the Greasewood Hub and the Wamsutter Compressor Station in Sweetwater County, Wyoming. The project was designed to receive and transport up to 350,000 dekatherms per day of natural gas from the Greasewood Hub (Rio Blanco County, Colorado) to interconnections with WIC and Colorado Interstate Gas Company at the Wamsutter Compressor Station (Sweetwater County, Wyoming). In early 2005, WIC filed an application with the Federal

BLM_0020169

Energy Regulatory Commission asking the Commission to authorize construction of the project facilities (El Paso Gas 2009).

In association with the above major pipelines, three gas processing facilities have been constructed in the MPA between 2006 and 2009: Enterprise Meeker Plant, Enterprise CTF, and Willow Creek Cryogenic Treatment Facility. The Willow Creek Cryogenic Treatment Facility is located on private lands while both Enterprises facilities are located on federal lands. Combined capacity of the three facilities is 2.15 billion standard cubic feet of gas per day.

Both underground and surface coal mines operations continue to operate within northwestern Colorado. Underground mines include Deserado in northwest Rio Blanco County, McLane in western Garfield County and Foidel in northern Routt County. Surface mines include the Colowyo and Trapper mines in southeastern Moffat County.

Congress began the Prototype Oil Shale Leasing Program in 1974 that was an initial attempt to open select public lands to private leasing. However, the area nominated as available for development within the Green River Formation was very limited (Prototype Oil Shale Leasing Program Final Environmental Impact Statement, 1973). Two oil shale lease tracts, both approximately 5,000 acres, were issued in Colorado and have subsequently been relinquished by the lessees. The Energy Policy Act of 2005 required the BLM to develop a more extensive commercial leasing program for oil shale development on public land; this Act was the impetus for the five 160 acre oil shale research, development, and demonstration leases in Colorado to demonstrate oil shale extraction technologies. Once the technology is proven commercially viable, and environmentally sound, these leases have an option to convert to a commercial lease of up to 5,000 acres each.

In 2008, the BLM finalized a PEIS for oil shale and tar sands resources leasing on lands administered by the BLM in Colorado, Utah, and Wyoming. Through this plan, the BLM amended 12 land use plans in Utah, Colorado, and Wyoming to set aside approximately 1.9 million acres of public lands for potential commercial oil shale development. The PEIS addresses land use plan amendments to designate lands available for oil shale and tar sands leasing and subsequent development activities (BLM 2009).

Also associated with the oil shale in the Green River Formation is nahcolite, which is natural occurring sodium bicarbonate. This resource was discovered in 1964 and five sodium preference right leases (PRL) were issued in 1971; three additional sodium PRLs were issued in 1991. Commercial in situ sodium solution began in 1991 and continues to operate under Natural Soda Inc. Three miles northeast of the Natural Soda mine-site, American Soda LLP operated a commercial sodium in situ mining operation from late 1999 to 2004.

In 2008, the BLM and the FS, in cooperation with the DOE, jointly prepared the Geothermal Leasing in the Western United States PEIS. The PEIS provides a framework to facilitate the BLM and FS efforts regarding pending geothermal lease applications and future determinations for projects on public and National Forest System (NFS) lands. Through this plan, the BLM amended the 1997 White River ROD/RMP.

The BLM signed the West-wide Energy Corridor PEIS ROD (November 2008) amending 92 land use plans in support of the designation of more than 6,000 miles of energy transport corridors on federal lands in 11 Western States. The PEIS identifies energy corridors to facilitate future siting of oil, gas, and hydrogen pipelines, as well as renewable energy development projects and electricity transmission and distribution facilities on federal lands in the West to meet the region's increasing

BLM_0020170

energy demands. Eighty-two percent of the corridors, approximately 5,000 miles, are located on the BLM-managed lands, while 16 percent are on USFS lands. The remaining corridor segments are on lands managed by the DOI's Bureau of Reclamation and NPS, or by the Department of Defense (BLM 2009a).

Resource decisions from this RMPA could combine with other present actions to produce cumulative impacts to resources within the Planning Area. Co-occurring planning projects in the region that could contribute to cumulative impacts include activities in Colorado BLM Field Offices (i.e., Little Snake, Colorado River Valley, and Grand Junction) and in the Vernal Field Office in Utah.

The CPW coordinated the development of Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans (published November 2, 2006). The Conservation Strategy identifies the top priority species and habitats needing conservation in the state, and the potential conservation actions that can be used in Colorado as a guide for planning, partnership building, and project design and implementation. The Action Plan is not an Endangered Species Recovery Plan, nor other type of regulatory or "decision" document. Its purpose is to convey the state's wildlife conservation needs in order to foster greater consistency in conservation efforts among all members of Colorado's wildlife conservation community and others with a stake in Colorado wildlife conservation.

Local plans that guide local land use and development activities exist within the Planning Area. The municipalities of Meeker (2005), Glenwood Springs (1998), Rifle (2005), and Rangely (2004) have developed comprehensive plans and land use plans that provide goals for basic infrastructure, maintain and protect the municipal resources, provide community systems or facilities and services, promote economic development and employment opportunities, adopt and implement land use plans, encourage affordable housing and a variety of housing types, and improve intergovernmental relations.

Moffat, Rio Blanco, and Garfield counties also have adopted comprehensive land use plans. Rio Blanco, Moffat County, and Garfield counties have adopted Comprehensive and Master Plans that have established guiding principles, goals, and policies for decision-makers to guide growth in the counties. Overarching goals of these plans are to balance resource extraction with rural qualities, agriculture and outdoor lifestyle, while concentrate growth in existing development areas or compatible development in the counties.

The goal of the Colorado Climate Action Plan is to mobilize Colorado's businesses, governments, and citizens in an effort to first slow, then halt the increase, and eventually reduce GHG emissions to 20 percent below 2005 levels by 2020. GHG emissions from human activity have grown by 35 percent in Colorado from 1990 to 2005. The largest contributors are electricity consumption (36 percent) and transportation (23 percent). The Climate Action Plan, which includes an agricultural carbon sequestration and offset program, establishes two greenhouse-gas reduction goals: 20 percent below 2005 levels by 2020 and 80 percent by 2050. The agricultural program would enlist farmers and ranchers to participate in a regional consortium to sequester carbon and reduce emissions on agricultural lands, and sell the resulting carbon credits over a multi-state region (Colorado's Energy Office 2007).

The Wildlife Commission sets CPW regulations and policies for hunting, fishing, watchable wildlife, non-game, and state threatened and endangered animal species. It is also responsible for making decisions about buying or leasing property for habitat and public access and for approving

BLM_0020171

the CPW annual budget proposals and long-range plans. By combining money collected from Habitat Stamp sales with grants from Great Outdoors Colorado and other sources, CPW continues to protect more than 66,500 acres of habitat for wildlife and wildlife-related recreation (CDNR 2009).

Big game hunting throughout the Planning Area and region is an important recreational use and is an important industry to the State of Colorado economy. In particular, elk populations within the Planning Area are above CPW objectives. CPW has increased the number of hunting licenses offered in the WRFO in an effort to reduce herd numbers. Once herds reach the reduction objectives, CPW would reduce the number of hunting licenses offered to sustain population numbers.

The Taylor Draw Dam and Kennedy Reservoir are located east of Rangely on the White River and provide many recreation opportunities. The completion of Taylor Draw Dam and Kennedy Reservoir was in October of 1984 and they are maintained and operated by the Rio Blanco Water Conservancy District. However, this dam also captures a substantial proportion of the sediment in the White River, making the river reaches below the town of Rangely sediment-starved. The Taylor Draw Dam is reaching the end of its 25-year design life.

Through the Integrated Weed Management Program, Moffat County partners with public land managers (including BLM, FWS, and NPS) as well as private landowners and oil and gas operators to control weeds. Moffat County also handles weed spraying on public as well as private lands in priority areas. Under state law, Rio Blanco County through their Weed Department, manages state listed noxious weeds throughout the county. In Garfield County, the Garfield County Weed Advisory Board was established to advise the Board of County Commissioners on noxious weed issues that pertain to Garfield County. The advisory board implemented an integrated weed management plan to stop the spread of noxious weeds.

### Reasonably Foreseeable Future Actions (2010 to 2027)

Approximately 210,000 persons lived in Mesa, Garfield, Rio Blanco, and Moffat counties in 2006. Based upon projected growth in energy activity and growth in the other components of the region's economic base, the total population is forecast to nearly double to 417,000 residents by 2035 without the development of a commercial oil shale industry. According to the State Demographer, the most rapid growth would occur in the rural areas of western Garfield, Rio Blanco, and Moffat counties, though Mesa County would gain the most residents in total.

Employment increases related to oil and gas exploration and development could decline as newer drilling technology requires fewer workers per well. Over time, more and more of the gas-related jobs in the region would be tied to maintaining and reworking existing wells. There are currently about 7,500 operating wells in the region. Even with stable drilling activity, an estimate of 50,000 additional wells could be drilled over the next 30 years. All wells would require support, gas processing, maintenance, and distribution. Barring unforeseen changes in the national supply and demand for natural gas, the industry could provide a long-term supply of jobs (BBC 2007).

Oil and gas development is driven primarily by variables outside of the BLM's control, including national and international energy prices, investment within the Planning Area, and business strategies of operators. In addition, oil and gas activity on state and private lands would be impacted by land management decisions of other agencies and individuals. Because the pace of development is unknown, actual cumulative impacts could differ. Because energy prices are the predominant force behind the pace of oil and gas development, some communities could experience boom and

BLM_0020172

bust cycles as a result of fluctuations in energy prices. This could cause hardships to local populations because of the temporary increased demand for housing and community services. Infrastructure could be expanded during boom times, and loans or bonds to pay for expansion of infrastructure must still be repaid if the boom turns to a bust.

The Colorado Department of Transportation (CDOT) Northwest Transportation Planning Region includes the northwestern area of Colorado. Composed of Grand, Jackson, Moffat, Rio Blanco, and Routt counties, this northwestern planning region includes the cities of Dinosaur, Rangely, Meeker, Craig, Hayden, Steamboat Springs, Oak Creek, Yampa, Kremmling, Hot Sulphur Springs, Winter Park, Fraser, Granby, Grand Lake, and Walden. Five corridors in this northwestern planning region– including SHs 13, 64, and 139 – have been identified by CDOT as regional priorities through 2035 (Table 4-107) due to increased traffic volumes, particularly increasing heavy truck traffic from energy extraction activities (CDOT 2008).

**Table 4-106. Colorado Department of Transportation
Regional Transportation Priorities**

| Corridor | Major Issues | CDOT Strategies |
|---|---|---|
| SH 13 Rifle North to Wyoming Border | Increase in passenger, tourism, and freight traffic | Add passing, turning, acceleration, and deceleration lanes |
| SH 64 Dinosaur to Meeker | Highway does not have adequate passing lanes or shoulders | Construct shoulders |
| SH 139 Loma North to Rangely | Increase in heavy truck traffic due to energy extraction activities | Construct intersection improvements |

SOURCE: CDOT 2008.

The BLM and DOE have jointly prepared a Draft PEIS for Solar Energy Development in Six Southwestern States (Solar PEIS), released in December 2010. For the BLM, the PEIS evaluates the agency's proposed actions to establish a new BLM Solar Energy Program applicable to utility-scale solar energy development on the BLM-administered lands in six southwestern states (Arizona, California, Colorado, Nevada, New Mexico, and Utah). For DOE, the PEIS evaluates the agency's proposed action to develop new program guidance relevant to DOE-supported solar projects.

A Notice of Intent (NOI) to prepare a PEIS and Possible Land Use Plan Amendments for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming was published on April 14, 2011. This PEIS is a new planning initiative would provide the BLM an opportunity to consider what public lands might be best suited for this kind of development in light of information not available in 2008.

## 4.11.3  Cumulative Impacts by Resource Category

### 4.11.3.1   Air and Atmospheric Values

Cumulative impacts to air and atmospheric values include impacts to air quality and climate change. The air quality assessment is primarily a quantitative assessment, while the cumulative climate change assessment is a qualitative assessment.

#### 4.11.3.1.1 Air Quality

For the cumulative air quality analysis, CALPUFF modeling assessed non-ozone criteria pollutant impacts and AQRVs, while CAMx modeling assessed ozone impacts. The cumulative boundary for non-ozone criteria air pollutants extends as much as 125 miles from the Planning Area (see

BLM_0020173

Appendix F, Map F-3). For ozone, the modeled cumulative boundary encompasses the 48 contiguous United States.

Due to major differences between CALPUFF and CAMx modeling, cumulative emissions were identified and modeled using different methods. CALPUFF modeling of non-ozone criteria pollutants included emissions from many reasonably foreseeable future actions, as provided in Appendix C of the ARTSD (URS 2011). Some of the largest reasonably foreseeable future actions include oil and gas development in the Colorado River Valley Field Office and Vernal Field Office and new gas plants in and near the Planning Area. Cumulative emissions also include future oil shale development and coal mines in and near the Planning Area. Additional future emission sources such as non-oil and gas vehicular traffic and emissions associated with population growth were not modeled. To the extent that non-modeled emissions would increase in future years, local air pollutant concentrations would increase near the emission sources. Depending on the quantity and proximity of non-modeled emissions to modeled emissions, maximum concentrations within the Planning Area could or could not increase. For example, cumulative emissions within the Planning Area would be likely to add to modeled concentrations within the Planning Area. Non-modeled cumulative emissions located outside the Planning Area (particularly emissions downwind of the Planning Area) would be less likely to add to pollutant concentrations within the Planning Area.

Cumulative ozone modeling includes comprehensive emission inventories for oil and gas development in the Colorado River Valley Field Office and Vernal Field Office. Cumulative emissions for other existing and future sources of ozone precursors (including VOCs and $NO_x$) were based on regional and national emission inventories for 2018. These inventories include a wide variety of existing emission sources and include future emissions for projected growth in population, energy development, transportation, and industrial development. Emission increases due to growth between 2018 and 2028 are not included in the modeled cumulative ozone impacts. Determining qualitative ozone impacts due to ozone emissions beyond 2018 is challenging because EPA announced plans to implement more stringent ozone NAAQS, which would cause many state and local air quality agencies to impose stricter limits on precursor emissions. Furthermore, recent EPA regulations require better emission controls on new engines, which would effectively reduce emissions from existing equipment as it is replaced with newer equipment meeting the more stringent emission limits.

Cumulative effects are assessed in terms of comparisons to non-ozone NAAQS and CAAQS; ozone; and AQRVs (deposition, lake chemistry, and visibility). Detailed impact analysis results are provided in Appendix F and in Appendices G and H of the ARTSD (URS 2011).

## Alternative A

Estimated cumulative emissions for each of the four alternatives are provided in Table 4-108, which shows that Alternative A would have the lowest non-particulate, non-VOC emissions of the four alternatives. Due to less stringent emission controls for the Planning Area and in the Colorado River Valley Field Office (CRVFO), Alternative A would have the greatest particulate matter emissions. Although VOC emissions are shown for disclosure purposes, VOC emissions were not included in far-field CALPUFF modeling, but were included (along with additional emission sets) in ozone modeling. Alternative A cumulative emissions include the following emission sets:

- WRFO Alternative A oil and gas source emissions,
- CRVFO Alternative A oil and gas source emissions,

BLM_0020174

*Chapter 4 – Environmental Consequences*

- Vernal Field Office and the Little Snake Field Office oil and gas source emissions, and

- Reasonably foreseeable future action (RFFA) emissions within the CALPUFF modeling domain.

**Table 4-107. 2028 Estimated Cumulative Emissions for Each Alternative**

| Pollutant | Emissions (tpy) | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| CO | 17,341 | 19,597 | 24,663 | 26,140 |
| $NO_x$ | 12,948 | 13,980 | 16,475 | 17,212 |
| $PM_{10}$ | 23,625 | 14,491 | 16,471 | 17,570 |
| $PM_{2.5}$ | 3,760 | 2,691 | 2,954 | 3,135 |
| $SO_2$ | 268 | 275 | 286 | 297 |
| VOCs | 41,695 | 31,864 | 39,717 | 50,038 |

NOTE:

tpy = short tons per year

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Detailed Alternative A far-field concentrations are provided in Tables F-23 though F-34 of Appendix F. When cumulative emissions are modeled, Alternative A cumulative impacts are predicted to be below the NAAQS and CAAQS at all modeled receptors for the CO 1-hour and 8-hour standards; the $NO_2$ annual standard; and the $SO_2$ 1-hour, 3-hour, 24-hour, and annual standards. Depending on the pollutant, averaging time, and receptor group, the maximum predicted concentrations vary from 5 to 95 percent of the standards. However, CALPUFF modeling predicts potential exceedances of the following standards in localized areas at Class II receptors:

- $NO_2$ 1-hour (up to 462 percent of NAAQS),

- $PM_{10}$ 24-hour (up to 174 percent of the NAAQS) and annual (up to 161 percent of the CAAQS only), and

- $PM_{2.5}$ 24-hour and annual (up to 178 and 118 percent, respectively).

Predicted future concentrations of $NO_2$ due to Alternative A cumulative emissions indicate possible exceedances of the new 1-hour $NO_2$ standard in several locations in the Planning Area and nearby BLM field offices. Many of the greatest predicted concentrations are near existing RFFA sources, such as compressor stations. Realizing that accurate modeling for the stringent 1-hour $NO_2$ standard could be challenging, EPA recently issued guidance for modeling $NO_2$ emissions to demonstrate compliance with the new 1-hour $NO_2$ standard (EPA 2010b). For air quality permitting purposes, the guidance suggests site-specific modeling using detailed data for each facility in order to avoid over-predicting $NO_2$ concentrations. Due to a lack of facility-specific data and the large number of modeled sources, this type of facility-specific modeling was not performed as part of this analysis. Consequently, the modeling results could over predict $NO_2$ concentrations. Over-prediction during the 20-year life of project is also likely to occur because (1) CALPUFF cumulative emission inventories do not account for future $NO_x$ emission reductions at existing sources, and (2) the potential for lower background $NO_2$ concentrations could not be taken into account. Recent EPA regulations would substantially reduce $NO_x$ emissions from stationary source engines, non-road engines, and motor vehicles.

Colorado continues to be designated attainment for the annual $NO_2$ NAAQS. Attainment designations for the new 1-hour $NO_2$ standard have not been determined. All new, modified, or reconstructed major sources of $NO_2$ (including those that could be constructed in the Planning Area) would be required to perform $NO_2$ modeling and undergo PSD air quality permitting to demonstrate compliance with the 1-hour $NO_2$ standard.

Predicted future concentrations of $PM_{10}$ and $PM_{2.5}$ due to Alternative A cumulative emissions indicate possible exceedances of these standards in small localized areas. One of these areas is near an existing coal mine. Contour plots indicating areas with high $PM_{10}$ concentrations are included in the ARTSD (URS 2011).

**Far-field Ozone Comparison to NAAQS and CAAQS**

Ozone impacts attributable to cumulative emissions are not expected to cause or contribute to violations of the ozone NAAQS, as shown in Table F-40 of Appendix F. For Alternative A (and all other alternatives), current and predicted design values in rural areas of the 2 mile domain would be below the 75 ppb ozone NAAQS. In addition, ozone impacts attributable to Planning Area oil and gas emissions would not extend to Denver metropolitan area monitors.

Based on photochemical grid modeling results, ozone impacts attributable to project and cumulative emissions are not expected to cause or contribute to violations of the ozone NAAQS. For all Alternatives (including cumulative oil and gas emissions), current and projected design values (DVs) at modeled monitoring sites in rural areas of the 4 km domain would be below the current 75 ppb ozone NAAQS. In addition, ozone impacts attributable to WRFO Project emissions would not extend to Front Range monitors.

Ozone impacts attributable to each of the Alternatives are quite similar. In some cases, ozone impacts associated with Alternatives C and D have a greater geographic extent and in some cases greater magnitude. However, future DV calculations for Project and cumulative emissions show no differences among the Alternatives at all monitors except for the two Rocky Mountain NP monitors. At these two monitors, a 1 ppb increase is predicted for one day during the July episode (July 18) for Alternatives C and D compared to Alternatives A and B. Maximum predicted future DVs at the two Rocky Mountain NP monitors are 70 ppb and 68 ppb during July.

The above ozone impact predictions should be carefully interpreted due to limitations on the accuracy of photochemical grid models. While the CAMx model used in this analysis was one of the best available tools available for predicting ozone concentration changes, the modeling effort was subject to the following limitations:

- Potential inaccuracies in emission inventories (which include emissions throughout the 48 contiguous United States),

- Potential inability to accurately model stratospheric ozone intrusion at high-altitude monitors,

- Potential inability to accurately model factors contributing to winter ozone events,

- Potential difficulty modeling extremely complex terrain in the Rocky Mountains, and

- Lack of ozone monitoring data that could be used to evaluate model performance at locations within the oil and gas development areas in the WRFO.

BLM_0020176

RRFs demonstrate small, but noticeable, decreases in predicted ozone concentrations when comparing predicted future year concentrations for the Alternative A modeling scenario to 2006 modeled concentrations. Ozone concentrations do not rise linearly with increases in $NO_x$ and/or VOC emissions. In fact, the relative ratio of $NO_x$ to VOC concentrations plays a role in ozone formation. The predicted future year ozone concentration decreases could be due to changes in the ratio of $NO_x$ to VOC concentrations and/or it could be due to the effect of decreased future year $NO_x$ concentrations stemming from stringent engine emission standards applicable throughout the nation. Time series plots for Gothic and other rural monitors illustrate that 8-hour daily maximum ozone concentration predicted for Alternative A would be less than the 2006 modeled concentrations on every day of each episode. During July, greater than average ozone decreases at the two Rocky Mountain National Park (RMNP) monitors would occur on peak ozone days. In other words, a greater ozone decrease would occur at RMNP monitors on the days with the highest predicted ozone concentrations than would occur on the days with low or moderate concentrations. The ARTSD includes many plots showing future absolute and relative ozone concentrations, time series plots, and detailed data analysis (URS 2011).

Absolute ozone concentration metrics demonstrate decreases in the number of days with ozone concentrations above 75 ppb, as well as reductions in the number of grid cells with absolute ozone concentrations above 75 ppb. These ozone improvements would occur within the Planning Area and across the 2 mile domain. However, on some days, absolute predicted concentrations would exceed 75 ppb. These predicted concentrations do not indicate a violation of the NAAQS because compliance with the ozone NAAQS is determined by comparing the three-year average of the 4th highest daily maximum 8-hour average monitored concentration to the NAAQS. The format of the ozone NAAQS is designed to allow multiple high ozone days over a three-year period.

Although decreases in future ozone concentrations within the WRFO oil and gas development area and nearby areas seem unlikely given the proposed increase in oil and gas activity, several factors can explain predicted ozone concentration reductions. First, emissions from future oil and gas development would be minimized due to stringent emission controls. Consequently, emissions are predicted to be lower for future oil and gas development sources on a per well basis than for currently operating oil and gas sources. Second, emissions from many existing sources within and beyond the 4 km domain would be reduced in future years. This is particularly true for $NO_2$ emissions due to stringent recent USEPA $NO_2$ emission control regulations affecting many types of stationary and mobile engines. As newer equipment replaces older equipment, less $NO_2$ will be emitted throughout the United States. Comparisons of future year and baseline year emission plots and emission data indicate substantial $NO_2$ emission reductions throughout many areas of the nation. These emission reductions will reduce ozone and ozone precursor pollutants transported into the WRFO.

Additional monitoring data collected in or near the Planning Area are needed in order to determine if high absolute ozone concentrations predicted within the Planning Area during April could cause concern in localized areas. New ozone monitors were installed in Meeker and Rangely, Colorado during 2010 and would provide additional ambient air quality data in the Planning Area. Although it would take several years for these monitors to acquire enough data to develop representative multi-year ozone design values, data from these monitors could be used to inform management actions in the near term and to better assess ozone concentration trends over the next three years.

Ozone monitoring data from the recently installed Rangely, Colorado monitor indicate periods of elevated ozone concentrations within the WRFO. The monitor began operating on August 7, 2010 and data were available and reviewed through November 8, 2011. The fourth highest daily

BLM_0020177

*Chapter 4 – Environmental Consequences*

maximum 8-hour average ozone concentration was 0.073 ppm during the partial 2011 calendar year and 0.058 during the partial 2010 calendar year. However, the three highest daily maximum 8-hour averages in 2011 were above the 0.075 ozone standard and were measured at 0.088 ppm, 0.088 ppm, and 0.081 ppm on February 13–15. At least three consecutive calendar years of ozone monitoring data are needed in order to calculate the three-year average of the fourth highest daily maximum 8-hour average ozone concentration in order to compare that value to the ozone NAAQS and determine compliance with the standard. Based on incomplete data, the partial two-year average would be less than the NAAQS. However, the Rangely monitor's recent high winter ozone values in 2011 indicate that this basin may be experiencing unique winter ozone formation episodes similar to those documented in the Upper Green River Basin in Wyoming. The cause of the high February 2011 ozone values has not been determined, though these values may be influenced by pollutant transport or a combination of winter meteorological conditions conducive to ozone formation. Based on photochemical grid model predictions shown on 4 km difference plots for April and July (see Appendix M), Project emissions are predicted to cause a greater number of ozone concentration decreases than ozone concentration increases at the Rangely monitor site during the months of April and July.

In contrast, another recently installed ozone monitor within the WRFO in Meeker, Colorado and one located south of the WRFO in Rifle, Colorado have recorded lower ozone concentrations than those observed in Rangely. At the Meeker monitor, which began operation on January 8, 2010, the fourth highest daily maximum 8-hour average ozone concentration was 0.063 ppm for 2011 (based on data through June 30, 2011) and 0.066 ppm for 2010 (based on nearly a full year of data). At the Rifle, Colorado monitoring site, the three-year average of the fourth highest ozone concentration was approximately 0.066 ppm based on slightly more than three years of data from June 20, 2008 through June 30, 2011. Data from these two monitors indicate that ozone concentrations at these locations are likely to comply with the NAAQS.

**Deposition.** Predicted Alternative A cumulative deposition analysis indicates that N and S deposition rates would be below the Levels of Concern at modeled Class I and sensitive Class II areas. Maximum N deposition would vary from 50 to 91 percent of the Levels of Concern, depending on the receptor group, and maximum S deposition would vary from 13 to 17 percent.

**Lake Chemistry.** As shown in Table F-37 of Appendix F, predicted Alternative A cumulative lake ANC changes would be below the LAC at six of the seven modeled lakes and would vary from 0.6 to 8.5 percent of the LAC. Cumulative impacts at Upper Ned Wilson Lake are predicted to be substantial because they would exceed the LAC of no change from baseline ANC. Modeling predicts up to a 2.6 percent change from the baseline ANC at Upper Ned Wilson Lake.

**Visibility.** Table 4-109 summarizes cumulative visibility impacts assessed in terms of visibility changes from estimated natural conditions. Predicted visibility changes due to cumulative emissions indicate a greater number of days with noticeable visibility changes compared to oil and gas related (i.e., Project) impacts described above. Although not required to be modeled or disclosed under the Clean Air Act, visibility results are also shown in Table 4-109 for sensitive Class II areas and scenic views. The number of days per year varies depending on the type of visibility post-processing methodology and the modeled year (2001, 2002, or 2003); complete results are provided in Tables F-38 and F-39 of Appendix F and in Appendices G and H of the ARTSD (URS 2011).

BLM_0020178

*Chapter 4 – Environmental Consequences*

**Table 4-108. Alternative A Cumulative Visibility Impacts**

| Class I Areas | Maximum Number of Days with ≥1.0 dv Visibility Change | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with ≥1.0 dv Visibility Change |
|---|---|---|---|
| Arches NP | 6 | Colorado NM | 26 |
| Eagles Nest Wilderness | 8 | Dinosaur NM | 180 |
| Flat Tops Wilderness | 58 | Big Mountain View | 208 |
| Maroon Bells-Snowmass Wilderness | 24 | Holy Cross View | 2 |
| Mount Zirkel Wilderness | 17 | Holy Cross Wilderness View | 2 |
| | | Rabbit's Ear View | 21 |
| | | Roan Cliffs View | 349 |

NOTE:
dv = deciview

## Alternative B

Estimated cumulative emissions for Alternative B are provided in Table 4-21, which shows that Alternative B would have the lowest cumulative particulate matter and VOC emissions of the four alternatives. For CO, $NO_x$, and $SO_2$, cumulative Alternative B emissions would be greater than Alternative A and less than those for Alternatives C and D. Alternative B cumulative emissions include the following emission sets:

- WRFO Alternative B oil and gas source emissions,
- CRVFO Alternative B oil and gas source emissions,
- Vernal Field Office and the Little Snake Field Office oil and gas source emissions, and
- RFFA emissions within the CALPUFF modeling domain.

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Depending on the pollutant, averaging time, and receptor group, maximum predicted Alternative B concentrations vary from 5 to 95 percent of the NAAQS for most pollutants. Predicted cumulative exceedances of the 1-hour $NO_2$ standard, the $PM_{10}$ annual standard, and the $PM_{2.5}$ 24-hour and annual standards are nearly identical to the values above for Alternative A. However, the maximum predicted 24-hour $PM_{10}$ concentration would be somewhat less (154 percent rather than 174 percent of the NAAQS) than the maximum Alternative A 24-hour $PM_{10}$ concentration. For Alternative B, a location near a coal mine would be the only location with cumulative $PM_{10}$ 24-hour impacts predicted to exceed the NAAQS (up to 154 percent of the NAAQS). Tables F-23 though F-34 of Appendix F provides details of the Alternative B far-field concentrations.

**Far-field Ozone Comparison to NAAQS and CAAQS.** Alternative B cumulative ozone impacts would be similar to those for Alternative A, as shown in Table F-40 of Appendix F.

**Deposition.** Predicted Alternative B cumulative deposition analysis indicates that N and S deposition rates would be nearly identical to Alternative A deposition rates and would be below the Levels of Concern at modeled Class I and sensitive Class II areas. Maximum N deposition would vary from 50 to 91 percent of the Levels of Concern, depending on the receptor group, and maximum S deposition would vary from 13 to 17 percent. Tables F-35 and F-36 in Appendix F provide additional information regarding nitrogen and sulfur deposition.

BLM_0020179

*Chapter 4 – Environmental Consequences*

**Lake Chemistry.** As shown in Table F-37 of Appendix F, predicted Alternative B cumulative lake ANC changes would be similar to Alternative A impacts. At six of the seven modeled lakes with maximum ANC changes would vary from 0.6 to 8.5 percent of the LAC, depending on the lake. Cumulative impacts at Upper Ned Wilson Lake are predicted to be substantial because they exceed the LAC of no change from baseline ANC. Modeling predicts up to a 2.6 percent change from the baseline ANC at Upper Ned Wilson Lake.

**Visibility.** Table 4-110 summarizes cumulative visibility impacts in terms of visibility changes from estimated natural conditions. Compared to Alternative A cumulative impacts, Alternative B cumulative visibility impacts indicate fewer days of visibility impacts at the Flat Tops Wilderness (up to 9 fewer days) and Maroon Bells-Snowmass Wilderness (up to 7 fewer days), while the three other Class I areas are predicted to have from up to 1 to 5 more days of visibility change of 1 dv or more. Visibility impacts at sensitive Class II areas and scenic views would also vary noticeably from Alternative A. For example, Big Mountain View is predicted to have 124 fewer days of visibility change of ≥1 dv, while Rabbit's Ear View would have up to 5 more days of visibility impact. Complete visibility results are provided in Tables F-38 and F-39 of Appendix F and in Appendices G and H of the ARTSD (URS 2011).

### Table 4-109. Alternative B Cumulative Visibility Impacts

| Class I Areas | Maximum Number of Days with ≥1.0 dv Visibility Change[1] | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with ≥1.0 dv Visibility Change[1] |
|---|---|---|---|
| Arches NP | 7 (+1) | Colorado NM | 28 (+2) |
| Eagles Nest Wilderness | 10 (+2) | Dinosaur NM | 167 (-13) |
| Flat Tops Wilderness | 51 (-7) | Big Mountain View | 84 (-124) |
| Maroon Bells-Snowmass Wilderness | 13 (-9) | Holy Cross View | 2 |
| Mount Zirkel Wilderness | 22 (+5) | Holy Cross Wilderness View | 2 |
| | | Rabbit's Ear View | 26 (+5) |
| | | Roan Cliffs View | 336 (-13) |

NOTES:

[1] Positive numbers in parentheses indicate an increase in the number of days with visibility changes ≥1.0 dv for Alternative B compared to Alternative A, while negative numbers in parentheses indicate a reduction in the number of days with visibility changes above the threshold.

dv = deciview

### Alternative C

Estimated cumulative emissions for Alternative C are provided in Table 4-25, which shows that cumulative Alternative C CO, $NO_x$, and $SO_2$, emissions would be greater than emissions from Alternatives A and B, and less than those for Alternative D. Cumulative Alternative C VOC and particulate matter emissions would be greater than Alternative B emissions and less than those for Alternatives A and D. Alternative C cumulative emissions include the following emission sets:

- WRFO Alternative C oil and gas source emissions,
- CRVFO Alternative C oil and gas source emissions,
- Vernal Field Office and the Little Snake Field Office oil and gas source emissions, and
- RFFA emissions within the CALPUFF modeling domain.

BLM_0020180

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Depending on the pollutant, averaging time, and receptor group, maximum predicted Alternative C concentrations vary from 5 to 95 percent of the NAAQS for most pollutants. Predicted cumulative exceedances of the 1-hour $NO_2$ standard, the $PM_{10}$ annual standard, and the $PM_{2.5}$ 24-hour and annual standards are nearly identical to the values above for Alternative A. However, the maximum predicted 24-hour $PM_{10}$ concentration would be somewhat less (155 percent rather than 174 percent of the NAAQS) than the maximum Alternative A 24-hour $PM_{10}$ concentration. For Alternative C, a location near a coal mine would be the only location with cumulative $PM_{10}$ 24-hour impacts predicted to exceed the NAAQS. Detailed Alternative C far-field concentrations are provided in Tables F-23 though F-34 of Appendix F.

**Far-field Ozone Comparison to NAAQS and CAAQS.** Ozone impacts attributable to Alternative C would be similar to those for Alternatives A and B, as shown in Table F-40 of Appendix F. In some cases, predicted ozone concentration increases associated with Alternative C would have a slightly greater geographic extent and in some cases a slightly greater magnitude. However, DVF calculations show no differences among the alternatives at 2 mile domain monitors except for the two RMNP monitors. At these two monitors, a 1 ppb ozone increase would be predicted for one day during the July episode (July 18) for Alternative C compared to Alternative A. Maximum predicted DVFs at the two RMNP monitors would be 70 ppb and 68 ppb during July.

**Deposition.** Predicted Alternative C cumulative deposition analysis indicates that N and S deposition rates would be slightly greater than Alternative A deposition rates. However, the incremental increase in deposition would be small compared to background concentrations. Maximum N deposition would vary from 51 to 91 percent of the Levels of Concern, depending on the receptor group, and maximum S deposition would vary from 13 to 17 percent.

**Lake Chemistry.** As shown in Table F-37 of Appendix F, predicted Alternative C cumulative lake ANC changes would be slightly greater than Alternative A and Alternative B impacts. At six of the seven modeled lakes with maximum ANC changes would vary from 0.7 to 10.5 percent of the LAC, depending on the lake. Cumulative impacts at Upper Ned Wilson Lake are predicted to be substantial because they would exceed the LAC of no change from baseline ANC. Modeling predicts up to a 3.2 percent change from the baseline ANC at Upper Ned Wilson Lake.

**Visibility.** Table 4-111 summarizes cumulative visibility impacts in terms of visibility changes from estimated natural conditions. Under Alternative C, the maximum number of days at any Class I area with predicted visibility changes greater than or equal to 1.0 dv would be 62 days at the Flat Tops Wilderness, which would be 4 more days than the maximum number of days predicted for Alternative A and 11 more days than the maximum number of days predicted for Alternative B. Complete visibility results are provided in Tables F-38 and F-39 of Appendix F and in Appendices G and H of the ARTSD (URS 2011).

BLM_0020181

**Table 4-110. Alternative C Cumulative Visibility Impacts**

| Class I Areas | Maximum Number of Days with ≥1.0 dv Visibility Change[1] | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with ≥1.0 dv Visibility Change[1] |
|---|---|---|---|
| Arches NP | 9 (+3) | Colorado NM | 31 (+5) |
| Eagles Nest Wilderness | 15 (+7) | Dinosaur NM | 202 (+22) |
| Flat Tops Wilderness | 62 (+4) | Big Mountain View | 117 (-91) |
| Maroon Bells-Snowmass Wilderness | 18 (-6) | Holy Cross View | 6 (+4) |
| Mount Zirkel Wilderness | 28 (+11) | Holy Cross Wilderness View | 6 (+4) |
| | | Rabbit's Ear View | 30 (+9) |
| | | Roan Cliffs View | 341 (-8) |

NOTES:

[1] Positive numbers in parentheses indicate an increase in the number of days with visibility changes ≥1.0 dv for Alternative C compared to Alternative A, while negative numbers in parentheses indicate a reduction in the number of days with visibility changes above the threshold.

dv = deciview

## Alternative D

Estimated cumulative emissions for Alternative D are provided in Table 4-29, which shows that cumulative Alternative D CO, $NO_x$, $SO_2$, and VOC emissions would be greater than emissions from Alternatives A, B, and C. Cumulative Alternative D particulate matter emissions would be greater than Alternatives B and C, but less than Alternative A particulate matter emissions. Alternative D cumulative emissions include the following emission sets:

- WRFO Alternative D oil and gas source emissions;
- CRVFO Alternative D oil and gas source emissions;
- Vernal Field Office and the Little Snake Field Office oil and gas source emissions, and
- RFFA emissions within the CALPUFF modeling domain.

**Far-field Comparisons to Non-ozone NAAQS and CAAQS.** Depending on the pollutant, averaging time, and receptor group, maximum predicted Alternative D concentrations vary from 5 to 95 percent of the NAAQS for most pollutants. Predicted cumulative exceedances of the 1-hour $NO_2$ standard, the $PM_{10}$ annual standard, and the $PM_{2.5}$ 24-hour and annual standards are nearly identical to the values above for Alternative A. However, the maximum predicted 24-hour $PM_{10}$ concentration would be somewhat less (155 percent rather than 174 percent of the NAAQS) than the maximum Alternative A 24-hour $PM_{10}$ concentration. For Alternative D, a location near a coal mine would be the only location with cumulative $PM_{10}$ 24-hour impacts predicted to exceed the NAAQS. Detailed Alternative D far-field concentrations are provided in Tables F-23 though F-34 of Appendix F.

**Far-field Ozone Comparison to NAAQS and CAAQS.** Ozone impacts attributable to Alternative D would be similar to Alternatives A, B, and C, as shown in Table F-40 of Appendix F. In some cases, predicted ozone concentration increases associated with Alternative D would have a slightly greater geographic extent and in some cases a slightly greater magnitude. However, DVF calculations show no differences among the alternatives at 2 mile domain monitors except for the two RMNP monitors. At these two monitors, a 1 ppb ozone increase would be predicted for one day during the July episode (July 18) for Alternative D compared to Alternative A. Maximum predicted DVFs at the two RMNP monitors are 70 ppb and 68 ppb during July.

BLM_0020182

**Deposition.** The cumulative deposition analysis for Alternative D indicates that N and S deposition rates would be slightly greater than Alternative A deposition rates. However, the incremental increase in deposition would be small compared to background concentrations. Maximum N deposition would vary from 50 to 91 percent of the Levels of Concern, depending on the receptor group, and maximum S deposition would vary from 13 to 17 percent.

**Lake Chemistry.** As shown in Table F-37 of Appendix F, predicted Alternative D cumulative lake ANC changes would be slightly greater than Alternative A, B, and C impacts. At six of the seven modeled lakes with maximum ANC changes would vary from 0.8 to 12.0 percent of the LAC, depending on the lake. Cumulative impacts at Upper Ned Wilson Lake are predicted to be substantial because they exceed the LAC of no change from baseline ANC. Modeling predicts up to a 3.6 percent change from the baseline ANC at Upper Ned Wilson Lake.

**Visibility.** Table 4-112 summarizes cumulative visibility impacts in terms of visibility changes from estimated natural (near pristine) conditions. Under Alternative D, the maximum number of days at any Class I area with predicted visibility changes greater than or equal to 1.0 dv would be 68 days at the Flat Tops Wilderness, which is 10 more days than the maximum number of days predicted for Alternative A, 17 more days than Alternative B, and 6 more days than Alternative C. Complete results are provided in Tables F-38 and F-39 of Appendix F and in Appendices G and H of the ARTSD (URS 2011).

### Table 4-111. Alternative D Cumulative Visibility Impacts

| Class I Areas | Maximum Number of Days with ≥1.0 dv Visibility Change[1] | Sensitive Class II Areas and Scenic Views | Maximum Number of Days with ≥1.0 dv Visibility Change[1] |
|---|---|---|---|
| Arches NP | 9 (+3) | Colorado NM | 32 (+6) |
| Eagles Nest Wilderness | 16 (+8) | Dinosaur NM | 209 (+29) |
| Flat Tops Wilderness | 68 (+10) | Big Mountain View | 140 (-68) |
| Maroon Bells-Snowmass Wilderness | 24 | Holy Cross View | 8 (+6) |
| Mount Zirkel Wilderness | 29 (+12) | Holy Cross Wilderness View | 7 (+5) |
| | | Rabbit's Ear View | 31 (+10) |
| | | Roan Cliffs View | 350 (+1) |

NOTES:

[1] Positive numbers in parentheses indicate an increase in the number of days with visibility changes ≥1.0 dv for Alternative D compared to Alternative A, while negative numbers in parentheses indicate a reduction in the number of days with visibility changes above the threshold.

dv = deciview

### 4.11.3.1.2 Climate Change

Climate change cumulative impacts are based on a qualitative analysis. Cumulative impacts are determined by increases and decreases in GHG emissions and atmospheric GHG concentrations. Increased usage of vehicles and equipment tend to increase GHG emissions, though future GHG emission limits and transition to renewable energy sources would reduce GHG emissions from some new equipment and vehicles. As mentioned in Section 4.11.2, the Colorado Climate Action Plan seeks to reduce GHG emissions to 20 percent below 2005 levels by 2020, with additional reductions implemented by 2050. Furthermore, the EPA expects to issue future regulations that would restrict

BLM_0020183

GHG emissions from vehicles and stationary sources. The effectiveness of future GHG emission
reduction plans cannot be predicted at this time.

Carbon sequestration would reduce GHG emissions and atmospheric concentrations. One type of
carbon sequestration captures GHGs before they are emitted to the atmosphere and sequesters the
carbon in underground formations. Natural carbon sequestration methods could decrease
atmospheric GHG concentrations by removing GHG from the atmosphere through vegetative and
soil uptake. Incentives to plant trees and other vegetation and to modify agricultural practices could
sequester greater quantities of carbon.

Cumulative climate change impacts would be caused by increases in global GHG emissions.
National, regional, and estimated GHG emissions from Planning Area oil and gas development
contribute to these increases. Possible changes to cumulative emissions are summarized below.

- Planning Area estimated increases in GHG emissions would contribute to cumulative
  increases in global GHG emissions.

- Cumulative GHG emissions may not increase or may increase by a smaller quantity if some
  or all Planning Area emissions would be offset due to decreased oil and gas production in
  other oil and gas basins, emission reductions or improvements in technologies in other
  emission sources within the Planning area, or improvements in oil and gas development
  technologies over the life of the plan beyond what has been estimated for this analysis.

- Cumulative GHG emissions may not increase or may increase by a smaller quantity if
  natural gas produced under the alternatives is used to replace combustion of high
  GHG-emitting fossil fuels.

**Impacts Common to All Alternatives**

Quantification of climate change impacts, such as changes in temperature, precipitation, and surface
albedo (i.e., the fraction of solar energy reflected from the Earth back into space) would require a
climate change modeling tool that could determine incremental impacts to climate change due to
GHG emission increases in localized areas. Furthermore, Planning Area GHG emissions and carbon
sinks are small relative to state, regional, and global GHG emission inventories. Consequently,
global or regional scale modeling would be unlikely to yield meaningful predictions of climate
change impacts in relation to GHG emissions attributable to Planning Area activities.

However, climate change predictions are available for the region. These climate trends are based on
global GHG emission inventory projections and global climate change modeling. To the extent that
the BLM-authorized activities would increase GHG emissions such that global GHG emissions are
greater than the quantities used in previous climate change modeling, climate changes could be
slightly greater than those summarized below. Due to the relative magnitude of Planning Area GHG
emissions, climate change impacts would be greatest for Alternative C. For the remaining
alternatives, climate change impacts would decrease in magnitude from Alternative D to Alternative
B, with Alternative A having the smallest climate change impact.

Many of the following predicted climate changes for the Planning Area and western Colorado are
derived from color shadings on U.S. climate change maps (USGCRP 2009). This type of available
data means that climate change predictions would be within the given range and may not reach the
maximum or minimum extents of the range. Past climate trends and future predictions for western
Colorado are summarized below (IPCC 2007; PCGCC 2007; RMCO-NRDC 2008; EPA 2010c,
EPA 2010d; USGCRP 2009).

BLM_0020184

- The average temperature increased by 1 to 3°F from a 1961 to 1979 baseline average to the average temperature measured from 1993 to 2008. By 2099, the average temperature is predicted to increase by 5 to 10°F above the 1961 to 1979 baseline. Temperatures are expected to increase more in winter than in summer, more at night than during the day, and more in the mountains than at lower elevations.

- The annual number of days above 90°F and the frequency of extreme heat events could increase.

- Annual average precipitation increased between 5 and 15 percent between 1958 and 2008. Based on modeling using a high emissions scenario, predicted precipitation changes indicate increased precipitation in the winter (up to +15 percent) and substantial decreases in the spring (from -5 percent to -20 percent) and summer (-5 percent to -15 percent). Fall precipitation is predicted to be within -5 percent to +5 percent.

- End-of-summer drought increased during the last 50 years, and drought is expected to be more prevalent in the future.

- Annual runoff could decrease by 10 to 20 percent by 2041 to 2060, compared to 1901 to 1970.

- Snowfall is predicted to decline in and near the Planning Area.

- Peak streamflow from melting snow is occurring earlier. In 2002, peak streamflow occurred up to five days earlier than during 1948. From 2080 to 2099, peak streamflow is predicted to occur 15 to 35 days earlier than during the 1951 to 1980 period.

- Very heavy precipitation occurred up to 10 percent more often between 1958 and 2007.

- Reduced winter snowpack causes less water to flow into the Colorado River, less water available for downstream residential and agricultural users, and shorter ski seasons, unless additional snowmaking is used to prolong the season;

- Earlier snowmelt means that peak stream flows occur earlier in the year, weeks before the peak needs of ranchers, farmers, recreationists, and others. In late summer, rivers, lakes, and reservoirs have lower flows and less capacity, which cause the following effects:

  o Less water availability for irrigating crops and watering animals,

  o Reduced crop and livestock productivity if additional irrigation is not available,

  o Increased water temperatures that adversely affect cold-water fish and reduce recreational fishing, and

  o Reduced mid- and late-summer stream flows that shorten tourism and recreation opportunities, such as whitewater rafting and boating.

- More frequent, more severe, and longer-lasting droughts are occurring and are expected to become more prevalent.

- Warmer and drier conditions could stress ecosystems and wildlife due to the following effects:

  o Shrinkage of coniferous forests within Colorado and replacement with larger savannas and woodlands,

  o Greater pest infestations in pine forests, such as the pine beetle infestation in Colorado's lodgepole forests,

BLM_0020185

- o Contraction of aspen forests due to sudden aspen decline linked to reduced snowpack and drought, and

- o Grassland and rangeland expansion into previously forested areas.

- Land could have increased susceptibility to fire with more frequent, larger, and more intense fires.

- Geographic flora and fauna could shift to the north or to higher elevations. Some species could be at greater risk of extinction if they could not successfully migrate or adapt.

- Longer growing seasons could increase productivity for some crops, decrease productivity for others, and increase agricultural pest populations, including weeds and insects.

- Warmer and drier conditions could adversely affect air quality due to the following effects:

  - o Increased ambient concentrations of particulate matter as less vegetated soils are more susceptible to wind erosion, and

  - o Increased ozone formation and reduced visibility due to increased particulate matter and wildfire smoke.

- Climate changes could have the following effects on human health:

  - o Heavy precipitation increases frequency and severity of flooding and could contaminate water supplies,

  - o Heat waves stress some individuals, particularly older adults, and

  - o Increased concentrations of ozone, particulate matter, and smoke stress some individuals, particularly those with asthma or other lung disease and those who exercise strenuously during poor air quality episodes.

**Alternative A**

Cumulatively, because Alternative A has the lowest oil and gas activity and the lowest emissions of each of the three GHGs ($CO_2$, $CH_4$, and $N_2O$), Alternative A would have the lowest potential to effect climate change. To the extent that Alternative A emissions add 2,288,465 mtpy to global GHG concentrations, Alternative A climate change impacts would add to the impacts described above.

**Alternative B**

In terms of $CO_2e$, Alternative B GHG emissions from oil and gas activity are approximately 3,532,992 mtpy (54 percent), which is greater than Alternative A emissions. Climate change impacts for Alternative B would generally be greater than those anticipated for Alternative A, although the relative increases in climate change parameters cannot be quantified due to the lack of climate change modeling tools.

**Alternative C**

In terms of $CO_2e$, Alternative C GHG emissions from oil and gas activity are approximately 5,251,537 mtpy, which is greater than Alternative A (129 percent) and 49 percent greater than Alternative B emissions. Climate change impacts for Alternative C would generally be greater than those for Alternatives A and B, although the relative increases in climate change parameters cannot be quantified due to the lack of climate change modeling tools.

BLM_0020186

**Alternative D**

In terms of $CO_2e$, Alternative D GHG emissions from oil and gas activity are approximately 5,040,686 mtpy, which is greater than Alternative A (120 percent), 43 percent greater than Alternative B, and 4 percent less than Alternative C emissions. Climate change impacts for Alternative D would generally be greater than those for Alternatives A and B, and less than Alternative C. The relative increases or decreases in climate change parameters cannot be quantified due to the lack of climate change modeling tools.

### 4.11.3.2   Geology

The cumulative impact analysis area for geological resources includes the Planning Area. In addition to oil and gas development, several other land and resource uses could increase cumulative disturbance, sand and gravel operations, sodium mining, coal mining, highway construction and maintenance, oil shale development, and development to support a growing population. It is expected sodium and coal development would remain similar to the current level. The extent of future disturbance from the remaining actions is not well known. Development of these resources would result in surface disturbance involved in construction of new facilities, thus increasing the potential for erosion. These effects combined with subsurface impacts from oil and gas development could increase cumulative geological impacts throughout the Planning Area. Cumulative impacts would be highest under Alternative D, since these alternative would have the greatest amount of oil and gas development, and would also require the highest density of support facilities for workers and other needed infrastructure, followed by Alternatives C, B, and A, respectively.

Within the Planning Area, the scale and extent of future oil shale development remains unclear. Currently, 810 acres of mineral estate are leased for oil shale research, development, and demonstration. Approximately 290,000 acres are available for oil shale leasing. In these areas, surface disturbance from oil extraction from shale would result in a potential impact to surface and subsurface geological resources similar to conventional oil and gas development, especially where hydrocarbons are extracted via surface mining and retorting. If oil shale development is eventually undertaken as a commercial enterprise, it would increase cumulative geological resource impacts throughout the Planning Area, with the greatest impacts occurring under Alternative D and the lowest impacts occurring under Alternative A.

### 4.11.3.3   Soil Resources

The cumulative impact boundary for soil resources includes watersheds, defined by the eight-digit hydrologic unit code, that are located partially or entirely within the Planning Area. This expanded area represents the domain where projects or actions could have an incremental effect on soil resources.

As described in Section 4.2.4 (Soil Resources), soil impacts occur mainly through surface disturbance. In addition to oil and gas development, there are a number of other land uses and resource uses that could increase cumulative disturbance, including construction of natural gas pipelines and treatment plants, coal mining, highway construction and maintenance, oil shale development, and development to support a growing population. The future disturbance area for these land uses likely encompasses the Planning Area. Coal-mining and road construction/maintenance projects are already planned within the Planning Area, and disturbance from construction of new natural gas pipelines, treatment plants, and residential and commercial development would likely occur given the scale of future oil and gas development projected in the 2007 RFD Scenario (BLM 2007). Surface disturbance for these land uses would impact soil in a similar manner as oil and gas development. Vegetation would be cleared to construct new facilities,

BLM_0020187

increasing the potential for wind and water erosion; soil would be compacted and paved over to build foundations and new roads; new road surfaces and parking lots would inhibit infiltration, increase runoff, and lead to higher erosion rates in down-slope areas; and soils and biological soil crusts would be permanently lost where above-ground facilities are constructed. These soil impacts would combine with impacts from oil and gas development to increase cumulative soil losses throughout the Planning Area. Cumulative impacts would be proportional to the total number of well pads and the total area of oil and gas surface disturbance allowed under each alternative. Consequently, cumulative soil impacts would be lowest under Alternative A (550 total well pads) and highest under Alternative D since this alternative would have the highest density of oil and gas development (2,556 total well pads in the Planning Area).

Surface disturbance from future oil shale development cannot be projected at this time. Within the Planning Area, the Green River formation has substantial shale resource potential (Bartis et al. 2005), but the scale and extent of future oil shale development remains unclear. Currently, 810 acres of the Planning Area are leased for oil shale research and development, and approximately 290,000 acres are available for oil shale leasing. In these areas, surface disturbance from oil extraction would impact soil in the same way as conventional oil and gas development, especially where hydrocarbons are extracted via surface mining and retorting. If oil shale development is eventually undertaken as a commercial enterprise, it would increase cumulative soil losses throughout the Planning Area. Cumulative soil impacts would be proportional to the total area of surface disturbance, and would be lowest under Alternative A and highest under Alternative D.

### 4.11.3.4   Water Resources

The cumulative impact boundary for water includes watersheds, defined by the eight-digit hydrologic unit code, that are located partially or entirely within the Planning Area. This expanded area represents the domain where projects or actions could have an incremental effect. Cumulative impacts are discussed in the context of each alternative. Past, present, and reasonably foreseeable future actions that have the potential to cumulatively impact water quality and quantity include oil shale development, construction of natural gas pipelines and treatment plants, coal mining, highway construction and maintenance, dams, nahcolite mining, and development to support a growing population.

Waste derived from commercial oil shale development could impact water quality. Oil shale mining and surface retorting result in spent shale leachate that has a high salt content and also contains small amounts of arsenic and selenium (Harney 1983). Other potential sources of water pollution include mine drainage and point-source discharges from mining and surface operations. Removing hydrocarbons from underground shale deposits via *in situ* retorting could increase shale permeability. Once extraction is complete, salts and trace metals could be leached and transported from the shale as groundwater flows through the extraction site. The resulting groundwater impacts depend on the magnitude of oil shale development and would not vary among the RMPA alternatives. Oil shale development could also place constraints on freshwater availability. For surface mining and retorting, water would be needed to control dust, cool and reclaim spent shale, and operate power and processing plants. Freshwater would also be used to drill surface casing, which in the Mesaverde Play extends through bedrock aquifers in the Uinta, Green River, and upper Wasatch Formations. A study by the U.S. Water Resources Council (1981) estimated that at advanced levels of production, oil shale development would require about three barrels of water for every barrel of oil produced. Other estimates from that time period ranged from 2.1 to 5.2 barrels of water per barrel of oil (OTA 1980). More current estimates based on updated industry water budgets suggest that requirements for new retorting methods would be around 1 to 3 barrels of water per barrel of oil extracted. It is also possible that some *in situ* processes could be net producers of water.

BLM_0020188

*Chapter 4 – Environmental Consequences*

However, if predicted energy needs are accurate, electricity production to support development (e.g., hydrocarbon extraction, post-extraction cooling, refining, environmental control systems, and power production) could require substantial amounts of water for thermoelectric plants.

If commercial oil shale development occurs, it would likely produce a new industrial water use for the White River Basin. Any new freshwater use would be in addition to the 2.6 acre-foot requirement for individual gas wells (BLM 2008). Water withdrawals would need to conform to Colorado water law and be compatible with existing water rights. However, water allocations for oil shale development could still make other water uses less favorable, such as wildlife and livestock watering and supporting aquatic habitat.

It is impossible to predict cumulative water use under the four RMPA alternatives without knowing the timing or scale of future oil shale development. However, it is clear that the magnitude of impacts on freshwater availability would be proportional to the amount of oil and gas development allowed by the BLM. Thus, cumulative impacts from oil shale development would be lowest under Alternative A and highest under Alternative D.

Indirect water quality impacts could occur from pipeline and gas treatment facility construction projects. As new pipelines are built, surface disturbance would increase in the construction ROWs. This would result in short-term water quality impacts as soil erosion increased from ROW disturbance areas. These impacts would combine with surface disturbance from new well pads and roads to increase cumulative water quality impacts. The magnitude of cumulative impacts would depend on the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D.

Surface disturbance impacts from future gas plants would be most pronounced during the construction phase when soil is exposed and if storm water management plans are not fully implemented. The resulting erosion could impact surface water quality and damage channel form and structure. Cumulative impacts would be proportional to the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D. Permanent above-ground facilities and concrete foundations constructed for gas plants would reduce infiltration and groundwater recharge. Nearly all precipitation received at gas processing sites would either dissipate via evaporation or leave the site as runoff. Enhanced runoff could increase erosion in down-slope areas and increase streamflows and sediment loads. Gas plants would also require a freshwater supply to sustain facility operations. Increased water use could reduce freshwater availability, although the degree of impact is difficult to quantify without knowing how much water would be required to operate future gas plants. Cumulative impacts from gas plant construction would be proportional to the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D.

Active coal mining occurs within the Planning Area and the primary impact from coal mining is surface disturbance. Surface mines such as the Colowyo and Trapper mines in southeast Moffat County would contribute to cumulative disturbance. However, these mines are located in the Yampa River watershed and would not impact surface water quality in the Planning Area. Although total surface disturbance is lower for underground coal mines, such as the Deserado mine in northwest Rio Blanco County, these mines could still add to cumulative water quality impacts from disturbance. The magnitude of cumulative impacts would depend on the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D.

BLM_0020189

Another potential impact from both underground and surface coal mines is acid mine drainage caused by oxidation of the mineral pyrite in coal, overburden, and mine waste piles. Acid mine drainage depends on the mineralogical composition of coal and not all mines are subject to acid drainage impacts (DuLong et al. 2002). However, since the composition of area coals was not available for the analysis, it was assumed that some acid mine drainage could occur. Cumulative impacts include acid drainage combining with $NO_x$ and $SO_x$ emissions from oil and gas drilling to decrease surface water pH. Lower pH would increase the solubility of certain metals, particularly iron, aluminum, and manganese that are harmful to aquatic life at elevated concentrations. Cumulative surface water impacts would be relatively low under Alternatives A and B due to lower levels of oil and gas development and the tighter emission standards specified under Alternative B. Cumulative impacts would increase with the higher level of development and more relaxed emission standards under Alternative C. Maximum predicted nitrogen and sulfur deposition for cumulative sources based on air quality modeling is shown in Tables F-35 and F-36. Considering the results for the Flat Tops Wilderness Area, since this area is the closest to the MPA and most likely to receive direct impacts due to prevailing wind directions, maximum atmospheric deposition is expected to be the highest for alternative D (0.0636 kg/ha/yr for Nitrogen deposition and 0.0028 kg/ha/yr for Sulfur deposition). The higher values for Alternative D are most likely a function of the higher oil and gas development assumed under Alternative D.

Road widening and construction for future transportation projects on SH 13 from Rifle to the Wyoming border, SH 64 from Dinosaur to Meeker, SH 139 from Loma to Rangely, and Rio Blanco County Road 5 would cause short-term surface disturbance that could increase erosion and runoff from construction areas. This could increase cumulative water quality impacts that arise from oil and gas surface disturbance, including erosion and sediment loading in streams. Cumulative impacts would be proportional to the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D.

Dams capture sediment which could change river channel characteristics above and below the dam, leading to erosion downstream and sediment deposition upstream of the dam. Riverbed erosion and down-cutting could lower the water table along a river, altering vegetation and groundwater levels in the flood plain. Dams could increase water quality and water supply impacts in conjunction with oil and gas development. These impacts could increase dramatically if more dams are needed to provide water-supply infrastructure for natural gas and potential oil shale development. A government report on oil shale concluded that the lack of water-supply infrastructure would constrain development in the Colorado River Basin as much as the available water supply (OTA 1980). If this finding is still valid, an increase in oil shale production could presumably result in more dams throughout the Planning Area. Cumulative water quality impacts from current and future dams would be proportional to the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D.

Nahcolite is mined from the Green River formation. Leaching from mine waste materials could contribute sodium and fine sediment to surface water bodies and decrease water quality. Additional surface disturbance for future mine expansions could also contribute to cumulative water quality impacts. Cumulative impacts would be proportional to the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest under Alternative D.

Surface disturbance from new residential and commercial developments could result in short-term increases in soil erosion and runoff, and could increase cumulative stream sediment loads in conjunction with oil and gas activities. Cumulative impacts would be proportional to the amount of oil and gas development allowed by the BLM, and would be lowest under Alternative A and highest

BLM_0020190

under Alternative **D**. Additional water supplies and infrastructure would also be required to support new residences and businesses. This would increase demand for freshwater in the Colorado, White, and Yampa river basins at the same time that more water is being used for oil and gas development. Simultaneous increases in residential, commercial, and industrial water demand would leave less water available for other classified uses. Combined water use would be lowest under Alternative A and highest under Alternative D.

### 4.11.3.5   Vegetation

The cumulative impact boundary for vegetation is the Planning Area. Vegetation resources on these public lands could be affected by offsite use and development regardless of the RMPA alternative selected. The BLM management actions combined with urban and residential development (and associated increased recreational activities), and increased roads and highways could increase localized removal of or disturbance to vegetation. Land acquisitions by the BLM, or other jurisdictions with interest in maintaining vegetation and wildlife habitat could increase the potential to mitigate removal and/or disturbance of vegetation, especially where such acquisitions by the BLM would result in large contiguous blocks of public land. Integrated weed management would reduce the spread and potential for noxious weeds and invasive species establishment.

Alternative A would result in the least amount of well pads developed in vegetation communities and the least amount of associated surface disturbance, followed by Alternatives B, C, and D, respectively, with the greatest amount of well pads and surface disturbance proposed for Alternative D. The potential for Alternative A to add cumulatively to the impacts of other management actions on the distribution and composition of vegetation communities and the establishment and spread of noxious and invasive plant species would be smallest of all alternatives, and the potential for Alternative D to add cumulatively would be greatest. The potential for impacts from surface disturbance associated with oil and gas development for Alternatives B and C would be greater than Alternative A, with Alternative C having more surface disturbance than Alternative B, however, the weed management and reclamation measures would be more stringent for Alternatives B and C, with the reclamation measures most stringent for Alternative B.

### 4.11.3.6   Fish and Wildlife

The cumulative impacts analysis boundary for fish and wildlife includes the Planning Area and adjoining GMUs. An increase in the demand for oil and gas development and oil shale development would increase the likelihood of conflicts with wildlife by decreasing the quantity or quality of available habitat and increasing the behavior-related stress that could displace wildlife from essential habitats. Population growth and increased recreational activities could exacerbate the effects associated with natural resource development in the region. Past designations of state and federal reserves of land in conjunction with more environmental legislation have helped to preserve habitat and land for wildlife. Protective management of wildlife in these areas likely has contributed to growth of some big game and other wildlife populations in recent decades. Future refinements to environmental legislation and future designations such as wilderness areas, parks, state wildlife areas, and other use-specific land designations could contribute further to directly or indirectly preserving habitat for wildlife in the Planning Area.

The greater consumptive use of limited water resources coupled with the already degraded condition of water resources from historic agriculture use would provide fewer water resources for wildlife in the future and could further compromise the quality of available water in localized areas. This would affect the integrity of aquatic and riparian habitats and the availability of drinking water for big game and other wildlife. Although historic interpretation of water rights did not recognize uses

BLM_0020191

for wildlife and other ecosystem functions as a beneficial use, modern interpretations of Colorado water law do recognize ecosystem functions as beneficial uses. This could somewhat counterbalance human consumptive uses in the future.

With greater development and a larger human population in the region, motorized vehicle use would likely have a greater influence on areas that are used by wildlife in the future. These influences could further alter the quality of habitat and increase the potential for behavior-related displacement from essential habitat areas.

Natural resource development in the Planning Area could alter traditional livestock grazing operations and other rural pursuits in response to development. This could introduce future ground disturbances and other human disturbances that are more influential at removing or altering habitats and use patterns of wildlife in the region.

Cumulative impacts to wildlife, (i.e., loss of habitat), increase in motorized vehicles, and a decrease in the volume and quality of water resources would increase with the total area of oil and gas surface disturbance allowed under each alternative in the Planning Area and adjoining GMUs. Cumulative wildlife impacts would be lowest under Alternative A (550 well pads) and highest under Alternative D as this alternative would have the highest density of oil and gas development (2,556 well pads) and would concurrently provide the fewest number of specific protections for wildlife.

### 4.11.3.7   Special Status Animal Species

The cumulative impacts analysis boundary for special status animals includes the Planning Area. For Colorado River endangered fish species, the cumulative impact analysis boundary also includes downstream rivers in the upper Colorado River system, and for sage-grouse, it includes the portions of the Parachute-Piceance-Roan Plateau and northwest Colorado populations that are located outside of the Planning Area.

The special status animal species that occur in the Planning Area have been affected by a variety of past actions including diversion of streamflows, introduction of diseases and competing species, removal or degradation of habitat, and increases in land disturbing and disruptive activities. Continued oil and gas and other energy development, utility and transportation corridors, and regional population increases are expected to continue to have the potential to reduce the population size and/or distribution of some special status animal species, including greater sage-grouse and sensitive aquatic species. Species listed under the ESA, including black-footed ferret, Canada lynx, and the four Colorado River endangered fish species are expected to not exhibit cumulative impacts. The alternatives include decisions that would mostly protect or enhance, to varying degrees, the populations and habitats of special status animal species.

Black-footed ferrets are currently known to exist only at reintroduction sites and in captivity, and all natural populations were lost through drastic reductions in habitat by land conversion, prairie dog control, and disease. Reintroduction began in 1991 and there are currently 18 black-footed ferret reintroduction sites in 8 states and Mexico with about 800 to 1,000 individuals alive in the wild (Black-footed ferret Recovery Implementation Team 2009). The Planning Area includes one recovery site (Wolf Creek) and a portion of a second site (Coyote Basin). Potential habitat (white-tailed prairie dog towns) extends outside of the Planning Area recovery areas, mostly along U.S. 40. Most of the suitable habitat is not a high priority area for oil and gas activities or other energy development, but transportation and utility corridors could be placed in these areas. One area, the Rangely Basin, has both white-tailed prairie dogs and large amounts of oil and gas

BLM_0020192

facilities. Present and reasonably foreseeable future actions are not expected to affect recovery of black-footed ferrets at Wolf Creek or Coyote Basin. All of the RMPA alternatives would contribute to recovery, but Alternative D would be the least effective.

Canada lynx could occur occasionally on BLM lands in the Planning Area, but there is only about 2,000 to 3,000 acres of suitable denning or winter habitat on BLM lands, compared to the average home range in Colorado of more than 100,000 acres. Canada lynx habitat occurs at high elevations and mostly on FS lands. Lynx habitat in Colorado is part of the Southern Rockies provisional core area for recovery (FWS 2005). Energy development and other present and reasonably foreseeable future actions would affect only a small portion of habitat and are not likely to change the population or overall availability of habitat. Increased human population is likely to result in increased recreation and hunting in their habitat, but similarly is not likely to reduce the overall availability of habitat or lynx populations, because lynx range over very large areas. None of the RMPA alternatives are anticipated to contribute to cumulative impacts on the species.

Most of the decline of the four Colorado River endangered fish species in the upper Colorado River is thought to be due to habitat loss from water diversions and dams and introduction of non-native fish species. The recovery program for these species includes maintenance of more natural river flows by releasing more water from dams in the spring, stabilizing flows in late summer, development of passageways around barriers, working to prevent non-native fish from adversely affecting the species, captive breeding, and management of riverside wetlands and backwaters for use by young endangered fish. Oil and gas, other energy development, and population growth in the region are likely to require additional consumptive use of water from the upper Colorado River. Depletions of any amount are considered by the FWS to be an adverse effect, and ESA consultation with the FWS would be required for all unreported historic and all future depletions that require a federal approval for their continuation or initiation. With the recovery program and requirements for consultation on depletions, present and reasonably foreseeable future actions are not expected to result in a cumulative loss of populations or habitat of these species.

Cumulative effects to Colorado River cutthroat trout and other sensitive aquatic species could occur from any activities that reduce the amount or quality of habitat, such as diversion or change of streamflows or reductions in water quality from increased erosion in disturbed areas. Increased oil and gas and other energy development is likely to result in cumulative impacts to these species and their habitat. Much of the distribution of sensitive aquatic species in the Planning Area, especially flannelmouth and mountain suckers, occurs on privately owned reaches of streams that could be subject to degradation of habitat from water depletion and inappropriate channel management that is outside of the BLM's control. Colorado River cutthroat trout could have similar effects although a larger proportion of their habitat in the Planning Area is managed by federal agencies. Alternative D could contribute to degradation of habitats of sensitive aquatic species.

Cumulative impacts to special status raptors could occur from human activity that affects raptor nesting and from loss of habitat on both the BLM and other lands. Although active raptor nests are protected by the Migratory Bird Treaty Act, energy development, transportation corridors, and human population growth are likely to lead to loss of functional nesting sites and woodland habitats, which could reduce population size. Populations of sensitive bat species could also be reduced by loss of mature woodland habitat. Alternative D could contribute to cumulative losses of functional nest sites and of mature woodlands, but the other RMPA alternatives are not likely to cause changes to the distribution and abundance of special status raptor species.

BLM_0020193

The primary threats to greater sage-grouse in northwest Colorado are energy development, disease (West Nile virus), and habitat fragmentation (FWS 2008). Cumulative impacts would occur from oil and gas activities and other energy development on both the BLM and private lands. Much of the habitat and many of the leks of the Parachute-Piceance-Roan population are on private land and outside the management of the BLM, but COGCC requirements would provide some protection. This population is likely to experience both reduction of population and distribution from the cumulative effects of development. Although all of the RMPA alternatives have measures to protect sage-grouse breeding and habitat on BLM lands, all of the alternatives could contribute to cumulative losses or population and/or distribution changes, with Alternatives A and D having the largest impacts. Sage-grouse in the northwest Colorado population are less likely to have reductions in population or distribution because of a lower potential for oil and gas development and because their habitat is less fragmented.

### 4.11.3.8    Special Status Plant Species

The cumulative impacts analysis boundary for special status plants includes the Planning Area. Past, present, and reasonably foreseeable future actions that could impact special status plant species in the Planning Area include oil and gas development, other energy exploration and development, utility and transportation corridors, and regional population increases. These actions would affect special status plants and their habitats mostly through construction and use of roads and utility corridors, OHV use and dispersed recreation, and introduction and spread of invasive species.

These activities could cause direct disturbance to occupied or suitable habitat, fragmentation of habitat, or degradation of habitat quality. Populations of special status plants are typically patchy and do not occupy all suitable habitat. Elimination or fragmentation of habitat could affect population dynamics. All surface disturbances have the potential to increase the spread and abundance of noxious weeds, which could degrade special status plant habitat and increase competition. Linear facilities (e.g., water courses, roads, utility ROWs) could increase the spread of noxious weeds through inadvertent transport by water, wind, vehicles, livestock, humans, and wildlife.

Most documented sensitive plant species within the Planning Area occur in locations outside of the majority of the proposed areas of oil and gas development, or on steep slopes which would be protected under NSO stipulations. Cumulative impacts would be more likely to occur indirectly to these populations. Cumulative impacts to special status plant species or their suitable habitats occurring outside of ACEC's would be similar across alternatives as Management Goals are consistent across all alternatives. Cumulative impacts would be the greatest under Alternative D, where the greatest amount of oil and gas development would occur. Due to the existing protections for these species, cumulative impacts between Alternatives B and C would be similar. The fewest protections would occur under Alternative A; however, Alternative A would have the least amount of disturbance. For Dudley Bluffs bladderpod and Dudley Bluffs twinpod, past activities appear to have had limited affects on the amount of occupied habitat and population size. Some losses of individuals and habitat have been reported from grazing, from unauthorized oil and gas activity, and from monitoring on steep slopes. In addition, successful reclamation of disturbed habitat has not been observed. These two species are protected under the ESA, and most of their occurrences are on federal land. Present and future activities are unlikely to directly result in cumulative reductions in populations or habitat of these species because of the protections provided through the ESA Section 7 consultation process. Loss or degradation of habitat could occur from indirect effects and from other causes such as unauthorized OHV use, but cumulative adverse effects are likely to be limited by the BLM's management.

BLM_0020194

The BLM sensitive species are only protected on federal land, and occurrences of these species and of CNHP-listed species on non-federal lands receive no official protection. Populations on BLM lands are likely to continue in existence because of the BLM management policies and actions. Populations on non-BLM lands could be eliminated or degraded by activities over which the BLM has no authority. If cumulative effects reduce these species to a point where survival could be jeopardized, they would likely become federally listed species and receive more protection.

Climate change could affect the populations and habitat of any of the special status plant species. Changes are likely to include increased temperatures, increased potential for drought, changes in the season of precipitation, and more intense rainfall. Climate change could affect fire ecology, erosion, and behavior of other species, including invasive species. Several of the special status plant species occur on restricted habitats, and would have limited or no ability to adapt to climate change by establishing new populations in new areas. The amount of change and the ultimate effects are not known at this time.

### 4.11.3.9    Wild Horses

The cumulative impacts analysis area for wild horse management includes the Planning Area. Historic development of oil and gas and agricultural uses in the region has increased demand for water and transferred water rights to consume more of the available water in the area. The trend has reduced the available surface water and degraded the quality of fresh water sources through time. This has likely affected the historic distribution and health of bands of wild horses in the Planning Area. This trend would likely continue into the future and could accelerate depending on the oil and gas markets. Higher oil and gas prices could accelerate this trend while depressed oil and gas prices could decelerate the trend.

The potential increase in oil and gas development and future potential oil shale and renewable energy development could increase the demand for land use authorizations within the Planning Area. Indirectly this would result in an increase in surface disturbance as more well pads, access roads, pipelines, and energy facilities are developed. These activities could reduce the quality of habitat and forage resources, and potentially alter the distribution of wild horses in the HMAs. Cumulative impacts on wild horses would be greatest under Alternative D, since this alternative has the highest projected oil and gas development. Management decisions under Alternative B would limit the extent of surface disturbance associated with oil and gas development compared to Alternatives A, C, and D.

### 4.11.3.10   Wildland Fire Ecology and Management

The cumulative impacts analysis area for wildland fire ecology and management includes the Planning Area, adjacent communities, wildland/urban interface areas, and the airshed. Future wildland fires and prescribed fire emissions would combine with vapor emissions from oil and gas operations and other potential resource industries (coal and oil-shale development) in the region for a cumulative increase of atmospheric haze with a corresponding reduction in long-range visibility. The cumulative effect of haze on visibility is uncertain considering annual fluctuations in fire related haze, weather, and the effects of emission control technology. This could combine to limit the ability to further use prescribed fire as a management tool in the Planning Area.

Past management practices of extinguishing or preventing all fires on public lands during the past 50 or more years in the western U.S. has led to the accumulation of unnaturally high fuel loads in native habitats. This has contributed to recent catastrophically intense fires throughout the region surrounding the Planning Area and an increased general risk of intense fires in the Planning Area.

BLM_0020195

This could require a greater management effort to protect human life, property, and natural and cultural resources throughout the life of this plan, given the increased potential of fires associated with oil and gas development.

Projected population growth could nearly double of the population in Mesa, Garfield, Rio Blanco, and Moffat counties to 417,000 residents by 2035. Increasing the population could increase the potential for human ignited wildland fires throughout the Planning Area, adjacent communities, wildland/urban interface areas and the airshed. These potential ignition sources could also come from increased recreation in the Planning Area or an expanded urban interface if it increases the number of remote dwellings regionally.

Alternative A would result in the least amount of well pads developed in vegetation communities retaining the greatest extent of the current FRCC. Alternatives B, C, and D include progressively increasing number of well pads and associated surface disturbance, with the greatest amount of well pads and surface disturbance proposed for Alternative D. Increasing the number of well pads in conjunction with the increase in potential ignition sources and WUI areas, the potential for wildland fire could increase relative to Alternative A. Conversely, depending upon site-specific conditions, the increase in the number of roads associated with oil and gas development could reduce the size of wildland fires. The increased amount of oil and gas development under Alternative D could increase access of wildland firefighters to wildland fires relative to Alternatives A, B, and C. Vapor and particulate emissions from development could limit the opportunities to implement prescribed wildland fire in the Planning Area due to smoke permit constraints based on air quality.

### 4.11.3.11   Cultural Resources

The cumulative impact analysis area for cultural resources includes the Planning Area and neighboring lands with a high potential for cultural resources. Surface-disturbing activities within areas containing cultural resources have the potential to damage these fragile, nonrenewable resources, especially those cultural resources listed or considered eligible for listing in the National Register of Historic Places. Existing laws, regulations, and policies provide the opportunity to mitigate adverse effects of federal activities through avoidance or collection of artifacts, ancillary specimens and data.

In addition to oil and gas development, several land and resource uses could increase cumulative disturbance, including construction of natural gas pipelines and treatment plants, coal mining, highway construction and maintenance, oil shale development, livestock grazing, recreation, and development to support a growing regional population. The extent of future disturbance from these actions is unclear. Surface disturbance associated with these land uses could result in a greater potential for erosion and other adverse effects to exposed and buried historic properties. Cumulative impacts would be highest under Alternative D, because this alternative would potentially have the greatest amount of oil and gas development (2,556 total well pads in the Planning Area) and would also require the highest density of support facilities for workers and other needed infrastructure. Alternative A, with a lower density of oil and gas development (550 total well pads), would have the least amount of cumulative impacts, while impacts associated with Alternative B (1,100 total well pads) and Alternative C (1,800 total well pads) would fall between these two extremes.

Within the Planning Area, the scale and extent of future oil shale development cannot be projected at this time. Currently, 800 acres of the Planning Area are leased for oil shale research and development tracts, and approximately 337,200 acres are available for oil shale leasing. If oil shale development is eventually undertaken as a commercial enterprise, it would increase the cumulative loss of cultural resources throughout the Planning Area. In general, cumulative impacts to cultural

BLM_0020196

resources would be proportional to the total area of surface disturbance, and thus would be lowest under Alternative A and highest under Alternative D.

### 4.11.3.12  Paleontological Resources

The cumulative impact analysis area for paleontological resources includes the Planning Area and neighboring lands with a high potential for paleontological resources. Surface and subsurface disturbing activities within areas containing substantial fossil deposits have the potential to damage these fragile, non-renewable resources; however, existing laws, regulations, and policies help mitigate the effects of federal activities through avoidance or collection of specimens and data.

In addition to oil and gas development, several land and resource uses could increase cumulative disturbance, including construction of natural gas pipelines and treatment plants, coal mining, highway construction and maintenance, oil shale development, and development to support a growing regional population. The extent of future disturbance from these actions is unclear. Development of these land uses would result in surface disturbance in order to construct new facilities, thus increasing the potential for erosion. These effects, when combined with subsurface impacts from oil and gas development, could increase cumulative paleontological losses throughout the Planning Area. Cumulative impacts would be highest under Alternative D, because this alternative would potentially have the greatest amount of oil and gas development (2,556 total well pads in the Planning Area), and would also require the highest density of support facilities for workers and other needed infrastructure. Alternative A, with a lower density of oil and gas development (550 total well pads), would have the least amount of cumulative impacts. The impacts associated with Alternative B (1,100 total well pads) and Alternative C (1,800 total well pads) would fall between these two extremes.

Within the Planning Area, the scale and extent of future oil shale development cannot be projected at this time. Currently, 800 acres of mineral estate are leased for oil shale research and development tracts, and approximately 337,200 acres are available for oil shale leasing. In these areas, disturbance from oil extraction would result in a potential loss of subsurface paleontological resources similar to conventional oil and gas development, especially where hydrocarbons are extracted via surface mining and retorting. If oil shale development is eventually undertaken as a commercial enterprise, it would increase cumulative paleontological resource losses throughout the Planning Area. Cumulative impacts to paleontological resources would be proportional to the total area of surface disturbance, and thus would be lowest under Alternative A and highest under Alternative D.

### 4.11.3.13  Visual Resources

The cumulative impact boundary for visual resources is the Planning Area. Under all alternatives, cumulative impacts on visual resources could occur from surface disturbance, emissions that alter visibility, or the introduction of man-made elements that increase contrast, or alter form, line and color within areas managed to meet VRM Class I and II objectives. The degree of impact would depend on the visibility of the project, and the VRM Class of the particular managed areas.

Road and ROW development associated with oil and gas development activities would alter landscape contrasts in line and landform. In comparison to Alternatives A, B, and C, Alternative D would potentially have the highest cumulative impacts associated with visual changes in landscape contrasts with an estimated 1,840 miles of roads constructed over the next 20 years.

BLM_0020197

Future wildfire and prescribed fire emissions would combine with combustion emissions and fugitive dust from oil and gas operations for a cumulative increase of atmospheric haze with a corresponding reduction in long-range visibility. The cumulative effect of haze on visibility is uncertain considering annual fluctuations in fire related haze, weather, and the effects of emission control technology. Smoke and haze would most likely limit long-range visibility during the summer season when fire is common and high pressure weather patterns result in relatively stagnant air. In comparison to Alternatives A, B, and C, Alternative D would have the potential for highest cumulative impacts with 21,200 possible new wells estimated as 2,556 new well pads over the next 20 years.

Livestock grazing management structures that would likely contribute to the appearance of structures in the Planning Area include fences, cattle guards, corrals, and stock tanks. Localized vegetation and forage improvement projects would result in moderate contrasts in texture, line, and color over the short-term. Cumulative impacts resulting from livestock grazing decisions would be similar for each RMPA alternative.

### 4.11.3.14   Forestry and Woodland Products

The cumulative impact boundary for forest and woodlands is the Planning Area. Past, current, and future management actions that could affect forest and woodland products include livestock grazing, wilderness area designation, timberland reserves, wildlife conservation easements, coal mining, construction of gas pipelines, oil shale leasing areas, gas plants, energy corridors, scenic byways, and transportation improvements. These actions, in combination with oil and gas development in the Planning Area, would add cumulatively to the effects on the quantity and quality of forest and woodland products available for harvest, seral stage, age class, and structure of forest and woodlands, and access by vehicles to forest and woodlands. Alternative A would result in the least amount of well pads developed in forest and woodlands, followed by Alternatives B, C, and D, respectively, with the greatest amount of well pads proposed for Alternative D. The potential for Alternative A to add cumulatively to the impacts of other management actions on forest and woodland products would be smallest of all alternatives, and the potential for Alternative D to add cumulatively would be greatest.

Present and future livestock grazing in the Planning Area could impact success of reclamation efforts. This in turn could affect the quality and quantity of forest and woodland products available for future harvest. Where livestock is excluded from regenerating areas prior to successful reclamation, success would not be impacted. However, livestock grazing on young saplings, such as aspen, could impede maturation of these trees.

Restrictions on where timber harvest is allowed in the White River National Forest (White River Plateau Timberland Reserve) in combination with restrictions and stipulations proposed for oil and gas development would cumulatively affect the quantity of forest and woodland products available for harvest.

If wildlife conservation easements overlap forest or woodlands, these easements could affect the availability of these areas for harvest. If unavailable, trees in these areas would continue to mature and could develop old-growth characteristics.

If proposed coal mining, gas pipelines, oil shale leasing areas, gas plants, and energy corridors are constructed in the Planning Area, in combination with oil and gas development overlap forest and woodland areas, an incremental decrease in harvest of forest and woodland products could result. Long-term, there could be a loss of productivity of these lands from the conversion of vegetated

BLM_0020198

areas to a disturbed condition. Loss of productivity could equate to a loss of quantity and quality of forest and woodlands available for future harvest and a delay of tree maturation and development of old-growth characteristics.

The Flat Tops Trail Scenic Byway cuts through the White River National Forest and provides access to forested areas on BLM lands which could potentially result in the harvest of forest and woodland products.

If transportation improvements on SHs 64 and 139 result in the removal of forest and/or woodland habitat, these reasonably foreseeable future actions could result in an incremental increase in harvest of forest and woodland products associated with construction, and a decrease in forest and woodland products available for future harvest.

### 4.11.3.15  Livestock Grazing

The cumulative impact boundary for livestock grazing is the Planning Area and the allotments that extend into adjacent management areas. Historic oil and gas development in the region has increased demand for water rights shifting water use from agriculture to oil and gas production. This water use trend has reduced the ability of some livestock operators in the region to run cow/calf operations because the water necessary to raise winter feed has gone into oil and gas production. Some livestock operators have changed their operations from cow/calf operations to yearling operations because yearling operations rely less on raising winter feed. This trend could continue into the future and could accelerate depending on the oil and gas markets. Higher oil and gas prices could accelerate this trend whereas depressed oil and gas prices could decelerate the trend.

Livestock grazing in the Planning Area could affect the success of reclamation efforts in disturbed areas. This could indirectly affect the quality and quantity of forage available for livestock grazing. Where livestock grazing is excluded from disturbed areas prior to successful reclamation, reclamation success could increase the quantity and quality of forage available for livestock grazing. However, livestock grazing on young saplings, such as aspen, could impede maturation of these trees and disturbance in these areas could reduce the area available.

Alternative A would result in the least amount of surface disturbance from well pads, transmission lines, and pipelines. Relative to Alternative A, the effects of surface disturbance on livestock grazing increases under Alternatives B, C, and D, respectively. The greatest amount of well pads and surface disturbances result under Alternative D. Alternative A has the lowest potential to incrementally increase the effects of other management actions on livestock grazing, while Alternative D has the greatest potential. With potentially greater development occurring under Alternative D than under Alternatives A, B, and C, there would be a greater potential to alter the distribution and amount of forage available for livestock.

### 4.11.3.16  Minerals

The cumulative impacts analysis boundary for minerals includes the Planning Area. The cumulative impact of past, present, and reasonably foreseeable future actions on the energy and minerals resource programs would result from the development of energy (renewable and non-renewable) and minerals and their associated infrastructure in the Planning Area.

Increased demand for energy and minerals would increase the amount of drilling, which varies by alternative. Alternative A has the lowest number of new well pads proposed, followed by Alternatives B and C, respectively; Alternative D has the highest number of new well pads proposed. The potential for Alternative A to add cumulatively to the impacts of other management

BLM_0020199

actions on energy and mineral resources would be smallest of all alternatives, and the potential for
Alternative D to add cumulatively would be the greatest. The majority of oil and gas development
has occurred in the western portion of the Planning Area, around Rangely and south along SH 139
west to the Utah border and in the White River Dome area. In the future, oil and gas development
activities are planned primarily in the Piceance Creek Basin (i.e., the MPA).

The cumulative effects on energy and minerals are interrelated with various energy-related
economic growth activities in the Planning Area. Increased demand for energy and minerals would
increase the likelihood of the need for new or expanded facilities to accommodate energy growth,
such as coal mining, oil shale leasing and development, natural gas production, nahcolite mining,
and renewable energy development; the need for major utilities such as transmission lines, gas
pipelines, and communications sites; and the need for distribution lines and roads. The development
of these resources within the Planning Area would continue to be limited by the protected status of
wilderness areas, national monuments, scenic byways, or other areas that contain management
prescriptions that restrict land use authorizations.

The West-wide Energy Corridor PEIS designated more than 6,000 miles of energy transport
corridors on federal lands in 11 western states (including Colorado) which could be utilized for
future energy and minerals development. The BLM WRFO would utilize these energy corridors to
facilitate future siting of oil, gas, and hydrogen pipelines, as well as renewable energy development
projects and electricity transmission and distribution facilities on federal lands to meet increasing
energy demands.

New shifts by agencies and developers toward renewable energy in response to regulations, climate
change, and the economic viability of renewable energy projects could cause a shift in demand for
the types of land use requests to the BLM. The Colorado Climate Action Plan – A Strategy to
Address Global Warming includes goals to reduce GHG emissions through implementation of an
agricultural carbon sequestration and offset program and establishment of two greenhouse-gas
reduction goals: 20 percent below 2005 levels by 2020 and 80 percent by 2050 (State of Colorado
2007). The BLM has undertaken several recent planning efforts to facilitate renewable energy
development (e.g., wind and solar) on BLM-managed lands. The viability of development of
renewable energy resources within the Planning Area could conflict with areas with oil and gas
leases within the Planning Area.

### 4.11.3.17   Recreation

The cumulative impact boundary for recreation and visitor services is the Planning Area. An
increase in the demand for oil and gas development and recreation opportunities in the Meeker area
could have impacts on recreational pursuits due to user conflicts or by excluding user access to
certain areas because of oil and gas development. Due to the increase in the surrounding area's
population, particularly in the Town of Meeker and surrounding areas, recreational demands on
nearby public land would continue to increase and could gradually degrade resources as recreational
and other uses expand to other areas. An increase in infrastructure, residential, and business
developments could decrease the experience for those seeking a primitive recreation experience. In
addition to these cumulative impacts, land use designations such as wilderness areas, parks, and
other use-specific land designations could also have small, localized impacts on the recreational
experience due to incompatibility of allowable uses.

Additionally, cumulative impacts on recreation would potentially occur from a combination of land
uses that result in limiting access for recreation and conflicts for unconfined and primitive
recreation opportunities. Community development, transportation infrastructure, and management

BLM_0020200

of fish and wildlife habitat areas and scenic byways have created a combination of land uses that could have regional or local impacts on recreation because of conflicting use or limited access to recreational opportunities. Such impacts are a result of an increase in recreational activities occurring within and outside of the Planning Area.

The potential increase in oil and gas development and future potential oil shale and renewable energy development could increase the demand for land use authorizations within the Planning Area. Indirectly this would result in an increase in surface disturbance as more well pads, access routes, pipelines, and energy facilities are developed. These activities could limit access for recreation activities, create user conflicts and reduce the quality of the recreation setting and degrade the experience for primitive and nonprimitive recreation. Cumulative impacts on the recreation setting and experience would be greatest under Alternative D, since this alternative has the highest projected oil and gas development. Management decisions under Alternative B would limit the extent of surface disturbance associated with oil and gas development compared to Alternatives A, C, and D.

### 4.11.3.18   Comprehensive Trails and Travel Management

The cumulative impact boundary for comprehensive trails and travel management is the Planning Area. Future roadway improvements identified by CDOT as regional priorities include SH 13 from Rifle to the Wyoming border, SH 64 from Dinosaur to Meeker, and SH 139 from Loma to Rangely to add passing and acceleration lanes and construct shoulders and intersection improvements. These projects would regionally improve access for motorized vehicle travel and accommodate an increase in traffic volume.

The potential increase and demand for oil shale development would result in an increase in transportation infrastructure (the development of resource roads) which would increase access for motorized vehicle travel throughout the Planning Area. Cumulative impacts would be the greatest under Alternative D, since this alternative has the highest projected oil and gas development and miles of resource roads. Management decisions under Alternative B would limit the miles of resource roads and limit access for motorized vehicle travel compared to Alternatives A, C, and D. Alternative C would result in an increase in the miles of resource roads and access for motorized vehicle use compared to Alternative A and B. The projected growth in population and employment (approximately 417,000 residents by 2035 with the most rapid growth occurring in rural areas of western Garfield, Rio Blanco, and Moffat counties) would result in a growing network of roads for motorized vehicle travel to access residential developments, businesses, and industry.

### 4.11.3.19   Lands and Realty

The cumulative impacts analysis boundary for lands and realty includes the Planning Area and major ROWs that intersect the Planning Area. The cumulative impact of identified actions on the BLM's lands and realty program would result from activities that affect the BLM's ability to authorize land use authorizations (including ROWs) in the Planning Area. Alternative D proposed the greatest increase compared to Alternatives A, B, and C, in land use authorizations from oil and gas development.

The collective effects on lands and realty for Alternatives A, B, C, and D are interrelated with various energy-related economic growth activities in the Planning Area. Increased demand for energy and minerals would increase the likelihood of the need for the use of existing ROW corridors for major utilities such as transmission lines, gas pipelines, and communications sites. The need for minor ROWs (such as distribution lines and roads) and new or expanded facilities to

BLM_0020201

accommodate energy growth, such as coal mining, oil shale leasing and development, natural gas production, and nahcolite mining, are also affected by the increased demand for energy and minerals. The development of these resources within the Planning Area and associated demand for land use authorizations to support development would continue to be limited by the protected status of wilderness areas, national monuments, scenic byways, or other areas that contain management prescriptions that would restrict land use authorizations. Most development of utility and transportation corridors has occurred in the central and western portion of the Planning Area, near Dinosaur, Rangely, and Meeker, and along U.S. 40 and SH 64. In the future, energy and minerals-related economic development activities and associated population growth in Mesa, Garfield, Rio Blanco, and Moffat counties would likely drive the location and types of ROWs authorized by the BLM WRFO. Future ROWs to support the needs of the increased population and continued energy and minerals development would require upgrades to existing transportation corridors (SHs 13, 64, and 139). The 2009 West-wide Energy Corridor ROD designated more than 6,000 miles of energy transport corridors on federal lands in 11 Western States (including Colorado) that could be utilized for future energy and minerals development. It amended the 1997 White River RMP and identified energy corridors that the BLM WRFO could utilize to facilitate future siting of oil, gas, and hydrogen pipelines, as well as renewable energy development projects and electrical transmission and distribution facilities on federal lands to meet increasing energy demands.

New shifts by agencies and developers toward renewable energy development in response to the regulatory climate and climate change could cause an additive shift in demand for the types of land use authorizations requested to the BLM. The Colorado Climate Action Plan – A Strategy to Address Global Warming includes goals to reduce GHG emissions through implementation of an agricultural carbon sequestration and offset program and establishment of two greenhouse-gas reduction goals: 20 percent below 2005 levels by 2020 and 80 percent by 2050 (State of Colorado 2007). The BLM has undertaken several recent planning efforts to facilitate renewable energy development (e.g., geothermal, wind, solar). The BLM in cooperation with other agencies prepared a Geothermal Resources Leasing PEIS to analyze and expedite the leasing of the BLM- and USFS-administered lands with high potential for renewable geothermal resources in 11 Western states and Alaska (BLM and USFS 2008). The viability of development of renewable energy resources within the Planning Area could cause additive demand for land use authorizations within the Planning Area.

## 4.11.3.20   Special Designations

The cumulative impacts analysis boundary for WSAs and ACECs is the boundary of each WSA and ACEC within the Planning Area. The cumulative impact analysis area for scenic byways is the extent of the ways in the Planning Area.

The cumulative effects on special designations are interrelated with various energy-related economic growth activities in the Planning Area. Increases in oil and gas exploration, population growth, and improvements to SH 64 and county roads could increase recreation in WSAs, ACECs, and scenic byways. Most development of utility and transportation corridors has occurred in the central and western portion of the Planning Area, near Dinosaur, Rangely, and Meeker, and along I-40, and SH 64. The November 2008 West-wide Energy Corridor PEIS designated more than 6,000 miles of energy transport corridors on federal lands in 11 Western States (including Colorado). Future ROWs to support the needs of the increased population and continued energy and minerals development would require upgrades to existing transportation corridors (SHs 13, 64, and 139). The increase in recreation within special designations could result in widespread, low intensity surface disturbance. This could indirectly result in the localized loss of wilderness characteristics within WSAs, relevant and important values in ACECs, and the loss of cultural or paleontological

BLM_0020202

resources associated with scenic byways. The cumulative effects to special designations from these actions could be the greatest under Alternative D due to the number of potential well pads and could be the least under Alternative A.

New shifts by agencies and developers toward renewable energy development in response to the regulatory climate and climate change could increase the demand for land use authorizations within the Planning Area. Indirectly this could increase visual contrasts in areas adjacent to Dinosaur Diamond and Flattops scenic byways. The expansion of oil and gas development allowed under Alternative D could result in the largest amount of land use authorizations to be sited outside of designated corridor networks and could require the BLM to establish new corridors to provide opportunities for future ROWs. Indirectly this could result in the greatest cumulative effect to visual resources in areas adjacent to scenic byways. The management approach associated with Alternative B would limit the spatial extent of surface disturbance associated with oil and gas activities over the development scenario presented in Alternatives A, C, and D. Concentrating oil and gas activities and the associated infrastructure of pipelines and other support features could result in less visual contrast in areas adjacent to scenic byways.

### 4.11.3.21  Non-WSA Lands with Wilderness Characteristics

The cumulative impact analysis boundary for lands with wilderness characteristics includes WSA lands and non-WSA lands with wilderness characteristics within, and adjacent to, the planning area. It also includes designated wilderness on neighboring federal lands. This is a general representation of the current regional area inventoried to have wilderness characteristics from the perspective of the users that would typically benefit from other resources or uses within the planning area.

Currently, approximately 81,116 acres are designated as WSAs within the WRFO. The neighboring Kremmling Field Office (KFO) contains 9,120 acres of designated WSAs; Colorado River Valley Field Office (CRVFO) contains approximately 27,760 acres of WSAs; Little Snake Field Office (LSFO) contains approximately 78,250 acres of WSAs; and Grand Junction Field Office (GJFO) contains approximately 92,765 acres of WSAs. In the neighboring Grand Junction Field Office, the Black Ridge Wilderness and the Dominguez Canyon Wilderness were designated in 2000 and 2009, respectively. The White River National Forest (WRNF) manages eight designated wilderness areas totaling approximately 754,500 acres, however only the Flat Tops Wilderness, totaling 235,214 acres, falls within, or immediately adjacent to, the Planning Area.

Under all alternatives, WSAs in the planning area would continue to be managed under the Interim BLM Management Policy (IMP) for Lands under Wilderness Review until Congress either designates or releases all or portions of the WSAs from further consideration for wilderness. Since this is the case, there are no present or future actions, or combination of actions, likely to have significant cumulative effects on the wilderness characteristics in WSAs.

Several reasonably foreseeable trends might result in cumulative impacts to non-WSA lands with wilderness character. One is the continued use of citizen-initiated proposals, or where areas that possess wilderness characteristic are not protected. Maintaining the high visibility of these lands with the public could result in beneficial impacts. Public participation in the planning and decision-making process would ensure the consideration of the assessed wilderness character. Two others, an overall population increase in the region over the life of the plan and a growth in regional tourism based on available outdoor opportunities and scenic landscapes, could be expected to continue the current trend of increased demand for a variety of recreation in a variety of recreation settings.

BLM_0020203

*Chapter 4 – Environmental Consequences*

The impact to lands with wilderness characteristics resulting from the human actions and natural processes listed above, combined with proposed management actions under Alternative B, would likely result in overall beneficial impacts to wilderness character in these areas. Additionally, the specific management actions designed to protect wilderness character, combined with the alignment of other resource management actions designed to support protection, would result in long-term protection of inventoried wilderness character.

### 4.11.3.22  Socioeconomic Resources

The cumulative impacts analysis area for socioeconomics includes the Planning Area and Moffat, Rio Blanco and Garfield counties. Social and economic conditions in both the PSSA and the SSSA over the next 20 years would be affected by numerous factors beyond the resource management decisions made by the BLM for the Planning Area. The analysis considered the potential for cumulative impacts from other reasonably foreseeable future actions within the PSSA and SSSA. At the landscape level, key factors in terms of cumulative social and economic impacts include:

- Oil and gas activity outside of the Planning Area, but within the SSSA;

- Economic development and growth in other sectors within the PSSA and SSSA;

- Further development of oil shale research development and demonstration projects within the PSSA; and

- Potential development of commercial oil shale within the PSSA.

Over the past decade, the majority of natural gas drilling activity in the socioeconomic study area has occurred outside of the Planning Area in the SSSA, principally in Garfield County and Uintah County, Utah. Research conducted by the study team with representatives of the natural gas industry in 2006-2007 indicated that the development of new oil and gas wells in Garfield County was expected to continue at approximately the same pace through about 2015 and then gradually diminish over the following 10 years or more. The national economic recession, which began in late 2008, and falling natural gas prices have led to a decrease in Garfield County and Uintah County natural gas activity. A rebound in activity to gas development levels more similar to those experienced from 2006-2008 appears to be reasonably foreseeable. Gas development in Garfield County and Uintah County, like gas development in the Planning Area, would result in economic and demographic effects throughout the PSSA and SSSA. This would be due to the extensive commuting of energy workers within the region and the regional nature of the energy industry.

Other economic drivers would also contribute to further economic development and population growth in the PSSA and SSSA. In Colorado, the official source of employment and population forecasts is the State Demography Office (SDO). The SDO's forecasts are based on projected growth in "economic base" jobs – these are activities such as tourism, regional services, manufacturing and agriculture that bring dollars from outside the area into the local economies. The SDO projections, adjusted by the study team to exclude energy-related activities, envision that the non-energy related economic base in the PSSA would increase from approximately 2,157 jobs in 2010 to approximately 4,744 jobs in 2030. The largest growth is expected to occur in tourism jobs, state and federal government jobs and regional service and household direct basic jobs. The latter represents the spending of household income by retirees and individuals receiving transfer payments, among other components.

BLM_0020204

*Chapter 4 – Environmental Consequences*

Figure 4-20 depicts the projected growth in the non-energy-related economic base in the PSSA under the SDO's latest projections.

**Figure 4-20. Projected Non-Energy Economic Base Jobs in the PSSA, 2010 and 2030**



SOURCE: SDO 2010, as adjusted by BBC to exclude energy-related activities.

Figure 4-21 depicts the projected growth in the non-energy-related economic base in the Colorado portions of the SSSA under the SDO's latest projections. The SDO projections anticipate that the non-energy related economic base in the SSSA would increase from approximately 55,182 jobs in 2010 to approximately 93,200 jobs in 2030. The largest growth is expected to occur in tourism jobs and regional service and household direct basic jobs.

**Figure 4-21. Projected Non-Energy Economic Base Jobs in the SSSA, 2010 and 2030**



SOURCE: SDO 2010, as adjusted by BBC to exclude energy-related activities.

To assess the potential cumulative effects of a rebound in oil and gas development activity in the Colorado portions of the SSSA (primarily Garfield County) along with the projected growth in other sectors anticipated by the SDO, the study team modeled the combined effects of those potential growth drivers together with the projected economic effects of the RMPA alternatives described earlier in this section.

BLM_0020205

Figure 4-22 depicts projected population growth in the PSSA from 2010 through 2030. In Figure 4-22, the area labeled cumulative effects indicates the growth in the existing population of the PSSA that is projected to occur based on projected growth in non-energy economic base activity combined with projected growth resulting from a rebound in Garfield County gas development. The figure also shows the additional population growth projected to result from each of the RMPA alternatives. The area shown for each alternative indicates the *incremental* effect of that alternative on population growth in the PSSA, relative to the next closest alternative — e.g., the area shown as Alternative A indicates the additional growth from that alternative beyond growth due to cumulative effects, while the area shown as Alternative D indicates the additional population growth from that alternative beyond the cumulative growth projected under Alternative C.

**Figure 4-22. Projected Future PSSA Population including Cumulative Effects**



SOURCE: BBC Research & Consulting 2010.

NOTE:

*Area shown for each alternative represents the incremental, additional population growth from that alternative beyond projected population levels due to cumulative effects and the next closest alternative.

As indicated in Figure 4-22, the population of the PSSA would be projected to grow from about 7,768 residents in 2010 to about 13,400 residents by 2030 even without any increase in the rate of oil and gas development activity within the Planning Area. With the addition of the modest increase in oil and gas activity projected under Alternative A (relative to 2010 oil and gas activity levels), the projected population of the PSSA would reach about 14,100 residents by 2030. Under Alternative

BLM_0020206

B, the projected 2030 population would reach almost 16,300 residents. Under Alternative C, about 19,200 residents are projected in 2030, while under Alternative D, nearly 22,000 residents are projected by 2030.

It is possible that oil and gas-related economic activity could affect the rate of growth in other economic base activities, particularly within the PSSA, due to competition for labor and other inputs and corresponding regional wage increases (a phenomenon sometimes referred to as "factor competition"). The potential effect of factor competition on the growth of other sectors is difficult to estimate and has not been included in the cumulative effects analysis — consequently, the results portrayed in Figure 4-22 may overstate potential cumulative effects on study area demographics. Nonetheless, it appears likely that accommodating the projected population growth in the PSSA under Alternative D (and potentially under Alternative C) would present challenges. During the *Northwest Colorado Socioeconomic Analysis and Forecasts* study conducted by the study team in 2007-2008, representatives from the Town of Meeker indicated they believed the ultimate population capacity of their community at build-out could be about 10,000 residents. Representatives from the Town of Rangely indicated they believed Rangely could ultimately accommodate about 7,000 residents. Under Alternative C, and particularly under Alternative D, a large number of people could need to be housed in other areas within the PSSA, or some of the projected growth in PSSA population could be pushed to the SSSA. The latter would further increase commuting activity and traffic loads into and out of the PSSA.

Figure 4-23 provides a comparable depiction of projected population growth in the Colorado portions of the SSSA from 2010 through 2030 including both cumulative effects and each of the RMPA alternatives. The projected population increases in the SSSA due to the RMPA alternatives are actually larger than the projected increases in the PSSA. However, the much larger scale of the existing population in the SSSA — and the substantial population growth projected to occur due to other factors not related to the RMPA alternatives — suggest there would not be a substantial difference between the alternatives in terms of effects on the SSSA population.

BLM_0020207

**Figure 4-23. Projected Future SSSA Population including Cumulative Effects (Colorado counties only)**



SOURCE: BBC Research & Consulting 2010.

NOTE:

*Area shown for each alternative represents the incremental, additional population growth from that alternative beyond projected population levels due to cumulative effects and the next closest alternative.

As indicated in Figure 4-23, the population of the Colorado portions of the SSSA would be projected to grow from about 225,000 residents in 2010 to about 355,000 residents by 2030 even without any increase in the rate of oil and gas development activity within the Planning Area. With the addition of the modest increase in natural gas activity projected under Alternative A (relative to 2010 natural gas activity levels), the projected population of the SSSA would reach about 356,000 residents by 2030. Under Alternative B, the projected 2030 population would reach about 358,500 residents. Under Alternative C, about 362,000 residents are projected in 2030, while under Alternative D, about 365,000 residents are projected by 2030.

Public revenues for both the state and local governments would rise as gas activity increases, and specifically, as the cumulative number of productive wells increases. Resource value, in this instance the value of oil and gas, is the most critical factor determining local government fiscal success. While service delivery costs are largely tied to the number of workers, revenues: property tax receipts, severance taxes and mineral leasing returns from drilling on federal land, all rise as gas prices and property valuations rise. If employment growth rates are too high, communities struggle to keep pace with growth-associated demands for housing and services—but rapid growth implies high resource values and thus higher revenues. Alternatives A through C present sustainable growth

BLM_0020208

rates, particularly given the existing back-drop of planning and assessed valuation that has contributed to the area's current fiscal health. The most rapid growth, suggested in Alternative D, implies a return to the rapid growth rates experienced in 2005 to 2008, which strained the fiscal capacity of many smaller communities in the immediate impact area.

**Cumulative Effects on Social Conditions**

Changes in three indicators provide a measure of the potential cumulative impacts to social conditions in the PSSA. Two of these are the cumulative population growth rate (indicator of social disruption) and the change in dependency of the cumulative population in the PSSA on the energy industry versus the traditional sectors of agriculture and recreation. The definitions and the interpretation of these indicators were described above and used to assess the impacts of the alternatives. Corresponding indicators have been calculated for each alternative that include the combined effects of other potential growth drivers (as defined by the SDO) together with the projected economic effects of the alternatives.

A third indicator, the cumulative number of producing wells in the PSSA, is used to indicate potential effects on quality of life for ranchers along Piceance Creek Road and its side roads and to recreation and environmental interests. Well development under the alternatives disproportionately occurs in this area, so the amount of cumulative development on BLM land would correspond to the magnitude of the potential for perceived loss in quality of life by these groups. The impacts to quality of life stem from the energy industries' contribution to noise, dust and activity along the Piceance Creek Road and its side roads, change in the quality of the recreational and commercial hunting experience and in the natural characteristics of the BLM-owned landscape after the installation of energy facilities.

The cumulative population growth rates that would occur in the PSSA, given each alternative, are based on the population data depicted in Figure 4-23. They are 3.0 percent per year under Alternative A, 3.8 percent under Alternative B, 4.6 percent under Alternative C, and 5.3 percent under the Alternative D. Alternatives C and D are near the threshold range of socially disruptive growth that has been observed in small, energy impacted communities. However, a rigorously documented case of social disruption, followed over the course of 24 years, involved a three-fold population increase in a community that was small compared to the PSSA (Brown et al. 2005). The cumulative average-annual growth rates that would occur in the PSSA under the alternatives would not be likely to be socially disruptive.

However, the cumulative average rates considered here assume that steady, gradual development would occur under each alternative. To the extent that the actual timing and magnitude of well development under any of the alternatives differs from this assumption, the social effect could be different. For example, market conditions could trigger surges of drilling activity and could cause periods during the 20-year planning horizon when socially disruptive growth could occur within the PSSA.

The cumulative employment growth that would occur in the PSSA, when combined with the population data presented above, also could cause a shift in the dependency of the population in the PSSA away from livelihoods based on agriculture, recreation and energy toward a concentration of dependency on energy. This dimension of cumulative change is depicted in Figure 4-24.

BLM_0020209

**Figure 4-24. Predicted Shares of the Cumulative Population in the PSSA Dependent on Cumulative Employment for three Key Economic Drivers, 2010 Estimates and 2030 Projection by Alternative**

| Economic Base Sectors | Existing Conditions | Projected Conditions in 2030 | | | |
|---|---|---|---|---|---|
| | | Alternative A | Alternative B | Alternative C | Alternative D |
| Agriculture | 18% | 13% | 12% | 10% | 8% |
| Energy | 26% | 20% | 30% | 41% | 48% |
| Recreation/Tourism | 16% | 23% | 20% | 16% | 14% |
| Remaining Economic Base | 40% | 44% | 38% | 33% | 30% |

SOURCE: BBC Research and Consulting and Lloyd Levy Consulting 2010.

As depicted in Figure 4-24, there would be a shift in dependency toward the energy industry of varying degrees because of cumulative employment and population growth under Alternative B, Alternative C, and Alternative D. This shift would be perceived by the population in communities of the PSSA as potentially enhancing quality of life, because of additional economic opportunities, but also potentially reducing quality of life because of exposure to volatility in the energy industry. This shift in the makeup of the PSSA economy could also increase competition for resources between the energy industry and agriculture and hunting, which embody traditional cultural values. Under Alternative A, cumulative population dependency on energy development and agriculture is projected to decrease over time relative to dependency on tourism.

The cumulative number of producing wells in the PSSA would grow from an estimated 2,866 in 2010 to 5,000 in 2030 under Alternative A, 8,500 under Alternative B, 15,000 under Alternative C, and 21,200 under Alternative D, with almost all of the growth occurring in the Piceance Creek Basin of the PSSA. Compared to the existing base of producing wells, cumulative producing wells would grow by a factor of 1.8 under Alternative A, 3.0 under Alternative B, 4.5 under Alternative C, and 6.0 under Alternative D.

Quality of life of ranchers on the Piceance Creek Road and its side roads committed to continuing an agricultural livelihood and lifestyle beyond the current generation would be affected by the cumulative shift of the PSSA's economic base away from agriculture as well as the noise, dust, and traffic associated with energy development. The cumulative effects on quality of life for recreation interests would be related to the lower perceived quality of the hunting experience in the area affected by the cumulative producing wells, which contribute to changes in landscape character from natural or rural to developed or industrial. This occurs in all of the RMPA alternatives in proportion to the growth factors calculated above.

National and local environmental interests likely would consider the cumulative increase in producing wells to diminish quality of life under all of the RMPA alternatives. This impact would be in rough proportion to the relative scale of cumulative development that occurs on BLM land in the Piceance Creek Basin area under each alternative.

**Oil Shale**

The most unpredictable issue in terms of cumulative social and economic effects is the potential development of oil shale resources within the Piceance Basin. On January 1, 2007, the BLM issued five Research, Development, and Demonstration (RD&D) leases on lands in Rio Blanco County to Shell Frontier Oil and Gas (Shell) (three separate leases), Chevron Shale Oil Company, and

BLM_0020210

American Shale Oil. All three companies are using these leases to further investigate *in situ* processes for extracting and recovering oil shale.

Information from the lease applications, environmental assessments of the lease applications and study team interviews with representatives of the companies in 2007 indicated that the RD&D programs would have a fairly modest effect on local economic conditions. Shell anticipated a peak construction workforce of about 700 jobs at each of their three leasing sites, but these peaks would not overlap. The Shell operating workforce was projected at about 150 jobs on each of the three sites. EGL's lease application indicated a construction workforce of 10 to 100 workers and an operating workforce of 10 to 40 workers. Chevron indicated to the study team that they anticipated a very limited on-site presence over the next 10 years, with most of the work being done on sample materials sent to other corporate locations. Overall, the study team estimated in the 2008 AGNC study that RD&D employment could eventually lead to as many as 800 direct jobs in the PSSA.

Longer-term, development of a viable commercial oil shale industry in Colorado is highly uncertain. At one end of the spectrum of possibilities, development efforts could come to a halt during, or at the conclusion of, the current RD&D projects. At the other end of the spectrum, if a commercial oil shale industry ultimately does develop in northwest Colorado, it could resemble the tar sands industry currently operating in Alberta, Canada. This type of large scale industrial development is unlikely to occur within the BLM's 20-year planning horizon for this planning effort, but could involve thousands or even tens of thousands of construction and operations jobs. Large scale commercial oil shale development could result in a fundamental transformation of northwest Colorado and would almost certainly have profound impacts on social and economic conditions in the area.

### 4.11.3.23  Public Health and Safety

The cumulative impacts analysis boundary for public health and safety includes the Planning Area. The cumulative impact of identified actions for public health and safety would result from activities that affect public health and safety in the Planning Area. Sensitive individuals could be affected by exposures to airborne particulates even at concentrations below the NAAQS criteria.

The collective effects on public health and safety for Alternatives A, B, C, and D are interrelated with various energy-related activities, oil and gas exploration and development, and population growth in the Planning Area. Increased demand for energy and minerals, new or expanded facilities such as coal mining, oil shale and tar sands leasing and development, natural gas production, and nahcolite mining could increase the risk of hazardous material spills and amount of vehicle traffic within the Planning Area. In the future, energy and minerals-related economic development activities and associated population growth in Mesa, Garfield, Rio Blanco, and Moffat counties would require upgrades to existing transportation corridors (SHs 13, 64, and 139). These transportation improvements could reduce the potential for vehicle accidents under all alternatives. Alternative D proposed the greatest increase compared to Alternatives A, B, and C, in vehicle traffic primarily from oil and gas development.

BLM_0020211

*This page intentionally left blank*

BLM_0020212

BLM

**Chapter 5**

# Consultation and Coordination



Public Lands USA: Use, Share, Appreciate

BLM_0020213

BLM_0020214

**CHAPTER 5 CONSULTATION AND COORDINATION** ................................................. **5-1**

5.1    Introduction ...................................................................................................5-1

5.2    Specific Actions Taken in Consultation and Coordination ...............................5-1
       5.2.1   Native American Tribes .....................................................................5-1
       5.2.2   Government Agencies .......................................................................5-3

5.3    Public Involvement ..........................................................................................5-5
       5.3.1   Scoping ............................................................................................5-6
       5.3.2   Project Mailing List ..........................................................................5-7
       5.3.3   Project Bulletins ...............................................................................5-7
       5.3.4   Website .............................................................................................5-7
       5.3.5   Future Public Involvement ................................................................5-7

5.4    Notification and Distribution of Draft RMPA/EIS ..............................................5-8
       5.4.1   Proposed RMPA/Final EIS and Record of Decision ........................5-10

5.5    List of Preparers .............................................................................................5-10

**List of Tables**

Table 5-1    Meetings with Cooperating Agencies and Other Agency Partners ...........................5-4
Table 5-2    List of Preparers..................................................................................................5-10

**List of Figures**

Figure 5-1    The EIS Process  ...............................................................................................5-2

BLM_0020215

*This page intentionally left blank*

BLM_0020216

# CHAPTER 5
# CONSULTATION AND COORDINATION

## 5.1   Introduction

This chapter describes specific actions taken by the BLM WRFO to consult and coordinate with Native American tribes, government agencies, and interest groups, and to involve the interested general public during preparation of this Draft RMPA/EIS for Oil and Gas Development. Figure 5-1 presents the BLM NEPA process and the opportunities for public and agency participation throughout the process.

A Notice of Intent published in the Federal Register on June 14, 2006, formally announced the intent of the BLM WRFO to amend the 1997 White River Record RMP, as amended, and prepare the associated EIS. Publication of the NOI initiated the scoping process and invited participation of affected and interested agencies, organizations, and the public in helping the BLM determine the scope and issues to be addressed in the Draft RMPA/EIS.

## 5.2   Specific Actions Taken in Consultation and Coordination

This section summarizes the specific actions taken by BLM throughout this process to consult and coordinate with local, state, federal, and tribal agencies under NEPA. The Federal Land Policy and Management Act of 1976 (43 United States Code [USC] 1712) directs BLM to coordinate planning efforts with Native American tribes, other federal agencies, and agencies of the state and local governments as part of its land use planning process. BLM is directed to integrate NEPA requirements with other environmental review and consultation requirements to reduce paperwork and delays (40 CFR 1500.4-5). For the Draft RMPA/EIS, BLM accomplished coordination with other agencies and consistency with other plans through ongoing communications including: meetings, emails, phone calls, and other collaborative efforts with BLM specialists and federal, state, and local agencies.

### 5.2.1   Native American Tribes

Consultation with Native American tribes is part of the NEPA scoping process and a requirement of FLPMA and Section VI, Native American Participation found in the Colorado State Protocol (1998). The BLM contacted the Native American tribes listed below in November 2006 inviting them to be a part of the planning process through consultation and scoping meetings, as well as requesting information to be considered in the planning process.

- Ute Indian Tribe of the Uintah and Ouray Reservation
- Eastern Shoshone Tribe of the Wind River Reservation
- Southern Ute Indian Tribe
- Ute Mountain Ute Tribe

BLM_0020217

**Figure 5-1. The EIS Process**



Source: Based on Figure 9.1 in BLM Handbook H-1790-1,
National Environmental Policy Act Handbook, January 2008

BLM_0020218

To date, none of these Native American tribes have contacted WRFO regarding this project. The BLM mailed a letter on September 9, 2008 to each of the four Native American tribes listed above providing a copy of the WRFO Oil and Gas RMPA/EIS Final Class I Overview of Cultural Resources Report (report dated July 2008). Follow up phone calls and emails were made in 2009.

The WRFO Field Manager will contact the appropriate tribal representative from the Native American tribes prior to the release of the Draft RMPA/EIS and offer to do formal face-to-face consultation including presentations to their tribal councils.

## 5.2.2   Government Agencies

The BLM formally invited state and local agencies and other federal resource management agencies to partner as cooperating agencies and to participate in the development of alternatives. The initial meeting with cooperating agencies occurred February 8, 2007. As of January 2012, the following agencies have accepted formal cooperating agency status:

- U.S. Army Corps of Engineers
- U.S. Fish and Wildlife Service
- U.S. Environmental Protection Agency, Region 8
- U.S. Forest Service, White River National Forest
- U.S. Park Service, Intermountain Region
- State of Colorado
    - Colorado Department of Natural Resources
        - Colorado Parks and Wildlife
        - Colorado Oil and Gas Conservation Commission
        - Colorado Natural Areas Program
    - Colorado Department of Public Health and Environment
        - Air Pollution Control Division
        - Water Quality Control Division
    - Colorado Department of Local Affairs
    - History Colorado (State Historic Preservation Office)
- Moffat County
- Rio Blanco County
- Garfield County
- Town of Meeker
- Town of Rangely

Other federal, state, and local agencies have actively participated with BLM in the RMPA planning effort and may request cooperating agency status in the future. These agency participants include the U.S. Geological Survey.

Cooperating agencies and other agency partners provided input during the initial scoping process on issues of special expertise or legal jurisdiction. In addition, cooperating agencies participated in a

BLM_0020219

series of alternatives development workshops, reviewed draft information and documents, and periodically met with BLM management and staff throughout the RMPA/EIS process to discuss planning issues and provide input to the process.

During the alternatives development workshops, the BLM introduced themes for preliminary alternatives that addressed the issues and planning challenges identified through the BLM's preplanning and public scoping, as well as the preliminary concepts for management scenarios for each of the preliminary alternatives. The workshops allowed BLM to consult with the cooperating agencies in developing the preliminary alternative themes, draft management goals and objectives, and overall management approach characteristics in each of the preliminary alternatives for key resources and resource uses. Throughout the process, the BLM and cooperating agencies identified and discussed other alternatives (i.e., management options) that were considered possible management approaches to resolving resource management issues and conflicts. Table 5-1 lists these meetings and workshops.

### Table 5-1. Meetings with Cooperating Agencies and Other Agency Partners

| Date | Location | Type of Meeting |
|------|----------|-----------------|
| February 8, 2007 | WRFO, Meeker, CO | Cooperating Agency Meeting |
| May 1, 2007 | WRFO, Meeker, CO | Cooperating Agency Meeting |
| November 2, 2007 | WRFO, Meeker, CO | Cooperating Agency Alternatives Development Work Session |
| January 22, 2008 | WRFO, Meeker, CO | Cooperating Agency Alternatives Development Work Session |
| April 15, 2009 | WRFO, Meeker, CO | NWRAC Subcommittee Meeting Final Draft Alternatives and Impacts Approach and Protocol |
| May 7, 2009 | WRFO, Meeker, CO | Cooperating Agency Meeting Final Draft Alternatives and Impacts Approach and Protocol |

NOTE:
NWRAC = Northwest Resource Advisory Council

### 5.2.2.1   Endangered Species Act, Section 7 Compliance

Section 7 of the Endangered Species Act directs all federal agencies to use their existing authorities to conserve Threatened and Endangered species and, in consultation with FWS, to ensure that their actions do not jeopardize the continued existence of listed or proposed species or destroy or adversely modify critical habitat. The FWS is a Cooperating Agency for this planning effort and has provided input to the BLM throughout the planning process, including input on Endangered, Threatened, Proposed, and Candidate species, and designated critical habitat in the WRFO that should be evaluated in the Draft RMPA/EIS. The WRFO will continue consultation with the FWS and submit a Biological Assessment based on the Proposed RMPA/Final EIS.

### 5.2.2.2   National Historic Preservation Act, Section 106 Compliance

As part of the Draft RMPA/EIS, the BLM has worked closely with History Colorado and the State Historic Preservation Office (SHPO) as required by Section IV of the Colorado State Protocol (1998). This section requires the BLM to provide the SHPO the opportunity to participate at the development stage and all subsequent phases of land use planning in accordance with 43 CFR

BLM_0020220

1610.3 (Coordination with Other Federal Agencies , State and Local Governments, and Indian Tribes). Also, the BLM has worked closely with the History Colorado, Office of Archaeology and Historic Preservation (CHS-OAHP) to reconcile survey and site records information in the CHS-OAHP database of previous surveys and known cultural resources (sites and isolated finds) with those records on file at the WRFO in Meeker, Colorado. This effort has resulted in the preparation of a Class I Overview of Cultural Resources Report (BLM 2008g) provided to the BLM with sufficient information to manage cultural (prehistoric and historic) resources within the WRFO Planning Area. The WRFO will coordinate directly with the SHPO through the RMPA/EIS process. Other Interested Stakeholders

The Northwest Resource Advisory Council was invited to participate in the initial scoping and planning process. The NWRAC is an advisory group chartered under the Federal Advisory Committee Act (FACA), which advises BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources within a jurisdictional area. The BLM invited the NWRAC to attend a meeting on April 15, 2009 to present the Final Draft Alternatives and Impacts Approach and Protocol.

The Colorado Environmental Coalition (CEC) in coordination with The Wilderness Society BLM Action Center provided comments to WRFO regarding scoping, progress, and specific issues related to this WRFO RMPA/EIS. The CEC was formed in 1965 and is an organization that educates and mobilizes citizens, and provides technical and organizing assistance to environmental organizations and other allies. The Wilderness Society was established in 1935 and is a community-based environmental protection organization assembled to protect wilderness and inspire Americans to care for wild places.

## 5.3 Public Involvement

The BLM's decision-making process is conducted in accordance with the requirements of the CEQ regulations implementing NEPA, and the U.S. Department of the Interior and BLM policies and procedures implementing NEPA. The NEPA and the associated regulatory and policy framework require federal agencies to involve the interested public in their decision making.

The CEQ scoping guidance defines scoping as the "process by which lead agencies solicit input from the public and interested agencies on the nature and extent of issues and impacts to be addressed and the methods by which they will be evaluated" (CEQ 1981). In accordance with CEQ scoping guidance, BLM provided opportunities for public involvement as an integral part of amending the 1997 White River RMP and preparing the EIS. A Scoping Report (BLM 2007) was prepared and summarizes issues identified during the scoping process. This and other project-related documents, as well as general project information, can be found on the WRFO RMPA/EIS website at: http://www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/white_river/documents.html.

The intent of the scoping process is to provide an opportunity for the public, Native American tribes, other government agencies, and interest groups to participate in the planning process and to identify planning issues to be addressed by alternatives or analyzed in the EIS. In general, public involvement assists the agencies through the following:

- Broadening the information base for decision making.
- Informing the public about the RMPA/EIS and the potential impacts associated with various management decisions, and

BLM_0020221

- Ensuring that public needs and viewpoints are brought to the attention of the agency.

## 5.3.1   Scoping

Publication of the NOI in the Federal Register on June 14, 2006 announced BLM's intention to amend the 1997 White River RMP (BLM 1997a) and prepare an EIS. Formal agency and public scoping for the Draft RMPA/EIS took place from June 14, 2006 to September 30, 2006. BLM resource management regulations require a 30-day scoping period; however, the Draft RMPA/EIS scoping period was extended to 75 days based on written requests from the public.

The BLM used the public scoping process to solicit comments that help identify planning issues and direct the formulation of alternatives and to frame the scope of analysis in the Draft RMPA/EIS. The scoping process was also used to introduce the public to preliminary planning criteria, which set limits to the scope of the Draft RMPA/EIS. The BLM received a total of 69 unique categories of comments during the scoping period. The Scoping Report (BLM 2007) issued for the project provides a general summary of the issues included in the written comments.

### 5.3.1.1   Scoping Notice

The BLM issued a press release with notice of the public scoping comment period on July 24, 2006 and a public notification of the scoping meetings on August 22, 2006. The notices were posted to the BLM WRFO RMPA/EIS website. In addition notices solicited written comments on the Draft RMPA/EIS planning process, issues, and perceived impacts. The notices also provided information on how to become involved in the project, and invited the public to a series of three public scoping meetings held throughout the WRFO Planning Area (described in Section 5.3.1.2).

### 5.3.1.2   Scoping Meetings

Public scoping meetings were held on September 12, 13, and 14, 2006 in Meeker, Rangely, and Rifle, Colorado, respectively. The BLM organized the meetings in an open house format, with a formal presentation made by the WRFO Field Manager. Resource specialists and other representatives of BLM were available to address questions and provide information to meeting participants. The BLM provided a newsletter, maps of the WRFO Planning Area, and comment forms at each scoping meeting. The BLM encouraged attendees to provide written comments using a variety of media, as described below.

### 5.3.1.3   Opportunities to Comment

The BLM provided a variety of opportunities through which the public could comment during the scoping period, as listed below.

*Mail / Email / Fax.* The NOI and the scoping notice invited interested parties to submit written comments by mail, email, or fax to the WRFO Project Manager. The WRFO RMPA/EIS website provides an overview of the project, a project schedule and process, a document library, and information on how to become involved.

*Scoping Meetings.* The BLM provided the public the opportunity to comment at all three public meetings. Comment methods included comment forms that could be filled out and submitted at the meetings or mailed in to the WRFO at a later date and flip charts for expressing written comments and concerns to share with BLM and with other members of the public.

BLM_0020222

## 5.3.2   Project Mailing List

The project mailing list for public scoping was initially developed from the WRFO mailing list, but has been updated continually throughout the planning process. The BLM encouraged scoping meeting participants to add their names to the mailing list. Some individuals added their contact information to the project mailing list by registering on the WRFO RMPA/EIS website, as well as through personally contacting BLM. Currently, the WRFO project mailing list includes more than 350 contacts.

## 5.3.3   Project Bulletins

Periodic planning bulletins were developed and distributed to keep the public informed of the WRFO RMPA/EIS planning progress. A September 2006 planning bulletin was issued and provided basic background information on the project, including the Purpose and Need for the RMPA/EIS and issues that the RMPA/EIS would address. The planning bulletin also extended an invitation to the public to be involved in the process, advertised the WRFO RMPA/EIS website, and solicited public scoping comments.

A second project bulletin (November 2007) provided a summary of scoping and an analysis of the management situation, described the development of the alternatives, announced the release of the Reasonable Foreseeable Development Scenario (BLM 2007) and offered opportunities for public involvement.

A third project bulletin was prepared and provided to cooperating agencies, Federal Agency Partners, and the NWRAC in April 2009 to update the agencies on the status of the project.

## 5.3.4   Website

The WRFO RMPA/EIS website serves as a virtual repository for documents related to the development of the RMPA/EIS, including announcements, bulletins, and documents. These documents are available in Adobe portable document format (PDF) to ensure that they are available to a wide range of interested parties. The WRFO RMPA/EIS website gives the public the opportunity to submit their comments for consideration as part of the planning process. The WRFO RMPA/EIS website is compliant with the Americans with Disabilities Act (ADA) and offers the public an opportunity to be added to the project mailing list. The website is: http://www.blm.gov/co/st/en/fo/wrfo.html.

## 5.3.5   Future Public Involvement

Public participation will continue throughout the remainder of the planning process. Members of the public will have the opportunity to comment on the content of the Draft RMPA/EIS during the 90-day public comment period. The Final RMPA/EIS will contain and respond to substantive comments received on the Draft RMPA/EIS during the public comment period. The BLM is not required to respond to non-substantive comments or comments that are received after the close of the comment period. During the public comment period, BLM will host formal public hearings on the Draft RMPA/EIS to provide a forum for the introduction of the Draft RMPA/EIS and to solicit comments.

BLM_0020223

## 5.4    *Notification and Distribution of Draft RMPA/EIS*

The public, interested stakeholders, and agencies are notified of the availability of the Draft RMPA/EIS through publishing the Notice of Availability in the Federal Register, media, mailings, and other avenues. Publishing of the NOA initiates a 90-day public review and comment period. A copy of the Draft RMPA/EIS will be provided to the following:

### Tribal Governments

- Ute Indian Tribe of the Uintah and Ouray Reservation
- Eastern Shoshone Tribe of the Wind River Reservation
- Southern Ute Indian Tribe
- Ute Mountain Ute Tribe

### Local Governments (Counties, Cities, Towns)

- Garfield County, Colorado
- Moffat County, Colorado
- Rio Blanco County, Colorado
- Town of Meeker, Colorado
- Town of Rangely, Colorado

### Colorado State Agencies, Boards, and Commissions

- Department of Natural Resources
  - Colorado Parks and Wildlife
  - Oil and Gas Conservation Commission
- Department of Local Affairs
- Department of Public Health and the Environment
  - Air Pollution Control Division
  - Water Quality Control Division
- State Historic Preservation Officer

### U.S. Department of the Interior

- Bureau of Indian Affairs
- Bureau of Land Management
- National Park Service
- Office of Environmental Policy and Compliance
- Office of Surface Mining
- U.S. Fish and Wildlife Service
- U.S. Geological Survey

### Other Federal Agencies

- U.S. Environmental Protection Agency, Region VIII
- U.S. Department of Agriculture, Forest Service, White River National Forest
- U.S. Army Corps of Engineers

BLM_0020224

This Draft RMPA/EIS will be available at the following repositories for public review during the public comment period:

### Public Repositories

- BLM Colorado State Office Library, Lakewood
- BLM WRFO (Meeker) Public Room
- BLM Kremmling Field Office Public Room
- BLM Little Snake Field Office (Craig) Public Room
- BLM Colorado River Valley Field Office (Silt) Public Room
- BLM Grand Junction Field Office and NW District Office Public Room (both co-located at the same Grand Junction office)

- Meeker Public Library (Rio Blanco County, Meeker Regional Library District)
- Rangely Public Library (Rio Blanco County, Rangely Regional Library District)
- Rifle Branch Library (Garfield County Library District)
- Craig Public Library (Moffat County)

A notification will be distributed to the entities on the WRFO project mailing list announcing the release of the Draft RMPA/EIS, public comment period, and information regarding the public hearings. In addition, public notice will be provided to the local congressional delegation, and provided to local and statewide media contacts, as listed below. The public notification will also be posted to the WRFO RMPA/EIS website.

### Congressional Delegation

- U.S. Senator Mark Udall Washington, D.C. and Colorado offices
- U.S. Senator Michael Bennet Washington, D.C. and Colorado offices

- U.S. Representative Scott Tipton Washington, D.C. and Colorado offices

### Media

Local Media
- Rio Blanco Herald Times (Colorado)
- Rifle Citizen Telegram (Colorado)
- Grand Junction Free Press (Colorado)
- Glenwood Post-Independent (Colorado)
- Grand Junction Daily Sentinel (Colorado)
- Craig Daily Press (Colorado)
- Vernal Express (Utah)

Statewide Media
- Denver Post (Colorado)

Wire Services
- Associated Press (Colorado)

BLM_0020225

## 5.4.1   Proposed RMPA/Final EIS and Record of Decision

Comments received on the Draft RMPA/EIS will be evaluated and modifications to the document would be made as needed. A second NOA will be published in the Federal Register to notify the public of the availability of the Proposed RMPA/Final EIS, and a copy of the document will be filed with the EPA. The publication of the second NOA initiates a 60-day Governor's consistency review to identify inconsistencies with state or local plans and a 30-day protest period under 43 CFR 1610.5-2. The State Director of the BLM may sign and implement that portion of the plan not under protest. Once protests have been resolved and the Governor's consistency review has been completed, the State Director can approve the RMPA by signing a Record of Decision (ROD). The RMPA would be continually monitored and evaluated until it is replaced or modified by another plan.

## 5.5   *List of Preparers*

This section presents the names and qualifications of the people responsible for preparing this Draft RMPA/EIS.

### Table 5-2. List of Preparers[1]

| Name | Discipline/ Background | Qualifications and Experience | Area of Participation |
|------|------------------------|-------------------------------|-----------------------|
| **Bureau of Land Management** | | | |
| Richard Brooks | Geospatial Science | M.S. 3 years | GIS Specialist |
| Stacey Burke | Realty Specialist | B.S. 5 years | Lands; Realty; Right-of-Way |
| Paul Daggett | Mining Engineer | B.S. 20 years | Geology and Minerals |
| Carol Dawson | Botanist | Ph.D. 23 years | Threatened, Endangered and Sensitive Plant Species; ACEC |
| Carol Hollowed | Hydrologist/Planning and Environmental Coordinator/GIS | B.S. 32 years | BLM Project Manager |
| Ed Hollowed | Wildlife Biologist | B.S. 34 years | Wildlife; Threatened, Endangered, Sensitive Animal Species; Migratory Birds; Greater Sage-Grouse; Areas of Critical Environmental Concern (ACECs) |
| Melissa Hovey | Air Resources Specialist | M.S. 15 years | Air Resources |
| Melissa Kindall | Range Technician | A.A.S. 19 years | Wild Horses |
| Bob Lange | Hydrologist | B.S. 13 years | Soil Resources; Hydrology; Surface and Groundwater; Air |
| Jim Michels | Supervisory Natural Resource Specialist (Fire Management) | 20 years | Forestry; Fuels; Fire Management |
| Zoe Miller | Ecologist | M.S. 2 year | Threatened, Endangered and Sensitive Plant Species; ACEC |

BLM_0020226

*Chapter 5 – Consultation and Coordination*

## Table 5-2. List of Preparers[1]

| Name | Discipline/ Background | Qualifications and Experience | Area of Participation |
|------|------------------------|-------------------------------|-----------------------|
| Heather Sauls | Planning and Environmental Coordinator | M.S. 5 years | Assistant Project Manager |
| Chad Schneckenburger | Outdoor Recreation Planner | M.S. 8 years | Recreation, Wilderness, Transportation and Access |
| Michael Selle | Archaeologist | B.A. 34 years | Cultural Resources; Paleontological Resources; Tribal Interests; ACEC |
| Mary Taylor | Rangeland Management Specialist | B.S. 8 years | Range; Riparian; Vegetation; Weeds |
| **URS Team** | | | |
| Rachel Badger | Environmental Planning, NEPA Compliance | B.A. 15 years | Project Technical Lead; Impacts Analysis Introduction & Cumulative Impacts Introduction |
| Susan Bassett | Chemical Engineering, Environmental Compliance, Air Quality | B.S. 20 years | Air Resources; Climate Change |
| Suzy Cavanagh | Geologist, NEPA Compliance | M.S. 15 years | Energy and Minerals; Geology |
| Brian Colson | GIS Analyst | B.S. 5 years | GIS Specialist |
| Jeff Dawson | Ecology, Botany | M.S. 30 years | Fish and Wildlife; Special Status Species Plants and Animals |
| Rob DeBaca | Biology, Natural Resource Management | Ph.D. 22 years | Wildland Fire Management; Wild Horse Management; Livestock Grazing; Vegetation; Noxious Weed Invasive Species; Riparian/Wetlands |
| Allison Getty | Natural Resource Management and Environmental Planning | M.A. 3 years | Recreation; Comprehensive Trails & Travel Management; Wild Horse Management |
| Jody Glennon | Administrative Record, Databases, Public Involvement, and Coordination | B.S. 8 years | Administrative Record; Public Involvement; Livestock Grazing |
| Susan Hall | Ecology, Botany | B.S. 7 years | Fish and Wildlife; Special Status Species Plants and Animals |
| Doug Jeavons (Consultant) | Socioeconomics | M.A. 22 years | Socioeconomics; Environmental Justice |
| Lloyd Levy (Consultant) | Socioeconomics | MBA 20 years | Socioeconomics; Environmental Justice |
| Pam McWharter | NEPA Planning and Environmental Permitting | B.S. 23 years | Document Coordination; Public Safety and Hazardous Materials; Lands and Realty; Visual Resources |

**Table 5-2. List of Preparers[1]**

| Name | Discipline/ Background | Qualifications and Experience | Area of Participation |
|---|---|---|---|
| Matt Spansky | Hydrogeology | M.S. 8 years | Assistant Project Management; Impacts Analysis; Water Resources; Soils |
| Rebecca Thompson | Wildlife Biologist/Ecologist, NEPA Planner for resource management | M.S. 14 years | Forestry; Woodland and Native Plant Products; Vegetation; Noxious and Invasive Species; Riparian and Wetlands |
| Gordon Tucker | Archaeology | Ph.D. 36 years | Cultural Resources; Paleontological Resources; Tribal Interests |
| Brian Vickers | Project/ Program Management, Hydrogeology | M.S., MBA 24 years | Project Management |
| Leslie Watson | Zoology | B.S. 15 years | Impacts Analysis; Cumulative Impacts; Wilderness Characteristics; Special Designation Areas |
| Jen Wennerlund | Geographic Information Systems (GIS) Analyst | B.S. 19 years | Geographic Information Systems (GIS) |

NOTE:

[1] Only preparers at the time of draft publication are listed in this table. A complete list of contributors is available upon request.

BLM_0020228

BLM

Chapter 6

# Acronyms, Glossary and References



Public Lands USA: Use, Share, Appreciate

BLM_0020229

BLM_0020230

**CHAPTER 6 ACRONYMS, GLOSSARY AND REFERENCES.......................................6-1**

6.1    Acronyms ........................................................................................................................6-1

6.2    Glossary..........................................................................................................................6-13

6.3    References ......................................................................................................................6-37

**List of Tables**

Table 6-1          English to Metric Conversion Table for Commonly Used Measurements ..........6-36

BLM_0020231

*This page intentionally left blank*

BLM_0020232

# CHAPTER 6
# ACRONYMS, GLOSSARY AND REFERENCES

## 6.1   Acronyms

| | |
|---|---|
| **2D** | Two Dimensional |
| **3D** | Three Dimensional |
| **$10^6$** | Million |
| **AADT** | Average Annual Daily Traffic |
| **ACEC** | Areas of Critical Environmental Concern |
| **ACHP** | Advisory Council of Historic Preservation |
| **ADA** | Americans with Disabilities Act |
| **AERMOD** | American Meteorological Society/Environmental Protection Agency Regulatory Model Improvement Committee's Dispersion Model |
| **AGNC** | Associated Governments of Northwest Colorado |
| **AML** | Appropriate Management Level |
| **AMP** | Allotment Management Plan |
| **AMS** | Analysis of the Management Situation |
| **ANC** | acid neutralizing capacity |
| **APCD** | Air Pollution Control Division |
| **APD** | Application for Permit to Drill (an oil or gas drill) |
| **APLIC** | Avian Power Line Interaction Committee |
| **AQCC** | Air Quality Control Commission |
| **AQRV** | Air Quality-Related Values |
| **ARMP** | Air Resource Management Plan |
| **ARTSD** | Air Resources Technical Support Document |
| **ATV** | All Terrain Vehicle |
| **AUM** | Animal Unit Month |
| **BA** | Biological Assessment |

BLM_0020233

| | |
|---|---|
| **BBC** | BBC Research & Consulting |
| **bcf** | billion cubic feet |
| **BGEPA** | Bald and Golden Eagle Protection Act |
| **BLM** | Bureau of Land Management |
| **BMP** | Best Management Practice |
| **BOCC** | Birds of Conservation Concern |
| **BOPE** | Blowout Preventer Equipment |
| **BSC** | Biological Soil Crusts |
| **BTEX** | Benzene, Toluene, Ethylbenzene, and Xylene |
| **CAA** | Clean Air Act |
| **CAAQS** | Colorado Ambient Air Quality Standards |
| **CACO$_3$** | Calcium Carbonate |
| **CAMx** | Comprehensive Air Quality Model with Extensions |
| **CASTNET** | Clean Air Status and Trends Network |
| **CBNG** | Coal Bed Natural Gas |
| **CCD** | Census County Division |
| **CCLT** | Colorado Coalition of Land Trusts |
| **CCR** | Code of Colorado Regulations |
| **CDLE** | Colorado Department of Labor and Employment |
| **CDNR** | Colorado Department of Natural Resources |
| **CDOT** | Colorado Department of Transportation |
| **CDOW** | Colorado Division of Wildlife |
| **CDP** | Concentrated Development Plans |
| **CDPHE** | Colorado Department of Public Health and Environment |
| **CEC** | Colorado Environmental Coalition |
| **CEQ** | Council on Environmental Quality |

BLM_0020234

*Chapter 6 – Acronyms, Glossary and References*

| | |
|---|---|
| **CERCLA** | Comprehensive Environmental Response Compensation and Liability Act |
| **CFR** | Code of Federal Regulations |
| **cfs** | Cubic Feet Per Second |
| **CH₄** | Methane |
| **CHS-OAHP** | Colorado Historical Society, Office of Archaeology and Historic Preservation |
| **CNAP** | Colorado Natural Areas Program |
| **CNHP** | Colorado Natural Heritage Program |
| **CO** | Carbon Monoxide |
| **CO₂** | Carbon Dioxide |
| **CO₂e** | Carbon dioxide equivalent |
| **COA** | Conditions of Approval |
| **COGCC** | Colorado Oil and Gas Conservation Commission |
| **CPNHD** | Canyon Pintado National Historic District |
| **CPW** | Colorado Parks and Wildlife |
| **CR** | County Road |
| **CRCT** | Colorado River Cutthroat Trout |
| **CRPP** | Cultural Resource Protection Plan |
| **CRVFO** | Colorado River Valley Field Office |
| **CSU** | Controlled Surface Use |
| **CWA** | Clean Water Act |
| **CWP** | Citizen's Wilderness Proposal |
| **DAT** | Deposition Analysis Threshold |
| **DAU** | Data Analysis Units |
| **dBA** | decibel |
| **dbh** | Diameter Breast Height |
| **DEA** | Development Exclusion Area |

BLM_0020235

| | |
|---|---|
| **DEIS** | Draft Environmental Impact Statement |
| **DMA** | Denver Metropolitan Area |
| **DOE** | U.S. Department of Energy |
| **DOI** | Department of the Interior |
| **DOLA** | Department of Local Affairs |
| **DOT** | U.S. Department of Transportation |
| **DPC** | Desired Plant Community |
| **DPS** | Distinct Population Segment |
| **dv** | deciviews |
| **DVF** | Future Design Value |
| ***E. Coli*** | *Escherichia coli* |
| **e.g.** | For example |
| **EA** | Environmental Assessment |
| **EIA** | U.S. Energy Information Administration |
| **EIS** | Environmental Impact Statement |
| **EPA** | U.S. Environmental Protection Agency |
| **EPCA** | Energy Policy and Conservation Act |
| **eq** | equivalents |
| **ERMA** | Extensive Recreation Management Area |
| **ESA** | Endangered Species Act |
| **FACA** | Federal Advisory Committee |
| **FAR** | Functional At-Risk |
| **FAR-DOWN** | Functional At-Risk with a downward trend |
| **FAR-NA** | Functional At-Risk no apparent trend |
| **FAR-UP** | Functional At-Risk with an upward trend |
| **FEIS** | Final Environmental Impact Statement |

BLM_0020236

| | |
|---|---|
| **FLAG** | Federal Land Managers' Air Quality Related Values Workgroup |
| **FLF** | Federal Leadership Forum |
| **FLM** | Federal Land Manager |
| **FLPMA** | Federal Land Policy and Management Act (of 1976) |
| **FML** | Federal Mineral Lease |
| **FMP** | Fire Management Plan |
| **FMU** | Fire Management Unit |
| **FR** | Federal Register |
| **FRCC** | Fire Regime Condition Class |
| **FSA** | Farm Service Agency |
| **FY** | Fiscal Year |
| **FS** | U.S. Forest Service |
| **FWS** | U.S. Fish and Wildlife Service |
| **GHG** | Greenhouse Gas |
| **GIS** | Geographic Information System |
| **GMU** | Game Management Unit |
| **GOCO** | Great Outdoors Colorado |
| **GPO** | Government Printing Office |
| **GRA** | Geographic Reference Area |
| **GWP** | Global Warming Potential |
| **$H_2S$** | hydrogen sulfide |
| **HA** | Herd Area |
| **HAP** | Hazardous Air Pollutant |
| **HFR** | Historic Fire Regime |
| **HFRA** | Healthy Forest Restoration Act |
| **HMA** | Herd Management Area |

BLM_0020237

| | |
|---|---|
| **HMRRP** | Hazard Management and Resource Restoration Program |
| **HUC** | Hydrologic Unit Code |
| **i.e.** | That is |
| **I-70** | Interstate 70 |
| **IB** | Information Bulletin |
| **ICS** | Incident Command System |
| **ID** | Interdisciplinary |
| **IDLH/10** | Immediately Dangerous to Life or Health Divided by 10 |
| **IM** | Instruction Memoranda |
| **IMP** | Interim Management Policy |
| **IMPROVE** | Interagency Monitoring of Protected Visual Environments |
| **IMT** | Incident Management Team |
| **INPS** | invasive, non-native plant species |
| **IPCC** | Intergovernmental Panel on Climate Change |
| **IPM** | Integrated Pest Management |
| **K factor** | soil erodibility |
| **km** | kilometer |
| **km²** | square kilometer |
| **LAC** | Limit of Acceptable Change |
| **LAU** | Lynx Analysis Unit |
| **LGS** | Liquids Gathering System |
| **LN** | Lease Notice |
| **LOC** | Level of Concern |
| **LSFO** | Little Snake Field Office |
| **MBTA** | Migratory Bird Treaty Act |
| **MEI** | maximally exposed individual |

BLM_0020238

| | |
|---|---|
| **meq/L** | milliequivalents per liter |
| **MFP** | Management Framework Plan |
| **mg/L** | Milligrams Per Liter |
| **MLA** | Mineral Leasing Act |
| **MLE** | Most Likely Exposure |
| **MLP** | Master Leasing Plan |
| **MMBtu** | million British thermal units |
| **MMscf** | million standard cubic feet |
| **mmhos/cm** | millimhos per centimeter |
| **MOU** | Memorandum of Understanding |
| **MPA** | Mesaverde Play Area |
| **mt** | metric tons |
| **mtpy** | metric tons per year |
| **µeq/l** | microequivalents per liter |
| **µg/m³** | micrograms per cubic meter |
| **µmhos/cm** | micromhos per centimeter |
| **MY** | Million Years Old |
| **N** | Nitrogen |
| **N₂O** | Nitrogen Oxide |
| **NAAQS** | National Ambient Air Quality Standards |
| **NAIP** | National Agriculture Imagery Program |
| **NDIS** | Natural Diversity Information Source (Colorado Division of Wildlife) |
| **NEPA** | National Environmental Policy Act (of 1969) |
| **NF** | Non-Functional |
| **NFS** | National Forest System |
| **NHD** | National Historic District |

BLM_0020239

*Chapter 6 – Acronyms, Glossary and References*

| | |
|---|---|
| **NHPA** | National Historic Preservation Act |
| **NLCS** | National Landscape Conservation Service |
| **NM** | National Monument |
| **NO$_2$** | Nitrogen Dioxide |
| **NOA** | Notice of Availability |
| **NOC** | Notice of Completion |
| **NOI** | Notice of Intent |
| **NO$_x$** | Nitrogen oxides |
| **NP** | National Park |
| **NPDES** | National Pollutant Discharge Elimination System |
| **NPS** | U.S. National Park Service |
| **NRCS** | Natural Resource Conservation Service (United States) |
| **NRDC** | Natural Resources Defense Council |
| **NREL** | National Renewable Energy Laboratory |
| **NRHP** | National Register of Historic Places |
| **NRHP** | National Register of Historic Places |
| **NSCR** | Non-selective catalytic reduction |
| **NSO** | No Surface Occupancy (a stipulation on an oil and gas lease) |
| **NTL** | Notice to Lessees |
| **NTT** | National Technical Team |
| **NTU** | nephelometric turbidity units |
| **NWPS** | National Wilderness Preservation System |
| **NWRAC** | Northwest Resource Advisory Council |
| **OHV** | Off-Highway Vehicle |
| **ONRR** | Office of Natural Resources Revenue |
| **ORV** | Off-Road Vehicle |

BLM_0020240

| | |
|---|---|
| **OSHS** | Occupational Safety and Health Standards |
| **PBA** | Programmatic Biological Assessment |
| **PCA** | Potential Conservation Areas |
| **PBO** | Programmatic Biological Opinion |
| **PCGCC** | Pew Center on Global Climate Change |
| **PDF** | Adobe Portable Document Format |
| **PDEIS** | Preliminary Draft Environmental Impact Statement |
| **PEIS** | Programmatic Environmental Impact Statement |
| **PFC** | Proper Functioning Condition (of riparian/wetland areas) |
| **PFYC** | Potential Fossil Yield Classification |
| **pH** | Measure of acidity or alkalinity |
| **PHMSA** | Pipeline and Hazardous Materials Safety Administration |
| **PM$_{2.5}$** | respirable particulate matter less than 2.5 microns in effective diameter |
| **PM$_{10}$** | respirable particulate matter less than 10 microns in effective diameter |
| **PNC** | Potential Natural Community |
| **ppb** | parts per billion |
| **ppm** | parts per million |
| **PPR** | Parachute-Piceance-Roan |
| **PRL** | Preference Right Lease |
| **PSSA** | Primary Socioeconomic Study Area |
| **PSD** | Prevention of Significant Deterioration |
| **psi** | Pounds per square inch |
| **R&PP** | Recreation and Public Purpose |
| **R&PP Act** | Recreation and Public Purposes Act |
| **RAC** | Resource Advisory Council |
| **RBC** | Rio Blanco County |

BLM_0020241

*Chapter 6 – Acronyms, Glossary and References*

| | |
|---|---|
| **RCRA** | Resource Conservation and Recovery Act (1976) |
| **RD&D** | Research, Development, and Demonstration |
| **REL** | Reference Exposure Level |
| **RfC** | Reference Concentrations for Chronic Inhalation |
| **RFD** | Reasonable Foreseeable Development |
| **RFFA** | Reasonably foreseeable future actions |
| **RMCO** | Rocky Mountain Climate Organization |
| **RMP** | Resource Management Plan |
| **RMNP** | Rocky Mountain National Park |
| **RMPA** | Resource Management Plan Amendment |
| **ROD** | Record of Decision |
| **ROS** | Recreation Opportunity Spectrum |
| **ROW** | Right-of-Way |
| **RRF** | relative response factor |
| **RV** | Recreational Vehicle |
| **RVA** | Rement Vegetation Association |
| **S** | Sulfur |
| **SCADA** | Supervisory Control and Data Acquisition |
| **SCS** | Soil Conservation Service |
| **SDWA** | Safe Drinking Water Act |
| **SH** | State Highway |
| **SHPO** | State Historic Preservation Officer |
| **SO$_2$** | Sulfur Dioxide |
| **SO$_x$** | Sulfur Oxide |
| **SRMA** | Special Recreation Management Area |
| **SRP** | Special Recreation Permit |

BLM_0020242

| | |
|---|---|
| **SSSA** | Secondary Socioeconomic Study Area |
| **SWA** | State Wildlife Area |
| **TD** | Total Depth |
| **TDS** | Total Dissolved Solids |
| **T/E** | Threatened/Endangered |
| **TEG** | Triethylene glycol |
| **TES** | Threatened, Endangered, and Sensitive |
| **TL** | Timing Limitation |
| **TMDL** | Total Maximum Daily Loads |
| **TSS** | Total Suspended Solids |
| **TWS** | The Wilderness Society |
| **USACE** | U.S. Army Corps of Engineers |
| **URS** | URS Corporation |
| **U.S. 40** | U.S. Highway 40 |
| **USC** | United States Code |
| **USDA** | U.S. Department of Agriculture |
| **USDW** | Underground Sources of Drinking Water |
| **USGCRP** | U.S. Global Change Research Program |
| **USGS** | U.S. Geological Survey |
| **UT** | Utah |
| **VFO** | Vernal Field Office |
| **VOC** | Volatile Organic Compound |
| **VRI** | Visual Resource Inventory |
| **VRM** | Visual Resource Management |
| **WAFWA** | Western Association of Fish and Wildlife Agencies |
| **WAG** | Water and Gas |

BLM_0020243

| | |
|---|---|
| **WAP** | Watershed Action Plan |
| **WEPP** | Water Erosion Prediction Project |
| **WFU** | Wildland Fire Use |
| **WIC** | Wyoming Interstate Company |
| **WO** | Washington Office (BLM) |
| **WQCC** | Water Quality Control Commission |
| **WQCD** | Water Quality Control Division |
| **WRAP** | Western Regional Air Partnership |
| **WRCC** | Western Regional Climate Center |
| **WRFO** | White River Field Office |
| **WRNF** | White River National Forest |
| **WSA** | Wilderness Study Area |
| **WSR** | Wild and Scenic River(s) |
| **WUI** | Wildland Urban Interface |
| **WWEC** | West-wide Energy Corridor |
| **° F** | Degrees Fahrenheit |

BLM_0020244

## 6.2   Glossary

### A

**Access Road.** Access roads are single-lane roads that carry a low volume of traffic at a low speed to individual well locations. Access roads are generally reclaimed upon field abandonment.

**Actual Use.** The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by periodic field checks by the BLM.

**Air Pollution.** The contamination of the atmosphere by any toxic or radioactive gases and particulate matter as a result of human activity.

**Allotment.** An area of land in which one or more livestock operators graze their livestock. Allotments generally consist of Bureau of Land Management (BLM) lands but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Management Plan (AMP).** A concisely written program of livestock grazing management, including supportive measures, if required, designed to attain specific management goals in a grazing allotment. An AMP is prepared in consultation with the permittee(s), lessee(s), and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife. An AMP establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**Alluvium.** Unconsolidated material deposited by running water, including gravel, sand, silt, clay, and various mixtures of these.

**Alternatives.** Other options to the proposed action by which the BLM can meet its purpose and need. The BLM is directed by the National Environmental Policy Act (NEPA) to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources..." (NEPA Section 102(2)(E).

**Analysis of the Management Situation (AMS).** Assessment of the current management direction. It includes a consolidation of existing data needed to analyze and resolve identified issues, a description of current BLM management guidance, and a discussion of existing problems and opportunities for solving them.

**Animal Unit (AU).** Defines forage consumption on the basis of one standard mature 1,000-pound cow, either dry or with calf up to 6 months old; all other classes and kinds of animals can be related to this standard, e.g. a bull equals 1.25 AU, a yearling steer equals 0.6 AU.

**Animal Unit Day (AUD).** One animal unit is defined as a 1,000 lb. (450 kg) beef cow with or without a nursing calf with a daily requirement of 26 lb. (11.8 kg) of dry matter forage (Ruyle and Ogden 1993). Therefore, one AUM is equal to 780 lb. (355 kg) of dry matter forage (30 days x daily forage requirement). Local AUM values may be modified and these values should be used only as a guide.

BLM_0020245

**Animal Unit Month**. The amount of forage needed to sustain one cow, five sheep, or five goats for a month. A full AUMs fee is charged for each month of grazing by adult animals if the grazing animal (1) is weaned, (2) is 6 months old or older when entering public land, or (3) will become 12 months old during the period of use. For fee purposes, an AUM is the amount of forage used by five weaned or adult sheep or goats or one cow, bull, steer, heifer, horse, or mule. The term AUM is commonly used in three ways: (1) stocking rate as in X acres per AUM, (b) forage allocation as in X AUMs in allotment A, and (3) utilization as in X AUMs consumed from Unit B.

**Applications for Permit to Drill (APD)**. The Department of Interior application permit form to authorize oil and gas drilling activities on federal land or mineral estate.

**Aquifer**. A water-bearing bed or layer of permeable rock, sand, or gravel capable of yielding water.

**Areas of Critical Environmental Concern (ACEC)**. Areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards. (From H-6310-1, Wilderness Inventory and Study Procedures.)

**Atmospheric Deposition**. Air pollution produced when acid chemicals are incorporated into rain, snow, fog or mist and fall to the earth. Sometimes referred to as "acid rain" and comes from sulfur oxides and nitrogen oxides, products of burning coal and other fuels and from certain industrial processes. If the acid chemicals in the air are blown into areas where the weather is wet, the acids can fall to Earth in the rain, snow, fog or mist. In areas where the weather is dry, the acid chemicals may become incorporated into dusts or smokes.

**Authorized Officer (AO)**. The BLM employee delegated by the Field Manager the authority to perform specific duties.

**Avoidance**. The practice of finding acceptable alternatives.

**Avoidance Area**. An area where the preferred strategy for managing surface disturbing and disruptive activities is to avoid sensitive resources. Activities would be relocated. Where avoidance is determined not to be feasible, intensive mitigation to prevent adverse effects to the sensitive resources would be required. The extent of avoidance areas may vary, depending on the sensitive resources involved.

**Avoidance Buffer**. A specified area to help to minimize dust transport, weed invasion, unauthorized vehicular activities, chemical and produced-water spills; and helps to protect pollinator habitat.

**AUM (Animal Unit Month)**. The amount of forage needed by an "animal unit" (AU) grazing for one month. The animal unit in turn is defined as one mature 1,000-pound cow and her suckling calf.

## B

**Back Country Byways**. Vehicle routes that traverse scenic corridors utilizing secondary or back country road systems. National back country byways are designated by the type of road and vehicle needed to travel the byway.

BLM_0020246

**Best Management Practices** (BMPs). Are state-of-the-art mitigation measures applied to oil and natural gas drilling and production to help ensure that energy development is conducted in an environmentally responsible manner. BMPs protect wildlife, air quality, and landscapes as we work to develop vitally needed domestic energy sources.

**Big Game.** Indigenous ungulate wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biotic Integrity.** The capacity of the soil biotic community to support ecological processes within the normal range of variability expected for the site, to resist loss in the capacity to support these processes, and to recover this capacity when losses do occur. The soil biotic community includes plants, animals, and microorganisms occurring both above and below ground.

**BLM Sensitive Species.** Species that require special management consideration to avoid potential future listing under the Endangered Species Act (ESA) and that have been identified in accordance with procedures set forth in BLM manual 6840. (From M6840, Special Status Species Manual.)

## C

**Candidate Species.** Plants and animals that have been studied and the U.S. Fish and Wildlife Service (FWS) has concluded that they should be proposed for addition to the Federal endangered and threatened species list. These species have formerly been referred to as category 1 candidate species. From the February 28, 1996 Federal Register, page 7597: "those species for which the Service has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposed rule to list but issuance of the proposed rule is precluded." Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the Federal Register. (From M6840, Special Status Species Manual.)

**Casual Use.** Means activities that involve practices which do not ordinarily cause any appreciable disturbance or damage to the public lands, resources or improvements and, therefore, does not require a right-of-way grant or temporary use permit (43 Code of Federal Regulations [CFR] 2800). Also means any short term non-commercial activity which does not cause appreciable damage or disturbance to the public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities (43 CFR 2920). Casual use generally includes the collecting of geochemical, rock, soil, or mineral specimens using hand tools, hand panning, and non-motorized sluicing. It also generally includes use of metal detectors, gold spears, and other battery-operated devices for sensing the presence of minerals, and hand battery-operated dry washers. Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Channery.** A flat rock fragment that is 2-150 mm long.

**Clean Air Act (CAA) of 1963 and Amendments.** Federal legislation governing air pollution control.

BLM_0020247

**Clean Water Act (CWA).** The Federal Water Pollution Control Act (known as the Clean Water Act or CWA) has the objective of restoring and maintaining the chemical, physical, and biological integrity of waters of the United States. The CWA establishes the basic structure for regulating discharges of pollutants (both point and non-point sources) into the waters and regulating quality standards for surface waters as well as defining the roles of States and Federal Agencies. The basis of the CWA was enacted in 1948 and was called the Federal Water Pollution Control Act, but the Act was significantly reorganized and expanded in 1972. "Clean Water Act" became the Act's common name with amendments in 1977.

**Closed.** Generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 sets forth the specific meaning of "closed" as it relates to off-highway vehicle use, and 43 CFR 8364 defines "closed" as it relates to closure and restriction orders.(From H-1601-1, BLM Land Use Planning Handbook.)

**Collector Roads.** These Bureau roads normally provide primary access to large blocks of land, and connect with or are extensions of a public road system. Collector roads accommodate mixed traffic and serve many uses. They generally receive the highest volume of traffic of all the roads in the Bureau road system. User cost, safety, comfort, and travel time are primary road management considerations. Collector roads usually require application of the highest standards used by the Bureau. As a result, they have the potential for creating substantial environmental impacts and often require complex mitigation procedures.

**Colluvium.** Unconsolidated, unsorted earth material being transported or deposited on sideslopes and/or at the base of slopes by mass movement (e.g., direct gravitational action) and by local, unconcentrated runoff.

**Compensatory Mitigation.** The objective of the Clean Water Act (CWA) is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Toward achievement of this goal, the CWA prohibits the discharge of dredged or fill material into wetlands, streams, and other waters of the United States unless a permit issued by the U.S. Army Corps of Engineers (USACE) or approved by the State under the CWA Section 404 authorizes such a discharge. When there is a proposed discharge, all appropriate and practicable steps must first be taken to avoid and minimize impacts to aquatic resources. For unavoidable impacts, compensatory mitigation is required to replace the loss of wetland, stream, and/or other aquatic resource functions. The USACE (or approved state authority) is responsible for determining the appropriate form and amount of compensatory mitigation required. Methods of providing compensatory mitigation include aquatic resource restoration, establishment, enhancement, and in certain circumstances, preservation.

**Concentrated Development Area (CDA).** A core area identified within the White River Field Office (WRFO) where oil and gas development would take place. Energy development within the Concentrated Development Areas would leave large, contiguous blocks of land and corridors available for wildlife without oil and gas development activities. Development and reclamation of Concentrated Development Areas would be in accordance with the Concentrated Development Plan.

**Concentrated Development Plan.** A long-term strategy for development of a core area within the WRFO where the majority of development activity would take place. SEE ALSO Concentrated Development Area.

BLM_0020248

**Condition Class (Fire Regimes).** Fire Regime Condition Classes are a measure describing the degree of departure from historical fire regimes, possibly resulting in alterations of key ecosystem components such as species composition, structural stage, stand age, canopy closure, and fuel loadings. One or more of the following activities may have caused this departure: fire suppression, timber harvesting, livestock grazing, introduction and establishment of exotic plant species, introduced insects or disease, or other management activities.

**Conditions of Approval (COA).** A site-specific and enforceable requirement included in an approved APD or Sundry Notice that my limit or amend the specific actions proposed by the operator. Conditions of Approval minimize, mitigate, or prevent impacts to resource values or other uses of public lands.

**Conformable.** Of or pertaining to an unbroken sequence of strata or beds, characteristic of uninterrupted deposition.

**Controlled Surface Use, (CSU).** A category of stipulations that allows some use and occupancy of public land while protecting identified resources or values. The stipulation identifies the location protected, activities prohibited or restricted, and the resources protected. The extent of protection may range from a limited area for only one activity to all uses. Typically used in use authorizations. For the protected resource, some activities may be prohibited while others are allowed. Activities may be allowed, but only under certain conditions. Examples include: (1) Seismic operations prohibited within a certain distance of an unstable resource (i.e., historic structure). (2) Only tracked construction vehicles are allowed access to the site (see also Stipulation Category).

**Cooperating Agency.** Assists the lead Federal agency in developing an Environmental Assessment or an Environmental Impact Statement. A cooperating agency may be any agency that has special jurisdiction by law or special expertise for proposals covered by the NEPA (40 CFR 1501.6). Any Federal, State, tribal, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor.** A tract of land forming a passageway for linear utilities or transportation uses.

**Council on Environmental Quality (CEQ).** An advisory council to the President of the United States established by the National Environmental Policy Act of 1969. It reviews Federal programs to analyze and interpret environmental trends and information.

**Critical Habitat.** An area occupied by a threatened or endangered species "on which are found those physical and biological features (1) essential to the conservation of the species, and (2) which may require special management considerations or protection."

**Cultural Modification.** Any human-caused change in the landform, water form, vegetation, or the addition of a structure which creates a visual contrast in the basic elements (form, line, color, texture) of the natural character of a landscape.

**Cultural Resources:** Past evidence, prehistoric or historic more than 50 years of age, of human use and occupation of the land.

**Cumulative Action.** Proposed actions, which, when viewed with the proposed action, potentially have cumulatively significant impacts related to one or more identified issues. Cumulative actions "should be discussed" in the same NEPA document (40 CFR 1508.25(a)(2)).

BLM_0020249

**Cumulative Effect.** " the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7 and 1508.25)

**Current Management Decisions.** A management decision is a decision made by the BLM to manage public lands. Management decisions are made on both land use plan decisions and implementation decisions. The BLM's current management decisions for oil and gas resources are described in the existing *White River Record of Decision and Approved Resource Management Plan* (approved July 1, 1997), as amended (referred to as the 1997 White River RMP).

**D**

**Deferred Rotation.** Rotation grazing with regard to deferring pastures beyond the growing season, if they were used early the prior year, or that have been identified as needing deferment for resource reasons.

**Designated Right-of-way Corridor**. A parcel of land with specific boundaries identified by law, a Secretarial order, the land-use planning process, or other management decision as being the preferred location for existing and future rights-of-way. The corridor could be suitable to accommodate more than one type of right-of-way or one or more rights-of-way that are similar, identical or compatible.

**Designated Roads and Trails.** Specific roads and trails identified by the BLM (or other agencies) where some type of motorized vehicle use is appropriate and allowed either seasonally or year-long. (From H-1601-1, BLM Land Use Planning Handbook.)

**Direct Employment.** Jobs specifically related to the sector under discussion. For example, drilling jobs and well and facility maintenance jobs in the natural gas industry.

**Disposal.** Transfer of public land out of federal ownership to another party through sale, exchange, Recreation and Public Purposes Act, Desert Land Entry or other land law statutes.

**E**

**Easement.** A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Economic Base Jobs.** Jobs in sectors and activities defined as economic drivers.

**Economic Drivers.** Activities that support the local economy by bringing in money from outside the region.

**Eligibility.** Qualification of a river for inclusion into the National Wild and Scenic Rivers System through the determination (professional judgment) that it is free-flowing and, with its adjacent land area, possesses at least one river-related value considered to be outstandingly remarkable. (From M-8351, BLM WSR Policy and Program.)

**Endangered Species.** Any species which is in danger of extinction throughout all or a significant portion of its range. (From M6840, Special Status Species Manual.)

BLM_0020250

**Energy Policy Act of 2005.** A bill passed by the 109th Congress in August 2005 that includes new authority (Section 388) for Minerals Management Service to regulate alternate energy resources on the outer continental shelf.

**Environmental Analysis.** An analysis of alternative actions and their short term and long-term environmental effects, incorporating physical, biological, economic, and social considerations (USDA, USDI 1994a).

**Environmental Impact Statement (EIS).** A detailed statement prepared by the responsible official in which a major Federal action which significantly affects the quality of the human environment is described, alternatives to the proposed action provided, and effects analyzed. (From BLM National Management Strategy for OHV Use on Public Lands.)

**Ephemeral Stream** - An ephemeral stream has flowing water only during, and for a short duration after, precipitation events in a typical year. Ephemeral stream beds are located above the water table year-round. Groundwater is not a source of water for the stream. Runoff from rainfall is the primary source of water for stream flow.

**Erosion.** The wearing away of the land surface by running water, wind, ice, or other geological agents.

**Exceedance.** An event, characterized by duration and degree of exceedance, where the concentration of a pollutant is greater than (or equal to) the appropriate quality standard.

**Exception.** Is a one-time exemption for a particular site within the leasehold; exceptions are determined on a case-by-case basis; the stipulation continues to apple to all other sites with the leasehold. An exception is limited type of waiver.

**Exclusion Areas.** Land areas determined to be unavailable for corridor allocation or facility siting. Exceptions would only be considered for short-term land use permits involving no development and projects that are consistent with management objectives for the area.

**Extensive Recreation Management Area (ERMA).** Areas in which significant recreation opportunities and problems are limited and explicit recreation management is not required. Minimal management actions related to BLM's stewardship responsibilities are adequate in these areas.

# F

**Facility.** An improvement or structure, whether existing or planned, that is or would be owned and controlled by the grant or lease holder within a right-of-way. For purposes of communication site rights-of-way or uses, facility refers to the building, tower, and related incidental structures or improvements authorized under the terms of the grant or lease.

**Factor Competition.** Competition for labor and other inputs, and corresponding wage and price increases that may constrain economic growth in some sectors.

**Federal Land Policy and Management Act of 1976 (FLPMA).** Public Law 94-579, October 21, 1976, often referred to as the BLM's "Organic Act," which provides the majority of the BLM's legislated authority, direction policy and basic management guidance. (From BLM National Management Strategy for OHV Use on Public Lands.)

BLM_0020251

*Chapter 6 – Acronyms, Glossary and References*

**Fire Frequency.** A general term referring to the recurrence of fire in a given area over time. It is sometimes stated as number of fires per unit time in a designated area. It is also used to refer to the probability of an element burning per unit time.

**Fire Intensity.** The rate of heat release along a unit length of fireline, measured in kW m$^{-1}$.

**Fire Regime.** The combination of fire frequency, predictability, intensity, seasonality, and extent characteristic of fire in an ecosystem.

**Fire Regime Condition Class (FRCC).** Fire Regime Condition Classes are a qualitative measure describing the degree of departure from historical fire regimes, possibly resulting in alterations of key ecosystem components such as species composition, structural stage, stand age, canopy closure, and fuel loadings. One or more of the following activities may have caused this departure: fire exclusion, timber harvesting, livestock grazing, introduction and establishment of exotic plant species, introduced insects and disease, or other management activities.

**Fire Severity.** The effect of fire on plants. For trees, severity is often measured as a percentage of basal area removed.

**Fire Suppression.** All work activities connected with fire extinguishing operations, beginning with discovery of a fire and continuing until the fire is completely out.

**Fluid Minerals.** Oil, gas, coal bed natural gas, and geothermal resources.

**Forage.** Browse and herbage that are available for food for grazing animals or be harvested for feeding.

**Forest.** Contains tree species commonly harvested as a timber resource including ponderosa pine, lodgepole pine, Douglas-fir, spruce/fir mix, and aspen.

**Functioning at Risk.** (1) Condition in which vegetation and soil are susceptible to losing their ability to sustain naturally functioning biotic communities. Human activities, past or present, may increase the risks. (2) Uplands or riparian-wetland areas that are properly functioning, but a soil, water, or vegetation attribute makes them susceptible to degradation and lessens their ability to sustain natural biotic communities. Uplands are particularly at risk if their soils are susceptible to degradation. Human activities, past or present, may increase the risks. SEE ALSO Properly Functioning Condition and Nonfunctioning Condition. (From H-4180-1, BLM Rangeland Health Standards Manual.)

## G

**Global Positioning System (GPS).** Computer software that records and stores coordinates for positions on earth via satellite.

**Goal.** A broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

**Grazing Allotment.** A grazing arrangement comprised of numerous subdivisions (pastures) with a central component for livestock management and movement.

**Grazing Preference.** The total number of AUMs on public land apportioned and attached to base property owned or controlled by a lessee.

BLM_0020252

**Ground Disturbance**. The result of an activity that causes surface and or subsurface disruption to vegetation, soil layers, or rock.

## H

**Habitat.** An environment which meets a specific set of physical, biological, temporal or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for part or all of their life cycle.

**Herd Management Area (HMA).** Public land under the jurisdiction of the BLM that has been designated for special management emphasizing the maintenance of an established wild horse or burro herd.

**Heritage Resources**: evidence of past life on earth including paleontological resources (fossils) and cultural resources (human activity) on the land.

**Historic Fire Regime (HFR).** A classification of the effects of ecosystem disturbance caused by fire over time and space. Generally encompasses the period between 1500 to late 1800, before extensive settlement by European-Americans in many parts of North America, before intense conversion of wildlands for agricultural and other purposes, and before fire suppression effectively reduced fire frequency in many areas. Sometimes referred to as "presettlement" fire regimes.

**Hydrologic Function.** The capacity of an area to capture, store, and safely release water from rainfall, run-on, and snowmelt, to resist a reduction in this capacity, and to recover this capacity when a reduction does occur.

## I

**Impacts (or Effects).** Consequences (the scientific and analytical basis for comparison of alternatives) as a result of a proposed action. Effects may be either direct, which are caused by the action and occur at the same time and place, or indirect, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable, or cumulative.

**Implementation Action.** An action that implements land use plan decisions.

**Indicator**. A measurable parameter (metric) or an index of multiple measurable parameters (metrics) used to track progress toward achieving a desired condition and/or standard. Indicators are measures that change in response to human activity and can be used to assess the quality of resource or experience conditions.

**Infrastructure.** The basic framework or underlying foundation of a community, including road networks, electric and gas distribution, water and sanitation services, and facilities.

**Interdisciplinary Team.** A group of individuals with different training, representing the physical sciences, social sciences, and environmental design arts, assembled to solve a problem or perform a task. The members of the team proceed to a solution with frequent interaction so that each discipline may provide insights to any stage of the problem and disciplines may combine to provide new solutions. The number and disciplines of the members preparing the plan vary with circumstances. A member may represent one or more discipline or Bureau program interest.

BLM_0020253

**Interior Board of Land Appeals (IBLA).** The Department of the Interior, Office of Hearings and Appeals board that acts for the Secretary of the Interior in responding to appeals of decisions on the use and disposition of public lands and resources. Because the Interior Board of Land Appeals acts for and on behalf of the Secretary of the Interior, its decisions usually represent the Department's final decision but are subject to the courts.

**Interim Reclamation.** Reclamation initiated on well pads, roads, and pipelines after drilling activity is completed and wells are in production. Interim reclamation is considered successful when reclamation performance objectives are met.

**Intermittent Stream.** An intermittent stream has flowing water during certain times of the year, when groundwater provides water for stream flow. During dry periods, intermittent streams may not have flowing water. Runoff from rainfall is a supplemental source of water for stream flow.

**Invasive Species.** A plant or animal species that has moved into an area and reproduced so aggressively that it has replaced some of the original (native) species.

**Issue.** A point or matter of discussion, debate, or dispute about the potential environmental effects or impacts, of an action. Issues point to environmental effects and may drive the development of alternatives to the proposed action.

# K

**K factor.** A soil erodibility factor used in the universal soil loss equation that is a measure of the susceptibility of soil particles to detachment and transport by rainfall and runoff. Estimation of the factor takes several soil parameters into account, including: soil texture, percent of sand greater than 0.10 mm, soil organic matter content, soil structure, soil permeability, clay mineralogy, and coarse fragments. K factor values range from .02 to .64, the greater values indicating the highest susceptibilities to erosion.

# L

**Late Season.** Fall or late summer grazing.

**Land Classification.** When, under criteria of 43 CFR 2400, a tract of land has potential for either retention for multiple use management or for some form of disposal, or for more than one form of disposal, the relative scarcity of the values involved and the availability of alternative means and sites for realization of those values will be considered. Long-term public benefits will be weighed against more immediate or local benefits. The tract will then be classified in a manner which will best promote the public interest.

**Land Tenure Adjustments.** Ownership or jurisdictional changes are referred as "Land Tenure Adjustments." To improve the manageability of the BLM lands and improve their usefulness to the public, BLM has numerous authorities for "repositioning" lands into a more consolidated pattern, disposing of lands, and entering into cooperative management agreements. These land pattern improvements are completed primarily through the use of land exchanges, but also through land sales, jurisdictional transfers to other agencies, and through the use of cooperative management agreements and leases.

**Land Use Allocation.** The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the Planning Area, based on desired future conditions. (From H-1601-1, BLM Land Use Planning Handbook.)

BLM_0020254

**Land Use Plan.** A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and MFPs. (From H-1601-1, BLM Land Use Planning Handbook.)

**Leasable Minerals.** A legal term that, for federal lands or a federally retained mineral interest in lands in the United States, defines a mineral or mineral commodity acquired through the Mineral Leasing Act of 1920, as amended, the Geothermal Steam Act of 1970, as amended, or the Acquired Lands Act of 1947, as amended. Acquisition of leasable minerals is by application for a government lease and permits to mine or explore after lease issuance.

**Lease.** Section 302 of the Federal Land Policy and Management Act of 1976 (FLPMA) provides the BLM's authority to issue leases for the use, occupancy, and development of the public lands. Leases are issued for purposes such as a commercial filming, advertising displays, commercial or noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, harvesting of native or introduced species, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy if the residential structures are not incidental to the mining operation, and water pipelines and well pumps related to irrigation and non-irrigation facilities. The regulations establishing procedures for the processing of these leases and permits are found in 43 CFR 2920.

**Lease Notice.** Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders.

**Lease Stipulation.** Is a condition of the lease issuance that provides a level of protection for other resource values or land uses by restricting lease operations during certain times or locations or to avoid unacceptable impacts, to an extent greater than standard lease terms or regulations. A stipulation is an enforceable term of the lease contract; supersedes any inconsistent provisions of the standard lease form, and is attached to and made a part of the lease. Lease stipulations further implement the BLM regulatory authority to protect resources or resource values. Lease stipulations are developed through the land use planning process.

**Lek.** An assembly area where birds, especially sage-grouse, carry on display and courtship behavior.

**Limited.** Designated areas and trails where the use of off-road vehicles is subject to restrictions, such as limiting the number or types or vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year. (From BLM National Management Strategy for OHV Use on Public Lands.)

BLM_0020255

**Local Roads.** These Bureau roads normally serve a smaller area than collectors, and connect to collectors or public road systems. Local roads receive lower volumes, carry fewer traffic types, and generally serve fewer uses. User cost, comfort, and travel time are secondary to construction and maintenance cost considerations. Low volume local roads in mountainous terrain, where operating speed is reduced by effort of terrain, may be single lane roads with turnouts. Environmental impacts are reduced as steeper grades, sharper curves, and lower design speeds than would be permissible on collector roads are allowable. (Note: for oil and gas development, a local road provides access to more than one well pad and provides the connection between collector roads and resource roads.)

**Locatable Minerals.** Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Long-term Impacts.** For the purpose of this NEPA analysis, long-term impacts last for the life of the project or beyond.

**LU Project Lands.** Privately owned submarginal farmlands incapable of producing sufficient income to support the family of a farm owner and purchased under Title III of the Bankhead-Jones Farm Tenant Act of July 22, 1937. These acquired lands became known as "Land Utilization Projects" and were subsequently transferred from jurisdiction of the U.S. Department of Agriculture to the U.S. Department of the Interior. They are now administered by the BLM.

## M

**Managed Development.** In the context of this Resource Management Plan Amendment (RMPA), "managed development" refers to managing the spatial extent of surface disturbance by limiting the extent of impacts to sensitive wildlife habitats (e.g., the extent of sensitive big game seasonal range subjected to cumulative adverse behavioral effects, such as harassment or avoidance) at any one time. The managed development approach considered in this RMPA includes establishing thresholds for cumulative adverse behavior effects to be applied per Game Management Unit (GMU), as defined by Colorado Division of Wildlife (CDOW), and by leaseholder. The managed development concept differs from the traditional "phased development" approach (defined in this Glossary) in that limitation of the spatial extent of surface disturbance is achieved by managing the extent of impacts to sensitive wildlife habitats rather than limiting total surface disturbance to a specific geographic area, or specific acreage regardless of habitat, condition, or terrain. Further, reclamation to a particular wildlife habitat, rather than a geographic area, is used as the criterion for removing acres of habitat from the disturbance threshold computation. The overall vision for a managed development approach would be to cluster, collocate, and consolidate surface facilities and other ground-disturbing activities.

**Management Decision.** A decision made by the BLM to manage public lands. Management decisions include both land use plan decisions and implementation decisions.

**Management Strategies.** Policy, regulatory and programmatic strategies implemented in order to reach desired conditions. Examples of management strategies may include education programs, environmental improvement projects and land use policies.

**Micromhos per centimeter.** The basic unit of measurement of conductivity in water is the mho or siemens. Conductivity is measured in micromhos per centimeter ($\mu$mhos/cm) or microsiemens per centimeter ($\mu$S/cm).

BLM_0020256

**Millimhos per centimeter.** Reporting unit for electrical conductivity (salinity) in soils; is the ability of a solution to conduct an electrical current, or the reciprocal of the solution's ability to resist the current.

**Mineral.** Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained for man's use, usually from the ground. Under Federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral Entry.** The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral Estate.** The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral Materials.** Materials such as sand and gravel and common varieties of stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Materials Act of 1947, as amended.

**Mining Claim.** A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, millsite, and tunnel site.

**Mitigation.** A method or process by which impacts from actions may be made less injurious to the environment through appropriate protective measures.

**Mitigation Measures.** Actions taken to reduce or minimize potential impacts to the environment.

**Modification.** Is a change to the provisions of the lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Multiple Use.** The management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (FLPMA). (From M6840, Special Status Species Manual.)

BLM_0020257

## N

**National Wild and Scenic Rivers System.** A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three types of streams: (1) recreation—rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) scenic—rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) wild—rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**Nonfunctioning Condition.** (1) Condition in which vegetation and ground cover are not maintaining soil conditions that can sustain natural biotic communities. (2) Riparian-wetland areas are considered to be in nonfunctioning condition when they do not provide adequate vegetation, landform, or large woody debris to dissipate stream energy associated with high flows and thus are not reducing erosion, improving water quality, or other normal characteristics of riparian areas. The absence of a flood plain may be an indicator of nonfunctioning condition. SEE ALSO Properly Functioning Condition and Functioning at Risk. (From H-4180-1, BLM Rangeland Health Standards Manual.)

**Notice of Availability (NOA).** The *Federal Register* notice that an EIS (draft or final) or record of decision is available. Publication of a notice of filing of an EIS by the Environmental Protection Agency formally begins the public comment period. A NOA may also be published for an EA.

**Notice of Intent (NOI).** This *Federal Register* notice announces that an environmental impact statement or an EA-level land use plan amendment will be prepared. Publication of this notice formally starts the scoping process.

**No Surface Occupancy, (NSO).** Land use allocation or approval restriction used when surface disturbance cannot be mitigated and must be prohibited. The land use decision or stipulation identifies the NSO area and allowed or excepted uses in the area. NSO stipulations are used on oil and gas leases where drilling and/or operations impacts cannot be adequately mitigated but fluid mineral resources may be recovered by directional drilling. Exclusion Area designations in the Realty Program are NSO land use decisions. This stipulation can be used to prohibit other surface disturbing or disruptive activities such as commercial recreational activities, mining, and timber harvest (see also Stipulation Category).

## O

**Objectives.** A description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

**Occupied habitat.** Intact habitat currently supporting special status plant species. Occupied habitat also includes areas that were previously mapped or confirmed as occupied habitat, but do not contain special status plant species presently

BLM_0020258

**Off-Highway Vehicle (OHV).** Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any non-amphibious registered motorboat: (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles m official use; and (5) any combat or combat support vehicle when used for national defense. (From H-1601-1, BLM Land Use Planning Handbook.)

**Old-growth Forest and Woodlands.** Distinguished by the age/seral stage, structure, and function of the community. Old-growth forest typically contain large-diameter trees of specific species, a wide variation in age including old trees, accumulations of large dead standing and fallen trees, decadence in the form of broken or deformed tops and boles, multi-layered canopies, and canopy interspaces and understory patchiness.

**Onshore Oil and Gas Orders.** Onshore Oil and Gas Orders implement and supplement the oil and gas regulations found at 43 CFR 3160 for conducting oil and gas operations on Federal and Indian lands.

**Open.** Designated areas and trails where off-road vehicles may be operated, subject to operating regulations and vehicle standards set forth in BLM Manuals 8341 and 8343; or an area where all types of vehicle use is permitted at all times, subject to the standards in BLM Manuals 8341 and 8343. (From BLM National Management Strategy for OHV Use on Public Lands.)

**Other Avoidance Area.** An area where the preferred strategy for managing surface disturbing and disruptive activities is to avoid sensitive resources, not primarily addressed in 'avoidance areas.' Other Avoidance Areas may include discrete areas such as: wildlife habitat and breeding habitat; location of nests/burrows; river and creek corridors; areas prone to severe erosion, landslides, and sinkholes; viewsheds; and areas not delineated as state or federal areas of critical environmental concern.

**Outstandingly Remarkable Values.** Values among those listed in Section 1(b) of the Act: "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values...." Other similar values which may be considered include ecological, biological or botanical, paleontological, hydrological, scientific or research values. (From M-8351, BLM WSR Policy and Program.)

**Ozone.** A faint blue gas produced in the atmosphere from chemical reactions of such sources as burning coal, gasoline and other fuels, and chemicals found in products including solvents, paints, hairsprays, etc.

**P**

**Perennial Stream.** A perennial stream has flowing water year-round during a typical year. The water table is located above the stream bed for most of the year. Groundwater is the primary source of water for stream flow. Runoff from rainfall is a supplemental source of water for stream flow.

**Permit Long.** Grazing for the duration of the permitted time with care taken not to overuse the resource.

**Permitted Use.** The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease, and is expressed in Animal Unit Months (AUMs) (43 CFR § 4100.0-5). (From H-4180-1, BLM Rangeland Health Standards Manual.)

BLM_0020259

*Chapter 6 – Acronyms, Glossary and References*

**Phased Development**. Traditionally, "phased development" refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while resting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed. Examples of a phased development approach include restricting drilling operations to prescribed geographical "development areas" at any one time and prohibiting shifting operations to the next development area until reclamation is complete; or limiting total surface disturbance at any one time to a specific acreage.

**Plan Maintenance.** The BLM regulation in 43 CFR 1610.54 provides that land use plans decisions and supporting components can be maintained through plan maintenance actions to reflect minor changes in data. Plan maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved plan.

**Planning Analysis**. A process using appropriate resource data and NEPA analysis to provide a basis for decisions in areas not yet covered by an RMP.

**Plant Consideration Area.** An area or zone of influence around occupied habitat for federally listed, proposed, or candidate species. The area of influence around a disturbance includes the species' niche (e.g. potential impacts to pollinator species, seed dispersal, etc.) related to the welfare and survival of the species.

**Play**. Refers to a group of hydrocarbon accumulations with a combination of common geologic, geographic, and/or temporal properties (e.g., source rock, migration pathway, timing, trap style, reservoir rock, hydrocarbon type, etc.) that have proven to be commercially productive in a given area.

**Potential habitat.** Unsurveyed habitat determined by the known geologic substrate on which the special status plant species are known to occupy.

**Prevention of Significant Deterioration (PSD).** An air pollution permitting program intended to ensure that air quality does not diminish in attainment areas.

**Primary Socioeconomic Study Area.** Rio Blanco County, Colorado.

**Primitive and Unconfined Recreation.** Non-motorized, non-mechanized (except as provided by law), and undeveloped types of recreational activities. Bicycles are considered mechanical transport. (From H-6310-1, Wilderness Inventory and Study Procedures.)

**Priority Riparian/Wetland Habitat**. Those areas with, or with potential to have, any of the following resource values: fisheries, special status species habitat, potential for system improvement or for persistent water flow or the presence of other identified riparian dependent values.

BLM_0020260

**Proper Functioning Condition (PFC).** (1) An element of the Fundamental of Rangeland Health for watersheds, and therefore a required element of State or regional standard and guidelines under 43 CFR § 4180.2(b). (2) Condition in which vegetation and ground cover maintain soil conditions that can sustain natural biotic communities. For riparian areas, the process of determining function is described in the BLM Technical Reference TR 1737-9. FEIS at 26, 72. (3) Riparian-wetland areas are functioning properly when adequate vegetation, landform, or large woody debris is present to dissipate stream energy associated with high waterflows, thereby reducing erosion and improving water quality; filter sediment, capture bedload, and aid flood plain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks against cutting action; develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and support greater biodiversity. (4) Uplands function properly when the existing vegetation and ground cover maintain soil conditions capable of sustaining natural biotic communities. SEE ALSO Nonfunctioning Condition and Functioning at Risk. (From H-4180-1, BLM Rangeland Health Standards Manual.)

**Proposed Action.** A proposal for the BLM to authorize, recommend, or implement an action to address a clear purpose and need. A proposal may be generated internally or externally.

**Proposed Species.** As defined by the FWS, any species of fish, wildlife, or plant that is proposed in the Federal Register to be listed under Section 4 of the Endangered Species Act (ESA). It is proposed for a limited amount of time to complete the status review, consideration of protective conservation measures, and make a final determination whether the species will be listed as threatened or endangered.

**Protest.** An opportunity for a qualified party to seek an administrative review of a proposed decision in accordance with program-specific regulations. For example, a protest may be filed with the Director of the BLM for review of a proposed resource management plan or plan amendment (43 CFR 1610.5-2), or a proposed grazing decision may be protested for review by the authorized officer (43 CFR 4160.2).

**Public Land.** Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired ownership, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos. (From H-1601-1, BLM Land Use Planning Handbook.)

# R

**Reasonable Foreseeable Development (RFD) Scenario.** The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Reclamation.** Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

BLM_0020261

**Recreation and Public Purposes (R&PP) Act (of 1926).** Recreation and Public Purposes Act provided for the lease and sale of public lands determined valuable for public purposes. The objective of the R&PP Act is to meet the needs of state and local government agencies and non-profit organizations by leasing or conveying public land required for recreation and public purpose uses. Examples of uses made of R&PP Act lands are parks and greenbelts, sanitary landfills, schools, religious facilities, and camps for youth groups. The Act provides substantial cost-benefits for land acquisition and provides for recreation facilities or historical monuments at no cost.

**Recreation Opportunity Spectrum (ROS).** A continuum used to characterize recreation opportunities in terms of setting, activity and experience opportunities. The spectrum covers a range of recreation opportunities from primitive to urban. With respective to river management planning, ROS represents one possible method for delineating management units or zones. See BLM Manual Section 8320 for more detailed discussion. (From M-8351, BLM WSR Policy and Program.)

**Recreational River.** Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

**Residuum.** (residual soil material) Unconsolidated, weathered, or partly weathered mineral material that accumulates by disintegration of bedrock in place.

**Resource Management Plan (RMP).** A land use plan as prescribed by the FLPMA that establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Resource Roads.** These BLM roads are spur roads that provide point access and connect to local or collector roads. They carry very low volume and accommodate only one or two types of use. Use restrictions are applied to prevent conflicts between users needing the road and users attracted to the road. The location and design of these roads are governed by environmental compatibility and minimizing BLM costs, with minimal consideration for user cost, comfort, or travel time.

**Rest Rotation.** Grazing rotation that rests pastures that have been grazed early the prior year or that have been identified as needing rest for resource reasons.

**Right-of-Way (ROW).** Means the public lands authorized to be used or occupied for specific purposes pursuant to a right-of-way grant, which are in the public interest and which require rights-of-way over, upon, under, or through such lands.

**Riparian.** Wetlands situated on or pertaining to the bank of a river, stream, lake or other body of water. Typically used to refer to the plants that grow rooted in the water table. In common use, this term can be synonymous with wetlands, but typically refers to areas along flowing water (see definition for Lentic and Lotic). (See also Wetland/Riparian)

**Riparian Area.** A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

BLM_0020262

**Rock Art.** Petroglyphs (carvings) or pictographs (painting) used by native persons to depict their history and culture.

**Rotation.** Grazing rotation between pastures in the allotment for the permitted time.

## S

**Sage-Grouse Population Area.** An area that is currently occupied by sage-grouse that are physically separated by areas of non-habitat and that may have local work groups addressing their management in Colorado. There are parts of three population areas in the WRFO, including the Parachute-Piceance-Roan, the Northwest Colorado, and the Meeker-White River. Population areas are mapped and identified in the Colorado Greater Sage-Grouse Conservation Plan (January 2008). Signatories include CDOW, Forest Service Rocky Mountain Region, Natural Resources Conservation Service, BLM, and FWS.

**Salable Minerals.** A legal term that, for federal lands, defines mineral commodities sold by sales contract from the federal government. The applicable statute is the Mineral Materials Sale Act of 1947, as amended. Salable minerals are generally common varieties of construction materials and aggregates, such as, sand, gravel, cinders, roadbed, and ballast material. Common variety minerals do not have a distinct, special value beyond normal use. On federal lands such minerals are considered salable and are disposed of by sales or by special permits to local governments.

**Saline soil.** A soil containing soluble salts in an amount that impairs growth of plants. A saline soil does not contain excess exchangeable sodium.

**Salinity.** The degree to which a soil is affected by soluble salts. Salinity is expressed as the electrical conductivity of the saturation extract in millimhos per centimeter at 25 degrees C. The degrees of salinity and their respective conductivities in millimhos per centimeter are:

- Nonsaline ....................................................... 0 to 2
- Very slightly saline ......................................... 2 to 4
- Slightly saline ................................................ 4 to 8
- Moderately saline .......................................... 8 to 16
- Strongly saline ...................................... more than 16

**Scenic Byways.** Highway routes, which have roadsides or corridors of special aesthetic, cultural, or historic value. An essential part of the highway is its scenic corridor. The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

**Scenic River.** A river or section of a river that is free of impoundments and whose shorelines are largely undeveloped but accessible in places by roads.

**Season of Use.** The time during which livestock grazing is permitted on a given range area, as specified in the grazing lease.

BLM_0020263

**Secondary Employment.** Jobs supported by the sector under discussion that are within other sectors, commonly referred to as "multiplier effects." Includes indirect employment effects (jobs supported by the purchases of goods and services by directly affected companies) and induced employment effects (jobs supported by the household purchases of employees in directly and indirectly affected businesses).

**Scoping.** The process of identifying the range of issues, management concerns, preliminary alternatives, and other components of an environmental impact statement or land-use planning document. It involves both internal and public viewpoints.

**Seral Stage**. Any stage of development of a plant community from a disturbed, unvegetated state to a climax plant community. (The climax plant community contains plants that inhabit an area within which the final stage of a succession has been reached.)

**Secondary Socioeconomic Study Area.** Garfield County, Mesa County and Moffat County, Colorado; Uintah County, Utah (except for cumulative effects, which exclude Uintah County due to modeling limitations).

**Section 110 Inventory.** Refers to Section 110 of the National Historic Preservation Act of 1966, as amended. Section 110 of the Act directs federal agencies to establish a preservation program for the identification, evaluation and nomination to the National Register of Historic Places, cultural properties that are under the agencies' jurisdiction or control. Section 110 also directs federal agencies to coordinate their respective preservation programs with the State Historic Preservation Offices, local governments and Indian tribes (110.a.2.D).

**Soil stability**. The capacity of an area to limit redistribution and loss of soil resources (including nutrients and organic matter) by wind and water.

**Special Recreation Management Area (SRMA).** A public lands unit identified in land use plans to direct recreation funding and personnel to fulfill commitments made to provide specific, structured recreation opportunities (i.e., activity, experience, and benefit opportunities). The BLM recognizes three distinct types of SRMAs: community-based; intensive; and undeveloped big open. (From H-1601-1, BLM Land Use Planning Handbook.)

**Special Status Plant Species.** Collectively, federally listed or proposed and BLM sensitive species, which include both Federal candidate species and delisted species within 5 years of delisting. (From M6840, Special Status Species Manual).

**Split Estate.** In split estate situations, the surface rights and subsurface rights (such as the rights to develop minerals) for a piece of land are owned by different parties. In these situations, mineral rights are considered the dominant estate, meaning they take precedence over other rights associated with the property, including those associated with owning the surface. However, the mineral owner must show due regard for the interests of the surface estate owner and occupy only those portions of the surface that are reasonably necessary to develop the mineral estate.

**Split Season.** Removing livestock from the allotment and returning them later in the year within the permitted time.

**State Implementation Plan (SIP).** A detailed description of the programs a state will use to carry out its responsibilities under the Clean Air Act. State implementation plans are collections of the regulations used by a state to reduce air pollution.

BLM_0020264

**Stocking Rate.** The number of specific kinds and classes of animals grazing or using a unit of land for specified time.

**Stipulation Category.** Land use decisions or authorization requirements intended to mitigate impacts of surface disturbing or disruptive activities. These include RMP decisions, oil and gas lease stipulations, conditions of approval, and terms and conditions. These stipulations may prohibit surface use, allow surface use under certain conditions, or allow surface use during certain times (see also No Surface Occupancy, Controlled Surface Use, and Timing Limitation).

**Sundry Notice.** A form designed for submitting proposals to perform or modify certain well operations and reports of such operations when completed as indicated on Federal and Indian lands as pursuant to applicable Federal law and regulations.

**Surface Disturbing Activity.** Any authorized action that disturbs vegetation and surface soil, increasing erosion potential above normal site conditions. This definition typically applies to mechanized or mechanical disturbance. However, intense or extensive use of hand or motorized hand tools may fall under this definition. Examples of surface disturbing activities are construction of well pads and roads, pits and reservoirs, pipelines and power lines, mining, and vegetation treatments.

**Suitable habitat.** Surveyed and mapped habitat occurring on the geologic substrate on which the special status plant species are known to occur, which includes associated vegetation and other subtle characteristics (such as vegetation cover, light availability, aspect, surface cobble size). Most habitat mapped as suitable has been surveyed and found to contain the correct geology but is not occupied the special status plant species.

**T**

**Tackifier.** A tackifier is a glue (organic or polyacrylamide polymer) used to tie mulch and soil together.

**Take.** In the Endangered Species Act, to "take" a species means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."

**Threatened Species.** Any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. (From M6840, Special Status Species Manual.)

**Timing Limitation.** A stipulation that prohibits surface disturbing or disruptive activities during specified times to protect identified resource values during sensitive periods (see also Stipulation Category)

**Total Maximum Daily Load (TMDL).** An estimate of the total quantity of pollutants (from all sources: point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Traditional Cultural Property.** A property that derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community. A traditional cultural property may qualify for the National Register if it meets the criteria and criteria exceptions at 36 CFR 60.4. See National Register Bulletin 38.

BLM_0020265

## U

**Unconformable**. Consisting of a series of younger strata that do not succeed the underlying older rocks in age or in parallel position, as a result of a long period of erosion or nondeposition.

## V

**Valid Existing Rights.** Any lease established (and valid) prior to a new authorization, change in land designation, or in regulation.

**Visibility (Air Quality).** A measurement of the ability to see and identify objects at different distances.

**Visitor Day.** Twelve visitor hours, which may be aggregated by one or more persons in single or multiple visits.

**Visitor Use.** Visitor use of a resource for inspiration, stimulation, solitude, relaxation, education, pleasure, or satisfaction.

**Visual Resource Management (VRM) Classes.** Visual resource management classes define the degree of acceptable visual change within a characteristic landscape. A class is based on the physical and sociological characteristics of any given homogeneous area and serves as a management objective. Categories assigned to public lands based on scenic quality, sensitivity level, and distance zones. Each class has an objective which prescribes the amount of change allowed in the characteristic landscape. (From H-1601-1, BLM Land Use Planning Handbook.) The four classes are described below:

- **Class I** provides for natural ecological changes only. This class includes primitive areas, some natural areas, some wild and scenic rivers, and other similar areas where landscape modification activities should be restricted.

- **Class II** areas are those areas where changes in any of the basic elements (form, line, color, or texture) caused by management activity should not be evident in the characteristic landscape.

- **Class III** includes areas where changes in the basic elements (form, line, color, or texture) caused by a management activity may be evident in the characteristic landscape. However, the changes should remain subordinate to the visual strength of the existing character.

- **Class IV** applies to areas where changes may subordinate the original composition and character; however, they should reflect what could be a natural occurrence within the characteristic landscape.

**Volatile Organic Compounds (VOCs).** Volatile organic chemicals that produce vapors readily; at room temperature and normal atmospheric pressure. Volatile organic chemicals include gasoline, industrial chemicals such as benzene, solvents such as toluene and xylene, and tetrachloroethylene (perchloroethylene, the principal dry cleaning solvent).

## W

**Waiver**. Is a permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Well or Wellbore.** The hole drilled from the surface to the gas-bearing formation, several of which may be developed from a single well pad.

BLM_0020266

*Chapter 6 – Acronyms, Glossary and References*

**Well Pad.** Relatively flat work area (surface location) that is used for drilling a well or wells and for producing from the well once it is completed.

**Wild and Scenic Study River.** Rivers identified in Section 5 of the Wild and Scenic Rivers Act for study as potential additions to the National Wild and Scenic Rivers System. The rivers shall be studied under the provisions of Section 4 of the Act. (From M-8351, BLM WSR Policy and Program)

**Wilderness.** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation, that is protected and managed to preserve its natural conditions and that (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practical its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value. The definition contained in Section 2(c) of the Wilderness Act of 1964 (78 Stat. 891). (From H-6310-1, Wilderness Inventory and Study Procedures.)

**Wilderness Characteristics.** Wilderness characteristics include size, the appearance of naturalness, outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include ecological, geological, or other features of scientific, educational, scenic, or historical value. However Section 2(c) of the Wilderness Act of 1964 has been updated by IM-2003-195, dated June 20, 2003. Indicators of an area's naturalness include the extent of landscape modifications; the presence of native vegetation communities; and the connectivity of habitats. Outstanding opportunities for solitude or primitive and unconfined types of recreation may be experienced when the sights, sounds, and evidence of other people are rare or infrequent, in locations where visitors can be isolated, alone or secluded from others, where the use of the area is through non-motorized, non-mechanical means, and where no or minimal developed recreation facilities are encountered.

**Wilderness Study Area (WSA).** A designation made through the land use planning process of a roadless area found to have wilderness characteristics as described in Section 2(c) of the Wilderness Act of 1964. (From H-6310-1, Wilderness Inventory and Study Procedures.)

**Wild Horse Management Area.** An area that has been designated for continuing management of wild horses.

**Wildland Fire.** Any fire, regardless of ignition source, that is burning outside of a prescribed fire and any fire burning on public lands or threatening public land resources, where no fire prescription standards have been prepared. (From H-1742-1, BLM Emergency Fire Rehabilitation Handbook.)

**Wildland Fire Use (WFU).** The management of naturally ignited wildland fires to accomplish specific pre-stated resource management objectives in predefined geographic areas.

**Wildland Urban Interface (WUI).** The line, area or zone where structures (most notably private homes) and other human developments meet or are intermingled with forest and other vegetative fuel types.

**Wild River.** Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

BLM_0020267

*Chapter 6 – Acronyms, Glossary and References*

**Wild, Scenic, and/or Recreational (WSR).** The term used in this Manual Section for what is traditionally shortened to "Wild and Scenic" rivers. Designated river segments are classified, i.e., wild, scenic, and/or recreational, but cannot overlap. (From M-8351, BLM WSR Policy and Program.)

**Withdrawal.** An action that restricts the use of described public lands from operation of certain laws, which are also described in the withdrawal order. Withdrawal also may be used to transfer jurisdiction or management to other federal agencies.

**Woodland.** Contains typically shorter-growing tree species than forest species that are commonly harvested for posts, poles, and Christmas trees including piñon pine and juniper.

**Workover.** Well maintenance activities that require onsite mobilization of a drill rig to repair the well bore equipment (casing, tubing, rods, or pumps) or the wellhead. In some cases, a workover may involve development activities to improve production from the target formation.

### Table 6-1. English to Metric Conversion Table
### for Commonly Used Measurements

| English Units | Metric Units |
|---|---|
| *Distance* | |
| 1 mile = | 1.6 kilometers |
| 1 foot = | 0.30 meters |
| 1 inch = | 2.54 centimeters |
| *Area* | |
| 1 acre = | 0.40 hectare (1 hectare = 10,000 square meters) |
| 1 square foot = | 0.09 square meters |
| *Mass* | |
| 1 ton (short) = 2,000 pounds = | 0.91 tonne (metric ton) (1 tonne = 1000 kilograms) |
| 1 pound = | 0.45 kilogram |
| 1 ounce = | 28.3 grams |
| *Volume* | |
| 1 gallon = | 3.8 liters |
| 1 barrel = | 42 gallons = 159 liters |
| 1 acre-foot = | 1,233 cubic meters |

BLM_0020268

## 6.3 References

Adams, L.W., and A.D. Geis. 1983. Effects of roads on small mammals. Journal of Applied Ecology 20: 403-415.

Andrén, H. 1994. Effects of Habitat Fragmentation on birds and mammals in landscapes with different proportions of suitable habitat: a review. Oikos 71(3): 355-366.

Albee, Beverly J., Leila M. Shultz, and Sherel Goodrich. 1988. Atlas of the Vascular Plants of Utah. Utah Museum of Natural History.

Algermissen, S.T. 1969. Seismic Risk Studies in the United States. U.S. Dept. of Commerce, Environmental Science Services Administration, Coast & Geodetic Survey.

Athearn. 1981. Frederic J. Athearn, An Isolated Empire: A History of Northwestern Colorado, Bureau of Land Management, Colorado, Cultural Resources Series, Number Two (Third Edition).

Avian Power Line Interaction Committee (APLIC). 2006. Suggested Practices for Avian Protection on Power Lines: The State of the Art in 2006. Edison Electric Institute, APLIC, and the California Energy Commission. Washington, DC and Sacramento, CA.

APLIC and U.S. Fish and Wildlife Service (USFWS). 2005. Avian Protection Plan (APP) Guidelines. http://www.fws.gov/migratorybirds/CurrentBirdIssues/Hazards/APP/AVIAN%20PROTEC TION%20PLAN%20FINAL%204%2019%2005.pdf (accessed 4/5/2012).

Bartis, J.T. T. LaTourrette, L. Dixon, D.J. Peterson, and G. Cecchine. 2005. Oil Shale Development in the United States, Prospects and Policy Issues. RAND Corporation. MG-414-NETL.

BBC Research & Consulting (BBC). 2008a. Northwest Colorado Socioeconomic Analysis and Forecasts. BBC Research & Consulting, prepared for the Associated Governments of Northwest Colorado. February, 2008.

BBC. 2008b. City of Rifle, A Case Study of Community Renewal, Growth and Change in Northwest Colorado. BBC Research & Consulting, prepared for the City of Rifle. May, 2008.

BBC. 2008c. The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado (Revised Draft Report). BBC Research & Consulting, prepared for the Colorado Division of Wildlife. September, 2008.

Beard, T.N., D.B. Tait, and J.W. Smith. 1974. Nahcolite and Dawsonite Resources in the Green River Formation, Piceance Creek Basin, Colorado in Murray, D.K., Energy Resources of the Piceance Creek Basin, Colorado, 25th Field Conference: Rocky Mountain Association of Geologists, p. 101-122.

Beck, T.D.I. 1977. Sage grouse flock characteristics and habitat selection in winter. Journal of Wildlife Management 41(1):18-26.

BLM_0020269

Belnap, J., J.H. Kaltnecker, R. Rosentreter, J. Williams, S. Leonard, and D. Eldridge. 2001. Biological Soil Crusts: Ecology and Management. U.S. Department of Interior, BLM Technical Reference 1730-2, 119.

Blankenship Consulting and Sammons/Dutton. 2006. Blankenship Consulting LLC and Sammons / Dutton LLC, ExxonMobil Piceance Development Project Environmental Assessment.

Bureau of Land Management (BLM). 1984. BLM Manual 9112 – Bridges and Major culverts. Rel. 9-220. June 5, 1984.

BLM. 1985. BLM Manual 9113 - Roads. Rel. 9-247. June 7, 1985.

BLM. 1991. U.S. Department of the Interior (DOI), Colorado BLM Statewide Wilderness Study Report, Volume One, Craig District Study Areas. October 1991.

BLM. 1994. White River Resource Area Draft Resource Management Plan and Environmental Impact Statement. U.S. Department of the Interior. BLM White River Field Office, Meeker, CO. October, 1994.

BLM. 1995. Instruction Memoranda 2005-110 Old Growth Definitions. IM 2005-110. Available on the internet: http://www.blm.gov/nhp/efoia/wo/fy05/im2005-110attach1.pdf (accessed January 2, 2008).

BLM. 1995. Interim Management Policy and Guidelines for Lands Under Wilderness Review. BLM Manual H-8550-1. July 5.

BLM. 1996. White River Resource Area Proposed Resource Management Plan and Final Environmental Impact Statement. U.S. Department of the Interior. U.S. Department of the Interior. BLM White River Field Office, Meeker, CO. June.

BLM. 1997a. White River Record of Decision and Approved Resource Management Plan. U.S. Department of the Interior. BLM White River Field Office, Meeker, CO. July.

BLM. 1997b. Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. United States Department of the Interior, Bureau of Land Management, Colorado State Office. February 3.

BLM. 1998. A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lotic Areas. Prichard, D., J. Anderson, C. Correll, J. Fogg, K. Gebhardt. Technical Reference 1737-15. U.S. Department of the Interior National Applied Resource Sciences Center. BLM/RS/ST-98/001+1737.

BLM 1998a. Measuring and Monitoring Plant Populations. Elzinga C. L., D. Salzer, and J. Willoughby. Technical Reference 1730-1. U.S. Department of the Interior National Applied Resource Sciences Center. BLM/RS/ST-98/005+1730.

BLM. 1999a. Riparian Area Management: A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lentic Areas. Prichard D., F. Berg, W. Hagenbuck, R. Krapf, R. Leinard, S. Leonard, M. Manning, C. Nobel, and J. Staats. Technical Reference 1737-16 (Revised 2003). U.S. Department of the Interior National Applied Resource Sciences Center.. BLM/RS/ST-99/001+1737.

BLM_0020270

BLM. 1999b. White River Fire Management Plan: Environmental Assessment Record Number CO-017-WR-99-99-EA. U.S. Department of the Interior. BLM White River Field Office, Meeker, CO. Available upon request from the White River Field Office, 220 East Market Street, Meeker, CO. Phone 970-878-3800. Email wrfo_webmail@blm.gov.

BLM. 2000. Colorado BLM State Director's Sensitive Species List (Animals and Plants). June. Available at http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html.

BLM. 2002. Instruction Memorandum No. 2002-164, Guidance to Address Environmental Justice in Land Use Plans and Related NEPA Documents, Washington, D.C.

BLM. 2004a. Final Figure Four Natural Gas Project Environmental Assessment. CO-WRFO-03-187-EA. December.

BLM. 2004b. Wolf Creek Watershed-Three Springs Ranch Landscape Health Assessment (CO-110-2006-055-EA). December 16.

BLM. 2004c. BLM Manual 8100 The Foundations for Managing Cultural Resources. December 3, 2004.

BLM. 2005a. Land Use Planning Handbook. BLM Handbook H-1601-1. March 11.

BLM. 2005b. 43 CFR 1600. Public Lands: Interior; Bureau of Land Management, Department of the Interior; Planning, Programming, Budgeting.

BLM. 2005c. West Douglas Herd Area, Amendment to the White River RMP Environmental Assessment (CO-WRFO-05-083-EA). U.S. Department of the Interior, BLM White River Field Office, Meeker, CO.

BLM. 2005d. Resource Note No. 80 Mancos Shale Literature Review on the Colorado Plateau. By Lynn Jackson, Resource Advisor – Science and Outreach, BLM, Moab Field Office, Utah.

BLM. 2006-2008. Baseline Geographic Information System Data. White River Field Office, Colorado.

BLM. 2006a. Preparation Plan Analysis for the White River Field Office Resource Management Plan Amendment. Prepared by the BLM WRFO. September 7.

BLM. 2006b. Shell Frontier Oil & Gas, Inc. Oil Shale Research, Development and Demonstration (R,D&D) Tracts Environmental Assessment (CO-110-2006-117-EA). http://www.blm.gov/co/st/en/fo/wrfo/oil_shale_wrfo/shell_frontier_oil.html (accessed May 3, 2007).

BLM. 2006c. Vegetation and Noxious Weeds Information received from Ken Holsinger, BLM WRFO Natural Resource Specialist.

BLM. 2006d. Personal conversation with Paul Daggett, BLM WRFO and David Mohrbacher, URS Corporation. November 10, 2006.

BLM. 2006e. Rangely Jeep Trails Environmental Assessment. CO-110-2005-218-EA. White River Field Office. Completed June 9, 2006.

BLM_0020271

BLM. 2006f. Instruction Memorandum (IM) 2006-073. http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2006/im_2006-073__.html

BLM 2007. U.S. Department of the Interior, Bureau of Land Management, White River Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas Activities in the BLM White River Field Office: Rio Blanco, Moffat and Garfield Counties, Colorado, September 10, 2007.

BLM. 2007a. Final Scoping Report for the White River Field Office Oil and Gas Resource Management Plan Amendment/Environmental Impact Statement. May 2007.

BLM. 2007b. Final Analysis of the Management Situation for the White River Field Office Oil and Gas Resource Management Plan Amendment/Environmental Impact Statement. November 2007.

BLM. 2007c. Record of Decision for the Approval of Portions of the Roan Plateau Resource Management Plan Amendment and Environmental Impact Statement. June 11 2007.

BLM. 2007d. Onshore Oil and Gas Order Number 1: Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations (issued under 43 CFR 3160).

BLM. 2008. U.S. Department of the Interior, Bureau of Land Management, White River Field Office, White River RMPA/EIS Chapter 1 – Purpose and Need for Action (Draft). July 2008.

BLM. 2008a. National Environmental Policy Act Handbook. BLM Handbook H-1790-1. January 2008.

BLM. 2008b. Geographic Information System data provided by the White River Field Office. Meeker, Colorado.

BLM. 2008c. Programmatic Biological Assessment for BLM's Fluid Minerals Program in Western Colorado re: Water Depletions and effects on the Four Endangered Big River Fishes: Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), bonytail chub (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*), May 2008. 34 pp.

BLM. 2008d. Bureau of Land Management Data and Metadata for White River BLM Field Office Management Area. Available on the internet: http://www.blm.gov/az/st/en/prog/maps/gis_files.html (accessed on August 1, 2008).

BLM. 2008e. Instruction Memorandum (IM) 2008-014. http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/20080/im_2008-014.html.

BLM. 2008f. Proposed Oil Shale and Tar Sands Management Plan Amendments to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic Environmental Statement (BLM WO GI 08-005-3900, DOI No. FES 8-32), September 2008.

BLM. 2008g. White River Field Office Oil and Gas RMPA/EIS Final Class I Overview of Cultural Resources Report. July.

BLM_0020272

BLM. 2008h. BLM Handbook H1740 – 2. Integrated Vegetation Management. Bureau of Land Management Rel. 1-1714. March 25, 2008.

BLM. 2010. Instruction Memorandum 2010-117. Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews.

Bureau of Reclamation (BOC). 2011. Quality of Water Colorado River Basin: Progress Report No. 23. Available on the internet: http://www.usbr.gov/uc/progact/salinity/pdfs/PR23fmal.pdf (accessed March 26, 2012).

Boone, R.B., J.J. Taylor, D.M. Swift, P.H. Evangelista, and E. Hollowed. 2011. Developing a Resource Management and Monitoring Protocol for a Semi-arid Landscape with Extensive Oil and Gas Development Potential. Technical Note 439. U.S. Department of the Interior. Bureau of Land Management, National Operations Center, Denver, Colorado. 52 pp.

Bowker, J.M., J.E. Harvard III, John C. Bergstrom, H. Ken Cordell, Donald B.K. English, and John B. Loomis. 2005. The Net Economic Value of Wilderness. In, The Multiple Values of Wilderness, H. Ken Cordell, John C. Bergstrom, J.M. Bowker, ed. State College, Pennsylvania: Venture Publishing, Inc.

Boyle, J.M., K.J. Covay, and D.P. Baur. 1984. Quantity and Quality of Streamflow in the White River Basin, Colorado and Utah. Water-Resources Investigations Report 84-4022. USGS Lakewood, Colorado.

Boyle, S. 2006. North American river otter (*Lontra canadensis*): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/northamericanriverotter.pdf (accessed December 30, 2011).

Bradley, W.H. 1964. Geology of Green River Formation and Associated Eocene Rocks in Southwestern Wyoming and Adjacent Parts of Colorado and Utah. U.S. Geological Survey Professional Paper 496-A. In: Steigers 1999.

Brennan, M. 2008. Interview with Lloyd Levy Consulting, LLC, August 26, 2008.

Brown, Kim. 2008. Kim Brown, Branch Manager, First National Bank of the Rockies, Meeker, Colorado. Interview with Lloyd Levy Consulting, LLC, August 27, 2008.

Buseck, Rebecca S., Douglas A. Keinath, and Michele Giraud. 2005. Species Assessment for Great Basin Spadefoot Toad (*Spea intermontana*) in Wyoming. Prepared for U.S. Department of the Interior, Bureau of Land Management, Wyoming State Office, Cheyenne, Wyoming.

Carpenter, J., C. Aldridge, and M.S. Boyce. 2010. Sage-grouse habitat selection during winter in Alberta. Journal of Wildlife Management 74(8): 1806-1814.

Carsey, K., G. Kittel, K. Decker, D.J. Cooper, and D. Culver. 2003. Field Guide to the Wetland and Riparian Plant Associations of Colorado. Colorado Natural Heritage Program, Fort Collins, CO.

Cashion, W.B. 1973. Geologic and Structure Map of the Grand Junction Quadrangle, Colorado and Utah: U.S. Geological Survey Miscellaneous Investigations Series Map, I-736.

BLM_0020273

Claritas. 2008a. 2007 Housing Value. Claritas. Downloaded August 25, 2008.

Claritas. 2008b. 2007 Household Income. Claritas. Downloaded August 25, 2008.

Clean Air Status and Trends Network (CASTNET). 2007. Available on the internet: http://www.epa.gov/castnet/.

Cole, E.K., M.D. Pope, and R.G. Anthony. 1997. Effects of road management on movement and survival of Roosevelt elk. Journal of Wildlife Management 61: 1115-1126.

Cole, R.D., G.J. Daub, and L.K. Weston. 1995. Review of Geology, Mineral Resources, and Ground-Water Hydrology of Green River Formation, North-Central Piceance Creek Basin, Colorado. In, The Green River Formation in Piceance Creek and Eastern Uinta Basins, Grand Junction Geological Society, Grand Junction, Colorado.

Collins, Cameron P., and Timothy D. Reynolds. 2005. Ferruginous hawk (*Buteo regalis*) A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project

Colorado Department of Education (CDE). 2008. Education Statistics. Colorado Department of Education. Downloaded September 11, 2008.

Colorado Department of Labor and Employment (CDLE). 2008. Colorado Department of Labor and Employment 2006 Quarterly Census of Employment and Wages. Downloaded August 28, 2008.

Colorado Department of Public Health and Environment (CDPHE). 2007. Air emissions data provided by David Thayer via e-mail on May 14, 2007.

CDPHE Air Pollution Control Division (CDPHE APCD). 2006a. Air Quality Standards. January 18.

CDPHE APCD. 2006b. Colorado State Implementation Plan for Regional Haze Technical Support Document for Flat Tops Wilderness Area. August.

CDPHE APCD. 2007. Data recorded from the Piceance Basin Bar-D Wind Data Station – January 1, 2002 through March 15, 2007.

CDPHE Water Quality Control Commission (CDPHE WQCC). 2010. Aquatic Life Use Attainment, Methodology to Determine Use Attainment for Rivers and Streams: Policy Statement 10-1, Approved October 12, 2010. Available on the internet: http://www.cdphe.state.co.us/op/wqcc/New/10-1.pdf (accessed March 26, 2012).

CDPHE WQCC. 2012a. Regulation No. 37. Classifications and Numeric Standards for Lower Colorado River Basin. Effective January 1, 2012. Available on the internet: http://www.cdphe.state.co.us/regulations/wqccregs/37_2012(01).pdf (accessed April 3, 2012)

CDPHE WQCC. 2012b. Regulations No. 93. Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List, Effective March 30, 2012. Available on the internet: http://www.cdphe.state.co.us/regulations/wqccregs/93_2012(03).pdf (accessed March 26, 2012).

BLM_0020274

CDPHE Water Quality Control Division. 2008. The Status of Water Quality in Colorado – 2008. April.

Colorado Division of Wildlife (CDOW). 2006. White River Resource Management Plan Amendment EIS Comments. Letter from Ron Velarde, Regional Manager, CDOW to Kent E. Walter, Field Office Manager, White River Field Office, Bureau of Land Management. October 9.

CDOW. 2007. Threatened and Endangered List. Available at: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/ (accessed February 2010).

CDOW. 2009. Species of Concern. Birds. Burrowing Owl. http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/Birds/BurrowingOwl.htm

CDOW, BLM, USFWS. 2001. A Cooperative Plan for Black-footed Ferret Reintroduction and Management, Wolf Creek and Coyote Basin Management Areas, Moffat and Rio Blanco Counties, Colorado. October 2001.

Colorado Greater Sage-Grouse Steering Committee. 2008. Colorado Greater Sage-Grouse Conservation Plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Colorado Natural Heritage Program (CNHP). 2007. 4th Annual Colorado Rare Plant Symposium. http://www.cnhp.colostate.edu/download/documents/2009/Fourth%20Annual%20Colorado%20Rare%20Plant%20Symposium%20-%20Minutes.pdf

CNHP. 2009. CNHP Tracked Vascular Plant Species. Updated August 6, 2009. http://www.cnhp.colostate.edu/download/list/vascular.asp.

Colorado Oil and Gas Conservation Commission (COGCC). 1991. Memorandum of Understanding between the Colorado Bureau of Land Management and the Colorado Oil and Gas Conservation Commission. http://cogcc.state.co.us/Library/mou-moa/MOU-BLM.htm (accessed March 26, 2012).

COGCC. 2006. COGCC GIS Online. Query Database Information System. http://www.oil-gas.State.Co.US/ (accessed November 11, 2006).

COGCC. 2008. Colorado Oil and Gas Conservation Commission, Staff Report, January 15, 2008. http://cogcc.state.co.us/ (accessed September 12, 2008).

COGCC. 2009. MOU: Permitting of Oil and Gas Operations on BLM and NFS Lands in Colorado

Colorado State Demography Office (SDO). 2010. Table 5: Colorado Population for Counties and Municipalities. Colorado State Demography Office. November 2007. Downloaded July 28.

Colorado State Forest Service. 2005. 2005 Report on the Health Colorado's Forests. Colorado Department of Natural Resources. Available on the internet: www.dnr.state.co.us (accessed January 18, 2007).

BLM_0020275

Colorado State Protocol. 1998. State Protocol Agreement Between the Colorado State Director of the Bureau of Land Management (BLM) and the Colorado State Historic Preservation Officer (SHPO) Regarding the Manner in which the BLM will meet its Responsibilities under the National Historic Preservation Act (NHPA) and the National Programmatic Agreement (NPA) Among the BLM, the Advisory Council On Historic Preservation (Council), and the National Conference of State Historic Preservation Officers (NCSHPO). Revised March 2011.Council on Environmental Quality (CEQ). 1981. Guidance Regarding NEPA Regulations, Forty Most Asked Questions Concerning NEPA.

CEQ. 1997. Council on Environmental Quality Environmental Justice Guidance Under the National Environmental Policy Act. December 10.

Day, Sharon, and Denise Sheridan. 2007. Sharon Day and Denise Sheridan, Town Administrator and Town Planner. Interview with BBC Research & Consulting. September 25, 2007.

Dinosaur Diamond Partnership, Inc. 2000. Dinosaur Diamond Prehistoric Highway Corridor Management Plan. Denver, Colorado.

Division of Plant Industry (DPI). 2006. Colorado Noxious Weed Information. Available on the internet: http://www.ag.state.co.us/DPI/home.html (accessed November 15, 2006).

Doherty, K.E. 2008. Sage-grouse and energy development: integrating science with conservation planning to reduce impacts. Ph.D. Dissertation. Univ. of Montana, Bozeman. 125pp.

Donnell, J.R. 1961. Tertiary Geology and Oil Shale Resources of the Piceance Creek Basin Between the Colorado and White Rivers, Northwestern Colorado. U.S. Geological Survey Bulletin 1082-L. In: Steigers 1999.

Dunn, H. 1972. The Piceance Basin and Axial Basin Uplift. In Geologic Atlas of the Rocky Mountain Region. Rocky Mountain Association of Geologists. Colorado: Hirschfeld Press.

Dyni, J.R. 1974. Sodium Carbonate from the Green River Formation. U.S. Geological Survey Open-File Report 96-0729.

Dyni, J.R. 2003. Geology and Resources of Some World Oil-Shale Deposits, Oil Shale, Vol. 20, No. 3, pp. 193-252.

Ekstrom, Bill. 2008. Bill Ekstrom, Extension Agent - Agriculture, Rio Blanco County Cooperative Extension, Meeker, Colorado. Interview with Lloyd Levy Consulting, LLC, August 12, 2008.

Ellingson, Lindsey, Andrew Seidl and CJ Mucklow. 2006. Tourists' Value of Routt County's Working Landscape, 2005. (EDR 06-05) Fort Collins Colorado: Department of Agricultural and Resource Economics, May 2006. Available here: http://www.cde.state.co.us/artemis/ucsu5/ucsu5213edr066internet.pdf (accessed February 12, 2009).

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

BLM_0020276

Fahrig, L. 1997. Relative effects of habitat loss and fragmentation on population extinction. Journal of Wildlife Management 61(3): 603-610).

Fahrig, L. 2003. Effects of habitat fragmentation on biodiversity. Annual Review of Ecology, Evolution and Systematics 2003 (34): 487-515. Available http://www.annualreviews.org.Federal Land Managers' Air Quality Related Values Workgroup (FLAG). 2000. Phase I Report. U.S. Forest Service-Air Quality Program, National Park Service-Air Resources Division, U.S. Fish and Wildlife Service-Air Quality Branch. December 2000.

Fertig, Walter, Rick Black, and Paige Wolken. 2005. Rangewide Status Review of Ute Ladies'-Tresses (*Spiranthes diluvialis*). Prepared for the U.S. Fish and Wildlife Service and the Central Utah Water Conservancy District.

Fire Regime Condition Class (FRCC). 2007. Interagency website designed to provide guidance on the FRCC system and approach. Available on the internet: http://frcc.gov/.

Fitzgerald, J., C. Meaney, and D. Armstrong. 1994. Mammals of Colorado. Denver Museum of Natural History, University Press of Colorado, Niwot, Colorado.

Fotz, Randy B. 1996. Traffic, and No-Traffic on an Aggregate Surfaced Road: Sediment Production Differences. Presented at the Food and Agricultural Organization seminar on "Environmentally Sound Forest and Road and Wood Transport:" Sinaia, Romania June.

Franklin, M.A. "Ben". 2005. Plant Information Compiled by the Utah Natural Heritage Program: A Progress Report. Utah Division of Wildlife Resources Publication Number 05-40. Prepared for Utah Reclamation and Conservation Commission. http://dwrcdc.nr.utah.gov/ucdc/ViewReports/Plant_Report_2005.pdf

Frederick, G.P. 1991. Effects of Forest Roads on Grizzly Bears, Elk, and Gray Wolves: a literature review. USDA Forest Service, Kootenai National Forest Publication No. R1-91-73.

Freeman, A.M. 1994. The measurement of environmental and resource values: Theory and methods. Washington, DC: Resources for the Future.

Garfield County. 2008. Garfield County Quick Facts. Available on the internet: http://www.garfield-county.com/index.aspx?page=698.

Garfield County Public Health Service. 2007. Garfield County Air Quality Monitoring Study June 2005 - May 2007. December.

General Accounting Office (GAO). 2004. Renewable Energy: Wind Power's Contribution to Electric Power Generation and Impact on Farms and Rural Communities. September. www.gao.gov/news.items/d04756.pdf

Ghist, J.M. 2005. Touring Colorado Geology: General Stratigraphic Column. http://www.geocities.com/jghist/Explanations/Stratigraphy/stratcol.htm (accessed January 22, 2009).

Gilbert, M.M., and A.D. Chalfoun. 2011. Energy development affects populations of sagebrush songbirds in Wyoming. Journal of Wildlife Management 75(4): 816-824.

BLM_0020277

U.S. Government Printing Office (GPO). 2010. "National Ambient Air Quality Standards for Ozone." 75 Federal Register 2938. January 19, 2010.

Hagen, C.A. 1999. Sage grouse habitat use and seasonal movements in a naturally fragmented landscape, northwestern Colorado. M.S. Thesis. University of Manitoba, Winnipeg, Canada.

Hammerson, G.A. 1999. Amphibians and Reptiles in Colorado. Second edition. University Press of Colorado and Colorado Division of Wildlife.

Hann, W.J., and D.L. Bunnell. 2001. Fire and Land Management Planning and Implementation Across Multiple Scales. Int. J. Wildland Fire. 10:389-403.

Harju, S.M., M.R. Dzialak, R.C. Taylor, L.D. Hayden-Wing, and J.B. Winstead. 2010. Thresholds and time lags in effects of energy development on greater sage-grouse populations. Journal of Wildlife Management 74(3): 437-448.

Harpman, David A., Michael P. Welsh, and Richard C. Bishop. 1994. Nonuse Economic Value: Emerging Policy Analysis Tool. Funded by the U.S. Bureau of Reclamation's General Investigation Program, November 1994. Available here: http://www.usbr.gov/pmts/economics/reports/NUPAP1024.pdf (accessed February 12, 2009).

Herrick, Jeffrey E., Justin W. Van Zee, Kris M. Havstad, Laura M. Burkett and Walter G. Whitford. 2009. Monitoring Manual for Grassland, Shrubland and Savanna Ecosystems Volume 1: Quick Start. USDA-ARS Jornada Experimantal Range. ISBN 0-9755552-0-0. Las Cruces, New Mexico http://usda-ars.nmsu.edu.

Herrick, Jeffrey E., et.al. 2009a. Monitoring Manual for Grassland, Shrubland and Savanna Ecosystems Volume 2: Design, supplementary methods and interpretation. USDA-ARS Jornada Experimental Range. ISBN 0-9755552-0-0. Las Cruces, New Mexico http://usda-ars.nmsu.edu.

Hirsch, Christine L., Shannon E. Albeke, and Thomas P. Nesler. 2006. Range-wide Status of Colorado River Cutthroat Trout (*Oncorhyncus clarkia pleuriticus*): 2005. Available at http://www.fws.gov/mountain-prairie/species/fish/crct/

Holloran, M.J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. PhD Thesis. University of Wyoming, Laramie.

Holloran, M.J. and S.H. Anderson. 2005. Spatial distribution of greater sage-grouse nests in relatively contiguous sagebrush habitats. Condor 107: 742-752.

Holloran, M.J., R.C. Kaiser, and W.A. Hubert. 2010. Yearling greater sage-grouse response to energy development in Wyoming. Journal of Wildlife Management 74(1): 65-72.

Hood, S. M., and M. Miller, editors. 2007. Fire ecology and management of the major ecosystems of southern Utah. Gen. Tech. Rep. RMRS-GTR-202. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 110 p.

BLM_0020278

Husband, Michael B. 1984. Colorado Plateau County Historic Context. Colorado Historical Society, 1984 (facsimile edition 2006), Office of Archaeology and Historic Preservation, Colorado Historical Society http://www.coloradohistory-oahp.org/publications/contexts.htm (accessed February 25, 2008).

Inglefmger, F., and S. Anderson. 2004. Passerine response to roads associated with natural gas extraction in a sagebrush steppe habitat. Western North American Naturalist 64(3): 385-395.

Intergovernmental Panel on Climate Change (IPCC). 2007. Climate Change 2007: Impacts, Adaptation and Vulnerability. Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. [M.L. Parry, O.F. Canziani, J.P. Palutikof, P.J. van der Linden, and C.E. Hanson, Eds.]. http://www.ipcc.ch/publications_and_data/ar4/wg2/en/contents.html

Johnson, R.C. 1979. Cross Section B-B' of Upper Cretaceous and Lower Tertiary Rocks, Northern Piceance Creek Basin, Colorado: U.S. Geological Survey Miscellaneous Field Investigations Map MF-1129B, 2 sheets.

Johnston, Robert J., and Joshua M. Duke. 2007. "Willingness to Pay for Agricultural Land Preservation and Policy Process Attributes: Does the Method Matter?" American Journal of Agricultural Economics 89(4) 1098-1115.

Joos, Michael. 2008. Rio Blanco County Undersheriff. Interview with Lloyd Levy Consulting, LLC, September 10, 2008.

Joy, Margie, M. 2008. Pioneers Hospital. Interview with BBC Research & Consulting, September 5, 2008.

Kade, A., and S.D. Warren. 2002. Soil and Plant recovery after historic military disturbances in the Sonoran Desert, USA." In Arid Land Research and Management 16: 231-243.

Kellogg, H.E. 1977. Geology and Petroleum of the Mancos B Formation, Douglas Creek Arch Area, Colorado and Utah. In Veal, Harry K., ed., Exploration Frontiers of the Central and Southern Rockies, Colorado: Rocky Mountain Association of Geologists.

Kingery, H. E. 1998. Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership. Copublished by the Colorado Division of Wildlife.

Lake, Phyllis. 2008. Phyllis Lake, County Executive Director, Farm Service Agency, Meeker, Colorado. Interview with Lloyd Levy Consulting, LLC, August 22, 2008.

Livo, L.J., and C. Loeffler (eds). 2003. Report on the Status and Conservation of the Boreal Toad (*Bufo boreas boreas*) in the Southern Rocky Mountains. 2001-2002. Prepared by the Boreal Toad Recovery Team, Colorado Division of Wildlife.

Loomis, John. 2005. United States Department of Agriculture Forest Service, Pacific Northwest Research Station. Updated Outdoor Recreation Use Values on National Forests and Other Public Lands. General Technical Report PNW-GTR-658, October 2005.

BLM_0020279

Loomis, John, Vicki Rameker and Andy Seidl. 2000. Potential Non-Market Benefits of Colorado's Agricultural Lands: A Review of the Literature (APR 00-02) Fort Collins Colorado: Department of Agricultural and Resource Economics, February 2000. Available here: http://www.cde.state.co.us/artemis/ucsu5/UCSU5212APR0002INTERNET.pdf (accessed February 12, 2009).

Lyon, A.G., and S.H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. Wildlife Society Bulletin 31(2): 486-491.

MacKinnon, W.C., J.W. Karl, G.R. Toevs, J.J. Taylor, M. Karl, C.S. Spurrier, and J.E. Herrick. 2011. BLM Core Terrestrial Indicators and Methods. Technical Note 440. U.S. Department of the Interior, Bureau of Land Management, National Operations Center, Denver, CO.

MacLachlan, M. 1987. General Geology of the Piceance Basin. Published in Oil Shale, Water Resource and Valuable Minerals of the Piceance Basin, Colorado: The Challenge and Choices of Development. Compiled by O. James Taylor. USGS Professional Paper 1310. U.S. Government Printing Office, Washington. 1987.

Magnan, Nicholas, Andrew Seidl, C.J. Mucklow and Deborah Alpe. 2005. The societal value of ranchlands to Routt County residents, 1995-2005 (EDR 05-01). Fort Collins Colorado: Department of Agricultural and Resource Economics, October 2005. Available here: http://nwcos.org/Resources/BLM%20Documents/Socioec%20Analysis/RoCo%20Ranchland%20Short%20Version.pdf (accessed February 12, 2009).

McDonald, L.A., H.W. Bender, E. Hurley, S. Donelly, and D. Taylor. 2007. Oil and Gas Economic Impact, Colorado Energy Research Institute Report 2007-1, Colorado School of Mines, June 2007. http://www.ceri-mines.org/documents/CERIOilGas.pdf (accessed August 7, 2007).

McGregor, R.L., D.J. Bender, and L. Fahrig. 2008. Do small mammals avoid roads because of the traffic? Journal of Applied Ecology 45: 117-123

McIntyre, S., and R. Hobbs. 1999. A framework for conceptualizing human effects on landscapes and its relevance to management and research models. Conservation Biology 13(6): 1282-1292.

McMahon, P.B., Paul von Guerard, Barbara Ruddy, Josh Linard, Jean Dupree, Robert Zuelllig. 2007. Regional Framework for Water-Resources Monitoring Related to Energy Exploration and Development. USGS Colorado Water Science Center.

Murray, D.K., and J.D. Haun. 1974. Introduction to the Geology of the Piceance Creek Basin and Vicinity, Northwestern Colorado. In: Murray, D.K. et al., editors, Energy Resources of the Piceance Creek Basin, Colorado. Rocky Mountain Association of Geologists Guidebook (1974). In: Steigers 1999.

National Atlas. 2005. Average Annual Precipitation Map of Colorado. Online data resource accessed at: http://nationalatlas.gov/printable/images/pdf/precip/pageprecip_co3.pdf.

National Diversity Information Source (NDIS). 2006. Natural Diversity Information Source, Colorado Division of Wildlife. Wildlife Mountain Lion Page. http://ndis.nrel.colostate.edu/ (accessed November 2006).

National Energy Policy Development Group. 2001. Reliable, Affordable, and Environmentally Sound Energy for America's Future. Report of the National Energy Policy Development Group. May.

NatureServe Explorer. 2009. An Online Encyclopedia of Life. http://www.natureserve.org/explorer/

Neely, B., S. Panjabi, E. Lane, P. Lewis, C. Dawson, A. Kratz, B. Kurzel, T. Hogan, J. Handwerk, S. Krishnan, J. Neale, and N. Ripley. 2009. Colorado Rare Plant Conservation Strategy. Developed by the Colorado Rare Plant Conservation Initiative. The Nature Conservancy, Boulder, Colorado. 117 pp.

Neilson, Renae. 2008. Rio Blanco County Assessor, Meeker, Colorado. Interviews with Lloyd Levy Consulting, LLC, September 5 and September 10, and email to Lloyd Levy Consulting, LLC, September 11, 2008.

O'Kane, Steven L. 1988. Colorado's Rare Flora. Great Basin Naturalist 48(4): 434-484.

Ortiz, Roderick F. 2002. Baseline Characterization of Water Quality and Mass Loading in Piceance Creek, Rio Blanco County, Colorado, December 2000. US Geologic Survey, Water Resources Investigation Report 02-4134. Denver, Colorado.

Partners in Flight. 2005. Partners in Flight Species Assessment Database. http://www.rmbo.org/pif/pifdb.html

Pauli, Johnathan N., Robert M. Stephens, and Stanley H. Anderson. 2006. White-tailed Prairie Dog (*Cynomys leucurus*): A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project.

PCGCC. 2007. Regional Impacts of Climate Change: Four Case Studies in the United States. Pew Center on Global Climate Change (PCGCC). December. http://www.pewclimate.org/docUploads/Regional-Impacts-FullReport.pdf

Pellant, Mike, Patrick Shaver, David A. Pyke, and Jeffery E. Herrick. 2000. Interpreting Indicators of Rangeland Health. U.S. Department of Interior (USDI, BLM) Technical Reference 1734-6, 130 p.

Preisler, H.K., A.A. Ager, and M.J. Wisdom. 2006. Statistical methods for analysing responses of wildlife to human disturbance. Journal of Applied Ecology 43: 164-172.

Rangely. 2008a. Rangely 2008 Proposed Budget. Submitted to BBC Research & Consulting by the Town of Rangely.

Rangely. 2008b. Town Administrator. Interview with BBC Research & Consulting, September 5, 2008.

Redifer J, G. Jouflas, T. Chase, and S. Morris. 2007. Socioeconomic Impacts of Growth: A Study by the Mesa State College Natural Resource and Land Policy Institute, September 2007. http://www.mesastate.edu/pdf/Socioeconomic%20Impacts%20of%20Growth.pdf (accessed July 14, 2008).

BLM_0020281

Redifer J., and G. Jouflas. 2008. Investigating Regional Collaboration in Northwest Colorado: A
Study by the Mesa State College Natural Resource and Land Policy Institute, May 2008.
http://www.mesastate.edu/pdf/irc/irc1.pdf (accessed July 14, 2008).

Reed, A.D., and M.D. Metcalf. 1999. Colorado Prehistory: A Context for the Northern Colorado
River Basin. Colorado Council of Professional Archaeologists, Denver.

Rickey, M., and B.P. Kurzel. 2007 Ten-year Population Trends in Lesquerella congesta at Duck
Creek Area of Critical Environmental Concern. Unpublished report prepared for Colorado
Natural Areas Program, Denver, Colorado. 5 pp.

Riffell, S.K., K.J. Gutzwiller, and S.H. Anderson. 1996. Does repeated human intrusion cause
cumulative declines in avian richness and abundance? Ecological Applications 6(2): 492-
505.

Righter, R., R. Levad, C. Dexter, and K. Potter. 2004. Birds of Western Colorado Plateau and Mesa
County. Grand Valley Audubon Society, Grand Junction.

Rio Blanco County. 2007. Welcome to the Rio Blanco County Home Page. Available on the
internet: http://www.co.rio-blanco.co.us/

Rio Blanco County. 2008. Rio Blanco County Department of Social Services. Available on the
internet: http://www.co.rio-blanco.co.us/socialservices/ (accessed August 22, 2008).

Ritter, Jr., Governor Bill. 2007. "Colorado Climate Action Plan: A Strategy to Address Global
Warming." November. http://www.cdphe.state.co.us/climate/ClimateActionPlan.pdf

RMCO-NRDC. 2008. Hotter and Drier: The West's Changed Climate. The Rocky Mountain
Climate Organization (RMCO) and the Natural Resources Defense Council (NRDC).
March. http://www.nrdc.org/globalwarming/west/west.pdf

Rocky Mountain Area and Coordination Center. 2000-2007. Annual Reports 2000-2007.
http://gacc.nifc.gov/rmcc/administrative/publications.html (accessed November 24, 2008).

Rocky Mountain News. 2007. Three's A Crowd in Two-Sided Garfield Politics. Study noted
December 12.

Romme, W., C. Allen, J. Bailey, W. Baker, B. Bestelmeyer, P. Brown, K. Eisenhart, L. Floyd-
Hanna, D. Huffman, B. Jacobs, R. Miller, E. Muldavin, T. Swetnam, R. Tausch and
P. Weisberg. 2007. Historical and Modern Disturbance Regimes of Piñon-Juniper
Vegetation in the Western U.S. http://www.cfri.colostate.edu/docs/P-
J_disturbance_regimes_short%20synthesis_5-07.pdf (accessed January 2, 2008).

Rose, J.B. 1984. "Farmland preservation policy and programs." Natural Resource Journal. 24:591-
640.

Rosenberger R., and R. Walsh. 1997. Non-Market Value of Western Valley Ranchland Using
Contingent Valuation. Journal of Agricultural and Resource Economics, 22(2):296-309.
Available here: http://ageconsearch.umn.edu/bitstream/30856/1/22020296.pdf (accessed
February 12, 2009).

Rosenberger, R.S., and J.B. Loomis. 1999. "The Value of Ranch Open Space to Tourists: Combining Observed and Contingent Behavior Data." Growth and Change 30(3):366-383.

Rost, G.R., and J.A. Bailey. 1979. Distribution of mule deer and elk in relation to roads. Journal of Wildlife Management 43(3): 634-641.

Rowland, M.M., M.J. Wisdom, B.K. Johnson, and M.A. Penninger. 2005. Effects of roads on elk: implications for management in forested ecosystems. Pages 42-52 in Wisdom, M.J., technical editor, The Starkey Project: a synthesis of long-term studies of elk and mule deer. Reprinted from the 2004 Transactions of the North American Wildlife and Natural Resources Conference, Alliance Communications Group, Lawrence, Kansas.

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000. Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI Park Service. Forest Service Publication #R1-00-53, Missoula, MT. 142pp.

Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, L.J. Lyon, and W.J. Zielinski. 1994. American marten, fisher, lynx, and wolverine in the western United States. USDA Forest Service. General Technical Report RM-254. 184p.

Saulnier, G.J., Jr. 1999. Groundwater Quality in Piceance Creek Basin. Duke Engineering and Services, Austin, Texas.

Sawyer, H., M.J. Kauffman, and R.M. Nielson. 2009a. Influence of well pad activity on winter habitat selection patterns of mule deer. Journal of Wildlife Management 73(7): 1052-1061.

Schenk, T. 2006. Wildlife Commission Meeting: November 8, 2006, Lynx Fact Sheet. Colorado Division of Wildlife. Available on the internet: http://wildlife.state.co.us/WidllifeSpeciesofConcern/Mammals/Lynx/LynxOverview.htm.

Smith, Brian E., and Douglas A Keinath. 2007. Northern Leopard Frog (*Rana pipiens*): A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project.

Smith, Michael A., Jerrold L. Dodd, Quentin D. Skinner, and J. Daniel Rodgers. 1993. Dynamics of vegetation along and adjacent to an ephemeral channel. J. Range Manage.46:56-64, January 1993.

Smith, J.W. 1980. Oil Shale Resources of the United States, Mineral and Energy Resources, Volume 23, No. 6, Colorado School of Mines.

Social Services. 2008. Social Services Administrator. Interview with BBC Research & Consulting, September 8.

Spackman, S., B. Jennings, J. Coles, C. Dawson, M. Minton, A. Kratz, and C. Spurrier. 1997. Colorado Rare Plant Guide. Prepared for the Bureau of Land Management, the U.S. Forest Service and the U.S. Fish and Wildlife Service, by the Colorado Natural Heritage Program.

BLM_0020283

Squires, John R. and Patricia L. Kennedy. 2006. Northern goshawk ecology: an assessment of current knowledge and information needs for conservation and management. Studies in Avian Biology 31:8-62.

Taylor, P.D., L. Fahrig, and K.A.With. 2006. Landscape connectivity: a return to the basics. Pp. 29-43 in K.R. Crooks and M. Sanjayan, (eds.) Connectivity Conservation. Cambridge University Press.

Tepedino, Vince. 2009. The Pollination Biology of a Piceance Basin Endemic: Physaria obcordata (Cruciferae). An unpublished report prepared for the Colorado Natural Areas Program, Denver, Colorado, by adjunct professor, Utah State University, Logan, Utah.

Thompson, J.G., and G. Williams. 1990. Vertical Linkage and Competition for local political Power: A Case of Natural Resource Development and Federal Land Policy, Impact Assessment, 10(4) pp. 33-58, 1990.

Thomas, J.C. and P.B. McMahon, in press, Overview of groundwater quality in the Piceance Basin, Western Colorado, 1946–2009: U.S. Geological Survey Scientific Investigations Report 2012.

Thomas, J.C., J.L. Moore, K.R. Schaffrath, J.A. Dupree, C.A. Williams, and K.J. Leib, in press, Characterization and data-gap analysis of surface-water quality in the Piceance study area, Western Colorado, from 1959-2009: U.S. Geological Survey Scientific Investigations Report.

Tobin Robert L. and Caroline P. Hollowed. 1990. Water-quality and Sediment-transport Characteristics in Kenney Reservoir, With River Basin, Northwestern Colorado. US Geological Survey, Water Resources Investigation Report 90-4071. Denver, Colorado.

Town of Meeker. 2005. Town of Meeker, Comprehensive Plan: Updated 2005. http://www.townofmeeker.org/Meeker%20Comp%20Plan%20Draft%20August%2023,%20 2005.pdf (accessed July 28, 2008).

Town of Meeker. 2008. Meeker 2008 Proposed Budget. Submitted to BBC Research & Consulting by the Town of Meeker.

Turner, Kai. 2008. Kai Turner, 5th Generation Committed to Rio Blanco Colorado (advertisement), Rio Blanco Herald Times, July 17, 2008, p. 10A.

University of Wyoming, Rocky Mountain Herbarium. 1998. Atlas of the Vascular Flora of Wyoming. http://www.rmh.uwyo.edu

URS Corporation (URS). 2007a. Air Quality Impact Assessment Protocol for the White River Resource Management Plan Amendment and Environmental Impact Statement. U.S. Department of Interior, Bureau of Land Management White River Field Office, Meeker, Colorado and Colorado State Office, Lakewood, Colorado. Prepared by URS Corporation. July.

URS. 2007b. Ozone Modeling Protocol for the White River Resource Management Plan Amendment and Environmental Impact Statement. U.S. Department of Interior, Bureau of Land Management White River Field Office, Meeker, Colorado and Colorado State Office, Lakewood, Colorado. Prepared by URS Corporation. November.

BLM_0020284

URS. 2011. Air Resources Technical Support Document for the White River Field Office Oil and Gas Resource Management Plan Amendment / Environmental Impact Statement. U.S. Department of Interior, Bureau of Land Management White River Field Office, Meeker, Colorado. Prepared by URS Corporation. January.

U.S. Bureau of Economic Analysis (BEA). 2008. Regional Economic Information System, Table CA25N. Downloaded August 15.

U.S. Department of the Interior (DOI) and U.S. Department of Agriculture (USDA). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

U.S. Census Bureau. 2000. Census 2000 Summary Tape File (STF) 3. U.S. Bureau of Census. Downloaded July 29, 2008.

U.S. Census Bureau. 2002.

U.S. Census Bureau. 2006a. Available on the internet: http://www.census.gov/population/projections/PressTab1.xls (accessed November 9, 2007).

U.S. Census Bureau. 2006b. Available on the internet: http://www.census.gov/popest/housing/tables/HU-EST2005-06.xls (accessed November 9, 2007).

U.S. Census Bureau. 2007. U.S. Census Bureau Tiger Data County Shapefiles. Available on the internet: http://www.census.gov/cgi-bin/geo/shapefiles/state-files?state=08 (accessed August 1, 2008).

U.S. Census Bureau. 2008. Available on the internet: http://quickfacts.census.gov/qfd/states/08/08081.html (accessed on January 7. 2008).

U.S. Department of Agriculture (USDA) Soil Conservation Service (SCS). 1982. Soil Survey of Rio Blanco County, Colorado.

USDA SCS. 1985. Soil Survey of Rifle Area, Parts of Garfield and Mesa Counties, Colorado.

USDA SCS. 2003. Soil Survey of Douglas-Plateau Area, Parts of Garfield and Mesa Counties, Colorado.

USDA Natural Resource Conservation Service (USDA, NRCS). 1997. National range and pasture handbook. USDA, NRCS, Grazing Lands Technology Institute 190-vi-NRPH, Washington, DC, U.S.A. http://www.ftw.nrcs.usda.gov/glti/NRPH.html 8-Nov-02.

NRCS. 2008a. Soil Survey of Rio Blanco County, Colorado.

NRCS. 2008b. Soil Survey of Rifle Area, Parts of Garfield and Mesa Counties, Colorado.

NRCS. 2008c. Soil Survey of Douglas-Plateau Area, Parts of Garfield and Mesa Counties, Colorado.

NRCS. 2008d. Soil Survey of Moffat County, Colorado.

BLM_0020285

NRCS. 2008e. Soil Survey of Dinosaur National Monument, Colorado and Utah.

NRCS 2009. The PLANTS database (http://plants.usda.gov. 23 November 2009. National Plant Data Center, Baton Rouge, LA 70874-4490 USA.

U.S. Department of Energy (DOE) and U.S. Department of the Interior (DOI), BLM. 2008. Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal Land in the 11 Western States (referred to as the West-Wide Energy Corridor Programmatic EIS). November.

U.S. Department of the Interior (DOI) and U.S. Department of Agriculture (USDA). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (Gold Book). Fourth edition BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

U.S. Department of Transportation, Federal Highway Administration. 2007. Available on the internet: http://www.byways.org/explore/byways/2107/ (accessed December 11, 2007).

U.S. Environmental Protection Agency (EPA). 1990. "National Oil and Hazardous Substances Contingency Plan Final Rule." U.S. Environmental Protection Agency (55 FR 8669, 40 CFR 300.340(e)(2)(i)(A)(2). March 8.

EPA. 2004. Attachment 3, The Piceance Basin, In. Evaluation of Impacts to Underground Sources of Drinking Water by Hydrofracturing of Coalbed Methane Reservoirs.

EPA. 2005a. "Air Toxics Database, Table 2, Acute Dose-Response Values for Screening Risk Assessments (6/02/2005)." Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. http://www.epa.gov/ttn/atw/toxsource/Table2.pdf (accessed September 7, 2008).

EPA. 2005b. "Air Toxics Database, Table 1, Prioritized Chronic Dose-Response Values (2/28/2005)." Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. http://www.epa.gov/ttn/atw/toxsource/Table1.pdf (accessed September 7, 2008).

EPA. 2008a. Stormwater Best Management Practices (BMP) Performance Analysis. Tetra Tech, Inc., December 2008, Revised March 2010. Pp 232.

EPA. 2008. USEPA AirData. http://iaspub.epa.gov/airsdata (accessed December 17, 2008).

EPA. 2010a. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2008. EPA 430-R-10-006/ USEPA, Washington, DC. April 15. http://www.epa.gov/climatechange/emissions/usinventoryreport.html

EPA. 2010b. "General Guidance for Implementing the New 1-hour National Ambient Air Quality Standard in Prevention of Significant Deterioration Permits, Including an Interim 1-hour NO2 Significant Impact Level." Air Quality Policy Division, USEPA. June 29.

EPA. 2010c. Climate Change Indicators in the United States. EPA 430-R-10-007. USEPA, Washington, DC. April. www.epa.gov/climatechange/indicators/pdfs/ClimateIndicators_full.pdf

BLM_0020286

EPA. 2010d. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2008. EPA 430-R-10-006. USEPA, Washington, DC. April 15. www.epa.gov/climatechange/emissions/usinventoryreport.html

U.S. Fish and Wildlife Service (FWS). 2002. Birds of Conservation Concern. Division of Migratory Bird Management, Arlington, VA. Available on the internet: http://migratorybirds.fws.gov/reports.bcc2002.pdf.

FWS. 2006a. Endangered and Threatened Wildlife and Plants; Proposed Threatened Status for Penstemon grahamii (Grahams beardtongue) with Critical Habitat; Proposed Rule. Federal Register 71(12):3158-3196.

FWS. 2006b. Endangered and Threatened Wildlife and Plants; Withdrawal of Proposed Rule to List Penstemon grahamii (Grahams beardtongue) as Threatened with Critical Habitat. Federal Register 71(243):76023-76035.

FWS. 2008. 5-Year Review, Dudley Bluffs bladderpod (*Lesquerella congesta* or *Physaria congesta*) and Dudley Bluffs twinpod (*Physaria Obcordata*). Region 6. Available at: http://www.fws.gov/mountain%2Dprairie/species/plants/dudleybluffs/

FWS. 2009. Review of Native Species that are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions; Proposed Rule. Federal Register 74(215):57804-57877.

FWS. 2010. Endangered and Threatened Wildlife and Plants; 12-month Finding on a Petition to List the White-tailed Prairie Dog as Endangered or Threatened; June 2010. Federal Register Volume 75, No. 104, June 1, 2010, pages 30338-30363.

U.S. Forest Service (USFS). 1993. Interim old growth definition for Douglas fir series, grand fir/white fir series, interior Douglas fir series, lodgepole pine series, pacific silver fir series, ponderosa pine series, Port-Orfordcedar and tanoak (redwood) series, subalpine fir series, western hemlock series. USDA For. Ser. Region 6.

USFS. 1998. "Guidelines for Evaluating Air Pollution Impacts on Wilderness Within the Rocky Mountain Region: Report of a Workshop, 1990." U.S. Department of Agriculture, U.S. Forest Service (USFS), April.

U.S. Global Change Research Program (USGCRP). 2009. Global Climate Change Impacts in the United States. Cambridge University Press. downloads.globalchange.gov/usimpacts/pdfs/climate-impacts-report.pdf.

U.S. Geological Survey (USGS). 1987. Oil Shale, Water Resources, and Valuable Minerals of the Piceance Basin, Colorado: the Challenge and Choices of Development. Compiled by O. James Taylor, USGS Professional Paper 1310.

USGS. 1989. Variations in vitrinite reflectance values for the Upper Cretaceous Mesaverde Formation, southeastern Piceance Basin, northwestern Colorado; implications for burial history and potential hydrocarbon generation and The Fryingpan Member of the Maroon Formation; a Lower Permian basin-margin dune field in northwestern Colorado. USGS Bulletin 1787-H,I.

BLM_0020287

USGS. 1995. 1995 National Assessment of United States Oil and Gas Resources. National Oil and Gas Resource Assessment Team. U.S. Geological Survey Circular 1118, U.S. Government Printing Office, Washington, D.C.

USGS. 2003. National Assessment of Oil and Gas Project: Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado. Digital Data Series DDS-69-B, Washington, D.C.

USGS. 2006a. National Earthquake Information Center database. http://neic.usgs.gov/neis/epic/database.html (accessed December 17, 2008).

USGS. 2011. Directory of Project Information and Data-Collection Sites. Available on the internet: http://waterdata.usgs.gov/co/nwis/annual/?referred_module=sw (accessed June 9, 2011).

USGS. 2011. USGS Surface-Water Data for the Nation. On-line resource at: http://waterdata.usgs.gov/nwis/sw (accessed October 2011).

Utah Department of Natural Resources. 2006. Range-wide Conservation Agreement and Strategy for Round-tail chub Gila robusta, Bluehead sucker Catastomus discobolus and Flannelmouth Sucker Catastomus latipinnis. Prepared for Colorado River Fish and Wildlife Council. Publication No. 06-18.

Van Liew, W.P., and M.L. Gesink. 1985. Preliminary Assessment of the Ground-water Resources of the alluvial Aquifer, White River Valley, Rio Blanco County, Colorado. Water-Resources Investigation Report 84-4307. USGS Lakewood, Colorado.

Walker, B.L., D.E. Naugle, and K.E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71(8): 2644-2654.

Webb, S.L., M.R. Dzialak, R.G. Osborn, S.M. Harju, J.J. Wondzell, L.D. Hayden-wing, and J.B. Winstead. 2011. Using pellet groups to assess response on elk and deer to roads and energy development. Wildlife Biology in Practice 7(1): 32-40. Available online at http://socpvs.org

Weeks, J.B. and F.A. Welder, compilers. 1974. Hydrologic and geophysical data from Piceance Basin, Colorado: Colorado Department of Natural Resources Water Resources Basic Data Release No. 35, 121 p.

Welder, Frank.A. 1987. Unconsolidated Deposits of the Piceance Basin. Published in Oil Shale, Water Resource and Valuable Minerals of the Piceance Basin, Colorado: The Challenge and Choices of Development. Compiled by O. James Taylor. USGS Professional Paper 1310. US Government Printing Office, Washington. 1987.

Welder, Frank A. and George J. Saulnier, Jr. 1978. Geohydraulic Data from Twenty-Four Test Holes Drilled in the Piceance Basin, Rio Blanco County, Colorado, 1975-76. Open File Report 78-734. United States Geological Survey. Lakewood, Colorado. 1978.

Westbrooks, R. 1998. Invasive Plants, Changing the Landscape of America: Fact book. The Federal Interagency Committee for the Management of Noxious and Exotic Weeds (FICNMEW), Washington, D.C., p. 8.

BLM_0020288

Wix, Steve. 2008. Mr. Steve Wix, Owner, Backcountry Realty, Meeker, Colorado. Email to Lloyd Levy Consulting, LLC, August 30, 2008.

Western Regional Climate Center (WRCC). 1997. Average Annual Precipitation of Colorado. On-line resource accessed at http://www.wrcc.dri.edu/pcpn/co.gif.

WRCC. 2008a. Climate Narrative of Colorado. On-line resource accessed at http://www.wrcc.dri.edu/narratives/COLORADO.htm.

WRCC. 2008b. Evaporation Stations by State. On-line data resource accessed at http://www.wrcc.dri.edu/htmlfiles/westevap.final.html.

Wohl, E. 2005. Virtual Rivers: Understanding Historical Human Impacts on Rivers in the Context of Restoration. Ecology and Society 10(2): 2. [online] URL: http://www.ecologyandsociety.org/vol10/iss2/art2/.

World Resources Institute (WRI). 2010. "Climate Analysis Indicator Tool" web site. http://cait.wri.org/ (accessed September 20, 2010).

Wolf Creek Work Group, in association with CDOW, BLM, and USFWS. 2001. A Cooperative Plan for Black-footed Ferret Reintroduction and Management. Wolf Creek and Coyote Basin Management Areas, Moffat and Rio Blanco Counties, CO.

Woodland, J. 1985. Colorado's Little Fish. A Guide to the Minnows and Other Lesser Known Fishes in the State of Colorado. Colorado Division of Wildlife, Denver, CO.

Wyoming Wildlife Consultants. 2009. Greater sage-grouse winter habitat selection relative to natural gas field infrastructure in northern portions of the Pinedale Anticline project area, Sublette County, Wyoming. Annual Report. Pinedale, WY. 17pp.

BLM_0020289

*This page intentionally left blank*

BLM_0020290

BLM

## Appendix A

# Oil and Gas Leasing Stipulations and Lease Notices



Public Lands USA: Use, Share, Appreciate

BLM_0020291

BLM_0020292

# Table of Contents

Page

**1.0    LEASE STIPULATIONS AND LEASE NOTICES APPLICABLE TO OIL AND GAS DEVELOPMENT ........................................................................ 1**

1.1    Introduction ..................................................................................................... 1
    1.1.1    Description of Lease Stipulations .............................................................. 1
    1.1.2    Exceptions, Modifications, and Waivers .................................................... 1

**2.0    NO SURFACE OCCUPANCY STIPULATION TABLE ........................................... 3**

**3.0    CONTROLLED SURFACE USE STIPULATION TABLE ..................................... 37**

**4.0    TIMING LIMITATION STIPULATION TABLE ...................................................... 59**

**5.0    LEASE NOTICES TABLE ................................................................................... 105**

**6.0    STIPULATION CROSSWALK TABLE TO CHAPTER 2 RECORDS ................. 109**

## List of Tables

Table A-1    No Surface Occupancy Stipulations ...................................................... A-3
Table A-2    Controlled Surface Use Stipulations .................................................... A-37
Table A-3    Timing Limitation Stipulations .......................................................... A-59
Table A-4    Lease Notices ................................................................................ A-105
Table A-5    Stipulation Crosswalk to Chapter 2 Records ...................................... A-109

BLM_0020293

*This page intentionally left blank*

BLM_0020294

# 1.0   Lease Stipulations and Lease Notices Applicable to Oil and Gas Development

## 1.1   Introduction

Appendix A contains detailed information for all of the stipulations presented as management actions in Chapter 2 (Tables 2-1 through 2-22), including the stipulation, area included in the stipulation, the purpose, and exception, modification and waiver criteria. In some cases the stipulation may be the same for more than one alternative, but may vary in the exception, modification, and waiver language. Table A-5 provides a crosswalk that matches each stipulation with the management actions in Chapter 2.

### 1.1.1   Description of Lease Stipulations

There are three types of stipulations that could be applied to land use authorizations: (1) no surface occupancy (NSO), (2) timing limitations (TL), and (3) controlled surface use (CSU). Although not a stipulation, lease notices (LN) are also provided in these tables. All other areas are open to oil and gas development subject to standard terms and conditions.

- **NSO:** Areas identified as NSO are open to oil and gas leasing but surface disturbing activities cannot be conducted on the surface of the land. Access to oil and gas deposits would require horizontal drilling from outside the boundaries of the NSO areas. The NSO areas are avoidance areas for rights of-way; no rights-of-ways would be granted in NSO areas unless there are no feasible alternatives.

- **TL:** Areas identified as TL are open to oil and gas leasing but would be closed to surface disturbing activities during identified time frames. This stipulation would not apply to operation and maintenance activities, including associated vehicle travel, unless otherwise specified.

- **CSU:** Areas identified as CSU are open to oil and gas leasing but would require proposals for surface disturbing activities to be authorized only according to the controls or constraints specified.

Areas identified as LN are open to oil and gas leasing; they provide information about a resource that is present that may limit activity or cause special operational planning to occur.

Appendix A provides a series of tables that list the lease stipulations presented in the Chapter 2 tables (Tables 2-1 through 2-22, Chapter 2 of the Draft RMPA/EIS) by the resources of concern. Stipulations for addressing those concerns and the criteria for considering requests for exceptions, waivers, and modifications are shown by alternative. Where there are overlapping stipulations on the same land, the more stringent stipulation applies.

### 1.1.2   Exceptions, Modifications, and Waivers

Information pertaining to lease stipulations is taken from IM No. 2008-032, Exceptions, Waivers, and Modifications of Fluid Minerals Stipulations and Conditions of Approval, and Associated Rights-of-way Terms and Conditions (BLM 2008). It is important to note, the term lease "stipulation" which is used frequently in IM No. 2008-032 refers not only to lease stipulations, but can also be applied with some adaptation to Terms and Conditions and as COAs. Exceptions, waivers, and modifications provide an effective means of applying "Adaptive Management"

BLM_0020295

techniques to oil and gas leases and associated permitting activities to meet changing circumstances. The criteria for approval of exceptions, waivers, and modifications should be supported by NEPA analysis, either through the land use planning process or site-specific environmental review.

The definitions for exceptions, waivers, and modifications are as follows:

- **Exception:** Is a one-time exemption for a particular site within the leasehold; exceptions are determined on a case-by-case basis; the stipulation continues to apply to all other sites within the leasehold. An exception is a limited type of waiver.

- **Waiver:** Is a permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

- **Modification:** Is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

The RMPA serves as the vehicle for explaining to industry and the public the conditions under which exceptions, waivers, or modifications of lease stipulations may be granted. All circumstances for granting an exception, waiver, or modification must be documented in the RMPA.

The person requesting the exception, waiver, or modification is encouraged to submit information that might assist the Authorized Officer in making a decision. The Authorized Officer reviews information submitted in support of the request and other pertinent information. The Authorized Officer may modify, waive, or grant an exception to a stipulation if:

- The action is consistent with federal laws.

- The action is consistent with the RMP.

- The management objectives that led the BLM to require the lease stipulation can be met without restricting operations in the manner provided for by the stipulation given changes in the condition of the surface resources involved, or given the nature, location, timing, or design of the proposed operations.

- The action is acceptable to the Authorized Officer based on a review of the environmental consequences.

All surface disturbing activities are subject to standard terms and conditions. These include the restrictions that are required for proposed actions in order to protect special status species and to comply with the Endangered Species Act. Standard terms and conditions for oil and gas leasing provide for relocation of proposed operations up to 660 feet and provide for prohibiting surface disturbing operations for a period not to exceed 60 days.

BLM_0020296

# 2.0 No Surface Occupancy Stipulation Table

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-01** | | | | |
| **Water Resources** | | | | |
| Stipulation: Surface occupancy would not be allowed in the following areas: 1) identified 100-year flood plains; 2) areas within 500 feet from perennial waters, springs, wells, and wetland/riparian areas; and 3) areas 100 feet from the inner gorge of ephemeral channels. Area: The areas within 100-year floodplains comprise 22,100 acres. Areas within 500 ft of perennial waters, springs, wells, and wetland/riparian areas comprise 55,300 acres. Wetlands and ephemeral channels will be identified during site-specific analysis. Purpose: To protect landscape features that are sensitive areas for water resource impacts. Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to negatively impact the water resources identified. Modification: Site specific modification may be granted by the Authorized Officer pending BLM approval of a site specific study by a qualified hydrologist or engineer that finds the areas proposed for surface occupancy would, after construction: 1) pass the 10-year peak flow event without erosion, 2) pass the 25-year peak flow without failed infrastructure, 3) pass the 50-year peak flow event without failure (when surface occupancy is planned for greater than 50 years), 4) not impede 100-year peak flow events, 5) not adversely impact springs or wells, 6) when a pipeline, utility or road crossing for a stream channel, floodplain or wetland can be shown to minimize impacts to these resources, and 7) any wetlands impacted could be restored to their original function post occupancy. Waiver: None. | | X | | |
| **NSO-02** | | | | |
| **Landslide Areas** | | | | |
| Stipulation: Landslide areas, as identified in USDA SCS Order III Soil Surveys, would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas. Area: 38,600 acres Purpose: To protect soils considered unstable and subject to slumping and mass movement. Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to impair the stability of the landslide areas. An exception may also be granted if a more detailed soil survey, i.e., Order I, conducted by a qualified soil scientist, finds the soil properties associated with the proposed action are not susceptible to slumping and mass movement. Modification: Site specific modifications may be granted by the Authorized Officer pending determination that a portion of the soil units meet the following conditions: 1) inclusions within the soil unit where slopes are less than 35 percent. 2) a more detailed survey identifies and delineates wet areas and sloping rock formations, and the proposed action is designed to avoid those areas. 3) the proposed action utilizes land treatments and soil stabilization practices that will demonstrate a high probability of reducing soil loss and preventing degradation of water quality, and 4) the proposed action would not cause slumping or mass movement as demonstrated through engineering and design criteria. Waiver: None. | X | | | X |

BLM_0020297

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-03** | | | | |
| **Landslide Areas** | | | | |
| Stipulation: Areas within 100 feet of landslide areas (as identified in USDA SCS Order III Soil Surveys) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas. Area: 46,400 acres Purpose: To protect soils considered unstable and subject to slumping and mass movement and soils within 100 feet of these soils. Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to impair the stability of the landslide areas. An exception may also be granted if a more detailed soil survey, i.e., Order I, conducted by a qualified soil scientist, finds the soil properties associated with the proposed action are not susceptible to slumping and mass movement. Modification: Site specific modifications may be granted by the Authorized Officer pending determination that a portion of the soil units meet the following conditions: 1) inclusions within the soil unit where slopes are less than 35 percent, 2) a more detailed survey identifies and delineates wet areas and sloping rock formations, and the proposed action is designed to avoid those areas, 3) the proposed action utilizes land treatments and soil stabilization practices that will demonstrate a high probability of reducing soil loss and preventing degradation of water quality, and 4) the proposed action would not cause slumping or mass movement as demonstrated through engineering and design criteria. Waiver: None. | | X | | |
| **NSO-04** | | | | |
| **Landslide Areas** | | | | |
| Stipulation: Areas within 50 feet of landslide areas, as identified in USDA SCS Order III Soil Surveys, would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas. Area: 42,500 acres Purpose: To protect soils considered unstable and subject to slumping and mass movement and soils within 50 feet of these soils. Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to impair the stability of the landslide areas. An exception may also be granted if a more detailed soil survey, i.e., Order I, conducted by a qualified soil scientist, finds the soil properties associated with the proposed action are not susceptible to slumping and mass movement. Modification: Site specific modifications may be granted by the Authorized Officer pending determination that a portion of the soil units meet the following conditions: 1) inclusions within the soil unit where slopes are less than 35 percent, 2) A more detailed survey identifies and delineates wet areas and sloping rock formations, and the proposed action is designed to avoid those areas, 3) the proposed action utilizes land treatments and soil stabilization practices that will demonstrate a high probability of reducing soil loss and preventing degradation of water quality, and 4) the proposed action would not cause slumping or mass movement as demonstrated through engineering and design criteria. Waiver: None. | | | X | |

BLM_0020298

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|:-:|:-:|:-:|:-:|
| **NSO-05** | | | | |
| **Saline Soils** | | | | |
| <u>Stipulation</u>: Areas within 100 feet of saline soils (i.e., greater than 8 mmhos/cm), as identified in USDA SCS Order III Soil Surveys, with the exception of the Coal Oil Basin exemption area north of Rangely, would be open to leasing with an NSO stipulation. <br> <u>Area</u>: 45,300 acres <br> <u>Purpose</u>: To protect the productivity of saline soils and soils within 100 feet of these areas and to reduce salt and selenium loading of surface waters. <br> <u>Exception</u>: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to result in any long term decrease in soil productivity or increased erosion. An exception may also be granted if a more detailed soil survey, i.e., Order I, conducted by a qualified soil scientist, finds the soil properties associated with the proposed action are not saline. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | | X | | |
| **NSO-06** | | | | |
| **Saline Soils** | | | | |
| <u>Stipulation</u>: Areas with saline soils (i.e., greater than 8 mmhos/cm), as identified in USDA SCS Order III Soil Surveys, with the exception of the Coal Oil Basin exemption area north of Rangely, would be open to leasing with an NSO stipulation. <br> <u>Area</u>: 34,100 acres <br> <u>Purpose</u>: To protect the productivity of saline soils and to reduce salt and selenium loading of surface waters. <br> <u>Exception</u>: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not result in any long term decrease soil productivity or increased erosion. An exception may also be granted if a more detailed soil survey, i.e., Order I, conducted by a qualified soil scientist, finds the soil properties associated with the proposed action are not saline. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | | | X | |

BLM_0020299

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-07** | | | | |
| **Steep Natural Slopes** | | | | |
| Stipulation: Natural slopes greater than or equal to 35 percent (as defined by digital elevation model data) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases associated with oil and gas development in these areas. <br> Area: 353,000 acres <br> Purpose: To protect soils on natural slopes greater than or equal to 35 percent. <br> Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to negatively impact the stability of or productivity of the steep slopes identified. <br> Modification. Site specific modification may be granted by the Authorized Officer pending determination that a portion of the proposed surface disturbance meets the following conditions: 1) more than 75 percent of the proposed surface disturbance and infrastructure would be on stable soils that are not on natural slopes greater than or equal to 35 percent, and 2) the proposed action utilizes construction, reclamation, and design features that would stabilize the site during occupation and restore the original contours after occupation. <br> Waiver: If better elevation data indicates that there are no natural slopes greater than or equal to 35 percent anywhere within the leasehold, the stipulation no longer applies. | | X | | |
| **NSO-08** | | | | |
| **Steep Natural Slopes** | | | | |
| Stipulation: Natural slopes greater than or equal to 50 percent (as defined by digital elevation model data) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases associated with oil and gas development in these areas. <br> Area: 114,300 acres <br> Purpose: To protect soils on natural slopes greater than or equal to 50 percent. <br> Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to negatively impact the stability of or productivity of the steep slopes identified. <br> Modification: Site specific modification may be granted by the Authorized Officer pending determination that a portion of the proposed surface disturbance meets the following conditions: 1) more than 75 percent of the proposed surface disturbance and infrastructure would be on stable soils that are not on natural slopes greater than or equal to 50 percent, and 2) the proposed action utilizes construction, reclamation, and design features that would stabilize the site during occupation and restore the original contours after occupation. <br> Waiver: If better elevation data indicates that there are no natural slopes greater than or equal to 50 percent anywhere within the leasehold, the stipulation no longer applies. | | | X | X |

BLM_0020300

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-9** | | | | |
| **Priority Riparian/Wetland Habitats** | | | | |
| <u>Stipulation</u>: Surface-disturbing activities would not be allowed in priority riparian/wetland habitats.<br><u>Area</u>: 1,600 acres<br><u>Purpose</u>: To maintain the proper functioning condition, including the vegetative, hydrologic, and geomorphic functionality of the riparian system and to maintain and protect water quality, stream stability, aquatic health, seasonal use, and downstream fisheries and sediment processes.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis determines that the proposed activity would not or could be conditioned to not degrade any of the resources values identified or forestall attainment of the proper functioning condition of the riparian/wetland habitat.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | X | | |
| **NSO-10** | | | | |
| **Remnant Vegetation Associations and BLM Sensitive Plant Species** | | | | |
| <u>Stipulation</u>: This area contains BLM sensitive plants and remnant vegetation associations. Surface occupation will not be allowed within known populations of these plants.<br><u>Area</u>: Remnant vegetation associations comprise approximately 3,600 acres. Known populations of BLM sensitive plants comprise approximately 7,200 acres (10,800 acres collectively).<br><u>Purpose</u>: To conserve remnant vegetation associations and BLM sensitive plants that are not otherwise protected.<br><u>Exception</u>: The Authorized Officer may grant an exception if an inventory and subsequent environmental analysis indicates that the nature or conduct of the action, as proposed and conditioned, would not directly or indirectly affect plant populations. An exception may also be applied if the NSO would hinder or preclude the exercise of valid existing rights. Under that circumstance, protection of the plants would be afforded through Conditions of Approval that would require reclamation of disturbed areas to include utilizing native seed mixes in RVAs, and reproducing sensitive species via transplant or some other means in areas containing sensitive species.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | X | | | |

BLM_0020301

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-11** | | | | |
| **Remnant Vegetation Associations** | | | | |
| <u>Stipulation</u>: Remnant vegetation associations would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas.<br><u>Area</u>: 3,600 acres<br><u>Purpose</u>: To conserve significant plant communities, remnant vegetation associations, and relic communities (e.g., old growth forests and woodlands) that are not otherwise protected.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis determines that the activity would not impair values associated with the maintenance or viability of the species or communities.<br><u>Modification</u>: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the plant community has shifted; the occupied habitat of the species or community has increased or decreased; or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or viability of the species or community.<br><u>Waiver</u>: A waiver may be granted by the Authorized Officer if the species or community is no longer designated as significant or relict or if the site has been unoccupied by the species or community for a minimum period of 15 years. | | X | X | X |
| **NSO-12** | | | | |
| **Ponderosa Pine and Sagebrush RVAs** | | | | |
| <u>Stipulation</u>: Identified ponderosa pine stands and unique or ecologically intact sagebrush communities would be managed as remnant vegetation associations (RVAs) with an NSO stipulation.<br><u>Area</u>: 630 acres<br><u>Purpose</u>: To conserve significant plant communities, remnant vegetation associations, and relic communities (e.g., old growth forests and woodlands) that are not otherwise protected.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental assessment determines that the activity would not impair values associated with the maintenance or viability of the species or communities.<br><u>Modification</u>: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the plant community has shifted; the occupied habitat of the species or community has increased or decreased; or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or viability of the species or community.<br><u>Waiver</u>: A waiver may be granted by the Authorized Officer if the species or community is no longer designated as significant or relict or if the site has been unoccupied by the species or community for a minimum period of 15 years. | | X | X | X |

BLM_0020302

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-13** | | | | |
| **Oak Ridge SWA** | | | | |
| Stipulation: This area involves federal lands within the designated perimeter of the Oak Ridge State Wildlife Area. Surface occupancy is not allowed within the designated area.<br>Area: 9,300 acres<br>Purpose: To maintain the wildlife-oriented recreational and biological values for which the Oak Ridge SWA was established.<br>Exception: The Authorized Officer may grant an exception, in consultation with Colorado Parks and Wildlife, if an environmental analysis finds that the proposed action could be conditioned to be compatible with the wildlife values and public uses associated with the area.<br>Modification: None.<br>Waiver: None. | X | | | |
| **NSO-14** | | | | |
| **State Wildlife Areas** | | | | |
| Stipulation: Federal mineral estate within the Oak Ridge (including associated BLM lands designated in the 1997 RMP), Jensen, and Piceance Creek (all units) State Wildlife Areas would be open to oil and gas leasing with an NSO stipulation.<br>Area: 18,900 acres<br>Purpose: To maintain the wildlife-oriented recreational and biological values for which the CPW property was established.<br>Exception: An exception may be granted or substituted with a timing limitation, by the Authorized Officer in coordination with CPW, if an environmental analysis determines that the action, as proposed or conditioned, would not impair the values of the SWA.<br>Modification: The no surface occupancy area may be modified in extent, by the Authorized Officer in coordination with CPW, if an environmental analysis finds that a portion of the area is nonessential to site utility or function, or that the proposed action could be conditioned so as not to impair the current or future values of the site. The stipulation may also be modified if the proponent, and CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to the SWA.<br>Waiver: This stipulation may be waived if the CPW disposes of the site. | | X | | |

BLM_0020303

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-15** | | | | |
| **State Wildlife Areas** | | | | |
| Stipulation: Federal mineral estate within the Oak Ridge (including associated BLM lands designated in the 1997 RMP), Square S Summer Range unit of Piceance Creek, and Jensen SWAs would be open to oil and gas leasing with an NSO stipulation. On existing land use authorizations, COAs that reflect the intent of these stipulations would be applied to the extent allowable. Area: 18,200 acres Purpose: To maintain the wildlife-oriented recreational and biological values for which the CPW property was established. Exception: An exception may be granted or substituted with a timing limitation, by the Authorized Officer in coordination with CPW, if an environmental analysis determines that the action, as proposed or conditioned, would not impair the values of the SWA. Modification: The no surface occupancy area may be modified in extent, by the Authorized Officer in coordination with CPW, if an environmental analysis finds that a portion of the area is nonessential to site utility or function, or that the proposed action could be conditioned so as not to impair the current or future values of the site. The stipulation may also be modified if the proponent, and CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to the SWA. Waiver: This stipulation may be waived if the CPW disposes of the site. | | | X | |
| **NSO-16** | | | | |
| **Raptor Nests – Other Than Special Status Raptors** | | | | |
| Stipulation: This area encompasses raptor nests of other than special status raptor species. Surface occupancy is not allowed within 0.125 mile of identified nests. Area: 20,900 acres Purpose: To maintain the utility of the nest site and the surrounding physical and vegetation character of the habitat for current and subsequent reproductive functions. Exception: An exception to the NSO may be granted by the Authorized Officer if authorization is obtained from the FWS (through applicable provisions of the Eagle Protection Act or Migratory Bird Treaty Act) to interrupt active nesting attempts and/or cause short or long term adverse modification of suitable nest site characteristics. The Authorized Officer may also grant an exception if an environmental analysis finds that the nature or conduct of the action, as proposed or conditioned, would not impair the function or utility of the nest site for current or subsequent nest activities or occupancy. Modification: Site specific modifications to the NSO area may be granted by the Authorized Officer pending determination that a portion of the NSO area is not essential to nest site functions or utility; or that the nature or conduct of the activity, as proposed or conditioned, would not impair the function or utility of the nest site for current or subsequent nest activities or occupancy. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to candidate raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a Geographic Reference Area perspective. Waiver: A waiver to may be granted by the Authorized Officer if documentation shows the nest site has remained unoccupied for a minimum of 3 years; or that the site conditions, including surrounding nest habitat, have changed such that there is no reasonable likelihood of site occupation for a subsequent minimum period of 10 years. | X | | | X |

BLM_0020304

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-17** | | | | |
| **Northern Saw-Whet, Long-Eared, and Great-Horned Owl Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.125 mile of functional nest sites of northern saw-whet, long-eared, and great-horned owls.<br><u>Area</u>: 2,300 acres<br><u>Purpose</u>: To maintain the utility of the nest site and the surrounding physical and vegetation character of the habitat for current and subsequent reproductive functions.<br><u>Exception</u>: An exception to the NSO can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. An exception to the NSO may also be granted by the Authorized Officer consistent with policies derived from federal administration of the Migratory Bird Treaty Act.<br><u>Modification</u>: The Authorized Officer may modify the NSO buffer distances or substitute with a timing limitation, if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | X | | |

BLM_0020305

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-18** | | | | |
| **Cooper's, Sharp-Shinned, Red-Tailed, and Swainson's Hawks; Flammulated and Pygmy Owls; Northern Harrier; and Osprey Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.25 mile of functional nest sites of Cooper's, sharp-shinned, red-tailed, and Swainson's hawks; flammulated and pygmy owls; northern harrier; and osprey.<br><u>Area</u>: 30,000 acres<br><u>Purpose</u>: To maintain the utility of the nest site and the surrounding physical and vegetation character of the habitat for current and subsequent reproductive functions.<br><u>Exception</u>: An exception to the NSO can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. An exception to the NSO may also be granted by the Authorized Officer consistent with policies derived from federal administration of the Migratory Bird Treaty Act.<br><u>Modification</u>: The Authorized Officer may modify the NSO buffer distances or substitute with a timing limitation, if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | X | | |

BLM_0020306

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-19** | | | | |
| **Golden Eagle and Prairie Falcon Nests** | | | | |
| Stipulation: Surface occupancy would not be allowed within 0.5 mile of functional nest sites of golden eagles and prairie falcons.<br>Area: 60,000 acres<br>Purpose: To maintain the utility of the nest site and the surrounding physical and vegetation character of the habitat for current and subsequent reproductive functions.<br>Exception: An exception to the NSO can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. An exception to the NSO may also be granted by the Authorized Officer consistent with policies derived from federal administration of the Migratory Bird Treaty Act.<br>Modification: The Authorized Officer may modify the NSO buffer distances or substitute with a timing limitation, if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br>Waiver: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | X | | |

BLM_0020307

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-20** | | | | |
| **Raptor Nests – Other Than Special Status Raptors, Golden Eagle and Prairie Falcon** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.125 mile of functional nest sites of those raptors that are not considered special-status.<br><u>Area</u>: 21,800 acres<br><u>Purpose</u>: To maintain the utility of the nest site and the surrounding physical and vegetation character of the habitat for current and subsequent reproductive functions.<br><u>Exception</u>: An exception to the NSO can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. An exception to the NSO may also be granted by the Authorized Officer consistent with policies derived from federal administration of the Migratory Bird Treaty Act.<br><u>Modification</u>: The Authorized Officer may modify the NSO buffer distances or substitute with a timing limitation, if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | | X | |

BLM_0020308

**Table A-1. No Surface Occupancy Stipulations**

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-21** | | | | |
| **Sage-Grouse Habitat** | | | | |
| <u>Stipulation</u>: Surface occupancy and long-term conversion or adverse modification of the following sage-grouse habitat would be limited to 2 percent of that habitat available within a leaseholding: 1) sagebrush-dominated stands with ≤35 percent canopy, ≤30 inches in height, and ≤4 miles from a lek, and 2) any sagebrush-dominated stand on slopes ≤20 percent in defined winter use areas or stands showing evidence of winter use.<br>In coordination with CPW, these areas could be refined consistent with site-specific evaluation of seasonal use functions. Reclaimed habitat that does not meet minimum functional habitat properties would be assessed against the acreage limitation. Reclamation success on sage-grouse habitats would be contingent on evidence of successful establishment of desired sagebrush forms on disturbed acreage or achieving minimum functional capacity to serve sage-grouse cover and forage needs. Reclamation assessments would consider site capability and seasonal habitat use, and may allow for surrogate (e.g. herbaceous) forms of cover, where appropriate, per Appendix A, "Structural Habitat Guidelines" from Colorado Greater Sage-grouse Conservation Plan.<br><u>Area</u>: 222,300 acres<br><u>Purpose</u>: To maintain the current availability of habitat suitable for occupation by greater sage-grouse.<br><u>Exception</u>: An exception to this NSO would be granted by the Authorized Officer for actions that do not cumulatively contribute to adverse modifications exceeding two percent of those habitats suitable for sage-grouse that are encompassed by a proponent's leaseholding within a GMU. An exception may be granted by the Authorized Officer if an environmental analysis determines that the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent use by sage-grouse. An exception may also be granted if the proponent, BLM, CPW, and other appropriate regulatory entities, devise a mutually acceptable compensation or operating plan that would satisfactorily offset or reduce the anticipated loss of habitat.<br><u>Modification</u>: The no surface occupancy or use area may be modified in extent by the Authorized Officer if an environmental analysis finds that: 1) a portion of the area is nonessential to site utility or function, or 2) that the proposed action could be conditioned so as not to impair the function or utility of the site for current or subsequent use by sage-grouse. The stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to sage-grouse habitat.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if BLM in cooperation with CPW and other appropriate regulatory entities determine that the described lands are incapable of serving the long term requirements of sage-grouse and that these ranges no longer warrant current or future consideration as components of sage-grouse habitat. | | X | | |

BLM_0020309

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-22** | | | | |
| **Sage-Grouse Leks** | | | | |
| <u>Stipulation</u>: This area encompasses sage-grouse leks. Surface occupancy is not allowed within 0.25 mile of identified lek sites.<br><br><u>Area</u>: 3,600 acres<br><br><u>Purpose</u>: To maintain the character and utility of sites used for communal reproductive display and to help prevent the disruption of sage-grouse reproductive activity and displacement of birds from favored reproductive display sites.<br><br><u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis determines that the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities.<br><br><u>Modification</u>: The NSO area may be modified in extent, or substituted with a timing limitation, by the Authorized Officer if an environmental analysis finds that a portion of the NSO area is nonessential to site utility or function, or that the proposed action could be conditioned so as not to impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities. The stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to sage-grouse breeding activities and/or habitats.<br><br><u>Waiver</u>: This stipulation may be waived if, in cooperation with the CPW, it is determined that the site has been permanently abandoned or unoccupied for a minimum of 5 years; site conditions have changed such that there is no reasonable likelihood of site occupation for a subsequent minimum period of 10 years. | X | | | X |

BLM_0020310

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-23** | | | | |
| **Sage-Grouse Leks** | | | | |
| <u>Stipulation</u>: Surface occupancy and surface-disturbing and disruptive activities within 0.6 mile of active (i.e., used by displaying males in the last 5 years) and inactive (i.e., evidence of use within last 10 years) strutting grounds (i.e., leks) would be prohibited, with strict and narrowly interpreted criteria for exception or modification. If existing facilities are within 0.6 mile of such leks, alternate access routes would be devised and/or surface facilities removed to the extent practicable within 5 years of approval of the ROD. <br> <u>Area</u>: 17,400 acres <br> <u>Purpose</u>: To maintain the character and utility of sites used for communal reproductive display and to help prevent the disruption of sage-grouse reproductive activity and displacement of birds from favored reproductive display sites. <br> <u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis determines that the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities. <br> <u>Modification</u>: The NSO or use area may be modified in extent, or substituted with a timing limitation, by the Authorized Officer if an environmental analysis finds: 1) that a portion of the area is nonessential to site utility or function, 2) that the proposed action could be conditioned so as not to impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities, or 3) it is determined that the site has been unoccupied for a minimum of 10 years unless the area has been identified for habitat restoration and population recovery. The stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to sage-grouse breeding activities and/or habitats. <br> <u>Waiver</u>: The Authorized Officer may grant a waiver if, in cooperation with CPW, it is determined that the lease area is no longer capable of supporting lekking activity. | | X | | |

BLM_0020311

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-24** | | | | |
| **Sharp-tailed Grouse Leks** | | | | |
| <u>Stipulation</u>: Surface occupancy and surface-disturbing and disruptive activities within 0.4 mile of active (i.e., used by displaying males in the last 5 years) strutting grounds (i.e., leks) would be prohibited. <br> <u>Area</u>: 1 acre <br> <u>Purpose</u>: To maintain the character and utility of sites used for communal reproductive display and to help prevent the disruption of sharp-tailed reproductive activity and displacement of birds from favored reproductive display sites. <br> <u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis determines that the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities. <br> <u>Modification</u>: The no surface occupancy or use area may be modified in extent, or substituted with a timing limitation, by the Authorized Officer if an environmental analysis finds 1) that a portion of the area is nonessential to site utility or function, 2) that the proposed action could be conditioned so as not to impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities or 3) it is determined that the site has been unoccupied for a minimum of 10 years unless the area has been identified for habitat restoration and population recovery. The stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to grouse breeding activities and/or habitats. <br> <u>Waiver</u>: The Authorized Officer may grant a waiver if, in coordination with the CPW, it is determined that the lease area is no longer capable of supporting lekking activity. | | X | X | X |
| **NSO-25** | | | | |
| **Prairie Dog Colonies** | | | | |
| <u>Stipulation</u>: Areas within 0.5 mile of active and suitable, inactive prairie dog colonies would be open to oil and gas leasing with an NSO stipulation. BLM could apply this mitigation measure to surface use activities associated with existing land use authorizations as a COA consistent with granted lease rights. <br> <u>Area</u>: 166,200 acres <br> <u>Purpose</u>: To maintain the integrity of black-footed ferret habitat and promote recovery of the species. <br> <u>Exception</u>: This NSO stipulation would not be applied to surface use activity in the Coal Oil Basin Exemption Area (the Rangely Oil Field). <br> <u>Modification</u>: None. <br> <u>Waiver</u>: The Authorized Officer, in conference with FWS, may grant a waiver to this stipulation if site conditions have changed sufficient to preclude black-footed ferret occupation of the stipulation area. | | X | | |

BLM_0020312

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-26** | | | | |
| **Endangered Colorado River Fish** | | | | |
| <u>Stipulation</u>: Critical or occupied habitat for federally listed fish species (e.g., 100-year flood plain of the White River below Rio Blanco Lake) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing and disruptive activities associated with all land use authorizations, permits, and leases issued on BLM-administered lands.<br><u>Area</u>: 1,100 acres<br><u>Purpose</u>: Confining surface disturbance and surface use activities to areas outside the flood-prone area would reduce the immediate risk of sediment and contaminant discharge into occupied riverine habitat and the compromise of physical and biological habitat features that are essential to the proper functioning condition of the aquatic systems that support federally listed fishes.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if the BLM, in consultation with the FWS, establishes that the White River's designated critical habitat is incapable of serving the long term requirements of Colorado pikeminnow and that this aquatic system no longer warrants consideration as a recovery component for the four species of endangered Colorado River fishes. | | **X** | | |
| **NSO-27** | | | | |
| **Endangered Colorado River Fish** | | | | |
| <u>Stipulation</u>: Critical or occupied habitat for federally listed fish species (e.g., 100-year flood plain of the White River below Rio Blanco Lake) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing and disruptive activities associated with all land use authorizations, permits and leases issued on BLM-administered lands.<br><u>Area</u>: 1,100 acres<br><u>Purpose</u>: Confining surface disturbance and surface use activities to areas outside the flood-prone area would reduce the immediate risk of sediment and contaminant discharge into occupied riverine habitat and the compromise of physical and biological habitat features that are essential to the proper functioning condition of the aquatic systems that support federally listed fishes.<br><u>Exception</u>: The Authorized Officer, in consultation with the FWS and CPW, may grant an exception to this stipulation if environmental analysis establishes that the proposed action would not adversely influence important fishery functions or compromise the integrity of constituent elements of critical habitat.<br><u>Modification</u>: The Authorized Officer, in consultation with the FWS, may modify the provisions of the NSO if the proposed action can be sited, conducted, or conditioned to remain compatible with habitat protection and species recovery objectives.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if the BLM, in consultation with the FWS, establishes that the White River's designated critical habitat is incapable of serving the long term requirements of Colorado pikeminnow and that this aquatic system no longer warrants consideration as a recovery component for the four species of endangered Colorado River fishes. | | | **X** | **X** |

BLM_0020313

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-28** | | | | |
| **Special Status Raptor Nests** | | | | |
| <u>Stipulation</u>: This area encompasses the nests of special status raptor, including listed, proposed, or candidate species for listing under the Endangered Species Act and BLM sensitive species. Surface occupancy is not allowed within 0.25 mile of identified nests.<br><u>Area</u>: 10,700 acres<br><u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to interrupt active nesting attempts and/or cause short or long term adverse modification of suitable nest site characteristics. An exception may also be granted by the Authorized Officer if it is determined that the nature or conduct of the proposed or conditioned activity would not impair the function or utility of the nest site for current or subsequent nest activities or occupancy.<br><u>Modification</u>: Site specific modifications to the NSO area may be granted by the Authorized Officer pending determination that a portion of the NSO area is not essential to nest site functions or utility; or that the nature or conduct of the activity, as proposed or conditioned, would not impair the function or utility of the nest site for current or subsequent nest activities or occupancy. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a Geographic Reference Area perspective. If a species status is downgraded, or delisted, the NSO buffer area may be modified to an appropriate level.<br><u>Waiver</u>: A waiver may be granted if the species becomes extinct or if the site conditions change such that there is no reasonable likelihood of occupation for a subsequent minimum period of 10 years. | X | | | |
| **NSO-29** | | | | |
| **Bald Eagle, Ferruginous Hawk, Peregrine Falcon, and Northern Goshawk Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.5 mile of functional nests of bald eagle, ferruginous hawk, peregrine falcon, and northern goshawk.<br><u>Area</u>: 10,700 acres<br><u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood that the lease area can support further nesting activity. | | X | | |

BLM_0020314

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-30** | | | | |
| **Burrowing Owl Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.25 mile of functional nests of burrowing owls.<br><u>Area</u>: 5,000 acres<br><u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood that the lease area can support further nesting activity. | | X | | |
| **NSO-31** | | | | |
| **Special Status Raptor, Golden eagle, and Prairie Falcon Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.25 mile of functional nests of federal endangered, threatened, proposed, and candidate raptor species; Colorado state endangered, threatened, and special-status raptor species; BLM sensitive raptor species; golden eagles, and prairie falcons.<br><u>Area</u>: 10,700 acres<br><u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site.<br><u>Exception</u>: An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of the nest for current or subsequent nesting activity or occupancy. Section 7 consultation procedures would be instituted in those instances where an exception is being considered that involves a federally listed or proposed species.<br><u>Modification</u>: The Authorized Officer may modify the stipulation buffer distances or substitute with a timing limitation if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, FWS, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of five years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period. Section 7 consultation procedures would be instituted in those instances where a modification is being considered that involves a federally listed or proposed species.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood that the lease area can support further nesting activity. Section 7 consultation procedures would be instituted in those instances where a waiver is being considered that involves a federally listed or proposed species. | | X | | |

BLM_0020315

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-32** | | | | |
| **Special Status Raptor Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 0.25 mile of functional nests of federal endangered, threatened, proposed, and candidate raptor species; Colorado state endangered, threatened, and special-status raptor species; or BLM sensitive raptor species.<br><u>Area</u>: 10,700 acres<br><u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to interrupt active nesting attempts and/or cause short or long term adverse modification of suitable nest site characteristics. An exception may also be granted by the Authorized Officer if it is determined that the nature or conduct of the proposed or conditioned activity would not impair the function or utility of the nest site for current or subsequent nest activities or occupancy. Section 7 consultation procedures would be instituted in those instances where an exception is being considered that involves a federally listed or proposed species.<br><u>Modification</u>: Site specific modifications to the NSO area may be granted by the Authorized Officer pending determination that a portion of the NSO area is not essential to nest site functions or utility; or that the nature or conduct of the activity, as proposed or conditioned, would not impair the function or utility of the nest site for current or subsequent nest activities or occupancy. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. If a species status is downgraded, or delisted, the NSO buffer area may be modified to an appropriate level. Section 7 consultation procedures would be instituted in those instances where a modification is being considered that involves a federally listed or proposed species.<br><u>Waiver</u>: The Field Office Manager may grant a waiver if conditions have changed such that there is no reasonable likelihood that the lease area can support further nesting activity. Section 7 consultation procedures would be instituted in those instances where a waiver is being considered that involves a federally listed or proposed species. | | | | X |
| **NSO-33** | | | | |
| **Abandoned Bald Eagle Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 330 feet of abandoned bald eagle nests (i.e., unoccupied for five consecutive years but with all or part of the nest remaining).<br><u>Area</u>: 60 acres<br><u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood that the lease area can support further nesting activity. | | X | | |

BLM_0020316

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-34** | | | | |
| **Abandoned Bald Eagle Nests** | | | | |
| <u>Stipulation</u>: Surface occupancy would not be allowed within 330 feet of abandoned bald eagle nests (i.e., unoccupied for five consecutive years but with all or part of the nest remaining). <br> <u>Area</u>: 60 acres <br> <u>Purpose</u>: To maintain the integrity of the nest substrate and the character of habitat surrounding the nest site. <br> <u>Exception</u>: An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of the nest for current or subsequent nesting activity or occupancy. <br> <u>Modification</u>: The Authorized Officer may modify the stipulation buffer distances or substitute with a timing limitation if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, FWS, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of five years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period. <br> <u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood that the lease area can support further nesting activity. | | | X | |
| **NSO-35** | | | | |
| **Bald Eagle Nocturnal Roosts and Concentration Areas** | | | | |
| <u>Stipulation</u>: This area encompasses bald eagle nocturnal roosts and/or concentration areas. Surface occupation is not allowed within 0.25 mile of designated features. <br> <u>Area</u>: 360 acres <br> <u>Purpose</u>: To maintain the integrity of the roost stand and the character of habitat surrounding the roost site. <br> <u>Exception</u>: An exception may be granted by the Authorized Officer if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act), to interrupt roosting activities and/or cause short or long term adverse modification of suitable roost site characteristics. The Authorized Officer may also grant an exception if an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent roosting activities or occupancy. <br> <u>Modification</u>: The NSO may be modified by the Authorized Officer if an environmental analysis indicates that a portion of the area is nonessential to roost site function or utility; or that the proposed action could be conditioned to not impair the function or utility of the site for current or subsequent roosting activities or occupancy. The stipulation may also be modified commensurate with changes in species status. <br> <u>Waiver</u>: The stipulation may be waived if the species becomes extinct or if the site has failed to support roosting activities over a minimum three year period. A waiver may also apply if the area has changed such that there is no reasonable likelihood of site occupation for a subsequent minimum period of 10 years. | X | | | X |

BLM_0020317

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-36** | | | | |
| **Bald Eagle Critical Night Roosts** | | | | |
| Stipulation: Surface occupancy would not be allowed within 0.25 mile of identified bald eagle critical night roosts (as defined by the FWS).<br>Area: 360 acres<br>Purpose: To maintain the integrity of the roost stand and the character of habitat surrounding the roost site.<br>Exception: None.<br>Modification: None.<br>Waiver: The Authorized Officer may grant a waiver if the area has changed such that there is no reasonable likelihood of further winter roost functions taking place within the lease area. | | X | | |
| **NSO-37** | | | | |
| **Bald Eagle Critical Night Roosts** | | | | |
| Stipulation: Surface occupancy would not be allowed within 0.25 mile of identified bald eagle critical night roosts (as defined by the FWS).<br>Area: 360 acres<br>Purpose: To maintain the integrity of the roost stand and the character of habitat surrounding the roost site.<br>Exception: The Authorized Officer may also grant an exception if an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent roosting activities or occupancy<br>Modification: The no surface occupancy or use stipulation may be modified by the Authorized Officer if an environmental analysis indicates that a portion of the area is nonessential to roost site function or utility; or that the proposed action could be conditioned to not impair the function or utility of the site for current or subsequent roosting activities or occupancy. The NSO may be modified if the site has failed to support roosting activities over a minimum five year period.<br>Waiver: The Authorized Officer may grant a waiver if the area has changed such that there is no reasonable likelihood of further winter roost functions taking place within the lease area. | | | X | |
| **NSO-38** | | | | |
| **Federally Listed Plant Species** | | | | |
| Stipulation: An NSO stipulation will be placed on known (occupied) and potential habitat of federally listed, and candidate T/E plants species. No surface occupancy will be allowed on mapped populations of these plants.<br>Area: 48,800 acres<br>Purpose: To protect federally listed and candidate plant species and potential habitat from direct and indirect impacts, including loss of habitat.<br>Exception: The Authorized Officer may grant an exception if an inventory and subsequent environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not directly or indirectly affect plant populations.<br>Modification: None.<br>Waiver: None. | X | | | |

BLM_0020318

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-39** | | | | |
| **Federally Listed Plant Species** | | | | |
| Stipulation: Occupied, suitable, and potential habitat for federally listed, proposed, and candidate species, including any new suitable habitat mapped as a result of future surveys, would be open to oil and gas leasing with an NSO stipulation. This includes any areas that are found in the future to contain currently unknown feature(s) (soil, geologic, vegetative, etc.) that would qualify as potential habitat for federally listed, proposed, or candidate species. An NSO buffer of 660 feet from the edge of the potential, suitable, and occupied habitat would be applied where geography and other resource concerns allow.<br>Area: 91,400 acres<br>Purpose: To protect federally listed, proposed, and candidate plant species and designated critical habitat from direct and indirect impacts, including loss of habitat. The protection buffer reduces the risk of impacts to special status plant populations from dust transport, weed invasion, chemical and produced-water spills. It also reduces impacts to important pollinators and their habitat.<br>Exception: None.<br>Modification: Site specific modifications may be granted if a habitat survey documents potential habitat as unsuitable for federally listed plant species. This only applies to areas found impossible to support these species.<br>Waiver: A waiver may be granted by the Authorized Officer if the species becomes extinct or if the species is downgraded in status the NSO stipulation may be replaced with less stringent criteria. | | X | | |

BLM_0020319

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-40** | | | | |
| **Federally Listed Plant Species** | | | | |
| Stipulation: Occupied and suitable habitat for federally listed, proposed, and candidate species, including any new habitat mapped as a result of future surveys, would be open to oil and gas leasing with an NSO stipulation. A buffer of 660 feet from the edge of the suitable or occupied habitat would be applied where geography and other resource concerns allow. Within 330 feet of occupied would be further protected by limited exceptions. Potential habitat for federally listed, proposed, and candidate species would be open to oil and gas leasing with an NSO stipulation. This includes any areas that are found in the future to contain currently unknown feature(s) (soil, geologic, vegetative, etc.) that would qualify as potential habitat for federally listed, proposed, or candidate species.<br>Area: 91,400 acres<br>Purpose: To protect federally listed, proposed, and candidate plant species and designated critical habitat from direct and indirect impacts, including loss of habitat. The protection buffer reduces the risk of impacts to special status plant populations from dust transport, weed invasion, chemical and produced-water spills. It also reduces impacts to important pollinators and their habitat.<br>Exception: Within 330 feet of occupied habitat, surface occupancy may be authorized following ESA Section 7 consultation with the FWS (for species listed under the ESA) that results in a concurrence with a "no effect" or a beneficial effect determination. Within 330 – 660 feet from occupied habitat and within 660 feet of suitable habitat, an exception may be granted if the proposed action results in insignificant (not reasonably measured/detected), discountable (extremely unlikely to occur), or wholly beneficial effects (no negative impacts) to suitable, or occupied habitat (as defined under ESA Section 7 implementing regulations). If an exception is granted, special design, construction, site specific dust abatement, and implementation measures, including relocation of operations by more than 660 feet and postponing construction by more than 60 days, may be required.<br>Modification: Site specific modifications may be granted if a habitat survey documents all affected potential habitat as unsuitable for federally listed plant species. This only applies to areas found impossible to support these species.<br>Waiver: A waiver may be granted by the Authorized Officer if the species becomes extinct or if the species is downgraded in status, the NSO stipulation may be replaced with less stringent criteria. | | | X | |

BLM_0020320

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-41** | | | | |
| **Federally Listed Plant Species** | | | | |
| <u>Stipulation</u>: Prohibit surface occupancy within a 660 feet buffer from the edge of occupied habitat for the following special status plant species: federally listed species, proposed species and candidate species. An NSO stipulation would be applied to all land use authorizations, permits, and leases that involve surface disturbance associated with oil and gas development. <br> <u>Area</u>: 51,700 acres <br> <u>Purpose</u>: To protect federally listed, proposed, and candidate plant species and designated critical habitat from direct and indirect impacts, including loss of habitat. The protection buffer reduces the risk of impacts to special status plant populations from dust transport, weed invasion, chemical and produced-water spills. It also reduces impacts to important pollinators and their habitat. <br> <u>Exception</u>: An exception may be granted by the Authorized Officer if it can be demonstrated that the activity would have negligible impacts. In addition, surface occupancy may be authorized following ESA Section 7 consultation with the FWS (for species listed under the ESA). If an exception is granted, special design, construction, site specific dust abatement, and implementation measures, including relocation of operations by more than 660 feet and postponing construction by more than 60 days, may be required. <br> <u>Modification</u>: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the species has relocated; the occupied habitat has increased or decreased; or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or recovery of the species. Site specific modifications may be granted if a habitat survey documents potential habitat as unsuitable for federally listed plant species. This only applies to areas found impossible to support these species. If the site has been unoccupied by the species for a minimum period of 20 years then the habitat will be considered as suitable instead of occupied. <br> <u>Waiver</u>: A waiver may be granted by the Authorized Officer if the species becomes extinct or if the species is downgraded in status, the NSO stipulation may be replaced with less stringent criteria. | | | | X |
| **NSO-42** | | | | |
| **BLM Sensitive Plant Species** | | | | |
| <u>Stipulation</u>: Occupied, suitable, and potential habitat buffered by 330 feet from the edge of habitat for BLM sensitive plants would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities and other land use authorizations, permits, and leases associated with oil and gas development. <br> <u>Area</u>: 78,700 acres <br> <u>Purpose</u>: To protect BLM sensitive plant species from direct and indirect impacts, including loss of habitat. The protection buffer reduces the risk of impacts to special status plant populations from dust transport, weed invasion, chemical and produced-water spills. It also reduces impacts to important pollinators and their habitat. <br> <u>Exception</u>: None. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | X | | | |

BLM_0020321

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-43** | | | | |
| **BLM Sensitive Plant Species** | | | | |
| Stipulation: Occupied and suitable habitat buffered by 330 feet from the edge of habitat for BLM sensitive plants would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities and other land use authorizations, permits, and leases associated with oil and gas development.<br>Area: 78,700 acres<br>Purpose: To protect BLM sensitive plant species from direct and indirect impacts, including loss of habitat. The protection buffer reduces the risk of impacts to special status plant populations from dust transport, weed invasion, chemical and produced-water spills. It also reduces impacts to important pollinators and their habitat.<br>Exception: An exception may be granted by the Authorized Officer if it can be demonstrated that the activity would not cause adverse impacts or have negligible impacts to occupied, suitable, and potential habitat. If an exception is granted, special design, construction, and implementation measures, including relocation of operations and postponing construction by more than 60 days, may be required. If the site has been unoccupied by the species for a minimum period of 20 years then the habitat will be considered as suitable instead of occupied.<br>Modification: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the species has relocated; the occupied habitat has increased or decreased; or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or recovery of the species.<br>Waiver: If the species is removed from the Colorado BLM State Director's Sensitive Species List, a waiver may be granted by the Authorized Officer or the NSO stipulation may be replaced with less stringent criteria. | | | X | |

BLM_0020322

**Table A-1. No Surface Occupancy Stipulations**

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-44** | | | | |
| **Duck Creek Wickiup Village** | | | | |
| <u>Stipulation</u>: Approximately 3 acres within and adjacent to the Duck Creek Wickiup Village would be protected with an NSO stipulation. <br> <u>Area</u>: 3 acres <br> <u>Purpose</u>: To protect a site listed on National Register of Historic Places. <br> <u>Exception</u>: None. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | X | | | |
| **NSO-45** | | | | |
| **Duck Creek Wickiup Village** | | | | |
| <u>Stipulation</u>: Approximately 3 acres within and adjacent to the Duck Creek Wickiup Village would be protected with an NSO stipulation. <br> <u>Area</u>: 3 acres <br> <u>Purpose</u>: To protect a site listed on National Register of Historic Places. <br> <u>Exception</u>: None. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: Destruction of all the physical characteristics of a district, site, building, structure, object, traditional cultural property, historic landscape, or discrete group of thematically related properties, that represents American history, architecture, archaeology, engineering and culture (BLM Manual 8110.32 E). These locations no longer possess integrity of location, design, setting, materials, workmanship, feeling and association that qualify them for nomination to the National Register of Historic Places described by Criteria (a) – (d) within 36 CFR 60.4. | | X | X | X |
| **NSO-46** | | | | |
| **Mellen Hill** | | | | |
| <u>Stipulation</u>: Approximately 360 acres within and adjacent to the Mellen Hill Sites (5RB227, 5RB279, 5RB489, etc.) would be protected with an NSO stipulation. <br> <u>Area</u>: 360 acres <br> <u>Purpose</u>: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. <br> <u>Exception</u>: None. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: Destruction of all the physical characteristics of a district, site, building, structure, object, traditional cultural property, historic landscape, or discrete group of thematically related properties, that represents American history, architecture, archaeology, engineering and culture (BLM Manual 8110.32 E). These locations no longer possess integrity of location, design, setting, materials, workmanship, feeling and association that qualify them for nomination to the National Register of Historic Places described by Criteria (a) – (d) within 36 CFR 60.4. | | X | X | X |

BLM_0020323

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-47** | | | | |
| **Douglas-fir and Aspen on Slopes** | | | | |
| Stipulation: Areas with Douglas-fir and aspen on slopes greater than 25 percent would be open to oil and gas leasing with an NSO stipulation. Area: 63,200 acres Purpose: To preserve forest communities on slopes where forest health is difficult to maintain and would otherwise have no protection. Exception: None. Modification: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the forest communities have decreased through natural causes (e.g., wildland fire, insects, blow down, etc.); or that the nature or conduct of the activity would not impair the preservation or health of the forest community. Waiver: None. | | X | | |
| **NSO-48** | | | | |
| **Douglas-fir and Aspen on Slopes** | | | | |
| Stipulation: Areas with Douglas-fir and aspen on slopes greater than 25 percent would be open to oil and gas leasing with an NSO stipulation. Area: 63,200 acres Purpose: To preserve forest communities on slopes where forest health is difficult to maintain and would otherwise have no protection. Exception: Operations may be permitted if the Authorized Officer determines through an environmental assessment analysis, that the activity would not impair values associated with the protection or health of the forest communities. Modification: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the forest communities have decreased through natural causes (e.g., wildland fire, insects, blow down, etc.); or that the nature or conduct of the activity would not impair the preservation or viability of the forest community. Waiver: None. | | | X | |

BLM_0020324

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|:-:|:-:|:-:|:-:|
| **NSO-49** | | | | |
| **Old Growth** | | | | |
| <u>Stipulation</u>: Lands managed as old growth and areas with high potential for old growth would be open to oil and gas leasing with an NSO stipulation.<br><u>Area</u>: Not mapped<br><u>Purpose</u>: To preserve old growth forests and woodlands communities that are not otherwise protected.<br><u>Exception</u>: Operations may be permitted if the Authorized Officer determines through an environmental assessment analysis, that the activity would not impair values associated with the maintenance or viability of the forest and woodland communities.<br><u>Modification</u>: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the forest and woodland communities have decreased through natural causes (e.g., wildland fire, insects, blow down, etc.); or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or viability of the forest and woodland community.<br><u>Waiver</u>: None. | | X | | |
| **NSO-50** | | | | |
| **Oil Shale RD&D Leases** | | | | |
| <u>Stipulation</u>: Drilling would be precluded on existing and future Oil Shale Research, Development and Demonstration (RD&D) leases in the Green River Formation.<br><u>Area</u>: 800 acres<br><u>Purpose</u>: To provide for a prudent and planned future leasing and development program for oil shale resources.<br><u>Exception</u>: Drilling could occur on the RD&D lease if the Authorized Officer determines and the RD&D Lessee are in agreement the proposed drilling activity will not adversely affect the RD&D operations or recovery of the oil shale resources.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may waive if this stipulation if the RD&D oil shale operations are abandoned or the RD&D lease is relinquished or terminated. | | X | X | X |
| **NSO-51** | | | | |
| **Sodium Mining** | | | | |
| <u>Stipulation</u>: Drilling would be precluded from active sodium mining areas in the Green River Formation.<br><u>Area</u>: 980 acres<br><u>Purpose</u>: To facilitate the orderly and environmentally sound development of sodium resources.<br><u>Exception</u>: Drilling could occur in active sodium mining areas if the Authorized Officer determines, and the sodium lessee/operator are in agreement, that the proposed drilling activity will not adversely affect the sodium operations or recovery of the sodium resources.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may waive this stipulation if the sodium mining operation is abandoned. | | X | X | X |

BLM_0020325

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-52** | | | | |
| **Recreation Management Emphasis Areas** | | | | |
| Stipulation: Anderson Gulch (2,000 acres), LO7 Hill (1,600 acres), and 3 Mile Gulch (4,200 acres) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated all other land use authorizations, permits, and leases granted in these areas.<br>Area: 7,700 acres<br>Purpose: To maintain and/or enhance targeted recreational opportunities, experiences, and benefits with a primary market-based strategy being "Community" for a market base of Meeker and the upper White River valley of northwestern Colorado.<br>Exception: The Authorized Officer may grant an exception to this stipulation if an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not directly or indirectly affect the purpose and intent of the management emphasis areas, and/or would benefit the primary market-base of Meeker and the upper White River valley in northwestern Colorado.<br>Modification: None.<br>Waiver: None. | | X | | |
| **NSO-53** | | | | |
| **Recreation Management Emphasis Areas** | | | | |
| Stipulation: Anderson Gulch (2,000 acres) and 3 Mile Gulch (4,200 acres) would be open to oil and gas leasing with an NSO stipulation. An NSO stipulation would be applied to surface-disturbing activities associated all other land use authorizations, permits, and leases granted in these areas.<br>Area: 6,200 acres<br>Purpose: To maintain and/or enhance targeted recreational opportunities, experiences, and benefits with a primary market-based strategy being "Community" for a market base of Meeker and the upper White River valley of northwestern Colorado.<br>Exception: The Authorized Officer may grant an exception to this stipulation if an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not directly or indirectly affect the purpose and intent of the management emphasis area, and/or would benefit the primary market-base of Meeker and the upper White River valley in northwestern Colorado.<br>Modification: None.<br>Waiver: None. | | | | X |

BLM_0020326

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-54** | | | | |
| **Areas of Critical Environmental Concern** | | | | |
| <u>Stipulation</u>: The following ACECs would be open to oil and gas leasing with an NSO stipulation: Dudley Bluffs, Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, Raven Ridge, South Cathedral Bluffs, Deer Gulch, Ryan Gulch, Blacks Gulch, Coal Draw, Moosehead Mountain, and Duck Creek.<br><br><u>Area</u>: 28,900 acres<br><br><u>Purpose</u>: These ACECs contain vertebrate and/or invertebrate fossils of high scientific value or possess plant species that are listed as T/E, candidates for listing, BLM sensitive, State of Colorado plant species of concern, or remnant vegetation associations. Surface occupancy or disturbance will not be allowed within the boundaries of the ACEC.<br><br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if, after an on the ground plant inventory is conducted, an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not directly or indirectly affect the identified important values of the ACEC.<br><br><u>Modification</u>: None.<br><br><u>Waiver</u>: None. | X | | | |
| **NSO-55** | | | | |
| **Areas of Critical Environmental Concern** | | | | |
| <u>Stipulation</u>: The following ACECs would be open to oil and gas leasing with an NSO stipulation: Dudley Bluffs, Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, Raven Ridge, South Cathedral Bluffs, Deer Gulch, Ryan Gulch, Blacks Gulch, Coal Draw, Moosehead Mountain, and Duck Creek.<br><br><u>Area</u>: 28,900 acres<br><br><u>Purpose</u>: These ACECs contain fossils of high scientific value; fragile soils; cultural resources; and/or plant species that are listed as threatened or endangered, proposed or candidates for listing, BLM sensitive, State of Colorado plant species of concern, important biologically diverse plant communities; riparian areas; and/or remnant vegetation associations. Surface occupancy or disturbance will not be allowed within the boundaries of the ACEC.<br><br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned, would not directly or indirectly adversely affect the identified important values of the ACEC. In ACECs with important plant species or communities, an on-the-ground plant inventory conducted at the appropriate phenological period for the plants of interest would be required prior to considering any requests for exceptions. In ACECs with federally listed and proposed plant species, an exception could be granted after Section 7 consultation with the FWS if it is determined that there is a "no effect" or beneficial effect to the species as a result of the proposed activities. In ACECs with BLM sensitive plant species, an exception could be granted if the BLM determines that there is no effect or beneficial effect to the species as a result of the proposed activities.<br><br><u>Modification</u>: None.<br><br><u>Waiver</u>: None. | | X | X | X |

BLM_0020327

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-56** | | | | |
| **Lands with Wilderness Characteristics** | | | | |
| <u>Stipulation</u>: Areas where non-WSA lands with wilderness characteristics have been identified for retention of their resource values (i.e., parcels are 5,000 acres in size or greater and 20% or less of the area is currently under encumbered by existing oil and gas leases, mineral entries, or non-compatible uses scheduled to expire by the year 2016) would be open to oil and gas leasing with an NSO stipulation.<br><u>Area</u>: 111,500 acres<br><u>Purpose</u>: To protect and retain the wilderness character of these lands.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | X | | |
| **NSO-57** | | | | |
| **Source Water Protection for Public Water Supplies from Groundwater** | | | | |
| <u>Stipulation</u>: Areas within ½ mile of groundwater public water supply wells for the town of Dinosaur, Dinosaur National Monument Headquarters, the town of Massadona, the town of Meeker; and the primary protection area with no buffer that includes the portion of the White River aquifer accessed by its groundwater wells would be open to oil and gas leasing with an NSO stipulation.<br><u>Area</u>: 1,200 acres<br><u>Purpose</u>: To protect and retain groundwater public water supplies.<br><u>Exception</u>: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to negatively impact the water resources identified.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | X | X | |

BLM_0020328

## Table A-1. No Surface Occupancy Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **NSO-58** | | | | |
| **Protection for Impaired Waters in the Mesaverde Play Area** | | | | |
| Stipulation: Areas within 500 feet of impaired stream segments including; Duck Creek tributary to Yellow Creek (COLCWH13b), Yellow Creek from Barcus Creek to the White River (COLCWH13c), Piceance Creek from Willow Creek to Hunter Creek (COLCWH14a), Piceance Creek from Ryan Gulch to the White River (COLCWH15), and Black Sulphur Creek (COLCWH20) within the Mesaverde play area would be open to oil and gas leasing with an NSO stipulation.<br>Area: 3,900 acres<br>Purpose: To maintain and allow for the improvement of water quality in these stream segments.<br>Exception: The Authorized Officer may authorize surface occupancy if an environmental analysis finds the nature of the proposed action could be conditioned so as not to negatively impact the water resources identified.<br>Modification: None.<br>Waiver: This NSO stipulation will be waved for individual stream segments if they are de-listed from the 303(d) list of impaired waters by Colorado Department of Public Health and Environment. | | X | X | |
| **NSO 59** | | | | |
| **Thornburgh/Battle of Milk Creek Site** | | | | |
| Stipulation: The Thornburgh/Battle of Milk Creek site would be open to oil and gas leasing with an NSO stipulation.<br>Area: 110 acres<br>Purpose: To preserve and protect the Thornburgh/Battle of Milk Creek site as listed on the National Register of Historic Places, maintaining the cultural values of this area.<br>Exception: The Field Manager may authorize surface disturbance or use within this area if an environmental analysis finds that the activity as proposed or conditioned would not adversely affect cultural values of the area after documented consultation with the Colorado State Historic Preservation Officer (SHPO) and the Advisory Council on Historic Preservation (ACHP).<br>Modification: None.<br>Waiver: None. | | X | | |

BLM_0020329

*This page intentionally left blank*

BLM_0020330

# 3.0   Controlled Surface Use Stipulation Table

### Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|:-:|:-:|:-:|:-:|
| **CSU-01** | | | | |
| **Fragile Soils** | | | | |
| <u>Stipulation</u>: Fragile soils on slopes greater than 35 percent and saline soils derived from Mancos Shale, as identified in the 1997 White River RMP and updated with better mapping would be managed with a CSU stipulation on oil and gas leasing. Surface disturbing activities will be allowed in these areas only after an engineered construction/reclamation plan is submitted by the operator and approved by the Authorized Officer. The following items must be addressed in the plan: 1) how soil productivity will be restored; and 2) how surface runoff will be treated to avoid accelerated erosion such as riling, gullying, piping, and mass wasting. <br> <u>Area</u>: 385,000 acres <br> <u>Purpose</u>: To protect fragile soils on slopes greater than 35 percent and saline soils derived from Mancos Shale from reduced soil productivity and erosion. <br> <u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis of the proposed action identifies that the scale of the operation would not result in any long term decrease in site productivity or increased erosion. An exception may also be granted by the Authorized Officer if a more detailed soil survey determines that soil properties associated with the disturbance do not meet fragile soil criteria. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | X | | | X |
| **CSU-02** | | | | |
| **Water Resources** | | | | |
| <u>Stipulation</u>: A CSU stipulation will be applied to oil and gas leases and land use authorizations to avoid the following areas: 1) identified 100-year flood plains; 2) areas within 500 feet from perennial waters, springs, wells, and wetland/riparian areas; and 3) areas 100 feet from the inner gorge of ephemeral channels. <br> <u>Area</u>: The areas within 100-year floodplains comprise 22,100 acres. Areas within 500 ft of perennial waters, springs, wells, and wetland/riparian areas comprise 55,300 acres. Wetlands and ephemeral channels will be identified during site-specific analysis. <br> <u>Purpose</u>: To protect landscape features that are sensitive areas for water resource impacts. <br> <u>Exception</u>: The Authorized Officer may authorize surface occupancy, if an environmental analysis finds the nature of the proposed action could be conditioned so as not to negatively impact the water resources identified. An exception may also be granted when areas cannot be avoided and when engineering, best management practices, and/or design considerations are implemented mitigate impacts to water resources. <br> <u>Modification</u>: Site specific modification may be granted by the Authorized Officer pending BLM approval of a site specific study by a qualified hydrologist or engineer that finds the areas proposed for surface occupancy after construction would: 1) pass the 10-year peak flow event without erosion, 2) pass the 25-year peak flow without failed infrastructure, 3) pass the 50-year peak flow event without failure (when surface occupancy is planned for greater than 50 years), 4) not impede 100-year peak flow events, 5) not negatively impact springs or wells, and 6) any wetlands impacted could be restored to their original function post occupancy. <br> <u>Waiver</u>: None. | | | X | X |

BLM_0020331

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-03** | | | | |
| **Saline Soils** | | | | |
| Stipulation: Areas with saline soils (i.e., greater than 8 mmhos/cm), as identified in USDA SCS Order III Soil Surveys, would be open to leasing with a CSU stipulation that would require operators to consider the stability and productivity of these soils in surface use plans. Surface disturbing activities will be allowed in these areas only after a reclamation plan is submitted by the operator and approved by the Authorized Officer. The following items must be addressed in the plan: 1) how soil productivity will be restored, and 2) how reclamation success will be evaluated.<br>Area: 45,700 acres<br>Purpose: To protect the productivity of saline soils and to reduce salt and selenium loading of surface waters.<br>Exception: An exception may be granted by the Authorized Officer if an environmental analysis of the proposed action identifies that the scale of the operation would not result in any long term decrease in site productivity or increased erosion. An exception may also be granted if a more detailed soil survey, i.e., Order I, conducted by a qualified soil scientist, finds the soil properties associated with the proposed action are not saline.<br>Modification: None.<br>Waiver: None. | | | | X |
| **CSU-04** | | | | |
| **Steep Natural Slopes** | | | | |
| Stipulation: Natural slopes greater than or equal to 25 percent but less than 35 percent (as defined by digital elevation model data) would be open to oil and gas leasing with a CSU stipulation. A CSU stipulation would be applied to surface-disturbing activities associated with all other land use authorizations, permits, and leases granted in these areas that are associated with oil and gas development. Surface disturbing activities will be allowed in these areas only after an engineered construction/reclamation plan is submitted by the operator and approved by the Authorized Officer. The following items must be addressed in the plan: 1) how soil productivity will be restored and 2) how surface runoff will be addressed to avoid accelerated erosion such as riling, gullying, piping, and mass wasting.<br>Area: 279,900 acres<br>Purpose: To protect soils on natural slopes greater than or equal to 25 percent but less than 35 percent.<br>Exception: An exception may be granted by the Authorized Officer if an environmental analysis of the proposed action identifies that the scale of the operation would not result in any long term decrease in site productivity or increased erosion. An exception may also be granted by the Authorized Officer if a more detailed survey determines that the proposed action will not disturb soils on slopes greater than or equal to 25 percent but less than 35 percent.<br>Modification: None.<br>Waiver: None. | | X | | |

BLM_0020332

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-05** | | | | |
| **Steep Natural Slopes** | | | | |
| <u>Stipulation</u>. Natural slopes greater than or equal to 35 percent but less than 50 percent (as defined by digital elevation model data) would be open to oil and gas leasing with a CSU stipulation A CSU stipulation would be applied to surface-disturbing activities associated with land use authorizations, permits, and leases granted in these areas that are associated with oil and gas development. Surface disturbing activities will be allowed in these areas only after an engineered construction/reclamation plan is submitted by the operator and approved by the Authorized Officer. The following items must be addressed in the plan: 1) how soil productivity will be restored; and 2) how surface runoff will be treated to avoid accelerated erosion such as riling, gullying, piping, and mass wasting.<br><u>Area</u>: 238,700 acres<br><u>Purpose</u>: To protect soils on natural slopes greater than or equal to 35 percent but less than 50 percent.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis of the proposed action identifies that the scale of the operation would not result in any long term decrease in site productivity or increased erosion. An exception may also be granted by the Authorized Officer if a more detailed survey determines that the proposed action will not disturb soils on slopes greater than or equal to 35 percent.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | | X | |
| **CSU-06** | | | | |
| **Riparian/Wetland Habitats** | | | | |
| <u>Stipulation</u>: Surface-disturbing activities would be avoided in riparian and wetland habitats (and potential habitats).<br><u>Area</u>: 1,600 acres<br><u>Purpose</u>: To maintain the proper functioning condition including the vegetative hydrologic and geomorphic functionality of the riparian system and to maintain and protect water quality, stream stability, aquatic health, seasonal use and downstream fisheries, and sediment processes downstream.<br><u>Exception</u>: Operations may be authorized by the AO if environmental analysis determines that the proposed activity would not or could be conditioned to not, degrade or forestall attainment of the proper functioning condition of the riparian/wetland area.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | | X | |

BLM_0020333

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-07** | | | | |
| **Riparian/Wetland Habitats** | | | | |
| <u>Stipulation</u>: Surface-disturbing activities would be avoided in priority riparian/wetland habitats. If the riparian areas could not be avoided, impacts could be mitigated to meet minimum objectives for the system.<br><u>Area</u>: 1,600 acres<br><u>Purpose</u>: To maintain the proper functioning condition, including the vegetative hydrologic and geomorphic functionality of the riparian system and to maintain and protect water quality, stream stability, aquatic health, seasonal use and downstream fisheries, and sediment processes downstream.<br><u>Exception</u>: Operations may be authorized by the Authorized Officer if environmental analysis determines that the proposed activity would not, or could be conditioned to not, degrade or forestall attainment of proper functioning condition of the riparian area.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | | | X |
| **CSU-08** | | | | |
| **Greater Sage-Grouse Leks** | | | | |
| <u>Stipulation</u>: Surface occupancy and surface-disturbing and disruptive activities within 0.6 mile of active and inactive strutting grounds would be avoided. If existing facilities are within 0.6 mile of such leks, leaseholder cooperation would be sought in developing plans that minimize disruption of sage-grouse lek functions and, where detrimental, removing or modifying surface facilities.<br>In those instances where habitat modification within 0.6 mile is unavoidable, disruption of lek activity would be reduced by applying one or more of the following COAs consistent with granted lease rights:<br>1) Locating facilities or features beyond line-of-sight.<br>2) Imposing a timing limitation from March 1 to May 15.<br>3) As a last resort or for activity deemed minor and temporary, daily limitations would be imposed that allow disturbance from two hours after sunrise to sunset, with restrictions most stringently applied during the period two hours before and after sunrise.<br><u>Area</u>: 17,400 acres<br><u>Purpose</u>: To maintain the character and utility of sites used for communal reproductive display and to help prevent the disruption of sage-grouse reproductive activity and displacement of birds from favored reproductive display sites.<br><u>Exception</u>: An exception may be granted by the Authorized Officer if an environmental analysis determines that the action, as proposed or conditioned, would not impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities.<br><u>Modification</u>: The no surface occupancy or use area may be modified in extent, or substituted with a timing limitation, by the Authorized Officer if an environmental analysis finds: 1) that a portion of the area is nonessential to site utility or function, 2) that the proposed action could be conditioned so as not to impair the function or utility of the site for current or subsequent reproductive display, including daytime loafing/staging activities, or 3) it is determined that the site has been unoccupied for a minimum of 10 years unless the area has been identified for habitat restoration and population recovery. The stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to sage-grouse breeding activities and/or habitats.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if, in cooperation with the CPW, it is determined that the lease area is no longer capable of supporting lekking activity. | | | X | |

BLM_0020334

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-09** | | | | |
| **Black-footed Ferret Management Area** | | | | |
| <u>Stipulation</u>: Ferret management areas (Wolf Creek and Coyote Basin) would be open to oil and gas leasing with a CSU stipulation. The following CSU stipulation would be applied to surface-disturbing and disruptive activities associated with all land use authorizations, permits and leases issued on BLM-administered lands. Surface occupancy or use is subject to the following special operating constraints:<br><br>1) Prior to authorizing activities in this area, the Authorized Officer will confer or consult with the FWS as required by Section 7 of the Endangered Species Act. Depending on the scope of the proposed action, a plan of development may be required that demonstrates how the proposed activities would be conducted or conditioned to avoid the direct or indirect loss of black-footed ferrets or to avoid affecting the capability of the site to achieve reestablishment objectives.<br><br>2) The Authorized Officer may impose land use measures and limitations derived from a site specific ferret reintroduction and management plan (see below). The measures and limitations would be designed to avoid, or reduce to acceptable levels, the short and long term adverse effects on ferret survival, behavior, reproductive activities, and/or the area's capacity to sustain ferret population objectives. Examples of measures and limitations include:<br><br>   a) relocation of surface activities more than 660 feet;<br>   b) deferring activities longer than 60 days;<br>   c) limiting access to designated roads and trails;<br>   d) modifications to project design to discourage raptor perching and prohibit the disruption of certain or all prairie dog burrow systems;<br>   e) limiting surface disturbance to certain seasons and times of day;<br>   f) Requiring efforts to offset losses of, or expand suitable prairie dog habitats to compensate for, unavoidable habitat loss or adverse habitat modification.<br><br>3) The following provisions are derived from "A Cooperative Plan for Black-footed Ferret Reintroduction and Management, Wolf Creek and Coyote Basin Management Areas":<br><br>   a) A "Plan of Operations" will be developed for large or multi-year mineral development programs that occur on federal estate within Black-footed Ferret Management Areas.<br>   b) Mineral development and utility installation activities will be designed to avoid adverse influence on prairie dog habitat. In the event adverse impacts to prairie dog habitat are unavoidable, activities will be designed to influence the smallest area practicable and/or those areas with the lowest prairie dog densities. When proposed developments cannot be designed or implemented to avoid substantive adverse impacts to the black-footed ferret or their habitat, the project proponents and appropriate agency(ies) would cooperatively develop a mitigation plan. The default objective for compensation is equal and in-kind replacement of the disturbed or destroyed prairie dog habitat via a cooperatively arranged expansion or enhancement of other prairie dog colonies in the Management Area.<br>   c) Ferret occupation at the site of a proposed commercial activity may require special mitigation measures (e.g., delay of activities, capture and relocation of ferrets, habitat mitigation, modification to the design of activities or facilities, singularly or in combination). The course of events chosen will be determined cooperatively by the operator, CPW, and FWS at the time of an identified conflict. Reliable evidence of a ferret occupying a proposed project vicinity during the reproductive period may warrant imposing measures as COAs in an effort to reduce the risk of compromising | X | | | X |

BLM_0020335

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| ferret reproductive efforts. Such measures may include relocating the proposed facility, modifying the conduct of an activity, or imposing a timing limitation (1 May to 15 July) on suitable habitats within 0.5 mile of the documented evidence.<br><br>d)  On-site habitat reclamation will be required upon cessation of temporary (less than two years) surface disturbances as necessary.<br><br>e)  As a general rule, acre-for-acre mitigation will be required for habitat lost due to permanent (equal to or greater than two years) surface disturbances. Examples of mitigation forms are listed below:<br><br>   i) Vegetation Treatment. Burning, mechanical, and/or chemical treatments applied to areas with excessive or otherwise incompatible vegetation adjacent to existing towns and likely to be colonized by prairie dogs following land treatment.<br><br>   ii) Relocation of Prairie Dogs. Prairie dogs translocated from the site of surface disturbance to an area with vacant burrow systems.<br><br>   iii) Create New Burrow Systems. The construction of artificial burrows in potential habitat which is lacking burrows and relocating affected prairie dogs to the artificial burrows.<br><br>   iv) Habitat Banking. To avoid the inconvenience and inefficiency of implementing a large number of small mitigation projects over time, operators would have the option of implementing larger mitigation projects that could be used as a credit against future habitat modifications.<br><br>Area: 53,200 acres<br><br>Purpose: This is a controlled surface use area for promoting the reestablishment and development of a self-sustaining black-footed ferret population.<br><br>Exception: The Authorized Officer, in conference with FWS, may authorize surface disturbance or use within these areas if an environmental analysis finds that the activity as proposed or conditioned, would not adversely influence ferret recovery, or conflict with the ferret reintroduction and management plan.<br><br>Modification: The Authorized Officer, in conference with FWS, may modify the terms of the CSU if the proposed action is shown to be compatible with ferret recovery goals and/or the ferret reintroduction and management plan.<br><br>Waiver: The Authorized Officer, in conference with FWS, may grant a waiver if extirpation of wild, free roaming ferret populations culminates in the discontinuance of the species recovery program, or local reintroduction efforts are otherwise abandoned. | | | | |

BLM_0020336

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-10** | | | | |
| **Black-footed Ferret Management Area** | | | | |
| Stipulation: Ferret management areas (Wolf Creek, Coyote Basin, and Snake John Reef) would be open to oil and gas leasing with a CSU stipulation. The following CSU stipulation would be applied to surface-disturbing and disruptive activities associated with all land use authorizations, permits and leases issued on BLM-administered lands. Surface occupancy or use is subject to the following special operating constraints: | | | | |

Stipulation: Ferret management areas (Wolf Creek, Coyote Basin, and Snake John Reef) would be open to oil and gas leasing with a CSU stipulation. The following CSU stipulation would be applied to surface-disturbing and disruptive activities associated with all land use authorizations, permits and leases issued on BLM-administered lands. Surface occupancy or use is subject to the following special operating constraints:

1) Prior to authorizing activities in this area, the Authorized Officer will confer or consult with the FWS as required by Section 7 of the Endangered Species Act. Depending on the scope of the proposed action, a plan of development may be required that demonstrates how the proposed activities would be conducted or conditioned to avoid the direct or indirect loss of black-footed ferrets or to avoid affecting the capability of the site to achieve reestablishment objectives.

2) The Authorized Officer may impose land use measures and limitations derived from a site specific ferret reintroduction and management plan (see below). The measures and limitations would be designed to avoid, or reduce to acceptable levels, the short and long term adverse effects on ferret survival, behavior, reproductive activities, and/or the area's capacity to sustain ferret population objectives. Examples of measures and limitations include:

    a) relocation of surface activities more than 660 feet;

    b) deferring activities longer than 60 days;

    c) limiting access to designated roads and trails;

    d) modifications to project design to discourage raptor perching and prohibit the disruption of prairie dog burrow systems;

    e) limiting surface disturbance to certain seasons and times of day;

    f) Requiring efforts to offset losses of, or expand suitable prairie dog habitats to compensate for, unavoidable habitat loss or adverse habitat modification.

3) The following provisions are derived from "A Cooperative Plan for Black-footed Ferret Reintroduction and Management, Wolf Creek and Coyote Basin Management Areas":

    a) A "Plan of Operations" will be developed for large or multi-year mineral development programs that occur on federal estate within Black-footed Ferret Management Areas.

    b) Mineral development and utility installation activities will be designed to avoid adverse influence on prairie dog habitat. In the event adverse impacts to prairie dog habitat are unavoidable, activities will be designed to influence the smallest area practicable and/or those areas with the lowest prairie dog densities. When proposed developments cannot be designed or implemented to avoid substantive adverse impacts to the black-footed ferret or their habitat, the project proponents and appropriate agency(ies) would cooperatively develop a mitigation plan. The default objective for compensation is equal and in-kind replacement of the disturbed or destroyed prairie dog habitat via a cooperatively arranged expansion or enhancement of other prairie dog colonies in the Management Area.

    c) Ferret occupation at the site of a proposed commercial activity may require special mitigation measures (e.g., delay of activities, capture and relocation of ferrets, habitat mitigation, modification to the design of activities or facilities, singularly or in combination). The course of events chosen will be determined cooperatively by the operator, CPW, and FWS at the time of an identified conflict. Reliable evidence of a ferret occupying a proposed project vicinity during the reproductive period may warrant imposing measures as COAs in an effort to reduce the risk of compromising

Column C marked: **X**

BLM_0020337

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| ferret reproductive efforts. Such measures may include relocating the proposed facility, modifying the conduct of an activity, or imposing a timing limitation (1 May to 15 July) on suitable habitats within 0.5 mile of the documented evidence. | | | | |
| d) On-site habitat reclamation will be required upon cessation of temporary (less than two years) surface disturbances as necessary. | | | | |
| e) As a general rule, acre-for-acre mitigation will be required for habitat lost due to permanent (equal to or greater than two years) surface disturbances. Examples of mitigation forms are listed below:<br><br>i) Vegetation Treatment. Burning, mechanical, and/or chemical treatments applied to areas with excessive or otherwise incompatible vegetation adjacent to existing towns and likely to be colonized by prairie dogs following land treatment.<br><br>ii) Relocation of Prairie Dogs. Prairie dogs translocated from the site of surface disturbance to an area with vacant burrow systems.<br><br>iii) Create New Burrow Systems. The construction of artificial burrows in potential habitat which is lacking burrows and relocating affected prairie dogs to the artificial burrows.<br><br>iv) Habitat Banking. To avoid the inconvenience and inefficiency of implementing a large number of small mitigation projects over time, operators would have the option of implementing larger mitigation projects that could be used as a credit against future habitat modifications. | | | | |
| <u>Area</u>: 58,600 acres | | | | |
| <u>Purpose</u>: This is a controlled surface use area for promoting the reestablishment and development of a self-sustaining black-footed ferret population. | | | | |
| <u>Exception</u>: The Authorized Officer, in conference with FWS, may authorize surface disturbance or use within these areas if an environmental analysis finds that the activity as proposed or conditioned, would not adversely influence ferret recovery, or conflict with the ferret reintroduction and management plan. | | | | |
| <u>Modification</u>: The Authorized Officer, in conference with FWS, may modify the terms of the CSU if the proposed action is shown to be compatible with ferret recovery goals and/or the ferret reintroduction and management plan. | | | | |
| <u>Waiver</u>: The Authorized Officer, in conference with FWS, may grant a waiver if extirpation of wild, free roaming ferret populations culminates in the discontinuance of the species recovery program, or local reintroduction efforts are otherwise abandoned. | | | | |

BLM_0020338

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-11** | | | | |
| **Colorado River Cutthroat Trout Habitat** | | | | |
| Stipulation: Colorado River cutthroat trout habitat would be open to oil and gas leasing and permitted surface use activities with a CSU stipulation. Prior to authorizing surface disturbance of occupied stream reaches, those slated for recovery, or within watersheds contributing to occupied habitats, the Field Office Manager may require the proponent/applicant to submit a plan of development that would demonstrate that the proposed action would not: 1) increase stream gradient; 2) result in a net increase in sediment contribution; 3) decrease stream channel sinuosity; 4) increase the channel width to depth ratio; 5) increase water temperature; 6) decrease vegetation derived stream shading; and 7) degrade existing water quality parameters, including specific conductance, turbidity, organic/inorganic contaminant levels, and dissolved oxygen in identified reaches or contributing perennial or intermittent tributaries. If approvals are granted and development results in these standards being exceeded, additional measures would be required to correct the deficiencies. The proponent may be required to monitor stream/channel responses throughout the life of the project.<br>Area: 97,000 acres<br>Purpose: Protection of aquatic habitats occupied by or suited for recovery of Colorado River cutthroat trout.<br>Exception: The Authorized Officer may authorize surface disturbance in these areas if an environmental analysis indicates that the project would have no adverse influence on identified stream characteristics.<br>Modification: Short term transgressions of the stream characteristics listed above may be allowed if the Authorized Officer determines, through environmental analysis, that short term deviations will have no adverse consequences on affected channel reaches beyond the construction phase of the project.<br>Waiver: In the event the population status of Colorado River cutthroat trout warrants downgrading, this stipulation may be replaced by less stringent criteria. | X | | | |

BLM_0020339

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-12** | | | | |
| **Colorado River Cutthroat Trout Habitat** | | | | |
| Stipulation: Colorado River cutthroat trout habitat would be open to oil and gas leasing and permitted surface use activities with a CSU stipulation. Prior to authorizing surface disturbance of occupied stream reaches, those slated for recovery, or within watersheds contributing to occupied habitats, the Field Office Manager may require the proponent/applicant to submit a plan of development that would demonstrate that the proposed action would not: 1) increase stream gradient; 2) result in a net increase in sediment contribution; 3) decrease stream channel sinuosity; 4) increase the channel width to depth ratio; 5) increase water temperature; 6) decrease vegetation derived stream shading; and 7) degrade existing water quality parameters, including specific conductance, turbidity, organic/inorganic contaminant levels, and dissolved oxygen in identified reaches or contributing perennial or intermittent tributaries. If approvals are granted and development results in these standards being exceeded, additional measures would be required to correct the deficiencies. The proponent may be required to monitor stream/channel responses throughout the life of the project. | | | | |
| Area: 97,000 acres | | X | X | X |
| Purpose: Protection of aquatic habitats occupied by or suited for recovery of Colorado River cutthroat trout. | | | | |
| Exception: The Authorized Officer may authorize surface disturbance in these areas if an environmental analysis indicates that the project would have no adverse influence on identified stream characteristics. | | | | |
| Modification: Short term transgressions of the stream characteristics listed above may be allowed if the Authorized Officer determines, through environmental analysis, that short term deviations will have no adverse consequences on affected channel reaches beyond the construction phase of the project. In the event the management status of Colorado River cutthroat trout warrants downgrading, this stipulation may be replaced by less stringent criteria. The provisions of the stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to channel function and aquatic habitat conditions as they pertain to the support of native trout populations. | | | | |
| Waiver: A waiver may be granted if habitat conditions are determined to be permanently incapable of supporting populations of BLM-sensitive fish. | | | | |

BLM_0020340

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-13** | | | | |
| **Colorado River Cutthroat Trout Habitat** | | | | |
| <u>Stipulation</u>: Colorado River cutthroat trout habitat and BLM-administered portions of Black Sulphur Creek would be open to oil and gas leasing and permitted surface use activities with a CSU stipulation. Prior to authorizing surface disturbance of occupied stream reaches, those slated for recovery, or within watersheds contributing to occupied habitats, the Field Office Manager may require the proponent/applicant to submit a plan of development that would demonstrate that the proposed action would not: 1) increase stream gradient; 2) result in a net increase in sediment contribution; 3) decrease stream channel sinuosity; 4) increase the channel width to depth ratio; 5) increase water temperature; 6) decrease vegetation derived stream shading; and 7) degrade existing water quality parameters, including specific conductance, turbidity, organic/inorganic contaminant levels, and dissolved oxygen in identified reaches or contributing perennial or intermittent tributaries. If approvals are granted and development results in these standards being exceeded, additional measures would be required to correct the deficiencies. The proponent may be required to monitor stream/channel responses throughout the life of the project. <br><br> <u>Area</u>: 2,700 acres <br><br> <u>Purpose</u>: Protection of aquatic habitats occupied by or suited for recovery of Colorado River cutthroat trout. <br><br> <u>Exception</u>: The Authorized Officer may authorize surface disturbance in these areas if an environmental analysis indicates that the project would have no adverse influence on identified stream characteristics. <br><br> <u>Modification</u>: Short term transgressions of the stream characteristics listed above may be allowed if the Authorized Officer determines, through environmental analysis, that short term deviations will have no adverse consequences on affected channel reaches beyond the construction phase of the project. In the event the management status of Colorado River cutthroat trout warrants downgrading, this stipulation may be replaced by less stringent criteria. The provisions of the stipulation may also be modified if the proponent, BLM, CPW, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to channel function and aquatic habitat conditions as they pertain to the support of native trout populations. <br><br> <u>Waiver</u>: A waiver may be granted if habitat conditions are determined to be permanently incapable of supporting populations of BLM-sensitive fish. | | X | X | |

BLM_0020341

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-14** | | | | |
| **Bald Eagle Nest, Roost, and Perch Habitat** | | | | |
| <u>Stipulation</u>: Prior to authorizing surface disturbance within this area, and pending conferral or consultation with the FWS as required by the Endangered Species Act, the Authorized Officer may require development that would demonstrate that: 1) involvement of cottonwood stands or cottonwood regeneration areas have been avoided to the extent practicable; 2) special reclamation measures or design features are incorporated that would accelerate recovery and/or reestablishment of affected cottonwood communities; 3) the pre-development potential of affected floodplains to develop or support riverine cottonwood communities has not been diminished; and 4) the current/future utility of such cottonwood substrate for bald eagle use would not be impaired.<br><u>Area</u>: 930 acres<br><u>Purpose</u>: To maintain the long term suitability, utility, and development opportunities for specialized riverine habitat features involving bald eagle nest, roost, and perch substrate on federal lands.<br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if an environmental analysis indicates that the proposed or conditioned activities would not affect the long term suitability or utility of habitat features or diminish opportunities for natural floodplain functions. Surface disturbance and occupation may also be authorized in the event that established impacts to habitat values would be compensated or offset to the satisfaction of the BLM in consultation with FWS and CPW.<br><u>Modification</u>: Integral with exception and stipulation.<br><u>Waiver</u>: None. | X | | | |
| **CSU-15** | | | | |
| **Bald Eagle Nest, Roost, and Perch Habitat** | | | | |
| <u>Stipulation</u>: Prior to authorizing surface disturbance within this area, and pending coordination with the FWS consistent with provisions of the Bald and Golden Eagle Protection Act, including its implementing regulations, the Authorized Officer may require the proponent/applicant to submit a plan of development that would demonstrate that: 1) involvement of cottonwood stands or cottonwood regeneration areas have been avoided to the extent practicable; 2) special reclamation measures or design features are incorporated that would accelerate recovery and/or reestablishment of affected cottonwood communities; 3) the pre-development potential of affected flood plains to develop or support riverine cottonwood communities has not been diminished; and 4) the current/future utility of such cottonwood substrate for bald eagle use would not be impaired.<br><u>Area</u>: 930 acres<br><u>Purpose</u>: For maintaining the long term suitability, utility and development opportunities for specialized riverine habitat features involving bald eagle nest, roost, and perch substrate on federal lands.<br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if an environmental analysis indicates that the proposed or conditioned activities would not affect the long term suitability or utility of habitat features or diminish opportunities for natural flood plain functions. Surface disturbance and occupation may also be authorized in the event that established impacts to habitat values would be compensated or offset to the satisfaction of the BLM in consultation with FWS and CPW.<br><u>Modification</u>: Integral with exception and stipulation.<br><u>Waiver</u>: None. | | X | X | |

BLM_0020342

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-16** | | | | |
| **BLM Sensitive Plant Species** | | | | |
| Stipulation: Occupied habitat for BLM sensitive plants would be open to oil and gas leasing with a CSU stipulation. A CSU stipulation would be applied to surface disturbing activities and other land use authorizations, permits, and leases for oil and gas activities issued on BLM-administered lands. For plant species listed as BLM sensitive, special design, construction, and implementation measures, including relocation of operations by more than 660 feet may be required. In addition, relocation would be required beyond 330 feet from occupied habitat. Area: 7,200 acres Purpose: To protect BLM sensitive plant species from direct and indirect impacts, including loss of habitat. Possible relocation of a project reduces the risk of impacts to special status plant populations from dust transport, weed invasion, chemical and produced-water spills. It also reduces impacts to important pollinators and their habitat. Exception: An exception may be granted by the Authorized Officer if it can be demonstrated that the activity would not cause adverse impacts or have negligible impacts. If an exception is granted, special design, construction, and implementation measures, including relocation of operations by more than 330 feet, may be required. If the site has been unoccupied by the species for a minimum period of 20 years then the habitat will be considered as suitable instead of occupied. Modification: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the species has relocated; the occupied habitat has increased or decreased; or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or recovery of the species. Waiver: None. | | | | X |
| **CSU-17** | | | | |
| **Texas-Missouri-Evacuation Creek** | | | | |
| Stipulation: In the event archaeological or historical resources are located during the inventory process, the proposed action will be relocated to avoid and protect the cultural values. The extent of relocation will be dependent upon the nature and extent of the proposal and the type of cultural resources involved. Relocation may involve moving surface disturbing activities a distance greater than 660 feet to adequately avoid the resource of concern. Proposed actions that would result in the production of supersonic, sonic, or low frequency subsonic vibrations shall be located a distance far enough from rock art or architectural features to allow full attenuation of the vibrations. Area: 22,500 acres Purpose: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. The Texas-Missouri-Evacuation Creek cultural resource concentration area contains a high potential for the occurrence of cultural resources. Exception: The Authorized Officer may grant an exception to this stipulation, if through an environmental analysis and consultation with the Colorado SHPO, ACHP, and Indian Tribes it is determined that other acceptable mitigation can be developed to protect or preserve sites and data. Modification: None. Waiver: None. | X | X | X | X |

BLM_0020343

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU- 18** | | | | |
| **Thornburgh/Battle of Milk Creek Viewshed** | | | | |
| <u>Stipulation</u>: The Thornburgh/Battle of Milk Creek viewshed would be open to oil and gas leasing with a CSU stipulation. The following CSU stipulation would be applied to surface-disturbing activities associated with all land use authorizations, permits and leases issued on BLM-administered lands and/or BLM mineral estate. Surface occupancy or use is subject to the following constraints: <br><br> The Authorized Officer may impose mitigation measures on a site specific basis designed to avoid, or reduced to acceptable levels, the short and long term visual and auditory adverse effects on the area. Mitigation measures may include, but are not limited to: <br><br> a)  Relocation of surface activities more than 660 feet <br> b)  Limiting access to existing roads and trails <br> c)  Limiting surface disturbance to certain seasons of the year <br> d)  Modifications of project design for permanent above ground facilities with height restrictions and use of visual resource management painting methods, including camouflage. <br> e)  Modifications of project design for temporary and permanent developments to adhere to sound restrictions. <br> <u>Area</u>: 5,800 acres <br> <u>Purpose</u>: To preserve and protect the landscape surrounding the Thornburgh/Battle of Milk Creek site as listed on the National Register of Historic Places, maintaining the cultural values of this area. <br> <u>Exception</u>: The Field Manager may authorize surface disturbance or use within this area if an environmental analysis finds that the activity as proposed or conditioned would not adversely affect cultural values of the area. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | | **X** | **X** | **X** |
| **CSU-19** | | | | |
| **Rock Art and Standing Architecture** | | | | |
| <u>Stipulation</u>: Within Canyon Pintado National Historic District, proposed actions that produce vibrations will be located a distance far enough away from rock art or structural features to allow full attenuation of the vibration before it gets to the resource of concern. <br> <u>Area</u>: 16,000 acres <br> <u>Purpose</u>: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. <br> <u>Exception</u>: None. <br> <u>Modification</u>: None. <br> <u>Waiver</u>: None. | **X** | | | |

BLM_0020344

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-20** | | | | |
| **Rock Art and Standing Architecture** | | | | |
| <u>Stipulation</u>: Development would be restricted within 1,000 ft. of rock art or standing architecture such as cabins, rock structures, or standing wickiups. Vibrations from construction would be substantially limited unless it could be shown that environmental attenuation would prevent the vibrations from reaching the rock art or standing architecture. Applicants would be required to monitor site integrity a minimum of once per year, or more frequently at the discretion of the BLM. If deterioration of the site integrity was documented, the holder would bear the cost and responsibility for stabilization or other data recovery. <u>Area</u>: Not mapped <u>Purpose</u>: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. <u>Exception</u>: If avoidance standards could not be met, full mitigation, including level II archival documentation (i.e., photographs or other measures) as determined necessary through consultation with the Colorado State Historic Preservation Office (SHPO), ACHP and Indian tribes, could be required before development would be allowed to proceed. <u>Modification</u>: None. <u>Waiver</u>: None. | | **X** | | |
| **CSU-21** | | | | |
| **Rock Art and Standing Architecture** | | | | |
| <u>Stipulation</u>: Development would be restricted within 750 ft. of rock art or standing architecture such as cabins, rock structures, or standing wickiups. Vibrations from construction would be substantially limited unless it could be shown that environmental attenuation would prevent the vibrations from reaching the rock art or standing architecture. Applicants would be required to monitor site integrity a minimum of once per year, or more frequently at the discretion of the BLM. If deterioration of the site integrity was documented, the holder would bear the cost and responsibility for stabilization or other data recovery. <u>Area</u>: Not mapped <u>Purpose</u>: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. <u>Exception</u>: If avoidance standards could not be met, full mitigation, including level II archival documentation (i.e., photographs or other measures) as determined necessary through consultation with the Colorado State Historic Preservation Office (SHPO), ACHP and Indian tribes, could be required before development would be allowed to proceed. <u>Modification</u>: None. <u>Waiver</u>: None. | | | **X** | |

BLM_0020345

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-22** | | | | |
| **Rock Art and Standing Architecture** | | | | |
| Stipulation: Development would be restricted within 500 ft. of rock art or standing architecture such as cabins, rock structures, or standing wickiups. Vibrations from construction would be substantially limited unless it could be shown that environmental attenuation would prevent the vibrations from reaching the rock art or standing architecture. Applicants would be required to monitor site integrity a minimum of once per year, or more frequently at the discretion of the BLM. If deterioration of the site integrity was documented, the holder would bear the cost and responsibility for stabilization or other data recovery. Area: Not mapped Purpose: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. Exception: If avoidance standards could not be met, full mitigation, including level II archival documentation (i.e., photographs or other measures) as determined necessary through consultation with the Colorado State Historic Preservation Office (SHPO), ACHP and Indian tribes, could be required before development would be allowed to proceed. Modification: None. Waiver: None. | | | | X |
| **CSU-23** | | | | |
| **Protected Historic Properties and Resources** | | | | |
| Stipulation: This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act (NHPA), American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, Executive Order (E.O.) 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized, or mitigated. Area: White River Field Office Purpose: To preserve and protect examples of cultural and historic resources to ensure that they are available for appropriate uses by present and future generations. Exception: None. Modification: None. Waiver: None. | X | X | X | X |

BLM_0020346

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-24** | | | | |
| **Forestry & Woodland Products** | | | | |
| <u>Stipulation</u>: Manage old growth and areas with high potential for old growth characteristics with a CSU stipulation. The CSU to retain stands with old growth characteristics or high potential to develop old growth characteristics.<br><u>Area</u>: Not mapped<br><u>Purpose</u>: To preserve old growth forests and woodlands communities that are not otherwise protected.<br><u>Exception</u>: Operations may be authorized if the Authorized Officer determines that the activity would not impair values associated with the maintenance or viability of the forest and woodland communities.<br><u>Modification</u>: The Authorized Officer may modify (increase, decrease, or relocate) the area subject to the stipulation if it is determined that the forest and woodland communities have decreased through natural causes (e.g., wildland fire, insects, blow down, etc.); or that the nature or conduct of the activity, as proposed or conditioned, would not impair values associated with the maintenance or viability of the forest and woodland community.<br><u>Waiver</u>: None. | | | X | |
| **CSU-25** | | | | |
| **Oil Shale** | | | | |
| <u>Stipulation</u>: In areas available for commercial oil shale and multi-mineral leasing, as identified in Appendix C (Table C-1) of the 2008 Proposed Oil Shale and Tar Sands RMP Amendments to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic EIS (and updated in the Draft Programmatic EIS and Possible Land Use Plan Amendments for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming), oil and gas wells may be relocated more than 660 feet such that drilling will not interfere with the mining and recovery of oil shale deposits or the extraction of shale oil by in situ methods or that the interest of the United States would best be served thereby.<br><u>Area</u>: 327,200 acres<br><u>Purpose</u>: To provide for a prudent and planned future leasing and development program for oil shale resources.<br><u>Exception</u>: The drilling location will be permitted only in the event that it is established to the satisfaction of the Authorized Officer that such drilling will not interfere with the mining and recovery of oil shale deposits or the extraction of shale oil by in situ methods or that the interest of the United States would best be served thereby.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | X | | |

BLM_0020347

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-26** | | | | |
| **Oil Shale** | | | | |
| <u>Stipulation</u>: On commercial oil shale leases, oil and gas wells may be relocated more than 660 feet such that drilling will not interfere with the mining and recovery of oil shale deposits or the extraction of shale oil by in situ methods or that the interest of the United States would best be served thereby.<br><br><u>Area</u>: No areas are currently leased for commercial oil shale development. The maximum area possible would be those areas identified as available for oil shale and multi-mineral leasing in the Green River Formation, as identified in Appendix C (Table C-1) of the 2008 Proposed Oil Shale and Tar Sands RMP Amendments to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic EIS (and updated in the Draft Programmatic EIS and Possible Land Use Plan Amendments for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming), which is 327,200 acres.<br><br><u>Purpose</u>: To provide for a prudent and planned future leasing and development program for oil shale resources.<br><br><u>Exception</u>: The drilling location will be permitted only in the event that it is established to the satisfaction of the Authorized Officer that such drilling will not interfere with the mining and recovery of oil shale deposits or the extraction of shale oil by in situ methods or that the interest of the United States would best be served thereby.<br><br><u>Modification</u>: None.<br><br><u>Waiver</u>: None. | | | X | X |
| **CSU-27** | | | | |
| **Oil Shale** | | | | |
| <u>Stipulation</u>: A maximum of four pads per section would be allowed in areas identified in the 1986 Oil Shale Agreement.<br><br><u>Area</u>: 86,000 acres<br><br><u>Purpose</u>: To provide for a prudent and planned future leasing and development program for oil shale resources.<br><br><u>Exception</u>: More than four pads per section may be allowed if the if the surface and oil shale mineral estate owners are in agreement that the pad locations will not adversely affect the orderly development of the oil shale resources.<br><br><u>Modification</u>: None.<br><br><u>Waiver</u>: May be waived if the surface and oil shale mineral estate owners are in agreement to allow the oil and gas lessee to locate more than four well pads per section. | | X | X | X |

BLM_0020348

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|:-:|:-:|:-:|:-:|
| **CSU-28** | | | | |
| **Permitted Coal Mine** | | | | |
| <u>Stipulation</u>: This area is included in the approved permit area for the Deserado Coal Mine. The oil and gas lessee must reach agreement with the federal coal lessee on the placement of wells or surface facilities within the coalmine permit area. Surface occupation may not be allowed within the mine permit area.<br><u>Area</u>: 12,000 acres<br><u>Purpose</u>: To protect the existing rights of the federal coal lessee.<br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if the coal lessee and the oil and gas lessee have reached an agreement as to the location of well(s) and surface facilities.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may waive this stipulation if the coal mining operation is abandoned. | X | | | |
| **CSU-29** | | | | |
| **Coal** | | | | |
| <u>Stipulation</u>: Permits for oil and gas drilling in all areas leased for coal along with the area adjacent to and south of the approved Deserado Coal Mine Permit Area are subject to this CSU. The oil and gas lessee must reach agreement with the federal coal lessee on the placement of wells or surface facilities within the coal lease and adjacent coalmine permit area. Surface occupation may not be allowed within the mine permit area.<br><u>Area</u>: 19,000 acres<br><u>Purpose</u>: To protect the existing rights of the federal coal lessee.<br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if the coal lessee and the oil and gas lessee have reached an agreement as to the location of well(s) and surface facilities.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may waive this stipulation if the coal mining operation is abandoned. | | X | | |
| **CSU-30** | | | | |
| **Coal** | | | | |
| <u>Stipulation</u>. Permits for oil and gas drilling in areas included in the Deserado Coal Mine Permit Area as well as the area adjacent to and south of the approved Deserado Coal Mine Permit Area are subject to this CSU. The oil and gas lessee must reach agreement with the federal coal lessee on the placement of wells or surface facilities within the coal lease and adjacent coalmine permit area. Surface occupation may not be allowed within the mine permit area.<br><u>Area</u>: 18,800 acres<br><u>Purpose</u>: To protect the existing rights of the federal coal lessee and protection of coal resources for future recovery.<br><u>Exception</u>: The Authorized Officer may grant an exception to this stipulation if the coal lessee and the oil and gas lessee have reached an agreement as to the location of well(s) and surface facilities.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer may waive this stipulation if the coal mining operation is abandoned. | | | X | X |

BLM_0020349

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-31** | | | | |
| **Recreation Management Emphasis Areas** | | | | |
| Stipulation: Anderson Gulch (2,000 acres), LO7 Hill (1,600 acres), and 3 Mile Gulch (4,200 acres) would be open to oil and gas leasing with a CSU stipulation. The CSU stipulation would be applied to surface-disturbing activities associated all other land use authorizations, permits, and leases granted in these areas. The Authorized Officer may impose land use measures and limitations designed to avoid, or reduce to acceptable levels, the short term and long term adverse effects on maintaining the prescribed ROS setting for Anderson Gulch, LO7 Hill, and Three Mile Gulch. Examples of measures and limitations include: 1) relocation of surface activities more than 660 feet; 2) deferring activities longer than 60 days; 3) limiting access to designated roads and trails; 4) limiting surface disturbance to certain seasons and times of day to minimize conflicts during periods of high recreation use; and 5) mitigation designed to reduce both the visual and auditory presence of oil and gas development activities.  Area: 7,700 acres  Purpose: To maintain and/or enhance targeted recreational opportunities, experiences, and benefits with a primary market-based strategy being "Community" for a market base of Meeker and the Upper White River Valley of northwestern Colorado.  Exception: The Authorized Officer may grant an exception to this stipulation if an environmental analysis indicates that the nature or conduct of the action, as proposed or conditioned would not directly or indirectly affect the purpose and intent of the management emphasis area, and/or would benefit the primary market-base of Meeker and the upper White River valley in northwestern  Modification: None.  Waiver: None. | | | X | |
| **CSU-32** | | | | |
| **Special Designations** | | | | |
| Stipulation: The following ACECs would be open to oil and gas leasing with a CSU stipulation: White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek.  Area: 70,100 acres  Purpose: These ACECs are known to contain, or have potential to contain, T/E plants or plants that are candidates for listing as T/E, State of Colorado plant species of concern, BLM sensitive plants, remnant vegetation associations, and/or unique plant communities. A plant inventory will be conducted prior to approving any surface disturbing activities within the ACEC boundaries. Surface disturbance will not be allowed within mapped locations of these plants. The presence of the above listed plants would require relocating surface disturbance or facilities more than 660 feet. The timing required for conducting the plant inventories may require deferring activities longer than 60 days.  Exception: This stipulation may be excepted by the Authorized Officer if an environmental analysis of the proposed action indicates that the plants of concern would not be affected.  Modification: None.  Waiver: None. | X | | | |

BLM_0020350

## Table A-2. Controlled Surface Use Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **CSU-33** | | | | |
| **Special Designations** | | | | |
| <u>Stipulation</u>: The following ACECs would be open to oil and gas leasing with a CSU stipulation: White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek.<br><br><u>Area</u>: 70,100 acres<br><br><u>Purpose</u>: Portions of these ACECs are known to contain, or have potential to contain, important biologically diverse plant communities, small aspen clones, riparian areas, and/or spruce-fir communities. Surface disturbance will not be allowed within mapped locations of these plant communities. The presence of the above listed plant communities would require relocating surface disturbance or facilities more than 660 feet. The timing required for conducting the plant inventories may require deferring activities longer than 60 days.<br><br><u>Exception</u>: In ACECs with important plant species or communities, an on-the-ground plant inventory conducted at the appropriate phenological period for the plants of interest would be required prior to considering any requests for exceptions. An exception may be granted by the Authorized Officer if an environmental analysis of the proposed action indicates that it would not cause adverse impacts or would have negligible adverse impacts on these plant communities. If an exception is granted, special design, construction, and implementation measures (including site specific dust abatement), may be required.<br><br><u>Modification</u>: None.<br><br><u>Waiver</u>: None. | | X | X | X |

BLM_0020351

*This page intentionally left blank*

BLM_0020352

# 4.0   Timing Limitation Stipulation Table

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-01** | | | | |
| **Elk Production Areas** | | | | |
| <u>Stipulation</u>: This area encompasses an elk production area. No development is allowed from May 15 through June 30. (Development can occur from July 1 through May 14).<br><br><u>Area</u>: 12,700 acres<br><br><u>Purpose</u>: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods of energetic challenge. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance.<br><br><u>Exception</u>: The Authorized Officer may grant an exception if an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity. An exception may also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to elk production or habitat condition. An exception may also be granted for actions intended to enhance the long term utility or availability of suitable habitat.<br><br><u>Modification</u>: The Authorized Officer may modify the size and timeframes of this stipulation if CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation. Modifications could be authorized if the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition. A modification may also be approved if the proponent, BLM, and CPW agree to compensation that satisfactorily offset detrimental impacts to elk production or habitat condition.<br><br><u>Waiver</u>: This stipulation may be waived if CPW determines that the area is no longer utilized by elk for production purposes. | X | | | X |

BLM_0020353

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-02** | | | | |
| **Big Game Severe Winter Range** | | | | |
| <u>Stipulation</u>: This area encompasses big game severe winter range. No development activity is allowed from December 1 through April 30. (Development is allowed from May 1 through November 30).<br><u>Area</u>: 446,600 acres<br><u>Purpose</u>: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods of energetic challenge. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance.<br><u>Exception</u>: The Authorized Officer may grant an exception if an environmental analysis indicates that the proposed action could be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity. An exception may also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game winter activities or habitat condition. Under mild winter conditions, when prevailing habitat or weather conditions allow early dispersal of animals from all or portions of a project area, an exception may be granted to suspend the last 60 days of this seasonal limitation. Severity of winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals were concentrated on the winter range during the winter months. Exceptions may also be granted for actions specifically intended to enhance the long term utility or availability of suitable habitat.<br><u>Modification</u>: The Authorized Officer may modify the size and timeframes of this stipulation if CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation. Modifications may also be authorized if the proposed action could be conditioned so as not to interfere with habitat function or compromise animal condition. In addition, if the proponent, BLM, and CPW agree to habitat compensation that satisfactorily offsets detrimental impacts to activity or habitat condition.<br><u>Waiver</u>: This stipulation may be waived if the CPW determines that all or specific portions of the area no longer satisfy this functional capacity. | X | | | X |

BLM_0020354

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-03** | | | | |
| **Deer and Elk Summer Range** | | | | |
| Stipulation: This area is located within deer and elk summer ranges, which due to limited extent, are considered critical habitat within appropriate CPW Game Management Units. This stipulation will not take effect until direct and indirect impacts to suitable summer range habitats exceed 10 percent of that available within the individual Game Management Units. When this threshold has been reached, no further development activity will be allowed from May 15 through August 15. (Development is allowed until 10 percent of individual GMU summer habitat has been affected, then additional development is allowed from August 16 through May 14). Area: 376,400 acres Purpose: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods of energetic challenge. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. Exception: The Authorized Officer may grant an exception if an environmental analysis indicates that the proposed action could be conditioned to have no additional influence on the utility or suitability of summer range habitats. An exception may also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to summer range function or habitat. Exceptions may also be granted for actions specifically intended to enhance the long term utility or availability of suitable habitat. Modification: The Authorized Officer may modify the size and timeframes of this stipulation if CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation. Modifications may also be authorized if the proposed action could be conditioned to have no additional influence on the utility or suitability of summer range habitats. Waiver: This stipulation may be waived if CPW determines that all or specific portions of the area no longer satisfy this functional capacity or that these summer ranges no longer merit critical habitat status. Waivers will also be applied to delineated summer range occurring below 7,350 feet in elevation. | X | | | X |

BLM_0020355

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-04** | | | | |
| **Pronghorn Production Area** | | | | |
| <u>Stipulation</u>: This area is located within a pronghorn production area. No development activity is allowed within this area between May 1 and June 30. The CPW has indicated that these features exist on public lands within the White River Resource Area but have not yet delineated specific areas that will be subject to this timing restriction.<br><br><u>Area</u>: CPW has indicated that these features exist on public lands within the White River Resource Area but have not yet delineated specific areas that will be subject to this timing restriction (0 acres).<br><br><u>Purpose</u>: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods of energetic challenge. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance.<br><br><u>Exception</u>: Exception language will be developed in cooperation with the CPW after the affected areas have been delineated.<br><br><u>Modification</u>: Modification language will be developed in cooperation with the CPW after the affected areas have been delineated.<br><br><u>Waiver</u>: Waiver language will be developed in cooperation with the CPW after the affected areas have been delineated. | X | | | X |

BLM_0020356

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-05** | | | | |
| **Big Game Severe Winter Range and Winter Concentration Areas** | | | | |
| Stipulation: All defined big game severe winter range, severe winter range/winter concentration areas, and winter concentration areas within the WRFO would be subject to a timing limitation from December 1 through April 30 which would be applied through lease stipulations or as COAs that could extend up to 120 days. Timing limitations would typically be applied regardless of weather conditions (i.e., to address of chronic influences). | | | | |
| Area: 493,500 acres | | | | |
| Purpose: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods when animals are physiologically or energetically challenged. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby reduce the extent of seasonal ranges subject to cumulative and chronic adverse behavioral effects (i.e., harassment, avoidance) attributable to oil and gas development. | | | | |
| Exception: The Authorized Officer may grant an exception under the following circumstances: 1) an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity, 2) the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game seasonal range function or utility, 3) an agreement can be reached whereby a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions, 4) for actions intended to enhance the long term utility or availability of suitable habitat, or 5) clustered development remaining within the following acute and collective thresholds (evaluated by total leaseholdings within a GMU). | | X | | |
| Acute Thresholds: The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations buffered by 660 feet on winter ranges and 1,300 feet on summer ranges. | | | | |
|    10 percent of deer winter range. | | | | |
|    10 percent of deer severe winter range. | | | | |
|    10 percent of deer summer range. | | | | |
|    10 percent of deer winter concentration area. | | | | |
|    5 percent of deer severe winter range/winter concentration area. | | | | |
|    0 percent of CPW-defined Restricted Development Areas. | | | | |
| Collective Thresholds: The area of collective effects would include the area of acute effects in addition to all residual and incomplete lease development activities buffered as above, including but not limited to: access corridors, multiple well pads awaiting further drilling or not meeting interim reclamation success criteria, linear ROWs that support vehicle traffic after final reclamation, and facilities receiving frequent visitation (i.e., an average greater than seven vehicle trips per pad per week). | | | | |
|    20 percent of deer winter range. | | | | |
|    20 percent of deer severe winter range. | | | | |
|    20 percent of deer summer range. | | | | |
|    20 percent of deer winter concentration area. | | | | |
|    10 percent of deer severe winter range/winter concentration area. | | | | |

BLM_0020357

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
|    5 percent of CPW-defined Restricted Development Areas. | | | | |
| The area of acute effects would be exempt from big game seasonal timing limitations as long as lease development activities are managed within the thresholds for collective and acute effects. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations. Construction activity that is unrelated to the exercise of lease rights would continue to be subject to timing limitations as established above. Development activities that may affect adjoining leaseholders' acreage would be assessed against the proponent's threshold calculation. Access or other features and facilities used in common would be prorated by operator. | | | | |
| Adverse effects that exceed either the acute or collective threshold would nullify the timing limitation exemptions and subject all leaseholding development to timing limitations as established above. | | | | |
| Threshold limits could be incrementally adjusted by BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring. | | | | |
| <u>Modification</u>: The Authorized Officer may modify the size and time frames of this stipulation if: 1) CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, 2) the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition, 3) the proponent, BLM, and CPW agree to compensation that satisfactorily offsets detrimental impacts to big game production or habitat condition, or 4) an agreement can be reached where by a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the lease area is no longer utilized for, or capable of serving as, seasonal habitat for big game. | | | | |

BLM_0020358

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-06** | | | | |
| **Big Game Winter Range** | | | | |
| <u>Stipulation</u>: All defined big game winter range would be subject to deferrals of up to 90 days within the period of December 1 through April 30 in stratified zones of seasonal use (refined set of seasonal use timeframes developed in coordination with CPW). Timing limitations would typically be applied regardless of weather conditions (i.e., to address of chronic influences). <br> <u>Area</u>: 847,200 acres <br> <u>Purpose</u>: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods when animals are physiologically or energetically challenged. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby reduce the extent of seasonal ranges subject to cumulative and chronic adverse behavioral effects (i.e., harassment, avoidance) attributable to oil and gas development. <br> <u>Exception</u>: The Authorized Officer may grant an exception under the following circumstances: 1) an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity, 2) the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game seasonal range function or utility, 3) an agreement can be reached whereby a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions, 4) for actions intended to enhance the long term utility or availability of suitable habitat, or 5) clustered development remaining within the following acute and collective thresholds (evaluated by total leaseholdings within a GMU). <br> Acute Thresholds: The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations buffered by 660 feet on winter ranges and 1,300 feet on summer ranges. <br>    10 percent of deer winter range. <br>    10 percent of deer severe winter range. <br>    10 percent of deer summer range. <br>    10 percent of deer winter concentration area. <br>    5 percent of deer severe winter range/winter concentration area. <br>    0 percent of CPW-defined Restricted Development Areas. <br> Collective Thresholds: The area of collective effects would include the area of acute effects in addition to all residual and incomplete lease development activities buffered as above, including but not limited to: access corridors, multiple well pads awaiting further drilling or not meeting interim reclamation success criteria, linear ROWs that support vehicle traffic after final reclamation, and facilities receiving frequent visitation (i.e., an average greater than seven vehicle trips per pad per week). <br>    20 percent of deer winter range. <br>    20 percent of deer severe winter range. <br>    20 percent of deer summer range. <br>    20 percent of deer winter concentration area. <br>    10 percent of deer severe winter range/winter concentration area. | | X | | |

BLM_0020359

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| 5 percent of CPW-defined Restricted Development Areas. | | | | |
| The area of acute effects would be exempt from big game seasonal timing limitations as long as lease development activities are managed within the thresholds for collective and acute effects. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations. Construction activity that is unrelated to the exercise of lease rights would continue to be subject to timing limitations as established above. Development activities that may affect adjoining leaseholders' acreage would be assessed against the proponent's threshold calculation. Access or other features and facilities used in common would be prorated by operator. | | | | |
| Adverse effects that exceed either the acute or collective threshold would nullify the timing limitation exemptions and subject all leaseholding development to timing limitations as established above. | | | | |
| Threshold limits could be incrementally adjusted by BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring. | | | | |
| Modification: The Authorized Officer may modify the size and time frames of this stipulation if: 1) CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, 2) the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition, 3) the proponent, BLM, and CPW agree to compensation that satisfactorily offsets detrimental impacts to big game production or habitat condition, or 4) an agreement can be reached where by a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions. | | | | |
| Waiver: The Authorized Officer may grant a waiver if CPW determines that the lease area is no longer utilized for, or capable of serving as, seasonal habitat for big game. | | | | |

BLM_0020360

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-07** | | | | |
| **Big Game Summer Range** | | | | |
| <u>Stipulation</u>: All defined big game summer range areas within the WRFO would be subject to a timing limitation from May 15 through August 15 which would be applied through lease stipulations or as COAs that could extend up to 120 days.<br><u>Area</u>: 437,900 acres<br><u>Purpose</u>: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods when animals are physiologically or energetically challenged. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby reduce the extent of seasonal ranges subject to cumulative and chronic adverse behavioral effects (i.e., harassment, avoidance) attributable to oil and gas development.<br><u>Exception</u>: The Authorized Officer may grant an exception under the following circumstances: 1) an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity, 2) the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game seasonal range function or utility, 3) an agreement can be reached whereby a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions, 4) for actions intended to enhance the long term utility or availability of suitable habitat, or 5) clustered development remaining within the following acute and collective thresholds (evaluated by total leaseholdings within a GMU).<br>Acute Thresholds: The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations buffered by 660 feet on winter ranges and 1,312 feet on summer ranges.<br>  10 percent of deer winter range.<br>  10 percent of deer severe winter range.<br>  10 percent of deer summer range.<br>  10 percent of deer winter concentration area.<br>  5 percent of deer severe winter range/winter concentration area.<br>  0 percent of CPW-defined Restricted Development Areas.<br>Collective Thresholds: The area of collective effects would include the area of acute effects in addition to all residual and incomplete lease development activities buffered as above, including but not limited to: access corridors, multiple well pads awaiting further drilling or not meeting interim reclamation success criteria, linear ROWs that support vehicle traffic after final reclamation, and facilities receiving frequent visitation (i.e., an average greater than seven vehicle trips per pad per week).<br>  20 percent of deer winter range.<br>  20 percent of deer severe winter range.<br>  20 percent of deer summer range.<br>  20 percent of deer winter concentration area.<br>  10 percent of deer severe winter range/winter concentration area.<br>  5 percent of CPW-defined Restricted Development Areas. | | X | | |

BLM_0020361

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| The area of acute effects would be exempt from big game seasonal timing limitations as long as lease development activities are managed within the thresholds for collective and acute effects. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations. Construction activity that is unrelated to the exercise of lease rights would continue to be subject to timing limitations as established above. Development activities that may affect adjoining leaseholders' acreage would be assessed against the proponent's threshold calculation. Access or other features and facilities used in common would be prorated by operator. | | | | |
| Adverse effects that exceed either the acute or collective threshold would nullify the timing limitation exemptions and subject all leaseholding development to timing limitations as established above. | | | | |
| Threshold limits could be incrementally adjusted by BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring. | | | | |
| <u>Modification</u>: The Authorized Officer may modify the size and time frames of this stipulation if: 1) CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, 2) the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition, 3) the proponent, BLM, and CPW agree to compensation that satisfactorily offsets detrimental impacts to big game production or habitat condition, or 4) an agreement can be reached where by a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the lease area is no longer utilized for, or capable of serving as, seasonal habitat for big game. | | | | |

BLM_0020362

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-08** | | | | |
| **Big Game Severe Winter Range and Winter Concentration Areas** | | | | |
| Stipulation: All defined big game severe winter range and severe winter range/winter concentration areas within the WRFO would be subject to a timing limitation from January 1 through April 30 which would be applied through lease stipulations or as COAs that could extend up to 90 days. Timing limitations would typically be applied regardless of weather conditions (i.e., to address of chronic influences).<br><br>Area: 379,500 acres<br><br>Purpose: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods when animals are physiologically or energetically challenged. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby reduce the extent of seasonal ranges subject to cumulative and chronic adverse behavioral effects (i.e., harassment, avoidance) attributable to oil and gas development.<br><br>Exception: The Authorized Officer may grant an exception under the following circumstances: 1) an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity, 2) the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game seasonal range function or utility, 3) an agreement can be reached whereby a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions, 4) for actions intended to enhance the long term utility or availability of suitable habitat, or 5) clustered development remaining within the following acute and collective thresholds (evaluated by total leaseholdings within a GMU).<br><br>Acute Thresholds: The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations buffered by 660 feet on all seasonal ranges.<br><br>    25 percent of deer winter range.<br>    25 percent of deer severe winter range.<br>    25 percent of deer summer range.<br>    25 percent of deer winter concentration area.<br>    10 percent of deer severe winter range/winter concentration area.<br>    5 percent of CPW-defined Restricted Development Areas.<br><br>Collective Thresholds: The area of collective effects would include the area of acute effects in addition to all residual and incomplete lease development activities buffered as above, including but not limited to: access corridors, multiple well pads awaiting further drilling or not meeting interim reclamation success criteria, linear ROWs that support vehicle traffic after final reclamation, and facilities receiving frequent visitation (i.e., an average greater than seven vehicle trips per pad per week).<br><br>    25 percent of deer winter range.<br>    25 percent of deer severe winter range.<br>    25 percent of deer summer range.<br>    25 percent of deer winter concentration area.<br>    20 percent of deer severe winter range/winter concentration area. | | | X | |

BLM_0020363

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| 5 percent of CPW-defined Restricted Development Areas. | | | | |
| The area of acute effects would be exempt from big game seasonal timing limitations as long as lease development activities are managed within the thresholds for collective and acute effects. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations. Construction activity that is unrelated to the exercise of lease rights would continue to be subject to timing limitations as established above. Development activities that may affect adjoining leaseholders' acreage would be assessed against the proponent's threshold calculation. Access or other features and facilities used in common would be prorated by operator. | | | | |
| Adverse effects that exceed either the acute or collective threshold would nullify the timing limitation exemptions and subject all leaseholding development to timing limitations as established above. | | | | |
| Threshold limits could be incrementally adjusted by BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring. | | | | |
| <u>Modification</u>: The Authorized Officer may modify the size and time frames of this stipulation if: 1) CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, 2) the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition, 3) the proponent, BLM, and CPW agree to compensation that satisfactorily offsets detrimental impacts to big game production or habitat condition, or 4) an agreement can be reached where by a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the lease area is no longer utilized for, or capable of serving as, seasonal habitat for big game. | | | | |

BLM_0020364

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-09** | | | | |
| **Big Game Winter Ranges** | | | | |
| Stipulation: All defined big game winter range and winter concentration areas would be subject to deferrals of up to 60 days within the period of January 1 through April 30 in stratified zones of seasonal use (refined set of seasonal use timeframes developed in coordination with CPW). Timing limitations would typically be applied regardless of weather conditions (i.e., to address of chronic influences).<br><br>Area: 961,200 acres<br><br>Purpose: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods when animals are physiologically or energetically challenged. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby reduce the extent of seasonal ranges subject to cumulative and chronic adverse behavioral effects (i.e., harassment, avoidance) attributable to oil and gas development.<br><br>Exception: The Authorized Officer may grant an exception under the following circumstances: 1) an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity, 2) the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game seasonal range function or utility, 3) an agreement can be reached whereby a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions, 4) for actions intended to enhance the long term utility or availability of suitable habitat, or 5) clustered development remaining within the following acute and collective thresholds (evaluated by total leaseholdings within a GMU).<br><br>Acute Thresholds: The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations buffered by 660 feet on all seasonal ranges.<br><br>    25 percent of deer winter range.<br>    25 percent of deer severe winter range.<br>    25 percent of deer summer range.<br>    25 percent of deer winter concentration area.<br>    10 percent of deer severe winter range/winter concentration area.<br>    5 percent of CPW-defined Restricted Development Areas.<br><br>Collective Thresholds: The area of collective effects would include the area of acute effects in addition to all residual and incomplete lease development activities buffered as above, including but not limited to: access corridors, multiple well pads awaiting further drilling or not meeting interim reclamation success criteria, linear ROWs that support vehicle traffic after final reclamation, and facilities receiving frequent visitation (i.e., an average greater than seven vehicle trips per pad per week).<br><br>    25 percent of deer winter range.<br>    25 percent of deer severe winter range.<br>    25 percent of deer summer range.<br>    25 percent of deer winter concentration area.<br>    20 percent of deer severe winter range/winter concentration area. | | | X | |

BLM_0020365

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| 5 percent of CPW-defined Restricted Development Areas. | | | | |
| The area of acute effects would be exempt from big game seasonal timing limitations as long as lease development activities are managed within the thresholds for collective and acute effects. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations. Construction activity that is unrelated to the exercise of lease rights would continue to be subject to timing limitations as established above. Development activities that may affect adjoining leaseholders' acreage would be assessed against the proponent's threshold calculation. Access or other features and facilities used in common would be prorated by operator. | | | | |
| Adverse effects that exceed either the acute or collective threshold would nullify the timing limitation exemptions and subject all leaseholding development to timing limitations as established above. | | | | |
| Threshold limits could be incrementally adjusted by BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring. | | | | |
| <u>Modification</u>: The Authorized Officer may modify the size and time frames of this stipulation if: 1) CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, 2) the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition, 3) the proponent, BLM, and CPW agree to compensation that satisfactorily offsets detrimental impacts to big game production or habitat condition, or 4) an agreement can be reached where by a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the lease area is no longer utilized for, or capable of serving as, seasonal habitat for big game. | | | | |

BLM_0020366

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-10** | | | | |
| **Big Game Summer Range** | | | | |
| Stipulation: All defined big game summer range areas within the WRFO would be subject to a timing limitation from May 15 through August 15 which would be applied through lease stipulations or as COAs that could extend up to 90 days. | | | | |
| Area: 437,900 acres | | | | |
| Purpose: Timing limitations are intended to reduce the intensity, frequency, and extent of disturbances imposed on animals occupying important seasonal habitats during periods when animals are physiologically or energetically challenged. The behavioral response of animals exposed to these disturbances generally elevates energetic demands (e.g., avoidance movements, elevated metabolism) or reduces foraging efficiency (e.g., disuse of available resources, reduced foraging efficiency) which suppresses animal fitness or reproductive performance. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby reduce the extent of seasonal ranges subject to cumulative and chronic adverse behavioral effects (i.e., harassment, avoidance) attributable to oil and gas development. | | | | |
| Exception: The Authorized Officer may grant an exception under the following circumstances: 1) an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity, 2) the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset anticipated impacts to big game seasonal range function or utility, 3) an agreement can be reached whereby a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions, 4) for actions intended to enhance the long term utility or availability of suitable habitat, or 5) clustered development remaining within the following acute and collective thresholds (evaluated by total leaseholdings within a GMU). | | | X | |
| Acute Thresholds: The area of acute effects would be defined by the physical footprint of those concentrated, intensive activities associated with, for example, pad and pipeline construction and well drilling and completion operations buffered by 660 feet on all seasonal ranges. | | | | |
|   25 percent of deer winter range. | | | | |
|   25 percent of deer severe winter range. | | | | |
|   25 percent of deer summer range. | | | | |
|   25 percent of deer winter concentration area. | | | | |
|   10 percent of deer severe winter range/winter concentration area. | | | | |
|   5 percent of CPW-defined Restricted Development Areas. | | | | |
| Collective Thresholds: The area of collective effects would include the area of acute effects in addition to all residual and incomplete lease development activities buffered as above, including but not limited to: access corridors, multiple well pads awaiting further drilling or not meeting interim reclamation success criteria, linear ROWs that support vehicle traffic after final reclamation, and facilities receiving frequent visitation (i.e., an average greater than seven vehicle trips per pad per week). | | | | |
|   25 percent of deer winter range. | | | | |
|   25 percent of deer severe winter range. | | | | |
|   25 percent of deer summer range. | | | | |
|   25 percent of deer winter concentration area. | | | | |
|   20 percent of deer severe winter range/winter concentration area. | | | | |
|   5 percent of CPW-defined Restricted Development Areas. | | | | |

BLM_0020367

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| The area of acute effects would be exempt from big game seasonal timing limitations as long as lease development activities are managed within the thresholds for collective and acute effects. Minor work involving lower intensity activity (e.g., installation of production facilities, reclamation) within the area of remaining collective effects would generally be subject to timing limitations. Construction activity that is unrelated to the exercise of lease rights would continue to be subject to timing limitations as established above. Development activities that may affect adjoining leaseholders' acreage would be assessed against the proponent's threshold calculation. Access or other features and facilities used in common would be prorated by operator. | | | | |
| Adverse effects that exceed either the acute or collective threshold would nullify the timing limitation exemptions and subject all leaseholding development to timing limitations as established above. | | | | |
| Threshold limits could be incrementally adjusted by BLM, in coordination with CPW, based on animal response or the influence of compensatory mitigation in meeting long-term population objectives, as determined through monitoring. | | | | |
| <u>Modification</u>: The Authorized Officer may modify the size and time frames of this stipulation if: 1) CPW monitoring information indicates that current animal use patterns are inconsistent with dates established for animal occupation, 2) the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition, 3) the proponent, BLM, and CPW agree to compensation that satisfactorily offsets detrimental impacts to big game production or habitat condition, or 4) an agreement can be reached where by a COGCC wildlife mitigation plan can be accommodated consistent with established RMP objectives and decisions. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the lease area is no longer utilized for, or capable of serving as, seasonal habitat for big game. | | | | |

BLM_0020368

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-11** | | | | |
| **Raptor Nests (Other than Special Status Species)** | | | | |
| Stipulation: No development activities are allowed within 0.25 mile of identified raptor nest sites from February 1 through August 15, or until fledgling and dispersal of young. (Development allowed from August 16 through January 31). <br> Area: 77,800 acres <br> Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest. <br> Exception: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Eagle Protection Act or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of active nesting attempts. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year. <br> Modification: The Authorized Officer may modify the size of the stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a Field Office perspective. <br> Waiver: A waiver may be granted by the Authorized Officer if documentation shows the nest site has remained unoccupied for a minimum of 3 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | X | | | |

BLM_0020369

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-12** | | | | |
| **Nocturnal Raptor Nests (Owls except for Burrowing Owls)** | | | | |
| <u>Stipulation</u>: Surface-disturbing and disruptive activities would not be allowed within 0.25 mile of active nest sites of northern saw-whet, flammulated, pygmy, long-eared, or great-horned owls during the period from nest territory establishment to dispersal of young from nest (within the period from February 1 through August 31).<br><u>Area</u>: 259,400 acres<br><u>Purpose</u>: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><u>Exception</u>: An exception to the TL can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year. An exception may be granted to these dates by the Authorized Officer, consistent with policies derived from federal administration of the Migratory Bird Treaty Act.<br><u>Modification</u>: The Authorized Officer may modify the TL dates or buffer distances if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | X | | |

BLM_0020370

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-13** | | | | |
| **Diurnal Raptor Nests** | | | | |
| Stipulation: Surface-disturbing and disruptive activities would not be allowed within 0.5 mile of active nest sites of Cooper's, sharp-shinned, red-tailed, and Swainson's hawks; northern harrier; prairie falcon; golden eagle, and osprey during the period from nest territory establishment to dispersal of young from nest (within the period from February 1 through August 31). | | | | |
| Area: 259,400 acres | | | | |
| Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest. | | | | |
| Exception: An exception to the TL can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year. An exception may be granted to these dates by the Authorized Officer, consistent with policies derived from federal administration of the Migratory Bird Treaty Act. | | X | | |
| Modification: The Authorized Officer may modify the TL dates or buffer distances if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period. | | | | |
| Waiver: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | | | |

BLM_0020371

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-14** | | | | |
| **Raptor Nests (Other than Special Status Species, Golden Eagle, and Prairie Falcon)** | | | | |
| <u>Stipulation:</u> Surface-disturbing and disruptive activities would not be allowed within 0.25 mile of active nest sites of those raptors that are not considered special-status during the period from nest territory establishment to dispersal of young from nest (within a period from February 1 through August 31).<br><u>Area:</u> 80,100 acres<br><u>Purpose:</u> To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><u>Exception:</u> An exception to the TL can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year. An exception may be granted to these dates by the Authorized Officer, consistent with policies derived from federal administration of the Migratory Bird Treaty Act.<br><u>Modification:</u> The Authorized Officer may modify the TL dates or buffer distances if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br><u>Waiver:</u> The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area in the long term. | | | **X** | |

BLM_0020372

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-15** | | | | |
| **Raptor Nests (Other than Special Status Species)** | | | | |
| <u>Stipulation</u>: Surface disturbing and disruptive activities would not be allowed within 0.25 mile of identified raptor nest sites from February 1 through August 15, or until fledgling and dispersal of young. (Development allowed from August 16 through January 31).<br><u>Area</u>: 77,800 acres<br><u>Purpose</u>: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><u>Exception</u>: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Eagle Protection Act or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of active nesting attempts. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year.<br><u>Modification</u>: The Authorized Officer may modify the size or the timeframes of the TL area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to interfere with adult attendance and visitation of the nest site, jeopardize survival of the eggs or nestlings, or otherwise impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a Field Office perspective.<br><u>Waiver</u>: A waiver may be granted by the Authorized Officer if documentation shows the nest site has remained unoccupied for a minimum of 3 years; or that the site conditions, including surrounding nest habitat, have changed such that there is no reasonable likelihood of site occupation for a subsequent minimum period of 10 years. | | | | X |

BLM_0020373

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-16** | | | | |
| **Sage-Grouse Winter Concentration Areas** | | | | |
| <u>Stipulation</u>: This area encompasses sagebrush habitats that are occupied by wintering concentrations of grouse, or represent the only habitats that remain available for use during periods of heavy snowpack. No development activity will be allowed between December 16 and March 15.<br><br><u>Area</u>: CPW has indicated that these features exist on public lands within the WRFO Planning Area but have not yet delineated specific areas that will be subject to this timing restriction.<br><br><u>Purpose</u>: To prevent disturbances to wintering sage-grouse that may elevate energetic demands or displace birds from favored forage and cover areas.<br><br><u>Exception</u>: Specific exception language will be developed in cooperation with CPW after the affected areas have been delineated.<br><br><u>Modification</u>: Specific modification language will be developed in cooperation with CPW after the affected areas have been delineated.<br><br><u>Waiver</u>: Specific waiver language will be developed in cooperation with CPW after the affected areas have been delineated. | X | | | |

BLM_0020374

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-17** | | | | |
| **Sage-Grouse Important Winter Use Areas** | | | | |
| <u>Stipulation</u>: Surface disturbing and disruptive activities would be prohibited from December 1 through March 15 in those areas most currently defined by CPW as serving important winter use functions for sage-grouse. This stipulation is intended to apply to construction, drilling, fracing, and completion activities, but may apply as well to operation, maintenance, and production activities that may disrupt winter use behaviors of sage-grouse.<br><br><u>Area</u>: 260,300 acres<br><br><u>Purpose</u>: To reduce disruption of important winter-use functions with the overall objective of expanding the distribution and promoting recovery of greater sage-grouse populations in the WRFO. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby confine and limit the extent of suitable habitat adversely influenced at any given time.<br><br><u>Exception</u>: The Authorized Officer may grant an exception under the following circumstances:<br>1) An environmental analysis and consultation with CPW indicates that the proposed action could be conditioned so as not to elevate energetic demands or displace birds from favored forage and cover area,<br>2) The proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated losses of winter habitat,<br>3) For actions designed to enhance the long term utility or availability of suitable winter habitat, or<br>4) Clustered development so that the extent of sage-grouse habitat subject to cumulative adverse habitat and behavioral effects (defined below) attributable to oil and gas development would not exceed any of the following thresholds:<br>  a) 10 percent of occupied habitat mapped as showing evidence of occupation in last 5 years within 4 miles of active or inactive leks (subject to concurrence of CPW),<br>  b) 20 percent of sage-steppe communities used solely for winter functions or occupied habitat greater than 4 miles from an active or inactive lek, and<br>  c) 25 percent of suitable but unoccupied habitat within 4 miles of an active or inactive lek.<br>The extent of adverse behavioral effects is defined by collective development activity buffered by 660 feet, in addition to any habitat parcels that become physically or behaviorally isolated by development features and are unavailable for effective use by sage-grouse (e.g., impediments to movement and use). Development activity includes, but is not limited to: construction, drilling, and completion operations; trunk and gathering pipeline construction and reclamation; access roads; wells receiving frequent visitation (i.e., average of more than seven vehicle trips per pad per week); and well pads not fully developed or reclaimed to established WRFO reclamation standards (interim or final, as appropriate).<br><br>Reclaimed habitat that does not meet minimum functional habitat properties would be assessed against the threshold. Reclamation success on sage-grouse habitats would be contingent on evidence of successful establishment of desired sagebrush forms on disturbed acreage or achieving minimum functional capacity to serve sage-grouse cover and forage needs. Reclamation assessments would consider site capability and seasonal habitat use, and may allow for surrogate (e.g., herbaceous) forms of cover, where appropriate, per Appendix A, "Structural Habitat Guidelines" from Colorado Greater Sage-grouse Conservation Plan. (Note: Sage-grouse thresholds would be considered separately but would also be integral with more expansive big game summer range thresholds).<br><br><u>Modification</u>: The Authorized Officer may modify the size or dates of the timing limitation area if site-specific information and ensuing environmental analysis indicates that the | | X | | |

**Table A-3. Timing Limitation Stipulations**

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| proposed action could be conditioned or conducted so as not to adversely affect the condition or distribution of wintering birds, winter use behaviors, or sustained fidelity to, and occupation of birds within the area influenced by development activity. A modification may also be granted if the proponent, BLM, CPW, and other appropriate regulatory entities, devise a mutually acceptable compensation or operating plan that would satisfactorily offset or reduce the anticipated loss of winter use habitat or activities. The BLM would encourage the voluntary application of this strategy to private holdings. Acreage on fee land holdings below the occupied habitat threshold that are considered by CPW to be of comparable or higher sage-grouse value could be substituted for federally administered acreage with the approval of the WRFO Authorized Officer | | | | |
| Waiver: The Authorized Officer may grant a waiver if BLM in cooperation with the CPW and other appropriate regulatory entities determine that the described lands are incapable of serving the long term requirements of sage-grouse winter habitat and that these ranges no longer warrant current or future consideration as components of sage-grouse habitat. | | | | |

BLM_0020376

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-18** | | | | |
| **Sage-Grouse Important Winter Use Areas** | | | | |
| <u>Stipulation:</u> Surface disturbing and disruptive activities would be prohibited from January 1 through March 15 in those areas most currently defined by CPW as serving important winter use functions for sage-grouse. This stipulation is intended to apply to construction, drilling, fracing, and completion activities, but may apply as well to operation, maintenance, and production activities that may disrupt winter use behaviors of sage-grouse. <br> <u>Area:</u> 260,300 acres <br> <u>Purpose:</u> To reduce disruption of important winter-use functions with the overall objective of expanding the distribution and promoting recovery of greater sage-grouse populations in the WRFO. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby confine and limit the extent of suitable habitat adversely influenced at any given time. <br> <u>Exception:</u> The Authorized Officer may grant an exception under the following circumstances: an environmental analysis and consultation with CPW indicates that the proposed action could be conditioned so as not to elevate energetic demands or displace birds from favored forage and cover area, <br> 1) The proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated losses of winter habitat, <br> 2) For actions designed to enhance the long term utility or availability of suitable winter habitat, or <br> 3) Clustered development so that the extent of sage-grouse habitat subject to cumulative adverse habitat and behavioral effects (defined below) attributable to oil and gas development would not exceed any of the following thresholds: <br>    a) 20 percent of occupied habitat mapped as showing evidence of occupation in last 5 years within 4 miles of active or inactive leks (subject to concurrence of CPW), <br>    b) 25 percent of occupied habitat greater than 4 miles from an active or inactive lek, and <br>    c) 25 percent of suitable but unoccupied habitat within 4 miles of an active or inactive lek. <br> The extent of adverse behavioral effects is defined by collective development activity buffered by 330 feet, in addition to any habitat parcels that become physically or behaviorally isolated by development features and are unavailable for effective use by sage-grouse (e.g., impediments to movement and use). Development activity includes, but is not limited to: construction, drilling, and completion operations; trunk and gathering pipeline construction and reclamation; access roads; wells receiving frequent visitation (i.e., average of more than seven vehicle trips per pad per week); and well pads not fully developed or reclaimed to established WRFO reclamation standards (interim or final, as appropriate). <br> Reclaimed habitat that does not meet minimum functional habitat properties would be assessed against the threshold. Reclamation success on sage-grouse habitats would be contingent on evidence of successful establishment of desired sagebrush forms on disturbed acreage or achieving minimum functional capacity to serve sage-grouse cover and forage needs. Reclamation assessments would consider site capability and seasonal habitat use, and may allow for surrogate (e.g. herbaceous) forms of cover, where appropriate, per Appendix A, "Structural Habitat Guidelines" from Colorado Greater Sage-grouse Conservation Plan. (Note: Sage-grouse thresholds would be considered separately but would also be integral with more expansive big game summer range thresholds). <br> <u>Modification:</u> The Authorized Officer may modify the size or dates of the timing limitation area if site-specific information and ensuing environmental analysis indicates that the proposed action could be conditioned or conducted so as not to adversely affect the condition | | | X | |

BLM_0020377

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| or distribution of wintering birds, winter use behaviors, or sustained fidelity to, and occupation of birds within, the area influenced by development activity. A modification may also be granted if the proponent, BLM, CPW, and other appropriate regulatory entities, devise a mutually acceptable compensation or operating plan that would satisfactorily offset or reduce the anticipated loss of winter use habitat or activities. The BLM would encourage the voluntary application of this strategy to private holdings. Acreage on fee land holdings below the occupied habitat threshold that are considered by CPW to be of comparable or higher sage-grouse value could be substituted for federally administered acreage with the approval of the WRFO Authorized Officer. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if BLM in cooperation with the CPW and other appropriate regulatory entities determine that the described lands are incapable of serving the long term requirements of sage-grouse winter habitat and that these ranges no longer warrant current or future consideration as components of sage-grouse habitat. | | | | |

BLM_0020378

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-19** | | | | |
| **Sage-Grouse Important Winter Use Areas** | | | | |
| <u>Stipulation</u>: Surface-disturbing and disruptive activities would be prohibited from January 15 through March 15 in winter concentration areas as defined by CPW.<br><br><u>Area</u>: 260,300 acres<br><br><u>Purpose</u>: To prevent disturbances to wintering sage-grouse that may elevate energetic demands or displace birds from favored forage and cover areas.<br><br>To prevent disruptions of nesting and early-brooding sage-grouse that may result in absences of the brooding hen sufficient to cause direct or indirect mortality of the eggs or young.<br><br><u>Exception</u>: The Authorized Officer may grant an exception if an environmental analysis and coordination with CPW indicate that the proposed action could be conditioned so as not to adversely affect breeding behavior, nest attendance, egg/chick survival, or nesting success, or winter distribution and survival. An exception could also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated loss of nesting habitat or nesting activities, or winter habitat or overwintering activities. Actions designed to enhance the long term utility or availability of suitable nest or winter habitat may be excepted.<br><br><u>Modification</u>: The Authorized Officer may modify the size or dates of the timing limitation area if an environmental analysis indicates that the proposed action could be conditioned so as not to adversely affect winter distribution or survival.<br><br><u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the described lands are incapable of serving the long term requirements of sage-grouse winter habitat and that these ranges no longer warrant consideration as components of sage-grouse wintering habitat. | | | | X |

BLM_0020379

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-20** | | | | |
| **Sage-Grouse Nesting Habitat** | | | | |
| <u>Stipulation</u>: This area encompasses suitable sage-grouse nesting habitat associated with individual leks. This stipulation will not take effect until direct and indirect impacts to suitable nesting cover exceeds 10 percent of the habitat available within 2 miles of identified leks. Further development, after this threshold has been exceeded, will not be allowed from April 15 through July 7. (Development can occur until 10 percent of the habitat associated with a lek is impacted, from then on, additional activity can occur from July 8 through April 14.)<br><br><u>Area</u>: 152,500 acres<br><br><u>Purpose</u>: To prevent disruptions of nesting and early-brooding sage-grouse that may result in absences of the brooding hen sufficient to cause direct or indirect mortality of the eggs or young.<br><br><u>Exception</u>: The Authorized Officer may grant an exception if an environmental analysis and consultation with CPW indicates that the proposed action could be conditioned so as not to affect nest attendance, egg/chick survival, or nesting success. An exception could also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated losses of nesting habitat or nesting activities. Actions designed to enhance the long term utility or availability of suitable nest habitat may be excepted.<br><br><u>Modification</u>: The Authorized Officer may modify the size of the TL area if an environmental analysis indicates that the proposed action could be conditioned so as not to affect nest attendance, egg/chick survival, or nesting success. Timeframes may be modified if operations could be conditioned to allow a minimum of 70 percent of nesting attempts to progress through hatch.<br><br><u>Waiver</u>: This stipulation may be waived if CPW determines that the described lands are incapable of serving the long term requirements of sage-grouse nesting habitat and that these ranges no longer warrant consideration as components of sage-grouse nesting habitat. | X | | | |

BLM_0020380

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-21** | | | | |
| **Sage-Grouse Nesting Habitat** | | | | |
| <u>Stipulation</u>: Surface disturbing and disruptive activities would be prohibited from April 1 through July 15 in suitable sage-grouse nesting habitat within a 4-mile radius of active and inactive leks or mapped habitat greater than 4 miles from a lek that has supported nest or early brood functions within the previous 5 years. This stipulation is intended to apply to construction, drilling, fracing, and completion activities, but may apply as well to operation, maintenance, and production activities that may disrupt reproductive activities of sage-grouse.<br><u>Area</u>: 152,500 acres<br><u>Purpose</u>: To prevent disruptions of nesting and early-brooding sage-grouse that may result in absences of the brooding hen sufficient to cause direct or indirect mortality of the eggs or young. The overall objective is to expand the distribution of and promote the recovery of greater sage-grouse populations in the WRFO. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby confine and limit the extent of suitable habitat adversely influenced at any given time.<br><u>Exception</u>: The Authorized Officer may grant an exception under the following circumstances:<br>1)  An environmental analysis and consultation with CPW indicates that the proposed action could be conditioned so as not to affect nest attendance, egg/chick survival, or nesting success,<br>2)  The proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated losses of nesting habitat or nesting activity,<br>3)  For actions designed to enhance the long term utility or availability of suitable nesting habitat, or<br>4)  Clustered development so that the extent of sage-grouse habitat subject to cumulative adverse habitat and behavioral effects (defined below) attributable to oil and gas development would not exceed any of the following thresholds:<br>   a)  10 percent of occupied habitat mapped as showing evidence of occupation in last 5 years within 4 miles of active or inactive leks (subject to concurrence of CPW),<br>   b)  20 percent of sage-steppe communities used solely for winter functions or occupied habitat greater than 4 miles from an active or inactive lek, and<br>   c)  25 percent of suitable but unoccupied habitat within 4 miles of an active or inactive lek.<br>The extent of adverse behavioral effects is defined by collective development activity buffered by 660 feet, in addition to any habitat parcels that become physically or behaviorally isolated by development features and are unavailable for effective use by sage-grouse (e.g., impediments to movement and use). Development activity includes, but is not limited to: construction, drilling, and completion operations; trunk and gathering pipeline construction and reclamation; access roads; wells receiving frequent visitation (i.e., average of more than seven vehicle trips per pad per week); and well pads not fully developed or reclaimed to established WRFO reclamation standards (interim or final, as appropriate).<br>Reclaimed habitat that does not meet minimum functional habitat properties would be assessed against the threshold. Reclamation success on sage-grouse habitats would be contingent on evidence of successful establishment of desired sagebrush forms on disturbed acreage or achieving minimum functional capacity to serve sage-grouse cover and forage needs. Reclamation assessments would consider site capability and seasonal habitat use, and may allow for surrogate (e.g. herbaceous) forms of cover, where appropriate, per Appendix A, "Structural Habitat Guidelines" from Colorado Greater Sage-grouse Conservation Plan. (Note: Sage-grouse thresholds would be considered separately but would also be integral with more expansive big game summer range thresholds). | | X | | |

BLM_0020381

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| <u>Modification</u>: The Authorized Officer may modify the size or dates of the timing limitation area if site-specific information and ensuing environmental analysis indicates that the proposed action could be conditioned or conducted so as not to adversely affect nest attendance, egg/chick survival, nesting success, or sustained fidelity to, and occupation of birds within, the area influenced by development activity. Nesting timeframes may be adjusted if appropriate monitoring data supports the primary objective of allowing 90 percent of initial nesting attempts, on average, to progress through hatch. A modification may also be granted if the proponent, BLM, CPW, and other appropriate regulatory entities, devise a mutually acceptable compensation or operating plan that would satisfactorily offset or reduce the anticipated loss of nesting habitat or activities. The BLM would encourage the voluntary application of this strategy to private holdings. Acreage on fee land holdings below the occupied habitat threshold that are considered by CPW to be of comparable or higher sage-grouse value could be substituted for federally administered acreage with the approval of the WRFO Authorized Officer. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if BLM in cooperation with the CPW and other appropriate regulatory entities determine that the described lands are incapable of serving the long term requirements of sage-grouse nesting habitat and that these ranges no longer warrant current or future consideration as components of sage-grouse habitat. | | | | |

BLM_0020382

**Table A-3. Timing Limitation Stipulations**

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-22** | | | | |
| **Sage-Grouse Nesting Habitat** | | | | |
| <u>Stipulation</u>: Surface disturbing and disruptive activities would be prohibited from April 15 through July 7 in suitable sage-grouse nesting habitat within a 4-mile radius of active and inactive leks or mapped habitat greater than 4 miles from a lek that has supported nest or early brood functions within the previous 5 years. This stipulation is intended to apply to construction, drilling, fracing, and completion activities, but may apply as well to operation, maintenance, and production activities that may disrupt reproductive activities of sage-grouse.<br><u>Area</u>: 152,500 acres<br><u>Purpose</u>: To prevent disruptions of nesting and early-brooding sage-grouse that may result in absences of the brooding hen sufficient to cause direct or indirect mortality of the eggs or young. The overall objective is to expand the distribution of and promote the recovery of greater sage-grouse populations in the WRFO. This stipulation includes an exception criterion that is intended to promote the clustering of development activity and thereby confine and limit the extent of suitable habitat adversely influenced at any given time.<br><u>Exception</u>: The Authorized Officer may grant an exception under the following circumstances:<br>1) An environmental analysis and consultation with CPW indicates that the proposed action could be conditioned so as not to affect nest attendance, egg/chick survival, or nesting success;<br>2) The proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated losses of nesting habitat or nesting activity;<br>3) For actions designed to enhance the long term utility or availability of suitable nesting habitat; or<br>4) Clustered development so that the extent of sage-grouse habitat subject to cumulative adverse habitat and behavioral effects (defined below) attributable to oil and gas development would not exceed any of the following thresholds:<br>  a) 20 percent of occupied habitat mapped as showing evidence of occupation in last 5 years within 4 miles of active or inactive leks (subject to concurrence of CPW),<br>  b) 25 percent of occupied habitat greater than 4 miles from an active or inactive lek, and<br>  c) 25 percent of suitable but unoccupied habitat within 4 miles of an active or inactive lek.<br>The extent of adverse behavioral effects is defined by collective development activity buffered by 330 feet, in addition to any habitat parcels that become physically or behaviorally isolated by development features and are unavailable for effective use by sage-grouse (e.g., impediments to movement and use). Development activity includes, but is not limited to: construction, drilling, and completion operations; trunk and gathering pipeline construction and reclamation; access roads; wells receiving frequent visitation (i.e., average of more than seven vehicle trips per pad per week); and well pads not fully developed or reclaimed to established WRFO reclamation standards (interim or final, as appropriate).<br>Reclaimed habitat that does not meet minimum functional habitat properties would be assessed against the threshold. Reclamation success on sage-grouse habitats would be contingent on evidence of successful establishment of desired sagebrush forms on disturbed acreage or achieving minimum functional capacity to serve sage-grouse cover and forage needs based on site capability and seasonal habitat use and allowing, where appropriate, for surrogate (e.g., herbaceous) forms of cover as per Appendix A, "Structural Habitat Guidelines" from Colorado Greater Sage-grouse Conservation Plan. (Note: Sage-grouse thresholds would be considered separately but would also be integral with more expansive big game summer range thresholds). | | | X | |

BLM_0020383

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| <u>Modification</u>: The Authorized Officer may modify the size or dates of the timing limitation area if site-specific information and ensuing environmental analysis indicates that the proposed action could be conditioned or conducted so as not to adversely affect the condition or distribution of wintering birds, winter use behaviors, or sustained fidelity and occupation of birds to area influenced by development activity. With the primary objective of allowing for 70 percent of initial nesting attempts to progress through hatch, timeframes may also be adjusted in nesting habitat as supported by appropriate monitoring data. A modification may also be granted if the proponent, BLM, CPW, and other appropriate regulatory entities, devise a mutually acceptable compensation or operating plan that would satisfactorily offset or reduce the anticipated loss of winter use habitat or activities. The BLM would encourage the voluntary application of this strategy to private holdings. Acreage on fee land holdings below the occupied habitat threshold that are considered by CPW to be of comparable or higher sage-grouse value could be substituted for federally administered acreage with the approval of the WRFO Authorized Officer. | | | | |
| <u>Waiver</u>: The Authorized Officer may grant a waiver if BLM in cooperation with the CPW and other appropriate regulatory entities determine that the described lands are incapable of serving the long term requirements of sage-grouse winter habitat and that these ranges no longer warrant current or future consideration as components of sage-grouse habitat. | | | | |

BLM_0020384

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-23** | | | | |
| **Sage-Grouse Nesting Habitat** | | | | |
| <u>Stipulation</u>: Surface-disturbing and disruptive activities would be prohibited in suitable nesting/early brood habitat within 4 miles of an active lek from April 15 through June 15.<br><br><u>Area</u>: 152,500 acres<br><br><u>Purpose</u>: To prevent disruptions of nesting and early-brooding sage-grouse that may result in absences of the brooding hen sufficient to cause direct or indirect mortality of the eggs or young.<br><br><u>Exception</u>: The Authorized Officer may grant an exception if an environmental analysis and coordination with the CPW indicate that the proposed action could be conditioned so as not to adversely affect breeding behavior, nest attendance, egg/chick survival, nesting success, or survival. An exception could also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated loss of nesting habitat or nesting activities. Actions designed to enhance the long term utility or availability of suitable nest habitat may be excepted.<br><br><u>Modification</u>: The Authorized Officer may modify the size or dates of the timing limitation area if an environmental analysis indicates that the proposed action could be conditioned so as not to adversely affect nest attendance, egg/chick survival, nesting success, or survival. With the primary objective of allowing for 50 percent of initial nesting attempts to progress through hatch, timeframes may also be adjusted in nesting habitat as supported by appropriate monitoring data.<br><br><u>Waiver</u>: The Authorized Officer may grant a waiver if CPW determines that the described lands are incapable of serving the long term requirements of sage-grouse nesting habitat and that these ranges no longer warrant consideration as components of sage-grouse nesting habitat. | | | | X |

BLM_0020385

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-24** | | | | |
| **Sharp-tailed Grouse Nesting Habitat** | | | | |
| Stipulation: Surface-disturbing and disruptive activities would be prohibited within 1.25 miles of active leks or mapped nesting habitat for Columbian sharp-tailed grouse from March 1 through July 30. Area: Colorado Parks and Wildlife has indicated that these features exist on public lands within the White River Field Office but have not yet delineated specific areas that will be subject to this timing restriction. (~1500 acres) Purpose: To prevent disruptions of nesting and early-brooding sharp-tailed grouse that may result in absences of the brooding hen sufficient to cause direct or indirect mortality of the eggs or young. Exception: The Authorized Officer may grant an exception if an environmental analysis and coordination with CPW indicate that the proposed action could be conditioned so as not to affect breeding behavior, nest attendance, egg/chick survival, or nesting success. An exception could also be granted if the proponent, BLM, and CPW negotiate compensation that would satisfactorily offset the anticipated loss of nesting habitat or nesting activities. Actions designed to enhance the long term utility or availability of suitable nest habitat may be excepted. Modification: The Authorized Officer may modify the size of the timing limitation area if an environmental analysis indicates that the proposed action could be conditioned so as not to affect nest attendance, egg/chick survival, or nesting success. With the primary objective of allowing for 90 percent of initial nesting attempts to progress through hatch, timeframes may also be adjusted in nesting habitat as supported by appropriate monitoring data. Waiver: This stipulation may be waived if CPW determines that the described lands are incapable of serving the long term requirements of sharp-tailed nesting habitat and that these ranges no longer warrant consideration as components of sharp-tailed grouse nesting habitat. | | X | X | X |
| **TL-25** | | | | |
| **Migratory Birds** | | | | |
| Stipulation: Vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, and utility installation) would not be allowed during the core migratory bird nesting season (i.e., May 15 to July 15). Area: WRFO boundary Purpose: To prevent the inadvertent disruption of migratory bird reproductive efforts that results in mortality of eggs, nestlings, or fledglings. Exception: An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity would be conducted or conditioned so as not to disrupt ongoing reproductive efforts that would result in mortality of eggs, nestlings, or dependent fledglings. Modification: The Authorized Officer may modify the stipulation dates or stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conducted or conditioned so as not to disrupt ongoing reproductive efforts that would result in mortality of eggs, nestlings, or dependent fledglings. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to breeding activities. Waiver: A waiver may be granted if habitat conditions are determined to be permanently incapable of supporting reproductive activities. | | X | | |

BLM_0020386

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-26** | | | | |
| **Migratory Birds** | | | | |
| <u>Stipulation</u>: Vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, and utility installation) would not be allowed in higher value habitats during the core migratory bird nesting season (i.e., May 15 to July 15). Higher value habitats will be determined during on-site inspections and include the following: mature arboreal oakbrush, riparian (all elevations), spruce-fir (including Douglas-fir), aspen, and mature stands of pinyon-juniper. Disruptions to nesting activities of migratory birds in remaining habitats, particularly those with management priority (e.g., BLM-sensitive, FWS Birds of Conservation Concern, Colorado Partners in Flight high priority), would be avoided or minimized as much as practicable through the development of site-specific conditions of approval.<br><u>Area</u>: 818,100 acres<br><br><u>Purpose</u>: To reduce or minimize, as much as practicable, the inadvertent disruption of migratory bird reproductive efforts that results in mortality of eggs, nestlings, or fledglings.<br><br><u>Exception</u>: An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity would be conducted or conditioned so as to substantially reduce or minimize disruption of ongoing reproductive efforts that would result in mortality of eggs, nestlings, or dependent fledglings.<br><br><u>Modification</u>: The Authorized Officer may modify the stipulation dates or stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conducted or conditioned so as to substantially reduce or minimize disruption of ongoing reproductive efforts that would result in mortality of eggs, nestlings, or dependent fledglings. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to breeding activities.<br><br><u>Waiver</u>: A waiver may be granted if habitat conditions are determined to be permanently incapable of supporting reproductive activities. | | | X | |

BLM_0020387

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-27** | | | | |
| **Special Status Raptor Nests (Except Bald Eagles and Ferruginous Hawks)** | | | | |
| Stipulation: This area encompasses the nests of listed, proposed, or candidate T/E and BLM sensitive raptors other than bald eagles and ferruginous hawks. No development activities are allowed within 0.5 mile of identified nest sites from February 1 through August 15, or until fledgling and dispersal of young. (Development activities allowed from August 16 through January 31.)<br><br>Area: 19,800 acres<br><br>Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><br>Exception: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of active nesting attempts. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year. Section 7 consultation procedures would be instituted in those instances where an exception is being considered that involves a federally listed or proposed species.<br><br>Modification: The Authorized Officer may modify the size of the stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a Geographic Reference Area perspective. If a species status is downgraded, or if a species is delisted, the size of the TL area may be reduced. Section 7 consultation procedures would be instituted in those instances where a modification is being considered that involves a federally listed or proposed species.<br><br>Waiver: A waiver may be granted if the species becomes extinct or there is no reasonable likelihood of site occupation over a minimum 10 year period. Section 7 consultation procedures would be instituted in those instances where a waiver is being considered that involves a federally listed or proposed species. | X | | | X |

BLM_0020388

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-28** | | | | |
| **Bald Eagle Nests** | | | | |
| <u>Stipulation</u>: This area encompasses bald eagle nests. No development is allowed within 0.5 mile of identified nests from December 15 through July 15, or until fledgling and dispersal of young. (Development activities allowed from July 16 through December 14.)<br><u>Area</u>: 370 acres<br><u>Purpose</u>: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><u>Exception</u>: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of active nesting attempts. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year.<br><u>Modification</u>: The Authorized Officer may modify the size of the stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. If the species status is downgraded, or if the species is delisted, the size of the TL area may be reduced.<br><u>Waivers</u>. A waiver may be granted if the nest has remained unoccupied for a minimum of three years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | X | | | X |

BLM_0020389

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-29** | | | | |
| **Ferruginous Hawk Nests** | | | | |
| Stipulation: This area encompasses the nests of ferruginous hawks which are candidates for listing under the Endangered Species Act. No development is allowed within one mile of identified nests from February 1 through August 15, or until fledgling and dispersal of young. (Development activities allowed from August 16 through January 31.)<br><br>Area: 70,200 acres<br><br>Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><br>Exception: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of active nesting attempts. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year.<br><br>Modification: The Authorized Officer may modify the size of the stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a Geographic Reference Area perspective. If the species status is downgraded, or if the species is delisted, the size of the TL area may be reduced.<br><br>Waiver: A waiver may be granted if the nest has remained unoccupied for a minimum of three years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | X | | | X |

BLM_0020390

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-30** | | | | |
| **Bald Eagle Winter Roosts and Concentration Areas** | | | | |
| <u>Stipulation</u>: This area encompasses bald eagle winter roosts and concentration areas. No development is allowed within 0.5 mile of identified sites from November 15 through April 15. (Development allowed from April 16 through November 14.)<br><u>Area</u>: 2,800 acres<br><u>Purpose</u>: To prevent disruption of eagles occupying winter roost and concentration areas and to decrease the likelihood that these areas are abandoned due to ongoing activity.<br><u>Exception</u>: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of ongoing roosting activities and/or short or long term adverse modification of suitable roost site characteristics. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of the site for current or subsequent roosting activities or occupancy. An exception may also be granted if forms of compensation are satisfactorily negotiated (through Section 7 Consultation) which fully offset losses associated with project implementation.<br><u>Modification</u>: The Authorized Officer may modify the size of the stipulation area or timeframes if an environmental analysis indicates that a portion of the area is nonessential to roost site function and utility, or that the proposed action could be conditioned so as not to impair the utility of the roost site for current or subsequent roosting activities or occupancy.<br><u>Waiver</u>: A waiver may be granted if the species becomes extinct, the site has failed to support roosting activities over a minimum 3 year period, or if the site conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | X | | | X |
| **TL-31** | | | | |
| **Peregrine Falcon, Northern Goshawk, and Burrowing Owl Nests** | | | | |
| <u>Stipulation</u>: Surface disturbing and disruptive activities would not be allowed within 0.5 mile of identified nests of peregrine falcon, northern goshawk, and burrowing owl from February 1 through August 15 or until fledging and dispersal of young.<br><u>Area</u>: 79,300 acres<br><u>Purpose</u>: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: None. | | X | | |

BLM_0020391

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-32** | | | | |
| **Bald Eagle Nests** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.5 mile of identified nests of bald eagles from November 15 through July 31 or until fledging and dispersal of young.<br>Area: 370 acres<br>Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br>Exception: None.<br>Modification: None.<br>Waiver: None. | | X | | |
| **TL-33** | | | | |
| **Bald Eagle Critical Night Roosts** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.5 mile of identified bald eagle critical night roosts from November 15 through March 15.<br>Area: 2,800 acres<br>Purpose: To prevent disruptions to bald eagles that may result in eagle injury or abandonment of the site.<br>Exception: None.<br>Modification: None.<br>Waiver: None. | | X | | |
| **TL-34** | | | | |
| **Bald Eagle Winter Hunting Perches** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.25 mile of identified bald eagle winter hunting perches from November 15 through March 15.<br>Area: 2,800 acres<br>Purpose: To prevent disruptions to bald eagles that may elevate energetic demands or displace birds from favored forage areas.<br>Exception: None.<br>Modification: None.<br>Waiver: None. | | X | | |
| **TL-35** | | | | |
| **Ferruginous Hawk Nests** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within one mile of identified nests of ferruginous hawks from February 1 through August 15 or until fledging and dispersal of young.<br>Area: 70,200 acres<br>Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br>Exception: None.<br>Modification: None.<br>Waiver: None. | | X | | |

BLM_0020392

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-36** | | | | |
| **Special Status Raptor (Except Bald Eagles), Golden Eagle, and Prairie Falcon Nests** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.5 mile of identified nests of federal endangered, threatened, proposed, and candidate raptor species; Colorado state endangered, threatened, and special-status raptor species; or BLM sensitive raptor species from February 1 through August 15 or until fledging and dispersal of young. Area: 79,300 acres Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest. Exception: An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest site for current or subsequent nesting activity or occupancy. The Authorized Officer may grant an exception if a nest is unattended or remains unoccupied by May 15 of the project year. An exception may also be granted to this timing limitation by the Authorized Officer consistent with policies derived from federal administration of the Migratory Bird Treaty Act. Section 7 consultation procedures would be instituted in those instances where an exception is being considered that involves a federally listed or proposed species. Modification: The Authorized Officer may modify the stipulation dates or buffer distances if an environmental analysis indicates that a portion of the area is nonessential to the utility or function of the feature, or that the proposed action could be conditioned so as not to impair the utility of the site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected agencies or interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of five years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period. Section 7 consultation procedures would be instituted in those instances where a modification is being considered that involves a federally listed or proposed species. Waiver: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of further nesting activity within the lease area. Section 7 consultation procedures would be instituted in those instances where a waiver is being considered that involves a federally listed or proposed species. | | | X | |

BLM_0020393

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-37** | | | | |
| **Bald Eagle Nests** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.5 mile of identified nests of bald eagles from November 15 through July 31 or until fledging and dispersal of young.<br>Area: 370 acres<br>Purpose: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br>Exception: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Endangered Species Act, Eagle Protection Act, or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of active nesting attempts. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy. The Authorized Officer may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year.<br>Modification: The Authorized Officer may modify the size of the stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation. If the species status is downgraded, or if the species is delisted, the size of the TL area may be reduced.<br>Waiver: A waiver may be granted if the nest has remained unoccupied for a minimum of 5 years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | | | X | |
| **TL-38** | | | | |
| **Bald Eagle Critical Night Roosts** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.5 mile of identified bald eagle critical night roosts from November 15 through March 15.<br>Area: 2,800 acres<br>Purpose: To prevent disruptions to bald eagles that may result in eagle injury or abandonment of the site.<br>Exception: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Eagle Protection Act or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of ongoing roosting activities and/or short or long term adverse modification of suitable roost site characteristics. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of the site for current or subsequent roosting activities or occupancy. An exception may also be granted if forms of compensation are satisfactorily negotiated which fully offset losses associated with project implementation.<br>Modification: The Authorized Officer may modify the size of the stipulation area or timeframes if an environmental analysis indicates that a portion of the area is nonessential to roost site function and utility, or that the proposed action could be conditioned so as not to impair the utility of the roost site for current or subsequent roosting activities or occupancy.<br>Waiver: A waiver may be granted if the species becomes extinct, the site has failed to support roosting activities over a minimum 5 year period, or if the site conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | | | X | |

BLM_0020394

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-39** | | | | |
| **Bald Eagle Winter Hunting Perches** | | | | |
| Stipulation: Surface disturbing and disruptive activities would not be allowed within 0.25 mile of identified bald eagle winter hunting perches from November 15 through March 15.<br><br>Area: 2,800 acres<br><br>Purpose: To prevent disruptions to bald eagles that may elevate energetic demands or displace birds from favored forage areas.<br><br>Exception: An exception may be granted to these dates by the Authorized Officer, if authorization is obtained from the FWS (through applicable provisions of the Eagle Protection Act or Migratory Bird Treaty Act) to harass, harm, wound, or kill in the context of ongoing perching activities and/or short or long term adverse modification of suitable winter hunting perch characteristics. An exception can also be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of the site for current or subsequent perching activities or occupancy. An exception may also be granted if forms of compensation are satisfactorily negotiated which fully offset losses associated with project implementation.<br><br>Modification: The Authorized Officer may modify the size of the stipulation area or timeframes if an environmental analysis indicates that a portion of the area is nonessential to perch site function and utility, or that the proposed action could be conditioned so as not to impair the utility of the perch site for current or subsequent perching activities or occupancy.<br><br>Waiver: A waiver may be granted if the species becomes extinct, the site has failed to support perching activities over a minimum 5 year period, or if the site conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10 year period. | | | X | |

BLM_0020395

## Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-40** | | | | |
| **Ferruginous Hawk Nests** | | | | |
| <u>Stipulation</u>: Surface disturbing and disruptive activities would not be allowed within one mile of identified nests of ferruginous hawks from February 1 through August 15 or until fledging and dispersal of young.<br><u>Area</u>: 79,300 acres<br><u>Purpose</u>: To prevent disruptions of nesting raptors that may result in absences of adults sufficient to cause direct or indirect mortality of the eggs or young or the premature departure of young from the nest.<br><u>Exception</u>: An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest site for current or subsequent nesting activity or occupancy. The Authorized Officer may grant an exception if a nest is unattended or remains unoccupied by May 15 of the project year. An exception may also be granted to this timing limitation by the Authorized Officer consistent with policies derived from federal administration of the Migratory Bird Treaty Act. Section 7 consultation procedures would be instituted in those instances where an exception is being considered that involves a federally listed or proposed species.<br><u>Modification</u>: The Authorized Officer may modify the stipulation dates or buffer distances if an environmental analysis indicates that a portion of the area is nonessential to the utility or function of the feature, or that the proposed action could be conditioned so as not to impair the utility of the site for current or subsequent nest activities or occupation. The stipulation may also be modified if the proponent, BLM, and where necessary, other affected agencies or interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. A modification may be granted if the nest has remained unoccupied for a minimum of five years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period.<br>Section 7 consultation procedures would be instituted in those instances where a modification is being considered that involves a federally listed or proposed species.<br><u>Waiver</u>: The Authorized Officer may grant a waiver if conditions have changed such that there is no reasonable likelihood of further nesting activity within the lease area. Section 7 consultation procedures would be instituted in those instances where a waiver is being considered that involves a federally listed or proposed species. | | | X | |
| **TL-41** | | | | |
| **Canada Lynx** | | | | |
| <u>Stipulation</u>: Surface-disturbing and disruptive activities that have the potential to disrupt the utility of habitat parcels suitable for Canada lynx denning functions would not be allowed from March 15 to July 15.<br><u>Area</u>: 1,800 acres<br><u>Purpose</u>: To maintain the integrity and utility of lynx denning habitat consistent with the Canada Lynx Conservation Assessment and Strategy guidelines.<br><u>Exception</u>: None.<br><u>Modification</u>: None.<br><u>Waiver</u>: The Authorized Officer, in consultation with the FWS, may grant a waiver to this stipulation if site conditions have changed sufficient to preclude lynx occupation of the lynx analysis unit (LAU). | X | | | |

BLM_0020396

### Table A-3. Timing Limitation Stipulations

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **TL-42** | | | | |
| **Canada Lynx** | | | | |
| <u>Stipulation</u>: Surface-disturbing and disruptive activities that have the potential to reduce the utility of habitat parcels suitable for Canada lynx denning functions would not be allowed from March 15 to July 15. <br> <u>Area</u>: 1,800 acres <br> <u>Purpose</u>: To maintain the integrity and utility of lynx denning habitat consistent with the Canada Lynx Conservation Assessment and Strategy guidelines. <br> <u>Exception</u>: The Authorized Officer, in consultation with FWS, may grant an exception to this stipulation if an environmental analysis indicates that the proposed or conditioned activities would not affect the long term suitability or utility of lynx denning habitat within lynx analysis units (LAUs). <br> <u>Modification</u>: The Authorized Officer, in consultation with FWS, may modify the size of the stipulation area or time frames if an environmental analysis indicates that a portion of the area is nonessential to the function and utility of lynx denning habitat, or that the proposed action could be conditioned so as not to impair the utility of denning habitat for lynx use and occupancy. <br> <u>Waiver</u>: The Authorized Officer, in consultation with the FWS, may grant a waiver to this stipulation if site conditions have changed sufficient to preclude lynx occupation of the LAU. | | | X | X |

BLM_0020397

*This page intentionally left blank*

BLM_0020398

# 5.0   Lease Notices Table

### Table A-4. Lease Notices

| Stipulation | A | B | C | D |
|---|:--:|:--:|:--:|:--:|
| **LN-01** | | | | |
| **Designated Surface and Groundwater Source Water Protection Zones** | | | | |
| <u>Lease Notice</u>: Development in designated surface and groundwater source water protection zones for public water supplies would require a plan that addresses drinking water sources. Mitigation measures that will be considered for inclusion in drinking water plans include, but are not limited to, the following: notification to the public water supply operator of the proposed development; use of closed loop drilling; pit lining requirements if pits are used; an emergency response program; and collection of baseline and long-term water quality data. <br> <u>Area</u>: White River Field Office | | X | X | |
| **LN-02** | | | | |
| **Produced Water** | | | | |
| <u>Lease Notice</u>: Evaporation would not be an acceptable disposal method for produced water from federal leases. Surface discharge of produced water would not be allowed. Injection of produced water from federal oil and gas leases would be required. <br> <u>Area</u>: White River Field Office | | X | | |
| **LN-03** | | | | |
| **Produced Water** | | | | |
| <u>Lease Notice</u>: Evaporation facilities for produced water disposal would not be approved on public lands. Surface discharge of produced water would not be approved for new projects. Existing surface discharges, approved under previous land use plans or authorizations, would be allowed to continue as long as they do not change or exceed water volumes or water quality specified during approval. <br> <u>Area</u>: White River Field Office | | | X | |
| **LN-04** | | | | |
| **Produced Water** | | | | |
| <u>Lease Notice</u>: Surface discharge of produced water that results in a conversion of ephemeral to perennial or intermittent stream systems would not be approved. <br> <u>Area</u>: White River Field Office | | | | X |
| **LN-05** | | | | |
| **Sage-Grouse Habitat Features** | | | | |
| <u>Lease Notice</u>: The BLM may impose management actions that mimic lease stipulations (i.e., > 660-foot moves, >60-day deferrals) on sage-grouse habitat features that are variable through time (e.g., leks), and/or may undergo distributional shifts through time (e.g., expansion onto restored ranges). <br> <u>Area</u>: White River Field Office | | X | X | |
| **LN-06** | | | | |
| **Sage-Grouse Complex Key Habitat Areas** | | | | |
| <u>Lease Notice</u>: An identified land base key to any given greater sage-grouse population subcomplex (defined by CPW) would be subject to additional conservation measures in an effort to retain an effective source population of sage-grouse in the subcomplex. These measures may include, but would not be limited to, well pad density limits, strict development schedules and timeframes, and facility siting that may involve moves of more than 660 feet. <br> <u>Area</u>: White River Field Office | | X | X | |

BLM_0020399

### Table A-4. Lease Notices

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **LN-07** | | | | |
| **Prairie Dog Towns** | | | | |
| <u>Lease Notice</u>: Lands within this lease parcel involve prairie dog ecosystems that constitute potential habitat for wild or reintroduced populations of the federally endangered black-footed ferret. Conservation and recovery efforts for the black-footed ferret are authorized by the Endangered Species Act of 1973 (as amended). The successful lessee may be required to perform special conservation measures prior to and during lease development. These measures may include one or more of the following:<br>1) Performing site-specific habitat analysis and/or participating in ferret surveys.<br>2) Participating in the preparation of a surface use plan of operations with BLM, FWS, and CPW, which integrates and coordinates long term lease development with measures necessary to minimize adverse impacts to black-footed ferrets or their habitat.<br>3) Abiding by special daily and seasonal activity restrictions on construction, drilling, product transport, and service activities.<br>4) Incorporating special modifications to facility siting, design, construction, and operation.<br>5) Providing in-kind compensation for habitat loss and/or displacement (e.g., special on-site rehabilitation/revegetation measures or off-site habitat enhancement).<br><u>Area</u>: Mapped Prairie Dog Towns | X | | | |
| **LN-08** | | | | |
| **Prairie Dog Towns** | | | | |
| <u>Lease Notice</u>: Lands within this lease parcel involve prairie dog ecosystems that constitute potential habitat for wild or reintroduced populations of the federally endangered black-footed ferret. Conservation and recovery efforts for the black-footed ferret are authorized by the Endangered Species Act of 1973 (as amended). The successful lessee may be required to perform special conservation measures prior to and during lease development. These measures may include one or more of the following:<br>1) Participating in the preparation of a surface use plan of operations with BLM, FWS, and CPW, which integrates and coordinates long term lease development with measures necessary to minimize adverse impacts to black-footed ferrets or their habitat.<br>2) Abiding by special daily and seasonal activity restrictions on construction, drilling, product transport, and service activities.<br>3) Incorporating special modifications to facility siting, design, construction, and operation.<br>4) Providing in-kind compensation for habitat loss and/or displacement (e.g., special on-site rehabilitation/revegetation measures or off-site habitat enhancement).<br><u>Area</u>: Mapped Prairie Dog Towns | | | X | |

BLM_0020400

## Table A-4. Lease Notices

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **LN-09** | | | | |
| **Endangered Species Act Section 7 Consultation** | | | | |
| Lease Notice: The lease may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act, as amended, I6 U.S.C. § 1531 et seq., including completion of any required procedure for conference or consultation. Area: White River Field Office | X | X | X | X |
| **LN-10** | | | | |
| **Wild Horse Habitat** | | | | |
| Lease Notice: This lease parcel encompasses a portion of a wild horse herd management area. In order to protect wild horses within this area, intensive development activities may be delayed for a specified 60 day period within the spring foaling period between March 1 and June 15.<br>The lessee may be required to perform special conservation measures within this area including:<br>1) Habitat improvement projects in adjacent areas if development displaces wild horses from critical habitat.<br>2) Disturbed watering areas would be replaced with an equal source of water, having equal utility.<br>3) Activity/improvements would provide for unrestricted movement of wild horses between summer and winter ranges.<br>Area: Herd Management Areas | X | X | X | X |
| **LN-11** | | | | |
| **Cultural Resources** | | | | |
| Lease Notice: Class III cultural resource inventory may be required prior to surface disturbing activities. Mitigation measures may be required to reduce the impacts of surface disturbances on the affected cultural resources. These mitigating measures may include, but are not limited to, relocation of roads, well pads and other facilities, evaluative testing, data recovery, and/or fencing. Mitigation may be required upon the discovery of any cultural resource. All cultural resource work must be performed by a BLM-permitted archaeologist. The BLM may charge Federal licensees and permittees project costs of preservation activities conducted under the National Historic Preservation Act as a condition to the issuance of such license or permit. [NHPA, as amended Section 110 (E) (g)]. Area: White River Field Office | X | X | X | |

BLM_0020401

**Table A-4. Lease Notices**

| Stipulation | A | B | C | D |
|---|---|---|---|---|
| **LN-12** | | | | |
| **Paleontological Values** | | | | |
| <u>Lease Notice</u>: This lease encompasses a PFYC 4 or PFYC 5 paleontological area and has the potential to contain important fossils. Prior to authorizing surface disturbing activities, the BLM will make a preliminary determination as to whether potential exists for the presence of fossil material. If potential exists for the presence of valuable fossils, the area will be required to have a Class I paleontological survey completed. Mapped fossil sites will be protected by applying the appropriate mitigation to the use authorization. Mitigation may involve the relocation of disturbance in excess of 660 feet, or excavation and recording of the fossil remains. Certain areas may require the presence of a qualified paleontologist to monitor operations during surface disturbing activities. The BLM will determine the disposition of any fossils discovered and excavated. <br> <u>Area</u>: Wasatch, Uinta, DeBeque, Upper Mesa Verde, Green River, and other formations containing scientifically significant fossil resources | X | | | |
| **LN-13** | | | | |
| **Paleontological Values** | | | | |
| <u>Lease Notice</u>: An on-the-ground survey would be required prior to approval of any surface disturbing activities to avoid resource bearing strata for PFYC Class 4 and 5 formations. Mitigation may be required upon the discovery of any vertebrate fossil or other scientifically-important paleontological resource. Mitigation of scientifically important paleontological resources may include avoidance, monitoring, collection, excavation, or sampling. Mitigation of discovered scientifically important paleontological resources might require the relocation of the disturbance over 330 feet. This and any subsequent mitigation work shall be conducted by a BLM-permitted paleontologist. The lessee shall bear all costs for inventory and mitigation (WO IM-2009-011). Exceptions to the survey requirement in these areas could be granted in areas having vertical to near-vertical (i.e., unsafe) slopes, areas of soil development, and areas covered with much vegetation, as these areas would be unlikely to produce recoverable fossils. For larger projects, an on-the-ground survey sample may be required of some likely fossiliferous PFYC 3 areas. <br> <u>Area</u>: PFYC 5: Morrison and Wasatch Formations; PFYC 4: Chinle, Glen Canyon, Cedar Mountain, Mowry Shale, Parachute Creek and Douglas Creek Members of the Green River Formation, Browns Park Formation, Williams Fork Formation, Iles Formation, Mesaverde Group, and Uinta Formation. Formations or members of formations could be added or removed from this list as additional data become available. | | X | X | X |
| **LN-14** | | | | |
| **Lands with Wilderness Characteristics** | | | | |
| <u>Lease Notice</u>: For non-WSA lands with wilderness characteristics, the BLM may apply a lease notice containing measures and limitations intended to maintain naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation. Examples of the measures and limitations in the lease notices may include: <br> 1) Limiting motorized access to trails and unimproved, non-maintained routes only, <br> 2) Vegetative screening and contouring, and <br> 3) Additional siting considerations to minimize visual impacts. <br> <u>Area</u>: Non-WSA lands with wilderness characteristics | | X | X | X |

BLM_0020402

# 6.0    Stipulation Crosswalk Table to Chapter 2 Records

## Table A-5. Stipulation Crosswalk to Chapter 2 Records

| RMPA Stipulation ID | Resource | Source |
|---|---|---|
| NSO-01 | Water Resources | Table 2-2, Record 12, Alt. B |
| NSO-02 | Landslide Areas | 1997 WRFO RMP/ROD, NSO-01, page A-2<br>Table 2-2, Record 15, Alt. A and D |
| NSO-03 | Landslide Areas | Table 2-2, Record 15, Alt. B |
| NSO-04 | Landslide Areas | Table 2-2, Record 15, Alt. C |
| NSO-05 | Saline Soils | Table 2-2, Record 16, Alt. B |
| NSO-06 | Saline Soils | Table 2-2, Record 16, Alt. C |
| NSO-07 | Steep Natural Slopes | Table 2-2, Record 17, Alt. B |
| NSO-08 | Steep Natural Slopes | Table 2-2, Record 17, Alt. C and D |
| NSO-09 | Priority Riparian/Wetland Habitats | Table 2-3, Record 20, Alt. B |
| NSO-10 | Remnant Vegetation Associations and BLM Sensitive Plant Species | 1997 WRFO RMP/ROD, NSO-09, page A-7<br>Table 2-3, Record 27, Alt. A;<br>Table 2-10, Record 16, Alt. A |
| NSO-11 | Remnant Vegetation Associations | Table 2-3, Record 27, Alt. B through D |
| NSO-12 | Ponderosa Pine and Sagebrush RVAs | Table 2-3, Record 28, Alt. B through D |
| NSO-13 | Oak Ridge SWA | 1997 WRFO RMP/ROD, NSO-10, page A-7<br>Table 2-4, Record 16, Alt. A |
| NSO-14 | State Wildlife Areas | Table 2-4, Record 16, Alt. B |
| NSO-15 | State Wildlife Areas | Table 2-4, Record 16, Alt. C |
| NSO-16 | Raptor Nests – Other Than Special Status Raptors | 1997 WRFO RMP/ROD, NSO-03, page A-4<br>Table 2-5, Record 11, Alt. A and D |
| NSO-17 | Northern Saw-Whet, Long-Eared, and Great-Horned Owl Nests | Table 2-5, Record 11, Alt. B |
| NSO-18 | Cooper's, Sharp-Shinned, Red-Tailed, and Swainson's Hawks; Flammulated and Pygmy Owls; Northern Harrier; and Osprey Nests | Table 2-5, Record 11, Alt. B |
| NSO-19 | Golden Eagle and Prairie Falcon Nests | Table 2-5, Record 11, Alt. B |
| NSO-20 | Raptor Nests – Other Than Special Status Raptors | Table 2-5, Record 11, Alt. C |
| NSO-21 | Sage-Grouse Habitat | Table 2-6, Record 17, Alt. B |
| NSO-22 | Sage-Grouse Leks | 1997 WRFO RMP/ROD, NSO-04, page A-5<br>Table 2-6, Record 18, Alt. A and D |
| NSO-23 | Sage-Grouse Leks | Table 2-6, Record 18, Alt. B |
| NSO-24 | Sharp-tailed Grouse Leks | Table 2-6, Record 21, Alt. B through D |
| NSO-25 | Prairie Dog Colonies | Table 2-9, Record 15, Alt. B |
| NSO-26 | Endangered Colorado River Fish | Table 2-9, Record 18, Alt. B |

BLM_0020403

**Table A-5. Stipulation Crosswalk to Chapter 2 Records**

| RMPA Stipulation ID | Resource | Source |
|---|---|---|
| NSO-27 | Endangered Colorado River Fish | Table 2-9, Record 18, Alt. C and D |
| NSO-28 | Special Status Raptor Nests | 1997 WRFO RMP/ROD, NSO-02, page A-3<br>Table 2-9, Record 28, Alt. A |
| NSO-29 | Bald Eagle, Ferruginous Hawk, Peregrine Falcon, and Northern Goshawk Nests | Table 2-9, Record 28, Alt. B |
| NSO-30 | Burrowing Owl Nests | Table 2-9, Record 28, Alt. B |
| NSO-31 | Special Status Raptor Nests | Table 2-9, Record 28, Alt. C |
| NSO-32 | Special Status Raptor Nests | Table 2-9, Record 28, Alt. D |
| NSO-33 | Abandoned Bald Eagle Nests | Table 2-9, Record 28, Alt. B |
| NSO-34 | Abandoned Bald Eagle Nests | Table 2-9, Record 28, Alt. C |
| NSO-35 | Bald Eagle Nocturnal Roosts & Concentration Areas | 1997 WRFO RMP/ROD, NSO-05, page A-5<br>Table 2-9, Record 29, Alt. A and D |
| NSO-36 | Bald Eagle Critical Night Roosts | Table 2-9, Record 29, Alt. B |
| NSO-37 | Bald Eagle Critical Night Roosts | Table 2-9, Record 29, Alt. C |
| NSO-38 | Federally Listed Plant Species | 1997 WRFO RMP/ROD, NSO-08, page A-6<br>Table 2-10, Record 15, Alt. A |
| NSO-39 | Federally Listed Plant Species | Table 2-10, Record 15, Alt. B |
| NSO-40 | Federally Listed Plant Species | Table 2-10, Record 15, Alt. C |
| NSO-41 | Federally Listed Plant Species | Table 2-10, Record 15, Alt. D |
| NSO-42 | BLM Sensitive Plant Species | Table 2-10, Record 16, Alt. B |
| NSO-43 | BLM Sensitive Plant Species | Table 2-10, Record 16, Alt. C |
| NSO-44 | Duck Creek Wickiup Village | 1997 WRFO RMP/ROD, NSO-07, page A-6<br>Table 2-12, Record 8, Alt. A |
| NSO-45 | Duck Creek Wickiup Village | Table 2-12, Record 8, Alt. B through D |
| NSO-46 | Mellen Hill | Table 2-12, Record 14, Alt. B through D |
| NSO-47 | Douglas-fir and Aspen on Slopes | Table 2-15, Record 10, Alt. B |
| NSO-48 | Douglas-fir and Aspen on Slopes | Table 2-15, Record 10, Alt. C |
| NSO-49 | Old Growth | Table 2-15, Record 12, Alt. B |
| NSO-50 | Oil Shale RD&D | Table 2-17, Record 21, Alt. B through D |
| NSO-51 | Active Sodium Mining | Table 2-17, Record 22, Alt. B through D |
| NSO-52 | Anderson Gulch, LO7 Hill, 3 Mile Gulch | Table 2-18, Record 5, Alt. B |
| NSO-53 | Anderson Gulch, 3 Mile Gulch | Table 2-18, Record 5, Alt. D |
| NSO-54 | ACECs | 1997 WRFO RMP/ROD, NSO-06, page A-6<br>Table 2-21, Record 13, Alt. A |
| NSO-55 | ACECs | Table 2-21, Record 13, Alt. B through D |
| NSO-56 | Lands with Wilderness Characteristics | Table 2-22, Record 7, Alt. B |
| NSO-57 | Source Water Protection for Public Water Supplies from Groundwater | Table 2-2, Record 23, Alt. B and C |

BLM_0020404

## Table A-5. Stipulation Crosswalk to Chapter 2 Records

| RMPA Stipulation ID | Resource | Source |
|---|---|---|
| NSO-58 | Protection for Impaired Waters in the Mesaverde Play Area | Table 2-2, Record 24, Alt. B and C |
| NSO-59 | Thornburgh/Battle of Milk Creek Site | Table 2-12, Record 13, Alt B |
| CSU-01 | Fragile Soils | 1997 WRFO RMP/ROD, CSO-01, page A-8 Table 2-2, Record 9, Alt. A and D |
| CSU-02 | Water Resources | Table 2-2, Record 12, Alt. C and D |
| CSU-03 | Saline Soils | Table 2-2, Record 16, Alt. D |
| CSU-04 | Steep Natural Slopes | Table 2-2, Record 17, Alt. B |
| CSU-05 | Steep Natural Slopes | Table 2-2, Record 17, Alt. C |
| CSU-06 | Riparian/Wetland Habitats | Table 2-3, Record 20, Alt. C |
| CSU-07 | Priority Riparian/Wetland Habitats | Table 2-3, Record 20, Alt. D |
| CSU-08 | Greater Sage-Grouse Leks | Table 2-6, Record 18, Alt. C |
| CSU-09 | Black-footed Ferret Management Areas | 1997 WRFO RMP/ROD, CSU-3, page A-9 Table 2-9, Record 11, Alt. A and D |
| CSU-10 | Black-footed Ferret Management Areas | Table 2-9, Record 11, Alt. C |
| CSU-11 | Colorado River Cutthroat Trout Habitat | 1997 WRFO RMP/ROD, CSU-6, page A-11 Table 2-9, Record 19 Alt. A |
| CSU-12 | Colorado River Cutthroat Trout Habitat | Table 2-9, Record 19, Alt. B, C, and D |
| CSU-13 | Colorado River Cutthroat Trout Habitat | Table 2-9, Record 20, Alt. B and C |
| CSU-14 | Bald Eagle Nest, Roost, and Perch Habitat | 1997 WRFO RMP/ROD, CSU-5, page A-10 Table 2-9, Record 26, Alt. A |
| CSU-15 | Bald Eagle Nest, Roost, and Perch Habitat | Table 2-9, Record 26, Alt. B and C |
| CSU-16 | BLM Sensitive Plant Species | Table 2-10, Record 16, Alt. D |
| CSU-17 | Texas-Missouri-Evacuation Creek | Table 2-12, Record 7, Alt. A through D |
| CSU-18 | Thornburgh/Battle of Milk Creek Viewshed | Table 2-12, Record 12, Alt. B through D |
| CSU-19 | Rock Art and Standing Architecture | 1997 WRFO RMP/ROD, CSU-7, page A-12 Table 2-12, Record 17, Alt. A |
| CSU-20 | Rock Art and Standing Architecture | Table 2-12, Record 17, Alt. B |
| CSU-21 | Rock Art and Standing Architecture | Table 2-12, Record 17, Alt. C |
| CSU-22 | Rock Art and Standing Architecture | Table 2-12, Record 17, Alt. D |
| CSU-23 | Protected Historic Properties and Resources | BLM Colorado State Lease Database Exhibit CO-39 |
| CSU-24 | Old Growth | Table 2-15, Record 12, Alt. C |
| CSU-25 | Oil Shale | Table 2-17, Record 21, Alt. B |
| CSU-26 | Oil Shale | Table 2-17, Record 21, Alt. C and D |
| CSU-27 | Oil Shale | Table 2-17, Record 21, Alt. B through D |

BLM_0020405

**Table A-5. Stipulation Crosswalk to Chapter 2 Records**

| RMPA Stipulation ID | Resource | Source |
|---|---|---|
| CSU-28 | Coal Mine | 1997 WRFO RMP/ROD, CSU-8, page A-12 Table 2-17, Record 23, Alt. A |
| CSU-29 | Coal Mine | Table 2-17, Record 23, Alt. B |
| CSU-30 | Coal Mine | Table 2-17, Record 23, Alt. C and D |
| CSU-31 | Anderson Gulch, LO7 Hill, 3 Mile Gulch | Table 2-18, Record 5, Alt. C |
| CSU-32 | ACEC | Table 2-21, Record 14, Alt. A |
| CSU-33 | ACEC | Table 2-21, Record 14, Alt. B through D |
| TL-01 | Elk Production Areas | 1997 WRFO RMP/ROD, TL-7, page A-19 Table 2-4, Record 12, Alt. A and D |
| TL-02 | Big Game Severe Winter Range | 1997 WRFO RMP/ROD, TL-8, page A-20 Table 2-4, Record 12, Alt. A and D |
| TL-03 | Deer and Elk Summer Range | 1997 WRFO RMP/ROD, TL-9, page A-21 Table 2-4, Record 12, Alt. A and D |
| TL-04 | Pronghorn Production Areas | 1997 WRFO RMP/ROD, TL-11, page A-21 Table 2-4, Record 12, Alt. A and D |
| TL-05 | Big Game Severe Winter Range and Winter Concentration Areas | Table 2-4, Record 12, Alt. B |
| TL-06 | Big Game Winter Range | Table 2-4, Record 12, Alt. B |
| TL-07 | Big Game Summer Range | Table 2-4, Record 12, Alt. B |
| TL-08 | Big Game Severe Winter Range and Winter Concentration Areas | Table 2-4, Record 12, Alt. C |
| TL-09 | Big Game Winter Ranges | Table 2-4, Record 12, Alt. C |
| TL-10 | Big Game Summer Range | Table 2-4, Record 12, Alt. C |
| TL-11 | Raptor Nests (Other than Threatened, Endangered, or Candidate Species) | 1997 WRFO RMP/ROD, TL-4, page A-16 Table 2-5, Record 11, Alt. A |
| TL-12 | Nocturnal Raptor Nests (Owls Other than Burrowing Owls) | Table 2-5, Record 11, Alt. B |
| TL-13 | Diurnal Raptor Nests (Including Burrowing Owls) | Table 2-5, Record 11, Alt. B |
| TL-14 | Raptor Nests (Other than Special Status Species) | Table 2-5, Record 11, Alt. C |
| TL-15 | Raptor Nests (Other than Threatened, Endangered, or Candidate Species) | Table 2-5, Record 11, Alt. D |
| TL-16 | Sage-Grouse Winter Concentration Areas | 1997 WRFO RMP/ROD, TL-10, page A-21 Table 2-6, Record 10, Alt. A |
| TL-17 | Sage-Grouse Important Winter Use Areas | Table 2-6, Record 10, Alt. B |
| TL-18 | Sage-Grouse Important Winter Use Areas | Table 2-6, Record 10, Alt. C |
| TL-19 | Sage-Grouse Winter Concentration Areas | Table 2-6, Record 10, Alt. D |
| TL-20 | Sage-Grouse Nesting Habitat | 1997 WRFO RMP/ROD, TL-10, page A-21 Table 2-6, Record 10, Alt. A |

BLM_0020406

## Table A-5. Stipulation Crosswalk to Chapter 2 Records

| RMPA Stipulation ID | Resource | Source |
|---|---|---|
| TL-21 | Sage-Grouse Nesting Habitat | Table 2-6, Record 10, Alt. B<br>Table 2-6, Record 16, Alt. B |
| TL-22 | Sage-Grouse Nesting Habitat | Table 2-6, Record 10, Alt. C<br>Table 2-6, Record 16, Alt. C |
| TL-23 | Sage-Grouse Nesting Habitat | Table 2-6, Record 10, Alt. D |
| TL-24 | Sharp-tailed Grouse Nesting Habitat | Table 2-6 Record 21, Alt B through D |
| TL-25 | Migratory Birds | Table 2-7, Record 6, Alt. B |
| TL-26 | Migratory Birds | Table 2-7, Record 6, Alt. C |
| TL-27 | Special Status Raptor Nests (Except Bald Eagles and Ferruginous Hawks) | 1997 WRFO RMP/ROD, TL-1, page A-13<br>Table 2-9, Record 30, Alt. A and D |
| TL-28 | Bald Eagle Nests | 1997 WRFO RMP/ROD, TL-2, page A-14<br>Table 2-9, Record 30, Alt. A and D |
| TL-29 | Ferruginous Hawk Nests | 1997 WRFO RMP/ROD, TL-3, page A-15<br>Table 2-9, Record 30, Alt. A, B, and D |
| TL-30 | Bald Eagle Winter Roosts and Concentration Areas | 1997 WRFO RMP/ROD, TL-5, page A-17<br>Table 2-9, Record 30, Alt. A and D |
| TL-31 | Peregrine Falcon, Northern Goshawk, and Burrowing Owl Nests | Table 2-9, Record 30, Alt. B |
| TL-32 | Bald Eagle Nests | Table 2-9, Record 30, Alt. B |
| TL-33 | Bald Eagle Critical Night Roosts | Table 2-9, Record 30, Alt. B |
| TL-34 | Bald Eagle Winter Hunting Perches | Table 2-9, Record 30, Alt. B |
| TL-35 | Ferruginous Hawk Nests | Table 2-9, Record 30, Alt. B |
| TL-36 | Special Status Raptor Nests (Except Bald Eagles) | Table 2-9, Record 30, Alt. C |
| TL-37 | Bald Eagle Nests | Table 2-9, Record 30, Alt. C |
| TL-38 | Bald Eagle Critical Night Roosts | Table 2-9, Record 30, Alt. C |
| TL-39 | Bald Eagle Winter Hunting Perches | Table 2-9, Record 30, Alt. C |
| TL-40 | Ferruginous Hawk Nests | Table 2-9, Record 30, Alt. C |
| TL-41 | Canada Lynx | Table 2-9, Record 36, Alt. B |
| TL-42 | Canada Lynx | Table 2-9, Record 36, Alt. C and D |
| LN-01 | Designated Surface and Groundwater Source Water Protection Zones | Table 2-2, Record 11, Alt. B and C |
| LN-02 | Produced Water | Table 2-2, Record 13, Alt. B<br>Table 2-2, Record 22, Alt. B |
| LN-03 | Produced Water | Table 2-2, Record 13, Alt. C<br>Table 2-2, Record 22, Alt. C |
| LN-04 | Produced Water | Table 2-2, Record 13, Alt. D<br>Table 2-2, Record 22, Alt. D |
| LN-05 | Sage-Grouse Habitat Features | Table 2-6, Record 11, Alt. B through D |

BLM_0020407

### Table A-5. Stipulation Crosswalk to Chapter 2 Records

| RMPA Stipulation ID | Resource | Source |
|---|---|---|
| LN-06 | Sage-Grouse Complex Key Habitat Areas | Table 2-6, Record 16, Alt. B and C |
| LN-07 | Prairie Dog Towns | 1997 WRFO RMP/ROD, LN-1, page A-22 Table 2-9, Record 15, Alt. A |
| LN-08 | Prairie Dog Towns | Table 2-9, Record 15, Alt. C |
| LN-09 | ESA Section 7 Consultation | BLM Colorado State Lease Database Exhibit CO-34 |
| LN-10 | Wild Horse Habitat | Table 2-11, Record 9, Alt. A through D |
| LN-11 | Cultural Resources | Table 2-12, Record 17, Alt. B through D |
| LN-12 | Paleontological Values | 1997 WRFO RMP/ROD, LN-2, page A-22 Table 2-13, Record 5, Alt. A |
| LN-13 | Paleontological Values | Table 2-13, Record 5, Alt. B through D |
| LN-14 | Lands with Wilderness Characteristics | Table 2-22, Record 7, Alt. C and D |

BLM_0020408

BLM

Appendix B

# Best Management Practices and Conditions of Approval



Public Lands USA: Use, Share, Appreciate

BLM_0020409

BLM_0020410

## Table of Contents

Page

1.0   INTRODUCTION ............................................................................................... B-1

2.0   BEST MANAGEMENT PRACTICES AND/OR CONDITIONS OF APPROVAL . B-2

    2.1   Air Resources ....................................................................................................... B-2

    2.2   Coal Resources ..................................................................................................... B-2

    2.3   Heritage Resources .............................................................................................. B-3

    2.4   Geophysical ........................................................................................................... B-4

    2.5   Oil and Gas ............................................................................................................ B-4

    2.6   Fire Management ................................................................................................. B-14

    2.7   Forestry ................................................................................................................ B-15

    2.8   Hazardous Wastes Management ...................................................................... B-15

    2.9   Range Management ............................................................................................. B-16

    2.10  Recreation Management .................................................................................... B-17

    2.11  Rights-of-Way ...................................................................................................... B-17

    2.12  Sodium Resources ............................................................................................. B-18

    2.13  Soil and Water Resources ................................................................................ B-19

    2.14  Special Status Species – Plants ....................................................................... B-20

    2.15  Vegetation and Invasive species ...................................................................... B-22

    2.16  Visual Resource Management .......................................................................... B-25

    2.17  Wild Horse Management ................................................................................... B-25

    2.18  Wildlife Management ......................................................................................... B-26

BLM_0020411

*Appendix B – Best Management Practices and Conditions of Approval*

*This page intentionally left blank*

BLM_0020412

## 1.0   Introduction

Best management practices (BMPs) are land and resource management techniques designed to maximize beneficial results and minimize negative impacts of management actions. Best management practices are applied as Conditions of Approval (COA) or may be selected by an applicant and incorporated into their request of authorization approvals. Best management practices are defined as methods, measures, or practices selected on the basis of site-specific conditions to provide the most effective, environmentally sound, and economically feasible means of managing an activity and mitigating its impacts. Interdisciplinary site-specific analysis is necessary to determine which management practices would be necessary to meet specific goals. Selection and implementation of any BMPs will be evaluated against the Colorado Public Land Health Standards (BLM, 1997b) to ensure progress toward public land health attainment. Best management practices include, but are not limited to, structural and nonstructural controls, operations, and maintenance procedures. Best management practices can be applied before, during, and after pollution-producing or surface-disturbing activities to reduce or eliminate the introduction of pollutants into receiving waters (40 Code of Federal Regulation 130.2(m), U.S. Environmental Protection Agency [EPA] Water Quality Standards Regulation) or to prevent unnecessary or undue degradation of resources.

Best Management Practices are identified as part of the National Environmental Policy Act (NEPA) process, with interdisciplinary involvement. Because the control of nonpoint sources of pollution and prevention of damage to other resources is an ongoing process, continual refinement of BMP design is necessary. This process can be described in five steps, which are: (1) selection of design of a specific BMP; (2) application of BMP; (3) monitoring; (4) evaluation; and (5) feedback. Data gathered through monitoring is evaluated and used to identify changes needed in BMP design, application, or in the monitoring program.

Best Management Practices described in this appendix are a compilation of existing policies and guidelines and commonly employed practices designed to assist in achieving the objectives for maintaining or minimizing water quality degradation from nonpoint sources; preventing the loss of soil productivity; providing guidelines for aesthetic conditions within watersheds; and mitigating impacts to soil, vegetation, or wildlife habitat from surface-disturbing activities. Best management practices are selected and implemented as necessary, based on site-specific conditions, to meet a variety of resource objectives for specific management actions. Therefore, this document does not provide an exhaustive list of BMPs, as additional BMPs or modifications may be identified to minimize the potential for negative impacts when evaluating site-specific management actions through an interdisciplinary process.

In addition, implementation and effectiveness of BMPs need to be monitored to determine whether the practices are achieving resource objectives and accomplishing desired goals. Adjustments will be made as necessary.

Each of the following BMPs are a part of the coordinated development of the White River Field Office (WRFO) Draft Resource Management Plan Amendment and Environmental Impact Statement (Draft RMPA/EIS) for Oil and Gas Development, and may be updated as new information becomes available to ensure objectives are met and to conform with changes in Bureau of Land Management (BLM) regulations, policy, direction, or new scientific information. Applicants also may suggest alternative procedures that could accomplish the same result. These guidelines will apply, where appropriate, to all use authorizations, including BLM-initiated projects. Any BMP listed may be used in any program wherever it may be effective.

BLM_0020413

Planning criteria were established to provide focus for data collection efforts, achieve compliance with legal mandates, and facilitate decision making. General and specific criteria that pertain to the RMPA/EIS are described in Chapter 1 of the Draft RMPA/EIS.

## 2.0   Best Management Practices and/or Conditions of Approval

### 2.1   *Air Resources*

The operator/holder will limit unnecessary emissions from point or nonpoint pollution sources and prevent air quality deterioration from necessary pollution sources in accordance with all applicable Federal, State, and local air quality laws and regulations.

The operator/holder will limit air pollutant emissions in accordance with management actions established in Chapter two and Appendix J of this RMP.

All access roads and the pipeline ROW will be treated with water and/or a BLM-approved chemical dust suppressant during construction and drilling activities so that there is not a visible dust plume behind vehicles. All vehicles will abide by company or public speed restrictions during all activities. If water is used as a dust suppressant, there should be no traces of oil or solvents in the water and it should be properly permitted for this use by the State of Colorado. Only water needed for abating dust should be applied; dust abatement should not be used as a water disposal option under any circumstances.

In the Mesaverde Play Area, proper road design, construction, and surfacing on resource roads (see BLM Manual Section 9113) would be required to achieve at least 80 percent reduction from uncontrolled fugitive dust emissions (using a combination of chemical suppression, watering, or other control measures). Resource roads in planning units other than the Mesaverde Play Area would be required to achieve at least 50 percent fugitive dust control effectiveness.

### 2.2   *Coal Resources*

All drill holes must be plugged with cement through the underground minable coal beds and aquifers for a distance of at least 50 feet above and below the coal beds and aquifers.

Holes may be plugged with a mud conditioner subject to the following: a. Drill holes encountering aquifers having artesian flow shall be plugged from bottom to top with a neat cement slurry or, at a minimum, be cemented across to a minimum of 50 feet on either side of the aquifer. b. Other drill holes not plugged with cement shall be plugged with abandonment mud having 10-second API gel strength of at least 20 pounds per 100 square feet and a filtrate volume not to exceed 13.5 cc, as determined by accepted procedures. The abandonment mud mix shall have a Marsh Funnel viscosity of at least 20 seconds per quart greater than that of the drilling fluid or at least 55 seconds Marsh Funnel viscosity.

All drill holes shall be plugged as soon after drilling as possible and at the surface with a minimum of five feet of cement.

Any hole proposed for groundwater monitoring must be completed and cemented to isolate all aquifer intervals that show significant head differences or changes in water quality to prevent mixing of unlike waters. Mineable coal beds also must be isolated using casing and cement.

BLM_0020414

All drilling fluid, foam, cuttings, and water must be contained on the drill site. Portable pits may be used; however, earth pits will be required if large volumes of fluid are encountered. Pits will be pumped out or allowed to dry completely before backfilling. Drill cuttings not returned to the hole shall be buried, hauled away, or scattered in a thin layer so they do not inhibit plant growth.

## 2.3    Heritage Resources

The <u>operator/holder/applicant</u> is responsible for informing all persons who are associated with the project that they will be subject to prosecution for knowingly disturbing archaeological sites or for collecting artifacts.

If any archaeological materials are discovered as a result of operations under this authorization, activity in the vicinity of the discovery will cease, and the BLM WRFO Archaeologist will be notified immediately. Work may not resume at that location until approved by the AO. The <u>operator/holder/applicant</u> will make every effort to protect the site from further impacts including looting, erosion, or other human or natural damage until BLM determines a treatment approach, and the treatment is completed. Unless previously determined in treatment plans or agreements, BLM will evaluate the cultural resources and, in consultation with the State Historic Preservation Office (SHPO), select the appropriate mitigation option within 48 hours of the discovery. The <u>operator/holder/applicant</u>, under guidance of the BLM, will implement the mitigation in a timely manner. The process will be fully documented in reports, site forms, maps, drawings, and photographs. The BLM will forward documentation to the SHPO for review and concurrence.

Pursuant to 43 CFR 10.4(g), the operator/holder/permittee/applicant must notify the Authorized Officer (AO), by telephone and written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony. Further, pursuant to 43 CFR 10.4(c) and (d), the operator/holder/permittee/applicant must stop activities in the vicinity of the discovery and protect it for 30 days or until notified to proceed by the AO.

Mineral material sales (e.g., sand and gravel) would not be allowed within the Canyon Pintado National Historic District (NHD).

Any new surface disturbance within the Canyon Pintado NHD would be required to be monitored by an approved and qualified archaeologist under the following conditions: Activity occurs in the vicinity of known resources. Activity occurs in the alluvial bottoms along Douglas Creek and its tributaries. Activity occurs in deep alluvial soils.

If any paleontological resources are discovered as a result of operations under this authorization, the operator/holder or any of his agents must stop work immediately at that site, immediately contact the BLM Paleontology Coordinator, and make every effort to protect the site from further impacts, including looting, erosion, or other human or natural damage. Work may not resume at that location until approved by the AO. The BLM or designated paleontologist will evaluate the discovery and take action to protect or remove the resource within 10 working days. Within 10 days, the operator will be allowed to continue construction through the site, or will be given the choice of either (a) following the Paleontology Coordinators instructions for stabilizing the fossil resource in place and avoiding further disturbance to the fossil resource, or (b) following the Paleontology Coordinators instructions for mitigating impacts to the fossil resource prior to continuing construction through the project area.

BLM_0020415

The operator/holder/ is responsible for informing all persons who are associated with the project operations that they will be subject to prosecution for disturbing or collecting vertebrate fossils, collecting large amounts of petrified wood (over 25lbs./day, up to 250lbs./year), or collecting fossils for commercial purposes on public lands.

Any excavations into the underlying native sedimentary rock must be monitored by a permitted paleontologist. The monitoring paleontologist must be present before the start of excavations that may impact bedrock.

## 2.4   Geophysical

In general, the BLM requires an examination of resource values and development of appropriate surface protection and reclamation measures before the geophysical contractor begins surface-disturbing activities associated with preliminary investigations. BLM will solicit involvement from public land users (e.g., grazing permittees) to develop site-specific protection measures and reclamation specifications. Compliance monitoring should occur during and after seismic exploration activities when or if necessary. Compliance inspections during the operation would ensure that requirements and guidelines are being followed. Compliance inspections upon completion of work would ensure that the lines are clean and drill holes are plugged properly.

Blasting or vibrating within 1/8-mile of federally-owned or controlled springs and flowing water wells would not be allowed.

Plugging of drill shot holes will conform to the Colorado Reclamation Standards Abandoned Drill Holes Act. Drill hole cuttings shall be placed back in the hole.

No blading or other dirt work will be allowed without specific written permission from the Area Manager.

## 2.5   Oil and Gas

### General
In conformance with Onshore Oil and Gas Order No. 1, operators would prepare and submit individual comprehensive drill site design plans for BLM approval. These plans would show the drill location layout over the existing topography, dimension of the location, volumes and cross-sections of cut and fill, location and dimensions of reserve pits, existing drainage patterns, and access road egress and ingress. Plans would be submitted and approved prior to initiation of construction.

Activities occurring during preliminary investigations may include remote sensing; mapping of rock outcrops and seeps (either of which result in little or no surface disturbance); and seismic, gravity, and magnetic surveys.

Operators would contact the BLM AO's field representative no earlier than 15 days and no later than 3 working days prior to commencement of construction activities. Construction under adverse conditions may require additional mitigation measures.

If applicable, the operator shall plan all activities and operations in a manner so as to avoid infringing on any timing limitations, without the need to apply for exceptions to the specified timing limitations.

BLM_0020416

In order to monitor activity, reclamation, and potential impacts to wildlife, the BLM WRFO requires notification of the following activities to the designated Natural Resource Specialist/Realty Specialist:

| Activity | Timeframe | Method |
|---|---|---|
| Construction[1]<br>Reclamation[2] | 24 hours<br>Prior to start | Sundry Notice<br>and either Email or Phone |
| Drilling Rig Moves on Location<br>Well Spud[3]<br>Drilling Rig Leaves Location | Within 24<br>Hours after<br>Start | Sundry<br>Notice |
| Completion Rig Moves on Location<br>Completion Rig Leaves Location | Within 24<br>Hours after start | Sundry<br>Notice |
| Work-Over Rig Moves on Location<br>Work-Over Rig Leaves Location | Within 24<br>Hours after start | Sundry<br>Notice |

NOTES:
[1] Construction-related activities may include, but are not limited to, pad and road construction, pad expansion, clearing pipeline corridors, trenching, recontouring. The Sundry Notice will include the well pad name, location, and date of construction.
[2] Reclamation activities may include, but are not limited to, seed bed preparation that requires disturbance of surface soils, seeding, or constructing exclosures (e.g., fences) to exclude livestock from reclaimed areas.
[3] Breaking ground for drilling surface casing.

**Post-Construction GIS Data Submission:**
In order to track reclamation of actions related to the development of Federal mineral resources, the operator shall provide the designated (Natural Resource Specialist [NRS] or Realty Specialist) with geospatial data in a format compatible with the WRFOs geographic information system (GIS) (i.e., point or polygon features). These data will be used to accurately locate and identify all geographic as-built (i.e., constructed and design implemented) features associated with this project.

- These data shall be submitted within 60 days of construction completion. If the operator is unable to submit the required information within the specified time period, the operator shall notify the designated [NRS or Realty Specialist] via email or phone, and provide justification supporting an extension of the required data submission time period.

- GIS polygon features may include, but are not limited to: full well pad footprints (including all stormwater and design features), constructed access roads/widths, existing roads that were upgraded/widths, temporary use areas, and pipeline corridors.

- Acceptable data formats are: (1) corrected global positioning system (GPS) files with sub-meter accuracy or better; (2) ESRI shapefiles or geodatabases; or (3) AutoCAD .dwg or .dxf files. If possible, both (2) and (3) should be submitted for each as-built feature. Geospatial data must be submitted in UTM Zone 13N, NAD 83, in units of meters. Data may be submitted as: (1) an email attachment or (2) on a standard compact disk (CD) in compressed (WinZip only) or uncompressed format. All data shall include metadata, for each submitted layer, that conforms to the Content Standards for Digital Geospatial Metadata from the Federal Geographic Data Committee standards. Questions shall be directed to WRFO BLM GIS staff at (970) 878-3800. If the operator is unable to send the data electronically, the operator shall submit the data on compact disk(s) to the designated [NRS or Realty Specialist].

- Internal and external review of the reporting process and the adequacy of the associated information to meet established goals will be conducted on an on-going basis. New information or changes in the reporting process will be incorporated into the request, as

BLM_0020417

appropriate. Subsequent permit application processing may be dependent upon successful execution of this request, as stated above.

Special location, design and reclamation measures may be required to protect scenic and natural landscape values and achieve the minimum adverse impact on visual quality. These design measures may include a variety of landscaping treatments and construction guidelines intended to minimize visual contrasts with surrounding landscapes. Surface disturbing activities may be moved up to 600 feet to avoid sensitive areas or to reduce the visual effects of the proposal. These measures would be applied to the following VRM Class II and Class III areas: (1) Canyon Pintado National Historic District; (2) State Highways 13, 40, 64 and 139 corridors; (3) Viewsheds in the Blue Mountain/Moosehead GRA; (4) White River Corridor; (5) Douglas and Baxter Pass divide; (6) Cathedral Bluffs; and (7) VRM Class II areas around Meeker. These measures may also be applied to other areas on a case by case basis.

### Reserve Pits, and Pits other Than Reserve Pits, and Drilling Muds

Prior to the onset of drilling, a "stock tight" fence would be installed on three sides of the reserve pit. This fence would be woven wire at least 28 inches high and within 4 inches of ground surface, with two strands of barbed wire above the woven wire with 10-inch spacing. The fence corners would be double H-brace panels constructed with treated wood corner posts or steel pipe posts of at least 4-inch outside diameter (see Gold Book, pgs. 16-18). The corner brace posts would securely set a minimum of 30 inches in the ground. Metal T-posts are not allowed for corner panel construction, but they may be used between corner panels. The fourth side of the reserve pit would be fenced after the drilling rig moves off the location. The fence would be located a maximum of 5 feet from the edge of the reserve pit. The double H-braces would be used on all corners of the pit area. The operator would implement measures to prevent wildlife and livestock from entering the reserve area during drilling and well completion operations before the fourth side of the fence has been constructed.

All reserve pits will be lined with a synthetic liner with a minimum thickness of 24 mils and shall be of a high-density polyethylene, polypropylene, poly vinyl chloride, hypalon, or other synthetic material that is impervious, weather resistant, and resistant to deterioration when in contact with hydrocarbons, aqueous acids, alkali, fungi, or other substances in the produced water. The synthetic liners shall also be resistant to deterioration by ultraviolet light, punctures and tearing, and shall be designed for the life of the pit.

The reserve pit will be allowed to dry through natural evaporation for up to six months after the drill rig has left the location. If a pit has not dried by the end of this period, all remaining fluids and/or mud must be removed and disposed of in an approved manner. The concentration of hazardous substances in the reserve pit at the time of pit backfilling must not exceed the standards set forth in CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act of 1980).

Before conducting any reserve pit evaporation, by means other than natural evaporation, the operator would submit a Sundry Notice for Authorized Officer approval. The Sundry Notice would provide a detailed description of the drying method. The operator is required to obtain authorization from the COGCC for pit fluid treatment by means other than natural evaporation.

Slope, grade, and other construction control stakes (e.g., exterior boundary centerline) would be placed, as necessary, to ensure construction in accordance with the surface use plan. The cut and fill slopes and spoil storage areas would be marked with a stake and/or lath at a minimum of 50-foot intervals. The tops of the stakes or laths would be painted or flagged in a distinctive color. All

BLM_0020418

boundary stakes and/or laths would be maintained in place until final construction cleanup is completed. If stakes are disturbed, they would be replaced before proceeding with construction.

It is the operator's responsibility to design and construct a liner system to contain fluids in the pits that contain liquids without compromising the integrity of the liners. Liners must be installed over smooth fill subgrade that is free of pockets, loose rocks, or other materials that could damage the liner. The pit should be padded with material if necessary to reduce potential damage to the liner by sharp rock edges. Sand, sifted soil or bentonite are suggested.

Reserve pits, evaporation ponds, or other oil and gas related pits shall be designed and operated in a manner that deters or prevents access to birds, waterfowl, livestock and wildlife. Pit netting is an example of a measure to accomplish this requirement.

Pits shall not be constructed on known intermittent or perennial springs, seeps, or other near surface water features. If groundwater is encountered during pit construction activity, pit construction shall cease and the location shall be reclaimed. An alternate location or an alternate plan (e.g., disposing of pit contents offsite or use of a closed loop and/or semi-closed loop system) must be submitted via Sundry Notice and approved by the AO before resuming operations. Pits shall be constructed, monitored, and operated to provide for a minimum of two feet of freeboard at all times and maintain fluids in pits at the lowest practicable level, subject to the type of operation in process.

All produced liquids shall be contained in a pit or tank, including the dehydrator vent/condensate line effluent. All production pits shall have a livestock-proof fence. All pits shall be bermed. Pits designed to contain fluids shall be constructed so that leaking or breaching problems are minimized and reclamation potential is maximized. At least 50percent of the pit capacity shall be in cut material. Since all pits may receive fluids from completion and fracing activities and soluble materials left in pits may migrate into the shallow groundwater, all pits (including cuttings pits) shall be lined with 24 mil reinforced liner and closed as per Onshore Order, Gold Book, and COGCC requirements. Pits may be allowed to air dry, but the use of chemicals to aid in fluid evaporation, stabilization, or solidification must have prior BLM approval.

If the COGCC requires the removal of the pit liner, the method of removal and location of disposal for pit liners and pit solids must be submitted to the AO and approved before beginning the pit closure. If pit liners are to be left in place, the fluids from the pit must be removed and/or evaporated before closing. The pit liner should be cut or folded at the mudline and the pit should be buried with at least 3 feet from final grade before interim reclamation efforts are started.

Pits remaining after the drilling period which store or are expected to store production fluids will be wired or netted to prevent or discourage entry by larger birds attracted to sources of water, including raptors and waterfowl. At a minimum, wire will be stretched over the entire length and breadth of the pit at intervals not exceeding three feet, and made permanently conspicuous either by choice of material or installation of flagging material evenly distributed across the pit at a minimum rate of one flag per 18 square feet.

Operators would submit a Sundry Notice describing how the oil contaminated drill cuttings would be treated to assure the oil stays contained in the cuttings and where the cuttings would be ultimately be stored (i.e., buried in the flare pit, buried in a separate "on-location" pit, or removed to a state-approved disposal site. Any on location disposal sites for the oil contaminated drill cuttings would be lined with a 12-mil or stronger impervious liner compatible with oils. A liner meeting this

BLM_0020419

specification also would be placed under any temporary storage area for the oil contaminated cuttings.

The operator shall exercise extreme caution to avoid discharging oil-based drilling mud into the reserve pit. Should an event occur, all oil from the surface of reserve pit will be removed within 24 hours.

Any drilling fluids pit that shows indications of containing hazardous wastes would be tested for the Toxicity Characteristic Leaching Procedure constituents. If analysis proves positive, the fluids would be disposed of in an approved manner. The cost of the testing and disposal would be borne by the potentially responsible party.

Drilling, well completion, and workover lights would be shrouded and directed on to the drilling platform and/or well pad, to the extent allowed by safety requirements, so that lights/glare are not directed away from the well pad.

Permanent and temporary lighting fixtures on oil and gas facilities should be shrouded and directed to illuminate only the location needed for work or safety. Care should be taken to not distract driving on roads adjacent to facilities, unnecessarily disrupt wildlife with lighting or contribute to light pollution not in keeping with rural and natural environments.

**Production Facilities**
All storage tank batteries, including drain sumps and sludge holdings at compressor facilities, installed on location and designed to contain any oil, glycol, produced water, or other fluid that may constitute a hazard to public health or safety, would be surrounded by a secondary means of containment for the entire contents of the largest single tank in use plus 1 foot of freeboard for precipitation or 110 percent of the capacity of the largest vessel. The appropriate containment and/or diversionary structures or equipment, including walls and floor, to prevent discharged fluid from reaching ground, surface, or navigable waters, would be impervious to any oil, glycol, produced water, or other fluid for 72 hours and would be constructed so that any discharge from a primary containment system (e.g., tank or pipe) would not drain, infiltrate, or otherwise escape to ground, surface, or navigable waters before cleanup is completed.

Treaters, dehydrators, and other production facilities installed on location that have the potential to leak or spill oil, glycol, produced water, or other fluid that may constitute a hazard to public health or safety, would be placed on or within an appropriate containment and/or diversionary structure to prevent spilled or leaking fluid from reaching ground, surface, or navigable waters. The appropriate containment and/or diversionary structure would be sufficiently impervious to oil, glycol, produced water, or other fluid and would be installed so that any spill or leakage would not drain, infiltrate, or otherwise escape to ground, surface, or navigable waters before cleanup is completed.

All aboveground permanent structures (permanent means onsite for longer than 90 days) not subject to safety requirements would be painted by the operator to blend with the natural color of the landscape. New production facilities would be painted a noncontrasting color that is harmonious with the surrounding landscape as specified and approved by the BLM on a case-specific basis.

The operator/holder assumes responsibility for the integrity of site [insert number] for the duration of the life or operation of [insert project/well pad name/number]. This includes, but is not limited to, having an approved archaeological consultant conduct yearly monitoring of site [insert number] as well as any stabilization or data recovery necessitated by site degradation, whether resulting from

BLM_0020420

construction and operation of [insert project/well pad name/number], vandalism, erosion, or any other cause.

## Well Plugging Standards

**A. Open Hole:** Cement plug shall be placed to extend at least from 50 feet below the bottom (except as limited by total depth (TD) or plugged back total depth (PBTD) to 50 feet above the top of (1) any zones encountered during drilling that contain fluid with a potential to migrate; (2) lost circulation zones; and (3) any potential valuable minerals, including noncommercial hydrocarbons, coal, and oil shale. Extremely thick sections may be secured by placing 100-foot plugs across the top and bottom of the formation. Lost circulation zones may require alternate methods. In the absence of productive zones or minerals that otherwise require placement of cement plugs, long sections of open hole shall be plugged at least every 3,000 feet. Such plugs shall be placed across in-gauge sections of the hole.

**B. Cased Hole:** Cement plug shall be placed opposite all open perforations and extend a minimum of 50 feet below (except as limited by TD or PBTD) to 50 feet above the perforated interval. In lieu of the cement plug, a bridge plug is acceptable, provided: (1) the plug is set as close as practical above the open perforations; (2) the perforations are isolated from any open hole below; and (3) the plug is capped-if cap is placed through tubing, a minimum of 50 feet of fill-up is required; if placed by bailer, a minimum of 35 feet of fill-up is needed. If production casing is cut and recovered, a cement plug shall be placed to extend at least 50 feet above and below the stub. An additional cement plug shall be placed to extend a minimum of 50 feet above and below the shoe of the surface casing (or intermediate string, as appropriate). The exposed hole resulting from the casing removal must be secured as required above.

**C. Annular Space:** No annular space that extends to the surface shall be left open to the drilled hole below. If this condition exists, a minimum of the top 50 feet of annulus shall be plugged with cement.

**D. Testing:** The first plug below the surface plug shall generally be tested by either tagging the plug with the working pipe string or pressuring to a minimum pump (surface) pressure of 1,000 psig with no more than a 10 percent drop during a 15-minute period (cased hole only). If the integrity of any other plug is questioned, it must be tested in the same manner. Also, any cement plug that is the only isolating medium for a fresh water interval or a zone containing a valuable mineral deposit should be tested by tagging with the drill string. Tagging the first plug below the surface plug will not be necessary where water flows or valuable mineral deposits have not been encountered.

**E. Surface Plug:** A cement plug of at least 50 feet shall be placed in the smallest casing that extends to the surface. The top of this plug shall be placed as near the eventual casing cut-off point as possible.

**F. Mud:** Each interval between the plugs shall be filled with mud of sufficient density to exert hydrostatic pressure exceeding the greatest formation pressure encountered while drilling such interval. In the absence of other information at the time plugging is approved, a minimum mud weight of nine pounds per gallon shall be specified.

**G. Surface Cap:** All casing shall be cut off at the base of the cellar or three feet below final restored ground level (whichever is deeper). The casing shall be filled from the cement plug to the surface with suitable material (e.g., cement, sand, gravel). The well bore must then be covered with a metal plate at least 1/4-inch thick, welded in place, or a four-inch pipe, extending four feet above

BLM_0020421

the recontoured ground surface and embedded in cement as specified by the authorized officer. The well location and identity shall be permanently inscribed on the pipe or plate.

## Surface Disturbance

Special design and reclamation measures may be required, as appropriate, to protect scenic and natural landscape values. This may include transplanting trees and shrubs, mulching and fertilizing disturbed areas, removing surfacing material, imprinting, irrigating, using low-profile permanent facilities, and painting to minimize visual contrasts. Surface-disturbing activities may be moved to avoid sensitive areas or to reduce the visual effects of the proposal.

Prior to approving surface-disturbing or potentially impacting activities within known or potential habitat for a listed, proposed or candidate plant species, a plant inventory conducted by a qualified botanist and an environmental analysis would be required for the Proposed Action. Based on the results of the plant survey, informal consultation with the FWS may be conducted during preparation of the environmental analysis. Formal consultation with the FWS would occur if the environmental analysis indicates a finding of possible impact to a listed species and the Proposed Action cannot be moved to avoid the impact.

All disturbed areas will be contoured to the original contours or at least to blend with the natural topography. Blending is defined as reducing form, line, shape and color contrast with the disturbing activity. In visually sensitive areas, all disturbed areas shall be contoured to match the original topography. Matching is defined as reproducing the original topography and eliminating form, line, shape and color caused by the disturbance as much as possible. See Appendix D (WRFO Surface Reclamation Plan) of the RMPA/EIS.

Pursuant to 43 CFR 10.4(g), the operator/holder/permittee/applicant must notify the Authorized Officer (AO), by telephone and written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony. Further, pursuant to 43 CFR 10.4(c) and (d), the operator/holder/permittee/applicant must stop activities in the vicinity of the discovery and protect it for 30 days or until notified to proceed by the AO.

All construction activity shall cease when soils or road surfaces become saturated to a depth of three inches unless there are safety concerns or activities are otherwise approved by the AO.

Topsoil will be removed to a depth of 6-8 inches or as determined on-site by BLM in areas of surface disturbance. To protect topsoil for future use during reclamation, topsoil piles will be covered, seeded, labeled, and stored unmixed with other soils.

Any erosion features (e.g., rilling, gullying, piping, or mass wasting) located either on or adjacent to the surface disturbance will be addressed immediately after observation by contacting the Natural Resource Specialist/Realty Specialist and by submitting a plan to assure successful soil stabilization with BMPs to address erosion problems.

All areas where the topsoil has been removed and soils have become compacted will be ripped to a depth of 18 inches below the finished grade or to bedrock, whichever is less. Another suitable method of de-compaction may be used before topsoil is re-spread with approval of the BLM AO. Areas where the topsoil has not been removed, but have been compacted, must be de-compacted by disking or other methods to prepare the soils for reclamation.

BLM_0020422

**Road Design and Maintenance**
**General**
General access to the following locations shall be restricted by means of a lockable gate (may require fence wings) placed along the proposed access at a point as close as possible to the intersection of the proposed and established access: [List locations]. The operator is responsible for constructing and maintaining these structures through the life of the project. The selected control point is subject to the approval of the AO with the objectives of effectively deterring all unauthorized vehicle use not associated with natural gas development and production (including other BLM permitted users, but excepting CPW District Wildlife Managers and BLM Rangers, [others]) and preventing bypass of the gate. These gates would be installed [selected timeframe] and are to remain closed and locked throughout the year, though they may remain open temporarily during well development or maintenance activities that require high traffic volumes.

**Road Design**
All road and well pad construction will adhere to Gold Book standards (DOI and USDA 2007) and to BLM Manuals 9112 and 9113 (BLM 1984, 1985), relating to culvert and road design and construction requirements.

Base road design criteria and standards on road management objectives such as the Gold Book, BLM Handbook , traffic requirements of the proposed activity and the overall transportation plan, economic analysis, safety requirements, resource objectives, and minimizing damage to the environment.

Locate roads to minimize heights of cutbanks. Avoid high, steeply sloping cutbanks in highly fractured bedrock.

Bridges and culverts on waters that support aquatic habitat will be designed to maintain the natural stream channel to the greatest extent feasible. Locate roads on well-drained soil types. Minimize their influence on riparian areas and, when stream crossing is necessary, design the approach and crossing perpendicular to the channel. Locate the crossing where the channel is well-defined, unobstructed and straight.

Locate roads on stable positions (e.g., ridges, natural benches, and flatter transitional slopes near ridges and valley bottoms). Implement extra mitigation measures when crossing areas of unstable or fragile soils.

Construct roads for surface drainage by using outslopes, crowns, grade changes, drain dips, waterbars, and/or insloping to ditches as appropriate.

When roads are located in low-lying areas, ensure that the road surface is constructed above the adjacent ground surface.

Sloping the road base to the outside edge for surface drainage and installing water bars is normally recommended for local spurs or minor collector roads where low-volume traffic and lower traffic speeds are anticipated. This is also recommended in situations where long intervals between maintenance will occur and where minimum excavation is wanted. Outsloping is not recommended on gradients greater than eight to 10 percent.

BLM_0020423

Sloping the road base to the inside edge is an acceptable practice on roads with gradients more than 10 percent and where the underlying soil formation is very rocky and not subject to appreciable erosion or failure. Inside ditch should be drained with cross-drains at regular intervals so that runoff does not accumulate and cause erosion. Cross-drains may include installation of 18 –inch diameter culverts or waterbars depend on the road design.

Crown and ditching is recommended for arterial and collector roads where traffic volume, speed, intensity and user comfort are considerations. Gradients may range from two to 15 percent as long as adequate drainage away from the road surface and ditchlines is maintained.

Locate and design drainage dips immediately upgrade of stream crossings, providing buffers and sediment basins, to prevent sediment from entering surface water features.

Do not locate drainage dips where water might accumulate or where there is an outside berm that prevents drainage from the roadway.

Provide vegetative or artificial stabilization of cut and fill slopes in the design process. Avoid establishment of vegetation where it inhibits drainage from the road surface or where it restricts safety or maintenance.

Avoid sidecasting where it will adversely affect water quality or weakens stabilized slopes.

Provide for erosion-resistant surface drainage prior to fall rain or snow.

Improve flat gradients to a minimum of two percent or provide raised subgrade sections to avoid saturation of the road base.

Identify potential water problems caused by off-site disturbance and add necessary drainage facilities.

Identify ditchline and outlet erosion caused by excessive flows and add necessary drainage facilities and armoring.

Add additional full-rounds, half-rounds, and energy dissipators as needed for drainage ditches.

Correct special drainage problems (e.g., high water table, seeps) that affect stability of subgrade by using perforated drains, geotextiles, or drainage bays.

Eliminate undesirable berms that retard normal surface runoff.

Surface roads needing to be accessed in wet weather for normal operations and surface inadequately surfaced roads that are to be left open to public traffic during wet weather.

Roadside brushing should be done in a way that prevents disturbance to root systems (i.e., avoid using excavators for brushing).

BLM_0020424

**Culverts and Drainage Features**
Culverts and waterbars should be installed according to BLM Manual 9113 standards and sized for the 10-year storm event with no static head and to pass a 25-year event without failing.

Keep road inlet and outlet ditches, catch basins, and culverts free of obstructions, particularly before and during spring run-off. Routine machine-cleaning of ditches should be kept to a minimum during wet weather. Leave the disturbed area in a condition that provides drainage with no additional maintenance.

Locate culverts or drainage dips in such a manner as to avoid discharge onto unstable terrain such as headwalls or slumps. Provide adequate spacing to avoid accumulation of water in ditches or road surfaces. Install culverts with adequate armoring of inlet and outlet. Operator/holder is responsible for maintaining the integrity of road beds as well as erosion control and drainage features.

Proper sized aggregate and rip rap should be used during culvert construction. Place rip rap at culvert entrance to streamline water flow and reduce erosion; provide aggregate for energy dissipations at culvert or drainage dip outlets.

Install cross drains for inside drainage ditches on roads according to the following: Percent Grace; Spacing (feet); 1-6; 300; 7-9; 200; 10-14; 150; 15-20; 90; 21-40; 50; Over 41; 25

Place permanent stream-crossing structures on fishery streams before heavy equipment moves beyond the crossing area. Where this is not feasible, install temporary crossings to minimize stream disturbance.

Use 12 inches as the minimum recommended cover over a culvert, or one-half the diameter of the culvert, whichever is greater.

Compact fill in lifts during culvert installation with water or other soil material in such a way that the loads anticipated will not deteriorate the road base or fill above and around the culvert. Armor fill as described above to protect compacted fill.

Monitor culvert installations to ensure adequate armoring of inlet and outlet and no erosion of design. Patrol areas susceptible to road or watershed damage during periods of high runoff.

**Bridges**
Bridges and major culverts should be designed and constructed according to the standards provided in BLM Manual 9112. The design, review, and evaluation of these crossings must be accomplished under the direct supervision of a registered professional engineer.

If the installation of a bridge would result in the discharge of soil into water, a permit must be obtained from the U.S. Army Corps of Engineers according to Section 404 of the Clean Water Act of 1977.

**Road Maintenance and Abandonment**
Locate and maintain roads to prevent their influence on riparian areas and surface waters, when stream crossing is necessary, design the approach and crossing perpendicular to the channel. Locate the crossing where the channel is well-defined, unobstructed and straight.

BLM_0020425

Perform maintenance to conserve existing surface material; retain the original crowned or outsloped, self-draining cross-section; and prevent or remove rutted berms (except those designed for slope protection) and other irregularities that retard normal surface runoff. Avoid casting loose ditch or surface material past the shoulder where it can cause stream sedimentation or weaken slump-prone areas. Avoid undercutting backslopes.

Promptly remove slide material when it is obstructing road surface and ditchline drainage. Save all soil or material useable for reclamation and stockpile for future reclamation needs. Use remaining slide material for needed road improvement or place in a stable waste area. Avoid sidecasting of slide material where it can damage, overload, saturate embankments, or flow into downslope drainage courses. Reestablish vegetation in areas where more than 50 percent of vegetation has been destroyed due to sidecasting.

Do not disturb the toe of cutslopes while pulling ditches or grading roads. Avoid side casting road material into streams.

Grade roads only as necessary. Maintain drain dips, waterbars, road crown, insloping, and outsloping, as appropriate, during road maintenance.

Maintain roads in special management areas according to special management area guidance. Generally, retain roads within existing disturbed areas and side cast material away from the special management area.

Well access roads following abandonment will be recontoured and reclaimed as consistent with the transportation plan.

## 2.6   Fire Management

When working on lands administered by the BLM WRFO, notify Craig Interagency Dispatch (970-826-5037) in the event of any fire.

    a.   The reporting party will inform the dispatch center of fire location, size, status, smoke color, aspect, fuel type, and provide their contact information.

    b.   The reporting party, or a representative of, should remain nearby, in a safe location, in order to make contact with incoming fire resources to expedite actions taken towards an appropriate management response.

    c.   The applicant and contractors will not engage in any fire suppression activities outside the approved project area. Accidental ignitions caused by e.g., welding, cutting, grinding, will be suppressed by the applicant only if employee safety is not endangered and if the fire can be safely contained using hand tools and portable hand pumps. If chemical fire extinguishers are used the applicant must notify incoming fire resources on extinguisher type and the location of use.

    d.   Natural ignitions caused by lightning will be managed by Federal fire personnel. If a natural ignition occurs within the approved project area, the fire may be initially contained by the applicant only if employee safety is not endangered. The use of heavy equipment for fire suppression is prohibited, unless authorized by the Field Manager.

BLM_0020426

## 2.7    Forestry

In accordance with the 1997 White River RMP/ROD, all trees removed in the process of construction shall be purchased from the BLM. Trees should first be used in reclamation efforts and then any excess material made available for firewood or other uses.

    a.   Woody materials required for reclamation shall be removed in whole with limbs intact and shall be stockpiled along the margins of the authorized use area separate from the topsoil piles. Once the disturbance has been recontoured and reseeded, stockpiled woody material shall be scattered across the reclaimed area where the material originated. Redistribution of woody debris will not exceed 20percent ground cover. Limbed material shall be scattered across reclaimed areas in a manner that avoids the development of a mulch layer that suppresses growth or reproduction of desirable vegetation. Woody material will be distributed in such a way to avoid large concentrations of heavy fuels and to effectively deter vehicle use.

    b.   Trees that must be removed for construction and are not required for reclamation shall be cut down to a stump height of 6 inches or less prior to other heavy equipment operation. These trees shall be cut in four foot lengths (down to 4 inches diameter) and placed in manageable stacks immediately adjacent to a public road to facilitate removal for company use or removal by the public.

All available topsoil will be stored for use in final reclamation. Soil storage areas will be clearly marked to restrict vehicle and equipment use. Metal fence posts, construction fencing, construction barriers or other physical barriers will be placed at regular intervals between the working surfaces and soil storage areas when necessary.

## 2.8    Hazardous Wastes Management

As a reasonable and prudent operator/holder acting in good faith, the operator/holder will report all emissions or releases that may pose a risk of harm to human health or the environment, regardless of a substances status as exempt or nonexempt and regardless of fault, to the BLM WRFO (970) 878-3800.

As a reasonable and prudent operator/holder, acting in good faith, the operator/holder will provide for the immediate clean-up and testing of air, water (surface and/or ground), and soils contaminated by the emission or release of any substance that may pose a risk of harm to human health or the environment, regardless of that substances status as exempt or non-exempt. Where the operator/holder fails, refuses, or neglects to provide for the immediate clean-up and testing of air, water (surface and/or ground), and soils contaminated by the emission or release of any quantity of a substance that poses a risk of harm to human health or the environment, the BLM WRFO may take measures to clean-up and test air, water (surface and/or ground), and soils at the operators/holders expense plus an additional 25 percent as per 43 CFR 3163.1 (a)(4). Such action will not relieve the operator/holder of any liability or responsibility.

Where required by law or regulation to develop a plan for the prevention of releases or the recovery of a release of any substance that poses a risk of harm to human health or the environment, provide a current copy of said plan to the BLM WRFO.

BLM_0020427

With the acceptance of this authorization, the commencement of operations under this authorization, or within thirty calendar days from the issuance of this authorization, whichever occurs first, operator/holder and, and through the operator/holder, its agents, employees, subcontractors, successors and assigns, stipulate and agree to indemnify, defend and hold harmless the United States Government, its agencies, and employees from all liability associated with the emission or release of substances that pose a risk of harm to human health or the environment.

Construction sites and all facilities shall be maintained in a sanitary condition at all times; waste materials shall be disposed of promptly at an appropriate waste disposal site. "Waste" means all discarded matter including, but not limited to, human waste, trash, garbage, refuse, oil drums, petroleum products, ashes, and equipment.

All operators/holders shall comply with all Federal, State and/or local laws, rules, and regulations, including but not limited to Onshore Orders and Notices to Lessees, addressing the emission of and/or the handling, use, and release of any substance that poses a risk of harm to human health or the environment.

When drilling to set the surface casing, drilling fluid will be composed only of fresh water, bentonite, and/or a benign lost circulation material that does not pose a risk of harm to human health or the environment (e.g., cedar bark, shredded cane stalks, mineral fiber and hair, mica flakes, ground and sized limestone or marble, wood, nut hulls, corncobs, or cotton hulls).

Through all phases of oil and gas exploration, development, and production, the operator/holder shall employ, maintain, and periodically update to the best available technology(s) aimed at reducing: (1) emissions, (2) fresh water use, and (3) utilization, production, and release of any substance that poses a risk of harm to human health or the environment.

## 2.9   Range Management

Any range improvement projects such as fences, water developments, cattle guards, gates, or other livestock handling/distribution facilities that are damaged or destroyed either directly or indirectly as a result of implementation of the Proposed Action shall be promptly repaired or replaced by the applicant to restore pre-disturbance functionality.

Surface disturbing activities will be coordinated with livestock grazing permittees to minimize effects of surface disturbance on approved livestock operations. This effort would include necessary consulting on scheduling of operations to mutually minimize effects.

Any damage to the function of range improvements (e.g., fence damage, cattle guard cleaning, livestock loss) from other approved operations would be repaired immediately or remedied by the operator causing the damage.

All range improvements (e.g., stock water tanks, pipelines, corrals) would be avoided by 500 feet unless no other alternative is available and impacts can be mitigated as per the BLM AO.

When industrial use dominates an allotment to the point of making it unsuitable for livestock grazing, BLM would consider granting special non-use so that livestock could be removed without penalty for a specified amount of time.

Where development is intense, operators would identify an employee to coordinate with grazing permittees on these issues.

BLM_0020428

Pipeline projects would be conducted to allow natural movement of livestock through the allotment. Gaps would be provided in the trenching process to allow livestock through the pipeline project area or project would be completed while livestock are not on the allotment.

Facilities that could be hazardous to livestock would be fenced to keep livestock out and the fences maintained in functioning condition.

Compensation would be provided by operators for cattle lost to oil and gas activities (includes deaths from pits and animals struck on roads). This would be addressed in the same manner as a road maintenance agreement, with operators making payment based on their level of activity, not on the proximity to the dead animal.

## 2.10  Recreation Management

During big game hunting season (generally mid-August through November) it is recommended that helicopter flights be limited to a critical, as needed basis only and no flights conducted on first two days of each big game hunting season. In *<insert year>*, the hunting seasons for deer, elk, pronghorn, and bear in Game Management Unit (GMU) #, are as follows: *<insert dates of applicable seasons.>* For information about the dates of seasons for other years, please refer to the Colorado Parks and Wildlife Big Game Hunting Brochure or contact the BLMs Outdoor Recreation Planner.

## 2.11  Rights-of-Way

Use areas adjoining or adjacent to previously disturbed areas for rights-of-way and utility corridors whenever possible rather than traverse undisturbed vegetation communities.

All activities shall comply with all applicable local, State, and Federal laws, statutes, regulations, standards, and implementation plans. This includes acquiring all required Federal, State, and/or local permits, effectively coordinating with existing facility right-of-way (ROW) holders, and implementing all applicable mitigation measures required by each permit.

Stabilize disturbed areas within road rights-of-way and utility corridors by implementing vegetation practices designed to hold soil in place and minimize erosion as described in the WRFO Surface Reclamation Plan (Appendix D).

Construct sediment barriers when needed to slow runoff, allow deposition of sediment, and prevent transport from the site. Employ straining or filtration mechanisms as needed for the removal of sediment from runoff.

At least 90 days prior to termination of the right-of-way, the holder shall contact the Authorized Officer to arrange a joint inspection of the right-of-way. This inspection will be held to agree to an acceptable termination and rehabilitation plan. This plan shall include, but is not limited to, removal of facilities, drainage structures, and surface material (e.g., gravel or concrete), as well as final recontouring, spreading of topsoil, and seeding. The Authorized Officer must approve the plan in writing prior to the holder's commencement of any termination activities.

Any proposal involving additional surface disturbance outside of the authorized ROW requires an application to the BLM for analysis and authorization. New stipulations for construction would be applied to projects subject to the regulations and policies existing at the time of authorization.

BLM_0020429

All terms, conditions, and stipulations of the original grant shall be carried forward and remain in full force and effect.

The holder shall conduct all activities associated with the construction, operation, and termination of the ROW within the authorized limits of the ROW.

The holder of the ROW grant shall not convey, assign, or otherwise transfer, in whole or in part, without prior written approval by the AO.

The holder of the ROW grant shall notify the Authorized Officer of any changes in the holder's status, such as changes in legal mailing address, financial condition, business or corporate status, and alien ownership.

For the purpose of determining joint maintenance responsibilities on shared access, the holder shall make road use plans known to all other authorized users of the common access road. Upon request, the AO shall be provided with copies of any maintenance agreement entered into.

Retention and maintenance of a permanent travel lane is not authorized in the following corridor segments: [list by milepost or legal]. On these segments, the [operator/holder] will be responsible for installing physical controls to effectively deter unauthorized vehicle use along the right-of-way, continuous maintenance of the controls (through project life), and, at a minimum, [interval] monitoring to assess the controls' efficacy. Monitoring reports and documentation of maintenance activity will be sent to the [Natural Resource Specialist/Realty Specialist] by September 30 of each year.

During pipeline construction, the ROW will remain undisturbed to the maximum extent possible. Only the minimum necessary disturbance will occur to make the working surface safe and passable. Topsoil will not be removed under areas used for the storage of soils and, if possible (i.e., not changing the grade of the working surface), topsoil will not be removed from working surfaces.

Under no circumstances will topsoil, soil material below or adjacent to the trench spoils, or subsoil excavated from the trench down to the effective rooting depth (refer to the WRFO Surface Reclamation Plan) be used as padding in the trench, to fill sacks for trench breakers, or for any other use as construction material.

## 2.12  Sodium Resources

Conditions of approval would be applied to permits for oil and gas drilling in areas available for sodium and multi-mineral leasing to protect sodium resources throughout the Green River Formation as follows: Utilized flooded reverse circulation drilling techniques from surface to 100 feet into the Wasatch formation to minimize fluid loss to the formation. Cement the Saline interval with Class 'G' cement plus 35percent silica flour of the surface casing with Add a fluorescent dye fluid, other than Rhodamin WT, to drilling fluids used from surface to 100 feet into the Wasatch formation. Take a drilling fluid sample every 100 feet during drilling from surface to 100 feet below the dissolution surface and analyze for pH and conductivity. Document any fluid losses during drilling, from the surface, to 100 feet into the Wasatch formation. Make available a tracer log survey of the upper most frac to demonstrate in-zone penetration and total vertical height growth achieved.

BLM_0020430

Conditions of approval would be applied to permits for oil and gas drilling on existing sodium leases to protect sodium resources throughout the Green River Formation (Appendix D): Utilized flooded reverse circulation drilling techniques from surface to 100 feet into the Wasatch formation to minimize fluid loss to the formation. Cement the Saline interval with Class 'G' cement plus 35percent silica flour of the surface casing with Add a fluorescent dye fluid, other than Rhodamin WT, to drilling fluids used from surface to 100 feet into the Wasatch formation. Take a drilling fluid sample every 100 feet during drilling from surface to 100 feet below the dissolution surface and analyze for pH and conductivity. Document any fluid losses during drilling, from the surface, to 100 feet into the Wasatch formation. Make available a tracer log survey of the upper most frac to demonstrate in-zone penetration and total vertical height growth achieved.

## 2.13  Soil and Water Resources

### Soil

Disturbance across unstable or fragile soils would be allowed only after all other options have been exhausted, and the WRFO Authorized Officer has approved an engineered construction and reclamation plan for the proposed location.

Oil and gas activities in areas exhibiting accelerated soil erosion or degraded soil conditions would be allowed only after all other options have been exhausted, and the WRFO Authorized Officer has approved an engineered construction and reclamation plan for the proposed location.

Any erosion features (e.g., rilling, gullying, piping, or mass wasting) that are the result of the Proposed Action and are located either on or adjacent to the surface disturbance will be addressed immediately after observation by contacting the Natural Resource Specialist/Realty Specialist and by submitting a plan to assure successful soil stabilization with BMPs to address erosion problems

Soil storage areas will be clearly marked to restrict vehicle and equipment use. Metal fence posts, construction fencing, construction barriers or other physical barriers will be placed at regular intervals between the working surfaces and soil storage areas when necessary.

No slopes planned for revegetation will be steeper than a 3(horizontal):1(vertical) slope before topsoil is placed. After spreading topsoil and seeding, the operator/holder will spread stored woody debris, hydromulch the location, or crimp in straw to stabilize the soil surface in seeded areas.

If salt is observed on the surface of soils during reclamation activities the Natural Resource Specialist/Realty Specialist will be notified and a plan will be developed with approval of the AO to improve reclamation on the site.

### Water

Any stormwater management BMPs that would result in additional surface disturbance beyond what is shown in the diagrams for the project must be submitted via Sundry Notice and approved by the AO before installation.

Surface casing shall be set to a depth below all potential sources of usable or potable drinking water. All surface casing shall be cemented from total depth back to surface. In the event surface casing cannot be set to this depth, the subsequent casing string shall be cemented from its total depth to at least 100 feet above the surface casing shoe. In the event surface casing cementing does not reach the surface, that casing shall be remedially cemented by squeeze or top cementing as approved by the BLM FO.

BLM_0020431

Operators would construct reserve pits with 2 feet of freeboard in cut areas or in compacted and stabilized fill. Reserve pits would not be located in areas in which groundwater is less than 50 feet from the surface. A closed system would be required if water shows in the conductor hole.

To ensure the timely review of the water quality data, the operator is required to have a CDPHE approved firm contracted to conduct water samples and to send a copy of water quality test results to the BLM WRFO at the same time that they are sent to the operator.

Pursuant to Onshore Order Number 7, a permanent disposal method for produced water must be approved by BLM and in operation 90-days after well completion. The reserve pit may not be used for produced water disposal after these 90-days except with prior written permission of the BLM AO.

## 2.14  Special Status Species – Plants

Prior to approving surface-disturbing or potentially impacting activities within known (occupied), suitable, or potential habitat for federal listed, proposed, and candidate species, a plant inventory conducted by a qualified botanist and an environmental analysis would be required for the Proposed Action. Based on the results of the plant survey, Section 7 consultation with FWS may be necessary, and appropriate conservation measures may be required to avoid or minimize impacts on federally listed species.

Limit motorized vehicle travel within and outside ACECs used to support oil and gas exploration and development activities within occupied, suitable, or potential habitats for federally listed species, proposed species, candidate species and BLM sensitive species to existing routes. Roads or trails in these areas not designated for use will be abandoned and reclaimed. Off road motorized vehicle travel will be prohibited in these areas.

Limit motorized vehicle travel for oil and gas activities within at least 660 feet of occupied, suitable, or potential habitats for federally listed, proposed, and candidate species to existing routes. Limit motorized vehicle travel for oil and gas activities within 330 feet of occupied BLM sensitive species habitat to existing routes.

Limit maintenance of existing and planned roads and/or rights or ways within special status plant species occupied, suitable or potential habitats to the existing disturbance; maintenance would be performed in accordance with specifications provided by the BLM during site specific environmental analysis.

All occupied habitat of federally listed plants would be exclusion areas for new ROW authorizations. All suitable and potential habitat for listed and candidate plants would be avoidance areas for new ROW authorizations.

BLM_0020432

*Appendix B – Best Management Practices and Conditions of Approval*

Conditions of approval identified as appropriate through environmental analysis to mitigate the impacts to federally listed, proposed, and candidate species would be applied to land use authorizations, permits, and leases that fall within the plant consideration area of the affected plant species. Possible mitigation strategies may include, but are not limited to:

    a.  Adjusting the location of the disturbance outside of the plant consideration area;
    b.  The use of several dust abatement measures;
    c.  Using signs, fencing, and other deterrents to reduce possible human disturbance;
    d.  Requiring construction to occur outside of the blooming season (September through March);
    e.  Using a higher percentage of forbs in the reclamation seed mix to promote pollinator habitat; and
    f.  Using a qualified, independent third party contractor to provide general oversight.

Control of 80 percent of fugitive dust within 330 feet from edge of occupied, suitable, and/or potential special status plant species (federally listed species, proposed species and candidate species) habitat would be achieved using BLM approved dust suppression methods to be determined on a case by case basis.

If plants of concern are known from the vicinity of potential project areas or potential habitat is present, plan to conduct field surveys for the plants of concern. Field botanical surveys should be conducted at a time when the plant species of concern can be detected and accurately identified. In some cases multi-year surveys are necessary. For example, in dry years some ephemeral annuals may not germinate and produce plants, but they are still present at the site in the seed bank. Botanical surveys are generally considered valid for three years.

Field botanical surveys should be completed within a 1,980 feet survey area around the project disturbance area. In some cases the topographic setting or land ownership patterns may impede covering the full recommended survey area. Surveys should also include areas where direct or indirect effects may impact hydrology. Surveys should be floristic, providing a list of plant species encountered during the survey. Negative survey data should also be reported.

Where avoidance is not feasible and development is allowed within 660 feet of plant populations, impacts to the plants of concern can be reduced by placing temporary fencing or other barriers around the footprint of the project so that vehicles don't go any further than needed and the sensitive habitat is avoided as much as possible. To avoid working in rare plant habitat and drawing attention to the plants, the edge of disturbance should be fenced, not the nearby plant population. Communication of the importance of rare plant habitat protection with those working on the project is vital to the success of fencing or barriers.

Ex-situ techniques such as transplanting are not recommended under any circumstances.

Construction should take place down slope of plants of concern where feasible. Down slope ground disturbing activities should be conducted in such a way as to avoid as much as is reasonably possible undercutting and sloughing of the slopes where rare plant habitat occurs. If well pads and roads must be sited upslope, buffers of 660 ft minimum between surface disturbances and plants of concern should be incorporated.

Ensure that a botanical expert is on site when clearing of vegetation occurs in the vicinity of plant species of concern.

BLM_0020433

Perform frequent and timely inspections of development sites and plants of concern occurrences to ensure that BMPs are being followed, and to identify areas of potential conflict. Inspections of plant occurrences should be performed by a botanist or other qualified personnel.

Replace soil and sub-soil horizons in their pre-disturbance order. Reclamation of the soil layers may allow future establishment of special status plant species on potential habitat

Restrict motorized travel to designated roads and trails. Routes should be designated and marked prior to implementation.

Prevent plumes of dust and particulate matter from impacting plants of concern. While new roads should not be built within 600 feet of the plants of concern, preexisting roads with an expected increase in traffic should be graveled in these areas. The operator is encouraged to apply water for dust abatement to such areas during the flowering period. If possible, dust abatement applications should be comprised of water only, with minimal use of magnesium chloride.

The operator will appoint a qualified, Independent Third-Party Contractor (Contractor) to provide general project oversight, assure compliance with the terms and conditions of the approval, and perform monitoring. The Contractor will be present during all surface disturbing operations that occur until reclamation is completed. Prior to the initiation of construction, pre-work meetings will be held between the BLM, the operator, and the Contractor to discuss required procedures associated with the conditions of approval.

All vegetation within the ACEC portion of the ROW corridor, with the exception of that immediately above the pipeline trench, shall be brush-hogged and left in place. The maximum allowable disturbance in the ACEC is brush hogging the ROW.

In the event that the operator elects to employ a padding machine to lay pipe within that portion of the ROW corridor that is also within the ACEC, said padding machine will include the use of necessary apparatus to prevent the generation of fugitive dust.

Any contractor or agent hauling earthen material, in association with the Proposed Action, will cover all of their loads.

## 2.15  *Vegetation and Invasive species*

### General

All disturbed areas shall be promptly seeded with Native or Standard Seed Mix <insert seed mix number> (see below). The elevation and vegetation community for this location are: Mid Elevation Sagebrush (5,500-7,200 ft). Therefore it is recommended that this site be seeded in accordance with the WRFO Surface Reclamation Plan (Appendix D). If an alternate date of seeding is requested, contact the designated Natural Resource Specialist/Realty Specialist prior to seeding for approval. Seed mixture rates are Pure Live Seed (PLS) pounds per acre. Drill seeding is the preferred method of application and drill seeding depth shall be no greater than ½ inch. If drill seeding cannot be accomplished, seed should be broadcast at double the rate used for drill seeding, and harrowed into the soil.

BLM_0020434

Use seed that is certified and free of noxious weeds. All seed tags will be submitted via Sundry Notice (SN)/*<letter for Realty>* to the designated Natural Resource Specialist/Realty Specialist within 14 calendar days from the time the seeding activities have ended. The SN will include the purpose of the seeding activity (i.e., seeding well pad cut and fill slopes, seeding pipeline corridor). In addition, the SN will include the well or well pad number associated with the seeding activity, if applicable, the name of the contractor that performed the work, his or her phone number, the method used to apply the seed (e.g., broadcast, hydro-seeded, drilled), whether the seeding activity represents interim or final reclamation, an estimate of the total acres seeded, an attached map that clearly identifies all disturbed areas that were seeded, and the date the seed was applied.

The operator/holder will be required to meet with the WRFO reclamation staff in March or April of each calendar year and present a comprehensive work plan. The purpose of the plan is to provide information pertaining to reclamation activities that are expected to occur during the current growing season. Operators/holders shall also provide a map that shows all reclamation sites where some form of reclamation activity is expected to occur during the current growing season.

A Reclamation Status Report will be submitted to the WRFO annually according to the WRFO Surface Reclamation Plan (Appendix D) for all actions that require disturbance of surface soils on BLM administered lands as a result of the Proposed Action. The Reclamation Status Report will include the well number, API number, legal description, UTM coordinates, project description (e.g., well pad, pipeline), reclamation status (e.g., interim or final), whether the well pad or pipeline has been revegetated and/or re-contoured, date seeded, photos of the reclaimed site, estimate of acres seeded, seeding method (e.g., broadcast, drilled, hydro-seeded), and contact information for the person responsible for developing the report. The report will include maps showing each point (i.e., well pad), polygon, or polyline (i.e., pipeline) feature that was included in the report. The data must be submitted in UTM Zone 13N, NAD 83, in units of meters. In addition, scanned copies of seed tags that accompanied the seed bags will be included with the report. Internal and external review of the WRFO Reclamation Status Report and the process used to acquire the necessary information will be conducted annually, and new information or changes in the reporting process will be incorporated into the report. The Reclamation Status Report will be submitted to the BLM Reclamation Coordinator.

A reclamation status report for each site would be submitted electronically to the WRFO annually until it is determined that reclamation of the site has met all required objectives of the particular reclamation phase. Every third year, a vegetation monitoring report should accompany the status report. (See Appendix D, Section 4.2 for the minimum components to be included in the report.)

Consult the BLM Integrated Vegetation Management Handbook to reach BLM objectives of maintaining and restoring native plant community diversity, resiliency, and productivity (BLM 2008). This handbook addresses renewable resource management and provides BMPs that can be used for energy development related projects.

### Riparian and Remnant Vegetation Associations

Authorized surface-disturbing activities and/or facilities that are negatively affecting riparian or wetland habitat would be required to immediately undertake mitigation and, if impacts are not mitigated, then relocate activities/facilities outside riparian/wetland habitat.

Reclamation of surface disturbance resulting from authorized activities within RVAs would use only locally gathered or genetic stock from locally gathered native species.

BLM_0020435

Locally collected seed or genetic stock from locally gathered seed would be used for reclamation and available in adequate quantity for reclamation needs prior to issuance of the notice to proceed. If such seed is not available in adequate quantity, then collection from the site of disturbance would be required. All seed collection, storage, or increase would be conducted in accordance with approved collection, storage, and seed increase protocols. If three growing seasons pass without adequate collection to provide the quantity necessary for reclamation needs, the impact of using non-local native species on the genetic integrity of native species would be evaluated by BLM and mitigated through site-specific environmental analysis.

### Noxious and Invasive Weeds

A pre-disturbance weed survey shall identify and quantify noxious and/or invasive weeds within the areas of direct and indirect use (i.e., within 660 feet of direct use), including all access roads, pipelines, and other associated surface disturbance. The weed survey report shall be submitted to the designated Natural Resource Specialist/Realty Specialist prior to initiating surface disturbing activities.

All authorized users of disturbed areas including rights-of-ways would be required to inventory the entire project area for noxious weeds and invasive species in both the spring and fall through final abandonment. Results of surveys would be provided to BLM as described in the WRFO Surface Reclamation Plan (Appendix D).

On BLM lands, noxious weeds on the Colorado Department of Agriculture's State Weed List A would be eliminated; noxious weeds on the Colorado Department of Agriculture's State Weed B and C Lists would be controlled; and the spread of invasive species within the permitted area of direct and indirect use (as defined in Appendix D) would be controlled and prevented. The following COAs would be attached to land use authorizations:

- All equipment that may act as a vector for weeds shall be washed before entering the WRFO. Equipment would also be washed when leaving and/or moving between work-sites if the pre-disturbance weed inventory indicated the presence of undesirable invasive or noxious weeds and there is a risk of transporting weed seeds or root propagules.
- Certified weed-free mulches, as per state guidelines, would be used (BLM 2006f).
- All seed applied on BLM public lands would comply with BLM policy described in IM 2006-073 (BLM 2006f).
- All authorized users of disturbed areas including rights-of-ways would be required to inventory the entire project area for noxious weeds and invasive species in both the spring and fall through final abandonment. Results of surveys would be provided to BLM as described in Appendix D.
- Operators would prepare and implement weed management plans for projects consistent with the WRFO Surface Reclamation Plan (see Appendix D).
- Operators would be responsible for ensuring all products placed on public lands (e.g., materials from gravel pits/quarries) are free of noxious weeds, including seeds or root material, listed on Colorado Department of Agriculture's State Weed List for A and B listed species. All sites shall be monitored and treated for noxious weeds, on an annual basis, for the life of the project until Final Abandonment has been approved by the BLM. Monitoring of land-disturbing activities will use permanent photo points to identify noxious weed growth stages, degree of infestation, and trends.

BLM_0020436

All pest control proposals will include an environmental analysis developed within an Integrated Pest Management format.

Sterile hybrids or sterile cereal annual grasses would not generally be approved for use on public lands for reclamation efforts.

**Herbicide Application**
Application of herbicides shall comply with the WRFO Integrated Weed Management Plan.

Pesticide Use Proposals (PUPs) shall be submitted to and approved by the BLM before applying herbicides on BLM lands. The PUP will include target weed species, the herbicides to be used, application rates and timeframes, estimated acres to be treated, as well as maps depicted the areas to be treated and known locations of weeds.

Application of herbicides must be under field supervision of an EPA-certified pesticide applicator. Herbicides must be registered by the EPA and application proposals must be approved by the BLM.

Use of off-highway vehicles (OHVs) for access to weed treatment areas along the pipeline/power line ROW will be considered on a case-by-case basis, provided that access is limited and will not create visible tracks, and will require prior written approval from the AO.

## 2.16  Visual Resource Management

All above ground facilities shall be painted to blend in with the surrounding environment. The chosen paint color will be selected from the BLM Standard Environmental Color Chart in consultation with the BLM Visual Resource Specialist.

## 2.17  Wild Horse Management

Should the Proposed Action occur simultaneously with a wild horse gather, all project-related traffic, including helicopters, would need to be coordinated with the BLM and the gather contractor.

To minimize incidents where young foals become separated from their mares, helicopters should avoid flights over wild horses observed in the area. Drilling and receiving crews are required to slow down or stop when wild horses are encountered, allowing bands to move away at a pace slow enough so that foals can keep pace and are not separated.

A "horseproof" cattle guard shall be installed and maintained at the following locations: [describe location or give legal description]. To reduce the potential for injuries to wild horses, sucker rod or rebar should be tack welded (centered between the equally spaced rails) to each cross member for the entire length and width of the cattle guard. "Horseproof" cattle guards shall be painted a dark color to help with snow melt.

In wild horse use areas, open trenches for burial of gathering pipelines should be inspected daily to reduce the potential for horses to become trapped should they fall into a trench. If a horse has fallen into the trench the BLM Range Staff shall be notified immediately.

No motorized or surface-disturbing activities within a 2,000-foot radius around water sources in the Piceance-East Douglas Herd Management Area.

BLM_0020437

## 2.18  Wildlife Management

The operator shall prevent migratory bird access to facilities that store or are expected to store fluids which may pose a risk to such birds (e.g., toxicity, compromised insulation). Features that prevent access to such fluids must be in place and functional within 24 hours of the drilling rig moving off the location and shall remain effective until such pits are removed or incapable of storing fluids. Deterrence methods may include netting or other alternative methods that effectively prevent use and that meet BLM approval (the use of "bird balls" is discouraged). It will be the responsibility of the operator to notify the BLM of the method that will be used to prevent use two weeks prior to when completion activities are expected to begin. The BLM approved method will be applied within 24 hours after completion activities have begun. All lethal and non-lethal events that involve migratory birds will be reported to the BLM AO immediately.

Surface disturbance and vegetation clearing associated with project construction should generally be located to avoid vegetative types in most limited supply, those less conducive to successful reclamation, or those representing greater site-specific value for wildlife, as determined during the NEPA process. Examples of these vegetative types are juniper stands in a predominant sagebrush type, sagebrush in a predominant woodland type, mature tree stands rather than younger growth, and woodlands with well-developed understory rather than with barren understory.

Vehicular access by the public on important wildlife habitats and/or during sensitive functional use periods (e.g., big game severe winter range, critical summer use areas, raptor nesting areas, sage grouse reproductive habitats) would be subject to restrictions as directed by the Area Manager. Use of restricted road segments by authorized personnel (e.g., BLM personnel, law enforcement, permitted land users) may be allowed for administrative and operational purposes. Methods used to restrict vehicular access may include: installing lockable gates, barricades or other forms of deterrents, signing, or reclaiming and abandoning roads or trails no longer necessary for management, or other methods prescribed by the Field Manager.

Woodland treatments will be designed and located where possible to replicate natural patterns of forest succession and distribution. Efforts will be made to minimize community fragmentation, including structural and we class components. In general, no point within an opened stand will be more than 200 yards from equal or greater intervals of cover.

Power lines shall be constructed in accordance with most current avian protection standards, for example, those designs presented in "Suggested Practices for Avian Protection on Power Lines, The State of the Art in 2006", Avian Power Line Interaction Committee, Edison Electric Institute and California Energy Commission (2006) (www.aplic.org). The holder shall assume the burden and expense of proving that pole designs deviating from those shown in the above publication provide effective electrocution and line-strike protection for birds. Such proof shall be provided by a subject-matter expert approved by the AO. The BLM reserves the right to require modifications or additions to all power line structures placed on this ROW, should they be necessary to ensure the safety of large birds. Such modifications and/or additions shall be made by the holder without liability or expense to the United States.

Encourage oil and gas operators to develop Avian Protection Plans that are similar to those voluntary partnerships formed between the utility industry and FWS to identify and implement practices that reduce the risk of bird mortality and the operators' liability under the Migratory Bird Treaty Act.

BLM_0020438

A raptor nest survey will be required in habitats potentially influenced by the Proposed Action, including suitable woodland habitat within [990] feet of project-related disturbance, and suitable cliff/rock outcrops within [1,320] feet of project-related disturbance. Surveys must be consistent with the most current WRFO raptor survey protocol (available upon request) and survey results must be analyzed by WRFO prior to project initiation. Depending on specific project circumstances and nest status, nest sites documented through these surveys would be subject to siting constraints and timing limitations.

In areas of concentrated development (e.g., the geography encompassing acute/collective activity), vehicle use on BLM vehicle access networks (including existing roads, trails, and ways), where logistically practicable, would be temporarily limited to that associated directly with oil and gas development, production, and maintenance. Use by other BLM permittees could be considered, as determined by the Authorized Officer, consistent with big game management objectives. To be effective, this mitigation should control the use of vehicle access networks in areas of concentrated development rather than controls applied to individual well access roads.

Road abandonment and use limitations would be used to limit effective road densities in the long term to an average maximum 1.5 miles per square mile in higher value big game habitat (i.e., defined severe winter range, severe winter range/winter concentration areas and summer ranges) and 3 miles per square mile on other big game ranges.

The design of utility corridors would be required to avoid the need for regular vehicular access for inspection by the ROW grantee/lessee and would be conditioned by the grantee/lessee to effectively preclude all subsequent vehicular travel throughout the term of the grant/lease. In the event continued access is required, the corridor would remain closed to public vehicular access and the grant/lease holder would be responsible for installing and maintaining effective vehicle deterrents that would be functional beyond final abandonment of the grant/lease.

In areas under an existing lease, a program would be developed in cooperation with current leaseholders, to apply (where appropriate) the most current reclamation standards and practices to existing well pads, roads, and pipelines. These standards and practices would be applied in annual increments that would allow for completed interim or final reclamation of active and inactive ROW corridors and producing, plugged, and abandoned wells and access roads within 20 years. This action would be most relevant to the Douglas/Evacuation Creek, Coal Oil Basin, Indian Valley, Crooked Wash, and White River Dome areas.

On a case-by-case basis and in addition to standard interim and final reclamation measures, special reclamation components or techniques would be prescribed to restore or provide supplemental forage species that would aid in meeting big game objectives (e.g., deciduous browse). While these additional forage species could be non-native species, species used could not be invasive or prone to persist in the community for more than a decade (e.g., non-native leguminous forbs).

Well access roads would be unavailable for public vehicular access (e.g., public access not expressly associated with natural gas facility development and maintenance), including BLM permittees not expressly associated with oil and gas development, production, monitoring, and maintenance. Exceptions would be evaluated on a case-by-case basis in the context of disturbance thresholds established for each seasonal range and leaseholding.

Access developed for well and facility access would generally be subject to complete abandonment once its intended use is complete.

BLM_0020439

Within occupied range of greater sage-grouse, operational noise from pump jacks and compressors should not exceed 49 dB at 30 feet from the source.

Use remote monitoring techniques for production facilities and develop a plan to reduce the frequency of vehicle use.

Restrict the construction of tall facilities, distribution powerlines, and fences to the minimum number and amount needed.

Design or site permanent structures to minimize impacts to sage-grouse, with emphasis on locating and operating facilities that create movement (e.g., pump jacks) or attract frequent human use and vehicular traffic (e.g., fluid storage tanks), in a manner to minimize disturbance of sage-grouse or interference with habitat use.

BLM_0020440

BLM

**Appendix C**

# Hazardous Materials Management Plan



Public Lands USA: Use, Share, Appreciate

BLM_0020441

BLM_0020442

## Table of Contents

                                                                **Page**

1.0      INTRODUCTION ......................................................................................... C-1
2.0      PRODUCTION STREAMS ........................................................................... C-1

      2.1     Natural Gas ........................................................................................... C-2
      2.2     Liquid Hydrocarbons ............................................................................ C-2
      2.3     Produced Water ..................................................................................... C-2

3.0      EXPLORATION AND PRODUCTION ACTIVITIES ........................................... C-3
4.0      FUELS ...................................................................................................... C-3

      4.1     Gasoline ................................................................................................ C-3
      4.2     Diesel .................................................................................................... C-4
      4.3     Jet A Fuel ............................................................................................. C-4
      4.4     Natural Gas ........................................................................................... C-4
      4.5     Propane ................................................................................................. C-4

5.0      LUBRICANTS ............................................................................................ C-4
6.0      COOLANT/ANTIFREEZE AND HEAT TRANSFER AGENTS ............................ C-5
7.0      DRILLING FLUIDS AND RESERVE PIT MAINTENANCE ................................ C-5
8.0      FRACTURING FLUIDS ............................................................................... C-5
9.0      CEMENT AND ADDITIVES .......................................................................... C-5
10.0   MISCELLANEOUS MATERIALS .................................................................. C-6
11.0   PIPELINE MATERIALS ............................................................................... C-6

      11.1   Combustion Emissions .......................................................................... C-6

12.0   POLICY AND PROCEDURE ......................................................................... C-7

### List of Tables

Table C-1      Materials Potentially Used or Produced during Construction, Drilling,
                   Production, and Reclamation Operations ................................................ C-9

BLM_0020443

*This page intentionally left blank*

BLM_0020444

## 1.0 Introduction

This management plan is provided pursuant to Bureau of Land Management (BLM) Instruction Memoranda Number WO-93-344 and CO-97-023, which requires that all National Environmental Policy Act (NEPA) documents list and describe any hazardous and extremely hazardous materials that will be produced, used, stored, transported, or disposed of as a result of a proposed project. Hazardous materials, as defined herein, are those substances listed in the United States Environmental Protection Agency's (EPA's) List of Hazardous Substances (40 Code of Federal Regulations [CFR] Part 302) and extremely hazardous materials are those identified in the EPA's List of Extremely Hazardous Substances (40 CFR Part 355). For purposes of this discussion, compounds included in the Clean Air Act Section 112(r) as the List of Substances for Accidental Release Prevention (40 CFR Part 68) are also considered hazardous materials. Materials identified on any of these lists that are expected to be used or produced by oil and gas activities are discussed herein.

A list of hazardous and extremely hazardous materials that may be produced, used, stored, transported, or disposed of as a result of exploration and production operations is assembled in Table C-1. Where possible, the quantities of these products or materials have been estimated on a per-well basis.

Some potentially hazardous materials that may be used in small, unquantifiable amounts have been excluded from this management plan. These materials might include:

- Wastes, as defined by the Solid Waste Disposal Act;
- Wood products, manufactured items, and articles that do not release or otherwise result in exposure to a hazardous material under normal conditions of use (e.g., steel structures, automobiles, and tires); and
- Food, drugs, tobacco products, and other miscellaneous substances (e.g., WD-40, gasket sealants, and glues).

Project personnel will be directed to properly manage and dispose of hazardous materials. Solid wastes generated at well locations will be collected in approved waste facilities (e.g., dumpsters). Each well location will be provided with one or more such facilities during drilling and completion operations. Solid wastes will be regularly removed from well locations and transported to an approved disposal facility.

Materials produced, used, stored, transported, or disposed of during the exploration and production phases of oil and gas activities may be hazardous or may contain hazardous constituents. The following discussion will address the hazardous substances generally associated with the lifecycle of a hydrocarbon well.

## 2.0 Production Streams

Oil and natural gas production from White River Field Office (WRFO) is primarily from the Cretaceous rock Mesaverde Group formation, as well as from other targeted deep formations. Water will be produced as a result of the extraction operations. Table C-1 lists and quantifies, where possible, the hazardous substances that may be found in the production streams.

BLM_0020445

## 2.1   Natural Gas

Natural gas produced from the wells will primarily contain methane, ethane, nitrogen, and carbon dioxide. Hexane, polynuclear aromatic hydrocarbons (**PAHs**), and polycyclic organic matter (POM) are hazardous substances that might be present in the gas stream of both oil and gas wells.

Produced natural gas from wells will be transported from each location through pipelines linking well locations to centralized processing facilities. The natural gas will eventually be delivered to consumers for combustion. Small quantities of gas may be vented or flared at certain well locations during well testing operations. During testing, produced gas may be vented or flared into a flare pit pursuant to BLM and Colorado Oil and Gas Conservation Commission (COGCC) rules and regulations (Notice to Lessees [NTL]-4A). Approval by BLM and COGCC will be obtained prior to flaring or venting operations. Natural gas storage facilities are not expected to be used.

## 2.2   Liquid Hydrocarbons

Liquid hydrocarbons are produced either as condensate from natural gas wells or from oil wells in the field office area. Oil wells also produce natural gas associated with the oil. Hexane, PAHs, and POM are hazardous substances that may be present in the gas stream of both oil and gas wells. Hydrogen sulfide is also present in the gas produced by some of the oil wells. This hydrogen sulfide is not naturally occurring, but has been generated by bacteria unintentionally introduced in the course of early waterflood projects. Benzene, POM, Ethylbenzene, Toluene, n-Hexane, Xylenes, and PAHs may also be present in the gas produced by oil wells.

Liquid hydrocarbons will be stored in tanks at centralized production facilities. The tanks will be bermed to contain 110 percent storage capacity of the largest tank plus 1 foot of freeboard, as mandated by the BLM. Liquid hydrocarbons will be periodically removed from the storage tanks and transported via truck or pipeline outside the project area, in adherence to Department of Transportation (DOT) rules and regulations. Necessary regulatory approvals for the production, storage, and transport of liquid hydrocarbons, including the Oil Pollution Act of 1990 (storage of >1,000,000 gallons), will be addressed before the initiation of liquid hydrocarbon production activities.

## 2.3   Produced Water

Produced water from wells within the project boundaries is expected to average 200 barrels per day per well. The water quality of the produced water will vary and will be monitored periodically. Water produced from the coal seams within the Mesaverde Group and other targeted formations is known to contain the following hazardous substances:

| | | |
|---|---|---|
| Antimony | Copper | Selenium |
| Arsenic | Cyanide | Silver |
| Barium | Lead | Sodium |
| Beryllium | Mercury | Thallium |
| Cadmium | Nickel | Zinc |
| Chromium | Radium 226 | |

Phenol, an extremely hazardous substance, is also found in the produced water stream. No other hazardous or extremely hazardous materials are known to be present.

Produced water will be transported by truck to permitted disposal facilities or re-injected into underground aquifers as permitted by the COGCC. The water quality of the produced water will be

BLM_0020446

monitored periodically. Agency authorizations that must be obtained before disposing of produced water include:

- BLM approval of disposal methodologies, and
- COGCC Water Quality Division approval of wastewater disposal (e.g., National Pollutant Discharge Elimination System [NPDES] permits and Underground Injection Control [UIC] permits).

## 3.0   Exploration and Production Activities

Exploration and production activities in the field office area will include geophysical, construction, drilling, testing, completion, production, maintenance, transportation, abandonment, and reclamation components.

Known hazardous and extremely hazardous materials typically used during exploration and production operations in the project area are listed in Table C-1 and generally fall into the following categories:

- Fuels;
- Lubricants;
- Coolant/antifreeze and heat transfer agents;
- Drilling fluids and reserve pit maintenance;
- Fracturing fluids;
- Cement and additives; and
- Miscellaneous materials.

## 4.0   Fuels

Gasoline, diesel, Jet A fuel, natural gas, and propane are the fuels that may be employed within the boundaries of the WRFO. Each of the fuels contains materials classified as hazardous. Gasoline and diesel will be used by vehicles providing transport to and from the project area. Diesel, gasoline, and Jet A fuel may be used for geophysical survey operations. Diesel fuel will also be used in drilling operations and construction equipment, and may be used as a minor component of fracturing fluids. Natural gas produced may be used to power compressor engines and other ancillary facilities. Propane may be used for miscellaneous heating purposes.

### *4.1   Gasoline*

Gasoline will be used to power vehicles traveling to and from the project area. Gasoline will be purchased from regional vendors and primarily stored and transported in vehicle gas tanks. Some additional gasoline may be stored in appropriately designed and labeled 1- to 5-gallon containers for supplemental use as vehicle fuel. No large-scale storage of gasoline is anticipated. The hazardous substances expected to be present in gasoline include:

| | | |
|---|---|---|
| Benzene | Methyl tert-butyl ether | Toluene |
| Cyclohexane | Naphthalene | Xylenes |
| Ethylbenzene | PAHs | |
| n-Hexane | POM | |

No extremely hazardous materials are expected to be present in the gasoline.

## 4.2 Diesel

Diesel fuel will be used to power transport vehicles, geophysical vehicles, drilling rigs, and construction equipment. Each well location will have aboveground storage tanks containing diesel fuel during drilling operations. Tanks will be filled by a local fuel supplier. Diesel fuel will be used, transported, and stored in accordance with all relevant local, state, and federal rules, regulations, and guidelines. The hazardous substances expected to be present in diesel fuel include:

| | | |
|---|---|---|
| Benzene | POM | Ethylbenzene |
| Toluene | Naphthalene | Xylenes |
| PAHs | | |

No extremely hazardous materials are expected to be present in the diesel fuel.

## 4.3 Jet A Fuel

Jet A fuel may be used to power geophysical vehicles. Jet A fuel will be purchased from regional vendors and primarily stored and transported in vehicle tanks. Some additional Jet A fuel may be stored in appropriately designed and labeled containers for supplemental use. No large-scale storage of Jet A fuel is anticipated. The hazardous substances expected to be present in Jet A fuel include:

| | | |
|---|---|---|
| Benzene | Methyl tert-butyl ether | Toluene |
| Cyclohexane | Naphthalene | Xylenes |
| Ethylbenzene | PAHs | n-Hexane |
| POM | | |

No extremely hazardous materials are expected to be present in the Jet A fuel.

## 4.4 Natural Gas

Natural gas produced on site may be burned to power compressor engines and other ancillary facilities. Hazardous materials expected to be present in natural gas include n-hexane, PAHs, and POM. No extremely hazardous materials are known to exist in the natural gas from the project area.

## 4.5 Propane

Propane may be used for miscellaneous heating purposes throughout the field office area. The propane will be purchased from regional vendors and transported and stored in appropriate tanks. No large-scale storage of propane is anticipated. The only hazardous material expected to be present in propane is propylene. No extremely hazardous materials are known to be present in propane.

## 5.0 Lubricants

Various lubricants, including motor oils, hydraulic oils, transmission oils, compressor lube oils, and greases, will be used in project equipment and machinery. Lubricants may contain hazardous substances, particularly:

| | | |
|---|---|---|
| Barium | Lead | PAHs |
| Cadmium | Manganese | POM |
| Copper | Nickel | Zinc |

No extremely hazardous materials are known to be present in the lubricants required for the proposed project. The lubricants will be used, stored, transported, and disposed of following manufacturers' guidelines and local, state, and federal requirements.

BLM_0020448

## 6.0    Coolant/Antifreeze and Heat Transfer Agents

Various materials will be used as coolant/antifreeze and heat transfer agents in association with exploration and development. Ethylene glycol, a hazardous substance, will be used as an engine coolant/antifreeze in vehicles, construction equipment, gas dehydrators, and drilling and workover rigs. In addition, ethylene glycol will be used as a heat transfer fluid during well completion and maintenance operations. No extremely hazardous materials are known to be present in the coolant/antifreeze and heat transfer agents required for the proposed project. Ethylene glycol will be disposed of in accordance with applicable local, state, and federal rules and regulations.

## 7.0    Drilling Fluids and Reserve Pit Maintenance

Water-based muds (drilling fluids) will be used for drilling each well. Drilling fluid additives consist of clays and other materials that are used in accordance with standard industry practices. Drilling fluid additives that are expected to be used and their hazardous and extremely hazardous components are listed in Table C-1. Drilling operations will be conducted in compliance with applicable BLM and COGCC rules and regulations.

Drilling fluid additives will be transported to well locations during drilling operations in appropriate sacks and other containers, in compliance with DOT regulations. Drilling fluids, cuttings, and water will be stored in reserve pits. The following protection actions will be employed at the reserve pits, as deemed appropriate by the BLM and COGCC: netting to protect waterfowl, other birds, and bats; pit liners to protect shallow groundwater aquifers and to conserve water; and perimeter fencing to protect wildlife. Following drilling and completion operations, the reserve pit contents will be evaporated or solidified in place, the pit backfilled, and the surface reclaimed. Reserve pit solidification and closure procedures will be approved by the BLM or COGCC before implementation. Alternatively, reserve pit contents may be removed and disposed of at an appropriate off-site facility in a manner commensurate with applicable local, state, and federal regulations.

## 8.0    Fracturing Fluids

It is standard practice that a well will be hydraulically fractured periodically to augment gas flow rates. Fracturing fluids potentially containing hazardous substances that may be used within the project area are listed in Table C-1.

Fracturing fluids and additives will be transported to well locations in bulk or in appropriately designed and labeled containers. Transportation of fracturing fluids and additives will be in adherence with DOT rules and regulations.

During fracturing, fluids are pumped under pressure down the wellbore and out through perforations in the casing into the formation. The pressurized fluid enters the formation and induces hydraulic fractures. When the pressure is released at the surface, a portion of the fracturing fluids will be forced back into the wellbore and up to the surface into a reserve pit with a liner. The fracturing fluids will then be transported off site for reuse or disposal at an authorized facility. The BLM and COGCC will determine the appropriate disposal of fracturing fluids on a case-by-case basis.

## 9.0    Cement and Additives

Well completion and abandonment operations include cementing and plugging various segments of the wellbore to protect freshwater aquifers and other downhole resources. Materials potentially used for cementing operations include cement, calcium hydroxide, calcium chloride, pozzolans, sodium bicarbonate, potassium chloride, and insulating oil. An unknown quantity of cement and additives will

BLM_0020449

be transported in bulk to each well location. These additives might contain the hazardous material classes of fine mineral fibers, PAHs, and POM. Small quantities might also be transported and stored on site in 50-pound sacks. Wells will be cased and cemented as directed and approved by the BLM for federal minerals, and COGCC for state and patented minerals.

## 10.0   Miscellaneous Materials

Miscellaneous materials will be used during geophysical, construction, drilling, testing, completion, production, maintenance, transportation, abandonment, and reclamation activities. Miscellaneous materials potentially containing hazardous substances that might be used within the project area are listed in Table C-1. Quantities of these miscellaneous materials are unknown. Materials will be transported to the site by service and supply companies and will be used, stored, transported, and disposed of following manufacturers' guidelines and local, state, and federal requirements. In conformance with all applicable regulatory requirements, industry-standard pipeline materials, equipment, techniques, and procedures will be employed during construction, testing, operation, and maintenance activities to ensure pipeline safety and efficiency.

## 11.0   Pipeline Materials

Natural gas produced from wells will be transported from each location through pipelines. Industry standard pipeline equipment, materials, techniques, and procedures, in conformance with all applicable regulatory requirements, will be employed during construction, testing, operation, and maintenance of the project. All necessary authorizing actions for natural gas pipelines will be addressed prior to installation.

Materials utilized for pipeline construction, operation, and maintenance that may contain hazardous materials will be handled in accordance with applicable state and federal regulations.

## 12.0   Combustion Emissions

Gasoline and diesel engines, flaring of natural gas, and fired production equipment will produce combustion emissions within the project area. The complete oxidation of hydrocarbon fuel yields only carbon dioxide and water as combustion products. However, complete combustion is seldom achieved. Unburned hydrocarbons, particulate matter, carbon monoxide, nitrogen oxides, and possibly sulfur oxides will be components of the exhaust streams. The formation of ozone from the photolysis of nitrogen oxides will also be expected. A listing of the hazardous and extremely hazardous materials potentially present in combustion emissions is provided in Table C-1.

Unburned hydrocarbons might contain potentially hazardous PAHs; particulate matter may contain metal-based particles from metallic lubricating oil additives and engine wear. Hazardous materials in the particulate matter might include compounds of lead, cadmium, nickel, copper, manganese, barium, and zinc. Particulate matter emissions and larger unburned hydrocarbons will eventually settle out onto the ground surface; whereas, gaseous emissions will react with other air constituents as components of the nitrogen, sulfur, and carbon cycles.

Nitrogen dioxide, sulfur dioxide, sulfur trioxide, and ozone are potential combustion emissions classified as extremely hazardous materials. Releases of these or other materials will not exceed allowable thresholds established by the Prevention of Significant Deterioration and the National Ambient Air Quality Standards.

BLM_0020450

## 13.0  Policy and Procedure

Project operators and their contractors will ensure production, use, storage, transport, and disposal of hazardous and extremely hazardous materials associated with the proposed project in strict accordance with applicable existing or hereafter promulgated federal, state, and local government rules, regulations, and guidelines. Oil and gas activities involving the production, use, or disposal of hazardous or extremely hazardous materials will be conducted in such a manner so as to minimize potential environmental impacts.

Operators will comply with emergency reporting requirements for releases of hazardous materials. Releases of hazardous or extremely hazardous substances in excess of the reportable quantity, as established in 40 CFR Part 117, will be reported as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended. The materials for which such notification must be given are the extremely hazardous substances listed under the Emergency Planning and Community Right to Know Act, Section 302, and the hazardous substances designated under Section 102 of CERCLA, as amended. If a reportable quantity of a hazardous or extremely hazardous substance is released, prompt notice of the release will be given to the BLM's Authorized Officer and other appropriate local, state, and federal agencies.

In addition, notice of any spill or leakage (i.e., any undesirable event), as defined in BLM NTL-3A, shall be given to the Authorized Officer and other such local, state, and federal officials, as required by law.

Operators will prepare and implement, as necessary, the following plans and policies:

- Spill prevention and control countermeasure plans;
- Storm water pollution prevention plans;
- Liquid hydrocarbon spill response plans;
- Inventories of hazardous chemical categories pursuant to Section 312 of the Superfund Amendments and Reauthorization Act, as amended; and
- Emergency response plans.

Copies of the above will be maintained by the operators, as required by regulation, and will be made available upon request.

Exploration and production activities in the field office area will comply with regulations promulgated under the Resource Conservation and Recovery Act, CERCLA, the Clean Water Act, the Safe Drinking Water Act, the Toxic Substances Control Act, the Occupational Safety and Health Act, the Clean Air Act, and NEPA, as appropriate. In addition, project activities will comply with applicable state rules and regulations relating to hazardous material handling, storage, transportation, management, disposal, and reporting.

BLM_0020451

*This page left intentionally blank*

BLM_0020452

**Appendix C – Hazardous Materials Management Plan**

**Table C-1.  Materials Potentially Used or Produced during Construction, Drilling, Production, and Reclamation Operations**

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| **Production Streams** | | | |
| **Natural Gas** | | | |
| | [1]n-Hexane | 110-54-3 | 0.003-5.0 mmcfd[3] |
| | [1]PAHs | -- | |
| | [1]POM | -- | |
| **Produced Water** | | | |
| | | | 50-500 bpd[3] |
| | [1]Antimony | 7440-36-0 | |
| | [1]Arsenic | 7440-38-2 | |
| | [1]Barium | 7440-39-3 | |
| | [1]Beryllium | 7440-41-7 | |
| | [1]Cadmium | 7440-43-9 | |
| | [1]Chromium | 7440-47-3 | |
| | [1]Copper | 7440-50-8 | |
| | [1]Cyanide | -- | |
| | [1]Lead | 7439-92-1 | |
| | [1]Mercury | 7439-97-6 | |
| | [1]Nickel | 7440-02-0 | |
| | [2]Phenols | 108-95-2 | |
| | [1]Radium 226 | | |
| | Selenium | 7782-49-2 | |
| | [1]Silver | 7440-22-4 | |
| | [1]Sodium | 7440-23-5 | |
| | [1]Thallium | 7440-28-0 | |
| | [1]Zinc | 7440-66-6 | |
| **Liquid Hydrocarbons** | | | |
| | | | UNK |
| | [1]Benzene | 71-43-2 | |
| | [1]Ethylbenzene | 100-41-4 | |
| | [1]n-Hexane | 110-54-3 | |
| | [1]PAHs | -- | |
| | [1]POM | -- | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 1330-20-7 | |
| **Fuels** | | | |
| Gasoline | | | UNK |
| | [1]Benzene | 71-43-2 | |
| | [1]Cyclohexane | 110-82-7 | |
| | [1]Ethylbenzene | 100-41-4 | |
| | [1]n-Hexane | 110-54-3 | |
| | [1]Methyl tert-butyl ether | 1634-04-4 | |
| | [1]Naphthalene | 91-20-3 | |
| | [1]PAHs | -- | |
| | [1]POM | -- | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 1330-20-7 | |

**Table C-1.  Materials Potentially Used or Produced during
Construction, Drilling, Production, and Reclamation Operations**

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| Diesel | | | UNK |
| | [1]Benzene | 71-43-2 | |
| | [1]Ethylbenzene | 10041-4 | |
| | [1]Naphthalene | 91-20-3 | |
| | [1]PAHs | | |
| | [1]POM | | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 108-38-3 | |
| Jet A Fuel | | | UNK |
| | [1]Benzene | 71-43-2 | |
| | [1]Cyclohexane | 110-82-7 | |
| | [1]Ethylbenzene | 100-41-4 | |
| | [1]n-Hexane | 110-54-3 | |
| | [1]Methyl tert-butyl ether | 1634-04-4 | |
| | [1]Naphthalene | 91-20-3 | |
| | [1]PAHs | | |
| | [1]POM | | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 108-38-3 | |
| Natural Gas | | | UNK |
| | [1]n-Hexane | 110-54-3 | |
| | [1]PAHs | | |
| | [1]POM | | |
| Propane | | | UNK |
| | [1]Propylene | 115-07-1 | |
| **Lubricants** | | | |
| | | | UNK |
| | [1]Barium | 7440-39-3 | |
| | [1]Cadmium | 7440133-9 | |
| | [1]Copper [1]Lead | 7440-50-8 | |
| | [1]Lead | 7439-92-1 | |
| | [1]Manganese | 7439-96-5 | |
| | [1]Nickel | 7440-02-0 | |
| | [1]PAHs | | |
| | [1]POM | | |
| | [1]Zinc | 7440-66-6 | |
| **Coolant/ Antifreeze and Heat Transfer Agents** | | | |
| | | | UNK |
| | [1]Ethylene glycol | 107-21-1 | |
| **Drilling Fluids** | | | |
| | | | 16,000lb |
| Barite | [1]Barium compounds | -- | |
| | [1]Fine mineral fibers | -- | |
| Bentonite | [1]Fine mineral fibers | -- | 45,000lb |
| Caustic Soda | [1]Sodium hydroxide | 1310-73-2 | 750lb |
| Glutaraldehyde | [1]Isopropyl alcohol | 67-63-0 | 20 gal |
| Lime | [1]Fine mineral fibers | -- | 3,500lb |
| Mica | [1]Fine mineral fibers | | 600lb |

BLM_0020454

**Table C-1.  Materials Potentially Used or Produced during
Construction, Drilling, Production, and Reclamation Operations**

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| Modified Tannin | [1]Ferrous sulfate | 7720-78-7 | 250 lb |
|  | [1]Fine mineral fibers |  |  |
| Phosphate Esters | [1]Methanol | 67-56-1 | 100 gal |
| Polyacrylamides | [2]Acrylamide | 79-06-1 | 100 gal |
|  | [1]PAHs | -- |  |
|  | [1]POM | -- |  |
| Retarder | [1]Fine mineral fibers | -- | 400 lb |
| **Fracturing Fluids** |  |  |  |
| Biocides | [1]Fine mineral fibers | -- | UNK |
|  | [1]PAHs | -- |  |
|  | [1]POM | -- |  |
| Breakers | [1]Copper compounds | -- | UNK |
|  | [1]Ethylene glycol | 107-21-1 |  |
|  | [1]Fine mineral fibers | -- |  |
|  | [1]Glycol ethers | -- |  |
| Clay Stabilizer | [1]Fine mineral fibers | -- | UNK |
|  | [1]Glycol ethers | -- |  |
|  | [1]Isopropyl alcohol | 67-63-0 |  |
|  | [1]Methanol | 67-56-1 |  |
|  | [1]PAHs | -- |  |
|  | [1]POM | -- |  |
| Crosslinkers | [1]Ammonium chloride | 12125-02-9 | UNK |
|  | [1]Methanol | 67-56-1 |  |
|  | [1]Potassium hydroxide | 1310-58-3 |  |
|  | [1]Zirconium nitrate | 13746-89-9 |  |
|  | [1]Zirconium sulfate | 14644-61-2 |  |
| Foaming Agent | [1]Glycol ethers | -- | UNK |
| Gelling Agent | [1]Benzene | 71-43-2 | UNK |
|  | [1]Ethylbenzene | 100-41-4 |  |
|  | [1]Methyl tert-butyl ether | 1634-04-4 |  |
|  | [1]Napthalene | 91-20-3 |  |
|  | [1]PAHs | -- |  |
|  | [1]POM | -- |  |
|  | [1]Sodium hydroxide | 1310-73-2 |  |
|  | [1]Toluene | 108-88-3 |  |
|  | [1]Xylenes | 1330-20-7 |  |
| Ph Buffers |  |  |  |
|  | [1]Acetic acid | 64-19-7 | UNK |
|  | [1]Benzoic acid | 65-85-0 |  |
|  | [1]Fumaric acid | 110-17-8 |  |
|  | [1]Hydrochloric acid | 7647-01-0 |  |
|  | [1]Sodium hydroxide | 1310-73-2 |  |
| Sands | [1]Fine mineral fibers | -- | UNK |
| Solvents | [1]Glycol ethers | -- | UNK |
| Surfactants | [1]Glycol ethers | -- | UNK |
|  | [1]Isopropyl alcohol | 67-63-0 |  |
|  | [1]Methanol | 67-56-1 |  |
|  | [1]PAHs | -- |  |
|  | [1]POM | -- |  |

BLM_0020455

### Table C-1.  Materials Potentially Used or Produced during Construction, Drilling, Production, and Reclamation Operations

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| **Cement and Additives** | | | |
| Anti-Foamer | [1]Glycol ethers | -- | 100 lb |
| Calcium Chloride Flake | [1]Fine mineral fibers | -- | 2,500 lb |
| Cellophane Flake | [1]Fine mineral fibers | -- | 300 lb |
| Cement | [1]Aluminum oxide | 1344-28-1 | 77,000 lb |
| | [1]Fine mineral fibers | -- | |
| Chemical Wash | [1]Ammonium hydroxide | 1336-21-6 | 850 gal |
| | [1]Glycol ethers | -- | |
| | | | |
| Diatomaceous Earth | [1]Fine mineral fibers | -- | 1,000 lb |
| Extenders | [1]Aluminum oxide | 1344-28-1 | 17,500 lb |
| | [1]Fine mineral fibers | -- | |
| Fluid Loss Additive | [2]Acrylamide | 79-06-1 | 900 lb |
| | [1]Fine mineral fibers | -- | |
| | [1]Naphthalene | 91-20-3 | |
| Friction Reducer | [1]Fine mineral fibers | -- | 160 lb |
| | [1]Naphthalene | 91-20-3 | |
| | [1]PAHs | -- | |
| | [1]POM | -- | |
| Mud Flash | [1]Fine mineral fibers | -- | 250 lb |
| Retarder | [1]Fine mineral fibers | -- | 100 lb |
| Salt | [1]Fine mineral fibers | -- | 2,570 lb |
| Silica Flour | [1]Fine mineral fibers | -- | 4,800 lb |
| **Miscellaneous Materials** | | | |
| Acids | [1]Acetic anhydride | 108-24-7 | UNK |
| | [1]Formic acid | 64-18-6 | |
| | [1]Sodium chromate | 777-11-3 | |
| | [2]Sulfuric acid | 7664-93-9 | |
| Batteries | [1]Cadmium | 744043-9 | UNK |
| | [2]Cadmium oxide | 1306-19-0 | |
| | [1]Lead | 7439-92-1 | |
| | [1]Nickel hydroxide | 7440-02-0 | |
| | [1]Potassium hydroxide | 1310-58-3 | |
| | [2]Sulfuric acid | 7664-93-9 | |
| Biocides | [2]Formaldehyde | 50-00-0 | UNK |
| | [1]Isopropyl alcohol | 67-63-0 | |
| | [1]Methanol | 67-56-1 | |
| Cleaners | [1]Hydrochloric acid | 7647-01-0 | |
| Corrosion Inhibitors | [1]4,4' Methylene dianiline | 101-77-9 | |
| | [1]Acetic acid | 64-19-7 | |
| | [1]Ammonium bisulfite | 10192-30-0 | |
| | [1]Diethylamine | 109-89-7 | |
| | [1]Dodecylbenzenesulfonic acid | 27176-87-0 | |
| | [1]Ethylene glycol | 107-21-1 | |
| | [1]Isobutyl alcohol | 78-83-1 | |
| | [1]Isopropyl alcohol | 67-63-0 | |
| | [1]Methanol | 67-56-1 | |
| | [1]Naphthalene | 91-20-3 | |

BLM_0020456

**Table C-1.  Materials Potentially Used or Produced during
Construction, Drilling, Production, and Reclamation Operations**

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| | [1]Sodium nitrite | 7632-00-0 | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 1330-20-7 | |
| | [1]Zinc carbonate | 3486-35-9 | |
| Emulsion Breakers | [1]Acetic acid | 64-19-7 | UNK |
| | [1]Acetone | 67-64-1 | |
| | [1]Ammonium chloride | 12125-02-9 | |
| | [1]Benzoic acid | 65-85-0 | |
| | [1]Isopropyl alcohol | 67-63-0 | |
| | [1]Methanol | 67-56-1 | |
| | [1]Naphthalene | 91-20-3 | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 1330-20-7 | |
| | [1]Zinc chloride | 7646-85-7 | |
| **Explosives, Fuses Detonators, and Boosters** | | | |
| | Benzene | 71-43-2 | UNK |
| | [1]Ethylbenzene | 100-41-4 | |
| | [1]Ethylene glycol | 107-21-1 | |
| | [1]Lead compounds | 7439-92-1 | |
| | [1]Methyl tert-butyl ether | 1634-04-0 | |
| | [1]Naphthalene | 91-20-3 | |
| | [2]Nitric acid | 7697-37-2 | |
| | [1]Nitroglycerine | 55-63-0 | |
| | [1]PAHs | - | |
| | [1]POM | - | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 1330-20-7 | |
| Fertilizers | UNK | - | UNK |
| Herbicides | UNK | - | UNK |
| Lead-Free Thread Compound | [1]Copper | 7440-50-8 | 25 gal |
| | [1]Zinc | 7440-66-6 | |
| Methanol | [1]Methanol | 67-56-1 | 200 gal |
| Motor oil | [1]Zinc Compounds | - | 220 gal |
| Paints | [1]Barium | 7440-39-3 | UNK |
| | [1]n-Butyl alcohol | 71-36-3 | |
| | [1]Cobalt | 7440-48-4 | |
| | [1]Lead | 7439-92-1 | |
| | [1]Manganese | 7438-96-5 | |
| | [1]PAHs | | |
| | [1]POM | | |
| | [2]Sulfuric acid | 7664-93-9 | |
| | [1]Toluene | 108-88-3 | |
| | [1]Triethylamine | 121-44-8 | |
| | [1]Xylenes | 1330-20-7 | |
| Paraffin Control | [2]Carbon disulfide | 75-15-0 | UNK |
| | [1]Ethylbenzene | 100-41-4 | |
| | [1]Methanol | 67-56-1 | |
| | [1]Toluene | 108-88-3 | |

BLM_0020457

**Table C-1.  Materials Potentially Used or Produced during
Construction, Drilling, Production, and Reclamation Operations**

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| | [1]Xylenes | 1330-20-7 | |
| Photoreceptors | [1]Selenium | 7782-49-2 | UNK |
| **Pipeline** | | | |
| Coating | [1]Aluminum oxide | 1334-28-1 | UNK |
| Cupric Sulfate Solution | [1]Cupric sulfate | 7758-98-7 | UNK |
| | [1]Sulfuric acid | 7664-93-9 | |
| Diethanolamine | [1]Diethanolamine | 111-42-2 | UNK |
| LP Gas | [1]Benzene | 71-43-2 | UNK |
| | [1]n-Hexane | 110-54-3 | |
| | [1]Propylene | 115-07-1 | |
| Molecular Sieves | [1]Aluminum oxide | 1344-28-1 | UNK |
| Pipeline Primer | [1]Naphthalene | 91-20-3 | UNK |
| | [1]Toluene | 108-88-3 | |
| Potassium Hydroxide Solution | [1]Potassium hydroxide | 1310-58-3 | UNK |
| Rubber Resin Coatings | [1]Acetone | 67-64-1 | UNK |
| | [1]Ethyl acetate | 141-78-6 | |
| | [1]Methyl ethyl ketone | 78-93-3 | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylene | 1330-20-7 | |
| Scale Inhibitors | [1]Acetic acid | 64-19-7 | UNK |
| | [1]Ethylene diamine tetraacetic acid | 60-00-4 | |
| | [1]Ethylene glycol | 107-21-1 | |
| | [1]Formaldehyde | 50-00-0 | |
| | [1]Hydrochloric acid | 7647-01-0 | |
| | [1]Isopropyl alcohol | 67-63-1 | |
| | [1]Methanol | 67-56-1 | |
| | [1]Nitrilotriacetic acid | 139-13-9 | |
| Sealants | [1]1,1,1-trichloroethane | 71-55-6 | UNK |
| | [1]n-Hexane | 110-54-3 | |
| | [1]PAHs | -- | |
| | [1]POM | -- | |
| Solvents | [1]1,1,1-trichloroethane | 71-55-6 | UNK |
| | [1]Acetone | 67-64-1 | |
| | [1]t-Butyl alcohol | 75-65-0 | |
| | [1]Carbon tetrachloride | 56-23-5 | |
| | [1]Isopropyl alcohol | 67-63-0 | |
| | [1]Methyl ethyl ketone | 108-10-1 | |
| | [1]Methanol | 67-56-1 | |
| | [1]PAHs | -- | |
| | [1]POM | -- | |
| | [1]Toluene | 108-88-3 | |
| | [1]Xylenes | 1330-20-7 | |
| Starting Fluid | [1]Ethyl ether | 60-29-7 | UNK |
| Surfactants | [2]Ethylene diamine | 107-15-3 | UNK |
| | [1]Isopropyl alcohol | 67-56-1 | |

BLM_0020458

**Appendix C – Hazardous Materials Management Plan**

### Table C-1.  Materials Potentially Used or Produced during Construction, Drilling, Production, and Reclamation Operations

| Source | Material | CAS No. | Approximate Quantities Used or Produced Per Well |
|---|---|---|---|
| **Combustion Emissions** | | | |
| Combustion Products | (2)Formaldehyde | 50-00-0 | |
| | (2)Nitrogen dioxide | 10102-44-0 | |
| | (2)Ozone | 10028-15-6 | |
| | (2)Sulfur dioxide | 7446-09-5 | |
| | (2)Sulfur trioxide | 7446-11-9 | |
| Unburned | (1)Benzene | 71-43-2 | |
| Hydrocarbons | (1)Ethylbenzene | 100-41-4 | |
| | (1)n-Hexane | 100-54-3 | |
| | (1)PAHs | -- | |
| | (1)Toluene | 108-88-3 | |
| | (1)Xylenes | 1330-20-7 | |
| Particulate Matter | (1)Barium | 7440-39-3 | |
| | (1)Cadmium | 7440-43-9 | |
| | (1)Copper | 7440-50-8 | |
| | (1)Fine mineral fibers | -- | |
| | (1)Lead | 7439-92-1 | |
| | (1)Manganese | 7439-96-5 | |
| | (1)Nickel | 7440-02-0 | |
| | (1)POM | -- | |
| | (1)Zinc | 7440-66-6 | |

Notes:                                         gal = gallons
bpd= barrels per day                  mmcfd = million cubic feet per day
lb = pounds                                  POM = polycyclic organic matter
PAHs = polynuclear aromatic hydrocarbons        UNK = unknown

(1) Hazardous Substances include those compounds identified in EPA's List of Hazardous Substances (40 CFR Part 302) and List of Substances for Accidental Release Prevention (40 CFR Part 68).

(2) Extremely Hazardous Substances include those compounds identified in EPA's List of Extremely Hazardous Substances (40 CFR Part 355).

(3) BLM 1997, *Reasonable Foreseeable Development Scenario for Oil and Gas Activities in the BLM White River Field Office: Rio Blanco, Moffat and Garfield Counties, Colorado.*

BLM_0020459

*This page intentionally left blank*

BLM_0020460

BLM

## Appendix D

# Surface Reclamation Plan



**Public Lands USA: Use, Share, Appreciate**

BLM_0020462

# Table of Contents

Page

1.0  INTRODUCTION ...................................................................................................... D-1

    1.1  Background ................................................................................................... D-1

    1.2  Authority ....................................................................................................... D-2

2.0  SITE-SPECIFIC RECLAMATION PLANS ............................................................ D-3

    2.1  Introduction .................................................................................................. D-3

    2.2  Plan Components .......................................................................................... D-3

    2.3  Additional Instances Requiring Site-Specific Reclamation Plan Submission .......... D-5

3.0  TIMEFRAMES, SUCCESS CRITERIA, AND REQUIREMENTS .......................... D-6

    3.1  Interim Reclamation ..................................................................................... D-6

        3.1.1  Phase I Interim Reclamation ................................................. D-6

        3.1.2  Phase II Interim Reclamation ................................................ D-9

    3.2  Final Reclamation ........................................................................................ D-12

        3.2.1  Timeframe (Final) ................................................................. D-12

        3.2.2  Success Criteria (Final) ........................................................ D-13

        3.2.3  Reclamation Requirements (Final) ........................................ D-14

4.0  RECLAMATION STATUS REPORTS ................................................................... D-17

    4.1  Timeframe for Reclamation Status Report Submission .......................... D-17

    4.2  Status Report Components .......................................................................... D-17

5.0  SEED MIXES ......................................................................................................... D-19

    5.1  Seed Mix Selection, Application Methods, and Rates ............................. D-19

    5.2  Acceptable Seeding Dates .......................................................................... D-25

6.0  MODIFICATIONS OF STANDARD RECLAMATION SUCCESS CRITERIA
    AND SEED MIXES ............................................................................................... D-26

    6.1  GREATER SAGE-GROUSE HABITAT ................................................. D-26

    6.2  Habitat for Special Status Plant Species ................................................... D-26

    6.3  Areas of Critical Environmental Concern (ACEC) and Remnant Vegetation
    Associations (RVA) ........................................................................................ D-26

7.0  SUPPLEMENTAL INFORMATION ...................................................................... D-28

    7.1  Acronyms ..................................................................................................... D-28

    7.2  Contact Information ...................................................................................... D-29

    7.3  References ..................................................................................................... D-29

    7.4  Glossary ........................................................................................................ D-29

BLM_0020463

*Appendix D – Surface Reclamation Plan*

## List of Tables

Table D-1      Timeline for Reclamation Activities ................................................................. D-16

Table D-2      Seed Mixes Tied to Range Sites within the WRFO ........................................... D-20

Table D-3      Standard Seed Mixes  (50 seeds per square foot application rate) ...................... D-21

Table D-4      Alternate Forb Species ...................................................................................... D-24

Table D-5      Acceptable Seeding Dates Based on Vegetation Community ............................ D-25

BLM_0020464

# 1.0   Introduction

## *1.1   Background*

The 2007 revised Onshore Order #1 requires oil and gas operators to incorporate a reclamation plan into its Application for Permit to Drill, which the Bureau of Land Management (BLM) utilizes to determine the overall effects of the proposal. These plans describe the operator's practices and procedures, which it will implement to ensure effective reclamation of disturbed lands occurs. The purpose of this document is three fold. First, it provides the minimum information and operation standards that the White River Field Office (WRFO) expects within reclamation plans, with the level of detail necessary to assess the technical adequacy and land use plan conformance of those plans. Secondly, the document establishes specific criteria the WRFO will implement which will determine if reclamation is successful. And finally the document identifies a number of techniques and methodologies that can be incorporated into a site specific reclamation plan which the WRFO has seen successfully use by operators in the past to achieve successful reclamation. The WRFO contains a diversity of site characteristics (i.e., elevation, topography, precipitation, and soil type) present across the 2.6 million acres within the WRFO requiring a standards-based approach to reclamation rather than a one-size fits-all procedure-based approach. The following standards are specific to the WRFO and are intended to complement current reclamation guidance found in the "Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development" (The Gold Book) and other BLM policy and guidance.

All surface disturbing activities approved on BLM lands administered by the WRFO will be subject to reclamation standards described in this document. It is important to note that reclamation success criteria expressed in this document are considered standards that, through the Authorized Officer (AO), are subject to adaptation depending on site-specific reclamation challenges (i.e., physical or biological constraints beyond the operator's control). WRFO will consider authorizing well-designed reclamation experiments and trials outside established strategies that may serve as the basis for enhancing reclamation efficacy or efficiency consistent with BLM's reclamation objectives.

Standards-based reclamation focuses on using the desired end condition as the ultimate determinant of reclamation success. Reclamation procedures are designed to provide soil stabilization while expediting the return of a functional and desirable plant community. These standards are to be location specific and strictly adhered to unless a written exception is granted by the AO. There are numerous other sources of guidance (e.g., Best Management Practices) to aid operators in achieving reclamation success. Industry is encouraged to propose analogous innovative approaches to help meet or exceed BLM reclamation standards.

Additional reclamation planning, requirements, implementation methods, and monitoring guidance can be found in the following references or on the WRFO's webpage:

- Revised Onshore Order Number 1 (Effective May 7, 2007)
- Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (The Gold Book)
- Bureau of Land Management – Colorado Standards for Public Land Health

BLM_0020465

- BLM Core Terrestrial Indicators and Methods Technical Note 440 and Monitoring Manual for Grassland, Shrubland, and Savanna Ecosystems, Volume I and II: Quick Start. Methods discussed in BLM Technical Reference 1730-1 may also be used after BLM pre-approval.

- Natural Resource Conservation Service (NRCS) Range Site Descriptions

  - Once available from the NRCS, the WRFO will transition from using range sites to the updated Ecological Site Descriptions.

## 1.2  Authority

The BLM is required by law to ensure that authorized actions are carried out in a manner that does not result in "permanent impairment of the productivity of the land or the quality of the environment" (Federal Land Policy and Management Act [FLPMA], 1976). In order to promote a consistent and science-based approach to reclamation, this document identifies minimum information and operational requirements and performance-based criteria that are expected to satisfy WRFO's responsibilities under FLPMA and Colorado's Public Land Health Standards.

The Mineral Leasing Act of 1920 (30 U.S.C. § 181-287), amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987, PL 100-203, among other things, authorizes the Secretary of Interior to regulate all surface-disturbing activities associated with any lease and to impose mitigation and reclamation measures in order to "conserve surface resources."

The White River 1997 Record of Decision/Resource Management Plan (ROD/RMP) specifies that surface disturbance be promptly reclaimed to the satisfaction of the Area Manager and reclamation be implemented concurrent with construction and site operations to the fullest extent possible.

BLM regulations established in 43 C.F.R. §3160 (i.e., Onshore Oil and Gas Order Number 1) require that a reclamation plan be submitted with the Surface Use Plan in the Application for Permit to Drill (APD). The Onshore Order Number 1, Section XII. B., in referencing Section III.D.4.j., requires that surface reclamation plans must be designed to return the disturbed areas to productive use and meet the objectives of the land and resource management plan.

BLM_0020466

## 2.0    Site-Specific Reclamation Plans

### 2.1    Introduction

As described in Onshore Order Number 1(Revised 2007), project specific reclamation plans are required for any surface disturbing activity related to oil and gas activities. All reclamation plans must be consistent with current standards and RMP goals and objectives for all land management designations throughout the Field Office. Project placement and planning should be designed to optimize reclamation success and prevent impacts to the surrounding area. Exceptions may be warranted for wells on existing multi-well pads with approved reclamation plans. The Code of Federal Regulations (CFR), at 43 CFR 2800 describes requirements for surface use plans and associated reclamation plans for rights-of-way. Reclamation plans must be designed to return the disturbed area to a condition that meets the objectives of the White River 1997 ROD/RMP. Reclamation plans will address surface reclamation and/or stabilization of all disturbed areas for both the interim reclamation of all areas not needed for production and final reclamation of locations (after plugging) or linear facilities (upon completion of construction). Such plans must include the reclamation timelines, configuration of the reshaped topography, drainage systems, segregation of spoil materials (stockpiles), storage, and redistribution of topsoil, soil treatments, seeding or other steps to stabilize soils and reestablish vegetation, and weed control. The reclamation plan should be updated and re-submitted for approval if any changes occur that may influence reclamation. The Reclamation Plan is part of the Surface Use Plan (SUP). An APD may have additional site specific Conditions of Approval (COAs) attached by the BLM.

### 2.2    Plan Components

At a minimum, project specific reclamation plans sufficient to accurately characterize surface and site conditions prior to disturbance will be submitted to the WRFO and must include:

1.  Documentation of surface and site conditions prior to disturbance:

    a.  Photos of area to be disturbed, taken from permanent photo points.

    b.  Pre-disturbance terrain and contour.

    c.  Soil type, texture, erosion potential, average topsoil depth and characteristics (i.e., physical and chemical properties), and average depth to bedrock by soil type.

    d.  If topsoil is expected to be stored for more than six months, BLM suggests that its physical and chemical characteristics should be measured to determine pre-disturbance baseline values and to identify potential changes during storage. The topsoil should be retested during Phase II interim reclamation using the same baseline methods to determine if there is a need for soil amendments. Suggested parameters for testing include pH, organic carbon, fertility (nitrogen, phosphorus, and potassium), aeration porosity, water-holding or available water capacity, bulk density, hydraulic conductivity, and electrical conductivity. An adequate number of samples should be taken to ensure that changes in soil attributes can be detected.

    e.  Pre-disturbance ground cover, including surface rock and vegetation composition (by species). Data must be gathered using quantitative methods to measure the six Core Terrestrial Indicators and Methods in BLM Technical Note 440. Approved methods are found in Monitoring Manual for Grassland, Shrubland, and Savanna Ecosystems, Volume I and II: Quick Start. Other data collection methods such as those described in BLM Technical Reference 1730-1 may be used if pre-approved by the BLM.

BLM_0020467

    f.   Pre-disturbance survey identifying and quantifying noxious and/or invasive weeds within the area of direct and indirect use (project disturbance and a 200 foot buffer), including all access roads, pipelines, or other associated surface disturbance.

    g.   NRCS range site(s) or associated reference site(s) (identified and mapped). Reference sites can be used when the operator and the BLM agree that the site does not reflect the range site. The reference site must be approved by the BLM. The operator must provide statistically valid quantitative reference site measurements of vegetation cover, vegetation composition, woody plant density, and percent bare ground. Pre-disturbance vegetation data must be gathered using quantitative methods as explained above in 2.2e.

2.   Construction practices and Phase I interim reclamation drainage design (including a plan view figure or diagram):

    a.   Pipeline construction practices that define the progression, method of installation such as using a plow, trencher, or excavator and a description of soil management practices during construction including storage of topsoil, subsoil, and methods for bedding the pipeline.

    b.   Note: Topsoil will only be used as a seed bed for reclamation. Under no circumstances will topsoil be used as a pipe bedding material, to fill sacks for trench breakers, or for any other use as a construction material.

    c.   Drainage systems including any stormwater measures, diversion ditches, catchment ditches, infiltration ponds, culverts, low-water crossings, or waterbars.

    d.   Planned disturbance including locations of stockpiles, stormwater measures, production facilities pads, or other needed infrastructure.

    e.   Identify and describe management of waste materials (e.g., cuttings management/ disposal, contaminated soils).

3.   Weed management:

    a.   Weed management plans to address treatment from pre-disturbance, the life of the project, and through final abandonment including a summary of methods used to monitor, treat, and report the presence of noxious or undesirable invasive weeds within the project area and surrounding area (i.e., within 200 feet of areas of direct use). Ensure that weed treatments are developed and conducted in an effective manner compatible with approved seed mixes. .

    b.   Plans for washing all vehicles and equipment to prevent the spread of weeds. Plans must address weed free zones identified in the White River 1997 ROD/RMP. Weed free zones are areas designated for intensive weed management through cooperation with private land owners, and state and county governments. Maps of designated weed free zones are in the White River 1997 ROD/RMP.

4.   Monitoring methods:

    a.   The location of permanent photo points, which should show all aspects of planned surface disturbance and the adjacent undisturbed landscape.

    b.   Reclamation monitoring plans must address all aspects of success criteria and include proposed methods, sampling design, inspection frequency, and reporting schedules. The operator will consult with the project lead (NRS/Realty Specialist) when developing the monitoring plan. Vegetation monitoring, completed by qualified personnel, should occur within the growing season and begin the second year after reclamation efforts are

BLM_0020468

initiated and every third year after that until final abandonment. The BLM may require more frequent monitoring of reclamation if necessary. Vegetation monitoring reports should be submitted to the BLM with the reclamation status report by January 1st. Vegetation monitoring must also be completed and reported in conjunction with the final abandonment notice.

5. Interim reclamation (Phase I & II):

    a.   Soil stabilization methods and stormwater management practices.

    b.   Topographic diagram showing interim reclamation footprint including the extent of recontouring (Phase II only), any areas put into final contours, and the means employed to maximize the extent of disturbance available for effective reclamation (e.g., placement of production facilities).

    c.   Topsoil management and stabilization practices.

    d.   Surface preparation before and after seeding, including but not limited to: depth of ripping, soil pocking, disking, mulching, incorporation of woody material, etc.

    e.   Seeding methods and seed mix.

    f.   Methods for managing livestock and wild horse influences.

6. Final reclamation:

    a.   Diagram showing proposed final recontouring.

    b.   Proposed seeding methods and seed mixes (updated to match current approved mixes).

    c.   Methods for managing livestock and wild horse influences.

7. Long-term maintenance plans for roads, pipelines, power lines, and facilities:

    a.   Weed control.

    b.   Erosion control.

    c.   Stormwater BMP maintenance.

    d.   Control of unauthorized use or travel.

    e.   Inspection and reporting schedule.

## 2.3   Additional Instances Requiring Site-Specific Reclamation Plan Submission

- As an attachment to Sundry Notice and Report on Well (Form 3160-5) if the APD was formerly approved without a reclamation plan.

- As a separate Sundry Notice submitted at the same time as the Subsequent Report of Well Abandonment (43 CFR 3162.4).

- Prior to requesting to abandon a right-of-way.

- Prior to any actions associated with the project that may influence reclamation.

The operator/holder can propose to amend the reclamation plan at any time via Sundry Notice.

BLM_0020469

# 3.0   Timeframes, Success Criteria, and Requirements

Reclamation success is determined by specific standards (that vary by phase) associated with a self-sustaining Desirable Plant Community (DPC) as defined by the range site or an associated reference site. In Phase I interim reclamation, physical measures may be combined with vegetation-based techniques to successfully stabilize, protect, and preserve soils. Phase II interim reclamation and Final reclamation for oil and gas activities would be considered successful once attaining the criteria described at 3.1.2.3 and 3.2, respectively. It is the responsibility of the operator to make repeated attempts (e.g., seeding, weed control) until successful reclamation has been achieved and accepted by the BLM. A timeline for reclamation activities is provided in Table D-1.

## 3.1   Interim Reclamation

There are two distinct phases of interim reclamation recognized by the WRFO to manage surface disturbance associated with energy development. Phase I interim reclamation generally begins within 24 hours from the time when surface disturbing activities have ended. Surface disturbing activities include, but are not limited to, road construction and well pad construction. Phase II generally begins when drilling on the pad has ended and the wells are ready for completion and/or production. Rights-of-way (e.g., pipelines and power lines) do not necessarily have an interim reclamation phase, but proceed immediately to Final reclamation upon completion of construction. Pipeline and power line construction should be scheduled so that seed bed preparation and seeding occurs in optimal timeframes for reclamation success.

### 3.1.1   Phase I Interim Reclamation

Phase I interim reclamation is designed to stabilize and protect soil resources from erosion and to properly store topsoil during periods of active well development such that it remains viable and available for redistribution during later stages of reclamation. Soil stabilization measures should include vegetation-based techniques, but may rely primarily on physical measures such as erosion fabric.

#### 3.1.1.1   Timeframe (Phase I)

Phase I interim reclamation will be implemented immediately (i.e., within 24 hours) after surface disturbing activities have ended. Application of seed should generally be avoided between April and August, but BLM will consider exceptions on a case-by-case basis.

#### 3.1.1.2   Success Criteria (Phase I)

The primary objective of Phase I interim reclamation is to stabilize and protect soil resources from wind and water erosion. BLM acknowledges that Phase I interim reclamation techniques may rely predominantly on physical measures such as erosion fabric. In those circumstances where vegetation establishment is used to stabilize soils, the primary determinant for evaluating reclamation success will be desirable ground cover rather than seeded vegetation composition. At a minimum, the following standards must be met in order for Phase I interim reclamation to be deemed successful:

1.   All disturbed areas including stockpiled soils and the surrounding area are kept free of noxious and undesirable invasive weeds, construction debris, and trash.

2.   Soil piles and all areas of surface disturbance not required for operations are protected (e.g., mulch, matting, netting, tackifiers, established re-vegetation,).

BLM_0020470

3. There is no evidence of excessive erosion such as slope or soil instability, subsidence, or slumping at the site or in areas adjacent to the site (as compared to the range site).

4. Stored topsoil to be used in later phase of reclamation is identified (e.g., signs or fencing), protected, and appropriately placed to minimize disturbance in later stages of reclamation.

### 3.1.1.3   Requirements (Phase I)

The following requirements apply to Phase I interim reclamation and are designed to help meet the success criteria for this phase of reclamation.

1. The project lead (NRS/Realty Specialist) will be notified via email or by phone at least 24 hours prior to beginning any BLM approved construction-related activities, regardless of size, that result in disturbance of surface soils.

2. Prior to beginning reclamation activities, a pre-reclamation onsite meeting must be scheduled with the project lead (NRS/Realty Specialist. Reclamation activities may include, but are not limited to recontouring, seed bed preparation, seeding, or construction of livestock exclosures.

3. All equipment that may act as a vector for weeds will be cleaned before entering the WRFO. Equipment will also be cleaned when leaving and/or moving between work-sites if the pre-disturbance weed inventory indicated the presence of undesirable invasive or noxious weeds and there is a risk of transporting weed seeds or propagules.

4. Trees or shrubs that must be removed for construction or ROW preparation will be cut down or masticated to a stump height of six inches or less prior to other heavy equipment operation. Trees removed for construction that are not needed for reclamation purposes will be cut in four foot lengths (down to four inches diameter) and placed in manageable stacks immediately adjacent to a public road to facilitate removal by the public. Woody materials required for reclamation will be stockpiled and stored separately from stockpiled topsoil and may be positioned along the margins of the authorized use area. Smaller limbs and trees may be chipped and stockpiled if needed for reclamation, and with approval from the AO, incorporated into the top 6-10 inches of topsoil. Boles, limbs, and other large woody material should be retained for redistribution not to exceed 20-30 percent total ground cover.

5. During site construction all topsoil will be stripped from the location, handled separately from subsoil materials, and stored for reuse during Phase II interim reclamation and/or Final reclamation.

6. Balance cut and fill to the maximum extent possible in order to minimize excess spoils piles and facilitate Phase II interim reclamation.

7. Topsoil must be salvaged during road construction and respread to the greatest degree practical on cut slopes, fill slopes, and borrow ditches prior to seeding. Road shape will be built using the borrow ditch subsoil. Topsoil may be stabilized with mulch as needed.

8. Properly store topsoil to protect it from erosion and compaction, assure that it remains readably identifiable (i.e., signed), viable, and available for redistribution during later stages of reclamation. Topsoil piles that will be stored for more than one month will be seeded

BLM_0020471

with an approved BLM seed mix, stabilized with certified weed free erosion fabric or mulch, and may require fencing. When topsoil will be stored for more than one year and other resource values can be accommodated, topsoil will be stored in piles with a depth of two feet or less.

9. Topsoil will only be used as a seed bed for reclamation. Under no circumstances will topsoil be used as a pipe bedding material, to fill sacks for trench breakers, or for any other use as construction material. Fines and organics will not be shaken out of the effective rooting zone soils for pipeline bedding.

10. Vegetative and structural soil stabilization practices will be required on cut and fill slopes off the working surfaces and in areas near water features, e.g., streams (including ephemeral drainages, ponds, and wetlands), or in other situations where wind or water erosion may otherwise accelerate movement of sediments.

11. All disturbed surfaces, including cut and fill slopes and drainage ditches along roads, will be seeded with a BLM approved seed mix. On roads, topsoil will be spread where successful revegetation is likely (e.g., along appropriate cut and fill slopes or at the top edge of the borrow ditches) and where it will not be disturbed during regular road maintenance activities.

12. Livestock should generally be excluded from reclaimed areas until successful reclamation is achieved. These decisions will be made by the BLM on a case-by-case basis. Fences, cattleguards, and gates (all built to BLM specifications per BLM manual H-1741-1) will be installed, maintained, and removed by the operator upon approval by the AO. In specific and predetermined instances, livestock exclosures may be retained for extended periods to meet other resource objectives.

13. To track Phase I and Phase II interim and Final reclamation, the operator will submit Geographic Information System (GIS) data to the WRFO project lead (NRS/Realty Specialist) for any post construction (i.e., "as-built") polygon feature that is associated with the project. GIS data will be submitted within 30 days from when construction has completed for all geographic features associated with the project. The operator will submit updated GIS data to the WRFO for any location or orientation changes within 14 calendar days of the change. GIS data will include constructed access roads, existing roads that were upgraded, pipeline corridors, temporary work areas, well pad footprints, and ancillary facilities. Geospatial (GIS/GPS/RS) data submitted to WRFO shall be in a format compatible with the WRFO's Geospatial Data Submission Standards. This information can be found on the WRFO website or in the glossary.

14. The operator will be required to meet with the WRFO reclamation staff in March or April of each calendar year and present a comprehensive work plan. The purpose of the plan is to provide information pertaining to reclamation activities that are expected to occur during the coming year. Operators will also provide a map that shows all sites where some form of reclamation activity is expected to occur during the coming year.

15. A Reclamation Status Report (see Section 4) including weed survey results for each site will be submitted electronically to the WRFO annually (due January 1st) until it is determined that reclamation of the site has met all required objectives of Phase I interim reclamation.

BLM_0020472

## 3.1.2  Phase II Interim Reclamation

Phase II interim reclamation will involve recontouring the site to maximize the extent of disturbance available for reclamation, leaving the minimum area necessary for routine production and maintenance activities or as necessary to accommodate BLM authorized development plans. Desired native or seeded vegetation will be established and self-sustaining on as much of the disturbance as practicable to minimize soil erosion, inhibit noxious and undesirable invasive weed establishment, minimize visual resource impacts, allow for the advance of successional processes, and provide specific wildlife habitat components over the productive life of the well pad or facility.

The WRFO uses early-seral successional stages of the NRCS Ecological Site Descriptions (ESDs) to compare to reclamation cover and composition values to determine if reclamation success has been achieved for Phase II and Final reclamation. Because many ESDs are not yet available, the WRFO has developed an eco-site database using the Assessment, Inventory, and Monitoring (AIM) protocol (BLM TN 440) to provide cover and composition data that will be used as DPC reference data until ESDs are developed. The AIM protocol gathers much of the same data used to characterize sites when developing ESDs. Success criteria for potential foliar and/or basal cover will be determined on a site by site basis according to the AIM data.

### 3.1.2.1  Timeframe (Phase II)

Revised Onshore Order Number 1 requires that earthwork for interim reclamation is to be completed within six months of the conclusion of drilling. WRFO prefers to have recontouring work either deferred or expedited so that seed can be applied to a fresh seedbed during the optimal seeding times (i.e., September through March), or as otherwise approved by the BLM. Topsoil redistribution and seedbed preparation should be accomplished immediately before seeding.

Phase II interim reclamation will be initiated when one of the following applies:

- The last well on a pad has been drilled and has undergone completion.
- There are no drilling activities expected on the pad for the next six months.
- There has been no activity on the pad within the last six months, regardless of whether or not there are outstanding approved APDs.

Deadlines for reclamation are subject to extension upon the approval of the AO based on weather, timing limitations, or other constraints on a case-by-case basis.

### 3.1.2.2  Success Criteria (Phase II)

Successful reclamation must conserve the potential of the site to produce vegetation on a sustainable basis and must meet the Colorado Standards for Public Land Health. At a minimum, with BLM consideration to site conditions (i.e., elevation, slope, aspect), the following standards must be met in order for Phase II interim reclamation to be deemed successful:

1. All disturbed areas including stockpiled soils are kept free of noxious and undesirable invasive weeds, construction debris, and trash.

2. There is no evidence of excessive erosion such as slope or soil instability, subsidence, or slumping at the site or in areas adjacent to the site (as compared to the range site description).

BLM_0020473

3. Self-sustaining desirable vegetative groundcover consistent with the site DPC (as defined by the range site, WRFO AIM protocol site data (BLM TN 440), or an associated approved reference site) is adequately established as described below on disturbed surfaces to stabilize soils through the life of the project. As Ecological Site Descriptions (ESD) are developed those cover values may replace range site, AIM data, or reference site values.

   a. Potential foliar cover must be at least 100, 80, 60 percent (depending on Alternative chosen) of the DPC and/or potential basal cover must be at least 50, 25, 5 percent (depending on Alternative chosen) of the DPC. In the absence of specified DPC data, the default minimum potential foliar cover must be 90, 70, 40 percent (depending on alternative chosen) and/or potential basal cover must be 30, 20, 5 percent (depending on Alternative chosen). Vegetative cover values for woodland or shrubland sites are based on the capability of those sites in an herbaceous state.

   b. The resulting plant community must have composition of at least five desirable plant species, at least three, two, one (depending on Alternative chosen) of which must be a forb or shrub, each comprising at least five, three, two percent (depending on Alternative chosen) relative cover. No one species may exceed 70 percent relative cover to ensure that site species diversity is achieved.

   c. If non-prescribed or unauthorized plant species (e.g. yellow sweetclover, *Melilotus officinalis*) appear in the reclamation site BLM may require their removal.

4. Adequate desirable vegetative groundcover is established on disturbed surfaces to stabilize soils through the operational life of the project.

   a. The vegetation community established on the reclaimed site is capable of persisting without continued intervention (excluding routine weed management) and will allow plant community successional processes to progress toward advanced community states.

   b. Bare ground does not exceed the range site description or if not described, bare ground will not exceed that of a representative undisturbed DPC meeting the Colorado Standards for Public Land Health.

5. Reclamation success in areas affected by cheatgrass and/or other invasive annual species will be qualified based on the condition of the project site (i.e., the relative vegetative cover) prior to disturbance.

   a. If the project site contains less than 25 percent relative cover of undesirable species, interim reclamation will be considered acceptable when the relative cover of undesirable species on the project site does not exceed 5 percent.

   b. If the project site contains 25 percent to 50 percent relative cover of undesirable species, interim reclamation will be considered acceptable when the relative cover of undesirable species on the project site does not exceed 10 percent.

   c. If the project site contains more than 50 percent relative cover of undesirable species, interim reclamation will be considered acceptable when the relative cover of undesirable species on the project site does not exceed the level defined by site-specific criteria established in the reclamation plan developed for that site.

BLM_0020474

### 3.1.2.3   Requirements (Phase II)

In addition to the procedures listed above for Phase I interim reclamation, the following requirements apply to Phase II interim reclamation.

1. Recontour to maximize the extent of disturbance available for reclamation and restore all natural drainages to the extent possible. Soils must be returned to their respective positions in the predisturbance soil profile. Recontoured surfaces must be stable and have adequate surface roughness to reduce surface run-off.

   a. For well pads, place rock into cut first where it can be buried below the surface. The surface cover and size distribution of exposed rock must not exceed pre-disturbance site conditions documented in the project specific reclamation plan (except when rock is used as an approved erosion control feature).

   b. After placement of subsoil, decompaction (ripping) or other preparation of subsoils must occur prior to spreading topsoil over the ground surface. Generally, all topsoil should be redistributed across all surfaces subject to Phase II interim reclamation. Topsoil will not be spread when the ground or topsoil is frozen or too wet to adequately support construction equipment. Soil is deemed "too wet" if equipment creates ruts greater than three inches.

   c. All topsoil that has been stockpiled for an extended period of time (six months or greater) should be retested using the same procedure described in Section 2.1 Item 1d to determine topsoil viability before it is re-spread. Analytical results should be compared to data obtained for soil characteristics prior to disturbance. If the comparison indicates problems with soil productivity, topsoil may be treated with amendments approved by the AO to meet the physical, chemical, and biological properties necessary for successful reclamation.

2. After topsoil has been redistributed, all disturbed areas will be seeded using a BLM approved seed mix. Seeding should occur between the beginning of September and the end of March (depending on elevation) or as otherwise approved by BLM (See Table D-5).

3. Once the disturbance has been recontoured and the seedbed has been prepared and seeded, stockpiled woody material be scattered across the reclaimed area where the material originated. Chipped material should be scattered across reclaimed areas in a manner that avoids the development of a mulch layer that suppresses growth or reproduction of desirable vegetation. With approval from the AO, chipped woody material could be incorporated into the top 6-10 inches of topsoil. Redistribution of large woody debris will not exceed 20-30 percent ground cover and excess material must be removed from the site. Large woody material should be distributed in a manner that helps deter vehicle use and promote a heterogeneous landscape. Materials would be distributed in such a way to avoid concentrations of heavy fuels that constitute a fire hazard or suppress adequate vegetation growth.

4. Disturbed and reclaimed areas will be managed to control dust and must be kept free of State of Colorado A and B listed noxious weeds.

5. Ensure that weed treatments are conducted in an effective manner compatible with approved seed mixes. To reduce the need for repeated bare ground herbicide treatments around facilities, alternative methods such as gravel, weed barrier fabric, or low-growing,

BLM_0020475

disturbance-tolerant herbaceous vegetation may be used as authorized for a specific site by the BLM.

6. Cover, composition, and diversity data should be gathered using quantitative methods to measure the six Core Terrestrial Indicators and Methods in BLM Technical Note 440. Approved methods are found in Monitoring Manual for Grassland, Shrubland, and Savanna Ecosystems, Volume I and II: Quick Start. Other data gathering methods must provide statistically rigorous quantitative monitoring data that conforms to BLM's Assessment Inventory and Monitoring (AIM) strategy. Other data collection methods can be found in BLM Technical Reference 1730-1 may be used if pre-approved by the BLM.

7. To track interim reclamation, the operator will submit Geographic Information System (GIS) data to the WRFO project lead (NRS/Realty Specialist) for all seed application areas. GIS data will be submitted within 14 calendar days from the time when seed has been applied.

8. A Reclamation Status Report, including weed survey results for each reclamation site will be submitted electronically to the WRFO annually and a vegetation monitoring report every third year (both due January 1st) until reclamation at that site is deemed successful (see Chapter 4).

## 3.2   Final Reclamation

Final reclamation will be applied once pipelines and power lines are installed, wells are plugged and abandoned, or after the operational life of the facilities has ended. Desired vegetation will be established on the entire reclaimed disturbance to minimize soil erosion, inhibit noxious and undesirable invasive weed establishment, allow for the advance of successional processes, and provide specified wildlife and/or special status plant habitat components. Operators may be required to update their reclamation plan to incorporate current reclamation practices at the time of abandonment or reauthorization.

### 3.2.1  Timeframe (Final)

Final reclamation on pipelines will be initiated immediately after installation and seeding should occur during recommended periods. Revised Onshore Order Number 1 requires that earthwork for Final reclamation is completed within six months of well plugging. WRFO prefers to have final recontouring work either deferred or expedited so that seed can be applied to a fresh seedbed during the optimal seeding times (i.e., September through March), or as otherwise approved by the BLM. Topsoil redistribution and seedbed preparation should be accomplished immediately before seeding.

Final reclamation will be initiated when one of the following conditions exist:

- The operator encounters a "dry hole" and no further exploration or production is planned at the location.

- The final well on a pad has been plugged and abandoned.

- Facilities or infrastructure are no longer used in operations.

- The facilities that an access road serves have ceased operations and the road will be obliterated.

BLM_0020476

## 3.2.2 Success Criteria (Final)

At a minimum, the following standards must be met in order for Final reclamation to be deemed successful:

1. All reclaimed areas are kept free of noxious and undesirable invasive weeds, construction debris and trash.

2. There is no evidence of excessive erosion such as slope or soil instability, subsidence, or slumping at the site or in areas adjacent to the site (as compared to the range site description).

3. Storm water management structures and drainage features (e.g., culverts and ditches) installed by the operator have been removed and reclaimed.

4. The site has been recontoured to its pre-disturbance contour or a contour that blends with the surrounding landform.

5. The surface cover and size distribution of exposed rock must not exceed pre-disturbance site conditions documented in the project specific reclamation plan (except when rock is used as an approved erosion control feature).

6. Roads built for and no longer supporting oil and gas development have been recontoured, obliterated, revegetated, and are no longer distinguishable as a means of vehicle travel (i.e., no ruts or two-tracks).

7. All signs, fences, gates, and cattleguards associated with livestock exclosures have been removed from the site, unless in specific predetermined instances the AO directs that livestock exclosures be retained for extended periods to meet other resource objectives.

8. Self-sustaining desirable vegetative groundcover consistent with the site DPC (as defined by the range site, WRFO AIM protocol site data (BLM TN 440), or an associated approved reference site) is adequately established as described below on disturbed surfaces to stabilize soils through the life of the project. As Ecological Site Descriptions (ESD) are developed those cover values may replace range site, AIM data, or reference site values.

9. Final reclamation is considered successful when the entire reclamation site (including obliterated roads) has attained the following criteria:

   a. Foliar cover must be at least 100, 80, 60 percent (depending on Alternative chosen) of the DPC and/or basal cover must be at least 50, 25, 5 percent (depending on Alternative chosen) of the DPC. In the absence of specified DPC data, the default minimum foliar cover must be 90, 70, 40 percent (depending on alternative chosen) and/or basal cover must be 30, 20, 5 percent (depending on Alternative chosen). Vegetative cover values for woodland or shrubland sites are based on the capability of those sites in an herbaceous state.

   b. The resulting plant community must have composition of at least five desirable plant species, at least three, two, one (depending on Alternative chosen) of which must be a forb or shrub, each comprising at least five, three, two percent (depending on Alternative chosen) relative cover. No one species may exceed 70 percent relative cover to ensure that site species diversity is achieved.

BLM_0020477

    c.   If non-prescribed or unauthorized plant species (e.g. Yellow sweetclover, *Melilotus officinalis*) appear in the reclamation site BLM may require their removal.

10.   The vegetation community established on the reclaimed site stabilizes soils, is capable of persisting without continued intervention (excluding routine weed management), and will allow plant community successional processes to progress toward advanced community states.

11.   Bare ground does not exceed that of the range site or if not described, bare ground does not exceed that of a representative undisturbed DPC meeting the Colorado Standards for Public Land Health.

12.   Reclamation success in areas affected by cheatgrass and/or other invasive annuals will be qualified based on the condition of the project site (i.e., the relative vegetative cover) prior to disturbance.

    a.   If the project site contains less than 25 percent relative cover of undesirable species, Final reclamation will be considered acceptable when the relative cover of undesirable species on the project site does not exceed 5 percent.

    b.   If the project site contains 25 percent to 50 percent relative cover of undesirable species, Final reclamation will be considered acceptable when the relative cover of undesirable species on the project site does not exceed 10 percent.

    c.   If the project site contains more than 50 percent relative cover of undesirable species, Final reclamation will be considered acceptable when the relative cover of undesirable species on the project site does not exceed the level defined by site-specific criteria established in the reclamation plan developed for that site.

## 3.2.3  Reclamation Requirements (Final)

In addition to all applicable Phase I and Phase II interim reclamation requirements listed above, the following additional requirements apply to Final reclamation.

1.   Sampling of soils directly beneath facilities may be required, depending on the type of facility, to assure compliance with State of Colorado Total Petroleum Hydrocarbons (TPH) and Salinity quality standards prior to being incorporated into the reclaimed surface. If sampled, laboratory analytical results, resulting actions taken by the operator, and GPS coordinates of tested locations must be submitted via Sundry Notice to the AO prior to submitting a Request for Final Abandonment.

2.   Roads that existed prior to development have been returned to their original state unless otherwise directed by the AO. Roads left at the end of Final reclamation should be designed at an appropriate standard, no higher than necessary to accommodate their intended function.

3.   Unless authorized, there will be no vehicle access, including OHVs, on linear rights-of-way (e.g., pipelines and power lines). Physical barriers (e.g., fences, rocks, etc.) may be necessary to prevent travel on reclaimed surfaces. Woody materials would be distributed in such a way to avoid large concentrations of heavy fuels.

BLM_0020478

4. Where needed, signs and/or deterrents to limit public use of reclaimed surfaces should be installed. These items and livestock control measures must also be removed upon approval of Final Abandonment by the WRFO BLM.

5. Cover, composition, and diversity data should be gathered using quantitative methods to measure the six Core Terrestrial Indicators and Methods in BLM Technical Note 440. Approved methods are found in Monitoring Manual for Grassland, Shrubland, and Savanna Ecosystems, Volume I and II: Quick Start. Other data gathering methods must provide statistically rigorous quantitative monitoring data that conforms to the BLM's Assessment Inventory and Monitoring (AIM) strategy. Other data collection methods can be found in BLM Technical Reference 1730-1 may be used if pre-approved by the BLM.

6. The BLM WRFO AO will be informed when Final reclamation has been successfully completed (based on results of vegetation monitoring data) and the site is ready for final inspection.

BLM_0020479

**Table D-1. Timeline for Reclamation Activities**

| Phase | Actions |
|---|---|
| **Predisturbance** | 1) A Reclamation Plan is submitted as part of the Surface Use Plan (SUP) with an Application for Permit to Drill (APD), Form 3160-3, or as part of a Right-of-Way Application, or when there is a change in action (see Section 2). *Prior to beginning construction; monitoring methods, site specific surveys, and pre-disturbance evaluations are completed as described in site specific reclamation plan.* |
| | 2) BLM reviews or prepares an environmental assessment to analyze potential impacts of the proposed action. Identified impacts are mitigated with BLM Conditions of Approval (COAs). The approved Reclamation Plan and applied COAs specify procedures and techniques to be used at each stage of reclamation. |
| **Phase I Interim Reclamation** | 3) Phase I interim reclamation is implemented immediately (within 24 hours) after surface disturbing activities (e.g., construction of access road and pad) have ended. The goal of Phase I interim reclamation is to stabilize, protect and preserve soils during construction and drilling (see Section 3.1.1.1). Rights-of-way (e.g., pipelines, power lines) proceed immediately to Final reclamation of the surface (see Section 3.2.1). |
| | 4) Phase I interim reclamation (see Section 3.1.1.3) typically involves the following activities:<br>• Install approved BMPs and stabilization measures for slopes and stockpiled soils<br>• Begin/continue weed control measures |
| **Phase II Interim Reclamation** | 5) Earthwork for Phase II recontouring must begin within six months (weather permitting) of drill rig leaving the location, (see Section 3.1.2.1). The goal of Phase II interim reclamation is to recontour and reclaim the maximum extent of the disturbance as possible while leaving the minimum area necessary for routine production and maintenance activities. Phase II interim reclamation helps to establish desirable vegetation to minimize soil erosion, inhibit weed establishment, allow for the advancement of successional processes, and provide specific wildlife habitat components over the productive life of the well pad or facility (see Section 3.1.2). |
| | 6) Maintenance activities such as weed control and stormwater control described in the approved Reclamation Plan continues throughout Phase II (see Section 3.1.2.3). |
| | 7) The completion of earthwork for Phase II should coincide with optimal seeding times (i.e. September through March), or as otherwise approved by the BLM. After recontouring is complete, stored topsoil is re-spread, and if approved, soil amendments are added. Following topsoil placement, seed is applied, stabilization measures are installed, and woody debris is spread on reclaimed areas. Following seeding, fencing (if not already in place) is installed. Phase II interim reclamation remains in place through the life of the well or facility (see Section 3.1.2.3). |
| **Final Reclamation** | 8) Earthwork for Final reclamation must be completed within six months of well plugging (see Section 3.2.1). The goal of Final reclamation is to return the site to as close as possible to its original contour and its predisturbed condition with desirable, self-sustaining vegetation to minimize soil erosion, inhibit weed establishment, allow for the advancement of successional processes, and provide specific wildlife habitat components (see Section 3.2). |
| | 9) Disturbed areas (e.g., pads, roads, linear facilities, facility sites) must be reclaimed to a satisfactorily revegetated, safe, and stable condition. Earthwork and soil preparation should be timed to be completed immediately prior to optimal seeding times (i.e., September through March), or as otherwise approved by the BLM (see Section 3.2.1). |
| | 10) When Final reclamation efforts are successful the operator submits a Final Abandonment Notice (FAN) to the BLM. Final abandonment will not be approved until the surface reclamation work has been completed and seeded vegetation has established to the satisfaction of the BLM (see Section 3.2.2). |

# 4.0   Reclamation Status Reports

Reclamation status reports will be submitted annually in order to monitor progress at all disturbed sites across the WRFO. In addition to determining whether success criteria have been met at a particular site, the reclamation status report will provide a clear record of the techniques used. Reclamation vegetation monitoring, completed by qualified personnel, should occur within the growing season and begin the second year after reclamation efforts are initiated and every third year after that until final abandonment. The BLM may require more frequent monitoring of reclamation if necessary. Vegetation monitoring reports should be submitted to the BLM with the reclamation status report. Vegetation monitoring must also be completed and reported in conjunction with the final abandonment notice. Internal and external review of the WRFO reclamation status report and the processes used to acquire necessary information will be conducted annually and new information or changes in the reporting process will be incorporated into the report.

## *4.1   Timeframe for Reclamation Status Report Submission*

A reclamation status report for each site will be submitted electronically to the WRFO annually (due January 1st) until it is determined that reclamation of the site has met all required objectives of that particular reclamation phase. Every third year, a vegetation monitoring report should accompany the status report.

The reclamation status report will be submitted electronically via email and as a hard copy to the WRFO project lead (NRS/Realty Specialist). Mail the hardcopy to: BLM, White River Field Office, 220 East Market Street, Meeker, CO 81641, Attn: Reclamation Status Report/WRFO (name of project lead).

## *4.2   Status Report Components*

The reclamation status report will include (at a minimum) the following components to sufficiently and accurately characterize progress and status of reclamation to be included in a BLM database:

- The original National Environmental Policy Act (NEPA) document number and, if applicable, realty case file number or the well number and American Petroleum Institute (API) number.
- "As-built" GIS data of the project feature(s) (e.g., well pad, pipeline, travel or power-line corridor, ancillary facilities, etc.).
- The date of the inspection.
- Legal description and UTM coordinates for each discrete point feature associated with the report.
- A reclamation diagram will be included in the report and submitted for each project feature. The reclamation diagram will clearly show the area(s) where reclamation activities have occurred and will also include each point, polygon, or polyline feature that is associated with the report.
- Range site.
- Reclamation status (e.g., "Phase I interim," "Phase II interim," or "Final").
- Re-contouring status, including areas returned to final contours.

BLM_0020481

- Date(s) seeded, an estimate of the total area seeded (in acres), seed mixture applied, and seeding method (e.g., broadcast, drilled, hydro-mulched, etc.), if applicable.

- Contact information for the person responsible for developing the report.

- Additional notes pertaining to the overall condition of the site including identification of sites in need of additional reclamation actions with an outline of the actions to be taken.

- Weed management plans, surveys, and treatment actions including Pesticide Application Reports (PAR).

- Permanent photo points identified and noted on the reclamation diagram. Photos will be taken at each photo point, and the date the photo was taken will be noted on each photo. (Refer to BLM Technical Reference 1730-1 for specific guidance regarding establishing photo points.)

Reclamation vegetation monitoring reports should accompany the (above) status report to include in the BLM database. It must include (at a minimum) the following components to sufficiently and accurately characterize progress of the vegetative community establishment:

- Vegetative attributes for seeded surfaces. (Refer to BLM Core Terrestrial Indicators and Methods (Technical Note 440), preferably, or Technical Reference 1730-1 for guidance regarding quantitatively assessing vegetative species composition and cover.) The size of each reclaimed area must be specified as well as the number of transects and points hit along the intercept. Indicators to measure and quantify:

  o Bare ground including rock fragment, woody debris, biotic soils (if applicable), and litter estimates

  o Plant cover

  o Vegetation composition

    ▪ Relative cover of all plant species found in the line-point intercept monitoring

    ▪ Plant species of management concern

    ▪ Species richness over entire reclaimed area

  o Nonnative invasive plant species

  o Vegetation height

  o Proportion of soil surface in large intercanopy gaps

If any portion of the report is not complete or accurate the operator may be required to re-sample and re-submit it.

BLM_0020482

## 5.0   Seed Mixes

BLM approved seed mixes are designed to promote long term establishment of native species, minimize erosion, compete with noxious and undesirable invasive weeds, and provide the foundation for further successional development of vegetation (particularly shrubs and trees) derived from adjacent native communities as habitat for wildlife. Seed mixes are developed according to plant community types and wildlife needs.

If the use of non-native species is desired, justification and documentation of the need is required for BLM to consider its approved use. Examples of this situation could be sites with soils that demonstrate repeated resistance to seedling establishment despite amendment or areas at high risk of reclamation failure due to noxious or invasive weeds. Seed mixes including annual cereal grasses or sterile hybrid crops will generally not be approved for use in the WRFO resource area. BLM may consider exceptions to this policy if research or well-founded empirical information indicates that benefits of a nurse crop outweigh competitive interactions on desired perennial vegetation. All seed placed on BLM and split-estate lands will comply with United States Department of Agriculture (USDA) state noxious weed seed requirements. Any seed lot with test results showing presence of State of Colorado A or B list species will be rejected in its entirety and a new tested lot will be used for reclamation.

## 5.1   Seed Mix Selection, Application Methods, and Rates

Most range sites within the WRFO have been assigned a seed mix (Table D-2). These seed mixes have been designed by considering soil types, ranges sites, and the composition of native species likely to occur in the potential native plant community. Some of the range sites or soil units within the WRFO have not been assigned a seed mix. For sites with specialized characteristics (e.g., riparian floodplains, shale barrens, community variations within the ecological site) or those difficult to reclaim (e.g., rocky, shallow soils or steep slopes) specific seed mixes will be approved by the BLM on a case-by-case basis.

Drill seeding is the preferred method of seed application, however special circumstances may warrant another seeding method. If slopes are too steep or otherwise unsuitable for drilling, seed will be broadcast at double the rate specified. Broadcast seed should be covered by harrowing or raking to ensure germination and establishment. Hydromulching after seed application will generally be recommended on steeper slopes.

Where appropriate, the AO may require (or consider proposals to employ) seeding and seedbed preparation techniques that favor germination and seedling establishment of forb and shrub seeds in conjunction with, or as a supplement to, conventional drill-seeding applications. These techniques are intended to avoid problems associated with applying or mixing seeds that differ from grass seed in size or density.

Seed mixes in Table D-3 were designed to average 50 seeds per square foot with the assumption that there would not be a substantial viable seed bank remaining in topsoil piles that had been stored for greater than six months. At the discretion of the BLM, it may be appropriate to reduce the seeding rates (i.e., adjusted to 20-30 seeds per square foot) in circumstances where a substantial viable seed bank persists in the topsoil (e.g., pipelines in which the topsoil is removed and replaced in the same growing season).

BLM_0020483

The composition of Phase I interim reclamation seed mixes may be different from those used during Phase II interim reclamation and Final reclamation since the BLM would not generally require the use of forb or shrub seed during Phase I interim reclamation. If non-prescribed or unauthorized plants appear in the reclamation site, BLM may require their removal.

### Table D-2. Seed Mixes Tied to Range Sites within the WRFO

| Seed Mix | Range Sites |
|---|---|
| 1 | Alkali Flat, Alkaline Slopes, Clayey Foothills, Clayey Slopes |
| 2 | Deep Loam, Loamy Slopes, Loamy, Loamy 10-14 in PPT, Loamy Bottom, Loamy Breaks, Loamy Slopes, Rolling Loam |
| 3 | Desert Clay, Foothills Juniper, Mountain Pinyon, Pinyon Juniper Woodlands, Sandy Juniper, Stoney Foothills, Soil Unit 206mcs |
| 4 | Sandhills, Sandy Foothills |
| 5 or 10[1] | Foothill Swale, Swale Meadow |
| 6 | Aspen, Brushy Loam, Deep Clay Loam, Douglas-Fir Woodland, Lodgepole Pine Woodland, Mountain Loam, Mountain Meadow, Mountain Shallow Loam, Mountain Swale, Spruce-Fir Woodland |
| 7 | Dry Exposure, Dry Mountain Loam, Stoney Loam |
| 8 or 9[1] | Clayey Loam, Clayey Saltdesert, Desert Shallow Clay, Loamy Cold Desert, Loamy Saltdesert, Salt Meadow, Saltdesert Breaks, Saltdesert Overflow, Sandy, Sandy Saltdesert, Semidesert Clay Loam, Semidesert Gravelly Loam, Semidesert Loam, Semidesert Sandy Loam, Semidesert Shallow Loam, Silty Saltdesert, Upland Shallow Loam, Upland Stony Loam, and Soil Units 196mcs and 204mcs |

NOTE:

[1]Two seed mixes are presented as options available only at the discretion of the BLM in areas that are known to be especially harsh sites to reclaim. The second seed mix listed is a mix of native and introduced species.

BLM_0020484

**Table D-3. Standard Seed Mixes**
**(50 seeds per square foot application rate)**

| Seed Mix | Cultivar | Common Name | Scientific Name | Application Rate (lbs PLS/acre) |
|---|---|---|---|---|
| 1 | Rosana | Western Wheatgrass | *Pascopyrum smithii* | 4.5 |
| | Critana | Thickspike Wheatgrass | *Elymus lanceolatus* ssp. *lanceolatus* | 3.5 |
| | Toe Jam Creek | Bottlebrush Squirreltail | *Elymus elymoides* | 3 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |
| | | Sulphur Flower Buckwheat | *Eriogonum umbellatum* | 1.5 |
| | | Winterfat | *Krascheninnikovia lanata* | 1 |
| | **Alternates:**[1] | | | |
| | Sodar | Streambank Wheatgrass | *Elymus lanceolatus* ssp. *psammophilus* | 3.5 |
| | | Annual Sunflower | *Helianthus annus* | 3 |
| | | Mat Saltbush | *Atriplex corrugata* | 2 |
| | | | | |
| 2 | Arriba | Western Wheatgrass | *Pascopyrum smithii* | 4 |
| | Rimrock | Indian Ricegrass | *Achnatherum hymenoides* | 3.5 |
| | Whitmar | Bluebunch Wheatgrass | *Pseudoroegneria spicata* ssp. *inermis* | 4 |
| | Lodorm | Green Needlegrass | *Nassella viridula* | 2.5 |
| | Timp | Northern Sweetvetch | *Hedysarum boreale* | 3 |
| | | Sulphur Flower Buckwheat | *Eriogonum umbellatum* | 1.5 |
| | **Alternates:**[1] | | | |
| | | Needle and Thread | *Hesperostipa comata* ssp. *comata* | 3 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |
| | | | | |
| 3 | Rosana | Western Wheatgrass | *Pascopyrum smithii* | 4 |
| | Whitmar | Bluebunch Wheatgrass | *Pseudoroegneria spicata* ssp. *inermis* | 3.5 |
| | Rimrock | Indian Ricegrass | *Achnatherum hymenoides* | 3 |
| | | Needle and Thread Grass | *Hesperostipa comata* ssp. *comata* | 2.5 |
| | Maple Grove | Lewis Flax | *Linum lewisii* | 1 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |
| | **Alternates:**[1] | | | |
| | Critana | Thickspike Wheatgrass | *Elymus lanceolatus* ssp. *lanceolatus* | 3 |
| | | Sulphur Flower Buckwheat | *Eriogonum umbellatum* | 1.5 |

BLM_0020485

### Table D-3 continued. Standard Seed Mixes
### (50 seeds per square foot application rate)

| Seed Mix | Cultivar | Common Name | Scientific Name | Application Rate (lbs PLS/acre) |
|---|---|---|---|---|
| 4 | Rosana | Western Wheatgrass | *Pascopyrum smithii* | 3.5 |
| | Critana | Thickspike Wheatgrass | *Elymus lanceolatus* ssp. *lanceolatus* | 2.5 |
| | Rimrock | Indian Ricegrass | *Achnatherum hymenoides* | 3 |
| | | Needle and Thread Grass | *Hesperostipa comata* ssp. *comata* | 2.5 |
| | | Northern Sweetvetch | *Hedysarum boreale* | 3 |
| | | Sulphur Flower Buckwheat | *Eriogonum umbellatum* | 1 |
| | **Alternates:** [1] | | | |
| | Toe Jam Creek | Bottlebrush Squirreltail | *Elymus elymoides* | 2 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |
| | | | | |
| 5 | Magnar | Basin Wildrye | *Leymus cinereus* | 3.5 |
| | Rosana | Western Wheatgrass | *Pascopyrum smithii* | 3.5 |
| | San Luis | Slender Wheatgrass | *Elymus trachycaulus* ssp. *trachycaulus* | 3 |
| | Critana | Thickspike Wheatgrass | *Elymus lanceolatus* ssp. *lanceolatus* | 3 |
| | Timp | Northern Sweetvetch | *Hedysarum boreale* | 4.5 |
| | Maple Grove | Lewis Flax | *Linum lewisii* | 1 |
| | **Alternates:** [1] | | | |
| | Sodar | Streambank Wheatgrass | *Elymus lanceolatus* ssp. *psammophilus* | 3 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |
| | | | | |
| 6 | UP Plateau | Sandberg bluegrass | *Poa secunda* ssp. *sandbergii* | 0.5 |
| | San Luis | Slender Wheatgrass | *Elymus trachycaulus* ssp. *trachycaulus* | 2 |
| | Sherman | Big Bluegrass | *Poa secunda* ssp. *ampla* | 1 |
| | Bromar | Mountain Brome | *Bromus marginatus* | 2 |
| | Maple Grove | Lewis Flax | *Linum lewisii* | 1 |
| | Bandera | Rocky Mountain Penstemon | *Penstemon strictus* | 0.5 |
| | **Alternates:** [1] | | | |
| | Canbar | Canby Bluegrass | *Poa secunda* ssp. *canbyi* | 0.5 |
| | | Arrowleaf Balsamroot | *Balsamorhiza sagittata* | 3 |

BLM_0020486

**Table D-3 continued. Standard Seed Mixes**
**(50 seeds per square foot application rate)**

| Seed Mix | Cultivar | Common Name | Scientific Name | Application Rate (lbs PLS/acre) |
|---|---|---|---|---|
| 7 | | Letterman needlegrass | *Elymus lanceolatus* ssp. *lanceolatus* | 3 |
| | San Luis | Slender Wheatgrass | *Elymus trachycaulus* ssp. *trachycaulus* | 2 |
| | Whitmar | Bluebunch Wheatgrass | *Pseudoroegneria spicata* ssp. *inermis* | 4 |
| | Sodar | Streambank Wheatgrass | *Elymus lanceolatus* ssp. *psammophilus* | 3 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |
| | | Sulfur Flower Buckwheat | *Eriogonum umbellatum* | 1 |
| | **Alternates:**[1] | | | |
| | UP Plateau | Sandberg Bluegrass | *Poa secunda* ssp. *sandbergii* | 0.5 |
| | | Northern Sweetvetch | *Hedysarum boreale* | 3 |
| 8 | Viva Florets | Galleta Grass | *Pleuraphis jamesii* | 3 |
| | Rimrock | Indian Ricegrass | *Achnatherum hymenoides* | 3 |
| | Toe Jam Creek | Bottlebrush Squirreltail | *Elymus elymoides* | 2.5 |
| | Rosana | Western Wheatgrass | *Pascopyrum smithii* | 4 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.25 |
| | | Annual Sunflower | *Helianthus annus* | 2.5 |
| | | Mat Saltbush | *Atriplex corrugata* | 2 |
| | **Alternates:**[1] | | | |
| | UP Plateau | Sandberg Bluegrass | *Poa secunda* ssp. *sandbergii* | 0.5 |
| | | Fernleaf Biscuitroot | *Lomatium dissectum* | 3 |
| | | Shadscale | *Atriplex confertifolia* | 2 |
| | **Seed Mix 9 and 10 may only be used after BLM interdisciplinary team analysis and approval** | | | |
| 9 | Rosana | Western Wheatgrass | *Pascopyrum smithii* | 5 |
| | Bozoisky-Select | Russian Wildrye | *Psathyrostachys juncea* | 3 |
| | Hycrest | Crested Wheatgrass | *Agropyron cristatum* | 3 |
| | | Annual Sunflower | *Helianthus annus* | 5 |
| | **Alternates:**[1] | | | |
| | P27 | Siberian Wheatgrass | *Agropyron fragile* | 3.5 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 1 |

BLM_0020487

**Table D-3 continued. Standard Seed Mixes**
**(50 seeds per square foot application rate)**

| Seed Mix | Variety | Common Name | Scientific Name | Application Rate (lbs PLS/acre) |
|---|---|---|---|---|
| | Magnar | Basin Wildrye | *Leymus cinereus* | 3.5 |
| | Rosanna | Western Wheatgrass | *Pascopyrum smithii* | 4 |
| | Luna | Pubescent Wheatgrass | *Elytrigia intermedia* | 4 |
| | Paiute | Orchardgrass | *Dactylis glomerata* | 1 |
| 10 | Ladak | Alfalfa | *Medicago sativa* | 1.5 |
| | Wytana | Fourwing Saltbush | *Atriplex canescens* | 2 |
| | **Alternates:**[1] | | | |
| | Hycrest | Crested Wheatgrass | *Agropyron cristatum* | 1.5 |
| | | Scarlet Globemallow | *Sphaeralcea coccinea* | 0.5 |

NOTE:
[1] As seeds for other native species become commercially available the BLM will consider the use of site adapted (i.e., varieties compatible with local conditions) native species that are listed as a component of the potential native plant community.

The table below is a list of some BLM approved alternate forb species acceptable for use in the seed mixes above. For site specific recommendations or application rates, contact the project lead (NRS or Realty Specialist).

**Table D-4. Alternate Forb Species**

| Variety | Common Name | Scientific Name |
|---|---|---|
| | American Vetch | *Vivia americana* |
| | Arrowleaf Balsamroot | *Balsamorhiza sagittata* |
| | Fernleaf Biscuitroot | *Lomatium dissectum* |
| | Hoary Tansyaster | *Machaeranthera canescens* |
| | Hood's Phlox | *Phlox hoodii* |
| | Mule's Ears | *Wyethia amplexicaulis* |
| | Munro Globemallow | *Sphaeralcea munroana* |
| | Narrowleaf Indian Paintbrush | *Castilleja linariaefolia* |
| | Rayless tansyaster | *Machaeranthera grindelioides* |
| | Rocky Mountain Beeplant | *Cleome serrulata* |
| | Scarlet Gilia | *Ipomopsis aggregata* |
| | Showy Goldeneye | *Heliomeris multiflora* |
| | Silverleaf Lupine | *Lupinus argenteus* |
| Occidentalis | Western Yarrow | *Achillea millefolium* |
| | White Evening Primrose | *Oenothera pallida* |
| | Wyeth Buckwheat | *Eriogonum heracleoides* |

BLM_0020488

## 5.2   Acceptable Seeding Dates

Seeding should occur between September 1 and March 31, depending on elevation and vegetation community, or as otherwise approved by the BLM. General guidelines for dominant vegetation communities within the White River Field Office resource area are provided in the table below.

**Table D-5. Acceptable Seeding Dates Based on Vegetation Community**

| Vegetation Community | Seeding Dates |
|---|---|
| Desert Shrub | September 1 - February 29 |
| Low Elevation Sagebrush (below 5,500 ft.) | September 1 - February 29 |
| Mid-elevation Sagebrush (5,500 - 7,200 ft.) | September 1 - March 15 |
| High Elevation Sagebrush (above 7,200 ft.) | September 1 - March 31 |
| Low Elevation Pinyon-Juniper (below 5,500 ft.) | September 1 - February 29 |
| Mid-elevation Pinyon-Juniper (5,500 - 7,200 ft.) | September 1 - March 15 |
| High Elevation Pinyon-Juniper (above 7,200 ft.) | September 1 - March 31 |
| Mixed Mountain Shrub | September 1 - March 31 |
| Aspen Forest | September 1 - March 31 |
| Douglas-Fir Forest | September 1 - March 31 |

BLM_0020489

## 6.0   Modifications of Standard Reclamation Success Criteria and Seed Mixes

BLM may request special reclamation procedures or seed mixes to be augmented with special components to meet specific and pre-defined resource objectives.

### *6.1   Greater Sage-Grouse Habitat*

Within the overall range of greater sage-grouse, the following conditions may be imposed:

- Reclamation success criteria on sage-grouse habitats would generally be contingent, where prescribed, on evidence of successful establishment of desired forbs and sagebrush. Reclaimed acreage would be expected to progress without further intervention to a state that meets sage-grouse cover and forage needs based on site capability and seasonal habitat use as per Appendix A, "Structural Habitat Guidelines" from the *Colorado Greater Sage-grouse Conservation Plan*.

- Consistent with existing land use decisions, adapted forms of forbs with recognized utility as sage-grouse forage or cover would be included in Phase II interim and Final reclamation seed mixes applied to surface disturbances in suitable sage-grouse nesting, early brood rearing, and late brood habitats. Native forms would be used as a general rule, but where unavailable or considered beneficial and consistent with existing land use decisions, non-native species with established value to sage-grouse that have no demonstrated tendency to persist more than ten years or disperse beyond the treatment area could be used where approved by BLM.

- When prescribed as a reclamation seed component, local accessions of sagebrush (i.e., material collected on site or seed propagated from "local" collections) would be used where appropriate and as specified by BLM to accelerate the redevelopment of sagebrush where canopies have been removed or adversely modified.

### *6.2   Habitat for Special Status Plant Species*

Reclamation of special status plant species habitats may require additional conditions to prevent topsoil from mixing into or percolating through large diameter spoils. Examples may include but are not limited to: topsoil and subsoil separation by protective covering and/or fencing during excavation, spoil crushing and/or compacting prior to topsoil and subsoil replacement, adhesion fabrics or mulch on steep slopes, and restrictions on topsoil storage timeframes.

### *6.3   Areas of Critical Environmental Concern (ACEC) and Remnant Vegetation Associations (RVA)*

Within RVAs and identified ACECs (i.e., those containing special status plant species), the following additional conditions apply:

- In order to maintain genetic integrity, native seed must be collected prior to construction operations or disturbance. Native seed will be collected utilizing established standards put forth and provided by the Association of Official Seed Certifying Agencies (www.AOSCA.org).

BLM_0020490

- If native seed production is insufficient to allow collection of an adequate quantity of seed after three consecutive growing seasons, then the operator may request authorization to use an alternate seed mix that resembles the desired native plant community as closely as possible. Any alternate seed mix must be approved, in writing, by the AO after appropriate environmental analysis is conducted.

BLM_0020491

# 7.0    Supplemental Information

## 7.1    Acronyms

| | |
|---|---|
| **AO** | Authorized Officer |
| **API** | American Petroleum Institute |
| **APD** | Application for Permit to Drill |
| **BLM** | Bureau of Land Management |
| **BMP** | Best Management Practice |
| **CDPHE** | Colorado Department of Health and Environment |
| **COA** | Condition of Approval |
| **DPC** | Desired Plant Community |
| **FLPMA** | Federal Lands Policy and Management Act of 1976 |
| **GIS** | Global Information System |
| **NEPA** | National Environmental Policy Act |
| **NRCS** | Natural Resources Conservation Service (USDA Federal Agency) |
| **OHV** | Off-highway vehicle |
| **RMP** | Resource Management Plan |
| **RMPA** | Resource Management Plan Amendment |
| **SUP** | Surface Use Plan |
| **USDA** | United States Department of Agriculture |
| **WRFO** | White River Field Office |

BLM_0020492

## 7.2    Contact Information

Phone: (970) 878-3800

All inquiries should be sent to the WRFO:

> Attn: [*name of project lead*]
> Bureau of Land Management
> White River Field Office
> 220 East Market Street
> Meeker, CO  81641

## 7.3    References

Bureau of Land Management (BLM) 1998a. Measuring and Monitoring Plant Populations. Elzinga C. L., D. Salzer, and J. Willoughby. Technical Reference 1730-1. U.S. Department of the Interior National Applied Resource Sciences Center. BLM/RS/ST-98/005+1730.

BLM 2008. Handbook 1740-2 Integrated Vegetation Management. Bureau of Land Management Rel. 1-1714. March 25, 2008.

Colorado Greater Sage-Grouse Steering Committee. 2008. Colorado Greater Sage-Grouse Conservation Plan. Colorado Division of Wildlife, Denver, Colorado, USA.

MacKinnon, W.C., J.W. Karl, G.R. Toevs, J.J. Taylor, M. Karl, C.S. Spurrier, and J.E. Herrick. 2011. BLM Core Terrestrial Indicators and Methods. Technical Note 440. U.S. Department of the Interior, Bureau of Land Management, National Operations Center, Denver, CO.

U.S. Department of Agriculture (USDA) Soil Conservation Service (SCS). 1976. Davis R.M. National Range Handbook. July 1976.

## 7.4    Glossary

**Best Management Practice (BMP)**: BMPs are state-of-the-art mitigation measures designed to provide for safe and efficient operations while minimizing undesirable impacts to the environment.

**Desirable species/desirable vegetative groundcover**: Include those plant species defined by the range site, from the BLM approved seed mix, or other desired species found in the surrounding areas (approved by the BLM).

**Desired Plant Community (DPC)**: DPCs are plant community types that may occupy a range site to meet management objectives and provide at least the minimum quality criteria for the soil, water, air, plant, and animal resources.

**Drilling**: A drill rig is present and in the act of drilling for placement of surface casing and or production casing.

**Ecological Site**: A distinctive kind of land with specific physical characteristics that differs from other kinds of land in its ability to produce a distinctive kind and amount of vegetation.

BLM_0020493

**Ecological Site Description**: Describes physiographic features, climate features, influencing water features, representative soil features, and plant communities (including information about state and transition of plant communities) for the ecological site. Information common for plant communities can include community narratives, annual production, species composition, growth curves, cover and structure, and photos. This system describes what is possible for a particular reclamation site and also allows for the updating of the site descriptions as new information becomes available.

**Effective Rooting Zone:** Effective rooting depth is the rooting zone or depth where plants obtain most of their water and nutrients. Approximately 80 percent of a given plant's root system is found within this zone. The depth of the effective rooting zone varies by plant species, soil type and local depths to bedrock.

**Final Reclamation**: Reclamation of an area (not planned for further disturbance) including recontouring, stabilization of soils, and establishment of vegetation representative of the DPC in a healthy early seral state that will allow progression toward the climax community.

**Growing Season**: Growing season is the portion of the year when temperatures and moisture permit plant growth. The growing season for the WRFO is defined as the period between the last frost of spring and the first frost of autumn, which varies with elevation. In the WRFO this period generally begins in April and may continue into September depending on elevation.

**Interim Reclamation (Phase I/II)**: Reclamation of an area (likely to be redisturbed in the future) including partial recontouring, soil stabilization, and revegetation. This includes sites where final recontouring will be needed at the end of the project and sites where periodic disturbance may occur due to on-going operation and maintenance activities. Phase I interim reclamation generally begins within 24 hours from the time when surface disturbing activities have ended.

**On-Site Evaluation**: A preplanning meeting to evaluate the site of proposed disturbance, usually attended by the operator, surface owner, BLM, and interested parties.

**Range Site:** A range site is a distinctive kind of rangeland that differs from other kinds of rangeland in its ability to produce a characteristic natural plant community. A range site is the product of all the environmental factors responsible for its development. It is capable of supporting a native plant community typified by an association of species that differs from that of other range sites in the kind or proportion of species or in total production. (see *National Range Handbook, Soil Conservation Service, USDA, 1976*).

**Reclamation**: The result of activities implemented to provide: surface and subsurface stability and a functioning plant community of desirable perennial vegetative cover that is capable of persisting and is compatible with or complements BLM established land management objectives. Vegetation will be representative of the range site or Desired Plant Community and allow for successional processes that allow progression toward the climax vegetative community expected for that range site.

**Reclamation Plan**: A plan submitted by the operator as outlined in the Revised Onshore Order Number 1 effective May 7, 2007. The Plan is a dynamic document that defines and explains the extent and timing of actions taken to contribute to the eventual restoration of the disturbed site to its natural undisturbed potential.

BLM_0020494

**Restoration**: Implementation of a set of actions that promotes plant community diversity and structure that allows plant communities to be more resilient to disturbance and invasive species over the long term.

**Revegetation**: Establishing or re-establishing desirable plants in areas where desirable plants are absent or of inadequate density, by natural revegetation or by seeding or transplanting (artificial revegetation).

**Soil Productivity:** Soil productivity is defined as the capacity of a soil for producing a specified plant or sequence of plants under a specified system of management. For reclamation, soil productivity is the effectiveness of the seed bed to propagate the reclamation seed mix.

**Surface Disturbing Activities:** An action that alters the vegetation, surface/near surface soil resources, and/or surface geologic features, beyond natural site conditions and on a scale that affects other Public Land values. Examples of surface disturbing activities may include: operation of heavy equipment to construct well pads, roads, pits and reservoirs, installation of pipelines and power lines, or vegetation treatments (e.g., prescribed fire, etc.). Surface disturbing activities may be either authorized or prohibited. *Wyoming Information Bulletin 2007-029, Guidance for Use of Standardized Surface Use Definitions.*

**Surrounding Area:** The variable area of influence (generally within 200 feet) associated with a disturbance that, if infested by noxious or undesirable invasive weeds, could serve as a seed source to infest or re-infest the disturbed area.

**Topsoil:** Surface soil, usually corresponding with the O and A, and sometimes B horizons; depths vary by location. It is distinguished from subsoil as the most favorable material for establishment of seeded species and plant growth. It is used to top-dress areas of previous disturbance.

**WRFO Geospatial Data Submission Standards**: Geospatial (GIS/GPS/RS) data submitted to White River Field Office (WRFO) shall be in a format compatible with the WRFO's Geographic Information System (GIS). Acceptable data formats are: (1) ESRI shapefiles or geodatabases and (2) AutoCAD .dwg or .dxf files. Option 1 is highly preferred, but in the case of engineering drawings, both Options 1 and 2 are required. AutoCAD submission must include, or be constructed with, spatial referencing (defined below) similar to standard GIS data for direct incorporation into WRFO data models. Data must be submitted in UTM Zone 13N, NAD83 in units of meters, and vertical datums must be specified. Data may be submitted as: (a) an email attachment; or (b) on a standard compact disk (CD) in uncompressed (preferred) or compressed (WinZip only) format. All submitted data shall include metadata that includes collection methods (e.g., type of GPS), accuracy, field notes, etc. and conforms to the Content Standards for Digital Geospatial Metadata from the Federal Geographic Data Committee standards. Alternatives to the stated submittal requirements may be approved on a case-by case basis. Questions should be directed to WRFO BLM GIS staff at 970-878-3800.

BLM_0020495

*This page intentionally left blank*

BLM_0020496

BLM

Appendix E

# Threshold and Temporal Analysis



Public Lands USA: Use, Share, Appreciate

BLM_0020497

BLM_0020498

## Table of Contents

**Page**

1.0   **INTRODUCTION** ........................................................................... E-1

2.0   **THRESHOLD ANALYSIS** ............................................................. E-1

    2.1   Develop Protocol ..................................................................... E-2

    2.2   Implement Protocol ................................................................. E-7

3.0   **TEMPORAL ANALYSIS** ............................................................... E-9

    3.1   Analysis Protocol .................................................................... E-10

    3.2   Implement Protocol ................................................................. E-15

4.0   **REFERENCES** .............................................................................. E-17

5.0   **ATTACHMENT 1** ......................................................................... E-17

    5.1   Temporal Analysis Tables ........................................................ E-17

6.0   **ATTACHMENT 2** ......................................................................... E-37

    6.1   Temporal Analysis Figures ....................................................... E-37

## List of Tables

Table E-1    Alternatives B and C Threshold Assumptions ................................. E-2

Table E-2    Assumed Acreage of Surface Disturbance ..................................... E-3

Table E-3    Assumed Buffers for Both Acute and Collective Effects ................... E-3

Table E-4    Detailed Formulas for Calculating Total Area ............................... E-4

Table E-5    Allocation of Well Pads in an Individual Year .............................. E-7

Table E-6    Minimum Acres Required to Receive a Well Pad ............................. E-7

Table E-7    Number of Well Pads Allowed by Alternative ............................... E-10

Table E-8    Spatial Datasets Used in Step 4 of the Temporal Analysis ................. E-14

Table E-9    Temporal Analysis Results, Step 2 ............................................ E-16

Table E-10   Estimated Surface Disturbance by Mule deer Range Area  in the Mesaverde
    Play Area White River Field Office – Alternative A ................................ E-17

Table E-11   Estimated Surface Disturbance by Muledeer Range Area  in the Mesaverde
    Play Area White River Field Office – Alternative B ................................ E-18

Table E-12   Estimated Surface Disturbance by Muledeer Range Area  in the Mesaverde
    Play Area White River Field Office – Alternative C ................................ E-19

Table E-13   Estimated Surface Disturbance by Muledeer Range Area  in the Mesaverde
    Play Area White River Field Office – Alternative D ................................ E-20

Table E-14   Estimated Surface Disturbance for Energy and Mineral Lease  Areas in the
    Mesaverde Play Area White River Field Office – Alternative A .................. E-21

Table E-15   Estimated Surface Disturbance for Energy and Mineral Lease  Areas in the
    Mesaverde Play Area White River Field Office – Alternative B .................. E-22

Table E-16   Estimated Surface Disturbance for Energy and Mineral Lease  Areas in the
    Mesaverde Play Area White River Field Office – Alternative C .................. E-23

Table E-17   Estimated Surface Disturbance for Energy and Mineral Lease  Areas in the
    Mesaverde Play Area White River Field Office – Alternative D .................. E-24

Table E-18   Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil
    Areas in the Mesaverde Play Area – White River Field Office – Alternative A ..... E-25

BLM_0020499

Table E-19    Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil
              Areas in the Mesaverde Play Area –White River Field Office – Alternative B ......E-26
Table E-20    Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil
              Areas in the Mesaverde Play Area –White River Field Office – Alternative C ......E-27
Table E-21    Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil
              Areas in the Mesaverde Play Area –White River Field Office – Alternative D......E-28
Table E-22    Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative A ...................................................................................E-29
Table E-23    Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative B....................................................................................E-30
Table E-24    Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative C....................................................................................E-31
Table E-25    Estimated Surface Disturbance by Vegetation Community in the Mesaverde
              Play Area – Alternative D ...................................................................................E-32
Table E-26    Estimated Surface Disturbance by Watershed in the  Mesaverde Play Area
              White River Field Office – Alternative A ..........................................................E-33
Table E-27    Estimated Surface Disturbance by Watershed in the  Mesaverde Play Area
              White River Field Office – Alternative B ...........................................................E-34
Table E-28    Estimated Surface Disturbance by Watershed in the  Mesaverde Play Area
              White River Field Office – Alternative C ...........................................................E-35
Table E-29    Estimated Surface Disturbance by Watershed in the  Mesaverde Play Area
              White River Field Office – Alternative D ...........................................................E-36

## List of Figures

Figure E-1    Linear Growth Well Pad Development ....................................................................E-6
Figure E-2    Alternative B GMU 22 Administrative Unit Lease-Holdings Effects.....................E-8
Figure E-3    Alternative C GMU 22 Administrative Unit Lease-Holdings Effects.....................E-9
Figure E-4    Linear Growth of Well Pad Development in the MPA ...........................................E-12
Figure E-5    Cumulative Oil and Gas Surface Disturbance in the MPA  During the
              20-Year Planning Period .....................................................................................E-16
Figure E-6    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each
              Soil Class during the 20-year Planning Period .......................................................E-37
Figure E-7    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each
              Watershed during the 20-year Planning Period ......................................................E-38
Figure E-8    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each
              Vegetation Class during the 20-year Planning Period.............................................E-38
Figure E-9    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each
              Range Type during the 20-year Planning Period.....................................................E-39
Figure E-10   Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each
              Mineral Estate Category during the 20-year Planning Period .................................E-39

BLM_0020500

## 1.0    Introduction

This appendix documents the assumptions and methodology used in the threshold and temporal analysis and summarizes the results of each analysis. The first half of the appendix is devoted to the threshold analysis performed for Alternatives B and C. The second half focuses on the temporal analysis.

## 2.0    Threshold Analysis

The threshold analysis protocol was developed in five steps, which are discussed in more detail below:

1. Define the assumptions for phased development with reclamation,
2. Divide the White River Field Office (WRFO) Planning Areas into discrete units of analysis,
3. Define the total area for a multi-well pad configuration,
4. Forecast the number of well pads developed in Years 1 to 7, 10 and 20 for Alternatives B and C, and
5. Define an allocation model for allocating the well pads developed in a given year across the units of analysis.

The threshold analysis protocol was used to forecast acute and collective effects in one year increments from years 1 to 7, 10 and 20 for Alternatives B and C. The threshold analysis evaluated if estimated impacts exceeded thresholds established in Chapter 2 management decisions under Alternative B and C which are also summarized in Table E-1.

The threshold analysis protocol was developed to evaluate acute and collective effects, based on forecasted allocation of well pads by Game Management Unit (GMU), lease-holding, and seasonal range areas. Acute and collective effects are represented by buffered acres of surface disturbance associated with activity related to well pad development. Acute effects occur during the period of well pad development [model assumption = 2 years] when construction and drilling are conducted. Collective effects accumulate from the time the well pad development commences until successful interim reclamation activities are achieved [model assumption = 5 years]. The allocation model is based on current trends in oil and gas development and Bureau of Land Management (BLM) management practices.

An indicator resource provides insight into how other resources could potentially respond to the acute and collective effects. Mule deer seasonal range areas were selected as an indicator resource for evaluating acute and collective effects because of the widespread coverage of the seasonal use areas in the WRFO Planning Area and the interrelationship between these big game animals and other resources such as vegetation.

Table E-1 show the respective threshold assumptions for mule deer seasonal range areas for both alternatives B and C.

BLM_0020501

**Table E-1. Alternatives B and C Threshold Assumptions**

| Alternative B | Alternative C |
|---|---|
| **Acute Thresholds** | **Acute Thresholds** |
| • 10% of winter range<br>• 10% of severe winter range<br>• 10% of summer range<br>• 10% of winter concentration area<br>• 5% of severe winter range/winter concentration area | • 25% of winter range<br>• 25% of severe winter range<br>• 25% of summer range<br>• 25% of winter concentration area<br>• 10% of severe winter range/winter concentration area |
| **Collective Thresholds** | **Collective Thresholds** |
| • 20 of winter range<br>• 20 of severe winter range<br>• 20 of summer range<br>• 20 of winter concentration area<br>• 10% of severe winter range/winter concentration area | • 25% of winter range<br>• 25% of severe winter range<br>• 25% of summer range<br>• 25% of winter concentration area<br>• 20 of severe winter range/winter concentration area |

## 2.1   Develop Protocol

### 1. Define the assumptions for phased development with reclamation

The first step was to define the following assumptions for phased development with reclamation. Development of a multi-well pad is assumed to be a two-year cycle. Multi-well pad development during this two-year cycle contributes to both acute and collective effects.

Interim reclamation of vegetation on an individual well pad was assumed to start at the beginning of the third year after the start of well-pad development. Multi-well pad development would begin in year one and be completed in year two. Interim reclamation would then start in year three. When reclamation starts, it was assumed that an individual multi-well pad no longer contributes to acute effects. Interim reclamation was assumed to be completed at the end of the fifth year after the start of well-pad development. For example, interim reclamation would be implemented in years three, four, and five. At the beginning of the sixth year after the start of well-pad development, interim reclamation would achieve success criteria and it was assumed that the individual well pad would no longer contribute to collective effects. Consequently, collective effects are limited to a five year window for the purpose of the threshold analysis. Because the number of developed well pads increases in a linear fashion from year to year, the collective effects would still continue to increase, but at a rate moderated by interim reclamation.

### 2. Divide the WRFO Planning Areas into discrete units of analysis

The second step in development of the threshold analysis protocol was to divide the WRFO Planning Areas into discrete units of analysis. The unit of analysis is defined as the cumulative mule deer seasonal range within a lease-holding within a GMU. There are a total of 525 units of analysis in the WRFO Planning Area. Units of analysis include lease areas that have been aggregated for a single operator, administrative units, and unleased areas.

The units of analysis were created by "unioning" the GMU and lease-holding area with Alternatives B and C geospatial data to produce worksheets with acreage by GMU, lease-holding area, seasonal use area, and Conditions of Approval (COA). The unit of analysis area was then calculated as the sum total of Controlled Surface Use (CSU), No Surface Occupancy (NSO) (exceptions), Open, and Timing Limitations (TL) stipulations. The NSO stipulation areas were included because the BLM

BLM_0020502

could apply exceptions (allowing development) in these areas. Closed areas were excluded because these areas are closed to oil and gas development.

### 3. Define the total area for a multi-well pad configuration

The third step was to define total area for a multi-well pad configuration (multi-well pads are assumed to average eight wells per pad). The total area for a multi-well pad configuration is defined as the total acreage of surface disturbance associated with an individual well pad plus the total acreage of buffer associated with an individual well pad. The total acreage of surface disturbance associated with an individual well pad includes the well pad and associated infrastructure, the access road, the collector road, and the pipeline (including other utilities rights of way). Table E-2 summarizes the acreage of surface disturbance assumed for each component associated with an individual well pad. The total acreage of buffer applied to the individual well pad components is calculated using the assumptions for mule deer summarized in Table E-3.

#### Table E-2. Assumed Acreage of Surface Disturbance

| Component | Assumed Length of Linear Features | Assumed Disturbance (acres) |
|---|---|---|
| Multi-well pad | NA | 8.25 acres per pad; includes 7.25 acres for well pad and 1 acre for associated infrastructure |
| Resource road | 2,042 feet | 0.75 acre road (acreage applies to running surface) and 16 feet running width |
| Local road | 1,742 feet | 1 acre road (acreage applies to running surface) and 25 feet running width. 1 acre collector road allotments are allocated per well pad. |
| Pipeline (including other utilities rights of way) | 2,723 feet | 2 acre pipeline and 32 feet width. The assumed 32 feet wide corridor for the pipeline includes a potential maintenance road along the pipeline. |
| Total surface disturbance associated with a multi-well pad | NA | 12 acres |

#### Table E-3. Assumed Buffers for Both Acute and Collective Effects

| Range | Alternative B Buffers Feet (meters) | Alternative C Buffers Feet (meters) |
|---|---|---|
| Winter ranges | 660 (200) | 660 (200) |
| Summer ranges | 1,320 (400) | 1,320 (200) |

Using the assumptions for surface disturbance and for buffers and the detailed formulas summarized in Table E-4, the following total areas for multi-well pad configurations (eight wells per pad) were calculated:

- Alternative B Winter Ranges = 229 acres

- Alternative B Summer Ranges = 459 acres

- Alternative C Winter and Summer Ranges = 229 acres

BLM_0020503

### Table E-4. Detailed Formulas for Calculating Total Area

| Component | Detailed Formulas |
|---|---|
| Multi-well pad | • 8.25 acres for multi-well pad (square) * 43,560 square feet/acre = 359,370 square feet<br>• Square root of (359,370 square feet) = 599 feet per side<br>• Winter ranges (and summer range Alternative C): 200 meter buffer around well pad * 3.28 feet/meter = 656 feet<br>• Summer range Alternative B: 400 meter buffer around well pad * 3.28 feet/meter = 1,312 feet<br>• Winter ranges (and summer range Alternative C): Buffer area = 4*(656 feet * 599 feet) + PI*(656)^2 [Note: the buffer is rounded on corners]<br>• Summer range Alternative B: Buffer area = 4*(1,312 feet * 599 feet) + PI*(1312)^2 [Note: The buffer is rounded on corners]<br>• Total area = well pad area + buffer area |
| Resource road | • 0.75 acre for road * 43,560 square feet/acre = 32,670 square feet<br>• 32,670 square feet / 16 feet wide = 2,042 feet (length of road)<br>• Winter ranges (and summer range Alternative C): 200 meter buffer around road * 3.28 feet/meter = 656 feet<br>• Summer range Alternative B: 400 meter buffer around road * 3.28 feet/meter = 1,312 feet<br>• Winter ranges (and summer range Alternative C): Buffer area = 2*(656 feet * (2,042 feet - 2*(656 feet)) [Note: One end of the road intersects the well pad and the other end intersects the local road.]<br>• Summer range Alternative B: Buffer area = 2*(1,312 feet * (2,042 feet - 2*(1,312 feet)) [Note: One end of the road intersects the well pad and the other end intersects the local road.]<br>• Total area = resource road area – (resource road overlap with well pad and local road buffer areas) + buffer area |
| Local road | • 1 acre for road * 43,560 square feet/acre = 43,560 square feet<br>• 43,560 square feet / 25 feet wide = 1,742 feet (length of road)<br>• Winter ranges (and summer range Alternative C): 200 meter buffer around road * 3.28 feet/meter = 656 feet<br>• Summer range Alternative B: 400 meter buffer around road * 3.28 feet/meter = 1,312 feet<br>• Winter ranges (and summer range Alternative C): Buffer area = 2*(656 feet * 1,742 feet) [Note: This is for one segment of the local road allocated to the well pad. Consequently, no additional buffer is included for the ends of the road segment.]<br>• Summer range Alternative B: Buffer area = 2*(1,312 feet * 1,742 feet) [Note: This is for one segment of the local road allocated to the well pad. Consequently, no additional buffer is included for the ends of the road segment.]<br>• Total area = local road area + buffer area |

BLM_0020504

**Table E-4. Detailed Formulas for Calculating Total Area**

| Component | Detailed Formulas |
|---|---|
| Pipeline (including other utilities rights of way) | • 2 acre pipeline, 32 feet width [Note: The assumed 32 feet wide corridor for the pipeline includes a potential maintenance road along the pipeline.]<br>• 2 acre for pipeline * 43,560 square feet/acre = 87,120 square feet<br>• 87,120 square feet / 32 feet wide = 2,723 feet (length of pipeline)<br>• Winter ranges (and summer range Alternative C): 200 meter buffer around pipeline * 3.28 feet/meter = 656 feet<br>• Summer range Alternative B: 400 meter buffer around pipeline * 3.28 feet/meter = 1,312 feet<br>• Winter ranges (and summer range Alternative C): Buffer area = 2*(656 feet * (2,723 feet – 656 feet)) + 1*(656 feet * 32 feet) + ½*PI*(656 feet)^2 [Note: One end of the pipeline intersects the well pad.]<br>• Summer range Alternative B: Buffer area = 2*(1,312 feet * (2,723 feet - 656 feet)) + 1*(1,312 feet * 32 feet) + ½*PI*(1,312 feet)^2 [Note: One end of the pipeline intersects the well pad.]<br>• Total area = pipeline area – (pipeline area overlap with well pad buffer area) + buffer area |
| Total area associated with a multi-well pad | Total area for well pad configuration = multi-well pad area + resource road area + local road area + pipeline area |

### 4. Forecast the number of well pads developed in Years 1 through 20 for Alternatives B and C

The fourth step was to forecast the number of well pads developed in Years 1-7, 10 and 20 for Alternatives B and C. For the purposes of the threshold analysis, BLM assumed that the number of new well pads developed per year would increase at a linear rate over the 20 years. Consequently, the following linear equations were developed for Alternatives B and C to describe this linear increase:

- Alternative B: Number of Well pads = 1.5 * (Year) + 40

- Alternative C: Number of Well pads = 5.2 * (Year) + 36

These equations are of the form y = mx + b, where "m" is the slope and "b" is the y-intercept. To develop the linear equations, it was first necessary to estimate the number of well pads drilled in Year 1. The number of well pads drilled in Year 1 was derived from the Reasonable Foreseeable Development (RFD) Scenario document (BLM 2007) page 63, Figure 1 where it is assumed that 331 wells will be drilled in Year 1. Dividing the 331 wells by an assumed 8 wells per well pad yields 41 well pads (when rounded to a whole number). Fixing Year 1 at 41 well pads, the slope of the line for the growth of development was varied iteratively until the total number of multi-well pads equaled the total numbers assumed for Alternatives B (1,100 multi-well pads) and Alternative C (1,800 multi-well pads). This resulted in a slope of approximately 1.5 well pads/year for Alternative B and 5.2 well pads/year for Alternative C. In addition, this resulted in a y-intercept of 40 well pads for Alternative B and 36 well pads for Alternative C.

Using the linear equations, the number of wells pads developed in Years 1-7, 10 and 20 was calculated. The estimated number of well pads developed in an individual year was rounded to a whole number. The linear growth in well pad development for Alternatives B and C is shown in Figure E-1.

BLM_0020505

**Figure E-1. Linear Growth Well Pad Development**



5. *Define an allocation model for allocating the well pads developed in a given year across the units of analysis*

The fifth step was to define an allocation model for allocating the well pads developed in a given year across the units of analysis. Table E-5 summarizes the allocation of well pads in an individual year. Within the MPA, 90 percent of total well pads assigned to the administrative unit lease-holdings were allocated by sorting the units of analysis in descending order by size and then allocating well pads proportionally to unit size. If the total area available in a unit of analysis was less than the area required to accommodate a single well pad without exceeding the acute threshold, then the unit of analysis was not included in the well pad distribution. For Alternatives B and C, the minimum size of a unit of analysis to receive a well pad is summarized in Table E-6.

BLM_0020506

**Table E-5. Allocation of Well Pads in an Individual Year**

| Category | Mesaverde Play Area | Other Areas | Areas not included in Well Pad Allocation |
|---|---|---|---|
| GMUs designated to represent areas | GMU 22 | GMUs 10, 11, 21, 31, 32, and 211 | GMUs 12, 23, 24, 30, and 33 |
| Percentage of individual year well pad allocation | 95% | 5% | 0% |
| Division within area | 90% of the 95% of the total new well pads will go in an administrative unit lease-holding, based on current development trends; and 10% of the 95% will go to other non-administrative unit lease-holdings. | Not applicable | Not applicable |

**Table E-6. Minimum Acres Required to Receive a Well Pad**

| Range | Alternative B (acres) | Alternative C (acres) |
|---|---|---|
| Winter ranges | 2,290 | 916 |
| Summer ranges | 4,590 | 916 |
| Severe winter range/winter concentration area | 4,580 | 2,290 |

The 10 percent of well pads assigned to non-administrative unit lease-holdings within the MPA (MPA) and the 5 percent of total well pads assigned to other areas outside of the MPA are distributed randomly. If the total area available in a unit of analysis was less than the area required to accommodate a single well pad without exceeding the acute threshold, then the unit of analysis was not included in the well pad distribution.

## 2.2   Implement Protocol

Following the five steps of development in the threshold analysis protocol, the threshold analyses for Years 1 through 20 for Alternatives B and C then proceeded according to the following process:

1. Assign allocated number of multi-well pads to seasonal use areas

2. Multiply the number of multi-well pads times the total acreage per pad (including buffer) to calculate the total area-of-effect.

3. Calculate acute effect in acres.

4. Divide the acute effect in acres by the total area available per seasonal use area to calculate the acute effect as a percent of total available area

5. Calculate collective effect in acres.

6. Divide the collective effect in acres by the total area available per seasonal use area to calculate the collective effect as a percent of total available area.

7. If year is less than or equal to 20, then repeat the preceding six steps.

BLM_0020507

Acute and collective effects across GMU 22 Administrative Unit lease-holdings are presented in Figure E-2 (Alternative B) and Figure E-3 (Alternative C). These effects were calculated for the total area of Administrative Unit lease-holdings within GMU 22. The results presented on Figures E-2 and E-3 likely represent a worst case scenario since the analysis uses a random distribution of well pads that does not account for the influence of planned well pad clustering, which would reduce the number of acute and collective effects by encouraging more shared facilities. Although the threshold analysis was performed at the unit of analysis level, these GMU 22 wide results provide an indication of the effects across all of the units of analysis contained within the GMU 22 Administrative Unit lease-holdings. The acute and collective effects for the non-administrative unit lease-holdings within GMU 22 and for the other areas outside of GMU 22 fall below the thresholds.

**Figure E-2. Alternative B GMU 22 Administrative Unit Lease-Holdings Effects**



BLM_0020508

**Figure E-3. Alternative C GMU 22 Administrative Unit Lease-Holdings Effects**



## 3.0   Temporal Analysis

The temporal analysis protocol was developed to estimate acres of oil and gas-related surface disturbance before and after interim reclamation in the MPA for Alternatives A, B, C, and D over the 20-year planning period. Based on the RFD Scenario document (BLM 2007), 95 percent of oil and gas development during the planning period will occur in the MPA; consequently, the temporal analysis focused on estimating surface disturbance on BLM mineral estate within this area. Many of the methods used in this analysis are similar in concept to protocols developed for the threshold analysis. However, an additional step was performed to allocate oil and gas-related surface disturbance to different land classifications identified for five key resources: soil, water, vegetation, mule deer range, and energy and minerals.

The temporal analysis protocol was a four-step process:

1.   Define assumptions for the temporal analysis.

2.   Forecast the surface disturbance associated with well pads developed during each year of the planning period for management Alternatives A, B, C, and D.

3.   Develop a method to predict the general distribution of oil and gas surface disturbance across the MPA.

4.   Perform a proportional analysis to allocate oil and gas surface disturbance to land area features for soil, water, vegetation, mule deer range, and energy and minerals.

BLM_0020509

## 3.1   Analysis Protocol

*1. Define assumptions for the temporal analysis.*

The first step was to define the analysis assumptions. Since the analysis was confined to the MPA, a key assumption was that 95 percent of oil and gas surface disturbance would occur in this area. As stated above, this assumption has its basis in the RFD Scenario document (BLM 2007). The number of total well pads allowed under each management alternative was taken from the air emissions assumptions outlined in Record 5a of Table 2-1 (Chapter 2 of the RMPA/EIS). Under this management action, the total number of well pads allowed during the planning period increases steadily between alternatives, from a low of 550 under Alternative A to a high of 2,556 well pads under Alternative D. The number of well pads expected in the MPA was calculated by multiplying the numbers from Record 5a by 0.95. According to this methodology, the number of well pads developed in the MPA under Alternative A would be 523 (550 x 0.95 ≈ 523) (results were rounded to the nearest whole number of well pads). This calculation was repeated to estimate the number of well pads expected in the MPA under Alternatives B, C, and D (Table E-7).

**Table E-7. Number of Well Pads Allowed by Alternative**

| Planning Unit | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| White River Field Office | 550 | 1,100 | 1,800 | 2,556 |
| Mesaverde Play Area | 523 | 1,045 | 1,710 | 2,428 |

Consistent with the threshold analysis, it was assumed that each well pad would result in 12 acres of surface disturbance on BLM mineral estate. Development of a multi-well pad was assumed to occur over a two-year cycle for Alternatives B and C. In contrast, Alternatives A and D were assumed to require a three-year development cycle per well pad. This assumption was made because Alternatives A and D do not include the threshold concept for managing impacts to mule deer. Absent the threshold concept, timing limitations would remain in effect on mule deer seasonal range, meaning that year-round drilling could not occur.

Another analysis assumption was that Phase II interim reclamation would start immediately at the conclusion of the well pad development cycle. For Alternatives A and D, this implies that reclamation would begin at the start of Year 4 once the three-year development cycle was completed. For Alternatives B and C, the onset of reclamation would begin one year earlier due to the shorter two-year development cycle. An assumption common to all alternatives is that Phase II interim reclamation would require three years for successful completion. This implies that for Alternatives A and D, the time frame from initial development to the conclusion of interim reclamation on a well pad would be six years. The time frame for Alternatives B and C would be a year shorter at five years.

Another important assumption regarding reclamation is, that for each well pad, a portion of the development area would remain in a disturbed state through the well production phase. Since well production is expected to last much longer than well development, it was assumed that all oil and gas wells developed under this Resource Management Plan Amendment (RMPA) would remain in production for the entire 20-year planning period. Each well pad was assumed to require a five-acre production footprint. Therefore, 7 of the 12 surface disturbance acres required per pad would be reclaimed during Phase II interim reclamation.

BLM_0020510

*2. Forecast the surface disturbance associated with well pads developed during each year of the planning period for management alternatives A, B, C, and D.*

The second step of the analysis was to forecast surface disturbance associated with well pads developed during each year of the planning period. The amount of oil and gas surface disturbance, $A_{(t)}$, in a given year (t) can be estimated from the following equation:

$$A(t) = W(t)*12 \hspace{4cm} \text{(Equation 1)}$$

In the above equation, $W_{(t)}$ represents the number of well pads constructed in Year (t), and the multiplier 12 represents the 12 acres of surface disturbance assumed per pad. This equation applies to each of the four management alternatives. The terms in the equation represent the quantity of well pads or surface disturbance created in a given year. Cumulative surface disturbance throughout a range of years would be calculated by summing the equation result for each year in the range.

In order to solve Equation 1, it was also necessary to estimate how the number of well pads constructed in the MPA will vary from year-to-year during the planning period. The temporal variation in well pad construction was already estimated for Alternatives B and C during the threshold analysis:

$$\text{Alternative B: } W(t) = 1.5 * (t) + 40 \hspace{3cm} \text{(Equation 2)}$$

$$\text{Alternative C: } W(t) = 5.2 * (t) + 36 \hspace{3cm} \text{(Equation 3)}$$

Equations 2 and 3 assume that well pad development will occur at an increasing linear rate over the 20-year planning period. The term $W_{(t)}$ represents the number of well pads constructed in a given year. To develop these equations, it was necessary to first estimate the number of well pads drilled in Year 1. The number of well pads drilled in Year 1 was derived from the RFD Scenario document (BLM 2007) page 63, Figure 1 where it is assumed that 331 wells will be drilled in Year 1. Dividing this number by an assumed 8 wells per well pad yields 41 well pads (when rounded to a whole number). Fixing Year 1 at 41 well pads, the slope of the line for the growth of development was varied iteratively until the total number of multi-well pads equaled the total numbers assumed for Alternative B (1,100 multi-well pads) and Alternative C (1,800 multi-well pads). This resulted in a slope of approximately 1.5 well pads/year and a y-intercept of 40 for Alternative B. Likewise, the slope of the Alternative C equation is 5.2 well pads/year and the y-intercept is 36. Equations 2 and 3 are only valid for the number of years in the planning period. They cannot be used to extrapolate the number of well pads constructed prior to Year 1 or beyond Year 20.

The same method was used to develop a linear equation for well pad development under Alternative D. Starting with 41 well pads in Year 1, the slope of the equation was adjusted iteratively until the total number of well pads equaled 2,556 for the 20-year planning period. This resulted in a slope of approximately 9.1 well pads/year and a y-intercept of 32.

$$\text{Alternative D: } W(t) = 9.1 * (t) + 32 \hspace{3cm} \text{(Equation 4)}$$

For Alternative A, the number of well pads installed in Year 1 had to be adjusted downward to maintain an increasing rate of development during the planning period. A trial-and-error estimate produced a Year 1 total of 14 well pads. From this baseline, an increasing rate of development could be maintained at approximately 1.4 well pads/year to achieve a total of 550 well pads during the planning period. The y-intercept of the Alternative A equation is 13.

$$\text{Alternative A: } W(t) = 1.4 * (t) + 13 \hspace{3cm} \text{(Equation 5)}$$

BLM_0020511

The equations for Alternatives A, B, C, and D apply to the entire Planning Area. To estimate the number of well pads developed annually in the MPA, the total number of well pads derived from Equations 2 through 5 were then multiplied by 0.95. Figure E-4 below illustrates the projected trend of well pad development for Alternatives A through D in the MPA.

**Figure E-4. Linear Growth of Well Pad Development in the MPA**



The data shown on Figure E-4 can be used to estimate oil and gas surface disturbance in a given year by multiplying the entire series by 12 according to Equation 1. This estimate of surface disturbance is limited in that it does not take into account the effects of interim reclamation. By Year 6 or 7 (depending on the alternative), well pads initiated during Year 1 would achieve successful interim reclamation, and the portion of each well pad that is reclaimed (i.e., 7 acres) would partially offset new surface disturbance that occurs during subsequent years. For Alternatives A and D, this "interim reclamation offset" would begin in Year 7. Prior to Year 7, annual surface disturbance would still be calculated according to Equation 1. After that time, the interim reclamation offset can be taken into account by adjusting Equation 1 to:

$$\Delta A(t) = W(t) * 12 - W(t - 6) * 7 \qquad \text{(Equation 6)}$$

In Equation 6, $\Delta A_{(t)}$ corresponds to the net change in surface disturbance that would occur during Year (t) of the planning period, where $t \geq 7$ and $t \leq 20$.

The reclamation offset begins in Year 6 under Alternatives B and C due to the shorter well pad development cycle assumed for these alternatives. Prior to Year 6, annual surface disturbance would still be calculated according to Equation 1. After that time, Equation 1 would be modified to:

$$\Delta A(t) = W(t) * 12 - W(t - 5) * 7 \qquad \text{(Equation 7)}$$

Again, $\Delta A_{(t)}$ corresponds to the net change in surface disturbance that would occur during Year (t) of the planning period, except that (t) will now be between 6 and 20.

BLM_0020512

Equations 1 through 7 were used during the temporal analysis to estimate surface disturbance in the MPA after Phase II interim reclamation for each alternative at Years 1-7, 10, and 20.

### 3. Develop a method to predict the general distribution of oil and gas surface disturbance across the MPA.

Exact locations in the MPA where oil and gas well pads would be constructed depend on a number of factors and cannot be predicted with complete certainty. However, with the aid of some simplifying assumptions, it is possible to generally predict what areas of the MPA are more likely to be developed. Oil and gas conditions of approval and lease stipulations identified in the management alternative tables (i.e., Tables 2-1 to 2-21 of the RMPA/EIS) – including Closed, NSO, CSU, TLs, and Open – provide the guiding principles for these predictions.

Prior to the temporal analysis, a spatial analysis was performed to overlay lease stipulations resulting from various management actions. Where different stipulation types overlapped, NSO stipulations were assigned the highest priority since they are more restrictive of oil and gas surface disturbance than any stipulation type except Closed. Closed stipulations were not given priority since no areas of the MPA would be closed to oil and gas development under any alternative. It was assumed during the temporal analysis that oil and gas surface disturbance would not occur in NSO stipulation areas. Although BLM can occasionally grant exceptions to NSO stipulations, this assumption is valid because the number of exceptions granted would likely be small compared to the total stipulation area.

The exclusion of NSO stipulation areas leaves a reduced footprint available for oil and gas surface disturbance in the MPA. The remaining stipulation types (i.e., CSU, TLs, open) do not specifically prohibit oil and gas surface disturbance. Therefore, it was assumed that well pads would be distributed evenly among areas of the MPA available for surface occupancy. In other words, all areas of the MPA not subject to NSO stipulations would have the same average spatial development density (i.e., the same number of well pads per acre of available land). This concept is a fundamental principle of the temporal analysis.

The final assumption made during step 3 pertained to the lease status of BLM mineral estate in the MPA. Spatial data available at the time of the analysis indicates that some areas of BLM mineral estate are not currently leased for oil and gas development. However, it was assumed for the analysis that all available parcels would eventually be leased, and thus had the same probability of future development as parcels that have already been leased.

### 4. Perform a proportional analysis to allocate oil and gas surface disturbance to land area features analyzed for soil, water, vegetation, mule deer range, and energy and minerals.

The final step of the temporal analysis involved allocating oil and gas surface disturbance projected under each alternative to different land area features for soil, water, vegetation, mule deer range, and energy and minerals. The purpose of the allocation was to identify which features could experience a greater impact from oil and gas development as a result of having a higher proportion of land available for surface occupancy. For example, vegetation classes in the MPA include vegetation types such as aspen and piñon/juniper, among others. It is possible that NSO stipulations established in the alternative comparison tables (Tables 2-1 to 2-21) may afford greater protection from surface disturbance to aspen stands than piñon/juniper. The difference arises due to management actions that are specifically designed to protect aspen, and potentially from management actions that are designed to protect other resources where aspen trees may also be present. Overall, the allocations performed during this step make it possible to evaluate how the sum total of NSO stipulations might

BLM_0020513

shift oil and gas development away from some resources while simultaneously concentrating it near others.

The datasets used during step 4 represent the intersection of data features in Chapter 3 of the RMPA with the hierarchy of leasing stipulations developed for Chapter 2 of the RMPA. The result of these data intersections were clipped to the MPA boundary using GIS tools. The Chapter 3 spatial datasets utilized for the five resource areas are listed in Table E-8. This table also describes whether the different datasets used in the analysis have overlapping features and whether they cover the entire MPA. For datasets that cover the MPA and have no overlap between data categories, calculated percentages should sum to 100 percent.

Some data features that were clipped for the analysis, such as watersheds, have boundaries that extend beyond the analysis area. For example, only a small portion of the Lower White River watershed is within the MPA. Thus, analysis results and percentages presented for the Lower White River watershed apply only to that portion of the watershed that is within the MPA. Areas of the watershed that are outside the MPA were not considered during this analysis since area outside of the MPA is only expected to receive five percent of oil and gas development during the planning period. The same concept applies to other features that extend beyond the MPA boundaries, such as saline soils, vegetation types, and mule deer range.

### Table E-8. Spatial Datasets Used in Step 4 of the Temporal Analysis

| Resource | Spatial Datasets | Overlapping Features? | Coverage |
|---|---|---|---|
| Soil | Fragile soils on slopes greater than 35 percent; Saline soils | No | Portions of MPA |
| Water | Watersheds (based on 8-digit hydrologic unit codes) | No | Entire MPA |
| Vegetation | Vegetation land cover | No | Entire MPA |
| Mule Deer Range | Summer range, winter range, severe winter range, and winter concentration areas for mule deer | Yes | Entire MPA |
| Energy and Minerals | Oil shale lease areas; Oil shale research, development, and demonstration tracts; Multi-mineral zone; Sodium lease areas | Yes | Portions of MPA |

A temporal analysis table was developed for each alternative and each of the five resources listed in Table E-8, resulting in 20 temporal analysis tables. Each table has eight lines that represent either a known feature area, or a calculated area or percentage. The temporal analysis tables are provided in Chapter 4 and at the end of this Appendix. An explanation of each line in the tables is presented below.

**Line 1** represents the total area of each land area feature, otherwise referred to as a "feature class."

**Line 2** represents the percent of land area that each feature class comprises in the MPA. It is calculated according to the formula:

Percent of Land Area in the MPA = 100 x (Feature area/MPA area)          (Equation 8)

**Line 3** represents the area of each feature class that would be managed with NSO stipulations under the respective alternative.

BLM_0020514

**Line 4** represents the area of each feature class that would not be subject to NSO lease stipulations. It is calculated according to the formula:

$$\text{Area Available for Surface Occupancy} = \text{Feature area} - \text{NSO Stipulation area} \quad \text{(Equation 9)}$$

**Line 5** represents the ratio of a feature area that is not subject to NSO stipulations divided by the total area in the MPA that is not subject to NSO stipulations. It is calculated according to the following formula:

$$\text{Percentage of Acres Available for Surface Occupancy in the MPA} =$$
$$100 \times (\text{Area Available for Surface Occupancy for an individual feature/}$$
$$\text{Total Area Available for Surface Occupancy in the MPA}) \quad \text{(Equation 10)}$$

**Line 6** represents the total number of well pads planned during the 20-year planning period. The well pad estimate is predetermined for the MPA as 95 percent of the total well pads allowed under each alternative. For each feature class, the estimated number of well pads is calculated as follows:

$$\text{Estimated Number of Well Pads} = \text{Number of Well Pads in the MPA}$$
$$\times \text{Percent of Acres Available for Surface Occupancy in the MPA} \quad \text{(Equation 11)}$$

**Line 7** represents the estimated area of surface disturbance that could occur in each feature class during the planning period based on the estimated number of well pads. It is calculated as follows:

$$\text{Estimated Area of Surface Disturbance during the 20-yr Planning Period} =$$
$$\text{Estimated Number of Well Pads (rounded to the nearest well pad)} \times 12 \text{ acres} \quad \text{(Equation 12)}$$

**Line 8** represents the percent of each feature area that could be developed during the 20-year planning period, a value that can also be referred to as "development density." It is calculated as follows:

$$\text{Percent of Total Land Area Developed During the 20-yr Planning Period} =$$
$$100 \times (\text{Estimated Area of Surface Disturbance During the 20-yr Planning Period/}$$
$$\text{Feature Area in the Mesaverde Play Area}). \quad \text{(Equation 13)}$$

## 3.2   Implement Protocol

This section presents calculation results from steps 2 and 4 of the temporal analysis. The reader should remember that step 2 involved forecasting surface disturbance associated with oil and gas development during the planning period. This was accomplished by using Equations 1, 6, and 7, and then summing the results for each year to estimate the cumulative surface disturbance at Year 20 (represented by the summation symbol $\sum$). Table E-9 presents the cumulative surface disturbance at Year 20 both before and after interim reclamation. Figure E-5 shows cumulative surface disturbance by alternative during each year of the planning period.

BLM_0020515

**Table E-9. Temporal Analysis Results, Step 2**

| Description | Units | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Assumed number of well pads, WRFO ($\sum W_{(t)}$ Eqns. 2, 3, 4, 5) | --- | 550 | 1,100 | 1,800 | 2,556 |
| Assumed number of well pads, MPA ($\sum W_{(t)}$*0.95) | --- | 523 | 1,045 | 1,710 | 2,428 |
| Surface disturbance per well pad | Acres | 12 | 12 | 12 | 12 |
| Total surface disturbance in MPA during the 20-yr planning period ($\sum A_{(t)}$ Eqn. 1) | Acres | 6,276 | 12,540 | 20,520 | 29,136 |
| Unreclaimed surface disturbance area in the MPA at end of 20-yr planning period after interim reclamation ($\sum \Delta A_{(t)}$ Eqn. 6/7) | Acres | 4,113 | 7,423 | 12,834 | 19,784 |

Note: The summation symbol $\sum$ represents the total quantity for years 1 through 20 of the planning period.

**Figure E-5. Cumulative Oil and Gas Surface Disturbance in the MPA During the 20-Year Planning Period**



BLM_0020516

The 20 temporal analysis tables developed for soil, water, vegetation, mule deer range, and energy and minerals under step 4 of the analysis are presented as Attachment 1 to this appendix. The results of step 4 are also presented graphically on Figures E-6 through E-10, which have been included as Attachment 2. The values presented on Figures E-6 through E-10 were calculated using the equation for **Line 8** of the temporal analysis tables described in step 4.

# 4.0   References

U.S. Department of the Interior, Bureau of Land Management (BLM). 2007. Reasonable Foreseeable Development Scenario for Oil and Gas Activities in the BLM White River Field Office: Rio Blanco, Moffat and Garfield Counties, Colorado. September 10.

# 5.0   Attachment 1

## 5.1   *Temporal Analysis Tables*

### Table E-10. Estimated Surface Disturbance by Mule deer Range Area in the Mesaverde Play Area White River Field Office – Alternative A

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Summer Range | Winter Range | Severe Winter Range | Winter Concentration Areas |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 304,100 | 414,600 | 121,300 | 5,300 |
| 2 | Percent of Land Area in the MPA | % | 100 | 51 | 70 | 20 | 0.9 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 65,500 | 37,700 | 51,700 | 15,500 | 700 |
| 4 | Area Available for Surface Occupancy | Acres | 533,200 | 266,400 | 362,900 | 105,900 | 4,600 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 50 | 68 | 20 | 0.9 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 | 262 | 357 | 104 | 4 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,300 | 3,100 | 4,300 | 1,200 | 50 |
| 8 | Percent of Range Type within the MPA Developed During 20-yr Planning Period [5] | % | 1.1 | 1.0 | 1.0 | 1.0 | 0.9 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for muledeer range are only for the identified range type. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-4 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020517

**Table E-11. Estimated Surface Disturbance by Muledeer Range Area
in the Mesaverde Play Area White River Field Office – Alternative B**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Summer Range | Winter Range | Severe Winter Range | Winter Concentration Areas |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 304,100 | 414,600 | 121,300 | 5,300 |
| 2 | Percent of Land Area in the MPA | % | 100 | 51 | 70 | 20 | 0.9 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 242,800 | 141,000 | 154,200 | 46,000 | 2,000 |
| 4 | Area Available for Surface Occupancy | Acres | 355,900 | 163,100 | 260,500 | 75,300 | 3,300 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 46 | 73 | 21 | 0.9 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,045 | 479 | 766 | 221 | 10 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 12,500 | 5,700 | 9,200 | 2,700 | 120 |
| 8 | Percent of Range Type within the MPA Developed During 20-yr Planning Period [5] | % | 2.1 | 1.9 | 2.2 | 2.2 | 2.3 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for muledeer range are only for the identified range type. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-4 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020518

**Table E-12. Estimated Surface Disturbance by Muledeer Range Area
in the Mesaverde Play Area White River Field Office – Alternative C**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Summer Range | Winter Range | Severe Winter Range | Winter Concentration Areas |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 304,100 | 414,600 | 121,300 | 5,300 |
| 2 | Percent of Land Area in the MPA | % | 100 | 51 | 70 | 20 | 0.9 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 150,900 | 88,600 | 98,500 | 31,900 | 1,100 |
| 4 | Area Available for Surface Occupancy | Acres | 447,800 | 215,500 | 316,100 | 89,400 | 4,200 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 48 | 71 | 20 | 0.9 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 | 824 | 1,209 | 342 | 16 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 20,500 | 9,900 | 14,500 | 4,100 | 190 |
| 8 | Percent of Range Type within the MPA Developed During 20-yr Planning Period [5] | % | 3.4 | 3.3 | 3.5 | 3.4 | 3.6 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for muledeer range are only for the identified range type. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-4 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020519

**Table E-13. Estimated Surface Disturbance by Muledeer Range Area
in the Mesaverde Play Area White River Field Office – Alternative D**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Summer Range | Winter Range | Severe Winter Range | Winter Concentration Areas |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 304,100 | 414,600 | 121,300 | 5,300 |
| 2 | Percent of Land Area in the MPA | % | 100 | 51 | 70 | 20 | 0.9 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 96,600 | 56,700 | 69,100 | 18,700 | 1,100 |
| 4 | Area Available for Surface Occupancy | Acres | 502,100 | 247,400 | 345,500 | 102,600 | 4,200 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 49 | 69 | 20 | 0.8 |
| 6 | Estimated Number of Well Pads [3] | --- | 2,428 | 1,198 | 1,674 | 497 | 20 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 29,100 | 14,400 | 20,100 | 6,000 | 240 |
| 8 | Percent of Range Type within the MPA Developed During 20-yr Planning Period [5] | % | 4.9 | 4.7 | 4.8 | 4.9 | 4.6 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for muledeer range are only for the identified range type. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-4 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020520

**Table E-14. Estimated Surface Disturbance for Energy and Mineral Lease Areas in the Mesaverde Play Area White River Field Office – Alternative A**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi- Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 289,600 | 810 | 164,000 | 18,200 |
| 2 | Percent of Land Area in the MPA | % | 100 | 49 | 0.1 | 28 | 3.1 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 65,500 | 22,100 | 40 | 13,200 | 1,900 |
| 4 | Area Available for Surface Occupancy | Acres | 533,200 | 267,500 | 770 | 150,800 | 16,300 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 89 | 50 | 0.1 | 28 | 3.1 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 | 263 | 1 | 148 | 16 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,300 | 3,200 | 10 | 1,800 | 190 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period [5] | % | 1.2 | 1.1 | 1.5 | 1.1 | 1.1 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for MPA are for all resources. The NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020521

**Table E-15. Estimated Surface Disturbance for Energy and Mineral Lease Areas in the Mesaverde Play Area White River Field Office – Alternative B**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi- Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 289,600 | 810 | 164,000 | 18,200 |
| 2 | Percent of Land Area in the MPA | % | 100 | 49 | 0.1 | 28 | 3.1 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 242,800 | 119,300 | 100 | 38,000 | 4,300 |
| 4 | Area Available for Surface Occupancy | Acres | 355,900 | 170,300 | 710 | 126,000 | 13,900 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 60 | 48 | 0.0 | 35 | 0.0 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,045 | 501 | 0 | 371 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 12,500 | 6,000 | 0 | 4,500 | 0 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period [5] | % | 3.5 | 2.1 | 0.0 | 2.7 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for MPA are for all resources. The NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

**Table E-16. Estimated Surface Disturbance for Energy and Mineral Lease Areas in the Mesaverde Play Area White River Field Office – Alternative C**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi- Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 289,641 | 810 | 163,951 | 18,246 |
| 2 | Percent of Land Area in the MPA | % | 100 | 49 | 0.1 | 28 | 3.1 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 150,900 | 64,900 | 40 | 22,100 | 5,100 |
| 4 | Area Available for Surface Occupancy | Acres | 447,800 | 224,800 | 770 | 141,900 | 13,100 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 75 | 50 | 0.0 | 32 | 0.0 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 | 860 | 0 | 543 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 20,500 | 10,300 | 0 | 6,500 | 0 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period [5] | % | 4.6 | 3.6 | 0.0 | 4.0 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for MPA are for all resources. The NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

**Table E-17. Estimated Surface Disturbance for Energy and Mineral Lease Areas in the Mesaverde Play Area White River Field Office – Alternative D**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Oil Shale Leasing | Oil Shale Research | Multi- Mineral Zone | Sodium Leases |
|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 289,600 | 810 | 164,000 | 18,200 |
| 2 | Percent of Land Area in the MPA | % | 100 | 49 | 0.1 | 28 | 3.1 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 69,600 | 40,300 | 40 | 15,700 | 2,900 |
| 4 | Area Available for Surface Occupancy | Acres | 502,100 | 249,300 | 770 | 148,300 | 15,300 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | 84 | 50 | 0.0 | 30 | 0.0 |
| 6 | Estimated Number of Well Pads [3] | --- | 2,428 | 1,208 | 0 | 719 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 29,100 | 14,500 | 0 | 8,600 | 0 |
| 8 | Percent of Mineral Feature Surface Estate within the MPA Developed During 20-yr Planning Period [5] | % | 4.9 | 5.0 | 0.0 | 5.3 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for MPA are for all resources. The NSO stipulations areas for mineral classes are only for the identified class. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-17 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020524

**Table E-18. Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil Areas in the Mesaverde Play Area – White River Field Office – Alternative A**

| Line [1] | Description | Note | Units | Mesaverde Play Area | Fragile Soils on Slopes Greater than 35 Percent | Saline Soils |
|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | --- | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | --- | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulation Area in the MPA | --- | Acres | 65,500 | 17,100 | 300 |
| 4 | Area Available for Surface Occupancy | --- | Acres | 533,200 | 104,800 | 1,700 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | --- | % | 100 | 20 | 0.3 |
| 6 | Estimated Number of Well Pads[2] | (1) | --- | 523 | 103 | 2 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[3] | (2) | Acres | 6,300 | 1,200 | 24 |
| 8 | Percent of Soil Feature within the MPA Developed During the 20-yr Planning Period[4] | (3) | % | 1.1 | 1.0 | 1.2 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[3] Assumed that each well pad would require 12 acres of surface disturbance.

[4] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature.

BLM_0020525

**Table E-19. Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil Areas in the Mesaverde Play Area –White River Field Office – Alternative B**

| Line [1] | Description | Note | Units | Mesaverde Play Area | Fragile Soils on Slopes Greater than 35 Percent | Saline Soils |
|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | --- | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | --- | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulation Area in the MPA | --- | Acres | 242,800 | 121,800 | 2,000 |
| 4 | Area Available for Surface Occupancy | --- | Acres | 355,900 | 120 | 0 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | --- | % | 100 | 0.0 | 0.0 |
| 6 | Estimated Number of Well Pads[2] | (1) | --- | 1,045 | 0 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[3] | (2) | Acres | 12,500 | 0 | 0 |
| 8 | Percent of Soil Feature within the MPA Developed During the 20-yr Planning Period[4] | (3) | % | 2.1 | 0.0 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[3] Assumed that each well pad would require 12 acres of surface disturbance.

[4] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature.

BLM_0020526

**Table E-20. Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil Areas in the Mesaverde Play Area –White River Field Office – Alternative C**

| Line [1] | Description | Note | Units | Mesaverde Play Area | Fragile Soils on Slopes Greater than 35 Percent | Saline Soils |
|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | --- | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | --- | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulation Area in the MPA | --- | Acres | 150,900 | 60,600 | 2,000 |
| 4 | Area Available for Surface Occupancy | --- | Acres | 447,800 | 61,300 | 0 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | --- | % | 100 | 14 | 0.0 |
| 6 | Estimated Number of Well Pads[2] | (1) | --- | 1,710 | 234 | 0 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period[3] | (2) | Acres | 20,500 | 2,800 | 0 |
| 8 | Percent of Soil Feature within the MPA Developed During the 20-yr Planning Period[4] | (3) | % | 3.4 | 2.3 | 0.0 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[3] Assumed that each well pad would require 12 acres of surface disturbance.

[4] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature.

BLM_0020527

**Table E-21. Estimated Surface Disturbance for Fragile, Highly Erodible, and Saline Soil Areas in the Mesaverde Play Area –White River Field Office – Alternative D**

| Line [1] | Description | Note | Units | Mesaverde Play Area | Fragile Soils on Slopes Greater than 35 Percent | Saline Soils |
|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | --- | Acres | 598,700 | 121,900 | 2,000 |
| 2 | Percent of Land Area in the MPA | --- | % | 100 | 20 | 0.3 |
| 3 | NSO Stipulation Area in the MPA | --- | Acres | 69,600 | 46,300 | 310 |
| 4 | Area Available for Surface Occupancy | --- | Acres | 502,100 | 75,700 | 1,700 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | --- | % | 100 | 15 | 0.3 |
| 6 | Estimated Number of Well Pads [2] | (1) | --- | 2,428 | 367 | 8 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [3] | (2) | Acres | 29,100 | 4,400 | 100 |
| 8 | Percent of Soil Feature within the MPA Developed During the 20-yr Planning Period [4] | (3) | % | 4.9 | 3.6 | 4.7 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[3] Assumed that each well pad would require 12 acres of surface disturbance.

[4] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature.

BLM_0020528

*Appendix E – Threshold and Temporal Analysis*

**Table E-22. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative A**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grass-lands | Grease-wood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sage-brush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25.2 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA [2] | Acres | 68,200 | 1,200 | 2,300 | 3,000 | 2,000 | 1,000 | 14,900 | 28,200 | 170 | 14,800 | 600 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 530,500 | 16,200 | 7,100 | 10,500 | 12,900 | 5,400 | 127,200 | 211,100 | 490 | 136,200 | 3,400 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 89 | 93 | 76 | 77 | 86 | 85 | 90 | 88 | 73 | 90 | 83 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 | 16 | 7 | 10 | 13 | 5 | 125 | 208 | 0.6 | 134 | 3 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,300 | 192 | 84 | 120 | 156 | 60 | 1,500 | 2,496 | 0 | 1,608 | 36 |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period [5] | % | 1.0 | 1.1 | 0.9 | 0.9 | 1.0 | 1.0 | 1.1 | 1.0 | 0.9 | 1.1 | 1.0 |

NOTES:

[1] The line-by-line analysis methodology is described in Appendix E.

[2] NSO stipulation areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0020529

*Appendix E – Threshold and Temporal Analysis*

**Table E-23. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative B**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grass-lands | Grease-wood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sage-brush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25.2 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA [2] | Acres | 314,100 | 16,400 | 9,200 | 11,800 | 10,200 | 4,800 | 87,600 | 115,400 | 500 | 55,300 | 2,900 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 284,600 | 1,000 | 200 | 1,700 | 4,700 | 1,600 | 54,500 | 123,900 | 164 | 95,700 | 1,100 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 48 | 5 | 2 | 13 | 31 | 25 | 38 | 52 | 25 | 63 | 28 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,045 | 3 | 1 | 6 | 17 | 6 | 200 | 455 | 1 | 351 | 4 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 12,500 | 36 | 12 | 72 | 204 | 72 | 2,400 | 5,460 | 12 | 4,212 | 48 |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period [5] | % | 2.1 | 0.2 | 0.1 | 0.6 | 1.4 | 1.1 | 1.7 | 2.3 | 1.1 | 2.8 | 1.2 |

NOTES:
[1] The line-by-line analysis methodology is described in Appendix E.
[2] NSO stipulation areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.
[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.
[4] Assumed that each well pad would require 12 acres of surface disturbance.
[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0020530

*Appendix E – Threshold and Temporal Analysis*

### Table E-24. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative C

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grass-lands | Grease-wood | Mountain Shrub | Pinyon/Juniper | Riparian and Wetlands | Sage-brush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA [2] | Acres | 192,700 | 16,300 | 9,300 | 8,800 | 5,800 | 2,200 | 52,500 | 62,900 | 380 | 33,200 | 1,400 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 406,000 | 1,100 | 143 | 4,700 | 9,100 | 4,200 | 89,600 | 176,400 | 283 | 117,700 | 2,600 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 68 | 6.2 | 1.5 | 34.7 | 61.4 | 65.4 | 63.1 | 73.7 | 42.6 | 78 | 64.9 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 | 5 | 1 | 20 | 38 | 18 | 378 | 743 | 1 | 496 | 11 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 20,500 | 60 | 12 | 240 | 456 | 216 | 4,536 | 8,916 | 12 | 5,952 | 132 |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period [5] | % | 3.4 | 0.3 | 0.1 | 1.8 | 3.1 | 3.3 | 3.2 | 3.7 | 2.23 | 3.9 | 3.3 |

NOTES:
[1] The line-by-line analysis methodology is described in Appendix E.
[2] NSO stipulation areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.
[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.
[4] Assumed that each well pad would require 12 acres of surface disturbance.
[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0020531

**Appendix E – Threshold and Temporal Analysis**

**Table E-25. Estimated Surface Disturbance by Vegetation Community in the Mesaverde Play Area – Alternative D**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Aspen | Conifer | Developed and Non-vegetated | Grass-lands | Grease-wood | Mountain Shrub | Pinyon/ Juniper | Riparian and Wetlands | Sage-brush | Salt Desert |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the MPA | Acres | 598,700 | 17,400 | 9,400 | 13,500 | 14,900 | 6,400 | 142,100 | 239,300 | 660 | 151,000 | 4,000 |
| 2 | Percent of Land Area in the MPA | % | 100 | 2.9 | 1.6 | 2.3 | 2.5 | 1.1 | 23.7 | 40 | 0.1 | 25.2 | 0.7 |
| 3 | NSO Stipulation Areas and Effective NSO Areas in the MPA [2] | Acres | 129,500 | 4,300 | 6,900 | 8,400 | 4,000 | 1,300 | 32,600 | 48,200 | 320 | 22,300 | 1,200 |
| 4 | Area Available for Surface Occupancy in the MPA | Acres | 469,200 | 13,100 | 2,500 | 5,100 | 10,900 | 5,100 | 109,500 | 191,100 | 340 | 128,700 | 2,800 |
| 5 | Percentage of Vegetation Class in the MPA Available for Surface Occupancy | % | 78 | 76 | 27 | 38 | 73 | 79 | 77 | 80 | 51 | 85 | 70 |
| 6 | Estimated Number of Well Pads [3] | --- | 2,428 | 68 | 13 | 27 | 56 | 26 | 567 | 989 | 2 | 666 | 15 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 29,100 | 816 | 156 | 324 | 672 | 312 | 6,804 | 11,868 | 24 | 7,992 | 180 |
| 8 | Percent of Vegetation Class Available within the MPA Developed During 20-yr Planning Period [5] | % | 4.9 | 4.7 | 1.6 | 2.4 | 4.5 | 4.9 | 4.8 | 5.0 | 3.2 | 5.3 | 4.4 |

NOTES:
[1] The line-by-line analysis methodology is described in Appendix E.
[2] NSO stipulation areas for MPA are for all resources. NSO Stipulations area for vegetation communities are only for the identified community. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-3 and Appendix A for exception, modification, and waiver criteria.
[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.
[4] Assumed that each well pad would require 12 acres of surface disturbance.
[5] Represents the ratio of estimated surface disturbance for a vegetation community divided by the total land area of that vegetation community within the MPA. Does not account for areas that would be reclaimed.

BLM_0020532

### Table E-26. Estimated Surface Disturbance by Watershed in the Mesaverde Play Area White River Field Office – Alternative A

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0.0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 64,100 | 0 | 14,300 | 2,300 | 45,900 | 1,600 |
| 4 | Area Available for Surface Occupancy | Acres | 531,700 | 64 | 13,800 | 28,800 | 455,200 | 33,900 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 0.0 | 2.6 | 5.4 | 85.6 | 6.4 |
| 6 | Estimated Number of Well Pads [3] | --- | 523 | 0 | 14 | 28 | 448 | 33 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 6,300 | 0 | 170 | 340 | 5,400 | 400 |
| 8 | Percent of Watershed within the MPA Developed During 20-yr Planning Period [5] | % | 1.0 | 0.0 | 0.6 | 1.1 | 1.1 | 1.1 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020533