**Table E-27. Estimated Surface Disturbance by Watershed in the
Mesaverde Play Area White River Field Office – Alternative B**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0.0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 240,400 | 12 | 22,900 | 18,300 | 188,300 | 11,000 |
| 4 | Area Available for Surface Occupancy | Acres | 355,400 | 52 | 5,200 | 12,800 | 312,800 | 24,500 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 0.0 | 1.5 | 3.6 | 88 | 6.9 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,045 | 0 | 15 | 38 | 920 | 72 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 12,500 | 0 | 180 | 460 | 11,000 | 860 |
| 8 | Percent of Watershed within the MPA Developed During 20-yr Planning Period [5] | % | 2.0 | 0.0 | 0.6 | 1.5 | 2.2 | 2.4 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020534

**Table E-28. Estimated Surface Disturbance by Watershed in the
Mesaverde Play Area White River Field Office – Alternative C**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0.0 | 4.7 | 5.2 | 84 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 148,600 | 10 | 21,700 | 10,300 | 111,500 | 5,191 |
| 4 | Area Available for Surface Occupancy | Acres | 447,200 | 54 | 6,400 | 20,800 | 389,600 | 30,300 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 0.0 | 1.4 | 4.7 | 87.1 | 6.8 |
| 6 | Estimated Number of Well Pads [3] | --- | 1,710 | 0 | 25 | 80 | 1,489 | 116 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 20,500 | 0 | 300 | 960 | 17,700 | 1,400 |
| 8 | Percent of Watershed within the MPA Developed During 20-yr Planning Period [5] | % | 3.0 | 0.0 | 1.1 | 3.1 | 3.6 | 3.9 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020535

**Table E-29. Estimated Surface Disturbance by Watershed in the
Mesaverde Play Area White River Field Office – Alternative D**

| Line [1] | Description | Units | Mesaverde Play Area (MPA) | Colorado Headwaters-Plateau | Lower White | Parachute-Roan | Piceance-Yellow | Upper White |
|---|---|---|---|---|---|---|---|---|
| 1 | Land Area in the Mesaverde Play Area (MPA) | Acres | 598,700 | 64 | 28,100 | 31,100 | 501,100 | 35,500 |
| 2 | Percent of Land Area in the MPA | % | 100 | 0.0 | 4.7 | 5.2 | 84.1 | 6.0 |
| 3 | NSO Stipulation Areas in the MPA [2] | Acres | 94,500 | 3 | 16,000 | 3,700 | 71,500 | 3,300 |
| 4 | Area Available for Surface Occupancy | Acres | 501,300 | 61 | 12,100 | 27,400 | 429,600 | 32,200 |
| 5 | Percentage of Acres Available for Surface Occupancy in the MPA | % | --- | 0 | 2.4 | 5.5 | 85.7 | 6.4 |
| 6 | Estimated Number of Well Pads [3] | --- | 2,428 | 0 | 58 | 133 | 2,081 | 156 |
| 7 | Estimated Area of Surface Disturbance During the 20-yr Planning Period [4] | Acres | 29,100 | 0 | 700 | 1,600 | 25,000 | 1,900 |
| 8 | Percent of Watershed within the MPA Developed During 20-yr Planning Period [5] | % | 5.0 | 0.0 | 2.5 | 5.1 | 5.0 | 5.3 |

NOTES:

[1] The line-by-line analysis methodology is described elsewhere in this appendix.

[2] The NSO stipulations areas for the MPA are for all resources. The NSO stipulations areas for each watershed are only for the identified watershed. This is a conservative assumption, as it does not include exceptions to NSO stipulations. Refer to Table 2-2 and Appendix A for exception, modification, and waiver criteria.

[3] Assumed that 95 percent of reasonably foreseeable oil and gas development would occur in the MPA.

[4] Assumed that each well pad would require 12 acres of surface disturbance.

[5] Represents the ratio of estimated surface disturbance for a feature divided by the total land area of that feature class within the MPA.

BLM_0020536

## 6.0   Attachment 2

### *6.1   Temporal Analysis Figures*

Temporal analysis figures including:

- Figure E-6    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Soil Class during the 20-year Planning Period

- Figure E-7    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Watershed during the 20-year Planning Period

- Figure E-8    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Class during the 20-year Planning Period

- Figure E-9    Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Range Type during the 20-year Planning Period

- Figure E-10   Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Mineral Estate Category during the 20-year Planning Period

**Figure E-6. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Soil Class during the 20-year Planning Period**



BLM_0020537

**Figure E-7. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Watershed during the 20-year Planning Period**



**Figure E-8. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Vegetation Class during the 20-year Planning Period**



BLM_0020538

*Appendix E – Threshold and Temporal Analysis*

**Figure E-9. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Range Type during the 20-year Planning Period**



**Figure E-10. Estimated Area of Surface Disturbance in the Mesaverde Play Area in Each Mineral Estate Category during the 20-year Planning Period**



BLM_0020539

*This page intentionally left blank*

BLM_0020540

BLM

### Appendix F

# Air Quality Impacts



**Public Lands USA: Use, Share, Appreciate**

BLM_0020541

BLM_0020542

# Table of Contents

**Page**

1.0 **AIR QUALITY IMPACTS FROM THE AIR RESOURCES TECHNICAL SUPPORT DOCUMENT**....................................................................................F-1

2.0 **NEAR-FIELD IMPACTS**..................................................................................F-1

3.0 **FAR-FIELD NON-OZONE PROJECT IMPACTS**..................................................F-4

4.0 **FAR-FIELD NON-OZONE CUMULATIVE IMPACTS**.........................................F-23

5.0 **OZONE IMPACTS**........................................................................................F-40

6.0 **MAPS**........................................................................................................F-48

7.0 **DRAFT RMPA/EIS AND ARTSD TABLE AND MAP LABELS**.........................F-51

## List of Tables

Table F-1    Near-Field 1-Hour HAP Maximum Concentration Comparison to RELs .................F-1

Table F-2    Near-Field Annual Average Predicted Concentrations  Compared to RfCs ..............F-2

Table F-3    Near-Field Cancer Risk From Long-Term Exposure ................................................F-3

Table F-4    Maximum Predicted 1-Hour $NO_2$ Impacts from Project Sources..............................F-4

Table F-5    Maximum Predicted Annual $NO_2$ Impacts from Project Sources ............................F-5

Table F-6    Maximum Predicted 24-Hour $PM_{10}$ Impacts from Project Sources ..........................F-6

Table F-7    Maximum Predicted Annual $PM_{10}$ Impacts from Project Sources ............................F-7

Table F-8    Maximum Predicted 24-Hour $PM_{2.5}$ Impacts from Project Sources ..........................F-8

Table F-9    Maximum Predicted Annual $PM_{2.5}$ Impacts from Project Sources ............................F-9

Table F-10   Maximum Predicted 1-Hour $SO_2$ Impacts from Project Sources ...........................F-10

Table F-11   Maximum Predicted 3-Hour $SO_2$ Impacts from Project Sources ............................F-11

Table F-12   Maximum Predicted 24-Hour $SO_2$ Impacts from Project Sources .........................F-12

Table F-13   Maximum Predicted Annual $SO_2$ Impacts from Project Sources ...........................F-13

Table F-14   Maximum Predicted 1-Hour CO Impacts from Project Sources .............................F-14

Table F-15   Maximum Predicted 8-Hour CO Impacts from Project Sources .............................F-15

Table F-16   Maximum Predicted Nitrogen Deposition Impacts from Project Sources ...............F-16

Table F-17   Maximum Predicted Sulfur Deposition Impacts from Project Sources....................F-17

Table F-18   Maximum Predicted Lake Acid Neutralizing Capacity Changes from Project Sources ...............................................................................................F-18

Table F-19   Days of Visibility Change Greater Than or Equal to 1.0 dv at Class I and Sensitive Class II Areas from Project Sources .......................................................F-19

Table F-20   Days of Visibility Change Greater Than or Equal to 0.5 dv at C lass I and Sensitive Class II Areas from Project Sources ........................................................F-20

Table F-21   Days of Visibility Change Greater Than or Equal to 1.0 dv at Scenic Views from Project Sources ............................................................................................F-21

Table F-22   Days of Visibility Change Greater Than or Equal to 0.5 dv at Scenic Views from Project Sources ............................................................................................F-22

Table F-23   Maximum Predicted 1-Hour $NO_2$ Impacts from WRFO and Cumulative Sources .................................................................................................................F-23

Table F-24   Maximum Predicted Annual $NO_2$ Impacts from WRFO and Cumulative Sources .................................................................................................................F-24

Table F-25   Maximum Predicted 24-Hour $PM_{10}$ Impacts from WRFO and Cumulative Sources .................................................................................................................F-25

BLM_0020543

**Appendix F – Air Quality Impacts**

Table F-26    Maximum Predicted Annual $PM_{10}$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-26
Table F-27    Maximum Predicted 24-Hour $PM_{2.5}$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-27
Table F-28    Maximum Predicted Annual $PM_{2.5}$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-28
Table F-29    Maximum Predicted 1-Hour $SO_2$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-29
Table F-30    Maximum Predicted 3-Hour $SO_2$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-30
Table F-31    Maximum Predicted 24-Hour $SO_2$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-31
Table F-32    Maximum Predicted Annual $SO_2$ Impacts from WRFO and Cumulative
              Sources .................................................................................................................. F-32
Table F-33    Maximum Predicted 1-Hour CO Impacts from WRFO and Cumulative Sources .... F-33
Table F-34    Maximum Predicted 8-Hour CO Impacts from WRFO and Cumulative Sources .... F-34
Table F-35    Maximum Predicted Nitrogen Deposition from WRFO and Cumulative
              Sources .................................................................................................................. F-35
Table F-36    Maximum Predicted Sulfur Deposition from WRFO Cumulative Sources ............. F-36
Table F-37    Maximum Predicted Lake Acid Neutralizing Capacity Changes from WRFO
              and Cumulative Sources ........................................................................................ F-37
Table F-38    Days of Visibility Change Greater Than or Equal to 1.0 dv at Class I and
              Sensitive Class II Areas from WRFO and Cumulative Sources............................... F-38
Table F-39    Days of Visibility Change Greater Than or Equal to 1.0 dv at Scenic Views
              from WRFO and Cumulative Sources...................................................................... F-39
Table F-40    Future Ozone Design Values for Monitors in the 4km Domain............................... F-40
Table F-41    Crosswalk between Draft RMPA/EIS Appendix F and ARTSD ............................. F-51

## List of Maps

Map F-1    CAMx Model Domains ............................................................................................. F-48
Map F-2    Ozone Monitors In and Near the 4km Domain ........................................................ F-49
Map F-3    CALPUFF Receptor Locations ............................................................................... F-50

BLM_0020544

# 1.0 Air Quality Impacts from the Air Resources Technical Support Document

The Air Resources Technical Support Document provides detailed information on the emissions inventory and modeling procedures and results. Tables and maps from the ARTSD that are referenced in the Chapter 4 Impacts Analysis are provided again here as a quick reference for the reader. Table F-41 provides a crosswalk to explain the source within the ARTSD of the tables and figures referenced in Chapter 4.

# 2.0 Near-Field Impacts

### Table F-1. Near-Field 1-Hour HAP Maximum Concentration Comparison to RELs

| HAP | Modeled Year | Maximum 1-Hour Modeled Concentration ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) [a] | Maximum Total Concentration ($\mu g/m^3$) | REL ($\mu g/m^3$) | Percent of REL (%) |
|---|---|---|---|---|---|---|
| Benzene | 2001 | 481.19 | 10.11 | 491.30 | 1,300 [b] | 38 |
| | 2002 | 482.86 | 10.11 | 492.97 | | 38 |
| | 2003 | 499.61 | 10.11 | 509.72 | | 39 |
| Ethylbenzene | 2001 | 10.84 | 4.30 | 15.14 | 350,000 | 0.4 |
| | 2002 | 10.97 | 4.30 | 15.27 | | 0.4 |
| | 2003 | 11.18 | 4.30 | 15.48 | | 0.4 |
| Formaldehyde | 2001 | 16.75 | 17.30 | 34.04 | 94 [b] | 36 |
| | 2002 | 3.37 | 17.30 | 20.67 | | 22 |
| | 2003 | 2.69 | 17.30 | 19.99 | | 21 |
| n-Hexane | 2001 | 2083.45 | NA [d] | 2083.45 | 390,000 [c] | 0.5 |
| | 2002 | 2090.75 | NA [d] | 2090.75 | | 0.5 |
| | 2003 | 2351.72 | NA [d] | 2351.72 | | 0.6 |
| Toluene | 2001 | 642.40 | 47.08 | 689.47 | 37,000 [b] | 2 |
| | 2002 | 668.29 | 47.08 | 715.36 | | 2 |
| | 2003 | 673.90 | 47.08 | 720.98 | | 2 |
| Xylene | 2001 | 331.06 | 20.70 | 351.76 | 22,000 [b] | 2 |
| | 2002 | 338.98 | 20.70 | 359.68 | | 2 |
| | 2003 | 345.71 | 20.70 | 366.41 | | 2 |

NA = not applicable
$\mu g/m^3$ = micrograms per cubic meter
REL = Reference Exposure Level
[a] Background concentrations are values averaged for years 2006 and 2007, based on monitored 24-hour maximum values collected in Grand Junction, Colorado (CDPHE-APCD 2008a).
[b] USEPA Air Toxics Database, Table 2 (USEPA, 2005a).
[c] No REL available for these HAPs. Values shown are from Immediately Dangerous to Life or Health (IDLH/10), USEPA Air Toxics Database, Table 2 (USEPA, 2005a).
[d] Monitored data was not available for this pollutant.

BLM_0020545

### Table F-2. Near-Field Annual Average Predicted Concentrations Compared to RfCs

| Pollutant | Year | Annual Modeled Concentration (μg/m³) | Background Concentration (μg/m³) [a] | Maximum Total Concentration (μg/m³) | RfC [b] (μg/m³) |
|---|---|---|---|---|---|
| Benzene | 2001 | 12.95 | 1.66 | 14.61 | 30 |
| | 2002 | 11.58 | 1.66 | 13.24 | |
| | 2003 | 12.21 | 1.66 | 13.87 | |
| Ethylbenzene | 2001 | 0.35 | 0.64 | 0.99 | 1,000 |
| | 2002 | 0.31 | 0.64 | 0.95 | |
| | 2003 | 0.33 | 0.64 | 0.97 | |
| Formaldehyde | 2001 | 0.06 | 4.02 | 4.08 | 9.8 |
| | 2002 | 0.06 | 4.02 | 4.08 | |
| | 2003 | 0.06 | 4.02 | 4.08 | |
| n-Hexane | 2001 | 13.67 | NA [c] | 13.67 | 200 |
| | 2002 | 12.34 | NA [c] | 12.34 | |
| | 2003 | 12.99 | NA [c] | 12.99 | |
| Toluene | 2001 | 20.13 | 4.14 | 24.27 | 400 |
| | 2002 | 17.95 | 4.14 | 22.09 | |
| | 2003 | 18.94 | 4.14 | 23.08 | |
| Xylene | 2001 | 9.69 | 2.95 | 12.64 | 100 |
| | 2002 | 8.65 | 2.95 | 11.60 | |
| | 2003 | 9.12 | 2.95 | 12.07 | |
| Diesel PM [d] | 2001 | 0.40 | NA [c] | 0.40 | 5 |
| | 2002 | 0.34 | NA [c] | 0.34 | |
| | 2003 | 0.35 | NA [c] | 0.35 | |

μg/m³ = micrograms per cubic meter

RfC = Reference Concentration for Chronic Inhalation

[a] Background concentrations are values averaged for years 2006 and 2007, based on annual average values from data collected in Grand Junction, Colorado (CDPHE-APCD 2008a).

[b] USEPA Air Toxics Database, Table 1 (USEPA, 2005b).

[c] Monitored data was not available for this pollutant.

[d] USEPA 2007.

## Table F-3. Near-Field Cancer Risk From Long-Term Exposure

| HAP | Year | Analysis | Carcinogenic RfC URF [a] 1/(µg/m³) | Exposure Adj. Factor | Cancer Risk (per million) |
|---|---|---|---|---|---|
| Benzene | 2001 | MLE | $7.8 \times 10^{-6}$ | 0.095 | 9.59 |
| | | MEI | $7.8 \times 10^{-6}$ | 0.29 | 29.29 |
| | 2002 | MLE | $7.8 \times 10^{-6}$ | 0.095 | 8.58 |
| | | MEI | $7.8 \times 10^{-6}$ | 0.29 | 26.19 |
| | 2003 | MLE | $7.8 \times 10^{-6}$ | 0.095 | 9.05 |
| | | MEI | $7.8 \times 10^{-6}$ | 0.29 | 27.62 |
| Formaldehyde | 2001 | MLE | $5.5 \times 10^{-9}$ | 0.095 | 0.00003 |
| | | MEI | $5.5 \times 10^{-9}$ | 0.29 | 0.00009 |
| | 2002 | MLE | $5.5 \times 10^{-9}$ | 0.095 | 0.00003 |
| | | MEI | $5.5 \times 10^{-9}$ | 0.29 | 0.00009 |
| | 2003 | MLE | $5.5 \times 10^{-9}$ | 0.095 | 0.00003 |
| | | MEI | $5.5 \times 10^{-9}$ | 0.29 | 0.0001 |
| **Total Combined** | **2001 to 2003** | **MLE** | | | **9.59003** |
| | | **MEI** | | | **29.2901** |

MEI = maximally exposed individual
µg/m³ = micrograms per cubic meter
MLE = most likely exposure
URF = unit risk factor
[a] USEPA Air Toxics Database, Table 1 (USEPA 2005b).

BLM_0020547

# 3.0   Far-Field Non-Ozone Project Impacts

### Table F-4.   Maximum Predicted 1-Hour NO$_2$ Impacts from Project Sources

**Pollutant:**  NO$_2$     **PSD Increments:**

**Averaging Time:**  1-Hour     **Class I Area**     N/A

**Class II Area (Non-Sensitive)**     N/A

| Area and Alternative | Annual 8th High Modeled Concentration at Any Receptor | | | Max. Modeled 3-Year Average 8th High Daily 1-hour Conc. [1] (µg/m³) | PSD Increment (µg/m³) | Back-ground Conc. [2] (µg/m³) | Max. Total Conc. (µg/m³) | NAAQS (µg/m³) | CAAQS (µg/m³) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m³) | 2002 (µg/m³) | 2003 (µg/m³) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0339 | 0.0058 | 0.0032 | 0.0142 | N/A | 32.08 | 32.09 | 189 | N/A |
| B | 0.0697 | 0.0219 | 0.0225 | 0.0370 | N/A | 32.08 | 32.12 | 189 | N/A |
| C | 0.1090 | 0.0248 | 0.0262 | 0.0530 | N/A | 32.08 | 32.13 | 189 | N/A |
| D | 0.0956 | 0.0157 | 0.0134 | 0.0415 | N/A | 32.08 | 32.12 | 189 | N/A |
| Eagles Nest WA | | | | | | | | | |
| A | 0.1256 | 0.1525 | 0.2593 | 0.1721 | N/A | 32.08 | 32.25 | 189 | N/A |
| B | 0.2035 | 0.2200 | 0.3528 | 0.2442 | N/A | 32.08 | 32.32 | 189 | N/A |
| C | 0.3195 | 0.3549 | 0.5519 | 0.3797 | N/A | 32.08 | 32.46 | 189 | N/A |
| D | 0.2988 | 0.3200 | 0.4817 | 0.3444 | N/A | 32.08 | 32.42 | 189 | N/A |
| Flat Tops WA | | | | | | | | | N/A |
| A | 0.7406 | 0.7630 | 0.8540 | 0.7596 | N/A | 32.08 | 32.84 | 189 | N/A |
| B | 1.0267 | 1.0547 | 1.3506 | 1.1402 | N/A | 32.08 | 33.22 | 189 | N/A |
| C | 1.4775 | 1.6116 | 1.8969 | 1.6620 | N/A | 32.08 | 33.74 | 189 | N/A |
| D | 1.2994 | 1.3958 | 1.5974 | 1.4309 | N/A | 32.08 | 33.51 | 189 | N/A |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.3152 | 0.3663 | 0.3717 | 0.3377 | N/A | 32.08 | 32.42 | 189 | N/A |
| B | 0.4257 | 0.4803 | 0.5492 | 0.4701 | N/A | 32.08 | 32.55 | 189 | N/A |
| C | 0.5618 | 0.7047 | 0.8214 | 0.6786 | N/A | 32.08 | 32.76 | 189 | N/A |
| D | 0.6362 | 0.7107 | 0.7367 | 0.6848 | N/A | 32.08 | 32.76 | 189 | N/A |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.1979 | 0.1689 | 0.2148 | 0.1823 | N/A | 32.08 | 32.26 | 189 | N/A |
| B | 0.3099 | 0.2820 | 0.3146 | 0.2948 | N/A | 32.08 | 32.37 | 189 | N/A |
| C | 0.4491 | 0.4004 | 0.4691 | 0.4205 | N/A | 32.08 | 32.50 | 189 | N/A |
| D | 0.4528 | 0.4112 | 0.4921 | 0.4232 | N/A | 32.08 | 32.50 | 189 | N/A |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.3165 | 0.2758 | 0.3293 | 0.3072 | N/A | 32.08 | 32.39 | 189 | N/A |
| B | 0.6370 | 0.4850 | 0.5831 | 0.5663 | N/A | 32.08 | 32.65 | 189 | N/A |
| C | 1.0113 | 0.7768 | 0.9845 | 0.9242 | N/A | 32.08 | 33.00 | 189 | N/A |
| D | 0.9226 | 0.7836 | 0.9919 | 0.8994 | N/A | 32.08 | 32.98 | 189 | N/A |
| Dinosaur NM | | | | | | | | | |
| A | 1.3248 | 1.5111 | 1.4252 | 1.3432 | N/A | 32.08 | 33.42 | 189 | N/A |
| B | 1.8803 | 2.1377 | 1.9004 | 1.8873 | N/A | 32.08 | 33.97 | 189 | N/A |
| C | 2.7072 | 2.9281 | 2.9087 | 2.6884 | N/A | 32.08 | 34.77 | 189 | N/A |
| D | 2.8132 | 3.0608 | 3.0270 | 2.8240 | N/A | 32.08 | 34.90 | 189 | N/A |
| **Class II Areas (Gridded Receptors)[3]** | | | | | | | | | |
| A | 36.1730 | 41.8080 | 29.4400 | 35.8070 | N/A | 32.08 | 67.89 | 189 | N/A |
| B | 57.2560 | 47.5780 | 53.6480 | 52.8273 | N/A | 32.08 | 84.91 | 189 | N/A |
| C | 56.3480 | 51.6270 | 57.2580 | 53.7900 | N/A | 32.08 | 85.87 | 189 | N/A |
| D | 35.5520 | 39.5280 | 33.3660 | 35.9367 | N/A | 32.08 | 68.02 | 189 | N/A |

[1] This is the three-year average of the annual modeled 8th-highest concentration within the area, as determined on a receptor-specific basis. The three-year average in this column is less than the average of the three annual 8th high modeled concentrations when the locations of the annual 8th high receptors vary from one year to another.

[2] The background concentration data is based on the 98th percentile of 1-hour NO$_2$ data from a U.S. Forest Service monitor (ID 08-067-1004) located in Bayfield, Colorado in La Plata County.

[3] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020548

**Table F-5.    Maximum Predicted Annual NO$_2$ Impacts from Project Sources**

Pollutant:     NO$_2$          PSD Increments:

Averaging Time: Annual          Class I Area                    2.5     µg/m$^3$

                              Class II Area (Non-Sensitive)   25      µg/m$^3$

| Area and Alternative | Modeled Concentration | | | Max. Modeled Conc. (µg/m$^3$) | PSD Increment [1] (µg/m$^3$) | Back-ground Conc. [2] (µg/m$^3$) | Max. Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0004 | 0.0001 | 0.0001 | 0.0004 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| B | 0.0009 | 0.0004 | 0.0004 | 0.0009 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| C | 0.0015 | 0.0006 | 0.0005 | 0.0015 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| D | 0.0012 | 0.0005 | 0.0004 | 0.0012 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0025 | 0.0026 | 0.0029 | 0.0029 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| B | 0.0038 | 0.0040 | 0.0045 | 0.0045 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| C | 0.0060 | 0.0064 | 0.0072 | 0.0072 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| D | 0.0052 | 0.0055 | 0.0062 | 0.0062 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0247 | 0.0229 | 0.0249 | 0.0249 | 2.5 | 30.6 | 30.62 | 100 | 100 |
| B | 0.0330 | 0.0311 | 0.0343 | 0.0343 | 2.5 | 30.6 | 30.63 | 100 | 100 |
| C | 0.0537 | 0.0507 | 0.0561 | 0.0561 | 2.5 | 30.6 | 30.66 | 100 | 100 |
| D | 0.0451 | 0.0430 | 0.0466 | 0.0466 | 2.5 | 30.6 | 30.65 | 100 | 100 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0036 | 0.0040 | 0.0036 | 0.0040 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| B | 0.0057 | 0.0059 | 0.0055 | 0.0059 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| C | 0.0094 | 0.0098 | 0.0090 | 0.0098 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| D | 0.0081 | 0.0083 | 0.0076 | 0.0083 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0039 | 0.0033 | 0.0043 | 0.0043 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| B | 0.0060 | 0.0051 | 0.0066 | 0.0066 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| C | 0.0094 | 0.0078 | 0.0101 | 0.0101 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| D | 0.0083 | 0.0069 | 0.0092 | 0.0092 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0035 | 0.0036 | 0.0031 | 0.0036 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| B | 0.0076 | 0.0082 | 0.0068 | 0.0082 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| C | 0.0121 | 0.0132 | 0.0106 | 0.0132 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| D | 0.0106 | 0.0113 | 0.0092 | 0.0113 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| Dinosaur NM | | | | | | | | | |
| A | 0.0616 | 0.0613 | 0.0523 | 0.0616 | 2.5 | 30.6 | 30.66 | 100 | 100 |
| B | 0.0964 | 0.0936 | 0.0793 | 0.0964 | 2.5 | 30.6 | 30.70 | 100 | 100 |
| C | 0.1429 | 0.1311 | 0.1114 | 0.1429 | 2.5 | 30.6 | 30.74 | 100 | 100 |
| D | 0.1367 | 0.1300 | 0.1088 | 0.1367 | 2.5 | 30.6 | 30.74 | 100 | 100 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 0.6158 | 0.7915 | 0.7470 | 0.7915 | 25 | 30.6 | 31.39 | 100 | 100 |
| B | 0.9080 | 1.1277 | 1.0584 | 1.1277 | 25 | 30.6 | 31.73 | 100 | 100 |
| C | 1.6274 | 2.0410 | 1.8795 | 2.0410 | 25 | 30.6 | 32.64 | 100 | 100 |
| D | 1.5015 | 1.9271 | 1.7867 | 1.9271 | 25 | 30.6 | 32.53 | 100 | 100 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The annual NO$_2$ background concentration was recommended by CDPHE and is based on the monitors at Woodmen and Colorado College stations, Colorado Springs, El Paso County.  (2005-2006 data).

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020549

## Table F-6. Maximum Predicted 24-Hour PM$_{10}$ Impacts from Project Sources

Pollutant: PM$_{10}$  PSD Increments:

Averaging Time: 24-Hour  Class I Area  8  µg/m$^3$

Class II Area (Non-Sensitive)  30  µg/m$^3$

| Area and Alternative | Modeled Concentration | | | Maximum High 2nd High Modeled Conc.[1] (µg/m$^3$) | PSD Increment[2] (µg/m$^3$) | Back-ground Conc.[3] (µg/m$^3$) | Maximum High 2nd High Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0681 | 0.0502 | 0.0622 | 0.0681 | 8 | 56 | 56.07 | 150 | --- |
| B | 0.1204 | 0.0564 | 0.0598 | 0.1204 | 8 | 56 | 56.12 | 150 | --- |
| C | 0.1939 | 0.0874 | 0.0977 | 0.1939 | 8 | 56 | 56.19 | 150 | --- |
| D | 0.1605 | 0.0790 | 0.0896 | 0.1605 | 8 | 56 | 56.18 | 150 | --- |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0878 | 0.1142 | 0.1023 | 0.1142 | 8 | 56 | 56.11 | 150 | --- |
| B | 0.0533 | 0.0970 | 0.0726 | 0.0970 | 8 | 56 | 56.10 | 150 | --- |
| C | 0.0821 | 0.1459 | 0.1185 | 0.1459 | 8 | 56 | 56.15 | 150 | --- |
| D | 0.0859 | 0.1662 | 0.1082 | 0.1662 | 8 | 56 | 56.17 | 150 | --- |
| Flat Tops WA | | | | | | | | | |
| A | 0.4561 | 0.6710 | 1.1567 | 1.1567 | 8 | 56 | 57.16 | 150 | --- |
| B | 0.1606 | 0.2691 | 0.2558 | 0.2691 | 8 | 56 | 56.27 | 150 | --- |
| C | 0.2959 | 0.4945 | 0.5484 | 0.5484 | 8 | 56 | 56.55 | 150 | --- |
| D | 0.2907 | 0.4926 | 0.5361 | 0.5361 | 8 | 56 | 56.54 | 150 | --- |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.1496 | 0.2196 | 0.1202 | 0.2196 | 8 | 56 | 56.22 | 150 | --- |
| B | 0.1077 | 0.1297 | 0.1125 | 0.1297 | 8 | 56 | 56.13 | 150 | --- |
| C | 0.1660 | 0.2004 | 0.1761 | 0.2004 | 8 | 56 | 56.20 | 150 | --- |
| D | 0.1595 | 0.2087 | 0.1636 | 0.2087 | 8 | 56 | 56.21 | 150 | --- |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.1179 | 0.1831 | 0.1715 | 0.1831 | 8 | 56 | 56.18 | 150 | --- |
| B | 0.0732 | 0.1505 | 0.0943 | 0.1505 | 8 | 56 | 56.15 | 150 | --- |
| C | 0.1362 | 0.2458 | 0.1492 | 0.2458 | 8 | 56 | 56.25 | 150 | --- |
| D | 0.1318 | 0.2360 | 0.1462 | 0.2360 | 8 | 56 | 56.24 | 150 | --- |
| **Sensitive Class II Areas** [4] | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.2622 | 0.2412 | 0.2955 | 0.2955 | | 56 | 56.30 | 150 | --- |
| B | 0.1030 | 0.2426 | 0.1334 | 0.2426 | 8 | 56 | 56.24 | 150 | --- |
| C | 0.1839 | 0.3828 | 0.2166 | 0.3828 | 8 | 56 | 56.38 | 150 | --- |
| D | 0.1797 | 0.3797 | 0.2072 | 0.3797 | 8 | 56 | 56.38 | 150 | --- |
| Dinosaur NM | | | | | | | | | |
| A | 1.5770 | 2.2886 | 1.9494 | 2.2886 | 8 | 56 | 58.29 | 150 | --- |
| B | 0.4170 | 0.4951 | 0.5066 | 0.5066 | 8 | 56 | 56.51 | 150 | --- |
| C | 0.8322 | 1.1125 | 1.0716 | 1.1125 | 8 | 56 | 57.11 | 150 | --- |
| D | 0.8304 | 1.0727 | 1.0205 | 1.0727 | 8 | 56 | 57.07 | 150 | --- |
| **Class II Areas (Gridded Receptors)** [5] | | | | | | | | | |
| A | 26.1150 | 33.7040 | 30.2960 | 33.7040 | 30 | 56 | 89.70 | 150 | --- |
| B | 5.3854 | 7.0311 | 8.1682 | 7.0311 | 30 | 56 | 63.03 | 150 | --- |
| C | 12.9770 | 16.5640 | 14.7360 | 16.5640 | 30 | 56 | 72.56 | 150 | --- |
| D | 12.0530 | 15.5820 | 13.7910 | 15.5820 | 30 | 56 | 71.58 | 150 | --- |

[1] The maximum modeled high 2nd high concentration over all three years (2001-2003).

[2] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[3] The 24-hour PM$_{10}$ background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2006 data).

[4] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[5] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020550

### Table F-7.   Maximum Predicted Annual PM$_{10}$ Impacts from Project Sources

**Pollutant:**  PM$_{10}$

**Averaging Time:** Annual

**PSD Increments:**

**Class I Area** 4 $\mu g/m^3$

**Class II Area (Non-Sensitive)** 17 $\mu g/m^3$

| Area and Alternative | Modeled Concentration 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | Max. Modeled Conc. ($\mu g/m^3$) | PSD Increment [1] ($\mu g/m^3$) | Back-ground Conc. [2] ($\mu g/m^3$) | Max. Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0020 | 0.0018 | 0.0019 | 0.0020 | 4 | 30 | 30.00 | --- | 50 |
| B | 0.0030 | 0.0019 | 0.0014 | 0.0030 | 4 | 30 | 30.00 | --- | 50 |
| C | 0.0048 | 0.0031 | 0.0024 | 0.0048 | 4 | 30 | 30.00 | --- | 50 |
| D | 0.0044 | 0.0028 | 0.0022 | 0.0044 | 4 | 30 | 30.00 | --- | 50 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0111 | 0.0146 | 0.0125 | 0.0146 | 4 | 30 | 30.01 | --- | 50 |
| B | 0.0076 | 0.0104 | 0.0085 | 0.0104 | 4 | 30 | 30.01 | --- | 50 |
| C | 0.0128 | 0.0177 | 0.0145 | 0.0177 | 4 | 30 | 30.02 | --- | 50 |
| D | 0.0122 | 0.0167 | 0.0137 | 0.0167 | 4 | 30 | 30.02 | --- | 50 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0463 | 0.0553 | 0.0557 | 0.0557 | 4 | 30 | 30.06 | --- | 50 |
| B | 0.0241 | 0.0279 | 0.0286 | 0.0286 | 4 | 30 | 30.03 | --- | 50 |
| C | 0.0428 | 0.0495 | 0.0507 | 0.0507 | 4 | 30 | 30.05 | --- | 50 |
| D | 0.0414 | 0.0478 | 0.0487 | 0.0487 | 4 | 30 | 30.05 | --- | 50 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0114 | 0.0124 | 0.0111 | 0.0124 | 4 | 30 | 30.01 | --- | 50 |
| B | 0.0085 | 0.0093 | 0.0077 | 0.0093 | 4 | 30 | 30.01 | --- | 50 |
| C | 0.0145 | 0.0160 | 0.0133 | 0.0160 | 4 | 30 | 30.02 | --- | 50 |
| D | 0.0136 | 0.0148 | 0.0124 | 0.0148 | 4 | 30 | 30.01 | --- | 50 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0164 | 0.0168 | 0.0165 | 0.0168 | 4 | 30 | 30.02 | --- | 50 |
| B | 0.0110 | 0.0120 | 0.0119 | 0.0120 | 4 | 30 | 30.01 | --- | 50 |
| C | 0.0186 | 0.0201 | 0.0198 | 0.0201 | 4 | 30 | 30.02 | --- | 50 |
| D | 0.0177 | 0.0192 | 0.0191 | 0.0192 | 4 | 30 | 30.02 | --- | 50 |
| **Sensitive Class II Areas** [3] | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0094 | 0.0120 | 0.0142 | 0.0142 | 4 | 30 | 30.01 | --- | 50 |
| B | 0.0078 | 0.0103 | 0.0085 | 0.0103 | 4 | 30 | 30.01 | --- | 50 |
| C | 0.0131 | 0.0172 | 0.0148 | 0.0172 | 4 | 30 | 30.02 | --- | 50 |
| D | 0.0122 | 0.0160 | 0.0139 | 0.0160 | 4 | 30 | 30.02 | --- | 50 |
| Dinosaur NM | | | | | | | | | |
| A | 0.1883 | 0.2101 | 0.1880 | 0.2101 | 4 | 30 | 30.21 | --- | 50 |
| B | 0.0740 | 0.0798 | 0.0685 | 0.0798 | 4 | 30 | 30.08 | --- | 50 |
| C | 0.1390 | 0.1476 | 0.1307 | 0.1476 | 4 | 30 | 30.15 | --- | 50 |
| D | 0.1360 | 0.1453 | 0.1260 | 0.1453 | 4 | 30 | 30.15 | --- | 50 |
| **Class II Areas (Gridded Receptors)** [4] | | | | | | | | | |
| A | 6.2148 | 7.9742 | 7.8424 | 7.9742 | 17 | 30 | 37.97 | --- | 50 |
| B | 1.4116 | 1.8369 | 1.7910 | 1.8369 | 17 | 30 | 31.84 | --- | 50 |
| C | 3.3397 | 4.3291 | 4.2249 | 4.3291 | 17 | 30 | 34.33 | --- | 50 |
| D | 3.1653 | 4.1061 | 4.0072 | 4.1061 | 17 | 30 | 34.11 | --- | 50 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The annual PM$_{10}$ background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2006 data).

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020551

*Appendix F – Air Quality Impacts*

### Table F-8. Maximum Predicted 24-Hour PM$_{2.5}$ Impacts from Project Sources

Pollutant: PM$_{2.5}$  **PSD Increments:**

Averaging Time: 24-Hour  Class I Area  2  μg/m$^3$

 Class II Area (Non-Sensitive)  9  μg/m$^3$

| Area and Alternative | Annual 8th-High Modeled Concentration at Any Receptor | | | 3-Year Average of Annual Max. Modeled 8th-High Conc.[2] (μg/m$^3$) | PSD Increment (μg/m$^3$) | Back-ground Conc.[1] (μg/m$^3$) | High 8th High Total Conc. (μg/m$^3$) | NAAQS (μg/m$^3$) | CAAQS (μg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (μg/m$^3$) | 2002 (μg/m$^3$) | 2003 (μg/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0303 | 0.0139 | 0.0127 | 0.0179 | 2 | 24 | 24.02 | 35 | --- |
| B | 0.0561 | 0.0206 | 0.0132 | 0.0300 | 2 | 24 | 24.03 | 35 | --- |
| C | 0.0904 | 0.0331 | 0.0207 | 0.0481 | 2 | 24 | 24.05 | 35 | --- |
| D | 0.0791 | 0.0297 | 0.0206 | 0.0431 | 2 | 24 | 24.04 | 35 | --- |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0355 | 0.0532 | 0.0379 | 0.0420 | 2 | 24 | 24.04 | 35 | --- |
| B | 0.0308 | 0.0564 | 0.0367 | 0.0413 | 2 | 24 | 24.04 | 35 | --- |
| C | 0.0479 | 0.0863 | 0.0603 | 0.0648 | 2 | 24 | 24.06 | 35 | --- |
| D | 0.0462 | 0.0789 | 0.0552 | 0.0599 | 2 | 24 | 24.06 | 35 | --- |
| Flat Tops WA | | | | | | | | | |
| A | 0.0919 | 0.1223 | 0.1173 | 0.1050 | 2 | 24 | 24.10 | 35 | --- |
| B | 0.0821 | 0.0925 | 0.1205 | 0.0983 | 2 | 24 | 24.10 | 35 | --- |
| C | 0.1220 | 0.1578 | 0.1977 | 0.1592 | 2 | 24 | 24.16 | 35 | --- |
| D | 0.1176 | 0.1482 | 0.1855 | 0.1508 | 2 | 24 | 24.15 | 35 | --- |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0471 | 0.0466 | 0.0381 | 0.0419 | 2 | 24 | 24.04 | 35 | --- |
| B | 0.0606 | 0.0561 | 0.0419 | 0.0517 | 2 | 24 | 24.05 | 35 | --- |
| C | 0.0982 | 0.0899 | 0.0664 | 0.0824 | 2 | 24 | 24.08 | 35 | --- |
| D | 0.0930 | 0.0813 | 0.0635 | 0.0772 | 2 | 24 | 24.08 | 35 | --- |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0381 | 0.0516 | 0.0465 | 0.0454 | 2 | 24 | 24.05 | 35 | --- |
| B | 0.0474 | 0.0604 | 0.0524 | 0.0509 | 2 | 24 | 24.05 | 35 | --- |
| C | 0.0718 | 0.0945 | 0.0780 | 0.0787 | 2 | 24 | 24.08 | 35 | --- |
| D | 0.0683 | 0.0898 | 0.0778 | 0.0771 | 2 | 24 | 24.08 | 35 | --- |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0516 | 0.0726 | 0.0588 | 0.0587 | 2 | 24 | 24.06 | 35 | --- |
| B | 0.0666 | 0.1029 | 0.0694 | 0.0797 | 2 | 24 | 24.08 | 35 | --- |
| C | 0.1075 | 0.1737 | 0.1117 | 0.1310 | 2 | 24 | 24.13 | 35 | --- |
| D | 0.0992 | 0.1658 | 0.1100 | 0.1250 | 2 | 24 | 24.12 | 35 | --- |
| Dinosaur NM | | | | | | | | | |
| A | 0.2277 | 0.2567 | 0.2775 | 0.2540 | 2 | 24 | 24.25 | 35 | --- |
| B | 0.2346 | 0.2533 | 0.2234 | 0.2359 | 2 | 24 | 24.24 | 35 | --- |
| C | 0.3281 | 0.3689 | 0.3654 | 0.3542 | 2 | 24 | 24.35 | 35 | --- |
| D | 0.3407 | 0.3716 | 0.3614 | 0.3553 | 2 | 24 | 24.36 | 35 | --- |
| **Class II Areas (Gridded Receptors)[3]** | | | | | | | | | |
| A | 2.7421 | 3.2224 | 2.8844 | 2.9342 | 9 | 24 | 26.93 | 35 | --- |
| B | 0.8754 | 1.0486 | 1.0007 | 0.9749 | 9 | 24 | 24.97 | 35 | --- |
| C | 1.6275 | 2.0894 | 1.8631 | 1.8600 | 9 | 24 | 25.86 | 35 | --- |
| D | 1.6701 | 2.0342 | 1.9568 | 1.8812 | 9 | 24 | 25.88 | 35 | --- |

[1] The 24-hour PM2.5 background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2006 data).

[2] This is the three-year average of the annual modeled 8th-highest concentration within the area, as determined on a receptor-specific basis. The three-year average in this column is less than the average of the three annual 8th high modeled concentrations when the locations of the annual 8th high receptors vary from one year to another.

[3] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

**Appendix F – Air Quality Impacts**

### Table F-9.     Maximum Predicted Annual PM$_{2.5}$ Impacts from Project Sources

Pollutant:        PM$_{2.5}$          PSD Increments:

Averaging Time:  Annual          Class I Area                                1       µg/m³

                                Class II Area (Non-Sensitive)           4       µg/m³

| Area and Alternative | Modeled Concentration | | | Max. Modeled 3 year Average Conc. (µg/m³) | PSD Increment (µg/m³) | Back-ground Conc. [1] (µg/m³) | Max. Total 3 year Average Conc. (µg/m³) | NAAQS (µg/m³) | CAAQS (µg/m³) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m³) | 2002 (µg/m³) | 2003 (µg/m³) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0017 | 0.0012 | 0.0010 | 0.0013 | 1 | 9 | 9.00 | 15 | --- |
| B | 0.0029 | 0.0017 | 0.0012 | 0.0020 | 1 | 9 | 9.00 | 15 | --- |
| C | 0.0046 | 0.0028 | 0.0020 | 0.0031 | 1 | 9 | 9.00 | 15 | --- |
| D | 0.0042 | 0.0025 | 0.0018 | 0.0028 | 1 | 9 | 9.00 | 15 | --- |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0064 | 0.0090 | 0.0072 | 0.0075 | 1 | 9 | 9.01 | 15 | --- |
| B | 0.0066 | 0.0093 | 0.0074 | 0.0078 | 1 | 9 | 9.01 | 15 | --- |
| C | 0.0107 | 0.0151 | 0.0121 | 0.0126 | 1 | 9 | 9.01 | 15 | --- |
| D | 0.0101 | 0.0142 | 0.0113 | 0.0119 | 1 | 9 | 9.01 | 15 | --- |
| Flat Tops WA | | | | | | | | | |
| A | 0.0195 | 0.0227 | 0.0229 | 0.0217 | 1 | 9 | 9.02 | 15 | --- |
| B | 0.0187 | 0.0214 | 0.0220 | 0.0207 | 1 | 9 | 9.02 | 15 | --- |
| C | 0.0305 | 0.0347 | 0.0357 | 0.0336 | 1 | 9 | 9.03 | 15 | --- |
| D | 0.0293 | 0.0333 | 0.0341 | 0.0322 | 1 | 9 | 9.03 | 15 | --- |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0063 | 0.0072 | 0.0062 | 0.0066 | 1 | 9 | 9.01 | 15 | --- |
| B | 0.0075 | 0.0083 | 0.0067 | 0.0075 | 1 | 9 | 9.01 | 15 | --- |
| C | 0.0121 | 0.0136 | 0.0110 | 0.0122 | 1 | 9 | 9.01 | 15 | --- |
| D | 0.0113 | 0.0125 | 0.0102 | 0.0113 | 1 | 9 | 9.01 | 15 | --- |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0091 | 0.0098 | 0.0095 | 0.0095 | 1 | 9 | 9.01 | 15 | --- |
| B | 0.0096 | 0.0106 | 0.0104 | 0.0102 | 1 | 9 | 9.01 | 15 | --- |
| C | 0.0153 | 0.0169 | 0.0165 | 0.0162 | 1 | 9 | 9.02 | 15 | --- |
| D | 0.0144 | 0.0161 | 0.0159 | 0.0155 | 1 | 9 | 9.02 | 15 | --- |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0051 | 0.0069 | 0.0063 | 0.0061 | 1 | 9 | 9.01 | 15 | --- |
| B | 0.0069 | 0.0093 | 0.0070 | 0.0077 | 1 | 9 | 9.01 | 15 | --- |
| C | 0.0111 | 0.0150 | 0.0113 | 0.0125 | 1 | 9 | 9.01 | 15 | --- |
| D | 0.0102 | 0.0138 | 0.0105 | 0.0115 | 1 | 9 | 9.01 | 15 | --- |
| Dinosaur NM | | | | | | | | | |
| A | 0.0569 | 0.0597 | 0.0512 | 0.0559 | 1 | 9 | 9.06 | 15 | --- |
| B | 0.0476 | 0.0524 | 0.0446 | 0.0482 | 1 | 9 | 9.05 | 15 | --- |
| C | 0.0772 | 0.0837 | 0.0719 | 0.0776 | 1 | 9 | 9.08 | 15 | --- |
| D | 0.0765 | 0.0837 | 0.0715 | 0.0773 | 1 | 9 | 9.08 | 15 | --- |
| **Class II Areas (Gridded Receptors)[2]** | | | | | | | | | |
| A | 0.7672 | 0.9938 | 0.9733 | 0.9114 | 4 | 9 | 9.91 | 15 | --- |
| B | 0.2634 | 0.3616 | 0.3454 | 0.3235 | 4 | 9 | 9.32 | 15 | --- |
| C | 0.5437 | 0.7369 | 0.7050 | 0.6619 | 4 | 9 | 9.66 | 15 | --- |
| D | 0.5347 | 0.7249 | 0.6961 | 0.6519 | 4 | 9 | 9.65 | 15 | --- |

[1] The annual PM2.5 background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2000 data).

[2] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020553

Appendix F – Air Quality Impacts

## Table F-10.   Maximum Predicted 1-Hour SO$_2$ Impacts from Project Sources

Pollutant:         SO$_2$                 PSD Increments:
Averaging Time:   1-hour               Class I Area                                    N/A    µg/m$^3$
                                        Class II Area (Non-Sensitive)                  N/A    µg/m$^3$

| Area and Alternative | Modeled Concentration[1] 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | Max. Modeled 3-Year Average 4th High Daily 1-hour Conc. (µg/m$^3$) | PSD Increment (µg/m$^3$) | Back-ground Conc.[2] (µg/m$^3$) | Max. Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0007 | 0.0004 | 0.0005 | 0.0005 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| B | 0.0013 | 0.0008 | 0.0009 | 0.0010 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| C | 0.0021 | 0.0012 | 0.0015 | 0.0015 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| D | 0.0028 | 0.0016 | 0.0021 | 0.0021 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0015 | 0.0012 | 0.0014 | 0.0013 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| B | 0.0026 | 0.0021 | 0.0026 | 0.0024 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| C | 0.0042 | 0.0033 | 0.0043 | 0.0038 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| D | 0.0056 | 0.0044 | 0.0058 | 0.0051 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| Flat Tops WA | | | | | | | | | N/A |
| A | 0.0041 | 0.0050 | 0.0048 | 0.0043 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| B | 0.0075 | 0.0085 | 0.0085 | 0.0079 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| C | 0.0125 | 0.0131 | 0.0140 | 0.0125 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| D | 0.0162 | 0.0174 | 0.0171 | 0.0157 | N/A | 80.82 | 80.84 | 195.54 | N/A |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0023 | 0.0021 | 0.0020 | 0.0021 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| B | 0.0041 | 0.0038 | 0.0037 | 0.0037 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| C | 0.0070 | 0.0063 | 0.0060 | 0.0062 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| D | 0.0091 | 0.0083 | 0.0075 | 0.0081 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0013 | 0.0016 | 0.0015 | 0.0014 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| B | 0.0024 | 0.0028 | 0.0025 | 0.0024 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| C | 0.0038 | 0.0041 | 0.0039 | 0.0037 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| D | 0.0050 | 0.0054 | 0.0051 | 0.0048 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0024 | 0.0026 | 0.0029 | 0.0026 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| B | 0.0048 | 0.0047 | 0.0045 | 0.0046 | N/A | 80.82 | 80.82 | 195.54 | N/A |
| C | 0.0076 | 0.0073 | 0.0064 | 0.0071 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| D | 0.0100 | 0.0087 | 0.0082 | 0.0090 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| Dinosaur NM | | | | | | | | | |
| A | 0.0091 | 0.0080 | 0.0085 | 0.0081 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| B | 0.0151 | 0.0136 | 0.0145 | 0.0135 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| C | 0.0211 | 0.0194 | 0.0219 | 0.0192 | N/A | 80.82 | 80.84 | 195.54 | N/A |
| D | 0.0262 | 0.0240 | 0.0258 | 0.0242 | N/A | 80.82 | 80.84 | 195.54 | N/A |
| **Class II Areas (Gridded Receptors)[3]** | | | | | | | | | |
| A | 0.0956 | 0.1287 | 0.0938 | 0.0870 | N/A | 80.82 | 80.91 | 195.54 | N/A |
| B | 0.1440 | 0.1883 | 0.1501 | 0.1339 | N/A | 80.82 | 80.95 | 195.54 | N/A |
| C | 0.1883 | 0.2449 | 0.1694 | 0.1662 | N/A | 80.82 | 80.99 | 195.54 | N/A |
| D | 0.2104 | 0.2502 | 0.2097 | 0.2099 | N/A | 80.82 | 81.03 | 195.54 | N/A |

[1] Maximum 98th percentile daily maximum 1-hour average SO$_2$ values are reported for "Modeled Concentration."

[2] The background concentration data is based on the 99th percentile of year 2006 1-hour SO$_2$ data from a monitor (ID 08-031-0002) located on Broadway Street, Denver, Colorado in Denver County.

[3] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

### Table F-11.   Maximum Predicted 3-Hour SO$_2$ Impacts from Project Sources

**Pollutant:**        SO$_2$              **PSD Increments:**

**Averaging Time:** 3-Hour              **Class I Area**                    25     µg/m$^3$

                                                                 **Class II Area (Non-Sensitive)**   512   µg/m$^3$

| Area and Alternative | Modeled Concentration 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | Max. High 2nd High Modeled Conc. (µg/m$^3$) | PSD Increment [1] (µg/m$^3$) | Back-ground Conc. [2] (µg/m$^3$) | Max. High 2nd High Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0010 | 0.0005 | 0.0007 | 0.0010 | 25 | 66.6 | 66.60 | 1300 | 700 |
| B | 0.0021 | 0.0009 | 0.0013 | 0.0021 | 25 | 66.6 | 66.60 | 1300 | 700 |
| C | 0.0033 | 0.0015 | 0.0020 | 0.0033 | 25 | 66.6 | 66.60 | 1300 | 700 |
| D | 0.0043 | 0.0020 | 0.0027 | 0.0043 | 25 | 66.6 | 66.60 | 1300 | 700 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0015 | 0.0009 | 0.0012 | 0.0015 | 25 | 66.6 | 66.60 | 1300 | 700 |
| B | 0.0029 | 0.0016 | 0.0023 | 0.0029 | 25 | 66.6 | 66.60 | 1300 | 700 |
| C | 0.0049 | 0.0028 | 0.0038 | 0.0049 | 25 | 66.6 | 66.60 | 1300 | 700 |
| D | 0.0064 | 0.0037 | 0.0049 | 0.0064 | 25 | 66.6 | 66.61 | 1300 | 700 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0033 | 0.0041 | 0.0035 | 0.0041 | 25 | 66.6 | 66.60 | 1300 | 700 |
| B | 0.0059 | 0.0072 | 0.0073 | 0.0073 | 25 | 66.6 | 66.61 | 1300 | 700 |
| C | 0.0093 | 0.0094 | 0.0125 | 0.0125 | 25 | 66.6 | 66.61 | 1300 | 700 |
| D | 0.0122 | 0.0125 | 0.0153 | 0.0153 | 25 | 66.6 | 66.62 | 1300 | 700 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0021 | 0.0023 | 0.0017 | 0.0023 | 25 | 66.6 | 66.60 | 1300 | 700 |
| B | 0.0038 | 0.0041 | 0.0032 | 0.0041 | 25 | 66.6 | 66.60 | 1300 | 700 |
| C | 0.0058 | 0.0062 | 0.0056 | 0.0062 | 25 | 66.6 | 66.61 | 1300 | 700 |
| D | 0.0077 | 0.0082 | 0.0072 | 0.0082 | 25 | 66.6 | 66.61 | 1300 | 700 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0010 | 0.0010 | 0.0013 | 0.0013 | 25 | 66.6 | 66.60 | 1300 | 700 |
| B | 0.0020 | 0.0019 | 0.0023 | 0.0023 | 25 | 66.6 | 66.60 | 1300 | 700 |
| C | 0.0032 | 0.0031 | 0.0037 | 0.0037 | 25 | 66.6 | 66.60 | 1300 | 700 |
| D | 0.0041 | 0.0041 | 0.0046 | 0.0046 | 25 | 66.6 | 66.60 | 1300 | 700 |
| **Sensitive Class II Areas** [3] | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0023 | 0.0027 | 0.0024 | 0.0027 | 25 | 66.6 | 66.60 | 1300 | 700 |
| B | 0.0045 | 0.0048 | 0.0043 | 0.0048 | 25 | 66.6 | 66.60 | 1300 | 700 |
| C | 0.0072 | 0.0074 | 0.0071 | 0.0074 | 25 | 66.6 | 66.61 | 1300 | 700 |
| D | 0.0090 | 0.0089 | 0.0092 | 0.0092 | 25 | 66.6 | 66.61 | 1300 | 700 |
| Dinosaur NM | | | | | | | | | |
| A | 0.0077 | 0.0068 | 0.0083 | 0.0083 | 25 | 66.6 | 66.61 | 1300 | 700 |
| B | 0.0129 | 0.0116 | 0.0135 | 0.0135 | 25 | 66.6 | 66.61 | 1300 | 700 |
| C | 0.0184 | 0.0170 | 0.0186 | 0.0186 | 25 | 66.6 | 66.62 | 1300 | 700 |
| D | 0.0251 | 0.0220 | 0.0230 | 0.0251 | 25 | 66.6 | 66.63 | 1300 | 700 |
| **Class II Areas (Gridded Receptors)** [4] | | | | | | | | | |
| A | 0.0696 | 0.0695 | 0.0722 | 0.0722 | 512 | 66.6 | 66.67 | 1300 | 700 |
| B | 0.1118 | 0.1169 | 0.1233 | 0.1233 | 512 | 66.6 | 66.72 | 1300 | 700 |
| C | 0.1438 | 0.1493 | 0.1573 | 0.1573 | 512 | 66.6 | 66.76 | 1300 | 700 |
| D | 0.1711 | 0.1873 | 0.1757 | 0.1873 | 512 | 66.6 | 66.79 | 1300 | 700 |

[1]  Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2]  The 3-hour SO$_2$ background concentration was recommended by CDPHE and is based on the monitor at Colorado College, Colorado Springs, El Paso County.  (2005-2006 data)

[3]  For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4]  Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020555

## Table F-12.   Maximum Predicted 24-Hour $SO_2$ Impacts from Project Sources

**Pollutant:** $SO_2$                       **PSD Increments:**

**Averaging Time:** 24-Hour             Class I Area                        5        $\mu g/m^3$

                                                        Class II Area (Non-Sensitive)     91       $\mu g/m^3$

| Area and Alternative | Modeled Concentration | | | Max. High 2nd High Modeled Conc. [1] ($\mu g/m^3$) | PSD Increment [1] ($\mu g/m^3$) | Back- ground Conc. [2] ($\mu g/m^3$) | Max High 2nd High Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0004 | 0.0002 | 0.0002 | 0.0004 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0008 | 0.0003 | 0.0004 | 0.0008 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0012 | 0.0005 | 0.0007 | 0.0012 | 5 | 34.6 | 34.60 | 365 | 365 |
| D | 0.0017 | 0.0007 | 0.0009 | 0.0017 | 5 | 34.6 | 34.60 | 365 | 365 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0004 | 0.0003 | 0.0004 | 0.0004 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0007 | 0.0005 | 0.0007 | 0.0007 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0011 | 0.0009 | 0.0011 | 0.0011 | 5 | 34.6 | 34.60 | 365 | 365 |
| D | 0.0015 | 0.0011 | 0.0015 | 0.0015 | 5 | 34.6 | 34.60 | 365 | 365 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0014 | 0.0011 | 0.0012 | 0.0014 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0022 | 0.0020 | 0.0022 | 0.0022 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0033 | 0.0030 | 0.0036 | 0.0036 | 5 | 34.6 | 34.60 | 365 | 365 |
| D | 0.0043 | 0.0042 | 0.0045 | 0.0045 | 5 | 34.6 | 34.60 | 365 | 365 |
| Maroon Bells- Snowmass WA | | | | | | | | | |
| A | 0.0006 | 0.0005 | 0.0005 | 0.0006 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0010 | 0.0009 | 0.0010 | 0.0010 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0017 | 0.0015 | 0.0017 | 0.0017 | 5 | 34.6 | 34.60 | 365 | 365 |
| D | 0.0023 | 0.0020 | 0.0024 | 0.0024 | 5 | 34.6 | 34.60 | 365 | 365 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0003 | 0.0004 | 0.0004 | 0.0004 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0006 | 0.0007 | 0.0007 | 0.0007 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0009 | 0.0011 | 0.0010 | 0.0011 | 5 | 34.6 | 34.60 | 365 | 365 |
| D | 0.0012 | 0.0013 | 0.0014 | 0.0014 | 5 | 34.6 | 34.60 | 365 | 365 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0008 | 0.0009 | 0.0007 | 0.0009 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0014 | 0.0017 | 0.0014 | 0.0017 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0023 | 0.0028 | 0.0024 | 0.0028 | 5 | 34.6 | 34.60 | 365 | 365 |
| D | 0.0031 | 0.0035 | 0.0031 | 0.0035 | 5 | 34.6 | 34.60 | 365 | 365 |
| Dinosaur NM | | | | | | | | | |
| A | 0.0025 | 0.0023 | 0.0029 | 0.0029 | 5 | 34.6 | 34.60 | 365 | 365 |
| B | 0.0044 | 0.0039 | 0.0049 | 0.0049 | 5 | 34.6 | 34.60 | 365 | 365 |
| C | 0.0065 | 0.0056 | 0.0068 | 0.0068 | 5 | 34.6 | 34.61 | 365 | 365 |
| D | 0.0086 | 0.0075 | 0.0083 | 0.0086 | 5 | 34.6 | 34.61 | 365 | 365 |
| **Class II Areas (Gridded Receptors) [4]** | | | | | | | | | |
| A | 0.0181 | 0.0160 | 0.0159 | 0.0181 | 91 | 34.6 | 34.62 | 365 | 365 |
| B | 0.0282 | 0.0256 | 0.0261 | 0.0282 | 91 | 34.6 | 34.63 | 365 | 365 |
| C | 0.0359 | 0.0366 | 0.0332 | 0.0366 | 91 | 34.6 | 34.64 | 365 | 365 |
| D | 0.0478 | 0.0506 | 0.0457 | 0.0506 | 91 | 34.6 | 34.65 | 365 | 365 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The 24-hour $SO_2$ background concentration was recommended by CDPHE and is based on the monitor at Colorado College, Colorado Springs, El Paso County.  (2005-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020556

**Appendix F – Air Quality Impacts**

## Table F-13.   Maximum Predicted Annual SO$_2$ Impacts from Project Sources

**Pollutant:** SO$_2$  **PSD Increments:**

**Averaging Time:** Annual

| | Class I Area | 2 | $\mu g/m^3$ |
| | Class II Area (Non-Sensitive) | 20 | $\mu g/m^3$ |

| Area and Alternative | Modeled Concentration 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | Max. Modeled Conc. ($\mu g/m^3$) | PSD Increment [1] ($\mu g/m^3$) | Back-ground Conc. [2] ($\mu g/m^3$) | Max. Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 2 | 5.3 | 5.30 | 80 | 80 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0003 | 0.0003 | 0.0003 | 0.0003 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0005 | 0.0005 | 0.0005 | 0.0005 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0007 | 0.0007 | 0.0007 | 0.0007 | 2 | 5.3 | 5.30 | 80 | 80 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 2 | 5.3 | 5.30 | 80 | 80 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0001 | 0.0000 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0002 | 0.0001 | 0.0002 | 0.0002 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 2 | 5.3 | 5.30 | 80 | 80 |
| **Sensitive Class II Areas** [3] | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0001 | 0.0002 | 0.0002 | 0.0002 | 2 | 5.3 | 5.30 | 80 | 80 |
| Dinosaur NM | | | | | | | | | |
| A | 0.0004 | 0.0004 | 0.0003 | 0.0004 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0007 | 0.0007 | 0.0006 | 0.0007 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0011 | 0.0011 | 0.0009 | 0.0011 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0015 | 0.0015 | 0.0013 | 0.0015 | 2 | 5.3 | 5.30 | 80 | 80 |
| **Class II Areas (Gridded Receptors)** [4] | | | | | | | | | |
| A | 0.0024 | 0.0026 | 0.0025 | 0.0026 | 20 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0049 | 0.0046 | 0.0044 | 0.0049 | 20 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0065 | 0.0067 | 0.0064 | 0.0067 | 20 | 5.3 | 5.31 | 80 | 80 |
| D | 0.0082 | 0.0097 | 0.0091 | 0.0097 | 20 | 5.3 | 5.31 | 80 | 80 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The 24-hour SO$_2$ background concentration was recommended by CDPHE and is based on the monitor at Colorado College, Colorado Springs, El Paso County.  (2005-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020557

Appendix F – Air Quality Impacts

### Table F-14.   Maximum Predicted 1-Hour CO Impacts from Project Sources

**Pollutant:**   CO  
**Averaging Time:** 1-Hour  

**PSD Increments:**  
Class I Area                           N/A  
Class II Area (Non-Sensitive)   N/A  

| Area and Alternative | Modeled Concentration | | | Max. High 2nd High Modeled Conc. ($\mu g/m^3$) | PSD Increment [1] ($\mu g/m^3$) | Back-ground Conc. [2] ($\mu g/m^3$) | Max. High 2nd High Total Conc. [2] ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 1.0269 | 0.3502 | 1.6615 | 1.6615 | N/A | 4656.4 | 4658.06 | 40000 | 40000 |
| B | 1.8862 | 0.6734 | 3.0500 | 3.0500 | N/A | 4656.4 | 4659.45 | 40000 | 40000 |
| C | 3.1046 | 1.0868 | 5.0831 | 5.0831 | N/A | 4656.4 | 4661.48 | 40000 | 40000 |
| D | 2.8810 | 0.9976 | 4.7190 | 4.7190 | N/A | 4656.4 | 4661.12 | 40000 | 40000 |
| Eagles Nest WA | | | | | | | | | |
| A | 1.5114 | 1.6673 | 2.0217 | 2.0217 | N/A | 4656.4 | 4658.42 | 40000 | 40000 |
| B | 2.3299 | 2.7095 | 3.3358 | 3.3358 | N/A | 4656.4 | 4659.74 | 40000 | 40000 |
| C | 3.6274 | 4.1353 | 5.2669 | 5.2669 | N/A | 4656.4 | 4661.67 | 40000 | 40000 |
| D | 3.4421 | 4.0161 | 5.1497 | 5.1497 | N/A | 4656.4 | 4661.55 | 40000 | 40000 |
| Flat Tops WA | | | | | | | | | |
| A | 3.7538 | 3.4480 | 3.7724 | 3.7724 | N/A | 4656.4 | 4660.17 | 40000 | 40000 |
| B | 5.6087 | 5.3310 | 5.8951 | 5.8951 | N/A | 4656.4 | 4662.30 | 40000 | 40000 |
| C | 7.5728 | 7.8267 | 9.2488 | 9.2488 | N/A | 4656.4 | 4665.65 | 40000 | 40000 |
| D | 6.9674 | 7.7356 | 9.2620 | 9.2620 | N/A | 4656.4 | 4665.66 | 40000 | 40000 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 3.4112 | 3.4272 | 2.3317 | 3.4272 | N/A | 4656.4 | 4659.83 | 40000 | 40000 |
| B | 5.5218 | 6.2084 | 3.7150 | 6.2084 | N/A | 4656.4 | 4662.61 | 40000 | 40000 |
| C | 8.3911 | 9.5891 | 5.5520 | 9.5891 | N/A | 4656.4 | 4665.99 | 40000 | 40000 |
| D | 8.1440 | 9.0930 | 5.5252 | 9.0930 | N/A | 4656.4 | 4665.49 | 40000 | 40000 |
| Mount Zirkel WA | | | | | | | | | |
| A | 1.1774 | 1.7050 | 1.3587 | 1.7050 | N/A | 4656.4 | 4658.11 | 40000 | 40000 |
| B | 2.2398 | 2.9538 | 2.1526 | 2.9538 | N/A | 4656.4 | 4659.35 | 40000 | 40000 |
| C | 3.4871 | 4.5611 | 3.3521 | 4.5611 | N/A | 4656.4 | 4660.96 | 40000 | 40000 |
| D | 3.1449 | 4.0411 | 3.1672 | 4.0411 | N/A | 4656.4 | 4660.44 | 40000 | 40000 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 1.5348 | 1.5733 | 2.6372 | 2.6372 | N/A | 4656.4 | 4659.04 | 40000 | 40000 |
| B | 2.8472 | 3.0059 | 4.7833 | 4.7833 | N/A | 4656.4 | 4661.18 | 40000 | 40000 |
| C | 4.4446 | 4.8324 | 7.8610 | 7.8610 | N/A | 4656.4 | 4664.26 | 40000 | 40000 |
| D | 4.3912 | 4.2362 | 7.2176 | 7.2176 | N/A | 4656.4 | 4663.62 | 40000 | 40000 |
| Dinosaur NM | | | | | | | | | |
| A | 5.3773 | 4.3922 | 4.8476 | 5.3773 | N/A | 4656.4 | 4661.78 | 40000 | 40000 |
| B | 8.4095 | 6.8315 | 7.2392 | 8.4095 | N/A | 4656.4 | 4664.81 | 40000 | 40000 |
| C | 12.8550 | 9.1004 | 10.9420 | 12.8550 | N/A | 4656.4 | 4669.26 | 40000 | 40000 |
| D | 13.1070 | 8.9931 | 11.4050 | 13.1070 | N/A | 4656.4 | 4669.51 | 40000 | 40000 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 150.1800 | 135.7900 | 128.1600 | 150.1800 | N/A | 4656.4 | 4806.58 | 40000 | 40000 |
| B | 167.3100 | 154.7400 | 200.0900 | 200.0900 | N/A | 4656.4 | 4856.49 | 40000 | 40000 |
| C | 204.2300 | 203.7600 | 205.4300 | 205.4300 | N/A | 4656.4 | 4861.83 | 40000 | 40000 |
| D | 116.7500 | 129.8100 | 118.8500 | 129.8100 | N/A | 4656.4 | 4786.21 | 40000 | 40000 |

[1]  Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2]  The 1-hour CO background concentration was recommended by CDPHE and is based on the monitor at Grand Junction, Mesa County. (average of -2004-2006 data)

[3]  For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4]  Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020558

**Appendix F – Air Quality Impacts**

## Table F-15.   Maximum Predicted 8-Hour CO Impacts from Project Sources

**Pollutant:** CO   **PSD Increments:**
**Averaging Time:** 8-Hour   **Class I Area** N/A
**Class II Area (Non-Sensitive)** N/A

| Area and Alternative | Modeled Concentration | | | Max. High 2nd High Modeled Conc. ($\mu g/m^3$) | PSD Increment [1] ($\mu g/m^3$) | Back-ground Conc. [2] ($\mu g/m^3$) | Max. High 2nd High Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.5531 | 0.2181 | 0.2794 | 0.5531 | N/A | 2328.2 | 2328.75 | 10000 | 10000 |
| B | 1.0784 | 0.4423 | 0.7264 | 1.0784 | N/A | 2328.2 | 2329.28 | 10000 | 10000 |
| C | 1.7278 | 0.7294 | 1.2989 | 1.7278 | N/A | 2328.2 | 2329.93 | 10000 | 10000 |
| D | 1.5855 | 0.6538 | 1.1552 | 1.5855 | N/A | 2328.2 | 2329.79 | 10000 | 10000 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.6155 | 0.7380 | 0.5790 | 0.7380 | N/A | 2328.2 | 2328.94 | 10000 | 10000 |
| B | 1.0425 | 1.1095 | 1.0954 | 1.1095 | N/A | 2328.2 | 2329.31 | 10000 | 10000 |
| C | 1.6006 | 1.6562 | 1.8947 | 1.8947 | N/A | 2328.2 | 2330.09 | 10000 | 10000 |
| D | 1.5410 | 1.5436 | 1.7004 | 1.7004 | N/A | 2328.2 | 2329.90 | 10000 | 10000 |
| Flat Tops WA | | | | | | | | | |
| A | 1.4090 | 1.6193 | 1.5317 | 1.6193 | N/A | 2328.2 | 2329.82 | 10000 | 10000 |
| B | 1.8790 | 2.7225 | 2.2031 | 2.7225 | N/A | 2328.2 | 2330.92 | 10000 | 10000 |
| C | 2.9170 | 4.3648 | 3.4233 | 4.3648 | N/A | 2328.2 | 2332.56 | 10000 | 10000 |
| D | 3.0171 | 4.2123 | 3.3757 | 4.2123 | N/A | 2328.2 | 2332.41 | 10000 | 10000 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 1.1600 | 1.2892 | 1.1625 | 1.2892 | N/A | 2328.2 | 2329.49 | 10000 | 10000 |
| B | 1.9534 | 1.7738 | 1.4579 | 1.9534 | N/A | 2328.2 | 2330.15 | 10000 | 10000 |
| C | 3.1399 | 2.8957 | 2.3794 | 3.1399 | N/A | 2328.2 | 2331.34 | 10000 | 10000 |
| D | 2.9352 | 2.8723 | 2.1148 | 2.9352 | N/A | 2328.2 | 2331.14 | 10000 | 10000 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.5805 | 0.6899 | 0.6034 | 0.6899 | N/A | 2328.2 | 2328.89 | 10000 | 10000 |
| B | 1.0230 | 1.2598 | 1.0849 | 1.2598 | N/A | 2328.2 | 2329.46 | 10000 | 10000 |
| C | 1.5877 | 1.8858 | 1.6879 | 1.8858 | N/A | 2328.2 | 2330.09 | 10000 | 10000 |
| D | 1.4611 | 1.8250 | 1.6060 | 1.8250 | N/A | 2328.2 | 2330.03 | 10000 | 10000 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 1.0731 | 1.0020 | 1.0383 | 1.0731 | N/A | 2328.2 | 2329.27 | 10000 | 10000 |
| B | 1.9334 | 1.9247 | 1.9034 | 1.9334 | N/A | 2328.2 | 2330.13 | 10000 | 10000 |
| C | 3.0619 | 3.2852 | 3.1738 | 3.2852 | N/A | 2328.2 | 2331.49 | 10000 | 10000 |
| D | 2.9399 | 2.9665 | 2.9194 | 2.9665 | N/A | 2328.2 | 2331.17 | 10000 | 10000 |
| Dinosaur NM | | | | | | | | | |
| A | 2.7959 | 2.4108 | 3.4825 | 3.4825 | N/A | 2328.2 | 2331.68 | 10000 | 10000 |
| B | 4.2472 | 3.5782 | 5.0924 | 5.0924 | N/A | 2328.2 | 2333.29 | 10000 | 10000 |
| C | 6.1792 | 5.2845 | 7.4633 | 7.4633 | N/A | 2328.2 | 2335.66 | 10000 | 10000 |
| D | 6.0876 | 5.3345 | 7.2980 | 7.2980 | N/A | 2328.2 | 2335.50 | 10000 | 10000 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 21.1440 | 26.6440 | 20.5880 | 26.6440 | N/A | 2328.2 | 2354.84 | 10000 | 10000 |
| B | 44.3430 | 48.2420 | 41.7400 | 48.2420 | N/A | 2328.2 | 2376.44 | 10000 | 10000 |
| C | 44.3580 | 73.5770 | 70.2370 | 73.5770 | N/A | 2328.2 | 2401.78 | 10000 | 10000 |
| D | 35.4920 | 38.4130 | 42.3740 | 42.3740 | N/A | 2328.2 | 2370.57 | 10000 | 10000 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regional increment consumption analysis.

[2] The 8-hour CO background concentration was recommended by CDPHE and is based on the monitor at Grand Junction, Mesa County. (average of -2004-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020559

Appendix F – Air Quality Impacts

### Table F-16.   Maximum Predicted Nitrogen Deposition Impacts from Project Sources

**Air Quality Related Value:**     N Deposition

| Area and Alternative | Modeled Deposition 2001 (kg/ha/yr) | 2002 (kg/ha/yr) | 2003 (kg/ha/yr) | Maximum Modeled Deposition (kg/ha/yr) | DAT [1] (kg/ha/yr) | Background Deposition [2] (kg/ha/yr) | Total Deposition (kg/ha/yr) | Level of Concern (kg/ha/yr) |
|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | |
| Arches NP | | | | | | | | |
| A | 0.0004 | 0.0001 | 0.0002 | 0.0004 | 0.005 | 1.9 | 1.90 | 3.0 |
| B | 0.0007 | 0.0002 | 0.0003 | 0.0007 | 0.005 | 1.9 | 1.90 | 3.0 |
| C | 0.0011 | 0.0003 | 0.0005 | 0.0011 | 0.005 | 1.9 | 1.90 | 3.0 |
| D | 0.0009 | 0.0003 | 0.0005 | 0.0009 | 0.005 | 1.9 | 1.90 | 3.0 |
| Eagles Nest WA | | | | | | | | |
| A | 0.0019 | 0.0021 | 0.0031 | 0.0031 | 0.005 | 1.5 | 1.50 | 3.0 |
| B | 0.0030 | 0.0034 | 0.0049 | 0.0049 | 0.005 | 1.5 | 1.50 | 3.0 |
| C | 0.0047 | 0.0054 | 0.0078 | 0.0078 | 0.005 | 1.5 | 1.51 | 3.0 |
| D | 0.0042 | 0.0047 | 0.0070 | 0.0070 | 0.005 | 1.5 | 1.51 | 3.0 |
| Flat Tops WA | | | | | | | | |
| A | 0.0117 | 0.0105 | 0.0118 | 0.0118 | 0.005 | 1.5 | 1.51 | 3.0 |
| B | 0.0163 | 0.0149 | 0.0172 | 0.0172 | 0.005 | 1.5 | 1.52 | 3.0 |
| C | 0.0264 | 0.0238 | 0.0276 | 0.0276 | 0.005 | 1.5 | 1.53 | 3.0 |
| D | 0.0224 | 0.0207 | 0.0238 | 0.0238 | 0.005 | 1.5 | 1.52 | 3.0 |
| Maroon Bells-Snowmass WA | | | | | | | | |
| A | 0.0032 | 0.0018 | 0.0027 | 0.0032 | 0.005 | 1.5 | 1.50 | 3.0 |
| B | 0.0051 | 0.0028 | 0.0045 | 0.0051 | 0.005 | 1.5 | 1.51 | 3.0 |
| C | 0.0081 | 0.0047 | 0.0073 | 0.0081 | 0.005 | 1.5 | 1.51 | 3.0 |
| D | 0.0073 | 0.0040 | 0.0063 | 0.0073 | 0.005 | 1.5 | 1.51 | 3.0 |
| Mount Zirkel WA | | | | | | | | |
| A | 0.0029 | 0.0025 | 0.0034 | 0.0034 | 0.005 | 2.7 | 2.70 | 3.0 |
| B | 0.0047 | 0.0039 | 0.0055 | 0.0055 | 0.005 | 2.7 | 2.71 | 3.0 |
| C | 0.0073 | 0.0061 | 0.0086 | 0.0086 | 0.005 | 2.7 | 2.71 | 3.0 |
| D | 0.0066 | 0.0054 | 0.0077 | 0.0077 | 0.005 | 2.7 | 2.71 | 3.0 |
| **Sensitive Class II Areas** | | | | | | | | |
| Colorado NM | | | | | | | | |
| A | 0.0013 | 0.0012 | 0.0016 | 0.0016 | 0.005 | 1.9 | 1.90 | 3.0 |
| B | 0.0027 | 0.0026 | 0.0031 | 0.0031 | 0.005 | 1.9 | 1.90 | 3.0 |
| C | 0.0043 | 0.0041 | 0.0049 | 0.0049 | 0.005 | 1.9 | 1.90 | 3.0 |
| D | 0.0037 | 0.0036 | 0.0043 | 0.0043 | 0.005 | 1.9 | 1.90 | 3.0 |
| Dinosaur NM | | | | | | | | |
| A | 0.0190 | 0.0170 | 0.0161 | 0.0190 | 0.005 | 1.5 | 1.52 | 3.0 |
| B | 0.0308 | 0.0266 | 0.0255 | 0.0308 | 0.005 | 1.5 | 1.53 | 3.0 |
| C | 0.0469 | 0.0389 | 0.0377 | 0.0469 | 0.005 | 1.5 | 1.55 | 3.0 |
| D | 0.0439 | 0.0373 | 0.0355 | 0.0439 | 0.005 | 1.5 | 1.54 | 3.0 |

[1] The Deposition Analysis Threshold (DAT) is a significance threshold. If the modeled deposition rate (without adding the background concentration) is below the DAT, predicted impacts are considered to be insignificant.

[2] Total (wet and dry) nitrogen background deposition values were obtained from the Clean Air Status and Trends Network (CASTNet) web page (http://www.epa.gov/castnet/index.html) on December 4, 2008. The following monitored data was used for each Class I Area:

Canyonlands (CAN407) Year 2000: Arches NP, Colorado NM

Gothic (GTH161) Year 2000: Dinosaur NM, Eagles Nest WA, Flat Tops WA, Maroon Bells-Snowmass WA

Rocky Mountain NP (ROM206) Year 2002: Mount Zirkel WA

BLM_0020560

**Appendix F – Air Quality Impacts**

### Table F-17.  Maximum Predicted Sulfur Deposition Impacts from Project Sources

**Air Quality Related Value:**     S Deposition

| Area and Alternative | Modeled Deposition | | | Maximum Modeled Deposition (kg/ha/yr) | DAT [1] (kg/ha/yr) | Background Deposition [2] (kg/ha/yr) | Total Deposition (kg/ha/yr) | Level of Concern (kg/ha/yr) |
|---|---|---|---|---|---|---|---|---|
| | 2001 (kg/ha/yr) | 2002 (kg/ha/yr) | 2003 (kg/ha/yr) | | | | | |
| **Class I Areas** | | | | | | | | |
| Arches NP | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.64 | 0.64 | 5.0 |
| B | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.64 | 0.64 | 5.0 |
| C | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.64 | 0.64 | 5.0 |
| D | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.64 | 0.64 | 5.0 |
| Eagles Nest WA | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0001 | 0.0001 | 0.0002 | 0.0002 | 0.005 | 0.73 | 0.73 | 5.0 |
| Flat Tops WA | | | | | | | | |
| A | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0002 | 0.0002 | 0.0003 | 0.0003 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0004 | 0.0004 | 0.0005 | 0.0005 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0006 | 0.0005 | 0.0006 | 0.0006 | 0.005 | 0.73 | 0.73 | 5.0 |
| Maroon Bells-Snowmass WA | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0001 | 0.0000 | 0.0001 | 0.0001 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0002 | 0.0001 | 0.0002 | 0.0002 | 0.005 | 0.73 | 0.73 | 5.0 |
| Mount Zirkel WA | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0001 | 0.0001 | 0.005 | 0.85 | 0.85 | 5.0 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.85 | 0.85 | 5.0 |
| C | 0.0001 | 0.0001 | 0.0002 | 0.0002 | 0.005 | 0.85 | 0.85 | 5.0 |
| D | 0.0002 | 0.0001 | 0.0002 | 0.0002 | 0.005 | 0.85 | 0.85 | 5.0 |
| **Sensitive Class II Areas** | | | | | | | | |
| Colorado NM | | | | | | | | |
| A | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.64 | 0.64 | 5.0 |
| B | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.005 | 0.64 | 0.64 | 5.0 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.64 | 0.64 | 5.0 |
| D | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.64 | 0.64 | 5.0 |
| Dinosaur NM | | | | | | | | |
| A | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0004 | 0.0004 | 0.0004 | 0.0004 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0006 | 0.0006 | 0.0005 | 0.0006 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0009 | 0.0007 | 0.0007 | 0.0009 | 0.005 | 0.73 | 0.73 | 5.0 |

[1] The Deposition Analysis Threshold (DAT) is a significance threshold. If the modeled deposition (without adding the background concentration) is below the DAT, predicted impacts are considered to be insignificant.

[2] Total (wet and dry) sulfur background deposition values were obtained from the Clean Air Status and Trends Network (CASTNet) web page (http://www.epa.gov/castnet/index.html) on December 4, 2008. The following monitored data was used for each Class I Area:
Canyonlands (CAN407) Year 2000: Arches NP, Colorado NM
Gothic (GTH161) Year 2000: Dinosaur NM, Eagles Nest WA, Flat Tops WA, Maroon Bells-Snowmass WA
Rocky Mountain NP (ROM206) Year 2002: Mount Zirkel WA

BLM_0020561

Appendix F – Air Quality Impacts

### Table F-18.   Maximum Predicted Lake Acid Neutralizing Capacity Changes from Project Sources

**Air Quality Related Value:**        Change in Lake ANC

| Lake and Alternative | H Deposition [1] | | | Background ANC [2] (eq) | Level of Acceptable Change [3] (eq) | Maximum ANC Change (eq) | Maximum Percent ANC Change (%) |
|---|---|---|---|---|---|---|---|
| | 2001 (eq) | 2002 (eq) | 2003 (eq) | | | | |
| Avalanche Lake | | | | | | | |
| A | 79.4 | 39.3 | 62.6 | 451,000 | 45,100 | 79.4 | 0.02 |
| B | 124.6 | 63.2 | 104.8 | 451,000 | 45,100 | 124.6 | 0.03 |
| C | 196.2 | 104.6 | 171.2 | 451,000 | 45,100 | 196.2 | 0.04 |
| D | 179.5 | 90.3 | 151.8 | 451,000 | 45,100 | 179.5 | 0.04 |
| Moon Lake | | | | | | | |
| A | 31.8 | 15.8 | 26.0 | 56,400 | 5,640 | 31.8 | 0.06 |
| B | 49.9 | 25.5 | 43.5 | 56,400 | 5,640 | 49.9 | 0.09 |
| C | 78.5 | 42.3 | 71.0 | 56,400 | 5,640 | 78.5 | 0.14 |
| D | 71.6 | 36.4 | 63.1 | 56,400 | 5,640 | 71.6 | 0.13 |
| Ned Wilson Lake | | | | | | | |
| A | 4.0 | 4.0 | 4.6 | 2,240 | 224 | 4.6 | 0.20 |
| B | 6.1 | 6.0 | 7.0 | 2,240 | 224 | 7.0 | 0.31 |
| C | 9.7 | 9.4 | 11.1 | 2,240 | 224 | 11.1 | 0.50 |
| D | 8.6 | 8.4 | 9.9 | 2,240 | 224 | 9.9 | 0.44 |
| Seven Lakes | | | | | | | |
| A | 9.5 | 6.8 | 11.6 | 15,100 | 1,510 | 11.6 | 0.08 |
| B | 15.5 | 11.1 | 18.7 | 15,100 | 1,510 | 18.7 | 0.12 |
| C | 23.9 | 17.1 | 29.2 | 15,100 | 1,510 | 29.2 | 0.19 |
| D | 21.8 | 15.4 | 26.7 | 15,100 | 1,510 | 26.7 | 0.18 |
| Summit Lake | | | | | | | |
| A | 1.6 | 1.5 | 2.0 | 2,860 | 286 | 2.0 | 0.07 |
| B | 2.6 | 2.3 | 3.2 | 2,860 | 286 | 3.2 | 0.11 |
| C | 4.1 | 3.6 | 5.1 | 2,860 | 286 | 5.1 | 0.18 |
| D | 3.7 | 3.3 | 4.6 | 2,860 | 286 | 4.6 | 0.16 |
| Trappers Lake | | | | | | | |
| A | 51.1 | 50.7 | 60.0 | 528,000 | 52,800 | 60.0 | 0.01 |
| B | 77.6 | 77.0 | 92.0 | 528,000 | 52,800 | 92.0 | 0.02 |
| C | 123.6 | 120.9 | 144.8 | 528,000 | 52,800 | 144.8 | 0.03 |
| D | 108.8 | 108.0 | 130.1 | 528,000 | 52,800 | 130.1 | 0.02 |
| Upper Ned Wilson Lake | | | | | | | |
| A | 1.5 | 1.4 | 1.7 | 271 | 21.2 | 1.7 | 0.62 |
| B | 2.2 | 2.2 | 2.6 | 271 | 21.2 | 2.6 | 0.95 |
| C | 3.6 | 3.4 | 4.1 | 271 | 21.2 | 4.1 | 1.50 |
| D | 3.1 | 3.1 | 3.6 | 271 | 21.2 | 3.6 | 1.34 |

ANC = acid neutralizing capacity.

μeq/l = microequivalents per liter.

[1] The 10th-percentile lowest ANC values were calculated in accordance with the USFS Rocky Mountain Region's *Screening Methodology for Calculating ANC Change to High Elevation Lakes, User's Guide* (USFS 2000).

[2] Background ANC values were obtained from http://www.fs.fed.us/waterdata on January 25, 2007.

[3] The level of acceptable change is 10 percent change for lakes with ANC background values greater than 25 μeq/l. For lakes with lower ANC background values (such as Upper Ned Wilson Lake), the level of acceptable change is 1 μeq/l, which is comparable to 21.2 equivalents.

**Appendix F – Air Quality Impacts**

**Table F-19.   Days of Visibility Change Greater Than or Equal to 1.0 dv at Class I and Sensitive Class II Areas from Project Sources**

Air Quality Related Value:          Visibility

| | 2001 | | | 2002 | | | 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| **Area and Alternative** | **FLAG 2000 (Protocol)** | **BLM Seasonal** | **BLM Daily** | **FLAG 2000 (Protocol)** | **BLM Seasonal** | **BLM Daily** | **FLAG 2000 (Protocol)** | **BLM Seasonal** | **BLM Daily** |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| D | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Eagles Nest WA | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 |
| D | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 |
| Flat Tops WA | | | | | | | | | |
| A | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 |
| B | 1 | 0 | 0 | 5 | 2 | 2 | 4 | 0 | 2 |
| C | 3 | 2 | 1 | 9 | 5 | 6 | 10 | 10 | 8 |
| D | 3 | 3 | 1 | 8 | 4 | 6 | 10 | 7 | 6 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 3 | 1 | 0 | 1 | 1 | 1 | 1 | 0 | 1 |
| D | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 1 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 1 |
| C | 0 | 0 | 0 | 5 | 2 | 3 | 2 | 0 | 1 |
| D | 0 | 0 | 0 | 5 | 2 | 2 | 2 | 0 | 1 |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| B | 1 | 1 | 0 | 3 | 3 | 1 | 0 | 0 | 0 |
| C | 2 | 1 | 1 | 4 | 5 | 4 | 1 | 1 | 1 |
| D | 1 | 1 | 1 | 3 | 5 | 3 | 1 | 1 | 1 |
| Dinosaur NM | | | | | | | | | |
| A | 3 | 4 | 1 | 7 | 7 | 6 | 8 | 6 | 5 |
| B | 9 | 10 | 7 | 14 | 13 | 10 | 12 | 11 | 8 |
| C | 28 | 32 | 21 | 35 | 41 | 25 | 32 | 28 | 22 |
| D | 29 | 32 | 19 | 35 | 38 | 25 | 30 | 30 | 23 |

Visibility calculation methods include the following:

FLAG 2000 (Protocol):  This method was specified in the *Air Quality Impact Assessment Protocol: White River Resource Management Plan Amendment and Environmental Impact Statement* (BLM 2007a).

BLM Seasonal:  This method uses seasonal natural background extinction data and monthly relative humidity data for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM Daily:  This method uses observed daily aerosol measurements and relative humidity data, with f(RH) limited at 90 percent for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM_0020563

**Appendix F – Air Quality Impacts**

## Table F-20.   Days of Visibility Change Greater Than or Equal to 0.5 dv at Class I and Sensitive Class II Areas from Project Sources

Air Quality Related Value:          Visibility

| | 2001 | | | 2002 | | | 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| Area and Alternative | FLAG 2000 (Protocol) | BLM Seasonal | BLM Daily | FLAG 2000 (Protocol) | BLM Seasonal | BLM Daily | FLAG 2000 (Protocol) | BLM Seasonal | BLM Daily |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 4 | 7 | 2 | 0 | 1 | 0 | 2 | 2 | 1 |
| D | 4 | 6 | 2 | 0 | 0 | 0 | 2 | 2 | 1 |
| Eagles Nest WA | | | | | | | | | |
| A | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| B | 1 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 |
| C | 2 | 1 | 1 | 10 | 4 | 4 | 4 | 2 | 3 |
| D | 1 | 1 | 1 | 8 | 4 | 4 | 3 | 2 | 1 |
| Flat Tops WA | | | | | | | | | |
| A | 1 | 1 | 0 | 3 | 3 | 4 | 11 | 7 | 5 |
| B | 6 | 4 | 5 | 19 | 9 | 7 | 17 | 12 | 12 |
| C | 25 | 19 | 10 | 34 | 24 | 24 | 31 | 32 | 23 |
| D | 18 | 19 | 9 | 32 | 22 | 19 | 27 | 30 | 22 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 |
| B | 7 | 2 | 1 | 4 | 2 | 1 | 2 | 2 | 1 |
| C | 11 | 7 | 9 | 5 | 7 | 5 | 7 | 4 | 3 |
| D | 11 | 7 | 9 | 5 | 5 | 5 | 6 | 4 | 3 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0 | 0 | 0 | 4 | 1 | 1 | 2 | 0 | 1 |
| B | 2 | 1 | 0 | 7 | 2 | 4 | 6 | 1 | 1 |
| C | 7 | 1 | 3 | 15 | 5 | 6 | 14 | 5 | 8 |
| D | 7 | 1 | 2 | 12 | 6 | 6 | 12 | 5 | 5 |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 1 | 1 | 0 | 3 | 3 | 2 | 0 | 0 | 0 |
| B | 3 | 1 | 1 | 6 | 8 | 5 | 2 | 2 | 4 |
| C | 10 | 10 | 8 | 13 | 13 | 11 | 10 | 10 | 8 |
| D | 10 | 10 | 5 | 10 | 13 | 11 | 5 | 9 | 7 |
| Dinosaur NM | | | | | | | | | |
| A | 43 | 42 | 16 | 59 | 53 | 34 | 46 | 39 | 26 |
| B | 43 | 55 | 29 | 50 | 65 | 41 | 47 | 53 | 33 |
| C | 86 | 98 | 57 | 101 | 107 | 74 | 95 | 97 | 71 |
| D | 88 | 103 | 59 | 103 | 109 | 75 | 94 | 97 | 76 |

Visibility calculation methods include the following:

FLAG 2000 (Protocol): This method was specified in the *Air Quality Impact Assessment Protocol: White River Resource Management Plan Amendment and Environmental Impact Statement* (BLM 2007a).

BLM Seasonal: This method uses seasonal natural background extinction data and monthly relative humidity data for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM Daily: This method uses observed daily aerosol measurements and relative humidity data, with f(RH) limited at 90 percent for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM_0020564

**Table F-21.   Days of Visibility Change Greater Than or Equal to 1.0 dv at Scenic Views from Project Sources**

Air Quality Related Value:       Visibility

| Area and Alternative | 2001 FLAG 2000 (Protocol) | 2001 BLM Seasonal | 2001 BLM Daily | 2002 FLAG 2000 (Protocol) | 2002 BLM Seasonal | 2002 BLM Daily | 2003 FLAG 2000 (Protocol) | 2003 BLM Seasonal | 2003 BLM Daily |
|---|---|---|---|---|---|---|---|---|---|
| **Big Mountain View** | | | | | | | | | |
| A | 3 | 2 | 2 | 7 | 4 | 4 | 2 | 0 | 2 |
| B | 2 | 2 | 3 | 10 | 7 | 7 | 7 | 7 | 4 |
| C | 9 | 9 | 6 | 22 | 21 | 15 | 16 | 16 | 12 |
| D | 10 | 8 | 6 | 21 | 19 | 12 | 16 | 14 | 13 |
| **Holy Cross View** | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| D | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Holy Cross Wilderness View** | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| D | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Rabbit's Ear View** | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 2 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| C | 3 | 3 | 1 | 2 | 2 | 2 | 0 | 1 | 1 |
| D | 3 | 2 | 1 | 2 | 2 | 2 | 0 | 1 | 1 |
| **Roan Cliffs View** | | | | | | | | | |
| A | 2 | 2 | 1 | 4 | 4 | 3 | 2 | 1 | 2 |
| B | 3 | 3 | 1 | 8 | 5 | 5 | 5 | 3 | 2 |
| C | 10 | 7 | 6 | 16 | 17 | 11 | 10 | 8 | 9 |
| D | 7 | 6 | 5 | 17 | 14 | 10 | 8 | 8 | 6 |

Visibility calculation methods include the following:

FLAG 2000 (Protocol):  This method was specified in the *Air Quality Impact Assessment Protocol: White River Resource Management Plan Amendment and Environmental Impact Statement* (BLM 2007a).

BLM Seasonal:  This method uses seasonal natural background extinction data and monthly relative humidity data for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM Daily:  This method uses observed daily aerosol measurements and relative humidity data, with f(RH) limited at 90 percent for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM_0020565

**Table F-22.   Days of Visibility Change Greater Than or Equal to 0.5 dv at Scenic Views from Project Sources**

Air Quality Related Value:      Visibility

| Area and Alternative | 2001 FLAG 2000 (Protocol) | 2001 BLM Seasonal | 2001 BLM Daily | 2002 FLAG 2000 (Protocol) | 2002 BLM Seasonal | 2002 BLM Daily | 2003 FLAG 2000 (Protocol) | 2003 BLM Seasonal | 2003 BLM Daily |
|---|---|---|---|---|---|---|---|---|---|
| **Big Mountain View** | | | | | | | | | |
| A | 12 | 10 | 6 | 27 | 25 | 17 | 20 | 20 | 15 |
| B | 16 | 20 | 13 | 30 | 32 | 23 | 24 | 26 | 22 |
| C | 44 | 47 | 30 | 57 | 68 | 49 | 57 | 60 | 48 |
| D | 40 | 43 | 29 | 54 | 56 | 41 | 53 | 54 | 42 |
| **Holy Cross View** | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 |
| D | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| **Holy Cross Wilderness View** | | | | | | | | | |
| A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 |
| D | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 |
| **Rabbit's Ear View** | | | | | | | | | |
| A | 2 | 1 | 1 | 2 | 2 | 1 | 0 | 0 | 0 |
| B | 3 | 3 | 2 | 3 | 5 | 3 | 1 | 3 | 2 |
| C | 6 | 7 | 4 | 11 | 12 | 7 | 4 | 4 | 4 |
| D | 6 | 6 | 4 | 8 | 9 | 5 | 4 | 4 | 4 |
| **Roan Cliffs View** | | | | | | | | | |
| A | 9 | 5 | 4 | 14 | 14 | 10 | 10 | 8 | 7 |
| B | 14 | 12 | 10 | 20 | 21 | 16 | 14 | 19 | 15 |
| C | 29 | 34 | 26 | 37 | 43 | 34 | 31 | 33 | 27 |
| D | 28 | 29 | 22 | 34 | 41 | 31 | 28 | 28 | 27 |

Visibility calculation methods include the following:

FLAG 2000 (Protocol): This method was specified in the *Air Quality Impact Assessment Protocol: White River Resource Management Plan Amendment and Environmental Impact Statement* (BLM 2007a).

BLM Seasonal: This method uses seasonal natural background extinction data and monthly relative humidity data for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM Daily: This method uses observed daily aerosol measurements and relative humidity data, with f[RH] limited at 90 percent for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM_0020566

# 4.0   Far-Field Non-Ozone Cumulative Impacts

## Table F-23.   Maximum Predicted 1-Hour $NO_2$ Impacts from WRFO and Cumulative Sources

Pollutant:        $NO_2$        PSD Increments:
Averaging Time: 1-Hour        Class I Area                                N/A
                              Class II Area (Non-Sensitive)        N/A

| Area and Alternative | Annual 8th High Modeled Concentration at Any Receptor 2001 ($\mu g/m^3$) | Annual 8th High Modeled Concentration at Any Receptor 2002 ($\mu g/m^3$) | Annual 8th High Modeled Concentration at Any Receptor 2003 ($\mu g/m^3$) | 3-Year Average of Annual Max. Modeled 8th-High Conc. [1] ($\mu g/m^3$) | PSD Increment ($\mu g/m^3$) | Back-ground Conc. [2] ($\mu g/m^3$) | Max. Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.2163 | 0.1462 | 0.1970 | 0.1779 | N/A | 32.08 | 32.26 | 189 | N/A |
| B | 0.2570 | 0.1803 | 0.1976 | 0.1894 | N/A | 32.08 | 32.27 | 189 | N/A |
| C | 0.2730 | 0.2205 | 0.1976 | 0.2167 | N/A | 32.08 | 32.30 | 189 | N/A |
| D | 0.2750 | 0.2131 | 0.1974 | 0.2139 | N/A | 32.08 | 32.29 | 189 | N/A |
| Eagles Nest WA | | | | | | | | | |
| A | 0.3054 | 0.3585 | 0.5408 | 0.3975 | N/A | 32.08 | 32.48 | 189 | N/A |
| B | 0.3438 | 0.4609 | 0.6255 | 0.4682 | N/A | 32.08 | 32.55 | 189 | N/A |
| C | 0.4979 | 0.6307 | 0.7917 | 0.6052 | N/A | 32.08 | 32.69 | 189 | N/A |
| D | 0.4912 | 0.6471 | 0.8591 | 0.6438 | N/A | 32.08 | 32.72 | 189 | N/A |
| Flat Tops WA | | | | | | | | | N/A |
| A | 1.8814 | 2.3528 | 2.1602 | 1.9741 | N/A | 32.08 | 34.05 | 189 | N/A |
| B | 1.6700 | 2.1449 | 2.1087 | 1.7829 | N/A | 32.08 | 33.86 | 189 | N/A |
| C | 2.0161 | 2.3092 | 2.8062 | 2.2630 | N/A | 32.08 | 34.34 | 189 | N/A |
| D | 2.2756 | 2.8446 | 2.7376 | 2.4619 | N/A | 32.08 | 34.54 | 189 | N/A |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 1.5280 | 1.8620 | 1.6696 | 1.6865 | N/A | 32.08 | 33.77 | 189 | N/A |
| B | 1.1180 | 1.4660 | 1.3030 | 1.2688 | N/A | 32.08 | 33.35 | 189 | N/A |
| C | 1.3007 | 1.6467 | 1.5451 | 1.4665 | N/A | 32.08 | 33.55 | 189 | N/A |
| D | 1.6290 | 2.2685 | 1.9570 | 1.8648 | N/A | 32.08 | 33.94 | 189 | N/A |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.4104 | 0.5152 | 0.4679 | 0.4402 | N/A | 32.08 | 32.52 | 189 | N/A |
| B | 0.5286 | 0.5421 | 0.5704 | 0.5229 | N/A | 32.08 | 32.60 | 189 | N/A |
| C | 0.6973 | 0.7089 | 0.7831 | 0.6980 | N/A | 32.08 | 32.78 | 189 | N/A |
| D | 0.7192 | 0.7617 | 0.8198 | 0.7208 | N/A | 32.08 | 32.80 | 189 | N/A |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 1.1411 | 1.4326 | 1.5356 | 1.3526 | N/A | 32.08 | 33.43 | 189 | N/A |
| B | 1.2200 | 1.4615 | 1.5361 | 1.3533 | N/A | 32.08 | 33.43 | 189 | N/A |
| C | 1.4738 | 1.6033 | 1.5631 | 1.4500 | N/A | 32.08 | 33.53 | 189 | N/A |
| D | 1.4599 | 1.6317 | 1.5921 | 1.5155 | N/A | 32.08 | 33.60 | 189 | N/A |
| Dinosaur NM | | | | | | | | | |
| A | 2.0856 | 2.2265 | 2.1312 | 2.0371 | N/A | 32.08 | 34.12 | 189 | N/A |
| B | 2.7453 | 2.9004 | 2.6649 | 2.6916 | N/A | 32.08 | 34.77 | 189 | N/A |
| C | 3.9303 | 4.0466 | 3.9801 | 3.7392 | N/A | 32.08 | 35.82 | 189 | N/A |
| D | 4.2322 | 4.3620 | 4.2505 | 4.0818 | N/A | 32.08 | 36.16 | 189 | N/A |
| **Class II Areas (Gridded Receptors)[3]** | | | | | | | | | |
| A | 750.8300 | 853.9900 | 918.5700 | 841.1300 | N/A | 32.08 | 873.21 | 189 | N/A |
| B | 750.8300 | 853.9900 | 918.5700 | 841.1300 | N/A | 32.08 | 873.21 | 189 | N/A |
| C | 750.8300 | 853.9900 | 918.5700 | 841.1300 | N/A | 32.08 | 873.21 | 189 | N/A |
| D | 750.8300 | 853.9900 | 918.5700 | 841.1300 | N/A | 32.08 | 873.21 | 189 | N/A |

[1] This is the three-year average of the annual modeled 8th-highest concentration within the area, as determined on a receptor-specific basis. The three-year average in this column is less than the average of the three annual 8th high modeled concentrations when the locations of the annual 8th high receptors vary from one year to another.

[2] The background concentration data is based on the 98th percentile of 1-hour $NO_2$ data from a U.S. Forest Service monitor (ID 08-067-1004) located in Bayfield, Colorado in La Plata County.

[3] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020567

Appendix F – Air Quality Impacts

### Table F-24.  Maximum Predicted Annual NO₂ Impacts from WRFO and Cumulative Sources

**Pollutant:** NO$_2$    **PSD Increments:**

**Averaging Time:** Annual    **Class I Area** 2.5 µg/m$^3$

    **Class II Area (Non-Sensitive)** 25 µg/m$^3$

| Area and Alternative | Modeled Concentration | | | Max. Modeled Conc. (µg/m$^3$) | PSD Increment [1] (µg/m$^3$) | Back-ground Conc. [2] (µg/m$^3$) | Max. Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0034 | 0.0028 | 0.0030 | 0.0034 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| B | 0.0039 | 0.0030 | 0.0031 | 0.0039 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| C | 0.0045 | 0.0032 | 0.0033 | 0.0045 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| D | 0.0045 | 0.0031 | 0.0033 | 0.0045 | 2.5 | 30.6 | 30.60 | 100 | 100 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0129 | 0.0129 | 0.0155 | 0.0155 | 2.5 | 30.6 | 30.62 | 100 | 100 |
| B | 0.0118 | 0.0118 | 0.0141 | 0.0141 | 2.5 | 30.6 | 30.61 | 100 | 100 |
| C | 0.0144 | 0.0146 | 0.0173 | 0.0173 | 2.5 | 30.6 | 30.62 | 100 | 100 |
| D | 0.0173 | 0.0176 | 0.0207 | 0.0207 | 2.5 | 30.6 | 30.62 | 100 | 100 |
| Flat Tops WA | | | | | | | | | |
| A | 0.1024 | 0.0961 | 0.1084 | 0.1084 | 2.5 | 30.6 | 30.71 | 100 | 100 |
| B | 0.0826 | 0.0768 | 0.0877 | 0.0877 | 2.5 | 30.6 | 30.69 | 100 | 100 |
| C | 0.1046 | 0.0946 | 0.1111 | 0.1111 | 2.5 | 30.6 | 30.71 | 100 | 100 |
| D | 0.1244 | 0.1212 | 0.1340 | 0.1340 | 2.5 | 30.6 | 30.73 | 100 | 100 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0476 | 0.0582 | 0.0532 | 0.0582 | 2.5 | 30.6 | 30.66 | 100 | 100 |
| B | 0.0356 | 0.0410 | 0.0391 | 0.0410 | 2.5 | 30.6 | 30.64 | 100 | 100 |
| C | 0.0399 | 0.0454 | 0.0432 | 0.0454 | 2.5 | 30.6 | 30.65 | 100 | 100 |
| D | 0.0553 | 0.0656 | 0.0598 | 0.0656 | 2.5 | 30.6 | 30.67 | 100 | 100 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0190 | 0.0189 | 0.0196 | 0.0196 | 2.5 | 30.6 | 30.62 | 100 | 100 |
| B | 0.0203 | 0.0199 | 0.0213 | 0.0213 | 2.5 | 30.6 | 30.62 | 100 | 100 |
| C | 0.0242 | 0.0231 | 0.0256 | 0.0256 | 2.5 | 30.6 | 30.63 | 100 | 100 |
| D | 0.0257 | 0.0244 | 0.0269 | 0.0269 | 2.5 | 30.6 | 30.63 | 100 | 100 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0480 | 0.0547 | 0.0512 | 0.0547 | 2.5 | 30.6 | 30.65 | 100 | 100 |
| B | 0.0500 | 0.0573 | 0.0529 | 0.0573 | 2.5 | 30.6 | 30.66 | 100 | 100 |
| C | 0.0534 | 0.0611 | 0.0553 | 0.0611 | 2.5 | 30.6 | 30.66 | 100 | 100 |
| D | 0.0543 | 0.0615 | 0.0555 | 0.0615 | 2.5 | 30.6 | 30.66 | 100 | 100 |
| Dinosaur NM | | | | | | | | | |
| A | 0.1629 | 0.1414 | 0.1389 | 0.1629 | 2.5 | 30.6 | 30.76 | 100 | 100 |
| B | 0.2000 | 0.1755 | 0.1672 | 0.2000 | 2.5 | 30.6 | 30.80 | 100 | 100 |
| C | 0.2660 | 0.2348 | 0.2180 | 0.2660 | 2.5 | 30.6 | 30.87 | 100 | 100 |
| D | 0.2692 | 0.2405 | 0.2218 | 0.2692 | 2.5 | 30.6 | 30.87 | 100 | 100 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 29.0580 | 32.5940 | 32.9910 | 32.9910 | 25 | 30.6 | 63.59 | 100 | 100 |
| B | 29.0580 | 32.5940 | 32.9910 | 32.9910 | 25 | 30.6 | 63.59 | 100 | 100 |
| C | 29.0580 | 32.5940 | 32.9920 | 32.9920 | 25 | 30.6 | 63.59 | 100 | 100 |
| D | 29.0580 | 32.5940 | 32.9920 | 32.9920 | 25 | 30.6 | 63.59 | 100 | 100 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The annual NO$_2$ background concentration was recommended by CDPHE and is based on the monitors at Woodmen and Colorado College stations, Colorado Springs, El Paso County  (2005-2006 data).

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020568

**Table F-25.   Maximum Predicted 24-Hour PM$_{10}$ Impacts from WRFO and Cumulative Sources**

Pollutant: PM$_{10}$  PSD Increments:

Averaging Time: 24-Hour  
Class I Area  8  $\mu g/m^3$  
Class II Area (Non-Sensitive)  30  $\mu g/m^3$

| Area and Alternative | Modeled Concentration 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | Maximum High 2nd High Modeled Conc.[1] ($\mu g/m^3$) | PSD Increment[2] ($\mu g/m^3$) | Back-ground Conc.[3] ($\mu g/m^3$) | Maximum High 2nd High Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.3585 | 0.2069 | 0.3238 | 0.3585 | 8 | 56 | 56.36 | 150 | --- |
| B | 0.4181 | 0.2205 | 0.2594 | 0.4181 | 8 | 56 | 56.42 | 150 | --- |
| C | 0.5132 | 0.2582 | 0.3051 | 0.5132 | 8 | 56 | 56.51 | 150 | --- |
| D | 0.5229 | 0.2736 | 0.3078 | 0.5229 | 8 | 56 | 56.52 | 150 | --- |
| Eagles Nest WA | | | | | | | | | |
| A | 0.4277 | 0.7520 | 0.3633 | 0.7520 | 8 | 56 | 56.75 | 150 | --- |
| B | 0.3602 | 0.5242 | 0.3313 | 0.5242 | 8 | 56 | 56.52 | 150 | --- |
| C | 0.4295 | 0.6175 | 0.3910 | 0.6175 | 8 | 56 | 56.62 | 150 | --- |
| D | 0.4425 | 0.6502 | 0.4056 | 0.6502 | 8 | 56 | 56.65 | 150 | --- |
| Flat Tops WA | | | | | | | | | |
| A | 2.9099 | 3.1295 | 3.2674 | 3.2674 | 8 | 56 | 59.29 | 150 | --- |
| B | 1.4110 | 1.9806 | 1.5151 | 1.9806 | 8 | 56 | 57.98 | 150 | --- |
| C | 1.4114 | 1.9972 | 1.6962 | 1.9972 | 8 | 56 | 58.00 | 150 | --- |
| D | 1.4120 | 2.0005 | 1.7415 | 2.0005 | 8 | 56 | 58.00 | 150 | --- |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 2.5300 | 3.1579 | 3.0012 | 3.1579 | 8 | 56 | 59.16 | 150 | --- |
| B | 0.3796 | 0.8073 | 0.4175 | 0.8073 | 8 | 56 | 56.81 | 150 | --- |
| C | 0.5185 | 1.3851 | 0.5041 | 1.3851 | 8 | 56 | 57.39 | 150 | --- |
| D | 0.6454 | 1.5790 | 0.5916 | 1.5790 | 8 | 56 | 57.58 | 150 | --- |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.7373 | 1.0827 | 0.8539 | 1.0827 | 8 | 56 | 57.08 | 150 | --- |
| B | 0.7377 | 1.0985 | 0.8665 | 1.0985 | 8 | 56 | 57.10 | 150 | --- |
| C | 0.7728 | 1.1290 | 0.8865 | 1.1290 | 8 | 56 | 57.13 | 150 | --- |
| D | 0.7792 | 1.1327 | 0.8896 | 1.1327 | 8 | 56 | 57.13 | 150 | --- |
| **Sensitive Class II Areas**[4] | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 1.7777 | 1.6892 | 1.5569 | 1.7777 | 8 | 56 | 57.78 | 150 | --- |
| B | 1.7792 | 1.6892 | 1.5126 | 1.7792 | 8 | 56 | 57.78 | 150 | --- |
| C | 1.7792 | 1.6892 | 1.5338 | 1.7792 | 8 | 56 | 57.78 | 150 | --- |
| D | 1.7785 | 1.6892 | 1.5429 | 1.7785 | 8 | 56 | 57.78 | 150 | --- |
| Dinosaur NM | | | | | | | | | |
| A | 3.0134 | 3.6933 | 3.2448 | 3.6933 | 8 | 56 | 59.69 | 150 | --- |
| B | 2.8095 | 3.7361 | 3.0293 | 3.7361 | 8 | 56 | 59.74 | 150 | --- |
| C | 2.9713 | 3.7946 | 3.8142 | 3.8142 | 8 | 56 | 59.81 | 150 | --- |
| D | 2.9956 | 3.7953 | 3.7885 | 3.7953 | 8 | 56 | 59.80 | 150 | --- |
| **Class II Areas (Gridded Receptors)**[5] | | | | | | | | | |
| A | 155.3700 | 176.4000 | 168.6800 | 176.4000 | 30 | 56 | 232.40 | 150 | --- |
| B | 155.3800 | 175.4100 | 168.3400 | 175.4100 | 30 | 56 | 231.41 | 150 | --- |
| C | 155.4000 | 175.9300 | 168.6500 | 175.9300 | 30 | 56 | 231.93 | 150 | --- |
| D | 155.4100 | 176.0500 | 168.7200 | 176.0500 | 30 | 56 | 232.05 | 150 | --- |

[1] The maximum modeled high 2nd high concentration over all three years (2001-2003).

[2] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they

[3] The 24-hour PM$_{10}$ background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2006 data).

[4] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[5] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020569

Appendix F – Air Quality Impacts

## Table F-26.   Maximum Predicted Annual PM$_{10}$ Impacts from WRFO and Cumulative Sources

**Pollutant:** PM$_{10}$        **PSD Increments:**

**Averaging Time:** Annual      **Class I Area**      4    µg/m$^3$

                    **Class II Area (Non-Sensitive)**    17    µg/m$^3$

| Area and Alternative | Modeled Concentration | | | Max. Modeled Conc. (µg/m$^3$) | PSD Increment [1] (µg/m$^3$) | Back-ground Conc. [2] (µg/m$^3$) | Max. Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0189 | 0.0220 | 0.0216 | 0.0220 | 4 | 30 | 30.02 | — | 50 |
| B | 0.0192 | 0.0205 | 0.0195 | 0.0205 | 4 | 30 | 30.02 | — | 50 |
| C | 0.0217 | 0.0227 | 0.0218 | 0.0227 | 4 | 30 | 30.02 | — | 50 |
| D | 0.0222 | 0.0231 | 0.0221 | 0.0231 | 4 | 30 | 30.02 | — | 50 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0874 | 0.1088 | 0.0866 | 0.1088 | 4 | 30 | 30.11 | — | 50 |
| B | 0.0562 | 0.0723 | 0.0612 | 0.0723 | 4 | 30 | 30.07 | — | 50 |
| C | 0.0685 | 0.0893 | 0.0751 | 0.0893 | 4 | 30 | 30.09 | — | 50 |
| D | 0.0742 | 0.0963 | 0.0804 | 0.0963 | 4 | 30 | 30.10 | — | 50 |
| Flat Tops WA | | | | | | | | | |
| A | 0.3358 | 0.3818 | 0.3892 | 0.3892 | 4 | 30 | 30.39 | — | 50 |
| B | 0.1791 | 0.2019 | 0.1935 | 0.2019 | 4 | 30 | 30.20 | — | 50 |
| C | 0.2124 | 0.2408 | 0.2560 | 0.2560 | 4 | 30 | 30.26 | — | 50 |
| D | 0.2287 | 0.2578 | 0.2751 | 0.2751 | 4 | 30 | 30.28 | — | 50 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.3153 | 0.4207 | 0.4569 | 0.4569 | 4 | 30 | 30.46 | — | 50 |
| B | 0.0625 | 0.0804 | 0.0686 | 0.0804 | 4 | 30 | 30.08 | — | 50 |
| C | 0.0751 | 0.0958 | 0.0818 | 0.0958 | 4 | 30 | 30.10 | — | 50 |
| D | 0.0922 | 0.1188 | 0.1043 | 0.1188 | 4 | 30 | 30.12 | — | 50 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.1367 | 0.1511 | 0.1411 | 0.1511 | 4 | 30 | 30.15 | — | 50 |
| B | 0.1161 | 0.1310 | 0.1239 | 0.1310 | 4 | 30 | 30.13 | — | 50 |
| C | 0.1340 | 0.1497 | 0.1417 | 0.1497 | 4 | 30 | 30.15 | — | 50 |
| D | 0.1385 | 0.1539 | 0.1457 | 0.1539 | 4 | 30 | 30.15 | — | 50 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.2390 | 0.2553 | 0.2476 | 0.2553 | 4 | 30 | 30.26 | — | 50 |
| B | 0.2284 | 0.2419 | 0.2297 | 0.2419 | 4 | 30 | 30.24 | — | 50 |
| C | 0.2383 | 0.2556 | 0.2447 | 0.2556 | 4 | 30 | 30.26 | — | 50 |
| D | 0.2410 | 0.2588 | 0.2473 | 0.2588 | 4 | 30 | 30.26 | — | 50 |
| Dinosaur NM | | | | | | | | | |
| A | 0.6620 | 0.6864 | 0.6696 | 0.6864 | 4 | 30 | 30.69 | — | 50 |
| B | 0.5057 | 0.5285 | 0.5279 | 0.5285 | 4 | 30 | 30.53 | — | 50 |
| C | 0.6754 | 0.7265 | 0.7090 | 0.7265 | 4 | 30 | 30.73 | — | 50 |
| D | 0.6931 | 0.7444 | 0.7200 | 0.7444 | 4 | 30 | 30.74 | — | 50 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 43.6950 | 50.4990 | 49.2570 | 50.4990 | 17 | 30 | 80.50 | — | 50 |
| B | 43.6950 | 50.4950 | 49.2510 | 50.4950 | 17 | 30 | 80.50 | — | 50 |
| C | 43.6980 | 50.5000 | 49.2580 | 50.5000 | 17 | 30 | 80.50 | — | 50 |
| D | 43.6980 | 50.5010 | 49.2580 | 50.5010 | 17 | 30 | 80.50 | — | 50 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The annual PM$_{10}$ background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2006 data).

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020570

**Appendix F – Air Quality Impacts**

### Table F-27. Maximum Predicted 24-Hour PM$_{2.5}$ Impacts from WRFO and Cumulative Sources

Pollutant: PM$_{2.5}$  
Averaging Time: 24-Hour

PSD Increments:  
Class I Area — 2 µg/m$^3$  
Class II Area (Non-Sensitive) — 9 µg/m$^3$

| Area and Alternative | Annual 8th-High Modeled Concentration at Any Receptor | | | 3-Year Average of Annual Max. Modeled 8th-High Conc. [2] (µg/m$^3$) | PSD Increment (µg/m$^3$) | Back-ground Conc. [1] (µg/m$^3$) | High 8th High Total Conc. (µg/m$^3$) | NAAQS (µg/m$^3$) | CAAQS (µg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 (µg/m$^3$) | 2002 (µg/m$^3$) | 2003 (µg/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.2261 | 0.1231 | 0.1176 | 0.1476 | 2 | 24 | 24.15 | 35 | --- |
| B | 0.2437 | 0.1362 | 0.1071 | 0.1550 | 2 | 24 | 24.16 | 35 | --- |
| C | 0.2703 | 0.1621 | 0.1213 | 0.1836 | 2 | 24 | 24.18 | 35 | --- |
| D | 0.2772 | 0.1664 | 0.1226 | 0.1887 | 2 | 24 | 24.19 | 35 | --- |
| Eagles Nest WA | | | | | | | | | |
| A | 0.2390 | 0.3657 | 0.2274 | 0.2748 | 2 | 24 | 24.27 | 35 | --- |
| B | 0.2222 | 0.3237 | 0.2126 | 0.2522 | 2 | 24 | 24.25 | 35 | --- |
| C | 0.2630 | 0.3878 | 0.2447 | 0.2969 | 2 | 24 | 24.30 | 35 | --- |
| D | 0.2707 | 0.4019 | 0.2567 | 0.3072 | 2 | 24 | 24.31 | 35 | --- |
| Flat Tops WA | | | | | | | | | |
| A | 0.7120 | 0.8238 | 0.8184 | 0.7847 | 2 | 24 | 24.78 | 35 | --- |
| B | 0.7335 | 0.7864 | 0.8198 | 0.7760 | 2 | 24 | 24.78 | 35 | --- |
| C | 0.7809 | 0.8925 | 0.8387 | 0.8297 | 2 | 24 | 24.83 | 35 | --- |
| D | 0.7600 | 0.8956 | 0.8401 | 0.8319 | 2 | 24 | 24.83 | 35 | --- |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.5765 | 0.7848 | 0.6974 | 0.6862 | 2 | 24 | 24.69 | 35 | --- |
| B | 0.2643 | 0.3329 | 0.2697 | 0.2855 | 2 | 24 | 24.29 | 35 | --- |
| C | 0.3260 | 0.3945 | 0.3132 | 0.3437 | 2 | 24 | 24.34 | 35 | --- |
| D | 0.3650 | 0.4246 | 0.3406 | 0.3689 | 2 | 24 | 24.37 | 35 | --- |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.3740 | 0.5635 | 0.4144 | 0.4470 | 2 | 24 | 24.45 | 35 | --- |
| B | 0.3718 | 0.5235 | 0.4094 | 0.4341 | 2 | 24 | 24.43 | 35 | --- |
| C | 0.4138 | 0.6190 | 0.4531 | 0.4911 | 2 | 24 | 24.49 | 35 | --- |
| D | 0.4195 | 0.6205 | 0.4620 | 0.5001 | 2 | 24 | 24.50 | 35 | --- |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.3657 | 0.3429 | 0.3175 | 0.3391 | 2 | 24 | 24.34 | 35 | --- |
| B | 0.3556 | 0.3706 | 0.3166 | 0.3384 | 2 | 24 | 24.34 | 35 | --- |
| C | 0.4330 | 0.4333 | 0.3719 | 0.4042 | 2 | 24 | 24.40 | 35 | --- |
| D | 0.4491 | 0.4427 | 0.3740 | 0.4148 | 2 | 24 | 24.41 | 35 | --- |
| Dinosaur NM | | | | | | | | | |
| A | 1.5872 | 1.5269 | 1.5101 | 1.5055 | 2 | 24 | 25.51 | 35 | --- |
| B | 1.6076 | 1.5498 | 1.4835 | 1.5326 | 2 | 24 | 25.53 | 35 | --- |
| C | 1.6767 | 1.6194 | 1.6803 | 1.6390 | 2 | 24 | 25.64 | 35 | --- |
| D | 1.6867 | 1.6280 | 1.7090 | 1.6548 | 2 | 24 | 25.65 | 35 | --- |
| **Class II Areas (Gridded Receptors)[3]** | | | | | | | | | |
| A | 30.8530 | 33.0970 | 50.5820 | 38.1773 | 9 | 24 | 62.18 | 35 | --- |
| B | 30.9450 | 33.0980 | 50.5820 | 38.2083 | 9 | 24 | 62.21 | 35 | --- |
| C | 31.0810 | 33.1040 | 50.5820 | 38.2557 | 9 | 24 | 62.26 | 35 | --- |
| D | 31.1060 | 33.1030 | 50.5820 | 38.2637 | 9 | 24 | 62.26 | 35 | --- |

[1] The 24-hour PM$_{2.5}$ background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2005 data).

[2] This is the three-year average of the annual modeled 8th-highest concentration within the area, as determined on a receptor-specific basis. The three-year average in this column is less than the average of the three annual 8th high modeled concentrations when the locations of the annual 8th high receptors vary from one year to another.

[3] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

**Table F-28.   Maximum Predicted Annual PM$_{2.5}$ Impacts from WRFO and Cumulative Sources**

Pollutant:       PM$_{2.5}$          PSD Increments:

Averaging Time: Annual             Class I Area                    1    $\mu g/m^3$

                                    Class II Area (Non-Sensitive)   4    $\mu g/m^3$

| Area and Alternative | Modeled Concentration | | | Max. Modeled 3 year Average Conc. ($\mu g/m^3$) | PSD Increment ($\mu g/m^3$) | Back-ground Conc. [1] ($\mu g/m^3$) | Max. Total 3 year Average Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 ($\mu g/m^3$) | 2002 ($\mu g/m^3$) | 2003 ($\mu g/m^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0151 | 0.0160 | 0.0139 | 0.0150 | 1 | 9 | 9.01 | 15 | --- |
| B | 0.0158 | 0.0157 | 0.0134 | 0.0150 | 1 | 9 | 9.01 | 15 | --- |
| C | 0.0181 | 0.0173 | 0.0148 | 0.0167 | 1 | 9 | 9.02 | 15 | --- |
| D | 0.0186 | 0.0175 | 0.0149 | 0.0170 | 1 | 9 | 9.02 | 15 | --- |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0573 | 0.0752 | 0.0600 | 0.0642 | 1 | 9 | 9.06 | 15 | --- |
| B | 0.0456 | 0.0608 | 0.0504 | 0.0523 | 1 | 9 | 9.05 | 15 | --- |
| C | 0.0528 | 0.0713 | 0.0586 | 0.0609 | 1 | 9 | 9.06 | 15 | --- |
| D | 0.0568 | 0.0759 | 0.0625 | 0.0650 | 1 | 9 | 9.07 | 15 | --- |
| Flat Tops WA | | | | | | | | | |
| A | 0.1603 | 0.1818 | 0.1796 | 0.1739 | 1 | 9 | 9.17 | 15 | --- |
| B | 0.1426 | 0.1640 | 0.1552 | 0.1539 | 1 | 9 | 9.15 | 15 | --- |
| C | 0.1585 | 0.1828 | 0.1735 | 0.1716 | 1 | 9 | 9.17 | 15 | --- |
| D | 0.1646 | 0.1890 | 0.1813 | 0.1783 | 1 | 9 | 9.18 | 15 | --- |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.1131 | 0.1454 | 0.1509 | 0.1365 | 1 | 9 | 9.14 | 15 | --- |
| B | 0.0458 | 0.0585 | 0.0478 | 0.0507 | 1 | 9 | 9.05 | 15 | --- |
| C | 0.0532 | 0.0674 | 0.0552 | 0.0586 | 1 | 9 | 9.06 | 15 | --- |
| D | 0.0619 | 0.0787 | 0.0656 | 0.0687 | 1 | 9 | 9.07 | 15 | --- |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.1004 | 0.1126 | 0.1050 | 0.1060 | 1 | 9 | 9.11 | 15 | --- |
| B | 0.0936 | 0.1062 | 0.1004 | 0.1000 | 1 | 9 | 9.10 | 15 | --- |
| C | 0.1038 | 0.1175 | 0.1110 | 0.1108 | 1 | 9 | 9.11 | 15 | --- |
| D | 0.1071 | 0.1206 | 0.1139 | 0.1139 | 1 | 9 | 9.11 | 15 | --- |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0670 | 0.0809 | 0.0732 | 0.0737 | 1 | 9 | 9.07 | 15 | --- |
| B | 0.0646 | 0.0778 | 0.0686 | 0.0703 | 1 | 9 | 9.07 | 15 | --- |
| C | 0.0704 | 0.0863 | 0.0760 | 0.0776 | 1 | 9 | 9.08 | 15 | --- |
| D | 0.0723 | 0.0883 | 0.0774 | 0.0794 | 1 | 9 | 9.08 | 15 | --- |
| Dinosaur NM | | | | | | | | | |
| A | 0.3859 | 0.4118 | 0.4086 | 0.4021 | 1 | 9 | 9.40 | 15 | --- |
| B | 0.3559 | 0.3881 | 0.3862 | 0.3767 | 1 | 9 | 9.38 | 15 | --- |
| C | 0.4188 | 0.4541 | 0.4433 | 0.4387 | 1 | 9 | 9.44 | 15 | --- |
| D | 0.4290 | 0.4647 | 0.4518 | 0.4485 | 1 | 9 | 9.45 | 15 | --- |
| **Class II Areas (Gridded Receptors)[2]** | | | | | | | | | |
| A | 7.7334 | 9.2117 | 9.0126 | 8.6526 | 4 | 9 | 17.65 | 15 | --- |
| B | 7.7342 | 9.2109 | 9.0118 | 8.6523 | 4 | 9 | 17.65 | 15 | --- |
| C | 7.7366 | 9.2135 | 9.0148 | 8.6550 | 4 | 9 | 17.65 | 15 | --- |
| D | 7.7368 | 9.2135 | 9.0149 | 8.6551 | 4 | 9 | 17.66 | 15 | --- |

[1] The annual PM$_{2.5}$ background concentration was recommended by CDPHE and is based on the monitor at Rifle, Garfield County (2006 data).

[2] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020572

**Table F-29.  Maximum Predicted 1-Hour SO$_2$ Impacts from WRFO and Cumulative Sources**

Pollutant:  SO$_2$        PSD Increments:
Averaging Time:  1-hour        Class I Area        N/A    µg/m$^3$
                              Class II Area (Non-Sensitive)    N/A    µg/m$^3$

| Area and Alternative | 2001 (µg/m³) | 2002 (µg/m³) | 2003 (µg/m³) | Max. Modeled 3-Year Average 4th High Daily 1-hour Conc. (µg/m³) | PSD Increment (µg/m³) | Back-ground Conc.[2] (µg/m³) | Max. Total Conc. (µg/m³) | NAAQS (µg/m³) | CAAQS (µg/m³) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0201 | 0.0072 | 0.0144 | 0.0130 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| B | 0.0210 | 0.0073 | 0.0148 | 0.0133 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| C | 0.0215 | 0.0081 | 0.0152 | 0.0140 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| D | 0.0221 | 0.0088 | 0.0159 | 0.0146 | N/A | 80.82 | 80.83 | 195.54 | N/A |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0338 | 0.0347 | 0.0269 | 0.0306 | N/A | 80.82 | 80.85 | 195.54 | N/A |
| B | 0.0340 | 0.0347 | 0.0275 | 0.0310 | N/A | 80.82 | 80.85 | 195.54 | N/A |
| C | 0.0358 | 0.0347 | 0.0286 | 0.0316 | N/A | 80.82 | 80.85 | 195.54 | N/A |
| D | 0.0373 | 0.0347 | 0.0304 | 0.0328 | N/A | 80.82 | 80.85 | 195.54 | N/A |
| Flat Tops WA | | | | | | | | | N/A |
| A | 0.0924 | 0.0779 | 0.0864 | 0.0817 | N/A | 80.82 | 80.90 | 195.54 | N/A |
| B | 0.0936 | 0.0786 | 0.0907 | 0.0836 | N/A | 80.82 | 80.90 | 195.54 | N/A |
| C | 0.0947 | 0.0796 | 0.0966 | 0.0861 | N/A | 80.82 | 80.91 | 195.54 | N/A |
| D | 0.0963 | 0.0824 | 0.1027 | 0.0911 | N/A | 80.82 | 80.91 | 195.54 | N/A |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0513 | 0.0450 | 0.0427 | 0.0424 | N/A | 80.82 | 80.86 | 195.54 | N/A |
| B | 0.0531 | 0.0456 | 0.0444 | 0.0438 | N/A | 80.82 | 80.86 | 195.54 | N/A |
| C | 0.0553 | 0.0477 | 0.0473 | 0.0456 | N/A | 80.82 | 80.87 | 195.54 | N/A |
| D | 0.0589 | 0.0502 | 0.0504 | 0.0476 | N/A | 80.82 | 80.87 | 195.54 | N/A |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0325 | 0.0408 | 0.0391 | 0.0374 | N/A | 80.82 | 80.86 | 195.54 | N/A |
| B | 0.0333 | 0.0421 | 0.0398 | 0.0383 | N/A | 80.82 | 80.86 | 195.54 | N/A |
| C | 0.0342 | 0.0437 | 0.0404 | 0.0393 | N/A | 80.82 | 80.86 | 195.54 | N/A |
| D | 0.0353 | 0.0454 | 0.0411 | 0.0403 | N/A | 80.82 | 80.86 | 195.54 | N/A |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0682 | 0.0549 | 0.0989 | 0.0732 | N/A | 80.82 | 80.89 | 195.54 | N/A |
| B | 0.0692 | 0.0566 | 0.0997 | 0.0746 | N/A | 80.82 | 80.89 | 195.54 | N/A |
| C | 0.0710 | 0.0576 | 0.1013 | 0.0762 | N/A | 80.82 | 80.90 | 195.54 | N/A |
| D | 0.0729 | 0.0588 | 0.1028 | 0.0774 | N/A | 80.82 | 80.90 | 195.54 | N/A |
| Dinosaur NM | | | | | | | | | |
| A | 0.3042 | 0.4520 | 0.5368 | 0.4135 | N/A | 80.82 | 81.23 | 195.54 | N/A |
| B | 0.3073 | 0.4525 | 0.5393 | 0.4170 | N/A | 80.82 | 81.24 | 195.54 | N/A |
| C | 0.3117 | 0.4531 | 0.5426 | 0.4219 | N/A | 80.82 | 81.24 | 195.54 | N/A |
| D | 0.3156 | 0.4537 | 0.5448 | 0.4262 | N/A | 80.82 | 81.25 | 195.54 | N/A |
| **Class II Areas (Gridded Receptors)[3]** | | | | | | | | | |
| A | 23.1150 | 23.4070 | 27.0410 | 24.5210 | N/A | 80.82 | 105.34 | 195.54 | N/A |
| B | 23.1270 | 23.4170 | 27.0410 | 24.5283 | N/A | 80.82 | 105.35 | 195.54 | N/A |
| C | 23.1390 | 23.4380 | 27.0420 | 24.5397 | N/A | 80.82 | 105.36 | 195.54 | N/A |
| D | 23.1670 | 23.4640 | 27.0420 | 24.5577 | N/A | 80.82 | 105.38 | 195.54 | N/A |

[1] Maximum 99th percentile daily maximum 1-hour average SO2 values are reported for "Modeled Concentration."
[2] The background concentration data is based on the 99th percentile of year 2006 1-hour SO2 data from a monitor (ID 08-031-0002) located on Broadway Street, Denver, Colorado in Denver County.
[3] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

Appendix F – Air Quality Impacts

### Table F-30. Maximum Predicted 3-Hour SO$_2$ Impacts from WRFO and Cumulative Sources

Pollutant: SO$_2$  
Averaging Time: 3-Hour

PSD Increments:  
Class I Area      25   $\mu$g/m$^3$  
Class II Area (Non-Sensitive)   512   $\mu$g/m$^3$

| Area and Alternative | Modeled Concentration 2001 ($\mu$g/m$^3$) | 2002 ($\mu$g/m$^3$) | 2003 ($\mu$g/m$^3$) | Max. High 2nd High Modeled Conc. ($\mu$g/m$^3$) | PSD Increment [1] ($\mu$g/m$^3$) | Back-ground Conc. [2] ($\mu$g/m$^3$) | Max. High 2nd High Total Conc. ($\mu$g/m$^3$) | NAAQS ($\mu$g/m$^3$) | CAAQS ($\mu$g/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0290 | 0.0081 | 0.0168 | 0.0290 | 25 | 66.6 | 66.63 | 1300 | 700 |
| B | 0.0300 | 0.0085 | 0.0175 | 0.0300 | 25 | 66.6 | 66.63 | 1300 | 700 |
| C | 0.0312 | 0.0090 | 0.0183 | 0.0312 | 25 | 66.6 | 66.63 | 1300 | 700 |
| D | 0.0324 | 0.0095 | 0.0192 | 0.0324 | 25 | 66.6 | 66.63 | 1300 | 700 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0311 | 0.0235 | 0.0219 | 0.0311 | 25 | 66.6 | 66.63 | 1300 | 700 |
| B | 0.0314 | 0.0242 | 0.0230 | 0.0314 | 25 | 66.6 | 66.63 | 1300 | 700 |
| C | 0.0317 | 0.0250 | 0.0246 | 0.0317 | 25 | 66.6 | 66.63 | 1300 | 700 |
| D | 0.0322 | 0.0253 | 0.0260 | 0.0322 | 25 | 66.6 | 66.63 | 1300 | 700 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0778 | 0.0762 | 0.0905 | 0.0905 | 25 | 66.6 | 66.69 | 1300 | 700 |
| B | 0.0778 | 0.0762 | 0.0908 | 0.0908 | 25 | 66.6 | 66.69 | 1300 | 700 |
| C | 0.0778 | 0.0762 | 0.0911 | 0.0911 | 25 | 66.6 | 66.69 | 1300 | 700 |
| D | 0.0778 | 0.0763 | 0.0914 | 0.0914 | 25 | 66.6 | 66.69 | 1300 | 700 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0409 | 0.0353 | 0.0409 | 0.0409 | 25 | 66.6 | 66.64 | 1300 | 700 |
| B | 0.0426 | 0.0376 | 0.0413 | 0.0426 | 25 | 66.6 | 66.64 | 1300 | 700 |
| C | 0.0453 | 0.0398 | 0.0420 | 0.0453 | 25 | 66.6 | 66.65 | 1300 | 700 |
| D | 0.0478 | 0.0429 | 0.0441 | 0.0478 | 25 | 66.6 | 66.65 | 1300 | 700 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0321 | 0.0434 | 0.0330 | 0.0434 | 25 | 66.6 | 66.64 | 1300 | 700 |
| B | 0.0325 | 0.0440 | 0.0343 | 0.0440 | 25 | 66.6 | 66.64 | 1300 | 700 |
| C | 0.0330 | 0.0447 | 0.0362 | 0.0447 | 25 | 66.6 | 66.64 | 1300 | 700 |
| D | 0.0335 | 0.0456 | 0.0378 | 0.0456 | 25 | 66.6 | 66.65 | 1300 | 700 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0774 | 0.0538 | 0.1091 | 0.1091 | 25 | 66.6 | 66.71 | 1300 | 700 |
| B | 0.0792 | 0.0562 | 0.1107 | 0.1107 | 25 | 66.6 | 66.71 | 1300 | 700 |
| C | 0.0817 | 0.0588 | 0.1124 | 0.1124 | 25 | 66.6 | 66.71 | 1300 | 700 |
| D | 0.0839 | 0.0613 | 0.1142 | 0.1142 | 25 | 66.6 | 66.71 | 1300 | 700 |
| Dinosaur NM | | | | | | | | | |
| A | 0.3242 | 0.3812 | 0.2890 | 0.3812 | 25 | 66.6 | 66.98 | 1300 | 700 |
| B | 0.3255 | 0.3833 | 0.2913 | 0.3833 | 25 | 66.6 | 66.98 | 1300 | 700 |
| C | 0.3275 | 0.3856 | 0.2944 | 0.3856 | 25 | 66.6 | 66.99 | 1300 | 700 |
| D | 0.3294 | 0.3885 | 0.2975 | 0.3885 | 25 | 66.6 | 66.99 | 1300 | 700 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 13.3410 | 15.6090 | 14.5700 | 15.6090 | 512 | 66.6 | 82.21 | 1300 | 700 |
| B | 13.3530 | 15.6210 | 14.5770 | 15.6210 | 512 | 66.6 | 82.22 | 1300 | 700 |
| C | 13.3840 | 15.6410 | 14.5800 | 15.6410 | 512 | 66.6 | 82.24 | 1300 | 700 |
| D | 13.4170 | 15.6530 | 14.5880 | 15.6530 | 512 | 66.6 | 82.25 | 1300 | 700 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The 3-hour SO$_2$ background concentration was recommended by CDPHE and is based on the monitor at Colorado College, Colorado Springs, El Paso County. (2005-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

**Appendix F – Air Quality Impacts**

### Table F-31. Maximum Predicted 24-Hour SO$_2$ Impacts from WRFO and Cumulative Sources

**Pollutant:** SO$_2$      **PSD Increments:**

**Averaging Time:** 24-Hour     **Class I Area**      5   μg/m$^3$

                           **Class II Area (Non-Sensitive)**   91   μg/m$^3$

| Area and Alternative | Modeled Concentration 2001 (μg/m$^3$) | 2002 (μg/m$^3$) | 2003 (μg/m$^3$) | Max. High 2nd High Modeled Conc. (μg/m$^3$) | PSD Increment [1] (μg/m$^3$) | Back-ground Conc. [2] (μg/m$^3$) | Max High 2nd High Total Conc. (μg/m$^3$) | NAAQS (μg/m$^3$) | CAAQS (μg/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arohes NP | | | | | | | | | |
| A | 0.0104 | 0.0031 | 0.0047 | 0.0104 | 5 | 34.6 | 34.61 | 365 | 365 |
| B | 0.0108 | 0.0032 | 0.0050 | 0.0108 | 5 | 34.6 | 34.61 | 365 | 365 |
| C | 0.0113 | 0.0035 | 0.0053 | 0.0113 | 5 | 34.6 | 34.61 | 365 | 365 |
| D | 0.0119 | 0.0037 | 0.0057 | 0.0119 | 5 | 34.6 | 34.61 | 365 | 365 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0083 | 0.0073 | 0.0072 | 0.0083 | 5 | 34.6 | 34.61 | 365 | 365 |
| B | 0.0088 | 0.0074 | 0.0075 | 0.0088 | 5 | 34.6 | 34.61 | 365 | 365 |
| C | 0.0097 | 0.0077 | 0.0079 | 0.0097 | 5 | 34.6 | 34.61 | 365 | 365 |
| D | 0.0102 | 0.0079 | 0.0084 | 0.0102 | 5 | 34.6 | 34.61 | 365 | 365 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0215 | 0.0190 | 0.0233 | 0.0233 | 5 | 34.6 | 34.62 | 365 | 365 |
| B | 0.0217 | 0.0194 | 0.0238 | 0.0238 | 5 | 34.6 | 34.62 | 365 | 365 |
| C | 0.0219 | 0.0200 | 0.0245 | 0.0245 | 5 | 34.6 | 34.62 | 365 | 365 |
| D | 0.0221 | 0.0207 | 0.0250 | 0.0250 | 5 | 34.6 | 34.62 | 365 | 365 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0124 | 0.0095 | 0.0092 | 0.0124 | 5 | 34.6 | 34.61 | 365 | 365 |
| B | 0.0130 | 0.0097 | 0.0094 | 0.0130 | 5 | 34.6 | 34.61 | 365 | 365 |
| C | 0.0138 | 0.0101 | 0.0099 | 0.0138 | 5 | 34.6 | 34.61 | 365 | 365 |
| D | 0.0147 | 0.0108 | 0.0105 | 0.0147 | 5 | 34.6 | 34.61 | 365 | 365 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0094 | 0.0122 | 0.0111 | 0.0122 | 5 | 34.6 | 34.61 | 365 | 365 |
| B | 0.0096 | 0.0125 | 0.0114 | 0.0125 | 5 | 34.6 | 34.61 | 365 | 365 |
| C | 0.0098 | 0.0129 | 0.0118 | 0.0129 | 5 | 34.6 | 34.61 | 365 | 365 |
| D | 0.0100 | 0.0134 | 0.0123 | 0.0134 | 5 | 34.6 | 34.61 | 365 | 365 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0193 | 0.0161 | 0.0218 | 0.0218 | 5 | 34.6 | 34.62 | 365 | 365 |
| B | 0.0195 | 0.0171 | 0.0222 | 0.0222 | 5 | 34.6 | 34.62 | 365 | 365 |
| C | 0.0203 | 0.0183 | 0.0226 | 0.0226 | 5 | 34.6 | 34.62 | 365 | 365 |
| D | 0.0217 | 0.0193 | 0.0231 | 0.0231 | 5 | 34.6 | 34.62 | 365 | 365 |
| Dinosaur NM | | | | | | | | | |
| A | 0.0567 | 0.0707 | 0.0719 | 0.0719 | 5 | 34.6 | 34.67 | 365 | 365 |
| B | 0.0570 | 0.0712 | 0.0732 | 0.0732 | 5 | 34.6 | 34.67 | 365 | 365 |
| C | 0.0573 | 0.0719 | 0.0747 | 0.0747 | 5 | 34.6 | 34.67 | 365 | 365 |
| D | 0.0576 | 0.0726 | 0.0765 | 0.0765 | 5 | 34.6 | 34.68 | 365 | 365 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 2.8502 | 3.2951 | 2.7804 | 3.2951 | 91 | 34.6 | 37.90 | 365 | 365 |
| B | 2.8545 | 3.3035 | 2.7834 | 3.3035 | 91 | 34.6 | 37.90 | 365 | 365 |
| C | 2.8637 | 3.3157 | 2.7888 | 3.3157 | 91 | 34.6 | 37.92 | 365 | 365 |
| D | 2.8703 | 3.3266 | 2.7936 | 3.3266 | 91 | 34.6 | 37.93 | 365 | 365 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The 24-hour SO$_2$ background concentration was recommended by CDPHE and is based on the monitor at Colorado College, Colorado Springs, El Paso County. (2005-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

**Table F-32.   Maximum Predicted Annual SO$_2$ Impacts from WRFO and Cumulative Sources**

**Pollutant:**  SO$_2$  **PSD Increments:**

**Averaging Time:** Annual

Class I Area  2  $\mu$g/m$^3$

Class II Area (Non-Sensitive)  20  $\mu$g/m$^3$

| Area and Alternative | Modeled Concentration | | | Max. Modeled Conc. ($\mu$g/m$^3$) | PSD Increment [1] ($\mu$g/m$^3$) | Back-ground Conc. [2] ($\mu$g/m$^3$) | Max. Total Conc. ($\mu$g/m$^3$) | NAAQS ($\mu$g/m$^3$) | CAAQS ($\mu$g/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 ($\mu$g/m$^3$) | 2002 ($\mu$g/m$^3$) | 2003 ($\mu$g/m$^3$) | | | | | | |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 0.0003 | 0.0002 | 0.0002 | 0.0003 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0003 | 0.0002 | 0.0002 | 0.0003 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0003 | 0.0002 | 0.0002 | 0.0003 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0003 | 0.0002 | 0.0002 | 0.0003 | 2 | 5.3 | 5.30 | 80 | 80 |
| Eagles Nest WA | | | | | | | | | |
| A | 0.0008 | 0.0009 | 0.0008 | 0.0009 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0009 | 0.0010 | 0.0009 | 0.0010 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0009 | 0.0010 | 0.0009 | 0.0010 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0010 | 0.0011 | 0.0010 | 0.0011 | 2 | 5.3 | 5.30 | 80 | 80 |
| Flat Tops WA | | | | | | | | | |
| A | 0.0028 | 0.0031 | 0.0032 | 0.0032 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0029 | 0.0032 | 0.0033 | 0.0033 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0032 | 0.0034 | 0.0036 | 0.0036 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0034 | 0.0037 | 0.0039 | 0.0039 | 2 | 5.3 | 5.30 | 80 | 80 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 0.0009 | 0.0010 | 0.0009 | 0.0010 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0009 | 0.0010 | 0.0009 | 0.0010 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0010 | 0.0011 | 0.0009 | 0.0011 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0011 | 0.0012 | 0.0010 | 0.0012 | 2 | 5.3 | 5.30 | 80 | 80 |
| Mount Zirkel WA | | | | | | | | | |
| A | 0.0014 | 0.0015 | 0.0015 | 0.0015 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0015 | 0.0015 | 0.0015 | 0.0015 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0016 | 0.0016 | 0.0016 | 0.0016 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0016 | 0.0016 | 0.0017 | 0.0017 | 2 | 5.3 | 5.30 | 80 | 80 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 0.0010 | 0.0011 | 0.0012 | 0.0012 | 2 | 5.3 | 5.30 | 80 | 80 |
| B | 0.0011 | 0.0011 | 0.0012 | 0.0012 | 2 | 5.3 | 5.30 | 80 | 80 |
| C | 0.0011 | 0.0012 | 0.0013 | 0.0013 | 2 | 5.3 | 5.30 | 80 | 80 |
| D | 0.0012 | 0.0012 | 0.0014 | 0.0014 | 2 | 5.3 | 5.30 | 80 | 80 |
| Dinosaur NM | | | | | | | | | |
| A | 0.0138 | 0.0122 | 0.0111 | 0.0138 | 2 | 5.3 | 5.31 | 80 | 80 |
| B | 0.0142 | 0.0126 | 0.0115 | 0.0142 | 2 | 5.3 | 5.31 | 80 | 80 |
| C | 0.0146 | 0.0130 | 0.0118 | 0.0146 | 2 | 5.3 | 5.31 | 80 | 80 |
| D | 0.0151 | 0.0135 | 0.0122 | 0.0151 | 2 | 5.3 | 5.32 | 80 | 80 |
| **Class II Areas (Gridded Receptors)[4]** | | | | | | | | | |
| A | 0.3473 | 0.5480 | 0.4963 | 0.5480 | 20 | 5.3 | 5.85 | 80 | 80 |
| B | 0.3489 | 0.5499 | 0.4982 | 0.5499 | 20 | 5.3 | 5.85 | 80 | 80 |
| C | 0.3515 | 0.5531 | 0.5014 | 0.5531 | 20 | 5.3 | 5.85 | 80 | 80 |
| D | 0.3544 | 0.5563 | 0.5047 | 0.5563 | 20 | 5.3 | 5.86 | 80 | 80 |

[1]  Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2]  The 24-hour SO$_2$ background concentration was recommended by CDPHE and is based on the monitor at Colorado College, Colorado Springs, El Paso County.  (2005-2006 data)

[3]  For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4]  Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020576

**Appendix F – Air Quality Impacts**

### Table F-33. Maximum Predicted 1-Hour CO Impacts from WRFO and Cumulative Sources

**Pollutant:** CO  
**Averaging Time:** 1-Hour  

**PSD Increments:**  
Class I Area — NA  
Class II Area (Non-Sensitive) — NA

| Area and Alternative | Modeled Concentration 2001 (µg/m³) | 2002 (µg/m³) | 2003 (µg/m³) | Max. High 2nd High Modeled Conc. (µg/m³) | PSD Increment [1] (µg/m³) | Back-ground Conc. [2] (µg/m³) | Max. High 2nd High Total Conc. (µg/m³) | NAAQS (µg/m³) | CAAQS (µg/m³) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| *Arches NP* | | | | | | | | | |
| A | 2.4458 | 1.8439 | 3.4685 | 3.4685 | NA | 4656.4 | 4659.87 | 40000 | 40000 |
| B | 2.9904 | 1.8967 | 4.7319 | 4.7319 | NA | 4656.4 | 4661.13 | 40000 | 40000 |
| C | 4.4239 | 1.9540 | 7.0914 | 7.0914 | NA | 4656.4 | 4663.49 | 40000 | 40000 |
| D | 4.5258 | 1.9383 | 7.4483 | 7.4483 | NA | 4656.4 | 4663.85 | 40000 | 40000 |
| *Eagles Nest WA* | | | | | | | | | |
| A | 4.8265 | 3.6702 | 3.3271 | 4.8265 | NA | 4656.4 | 4661.23 | 40000 | 40000 |
| B | 4.6295 | 3.8262 | 4.6217 | 4.6295 | NA | 4656.4 | 4661.03 | 40000 | 40000 |
| C | 5.9409 | 5.3621 | 6.7231 | 6.7231 | NA | 4656.4 | 4663.12 | 40000 | 40000 |
| D | 7.6206 | 5.7840 | 7.3883 | 7.6206 | NA | 4656.4 | 4664.02 | 40000 | 40000 |
| *Flat Tops WA* | | | | | | | | | |
| A | 5.1544 | 6.7590 | 6.6997 | 6.7590 | NA | 4656.4 | 4663.16 | 40000 | 40000 |
| B | 7.2256 | 7.2282 | 8.9508 | 8.9508 | NA | 4656.4 | 4665.35 | 40000 | 40000 |
| C | 9.1364 | 10.0160 | 10.4060 | 10.4060 | NA | 4656.4 | 4666.81 | 40000 | 40000 |
| D | 9.2746 | 10.7340 | 11.7700 | 11.7700 | NA | 4656.4 | 4668.17 | 40000 | 40000 |
| *Maroon Bells-Snowmass WA* | | | | | | | | | |
| A | 7.0500 | 8.0009 | 6.5311 | 8.0009 | NA | 4656.4 | 4664.40 | 40000 | 40000 |
| B | 8.5636 | 9.9922 | 6.0471 | 9.9922 | NA | 4656.4 | 4666.39 | 40000 | 40000 |
| C | 11.8880 | 13.9600 | 8.4520 | 13.9600 | NA | 4656.4 | 4670.36 | 40000 | 40000 |
| D | 13.3300 | 14.8370 | 9.3500 | 14.8370 | NA | 4656.4 | 4671.24 | 40000 | 40000 |
| *Mount Zirkel WA* | | | | | | | | | |
| A | 3.4717 | 4.5173 | 6.0133 | 6.0133 | NA | 4656.4 | 4662.41 | 40000 | 40000 |
| B | 3.4717 | 4.8636 | 6.1067 | 6.1067 | NA | 4656.4 | 4662.51 | 40000 | 40000 |
| C | 4.2959 | 6.0585 | 6.3695 | 6.3695 | NA | 4656.4 | 4662.77 | 40000 | 40000 |
| D | 4.3764 | 6.2751 | 6.4613 | 6.4613 | NA | 4656.4 | 4662.86 | 40000 | 40000 |
| **Sensitive Class II Areas [3]** | | | | | | | | | |
| *Colorado NM* | | | | | | | | | |
| A | 4.4010 | 4.5012 | 5.9566 | 5.9566 | NA | 4656.4 | 4662.36 | 40000 | 40000 |
| B | 4.5826 | 4.5167 | 8.0633 | 8.0633 | NA | 4656.4 | 4664.46 | 40000 | 40000 |
| C | 6.2986 | 6.0759 | 11.5760 | 11.5760 | NA | 4656.4 | 4667.98 | 40000 | 40000 |
| D | 6.9642 | 6.5382 | 12.3320 | 12.3320 | NA | 4656.4 | 4668.73 | 40000 | 40000 |
| *Dinosaur NM* | | | | | | | | | |
| A | 9.9114 | 14.3610 | 20.9520 | 20.9520 | NA | 4656.4 | 4677.35 | 40000 | 40000 |
| B | 11.6210 | 14.6110 | 20.9520 | 20.9520 | NA | 4656.4 | 4677.35 | 40000 | 40000 |
| C | 17.2030 | 15.3090 | 20.9550 | 20.9550 | NA | 4656.4 | 4677.36 | 40000 | 40000 |
| D | 18.1100 | 15.6230 | 20.9550 | 20.9550 | NA | 4656.4 | 4677.36 | 40000 | 40000 |
| **Class II Areas (Gridded Receptors) [4]** | | | | | | | | | |
| A | 1362.3000 | 710.1200 | 1067.6000 | 1362.3000 | NA | 4656.4 | 6018.70 | 40000 | 40000 |
| B | 1362.3000 | 710.3100 | 1067.9000 | 1362.3000 | NA | 4656.4 | 6018.70 | 40000 | 40000 |
| C | 1362.3000 | 710.6000 | 1068.0000 | 1362.3000 | NA | 4656.4 | 6018.70 | 40000 | 40000 |
| D | 1362.3000 | 710.6600 | 1067.9000 | 1362.3000 | NA | 4656.4 | 6018.70 | 40000 | 40000 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments. PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The 1-hour CO background concentration was recommended by CDPHE and is based on the monitor at Grand Junction, Mesa County. (average of -2004-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020577

Appendix F – Air Quality Impacts

### Table F-34.  Maximum Predicted 8-Hour CO Impacts from WRFO and Cumulative Sources

**Pollutant:** CO  
**Averaging Time:** 8-Hour  

**PSD Increments:**  
Class I Area             NA  
Class II Area (Non-Sensitive)  NA

| Area and Alternative | Modeled Concentration 2001 ($\mu g/m^3$) | Modeled Concentration 2002 ($\mu g/m^3$) | Modeled Concentration 2003 ($\mu g/m^3$) | Max. High 2nd High Modeled Conc. ($\mu g/m^3$) | PSD Increment [1] ($\mu g/m^3$) | Back-ground Conc. [2] ($\mu g/m^3$) | Max. High 2nd High Total Conc. ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|---|---|
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 1.5477 | 1.0514 | 1.0168 | 1.5477 | NA | 2328.2 | 2329.75 | 10000 | 10000 |
| B | 2.1677 | 1.1063 | 1.4053 | 2.1677 | NA | 2328.2 | 2330.37 | 10000 | 10000 |
| C | 2.9729 | 1.2007 | 2.0591 | 2.9729 | NA | 2328.2 | 2331.17 | 10000 | 10000 |
| D | 3.1368 | 1.2375 | 2.0411 | 3.1368 | NA | 2328.2 | 2331.34 | 10000 | 10000 |
| Eagles Nest WA | | | | | | | | | |
| A | 1.3515 | 1.7893 | 2.2977 | 2.2977 | NA | 2328.2 | 2330.50 | 10000 | 10000 |
| B | 1.5288 | 1.8289 | 2.6812 | 2.6812 | NA | 2328.2 | 2330.88 | 10000 | 10000 |
| C | 2.2086 | 2.4904 | 3.6545 | 3.6545 | NA | 2328.2 | 2331.85 | 10000 | 10000 |
| D | 2.2571 | 2.8387 | 3.9884 | 3.9884 | NA | 2328.2 | 2332.19 | 10000 | 10000 |
| Flat Tops WA | | | | | | | | | |
| A | 2.8709 | 2.9043 | 2.8199 | 2.9043 | NA | 2328.2 | 2331.10 | 10000 | 10000 |
| B | 3.0585 | 4.0237 | 3.5439 | 4.0237 | NA | 2328.2 | 2332.22 | 10000 | 10000 |
| C | 3.9921 | 5.6570 | 4.8696 | 5.6570 | NA | 2328.2 | 2333.86 | 10000 | 10000 |
| D | 4.5491 | 6.1565 | 5.2646 | 6.1565 | NA | 2328.2 | 2334.36 | 10000 | 10000 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 3.3825 | 3.1508 | 3.3374 | 3.3825 | NA | 2328.2 | 2331.58 | 10000 | 10000 |
| B | 3.4370 | 3.0305 | 3.1028 | 3.4370 | NA | 2328.2 | 2331.64 | 10000 | 10000 |
| C | 4.8275 | 4.0136 | 4.0392 | 4.8275 | NA | 2328.2 | 2333.03 | 10000 | 10000 |
| D | 5.3741 | 5.0938 | 5.0276 | 5.3741 | NA | 2328.2 | 2333.57 | 10000 | 10000 |
| Mount Zirkel WA | | | | | | | | | |
| A | 1.2801 | 2.2181 | 1.5108 | 2.2181 | NA | 2328.2 | 2330.42 | 10000 | 10000 |
| B | 1.6567 | 2.5639 | 2.0004 | 2.5639 | NA | 2328.2 | 2330.76 | 10000 | 10000 |
| C | 2.3251 | 3.4196 | 2.7016 | 3.4196 | NA | 2328.2 | 2331.62 | 10000 | 10000 |
| D | 2.4998 | 3.6592 | 2.8319 | 3.6592 | NA | 2328.2 | 2331.86 | 10000 | 10000 |
| **Sensitive Class II Areas** [3] | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 2.6298 | 2.2957 | 2.9218 | 2.9218 | NA | 2328.2 | 2331.12 | 10000 | 10000 |
| B | 2.7168 | 2.9858 | 3.6544 | 3.6544 | NA | 2328.2 | 2331.85 | 10000 | 10000 |
| C | 4.0661 | 4.3169 | 4.9734 | 4.9734 | NA | 2328.2 | 2333.17 | 10000 | 10000 |
| D | 4.2400 | 4.5480 | 5.2820 | 5.2820 | NA | 2328.2 | 2333.48 | 10000 | 10000 |
| Dinosaur NM | | | | | | | | | |
| A | 4.5543 | 4.0513 | 4.5764 | 4.5764 | NA | 2328.2 | 2332.78 | 10000 | 10000 |
| B | 6.1316 | 5.4233 | 6.3816 | 6.3816 | NA | 2328.2 | 2334.58 | 10000 | 10000 |
| C | 8.7515 | 7.5312 | 9.3317 | 9.3317 | NA | 2328.2 | 2337.53 | 10000 | 10000 |
| D | 9.1344 | 7.8305 | 9.6545 | 9.6545 | NA | 2328.2 | 2337.85 | 10000 | 10000 |
| **Class II Areas (Gridded Receptors)** [4] | | | | | | | | | |
| A | 182.4000 | 101.1100 | 135.0300 | 182.4000 | NA | 2328.2 | 2510.60 | 10000 | 10000 |
| B | 182.4100 | 101.2100 | 135.1500 | 182.4100 | NA | 2328.2 | 2510.61 | 10000 | 10000 |
| C | 182.4600 | 101.5300 | 135.3100 | 182.4600 | NA | 2328.2 | 2510.66 | 10000 | 10000 |
| D | 182.4600 | 101.5300 | 135.2900 | 182.4600 | NA | 2328.2 | 2510.66 | 10000 | 10000 |

[1] Background concentrations are not added to the modeled concentration when comparing to PSD increments.  PSD increment comparisons are for information only; they do not represent a regulatory increment consumption analysis.

[2] The 8-hour CO background concentration was recommended by CDPHE and is based on the monitor at Grand Junction, Mesa County. (average of -2004-2006 data)

[3] For sensitive Class II areas, PSD increment comparisons are based on Class I PSD increments.

[4] Near-field receptors excluded from high potential O&G development areas of WRFO and CRVFO.

BLM_0020578

**Table F-35.    Maximum Predicted Nitrogen Deposition from WRFO and Cumulative Sources**

**Air Quality Related Value:**    N Deposition

| Area and Alternative | Modeled Deposition | | | Maximum Modeled Deposition (kg/ha/yr) | DAT [1] (kg/ha/yr) | Background Deposition [2] (kg/ha/yr) | Total Deposition (kg/ha/yr) | Level of Concern (kg/ha/yr) |
|---|---|---|---|---|---|---|---|---|
| | 2001 (kg/ha/yr) | 2002 (kg/ha/yr) | 2003 (kg/ha/yr) | | | | | |
| **Class I Areas** | | | | | | | | |
| Arches NP | | | | | | | | |
| A | 0.0029 | 0.0017 | 0.0021 | 0.0029 | 0.005 | 1.9 | 1.90 | 3.0 |
| B | 0.0031 | 0.0018 | 0.0023 | 0.0031 | 0.005 | 1.9 | 1.90 | 3.0 |
| C | 0.0036 | 0.0019 | 0.0025 | 0.0036 | 0.005 | 1.9 | 1.90 | 3.0 |
| D | 0.0037 | 0.0019 | 0.0026 | 0.0037 | 0.005 | 1.9 | 1.90 | 3.0 |
| Eagles Nest WA | | | | | | | | |
| A | 0.0105 | 0.0110 | 0.0143 | 0.0143 | 0.005 | 1.5 | 1.51 | 3.0 |
| B | 0.0101 | 0.0110 | 0.0143 | 0.0143 | 0.005 | 1.5 | 1.51 | 3.0 |
| C | 0.0123 | 0.0134 | 0.0177 | 0.0177 | 0.005 | 1.5 | 1.52 | 3.0 |
| D | 0.0140 | 0.0150 | 0.0201 | 0.0201 | 0.005 | 1.5 | 1.52 | 3.0 |
| Flat Tops WA | | | | | | | | |
| A | 0.0405 | 0.0363 | 0.0459 | 0.0459 | 0.005 | 1.5 | 1.55 | 3.0 |
| B | 0.0406 | 0.0352 | 0.0453 | 0.0453 | 0.005 | 1.5 | 1.55 | 3.0 |
| C | 0.0513 | 0.0448 | 0.0568 | 0.0568 | 0.005 | 1.5 | 1.56 | 3.0 |
| D | 0.0575 | 0.0501 | 0.0636 | 0.0636 | 0.005 | 1.5 | 1.56 | 3.0 |
| Maroon Bells-Snowmass WA | | | | | | | | |
| A | 0.0237 | 0.0191 | 0.0248 | 0.0248 | 0.005 | 1.5 | 1.52 | 3.0 |
| B | 0.0211 | 0.0162 | 0.0216 | 0.0216 | 0.005 | 1.5 | 1.52 | 3.0 |
| C | 0.0247 | 0.0184 | 0.0250 | 0.0250 | 0.005 | 1.5 | 1.52 | 3.0 |
| D | 0.0307 | 0.0236 | 0.0313 | 0.0313 | 0.005 | 1.5 | 1.53 | 3.0 |
| Mount Zirkel WA | | | | | | | | |
| A | 0.0139 | 0.0135 | 0.0169 | 0.0169 | 0.005 | 2.7 | 2.72 | 3.0 |
| B | 0.0152 | 0.0144 | 0.0182 | 0.0182 | 0.005 | 2.7 | 2.72 | 3.0 |
| C | 0.0184 | 0.0170 | 0.0221 | 0.0221 | 0.005 | 2.7 | 2.72 | 3.0 |
| D | 0.0193 | 0.0179 | 0.0232 | 0.0232 | 0.005 | 2.7 | 2.72 | 3.0 |
| **Sensitive Class II Areas** | | | | | | | | |
| Colorado NM | | | | | | | | |
| A | 0.0139 | 0.0156 | 0.0178 | 0.0178 | 0.005 | 1.9 | 1.92 | 3.0 |
| B | 0.0148 | 0.0167 | 0.0190 | 0.0190 | 0.005 | 1.9 | 1.92 | 3.0 |
| C | 0.0164 | 0.0184 | 0.0209 | 0.0209 | 0.005 | 1.9 | 1.92 | 3.0 |
| D | 0.0167 | 0.0185 | 0.0211 | 0.0211 | 0.005 | 1.9 | 1.92 | 3.0 |
| Dinosaur NM | | | | | | | | |
| A | 0.0612 | 0.0498 | 0.0570 | 0.0612 | 0.005 | 1.5 | 1.56 | 3.0 |
| B | 0.0733 | 0.0595 | 0.0665 | 0.0733 | 0.005 | 1.5 | 1.57 | 3.0 |
| C | 0.0948 | 0.0772 | 0.0836 | 0.0948 | 0.005 | 1.5 | 1.59 | 3.0 |
| D | 0.0960 | 0.0789 | 0.0847 | 0.0960 | 0.005 | 1.5 | 1.60 | 3.0 |

[1] The Deposition Analysis Threshold (DAT) is a significance threshold.  If the modeled deposition rate (without adding the background concentration) is below the DAT, predicted impacts are considered to be insignificant.

[2] Total (wet and dry) nitrogen background deposition values were obtained from the Clean Air Status and Trends Network (CASTNet) web page (http://www.epa.gov/castnet/index.html) on December 4, 2008.  The following monitored data was used for each Class I Area:

   Canyonlands (CAN407) Year 2000: Arches NP, Colorado NM

   Gothic (GTH161) Year 2000:  Dinosaur NM, Eagles Nest WA, Flat Tops WA, Maroon Bells-Snowmass WA

   Rocky Mountain NP (ROM206) Year 2002:  Mount Zirkel WA

BLM_0020579

Appendix F – Air Quality Impacts

### Table F-36.   Maximum Predicted Sulfur Deposition from WRFO Cumulative Sources

**Air Quality Related Value:**   S Deposition

| Area and Alternative | Modeled Deposition | | | Maximum Modeled Deposition (kg/ha/yr) | DAT [1] (kg/ha/yr) | Background Deposition [2] (kg/ha/yr) | Total Deposition (kg/ha/yr) | Level of Concern (kg/ha/yr) |
|---|---|---|---|---|---|---|---|---|
| | 2001 (kg/ha/yr) | 2002 (kg/ha/yr) | 2003 (kg/ha/yr) | | | | | |
| **Class I Areas** | | | | | | | | |
| Arches NP | | | | | | | | |
| A | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.64 | 0.64 | 5.0 |
| B | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.64 | 0.64 | 5.0 |
| C | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.64 | 0.64 | 5.0 |
| D | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.005 | 0.64 | 0.64 | 5.0 |
| Eagles Nest WA | | | | | | | | |
| A | 0.0006 | 0.0006 | 0.0007 | 0.0007 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0006 | 0.0006 | 0.0007 | 0.0007 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0006 | 0.0007 | 0.0008 | 0.0008 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0007 | 0.0007 | 0.0008 | 0.0008 | 0.005 | 0.73 | 0.73 | 5.0 |
| Flat Tops WA | | | | | | | | |
| A | 0.0021 | 0.0021 | 0.0022 | 0.0022 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0022 | 0.0022 | 0.0024 | 0.0024 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0024 | 0.0024 | 0.0026 | 0.0026 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0026 | 0.0026 | 0.0028 | 0.0028 | 0.005 | 0.73 | 0.73 | 5.0 |
| Maroon Bells-Snowmass WA | | | | | | | | |
| A | 0.0006 | 0.0005 | 0.0006 | 0.0006 | 0.005 | 0.73 | 0.73 | 5.0 |
| B | 0.0007 | 0.0005 | 0.0006 | 0.0007 | 0.005 | 0.73 | 0.73 | 5.0 |
| C | 0.0007 | 0.0005 | 0.0007 | 0.0007 | 0.005 | 0.73 | 0.73 | 5.0 |
| D | 0.0008 | 0.0006 | 0.0008 | 0.0008 | 0.005 | 0.73 | 0.73 | 5.0 |
| Mount Zirkel WA | | | | | | | | |
| A | 0.0010 | 0.0009 | 0.0011 | 0.0011 | 0.005 | 0.85 | 0.85 | 5.0 |
| B | 0.0011 | 0.0010 | 0.0012 | 0.0012 | 0.005 | 0.85 | 0.85 | 5.0 |
| C | 0.0011 | 0.0010 | 0.0013 | 0.0013 | 0.005 | 0.85 | 0.85 | 5.0 |
| D | 0.0012 | 0.0011 | 0.0013 | 0.0013 | 0.005 | 0.85 | 0.85 | 5.0 |
| **Sensitive Class II Areas** | | | | | | | | |
| Colorado NM | | | | | | | | |
| A | 0.0005 | 0.0005 | 0.0007 | 0.0007 | 0.005 | 0.64 | 0.64 | 5.0 |
| B | 0.0005 | 0.0005 | 0.0007 | 0.0007 | 0.005 | 0.64 | 0.64 | 5.0 |
| C | 0.0005 | 0.0005 | 0.0008 | 0.0008 | 0.005 | 0.64 | 0.64 | 5.0 |
| D | 0.0006 | 0.0005 | 0.0008 | 0.0008 | 0.005 | 0.64 | 0.64 | 5.0 |
| Dinosaur NM | | | | | | | | |
| A | 0.0071 | 0.0056 | 0.0056 | 0.0071 | 0.005 | 0.73 | 0.74 | 5.0 |
| B | 0.0073 | 0.0057 | 0.0058 | 0.0073 | 0.005 | 0.73 | 0.74 | 5.0 |
| C | 0.0076 | 0.0060 | 0.0060 | 0.0076 | 0.005 | 0.73 | 0.74 | 5.0 |
| D | 0.0079 | 0.0062 | 0.0063 | 0.0079 | 0.005 | 0.73 | 0.74 | 5.0 |

[1] The Deposition Analysis Threshold (DAT) is a significance threshold. If the modeled deposition rate (without adding the background concentration) is below the DAT, predicted impacts are considered to be insignificant.

[2] Total (wet and dry) sulfur background deposition values were obtained from the Clean Air Status and Trends Network (CASTNet) web page (http://www.epa.gov/castnet/index.html) on December 4, 2008. The following monitored data was used for each Class I Area:
Canyonlands (CAN407) Year 2000: Arches NP, Colorado NM
Gothic (GTH161) Year 2000: Dinosaur NM, Eagles Nest WA, Flat Tops WA, Maroon Bells-Snowmass WA
Rocky Mountain NP (ROM206) Year 2002: Mount Zirkel WA

BLM_0020580

**Table F-37.   Maximum Predicted Lake Acid Neutralizing Capacity Changes from WRFO and Cumulative Sources**

Air Quality Related Value:          Change in Lake ANC

| Lake and Alternative | H Deposition [1] 2001 (eq) | H Deposition [1] 2002 (eq) | H Deposition [1] 2003 (eq) | Background ANC [2] (eq) | Level of Acceptable Change [3] (eq) | Maximum ANC Change (eq) | Maximum Percent ANC Change (%) |
|---|---|---|---|---|---|---|---|
| Avalanche Lake | | | | | | | |
| A | 457.8 | 333.4 | 458.0 | 451,000 | 45,100 | 458.0 | 0.10 |
| B | 425.9 | 291.2 | 415.1 | 451,000 | 45,100 | 425.9 | 0.09 |
| C | 513.4 | 339.6 | 495.9 | 451,000 | 45,100 | 513.4 | 0.11 |
| D | 616.0 | 421.2 | 599.6 | 451,000 | 45,100 | 616.0 | 0.14 |
| Moon Lake | | | | | | | |
| A | 186.3 | 138.5 | 189.7 | 56,400 | 5,640 | 189.7 | 0.34 |
| B | 171.5 | 118.6 | 170.9 | 56,400 | 5,640 | 171.5 | 0.30 |
| C | 206.6 | 138.2 | 204.4 | 56,400 | 5,640 | 206.6 | 0.37 |
| D | 248.6 | 173.2 | 248.5 | 56,400 | 5,640 | 248.6 | 0.44 |
| Ned Wilson Lake | | | | | | | |
| A | 17.3 | 15.5 | 20.4 | 2,240 | 224 | 20.4 | 0.91 |
| B | 17.2 | 15.6 | 20.4 | 2,240 | 224 | 20.4 | 0.91 |
| C | 21.4 | 19.6 | 25.2 | 2,240 | 224 | 25.2 | 1.12 |
| D | 24.3 | 22.2 | 28.7 | 2,240 | 224 | 28.7 | 1.28 |
| Seven Lakes | | | | | | | |
| A | 48.4 | 41.0 | 59.9 | 15,100 | 1,510 | 59.9 | 0.40 |
| B | 52.9 | 43.8 | 65.2 | 15,100 | 1,510 | 65.2 | 0.43 |
| C | 63.4 | 51.1 | 78.1 | 15,100 | 1,510 | 78.1 | 0.52 |
| D | 66.3 | 53.6 | 81.7 | 15,100 | 1,510 | 81.7 | 0.54 |
| Summit Lake | | | | | | | |
| A | 8.0 | 7.9 | 10.1 | 2,860 | 286 | 10.1 | 0.35 |
| B | 8.6 | 8.4 | 10.8 | 2,860 | 286 | 10.8 | 0.38 |
| C | 10.4 | 10.0 | 13.0 | 2,860 | 286 | 13.0 | 0.46 |
| D | 11.0 | 10.6 | 13.8 | 2,860 | 286 | 13.8 | 0.48 |
| Trappers Lake | | | | | | | |
| A | 216.0 | 195.8 | 258.9 | 528,000 | 52,800 | 258.9 | 0.05 |
| B | 221.3 | 203.8 | 266.1 | 528,000 | 52,800 | 266.1 | 0.05 |
| C | 274.6 | 255.8 | 328.8 | 528,000 | 52,800 | 328.8 | 0.06 |
| D | 307.2 | 284.4 | 368.3 | 528,000 | 52,800 | 368.3 | 0.07 |
| Upper Ned Wilson Lake | | | | | | | |
| A | 6.3 | 5.7 | 7.4 | 271 | 21.2 | 7.4 | 2.74 |
| B | 6.3 | 5.7 | 7.4 | 271 | 21.2 | 7.4 | 2.74 |
| C | 7.8 | 7.2 | 9.2 | 271 | 21.2 | 9.2 | 3.39 |
| D | 8.9 | 8.1 | 10.4 | 271 | 21.2 | 10.4 | 3.86 |

ANC = acid neutralizing capacity.

μeq/l = microequivalents per liter.

[1] The 10th-percentile lowest ANC values were calculated in accordance with the USFS Rocky Mountain Region's *Screening Methodology for Calculating ANC Change to High Elevation Lakes, User's Guide* (USFS 2000).

[2] Background ANC values were obtained from http://www.fs.fed.us/waterdata on January 25, 2007.

[3] The level of acceptable change is 10 percent change for lakes with ANC background values greater than 25 meq/l. For lakes with lower ANC background values (such as Upper Ned Wilson Lake), the level of acceptable change is 1 meq/l, which is comparable to 21.2 equivalents.

BLM_0020581

**Table F-38. Days of Visibility Change Greater Than or Equal to 1.0 dv at Class I and Sensitive Class II Areas from WRFO and Cumulative Sources**

Air Quality Related Value:       Visibility

| | 2001 | | | 2002 | | | 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| **Area and Alternative** | **FLAG 2000 (Protocol)** | **BLM Seasonal** | **BLM Daily** | **FLAG 2000 (Protocol)** | **BLM Seasonal** | **BLM Daily** | **FLAG 2000 (Protocol)** | **BLM Seasonal** | **BLM Daily** |
| **Class I Areas** | | | | | | | | | |
| Arches NP | | | | | | | | | |
| A | 3 | 6 | 0 | 1 | 1 | 0 | 1 | 1 | 0 |
| B | 4 | 7 | 0 | 1 | 3 | 0 | 1 | 2 | 0 |
| C | 7 | 9 | 0 | 3 | 4 | 0 | 2 | 2 | 0 |
| D | 7 | 9 | 0 | 3 | 4 | 0 | 2 | 2 | 0 |
| Eagles Nest WA | | | | | | | | | |
| A | 1 | 1 | 1 | 8 | 2 | 5 | 2 | 1 | 1 |
| B | 1 | 1 | 1 | 10 | 5 | 6 | 3 | 1 | 1 |
| C | 3 | 1 | 2 | 15 | 9 | 11 | 6 | 2 | 5 |
| D | 3 | 2 | 2 | 16 | 10 | 13 | 8 | 2 | 5 |
| Flat Tops WA | | | | | | | | | |
| A | 40 | 27 | 20 | 54 | 33 | 29 | 58 | 43 | 36 |
| B | 35 | 25 | 16 | 42 | 26 | 25 | 51 | 38 | 34 |
| C | 49 | 40 | 26 | 56 | 44 | 33 | 62 | 54 | 39 |
| D | 54 | 48 | 31 | 61 | 56 | 40 | 68 | 64 | 43 |
| Maroon Bells-Snowmass WA | | | | | | | | | |
| A | 18 | 12 | 13 | 24 | 18 | 19 | 22 | 11 | 10 |
| B | 13 | 7 | 12 | 13 | 12 | 12 | 10 | 5 | 6 |
| C | 18 | 12 | 14 | 16 | 17 | 15 | 12 | 8 | 13 |
| D | 24 | 22 | 21 | 22 | 23 | 20 | 13 | 12 | 15 |
| Mount Zirkel WA | | | | | | | | | |
| A | 10 | 4 | 9 | 17 | 8 | 6 | 15 | 3 | 3 |
| B | 14 | 5 | 10 | 22 | 9 | 8 | 19 | 6 | 5 |
| C | 18 | 8 | 14 | 28 | 15 | 10 | 24 | 12 | 10 |
| D | 18 | 10 | 14 | 29 | 16 | 11 | 26 | 14 | 11 |
| **Sensitive Class II Areas** | | | | | | | | | |
| Colorado NM | | | | | | | | | |
| A | 22 | 17 | 17 | 23 | 26 | 22 | 18 | 17 | 11 |
| B | 24 | 19 | 17 | 25 | 28 | 24 | 19 | 17 | 14 |
| C | 28 | 23 | 19 | 29 | 31 | 30 | 22 | 22 | 19 |
| D | 31 | 24 | 21 | 30 | 32 | 30 | 24 | 22 | 19 |
| Dinosaur NM | | | | | | | | | |
| A | 180 | 160 | 100 | 168 | 154 | 114 | 172 | 153 | 115 |
| B | 167 | 157 | 99 | 156 | 148 | 110 | 162 | 149 | 110 |
| C | 202 | 189 | 127 | 194 | 178 | 138 | 193 | 176 | 141 |
| D | 209 | 195 | 130 | 198 | 185 | 146 | 195 | 180 | 143 |

Visibility calculation methods include the following:

Protocol: This method was specified in the *Air Quality Impact Assessment Protocol: White River Resource Management Plan Amendment and Environmental Impact Impact Statement* (BLM 2007a).

BLM Seasonal: This method uses seasonal natural background extinction data and monthly relative humidity data for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM Daily: This method uses observed daily aerosol measurements and relative humidity data, with f(RH) limited at 90 percent for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM_0020582

**Table F-39.   Days of Visibility Change Greater Than or Equal to 1.0 dv at Scenic Views from WRFO and Cumulative Sources**

**Air Quality Related Value:**      Visibility

| Area and Alternative | 2001 FLAG 2000 (Protocol) | 2001 BLM Seasonal | 2001 BLM Daily | 2002 FLAG 2000 (Protocol) | 2002 BLM Seasonal | 2002 BLM Daily | 2003 FLAG 2000 (Protocol) | 2003 BLM Seasonal | 2003 BLM Daily |
|---|---|---|---|---|---|---|---|---|---|
| **Big Mountain View** | | | | | | | | | |
| A | 158 | 142 | 73 | 178 | 159 | 109 | 208 | 176 | 138 |
| B | 52 | 55 | 31 | 81 | 84 | 67 | 72 | 74 | 56 |
| C | 82 | 83 | 53 | 108 | 117 | 84 | 116 | 111 | 90 |
| D | 99 | 100 | 73 | 126 | 140 | 101 | 136 | 137 | 107 |
| **Holy Cross View** | | | | | | | | | |
| A | 0 | 0 | 0 | 2 | 1 | 2 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| C | 0 | 0 | 0 | 6 | 2 | 2 | 2 | 0 | 1 |
| D | 1 | 0 | 0 | 8 | 3 | 3 | 2 | 0 | 1 |
| **Holy Cross Wilderness View** | | | | | | | | | |
| A | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| B | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| C | 1 | 0 | 0 | 6 | 1 | 1 | 0 | 0 | 0 |
| D | 2 | 0 | 0 | 7 | 3 | 1 | 0 | 0 | 1 |
| **Rabbit Ears View** | | | | | | | | | |
| A | 15 | 16 | 9 | 20 | 21 | 16 | 15 | 14 | 9 |
| B | 18 | 17 | 11 | 23 | 26 | 19 | 19 | 17 | 11 |
| C | 23 | 21 | 14 | 26 | 30 | 24 | 20 | 20 | 13 |
| D | 23 | 21 | 15 | 26 | 31 | 24 | 24 | 21 | 13 |
| **Roan Cliffs View** | | | | | | | | | |
| A | 314 | 338 | 319 | 331 | 349 | 342 | 312 | 335 | 325 |
| B | 279 | 314 | 244 | 316 | 336 | 279 | 300 | 328 | 283 |
| C | 287 | 320 | 253 | 320 | 341 | 289 | 302 | 331 | 293 |
| D | 316 | 341 | 311 | 331 | 350 | 319 | 316 | 339 | 319 |

Visibility calculation methods include the following:

Protocol:  This method was specified in the *Air Quality Impact Assessment Protocol, White River Resource Management Plan Amendment and Environmental Impact Statement* (BLM 2007a).

BLM Seasonal:  This method uses seasonal natural background extinction data and monthly relative humidity data for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM Daily:  This method uses observed daily aerosol measurements and relative humidity data, with f(RH) limited at 90 percent for each sensitive area. This tool is based on FLAG published method to evaluate visibility at Class I areas.

BLM_0020583

# 5.0   Ozone Impacts

## Table F-40.   Future Ozone Design Values for Monitors in the 4km Domain

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Rural Monitors** | | | | | | | | |
| RPCK | Ripple Creek Pass | April | | | | | | 2006–2007 |
| | | A | 70 | 70 | 1.00 | 66 | 65 | |
| | | B | 70 | 70 | 1.00 | 66 | 65 | |
| | | C | 70 | 70 | 1.00 | 66 | 65 | |
| | | D | 70 | 70 | 1.00 | 66 | 65 | |
| | | July | | | | | | 2006–2007 |
| | | A | 67 | 66 | 0.99 | 66 | 65 | |
| | | B | 67 | 66 | 0.99 | 66 | 65 | |
| | | C | 67 | 66 | 0.99 | 66 | 65 | |
| | | D | 67 | 66 | 0.99 | 66 | 65 | |
| SUNM | Sunlight | April | | | | | | 2006–2007 |
| | | A | 69 | 68 | 0.99 | 70 | 69 | |
| | | B | 69 | 68 | 0.99 | 70 | 69 | |
| | | C | 69 | 68 | 0.99 | 70 | 69 | |
| | | D | 69 | 68 | 0.99 | 70 | 69 | |
| | | July | | | | | | 2006–2007 |
| | | A | 64 | 58 | 0.91 | 70 | 63 | |
| | | B | 64 | 57 | 0.89 | 70 | 62 | |
| | | C | 64 | 57 | 0.89 | 70 | 62 | |
| | | D | 64 | 58 | 0.91 | 70 | 63 | |
| COLM | Colorado NM | April | | | | | | 2006–2008 |
| | | A | 67 | 66 | 0.99 | 69 | 68 | |
| | | B | 67 | 66 | 0.99 | 69 | 68 | |
| | | C | 67 | 66 | 0.99 | 69 | 68 | |
| | | D | 67 | 66 | 0.99 | 69 | 68 | |
| | | July | | | | | | 2006–2008 |
| | | A | 63 | 60 | 0.95 | 69 | 65 | |
| | | B | 63 | 60 | 0.95 | 69 | 65 | |
| | | C | 63 | 60 | 0.95 | 69 | 65 | |
| | | D | 63 | 60 | 0.95 | 69 | 65 | |

BLM_0020584

**Table F-40.   Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Rural Monitors (cont.)** | | | | | | | | |
| GTH161 | Gothic | April | | | | | | 2004–2008 |
| | | A | 71 | 70 | 0.99 | 67 | 66 | |
| | | B | 71 | 70 | 0.99 | 67 | 66 | |
| | | C | 71 | 70 | 0.99 | 67 | 66 | |
| | | D | 71 | 70 | 0.99 | 67 | 66 | |
| | | July | | | | | | 2004–2008 |
| | | A | 62 | 60 | 0.97 | 67 | 64 | |
| | | B | 62 | 60 | 0.97 | 67 | 64 | |
| | | C | 62 | 60 | 0.97 | 67 | 64 | |
| | | D | 62 | 60 | 0.97 | 67 | 64 | |
| DINO | Dinosaur NM | April | | | | | | 2005–2008 |
| | | A | 65 | 65 | 1.00 | 66 | 65 | |
| | | B | 65 | 65 | 1.00 | 66 | 65 | |
| | | C | 65 | 65 | 1.00 | 66 | 65 | |
| | | D | 65 | 65 | 1.00 | 66 | 65 | |
| | | July | | | | | | 2005–2008 |
| | | A | 64 | 62 | 0.97 | 66 | 64 | |
| | | B | 64 | 62 | 0.97 | 66 | 64 | |
| | | C | 64 | 62 | 0.97 | 66 | 64 | |
| | | D | 64 | 62 | 0.97 | 66 | 64 | |
| 080690007 | Rocky Mountain NP | April | | | | | | 2004–2008 |
| | | A | 71 | 70 | 0.99 | 75 | 74 | |
| | | B | 71 | 70 | 0.99 | 75 | 74 | |
| | | C | 71 | 70 | 0.99 | 75 | 74 | |
| | | D | 71 | 70 | 0.99 | 75 | 74 | |
| | | July | | | | | | 2004–2008 |
| | | A | 67 | 62 | 0.93 | 75 | 69 | |
| | | B | 67 | 62 | 0.93 | 75 | 69 | |
| | | C | 67 | 63 | 0.94 | 75 | 70 | |
| | | D | 67 | 63 | 0.94 | 75 | 70 | |

BLM_0020585

**Table F-40.   Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Rural Monitors (cont.)** | | | | | | | | |
| ROM206 | Rocky Mountain NP Co-Located | April | | | | | | 2004–2008 |
| | | A | 71 | 70 | 0.99 | 73 | 72 | |
| | | B | 71 | 70 | 0.99 | 73 | 72 | |
| | | C | 71 | 70 | 0.99 | 73 | 72 | |
| | | D | 71 | 70 | 0.99 | 73 | 72 | |
| | | July | | | | | | 2004–2008 |
| | | A | 67 | 62 | 0.93 | 73 | 67 | |
| | | B | 67 | 62 | 0.93 | 73 | 67 | |
| | | C | 67 | 63 | 0.94 | 73 | 68 | |
| | | D | 67 | 63 | 0.94 | 73 | 68 | |
| SHAM | Shamrock | April | | | | | | 2004–2008 |
| | | A | 68 | 67 | 0.99 | 71 | 70 | |
| | | B | 68 | 67 | 0.99 | 71 | 70 | |
| | | C | 68 | 67 | 0.99 | 71 | 70 | |
| | | D | 68 | 67 | 0.99 | 71 | 70 | |
| | | July | | | | | | 2004–2008 |
| | | A | 63 | 62 | 0.98 | 71 | 69 | |
| | | B | 63 | 62 | 0.98 | 71 | 69 | |
| | | C | 63 | 62 | 0.98 | 71 | 69 | |
| | | D | 63 | 62 | 0.98 | 71 | 69 | |
| 080830101 | Mesa Verde NP | April | | | | | | 2004–2008 |
| | | A | 67 | 67 | 1.00 | 72 | 71 | |
| | | B | 67 | 67 | 1.00 | 72 | 71 | |
| | | C | 67 | 67 | 1.00 | 72 | 71 | |
| | | D | 67 | 67 | 1.00 | 72 | 71 | |
| | | July | | | | | | 2004–2008 |
| | | A | 64 | 63 | 0.98 | 72 | 70 | |
| | | B | 64 | 63 | 0.98 | 72 | 70 | |
| | | C | 64 | 63 | 0.98 | 72 | 70 | |
| | | D | 64 | 63 | 0.98 | 72 | 70 | |

BLM_0020586

**Table F-40.   Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Urban Monitors** | | | | | | | | |
| 080013001 | Welby | April | | | | | | 2004–2008 |
| | | A | 74 | 74 | 1.00 | 70 | 69 | |
| | | B | 74 | 74 | 1.00 | 70 | 69 | |
| | | C | 74 | 74 | 1.00 | 70 | 69 | |
| | | D | 74 | 74 | 1.00 | 70 | 69 | |
| | | July | | | | | | 2004–2008 |
| | | A | 77 | 72 | 0.94 | 70 | 65 | |
| | | B | 77 | 72 | 0.94 | 70 | 65 | |
| | | C | 77 | 72 | 0.94 | 70 | 65 | |
| | | D | 77 | 72 | 0.94 | 70 | 65 | |
| 080050002 | Highland | April | | | | | | 2004–2008 |
| | | A | 73 | 72 | 0.99 | 75 | 74 | |
| | | B | 73 | 72 | 0.99 | 75 | 74 | |
| | | C | 73 | 72 | 0.99 | 75 | 74 | |
| | | D | 73 | 72 | 0.99 | 75 | 74 | |
| | | July | | | | | | 2004–2008 |
| | | A | 77 | 71 | 0.92 | 75 | 69 | |
| | | B | 77 | 71 | 0.92 | 75 | 69 | |
| | | C | 77 | 71 | 0.92 | 75 | 69 | |
| | | D | 77 | 71 | 0.92 | 75 | 69 | |
| 080130011 | South Boulder Creek | April | | | | | | 2004–2008 |
| | | A | 73 | 71 | 0.97 | 79 | 76 | |
| | | B | 73 | 71 | 0.97 | 79 | 76 | |
| | | C | 73 | 71 | 0.97 | 79 | 76 | |
| | | D | 73 | 71 | 0.97 | 79 | 76 | |
| | | July | | | | | | 2004–2008 |
| | | A | 73 | 67 | 0.92 | 79 | 72 | |
| | | B | 73 | 67 | 0.92 | 79 | 72 | |
| | | C | 73 | 67 | 0.92 | 79 | 72 | |
| | | D | 73 | 67 | 0.92 | 79 | 72 | |
| 080310002 | CAMP | April | | | | | | 2005–2007 |
| | | A | 74 | 74 | 1.00 | 56 | 56 | |
| | | B | 74 | 74 | 1.00 | 56 | 56 | |
| | | C | 74 | 74 | 1.00 | 56 | 56 | |
| | | D | 74 | 74 | 1.00 | 56 | 56 | |
| | | July | | | | | | 2005–2007 |
| | | A | 79 | 73 | 0.92 | 56 | 51 | |
| | | B | 79 | 73 | 0.92 | 56 | 51 | |
| | | C | 79 | 73 | 0.92 | 56 | 51 | |
| | | D | 79 | 73 | 0.92 | 56 | 51 | |

BLM_0020587

**Table F-40.   Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Urban Monitors (cont.)** | | | | | | | | |
| 080310014 | Carriage | April | | | | | | 2004–2008 |
| | | A | 73 | 73 | 1.00 | 72 | 71 | |
| | | B | 73 | 73 | 1.00 | 72 | 71 | |
| | | C | 73 | 73 | 1.00 | 72 | 71 | |
| | | D | 73 | 73 | 1.00 | 72 | 71 | |
| | | July | | | | | | 2004–2008 |
| | | A | 79 | 73 | 0.92 | 72 | 66 | |
| | | B | 79 | 73 | 0.92 | 72 | 66 | |
| | | C | 79 | 73 | 0.92 | 72 | 66 | |
| | | D | 79 | 73 | 0.92 | 72 | 66 | |
| 080350004 | Chatfield Park | April | | | | | | 2004–2008 |
| | | A | 73 | 72 | 0.99 | 82 | 81 | |
| | | B | 73 | 72 | 0.99 | 82 | 81 | |
| | | C | 73 | 72 | 0.99 | 82 | 81 | |
| | | D | 73 | 72 | 0.99 | 82 | 81 | |
| | | July | | | | | | 2004–2008 |
| | | A | 77 | 70 | 0.91 | 82 | 74 | |
| | | B | 77 | 70 | 0.91 | 82 | 74 | |
| | | C | 77 | 70 | 0.91 | 82 | 74 | |
| | | D | 77 | 70 | 0.91 | 82 | 74 | |
| 080410013 | USAF Academy | April | | | | | | 2004–2008 |
| | | A | 71 | 70 | 0.99 | 72 | 71 | |
| | | B | 71 | 70 | 0.99 | 72 | 71 | |
| | | C | 71 | 70 | 0.99 | 72 | 71 | |
| | | D | 71 | 70 | 0.99 | 72 | 71 | |
| | | July | | | | | | 2004–2008 |
| | | A | 67 | 61 | 0.91 | 72 | 65 | |
| | | B | 67 | 61 | 0.91 | 72 | 65 | |
| | | C | 67 | 61 | 0.91 | 72 | 65 | |
| | | D | 67 | 61 | 0.91 | 72 | 65 | |

BLM_0020588

**Table F-40.   Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Urban Monitors (cont.)** | | | | | | | | |
| 080410016 | Manitou Springs | April | | | | | | 2004–2008 |
| | | A | 71 | 70 | 0.99 | 73 | 72 | |
| | | B | 71 | 70 | 0.99 | 73 | 72 | |
| | | C | 71 | 70 | 0.99 | 73 | 72 | |
| | | D | 71 | 70 | 0.99 | 73 | 72 | |
| | | July | | | | | | 2004–2008 |
| | | A | 67 | 61 | 0.91 | 73 | 66 | |
| | | B | 67 | 61 | 0.91 | 73 | 66 | |
| | | C | 67 | 61 | 0.91 | 73 | 66 | |
| | | D | 67 | 61 | 0.91 | 73 | 66 | |
| 080590002 | Arvada | April | | | | | | 2004–2008 |
| | | A | 73 | 72 | 0.99 | 77 | 76 | |
| | | B | 73 | 72 | 0.99 | 77 | 76 | |
| | | C | 73 | 72 | 0.99 | 77 | 76 | |
| | | D | 73 | 72 | 0.99 | 77 | 76 | |
| | | July | | | | | | 2004–2008 |
| | | A | 78 | 72 | 0.92 | 77 | 70 | |
| | | B | 78 | 72 | 0.92 | 77 | 70 | |
| | | C | 78 | 72 | 0.92 | 77 | 70 | |
| | | D | 78 | 72 | 0.92 | 77 | 70 | |
| 080590005 | Welch | April | | | | | | 2004–2008 |
| | | A | 73 | 72 | 0.99 | 74 | 73 | |
| | | B | 73 | 72 | 0.99 | 74 | 73 | |
| | | C | 73 | 72 | 0.99 | 74 | 73 | |
| | | D | 73 | 72 | 0.99 | 74 | 73 | |
| | | July | | | | | | 2004–2008 |
| | | A | 77 | 71 | 0.92 | 74 | 68 | |
| | | B | 77 | 71 | 0.92 | 74 | 68 | |
| | | C | 77 | 71 | 0.92 | 74 | 68 | |
| | | D | 77 | 71 | 0.92 | 74 | 68 | |

BLM_0020589

**Table F-40.  Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Urban Monitors (cont.)** | | | | | | | | |
| 080590006 | Rocky Flats North | April | | | | | | 2004–2008 |
| | | A | 73 | 72 | 0.99 | 83 | 82 | |
| | | B | 73 | 72 | 0.99 | 83 | 82 | |
| | | C | 73 | 72 | 0.99 | 83 | 82 | |
| | | D | 73 | 72 | 0.99 | 83 | 82 | |
| | | July | | | | | | 2004–2008 |
| | | A | 75 | 69 | 0.92 | 83 | 76 | |
| | | B | 75 | 69 | 0.92 | 83 | 76 | |
| | | C | 75 | 69 | 0.92 | 83 | 76 | |
| | | D | 75 | 69 | 0.92 | 83 | 76 | |
| 080590011 | NREL | April | | | | | | 2004–2008 |
| | | A | 73 | 72 | 0.99 | 80 | 79 | |
| | | B | 73 | 72 | 0.99 | 80 | 79 | |
| | | C | 73 | 72 | 0.99 | 80 | 79 | |
| | | D | 73 | 72 | 0.99 | 80 | 79 | |
| | | July | | | | | | 2004–2008 |
| | | A | 77 | 72 | 0.94 | 80 | 75 | |
| | | B | 77 | 72 | 0.94 | 80 | 75 | |
| | | C | 77 | 72 | 0.94 | 80 | 75 | |
| | | D | 77 | 72 | 0.94 | 80 | 75 | |
| 080690011 | Fort Collins West | April | | | | | | 2006–2008 |
| | | A | 71 | 69 | 0.97 | 82 | 79 | |
| | | B | 71 | 69 | 0.97 | 82 | 79 | |
| | | C | 71 | 69 | 0.97 | 82 | 79 | |
| | | D | 71 | 69 | 0.97 | 82 | 79 | |
| | | July | | | | | | 2006–2008 |
| | | A | 67 | 62 | 0.93 | 82 | 76 | |
| | | B | 67 | 62 | 0.93 | 82 | 76 | |
| | | C | 67 | 62 | 0.93 | 82 | 76 | |
| | | D | 67 | 62 | 0.93 | 82 | 76 | |

BLM_0020590

**Table F-40    Future Ozone Design Values for Monitors in the 4km Domain (cont.)**

| Monitor ID | Location Description | Episode / Alternative | CB (ppb) | CF (ppb) | RRF | DVB (ppb) | DVF (ppb) | Data Available for Years |
|---|---|---|---|---|---|---|---|---|
| **Urban Monitors (cont.)** | | | | | | | | |
| 080691004 | Fort Collins | April | | | | | | 2004–2008 |
| | | A | 71 | 70 | 0.99 | 72 | 71 | |
| | | B | 71 | 70 | 0.99 | 72 | 71 | |
| | | C | 71 | 70 | 0.99 | 72 | 71 | |
| | | D | 71 | 70 | 0.99 | 72 | 71 | |
| | | July | | | | | | 2004–2008 |
| | | A | 67 | 62 | 0.93 | 72 | 66 | |
| | | B | 67 | 62 | 0.93 | 72 | 66 | |
| | | C | 67 | 62 | 0.93 | 72 | 66 | |
| | | D | 67 | 62 | 0.93 | 72 | 66 | |
| 081230009 | Weld County Tower | April | | | | | | 2004–2008 |
| | | A | 71 | 69 | 0.97 | 76 | 73 | |
| | | B | 71 | 69 | 0.97 | 76 | 73 | |
| | | C | 71 | 69 | 0.97 | 76 | 73 | |
| | | D | 71 | 69 | 0.97 | 76 | 73 | |
| | | July | | | | | | 2004–2008 |
| | | A | 69 | 63 | 0.91 | 76 | 69 | |
| | | B | 69 | 63 | 0.91 | 76 | 69 | |
| | | C | 69 | 63 | 0.91 | 76 | 69 | |
| | | D | 69 | 63 | 0.91 | 76 | 69 | |

CB = Baseline concentration (mean modeled 8-hour daily maximum baseline [Base06c] concentration during the episode)
CF = Future concentration (mean modeled 8-hour daily maximum future concentration during the episode)
DVB = Baseline design value (Base06c)
DVF = Future design value
NM = National Monument
NP = National Park
ppb = parts per billion
RRF = Relative response factor

BLM_0020591

*Appendix F – Air Quality Impacts*

## 6.0   Maps

### Map F-1.   CAMx Model Domains



BLM_0020592

## Map F-2.   Ozone Monitors In and Near the 4km Domain



BLM_0020593

## Map F-3.   CALPUFF Receptor Locations



BLM_0020594

# 7.0    Draft RMPA/EIS and ARTSD Table and Map Labels

## Table F-41.    Crosswalk between Draft RMPA/EIS Appendix F and ARTSD

| Appendix F | Description | ARTSD |
|---|---|---|
| | **Near-Field Impacts** | |
| Table F-1 | Near-Field 1-Hour HAP Maximum Concentration Comparison to RELs | 3-6 |
| Table F-2 | Near-Field Annual Average Predicted Concentrations Compared to RfCs | 3-7 |
| Table F-3 | Near-Field Cancer Risk From Long-Term Exposure | 3-8 |
| | **Far-Field Non-Ozone Project Impacts** | |
| Table F-4 | Maximum Predicted 1-Hour $NO_2$ Impacts from Project Sources | G-1 |
| Table F-5 | Maximum Predicted Annual $NO_2$ Impacts from Project Sources | G-2 |
| Table F-6 | Maximum Predicted 24-Hour $PM_{10}$ Impacts from Project Sources | G-3 |
| Table F-7 | Maximum Predicted Annual $PM_{10}$ Impacts from Project Sources | G-4 |
| Table F-8 | Maximum Predicted 24-Hour $PM_{2.5}$ Impacts from Project Sources | G-5 |
| Table F-9 | Maximum Predicted Annual $PM_{2.5}$ Impacts from Project Sources | G-6 |
| Table F-10 | Maximum Predicted 1-Hour $SO_2$ Impacts from Project Sources | G-7 |
| Table F-11 | Maximum Predicted 3-Hour $SO_2$ Impacts from Project Sources | G-8 |
| Table F-12 | Maximum Predicted 24-Hour $SO_2$ Impacts from Project Sources | G-9 |
| Table F-13 | Maximum Predicted Annual $SO_2$ Impacts from Project Sources | G-10 |
| Table F-14 | Maximum Predicted 1-Hour CO Impacts from Project Sources | G-11 |
| Table F-15 | Maximum Predicted 8-Hour CO Impacts from Project Sources | G-12 |
| Table F-16 | Maximum Predicted Nitrogen Deposition Impacts from Project Sources | G-13 |
| Table F-17 | Maximum Predicted Sulfur Deposition Impacts from Project Sources | G-14 |
| Table F-18 | Maximum Predicted Lake Acid Neutralizing Capacity Changes from Project Sources | G-15 |
| Table F-19 | Days of Visibility Change ≥1.0 dv at Class I and Sensitive Class II Areas from Project Sources | G-17 |
| Table F-20 | Days of Visibility Change ≥0.5 dv at Class I and Sensitive Class II Areas from Project Sources | G-16 |
| Table F-21 | Days of Visibility Change ≥1.0 dv at Scenic Views from Project Sources | G-19 |
| Table F-22 | Days of Visibility Change ≥0.5 dv at Scenic Views from Project Sources | G-18 |

**Table F-42.   Crosswalk between Draft RMPA/EIS Appendix F and ARTSD (cont.)**

| Appendix F | Description | ARTSD |
|---|---|---|
| **Far-Field Non-Ozone Cumulative Impacts** | | |
| Table F-23 | Maximum Predicted 1-Hour $NO_2$ Impacts from Cumulative Sources | H-1 |
| Table F-24 | Maximum Predicted Annual $NO_2$ Impacts from Cumulative Sources | H-2 |
| Table F-25 | Maximum Predicted 24-Hour $PM_{10}$ Impacts from Cumulative Sources | H-3 |
| Table F-26 | Maximum Predicted Annual $PM_{10}$ Impacts from Cumulative Sources | H-4 |
| Table F-27 | Maximum Predicted 24-Hour $PM_{2.5}$ Impacts from Cumulative Sources | H-5 |
| Table F-28 | Maximum Predicted Annual $PM_{2.5}$ Impacts from Cumulative Sources | H-6 |
| Table F-29 | Maximum Predicted 1-Hour $SO_2$ Impacts from Cumulative Sources | H-7 |
| Table F-30 | Maximum Predicted 3-Hour $SO_2$ Impacts from Cumulative Sources | H-8 |
| Table F-31 | Maximum Predicted 24-Hour $SO_2$ Impacts from Cumulative Sources | H-9 |
| Table F-32 | Maximum Predicted Annual $SO_2$ Impacts from Cumulative Sources | H-10 |
| Table F-33 | Maximum Predicted 1-Hour CO Impacts from Cumulative Sources | H-11 |
| Table F-34 | Maximum Predicted 8-Hour CO Impacts from Cumulative Sources | H-12 |
| Table F-35 | Maximum Predicted Nitrogen Deposition from Cumulative Sources | H-13 |
| Table F-36 | Maximum Predicted Sulfur Deposition from Cumulative Sources | H-14 |
| Table F-37 | Maximum Predicted Lake Acid Neutralizing Capacity Changes from Cumulative Sources | H-15 |
| Table F-38 | Days of Visibility Change ≥1.0 dv at Class I and Sensitive Class II Areas from Cumulative Sources | H-16 |
| Table F-39 | Days of Visibility Change ≥1.0 dv at Scenic Views from Cumulative Sources | H-17 |
| **Ozone Impacts** | | |
| Table F-40 | Future Ozone Design Values for Monitors in the 4km Domain | K-1 |
| **Maps** | | |
| Map F-1 | CAMx Model Domains | Map 5-1 |
| Map F-2 | Ozone Monitors In and Near the 4km Domain | Map 5-2 |
| Map F-3 | CALPUFF Receptor Locations | Map 4-3 |

BLM_0020596

BLM 0020597



Appendix G

# Social and Economic Analysis Technical Report

**BLM**

BLM_0020598

**Final Report**

# Social and Economic Analysis Technical Report

Bureau of Land Management

White River RMPA

Environmental Impact Statement

BLM_0020599

BLM_0020600

**Final Report**

Revised April 8, 2011

# Social and Economic Analysis Technical Report

Bureau of Land Management

White River RMPA

Environmental Impact Statement

**Prepared by**

BBC Research & Consulting
3773 Cherry Creek N. Drive, Suite 850
Denver, Colorado 80209-3868
303.321.2547  jeavons@bbcresearch.com

And

Lloyd Levy Consulting, LLC
3275 Upham St.
Wheat Ridge, CO 80033
303-458-5363  lloydlevy@aol.com

BLM_0020601

BLM_0020602

# Table of Contents

**I.    Introduction**

Background and Objectives ..................................................................................................I–1

Report Organization...........................................................................................................I–1

The White River Field Office Management Alternatives ...............................................I–1

Methods ...............................................................................................................................I–2

Definition of the Primary and Secondary Socioeconomic Study Areas .........................I–2

**Part One — Social and Economic Affected Environment**

**II.   Economic and Demographic Conditions in the Socioeconomic Study Area**

Current Economic Activities Specifically Related to Lands Managed by
   BLM White River Field Office .............................................................................II–1

Overview of General Socioeconomic Conditions in the Primary and
   Secondary Socioeconomic Study Areas .............................................................II–5

Regional Economic Trends.................................................................................................II–7

Population .........................................................................................................................II–13

Housing Trends.................................................................................................................II–19

Housing Development Activity, Plans and Issues ........................................................II–21

Summary of Baseline Economic Conditions..................................................................II–24

**III.  Public Facilities, Finances and Services in the Socioeconomic Study Areas**

Rio Blanco County............................................................................................................III–1

County Revenues ..............................................................................................................III–2

County Expenditures and Services .................................................................................III–5

Municipal Governments ..................................................................................................III–8

General Fiscal and Service Provision Challenges in the PSSA and SSSA....................III–11

Influence of BLM Lands and Policies............................................................................III–14

Severance Taxes ..............................................................................................................III–14

Federal Mineral Lease (FML) Revenue..........................................................................III–16

Property Taxes .................................................................................................................III–18

**IV.   Social Conditions**

Historical Energy Development......................................................................................IV–1

Relevant Literature on Social Disruption and Change ................................................IV–3

Quality of Life Perceptions and Concerns ....................................................................IV–5

Non-Market Value...........................................................................................................IV–13

BLM_0020603

# Table of Contents

**Part Two – Social and Economic Environmental Consequences**

**V.    Impacts Common to All Alternatives**

Indirect Effects of Oil and Gas Development ............................................................................ V–1

Effects on Hunting ................................................................................................................ V–2

Effects on Agriculture ........................................................................................................... V–5

Effects on Non-market Values ................................................................................................ V–8

**VI.    Social and Economic Effects Under Alternative A (Existing Management)**

Total Employment and Population Effects ................................................................................ VI–1

Energy-related Activity and Employment ................................................................................. VI–3

Agricultural Activity and Employment ..................................................................................... VI–4

Hunting and Tourism Activity and Employment ........................................................................ VI–5

Fiscal Effects ....................................................................................................................... VI–5

Housing, Public Services and Infrastructure ............................................................................. VI–6

Social Conditions ................................................................................................................. VI–7

Non-market Values ............................................................................................................... VI–8

**VII.    Social and Economic Effects Under Alternative B (Conservation Emphasis)**

Total Employment and Population Effects ................................................................................ VII–1

Energy-related Activity and Employment ................................................................................. VII–3

Agricultural Activity and Employment ..................................................................................... VII–4

Hunting and Tourism Activity and Employment ........................................................................ VII–5

Fiscal Effects ....................................................................................................................... VII–6

Housing, Public Services and Infrastructure ............................................................................. VII–8

Social Conditions ................................................................................................................. VII–8

Non-market Values ............................................................................................................... VII–10

**VIII.    Social and Economic Effects Under Alternative C (Managed Development)**

Total Employment and Population Effects ................................................................................ VIII–1

Energy-related Activity and Employment ................................................................................. VIII–3

Agricultural Activity and Employment ..................................................................................... VIII–4

Hunting and Tourism Activity and Employment ........................................................................ VIII–5

Fiscal Effects ....................................................................................................................... VIII–6

Housing, Public Services and Infrastructure ............................................................................. VIII–8

Social Conditions ................................................................................................................. VIII–9

Non-market Values ............................................................................................................... VIII–11

BLM_0020604

# Table of Contents

**IX.    Social and Economic Effects Under Alternative D (Development Emphasis)**

Total Employment and Population Effects ............................................................................... IX–1

Energy-related Activity and Employment.............................................................................. IX–3

Agricultural Activity and Employment.................................................................................. IX–4

Hunting and Tourism Activity and Employment ................................................................. IX–5

Fiscal Effects ............................................................................................................................ IX–6

Housing, Public Services and Infrastructure.......................................................................... IX–8

Social Conditions ................................................................................................................... IX–8

Non-market Values.................................................................................................................. IX–11

**X.    Cumulative Social and Economic Effects**

Cumulative Effects on Social Conditions ............................................................................. X–6

Oil Shale ................................................................................................................................... X–8

**XI.    Bibliography**

BLM_0020605

BLM_0020606

# SECTION I.
# Introduction

This report provides a description and evaluation of the socioeconomic affected environment and the anticipated social and economic effects of alternative resource management plans (RMP) being considered by the Bureau of Land Management's (BLM), White River Field Office (WRFO). The WRFO manages public lands under BLM jurisdiction for a large region generally coinciding with the boundaries of Rio Blanco County, Colorado.

## Background and Objectives

In June 2008, BBC Research & Consulting (BBC) was retained as a subcontractor to URS Corporation to assist them in the development of an Environmental Impact Study of alternative resource management plans being evaluated by the BLM WRFO. BBC has extensive experience in socioeconomic evaluations and considerable recent experience in northwest Colorado.

BBC was assisted in this effort by Mr. Lloyd Levy of Lloyd Levy Consulting, LLC.

## Report Organization

This report presents a description of the social and economic affected environment and an evaluation of the social and economic environmental consequences associated with alternative resource management plan amendments (RMPAs) being considered by the BLM WRFO. This report is intended to serve as a base document for the environmental impact statement, which is being assembled by URS Corporation.

Following this Introduction, Part One presents the description of the socioeconomic affected environment. In Part One, Section II presents a description of current economic and demographic conditions in the primary and secondary socioeconomic study areas. Section III describes current fiscal conditions and trends for local governments likely to be affected by BLM resource management strategies. Section IV describes social conditions in the study areas.

Part Two of this report presents the anticipated social and economic environmental consequences associated with the alternative RMPAs under BLM consideration. Section V presents the impacts common to all alternatives. Section VI presents the anticipated social and economic effects associated with Alternative A, Existing Management (the No Action Alternative). Sections VII through  IX present the anticipated social and economic effects under Alternatives B, C and D, respectively (the action alternatives). Section X analyzes cumulative social and economic impacts anticipated under each alternative. Section XI provides a list of references for this study.

BLM_0020607

## The White River Field Office Management Alternatives

Four alternatives were analyzed in detail in this RMPA/EIS.  These alternatives were developed to present for analysis of a range of reasonable management options to assist decision-makers and the public in understanding the potential environmental consequences of each alternative.  The four alternatives are:

- Alternative A (Existing Management or No Action Alternative) retains the current management goals, objectives, and direction specified in the 1997 White River RMP, and is designed to analyze the impacts of continuing current management resources and resource programs at the levels and locations of future oil and gas development projected in the RFD Scenario (BLM 2007a).

- Alternative B (Conservation Emphasis)—limits the duration and overall extent of disruptive development activities in order to maintain existing resource conditions throughout all phases of development (i.e., from construction throughout and beyond the production phase), and is designed to evaluate the impacts of emphasizing conservation and protection of other resources and resource uses while allowing continued production of oil and gas.

- Alternative C (Managed Development)—designed to evaluate the impacts of short-term use of the environment and the maintenance and enhancement of long-term community function and ecological integrity (throughout and beyond the production phase).

- Alternative D (Development Emphasis)—designed to evaluate the impacts of emphasizing the production of oil and gas resources under the environmental protection afforded by applicable laws, regulations, and BLM policy.

## Definition of the Primary and Secondary Socioeconomic Study Areas

For purposes of this analysis, the study team has categorized northwestern Colorado into a Primary Socioeconomic Study Area (PSSA) and a Secondary Socioeconomic Study Area (SSSA). While the BLM WRFO includes lands in Moffat County and Garfield County, as well as in Rio Blanco County, the vast majority of the population within the WRFO resides in Rio Blanco County. Consequently, Rio Blanco County constitutes the PSSA. The PSSA is the geographic region that will be most directly affected by BLM WRFO management and operational decisions. The SSSA is a broader region that includes both sparsely populated lands in Garfield County and Moffat County that are within the WRFO, and other areas of northwestern Colorado that have indirect social and economic ties with WRFO activities. Though these areas are termed the "Secondary" Socioeconomic Study Area, they will likely provide business support services as well as additional housing or community services associated with changes in WRFO management practices and may experience substantial effects from WRFO management alternatives.

**The Primary Socioeconomic Study Area.**  The BLM White River Field Office encompasses virtually all of Rio Blanco County in addition to small portions of northern Garfield and southern Moffat counties (see Exhibit II-1 on the following page).  Potential changes to the WRFO Resource Management Plan, most notably increases in natural gas drilling activity, would occur primarily in the Mesa Verde formation in central Rio Blanco County. It is likely that unincorporated Rio Blanco County and the nearby towns of Meeker and Rangely will be the communities most immediately and

BLM_0020608

directly affected by changes in resource management policies and any new workforce-related population or related demand for housing and public services (though the City of Rifle, in the SSSA, is also likely to house a substantial portion of the workforce associated with WRFO management alternatives). Based on this assessment, the PSSA is defined as Rio Blanco County, which includes the towns of Meeker and Rangely. Given current road configurations, portions of Garfield County—particularly the City of Rifle and nearby communities along the I-70 corridor—may also be affected. The City of Rifle, although outside of the PSSA boundary, is a focus of this analysis because it is a major service center and housing location for the oil and gas workforce in the region.

**The Secondary Socioeconomic Study Area (SSSA).** As documented in a number of recent studies, Rio Blanco County lies at the center of a large, interdependent economic region that stretches from eastern Utah to the border of Eagle County, Colorado (BBC, 2008; Redifer et al 2008). This sparsely populated, five-county area incorporates one Utah county (Uintah) and four northwest Colorado counties. The subject area shares a common economic base of ranching, hunting and tourism as well as energy extraction (oil, gas and coal). Grand Junction, Colorado is the largest service community in the region, but much of the remainder of the region's resident population resides in small towns dispersed broadly across this large geographic area. Interstate 70 is the primary transportation corridor but beyond the interstate corridor, road systems are limited. For the purposes of this analysis, this five-county SSSA includes Garfield, Rio Blanco, Moffat and Mesa counties in Colorado, and Uintah County, Utah.

Within the SSSA, potential changes to WRFO management and operations will affect the socioeconomic environment, but effects will be diffused because of the long distances and the multiple communities involved. Nevertheless, because of the economic interdependence of this area, it is appropriate to consider this broader region as part of the socioeconomic evaluation.

The PSSA (Rio Blanco County) and the larger SSSA are shown in Exhibit I-1 on the following page.

BLM_0020609

*Social and Economic Analysis Technical Report*

**Exhibit I-1.**
**The BLM White River District and the Primary and Secondary Socioeconomic Study Areas**



Source:   BBC Research & Consulting, 2008.

## Methods

Methods, sources, key assumptions and metrics for the social and economic analysis are described in the following portion of this section.

**Affected Environment.** Information to characterize baseline socioeconomic conditions in the study area was assembled from local, state and federal data sources as well as previous reports and publications. The study team also conducted interviews with local sources within the primary and secondary socioeconomic study areas.

Published data were used to describe current conditions and historic trends in measures such as total population, ethnic/minority population, housing, total employment, employment by sector, earnings

BLM_0020610

by sector, labor force, unemployment rates, household income and other general economic and demographic metrics. Published data sources reviewed and used in the analysis include:

- Information from federal sources, such as demographic information from the 2000 Census and economic information from the Bureau of Economic Analysis, Regional Economic Information System;

- Information from state sources, including the Colorado State Demography Office, Colorado Department of Labor, and Utah state agencies; and

- Information from local sources, including local government budget and operating data.

Information from a number of previous reports also contributed substantially to the description and evaluation of existing socioeconomic conditions. Among the key reports used in this evaluation were:

- Socioeconomic studies conducted by BBC Research & Consulting in 2005 through 2008 for Garfield County, the Associated Governments of Northwest Colorado and the Colorado Department of Local Affairs;

- Socioeconomic studies conducted by Mesa State College in 2007;

- The 2008 environmental impact statement developed by the BLM for proposed management plan amendments to address land use allocations for potential oil shale and tar sands development; and

- Extensive previous literature regarding social issues associated with energy development in rural areas of the Western U.S.

The study team also conducted interviews with representatives of a variety of interests within the study area, including local government officials, ranchers, recreational interests and various other sources. A complete list of these sources is provided at the end of this report.

**Social and economic environmental consequences.**  The analysis of oil and gas leasing effects on social and economic conditions is based on the following indicators and attributes:

*Indicators*

- Economic conditions in the socioeconomic study area;
- Demographic conditions in the socioeconomic area;
- Fiscal conditions within state and local governments; and
- Social conditions within Planning Area and local communities.

*Attributes*

- Direct oil and gas-related employment;
- Direct recreation, tourism, and hunting-related employment;
- Direct agriculture employment;
- Secondary jobs related to oil and gas, recreation, tourism and hunting and agriculture;
- Total population in study area and population by location;

BLM_0020611

*Social and Economic Analysis Technical Report*

- Direct and indirect revenue for state and local governments resulting from BLM-managed activities;
- Direction, magnitude and rate of change in demographic conditions;
- Change in economic conditions for "traditional" industries – agriculture, recreation/tourism and energy;
- Changes in land use; and
- Geographic concentration of land use, demographic and economic changes.

Attributes and indicators were quantified, where feasible. Qualitative assessments were also used to evaluate potential effects.

In some cases, social effects are described in terms of effects to the quality of life. Factors that could affect quality of life include the amount and quality of available resources, such as grazing and hay land, wildlife and places to hunt, and the pace and character of community growth and development. Quality of life also could also be affected by conflict over resources, such as may occur in allocating BLM land among multiple uses such as grazing, habitat and resource extraction, or conflict over community development, such as whether growth should occur in towns or in the unincorporated county.

The intensity, or magnitude, of social impacts would be roughly in proportion to three indices of change, constructed specifically for this analysis. The first is the annual rate of community growth over the 20 year planning horizon for the RMPA (growth rate metric). The second is the degree of resource dependency among the community labor force and population, as measured by the percentage of the population that depends directly or indirectly on jobs in agriculture, energy, and recreation (resource dependency metric). The third is the stability of the energy industry, as measured by the ratio of "permanent" jobs in field operation and maintenance compared to temporary or rotational jobs in drilling and facilities construction (energy industry stability metric).

Environmental justice is evaluated by identifying populations, communities or groups that may suffer disproportionate adverse effects and considering whether or not those groups are disadvantaged or minority populations based on the data and analyses presented in Part One.

**Key assumptions.** Primary assumptions upon which the social and economic analysis is based are presented below.

- The number of wells completed in each year, under each alternative, is based on the projections developed for the air quality analysis.

- Development of ancillary oil and gas facilities (e.g., pipelines, compressor stations, gas plants) is assumed to be proportional to number of wells developed.

- Oil and gas exploration and development activity may affect agriculture due to changes in the amount of grazing land available for use by ranchers and due to potential increases in the energy-related use of private lands owned by energy companies that have historically been leased back to agricultural operators.

BLM_0020612

- Oil and gas development activity may affect hunting activity due to potential changes in the game population supported within the Planning Area and/or potential changes in the perception of the area as a hunting destination among in-state and out-of-state hunters.

- For assessing cumulative effects, projected future changes in the economic drivers in the PSSA and SSSA are based on the most recent projections developed by the Colorado State Demography Office (SDO) — except for economic activities directly or secondarily associated with oil and gas development and other activities in the Planning Area related to BLM resource management (e.g., hunting, agriculture, tourism).

- Direct and secondary employment and demographic changes resulting from oil and gas development, changes in hunting activity levels and changes in agricultural activity (as well as cumulative economic and demographic effects from reasonably foreseeable activities) were estimated using the socioeconomic model developed for the Associated Governments of Northwest Colorado and Colorado Department of Local Affairs (AGNC model) in 2007-2008. The AGNC model is described later in this section.

The differences in the number of wells assumed in the air quality analysis for the alternatives are assumed to include the collective effects of differences among the management actions for each alternative in technological requirements, timing limitations stipulation, available acreages and other management action requirements for oil and gas development. However, the relationship between the individual and collective management actions under each scenario and the ultimate number of wells that would be developed is difficult to predict. To the extent that the actual timing and magnitude of well development under any of the alternatives differs from the estimates prepared for the air quality analysis, social and economic effects will differ from the estimates presented in this section.

**Social effects metrics.** As discussed in Section IV of this report, current residents of the PSSA have a positive attitude toward growth in general. However, there is concern over an energy industry characterized by uncertain and potentially disruptive cycles of very rapid growth and decline (i.e. a pattern of short term "booms" and "busts.)"

The growth rate metric is the primary indicator of potentially disruptive social impact. Previous "boomtown" case studies have identified annual population growth rates ranging from 5 percent to more than 15 percent (population doubles in less than 10 years) as being socially disruptive (Jacquet 2009:10-11). If an alternative were to cause population growth rates within this range, published observations indicate a range of potential social effects. The principal cause of disruptive social impact is a large or rapid influx of newcomers, transplanted from different social and cultural contexts and focused primarily on short-term economic opportunity, who would settle temporarily in the community. Attributes of this level of disruptive social impact include pressure on local government facilities and services; inflation of local wages and prices to the detriment of those outside the flow of new benefits; dilution of the familiarity, security and mutual support that Western communities value, and alteration of social relationships in the community for the duration of the boom. Historically, rapid growth impacts are often followed by a succeeding bust, another stressful period of re-adjustment and dissatisfaction with the quality of life in reaction to employment and population decline, a deflating economy, and shrinkage of important tax bases. Only when stability returns after

BLM_0020613

a boom and bust episode do residents again begin perceiving the quality of life as satisfactory (Smith et al 2001, Brown et al 2005).

None of the WRFO RMP management alternatives constitutes a large-scale, socially disruptive boom-bust cycle. The average annual population growth rate implied by each management alternative is below the growth rate threshold considered highly disruptive in this analysis. However, this does not eliminate the potential for growth-related social impacts to occur in the PSSA for shorter periods of time within the 20-year planning horizon.. The energy industry is subject to wide growth rate fluctuations over periods of less than 20 years because of external economic circumstances. The short-term swings in activity that might occur during overall planning horizon could cause interim boom-bust episodes where the rates of growth (and subsequent decline) exceed the 5-percent threshold. No specific prediction can be made as to when or how often this kind of disruptive boom-and-bust episode might occur over 20 years or how disruptive they might be. For example, the rapid pullback in drilling activity in Rio Blanco County as resource prices declined and the national economy suddenly descended into recession in 2008 was unforeseen and households, businesses, and local governments are still adjusting to the consequences.

Sustained high levels of growth in the PSSA could also bring about "transformative" change in the character of the area from a social standpoint. Substantial cumulative growth would affect social relations and institutions in the PSSA simply because the character of places and the composition of their populations would change. In effect, growth in the PSSA, varying in degree across the management alternatives, would initiate change that further distances communities from a rural and agricultural past. If sustained and permanent, the change would move communities farther along the path toward urbanization. Social impacts shared by residents of communities experiencing this trend could include rising fear of crime and less openness to casual interaction with others, both of which may derive from the rising number of unfamiliar individuals. Additional social stress may come from upward pressure on the cost of living due to growth. These and other issues associated with growth, such as housing shortages, overtaxed police and fire services, and constraints on health care, education and public infrastructure, would continue to challenge leaders and their constituents. A changing quality of life may also affect the sense of place among more rooted groups in the community, leading to feelings of detachment, even alienation, from political and social affairs.

Social effects of this last kind, i.e. related to sense of place, would concentrate in communities of Meeker and Rangely and especially in the ranch community along Piceance Creek. The key difference among the communities—as confirmed in recent surveys and political dialogue—is that attitudes in Rangely, after decades of close association with the energy industry, tend toward acceptance of change related to energy development, while attitudes in Meeker—and to an even greater degree among residents of ranch community along Piceance Creek—tend toward discomfort and resistance to an industry that has visibly altered the landscape in the Piceance Creek Basin over the past decade.

Two other metrics are presented as proxies for change and social effects that would potentially occur as the energy industry grows under the management alternatives. The first metric represents the share of the resident workforce that depends on the growing gas exploration and development industry in contrast with those who depend on the PSSA's traditional economic drivers. The PSSA's current economic and social institutions are structured around energy resources, grazing capacity, wildlife

BLM_0020614

habitat, and community and recreational settings largely supplied by the BLM. Management decisions that re-allocate these public lands resources would potentially change the composition of the population in terms of its resource dependency.

The final metric that can serve as a proxy for social disruptions is the ratio of "permanent" jobs in the energy industry to drilling and development jobs. This measure is a proxy for the stability of the energy industry as a component of the economic base in the PSSA and as a social and economic part of its communities. Social disruption in the PSSA remains a possibility in any management alternative that is composed primarily of drilling and development activity, which is most susceptible to economic ups and downs. This economic reality becomes a social issue as households, firms and social and governmental institutions cope with the uncertainty and the economic fluctuations likely to occur over the entire 20-year life of the management alternative.

**Other key metrics.** In order to develop a consistent metric for comparison among the management alternatives considered in this EIS, the study team analyzed the impact on direct and secondary agricultural employment in the PSSA by assuming direct agricultural employment is proportional to the amount of public grazing land available in the area. However, there are a number of considerations that could result in smaller or larger impacts on agricultural activity and employment than indicated by changes in grazing land alone. The maximum cumulative reduction in grazing acres does not reflect the effects of reclamation activities following well completion. At no time during the life of the plan would this amount of forage become unavailable all at once because reclamation would reestablish vegetation on abandoned well pads as new pads are approved. This forage would be reestablished to the extent that reclamation activities reestablish palatable plant communities and reclamation areas are accessible to livestock.

Other considerations; however, suggest that the effects on agricultural activity and employment could be greater than indicated by changes in the amount of available grazing land. The noise, disruption and traffic associated with drilling and maintenance activities may have indirect effects on grazing on public lands beyond the areas of direct surface disturbance. Of potentially greater significance to the agricultural sector, development of additional oil and gas wells on public lands in the Planning Area may lead to increased development of related energy facilities on private lands in river valley areas near Piceance Creek and the White River. As discussed in Chapter 3, a substantial proportion of these valley-bottom lands in the Piceance Basin are already owned by energy companies, but have historically been leased back to agricultural operators for hay production. These hay lands provide critical feed for local agriculture during the months outside of the spring and summer grazing season.

The study team has assumed that changes in future hunting activity due to energy development activity, and corresponding social and economic effects, will be proportional to changes in the big-game population. The study team further assumed that the reduction in big-game population would reflect the management goal that BLM has identified for each alternative (e.g., 90 percent of the state-established population objective under Alternative B) and that this reduction would be correlated with the number of new wells developed in each year. (So the full 10-percent reduction under Alternative B would not occur until the maximum well development year of 2031.)

The study team also recognized that the perception of the area among hunters will play an important role in determining hunting activity levels. Consequently, a range of potential effects on hunting-related jobs is presented. The lower end of the impact range assumes that only hunting activity in

BLM_0020615

GMU 22 (which approximately corresponds to the Mesaverde Gas Play Area and the Piceance Basin and represents about 20 percent of all hunting activity in Rio Blanco County) is affected by energy development. The upper end of the impact range assumes that all hunting activity in the Planning Area is affected in proportion to the changes in big-game population objectives identified by BLM's management goal.

The indirect fiscal impacts of the WRFO alternatives are associated with the development of natural resources and the creation of new jobs and resultant new residents migrating to the SSSA and the PSSA for expanded employment opportunities. Key public revenues within the PSSA are closely tied to the value of oil and gas and the cumulative oil and gas production in the area.

The extraction of natural resources generates new resource-specific tax revenues for both state and local governments. Key resource-associated revenues are: severance taxes, federal mineral leasing charges and property taxes. The annual revenues associated with these taxes are influenced by the annual number of new wells, the productivity of wells, the location of wells and the market value of oil and gas.

The State of Colorado has instituted programs to ensure that revenues associated with resource extraction are available to those communities facing the fiscal challenges of providing public services and infrastructure for energy-related growth. The Department of Local Affairs (DOLA) distributes funds directly to communities where energy workers live from DOLA's Employee Direct Distribution Fund. In addition, DOLA maintains an Impact Grant Program that allows energy-impacted communities the opportunity to apply for state grants and loan assistance.

The state's severance tax receipts support multiple state functions, but a share of this severance tax revenue is allocated to the DOLA Direct Distribution Fund and the DOLA Grant Fund. Similarly a share of the Federal Mineral Lease revenues are allocated to the state of Colorado and a portion of these funds are also available to local governments for impact assistance.

The state's programs that distribute tax revenues based on energy worker residency will help mitigate the uncertainty associated with worker commuting decisions and ensure that revenues effectively follow workers wherever they choose to live. The state's impact grant program has the flexibility to provide funds to the appropriate jurisdictions as worker residency choices become clear. Rio Blanco County also imposes a road impact fee, which is designed to recover the costs of road construction associated with oil and gas well development. Worker decisions regarding location of residency will influence the net fiscal effects of growth. In addition to these resource-based revenues, new households will generate the traditional sales and property taxes typically associated with residential growth.

The major issue facing local governments in terms of the indirect fiscal effects of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population and growing commuter workforce, and the challenges presented in making investment commitments given the risk and uncertainty inherent in a resource-based economy. Similar challenges confront private investors considering the development of new housing and other privately provided infrastructure in the area.

BLM_0020616

**Additional Information – The AGNC Model.** In 2007-2008, members of the study team developed a regional economic and demographic model to estimate employment and population effects associated with energy development, and other economic drivers, on behalf of the Associated Governments of Northwest Colorado (AGNC) and the Colorado Department of Local Affairs (DOLA). This regional economic and demographic model (AGNC model) was updated and used in the socioeconomic effects analysis for this EIS.

The AGNC model develops estimates of direct employment related to natural gas development and maintenance of existing wells based on the projected number of new and existing wells in the region each year. The model assumes worker productivity in the natural gas industry will continue to increase gradually over the 20-year planning period as a result of ongoing technological improvements. The model also calculates the cumulative number of producing wells in each year, which determines the size of the natural gas maintenance workforce. A proportion of existing wells are assumed to be retired each year as they reach the end of their economic lives.

The AGNC model determines the proportion of the gas workforce residing in each county within the PSSA and SSSA, and the secondary jobs ("multiplier effects") in the PSSA and SSSA associated with natural gas development and other basic economic activities such as agriculture and hunting. The model converts net employment effects into estimated affects on population based on relationships between jobs, employed residents and corresponding population. To the extent that portions of the natural gas-related workforce, particularly the workers involved in drilling new gas wells, are comprised of temporary workers not residing with their families, the estimated effects on population may be somewhat overstated.

BLM_0020617

BLM_0020618

# Part One.
# Social and Economic Affected Environment

Preparer's note: The information contained in this section was prepared in 2008. Consequently, the economic and demographic data contained herein is approximately four years old. Since 2008, economic conditions in the study area (and elsewhere) have been substantially affected by the global and national economic recession.

The pace of energy development in Northwest Colorado has also slowed substantially since 2008. Whether this slowdown is temporary or more long lasting is uncertain. However, anecdotal information from the study area suggests that the prevalent concerns of a few years ago regarding rapid growth have more recently been supplanted by concerns about retaining jobs and meeting local government fiscal obligations.

BLM_0020619

BLM_0020620

# SECTION II.
# Economic and Demographic Conditions in the Socioeconomic Study Area

This section documents recent employment, population, housing and demographic trends in the area most likely to be affected by changes in BLM resource management decisions. Fiscal and service provision conditions for the area's local communities and key service districts are described in the following Section III. Social conditions are addressed in Section IV.

## Current Economic Activities Specifically Related to Lands Managed by BLM White River Field Office

As discussed in Section I, the geographic area encompassed by the White River Field Office (WRFO) roughly corresponds to the political jurisdiction of Rio Blanco County. A wide spectrum of economic and social conditions in the Primary Socioeconomic Study Area (PSSA)—Rio Blanco County—and the Secondary Socioeconomic Study Area (SSSA) are indirectly influenced by the management and disposition of WRFO lands. Three types of economic activities in the PSSA, however, are most directly related to the management of WRFO lands—agriculture; recreation, hunting and fishing; and oil and gas development.

**Agriculture.** Ranches in Rio Blanco County as a whole raise cattle, sheep and horses. One estimate puts the total county-wide livestock inventory at about 40,000 cattle, 20,000 sheep, and 11,000 horses. A few farms in the PSSA, all within a 20-mile radius of Meeker, still grow grain. In all, the Farm Service Agency lists 475 active agricultural producers in Rio Blanco County. These are producers that sell the output of one or more of four types of commodity: livestock, hay, grain and forage (Lake 2008).

Rio Blanco County ranches function by making use of ownership and use rights on multiple parcels of private and public land. This arrangement has been essential for ranches in the PSSA since before the Taylor Grazing Act of 1934, which culminated 40 years of change in western Colorado agriculture. Over time, successive legislation—beginning with the creation of the White River Forest reserve in 1891—put an end to open range ranching and implemented the existing permit and quota system, which means permittees must own or lease land proportionate to the number of animals grazed on the public range (Husband 1984).

The WRFO manages 144 grazing allotments that, together, provide forage for over 126,000 animal unit months (AUMs). Most of the BLM land is used for livestock grazing in the spring and early summer growing periods. (WRFO 1996).

BLM_0020621

Within the PSSA, the Piceance Creek area stands out as a historical and still important ranch district. Piceance Creek ranches—of which there are 30 in the drainage—have a long history. Two of them are designated as Colorado Centennial Farms, meaning they are working ranches that have been in the same family continuously for 100 years or more. One of the two Piceance Creek ranches on the list is the oldest of the designated Colorado Centennial Farms in all of Rio Blanco County (Colorado Historical Society 2008).

Piceance Creek ranches are cattle or sheep ranches. They currently support an inventory of 5,000 head of cattle and 4,000 head of sheep (Lake 2008). Private parcels on the valley floors and low slopes of Piceance Creek, and its tributaries, contain residences and other structures, hay meadows, and irrigated and cultivated hay fields. Public uplands owned by BLM are leased to ranchers for grazing. Cattle are wintered over on the hay output from private land and are grazed for the four snow-free "turnout" months on forage leased from the BLM and the U.S. Department of Agriculture (USDA) Forest Service.

Over time, difficult conditions for western Colorado agriculture have created pressure to sell off private land as one strategy to sustain a ranching way of life. Piceance Creek ranches have sold land, since perhaps as early as the 1950s, to energy companies seeking land for gas field and oil shale development. Sales of ranch lands in the Piceance Creek area have typically not included all of the private ranch lands. In addition, land sales often have been accompanied by a lease-back arrangement that has allowed families to continue to work and live on the ranch (Ekstrom 2008, Lake 2008, Neilson 2008).

Despite ownership by energy companies, most Piceance Creek ranches continue to be run as ranches by the companies, by the historical owners as lessees, or on a smaller scale to fit lower hay output or reduced forage on grazing allotments. At present, just two former Piceance Creek ranches owned by energy companies are not run as ranches (Lake 2008). Thirteen ranch families have some of their own land and also lease from oil and gas companies, or the State of Colorado (Neilson 2008).

As recent development activity on Piceance Creek indicates, energy companies do convert their own ranch lands to industrial use as the need arises. This is apparent on Piceance Creek where production, gathering, processing and transportation facilities are found on former agricultural land. Seeking income, rancher-owners have also leased or developed land for development-related production, support, and residential facilities. No estimate of the amount or rate of the conversion is made here, but the change of use is clear in places along many county roads in the Piceance Creek area (Burkhead 2008a). Initially, some residential facilities were intended to be temporary, but demand for such accommodations has continued (Rio Blanco County 2005, Burkhead 2008b, Burkhead 2008c). New sales of places with good location for an RV park continue to occur (Neilson 2008).

**Recreation, hunting and fishing.** Lands managed by the WRFO provide recreational opportunities for local residents and visitors, and support hunting and fishing activities that are an important part of the economy in the PSSA.

When the last Resource Management Plan (RMP) was developed for the WRFO in 1997, the Colorado Parks and Wildlife (CPW) had established the following big game objectives for the area: 5,526 elk; 39,026 deer; and 268 Pronghorn. The 1997 RMP also targeted habitat conditions sufficient to support a minimum winter deer population of 24,900 on BLM land in the Piceance Basin (WRFO 1996).

BLM_0020622

These big game populations, along with fishing opportunities in the White River and other streams in the PSSA, provide an important contribution to the economy in Rio Blanco County. The latest preliminary analysis for the CPW indicates that there were approximately 123,000 hunting activity days in Rio Blanco County in 2005, and about 58,000 fishing activity days (an activity day is one individual participating for all or part of a day). Almost one-half of all of the hunting activity days in Rio Blanco County were logged by non-Colorado residents; however, most fishing activity in Rio Blanco County was by Colorado residents (BBC 2008c).

In 2007, hunting and fishing directly and indirectly led to about $30 million in economic activity in Rio Blanco County and supported over 300 jobs. With nearly six percent of total county employment attributable to hunting and fishing, Rio Blanco County is the fourth most dependent on hunting and fishing among Colorado's 64 counties. Only Jackson, San Juan and Mineral counties have a larger percentage of employment that is attributable to hunting and fishing activity (BBC 2008c).

BLM lands provide other recreational opportunities in the PSSA as well. Lands managed by the WRFO provide activities such as:

- Mountain biking;
- Scenic viewing;
- Horseback riding;
- Wildlife viewing;
- Wilderness hiking and backpacking;
- River floatboating (canoeing);
- Motorized (ATV, snowmobile) trail use; and
- Camping (WRFO 1996).

Statistics on the extent of participation in these recreational activities in the PSSA, and their economic contribution, are not available. Approximately 80 percent of the public lands in Rio Blanco County (1.15 million of 1.44 million acres) are managed by BLM (USDOI BLM WRFO 2008). Although the lands managed by the White River National Forest in the eastern portions of the county consist of far fewer acres than the lands managed by BLM, the National Forest lands include important areas for fishing, hiking, and other recreational uses.

**Oil and gas.** There is a long history of energy development in the region, as discussed further in Section IV of this report. Most recently, the combined study area has been one of the focal points in the natural gas "boom" that has occurred in northwest Colorado since 2000. Exhibit II-1 on the following page depicts the general location of gas wells completed in northwest Colorado between 2000 and 2007.

BLM_0020623

*Social and Economic Analysis Technical Report*

**Exhibit II-1.**
**Natural Gas Wells Completed In Northwest Colorado, 2000 to 2007**



Source:   BBC Research & Consulting, 2007, based on Colorado Oil and Gas Conservation Committee data.

Thus far, the primary focus of natural gas exploration and production in northwest Colorado has been in Garfield County, south of the PSSA. As of September 2007, Rio Blanco County accounted for about 1,500 of the 9,500 wells completed since 2000, compared to 6,500 in Garfield County.

Determining the economic contribution of natural gas activity to individual counties within northwest Colorado is complicated by differences between the geographic locations of where the activity takes place (well locations), where the businesses providing development services (including subcontractors) are based, and where the employees reside. As discussed later in this section, up to the present, many of the workers at Rio Blanco County well sites live in nearby counties and many of the businesses are also based elsewhere—primarily in Mesa and Garfield counties in Colorado, as well as Uintah County, Utah.

BLM_0020624

The socioeconomic analysis and forecasts developed in 2008 for the Associated Governments of Northwest Colorado (AGNC) and the Colorado Department of Local Affairs (DOLA) sought to sift through the varying geographic complexities and estimate the economic effects of gas development, by location, within northwest Colorado. That analysis estimated that about 1,000 jobs in Rio Blanco County were directly or indirectly supported by natural gas activity in 2005, and the figure was anticipated to more than double by 2010 (BBC 2008b), although the recent economic downturn and falling prices for natural gas may slow development in the near term.

There is no way to determine exactly how many of these jobs are related to gas wells located on lands managed by the WRFO. However, the Reasonably Foreseeable Development Scenario for the RMPA indicates that approximately 80 percent of new wells in Rio Blanco County are expected to be located on lands managed by the WRFO (USDOI BLM 2007). Recognizing that some of the gas workers that reside in Rio Blanco County also commute out to work on wells located on non-WRFO managed lands in Garfield and Moffat counties, perhaps 50 percent of current oil and gas-related employment in Rio Blanco County stems from development and maintenance of wells and other gas facilities located on lands managed by the WRFO. This proportion is expected to increase in the future as the focus of Piceance Basin natural gas activity shifts north from Garfield County to Rio Blanco County. Given the fluid relationship between well locations, business offices and worker residences, gas activity on WRFO lands also affects employment in the SSSA, as well as the PSSA.

Apart from the three categories of economic activity just described, the lands managed by the WRFO are part of the overall economic, demographic and social conditions in the PSSA and the SSSA. The remainder of this section provides broader information regarding current economic and demographic conditions.

## Overview of General Socioeconomic Conditions in the Primary and Secondary Socioeconomic Study Areas

Rio Blanco County, the primary socioeconomic study area, is one of the largest counties in Colorado in terms of land area, but contains only two incorporated municipalities and has a population of less than 8,000 persons (SDO 2008). The county is part of a larger socioeconomic area (included in the SSSA) with common economic underpinnings and shared growth opportunities and challenges. In recent years, a rapidly growing natural gas industry has supplemented the area's traditional economic base of other energy development (e.g., the Rangely Oil Field), agriculture, tourism, recreation and retirees.

The study area is also influenced by activities along its borders. Resort developments in Pitkin, Eagle and Routt counties are important economic influences on the east side of the SSSA. Uintah County, Utah shares some economic ties with Grand Junction, but also with Salt Lake City to the west. An expanding natural gas industry in southern Wyoming is also an influence on Moffat County and the town of Craig.

A few geographic characteristics of the primary and secondary socioeconomic study areas are particularly important in terms of baseline social and economic characteristics as well as potential environmental consequences of management alternatives:

- The combined study area is very rural. Despite its physical size, the entire area has only about 240,000 residents. Nearly two-thirds of the area's residents are concentrated in Mesa County;

BLM_0020625

- Currently, urbanization is concentrated along the I-70 corridor, which also contains the area's major rail line and the Colorado River. Rio Blanco County, the PSSA, is very large and very sparsely populated;

- Grand Junction is the major regional service center for retailing, professional service, health care and education; and

- There are only two north/south highways in the entire region: SH-13 between Rifle and Meeker, and SH-139 between Grand Junction and Rangely.

The combined study area (PSSA and SSSA), the local road network and the region's communities (by population) are shown in Exhibit II-2 on the following page.

BLM_0020626

**Exhibit II-2.**
**Primary and Secondary Socioeconomic**
**Study Areas and Location of the WRFO Management Area**



Source:   Shape Files Provided by U.S. TIGER data (Census Tiger 2007) and Bureau of Land Management (BLM 2008)

## Regional Economic Trends

**Employment history.** As shown in Exhibit II-3, Rio Blanco County has experienced periods of rapid growth, and rapid decline, in employment over the past 36 years. Rio Blanco County was particularly hard hit by the termination of the Exxon oil shale project in the early 1980's. The pace of employment growth has recovered in recent years with employment expanding at a robust rate of 3.9 percent per year for the period 2000-2006.

The broader region has experienced similar patterns. Between 1970 and 2006, employment in the SSSA grew at an average annual rate of 3.9 percent, faster than the 3.2 percent average growth rate for the State if Colorado as whole (BEA 2008). This long-term growth masks considerable economic fluctuations. Perhaps the most memorable single economic event in the region was the rise and subsequent rapid decline of the oil shale industry during the late 1970s and early 1980s. After a few years of rapid expansion, on May 2, 1982—now known as "Black Sunday"—Exxon terminated its experimental oil shale project near the Town of Parachute, and TOSCO (The Oil Shale Company) and UNOCAL soon followed suit. The resultant oil shale bust produced a large exodus of workers from Colorado's Western Slope.

BLM_0020627

*Social and Economic Analysis Technical Report*

Exhibit II-3 shows employment growth rates for the PSSA and the SSSA over the 36 year period ending in 2006.

**Exhibit II-3.**
**Employment Totals and Average Annual Growth Rate, Socioeconomic Study Area, 1970–2006**

| County, State | Total Employment | | | | | Average Annual Growth Rate | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1970 | 1980 | 1990 | 2000 | 2006 | 1970-1980 | 1980-1990 | 1990-2000 | 2000-2006 |
| Rio Blanco, CO | 2,375 | 4,609 | 3,653 | 4,149 | 5,224 | 9.4% | -2.1% | 1.4% | 4.3% |
| Garfield, CO | 6,055 | 12,262 | 18,245 | 29,693 | 37,255 | 10.3% | 4.9% | 6.3% | 4.2% |
| Mesa, CO | 23,121 | 43,853 | 49,881 | 70,724 | 83,742 | 9.0% | 1.4% | 4.2% | 3.1% |
| Moffat, CO | 2,916 | 6,865 | 6,394 | 7,365 | 8,036 | 13.5% | -0.7% | 1.5% | 1.5% |
| Uintah, UT | 5,121 | 9,123 | 10,057 | 13,667 | 17,844 | 7.8% | 1.0% | 3.6% | 5.1% |

Source:   Bureau of Economic Analysis; BBC Research & Consulting

Although it required nearly ten years for the region to recover the jobs lost during the mid 1980's, the area did stabilize and eventually created a larger and more diverse economy. In the 1990s, the area's low cost of living and relatively affordable housing options spurred the in-migration of retirees and persons attracted by the region's hunting and fishing recreation as well as the affordable lifestyle. In some areas, second homes became an important influence. Since the year 2000, increasing natural gas exploration, development and distribution has further bolstered the regional economy.

Exhibit II-4 shows Rio Blanco County's job growth by sector over the 30-year period between 1970 and 2000[1]. After gaining 1,500 mining jobs by the mid-1980s, Rio Blanco County netted only 117 new mining jobs between 1970 and 2000 (BEA 2008).

**Exhibit II-4.**
**Employment Growth by Industry, Rio Blanco County, 1970 and 2000**

Note:
* Indicates that data was suppressed and total for all industries may not be summation of individual industries.

Source:
United States, Bureau of Economic Analysis (BEA 2008).

| Industry (SIC) | Employment | | Absolute Change | Annual Percent Change | Statewide Annual Percent Change |
|---|---|---|---|---|---|
| | 1970 | 2000 | | | |
| Farm employment | 216 | 276 | 60 | 0.8% | 0.1% |
| Agricultural services, forestry and fishing | 11 | * | * | * | 6.5% |
| Mining | 371 | 488 | 117 | 0.9% | 0.8% |
| Construction | 215 | 278 | 63 | 0.9% | 4.7% |
| Manufacturing | 15 | 62 | 47 | 4.8% | 2.0% |
| Transportation and public utilities | 121 | 125 | 4 | 0.1% | 3.6% |
| Wholesale trade | 19 | * | * | * | 3.1% |
| Retail trade | 304 | 507 | 203 | 1.7% | 3.7% |
| Finance, insurance and real estate (F.I.R.E.) | 72 | 174 | 102 | 3.0% | 4.1% |
| Services | 333 | 796 | 463 | 2.9% | 5.4% |
| Government | 508 | 1,146 | 638 | 2.7% | 1.7% |
| **All Industries** | **2,375** | **4,149** | **1,774** | **1.9%** | **3.6%** |

Although rich in natural resources, prior to year 2000 Rio Blanco County employment had not grown as rapidly as neighboring Garfield or Mesa counties, which have better transportation access and more economic diversity. As noted later in this report[2], the Rio Blanco community harbors some skepticism about forecasts of future job growth based on its long-standing, but never fully realized, label as the "next" area to experience rapid economic expansion.

---

[1] Because the SIC classification system was replaced by a new NAICS industry classification system in 2000, consistent trend historical data can only go to the year 2000.

[2] See Section IV, *Baseline Social Conditions.*

BLM_0020628

Since 2000, however, Rio Blanco County has averaged 4.3 percent job growth per year. This growth rate is similar to the rate of job growth in Garfield County and faster than the rate of job growth in Mesa and Moffat counties (though slower than the growth rate in Uintah County, Utah). Almost 900 of the 1,021 new jobs added in Rio Blanco County from 2001 to 2006 were in the mining and construction sectors (CDLE 2008).

**Current employment.** Exhibit II-5 displays current wage and salary positions by county for 2007.[3] Although wage and salary positions are not a full accounting of all employment, these data provide a valuable comparative profile of both the PSSA and the SSSA. Nearly 50 percent of Rio Blanco County's wage and salary employment is in mining and construction. A large share of these jobs is associated with the county's older oil fields and more recent natural gas development.

**Exhibit II-5.**
**Wage and salary jobs by industry, Primary and Secondary Study Areas, 2007**

| Industry | Primary Area Rio Blanco, CO Number | Primary Area Rio Blanco, CO Percent | Garfield, CO Number | Garfield, CO Percent | Mesa, CO Number | Mesa, CO Percent | Moffat, CO Number | Moffat, CO Percent | Uintah, UT Number | Uintah, UT Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Agriculture | 40 | 1.0% | 179 | 0.7% | 463 | 0.8% | 46 | 1.0% | 71 | 0.5% |
| Mining | 868 | 21.0% | 2,339 | 8.6% | 3,017 | 4.9% | 639 | 14.4% | 3,526 | 24.6% |
| Utilities | 42 | 1.0% | 241 | 0.9% | 378 | 0.6% | * | * | 186 | 1.3% |
| Construction | 1,106 | 26.8% | 4,759 | 17.5% | 5,902 | 9.6% | 264 | 6.0% | 1,105 | 7.7% |
| Manufacturing | 48 | 1.2% | 411 | 1.5% | 3,293 | 5.4% | 90 | 2.0% | 255 | 1.8% |
| Wholesale Trade | 0 | 0.0% | 731 | 2.7% | 2,331 | 3.8% | 256 | 5.8% | 634 | 4.4% |
| Retail Trade | 234 | 5.7% | 3,647 | 13.4% | 8,480 | 13.8% | 735 | 16.6% | 1,579 | 11.0% |
| Transportation and Warehousing | 144 | 3.5% | 1,055 | 3.9% | 2,559 | 4.2% | 144 | 3.2% | 861 | 6.0% |
| Information | 25 | 0.6% | 267 | 1.0% | 998 | 1.6% | 41 | 0.9% | 172 | 1.2% |
| Finance and Insurance | 43 | 1.0% | 601 | 2.2% | 2,187 | 3.6% | 100 | 2.3% | 216 | 1.5% |
| Real Estate and Rental and Leasing | 25 | 0.6% | 656 | 2.4% | 1,222 | 2.0% | 44 | 1.0% | 390 | 2.7% |
| Professional and Technical Services | 67 | 1.6% | 1,194 | 4.4% | 2,330 | 3.8% | 102 | 2.3% | 380 | 2.7% |
| Management of Companies and Enterprises | * | 0.0% | 144 | 0.5% | 91 | 0.1% | * | * | * | * |
| Administrative and Waste Services | 65 | 1.6% | 878 | 3.2% | 3,078 | 5.0% | 164 | 3.7% | 340 | 2.4% |
| Educational Services | 296 | 7.2% | 2,223 | 8.2% | 4,140 | 6.7% | * | * | 857 | 6.0% |
| Health Care and Social Assistance | 260 | 6.3% | 2,317 | 8.5% | 9,037 | 14.7% | 470 | 10.6% | 964 | 6.7% |
| Arts, Entertainment, and Recreation | 54 | 1.3% | 359 | 1.3% | 1,067 | 1.7% | 90 | 2.0% | 141 | 1.0% |
| Accommodation and Food Services | 320 | 7.8% | 2,901 | 10.7% | 6,156 | 10.0% | 492 | 11.1% | 953 | 6.6% |
| Other Services | 67 | 1.6% | 741 | 2.7% | 1,715 | 2.8% | 173 | 3.9% | 400 | 2.8% |
| Public Administration | 423 | 10.2% | 1,562 | 5.7% | 3,079 | 5.0% | 584 | 13.2% | 1,305 | 9.1% |
| **Total** | **4,127** | **100%** | **27,205** | **100%** | **61,523** | **100%** | **4,434** | **100%** | **14,335** | **100%** |

Source:   Colorado Department of Labor, Quarterly Census of Employment and Wages (QCEW).

---

[3] Data in Exhibit II-5 shows the employment distribution by 2-digit North American Industry Classification System (NAICS) in 2007, based on Quarterly Census of Wage and Salary (QCEW) data from the Colorado Department of Labor. The NAICS system replaced the Standard Industrial Classification (SIC) system in 2000 to better describe the nation's increasingly service-oriented economy.

BLM_0020629

*Social and Economic Analysis Technical Report*

Exhibit II-6 on the following page offers a comparison of Rio Blanco County's employment distribution with the State of Colorado as a whole. Exhibit II-6 is based on the total employment estimates developed by the Colorado State Demography Office. The total employment estimates include proprietors as well as the wage and salary workers shown in earlier exhibits of this section.

The 2006 employment comparison indicates:

- Rio Blanco County relies heavily on mining and construction activity, both of which are largely associated with gas development. Over 38 percent of the county's employment is in these industries in comparison with nine percent statewide. This would imply that the PSSA has already transitioned from its agricultural roots, and that further development of this kind would not be as transformative as it might be in an area with less mining and construction experience.

- Rio Blanco County's relatively large share of jobs in public administration reflects the small size of the county's economy and the lack of economies of scale in providing government services.

- Conversely, only a small share of Rio Blanco employment is in retail trade, finance, real estate and other services. This is an indication that a large share of these services currently must be purchased outside of the county.

- Future growth of natural resource-related employment might produce sufficient scale for secondary jobs to develop in retail and services. This would accelerate the amount of employment and population growth but would also diversify the economy and provide greater retail and service options for local residents.

BLM_0020630

*Social and Economic Analysis Technical Report*

**Exhibit II-6.**
**Comparison of 2006 Total Jobs by Sector: Rio Blanco County and State of Colorado**



Note:      Job estimates include proprietors and wage and salary jobs.

Source:   Colorado State Demographer's Office and IMPLAN, 2008.

BLM_0020631

*Social and Economic Analysis Technical Report*

**Unemployment Rates.** Unemployment rates in the PSSA and portions of the SSSA exceeded 10 percent between 1982 and 1987, following the collapse of the oil shale industry. The regional economy has since stabilized and is now experiencing unemployment rates far below statewide averages. These data confirm that increased oil and gas activity has created a high demand for labor throughout the regional economy.

**Exhibit II-8.**
**Unemployment Rates, PSSA and SSSA, 2000—2007**

Source:
Colorado Economic and Demographic Information System, Colorado Department of Local Affairs.

| County, State | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Rio Blanco, CO | 2.9 | 2.7 | 3.5 | 4.7 | 4.3 | 3.6 | 2.6 | 2.1 |
| Garfield, CO | 2.7 | 3 | 4.7 | 5.4 | 4.4 | 3.7 | 2.9 | 2.5 |
| Mesa, CO | 3.2 | 3.5 | 4.9 | 5.7 | 5.1 | 4.7 | 3.9 | 3.2 |
| Moffat, CO | 3.5 | 3.7 | 5 | 6.4 | 5.3 | 4.6 | 3.7 | 3.2 |
| Uintah, UT | 4.2 | 4.4 | 6 | 5.8 | 5.1 | 3.8 | 2.5 | 2.3 |
| Colorado | 2.7 | 3.8 | 5.7 | 6.1 | 5.6 | 5 | 4.3 | 3.8 |

As indicated in Exhibit II-8, Rio Blanco County's unemployment rates are notably low and many local businesses report difficulty in finding skilled workers (BBC, 2008b).

**Salaries and Wages.** Exhibit II-9 shows average reported wages by industry for the region in comparison with the state as a whole.

**Exhibit II-9.**
**Average Weekly Wages by Industry: PSSA, SSSA and State of Colorado, 2007**

| NAICS Code | Industry | Rio Blanco, CO | Garfield, CO | Mesa, CO | Moffat, CO | Uintah, UT | Regional Average | Colorado |
|---|---|---|---|---|---|---|---|---|
| 11 | Agriculture | $ 708 | $ 574 | $ 499 | $ 499 | $ 418 | $ 540 | $ 515 |
| 21 | Mining | $ 1,341 | $ 1,375 | $ 1,316 | $ 1,316 | $ 1,387 | $ 1,347 | $ 1,680 |
| 22 | Utilities | $ 1,233 | $ 1,266 | * | * | $ 1,482 | $ 1,327 | $ 1,326 |
| 23 | Construction | $ 1,479 | $ 963 | $ 659 | $ 659 | $ 729 | $ 898 | $ 877 |
| 31 | Manufacturing | $ 493 | $ 941 | $ 827 | $ 827 | $ 611 | $ 740 | $ 1,094 |
| 42 | Wholesale Trade | * | $ 966 | $ 887 | $ 887 | $ 1,116 | $ 964 | $ 1,269 |
| 44 | Retail Trade | $ 356 | $ 601 | $ 545 | $ 545 | $ 452 | $ 500 | $ 511 |
| 48 | Transportation and Warehousing | $ 1,216 | $ 1,028 | $ 769 | $ 769 | $ 1,090 | $ 974 | $ 849 |
| 51 | Information | $ 657 | $ 852 | $ 757 | $ 757 | $ 513 | $ 707 | $ 1,457 |
| 52 | Finance and Insurance | $ 561 | $ 1,000 | $ 780 | $ 780 | $ 665 | $ 757 | $ 1,322 |
| 53 | Real Estate and Rental and Leasing | $ 1,151 | $ 755 | $ 411 | $ 411 | $ 1,107 | $ 767 | $ 829 |
| 54 | Professional and Technical Services | $ 618 | $ 998 | $ 495 | $ 495 | $ 915 | $ 704 | $ 1,449 |
| 55 | Management of Companies | * | $ 899 | * | * | * | $ 899 | $ 2,117 |
| 56 | Administrative and Waste Services | $ 864 | $ 792 | $ 412 | $ 412 | $ 620 | $ 620 | $ 609 |
| 61 | Educational Services | $ 553 | $ 611 | * | * | $ 555 | $ 573 | $ 717 |
| 62 | Health Care and Social Assistance | $ 658 | $ 877 | $ 601 | $ 601 | $ 474 | $ 642 | $ 813 |
| 71 | Arts, Entertainment, and Recreation | $ 283 | $ 387 | $ 503 | $ 503 | $ 351 | $ 405 | $ 572 |
| 72 | Accommodation and Food Services | $ 368 | $ 332 | $ 250 | $ 250 | $ 238 | $ 288 | $ 322 |
| 81 | Other Services | $ 651 | $ 578 | $ 481 | $ 481 | $ 626 | $ 563 | $ 604 |
| 92 | Public Administration | $ 616 | $ 839 | $ 754 | $ 754 | $ 693 | $ 731 | $ 977 |

Note:    * Indicates suppressed data.

Source:    Colorado Department of Labor and Employment and Utah Department of Workforce Services, QCEW, 2007.

BLM_0020632

Although the average salary among mining jobs in Rio Blanco is below the statewide average, this likely results from the inclusion of high-level executive positions located in Denver, Grand Junction and other metropolitan areas in the statewide average. High demand and highly-skilled labor positions in construction, transportation and real estate, often associated with energy development, pay well within Rio Blanco County. However, professional positions (e.g. government and educational employees) are paid below statewide averages (CDLE 2008).

Exhibit II-10 summarizes wage trends—net of inflation—from 2001 to 2007 for all wage and salary employment. All counties in the study area have witnessed wage escalation beyond Colorado statewide averages.[4] In recent years, wage growth in Rio Blanco County has been remarkable, particularly in relationship to trends in the state as a whole, which has experienced very little overall growth in real wage levels net of inflation.

**Exhibit II-10.**
**Wage Trends in the Socioeconomic Study Area and Colorado, 2001 to 2007**

| | Average Weekly Wage | | | | | | Annual Average Percent Change (after inflation) | | Total Percent Change (after inflation) | |
| | 2001 (in 2001 dollars) | | 2001 (in 2007 dollars) | | 2007 (in 2007 dollars) | | | | | |
| County, State | All Industries | Mining | All Industries | Mining | All Industries | Mining | All Industries | Mining | All Industries | Mining |
|---|---|---|---|---|---|---|---|---|---|---|
| **Rio Blanco, CO** | **$551** | **$975** | **$647** | **$1,145** | **$994** | **$1,341** | **7.4%** | **2.7%** | **53.7%** | **30.4%** |
| Garfield, CO | $585 | $1,176 | $687 | $1,381 | $814 | $1,375 | 2.9% | -0.1% | 18.5% | -0.8% |
| Mesa, CO | $527 | $912 | $619 | $1,071 | $697 | $1,316 | 2.0% | 3.5% | 12.7% | 39.6% |
| Moffat, CO | $567 | $1,002 | $666 | $1,176 | $728 | $1,316 | 1.5% | 1.9% | 9.4% | 21.0% |
| Uintah, UT | $568 | $988 | $667 | $1,160 | $883 | $1,387 | 4.8% | 3.0% | 32.3% | 34.0% |
| Colorado | $730 | $1,447 | $857 | $1,699 | $873 | $1,680 | 0.3% | -0.2% | 1.9% | -2.2% |

Source: Colorado Department of Labor and Employment, and Utah Department of Workforce Services, QCEW, 2007.

It is also notable that the overall average wage in Rio Blanco County now exceeds the state average. Interviews with Rio Blanco businesses and recent studies in the area suggest that there has been a considerable increase in wages as growing local businesses of all kinds have been forced to compete for local labor in the very isolated area (BBC 2008b).

## Population

**Growth trends.** Population growth tends to mirror employment trends. Population growth in the region accelerated after the national recession of 1973-1974, stimulated in part by rising energy prices, federal fuels policies and investment in northwestern Colorado oil shale. Growth was unaffected by the national recessions of 1980 and 1981-1982, but Exxon's closure of the Colony Oil Shale Project in 1982 dealt the region a significant setback, as job losses caused a widespread dispersal from the area (BBC 2008b).

---

[4] The wage data are adjusted 17.4 percent for inflation between 2001 and 2007.

BLM_0020633

*Social and Economic Analysis Technical Report*

Exhibit II-11 displays the relationship between aggregate population data and employment for the five-county region encompassing the primary and secondary socioeconomic study areas.



**Exhibit II-11. Population and Employment Growth in the Five-county Primary and Secondary Socioeconomic Study Areas, 1970–2006**

Source:
U.S. Bureau of Economic Analysis, DOLA, Utah Governor's Office of Planning and Budget, and Utah Department of Workforce Services.



Exhibit II-12 reflects population growth by county for the region. Population trends have not been uniform throughout the study region. Rio Blanco and Moffat counties were particularly hard hit by the oil shale industry pullout in the early 1980s and took many years to recover.

**Exhibit II-12.**
**Population Growth by County, Primary and Secondary Study Area, 1970–2006**

| County, State | 1970 | 1980 | 1990 | 2000 | 2006 | Annual Growth Rate 1970 2000 | 2000 2006 |
|---|---|---|---|---|---|---|---|
| Rio Blanco, CO | 4,842 | 6,255 | 5,972 | 5,986 | 6,288 | 0.7% | 0.8% |
| Garfield, CO | 14,821 | 22,514 | 29,974 | 43,791 | 53,020 | 3.7% | 3.2% |
| Mesa, CO | 54,374 | 81,530 | 93,145 | 116,255 | 135,468 | 2.6% | 2.6% |
| Moffat, CO | 6,525 | 13,133 | 11,357 | 13,184 | 13,729 | 2.4% | 0.7% |
| Uintah, UT | 5,121 | 9,123 | 10,057 | 13,667 | 17844 | 3.3% | 4.5% |
| Colorado | 2,209,596 | 2,889,733 | 3,294,394 | 4,301,261 | 4,813,536 | 2.2% | 1.9% |

Source:   Colorado Department of Local Affairs, and Utah Governor's Office of Planning and Budget.

In small rural areas, individual construction projects, such as expansion of I-70 or construction of the Craig electric generating station, can unduly influence year-to-year population data. The more diverse economies of Garfield and Mesa counties tend to stabilize population fluctuations. Rio Blanco County experienced population growth rates below one percent annually between 1970 and 2006.

Comparing the relatively slow rate of population growth in Rio Blanco County since 2000 with the much faster rate of employment growth shown earlier in Exhibit II-3 indicates that the recent surge in job growth has not yet led to a corresponding increase in county population. Instead, recent job growth has likely resulted in an increase in commuting into the county from Garfield, Mesa and Moffat counties and from Uintah County, Utah.

BLM_0020634

Exhibit II-13 presents population trends for the larger municipalities in the PSSA and SSSA that are the key residential and retail service centers in the region. If development were to accelerate, these communities would likely experience the most notable direct or indirect socioeconomic effects.

**Exhibit II-13.**
**Population Growth for Selected Municipalities, 1970–2006**

|  | 1970 | 1980 | 1990 | 2000 | 2006 | Average Annual Growth Rate | |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1970-2000 | 2000-2006 |
| **Regional Municipalities** |  |  |  |  |  |  |  |
| Craig, Colorado | 4,205 | 8,133 | 8,091 | 9,189 | 9,260 | 2.6% | 0.1% |
| Fruita, Colorado | 1,822 | 2,810 | 4,045 | 6,478 | 10,349 | 4.3% | 8.1% |
| Glenwood Springs, Colorado | 4,106 | 4,637 | 6,561 | 7,736 | 8,743 | 2.1% | 2.1% |
| Grand Junction, Colorado | 20,170 | 27,956 | 32,893 | 41,986 | 51,631 | 2.5% | 3.5% |
| Meeker, Colorado | 1,597 | 2,356 | 2,098 | 2,242 | 2,357 | 1.1% | 0.8% |
| Rangely, Colorado | 1,591 | 2,113 | 2,278 | 2,096 | 2,111 | 0.9% | 0.1% |
| Rifle, Colorado | 2,150 | 3,215 | 4,858 | 6,784 | 8,706 | 3.9% | 4.2% |
| Vernal, Utah | N/A | N/A | 6,644 | 7,702 | 8,140 | N/A | 0.9% |
| Unincorporated Rio Blanco County | 1,654 | 1,786 | 1,596 | 1,648 | 1,820 | 0.0% | 1.7% |

Note: Vernal, Utah data are from the U.S. Census Bureau.

Source: Colorado Department of Local Affairs, U.S. Census Bureau Population Estimates Program.

Growth patterns have shifted over the years. In the most recent six-year period, the communities of Fruita, Rifle and Grand Junction have witnessed the most rapid development.

**Household size.** Exhibit II-14 presents average household size for the PSSA and SSSA. Household size does not vary radically within the PSSA and the SSSA, except for Uintah County, which has a substantially larger average household size than its nearby Colorado counties (Claritas 2008a). Communities with smaller average household sizes are sometimes older and slow growing, with more one and two person elderly households; or conversely, younger and faster growing, with singles and younger couples.

**Exhibit II-14.**
**Average Household Size, Primary and Secondary Study Area, 2006**

Note:
Claritas was used for Uintah County's Average Household Size.

Source:
Colorado Department of Local Affairs and Claritas.

| PSSA | Average Household Size | SSSA | Average Household Size |
|---|---|---|---|
| Rio Blanco County, CO | 2.49 | Garfield County, CO | 2.66 |
| Town of Meeker | 2.39 | Mesa County, CO | 2.46 |
| Town of Rangely | 2.59 | Moffat County, CO | 2.59 |
| Town of Rifle | 2.68 | Uintah County, UT | 2.93 |
|  |  | **Colorado** | **2.55** |

**Race and ethnicity.** The population within the PSSA and SSSA is relatively homogenous, consisting primarily of white, non-Hispanic residents. Exhibit II-15 on the following page displays the percentage of the population that identifies themselves as non-white. In 2000, 95 percent of Rio Blanco County's population identified themselves to be racially white; the remaining portion of the population identified themselves as one of the other racial categories: African American, Asian, Two or More Races, "Some other Race," American Indian or Native Hawaiian.

BLM_0020635

*Social and Economic Analysis Technical Report*

Individuals identifying themselves of Hispanic ethnicity trace their origin to Mexico, Puerto Rico, Cuba, Spanish-speaking Central and South American countries, and other Spanish cultures. Exhibit II-16 presents the percentage of the population identifying themselves as being of Hispanic origin. Counties within the study areas saw a rise in their Hispanic population between 1990 and 2000, consistent with national trends. Garfield County saw the greatest rise in Hispanic residents, indicating that overall population growth in the 1990s included a larger proportion of Hispanic residents than was seen in previous decades.

The State if Colorado as a whole contains a larger non-white and Hispanic population, as compared to the PSSA and the SSSA. In 2000, 17 percent of the state identified themselves as non-white, with 7 percent identifying themselves as "Some Other Race"; 4 percent of the population identifying themselves as African American; and 3 percent considering themselves of "Two or more races" (Census 2000 STF3).

**Exhibit II-15.**
**Non-White Population, as a Percent of Total Population, Socioeconomic Study Areas, 1990-2000**

Source: U.S> Census Bureau, 2000, SF3

|  | 1990 | 2000 |
|---|---|---|
| Rio Blanco, CO | 3% | 5% |
| Garfield, CO | 3% | 10% |
| Mesa, CO | 5% | 8% |
| Moffat, CO | 4% | 6% |
| Uintah, UT | 12% | 12% |

**Exhibit II-16.**
**Hispanic Population, as a Percent of Total Population, Socioeconomic Study Areas, 1990-2000**

Note:
Claritas was used for most recent estimation years, as some study area counties are too small to be included in the Census' American Community Survey.

Source:
U.S. Census Bureau and Claritas.

|  | 1990 | 2000 |
|---|---|---|
| Rio Blanco, CO | 4% | 5% |
| Garfield, CO | 6% | 17% |
| Mesa, CO | 8% | 10% |
| Moffat, CO | 6% | 9% |
| Uintah, UT | 3% | 4% |

**Personal income and Poverty.** Despite growing wage levels, Rio Blanco County residents continue to trail the state as a whole in measures of household and personal income. Currently, Rio Blanco County is home to a larger proportion of low-earning households than the region as a whole. For example, 13 percent of households in the SSSA earn $100,000 or more per year. This compares to only nine percent of households in Rio Blanco County (Claritas 2008b). Household income statistics reflect many factors, including the number of persons per household, household age, and the number of workers per household.

BLM_0020636

Exhibit II-17 provides income statistics for the PSSA and SSSA. Rio Blanco County, as well as all counties within the SSSA, trail the State of Colorado as a whole in terms of average household income, median household income and per capita income. Garfield County residents have the highest incomes with a median household income 25 percent greater than Rio Blanco County's corresponding statistic.

**Exhibit II-17.**
**Average, Median and Per Capita**
**Income for the Study Area, 2007**

Source:
Claritas.

| | Average Household Income | Median Household Income | Per Capita Income |
|---|---|---|---|
| **Rio Blanco County, CO** | **$52,409** | **$44,804** | **$21,143** |
| Town of Meeker | $48,236 | $40,132 | $20,632 |
| Town of Rangely | $58,377 | $48,977 | $21,921 |
| Town of Rifle | $57,500 | $48,788 | $21,076 |
| | | | |
| Garfield County, CO | $68,264 | $55,441 | $25,473 |
| Mesa County, CO | $55,642 | $42,772 | $22,583 |
| Moffat County, CO | $55,795 | $49,386 | $21,936 |
| Uintah County, UT | $52,533 | $43,573 | $17,832 |
| | | | |
| Colorado | $73,236 | $56,432 | $28,654 |

Exhibit II-18 compares the household income distributions of the PSSA and SSSA. Many of the higher-earning households in the SSSA reside in Garfield and Mesa counties, where there is greater economic diversity.

**Exhibit II-18.**
**Household Income**
**Distribution, Rio Blanco**
**County and Socioeconomic**
**Study Area, 2007**

Source:
Claritas.



Poverty levels within the SSSA were consistent with statewide poverty statistics. In 2000, ten percent of residents in the entire SSSA were living below the poverty level, compared with nine percent of the state's residents. Garfield County reported the lowest county-level poverty rate within the SSSA (seven percent), while Uintah County, Utah had the highest incidence of poverty within the SSSA at 14 percent (Census 2000 STF3).

BLM_0020637

**Commuting Patterns.** Commuting data reflect the interdependency of the counties within the study areas. Because the most complete available data come from the 2000 Census, these data do not capture more recent changes in job location and community growth. The tendency to commute out of the area for resort jobs in Pitkin and Routt counties is notable. Exhibit II-19 presents the county of which residents commute to within the SSSA.

**Exhibit II-19.**
**Place of Work for SSSA Residents, Secondary Socioeconomic Study Area, 2000**

| | Place of Work | | | | | | |
|---|---|---|---|---|---|---|---|
| | Study Area | | | | | Non-Study Area | |
| Place of Residence | Garfield, CO | Mesa, CO | Moffat, CO | Rio Blanco, CO | Uintah, UT | Pitkin, CO | Routt, CO |
| Rio Blanco, CO | 3% | 0% | 4% | 89% | <1% | 1% | <1% |
| Garfield, CO | 74% | <1% | <1% | <1% | NA | 16% | <1% |
| Mesa, CO | 1% | 96% | <1% | <1% | NA | <1% | <1% |
| Moffat, CO | <1% | <1% | 72% | 3% | <1% | NA | 21% |
| Uintah, UT | <1% | NA | <1% | 1% | 88% | NA | <1% |

Note:   NA indicates that this commuting pattern did not exist in the JTW data.
Source:  Census Bureau, Journey to Work data, 2000.

Recent natural gas exploration and development is changing commuting patterns in northwest Colorado. The location of gas drilling is continuously changing as wells are completed and new drilling commences in new locations. The gas workforce is similarly mobile. The recently completed study for the Associated Governments of Northwest Colorado contained updated commuting estimates for the natural gas workforce based on a combination of data on worker residence locations filed by energy companies for purposes of severance tax distribution, and data on well drilling by location (BBC 2008b). Exhibit II-20 depicts the estimated relationship between work sites (e.g. well locations) and the residences of the natural gas workforce.

As shown in Exhibit II-20, only 25 percent of gas workers operating in Rio Blanco County also live in that county. By comparison, an estimated 45 percent of the workers drilling wells in Garfield County also live there. Commuting from the borders of the region is particularly significant for wells drilled in Rio Blanco County (primarily Utah workers) and Moffat County (primarily Wyoming workers).

**Exhibit II-20.**
**Estimated Work Site-to-Residence Relationship**
**for Natural Gas Operations in Northwest Colorado**

| County | Place of Residence | | | | Edge of | |
|---|---|---|---|---|---|---|
| Well Location | Garfield, CO | Rio Blanco, CO | Moffat, CO | Mesa, CO | Region | Total |
| Rio Blanco, CO | 25% | 25% | 5% | 20% | 25% | 100% |
| Garfield, CO | 45% | 5% | 0% | 50% | 0% | 100% |
| Moffat, CO | 15% | 10% | 10% | 30% | 35% | 100% |
| Mesa, CO | 0% | 0% | 0% | 100% | 0% | 100% |

Note: Data not available for Uintah County.
Source:   BBC Research & Consulting, 2008.

Anecdotal data suggest that lengthy commuting patterns reflect the challenges in finding local housing and services near active gas fields in Rio Blanco and Garfield counties.

BLM_0020638

## Housing Trends

It is likely that unincorporated Rio Blanco County and the nearby towns of Meeker and Rangely—the PSSA for this analysis—will be the most immediately and directly affected by an RMP amendment as well as new workforce-related population and related demand for housing. Given the area's human geography (i.e., the distribution of communities, roads and resources), portions of Garfield County may also be affected, particularly the City of Rifle and nearby communities along the I-70 corridor. In addition, anecdotes from local interviews suggest that long commutes can occur when local housing is tight near the active gas fields in Rio Blanco and Garfield counties (Brown 2008).

**Overview.** Although it required nearly a decade for the region to recover the jobs lost during the mid-1980's, the area eventually stabilized to support a larger and more diverse economy. In the 1990s, the area's low cost of living and relatively affordable housing options spurred the in-migration of retirees and persons seeking a different quality of life into the region. In some areas, second homes became an important influence. Rio Blanco County has participated in both the retirement and second home trends, with seasonal and second-home interest focused especially on the locally-identified "Upper White River Valley" east of Meeker (Viscardi 2008). Since the year 2000, increasing natural gas exploration, development and distribution has further bolstered the regional economy.

As noted in Exhibit II-21, Garfield and Mesa counties capitalized on a strong housing market between the years 2000 and 2006, expanding their current housing stocks by 18 percent and 20 percent, respectively. Within Garfield County, Rifle's housing stock grew by about 25 percent to 3,231 units.

In contrast, Rio Blanco County saw little housing development during this time. The total number of housing units in Rio Blanco County increased by about 6 percent between 2000 and 2006, from 2,855 to 3,021 units. Moffat County also experienced slow development over the most recent six-year period.

**Exhibit II-21.**
**Housing Units, Secondary Socioeconomic Study Area, 2000-2006**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Percent Change 2000-2006 |
|---|---|---|---|---|---|---|---|---|
| Rio Blanco County, CO | 2,855 | 2,872 | 2,897 | 2,915 | 2,938 | 2,977 | 3,021 | 6% |
| Town of Meeker | 1,054 | 1,056 | 1,069 | 1,076 | 1,085 | 1,095 | 1,111 | 5% |
| Town of Rangely | 899 | 904 | 905 | 906 | 907 | 908 | 908 | 1% |
| | | | | | | | | |
| Garfield County, CO | 17,336 | 17,972 | 18,622 | 19,117 | 19,489 | 19,995 | 20,525 | 18% |
| City of Rifle | 2,586 | 2,675 | 2,795 | 2,889 | 2,974 | 3,110 | 3,231 | 25% |
| Mesa County, CO | 48,427 | 50,400 | 51,811 | 53,437 | 54,989 | 56,541 | 58,098 | 20% |
| Moffat County, CO | 5,635 | 5,701 | 5,749 | 5,839 | 5,872 | 5,943 | 6,019 | 7% |

Note:   Uintah County is not included because of the lack of available data.

Source:   Colorado Department of Local Affairs (SDO 2008).

BLM_0020639

*Social and Economic Analysis Technical Report*

In the past, Garfield County has been the affordable housing provider for nearby Pitkin and Eagle counties seasonal workforce. However, a 2006 study released by the Garfield County Building and Planning Department suggested housing was becoming less affordable in the county and commuting to nearby resorts was less common. The study reported that home appreciation was exceeding increases in average wages, thereby making the median priced home in Garfield County unaffordable for a household earning the county's median household income (RMN 2007).

Garfield County boasts the most expensive housing stock within the SSSA. In 2007, Garfield County reported a median home price of $267,368, compared with the much lower home prices in Rio Blanco ($119,589) and Uintah counties ($94,169). Garfield County's housing is also newer; the median year of construction for Garfield County housing stock was 1986. In Rio Blanco County, the median year of construction for a home was 1975 (Claritas 2008c)

**Vacancy rates.** Exhibit II-22 shows housing vacancy rates for the Colorado counties in the primary and secondary socioeconomic study areas. Rio Blanco and Moffat counties have had relatively high vacancy rates over most of the past two decades. Vacancy rates in Mesa and Garfield counties have been comparatively lower, generally staying below ten percent since 1990 (BBC 2008a). The decline in vacancy rates for all counties in 2006 reflects recent effects from growth in regional energy development.

It should be noted that vacancy rates reported here include second homes, which alters vacancy statistics and interpretation. Local authorities in both Garfield and Rio Blanco counties report that for-sale housing and rental markets are now very constrained and availability is very low. Rifle vacancy is reportedly less than one percent in 2007, a rate at which available units among existing housing are extremely difficult to find (BBC 2008a).



**Exhibit II-22. Vacancy Rates, 1985–2006**

Note:
Uintah County is not included because of the lack of available data.

Note:
Data provided by Colorado Department of Local Affairs.

Source:
BBC 2008b.



Observers from Rio Blanco County have expressed skepticism about even modest vacancy rates. For-sale housing prices have remained high, reflecting sellers' expectation of appreciation in the future (Wix 2008). The price of houses sold over the past 18 months to two years reportedly indicate that values have doubled since 2006 (Brown 2008). In the summer of 2008, demand for homes priced under $250,000 was very strong, homes priced above that tend to stay on the market for much longer intervals (Wix 2008).

BLM_0020640

**Temporary workers.** Another distinctive aspect of the energy development currently taking place in northwest Colorado is the large number of temporary workers living out of motel rooms and RV campgrounds in the region. Based on 2007 interviews with local visitor bureaus, BBC estimates that between 15 and 30 percent of the approximately 6,800 motel rooms in the four-county northwest Colorado region are continuously occupied by workers associated with regional energy development (BBC 2008b).

## Housing Development Activity, Plans and Issues

**Rio Blanco County**. Economic expansion in recent years has lead to a modest increase in Rio Blanco County housing starts. Exhibit II-23 reflects building permit data for Meeker, Rangely and unincorporated Rio Blanco County. Meeker and Rangely have seen steady growth in housing starts since mid-year 2004, but the number of new units remains very small—about 60 units in total in 2007. Land with the potential for subdivision is available in Rio Blanco County and the county is beginning a new comprehensive planning process, which is intended to better define the location and building conditions that are suitable for rural subdivision growth (Brown 2008).

**Exhibit II-23.
Building Permits**

Source:
U.S. Census Building Permit data



Industry activity has stimulated some subdivision and housing construction in unincorporated Rio Blanco County along Highway 64 between Meeker and the intersection of County Road 5, which is the main access to ongoing natural gas development. New lots have been developed and housing built in Meeker, where the town's comprehensive plan update of 2005 showed that three-fourths of Meeker's households supported growth as "somewhat" or "very" important (Town of Meeker 2005).

Real estate agents report that current demand for Meeker rental housing is high, with supplies of units low, availability "near zero," and rents "very high" (Wix 2008). Availability of this type of housing in Meeker and Rangely has been limited or extremely tight since the fall of 2005 (Blankenship Consulting and Sammons/Dutton 2006). Policies in the Meeker plan recognize this need, and the plan's objectives call for a range of development densities (Town of Meeker 2005). Recently, three apartment complexes have been completed in Meeker and a fourth is nearing completion. However, these were undertaken by firms specifically for employee use (Brown 2008). Most of the recent construction of single-family housing units in the Meeker area has occurred at suburban or rural residential densities, despite demand for lower priced "for sale" and rental units. Similarly, recent subdivision proposals in Meeker have been for larger lots (Town of Meeker 2008).

BLM_0020641

Transient accommodations, such as motels and RV parks, are also in high demand, often as a substitute for more permanent residences. Construction crews occupied many mobile home spaces and motel units, leading local land owners to apply for and receive permits for temporary RV parks during the Entrega and WIC pipeline projects, which have since been completed (Blankenship Consulting and Sammons/Dutton 2006). As new projects have been launched, demand for this type of housing has remained high (Burkhead 2008b and 2008c). Long-established seasonal demand from hunters is also a factor in Meeker, and transient accommodations are stretched thin when demands pile up. This situation led organizers of the 2008 annual Meeker Classic Sheepdog Event to recruit housing for participants from local residents for the first time because of the lack of available commercial lodging (Brown 2008).

**City of Rifle.** The City of Rifle is outside of the PSSA, but the community could be directly affected by BLM WRFO management decisions if growth rates are high or communities within the PSSA are unable to expand offerings in line with population demands. With approximately 9,000 residents, Rifle is the largest city between Glenwood Springs and Grand Junction and is located on one of two north-south highways that provide direct access into the BLM White River area. Rifle has grown rapidly in recent years as a retail and service center, and the community's experience is instructive in terms of the challenges faced by rural communities compelled to provide for rapid urbanization.

Rifle currently reports a total of 3,132 housing units, of which 1,970 are single-family dwellings, while the remainder are townhouses, duplexes and multifamily. The housing stock has increased 43 percent from 2,194 housing units, since the 2000 Census.

A very large number of housing units (approximately 1,400 single-family and 2,400 multifamily) are currently in the approval and planning stages (May 2008). The largest developments include 1,400-unit Rim Rock project north of the Rifle and the 1,200-unit Bryce Valley project northeast of the city. Several smaller developments are planned for the areas south and west of Rifle.

**Exhibit II-24.**
**Future Development**

Source:
City of Rifle Planning Department; BBC
Research & Consulting, May 2008

| Development | No. of Units | Description | Progress |
|---|---|---|---|
| Rim Rock | 1,400 | Village center, mixed residential | In process |
| Bryce's Valley | 1,500 | Village center, mixed residential | In process |
| The Farm | 450 | Mixed residential | In process |
| Trapper Hollow | 22 | Multifamily, townhomes | Drawing board |
| Rifle Heights | 95 | Single family | In process |
| Two Creeks | 184 | Townhomes | In process |
| Queen's Crown | 120 | Single family | In process |
| Brown Property | (40 acres) | Mixed residential | Drawing board |
| Black Lion | (40 acres) | Mixed residential | Drawing board |
| Pioneer Mesa | 115 | Single family | In process |

At the time of this report, Rifle has over 3,000 homes in the regulatory approval process. For-sale housing availability and rental vacancies have been near zero for the last few years despite aggressive annexations, utility extensions and the addition of roughly 400 new homes per year over the past three years. Growth pressures have been so strong and workforce so stretched that finalization of the city's comprehensive plan—which is complete at a draft level—has been delayed two years waiting for staff time for final review.

BLM_0020642

**Construction costs.** The costs of home building and road construction in Rifle have risen sharply in recent years. Prices of construction materials have been driven up by strong demand from the energy sector.

According to city staff responsible for construction contracts, the prices of asphalt and concrete have risen by 30 percent in the past two years (2006-2007). Currently, Rifle is constructing a new public safety facility at over $250 per square foot—a large increase from the $125-$150 per square foot cost of a similar building constructed by Garfield County in 2005. The cost of Rifle's new wastewater treatment plant was estimated at $14 to $16 million in 2006, but the actual cost is over $23 million (BBC 2008b)

As a result of increasing costs, bids on public works projects have increased by 30 percent over the past three years, and many public works projects receive no bids at all because of contractor and worker shortages (BBC 2008b)

**Housing prices.** Housing prices in Garfield County have risen rapidly. Rifle is no longer a low cost alternative for commuting resort workers. The surge of energy workers and related service jobs, most of which pay higher wages than resort jobs and may not require a lengthy and increasingly expensive commute, has largely replaced resort employment as a driving factor in local real estate markets. One of the ramifications of Garfield County's rapid growth has been the reduction of housing options for resort workers, resultant "push-back" pressure to develop more housing within the resorts and, at least for the time being, significant shortages of workers for seasonal and construction demands in Eagle and Pitkin counties due largely to lack of affordable housing.

A 2008 report looked at Multiple Listing Service (MLS) data since 2005 and found that the median price for homes had increased rapidly from $200,000 in 2005 to $275,000 in 2007, an increase of 38 percent in two years. More tellingly, the report found that in 2007, the proportion of housing affordable to families making 180 percent of the regional median income was only 32 percent, and an analysis of current listings in 2008 suggests that this proportion may be declining even further.

The increasing costs of housing and lack of affordable housing are blamed by area schools, hospitals and other agencies for creating difficulties in attracting and retaining qualified teachers, health care professionals, and other skilled employees. The City of Rifle has experienced this effect in its own workforce, demonstrated by a recent example in which a Rifle city planner left to work for the City of Aspen because it was able to offer affordable housing for its employees (BBC 2008a).

**Overcrowding.** Another housing issue has been the use of some units as illegal hot-bunk houses where a large number of industry employees rent the same house and stagger their work schedules so that they can sleep in shifts. Such overcrowding leads to poorly maintained properties and overcrowded streets and driveways. Some local motels may serve as "man camps," and it is estimated that 80 percent of local hotel room-nights are used by energy workers.

Meanwhile, the unavailability of lodging in Rifle has meant that tourists have gone elsewhere for temporary lodging. Hunting has long been a significant economic generator for Rifle and the surrounding area, but congestion and the lack of available rooms in the city have caused hunters to look elsewhere for supplies and accommodations (BBC 2008a).

BLM_0020643

**Building fees.** Rifle imposes a number of fees on new development. On a sample home valued at $200,000, fees totaled almost $21,000. The largest fees include the use tax fee (about $4,400 on a $200,000 home), wastewater improvement fee ($5,300), water system improvement fee ($4,700) and street impact fee ($3,000). In recent years, the city has doubled wastewater rates and increased tap fees by 50 percent to ensure that new development is "paying its way." To this end, the city also plans to increase water fees by 50 percent in the next three years and to continue charging impact fees for streets, parks and special improvements (BBC 2008a).

## Summary of Baseline Economic Conditions

- The BLM WRFO manages an area that is largely coincident with Rio Blanco County, one of the state's largest, but most sparsely populated, counties.

- Changes in BLM resource management practices, particularly the prospect of greatly increased gas drilling activity, will affect socioeconomic conditions in a wide area. The PSSA is that geographic region that will likely be directly and immediately affected by WRFO management and operational decisions. The PSSA consists of Rio Blanco County and its two incorporated towns: Meeker and Rangely. Rio Blanco County is very isolated and its municipalities are small.

- The SSSA is a broader region that has indirect social and economic ties with WRFO activities and will likely provide some business support services, resident housing and community services for WRFO associated development. This five-county SSSA includes Garfield, Rio Blanco, Moffat and Mesa counties in Colorado, and Uintah County, Utah.

- The northwest Colorado region has a diverse economic base of ranching, hunting, tourism, agriculture, retirees, education, health services and energy extraction (oil, gas and coal). Rio Blanco County, the PSSA, is increasingly reliant on energy and construction trades—nearly 50 percent of jobs in Rio Blanco County are in the mining and construction industries.

- The oil shale bust in 1992, when Exxon Company abruptly pulled out of the oil shale development business, was a defining event for northwest Colorado with lasting repercussions for residents of both the PSSA and SSSA. Oil shale's boom and bust underscores resident concerns about reliance on a single industry and dependence on natural resource extraction for long-term economic sustainability.

- The SSSA, particularly Garfield County, has traditionally been the affordable housing option for resort workers employed in Pitkin and Eagle counties, as well as housing Rio Blanco-based gas workers in recent years. Increasing population growth and housing demand associated with energy extraction has led to rapid home price appreciation and housing shortages in Garfield County. Housing has become considerably less affordable throughout the SSSA in recent years.

- Increased oil and gas activity has led to rapid employment growth in Rio Blanco County but population and retail service growth has thus far lagged behind employment growth. Between 2000 and 2006, Rio Blanco County added jobs at an average annual growth rate of nearly four percent, which is double the growth rate experienced during the 1990s. Rio Blanco population growth has been at a much slower rate, as most new workers have commuted from Garfield and Mesa counties, or from Utah.

# SECTION III.
# Public Facilities, Finances and
# Services in the Socioeconomic Study Areas

Changes in BLM WRFO management practices and potential additional development of WRFO oil and gas reserves have the potential to affect public costs and revenues for Rio Blanco County, as well as local municipal governments, school districts and the public service providers. Lesser effects may occur throughout the Secondary Socioeconomic Study Area (SSSA).

Potential changes in property values, employment levels, resident population and worker commuting patterns will affect the funding and provision of most government services, particularly county road maintenance, county and municipal law enforcement, health and human services, and emergency response systems.

This section offers an overview of current conditions for key service providers within the Primary Socioeconomic Study Area (PSSA). The section also provides a more general discussion of issues and challenges in the broader SSSA.

## Rio Blanco County

**Budget Organization.** Rio Blanco County serves approximately 6,300 residents; nearly 70 percent of its residents reside in the incorporated municipalities of Meeker (pop. 2,357) and Rangely (pop. 2,111) (SDO 2008).

The county's overall budget includes six types of major funds, which are listed below:

- **General Fund**—provides for most of the administrative, public safety, public works and health and welfare functions, excluding the county-operated hospital.

- **Capital Expenditure Fund**—supports annual expenditures for the "acquisition, development, construction and renovations of facilities, projects and equipment, as well as purchases of computer and communications equipment." Two capital expenditure funds exist to support the following county services:

  - ➤ Road and Bridge; and

  - ➤ Social Services.

- **Use Tax Fund**[1]—supports senior transportation, aviation, public welfare, and other designated programs. Use tax is derived from a tax on building materials.

---

[1]   Use tax receipts after 2007 are uncertain. The county and the oil and gas industry is in a legal dispute over the applicability of use tax on certain drilling and gas production equipment.

BLM_0020645

- **Proprietary or Enterprise Funds**—recover all or nearly the full cost of providing services by charging fees for those persons who use these services. Rio Blanco County has three proprietary funds:
  - ➤ Fairfield Complex – the complex provides meeting locations for community activities, the Meeker District Library and the Meeker Senior Nutrition program;
  - ➤ Solid Waste Landfill; and
  - ➤ Weed and Pest Control.

The county also has a conservation trust fund, a contingency fund for countywide emergencies[2] and a capital improvement fund, which received its initial principal from the state's oil shale trust fund. The county general fund accounts for the great majority of direct services. In 2007, over 85 percent of Rio Blanco County's $23.3 million in revenues accrued to the general fund (Rio Blanco County 2008b).

## County Revenues

Exhibit III-1 displays the distribution of Rio Blanco County's revenues in 2007 and 2008.

In 2007, intergovernmental revenues were the largest single category of county receipts. Intergovernmental revenues are primarily mineral leasing and severance tax funds that are distributed to the county based on the amount of drilling activity and location of employees. County pass through funds (funds from state sources) for road and bridge and human services are also included in this category (Rio Blanco County 2008b).

Impact fees, a charge levied on new development —including new gas wells—in order to recover the capital costs associated with servicing new growth, is a relatively new taxing vehicle that was first applied in part of 2007.  As a result, impact fee revenue is expected to rise rapidly in 2008 (Rio Blanco County 2008b).

**Exhibit III-1.**
**Rio Blanco County 2007 Estimated and 2008 Proposed Total Revenues by Source**



Source: Rio Blanco County Budgets for years 2007 and 2008.

---

[2]  Contingency fund has not been used in 15 or more years.

BLM_0020646

As noted previously, revenue from use tax, which is a form of excise tax applied on certain building materials and equipment imported to Rio Blanco County for use within the county, is budgeted to decrease 60 percent in 2008. This loss is attributable to a dispute over the applicability of use tax to certain natural gas production equipment, which is currently being contested in the state court system (Rio Blanco County 2008b).

The voters of Rio Blanco County have "de-Bruced" county functions, allowing county revenues to grow without regard to the Taxpayer's Bill of Rights (TABOR) Amendment limitations. The TABOR would otherwise require a rebate of revenues that increase above certain limits.

Property tax revenue, the second largest revenue category for the county, is dependent on the assessed value of land and personal property, assessment percentages that are dictated by state law, and the mill levy amount applied for each service entity. Total assessed valuation on taxable property in Rio Blanco County has increased sharply over the past several years, primarily due to the increased natural gas activity in the region. Conversely, the assessed value for agricultural land has decreased, demonstrating the county's shift away from agricultural applications (Rio Blanco County 2008a).

In 2008, the county is anticipating sharp increases in property tax revenues, mostly because of increased oil and gas drilling activity and increased reserve values. In Colorado, the value of natural gas and oil production, along with the value of gas field collection, processing, and transmission facilities, is subject to ad valorem taxes (property taxes) levied by the affected jurisdictions. Exhibit III-2 presents the change in assessed land value by property classification in Rio Blanco County for years 2005 through 2007. Oil and gas assessed values dominate all other categories.

**Exhibit III-2.**
**Rio Blanco Assessed Value by Property Classification, 2005-2007**

| Classification | Assessed Value | | | Percent Change | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2005-2006 | 2006-2007 |
| Vacant land | $4,034,170 | $4,265,340 | $5,437,300 | 6% | 27% |
| Residential | $18,614,720 | $19,033,570 | $29,001,420 | 2% | 52% |
| Commercial | $15,017,610 | $16,259,180 | $21,521,619 | 8% | 32% |
| Industrial | $21,068,880 | $27,289,940 | $24,526,557 | 30% | -10% |
| Agricultural | $11,916,030 | $12,198,950 | $7,121,390 | 2% | -42% |
| Natural Resources | $27,274,010 | $26,844,690 | $27,601,164 | -2% | 3% |
| Oil and Gas | $303,612,600 | $435,989,240 | $537,651,791 | 44% | 23% |
| State Assessed | $33,101,400 | $33,455,900 | $59,583,000 | 1% | 78% |

Source: Rio Blanco County Assessor

Exhibit III-3 on the following page displays the taxing entities within Rio Blanco County. Land and personal property are subject to property taxes from the listed entities, depending on whether the parcels fall within the taxing entity's jurisdiction.

BLM_0020647

**Exhibit III-3.**
**Rio Blanco County Taxing Entities, 2007**

| Taxing Entity and Assessed Value | | Mill Levy | Revenue |
|---|---|---|---|
| **Rio Blanco County** | *General Fund* | 4.750 | $3,384,110 |
| *Assessed Value: $431,977,129* | *Road & Bridge Fund* | 2.500 | $1,781,111 |
| | *Public Welfare* | 0.550 | $391,844 |
| | *Capital Expenditures* | 1.250 | $890,555 |
| **School District RE-1** | *General Fund* | 9.517 | $2,667,321 |
| *Assessed Value: $280,269,062* | | | |
| **School District RE-4** | *General Fund* | 3.671 | $1,585,788 |
| *Assessed Value: $431,977,129* | *Bond* | 1.552 | $670,429 |
| | *Transportation* | 0.197 | $85,099 |
| **School District RE-JT3** | *General Fund* | 27.116 | $5,370 |
| *Assessed Value: $198,050* | *Bond* | 7.750 | $1,535 |
| **Colorado Northwest Community College** | *General Fund* | 5.000 | $2,159,886 |
| *Assessed Value: $431,977,129* | *Bond* | 1.600 | $691,163 |
| **Town of Meeker** | *General Fund* | 7.000 | $127,252 |
| *Assessed Value: $18,178,865* | | | |
| **Town of Rangely** | *General Fund* | 10.000 | $138,051 |
| *Assessed Value: $13,805,070* | | | |

| Special Districts | Assessed Value | Mill Levy | Revenue |
|---|---|---|---|
| Colorado River Water | $712,444,241 | 0.191 | $136,077 |
| Yellow Jacket Water | $91,247,806 | 0.161 | $14,691 |
| Meeker Cemetery | $280,269,062 | 0.867 | $242,993 |
| RBC Fire Protection | $280,269,062 | 2.573 | $721,132 |
| Meeker Sanitation | $17,342,448 | 9.470 | $164,233 |
| Meeker Regional Library | $280,269,062 | 2.032 | $569,507 |
| East Rio Blanco County Parks & Recreation | $262,470,421 | 7.512 | $1,971,678 |
| West Rio Blanco County Parks & Recreation | $426,401,092 | 5.740 | $2,447,542 |
| Rangely Fire Protection | $431,977,129 | 0.874 | $377,548 |
| Rangely Cemetery | $431,977,129 | 0.086 | $37,150 |
| Rangely Regional Library | $431,977,129 | 0.500 | $215,989 |
| Rio Blanco Water Conservation | $431,977,129 | 0.623 | $269,122 |
| Lower White River Pest Control | $102,913,080 | 2.000 | $205,826 |
| Piceance Creek Pest Control | $92,430,420 | 2.000 | $184,861 |
| White River Soil and Conservation | $263,295,068 | 0.275 | $72,406 |
| Douglas Creek Soil and Conservation | $415,267,679 | 0.037 | $15,365 |
| E. Rio Blanco County Health Services | $280,467,112 | 7.280 | $2,041,801 |
| Rangely Hospital District | $431,977,129 | 5.050 | $2,181,485 |

Source:   Rio Blanco County Assessor.

BLM_0020648

## County Expenditures and Services

As documented in Exhibit III-4, Rio Blanco County's largest expenditures are for public works, a category that is predominantly road maintenance and repair. The majority of additional general fund revenues expected in 2008 will be applied to expanded public works projects, although as noted below, virtually all service categories are expected to see some expenditure increases. The county's capital expenditure fund, which is separate from the general fund, accounts for most street expansion and highway improvement expenditures.

**Exhibit III-4.**
**Rio Blanco County 2007**
**Estimated and 2008**
**Proposed Total Expenditures**
**by Function**

Source:
Rio Blanco County, 2007 and 2008 Budgets.



According to interviews with county staff and policy makers, Rio Blanco County's expenditures are largely associated with servicing local residents and the local oil and gas activity. Despite modest growth in full-time residents, pressure on county infrastructure and services has grown significantly with drilling activity, and associated traffic and commuting workers. The county also cites "inflationary pressures in salaries and benefits" as a contributing cause to increased expenditures. Salary and benefit expenses increased 30 percent between 2006 and 2007, and the 2008 budget forecasts a 13 percent increase from 2007 costs (Rio Blanco County 2008b). The county has also expressed difficulty in finding and retaining qualified county workers, who are often lured away by higher-waged jobs in the private sector (Joos 2008).

**Law enforcement.** The Rio Blanco County Sheriff's Office provides law enforcement services to the unincorporated portions of Rio Blanco County. The county sheriff's department currently employees nine patrol officers: one sergeant and four deputies in the main office in Meeker; and one Sergeant and three deputies in the Rangely substation.

Despite accounting for a small proportion of the county's acreage, the Piceance Basin, which houses much of the county's oil and gas activity, has experienced a rapid increase in police reports. In 2003, 135 reports were made from the basin; in 2007, 1,675 calls were made from the basin. As a result, county police staffing needs have changed. A new deputy is being hired in Meeker and an existing Meeker deputy is being converted a full-time traffic deputy. This is the first time the county has employed a full-time deputy exclusively for traffic issues (Joos 2008).

BLM_0020649

*Social and Economic Analysis Technical Report*

The sheriff's office has difficulty attracting new staff members. It is not uncommon for deputies to be required to work at least one overtime shift per week. To assist the department with additional demand, the department requested nine additional deputies in 2007, but only two additional deputies were approved (Joos 2008).

**Jail.** The Rio Blanco County Detention Center was constructed in 1937 and is designed to hold 18 prisoners. Recent daily jail populations have exceeded 18, which requires prisoners to sleep on the floor. One cell block (three beds) is for female inmates. An area that formerly housed the police cars has been adapted into a juvenile detention center, which can hold juveniles for up to two weeks. After two weeks, the under-aged inmates are transported to Grand Junction, which requires a deputy chauffer. This practice is viewed as a temporary solution to the increasing juvenile detention needs.

The county conducted a feasibility study in 2006 to determine the configuration, location and cost for a new 55-bed jail facility.  Construction of the new facility has not yet been approved (Joos 2008).

**Emergency Management and Response.** The Rio Blanco Emergency Manager, a sheriff's office employee, coordinates emergency response planning and training functions for emergency response agencies in the county.  Emergency response agencies in the county face a variety of obstacles to providing timely service:

- the county is large;
- the transportation infrastructure (roads) can be dangerous;
- the large number of recreational visitors in remote areas;
- the proliferation of dispersed energy exploration and development sites; and
- extensive communication dead spots.

**Public Health and Social Services.**  Rio Blanco County Nursing Service is the public health agency serving all of Rio Blanco County as well as the incorporated areas.  Services provided include:

- monitoring of the health status of the population and identification of community health problems;
- prevention and control of the spread of communicable diseases; promotion of positive health behaviors and environmental practices;
- mobilization of community partnerships to solve identified health problems; and
- enforcement of laws and regulations that protect public health and assurance of access to personal health services.

From offices in Meeker and Rangely, the Rio Blanco County Social Services Department administers the following programs: Food Stamp Program, Colorado Works Program, Medical Assistance Program, Families in Transition, Child Support Enforcement, Child Protection, Adult Protection, Child Care Services, Old Age Pension (OAP), Aid to the Needy Disabled (AND), Long-Term Care (LTC), Colorado Employment First, and Senior Nutrition (Rio Blanco County 2008c).

The social services department has not witnessed a dramatic increase in demand for services, a trend they attribute to slow population growth and an increase in employment opportunities brought about by oil and gas activity in the area (Social Services 2008).

BLM_0020650

**Hospital and Medical Services.**  Pioneers Medical Center provides hospital and medical services for Meeker and the eastern portion of Rio Blanco County. It operates a 15-bed hospital and provides 24-hour emergency medical, pulmonary, laboratory, radiological, surgical, acute care and rehabilitative services. Pioneers operates an attached 33-bed skilled convalescent and long-term care facility, named the Walbridge Wing. The hospital is designated as a Level IV trauma center and provides advanced cardiac and life-support trauma services.

Pioneers also operates the Meeker Family Health Center, which offers a variety of medical care for children, adults and families.  Four resident physicians provide services through the Meeker Family Health Center, and staff the hospital and emergency room.  The physicians also provide medical direction to Emergency Medical Technicians (EMTs) who staff the ambulance service and provide training to law enforcement and emergency response personnel in the county.  The medical center offers industrial medicine services and is currently evaluating options for on-site medical services for energy companies. In addition to the four primary care physicians, another eight or nine physicians visit from neighboring communities and use Pioneers' clinic to provide specialized care.

In September of 2007, Pioneers opened a clinic in the Piceance Basin one day per week to accommodate oil and gas companies requiring pre-employment screenings (Pioneers 2008).

**Public Schools**. Two school districts cover the majority of Rio Blanco County; Meeker School District RE-1 (Meeker RE-1), and Rangely School District RE-4 (Rangely RE-4).  Meeker RE-1 covers about the eastern two-thirds of the county, including the Piceance Creek project area (CDE 2008).

The 2006 Meeker RE-1 enrollment was 678 students, an increase of 54 students since 2003. Meeker public schools have only recently returned to the enrollment levels reached in 2000, after declines in enrollment between 2001 and 2003 (CDE 2008). Enrollment reduction trends are attributed to an aging population, growth in childless households, and few affordable housing options for younger families. However, with the grade school absorbing much of the district's growth, local officials see some evidence that young families are returning to Meeker to capitalize on well-paying jobs within the oil and gas industry (Meeker 2008a).

The grade school facility has reached capacity. As such, a $24 million bond is currently being sought for a new grade school facility. The middle and high school facilities have adequate space to meet current demands, although repairs and maintenance are needed (Meeker 2008a).

Meeker public schools have struggled to maintain staff, as higher paying jobs have drawn workers away from lower paying public service jobs. To attract and retain staff, average salaries have increased. In 2006, the average teacher salary was $44,400, an 18 percent increase from the $37,567 average salary in 2000.[3] By comparison, the average yearly salary for a construction worker in Rio Blanco County was $76,908, nearly 73 percent more than Meeker's teacher salaries.[4]

---

[3]   Salaries are not adjusted for inflation between 2000 and 2006.

[4]   Average construction worker salary is provided by Department of Labor and Employment QCEW data and assumes a 52 week work year.

BLM_0020651

*Social and Economic Analysis Technical Report*

Rangely public schools have seen a decrease in enrollment in recent years; 2006 enrollment was 478 students, down 26 percent from 2000's enrollment of 643 students (CDE 2008). As such, District RE-4 has excess physical capacity and a school building was recently closed as a result of declining enrollment. Full-time staff has decreased as student population decreases. In 2000, RE-4 supported 40 staff members; in 2006, 29 full-time staff members were reported (CDE 2008). An improvement project is currently underway to improve the roofs of all three school buildings in RE-4 (Rangely 2008b).

## Municipal Governments

Rio Blanco County includes two municipalities: Meeker and Rangely.  Proximity to the Piceance Basin has created challenges for both Meeker and Rangely. The City of Rifle, nearby in Garfield County, is also heavily affect by activity in the PSSA. A closer look at the communities' budgets and development challenges follows.

**Town of Meeker.**  The Town of Meeker, with a population of 2,357 residents, operates with a general fund of approximately $3.2 million (Meeker 2008b).

**Exhibit III-5.**
**Town of Meeker 2008 Proposed General Fund Budget Revenue and Expenditures**



Source:   Town of Meeker

The revenue attributed to "reserve" represents a transfer of funds from reserve accounts, which are supported largely by severance tax and mineral leasing distributions from the State of Colorado, to the general fund.  The town often accrues multiple years of these transfer revenues, or partial amounts of annual revenues, accounting for them as revenue to the general fund in the year in which they are expended (Meeker 2008b).

In addition to the general fund, Meeker also has a water fund, a conservation trust fund, and the Walbridge fund, which covers hospital and nursing home operating costs.

BLM_0020652

Some notable recent public improvements, and financing issues are identified below(Meeker 2008a).

- A new water well was recently drilled, enhancing raw water supply and reliability.

- Major streets were rebuilt and paved with a form of asphalt better suited to accommodating heavy truck traffic. An state energy impact grant and local systems development funds paid for the project, which account for 47 percent of Meeker's 2008 expenditures.

- An energy impact grant was used to improve pedestrian access along SH-13, which has seen a substantial increase in truck traffic. The street is often crossed by children to get to school or to the town and the town park and safety along SH-13 had been a long standing concern for town officials.

- The local school district is currently seeking approval for a $24 million bond issuance to construct a new elementary school, where enrollments have exceeded capacity. Additional improvements are needed for the middle and high schools.

- A task force, comprised of representative of tax collecting entities, has been assembled to discuss pressing needs related to oil and gas activity. Topics include capital improvement plans and workforce housing needs.

- Sales tax revenues have been volatile in Meeker for a number of years. Despite regional growth, the town's retail base is still very small.

- The receipt of a $350,000 energy implementation and comprehensive plan grant increased the contribution of intergovernmental revenue from previous years (Meeker 2008a).

**Town of Rangely.** The Town of Rangely, with a population of 2,111 residents, operates with a general fund budget of approximately $4.5 million (Rangely 2008b).

**Exhibit III-6.**
**Town of Rangely 2008 Proposed General Fund Budget Revenue and Expenditures**



Source:   Town of Rangely 2008 Proposed Budget.

BLM_0020653

*Social and Economic Analysis Technical Report*

Additional segregated funds within the town of Rangely include accounts for water, gas, wastewater, the housing authority, housing assistance, the Rangely Development Corporation, the Foundation for Public Giving, and a Conservation Trust Fund.

Review of the town's budget led to the following observations.

- The town's traditional accounting of annual revenues and expenditures includes capital improvement spending and one-time revenues, which makes year-to-year comparisons difficult.

- Generally property tax revenue has been stagnant; sales tax revenue has experienced moderate growth since 2006.

- Growth in "miscellaneous revenue" is attributed to a $1.3 million energy rehab loan, administered by DOLA to improve energy efficiency of the town's housing stock;

- Over $330,000 in severance tax and mineral lease distributions are expected for the proposed 2008 fiscal year.

- Police department and public works spending has consistently accounted for a large proportion of Rangely's expenditures.

- A $1.3 million building and grounds capital improvement project is proposed for 2008 to update insufficient and ageing infrastructure.

- Primary concerns in the community are affordable housing opportunities for the town's workforce and an increase in traffic through town, due to oil and gas activity. A traffic study is currently being conducted on the west side of town to supplement proposed housing projects (Rangely 2008a).

**City of Rifle.**  The City of Rifle in Garfield County has a population of approximately 8,700 persons and operates on an annual budget of approximately $9 million (Rifle 2008). Rifle is outside of the PSSA, but may be greatly affected by WRFO management decisions if the magnitude of growth is significant and the smaller communities in Rio Blanco County are unable to fully accommodate new resident demands.

Rifle is in a very different fiscal and service position than Meeker or Rangely. Rifle has experienced rapid growth since about 2000 and, although challenged to provide appropriate services, the community has generally risen to the challenge.

The current Rifle population boom has put a strain on the infrastructure of the city. Water, wastewater, transportation and other infrastructure projects that would have required improvements, expansions or replacement in the 2012-2015 time frame are needed today.  In every segment of the community's infrastructure, there has been expansive growth and the timetable for improvements have been accelerated dramatically (BBC 2008a).

Increased traffic flows at the intersection of I-70 and SH-13 will require the construction of several roundabouts. Currently, the city only has sufficient funds to construct two of the three needed roundabouts south of I-70, while a roundabout north of I-70 will require additional funding. The intersection of SH-13 and SH-6 nearby will also need to be redesigned in the coming years due to increases in heavy traffic (BBC 2008a).

BLM_0020654

A growing population has bought increased demands on the city's public safety department. As a result, Rifle, in partnership with Garfield County, will construct a new public safety facility in 2008. The existing wastewater and tap water treatment plants are approaching full capacity and will be expanded or replaced in coming years (BBC 2008a).

Exhibit II-12 below summarizes Rifle's five-year infrastructure needs.

**Exhibit III-7.**
**Five-year Infrastructure Needs**

Source:
City of Rifle, August 13, 2007.

| | Five-year needs 2007 |
|---|---|
| Roads/Streets | $14,120,000 |
| Water | $15,372,000 |
| Wastewater | $26,925,000 |
| Storm drainage | $1,270,000 |
| Parks/recreation | $5,645,000 |
| Police | $4,638,000 |
| **Total** | **$67,970,000** |

Traffic congestion is a major problem in several areas of Rifle, most notably along Railroad Avenue in the city center where average daily traffic was estimated to be over 14,000 vehicles per day in 2002. Congestion is a growing problem along the stretch of SH-13 going under I-70 and connecting Rifle proper to the southern commercial district, where average daily traffic was estimated to be 14,500 vehicles per day in 2002 (BBC 2008a).

In the past five years, traffic on Railroad Avenue has increased from 9,000 vehicles per day to over 14,000 vehicles per day. As drilling activity moves north, Railroad Avenue's traffic will increase proportionally. City public works staff reports that increased traffic has created longer lines at street lights and various intersections. The increase in the number of heavy trucks related to the energy industry is a particular concern, as these vehicles put a large strain on Rifle's infrastructure (BBC 2008a).

## General Fiscal and Service Provision Challenges in the PSSA and SSSA

A recent study conducted By BBC Research & Consulting for the Associated Governments of Northwest Colorado (AGNC) and the Colorado Department of Local Affairs (DOLA) offered a summary of issues facing local governments related to service provision in northwest Colorado (BBC 2008b). This study was intended to find state and local consensus on the nature and magnitude of socioeconomic issues in anticipation of increased energy development activity in the region, as well as prospective oil shale development. Interviews conducted with Rio Blanco County, Meeker and Rangely staff for this EIS confirms that these issues remain.

- **Municipal growth capacity and related financial support are pressing issues in Garfield, Rio Blanco and Moffat counties.**
  - ➤ The level of growth anticipated in northwest Colorado generally exceeds the reasonable long-term capacity of the existing communities. Rifle and nearby communities are already stretched to accommodate additional development, and Rio Blanco and Moffat counties have minimal growth capacity.

BLM_0020655

*Social and Economic Analysis Technical Report*

- **Accommodating growth in this region is unusually challenging.**

  - ➤ The area is among the most rural in the United States and local communities have very limited ability to absorb and service new development.

  - ➤ Public lands and topographic barriers can force inefficient development patterns.

  - ➤ Existing road systems were never intended to serve high levels of traffic and heavy trucks. Projected street maintenance and repair costs are staggering expenses for most communities.

  - ➤ Worker shortages, compounded by rising housing and cost of living expenses, make retention of service workers difficult and expensive. Similarly, the absence of contractors and the competition for their services along with shortages of materials drives up the costs of new projects and personnel.

  - ➤ Capital investment is needed far in advance of likely revenue. As a rule, residents arrive first and revenues follow, sometimes years later. Nevertheless, residents require public services, streets and utilities from the day of arrival.

  - ➤ The problems with TABOR expenditure limitations, which require population to be in place before increased spending can be allowed, compound service provision problems.

- **Gas drilling and extraction activity produces high volumes of traffic in an area with limited road system capacity; this represents a challenging financial situation.**

  - ➤ The natural gas industry is decentralized and highly mobile, and its employees and subcontractors often commute each day to job sites in remote areas. High volumes of vehicle and truck traffic will continue even as activity turns from drilling to maintenance. Road expansion and a mixture of surface improvements, system expansions, safety enhancements and on-going maintenance, are pressing needs.

**Exhibit III-8.**
**Traffic Congestion and Population Growth**



Source:    Colorado Department of Transportation, 2007.

---

BLM_0020656

- **Housing and worker shortages restrict community development options.**

  - ➤ The natural gas industry has the ability to pay higher wages and aggressively compete for workers. Although beneficial for local residents, this competition for workers and housing has strained many other local businesses as well as local governments, hospitals and schools. Housing costs have risen rapidly in the area and housing of any kind is scarce, making attraction of new residents challenging.

- **Funding and timing of critical capital infrastructure, such as roads, water, sewer and community amenities, are the area's primary fiscal challenges.**

  - ➤ Community operating costs will rise as growth occurs, but the state's per worker reimbursement system helps those communities directly impacted by energy workers. Each qualified energy worker in northwest Colorado meant slightly over $4,000 in state reimbursement funds in 2008.

- **The lag-time between infrastructure need and tax revenue exacerbates funding problems.**

  - ➤ Residents need functioning communities when they arrive, but most revenue sources (property taxes, sales taxes and severance taxes) occur only after new workers are in place, drilling and production is complete, and tax-revenue is flowing. This tax lag problem is further compounded by the need to plan, design and construct infrastructure even before resident relocation.



**Exhibit III-9. Public Investment Timing Issue**

Source:
BBC Research & Consulting

- **Uncertainty undermines infrastructure investment strategies.**

  - ➤ Natural resource extraction has traditionally been a boom-and-bust business. Changes in gas development economics, rising or declining prices, and the uncertainty of tax revenue redistribution make infrastructure investment difficult. Gas prices are uncertain and the pace and value of extraction is subject to sudden swings. This makes both private and public investment decisions, which are often made in anticipation of future events, more difficult.

- **Resource derived property taxes will rise substantially as new wells come online.**

  - ➤ Natural resource-based property taxes will rise rapidly as the region's operating gas wells increases. In aggregate, counties with strong gas production will benefit, but revenue timing and imbalances between service delivery responsibility and tax revenue collections will remain. Local communities will also benefit from expected increases in severance tax and federal royalty payments, which are currently distributed, in part, based on energy worker residence. Rio Blanco County's high assessed valuation is evidence of energy extraction's high value added presence.

BLM_0020657

*Social and Economic Analysis Technical Report*

- **Federal royalties and severance tax revenue production from northwest Colorado will grow rapidly, but distribution of revenues to northwest Colorado is uncertain.**

  - ➤ Northwest Colorado federal royalty and severance tax payments are projected to rise very rapidly in line with gas production. The percentage of production on federal lands (subject to federal royalty taxes) will more than double, stimulating federal royalty payments. As tax production in this area grows, other Colorado gas and oil fields will likely decline dampening the overall growth in statewide collections. If severance tax and Federal Royalty payments to local municipalities rise in line with state collections, local municipalities will be well positioned to meet operating obligations.

- **Local ability and willingness to expand self-funding capacity is uneven.**

  - ➤ Certain communities—larger cities with strong retail sales, towns that can attract higher value development and communities with aggressive impact fees—will be able to fund much of what is required to service rapid residential growth. As energy development migrates northward, affecting the smaller and more remote communities of Rio Blanco and Moffat counties, growth-financing capacities become more constrained and infrastructure solutions will require additional regional and state support. Communities that retain TABOR limitations will be hard pressed to maintain services.

### Influence of BLM Lands and Policies

The WRFO of the BLM manages approximately 1.2 million acres of land within Rio Blanco County, or approximately 44 percent of the county's 2.7 million acres. In addition, the BLM manages approximately 232,000 acres of Rio Blanco County split-estate lands, where the Federal government controls subsurface mineral rights including oil and gas. The USDA Forest Service manages an additional 247,000 acres in Rio Blanco County, which includes a large share of the public lands with high esthetic resource values and high economic value for hunting, fishing and recreation.

The BLM properties represent the majority of county lands with high oil and gas and mineral values. Because of this property and mineral concentration, BLM management policy decisions are critical to the local economy and to governmental revenues. Resource development on public lands is the primary economic opportunity that might produce significant employment and residential growth in the future.

As discussed previously in this section, assuming market conditions and regulatory conditions are attractive, and the BLM allows additional leasing and development of public lands, local job creation and population growth will follow. County revenues are also very sensitive to resource development pace and patterns and thus BLM decisions. Specifically, development of mineral resources on BLM lands will influence production of state severance taxes, Federal mineral leasing and bonus revenues, and county property taxes. These revenue sources and the distribution of tax proceeds are described below.

## Severance Taxes

**Severance tax rates**. Severance taxes are imposed by the state of Colorado on the extraction of non-renewable natural resources from both public and private property. Tax revenue is intended to offset the losses associated with the removal of the state's natural resource.

For oil and natural gas, annual severance taxes are based on gross income produced by all wells except "stripper wells" (those producing less than 15 barrels of crude oil or 90,000 cubic feet of gas per year on average). Certain production costs, which include transportation, processing and manufacturing costs, are deducted from gross revenue to account for the costs to move the gas from the point of severance (the wellhead; where valuation is supposed to occur) to the point of valuation (usually a regional gas gathering hub). The resultant value is then multiplied by a variable tax rate to determine gross severance tax due. Taxpayers may credit 87.5 percent of ad valorem property taxes paid to local governments on oil and gas production (not including taxes related to stripper wells or taxes on buildings, improvements and equipment) to determine the net severance tax due.[5]

**Exhibit III-10.**
**Calculation of Severance Taxes, Colorado**

| Gross income from all wells (excluding stripper wells) | X | Tax Rate Schedule | | — | 87.5% of ad valorem tax paid to local government (excluding stripper wells, buildings, improvements and equipment) |
|---|---|---|---|---|---|
| | | **Gross income** | **Tax rate** | | |
| | | Under $25,000 | 2% of gross income | | |
| | | $25,000 - $99,999 | $500 + 3% of gross income > $24,999 | | |
| | | $100,000 - $299,999 | $2,750 + 4% of gross income > $99,999 | | |
| | | $300,000 and over | $10,750 + 5% of gross income > $299,999 | | |

Source:   Colorado Department of Revenue, BBC Research & Consulting.

**Severance tax revenue distribution.** Once collected, severance taxes are distributed through a complex state process. Colorado's severance tax revenues are first split 50-50 between State Trust Fund and the Local Impact Fund. The State Trust Fund provides funding for Water Conservation and Department of Natural Resources operations. The Local Impact Fund gives 70 percent (85 percent prior to 2008) of its collections to a local government grant program that awards funding through a competitive process. The other 30 percent is directly distributed to local governments (15 percent prior to 2008). It should be noted that Federal Mineral Leasing funds (revenues from leasing of Federal lands within the state) also accrue to the Local Impact Fund, thus total available funds are more than the severance tax distributions.

This direct distribution to local governments is based on energy employee residence and is designed to offset additional public service and infrastructure costs in areas where these workers live. This distribution translates to a per-resident-employee payment made to a jurisdiction in which industry-specific qualified employees reside. Per capita formulas differentiate between the types of natural resource employees; thus, certain industries, such as natural gas extraction, generate more revenue per qualified worker than other industries.

---

[5] This credit is designed to eliminate the disincentive to invest in counties/jurisdictions with high property taxes.

BLM_0020659

*Social and Economic Analysis Technical Report*

**Exhibit III-11. Colorado Severance Tax Distribution, 2008**

Source: Colorado Department of Local Affairs.



## Federal Mineral Lease (FML) Revenue

The Office of Natural Resources Revenues (ONRR) of the U.S. Department of the Interior collects mineral lease revenues from the leasing of federal lands used for mineral extraction. Of the total FML revenue collected, the federal government retains approximately half of the revenue and half is returned to the state from which the revenue originated. Each state distributes FML revenue using different methodologies.

**FML tax rates.** For oil and natural gas operations, gross FML revenue is based on three components:

- **Rent** of $1.50 per acre annually for the first 5 years and $2.00 per acre annually thereafter .

- **Royalties** of 12.5 percent of the revenue generated from mineral extraction on these federal lands.

- **Bonuses** paid by companies to obtain mineral leases, based on a competitive bidding process.

**FML revenue distribution.** Colorado's share of federal mineral lease receipts are distributed within the state based on a complex formula, described below and depicted in a flowchart in Exhibit III-12 Generally, rents, royalties, and interest earnings on the same are allocated in the following manner:

- 48.3 percent of all state mineral lease rent and royalty receipts are sent to the State Education Fund (to fund K-12 education), up to $65 million in FY 2009 – FY 2011, and growing at four percent per year thereafter.  Any amounts greater than the upper limit flow to the Higher Education Capital Fund.

- 10 percent of all state mineral lease rent and royalty receipts are sent to the Colorado Water Conservation Board (CWCB), up to $13 million in FY 2009, and growing at four

BLM_0020660

percent per year thereafter. Any amounts greater than the upper limit flow to the Higher Education Capital Fund.

- 41.4 percent of all state mineral lease rent and royalty receipts are sent to the DOLA, which then distributes half of the total amount received to a grant program, designed to provide assistance with offsetting community impacts due to mining, and the remaining half directly to the counties and municipalities originating the FML revenue or providing residence to energy employees.

Bonus payments are allocated separately from rents and royalties, in the following manner:

- 50 percent of all state mineral lease bonus payments are allocated to two separate higher education trust funds: the "Revenues Fund" and the "Maintenance and Reserve Fund". The Revenues Fund receives the first $50 million of bonus payments to pay debt service on outstanding higher education certificates of participation (COPs). The Maintenance and Reserve Fund receives 50 percent of any bonus payment allocations greater than $50 million. These funds are designated for controlled maintenance on higher education facilities and other purposes.

- The remaining 50 percent of state mineral lease bonus payments are allocated to the Local Government Permanent Fund, which is designed to accumulate excess funds in trust for distribution in years during which FML revenues decline by ten percent or more from the preceding year.

WRFO Oil and Gas Development Draft RMPA/EIS                                      Section III, Page 17
Appendix G – Social and Economic Analysis Technical Report

BLM_0020661

**Exhibit III-12.**
**Colorado Federal Mineral Lease Revenue Distribution**



Source:   Colorado Municipal League, memo dated 5/8/2008.

## Property Taxes

As described previously in this section, property taxes, particularly taxes on mineral reserves, are the largest source of governmental revenues for Rio Blanco County and the local school and hospital district. In Colorado, the value of natural gas and oil production, along with the value of gas field collection, processing, and transmission facilities, is subject to ad valorem taxes (property taxes) levied by the affected jurisdictions. Valuation of mineral resources and production is a complicated process

BLM_0020662

accommodating changing resource values and certain deductions and allowances for costs of production. Property tax revenue flows typically lag mineral production by two years and the uncertainty of mineral values over time introduces a high level of uncertainty in property tax projections.

BLM_0020663

BLM_0020664

# SECTION IV.
# Social Conditions

This section characterizes social conditions in the primary socioeconomic study area (PSSA) and, to a lesser extent, the secondary socioeconomic study area (SSSA) and beyond. The section begins with a discussion of the area's historical experience with energy development. A brief summary of relevant literature on social disruption and change associated with rapid, energy-based development in rural areas follows. The section concludes with a discussion of local perceptions of quality of life and concerns related to energy development and growth among stakeholders within the primary and secondary socioeconomic study area as well as outside of those areas.

## Historical Energy Development

Although, Rio Blanco County's economy was originally based on agriculture, the county has a long history of energy development.

**The Rangely Oil Field.** The Rangely Field, at the western end of the county, began producing oil around 1900. Oil development in Rangely grew more prominent after World War II as demand rose for petroleum products. In the mid-1940s, during a period of field expansion, Rangely was a tent city for a time with a population of as many as 5,000 residents (Thompson and Williams 1990). The local population declined substantially in Rangely after the 1940s oil boom, but the Rangely Field has been pumped heavily since that time, using enhanced recovery methods to maintain production. As a result, the Rangeley Field has been one of the most prolific sources of oil in the State of Colorado (Athearn 1981, McDonald et al. 2007).

**Oil shale: 1973-1982.** The SSSA also hosts the nation's and world's largest deposit of oil shale. A fact sheet from the Colorado School of Mines summarizes the history of oil shale in northwestern Colorado.

> "In 1915, it was reported that the U.S. may be running out of petroleum and the first oil shale boom was on. The boom went bust in the late 1920s when the West Texas oil fields were discovered and developed."

> "In 1944, interest in oil shale was renewed when the federal government realized that domestic conventional crude oil reserves would be unable to meet demand in the near future. However, nuclear energy and the discovery of enormous deposits of oil in the Middle East kept oil shale development relatively low until 1973."

> "In 1973, the Arab oil embargo and Organization of the Petroleum Exporting Countries (OPEC's) escalating prices created awareness of U.S. dependence on foreign oil and a second oil shale boom resulted. This time, major oil companies began developing oil shale projects with federal subsidization. As the oil companies moved into place, so did the people. By 1980, the population in some of the small towns near the oil shale deposits had increased as much as 400%. Even with all of the new construction that occurred, there was insufficient housing and utilities to support the exploding population" (CSM 2005b).

BLM_0020665

*Social and Economic Analysis Technical Report*

"This oil shale boom, as had its predecessors, also ended. OPEC lost control of oil prices and it was soon apparent that even subsidized shale oil could not compete with the declining prices for conventional crude. Almost overnight, the jobs were gone, leaving a housing glut as people moved away seeking employment elsewhere. Local businesses that had expanded during the boom faced a reduced market, and many went bankrupt as loans were foreclosed. Local companies were crippled as city and county governments were faced with a substantially reduced tax base from which to service debt accrued in an effort to keep pace with anticipated growth. By the early 1990s, there were no commercial oil shale facilities operating in the U.S., with the exception of the New Paraho Corporation, which was experimenting with the development of road asphalt additives, and other applications" (CSM 2005b).

In Rio Blanco County, the oil shale booms of the 1940s and the 1970s led to waves of land acquisition by oil companies in the Piceance Creek area, which contains private oil shale resources and is near the federally-owned oil shale deposits (Ekstrom 2008, Lake 2008, Neilson 2008, C.W. Brennan 2008). Rio Blanco County also saw a population surge and related effects from oil shale in the 1970s, mainly because of the federal C-a tract, south of Rangely, and the C-b tract, in the Piceance Creek drainage. The oil shale boom in Rio Blanco County was less frenzied than in Garfield and Mesa counties to the south. In Rio Blanco County, the boom ended, as it did elsewhere in the SSSA, with a decline to pre-boom levels in the economy and the population, which is where Rio Blanco County stayed until the recent renewed interest in the area's natural resources (USDOI BLM 2006).

**Recent developments.** While the prospect of commercial oil shale production again looms on the horizon, natural gas has been the dominant factor in energy development within the PSSA and SSSAs over the past decade. Energy companies began pursuing Colorado natural gas in earnest in the late 1980s, with drilling and production growing steadily since then and, more recently, at a fast pace. According to the BLM, by the end of the 1990s, the new thrust in the Colorado and Utah oil and gas industry was putting local communities under many of the same pressures felt during the oil shale boom. (USDOI BLM 2008).

Since 2003, drilling and related construction has accelerated, with many development companies active in northwestern Colorado, including major corporations such as Williams, Encana, Exxon-Mobil, Conoco-Phillips, and Chevron-Texaco. The path of development has moved east and north from western Garfield County, and the BLM's Reasonably Foreseeable Development Scenario (RFDS) for natural gas activity in the WRFO projects movement north into Rio Blanco County (USDOI BLM WRFO 2007).

In 2006 and 2007, the Colorado Oil and Gas Conservation Commission approved 360 and 321 drilling permits respectively for Rio Blanco County, even as Garfield County's total permits grew to 2,550 from 1,844 (COGCC 2008). Activity in 2008 was expected to be comparable to 2007. Construction of pipeline and processing facilities has also added to industry activity and employment in the area. Projects built in Rio Blanco County alone include completed interstate pipeline segments and large gas processing plants needing 500 or more temporary workers, with more projects currently undergoing permitting or projected for the future.

BLM_0020666

Though modest in comparison to the natural gas activity in the Piceance Basin, Chevron's operations in the Rangely Field also maintain Rangely's historical association with the petroleum industry. To continue production, Chevron deployed secondary recovery through water flooding in the late 1950s; tertiary recovery using carbon dioxide injection began in 1986. The field obtains carbon dioxide through a pipeline link to a natural gas processing plant in western Wyoming (CSM 2005a). In 1999, Chevron began a major revitalization of the field. Today, the company annually employs 58 workers, contracts for an additional 200 workers, typically drills 10 to 15 wells, and installs 10 miles of pipeline per year. Chevron spent $67 million on the field in 2007 and paid $19 million in property and severance taxes on production and assets (Urbanik 2008).

## Relevant Literature on Social Disruption and Change

The current experience of Rio Blanco County, and the SSSA, with rapid energy development is not unique. Sociologists and others have written extensively on social issues associated with rapid development in rural areas since the 1980s. Analysts have focused on past energy development campaigns in the western United States and impacts to the social well-being in host communities (USDOI BLM 2008).

**Indicators of social disruption.** In some studies, disruption is identified and measured using the social statistics, or "indicator rates," that are maintained and often published by government and other institutions (Little and Krannich 1989). Wilkinson and Camasso (1984) measured an increase in adolescent "delinquency" during boom years and, similarly, Camasso and Wilkinson (1990) found an increase in incidents of child abuse and neglect. However, three studies in the same vein found that rapid growth did not significantly raise divorce or crime *rates* [emphasis supplied], despite the apparent rise in caseload accompanying development and a growing population (Brookshire and D'Arge 1980; Wilkinson 1983; Wilkinson et al. 1984). In two victimization studies using direct, personal surveys instead of official statistics, the conclusions were different: Krannich et al. (1989) did not find a higher crime victimization rate during the boom years in several energy communities, but Freudenburg and Jones (1991) did find an increase in the rate for their area and period of study.

Instead of crime statistics, survey studies usually measure *fear* of crime (Saltiel et al. 1992), which has been shown to rise during energy booms. Studies from the 1980s that found higher fear of crime during rapid, energy-related growth are Freudenburg (1986), Brown et al. (1989), and Krannich et al (1989). Other feelings, attitudes and behaviors studied and shown to respond negatively, at least temporarily, to "boom" conditions are local friendship ties (Brown et al. 1989), residential stability (Brown et al. 1989), personal integration with the community (Greider et al. 1991), social support behavior (Greider and Krannich 1985), satisfaction with community facilities and services (England and Albrecht 1984, Greider and Krannich 1985), and general community satisfaction (Brown et al. 1989).

**Mixed findings.** When studies of this type are considered together, it is seen that not all of the effects show up under boom conditions, or in all communities. For example, Krannich et al. (1989) did find changed perceptions of social integration, while England and Albrecht (1984) found no dramatic shift in community perceptions. Seyfrit and Sadler-Hammer (1988) found only a limited connection between rapid growth and the change in young peoples' attitudes toward, and ties to, community and family.

BLM_0020667

Neighborhood relationships may be resilient during community upheavals, a finding reported in several studies. Berry et al. (1990) found relative stability in measures of "neighboring," Greider et al. (1991) reported no large increases in distrust among neighbors, and Greider and Krannich (1985) found that neighborly interaction did not decline significantly because of more "heterogeneity" (i.e., diversity) in the fast-growing population. Recently, the USDOI BLM (2008) stated that "residents of rapidly growing communities may experience expanded opportunities for obtaining social support *beyond* [emphasis supplied] their local neighborhood, while at the same time maintaining adequate relations with their neighbors."

While social disruption often occurs in so-called "boomtowns," there is contradictory evidence for whether social structures (functional and meaningful networks of human relationships) are fundamentally changed. Krannich et al. (1989) asserted "that rapid community change does alter the social environment of the community," but this statement is an interpretation of the context for the study and was not a direct measure of social structure. Using a more direct approach, England and Albrecht (1984), found no evidence that formal interpersonal relationships theoretically characterized as "urban" came to replace the informal relationships expected of rural areas. Instead, the authors suggested that informal and external ties may actually strengthen with length of residence and that a boomtown environment may facilitate rather than diminish informal social ties.

Using a non-statistical research framework, a case study by Thompson and Williams (1990) found that energy development in Rangely in the late 1970s appeared to change local power relationships. The authors construed development as bringing with it opportunities for the community to establish new "vertical" linkages, or connections to the larger society, especially to influential energy companies. They observed that this changed the local "power structure" and continued to stimulate competition for power among community groups for years.[1]

In Seyfrit and Sadler-Hammer (1988), cited above, the authors found an effect of rapid growth that was distinctive for adolescents. Other groups within a community may have distinctive reactions to a boom, as well. Freudenberg (1984) found higher levels of dissatisfaction and alienation for boomtown adolescents compared to neighboring communities but no differences in attitude for adults. Krannich and Greider (1984) found lower perceived social integration among temporary mobile home residents in boomtown communities. Additionally, Thompson and Williams (1990) observed that new "vertical linkage" in the community can create winners and losers among groups competing for power and benefits. Similarly, it is often stated that the elderly, usually the longest residents of a community, suffer dissatisfaction with a boom. However, no studies directly addressing this topic have been identified.

**Longer term effects.** Studies covering the full cycle of development—boom, decline, and (at least partial) recovery—address the question of whether disruptions will persist after growth has moderated or stabilized and will permanently change community well-being. Smith et al. (2001) found that disruptive effects to social well-being vary by phase in the development cycle and that the effects may not be permanent in some communities, dissipating over time after the boom ends (Smith et al. 2001). Brown et al. (2005) reported a rebound in community satisfaction after the decline phase and an ensuing, improved sense of community well-being. In Greider et al. (1991), the findings show that a decline in community identity and solidarity caused by rapid population growth rebounded

---

[1] Through a case study based on participant observation, Thompson and Williams (1990) is included because it directly addresses the PSSA.

BLM_0020668

fairly quickly as growth became moderate and consistent again. The Greider study emphasizes "local identity, solidarity and trust" as key elements of "community," and argues that "even when some elements of community are adversely affected by rapid change, there is likely to be a general tendency for the community to emerge and be reaffirmed when conditions stabilize."

The reaffirmation of community and of community character may depend in part on the landscape around it. A case study by Greider and Garkovich (1994) states that "... 'landscape' [as] the symbolic environment created by a human act of conferring meaning on nature and the environment... reflects the self-definitions of the people within a particular cultural context... [and is] reconstructed in response to people's changing definitions of themselves." In the SSSA, where community and landscape are traditionally closely linked, physical changes to the landscape are accelerated. Over time, a changed landscape, if changed enough and if permanently changed, may change the culture of the people who live within it.

## Quality of Life Perceptions and Concerns

The remainder of this section describes meanings and attitudes toward "quality of life" and related concerns based upon the public scoping report, recent special studies, local newspaper content, and interviews with selected individuals.

The discussion begins with Rio Blanco County as a whole, and then focuses on the localities of Meeker, Rangely and the Piceance Creek area, which is one of the areas in Rio Blanco County that has experienced the most activity during the natural gas "boom" over the past decade. The discussion then considers the SSSA—by considering the regional quality of life in general and then focusing on Rifle and Craig, which have a strengthening commuter and supply linkage to the WRFO management area under current conditions. Finally, this section concludes with a discussion of the perspectives and values of stakeholders outside the region—focusing on wild land preservation interests.

**Rio Blanco County.** The goals of achieving "balanced and responsible growth," helping county employees "efficiently accommodate growth," and helping law enforcement and social services "meet the needs of our growing population," dominated a political statement published recently by a candidate for Rio Blanco County Commissioner (Turner 2008). A study conducted by Mesa State College researchers in 2007 identified similar themes based upon interviews with local officials. The researchers stated that they were already hearing their respondents suggest that "county-wide there is a desire to look at growth in new ways" (Redifer et al. 2007).

In those interviews—with Rio Blanco County commissioners and other local officials—the Grand Junction-based researchers sought to "identify the benefits and challenges" perceived by leaders "during this period of economic expansion." They found "concern over potential negative impacts to quality of life in Rio Blanco County, especially in the southeastern section of the county where energy development is "exploding" (Redifer et al. 2007).

BLM_0020669

Rio Blanco County's principal towns—Meeker and Rangely—"are experiencing different impacts and their cultures equip them with different tools to harness the winds of change." Meeker residents live in, and often own, some the county's best known agricultural and outdoors assets. There, the researchers said, one might hear "nostalgic comments" from residents wanting to protect the "western way of life" and hold onto the ability to "push your sheep through the middle of town" (Redifer et al. 2007).

Ranching is harder and recreation more specialized in Rangely, where homesteads and other private holdings are hemmed in by remote public lands. Nostalgia in Rangely might instead be for the boom town of 5,000 residents that built the Rangely oil field.

The practical side of quality of life emerged when the government officials spoke of their own responsibility for "maintaining acceptable levels of [government] service" for all of the county's residents. They reported existing revenue shortfalls, higher labor costs, and shortages of space for government operations. They made a long list of statistics they officially track as "indicators" of social impact and cost: crime, traffic, jail detainees, public school enrollment (up), community college enrollment (down, because of the new industry jobs, which is seen as not necessarily a bad thing but could lead to underinvestment in human capital in the long run), services to the unemployed (down, for the same reason), and higher demand for child protection, public child care, low-income housing, and medical care and hospitalization for the uninsured (Redifer et al. 2007). Researchers said they sensed that the local officials may feel "overwhelmed just trying to keep up and not able to be proactive, given limited resources available in a small county" (Redifer et al. 2007).

One way that two of "the most critical issues" mentioned to the researchers—temporary and transient workforces (including "too many illegal immigrants" [Redifer et al. 2008]), and the housing shortage—interact with each other reflects on social integration in Rio Blanco County today. Temporary workforces are neither members of the community (though some may stay, eventually) nor are they always affiliated with a company with a local presence other than the project site. Without strong community ties themselves, temporary workers create housing demand that is hard to satisfy when there is a housing shortage, competition for housing resources, and competition for the land upon which to develop housing. Similarly, labor and service companies down the supply chain may have weak local ties, too. "Companies call us all the time and ask about housing. They seem to have no idea what they're getting into," said the Rio Blanco County undersheriff (Joos 2008).

A similar idea was repeated in Rio Blanco County's official response to the recent economic and demographic impact forecasts developed for the Associated Governments of Northwest Colorado (AGNC) and the Colorado Department of Local Affairs (DOLA). "Growth brings problems on an urban scale, disproportionate to local capabilities, and appearing to outweigh [sic] the economic and social benefits, except to a limited range of economic agents within the community," stated a county commissioner (BBC 2008b). Although not always a part of discussions of quality of life, this response highlights concerns about the equity of growth effects within the community.

The goal of improving, or at least maintaining, quality of life through collaborative efforts shows up in different ways in public attitudes toward growth. In the political ad mentioned previously, the candidate proposed to pursue growth while preserving "our way of life." The mix is based upon "a heritage of agriculture, energy production and recreation" in the candidate's view, all of which depend on the same resource base (Turner 2008).

BLM_0020670

This "multi-use" character is often cited as essential to community character (USDOI BLM WRFO 2007b). While the multi-use concept may have different interpretations in Rio Blanco County, it is often invoked. The candidate, for instance, called for "all of the county's industries to work together so we don't give any special interest groups a reason to question our way of life" (Turner 2008). Others may want to establish different linkages and coalesce with other influential, outside institutions if industry interests appear too dominant in local decision-making and activities.

County officials also express support for cooperation in handling growth and preserving quality of life. Rio Blanco County government leaders have looked for industry participation, in terms of "public/private partnerships," and report that "there have been cooperative measures to replace and repair roads." The electorate's cooperation also has been obtained in these efforts. Voters supported referenda to override fiscal caps imposed by the TABOR amendment to the state constitution and have, at least tacitly, supported county code changes for residential camps in the field (the so-called "man camps"), and to impose impact fees on gas developments under county jurisdiction. The Mesa County researchers see these as indications of where the ongoing conversation about growth and quality of life may lead Rio Blanco County (Redifer et al. 2007).

**Town of Meeker.** Many Meeker residents still identify with a rural lifestyle that centers on agriculture, the outdoors, and living and working among neighbors, friends and family. "[Meeker is] a close-knit community with a small town feel," said a business leader (Brown 2008). Some residents see new faces in town as a signal of disruption of the community's solidarity that could weaken traditions of volunteerism that make some public services possible, such as fire protection, emergency response, and boards and commissions. If community cohesion declines, it could also interfere with the staging of signature events, like the annual Range Call Rodeo and the Meeker Classic Championship Sheepdog Trials, which bolster identity and attract tourism.

The town's self-image emphasizes wildlife, hunting, recreation and tourism; residents likely see that image reflected in the historically open and agricultural landscape surrounding the town (see Greider and Garkovich 1994). With planning and management of impacts, residents would mostly welcome growth, but many are wary of a future "bust" (Sheridan and Day). In addition, the town would like to keep its populations centralized to minimize impacts on agriculture and tourism. However, the cost of infrastructure and development in town tends to push the growth into the unincorporated areas of the county, which hastens the conversion of agricultural lands that have long been the town's setting (BBC 2008b).

For local officials, quality of life concerns are tied to the communities housing situation and level of municipal services. The potential for more aggressive energy development in the future has raised concerns. "I feel the most significant issues facing the town right now are housing needs, infrastructure needs and quality of life," said the town's new mayor (Rio Blanco Herald Times 2008). As energy development has moved north away from Garfield County into the Piceance Creek area, the town in seeing more construction activity than ever before. Industry's reliance on temporary workers exacerbates the housing shortage, places new demands on water and sewer infrastructure, and confronts police with more, and more serious, law enforcement and public safety issues.

BLM_0020671

The faster pace in town also stretches the business community. Mesa State College researchers heard it expressed "that the business community is tired. This is especially true in the Meeker area where hunting season brings an influx of people but then they leave. This recent period of accelerated growth has not let up and residents are concerned about the ability of businesses to withstand the pace." (Redifer et al. 2007). Quality of services may have declined, as "people are not able to pay the higher wages the energy companies can and in turn, employment is unavailable to the services community" (BBC 2008b).

Hotel and motel accommodations are full, due to the needs of energy workers in the area. Tourism, wildlife-related businesses for fishing and hunting—as well as general recreation activities—are being negatively impacted because of competition for available lodging (BBC 2008b). Industrial traffic is affecting Colorado State Highway 13 (SH-13), which runs through town as Market Street, and could conflict with plans to upgrade the streetscape (Brown 2008). Traffic on the street now includes trucks and equipment. This carries over to other parts of town, and entering Market Street from arterial streets has become more difficult than ever before (BBC 2008b).

Traffic outside of town also affects quality of life. Rifle is Meeker's closest regional shopping and services center, historically less than an hour's drive away on Colorado SH-13. Now, "there are also serious safety concerns along [Colorado State Highway] 13 from Rifle to Meeker for the town's residents. With the increasingly large number of trucks and over-sized vehicles on this highway, major accidents are becoming a common occurrence" (BBC 2008b).

If the town's character is affected, some town officials worry that second homeowners may leave, bringing a drop in property values and the loss of economic diversity (Day and Sheridan 2007). Though town officials say less than one percent of growth now comes from second homes and quality of life migrants (Day and Sheridan 2007), some see retirees as a potential driver of growth and source of diversification that would fit well with Meeker's traditional lifestyle.

**Town of Rangely.** Rangely today expresses a willingness to capitalize on growth from natural gas development and a community capacity to do so, in terms of a view that economic development would promote quality of life. "Bring it on," was a response heard from town administrators asked about the community's attitudes toward energy-related growth (Stewart and Devere 2007).  The Rangely area, as described in the historical sections above, has experienced fluctuations in their economy, due to its reliance on natural resources (USDOI BLM 2008), community feeling is that the last decade or so was spent managing a depression (Stewart and Devere 2007).

Located further away from the Rio Blanco County epicenter of new gas development than Meeker, Rangely strategizes to obtain economic benefits. Oil company industry and occupational groups are already embedded in the community, though not all are affiliated with companies developing in the Piceance Creek area. The town's location on the highway route between the Piceance Basin and the large industry services center in Vernal, Utah, fits with the town's economic development strategy of capitalizing on the boom as a workforce residential center (Stewart and Devere).

BLM_0020672

Economic revitalization overlaps with quality of life objectives in Rangely. An economic stimulus would promote revitalization of the town's Main Street and raise revenue to maintain the town's spacious facilities and infrastructures, that are the legacy of past energy development. "In the last boom, Rangely did plan and grew properly with the money we had, but when the population dropped we lost the money to keep the infrastructure up to date," said a respondent in a recent focus group (Redifer et al 2008).

As a small community out of the direct path of anticipated natural gas development, Rangely is receptive to linkage to other groups, institutions and governments. "Collaboration between county and towns for infrastructure development ... is critical to meeting the demands of the workforce, as well as families, seniors and school-age children," said a town official after attending a presentation by leaders from a Wyoming town experiencing intensive natural gas development (Rio Blanco County Herald 2008).

The difficulties that came from the last boom-and-bust cycle still make the community cautious, but receptive to the possibilities if handled right. "As we move forward we may have to contend with a boom, for which there may not be sufficient fiscal support. Or if we moderate, overreact and suppress development, we may have to contend with a bust," said a former town official (Devere 2008).

**Piceance Creek.** Historically, ranch communities like Piceance Creek have produced models of non-governmental, community cooperation. In fact, the Piceance Creek Stock Growers, which existed for a decade or two in the early twentieth century, once appeared as an item in a young academic's dissertation for its cooperative handling of wolf predation (Yoder 1999).

Few today likely know of the Stock Growers' association, and Piceance Creek is a different community today. The economic pressures and cycles of energy development have led to sales of private land and to the rising demand for mineral development on BLM range lands. Piceance Creek ranchers have sold productive land, sold water, and peeled off land to rent out or develop on their own for revenue. "You do what you can do to survive," said a Meeker resident from a long time Piceance Creek ranching family (Brennan, M. 2008). Outfitting or simply selling trespass hunting rights is also a "value added" strategy for ranchers, but development activity or energy company policy on leased land has led to cutbacks for some operations (Ekstrom 2008).

The urban and industrial attributes evident now in the Piceance Creek are affecting residents' way of life. One key indicator of change is the traffic counts on local roads, which indicate the need for more and different services from local government. The Rio Blanco County Sheriff's Office tracks the Piceance Creek area, which patrol a network of roads that access roughly 500 square miles. The area generated 1,675 calls for service in 2007, and 1,171 calls through August of 2008, a rate of about five a day, compared to 135 in 2003. The county now operates a satellite health clinic in the area, and is maintaining the road to a higher standard with industry participation.

BLM_0020673

Growth in general has contributed to added demands on local roads, and not all the change comes from energy development activity. Still, use of the roads for access to gas development is more often mentioned than other effects. "The biggest impact now is the traffic," said a rancher on County Road 5 (CR-5), the Piceance Creek Road. "I can remember a time when you didn't even have to look down the road to cross it. Sometimes now you see a line of 10 or 15 vehicles at a time." The rancher expressed concern for his "older neighbors" driving CR-5 under these conditions (Oldland 2008).

Piceance Creek residents encounter people from outside the area much more often that in the past. Ranches may not be able to lock perimeter gates and, with gas companies having access, see outside vehicles on interior roads "all the time," said a rancher who added that, before, the only people that came to the area "were in the cattle business." This can be seen during hunting season, too: "In the past we never had anybody on the ranch that we didn't know. Now there is a tremendous influx" (Oldland 2008).

Under current conditions, some question whether the ranch community on Piceance Creek can coexist with energy development. "At a certain industrial density, a ranch could continue to operate" said the county extension agent, and said, "Up to that level it's not a bad deal," if there are beneficial spillovers, as there are in some cases (Ekstrom 2008).

One rancher said a lot depends on how the industry's development approach affects activity levels in the long run. "Directional drilling … where they're not constructing and operating so many sites, temporary living quarters near sites, buses to transport workers…those kinds of things make a big difference. It helps the people living here. It helps the community" (Oldland 2008).

Under current conditions, ranchers young and old on Piceance Creek are considering personal options with social implications. The small group of between 25 and 30 ranches (depending on the estimate) is linked to the immediate area as well as to multiple external contexts on many levels and in varying ways. Each ranch is faced with a set of individual circumstances.

Not all trends affecting the ranching community are related to the natural gas industry. One trend is the aging of the ranch community. Another is the finite resource: one Meeker resident, now in a second career as a business owner in town, said he left the family ranch on Piceance Creek early in his life because, "there was more family than there was ranch" (Brennan 2008). High paying jobs in industry are creating other options now. For some young family members, those options may lead away from Piceance Creek. Financial considerations also play a part. "There's a magic number (regarding income and profits) where if it gets below that, they can't continue," said the county extension agent (Ekstrom 2008). For some, a second income can contribute to a ranch's survival.

BLM_0020674

Change in the perceived quality of life along Piceance Creek affects the outlook of residents about the area as a place to live and as a place to run a ranch. Piceance Creek "used to be nice, friendly and quiet. It's still nice, it's still friendly, but it's no longer quiet" (Ekstrom 20008). The change an older rancher has seen, "Makes you wonder why we want to stay put, but we have to. It's our livelihood" (Brennan, C.W 2008).

A new ripple of real estate activity is under way in response to an increasing natural gas industry presence. Some ranchers have sold, some are considering selling, and some "people are trying to get out, but no one wants in," said the county extension agent (Ekstrom 2008). Others are waiting and watching. The industry appears to be "very active" now, and "I'm hopeful when that's complete, the activity will drop down...I'm a strong believer in developing our domestic resources of oil and gas. But if [the development] is in your backyard it takes a lot of patience" (Oldland 2008).

**Secondary Socioeconomic Study Area.** Since the end of the 1990s, northwestern Colorado communities have been adapting to the natural gas industry's growing presence. The regional perspective that has emerged since 2003, when natural gas development began to accelerate, often emphasizes the wider region's "quality of life." Summarizing interviews with officials of each county—Mesa, Moffat, Garfield, Rio Blanco and Routt—Mesa State College researchers noted four general trends in people's reaction to ongoing change in the quality of life throughout the wider region:

- Urbanization and higher land values have reduced agriculture's viability, changing the culture of the area;

- Long-term residents miss the "small town atmosphere" of the past;

- Many of these same residents find it less satisfying to hunt and fish in their favorite places as development encroaches into wildlife areas; and

- The natural beauty of the area is disrupted as views are marred by drilling rigs and networks of resource roads. (Redifer et al. 2007).

The business community, as a whole, considers the quality of life "a specific strength of the business environment," according to the Mesa State research. The business community would have policymakers "be aware of the effect growth has on the perceived quality of life since that one factor is consistently named as the most significant community strength," the researchers said. Overall, the region's business leaders were reported to be optimistic that "quality of life" can be achieved in the face of change—seen as "not all bad"—if quality of life is addressed as an "essential" outcome when other priorities are set (Redifer et al. 2008).

Two communities outside of the PSSA—Rifle in Garfield County and Craig in Moffat County—are tied closely to the WRFO management area by proximity, commuting patterns and a historical role as residential and service centers for energy development. The shortage of housing in the WRFO immediately triggered commuting to the Piceance Creek area from Rifle and Craig as energy development began. The pattern was reinforced by contractors running bus shuttles to the construction sites of major gas processing facilities. In both Rifle and Craig, growth from energy development in Rio Blanco County is incremental to trends already under way in each community.

BLM_0020675

The growth factors affecting Rifle and Craig differ according to their location, but the two communities share a "concern about the quality of life" with the rest of a growing northwestern Colorado (Redifer et al. 2007). Rifle as a community generally accepts its role as a residential center and has coalesced in support of policies that accommodate growth, as long as city leaders take steps "to ensure new growth and development pays its way," said the city's Government Affairs and Energy Coordinator (Braaten 2008).

Craig still smarts from past "boom and bust" experiences, which include a coal-fired power plant construction project, the oil shale surge of the early 1980s, and ripples of oil and gas field development. The community remains "somewhat apprehensive about growth," according to interviews with city officials (Moffat County and the City of Craig 2008).

**Wildland Preservation Interests.** Aside from industry—whose interests and objectives are reflected in the purpose and need for this EIS—another outside "community of interests" with objectives for the WRFO area comprises individuals and organized or informal associations whose primary interest is in "wildland" preservation. The Wilderness Society (TWS)—a national organization with a strong Colorado presence—participated in public scoping for the WRFO RMPA and submitted a detailed set of recommendations for an approach to the analysis of alternatives in the EIS.

A program of TWS's is the "Too Wild to Drill" campaign whose objective is to prevent drilling in areas identified by the organization as having wilderness quality but not designated as wilderness under the Wilderness Act. The TWS list contains seventeen areas, including five in Colorado. The WRFO management area is not among the Colorado areas, but the Roan Plateau, which is adjacent to the WRFO area, is included on the list.

TWS argues that the "Too Wild to Drill" areas are too "fragile" for gas development to be undertaken without causing irreparable damage to natural values. The critique casts drilling in a negative light. However, TWS does not condemn drilling in general, stating that drilling may be conducted "responsibly as part of a balanced energy policy," which entails drilling only in places "where it is appropriate to drill," drilling at a slower pace, and having "energy efficiency, renewable energy, and conservation" play "larger roles" in a national energy policy (The Wilderness Society).

No data is provided here on TWS membership or its current influence in the WRFO area. However, environmental messages are pervasive in the larger culture, available to all, and potentially appealing to a conditioned audience. Interviews with local officials throughout the wider region of northwestern Colorado convinced Mesa State College researchers that "the past history of environmental damage and the forecast of future substantial development of the energy industry makes it easy for preservationists to encourage distrust of the energy industry, and anyone who supports it" (Redifer et al. 2007).

BLM_0020676

That observation resonates in Rio Blanco County—though the prevalence of these concerns, or counter-reactions against perceived outside interests, cannot be known without direct surveys of public opinion. A recent ad for the winning candidate for a Rio Blanco County commissioner's seat seemed to allude to TWS, or environmental advocacy groups in general. It set such interests apart from the local social setting when, in one plank of his platform, the candidate stated this formula for local leadership: "Encourage all of the county's industries to work together, managing our natural resources so we do not give any special interest groups a reason to question our way of life" (Turner 2008).

## Non-Market Value

Non-market values are often associated with "public goods." Public goods are goods and services that, once provided to one person, can be consumed by another for no additional cost. Despite not being traded in markets, economic theory defines the total economic value of a public good as what individuals would be willing to pay for all of its attributes. It is difficult to measure total economic value, which can only be inferred from related data by conducting special quantitative analyses.

In some cases, goods that are traded in markets also have non-market attributes that people would be willing to pay for in addition to the costs that show up in the financial transactions. Publicly provided recreation is an example in which recreation visitors may be willing to pay for value that is in addition to what it costs out of pocket (measured by gate fees, travel , and so forth) for the experience of using a recreation area. Productive agricultural land may have value as a public good as well, with people being willing to pay for the character that agricultural land adds to an area that is over and above the dollar value attributed to the land for its ability to produce commodities.

During scoping, participants asked BLM to consider the non-market value of conserving public wildlands and places with wilderness character (BLM WRFO 2007b, p. 40-41). The WRFO Planning Area contains six Wilderness Study Areas (WSA), three of which have been recommended for wilderness designation. The three WSAs recommended for wilderness contain a total of about 42,000 acres and would potentially support between 2,100 and 2,550 visitor days per year (U.S. Department of the Interior, Bureau of Land Management, Colorado State Office, Wilderness Study Report, Volume 1, Craig District Study Areas, October 1991. Available from the State Office).

Other resources besides wilderness on BLM-managed and private land in the PSSA could potentially have qualities that generate non-market economic benefits. Abundant wildlife is a well-known example. Another is the area's open landscapes where agricultural activity dominates other types of development. The following sections discuss these resources as public goods with possible economic value. The discussion does not include a determination of the economic value itself. Instead, it relies on theory and refers to quantitative analyses conducted elsewhere. No studies of non-market value have focused on the PSSA in the past, although the non-market value of natural resources has been studied in Colorado.

**Wilderness.** Current knowledge about the economic value of wilderness can be summed up by focusing on the published research concerning the "on-site recreation" and "passive use" benefits derived from designated wilderness areas created pursuant to the Wilderness Act of 1964 (Bowker et al. 2005). Three of the six WSAs in the WRFO have the potential to be ratified as part of the National Wilderness Preservation System (NWPS) through an act of Congress.

BLM_0020677

Recreation benefits accrue to people from their activities in wildness area, such as fishing, hunting, birdwatching, hiking, camping, and other non-motorized recreation. Passive use benefits (also called "non-use" benefits) "are less tangible than the physical presence of a person being on site and participating in a recreational activity" (p.162)." The authors acknowledge three components of non-use benefits: 1) "Option benefits" accrue to a person because the opportunity to visit a wilderness in the future has been assured; 2) "bequest benefits" accrue because one knows his or her heirs or future generations will be able to use and enjoy wilderness areas, and 3) "existence benefits" accrue because one simply knows that a wilderness exists. Citing Freeman (1994, p. 141), the authors say the question of whether non-use value exists is more or less settled:

> "While there is some debate among economists over the precise definitions for the
> various components, and perhaps even more debate as to the empirical measurement
> of the resulting economic values, most natural resource economists would agree with
> the concept of passive use benefits." (Bowker, et al. 2005).

The Bowker, et al. review of the economics literature identified 14 published studies that quantify "individual consumer surplus[2] for on-site Wilderness recreation" and eight published studies that quantify the "passive use values of Wilderness." These papers reflect studies from wilderness areas across the country between 1981 and 1999. They were performed as the opportunity presented itself to individual researchers, so they do not represent a systematic wilderness program evaluation.

The following table is a brief presentation of the findings in Bowker et al (2005).

**Exhibit IV-1.**
**Average Consumer Surpius Value per Person per Day by Activity on Public Land Based upon Existing Studies in the Intermountain Region, 2004 Dollars**

| Category of Benefits | Denomination (2002 dollars) | Consumer Surplus / Willingness-to-Pay Average / Median | Range |
|---|---|---|---|
| On-Site Recreation Use | Per person per trip for a single day use | $19.50 / $17.99 | $12 to $31 |
| | Per person per trip for a multi-day use | $68.47 / $30.11 | $5 to $287 |
| Passive Use | Per household per year | $67 | $20 to $98 |

Source: Summarized by Lloyd Levy Consulting LLC from Bowker et al. (2005)

Some of the studies identified by Bowker et al. focused specifically on wilderness in Colorado. For the Colorado studies, the estimates of per person per trip consumer surplus are $31 for single day use (one study) and $94 to $185 (2002 dollars) for multi-day use (two studies). The Colorado estimates of annual household willingness-to-pay for wilderness ranged from $38 to $98 (2002 dollars, two Colorado only and two multi-state studies that included Colorado).

The national and Colorado wilderness value estimates should be interpreted with caution. Because of how recreation use value is denominated by Bowker et al., their findings cannot be used simply as a

---

[2] Consumer surplus is the dollar amount a person would be willing to pay over and above out of pocket expenditures.

BLM_0020678

multiplier in combination with the BLM's standard unit of measurement for recreation use, which is the "recreation visitor day," or RVD.

**Wildlife.** In Colorado and other western states, the public, through state government, "owns" its wildlife populations. Wildlife viewing on public land is open to the public. The State sells hunting permits, but the permit cost is generally set for management purposes, to reflect wildlife's public status and to maintain quality. The price of hunting permits is set to "ration" hunting opportunities and is not a market-determined price for hunting.

Besides permits, hunters make other cash expenditures for goods and services that are part of the price of hunting. People who visit public land to view wildlife make similar travel-related expenditures. These expenditures generate local "economic impacts" when spent away from the participant's home county. However, participants are typically willing to pay more than these direct costs for the satisfaction of hunting and wildlife observation. The total amount that participants would be willing to pay, net of costs, is the measure of wildlife recreation's economic benefits. This is called the net willingness to pay, or "consumer surplus."

Valuation studies of recreation use, including wildlife recreation, are common nationally, with most studies of hunting and wildlife viewing that have been conducted since 1967 having been conducted in the intermountain region of the U.S.—which includes Colorado (Loomis 2005). Exhibit IV-2 presents average values for the consumer surplus of wildlife recreation in the intermountain region. The exhibit also presents the overall U.S. average value. These values represent the economic value received by participants in hunting and wildlife viewing over and above their direct costs of participation.

**Exhibit IV-2.**
**Average Consumer Surplus Value per Person per Day by Activity on Public Land Based upon Existing Studies in the Intermountain Region, 2004 Dollars**

| Activity | Intermountain Region Average | United States Average |
|---|---|---|
| Hunting | $49 | $47 |
| Wildlife Viewing | $37 | $42 |

Note: Consumer surplus is the value of a recreation activity beyond what must be paid to enjoy it. The data in the table are based on studies published from 1967 to 2003. The Intermountain Region is a U.S. Forest Service definition that incorporates 12 states, including Colorado (Loomis, 2005). Amounts in the table have been rounded to the nearest dollar.

Source: Loomis, 2005.

**Agricultural land.** Analysts began considering "farmland preservation" in the mid-1980s (Rose 1984). Since then, studies of how open space benefits the citizens of a community have become more common as economists pay more attention to non-market values. The studies generally indicate the public puts a value on agricultural land for qualities and societal benefits that are in addition to private benefits, though there is debate over how analytical methods affect the reliability of specific dollar estimates (Johnston and Duke 2007)

BLM_0020679

The community benefits most associated with agricultural land in Colorado are open space, viewshed, wildlife habitat and lifestyle (Loomis et al. 2000). Methods for analyzing these public benefits are the same as those used to study other types of non-market values. They include 1) observing actual market purchases of agricultural land for preservation by governments and land trusts; 2) analyzing related market transactions to identify land or house price differentials attributable to closeness to agricultural land; and 3) analyzing public perceptions agricultural land's value by using a combination of qualitative and quantitative social research methods (Loomis et al. 2000).

To illustrate the use of market transactions as an indicator of non-market values, Loomis et al. (2000) analyzed purchases by governments and land trusts that led to restricting lands from residential, commercial and industrial development. The transactions were assumed to represent a societal evaluation of the benefit of preserving certain agricultural lands, given the public or quasi-public character of the buyers. Exhibit IV-3 presents the average price per acre revealed in these conservation purchases occurring in three parts of Colorado.

**Exhibit IV-3.**
**Market Transaction Values of Restricting Colorado Lands from Development, 1998 Dollars**

|  | Front Range | Western Slope | Mountains |
|---|---|---|---|
| Total Number of Purchases | 51 | 6 | 14 |
| Total Acres | 18,999 | 18,849 | 82,364 |
| Average Cost Per Acre (nominal dollars) | $26,582 | $1,889 | $3,577 |

Note: These transactions include the state government-sponsored and lottery-funded Great Outdoors Colorado Land Trust (GOCO) and Private Land Trusts. The Colorado Coalition of Land Trusts (CCLT) reported an additional 34 Land Trusts that protected some 518,209 acres on 686 parcels in 1998. Average costs by region were calculated from a subset of the total number of purchases reported above: 39 for Front Range, 5 for Western Slope, and 12 for Mountains. One conservation purchase was also reported for the Eastern Plains.

Source: Loomis et al., 2000.

A study in Routt County in 2004 used a social research method known as contingent valuation (CV) to estimate what registered voters would be willing to pay to protect local ranch open space through county government action (Magnan et al. 2005). The estimate of average willingness to pay of up to $220 per person per year was larger than the amount of $182 (inflation adjusted) estimated ten years earlier (Rosenberger and Walsh 1997). Contingent valuation uses a survey to describe a hypothetical change in a market and then elicit a stated preference for how much the respondent would be willing to pay for the hypothesized benefit.

A related study using CV in Routt County in 2005 estimated that tourists would spend an average of $210 per person per trip less (median value of $63) because they would spend less and stay fewer days given a change from ranch land to urban use around Steamboat Springs (Ellingson et al. 2006). This result was contrasted with a previous estimate (Rosenberger and Loomis 1999) that predicted no significant impact to tourist spending from the loss of agricultural land in the surrounding area.

BLM_0020680

**Non-use value.** Non-market valuation studies view public lands in terms of their on-site use value and their off-site, non-use, or "passive" use value (all interchangeable terms). Passive users, or individuals who never visit or otherwise use a natural resource, may still perceive themselves to be affected by changes in its status or quality (Harpman et al. 1994). As discussed above, more and more studies from around the country have focused on use values for public goods like hunting and wildlife observation. Fewer studies to date focus on passive use, but the literature includes measures of the passive use value of rare species and natural environments such as free flowing rivers and wilderness.

Wildlife and agricultural open space may also have passive use economic value. Residents, property owners, tourists and potential migrants may put an economic value on wildlife and agricultural open space even if it is outside of a group's usual domain of use or direct experience, as indicated by the Routt County studies already discussed. Compared to a decade earlier, registered voters in Routt County in 2004 seemed be "willing to pay at least as much to protect ranch open space in the area in and around Steamboat Springs ... and more to protect ranch open space elsewhere in the county" (Magnan et al. 2005). The tourists surveyed in 2005 ascribed 56 percent of the economic value they put on ranch open space to vicarious benefits like opportunity to view in the future, potential for upcoming generations to enjoy viewing, knowing that it exists for its own sake, and conserving soil, water, wildlife, and western cultural heritage. They ascribed the rest of the value to a mix of market and non-market use benefits like actually viewing, managing growth to reduce dispersed rural residential development and a source of private enterprise for ranchers and for the local economy (Ellingson et al. 2006).

**BLM management and non-market value.** There is no existing research quantifying non-market values in the WRFO Planning Area. However, characteristics of the Affected Environment's geography, economy and social conditions — and some similarities to other areas where non-market valuation studies have been conducted — suggest  that BLM management could potentially affect non-market values. Two brief descriptions relating public and private resources as they exist in the WRFO Planning Area illustrate the possibilities for such interaction.

For wildlife populations that may provide non-market values, such as big game animals or other large fauna, the connection potentially exists because seasonal ranges may cover areas that are a mosaic of public and private land. Specific parts of the public domain may have no substitutes elsewhere, so wildlife populations valued for their use or simply for their existence may be affected.

Previous portions of this technical report described an example of the relationship between BLM management and the agricultural private sector, focusing on the ranches on Piceance Creek. These ranches are intrinsically a combination of public range and private land, much of latter being held open to grow hay and pasture livestock. Industrial development occurring on public land may entail increasing disturbance of ranch operations. By pressuring ranch operators economically, socially and psychologically, BLM management decisions that facilitate development on public land may, for one reason or another may affect a ranch's viability.

BLM_0020681

BLM_0020682

# Part Two.
# Social and Economic Environmental Consequences

Preparer's note: The information contained in this section was developed in 2005 through 2010. Since 2008, economic conditions in the study area (and elsewhere) have been substantially affected by the global and national economic recession.

The pace of energy development in Northwest Colorado has also slowed substantially since 2008. Whether this slowdown is temporary or more long lasting is uncertain. However, anecdotal information from the study area suggests that the prevalent concerns of a few years ago regarding rapid growth have more recently been supplanted by concerns about retaining jobs and meeting local government fiscal obligations.

BLM_0020683

BLM_0020684

# SECTION V.
# Impacts Common to All Alternatives

Part Two of this report describes the potential effects on social and economic conditions in the socioeconomic study area from the implementation of the four proposed alternatives to manage oil and gas exploration and development in the Planning Area. This section describes the impacts common to all alternatives.

As defined in Part One, the socioeconomic study area consists of the primary socioeconomic study area (PSSA), which encompasses Rio Blanco County, and the secondary socioeconomic study area (SSSA), which encompasses Garfield County, Moffat County and Mesa County in Colorado and Uintah County in Utah. As described in the WRFO RFD Scenario (2007), 95 percent of future oil and gas wells are projected to be drilled in the Mesaverde Gas Play Area, which generally corresponds with the area known as the Piceance Basin in Rio Blanco County. Oil and gas exploration and development is expected to affect social and economic conditions in the SSSA due to workforce commuting from outside Rio Blanco County and the extensive economic interrelationships between the PSSA and the SSSA.

## Indirect Effects of Oil and Gas Development

The magnitude and pace of oil and gas development determines most of the social and economic effects that would indirectly result from the WRFO management alternatives.

The drilling-related oil and gas workforce will include drilling-related employees of the energy development companies operating in the area (e.g., Williams, EnCana, etc.) and subcontract workers primarily in the oil and gas and construction industries. In addition to direct jobs associated with drilling and maintaining oil and gas wells and related infrastructure, oil- and gas-related economic activity would support other secondary jobs in both the PSSA and SSSA. These jobs result from both indirect economic effects of oil and gas activity (purchases of goods and services by energy companies and their subcontractors) and induced economic effects (purchases of household goods by the employees of energy companies, subcontractors and indirectly affected firms). A relatively large proportion of secondary jobs would occur in the SSSA due to oil and gas activity in the Planning Area (within the PSSA). This reflects both the extensive commuting of oil and gas workers from outside the PSSA and the role of the larger communities in Mesa County, Garfield County and Uintah County in providing regional services.

Projected well development for each alternative is defined in the air quality analysis. Management decisions related to some other resources may affect the pace and timing of oil and gas development because of their effects on the economics of energy development. In this context, relevant resource management categories include:

- Soil and water resources;
- Vegetation;

BLM_0020685

*Social and Economic Analysis Technical Report*

- Fish and wildlife;
- Trails and travel management;
- Lands and realty; and
- Special status species.

## Effects on Hunting

The collective effect of the individual management actions on the hunting resource are assumed to be reflected in the management goals BLM has established for wildlife population objectives under each alternative. Those management goals are:

- 100 percent of the state-established (CPW) population objective under Alternative A;
- 90 percent of the state-established population objective under Alternative B;
- 70 percent of the state-established population objective under Alternative C; and
- 50 percent of the state-established population objective under Alternative D.

The relationship between hunting activity levels and big game herd sizes is imprecise. For purposes of this analysis; however, the relationship is assumed to be linear. For example, Alternative D would support only 50 percent as many hunting days as Alternative A.

## Effects on Agriculture

In general, Alternatives A, C and D would adjust grazing management to resolve potential conflicts with oil and gas operations, while Alternative B would adjust oil and gas activity to resolve conflicts with grazing. There are differences in the amount of grazing land and the number of AUMs that can be supported among the alternatives, which would affect the agricultural economy.

## Effects on Non-market Values

There are non-market values associated with several of the resources managed by BLM in the Planning Area, as well as with agricultural open space on both public and private lands. As discussed more fully in Chapter 3, non-market values include the benefits received by people from participating in recreational activities in the Planning Area, as well as the passive, or non-use benefits individuals derive from the existence of abundant wildlife, six wilderness study areas, extensive agricultural lands with little development and other amenities in the area. BLM management decisions that offer more protection for the following resource categories will tend to also provide more protection for non-market values and non-quantifiable recreation benefits:

- Special status species;
- Wild horses;
- Cultural resources;
- Paleontological resources;
- Visual resources; and
- Recreation resources.

BLM_0020686

# SECTION VI.
# Social and Economic Effects Under Alternative A (Existing Management)

This section describes anticipated direct and indirect social and economic effects related to Alternative A (Existing Management or the No Action Alternative). The section addresses the following effects in sequence:

- total employment and population effects;
- energy-related activity and employment;
- agricultural activity and employment;
- hunting and tourism activity and employment;
- fiscal effects;
- housing, public services and infrastructure
- social conditions; and
- non-market values.

## Total Employment and Population Effects

The estimated net effect of Alternative A on employment in the PSSA and SSSA combines the new direct and secondary jobs associated with increased oil and gas development with the projected decrease in direct and secondary jobs related to agriculture.

Within the PSSA, Alternative A is projected to lead to a net increase of 329 employed persons and 679 residents by 2030. These estimates represent a seven percent increase in employment and a nine percent increase in population compared to 2010 existing conditions. Exhibit VI-1 shows the projected changes in employment and population within the PSSA under Alternative A – compared to existing conditions – in five-year increments.

BLM_0020687

*Social and Economic Analysis Technical Report*

**Exhibit VI-1.**
**Projected Employment and Population Effects in the PSSA (Alternative A)**



Source: BBC Research & Consulting 2010.

Within the SSSA, Alternative A is projected to lead to a net increase of 562 employed persons and 1,082 residents by 2030. These estimates represent less than a 1 percent increase in SSSA employment and population compared to 2010 existing conditions. Exhibit VI-2 shows the projected changes in employment and population within the SSSA under Alternative A – compared to existing conditions – in five-year increments.

BLM_0020688

**Exhibit VI-2.**
**Projected Employment and Population Effects in the SSSA (Alternative A)**



Source: BBC Research & Consulting, 2010.

## Energy-related Activity and Employment

Under Alternative A, approximately 4,600 new wells would be developed in the Planning Area over the 20-year planning horizon. The average number of new wells per year is similar to the rate of development in 2007 when the RFD Scenario was identified. This average reflects a slightly higher rate of well development than the study team projects for 2010 (160 wells). The current (2010) development rate continues to reflect the ongoing recession affecting the oil and gas industry in Northwest Colorado. The maximum rate of well development under Alternative A is projected to occur in the final three years of the 20-year planning period, when 263 wells are projected to be developed each year.

The total number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 5,042 by 2030 under Alternative A.

The drilling-related workforce employed in the Planning Area (based on work sites) is projected to increase from about 475 workers in 2010 to about 691 workers by 2030 under Alternative A. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 655 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by almost 400 jobs over the 20-year study period.

BLM_0020689

Secondary employment in the PSSA resulting from oil and gas activity is projected to increase from 666 jobs in 2010 to 941 jobs by 2030 under Alternative A. In the SSSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs to 1,177 jobs by 2030.

Exhibit VI-3 summarizes projected energy-related activity and employment under Alternative A from 2010 (existing conditions) through 2030.

**Exhibit VI-3.**
**Projected Energy-related Activity and Employment (Alternative A)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 208 | 219 | 241 | 263 |
| Cumulative producing wells | 2,866 | 3,364 | 3,900 | 4,464 | 5,042 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 547 | 576 | 633 | 691 |
| Maintenance jobs in PSSA | 478 | 538 | 585 | 625 | 655 |
| Total direct jobs in PSSA | 953 | 1,085 | 1,161 | 1,258 | 1,347 |
| Secondary jobs in PSSA | 666 | 758 | 811 | 880 | 941 |
| Secondary jobs in SSSA | 833 | 948 | 1,015 | 1,100 | 1,177 |

Note:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Source: BBC Research & Consulting, 2010.

## Agricultural Activity and Employment

The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 6,664 acres of publicly administered grazing lands could be impacted under Alternative A over the 20-year study period. This total represents 0.46 percent of the approximately 1.445 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the Mesaverde Gas Play Area (roughly corresponding to the Piceance Basin), it would represent about 1.24 percent of the 588,000 acres of publicly administered grazing land in that area.

As shown in Exhibit VI-4, the relatively small amount of grazing land that could be affected under Alternative A corresponds to a very small direct and secondary impact on agricultural employment in the PSSA under these analytical assumptions.

BLM_0020690

**Exhibit VI-4.**
**Projected Agricultural Sector Effects (Alternative A)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Maximum cumulative reduction in grazing acres | 0 | 1,153 | 2,709 | 4,424 | 6,283 |
| Percent of total Planning Area grazing land | 0% | 0.08% | 0.19% | 0.31% | 0.43% |
| Percent of total Mesa Verde Play Area grazing land | 0% | 0.21% | 0.50% | 0.82% | 1.17% |
| Projected effects on agricultural jobs |  |  |  |  |  |
|    Direct jobs | 0 | -0.3 | -0.8 | -1.3 | -1.9 |
|    Secondary jobs | 0 | -0.2 | -0.5 | -0.9 | -1.2 |
|    Total jobs | 0 | -0.6 | -1.3 | -2.2 | -3.1 |

Note:    Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land. Actual impacts may be larger or smaller for reasons discussed in the narrative.
Source:  BBC Research & Consulting, 2010.

## Hunting and Tourism Activity and Employment

Under Alternative A, BLM has identified the management goal of maintaining the big-game population objectives established by CPW. Consequently, this alternative would not be expected to lead to changes in hunting activity levels due to reductions in big-game herd sizes.

Some anecdotal reports suggest there has been some decrease in interest in big-game hunting in the Planning Area (and in Garfield County south of the Planning Area) due to hunter perceptions of extensive, energy-related industrial activity in the area. Since future oil and gas activity under Alternative A would be of a similar scale to existing conditions, effects of public perceptions on hunting activity levels would likely remain similar to existing conditions.

The results of the temporal analysis indicate that approximately 1.1 percent of the mule deer range area in the Mesaverde Play Area would be developed over the 20 year planning period under Alternative A.

## Fiscal Effects

Projections of oil and gas-associated state and local revenues for Alternative A are set forth in Exhibit VI-5. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in the exhibit. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

Under Alternative A, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $9.3 million by 2031. These funds will be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area will rise from $12.0 million to $21.6 million. Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $42.6 million by 2031.

BLM_0020691

*Social and Economic Analysis Technical Report*

**Exhibit VI-5.**
**Energy Associated Revenue Projections (Alternative A)**

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Dollars in Millions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $ 34.4 | $ 5.2 | $ 12.0 | $ 17.6 | $ 23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $ 35.3 | $ 5.3 | $ 12.3 | $ 18.0 | $ 24.3 |
| 2012 | 195 | 3,047 | 1,020 | 152,355 | $ 914.1 | $ 36.6 | $ 5.5 | $ 12.8 | $ 18.7 | $ 25.2 |
| 2013 | 195 | 3,151 | 1,017 | 157,534 | $ 945.2 | $ 37.8 | $ 5.7 | $ 13.2 | $ 19.3 | $ 26.0 |
| 2014 | 197 | 3,253 | 1,038 | 162,658 | $ 976.0 | $ 39.0 | $ 5.9 | $ 13.7 | $ 19.9 | $ 26.9 |
| 2015 | 208 | 3,364 | 1,085 | 168,179 | $ 1,009.1 | $ 40.4 | $ 6.1 | $ 14.1 | $ 20.6 | $ 27.8 |
| 2016 | 208 | 3,471 | 1,102 | 173,533 | $ 1,041.2 | $ 41.6 | $ 6.2 | $ 14.6 | $ 21.3 | $ 28.7 |
| 2017 | 208 | 3,575 | 1,083 | 178,727 | $ 1,072.4 | $ 42.9 | $ 6.4 | $ 15.0 | $ 21.9 | $ 29.5 |
| 2018 | 219 | 3,686 | 1,128 | 184,315 | $ 1,105.9 | $ 44.2 | $ 6.6 | $ 15.5 | $ 22.6 | $ 30.5 |
| 2019 | 219 | 3,795 | 1,145 | 189,736 | $ 1,138.4 | $ 45.5 | $ 6.8 | $ 15.9 | $ 23.3 | $ 31.4 |
| 2020 | 219 | 3,900 | 1,161 | 194,994 | $ 1,170.0 | $ 46.8 | $ 7.0 | $ 16.4 | $ 23.9 | $ 32.2 |
| 2021 | 230 | 4,013 | 1,206 | 200,644 | $ 1,203.9 | $ 48.2 | $ 7.2 | $ 16.9 | $ 24.6 | $ 33.2 |
| 2022 | 230 | 4,122 | 1,182 | 206,125 | $ 1,236.7 | $ 49.5 | $ 7.4 | $ 17.3 | $ 25.3 | $ 34.1 |
| 2023 | 241 | 4,240 | 1,227 | 211,991 | $ 1,271.9 | $ 50.9 | $ 7.6 | $ 17.8 | $ 26.0 | $ 35.0 |
| 2024 | 241 | 4,354 | 1,243 | 217,681 | $ 1,306.1 | $ 52.2 | $ 7.8 | $ 18.3 | $ 26.7 | $ 36.0 |
| 2025 | 241 | 4,464 | 1,258 | 223,201 | $ 1,339.2 | $ 53.6 | $ 8.0 | $ 18.7 | $ 27.4 | $ 36.9 |
| 2026 | 252 | 4,582 | 1,304 | 229,105 | $ 1,374.6 | $ 55.0 | $ 8.2 | $ 19.2 | $ 28.1 | $ 37.9 |
| 2027 | 252 | 4,697 | 1,273 | 234,832 | $ 1,409.0 | $ 56.4 | $ 8.5 | $ 19.7 | $ 28.8 | $ 38.8 |
| 2028 | 252 | 4,808 | 1,287 | 240,387 | $ 1,442.3 | $ 57.7 | $ 8.7 | $ 20.2 | $ 29.5 | $ 39.7 |
| 2029 | 263 | 4,927 | 1,332 | 246,325 | $ 1,478.0 | $ 59.1 | $ 8.9 | $ 20.7 | $ 30.2 | $ 40.7 |
| 2030 | 263 | 5,042 | 1,347 | 252,085 | $ 1,512.5 | $ 60.5 | $ 9.1 | $ 21.2 | $ 30.9 | $ 41.7 |
| 2031 | 263 | 5,153 | 1,361 | 257,673 | $ 1,546.0 | $ 61.8 | $ 9.3 | $ 21.6 | $ 31.6 | $ 42.6 |

Note:  MMCF = million cubic feet
Source:  BBC Research & Consulting 2010.

## Housing, Public Services and Infrastructure

It is likely that unincorporated Rio Blanco County and the towns of Meeker and Rangely— the PSSA for this analysis — will be the area most immediately and directly affected by the housing needs associated with energy development.  Given the PSSA's  limited housing and services capacity, portions of Garfield County may also be affected, particularly the City of Rifle and other nearby communities along the I-70 corridor.

As noted earlier, Alternative A is projected to lead to a net increase of 679 residents in the PSSA by the end of the 20 year planning horizon – corresponding to an average annual increase of about 39 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 16 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller households.

As summarized in Table 3.8.1-1 of the RMPA/EIS, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on

BLM_0020692

this comparison, the existing rate of housing development in the PSSA appears sufficient to accommodate the incremental population growth associated with Alternative A, although there is likely to be a need for greater development emphasis on multifamily and rental housing. When the cumulative effects of other growth drivers are added to the incremental effects of Alternative A, there will be greater demands for new housing in the PSSA.

Since the rate of gas development under Alternative A would be similar to existing conditions, effects on public services would likely remain similar to what the PSSA is currently experiencing. As noted in Part One of this report, there was a substantial increase in police reports from the Piceance Basin between 2003 and 2007, which led to the reorganization of law enforcement services in Meeker and the county. Under Alternative A, law enforcement demands, and other public service needs, are likely to remain at levels similar to existing conditions.. Meeker has already identified the need for a new grade school facility, but the relatively modest additional growth associated with Alternative A would not substantially worsen existing public school capacity issues in the PSSA.

## Social Conditions

Within the PSSA (Rio Blanco County), Alternative A would cause an incremental population growth rate of less than 1 percent per year through 2030. This incremental growth rate caused by Alternative A is well below the growth rates likely to cause socially disruptive change. As discussed in Part One, residents of the PSSA are generally supportive of economic and population growth and are generally willing to trade some desirable local characteristics for increased prosperity and the opportunities that come with change. However, a number of undesirable social effects have already been observed in the PSSA as a result of increasing energy development and growth over the past decade. As discussed in Part One, some of the community's concerns include:

- Residents wanting to protect the "western way of life";
- Maintaining acceptable levels of public service, including law enforcement, fire protection, emergency response, and boards and commissions;
- Additional strain on limited resources, including the business community;
- Temporary and transient workforces and associated social disruption;
- Housing and hotel shortages;
- Increased construction disruption;
- Concern about repercussions associated with a future "bust";
- Desire to minimize impacts on agriculture and tourism;
- Negative aspects of increased traffic.

The PSSA is adapting to the pace of growth experienced during the past decade. Since the projected rate of energy development, and overall population growth, under Alternative A would be similar to existing conditions, social concerns will likely diminish over the 20 year planning horizon under this Alternative.

Under Alternative A in the PSSA, 39 percent of incremental growth in the number of employed residents would come directly or indirectly from energy development by 2030, compared to 16 percent from agriculture, and six percent from hunting (hunting being just part of total recreation and

BLM_0020693

tourism employment). This change would have little incremental effect on the overall dependency of the PSSA's labor force and population on energy industry employment, agriculture or hunting. Consequently, this alternative would tend to preserve the existing balance of interests among different population groups within the PSSA.

The energy labor force of the PSSA would continue to be roughly equally split between more temporary drilling jobs and more permanent field maintenance and operations jobs during the 20-year planning horizon. The substantial proportion of drilling jobs among oil- and gas-related jobs in the PSSA indicates that the energy industry would not become a fully stable component of the economic base during the 20-year planning horizon. The volatile attribute of the drilling sector of the energy industry is perceived by the population in communities of the PSSA as having the potential to diminish their quality of life. The validity of this concern has been reinforced by the downturn in the local gas industry over the past two years.

Overall the social indicators suggest that Alternative A would not have an impact on the quality of life of most community residents in the PSSA compared to existing conditions. Since future oil and gas activity under Alternative A would be of a similar scale to existing conditions, no change to quality of life for recreation interests would occur from effects on hunting. For ranchers along the Piceance Creek Road and its side roads, Alternative A would affect their quality of life due to traffic, noise, dust, and competition for resources on BLM land, but these effects would be similar to current conditions. Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life under Alternative A. However, groups with environmental interests would see some benefit to the quality of life in the PSSA under Alternative A because higher levels of potential development under consideration in this RMPA would be avoided.

## Non-market Values

The number of wells projected to be developed under Alternative A (and corresponding development of other energy-related infrastructure) is relatively small compared to the other alternatives and is generally similar to the development rate under existing conditions. As noted earlier, this alternative is not expected to affect the big game population in the Planning Area. The temporal analysis indicates that approximately 1.1 percent of the vegetation communities and the mule deer range in the Mesaverde Play Area would be developed over the 20 year planning period under Alternative A. Consequently, this alternative is likely to have little effect on recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly affected public and private lands.

BLM_0020694

# SECTION VII.
# Social and Economic Effects Under Alternative B (Conservation Emphasis)

This section describes anticipated direct and indirect social and economic effects related to Alternative B (Conservation Emphasis). The section addresses the following effects in sequence:

- total employment and population effects;
- energy-related activity and employment;
- agricultural activity and employment;
- hunting and tourism activity and employment;
- fiscal effects;
- housing, public services and infrastructure
- social conditions; and
- non-market values.

## Total Employment and Population Effects

The estimated net effect of Alternative B on employment and population in the PSSA and SSSA combines the projected direct and secondary jobs that would be added due to increased oil and gas development (relative to existing conditions) with the projected decrease in direct and secondary jobs related to agriculture and hunting activity.

Within the PSSA, Alternative B is projected to lead to a net increase of 1,580 employed persons and 2,868 residents by 2030. These estimates represent a 35-percent increase in employment and a 37-percent increase in population compared to 2010 existing conditions. Exhibit VII-1 shows the projected changes in employment and population within the PSSA under Alternative B – compared to existing conditions – in five-year increments.

BLM_0020695

*Social and Economic Analysis Technical Report*

**Exhibit VII-1.**
**Projected Employment and Population Effects in the PSSA (Alternative B)**



Source:  BBC Research & Consulting 2010.

Within the SSSA, Alternative B is projected to lead to a net increase of 2,641 employed persons and 4,816 residents by 2030. These estimates represent about a two percent increase in SSSA employment and population compared to 2010 existing conditions. Exhibit VII-2 shows the projected changes in employment and population within the SSSA under Alternative B – compared to existing conditions – in five-year increments.

BLM_0020696

**Exhibit VII-2.**
**Projected Employment and Population Effects in the SSSA (Alternative B)**



Source:  BBC Research & Consulting, 2010.

## Energy-related Activity and Employment

Under Alternative B, approximately 9,200 new wells would be developed in the Planning Area over the 20-year planning horizon. The maximum rate of well development is projected to occur in the final three years of the 20-year planning period, when over 600 wells are projected to be developed each year.

The cumulative number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 8,500 by 2030 under Alternative B.

The drilling-related workforce employed in the Planning Area (based on work site, not office location) is projected to increase from about 475 workers in 2010 to about 1,671 workers by 2030 under Alternative B. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 1,105 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by more than 1,800 jobs over the 20-year study period.

Secondary employment resulting from oil and gas activity is projected to increase from 666 jobs in 2010 in the PSSA to 1,941 jobs by 2030 under Alternative B. In the SSSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs in 2010 to 2,427 jobs by 2030.

BLM_0020697

*Social and Economic Analysis Technical Report*

Exhibit VII-3 summarizes projected energy-related activity and employment under Alternative B from 2010 (existing conditions) through 2030.

**Exhibit VII-3.**
**Projected Energy-related Activity and Employment (Alternative B)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** |  |  |  |  |  |
| Annual new wells | 160 | 318 | 434 | 535 | 636 |
| Cumulative producing wells | 2,866 | 3,711 | 5,017 | 6,628 | 8,501 |
| **Related employment** |  |  |  |  |  |
| Drilling jobs in PSSA | 475 | 836 | 1,141 | 1,406 | 1,671 |
| Maintenance jobs in PSSA | 478 | 594 | 753 | 928 | 1,105 |
| Total direct jobs in PSSA | 953 | 1,429 | 1,893 | 2,334 | 2,777 |
| Secondary jobs in PSSA | 666 | 999 | 1,324 | 1,632 | 1,941 |
| Secondary jobs in SSSA | 833 | 1,250 | 1,655 | 2,041 | 2,427 |

Note:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Source: BBC Research & Consulting, 2010.

Relative to Alternative A, Alternative B is projected to lead to 1,430 more direct energy-related jobs and 1,000 more secondary jobs in the Planning Area (PSSA) by 2030. Alternative B is also projected to lead to 1,250 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

## Agricultural Activity and Employment

The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 13,328 acres of publicly administered grazing lands could be impacted under Alternative B over the 20-year study period. This total represents 0.92 percent of the approximately 1.445 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the Mesaverde Gas Play Area (roughly corresponding to the Piceance Basin), it would represent about 2.48 percent of the 588,000 acres of publicly administered grazing land in that area.

If agricultural employment is proportional to the amount of public grazing land available in the area, the relatively small amount of grazing land that could be affected under Alternative B corresponds to a small direct and secondary impact on agricultural employment in the PSSA, as shown Exhibit VII-4. The projected impact on agricultural activity and employment under Alternative B would be twice as large as under Alternative A, but the estimated effect on direct and secondary employment (based on the simplified assumption of proportionality to the loss of grazing land) would be only about six jobs by 2030.

BLM_0020698

**Exhibit VII-4.**
**Projected Agricultural Sector Effects (Alternative B)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Maximum cumulative reduction in grazing acres | 0 | 1,676 | 4,485 | 8,048 | 12,363 |
| Percent of total Planning Area grazing land | 0% | 0.12% | 0.31% | 0.56% | 0.86% |
| Percent of total Mesa Verde Play Area grazing land | 0% | 0.31% | 0.83% | 1.49% | 2.30% |
| Projected effects on agricultural jobs |  |  |  |  |  |
| Direct jobs | 0 | -0.5 | -1.3 | -2.4 | -3.7 |
| Secondary jobs | 0 | -0.3 | -0.9 | -1.6 | -2.4 |
| Total jobs | 0 | -0.8 | -2.2 | -4.0 | -6.1 |

Note:    Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land.
         Actual impacts may be larger or smaller for reasons discussed in the narrative.
Source:  BBC Research & Consulting, 2010.

With the additional well development projected in the Planning Area under Alternative B compared to Alternative A, valley-bottom hay lands currently owned by energy companies are more likely to be developed for energy-related activities than under Alternative A.

## Hunting and Tourism Activity and Employment

Under Alternative B, the BLM has identified a management goal of maintaining 90 percent of the big-game population objectives established by CPW. The maximum ten percent reduction would occur in year 2031 when annual development would peak at 666 wells. The results of the temporal analysis indicate that approximately 2.1 percent of the mule deer range area in the Mesaverde Play Area would be developed over the 20 year planning period under Alternative B (compared to 1.1 percent under Alternative A).

Exhibit VII-5 shows the estimated percentage of the CPW big-game population targets maintained under Alternative B from 2010 through 2030 and the projected effects on hunting related jobs in the PSSA and the SSSA. By 2030, Alternative B is projected to result in the loss of between 4 and 22 direct and secondary hunting-related jobs in the Planning Area (PSSA) and between 3 and 14 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels.

BLM_0020699

*Social and Economic Analysis Technical Report*

**Exhibit VII-5.**
**Projected Hunting Sector Effects (Alternative B)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Percent of CPW target big game population** | 100% | 99% | 97% | 94% | 91% |
| **Projected effects on hunting-related jobs** |  |  |  |  |  |
| Direct jobs in PSSA | 0 | -1 to -4 | -2 to -8 | -2 to -11 | -3 to -15 |
| Secondary jobs in PSSA | 0 | 0 to -2 | -1 to -4 | -1 to -5 | -1 to -7 |
| Total jobs jobs in PSSA | 0 | -1 to -5 | -2 to -11 | -3 to -17 | -4 to -22 |
| Direct jobs in SSSA | 0 | 0 to -2 | -1 to -4 | -1 to -6 | -2 to -8 |
| Secondary jobs in SSSA | 0 | 0 to -1 | -1 to -3 | -1 to -5 | -1 to -6 |
| Total jobs in SSSA | 0 | -1 to -3 | -1 to -7 | -2 to -11 | -3 to -14 |

Note:   PSSA is equivalent to Rio Blanco County.
           SSSA includes Mesa, Moffat, Garfield and Uintah, UT counties – hunting related effects arise in Mesa and
           Moffat counties only.
Source:  BBC Research & Consulting, 2010.

## Fiscal Effects

Projections of oil and gas-associated state and local revenues for Alternative B are set forth in Exhibit VII-6. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in the exhibit. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

BLM_0020700

**Exhibit VII-6.**
**Energy Associated Revenue Projections (Alternative B)**

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Dollars In Millions | | | | | |
|------|------|------|------|------|------|------|------|------|------|------|
| | | | | | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $ 34.4 | $ 5.2 | $ 12.0 | $ 17.6 | $ 23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $ 35.3 | $ 5.3 | $ 12.3 | $ 18.0 | $ 24.3 |
| 2012 | 260 | 3,112 | 1,209 | 155,605 | $ 933.6 | $ 37.3 | $ 5.6 | $ 13.1 | $ 19.1 | $ 25.7 |
| 2013 | 275 | 3,294 | 1,250 | 164,687 | $ 988.1 | $ 39.5 | $ 5.9 | $ 13.8 | $ 20.2 | $ 27.2 |
| 2014 | 303 | 3,498 | 1,356 | 174,896 | $ 1,049.4 | $ 42.0 | $ 6.3 | $ 14.7 | $ 21.4 | $ 28.9 |
| 2015 | 318 | 3,711 | 1,429 | 185,549 | $ 1,113.3 | $ 44.5 | $ 6.7 | $ 15.6 | $ 22.7 | $ 30.7 |
| 2016 | 347 | 3,947 | 1,543 | 197,333 | $ 1,184.0 | $ 47.4 | $ 7.1 | $ 16.6 | $ 24.2 | $ 32.6 |
| 2017 | 361 | 4,189 | 1,577 | 209,463 | $ 1,256.8 | $ 50.3 | $ 7.5 | $ 17.6 | $ 25.7 | $ 34.6 |
| 2018 | 390 | 4,454 | 1,693 | 222,679 | $ 1,336.1 | $ 53.4 | $ 8.0 | $ 18.7 | $ 27.3 | $ 36.8 |
| 2019 | 405 | 4,725 | 1,773 | 236,249 | $ 1,417.5 | $ 56.7 | $ 8.5 | $ 19.8 | $ 29.0 | $ 39.1 |
| 2020 | 434 | 5,017 | 1,893 | 250,861 | $ 1,505.2 | $ 60.2 | $ 9.0 | $ 21.1 | $ 30.8 | $ 41.5 |
| 2021 | 448 | 5,315 | 1,975 | 265,735 | $ 1,594.4 | $ 63.8 | $ 9.6 | $ 22.3 | $ 32.6 | $ 43.9 |
| 2022 | 477 | 5,632 | 2,042 | 281,613 | $ 1,689.7 | $ 67.6 | $ 10.1 | $ 23.7 | $ 34.5 | $ 46.6 |
| 2023 | 491 | 5,954 | 2,124 | 297,715 | $ 1,786.3 | $ 71.5 | $ 10.7 | $ 25.0 | $ 36.5 | $ 49.2 |
| 2024 | 506 | 6,282 | 2,209 | 314,083 | $ 1,884.5 | $ 75.4 | $ 11.3 | $ 26.4 | $ 38.5 | $ 51.9 |
| 2025 | 535 | 6,628 | 2,334 | 331,411 | $ 1,988.5 | $ 79.5 | $ 11.9 | $ 27.8 | $ 40.6 | $ 54.8 |
| 2026 | 549 | 6,978 | 2,420 | 348,919 | $ 2,093.5 | $ 83.7 | $ 12.6 | $ 29.3 | $ 42.8 | $ 57.7 |
| 2027 | 578 | 7,347 | 2,474 | 367,351 | $ 2,204.1 | $ 88.2 | $ 13.2 | $ 30.9 | $ 45.0 | $ 60.7 |
| 2028 | 592 | 7,719 | 2,559 | 385,931 | $ 2,315.6 | $ 92.6 | $ 13.9 | $ 32.4 | $ 47.3 | $ 63.8 |
| 2029 | 621 | 8,108 | 2,686 | 405,403 | $ 2,432.4 | $ 97.3 | $ 14.6 | $ 34.1 | $ 49.7 | $ 67.0 |
| 2030 | 636 | 8,501 | 2,777 | 425,041 | $ 2,550.2 | $ 102.0 | $ 15.3 | $ 35.7 | $ 52.1 | $ 70.3 |
| 2031 | 666 | 8,912 | 2,909 | 445,589 | $ 2,673.5 | $ 106.9 | $ 16.0 | $ 37.4 | $ 54.6 | $ 73.7 |

Note:  MMCF = million cubic feet
Source:  BBC Research & Consulting 2010.

Under Alternative B, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $16.0 million by 2031 (compared with $9.3 million in Alternative A). These funds will be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area will rise from $12.0 to $37.4 million (compared with $21.6 million under Alternative A). Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $73.7 million by 2031 (compared with $42.6 million under Alternative A).

The major issue facing local governments in terms of the fiscal impact of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population, and the challenges presented in making investment commitments, given the risk and uncertainty inherent in a resource based economy. These issues and challenges will be somewhat greater under Alternative B than under Alternative A, given the larger increase in population projected to occur under Alternative B.

*Social and Economic Analysis Technical Report*

### Housing, Public Services and Infrastructure

Alternative B is projected to lead to a net increase of 2,868 residents in the PSSA by the end of the 20 year planning horizon – corresponding to an average annual increase of about 144 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 58 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller households.

As summarized in Table 3.8.1-1 of the RMPA/EIS, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the rate of housing development in the PSSA will need to approximately double to accommodate the incremental population growth associated with Alternative B. There is also likely to be a need for greater development emphasis on multifamily and rental housing. When the cumulative effects of other growth drivers are added to the incremental effects of Alternative B, there will be even greater demands for new housing in the PSSA.

Since Alternative B would increase both the rate of gas development and the rate of overall population growth relative to existing conditions, public service challenges that the PSSA is already experiencing are likely to be exacerbated. As noted in Part One of this report, there was a substantial increase in police reports from the Piceance Basin between 2003 and 2007 which has led to the reorganization of law enforcement services in Meeker and the county. Law enforcement demands, and other public service needs, are likely to further increase under Alternative B. The need for a new grade school in Meeker will become more acute, though student enrollment growth in the Rangely area would likely be welcome given the decline in that district's enrollment since 2000. Infrastructure and service delivery costs will be at least somewhat offset by rising property values, particularly the rising value of minerals and the resultant property and severance taxes. The county and school district are likely to be significant revenue beneficiaries, but the towns of Meeker and Rangeley will be required to provide most new resident services with little new tax revenue. The state's mineral revenue redistribution programs will offer some revenue relief.

As also noted in Part One, local governments and school districts in the PSSA have struggled to hire and retain staff due to wage competition from the energy industry. These challenges are likely to increase under Alternative B.

### Social Conditions

Alternative B would cause an incremental population growth rate in the PSSA of less than two percent per year through 2030 compared to less than one percent per year for Alternative A. The rate for Alternative B is three percent below the threshold range of socially-disruptive growth that has been observed in small, energy impacted communities. This is just the incremental effect of the alternative.

Previously identified social issues in the PSSA associated with energy-driven growth include:

- Residents wanting to protect the "western way of life":

BLM_0020702

- Maintaining acceptable levels of public service, including law enforcement, fire protection, emergency response, and boards and commissions;
- Additional strain on limited resources, including the business community;
- Temporary and transient workforces and associated social disruption;
- Housing and hotel shortages;
- Increased construction disruption;
- Concern about repercussions associated with a future "bust";
- Desire to minimize impacts on agriculture and tourism;
- Negative aspects of increased traffic.

While the PSSA is adapting to the pace of growth experienced during the past decade, that pace would accelerate somewhat under Alternative B. The cumulative level of population growth under Alternative B is unlikely to result in "transformative" social change (as discussed in Section 4.1.1 of the RMPA/EIS) in the PSSA and the rate and level of growth that would result under Alternative B would likely be welcomed by many PSSA residents. However, in contrast to Alternative A, where social issues are likely to diminish over the 20-year planning period, many of the social concerns identified to date in the PSSA may continue to arise under Alternative B.

Under Alternative B in the PSSA, 53 percent of incremental growth in the number of employed residents would come directly or indirectly from energy development by 2030, compared to 13 percent from agriculture, and four percent from hunting (hunting being just part of total recreation and tourism employment). This change is 14 percent higher than under Alternative A for energy development (39 percent), three percent lower for agriculture (16 percent) and two percent lower for hunting (six percent). These differences suggest Alternative B would cause a shift toward labor force and population dependency on employment in the energy industry in the PSSA and away from agriculture and hunting. The impact of the shift in dependency under Alternative B could be perceived by the population in communities of the PSSA as potentially improving the quality of life because of additional economic opportunities. However, the shift also could be perceived as potentially reducing quality of life because of increased exposure to volatility in the energy industry and greater competition for resources with agriculture and hunting, which embody traditional cultural values. These effects would be larger under Alternative B than Alternative A roughly in proportion to the relative change in dependency among the three kinds of livelihoods in the PSSA. The change in the mix of livelihoods under Alternative B would somewhat modify the balance of interests among different population groups within the PSSA, increasing the potential for social tensions between differing groups relative to Alternative A.

Under Alternative B, the majority of employment by the energy industry would be in drilling and development during the 20-year planning horizon. The share involved in drilling would grow over time. By 2030, 60 percent of energy jobs in the PSSA would be in drilling and 40 percent in field maintenance and operation compared to an equal split in 2010 and a roughly equal split in 2030 under Alternative A. This indicates that the energy industry would have the potential for greater instability during the 20-year planning horizon under Alternative B than under Alternative A. The volatile attribute of the drilling sector of the energy industry is likely to be perceived by the population in communities of the PSSA as having the potential to diminish their quality of life.

BLM_0020703

The prevalence of drilling jobs in the PSSA under Alternative B would be about ten percent greater in 2030 than under Alternative A. A drilling-oriented industry can both increase quality of life, because of economic opportunities, and reduce quality of life, because of exposure to industry volatility. These impacts would be larger under Alternative B than Alternative A roughly in proportion to the change in prevalence of drilling jobs.

For ranchers on the Piceance Creek Road and its side roads, Alternative B would affect their quality of life due to traffic, noise, dust, and competition for resources on BLM land, much of it related to drilling activity and facilities development. The impact to ranchers would be greater from Alternative B than from Alternative A. The increase in these effects under Alternative B is indicated by the estimated change in drilling employment and the number of annual wells drilled, which are more than double the levels under Alternative A in 2030.

The impact to quality of life for recreation interests would be larger under Alternative B than for Alternative A. The impact is related to the loss of between 4 and 22 direct and secondary hunting-related jobs in the PSSA and between 3 and 14 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Recreation interests would also be impacted because of lower perceived quality of the hunting experience in the area affected by oil and gas drilling and production. This is indicated by the development of 4,600 more wells under Alternative B than Alternative A over the 20-year period.

Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life. Alternative B allows about twice as much development compared to Alternative A. However, groups with environmental interests would see some benefit to the quality of life in the PSSA because higher levels of potential development under consideration in this RMPA would be avoided during the 20-year planning horizon.

## Non-market Values

Compared to Alternative A, the larger number of wells that would be developed under Alternative B (along with associated infrastructure and land disturbance) implies more potential to affect recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly-affected public and private lands. As noted earlier, Alternative B is expected to potentially reduce the big game population in the Planning Area by up to ten percent by the end of the 20 year planning period and would likely affect the recreational value associated with hunting compared to Alternative A. The temporal analysis indicates that approximately 2.1 percent of the vegetation communities and the mule deer range in the Mesaverde play area would be developed over the 20 year planning period under Alternative B, compared to 1.1 percent under Alternative A. The six Wilderness Study Areas in the Planning Area are not expected to be affected by energy development under Alternative B.

BLM_0020704

# SECTION VIII.
# Social and Economic Effects Under Alternative C (Managed Development)

This section describes anticipated direct and indirect social and economic effects related to Alternative C (Managed Development). The section addresses the following effects in sequence:

- total employment and population effects;
- energy-related activity and employment;
- agricultural activity and employment;
- hunting and tourism activity and employment;
- fiscal effects;
- housing, public services and infrastructure
- social conditions; and
- non-market values.

## Total Employment and Population Effects

The estimated net effect of Alternative C on employment and population in the PSSA and SSSA combines the projected direct and secondary jobs that would be added due to increased oil and gas development (relative to existing conditions) with the projected decrease in direct and secondary jobs related to agriculture and hunting activity.

Within the PSSA, Alternative C is projected to lead to a net increase of 3,255 employed persons and 5,800 residents by 2030. These estimates represent a 72-percent increase in employment and a 75-percent increase in population compared to 2010 existing conditions. Exhibit VIII-1 shows the projected changes in employment and population within the PSSA under Alternative C – compared to existing conditions – in five-year increments.

BLM_0020705

*Social and Economic Analysis Technical Report*

**Exhibit VIII-1.**
**Projected Employment and Population Effects in the PSSA (Alternative C)**



Source: BBC Research & Consulting 2010.

Within the SSSA, Alternative C is projected to lead to a net increase of 5,431 employed persons and 9,285 residents by 2030. These estimates represent about a 4 percent increase in SSSA employment and population compared to 2010 existing conditions. Exhibit VIII-2 shows the projected changes in employment and population within the SSSA under Alternative C – compared to existing conditions – in five-year increments.

BLM_0020706

**Exhibit VIII-2.**
**Projected Employment and Population Effects in the SSSA (Alternative C)**



Source: BBC Research & Consulting, 2010.

## Energy-related Activity and Employment

Under Alternative C, approximately 15,000 new wells would be developed in the Planning Area over the 20-year planning horizon. The maximum rate of well development is projected to occur in the final three years of the 20-year planning period, when over 1,100 wells are projected to be developed each year.

The cumulative number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 12,943 by 2030 under Alternative C.

The drilling-related workforce employed in the Planning Area (based on work site, not office location) is projected to increase from about 475 workers in 2010 to about 3,017 workers by 2030 under Alternative C. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 1,683 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by about 3,750 jobs over the 20-year study period.

Secondary employment resulting from oil and gas activity is projected to increase from 666 jobs in 2010 in the PSSA to 3,286 jobs by 2030 under Alternative C. In the SSSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs in 2010 to 4,109 jobs by 2030.

BLM_0020707

*Social and Economic Analysis Technical Report*

Exhibit VIII-3 summarizes projected energy-related activity and employment under Alternative C from 2010 (existing conditions) through 2030.

**Exhibit VIII-3.**
**Projected Energy-related Activity and Employment (Alternative C)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 450 | 682 | 915 | 1,148 |
| Cumulative producing wells | 2,866 | 4,060 | 6,274 | 9,273 | 12,943 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 1,183 | 1,792 | 2,405 | 3,017 |
| Maintenance jobs in PSSA | 478 | 650 | 941 | 1,298 | 1,683 |
| Total direct jobs in PSSA | 953 | 1,832 | 2,733 | 3,703 | 4,700 |
| Secondary jobs in PSSA | 666 | 1,281 | 1,911 | 2,589 | 3,286 |
| Secondary jobs in SSSA | 833 | 1,602 | 2,390 | 3,237 | 4,109 |

Note:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Source:  BBC Research & Consulting, 2010.

Relative to Alternative **A**, Alternative C is projected to lead to about 3,353 more direct energy-related jobs and 2,345 more secondary jobs in the Planning Area (PSSA) by 2030. Alternative C is also projected to lead to 2,932 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

## Agricultural Activity and Employment

The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 21,811 acres of publicly administered grazing lands could be impacted under Alternative C over the 20-year study period. This total represents 1.51 percent of the approximately 1.445 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the Mesaverde Gas Play Area (roughly corresponding to the Piceance Basin), it would represent about 4.05 percent of the 588,000 acres of publicly administered grazing land in that area.

If agricultural employment is proportional to the amount of public grazing land available in the area, the relatively small amount of grazing land that could be affected under Alternative C corresponds to a small direct and secondary impact on agricultural employment in the PSSA, as shown in Exhibit VIII-4. The projected impact on agricultural activity and employment under Alternative C would be over three times as large as under Alternative A, but the estimated effect on direct and secondary employment (based on the simplified assumption of proportionality to the loss of grazing land) would be only about ten jobs by 2030.

BLM_0020708

**Exhibit VIII-4.**
**Projected Agricultural Sector Effects (Alternative C)**

| | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Maximum cumulative reduction in grazing acres | 0 | 2,200 | 6,471 | 12,432 | 20,080 |
| Percent of total Planning Area grazing land | 0% | 0.15% | 0.45% | 0.86% | 1.39% |
| Percent of total Mesa Verde Play Area grazing land | 0% | 0.41% | 1.20% | 2.31% | 3.73% |
| Projected effects on agricultural jobs | | | | | |
| Direct jobs | 0 | -0.7 | -1.9 | -3.7 | -6.0 |
| Secondary jobs | 0 | -0.4 | -1.2 | -2.4 | -3.9 |
| Total jobs | 0 | -1.1 | -3.2 | -6.1 | -9.9 |

Note:    Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land.
         Actual impacts may be larger or smaller for reasons discussed in the narrative.
Source:  BBC Research & Consulting, 2010.

With the additional well development projected in the Planning Area under Alternative C compared to Alternatives A or B, valley-bottom hay lands currently owned by energy companies are more likely to be developed for energy-related activities than under those alternatives.

## Hunting and Tourism Activity and Employment

Under Alternative C, BLM has identified the management goal of maintaining 70 percent of the big-game population objectives established by the CPW. The maximum 30-percent reduction would occur in year 2031 when annual development would peak at 1,194 wells. The results of the temporal analysis indicate that approximately 3.4 percent of the mule deer range area in the Mesaverde Play Area would be developed over the 20 year planning period under Alternative C (compared to 1.1 percent under Alternative A).

Exhibit VIII-5 shows the estimated percentage of the CPW big-game population targets maintained under Alternative C from 2010 through 2030 and the projected effects on hunting-related jobs in the PSSA and the SSSA. By 2030, Alternative C is projected to result in the loss of between 13 and 67 direct and secondary hunting-related jobs in the Planning Area (PSSA) and between 9 and 43 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels.

BLM_0020709

*Social and Economic Analysis Technical Report*

**Exhibit VIII-5.**
**Projected Hunting Sector Effects (Alternative C)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Percent of CPW target big game population** | 100% | 97% | 91% | 83% | 72% |
| **Projected effects on hunting-related jobs** |  |  |  |  |  |
| Direct jobs in PSSA | 0 | -2 to -11 | -5 to -23 | -7 to -34 | -9 to -46 |
| Secondary jobs in PSSA | 0 | -1 to -5 | -2 to -11 | -3 to -16 | -4 to -21 |
| Total jobs in PSSA | 0 | -3 to -17 | -7 to -33 | -10 to -50 | -13 to -67 |
| Direct jobs in SSSA | 0 | -1 to -6 | -2 to -12 | -4 to -18 | -5 to -25 |
| Secondary jobs in SSSA | 0 | -1 to -5 | -2 to -9 | -3 to -14 | -4 to -19 |
| Total jobs in SSSA | 0 | -2 to -11 | -4 to -22 | -7 to -33 | -9 to -43 |

Note:   PSSA is equivalent to Rio Blanco County.
SSSA includes Mesa, Moffat, Garfield and Uintah, UT counties – hunting related effects arise in Mesa and Moffat counties only.
Source:  BBC Research & Consulting, 2010.


## Fiscal Effects

Projections of oil and gas-associated state and local revenues for Alternative C are set forth in Exhibit VIII-6. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in the exhibit. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

BLM_0020710

**Exhibit VIII-6.**
**Energy Associated Revenue Projections (Alternative C)**

| | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Dollars in Millions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | | | | | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $ 34.4 | $ 5.2 | $ 12.0 | $ 17.6 | $ 23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $ 35.3 | $ 5.3 | $ 12.3 | $ 18.0 | $ 24.3 |
| 2012 | 307 | 3,159 | 1,344 | 157,955 | $ 947.7 | $ 37.9 | $ 5.7 | $ 13.3 | $ 19.4 | $ 26.1 |
| 2013 | 357 | 3,421 | 1,486 | 171,066 | $ 1,026.4 | $ 41.1 | $ 6.2 | $ 14.4 | $ 21.0 | $ 28.3 |
| 2014 | 403 | 3,722 | 1,655 | 186,084 | $ 1,116.5 | $ 44.7 | $ 6.7 | $ 15.6 | $ 22.8 | $ 30.8 |
| 2015 | 450 | 4,060 | 1,832 | 203,002 | $ 1,218.0 | $ 48.7 | $ 7.3 | $ 17.1 | $ 24.9 | $ 33.6 |
| 2016 | 496 | 4,434 | 2,013 | 221,712 | $ 1,330.3 | $ 53.2 | $ 8.0 | $ 18.6 | $ 27.2 | $ 36.6 |
| 2017 | 543 | 4,844 | 2,154 | 242,210 | $ 1,453.3 | $ 58.1 | $ 8.7 | $ 20.3 | $ 29.7 | $ 40.0 |
| 2018 | 589 | 5,288 | 2,341 | 264,394 | $ 1,586.4 | $ 63.5 | $ 9.5 | $ 22.2 | $ 32.4 | $ 43.7 |
| 2019 | 636 | 5,765 | 2,536 | 288,262 | $ 1,729.6 | $ 69.2 | $ 10.4 | $ 24.2 | $ 35.3 | $ 47.6 |
| 2020 | 682 | 6,274 | 2,733 | 313,714 | $ 1,882.3 | $ 75.3 | $ 11.3 | $ 26.4 | $ 38.5 | $ 51.9 |
| 2021 | 729 | 6,815 | 2,938 | 340,753 | $ 2,044.5 | $ 81.8 | $ 12.3 | $ 28.6 | $ 41.8 | $ 56.3 |
| 2022 | 776 | 7,387 | 3,073 | 369,330 | $ 2,216.0 | $ 88.6 | $ 13.3 | $ 31.0 | $ 45.3 | $ 61.1 |
| 2023 | 822 | 7,987 | 3,278 | 399,351 | $ 2,396.1 | $ 95.8 | $ 14.4 | $ 33.5 | $ 49.0 | $ 66.0 |
| 2024 | 869 | 8,616 | 3,490 | 430,820 | $ 2,584.9 | $ 103.4 | $ 15.5 | $ 36.2 | $ 52.8 | $ 71.2 |
| 2025 | 915 | 9,273 | 3,703 | 463,645 | $ 2,781.9 | $ 111.3 | $ 16.7 | $ 38.9 | $ 56.8 | $ 76.6 |
| 2026 | 962 | 9,957 | 3,922 | 497,836 | $ 2,987.0 | $ 119.5 | $ 17.9 | $ 41.8 | $ 61.0 | $ 82.3 |
| 2027 | 1,008 | 10,666 | 4,036 | 533,301 | $ 3,199.8 | $ 128.0 | $ 19.2 | $ 44.8 | $ 65.4 | $ 88.2 |
| 2028 | 1,055 | 11,401 | 4,255 | 570,052 | $ 3,420.3 | $ 136.8 | $ 20.5 | $ 47.9 | $ 69.9 | $ 94.2 |
| 2029 | 1,101 | 12,160 | 4,474 | 608,000 | $ 3,648.0 | $ 145.9 | $ 21.9 | $ 51.1 | $ 74.5 | $ 100.5 |
| 2030 | 1,148 | 12,943 | 4,700 | 647,160 | $ 3,883.0 | $ 155.3 | $ 23.3 | $ 54.4 | $ 79.3 | $ 107.0 |
| 2031 | 1,194 | 13,749 | 4,925 | 687,446 | $ 4,124.7 | $ 165.0 | $ 24.7 | $ 57.7 | $ 84.3 | $ 113.6 |

Note:  MMCF = million cubic feet
Source:  BBC Research & Consulting 2010.

Under Alternative C, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $24.0 million by 2031 (compared with $16.0 million in Alternative B). These funds will be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area will rise from $12.0 to $57.7 million (compared with $37.4 million under Alternative B). Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $113.6 million by 2031 (compared with $73.7 million under Alternative B).

The major issue facing local governments in terms of the fiscal impact of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population, and the challenges presented in making investment commitments given the risk and uncertainty inherent in a resource-based economy. These issues and challenges will be greater under Alternative C than under Alternative B or Alternative A, given the larger increase in population projected to occur under Alternative C.

BLM_0020711

*Social and Economic Analysis Technical Report*

## Housing, Public Services and Infrastructure

Alternative C is projected to lead to a net increase of 5,800 residents in the PSSA by the end of the 20 year planning horizon – corresponding to an average annual increase of about 290 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 116 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller household s.

As summarized in Table 3.8.1-1 in the RMPA/EIS, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the rate of housing development in the PSSA will need to substantially increase to accommodate the incremental population growth associated with Alternative C. There is also likely to be a need for greater development emphasis on multifamily and rental housing. When the cumulative effects of other growth drivers are added to the incremental effects of Alternative C, there will be even greater demands for new housing in the PSSA.

During the socioeconomic study performed for the AGNC in 2007-2008, representatives of Meeker, Rangely and other communities in the region were interviewed to estimate the ultimate buildout capacity of their communities. Those interviews suggested that Meeker may be able to ultimately house as many as 10,000 people, while Rangely may be able to house up to 7,000 residents (AGNC 2008). Since the two communities currently house about 4,500 people, it is theoretically possible that all of the new residents associated with Alternative C could be housed in Rio Blanco County municipalities. However, it is more likely that Alternative C will also increase development pressure in the unincorporated portions of Rio Blanco County and that some residents will locate in the Rifle area in Garfield County.

Since Alternative C would approximately triple the rate of gas development and the rate of energy-related population growth relative to existing conditions, public service challenges in the PSSA will increase compared to either Alternative A or Alternative B. The county has already experienced a substantial increase in law enforcement demands, particularly for calls in the Piceance Basin, and those demands and corresponding staffing requirements would likely be substantially greater under Alternative C than under Alternatives A or B. Although Rio Blanco County has yet to experience substantial increases in social service demands, the experience of neighboring Garfield County with more rapid gas development suggests those demands could increase substantially in the Rio Blanco County under the higher development levels associated with Alternative C. In addition to the existing need for a new grade school in Meeker, the additional growth associated with Alternative C may also begin to strain capacities for other grade levels. Student enrollment growth in the Rangely area would likely be welcome given the decline in that district's enrollment since 2000.

The challenges local governments and school districts in the PSSA have already confronted in hiring and retaining staff due to wage competition from the energy industry would be greater under Alternative C than under Alternative B or Alternative A.

BLM_0020712

## Social Conditions

Alternative C would cause an incremental population growth rate in the PSSA of less than 3 percent per year through 2030 compared to less than 1 percent per year for Alternative A. The rate for Alternative C is 2 percentage points below the threshold range of socially-disruptive growth that has been observed in small, energy-impacted communities. This is just the incremental effect of the alternative, however, and does not include the cumulative effects of other economic and population growth drivers.

Previously identified social issues in the PSSA associated with energy-driven growth include:

• Residents wanting to protect the "western way of life":

• Maintaining acceptable levels of public service, including law enforcement, fire protection, emergency response, and boards and commissions;

• Additional strain on limited resources, including the business community;

• Temporary and transient workforces;

• Housing and hotel shortages;

• Increased construction disruption;

• Concern about repercussions associated with a future "bust";

• Desire to minimize impacts on agriculture and tourism;

• Negative aspects of increased traffic.

The PSSA is adapting to the pace of growth experienced during the past decade. While residents of the PSSA tend to be favorably disposed toward growth, the rate of development under Alternative C would be more socially "transformative" for the area (as discussed in Section 4.1.1 in the RMPA/EIS) than under Alternative A or Alternative B. Many of the social concerns identified to date are likely to grow under Alternative C.

Under Alternative C in the PSSA, 65 percent of incremental growth in the number of employed residents would come directly or indirectly from energy development by 2030, compared to ten percent from agriculture, and two percent from hunting (hunting being just part of total recreation and tourism employment). This change is 26 percent higher than under Alternative A for energy development (39 percent), six percent lower for agriculture (16 percent) and four percent lower for hunting (6 percent). This indicator suggests that Alternative C would cause an additional shift toward labor force and population dependency on the energy industry and away from agriculture and hunting. The impact of the shift in dependency under Alternative C could be perceived by the population in communities of the PSSA as potentially improving quality of life because of additional economic opportunities. However, the shift also could be perceived as potentially reducing quality of life because of greater exposure to volatility in the energy industry and increased competition for resources with agriculture and hunting, which embody traditional cultural values. These effects would

BLM_0020713

*Social and Economic Analysis Technical Report*

be larger under Alternative C than Alternatives A or B. The change in the mix of livelihoods under Alternative C would change the balance of interests among different population groups within the PSSA and the population would be increasingly dominated by individuals dependent on the energy industry. There would be greater potential for social tensions between differing groups, and between new and established residents, relative to Alternative A or Alternative B.

The majority of employment by the energy industry under Alternative C would be in drilling and development during the 20-year planning horizon. The share involved in drilling would grow over time. By 2030, 65 percent of energy jobs in the PSSA would be in drilling and 35 percent in field maintenance and operations compared to a roughly equal split under Alternative A. This indicates that the energy industry would have the potential for greater instability during the 20-year planning horizon under Alternative C than under Alternatives A or B. The volatile attribute of the drilling sector of the energy industry is likely to be perceived by the population in communities of the PSSA as having the potential to diminish their quality of life.

The prevalence of drilling jobs in the PSSA under Alternative C would be 15 percent greater in 2030 than under Alternative A. A drilling-oriented industry can both increase quality of life because of economic opportunities, and reduce quality of life because of exposure to industry volatility. These impacts would be larger under Alternative C than Alternatives A or B roughly in proportion to the differences in the prevalence of drilling jobs.

For ranchers on the Piceance Creek Road and its side roads, Alternative C would affect quality of life due to traffic, noise, dust, and competition for resources on BLM land, much of it related to drilling activity and facilities development. The scale of these effects under Alternative C is indicated by the estimated drilling employment and the annual number of wells drilled by 2030, which are approximately four times the levels under Alternative A and two times the levels under Alternative B.

The impact to quality of life for recreation interests would be larger under Alternative C than for Alternative A. The impact is related to the loss of 13 and 67 direct and secondary hunting-related jobs in PSSA and between 9 and 43 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Recreation interests would also be impacted because of a lower perceived quality of the hunting experience in the area affected by oil and gas drilling and production. This is indicated by the development of 10,400 more wells under Alternative C than Alternative A over the 20-year period.

Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life. The relative magnitude of this effect corresponds to the scale of development under Alternative C compared to Alternatives A or B. Alternative C allows more than three times as much well development as Alternative A over the 20-year study period and about 50 percent more development than Alternative B. However, groups with environmental interests would see some benefit to the quality of life in the PSSA because higher levels of potential development under consideration in this RMPA would be avoided during the 20-year planning horizon.

BLM_0020714

## Non-market Values

The larger number of wells that would be developed under Alternative C (compared to Alternatives A or B) implies more land disturbance, greater development of associated energy infrastructure and more potential to affect recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly-affected public and private lands. As noted earlier, Alternative C is expected to potentially reduce the big game population in the Planning Area (relative to Alternative A or Alternative B) and affect the recreational value associated with hunting compared to those alternatives. The temporal analysis indicates that approximately 3.4 percent of the vegetation communities and the mule deer range in the Mesaverde play area would be developed over the 20 year planning period under Alternative C, compared to 1.1 percent under Alternative A. The six Wilderness Study Areas in the Planning Area are not expected to be affected by energy development under Alternative C.

BLM_0020715

BLM_0020716

# SECTION IX.
# Social and Economic Effects Under Alternative D (Development Emphasis)

This section describes anticipated direct and indirect social and economic effects related to Alternative D (Development Emphasis). The section addresses the following effects in sequence:

- total employment and population effects;
- energy-related activity and employment;
- agricultural activity and employment;
- hunting and tourism activity and employment;
- fiscal effects;
- housing, public services and infrastructure
- social conditions; and
- non-market values.

## Total Employment and Population Effects

The estimated net effect of Alternative D on employment and population in the PSSA and SSSA combines the projected direct and secondary jobs that would be added due to increased oil and gas development (relative to existing conditions) with the projected decrease in direct and secondary jobs related to agriculture and hunting activity.

Within the PSSA, Alternative D is projected to lead to a net increase of 4,801 employed persons and 8,506 residents by 2030. These estimates represent a 106-percent increase in employment and a 110-percent increase in population compared to 2010 existing conditions. Exhibit IX-1 shows the projected changes in employment and population within the PSSA under Alternative D – compared to existing conditions – in five-year increments.

BLM_0020717

*Social and Economic Analysis Technical Report*

**Exhibit IX-1.**
**Projected Employment and Population Effects in the PSSA (Alternative D)**



Source: BBC Research & Consulting 2010.

Within the SSSA, Alternative D is projected to lead to a net increase of 8,007 employed persons and 14,450 residents by 2030. These estimates represent about a 6 percent increase in SSSA employment and population compared to 2010 existing conditions. Exhibit IX-2 shows the projected changes in employment and population within the SSSA under Alternative D – compared to existing conditions – in five-year increments.

BLM_0020718

**Exhibit IX-2.**
**Projected Employment and Population Effects in the SSSA (Alternative D)**



Source: BBC Research & Consulting, 2010.

## Energy-related Activity and Employment

Under Alternative D, approximately 21,200 new wells would be developed in the Planning Area over the 20-year planning horizon. The maximum rate of well development is projected to occur in the final three years of the 20-year planning period, when over 1,500 wells are projected to be developed each year.

The cumulative number of producing wells, reflecting both the addition of new wells completed during the planning period and the retirement of new and existing wells that reach the end of their productive lives, is projected to grow from about 2,866 wells in 2010 to about 17,550 by 2030 under Alternative D.

The drilling-related workforce employed in the Planning Area (based on work site, not office location) is projected to increase from about 475 workers in 2010 to about 4,194 workers by 2030 under Alternative D. The maintenance-related oil and gas workforce employed in the Planning Area is projected to increase from about 478 jobs in 2010 to 2,282 jobs by 2030. Combining drilling-related jobs and maintenance jobs, the total workforce directly related to the oil and gas industry in the Planning Area is projected to increase by about 5,523 jobs over the 20-year study period.

Secondary employment resulting from oil and gas activity is projected to increase from 666 jobs in 2010 in the PSSA to 4,528 jobs by 2030 under Alternative D. In the SSSA, secondary employment resulting from oil and gas activity in the Planning Area is projected to increase from 833 jobs in 2010 to 5,662 jobs by 2030.

BLM_0020719

*Social and Economic Analysis Technical Report*

Exhibit IX-3 summarizes projected energy-related activity and employment under Alternative D from 2010 (existing conditions) through 2030.

**Exhibit IX-3.**
**Projected Energy-related Activity and Employment (Alternative D)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Gas Activity in Planning Area** | | | | | |
| Annual new wells | 160 | 650 | 965 | 1,282 | 1,596 |
| Cumulative producing wells | 2,866 | 4,737 | 8,037 | 12,356 | 17,550 |
| **Related employment** | | | | | |
| Drilling jobs in PSSA | 475 | 1,708 | 2,536 | 3,369 | 4,194 |
| Maintenance jobs in PSSA | 478 | 758 | 1,206 | 1,730 | 2,282 |
| Total direct jobs in PSSA | 953 | 2,466 | 3,742 | 5,099 | 6,476 |
| Secondary jobs in PSSA | 666 | 1,724 | 2,616 | 3,565 | 4,528 |
| Secondary jobs in SSSA | 833 | 2,156 | 3,271 | 4,458 | 5,662 |

Note:
PSSA is equivalent to Rio Blanco County.
SSSA includes Garfield County, Mesa County, Moffat County and Uintah County, UT.
Sums may not equal totals due to rounding.

Source: BBC Research & Consulting, 2010.

Relative to Alternative A, Alternative D is projected to lead to about 5,129 more direct energy-related jobs and 3,587 more secondary jobs in the Planning Area (PSSA) by 2030. Alternative D is also projected to lead to 4,485 more secondary jobs in the SSSA by 2030 due to greater oil and gas development in the Planning Area.

## Agricultural Activity and Employment

The study team's analysis of the impacts on livestock grazing indicates that a cumulative total of 30,741 acres of publicly administered grazing lands could be impacted under Alternative D over the 20-year study period. This total represents 2.13 percent of the approximately 1.445 million acres of publicly administered grazing lands in the Planning Area as a whole. If all of the affected grazing land were within the Mesaverde Gas Play Area (roughly corresponding to the Piceance Basin), it would represent about 5.71 percent of the 588,000 acres of publicly administered grazing land in that area.

If agricultural employment is proportional to the amount of public grazing land available in the area, the relatively small amount of grazing land that could be affected under Alternative D corresponds to a small direct and secondary impact on agricultural employment in the PSSA, as shown in Exhibit IX-4. The projected impact on agricultural activity and employment under Alternative D would be over four times as large as under Alternative A, but the estimated effect on direct and secondary employment (based on the simplified assumption of proportionality to the loss of grazing land) would be only about 14 jobs by 2030.

BLM_0020720

**Exhibit IX-4.**
**Projected Agricultural Sector Effects (Alternative D)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Maximum cumulative reduction in grazing acres | 0 | 3,223 | 9,306 | 17,677 | 28,333 |
| Percent of total Planning Area grazing land | 0% | 0.22% | 0.64% | 1.22% | 1.96% |
| Percent of total Mesa Verde Play Area grazing land | 0% | 0.60% | 1.73% | 3.28% | 5.26% |
| Projected effects on agricultural jobs |  |  |  |  |  |
| Direct jobs | 0 | -1.0 | -2.8 | -5.3 | -8.5 |
| Secondary jobs | 0 | -0.6 | -1.8 | -3.4 | -5.5 |
| Total jobs | 0 | -1.6 | -4.6 | -8.7 | -14.0 |

Note:     Impacts on jobs if agricultural employment is directly proportionate to total Planning Area grazing land.
          Actual impacts may be larger or smaller for reasons discussed in the narrative.
Source:   BBC Research & Consulting, 2010.

With the additional well development projected in the Planning Area under Alternative D compared to the other alternatives, valley-bottom hay lands currently owned by energy companies are more likely to be developed for energy-related activities than under those alternatives.

## Hunting and Tourism Activity and Employment

Under Alternative D, BLM has identified the management goal of maintaining 50 percent of the big-game population objectives established by the CPW. The maximum 50-percent reduction would occur in year 2031 when annual development would peak at 1,661 wells.

Exhibit IX-5 shows the estimated percentage of the CPW big-game population targets maintained under Alternative D from 2010 through 2030 and the projected effects on hunting-related jobs in the PSSA and the SSSA. By 2030, Alternative D is projected to result in the loss of between 22 and 112 direct and secondary hunting-related jobs in the Planning Area (PSSA) and between 15 and 73 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels.

WRFO Oil and Gas Development Draft RMPA/EIS                                SECTION IX, PAGE 5
Appendix G – Social and Economic Analysis Technical Report

BLM_0020721

**Exhibit IX-5.**
**Projected Hunting Sector Effects (Alternative D)**

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Percent of CPW target big game population** | 100% | 95% | 85% | 71% | 54% |
| **Projected effects on hunting-related jobs** |  |  |  |  |  |
| Direct jobs in PSSA | 0 | -5 to -24 | -8 to -41 | -12 to -59 | -15 to -76 |
| Secondary jobs in PSSA | 0 | -2 to -11 | -4 to -19 | -5 to -27 | -7 to -36 |
| Total jobs jobs in PSSA | 0 | -7 to -35 | -12 to -61 | -17 to -86 | -22 to -112 |
| Direct jobs in SSSA | 0 | -3 to -13 | -4 to -22 | -6 to -32 | -8 to -41 |
| Secondary jobs in SSSA | 0 | -2 to -10 | -3 to -17 | -5 to -24 | -6 to -32 |
| Total jobs in SSSA | 0 | -5 to -23 | -8 to -39 | -11 to -56 | -15 to -73 |

Note:   PSSA is equivalent to Rio Blanco County.
        SSSA includes Mesa, Moffat, Garfield and Uintah, UT counties – hunting related effects arise in Mesa and
        Moffat counties only.
Source:  BBC Research & Consulting, 2010.

## Fiscal Effects

Projections of oil and gas-associated state and local revenues for Alternative D are set forth in Exhibit IX-6. County property taxes accruing to Rio Blanco County as a result of oil and gas well development are also shown in the exhibit. These revenues are an indirect effect of the proposed management actions because they result from the rate of well development in the Planning Area.

BLM_0020722

**Exhibit IX-6.**
**Energy Associated Revenue Projections (Alternative D)**

| Year | New Wells Drilled (region total) | Cumulative Producing Wells | Total Natural Gas Jobs | Production MMCF | Production Value | State Severance Tax | DOLA Direct Distribution Revenue | DOLA Grant Revenues | Mineral Lease Revenues to DOLA | County Property Tax Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Dollars in Millions | | | |
| 2009 | | | | | | | | | | |
| 2010 | 160 | 2,866 | 953 | 143,315 | $ 859.9 | $ 34.4 | $ 5.2 | $ 12.0 | $ 17.6 | $ 23.7 |
| 2011 | 160 | 2,940 | 946 | 147,016 | $ 882.1 | $ 35.3 | $ 5.3 | $ 12.3 | $ 18.0 | $ 24.3 |
| 2012 | 462 | 3,314 | 1,793 | 165,705 | $ 994.2 | $ 39.8 | $ 6.0 | $ 13.9 | $ 20.3 | $ 27.4 |
| 2013 | 524 | 3,739 | 1,975 | 186,934 | $ 1,121.6 | $ 44.9 | $ 6.7 | $ 15.7 | $ 22.9 | $ 30.9 |
| 2014 | 587 | 4,214 | 2,217 | 210,676 | $ 1,264.1 | $ 50.6 | $ 7.6 | $ 17.7 | $ 25.8 | $ 34.8 |
| 2015 | 650 | 4,737 | 2,466 | 236,856 | $ 1,421.1 | $ 56.8 | $ 8.5 | $ 19.9 | $ 29.0 | $ 39.2 |
| 2016 | 713 | 5,308 | 2,723 | 265,400 | $ 1,592.4 | $ 63.7 | $ 9.6 | $ 22.3 | $ 32.5 | $ 43.9 |
| 2017 | 776 | 5,925 | 2,928 | 296,238 | $ 1,777.4 | $ 71.1 | $ 10.7 | $ 24.9 | $ 36.3 | $ 49.0 |
| 2018 | 839 | 6,586 | 3,193 | 329,301 | $ 1,975.8 | $ 79.0 | $ 11.9 | $ 27.7 | $ 40.4 | $ 54.4 |
| 2019 | 902 | 7,290 | 3,464 | 364,522 | $ 2,187.1 | $ 87.5 | $ 13.1 | $ 30.6 | $ 44.7 | $ 60.3 |
| 2020 | 965 | 8,037 | 3,742 | 401,836 | $ 2,411.0 | $ 96.4 | $ 14.5 | $ 33.8 | $ 49.3 | $ 66.4 |
| 2021 | 1,028 | 8,824 | 4,025 | 441,181 | $ 2,647.1 | $ 105.9 | $ 15.9 | $ 37.1 | $ 54.1 | $ 72.9 |
| 2022 | 1,092 | 9,651 | 4,221 | 482,546 | $ 2,895.3 | $ 115.8 | $ 17.4 | $ 40.5 | $ 59.2 | $ 79.8 |
| 2023 | 1,154 | 10,515 | 4,505 | 525,769 | $ 3,154.6 | $ 126.2 | $ 18.9 | $ 44.2 | $ 64.5 | $ 86.9 |
| 2024 | 1,217 | 11,417 | 4,797 | 570,846 | $ 3,425.1 | $ 137.0 | $ 20.6 | $ 48.0 | $ 70.0 | $ 94.4 |
| 2025 | 1,282 | 12,356 | 5,099 | 617,821 | $ 3,706.9 | $ 148.3 | $ 22.2 | $ 51.9 | $ 75.7 | $ 102.1 |
| 2026 | 1,343 | 13,329 | 5,395 | 666,436 | $ 3,998.6 | $ 159.9 | $ 24.0 | $ 56.0 | $ 81.7 | $ 110.2 |
| 2027 | 1,407 | 14,336 | 5,561 | 716,793 | $ 4,300.8 | $ 172.0 | $ 25.8 | $ 60.2 | $ 87.9 | $ 118.5 |
| 2028 | 1,470 | 15,376 | 5,862 | 768,789 | $ 4,612.7 | $ 184.5 | $ 27.7 | $ 64.6 | $ 94.3 | $ 127.1 |
| 2029 | 1,533 | 16,448 | 6,167 | 822,376 | $ 4,934.3 | $ 197.4 | $ 29.6 | $ 69.1 | $ 100.8 | $ 135.9 |
| 2030 | 1,596 | 17,550 | 6,476 | 877,504 | $ 5,265.0 | $ 210.6 | $ 31.6 | $ 73.7 | $ 107.6 | $ 145.1 |
| 2031 | 1,661 | 18,685 | 6,794 | 934,229 | $ 5,605.4 | $ 224.2 | $ 33.6 | $ 78.5 | $ 114.5 | $ 154.4 |

Note:  MMCF = million cubic feet
Source:  BBC Research & Consulting 2010.

Under Alternative D, Rio Blanco County-generated funds from the DOLA Direct Distribution Fund are projected to increase from about $5.2 million in 2010 to about $33.6 million by 2031 (compared with $26.0 million in Alternative C). These funds will be distributed to local jurisdictions in both the PSSA and the SSSA based on worker residence. WRFO-generated grant funds available, but not necessarily designated, for the area will rise from $12.0 to $78.5 million (compared with $57.7 million under Alternative C). Rio Blanco County property tax revenues are projected to increase from about $23.7 million in 2010 to $154.4 million by 2031 (compared with $113.6 million under Alternative C).

The major issue facing local governments in terms of the fiscal impact of oil and gas development involves the provision of critical infrastructure (roads, water, and sewer) in advance of an expanding population, and the challenges presented in making investment commitments given the risk and uncertainty inherent in a resource based economy. These issues and challenges will be considerably greater under Alternative D than under Alternative C, Alternative B or Alternative A, given the larger increase in population projected to occur under Alternative D.

BLM_0020723

*Social and Economic Analysis Technical Report*

## Housing, Public Services and Infrastructure

Alternative D is projected to lead to a net increase of 8,506 residents in the PSSA by the end of the 20 year planning horizon – corresponding to an average annual increase of about 425 residents per year. Based on the county's overall average of about 2.5 residents per household, this rate of population growth would indicate the need to add at least 170 housing units per year – although the segment of this new population comprised of workers engaged in drilling and production is likely to prefer temporary housing options and to form smaller household s.

As summarized in Table 3.8.1-1 in the RMPA/EIS, Rio Blanco County added approximately 165 housing units between 2000 and 2006, corresponding to an average of about 27 units per year. Based on this comparison, the PSSA would need to add as many housing units each year as it did over the entire six year period from 2000 through 2006 to accommodate the incremental population growth associated with Alternative D. There is also likely to be a need for much greater development emphasis on multifamily and rental housing. As discussed later in this section, when the cumulative effects of other growth drivers are added to the incremental effects of Alternative D, there will be even greater demands for new housing in the PSSA.

As discussed earlier, the ultimate buildout capacity of Meeker was estimated at 10,000 people, and Rangely's buildout capacity was estimated at 7,000 residents, during the 2007-2008 AGNC socioeconomic study (AGNC 2008). Since the two communities currently house about 4,500 people, it is theoretically possible that all of the new residents associated with Alternative D could be housed in Rio Blanco County municipalities. However, it is much more likely that Alternative D will substantially increase development pressure in the unincorporated portions of Rio Blanco County and that a substantial portion of the growth may be shifted to the Rifle area in Garfield County.

Since the rate of gas development under Alternative D would be approximately six times the rate under existing conditions, and the incremental population effects of the alternative would more then double the county's population during the 20 year planning period, public service challenges in the PSSA under Alternative D would be substantial. Increases in staff and infrastructure for law enforcement, social services, public health and public education are likely to be needed. Local governments and school districts in the PSSA are likely to face considerable challenges in hiring staff due to wage competition from the energy industry. All of these community challenges would be greater under Alternative D than under Alternative C, and considerably greater than under Alternative B or Alternative A.

## Social Conditions

Alternative D would cause an incremental population growth rate in the PSSA of less than four percent per year through 2030 compared to less than one percent per year for Alternative A. The rate for Alternative D is one percent below threshold range of socially-disruptive growth that has been observed in small, energy-impacted communities. This is just the incremental effect of the alternative, when combined with the cumulative effects of other growth drivers in the region, annual population growth could well exceed five percent per year.

Rapid population growth in a generally rural and sparsely populated area such as the PSSA can lead to a number of social issues. Although the area has not yet experienced the magnitude or pace of growth

BLM_0020724

anticipated under Alternative D, a number of social concerns have already been identified in response to energy-driven growth over the past decade. Some of the concerns to date have included:

- Residents wanting to protect the "western way of life":

- Maintaining acceptable levels of public service, including law enforcement, fire protection, emergency response, and boards and commissions;

- Additional strain on limited resources, including the business community;

- Temporary and transient workforces;

- Housing and hotel shortages;

- Increased construction disruption;

- Concern about repercussions associated with a future "bust";

- Desire to minimize impacts on agriculture and tourism;

- Negative aspects of increased traffic.

The rate of development under Alternative D would be the most "transformative" for the area (as described in Section 4.1.1 in the RMPA/EIS) of any of the alternatives. Most of the social concerns identified to date are likely to increase under Alternative D and additional social issues may well arise.

Under Alternative D in the PSSA, 71 percent of incremental growth in employed residents would come directly or indirectly from energy development by 2030, compared to eight percent from agriculture, and one percent from hunting (hunting being just part of total recreation and tourism employment). This change is 32 percent higher than under Alternative A for energy development (39 percent), eight percent lower for agriculture (16 percent) and five percentage points lower for hunting (six percent). This indicator suggests that Alternative D would cause an additional shift toward labor force and population dependency on the energy industry in the PSSA and away from agriculture and hunting. The impact of the shift in dependency under Alternative D could be perceived by the population in communities of the PSSA as potentially improving their quality of life because of additional economic opportunities. However, the shift also could be perceived as potentially reducing quality of life because of greater exposure to volatility in the energy industry and increased competition for resources with agriculture and hunting, which embody traditional cultural values. These effects would be larger under Alternative D than Alternative A through Alternative C roughly in proportion to the relative changes in dependency among the three kinds of livelihoods in the PSSA. Under Alternative D, the population of the PSSA would be increasingly dominated by individuals dependent on the energy industry. There would be greater potential for social tensions between differing groups, and between new and established residents, than under Alternative A, Alternative B or Alternative C.

The majority of employment by the energy industry under Alternative D would be in drilling and development during the 20-year planning horizon. The share involved in drilling would grow over time. By 2030, 65 percent of percent of energy jobs in Rio Blanco County would be in drilling and

BLM_0020725

*Social and Economic Analysis Technical Report*

35 percent in field maintenance and operations compared to a roughly equal split under Alternative A. The volatile attribute of the drilling sector of the energy industry is likely to be perceived by the population in communities of the PSSA as having the potential to diminish their quality of life. With greater exposure to economic volatility due to national forces affecting the energy industry, t he PSSA could experience more profound "boom and bust" cycles, and associated social disruption, under Alternative D than under the other alternatives.

The prevalence of drilling jobs in the PSSA under Alternative D would be 15 percent greater in 2030 than under Alternative A. A drilling-oriented industry can both increase quality of life, because of economic opportunities, and reduce quality of life because of exposure to industry volatility. These impacts would be larger under Alternative D than Alternative A and Alternative B roughly in proportion to the change in the prevalence of drilling jobs. These impacts would be similar in Alternative D and Alternative C as both alternatives are projected to lead to comparable ratios of temporary drilling workers to more permanent maintenance and operations workers.

Overall, the social indicators suggest that Alternative D would incrementally affect the quality of life of community residents in the PSSA more than Alternatives A and B. The impact would also be larger than under Alternative C in terms of the incremental population growth rate and relative increase in labor force and population dependency on the energy industry, compared to the agriculture and hunting components of the economic base.

For ranchers on the Piceance Creek Road and its side roads, Alternative D would affect quality of life due to traffic, noise, dust, and competition for resources on BLM land, much of it related to drilling activity and facilities development. This impact from Alternative D would be greater than from Alternative A through Alternative C. The relative magnitude of these effects is indicated by level of drilling employment and the annual number of new wells by 2030, which range from 6 times the levels projected under Alternative A to about 40 percent more than under Alternative C.

The impact to quality of life for recreation interests would be higher under Alternative D than for Alternative A through Alternative C. The impact is related to the loss of between 22 and 112 direct and secondary hunting-related jobs in the PSSA and between 15 and 73 direct and secondary hunting-related jobs in the SSSA. These employment effects are relative to Alternative A, which maintains existing conditions relative to hunting activity levels. Recreation interests would also be impacted because of a lower perceived quality of the hunting experience in the area affected by oil and gas drilling and production. This is indicated by the development of 16,600 more wells under Alternative D than Alternative A over the 20-year period.

Social effects in the SSSA would be minimal relative to existing conditions.

National and local environmental interests likely would consider continued energy development to diminish quality of life. The magnitude of this effect likely corresponds to the scale of development under Alternative D compared to Alternative A. Alternative D allows almost six times as much well development as Alternative A. Groups with environmental interests would not see a benefit to the quality of life from Alternative D because this alternative would allow the most energy development within the full range of development under consideration by the BLM.

BLM_0020726

### Non-market Values

Alternative D would result in the largest number of wells, and correspondingly largest amount of associated infrastructure and overall land disturbance, over the 20-year study period. Consequently, this alternative has the greatest potential to affect recreation values, passive use values or other non-market values associated with agricultural open space, preservation of special status species, visual resources and other resources associated with BLM lands or indirectly-affected public and private lands. As noted earlier, Alternative D is expected to potentially reduce the big game population in the Planning Area by as much as 50 percent by the end of the planning period (relative to Alternative A) and, consequently, could reduce the recreational value associated with big game hunting to a corresponding degree. The temporal analysis indicates that approximately 4.9 percent of the vegetation communities and the mule deer range in the Mesaverde Play Area would be developed over the 20 year planning period under Alternative D, compared to 1.1 percent under Alternative A. The six Wilderness Study Areas in the Planning Area are not expected to be affected by energy development under Alternative D.

BLM_0020727

BLM_0020728

# SECTION X.
# Cumulative Social and Economic Effects

Social and economic conditions in both the PSSA and the SSSA over the next 20 years will be affected by numerous factors beyond the resource management decisions made by BLM for the WRFO. The study team considered the potential for cumulative impacts from other reasonably foreseeable activities within the PSSA and SSSA. At the landscape level, key factors in terms of cumulative social and economic impacts include:

- Oil and gas activity outside of the WRFO, but within the SSSA;
- Economic development and growth in other sectors within the PSSA and SSSA;
- Further development of oil shale research development and demonstration projects within the PSSA; and
- Potential development of commercial oil shale within the PSSA.

Over the past decade, the majority of natural gas drilling activity in the socioeconomic study area has occurred outside of the WRFO in the SSSA, principally in Garfield County and Uintah County, Utah. Research conducted by the study team with representatives of the natural gas industry in 2006-2007 indicated that the development of new gas wells in Garfield County was expected to continue at approximately the same pace through about 2015 and then gradually diminish over the following ten years or more. The national economic recession, which began in late 2008, and falling natural gas prices have led to a decrease in Garfield County and Uintah County natural gas activity. A rebound in activity to gas development levels more similar to those experienced from 2006-2008 appears to be reasonably foreseeable. Gas development in Garfield County and Uintah County, like gas development in the WRFO, results in economic and demographic effects throughout the PSSA and SSSA due to the extensive commuting of energy workers within the region and the regional nature of the energy industry.

Other economic drivers will also contribute to further economic development and population growth in the PSSA and SSSA. In Colorado, the official source of employment and population forecasts is the State Demography Office (SDO). The SDO's forecasts are based on projected growth in "economic base" jobs – these are activities such as tourism, regional services, manufacturing and agriculture that bring dollars from outside the area into the local economies. The SDO projections, adjusted by the study team to exclude energy-related activities, envision that the non-energy related economic base in the PSSA will increase from approximately 2,157 jobs in 2010 to approximately 4,744 jobs in 2030. The largest growth is expected to occur in tourism jobs, state and federal government jobs and regional service and household direct basic jobs. The latter represents the spending of household income by retirees and individuals receiving transfer payments, among other components.

Exhibit X-1 depicts the projected growth in the non-energy-related economic base in the PSSA under the SDO's latest projections.

BLM_0020729

*Social and Economic Analysis Technical Report*

**Exhibit X-1**
**Projected Non-Energy Economic Base Jobs in the PSSA, 2010 and 2030**



Source:   SDO, 2010 as adjusted by BBC to exclude energy-related activities.

Exhibit X-2 depicts the projected growth in the non-energy-related economic base in the Colorado portions of the SSSA under the SDO's latest projections. The SDO projections anticipate that the non-energy related economic base in the SSSA will increase from approximately 55,182 jobs in 2010 to approximately 93.200 jobs in 2030. The largest growth is expected to occur in tourism jobs and regional service and household direct basic jobs.

**Exhibit X-2**
**Projected Non-Energy Economic Base Jobs in the SSSA, 2010 and 2030**



Source:   SDO, 2010 as adjusted by BBC to exclude energy-related activities.

BLM_0020730

*Social and Economic Analysis Technical Report*

To assess the potential cumulative effects of a rebound in gas development activity in the Colorado portions of the SSSA (primarily Garfield County) along with the projected growth in other sectors anticipated by the SDO, the study team modeled the combined effects of those potential growth drivers together with the projected economic effects of the WRFO alternatives described earlier in this section.

Exhibit X-3 depicts projected population growth in the PSSA from 2010 through 2030. In Exhibit X-3, the area labeled cumulative effects indicates the growth in the existing population of the PSSA that is projected to occur based on projected growth in non-energy economic base activity combined with projected growth resulting from a rebound in Garfield County gas development. The exhibit also shows the additional population growth projected to result from each of the WRFO alternatives. The area shown for each alternative indicates the incremental effect of that alternative on population growth in the PSSA, relative to the next closest alternative — e.g. the area shown as Alternative A indicates the additional growth from that Alternative beyond growth due to cumulative effects, while the area shown as Alternative D indicates the additional population growth from that alternative beyond the cumulative growth projected under Alternative C.

**Exhibit X-3**
**Projected Future PSSA Population including Cumulative Effects**



Note:   *Area shown for each alternative represents the incremental, additional population growth from that alternative beyond projected population levels
        due to cumulative effects and the next closest alternative.
Source:   BBC Research & Consulting, 2010.

BLM_0020731

As indicated in Exhibit X-3, the population of the PSSA would be projected to grow from about 7,768 residents in 2010 to about 13,400 residents by 2030 even without any increase in the rate of natural gas development activity within the WRFO. With the addition of the modest increase in natural gas activity projected under Alternative A (relative to 2010 natural gas activity levels), the projected population of the PSSA would reach about 14,100 residents by 2030. Under Alternative B, the projected 2030 population would reach almost 16,300 residents. Under Alternative C, about 19,200 residents are projected in 2030, while under Alternative D, nearly 22,000 residents are projected by 2030.

It is possible that natural gas-related economic activity could affect the rate of growth in other economic base activities, particularly within the PSSA, due to competition for labor and other inputs and corresponding regional wage increases (a phenomenon sometimes referred to as "factor competition"). The potential effect of factor competition on the growth of other sectors is difficult to estimate and has not been included in the cumulative effects analysis — consequently, the results portrayed in Exhibit X-3 may overstate potential cumulative effects on study area demographics. Nonetheless, it appears likely that accommodating the projected population growth in the PSSA under Alternative D (and potentially under Alternative C) will present challenges. During the Northwest Colorado Socioeconomic Analysis and Forecasts study conducted by the study team in 2007-2008, representatives from the Town of Meeker indicated they believed the ultimate population capacity of their community at build-out might be about 10,000 residents. Representatives from the Town of Rangely indicated they believed Rangely could ultimately accommodate about 7,000 residents. Under Alternative C, and particularly under Alternative D, a large number of people may need to be housed in other areas within the PSSA, or some of the projected growth in PSSA population may be pushed to the SSSA. The latter would further increase commuting activity and traffic loads into and out of the PSSA.

Exhibit X-4 provides a comparable depiction of projected population growth in the Colorado portions of the SSSA from 2010 through 2030 including both cumulative effects and each of the WRFO alternatives. The projected population increases in the SSSA due to the WRFO alternatives are actually larger than the projected increases in the PSSA. However, the much larger scale of the existing population in the SSSA — and the substantial population growth projected to occur due to other factors not related to the WRFO alternatives — suggest there would not be a substantial difference between the alternatives in terms of effects on the SSSA population.

BLM_0020732

**Exhibit X-4**
**Projected Future SSSA Population including Cumulative Effects (Colorado Counties only)**



Note:   *Area shown for each alternative represents the incremental, additional population growth from that alternative beyond projected population levels due to cumulative effects and the next closest alternative.

Source:   BBC Research & Consulting, 2010.

As indicated in Exhibit X-4, the population of the Colorado portions of the SSSA would be projected to grow from about 225,000 residents in 2010 to about 355,000 residents by 2030 even without any increase in the rate of natural gas development activity within the WRFO. With the addition of the modest increase in natural gas activity projected under Alternative A (relative to 2010 natural gas activity levels), the projected population of the SSSA would reach about 356,000 residents by 2030. Under Alternative B, the projected 2030 population would reach about 358,500 residents. Under Alternative C, about 362,000 residents are projected in 2030, while under Alternative D, about 365,000 residents are projected by 2030.

Public revenues for both the state and local governments will rise as gas activity increases, and specifically, as the cumulative number of productive wells increases. Resource value, in this instance the value of natural gas, is the most critical factor determining local government fiscal success. While service delivery costs are largely tied to the number of workers, revenues: property tax receipts, severance taxes and mineral leasing returns from drilling on Federal land, all rise as gas prices and property valuations rise. If employment growth rates are too high, communities struggle to keep pace

BLM_0020733

*Social and Economic Analysis Technical Report*

with growth-associated demands for housing and services—but rapid growth implies high resource values and thus higher revenues. Alternatives A-C present sustainable growth rates, particularly given the existing back drop of planning and assessed valuation that has contributed to the area's current fiscal health. The most rapid growth, suggested in Alternative D, implies a return to the rapid growth rates experienced in 2005-2008, which strained the fiscal capacity of many smaller communities in the immediate impact area.

## Cumulative Effects on Social Conditions

Changes in three indicators provide a measure of the potential cumulative impacts to social conditions in the PSSA. Two of these are the cumulative population growth rate (indicator of social disruption) and the change in dependency of the cumulative population in the PSSA on the energy industry versus the traditional sectors of agriculture and recreation. The definitions and the interpretation of these indicators were described above and used to assess the impacts of the alternatives (see Section I of this report). Corresponding indicators have been calculated for each alternative that include the combined effects of other potential growth drivers (as defined by the SDO) together with the projected economic effects of the alternatives.

A third indicator, the cumulative number of producing wells in the PSSA, is used to indicate potential effects on quality of life for ranchers along Piceance Creek Road and its side roads and to recreation and environmental interests. Well development under the alternatives disproportionately occurs in this area, so the amount of cumulative development on BLM land would correspond to the magnitude of the potential for perceived loss in quality of life by these groups. The impacts to quality of life stem from the energy industries' contribution to noise, dust and activity along the Piceance Creek Road and its side roads, change in the quality of the recreational and commercial hunting experience and in the natural characteristics of the BLM-owned landscape after the installation of energy facilities.

The cumulative population growth rates that would occur in the PSSA, given each alternative, are based on the population data depicted in Exhibit X-3. They are 3.0 percent per year under Alternative A, 3.8 percent under Alternative B, 4.6 percent under Alternative C, and 5.3 percent under the Alternative D. Alternatives C and D are near the threshold range of socially disruptive growth that has been observed in small, energy impacted communities (see Section I). However, a rigorously documented case of social disruption, followed over the course of 24 years, involved a three-fold population increase in a community that was small compared to the PSSA (Brown et al. 2005). Therefore, the cumulative average-annual growth rates that would occur in the PSSA under the alternatives would not be likely to be socially disruptive.

However, the cumulative average rates considered here assume that steady, gradual development would occur under each alternative. To the extent that the actual timing and magnitude of well development under any of the alternatives differs from this assumption, the social effect could be different. For example, market conditions could trigger surges of drilling activity and could cause periods during the 20-year planning horizon when socially disruptive growth could occur within the PSSA.

The cumulative employment growth that would occur in the PSSA, when combined with the population data presented above, also could cause a shift in the dependency of the population in the

BLM_0020734

PSSA away from livelihoods based on agriculture, recreation and energy toward a concentration of dependency on energy. This dimension of cumulative change is depicted in Exhibit X-5.

**Exhibit X-5**
**Predicted Shares of the Cumulative Population in the PSSA Dependent on Cumulative Employment for three Key Economic Drivers, 2010 Estimates and 2030 Projection by Alternative**

| Economic Base Sectors | Existing Conditions | Projected Conditions in 2030 | | | |
|---|---|---|---|---|---|
| | | Alternative A | Alternative B | Alternative C | Alternative D |
| Agriculture | 18% | 13% | 12% | 10% | 8% |
| Energy | 26% | 20% | 30% | 41% | 48% |
| Recreation/Tourism | 16% | 23% | 20% | 16% | 14% |
| Remaining Economic Base | 40% | 44% | 38% | 33% | 30% |

Source:    Source: BBC Research and Consulting and Lloyd Levy Consulting, 2010.

As depicted in Exhibit X-5, there would be a shift in dependency toward the energy industry of varying degrees because of cumulative employment and population growth under Alternative B, Alternative C, and Alternative D. This shift would be perceived by the population in communities of the PSSA as potentially enhancing quality of life, because of additional economic opportunities, but also potentially reducing quality of life because of exposure to volatility in the energy industry. This shift in the makeup of the PSSA economy could also increase competition for resources between the energy industry and agriculture and hunting, which embody traditional cultural values. Under Alternative A, cumulative population dependency on energy development and agriculture is projected to decrease over time relative to dependency on tourism.

The cumulative number of producing wells in the PSSA would grow from an estimated 2,866 in 2010 to 5,000 in 2030 under Alternative A, 8,500 under Alternative B, 15,000 under Alternative C, and 21,200 under Alternative D, with almost all of the growth occurring in the Piceance Creek Basin of the PSSA. Compared to the existing base of producing wells, cumulative producing wells would grow by a factor of 1.8 under Alternative A, 3.0 under Alternative B, 4.5 under Alternative C, and 6.0 under Alternative D.

Quality of life of ranchers on the Piceance Creek Road and its side roads committed to continuing an agricultural livelihood and lifestyle beyond the current generation would be affected by the cumulative shift of the PSSA's economic base away from agriculture as well as the noise, dust and traffic associated with energy development. The cumulative effects on quality of life for recreation interests would be related to the lower perceived quality of the hunting experience in the area affected by the cumulative producing wells, which contribute to changes in landscape character from natural or rural to developed or industrial. This occurs in all of the alternatives in proportion to the growth factors calculated above.

National and local environmental interests likely would consider the cumulative increase in producing wells to diminish quality of life under all of the alternatives. This impact would be in rough

BLM_0020735

proportion to the relative scale of cumulative development that occurs on BLM land in the Piceance Creek Basin area under each alternative.

## Oil Shale

The most unpredictable issue in terms of cumulative social and economic effects is the potential development of oil shale resources within the Piceance Basin. On January 1st, 2007, BLM issued five Research, Demonstration & Development (RD&D) leases on lands in Rio Blanco County to Shell Frontier Oil and Gas (three separate leases), Chevron Shale Oil Company and EGL Resources Inc. All three companies are using these leases to further investigate in situ processes for extracting and recovering oil shale.

Information from the lease applications, environmental assessments of the lease applications and study team interviews with representatives of the companies in 2007 indicates that the RD&D programs will have a fairly modest effect on local economic conditions. Shell anticipates a peak construction workforce of about 700 jobs at each of their three leasing sites, but these peaks would not overlap. The Shell operating workforce was projected at about 150 jobs on each of the three sites. EGL's lease application indicates a construction workforce of 10 to 100 workers and an operating workforce of 10 to 40 workers. Chevron indicated to the study team that they anticipate a very limited on-site presence over the next ten years, with most of the work being done on sample materials sent to other corporate locations. Overall, the study team estimated in the 2008 AGNC study that RD&D employment could eventually lead to as many as 800 direct jobs in the PSSA.

Longer-term, development of a viable commercial oil shale industry in Colorado is highly uncertain. At one end of the spectrum of possibilities, development efforts may come to a halt during, or at the conclusion of, the current RD&D projects. At the other end of the spectrum, if a commercial oil shale ultimately does develop in northwest Colorado, it might resemble the tar sands industry currently operating in Alberta, Canada. This type of large scale industrial development is unlikely to occur within BLM's 20 year planning horizon for this RMPA EIS, but could involve thousands or even tens of thousands of construction and operations jobs.

BLM_0020736

# SECTION XI.
# Bibliography

Athearn 1981. Frederic J. Athearn, An Isolated Empire: A History of Northwestern Colorado, Bureau of Land Management, Colorado, Cultural Resources Series, Number Two (Third Edition), 1981.

BBC 2008a. City of Rifle, A Case Study of Community Renewal, Growth and Change in Northwest Colorado. BBC Research & Consulting, prepared for the City of Rifle. May, 2008.

BBC 2008b. Northwest Colorado Socioeconomic Analysis and Forecasts. BBC Research & Consulting, prepared for the Associated Governments of Northwest Colorado. February, 2008.

BBC 2008c. The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado (Revised Draft Report). BBC Research & Consulting, prepared for the Colorado Division of Wildlife. September, 2008.

BEA 2008. U.S. Bureau of Economic Analysis, Regional Economic Information System, Table CA25N. U.S. Bureau of Economic Analysis. Downloaded August 15, 2008.

Berry et al.1990. Berry, E.H. et al., "A Longitudinal Analysis of Neighboring in Rapidly Changing Rural Places," Journal of Rural Studies 6:175−186, 1990.

Blankenship Consulting and Sammons/Dutton 2006. Blankenship Consulting LLC and Sammons / Dutton LLC, ExxonMobil Piceance Development Project Environmental Assessment Socioeconomic Technical Report. Prepared for US BLM White River Field Office, May 2006.

BLM 2008. Bureau of Land Management Data and Metadata for White River BLM Field Office Management Area. Available here: http://www.blm.gov/az/st/en/prog/maps/gis_files.html (Accessed August 1, 2008).

Bowker et al. 2005. J.M. Bowker, J.E. Harvard III, John C. Bergstrom, H. Ken Cordell, Donald B.K. English, and John B. Loomis. The Net Economic Value of Wilderness. In, The Multiple Values of Wilderness, H. Ken Cordell, John C. Bergstrom, J.M. Bowker, ed. State College, Pennsylvania: Venture Publishing, Inc., 2005.

Braaten 2008. Mike Braaten, Government Affairs and Energy Coordinator, City of Rifle, Comments on the NW Colorado Socioeconomic Projection, February 8, 2008. In BBC 2008. BBC Research and Consulting, Northwest Colorado Socioeconomic Analysis and Forecasts: Final Report, April, 2008.

Brennan, M. 2008. Mike Brennan. Interview with Lloyd Levy, August 26, 2008.

Brennan, C.W. 2008. C. W. Brennan. Interview with Lloyd Levy, August 27, 2008.

BLM_0020737

Brown et al. 1989. Brown, R.B., et al., "Community Satisfaction and Social Integration in a Boomtown: A Longitudinal Analysis," Rural Sociology 54:568-586, 1989.

Brown et al. 2005. Brown, R.B., et al., "The Boom-Bust-Recovery Cycle: Dynamics of Change in Community Satisfaction and Social Integration in Delta, Utah," Rural Sociology 70:28–49, 2005.

Brown 2008. Kim Brown, Branch Manager, First National Bank of the Rockies, Meeker, Colorado. Interview with Lloyd Levy, August 27, 2008.

Brookshire and D'Arge 1980. Brookshire, D.S., and R.C. D'Arge, "Adjustment Issues of Impacted Communities or, Are Boomtowns Bad?" Natural Resources Journal 20:523–546, 1980.

Burkhead 2008a. Jeff Burkhead, It was past time to get out and look around a bit. Rio Blanco Herald Times, June 26,2008.

Burkhead 2008b. Jeff Burkhead, County weighs future of RV park. Rio Blanco Herald Times, August 21,2008.

Burkhead 2008c. Jeff Burkhead, RVs will move from Love's to Stagecoach. Rio Blanco Herald Times, July 3,2008.

CDLE 2008. Colorado Department of Labor and Employment 2006 QCEW. Downloaded August 28, 2008.

Census 2000 STF3. Census 2000 Summary Tape File 3. U.S. Bureau of Census. Downloaded July 29, 2008.

Census Tiger 2007. U.S. Census Bureau Tiger Data County Shapefiles. Available here: http://www.census.gov/cgi-bin/geo/shapefiles/state-files?state=08 (Accessed August 1, 2008).

Claritas, 2008a. 2007 Average Household Size. Claritas. Downloaded August 25, 2008.

Claritas, 2008b. 2007 Household Income. Claritas. Downloaded August 25, 2008.

Claritas, 2008c. 2007 Housing Value. Claritas. Downloaded August 25, 2008.

Camasso and Wilkinson 1990. Michael J. Camasso and Kenneth P. Wilkinson, Severe Child Maltreatment in Ecological Perspective: The Case of the Western Energy Boom, Journal of Social Service Research, 13(3), 1990.

CDE 2008. Colorado Department of Education Statistics. Colorado Department of Education. Downloaded September 11, 2008.

COGCC 2008. Colorado Oil and Gas Conservation Commission, Staff Report, January 15, 2008. http://cogcc.state.co.us/(accessed 9/12/08).

BLM_0020738

Colorado Historical Society 2008. Colorado Historical Society, Office of Archaeology and Historic Preservation. 2008. Centennial Farms: All Awards (PDF). (http://coloradohistory-oahp.org/programareas/centfarm/centfarmslist.pdf, accessed 8/25/08).

CSM 2005a. Colorado School of Mines, Office of Special Programs & Continuing Education, Energy & Minerals Field Institute, ChevronTexaco's Rangely Oil Field Operations. http://www.mines.edu/outreach/cont_ed/emfi/emfi2005/ChevronTexaco.pdf (accessed 7/16/2008).

CSM 2005b. Colorado School of Mines, Office of Special Programs & Continuing Education, Energy & Minerals Field Institute, Oil Shale Fact Sheet. http://www.mines.edu/outreach/cont_ed/emfi/emfi2005/OilShale.pdf (accessed 8/2/2008).

Day and Sheridan 2007. Sharon Day and Denise Sheridan, Town Manager and Town Planner. Interviewed by BBC Research and Consulting, September 25, 2007.Devere 2008. Jeff Devere, (formerly) Community/Economic Development, Town of Rangely. Comments on the NW Colorado Socioeconomic Projection, February 19, 2008. In BBC Research and Consulting, Northwest Colorado Socioeconomic Analysis and Forecasts: Final Report, April, 2008.

Ekstrom 2008. Bill Ekstrom, Extension Agent - Agriculture, Rio Blanco County Cooperative Extension, Meeker, Colorado. Personal interview with Lloyd Levy, August 12, 2008.

Ellingson et al. 2006. Ellingson, Lindsey, Andrew Seidl and CJ Mucklow. Tourists' Value of Routt County's Working Landscape, 2005. (EDR 06-05) Fort Collins Colorado: Department of Agricultural and Resource Economics, May 2006. Available here: http://www.cde.state.co.us/artemis/ucsu5/ucsu5213edr066internet.pdf (accessed February 12, 2009).

England and Albrecht 1984. England, J.L., and S.L. Albrecht, "Boomtowns and Social Disruption," Rural Sociology 49:230−246, 1984.

Freudenburg 1986. Freudenburg, W.R., "The Density of Acquaintanceship: An Overlooked Variable in Community Research?" American Journal of Sociology 92:27−63, 1986.

Freudenburg and Jones 1991. Freudenburg, W.R., and R.E. Jones, "Criminal Behavior and Rapid Community Growth: Examining the Evidence," Rural Sociology 56:619−645, 1991.

Greider and Krannich 1985. Greider, T., and R.S. Krannich, "Neighboring Patterns, Social Support and Rapid Growth: A Comparison Analysis from Three Western Communities," Sociological Perspectives 28:51−70, 1985.

Greider et al. 1991. Greider, T., et al., "Local Identity, Solidarity, and Trust in Changing Rural Communities," Sociological Focus 24:263−282, 1991.

Greider and Garkovich 1994. Thomas Greider and Lorraine Garkovich, Landscapes: The Social Construction of Nature and the Environment, Rural Sociology, 59(1), 1994, pp. 1-24.

BLM_0020739

Harpman et al. 1994. Harpman, David A., Michael P. Welsh and Richard C. Bishop. Nonuse Economic Value: Emerging Policy Analysis Tool. Funded by the U.S. Bureau of Reclamation's General Investigation Program, November 1994. Available here: http://www.usbr.gov/pmts/economics/reports/NUPAP1024.pdf (accessed February 12, 2009).

Husband 1984. Husband (1984). Michael B. Husband. Colorado Plateau County Historic Context. Colorado Historical Society, 1984 (facsimile edition 2006), Office of Archaeology and Historic Preservation, Colorado Historical Society [http://www.coloradohistory-oahp.org/publications/contexts.htm (accessed 2/25/08).

Johnston and Duke 2007. Johnston, Robert J. and Joshua M. Duke. Willingness to pay for Agricultural Land Preservation and Policy Process Attributes: Does the Method Matter? American Journal of Agricultural Economics. Volume 89, Issue 4, Pages 1098 – 1115. Published online 15 Jun 2007. Digital Object Identifier (DOI) 10.1111/j.1467-8276.2007.01029.x.

Joos 2008. Michael Joos, Rio Blanco County Undersheriff. Interview with Lloyd Levy, September 10, 2008.

Krannich et al. 1989. Krannich, R., et al., "Fear of Crime in Rapidly Changing Communities: A Longitudinal Analysis," Rural Sociology 54:195–212, 1989.

Lake (2008) Phyllis Lake, County Executive Director, Farm Service Agency, Meeker, Colorado. Personal interview with Lloyd Levy, August 22, 2008.

Little and Krannich 1989. Ron L. Little and Richard S. Krannich, A Model for Assessing the Social Impacts of Natural [Resource] Communities, Impact Assessment Bulletin 6(2), 1989.Loomis 1993. Loomis, John B. Integrated Public Lands Management: Principles and Applications to National Forests, Parks, Wildlife Refuges, and BLM Lands. New York: Columbia University Press, 1993.

Loomis et al. 2000. Loomis, John, Vicki Rameker and Andy Seidl. Potential Non-Market Benefits of Colorado's Agricultural Lands: A Review of the Literature (APR 00-02) Fort Collins Colorado: Department of Agricultural and Resource Economics, February 2000. Available here: http://www.cde.state.co.us/artemis/ucsu5/UCSU5212APR0002INTERNET.pdf (accessed February 12, 2009).

Loomis 2005. Loomis, John. United States Department of Agriculture Forest Service, Pacific Northwest Research Station. Updated Outdoor Recreation Use Values on National Forests and Other Public Lands. General Technical Report PNW-GTR-658, October 2005.

Magnan et al. 2005. Magnan, Nicholas, Andrew Seidl, C.J. Mucklow and Deborah Alpe. The societal value of ranchlands to Routt County residents, 1995-2005 (EDR 05-01). Fort Collins Colorado: Department of Agricultural and Resource Economics, October 2005. Available here: http://nwcos.org/Resources/BLM%20Documents/Socioec%20Analysis/RoCo%20Ranchland%20Short%20Version.pdf (accessed February 12, 2009).

BLM_0020740

Rosenberger and Walsh 1997. Rosenberger R. and R. Walsh. Non-Market Value of Western Valley Ranchland Using Contingent Valuation. Journal of Agricultural and Resource Economics, 22(2):296-309. Available here: http://ageconsearch.umn.edu/bitstream/30856/1/22020296.pdf (accessed February 12, 2009).

McDonald et al. 2007. Lisa A. McDonald, Holly Wise Bender, Eric Hurley, Sheri Donelly and David "Tex" Taylor, 2007. Oil and Gas Economic Impact, Colorado Energy Research Institute Report 2007-1, Colorado School of Mines, June 2007. http://www.ceri-mines.org/documents/CERIOilGas.pdf (accessed 8/7/2007).

Meeker 2008a. Town Administrator Sharon Day. Interview with Rachel Thompson, September 9, 2008.

Meeker 2008b. Meeker 2008 Proposed Budget. Received directly from town staff.

Moffat County and the City of Craig 2008. Moffat County and the City of Craig, Comments on the NW Colorado Socioeconomic Projection: General Response, February 11, 2008.

Mr. Steve Wix, Owner, Backcountry Realty, Meeker, Colorado. Email to Lloyd Levy, August 30, 2008.

Neilson 2008. Renae Neilson, Rio Blanco County Assessor, Meeker, Colorado. Personal interviews with Lloyd Levy, September 5 and September 10, and email to Lloyd Levy, September 11, 2008.

Oldland 2008. Gerald Oldland. Interview with Lloyd Levy, August 26, 2008.

Pioneers 2008. Pioneers Hospital Margie Joy. Interview by Rachel Thompson, September 5, 2008.

Rangely 2008a. Rangely 2008 Proposed Budget. Received directly from the town of Rangely.

Rangely 2008b. Town Administrator. Interview by Rachel Thompson, September 5, 2008.

Rio Blanco Herald Times 2008. Rio Blanco Herald Times, Rio Blanco Reactions: Community Leaders share responses to visit by Pinedale, Wyo., officials. Rio Blanco Herald Times, September 4, 2008, p. 1.

Redifer et al 2007. John Redifer, Georgann Jouflas, Thea Chase and Susanna Morris, Socioeconomic Impacts of Growth: A Study by the Mesa State College Natural Resource and Land Policy Institute, September 2007. http://www.mesastate.edu/pdf/Socioeconomic%20Impacts%20of%20Growth.pdf (accessed 7/14/2008).

Redifer et al 2008. John Redifer, Georgann Jouflas, Investigating Regional Collaboration in Northwest Colorado: A Study by the Mesa State College Natural Resource and Land Policy Institute, May 2008. http://www.mesastate.edu/pdf/irc/irc1.pdf (accessed July 14, 2008).

WRFO OIL AND GAS DEVELOPMENT DRAFT RMPA/EIS                                    SECTION XI, PAGE 5
APPENDIX G – SOCIAL AND ECONOMIC ANALYSIS TECHNICAL REPORT

BLM_0020741

Rifle 2008. Proposed 2008 Rifle budget. Received directly from the city of Rifle.

Rio Blanco County 2005. Rio Blanco County, Minutes [of the] Board of County Commissioners, August 8, 2005. http://www.co.rio-blanco.co.us/commissioners/viewMinutes.php?IDnum=125&archive=yes (accessed 9/6/2008).

Rio Blanco County 2008a. Summary of Taxes. Rio Blanco County Assessor's Office. http://www.co.rio-blanco.co.us/assessor/summary_of_taxes.php (accessed September 11, 2008).

Rio Blanco County 2008b. Rio Blanco County Budget, 2008 Rio Blanco County Budget, available here: http://www.co.rio-blanco.co.us/budget/pdf/2008%20Adopted%20budget/Table%20of%20Contents.pdf (accessed August 22, 2008).

Rio Blanco County 2008c. Rio Blanco County Department of Social Services, available here: http://www.co.rio-blanco.co.us/socialservices/ (accessed August 22, 2008).

RMN, 2007. Study noted in Rocky Mountain News December 12, 2007 article entitled "Three's a crowd in two-sided Garfield politics".

Rose 1984. Rose, J.G.. Farmland preservation policy and programs. Natural Resources Journal 24:591-640.

Rosenberger and Loomis 1999. Rosenberger, Randall S. and John B. Loomis. Summer 1999. "The Value of Ranch Open Space to Tourists: Combining Observed and Contingent Behavior Data." Growth and Change. 30: 366-383. Published Online: 3 Jan 2006. Digital Object Identifier (DOI) 10.1111/j.1468-2257.1999.tb00035.x.

Saltiel et al. 1992. John Saltiel, Jack Gilchrist, and Robert Harvie, Concern About Crime Among Montana Farmers and Ranchers, Rural Sociology 57(4), 1992.

SDO 2008. Table 5. Colorado Population for Counties & Municipalities. Colorado State Demography Office. November 2007. Downloaded July 28, 2008.

Seyfrit and Sadler-Hammer 1988. Seyfrit, C.L., and N.C. Sadler-Hammer, "Social Impact of Rapid Energy Development on Rural Youth: A Statewide Comparison," Society and Natural Resources 1:57−67, 1988.

Smith et al. 2001. Smith, M. et al., "Growth, Decline, Stability and Disruption: A Longitudinal Analysis of Social Well-Being in Four Western Communities." Rural Sociology 66:425−450, 2001.

Social Services 2008. Social Services Administrator. Interview by Rachel Thompson, September 8, 2008.

Stewart and Devere 2007. Lance Stewart and Jeff Devere, Sheridan, Town Manager and Community Development Director. Interviewed by BBC Research and Consulting, September 25, 2007.

BLM_0020742

Thompson and Williams 1990. James G. Thompson and Gary Williams, Vertical Linkage and Competition for local political Power: A Case of Natural Resource Development and Federal Land Policy, Impact Assessment, 10(4) pp. 33-58, 1990.

Town of Meeker 2005. Town of Meeker, Comprehensive Plan: Updated 2005. http://www.townofmeeker.org/Meeker%20Comp%20Plan%20Draft%20August%2023,%202005.pdf (accessed July 28, 2008).

Town of Meeker 2008. Town of Meeker, Colorado, The [Minutes of the] Regular Meeting of the Meeker Town Board, January 8, 2008. http://www.townofmeeker.org/tm010808.htm (accessed 9/8/2008).

Turner 2008. Kai Turner, 5th Generation Committed to Rio Blanco Colorado (advertisement), Rio Blanco Herald Times, July 17, 2008, p. 10A.

Urbanik 2008. John Urbanik, Chevron invests $67 million in area, Rio Blanco Herald Times, July 3, 2008.

USDOI BLM 2006. U.S. Department of the Interior, Bureau of Land Management, Shell Frontier Oil & Gas, Inc. Oil Shale Research, Development and Demonstration (R,D&D) Tracts Environmental Assessment (CO-110-2006-117-EA). http://www.blm.gov/co/st/en/fo/wrfo/oil_shale_wrfo/shell_frontier_oil.html (accessed 5/3/2007).

USDOI BLM 2008. U.S. Department of the Interior, Bureau of Land Management, Proposed Oil Shale and Tar Sands Management Plan Amendments to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic Environmental Statement (BLM WO GI 08-005-3900, DOI No. FES 8-32), September 2008

USDOI BLM WRFO 2007. U.S. Department of the Interior, Bureau of Land Management, White River Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas Activities in the BLM White River Field Office: Rio Blanco, Moffat and Garfield Counties, Colorado, September 10, 2007.

USDOI BLM WRFO 2007b. U.S. Department of the Interior, Bureau of Land Management, White River Field Office, White River RMPA/EIS Final Scoping Report, May 2007. http://www.blm.gov/rmp/co/whiteriver/documents/WFRO_Final_Scoping_Report_May07.pdf (accessed 9/12/08).

USDOI BLM WRFO 2008. U.S. Department of the Interior, Bureau of Land Management, White River Field Office, White River RMPA/EIS Chapter 1 – Purpose and Need for Action (Draft). July 2008.

Viscardi 2008. Dolly Viscardi, Why did you move to town? Rio Blanco Herald Times, June 12, 2008.

Wilderness Society. The Wilderness Society, Too Wild to Drill: Introduction. http://www.wilderness.org/OurIssues/ Energy/TooWildToDrill.cfm?TopLevel=Areas (accessed 9/6/08).

BLM_0020743

Wilkinson 1983. Wilkinson, K.P., "Divorce and Recent Net Migration into the Old West," Journal of Marriage and the Family 45:437−445, 1983.

Wilkinson 1984. Wilkinson, K.P., et al., "Violent Crime in the Western Energy-Development Region," Sociological Perspectives 27:241−256, 1984.

Wilkinson and Camasso 1984. Wilkinson, K.P., and M. Camasso, "Juvenile Delinquency and Energy Development in a Traditional Setting," unpublished manuscript, Department of Rural Sociology, Pennsylvania State University, State College, Pa., 1984.

WRFO 1996. White River Resource Area: Proposed Resource Management Plan and Final Environmental Impact Statement. U.S. Department of Interior, Bureau of Land Management, White River Resource Area, Craig District, Colorado. June 1996.

Yoder 1999 Wildlife on Private Land: Contracting Over Wildlife-Inflicted Property Damage and Abatement by Jonathan Keith Yoder A Dissertation submitted to the Graduate Faculty of North Carolina State University in partial fulfillment of the requirements for the Degree of Doctor of Philosophy Department of Economics Department of Agricultural and Resource Economics Raleigh 1999.

BLM_0020744

BLM

*Appendix H*

# Oil and Gas Operations in the White River Field Office



Public Lands USA: Use, Share, Appreciate

BLM_0020746

*Appendix H – Oil and Gas Operations in the White River Field Office*

## Table of Contents

Page

1.0    **GEOPHYSICAL EXPLORATION** ........................................................ **H-1**

    1.1   Seismic Reflection Surveys ...................................................................... H-1

2.0    **GEOPHYSICAL MANAGEMENT (PERMITTING PROCESS)............................ H-2**

    2.1   State Standards ....................................................................................... H-3

    2.2   Mitigation ................................................................................................ H-3

3.0    **OIL AND GAS LEASING** .................................................................. **H-3**

4.0    **DRILLING PERMIT PROCESS** ........................................................... **H-4**

    4.1   Permitting ............................................................................................... H-5

    4.2   Standard Drilling Conditions of Approval ................................................ H-6

    4.3   Surface Disturbance Associated With Oil and Gas Drilling...................... H-8

    4.4   Issuance of Rights-of-Way ...................................................................... H-9

5.0    **DRILLING OPERATIONS** ................................................................. **H-9**

    5.1   Rotary Drilling......................................................................................... H-9

    5.2   Logging................................................................................................. H-10

    5.3   Casing .................................................................................................. H-10

    5.4   Hydraulic Fracturing.............................................................................. H-11

    5.5   Oil and Gas Exploratory Units .............................................................. H-12

    5.6   Field Development ................................................................................ H-12

6.0    **PRODUCTION** ............................................................................. **H-13**

    6.1   Gas Production ..................................................................................... H-13

    6.2   Oil Production........................................................................................ H-13

    6.3   CBNG Production.................................................................................. H-14

    6.4   Water Production ................................................................................... H-15

    6.5   Production Problems............................................................................. H-15

    6.6   Secondary and Enhanced Oil Recovery ............................................... H-15

    6.7   Gas Storage.......................................................................................... H-16

7.0    **PLUGGING AND ABANDONMENT OF WELLS**............................................. **H-17**

BLM_0020747

*This page intentionally left blank*

BLM_0020748

# 1.0    Geophysical Exploration

Oil and gas can be discovered by direct or indirect exploration methods, such as the mapping of rock outcrops, seeps, borehole data, and remote sensing data. In many cases, indirect methods, such as seismic, gravity, and magnetic surveys are required to delineate subsurface features that could contain oil and gas. Geophysical exploration could provide information that increases the chances of drilling a discovery well, as well as information that could discourage drilling and the associated surface disturbance. More sophisticated geophysical techniques, such as three-dimensional seismic surveys, could supply enough information to model a reservoir and optimize drilling to prevent excess wells and the associated surface disturbance. Economics and past information also play a role in determining the method used.

## 1.1    Seismic Reflection Surveys

Seismic prospecting is the best and most popular indirect method for locating subsurface structures and stratigraphy that might contain hydrocarbons. Seismic energy (shock waves) is induced into the Earth using one of several methods. As these waves travel downward and outward, they encounter various rock strata, each having a different seismic velocity characteristic. As the wave energy encounters the interface between rock layers, where the lower layer is of lower seismic velocity, some of the seismic energy is reflected upward. Sensing devices, commonly called geophones, are placed on the surface to detect these reflections. The geophones are connected to a recording truck that stores the data. The time required for the shock waves to travel from the shot point down to a given reflector and back to the geophone is related to depth, and this value is mapped to give an underground picture of the geologic structure.

There are many methods available today that an explorationist can use to induce the initial seismic energy into the Earth. All methods require preliminary surveying and laying of geophones. The thumper and vibrator methods pound or vibrate the ground to create a shock wave. Usually large trucks are used, each equipped with vibrator pads (about 4 feet square). The pads are lowered to the ground, and vibrators on all trucks are triggered electronically from the recording truck. Information is recorded, and then the trucks move forward a short distance, and the process is repeated. Less than 50 square feet of surface area is required to operate the equipment at each test site. The trucks are equipped with large flotation type tires, which reduce the impact of driving over undisturbed terrain.

The drilling method uses vehicle-mounted or heli-portable drills that drill small-diameter holes to depths down to 100 feet. Depending on type of survey, over 100 holes are drilled per mile of line. Usually, a 20-pound charge of explosives is placed in the hole, covered, and detonated. The detonated explosive sends a shock wave below the Earth's surface that is subsequently reflected back to the surface from various subsurface rock layers. In rugged topography, a portable drill is sometimes carried in by helicopter. In remote areas where there is little known subsurface data, a series of short seismic lines might be required to determine the subsurface geology. Subsequently, more extensive seismic lines are arranged to obtain the greatest amount of geologic information.

Seismic information can be obtained in two- (2D) or three- (3D) dimensional configurations. To obtain 3D seismic information, the seismic sensors and energy source are located along lines in a grid pattern. This type of survey differs from the more common 2D surveys because of the large volume of data and the intensive computerization of the data. The results are expensive to obtain but give a more detailed and informative subsurface picture. The orientation and arrangement of the components in 3D seismic surveys are less tolerant of adjustments to the physical locations of the

BLM_0020749

lines and geophones, but they are also more compact in the area they cover. Although alignment can be fairly critical, spacing of the lines can often be changed to significantly increase the information collected. The depth of the desired geologic information dictates the spacing of the grid lines, with smaller spacing detailing shallower formations. The 3D surveys are more detailed and are usually conducted after 2D surveys or drilling has delineated a geologic prospect. Extensive computer processing of the raw data is required to produce a useable seismic section from which geophysicists can interpret structural relationships to depths of 30,000 feet or more. The effective depth of investigation and resolution are determined, to some degree, by which method is used.

A typical drilling seismic operation can use 10 to 15 people operating 5 to 7 trucks. Under normal conditions, 3 to 5 miles of line can be surveyed each day using the explosive method. Larger seismic operations may require up to approximately 160 personnel on-site during project operations. Work day shifts are 13-14 hour days, although some workers may occasionally be present earlier or later during the day, if necessary. The vehicles used for a drilling program include several vehicle-mounted or heli-portable drill rigs, helicopters, water trucks, a computer recording truck, and several light pickup trucks for the surveyors, shot hole crew, geophone crew permit man, and party chief.

Use of off-highway vehicle (OHV) travel may be authorized to carry out cross country tasks. Vehicles are spread out so that vehicle routes are not straight, and vehicles do not retrace the same route. In some cases, this approach has prevented the establishment of new vehicle routes and has reduced impacts. Drilling water, when needed, is usually obtained from a permitted source.

Reconnaissance type surveys of gravity and geomagnetic can be run in areas where there is limited information with the attendant lower costs and less impact. More expensive and higher impact seismic surveys are run when more detailed information is required.

## 2.0   Geophysical Management (Permitting Process)

Geophysical operations on and off an oil and gas lease are reviewed by the appropriate federal surface management agency (SMA) (e.g., BLM, Bureau of Reclamation, or USFS). Effective administration and surface protection can only be accomplished through close cooperation between the operator and the affected agency. The responsibilities of the geophysical operator and the Authorized Officer are as follows (The Gold Book, DOI and USDA 2007).

Geophysical Operator: An operator is required to file with the Authorized Officer a "Notice of Intent to Conduct Oil and Gas Exploration Operations." The Notice of Intent shall include site-specific project information and field techniques to minimize surface impacts; a map showing the location of the proposed 2D geophysical lines or 3D source and receiver proposed locations; all access routes and ancillary facilities; and a proposed schedule of field activities.

- The map should be at a minimum scale of one-half inch equals 1 mile; however, a 1:24,000 USGS topographic map is recommended.
- The party filing the Notice of Intent should be bonded. When applicable, a copy of the bond or other evidence of satisfactory bonding must accompany the Notice of Intent. Holders of statewide or nationwide oil and gas lease bonds may satisfy this requirement by obtaining a rider to include coverage of geophysical operations.
- For geophysical operation methods involving surface disturbance, a cultural resources survey may be necessary. In some circumstances, sensitive or threatened and endangered species surveys may also be necessary.

BLM_0020750

- A pre-work field conference is recommended and may be conducted by the surface management agency.
- Earth moving equipment shall not be used without prior approval.
- Upon completion of operations, including any required reclamation, the operator is required to file a Notice of Completion (NOC) of Oil and Gas Geophysical Exploration Operations (BLM Form 3150-5).

Authorized Officer: The authorized officer will contact the operator after the Notice of Intent (BLM Form 3150-4) is filed and inform the operator of the practices and procedures to be followed and the estimated time frame for approval.

- The authorized officer will complete a final post-work inspection of the site and notify the operator that the terms and conditions of the Notice of Intent have been met or that additional action is required by the operator.
- Consent to release the bond or terminate liability will not be granted by the surface management agency until the operator has met the terms and conditions of the Notice of Intent. (e.g., NEPA, approved Form 3040-1) before commencing operations on BLM-administered lands.
- After the operations are completed, as specified by the Notice of Completion, the Authorized Officer should complete a final inspection and notify the operator if the terms and conditions of the Notice of Intent have been met or if additional action is required.
- Consent to release the bond or termination of liability should not be granted until the terms and conditions have been met.

## 2.1   State Standards

The operator is required to register with the Colorado Oil and Gas Conservation Commission (COGCC). COGCC standards for plugging shot holes and personnel safety will be followed.

## 2.2   Mitigation

Seasonal restrictions may be imposed to reduce conflicts with wildlife, watershed damage, and hunting activity.

The most critical management practice is compliance monitoring during and after seismic activity. Compliance inspections during the operation ensure that stipulations are being followed. Compliance inspections upon completion of work ensure that the lines are clean, and the drill holes are properly plugged.

## 3.0   Oil and Gas Leasing

Based on the Federal Onshore Oil and Gas Leasing Reform Act of 1987, all leases must be available for competitive lease sales. Lands for which bids are not received at the lease sale will be available for noncompetitive leasing for a period not to exceed 2 years. Competitive sales will be held at least quarterly and by oral auction. Competitive and noncompetitive leases are issued for a 10-year term or for as long as oil and/or gas are produced. The Federal Government receives yearly rental fees on non-producing leases. Royalty is received at the rate of 12.5 percent of the total saleable production, one-half of which is returned to the State of Colorado.

Lease stipulations may be attached to each parcel and become part of the lease after sale. Initially, stipulations are attached to a parcel by the State office leasing section from various databases. The

BLM_0020751

parcel list is segregated and sent to the field office that has the majority of the parcel lands in its area. In the field office, the parcel is reviewed by a group of resource and National Environmental Policy Act (NEPA) specialists to ensure that lands are in conformance with the resource management plan (RMP), the stipulations are correct, and that any missing stipulations are included. This completes the process and allows the parcel to be included in a sale package.

The authorized officer has the authority to relocate, control timing, and impose other mitigation measures under Section 6 of the Standard Lease Form. This authority is invoked when lease stipulations are not attached to the lease, or new resources are discovered on a lease. Lease stipulations are conditions of lease issuance that provide protection for other resource values or land uses by establishing authority for delay, site changes, or the denial of operations within the terms of the lease contract. The stipulations are specified for each applicable parcel in the Notice of Competitive Oil and Gas Lease Sale and are intended to inform interested parties (potential lessees, operators) that certain activities will be regulated or prohibited unless the operator and the SMA arrive at an acceptable plan for mitigation of anticipated impacts. These stipulations are either attached to the entire lease, or by aliquot portions identifying the protection measure specific to the lease.

Lease stipulations are based on the perceived resource requirements and land uses as specified in NEPA documentation. New science, comprehensive documentation of resource requirements, land pattern interference, and ongoing monitoring of the effectiveness of a stipulation may allow granting of a waiver, exception, or modification to a stipulation. A lease stipulation "waiver" is a permanent exemption to a lease stipulation. An "exception" is a one-time exemption to a lease stipulation and is determined on a case-by-case basis. A "modification" is a change to the provisions of a lease stipulation, either temporarily, or for the term of the lease.

## 4.0    Drilling Permit Process

Onshore Oil and Gas Operations; Federal and Indian Oil and Gas leases; Onshore Oil and Gas Order Number 1, Approval of Operations; Final Rule issued March 7, 2007 under 43 CFR 3160. These procedures cover the full gamut of operations on federal minerals, from initial permitting of the well to subsequent operations and final abandonment. In 2009 the Colorado BLM entered into a Memorandum of Understanding (MOU) with U.S. Forest Service (USFS), Rocky Mountain Region and COGCC concerning oil and gas permitting on BLM and Forest Service lands. Under the MOU, operators on federal lands will be advised of their responsibility to comply with all applicable laws and regulations, including the COGCC rules.

In the initial permitting process, the operator selects the location of a proposed drill site. This selection is based on COGCC spacing requirements, the subsurface geology, the topography, and the avoidance of known protected surface resource values.

Location of wells and spacing requirements are established by the COGCC to protect the correlative rights of offsetting mineral owners and efficiently recover the resource. This applies to all mineral ownership (i.e., fee, State, and federal minerals). The spacing requirements are to be applied to the subsurface point of production. Wells must be drilled within 200 feet of the center of a legal subdivision, such as a quarter section, depending on the spacing assigned to the particular area. A proposed location may be moved beyond the designated tolerance by a spacing exception granted by COGCC. A spacing exception requires notification of the offsetting mineral lease owners. If there is a protest, the matter must be presented at a public hearing with full evidence of the need to relocate the well before a decision can be made by COGCC. The White River Field Office (WRFO) is subject to State spacing COGCC Rule 318, which for wells deeper than 2,500 feet would be about

BLM_0020752

40 acres; however wells may be approved at less than 40- acre spacing for efficient resource recovery. For wells shallower than 2,500 feet, the wells must be spaced at least 300 feet from the nearest well and a distance of at least 200 feet from the lease boundary. Forty acres is not a probable future spacing for the entire WRFO, except in specific instances, because spacing is based on the most efficient recovery of the reserves. The probable maximum subsurface density of wells is 40 acres throughout most of the WRFO, with certain areas having a subsurface density of 10 acres based on the currently projected recovery efficiencies and economics. Surface density of wells would be a variable based on the surface resource conflicts, economics of directional drilling and the subsurface density.

## 4.1    Permitting

After the operator makes a decision to drill a well, the well, access road, and pipeline can be surveyed and staked without notifying BLM. Cultural resource inventories can also be obtained without notice. An Application for Permit to Drill (APD) or Reenter, on Form 3160-3, is required for each proposed well, and for reentry of existing wells (including disposal and service wells). Further details on the APD process are found in Onshore Oil and Gas Order Number 1. Three methods of notification are as follows:

- Early Notification - The operator may wish to contact the BLM and any applicable SMA, as well as all private surface owners, to request an initial planning conference as soon as the operator has identified a potential area of development. Early notification is voluntary and would precede the Notice of Staking (NOS) option or filing of an APD.

- Notice of Staking Option - After the operator makes the decision to drill a well, it must decide whether to submit an NOS or an application to drill (APD). The NOS is an abbreviated notice that consists of an NOS form, a staked location map, and sketched site plan. This notice is posted for a 30-day public review. The NOS triggers the onsite inspection of the well, which determines whether there are any conflicts with critical resources, as well as provides the preliminary data to assess what additional items are necessary to complete the APD.

- Application for Permit to Drill - The operator can submit a completed APD in lieu of an NOS, but in either case, no surface disturbing activity can be conducted in conjunction with the drilling operations until the APD is approved by the Authorized Officer. Operators are encouraged to consider and incorporate BMPs into their APDs because BMPs can result in reduced processing times and reduced number of COAs.

If the APD option is used, an APD is submitted to the Authorized Officer, and a field inspection is held with the operator and any other interested party. The purpose of the onsite field inspection is to evaluate the operator's plan, to assess the situation for possible impacts (surface and subsurface), and to formulate resource protection stipulations. To lessen environmental impacts, a site can be moved, reoriented, or resized, within certain limits, at the onsite inspection. The proposed access road or pipeline can also be rerouted. If necessary, site-specific mitigations are added to the APD as Conditions of Approval (COA) for protection of surface and subsurface resource values in the vicinity of the proposed activity.

The field office is responsible for preparing environmental documentation necessary to satisfy the NEPA requirements and provide any mitigation measures needed to protect the affected surface resource values. Consideration is also given to the protection of subsurface resources. Casing and cementing programs shall be conducted as approved to protect and/or isolate all usable water zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Usable water is defined as water containing 10,000 parts per million or less of total

BLM_0020753

dissolved solids. Water of this quality is to be protected usually by surface casing and cement. Determining the depth of fresh water requires specific water quality data in the proposed well vicinity or geophysical log determination of water quality, depending on existing well proximity and log availability. If water quality data or logs from nearby wells are not available, the area within a 2-mile radius of the proposed well is checked for water wells. If wells exist, surface casing is required to be set below the deepest fresh water zone found in these wells, or below a depth reasonably estimated for future water wells. In the WRFO, usable water can be available to great depths and beyond the surface casing setting point. In this case, surface casing is set through the fresh surface waters, and cement is required to protect the remaining useable water from the underlying non-useable water. The depth of the casing is specified to be below a depth reasonably anticipated for future useable water recovery.

When final approval is given by BLM, the operator can commence construction and drilling operations. Approval of an APD is valid for 2 years. If drilling does not begin within the 2 years, the conditions of approval can be revised before extending the APD for 2 additional years. The operator is responsible for reclaiming any surface disturbance that resulted from its actions, even if a well was not drilled.

Economic conditions dramatically affect drilling activity. A downturn in the oil and gas market could create a significant decrease in the number of drilling wells within the WRFO. More information on drilling and production trends for the WRFO can be found in the reasonable foreseeable development (RFD) scenario created for the RMPA/EIS.

## 4.2   Standard Drilling Conditions of Approval

In addition to any conditions of approval that are developed during the environmental analysis, APDs are also subject to WRFO's standard drilling COAs which are listed below.

1. All operations, unless a variance has been granted in writing by the Authorized Officer, must be conducted in accordance with 43 CFR PART 3160 - Onshore Oil and Gas Operations, Onshore Oil and Gas Order No. 1; Approval of Operations on Onshore Federal and Indian Oil and Gas Leases; and Onshore Oil and Gas Order No. 2; Drilling Operations. If air or mist drilling is used, operations must be in accordance with Onshore Oil and Gas Order No. 2; Drilling Operations, Part E; Special Drilling Operations.

2. The operator is responsible for the actions of his subcontractors. A copy of the approved APD must be on location during construction, drilling, and completion operations.

3. Major deviations from the drilling plan require prior approval from the Authorized Officer. The operator shall verbally notify either the petroleum engineer or petroleum engineering technician 24 hours prior to the following operations to provide notice of:

   a. Well spud (Breaking ground for drilling surface casing)
   b. Running and cementing of all casing strings
   c. Pressure testing of blowout preventer equipment (BOPE) or any casing string
   d. Commencing completion operations

   A written sundry notice of the well spud must be submitted within five (5) working days.

4. All BOPE tests will be done by a tester and not by the rig pumps. The tests will include a low pressure test of 250 psi for five minutes prior to initiating the high pressure tests discussed in Onshore Order No. 2

BLM_0020754

5.  No "new" hardband drill pipe abrasive to casing will be rotated inside the surface casing unless it can be shown to be casing friendly in the manufacturer's specifications. Hardband drill pipe will be considered new until it has been run at least once.

6.  Drilling muds with chlorides testing in excess of 3,000 ppm or those containing hydrocarbons shall not be used in drilling operations until after the surface casing has been set. When drilling to set the surface casing, drilling fluid will be composed only of fresh water, bentonite and/or a benign lost circulation material – that is a lost circulation material that does not pose a threat to human health or the environment, e.g. cedar bark, shredded cane stalks, mineral fiber and hair, mica flakes, ground and sized limestone or marble, wood, nut hulls, corncobs, or cotton hulls.

7.  During surface cementing operations, should cement not be circulated to surface the WRFO shall be verbally notified as soon as reasonably possible. A log acceptable to the WRFO shall be run to determine the top of cement prior to commencing remedial cementing operations. If cement is circulated to surface and subsequently falls back, top job(s) will be performed until cement remains at surface.

8.  Due to the extensive lost circulation problems that are being encountered in the Piceance Basin during drilling operations from surface to total depth (TD), and given that all usable water zones, potential productive zones, and lost circulation zones shall be protected and/or isolated per Onshore Order No. 2, the White River Field Office requires sufficient volumes of cement be pumped to meet these requirements. Cement tops behind intermediate and production casing will be verified by an acceptable log to ensure compliance with this Order. We require cement to be run a minimum of 200 feet above the shoe of the previous casing string.

9.  Chronologic drilling progress reports must be sent directly to the BLM White River Field Office on a daily basis, either electronically or by fax (970-878-3805) to the Petroleum Engineer and/or other designated petroleum engineering technicians until the well is drilled to total depth.

10. All drill cuttings shall be contained in a pit on the pad of the well being drilled, or hauled to an approved disposal site. All pits shall maintain a minimum of two feet of free board at all times.

11. For foam and ultralight cement jobs that are performed in cementing the intermediate or production strings, the operator will wait at least 36 hours for cement to harden before running a specialized log capable of reading pipe cement bond and verifying tops of cement. The White River Field Office shall be verbally notified prior to running such specialized log with enough advance notice to allow a representative from this office to witness. Logs showing pipe cement bond and tops of cement for intermediate and production cement jobs will be forwarded to the BLM.

12. One copy of all charted BOPE tests, logs, core descriptions, core analyses, well-test data, geologic summaries, sample descriptions, and all other surveys or data obtained and compiled during the drilling, workover, and/or completion operations, shall be filed with the completion report, Form 3160-4. The logs should be submitted in a digital format, on a CD. This completion report shall be filed within 30 days of completion of operations and submitted prior to, or along with the first production notice.

13. The WRFO requires the measurement of individual gas, oil (condensate) and water production streams at the wellhead, unless otherwise approved in advance by the BLM. The sales point for natural gas will be at the wellhead. All meters will be calibrated in place prior to any deliveries. The White River Field Office will be provided with a date and time for the initial meter calibration and all future meter proving and calibration schedules with enough advance notice, 24 hour minimum, to allow a representative from this office to witness. A copy of the meter proving and calibration reports will be submitted to the White River Field Office. Oil

BLM_0020755

(condensate) will be sold from secured tanks on location, unless otherwise approved in advance by the BLM.

## 4.3    Surface Disturbance Associated With Oil and Gas Drilling

Upon receiving approval to drill the proposed well, the operator moves construction equipment over existing roads to the point where the access road will begin. Generally, the types of equipment include trackhoe, dozers (track-mounted and rubber-tired), scrapers, and motor-graders. Moving equipment to the construction site requires moving several loads (some overweight and overwidth) over public and private roads. Existing roads and vehicle routes are improved in places and occasionally, culverts and cattle guards are installed as specified in the approved APD.

The length of the access road varies. Generally the route is selected to reduce impacts to resources identified in the NEPA document. Environmental factors or the landowner's preference might dictate a longer route. Roads are usually constructed with a 14-foot (single lane) or 24-foot (double lane) running surface depending on well type (multiple or single well pad). Soil texture, steepness of the topography, and moisture conditions might require surfacing (e.g., gravel, dust suppressants) the access road.

All soil material suitable for plant growth is first removed and stockpiled in a designated area. Sites on flat terrain usually require slightly more than removing the topsoil material and vegetation. Drilling sites on ridge tops and hillsides are constructed by cutting and filling portions of the location. The majority of the excess cut material is stockpiled in an area that will allow it to be easily recovered for rehabilitation. It is important to confine extra cut material in a stockpile rather than to cast it down hillsides and drainages where it cannot be recovered for rehabilitation.

The amount of level surface required for safely assembling and operating a drilling rig varies with the type of rig, the depth, type of the well, and number of wells on the pad. The size of a pad is primarily determined by the capacity of the reserve pits to hold the cuttings from all wells drilled on the pad, as well as having sufficient room for drilling and well completion operations. The average size for a single-well pad is 4 acres, 8 acres for an eight-well pad, and 12 acres for a sixteen-well pad. The number of optimal locations is finitely limited, therefore operators needs to optimize the location of future roads and wellpads for maximum benefit, and utilize directional drilling technology to target bottom-hole locations where there is steep terrain overhead (BLM, 2007a). In addition to the drilling rig footprint, a reserve pit is constructed, usually square or oblong, but sometimes in another shape to accommodate topography. Generally, the reserve pit is 8 to 12 feet deep, but could be deeper to compensate for smaller length and width or deeper drilling depths. Depending on the relationship of the location to natural drainages, it might be necessary to construct water bars or diversions. The amount of area disturbed for construction depends largely on the steepness of the slope. Depending on the soil permeability, pits may be lined with an impermeable material to contain the drilling fluids. If water is encountered while digging the reserve pit, a closed mud system, consisting of steel tanks, could be required. For oil base mud, closed systems are mandatory, and the mud and cuttings must be recycled or disposed of in an approved manner.

Moving a drill rig might require approximately 35 truck trips of construction equipment over public highways and private roads. Drill rigs for Coal Bed Natural Gas (CBNG) as compared to deep drilling rigs are smaller, require fewer loads, and are less structurally imposing.

Water for drilling and well completion may be hauled or piped to drilling locations. Water sources are usually commercial water sources or recycled water if drilling is below the surface casing and fresh water aquifer zones. When drilling commences, and as long as it progresses, water is

BLM_0020756

continually transported to the rig location. Roughly 5,000 barrels of water are required to drill and 23,000 barrels for completion operations for an oil or gas well to the depth of 9,000 feet or greater. Generally, water required for completion operations is recycled to the extent practical, More water would be required if circulation is lost, or permeable zones that cannot withstand the pressure of the drilling fluid are encountered.

## 4.4    Issuance of Rights-of-Way

Rights of way (ROW) are required for all facilities, tank batteries, pipelines, powerlines, and access roads that occupy federally owned land outside the lease or unit boundary. When a third party (someone other than the operator) constructs a facility or installation on or off the lease, a ROW is also required. The ROW is issued by BLM.

## 5.0    Drilling Operations

This section describes more conventional or traditional drilling operation techniques. BLM encourages the use of other new alternative construction and drilling techniques and technologies designed to limit environmental effects.

## 5.1    Rotary Drilling

Initially, drilling proceeds rapidly because of the less competent nature of shallow formations. Drilling is accomplished by rotating the drill string and putting variable weights on the bit located at the bottom of the string. While drilling, the derrick and associated hoisting equipment bear a majority of the drill string's weight. The combination of rotary motion and weight on the bit causes rock to be gouged away at the bottom of the hole. The rotary motion is created by a square or hexagonal rod, called a kelly, which fits through a square or hexagonal hole in a large turntable, called a rotary table. The rotary table sits on the drilling rig floor and as the bit advances, the kelly slides down through it. When the kelly has gone as deep as it can, it is raised, and a new piece of drill pipe about 30 feet in length is attached in its place. The drill pipe is then lowered, the kelly is reattached, and drilling recommences. When the bit becomes dull, it is necessary to "trip" the drill string and replace the bit. This is a time-consuming process of withdrawing 90-foot sections of the drill pipe until the bit is out of the hole. This process requires a large part of the total drilling time and could cause other hole problems. New bits constructed with modern metals and manufactured polycrystalline diamonds along with down hole mud motors have revolutionized drilling operations, whereby thousands of feet of hole can be drilled with one bit run. The mud motor is a positive displacement pump (moineau pump run in reverse) driven by high-pressure mud and is placed at the top of the bit to enable more rotational power to be transmitted to the bit and thus increase penetration rates.

Drilling mud is circulated through the drill pipe to the bottom of the hole, through the bit, up the annulus (i.e., the space around a pipe in a well bore) of the well, across a screen that separates the rock chips, and into holding tanks from which finer sediments settle from the mud before it is pumped back into the well. The mud is maintained at a required weight and viscosity to cool the bit, reduce the drag of the drill pipe on the sides of the hole, seal off any porous zones, contain formation fluids to prevent a blowout, and bring the rock chips to the surface for disposal. Various additives are used in maintaining the mud at the appropriate viscosity and weight. Most of the mud consists of bentonite. Some of the additives are caustic, toxic, or acidic, but these hazardous additives are used in small amounts during the drilling operations and later contained within the reserve pit.

BLM_0020757

Within the WRFO, drilling is usually accomplished with water or light mud to depths within about 1,000 feet of the prospective formation. Water and natural clays recovered during the drilling operation, or light drilling mud, allow fast drilling rates and the attendant reduction in mud chemicals. Once the bit reaches the target depth, the mud system is gradually made more sophisticated by addition of bentonite, chemicals, and natural weight materials to reduce water loss to the potential producing zones and to control the subsurface pressure. In almost all cases, the subsurface pressure is higher than an equivalent water column, and it is necessary to increase the mud weights to control the pressure and prevent a blowout or uncontrolled flow of formation fluids. Many wells are drilled in an underbalanced condition, whereby the mud pressure is slightly less than the formation pressure, which increases penetration rate and reduces the time on the well, or in the formations of interest. Drilling in this condition also reduces the potential of damaging the formation, with the attendant loss of flow capacity and recovery. The wells are always overbalanced for safety requirements when a bit trip is made, the well is logged, or the casing is installed.

Drilling operations are continuous, 24 hours a day, 7 days a week. The crews usually work three 8-hour shifts or two 12-hour shifts a day. Pickup trucks or cars are used for workers' transportation to and from the site. On remote isolated sites, a camp might be established to house the crews, which will reduce the travel requirements. Other operations, such as cementing, running casing, and rig maintenance will require road travel, sometimes with heavy equipment.

Upon completion of the drilling, a determination is made regarding the productive potential of the well. If oil or gas is not discovered in commercial quantities, the well is considered dry. The operator is then required to follow BLM procedures to properly plug the dry hole. The drill site and access road are then rehabilitated in accordance with the stipulations attached to the APD and the plugging approval. If the well is a producer, drilling rig operations continue until the production casing is cemented into the well before removing the drilling equipment from the location.

## 5.2   Logging

Geophysical logs are obtained by running various instruments into the hole on a wire cable. Logs are usually run at a depth point where casing will be installed. A log is not usually run before surface casing is set, but in most instances a log recording natural gamma radiation is run through the surface casing to determine the geology of that section. The logs can determine water resistivity, hydrocarbon saturations, natural gamma radiations, porosity of the rock by density, nuclear receptivity and sonic measurements, permeability, pressure, temperature, hole geometry, and subsurface track. Logs are used to evaluate whether the well is dry or has the potential for a satisfactory completion. Logs also delineate the various geologic horizons; hydrocarbon zones; fresh, usable, and unusable water; and sands, shales, limestone, coal, and other minerals. Logs are required to specify productive intervals so that they can be perforated and stimulated during the completion program. Normally in the WRFO, logs recording resistivity and a combined porosity log of density and nuclear receptivity are run in the well. The dual porosity logs are a direct indicator of gas because the measured values can be compared to provide contrasting porosit.

## 5.3   Casing

Various types of casing are placed in the drilled hole to enhance completion operations and safety. Casing is a string of steel pipe composed of approximately 40-foot lengths of pipe that are threaded together. Centralizers are attached to casing to ensure that the casing is centered in the hole. This practice improves the efficacy of cement jobs. Casing is cemented into the well to protect against migration of fluids along the annulus between the casing and the hole. Cementing isolates the formations so they can be completed and produced without interference from other zones containing

BLM_0020758

hydrocarbons or water. Hole deviation, depth, bore hole environment, placement of centralizers, and a myriad of other factors affect the integrity of the casing and cement job, and must be considered in the original design.

Surface casing that is properly set and cemented also protects surface aquifers from contamination by drilling and production operations. Surface casing should be set to a depth greater than the deepest fresh water aquifer that could be reasonably developed. Usable water could exist at great depths but these aquifers are not normally considered to be important water sources. Surface casing is designed to be large enough to allow subsequent strings of smaller casing to be set as the well is drilled deeper. Cement is placed in the annulus of the surface casing from casing shoe to ground level. The surface casing is the first string on which BOPE is installed. The BOPE allows the well to be shut in at any time that conditions warrant, protecting against unanticipated formation pressures and allowing safe control of the well. Blowout preventer equipment is tested and inspected regularly by both the rig personnel and the inspection and enforcement branch of BLM. Minimum standards and enforcement provisions are part of Onshore Order No. 2.

Casing strings subsequent to the surface string are required to be cemented 200 feet above the bottom of the previous string. In the WRFO, the annulus (i.e., the space around a pipe in a well bore) is required to be filled with sufficient cement to provide adequate protection from interzonal migration of unsuitable water and hydrocarbons. Production casing or production liner is designed to provide isolation of oil and gas formations, and a high-pressure conduit to the hydrocarbon zones that allows stimulation of these intervals to improve the productivity.

During completion operations, the production casing or liner is perforated into zones containing the oil or gas. In the WRFO, the low permeability character of the productive formations requires these zones to be "fracked" or stimulated by treated fresh water and large quantities of sand, which improves the productivity to an economic rate. Generally, two and up to five stimulation treatments can be accomplished in each well. Roughly 50 percent of the stimulation fluid is produced within a couple of days, and the rest over an extended period at low rates. Fracs stay within the simulated reservoir, which is important to maximize the enhanced productivity. After completion operations are finished, wellhead equipment, consisting of various valves and pressure regulators, is installed to control the oil or gas flow to the production facilities and to safely shut-in the well under any conditions.

## 5.4    Hydraulic Fracturing

Hydraulic fracturing is the process of creating small cracks, or fractures, in deep, underground geological formations to liberate oil or natural gas and allow it to flow up the well for capture. To fracture the formation, fracturing fluids – approximately 99.5 percent water and sand, with the remaining percentage chemical additives – are injected down the well bore into the formation. The fluid, injected under pressure, causes the rock to fracture along weak areas. These fractures typically range from 0.1 to 0.3 inches in width, 20 to 300 feet in height, and 300 to 1,500 feet in length. When the fractures are complete, and pressure is relieved, the fluids flow back up the well where they are captured and stored for later treatment or disposal. As the fluids flow back up, sand remains in the fractures and props the rock open. This allows the oil and gas to seep from the rock into the pathway, up the well and to the surface for collection. In Colorado, the targeted formations for hydraulic fracturing are often more than 7,000 feet underground, and some 5,000 feet below any drinking water aquifers.

The COGCC rules require that operators publicly disclose the ingredients and concentrations of fracturing chemicals for each well within 60 days of completion. That information is required to be

BLM_0020759

posted on the website www.fracfocus.org, which is searchable by county, operator and well. The website also provides information on chemicals used and their purpose. In addition, on May 4, 2012, the DOI released a draft rule requiring public disclosure of chemicals used in hydraulic fracturing and confirmation that wells used in fracturing operations meet appropriate construction standards.

## 5.5    Oil and Gas Exploratory Units

Surface use in an oil or gas field could be affected by unitization of the leaseholds. In areas of federal and mixed mineral ownership, an exploratory unit can be formed before a wildcat exploratory well is drilled. The boundary of the unit is based on geologic data and attempts to consolidate the interests in an entire structure or geologic play. The developers of the unit enter into an agreement to develop and operate as a single entity, regardless of separate lease ownerships. Costs and benefits are allocated according to agreed-upon terms. Development in a unitized field can proceed more efficiently than in a field composed of individual leases because competition between lease operators and drainage considerations is not a primary concern. Unitization also can reduce surface use requirements because all wells are operated as though under a single lease, and operations can be planned for more efficiency. Duplication of field processing facilities is eliminated, and consolidation of facilities into more efficient systems is probable. Unitization can also involve wider spacing than usual, or spacing based on reservoir factor rather than a set rule, which could result in fewer wells and higher recovery efficiency. Through planning, access roads are usually shorter and better organized, and facilities are usually consolidated.

## 5.6    Field Development

New field development is analyzed in an environmental assessment (EA) or environmental impact statement (EIS) after the sufficient confirmation wells are drilled. The operator generally can estimate the extent of drilling and disturbance required to extract and produce the oil and gas at that time. Many fields go through several development stages. A field can be considered fully developed, and can produce for many years when it is determined that a well can be drilled to a deeper pay zone, or a new interval is discovered to be economically attractive. In this case, there is typically less new disturbance because the old well bores or the old well pads are used for the new completions. A new stage of field development, such as infill drilling, can lead to increases in roads and facilities. All new construction, reconstruction, or alterations of existing facilities, including roads, flow lines, pipelines, tank batteries, or other production facilities must be approved by BLM and could require a new environmental document. Throughout field development, partial restoration and rehabilitation is required to reduce the surface impacts to the minimum required to produce the resource.

The most important factor in further development of an oil or gas field is the economics of production. When an oil or gas discovery is made, a well spacing pattern can be established before development drilling begins. This pattern is dependent on the current statewide or area wide spacing. Well spacing is regulated by COGCC, and factors considered in the establishment of a spacing pattern include data from the discovery well that translate into recovery efficiency. These data include porosity, permeability, pressure, composition of reservoir and fluids, depth of formations, well production rates, and the economic effect of the proposed spacing on recovery. These data are relatively sparse in the initial phase of development, and extended production permits refinement of these values. Because these data are so tentative, COGCC tends to define large spacing until the data are more conclusive. Spacing for oil wells usually varies from 40 to 320 acres per well but can be as small as 2.5 acres. Spacing for gas wells is generally from 160 to 640 acres per well, but can be as small as 10 acres if reservoir recovery efficiency dictates that

BLM_0020760

spacing. Spacing requirements can pose problems in selecting an environmentally sound location or in the cumulative impacts. Reservoir characteristics determine the most efficient spacing to achieve maximum recovery. If an operator determines that a different spacing is necessary to achieve maximum recovery, the State (with input from BLM) may grant exceptions to the spacing requirements.

# 6.0   Production

Gas, oil, and water are being produced in the WRFO by means of natural pressure (plunger lifts) and artificial lift (gas and electric pumping units and submersible pumps).

## 6.1   Gas Production

A typical gas well facility consists of methanol injection equipment (to keep production and surface lines from freezing), separator (which separates gas, oil, and water), dehydrator (uses glycol or calcium chloride to extract entrained water in the gas), and an orifice meter. An intermitter is sometimes used to either shut-in the well to build up pressure, or to blow the well down if it is being loaded with fluid. If the gas well is producing some oil or condensate, oil tanks are used to store the oil or condensate until it is sold by truck or pipeline. Pipeline quality gas at the wellhead requires a minimum of processing equipment. As the quality of gas decreases with the increased presence of water, solids, or liquid hydrocarbons, the amount of processing equipment increases. Water or liquid hydrocarbons in the gas are removed before the gas is sold, usually in the separation equipment near the wellhead. If liquid hydrocarbons are present, storage facilities (tank batteries) are required to store the liquids until they accumulate in sufficient quantities to be hauled out by large trucks. Gas dehydration equipment might also be onsite to remove water entrained in the gas to a water content defined by pipeline specifications. Gas production data can be found in the RFD scenario for oil and gas that was developed for the revised RMP.

Gas that occurs with oil is separated by collecting it into feeder lines leading to compressors that boost the pressure to the transportation system, venting or flaring. If enough casing head gas is separated to make it economical for marketing, a plant can be constructed to process the gas, or a pipeline can be constructed to carry the product to an existing plant. If the volume of casing head gas is insufficient to warrant treatment in a gas plant, it is usually used as fuel for pump engines in the field, or as heating fuel for the heater-treaters. Gas may be with written permission be flared or vented into the atmosphere if the quantity exceeds the fuel requirements on the lease but is not recoverable in commercial quantities.

## 6.2   Oil Production

In the WRFO, oil is generally produced using artificial lift methods (pump units). The oil production equipment, such as heater-treater, tank battery, and holding facility for production water, are either placed on a portion of the location (on cut rather than fill) and located a safe distance from the wellhead, or placed as a centralized facility that services a number of wells with pipeline connections. The heater treater and tanks are surrounded by earthen dikes to contain accidental spills. Either all the facilities or only the produced water pit (if present) will be fenced. Production facility colors are required to be from the standard color chart and are specified in the APD COAs.

Production from several wells on one lease can be carried by pipeline to a central tank battery. Use of a central tank battery can depend on whether the oil is from the same formation, the same lease ownership, or multiple lease ownerships and formations, or whether a commingling agreement is approved. Because of the nature of the oil, adequate separation of oil and water is only obtained

BLM_0020761

through applications of heat. The fluid stream arrives at a separator point where the flash gas is taken off. In most cases, this flash gas is used for lease operations. The remainder of the flash gas is either compressed and sold or flared. Flash gas is defined as solution gas liberated from the oil through a reduction in pressure. Water and oil are also being separated at this point by gravity segregation. The oil is sent to storage tanks, and the water is sent to a disposal or injection facility. Two main methods of oil measurement used in the WRFO are lease automatic custody transfer units and tank gauging. Measurement is required by 43 CFR 3162.7-2 and Onshore Order No. 4 to ensure proper and full payment of federal royalty.

Oil wells can be completed as flowing (those wells with sufficient underground pressure to raise the oil to the surface), or if the pressure is inadequate, they are completed with the installation of subsurface pumps. The subsurface pumps are usually mechanically powered by a pumping unit. Pumping units come in a variety of sizes, the larger ones reaching a height of 30 to 40 feet. The units are powered by internal combustion engines or electric motors. Fuel for the engines may be casing head gas or propane. In cases where large volumes of water are produced with the oil, electric submersible pumps can be installed. These pumps could produce up to 6,000 barrels of fluid per day at an oil cut of ½ of 1 percent oil. Oil production data can be found in the RFD scenario for oil and gas that was developed for the revised RMP.

## 6.3   CBNG Production

Coalbed natural gas production combines high water production rates of some oil fields with low-pressure operations of some gas fields. Because of the reservoir characteristics of coal, high water production rates are initially required to dewater the reservoir and allow gas to be liberated from cleat surfaces (i.e., the vertical cleavage in coal seams) within the coal. In a coal reservoir, gas is primarily trapped on the face of the coal within the cleat system by molecular attraction. Pressure must be reduced to liberate the gas molecules from the coal face. The production history shows that water production rates begin high, with little or no gas. The water rate then drops at a constant rate, with increasing gas rates until a maximum gas rate is achieved relative to the original gas saturation and reservoir pressures. The gas rate then declines to the economic limit. This process is the exact opposite of that associated with most oil and gas production, which starts at high hydrocarbon rates and low water rates and advances to low hydrocarbon rates and high water rates. The reservoir depths of CBNG production are generally shallow (less than 5,000 feet) compared with most oil and gas production in the WRFO. The depth limit is based on coal permeability, which is highly sensitive to overburden weight. A CBNG operation usually consists of a high-capacity submersible or progressive cavity pump, with water produced out of the tubing, and low-pressure gas produced out of the casing. Centralized facilities collect the gas for compression to pipeline pressures and the water for disposal. Electric power is usually used to power the well pumps and is connected to the well by a subsurface cable laid with the water and gas lines. The producing well pad is very small, with only the wellhead and an insulating house to cover the wellhead. The centralized production facilities contain well header buildings where the individual well gas is measured, and where house collection tanks, injections wells, and pumps for disposal of the water as well as multistage compressors that bring the very low pressure gas to sales line pressure. Sometimes the water can be disposed of in the local drainages if the Colorado Department of Public Health and Environment, Water Quality Control Division (CDPHE) and the BLM approve this type of disposal. Currently in the WRFO, CBNG production is in its infancy, and little history is available regarding its economics and production rates. The RFD has further discussions on pilot projects, production, and the future prognosis of CBNG development within the WRFO.

BLM_0020762

## 6.4    Water Production

Produced water associated with oil, gas, or CBNG is disposed of by trucking or piping the water to an authorized disposal pit, placing the water in lined pits, discharging the water into surface drainages, or through subsurface injection. Water disposal is controlled by the COCGG for subsurface disposal and secondary recovery purposes. The quality of the water often dictates the appropriate disposal method, and CDPHE has primacy through the Environmental Protection Agency (EPA) to approve surface disposal of this water. Produced water is also used in enhanced recovery projects. The RFD contains further discussions on produced water production rates.

## 6.5    Production Problems

Weather extremes pose problems for producers by causing roads to become impassable, equipment to malfunction, and flow lines, separators, and tanks to freeze up. Other problems producers may encounter in the area are production of $H_2S$, $CO_2$, and paraffin; corrosion; electrolysis; and broken flow lines

## 6.6    Secondary and Enhanced Oil Recovery

Gas reservoirs typically have no secondary recovery associated with the recovery of gas because natural gas is produced by expansion resulting from the reduction of reservoir pressure. A high reservoir recovery factor can be expected from this expansion process unless the reservoir is of such low permeability that economics becomes a factor in the recovery efficiency. Economics is a determining factor because of the expense of operating compression facilities to reduce the reservoir pressure to the minimum.

Secondary recovery in coal reservoirs has been tested in the San Juan Basin and found to be technically feasible. This recovery process involves the molecular replacement of natural gas by $CO_2$ or nitrogen, and has also been touted as a method of sequestering $CO_2$ to remove the greenhouse gas from the atmosphere. An oil reservoir typically contains oil, gas, and water trapped within the rock matrix under pressure. Because of the pressure, much or all of the gas is dissolved in the oil. "Primary drive" is accomplished by expanding gas in solution, which forces oil out of the reservoir into the well and up to the surface. Oil flowing out of the reservoir drains energy from the formation and the primary drive diminishes. To keep oil flowing in the reservoir, pressure drawdown is required, and subsurface pumps could be used to lift oil to the surface. As reservoir pressures continue to drop, solution gas in the oil escapes, forming bubbles in the pore space. These bubbles further retard the flow of oil and increase the gas saturation and the flow of solution gas. This process accelerates as the pressure declines, and at some point, production rates become uneconomical, with as much as 80 percent of the original oil remaining in the reservoir. Currently, in the United States, primary oil recovery accounts for less than half of the current oil production. The remaining oil is produced by secondary and enhanced recovery techniques.

Two basic secondary recovery methods are in use—water flooding and displacement by gas. The preferred secondary recovery method is water flooding, which involves injecting water into oil reservoirs to maintain or increase pressure. The process is usually most efficient when the pressure has not fallen to the point where the reservoir is highly saturated with gas. Reservoir heterogeneity in the form of fractures, directional permeability, and thin zones could limit the success of this process.

The process of injecting gas is a less popular secondary recovery technique. Historically, produced gas was considered a waste product and was flared (burned) at the point of production. Later, it was

BLM_0020763

recognized that the energy could be conserved and the recovery of oil increased if the produced gas was reinjected into the reservoir. Increased production was achieved by maintaining reservoir pressure by injecting the gas into the existing gas cap and also by injecting the gas directly into the oil-saturated zone, creating an immiscible gas drive that displaced the oil. To achieve miscibility, the reservoir must have reasonably high pressures and temperatures and contain high-gravity oil. Many gas injection projects use the water and gas (WAG) process, which is injecting water and gas alternately to achieve better contact with the oil within the reservoir. Currently, the high price and demand for natural gas has precluded this type of secondary recovery.

The term "enhanced recovery" is used to describe recovery processes other than the more traditional secondary recovery procedures. These enhanced recovery methods include thermal, chemical, and miscible (mixable) drives. Currently, no enhanced recovery techniques are being implemented within the WRFO, but it is unknown whether these techniques could be applicable in the future based on economics and new discoveries.

Some reservoirs contain large quantities of heavy oil that cannot be produced using normal or secondary methods. These reservoirs can be stimulated by thermal drive processes in which heat is introduced from the surface or developed in place in the subsurface reservoir. In the surface introduction process, hot water or steam is injected. Raising the temperature of heavy oil reduces the viscosity and makes the oil more mobile. Thermal recovery techniques are not likely to be tried in the WRFO because the oils in this area are not heavy oils. In the in-situ process, both heavy and light oils can be processed. Spontaneous or induced ignition within the reservoir is induced by injected air to develop a fire front that burns the hydrocarbons. Evaporation of the lighter ends immediately ahead of the fire front, and later condensation is the primary recovery mechanism. The remaining hydrocarbons are consumed by the fire and are generally not considered of any value. These techniques are very expensive and must have large reserves and thick pay zones to be economical. It is unlikely these techniques will be used within the WRFO in the immediate future unless new discoveries are made.

Several chemical drive techniques are currently in use, including polymer flooding, caustic flooding, and surfactant-polymer injection. These methods attempt to change reservoir conditions to allow recovery of additional oil. Caustic and surfactant-polymer flooding have not been economical in the past, and unless a breakthrough in technology is achieved, these techniques will probably not be considered during the planning period. Polymer flooding is an economically viable process but is used mainly in viscous reservoirs with high permeability. Currently, no such reservoirs exist in the WRFO but future discoveries could be made.

## 6.7   *Gas Storage*

Pipeline-quality gas can be stored in good quality reservoirs with sufficient sealing parameters. This gas is pumped into the reservoir during nonpeak, usually lower priced time periods, and then pumped out into the transmission lines at times of peak demand and higher prices. The price differential pays for the governmental fees required the use of the storage reservoir and the injection/compression costs required to store and retrieve the gas. Gas storage also serves as a buffer for cold periods when demand is high and levels out the summer slack period of production. There are no active gas storage reservoirs within the WRFO.

BLM_0020764

# 7.0    Plugging and Abandonment Of Wells

The purpose of plugging and abandoning a well is to prevent fluid migration between zones, to protect mineral and water resources from damage, and to restore the surface area. Each well must be handled individually because of a combination of factors, including geology, subsurface well design, and specific rehabilitation concerns; therefore, only minimum requirements can be established, and these must be modified for individual wells.

The first step in the plugging process is the filing of the Notice of Intent to Abandon. This notice is reviewed by both the SMA and WRFO petroleum engineer. The notice must be filed and approved before plugging a previously producing well. Verbal plugging instructions can be given for plugging current drilling operations, but a notice must be filed after the work is completed. If usable fresh water was encountered while the well was being drilled, the SMA may be allowed, if interested, to assume future responsibility for the well, and the operator will be reimbursed for the attendant costs. This assumption of responsibility becomes effective after the deeper zones are plugged back to the usable water zone. Usually the operator is more than satisfied to remove the surface reclamation liability and will not charge for the remaining well equipment.

The operator's plan for securing the hole is reviewed. The minimum requirements, as stated in Onshore Order No. 2, are as follows: In open hole situations, cement plugs must extend at least 50 feet above and below zones that have fluid with the potential to migrate, zones of lost circulation (this type of zone could require an alternate method to isolate it), and zones of potentially valuable minerals. Thick zones may be isolated using cement plugs across the top and bottom of the zone. In the absence of productive zones and minerals, long sections of open hole may be plugged with cement plugs placed every 3,000 feet. In cased holes, cement plugs must be placed opposite perforations and extending 50 feet above and below, except where limited by plug back depth. The length of the plug is 100 feet plus 10 percent per 1,000 feet (i.e., at 10,000 feet). The plug will be 200 feet long.

Cement plugs could be replaced with a cement retainer, if the retainer is set 50 feet above the open perforations and the perforations are squeezed with cement. A bridge plug could also be used to isolate a producing zone and must be capped, if placed through tubing, with a minimum of 50 feet of cement. If the cap is placed using a dump bailer, a minimum of 35 feet of cement is required. A dump bailer is an apparatus run on wire line to convey the cement to the bottom of the hole. In the event that the casing has been cut and recovered, a plug is placed 50 feet within the casing stub, and the 100 feet plus 10 percent per 1,000 feet rule is used for the space above the cutoff point. In all cases, a plug is set at the bottom of the surface casing that has a volume of cement using the 100 feet plus 10 percent per 1,000 feet rule. This could require perforating the casing and circulating or squeezing cement behind the production casing if that casing is not removed. Annular space at the surface will be plugged with 50 feet of cement using small-diameter tubing or by perforating and circulating cement.

If the integrity of a plug is questionable, or the position is extremely vital, it can be tested with pressure or by tagging the plug with the tubing or drill string. Tagging the plug involves running a pipe into the hole until the plug is encountered, and placing a specified amount of weight on the plug to verify its placement and competency. The surface plug within the casing must be a minimum of 50 feet. The interval between plugs must be filled with mud that will balance the subsurface pressures, and if this balance point is unknown, a minimum of 9 pounds per gallon is specified. After the casing has been cut off below the ground level, any void at the top of the casing must be filled with cement. If a metal plate is welded over the top of the casing, a weep hole is placed in the plate. A permanent abandonment marker is required on all wells unless otherwise

BLM_0020765

requested by the SMA. This marker pipe is usually at least 4 inches in diameter, 10 feet long, 4 feet above the ground, and embedded in cement. The pipe must be capped with the well identity and location permanently inscribed.

The SMA is responsible for establishing and approving methods for surface rehabilitation, and determining when this rehabilitation has been satisfactorily accomplished. With satisfactorily rehabilitation, a Subsequent Report of Abandonment is approved, and the well bond is released.

BLM_0020766

BLM

### Appendix I

# Master Leasing Plans



**Public Lands USA: Use, Share, Appreciate**

BLM_0020767

BLM_0020768

# Table of Contents

**Page**

1.0 INTRODUCTION ..................................................................................................... 1

2.0 MASTER LEASING PLANS SUBMITTED BY CITIZEN GROUPS ........................... 3

    2.1 MLP Nominated Areas Criteria Analysis ......................................................................... 3

    2.2 Resource Concerns Addressed In the RMPA .................................................................... 4

        2.2.1 Air Quality ............................................................................................................ 5

        2.2.2 Soil and Water Resources ..................................................................................... 5

        2.2.3 Remnant Vegetation Associations, Old Growth Pinyon-Juniper Stands, and Special Status Plant Species ................................................................................. 6

        2.2.4 Big Game ............................................................................................................. 6

        2.2.5 Raptors ................................................................................................................. 7

        2.2.6 Greater Sage-Grouse ............................................................................................ 7

        2.2.7 Migratory Birds .................................................................................................... 7

        2.2.8 Fish ...................................................................................................................... 8

        2.2.9 Black-footed Ferrets and White-tailed Prairie Dogs ............................................ 8

        2.2.10 Cultural Resources ............................................................................................... 8

        2.2.11 Paleontological Resources .................................................................................... 9

        2.2.12 Visual Resources .................................................................................................. 9

        2.2.13 Special Designations & Other Areas ..................................................................... 9

        2.2.14 Reclamation ....................................................................................................... 11

3.0 THE RMPA/EIS AND ANALYSIS OF MASTER LEASING PLANS ........................ 11

    3.1 Stipulations .................................................................................................................. 12

    3.2 Phased Leasing ............................................................................................................. 12

    3.3 Threshold Concept ....................................................................................................... 12

    3.4 Reduction of Emissions and Three-Phase Gathering ..................................................... 12

    3.5 Multiple Wells Per Pad ................................................................................................. 12

4.0 SUMMARY ........................................................................................................... 13

BLM_0020769

**Appendix I – Master Leasing Plans**

## List of Tables

Table I-1     Acres Managed with Conditions of Approval and Lease Stipulations for Alternatives A through D within the Eastern Book Cliffs/Piceance Basin MLP.................................................................................................................I-5

Table I-2     Acres Managed with Conditions of Approval and Lease Stipulations  for Alternatives A through D within the Dinosaur Lowlands MLP.............................I-5

Table I-3     Areas Emphasized in the Eastern Book Cliffs/Piceance Basin and Dinosaur Lowlands MLP Recommendations ........................................................................I-9

## List of Maps

Map I-1     Master Leasing Plans Submitted by Citizen Groups

BLM_0020770

# 1.0    Introduction

The Master Leasing Plan (MLP) concept, introduced in May 2010 via the Washington Office's Oil and Gas Leasing Reform Instruction Memorandum (IM) 2010-117, promotes a proactive approach to planning for oil and gas development. Generally, the BLM uses RMPs to make oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values and reasonably foreseeable oil and gas development scenarios. However, this policy acknowledged that additional planning and analysis may be necessary in some areas prior to new oil and gas leasing because of changing circumstances, updated policies, and new information. To determine whether or not circumstances warrant additional planning and analysis, WO-IM-2010-117 lists numerous criteria to be considered. Specifically, the BLM must prepare an MLP when all four of the following criteria are met:

- A substantial portion of the area to be analyzed in the MLP is not currently leased;

- There is a majority Federal mineral interest;

- The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.

- Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are:

    o    Multiple-use or natural/cultural resource conflicts;

    o    Impacts to air quality;

    o    Impacts on the resources or values of any unit of the National Park System, national wildlife refuge, or National Forest wilderness areas, as determined after consultation or coordination with the NPS, the FWS, or the FS; or

    o    Impacts on other specially designated areas.

The BLM has the discretion to complete an MLP for areas that do not meet the MLP criteria. For example, even though a substantial portion of an area is already leased or an area lacks a majority Federal mineral interest, additional analysis of measures to resolve potential resource conflicts may benefit future leasing decisions.

The MLP process entails analyzing likely development scenarios and varying levels of protective design features and/or mitigation measures in a defined area with greater detail than a traditional RMP allocation analysis but at a less site-specific level than a development plan that has been fully defined by an operator.

The following are examples of the kinds of decisions that may be made as a result of preparation of an MLP:

- Stipulations (No Surface Occupancy, Timing Limitation, and Controlled Surface Use);

- Phased leasing;

- Planned or required unitization of Federal lands;

- Phased development;

BLM_0020771

- Caps or limits on new surface disturbance (pending acceptable interim and final reclamation);

- Use of existing infrastructure;

- Multiple wells per pad;

- Requirements to reduce or capture emissions;

- Liquids gathering systems to centralized offsite production facilities;

- Placement of all linear disturbances (e.g., pipelines and power lines) in corridors;

- Extensive interim reclamation of roadway disturbance up to or including the road surface and reclamation of pads to the well head; and

- Final reclamation fully restoring the landform and re-establishing the native plant community.

Because the WRFO began this planning process in 2006 and had prepared the majority of the document prior to the adoption of WO-IM-2010-117, the phrase "Master Leasing Plan" is generally absent from the Draft RMPA/EIS. However, since the focus of this amendment is oil and gas development, the alternatives analyzed capture, in detail, the requirements of an MLP for the entire resource area.

Chapter 2 discusses the following four alternatives:

- Alternative A is the No Action Alternative which retains present management goals, objectives, and direction however it would update the 20-year development projection from the 1997 White River ROD/RMP and consider development of up to 550 well pads.

- Alternative B incorporates a managed development approach that offers operators incentives for concentrated development and emphasizes conservation and protection of other resources concurrently with oil and gas production associated with up to 1,100 well pads.

- Alternative C is similar to Alternative B in that it incorporates a managed development approach but with higher disturbance thresholds and more exceptions to lease stipulations to accommodate the development of up to 1,800 well pads.

- Alternative D emphasizes the production of oil and gas resources (up to 2,550 well pads) under environmental protection afforded by applicable laws, regulations, and BLM policy.

Chapter 3 provides an overview of the current conditions of the resources and resource uses managed by the WRFO. The characterization of the resource/resource use includes the indicators that assess the resource condition, trends that express the direction of change between the present and some point in the past, and forecasts that predict changes in the condition of resources given current management.

Chapter 4 evaluates how each alternative will impact the environment and the various resources/resource uses managed by the WRFO.

BLM_0020772

## 2.0   Master Leasing Plans Submitted by Citizen Groups

In August 2010, the Wilderness Society, the Southern Utah Wilderness Alliance, the Center for Native Ecosystems, and the Colorado Environmental Coalition submitted recommendations that the BLM prepare an Eastern Book Cliffs/Piceance Basin MLP and a Dinosaur Lowlands MLP. The Eastern Book Cliffs/Piceance Basin MLP proposal encompasses 847,500 acres within areas managed by the WRFO and the Vernal Field Office (VFO). The Dinosaur Lowlands MLP proposal encompasses 999,400 acres within areas managed by the WRFO, the VFO, and the Little Snake Field Office (LSFO). The following discussion concerns only those areas that are managed by the WRFO (see Map I-1). For the remaining acreage, any interested parties should contact the VFO or the LSFO.

## *2.1   MLP Nominated Areas Criteria Analysis*

### Criterion #1: A substantial portion of the area to be analyzed in the MLP is not currently leased.

Neither the Eastern Book Cliffs/Piceance Basin MLP nor the Dinosaur Lowlands MLP meets this criterion. Within the Federal mineral estate acreage of the Eastern Book Cliffs/Piceance Basin MLP, 421,030 acres are leasable minerals and 18,250 acres are closed to leasing. Of those leasable acres, 328,320 acres (78 percent) are currently leased for oil and gas development.

Of the Federal mineral estate acreage included in the Dinosaur Lowlands MLP, 526,270 acres are leasable minerals (not including federal minerals associated with surface managed by the National Park Service) and 38,950 acres are closed to leasing. Of those leasable acres, 314,890 acres (60 percent) are currently leased.

### Criterion #2: There is a majority Federal mineral interest.

Both the Eastern Book Cliffs/Piceance Basin MLP and the Dinosaur Lowlands MLP meet this criterion. The WRFO has jurisdiction over 459,960 acres in the Eastern Book Cliffs/Piceance Basin MLP and manages 439,280 acres (96 percent) of Federal mineral estate. Within the Dinosaur Lowlands MLP, the WRFO has jurisdiction over 666,250 acres, including 565,220 acres (85 percent) of Federal mineral estate.

### Criterion #3: The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.

Both the Eastern Book Cliffs/Piceance Basin MLP and the Dinosaur Lowlands MLP meet this criterion. As stated above, substantial portions of both areas have already been leased for oil and gas development. All of the Eastern Book Cliffs/Piceance Basin MLP and a considerable amount of the Dinosaur Lowlands MLP (71 percent) are considered to have high potential for oil and gas. The RFD Scenario prepared for the 1997 White River RMP forecasted that 67 percent of development would occur in the Douglas Creek arch (which is in the Eastern Bookcliffs/Piceance Basin MLP) and 3 percent would occur in the Rangely Field (which is in the Dinosaur Lowlands MLP). There are several established oil and gas fields within these areas. There are over 900 producing wells within the Eastern Book Cliffs/Piceance Basin MLP (in the area South of Rangely). Within the Dinosaur Lowlands MLP, there are over 550 producing wells (mostly confined to the Coal Oil Basin area and the White River Dome area). Industry continues to express interest in leasing within the MLP areas and has nominated parcels for leasing as recently as the May 2011 lease sale.

BLM_0020773

**Criterion #4: Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are multiple use or natural/cultural resource conflicts; impacts to air quality; impacts on the resources or values of any unit of the National Park System; or impacts on other specially designated areas.**

Both the Eastern Book Cliffs/Piceance Basin MLP and the Dinosaur Lowlands MLP meet this criterion. The two external MLP proposals focused primarily on concerns regarding wildlife, cultural resources, special status plant species, and lands within Citizen Wilderness Proposals (CWP), ACECs, Colorado National Heritage Program (CNHP) Potential Conservation Areas, Colorado Natural Areas Program (CNAP) Natural Areas, and Colorado State Wildlife Areas (SWA). According to WO-IM-2010-117, other important national and local resource issues that should be considered when developing an MLP include air quality, Special Recreation Management Areas, paleontological resources, visual resources, watershed conditions (including steep slopes and fragile soils), municipal watersheds, public health and safety, and the ability to achieve interim and final reclamation standards.

## 2.2   Resource Concerns Addressed In the RMPA

The White River Oil and Gas Development Draft RMPA/EIS addresses resource concerns through extensive analysis and balances various levels of protection with energy development across the four alternatives. More detailed information and further discussion can be found in Chapter 4 of the Draft RMPA/EIS. It is important to note, however, that much of the analysis within Chapter 4 focuses on the MPA since 95 percent of future development is expected to occur there over the next 20 years. The majority of both the Eastern Book Cliffs/Piceance Basin MLP (95 percent) and Dinosaur Lowlands MLP (87 percent) are outside of the MPA and thus are expected to experience much lower levels of development. (For example, for the remaining acreage within the WRFO outside of the MPA, it is expected that there may be up to 28 well pads under Alternative A, up to 55 well pads under Alternative B, up to 90 well pads under Alternative C, and up to 128 well pads under Alternative D.) It should also be noted that revisions to decisions on the acreage of lands available for oil and gas leasing and the designation of new Wilderness, Wilderness Study Areas (WSA), ACECs, or other special designations were considered to be outside the scope of this planning effort. The following discussion summarizes some of the key elements of the comprehensive management actions being considered within the two proposed MLP areas. For an inclusive list of management actions being considered under each alternative, refer to Chapter 2 (Tables 2-1 through 2-22).

Tables I-1 and I-2 show, by alternative, the amount of acreage that is open to leasing with standard lease terms, open to leasing with CSU stipulations, open to leasing with TL stipulations, and open to leasing with NSO stipulations within both the Eastern Book Cliffs/Piceance Basin and the Dinosaur Lowlands MLPs. The acreage shown in this table is based on the hierarchy described in the Impact Analysis Overview (Chapter 4, Section 4.1.2) I-1 which basically represents the most restrictive condition of approval or lease stipulation for any given area (essentially that NSO trumps CSU and CSU trumps TL) and thus will not add up to the amount of acreage described for stipulations associated with individual resources as described in Chapter 2 or Appendix A.

BLM_0020774

**Table I-1. Acres Managed with Conditions of Approval and Lease Stipulations for Alternatives A through D within the Eastern Book Cliffs/Piceance Basin MLP**

| Alternative | Total Leasable Acres | No Surface Occupancy | Controlled Surface Use | Timing Limitation | Open |
|---|---|---|---|---|---|
| A | 421,030 | 19,100 | 184,130 | 106,430 | 111,370 |
| B | 421,030 | 158,810 | 116,770 | 145,450 | 0 |
| C | 421,030 | 79,830 | 135,520 | 205,680 | 0 |
| D | 421,030 | 50,530 | 156,960 | 104,380 | 109,160 |

**Table I-2. Acres Managed with Conditions of Approval and Lease Stipulations for Alternatives A through D within the Dinosaur Lowlands MLP**

| Alternative | Total Leasable Acres | No Surface Occupancy | Controlled Surface Use | Timing Limitation | Open |
|---|---|---|---|---|---|
| A | 526,270 | 52,930 | 204,740 | 134,600 | 134,000 |
| B | 526,270 | 267,930 | 81,900 | 176,440 | 0 |
| C | 526,270 | 111,710 | 144,700 | 269,860 | 0 |
| D | 526,270 | 66,730 | 175,000 | 151,420 | 133,120 |

## 2.2.1 Air Quality

Management actions related to air quality can be found in Chapter 2, Table 2-1. There are several management actions under consideration that would minimize impacts to air quality including the following requirements:

- achievement at least 50 percent fugitive dust control effectiveness on all roads and treatment of locations so that no dust plume is visible during construction or drilling activities;
- use of green completion technology for all well completions and recompletions;
- emissions controls for glycol dehydrators (90 percent reduction) and condensate and produced water tanks (95 percent reduction);
- all new and existing drill rig engines would meet EPA Tier 4 standards;
- new engines at field compression stations would meet CDPHE AQCC Regulation No. 7 emission standards; and
- between 40 and 90 percent of all well pads would use three-phase gathering systems.

## 2.2.2 Soil and Water Resources

Management actions related to soil and water resources can be found in Chapter 2, Table 2-2. Fragile soils; landslide or unstable soils, saline soils; areas within identified 100 year flood plains; areas within 500 feet of perennial waters, springs, or wetlands; areas within 100 feet of ephemeral channels; landslide areas; and slopes greater than 35 percent would all be protected through the use of either a CSU or NSO stipulation (except for saline soils within the Coal Oil Basin exemption area). Additionally, development in designated surface and groundwater source water protection zones for public water supplies would require a plan that addresses drinking water sources and

BLM_0020775

alternatives for methods for disposing of produced water from oil and gas development are considered.

## 2.2.3 Remnant Vegetation Associations, Old Growth Pinyon-Juniper Stands, and Special Status Plant Species

Management actions related to vegetation and special status plant species can be found in Chapter 2, Tables 2-3 and 2-10. Identified ponderosa pine stands and unique or ecologically intact sagebrush communities would be managed as remnant vegetation associations with an NSO stipulation. New pipelines in mature pinyon-juniper woodland communities and old growth stands would be required to be located in previously authorized areas of disturbance (Alternatives B and C). Additionally, old growth stands and areas with high potential for old growth would be managed with either NSO or CSU stipulations (Alternatives B and C) and as either exclusion or avoidance areas for land use authorizations.

Management of special status plant species varies depending on whether the plants are federally listed or are BLM sensitive species. At a minimum, occupied habitat for listed plant species are protected by an NSO stipulation. Occupied habitat for BLM sensitive plants is also protected through the use of NSO or CSU stipulations. In addition, under Alternatives B, C, and D, these protections for special status plant habitat include buffers of 329 feet (for BLM sensitive species) or 656 feet (for listed species) from the edge of habitat. Habitat for listed plant species would be exclusion areas for new ROW authorizations.

## 2.2.4 Big Game

Management actions related to big game can be found in Chapter 2, Table 2-4. Both the Eastern Book Cliffs/Piceance Basin and Dinosaur Lowlands MLP provide diverse seasonal ranges for big game including summer range, winter range, and severe winter range. Under Alternatives B and C, the BLM would provide habitat of sufficient utility and suitability to sustain at least 90 and 70 percent, respectively, of the CDOW's long-term big game population objectives. In order to achieve these goals, while allowing for oil and gas development, the RMPA includes various management actions designed to minimize long-term habitat loss while also minimizing indirect impacts associated with displacement or physiological stress to animals due to human activity within an area.

In regards to habitat loss, reductions in essential winter forage bases would be minimized by limiting cumulative treatment of suitable sagebrush forage types on deer winter ranges and pronghorn overall ranges. In addition to standard reclamation measures, special reclamation components or techniques may be required in order to restore or provide supplemental forage species (e.g., deciduous browse). Additionally, a mitigation fund would be established with industry contributions in order to fund wildlife specific mitigation projects.

To address impacts associated with human activity during critical times of the year, all seasonal ranges within the WRFO would be subject to timing limitations that could extend up to 120 days. However, in an effort to encourage clustered development (and thus a reduction in both habitat loss and the extent of the area impacted by activity), exceptions to timing limitations would be offered contingent on development remaining within defined thresholds. In addition to protective measures applied to seasonal ranges (e.g., winter range, summer range), the BLM would also impose modified siting of surface facilities and up to a 60-day deferment of activities within wildlife movement corridors that animals use to travel between and within seasonal ranges. Utility corridors would be designed to reduce the need for regular vehicular access for inspection and the ROW

BLM_0020776

holder would be required to effectively preclude all subsequent vehicle travel along the ROW throughout the term of the grant or lease. In areas of concentrated development, vehicle use on BLM road networks would be temporarily limited to that associated directly with oil and gas development, production, and maintenance. These use limitations (in concert with road abandonment) would be used to limit effective road densities to 1.5 miles per square mile in higher value big game habitat and 3 miles per square mile on other big game ranges.

## 2.2.5  Raptors

Management actions related to raptors can be found in Chapter 2, Tables 2-4 and 2-9. Raptor nests and bald eagle roost sites are protected by both NSO and TL stipulations. To minimize other sources of mortality, the BLM requires power lines be designed to prevent raptor electrocution and that physical barriers (e.g., nets) are used to prevent contact with stored fluids in pits. Relocations of facilities and design modifications would be used to reduce the long-term reduction in the extent and continuity nest and foraging habitat within aspen, spruce-fir, Douglas-fir, and mature pinyon-juniper woodland communities.

## 2.2.6  Greater Sage-Grouse

Management actions related to greater sage-grouse can be found in Chapter 2, Table 2-6. The Colorado Greater Sage-Grouse Conservation Plan (Colorado Greater Sage-Grouse Steering Committee 2008) identified "core refuge areas". The only "core refuge area" within the WRFO is associated with the Northwest Colorado population on Blue Mountain. The "core refuge area" from the statewide conservation plan identified approximately 66,830 acres (of federal mineral estate) within the Dinosaur Lowlands MLP. Under Alternatives B and C, the BLM would defer oil and gas leasing decisions on about 96,100 acres of sage-grouse habitat on Blue Mountain until the effects of oil and gas development on sage-grouse behavior and habitat utility are sufficiently understood so as to allow for management of energy development in a manner that would maintain viable populations of sage-grouse.

Seasonal timing limitations would apply for both winter concentration areas and nesting/early brood habitat unless operators qualified for an exception by working within the disturbance threshold criteria. Sage-grouse thresholds would be considered separately but would also be integral with the more expansive big game summer range thresholds. Alternative management actions for lek sites include continued use of the 0.25 mile NSO, a 0.6 mile NSO, locating facilities beyond line-of-sight, and/or use of either a seasonal or daily timing limitation.

## 2.2.7  Migratory Birds

Management actions related to migratory birds can be found in Chapter 2, Table 2-7. To reduce long-term habitat loss, facility and ROW siting would either avoid or minimize the involvement (i.e., surface occupancy and vegetation clearing) of habitat associations identified as either having higher value for nesting migratory birds (e.g., mature arboreal oak brush, riparian, spruce-fir, aspen, mature pinyon-juniper, Wyoming and mountain big sagebrush communities) or localized parcels that support BLM sensitive species or FWS Birds of Conservation Concern (e.g., mat/Gardner saltbush or Utah juniper/black sagebrush). To minimize disruption of migratory bird nesting activities, vegetation clearing, facility construction, and concentrated operation activities would avoid the core nesting season.

As mentioned above under raptors, physical barriers would be used to prevent contact with stored fluids in pits.

BLM_0020777

## 2.2.8  Fish

Management actions related to fish can be found in Chapter 2, Tables 2-8 and 2-9. The Dinosaur Lowlands MLP contains designated critical habitat for the Colorado pikeminnow (i.e., the 100-year floodplain of the White River below Rio Blanco Lake) which would be managed with an NSO stipulation. For other sensitive fish species, the BLM would consider a variety of management actions to minimize impacts to habitat including: recognizing stream restoration on private lands in the context of habitat banking; specialized reclamation techniques; pursuing agreements to increase in-stream flows; and applying restorative measures to existing oil and gas facilities that have the potential to reduce the extent or quality of habitat available. In addition, as noted above under Soil and Water Resources, areas within identified 100 year flood plains or within 500 feet of perennial waters, springs, or wetlands would all be protected through the use of either a CSU or NSO stipulation.

## 2.2.9  Black-footed Ferrets and White-tailed Prairie Dogs

Management actions related to black-footed ferrets and white-tailed prairie dogs can be found in Chapter 2, Table 2-9. Both the Wolf Creek and Coyote Basin black-footed ferret management areas are located within the Dinosaur Lowlands MLP. Under Alternatives B and C, approximately 6,000 acres along Snake John Reef would be identified as part of WRFO's ferret management areas. Within these areas, CSU stipulations would be applied under Alternatives A, C, and D (except Snake John Reef).

Since black-footed ferrets are dependent upon prairie dogs as a prey base, management actions that benefit prairie dogs also benefit ferrets. Under Alternative B, areas within 0.5 mile of prairie dog colonies would be subject to an NSO stipulation (except for the Coal Oil Basin Exemption Area). Timing limitations would be used to limit disturbance to prairie dogs during the breeding and young-rearing period. There would also be times of the year when seismic activity would be avoided on prairie dog colonies.

## 2.2.10  Cultural Resources

Management actions related to cultural resources can be found in Chapter 2, Table 2-12. The Canyon Pintado National Historic District (CPNHD; 16,040 acres) is located within the Eastern Bookcliffs/Piceance Basin MLP. It would continue to be managed as an avoidance area for major new rights-of-ways and mineral material sales would not be allowed. The Texas-Missouri-Evacuation Creek areas are also located within the Eastern Bookcliffs/Piceance Basin MLP. These areas would be open to oil and gas leasing with a CSU stipulation and would also be avoidance areas for ROWs. Throughout the resource area, under Alternatives B, C, and D, development would be severely restricted within 500 to 1,000 feet of rock art or standing architecture to protect those sites from damage associated with vibrations.

In addition, cultural resource project plans (CRPP) will be developed for both the CPNHD and the Dragon Trail/Douglas Arch area south of Rangely (generally along Rio Blanco County Road 23; within the Eastern Bookcliffs/Piceance Basin MLP). The CRPPs will be the basis for review and alteration of management decisions in a future RMP revision or amendment. For CPNHD, the CRPP will analyze the compatibility of an NSO designation; the impacts of livestock grazing and recreation on National Register of Historic Places (NRHP)-eligible sites and sites contributing to CPNHD; and existing impacts on visual resources within CPNHD. The CRPP will also identify a management boundary to wholly contain CPNHD's National Register boundary and will establish a site monitoring plan. The CRPP for the Dragon Trail/Douglas arch area will consider the feasibility

BLM_0020778

of additional special management areas (e.g., ACECs or historic districts); identify boundaries for NRHP-eligible sites; and establish a monitoring plan for the area.

## 2.2.11  Paleontological Resources

Management actions related to soil and water resources can be found in Chapter 2, Table 2-13. Paleontological resources are managed on a project-level basis. Within PFYC Class 4 and 5 formations, an on-the-ground survey is required prior to approval of surface disturbing activities. For projects that require excavation into the underlying rock formation, a BLM-approved paleontological monitor is often required to be present during construction. If paleontological resources are discovered, then work immediately ceases until the BLM evaluates the discovery and then takes action to either protect or remove the resource.

## 2.2.12  Visual Resources

Management actions related to visual resources can be found in Chapter 2, Table 2-14.The WRFO is currently in the process of conducting a visual resources inventory for the entire resource area and this updated information will be used to help inform decision making and the evaluation of appropriate project-specific mitigation measures. Areas of primary concern include VRM Class I and II areas, Canyon Pintado NHD, National and State Scenic Byways, and areas surrounding communities.

## 2.2.13  Special Designations & Other Areas

Management actions related to special designations can be found in Chapter 2, Table 2-21.When developing an MLP, WO-IM-2010-117 directs that the effects of oil and gas leasing and development should be considered in areas such as ACECs, WSAs, lands with wilderness characteristics, and any nearby state, tribal, or other Federal agency lands. Table I-3 shows the amount of acreage associated with these emphasis areas within the Eastern Book Cliffs/Piceance Basin and Dinosaur Lowlands MLPs. Since many of these emphasis areas overlap and may already be protected by BLM as either WSAs or ACECs, only acreages outside of those areas are shown.

**Table I-3. Areas Emphasized in the Eastern Book Cliffs/Piceance Basin and Dinosaur Lowlands MLP Recommendations**

| Emphasis Area | Eastern Book Cliffs / Piceance Basin | Dinosaur Lowlands |
|---|---|---|
| Wilderness Study Areas | 18,250 | 38,950 |
| Areas of Critical Environmental Concern | 67,520 | 21,030 |
| Citizen Wilderness Proposals[1] | 41,582 | 18,846 |
| State Wildlife Areas[2] | 5,225 | 0 |
| CNHP Potential Conservation Areas[3] | 18,863 | 77,147 |
| CNAP Natural Areas[4] | 0 | 0 |

NOTES:

[1]Acreage includes only areas outside of WSAs and within federal mineral estate.

[2]Acreage includes only federal mineral estate.

[3]Acreage includes only areas outside of ACECs and within federal mineral estate.

[4]Acreage includes only areas outside of ACECs; the CNAP Natural Areas within the two MLP areas are wholly within ACECs.

BLM_0020779

**Wilderness Study Areas**

The Bull Canyon, Willow Creek, Skull Creek, and Oil Spring Mountain WSAs would remain closed to oil and gas leasing.

**Areas of Critical Environmental Concern**

The Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, Raven Ridge, South Cathedral Bluffs, Coal Draw, and Moosehead Mountain ACECs (20,200 acres) would be open to oil and gas leasing with an NSO stipulation. The White River Riparian, Coal Oil Rim, Oil Spring Mountain, and East Douglas Creek ACECs (68,350 acres) would be open to leasing with a CSU stipulation.

**Lands with Wilderness Characteristics**

The Big Ridge, Bitter Creek, Dragon Canyon, Oil Spring Mountain, and Prairie Canyon citizen wilderness proposal (CWP) areas are within the Eastern Bookcliffs/Piceance Basin MLP. The final wilderness inventory for the Oil Spring Mountain area was completed in 1980 and portions of the area were subsequently designated as a WSA. The BLM does not consider the remaining Oil Spring Mountain CWP area to meet the criteria for further consideration.

As described in Chapter 3 (Section 3.9), the WRFO began the process of identifying potential lands with wilderness characteristics that needed to be inventoried. Areas evaluated for wilderness character consisted of roadless areas greater than 5,000 acres as well as roadless areas under 5,000 acres that were contiguous with either lands determined to have wilderness or lands managed for the protection of wilderness characteristics or were of sufficient size to make practicable their preservation and use in an unimpaired condition. These areas were then given an initial evaluation for the presence of naturalness and outstanding opportunities for solitude and primitive and unconfined types of recreation. This process resulted in the identification of 30 polygons that need an intensive, on the ground field inventory. Most (85%) of these areas occur within the MLP areas, including approximately 135,300 acres within the Dinosaur Lowlands MLP and 79,500 acres within the Eastern Bookcliffs/Piceance Basin MLP. The Big Ridge CWP and portions of the Prairie Canyon, Bitter Creek, and Dragon Canyon CWPs occur within these areas identified for further inventory.

The Bull Canyon, Skull Creek, and Pinyon Ridge CWPs are located within the Dinosaur Lowlands MLP. Portions of Bull Canyon and Skull Creek were subsequently designated as the Bull Canyon, Willow Creek, and Skull Creek WSAs. The BLM does not consider the remaining areas to meet the criteria for further consideration.

Management actions related to non-WSA lands with wilderness characteristics can be found in Chapter 2, Table 2-22. Alternative management strategies being considered for these areas range from managing these areas to retain their resource value (if the parcels are greater than 5,000 acres in size and less than 20 percent of the area is encumbered by leases) to managing these areas to give priority to other uses. As such, specific management actions range from applying an NSO to these areas to applying a LN containing measures and limitations intended to maintain naturalness and outstanding opportunities for solitude and primitive and unconfined recreation. For new ROW authorizations, management actions vary from exclusion areas to open areas with applied mitigation that would minimize impacts to wilderness character.

BLM_0020780

**State Wildlife Areas**

The Square S Summer Range Unit of the Piceance State Wildlife Area is located within the Eastern Bookcliffs/Piceance Basin MLP. Under Alternatives B and C, this area would be open for oil and gas development with an NSO stipulation.

**CNHP Potential Conservation Areas**

The Colorado Natural Heritage Program identifies potential conservation areas (PCAs) as the estimated area required to support the long-term (100+ years) survival of targeted species or natural communities. Portions of Raven Ridge, Calamity Gulch, School Gulch, Lower Greasewood Gulch, Cathedral Bluffs, Soldier Creek, Lake Creek, and East Douglas Creek PCA are included within ACECs. The targeted species within most of the PCAs are rare plants, including those specifically managed for by the BLM as either BLM sensitive species or federally listed species. The target species for Skinner Ridge PCA is sage-grouse. Brief descriptions of management actions for ACECs, special status plants, and sage-grouse are provided above. The East Douglas Creek, Lake Creek, and Soldier Creek PCAs target montane riparian woodland communities. As described above under Soil and Water Resources, floodplains and areas adjacent to perennial waters, springs, and wetlands are all protected through the use of either a CSU or NSO.

**CNAP Natural Areas**

The Natural Areas Act established a statewide Colorado Natural Areas Program to provide a means by which specific examples of Colorado's natural features and ecological phenomena can be identified, evaluated, and protected through a statewide system of designated natural areas. The Raven Ridge, Yanks Gulch/Upper Greasewood Creek, Lower Greasewood Creek, and South Cathedral Bluffs Natural Areas all occur wholly within the boundaries of BLM's ACECs of the same names within the two MLP areas. Under all alternatives, these areas are open for leasing with an NSO stipulation and occupied habitat for federally listed plant species would be managed as an exclusion area for rights-of-way; which is consistent with the management agreements made between the BLM and the CNAP.

## 2.2.14 Reclamation

The BLM understands that successful reclamation is a critical component of managing oil and gas development within the context of its multiple use mission. The Oil and Gas Development RMPA/EIS includes the WRFO Surface Reclamation Plan as Appendix D. The reclamation protocol gives detailed guidance and specific timeframes and criteria that must be met in order for reclamation to be considered successful. Additional management actions related to reclamation, including weed management, acceptable desired plant communities, the use of native species, and the use of sterile hybrids or cereal grasses can be found in Table 2-3 (Vegetation). The importance of successful reclamation is underscored by both the big game and sage-grouse development thresholds.

## 3.0   The RMPA/EIS and Analysis of Master Leasing Plans

The WRFO has reviewed the RMPA/EIS and considered whether it is consistent with the intent of the MLP concept. The WRFO has determined that the RMPA/EIS does address the issues present in this new policy. The RMPA/EIS is a detailed look at oil and gas development within the WRFO over the next 20 years and considers a range of protective measures designed to minimize resource conflicts. Indeed, the RMPA/EIS incorporates almost all of the examples given in WO-IM-2010-117 of the types of decisions that may be made during preparation of an MLP.

BLM_0020781

## 3.1    Stipulations

As identified in the Table I-1, there are no areas open to leasing with standard terms and conditions under either Alternatives B or C. Even under Alternative D, which allows the highest level of development (i.e., most well pads), there are still 705,000 acres (74 percent) across both MLP areas that are only open to development under NSO stipulation, CSU stipulation, or TL stipulation.

## 3.2    Phased Leasing

Phased leasing is typically considered as a means to protect resource values when the mineral development potential is unknown. The WRFO has used phased leasing in a slightly different context to protect resource values when the mineral development potential is known but a full understanding of how to protect a resource value is unknown. The WRFO may defer leasing on core sage-grouse habitat until the effects of development are understood so as to manage development in a manner that would, with a reasonable level of certainty, maintain viable populations of sage-grouse in the long-term.

## 3.3    Threshold Concept

The threshold concept being applied to big game seasonal ranges incorporates several of the decisions that may be made in an MLP including: phased development, limits on new surface disturbance, use of existing infrastructure, placement of linear disturbances in corridors, and reclamation. While operators are not required to abide by the thresholds, the BLM hopes that the incentive of year-round drilling will entice them to remain at or under the thresholds by clustering their development activities so as to take advantage of existing/common infrastructure. As such it is anticipated that linear disturbances will be placed in corridors in order to take advantage of a combined buffered area (rather than each individual project being buffered). Successful reclamation will be a key component in allowing an operator to drill from new well pads as other wells go into production. The use of liquids gathering systems to centralized offsite production facilities not only helps reduce truck traffic, it also aids in meeting thresholds since a greater extent of individual well pads can be reclaimed since the need for tank batteries is either reduced or eliminated (i.e., not every well pad location would require a tank battery).

## 3.4    Reduction of Emissions and Three-Phase Gathering

There are several management actions described above under Air Quality that are designed to reduce emissions so that full field development will not contribute to eventual nonattainment of air quality standards. In addition, the use of three-phase gathering systems (liquid gathering systems to centralized offsite production facilities) are currently being used within the Piceance Basin and over the next 20 years it is expected that between 40-90 percent of all well pads will be piping natural gas, condensate, and produced water to consolidated facilities.

## 3.5    Multiple Wells Per Pad

The analysis in the RMPA/EIS is based on the RFD scenario. It is expected that 95 percent of the development over the next 20 years will be within the MPA and will be from multi-well pads. Both MLPs are largely outside of the MPA and are expected to have lower levels of development that will likely occur from single well pads. However, drilling of multiple wells from a single well pad is a technique that BLM WRFO specialists are well aware of and they will pursue the use of when it is technically feasible and will minimize resource conflicts.

BLM_0020782

## 4.0   Summary

In Colorado, the BLM received four proposals; the Dinosaur Lowlands MLP and the Eastern Bookcliffs/Piceance Basin MLP both occur within the WRFO. Neither of the MLP proposals meet all four of the criteria since in both areas a substantial portion of the federal mineral estate is leased. However, even if the proposals do not meet the criteria, the BLM may still choose to prepare MLPs or similar plans. The WRFO Oil and Gas Development RMPA/EIS is different than other types of amendments or plan revisions since the sole purpose of the planning effort is to examine management decisions related to oil and gas development. Thus, the BLM is able to conduct a much more detailed analysis of a range of development levels and management actions through the RMPA/EIS and it is the equivalent of preparing an MLP-level of analysis across the entire planning area. Since the RMPA/EIS considers protective measures designed to minimize resource conflicts both inside and outside of both the MPA and the MLPs, the WRFO does not intend to further develop either the Dinosaur Lowlands MLP or the Eastern Bookcliffs/Piceance Basin MLP.

BLM_0020783

*This page intentionally left blank*

BLM_0020784



BLM_0020785

BLM

Appendix J

# Air Resources
# Management Plan



Public Lands USA: Use, Share, Appreciate

BLM_0020786

BLM_0020787

*Appendix J – Air Resources Management Plan*

## Table of Contents

Page

1.0    INTRODUCTION ..................................................................................................... J-1

2.0    GENERAL CONDITIONS.................................................................................... J-1

3.0    PERMITTING ........................................................................................................ J-2

4.0    MONITORING ....................................................................................................... J-3

5.0    MODELING ............................................................................................................ J-4

6.0    MITIGATION ......................................................................................................... J-5

**List of Tables**

Table J-1          Emission Reduction Strategies for Oil and Gas Development ............................... J-7

*This page intentionally left blank*

BLM_0020789

# 1.0   Introduction

The purpose of this Air Resources Management Plan (ARMP) is to further clarify Air and Atmospheric Values management goals, objectives, and actions set forth in Table 2-1 of this Draft RMPA/EIS for Oil and Gas Development. This ARMP describes air resources management and outlines BLM's commitments for managing air resources and authorizing activities that have the potential to adversely impact air resources within the WRFO Planning Area. The plan also outlines specific requirements for proponents of projects that have the potential to generate air emissions and adversely impact air resources within the WRFO Planning Area.

# 2.0   General Conditions

1. This ARMP may be modified as necessary to comply with law, regulation, and policy and to address new information and changing circumstances. Maintenance or Amendment of a Resource Management Plan (RMP) is necessary to change the goals, objectives or management actions set forth in the RMP while change to implementation, including this ARMP, may be made without Maintaining or Amending this RMPA/EIS.

2. The BLM has the authority and responsibility under the Federal Land Policy and Management Act to manage public lands in a manner that will protect the quality of air and atmospheric values. Therefore, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals

3. The BLM will ensure implementation of reasonable mitigation, control measures and design features through appropriate mechanisms, including lease stipulations and conditions of approval, notices to lessees, and permit terms and conditions as provided for by law and consistent with lease rights and obligations.

4. The BLM will ensure that air resources management strategies and control measures (both operator committed and required mitigation) are enforceable by including specific conditions in a Record of Decision (ROD).

5. Within one year of signing the ROD, the BLM will establish a mechanism to track actual annual criteria and VOC pollutant emissions from BLM authorized oil and gas activities within the planning area. The emissions tracking system may be developed in collaboration with CDPHE and with input from EPA.

6. Within one year of signing the ROD, and annually thereafter, the BLM will conduct a review of its air resources management plan in order to implement the adaptive management strategy included in item 2.7 of the ARMP. This annual review will include the following:

   a. Evaluation of current air monitoring data and trends from air monitoring sites located within the planning area to determine the status of current air quality conditions within the planning area including:

      i. Measured concentrations approaching or exceeding any NAAQS,

      ii. Measured adverse impacts to AQRVs at Class I areas or sensitive Class II areas (as identified on a case-by-case basis by CDPHE or federal land management or Tribal agencies).

   b. Review of annual emissions data from BLM authorized oil and gas activities and comparison to emission levels analyzed in the RMPA/EIS,

   c. Review of oil and gas development activities authorized by BLM within the planning area in the previous 12 months and comparison to the level of

BLM_0020790

development analyzed in the RMPA/EIS, including numbers of wells drilled, compressor stations installed, and centralized gathering and treatment facilities constructed,

    d.  Evaluate oil and gas development projection data for the coming three to five year period.

7. Based on the annual review of the air resources management plan outlined in item 2.6, the BLM with input from CDPHE and EPA will determine if the air analysis conducted for the RMPA/EIS should be updated. Based on the emissions tracking, air monitoring data, and development projections, BLM with input from CDPHE and EPA will determine if current management strategies are meeting the goals and objectives established in the RMPA/EIS. The BLM in coordination with the CDPHE and the EPA will adapt management strategies as necessary to effectively manage air resources. Adaptive management strategies may include pacing of development, sponsoring additional air monitoring, conducting updated air modeling, or requiring mitigation within BLM's authority.

8. The BLM will work collaboratively with other state, local, federal, and Tribal agencies responsible for regulating air quality and authorizing oil and gas activities to develop a comprehensive management strategy to reduce air emissions from all oil and gas development in western Colorado. This strategy will include conducting a new modeling analysis, as soon as possible after signing the ROD, using updated emissions inventory, monitoring data, and oil and gas development projection data. The modeling analysis would limit projections of potential impacts from oil and gas development up to a maximum of ten years in the future to reflect realistic estimations of development projections and technology improvements. The new modeling analysis would be performed as a collaborative effort with appropriate state, local, federal, and Tribal agencies involved in the authorization and regulation of oil and gas development. Modeling may be conducted as part of a broader regional assessment, but results will include the direct WRFO impacts resulting from the project. Results of the modeling will be made available for public review. The modeling analysis would provide a cumulative analysis for all agencies involved in oil and gas authorizations to tier to. The agencies would evaluate the modeling results and identify any needed additional reductions in criteria pollutant or ozone precursor emissions and if needed, would use their respective authorities to implement enhanced emission control strategies and/or operating limitations necessary to ensure continued compliance with applicable ambient air quality standards. Absent effective control technologies, reductions in the pace of development may be utilized to ensure ambient air quality standards are met.

## 3.0   Permitting

1. The BLM has the responsibility to implement the decisions of an RMP in a manner that protects air quality and also must recognize valid and existing leasing rights. The BLM can require specific actions and measures necessary to protect air quality in response to adverse impacts at the project permitting stage.

2. The BLM will, prior to authorization of any oil and gas development project, consider the magnitude of potential air emissions from the project or activity, existing air quality conditions, proximity to Class I areas, and issues identified during project scoping to identify pollutants of concern and to determine the appropriate level of air analysis to be conducted for the project. This analysis may include; obtaining additional air monitoring data, air dispersion modeling, photochemical grid modeling, and/or mitigation measures in addition to any applicable regulatory emission limits and standards.

BLM_0020791

3. The BLM will require an emissions inventory for oil and gas development project proposals included in Concentrated Development Plans specified in the WRFO Draft RMPA/EIS, Chapter 2-Management Actions for Minerals (Table 2-17 Record 12). The emissions inventory will quantify emissions of regulated air pollutants from all sources related to the proposed project, including fugitive emissions and greenhouse gas emissions, estimated for each year for the life of the project. The BLM will review any project specific emissions inventory submitted to determine its completeness and accuracy. The BLM will use this estimated emissions inventory to identify pollutants of concern and to determine the appropriate level of air analysis to be conducted for the proposed project. This information will inform any monitoring, modeling, or mitigation decisions to be made for the Concentrated Development Plan.

4. The proponent of a mineral development project that has the potential to emit any regulated air pollutant will be required to provide a detailed description of operator committed measures to reduce project related air pollutant emissions including greenhouse gases and fugitive dust. Project proponents for oil and gas development projects should refer to Table J-1 as a reference for potential mitigation technologies and strategies. The list is not intended to preclude the use of other effective air pollution control technologies that may be proposed. Details of operator committed measures would be submitted by the applicant and enforced as a condition of the BLM-issued authorization.

5. The BLM will include, as a Condition of Approval for any oil and gas authorization, a requirement that operators submit an annual report of actual annual emissions for all criteria pollutants, VOCs, and GHG emissions related to the authorization. The BLM will use the reported emissions to track total emissions from BLM authorized oil and gas activities within the Planning Area.

## 4.0   Monitoring

The BLM recognizes that ambient air monitoring is valuable for determining current concentrations of air pollutants, describing long term trends in air pollutant concentrations, and evaluating the effectiveness of air control strategies. As part of a comprehensive air management plan for the Planning Area, the BLM commits to the measures described in this section with regards to ambient air monitoring.

1. BLM will continue to fund and operate BLM's air monitoring stations located in Meeker and Rangely contingent upon continued funding,

2. The BLM will facilitate a cooperative effort with oil and gas industry, CDPHE, FS, NPS, EPA, and local counties to establish, fund, operate, and maintain a comprehensive air monitoring network within the Planning Area. The purpose of the air monitoring network is to establish background concentrations of air pollutants, determine long term trends in air pollutant concentrations, and determine the effectiveness of air pollutant control strategies. The BLM will facilitate the sharing of air monitoring data collected by the air monitoring network.

3. The BLM may require project proponents for oil and gas development projects to conduct pre-construction air monitoring within or adjacent to the proposed development area. The purpose of this monitoring is to establish baseline air quality conditions prior to development at the site. The requirement for monitoring will be determined by BLM based on:

   a. The absence of existing representative air monitoring data;

   b. Existing air quality conditions;

   c. Magnitude of potential air emissions from the project or activity;

BLM_0020792

    d.   Magnitude of existing emission sources in the area;

    e.   Proximity to a federally mandated Class I area, sensitive Class II area (as identified on a case-by-case basis by CDPHE or federal land management or Tribal agencies), or population center;

    f.   Location within a non-attainment or maintenance area;

    g.   Meteorologic or geographic conditions;

    h.   Project duration; or

    i.   Issues identified during project scoping.

The project proponent will be required to provide a minimum of one year of baseline ambient air monitoring data for any pollutant(s) of concern as determined by the BLM. If the BLM determines that baseline monitoring is required, this pre-analysis data must meet CDPHE air monitoring standards, be obtained from a site within 50 km of the project boundary, and cover the year immediately prior to the proposed project submittal. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

4. The BLM may require project proponents for oil and gas development projects to conduct air monitoring for the life of the oil and gas development project considering the factors listed in 3 (a)-(i) above. The purpose of this air monitoring is to determine impacts attributable to the project over time. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

5. The BLM will work cooperatively with CDPHE to determine a mechanism to submit, track, and approve project specific pre-construction monitoring or monitoring data required in a project specific record of decision.

## 5.0   Modeling

The BLM recognizes that air dispersion and photochemical grid models are useful tools for predicting project specific impacts to air quality, predicting the potential effectiveness of control measures and strategies, and for predicting trends in regional concentrations of some air pollutants. As part of a comprehensive air management plan for the Planning Area, the BLM commits to the measures described in this section with regards to air quality modeling.

1. The BLM has identified air modeling as a significant component of its adaptive management strategy for managing air resources as outlined in section 2.7 and 2.8 above.

2. The BLM may require a project proponent to conduct air quality modeling for any pollutant(s) of concern in the absence of sufficient data to ensure compliance with laws and regulations or to determine the effectiveness of mitigation options, unless the project proponent can demonstrate that the project will result in no net increase in emissions of the pollutant(s) of concern. The requirement for modeling will be based on:

    a.   Existing air quality conditions;

    b.   Magnitude of potential air emissions from the project or activity;

    c.   Magnitude of existing emission sources in the area;

BLM_0020793

    d.   Proximity to a federally mandated Class I area, sensitive Class II area (as identified on a case-by-case basis by CDPHE or federal land management or Tribal agencies), an area expected to exceed a NAAQS or PDS increment, population center, non-attainment or maintenance area;

    e.   Meteorologic or geographic conditions;

    f.   Project duration; or

    g.   Issues identified during project scoping.

The BLM, in cooperation with an interagency review team, will determine the parameters for the modeling analysis through the development of a project specific modeling protocol.

3.   The BLM will support and participate in regional modeling efforts through multi-state and/or multi-agency organizations such as Western Governors' Association – Western Regional Air Partnership (WRAP) and the Federal Leadership Forum (FLF).

## 6.0   Mitigation

The BLM recognizes that many of the activities that it authorizes, permits, or allows generate air pollutant emissions that have the potential to adversely impact air quality. The primary mechanism to reduce air quality impacts is to reduce emissions (mitigation). As part of this comprehensive air management plan for the Planning Area, the BLM commits to the measures described in this section with regards to reducing emissions.

1.   The BLM will require additional air emission control measures and strategies within its regulatory authority and in consultation with federal, state, and Tribal agencies with responsibility for managing air resources if proposed or committed measures are insufficient to achieve air quality goals and objectives. Mitigation measures may include emission control strategies listed in Table J-1.

2.   The BLM will consider applying mitigation to emissions sources not otherwise regulated by CDPHE for oil and gas development projects where an air quality impact analysis determines there are or will likely be future impacts above acceptable levels, including impacts to Class I or sensitive Class II areas (as identified on a case-by-case basis by CDPHE or federal land management or Tribal agencies). In addition, the BLM will consider applying mitigation to emissions sources when nearby air monitoring identifies exceedances of the NAAQS or measured adverse impacts to AQRVs in Class I or sensitive Class II areas (as identified on a case-by-case basis by CDPHE or federal land management or Tribal agencies) in close proximity to the project area. Mitigation may include reduction in the pace or scale of development.

3.   The proponent of a project will be required to minimize air pollutant emissions by complying with all applicable state and federal regulations (including application of best available control technology) and may be required to apply mitigation including but not limited to best management practices, and other control technologies or strategies identified by the BLM or CDPHE in accordance with delegated regulatory authority.

4.   Development and implementation of appropriate protection measures is effective at the project approval stage, because the proposed action has been defined in terms of temporal and spatial characteristics as well as development processes and procedures. This better defined information allows more precise identification of impacts to air quality which results in more specific impact analysis, and identification of effective mitigation. As part of the project

BLM_0020794

approval process the BLM will identify project-specific measures in response to identified impacts to air resources. These measures may include emission control strategies listed in Table J-1.

5. The BLM may require project proponents for oil and gas development projects to submit a contingency plan that provides for reduced operations in the event of an air quality episode such as a monitored exceedance. Specific operations and pollutants to be addressed in the contingency plan will be determined by the BLM on a case-by-case basis taking into account existing air quality and pollutants emitted by the project.

BLM_0020795

**Table J-1**
**Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| **Control Strategies for Drilling and Compression** | | | |
| Directional Drilling. | Reduces construction related emissions (dust and vehicle and construction equipment emissions). Decreases surface disturbance and vegetation impacts (dust and CO2 and nitrogen flux). Reduces habitat fragmentation. | Could result in higher air impacts in one area with longer sustained drilling times. | Depends on geological strata. |
| Improved engine technology (Tier 2 or better) for diesel drill rig engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers. |
| Selective Catalytic Reduction (SCR) for drill rig engines and/or compressors. | NOx emissions reduction, potential decreased formation of visibility impairing compounds and ozone. NOx control efficiency of 95% achieved on drill rig engines. NOx emission rate of 0.1 g/hp-hr achieved for compressors. | Potential NH3 emissions and formation of visibility impairing ammonium sulfate. Regeneration/disposal of catalyst can produce hazardous waste. | Not applicable to 2-stroke engines. |
| Non-selective catalytic reduction (NSCR) for drill rig engines and/or compressors. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. NOx control efficiency of 80-90% achieved for drill rig engines. NOx emission rate of 0.7 g/hp-hr achieved for compressor engines greater than 100 hp. | Regeneration/disposal of catalysts can produce hazardous waste. | Not applicable to lean burn or 2-stroke engines. |
| Natural Gas fired drill rig engines. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. | | Requires onsite processing of field gas. |

BLM_0020796

**Table J-1**
**Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Electrification of drill rig engines and/or compressors using electric generating unit (EGU). | Decreased emissions at the source. Transfers emissions to more efficiently controlled source (EGU). | Displaces emissions to EGU. | Depends on availability of power and transmission lines. |
| Improved engine technology (Tier 2 or better) for all mobile and non-road diesel engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers. |
| Green (a.k.a. closed loop or flareless) completions. | Reduction in VOC and CH4 emissions. Reduces or eliminate flaring and venting and associated emissions. Reduces or eliminates open pits and associated evaporative emissions. Increased recovery of gas to pipeline rather than atmosphere. | Temporary increase in truck traffic and associated emissions. | Need adequate pressure and flow. Need onsite infrastructure (tanks/dehydrator). Availability of sales line. Green completion required where feasible per COGCC Rule 805(b)(3). |
| Green workovers. | Same as above. | Same as above. | Same as above. |
| Minimize/eliminate venting and/or use closed loop process where possible during "blow downs". | Same as above. | | |
| Eliminate evaporation pits for drilling fluids. | Reduces VOC and GHG emissions. Reduces potential for soil and water contamination. Reduces odors. | May increase truck traffic and associated emissions. | Requires tank and/or pipeline infrastructure. |
| Electrification of wellhead compression/ pumping. | Reduces local emissions of fossil fuel combustion and transfers to more easily controlled source. | Displaces emissions to EGU. | Depends on availability of power and transmission lines. |
| Wind (or other renewable) generated power for compressors. | Low or no emissions. | May require construction of infrastructure. Visual impacts. Potential wildlife impacts. | Depends on availability of power and transmission lines. |
| Compressor seals – replace wet with dry or use mechanical seal. | Reduce gas venting (VOC and GHG emissions). | | May be costly or not mechanically feasible. |

BLM_0020797

**Table J-1**
**Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Compressor rod packing system – use monitoring and replacement system. | Reduce gas leaks (VOC and GHG emissions). | | Requires establishing a monitoring system and doing replacements. |
| **Control Strategies Utilizing Centralized Systems** | | | |
| Centralization (or consolidation) of gas processing facilities (e.g., separation, dehydration, sweetening). | Reduces vehicle miles traveled (truck traffic) and associated emissions. Reduced VOC and GHG emissions from individual dehydration/separator units. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure. |
| Liquids Gathering systems (for condensate and produced water). | Reduces vehicle miles traveled and associated emissions. Reduced VOC and GHG emissions from tanks, truck loading/unloading, and multiple production facilities. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure. |
| Water and/or fracturing liquids delivery system. | Reduced long term truck traffic and associated emissions. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure. Not feasible for some terrain. |
| **Control Strategies for Tanks, Separators, and Dehydrators** | | | |
| Eliminate use of open top tanks. | Reduced VOC and GHG emissions. | | |
| Capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units. | Reduces VOC and GHG emissions. | Pressure build up on older tanks can lead to uncontrolled rupture. | |
| Capture and control of produced water, crude oil, and condensate tank emissions. | Reduces VOC and GHG emissions. | | 95% VOC control required by COGCC in some areas. |

BLM_0020798

**Table J-1**
**Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion. | Reduces VOC, HAP, and GHG emissions. | | 90% VOC control required by COGCC in some areas. |
| Use zero emissions dehydrators or use desiccants dehydrators. | Reduces VOC, HAP, and GHG emissions. | Requires desiccants (salt tablets and forms a brine solution that must be disposed of. | Can be as effective as Triethylene glycol (TEG) dehydration. |
| **Control Strategies for Misc. Fugitive VOC Emissions** | | | |
| Install plunger lift systems to reduce well blow downs. | Reduces VOC and GHG emissions. | | Can be more efficient at fluids removal than other methods, must have adequate pressure. |
| Install and maintain low VOC emitting seals, valves, hatches on production equipment. | Reduces VOC and GHG emissions. | | |
| Initiate equipment leak detection and repair program (e.g., including use of FLIR infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection). | Reduction in VOC and GHG emissions. | | |
| Install or convert gas operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Use "low" or "no bleed" gas operated pneumatic devices/controllers. | Reduces VOC and GHG emissions. | | Required by COGCC. |
| Use closed loop system or thermal combustion for gas operated pneumatic pump emissions. | Reduces VOC and GHG emissions. | | |

BLM_0020799

Table J-1
**Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Install or convert gas operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Install vapor recovery on truck loading/unloading operations at tanks. | Reduces emissions of VOC and GHG emissions. | Pressure build up on older tanks can lead to uncontrolled rupture. | |
| **Control Strategies for Fugitive Dust and Vehicle Emissions** | | | |
| Unpaved surface treatments including watering, chemical suppressants, and gravel. | 20% - 80% control of fugitive dust (particulates) from vehicle traffic. | Potential impacts to water and vegetation from runoff of suppressants. | |
| Use remote telemetry and automation of wellhead equipment. | Reduces vehicle traffic and associated emissions. | | |
| Speed limit control and enforcement on unpaved roads. | Reduction of fugitive dust emissions. | | |
| Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative work schedules, or work camps. | Reduced combustion emissions, reduced fugitive dust emissions, reduced ozone formation, reduced impacts to visibility. | | |
| **Miscellaneous Control Strategies** | | | |
| Use of ultra-low sulfur diesel (e.g., in engines, compressors, construction equipment). | Reduces emissions of particulates and sulfates. | | Fuel not readily available in some areas. |
| Reduce unnecessary vehicle idling. | Reduced combustion emissions, reduced ozone formation, reduced impacts to visibility, reduced fuel consumption. | | |
| Reduced pace of (phased) development. | Peak emissions of all pollutants reduced. | Emissions generated at a lower rate but for a longer period. LOP, duration of impacts is longer. | May not be economically viable or feasible if multiple mineral interests. |

BLM_0020800

*This page intentionally left blank*

BLM_0020801

**BLM**

# United States Department of the Interior
# Bureau of Land Management

---

**Environmental Assessment**
**DOI-BLM-CO-S010-2009-0076**

---

**October 2012**

# RM Potash Exploration Project

***Location:***   T. 43 N., R. 19 W., sec. 11, 14 (COC73567);
T. 43 N., R. 19 W., sec. 13, 23-26 (COC73569);
T. 43 N., R. 18 W., sec. 20, 29, 32; T. 42 N., R. 18 W., sec. 5 (COC73572);
T. 43 N., R. 18 W., sec. 28, 33; T. 42 N., R. 18 W., sec. 4, 9, 16 (COC73574)
T. 42 N., R. 18 W., sec. 3, 10, 15 (COC73576);
T. 42 N., R. 19 W., sec. 4, 5, 9, 10, 13; T. 42 N., R. 18 W., sec. 29, 32
(COC74370).

Dolores and San Miguel Counties, Colorado

***Applicant/Address:***   RM Potash, Inc.
3611 South Xenia Street
Denver, CO 80237

---

Tres Rios Field Office
29211 Highway 184
Dolores, CO  81323
970-882-6841



# RM Potash Exploration Project

## DOI-BLM-CO-S010-2009-0076

### Table of Contents

1.0   PURPOSE & NEED ................................................................................. 1
1.1   Introduction ........................................................................................ 1
1.2   Background ......................................................................................... 2
1.3   Purpose(s) of the Proposed Action .................................................... 4
1.4   Need for the Proposed Action ........................................................... 4
1.5   Decision to be Made .......................................................................... 4
1.6   Conformance with BLM Land Use Plan ............................................ 5
1.7   Relationship to Statutes, Regulations, or other Plans....................... 7
  1.7.1   Climate Change Policy ................................................................8
  1.7.2   Section 7 of the Endangered Species Act (ESA) ........................8
  1.7.3   Section 106 of the National Historic Preservation Act (NHPA) .................8
1.8   Identification of Issues ...................................................................... 8
  1.8.1   Cultural Resources .......................................................................9
  1.8.2   Geology and Minerals...................................................................9
  1.8.3   Land Use and Realty .....................................................................9
  1.8.4   Livestock Grazing .........................................................................9
  1.8.5   Migratory Birds..............................................................................9
  1.8.6   Noise ..............................................................................................9
  1.8.7   Recreation ....................................................................................10
  1.8.8   Socioeconomics ..........................................................................10
  1.8.9   Soils..............................................................................................10
  1.8.10  Federal Endangered, Threatened, and Candidate; BLM Sensitive and Species of Concern; State of Colorado Endangered and Threatened species, and Federal Birds of Conservation Concern ...............................................10
  1.8.11  Transportation ..............................................................................10
  1.8.12  Vegetation, Including Invasive Species/Noxious Weeds ...........10
  1.8.13  Waste - Hazardous, Fluid, and Solid .........................................10
  1.8.14  Water Resources/Quality (drinking/surface/ground)..................11
  1.8.15  Wildlife .........................................................................................11
  1.8.16  Air quality and Climate Change .................................................11
1.9   Issues and Resources Considered but Eliminated ........................... 11
  1.9.1   Air Quality ...................................................................................11
  1.9.2   Paleontological Resources ........................................................12
  1.9.3   Special Designations..................................................................12
  1.9.4   Potash Production Concerns ......................................................12
  1.9.5   Public Health and Safety............................................................12
  1.9.6   Additional Issues and Resources Considered But Eliminated from Analysis ....................................................................................13
1.10  Summary ......................................................................................... 13

BLM_0020803

2.0    DESCRIPTION OF ALTERNATIVES, INCLUDING PROPOSED ACTION ........................................................................................ 14
2.1    Introduction ................................................................................................ 14
2.2    Alternative A – Proposed Action ............................................................... 14
    2.2.1    Land Ownership and Location .................................................................. 16
    2.2.2    Overview of Drill Sites ............................................................................. 17
    2.2.3    Drill Pad Layout and Equipment ............................................................. 18
    2.2.4    Access Roads ......................................................................................... 24
    2.2.5    Location and Source of Water Supply ..................................................... 24
    2.2.6    Construction Workforce ........................................................................... 25
    2.2.7    Reclamation ............................................................................................ 25
    2.2.8    Design Features, Environmental Protection Measures (EPMs), and Best Management Practices (BMPs) ............................................................... 27
2.3    Alternative B – No Action .......................................................................... 33
2.4    Alternatives Considered but Eliminated from Further Analysis ................... 33
3.0    AFFECTED ENVIRONMENT ..................................................................... 34
3.1    Introduction ................................................................................................ 34
3.2    General Setting .......................................................................................... 34
3.3    Resources and Issues Brought Forward for Analysis ................................. 34
    3.3.1    Cultural Resources .................................................................................. 34
    3.3.2    Geology and Minerals .............................................................................. 35
    3.3.3    Land Use and Realty ............................................................................... 39
    3.3.4    Livestock Grazing .................................................................................... 39
    3.3.5    Migratory Birds ........................................................................................ 40
    3.3.6    Noise ....................................................................................................... 41
    3.3.7    Recreation ............................................................................................... 41
    3.3.8    Socioeconomics ...................................................................................... 42
    3.3.9    Soils ........................................................................................................ 43
    3.3.10    Federal Threatened, Endangered, and Candidate; BLM Sensitive and Species of Concern; State of Colorado Endangered and Threatened Species, and Federal Birds of Conservation Concern ................................. 43
    3.3.11    Transportation ......................................................................................... 45
    3.3.12    Vegetation, including Noxious & Invasive Weeds ..................................... 46
    3.3.13    Waste - Hazardous, Fluid, and Solid ....................................................... 49
    3.3.14    Water Resources ..................................................................................... 49
        3.3.14.1 Surface Water ...................................................................................... 49
        3.3.14.2 Groundwater ........................................................................................ 52
    3.3.15    Wildlife .................................................................................................... 54
    3.3.16 Air Quality and Climate Change ............................................................... 55
4.0    ENVIRONMENTAL EFFECTS .................................................................... 57
4.1    Introduction ................................................................................................ 57
4.2    Direct/Indirect Effects ................................................................................ 57
    4.2.1    Alternative A – Proposed Action .............................................................. 57
        4.2.1.1    Cultural Resources ............................................................................... 57
        4.2.1.2    Geology and Minerals .......................................................................... 58
        4.2.1.3    Land Use and Realty ............................................................................ 58

BLM_0020804

| 4.2.1.4 | Livestock Grazing | 59 |
| 4.2.1.5 | Migratory Birds | 59 |
| 4.2.1.6 | Noise | 60 |
| 4.2.1.7 | Recreation | 60 |
| 4.2.1.8 | Socioeconomics | 60 |
| 4.2.1.9 | Soils | 61 |
| 4.2.1.10 | Threatened, Endangered, Candidate, and Sensitive Species | 61 |
| 4.2.1.11 | Transportation | 62 |
| 4.2.1.12 | Vegetation | 63 |
| 4.2.1.13 | Waste - Hazardous, Fluid, and Solid | 63 |
| 4.2.1.14 | Water Resources | 64 |
| 4.2.1.15 | Wildlife | 71 |
| 4.2.1.16 | Air Quality and Climate Change | 71 |
| 4.2.1.17 | Mitigation, Monitoring, and/or Compliance | 72 |
| 4.2.1.18 | Residual Effects | 72 |
| 4.2.2 | Alternative B – No Action | 72 |
| 4.3 | Cumulative Effects Analysis | 73 |
| 4.3.1 | Cumulative Effects Areas | 73 |
| 4.3.2 | Past and Present Actions | 73 |
| 4.3.3 | Reasonably Foreseeable Action Scenario (RFAS) | 74 |
| 4.3.4 | Cumulative Effects | 76 |
| **5.0** | **CONSULTATION AND COORDINATION** | **77** |
| 5.1 | Introduction | 77 |
| 5.2 | Persons, Groups, and Agencies Consulted | 77 |
| 5.3 | Summary of Public Participation | 77 |
| 5.4 | List of Preparers | 78 |
| **6.0** | **REFERENCES, ACRONYMS, AND GLOSSARY** | **79** |
| 6.1 | References Cited | 79 |
| 6.2 | List of Acronyms Used in this EA | 85 |
| 6.3 | Glossary | 86 |

| Appendix A | Interdisciplinary Team Checklist |
| Appendix B | Photos of Drill Sites |
| Appendix C | Noxious Weed Management Plan |
| Appendix D | COGCC Rules 900 Series and Joint Agency Guidelines for Uranium Exploration Drilling Reclamation |
| Appendix E | Soils Descriptions |
| Appendix F | Wildlife Timing and Controlled Surface Use Stipulations |

BLM_0020805

## List of Tables

Table 2-1    Legal Locations of the Prospecting Permit Application Areas .................. 16
Table 2-2    Access Roads ................................................................................................ 24
Table 2-3    Disturbance from Access Road Improvements ........................................... 24
Table 2-4    Pinyon-Juniper Seed-Mix ........................................................................... 26
Table 2-5    Sage Flats Seed-Mix .................................................................................... 26
Table 3-1    Cultural Resource Sites within the Study Areas ......................................... 35
Table 3-2    Grazing Allotments ..................................................................................... 40
Table 3-3    Birds Observed in the Project Area ............................................................. 41
Table 3-4    Sensitive Species Potentially Present in Tres Rios Field Office Resource
             Area ............................................................................................................ 44
Table 3-5    Towns and Communities in Proximity to the Project Area ........................ 45
Table 3-6    Project Area Access Roads .......................................................................... 46
Table 3-7    HUC 6 Watersheds ...................................................................................... 50
Table 3-8    Springs in the analysis area by HUC .......................................................... 50
Table 4-1    Summary of Sites and Recommendations ................................................... 57
Table 4-2    Impacts to Grazing Allotments ................................................................... 59
Table 4-3    Water Wells Permitted Within Two Miles of a Proposed Drill Site ......... 67
Table 4-4    Selected Oil and Gas Wells In or Near the Project Area ............................ 69
Table 4-5    Water Rights in the Four Townships Encompassing the Project Area ...... 70
Table 5-1    List of all Persons, Agencies and Organizations Consulted ...................... 77
Table 5-2    Tres Rios Field Office Personnel ................................................................ 78
Table 5-3    Non-BLM Preparers .................................................................................... 78

## List of Figures

Figure 1     General Project Location .............................................................................. 3
Figure 2     Project Areas and Land Status .................................................................... 15
Figure 3     Drill Pad Schematic .................................................................................... 22
Figure 4     Drill Hole Cross Section ............................................................................. 23
Figure 5     Oil, Gas, and Mining .................................................................................. 38
Figure 6     HUC-6 Watershed, 303(d) Streams ............................................................ 51
Figure 7     Hydrogeologic Units of the Paradox Basin ................................................ 53
Figure 8     Proposed Drill Holes, Water Wells, and Natural Springs ........................... 68

Photo 1      Schramm T130XD Drill Rig.  Not shown are associated infrastructure such as
             trailers, topsoil stockpile, tanks, flare pad, and other support facilities .......... 19

BLM_0020806

# RM Potash Exploration Project

## DOI-BLM-CO-S010-2009-0076

# 1.0 PURPOSE & NEED

## 1.1 Introduction

This Environmental Assessment (EA) has been prepared to disclose and analyze the environmental consequences of the RM Potash Exploration Project (Project), as proposed by RM Potash, Inc. An EA is a site-specific analysis of potential effects that could result with the implementation of a Proposed Action or alternatives to the Proposed Action. It assists the Bureau of Land Management (BLM) in project planning and ensuring compliance with the National Environmental Policy Act (NEPA), and in making a determination as to whether any "significant" effects could result from the analyzed actions. "Significance" is defined by NEPA and is found in regulation 40 CFR 1508.27.

An EA provides evidence for determining whether to prepare an Environmental Impact Statement (EIS) or a statement of "Finding of No Significant Impact" (FONSI). If the decision maker determines that this Project has "significant" effects following the analysis in the EA, then an EIS would be prepared for the Project. If not, a Decision Record (DR) may be signed for the EA approving the selected alternative, whether the Proposed Action or another alternative. A DR, including a FONSI statement, documents the reasons why implementation of the selected alternative would not result in "significant" environmental effects (effects) beyond those already addressed in the San Juan/San Miguel Resource Management Plan (RMP) (December 1985). The Tres Rios Field Office (TRFO) of the BLM is responsible for implementing this RMP, including the lands where the proposed RM Potash Exploration Project would occur.

The RM Potash Exploration Project EA has been prepared in accordance with NEPA of 1969 and the Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 CFR 1500-1508); the Federal Land Policy and Management Act (FLPMA) of 1976; the 1985 San Juan/San Miguel RMP and Record of Decision (ROD), and BLM guidance on implementing NEPA, including the BLM NEPA Handbook H-1790-1 (BLM 2008). Information gathered from federal, state, and local agencies, RM Potash, and publicly available literature, as well as in-house BLM sources such as the RMP, were used in the preparation of this EA.

In this EA, the BLM is analyzing potential effects of approving up to six potassium prospecting permit applications and implementing the associated Exploration Plan(s) that RM Potash submitted for the proposed exploration Project. The exploration plan was initially submitted in December 2009, and was revised most recently in March of 2012 to reflect changes in drill pad size from 100 feet x 100 feet to 250 feet x 250 feet. These

BLM_0020807

changes were made to reasonably accommodate larger drill rigs and additional tanks required for closed-loop drilling systems resulting in added protection for surface and ground water. The locations of drill holes and access roads remain the same and are located within the resource survey areas. In addition, the Project includes improving existing access roads, most of which would be within the lands under permit application. A legal access agreement with private land owners would be needed by RM Potash to access sites 2 and 6.

Potash is the common name for the element potassium (symbol K). Potash is generally found associated with salt deposits or salt brines and is one of three key ingredients in fertilizer. Potash is also used in the manufacture of TV and computer screens, soaps, perfumes, water softeners, de-icers, aluminum recycling, metal electroplating, steel heat-treating, drilling mud, ceramics, potassium hydroxide, pharmaceuticals, and livestock and poultry feed. Currently, over 90 percent of required potash in the United States is imported.

Core drilling is proposed on the six permit application sites to confirm the presence of potash and determine its thickness and grade. Geophysical logs from petroleum exploration wells drilled in the prospecting permit areas indicate the presence of potash layers in the evaporite sequences of the Paradox Formation in the Dolores Anticline at thicknesses and depths which may be amenable to commercial production.

## 1.2   Background

RM Potash has submitted 21 Prospecting Permit Applications (Applications) over a combined area of approximately 40,000 acres (**Figure 1**). However, this document is analyzing the issuance of up to six individual permit applications for this exploration Project: COC73567, COC73569, COC73572, COC73574, COC73576, and COC74370. If RM Potash determines that the results of core drilling indicate the deposit would not be economical, further drilling could be discontinued. If the results of drilling on the six individual permit holes are promising, RM Potash could submit additional drilling plans on other permit applications requiring additional site-specific NEPA analysis.

The six permit applications cover a total of 9,954 acres and disturbance for each core hole would be limited to a 250 foot by 250 foot pad (~1.4 acres) and associated road improvements (up to 20 feet wide) on 3 access roads (**Tables 2.2, 2.3**). Total disturbance is estimated to be approximately 19 acres for all drill pads and road improvements; this is defined as the Project Area (see **Figure 2 iu Chapter 2**).

RM Potash needs geologic, geochemical, and technical information to delineate and assess the potash resources within the permit application areas and proposes to conduct an initial "proof of concept" drilling program to test the continuity and thickness of the potash beds and provide core for geochemical analysis.

BLM_0020808



RM Potash hopes to determine the thickness and grade of potash initially in any or all of the six proposed drill hole locations presently under consideration in this EA, and ultimately across the larger (approximately 40,000 acres) area covered by their 21 prospecting permits. This would be done by additional drilling and other exploration methods, such as seismic profiling or geologic mapping. Once the deposit has been adequately delineated, RM potash could apply for preference right leases on those lands (43 CFR 3507.11). BLM would need to prepare a mineral report based on the results of exploration and determine whether RM Potash had indeed discovered a *valuable deposit* of potash and whether the lands under permit application were *chiefly valuable* for potash (as defined at 43 CFR 3501.5).

If RM Potash considers the results of the initial coring to be favorable, new drilling plans for additional permit application areas may be submitted. However, because the locations of future drilling would be based on data obtained through the proposed exploratory drilling analyzed in this EA (if approved), future activities have yet to be determined and are considered to be beyond the scope of this EA. Any additional drilling not analyzed in this EA would be subject to additional NEPA review if later proposed.

RM Potash would be required to obtain all necessary permits from other agencies. In coordination with appropriate state and federal regulatory agencies, RM Potash would comply with all applicable state and federal drilling and exploration rules, regulations, policies, orders, notices, guidelines, standards, etc. when conducting the proposed exploration activities and operations.

## 1.3    Purpose(s) of the Proposed Action

The BLM is responsible for managing the public lands and federal mineral estate within the prospecting permit areas. The BLM's purpose for the Proposed Action is to consider authorization of six prospecting permit applications and exploration activities described in the Exploration Plan(s).

## 1.4    Need for the Proposed Action

The need for the Proposed Action is established by BLM's responsibility to respond to the Applications submitted by RM Potash under the Mineral Leasing Act of 1920, as amended (MLA) and FLPMA.

## 1.5    Decision to be Made

The BLM would decide which, if any prospecting permits submitted by RM Potash would be approved or declined, and if so, under what terms and conditions. Prospecting Permits are mineral leasing-related actions and decided by the BLM State Director (as delegated), while exploration plans may be approved at the Field Office level.

BLM_0020810

## 1.6    Conformance with BLM Land Use Plan

The Proposed Action is subject to and has been reviewed for conformance with the following plan (43 CFR 1610.5, BLM 1617.3):

- <u>Name of Plan</u>: San Juan/San Miguel Resource Management Plan and Record of Decision

- <u>Date Approved/Amended</u>: September 1985, as amended

Although the potassium exploration drilling is not explicitly mentioned in the plan, it is consistent with the objectives, goals, and decisions as they relate to the management of mineral resources as stated on pages 16 and 17 of the RMP.  The San Juan/San Miguel RMP and ROD from 1985 (BLM 1985) does not have a separate section covering solid non-energy leasable minerals (i.e. potash), or the issuance of permits, licenses, or leases, and the exploration drilling and mining activity that would be associated with them. However, in the permit application areas, lands are *open for all mineral activity*, including oil and gas leasing, and the effects of potash core hole drilling are very similar to the drilling of petroleum stratigraphic test holes.  The Mineral Management section of Chapter 2 of the RMP ROD, on pages 16 and 17 states:

The following principles will guide the BLM in managing mineral resources on public lands (per BLM Instruction Memorandum No. 84-568, dated June 28, 1984).

1.  Except for Congressional withdrawals, public lands shall remain open and available for mineral exploration and development unless withdrawal or other administrative action is clearly justified in the national interest.
2.  BLM actively encourages and facilitates the development by private industry of public land mineral resources so that national and local needs are satisfied and economically and environmentally sound exploration, extraction, and reclamation practices are provided.
3.  BLM will process mineral patent applications, permits, operating plans, mineral exchanges, leases, and other use authorizations for public lands in a timely and efficient manner.
4.  BLM's land use plans and multiple use management decisions will recognize that mineral exploration and development can occur concurrently or sequentially with other resource uses.  BLM further recognizes that land use planning is a dynamic process and decisions will be updated as new data are evaluated.
5.  Land use plans will reflect geologic, energy, and mineral values on public lands through more effective data assessment of those values.
6.  BLM will monitor saleable and leasable mineral operations to ensure proper resource recovery and evaluation, production verification, diligence and

BLM_0020811

inspection, and enforcement of the lease, sale, or permit terms. BLM will ensure receipt of fair market value for mineral commodities unless otherwise provided for by statute.

7. BLM will maintain effective professional, technical, and managerial personnel knowledgeable in mineral exploration and development.

In addition, a solid, non-energy mineral lease for sodium was in existence from 1934-1997 within the planning area of the 1985 RMP (COD-46504) to produce sodium brine. This implicitly acknowledges solid leasable mineral production in the 1985 RMP.

The majority of the prospecting permit application areas are in land designated as being management area A (livestock), J (forestry), E (mineral resources), and H (public land disposal), and is open for mineral development. A small portion near the Dolores River canyon may be designated as management areas B (wildlife) and C (recreation). However, the specific proposed drill sites are located in the following management areas:

| Drill Site Number | Land Management Designation |
|---|---|
| Drill Site 1 | E (mineral resources) |
| Drill Site 2 | A (livestock) |
| Drill Site 3 | A (livestock) |
| Drill Site 4 | A (livestock) |
| Drill Site 5 | J (forestry) |
| Drill Site 6 | A (livestock) |

The Oil and Gas Plan Amendment to the San Juan/San Miguel Resource Management Plan was completed in October 1991 and specifically deals with Oil and Gas development within the planning area. The area covered by the plan amendment has moderate to high potential for oil and gas development and is available for oil and gas leasing, although limited areas along the Dolores River Canyon may have no-surface occupancy (NSO) stipulations. Additionally, there may be timing restrictions for some areas and site specific NSO or no-leasing for site specific resource issues (e.g., sage grouse leks, cultural resource sites) not directly addressed in the 1991 amendment. Surface disturbance, road access, and water use for potash exploration and development is similar to oil and gas exploration and development. Because of these similarities, management direction for oil and gas activities will be applied to potash activities, including, but not limited to using the same NSO areas, timing stipulations, etc., as set forth in the 1985 RMP, or any applicable supplemental guidance documents, standards, or guidelines, requiring similar drilling and surface management plans and mitigation measures, which may be incorporated as design features (see section 2.2.8, below) and/or conditions of approval.

BLM_0020812

## 1.7    Relationship to Statutes, Regulations, or other Plans

Exploration of mineral resources (the Proposed Action) is consistent with NEPA and the federal guidelines for implementing NEPA including the CEQ regulations for implementing the Procedural Provisions of NEPA outlined in 40 CFR 1500-1508, and USDI and BLM policies and manuals (BLM NEPA Handbook H-1790-1 [BLM 2008]). The Proposed Action is also consistent with other plans, programs, and policies of Affiliated Tribes, other federal agencies, as well as state and local governments to the extent practical, including but not limited to the following:

- The FLPMA of 1976, as amended in 43 United States Code (USC) 1701 et seq.
- The CEQ's *Considering Cumulative Effects under the NEPA* (CEQ 1997)
- 43 CFR Part 46, Implementation of the NEPA of 1969; Final Rule, effective November 14, 2008
- USDI requirements provided in Part 516, Chapters 1 through 15, of the Departmental Manual (USDI 2004)
- Mineral Leasing Act of 1920
- Clean Air Act (42 USC 1857 et seq.), as amended and recodified (42 USC 7401 et seq.)
- Clean Water Act (33 USC 1251 et seq.)
- Executive Order 11988, Floodplain Management
- Executive Order 11990, Protection of Wetlands
- FSM 2542.05, Municipal Supply Watersheds
- Public Law 93-523, Safe Drinking Water Act
- Rangeland Health Standards as developed by the Secretary of the Interior on February 22, 1995
- Endangered Species Act (ESA) (16 USC 1531 et seq.)
- Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations
- Migratory Bird Treaty Act (MBTA) (16 USC 703 et seq.)
- National Historic Preservation Act of 1966 (NHPA), as amended (16 USC 470 et seq.).
- Protection of Historic Properties (36 CFR 800)
- Native American Graves Protection and Repatriation Act of 1990 and 43 CFR Part 10
- American Indian Religious Freedom Act of 1978
- Native American Trust Resource Policy standards as presented in the Department of the Interior Comprehensive Trust Management Plan dated March 28, 2003
- U.S. Fish and Wildlife Service (USFWS) Bald and Golden Eagle Protection Act, as amended

BLM_0020813

*State of Colorado and Local Compliance:*
- Dolores County Development and Land Use Regulation (Dolores County 2007)
- San Miguel County Land Use Code (San Miguel County 2010)

*Other Regulations which May be Consulted for Guidance*
- Best Management Practices (BMPs) as defined in *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development, Fourth Edition* (Gold Book) (USDI and USDA 2007)
- BLM Oil and Gas Onshore Orders 1, 2, and 6
- Colorado Oil and Gas Commission Rules

Some of these federal and state programs are described more fully below.

### 1.7.1   Climate Change Policy

The federal government released the Global Climate Change Initiative and Policy Book in 2002. The plan comprehensively addresses climate change and includes a goal to reduce the greenhouse gas intensity of the U.S. economy by 18 percent between 2002 and 2012. It also provides initiatives to reduce greenhouse gas emissions and encourage renewable energy resources development (U.S. Global Change Research Program 2002).

### 1.7.2   Section 7 of the Endangered Species Act (ESA)

The ESA of 1973 provides for conservation of species that are endangered or threatened throughout all or a significant portion of their range, as well the ecosystems on which they depend. Under Section 7(a) (2) of the ESA, federal agencies must consult with the USFWS on activities that may affect a listed species.

### 1.7.3   Section 106 of the National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires federal agencies to consider the effects of their undertakings on historic properties through a mandated review process (relevant regulations at 36 CFR 800). Section 106 of the NHPA also mandates that the Advisory Council on Historic Preservation is given a reasonable opportunity to comment.

## 1.8   Identification of Issues

The RM Potash Exploration Project was posted on the BLM's NEPA Register and Schedule of Proposed Actions (SOPA). A Notice of Scoping was also posted on the BLM Newsroom web page on June 28, 2011 and a public scoping letter was mailed to 74 addresses on June 24, 2011. A scoping meeting was held at the Dove Creek High School Commons in Dove Creek, Colorado on July 12, 2011 to identify potential issues. Written scoping comments were accepted via mail, e-mail, and fax resulting in a total of 15 scoping letters.

The Interdisciplinary Team (IDT) met on August 25, 2011 to review public scoping comments and identify resource issues. Minutes taken from this meeting formed the basis of the analysis in this EA and are included in the Project Record. Based upon either the resource not being present in the Project Area or the lack of the resource being impacted by the proposed Project, several resources were dismissed from further analysis in this EA (**Appendix A** - Interdisciplinary Team Checklist).

The relevant issues were identified through the scoping process and through the IDT meeting. Those issues that are potentially affected are carried forward through analysis in this EA include the following:

### 1.8.1   Cultural Resources
- Proposed disturbances could impact cultural resources eligible and potentially eligible for the National Register of Historic Places (NRHP).

### 1.8.2   Geology and Minerals
- The Proposed Action could impact or disrupt existing oil and gas leases, exploration, and development. The oil and gas formations are within or near the same depths as the exploratory drilling targets. Drilling activities may adversely impact leased federal oil and gas resources.
- Uranium development has occurred in the area and drilling activities may interfere with uranium proposals. Drilling may penetrate uranium-bearing horizons.
- Geological hazards typically associated with petroleum drilling, such as over-pressurized gas reservoirs or hydrogen sulfide ($H_2S$) releasing strata may be encountered.

### 1.8.3   Land Use and Realty
- The Proposed Action could change the land use of the area.
- The Proposed Action would impact private property.
- The Proposed Action would occur in two counties with different codes and regulations. For regulations not superseded by state and/or federal regulations, the design of the Project needs to take into account these differences.

### 1.8.4   Livestock Grazing
- Proposed disturbances may result in forage loss (i.e. AUM loss).

### 1.8.5   Migratory Birds
- Depending upon the timing of Project activities, migratory birds and their nests could be impacted.

### 1.8.6   Noise
- Equipment noise may exceed human health dBA restrictions or other standards and restrictions.

BLM_0020815

### 1.8.7 Recreation
- The Project could impact recreational opportunities, such as hunting.

### 1.8.8 Socioeconomics
- The Project could burden local infrastructure funded by municipalities, counties, the state, and federal governments.
- The Project could have beneficial or adverse effects on the San Miguel and Dolores County economies.
- Project activities could adversely impact people living and working in close proximity to Project activities.

### 1.8.9 Soils
- The Project may impact soil productivity through compaction and loss of topsoil and may increase erosion potential through the removal of ground cover and/or constructing roads and/or drilling on steep slopes.
- Accidental surface spills and releases of drilling fluids, mud additives, and other chemicals or materials used in the proposed operations could contaminate native soils and degrade soil productivity.

### 1.8.10 Federal Endangered, Threatened, and Candidate Species; BLM Sensitive Species and Species of Concern; State of Colorado Endangered and Threatened Species, and Federal Birds of Conservation Concern
- Increased noise, traffic, and human presence from Project activities could impact raptor foraging, roosting, breeding, or nesting behavior.
- BLM Special Status Species and Birds of Conservation Concern, such as Gunnison sage grouse, and associated habitats could be impacted.
- Mexican spotted owl which is federally listed as threatened may be affected by Project activities which are proposed adjacent to potential habitat.

### 1.8.11 Transportation
- Project activities would adversely impact local roads and access to private and public lands.

### 1.8.12 Vegetation, Including Invasive Species/Noxious Weeds
- Ground disturbances would impact shrub/grass vegetation.
- Ground disturbance could spread or introduce invasive species/noxious weeds.
- Dolores and San Miguel Counties host a number of rare and BLM sensitive plant species and communities that could be impacted by Project activities.

### 1.8.13 Waste - Hazardous, Fluid, and Solid
- Formations containing naturally occurring radioactive materials (NORMs) could be encountered, potentially contaminating water resources, soils, surface conditions, etc.
- The Project would generate solid waste that may require special measures for disposal.

BLM_0020816

- Liquid waste products, some of which could be hazardous, will be generated by the Project. Improper handling, storage, and disposal of these products could negatively impact natural resources in the area.

### 1.8.14  Water Resources/Quality (drinking/surface/ground)
- Soil disturbance and erosion may impact surface water quality.
- Accidental spills or releases of drilling/cementing fluids, additives, or waste products may degrade surface water quality.
- Improper drilling, casing, cementing, and abandonment techniques may degrade groundwater quality and/or quantity by introducing non-native fluids into existing aquifer systems, establishing communication pathways between two or more naturally isolated aquifers, or creating zones of cross-contamination between hydrocarbon-bearing and water-bearing intervals.

### 1.8.15  Wildlife
- Project activities could impact big game, such as mule deer and elk, which use the area for winter concentration areas and critical winter range.
- The Project could impact wildlife habitat, including raptor nesting areas.
- The Project could cause habitat fragmentation.

### 1.8.16  Air quality and Climate Change
- The Project would release carbon dioxide and/or other gasses associated with climate change.

## 1.9    Issues and Resources Considered but Eliminated

In addition to the resources listed above, the potential effects of the Project on other issues and resources were also evaluated. However, these resources and concerns are either not present/applicable or will be addressed through Project design, management requirements, and/or Environmental Protection Measures (EPMs). It is emphasized that as described in the proposed action, all surface and downhole activities associated with the Project would comply with applicable State of Colorado and federal mining and environmental laws and regulations. State and federal Oil and Gas rules, regulations, policies, orders, notices, best management practices (including Colorado Oil and Gas Conservation Commission Rules and Policies, Onshore Oil and Gas Federal Regulations 43 CFR Part 3160, Department of Interior Onshore Oil and Gas Operating Orders, BLM National and BLM State of Colorado Notice to Lessees, BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development), and any other standards, guidelines, and policies would be used as guidance in developing mitigation measures and Conditions of Approval by the TRFO. Such compliance would mitigate effects to potential resources and ensure public health and safety throughout the Project. These concerns will not be carried through in **Chapters 3** and **4**.

### 1.9.1  Air Quality
The Project Area lies within an area designated as an attainment area. Air emissions resulting from the Project would consist of emissions from mobile sources and the disturbance of soil. Best Management Practices (BMPs) for dust control would be

BLM_0020817

employed. All Project vehicles would have legally mandated on-board emission controls; traffic and drilling would only create a small amount of dust. Effects to air quality would be short term and negligible.

### 1.9.2   Paleontological Resources
A Project-specific paleontological survey was completed for the Project (Blair 2011). No fossil resources were observed with the exception of a single pebble, which may have been a gastrolith (i.e., a stone swallowed to aid in digestion) at proposed Drill Site 3. If any suspected vertebrate paleontological resources are uncovered during the Project, disturbance would cease and BLM would be notified to determine the significance and need for documentation and protection.

### 1.9.3   Special Designations
The Project Area is not within any special designation areas (i.e. Wilderness, Wilderness Study Areas, Areas of Critical Environmental Concern, Wild and Scenic Rivers, research natural areas). The area is identified as natural landscape with limited management and is near areas identified as special areas and unique landscapes (BLM and USFS 2007).

### 1.9.4   Potash Production Concerns
Several public comments (BLM 2011a) expressed concerns regarding the potential effects of leasing and commercial potash production and recovery facilities, such as the demands on infrastructure, requirements of natural gas pipelines, emissions from boilers, the amount of water required for potash pumping, potential subsidence, and other geotechnical issues. These concerns cannot be meaningfully evaluated until the potash deposit has been adequately delineated and a mining and production plan has been proposed. If exploration results indicate that economically viable potash resources may be present and a leasing or production proposal is received, these concerns will be fully evaluated in a site-specific NEPA document or documents analyzing the effects of leasing and development of the resource.

### 1.9.5   Public Health and Safety
Many of the drilling activities associated with the Project can be dangerous without proper precautions. General risks to public health and safety that may be associated with this Project include, but are not limited to, encountering hydrogen sulfide gas in subsurface formations, possibly drilling through over-pressured and/or under-pressured formations potentially resulting in well control problems, and potential health issues related to working around oil-based mud systems. At a minimum, the Project would be adhering to all applicable state and federal mining and oil and gas drilling regulations, rules, policies, orders, and notices, in order to eliminate potential risks to public health and safety.

**1.9.6    Additional Issues and Resources Considered But Eliminated from Analysis**
The following critical elements and/or natural resources are not present or do not occur within or near the Project Area, would not be affected by the Proposed Action and/or any Alternatives, including the No Action Alternative and will not be carried forward in the analysis.

- **Areas of Critical Environmental Concern:**  No ACEC's occur within the Project Area.
- **Environmental Justice (Executive Order 12898):**  Given the scale of the Project, and that the proportion of minorities and overall income level of people living near the Project Area is likely similar to those figures for San Miguel and Dolores Counties, it is not expected that the Project would cause disproportionate adverse human health or environmental effects on minority or low-income communities.
- **Fish Habitat:**  There are no fisheries in or near the Project Area.
- **Floodplains (Executive Order 11988):**  No floodplains occur in the Project Area.
- **Native American Religious Concerns:**  Potentially affected Native American tribes were included in the distribution of the NOS.  No responses or concerns from any of the notified tribes have been received or expressed.
- **Prime or Unique Farmlands:**  No prime or unique farmlands occur within the Project Area.
- **Wetlands/Riparian Zones (Executive Order 11990):** The proposed disturbance within the Project Area does not include any wetlands or riparian zones.
- **Wilderness:**  The Project Area is not located within a designated wilderness, proposed Wilderness Area or wilderness study area.
- **Wild Horses and Burros:**  No wild horses or burros, or wild horse/burro management areas, occur within or near the Project Area.
- **Wild and Scenic Rivers:**  There are no wild and scenic rivers within the Project Area.
- **Visual Resources:**  Based on a preliminary review of data provided in the DEIS for San Juan Public Lands, it appears that the Project Area has a visual resource management (VRM) designation of Class III.  The Project would be in conformance with the VRM objectives for the Project Area.

## 1.10   Summary

This chapter has presented the purpose and need of the proposed RM Potash Exploration Project, as well as the relevant issues, i.e., those elements of the human environment that could be affected by the implementation of the proposed Project.  The Proposed Action, as well as a No Action Alternative, is presented in **Chapter 2**.  **Chapter 3** presents the affected environment of the Project. The potential environmental effects or consequences resulting from the implementation of each alternative are then analyzed in **Chapter 4** for each of the identified issues.

BLM_0020819

## 2.0   DESCRIPTION   OF   ALTERNATIVES,   INCLUDING PROPOSED ACTION

### 2.1   Introduction

Two alternatives were considered for analysis in this EA: the Proposed Action (Alternative A) and the No Action Alternative (Alternative B).  The No Action Alternative is required to be considered by NEPA and the CEQ implementing regulations under 40 CFR 1500-1508.  This chapter describes both of these alternatives in detail.

### 2.2   Alternative A – Proposed Action

The current proposal includes six prospecting permit applications and associated Exploration Plan(s), potentially resulting in the construction of exploration drill pads and drilling up to six sites (**Figure 2**).  In addition, existing road alignments would be used for access; no new roads would be constructed.  However, short segments of potential access roads en-route to Drill Sites 2, 4, and 6 would need substantial improvement to accommodate drilling equipment, including, but not limited to, blading, graveling, and/or road-fill.  Because these specific roads are infrequently travelled and require substantial improvement, this is being treated as 'new disturbance' for the purposes of calculating disturbance area in this document.

Drill Site 1 is located immediately adjacent to a state highway and Drill Sites 3 and 5 are located immediately adjacent to existing county roads.  Some road maintenance may occur as-needed, but no substantial improvements have been identified and these access roads are not treated as 'new disturbance'.

The following subsections detail the specific construction and operational procedures that comprise the Proposed Action and are the subject of the analysis of this EA.

BLM_0020820



BLM_0020821

### 2.2.1   Land Ownership and Location

The six prospecting permit applications are on the National System of Public Lands administered by the TRFO in the BLM. They are located in Dolores and San Miguel Counties, Colorado, between 7 to 16 miles north of Dove Creek in Dolores County (**Figure 1**). The legal locations of the six prospecting permit application areas are presented in **Table 2-1**.

**Table 2-1   Legal Locations of the Prospecting Permit Application Areas**

| Prospecting Permit Application Number | Township/Range | Section | County | Associated Drill Site |
|---|---|---|---|---|
| COC73567 | T. 43 N., R. 19 W. | sec. 11 all; N½ and E½ SE¼ sec. 14 | San Miguel | 1 |
| COC73569 | T. 43 N., R. 19 W. | sec. 13 all; E½ and E½ NW¼ sec. 23, N½ and N½ S½ sec. 24; SW¼ NW¼ and NW¼ SW¼ sec. 25; E½ sec. 26 | San Miguel | 2 |
| COC73572 | T. 43 N., R. 18 W. | SW¼ sec. 20; sec. 29 all; sec. 32 all | San Miguel | 3 |
| | T. 42 N., R. 18 W. | N½ sec. 5 | | |
| COC73574 | T. 43 N., R. 18 W. | S½ sec. 28; sec. 33 all | San Miguel | 4 |
| | T. 42 N., R. 18 W. | sec. 4 all; sec. 9 all; E½ sec. 16 | | |
| COC73576 | T. 42 N., R. 18 W. | NW¼ and S½ sec. 3; sec. 10 all; S½ sec. 15 | San Miguel | 5 |
| COC74370 | T. 42 N., R. 19 W. | SE¼ NW¼, NE¼ SW¼, and SW¼ SW¼ sec. 4; N½ N½, SW¼ NE¼, NW¼ SE¼, and S ½ SE ¼ sec. 5; NW¼ NW¼, NE¼ SW¼, and NW¼ SE¼ sec. 9; N½ sec. 10; SE¼ NW¼ sec. 13 | San Miguel and Dolores | 6 |
| | T. 42 N., R. 18 W. | S½ NW¼ and SW¼ sec. 29; W½ NW¼ sec. 32 | | |

BLM_0020822

## 2.2.2   Overview of Drill Sites

The drill sites are located along the crest of the geological structure named the Dolores Anticline, a broad northwest-southeast trending fold.  The geological formations exposed at the surface in the vicinity of these areas range in age from the Cretaceous-age Mancos Shale (primarily outcropping above the rim of the Dolores Canyon) down to, and including, the upper part of the Permian-age Cutler Formation (primarily exposed at the base of the Dolores Canyon).  The Paradox Formation (previously Paradox member of the Hermosa Formation) has been subdivided into evaporative salt cycles by Hite (1960) that were numbered 1 through 29 from the top down.  Potash occurrences were noted by Hite in 18 of the 29 salt cycles.  The intended exploration target is potash beds in Salt Cycles #5, #6, and possibly #9 in the upper 500 feet of the middle evaporate member of the Paradox Formation.  The upper part of this formation is composed of a series of interbedded layers of salt (halite and potash), siltstone, anhydrite, dolomite, and black shale.  Several of the salt layers within the Paradox Formation contain layers of potassium minerals (potash) including the minerals sylvite (KCl) and carnalite (KMgCL3 6H20).

Six possible drill sites are being proposed (**Figure 2**; **Appendix B**); from these sites one to three sites would initially be selected.  The final selection of sites to be drilled would depend partly on environmental considerations and prospective geologic data.  Each drilling site would be on a pad approximately 250 by 250 feet in size (1.4 acres).

Drill Site 1 is located adjacent to Highway 141 about 1,500 feet south of an old petroleum well drilled in 1955 (Reynolds Mining #1 Egnar, API#05-113-05004).  No road construction would be needed to reach it.  This old bore hole appears to have intersected about 6.7 meters (22 feet) of potash, according to geophysical logs.  The drill site is located on prospecting permit application COC-73567.  The site access is on an existing road just west of Highway 141.

Drill Site 2 is located along existing dirt road extending from County Road K8.  The drill site is located on prospecting permit application COC-73569 and was positioned to intersect a region of flat dipping stratigraphy.  The drill site is accessible by approximately 1.5 miles of existing dirt roads, but substantial improvements to a segment of the existing dirt road may be necessary.  The proposed drill hole would be located adjacent to the road and would not block existing access.

Drill Site 3 is located about 1,000 feet north of County Road L9 along an existing unimproved dirt road.  The drill site is located on prospecting permit application COC-73572 and was positioned to intersect a region of flat dipping stratigraphy.  The proposed drill hole would be located adjacent to the road and would not block the existing thoroughfare.  Site access would not require new road construction or improvements.

Drill Site 4 is located along an existing 4-wheel drive (4WD) road, utilizing County Roads K8 and L9 roads, on prospecting permit application COC-73574.  The proposed drill site was positioned to intersect a region of flat dipping stratigraphy and is located

BLM_0020823

about 500 feet west of the Dolores Canyon rim. Access to the site requires substantial improvement of about 3,500 feet of existing 4WD road.

Drill Site 5 is located along existing roads (County Roads F4 and F11) on prospecting permit application COC-73576. The proposed drill site was positioned to intersect a region of flat dipping stratigraphy and is located about 500 feet west of the Dolores Canyon rim. Access to the site would not require substantial road improvement.

Drill Site 6 is located on prospecting permit application COC-74370 and was positioned to intersect a region of flat dipping stratigraphy. It is accessible by about 1 mile of existing 4WD road extending from Sand Rock Road (also known as B Road). However, substantial improvements to the existing 4WD road will be necessary to facilitate drilling operations.

### 2.2.3   Drill Pad Layout and Equipment

The anticipated cores and tests would require moderate size drilling equipment capable of reaching depths of 6,500 feet and would employ a pitless closed loop drilling system. Each drill pad would measure 250 by 250 feet (1.43 acres) and include: four 400 barrel (16,800 gallon) tanks to hold mud and four rectangular tanks holding roughly 700 barrels (29,400 gallons) each to do premixing of chemicals for fresh water- and oil-based muds, a drill rig with blowout preventer, shale shaker, centrifuge, mud pumps, two personnel trailers, a topsoil storage stockpile from initial grading of the drill pad area, a bermed and lined pad for drying and temporary storage of fresh water-based drill cuttings (40 feet by 35 feet), a temporary storage area for the steel drums that would contain the oil-based cuttings (30 by 30 feet), a flare pad (15 by 35 feet), and a portable toilet (**Figure 3**). A 10 barrel (420 gallon) tank with secondary containment of 150 percent of the tank volume would be used to store diesel fuel to run the drilling rig engines.

The drill rig would be a large truck-mounted drilling rig such as a Schramm T130XD type (**Photo 1**), or similar, depending on availability. This rig is capable of mud drilling to at least 5,500 feet and coring up to 7,000 feet. A shale shaker is set up behind the drill rig to remove cuttings for minimum water and mud consumption, and effective mud re-circulation. The drill rig is 9 feet by 43 feet by about 14 feet high at transport; when extended, the drill rig with the extended derrick is about 70 feet high. The wellhead would be equipped with a blowout preventer (BOP) stack, rated to handle any expected high pressure zones (at least 3,000 psi), and related equipment.

BLM_0020824



**Photo 1  Schramm T130XD Drill Rig.  Not shown are associated infrastructure such as trailers, topsoil stockpile, tanks, flare pad, and other support facilities.**

BLM_0020825

Each well would be drilled to approximately 5,500 feet using water-based mud. Any water-based mud cuttings from the drilling operation would be stored and allowed to dry on a temporary lined and bermed pad and later sampled and tested. If potential contaminants are below maximum allowable concentrations and levels, the material would be buried on location. A typical well would have conductor casing set at approximately 40 feet, surface casing set at about 1,500 feet, and intermediate casing set at roughly 5,500 feet. After setting the intermediate casing with cement and reaching the applicable depth, the mud would be changed from water based to an oil based mud system. The used water-based mud would be removed from the storage tanks and transported offsite to either the next drilling location for reuse or to a permitted commercial waste facility for disposal. The mud tanks would be washed out and filled with oil-based mud made with diesel and calcium chloride (CaCl) solutions in the premix tanks. Coring operations would be conducted using the oil-based mud system. Any solid cuttings drilled with oil-based mud would be put in steel containers and transported to a permitted commercial waste disposal facility. The oil-based mud would be entirely contained within tanks and the wellbore. When coring operations are complete, the oil-based mud would be transported offsite for reuse, recycling, or disposal at a permitted commercial waste facility.

After completion of all drilling operations, the water-based drill cuttings would be allowed to dry on the temporary pad and then sampled and tested to determine whether onsite or offsite disposal is required. All water-based and oil-based muds would ultimately be disposed of or recycled at a licensed commercial waste facility. See also **Section 2.2.8** on Hazardous Materials.

The flare pad would contain a burner used for disposal of hydrocarbons during clean-up, emergency shut downs, and for disposal of small volume waste streams of mixed gasses that cannot easily or safely be separated or stored on location. The flare pad would be an area 15 by 35 feet in size surrounded by a 3 foot high berm (**Figure 3**).

Drill Holes

Each wellbore would be drilled in three sections: an upper 10-inch diameter rotary drilled section, an intermediate 8-inch diameter rotary drilled section, and a lower 6-inch diameter core drilled section (**Figure 4**). The upper 10-inch diameter hole would be drilled to about 1,000 to 1,500 feet below ground surface (bgs), and a 9 5/8-inch surface casing string would be set at least 50 feet into the Chinle Formation. The hole would be lined with steel casing and cemented all the way back to ground surface. Next, an 8-inch diameter hole section would be rotary drilled to approximately 5,500 feet bgs and lined with temporary steel 7-inch casing. This intermediate casing string would be cemented at the base to roughly 150 feet above the intermediate casing shoe. From 5,500 to 6,000 feet bgs a 6-inch diameter core hole would be drilled into the Paradox formation. Oil-based mud would be used in the deepest part of the wellbore to prevent dissolution of

BLM_0020826

potash salts, and the 7-inch casing string above would prevent contact of oil-based mud with any fluid-bearing intervals above the Paradox Formation. After drilling was completed, the intermediate casing string would be removed and the entire borehole would be cemented from bottom to top and the well permanently plugged and abandoned. The uppermost 4 feet of the casing would be excavated and cut off before being buried below the ground surface.

Drilling of the upper portion of the well (i.e. Surface and Intermediate Hole Sections) would be done with conventional tri-cone drill tools (**Figure 4**), similar to those used to drill oil or water wells. In this part of the drilling, water-based mud would be circulated in the drill hole to remove cuttings. Cuttings would be de-watered with centrifuges and stored on a lined and bermed cuttings pad. Water-based mud cuttings that are at or below the maximum allowable concentrations and levels for contaminants specified in the COGCC's 900 series rules, Table 910-1, may be buried in a trench on site. If the water-based cuttings exceed these thresholds, the material would be hauled offsite to a permitted commercial solid waste disposal facility (also known as a "land farm" facility). Water-based drilling fluids would be mixed and stored in above ground tanks and would be reused at future drilling locations or transported to a commercial waste facility for recycling or disposal.

In the Core Hole portion of the well (**Figure 4**), an oil-based mud would be required because water-based mud, even salt-saturated water-based mud, would dissolve the highly soluble potassium minerals before they could be successfully cored and recovered. The oil-based mud would be recirculated in a pitless, closed loop drilling system. Once drilling was completed, any residual oil-based mud would be flushed out of the hole using a non-toxic drilling fluid, that would be captured in tanks, and reused, recycled, or disposed of, prior to plugging and abandonment. Oil-contaminated drill cuttings from this hole section would be temporarily stored in steel drums and hauled offsite to a licensed commercial (land farm) waste facility. Oil-based fluids would be reused on other drill holes, recycled, or disposed of at a licensed commercial waste facility. When using the oil-based mud, a 7-inch intermediate casing string would extend from ground level down to the depth where coring begins and would be cemented at the bottom in order to isolate the upper portions of the drill hole and any potential aquifers from the oil-based mud. Oil-based mud would be mixed and stored in separate tanks, and completely contained during the drilling process.

Drill holes would be permanently plugged and abandoned by cementing the open hole from bottom to top, all the way back to ground level, in order to prevent any migration of water or hydrocarbons within the wellbore. The intermediate casing string would be removed prior to cementing. The uppermost 4 feet of the abandoned casing would be excavated, cut off below ground level, and filled with soil according to COGCC rules for oil well abandonment. A metal plate with the name of the core hole would be welded to the top of the casing before burial.

BLM_0020827



**RM POTASH**
**POTASH EXPLORATION PROJECT**

Figure 3
Drill Pad Schematic

| DRAWN BY | CP | DATE DRAWN | 06/07/2012 |
| SCALE | | 1'=40' | |

Drill Hole ID: To Be Determined (TBD)
Location: TBD
Objective: Paradox Salt, cycles 5 through 9

Ground elevation: TBD

| Geology/Formation Tops | Depth in Feet BGS* |
|---|---|
| Dakota | 0 |
| Burro Canyon | 100 |
| Brushy Basin | 200 |
| Saltwash | 500 |
| Summerville | 850 |
| Entrada | 920 |
| Carmel | 1050 |
| Kayenta | 1100 |
| Wingate | 1230 |
| Chinle | 1470 |
| 9-5/8 inch surface casing shoe | 1520 |
| Moenkopi | 2010 |
| Cutler | 2140 |
| Hermosa | 3960 |
| Upper Paradox | 4930 |
| 7 inch temporary casing shoe | 5500 |
| Paradox Salt | 5550 |
| Potash bed 5 | 5600* |
| Potash bed 6 | 5800 |
| Potash bed 9 | 6400 |
| TD | 6500 |

Drill site surface

SURFACE HOLE:

10 inch diameter hole from 0 feet to approximately 1000-1500 feet to below Top of Chinle Formation

Lined with 9-5/8 diameter steel surface casing

Cemented to surface

9-5/8 inch diameter surface casing shoe at approximately 1500 feet (at least 50 feet below Top of Chinle Formation)

INTERMEDIATE HOLE:

8 inch diameter hole from 1000-1500 feet to 5500-6000 feet as appropriate to site

Lined with temporary 7 inch diameter steel intermediate casing

Cemented at base of intermediate casing to 150 feet above casing shoe

7 inch temporary intermediate casing shoe at approximately 5500 feet

CORE HOLE:

6 inch diameter hole from approximately 5500-6000 feet to 6500 feet as appropriate to site. Core to be retrieved.

Paradox Salt with potash beds

Proposed Total Depth approximately 6500 feet

Water-based Mud

Oil-based Mud

Hermosa

*Note that actual depths may vary from site to site.

PERMANENT ABANDONMENT; Immediately after drilling and testing, the entire well (i.e. Surface Hole, Intermediate Hole, and Core Hole sections) will be plugged by filling with cement from total depth to surface.

**RM POTASH
POTASH EXPLORATION PROJECT**

**FIGURE 4
SCHEMATIC WELL CONSTRUCTION DIAGRAM**

JBR

| DRAWN BY | CP | DATE DRAWN | 06/07/2012 |
|---|---|---|---|
| SCALE | | | Not to Scale |

BLM_0020829

### 2.2.4   Access Roads

Existing roads would be used to access the drill sites; no new access roads would be constructed.  From Highway 141, various county and local roads would be used to access the drill sites (**Table 2-2**).

**Table 2-2        Access Roads**

| Associated Drill Site | Main Access Road off Highway 141 | Secondary Access Road | Tertiary Access Road | Total Length of Access (miles) |
|---|---|---|---|---|
| Drill Site 1 | Immediately off Hwy 141 on unnamed road | n/a | n/a | <0.1 |
| Drill Site 2 | K8 Road | 8K Road | n/a | 3.2 |
| Drill Site 3 | K8 Road | L9 Road | n/a | 3.8 |
| Drill Site 4 | K8 Road | L9 Road | 4733 Road | 5.0 |
| Drill Site 5 | F4 Road | F11 Road | n/a | 7.7 |
| Drill Site 6 | B Road | Sand Rock Road | unnamed 4WD Road | 4.8 |
| Total Access | | | | 24.6 |

Three of the roads would need some improvement in order to get equipment to the drill site (**Table 2-3**).  Road improvements would consist of gravelling, blading, and filling as needed and would be identified in a pre-authorization walk-through with the BLM.  Road improvements would be kept to a minimum, but may require some widening.  Although wider than the actual disturbance would be in most cases, acres of road disturbance were calculated using a 20 foot width.  The Counties may also identify additional segments of road and types of improvements and/or maintenance, such as blading and gravelling, which they might require for use of County roads.

**Table 2-3        Disturbance from Access Road Improvements**

| Associated Drill Site | Road Name | Land Owner | Length (in feet) | Length (in miles) | Acres |
|---|---|---|---|---|---|
| Drill Site 2 | 8K Road | Private | 6,657.24 | 1.3 | 3.1 |
| | | BLM | 3,738.55 | 0.7 | 1.7 |
| Drill Site 4 | 4733 Road | BLM | 5,907.00 | 1.1 | 2.7 |
| Drill Site 6 | Unnamed 4WD Road | Private | 2,236.36 | 0.4 | 1.0 |
| | | BLM | 3,673.71 | 0.7 | 1.7 |
| Total | | | 22,212.86 | 4.2 | 10.2 |

### 2.2.5   Location and Source of Water Supply

Water would be needed for drilling operations, construction and compaction of pads, and for dust control.  Up to approximately 5,000 gallons of water per day could be required for each drill site throughout the 60 day drilling period at each drill site.  Water would be stored in the mud tanks.  Additional water may also be needed and used for dust control;

BLM_0020830

however, the amount needed for dust abatement is highly variable and depends upon site-specific conditions when needed. Water use could range from zero to several thousand gallons per day.

Water needed for construction and drilling operations would be purchased and trucked from nearby sources on private land.

### 2.2.6   Construction Workforce

Only one drilling unit would be operating at any time.  The drilling unit would require a workforce of approximately 3 to 5 workers.  Work would be conducted 24 hours per day, seven days a week at each hole until it is completed.

Each drill hole would take approximately 2 months (60 days) to drill and core.  In addition, another 15 days would be required for plugging and abandonment activities per drill site.

Once the equipment is setup, there would be approximately 6 to 8 vehicle trips per day to each drill site location, depending on the day's activities.  Vehicles would likely be mostly passenger vehicles of the workers travelling to the worksite and water trucks used for dust suppression.  In addition, there would be an additional truck trip to the site on a bi-weekly (i.e., every other week) basis to service the portable toilet.

### 2.2.7   Reclamation

Schedule

Core holes would be cement plugged and abandoned immediately after they are no longer needed for core recovery, or downhole testing. Reclamation earthwork and seeding would be completed within 180 days of drill hole abandonment.

Methods

The naturally occurring topsoil from the drill sites would be stripped and saved for final reclamation.  All topsoil stockpiles would be placed in long, shallow windrows (rather than a large single heap) and seeded and maintained in weed-free condition in order to preserve soil productivity.  Drill sites would be re-graded and re-contoured with equipment appropriate to return the disturbed land as closely as possible to its original contour.  Topsoil, striped and saved at the initial disturbance of the site, would be mixed with available shrub/wood slash material, and then spread, re-contoured, and compacted over the regraded site in order to inhibit soil erosion and promote re-vegetation.  The sites would be raked to create a rough surface and promote natural seed collection and if necessary reseeded by broadcasting an approved seed mix, and the soil would be compacted over the seed with the tread of tires of the re-grading and re-contouring equipment to help prevent soil erosion.

<u>Seed-Mix</u>

The type and mix of grasses, forbs, and other plant seeds would be appropriate and approved to be consistent with the surrounding natural vegetation. The following BLM-approved seed-mixes would be used (**Tables 2-4** and **2-5**).

**Table 2-4       Pinyon-Juniper Seed-Mix**

| Common Name | Species Name | Variety | PLS lbs/ac* |
|---|---|---|---|
| Indian Ricegrass | *Achnatherum hymenoides* | Paloma | 3.7 |
| Blue Grama | *Chondrosum gracile* | Alma | 0.5 |
| Muttongrass | *Poa fendleriana* | CO Source ID | 0.2 |
| Squirreltail | *Elymus elymoides* | Tusas | 2.3 |
| Total | | | 6.7 |

*This reflects the drilled seeding rate of 40 Pure Live Seed (PLS)/ ft²; it needs to be doubled if broadcast.

**Table 2-5       Sage Flats Seed-Mix**

| Common Name | Species Name | Variety | PLS lbs/ac* |
|---|---|---|---|
| Sand Dropseed | *Sporobolus cryptandrus* | VNS | 0.05 |
| Galleta | *Hilaria jamesii* | Viva, florets | 1.6 |
| Wyoming Big Sagebrush | *Artemisia tridentata var. wyomingensis* | VNS | 0.1 |
| Winterfat | *Krasheninnikovia lanata* | VNS | 0.25 |
| Four-wing Saltbrush | *Atriplex canescens* | VNS | 0.25 |
| Indian Ricegrass | *Achnatherum hymenoides* | Paloma | 2.5 |
| Blue Grama | *Chondrosum gracile* | Alma | 0.3 |
| Squirreltail | *Elymus elymoides* | Tusas | 1.4 |
| Muttongrass | *Poa fendleriana* | CO Source ID | 0.1 |
| Total | | | 6.6 |

*This reflects the drilled seeding rate of 40 PLS /ft²; it needs to be doubled if broadcast.
VNS=Variety Not Specified, get most local variety available.


<u>Monitoring and Reporting</u>

Photographic monitoring of each site before, during, and after reclamation would be undertaken to document the reclamation process at each site. A rehabilitation report documenting the reclamation would be submitted to BLM within 12 months of completing the drilling.

BLM_0020832

## 2.2.8   Design Features, Environmental Protection Measures (EPMs), and Best Management Practices (BMPs)

As noted previously, all surface and downhole activities associated with the Project would comply with applicable State of Colorado and federal mining and environmental laws and regulations.  To address issues related to deep drilling conditions, typically associated with oil and gas development, the project would also conform to all applicable state and federal Oil and Gas rules, regulations, policies, orders, notices, BMPs (including COGCC Rules and Policies, Onshore Oil and Gas Federal Regulations 43 CFR Part 3160, Department of Interior Onshore Oil and Gas Operating Orders, BLM National and BLM State of Colorado Notice to Lessees, BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development), and any other standards, guidelines, and policies that the TRFO deems necessary. In addition to complying with permit stipulations, RM Potash would implement EPMs and BMPs to mitigate the potential adverse effects of the Project.

<u>Reclamation</u>

Reclamation activities would be implemented as described in **Section 2.2.7** above. Following the reclamation activities, each drill site area would be fenced with three-strand wire and t-posts to aid in reclamation success by preventing livestock and/or big game access to seeded areas.  Once the reclamation has been deemed successful according to appropriate criteria, the fence would be removed (see below).

All of the access roads that would be used for the Project are existing roadways.  A few segments (**Table 2-3**) of these roads would need some improvement.  Reclamation of improved roads would depend on the amount of improvement (i.e. increased width) and use the road receives during Project activities.  If the vegetation currently present on the road bed appears to retain the ability to recover, ripping and seeding would not be necessary.  If the vegetation is beyond recovery and compaction of the road bed has occurred, then the following measures could be necessary:

- Re-grading any cuts and fills to re-establish the original ground contours and drainages.
- Construction of drainage dips at the appropriate spacing.
- Access to Drill Site 6 across public land would be completely obliterated and re-seeded back to its original condition.  Any gravel or non-native fill would be removed and disposed of properly.
- Any access across private land would be reclaimed back to the original condition, or may be left in its improved state, as per the desires of the private land owner.
- Ripping the new road construction to a depth of 12 to 18 inches.
- Placing 6 inches of loose topsoil in locations where topsoil was removed (if applicable).
- Seeding the soil with a BLM-approved seed mix following ripping and before physical crusts form on the soil surface.

BLM_0020833

- Placing slash (shrubs and woody material removed from the route to make it passable) on the reclaimed road bed as a final step, alternately slash may be incorporated into the topsoil and the road compacted to prevent erosion.
- Approximately the first 100 feet of the access road may be ripped, seeded, and blocked even if the rest of the road does not need reclamation treatment, at BLM's discretion.

Additional applicable general reclamation measures would also be implemented for the overall Project and include:

- Closed loop, pitless drilling systems would be used. Water-based cuttings would be dried on site and stored on pads for future onsite burial or offsite disposal. Oil-based cuttings would be stored in steel containers and transported offsite to a licensed, commercial waste disposal facility.
- Reclamation of drill sites and access roads would include weed control for three years post reclamation.
- Post reclamation success would be gauged by 70 percent vegetation and crown cover over the entire disturbed area and 60 percent ground cover (vegetation, rock, litter) or until equivalent of surrounding vegetation is reached.
- The operator may be directed to gravel portions of affected roads prior to or during Project implementation if needed to prevent mud or rutting. Any gravel applied may be removed after the end of operations, or left in place with the consent of the county and BLM.

Water

A Storm Water Pollution Prevention Plan (SWPPP) would be completed for the Project, as an attachment to the Exploration Plan. The Project-specific SWPPP would identify structural and non-structural controls that would be put in place to minimize erosion and run-off of pollutants and sediment. The SWPPP supports compliance with the terms and conditions of the National Pollutant Discharge Elimination System (NPDES) permit and complies with the Clean Water Act.

Prior to drilling, baseline water quality samples would be taken from the groundwater well located closest to each drill hole that would be drilled, contingent upon consent of the well's owner. Results of these samples would be used to ensure that there is no degradation of groundwater supplies as a result of the Project. Since there are no wells near proposed Drill Site 5, Quakie Spring or Sawmill Spring would be sampled to get a representative baseline analysis of groundwater quality.

Diesel fuel for the drilling rig and support equipment would be stored in approved tanks positioned in bermed areas lined with at least 35 millimeter (mil) impermeable plastic so that any spills would be contained. These bermed areas would be of sufficient volume to contain at least 150 percent of the entire contents of the tank should a full tank rupture. Drilling mud would be contained within a pitless, closed loop drilling system used to drill both the fresh water-based and oil-based mud sections. This mud system would be fully contained (i.e. closed system, not released to the environment) and would be reused at

BLM_0020834

future drilling locations or transported to a commercial waste facility for recycling or disposal. Oil-based mud and oil-contaminated cuttings would be stored in steel drums and hauled off-site for proper disposal at a permitted solid waste facility.

Noxious and Invasive Weed Species

A weed management plan would be implemented (**Appendix C**) to provide preventative BMPs and control treatment.

- Ground and vegetation disturbance would be kept to the minimum possible.
- Equipment would be cleaned of all mud, plant parts, and seed prior to entering BLM lands.
- Seeded topsoil stockpiles would be maintained in weed-free condition.

Range Management

- All range improvements would be protected during exploration and/or drilling.
- Fences must be kept in good repair during operations. No fences would be cut unless absolutely necessary and agreed to in writing by the BLM. Any fences damaged as a result of the Project would be repaired immediately by RM Potash.
- Any pasture gates would remain closed when cattle are in or adjacent to affected pastures. RM Potash would coordinate with the BLM on rotation schedules.

Soils

The naturally occurring topsoil from the improved access roads and drill sites would be stripped from the sites, stockpiled in long, shallow windrows, seeded and maintained weed-free, and saved for future final reclamation. When the disturbed ground is reclaimed, the topsoil would be spread back over the re-contoured surface and raked to create a rough surface to promote natural seed collection, then seeded by broadcasting.

Drill sites would be graded so that any soil eroded from the drill site would be contained on-site. If needed, water bars would be constructed on access roads to minimize soil erosion and approved culverts would be used where access roads cross gulleys or drainages, as approved by landowner (i.e., BLM, County, or private).

Wildlife

- **NSO (No Surface Occupancy) Stipulation**: NSO stipulation within 0.6 mile radius of a Gunnison sage grouse lek complex.
- **CSU (Controlled Surface Use) Stipulation**: CSU stipulation for project occupation, noise and operational time limits will be applied within 4 mile radius of mapped Gunnison sage grouse production area.
- **Timing Limitation Stipulation**: Timing limitation to protect big game (deer/elk) crucial winter range *December 1 to March 30*. Timing limitation to protect big game production areas *April 15 to June* 30. Timing limitation to protect Gunnison sage grouse nesting habitat from *March 1 to June 30* within the 4 mile radius of mapped Gunnison sage grouse production area.

BLM_0020835

Additional wildlife stipulations for the Project Area include:

**1.)** Big Game Production Areas: Elk and Deer, Timing Limitation Stipulation April 15 - June 30
**2.)** Big Game Winter Range: Elk and Deer, Timing Limitation Stipulation December 1 - March 30
**3.)** Big Game Critical/Severe Winter Range: Elk and Deer, Timing Limitation Stipulation December 1 - March 30
**4.)** Sage Grouse Lek Complex (Mapped): No Surface Occupancy within 0.6 mile radius
**5.)** Sage Grouse Production Areas: Timing Limitation Stipulation and Controlled Surface Use between March 1 - June 30
**6.)** Mexican spotted owl: Timing limitation stipulation-no authorized activities will take place within ½ mile of the Dolores River canyon rim between March 1 – Aug 31

Wildlife timing restrictions and associated noise restrictions are shown in Figure F1 and Table F1 of **Appendix F**.

<u>Migratory Birds</u>
If possible, construction would be limited to outside the nesting season for migratory birds (April 1 – July 31).  If construction were to be initiated prior to the end of the nesting season, a pre-construction nest survey would be conducted in areas where Project activities could impact existing vegetation so that active nests could be avoided until after fledging.  Pre-construction surveys would be conducted for Sensitive bird species in conjunction with migratory birds in suitable habitat.  If any migratory bird nests were discovered along the route, BLM would be notified and the nest would be avoided until birds had fledged.

<u>Hazardous Materials</u>
Diesel fuel for the drilling rig and support equipment would be stored in approved tanks positioned in bermed areas lined with at least 35 mil impermeable plastic so that any spills would be contained.  These bermed areas would be of sufficient volume to contain 150 percent of the entire contents of the tank should a full tank rupture.  The water-based and oil-based drilling mud would be contained and re-circulated from tanks within a lined (at least a 35 mil impermeable liner), bermed area designed for 150 percent containment for any potential spills.  The oil-based mud system would be fully contained, and oil-contaminated cuttings would be stored in steel drums and hauled off-site for proper disposal at licensed, commercial waste facilities.

All heavy equipment and service vehicles would have a supply of absorbent and other cleanup materials on hand for initial containment of spills and the Project would adhere to the Hazardous Substance Spill Plan in case of accidents.  Stationary equipment would have absorbent pads or trays placed beneath them.

BLM_0020836

Refueling areas would be a minimum of 300 feet from perennial and intermittent stream channels, seeps and springs, wetlands, lakes and reservoirs, stock water developments, and other water features.

A Spill Prevention, Control, and Countermeasure (SPCC) Plan would be completed for the Project, as an attachment to the Exploration Plan. The Project-specific SPCC would identify structural and non-structural controls that would be put in place to prevent spills and minimize effects in the event of a spill.

A hydrogen sulfide ($H_2S$) contingency plan would be completed for the Project, as an attachment to the Exploration Plan. This plan would ensure that all rig personnel are properly trained to work in a hydrogen sulfide environment and fully understand the purpose of hydrogen sulfide monitors and alarms, and the action to take when alarms visual/audible initiate. All crew members would be trained to understand the buddy system, safe briefing areas, muster stations, emergency evacuation procedures, and individual duties.

The Project would conform to the *Joint Agency Guidelines for Uranium Exploration Drilling Reclamation* (USFS et al. 2007). Prior to exploration disturbance, background radiation level readings would be taken at each drill site. This data would be used as a reclamation standard for cleanup of each drill site. These guidelines contain stipulations for radiation readings, drill hole abandonment, on-site drill cuttings disposal (non-diesel only), radiation reclamation, and overall reclamation (**Appendix D**). Water-based drill cuttings that do not meet state COGCC standards for cuttings disposal set forth in Table 910 (**Appendix D**) would be hauled off site to a permitted land farm facility.

Solid Waste

Dried, water-based cuttings would only be stored onsite within a bermed, lined cuttings pad. If the chemical makeup of the dry cuttings material is below contaminant thresholds by the State of Colorado (COGCC Rule 907d), this material could be buried in an onsite trench. Cuttings not meeting State of Colorado thresholds would be transported offsite to a licensed commercial waste disposal facility.

In accordance with the *Joint Agency Guidelines for Uranium Exploration Drilling Reclamation* (USFS et al. 2007), if any of the dried water-based cuttings show radioactive readings in excess of background readings (see Hazardous Materials section above), they shall be buried and covered with no less than 3 feet of earthen material to bring radiation readings back to background levels. The goal of radiation reclamation is for all exploration drill hole locations to be abandoned with radiation levels that are no more than the level that was measured for the background readings. Following drill hole abandonment, radiological data shall be obtained at each drill location to verify.

BLM_0020837

No construction or domestic refuse or garbage would be disposed of by burning; all such material would be hauled away for disposal at permitted facilities.

Fluid Waste

All drilling fluids would be contained within a closed-loop mud system. Upon completion of drilling, all water-based and oil-based drilling fluids will either be reused at a future drilling locations or transported to a commercial waste facility for recycling or disposal.

Noise

Personnel would be required to comply with all applicable federal, state, and local laws and regulations concerning prevention and control of noise during project construction and operation.

In areas within sage grouse habitat, noise stipulations would apply. CDOW's Controlled Surface Use (CSU) lease stipulation would be implemented to muffle or otherwise control noise from drill sites and roads, so that drilling and operational noise would not exceed 49 dBA measured at 30 feet from the source in areas between 0.6-4.0 miles from a lek year round (CDOW 2010).

Fire

The drilling operations area, approximately 250 by 250 feet, would be prepared by grading and leveling. All vegetation and topsoil would be stockpiled. This drill site size would allow for drilling operations to be conducted within an area that has a periphery of bare earth between the drilling and support equipment and adjacent vegetation. Drilling and support equipment would have approved fire suppression equipment and the drilling crews would be trained in its use. Any gas flaring equipment would be located on an area of bare soil in a 25 foot radius from the flare. The flare would be directed vertically upwards to prevent ignition.

Public Safety

The public would be warned of the dangers of equipment and drilling operation by adequate signage. Where possible, drill sites would be gated or chained to prevent public access. No firearms would be allowed on the drill site. Vehicles would not exceed posted speed limits and if necessary, speeds would be reduced, especially when other vehicles are present or wildlife is active near access roads. Blow out prevention (3000 psi minimum) and a hydrogen sulfide contingency plan would protect the public from well control issues.

BLM_0020838

## 2.3    Alternative B – No Action

The No Action Alternative is required to be considered by NEPA and the CEQ implementing regulations under 40 CFR 1500-1508.

The No Action Alternative is considered and analyzed to provide a baseline for comparison of the effects of the Proposed Action.  Under the No Action Alternative, no surface disturbance and exploration would occur.  The Applications would not be approved and the availability of a known and sufficient potash resource in the area would be undetermined.  Implementation of the No Action Alternative would not meet the stated purpose and need for the Project.

## 2.4    Alternatives Considered but Eliminated from Further Analysis

NEPA directs the BLM and other federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources" (42 USC 4332). Applicable design features have been incorporated into the Proposed Action to avoid and minimize disturbance to resources present within the proposed Project Area.  There have been no other alternatives suggested that would meet the purpose and need for the Proposed Action while altering the impact on the resources identified.  Further, the Proposed Action was precisely designed to recover the necessary geological and geochemical data and deviation from it would fail to produce the data and result in an inadequate evaluation of the potential potash resources at the relevant prospecting permit application areas.  For these reasons, the EA only focuses on the Proposed Action and No Action Alternative, as described above in **Sections 2.2** and **2.3**.

BLM_0020839

## 3.0   AFFECTED ENVIRONMENT

### 3.1   Introduction

This chapter presents the potentially affected existing environment (i.e., the physical, biological, social, and economic values and resources) of the Project Area as identified from the IDT meeting and presented in **Chapter 1** of this assessment.  This chapter provides the baseline for comparison of effects/consequences described in **Chapter 4**.

### 3.2   General Setting

The Project Area is located in western San Miguel and Dolores Counties, in an area of plateaus and canyons between elevations of about 5,600 and 8,200 feet above mean sea level (amsl), with a semi-arid climate.  Much of the area is covered with pinyon-juniper woodlands; small areas of the more exposed and less moist plateaus contain patches of open lands covered by a mixture of grasses, shrubs, and sagebrush.  Some of the steeper and moister slopes may contain stands of scattered ponderosa pine trees.  The area is largely undeveloped, although it is crossed by Colorado State Highway 141.  The area has a well-developed network of gravel and dirt roads and trails, constructed for petroleum and uranium exploration and production, as well as residential use.  Some of the Project Area is adjacent to private ranch lands that have been cleared for pasture.

Vegetation is a mixture of sagebrush, grasses, scrub oak,  and pinion-juniper woodlands. Vegetation is thicker at higher elevations and ponderosa pines may be present in conjunction with the other vegetation.  Precipitation averages about 15 inches per year (WRCC 2011).

### 3.3   Resources and Issues Brought Forward for Analysis

#### 3.3.1   Cultural Resources

Cultural resources consist of definite locations of human activity, occupation, or use identified through field inventory, historic documentation, or oral evidence.  The term includes archaeological, historic, and architectural properties and sites or places of traditional cultural or religious importance to Native American Tribes or other social or cultural groups.  The BLM is responsible for identifying, protecting, and managing cultural resources located on public lands and on non-federal lands that may be affected by BLM actions.

Decisions regarding the management of cultural resources are dependent on determinations of significance in their evaluation for the National Register of Historic Places (NRHP).  In order for a cultural resource site to be eligible for the NRHP, the site must meet certain criteria (36 CFR 60.4) and retain aspects of integrity including location, design, setting, materials, workmanship, feeling, and association.

Cultural resource surveys were performed on a 10-acre area surrounding each proposed drill hole location and within a 100-foot wide corridor centered on the proposed access

BLM_0020840

routes.  These areas are identified as the "Study Areas" on **Figure 2**.  A Project-specific cultural resource inventory was conducted at each of the six 10-acre blocks surrounding the drill site locations (Davidson 2012).  Three new cultural resource sites (5SM7095, 5SM7096, and 5SM7097) and two previously recorded cultural resource sites (5SM4822 and 5SM4936) were encountered during the inventory (**Table 3-1**).  An additional previously recorded site (5SM1410) was not relocated.  The three newly recorded sites are all recommended as not eligible for the NRHP.  Site 5SM4822 was previously recommended and officially determined as needing data to evaluate for the NRHP.  Site 5SM4936 was officially determined as not eligible for the NRHP.  Two prehistoric isolated finds (5SM7098 and 5SM7099) were also noted; isolated finds are not eligible for the NRHP.

#### Table 3-1      Cultural Resource Sites within the Study Areas

| Site Number | Age | Type | NRHP Evaluation | Drill Site Study Area |
|---|---|---|---|---|
| 5SM7095 | Prehistoric | Lithic scatter | Not Eligible | 1 |
| 5SM7096 | Historic | Trash Scatter | Not Eligible | 1 |
| 5SM7097 | Historic | Trash Scatter | Not Eligible | 3 |
| 5SM1410* | Prehistoric | Lithic Scatter | Not Eligible | 3 |
| 5SM4822 | Prehistoric | Lithic Scatter | Needs Data | 5 |
| 5SM4936 | Prehistoric | Lithic Scatter | Not Eligible | 4 |

*Not Relocated

### 3.3.2   Geology and Minerals

The Project Area is located on lands within the Paradox Basin portion of the Colorado Plateau physiographic province (BLM 2010).  Rocks exposed at the surface in the vicinity of the Project Area range in age from Permian to Cretaceous, and include (from oldest to youngest) the Cutler Formation (Permian), Chinle Formation (Triassic), Dolores Formation (Triassic), Wingate Sandstone (Triassic), Kayenta Formation (Jurassic), Navajo Sandstone (Jurassic), Entrada Formation (Jurassic), Summerville Formation (Jurassic), the Brushy Basin and Salt Wash members of the upper Morrison Formation (Jurassic), the Lower Cretaceous Burro Canyon Formation, the Lower Cretaceous Dakota Sandstone, and Upper Cretaceous Mancos Shale. (Cater 1955a,b,and c).

The Project Area is located along the crest of a geologic feature known as the Dolores Anticline, a salt-cored anticline capped by late Paleozoic and Mesozoic sedimentary rock, within the greater Paradox Basin portion of the Colorado Plateau.  The Project Area also lies within the Uravan mineral belt – a uranium and vanadium mining district which stretches from Dove Creek to Gateway along the Utah border.

The target formation for potassium is the Pennsylvanian Paradox Formation which contains cyclical evaporite rocks including shale, dolomite, gypsum, and rock salt.  It is not exposed at the surface in the Project Area.  The surface rocks include the following units (Cater 1955a and 1955b):

BLM_0020841

Quaternary Alluvium – Qal
Wind Deposited Sand and Silt and Alluvial Gravels, undifferentiated.  In the Project Area, the Qal unit appears to mostly be eolian silt and loess in nature, rather than fluvial, alluvial, or other deposits.

Upper Jurassic Morrison Formation – Salt Wash member – Jms
The Upper Jurassic Morrison Formation includes white to gray, light buff, and rusty red sandstone with some interbeds of red shale and mudstone and a few thin beds of dense gray limestone.  The sandstone generally forms ledges and consists of lenticular beds.  It is interpreted to have been formed in a fluvial environment.  Fossil wood, carbonaceous matter, and saurian bones occur locally.  The formation is generally 260-300 feet thick in the Egnar quadrangle and 230-360 feet in the Joe Davis Hill quadrangle.  Uranium deposits in the Uravan mineral belt are generally in the Salt Wash member and are associated with reducing conditions caused by organic materials, including dinosaur bone and wood.

Upper Jurassic Morrison Formation – Brushy Basin Shale member – Jmb
This formation is composed predominantly of varicolored bentonitic shale and mudstone with intercalated beds and lenses of conglomerate and sandstone.  It forms smooth slopes covered with blocks and boulders.  Its contact with the overlying Burro Canyon Formation is gradational and is generally mapped as the base of the lowermost conglomerate.  Silicified saurian bones and wood are much more common in the Brushy Basin member than in the underlying Salt Wash member, especially in conglomerate beds.  It is generally 320 to 420 feet thick in the Egnar quadrangle.

Lower Cretaceous Burro Canyon Formation – Bbc
The formation consists of white, gray, and red lenticular sandstone and conglomerate with interbedded green and purplish shale.  It outcrops as a cliff or a series of thick, resistant ledges.  Cross bedding is common throughout.  The conglomerate consists mostly of chert pebbles, but also quartzite, sandstone, and shale.  The formation is 50 to 140 feet thick in the Egnar quadrangle and about 45 feet thick on the crest of the Dolores Anticline in the Joe Davis Hill quadrangle.

Lower and Upper Cretaceous Dakota Sandstone – Kd
Dakota sandstone is yellowish, lenticular sandstone and conglomerate with interbedded carbonaceous shale and impure coal.  The sandstone is generally gray, yellow, and buff colored and is flaggy bedded.  Some is fine grained and thin bedded, but much is coarse grained and cross bedded.  Irregular, discontinuous lenses of conglomerate, with pebbles up to 2 inches in diameter are scattered throughout the sandstone.  Inter-fingered with the sandstone are black carbonaceous shale and thin coal seams and beds.  Plant impressions are common in both the shale and sandstone.  The entire thickness is not exposed in the Egnar quadrangle due to erosion, but the beds that remain are up to 150 feet thick and 120 feet thick in the Joe Davis Hill quadrangle.

BLM_0020842

Upper Cretaceous Mancos Shale – Km

Mancos shale is dark gray, soft, homogeneous fissile rock that erodes to smooth landforms or badlands. Large, calcareous concretionary masses are present in some horizons. Greater than 3,000 feet thick, but only a few hundred feet of the bottom of this formation is present in the Joe Davis quadrangle (Cater 1955c).

Uranium mining was once common in the area and small adits, prospects, and mines are common, as are trash dumps from miners who occupied the area. Where the salt was close to the surface, mining was often done by using a Geiger counter to high grade small hotspots, particularly in areas such as the Spud Patch.

**Potash Deposits**

Several USGS reports identify potash deposits of the middle Paradox Formation (Hite 1960, 1961; Raup and Hite 1992). The lowermost member of the Paradox Formation consists of alternating black dolomite shale, carbonates, and anhydrite, but contains no bedded salt. The upper member of the Paradox Formation is similar to the lower member. The middle member of the Paradox Formation exhibits 29 evaporite cycles of which 18 have been shown to contain some potash. Cycles #5, #6, and #9 are the targets of this proposal. The Paradox Formation is not exposed anywhere at the surface in the area of this proposal, but is exposed in Big Gypsum, Little Gypsum, and Paradox valleys to the north. In these valleys the salt reached the surface, but because of the solubility of sodium and potassium chlorides, the surface is now mostly composed of a residue of insoluble gypsum, dolomite, and clay.

**Mineral and Energy Resources**

There are several Department of Energy (DOE) Uranium Lease Tracts and oil and gas leases in the Project Area. **Figure 5** displays the locations of oil and gas leases, oil and gas units, existing and permitted wells, inactive and under review DOE uranium leases, mining claims, and abandoned mine features in and around the prospecting permit application areas and beyond. There are two oil and gas units in proximity to the Project Area: the Bill Barrett Corporation's Sand Rock Unit (COC-075088X) and the DJ Simmons' Secret Canyon Unit (COC-074872X). Drill Sites 5 and 6 are within the Sand Rock Unit. In addition, there are producing and proposed gas wells in the vicinity. There are also several hundred mining claims in the greater prospecting permit application areas. There are no active mining permits in the area; however, there have been several drilling notices in the last few years. There are five drilling notice case files (4 lynx royal, 1 energy fuels) currently in reclamation status.

The DOE Uranium leasing program is currently enjoined pending a Programmatic EIS; however, the surface management and non-locatable minerals within the lease tract areas are administered by the BLM and remain open to non-uranium mineral leasing.

BLM_0020843



**Legend**

- Proposed RM Potash Drill Hole Locations
- Access Roads
- Evaluated RM Potash Prospecting Permit Applications
- Legal Subdivisions Containing Mining Claim(s)
- Inventoried Abandoned Mine Feature
- DOE Uranium Lease Program Withdrawal
- Active Notice Drill Hole Locations
- Oil and Gas Unit Outlines
- Existing Well / Drilled
- Permitted Well / Not Yet Drilled

**Oil and Gas Leases**

- BILL BARRETT CORP
- GASCONADE OIL CO
- IMPACT ENERGY RESOURCES LLC
- KLURFELD GREGOR
- LIBERTY PETRO CORP
- PATARA OIL & GAS LLC
- WILLIAMS PRODUCTION RMT CO

N

0 2 Miles

RM POTASH
POTASH EXPLORATION PROJECT

FIGURE 5
OIL, GAS, AND MINING

JBR

| DRAWN BY | DATE DRAWN |
|---|---|
| CP | 7/5/2012 |
| SCALE 1:144,400 | |

Path: E:\drawings\Colorado Potash Exporation EA RM Potash\EA\Fig5 Oil, Gas, and Mining.mxd

### 3.3.3   Land Use and Realty

The Project Area is located in San Miguel and Dolores Counties, Colorado and includes BLM-administered and private lands. The San Miguel / Dolores County lines bisect the Project Area with Drill Sites 1 through 5 in San Miguel County and Drill Site 6 in Dolores County.

The Project Area would be accessed via State Highway 141 that traverses north-south. The major land uses in the area include irrigated and non-irrigated cropland, pastureland, rangeland, wildlife habitat, mineral extraction, and recreation such as off-highway vehicle use, hunting, and camping. Public lands are available for recreational use. Recreation in the area is generally dispersed.

According to the San Miguel County Management Plan, tourism, real estate, and construction are the primary economic generators in the county (SMCMP 2008). In San Miguel County, the Project Area is located in the West End zone. The "West End" of the county, including Egnar, Slick Rock, and Disappointment and Big Gypsum Valleys, is primarily high desert country bisected by the Dolores River and its sandstone canyons. Ranching is the livelihood for many West End residents, who number about 200.

According to the Dolores County Master Plan (DCMP; DCPC 1997), current land uses in Dolores County are primarily ranching and farming, and the timber industry. Western Dolores County also includes oil, gas, and carbon dioxide production. The western end of Dolores County has historically been agricultural, and there is a desire for this heritage to be sustained. Two planning themes noted in the DCMP (DCPC 1997 p. 22) include:

- Future land use patterns should sustain a rural quality of life, with special recognition of unique community histories, traditions, and values.
- Public lands should be preserved while remaining open for a diversity of social purposes and human activities.

### 3.3.4   Livestock Grazing

Domestic livestock grazing has occurred on public lands in Colorado since the late 1870s. The livestock industry has been an integral part of community development, as well as overall lifestyle, in southwestern Colorado. Public lands supply winter, spring, and summer grazing for dependent livestock producers, and represent a significant portion of their total operations. In Colorado, nearly 1,500 livestock operators are authorized for grazing use on 2,500 grazing areas called allotments through an approved grazing permit/lease (BLM 2011b). Grazing is managed by the terms and conditions specified for each allotment on the permit/lease, e.g., kind and number of livestock, season of use, and amount of use permitted each grazing year. Permit/leases are generally issued for a term of 10 years.

Livestock grazing is a primary land use in the Project Area. Most allotment lands are managed by the BLM, but there may be inholdings of state or private land. Livestock use levels are measured in Animal Unit Months, or AUMs. An AUM is the amount of forage it takes to support one cow/calf pair, one bull, five sheep, or one horse for one month.

BLM_0020845

Vegetation composition varies slightly among the six drill sites; however, in general the Project Area is located at an average of approximately 7,500 feet elevation and is dominated by pinion-juniper forest and typical associated vegetation: big sagebrush (*Artemisia tridentata*), Gambel oak (*Quercus Gambelii*), and alder-leaf mountain mahogany (*Cercocarpus montanus*).

**Table 3-2** provides the basic information of each of the four grazing allotments in the Project Area.

### Table 3-2        Grazing Allotments

| Allotment Number | Allotment Name | Management | Acres | AUMs | Type | Period of Use | Associated Drill Site |
|---|---|---|---|---|---|---|---|
| 17015 | Bush Canyon | Maintain | 4,677 | 76 | Cattle | 6/1 – 7/15 8/25 – 10/8 | 2 |
| 17034 | Slick Rock | Improve | 53,572 | 2,492 | Cattle | 11/1 – 2/28 3/1 – 4/30 | 1 |
| 17038 | Spud Patch | Maintain | 11,880 | 878 | Cattle | 5/16 – 11/14 | 3, 4, 6 |
| 08063 | Sandrock | Maintain | 6,276 | 590 | Cattle | 6/1 – 10/15 | 5 |

### 3.3.5   Migratory Birds

During summer 2011, a biological survey of each of the drill sites was conducted and all observations of bird species were documented (JBR 2011a). In addition, all areas within 0.5 mile of proposed drill sites were surveyed for raptor nests that may occur in cliff faces, trees, and rock outcrops.

Migratory birds are found in the vicinity of the Project Area as either seasonal residents or as migrants. Provisions of the Migratory Bird Treaty Act (16 USC 701-718h) prohibit the taking, killing, or possession of any migratory birds, including the taking of any nest or egg. As of November 2010, all native birds commonly found in the United States are protected under the Migratory Bird Treaty Act, except for resident native and introduced game birds, house sparrows (*Passer domesticus*), European starlings (*Sturnus Vulgaris*), rock doves (pigeons; *Columba livia*) and Eurasian collared doves (*Streptopeleia decaocto*). There are numerous species of migratory birds that have the potential to use habitat in the Project Area. **Table 3-3** lists the birds observed during the survey.

BLM_0020846

**Table 3-3    Birds Observed in the Project Area**

| Common Name | Scientific Name |
| --- | --- |
| Black-Chinned Hummingbird | *Archilochus alexandri* |
| Black-Throated Gray Warbler | *Dendroica nigrescens* |
| Blue-Gray Gnatcatcher | *Polioptila caerulea* |
| Chipping Sparrow | *Spizella passerina* |
| Common Raven | *Corvus corax* |
| Mourning Dove | *Zenaida macroura* |
| Northern Flicker | *Colaptes auratus* |
| Spotted Towhee | *Pipilo maculatus* |
| Turkey Vulture | *Cathartes aura* |
| Western Bluebird | *Sialia mexicana* |
| Western Scrub-Jay | *Aphelocoma californica* |
| Yellow-Rumped Warbler | *Dendroica coronata* |
| Red-tailed Hawk | *Buteo jamaicensis* |

The Project Area is within bald eagle winter range and potential peregrine nesting habitat is within 0.5 mile of Drill Sites 4 and 5. Raptor nest surveys were conducted by scanning cliff faces, trees, rock outcrops, etc. with binoculars and spotting scopes from vantage points providing coverage of the area. No raptor nests were identified. However, given the number of trees available within the 0.5-mile buffer area, a nest could have been missed during the one-day survey.

### 3.3.6  Noise

The Project Area is rural and generally undeveloped. Sources of noise are limited to occasional vehicles on county roads, winds, and wildlife. Sensitive receptors include a few residences, a few motorists, recreationists on BLM lands, and wildlife (including sensitive species). The settlement of Egnar and the town of Dove Creek are characterized as rural communities. Ambient or background noise in the majority of the Project Area is typically natural outdoor and wildlife sounds. Additional noise in areas adjacent to the Project Area results from agricultural activities and Highway 141. Local traffic and community activity are also noise sources associated with Egnar and Dove Creek and are classified as ambient noise.

### 3.3.7  Recreation

The Project Area is accessed via State Highway 141, beyond that are public and private lands. Recreation in the area is generally dispersed. The area provides a variety of dispersed outdoor settings and opportunities. The lands are somewhat remote and rustic with primitive settings, suitable for camping, picnicking, hiking/walking, hunting, enjoying wildlife, sightseeing, and other dispersed uses. There are no developed recreation areas in the Project Area.

BLM_0020847

While the West End has few public trails, the opportunity to explore BLM land often draws people to the slickrock country near the Dolores River (SMCMP 2008). Bikers and hikers find abundant roads built during the height of uranium/vanadium exploration and extraction, and climbers have found numerous sandstone routes in the West End.

### 3.3.8   Socioeconomics

*San Miguel County – Background, Population, and Economy*

San Miguel County was established in 1883 and named for the nearby San Miguel River. The county seat is the town of Telluride. The county was settled by ranchers and miners. Beginning in the late 1800s, radium was discovered in southwestern Colorado. San Miguel County was part of the Uravan mineral belt, a zone of uranium-vanadium deposits located in San Miguel, Montrose, and Mesa counties, Colorado, and Grand County, Utah. The Uravan mineral belt supplied about half the world's radium from 1910 to 1922, and vanadium and uranium were byproducts. The mines closed in 1923, when deposits in the Belgian Congo forced down the price of radium. Mining revived in 1935 when the price of vanadium rose, and boomed after World War II when the government stockpiled uranium for nuclear weapons programs. The uranium boom of the late 1940s revived the search for uranium orebodies. Uranium was produced from a number of mines, but the orebodies were small and discontinuous.

The 2010 population of San Miguel County is 7,359, an 11.6 percent increase over the 2000 population of 6,594 (US Census Bureau 2011). Land area in the county is 1,286.61 square miles which equates to 5.7 persons per square mile. Egnar, located in the west end of San Miguel County, is the only county community in close proximity to the Project Area, and is unincorporated. According to the 2000 Census Data, the population of the Egnar area (which includes Slickrock) is 129 persons (US Census Bureau 2011). There has been some growth in the county as 47 building permits were issued in 2010 (US Census Bureau 2011).

*Dolores County – Background, Population, and Economy*

Dolores County was created in 1881 from a part of Ouray County. The town of Rico, incorporated in 1879, became the county seat. Rico was a thriving mining town until the Silver Crash in 1893. Although some mining continued in the area, a substantial portion of the population moved away during this time. In 1945, the county seat was moved from Rico to Dove Creek. Rico and Dove Creek are the only incorporated towns in the county.

Western Dolores County, where the Project Area is located, has been a major dry land farming area for short season crops. In an effort to expand the agricultural base, an irrigation water system was constructed to irrigate 7,500 acres of farmland. The agricultural sector in western Dolores County was built on dry land farming with pinto beans as the primary crop along with oil seed crops, dry land winter wheat, and alfalfa.

The 2010 population of Dolores County was 2,064, an 11.9 percent increase over the 2000 population of 1,844. The land area in Dolores County is 1,067.1 square miles, which equates to 1.9 persons per square mile (US Census Bureau 2011). The town of Dove Creek is south of the Project Area. Settlement of the Dove Creek area started

BLM_0020848

around 1912 with ranchers and farmers moving into the area. The western part of the county was one of the last areas in the United States to be homesteaded. The Stokes Brothers built a store around 1914-1916. There was a post office and many businesses in the early 1920s, but the Town of Dove Creek was not incorporated until 1939. The 2009 population of Dove Creek was 689 (US Census Bureau, 2005-2009 American Community Survey).

No building permits were issued in Dolores County in 2010 (US Census Bureau 2011).

### 3.3.9   Soils

Using the NRCS web soil surveys (San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties; Animas-Dolores Area, Colorado, Parts of Archuleta, Dolores, Hinsdale, La Plata, Montezuma, San Juan, and San Miguel Counties; Cortez Area, Colorado, Parts of Dolores and Montezuma Counties), seven soil units or soil associations have been identified in the Project Area (NRCS 2011, 2010, and 2008). Soils in the Project Area are mostly of the order Mollisols and are dominantly loam (e.g., Monticello-Witt loams, Gurley-Skein loams, Nortez-Fivepine loams, and Granath loam). Other soils in the area include rock outcrops (e.g., Borolls-Rock outcrop complex, and Gladel-Bond-Rock outcrop complex) and the Nortez-Granath and Ormiston-Fivepine complexes (NRCS 2009). Generally, soils include loams over unweathered bedrock on the tops of ridges, terraces, and mesas, to loams on the sideslopes of hills and mesas. The soil units and descriptions are provided in **Appendix E**.

### 3.3.10   Federal Threatened, Endangered, and Candidate Species; BLM Sensitive Species and Species of Concern; State of Colorado Endangered and Threatened Species, and Federal Birds of Conservation Concern

A total of 17 plant and animal federal Threatened, Endangered, and Candidate (TEC) species were reviewed for their potential to occur in the Project Area (JBR 2011b). Two of the 12 wildlife TEC species or their habitats that are known or expected to occur on lands administered by the TRFO and private lands within San Miguel and Dolores Counties was determined to potentially be present in the Project Area; Mexican spotted owl (threatened) and the Gunnison sage grouse (candidate). None of the five TEC plant species are potentially present in the Project Area. The biological report (JBR 2011b) contains species and habitat descriptions for the species having the potential to occur within the Project Area.

There are 28 BLM plant and animal Sensitive Species (13 wildlife and 15 plant sensitive species) known or expected to occur on lands administered by the TRFO and private lands within San Miguel and Dolores Counties (JBR 2011b). Of these, 13 were determined as having the potential to occur in the Project Area (**Table 3-4**).

BLM_0020849

**Table 3-4     Sensitive Species Potentially Present in Tres Rios Field Office Resource Area**

| Common Name | Scientific Name | Status | Known/ Suspected to be present? | Suitable habitat present? |
|---|---|---|---|---|
| BIRDS | | | | |
| American peregrine falcon | *Falco peregrines anatum* | BLM | Yes | Yes |
| Bald Eagle | *Haliaeetus leucocephalus* | BLM | Yes | Yes |
| Brewer's sparrow | *Spizella breweri* | BLM | Yes | Yes |
| Ferruginous hawk | *Buteo regalis* | BLM | Yes | Yes |
| Gunnison sage grouse | *Centrocercus minimus* | BLM, federal candidate | Yes | Yes |
| Mexican Spotted Owl | | BLM, federal threatened | Yes | Yes |
| Northern goshawk | *Accipiter gentilis* | BLM | Yes | Yes |
| MAMMALS | | | | |
| Allen's big-eared bat | *Idionycteris phyllotis* | BLM | Yes | Yes |
| Big free-tailed bat | *Nyctinomops macrotis* | BLM | Yes | Yes |
| Fringed myotis | *Myotis thysanodes pahasapensis* | BLM | Yes | Yes |
| Spotted bat | *Euderma maculatum* | BLM | No | Yes |
| REPTILES and AMPHIBIANS | | | | |
| Longnose leopard lizard | *Gambelia wislizenii* | BLM | Yes | Yes |
| PLANTS | | | | |
| Naturita milkvetch | *Astragalus naturitensis* | BLM | No | Yes |
| Aromatic Indian breadroot | *Pediomelum aromaticum* | BLM | No | Yes |

Other than raptors, species-specific surveys for special status wildlife species were not conducted (JBR 2011a and 2011b). Occupied habitat does exist for the Gunnison sage-grouse (*Centrocercus minimus*) within the Project Area. This occupied habitat consists of both leking and production habitat. The Project Area also provides habitat for several Sensitive raptors and bats, for the longnose leopard lizard (*Gambelia wislizenii*), and two plant species (**Table 3-4**). The Project Area does not provide habitat for any Threatened or Endangered wildlife species. In addition, no special status plant species were observed, and based on actual, on-the-ground surveys, it does not appear that the Project Area provides habitat for any sensitive plants (JBR 2011a and 2011b).

### 3.3.11 Transportation

The main access into the Project Area is Highway 141. Highway 141 begins about two miles west of Dove Creek, Colorado heading north from US Route 491 (previously known as US Route 666). Highway 141 is a two-lane rural highway. The annual average daily traffic (AADT) is 590 vehicles between US Route 491 and milepost 9.38 (intersection with County Road 6) and the AADT is 350 from there to Egnar (CDOT 2010). From Egnar north, the AADT drops to 250. Nearer US Route 491, 10 percent of vehicles utilizing Highway 141 are trucks; further north toward the Project Area, the number of trucks increases to about 25 percent (CDOT 2010).

The US Route 491 AADT between Cortez and Dove Creek ranges between 2,500 to 3,800 vehicles (CDOT 2010). From the Colorado-Utah border to the intersection with Highway 141, the US Route 491 AADT ranges from 2,100 to 3,100 at the intersection.

There are few towns in the vicinity of the Project Area that could provide personnel, materials, and services. Nearby communities include Dove Creek, Egnar, and Slick Rock (**Table 3-5**). The two closest (within 50 miles) large towns include Cortez, Colorado which is about 37 miles southeast of Highway 141 on US Route 491 and Monticello, Utah which is about 25 miles west on US Route 491.

**Table 3-5      Towns and Communities in Proximity to the Project Area**

| Town/Community | Population | Distance in miles from Highway 141 at Egnar |
|---|---|---|
| Cortez | 8,632 | 47 |
| Dove Creek | 689 | 12 |
| Egnar | 129 | 0 |
| Monticello | 2,028 | 33 |
| Slick Rock | * | 13 |

*population included in Egnar total

BLM_0020851

From Highway 141, the Project Area is accessed via a system of unpaved county and private roads (**Table 3-6**). These roads are used to access BLM lands and the scattered private residences and ranches.

**Table 3-6        Project Area Access Roads**

| Associated Drill Site | Main Access Road off Highway 141 | Secondary Access Road | Tertiary Access Road | Total Length of Access (miles) | County |
|---|---|---|---|---|---|
| Drill Site 1 | Immediately off Hwy 141 on unnamed road | n/a | n/a | <0.1 | San Miguel |
| Drill Site 2 | K8 Road | 8K Road | n/a | 3.2 | San Miguel |
| Drill Site 3 | K8 Road | L9 Road | n/a | 3.8 | San Miguel |
| Drill Site 4 | K8 Road | L9 Road | 4733 Road | 5.0 | San Miguel |
| Drill Site 5 | F4 Road | F11 Road | n/a | 7.7 | San Miguel |
| Drill Site 6 | B Road | Sand Rock Road | unnamed 4WD Road | 4.8 | Dolores |

### 3.3.12  Vegetation, including Noxious & Invasive Weeds
The Project Area lies in the Colorado Plateaus Ecoregion (CEC 2010):

> The ecoregion has a dry, mid-latitude steppe climate.  It is marked by hot summers with low humidity, and cool to cold dry winters.  Low elevation basins and canyons [are] sparsely vegetated with blackbrush, shadscale, fourwing saltbush, and galleta grass.  Uplands and higher valleys have Wyoming big sagebrush, black sagebrush, pinyon-juniper woodlands and at higher elevations some areas of Gambel oak, mountain mahogany, aspen, and some Douglas-fir.  There are many ephemeral and intermittent streams.  Perennial streams originate in adjacent mountainous ecoregions. Rugged tableland topography with precipitous side-walls mark abrupt changes in local relief, often from 300 to 600 meters [985 to 1,970 feet]. The region has large low lying areas in river canyons.  The uplifted, eroded, and deeply dissected tableland of sedimentary rock contains benches, mesas, buttes, cliffs, canyons, and salt valleys.

BLM_0020852

**General Vegetation**

Based on Provisional Southwest Regional GAP data (USGS 2004), the majority of the Project Area occurs within the following three landcover categories.

Inter-Mountain Basins Big Sagebrush Shrubland.  This category is described as (USGS 2005):

> This ecological system occurs throughout much of the western US, typically in broad basins between mountain ranges, plains and foothills between 1,500-2,300 meters [4,920 to 7,544 feet] elevation.  Soils are typically deep, well-drained, and non-saline.  These shrublands are dominated by *Artemisia tridentata tridentata* and/or *Artemisia tridentata wyomingensis*.  Scattered *Juniperus* spp., *Sarcobatus vermiculatus*, and *Atriplex* spp. may be present in some stands.  Perennial herbaceous components typically contribute less than 25 percent vegetative cover.  Common graminoid species include *Achnatherum hymenoides*, *Bouteloua gracilis*, *Elymus lanceolatus*, *Festuca idahoensis*, *Hesperostipa comata*, *Leymus cinereus*, *Pleuraphis jamesii*, *Pascopyrum smithii*, *Poa secunda*, or *Pseudoroegneria spicata*.

Colorado Plateau Pinyon-Juniper Woodland.  This category is described as (USGS 2005):

> This ecological system occurs in dry mountains and foothills of the Colorado Plateau region including the Western Slope of Colorado to the Wasatch Range, south to the Mogollon Rim and east into the northwestern corner of New Mexico.  It is typically found at lower elevations ranging from 1,500-2,440 meters [4,920 to 8,000 feet].  These woodlands occur on warm, dry sites on mountain slopes, mesas, plateaus, and ridges.  *Pinus edulis* and/or *Juniperus osteosperma* dominate the tree canopy.  Understory layers are variable and may be dominated by shrubs, graminoids, or be absent.  Associated species include *Arctostaphylos patula*, *Artemisia tridentata*, *Cercocarpus intricatus*, *Cercocarpus montanus*, *Coleogyne ramosissima*, *Purshia stansburiana*, *Purshia tridentata*, *Quercus gambelii*, *Bouteloua gracilis*, *Pleuraphis jamesii*, or *Poa fendleriana*.

Rocky Mountain Gambel Oak-Mixed Montane Shrubland.  This category is described as (USGS 2005):

> This ecological system occurs in the mountains, plateaus and foothills in the southern Rocky Mountains and Colorado.  These shrublands are most commonly found along dry foothills, lower mountain slopes, and at the edge of the western Great Plains from approximately 2,000 to 2,900 meters [6,560 to 9,512 feet] in elevation, and are often situated above pinyon-juniper woodlands.  The vegetation is typically dominated by *Quercus gambelii* alone or codominant with *Amelanchier alnifolia*,

RM Potash Exploration Project                                                                                              47
Environmental Assessment

BLM_0020853

*Amelanchier utahensis, Artemisia tridentata, Cercocarpus montanus, Prunus virginiana, Purshia stansburiana, Purshia tridentata, Robinia neomexicana, Symphoricarpos oreophilus,* or *Symphoricarpos rotundifolius.*

The Project Area was surveyed in order to describe and map the existing vegetative communities (JBR 2011a). While vegetation composition varied slightly among the six drill sites, the greater Project Area is located at approximately 7,500 feet elevation and is dominated by pinion-juniper forest and typical associated vegetation: big sagebrush (*Artemisia tridentata*), Gambel oak (*Quercus Gambelii*), and alder-leaf mountain mahogany (*Cercocarpus montanus*). Drill Site 5 is slightly higher in elevation (8,180 feet) and vegetation is dominated by ponderosa pine (*Pinus ponderosa*) and Gambel oak. Drill Site 6, the most southern drill site, is dominated by alder-leaf mountain mahogany and big sagebrush vegetation. The remaining drill sites are all dominated by pinion-juniper.

**Noxious and Invasive Weed Species**
There are 71 species on the Colorado noxious and non-native invasive weed list (CDOA 2011). These species are classified in one of three categories.

**List A species**
List A weed species in Colorado that are designated by the Commissioner for eradication.

**List B species**
List B weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, develops and implements state noxious weed management plans designed to stop the continued spread of these species.

**List C species**
List C weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, will develop and implement state noxious weed management plans designed to support the efforts of local governing bodies to facilitate more effective integrated weed management on private and public lands. The goal of such plans will not be to stop the continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species.

The only noxious or non-native, invasive species observed during surveys was cheatgrass (*Bromus tectorum*), also known as downy brome (JBR 2011a).

BLM_0020854

### 3.3.13  Waste - Hazardous, Fluid, and Solid

The Project Area is generally undeveloped and shows no signs of solid or hazardous waste.   The exception to this is historic debris/trash associated with uranium exploration/mining in a few adjacent areas.  Previous drilling has occurred in the vicinity of the exploration drill sites; these locations have been reclaimed.  Naturally occurring radioactive materials (NORMs) are present in the Project Area, where the Morrison Formation is at or near the surface, as evidenced by historic uranium mining or prospecting in the vicinity of Drill Sites 1, 2, 3, and 4.

The closest solid waste landfill is the Cahone Landfill near Dove Creek, Colorado.  In addition, there is the Montezuma County Landfill located in Cortez, Colorado; it is a 360-acre facility with 40 acres currently active for receiving solid waste.

There is no hazardous waste disposal facility located in the immediate area so any hazardous materials generated locally and disposed in permitted hazardous waste facilities would be trucked by authorized carriers to existing, permitted facilities in Colorado.   Safety Kleen Systems (Safety Kleen) has a location (#605201) in Grand Junction, Colorado, approximately 185 miles away.  Safety Kleen collects used oil which is then recycled and re-refined.  Safety Kleen provides other removal services as well, including drummed waste, hydraulic fluids, compressor oils & filters, and hydrocarbon (solids & liquid) collection.  Safety Kleen services include soil testing and lab services (Safety Kleen 2010).  Safety Kleen also has additional locations in Englewood and Pueblo, both over 300 miles away.

Certain oil and gas exploration and production wastes are exempt from regulation as hazardous wastes under Subtitle C of the Resource Conservation and Recovery Act (RCRA), including produced water, drill cuttings, and drilling fluids (EPA 2002, p.10).  Reams Construction, located in Naturita, Colorado provides field drilling services including produced water and drilling fluid waste disposal; all drilling fluids, not reused, would be transported to their facility for treatment and recycling.  This is about 62 miles from Dove Creek, less from the Project Area.

### 3.3.14  Water Resources

According to the Colorado Department of Public Health and Environment (Colbert 2012), the Project Area is not within any surface or ground water Source Water Assessment Areas or Protection Areas.

#### 3.3.14.1 Surface Water

The Project Area is adjacent to the Dolores Canyon area of the Dolores River, which is east of the proposed drill sites.  The river is 2,300 feet below proposed Drill Site 5, the closest drill site location to the river, over a horizontal distance of 1.4 miles.  The nearest USGS Gaging Station is USGS 09168730 Dolores River near Slick Rock, Colorado, which is approximately four miles north-northeast (downriver) of proposed Drill Site 1.  The station is below the confluence of the Dolores River and Disappointment Creek, and has operated since May 1, 1997. However USGS has only calculated mean annual discharge for 2000, 2009, and 2010 (161.5 cubic feet per second [cfs], 120.2 cfs, and

BLM_0020855

120.4 cfs, respectively). Records for the station show many gaps in the data, notably between 2003 and 2008 and over several winters. For the period of record (which is intermittent), the minimum recorded discharge was 1 cfs (June 11, 2002); the maximum recorded discharge was 3,660 cfs (May 7, 1998); and the mean discharge was 184.8 cfs.

**Figure 6** and **Table 3-7** show the HUC 6 watersheds in which the proposed drill sites are located. Only the Dolores River is perennial within these watersheds; all of the other streams are described as intermittent in the USGS National Hydrographic Dataset (2012). Named creeks include Bell Creek (tributary to Bush Canyon, tributary to the Dolores River); Bishop Canyon and Summit Canyon (tributary to the Dolores River); Morrison, Blue, and Bell canyons (tributary to the Dolores River); and Chico Creek (tributary to Coal Creek Canyon). **Table 3-8** shows springs, by the HUC watershed, in the analysis area (i.e., the six HUCs in **Table 3-8**; **Figure 8** in Chapter 4).

### Table 3-7        HUC 6 Watersheds

| Drill Site # | HUC 6 Number | HUC 6 Name |
|---|---|---|
| 1 | 140300020702 | Summit Canyon |
| 2 | 140300020701 | Bush Canyon |
| 3 | 140300020706 | 140300020706 |
| 4 | 140300020605 | Joe Davis Hill-Dolores River Canyon |
| 5 | 140300020605 | Joe Davis Hill-Dolores River Canyon |
| 6 | 140802030201 | Chico Creek |

### Table 3-8        Springs in the analysis area by HUC

| HUC 6 Name | Springs |
|---|---|
| Summit Canyon | Secret, Overall, Phearson, Reynolds, Strawberry, Bishop Canyon, Unnamed |
| Bush Canyon | Unnamed, Spud Patch |
| 140300020706 | Unnamed |
| Joe Davis Hill-Dolores River Canyon | Quakie, Tommy, Sawmill Canyon, Bishop Rim |
| Chico Creek | Mega-Snake, Chico #1, Chico #2, CB's Willow |

Dolores County is currently developing a source water protection program under the Colorado Department of Public Health and the Environment.

BLM_0020856



Legend

▲ Proposed RM Potash Drill Hole Locations
● Spring Location
⌁ Intermittent Stream
⌁ 303(d) Listed River
▭ HUC-6 Watershed Boundary
▬ 303(d) Listed Impaired Waters

RM POTASH
POTASH EXPLORATION PROJECT

FIGURE 6
HUC-6 WATERSHED, 303(d) STREAMS

DRAWN BY: CP
DATE DRAWN: 6/7/2012
SCALE: 1:75,000

JBR™

0          2 Miles

Base Map: Copyright © 2011 National Geographic Society, i-cubed
(http://goto.arcgisonline.com/maps/USA_Topo_Maps)
Nucla, CO., 1983 and Delta, CO., 1980, 1:100,000 Topographic Maps.
Coordinate System: NAD83 UTM Zone 12

Path: E:\drawings\Colorado Potash Exporation EA RM Potash\EA\Fig6 HUC-6 Watershed, 303(d) Streams.mxd

BLM_0020857

The Dolores River is meeting its designated use for agriculture, public water supply, and recreation, but is impaired for cold water aquatic life due to excessive iron content (CDPHE 2010), and is on the State 303(d) list for impaired waters. This designation covers 62.8 miles of river near the Montezuma/Dolores County line and the Little Gypsum Valley Bridge at the San Miguel/Montrose County Line. No other water bodies in the analysis area are in the Colorado Integrated 305(b) and 303(d) 2010 Report (CDPHE 2010).

Water quality in the Dolores River gets progressively more saline as the stream travels through the Mancos shale and other surface formations of marine origin (BLM 1984). Disappointment Creek, which joins the river downstream, runs through the Mancos shale and adds a substantial salinity to the river. The only available water quality data for the Slick Rock gaging station is for specific conductance, which is often used as a surrogate for salinity, which increases ionic strength. Thirty-eight readings were taken between 1997 and 2003; readings were between 264 microsiemens per centimeter (µS/cm) and 960 µS/cm, with a mean of 491 µS/cm. Although there are no regulatory standards for specific conductance in Colorado, typical values are as follows (CWT 2004):

- Distilled water ranges from 0.5 to 3.0 µS/cm
- Melted snow ranges from 2-42 µS/cm
- Potable water (U.S.) ranges from 30-0500 µS/cm
- Ocean water is typically 50,000 to 56,000 µS/cm

Drill Site 6 is in the Chico Creek Watershed, which drains to Coal Bed Canyon in Utah, before reaching Montezuma Creek. No water quality data is available for Chico Creek, which is intermittent.

### 3.3.14.2 Groundwater

There are four major, regional aquifers in the planning area (Uinta-Animas, Mesa Verde, Dakota-Glen Canyon, and Fruitland-Pictured Cliffs), in addition to more local aquifers (Coconino-DeChelly, Florida Mesa, and major alluvial aquifers). Of these, the Mineral Report for the current Project (BLM 2010) shows only the Dakota Formation as exposed at the surface of the mineral leases, in addition to alluvial aquifers.

The Groundwater Atlas of Colorado (Topper et al. 2003) describes two major hydrogeologic units in the Paradox Basin as 1) a Mesozoic sandstone aquifer composed of a stacked sequence of about 10 sandstone and shale geologic units with varying water quality and quantity, and 2) a lower Paleozoic carbonate (primarily limestone) aquifer with saline water. The two aquifers are separated by a thick sequence of confining salt beds, as shown in **Figure 7**.

BLM_0020858

**Figure 7        Hydrogeologic Units of the Paradox Basin**

| Era | System | Stratigraphic Unit | | Unit Thickness (feet) | Physical Characteristics | Hydrogeologic Unit | Hydrologic Characteristics |
|---|---|---|---|---|---|---|---|
| Cenozoic | Quaternary | Alluvium | | 0–100 | Alluvial sands and gravels, loess, colluvium, windblown sands | Alluvium | Yields large quanities for domestic, stock, and municipal |
| Mesozoic | Upper Cretaceous | Mancos Shale | | 1,000–5,000 | Shales interbedded with minor sandstone | Cretaceous confining beds | Confining unit; none |
| | Lower Cretaceous | Dakota Sandstone | | 0–200 | Fine-to coarse-grained cross-bedded sandstone | Mesozoic sandstone aquifer | Yields some water, stock and domestic |
| | | Burro Canyon Fm | | 0–250 | Conglomerate, sand-stone and shale | | Yields water to springs |
| | Upper Jurassic | Morrison Formation | Brushy Basin Member | 400–500 | Shales interbedded with minor sandstone | | None |
| | | | Saltwash Member | 300 | Medium-grained sand-stone interbedded with red shale | | Yields small quantities, stock and domestic |
| | Upper and Middle Jurassic | Summerville Fm | | 0–120 | Shales interbedded with minor sandstone | | None |
| | | Entrada Sandstone | | 15–170 | Buff to grayish-white cross-bedded sandstones | | Yields water |
| | | Carmel Formation | | 0–40 | Siltstone and mudstone interbedded with fine-grained sandstone | | None |
| | | Navajo Sandstone | | 0–125 | Fine-grained, cross-bed-ded quartz sandstone | | Small to moderate amounts from fractures, stock and domestic |
| | | Kayenta Formation | | 0–200 | Sandstone interbedded with siltstone and thin-bedded shale | | Yields little to no water |
| | Upper Triassic | Wingate Sandstone | | 0–400 | Medium grained, poorly cemented, cross-bedded sandstone | | Yields water to numer-ous springs |
| | | Dolores Formation | | 150–230 | Pink to red mudstone and fine-grained sandstone. Not present in all areas | Mesozoic-Upper Paleozoic confining beds | Not water bearing |
| | | Chinle Formation | | 0–500 | Shale, siltstones, interbedded with minor fine-grained sandstone | | Yields small quantities, stock and domestic |
| | Lower Triassic | Moenkopi Formation | | 0–480 | Mudstone interbedded with minor sandstone | | Yields small quantities, stock and domestic |
| Paleozoic | Permian | Cutler Formation | | 0–3,500 | Fine grained sandstone interbedded with minor conglomerate and mud-stone | | Yields small quantities where fractured, stock and domestic |
| | Pennsylvanian | Hermosa Formation | | 0–3,900 | Shales, limestones, salt and gypsum; includes the Paradox Member | Confining salt beds | None |
| | Mississippian | Leadville Limestone | | 20–100 | Massive to thinly lami-nated, gray buff and yellow limestone | Lower Paleozoic carbonate aquifer | Transmits saltwater through fractures |
| | Devonian and Cambrian | Ouray, Elbert, and Ignacio Formations | | 0–150 | Limestone, shale, dolomite; Ignacio is a quartzite | | |

Source: Topper et al. 2003

BLM_0020859

The average well depth in the Paradox Basin is 180 feet below ground surface (bgs), with at least 90 percent of the wells of record completed to depths less than 350 feet bgs (Topper et al. 2003). Well yields are typically low, with 90 percent yielding less than the average yield of 20 gallons per minute (gpm); the most productive wells are typically found in the Navajo Sandstone (Topper et al. 2003); however, most wells in the Project Area are likely in the Dakota- Burro Canyon aquifer, given the well depths. No known groundwater wells are developed in the lower Paleozoic aquifer due to both its depth and salinity (Topper et al. 2003). Groundwater quality is highly variable with the best quality water found in the shallower and/or more highly productive units (i.e., alluvium and the Navajo Sandstone), with concentrations of total dissolved solids, chloride, and sulfate all increasing generally with depth (Topper et al. 2003).

### 3.3.15 Wildlife

The three main vegetation communities (**Section 3.3.12**) in the Project Area include Inter-Mountain Basins Big Sagebrush Shrubland (sagebrush shrubland), Colorado Plateau Pinyon-Juniper Woodland (pinyon-juniper woodland), and Rocky Mountain Gambel Oak-Mixed Montane Shrubland (Mountain shrubland/oak).

Sagebrush shrublands are an extremely important vegetation type for many wildlife species. Many of the birds that occur in this habitat are sagebrush obligate species that exhibit sensitivity to habitat edges and fragmentation, such as sage sparrow (*Amphispiza belli*), Brewer's sparrow (*Spizella breweri*), and Gunnison sage-grouse (*Centrocercus minimus*). Many of these species also nest on, or near, the ground beneath the shrubs, and are, therefore, vulnerable to effects. Sagebrush shrublands also support many of the same small mammal species as mountain shrublands and pinyon-juniper woodlands. Some jackrabbit (*Lepus californicus*) and cottontail (*Sylvilagus audubonii*) species may reach high population densities in this habitat type. As with mountain shrublands, sagebrush shrublands can support a high diversity of reptile species, especially when interspersed with semi-desert shrublands, rock/cliff habitat, and other dry habitat types. However, amphibians are generally absent, except where water sources are present (BLM and USFS 2007 p.3-148).

Pinyon-juniper woodlands are essential to avian species, and support the largest assemblage of nesting bird species of any upland vegetation type in the western United States (BLM and USFS 2007 p.3-148). Typical bird species that utilize local pinyon-juniper habitats include the bushtit (*Psaltriparus minimus*), pinyon jay (*Gymnorhinus cyanocephalus*), and mountain chickadee (*Poecile gambeli*). Pinyon-juniper habitats are utilized by many big game species, at least on a seasonal basis, and may provide year-round habitat for mule deer (*Odocoileus hemionus*) and elk (*Cervus canadensis*) when food and water resources are available. Pinyon-juniper habitats are also frequently associated with desert bighorn sheep (*Ovis canadensis*) when in proximity to the cliff/rock/talus habitat type. Numerous small mammal species may occupy pinyon-juniper, including deer mouse (*Peromyscus maniculatus*), bushy-tailed woodrat (*Neotoma cinerea*), white-footed mouse (*Peromyscus leucopus*), and white-tailed jackrabbit (*Lepus townsendii*). Large carnivores such as cougars (*Puma concolor*) may also frequent pinyon-juniper, especially when prey species are available. The diversity of reptile

BLM_0020860

species within these woodlands is high and includes species such as the western rattlesnake (*Crotalus viridis helleri*). Pinyon-juniper habitats also support the highest diversity of bat species in Colorado; this is especially valuable where wetlands and riparian habitats occur. Bat species such as the fringed myotis (*Myotis thysanodes*) and Yuma myotis (*Myotis yumanensis*) are also known to utilize pinyon-juniper trees (and the associated cliff and rock habitat) as roosting areas. In general, amphibian species are scarce in pinyon-juniper woodlands, except where water is available.

Mountain shrublands/oak habitat provides valuable food and cover for many wildlife species, and some species, such as black bears (*Ursus americanus*) depend heavily upon the mast crops (BLM and USFS 2007 p.3-147). Fewer small rodent species utilize mountain shrubland habitats in Colorado; however, some small mammals, such as Nuttall's cottontail (*Sylvilagus nuttallii*), may reach high densities in this habitat type. At least 24 bird species in Colorado utilize mountain shrublands. Local bird species that are closely associated with this habitat type include the green-tailed towhee (*Pipilo chlorurus*), spotted towhee (*Pipilo maculatus*), Virginia's warbler (*Oreothlypis virginiae*), and wild turkey (*Meleagris gall*).

Based on GIS data provided by the Colorado Division of Wildlife, Natural Diversity Information Source (CDOW NDIS 2011), the Project Area is located near (within 1 - 4 miles) bighorn sheep winter range. The middle and southern portions of the Project Area provide winter, summer, and production habitat for elk and the entire Project Area is identified as winter range for mule deer.

No mammals were observed during the survey (JBR 2011a); however, the following mammal sign was recorded: elk, mule deer, cougar, cottontail rabbit, jack rabbit, and coyote (*Canis latrans*). A complete list of bird species observed is provided in **Table 3-3 (Section 3.3.5)**.

### 3.3.16 Air Quality and Climate Change

There is broad scientific consensus that humans are changing the chemical composition of our atmosphere. Activities such as fossil fuel combustion, deforestation, and other changes in land use are resulting in the accumulation of trace greenhouse gasses (GHGs) such as carbon dioxide ($CO2$), methane ($CH4$), nitrous oxide ($N2O$), water vapor, and several industrial gases in our atmosphere. An increase in GHG emissions is said to result in an increase in the earth's average surface temperature, primarily by trapping and decreasing the amount of heat energy radiated by the earth back into space. The phenomenon is commonly referred to as global warming. Global warming is expected, in turn, to affect weather patterns, average sea level, ocean acidification, chemical reaction rates, precipitation rates, etc., which is commonly referred to as climate change. The Intergovernmental Panel on Climate Change (IPCC) has predicted that the average global temperature rise between 1990 and 2100 could be as great as 5.8°C (10.4°F), which could have massive deleterious effects on the natural and human environments. Although GHG levels have varied for millennia (along with corresponding variations in climatic conditions), industrialization and burning of fossil carbon sources have caused GHG concentrations to increase measurably, from approximately 280 ppm in 1750 to 396 ppm

BLM_0020861

in 2012 (as of June).   The rate of change has also been increasing as more industrialization and population growth is occurring around the globe.   This fact is demonstrated by data from the Mauna Loa $CO_2$ monitor in Hawaii that documents atmospheric concentrations of $CO_2$ going back to 1960, at which point the average annual $CO_2$ concentration was recorded at approximately 317 ppm.   The record shows that approximately 70 percent of the increases in atmospheric $CO_2$ concentration, or build up, since pre-industrial times has occurred within the last 50 years.   In the coming decades climate change may lead to changes in the Mountain West and Great Plains, such as increased drought and wild land fire potential.

BLM_0020862

# 4.0   ENVIRONMENTAL EFFECTS

## 4.1   Introduction

This section describes the potential environmental effects of the Proposed Action and No Action Alternatives on the physical, biological, and other resources in the Project Area described above in **Chapter 3**.  In consideration of environmental protection and design criteria included in the Proposed Action, the remaining environmental consequences described below may be unavoidable.

## 4.2   Direct/Indirect Effects

### 4.2.1   Alternative A – Proposed Action

#### 4.2.1.1   Cultural Resources

There would be No Effects to Historic Properties under the Proposed Action (**Table 4-1**). Two newly recorded sites, 5SM7095 and 5SM7096, are at the Drill Site 1 Project Area. Neither is recommended eligible for the NRHP.  Site 5SM7095, the lithic scatter, is located away from the proposed drilling location, so would not be impacted by drilling activity.  Site 5SM7096 is in the area of proposed exploration drilling activities; however, since the site is ineligible for the NRHP, avoidance is not necessary.  Site 5SM7097, a trash dump within the Drill Site 3 Project Area, is recommended as not eligible for the NRHP.  It is located northwest of the proposed exploration drilling site and would not be impacted by the Project.  Site 5SM1410 was not relocated; however, the plotted location is northwest of the drill pad at Drill Site 3 and would not be impacted.  The original Drill Site 5 was moved south to avoid impacting site 5SM4822; therefore the site would not be affected.  Site 5SM4936 is officially not eligible for the NRHP; however, this site would not be impacted by the proposed exploration activities at Drill Site 4 as the drill location is southwest of the site area.

**Table 4-1       Summary of Sites and Recommendations**

| Site Number | Site Type | Affiliation | NRHP Evaluation | Project Recommendation |
|---|---|---|---|---|
| 5SM1410 | Lithic Scatter | Prehistoric | Not Eligible | None |
| 5SM4822 | Lithic Scatter | Prehistoric | Needs Data | Avoid |
| 5SM4936 | Artifact Scatter | Prehistoric | Not Eligible | None |
| 5SM7095 | Lithic Scatter | Prehistoric | Not Eligible | None |
| 5SM7096 | Trash Dump | Historic | Not Eligible | None |
| 5SM7097 | Debris Scatter | Historic | Not Eligible | None |

BLM_0020863

#### 4.2.1.2    Geology and Minerals

Exploration activities would not be expected to impact geological conditions or mineral resources. RM Potash would comply with all state and federal requirements, and with the permit stipulations. In addition to complying with permit stipulations, RM Potash would implement EPMs and BMPs to mitigate potential adverse effects of the Project (**Section 2.2.8**). RM Potash would coordinate with the DOE as appropriate to avoid conflicts with ongoing activities on the uranium lease tracts, which remain open to mineral leasing under the 1920 leasing act.

While there are mining claims in the area, there are no mining operation plans or notices-level activities that would be interfered with, and none have been proposed at the time this EA was written. Much of the area has been leased for oil and gas production, and hydrocarbon bearing strata are expected to be encountered. Core holes would be drilled, cased, cemented, and abandoned in such a way that they would not infringe on or diminish other mineral resources – including oil and gas. No subsidence or induced seismicity would result from core drilling. Blow out prevention, gas flares, and hydrogen sulfide contingency plans would eliminate risks due to well control issues, so effects to geology and mineral resources would be negligible. These plans would be prepared using the Oil and Gas Applications for Permits to Drill as a template and as specifically laid out in BLM Onshore Orders 1, 2, and 6;these would be a required as a condition of approval.

#### 4.2.1.3    Land Use and Realty

Segments of roads identified in **Figure 2** and **Tables 2.2** and **2.3** totaling 10.2 acres would need to be improved (i.e. blading, gravelling or widening). Disturbance width for roads was estimated at 20 feet, thought it is likely to be less in many areas. These improvements may be left in place upon the concurrence of the land owner (if on private) or of the county (if a county road), and would result in a better road surface than currently is in place. The roads would be seeded back to the original road width as required. If warranted, roads would be reclaimed back to their original condition, resulting in no net disturbance in either case. The effect would be a short-term, negligible impact until reclamation vegetation is successfully re-established in 3-4 years.

The Proposed Action would require a Conditional Use Permit in both San Miguel and Dolores Counties and RM Potash would be responsible for obtaining these permits. Land use surrounding the Project Area would not be affected.

RM Potash would coordinate with the San Miguel and Dolores County Road Departments. The Counties may identify additional segments of County roads as well as specify the type and degree of additional improvements they might require. The proposed Project would not affect any existing ROWs. There would be no conflicts with other land use authorizations.

BLM_0020864

#### 4.2.1.4     Livestock Grazing

The Proposed Action would involve the short-term loss of vegetation of up to 1.4 acre per drill location.  Maximum drill pad disturbance if all six drill locations were drilled would be approximately 8.6 acres.  In addition, some existing roads would need improvement for an additional maximum disturbance of 10.2 acres.  **Table 4-2** provides the potential acres of disturbance within each grazing allotment and the estimate of AUMs that would be temporarily lost.

Table 4-2        Impacts to Grazing Allotments

| Allotment Name | Acres | AUMs | Associated Drill Site | Drill Pad Disturbance (acres) | Access Road Disturbance (acres) | AUMS Lost |
|---|---|---|---|---|---|---|
| Bush Canyon | 4,677 | 76 | 2 | 1.4 | 4.8 | <1 |
| Slick Rock | 53,572 | 2,492 | 1 | 1.4 | 0 | <1 |
| Spud Patch | 11,880 | 878 | 3, 4, 6 | 4.2 | 5.4 | <1 |
| Sandrock | 6,276 | 590 | 5 | 1.4 | 0 | <1 |

Upgraded existing roads to the drill locations might aid stockmen's access to the allotments.  Effects related to drill pad construction and operation would be short term.  Less than one AUM would be impacted in each of the four allotments.  The disturbed areas would be reclaimed with the goal of providing rangeland vegetation and forage again.  Drill pad areas would be fenced off during reclamation until revegetation is successful.  The small size of the disturbances relative to undisturbed lands would make these disturbances negligible.

Use of design features, BMPs, and EPMs, as outlined in **Section 2.2.8**, would minimize effects to livestock grazing and associated range improvements.

#### 4.2.1.5     Migratory Birds

Up to a maximum of approximately 18.8 acres of habitat for migratory bird (passerine) nesting and raptor foraging would be lost short-term due to exploration drilling pad construction and access road improvement.  The disturbance to migratory bird habitat would be minimal.  Although some individuals may be displaced during pad construction and nesting habitat may be removed, these disturbances should not affect the regional populations of migratory birds.  Vegetation would be cleared from a drill pad site in a 250 by 250 foot area.  Adjacent undisturbed habitat would be available for migratory bird nesting and foraging during exploration activities.

Though unlikely, there may be some direct disturbance to passerine bird nests from vehicles and construction equipment.  Active nests are most likely to be present between April 1 and July 31 and may be impacted if activity occurs during this time and the nests were undetected.  If vegetation at each site is cleared prior to the nesting season, direct effects to migratory bird nests would be avoided.  If Project activities were to take place

BLM_0020865