between April 1 and July 31, additional surveys would be required immediately prior to drill pad construction and/or drilling to identify any active nests.

Noise effects from construction activities would be temporary and could affect raptors nesting within 0.5 mile of the Project Areas. Effects to nesting migratory birds would be short-term (1-5 years) because birds could nest elsewhere in the same or following season if interrupted. If a passerine nest is found within the disturbance area, or if a raptor nest is found within 0.5 miles of the planned activities, activities would need to be delayed until birds have fledged from the nest. Therefore, only nests that are undetected may be adversely affected by noise or human presence.

### 4.2.1.6    Noise
Noise effects would be short-term and minor. There would be a short-term increase in noise level both in intensity of the noise and the frequency of events in a remote area. This could change the recreation experience of those seeking a remote type of recreation. Increased traffic on county roads would increase noise at nearby residences and ranches, but would be sporadic and limited. Only occasional motorists use the county roads, and residents and recreationists would be sufficiently distant from the work areas that any increase in noise would have attenuated to very low levels. Any displaced wildlife would be expected to return to the area once drilling is completed. Once drilling activities were completed and reclamation successful, noise levels would return to previous levels.

Specific noise stipulations for Gunnison sage grouse are presented in **Section 4.2.1.10**.

### 4.2.1.7    Recreation
There are no BLM-developed recreation areas/facilities in the Project Area; however, scattered recreation may take place on these lands. Construction of the Project would not be expected to have any detrimental effects on recreation. Drilling activity during the fall months may affect the quality of hunting within approximately a 0.5 mile radius of the active drill site, depending on topography.

Local residents could continue to access the BLM-administered lands using the existing access roads as the Project would not impact access. Recreation users in close proximity to the Project would see and hear Project activities; however, this would be a short-term and minor impact. Recreation opportunities on BLM-administered lands adjacent to and/or accessed via the Project Area would not be affected. Drilling activities would not be visible or audible from within the Dolores River Canyon, and therefore would not have any effect on boaters or other recreational users in the canyon bottom.

### 4.2.1.8    Socioeconomics
The Proposed Action would increase traffic through rural areas with a few adjacent residences. This would be a short-term and minor impact. There would not likely be any direct effects to San Miguel or Dolores County, other than the benefits to the local economy that would be provided during the exploration drilling in the form of services and goods provided to Project personnel in the communities along Highway 141.

BLM_0020866

#### 4.2.1.9    Soils

The Proposed Action would result in 8.6 acres of soil disturbance from drill pad construction and drilling, and 10.2 acres of improved existing access road disturbance. All Project disturbances would be temporary.  Surface disturbance (i.e. core drilling) would result in direct effects within the Project Area.  Direct physical effects to soil resources include compaction and crushing of the soil and soil crust by equipment during Project activities at the 250 by 250 foot drill pads and improved access roads.  Vegetation would only be cleared to the extent necessary, minimizing effects to soil resources. Although clearing of vegetation would be kept to a minimum, there would be increased susceptibility of soils to wind and water erosion, until reclamation occurs. Implementation of EPMs, as identified in **Section 2.2.8**, would minimize loss of soil from erosion due to wind and water.  Reclamation would include recontouring drill pad locations and reseeding.  Temporary or permanent erosion control structures would be installed as needed.  The effects to the disturbed areas would be site-specific, short-term, and negligible.

#### 4.2.1.10   Threatened, Endangered, Candidate, and Sensitive Species

Implementation of the Proposed Action **May Effect, but Not Likely to Adversely Affect** Mexican spotted owl.  The only BLM sensitive species that the Proposed Action **may adversely impact individuals, but is not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing** is Gunnison sage-grouse. All other BLM sensitive species were a **no effec**t determination.  A combined Biological Assessment/Biological Evaluation (BA/BE) prepared for this Project (JBR 2011b) is included in the Project Record and provides additional details and descriptions for the impact analysis for those species having the potential to occur within the Project Area (see Figure F1, and Table F1 of **Appendix F**).

The proposed activities associated with Drill Sites 4 and 5 could affect Mexican spotted owls based on the proximately of these sites to the Dolores River canyon rim.  The Dolores River canyon has been identified as potential Mexican spotted owl habitat by USFWS.  Any activities within 0.5 mile of the canyon rim during March 1 – Aug 31 have been determined to potentially affect this species (see Figure F1, and Table F1 of **Appendix F**).

The proposed pad construction activities at Drill Site 6 and improvement of the associated existing access road would directly remove up to 4.1 acres of occupied sage-grouse (a BLM Sensitive Species) habitat within a mapped Gunnison sage-grouse (GUSG) production area.  This action would affect acreage of production area habitat, but is expected to have a minimal impact to the overall utility of this habitat long term, if disturbance is reclaimed.  In addition, by applying the construction timing restrictions (March 15 - June 15) that would allow for activities to occur outside of the nesting and fledging periods, functional habitat affects to this production area could be short-term and may not affect reproduction of GUSG.  There are detrimental effects to GUSG when noise levels are high.  Noise dB restrictions would apply if activities occur in the production area.  If GUSG are in the area during drilling, noise and human presence could cause individuals to alter their normal movement patterns and the amount of habitat

BLM_0020867

not available could be larger than the actual disturbance footprint. In general, GUSG displaced by such activities would probably return to the area after the disturbance, unless birds in the vicinity were nesting, in which case nesting activities could be disrupted and adverse reproductive effects could occur.

Construction vehicles may transport invasive plant seeds to the disturbance areas and lead to increases in these undesirable species. Invasive species do not provide the same level of nutritious forage as sagebrush plants, and invasive grasses facilitate fire, after which sagebrush plants that rely on seed to reestablish are out-competed by the abundance of invasive grass seeds in the soil. EPMs designed to minimize the establishment of invasive species would minimize this potential impact (**Section 2.2.8** and **Appendix C**).

EPMs identified for the Proposed Action include noise stipulations for GUSG. The Gunnison Sage Grouse Rangewide Conservation Plan (GUSG RCP 2005) recommends that continuous sources of noise be limited to 10 dBA above ambient in all seasonal GUSG habitats. Consistent with this recommendation, CDOW has suggested that a Controlled Surface Use (CSU) lease stipulation be implemented to muffle or otherwise control noise from well sites, roads, and compressors, so that drilling and operational noise will not exceed 49 dBA measured at 30 feet from the source in areas between 0.6-4.0 miles from a lek year round (CDOW 2010). CDOW's recommendation to limit drilling and operational noise to 49 dBA measured at 30 feet from the source is based on a calculation of the noise limits necessary to achieve less than 10 dBA above ambient at a lek from a distance of 0.6 mile (the edge of the No Surface Occupancy (NSO) Buffer recommended in the GUSG RCP). CDOW's 49 dBA at 30 feet recommendation assumes that the NSO buffer is enforced such that no facilities are placed within 0.6 mile of a lek site.

### 4.2.1.11   Transportation
If all six drill sites were to be drilled sequentially, exploration activities could take up to approximately 2 years (24 months) to complete, although it is most likely that only between 1-3 drill sites would be drilled in a single drilling season (approximately March – October). The following general assumptions about travel patterns were used to determine effects:

Drilling activities would occur 24 hours per day, 7 days per week. Site preparation and reclamation activities would be done during daylight hours. Between six and eight vehicle trips per day would be made to each drill site, with only one drill site being drilled at any given time. Because of a lack of amenities available in communities in the north (i.e. Egnar or Slickrock), it is likely personnel would be located in either Dove Creek, Monticello, or Cortez and therefore would access the Project Area from the south.

The Proposed Action would increase the AADT on Highway 141 by about 3 percent on the least frequented section north of Egnar when accessing drill sites 1 through 4. This AADT increase would be less (1.3 percent) on the section of Highway 141 south of Egnar. The increase in traffic on US Route 491 would be negligible. The increase in traffic on the county access roads (**Table 3-6**) would likely be noticeable to local

BLM_0020868

residents, but would not impede traffic flow.  Effects to transportation would be short-term and negligible to minor.

Once drilling activities were completed and reclamation successful, traffic levels would return to previous levels.

### 4.2.1.12   Vegetation
There would be approximately 18.8 acres of vegetation disturbed by the Proposed Action, assuming all six drill sites were drilled.  About 8.6 acres of vegetation would be disturbed by drilling activities as well as some vegetation on either side of the existing access roads to be improved.  Effects to vegetation would be minor and short-term.

Use of design features, BMPs, and EPMs, as outlined in **Sections 2.2.7** and **2.2.8**, would minimize effects to vegetation and reduce the potential to spread noxious and non-native, invasive weeds.

### 4.2.1.13   Waste -  Hazardous, Fluid, and Solid
Waste products that would be generated during exploration drilling would include municipal solid waste, workforce sewage, used oil, non-hazardous hydrocarbon and antifreeze waste, and drilling waste (i.e., water-based and diesel mud and drill cuttings).

Drill cuttings created during the water-based mud drilling would be dried in a cuttings area.  Cuttings that meet or exceed the specifications in COGCC 900 series rules (Table 910-1: 500 mg/kg total petroleum hydrocarbons and other organic compounds and metals) may be buried on site (see **Section 2.2.3**).

Quantities of municipal solid waste (i.e., office/lunch room waste), wood, paper, and plastic debris would be generated during exploration activities, mostly from used packaging and empty containers, as well as other sources.  This would be contained on-site in bins and transported off site to a permitted landfill for disposal and/or recycling, as appropriate.  During exploration drilling activities, the on-site workers would use portable sanitary facilities for collection of sewage that would be collected by contractors and shipped off site for treatment and disposal.  Sanitary sewage managed in this way would cause short-term, negligible effects to resources in the Project Area.

A drill rig and other equipment and vehicles would be used at each exploration drill site.  The equipment would be maintained and fueled on-site as would some of the trucks.  This would require installation of temporary tanks and containers for storage of diesel fuel, gasoline, lubricating oil, grease, and antifreeze.  These tanks and containers would be designed and maintained to be leak free, but would also be installed within secondary containment systems.  SPCC requirements would be complied with for these installations to minimize the potential for spills.  Used oil, antifreeze, and grease would also be managed in containers for recycling or disposal in permitted facilities (such as Safety Kleen).

BLM_0020869

Hazardous materials would be required during exploration drilling activities as oil-based mud would be used for drilling the core hole section between approximately 5,500 to 6,000 feet in each hole. However, drilling muds are exempt from regulation as hazardous wastes under Subtitle C of the RCRA (EPA 2002, p.10). Reams Construction (or an equivalent), located in Naturita, Colorado would be used for drilling fluid waste disposal; drilling fluids would be transported to their facility for treatment and recycling.

In addition, diesel fuel and gasoline would be used for on-site vehicles and generators. All hazardous materials would be handled in compliance with applicable federal, state, and local requirements. Liquid hazardous materials would be stored on-site within secondary containment systems to prevent releases of such materials to the environment in the event of a spill. Spills would be contained and promptly cleaned up and the spill residues would be packaged for disposal off site at permitted facilities. Hazardous materials managed this way, in full compliance with applicable regulations and manufacturers' recommendations, would cause short-term, negligible effects to environmental resources in the Project area or during transport.

Further, because of the existence of uranium deposits and other NORMS that may be encountered during drilling activities, the Project would conform to the *Joint Agency Guidelines for Uranium Exploration Drilling Reclamation* (USFS et al. 2007), as well as the COGCC 900 series rules. Hazardous waste effects would be short-term and negligible. Potassium 40 is a naturally occurring NORM that makes up approximately ~0.012 percent of all potassium, and is naturally taken up as a nutrient with other potassium isotopes. Because closed loop drilling would be used, and diesel bearing mud (used to drill the potash) would be disposed of in a licensed land farm, and core would be hauled off for study, no potassium 40 would be left at the surface.

### 4.2.1.14  Water Resources

As described in **Section 1.7**, the Project would be compliant with all applicable laws, regulations and executive orders, including EO11988 (Floodplain Management), EO11990 (Protection of Wetlands), the Municipal Water/Drinking Water Source Protection Area regulations, and the Clean Water Act.

#### 4.2.1.14.1     Surface water

Two issues were identified as potential risks to surface water (**Section 1.8.14**). They are sedimentation from soil disturbance and erosion, and spill releases. EPMs described in **Section 2.2.7** and **2.2.8**, such as expedient reclamation and using a closed-loop system, would reduce the potential effects to short duration and negligible amounts. Soil disturbance would be limited in time to the drilling period (approximately 60 days) after which reclamation procedures would be initiated to re-vegetate the sites. Drill cuttings would be dried and temporarily stored within a bermed, lined cuttings pad. In addition, water bars would be used to minimize erosion from roads. Most of the proposed drill holes are located away from surface water features. The only perennial stream in the general Project Area is the Dolores River, which is a substantial distance away. The two drill hole locations closest to surface water features are Drill Site 6, which would be

BLM_0020870

approximately 600 feet from Wilson Draw, and Drill Site 2, which is more than 1,900 feet from an un-named intermittent stream.

All process fluids would be stored in tanks with secondary containment capable of containing at least 150 percent of the full contents of the tank. Implementation of SWPPP and SPCC plans would be implemented to prevent and/or minimize any potential effects to surface water (**Section 2.2.8**).

4.2.1.14.2    Groundwater

The issue identified as the potential risk to groundwater resources (**Section 1.8.14**) concerns possible degradation of groundwater and associated aquifers through introduction of fluids such as drilling mud or cross-contamination of aquifers with either one another or with hydrocarbon reservoirs facilitated by the annular space outside the drill casing. Several precautions would be taken to prevent this from occurring, including the use of appropriate casing and cementing design criteria, and plugging holes by means of cementing from the bottom to the surface (**Sections 2.2.3** and **2.2.8**).

The uppermost section of the drill hole would be 10 inches in diameter and lined with a permanent 9-5/8 inch surface steel casing string and a continuous column of cement behind this string (**Figure 4**). The surface casing section would be set at approximately 1,000 and 1,500 feet deep, below the water-bearing Navajo and Wingate Sandstones and at least 50 feet below the top of the relatively fine-grained rocks of the Chinle Formation (**Table 4-4**). This shallow casing and cement program would prevent cross-communication between and isolation of all potentially useable aquifers above the Chinle Formation (i.e. above the surface casing shoe).

The next drill hole section down would be 8 inches in diameter and lined with a 7 inch intermediate steel casing. The intermediate casing string would extend from ground level down to the depth at which coring would take place at approximately 5,500 feet bgs. The bottom of this second string would be cemented from the base of the pipe to at least 150 feet above the intermediate casing shoe. Such a design would protect the formations in the annual space behind the intermediate string from contamination by oil-based muds used to drill the deepest portion of the well, or by brines which could potentially flow from salt-laden formations when drilling the final core hole interval. In addition, the presence of weighted water-based drilling mud in the annulus behind the 7 inch casing would effectively prevent cross-communication of fluid-bearing intervals within the intermediate hole section.

The deepest section of the well would be a 6-inch diameter drill hole from which a 3-inch diameter core would be extracted using an oil-based mud to prevent water from dissolving any potassium salts, rendering the cores useless. Formation water at these depths is extremely saline and, as previously explained, will not be in communication with any potentially useable water aquifers shallower in the hole. Furthermore, the drilling fluids used in the project would only be pumped into the bore hole at pressures sufficient for cooling and lubrication of the well and at rates sufficient to lift drill cuttings to the surface. Hydraulic fracturing or "fracing", a practice used to induce artificial

BLM_0020871

fractures in the surrounding rock in order to stimulate production in oil and gas wells, would not be employed.

After coring and any downhole testing is done, all oil-based mud would be pumped out of the well and the borehole would be cleaned of any residual oil-based mud.  Both the oil-based drilling fluids and contaminated cleaning solutions would be circulated out of the well and then collected and reused, recycled, or disposed of in a licensed facility.  The intermediate casing string would be cut above the casing shoe and removed, and the entire hole would be cemented from bottom to top.  Water-bearing aquifers and/or hydrocarbon-bearing reservoirs in the intermediate and deep hole sections might be exposed during these abandonment activities once the intermediate casing is removed, but the potential for cross-communication would be short–term and negligible based on the brief duration of such operations.

**Table 4-3** shows all water wells within 2 miles of the proposed drill sites and **Table 4-4** shows four oil and gas wells close to the proposed drill sites.  See **Figure 8** for their locations.  The tables give an indication of the distances between the aquifers being used for water wells and those that would likely be encountered during drilling.  More information about the water-bearing characteristics of the formations is in **Figure** 7.  The tables show that the saline aquifers and the target formation of the exploratory wells are several thousand feet below any freshwater aquifers.

There is no groundwater quality data available for the wells in **Table 4-3** or any others in the local area.  Consequently, one of the EPMs (**Section 2.2.8**) would be to obtain water samples from at least one of the wells near each drill-hole that would be used.  From these samples baseline water quality would be determined for future reference.  Since there are no wells within two miles of Drill Site 5, water samples would be taken from either Quakie Spring or Sawmill Spring for representative groundwater quality analysis.

BLM_0020872

**Table 4-3      Water Wells Permitted Within Two Miles of a Proposed Drill Site[1]**

| Location (Figure 8) | Depth (feet bgs) | Depth to Water (feet bgs) | Pumping Rate (gpm) | Uses | Nearest Drill Site |
|---|---|---|---|---|---|
| A | 200 | 100 | 4 | Domestic | 2 |
| B[2] | 220 | | | Stock | 2 |
| C | 200 | | 5 | Stock | 1 |
| D | | | | Irrigation | 1 |
| E | | | | Irrigation | 1 |
| F | | | | Domestic, Stock | 2 |
| G | | | | Domestic, Stock | 1 |
| H | | | | Stock | 6 |
| I | 70 | 64 | 35 | Domestic, Stock | 6 |
| J | 110 | | | Domestic | 6 |
| K | 250 | | 5 | Domestic | 6 |
| L[3] | 140 | 65 | 4 | Domestic | 6 |
| M | 125 | 44 | 3 | Domestic, Stock | 2 |
| N | 200 | 63 | 4 | Stock | 2 |
| O | 150 | 40 | 2 | Domestic | 6 |
| P | 53 | 30 | | Other | 6 |
| Q | 203 | 90 | 2 | Domestic | 6 |
| R | | | | Domestic | 3 |

[1] Blank means no data- well may or may not have been drilled
[2] Burro Canyon Formation – All others listed as "unnamed aquifer"
[3] Abandoned
Source: Colorado Division of Water Resources Well Permit Database (2011)

BLM_0020873



RM POTASH
POTASH EXPLORATION PROJECT

FIGURE 8
PROPOSED DRILL HOLES, WELLS,
AND NATURAL SPRINGS

Legend

▲ Proposed RM Potash Drill Hole Locations
★ Water Well
◉ Spring Location
〜 Intermittent Stream
〜 River

Base Map: Copyright© 2011 National Geographic Society, i-cubed
(http://gcto.arcgisonline.com/maps/USA_Topo_Maps)
Nucla, CO., 1983 and Delta, CO., 1980, 1:100,000 Topographic Maps.
Coordinate System: NAD83 UTM Zone 12

DRAWN BY: CP
DATE DRAWN: 6/7/2012
SCALE: 1:96,000

0        2 Miles

N

BLM_0020874

**Table 4-4        Selected Oil and Gas Wells In or Near the Project Area**

| Formation | 6-H-18 Mc Intyre Canyon (T44N R19W Sec. 16) | Egnar #1 (T43N R19W Sec. 14) | 1X Shenandoh-Pinto (T42N R18W Sec. 34) | 1 Dolores Unit (T41N R18W Sec. 16) |
|---|---|---|---|---|
| **Top of Formation in Feet bgs** | | | | |
| Alluvium* | | | | |
| Dakota Sandstone* | | | | 0 |
| Burro Canyon* | | | | |
| Saltwash* | | 0 | | 490 |
| Summerville | | 288 | | 915 |
| Entrada* | | 359 | 1,045 | 957 |
| Carmel | 806 | 489 | 1,142 | 994 |
| Navajo Sandstone* | | 562 | 1,168 | 1,057 |
| Kayenta | | | 1,295 | |
| Wingate* | | 706 | 1,468 | |
| Chinle | 1,290 | 958 | 1,700 | 1,677 |
| Shinarump | | 1,445 | 2,370 | |
| Moenkopi | 1,721 | 1,491 | 2,410 | |
| Cutler | 1,850 | 1,615 | 2,470 | 2,395 |
| Hermosa | | 3,650 | 4,148 | |
| Paradox, Ismay, Desert Creek, Salt | | 4,700 | 5,639 | 5,600 |
| Leadville Limestone** | 8,398 | | | |
| Ouray, Elbert, Ignacio** | 8,450 | | | |

*Yields water
**Yields saltwater
Sources: Colorado Oil & Gas Conservation Commission Information System

BLM_0020875

Water use for the Project is estimated at approximately 5,000 gallons per day (gpd) during drilling and an additional unknown amount for possible dust suppression. RM Potash would obtain water from a private source. It is estimated that each drill hole would take approximately 60 days to complete. This works out to 300,000 gallons or 0.92 acre feet per well. **Table 4-5** shows the water rights for the four townships in which there are wells within two miles of a proposed drill hole. Under Colorado water law, most, if not all, of the water wells in **Table 4-3** above are not required to have water rights. In other words, the water wells in the previous section are likely not represented among the water rights in **Table 4-5**. As noted in **Figure 7**, the Burro Canyon Formation and the Wingate Sandstone are known to yield water through springs. The table shows that the 0.92 acre feet of water use per well would have a negligible impact on local water supplies.

**Table 4-5     Water Rights in the Four Townships Encompassing the Project Area**

| Water Right Name | Section | Township | Range | Uses | Structure Type | Rate[1] (cfs) |
|---|---|---|---|---|---|---|
| San Miguel PMPG PLT | 10 | 43N | 18W | irrigation, commercial, industrial, domestic, other | ditch, pipeline | 5.000 |
| Bush Canyon Spring | 35 | 43N | 19W | domestic, stock | spring | 0.022 |
| Overall Spring | 22 | 43N | 19W | stock | spring | 0.050 |
| Phearson Spring | 27 | 43N | 19W | stock | spring | 0.050 |
| Reynolds Spring | 33 | 43N | 19W | stock | spring | 0.050 |
| Smitty Well | 35 | 43N | 19W | domestic, stock | well | 0.050 |
| Strawberry Spring | 32 | 43N | 19W | storage, domestic, stock | spring | 0.001 |
| Strawberry Spring | 32 | 43N | 19W | storage, domestic, stock | spring | 0.001 |
| Bishop Rim Spring | 15 | 42N | 18W | storage, stock | reservoir | 0.010 |
| Spud Patch Spring | 6 | 42N | 18W | stock, wildlife | spring | 0.0006 |
| Bishop Canyon Spring | 9 | 42N | 19W | domestic, stock | spring, pipeline | 0.011 |

[1] 1.0 cfs = 448.8 gallons per minute = 1.983 acre feet per day
Source: Colorado Decision Support Systems and Colorado Division of Water Resources Hydrobase database (2011)

BLM_0020876

Oil-based drilling mud is sometimes used in oil and gas operations, where fresh water-based muds could potentially react with and/or degrade sensitive geologic formations such as shale-rich (clayey) or evaporitic (salty) intervals that may be penetrated in the proposed drill site.  A closed loop system would be employed to ensure that the drilling mud would not contact either aquifers or the environment outside the drill hole.  First, only water-based mud would be used down to the target formation at approximately 5,500 feet bgs.  Second, the well would be sealed from the bottom of the intermediate casing with a 150 foot cement plug to ensure that no oil-based mud or other contaminants could reach any intermediate aquifers above the base of the intermediate casing shoe.  Finally, the oil-based drilling mud would be kept in a closed system when it is pumped into and out of the drill hole, it would not go to any open cuttings pit, and would be fully contained in a closed system throughout the Project.

EPMs identified for the Proposed Action includes re-sampling wells and springs previously sampled for baseline data after drilling (**Section 2.2.8**).

#### 4.2.1.15   Wildlife
Overall effects to non-listed wildlife would be negligible to minor and short-term.  Up to 18.8 acres of habitat would be temporarily impacted from drilling activities under the Proposed Action.  The 8.6 acres of disturbance at the drill locations (6 x 1.43 acres) would be reclaimed and re-seeded after drilling and thus would be a short-term loss.  Suitable habitat is abundant and available adjacent to the Project Area.  Minimal indirect effects to some small, less mobile individuals would likely occur as they could be forced to disperse from the area or may be killed or injured during construction activities.  Wildlife in the area would likely be displaced temporarily during active drilling activities into adjacent undisturbed habitat.  Populations on the whole would not be affected.

To further reduce potential effects to big game using the Project Area during drilling activities, applicable wildlife timing stipulations would be implemented as part of the Proposed Action (**Section 2.2.8**).  These time restrictions would apply, for any drill holes located within Big Game Production Areas, Big Game Winter Range, Big Game Critical/Severe Winter Range for elk and deer, and potential Mexican spotted owl breeding and nesting habitat.

#### 4.2.1.16   Air Quality and Climate Change
Greenhouse gas emissions were calculated using a factor of 1.16 lb./hp-hr (EPA table 3.2-1 $CO_2$ emissions, AP-42).  The proposed drill rig is rated at 760 horsepower (hp).  Each drill hole is estimated to take approximately 75 days to drill and plug (760hp * 1800hrs * 1.16)/2000 = 800 tons of $CO_2$ generated by the drill rig for each core hole drilled).  Three passenger/support vehicles (pickup trucks) would need to drive to the drill site from Dove Creek each day in 2 shifts for a total of 6 vehicle trips per day.  Each vehicle is assumed to burn 5 gallons of gasoline for each trip.  This yields a total of 30 gallons of gasoline consumed each day.  Each hole would take approximately 75 days to drill and abandon.  Combustion of a gallon of gasoline creates 19.8 lbs of $CO_2$ (http://www.epa.gov/cleanenergy/energy-resources/calculator.html).  So (30 gallons * 75 days *19.8lbs/gallon)/2000 = 22.3 tons of $CO_2$ released for each drill hole for travel to

and from the drill sites. This is approximately 3 percent the amount of fuel consumed by the drill rig. Other service vehicles, water trucks, bulldozers/excavators for site preparation, etc., would consume a similarly small proportion of gasoline or diesel as compared to the drill rig. Only negligible amounts of methane or $CO_2$ are expected to be released from underground due to the drilling methods, blowout protection, and abandonment methods to be employed. The total amount of $CO_2$ released from this Project as compared to the amount released nationally from all fossil fuels consumption is negligible, and the effect the release of this amount would have is poorly constrained.

### 4.2.1.17   Mitigation, Monitoring, and/or Compliance

No mitigation or monitoring needs have been identified for this action, other than inspection and enforcement by BLM staff to ensure that the EPMs (**Section 2.2.8**) and any items adopted as conditions of approval described in the Proposed Action are followed. The EPMs described in the Proposed Action would be sufficient because they would avoid and/or minimize potential effects to a negligible level. BLM would monitor sites after drilling to ensure that reclamation is successful. No other recommended mitigation measures resulted from evaluation of the environmental consequences of the Proposed Action.

### 4.2.1.18   Residual Effects

There would be no adverse residual effects as a result of the Proposed Action.

### 4.2.2   Alternative B – No Action

Under the No Action Alternative, the proposal would be rejected; the BLM would not authorize exploration drilling. None of the previously described environmental consequences associated with the proposed activity would occur. The current land uses such as grazing, oil and gas exploration/development, uranium exploration, recreation, rural residential development, and agriculture would continue. Oil and gas development would continue to drill exploration and production wells. Uranium leases under the jurisdiction of the Department of Energy would continue to be enjoined until the PEIS is completed and a ROD describing approved activities is published. Effects to soils, vegetation, wildlife species (including special status species), cultural resources, livestock grazing, and water would continue to be subject to the existing conditions and trends associated with existing land uses.

Selection of the No Action Alternative would likely prompt the Proponent to find other locations for potash exploration or to abandon the exploration Project altogether.

The No Action Alternative would limit the data gathering and resource analysis that could lead to development of potash resources in the Paradox Basin. The potential to define commercial quantities of potash resources that would occur as a result of the Proposed Action would be deferred or foregone under the No Action Alternative.

BLM_0020878

## 4.3     Cumulative Effects Analysis

"Cumulative effects" are those effects resulting from the incremental effect of an action when added to other past, present, or reasonably foreseeable actions regardless of what agency or person undertakes such other actions.  Cumulative effects could only occur for those resources that are 1) affected by the Proposed Action and 2) affected by other actions whose effects occur within the same area and timeframe.

### 4.3.1   Cumulative Effects Areas

The resources analyzed in **Chapter 4** that have the potential to be adversely impacted by the Proposed Action include migratory birds; soils; threatened, endangered, candidate or special status animal species; water resources/quality (drinking/surface/ground); vegetation; and wildlife resources.  The cumulative effects area (CEA) is typically a resource-based area.  For this EA, CEAs are defined as follows:

The CEA for migratory birds; threatened, endangered, candidate or special status animal species; and wildlife is defined as 15 miles in all directions generally surrounding the Proposed Action.

The CEA for soils, vegetation, and for water resources/quality (drinking/surface/ground) is defined as the two HUC 8 watersheds that cover all of the proposed drill holes and access roads.  Drill Sites 1-5 occur within the HUC 8 - Upper Dolores watershed (HUC 14030002) and encompass approximately 1,394,078 acres.  Drill Site 6 occurs within the HUC 8 - Montezuma watershed (HUC 14030002) and encompasses approximately 749,772 acres.

The purpose of this cumulative effects analysis is to describe the interaction among the effects of the Proposed Action and the various past, present, and reasonable foreseeable future actions.

### 4.3.2   Past and Present Actions

The portion of Dolores and San Miguel counties where the Project Area is located is very rural and undeveloped or under agricultural use.  Past or ongoing actions that affect the same components of the environment as the Proposed Action are:

- **Livestock Grazing.**  Currently and historically, livestock grazing has been a primary land use on public lands in the Project Area.

- **Recreation including Camping, All-Terrain Vehicle (ATV) Use, and Hunting.** Though dispersed, these past and present activities use the existing roads and travel ways, as well as off-road travel.

- **Oil and Gas Exploration.**  Oil and gas leases, units, and drilling permit applications are present in the Project Area (**Figure 5**) and are currently held by Bill Barrett Corporation.  In addition, there are existing gas wells operated by Patara.  Some of these wells are producing while others are plugged and abandoned.

BLM_0020879

- **Uranium Exploration and Mining.** The Project Area is part of the Uravan Belt, an area that was heavily explored and mined for uranium and vanadium from the 1940's through the 1980's with some exploration and mining activity continuing to the present day. There are inactive DOE lease tracts and DOE lease tracts under review in the Project Area (**Figure 5**).

- **Private Land Actions.** There has been some development of private lands in the CEAs. Rural residences, associated infrastructure, and roads have been constructed. According to US Census Bureau data (2011), few building permits have been issued recently.

- **Habitat Improvement.** Various beneficial big game winter range habitat improvement projects have modified habitat within the Project Area.

### 4.3.3    Reasonably Foreseeable Action Scenario (RFAS)

BLM provides a list of proposed actions by posting Project information on the TRFO NEPA Register. RFAS include potential activities on public and private lands within the CIAs. The following list of RFAS identifies reasonably foreseeable future actions that would cumulatively affect the same resources in the cumulative impact areas as the Proposed Action.

- **Livestock Grazing.** Livestock grazing would continue to occur on public and private lands. BLM would continue to preclude or mitigate potential effects to grazing allotments through analysis of allotments, such as the Lower Disappointment Grazing Allotment Analysis.

- **Recreation including Camping, All-Terrain Vehicle (ATV) Use, and Hunting.** Dispersed recreation activities would continue and likely increase as nearby populations increase.

- **Continued Oil and Gas Exploration and Development.** It is reasonable to assume that Bill Barrett Corporation and/or other companies would continue to build upon its oil and gas exploration program by either performing additional evaluations on previously drilled holes and by drilling new holes within their lease areas and/or acquiring 2D or 3D seismic data. In general, direct effects from these projects would be similar to those already predicted for the planned Project. These activities could result in additional gas wells. Additional NEPA analyses would be required and could include mitigation measures to reduce projected effects. A Supplemental Draft EIS for a RMP Amendment for oil and gas development in the Gothic Shale member of the Paradox formation is currently in progress. If approved, and it is foreseeable that there could be dozens or hundreds of wells drilled for gas in the same area as is proposed for potash development, as well as in areas outside the area currently proposed for potash development. Thus, continued oil and gas development could potentially constrain the location and or timing of potash resource development, or vice versa.

