ACEC Importance and Relevance Evaluations

## ACEC Map 7 - Roubideau Corridors ACEC (Proposed)
### 8,720 acres



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0021990

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 8. ROUBIDEAU-POTTER-MONITOR ACEC (Proposed)

**Status:** Proposed

**Proponent:** Jim Riddell

**General Location:** Approximately ten miles southwest of Delta, CO, and eleven miles west of Olathe, CO. Area includes Roubideau and Potter creeks, as well as lands between and adjacent to the creeks.

**Acreage:** 20,470

**Significance:** The canyons and streams have very high biodiversity significance, supporting good and excellent examples of narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests with blue spruce, Douglas fir, narrowleaf cottonwood and red-osier dogwood. The canyons also have foothill riparian shrublands characterized by river birch and coyote willow. BLM Sensitive species including Grand Junction milkvetch *(Astragalus linifolius)*, peregrine falcon *(Falco peregrinus)*, desert bighorn sheep *(Ovis canadensis)*, and northern leopard frog *(Rana pipiens)* are found there. A recent fish survey conducted by the BLM indicates that Potter Creek supports, and Monitor Creek is likely to support, viable populations of BLM sensitive species bluehead sucker *(Catostomus discobolus)* and flannelmouth sucker *(Catostomus latipinnis)*. The canyons form important movement corridors from the desert and Gunnison River up to the forest on the Uncompahgre Plateau. The uplands afford protection to the integrity of the canyons below, as well as offer spectacular views down into the canyons and to mountains and mesas in the distance. There are many archaeological and historical sites in the area, including wickiups, petroglyphs, and historic structures.

**Description:** The Roubideau-Potter-Monitor ACEC would be a new ACEC encompassing all of the Camel Back WSA. The new ACEC contains the Roubideau Creek Potential Conservation Area recommended by the Colorado Natural Heritage Program. The canyons and streams including and surrounding Roubideau Creek are considered to have very high biodiversity significance by the CNHP. The canyons contain three perennial streams providing an available water source for the bighorn sheep and other wildlife, and also form important movement corridors from the desert and Gunnison River up to the forest on the Uncompahgre Plateau. These corridors are important for wildlife, and were important for early settlers as well. Several historic structures are found along Roubideau Creek. With a depth of 750 to 1,000 feet from the rim to the creeks, the area is geographically configured to offer a sense of isolation for wildlife and human visitors.

While some of this area already enjoys special protection through the Wilderness Study Area designation, the three canyons (Roubideau, Potter, and Monitor) offer equally valuable biological resources and wildness, and together form a single canyon system of three branches. The road along Potter Creek initially constrained the boundary of the Camel Back WSA; the road was closed to motorized and mechanized travel at the request of

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

34

BLM_0021991

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

DOW soon after the formation of the WSA to protect migration corridors for bighorn sheep in Potter and Monitor Canyons. The road has remained closed for two decades.

Archeological and historical sites abound in this area, including a rare collection of thirteen Ute wikiups, as well as petroglyphs perhaps 6,000 years old and an historic inscription in Roubideau Canyon that may date back to the time of the American Revolution, as well as sheep herder cabins and structures more than 100 years old.

**Values Assessed**
- Botanical: *Riparian Vegetation and BLM Sensitive Species*
- Fish and Wildlife: *Aquatic and BLM Sensitive Species*
- Historical: *Early Settlement*

**Relevance Criteria Considered:** 1, 2, and 3

**Importance Criteria Considered:** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | The area has historic cabins. There is also historic human and livestock passage from the desert to the high country. Scenic values: VRI Class 2. |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Area provides wildlife movement corridors and habitat for BLM Sensitive desert bighorn sheep, northern leopard frogs, and peregrine falcons. Golden eagle nests also occur in the area. The area also supports viable populations of BLM sensitive species bluehead sucker (*Catostomus discobolus*) and flannelmouth sucker (*Catostomus latipinnis*). |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Intact riparian systems and high quality riparian vegetation occur along the creeks. The hydrologic systems are largely intact. The area is predominantly roadless and the habitat is not substantially fragmented. The area is adjacent to a Forest Service congressionally designated "area" managed as wilderness. |

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0021992

**ACEC IMPORTANCE AND RELEVANCE EVALUATIONS**

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Area riparian vegetation has a CNHP rating of B2 for very high biodiversity (statewide and global significance). |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Area vegetation provides good and excellent examples of native riparian communities with overall global significance. The creeks support viable populations of BLM sensitive species bluehead sucker (*Catostomus discobolus*) and flannelmouth sucker (*Catostomus latipinnis*). The area contains cultural and historic sites that are vulnerable to adverse change. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Camel Back WSA is within the proposed ACEC. The ACEC contains globally significant riparian areas, as well as eligible historic/cultural sites. |

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

36

BLM_0021993

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 8 - Roubideau-Potter-Monitor ACEC (Proposed)**
**20,470 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0021994

ACEC I<small>MPORTANCE AND</small> R<small>ELEVANCE</small> E<small>VALUATIONS</small>

## 9. LOWER UNCOMPAHGRE PLATEAU CULTURAL ACEC (Proposed)

**Status:**  Proposed

**Proponent:**  WSERC, WCC

**General Location:**  East side of Uncompahgre Plateau, from about Dry Creek to the east side of the Camel Back WSA.

**Acreage:**  31,870

**Significance:**  The proposed ACEC contains important rock art and archaeological sites from three different transitional time periods of occupation not represented elsewhere.  The area was a central part of the early homeland of the Ute Indians, and has numerous traditional cultural and sacred sites of interest to modern Utes.  The archaeological sites are nationally significant.

**Description:**  The proposed ACEC is on the east side of the Uncompahgre Plateau within a predominately pinyon-juniper plant community, and includes sagebrush parks and riparian areas.  The area has numerous scattered significant archaeological sites that include Archaic to historic Ute occupation dating to the 1880s (including the Harris site, rock art sites, and wickiups).

**Values Assessed**
- Cultural

**Relevance Criteria Considered:**  1

**Importance Criteria Considered:**  1 and 2

| RELEVANCE CRITERION | | Y<small>ES</small>/ N<small>O</small> | R<small>ATIONALE FOR</small> D<small>ETERMINATION</small> |
|---|---|---|---|
| # | D<small>ESCRIPTION</small> | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | Three different transitional time periods of occupation not represented elsewhere. |

**Evaluation of Existing and Proposed**
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
**for the Uncompahgre Planning Area**

38

BLM_0021995

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The archaeological sites are nationally significant. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The archaeological sites are irreplaceable if damaged. |

39                    Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0021996

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 9 - Lower Uncompahgre Plateau Cultural ACEC (Proposed)**
**31,870 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

40

BLM_0021997

## 10. SAN MIGUEL RIVER ACEC (Existing)

**Status:**  Existing

**General Location:**  San Miguel River and adjacent lands, from approximately Placerville, CO to Horsefly Creek, including Saltado Creek and Beaver Creek.

**Acreage:**  22,780

**Significance:**  The ACEC preserves the high quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor.

**Description:**  The San Miguel River ACEC was designated through amendment of the San Juan/San Miguel RMP in 1993.  It protects high quality native riparian communities that are mainly due to the undammed San Miguel River and its intact hydrology.  Such communities are becoming increasingly rare in Colorado.

The ACEC has been designated as an Important Bird Area by Audubon Society.  This site represents the finest protected Southwest Canyon Riparian Habitat (SWCR) in the United States (with the exception of Arizona's San Pedro SWCR), and it provides breeding sites for a wide variety of species and primary migratory routes for nearly all of the West's songbirds.  More than 300 bird species have been observed at the site.  The expanding black phoebe population, which has been moving up the San Miguel River, reached the lower end of the ACEC in 1999.  The river also has yellow-billed cuckoo habitat.

The Unaweep Tabeguache Scenic and Historic Byway runs along the river.  The ACEC is a VRI Class 2.

**Values Assessed**
- Botanical:  *Riparian Vegetation*
- Wildlife:  *Important Bird Area*
- Scenic

**Relevance Criteria Considered:**  1, 2, and 3

**Importance Criteria Considered:**  1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | The ACEC has high (VRI Class 2) scenic values.  The Unaweep Tabeguache Scenic and Historic Byway runs along the river. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0021998

ACEC Importance and Relevance Evaluations

| RELEVANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The area is designated an Important Bird Area by the Audubon Society and provides habitat for the yellow-billed cuckoo (a federal candidate and BLM Sensitive species) habitat and a black phoebe (rare) population. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | There are exemplary and highly diverse riparian communities supported by the naturally functioning San Miguel River. |

| IMPORTANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The riparian vegetation communities have high biodiversity significance on a global level. The area is designated as an Important Bird Area with national significance. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The area supports exemplary and extensive riparian communities, now rare in Colorado (since dams control most rivers).  Vulnerable to invasive weeds that threaten native ecosystems. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The area is an existing ACEC.  High priority riparian area.  One of two free-flowing (undammed) rivers in Colorado.  The Nature Conservancy has designated the area as an endangered landscape. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

42

BLM_0021999

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 10 - San Miguel River ACEC (Existing)**
**22,780 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022000

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 11. SAN MIGUEL RIVER ACEC (Proposed Expansion)

**Status:**  Existing with proposed addition

**Proponent:**  BLM, Trout Unlimited

**General Location:**  San Miguel River and adjacent lands, from approximately Deep Creek to the powerline about one-half mile upstream of Montrose County Rd 90, including Saltado Creek, Beaver Creek, and a portion of Leopard Creek.

**Acreage:**  35,420

**Significance:**  The ACEC preserves the high quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor.

**Description:**   The San Miguel River ACEC is an existing ACEC.  It was designated through amendment of the San Miguel RMP in 1993.  It protects high quality native riparian communities that are mainly due to the undammed San Miguel River and its intact hydrology.  Such communities are becoming increasingly rare in Colorado.

The proposed expansion would extend protection to additional areas that have been recognized by the BLM and the Colorado Natural Heritage Program (CNHP) as having high biodiversity significance.  The CNHP has proposed the San Miguel River at Cottonwood Creek as a Potential Conservation Area which hosts skunkbrush/coyote willow riparian shrubland, narrowleaf cottonwood/skunkbrush riparian woodland, and coyote willow/mesic graminoid riparian shrubland, all of which are good to excellent examples of these community types.

The original ACEC has been designated as an Important Bird Area by Audubon Society.  This site represents the finest protected Southwest Canyon Riparian Habitat (SWCR) in the United States, with the exception of Arizona's San Pedro SWCR.  It provides breeding sites for a wide variety of species and primary migratory routes for nearly all of the West's songbirds.  More than 300 bird species have been observed at the site.  The expanding black phoebe population, which has been moving up the San Miguel River, reached the lower end of the original ACEC in 1999.

The Unaweep Tabeguache Scenic and Historic Byway follows the river downstream from Placerville.  The San Juan Skyway is follows the river upstream from Placerville.  The potential ACEC is a VRI Class 2 rating.

**Values Assessed**
- Botanical:  *Riparian Vegetation*
- Wildlife:  *Important Bird Area*
- Scenic

**Relevance Criteria Considered:**  1, 2, and 3

**Importance Criteria Considered:**  1, 2, and 3

Evaluation of Existing and Proposed                                    44
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022001

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | The ACEC has scenic values, with a VRI Class 2 rating. The Unaweep Tabeguache Scenic and Historic Byway follows the river downstream from Placerville, while the San Juan Skyway follows the river upstream from Placerville. |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The Audubon Society has designated the area as an Important Bird Area. The area provides a Canada lynx (threatened species) movement corridor and habitat for Colorado River cut-throat trout (a BLM Sensitive species), yellow billed cuckoo (Candidate and BLM Sensitive species), and a population of rare black phoebes. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | There are exemplary and highly diverse riparian communities supported by the naturally functioning San Miguel River. An important wetland area is also in the proposed ACEC. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | High biodiversity significance at a global level, and a designated Important Bird Area of national importance. Part of national and state scenic and historic byway system. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Exemplary and extensive riparian communities, now rare in Colorado with dams controlling most rivers. Vulnerable to invasive species that threaten native ecosystems. High water quality in the area. |

45                    Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022002

ACEC Importance and Relevance Evaluations

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The existing ACEC needs some expansion to extend protection to additional significant riparian communities. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

46

BLM_0022003

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 11 - San Miguel River ACEC (Proposed Expansion)**
**35,420 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022004

## 12. SAN MIGUEL GUNNISON SAGE GROUSE ACEC (Proposed)

**Status:**  Proposed

**Proponent:**  San Miguel County, WSERC, WCC

**General Location:**  Scattered parcels of BLM lands beginning about seven miles southeast of, and about nine miles southwest of, Norwood, CO.

**Acreage:**  470

**Significance:**  The proposed ACEC contains potential, occupied, and historic Gunnison sage grouse (GUSG) habitat in San Miguel County.

**Description:**   The proposed ACEC is located on several small parcels of BLM land containing potential, historic, and occupied GUSG habitat, as defined by Colorado Division of Wildlife.  This area also contains proposed critical habitat (460 acres) for Gunnison sage-grouse, as designated by USFWS.  It should be noted that determining the historic range of GUSG is problematic for many reasons, most notably because of widespread loss of sagebrush habitats, which preceded scientific study of the species.  Additionally, GUSG have been extirpated from many areas for which no useful zoological records or specimens exist ([1]).

GUSG currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah.  In Colorado, seven GUSG population areas are: Cerro Summit-Cimarron-Sims Mesa, Crawford, Dove Creek, Gunnison Basin, Piñon Mesa, Poncha Pass, and San Miguel Basin.  The San Miguel Basin population exhibits a patchy distribution of GUSG.  As a result, there are six separate "subpopulations" identified within San Miguel Basin: Dry Creek Basin; Hamilton Mesa; Miramonte Reservoir; Gurley Reservoir; Beaver Mesa; and Iron Springs.[2]  This proposed ACEC area incorporates the northern end of what is considered part of the San Miguel (Miramonte Reservoir) population of GUSG. The core of this population is found on the Dolores Field Office to the south, but small portions of occupied habitat exist in this proposed ACEC.  Historically, Dove Creek-Monticello, San Miguel, Crawford, and Piñon Mesa all had much more sagebrush habitat and probably larger GUSG populations that were somewhat connected through more contiguous areas of sagebrush habitat.  An estimated 20% loss of sagebrush habitat between the late 1950s and the early 1990s and fragmentation of sagebrush habitat in southwestern

---

[1] Pg 32 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.
[2] Pg 36-37 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Evaluation of Existing and Proposed     48
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022005

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

Colorado is thought to have led to the current isolation of these populations.[3]  The protection of the small BLM portions of occupied habitat adjacent to private, state and Forest Service lands being managed for GUSG, provide additional protection for the species.

**Values Assessed**
- Wildlife Resource:  *Habitat for BLM Sensitive Species*

**Relevance Criteria Considered:**  2

**Importance Criteria Considered:**  2 and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Much of the historic and occupied habitat and leks are on private and state lands in the area.  Concentrated nesting and brood rearing habitat exist on BLM lands in limited small areas near Miramonte Reservoir. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Locations of this potential ACEC, adjacent to occupied habitats on state forest and private lands where active management is occurring, could be sensitive to change and change could have impacts to populations. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Gunnison sage grouse is being considered for federal listing under the Endangered Species Act.  There is also a great deal of interest locally and statewide in protecting the species. |

---

[3] Pg 51 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022006

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 12 - San Miguel Gunnison Sage-Grouse ACEC (Proposed)**
**470 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

50

BLM_0022007

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 13. WEST MONTROSE COUNTY GUNNION SAGE GROUSE ACEC (Proposed)

**Status:**  Proposed

**Proponent:**  San Miguel County, WSERC, WCC

**General Location:**   Western Montrose County, in Paradox Valley, and in areas from northwest of Nucla to south of Naturita, CO.

**Acreage:**   22,930

**Significance:**   The proposed ACEC contains historic and potential Gunnison sage grouse (GUSG) habitat in western Montrose County.

**Description:**    The proposed ACEC is located on several small parcels of BLM land containing historic GUSG habitat, as defined by Colorado Division of Wildlife.  This area also contains a small portion of proposed critical habitat (approx. 290 acres) for Gunnison sage-grouse, as designated by USFWS.  It should be noted that determining the historic range of GUSG is problematic for many reasons, most notably because of widespread loss of sagebrush habitats, which preceded scientific study of the species.  Additionally, GUSG have been extirpated from many areas for which no useful zoological records or specimens exist ([4]).

GUSG currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah.  In Colorado, seven GUSG population areas are: Cerro Summit-Cimarron-Sims Mesa, Crawford, Dove Creek, Gunnison Basin, Piñon Mesa, Poncha Pass, and San Miguel Basin.  The San Miguel Basin population exhibits a patchy distribution of GUSG.  As a result, there are six separate "subpopulations" identified within San Miguel Basin: Dry Creek Basin; Hamilton Mesa; Miramonte Reservoir; Gurley Reservoir; Beaver Mesa; and Iron Springs.[5]  This proposed ACEC area is the northern end of what is considered part of the San Miguel population of GUSG.  The core of this population is found on the Dolores Field Office to the south.  Historically, Dove Creek-Monticello, San Miguel, Crawford, and Piñon Mesa all had much more sagebrush habitat and probably larger GUSG populations that were somewhat connected through more contiguous areas of sagebrush habitat.  An estimated 20% loss of sagebrush habitat between the late 1950s and the early 1990s and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these populations.[6]

---

[4] Pg 32 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.
[5] Pg 36-37 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.
[6] Pg 51 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

**Evaluation of Existing and Proposed**
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
**for the Uncompahgre Planning Area**

BLM_0022008

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

*Values Assessed*
- Wildlife Resource: *Habitat for BLM Sensitive Species*

***Relevance Criteria Considered:*** 2

***Importance Criteria Considered:*** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | No | Locations in the proposed ACEC contain areas of potential habitat which have not been occupied for greater than 50 years.  These particular locations do not meet the relevance criteria. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | No | The habitat is not occupied, and has not been for over 50 years.  The area is in the extreme northern portion of habitat for the San Miguel population. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | Locations west of Redvale contain areas of potential habitat which has not been occupied for greater than 50 years.  Potential habitat in these locations does not meet the importance criteria. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Gunnison sage grouse is being considered for federal listing under the Endangered Species Act.  There is also a great deal of interest locally and statewide in protecting the species. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

52

BLM_0022009

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 13 - West Montrose County Gunnison Sage-Grouse ACEC (Proposed)**
**22,930 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022010

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 14. SIMS CERRO GUNNISON SAGE GROUSE ACEC (Proposed)

**Status:** Proposed

**Proponent:** Art Goodtimes

**General Location:** Approximately five to thirteen miles south of Montrose, CO, east of Spring Creek, and on BLM lands on both sides of Happy Canyon, Dolores Canyon, and Horsefly Canyon; approximately ten to fourteen miles east of Montrose, on both sides of highway 50 near Cerro Summit.

**Acreage:** 25,620

**Significance:** The proposed ACEC contains potential, occupied, and historic Gunnison Sage grouse (GUSG) habitat in Montrose County. This area also contains proposed critical habitat (6,970 acres) for Gunnison sage-grouse, as designated by USFWS. The Sims Mesa lek locations have been periodically occupied by a few grouse as recently as 2002. While no Gunnison sage-grouse have been seen on Sims Mesa leks in many years, Gunnison sage-grouse have been seen in the area in 2011 and 2012. Other lek sites in the area include Coal Hill (6 birds seen in 2004), Hairpin (1 bird seen in 2010), Cimarron (5 birds seen 2009), Cerro (last seen 2000) (Banulis, CDOW pers. comm. 5/27/2010). While no GUSG have been seen on the Cerro lek in recent years, a GUSG was seen in the Cerro Summit area in 2009 (based on personal communication with Ken Holsinger).

**Description:** The proposed ACEC is located on a large parcel of BLM land southeast of Montrose, and on smaller pieces of BLM lands about 10 miles east of Montrose near Cerro Summit. The ACEC contains historic, potential, and occupied GUSG habitat, as defined by Colorado Division of Wildlife.

GUSG currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah. In Colorado, the seven identified GUSG population areas are: Cerro Summit-Cimarron-Sims Mesa, Crawford, Dove Creek, Gunnison Basin, Piñon Mesa, Poncha Pass, and San Miguel Basin. The Cerro Summit-Cimarron-Sims Mesa population exhibits a patchy distribution of GUSG. As a result, there are two subpopulations identified within Cerro Summit-Cimarron-Sims Mesa: Cerro Summit-Cimarron; and Sims Mesa.[7] This proposed ACEC area includes the BLM lands within the Sims Mesa subpopulation, and a very small portion of the Cerro Summit-Cimarron subpopulation that is within the planning area. An estimated 20% loss of sagebrush habitat between the late 1950s and early 1990s and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these

---

[7] Pg 36-37 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area                                                54

BLM_0022011

populations.[8]  The protection of the small BLM portions of occupied/historic habitat provides additional protection for the species.

**Values Assessed**
- Wildlife Resource:  *Habitat for BLM Sensitive Species*

**Relevance Criteria Considered:**  2

**Importance Criteria Considered:**  1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | These locations have historic, potential, and occupied habitat for the Gunnison sage grouse as defined by CDOW. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | No | The habitat has had only occasional grouse lekking activity in recent years (See the description above). |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Gunnison sage grouse habitat has been fragmented by human uses. Habitat for this GUSG population has become relatively small and isolated from other GUSG populations, and the population is vulnerable to extirpation. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Gunnison sage grouse is being considered for federal listing as an endangered species.  There is also a great deal of interest locally and statewide in protecting the species. |

---

[8] Pg 51 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022012

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 14 - Sims Cerro Gunnison Sage-Grouse ACEC (Proposed)**
**25,620 acres**



Evaluation of Existing and Proposed                           56
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022013

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 15. DOLORES RIVER SLICK ROCK CANYON ACEC (Proposed)

**Status:**  Proposed

BLM has submitted two ACEC proposals for the area.  The larger one is called "Dolores Slick Rock Canyon" and this smaller proposed area is called "Dolores River Slick Rock Canyon."

**Proponent:**  BLM (includes the CNHP La Sal PCA)

**General Location:**   Coyote Wash to approximately Bedrock, CO, within the Dolores River canyon, including La Sal Creek and La Sal Creek canyon.

**Acreage:**  10,670 and 9,780

**Significance:**   A spectacular deep canyon with steep cliffs supports high quality riparian vegetation and rare and exemplary riparian communities, hanging gardens, BLM Sensitive plants and fish, desert bighorn sheep, and peregrine falcon.  The area also has high scenic quality.  An ACEC would help protect these resources.

**Description:**   The Dolores River, La Sal Creek, and Coyote Wash have carved a spectacular deep canyon through Jurassic and Triassic sandstones.  Steep vertical cliffs dominate the canyonsides, broken only where tributaries enter the canyon.

Major geologic formations in the canyon are Wingate, Kayenta, Navajo, and Entrada sandstones.  The Morrison Formation appears near the southern end.  Most of this area is roadless and accessible only by raft, canoe, or kayak.

This site includes the riparian zone and adjacent uplands along the Dolores River, from Slick Rock Canyon north to Bedrock.  There are excellent to good occurrences of the globally common coyote willow/mesic graminoids (*Salix exigua*/mesic graminoids).  Typical vegetation along the river and creeks includes a band of coyote willow, mixed with giant reed at the water's edge between the low and high water marks.  La Sal Creek supports a critically imperiled plant association consisting of box elder and river birch.  The largest population of the BLM Sensitive (G2/S1) Kachina daisy *(Erigeron kachinensis)* within Colorado occurs along drainages feeding into Coyote wash and canyon.