BLM_0020880

- **Continued Potash Exploration.** It is reasonable to assume that RM Potash and/or other companies would continue to build upon its potash exploration program by either performing other evaluations on holes that are currently planned to be drilled, by drilling other holes within the respective prospecting permit application areas, or by exploring the surrounding prospecting permit application areas wherein no drilling is currently permitted. In general, direct effects from these projects would be similar to those already predicted for the Proposed Action. Additional NEPA analyses would be required and could include mitigation measures to reduce projected effects. It is estimated that up to a total of 20 or so core holes could be needed to prove up the potash deposit presently covered by prospecting permit applications to the point where a mine plan could be designed. Disturbance associated with each permit and associated drill hole could reasonably be expected to be similar to those analyzed for the six permits under consideration for this project. Additional geophysical prospecting methods, such as seismic may also be needed.

- **Potash Development.** It is possible that the above-mentioned exploration activities would result in a full-scale potash production. Such a development would entail facility construction, operation, and maintenance activities, including new or upgraded roads, power lines, and pipelines. Water consumption and visual changes are among the types of effects that might occur. It is possible that potash development could affect hydrocarbon recovery positively or negatively. Results of exploration would be needed to generate a proposed action for potash development, and without them, potential potash development scenarios would be speculative. A project-specific NEPA analysis would be required prior to any leasing or development of the potash resource, and mitigation may be required to reduce effects.

- **Uranium/Vanadium Mining and Exploration.** Uranium mining claims and uranium lease tracts occur within the area. It is likely that exploration activities would continue intermittently in the area. It is possible in the future that some of these claims or lease tracts may progress to active mining activity at some time in the future at the same time as potash development is taking place. It is extremely unlikely that all of these claims and lease tracts would be developed, let alone developed at the same time. Increased uranium/vanadium exploration and mining would be more likely if a proposed uranium mill in Paradox Valley, about 50 miles to the north, is ever constructed.

- **Habitat Improvement.** Additional various beneficial big game winter range habitat improvement projects would continue to modify habitat within the Project Area.

- **Private Land Actions.** There are private lands in the CIAs which could be modified or developed. At this time, neither Dolores County nor San Miguel County officials are in receipt of any sizeable development proposals on private lands.

BLM_0020881

### 4.3.4    Cumulative Effects
#### Migratory Birds
Cumulative effects to migratory birds would be possible if substantial uranium, oil and gas, potash or other development activity were approved and ongoing concurrently in the area. This could lead to substantial direct and indirect habitat losses for these species that would be long term.

#### Soils
At least some of the other past, present, and reasonably foreseeable future actions (such as livestock grazing, ATV use, uranium mining, oil and gas exploration, and gas development) have the potential to cause soil erosion. However, with planned and successful BMPs, cumulative effects should be reduced.

#### Threatened, Endangered, Candidate or Special Status Animal Species
Only the Mexican spotted-owl has the potential to be within the Project Area, and with the timing stipulations put in place, there would be no cumulative effects to these species. Cumulative effects to BLM sensitive species, especially the Gunnison sage-grouse, would be possible if substantial additional uranium, oil and gas, potash or other development activity were approved and ongoing concurrently in the area. This could lead to direct and indirect habitat losses for these species that would be long term.

#### Water Resources/Quality (drinking/surface/ground)
Some of the other past, present, and reasonably foreseeable future actions (such as irrigation, recreational use, mineral development, and population growth) have the potential to affect surface water supplies and quality, as well as groundwater supplies and quantities. However, with prudent development and well-instituted BMPs, cumulative effects should be minimal.

#### Vegetation
If uncontrolled, noxious and non-native, invasive plant species could continue their spread and establishment in the area. Projects under federal oversight would be required to monitor and treat any project-related occurrences/spread of invasive plant species.

#### Wildlife
Cumulative effects to non-listed wildlife, especially big game species such as mule deer and elk, would be possible if substantial uranium, oil and gas, potash or other development activity were approved and ongoing concurrently in the area.

#### Summary
Cumulative effects from the project would be negligible and minor when added to the potential effects of all past, present and reasonably foreseeable actions. The effects would include a maximum of 18.8 acres of disturbance. Mechanized/drilling activities would last less than 1 year, and reclamation vegetation would be established in three to four years, though it may take decades for some species of shrubs and trees to grow to maturity.

# 5.0   CONSULTATION AND COORDINATION

## 5.1   Introduction

The issue identification section of **Chapter 1** identifies those issues analyzed in detail in **Chapter 4**. The issues were identified through the public and agency involvement process described in **Sections 5.2** and **5.3** below.

## 5.2   Persons, Groups, and Agencies Consulted

**Table 5-1      List of all Persons, Agencies and Organizations Consulted**

| Name | Purpose & Authorities for Consultation or Coordination | Findings & Conclusions |
|---|---|---|
| U.S. Fish & Wildlife Service (USFWS) | Information on Consultation, under Section 7 of the Endangered Species Act (16 USC 1531) | Provided an email response for direction on obtaining a federally protected species list for counties within the Project Area. |
| Colorado State Office of Archaeology and Historic Preservation (OAHP) | Consultation for undertakings, as required by the National Historic Preservation Act (NHPA) (16 USC 470) | Concurrence was received on the cultural resources report. |
| Native American Indian Tribes | Consultation as required by the American Indian Religious Freedom Act o f 1978 (42 USC 1531) and NHPA (16 USC 1531) | No responses have been received to date. |
| Division of Reclamation, Mining, and Safety | Exploration Plan Approval and Reclamation Bonding | Provided review of Exploration Plan and Reclamation Bond Estimate |

## 5.3   Summary of Public Participation

A Notice of Scoping was posted on the BLM Newsroom web page on June 28, 2011. In addition, a public scoping letter was mailed to 74 addresses on June 24, 2011. The scoping mailing list is provided in the RM Potash Exploration Project Scoping Report (BLM 2011a). A public scoping meeting was held at the Dove Creek High School Commons in Dove Creek, Colorado on July 12, 2011. During the scoping meeting, 16 people registered their attendance. Written scoping comments were accepted via mail, e-mail, the website, and fax resulting in a total of 15 scoping responders. Resource issues for the Proposed Action were identified through public and internal scoping.

BLM_0020883

## 5.4    List of Preparers

The following two tables list the BLM and non-BLM preparers of the EA.

### Table 5-2        Tres Rios Field Office Personnel

| Name | Title |
|------|-------|
| James Blair | Geologist, Project Manager |
| Connie Clementson | Field Office Manager |
| Deborah Kill | NEPA Coordinator |
| Pam Leschak | Petroleum Geologist |
| Ivan Messinger | Wildlife Biologist |
| John Pecor | Petroleum Engineer |
| Joni Vanderbilt | Hydrologist |
| Cara MacMillan | Ecology/Plants |
| Mike Jensen | Range and Weeds |
| Tina Transtrom Kincaid | NEPA Coordinator |
| Amy Wise | Archaeologist |

### Table 5-3        Non-BLM Preparers

| Name | Title | Responsible for the Following Section(s) of this Document |
|------|-------|-----------------------------------------------------------|
| Greg Brown | JBR Project Manager, Biologist | Project Management, Overall Quality Assurance |
| Jon Schulman | JBR Hydrologist | Water Resources |
| Connie Pixton | JBR GIS Specialist | GIS, Maps, Acreages |
| Jenni Prince-Mahoney | JBR Senior NEPA Specialist, Archaeologist | Cultural Resources, Geology & Minerals, Land Use & Realty, Noise, Range Mgmt., Recreation, Socio, Soils, Transportation, Waste, Cumulative Effects |
| Eric Holt | JBR Wildlife Biologist | Wildlife Resources, Vegetation, TEC & Special Status Species, Migratory Birds |
| Ron Rood | JBR Archaeologist | Cultural Resources |
| Seth Topham | JBR Biologist | GIS, Wildlife Resources |
| Jon Thorson, RM Potash | Geologist, Proponent Project Manager | Proposed Action/Project details |

BLM_0020884

# 6.0    REFERENCES, ACRONYMS, AND GLOSSARY

## 6.1    References Cited

Blair, James.  2011.  Paleontological Inventory of the RM Potash Prospecting Permits and Exploration Drilling Program (Phase I).  Tres Rios Field Office, Bureau of Land Management. October 7.

Bureau of Land Management (BLM). 1984.   San Juan/San Miguel Resource Management Plan and Environmental Impact Statement, Bureau of Land Management Montrose District, Colorado, Final, December 1984.

Bureau of Land Management (BLM). 1985.   San Juan/San Miguel Resource Management Plan Record of Decision, Bureau of Land Management Montrose District, Colorado, signed December 1985.

Bureau of Land Management (BLM). 1991.  Record of Decision: San Juan/San Miguel Resource Management Plan Amendment for Oil & Gas Leasing and Development.  Montrose District.  October.

Bureau of Land Management and United States Forest Service (BLM and USFS). 2007. San Juan Public Lands *Draft Land Management Plan Draft Environmental Impact Statement*. BLM, Dolores, Columbine, and Pagosa Field Offices and U.S. Forest Service – Region 2, San Juan National Forest.

Bureau of Land Management (BLM).  2008.  B*LM National Environmental Policy Act Handbook H-1790-1.*  Washington, D.C.

Bureau of Land Management (BLM). 2010.  Mineral Report: Determination of Whether Prospecting is Necessary – Potassium Prospecting Permit Applications COC-73563 Through 73579, COC-73592, COC-74369, COC-74370, and COC-744017. USDI, BLM, Dolores Public Lands Office.  October 5.

Bureau of Land Management (BLM). 2011a.  RM Potash Exploration Project Scoping Report.  USDI, BLM, Dolores Public Lands Office.  October.

Bureau of Land Management (BLM).  2011b.  Colorado BLM Website: *Grazing and Rangeland            Management.*            Available            at http://www.blm.gov/co/st/en/BLM_Programs/grazing.html.  Accessed  online October 2011.

Bureau of Land Management (BLM).  2011c.  San Juan Public Lands Center NEPA Register.                              Available                              at http://www.blm.gov/co/st/en/BLM_Information/nepa/sjplc.print.html.    Accessed online November 10, 2011.

BLM_0020885

Bureau of Land Management (BLM) and US Forest Service (USFS). 2007a. *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development, The Gold Book*. Fourth Edition. BLM/WO/ST-06/021+3071/REV 07. BLM. Denver, Colorado.

Bureau of Land Management (BLM) and US Forest Service (USFS). 2007b. *Onshore Oil and Gas Order No. 1: Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations*. Issued Under 43 CFR 3160. Federal Register Vol. 72, No. 44. Wednesday March 7, 2007. Rules and Regulations.

Cater, Fred W. 1955a. Geology of the Egnar Quadrangle, 1:24,000 Scale, U.S. Geological Survey Map GQ 68.

Cater, Fred W. 1955b. Geology of the Horse Range Mesa Quadrangle, 1:24,000 Scale, U.S. Geological Survey Map GQ 64.

Cater, Fred W. 1955c. Geology of the Joe Davis Hill Quadrangle, 1:24,000 Scale, U.S. Geological Survey Map GQ 66.

Clean Water Team (CWT). 2004. Electrical conductivity/salinity Fact Sheet, FS-3.1.3.0(EC). In: The Clean Water Team Guidance Compendium for Watershed Monitoring and Assessment, Version 2.0. Division of Water Quality, California State Water Resources Control Board (SWRCB), Sacramento, CA.

Colbert, John A. 2012. Personal communication regarding source water protection areas or municipal supplies in the RM Potash project area. Physical Science - Research Scientist II, Restoration & Protection Unit at the Colorado Department of Public Health and Environment. Email dated May 1, 2012.

Colorado Decision Support Systems & Colorado Division of Water Resources. 2011. Hydrobase database accessed on November 14, 2011 at ftp://dwrftp.state.co.us/cdss/ovw/in/HydroBase_OvLow_20000101.pdf.

Colorado Department of Agriculture (CDOA). 2011. Colorado Noxious Weed List. Available at http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1174084048733. Accessed October 24, 2011.

Colorado Department of Public Health and Environment (CDPHE). 2010. Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List. Published by the CDPHE Water Quality Control Commission.

Colorado Department of Public Health and Environment (CDPHE). 2010. Integrated Water Quality Monitoring and Assessment Report, State of Colorado, Prepared pursuant to Section 303(d) and Section 305(b) of the Clean Water Act, prepared by Water Quality Control Division.

BLM_0020886

Colorado Department of Transportation (CDOT).  2010.  Annual Average Daily Traffic (AADT)  Volumes  for  Highway  141A.  Available  online  at http://apps.coloradodot.info/dataaccess/Traffic/inde...FIPSCounty=033&menuTy pe=Traffic&leftMenu=TrafficInfo.  Accessed October 10, 2011.

Colorado Division of Wildlife (CDOW).  2010.  Justification for Noise Limitations in Gunnison Sage Grouse Habitats.  October 21.

Colorado Division of Wildlife, Natural Diversity Information Source (CDOW NDIS). 2011.  Available at http://ndis.nrel.colostate.edu/ftp/ftp_response.asp.  Accessed September 2011.

Colorado Oil and Gas Conservation Commission (COGCC).  2012.  Oil and Gas Conservation Act Rules and Regulations.  Available at http://cogcc.state.co.us/. Accessed April 2012.

Commission for Environmental Cooperation (CEC).  2010.  Ecological Regions of North America.  Available  at http://www.epa.gov/wed/pages/ecoregions/na_eco.htm#CEC  1997.  Accessed April 2012.

Council on Environmental Quality (CEQ). 1997.  *Considering Cumulative Effects under the National Environmental Policy Act.*  Washington, D.C.

Davidson, Dale.  2012.  Intensive Cultural Resource Inventory of Six Potash Exploration Drill  Hole  Locations  and  Associated  Access  Roads  for  the  RM  Potash Exploration  Project  Dolores  and  San  Miguel  Counties,  Colorado SJ11021/MC.LM.R638.  Sandy, Utah.

Dolores County Planning Commission (DCPC).  1997.  Dolores County Master Plan. Available  online  at http://www.dolorescounty.org/documents/DC_Master_Plan_2.pdf.  Accessed September 13, 2011.

Dolores County.  2007.  Dolores County Development and Land Use Regulation as Amended  December  10,  2007.  Available  online  at http://www.dolorescounty.org/documents/DoloresCountyLandUseRegs.pdf. Accessed September 12, 2011.

Environmental Protection Agency (EPA).  2002.  Exemption of Oil and Gas Exploration and Production Wastes from Federal Hazardous Waste Regulations.  Available online  at  http://epa.gov/osw/nonhaz/industrial/special/oil/.  Accessed April 24, 2012.  October.

BLM_0020887

Hite, Robert J. 1961. Potash-Bearing Evaporite Cycles in the Salt Anticlines of the Paradox Basin, Colorado and Utah. USGS Short Papers in the Geologic and Hydrologic Sciences, Article 337, p. D135-D138.

Hite, R.J. 1960. Preliminary Stratigraphic Nomenclature of the "Saline Facies" of the Paradox member of the Hermosa Formation of Southeastern Utah and Southwestern Colorado. Four Corners Geological Society Guidebook, p. 86-89, plus 2 plates.

JBR Environmental Consultants, Inc. (JBR). 2011a. Biological Report for the RM Potash Exploration Project. St. George, Utah.

JBR Environmental Consultants, Inc. (JBR). 2011b. Biological Assessment/Biological Evaluation Report for the RM Potash Exploration Project. St. George, Utah.

Natural Resource Conservation Service (NRCS). 2008. Soil Survey Area: Cortez Area, Colorado, Parts of Dolores and Montezuma Counties. Web Soil Survey available online at http://websoilsurvey.nrcs.usda.gov. Survey Area Data: Version 5, Jan 31, 2008. Accessed October 11, 2011.

Natural Resource Conservation Service (NRCS). 2009. Soil Survey Geographic (SSURGO) Database. GIS data retrieved from ArcGIS Online <services.arcgisonline.com>.

Natural Resource Conservation Service (NRCS). 2010. Soil Survey Area: Animas-Dolores Area, Colorado, Parts of Archuleta, Dolores, Hinsdale, La Plata, Montezuma, San Juan, and San Miguel Counties. Web Soil Survey available online at http://websoilsurvey.nrcs.usda.gov. Survey Area Data: Version 7, Aug 2, 2010. Accessed October 11, 2011.

Natural Resource Conservation Service (NRCS). 2011. Soil Survey Area: San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties. Web Soil Survey available online at http://websoilsurvey.nrcs.usda.gov. Survey Area Data: Version 7, May 3, 2011. Accessed October 11, 2011.

Raup, O. B., and R. J. Hite, 1992, Lithology of evaporite cycles and cycle boundaries in the upper part of the Paradox Formation of the Hermosa Group of Pennsylvanian age in the Paradox Basin, Utah and Colorado, United States Geological Survey Bulletin 2000-B, 37 pages.

Safety Kleen. 2010. Used Oil Collection and Project Management Services. Available online at http://www.safety-kleen.com/services. Accessed April 25, 2012.

BLM_0020888

San Juan Public Lands. 2007.  Draft Land Management Plan, Draft Environmental Impact Statement, Volume 1, Draft Environmental Impact Statement.  U.S. Department of Interior, Bureau of Land Management, Dolores, Columbine, and Pagosa Field Offices, and U.S. Department of Agriculture, U.S. Forest Service, Region 2, San Juan National Forest.

San Juan Public Lands. 2011.  Draft Land Management Plan, Draft Environmental Impact Statement, Supplement to the Draft Environmental Impact Statement. U.S. Department of Interior, Bureau of Land Management, Dolores, Columbine, and Pagosa Field Offices, and U.S. Department of Agriculture, U.S. Forest Service, Region 2, San Juan National Forest.  August 2011.

San Miguel County. 2008.  San Miguel County Management Plan.  Available online at http://www.sanmiguelcounty.org/departments/planning/index.html?tab=1#tabsDepts.  Accessed September 12, 2011.

San Miguel County. 2010.  San Miguel County Land Use Code.  Available online at http://www.sanmiguelcounty.org/departments/planning/documents/LUC/PLN_LUC_Article2.pdf.  Accessed September 12, 2011.

Schroeder, M. A., J. R. Young and C. E. Braun. 1999.  Greater Sage-Grouse (*Centrocercus urophasianus*), The Birds of North America Online (A. Poole, Ed.).  Ithaca: Cornell Lab of Ornithology; Retrieved from the Birds of North America Online: http://bna.birds.cornell.edu/bna/species/425doi:10.2173/bna.425

Topper, R., K.L. Spray, W.H. Bellis, J.L Hamilton, P.E. Barkmann, 2003.  Groundwater Atlas of Colorado.  Colorado Geological Survey.  Denver, Colorado.

U.S. Census Bureau. 2009. 2005-2009 American Community Survey 5-Year Estimates: Dove Creek town and Zip Code 81325 [Egnar], Colorado.  Available online at http://factfinder.census.gov/servlet/ACSSAFFFa...US08&_zip=&_lang=en&_sse =on&pctxt=fph&pgsl=010.  Accessed October 20, 2011.

U.S. Census Bureau.  2011.  State & County QuickFacts: San Miguel and Dolores Counties.  Available online at http://quickfacts.census.gov/qfd/states/08. Accessed October 19, 2011.

U.S. Department of the Interior (USDI). 2004.  *Environmental Quality, Departmental Manual 516.*  Washington, D.C.

U.S. Department of the Interior and U.S. Department of Agriculture. 2007.  Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development.  BLM/WO/ST-06/021+3071/REV 07.  Bureau of Land Management. Denver, Colorado. 84 pp.

BLM_0020889

U.S. Forest Service (USFS), Bureau of Land Management, and NM Mining and Minerals Division. 2007. *Joint Agency Guidelines for Uranium Exploration Drilling Reclamation. U*pdated June 26.

US Geological Survey (USGS). 2004. National Gap Analysis Program. Provisional Digital Land Cover Map for the Southwestern United States. Version 1.0. RS/GIS Laboratory, College of Natural Resources, Utah State University.

US Geological Survey (USGS). 2005. National Gap Analysis Program. Southwest Regional GAP Analysis Project—Land Cover Descriptions. Accessed at http://earth.gis.usu.edu/swgap/legenddataquery.php. Descriptions: SCODE = S039, SCODE = S046, SCODE = S054. RS/GIS Laboratory, College of Natural Resources, Utah State University.

U.S. Geological Survey (USGS). 2012. USGS National Hydrographic Dataset GIS file NHD50643 accessed on line at http://nhd.usgs.gov/. Access April 2012.

U.S. Global Change Research Program (USGCRP). 2002. Global Climate Change Policy Book. Announced 14 February 2002. Available online at http://www.usgcrp.gov/usgcrp/Library/gcinitiative2002/gccstorybook.htm.

Western Regional Climate Center (WRCC). 2011. Average Annual Precipitation in Colorado Map. Available online at http://www.wrcc.dri.edu/pcpn/co.gif. Accessed November 2011.

Wikipedia. 2011. San Miguel County, Colorado. Accessed October 19, 2011. Available online at http://en.wikipedia.org/wiki/San_Miguel_County%2C_Colorado

## 6.2    List of Acronyms Used in this EA

| | |
|---|---|
| **AADT** | Annual Average Daily Traffic |
| **APD** | Application for Permit to Drill |
| **ATV** | All Terrain Vehicle |
| **AUM** | Animal Unit Month |
| **BBC** | Bill Barrett Corporation |
| **BGS** | Below Ground Surface |
| **BLM** | Bureau of Land Management |
| **BMPs** | Best Management Practices |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **CIA** | Cumulative Impact Area |
| **DCMP** | Dolores County Master Plan |
| **DEIS** | Draft Environmental Effects Statement |
| **DOE** | Department of Energy |
| **DR** | Decision Record |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **FLPMA** | Federal Land Policy and Management Act |
| **FONSI** | Finding of No Significant Impact |
| **FSM** | Forest Service Manual |
| **GPD** | Gallons Per Day |
| **GPM** | Gallons Per Minute |
| **IDT** | Interdisciplinary Team |
| **JBR** | JBR Environmental Consultants, Inc. |
| **KCl** | Sylvite |
| **KMgCL3 6H20** | Carnalite |
| **MBTA** | Migratory Bird Treaty Act |
| **NHPA** | National Historical Preservation Act |
| **MLA** | Mineral Leasing Act |
| **NEPA** | National Environmental Policy Act |
| **NORMs** | Naturally Occurring Radioactive Materials |
| **NPDES** | National Pollutant Discharge Elimination System |
| **NRHP** | National Register of Historic Places |
| **NSO** | No Surface Occupancy |
| **RFAS** | Reasonably Foreseeable Action Scenarios |
| **RMP** | Resource Management Plan |
| **ROD** | Record of Decision |
| **ROW** | Right of Way |
| **SOPA** | Schedule of Proposed Actions |

BLM_0020891

| | |
|---|---|
| **SPCC** | Spill Prevention, Control, and Countermeasure |
| **SWPPP** | Stormwater Pollution Prevention Plan |
| **TEC** | Threatened, Endangered, and Candidate |
| **TRFO** | Tres Rios Field Office |
| **USC** | United States Code |
| **USDI** | U.S. Department of the Interior |
| **USFWS** | U.S. Fish and Wildlife Service |
| **USFS** | U.S. Forest Service |
| **USGS** | U.S. Geological Survey |
| **WRCC** | Western Regional Climate Center |
| **4WD** | Four-Wheel Drive |

## 6.3    Glossary

**Adverse Effect**: An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register of Historic Places in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.

**Affected Environment**: A physical, biological, social, and economic environment within which human activity is proposed.  The natural, physical and human-related environment that is sensitive to changes from the alternatives.

**Air Quality**: Refers to standards for various classes of land as designated by the Clean Air Act (PL 88-206: Jan. 1978.).

**Allotment**: A unit of public (and sometimes including private) land suitable and available for livestock grazing that is managed as one grazing unit.

**Alternatives**: A choice of two or more things.  For NEPA purposes, alternatives to the Proposed Action must be examined in the planning process.  The discussion of alternatives must define the issues and provide a clear basis for choice by the decision maker and the public (40 CFR 1502.14).

**Animal Unit Month**: Amount of forage required by a cow/calf pair (or five sheep or one horse) for 1 month.

**Applicant Committed Environmental Protection Measures**: Measures that are part of the proposed project and would be implemented by the Proponent to avoid or minimize effects to resources.

**Application**: A formal, written request.

BLM_0020892

**Aquifer**: A body of rock that is sufficiently permeable to conduct groundwater and to yield economically significant quantities of water to wells and springs.

**Bedrock**: Any solid rock exposed at the surface or overlain by unconsolidated material.

**Best Management Practices (BMPs)**: Methods, measures or practices to prevent or reduce water pollution including, but not limited to, structural and non-structural controls, operation and maintenance procedures, other requirements, scheduling and distribution of activities. Usually, BMPs are selected on the basis of site-specific conditions that reflect natural background conditions and political, economic, and technical feasibility.

**Big Game**: Those species of large mammals normally managed as a sport hunting resource. Generally includes; elk, moose, white-tailed deer, mule deer, mountain goat, bighorn sheep, black bear & mountain lion.

**BLM special-status species**: Species designated as federally endangered, threatened, proposed, or candidate under the ESA, those designated by the Colorado Division of Wildlife as state endangered or threatened, and BLM Sensitive Species which are species under status review by the USFWS, species with numbers declining so rapidly that federal listing may become necessary, species with typically small and widely dispersed populations, or species inhabiting ecological refugia or other specialized or unique habitats.

**Blowout**: An uncontrolled flow of gas, oil, or other well fluids into the atmosphere or into an underground formation. A blowout, or gusher, can occur when formation pressure exceeds the pressure applied to it by the column of drilling fluid.

**Clean Water Act, as amended in 1977**: Legislation enacted by the U.S. Congress in 1977 to maintain and restore the chemical, physical, and biological integrity of the waters of the United States. This act was formerly known as the Federal Water Pollution Control Act (33 USC 1344).

**Critical Habitat**: An area occupied by a threatened or endangered species "on which are found those physical and biological features: 1) essential to the conservation of the species, and 2) which may require special management considerations or protection."

**Crucial Winter Range**: That part of the overall range where 90 percent of the individuals are located during the average five winters out of ten from the first heavy snowfall to spring green-up, or during a site-specific period of winter as defined for each Colorado Division of Wildlife Data analysis unit.

**Cultural Resource**: Any prehistoric site, as well as historic site, which is more than 50 years old. The physical remains of human activity (artifacts, ruins, burial mounds, petroglyphs, etc.) having scientific, prehistoric, or social values.

BLM_0020893

**Cumulative Impact**: Impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

**Cumulative Effects Area**: The cumulative effects area is the geographic area that may be affected by the project's contribution to cumulative effects on a particular resource. The project study area for cumulative effects analysis generally will be larger than what is traditionally defined as the area under study for direct effects. It is generally not necessary to conduct the same level of detailed analysis throughout the entire cumulative effects study area as is done for the direct effects study area.

**Direct Effects (Direct Effects)**: Effects that are caused by the action and occur at the same time and place.

**Dispersed Recreation**: Outdoor recreation in which visitors are diffused over relatively large areas. Where facilities or developments are provided, they are more for access and protection of the environment than for the comfort or convenience of the people.

**Discharge**: The volume of water flowing past a point per unit time, commonly expressed as cubic feet per second, gallons per minute, or million gallons per day.

**Disturbance**: A discrete event, either natural or human-induced, that causes a change in the existing condition of an ecosystem.

**Disturbed Area**: An area where natural vegetation has been removed.

**Drainage**: The natural channel through which water flows some time of the year; natural and artificial means for affecting discharge of water as by a system of surface and subsurface passages

**Drawdown**: The lowering of the water level in a well as a result of withdrawal; the reduction in groundwater level at a point caused by the withdrawal of water from an aquifer.

**Drilling Mud**: A specially compounded liquid circulated through the wellbore during rotary drilling operations. In addition to its function of bringing cuttings to the surface, drilling mud cools and lubricates the bit and drill stem, protects against blowouts by holding back subsurface pressures, and deposits a mud cake on the wall of the borehole to prevent loss of fluids to the formation.

BLM_0020894

**Effects**: "Effect" and "impact" are synonymous as used in this document. Environmental consequences (the scientific and analytical basis for comparison of alternatives). Effects may be either direct, which are caused by the action and occur at the same time and place, or indirect, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable, or cumulative.

**Endangered Species**: Any species in danger of extinction throughout all or a significant portion of its range. Plant or animal species identified by the Secretary of the Interior as endangered in accordance with the 1973 Endangered Species Act.

**Environment**: The physical conditions that exist within the area that will be affected by a proposed project, including land, water, minerals, flora, fauna, and objects of historical or aesthetic significance. The area involved is the area in which significant effects would occur either directly or indirectly as a result of the project. The "environment" includes both natural and human-made conditions.

**Environmental Analysis**: An analysis of alternative actions and their predictable environmental effects, including physical, biological, economic, and social consequences and their interactions; short- and long-term effects; direct, indirect, and cumulative effects.

**Erosion**: The wearing away of soil and rock by weathering, mass wasting, and the action of streams, glaciers, waves, wind, and groundwater.

**Exploration Plan**: Detailed plan to search for oil and gas, or other minerals, including aerial and geophysical surveys, geological studies, core testing, and core drilling.

**Fugitive Dust**: Dust particles suspended randomly in the air from various sources including road travel, excavation, and rock loading operations.

**Geochemistry**: The study of the distribution and amounts of the chemical elements in minerals, ores, rocks, soils, water, and the atmosphere, and their circulation in nature on the basis of the properties of their atoms and ions.

**Ground Cover**: The percentage of biotic and abiotic material (other than bare soil) covering the ground surface including litter, mosses, lichens, vegetation basal area, and rock fragments. Ground cover plus bare soil equals 100 percent.

**Groundwater Table**: The surface between the zone of saturation and the zone of aeration; that surface of a body of unconfined groundwater at which the pressure is equal to that of the atmosphere.

**Growth Media**: Natural soils or soil-like materials that are capable of sustaining plant growth when placed in a layer over disturbed land surfaces.

BLM_0020895

**Habitat**: A specific set of physical conditions that surround a single species, a group of species, or a large community.  In wildlife management, the major components of habitat are considered to be food, water, cover, and living space.

**Hazardons Materials**: CERCLA term identifying those substances designated pursuant to section 1321(b)(2)(A) of Title 33, or 42 USC 9602, or listed in 40 CFR 302 or 355.

**Hazardous Materials Release**: Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant).

**Hazardous Waste**: Refers to a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may pose a substantial threat to human health and the environment.

**Impact**: A modification in the status of the environment brought about by the proposed action or an alternative.

**Indirect Impact**: Effects that are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable (40 Code of Federal Regulations 1508.8); synonymous with indirect effects.

**Lease**: A temporary property right that authorizes public lands for developing deposits of coal, petroleum, natural gas and other hydrocarbons, in addition to phosphates, sodium, sulphur, and potassium.

**Mineral**: Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained for man's use, usually from the ground.  Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mitigate, Mitigation**: To cause to become less severe or harmful; actions to avoid, minimize, rectify, reduce or eliminate, and compensate for effects to environmental resources.

**Mitigation Measure**: Actions taken to reduce or eliminate effects (effects) from management actions, including: 1) avoiding the impact altogether by not taking certain action or parts of an action; 2) minimizing effects by limiting the degree or magnitude of the action and its implementation; 3) rectifying the effects by repairing, rehabilitating or restoring the affected environment; 4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and 5) compensating for the impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

BLM_0020896

**Monitor**: To systematically and repeatedly watch, observe, or measure environmental conditions in order to track changes.

**National Environmental Policy Act**: The National Environmental Policy Act (NEPA) of 1969 established the national policy charter for protecting the environment. NEPA established the Council on Environmental Quality (CEQ), and provides the process for the preparation of an environmental analysis (EA) or an environmental impact statement (EIS). The CEQ regulations in 40 CFR 1500-1508 implement NEPA and provide rules for the preparation of EAs and EISs.

**National Historic Preservation Act of 1966, as amended**: Act directing federal agencies to consider the effects of their programs and projects on properties listed on or eligible for the National Register of Historic Places. If a proposed action might impact any archaeological, historical, or architectural resource, this act mandates consultation with the proper agencies.

**National Pollution Discharge Elimination System**: A part of the Clean Water Act that requires point source dischargers to obtain permits. These permits are referred to as National Pollution Discharge Elimination System permits and are administered by the U.S. Environmental Protection Agency.

**National Register of Historic Places**: A register maintained by the National Park Service that lists districts, sites, buildings, structures, and objects significant in American history, architecture, archaeology, engineering and culture that meet criteria set forth in 36 Code of Federal Regulations 60.