The canyon bottoms support a nearly continuous occurrence of the riparian plant association known as New Mexico privet foothills riparian shrubland.  The site supports two excellent (A-ranked) occurrences of a globally imperiled (G2/S1) New Mexico privet riparian shrub community (*Forestiera pubescens*) along the Dolores River.  The New Mexico privet plant community is known only from the major rivers in the Four Corners area.

There are a few hanging garden communities (*Aquilegia micrantha - Mimulus eastwoodiae*), imperiled to vulnerable on a global scale (G2G3/S2S3), containing small populations of the globally vulnerable (G3/S1) Eastwood monkeyflower (*Mimulus eastwoodiae*).

57                          **Evaluation of Existing and Proposed**
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
**for the Uncompahgre Planning Area**

BLM_0022014

## ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

The proposed ACEC also has a good (B-ranked) occurrence of the Naturita milkvetch (*Astragalus naturitensis*), a BLM Sensitive species and considered to be imperiled to vulnerable both globally and in Colorado (G2G3/S2S3).

Uplands in this area have pinyon-juniper woodlands, sagebrush, or barren sandstone cliffs. Naturita milkvetch was found in the pinyon-juniper community.

Additionally, the Dolores River throughout the length of the site supports populations of roundtail chub (*Gila robusta*), which is a BLM Sensitive species and globally vulnerable (G3/S2). Populations of the chub are at the upstream margin of the species' range and comprise the majority of occurrences for this species. The La Sal Creek tributary harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*); this is one of a very few spawning tributaries for these species within the Dolores River Basin. Other animal species with conservation significance are desert bighorn sheep and peregrine falcon.

The proposed ACEC also has rock art panels and paleontological sites.

***Values Assessed***
- Botanical: *Riparian Communities and BLM Sensitive Species*
- Fish and Wildlife: *BLM Sensitive Species*
- Scenic

***Relevance Criteria Considered:*** 1, 2, and 3

***Importance Criteria Considered:*** 1, 2, and 3

| # | RELEVANCE CRITERION DESCRIPTION | YES/NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | BLM has rated the area as VRI Class 2. Cultural sites (rock art panels and historic structures) are in the area, as is a paleontological study area. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

58

BLM_0022015

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Desert bighorn sheep, peregrine falcon, and Roundtail chub (BLM Sensitive species) inhabit the area. Supports populations of roundtail chub (*Gila robusta*), which is a BLM Sensitive species and globally vulnerable (G3/S2); also populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*). |
|---|---|---|---|
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Several globally vulnerable and state rare plants are in the proposed ACEC area. The river banks also have box-elder, river birch and red-osier dogwood communities. |

| IMPORTANCE CRITERION | | YES/ NO | |
|---|---|---|---|
| # | DESCRIPTION | NO | RATIONALE FOR DETERMINATION |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The paleontological resource is of state and national significance. Rare and globally vulnerable plants and plant communities are in the area. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Rock art panels are vulnerable to damage. Vulnerable to invasive species that threaten native ecosystems. Several globally vulnerable and state rare plants are in the proposed ACEC area. Nesting peregrine falcons, a recently delisted species, are sensitive to disturbances. Bighorn sheep are experiencing declines across the region and human-related disturbances and other adverse changes may contribute to these trends. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Within a WSA. |

59          Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022016

### ACEC Map 15a - Dolores Slick Rock Canyon ACEC (Proposed)
### 10,670 acres



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

60

BLM_0022017

["

## 16. LA SAL CREEK ACEC (Proposed)

**Status:**  Proposed

**Proponent:**  CNAP

**General Location:**  In Montrose County, from the south rim of La Sal Creek to Paradox Valley, and from the east rim of the Dolores River canyon to about Spring Creek.

**Acreage:**  10,500

**Significance:**  A spectacular deep canyon supports high quality riparian vegetation and relic riparian communities, BLM Sensitive plants, desert bighorn sheep, and peregrine falcon. Eroding shale slopes on the uplands support populations of rare plants.  La Sal Creek harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*).  This is one of a very few spawning tributaries for these species within the Dolores River Basin.  The area also has high scenic quality.

**Description:**   La Sal Creek cuts a spectacular canyon of entrenched meanders through red Triassic and Jurassic sandstones and siltstones.  The narrow floodplain supports a critically imperiled plant association consisting of box elder and river birch.  In the narrow band of riparian vegetation, box elder accounts for as much as 70% cover, with river birch providing 25 to 60% cover.  Only a few other small occurrences of this community are known.

New Mexico privet, coyote willow, red-osier dogwood, giant reed, and wild rose are also common.  Although there are some introduced pasture grasses, including Kentucky bluegrass, there is no tamarisk along the upper part of the creek.

Eroding shale slopes support populations of rare plants:  Paradox breadroot (*Pediomelum aromaticum*), a G3/S2 BLM Sensitive Species; and Paradox Valley lupine (*Lupinus crassus*), a G2/S2, BLM Sensitive Species.

Upland vegetation consists of pinyon-juniper woodland with dwarf and true mountain mahogany, cliffrose, Gambel oak, yucca, cacti, and rabbitbrush.  A good-sized population of Paradox breadroot, with several hundred plants, was found on a dry bench overlooking La Sal Creek.

**Values Assessed**
- Botanical:  *Unique Vegetation Communities and BLM Sensitive Species*
- Fish and Wildlife:  *BLM Sensitive Species*

**Relevance Criteria Considered:**  2 and 3

**Importance Criteria Considered:**  1, 2, and 3

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

62

BLM_0022019

ACEC Importance and Relevance Evaluations

| RELEVANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Desert bighorn sheep and peregrine falcon (BLM Sensitive species) inhabit the area. Exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (Catostomus latipinnis), bluehead suckers (Catostomus discobolus), and roundtail chubs (Gila robusta). |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Several globally vulnerable and state rare plants are in the proposed ACEC area. The river banks also have box-elder, river birch and red-osier dogwood communities. |

| IMPORTANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Rare and globally vulnerable plants and plant communities are in the area. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Vulnerable to invasive species that threaten native ecosystems. The globally vulnerable plant communities are difficult to restore. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | A portion of the ACEC is within a WSA. |

63          Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022020

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 17 - La Sal Creek ACEC (Proposed)**
**10,500 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

64

BLM_0022021

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 17. COYOTE WASH ACEC (Proposed)

**Status:** Proposed

**Proponent:** CNAP

**General Location:** In Montrose County, CO; Coyote Wash to the rim of Wray Mesa.

**Acreage:** 2,100

**Significance:** A spectacular deep canyon with steep cliffs supports hanging gardens and BLM Sensitive plant species. Coyote Wash contains the best known occurrence of the globally imperiled Kachina daisy.

**Description:** Coyote Wash is a steep-sided tributary canyon that joins the Dolores Canyon. Its flat sandy bottom has a small meandering stream that occasionally floods. Colorado's largest population of Kachina daisy (*Erigeron kachinensis*), a G2/S1 BLM Sensitive Species, occurs along drainages feeding into the wash and canyon; hanging gardens in the canyon walls support Eastwood monkeyflower (*Mimulus eastwoodiae*) a BLM Sensitive species. Isolated benches in the canyon support Great Basin grassland communities in excellent condition.

The south boundary of the ACEC is the Uncompahgre Field Office boundary. Because of this, the proposed ACEC does not include the bottom of the Coyote Wash drainage.

**Values Assessed**
- Botanical: BLM Sensitive Species

**Relevance Criteria Considered:** 3

**Importance Criteria Considered:** 1, 2, and 3

| # | RELEVANCE CRITERION DESCRIPTION | YES/NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Several globally vulnerable and state rare plants occur within the proposed ACEC area. The river banks also support box-elder, river birch and red-osier dogwood communities. |

65        Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022022

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | BLM Sensitive and rare and globally vulnerable plants and plant communities are in the area. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Globally vulnerable, state rare and BLM Sensitive plants are in the proposed ACEC area. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Within a WSA. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

66

BLM_0022023

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## ACEC Map 18 - Coyote Wash ACEC (Proposed)
### 2,100 acres



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022024

ACEC Importance and Relevance Evaluations

## 18. EAST PARADOX ACEC (Proposed) and Biological Soil Crust (Proposed)

**Status:** Proposed

The BLM has two proposed ACECs for the area. The larger one in called "East Paradox ACEC", and the smaller ACEC within this area called the "Biological Soil Crust ACEC."

**Proponent:** BLM

**General Location:** Montrose County, CO, from the west rim of the Dolores River canyon to about six miles east of Dolores River, and from highway 90 to the north rim of Paradox Valley.

**Acreage:** 7,360 (Biological Soil Crust ACEC is 1,900 acres)

**Significance:** The proposed ACEC would preserve the best known occurrence of the BLM Sensitive Paradox Valley lupine (*Lupinus crassus*), a higher than normal density and diversity of biological soil crusts (BSC), and two species of BSC that are rare and typically found only on gypsiferous soils.

**Description:** The East Paradox Creek site is located west of Naturita, Colorado and north of Highway 90 as it travels through Paradox Valley. Geologic strata includes the Hermosa, Moenkopi, Cutler, Kayenta, and Chinle formations, and Quaternary alluviums. The site is underlain by multiple soils, including Mikim (ustic torriorthents, fine-loamy, mesic, mixed calcareous soils), Palmer (ustollic haplargids, coarse-loamy, mixed, mesic soils), and Zyme (ustic torriorthents, clayey, montmorillontic calcareous, mesic shallow soils) compositions.

The proposed East Paradox ACEC supports the best known occurrence of Paradox Valley lupine, a globally imperiled (G2/S2) BLM Sensitive species found only in Colorado. There are two excellent (A-ranked) occurrences of Paradox breadroot (*Pediomelum aromaticum*), a BLM Sensitive species considered to be globally vulnerable and rare in Colorado (G3/S2).

Dark red soils apparently derived from the Chinle Formation provide habitat for the Paradox Valley lupine. The soils differ notably from those at the other major lupine location near Naturita. Large populations of Paradox breadroot grow with the lupine, typically further downstream in washes.

Well-developed BSC occurs between plants. Highly gypsiferous soils derived from the Paradox Formation tend to support a higher than normal density and diversity of BSC. During the spring of 2009, BLM Vernal Field Office Botanist Jessie Salix conducted a BSC inventory in the Paradox Valley at the request of the UFO.

The inventory was conducted approximately within T47N, R18W, sections 22, 23, 26, and 27 immediately southeast of the Dolores River and resulted in documentation of the occurrence of two BSC species (*Lecanora gypsicola* and *Gypsoplaca macrophylla*) considered somewhat rare and typically found only on gypsiferous soils. The identification of these species was verified by Dr. Larry St. Clair, a lichenologist at Brigham Young University. Dr.

Evaluation of Existing and Proposed        68
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022025

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

St. Clair conveyed to Jessie Salix via e-mail that he felt that the lichen were in need of protection because 1) they occur exclusively on gypsiferous soils (a limited habitat that is commonly mined) and 2) the species occur on less than half of the gypsiferous sites that Dr. St. Clair has inventoried.  The location is also the type locality for the Paradox catseye (*Cryptantha paradoxa*).

In addition, the area supports occurrences of a number of wildlife species with conservation significance, the rarest of which are the roundtail chub *(Gila robusta)* and flannelmouth sucker *(Catostomus latipinnis)*, both BLM Sensitive fish species.  Peregrine falcons also nest within the proposed area.

***Values Assessed***
- Botanical:  *Unique Vegetation Communities and BLM Sensitive Species*
- Fish and Wildlife:  *BLM Sensitive Species*

***Relevance Criteria Considered:***  2 and 3

***Importance Criteria Considered:***  1, 2, and 3

| RELEVANCE CRITERION | | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|---|
| # | DESCRIPTION | | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | | Yes | The Dolores River through the area supports two BLM Sensitive fish species:  roundtail chub and flannelmouth sucker.  Peregrine falcons nest in the area. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | | Yes | Supports biological soil crust containing two significant and rare lichen species found only in gypsiferous soil ecosystems. Supports BLM Sensitive Paradox Valley lupine and Paradox breadroot. Paradox catseye is endemic to gypsiferous soils and somewhat rare only found in eastern Utah, western Colorado, and one site in northwest New Mexico. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022026

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Two significant and rare species of biological soil crust are limited to this type locality. The BLM Sensitive Paradox Valley lupine and Paradox breadroot that occur here have national significance. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The biological soil crusts are fragile, easily damaged, and heal slowly. Supports the best known occurrence of sensitive and rare Paradox Valley lupine, which grows only in Colorado. Type locality for Paradox catseye is both scientifically unique and irreplaceable. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | CNHP has recommended the area as a PCA. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

70

BLM_0022027

**ACEC Map 19a - East Paradox ACEC (Proposed)**
**7,360 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022028

### ACEC Map 18b - Biological Soil Crust ACEC (Proposed)
### 1,900 acres



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

72

BLM_0022029

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 19. WEST PARADOX ACEC (Proposed)

**Status:** Proposed

**Proponent:** BLM

**General Location:** Montrose County, CO, from the west rim of the Dolores River canyon to the west end of Paradox Valley, and up to Montrose County Rd Q13.

**Acreage:** 5,190

**Significance:** The proposed ACEC would preserve habitat for the Paradox Valley lupine (*Lupinus crassus*). In addition, the area supports peregrine falcon *(Falco peregrinus)* eyries.

**Description:** The West Paradox Valley site is located on the north side of Paradox Valley and west of the Dolores River, on dark red soils derived from the Chinle Formation. This site contains an excellent (A-ranked) occurrence and historical occurrences of Paradox Valley lupine (*Lupinus crassus*), a BLM Sensitive and globally imperiled (G2/S2) species. It also contains Paradox breadroot (*Pediomelum aromaticum*), which is also BLM Sensitive, and a globally vulnerable (G3/S2) plant.

Paradox Valley lupine and Paradox breadroot are both locally common in the bottoms and on the sides of draws at the base of the south-facing slopes, with thousands of individuals of both species and a variety of ages represented.

Other vegetation consists of Utah juniper woodland, with galleta (Genus *Pleuraphis)* and snakeweed (Genus *Gutierrezia)*. The plant community is in good condition, with few exotic species present.

The boundary is drawn to encompass known occupied sites of Paradox Valley lupine and Paradox breadroot, while allowing adequate additional habitat for the plants to move or expand their range over time. The proposed area includes the lower edge of the pinyon-juniper community where the two species occur and includes the cliff faces to the canyon rim, which support peregrine falcon eyries.

The area experiences light vehicle use. The land is primarily administered by the BLM, with some private land on the south side.

**Values Assessed**
- Botanical: *Unique Vegetation Communities and BLM Sensitive Species*
- Fish and Wildlife: *BLM Sensitive Species*

**Relevance Criteria Considered:** 2 and 3

**Importance Criteria Considered:** 1, 2, and 3

73   Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022030

ACEC Importance and Relevance Evaluations

| RELEVANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The area supports peregrine falcon (a BLM Sensitive species). |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The area supports Paradox lupine and Paradox breadroot (BLM Sensitive species). |

| IMPORTANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Paradox lupine and Paradox breadroot are BLM Sensitive species; they are also globally imperiled and globally vulnerable, respectively. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Has populations of the sensitive and rare Paradox Valley lupine which grows only in Colorado. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | CNHP has recommended the area as a PCA. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

74

BLM_0022031

**ACEC Map 19 - West Paradox ACEC (Proposed)**
**5,190 acres**



| | | | |
|---|---|---|---|
| BLM | Private | BLM Wilderness | RMP Boundary |
| NPS | State | NPS Wilderness | NCAs |
| USFS | CDOW | USFS Wilderness | WSAs |

0 — 1 Miles  N

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022032

## 20. PARADOX ROCK ART ACEC (Proposed)

**Proponent:**  WSERC, WCC

**General Location:**  Montrose County, on the north slope of Paradox Valley, approximately nine miles west of Nucla, CO.

**Acreage:**  1,080

**Significance:**  The proposed ACEC contains important rock art and archaeological sites.  It is the northern extent Anasazi rock art and occupation.  The area also contains Paradox Valley lupine (*Lupinus crassus*).

**Description:**  The proposed ACEC is located in the eastern portion of Paradox Valley and contains important rock art panels and archaeological sites, including several outstanding examples of Ancestral Puebloan-style petroglyphs, Formative Period and earlier occupations, features, and isolates, and settled village sites dating back more than five hundred to a thousand years.

The site contains an occurrence and historical occurrences of Paradox Valley lupine (*Lupinus crassus*), a BLM Sensitive and globally imperiled (G2/S2) species.  There is potential for conflict between peregrine falcons and hang gliders on the cliffs above Paradox.

**Values Assessed**
- Cultural

**Relevance Criteria Considered:**  1

**Importance Criteria Considered:**  1 and 2

| RELEVANCE CRITERION | | YES/NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | Rare northern extent Anasazi rock art and occupation.  VRI Class 2. |

Evaluation of Existing and Proposed  76
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022033

## ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Inter-state and Regional significance due to Anasazi rock art. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Fragile and irreplaceable if damaged. |

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 20 - Paradox Rock Art ACEC (Proposed)**
**1,080 acres**



Evaluation of Existing and Proposed                    78
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022035

## 21. TABEGUACHE PUEBLO/TABEGUACHE CAVES ACEC (Proposed)

**Status:** Proposed

**Proponent:** WSERC, WCC

**General Location:** Montrose County, approximately six miles north of Nucla, CO, from the Uncompahgre National Forest to about two miles east of old Uravan; along Tabeguache Creek and Spring Creek, and areas in between.

**Acreage:** 26,400

**Significance:** The proposed ACEC contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. There is some evidence of farming (corn production).

**Description:** The proposed ACEC includes part of the Tabeguache Special Management Area. The Tabeguache Pueblo and Tabeguache Caves are important both to the prehistory of the region and to the history of archaeology in Colorado, being some of the earliest explored and described archaeological sites in the state. In addition to their historic interest, both Tabeguache caves and the pueblos still contain intact archaeological deposits dating to the Formative period Anasazi, or Ancestral Puebloan people.

**Values Assessed**
- Cultural

**Relevance Criteria Considered:** 1

**Importance Criteria Considered:** 1 and 2

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | Contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022036

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The area is important to the history of archaeology in North America. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The archaeological sites are fragile and irreplaceable if damaged. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

80

BLM_0022037

**ACEC Map 21 - Tabeguache Pueblo/Tabeguache Caves ACEC (Proposed)**
**26,400 acres**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022038

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 22. TABEGUACHE CREEK ACEC/ONA (Existing)

**Status:**  Existing.

**General Location:**  In Montrose County, approximately seven miles north of the town of Nucla, and within the Tabeguache Special Management Area.

**Acreage:**  560

**Significance:**  The Tabeguache Creek ACEC and ONA is managed to protect cultural resources.  The ACEC/ONA contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures.  There is some evidence of farming (corn production).

**General Description:**  The 1985 San Juan/San Miguel RMP designated the area as Tabeguache Creek Outstanding Natural Area (ONA).  An ONA is considered an ACEC.  The ACEC/ONA is completely within the Tabeguache Special Management Area.  The Tabeguache Creek ACEC/ONA is important both to the prehistory of the region and to the history of archaeology in Colorado.  It has some of the earliest explored and described archaeological sites in the state.  The ACEC contains intact archaeological deposits dating to the Formative period Anasazi, or Ancestral Puebloan people.

**Values Assessed**
- Cultural

**Relevance Criteria Considered:**  1

**Importance Criteria Considered:**  1 and 2

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | Contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

82

BLM_0022039

## ACEC Importance and Relevance Evaluations

| IMPORTANCE CRITERION | | Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The area is important to the history of archaeology in North America. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The archaeological sites are fragile and irreplaceable if damaged. |

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022040

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 22 – Tabeguache Creek ACEC/ONA (Existing)**



Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

84

BLM_0022041

# 5.0 – INTERDISCIPLINARY TEAM MEMBERS

The following Uncompahgre Field Office Staff participated in determining the relevance and importance of the nominated and existing ACECs.

| NAME | TITLE |
| --- | --- |
| Debbie Burch | Range Technician |
| Amanda Clements | Ecologist |
| Rob Ernst | Geologist |
| Glade Hadden | Archaeologist |
| Ken Holsinger | Natural Resource Specialist |
| Dan Huisjen | Fire Ecologist |
| Julie Jackson | Outdoor Recreation Planner |
| Bruce Krickbaum | Planner |
| Jeff Litteral | Hydrologist (former) |
| D. Maggie Magee | Technical Writer-Editor |
| Teresa Pfifer | Land and Minerals Supervisor |
| Linda Reed | Realty Specialist |
| Lynae Rogers | Rangeland Management Specialist |
| Charles Sharp | Wildlife and T&E Biologist (former) |
| Barbara Sharrow | Field Manager |
| Melissa Siders | Wildlife and T&E Biologist |
| David Sinton | GIS Specialist |
| Jedd Sondergard | Hydrologist |
| Dean Stindt | Rangeland Management Specialist (former) |
| Thane Stranathan | Natural Resource Specialist |
| Karen Tucker | Recreation Staff Supervisor |

Evaluation of Existing and Proposed
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

BLM_0022042

INTERDISCIPLINARY TEAM MEMBERS

## 6.0 – REFERENCES

**Bureau of Land Management**

1988    Manual H-1613, *Areas of Critical Environmental Concern.*

2000    Colorado BLM State Director's Sensitive Species List (Animals and Plants). Webpage: *http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html*

2007    *San Juan Public Lands Center Draft Land Management Plan and Draft Environmental Impact Statement.* Durango, Colorado.

2008    *Moab Field Office Record of Decision and Approved Resource Management Plan.* Moab Field Office, Utah.

2008b   *Monticello Field Office Record of Decision and Approved Resource Management Plan.* Moab Field Office, Utah.

2008c   *Preparation Plan for the Uncompahgre Resource Management Plan.* Uncompahgre Field Office. Montrose, Colorado.

**Colorado Division of Wildlife**

2005    Gunnison Sage-grouse Rangewide Steering Committee, Gunnison Sage-grouse Rangewide Conservation Plan. Colorado Division of Wildlife, Denver, Colorado.

**Colorado Natural Heritage Program**

2009    Level 4 Potential Conservation Area (PCA) Reports. Colorado Natural Heritage Program (CNHP). Colorado State University, Fort Collins, CO.

**FLPMA**

1976    Section 202 (43 US Code 1712[c][3]) Federal Land Policy and Management Act of 1976, Public Law 94-579, as amended.

**National Audubon Society**

2010    Important Bird Areas in the U.S. Available online at: *http://www.audubon.org/bird/iba*

**StClair, Larry**

2009    Email communication regarding lichens in Paradox Valley. Larry StClair, Brigham Young University, Utah.

Evaluation of Existing and Proposed                86
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0022043

**APPENDIX A – UFO RMP SCOPING ACEC FACT SHEET**

## 7.0 - Appendices

### Appendix A: UFO RMP Scoping ACEC Fact Sheet



| BLM UNCOMPAHGRE FIELD OFFICE RMP PLANNING FACT SHEET *Areas of Critical Environmental Concern* | Barbara Sharrow, UFO Field Manager 2465 S. Townsend Ave, Montrose, CO 81401 Office hours are 8:00 am to 4:30 pm Phone: (970) 240-5300 | TDD (970) 240-5300 FAX (970) 240-5367 |

**4.3**

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area.  The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield.*

*Areas of Critical Environmental Concern*, commonly known as *ACECs*, are public lands where special management is required in order to protect the area's values.  To be eligible for designation as an ACEC, an area must meet criteria for both *relevance* and *importance*.  An ACEC possesses significant historic, cultural, or scenic values, fish or wildlife resources (including habitat, communities, or species), natural processes or systems, or natural hazards.  In addition, the significance of these values and resources must be substantial in order to satisfy the importance criteria.