**Noxious Weeds**: Plants designated as noxious by the Secretary of Agriculture or by the responsible state official. They are usually an invasive species. They generally possess one or more of the following characteristics: aggressive and difficult to manage, poisonous, toxic, parasitic, a carrier or host of serious insects or disease, non-native, new, or not common to the United States. According to the Federal Noxious Weed Act (PL 93-639), a noxious weed is one that causes disease or has other adverse effects on people or their environment and therefore is detrimental to the agriculture and commerce of the United States and to the public health.

**Potash**: Various mined and manufactured salts that contain potassium in water-soluble form. Potash is used primarily as an agricultural fertilizer (plant nutrient) because it is a source of soluble potassium.

**Prospect Permit**: Permit to explore for leasable mineral deposits on lands where BLM has determined that prospecting is needed to determine the existence of a valuable deposit.

**Reclamation**: The recontouring and revegetation of a site after exploration activity is completed.

BLM_0020897

**Reclamation**: Returning disturbed land to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

**Revegetation**: The reestablishment and development of a plant cover.  This may take place naturally through the reproductive processes of the existing flora, or artificially through the direct action of reforestation or reseeding.

**Runoff**: That part of precipitation that appears in surface streams; precipitation that is not retained on the site where it falls and is not absorbed by the soil.

**Special-Status Species**: Refers to federally listed threatened or endangered species, federal candidate species, species recognized as requiring special protection by State agencies, and species managed as sensitive species by the USFS and/or by the BLM.

**Species**: A group of individuals of common ancestry that closely resemble each other structurally and physiologically, and in nature interbreed producing fertile offspring.

**Summer Range**: A range, usually at higher elevation, used by deer and elk during the summer; a summer range is usually much more extensive than a winter range.

**Threatened Species**: Any species of plant or animal that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range.  Plant or animal species identified by the Secretary of the Interior as threatened in accordance with the 1973 Endangered Species Act.

**Visual Resource**: The composite of basic terrain, geologic features, water features, vegetation patterns, and land use effects that typify a land unit and influence the visual appeal the unit may have for viewers.

**Visual Resource Management Classes**: A classification of landscapes according to the kinds of structures and changes that are acceptable to meet established visual goals (BLM).

**Water Quality**: The biological, physical, and chemical properties of water that make it suitable for specific uses.

**Watershed**: The entire land area that contributes water to a particular drainage system or stream.

**Water Table**: The level in the saturated zone at which the pressure is equal to the atmospheric pressure.

**Winter Range**: A range, usually at lower elevation, used by migratory deer and elk during the winter months; usually better defined and smaller than summer ranges.

# Appendix A

# Interdisciplinary Team Checklist

# INTERDISCIPLINARY TEAM CHECKLIST

**Project Title**: RM Potash Exploration Project

**NEPA Log Number**: DOI-BLM-CO-S010-2009-0076

**File/Serial Number**: COC73567. Et al

**Project Leader**: James Blair

## DETERMINATION OF STAFF: *(Choose one of the following abbreviated options for the left column)*

NP = not present in the area impacted by the proposed or alternative actions

NI = present, but not affected to a degree that detailed analysis is required

PI = present with potential for relevant impact that need to be analyzed in detail in the EA

NC = (DNAs only) actions and impacts not changed from those disclosed in the existing NEPA documents cited in Section D of the DNA form. The Rationale column may include NI and NP discussions.

| Determi-nation | Resource | Rationale for Determination* | Signature | Date |
|---|---|---|---|---|
|  | **RESOURCES AND ISSUES CONSIDERED (INCLUDES SUPPLEMENTAL AUTHORITIES APPENDIX I H-1790-1)** |||||
| NI | Air Quality | mitigation & design features would prevent substantial impacts | James J Blair | 7/23/12 |
| NP | Areas of Critical Environmental Concern | There are no ACECs present | James J Blair | 7/23/12 |
| NP | BLM Natural Areas** | NP | | 7/30/12 |
| NI | Cultural Resources | No Historic Resources will be impacted | James Blair (FOR Amy Wise) | 7/16/12 |
| NI | Greenhouse Gas Emissions** | Calculated in EA | James J Blair | 7/23/12 |
| NI | Environmental Justice | VERY FEW INHABITANT. EFFECT WOULD BE NEGLIGIBLE. SEE CALCULATIONS IN EA | James J Blair | 7/23/12 |
| NP | Farmlands (Prime or Unique) | | James J Blair | 7/23 |
| PI | Fish and Wildlife Excluding USFW Designated Species | Gunnison Sage Grouse May affect | Ivan Messy | 7/31/12 |
| NP | Floodplains | Site inspection indicates no floodplains | | 7/23/12 |
| NI | Fuels/Fire Management | Mitigation measures in EA | James Blair | 7/23/12 |
| PI | Geology / Mineral Resources/Energy Production | Mitigation & design features would prevent impacts | James Blair | 7/23/12 |
| NI | Hydrologic Conditions** | Mitigation and design features would prevent any impacts. | | 7/23/12 |
| NI | Invasive Species/Noxious Weeds | Mitigation measures for Noxious Weeds in EA. | | 7/25/12 |
| NI | Lands/Access | No Substantive issues | | 7/23/12 |
| NI | Livestock Grazing | Mitigation measures included in document. | | 7/26/12 |

| Determi-nation | Resource | Rationale for Determination* | Signature | Date |
|---|---|---|---|---|
| PI | Migratory Birds. | addressed MBTA compliance and migratory bird mitigation. | *[signature]* | 7/31/12 |
| NI | Native American Religious Concerns | RELIGIOUS CONCERNS MAY BE PRESENT HOWEVER NO SPECIFIC CONCERNS ID'D IN Proposed AREA U AREA | *[signature]* FOR JULIE BELL | 4/25/12 |
| NP/NI | Paleontology | No paleo resources found in surveys. If resources uncovered, BLM will be notified | *[signature]* | 7/24/12 |
| NI | Rangeland Health Standards | Activity will not have significant impact to RHS. | *[signature]* | 7/26/12 |
| NI | Recreation | Mitigation measures will minimize effects | *[signature]* | 7/23/12 |
| NI | Socio-Economics | No impacts for exploration-level activity | *[signature]* | 7/23/12 |
| NI | Soils | Mitigation and design features would prevent any impacts. | *[signature]* | 7/23/12 |
| NI | Threatened, Endangered or Candidate Plant Species | Mitigation measures in EA. | *[signature]* | 7/30/12 |
| PI | Threatened, Endangered or Candidate Animal Species | Mexican Spotted Owl has a may affect not likely to adversely effect | *[signature]* | 7/31/12 |
| NI | Wastes (hazardous or solid) | Mitigation & design features would prevent impacts | *[signature]* | 7/24/12 |
| NI | Water Resources/Quality (drinking/surface/ground) | Mitigation and design features would prevent any impacts. | *[signature]* | 7/23/12 |
| NP | Wetlands/Riparian Zones | Site inspection indicates no wetlands/riparian | *[signature]* | 7/23/12 |
| NP | Wild and Scenic Rivers | Not present | *[signature]* | 7/23/12 |
| NP | Wilderness/WSA | Not present. Confirmed | *[signature]* | 7/24/12 |
| NP | Woodland / Forestry | No timber resources. | *[signature]* | 7/23/12 |
| NI | Vegetation Excluding USFW Designated Species | mitigation measured in EA. | *[signature]* | 7/30/12 |
| NI | Visual Resources | Not visible for canyon Bureau @ effect from rim | *[signature]* | 7/23/12 |
| NP | Wild Horses and Burros | NONE Present | *[signature]* | 7/23/12 |
| NI | Areas with Wilderness Characteristics** | Canyon is citizen proposed wilderness, but coreholes will not affect proposed area if idy'd & considered & are outside proposed will. Ver | *[signature]* | 7/23/12 |

BLM_0020901

**FINAL REVIEW:**

| Reviewer Title | Signature | Date | Comments |
|---|---|---|---|
| Environmental Coordinator | S/Tiva Kivkaid | 8/8/12 | J. Bhii for T.k va verbal confirmation (JB) |
| Authorized Officer | | 8·16·12 | design features are used as part of. |

note) the proposed action
Mitigation reg'd
as a result of
effects analysis

# Appendix B

# Photos of Drill Sites

BLM_0020903



**Drill Site 1 – Stake with Pink Flagging Marks Drill Site**



**Drill Site 2 – Stake with Pink Flagging Marks Drill Site**

BLM_0020904



**Drill Site 3 – Stake with Pink Flagging Marks Drill Site**



**Drill Site 4 – Stake with Pink Flagging Marks Drill Site**

BLM_0020905



**Drill Site 5 – Stake with Pink Flagging Marks Drill Site**



**Drill Site 6 – Stake with Pink Flagging Marks Drill Site**

# Appendix C

# Noxious Weed Management Plan

BLM_0020907

**RM POTASH EXPLORATION PROJECT**
**NOXIOUS WEED MANAGEMENT PLAN**

## 1.0     Introduction

RM Potash has submitted six prospecting permit applications and an associated exploration plan for up to six drill holes to the Bureau of Land Management (BLM), Tres Rios Field Office. The project area is located northwest of Dove Creek, Colorado. This Noxious Weed Management Plan is being developed in order to help control noxious weed species from becoming established in areas disturbed by this project.

Noxious weeds within Colorado are defined in the Colorado Noxious Weed Act, §§ 35-5.5-101 through 119, C.R.S. (CDOA 2003). A noxious weed is any species of plant which is, or is likely to be, detrimental or destructive and difficult to control or eradicate. The following laws, regulations, policies, and agreements apply to the management of noxious weeds:

- BLM Manuals 9011, 9014, and 9015;

- BLM 1991 Environmental Impact Statement, Vegetation Treatment on BLM Lands in Thirteen Western States;

- Executive Order 13112, Invasive Species;

- Federal Noxious and Invasive Weed Laws; and

- Colorado Noxious Weed Act, §§ 35-5.5-101 through 119, C.R.S.

The Colorado Department of Agriculture maintains a list of noxious weeds in the state. There are 71 species on the Colorado noxious and non-native invasive weed list (CDOA 2011). These species are classified into one of three categories.

**List A species**
List A weed species in Colorado that are designated by the Commissioner for eradication.

**List B species**
List B weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, develops and implements state noxious weed management plans designed to stop the continued spread of these species.

**List C species**
List C weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, will develop and implement state noxious weed management plans designed to support the efforts of local governing bodies to facilitate more effective integrated weed

management on private and public lands. The goal of such plans will not be to stop the continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species.

## 2.0    Noxious Weed Management Plan

In order to minimize the establishment of noxious weeds within the project area, RM Potash would use the following environmental protection measures for their project:

**Noxious Weed Control**
- Noxious weed infestation would be reported to the BLM upon discovery. The extent of the infestation would be documented on a map;

- RM Potash would treat any noxious weed infestations with BLM-approved herbicides. Application would be coordinated with the BLM and Pesticide Application Records would be turned into the BLM after every application.

**Equipment and Vehicles**
- RM Potash would restrict vehicle traffic to existing roads and the authorized ROW to reduce potential mechanical transport of noxious weed seeds; and

- RM Potash would wash all vehicles that are within areas of established noxious weed populations prior to leaving the site.

**Reclamation**
- RM Potash would reclaim and seed surface disturbance with a seed mix composed of quick-growing species to provide a quick vegetative cover;

- Equipment would be cleaned of all mud, plant parts, and seed prior to entering BLM lands.

- The seed mix would be certified pure live seed and weed free; and

- Reclaimed areas would be monitored to ensure successful vegetative growth efforts and to deter noxious weed establishment.

## 3.0    References

Colorado Department of Agriculture (CDOA). 2011. Colorado Noxious Weed List. Available online at http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1174084048733. Accessed October 24, 2011.

**Appendix D**

**COGCC Rules 900 Series and
Joint Agency Guidelines for
Uranium Exploration Drilling Reclamation**

BLM_0020910

## E&P WASTE MANAGEMENT

### 901. INTRODUCTION

a.   **General.** The rules and regulations of this series establish the permitting, construction, operating and closure requirements for pits, methods of E&P waste management, procedures for spill/release response and reporting, and sampling and analysis for remediation activities. The 900 Series rules are applicable only to E&P waste, as defined in § 34-60-103(4.5), C.R.S., or other solid waste where the Colorado Department Of Public Health And Environment has allowed remediation and oversight by the Commission.

b.   **COGCC reporting forms.** The reporting required by the rules and regulations of this series shall be made on forms provided by the Director. Alternate forms may be used where equivalent information is supplied and the format has been approved by the Director.

c.   **Additional requirements.** Whenever the Director has reasonable cause to believe that an operator, in the conduct of any oil or gas operation, is performing any act or practice which threatens to cause or causes a violation of Table 910-1 and with consideration of water quality standards or classifications established by the Water Quality Control Commission ("WQCC" ) for waters of the state, the Director may impose additional requirements, including but not limited to, sensitive area determination, sampling and analysis, remediation, monitoring, permitting and the establishment of points of compliance. Any action taken pursuant to this Rule shall comply with the provisions of Rules 324A. through D. and the 500 Series rules.

d.   **Alternative compliance methods.** Operators may propose for prior approval by the Director alternative methods for determining the extent of contamination, sampling and analysis, or alternative cleanup goals using points of compliance.

e.   **Sensitive area determination.** When the operator or Director has data that indicate an impact or threat of impact to ground water or surface water, the Director may require the operator to make a sensitive area determination and that determination shall be subject to the Director's approval. The sensitive area determination shall be made using appropriate geologic and hydrogeologic data to evaluate the potential for impact to ground water and surface water, such as appropriate percolation tests that demonstrate that seepage will not reach underlying ground water or waters of the State and impact current or future uses of these waters. Operators shall submit data evaluated and analysis used in the determination to the Director.

f.   **Sensitive area operations.** Operations in sensitive areas shall incorporate adequate measures and controls to prevent significant adverse environmental impacts and ensure compliance with the concentration levels in Table 910-1, with consideration to WQCC standards and classifications.

### 902. PITS - GENERAL AND SPECIAL RULES

a.   Pits used for exploration and production of oil and gas shall be constructed and operated to protect public health, safety, and welfare and the environment, including soil, waters of the state, and wildlife, from significant adverse environmental, public health, or welfare impacts from E&P waste, except as permitted by applicable laws and regulations.

b.   Pits shall be constructed, monitored, and operated to provide for a minimum of two (2) feet of freeboard at all times between the top of the pit wall at its point of lowest elevation and

BLM_0020911

the fluid level of the pit. A method of monitoring and maintaining freeboard shall be employed. Any unauthorized release of fluids from a pit shall be subject to the reporting requirements of Rule 906.

c.  Any accumulation of oil or condensate in a pit shall be removed within twenty-four (24) hours of discovery. Operators shall use skimming, steam cleaning of exposed liners, or other safe and legal methods as necessary to maintain pits in clean condition and to control hydrocarbon odors. Only de minimis amounts of hydrocarbons may be present unless the pit is specifically permitted for oil or condensate recovery or disposal use. A Form 15 pit permit may be revoked by the Director and the Director may require that the pit be closed if an operator repeatedly allows more than de minimis amounts of oil or condensate to accumulate in a pit. This requirement is not applicable to properly permitted and properly fenced, lined, and netted skim pits that are designed, constructed, and operated to prevent impacts to wildlife, including migratory birds.

d.  Where necessary to protect public health, safety and welfare or to prevent significant adverse environmental impacts resulting from access to a pit by wildlife, migratory birds, domestic animals, or members of the general public, operators shall install appropriate netting or fencing.

e.  Pits used for a period of no more than three (3) years, or more than three (3) years if the Director has issued a variance, for storage, recycling, reuse, treatment, or disposal of E&P waste or fresh water, as applicable, may be permitted in accordance with Rule 903 to service multiple wells, subject to Director approval.

f.  Unlined pits shall not be constructed on fill material.

g.  Except as allowed under Rule 904.a, unlined pits shall not be constructed in areas where pathways for communication with ground water or surface water are likely to exist.

h.  Produced water shall be treated in accordance with Rule 907 before being placed in a production pit.

i.  Operators shall utilize appropriate biocide treatments to control bacterial growth and related odors as needed.

## 903. PIT PERMITTING/REPORTING REQUIREMENTS

a.  An Earthen Pit Report/Permit, Form 15, shall be submitted to the Director for prior approval for the following pits:

(1)  All production pits.

(2)  Special purpose pits except those reported under Rule 903.b.(1) or Rule 903.b.(2).

(3)  Drilling pits designed for use with fluids containing hydrocarbon concentrations exceeding 10,000 ppm TPH or chloride concentrations at total well depth exceeding 15,000 ppm.

(4)  Multi-well pits containing produced water, drilling fluids, or completion fluids that will be recycled or reused, except where reuse consists only of moving drilling fluids from one (1) oil and gas location to another such location for reuse there.

b.  An Earthen Pit Report/Permit, Form 15, shall be submitted within thirty (30) calendar days after construction for the following:

BLM_0020912

(1) Special purpose pits used in the initial phase of emergency response.

(2) Flare pits where there is no risk of condensate accumulation.

c. An Earthen Pit Report/Permit, Form 15, shall not be required for drilling pits using water-based bentonitic drilling fluids with concentrations of TPH and chloride below those referenced in Rule 903.a.(3).

d. An Earthen Pit Report/Permit, Form 15, shall be completed in accordance with the instructions in Appendix I. Failure to complete the form in full may result in delay of approval or return of form.

e. The Director shall endeavor to review any properly completed Earthen Pit Report/Permit, Form 15, within thirty (30) calendar days after receipt. In order to allow adequate time for pit permit review and approval, operators shall submit an Earthen Pit Report/Permit, Form 15, at the same time as the Application for Permit to Drill, Form 2, is submitted. The Director may condition permit approval upon compliance with additional terms, provisions, or requirements necessary to protect the waters of the state, public health, or the environment.

## 904. PIT LINING REQUIREMENTS AND SPECIFICATIONS

a. Pits that were constructed before May 1, 2009 on federal land, or before April 1, 2009 on other land, shall comply with the rules in effect at the time of their construction.  The following pits shall be lined if they are constructed on or after May 1, 2009 on federal land, or on or after April 1, 2009 on other land:

(1) Drilling pits designed for use with fluids containing hydrocarbon concentrations exceeding 10,000 ppm TPH or chloride concentrations at total well depth exceeding 15,000 ppm.

(2) Production pits, other than skim pits, unless the operator demonstrates to the Director's satisfaction that the quality of the produced water is equivalent to or better than that of the underlying groundwater or the operator can clearly demonstrate by substantial evidence, such as by appropriate percolation tests, that seepage will not reach the underlying aquifer or waters of the state at contamination levels in excess of applicable standards.  Subject to Rule 901.c, this requirement shall not apply to such pits in Huerfano or Las Animas Counties constructed before May 1, 2011, or to such pits in Washington, Yuma, Logan, or Morgan counties constructed before May 1, 2013.

(3) Special purpose pits, except emergency pits constructed during initial emergency response to spills/releases, or flare pits where there is no risk of condensate accumulation.

(4) Skim pits.

(5) Multi-well pits used to contain produced water, drilling fluids, or completion fluids that will be recycled or reused, except where reuse consists only of moving drilling fluids from one oil and gas location to another such location for reuse there.  Subject to Rule 901.c, this requirement shall not apply to multi-well pits used to contain produced water in Huerfano or Las Animas Counties constructed before May 1, 2011, or to multi-well

BLM_0020913

pits used to contain produced water in Washington, Yuma, Logan, or Morgan counties constructed before May 1, 2013.

(6) Pits at centralized E&P waste management facilities and UIC facilities.

b. The following specifications shall apply to all pits that are required to be lined:

(1) Materials used in lining pits shall be of a synthetic material that is impervious, has high puncture and tear strength, has adequate elongation, and is resistant to deterioration by ultraviolet light, weathering, hydrocarbons, aqueous acids, alkali, fungi or other substances in the produced water.

(2) All pit lining systems shall be designed, constructed, installed, and maintained in accordance with the manufacturers' specifications and good engineering practices.

(3) Field seams must be installed and tested in accordance with manufacturer specifications and good engineering practices. Testing results must be maintained by the operator and provided to the Director upon request.

c. The following specifications shall also apply to pits that are required to be lined, except those at centralized E&P waste management facilities, unless an oil and gas operator demonstrates to the satisfaction of the Director that a liner system offering equivalent protection to public health, safety, and welfare, including the environment and wildlife resources, will be used:

(1) Liners shall have a minimum thickness of twenty-four (24) mils. The synthetic or fabricated liner shall cover the bottom and interior sides of the pit with the edges secured with at least a twelve (12) inch deep anchor trench around the pit perimeter. The anchor trench shall be designed to secure, and prevent slippage or destruction of, the liner materials.

(2) The foundation for the liner shall be constructed with soil having a minimum thickness of twelve (12) inches after compaction covering the entire bottom and interior sides of the pit, and shall be constructed so that the hydraulic conductivity shall not exceed $1.0 \times 10^{-7}$ cm/sec after testing and compaction. Compaction and permeability test results measured in the laboratory and field must be maintained by the operator and provided to the Director upon request.

(3) As an alternative to the soil foundation described in Rule 904.c.(2), the foundation may be constructed with bedding material that exceeds a hydraulic conductivity of $1.0 \times 10^{-7}$ cm/sec, if a double synthetic liner system is used; however, the bottom and sides of the pit shall be padded with soil or synthetic matting type material and shall be free of sharp rocks or other material that are capable of puncturing the liner. Each synthetic liner shall have a minimum thickness of twenty-four (24) mils.

d. The following specifications shall also apply to pits used at centralized E&P waste management facilities, unless an oil and gas operator demonstrates to the satisfaction of the Director that a liner system offering equivalent protection to public health, safety, and welfare, including the environment and wildlife resources, will be used:

(1) Liners shall have a minimum thickness of sixty (60) mils. The synthetic or fabricated liner shall cover the bottom and interior sides of the pit with the edges secured with at least a twelve (12) inch deep anchor trench around the pit perimeter. The

BLM_0020914

anchor trench shall be designed to secure, and prevent slippage or destruction of, the liner materials.

(2) The foundation for the liner shall be constructed with soil having a minimum thickness of twenty-four (24) inches after compaction covering the entire bottom and interior sides of the pit, and shall be constructed so that the hydraulic conductivity shall not exceed 1.0 x $10^{-7}$ cm/sec after testing and compaction. Compaction and permeability test results measured in the laboratory and field must be maintained by the operator and provided to the Director upon request.

(3) As an alternative to the soil foundation described in Rule 904.d.(2), a secondary liner consisting of a geosynthetic clay liner, which is a manufactured hydraulic barrier typically consisting of bentonite clay or other very low permeability material, supported by geotextiles or geomembranes, which are held together by needling, stitching, or chemical adhesives, may be used.

e.  In Sensitive Areas, the Director may require a leak detection system for the pit or other equivalent protective measures, including but not limited to, increased record-keeping requirements, monitoring systems, and underlying gravel fill sumps and lateral systems. In making such determination, the Director shall consider the surface and subsurface geology, the use and quality of potentially-affected ground water, the quality of the produced water, the hydraulic conductivity of the surrounding soils, the depth to ground water, the distance to surface water and water wells, and the type of liner.

**905. CLOSURE OF PITS, AND BURIED OR PARTIALLY BURIED PRODUCED WATER VESSELS.**

a.  Drilling pits shall be closed in accordance with the 1000-Series Rules.

b.  Pits not used exclusively for drilling operations, buried or partially buried produced water vessels, and emergency pits shall be closed in accordance with an approved Site Investigation and Remediation Workplan, Form 27. The workplan shall be submitted for prior Director approval and shall include a description of the proposed investigation and remediation activities in accordance with Rule 909. Emergency pits shall be closed and remediated as soon as the initial phase of emergency response operations are complete or process upset conditions are controlled.

(1) Operators shall ensure that soils and ground water meet the concentration levels of Table 910-1.

(2) **Pit evacuation.** Prior to backfilling and site reclamation, E&P waste shall be treated or disposed in accordance with Rule 907.

(3) Liners shall be disposed as follows:

A.  **Synthetic liner disposal.** Liner material shall be removed and disposed in accordance with applicable legal requirements for solid waste disposal.

B.  **Constructed soil liners.** Constructed soil liner material may be removed for treatment or disposal, or, where left in place, the material shall be ripped and mixed with native soils in a manner to alleviate compaction and prevent an impermeable barrier to infiltration and ground water flow and shall meet soil standards listed in Table 910-1.

BLM_0020915

(4)   Soil beneath the low point of the pit must be sampled to verify no leakage of the managed fluids. Soil left in place shall meet the standards listed in Table 910-1.

c.   **Discovery of a spill/release during closure.** When a spill/release is discovered during closure operations, operators shall report the spill/release on the Spill/Release Report, Form 19, in accordance with Rule 906. Leaking pits and buried or partially buried produced water vessels shall be closed and remediated in accordance with Rules 909. and 910.

d.   **Unlined drilling pits.** Unlined drilling pits shall be closed and reclaimed in accordance with the 1000 Series rules and operators shall ensure that soils and ground water meet the concentration levels in Table 910-1.

## 906. SPILLS AND RELEASES

a.   **General.** Spills/releases of E&P waste, including produced fluids, shall be controlled and contained immediately upon discovery to protect the environment, public health, safety, and welfare, and wildlife resources. Impacts resulting from spills/releases shall be investigated and cleaned up as soon as practicable. The Director may require additional activities to prevent or mitigate threatened or actual significant adverse environmental impacts on any air, water, soil or biological resource, or to the extent necessary to ensure compliance with the concentration levels in Table 910-1, with consideration to WQCC ground water standards and classifications.

b.   **Reportable spills and reporting requirements for spills/releases.**

(1)   Spills/releases of E&P waste or produced fluid exceeding five (5) barrels, including those contained within lined or unlined berms, shall be reported on COGCC Spill/Release Report, Form 19.

(2)   Spills/releases which exceed twenty (20) barrels of an E&P waste shall be reported on COGCC Spill/Release Report, Form 19, and shall also be verbally reported to the Director as soon as practicable, but not more than twenty-four (24) hours after discovery.

(3)   Spills/releases of any size which impact or threaten to impact any waters of the state, residence or occupied structure, livestock, or public byway shall be reported on COGCC Spill/Release Report, Form 19, and shall also be verbally reported to the Director as soon as practicable, but not more than twenty-four (24) hours, after discovery.

(4)   Spills/releases of any size which impact or threaten to impact any surface water supply area shall be reported to the Director and to the Environmental Release/Incident Report Hotline (1-877-518-5608). Spills and releases that impact or threaten a surface water intake shall be verbally reported to the emergency contact for that facility immediately after discovery.

(5)   For all reportable spills, operators shall submit a Spill/Release Report, Form 19, within ten (10) days after discovery. An 8 1/2 x 11 inch topographic map showing the governmental section and location of the spill shall be included. Such report shall also include information relating to initial mitigation, site investigation, and remediation. The Director may require additional information.

BLM_0020916

(6) Chemical spills and releases shall be reported in accordance with applicable state and federal laws, including the Emergency Planning and Community Right-to-Know Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Oil Pollution Act, and the Clean Water Act, as applicable.

c. **Surface owner notification and consultation.** The operator shall notify the affected surface owner or the surface owner's appointed tenant of reportable spills as soon as practicable, but not more than twenty-four (24) hours, after discovery. The operator also shall make good faith efforts to notify and consult with the affected surface owner, or the surface owner's appointed tenant, prior to commencing operations to remediate E&P waste from a spill/release in an area not being utilized for oil and gas operations.

d. **Remediation of spills/releases.** When threatened or actual significant adverse environmental impacts on any air, water, soil or other environmental resource from a spill/release exists or when necessary to ensure compliance with the concentration levels in Table 910-1, with consideration to WQCC ground water standards and classifications, the Director may require operators to submit a Site Investigation and Remediation Workplan, Form 27. Such spills/releases shall be remediated in accordance with Rules 909. and 910.

e. **Spill/release prevention.**

(1) **Secondary containment.** Secondary containment that was constructed before May 1, 2009 on federal land, or before April 1, 2009 on other land, shall comply with the rules in effect at the time of construction. Secondary containment constructed on or after May 1, 2009 on federal land, or on or after April 1, 2009 on other land shall be constructed or installed around all tanks containing oil, condensate, or produced water with greater than 3,500 milligrams per liter (mg/l) total dissolved solids (TDS) and shall be sufficient to contain the contents of the largest single tank and sufficient freeboard to contain precipitation. Secondary containment structures shall be sufficiently impervious to contain discharged material. Operators are also subject to tank and containment requirements under Rules 603. and 604. This requirement shall not apply to water tanks with a capacity of fifty (50) barrels or less.

(2) **Spill/release evaluation.** Operators shall determine the cause of a spill/release, and, to the extent practicable, shall implement measures to prevent spills/releases due to similar causes in the future. For reportable spills, operators shall submit this information to the Director on the Spill/Release Report, Form 19, within ten (10) days after discovery of the spill/release.

## 907. MANAGEMENT OF E&P WASTE

a. **General requirements.**

(1) **Operator obligations.** Operators shall ensure that E&P waste is properly stored, handled, transported, treated, recycled, or disposed to prevent threatened or actual significant adverse environmental impacts to air, water, soil or biological resources or to the extent necessary to ensure compliance with the concentration levels in Table 910-1, with consideration to WQCC ground water standards and classifications.

(2) E&P waste management activities shall be conducted, and facilities constructed and operated, to protect the waters of the state from significant adverse environmental impacts from E&P waste, except as permitted by applicable laws and regulations.

BLM_0020917

(3) **Reuse and recycling.** To encourage and promote waste minimization, operators may propose plans for managing E&P waste through beneficial use, reuse, and recycling by submitting a written management plan to the Director for approval on a Sundry Notice, Form 4, if applicable. Such plans shall describe, at a minimum, the type(s) of waste, the proposed use of the waste, method of waste treatment, product quality assurance, and shall include a copy of any certification or authorization that may be required by other laws and regulations. The Director may require additional information.

b. **Waste transportation.**

(1) E&P waste, when transported off-site within Colorado for treatment or disposal, shall be transported to facilities authorized by the Director or waste disposal facilities approved to receive E&P waste by the Colorado Department of Public Health and Environment. When transported to facilities outside of Colorado for treatment or disposal, E&P waste shall be transported to facilities authorized and permitted by the appropriate regulatory agency in the receiving state.

(2) **Waste generator requirements.** Generators of E&P waste that is transported off-site shall maintain, for not less than five (5) years, copies of each invoice, bill, or ticket and such other records as necessary to document the following requirements A through F:

A. The date of the transport;

B. The identity of the waste generator;

C. The identity of the waste transporter;

D. The location of the waste pickup site;

E. The type and volume of waste; and

F. The name and location of the treatment or disposal site.

Such records shall be signed by the transporter, made available for inspection by the Director during normal business hours, and copies thereof shall be furnished to the Director upon request.

c. **Produced water.**

(1) **Treatment of produced water.** Produced water shall be treated prior to placement in a production pit to prevent crude oil and condensate from entering the pit.

(2) **Produced water disposal.** Produced water may be disposed as follows:

A. Injection into a Class II well, permitted in accordance with Rule 325.;

B. Evaporation/percolation in a properly permitted pit;

C. Disposal at permitted commercial facilities;

D. Disposal by roadspreading on lease roads outside sensitive areas for produced waters with less than 3,500 mg/l TDS when authorized by the surface owner. Roadspreading of produced waters shall not impact

BLM_0020918

waters of the state, shall not result in pooling or runoff, and the adjacent soils shall meet the concentration levels in Table 910-1. Flowback fluids shall not be used for dust suppression.

    E.  Discharging into state waters, in accordance with the Water Quality Control Act and the rules and regulations promulgated thereunder.

        i.  Operators shall provide the Colorado discharge permit number, latitude and longitude coordinates, in accordance with Rule 215.f, of the discharge outfall, and sources of produced water on a Source of Produced Water for Disposal, Form 26, and shall include a U.S.G.S. topographic map showing the location of the discharge outfall.

        ii.  Produced water discharged pursuant to this subsection (2).E. may be put to beneficial use in accordance with applicable state statutes and regulations governing the use and administration of water.

    F.  Evaporation in a properly lined pit at a centralized E&P waste management facility permitted in accordance with Rule 908.

(3)  **Produced water reuse and recycling.** Produced water may be reused for enhanced recovery, drilling, and other approved uses in a manner consistent with existing water rights and in consideration of water quality standards and classifications established by the WQCC for waters of the state, or any point of compliance established by the Director pursuant to Rule 324D.