#### ACECs IN THE PLANNING AREA

The Uncompahgre planning area contains four ACECs, which were designated in the two existing RMPs:

| ACEC | AREA (ACRES) | VALUES |
|---|---|---|
| Fairview | 374 | Large population of a listed endangered plant species and significant populations of a candidate plant species |
| Needle Rock | 83 | A volcanic geological structure with high-value scientific, interpretive, and scenic characteristics |
| Adobe Badlands | 6,383 | Consists of Mancos Shale hills and flats which, through wind and water erosion, have formed unique scenic formations.  The area's soils are highly erodible and saline, resulting in high sediment loads and very saline runoff.  The area also contains known and potential habitat for several endangered and threatened plant species. |
| San Miguel | 22,841 | Unique, high quality riparian vegetation resources, the scenic values of the corridor, and preservation of relic riparian communities |

#### PROTECTING SIGNIFICANT VALUES

Restrictions arising from ACEC designation are proposed during the final RMP revision and are part of the final decision process. Restrictions are designed to protect the values and/or serve the purposes for which the designation was made. Management prescriptions are developed expressly to protect the important and relevant values of an area. Such measures would not be necessary or prescribed if the critical and important features were not present



BLM 4.3—Areas of Critical Environmental Concern

**Evaluation of Existing and Proposed AREAS OF CRITICAL ENVIRONMENTAL CONCERN for the Uncompahgre Planning Area**

**APPENDIX A – UFO RMP SCOPING ACEC FACT SHEET**

### *RMP Scoping ACEC Fact Sheet – Page 2*

**REVIEW OF NEW AND EXISTING ACECs**

As part of the RMP revision, existing ACECs will be reevaluated to determine whether:

- the ACEC's relevant and important values are still present and require continued management attention

- threats of irreparable damage to the values have been identified

- current management is sufficient to protect the values.

In addition, new ACECs nominated during the public scoping period will be evaluated for relevance and importance.



Uncompahgre Planning Area
Bureau of Land Management
U.S. Department of the Interior

### *The BLM wants your input...*

- **Do you know of any areas within the planning area that meet the criteria for becoming an ACEC?**

    Any individual or organization may nominate an ACEC during the public scoping period. The nomination should describe the area's special values. Information on why the area meets relevance and importance criteria (43 CFR 1610.7-2) must be included in the nomination.

| UFO Planning Webpage:<br>www.UFORMP.com | Mail comments to:<br>Bruce Krickbaum,<br>RMP Project Manager<br>2465 S. Townsend Ave<br>Montrose, CO  81401 | Email comments to:<br>UFORMP@blm.gov |
|---|---|---|

UFO 1/2010

**Evaluation of Existing and Proposed**
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
**for the Uncompahgre Planning Area**

88

## APPENDIX B – UFO RMP SCOPING ACEC DISPLAY

*Appendix B: UFO RMP Scoping ACEC Display Panel*



**Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area**

BLM_0022046



**Evaluation of Proposed and Existing
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area**

BLM_0022047

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

May 30, 2013

In Reply Refer To:
1610 (210) I

EMS TRANSMISSION 05/31/2013
Instruction Memorandum No. 2013-131
Expires: 09/30/2014

**To:**   All Washington Office and Field Office Officials

**From:**   Assistant Director, Renewable Resources and Planning

**Subject:** Guidance on Estimating Nonmarket Environmental Values

**Program Areas:** Land Use Planning, National Environmental Policy Act.

**Purpose:** This Instruction Memorandum (IM) transmits guidance (Attachment 1) describing when and how to consider nonmarket environmental values when preparing National Environmental Policy Act (NEPA) analyses for the Bureau of Land Management's (BLM) resource management planning and other decision-making.

**Policy/Action:** All BLM managers and staff are directed to utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making where relevant and feasible, in accordance with the attached guidance. At least a *qualitative* description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in NEPA analyses involving environmental impact statements (EIS), for both resource management plans and project-level decisions. Such description may also be appropriate for inclusion in environmental assessments.

The use of *quantitative* valuation methods should contribute to the analysis of one or more issues to be addressed in the environmental analysis supporting planning or other decision-making. A quantitative analysis of nonmarket values in EIS-level NEPA analyses is strongly encouraged where one or more of the criteria described in the attached guidance apply.

**Timeframe:** Effective immediately.

**Budget Impact:** Minimal.

**Background:** Nonmarket environmental values reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that

BLM_0022048

do not involve market transactions and therefore lack prices. Examples include the perceived benefits from hiking in a wilderness or fishing for subsistence rather than commercial purposes. The economic methods described in this guidance provide monetary estimates of nonmarket values. Several non-economic, primarily qualitative methods can also be used to characterize the values attributed to places, landscapes, and other environmental features. Guidance on qualitative methods for assessing environmental values, including ethnography, interviews, and surveys, is in preparation.

Ideally, economic analysis for resource management should consider all relevant values, not merely those that are easy to quantify. Utilizing nonmarket values provides a more complete picture of the consequences of a proposed activity than market data alone would allow. The BLM's Land Use Planning Handbook, Appendix D encourages inclusion of information on nonmarket values, but does not provide detail.

This IM provides initial guidance on these topics. The socioeconomics program is currently funding field-based case studies on using nonmarket economic methods for resource management decisions. Those case studies and other lessons learned from state and field office staff will be incorporated in revised guidance, emphasizing practical applications, targeted for fiscal year 2015. We welcome your observations on your experiences as you implement this guidance.

Draft guidance on the use of nonmarket values was first circulated for comment to Washington Office and state office officials in 2010 under IM 2010-061, as well as to a limited number of external reviewers. In addition to many comments from BLM staff, comments were also received from economists at the Interior Department's Office of Policy Analysis, the National Park Service, and the U.S. Geological Survey; the American Petroleum Institute and the Wilderness Society; and Colorado State University and the University of New Mexico. To respond to these comments, the initial draft was extensively revised and expanded. Based on a further review by BLM socioeconomics and planning staff, the second draft was further revised to provide greater clarity and practicality.

**Manual/Handbook Sections Affected:** The BLM Land Use Planning Handbook (H-1601-1), Appendix D.

**Coordination:** This guidance has been coordinated with BLM socioeconomics staff, state office planners, and Washington Office programs in WO-200, WO-300, WO-400, and the Solicitor's Office.

**Contact:** Joe Stout, Chief, Division of Decision Support, Planning and NEPA (WO-210), 202-912-7275; Rob Winthrop, Senior Social Scientist (WO-210), 202-912-7287; Rebecca Moore, Economist (WO-210), 970-226-9246, rmoore@blm.gov.

For other sources of assistance, consult the roster of BLM socioeconomic staff, available on the socioeconomic program's SharePoint site:
https://partnerteamspace.blm.doi.net/sites/sosc/communityofpractice/Pages/SocioeconomicStaff.aspx.

Signed by:                              Authenticated by:
Edwin Roberson                          Ambyr Fowler
Assistant Director                      Division of IRM Governance, WO-560
Renewable Resources and Planning

3 Attachments:

1 - Economic Methods for Estimating Nonmarket Environmental Values (15 pp)
2 - Table: Methods of Environmental Valuation (EPA Science Advisory Board) (2 pp)
3 - The Use of Stated Preference Methods (Office of Management and Budget) (2 pp)

BLM_0022050

Bureau of Land Management Socioeconomics Program Guidance
**Economic Methods for Estimating Nonmarket Environmental Values**

**Purpose.**  This guidance describes when and how to use economic methods to estimate nonmarket environmental values when preparing National Environmental Policy Act (NEPA) analyses for the Bureau of Land Management's (BLM) resource management planning and other decision-making.  These methods estimate the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices.

At least a *qualitative* description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in NEPA analyses involving environmental impact statements (EIS), for both resource management plans (RMP) and project-level decisions.  Such description may also be appropriate for inclusion in environmental assessments (EA).

The use of *quantitative* valuation methods should contribute to the analysis of one or more issues to be addressed in the environmental analysis supporting planning or other decision-making.  A quantitative analysis of nonmarket values in EIS-level NEPA analyses is strongly encouraged where one or more of the criteria provided below apply (see *Criteria for Nonmarket Valuation*).

This guidance is directed to several audiences.  For non-specialists, it explains the basic concepts of nonmarket valuation and provides direction on when and how such methods can best be used (see *General Guidance*).  For economists and other socioeconomic specialists, it provides additional notes on the use of these methods (see *Technical Guidance*).

The socioeconomics program is currently funding a series of field-based case studies on nonmarket economic valuation for resource management decisions.  Those case studies and other comments from state and field office staff will be incorporated in revised guidance targeted for fiscal year 2015, emphasizing practical applications and lessons learned.

In addition to economic valuation methods, a number of sociocultural methods can be used to characterize the values attributed to places, landscapes, and other environmental features.  Guidance on sociocultural methods for assessing environmental values, including ethnography, interviews, and surveys, is in preparation.  See **Attachment 2** for a list of non-economic as well as economic methods of environmental valuation.

All new studies of nonmarket values require substantial knowledge of economics to design and interpret.  Individuals preparing nonmarket studies or advising on their use should have demonstrated expertise in this topic.  See information on professional support, section 6.  This guidance is not a comprehensive manual for conducting nonmarket value studies.  Rather, it is primarily intended to introduce non-specialists to the terminology, concepts, and appropriate application of nonmarket environmental valuation.

Attachment 1-1

**GENERAL GUIDANCE**

**(1)  What are nonmarket values?**

*Nonmarket environmental values* (or simply "nonmarket values") reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions, and therefore lack prices.  Examples include the perceived benefits from hiking in a wilderness, fishing for subsistence rather than commercial purposes, and appreciating the existence of the Grand Canyon without actually visiting it (an example of passive or non-use value).

*Ecosystem goods and services* include a range of human benefits resulting from appropriate ecosystem structure and function, such as flood control from intact wetlands and carbon sequestration from healthy forests.  Some involve commodities sold in markets, for example, timber production.  Others, such as wetlands protection and carbon sequestration, do not commonly involve markets, and thus reflect nonmarket values.

The scope of nonmarket values is not limited to the natural environment.  Archaeological and historical sites, for example, may also hold such values.

Since the 1980s, nonmarket valuation has been used in a variety of Federal environmental protection contexts.  Litigation concerning compensation for the 1989 *Exxon Valdez* oil spill in the Gulf of Alaska drew attention to nonmarket valuation as one basis for estimating the losses to the native subsistence fishery, and stimulated extensive academic research.  Nonmarket valuation has a prominent place in the Department of the Interior's regulations for conducting Natural Resource Damage Assessments of events such as oil spills (see 43 CFR 11.83).  The Office of Management and Budget's (OMB) Circular A-4 on regulatory analysis also provides guidance on the use of nonmarket valuation methods (see **Attachment 3**).

Here are some examples of the use of nonmarket values in the BLM's resource management documents.

•       The King Range National Conservation Area's Resource Management Plan has a short discussion of nonmarket values of recreation to supplement market information in the socioeconomic portion of the Affected Environment chapter (**Ref. 10**).

•       The California State Office assessed the social and environmental benefits associated with the BLM's Community Assistance and Hazardous Fuel Programs, considering "both the market-based and nonmarket values that are at risk from wildfire" (**Ref. 12**).

•       In developing a plan to manage scattered tracts along the Little Snake River, the Wyoming State Office obtained nonmarket values "to quantify attitudes and economic values toward alternative ways of managing, selling or trading scattered tracts of BLM-administered lands."  The management alternatives included increased recreation, enhanced wildlife habitat, and increased mining and grazing (**Ref. 11**).

•       The Taos Field Office's Resource Management Plan describes nonmarket values qualitatively.  "Nonmarket values are important to the welfare of visitors, area residents, and other communities inside and outside the planning area. . . . Specific natural amenities mentioned during the public involvement process include cultural resource protection, water quality, soil condition, habitat, landscape and riparian health" (**Ref. 21**).

Attachment 1-2

BLM_0022052

**(2) Why analyze nonmarket values?**

In principle, economic analysis for resource management should consider all relevant values, not merely those that are easy to quantify. Utilizing nonmarket values provides a more complete picture of the consequences of a proposed activity than market data alone would allow.

Information on nonmarket values can support resource management decisions in several ways. These include clarifying the range of non-commodity values potentially affected by management decisions, revealing the magnitude of change in non-commodity values under action alternatives, and better differentiating stakeholder interests. For environmental analyses associated with individual projects, consideration of nonmarket values can clarify potential mitigation strategies. Finally, the analysis of nonmarket values can help offices and programs explain more effectively the objectives of the BLM's resource management.

Economic analyses in NEPA reviews associated with resource management plan adoption, revision and amendment, as well as with other kinds of BLM decision-making have primarily estimated the market impacts of commodity production and recreation. This level of analysis provides important information on the distributional effects of a management decision, asking who gains and who loses. Such information can help local governments anticipate demands on housing and public services. In contrast, assessing the value to society of different management decisions requires a consideration of both the costs and the benefits of each alternative. Both types of economic analysis should contribute to the BLM's decision-making.

- *Impact analysis* provides estimates of the direct, indirect, and cumulative economic activity that a given management decision is expected to create within a specified geographic area. This activity is typically expressed as projected changes in employment, personal income, or economic output. For example, developing a large oil and gas field might employ 9,000 workers and provide $500 million in wages per year, with a certain proportion of that economic impact remaining in the county or other local area. This type of analysis calculates the changes in activity for various economic sectors, typically measured as a difference from the "no-action alternative."

- *Benefit-cost analysis* in principle estimates the full range of economic benefits and costs to society of a proposed activity, both market and nonmarket, providing another picture of the proposed action. The spatial scale of benefit-cost analysis is usually large, for it attempts to capture benefits and costs to individuals regardless of where they reside. Such an analysis can provide a more holistic picture of each management scenario.

*Example 1.* To assess the impacts of a proposed oil and gas field, for example, the BLM routinely performs an impact analysis that estimates the jobs, income, and economic output that will occur over the life of the development. A benefit-cost analysis would estimate the overall economic value of the proposed field. From a market perspective, the economic value of the proposed oil and gas development and production would generally equal the price of oil and gas minus the cost of producing, processing, and transporting the minerals (**Ref. 2**).

Identifying and quantifying nonmarket values associated with this management decision is more challenging, but important. For example, the development of an oil and gas field could reduce the perceived amenity value of the area. This cost could be captured by considering changes to

Attachment 1-3

BLM_0022053

property values.  One study of the effects of siting oil and gas wells near urban development showed a mean loss of some $21,000 (Canadian) or 7 percent of property values for wells within 4 km of residential properties (**Ref. 18**).

*Example 2.*  Visiting fishers, hunters, and climbers may spend money on motels and restaurants, but for the most part recreation on BLM-managed lands comes free or at a nominal charge. Numerous surveys document that individuals are often willing to pay more than their actual costs for a particular recreational experience.  This is termed *consumer surplus* or *net willingness to pay* (WTP), the amount an individual would have been willing to pay for an environmental benefit minus the amount actually expended.  Such surveys provide an important source of information for quantifying nonmarket values.  One nonmarket study of mountain biking on the popular Slickrock Trail, located on the Moab, Utah Field Office, yielded an estimated consumer surplus of $197 to $205 per trip, and an aggregate annual value of $8.4 to $8.8 million (**Ref. 19**).

At least for the BLM's resource management decisions, it is seldom if ever feasible to assess all potential benefits and costs of an action.  In practice the assessment of estimated economic consequences in NEPA analyses for both RMPs and other decisions should describe key economic activity and *selectively* consider benefits and costs of the proposed alternatives, notably nonmarket values.  *Note that the results of impact analysis (in personal income or output) and benefit-cost analysis (in consumer surplus) cannot be directly compared.*  For more on this point, see Technical Guidance.

**(3)  Total economic value – market and nonmarket**

Whatever the scale of analysis, environments have multiple potential uses and provide many benefits.  Some of these benefits are evident in market transactions, others are not.  The term *total economic value* refers to all uses and benefits, both market and nonmarket, provided by a given environment.  The components of total economic value represent a wide range of benefits. For example, a hypothetical landscape managed primarily for conservation and recreation rather than commodity production provides benefits related to:

- Direct use of the resource through recreation, education, and other activities on the landscape that might provide both market and nonmarket values.  Some uses are linked to traditional community practices, such as the contribution of healthy caribou herds to Iñupiat villagers' subsistence way of life on the North Slope of Alaska.

- Indirect use of the resources, such as providing watershed protection for downstream communities, or protecting nearby scenic landscapes for residential property.  These indirect uses typically reflect nonmarket values, though they might be related to market decisions.

- Passive use (sometimes called non-use) benefits, which might stem from a desire to preserve a resource as a social or public good (existence value), for future use (option value), or for enjoyment by future generations (bequest value).  Passive use benefits reflect nonmarket values.

Attachment 1-4

BLM_0022054

**(4)  How and when to consider nonmarket values**

*Describing nonmarket values*

In framing information for management decisions, focus on the *difference in changes to nonmarket values* between action alternatives.  Such information can highlight tradeoffs.  For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may *increase* the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may *decrease* the benefits of subsistence hunting and watershed protection in this area.  The *difference* between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives.

Nonmarket studies provide estimates of both individual and aggregate benefits.  In its simplest form, estimates of the aggregate benefit (consumer surplus) generated by an environmental use or experience is simply the product of the estimated individual benefit (often the arithmetic mean or median of responses) by the estimated population holding such values.  (In the mountain biking example given above, these estimates were $8.4 to $8.8 million per year and $197 to $205 per trip, respectively.)

Nonmarket values can be described in several ways, which vary in specificity, validity, and level of effort.  From least to most effort, these methods include:

- describing the values qualitatively,
- citing quantitative estimates of this type of benefit from other sites (*benefit transfer*), and
- conducting a new study for the site and activity in question.

*First*, nonmarket values can be described qualitatively.

- An assessment of actions to increase access to technical climbing sites might note: "Road and campground improvements under Alternative B will provide the greatest access to technically advanced rock climbing.  More technically demanding climbing opportunities are perceived to offer greater benefits, as documented in 'willingness to pay' surveys of recreational climbing."

- In planning a timber sale, greater harvest setbacks from stream corridors can be linked to greater soil stabilization (an ecosystem service), resulting in cost savings from the reduced need for stream restoration.

*Second*, in benefit transfer, nonmarket values for a plan or project area may be characterized by citing representative estimates of comparable activities studied elsewhere.  The most common approach (*point transfer*) directly applies value estimates from a study site or an average from multiple studies to the proposed site.  For example, nonmarket value estimates for whitewater rafting on the Snake River in Idaho could be applied to rafting on the Rogue River in Oregon.  The main weakness in point transfer is its inability to account systematically for differences between sites.  Therefore, the uncertainty associated with the interpolated estimate may be high.

- A recent EIS for an oil and gas full field development plan characterized the nonmarket values of recreation by citing average benefit estimates from a 2001 meta-analysis, adjusted for inflation (see **Ref. 20**).  For example, the average benefit for camping is cited as $28 and for biking $69 per person per activity day.

Attachment 1-5

BLM_0022055

While such figures may provide a reasonable estimate of the *magnitude* of the benefits to be found if a nonmarket value study were done for the new EIS, such average figures also mask wide variation. The estimated benefits reported in the 2001 review for camping vary from $1.69 to $187.11 per person per activity day; for biking these vary from $17.61 to $62.88 (**Ref. 6, Table 1**).

In contrast, *function transfer* uses regression analysis to account for differences in characteristics between the sites for which estimates are available and the new study site. A function transfer exercise for mountain biking trails might consider as independent variables such attributes as the trail difficulty rating and the trail's scenic quality. This is more accurate than point transfer, but correspondingly more complex. See Technical Guidance: Using Benefit Transfer.

*Third*, if properly conducted, primary (new) research provides the most valid estimates of nonmarket environmental values, with correspondingly lower uncertainty. The drawback is significantly greater time and expense.

A variety of nonmarket valuation methods can be used, depending on the problem (see Methods, below). All methods are technically demanding. Most methods use a survey to collect information on either preferences or behavior. When conducted by or on behalf of a Federal agency, such surveys require approval by OMB, which can add 9 to 12 months or more to the research schedule.

The added time and expense required for original nonmarket studies should not preclude their use by the BLM: many biophysical studies prepared for environmental analyses supporting RMPs or individual project approvals require as great or greater budgets and timeframes. The key is to have a clear rationale for why the improved data provided by a primary study justifies the additional time and expense, and to make this determination early in the planning or project assessment process.

*Criteria for nonmarket valuation*

It is not feasible to estimate *all* nonmarket values potentially associated with a site or landscape. The analysis should instead consider those nonmarket values most relevant to (a) describing the socioeconomic context (affected environment), (b) estimating impacts of the alternatives under consideration, or (c) identifying mitigation measures.

At least a *qualitative* description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in EIS-level NEPA analyses, for both RMPs and project-level decisions. Such description may also be appropriate for inclusion in environmental assessments (EA).

The use of *quantitative* valuation methods should contribute to the analysis of one or more issues to be addressed in the environmental analysis supporting planning or other decision-making (see the *BLM National Environmental Policy Act Handbook*, H-1790-1, Section 6.4). A quantitative analysis of nonmarket values in EIS-level NEPA analyses is strongly encouraged, either through systematic benefit transfer techniques or primary research, where one or more of the criteria provided below apply.

- A proposed action is likely to have a significant direct or indirect effect (as defined at 40 CFR 1508.8 and 1508.27), and the quality or magnitude of the effect can be clarified

Attachment 1-6

BLM_0022056

through the analysis of nonmarket values.  For example, a proposed wind energy installation may affect the viewshed of a nearby community in ways that alter scenic values.

- The alternatives to be considered present a strong contrast between extractive and non-extractive uses of land and resources.  For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation.

- The magnitude of the proposed change is large.  An example could be the difference between a maximum allowable oil and gas development of 250 wells under the no-action alternative and 2,500 wells under the intensive use alternative.

## (5)  Nonmarket valuation methods

Select an approach to estimating environmental values that is appropriate for the decisions to be made, given the constraints of time, budget, available technical support, and the effort required to obtain and analyze the data.

*Revealed preference methods*

Revealed preference is used to estimate direct use values, deriving economic value from an individual's behavior.  These include travel cost, hedonic pricing, and averting behavior.

- The *travel cost method* analyzes data on distance visitors travelled, time spent to reach a site, time spent on-site, other trip expenses, and number of visits to that site over a stated period of time – most commonly for recreation.  From these data a demand curve is generated, which is used to estimate visitors' willingness to pay for a given experience beyond their actual expenditures.

- The *hedonic method* looks for price differences among otherwise similar goods that differ in a particular environmental attribute.  For example, the difference in sale price for otherwise comparable homes in the same general location but with very different views (a parking lot versus an undeveloped mountain meadow) provides an indirect way to estimate the value placed on views of mountain meadows.

- The *averting (or defensive) behavior method* considers the cost of actions taken to avoid an environmental harm as a way to value the experience of some current environmental condition, absent that harm.  For example, the expenditures a homeowner makes to reduce the risk of property damage from wildland fire, such as installing non-flammable roofing tiles or clearing vegetation, provides a lower bound estimate of the value placed on the current condition of the property and its setting.  This approach has particular usefulness in assessing the health effects of pollution.

*Stated preference methods*

Stated preference can be used to estimate both use and passive use values.  Stated preference methods use an individual's stated "willingness to pay" for an environmental use to calculate

Attachment 1-7

BLM_0022057

value.  In some cases stated preference approaches can more precisely target the nonmarket values of interest than can revealed preference approaches.  See **Attachment 3** for recommendations on designing effective stated preference surveys.

- *Contingent valuation* uses surveys to identify the dollar value individuals hypothetically would be willing to pay to preserve an environmental benefit.  Alternatively, such surveys can be used to estimate the amount individuals would be willing to accept in compensation for some environmental loss.