(4)  **Mitigation.** Water produced during operation of an oil or gas well may be used to provide an alternative domestic water supply to surface owners within the oil or gas field, in accordance with all applicable laws, including, but not limited to, obtaining the necessary approvals from the WQCD for constructing a new "waterworks," as defined by Section 25-1-107(1)(X)(II)(A), C.R.S. Any produced water not so used shall be disposed of in accordance with subsection (2) or (3). Providing produced water for domestic use within the meaning of this subsection (4) shall not constitute an admission by the operator that the well is dewatering or impacting any existing water well. The water produced shall be to the benefit of the surface owner within the oil and gas field and may not be sold for profit or traded.

d.  **Drilling fluids.**

(1)  **Recycling and reuse.** Drilling pit contents may be recycled to another drilling pit for reuse consistent with Rule 903.

(2)  **Treatment and disposal.** Drilling fluids may be treated or disposed as follows:

    A.  Injection into a Class II well permitted in accordance with Rule 325;

    B.  Disposal at a commercial solid waste disposal facility; or

    C.  Land treatment or land application at a centralized E&P waste management facility permitted in accordance with Rule 908.

(3)  **Additional authorized disposal of water-based bentonitic drilling fluids.** Water-based bentonitic drilling fluids may be disposed as follows:

BLM_0020919

A. Drying and burial in pits on non-crop land. The resulting concentrations shall not exceed the concentration levels in Table 910-1, below; or

B. Land application as follows:

    i. **Applicability.** Acceptable methods of land application include, but are not limited to, production facility construction and maintenance, and lease road maintenance.

    ii. **Land application requirements.** The average thickness of water-based bentonitic drilling fluid waste applied shall be no more than three (3) inches prior to incorporation. The waste shall be applied to prevent ponding or erosion and shall be incorporated as a beneficial amendment into the native soils within ten (10) days of application. The resulting concentrations shall not exceed those in Table 910-1.

    iii. **Surface owner approval.** Operators shall obtain written authorization from the surface owner prior to land application of water-based bentonitic drilling fluids.

    iv. **Operator obligations.** Operators shall maintain a record of the source, the volume, and the location where the land application of the water-based bentonitic drilling fluid occurred. Upon the Director's written request, this information shall be provided within five (5) business days, in a format readily reviewable by the Director. Operators with control and authority over the wells from which the water-based bentonitic drilling fluid wastes are obtained retain responsibility for the land application operation, and shall diligently cooperate with the Director in responding to complaints regarding land application of water-based bentonitic drilling fluids.

    v. **Approval.** Prior Director approval is not required for reuse of water-based bentonitic drilling fluids for land application as a soil amendment.

e. **Oily waste.** Oily waste includes those materials containing crude oil, condensate or other E&P waste, such as soil, frac sand, drilling fluids, and pit sludge that contain hydrocarbons.

    (1) Oily waste may be treated or disposed as follows:

        A. Disposal at a commercial solid waste disposal facility;

        B. Land treatment onsite; or

        C. Land treatment at a centralized E&P waste management facility permitted in accordance with Rule 908.

    (2) Land treatment requirements:

        A. Free oil shall be removed from the oily waste prior to land treatment.

        B. Oily waste shall be spread evenly to prevent pooling, ponding, or runoff.

BLM_0020920

    C.  Contamination of stormwater runoff, ground water, or surface water shall be prevented.

    D.  Biodegradation shall be enhanced by disking, tilling, aerating, or addition of nutrients, microbes, water or other amendments, as appropriate.

    E.  Land-treated oily waste incorporated in place or beneficially reused shall not exceed the concentrations in Table 910-1.

    F.  When a threatened or significant adverse environmental impact from onsite land treatment exists, operators shall submit a Site Investigation and Remediation Workplan, Form 27, for approval by the Director. Treatment shall thereafter be completed in accordance with the workplan and Rules 909. and 910.

    G.  When land treatment occurs in an area not being utilized for oil and gas operations, operators shall obtain prior written surface owner approval.

f.  **Other E&P Waste.** Other E&P waste such as workover fluids, tank bottoms, pigging wastes from gathering and flow lines, and natural gas gathering, processing, and storage wastes may be treated or disposed of as follows:

    (1)  Disposal at a commercial solid waste disposal facility;

    (2)  Treatment at a centralized E&P waste management facility permitted in accordance with Rule 908;

    (3)  Injection into a Class II injection well permitted in accordance with Rule 325; or

    (4)  An alternative method proposed in a waste management plan in accordance with rule 907.a.(3) and approved by the Director.

## 907A.  MANAGEMENT OF NON-E&P WASTE

a.  Certain wastes generated by oil and gas-related activities are non-E&P wastes and are not exempt from regulation as solid or hazardous wastes. These wastes need to be properly identified and disposed of in accordance with state and federal regulations.

b.  Certain wastes generated by oil and gas-related activities can either be E&P wastes or non-E&P wastes depending on the circumstances of their generation.

c.  The hazardous waste regulations require that a hazardous waste determination be made for any non-E&P solid waste. Hazardous wastes require storage, treatment, and disposal practices in accordance with 6 C.C.R. 1007-3. All non-hazardous/non-E&P wastes are considered solid waste which require storage, treatment, and disposal in accordance with 6 C.C.R. 1007-2.

## 908.  CENTRALIZED E&P WASTE MANAGEMENT FACILITIES

a.  **Applicability.** Operators may establish non-commercial, centralized E&P waste management facilities for the treatment, disposal, recycling or beneficial reuse of E&P waste. This rule applies only to non-commercial facilities, which means the operator does not represent itself as providing E&P waste management services to third parties, except as part of a unitized area or joint operating agreement or in response to an emergency. Centralized

BLM_0020921

facilities may include components such as land treatment or land application sites, pits, and recycling equipment.

b. **Permit requirements.** Before any person shall commence construction of a centralized E&P waste management facility, such person shall file with the Director an application on Form 28 and pay a filing and service fee established by the Commission (see Appendix III), and obtain the Director's approval. The application shall contain the following:

(1) The name, address, phone and fax number of the operator, and a designated contact person.

(2) The name, address, and phone number of the surface owner of the site, if not the operator, and the written authorization of such surface owner.

(3) The legal description of the site.

(4) A general topographic, geologic, and hydrologic description of the site, including immediately adjacent land uses, a topographic map of a scale no less than 1:24,000 showing the location, and the average annual precipitation and evaporation rates at the site.

(5) **Centralized facility siting requirements.**

A. A site plan showing drainage patterns and any diversion or containment structures, and facilities such as roads, fencing, tanks, pits, buildings, and other construction details.

B. Scaled drawings of entire sections containing the proposed facility. The field measured distances from the nearer north or south and nearer east or west section lines shall be measured at ninety (90) degrees from said section lines to facility boundaries and referenced on the drawing. A survey shall be provided including a complete description of established monuments or collateral evidence found and all aliquot corners.

C. The facility shall be designed to control public access, prevent unauthorized vehicular traffic, provide for site security both during and after operating hours, and prevent illegal dumping of wastes. Appropriate measures shall also be implemented to prevent access to the centralized facility by wildlife or domestic animals.

D. Centralized facilities shall have a fire lane of at least ten (10) feet in width around the active treatment areas and within the perimeter fence. In addition, a buffer zone of at least ten (10) feet shall be maintained within the perimeter fire lane.

E. Surface water diversion structures, including, but not limited to, berms and ditches, shall be constructed to accommodate a one hundred (100) year, twenty four (24) hour event. The facility shall be designed and constructed with a run-on control system to prevent flow onto the facility during peak discharge and a run-off control system to contain the water volume from a twenty-five (25) year, twenty-four (24) hour storm.

(6) **Waste profile.** For each type of waste, the amounts to be received and managed by the facility shall be estimated on a monthly average basis. For each waste type to be treated, a characteristic waste profile shall be completed.

BLM_0020922

(7) **Facility design and engineering.** Facility design and engineering data, including plans and elevations, design basis, calculations, and process description.

    A. Geologic data, including, but not limited to:

        i. Type and thickness of unconsolidated soils;

        ii. Type and thickness of consolidated bedrock, if applicable;

        iii. Local and regional geologic structures; and

        iv. Any geologic hazards that may affect the design and operation of the facility.

    B. Hydrologic data, including, but not limited to:

        i. Surface water features within two (2) miles;

        ii. Depth to shallow ground water and major aquifers;

        iii. Water wells within one (1) mile of the site boundary and well depth, depth to water, screened intervals, yields, and aquifer name;

        iv. Hydrologic properties of shallow ground water and major aquifers including flow direction, flow rate, and potentiometric surface;

        v. Site location in relation to the floodplain of nearby surface water features;

        vi. Existing quality of shallow ground water; and

        vii. An evaluation of the potential for impacts to nearby surface water and ground water.

    C. Engineering data, including, but not limited to:

        i. Type and quantity of material required for use as a liner, including design components;

        ii. Location and depth of cut for liners;

        iii. Location, dimensions, and grades of all surface water diversion structures;

        iv. Location and dimensions of all surface water containment structures; and

        v. Location of all proposed facility structures and access roads.

(8) **Operating plan.** An operating plan, including, but not limited to:

    A. A detailed description of the method of treatment, loading rates, and application of nutrients and soil amendments;

    B. Dust and moisture control;

BLM_0020923

C.  Sampling;

D.  Inspection and maintenance;

E.  Emergency response;

F.  Record-keeping;

G.  Site security;

H.  Hours of operation;

I.  Noise and odor mitigation; and

J.  Final disposition of waste. Where treated waste will be beneficially reused, a description of reuse and method of product quality assurance shall be included.

(9)  **Ground water monitoring.**

A.  **Water Wells.**

Water samples shall be collected from water wells known to the operator or registered with the Colorado State Engineer within a one (1) mile radius of the proposed facility and shall be analyzed to establish baseline water quality. Analytical parameters shall be selected based upon the proposed waste stream and shall include, at a minimum, all major cations and anions, total dissolved solids, iron and manganese, nutrients (nitrates, nitrites, selenium), benzene, toluene, ethylbenzene, xylenes, pH, and specific conductance. Operators shall use reasonable good faith efforts to identify and obtain access to such water wells for the purpose of collecting water samples. If access cannot be obtained, then the operator shall notify the Director of the wells for which access was not obtained and sampling of such wells by the operator shall not be required. Not conducting sampling because access to water wells cannot be obtained shall not be grounds for denial of the proposed facility.

Copies of all test results described above shall be provided to the Director and the water well owner within three (3) months of collecting the samples. Laboratory results shall also be submitted to the Director in an electronic data deliverable format.

B.  **Site-specific monitoring wells.**

i.  Where applicable, the Director shall require ground water monitoring to ensure compliance with the concentration levels in Table 910-1 and WQCC standards and classifications by establishing points of compliance, unless an oil and gas operator demonstrates to the satisfaction of the Director that an alternative method offering equivalent protection of public health, safety, and welfare, including the environment and wildlife resources, can be employed and provided the operator employs a dual liner with a leak detection system that provides for immediate leak detection from the uppermost liner. All monitoring well construction must be completed in accordance with the

BLM_0020924

State Engineer's regulations on well construction, "Water Well Construction Rules" (2 C.C.R. 402-2).

    ii.  Where monitoring is required, the direction of flow, ground water gradient and quality of water shall be established by the installation of a minimum of three (3) monitor wells, including an up-gradient well and two (2) down-gradient wells that will serve as points of compliance, or other methods authorized by the Director.

(10) **Surface water monitoring.** Where applicable, the Director shall require baseline and periodic surface water monitoring to ensure compliance with WQCC surface water standards and classifications. Operators shall use reasonable good faith efforts to obtain access to such surface water for the purpose of collecting water samples. If access cannot be obtained, then the operator shall notify the Director of the surface water for which access was not obtained and sampling of such surface water by the operator shall not be required. Not conducting sampling because access to surface water cannot be obtained shall not be grounds for denial of the proposed facility.

(11) **Contingency plan.** A contingency plan that describes the emergency response operations for the facility, 24-hour contact information for the person who has authority to initiate emergency response actions, and an outline of responsibilities under the joint operating agreement regarding maintenance, closure, and monitoring of the facility.

c.  **Permit approval.** The Director shall endeavor to approve or deny the properly completed permit within thirty (30) days after receipt and may condition permit approval as necessary to prevent any threatened or actual significant adverse environmental impact on air, water, soil or biological resources or to the extent necessary to ensure compliance with the concentration levels in Table 910-1, with consideration to WQCC ground water standards and classifications.

d.  **Financial assurance.** The operator of a centralized E&P waste management facility shall submit for the Director's approval such financial assurance as required by Rule 704. prior to issuance of the operating permit.

e.  **Facility modifications.** Throughout the life of the facility the operator shall submit proposed modifications to the facility design, operating plan, permit data, or permit conditions to the Director for prior approval.

f.  **Annual permit review.** To ensure compliance with permit conditions and the 900 Series rules, the facility permit shall be subject to an annual review by the Director. To facilitate this review, the operator shall submit an annual report summarizing operations, including the types and volumes of waste actually handled at the facility. The Director may require additional information.

g.  **Closure.**

(1) **Preliminary closure plan.** A general preliminary plan for closure shall be submitted with the centralized E&P waste management facility permit, Form 28. The preliminary closure plan shall include, but not be limited to:

    A.  A general plan for closure and reclamation of the entire facility, including a description of the activities required to decommission and remove all

BLM_0020925

equipment, close and reclaim pits, dispose of or treat residual waste, collect samples as needed to verify compliance with soil and ground water standards, implement post-closure monitoring, and complete other remediation, as required.

B. An estimate of the cost to close and reclaim the entire facility and to conduct post-closure monitoring. Cost estimates shall be subject to review by the Director.

(2) **Final closure plan.** A detailed Site Investigation and Remediation Workplan, Form 27, shall be submitted at least sixty (60) days prior to closure for approval by the Director. The workplan shall include, but not be limited to, a description of the activities required to decommission and remove all equipment, close and reclaim pits, dispose of or treat residual waste, collect samples as needed to verify compliance with soil and ground water standards, implement post-closure monitoring, and complete other remediation, as required.

h. Operators may be subject to local requirements for zoning and construction of facilities and shall provide copies of any approval notices, permits, or other similar types of notifications for the facility from local governments or other agencies to the Director for review prior to issuance of the operating permit.

## 909. SITE INVESTIGATION, REMEDIATION, AND CLOSURE

a. **Applicability.** This section applies to the closure and remediation of pits other than drilling pits constructed pursuant to Rule 903.a.(3); investigation, reporting and remediation of spills/releases; permitted waste management facilities including treatment facilities; plugged and abandoned wellsites; sites impacted by E&P waste management practices; or other sites as designated by the Director.

b. **General site investigation and remediation requirements.**

(1) **Sensitive Area Determination.** Operators shall complete a sensitive area determination in accordance with Rule 901.e.

(2) **Sampling and analyses.** Sampling and analysis of soil and ground water shall be conducted in accordance with Rule 910. to determine the horizontal and vertical extent of any contamination in excess of the concentrations in Table 910-1.

(3) **Management of E&P waste.** E&P waste shall be managed in accordance with Rule 907.

(4) **Pit evacuation.** Prior to backfilling and site reclamation, E&P waste shall be treated or disposed in accordance with Rule 907. and the 1000 Series rules.

(5) **Remediation.** Remediation shall be performed in a manner to mitigate, remove, or reduce contamination that exceeds the concentrations in Table 910-1 in order to ensure protection of public health, safety, and welfare, and to prevent and mitigate significant adverse environmental impacts. Soil that does not meet concentrations in Table 910-1 shall be remediated. Ground water that does not meet concentrations in Table 910-1 shall be remediated in accordance with a Site Investigation and Remediation Workplan, Form 27.

(6) **Reclamation.** Remediation sites shall be reclaimed in accordance with the 1000 Series rules for reclamation.

BLM_0020926

c. **Site Investigation And Remediation Workplan, Form 27.** Operators shall prepare and submit for prior Director approval a Site Investigation and Remediation Workplan, Form 27, for the following operations and remediation activities:

    (1)  Unlined pit closure when required by Rule 905.

    (2)  Remediation of spills/releases in accordance with Rule 906.

    (3)  Land treatment of oily waste in accordance with Rule 907.e.(2).F.

    (4)  Closure of centralized E&P waste management facilities in accordance with Rule 908.g.

    (5)  Remediation of impacted ground water in accordance with Rule 910.b.(4).

d. **Multiple sites.** Remediation of multiple sites may be submitted on a single workplan with prior Director approval.

e. **Closure.**

    (1)  Remediation and reclamation shall be complete upon compliance with the concentrations in Table 910-1, or upon compliance with an approved workplan.

    (2)  **Notification of completion.** Within thirty (30) days after conclusion of site remediation and reclamation activities operators shall provide the following notification of completion:

        A.  Operators conducting remediation operations in accordance with Rule 909.b. shall submit to the Director a Site Investigation and Remediation Workplan, Form 27, containing information sufficient to demonstrate compliance with these rules.

        B.  Operators conducting remediation under an approved workplan shall submit to the Director, by adding or attaching to the original workplan, information sufficient to demonstrate compliance with the workplan.

f. **Release of financial assurance.** Financial assurance required by Rule 706. may be held by the Director until the required remediation of soil and/or ground water impacts is completed in accordance with the approved workplan, or until cleanup goals are met.

**910. CONCENTRATIONS AND SAMPLING FOR SOIL AND GROUND WATER**

a. **Soil and groundwater concentrations.** The concentrations for soil and ground water are in Table 910-1. Ground water standards and analytical methods are derived from the ground water standards and classifications established by WQCC.

b. **Sampling and analysis.**

    (1)  **Existing workplans.** Sampling and analysis for sites subject to an approved workplan shall be conducted in accordance with the workplan and the sampling and analysis requirements described in this rule.

    (2)  **Methods for sampling and analysis.** Sampling and analysis for site investigation or confirmation of successful remediation shall be conducted to determine the

BLM_0020927

nature and extent of impact and confirm compliance with appropriate concentration levels in Table 910-1.

A. **Field analysis.** Field measurements and field tests shall be conducted using appropriate equipment, calibrated and operated according to manufacturer specifications, by personnel trained and familiar with the equipment.

B. **Sample collection.** Samples shall be collected, preserved, documented, and shipped using standard environmental sampling procedures in a manner to ensure accurate representation of site conditions.

C. **Laboratory analytical methods.** Laboratories shall analyze samples using standard methods (such as EPA SW-846 or API RP-45) appropriate for detecting the target analyte. The method selected shall have detection limits less than or equal to the concentrations in Table 910-1.

D. **Background sampling.** Samples of comparable, nearby, non-impacted, native soil, ground water or other medium may be required by the Director for establishing background conditions.

(3) **Soil sampling and analysis.**

A. **Applicability.** If soil contamination is suspected or known to exist as a result of spills/releases or E&P waste management, representative samples of soil shall be collected and analyzed in accordance with this rule.

B. **Sample collection.** Samples shall be collected from areas most likely to have been impacted, and the horizontal and vertical extent of contamination shall be determined. The number and location of samples shall be appropriate to the impact.

C. **Sample analysis.** Soil samples shall be analyzed for contaminants listed in Table 910-1 as appropriate to assess the impact or confirm remediation. The analytical parameters shall be selected based on site-specific conditions and process knowledge and shall be agreed to and approved by the Director.

D. **Reporting.** Soil Analysis Report, Form 24, shall be used when the Director requires results of soil analyses.

E. **Soil impacted by produced water.** For impacts to soil due to produced water, samples from comparable, nearby non-impacted native soil shall be collected and analyzed for purposes of establishing background soil conditions including pH and electrical conductivity (EC). Where EC of the impacted soil exceeds the level in Table 910-1, the sodium adsorption ratio (SAR) shall also be determined.

F. **Soil impacted by hydrocarbons.** For impacts to soil due to hydrocarbons, samples shall be analyzed for TPH.

BLM_0020928

**(4)  Ground water sampling and analysis.**

    A.  **Applicability.** Operators shall collect and analyze representative samples of ground water in accordance with these rules under the following circumstances:

        (i)  Where ground water contamination is suspected or known to exceed the concentrations in Table 910-1;

        (ii)  Where impacted soils are in contact with ground water; or

        (iii)  Where impacts to soils extend down to the high water table.

    B.  **Sample collection.** Samples shall be collected from areas most likely to have been impacted, downgradient or in the middle of excavated areas. The number and location of samples shall be appropriate to determine the horizontal and vertical extent of the impact. If the concentrations in Table 910-1 are exceeded, the direction of flow and a ground water gradient shall be established, unless the extent of the contamination and migration can otherwise be adequately determined.

    C.  **Sample analysis.** Ground water samples shall be analyzed for benzene, toluene, ethylbenzene, xylene, and API RP-45 constituents, or other parameters appropriate for evaluating the impact. The analytical parameters shall be selected based on site-specific conditions and process knowledge and shall be agreed to and approved by the Director.

    D.  **Reporting.** Water Analysis Report, Form 25, shall be used when the Director requires results of water analyses.

    E.  **Impacted ground water.** Where ground water contaminants exceed the concentrations listed in Table 910-1, operators shall notify the Director and submit to the Director for prior approval a Site Investigation and Remediation Workplan, Form 27, for the investigation, remediation, or monitoring of ground water to meet the required concentrations in Table 910-1.

**911.  PIT, BURIED OR PARTIALLY BURIED PRODUCED WATER VESSEL, BLOWDOWN PIT, AND BASIC SEDIMENT/TANK BOTTOM PIT MANAGEMENT REQUIREMENTS PRIOR TO DECEMBER 30, 1997.**

a.  **Applicability.** This rule applies to the management, operation, closure and remediation of drilling, production and special purpose pits, buried or partially buried produced water vessels, blowdown pits, and basic sediment/tank bottom pits put into service prior to December 30, 1997 and unlined skim pits put into service prior to July 1, 1995. For pits constructed after December 30, 1997 and skim pits constructed after July 1, 1995, operators shall comply with the requirements contained in Rules 901. through 910.

b.  **Inventory.** Operators were required to submit to the Director no later than December 31, 1995, an inventory identifying production pits, buried or partially buried produced water vessels, blowdown pits, and basic sediment/tank bottom pits that existed on June 30, 1995. The inventory required operators to provide the facility name, a description of the location, type, capacity and use of pit/vessel, whether netted or fenced, lined or unlined, and where available, water quality data. Operators who have failed to submit the required inventory are in continuing violation of this rule.

BLM_0020929

c. **Sensitive area determination.**

    (1) For unlined production and special purpose pits constructed prior to July 1, 1995 and not closed by December 30, 1997, operators were required to determine whether the pit was located within a sensitive area in accordance with the Sensitive Area Determination Decision Tree, Figure 901-1 (now Rule 901.e.) and submit data evaluated and analysis used in the determination to the Director on a Sundry Notice, Form 4. In December 2008, Figure 901-1 was deleted from the 900-Series Rules.

    (2) For steel, fiberglass, concrete, or other similar produced water vessels that were buried or partially buried and located in sensitive areas prior to December 30, 1997, operators were required to test such vessels for integrity, unless a monitoring or leak detection system was put in place.

d. The following permitting/reporting requirements applied to pits constructed prior to December 30, 1997:

    (1) A Sundry Notice, Form 4, including the name, address, and phone number of the primary contact person operating the production pit for the operator, the facility name, a description of the location, type, capacity and use of pit, engineering design, installation features and water quality data, if available, was required for the following:

        A. Lined production pits and lined special purpose pits constructed after July 1, 1995.

        B. Unlined production pits constructed prior to July 1, 1995 which are lined in accordance with Rule 905. by December 30, 1997.

    (2) An Application For Permit For Unlined Pit, Form 15 was required for the following:

        A. Unlined production pits and special purpose pits in sensitive areas constructed prior to July 1, 1995, and not closed by December 30, 1997.

        B. Unlined production pits outside sensitive areas constructed after July 1, 1995 and not closed by December 30, 1997.

    (3) An Application For Permit For Unlined Pit, Form 15 and a variance under Rule 904.e.(1). (repealed, now Rule 502.b.) was required for unlined production pits and unlined special purpose pits in sensitive areas constructed after July 1, 1995.

    (4) A Sundry Notice, Form 4 was required for unlined production pits outside sensitive areas receiving produced water at an average daily rate of five (5) or less barrels per day calculated on a monthly basis for each month of operation constructed prior to December 30, 1997.

e. The Director may have established points of compliance for unlined production pits and special purpose pits and for lined production pits in sensitive areas constructed after July 1, 1995.

f. **Closure requirements.**

    (1) Operators of production or special purpose pits existing on July 1, 1995 which were closed before December 30, 1997, were required to submit a Sundry Notice,

BLM_0020930

Form 4, within thirty (30) days of December 30, 1997. The Sundry Notice, Form 4 shall include a copy of the existing pit permit, if a permit was obtained, and a description of the closure process.

(2) Pits closed prior to December 30, 1997 were required to be reclaimed in accordance with the 1000 Series rules. Pits closed after December 30, 1997 shall be closed in accordance with the 900 Series rules and reclaimed in accordance with the 1000 Series rules.

(3) Operators of steel, fiberglass, concrete or other similar produced water vessels buried or partially buried and located in sensitive areas were required to repair or replace vessels and tanks found to be leaking. Operators shall repair or replace vessels and tanks found to be leaking. Operators shall submit to the Director a Sundry Notice, Form 4, describing the integrity testing results and action taken within thirty (30) days of December 30, 1997.

(4) Closure of pits and steel, fiberglass, concrete or other similar produced water vessels, and associated remediation operations conducted prior to December 30, 1997 are not subject to Rules 905., 906., 907., 909. and 910.

## 912. VENTING OR FLARING NATURAL GAS

a.  The unnecessary or excessive venting or flaring of natural gas produced from a well is prohibited.

b. Except for gas flared or vented during an upset condition, well maintenance, well stimulation flowback, purging operations, or a productivity test, gas from a well shall be flared or vented only after notice has been given and approval obtained from the Director on a Sundry Notice, Form 4, stating the estimated volume and content of the gas. The notice shall indicate whether the gas contains more than one (1) ppm of hydrogen sulfide. If necessary to protect the public health, safety or welfare, the Director may require the flaring of gas.

c. Gas flared, vented or used on the lease shall be estimated based on a gas-oil ratio test or other equivalent test approved by the Director, and reported on Operator's Monthly Production Report, Form 7.

d. Flared gas that is subject to Sundry Notice, Form 4, shall be directed to a controlled flare in accordance with Rule 903.b.(2) or other combustion device operated as efficiently as possible to provide maximum reduction of air contaminants where practicable and without endangering the safety of the well site personnel and the public.

e. Operators shall notify the local emergency dispatch or the local governmental designee of any natural gas flaring. Notice shall be given prior to flaring when flaring can be reasonably anticipated, or as soon as possible, but in no event more than two (2) hours after the flaring occurs.

Table 910-1
CONCENTRATION LEVELS[1]

| Contaminant of Concern | Concentrations |
| --- | --- |
|  |  |
| Organic Compounds in Soil | |
| TPH (total volatile and extractable petroleum hydrocarbons) | 500 mg/kg |
| Benzene | 0.17 mg/kg[2] |

BLM_0020931

| | |
|---|---|
| Toluene | 85 mg/kg[2] |
| Ethylbenzene | 100 mg/kg[2] |
| Xylenes (total | 175 mg/kg[2] |
| Acenaphthene | 1,000 mg/kg[2] |
| Anthracene | 1,000 mg/kg[2] |
| Benzo(A)anthracene | 0.22 mg/kg[2] |
| Benzo(B)fluoranthene | 0.22 mg/kg[2] |
| Benzo(K)fluoranthene | 2.2 mg/kg[2] |
| Benzo(A)pyrene | 0.022 mg/kg[2] |
| Chrysene | 22 mg/kg[2] |
| Dibenzo(A,H)anthracene | 0.022 mg/kg[2] |
| Fluoranthene | 1,000 mg/kg[2] |
| Fluorene | 1,000 mg/kg[2] |
| Indeno(1,2,3,C,D)pyrene | 0.22 mg/kg[2] |
| Napthalene | 23 mg/kg[2] |
| Pyrene | 1,000 mg/kg[2] |
| **Organic Compounds in Ground Water** | |
| Benzene | 5 $\mu$g/l[3] |
| Toluene | 560 to 1,000 $\mu$g/l[3] |
| Ethylbenzene | 700 $\mu$g/l[3] |
| Xylenes (Total) | 1,400 to 10,000 $\mu$g/l[3,4] |
| **Inorganics in Soils** | |
| Electrical Conductivity (EC) | <4 mmhos/cm or 2x background |
| Sodium Adsorption Ratio (SAR) | <12[5] |
| pH | 6-9 |
| **Inorganics in Ground Water** | |
| Total Dissolved Solids (TDS) | <1.25 x background[3] |
| Chlorides | <1.25 x background[3] |
| Sulfates | <1.25 x background[3] |
| **Metals in Soils** | |
| Arsenic | 0.39 mg/kg[2] |
| Barium (LDNR True Total Barium) | 15,000 mg/kg[2] |
| Boron (Hot Water Soluble) | 2 mg/l[3] |
| Cadmium | 70 mg/kg[3,6] |
| Chromium (III) | 120,000 mg/kg[2] |
| Chromium (VI) | 23 mg/kg[2,6] |
| Copper | 3,100 mg/kg[2] |
| Lead (inorganic) | 400 mg/kg[2] |
| Mercury | 23 mg/kg[2] |
| Nickel (soluble salts) | 1,600 mg/kg[2,6] |
| Selenium | 390 mg/kg[2,6] |
| Silver | 390 mg/kg[2] |
| Zinc | 23,000 mg/kg[2,6] |
| **Liquid Hydrocarbons in Soils and Ground Water** | |
| Liquid hydrocarbons including condensate and oil | Below detection level |

COGCC recommends that the latest version of EPA SW 846 analytical methods be used where possible and that analyses of samples be performed by laboratories that maintain state or national accreditation programs.

[1] Consideration shall be given to background levels in native soils and ground water.
[2] Concentrations taken from CDPHE-HMWMD Table 1 Colorado Soil Evaluation Values (December 2007).
[3] Concentrations taken from CDPHE-WQCC Regulation 41 - The Basic Standards for Ground Water.
[4] For this range of standards, the first number in the range is a strictly health-based value, based on the WQCC's established methodology for human health-based standards. The second number in the range is a maximum contaminant level (MCL), established under the Federal Safe Drinking Water Act which has been

BLM_0020932

determined to be an acceptable level of this chemical in public water supplies, taking treatability and laboratory detection limits into account. The WQCC intends that control requirements for this chemical be implemented to attain a level of ambient water quality that is at least equal to the first number in the range except as follows: 1) where ground water quality exceeds the first number in the range due to a release of contaminants that occurred prior to September 14, 2004 (regardless of the date of discovery or subsequent migration of such contaminants) clean-up levels for the entire contaminant plume shall be no more restrictive than the second number in the range or the ground water quality resulting from such release, whichever is more protective, and 2) whenever the WQCC has adopted alternative, site-specific standards for the chemical, the site-specific standards shall apply instead of these statewide standards.

[5] Analysis by USDA Agricultural Handbook 60 method (20B) with soluble cations determined by method (2). Method (20B) = estimation of exchangeable sodium percentage and exchangeable potassium percentage from soluble cations. Method (2) = saturated paste method (note: each analysis requires a unique sample of at least 500 grams). If soils are saturated, USDA Agricultural Handbook 60 with soluble cations determined by method (3A) saturation extraction method.

[6] The table value for these inorganic constituents is taken from the CDPHE-HMWMD Table 1 Colorado Soil Evaluation Values (December 2007). However, because these values are high, it is possible that site-specific geochemical conditions may exist that could allow these constituents to migrate into ground water at levels exceeding ground water standards even though the concentrations are below the table values. Therefore, when these constituents are present as contaminants, a secondary evaluation of their leachability must be performed to ensure ground water protection.

BLM_0020933

Updated June 26, 2007

# Joint Agency Guidelines
## for
## Uranium Exploration Drilling Reclamation

Forest Service
Bureau of land Management
NM Mining and Minerals Division

## Background Radiation Readings

Prior to any exploration disturbance, the operator and the affected agency will verify background radiation at each proposed drill hole site. These readings will be considered "background". This data will be used as a reclamation standard for radiation cleanup for the site. Gamma ray emissions will be used as the basis for establishing the background standard. Readings should be taken 1 meter above the ground at the staked drill hole location and at any proposed pit locations. The readings should be taken unshielded, with a Ludlum microR or similar gamma radiation measuring device. The purpose of the background readings is to provide a standard which will be the goal for final reclamation, at the same site. For example, if the background reading in the area averages 20uR/hour, then the clean-up standard would be the same.

Radiation Exposure is measured with gamma rays.
Relationship between milliRoetgens and microRoentgens: 1 milli R (mR) = 1000 micro R (uR)

$$0.02mR/hr. = 20uR/hr$$

All measuring devices should be calibrated annually.