- *Choice experiments* also use surveys to elicit willingness to pay, but here the choices are made among sets of multiple attributes.  For example, a questionnaire on forest management might describe alternative management prescriptions with different options for the spacing of roads, treatment of dead and dying trees, and techniques of riparian protection, as well as the hypothetical payment the respondent would make to value each alternative.  This method elicits economic values for sets of choices that more closely resemble land management decisions than do the simpler questions used in contingent valuation, but such surveys are correspondingly more complex to design and interpret.

Passive uses concern values attributed to a place, landscape, or ecological condition without direct use or experience.  Many Americans will attribute value to the existence of the Arctic National Wildlife Refuge (ANWR) as a wilderness without having been there.  By and large, stated preference methods are the only feasible way to estimate passive use values.  Ignoring passive uses can result in substantially underestimating total economic value.  Nonetheless, using stated preference methods to develop defensible estimates of passive use values can be quite challenging.  See the discussion of estimating passive use values in the Technical Guidance.

*Cost-based methods*

Valuation based on cost can be useful and in some cases may be simpler to use.  Assume a proposed project will degrade a wetland.  One way to value the benefits of conserving the wetland would be to calculate its *replacement cost*; for example, the cost of restoring a wetland elsewhere in the region to provide comparable ecological functions (**Ref. 7**, p. 114).

**(6)  Other recommendations**

(a) Get professional support.  Nonmarket valuation studies require appropriate economic expertise.  If a BLM economist with experience in nonmarket valuation is not available to assist, there are several alternatives:

- The BLM's National Operations Center (NOC), Division of Resource Services has established a Blanket Purchase Agreement with several consulting firms to provide socioeconomic analyses, including nonmarket valuation.

- The NOC has also established interagency agreements with the Forest Service (USFS) and the U.S. Geological Survey (USGS) to provide social and economic assistance to state and field offices.

Attachment 1-8

- The Cooperative Ecological Studies Units (CESU) system, regional networks of federal agencies and universities, provide access to many faculty members with expertise in environmental or ecological economics. Information is available at: http://www.cesu.psu.edu/.

See Contacts (below) for assistance.

(b) Use appropriate assumptions and well established methods. When in doubt, it is better to risk understating rather than risk overstating nonmarket values. Disclose all relevant assumptions and limitations.

(c) Take a collaborative approach in designing an analysis of nonmarket values. Seek buy-in from cooperating agencies and other key stakeholders (consistent with Federal Advisory Committee Act requirements) on the objectives and methods of any nonmarket valuation study. This may forestall a challenge by commodity users or others who may be skeptical about the fairness and validity of nonmarket analyses.

(d) Allow adequate lead times when planning to use nonmarket value surveys. Identical questions administered to 10 or more members of the public require approval by the OMB. In estimating project schedules that require surveys, assume 9 to 12 months for OMB clearance, in addition to the time needed to develop the questionnaire, administer it, and analyze the results. In some cases, it may be feasible to utilize the results of nonmarket value studies commissioned by other organizations, such as a stakeholder group, without a requirement for survey clearance by OMB. Socioeconomic staff at the Washington Office and the National Operations Center can advise. See Contacts.

(e) Estimate the benefiting population as carefully as is practical. There is little point in calculating nonmarket values carefully if the estimated number of benefiting individuals is very imprecise. The nonmarket values of recreation uses are often the most practical to estimate, because many recreation sites have reliable data on annual visitor days.

**(7)  For further information**

At an introductory level, *Ecosystem Valuation* (http://www.ecosystemvaluation.org/) is a website offering extensive information and case studies on nonmarket valuation techniques, sponsored by the Natural Resources Conservation Service and the National Oceanographic and Atmospheric Administration **(Ref. 1).**

For a more rigorous introduction to the use of nonmarket environmental values in resource management, see Cindy S. Swanson and John B. Loomis, *Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management* **(Ref. 2).**

For a technically thorough guide to nonmarket valuation, see Patricia A. Champ, Kevin J. Boyle, and Thomas C. Brown, eds., *A Primer on Nonmarket Valuation* **(Ref. 3).** For information on the methods mentioned in this guidance, see the following chapters:

- averting behavior (11),
- benefit transfer (12),
- choice experiments (6),
- contingent valuation (5),

Attachment 1-9

- hedonic method (10), and
- travel cost (9).

The BLM's course *Socio-Economic Aspects of Planning* is available in a webcast version, and includes a section on the use of nonmarket values **(Ref. 4).**

A report by the Environmental Protection Agency's Science Advisory Board, *Valuing the Protection of Ecological Systems and Services*, provides an excellent review of the methods and challenges of environmental valuation **(Ref. 5).**

For a thoughtful discussion of environmental values and the limits of economics in characterizing them, see Mark Sagoff, *Price, Principle, and the Environment* **(Ref. 14).**

For an overview of ecosystem services and their valuation see Millennium Ecosystem Assessment, *Ecosystems and Human Well-being: A Framework for Assessment* **(Ref. 17)**.

Please check BLM's Socioeconomics Program SharePoint site for additional information on environmental valuation, including nonmarket values and ecosystem services.  Link: https://partnerteamspace.blm.doi.net/sites/sosc/default.aspx.

**(8)  Contacts**

*Washington Office*:  Rob Winthrop, Senior Social Scientist, Socioeconomics Program, Division of Decision Support, Planning, and NEPA (WO-210), 202-912-7287, rwinthro@blm.gov; Rebecca Moore, Economist, Socioeconomics Program (WO-210), 970-226-9246, rmoore@blm.gov.

*National Operations Center*: Josh Sidon, Economist, Division of Resource Services, 303-236-6343, jsidon@blm.gov.

**TECHNICAL GUIDANCE**

This section provides additional technical notes that should be considered by specialists incorporating nonmarket values into the BLM's RMPs and EISs.

**(9)  Comparisons using benefit-cost analysis**

As noted above, economic information can be used in resource management in two main ways.

- *Impact analysis* provides estimates of the direct and indirect economic activity that a given management decision is expected to create within a specified geographic area. This activity is typically expressed as projected changes in employment, personal income, or economic output.

- *Benefit-cost analysis* in principle estimates the full range of economic benefits and costs to society of a proposed activity, both market and nonmarket, providing another picture of the proposed action.  The spatial scale of benefit-cost analysis is usually large, for it attempts to capture benefits and costs to individuals regardless of where they reside.

Attachment 1-10

BLM_0022060

To use nonmarket values in benefit-cost comparisons, they must be compared to like values, expressed as consumer surplus.  For example, if the recreational alternatives under consideration involve different ways of balancing motorized and non-motorized recreation, an appropriate comparison would involve the estimated change in consumer surplus for the various recreational uses, for each alternative.  This involves multiplying the change in net WTP for that use by the estimated number of users.

Nonmarket values reflecting the benefits of recreation or other non-extractive uses can also be compared with the benefits from extractive uses.  In this case the consumer surplus generated by a non-extractive use is compared with the *producer surplus* created by an extractive use.  Producer surplus is the difference between the price a producer of a good or service receives and the minimum price that producer would be willing to accept.  More technically, producer surplus reflects gross revenues minus the variable costs of production, not including the input from public resources made available by the land management decision (**Ref. 2**, pp. 6-12).

In the case of a proposed timber sale, a logging company's producer surplus would be the sale price of the logs delivered to the mill (gross revenues) less the cost of production, including felling the timber, bucking and yarding the logs, and hauling them to the mill.  This is equivalent to the stumpage price, the price paid in the timber sale.  If the timber sale reduces the attractiveness of that forest for recreational uses, then a benefit-cost analysis of the timber sale could include comparing the producer surplus resulting from the timber sale with the change in consumer surplus for recreational uses, which might reflect both a lower number of users and a lower willingness to pay for the recreational experience.

*Do not compare the consumer surplus estimated for a non-extractive use with the economic impact, as measured by personal income or the value of output, for an extractive use.*  The personal income generated by expenditures for a non-extractive use such as mountain biking (e.g., employment at a bike rental shop) *can* be compared with the income generated by an extractive use such as logging.


## (10)  Using benefit transfer

In benefit transfer, nonmarket values for a plan or project area may be characterized by citing representative estimates of comparable activities studied elsewhere.  Unfortunately, the uncertainties involved in nonmarket valuation studies are compounded in applying the results of an existing study to a proposed plan or project in a new environmental and social setting.  As noted above, there are several techniques for benefit transfer.

*Point transfer* directly applies value estimates from a study site or an average from multiple studies to the proposed site.  The main weakness in point transfer is its inability to account systematically for differences between sites.  The simplicity of this method is attractive in situations with limited staff expertise and quick deadlines.  However, for this method to be technically defensible there should be a high degree of correspondence between the study site and the proposed site.

*Function transfer* assumes that nonmarket environmental values are a function of numerous attributes, including biophysical attributes and the socioeconomic context of the environmental use or experience.  For example, a function transfer to estimate the value of improved lake conditions for recreation may relate the willingness to pay for improved water quality (the

Attachment 1-11

BLM_0022061

dependent variable) to multiple factors, including existing water quality, the amount and types of recreational use, population within a half-day drive to the recreation site, the number of substitute sites within a specified distance, and per capita income of the user group (the independent variables). The functional relationship at the study site between the value users attribute to improved water quality and these independent variables will be applied to equivalent data from the new site to provide an estimate of willingness to pay for the proposed improvement.

Function transfer is inherently more accurate than point transfer, but is correspondingly more complex (**Refs. 6, 8,** and **9**).

## (11)  Considerations in estimating passive uses

As noted, a wide range of nonmarket environmental values can be associated with a site or landscape, involving both direct uses (such as the value of a mountain bike trip) and passive uses (such as the value attributed to the existence of the Grand Canyon). Ignoring passive uses can result in substantially underestimating total economic value. Nonetheless, using stated preference methods to develop technically defensible estimates of passive use values can be more challenging than estimating direct use values. Here are some factors to consider.

(1) Surveys should be carefully designed to maximize validity and minimize bias. Survey respondents commonly are more generous when responding to hypothetical questions regarding their willingness to pay for an environmental good than when solicited for actual donations to support the same cause (**Ref. 15**, p. 166). This is termed *hypothetical bias* or *warm glow*, a factor that is particularly relevant to estimating passive use values. Considerable research has been devoted to improving survey techniques to minimize hypothetical bias (**Ref. 16**). In estimating passive use values, the proposed survey and the protocol for administering it should be developed by an experienced researcher, and carefully pretested to minimize hypothetical bias and other distorting factors. (See **Attachment 3**.)

(2) Selecting the appropriate geographic scale is particularly important in surveying passive use values. Total nonmarket benefits resulting from an environmental change are typically determined by multiplying the mean survey value by the estimated population "willing to pay" for the environmental benefit. In estimating passive use benefits, where by definition there is no clearly identifiable group of users, there is no generally accepted principle for determining what geographic area should be included.

The decision on geographic scale has a large effect on the results. A 2009 study of passive use values associated with National Park units affected by operations of the Glen Canyon Dam surveyed at two scales: the dam's hydropower marketing area and nationwide. Across three options considered, the aggregate passive use values for the marketing area ranged from $51 to $81 million, while national estimates ranged from $2.3 to $3.4 billion (**Ref. 13**, Table 1). Similarly, the issue of whether to open the Arctic National Wildlife Refuge (ANWR) for oil and gas development has attracted attention world-wide. It is not clear whether the total passive use value of preserving ANWR as wilderness should be estimated for the population of the North Slope, the state of Alaska, the United States, or the world.

Attachment 1-12

The decision over what geographic area to estimate passive use values is more a matter of management judgment than economic expertise. The choice of scale should be reasonable, considering the nature of the proposed change. In passive use estimates, "the good being valued may have little meaning to respondents, and respondents may be forming their valuations for the first time in response to the questions posed" (**Attachment 3**). It may be appropriate to estimate on a nationwide basis passive use values associated with the Grand Canyon or other nationally recognized environmental goods. But for environmental values associated with most BLM land use plans or projects, a smaller geographic scale is generally appropriate.

## References

1. Website: *Ecosystem Valuation*. Link: http://www.ecosystemvaluation.org/.

2. Cindy S. Swanson and John B. Loomis, *Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management*. Gen. Tech. Rep. PNW-GTR-361. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 32 p, 1996. URL: http://www.treesearch.fs.fed.us/pubs/5620.

3. Patricia A. Champ, Kevin J. Boyle, and Thomas C. Brown, eds., *A Primer on Nonmarket Valuation*, Springer, 2005, 592 pages. Economists from the Forest Service's Rocky Mountain Research Station have developed a companion website, providing examples of survey instruments, data sets, and relevant articles. Link: http://www.fs.fed.us/nonmarketprimerdata/index.html.

4. BLM, National Training Center, *Socio-Economic Aspects of Planning* (webcast). Use the link below to reach the course, select Step 6 (Effects), then select "Valuing Resources." Link: http://www.ntc.blm.gov/krc/uploads/249/social_econ.html.

5. Environmental Protection Agency, *Valuing the Protection of Ecological Systems and Services: A Report of the EPA Science Advisory Board* (EPA-SAB-09-012), 2009. Link: http://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/ValProtEcolSys%26Serv?OpenDocument.

6. Randall Rosenberger and John Loomis, *Benefit Transfer of Outdoor Recreation Use Values*. U.S. Forest Service General Technical Report RMRS-GTR-72, 2001. Link: http://www.fs.fed.us/rm/pubs/rmrs_gtr72.html.

7. R. Kerry Turner, David Pearce, and Ian Bateman, *Environmental Economics: an Elementary Introduction*, Johns Hopkins University Press, 1993, chapters 7 and 8.

8. Randall S. Rosenberger and John B. Loomis, "Benefit Transfer," in Patricia A. Champ, Kevin J. Boyle, and Thomas C. Brown, eds., *A Primer on Nonmarket Valuation*, Springer, 2005, ch. 12.

9. Website: Environmental Valuation Reference Inventory (EVRI) database. The site includes extensive search capabilities. Link: https://www.evri.ca/Global/HomeAnonymous.aspx.

10. *King Range National Conservation Area Resource Management Plan*, 2005. See pp. 3-47 to 3-49 for discussion of nonmarket values. Link: http://www.blm.gov/pgdata/etc/medialib/blm/ca/pdf/pdfs/arcata_pdfs/kingrangefinal.Par.71c73b19.File.dat/chapter3part3.pdf.

BLM_0022063

**11.** John Loomis, *Final Snake River Contingent Value Methodology Study Report*, 2001. Link**:** http://nwcos.org/Resources/BLM%20Documents/Loomis%20BLM%20Snake%20River%20CVM%20Report.pdf .

**12.** David J. Ganz, David S. Saah, Matthew A. Wilson, and Austin Troy. 2007. Efficacy of the California Bureau of Land Management Community Assistance and Hazardous Fuels Programs. Bret W. Butler and Wayne Cook, comps., *The fire environment—innovations, management, and policy.* Proceedings RMRS-P-46CD. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. Link: http://www.fs.fed.us/rm/pubs/rmrs_p046/rmrs_p046_585_606.pdf.

**13.** Bruce Peacock, *Economic Values of National Park System Resources Within the Lower Colorado River Basin: A Compilation of Existing Data and Proposal for Future Work.* National Park Service, Environmental Quality Division, Fort Collins, CO, 2009. Link: http://www.usbr.gov/uc/rm/amp/twg/mtgs/09jun22/Attach_02.pdf.

**14.** Mark Sagoff, *Price, Principle, and the Environment*, New York: Cambridge University Press, 2004.

**15.** Patricia Champ, Rebecca Moore, and Richard C. Bishop, "A Comparison of Approaches to Mitigate Hypothetical Bias," *Agricultural and Resource Economics Review* 38(2):166-180, 2009.

**16.** Richard T. Carson, Nicholas E. Flores and Norman F. Meade, "Contingent Valuation: Controversies and Evidence," *Environmental and Resource Economics* 19:173-210, 2001.

**17.** Millennium Ecosystem Assessment, *Ecosystems and Human Well-being: A Framework for Assessment*, Washington, DC: Island Press, 2003; also available online at: http://www.maweb.org/en/Framework.aspx#download.

**18.** Peter C. Boxall, Wing H. Chan, and Melville L. McMillan, "The Impact of Oil and Natural Gas Facilities on Rural Residential Property Values: A Spatial Hedonic Analysis," *Resource and Energy Economics* 27:266, 2005.

**19.** Fix, Peter, and John Loomis, "The Economic Benefits of Mountain Biking at One of Its Meccas: An Application of the Travel Cost Method to Mountain Biking in Moab, Utah," *Journal of Leisure Research* 29(3):349, 351.

**20.** West Tavaputs Plateau Natural Gas Full Field Development Plan. Final Environmental Impact Statement. UT-070-05-055. Bureau of Land Management, Price Field Office, Price, Utah, Table 3-13-15 (p. 3-210). URL: http://www.blm.gov/ut/st/en/fo/price/energy/Oil_Gas/wtp_final_eis.html (8/12/2012).

**21.** *Proposed Taos Resource Management Plan and Final Environmental Impact Statement.* Bureau of Land Management, Taos Field Office, New Mexico, 2011, vol. 1, ch. 4, pp. 474-475, 2011.

BLM_0022064

## Acknowledgements

Two drafts of this guidance have been extensively revised based on responses from reviewers. Thanks are due to the following colleagues for their thoughtful comments and suggestions:

***Bureau of Land Management***:  Roy Allen, Stewart Allen, Aimee Betts, Meagan Conry, Michael Hildner, Michael Johnson, Vicki Josupait, Joel Larson, Paul McNutt, Liz Meyers-Shields, Rebecca Moore, Matt Preston, Kim Prill, Brent Ralston, Josh Sidon, Bill Stevens, John Thompson, Joan Trent, and Travis Young.

***External reviewers***:  Ken Bagstad (USGS), David Brookshire (University of New Mexico), Steve Crookshank (American Petroleum Institute), Christian Crowley (DOI Office of Policy Analysis), Billy Gascoigne (USGS), Lynne Koontz (USGS), John Loomis (Colorado State University), Pete Morton and colleagues (The Wilderness Society), Bruce Peacock (National Park Service), Leslie Richardson (USGS), and Ben Simon (DOI Office of Policy Analysis). Acknowledgement of these external reviewers does not imply endorsement of this guidance by these individuals or their organizations.

Thanks also to Delilah Jaworski (USFS) for her review of benefit transfer techniques, from which the section on benefit transfer was adapted.

Attachment 1-15

# Attachment 2:  Methods of Environmental Valuation
## (EPA Science Advisory Board)

*Table 3: Methods considered by the committee for possible use in valuation*

| Method | Form of output/units | Related concepts(s) of value from table 1 |
|---|---|---|
| **Measures of attitudes, preferences, and intentions** | | |
| Survey questions eliciting information about attitudes, preferences, and intentions | Attitude scales, preference or importance rankings, behavioral intentions toward depicted environments or conditions | Attitudes and judgments; community-based values |
| Individual narratives and focus groups | Qualitative summaries and assessments from transcripts | Attitudes and judgments; community-based values |
| Behavioral observation | Inferences from observations of behavior by individuals interacting with actual or computer-simulated environments | Attitudes and judgments; community-based values |
| **Economic methods** | | |
| Market-based methods | Monetary measure of willingness-to-pay (WTP) for ecosystem services that contribute to the provision of marketed goods and services | Economic value |
| Travel cost | Monetary measure of WTP for ecosystem services that affect decisions to visit different locations | Economic value |
| Hedonic pricing | Monetary measure of marginal WTP or willingness-to-accept (WTA) as revealed by price for houses or wages paid for jobs with different environmental characteristics | Economic value |
| Averting behavior | Monetary or other measure of WTP as revealed by responses to opportunities to avoid or reduce damages, for example, through expenditures on protective goods or substitutes | Economic value |
| Survey questions eliciting stated preferences | Monetary or other measures of WTP or WTA as expressed in survey questions about hypothetical tradeoffs | Economic value |
| **Civic valuation** | | |
| Referenda and initiatives | Rankings of alternative options, or monetary or other measure of tradeoffs a community is willing to make, as reflected in community choices | Community-based values; indicator of economic value under some conditions |
| Citizen valuation junes | Rankings of alternative options, or monetary or other measures of required payment or compensation, based on jury-determined assessments of public values | Community-based values; constructed values |
| **Decision science approaches** | | |
| Decision science approaches | Attribute weights that reflect tradeoffs individuals are willing to make across attributes, including ecological attributes, for use in assigning scores to alternative policy options | Constructed values |

BLM_0022066

| Method | Form of output/units | Related concepts(s) of value from table 1 |
|---|---|---|
| **Ecosystem benefit indicators** | | |
| Ecosystem benefit indicators | Quantitative spatially-differentiated metrics or maps related to supply of or demand for ecosystem services | Indicators of economic value and/or community-based values |
| **Biophysical ranking methods** | | |
| Conservation value method | Spatially-differentiated index of conservation values across a landscape | Bio-ecological value |
| Embodied energy analysis | Cost of the total (direct plus indirect) energy required to produce an ecological or economic good or service | Energy-based value |
| Ecological footprint | Area of an ecosystem (land and/or water) required to support a consumption pattern or population | Bio-ecological value |
| **Cost as a proxy for value** | | |
| Replacement cost | Monetary estimate of the cost of replacing an ecosystem service using the next best available alternative | Lower bound on economic value only under limited conditions |
| Habitat equivalency analysis | Units of habitat (e.g., equivalent acres of habitat) or other compensating changes needed to replace ecosystem services lost through a natural resource injury | Biophysical value; not economic value except under some very limited conditions |

Environmental Protection Agency, *Valuing the Protection of Ecological Systems and Services: A Report of the EPA Science Advisory Board* (EPA-SAB-09-012), 2009.  Accessed at: http://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/ValProtEcolSys%26Serv?OpenDocument

[NMV guidance 2j - Attachment 2 - EPA Methods]

BLM_0022067

# Attachment 3: Office of Management and Budget
## Guidance on the Use of Stated Preference Methods
## (Circular A-4)

Stated Preference Methods (SPM) have been developed and used in the peer-reviewed literature to estimate both "use" and "non-use" values of goods and services. They have also been widely used in regulatory analyses by Federal agencies, in part, because these methods can be creatively employed to address a wide variety of goods and services that are not easy to study through revealed preference methods.

The distinguishing feature of these methods is that hypothetical questions about use or non-use values are posed to survey respondents in order to obtain willingness-to-pay estimates relevant to benefit or cost estimation. Some examples of SPM include contingent valuation, conjoint analysis and risk-tradeoff analysis. . . .

When you are designing or evaluating a stated-preference study, the following principles should be considered:

- the good or service being evaluated should be explained to the respondent in a clear, complete and objective fashion, and the survey instrument should be pre-tested;

- willingness-to-pay questions should be designed to focus the respondent on the reality of budgetary limitations and alerted to the availability of substitute goods and alternative expenditure options;

- the survey instrument should be designed to probe beyond general attitudes (e.g., a "warm glow" effect for a particular use or non-use value) and focus on the magnitude of the respondent's economic valuation;

- the analytic results should be consistent with economic theory using both "internal" (within respondent) and "external" (between respondent) scope tests such as the willingness to pay is larger (smaller) when more (less) of a good is provided;

- the subjects being interviewed should be selected/sampled in a statistically appropriate manner. The sample frame should adequately cover the target population. The sample should be drawn using probability methods in order to generalize the results to the target population;

- response rates should be as high as reasonably possible. Best survey practices should be followed to achieve high response rates. Low response rates increase the potential for bias and raise concerns about the generalizability of the results. If response rates are not adequate, you should conduct an analysis of non-response bias or further study. Caution should be used in assessing the representativeness of the sample based solely on demographic profiles. Statistical adjustments to reduce non-response bias should be undertaken whenever feasible and appropriate;

- the mode of administration of surveys (in-person, phone, mail, computer, internet or multiple modes ) should be appropriate in light of the nature of the questions being posed to respondents and the length and complexity of the instrument;

- documentation should be provided about the target population, the sampling frame used and its coverage of the target population, the design of the sample including any stratification or clustering, the cumulative response rate (including response rate at each stage of selection if applicable); the item non-response rate for critical questions; the exact wording and sequence of questions and other information provided to respondents; and the training of interviewers and techniques they employed (as appropriate);

- the statistical and econometric methods used to analyze the collected data should be transparent, well suited for the analysis, and applied with rigor and care.