## Drill Hole Abandonment

Dry Holes

For holes which don't encounter water, the operator shall backfill with cuttings, clean native fill, or other approved materials, then install a non-metallic plug 10 feet below the ground surface and backfilled with concrete to within 1 foot of the surface. The remaining hole shall be backfilled with native soil.

Wet Holes

For holes that encounter groundwater, within 30 days of encountering the water stratum, they need to be filled from the bottom upwards to the ground surface using a tremie or similar pipe. The well shall be plugged with neat cement slurry, bentonite based material, or other sealing material approved by the State Engineer as required pursuant to

BLM_0020934

the State Engineer's Office's Rules and Regulations Governing Well Driller Licensing, Construction, Repair, and Plugging of Wells, 19.27.4 NMAC (see 19.27.4.36, Requirements for Mine Drill Holes that Encounter Water).

## Drill Cuttings Disposal

All drill cores and cuttings that show radioactive readings in excess of background readings shall be buried and covered with no less than 3 feet of earthen material to bring radiation readings back to background levels. In some cases where it is impractical to dig a pit for cuttings use such as when bedrock is at the surface, the cuttings are to be removed to another approved site where they can be buried and covered with 3 feet of soil. .

## Radiation Reclamation

The goal of radiation reclamation is for all exploration drill hole locations to be abandoned with radiation levels that are no more than the level that was measured for the background readings. To verify this, following drill hole abandonment, the operator and affected agency (s) shall obtain radiological data at each drill hole location and reclaimed pit as described above in the Background Radiation Readings section.

> In the event that background radiation levels can not be replicated by using a 3 foot cover, for good cause, the agencies may consider an alternative closeout, radiation level, which shall not be less stringent than established by guidelines/standards such as those established by the Nuclear Regulatory Commission (NRC ) or the Environmental Protection Agency (EPA).

## Overall Reclamation

Finally, the entire site that has been disturbed is to be regraded, ripped, or scarified, then reseeded with native grasses approved by the land management agency.

Here's the stip discussed at the meeting today. This was applied to a drilling program approved in 2007.

**Stipulation:** The surface of the backfilled mud pits will not exceed the following limits:

1. The concentration of radium-226 or radium-228 in soil may not exceed the background level by more than 5 picocuries per gram (pCi/g) or 0.185 becquerels per gram (Bq/g), averaged over the first 15 centimeters (cm) of soil below the surface; and

2. The concentration of natural uranium in soil, with no radioactive decay products present may not exceed the background level by more than 30 pCi/g or 1.11 Bq/g, averaged over the top 15 cm of soil below the surface; and 150 pCi/g or 5.55 Bq/g, average concentration at depths greater than 15 cm below the surface, so that no individual member of the public will receive an effective dose equivalent in excess of 100 mrem per year or 1 millisievert (mSv) per year.

BLM_0020936

# Appendix E

# Soils Descriptions

BLM_0020937

Mapped soils (NRCS 2011a, Survey Area Data Version 7, May 3, 2011) at Drill site 1 include the Gladel-Bond-Rock outcrop complex, Monticello-Witt loams (1-3 percent slope), and Monticello-Witt loams (3-6 percent slope).   Gladel-Bond-Rock outcrop occurs generally between 6,800 to 7,400 feet above mean sea level (amsl) on ridges and mesas.  It occurs on slopes 3 to 25 percent and is well-drained.  The soils are sandy loam over unweathered sandstone.  Monticello-Witt loams (both the 1-3 percent slope and the 3-6 percent slope) is found at 6,800 to 7,400 feet amsl on ridges.  It is a well-drained loam.

Mapped soils at Drill site 2 are comprised entirely of Gurley-Skein loams (3-20 percent slope).  The Gurley-Skein loam occurs generally between 6,800 to 7,400 feet above mean sea level (amsl) on ridges and terraces.  It occurs on slopes of 3 to 20 percent and is well-drained.  Soils consist of loam and gravelly loam over unweathered bedrock.

Mapped soils at Drill site 3 is entirely Gurley-Skein loams.  It is the same as described under Drill Site 2.

Mapped soils at Drill site 4 is comprised almost entirely of Nortez-Fivepine loam with a small area of Borolls-Rock outcrop (NRCS 2011; Survey Area Data: Version 7, May 3, 2011).  The Nortez-Fivepine loam occurs at elevations between 7,400 to 8,500 feet amsl on mesas and structural benches.  The soils consist of loam, clay loam, clay or loam, on unweathered bedrock.  It occurs on slopes ranging from 1 to 12 percent and is well-drained.  The Borolls-Rock outcrop series is located at elevations between 6,600 and 9,200 feet amsl on mesa and canyons.  Borolls includes very stony loam, very stony sandy clay loam, very cobbly clay, and very stony clay, while the Rock outcrop is just unweathered bedrock.  Slopes range from 40 to 90 percent and the Borolls is well-drained.

Mapped soils at Drill site 5 include Nortez-Granath and Ormiston-Fivepine loam (NRCS 2010, Survey Area Data: Version 7, Aug 2, 2010).  The Nortez-Granath soils generally occur at 7,400 to 8,500 feet and on sideslopes of hills and mesas.  The soils consist of loams and clays loams over unweathered bedrock.  It occurs on slopes ranging from 1 to 12 percent and is well-drained.  The Omiston-Fivepine loam occurs between 7,100 to 8,500 feet amsl on the sideslopes of hills and mesas.  Soils include loam, flaggy loam, flaggy clay loam, and stony clay loam, over unweathered bedrock.  It occurs on slopes ranging from 0 to 15 percent and is well-drained.

Mapped soils at Drill site 6 is entirely Nortez-Granath complex (0-6 percent slopes) (NRCS 2011c, Survey Area Data: Version 5, Jan 31, 2008).  It is the same as described under Drill Site 5.

BLM_0020938

# Appendix F

# Wildlife Timing and Controlled Surface Use Requirements

BLM_0020939

## Table F1:  Noise and Timing Requirements for Wildlife Protection Based on Figure F1

| | Gunnison Sage Grouse (NSO) | Gunnison Sage Grouse (CSU3/11-6/30, Noise Stipulation | Mule Deer Critical Winter Range (TL 12/1-4/30) | Mule Deer Severe Winter Range (TL  12/1-4/30) | Elk Production Area (TL 4/15-6/30) | Elk Severe Winter Range (TL 12/1-4/30) | Mexican Spotted Owl (TL within 1/2 mile from Dolores Canyon Rim 3/15-8/31) | Annual Migratory Bird Nesting Survey - 4/1-7/31) | Dates when activity may occur without timing restrictions, pending results of migratory bird survey. |
|---|---|---|---|---|---|---|---|---|---|
| Site 1 | N | N | N | N | N | N | N | TBD | JAN 1 - DEC 31 |
| Site 1 Access Improvement | na | na | na | na | na | na | na | TBD | na |
| Site 2 | N | N | N | N | N | N | N | na | JAN 1 - DEC 31 |
| Site 2 Access Improvement | N | N | Y | N | N | N | N | TBD | MAY 1 - NOV 30 |
| Site 3 | N | N | Y | N | N | N | N | TBD | MAY 1 - NOV 30 |
| Site 3 Access Improvement | na | na | na | na | na | na | na | na | na |
| Site 4 | N | Y | Y | N | N | N | Y | TBD | SEP 1 - NOV 30 |
| Site 4 Access Improvement | N | Y | Y | Y | N | N | Y | TBD | SEP 1 - NOV 30 |
| Site 5 | N | Y | N | N | Y | N | Y | TBD | SEP 1 - NOV 30 |
| Site 5 Access Improvement | na | na | na | na | na | na | na | na | na |
| Site 6 | Y | Y | N | N | N | N | N | TBD | JUL 1 – APR 28* |
| Site 6 Access Improvement | Y | Y | N | N | N | Y | N | TBD | NOT AVAILABLE |

Y = Impact, N = No Impact, na = Not Applicable, TBD = To Be Determined

1.)   **NSO** (No Surface Occupancy) Stipulation: NSO stipulation within 0.6 mile radius of a Gunnison sage grouse lek complex.

2.)   **CSU** (Controlled Surface Use) Stipulation: CSU stipulation for project occupation, noise and operational time limits (operations will occur from 10AM to 6PM) will be applied within 4 mile radius of mapped Gunnison sage grouse production area, if occurring <u>March 1- June 30</u>.

3.)   **Timing Limitation Stipulation**:  Timing limitation to protect big game (deer/elk) crucial winter range <u>*December 1 to April 30*</u>.  Timing Limitation for Elk Production <u>April 15 to June 30</u>. Timing limitation to protect Gunnison sage grouse nesting habitat from <u>*March 1 to June 30*</u> within the 4 mile radius of mapped Gunnison sage grouse production area.  Timing limitation to protect Mexican Spotted Owl (in the absence of a negative survey) March 1 to August 31.

*Note: While drill site 6 is outside of the Sage Grouse No Surface Occupancy Area (NSO), it cannot be accessed without ground disturbance inside the Sage Grouse NSO area.

BLM_0020940



Page 2 of 2
APPENDIX F – WILDLIFE TIMING AND CONTROLLED SURFACE USE REQUIREMENTS

BLM

Best Management Practices for
# Reducing Visual Impacts of Renewable Energy Facilities
on BLM-Administered Lands

First Edition - 2013



BLM_0020942

BLM_0020943



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Wyoming State Office
P.O. Box 1828
Cheyenne, Wyoming 82003-1828

In Reply Refer To:
(930)

Dear Reader:

The Bureau of Land Management (BLM) manages vast stretches of public lands giving the BLM a leading role in fulfilling the Nation's goals for a new energy economy based on utility-scale production of renewable energy, including wind, solar, and geothermal energy.

The BLM must ensure that renewable energy developments on BLM-administered lands meet all applicable environmental laws and regulations, including the National Environmental Policy Act of 1969 and the Federal Land Policy and Management Act of 1976. As part of this task, the BLM requires that visual design considerations be incorporated into all surface-disturbing activities, including renewable energy construction, operation, and decommissioning.

In light of the increasing use of BLM-administered lands for large-scale renewable energy projects, the BLM presents this publication, entitled *Best Management Practices for Reducing Visual Impacts of Renewable Energy Facilities on BLM-Administered Lands*. The publication presents 122 best management practices (BMPs) to avoid or reduce potential visual impacts associated with siting, designing, constructing, operating, and decommissioning utility-scale renewable energy generation facilities, including wind, solar, and geothermal facilities. The publication includes BMPs for avoiding and reducing visual impacts associated with the energy generation components of a facility, such as wind turbines or solar energy collectors, and includes many BMPs for reducing visual impacts associated with ancillary components, such as electric transmission, roads, and structures.

The BMP publication provides individual BLM District and Field Offices, industry, and other stakeholders with proven, effective, and vetted BMPs to address a wide range of potential visual impacts from renewable energy facilities throughout the project lifecycle. The BMPs presented are designed to provide for safe and efficient operations while minimizing undesirable impacts on visual resources. Proactively incorporating visual BMPs into project planning and development typically results in a more efficient review process, greater stakeholder acceptance of proposed projects, and in many cases, reduced remediation costs. Their effective use helps the BLM fulfill its mandate to preserve scenic resources for future generations.

Feedback and questions regarding this publication are welcomed. If you have suggestions or questions, or need additional information, please contact Sherry Lahti at 307-775-6484.

Sincerely,

Donald A. Simpson
State Director



**Prepared By:**

 United States Department of the Interior
Bureau of Land Management
Wyoming State Office

**Suggested Citation**

United States Department of the Interior. 2013. Best Management Practices for Reducing Visual Impacts of Renewable Energy Facilities on BLM-Administered Lands. Bureau of Land Management. Cheyenne, Wyoming. 342 pp, April.

**First Edition**
**2013**

iv

# Contributors

Tom Lahti of BLM (retired) originally conceived the idea for the Renewable Energy Visual BMP publication and obtained funding for its development. Sherry Roché (National Landscape Conservation System and Visual Resource Program Lead, BLM Wyoming State Office) was the BLM project manager for development of the BMP publication.

Robert Sullivan (Environmental Scientist, Argonne National Laboratory), Ron Kolpa (Principal Environmental Systems Engineer, Argonne National Laboratory), and John McCarty (Chief Landscape Architect, BLM Washington Office) were the principal authors. The following individuals reviewed all or portions of the BMP publication and provided comments.

**BLM Reviewers**

- Beverly Gorny, Public Affairs Specialist, BLM Wyoming State Office
- Ken Henke, State Natural Resource Specialist, BLM Wyoming State Office
- Jim Perry, Senior Natural Resource Specialist, BLM Washington Office
- Adrienne Pilmanis, Plant Conservation Lead/Science Coordinator, BLM Wyoming State Office
- Karla Rogers, Landscape Architect/VRM Specialist, BLM National Operations Center
- David Scott, Safety Officer, BLM Wyoming State Office
- Mike Valle, Renewable Energy Coordinator, BLM Wyoming State Office
- Bob Wick, Wilderness and Wild and Scenic Rivers Program Lead, BLM California State Office

**Other Reviewers**

- Laine Anderson, Plant Supervisor, Pacificorp Energy
- Kevin Boesch, Stormwater and Air Quality Permitting Specialist, Logan Simpson Design, Inc.
- Ken Borngrebe, Manager of Siting and Permitting, First Solar, Inc.
- Jeremy Call, Senior Landscape Architect and Environmental Planner, Logan Simpson Design, Inc.
- Terry DeWan, Principal, Terrence J. DeWan and Associates
- Craig Johnson, Senior Landscape Architect and Environmental Planner, Logan Simpson Design, Inc.
- Louise Kling, Environmental Planning Lead, URS Corporation
- Randy Manion, Renewable Resource Program Manager, Western Area Power Administration
- Jim May, Environmental Scientist, Argonne National Laboratory
- Mark Meyer, Renewable Energy Visual Resource Specialist, National Park Service
- Chad Moore, Night Skies Team Leader, National Park Service
- Guy Nelson, Executive Director, Utility Geothermal Working Group
- Merlyn Paulson, Professor, Department of Landscape Architecture, Colorado State University
- Kate Schwarzler, Landscape Architect/Principal, Otak, Inc.

The authors and BLM wish to thank the reviewers for their many thoughtful and helpful comments.

Lindsey Utter (Argonne National Laboratory) contributed sketch graphics. Pamela Richmond, Carolyn Steele, and Vicki Skonicki of Argonne National Laboratory were responsible for graphic design, production, editing, and word processing. Several organizations and individuals contributed photographs and illustrations; their contributions are acknowledged in the figure captions.

BLM_0020946

# Table of Contents

**1 Introduction** ........................................................................................................ **1**
   1.1 Purpose and Need ........................................................................................ 1
   1.2 How to Use the Renewable Energy Visual BMP Publication ............................. 4

**2 Visual Resources** .................................................................................................. **7**
   2.1 An Overview of the BLM Visual Resource Management (VRM) System .............. 7
      2.1.1 Visual Resource Inventory ...................................................................... 7
      2.1.2 The RMP and Visual Resource Management Classes ............................. 10
      2.1.3 Visual Contrast Rating .......................................................................... 12
   2.2 Visual Contrast and Visibility Factors .......................................................... 14
      2.2.1 Visual Contrast .................................................................................... 15
      2.2.2 Visibility Factors .................................................................................. 19

**3 Wind** .................................................................................................................. **35**
   3.1 Consider Topography When Siting Wind Turbines ........................................ 44
   3.2 Cluster or Group Turbines to Break up Overly Long Lines of Turbines ............ 46
   3.3 Create Visual Order and Unity among Turbine Clusters ................................. 48
   3.4 Site Wind Turbines to Minimize Shadow Flicker ........................................... 49
   3.5 Relocate Turbines to Avoid Visual Impacts .................................................. 50
   3.6 Use Audio Visual Warning System (AVWS) Technology to Reduce Night Sky Impacts ... 52
   3.7 Create Visual Uniformity in Shape, Color, and Size ...................................... 54
   3.8 Use Fewer, Larger Turbines ........................................................................ 55
   3.9 Use Non-reflective Coatings on Wind Turbines and Other Facility Components .. 56
   3.10 Prohibit Commercial Messages and Symbols on Wind Turbines ................... 57
   3.11 Keep Wind Turbines in Good Repair .......................................................... 58
   3.12 Clean Nacelles and Towers ....................................................................... 59

**4 Solar** ................................................................................................................. **61**
   4.1 Develop a Glint and Glare Assessment, Mitigation, and Monitoring Plan ........ 80
   4.2 Use Dry-Cooling Technology for CSP Facilities ............................................ 82
   4.3 Site and Operate Solar Collectors to Avoid Offsite Glare .............................. 83
   4.4 Screen Solar Collectors to Avoid Off-site Glare ........................................... 85
   4.5 Use Color-Treated Solar Collectors and Support Structures .......................... 87
   4.6 Maintain Color-Treated Surfaces of Solar Collectors .................................... 89

BLM_0020947

4.7 Avoid Complete Removal of Vegetation beneath Solar Collector Array _____ 90
4.8 Prohibit Commercial Messages and Symbols on Solar Power Towers and Solar Collector Arrays _____ 92

## 5 Geothermal _____ 93
5.1 Use Dry-Cooling Technology _____ 100
5.2 Screen Pipelines from Roads and Other Sensitive Viewpoints _____ 102
5.3 Paint or Coat Aboveground Pipelines _____ 104
5.4 Minimize Drill Rig and Well Test Facility Lighting _____ 106

## 6 Common Elements _____ 107

### 6.1 Mitigation Planning
6.1.1 Ensure that Qualified Individuals Conduct and Review Impact Analyses and Mitigation _____ 114
6.1.2 Use Appropriate Methods and Data for Visual Impact Assessment and Mitigation Planning and Design _____ 116
6.1.3 Incorporate Stakeholder Input into the Siting and Design and Mitigation Planning Processes _____ 118
6.1.4 Consult the Applicable Visual Resource Inventory (VRI) and Visual Resource Management (VRM)
      Class Designations _____ 120
6.1.5 Conduct a Thorough Assessment of Existing and Potentially Affected Visual Resources _____ 123
6.1.6 Develop Spatially Accurate and Realistic Photo Simulations of Project Facilities _____ 127
6.1.7 Develop a Visual Resource Impact Monitoring and Mitigation Compliance Plan _____ 131
6.1.8 Develop a Decommissioning and Site Reclamation Plan _____ 133
6.1.9 Hold a Preconstruction Meeting to Coordinate the Mitigation Strategy _____ 134
6.1.10 Discuss Visual Mitigation Objectives with Equipment Operators _____ 136
6.1.11 Use Offsite Mitigation _____ 138

### 6.2 Siting and Design
6.2.1 Site Facilities and ROWs outside Sensitive Viewsheds, or as Far as Possible from Sensitive Viewing Locations ___ 141
6.2.2 Site ROW Crossings to Minimize Impacts on Linear KOPs _____ 145
6.2.3 Site Projects Away from Visually Prominent Landscape Features _____ 147
6.2.4 Site Facilities to Avoid Night-Sky Impacts on Sensitive Locations _____ 149
6.2.5 Site Facilities in Previously Developed or Disturbed Landscapes _____ 150
6.2.6 Site Facilities and Components in Existing Clearings _____ 151
6.2.7 Site and Design Facilities to Repeat the Form, Line, Color, and Texture of the Existing Landscape _____ 152
6.2.8 Site Facilities in Areas Suitable for Reclamation _____ 155
6.2.9 Minimize the Number of Facility Structures _____ 156
6.2.10 Collocate Linear Features in Existing ROWs or Corridors _____ 157
6.2.11 Avoid Siting Linear Features in the Centers of Valley Bottoms and on Ridgetops _____ 158
6.2.12 Avoid Skylining _____ 160
6.2.13 Site Linear Facilities along Natural Lines within the Landscape _____ 161

BLM_0020948

6.2.14 Avoid Siting Roads on Side Slopes _____ 163
6.2.15 Site Facility Components to Minimize Cut and Fill_____ 164
6.2.16 Avoid Siting Staging and Laydown Areas in Visually Sensitive Areas _____ 166
6.2.17 Bury Underground Utilities along Roads_____ 167

**6.3 Structure Design and Material Selection**
6.3.1 Use Low-Profile Structures and Tanks _____ 170
6.3.2 Custom Design Structures in Key Areas_____ 172
6.3.3 Consider Use of Alternative Components] _____ 173
6.3.4 Use Natural-Looking Constructed Landform, Vegetative, or Architectural Screening_____ 174
6.3.5 Minimize Use of Signs and Make Signs Visually Unobtrusive _____ 176
6.3.6 Avoid Unnecessary Use of Gravel/Paved Surfaces _____ 177
6.3.7 Use Rounded Road Cut Slopes _____ 178
6.3.8 Use Monopole and Lattice Electric Transmission Towers Appropriately _____ 179

**6.4 Materials Surface Treatments**
6.4.1 Require a Site Study for Color and Texture Selection _____ 183
6.4.2 Select Materials and Surface Treatments to Repeat the Form, Line, Color, and Texture of
       Surrounding Landscape_____ 185
6.4.3 Consider Seasonal Changes and Seasons of Heaviest Use in Choosing Material Colors and Textures _____ 187
6.4.4 Color Treat Structures to Reduce Contrasts with Existing Landscape_____ 189
6.4.5 Use Non-reflective Materials, Coatings, and/or Paint_____ 191
6.4.6 Select Surface Treatment Colors from the BLM Standard Environmental Colors Chart _____ 193
6.4.7 Test Color Selections _____ 195
6.4.8 Color Treat Grouped Structures Using the Same Color _____ 197
6.4.9 Color Treat Exposed Rock Faces _____ 200
6.4.10 Color Treat Transmission Towers to Reduce Contrasts with Existing Landscape _____ 201
6.4.11 Use Camouflage and/or Disguise Strategies for Close KOPs in Highly Sensitive Viewsheds _____ 205
6.4.12 Maintain Painted, Stained, or Coated Surfaces Properly _____ 206

**6.5 Lighting**
6.5.1 Prepare a Lighting Plan _____ 208
6.5.2 Use Audiovisual Warning System (AVWS) Technology for Hazard Lighting on Structures Taller than 200 ft_____ 210
6.5.3 Use Full Cutoff Luminaires _____ 211
6.5.4 Direct Lights Properly to Eliminate Light Spill and Trespass _____ 213
6.5.5 Use Amber instead of Bluish-White Lighting_____ 214
6.5.6 Minimize Lighting Usage during Construction and Operations _____ 215
6.5.7 Use Vehicle-Mounted Lights or Portable Light Towers for Nighttime Maintenance Activities _____ 218

BLM_0020949

## 6.6 Avoiding Unnecessary Disturbance

6.6.1 Minimize Project Footprint and Associated Disturbance _____ 220
6.6.2 Avoid Unnecessary Road Improvements _____ 221
6.6.3 Use Penalty Clauses to Protect High-Value Landscape Features _____ 222
6.6.4 Confine Construction Activities and Facilities to Pre-Defined Areas _____ 223
6.6.5 Provide Construction Personnel with Avoidance Area Maps _____ 224
6.6.6 Do Not Apply Paints or Permanent Discoloring Agents to Rocks or Vegetation _____ 225
6.6.7 Require Overland Driving Where Re-contouring Is Not Required _____ 226
6.6.8 Use Air Transport to Erect Transmission Towers _____ 227

## 6.7 Soils, Erosion, and Dust Management

6.7.1 Implement Dust and Wind Erosion Control Measures _____ 230
6.7.2 Implement Erosion and Sediment Control Measures _____ 232
6.7.3 Implement Temporary and/or Permanent Soil Stabilization Measures _____ 235
6.7.4 Strip, Stockpile, and Stabilize Topsoil for Re-spreading _____ 237
6.7.5 Segregate Topsoil and Reapply to Disturbed Areas _____ 239

## 6.8 Vegetation Management

6.8.1 Prepare a Reclamation Plan _____ 242
6.8.2 Design Vegetative Openings to Mimic Natural Openings _____ 244
6.8.3 Use Partial ROW Clearing and Feather Edges of Transmission ROWs _____ 248
6.8.4 Preserve Existing Vegetation _____ 251
6.8.5 Use Retaining Walls, Berms, Fences, and Markings to Protect Trees and Other Scenic Features _____ 253
6.8.6 Avoid Slash Piles in Sensitive Viewing Areas; Chip Slash for Mulch to Hide Fresh Soil _____ 255
6.8.7 Mulch Cleared Areas, Furrow Slopes, and Use Planting Holes _____ 257
6.8.8 Use Pitting and Vertical Mulching to Facilitate Revegetation and Discourage Vehicle Traffic _____ 260
6.8.9 Revegetate Using Salvaged Native Plants and Approved, Weed-free Seed Mixes _____ 262
6.8.10 Transplant Vegetation from Cleared Areas _____ 263
6.8.11 Monitor and Maintain Revegetated Areas until Vegetation Is Self-Sustaining _____ 264

## 6.9 Reclamation

6.9.1 Review Predevelopment Visual Conditions after Construction _____ 266
6.9.2 Begin Site Reclamation during Construction and Operations, Immediately after Disturbances _____ 268
6.9.3 Recontour Disturbed Areas to Approximate Natural Slopes _____ 270
6.9.4 Scarify/Roughen Cut Slopes and Recontoured Areas _____ 272
6.9.5 Salvage and Replace Rocks, Brush, and Woody Debris _____ 274
6.9.6 Sculpt and Shape Bedrock Landforms _____ 275
6.9.7 Remove Two-Track Roads _____ 279
6.9.8 Close and Remediate Unused Access Roads _____ 281

BLM_0020950

6.9.9 Remove Above-Ground and Near-Ground Structures _____ 283
6.9.10 Remove or Bury Gravel and Other Surface Treatments_____ 284

**6.10 Good Housekeeping**
6.10.1 Develop "Housekeeping" Procedures_____ 286
6.10.2 Maintain a Clean Worksite _____ 287
6.10.3 Prohibit Onsite Burning _____ 289
6.10.4 Use Exit Tire Washes and Vehicle Tracking Pads to Reduce the Tracking of Sediment onto Roads _____ 290
6.10.5 Remove or Avoid Slash Piles_____ 292
6.10.6 Clean Off-Road Equipment_____ 294
6.10.7 Remove Stakes and Flagging _____ 295
6.10.8 Use Fabric-Covered Fences to Conceal Material Storage Yards and Laydown Yards _____ 296
6.10.9 Actively Maintain Operating Facilities _____ 298

**BMP Source Documents**_____ **299**

**For Further Reading**_____ **303**

**Acronym List**_____ **305**

**Glossary** _____ **307**

BLM_0020951



# 1 Introduction

## 1.1 Purpose and Need

The Energy Policy Act of 2005 (EPACT) established several key goals for achieving a move from non-renewable energy sources to clean energy sources. It contains provisions to encourage or facilitate the use and development of utility-scale renewable energy resources for electricity production. Investment in these programs will assist in getting new technologies to market, provide a clean baseload of power, accelerate the clean energy economy, create and revitalize local economies, and help advance long-term energy independence (DOE 2010). The U.S. Department of the Interior (DOI) has issued permits for more than 10,000 megawatts (MW) of renewable energy on public lands and in offshore waters as of the end of 2012 (DOI 2012).

The DOI's Bureau of Land Management (BLM) has a key role in implementing EPACT, because the BLM manages more than 245 million surface acres and 700 million subsurface acres of mineral estate for multiple uses, including energy development. Over 20.6 million acres of public land have wind potential in 11 western states, and 22 million acres of public land within six states have solar potential. In addition, the BLM has delegated authority for leasing 249 million acres of public lands with geothermal potential, including over 100 million acres of National Forest lands (BLM 2010).

The BLM faces increasing interest in the use of BLM-administered public lands for utility-scale renewable energy development. As renewable energy projects are proposed throughout the western United States, the

**1**

BLM_0020952

BLM evaluates and processes the applications for rights-of-way (ROWs) and use of public land for these projects. The BLM must ensure that these developments meet all applicable environmental laws and regulations, including the National Environmental Policy Act of 1969 (NEPA) and the Federal Land Policy and Management Act of 1976 (FLPMA).

The BLM's responsibility to manage the scenic resources of the public lands is established by FLPMA and NEPA as follows:

- FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and stipulates that "The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values…)." The act prohibits unnecessary or undue degradation of public lands, and makes protecting a range of environmental values, including scenic values, an explicit criterion that must be applied throughout the BLM's land management activities.
- A stated goal of NEPA is to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings." NEPA requires the development of procedures to ensure that environmental values are given appropriate consideration in decision-making processes in which a federal agency is involved (Ross 1979).

To comply with these Acts, the BLM requires that visual design considerations be incorporated into all surface-disturbing activities, including construction, operation, and decommissioning of renewable energy facilities. Design considerations are evaluated through assessments of visual resources, which include all natural and cultural features of the environment that have the potential to be seen (Grinde and Kopf 1986).

It is the BLM's mission to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. These practices are supported by the establishment of district and field office resource management plans (RMPs). RMPs are comprehensive management documents that determine how the BLM will manage the public lands within the boundaries of a particular field office or district. Decisions made within the RMP provide direction for the actions of the agency. RMPs are developed with the consideration and involvement of the public.

As part of the RMP, management objectives are established for visual resources on all lands included in the RMP. Management decisions in the RMP must consider the value of visual resources, along with other important resources and agency objectives. Management decisions regarding visual resources are framed as Visual Resource Management Classes (VRM) I through IV, with VRM Class I having the greatest degree of protection and VRM Class IV having the least.

The use of best management practices (BMPs) to avoid or reduce the visual impacts of development is a key component in the BLM's fulfillment of its scenic resource management requirements while meeting its goals to facilitate renewable energy development on

2

BLM_0020953

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 89 of 155

BLM-administered lands. The BLM and the U.S. Forest Service previously developed standards and guidelines for oil and gas development (DOI and USDA 2007) that include measures to reduce the visual impacts of these types of facilities, and the BLM has developed specific guidance for reducing the visual impacts of oil and gas development (BLM 2006). Now, in response to the increasing use of BLM-administered lands for large-scale renewable energy projects, the BLM presents *Best Management Practices for Reducing Visual Impacts of Renewable Energy Facilities on BLM-Administered Lands* (hereafter referred to as the "BMP publication"). The BMP publication presents 122 BMPs to avoid or reduce potential visual impacts associated with the siting, design, construction, operation, and decommissioning of utility-scale renewable energy generation facilities, including wind, solar, and geothermal facilities.

The BMP publication includes BMPs for avoiding and reducing visual impacts associated with the energy generation components of a facility, such as wind turbines or solar energy collectors, and includes many BMPs for reducing visual impacts associated with ancillary components, such as electric transmission, roads, and structures. However, visual impact mitigation is only partly partly addressed by considering *what* is built; mitigation must also address *where* a facility is built, and *how* it is built, operated, and decommissioned. Planning phase activities, such as facility siting and design, and selection of structural materials and coatings, are critical to effective visual impact mitigation, as are "on-the-ground" activities, such as recontouring and revegetating disturbed areas. Consequently, a large part of this BMP publication is devoted to BMPs for key activities that typically have a major effect on the visual impacts associated with

facility development, including project siting and design, mitigation planning, structure design and materials selection, materials surface treatments, lighting practices,  and soils and vegetation management.

The BMP publication provides BLM staff, industry, and other stakeholders with proven, effective, and vetted BMPs to address a wide range of potential visual impacts from renewable energy facilities throughout the project lifecycle. The BMP publication is intended for use by the BLM's visual resource management staff, and other staff including, but not limited to, recreational planners, landscape architects, project managers, realty specialists, and cultural resource specialists. The BMP publication can be used to provide guidance for specific projects or as a general information source for strategies to mitigate impacts on visual resources on BLM-administered lands. The BMPs were compiled from a variety of sources, including guidance documents developed by various federal and state agencies; existing environmental analyses, including programmatic and project-specific environmental impact statements and assessments; professional practice literature; consultations with landscape architects, engineers, and renewable energy professionals; and field observations of existing renewable energy facilities and facilities under construction.

The BMPs presented are proven measures designed to provide for safe and efficient operations while minimizing undesirable impacts on visual resources. As noted in the BMP descriptions, many visual BMPs also benefit other valued resources, such as wildlife habitat, biodiversity, and water quality. The best outcomes are

**3**

BLM_0020954

achieved when BMPs are considered and implemented as early as possible; the proactive incorporation of visual BMPs into project planning and development typically results in a more efficient review process, greater stakeholder acceptance of proposed projects, and in many cases, reduced remediation costs. Their effective use helps the BLM manage and preserve scenic resources on public lands for the enjoyment of present and future generations.