Professional judgment is necessary to apply these criteria to one or more studies, and thus there is no mechanical formula that can be used to determine whether a particular study is of sufficient quality to justify use in regulatory analysis. When studies are used despite having weaknesses on one or more of these criteria, those weaknesses should be acknowledged in the regulatory analysis, including any resulting biases or uncertainties that are likely to result. If a study has too many weaknesses with unknown consequences for the quality of the data, the study should not be used.

The challenge in designing quality stated-preference studies is arguably greater for non-use values and unfamiliar use values than for familiar goods or services that are traded (directly or indirectly) in market transactions. The good being valued may have little meaning to respondents, and respondents may be forming their valuations for the first time in response to the questions posed. Since these values are effectively constructed by the respondent during the elicitation, the instrument and mode of administration should be rigorously pre-tested to make sure that responses are not simply an artifact of specific features of instrument design and/or mode of administration.

Since SPM generate data from respondents in a hypothetical setting, often on complex and unfamiliar goods, special care is demanded in the design and execution of surveys, analysis of the results, and characterization of the uncertainties. A stated-preference study may be the only way to obtain quantitative information about non-use values, though a number based on a poor quality study is not necessarily superior to no number at all. Non-use values that are not quantified should be presented as an "intangible" benefit or cost.

If both revealed-preference and stated-preference studies that are directly applicable to regulatory analysis are available, you should consider both kinds of evidence and compare the findings. If the results diverge significantly, you should compare the overall size and quality of the two bodies of evidence. Other things equal, you should prefer revealed preference data over stated preference data because revealed preference data are based on actual decisions, where market participants enjoy or suffer the consequences of their decisions. This is not generally the case for respondents in stated preference surveys, where respondents may not have sufficient incentives to offer thoughtful responses that are more consistent with their preferences or may be inclined to bias their responses for one reason or another.

Office of Management and Budget, *Circular A-4: Regulatory Analysis*, September 17, 2003.  Developing Benefit and Cost Estimates, (4) Stated Preference Methods.  Accessed 2/12/11.  URL: http://www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf

NMV guidance 2j - Attachment 3 - OMB Methods

BLM_0022069

**John Grant**

| | |
|---|---|
| **From:** | Meister, Chad <cmeister@blm.gov> |
| **Sent:** | Monday, September 08, 2014 1:43 PM |
| **To:** | John Grant |
| **Cc:** | Forrest Cook; Drew Vankat; Angie Adams |
| **Subject:** | Fwd: B.1 Oil-Gas well Estimate |
| **Attachments:** | Uncompahgre Oil Gas Well Estimate 09082014.docx |

Hi John,

Please see the answers to a couple of your questions below (well counts and timing).

I also second Forrest's concerns about listing any controls scenarios since these will be made as implementation decisions, not a broad based across the board, especially since our justification for such will not be readily surmised from the modeling results (i.e. UFO high produced minimal impacts).

If we need to chat, let's set something up, thanks.

---------- Forwarded message ----------
From: **Krickbaum, John (Bruce)** <bkrickba@blm.gov>
Date: Mon, Sep 8, 2014 at 2:12 PM
Subject: Re: B.1 Oil-Gas well Estimate
To: "Meister, Chad" <cmeister@blm.gov>
Cc: Forrest Cook <fcook@blm.gov>

Hi Chad,

I have attached a file with track changes that show the well estimates.

Regarding the schedule, we had hoped to have the Draft to the printers on 10/16.  EMPSi is planning to make the final edits by 9/19.  But, we could add air quality information a week later, by 9/26.

--Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
970-240-5384

On Mon, Sep 8, 2014 at 9:17 AM, Meister, Chad <cmeister@blm.gov> wrote:
Hi Bruce,

1

I feel like you should have been copied on this... can you verify with UFO staff that the well counts for the various alternatives (A-D) under the new UFO RMP are still valid (see below)?


Thank you!!!


---------- Forwarded message ----------
From: **John Grant** <jgrant@environcorp.com>
Date: Fri, Sep 5, 2014 at 6:17 PM
Subject: RE: B.1 Oil-Gas well Estimate
To: "Forrest Cook (fcook@blm.gov)" <fcook@blm.gov>, "Meister, Chad C (cmeister@blm.gov)" <cmeister@blm.gov>
Cc: "Angie Adams (angie.adams@empsi.com)" <angie.adams@empsi.com>, "Drew Vankat (drew.vankat@empsi.com)" <drew.vankat@empsi.com>, Ralph Morris <rmorris@environcorp.com>


Forrest/Chad,


I would like to get started on the work to develop revised UFO oil and gas emission inventories for each of the RMP alternatives (A, B, C, D, and the North Fork Alternative).  As you know, we will be interpolating/extrapolating from the CARMMS low, medium, and high scenarios to estimate these emissions.


Do you know what the timeline is for the completion the updated AQTSD and Chapter 4 section that I'll develop from the revised inventory?


I'm also looking for your input on some of the assumptions that we have to make to develop these emissions. Based on what I know about the alternatives, I have mapped the alternatives according to whether they would have the additional controls included in the CARMMS medium scenario or simply the on-the-books regulations included in the low and high scenarios.  I think Alternative A is clear in terms of the assumptions.  However, for the remaining alternatives, I'm not sure what type of control assumptions you all think would best characterize each alternative.


| Alternative | Controls |
|---|---|
| Alternative A (no action) | Assume similar controls to CARMMS low/high scenario (i.e. on-the-books regulations) |
| Alternative B (protective) | Assume similar controls to CARMMS mitigated scenario (i.e. on-the-books regulations + more stringent controls)? |
| Alternative C (intensive development) | In the previous UFO RMP inventory we had assumed more control than the no action alternative (A), but less control than the protective alternative (B).  We need to decide on what level |

BLM_0022071

| | of control to use for this alternative. |
|---|---|
| Alternative D (preferred) | Same as Alternative C |
| NFA Alternative | Same as Alternative B or additional alternative specific considerations? |

Additionally, we have the following estimates of the number of wells added per year for alternatives A, B, C, and D based on the previous inventory work conducted for the UFO and from the email below for the North Fork Alternative.  I wanted to confirm that the estimates for alternatives A, B, C, and D are still accurate.

| Description | BLM | Cumulative |
|---|---|---|
| **Alternative A** | | |
| Annual Number of Wells Drilled (CBNG) | 25.8 | 27.0 |
| Annual Number of Wells Drilled (Conventional) | 15.9 | 16.7 |
| **Alternative B** | | |
| Annual Number of Wells Drilled (CBNG) | 25.4 | 33.5 |
| Annual Number of Wells Drilled (Conventional) | 17.7 | 22.9 |
| **Alternative C** | | |
| Annual Number of Wells Drilled (CBNG) | 30.9 | 39.0 |
| Annual Number of Wells Drilled (Conventional) | 19.2 | 24.4 |
| **Alternative D** | | |
| Annual Number of Wells Drilled (CBNG) | 28.30 | 36.4 |
| Annual Number of Wells Drilled (Conventional) | 19.10 | 24.3 |
| **NFA Alternative** | | |
| Annual Number of Wells Drilled (CBNG) | 22.9 | 30.8 |
| Annual Number of Wells Drilled (Conventional) | 16.2 | 21.3 |

Thanks,

John



**John Grant** | Manager

ENVIRON International Corporation

3

BLM_0022072

773 San Marin Drive, Suite 2115 | Novato, CA 94998
T: +1 415 899 0706 | F: +1 415 899 0707

jgrant@environcorp.com

---

**From:** Angie Adams [mailto:angie.adams@empsi.com]
**Sent:** Tuesday, August 26, 2014 8:44 AM
**To:** Ralph Morris; jim@carterlakeconsulting.com
**Cc:** Bruce Krickbaum (bkrickba@blm.gov); Kate Krebs; Drew Vankat
**Subject:** FW: B.1 Oil-Gas well Estimate

Ralph and Jim,

Below is the expected oil and gas development for Alternative B.1, North Fork Alternative, to be used for the air quality task. Please work with Forrest Cook and Chad Meister at the BLM COSO to identify any other changes that differentiate Alternative B.1 from the other alternatives or with any questions. Please copy me and Drew Vankat (drew.vankat@empsi.com) on all correspondence with BLM, including notes of phone calls, so that we are kept in the loop. Thank you.

**Angie Adams**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO 80301
tel:  303-447-7160     fax:  866-625-0707

www.EMPSi.com        Twitter: EMPSInc        Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S*

Asheville      Denver      Portland      Reno      San Francisco      Santa Fe      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

---

**From:** Krickbaum, John (Bruce) [mailto:bkrickba@blm.gov]
**Sent:** Monday, August 25, 2014 1:40 PM
**To:** Angie Adams; Kate Krebs
**Subject:** B.1 Oil-Gas well Estimate

BLM_0022073

Hi,

For the Air Quality model, use the following numbers for the expected Oil-Gas development for alternative B.1.

| Alternative | # 0F WELLS | BLM | FED FLUID | NPS | OTHER | PRIVATE | USFS |
|:---:|---|---:|---:|---:|---:|---:|---:|
| **B1** | CBM | 0.7 | 1.2 | - | 0.0 | 7.9 | 21.0 |
| | CONVENTIONAL | 4.0 | 1.4 | 0.1 | 0.0 | 5.1 | 10.7 |
| | *TOTAL* | *4.8* | *2.7* | *0.1* | *0.0* | *13.0* | *31.7* |

Bruce Krickbaum

Planner, Environmental Coordinator

BLM Uncompahgre Field Office

2465 South Townsend Ave.

Montrose, CO 81401

970-240-5384

This message contains information that may be confidential, privileged or otherwise protected by law from disclosure. It is intended for the exclusive use of the Addressee(s). Unless you are the addressee or authorized agent of the addressee, you may not review, copy, distribute or disclose to anyone the message or any information contained within. If you have received this message in error, please contact the sender by electronic reply to email@environcorp.com and immediately delete all copies of the message.

--
*Chad C. Meister*
*Air Resource Specialist*

BLM Colorado State Office
2850 Youngfield Street

BLM_0022074

Lakewood, CO 80215
303-239-3949


--
***Chad C. Meister***
***Air Resource Specialist***

BLM Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215
303-239-3949

6

BLM_0022075

U.S. DEPARTMENT OF THE INTERIOR  **BUREAU OF LAND MANAGEMENT**
**National**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

May 30, 2014

In Reply Refer To:
6500 (170/200/300/400) P

EMS TRANSMISSION 06/16/2014
Instruction Memorandum No. 2014-100
Expires: 09/30/2015

To:              State Directors, Colorado and Utah

From:            Assistant Director, Resources and Planning

Subject:         Gunnison Sage-grouse Habitat Management Policy on Bureau of Land Management-
Administered Lands in Colorado and Utah

**Program Area**: All Programs.

**Purpose**:  The intent of this Instruction Memorandum (IM) is to provide interim guidance for protecting
important habitat across the range of the Gunnison Sage-Grouse (GUSG). The Bureau of Land Management
(BLM) will continue to apply conservation measures to manage and conserve GUSG and their habitat and
consider the U.S. Fish and Wildlife Service (FWS) advisory recommendations for minimizing or avoiding
adverse effects to GUSG or their proposed critical habitat. Habitat protection is crucial for the conservation
and protection of this species. The BLM will focus any type of development in non-habitat
areas. Disturbance will be focused outside of a 4-mile buffer around leks.  The BLM intends that little or no
disturbance occur within the 4-mile buffer, except for valid existing rights, and except where benefits to the
GUSG are greater compared to other available alternatives. This guidance:

- Recognizes the FWS Proposed Listing of the GUSG as endangered (78 FR 2486) under the
  Endangered Species Act (ESA) (January 11, 2013) posted at http://www.fws.gov/policy/library
  /2013/2012-31667.pdf.
- Provides updated direction regarding management and ongoing planning actions in GUSG occupied
  habitat.
- Recognizes that the BLM proposes to incorporate objectives and conservation measures for the
  protection of GUSG and its habitat into relevant Resource Management Plans (RMP) through a GUSG
  range-wide plan amendment process.
- Ensures continued coordination with the FWS, State fish and wildlife agencies, and other partners
  regarding implementation, updates and project prioritization for GUSG conservation and strategies
  identified in the Range-wide GUSG Conservation Plan (RCP) and local GUSG population conservation
  plans posted at: http://wildlife.state.co.us/WildlifeSpecies/RecoveryConservationPlans/Pages
  /RecoveryConservationPlans.aspx.
- Does not preclude developing or using additional conservation measures or strategies deemed
  necessary to maintain or enhance local GUSG habitat and populations.

Should the final FWS determination be to list GUSG under the ESA, the BLM will review the implementation
of this policy in accordance with any Recovery Planning schedules to determine the effectiveness of the
guidance and make changes as necessary.

**Policy/Action:**  The BLM will continue to apply conservation measures to manage and conserve GUSG and
its habitat and consider the FWS advisory recommendations for minimizing or avoiding adverse effects to
GUSG or its proposed critical habitat. The BLM's policy is to manage GUSG seasonal habitats and maintain
habitat connectivity to support sustainable GUSG populations and/or GUSG population objectives as
determined in coordination with the FWS and State fish and wildlife agencies.  This policy is consistent with
strategies outlined in the GUSG RCP.  This policy is consistent with the BLM National Sage-grouse Habitat
Conservation Strategy (USDI BLM 2004a), CO IM 2010-028 (GUSG & Greater Sage-grouse [GRSG] habitat
management), WO IM 2010-071 (energy), WO IM 2010-022 (structures), WO IM 2013-128 (fire), WO IM
2010-117 (oil and gas leasing reform), CO IM 2005-038 (GUSG RCP), and CO IM 2013-033 (GUSG habitat
management).  This policy is structured to incorporate adaptive management processes to achieve habitat

conservation, restoration and enhancement goals. This policy will be reviewed and updated, as necessary, following the final FWS listing decision.

Unless otherwise stated, BLM management actions and conservation measures in this IM apply to occupied habitat. Occupied habitat is defined in this IM as the FWS "proposed occupied critical habitat" (hereafter referred to as occupied) for GUSG in Colorado and Utah. Within the Gunnison Basin, occupied habitat is further delineated as Tier 1 or Tier 2 habitats using a habitat prioritization tool, developed locally in conjunction with Gunnison County, FWS, Colorado Parks and Wildlife (CPW), and other agencies. This policy applies to all activities and programs authorized and/or occurring on BLM-administered lands, including federal mineral estate. The direction in this IM is time-limited: the conservation policies and procedures described in this IM will be applied until the BLM makes GUSG conservation and resource management decisions through the land use planning process.

The BLM will work with FWS, and the State fish and wildlife agencies in identifying the best available science for implementation of this IM.

**GUSG Habitat Mapping**

As part of the proposed listing decision, the FWS proposed critical habitat for GUSG (78 FR 2540) posted at http://www.fws.gov/policy/library/2013/2012-31666.pdf. The proposed critical habitat map includes occupied GUSG habitat (as previously mapped by CPW and the Utah Division of Wildlife Resources (UDWR), 2004, as updated), and proposed unoccupied habitat. The FWS compiled proposed unoccupied critical habitat using mapping from the RCP (*potentially suitable habitat* – defined as in need of restoration, but capable of supporting sagebrush communities, and *vacant/unknown habitat* – defined as suitable habitat with no documentation of occupancy) and additional areas thought necessary for GUSG conservation based on 1) proximity to occupied habitat, 2) ability to provide connectivity, and 3) size of area, where sagebrush is a primary plant community (78 FR 2552). The final decision on whether to designate critical habitat for GUSG is expected around the same time as the final listing decision (anticipated November 12, 2014).

The BLM will continue to work with State fish and wildlife agencies and other partners to collect site-specific GUSG habitat data. GUSG habitat data includes seasonal habitat mapping (nesting, brood rearing and winter), and/or GUSG habitat condition assessments as documented in Land Health Assessments (LHA). Habitat condition assessments reflect progress towards meeting GUSG habitat objectives set forth in the RCP or local conservation plans, as determined through the Habitat Assessment Framework (HAF) indicators or other BLM-approved habitat monitoring methods.[1]

If the species is listed and the FWS develops a range-wide Recovery Plan, the BLM will cooperate in the development and implementation of the Recovery Plan on public lands consistent with the policies in BLM's Special Status Species Management Manual 6840. This participation includes, but is not limited to, representation on the Range-wide Steering Committee (RSC) and local GUSG population working groups.

**Land Use Planning**

The BLM proposes to incorporate objectives and conservation measures for the protection of GUSG and its habitat into approved Resource Management Plans (RMP) through a GUSG range-wide plan amendment process.

As part of this GUSG range-wide planning process, the BLM will consider alternative(s) that:

- Close fluid mineral (oil and gas or geothermal) leasing, and consider land allocations following expiration of oil and gas and geothermal leases with a full range of alternatives, including a scenario where the lands will not be re-offered for lease in occupied GUSG areas;
- Exclude new energy development and rights-of-way (ROW);
- Reduce or make lands unavailable to livestock grazing (consistent with WO-IM-2012-169) in GUSG occupied habitat;
- Include consideration of regional mitigation strategies and appropriate mitigation measures (avoid, minimize, and/or compensate) to reduce or eliminate impacts to GUSG populations;
- Address other factors that may pose a threat to GUSG populations, including recreation management, vegetation treatments, and invasive plant management; and
- Consider citizen-based alternatives, as appropriate.

Through this range-wide plan amendment process, BLM Colorado and Utah FOs should consider and evaluate GUSG habitat conservation measures related to timing restrictions, buffer distances, percentages of allowable surface-disturbing activities, noise and desired density levels or other development constraints consistent with the GUSG RCP (including subsequent updates), current peer reviewed sage-grouse

research, conservation summaries based on research or as developed in conjunction with State fish and wildlife agencies and the FWS to meet local population objectives. At a minimum, FOs will analyze and implement conservation measures that prohibit or limit energy and discretionary mineral development within four miles of active leks, and minimize surface disturbance and disruptive activities in all occupied habitat, where appropriate.

**Gunnison Basin Candidate Conservation Agreement**

The Gunnison FO, in conjunction with the FWS, CPW, National Park Service (NPS), U.S. Forest Service (USFS), Natural Resources Conservation Service (NRCS) and multiple stakeholders, developed a Candidate Conservation Agreement (CCA) to guide management of GUSG on public lands in the Gunnison Basin. The CCA focuses on managing key threats on federal lands identified by FWS for this population: grazing, recreation, roads, and transmission lines. Actions that fall under the purview of the CCA will follow CCA direction in the Basin. The range-wide planning effort will incorporate measures found in the CCA. All other actions will consider conservation measures identified in the RCP and this IM as the primary guidance for management.

**All Program Areas**

BLM FOs will:

- Work within multiple programs including recreation, hazardous fuels, fire management, Public Domain forestry, range management, and wildlife to accomplish GUSG habitat conservation.  When permitting or authorizing activities, FOs will consider, analyze and incorporate appropriate GUSG management strategies, best management practices (BMPs), and mitigation actions (avoid, minimize, and compensate) through NEPA analysis or other regulatory processes.  FOs will continue to implement appropriate BMPs through the permitting process in all program areas.  BMPs could include those identified at the local, state or national level for oil and gas development in GUSG habitat (see also RCP (Appendix L), fire (WO-IM 2013-128), and grazing guidelines (RCP 2005)).

- Continue coordination with the FWS and State fish and wildlife agencies on appropriate site-specific habitat or population-level management strategies (RCP 2005).  This will include, but is not limited to, considering, prioritizing and implementing management prescriptions and strategies outlined in the RCP and local GUSG conservation plans, as well as all subsequent updates as appropriate. The BLM will work with FWS and State fish and wildlife agencies to determine the best available science for implementation of this IM and, if appropriate, will revise the IM accordingly.

- Implement a 0.6-mile no surface disturbance/no surface occupancy buffer radius (RCP 2005) around all active leks for project-level implementation such as fences or sagebrush habitat treatments. Any sagebrush removal or treatment should be prohibited within this buffer, unless implemented to maintain or enhance the lek (RCP, Appendix I).

- Per the RCP (Appendix I), the BLM should manage all sagebrush habitat within a 4-mile radius of an active lek as GUSG breeding habitat (lekking, nesting, early brood rearing). To complement protections within the 0.6-mile buffer (described above), breeding habitat should be managed to minimize disturbance to GUSG during critical seasonal time periods and minimize the footprint of any project, habitat fragmentation across the landscape, and cumulative effects on the associated population (see RCP, Appendix L).  The following specific disturbance guidelines (see RCP, Appendix I) should be analyzed and applied to all ongoing program authorizations where appropriate:

    o  Prohibit surface disturbing activities and disruptive activities within four miles of active leks from March 1 through June 30 (RCP 2005), subject to valid existing rights and emergency repairs of ROWs.
    o  Avoid surface disturbance within mapped winter habitat for GUSG (if not mapped, within four miles of active leks); if surface disturbance cannot be avoided, prohibit said activity from December 1 through March 15 (RCP 2005).

- Include requirements to new Special Recreation Permits (SRP) to avoid disturbing leks during the breeding season. SRPs for hunting (other wildlife species), bird watching, and other activities should include appropriate timing restrictions to minimize disturbance to GUSG during critical seasonal periods such as the breeding, late brood rearing and winter-use periods.

- Evaluate the need, and implement where appropriate, seasonal or permanent road or trail closures in occupied habitat through travel management planning and associated NEPA analysis for BLM authorized routes.  Avoid construction of new roads or ROWs within four miles of active leks.

BLM_0022078

- Analyze the impacts to GUSG when renewable energy (e.g., wind, solar, biomass) development and associated infrastructure (e.g., transmission lines) is proposed in or adjacent to sagebrush habitat, and avoid occupied habitat where warranted.  Manage areas within four miles of active leks as ROW avoidance areas.

- Avoid routing above-ground transmission or distribution lines within occupied habitat.

- In response to a Plan of Operations, evaluate the impacts of non-discretionary activities managed under 43 CFR 3809 (those actions authorized under the 1872 mining law) on local GUSG populations, and clearly describe those effects that cannot be mitigated through the regulatory process.  Through the NEPA process, analyze potential impacts of discretionary mining activities and mitigation approved under 43 CFR 3400 (such as coal management), 43 CFR 3500 (non-energy leasable materials), and exploration or extraction of other solid minerals wherever possible.

- Incorporate adequate reclamation standards designed to re-establish suitable GUSG seasonal habitats (RCP 2005, Appendix H) for all surface-disturbing activities within occupied GUSG habitat.  Incorporate native seed mixtures in restoration efforts.  Wherever possible, native seed mixtures should include a minimum of three native grasses, two native forbs and one native sagebrush species.  Use desired non-persistent, non-native vegetation in rehabilitation only where other options have been proven unsuccessful.

- Monitor all restoration activities for success in meeting short- and long-term vegetation objectives and reclamation standards, including potential weed infestations following the principles outlined in the BLM Assessment, Inventory and Monitoring Strategy.  Conduct follow-up treatments to eliminate weeds as identified through monitoring.  If vegetation objectives are not being met, adjust restoration actions accordingly to improve success of achieving desired GUSG habitat objectives.

## Proper Livestock Grazing

Continue to evaluate and implement livestock grazing management practices consistent with achieving GUSG seasonal habitat objectives during allotment permit renewals and associated NEPA analysis, or as identified through LHAs.  Consistent with the best available science compiled in accordance with the Policy section above, GUSG habitat objectives identified in the RCP (Appendix H) should be considered the range-wide standards for managing GUSG seasonal habitats.  Habitat objectives may be adjusted if more localized habitat structural data are available in coordination with State fish and wildlife agencies and the FWS on a population-by-population basis.  GUSG habitat objectives should always be managed with consideration to ecological site potential.