## 1.2 How to Use the Renewable Energy Visual BMP Publication

This BMP publication is divided into two main parts. The first part (Chapters 1 and 2) provides an introduction to the BMP publication and to key visual resource concepts within the context of utility-scale energy development on BLM lands. It includes an abbreviated discussion of the BLM visual resource management (VRM) system, a description of terminology associated with visual resources, a discussion of viewsheds, and an explanation of factors that affect the overall visibility of large-scale facilities.

The second part (Chapters 3–6) presents information about the visual characteristics of renewable energy facilities and BMPs for avoiding or reducing visual impacts from the facilities. Chapters 3–5 present the visual characteristics and BMPs for wind energy facilities, solar energy facilities, and geothermal facilities respectively. Chapter 6 presents BMPs for "common elements," which include ancillary facilities common to utility-scale energy facilities as well as the design, construction, operation, and decommissioning activities common to large-scale energy development projects.

The common element BMPs presented in Chapter 6 for ancillary facilities include BMPs for electric transmission systems, roads and other surfaces, structures, and signs. The common element BMPs for design, construction, operation, and decommissioning activities include the following:

- Visual impact analysis and mitigation planning;
- Facility siting and design;
- Structure design and materials selection;
- Materials surface treatments;
- Lighting design and operation;
- Avoiding unnecessary disturbance;
- Soil management and erosion control;
- Vegetation management;
- Interim and long-term reclamation; and
- "Good housekeeping" practices.

These activities provide the framework for organizing the common element BMPs. Chapter 6 is divided into 10 subsections, each of which presents BMPs specific to the activities listed above.

A relatively large number of elements and activities are common to most large-scale facilities, and there are a variety of methods for mitigating impacts associated with these elements. As a result, there are almost 100 common-element BMPs in the BMP publication. It should be a valuable source of BMPs to address visual impacts for almost any large-scale energy development that occurs on BLM-administered lands.

Each discussion of a BMP generally includes the following information:

- The BMP title;

**4**

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 91 of 155

- Project phase(s) during which the BMP is implemented;
- Description of the BMP;
- Notes—supplementary information about the BMP (e.g., the benefits of implementing the BMP, details about the mechanism by which the BMP actually reduces visual contrasts, or technical details about implementation);
- Limitations, where applicable, including important restrictions, caveats, or considerations that should be taken into account when considering implementation of the BMP; and
- Photos or diagrams that show examples of poor practices that worsen visual contrasts, the results of successful application of the BMP, and/or "how to" images that show the BMP being implemented in a real situation.

Other useful features include tables at the beginning of each BMP topic listing the BMP titles and indicating the appropriate project phases for each BMP; a list of recommended additional reading materials; a glossary of technical terms used; and an acronym list.

Readers are cautioned that the BMP publication is not prescriptive in nature, as not every BMP in the BMP publication is appropriate for every project. Some BMPs simply do not apply in all landscapes (e.g., color treating exposed rock faces might not be applicable for a wind farm sited in flat grasslands). In some cases, site conditions might preclude the application of particular BMPs or render the BMPs ineffective; for example, transplanting native vegetation may not be a viable option where suitable stock for transplanting does not exist. There may also be conflicts between visual BMPs

and concerns for safety or other valued resources; for example, additional lighting may be needed for safety reasons, or building a screening landform might interfere with water drainage. There may be technical reasons why a particular BMP cannot be implemented; for example, applying paint or a coating to a piece of equipment may interfere with its functionality. And finally, there may be cost-benefit concerns that might make some visual BMPs impractical or inadvisable in a given situation; changing a transmission line route may result in lower visual impacts, but if an alternative route adds length to the transmission line, makes getting approval difficult, or results in significant project delays, it could be prohibitively expensive and might only be justifiable if the proposed route would result in major impacts on a highly sensitive landscape. Similarly, moving or eliminating a large number of wind turbines because of visual or other potential impacts could seriously affect the financial viability of a proposed project, and should only be undertaken after ensuring that the nature and severity of the potential impacts justifies implementing the BMP, and of course after exploring other means to reduce the impacts to an acceptable level.

Fortunately, there are many highly effective visual BMPs that are not particularly expensive or difficult to implement, particularly if incorporated early in the development process; these include successful revegetation, recontouring to match existing terrain characteristics, or painting facility components to blend with the landscape background. Except in special circumstances, such practices should always be implemented where possible. Other visual BMPs also have benefits to other resources (e.g., successful revegetation could have beneficial effects on wildlife

**5**

BLM_0020956

habitat, water quality, and air quality) that more than justify the costs.

Choosing appropriate visual BMPs for a particular renewable energy project is not as simple as copying the list of BMPs from the BMP publication and requiring a developer to implement them all. Careful consideration must be given to the nature of the project and the site, and to how site- and project-specific conditions may affect the technical feasibility of BMPs under consideration. Potential effects on other important resources, the project's operations, and the project's viability that may result from implementing the BMPs must also be considered. Early and frequent consultation with the developer, other resource specialists, and potentially affected stakeholders will help ensure that visual BMPs are applied where they are needed, where they are effective, where the costs of implementing them are appropriately weighed against the benefits, and where they do not adversely affect safety or other important environmental resources.

# References

BLM (Bureau of Land Management), 2006, *Visual Resource Management: Best Management Practices for Fluid Minerals*, U.S. Department of the Interior.

BLM, 2010, *Renewable Energy and the BLM*, BLM Fact Sheet. Available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS_REALTY_AND_RESOURCE_PROTECTION_/energy/renewable_references.Par.95879.File.dat/2010%20Renewable%20Energy%20headed.pdf. Accessed Sept. 1, 2011.

DOE (U.S. Department of Energy), 2010, *Geothermal Technologies Program*, DOE/GO-102010-3045. Energy Efficiency and Renewable Energy. Available at http://www1.eere.energy.gov/office_eere/pdfs/geothermal_fs.pdf. Accessed Sept. 2, 2011.

DOI (U.S. Department of the Interior), 2012, *Salazar Authorizes Landmark Wyoming Wind Project Site, Reaches President's Goal of Authorizing 10,000 Megawatts of Renewable Energy*, press release. Available at http://www.doi.gov/news/pressreleases/Salazar-Authorizes-Landmark-Wyoming-Wind-Project-Site-Reaches-Presidents-Goal-of-Authorizing-10000-Megawatts-of-Renewable-Energy.cfm. Accessed Dec. 27, 2012.

DOI (U.S. Department of the Interior) and USDA (U.S. Department of Agriculture), 2007, *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development*, BLM/ST-06/021+3071/REV 07.

Grinde, K., and A. Kopf, 1986, "Illustrated Glossary," pp. 308–333 in *Foundations for Visual Project Analysis*. Smardon et al. (editors), John Wiley and Sons, New York, NY. Available at http://www.esf.edu/es/via/Vis_Found/FOUNDATIONS%20FOR%20VISUAL%20PROJECT%20ANALYSIS%20-%20INDEX.PDF. Accessed Sept. 13, 2011.

Ross, R.W., 1979, *The Bureau of Land Management and Visual Resource Management – An Overview*. Presented at the National Conference on Applied Techniques for Analysis and Management of the Visual Resource, Incline Village, NV, Apr. 23–25, 1979. Available at http://www.fs.fed.us/psw/publications/documents/psw_gtr035/psw_gtr035_15_ross.pdf. Accessed Sept. 26, 2011.



# 2 Visual Resources

## 2.1 An Overview of the BLM Visual Resource Management (VRM) System

The BLM's VRM system provides a framework for managing visual resources on BLM- administered lands. Included in this system is a mechanism for identifying visual resource values on BLM-administered lands, minimizing the impacts of surface-disturbing activities on visual resources, and maintaining the scenic value of tracts of land for the future. The VRM system involves the following:

- Inventorying scenic values of BLM-administered lands through the Visual Resource Inventory (VRI) process;
- Assigning VRM classes that establish VRM objectives for these BLM-administered lands;

- Evaluating proposed activities to determine their impact on VRI values and whether or not they conform to the established management objectives through the Visual Contrast Rating process; and
- Updating the VRI to reflect the changed conditions.

These processes are summarized below.

### 2.1.1 Visual Resource Inventory

The BLM's VRI is a systematic process for:

- Assessing and rating the inherent scenic quality of a particular tract of land, through the Scenic Quality Rating process;

7

BLM_0020958

- Measuring the public concern for the scenic quality of the tract, through the Sensitivity Level Analysis; and
- Classifying the distance from which the landscape is most commonly viewed, through delineation of distance zones.

Based on the outcome of the VRI, BLM-administered lands are assigned to one of four VRI classes. VRI Class I lands have the greatest relative visual values, and VRI Class IV lands have the lowest relative visual values. The Scenic Quality Rating process, the Sensitivity Level Analysis, and the Distance Zone delineation process are discussed in more detail below.

### 2.1.1.1 Scenic Quality Rating

Within the VRI process, public lands are evaluated with regard to their scenic quality, defined as the visual appeal of a particular tract of land (BLM 1986a). Scenic quality is determined systematically by (1) dividing the landscape into Scenic Quality Rating Units (SQRUs) based on conspicuous changes in physiography or land use, and (2) ranking scenic quality within each SQRU based on the assessment of seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. The ratings are made in the field by trained observers who evaluate the landscape view from inventory observation points, which are either important viewpoints or points with views that are representative of the SQRU. Based on the outcome of this assessment, lands within each SQRU are assigned a scenic value rating of A (high scenic value), B (moderate scenic value), or C (low scenic value). Generally, those areas with the most variety and most harmonious composition have the highest scenic value ratings, while areas with less variety and greater levels of disturbance

from human activities have the lowest scenic value ratings.



This colorful and varied BLM landscape has very high scenic quality. (Credit: BLM.)

### 2.1.1.2 Sensitivity Level Analysis

Visual sensitivity is defined as a measure of public concern for scenic quality (BLM 1986a). Sensitivity is determined by evaluating the types and numbers of potential viewers of a specified area (this area is referred to as a Sensitivity Level Rating Unit or SLRU), the level of public interest in the SLRU, adjacent land uses, and the presence of special areas. The Sensitivity Level Analysis (SLA) is completed in two steps: (1) delineation of SLRUs, and (2) rating visual sensitivity within each SLRU. SLRUs represent geographic areas where public sensitivity to change of the visual resources is shared among constituents.

Determining the level of sensitivity requires familiarity with the tracts of lands being evaluated, and with the people who use them. Sensitivity is generally determined by BLM staff most familiar with the users of the areas, and can be supplemented by direct input from other agencies, interest groups/stakeholders, and the general public.

Sensitivity levels are described as high, medium, or low within the VRI process. Scenic byways, wilderness

**8**

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 95 of 155

areas, and lands adjacent to national parks are examples of lands that often have high sensitivity.



**Landscapes viewed from scenic overlooks may have increased visual sensitivity. (Credit: BLM.)**

### 2.1.1.3 Distance Zone Delineation

Within the VRI process, distance zones are assigned based on the distance of lands from places such as highways, waterways, trails, or other key locations. They include the following:

- **Foreground-middle ground**—This zone includes visible areas from 0 to 5 mi.
- **Background**—This zone includes visible areas from 5 to 15 mi.
- **Seldom seen**—This zone includes lands visible beyond 15 mi or lands hidden from view from key locations.

These distance zones are for use in conducting VRIs only. While distance is an important factor in the perception of visual contrast in the landscape (see Section 2.2.4), BLM distance zones are not used in visual contrast or impact analyses, or to identify appropriate mitigation. The effects of distance are highly dependent on the size and other characteristics of the facility and the landscape, and must be incorporated into the contrast and impact analyses and mitigation efforts on a case-by-case basis.

### 2.1.1.4 VRI Class Determination

The VRI class for the tract of land being inventoried is determined by consulting a matrix that incorporates all possible values for scenic quality rating, the sensitivity rating, and the distance zone. For example, the matrix indicates that an area with a scenic quality rating of B, with a high sensitivity level rating, that falls within the background distance zone as viewed from travel routes and other key locations, would be assigned a VRI class of III, indicating moderate relative visual values.

It should be noted that a typical BLM VRI contains valuable information about the inventoried lands in addition to the VRI classes, including representative photos, maps, and supporting text. This information is useful for a variety of purposes related to VRM and planning, for example, plan amendments and RMP planning-level decisions, landscape setting descriptions, and viewer sensitivity analyses.

BLM_0020960



VRI classes for Little Snake Field Office in Colorado. (Credit: Logan Simpson Design, Inc.)

### 2.1.2 The RMP and Visual Resource Management Classes

The RMP establishes how the public lands will be used and allocated for different purposes; it is developed with public participation and collaboration. RMP decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). The visual values reflected in the VRI classes are considered in establishing goals and objectives for resource management, and when management actions and allowable uses are determined for the lands in the RMP,

VRM classes are designated for the lands that reflect these management actions and allowable uses.

The VRI class values reflect the quality of the visual resource, but they are not the sole determinant of how the visual resources on the lands are to be managed; the BLM manages lands for a variety of purposes, and preservation of scenic values is only one of many factors to consider in determining land management objectives. The VRI class values inform the VRM class determination made in the RMP; they are the basic measure of the quality of the visual resource, which must be considered when determining VRM objectives in the RMP process, and should be discussed when

**10**

BLM_0020961

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 97 of 155

describing the visual impacts of a proposed surface-disturbing action.

VRI classes are not intended to automatically become VRM class designations. Management classes are determined through careful analyses of other resource values, and other potential land uses and demands. The VRM class determination is based on a full assessment that evaluates the VRI in concert with needed resource uses and desirable future outcomes. The VRM class designations may be different than the VRI classes assigned in the inventory and should reflect a balance between protection of visual values and meeting America's energy and other land use or commodity needs.

The VRM classes set VRM objectives for lands in each class, as well as the level of visual change in the landscape character that is allowed as a result of proposed management activities. The objectives and allowed levels of change for each of the four VRM classes are as follows:

- **Class I Objective:** To preserve the existing character of the landscape. **Allowed Level of Change:** This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.
- **Class II Objective:** To retain the existing character of the landscape. **Allowed Level of Change:** The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer.

Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

- **Class III Objective:** To partially retain the existing character of the landscape. **Allowed Level of Change:** The level of change to the characteristic landscape should be moderate. Management activities may attract attention, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.
- **Class IV Objective:** To provide for management activities which require major modification of the existing character of the landscape. **Allowed Level of Change:** The level of change to the characteristic landscape can be high. Management activities may dominate the view and may be the major focus of viewer attention. However, the impact of these activities should be minimized through careful siting, minimal disturbance, and repeating the basic elements of form, line, color, and texture within the existing setting.

Once the VRM class is determined for a tract of BLM-administered land in the RMP, BLM policy requires that proposed management activities, such as constructing and operating a utility-scale renewable energy facility on that tract, must meet the requirements of the VRM class. Disclosure of impacts to the visual values of the project area and conformance with the VRM class requirements is determined through the Visual Contrast Rating (VCR) process (see below) during NEPA analysis. If the VCR process determines that the project

**11**

BLM_0020962

conforms to the VRM class objectives and the project is allowed, a concerted effort must still be made to reduce the visual contrasts, even if the proposed project meets the VRM class objectives. If the VCR determines that, as proposed, the project will not conform to the VRM class objectives, additional visual impact mitigation must be implemented until the project does comply with the VRM class requirements. If additional mitigation will not result in the project meeting VRM class requirements, the project is not permitted, or the VRM class for the project area must be changed through an amendment to the RMP.

### 2.1.3 Visual Contrast Rating

VCR determines whether the potential visual impacts from proposed surface-disturbing activities will meet the VRM class objectives and allowable level of change established for the area, or if design adjustments or additional mitigation will be required. Contrast analysis also is used as the basis for conducting impact assessment to characterize impacts to visual resources (i.e., the landscape) and potential viewers. These impacts and viewers may or may not be on BLM-administered lands; in compliance with NEPA and FLPMA, BLM is required to disclose impacts on visual



**VRM classes for Little Snake Field Office in Colorado. (Credit: BLM.)**

BLM_0020963

resources regardless of whether the affected lands are public or private, or are managed by BLM, and regardless of whether potential viewers are located on BLM-administered or other lands. Contrast analysis is also used to identify opportunities for avoidance or mitigation of impacts.

The VCR involves a systematic comparison of the landscape's visual characteristics before and after the project is implemented, as seen from key observation points (KOPs), using the basic design elements of form, line, color, and texture. The BLM defines KOPs as "the most critical viewpoints," such as points or a series of points on a travel route, or at a use area or a potential use area (BLM 1986b).

The following steps are included within the BLM contrast rating process:

(1) **Obtain a project description**—The level of detail required for this step varies by individual project. This information usually can be obtained from a project developer or proponent. Typically, a preliminary Plan of Development (POD) is submitted with the ROW application. However, details such as exact layout of facilities, roads, and transmission lines are not identified, and therefore meeting with the project proponent is warranted. Assesing the impacts of renewable energy facilities is strongly dependant on the location of the components of the project. Details about the main components and ancillary facilities are therefore necessary to identify and characterize contrast and associated impacts.

(2) **Describe the VRM objectives**—For each field office or region, the RMP includes the VRM

objectives for lands included in the RMP, usually in a GIS-generated map with polygons labeled with the applicable VRM classes. From this is drawn the existing VRM objective for the parcel or parcels in which the proposed project would be located.

(3) **Select KOPs**—Viewpoints are selected from which to evaluate the visual contrast that would be created if the proposed project were built. KOPs should represent either a typical view from a sensitive viewing location or the range of impacts associated with the project. These locations are usually located on commonly travelled routes from which the project would be visible, or other likely observation points. KOPs typically are selected through a consultation process with the BLM, and, in some cases, interested stakeholders and the public.

(4) **Prepare visual impact simulations**—Visual simulations are spatially accurate and realistic visualizations (typically computer-generated photomontages) of the project and surrounding landscape that are used to depict the overall appearance of a proposed project. Simulations depict views of the project from selected KOPs. Simulations help the BLM and other stakeholders visualize and respond to development proposals. They are also used to evaluate the effectiveness of mitigation measures and BMPs to address visual impact issues.

(5) **Complete the contrast rating form**—The BLM provides a worksheet (Form 8400-4) with which to conduct and record visual contrast ratings for views from the KOPs selected for the VCR.

**13**

BLM_0020964

The worksheet guides the evaluation and allows for multiple observers to evaluate a potential project. Contrast ratings are made by comparing the basic elements of form, line, color, and texture of the existing landscape with the proposed development, using the simulation to guide the assessment of expected future conditions. Factors to be considered when assessing visual contrast from the proposed facility include distance, angle of observation, length of time the project is in view, relative size or scale, season of use, lighting conditions, recovery time, spatial relationships, atmospheric conditions, and motion. These factors are considered in greater detail in Section 2.2.

The results of the VCR for each KOP include a determination of the level of visual contrast associated with the project for each of the four design elements. One of four levels of contrast (i.e., none, weak, moderate, and strong) is assigned for each of the design elements. The contrast assessment is used as the basis for determining whether or not the proposed project complies with the VRM objectives and allowable levels of change assigned to the area in the RMP. If it is determined that the project will not conform to the VRM class requirements, the VCR also specifies mitigation that will be required to meet the VRM class requirements, if compliance could be achieved through mitigation. Regardless of compliance with VRM class objectives, the VCR is used to identify appropriate impact avoidance and mitigation measures that should be implemented.

Additional information on the VRM system can be found in the following BLM documents:

- BLM Handbook 8400, *Visual Resource Management*;
- BLM Manual H-8410-1, *Visual Resource Inventory*;
- BLM Handbook H-8431-1, *Visual Resource Contrast Rating*;
- Information Bulletin No. 98-135;
- Instruction Memorandum No. 98-164; and
- Instruction Memorandum 2009-167.

Additional information on the RMP process can be found in the BLM Land Use Planning Handbook H-1601-1.

## 2.2 Visual Contrast and Visibility Factors

At a very basic level, visual impacts can be defined as changes to the scenic attributes of the landscape brought about by the introduction of visual contrasts, and the associated changes in the human visual experience of the landscape. Visual impacts on the visual experience of the landscape can be positive or negative. If viewers feel that the visual contrasts generated by a change to the visible elements of the landscape improve its visual qualities, the impact is positive. If viewers feel that the contrasts detract from the scenic quality of a landscape rather than improve it, the impacts are negative.

The concepts of *visual contrast* and *visual impact* are central to understanding how renewable energy facilities and other types of developments affect visual resources on BLM-administered lands.

- *Visual contrast* is a change in what is seen by the observer. For example, if wind turbines are

BLM_0020965

introduced to a natural-appearing landscape, the tall shapes of the towers, and their white color, long vertical lines, smooth textures, blade motion, and blinking lights at night are all visual contrasts that can be seen by people and can change the scenic quality of the landscape.

- *Visual impact* includes both the change to the visual qualities of the landscape resulting from the introduction of visual contrasts, and the resulting change to the human visual experience of the landscape. Continuing with the wind energy example above, the introduction of contrasts from wind turbines may change the VRI scenic quality rating of an undisturbed and highly scenic area from an A to a B; this change in scenic quality constitutes a part of the visual impact from the project. The presence of the wind facility may also change the visual experience of persons who view the project area; this constitutes another dimension of the visual impact of the facility. Some viewers may think that the addition of wind turbines improves the view, perhaps because it adds visual interest to an otherwise static view. For these people, the visual impact of the wind turbines is positive. Other viewers may feel that the wind turbines add visual clutter or block the view of mountains they enjoy looking at. For these viewers, the visual impact of the wind turbines is negative.

Broadly speaking, visual impact assessment includes:

(1) determination of the extent and nature of the visual contrasts caused by a project;

(2) prediction of the effects of the contrasts on the landscape's visual qualities;

(3) prediction of viewers' emotional responses to the observed contrasts, as seen by likely viewers from likely viewpoints; and

(4) identification of measures to avoid or reduce the visual contrasts associated with the proposed project.

### 2.2.1 Visual Contrast

The BLM's VCR process focuses on the systematic assessment of visual contrast. While the VRI process recognizes that cultural modifications (manmade elements visible in the landscape) may sometimes positively affect scenic quality, the VCR process identifies the sources and levels of visual contrast from a proposed project. The BLM's visual impact mitigation approach seeks to reduce the visible contrasts from the project or to avoid the contrasts altogether; this may be accomplished, for example, by moving the entire project or its visible elements, or by screening the project from view. Because of this, a good understanding of the sources of visual contrast and the factors that affect the perception of visual contrast in the landscape is important not only to visual impact assessment, but also to the identification of appropriate visual impact mitigation.

In the VRM system, contrast is described as the differences in the four basic design elements of form, line, color, and texture between the proposed project and the surrounding landscape. Additional information about these elements is presented in BLM VRM Manual Handbook H-8431-1 (BLM 1986b); however, they are summarized as follows:

**15**

BLM_0020966

**Renewable Energy Visual BMPs**

**Form:** The mass or shape of an object or of objects that appear unified. Two types are recognized:

- Two-Dimensional Shape—the presence of an area or areas that contrast in color and/or texture with adjacent areas, creating a two-dimensional shape in the landscape.
- Three-Dimensional Mass—the volume of a landform, natural object, or manmade structure in the landscape.

Examples of forms commonly encountered in natural-appearing BLM landscapes are masses of mountains, valley floors or plains, or large masses of similar-appearing vegetation, such as an expanse of shrubs in a landscape dominated by grasslands. Forms can also be manmade; they can include buildings, or the large rectangular block of a solar collector array at a solar energy facility.

Geometry is noted as a sub-element of form; forms in the landscape can approach a standard geometrical figure of two or three dimensions (e.g., square, circle, triangle, cube, sphere, cone). Solar collector arrays often appear as rectangles, parallelograms, or ellipses as viewed from elevated viewpoints. Forms can have irregular geometry, and those found in natural settings (e.g., those of mountains, lakes, or vegetation patches) usually do.



The massive forms of mountain ridges are an important element in this BLM landscape. (Credit: Robert Sullivan, Argonne National Laboratory.)

**Line:** The path, real or imagined, that the eye follows when perceiving abrupt differences in form, color, or texture or when objects are aligned in a one-dimensional sequence. Line is usually evident as the edge of shapes or masses in the landscape. Three main types of line are recognized: edges, bands, and silhouette lines.

- **Edge**—The boundaries along which contrasting areas are related and joined together; the outline of a two-dimensional shape on the land surface. There are several types of edges:
  - *Butt Edge*—the simple sharp edge between two contrasting areas.
  - *Digitate Edge*—the complex indented edge between two interlocking and contrasting areas.
  - *Transitional Edge*—the presence of one or more band(s) connecting two contrasting areas, forming a transitional stage between the two.
  - *Diffuse Edge*—soft edge formed by a gradation between two contrasting areas.

**16**

- **Band**—contrasting linear form with two roughly parallel edges dividing an area in two.
- **Silhouette-line**—the outline of a mass seen against a backdrop. The skyline is the silhouette-line of the land against the sky.

Boldness, complexity, and orientation are sub-elements of the line feature. Boldness refers to the visual strength of the line; complexity refers to the degree of simplicity or intricacy of a line; and orientation refers to the overall relationship of the line to the (horizontal) axis of the landscape or to compass bearings.

Examples of lines commonly encountered in natural-appearing BLM landscapes are the horizon line; lines of stratified layers of topography (e.g., successive ridges); the lines of mountains or ridges against the sky; strata in rock formations; streams; and the edges of vegetation masses. Like forms, lines in the landscape can be manmade, and manmade lines in BLM landscapes are quite common; they include fences, transmission towers and conductors, wind turbine towers, the edges of solar arrays, and the pipelines of geothermal plants.

Because wind, solar, and geothermal facilities typically have many butt edge, straight line, straight edged, or curved components (e.g., turbine towers, steam pipes, solar panels, mirrors, heliostats, or electricity conductors), line contrast from these facilities can be very strong if the lines are bold, especially when the orientation of the lines introduced by the facility are perpendicular to the predominant natural line. This situation is common for wind energy facilities, which often introduce strong vertical lines into strongly horizontal landscapes, such as the plains and valley floors common on BLM landscapes.



**Wind turbines create strong vertical line contrasts in flat landscapes with strong horizon lines. (Dunlap Ranch Wind Energy Project near Medicine Bow, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)**

**Color:** The property of reflecting light of a particular intensity and wavelength (or mixture of wavelengths) to which the eye is sensitive. Color is the major visual property of surfaces.

Sub-elements of the color feature include hue, value, and chroma:

- **Hue**—aspect of color we know by particular names (e.g., red, blue, orange), and that is determined by the particular wavelengths of light emitted or reflected from an object.

**17**

- **Value**—lightness or darkness of the color, which is caused by the intensity of light being reflected, and ranges from black to white.
- **Chroma**—degree of color saturation or brilliance, determined by the mixture of light rays emitted or reflected from an object. It is the degree of grayness in a color, ranging from pure (high chroma) to dull (low chroma).

Colors common to many BLM landscapes, particularly in the desert southwest and intermountain west, are the colors of vegetation, rock, and soil, which tend toward muted (low chroma) greens, browns, and grays. Soil color varies widely, but soils are often light tan, red, or gray, and in desert or rocky areas with scant vegetation soil can be an important contributor to landscape color. Brighter colors, such as the colors of flowers, are present but tend to be ephemeral. Water is generally rare, but may be locally plentiful. The color of water ranges from brown to green to blue, but it can be white when water is cascading. Blue skies are common overhead, but skies are generally very pale blue to light gray at or near the horizon, except at sunrise and sunset. Night skies away from cities tend to be dark, in some places exceptionally dark. Manmade elements, of course, can be any color, but in many BLM landscapes, manmade elements are relatively uncommon and tend to be widely spaced. They are often constructed of wood or metal, with galvanized metal surfaces common, and they can sometimes be highly reflective.

Depending on the technology, solar facilities use thousands, or even hundreds of thousands, of mirrored surfaces that in some instances are sources of glinting (a brief flash of light) or glare (light bright enough to cause annoyance or discomfort). When glinting and glare are absent, the mirrors or heliostats may reflect the sky, clouds, or, at certain angles, even the ground or surrounding vegetation. Modern wind turbines are always white, which often contrasts strongly with the surrounding natural colors. Geothermal facilities can be any color, but if their sometimes-extensive pipeline networks are not painted or coated to match the backdrop, their surfaces may be highly reflective.



Reflections of the blue sky in this solar parabolic trough facility's mirrors causes strong color contrast with the surrounding vegetation. (Nevada Solar One near Boulder City, Nevada. Credit: Robert Sullivan, Argonne National Laboratory.)

**18**

**Texture:** The aggregation of small forms or color mixtures into a continuous surface pattern; the aggregated parts are small enough that they do not appear as discrete objects in the visible landscape. Two types of texture are recognized:

- **Color Mixture (mottling)**—intrinsic surface color contrasts of very small scale, which may be due to hue, chroma, or value, alone or in combination.
- **Light and Shade**—the color contrast, particularly in value, created by differences in lighting on a varied surface or repeated forms. It consists of the repetition of a lit side, a shaded side, and the shadow cast.

Sub-elements of texture include grain, regularity, and internal contrast. Grain refers to the relative dimensions of the surface variations, ranging from large (coarse texture, e.g., coniferous forest) to small (fine texture, e.g., grassland). Regularity refers to the degree of uniform recurrence and symmetrical arrangement of the surface variation. Internal contrast refers to the degree of contrast in colors or values creating the texture. Perception of texture is highly dependent on distance; a texture that appears coarse at short distances may appear as a fine texture at longer distances and will appear to be smooth at even longer distances.

Naturally occurring textures include those of vegetation, soils, and rocks. Vegetation and soil textures are often predominantly color mixtures, but light and shade textures are often important components of the coarser textures of rocky areas and mountains. The individual structures of renewable energy facilities often have monotone, smooth surfaces that lack texture

even at very close viewing distances; however, light and shade textures may be important contrast sources from longer distances. They may be seen as the interplay of shadows and lit surfaces from complex piping and other elements of a power block at a thermal plant, or from thousands of visually overlapping sunlit solar collectors and the shadows they cast on the ground.



The power block, collector array, and buildings of this solar parabolic trough facility introduce a variety of non-natural textures to this landscape. (Nevada Solar One near Boulder City, Nevada. Credit: Robert Sullivan, Argonne National Laboratory.)

## 2.2.2 Visibility Factors

In many BLM landscapes, utility-scale wind, solar, and geothermal energy facilities may create strong visual contrasts with scenic settings. This is particularly true for wind and solar facilities, because these projects cover very large areas, and the structures involved can be very tall and/or highly reflective. All three technologies involve structures with distinctly manmade geometry that may contrast strongly with natural-appearing backgrounds when lighting conditions and viewing angles are suitable, and viewers are within a certain distance of the facility. However, at other times, even when viewed from the same location, the facilities may be invisible; they may be visible but hard to distinguish from the background; or they may be plainly visible but appear substantially different than they have appeared at other times. The visibility of an

**19**

object in a landscape setting, and its apparent visual characteristics for any given view, are the result of a complex interplay between the observer, the observed object, and various factors that affect visual perception, referred to as *visibility factors*. After introducing the concept of the *viewshed*, the area of the landscape seen from a particular location, the remainder of this chapter is devoted to describing visibility factors and how they affect the visibility and apparent visual contrast associated with objects in the landscape, including renewable energy facilities.

### 2.2.2.1 Viewsheds

A viewshed is the typical unit of study for a visual impact assessment. A viewshed is the total landscape that can be seen from a particular location, which could be a point, such as a scenic overlook; a line, such a travel route; or an area, such as a lake. Most visual impact assessments begin with a *viewshed analysis*, a spatial analysis conducted using various computer software programs such as a geographic information system (GIS). These programs analyze the land surface around the point, line, or area of interest to determine which part of the landscape would be visible from that location, and which part of the landscape would be screened from view, based on elevation data and data on screening elements such as vegetation or structures, if available. The user sets the maximum distance from the viewshed origin (the viewpoint from which visibility is being determined), as well as other controls (discussed below). The output of the viewshed analysis is usually a *viewshed map*, a map that indicates which areas around the viewpoint are visible and which are not. More specialized viewshed analyses are sometimes conducted; these may include composite viewsheds that indicate visibility of areas from multiple KOPs, or

viewsheds that indicate the height of an object at a given location that could be concealed from view of a KOP.

### 2.2.2.2 Viewshed Limiting Factors

Several factors determine the spatial extent of the viewshed from a given viewpoint, within the maximum distance of analysis set by the user; these factors are here referred to as *viewshed limiting factors*, because they define the spatial limits of the viewshed. They include the following:

- **Topography:** Obviously, terrain such as a ridge or hill may block the view from a particular location; in hilly or mountainous areas, topography has a major effect on the shape and size of the viewshed. The elevation data used in the viewshed analysis provide information used in the analysis to determine topographic screening.