Use the BLM-approved monitoring techniques described in the HAF to assess and monitor long-term GUSG habitat conditions and trend in conjunction with authorized grazing management.

Where current livestock grazing management has been identified as a causal factor in not meeting Land Health Standards (43 CFR 4180), use the process in WO-IM-2009-007, Process for Evaluating Status of Land Health and Making Determinations of Causal Factors When Land Health Standards Are Not Achieved, to identify appropriate actions. Evaluate progress towards meeting standards that may affect GUSG or its habitat prior to authorizing grazing on an allotment that was not achieving land health standards in the last renewal cycle, and livestock was a significant causal factor.  Where available, use current monitoring data to identify any trends (e.g., progress) toward meeting the standards.  Where monitoring data are not available or inadequate to determine whether progress is being made toward achieving Land Health Standards, an interdisciplinary team should be deployed as practicable to conduct a new land health assessment.  The NEPA analysis for the permit/lease renewal must address a range of reasonable alternatives including alternatives that improve GUSG habitat.

## Wildland Fire and Fuels Management

While GUSG protection and habitat enhancement is a high priority for the fire management program, firefighter and public safety is the first priority on every fire and takes precedence over natural resource protection. Local agency administrators and resource advisors will convey resource protection priorities to incident commanders. Incident Commanders will then develop and establish incident objectives, strategies, and operational tactics that ensure firefighter and public safety.[2]

The strategy for all unplanned ignitions in GUSG habitat will be "fire suppression." Fire suppression strategies and tactics used on an incident will comply with RMP and Fire Management Plan (FMP) direction. Unplanned ignitions in GUSG occupied habitat will not be managed to meet resource objectives until a final FWS listing decision is made and a programmatic consultation can be completed, if warranted.

Discretionary actions under the fire and fuels management program include:  unplanned ignitions managed to meet resource objectives; planned ignitions (i.e., prescribed fires); and mechanical, biological and chemical vegetation treatments to reduce hazardous fuels. When these discretionary actions are expected to occur in occupied or unoccupied critical habitat, they must occur under conditions analyzed to be acceptable to meet GUSG resource objectives. The NEPA analysis for FMPs and project plans for these discretionary actions address achieving GUSG habitat objectives and must undergo appropriate consultation with the FWS following the final GUSG listing decision under ESA should the FWS make a final determination to list GUSG. These decisions must be documented in the Wildland Fire Decision Support System.

**Climate Change/Rapid Eco-regional Assessments (REA)**

The proposed GUSG listing package acknowledges the potential for climate change to alter the distribution of native vegetation, increase the potential for invasive species introduction and increase fire frequencies and intensities, all of which may have long-term impacts to key GUSG seasonal habitats across the landscape.

- The BLM Colorado State Office (COSO) will continue to develop a statewide Climate Change Adaptation Strategy, which will include a vulnerability assessment of GUSG.

- FOs in Colorado will implement climate change adaptation strategies developed through the statewide effort. The strategies will be informed by data provided by REAs or other assessment documents, as appropriate.

- BLM Colorado and Utah will incorporate landscape-level data and adaptive management strategies using information identified through the REAs or other assessments to conserve and restore sagebrush habitats.

**Processing Fluid Mineral Leases in GUSG Habitat**

*New Nominated Leases*
In accordance with WO IM 2010-117, Change 1, "the State Directors have discretion to temporarily defer leasing on specific tracts of land based on information under review during planning." Since the RCP (2005) was signed, the BLM Colorado's policy has been to defer leasing of occupied GUSG habitat until new FO land use planning has been completed, as these documents detail significant new information on GUSG not addressed in current plans.  The BLM will continue to defer leasing in occupied habitat to avoid affecting decisions related to future management decisions.

*Existing Leases*
For authorization of any development actions (for individual APDs or where an operator proposes a Master Development Plan) where there are valid existing rights, FOs must coordinate with the FWS (consistent with requirements under ESA), CPW (consistent with COGCC MOU – Attachment 1), UDWR, and industry on management actions designed to minimize impacts to GUSG or their habitat, including Conditions of Approval (COA) that will be applied to future APDs.  The BLM must ensure that any proposed COAs or mitigation measures are consistent with the RMP, are adequately supported by site-specific NEPA analysis and do not violate any lease rights (see Yates Petroleum Corp., 176 IBLA 144 [2008]).

In accordance with standard lease terms and conditions, existing leases are subject to applicable laws, including ESA, and therefore, may be required to adopt conditions of approval that would reduce adverse impacts to the species consistent with site-specific environmental analysis and ESA conference or consultation.

BLM offices are encouraged to work with the FWS, State fish and wildlife agencies, and industry in advance of planning to develop potential strategies in a particular geographic area.  This pre-planning may include conservation strategies such as siting a project in lower quality habitat, clustering activities to minimize fragmentation of existing habitat patches, or noise mitigation.

This policy does not preclude developing and immediately implementing new mitigation or conservation measures necessary to reduce activity/project impacts to GUSG or their habitats, provided this mitigation is in accordance with existing RMPs and lease rights granted.  Any new measures applied for GUSG will be coordinated with the FWS and State fish and wildlife agencies.  FOs will work with project proponents, the State, the FWS, and private landowners when appropriate to implement direct avoidance and minimization measures (e.g. relocating disturbance, timing restrictions, etc.) and use COAs.  FOs must ensure any recommended COAs or operator-negotiated stipulations are supported by appropriate analysis through

NEPA during the APD, plan of development, or use-authorization approval process.  Biologists are encouraged to reference existing analyses or accepted recommendations from national, range-wide, or local conservation plans; existing or new peer reviewed research studies; or other scientific reports within the NEPA analysis, rather than restate those analyses.

In accordance with Fluid Mineral Resources Handbook (H-1624-1, 2013), the federal government retains certain rights when issuing an oil and gas lease. While the BLM may not unilaterally add a new stipulation to an existing lease that it has already issued, the BLM can subject development of existing leases to reasonable conditions, as necessary, through the application of COAs at the time of permitting. The new constraints must be consistent with the applicable land use plan and not in conflict with rights granted to the holder under the lease.

If the existing lease is in occupied GUSG habitat, and the land use plan does not contain mitigation, FOs should request the operator to modify existing stipulations or add an additional stipulation to mitigate the impacts to GUSG habitat.  When applicable under 43 CFR 3101.1-4, if, after the lease is issued, the authorized officer determines that a modification of a lease term or stipulations involve an issue of major concern for the public, the modification shall be subject to public review for at least 30 days.  43 CFR 3101.1-4. If the operator refuses to sign a stipulation modification or to add a new stipulation, the BLM will need to carefully evaluate whether the project can proceed based on the level of impacts identified in the site-specific NEPA analysis and the BLM's obligation to prevent unnecessary or undue degradation [43 USC 1732(b).]. Any development pursuant to valid existing rights will be approved in the location and in a manner that best minimizes impacts to GUSG.

Where authorized in the applicable RMP, exceptions to lease stipulations or COAs in sagebrush habitats will be considered on a case-by-case basis and coordinated with the FWS and State fish and wildlife agencies before approval.  Any exception authorized in occupied habitat will require District Manager review.

The BLM will defer fluid mineral lease nominations in GUSG occupied habitat until management prescriptions and strategies outlined in the RCP, local GUSG population conservation plans, and/or potential impacts to local GUSG populations as summarized in recent/existing research studies or conservation summaries, have been considered and evaluated through the range-wide plan amendment effort and associated NEPA analysis. Such analyses must consider the cumulative impact of decisions and mitigation measures.

Development constraints may vary by FO when those constraints are based on locally-collected scientific data or local habitat conditions and are supported with clear rationale in the range-wide amendment NEPA analysis. Prescriptive measures carried forward through the selection of the preferred alternative in the range-wide plan amendment will be incorporated into all new leases within occupied or other GUSG habitats, as outlined in the planning document.

Lands determined to be available for lease and development within occupied GUSG habitat, and under what constraints, will be described in the proposed range-wide plan amendment. The BLM will ensure that the GUSG range-wide plan amendment contains language consistent with recent Interior Board of Land Appeals (IBLA) decisions (Yates Petroleum Corp., 176 IBLA 144 [2008] and William P. Maycock, 177 IBLA 1 [2009]).[3] These decisions allow the BLM discretion to modify surface operations to add specific mitigation measures supported by site-specific National Environmental Policy Act of 1969 (NEPA) analysis undertaken during the development phase on existing leases. The IBLA has made it clear when making a decision regarding discrete surface-disturbing oil and gas development activities following site-specific environmental review, the BLM has the authority to impose reasonable protective measures not otherwise provided for in lease stipulations to minimize adverse impacts on other resource values.

### Drainage
It is the responsibility of the BLM to protect the interests of the United States where it is determined that the oil and gas resource is subject to drainage. The BLM has many tools at its disposal to do so, such as forced pooling, communication agreements, issuing leases, and drilling protective wells. Where it is determined that drainage is occurring, the BLM will analyze and employ the least disruptive method necessary to protect the interests of the United States. If disturbance is necessary, the BLM protect GUSG habitat by applying the conservation concepts outlined in this IM, as well as other best management practices, as appropriate.

**Processing Proposed Solid Mineral Leases (Coal) in GUSG Habitat** (i.e., a lease has not been issued and, therefore, no valid existing rights have been established)

The BLM will defer leasing in occupied habitat to avoid affecting decisions related to future management

until new FO land use planning has been completed.

**Sagebrush Habitat Improvement/Restoration Projects**

All GUSG habitat improvement projects should clearly articulate and document the need for the project to achieve desired habitat objectives (RCP 2005, Appendix H).  Documentation should include current habitat condition assessments and specific treatment objectives as they relate to GUSG habitat.

All vegetation treatments in sagebrush habitat should consider and incorporate seasonal GUSG habitat needs into project design, analysis and approval when those projects are completed to meet other program area objectives.  Recommendations for sagebrush removal or treatment projects within seasonal habitats are located in the RCP, Appendix I (pg. 6-7). (See guidance under "All Program Areas" for more information.)

All habitat treatments and management prescriptions in GUSG habitat should incorporate appropriate effectiveness monitoring to determine whether one or more of the following goals are being achieved:

1)    Meeting site-specific GUSG habitat objectives consistent with best available science compiled in accordance with the Policy section above;
2)    Enhancing the long-term sustainability of local GUSG populations;
3)    Promoting the maintenance of large intact sagebrush communities;
4)    Limiting the expansion or dominance of invasive species;
5)    Maintaining or improving soil site stability, hydrologic function, and biological integrity;
6)    Enhancing the native plant community, including the native shrub reference state in the *State and Transition Model*, with appropriate shrub, grass, and forb composition identified in the applicable ESD where available; and
7)    Meeting specific project or management objectives as they relate to GUSG or their habitat.

Monitoring objectives will be coordinated and/or conducted in conjunction with State fish and wildlife agencies, and will use BLM-approved inventory or monitoring methods.

Livestock grazing will be deferred for all GUSG habitat improvement or restoration treatments for a minimum of two growing seasons to ensure establishment and persistence of desired vegetation, unless analysis or management objectives recommend otherwise.

The BLM will prioritize all GUSG restoration efforts in Proposed Unoccupied Critical Habitat in conjunction with the FWS and State fish and wildlife agencies. Priorities will reflect ground-truthing of site capability, likelihood of success, planning and design, monitoring needs, and prioritization by population status and need.

BLM Colorado and Utah will continue to support, coordinate with, and participate in GUSG conservation activities that are led or initiated by the FWS, State fish and wildlife agencies, and local workgroups or other partnerships.  Such activities may include, but are not limited to, ongoing GUSG research studies, habitat mapping and modeling efforts, conservation planning and project implementation, and population monitoring.

**Conference and Consultation with FWS**

The ESA requires the BLM to conference on all management actions that may result in a Jeopardy determinations of a proposed species. Since the BLM is generally not in a position to determine Jeopardy, BLM policy (Manual Section 6840) is to conference on all discretionary
actions that May Affect, or are Likely to Adversely Affect (LAA). Per the FWS Guidance for Conferencing (Attachment 2), the FWS has agreed to continue ongoing discussions and/or conferencing for all land use planning efforts and for the Gunnison Basin CCA. The BLM has shared a list of ongoing planning efforts with FWS to help plan their interim workload with the BLM.

The FWS will not be conferencing on individual projects that may have adverse effects to the species or proposed critical habitat, but are not likely to reach the level of Jeopardy to the species. Assessment of project-level impacts should be documented in the associated NEPA analysis.

Individual projects with an LAA determination will be coordinated through the appropriate state office to support continuing ongoing actions. This will include providing feedback to the field on appropriate conservation measures and levels of impacts.

FOs will work with the appropriate state office to prioritize and streamline future consultation needs if the species is listed and help develop a schedule for submitting priority projects/activities/programmatic Biological Assessments (BA) to the FWS for consultation to manage reasonable workloads for both agencies. This will include assisting the FOs in identifying and grouping similar actions (existing and future) that may be assembled and analyzed in programmatic consultation documents or covered by project screens for one or more GUSG populations.

**Adaptive Management**

For purposes of this IM, adaptive management is used in two broad contexts:

1. Incorporating applicable new research or guidance into GUSG management.

2. Adjusting management to achieve specific GUSG resource objectives as determined    through monitoring (DOI Technical Guide for Adaptive Management, Williams et.al 2007).[4]

As new research, national or state management guidance, population or habitat data, or other pertinent GUSG information becomes available, recommended management of GUSG should be adjusted accordingly.  All recommended management applications will continue to be implemented via NEPA analysis.  The success in implementation and effectiveness of this management direction will be reviewed to determine if GUSG resource objectives are being met. This review will be in coordination with the FWS, State fish and wildlife agencies, and other agencies through the GUSG RSC.  As RMPs are amended or revised in the future with sufficient local population guidance, those conservation measures and management constraints will be reviewed for effectiveness as described above.

Alternatively, where specific GUSG population or habitat objectives have been set, the BLM will use monitoring data to determine the effectiveness of existing management actions in meeting those objectives.  If not deemed effective, management prescriptions should be adjusted to meet identified resource objectives.

**Timeframe**:  This IM is effective immediately.

**Budget Impact**:  This IM will result in additional operational costs for coordination, NEPA review and monitoring of all activities in GUSG habitats in Colorado and Utah.  In addition, full implementation of this IM including initiating a GUSG range-wide Plan Amendment, restoration efforts, response to climate change indicators, and adaptive management may require significant funding.

**Background:**  Since 1999, the GUSG has been petitioned and reviewed for listing under ESA several times. The FWS issued a 12-month finding on September 27, 2010, (75 FR 59804), and determined that GUSG warranted protection under the ESA, but that proposing the species for protection would be delayed while the FWS addressed the needs of other higher priority species. On January 11, 2013, the FWS proposed GUSG as endangered, and concurrently proposed the designation of approximately 1.7 million acres of critical habitat, under ESA, as amended (78 FR 2486; 78 FR 2540).

GUSG occur in seven isolated populations, one of which is connected to a GUSG population in Utah.  It is important to maintain existing populations and/or current distribution throughout both Colorado and Utah, where more than 90 percent of the estimated range-wide population of GUSG occurs within Colorado.  Local GUSG workgroups have been established for six of the seven populations and are engaged in management of the species to varying degrees depending on land ownership and local involvement.  Threats to these species vary by population in both Colorado and Utah, and are articulated in their respective Conservation Plans (RCP 2005).

As a land manager of GUSG habitat, it is imperative that the BLM conserve sagebrush communities to support sustainable GUSG populations and maintain or improve connectivity of habitat within and between existing populations, where appropriate.  However, successful management of GUSG will require cooperation from private, state and federal land owners and managers to address the wide range of land uses that intersect with GUSG habitat.  For instance, while the BLM is a primary land manager of GUSG habitat in Colorado, between 80-90 percent of all oil and gas drilling activity statewide occurs on private, county, or state lands, with no federal nexus.  Only by finding ways to work across landscapes that transcend ownership boundaries will federal, state, and private land owners and managers achieve substantial and measurable conservation of sagebrush communities and sustainable GUSG populations.

**Directives Affected**:  A BLM Colorado/Utah Handbook Supplement will incorporate the new policy and guidance.

**Coordination:** This IM was coordinated with BLM Utah State Office; Colorado State Office; the Washington Office (WO) Resources and Planning Directorate; WO Energy, Minerals, and Realty Management Directorate; and the WO National Landscape Conservation System and Community Programs Directorate.

**Contact:** Robin Sell, Conservation Biologist, at (303) 239-3723, or Leigh Espy, Project Manager, at (303) 239-3801.


Signed by:                              Authenticated by:
Edwin L. Roberson                       Robert M. Williams
Assistant Director                      Division of IRM Governance, WO-860
Resources and Planning


2 Attachments
  1 - COGCC MOU (9 pp)
  2 - FWS Guidance for Endangered Species Act Conferencing for GUSG (1 p)

_____

[1] The HAF is available at http://sagemap.wr.usgs.gov/docs/rs/SG%20HABITAT%20ASESSMENT%202010.pdf
[2] More information available at: https://www.nifc.gov/policies/policies_documents/GIFWFMP.pdf.
[3] Available at: http://www.oha.doi.gov:8080/index.html.
[4] Available at: http://www.doi.gov/initiatives/AdaptiveManagement/TechGuide/openingpgs.pdf

BLM_0022084

BLM-MOU-CO-485

**Memorandum of Understanding Among**
**Bureau of Land Management, Colorado State Office,**
**U.S. Forest Service, Rocky Mountain Region, and**
**Colorado Oil and Gas Conservation Commission**

**Concerning Oil and Gas Permitting**
**on BLM and NFS Lands in Colorado**

This MEMORANDUM OF UNDERSTANDING is hereby made and entered into by and among the Bureau of Land Management, Colorado State Office (BLM); United States Forest Service, Rocky Mountain Region (USFS); and the Colorado Oil and Gas Conservation Commission (COGCC), together referred to as the Parties.

A.  **Introduction**

On December 11, 2008, the COGCC adopted amendments to its Rules of Practice and Procedure (COGCC Rules), 2 C.C.R. 404-1.  On May 30, 2009, COGCC Rule 201A was amended to provide that unless otherwise specified, the amendments would become effective on July 1, 2009 on federal land in Colorado.

B.  **Purpose**

The Parties have enjoyed a successful working relationship in regulating oil and gas exploration and production on federal lands and minerals, and desire and expect that relationship to continue.

The Parties enter into this MOU to provide for efficient and effective oil and gas permitting on BLM and NFS lands in Colorado.  This MOU clarifies the Parties' respective roles and responsibilities in permitting and administering oil and gas operations on federal lands and minerals administered by the BLM and the USFS in Colorado.

C.  **Authorities**

The authorities to enter into this MOU are the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701, *et seq.*; the Forest Service Organic Act, 16 U.S.C. § 551; and the Colorado Revised Statutes, including the Oil and Gas Conservation Act, 34-60-101 *et seq.*, C.R.S.

This MOU is not intended to supersede existing state or federal law, rule, regulation, or pre-existing MOU, including, without limitation, the MOU signed by COGCC and BLM on August 22, 1991, as amended.  Nothing in this MOU will be construed as affecting the authorities of the participants or as binding beyond their respective authorities.

D.  **Reservations**

This MOU is entered into without prejudice to, and without waiving, any jurisdiction or other rights, powers and privileges of any of the Parties thereto.

---

E.    **Party Contacts**

| PARTY | DESIGNATED OFFICIAL | PRINCIPAL CONTACT |
|-------|---------------------|-------------------|
| BLM | State Director<br>Bureau of Land Management<br>Colorado State Office<br>2850 Youngfield Street<br>Lakewood, Colorado 80215-7093<br>303-239-3700 | Chief, Branch of Fluid Minerals |
| USFS | Regional Forester<br>U.S. Forest Service<br>Rocky Mountain Region<br>740 Simms Street<br>Golden, Colorado 80401<br>303-275-5350 | Program Manager, Leasable Minerals |
| COGCC | Director<br>Colorado Oil and Gas<br>Conservation Commission<br>1120 Lincoln Street, Suite 801<br>Denver, Colorado 80203<br>303-894-2100 | Permit Manager |

F.    **Administration**

1.    **Principal Contacts**

Attachment 1 identifies the name and contact information of the Principal Contacts set out above. Upon any change to the name or contact information of a Party's Principal Contact, such Party will communicate the new Principal Contact's name and contact information to the other Parties and Attachment 1 will be updated accordingly.

2.    **Coordination Meetings**

The Parties will hold coordination meetings twice a year to discuss implementation of this MOU. Prior to the meeting, each Party's Principal Contact will identify and circulate to the other Parties any matters to be discussed at the meeting.

3.    **Rights of Enforcement Among the Parties, or by Non-Parties**

This MOU is not a final agency action by any of the Parties, and is not intended to, and does not create, any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity, among the Parties, or by any non-party.

G.    **Definitions**

For purposes of this MOU, the following definitions apply:

1.    **APPLICATION FOR PERMIT TO DRILL** or **APD** means BLM Form 3160-3 (Application for Permit to Drill or Reenter) or COGCC Form 2 (Application to Drill, Deepen, Re-Enter, or Recomplete and Operate).

2.    **BLM LANDS** mean lands in which the surface and/or the oil and gas estate is owned by the United States of America, and administered by the BLM.

3.    **COMMISSION** refers to the Colorado Oil and Gas Conservation Commission.

4.    **COGCC** refers to the staff of the Colorado Oil and Gas Conservation Commission, unless otherwise specified.

5.    **CONDITIONS OF APPROVAL** or **COA** means provisions or requirements under which an Application for a Permit to Drill, a Sundry Notice, or COGCC Form 2 or 2A is approved.

6.    **CONSULTATION** refers to the process described in the COGCC Rules, unless otherwise specified. *See, e.g.* Rules 303, 306, and 1202.

7.    **DAYS** means all calendar days, including holidays, unless otherwise specified.

8.    **MASTER DEVELOPMENT PLAN** or **MDP** means the optional process described in Section III.H of Onshore Order No. 1.

9.    **NATIONAL FOREST SYSTEM LANDS** or **NFS LANDS** means lands, waters, or interests therein administered by the U.S. Forest Service.

10.   **NOTICE OF STAKING** or **NOS** means the optional process described in Section III(C) of Onshore Order No. 1.

11.   **OIL AND GAS LOCATION** means a definable area where an operator has disturbed or intends to disturb the land surface in order to locate equipment or improvements used or installed at an oil and gas location for the exploration, production, withdrawal, gathering, treatment, or processing of oil or natural gas, as provided in the COGCC 100-Series Rules.

12.   **OIL AND GAS OPERATIONS** or **OPERATIONS** means exploration for oil and gas, including the conduct of seismic operations and the drilling of test bores; the siting, drilling, deepening, recompletion, reworking, or abandonment of an oil and gas well, underground injection well, or gas storage well; production operations related to any such well including the installation of flow lines and gathering systems; the generation, transportation, storage, treatment, or disposal of exploration and production wastes; and any construction, site preparation, or reclamation activities associated with such operations, as provided in the COGCC 100-Series Rules and C.R.S. § 34-60-103(6.5).

BLM_0022087

13.   **ONSHORE ORDER NO. 1** refers to the Rule and Preamble published in the *Federal Register* on March 7, 2007, 72 Fed. Reg. 10328, *et seq*., that governs approval of operations on federal oil and gas leases.

14.   **OPERATOR** means any person who exercises the right to control the conduct of oil and gas operations on BLM or NFS lands, as provided in the COGCC 100-Series Rules, or who meets the definition in 43 C.F.R. § 3160.0-5.