- **Vegetation:** Vegetation, typically trees, may screen views fully or partially, especially close to the viewpoint. In many but not all BLM landscapes, vegetation tall enough to screen views is sparse or absent; however, where it is present and of sufficient density to block views, it can affect the size and shape of the viewshed. Specialized elevation data may be required to account for vegetation height in a viewshed analysis, unless a standard vegetation height can be calculated and incorporated into the viewshed analysis. In areas with deciduous vegetation, seasonal leaf drop may affect the extent of screening. Views may be screened less effectively when leaves are shed.

**20**

BLM_0020971

**Viewer Characteristics**
Visual Acuity
Viewer Engagement and Experience
Viewer Motion

**Viewshed Limiting Factors**
Viewer Height
Target Height
Topographic Screening
Vegetative Screening
Structural Screening
Earth Curvature
Atmospheric Refraction

**Lighting**
Solar Altitude and Azimuth
Weather and Climate

**Atmospheric Conditions**

**Distance**

**Viewing Geometry**
Vertical Angle of View
Horizontal Angle of View

**Object Visual Characteristics**
Size
Form and Line
Color and Texture
Motion

**Backdrop**

Viewer

Screening Elements

Renewable Energy Facility

Backdrop

**Schematic Diagram of Visibility Factors that Affect Visual Perception of Landscape Elements (Credit: Lindsey Utter, Argonne National Laboratory)**

- **Structures:** Manmade structures may also screen views fully or partially, especially if they are close to the viewpoint. Similarly to vegetation, specialized elevation data may be required to account for structure height in a viewshed analysis, unless the location and height of each structure can be incorporated into the viewshed analysis.

- **Viewer height:** The eyes of a standing adult are generally between 5 and 6 ft above the ground surface, so viewers see more than they would if their eyes were at ground level; this height must be added to the viewpoint elevation to obtain an accurate result from the viewshed analysis. If the viewpoint is further elevated (e.g. the viewpoint is at the top of a building), then the heights of both the viewer and the structure must both be accounted for in the viewshed analysis. Viewer height is a typical input setting for a viewshed analysis.

- **Target height:** Tall objects may project above topographic or other screening, and if a

viewshed analysis is being run to determine visibility of a particular type of object (e.g., a wind turbine), the height of the object must be accounted for in the viewshed analysis. Target height is a typical input setting for a viewshed analysis. The components of the proposed energy facility should be considered when determining the target height to be used for viewshed analysis. Solar facility component height varies widely depending on the solar technology employed. Wind turbines also vary in height, and the viewshed analysis must account for the blade tip height in addition to the hub height.

- **Earth curvature:** The curvature of the earth's surface will affect viewshed results at long distances; if earth curvature is not accounted for in the viewshed calculation, objects at longer distances will be indicated as visible when in fact the curvature of the earth would have caused them to drop partially or completely below the horizon. Earth curvature

**21**

BLM_0020972



Solar photovoltaic facilities and the solar collector array of parabolic trough facilities have relatively low profiles and may be fully or partially screened by desert vegetation in flat landscapes where viewpoints are not elevated. (Solar Energy Generating System [SEGS] III–VII parabolic trough facilities, Kramer Junction, California. Credit: Robert Sullivan, Argonne National Laboratory.)

incorporation is a typical setting for a viewshed analysis. It should be noted that for large structures, such as renewable energy facilities that may be visible for very long distances (25 mi or more for wind and solar facilities), earth curvature can substantially reduce structure visibility, and it is important that it be accounted for in visibility analyses.

- **Atmospheric refraction:** Light rays passing through the atmosphere over long distances are bent downward due to the variation in air density as a function of altitude, which causes objects to appear slightly higher than they actually are. The effect is opposite from that of earth curvature, but much smaller in magnitude. Atmospheric refraction incorporation is a typical setting for a viewshed analysis.

If the above factors are accounted for in a properly run viewshed analysis with accurate input data, the result will be a viewshed map that shows the limits of the theoretically visible area around a viewpoint (within the radius set by the user); however, this does not mean that any object within the viewshed will actually be visible at any given time. The actual visibility of an object would depend on the viewer's eyesight, and on the object's size, shape, color, reflectivity, and orientation to the viewer; the lighting that falls on the object; and the presence of haze, among other factors. These factors are described below.

### 2.2.2.3 Viewer Characteristics

Characteristics of the viewer affect the perception of contrast and the ability to discern objects in the landscape. *Visual acuity* is the acuteness or clarity of vision. *Visual engagement and experience* refer to how

22

closely the viewer is looking at the landscape, whether they are looking for a particular object or type of object, and their familiarity with the type of object. *Viewer motion* may change the aspect of the viewed facility, but it can also limit the duration of views.

- **Visual acuity:** Visual acuity is the ability to discern visual details and is a physical limitation of the human vision system. It is dependent on the sharpness of the retinal focus within the eye, the sensitivity of the nervous elements, and the interpretative faculty of the brain. It varies between individuals and decreases with age, but generally can be corrected with eyeglasses, contact lenses, or surgery, or by other means.

- **Viewer engagement and experience:** Human vision has many similarities to a camera, but unlike a camera, the human vision system is not a passive recorder of the scene in front of the lens. Seeing is an active process that involves scanning the landscape to pick out recognizable objects from the background, to look for patterns, and in general, to organize and make sense of the jumble of forms, lines, colors, and textures presented to the eye. While much of this activity happens without conscious effort by the viewer, viewers who are consciously and actively focusing on the landscape will normally be better able to discern particular objects, particularly if they know what they are looking for, and especially if they have previous visual experience with the object, such that they have a mental "template" to help them predict the forms, lines, colors, and textures they should be looking for as they scan the view. Viewers who

are not focusing on the view, not actively scanning the scene in front of them, and not trying to identify a known type of object may be less likely to see a given facility unless it is so large or eye-catching as to be hard to miss.

- **Viewer motion:** If the viewer is moving through the landscape, the visual experience differs from that of a static viewer in important ways. If the viewer is moving directly toward or away from the facility, the general aspect of the facility will not change, but its apparent size will, and the level of contrast it creates will change similarly. If the viewer is moving perpendicular to the line of sight to the facility (i.e., the facility is moving across the field of view), visual parallax will make the facility seem to move across its visual backdrop. If the backdrop is not uniform, and if the viewer is sufficiently close to the facility, the contrast from the facility may change dynamically as the color and texture of the backdrop change. The portions of the facility in view may change as well. Viewer motion will also tend to decrease the duration of views of the facility, particularly if the motion is perpendicular to the line of sight to the facility rather than toward the facility. Decreased view duration will decrease the likelihood that the facility is noticed and decrease the overall perception of contrast.

**23**



Viewers who are consciously and actively focusing on the landscape are likely to notice more details. (Credit: BLM.)

### 2.2.2.4 Distance

*Distance* affects the apparent size and degree of contrast between an object and its surroundings (Saratoga Associates 2008). In general, visual contrasts are greater when objects are seen at close range. If other visibility factors are held constant, the greater the distance, the less detail is observable and the more difficult it will be for an observer to distinguish individual features (Landscape Institute 2002).





Viewing distance has a large effect on visual contrast. Wind turbines viewed from a distance of 2 mi (top) and 5 mi (bottom). (Cedar Creek Wind Farm, near Grover, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)

BLM-sponsored research has shown that in clear, dry air, under favorable but not uncommon lighting conditions and viewing geometry, wind turbines can often be visible at distances exceeding 25 mi, and occasionally beyond 35 mi (Sullivan et al. 2012a). Very limited research is available about the visual characteristics of solar facilities; however, a small thin-film PV facility was repeatedly observed at a distance of 22 mi, viewed from the north. Because this perspective did not include the south-facing sunlit PV panels, it is assumed that a larger, sunlit facility might be visible at longer distances (Sullivan et al. 2012b). At any given time and location, the maximum distance at which a facility might be seen, and the degree of visual contrast observed at a particular distance may vary widely, and depends on a complex interaction of the visibility factors discussed below.

### 2.2.2.5 Viewing Geometry

*Viewing geometry* refers to the spatial relationship of viewer to the viewed object (e.g., a renewable energy facility), including the *vertical angle of view* and the *horizontal angle of view*. The vertical angle of view refers to the viewer's elevation with respect to the viewed object: whether the viewer is elevated with respect to the facility and therefore looking downward at it, lower in elevation than the facility and therefore looking upward at it, or level with the facility and looking across it. The horizontal angle of view refers to the compass direction of the view from the viewer to the object.

Both the vertical and horizontal angle of view may have important effects on facility visibility and contrast levels. Because of the large areas typically covered by renewable energy facilities, particularly wind and solar facilities, views from elevated viewpoints often include

**24**

the top surfaces of the structures in the facility, causing it to occupy more of the field of view, and making the full areal extent and the regular geometry of the facility more apparent. For solar facilities, elevated views tend to show more of the often highly reflective solar arrays, which can greatly increase visual contrast, especially if glare or glinting occurs.

The horizontal angle of view determines which side of the facility is in view, and the angle of surfaces with respect to the viewer (for example, whether wind turbine blade motion is seen face-on, where it can be quite noticeable, or seen from the side, where it may be nearly invisible). The horizontal angle of view also interacts with the solar azimuth (see Section 2.2.2.7 below) to determine whether the object is frontlit (the side facing the viewer is fully illuminated by light coming from behind the viewer), backlit (the side facing the viewer is fully shaded because the object is between the viewer and the light source), or sidelit (the side facing the viewer is partly illuminated and partly shaded because the light is falling more or less perpendicular to the line of sight between the viewer and the object).

Movement of the viewer during the act of viewing a facility, as when viewing from an automobile on the highway or while walking down a trail, causes the viewing geometry to change, which can have dramatic effects on visibility and visual contrast. As rapidly changing viewing geometry changes the orientation of the line of sight to reflective surfaces, bright flashes of light, abrupt changes in apparent color, and abrupt changes in the patterns of light and shadows may result. For moving viewers, the visual experience of wind facilities and especially solar facilities tends to be very dynamic, with major changes in the appearance of the facilities sometimes occurring over short periods of time or with small changes in viewer position.



**Views of the Silver State North solar PV facility, near Primm, Nevada from ground level (top photo) and from an elevated viewpoint (bottom photo). Views from elevated viewpoints often include the top surfaces of the structures in the facility, causing it to occupy more of the field of view, and making the full areal extent and the regular geometry of the facility more apparent. Credit: Robert Sullivan, Argonne National Laboratory.)**

**2.2.2.6 Background/Backdrop**

Objects that stand out against the visual background typically command a viewer's attention. The ability to see or detect an object is heavily influenced by the contrast between the object and its background or backdrop (Sprawls 1995). As contrast between an object and its background is reduced, the ability to distinguish

**25**

BLM_0020976

the object from the background diminishes. When the contrast becomes too small, the object will no longer be visible as separate from its background.

The backdrop against which the structures of a renewable energy facility are viewed affects their visibility. The degree to which visibility is affected depends on the color and textures of the structures and the backdrop, and the lighting falling on both (see Section 2.2.2.4). Light-colored or sunlit structures viewed against backdrops of dark vegetation or rock will show strong contrasts that can greatly extend their visibility, while dark or shaded structures against the same backdrop may nearly disappear. Conversely, dark or shaded structures against light backdrops such as white or light gray clouds, pale blue skies, snow-covered slopes, or expanses of dried grasses may cause strong contrasts, while light-colored or sunlit structures may be difficult to discern against these backdrops.

Because of their height, the visual backdrop of wind turbines may have a particularly large effect on their visibility. The strong vertical, stark white lines of sunlit turbines against dark mountain ridges or dark clouds may be especially conspicuous, while backlit turbines, geothermal facilities, and especially low-height solar facilities (e.g., PV facilities), may be substantially less visible. It should be noted that sunlit water vapor plumes at facilities that use thermal power technology may stand out strongly against dark backdrops.

The texture or visual complexity of an object's backdrop may also affect the visibility of the object. While, in general, it is harder to distinguish objects against visually complex backgrounds, the flat, textureless surfaces of some manmade facilities can contrast strongly with visually complex, highly textured natural

backgrounds, although texture effects tend to become less important at long distances.

### 2.2.2.7 Lighting

Objects are visible when light bounces (i.e., reflects) off their surfaces and is redirected into an observer's eye (Hyslop 2009). The intensity and distribution of lighting has a profound effect on the apparent color of objects and their backgrounds. The angle of sunlight falling on an object may result in shadows that greatly increase its apparent contrast with the background. Sunlight can cause glare from solar mirrors and glinting from wind turbine blades, and can cause dramatic increases or decreases in facility visibility as it interacts with clouds. Lighting's effects on visibility are complex and interact with other visibility factors, such as atmospheric conditions, and the surface characteristics of structures. A number of variables affect the strength, quality, and distribution of lighting and determine its effects on the visibility of renewable energy facilities; these are discussed below.

- **Solar altitude and azimuth**—The solar altitude is the angle of the sun above the horizon. Solar altitude affects the overall visibility of a renewable energy facility by altering the amount and position of light on an object, and in some instances by casting shadows onto the object and the ground that can substantially increase or decrease visual contrast. At higher sun angles,







The complex interaction of viewing geometry, lighting, and visual backdrop may have large effects on facility visibility and contrast levels. Viewing distance ranges from 6 mi for top photo to 10 mi for bottom photo. (Dunlap Ranch Wind Energy Project near Medicine Bow, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)

**27**

BLM_0020978

light may be cast more on the tops of structures, which can increase the brightness and contrast of the facility as seen from elevated viewpoints. At higher sun angles, shadows are diminished, and the landscape can take on a more washed-out appearance, with lower levels of contrast for more distant objects. Of course, the horizontal angle of sunlight (the solar azimuth) also alters the amount and position of light on an object, interacting with the viewing geometry to determine whether structures in the landscape are frontlit, backlit, or sidelit. Whether an object is frontlit, backlit, or sidelit can greatly increase or diminish its visibility, depending, in part, on the visual backdrop against which it is viewed. In general, backlighting from the sun will silhouette objects, making their contours prominent, but concealing surface detail. Frontlighting reveals surface detail, texture, and color differences and causes objects to contrast more strongly with darker backdrops. As discussed below, solar altitude and azimuth vary both during the course of the day and seasonally, sometimes causing facilities to vary dramatically in appearance and contrast at different times of day and at different times of year.

*Time of day*—As the sun rises in the east, passes through the meridian at noon, and sets in the west, it will cause facilities to the east or west of viewers to switch from being backlit to frontlit or vice versa during the course of the day. Both conditions may result in high contrast with the visual backdrop, either because the backlit objects are silhouetted against the brightly sunlit background or frontlit objects are viewed

against the darker sky (or a ground backdrop) opposite the sun. Objects will typically be sidelit from the south during the middle parts of the day, but the high-angle sunlight strikes vertically oriented objects (e.g., wind turbines) obliquely and with diminished shadows, so contrast is somewhat lower.

Facilities south or north of viewers may be sidelit at the beginning and end of the day, depending upon the season (see below). For viewers north of a facility, the facility will likely be backlit in the middle part of the day, but because the sun will be at a relatively high angle the contrast will generally be less than if it were directly behind the object. For viewers south of a facility, it will generally be frontlit in the middle of the day, but again, because the sun will be at a relatively high angle, the contrast will often be less than if the sun were more directly behind the viewer.

In addition, renewable energy facilities are lighted in the evening, although the nature and amount of lighting varies widely. This lighting will increase the visibility of the facilities during the evening hours. For instance, wind turbines and solar power towers would be lighted at night for air navigation safety, typically with red, slowly flashing lights. These lights can be visible for very long distances, and although they are not extremely bright, they can be conspicuous in dark night skies, particularly as a result of the flashing.

*Seasonal variation*— In the northern hemisphere during the fall and winter, the sun is in the

BLM_0020979

southern sky the entire day; in the spring and summer, the sun rises and sets in the northern sky but is in the southern sky most of the day. At the beginning of spring and fall, the sun rises and sets near due east and due west. It is only in spring and summer, in the early morning and late afternoon, that the sun is located in the northern sky for a significant portion of the day. This means that throughout the year, except for the early mornings and late afternoons in spring and summer, a facility will appear completely or mostly frontlit to viewers south of the facility. It will be fully illuminated, with little shadowing evident. If the backdrop is light, contrast may be low. If the backdrop is dark, contrast may be high. Viewers north of a facility will almost always see the facility components completely or mostly backlit (shaded), and in winter, with the sun low in the southern sky, components with a sky backdrop may be silhouetted and show strong contrasts. If the backdrop is dark, the components may be difficult to discern. Viewers to the east or west of a facility will tend to see the facility more sidelit in winter than in summer.

There are other seasonal aspects to lighting that are important: the sun is at a lower angle in the winter months, and is consequently weaker, which reduces the overall contrast levels somewhat. Of course, day length is much shorter in winter than in summer, so night sky contrasts are a much greater percentage of the overall visual contrast generated by the facility on a daily basis. In some locations, there are seasonal variations in weather that change the average percentage of cloud cover and humidity, both of which will affect perceived visual contrast. Finally, in some regions, the change of season may be accompanied by large changes to the color of visual backdrops for facilities, caused by greening of vegetation in the spring, the drying of vegetation as summer progresses, changes in leaf color and leaf drop in the autumn, and snowfall in winter.

- **Weather and Climate**—Local weather can greatly affect the visibility and appearance of facilities, primarily by changing the amount and quality of sunlight falling on the facility. A cloud passing in front of the sun changes the light on both the facility and the backdrop, and often causes a sudden drop in contrast that may make distant facilities difficult to see. When the sun "pops out" from behind a cloud, there may a rapid increase in contrast and consequently visibility. Thus in some circumstances, weather adds a dynamic quality to the viewing experience. Light diffused through clouds and fog also can decrease contrast substantially (San Diego County 2003).

Weather-induced lighting changes can have dramatic effects on the contrast levels associated with wind turbines, and especially for solar facilities that utilize mirrors or heliostats. White wind turbines may appear to be starkly white in bright sunlight, but a medium or even a dark gray when shaded. When sunlit and shaded turbines are side by side, the contrast between them can be striking. Because solar mirrors and heliostats typically reflect the sky above them, they will assume the

**29**

hue, value, and chroma of the blue sky or clouds, if present, and thus they can appear to be a solid blue, a dull gray, a brilliant white, a dappled blue and white, or even green as they reflect nearby vegetation, and their appearance may change rapidly and dramatically as clouds pass by.

Climate will also affect facility visibility and contrast. Regions with sunnier skies and dryer air will, on average, experience higher levels of visual contrast and longer visibility distances for renewable energy facilities than will regions with less sunny skies and higher humidity levels.



A passing cloud has shaded the two foreground wind turbines, causing a dramatic change in apparent color. (Cedar Creek Wind Farm, near Grover, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)



Viewed from the west, a dark cloud backdrop behind wind turbines illuminated by late afternoon sun results in very high visual contrast. (Cedar Creek Wind Farm, near Grover, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)



Winter brings lower light levels, and different colors and textures, to the landscape. (Wind farms near Peetz, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)

30

## 2.2.2.8 Atmospheric Conditions

Water vapor (humidity) and particulate matter (dust, air pollution, and other particles) within the air affect visibility in multiple ways. Particulate matter scatters and absorbs light coming from an object, which diminishes contrast and subdues colors. The nature and degree of these effects depends on particle type and density, distance between the viewer and viewed object, and lighting conditions, among other things. Atmospheric conditions may affect an object's visibility through alterations of sharpness, brightness, and color, and can have a substantial effect on project visibility, especially at longer distances. On humid days with high levels of dust or pollutants, distant facilities may not be visible at all, or may be much harder to see, with substantially lower contrast and indistinct structure edges.



Atmospheric haze may substantially reduce visual contrast of facilities. (Ivanpah SEGS solar power towers, under construction, Ivanpah Valley, California. Credit: Robert Sullivan, Argonne National Laboratory.)

## 2.2.2.9 Object Visual Characteristics

The inherent visual characteristics of the viewed object (e.g., a renewable energy facility) will obviously affect its visibility and the level of visual contrast it creates. The facility and structure size; the scale relative to other objects in view; the form, line, surface colors, and textures of the facility components; and any visible motion of the facility components will all affect the facility's apparent visual contrast.

- **Size:** Other things being equal, larger facilities with larger structures will obviously show increased visual contrasts relative to smaller facilities. Depending on the distance and the amount of the facility in view, a large wind facility can cover a significant portion of the horizontal field of view, even at long distances. Solar facilities, while generally smaller in size, are still quite large objects relative to what humans normally encounter, and can occupy a substantial portion of the field of view at distances of several miles. Wind turbines and power towers are likely to be much taller than most other objects in BLM landscapes and may seem out of scale with nearby objects in some situations, which may tend to focus visual attention on them.

- **Form and Line (Geometry):** As noted in Section 2.2.1, because wind, solar, and geothermal facilities typically have many rectilinear or regularly curved components, they may contrast strongly with the forms and lines of predominantly natural landscapes.

- **Surface Color and Texture:** The color and surface texture of facility components can make them stand out or blend in with the visual backdrop. Darker colors tend to "recede" from the viewer, and lighter colors to "advance," so that lighter colors may appear to be closer to the viewer than darker background elements, and may stand out against the background. Wind turbines effectively must be painted white for

**31**

BLM_0020982

safety reasons. The mirrored surface of solar collectors and the collecting surfaces of PV panels cannot be painted for performance reasons. Some other facility components cannot be painted for safety or technical reasons, but many facility components could be painted to better match the surroundings, substantially decreasing their visibility and contrast. Where structures cannot be painted or coated to reduce their color contrast, the color contrast may attract visual attention. Most facility components have smooth surfaces that may be highly reflective without special coatings to dull the finish, and if these components cause glinting or glare, the glinting or glare may greatly increase their visibility at long distances, causing them to be strong sources of visual contrast.

- **Motion:** Motion is a strong attractant of visual attention, and facilities with moving components or other sources of visible motion are more likely to attract attention. An obvious example is the motion of wind turbines; the blade motion may strongly attract visual attention and has been shown to be visible at distances greater than 25 mi in clear air with good viewing conditions (Sullivan et al. 2012a). The mirrors of parabolic trough facilities, the heliostats of power towers, and in some cases the panels of PV facilities will track the daily course of the sun, and thus slowly move. This movement is generally too slow to notice, but it can affect contrast levels and change the appearance of the facility. Water vapor plumes from steam turbine generators or gas boilers

are also sources of visual contrast associated with motion. In some lighting situations, especially if viewed against dark vegetation or mountain ridges, the plumes can be visible for miles, and their color and movement will attract visual attention and substantially increase the visual contrast associated with the facility.



Glare from reflected sunlight on a solar Compact Linear Fresnel Reflector mirror. (Kimberlina Solar Thermal Energy Plant near Bakersfield, California. Credit: Robert Sullivan, Argonne National Laboratory.)



The polished surfaces of black photovoltaic solar panels are highly reflective. (Copper Mountain Solar Facility, near Boulder City, Nevada. Credit: Robert Sullivan, Argonne National Laboratory.)

32



Sunlit white wind turbines may contrast strongly with blue skies and may be visible for long distances in open landscapes. (Wind energy project near Medicine Bow, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)

## References

BLM (Bureau of Land Management), 1986a, *Visual Resource Inventory*, BLM Manual Handbook 8410-1, Release 8-28, U.S. Department of the Interior, Washington, DC, Jan.

BLM, 1986b, *Visual Resource Contrast Rating*, BLM Manual Handbook 8431-1, Release 8-30, U.S. Department of the Interior, Washington, DC, Jan.

Hyslop, N.P., 2009, "Impaired Visibility: the Air Pollution People See," *Atmospheric Environment* 43: 182–195. Available at http://air.snu.ac.kr/journals/Hyslop_AE(2009).pdf. Accessed Nov. 7, 2011.

Landscape Institute, 2002, *Guidelines for Landscape and Visual Impact Assessment*, 2nd edition. Spon Press, Taylor and Francis Group, New York, NY.

San Diego County, 2003, "Chapter 4.13 – Aesthetics," in *Gregory Canyon Landfill*, final EIR. State Clearinghouse No. 1995061007. Available at http://www.sdcounty.ca.gov/deh/waste/chd_gc_eir.html#Decision Documents. Accessed June 6, 2011.

Saratoga Associates, 2008, *New Grange Wind Farm Visual Resource Assessment*. Prepared for New Grange Wind Farm, LLC, Feb. 2008. Available at http://www.horizonwindfarms.com/northeast-region/documents/under-dev/arkwright/deis/Appendices/New%20Grange%20DEIS_Feb08_AppF_Visual%20Resource%20Assmt.pdf. Accessed June 3, 2011.

Sprawls, P., 1995, "Image Characteristics and Quality." In *The Physical Principles of Medical Imaging*, 2nd Edition. Available at http://www.sprawls.org/ppmi2/IMGCHAR/#Background_Brightness.

Sullivan, R., et al., 2012a, *Wind Turbine Visibility and Visual Impact Threshold Distances in Western Landscapes*. *Proceedings*, National Association of Environmental Professionals, 37th Annual Conference, May 21–24, 2012, Portland, OR.

Sullivan, R., et al., 2012b, *Visual Impacts of Utility-scale Solar Energy Facilities on Southwestern Desert Landscapes*, National Association of Environmental Professionals, 37th Annual Conference, May 21–24, 2012, Portland, OR.

**33**

BLM_0020984

BLM_0020985



# 3 Wind

## Introduction

The following sections provide a discussion of the general stages of utility-scale wind farm development, as well as a summary of visual contrast sources and effects by project phase.

### Facility Life Cycle

In general, the development of a wind farm consists of six stages, including planning/preliminary siting, site evaluation, design/engineering, construction, operations, and decommissioning. The following discussion includes only the phases that involve onsite activities that would lead to significant visual contrasts: site evaluation, construction, operations, and decommissioning and reclamation.

### Site Evaluation Phase

Before a wind farm can be planned and built, the wind regime at a potential site must be characterized precisely. Meteorological monitoring towers, which vary in height, are installed to transmit data on weather conditions and wind speed, direction, and shear on a continuous basis to a remote monitoring facility. The data is used as the basis for a "micrositing" strategy that places turbines on the site in locations where maximum power production is possible throughout the year.

### Construction Phase

Throughout wind energy project construction, the entire project area would be temporarily affected by site preparation activities such as clearing;

**35**

BLM_0020986


**Renewable Energy Visual BMPs**

construction of access and onsite roads; preparation and use of material and equipment laydown areas; installation of turbine foundations; erection of turbines; construction of the electrical substation, central control facility, and ancillary facilities; and installation of power and signal cables (typically buried or vaulted). Concrete ingredients (sand, aggregate) may also need to be extracted and hauled to the site.

### Operations Phase

No land-disturbing activities or associated impacts would normally occur during the operations phase. Routine operations include wind-driven operations of the turbines to produce power, and regular monitoring and maintenance activities to ensure safe and consistent operation. Most monitoring would be done remotely, but maintenance crews would be present on regular shifts. In areas with significant snowfall, roads might be snowplowed in the winter.

### Decommissioning and Reclamation Phase

Decommissioning of a wind energy project would include removal of turbines, buildings, concrete pads, and foundations, as well as the excavation and removal of buried components. Underground components would be removed (generally to a depth of at least 3 ft) to ensure an unobstructed root zone for revegetation. More deeply buried components might be abandoned in place. Following removal of site components, site reclamation and revegetation would mitigate some impacts, such as soil erosion, habitat fragmentation, and visual impacts.

## Visual Contrast Sources and Effects Summary by Project Phase

### Site Evaluation Phase

Typical site evaluation activities include the placement of one or more meteorological towers in or near the proposed wind energy facility to collect one or more years of meteorological data. Meteorological towers are instrumented towers that vary in height and appearance, but generally approximate the hub height of the proposed wind turbine generators. Multiple meteorological towers would be interconnected with data collection and integration equipment, usually contained in an enclosure centrally located between the towers. Meteorological towers are typically metal (galvanized or painted), lattice-type structures; however, composite materials are also used sometimes, as are smooth-skinned materials. Meteorological towers may be guyed or self-supporting; on guyed meteorological towers, guy wires could be visible depending on distance, and depending on the presence of bird diverters.

Aviation warning lights would be required for meteorological towers more than 200 ft (60.9 m) tall; normally these would be red flashing lights (FAA 2007).

Vehicles and workers would be seen during tower construction, and vehicles and workers might occasionally be seen at the tower for maintenance activities, but these activities would be rare.

36

the meteorological towers. Some color contrast would also be present, in addition to the FAA-required lighting at night on sufficiently tall towers.

Duration of the visual impacts associated with site characterization meteorological towers would be from 1 to 3 years for a typical project, although some meteorological towers might be retained for the life of the project, or replaced elsewhere on the project site with permanent meteorological towers.

### Construction Phase

Construction activities for a wind energy facility are site- and project-dependent; however, construction of a typical facility would normally involve the following major actions with potential visual impacts: building/upgrading roads; grading the site; constructing laydown areas; removing vegetation from construction and laydown areas; transporting towers, turbines, nacelles, and other materials and equipment to the wind energy facility site; assembling and erecting the wind turbine generators; installing permanent meteorological towers (as necessary); constructing ancillary structures (e.g., control building, fences); constructing electrical power conditioning facilities and substations; and installing power-conducting cables and signal cables (typically buried). Additional construction activities may also be necessary at very remote locations or for very large wind energy projects; they may include constructing temporary offices, sanitary facilities, a concrete batching plant, or a transmission line.

Potential visual contrasts that could result from construction activities include contrasts in form, line,



**Meterological tower at Dunlap Ranch Wind Energy Project near Medicine Bow, Wyoming. (Credit: Robert Sullivan, Argonne National Laboratory.)**

A meteorological tower in a typical BLM landscape would introduce a vertical line that would contrast with the horizon line. Due to their thin profile and lack of moving parts, meteorological towers generally cause lower visual contrasts than wind turbines and have a shorter radius of visibility. On guyed meteorological towers, guy wires and bird diverters might be visible, depending on viewer distance from

**37**


**Renewable Energy Visual BMPs**

color, and texture resulting from vegetation clearing and grading (with associated debris); road building/upgrading; construction and use of staging and laydown areas; wind turbine generator, electric transmission, and support facility construction; vehicular, equipment, and worker presence and activity; dust; and emissions.


Unloading a wind turbine blade. (Milford Wind Corridor project, near Milford, Utah. Credit: BLM.)


Partially erected turbine, with nacelle and hub visible at right center. (Near Peetz, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)

Construction visual contrasts would vary in frequency and duration throughout the course of construction; there may be periods of intense activity followed by periods with less activity, and associated visual impacts would to some degree vary in accordance with construction activity levels. Construction schedules are project dependent. While many projects might be completed within 1 year, larger projects may take longer and could involve phased development, with construction-related visual impacts therefore lasting longer.

**Operations Phase**

Visual impacts associated with wind facility operations include the presence of wind turbines, control buildings, and other ancillary structures; movement of the rotor blades; shadow flicker and blade glinting; turbine marker lights and other lighting on control buildings and other ancillary structures; roads; vehicles; and workers conducting maintenance activities.

***Wind Turbines***

The major visible components of a wind turbine include the following:

**Tower:** Wind turbine towers typically consist of large, tubular steel pieces that support the nacelle and rotor hub. Heights vary, but as an example, a modern 3.0-MW tower may be nearly 400 ft tall, with a trend toward increasing height.

**Nacelle:** An enclosure atop the tower that houses the controller, gearbox, generator, and shafts. It typically is equipped with an anemometer and wind vane, which may be visible at short distances.

**Rotor:** The rotor consists of the blades and the hub.

- Hub: The junction of the blades and the rotor shaft, covered with a protective nose cone.

**38**

- Blades: The moving parts of the wind turbine that capture wind energy, typically three in number. Lengths vary, but typically range from 110 to 180 ft, with a trend toward increasing length.

The primary visual impacts associated with wind energy developments would result from the introduction of the numerous vertical lines of wind turbines into the generally strongly horizontal landscapes common to many BLM lands, or the placement of turbines on mesas or ridgelines where they would be "skylined". The visible structures would potentially produce visual contrasts by virtue of their design attributes (form, color, and line) and the reflectivity of their surfaces. In addition, aviation warning lighting could cause large visual contrasts at night.



**Vertical line contrast from wind turbines in a strongly horizontal landscape. (Seven Mile Hill Wind Farms, Carbon County, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)**

For nearby viewers, the very large sizes and strong geometric lines of both the individual turbines and the array of turbines could dominate views, and the large sweep of the moving blades might command visual attention. Structural details could become apparent, and the control buildings and other structures could be visible as well, as could strong specular reflections from the towers and moving



**Wind facility at night, with synchronized flashing hazard navigation lighting visible on several turbines. (Cedar Creek Wind Farm, near Grover, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)**

 **Renewable Energy Visual BMPs**

rotor blades (blade glint). For viewers close enough to fall within the cast shadows of the turbines, shadow flicker might be observed.