15.   **STATE CONSULTATION CONTACTS** means the COGCC, any local government designee within whose jurisdiction an oil and gas location is to be constructed who has indicated to the COGCC the desire to consult on the oil and gas location according to COGCC Rule 306.b, the Colorado Division of Wildlife (CDOW) where the proposed oil and gas location would trigger consultation under COGCC Rule 306.c, the Colorado Department of Public Health and Environment (CDPHE) where the proposed oil and gas location would trigger consultation under COGCC Rule 306.d, and the surface owner where the owner of the surface estate is not the United States of America.

16.   **STIPULATION** means a provision that modifies standard federal lease rights and is attached to and made a part of a federal oil and gas lease.

17.   **SUNDRY NOTICE** means BLM Form 3160-5 and/or COGCC Form 4.

18.   **SURFACE OWNER** means the responsible federal agency having jurisdiction over the surface estate for lands where the surface estate is owned by the United States of America.

H.   **Locations and Operations on BLM or NFS Lands and Federal Leases**

The Parties will advise operators that they are responsible for complying with all applicable laws and regulations, including the COGCC Rules.

1.   **Contacts**

The Parties will compile and make available a list of contacts for purposes of consultation and coordination under this MOU.

2.   **Permitting**

a.   **Pre-Application for Federal APD or MDP**

The Parties will advise operators to identify and incorporate applicable standards and practices contained in the COGCC Rules into a federal APD, MDP, or other authorization related to oil and gas operations so long as such state standards or practices are at least as stringent as comparable federal standards or practices, in order to minimize the potential for multiple reviews.

The Parties will advise operators to provide the BLM, and USFS for operations on NFS lands, with a list of the State Consultation Contacts at the time the operator files an

---

BLM_0022088

application or formal proposal for an oil and gas location(s) with the BLM, or USFS for operations on NFS lands, by including such information on the federal NOS, APD or MDP.

The BLM, or USFS for operations on NFS lands, will furnish the list of State Consultation Contacts to the COGCC along with location coordinates or legal land description of any formally proposed oil and gas location.

**b.      Consultation at Onsite Inspections and on MDPs**

The BLM, or USFS for operations on NFS lands, will include COGCC in scheduling any onsite inspection on a federal APD or NOS and COGCC will invite State Consultation Contacts to attend the onsite inspection once it is scheduled in accordance with Onshore Order No. 1. Additionally, the BLM, or USFS for operations on NFS lands, will work with COGCC to offer State Consultation Contacts the opportunity to participate in initial discussions on an MDP or other application for an authorization related to oil and gas operations. The COGCC will provide the BLM, or USFS for operations on NFS lands, with a list of the State Consultation Contacts notified of an onsite inspection or initial discussions.

The Parties will advise State Consultation Contacts to submit recommendations to BLM, or USFS for operations on NFS lands, within a reasonable amount of time after the onsite inspection to facilitate their NEPA review. The Parties acknowledge that Onshore Order No. 1 allows the BLM to issue a federal APD after 30 days of posting if an onsite inspection has occurred, the application is deemed complete, and NEPA review has occurred.

**c.      Permit Applications**

The Parties will advise operators to file a federal APD concurrently with a COGCC Form 2A, along with any other application(s) or form(s) required by the Parties.

Where the operator, the BLM, or USFS for operations on NFS lands, and any State Consultation Contacts agree to design features or conditions of approval for oil and gas operations as a result of the onsite inspection and subsequent discussions, the Parties will advise operators to incorporate these features into the federal APD (or amended APD) or MDP so that they are part of the "proposed action" analyzed by the BLM and/or USFS pursuant to NEPA, as well as the action proposed in the COGCC Form 2A.

The COGCC will encourage operators to attach to its COGCC Form 2A any forms or attachments completed for its federal APD (or amended APD) or other relevant federal permits and to identify on the Form 2A where the information required for the COGCC Form 2A may be found therein, pursuant to COGCC Rule 303.d.(3).

**d.      Permit Review**

The BLM, or USFS for operations on NFS lands, will provide the State Consultation Contacts timely access to all public comments it receives. Likewise, the COGCC will

BLM_0022089

provide the BLM, or USFS for operations on NFS lands, timely access to all public comments it receives.

During review of permits, the Parties may confer, as necessary, to identify, discuss, and work to resolve any potential concerns that may be addressed by conditions of approval on a federal APD, MDP, or COGCC Form 2 or 2A.

**e.    Other Permitting Matters**

Notwithstanding the foregoing, where the process for BLM, or USFS for operations on NFS lands, approval provides substantially equivalent notice, comment, and consultation procedures as those called for in COGCC Rules 305 and 306, the COGCC Director may, through variances, exempt an oil and gas location from the Form 2A process set out in the COGCC Rules.

The COGCC will advise any party with standing under COGCC Rule 503 who seeks a hearing before the Commission on approval of a COGCC Form 2A to seek concurrent resolution from the BLM Colorado State Director or USFS Regional Forester, where applicable.

**f.    COGCC Comprehensive Drilling Plans and federal MDPs**

The COGCC staff will, upon request of the operator, place a federally approved MDP on the Commission's hearing agenda for approval as a Comprehensive Drilling Plan under COGCC Rule 216 so long as State Consultation Parties and any non-federal surface owners had an opportunity to consult and offer recommendations on the MDP.

**3.    Changes to Terms of BLM, USFS, or COGCC Approvals**

The Parties will advise operators requesting any change to terms of a federal authorization related to oil and gas operations, including conditions of approval, or COGCC Form 2A or other permit, to file such request concurrently with the BLM, and USFS for operations on NFS lands, and COGCC. The Parties may confer on any such request for a change to authorization terms.

**I.    Other Matters**

**1.    Enforcement**

Where the COGCC has reasonable cause to believe that an oil and gas operation on BLM or NFS land violates a provision of the Oil and Gas Conservation Act, its Rules, an order of the Commission, or a permit issued by the COGCC, it will notify the BLM, or USFS for operations on NFS lands, before taking action. The COGCC will consider any enforcement action by the BLM, or USFS for operations on NFS lands, in determining how to proceed with its own action.

BLM_0022090

2. **Waste Management**

a. **Generally**

Consistent with current federal and state practices, the Parties will advise operators that waste generated by their operations must be handled, treated, stored, transported, or disposed of in accordance with applicable federal, Colorado, and local laws, regulations, and orders.

b. **Exceptions**

The Parties will advise an operator seeking an exception from a federal or state practice or standard regarding waste management to file a Sundry Notice or other applicable request with both the COGCC and the BLM.

Upon receipt of such a Sundry Notice or request, the COGCC and BLM, and USFS for operations on NFS lands, will coordinate on consideration of the Sundry Notice or request.

3. **Importance of Planning**

In the interest of achieving long-term resolution of issues, the Parties will endeavor to participate in each others' planning processes, where applicable. The BLM and USFS will consider COGCC input concerning COGCC standards and practices when revising or amending land use plans or any leasing availability decisions, where applicable. Likewise, the Commission will consider BLM or USFS input concerning BLM or USFS standards and practices when adopting Rules or orders.

J. **Information Disclosure**

Any information furnished pursuant to this MOU will be subject to disclosure to the extent allowed under the Freedom of Information Act (5 U.S.C. § 552), the Privacy Act (5 U.S.C. §552a), and/or the Colorado Open Records Act (C.R.S. § 24-72-201 et seq.).

K. **Similar Activities**

This MOU in no way restricts the Parties from participating in similar activities with other public or private agencies, organizations, and individuals.

L. **Effective Date, Duration, and Amendment**

This MOU takes effect upon the signature of all the Parties thereto, and it shall remain in effect for ten (10) years from the date of execution. This MOU may be extended or amended upon written request of any, and written concurrence of all, of the Parties.

BLM_0022091

**M.    Separate Activities and Resources**

Each of the Parties will handle its own activities and utilize its own resources, including expenditure of its own funds, in implementing this MOU. Each Party will carry out its separate activities in a coordinated and mutually beneficial manner.

**N.    Obligation of Funds**

Nothing in this MOU shall obligate any Party to obligate or transfer any funds. Specific work projects or activities that involve the transfer of funds, services, or property among the Parties will require separate agreements and be contingent upon the availability of appropriated funds. Such agreements must be independently authorized by appropriate Colorado or federal authority. This MOU does not provide that authority. Negotiation, execution, and administration of each such agreement must comply will all applicable federal and Colorado statutes and regulations.

**O.    Authorized Representatives**

By signature below, each of the Parties certifies that it is authorized to act in its respective areas for matters related to this agreement.

_____          30 June 09
**David Neslin, Director**                              **Date**
Colorado Oil and Gas Conservation Commission

_____          7/1/09
**Sally Wisely, Colorado State Director**        **Date**
Bureau of Land Management, Colorado State Office

_____          7-10-09
**Rick Cables, Regional Forester**               **Date**
U.S. Forest Service, Rocky Mountain Region

---

MOU: Permitting of Oil and Gas Operations on BLM & NFS Lands in Colorado                    Attachment 1-8    **8**

**Memorandum of Understanding Among
Bureau of Land Management, Colorado State Office,
U.S. Forest Service, Rocky Mountain Region, and
Colorado Oil and Gas Conservation Commission**

**Concerning Oil and Gas Permitting
on BLM and NFS Lands in Colorado**

# ATTACHMENT 1:
**Principal Contacts**

**Jamie Sellar-Baker**
303-239-3753
Jamie_sellar-baker@blm.gov
Acting Chief, Branch of Fluid Minerals
BLM Colorado State Office

**Melody Holm**
303-275-5094
mholm@fs.fed.us
Program Manager, Leasable Minerals
USFS Rocky Mountain Region

**Thom Kerr**
303-894-2100 x5127
thom.kerr@state.co.us
Permit & Technical Services Manager
Colorado Oil and Gas Conservation Commission

BLM_0022093

### Guidance for Endangered Species Act Conferencing for
### Gunnison Sage-grouse and Proposed Critical Habitat

*Background*

- Pursuant to section 7 of the Endangered Species Act (ESA) for Federal agencies, conferencing on proposed species is required only for projects that are likely to jeopardize Gunnison sage-grouse (GUSG), or for projects likely to result in destruction or adverse modification of proposed critical habitat for the species.

- Pursuant to section 7 of the ESA, the Service does not provide "concurrence" for projects that "may affect" proposed species (such as Gunnison sage-grouse) or proposed critical habitat, or projects determined to have "no effect".

*Expectations*

- The Service requests that Federal agencies seek section 7 conferencing only for landscape level projects, and/or projects that are likely to jeopardize GUSG, or projects likely to result in destruction or adverse modification of proposed critical habitat for the species (however, see *Recommendations* below). This is consistent with the section 7 regulations and requirements for Federal agencies.

- The Service will continue focusing its conferencing efforts on significant, landscape level projects or activities that may affect Gunnison sage-grouse. This includes planning associated with conservation tools and actions.  Examples of significant, landscape level projects include resource or forest management plans, national wildlife and species initiatives, and candidate conservation agreements.

*Recommendations*

- The Services recommends that Federal agencies consult the Gunnison sage-grouse Rangewide Conservation Plan (e.g., see Appendix I: GUSG Disturbance Guidelines) in the design of their projects.  As necessary, the Service can provide further technical assistance in the design of projects to avoid and minimize effects to GUSG.

- The Service recommends that Federal agencies internally document project effect determinations (e.g., no jeopardy or adverse modification), as appropriate, including rationale for not conferencing under the ESA (see *Background* above).

Attachment 2-1

BLM_0022094





**COLORADO AIR RESOURCE MANAGEMENT MODELING STUDY (CARMMS) 2021 MODELING RESULTS FOR THE HIGH, LOW AND MEDIUM OIL AND GAS DEVELOPMENT SCENARIOS**
**Draft Final**

Prepared for:
Bureau of Land Management (BLM)
Colorado State Office (COSO)
2850 Youngfield Street
Lakewood, Colorado 80215

Prepared by:
ENVIRON International Corporation
773 San Marin Drive, Suite 2115
Novato, California, 94998
(415) 899-0700

Carter Lake Consulting
P.O. Box 994
Laramie, Wyoming 82073
(307) 760-1538

Environmental Management and
Planning Solutions, Inc. (EMPSi).
1630 30th Street, Suite A-195
Boulder, Colorado 80301
(303) 447-7160

December 2014
06-35841A

BLM_0022095

BLM_0022096

December 2014



## CONTENTS

1.0 INTRODUCTION ...........................................................................................................1

    1.1  Background .................................................................................................................1

    1.2  Purpose .......................................................................................................................2

    1.3  Overview of Modeling Approach ...............................................................................3

    1.4  Air Quality Standards and AQRV Thresholds...........................................................5

        1.4.1  Federal and State Air Quality Standards and PSD Increments ............................5

        1.4.2  Air Quality Related Value (AQRV) Thresholds ....................................................7

2.0 CARMMS DATABASE DEVELOPMENT ........................................................................8

    2.1  Modeling System .......................................................................................................8

    2.2  Episode Selection .......................................................................................................8

    2.3  CARMMS Modeling Domains ...................................................................................9

    2.4  Meteorological Modeling Approach .......................................................................13

        2.4.1  2008 WRF Modeling Methodology ....................................................................13

        2.4.2  Meteorological Model Performance Evaluation ................................................15

    2.5  2008 BASE CASE EMISSIONS ...............................................................................16

        2.5.1  Source of 2008 Base Case Emissions .................................................................16

        2.5.2  On-Road Mobile Sources .....................................................................................19

        2.5.3  Area and Non-Road Mobile Sources...................................................................19

        2.5.4  2008 Oil and Gas Emissions ................................................................................21

        2.5.5  Fire Emissions ......................................................................................................23

        2.5.6  Ammonia Emissions .............................................................................................23

        2.5.7  Ocean Going Vessels ...........................................................................................24

        2.5.8  Biogenic Emissions ..............................................................................................24

        2.5.9  Spatial Allocation ................................................................................................24

        2.5.10 Temporal Allocation............................................................................................25

        2.5.11 Chemical Speciation ...........................................................................................25

        2.5.12 Emissions Quality Assurance and Quality Control ............................................26

    2.6  2008 Base Case Modeling and Model Performance Evaluation .............................28

3.0 FUTURE YEAR EMISSIONS .........................................................................................30

    3.1  Western Colorado BLM Planning Area Oil and Gas Emissions.............................30

        3.1.1  Overview of Calculators ......................................................................................31

        3.1.2  Pollutants .............................................................................................................31

        3.1.3  Temporal ..............................................................................................................32

BLM_0022097

December 2014



3.1.4   Calculator Inputs ................................................................32
3.1.5   Emission Calculations ..........................................................32
3.2   Oil and Gas Emissions outside of the BLM Western Colorado Planning Areas.............35
3.2.1   Colorado Royal Gorge Field Office ...........................................35
3.2.2   South San Juan Basin, New Mexico ...........................................35
3.2.3   Uinta Basin, Utah ...........................................................38
3.2.4   Southwestern Wyoming ........................................................38
3.3   Other Anthropogenic Emissions.................................................39
3.4   Emissions that Remain at 2008 Levels .........................................39
3.5   Western Colorado BLM Planning Area Oil and Gas Emissions.......................39
3.5.1   2021 High, Low and Medium Development Scenarios.........................40
3.5.2   2021 High, Low and Medium Development Scenarios.........................42
3.6   Future Year Emissions Modeling Procedures.....................................46
3.6.1   Non-Oil and Gas Future-Year Emissions Data.............................47
3.6.2   Oil and Gas Future-Year Emissions Data.................................52
3.6.3   Mining Future-Year Emissions Data......................................53
3.7   Emissions Modeling Results....................................................53
3.7.1   Mining PM Speciation Issues ...........................................61
4.0 FUTURE YEAR MODELING APPROACH .....................................................67
4.1   CARMMS Source Apportionment Modeling Approach.................................67
4.1.1   Overview of Source Apportionment Tools ................................67
4.1.2   CARMMS Source Apportionment Configuration .............................68
4.2   Post-Processing of the CAMx 2021 Source Apportionment Modeling Results ...........71
4.3   Class I and Sensitive Class II Areas for Analysis ...........................74
4.3.1   Final Class I and Sensitive Class II Areas.............................74
4.3.2   Class I and Sensitive Class II Area Grid Cell Assignments..............82
4.4   Ambient Concentration Analysis using Absolute Modeling Results ...............87
4.5   Ambient Concentration Analysis using Relative Modeling Results...............87
4.6   Visibility Analysis .........................................................87
4.6.1   IMPROVE Reconstructed Mass Extinction Equations .......................88
4.6.2   Cumulative Visibility..................................................90
4.7   Sulfur and Nitrogen Deposition...............................................91
4.8   Acid Neutralizing Capacity ..................................................93
5.0 2021 MODELING RESULTS .............................................................94
5.1   PSD Pollutant Concentration Impacts at Class I and Sensitive Class II Areas...............94

BLM_0022098

December 2014



    5.1.1    Maximum PSD Concentration Impacts at any Class I or II Area .......................95

    5.1.2    PSD Concentration across All Class I and Sensitive Class II Areas ...................110

5.2  Visibility Impacts at Class I/II Areas using FLAG (2010) ...............................................119

    5.2.1    Maximum Visibility Impacts at any Class I Area for all Source Groups ............120

    5.2.2    Individual Planning Area Contributions to Visibility Impairment at Class I and II Areas using FLAG (2010) ...............................................126

5.3  Cumulative Visibility Impacts at Class I Areas .............................................................142

5.4  Sulfur and Nitrogen Deposition at Class I and Sensitive Class II Areas .......................151

    5.4.1    Highest Deposition Impacts at Class I/II Areas .................................................151

5.5  Acid Neutralizing Capacity (ANC) at Sensitive Lakes ...................................................167

    5.5.1    ANC Calculations for Individual BLM Planning Areas .......................................167

    5.5.2    ANC Calculations for Combined BLM Planning Areas........................................171

5.6  2021 NAAQS Comparisons ..........................................................................................178

    5.6.1    Ozone NAAQS Analysis using Relative Modeling Results .................................178

    5.6.2    Ozone NAAQS Analysis using the Absolute Modeling Results .........................191

    5.6.3    $PM_{2.5}$ NAAQS Analysis ................................................................................209

    5.6.4    $PM_{10}$ NAAQS Analysis ..................................................................................226

    5.6.5    $SO_2$ NAAQS Analysis .......................................................................................229

    5.6.6    $NO_2$ NAAQS Analysis .......................................................................................235

5.7  Source-Receptor Issues ...............................................................................................238

**6.0 ACRONYMS.................................................................................................................242**

**7.0 REFERENCES..............................................................................................................245**

## TABLES

Table 1-1.    Applicable National and State Ambient Air Quality Standards and PSD concentration increments. ...................................................................6

Table 2-1.    Summary of models selected for the BLM CARMMS modeling. .............................8

Table 2-2.    37 Vertical layer interface definition for WRF simulations (left most columns), and approach for reducing to 25 vertical layers for CAMx by collapsing multiple WRF layers (right columns). .....................................12

Table 2-3.    Physics options used in the WestJumpAQMS WRF 2008 simulation modeling.................................................................................................15

Table 2-4.    Summary of sources of emissions and emission models used to generate 2008 base case emissions for use in CARMMS........................................18

Table 2-5.    Spatial surrogate distributions to be used in the SMOKE emissions modeling spatial allocations..........................................................................25

BLM_0022099

December 2014



Table 2-6.     Emissions processing categories and temporal allocation approach for 2008 Base Case emissions modeling. ................................................................. 27

Table 3-1.     Comparison of oil and gas emissions (tons per year, TPY) from the 8 western Colorado BLM Planning Areas for 2021 High, Low and Medium Development emission scenarios. ........................................... 41

Table 3-2a.   Summary of oil and gas NOₓ and VOC emissions within the 8 western Colorado BLM Planning Areas for the 2011 current year and 2021 High Development emission scenarios (2021 emissions include both existing and new O&G sources). ......................................... 43

Table 3-2b.   Summary of oil and gas NOₓ and VOC emissions within the 8 western Colorado BLM Planning Areas for the 2011 current year and 2021 Medium Development emission scenarios (2021 emissions include both existing and new O&G sources). ......................................... 44

Table 3-2c.   Summary of oil and gas NOₓ and VOC emissions within the 8 western Colorado BLM Planning Areas for the 2011 current year and 2021 Low Development emission scenarios (2021 emissions include both existing and new O&G sources). ......................................... 45

Table 3-3.      Source of VOC speciation profile and spatial surrogates used for gridding oil and gas emissions in the 14 CO/NM BLM Planning Areas. ............... 53

Table 3-4.     Total emissions (tons per year) for each Source Category (see Table 4-1) and combinations of Source Categories for the 2021 High Development Scenario from the CAMx source apportionment diagnostic output files after processing by SMOKE. .............................. 56

Table 3-5a.   Total emissions (tons per year) for each Source Category (see Table 4-1) and combinations of Source Categories for the 2021 Low Development Scenario from the CAMx source apportionment diagnostic output files after processing by SMOKE. .............................. 57

Table 3-5b.   Percent difference in 2021 High and Low Development Scenario emissions (High – Low) for each Source Category (see Table 4-1) and combinations of Source Categories from the CAMx source apportionment diagnostic output after processing by SMOKE. .......................... 58

Table 3-6a.   Total emissions (tons per year) for each Source Category (see Table 4-1) and combinations of Source Categories for the 2021 Medium Development Scenario from the CAMx source apportionment diagnostic output files after processing by SMOKE. .............................. 59

Table 3-6b.   Percent difference in 2021 High and Medium Development Scenario emissions (High – Medium) for each Source Category (see Table 4-1) and combinations of Source Categories from the CAMx source apportionment diagnostic output files after processing by SMOKE. .................... 60

BLM_0022100

December 2014



Table 3-7.   SCC number and description, PM$_{2.5}$ speciation profile code and name, and PM emissions for 95% of the mining emissions on Federal lands used in the CARMMS 2021 modeling ....................................................................65

Table 3-8.   PM$_{2.5}$ speciation profiles used to speciate the mining PM emissions..................66

Table 4-1.   Ordering of the 20 Source Categories used in the CAMx 2021 source apportionment modeling. .........................................................................69

Table 4-2.   24 Source apportionment post-processing Source Groups that separate AQ/AQRV impacts at Class I and sensitive Class II areas will be disclosed for the 2021 emission scenarios and 2008 base case. ..........................72

Table 4-3.   Applicable National and State Ambient Air Quality Standards and PSD concentration increments (bold indicates units in which standard was defined, conversion to ppm/ppb following CDPHE modeling guidance and with the exception of ozone that will be reported in ppb, all modeled concentrations will be reported in µg/m$^3$). ............................................73

Table 5-1a.   Maximum annual NO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. .........................................................................96

Table 5-1b.   Maximum annual NO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. .........................................................................97

Table 5-1c.   Maximum annual NO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. .........................................................................97

Table 5-2a.   Maximum annual SO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. .........................................................................98

Table 5-2b.   Maximum annual SO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. .........................................................................99

Table 5-2c.   Maximum annual SO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. .........................................................................99

Table 5-3a.   Maximum 24-hour SO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. .......................................................................100

Table 5-3b.   Maximum 24-hour SO$_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. .......................................................................100

BLM_0022101

December 2014 

Table 5-3c.   Maximum 24-hour $SO_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. ........................................................................101

Table 5-4a.   Maximum 3-hour $SO_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. ........................................................................101

Table 5-4b.   Maximum 3-hour $SO_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. ........................................................................102

Table 5-4c.   Maximum 3-hour $SO_2$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. ........................................................................102

Table 5-5a.   Maximum Annual $PM_{2.5}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. ........................................................................104

Table 5-5b.   Maximum Annual $PM_{2.5}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. ........................................................................104

Table 5-5c.   Maximum Annual $PM_{2.5}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. ........................................................................105