***Ancillary Structures***

In addition to visual impacts associated with wind turbines, aboveground ancillary structures (including permanent meteorological towers, control buildings, electrical power conditioning facilities, and substations) would potentially produce visual

contrasts by virtue of their design attributes (form, color, line, and texture) and the reflectivity of their surfaces.

***Roads***

Permanent roads could also contribute to visual impacts during wind facility operations. While some construction access roads would not be needed during operations and would be reclaimed after construction, certain roads would remain, such as



Wind energy facility substation, with meterological tower in background. (Dunlap Ranch Wind Energy Project near Medicine Bow, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)



Wind energy facility control building, fences, and parking area. (Dunlap Ranch Wind Energy Project near Medicine Bow, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)

**40**

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 127 of 155



onsite roads used for inspection and maintenance and the permanent facility access road. In addition to vegetative clearing, roads may introduce long-term visual contrasts to the landscape, including ground disturbances (e.g., grading and erosion control measures) and contrasts from rock faces exposed by blasting. Temporary visual contrasts could be created by snowplowing of roads in areas with significant snowfall in winter.

### Workers, Vehicles, and Equipment

Maintenance activities could potentially cause visual impacts. Vehicles (potentially with associated dust plumes) and technicians would be present at or near wind turbines and other facilities, where they would either work directly on the turbine or associated facilities or remove components for repair and subsequent reinstallation. Towers, nacelles, and rotors may need to be upgraded or replaced. Infrequent outages, disassembly, and repair of equipment may occur. These may produce the appearance of idle or missing rotors, "headless" towers (when nacelles are removed), and lowered towers.



**Wind turbine maintenance. (Dunlap Ranch Wind Energy Project near Medicine Bow, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)**

**Magnitude and duration of impacts:** The magnitude of the visual contrasts associated with a given wind energy facility during operations would depend on site- and project-specific factors, including the following:

- Distance of the proposed wind energy facility from viewers;
- Weather and lighting conditions;
- Size of the facility (i.e., number of turbines) and turbine spacing;
- Size (including height and rotor span) of the wind turbines;
- Surface treatment of wind turbines, the control building, and other structures (primarily color);
- The use of identifying graphics on nacelles;
- The presence and arrangement of lights on the turbines and other structures; and
- The presence of workers and vehicles for maintenance activities.

These impacts would occur during the entire operational life of the facility.

### Decommissioning and Reclamation Phase

Decommissioning of a wind energy project would involve the dismantling and removal of infrastructure associated with each wind turbine, the removal of aboveground and some buried ancillary structures, road redevelopment, temporary fencing, and restoration of the decommissioned site to pre-project conditions. In terms of expected visual impacts, decommissioning activities would be similar to construction activities. However, activities would

BLM_0020992


**Renewable Energy Visual BMPs**

generally proceed in reverse order from construction and would proceed more quickly than during construction; thus, the associated impacts would last for a shorter time.

Restoration activities would include recontouring, grading, scarifying, seeding and planting, and stabilizing disturbed surfaces. Newly disturbed soils would create a visual contrast that could persist for several seasons before revegetation would begin to disguise past activity. Restoration of vegetation to pre-project conditions may take much longer. Invasive species may colonize recently reclaimed areas. These species may be introduced naturally or in seeds, plants, or soils introduced for intermediate restoration, or by vehicles. Non-native plants that are not locally adapted would likely produce contrasts of color, form, texture, and line.

Similarly to construction, the various decommissioning activities described above require work crews, vehicles, and equipment that would add to visual impacts during decommissioning.

## References

FAA (Federal Aviation Administration), 2007, *Obstruction Marking and Lighting*, Advisory Circular AC 70/7460-1K, Feb. Available at http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgAdvisoryCircular.nsf/0/b993dcdfc37fcdc486257251005c4e21/$FILE. Accessed Sept. 24, 2012.

BLM_0020993



| Wind Energy Facility BMPs and Applicable Project Phases | Siting and Design | Construction | Operations | Decommissioning and Reclamation |
|---|:---:|:---:|:---:|:---:|
| **3.1 Consider Topography When Siting Wind Turbines** (p 44) | ● | | | |
| **3.2 Cluster or Group Turbines to Break up Overly Long Lines of Turbines** (p 46) | ● | | | |
| **3.3 Create Visual Order and Unity among Turbine Clusters** (p 48) | ● | | | |
| **3.4 Site Wind Turbines to Minimize Shadow Flicker** (p 49) | ● | | | |
| **3.5 Relocate Turbines to Avoid Visual Impacts** (p 50) | ● | | | |
| **3.6 Use Audio Visual Warning System (AVWS) Technology to Reduce Night Sky Impacts** (p 52) | ● | | | |
| **3.7 Create Visual Uniformity in Shape, Color, and Size** (p 54) | ● | | | |
| **3.8 Use Fewer, Larger Turbines** (p 55) | ● | | | |
| **3.9 Use Non-reflective Coatings on Wind Turbines and Other Facility Components** (p 56) | ● | | | |
| **3.10 Prohibit Commercial Messages and Symbols on Wind Turbines** (p 57) | ● | | | |
| **3.11 Keep Wind Turbines in Good Repair** (p 58) | | | ● | |
| **3.12 Clean Nacelles and Towers** (p 59) | | | ● | |

43

BLM_0020994

**Renewable Energy Visual BMPs**

# 3.1 Consider Topography When Siting Wind Turbines

**Project Phase: Siting and Design**

During the facility design process, wind turbine siting should be sensitive to, and respond to, the surrounding landscape in a visually pleasing way. Avoid major modifications to natural landforms, roads, water bodies, structures, or other characteristic parts of the landscape.



Non-linear turbine configurations are better suited to rolling terrain. (Spanish Fork Wind Farm, Utah. Credit: NREL.)



Linear turbine configuration in flat agricultural landscape. (Big Horn Wind Farm near Bickleton, Washington. Credit: NREL.)



## Notes

For example, in rolling landscapes, a less rectilinear and rigid configuration of wind turbines that follows local topography may be appropriate. In flatter, agricultural landscapes with rectilinear patterns of roads and fields, a more geometric or linear wind turbine configuration may be preferred. Where possible, the nacelles should be kept at a constant height relative to the ground. Consideration should be given to the appearance of the project at night, when the aircraft warning lights will create a strong horizontal line above the ground. Computer modeling can be an effective tool to study the relationship between the turbines and topography.



## Limitations

Wind farm efficiency (and therefore profitability) depends, in part, on precise turbine siting, based on local topography, the local wind regime, and other technical factors. Micro-siting may reflect concerns for small-scale components of the landscape, both cultural and environmental. Therefore, developers may be

BLM_0020995



reluctant to site turbines in response to potential visual impacts, except where visual values are considered a critical concern.

BLM_0020996



**Renewable Energy Visual BMPs**

# 3.2 Cluster or Group Turbines to Break up Overly Long Lines of Turbines

**Project Phase: Siting and Design**

During the facility design process, to the extent possible given the terrain of a site, create well-organized clusters or groupings of wind turbines when placed in large numbers; to avoid cluttering, separate overly long lines of turbines, or large arrays, and insert breaks or open zones to create distinct visual units or groups of turbines.



Organized clusters of wind turbines separated by open zones create distinct visual units. The breaks reduce visual clutter and the potentially overwhelming visual presence of turbines. (Seven Mile Hill Wind Farms, Carbon County, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)

BLM_0020997





### Notes

When siting large numbers of turbines, developers may be able to relieve visual clutter or a potentially overwhelming visual presence of turbines by clustering turbines to create visual breaks.



### Limitations

Because engineering and other technical considerations are the primary drivers for decisions about wind turbine locations, clustering may be impractical in some cases; in other cases, local topography may make clustering ineffective for reducing visual impacts. In some situations, turbine clustering could increase the lengths of the conductors needed to bring current to a central power control facility, which would involve increased cost.

BLM_0020998

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 134 of 155

# 3.3 Create Visual Order and Unity among Turbine Clusters

**Project Phase: Siting and Design**

The operator should create visual order and unity among clusters of turbines (visual units) to avoid visual disruptions and perceived disorder, disarray, or clutter.



This array of turbines lacks visual order and unity, and appears cluttered. (Wind farm near Peetz, Colorado.  Credit: Robert Sullivan, Argonne National Laboratory.)

 **Notes**

Large numbers of turbines in a visually disordered and apparently random array may appear to be visually cluttered and have an overwhelming visual presence.

 **Limitations**

Wind farm efficiency (and therefore profitability) depends, in part, on precise siting of individual turbines and turbine strings, based on local topography, the local wind regime, and other technical factors. As a result, siting flexibility may be constrained, and developers may thus be reluctant to site turbines in response to potential visual impacts, except where visual values are considered a critical concern. In addition, perceived order in the turbine array is partially dependent on viewer location and viewing angle with respect to the turbine array. Furthermore, where multiple, visually overlapping wind facilities are visible from one observation point, some level of perceived disorder or clutter is almost inevitable.

BLM_0020999

# 3.4 Site Wind Turbines to Minimize Shadow Flicker

**Project Phase: Siting and Design**

Wind turbines should be sited properly to eliminate shadow flicker effects on nearby residences or other highly sensitive viewing locations as calculated using appropriate siting software and procedures. If shadow flicker is anticipated, the ROW lease should stipulate that the turbines will not operate over the relatively short time periods where shadow flicker presents an important concern. Accurately determined shadow flicker analyses should be made available to stakeholders in advance of project approval. If wind turbine locations are changed during the siting process, shadow flicker effects should be recalculated and made available to potentially affected stakeholders.



Wind turbine shadow. Tower shadow is the wide vertical shadow at center, blade shadows are visible at left, with the nacelle shadow appearing as a horizontal shadow connecting the tower and blade shadows. Shadow flicker is caused by the moving blade shadows passing across a viewed object. (Seven Mile Hill Wind Farms, Carbon County, Wyoming. Credit: Robert Sullivan, Argonne National Laboratory.)


## Notes

Because of the relatively short distance and short timeframes in which shadow flicker effects are observed, they are generally not a major concern for wind facilities sited on BLM lands; most wind farms on BLM-administered lands would generally not be close enough to sensitive resource areas to cause significant shadow flicker effects.

BLM_0021000

**Renewable Energy Visual BMPs**

# 3.5 Relocate Turbines to Avoid Visual Impacts

**Project Phase: Siting and Design**

During the facility design process, move turbines to locations of less impact, for example, to take advantage of screening effects of topography or vegetation. Where possible, relocate turbines to areas that have already been impacted by other development.



**Hypothetical turbine relocation map. Turbines near a national historic trail and a wild and scenic river overlook would be relocated. (Credit: BLM.)**

 **Notes**

Developers may be able to relocate turbines that pose particular impact concerns for stakeholders.



 ## Limitations

Wind farm efficiency (and therefore profitability) depends, in part, on precise siting of the turbines. Therefore, developers may be reluctant to relocate turbines in response to potential visual impacts, except where visual values are considered a critical concern. Furthermore, landscapes suitable for wind energy development on BLM-administered lands typically lack sufficient topographic relief or vegetation tall enough to screen wind turbines effectively.

BLM_0021002

Case No. 1:20-cv-02484-MSK   Document 33-1   filed 04/27/21   USDC Colorado   pg 138 of 155

# 3.6 Use Audio Visual Warning System (AVWS) Technology to Reduce Night Sky Impacts

**Project Phase: Siting and Design**

In order to minimize night-sky impacts from hazard navigation lighting associated with wind facilities, AVWS technology should be employed, when the FAA has approved its use. The use of red or white strobe lighting should be prohibited without BLM approval (which may be given because of conflicting mitigation requirements). Until the FAA approves the use of AVWS, aerial hazard navigation lighting should be limited to the minimum required to meet FAA safety requirements.



FAA-required hazard navigation lighting presents a major unavoidable source of night-sky impacts from utility-scale wind facilities. (Cedar Creek I Wind Farm, near Grover, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)



## Notes

Dark night skies are a highly valued amenity in many parts of the American west. AVWS is a radar-based obstacle avoidance system that activates obstruction lighting and audio signals only when an aircraft is in close proximity to an obstruction on which an AVWS unit is mounted, such as a wind turbine. The obstruction lights and audio warnings are inactive when aircraft are not in proximity to the obstruction. Currently, the FAA may approve use of AVWS on a case-by-case basis. If approved by the FAA for general use, AVWS technology would greatly reduce the night-sky impacts of lighting from tall structures and

BLM_0021003



would also reduce avian mortality. Visual resource impact analysts and developers are encouraged to remain current on the status of FAA approval.



## Limitations

As of the publication date, the use of AVWS technology for any structures other than communication towers is under FAA evaluation. In the interim, projects proposing the use of AVWS technology are reviewed on a case-by-case basis until the FAA makes a final determination on suitability. FAA approval of the technology for utility-scale wind projects is anticipated in the near future; however, its use might not be appropriate for all locations (e.g., near airports).

BLM_0021004

# 3.7 Create Visual Uniformity in Shape, Color, and Size

**Project Phase: Siting and Design**

If multiple turbine types are to be used in a single facility, developers should be encouraged to create visual uniformity in the shape and size of blades, nacelles, and towers. Where multiple types are used in a project, similar turbine designs should be grouped together and separated from dissimilar models to lessen the perceived contrasts in height or appearance.



Multiple wind turbine models in close proximity add to the visual clutter in this view. (Tehachapi Pass Wind Farm, Kern County, California. Credit: David Hicks, NREL.)



## Notes

Multi-phase wind energy developments may occasionally utilize more than one turbine type. Developers should be encouraged to use turbine designs that are as similar as possible in their visual characteristics, because a uniform appearance is generally more pleasing.



## Limitations

Developers would normally be expected to use a single turbine type for a given project; however, because engineering and other technical, cost, and supply considerations drive decisions about wind turbine selection, developers may not always be able to use similar turbines.

BLM_0021005

# 3.8 Use Fewer, Larger Turbines

**Project Phase: Siting and Design**

Downsize the facility by eliminating certain turbines to reduce visual impacts. Use fewer, larger turbines to achieve desired power output in preference to using a greater number of smaller turbines.



## Notes

In some instances, a few larger turbines may result in a better visual outcome than a greater number of smaller turbines. Developers may be able to eliminate turbines that pose particular impact concerns for stakeholders (e.g., turbines prominently visible from a historic trail or residential area).



## Limitations

Because engineering and other technical, cost, and supply considerations drive decisions about wind turbine selection, it may be impractical for developers to use fewer turbines in some cases, based solely on potential visual impacts. Increasing turbine height may increase shadow flicker effects (see BMP 3.4) and could accentuate scale differences between the turbines and elements in the surrounding landscape.



In some instances, a few larger turbines may result in a better visual outcome than a greater number of smaller turbines. (Credit: Lindsey Utter, Argonne National Laboratory.)

BLM_0021006

 **Renewable Energy Visual BMPs**

# 3.9 Use Non-reflective Coatings on Wind Turbines and Other Facility Components

**Project Phase: Siting and Design**

Where feasible, non-reflective paints and coatings should be used on wind turbines, visible ancillary structures, and other equipment to reduce reflection and glare. Turbines, visible ancillary structures, and other equipment should be painted before or immediately after installation. Uncoated galvanized metallic surfaces should be avoided because they may create a stronger visual contrast.



Blade glinting near hub of turbine at left. These bright flashes from sunlight falling on the reflective surface of the blade have been observed at distances exceeding 15 mi, and can increase turbine visibility considerably. (Cedar Creek 1 Wind Farm, near Grover, Colorado. Credit: Robert Sullivan, Argonne National Laboratory.)

 ## Notes

BLM-sponsored research has shown that wind turbines may be visible for very long distances, and reflections from untreated surfaces can increase visibility and cause blade glinting (brief flashes of reflected light) as the observer moves, or as wind turbine blades move. Using non-reflective paints and coatings reduces glinting and decreases the visual impact of the turbines in the landscape. Certain wind facility ancillary components may be treated with non-reflective coatings or colors selected to blend in with their immediate surroundings, for example, security fencing, substation components, and operations and maintenance buildings.

## ⚠ Limitations

Non-reflective paints and coatings may not be available for some pre-manufactured facility components. Wind turbines are not painted after erection, and the use of radar-absorbing materials on turbines (where applied) may preclude the use of non-reflective coatings. It may be difficult for the wind farm developer to control the appearance of equipment on substations owned by third parties.

BLM_0021007

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 143 of 155

# 3.10 Prohibit Commercial Messages and Symbols on Wind Turbines

Project Phase: **Siting and Design**

Commercial messages and symbols (such as logos or trademarks) on wind turbines should be prohibited.



Commercial logo on a wind turbine adds to visual contrast. (Happy Jack Wind Farm, Cheyenne, Wyoming. Credit: NREL.)



## Notes

Commercial messages and symbols such as logos add to the color contrast of wind turbines, particularly at shorter viewing distances.

BLM_0021008

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 144 of 155


# 3.11 Keep Wind Turbines in Good Repair

**Project Phase: Operations**

Wind turbines should be well maintained for the duration of the operating permit. Nacelle covers and rotor nose cones should always be in place and undamaged. Inoperative turbines should be repaired, replaced, or removed as quickly as feasible. A clear deliniation of maintenance responsibilities and schedules should be part of the project approval process.



**Collapsed wind turbine. (Arlington Wind Farm, Wyoming. Credit: BLM.)**

 ## Notes

Inoperative or incomplete turbines could cause viewers to perceive that "wind power does not work" or that it is unreliable. Inoperative turbines disrupt the "visual rhythm" of turning blades within a group of wind turbines. A turbine that is broken or disabled creates a health and safety hazard as well as being disruptive to the visual experience of the casual observer.

## ⚠ Limitations

Inclement weather and other practical considerations, such as poor road conditions or a lack of availability of turbine components or heavy equipment, may prevent immediate repair of inoperable wind turbines.

BLM_0021009

Case No. 1:20-cv-02484-MSK   Document 32-1   filed 04/27/21   USDC Colorado   pg 145 of 155



# 3.12 Clean Nacelles and Towers

**Project Phase: Operations**

Nacelles and towers should be cleaned to remove any spilled or leaking fluids and the dirt and dust that would accumulate on them.

 **Notes**

Cleaning nacelles and towers improves their appearance and reduces the potential for negative public perception of the wind energy facility and the operating company.



**Cleaning leaking fluid from a wind turbine. (Credit: TGM Wind Services)**

BLM_0021010

BLM_0021011



# 4 Solar

## Introduction

The following sections provide a discussion of the general stages of utility-scale solar facility development, a summary of visual contrast sources and effects by project phase, and summaries of technology-specific visual impacts.

### Facility Life Cycle

In general, the development of a solar facility consists of six stages, including planning/preliminary siting, site evaluation, design/engineering, construction, operation, and decommissioning. The following discussion includes only the phases that involve onsite activities that would lead to significant visual

contrasts: site evaluation, construction, operations, and decommissioning and reclamation.

### Site Evaluation Phase

During the site evaluation phase, a geotechnical survey would evaluate general surface conditions, subsurface conditions, seismicity, and other geological information required to develop recommendations for the design and construction of project components (e.g., type of foundations required to support the solar collectors). The geotechnical survey would require soil borings.

Onsite monitoring/sampling wells and associated impoundments for well drilling fluids and cuttings

**61**

 **Renewable Energy Visual BMPs**

may be required if groundwater resources would be used to meet water requirements.

Before a solar development can be planned and built, the solar regime at a potential site must be precisely characterized. Solar monitoring equipment, including solar sensors and a meteorological tower, would be installed to collect data on direct normal insolation and weather conditions.

**Construction Phase**

The entire solar project area could be affected by site preparation activities such as clearing and grading; construction of access and onsite roads; preparation and use of material and equipment laydown areas; placement of solar collectors; construction of the electrical substation, central control facility, and ancillary facilities; and installation of power and signal cables (typically buried or vaulted).

Concrete ingredients (sand, aggregate) may need to be extracted and hauled to the site.

A refueling station (with diesel and gas storage tanks) would be used during construction.

Construction of a transmission line, and possibly a substation, would be required.

Construction of a gas pipeline might be required for parabolic trough, compact linear Fresnel reflector (CLFR), and power tower solar developments. Water pipelines may also need to be constructed unless onsite wells were drilled to obtain the water needed for plant operations and maintenance.



**Ivanpah Solar Energy Generating System power tower under construction. The grayish area at center is a heliostat field for the central tower, one of three towers in the facility. The structure just to the right of the tower base will house the steam turbine generator. (Credit: Robert Sullivan, Argonne National Laboratory.)**

**62**



## Operations Phase

Minimal land-disturbing activities and associated impacts would occur during the operations phase. Routine activities would include operation of the solar facility to produce power, and regular monitoring and maintenance activities to ensure safe and consistent operation.

Mirror washing would be required routinely at some facilities. In most cases, mirror washing would occur during evening hours.

Both on- and offsite maintenance of access roads may be required after rainfall events (e.g., blading and sediment removal from culverts).

Vegetation maintenance would be required within the solar collector field and within the transmission line, gas pipeline, and water pipeline ROWs.

## Decommissioning and Reclamation Phase

Decommissioning of a solar energy project could range from mothballing to full removal of equipment and facilities. If the latter were chosen, underground components would be removed to a depth of at least 2 ft to ensure an unobstructed root zone for revegetation. More deeply buried components might be abandoned in place.

## Visual Contrast Sources and Effects Summary by Project Phase

### Site Evaluation Phase

Potential visual impacts that could result from site evaluation activities include contrasts in form, line, color, and texture resulting from vegetation clearing,

if required for site evaluation activities such as meteorological tower construction; the presence of trucks and other vehicles and equipment, with associated occasional, short-duration road traffic and parking, and associated dust; and the presence of workers. If road upgrading or new road construction were required for site characterization activities, visual contrasts might be introduced. Site evaluation visual impacts would generally be temporary; however, impacts due to road construction, erosion, or other landform altering or vegetation clearing in arid environments might be visible for extended periods.

### Construction Phase

Potential visual impacts that could result from construction activities include contrasts in form, line, color, and texture resulting from vegetation clearing for the solar field and other areas such as building pads (with associated debris); road building/upgrading; construction and use of staging and laydown areas; solar energy collector and support facility construction; vehicle, equipment, and worker presence and activity; and associated vegetation and ground disturbances, dust, and emissions. If construction-related activities took place at night, there would be night-sky impacts, and some lighting impacts would be expected in any event. Construction visual impacts would vary in frequency and duration throughout the course of construction, which for a utility-scale project may last several years.

**63**

BLM_0021014



Antelope Valley Solar Ranch thin-film PV facility under construction. Fixed (non-tracking) mounts for the PV panels have been installed, and await the panels. Note complete clearing of vegetation and leveling of ground underneath the collectors. (Credit: Robert Sullivan, Argonne National Laboratory.)

## Operations Phase

Visual impacts associated with solar facility operations include the presence of the cleared solar field, the presence of the solar collector array and supporting infrastructure, control buildings, and other ancillary buildings and structures; glare, glinting, and other reflections from the solar array and ancillary facilities; lighting on ancillary buildings and structures; roads; vehicles; and workers conducting maintenance activities, which if conducted at night would require lighting.

The operation and maintenance of solar energy projects and associated electricity transmission lines, roads, and ROWs would potentially have substantial long-term visual effects. Some impacts are common to all utility-scale solar energy projects, regardless of solar technology employed; however, the solar energy collectors and associated structures differ in terms of visual impacts. Power tower projects generally have larger visual impacts than the other technologies because of the relatively tall and brightly illuminated receiver towers. Photovoltaic (PV) projects generally have lower visual impacts than the other technologies because of the low profile of the collector arrays and the lower reflectivity of the PV panels compared to the highly reflective mirrors used by the other technologies. However, all utility-scale solar facilities could create strong visual contrasts for nearby viewers. The following discussion includes impacts



Operating solar facilities near Boulder City, Nevada: Nevada Solar One parabolic trough facility at center and right; Copper Mountain thin-film PV facility at left. The large building adjacent to the Copper Mountain facility at left is a natural gas power plant. A large substation is visible behind the facilities. (Credit: Robert Sullivan, Argonne National Laboratory.)

common to the various solar energy technologies, while impacts that are significantly different between the technologies are discussed separately below.

Site operation impacts would generally occur throughout the life of the facility, with some impacts (e.g., impacts resulting from land forming and vegetation clearing) potentially continuing many years beyond the lifetime of the project.

### Solar Field Clearing

Visual impacts associated with solar field clearing include the potential loss of vegetative screening, which would result in the opening of views; the exposure of potentially highly contrasting soils; potentially significant changes in form, line, color, and texture for viewers close to the solar field; and potentially significant changes in line and color for viewers with distant views of the solar field. Vegetation removal could result in windblown dust

that could create visual contrasts and visible movement of dust clouds, obscure views of nearby landscape features, and degrade general visibility of both day and night skies. It should be noted that complete clearing of vegetation is not required for all solar technologies or projects.

Other cleared areas would include maintenance roads and facility access roads (e.g., electric substations or pump stations). Some support facilities would be surrounded by cleared areas.

### Solar Collectors and Support Facilities

Solar energy collectors and some support facilities vary by solar energy technology, and specific descriptions and potential impacts for each technology are discussed below. Operational activities associated with the collectors and support facilities include routine maintenance, such as washing of

**65**



**Renewable Energy Visual BMPs**

solar collector surfaces, road and building maintenance, and repairs.

Buildings common to solar energy projects may include a control/administrative building, a warehouse/shop building, a security building or gatehouse, and a fire-water pump building. These structures would normally be constructed of sheet metal, concrete, or cinderblocks and would be expected to range from approximately 20 to 40 ft in height.

Utility-scale solar energy facilities may also include various tanks for water and other chemicals (e.g., gasoline or diesel fuel, potable water). Solar energy projects would normally be fenced around the outside perimeter and might include additional fencing around certain support facilities.

These built structures would introduce complex, rectilinear geometric forms and lines and artificial-looking textures and colors into the landscape, and would likely contrast markedly with natural-appearing landscapes. Most buildings and some tanks would be of sufficient height to protrude above the collector arrays as viewed from outside the facility and would likely contrast with the collector arrays in terms of form, line, and color.

In addition to the collector/reflector arrays, solar facilities would normally include other components that may have reflective surfaces, such as array support structures, steam turbine generator components (for parabolic trough, CLFR, and power tower facilities), piping, fencing, and transmission towers and lines. Under certain viewing conditions,



Ancillary structures at a parabolic trough facility, including substation, administration building, equipment shed, and HTF tank. Steam turbine generator and cooling tower visible behind substation. Solar collector array visible at far right. (Nevada Solar One near Boulder City, Nevada. Credit: Robert Sullivan, Argonne National Laboratory.)

**66**

BLM_0021017





Ancillary structures at a parabolic trough facility, including cooling tower, steam turbine generator, and equipment shed. Note prominent plume. (Nevada Solar One near Boulder City, Nevada. Credit: Robert Sullivan, Argonne National Laboratory.)

these reflective surfaces can give rise to specular reflections (glint and glare) that may be visible to moving observers as spots of intensely bright light on the reflective surface or as flashes of bright light.

### Roads

Permanent roads could also contribute to visual impacts during solar facility operations. While some construction access roads would not be needed during operations and would be reclaimed after construction, certain roads would remain, such as onsite roads used for inspection and maintenance and the permanent facility access road. In addition to vegetative clearing, roads may introduce long-term visual contrasts to the landscape, including ground disturbances (e.g., grading and erosion control measures).

### Lighting

Solar energy facilities would include exterior lighting around buildings, parking areas, and other work areas. Security and other lighting around and on support structures (e.g., the control building) could contribute to light pollution. Maintenance activities conducted at night, such as mirror or panel washing, might require vehicle-mounted lights, which could also contribute to light pollution. Light pollution impacts associated with utility-scale solar facilities include skyglow, light trespass, and glare.



Power block of operating solar parabolic trough facility. (Nevada Solar One near Boulder City, Nevada. Credit: Marc Sanchez, BLM.)

**67**

 **Renewable Energy Visual BMPs**

*Workers, Vehicles, and Equipment*

Maintenance activities could potentially cause visual impacts. Vehicles (potentially with associated dust plumes) and technicians would be present at or near the solar collector array and other facilities. Mirrors, panels, heliostats, and other components may need to be repaired, upgraded, or replaced, and if mirrors, panels, or heliostats are missing from the array during these activities, they may create noticeable gaps in the array for nearby viewers.

## Decommissioning and Reclamation Phase

During decommissioning/reclamation, the immediate visual impacts would be similar to those encountered during construction, but likely of shorter duration. These impacts likely would include road redevelopment, removal of aboveground structures and equipment, the presence of workers and equipment with associated dust and possibly other emissions and litter, and the presence of idle or dismantled equipment, if allowed to remain onsite. Deconstruction activities would involve heavy equipment, support facilities, and possibly lighting. The associated visual impacts would be substantially the same as those in the construction phase, but of shorter duration. Decommissioning likely would be an intermittent or phased activity persisting over extended periods of time and would include the presence of workers, vehicles, and temporary fencing at the worksite.

Restoring a decommissioned site to pre-project conditions would also entail recontouring, grading, scarifying, seeding, and planting, and perhaps stabilizing disturbed surfaces. This might not be possible in all cases; that is, the contours of restored areas might not always be identical to pre-project conditions. In the arid conditions generally found in the BLM-administered lands where utility-scale solar energy development is likely to occur, newly disturbed soils might create visual contrasts that could persist for many seasons before revegetation would begin to disguise past activity.

## Technology-Specific Visible Components and Visual Contrasts

Two main types of solar facilities are used for utility-scale solar power production: concentrating solar power (CSP) and PV systems. CSP technologies are those that concentrate the sun's energy to produce heat; the heat then drives either a steam turbine or an external heat engine to produce electricity. Parabolic trough, power tower, and dish engine technologies are three types of CSP technologies discussed in the BMP publication.

In PV systems, the energy of photons in sunlight is converted directly to electricity. The main component of this type of system is the solar panel, which is comprised of a group of individual solar cells. The most common PV technologies used in utility-scale solar facilities are crystalline silicon and thin film.

The following discussion provides a description of the visible components of CSP and PV facilities, based primarily on the characteristics of existing facilities or facilities under construction within the United States.

**68**

BLM_0021019



**CSP Systems**

CSP systems generally include three types of systems, including **linear concentrators** (e.g., parabolic troughs and CLFR systems), **power towers**, and **dish engines**. These systems use mirrors to convert the sun's energy to heat and then to apply that heat in various ways to produce electricity.

**Parabolic trough** facilities are the most common type of linear concentrator system and are among the most developed technologies for commercial applications of CSP systems. These facilities require very flat terrain and the solar field for these facilities is typically completely cleared and leveled.

The visible components of parabolic trough facilities include the following features:

- Solar field;
- Power block;
- Cooling system (e.g., cooling water and steam water support systems, including wells, pipelines, filtration, chemical treatment equipment, blowdown and evaporation ponds, zero-discharge facilities, and pumping stations);
- Electrical switchyard and power conditioning facility;
- Thermal storage facilities (if needed); and
- Support buildings (e.g., control building, warehouse, and maintenance facilities).

A parabolic trough solar field typically consists of rows of north-south oriented solar collectors that focus the sun's energy on a central absorber tube containing a heat transfer fluid (HTF). The collectors consist of large curved reflectors; a receiver (in

essence a steel tube encased by a glass tube) a few feet above the reflector and oriented parallel to the long axis of the reflector; supporting structures for both the reflector and the receiver; and additional pipes to transport HTF to and from the solar collectors. The height of the trough assembly (including ground clearance) would generally be between 18 and 25 ft. A single-axis tracking system allows the reflectors to tilt from east to west to track the sun's apparent movement across the sky, which result in changes in orientation of the reflectors over the course of a day; the reflectors face east in the morning, upward in the middle of the day, and west in the afternoon.



Pabolic trough assembly at a parabolic trough facility, including large curved reflectors, the HTF tube at the focal point of the reflectors, and the support structure behind and below the reflectors. (Nevada Solar One near Boulder City, Nevada. Credit: Robert Sullivan, Argonne National Laboratory.)

The HTF is heated and then flows to the power block, where its heat is transferred to steam via a heat exchanger; the steam is used to produce electricity via a steam turbine generator (STG). The power block also contains a substation, where electrical equipment is used to condition the power by adjusting its voltage and phase to match existing conditions on the transmission line segment of the power grid to which

**69**