Table 5-6a.   Maximum 24-Hour $PM_{2.5}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. ........................................................................105

Table 5-6b.   Maximum 24-Hour $PM_{2.5}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. ........................................................................106

Table 5-6c.   Maximum 24-Hour $PM_{2.5}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. ........................................................................106

Table 5-7a.   Maximum Annual $PM_{10}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. ........................................................................107

Table 5-7b.   Maximum Annual $PM_{10}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. ........................................................................108

Table 5-7c.   Maximum Annual $PM_{10}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. ........................................................................108

BLM_0022102

December 2014



Table 5-8a.   Maximum 24-Hour $PM_{10}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 High Development Scenario. ........................................................................109

Table 5-8b.   Maximum 24-Hour $PM_{10}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Low Development Scenario. ........................................................................109

Table 5-8c.   Maximum 24-Hour $PM_{10}$ concentration at any Class I or sensitive Class II area due to the different Source Groups for the 2021 Medium Development Scenario. ........................................................................110

Table 5-9a.   Contributions of new oil and gas emissions on Federal lands within the BLM Grand Junction Field Office Planning Area to PSD pollutant concentrations at Class I and sensitive Class II areas for the 2021 High Development Scenario. ........................................................................111

Table 5-9b.   Contributions of new oil and gas emissions on Federal lands within the BLM Grand Junction Field Office Planning Area to PSD pollutant concentrations at Class I and sensitive Class II areas for the 2021 Low Development Scenario. ........................................................................112

Table 5-9c.   Contributions of new oil and gas emissions on Federal lands within the BLM Grand Junction Field Office Planning Area to PSD pollutant concentrations at Class I and sensitive Class II areas for the 2021 Medium Development Scenario. ........................................................................113

Table 5-10a. Contributions of new oil and gas and mining on Federal lands within the 13 Colorado BLM Planning Areas to PSD pollutant concentrations at Class I areas (Source Group R) for the 2021 High Development Scenario. ........................................................................115

Table 5-10b. Contributions of new oil and gas and mining on Federal lands within the 13 Colorado BLM Planning Areas to PSD pollutant concentrations at Class I areas (Source Group R) for the 2021 Low Development Scenario. ........................................................................115

Table 5-10c. Contributions of new oil and gas and mining on Federal lands within the 13 Colorado BLM Planning Areas to PSD pollutant concentrations at Class I areas (Source Group R) for the 2021 Medium Development Scenario. ........................................................................116

Table 5-11a. Contributions of new oil and gas and mining on Federal lands and new oil and gas on non-Federal lands within the 14 BLM Planning Areas to PSD pollutant concentrations at Class I and sensitive Class II areas (Source Group T) for the 2021 High Development Scenario. ........................116

Table 5-11b. Contributions of new oil and gas and mining on Federal lands and new oil and gas on non-Federal lands within the 14 BLM Planning Areas to PSD pollutant concentrations at Class I and sensitive Class II areas (Source Group T) for the 2021 Low Development Scenario. ........................117

BLM_0022103

December 2014 

Table 5-11c. Contributions of new oil and gas and mining on Federal lands and new oil and gas on non-Federal lands within the 14 BLM Planning Areas to PSD pollutant concentrations at Class I and sensitive Class II areas (Source Group T) for the 2021 Medium Development Scenario. .......................117

Table 5-12a. Contributions of new Federal and non-Federal and existing oil and gas throughout the CARMMS 4 km domain and mining on Federal lands in Colorado to PSD pollutant concentrations at Class I areas (Source Group U) for the 2021 High Development Scenario. ...........................................118

Table 5-12b. Contributions of new Federal and non-Federal and existing oil and gas throughout the CARMMS 4 km domain and mining on Federal lands in Colorado to PSD pollutant concentrations at Class I areas (Source Group U) for the 2021 Low Development Scenario.............................................118

Table 5-12c. Contributions of new Federal and non-Federal and existing oil and gas throughout the CARMMS 4 km domain and mining on Federal lands in Colorado to PSD pollutant concentrations at Class I areas (Source Group U) for the 2021 Medium Development Scenario.....................................119

Table 5-13a. Class I area where each of the 24 Source Groups have the maximum number of days that Δdv exceeds the 0.5 and 1.0 dv thresholds for the High Development Scenario...................................................................122

Table 5-13b. Sensitive Class II area where each of the 24 Source Groups has the maximum number of days that Δdv exceeds the 0.5 and 1.0 dv thresholds for the High Development Scenario....................................................122

Table 5-14a. Class I area where each of the 24 Source Groups have the maximum number of days that Δdv exceeds the 0.5 and 1.0 dv thresholds for the Low Development Scenario. ..................................................................123

Table 5-14b. Sensitive Class II area where each of the 24 Source Groups has the maximum number of days that Δdv exceeds the 0.5 and 1.0 dv thresholds for the Low Development Scenario. ...................................................123

Table 5-15a. Class I area where each of the 24 Source Groups have the maximum number of days that Δdv exceeds the 0.5 and 1.0 dv thresholds for the Medium Development Scenario. ........................................................124

Table 5-15b. Sensitive Class II area where each of the 24 Source Groups has the maximum number of days that Δdv exceeds the 0.5 and 1.0 dv thresholds for the Medium Development Scenario. ...........................................124

Table 5-16a. Maximum Δdv impact at any Class I and sensitive Class II area due to each of the 24 Source Groups for the 2021 High Development Scenario. ...............................................................................................125

Table 5-16b.Maximum Δdv impact at any Class I and sensitive Class II area due to each of the 24 Source Groups for the 2021 Low Development Scenario. ...............................................................................................125

BLM_0022104

December 2014



Table 5-16c. Maximum Δdv impact at any Class I and sensitive Class II area due to each of the 24 Source Groups for the 2021 Medium Development Scenario. ...................................................................................................126

Table 5-17a. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the WRFO Planning Area (2021 High Development Scenario). ..............................................128

Table 5-17b. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the WRFO Planning Area (2021 Low Development Scenario). .............................................129

Table 5-17c. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the WRFO Planning Area (2021 Medium Development Scenario). ......................................130

Table 5-18a. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the GJFO Planning Area (2021 High Development Scenario). ..............................................131

Table 5-18b. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the GJFO Planning Area (2021 Low Development Scenario). .............................................132

Table 5-18c. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the GJFO Planning Area (2021 Medium Development Scenario). ......................................133

Table 5-19a. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the TRFO Planning Area (2021 High Development Scenario). ..............................................134

Table 5-19b. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the TRFO Planning Area (2021 Low Development Scenario). .............................................135

Table 5-19c. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the TRFO Planning Area (2021 Medium Development Scenario). ......................................136

Table 5-20a. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the NMFFO Planning Area (2021 High Development Scenario). ..............................................137

Table 5-20b. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the NMFFO Planning Area (2021 Low Development Scenario). .............................................138

Table 5-20c. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the NMFFO Planning Area (2021 Medium Development Scenario). ......................................139

BLM_0022105

December 2014



Table 5-21a. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the USFS-PG Planning Area (2021 High Development Scenario)..............................................140

Table 5-21b. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the USFS-PG Planning Area (2021 Low Development Scenario).................................................141

Table 5-21c. Maximum Δdv and number of days Δdv exceeds 0.5 and 1.0 for each Class I area due to emissions from Federal O&G within the USFS-PG Planning Area (2021 Medium Development Scenario).......................................142

Table 5-22a. Cumulative visibility results for W20% visibility days at Class I areas for current year (2008) and 2021 High Development Scenario using all emissions and without Source Groups R, S, T and U. ..............................145

Table 5-22b. Differences in cumulative visibility results for W20% visibility days at Class I areas between current year (2008) and 2021 High Development Scenario (2008-2021) and contributions of Source Groups R, S, T and U to 2021 W20% day's visibility................................................................145

Table 5-23a. Cumulative visibility results for W20% visibility days at Class I areas for current year (2008) and 2021 Low Development Scenario using all emissions and without Source Groups R, S, T and U. ..............................146

Table 5-23b. Differences in cumulative visibility results for W20% visibility days at Class I areas between current year (2008) and 2021 Low Development Scenario (2008-2021) and contributions of Source Groups R, S, T and U to 2021 W20% day's visibility................................................................146

Table 5-24a. Cumulative visibility results for W20% visibility days at Class I areas for current year (2008) and 2021 Medium Development Scenario using all emissions and without Source Groups R, S, T and U. ..............................147

Table 5-24b. Differences in cumulative visibility results for W20% visibility days at Class I areas between current year (2008) and 2021 Medium Development Scenario (2008-2021) and contributions of Source Groups R, S, T and U to 2021 W20% day's visibility...........................................147

Table 5-25a. Cumulative visibility results for B20% visibility days at Class I areas for current year (2008) and 2021 High Development Scenario using all emissions and without Source Groups R, S, T and U. ..............................148

Table 5-25b. Differences in cumulative visibility results for B20% visibility days at Class I areas between current year (2008) and 2021 High Development Scenario (2008-2021) and contributions of Source Groups R, S, T and U to 2021 W20% day's visibility................................................................148

Table 5-26a Cumulative visibility results for B20% visibility days at Class I areas for current year (2008) and 2021 Low Development Scenario using all emissions and without Source Groups R, S, T and U. ..............................149

BLM_0022106

December 2014



Table 5-26b. Differences in cumulative visibility results for B20% visibility days at Class I areas between current year (2008) and 2021 Low Development Scenario (2008-2021) and contributions of Source Groups R, S, T and U to 2021 W20% day's visibility...................................149

Table 5-27a. Cumulative visibility results for B20% visibility days at Class I areas for current year (2008) and 2021 Medium Development Scenario using all emissions and without Source Groups R, S, T and U. .........................................150

Table 5-27b. Differences in cumulative visibility results for B20% visibility days at Class I areas between current year (2008) and 2021 Medium Development Scenario (2008-2021) and contributions of Source Groups R, S, T and U to 2021 W20% day's visibility.............................................150

Table 5-28a. Highest maximum and average nitrogen deposition (kg/ha/yr) at any Class I or sensitive Class II area due to new Federal oil and gas emissions from the BLM Grand Junction Field Office and Uncompahgre Field Office and the USFS Pawnee Grassland Planning Areas for the 2021 High, Low and Medium Development Scenarios. ......................................152

Table 5-28b. Highest maximum and average sulfur deposition (kg/ha/yr) at any Class I or sensitive Class II area due to new Federal oil and gas emissions from the BLM Grand Junction Field Office and Uncompahgre Field Office and the USFS Pawnee Grassland Planning Areas for the 2021 High, Low and Medium Development Scenarios. ......................................153

Table 5-29a. Highest nitrogen deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 High Development Scenario using the Maximum deposition in any receptor in the Class I/II area. ...........................................................153

Table 5-29b. Highest nitrogen deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 High Development Scenario using the Average deposition in any receptor in the Class I/II area......................................................................154

Table 5-30a. Highest nitrogen deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 Low Development Scenario using the Maximum deposition in any receptor in the Class I/II area. ...........................................................155

Table 5-30b. Highest nitrogen deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 Low Development Scenario using the Average deposition in any receptor in the Class I/II area......................................................................156

Table 5-31a. Highest nitrogen deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 Medium Development Scenario using the Maximum deposition in any receptor in the Class I/II area. ...........................................................157

BLM_0022107

December 2014



Table 5-31b. Highest nitrogen deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 Medium Development Scenario using the Average deposition in any receptor in the Class I/II area..................................................................................................................158

Table 5-32.   Highest sulfur deposition at any Class I area or sensitive Class II area for each of the 24 Source Groups and the 2021 High Development Scenario using the Maximum deposition in any receptor in the Class I/II area. ..............................................................................................................159

Table 5-33a. Total annual nitrogen deposition at Class I areas for the 2021 High Development Scenario, 2008 Base Case, their differences (2021 High minus 2008) and 2021 High Development Scenario without the contributions of natural emissions (e.g., wildfires). .............................................161

Table 5-33b. Total annual nitrogen deposition at Class I areas for the 2021 Low Development Scenario, 2008 Base Case, their differences (2021 Low minus 2008) and 2021 Low Development Scenario without the contributions of natural emissions (e.g., wildfires). .............................................162

Table 5-33c. Total annual nitrogen deposition at Class I areas for the 2021 Medium Development Scenario, 2008 Base Case, their differences (2021 Medium minus 2008) and 2021 Medium Development Scenario without the contributions of natural emissions (e.g., wildfires). .......................163

Table 5-34a. Total annual sulfur deposition at Class I areas for the 2021 High Development Scenario, 2008 Base Case, their differences (2021 High minus 2008) and 2021 High Development Scenario without the contributions of natural emissions (e.g., wildfires). .............................................164

Table 5-34b. Total annual sulfur deposition at Class I areas for the 2021 Low Development Scenario, 2008 Base Case, their differences (2021 Low minus 2008) and 2021 Low Development Scenario without the contributions of natural emissions (e.g., wildfires). .............................................165

Table 5-34c. Total annual sulfur deposition at Class I areas for the 2021 Medium Development Scenario, 2008 Base Case, their differences (2021 Medium minus 2008) and 2021 Medium Development Scenario without the contributions of natural emissions (e.g., wildfires). .......................166

Table 5-35a. ANC calculations at sensitive lakes for new Federal oil and gas development within the BLM Grand Junction Field Office Planning Area (Source Group E) and the 2021 High Development Scenario. ...................168

Table 5-35b. ANC calculations at sensitive lakes for new Federal oil and gas development within the BLM Uncompahgre Field Office Planning Area (Source Group F) and the 2021 High Development Scenario. ............................169

Table 5-35c. ANC calculations at sensitive lakes for new Federal oil and gas development within the USFS Pawnee Grasslands Planning Area (Source Group J) and the 2021 High Development Scenario..............................170

BLM_0022108

December 2014



Table 5-36a. ANC calculations at sensitive lakes for new Federal oil and gas development and mining within the 13 Colorado BLM Planning Areas (Source Group R) and 2021 High Development Scenario. ...................................172

Table 5-36b. ANC calculations at sensitive lakes for new Federal oil and gas development and mining within the 13 Colorado BLM Planning Areas (Source Group R) and 2021 Low Development Scenario. ...................................173

Table 5-36c. ANC calculations at sensitive lakes for new Federal oil and gas development and mining within the 13 Colorado BLM Planning Areas (Source Group R) and 2021 Medium Development Scenario. ...........................174

Table 5-37a. ANC calculations at sensitive lakes for new Federal oil and gas development and mining and new non-Federal oil and gas within the 14 Colorado and northern New Mexico BLM Planning Areas (Source Group T) and the 2021 High Development Scenario. .........................................175

Table 5-37b. ANC calculations at sensitive lakes for new Federal oil and gas development and mining and new non-Federal oil and gas within the 14 Colorado and northern New Mexico BLM Planning Areas (Source Group T) and the 2021 Low Development Scenario. ...........................................176

Table 5-37c. ANC calculations at sensitive lakes for new Federal oil and gas development and mining and new non-Federal oil and gas within the 14 Colorado and northern New Mexico BLM Planning Areas (Source Group T) and the 2021 Medium Development Scenario. ...................................177

Table 5-39a. Current year ozone Design Values (DVC) and projected 2021 future year ozone Design Values (DVF) for the 2021 High Development Scenario and without Source Group R, S, T and U. ...............................................179

Table 5-39b. Current year ozone Design Values (DVC) and projected 2021 future year ozone Design Values (DVF) for the 2021 Low Development Scenario and without Source Group R, S, T and U. ...............................................179

Table 5-39c. Current year ozone Design Values (DVC) and projected 2021 future year ozone Design Values (DVF) for the 2021 Medium Development Scenario and without Source Group R, S, T and U. ...............................................180

Table 5-40. Maximum contribution to the 4th highest DMAX8 ozone (ppb) for each of the Source Groups and the 2021 High, Low and Medium Development Scenarios. ....................................................................193

Table 5-41a. Maximum ozone contribution by Source Group to total modeled 2021 4th high DMAX8 ozone greater than the NAAQS for the 2021 High Development Scenario. ....................................................................204

Table 5-41b. Maximum ozone contribution by Source Group to total modeled 2021 4th high DMAX8 ozone greater than the NAAQS for the 2021 Low Development Scenario. ....................................................................205

BLM_0022109

December 2014



Table 5-41c.  Maximum ozone contribution by Source Group to total modeled 2021 4th high DMAX8 ozone greater than the NAAQS for the 2021 Medium Development Scenario. .......................................................................206

Table 5-42a.  Maximum contribution to the 8th high 24-hour PM$_{2.5}$ concentrations (μg/m$^3$) for each of the Source Groups and the 2021 High, Low and Medium Development Scenarios. .......................................................211

Table 5-42b.  Maximum contribution to the annual PM$_{2.5}$ concentrations (μg/m$^3$) for each of the Source Groups and the 2021 High, Low and Medium Development Scenarios. .......................................................212

## FIGURES

Figure 2-1.  4 km modeling domain used in the Colorado Air Resource Management Modeling Study (CARMMS). ..........................................11

Figure 3-1.  Mancos Shale development area (shown with other oil and gas source areas from CARMMS). .................................................36

Figure 3-2.  Map of oil and gas prone development areas within the Mancos Shale Oil formation primarily in the New Mexico BLM FFO planning area. ...................36

Figure 3-3.  Historical gas production in the South San Juan Basin (including Rio Arriba, San Juan, Sandoval, and McKinley Counties). .............................38

Figure 3-4.  Comparison of total oil and gas emissions from the 8 western Colorado BLM Planning Areas for the 2021 High, Low and Medium Development Scenarios. ........................................................42

Figure 3-5.  NO$_X$ and VOC emissions and well counts from oil and gas development within the 8 western Colorado BLM Planning Areas and for the 2011 current (left) and 2021 High Development Scenario (right) emissions scenarios..................................................................46

Figure 3-6.  List of counties where the 3SAQS made targeted emission improvements to the EPA NEI. ....................................................49

Figure 3-7.  3SAQS 2011 residential natural gas consumption monthly temporal profiles. ..............................................................................51

Figure 3-8.  Colorado roadway spatial data improvement plots. Left: TIGER 2010 Shapefile of urban/rural primary/secondary roads. Right: CO 2008 VMT-based roadways. ...........................................................51

Figure 3-9.  Wyoming CAFO locations. ......................................................52

Figure 3-10a. Spatial distribution of Federal (top) and non-Federal oil and gas NO$_X$, VOC and PM$_{2.5}$ emissions (tons per year) for the 14 BLM Planning Areas and the 2021 High Development Scenario. .................................62

BLM_0022110

December 2014



Figure 3-10b. Spatial distribution of Existing oil and gas (top) and mining on Federal lands $NO_x$, VOC and $PM_{2.5}$ emissions (tons per year) for the 14 BLM Planning Areas and the 2021 High Development Scenario. ................................. 63

Figure 3-10c. Spatial distribution of other anthropogenic (top) and natural (biogenic, fires, lightning, sea salt and windblown dust) $NO_x$, VOC and $PM_{2.5}$ emissions (tons per year) for the 14 BLM Planning Areas and the 2021 High Development Scenario. ................................................................................... 64

Figure 4-1.    13 Colorado and New Mexico BLM planning areas (the 14 BLM Planning Areas) where separate contributions of new O&G development on Federal lands was obtain for 2021 source apportionment modeling. ......................................................................... 70

Figure 5-1a. 2008 ozone DVC (top left), 2021 High Development Scenario ozone DVF (top right) and their differences (2021 High – 2008) (bottom) calculated using MATS. ........................................................................ 182

Figure 5-1b. 2008 ozone DVC (top left), 2021 Low Development Scenario ozone DVF (top right) and their differences (2021 Low – 2008) (bottom) calculated using MATS. ........................................................................ 183

Figure 5-1c. 2008 ozone DVC (top left), 2021 Medium Development Scenario ozone DVF (top right) and their differences (2021 Medium – 2008) (bottom) calculated using MATS. ........................................................................ 184

Figure 5-2a. 2021 projected ozone DVF 2021 Unmonitored Area Analysis for Source Group R (top) and S (bottom) showing 2021 DVF without each Source Group (left) and difference in DVFs with 2021 High Development Scenario (right). ........................................................................ 185

Figure 5-2b. 2021 projected ozone DVF 2021 Unmonitored Area Analysis for Source Group T (top) and U (bottom) showing 2021 DVF without each Source Group (left) and difference in DVFs with 2021 High Development Scenario (right). ........................................................................ 186

Figure 5-3a. 2021 projected ozone DVF 2021 Unmonitored Area Analysis for Source Group R (top) and S (bottom) showing 2021 DVF without each Source Group (left) and difference in DVFs with 2021 Low Development Scenario (right). ........................................................................ 187

Figure 5-3b. 2021 projected ozone DVF 2021 Unmonitored Area Analysis for Source Group T (top) and U (bottom) showing 2021 DVF without each Source Group (left) and difference in DVFs with 2021 Low Development Scenario (right). ........................................................................ 188

Figure 5-4a. 2021 projected ozone DVF 2021 Unmonitored Area Analysis for Source Group R (top) and S (bottom) showing 2021 DVF without each Source Group (left) and difference in DVFs with 2021 Medium Development Scenario (right). ........................................................................ 189

BLM_0022111

December 2014



Figure 5-4b.  2021 projected ozone DVF 2021 Unmonitored Area Analysis for Source
Group T (top) and U (bottom) showing 2021 DVF without each Source
Group (left) and difference in DVFs with 2021 Medium Development
Scenario (right). ...................................................................................................190

Figure 5-5a.  Fourth highest daily maximum 8-hour ozone concentrations for the
2008 Base Case (top left), 2021 High Development Scenario (top right),
2021 High minus 2008 differences (bottom left) and Natural Emissions
(bottom right)....................................................................................................194

Figure 5-5b.  Fourth highest daily maximum 8-hour ozone concentrations for the
2008 Base Case (top left), 2021 Low Development Scenario (top right),
2021 Low minus 2008 differences (bottom left) and Natural Emissions
(bottom right)....................................................................................................195

Figure 5-5c.  Fourth highest daily maximum 8-hour ozone concentrations for the
2008 Base Case (top left), 2021 Medium Development Scenario (top
right), 2021 Medium minus 2008 differences (bottom left) and Natural
Emissions (bottom right). ..................................................................................196

Figure 5-6a.  Contributions to fourth highest daily maximum 8-hour ozone due to
emissions from new Federal O&G within the GJFO (Source Group E)
for the 2021 High (top left), Low (top right) and Medium (bottom)
Development Scenarios. .....................................................................................197

Figure 5-6b.  Contributions to fourth highest daily maximum 8-hour ozone due to
emissions from new Federal O&G within the UFO (Source Group F) for
the 2021 High (top left), Low (top right) and Medium (bottom)
Development Scenarios. .....................................................................................198

Figure 5-6c.  Contributions to fourth highest daily maximum 8-hour ozone due to
emissions from new Federal O&G within the USFS Pawnee Grasslands
(Source Group J) for the 2021 High (top left), Low (top right) and
Medium (bottom) Development Scenarios. .......................................................199

Figure 5-6d.  Contributions to fourth highest daily maximum 8-hour ozone due to
emissions from new Federal O&G and mining within the 13 Colorado
BLM Planning Areas (Source Group R) for the 2021 High (top left), Low
(top right) and Medium (bottom) Development Scenarios. ...............................200

Figure 5-6e.  Contributions to fourth highest daily maximum 8-hour ozone due to
emissions from new Federal and non-Federal O&G and mining within
the 14 CO/NM BLM Planning Areas (Source Group T) for the 2021 High
(top left), Low (top right) and Medium (bottom) Development
Scenarios. .........................................................................................................201

Figure 5-6f.   Contributions to fourth highest daily maximum 8-hour ozone due to
emissions from existing, new Federal and non-Federal O&G within the
entire CARMMS 4 km domain and Federal mining in Colorado (Source

BLM_0022112