

Rank (watts per square meter)

- Class 1, Poor (0-200)
- Class 2, Marginal (200-300)
- Class 3, Fair (300-400)
- Class 4, Good (400-500)
- Class 5, Excellent (500-600)
- Class 6, Outstanding (600-700)
- Existing Transmission Line

Figure shows wind energy potential areas, excluding Wilderness Study Areas and unsuitable areas for right-of-ways.

Data show annual average wind resource potential at a height of 50 meters.

Source: BLM 2010a

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project way developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

0  2.25 4.5    9    13.5    18
Miles

*Wind Energy Potential*

Figure A3-18

BLM Grand Junction Field Office Resource Management Plan

BLM_0022723



**Developed Recreation Sites**

Legend:
- Shooting Range
- Campground
- Trailhead
- Picnic Area
- River Access
- Scenic Overlook
- Restroom

Source: BLM 2010a

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

0  2.25 4.5     9     13.5     18
Miles

Figure A3-19

BLM Grand Junction Field Office Resource Management Plan

BLM_0022724



Source: BLM 2010a

**Right-of-Way Locations**

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project way developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

0  2.5  5      10      15      20
Miles

Figure A3-20

BLM Grand Junction Field Office Resource Management Plan

Right-of-Way



**Master Leasing Plan Surface Management and Split Estate**

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A3-21

BLM Grand Junction Field Office Resource Management Plan

BLM_0022726



**Legend:**

- Wilderness Study Area (WSA)
- Shale Ridges & Canyons Master Leasing Plan Boundary
- Fluid Minerals Currently Leased
- Federal Mineral Estate

Demaree WSA

Little Book Cliffs WSA

McInnis Canyons NCA (Not included in RMP Revision)

Mack
Loma
Fruita
Grand Junction
Glade Park
Palisade
Whitewater
De Beque
Mesa

0 1 2 4 6 8
Miles
Source: BLM 2010a





*Master Leasing Plan Oil and Gas Leases*

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A3-22

BLM Grand Junction Field Office Resource Management Plan

BLM_0022727



Source: BLM 2010a

**Bighorn Sheep**

Bighorn Migration Corridors
Bighorn Severe Winter Range
Bighorn Winter Concentration Area
Bighorn Production Area

This map will be periodically updated to reflect the most current habitat mapping by CPW.

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

0   2.5   5      10      15      20
Miles

Figure A3-23

BLM Grand Junction Field Office Resource Management Plan



Pronghorn Winter Concentration

This map will be periodically updated to reflect the most current habitat mapping by CPW.

Source: BLM 2010a

*Pronghorn Antelope*

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

0  2.5  5      10      15      20
Miles

Figure A3-24

BLM Grand Junction Field Office Resource Management Plan

BLM_0022729



**Shale Ridges and Canyons**
Master Leasing Plan Boundary

Wilderness Study Area (WSA)

Oil and gas potential on federal mineral estate

No known oil and gas potential on federal mineral estate

*Master Leasing Plan Oil and Gas Potential*




No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-1

BLM Grand Junction Field Office Resource Management Plan

BLM_0022730



**Legend:**
- Shale Ridges and Canyons Master Leasing Plan Boundary
- Federal Mineral Estate
- Wilderness Study Area (WSA)
- Federal Mineral Estate Closed to Leasing
- Federal Mineral Estate Open to Leasing
- No Surface Occupancy

Demaree WSA

Little Book Cliffs WSA

McInnis Canyons NCA (Not Included in RMP Revision)

0 1 2   4   6   8
Miles
Source: BLM 2010a

*Master Leasing Plan No Surface Occupancy*

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-2

BLM Grand Junction Field Office Resource Management Plan



BLM_0022731



# Master Leasing Plan Controlled Surface Use

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-3

BLM Grand Junction Field Office Resource Management Plan



## *Master Leasing Plan Timing Limitations*

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-4

BLM Grand Junction Field Office Resource Management Plan



**Master Leasing Plan ACECs and Wildlife Emphasis Areas**

Figure A4-5

BLM Grand Junction Field Office Resource Management Plan

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

BLM_0022734



**Legend:**
- Shale Ridges and Canyons Master Leasing Plan Boundary
- Wilderness Study Area (WSA)
- Federal Mineral Estate Closed to Leasing
- Federal Mineral Estate Open to Leasing
- Recreation Management Area

0 1 2   4   6   8
Miles
Source: BLM 2010a

 



*Master Leasing Plan Recreation Management Areas*

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-6

BLM Grand Junction Field Office Resource Management Plan

BLM_0022735



## Master Leasing Plan VRM Classes

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-7

BLM Grand Junction Field Office Resource Management Plan



**Legend:**
- Wilderness Study Area (WSA)
- Shale Ridges & Canyons Master Leasing Plan Boundary
- Fluid Minerals Currently Leased
- Federal Mineral Estate

0 1 2  4  6  8
Miles
Source: BLM 2010a





*Current Oil and Gas Leases and Proposed Fluid Mineral Leasing*

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

Figure A4-8

BLM Grand Junction Field Office Resource Management Plan

BLM_0022737

# Appendix B
## Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

BLM_0022738

BLM_0022739

# TABLE OF CONTENTS

Chapter | Page

**B. STIPULATIONS APPLICABLE TO FLUID MINERAL LEASING AND OTHER SURFACE-DISTURBING ACTIVITIES**................................................................................................B-1

B.1    Description of Stipulations ...............................................................................B-3
      B.1.1    No Surface Occupancy (NSO) or Other Surface-disturbing Activities............B-3
      B.1.2    Controlled Surface Use (CSU)...........................................................B-4
      B.1.3    Timing Limitations (TL) ....................................................................B-4
      B.1.4    Lease Notice (LN)............................................................................B-4
      B.1.5    Condition of Approval (COA) ...........................................................B-5
      B.1.6    Mitigation and Monitoring ................................................................B-5
B.2    Exceptions, Modifications, and Waivers..............................................................B-5
      B.2.1    Exception, Modification, or Waiver Process.........................................B-5
      B.2.2    Standard Exception ..........................................................................B-6
      B.2.3    Standard Modification ......................................................................B-6
      B.2.4    Standard Waiver .............................................................................B-7
B.3    Standard Terms and Conditions for Fluid Mineral Leasing....................................B-7

# TABLES

Page

B-1    Summary of No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1] ...............................................B-8

B-2    Summary of Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1] ............................................ B-11

B-3    Summary of Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1] .......................................................... B-13

B-4    Summary of Lease Notices (LN) Applicable to Fluid Mineral Leasing[1]........................ B-14

B-5    No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities ............................................................ B-15

B-6    Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities ............................................................ B-36

B-7    Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities............................................................................ B-50

B-8    Lease Notices (LN) and Additional Required Conditions of Approval Applicable to Authorized Ground-disturbing Activities.......................................................... B-57

This page intentionally left blank.

BLM_0022741

# APPENDIX B
# STIPULATIONS APPLICABLE TO FLUID MINERAL LEASING AND OTHER SURFACE-DISTURBING ACTIVITIES

This appendix lists the stipulations for fluid mineral leasing (e.g., oil, gas, and geothermal) referred to throughout this Approved RMP. These stipulations will also apply, where appropriate, to all surface-disturbing activities (and occupancy) associated with land use authorizations, permits, and leases issued on BLM lands. The stipulations will not apply to activities and uses where they are contrary to laws, regulations, or specific program guidance. The intent of these stipulations is to consistently mitigate impacts by applying the same stipulation to all land use authorizations across the board. It is BLM's intent to incorporate the same level of restrictions, to the extent practicable, on agency proposed projects.

Stipulations also apply to fluid mineral leasing on lands overlying federal mineral estate, which includes federal mineral estate underlying BLM lands, privately owned lands, and state-owned lands. As such, federal mineral estate acres are greater than BLM surface acres. Within the planning area, the BLM administers 1,061,400 acres of surface estate and 169,800 acres of split-estate (i.e., where the surface rights are in private ownership and the rights to development of the mineral resources are publicly held and managed by the federal government [BLM]). The BLM will coordinate with the surface owner when applying stipulations on split-estate at the leasing phase. Other land management agencies may have their own surface management decisions for oil and gas development; the BLM will apply these decisions with consent and may add additional stipulations in cooperation with the surface-management agency. Acreages in this appendix reflect federal mineral estate overlain by BLM, private, and state-owned land. Acreages for stipulations are calculated based on current information and may be adjusted in the future through plan maintenance as conditions warrant.

BLM_0022742

Data from GIS was used in developing acreage calculations and for generating many of the figures in Appendix A. Calculations are dependent upon the quality and availability of data and most calculations in this RMP are rounded to the nearest one hundred acres. Given the scale of the analysis, the compatibility constraints between datasets, and lack of data for some resources, all calculations are approximate and serve for comparison and analytic purposes only. Likewise, the figures in Appendix A are provided for illustrative purposes and subject to the limitations discussed above. BLM may receive additional GIS data; therefore, acreages may be recalculated and revised at a later date.

Surface-disturbing activities are those that normally result in more than negligible (i.e., immeasurable, not readily noticeable) disturbance to vegetation and soils on public lands and accelerate the natural erosive process.

Surface disturbances could require reclamation and normally involve use and/or occupancy of the surface, causing disturbance to soils and vegetation. They include, but are not limited to: the use of mechanized earth-moving equipment; truck-mounted drilling and geophysical exploration equipment off designated routes; off-road vehicle travel in areas designated as limited or closed to off road vehicle use; construction of facilities such as oil and gas wells and/or pads; major recreation sites; new trail construction; and use of pyrotechnics and explosives. Surface disturbance is not normally caused by casual-use activities. Activities that are not normally considered surface disturbing include, but are not limited to: livestock grazing, cross country hiking, minimum impact filming, vehicular travel on designated routes, and minimum impact emergency response activities such as construction of fire line using hand tools as a tactic for suppression and management of unplanned fire. Even where stipulations prohibit surface disturbing activities, some surface disturbing activities may be allowed under exceptions from stipulations through the process described under **Section B.2.1**. (Example 1: A livestock fence proposed in an area covered by NSO-35 for Wildlife Emphasis Areas may be excepted from the stipulation if it can be shown that the project will have negligible impacts to wildlife through appropriate mitigation; or example 2: A natural gas well pad proposed in an area covered by CSU-8 for Old Growth Forests and Woodlands may be excepted from the stipulation if it can be shown that the project will have negligible impacts on old growth forests and woodlands through appropriate mitigation.)

The BLM has the discretion to modify surface operations to change or add specific mitigation measures when supported by environmental analysis. All mitigation/conservation measures not already required as stipulations will be analyzed in a site-specific NEPA document, and be incorporated, as appropriate, into conditions of approval of the permit, plan of development, and/or other use authorizations.

BLM_0022743

## B.1    DESCRIPTION OF STIPULATIONS

Tables **B-1** through **B-4** summarize the stipulations, and **Tables B-5** through **B-8** provide detailed details of the stipulations and protected resources including exceptions, modifications, and waivers. Three types of stipulations could be applied to fluid mineral leasing or to land use authorizations, except for those authorized under the realty program: 1) NSO or other no surface-disturbing activities; 2) CSU; and 3) TL. ROW authorizations are governed by avoidance and exclusion area restrictions. ROW avoidance areas may have corresponding stipulations, as specifically noted in **Tables B-1** through **B-3** and **Tables B-5** through **B-7**. In these cases, denoted as NSO-X (ROWA), CSU-X (ROWA), or TL-X (ROWA), the surface area covered by the stipulation is considered a ROW avoidance area. Where stipulations are noted as *Partial ROWA*, only a portion of the area covered by the stipulation is a ROW avoidance area. See the glossary for descriptions of ROW avoidance and ROW exclusion.

Lease stipulations and lease notices will be applied to all new leases. On existing leases, the BLM will seek voluntary compliance or will develop Conditions of Approval for Applications for Permit to Drill to achieve resource objectives of the RMP (see BLM's Land Use Planning Handbook H-1601-1 at Appendix C, part H), when determined reasonable and consistent with valid existing rights.[1]

### B.1.1    No Surface Occupancy (NSO) or Other Surface-disturbing Activities

Use or occupancy of the land surface for fluid mineral exploration or development and other surface-disturbing activities (as defined above) is prohibited to protect identified resource values. Acreages are provided in these tables for mapped stipulations.

The NSO/No Surface-disturbing Activities stipulation, a major constraint, includes stipulations that may have been worded as "No Surface Use/Occupancy," "No Surface Disturbance," "Conditional NSO," "ground-disturbing activity," and "Surface Disturbance or Surface Occupancy Restriction (by location)."

Areas identified as NSO/No Surface-disturbing Activities are open to fluid mineral leasing, but surface-disturbing activities cannot be conducted on the surface of the land unless an exception, waiver, or modification is granted (Section B.2). Access to fluid mineral deposits would require directional drilling from outside the boundaries of the NSO/No Surface-disturbing Activities areas.

An NSO/No Surface-disturbing Activities stipulation cannot be applied to operations conducted under the 1872 Mining Law unless the lands have been

---

[1] See also 43 CFR 1610.5-3(b): "…the Field Manager shall take appropriate measures, subject to valid existing rights, to make operations and activities under existing permits, contracts, cooperative agreements or other instruments for occupancy and use, conform to the approved plan or amendment within a reasonable period of time."

BLM_0022744

withdrawn from mineral entry and the operator has no valid and existing mining claims. A withdrawal is not considered a land use planning decision because it must be approved by the Secretary of Interior. Therefore, unless withdrawn from mineral entry with no pre-existing mining claims, areas identified as NSO/No Surface-disturbing Activities are open to operations conducted under the mining laws, and subject only to TL and CSU stipulations that are consistent with the rights granted under the mining laws. Where only an NSO stipulation exists, and no equivalent CSU or TL stipulations applies to operations conducted under the mining laws, the NSO stipulation will be applied as a CSU stipulation (i.e., the surface-disturbing activity could be shifted more than 200 meters [656 feet] to protect the specified resource or value if consistent with the rights granted under the mining laws).

An NSO/No Surface-disturbing Activities stipulation does not apply to existing facilities and the maintenance of existing facilities, such as, but not limited to, range improvements, oil and gas wells and/or pads, and major recreation sites.

## B.1.2  Controlled Surface Use (CSU)

CSU is a category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values. A CSU stipulation allows the BLM to require special operational constraints, or the surface-disturbing activity can be shifted more than 200 meters (656 feet) to protect the specified resource or value. Refer to **Tables B-2** and **B-6**. Acreages are provided in these tables for mapped stipulations.

## B.1.3  Timing Limitations (TL)

Areas identified for TL, a moderate constraint, are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance and routine or scheduled workovers on wells is not permitted. Administrative activities are allowed at the discretion of the Authorized Officer. Refer to **Tables B-3** and **B-7**. Acreages are provided in these tables for mapped stipulations.

## B.1.4  Lease Notice (LN)

A LN provides more-detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. A LN also addresses special items that lessees should consider when planning operations but does not impose additional restrictions. Lease Notices apply only to leasable minerals (e.g., oil, gas, and geothermal) and not to other types of leases, such as livestock grazing. Refer to **Tables B-4** and **B-8**.

BLM_0022745

### B.1.5   Condition of Approval (COA)

Conditions of Approval are enforceable conditions or provisions (requirements) under which an Application for Permit to Drill is approved.

### B.1.6   Mitigation and Monitoring

Stipulations are designed to provide resource-specific protections. Permit holders shall be responsible for the monitoring and reporting deemed necessary to document and maintain mandated protective measures. Also, the BLM retains the right to modify the operations of all surface and other disturbance activities caused by the presence of humans and to require additional specific or specialized mitigation following the submission of a detailed plan of development or other project proposal, a monitoring report, and an environmental analysis of such.

## B.2   EXCEPTIONS, MODIFICATIONS, AND WAIVERS

Stipulations could be excepted, modified, or waived by the Authorized Officer. An exception exempts the holder of the land use authorization document from the stipulation on a one-time basis. A modification changes the language or provisions of a surface stipulation, either temporarily or permanently. A waiver permanently exempts the surface stipulation. Any changes to stipulations will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of stipulations, see BLM Manuals 1624 and 3101.)

### B.2.1   Exception, Modification, or Waiver Process

An exception, modification, or waiver may be granted at the discretion of the Authorized Officer if any of the standard exception, modification, or waiver criteria (**Section B.2.2**, **B.2.3**, **B.2.4**) are met; or if any of the exception, modification, or waiver criteria specific to the stipulation (**Tables B-5, B-6, B-7**) are met. In order to implement an action that will not normally be allowed because of a stipulation, the proponent must submit a request in writing for an exception, modification, or waiver. The request shall detail which exception, modification, or waiver criteria are met. When requested concurrently with an application, the exception, modification, or waiver is considered as part of the project proposal in RMP and NEPA compliance review. For separate requests, the request is considered as a unique action and is analyzed and documented individually for RMP and NEPA compliance. The Authorized Officer will make the final determination whether to grant an exception, modification, or waiver to stipulations. When use of heavy equipment is necessary for emergency response activities such as wildland fire suppression, management of unplanned fire, and emergency stabilization, the standard exception will be approved verbally by the BLM authorized officer as delegated (e.g., Incident Commander in coordination with Resource Advisor).

BLM_0022746

## B.2.2   Standard Exception

The standard exception applies to all NSO/No Surface-disturbing Activities, CSUs, and TLs, even though the standard exception is not included in the "exception" portion of **Tables B-5** through **B-7**. In situations where a surface-disturbing activity is excepted, the activity could be subject to additional conditions of approval, reclamation measures, or BMPs. Measures required will be based on the nature and extent of resource values potentially affected by the surface-disturbing activity.

### Fluid Minerals

An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold. The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that:

1. the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or

2. proposed operations will not cause unacceptable impacts.

The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

### All Programs Except Fluid Minerals

An exception may be granted by the Authorized Officer if it can be demonstrated that the surface-disturbing activity:

1. will not cause adverse impacts or will have negligible impacts to the resource or resource use that the stipulation was designated to protect; or

2. will improve the protected resource or resource use as defined by RMP objectives, standards, or conditions in the stipulation (e.g., fuels treatment that improves forbs in key wildlife habitat, or trail construction for resource protection in an ACEC or elsewhere);

3. is necessary to meet health and safety objectives such as fire suppression or fire emergency stabilization and rehabilitation; or

4. is necessary to protect federal mineral estate.

## B.2.3   Standard Modification

A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 CFR 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if:

1. the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP;

2. the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or

3. proposed operations will not cause unacceptable impacts.

The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

### B.2.4   Standard Waiver

A waiver is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 CFR 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination. The waiver may be subject to public review for at least a 30-day period.

No permanent exemptions or waivers are authorized unless the areas mapped as possessing the attributes are field verified by BLM staff to lack those attributes.

## B.3   STANDARD TERMS AND CONDITIONS FOR FLUID MINERAL LEASING

Oil and gas development is subject to standard terms and conditions of the lease. Onshore Oil and Gas Order No. 1 (Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations) regulations (43 CFR 3160) give the BLM the ability to relocate proposed operations up to 200 meters (656 feet) and prohibit surface-disturbing operations for a period not to exceed 60 days.

BLM_0022748

**Table B-1**
**Summary of No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1]**

| Stipulation Number | Protected Resource | Fluid Minerals Only | All Surface-disturbing Activities |
|---|---|---|---|
| Water Resources | | | |
| **HYDROLOGY RIVER NSO CO** | Hydrology River | | ✓ |
| **NSO-2** *(ROWA)* | Streams/Springs Possessing Lotic Riparian Characteristics | | ✓ |
| **NSO-4** *(ROWA)* | Lentic Riparian Areas (including springs, seeps, and fens) | | ✓ |
| **NSO-5** | Palisade and Grand Junction Municipal Watersheds | | ✓ |
| Soils and Geology | | | |
| **GEOLOGY SLOPE NSO CO** | Geology Slope | | ✓ |
| **GEOLOGY SOIL NSO CO** | Geology Soil | | ✓ |
| Vegetation | | | |
| **NSO-2** *(ROWA)* | Streams/Springs Possessing Lotic Riparian Characteristics | | ✓ |
| **NSO-4** *(ROWA)* | Lentic Riparian Areas (including springs, seeps, and fens) | | ✓ |
| Special Status Species | | | |
| **HYDROLOGY RIVER NSO CO** | Hydrology River | | ✓ |
| **NSO-2** *(ROWA)* | Streams/Springs Possessing Lotic Riparian Characteristics | | ✓ |
| **NSO-12** *(Partial ROWA)* | ACECs | | ✓ |
| **NSO-13** *(ROWA)* | Current and Historically Occupied Habitat and Critical Habitat of Threatened, Endangered, Proposed, and Candidate Plant and Animal Species | | ✓ |
| **NSO-23** *(ROWA)* | Golden Eagle Nest Sites | | ✓ |
| **NSO-24** *(ROWA)* | Bald Eagle Nest Sites | | ✓ |
| **NSO-25** *(ROWA)* | Sage-grouse Leks, Nesting, and Early Brood-rearing Habitat (6.4 kilometers [4 miles]) | | ✓ |
| **NSO-26** *(ROWA)* | Canyon Treefrog, Midget Faded Rattlesnake, Northern Leopard Frog, Great Basin Spadefoot, Long-nosed Leopard Lizard, Boreal Toad (no buffer) | | ✓ |
| **WILDLIFE BAT** | Wildlife Bat | | ✓ |

BLM_0022749

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-1**
**Summary of No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1]**

| Stipulation Number | Protected Resource | Fluid Minerals Only | All Surface-disturbing Activities |
|---|---|:---:|:---:|
| **NSO CO** | | | |
| **NSO-30** *(ROWA)* | Occupied Prairie Dog Towns (no buffer) | | ✓ |
| | Fish and Wildlife | | |
| **NSO-32** *(ROWA)* | Research Sites | | ✓ |
| **NSO-12** *(Partial ROWA)* | ACECs | | ✓ |
| **RECREATION PARKS NSO CO** | Recreation Parks | | ✓ |
| **NSO-34** *(ROWA)* | Elk Production Area | | ✓ |
| **WILDLIFE HABITAT NSO CO** | Wildlife Habitat | | ✓ |
| | Wild Horses | | |
| **NSO-36** *(ROWA)* | Little Book Cliffs Wild Horse Range | | ✓ |
| | Cultural Resources | | |
| **NSO-37** *(ROWA* | Allocation to Conservation Use Category | | ✓ |
| **NSO-38** *(ROWA* | Allocation to Traditional Use Category | | ✓ |
| **NSO-39** *(ROWA* | Cultural Resources (Indian Creek) | | ✓ |
| | Visual Resources | | |
| **VISUAL CLASS I NSO CO** | Visual Class I | | ✓ |
| | Lands Managed for Wilderness Characteristics | | |
| **LANDS WITH WILDERNESS CHARACTER-ISTICS NSO CO** | Lands with Wilderness Characteristics | | ✓ |
| | Recreation and Visitor Services | | |
| **RECREATION SRMA NSO CO** | Recreation SRMA | | ✓ |
| **RECREATION PARKS NSO CO** | Recreation Parks | | ✓ |
| | Fluid Minerals (Oil and Gas and Geothermal Resources) | | |
| **RECREATION PARKS NSO CO** | Recreation Parks | | ✓ |
| | ACECs | | |
| **NSO-12** *(Partial ROWA)* | ACECs | | ✓ |
| | Wilderness Study Areas | | |
| **NSO-43** | Wilderness Study Areas | | ✓ |
| | National Trails | | |

BLM_0022750

**Table B-1**
**Summary of No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**[1]

| Stipulation Number | Protected Resource | Fluid Minerals Only | All Surface-disturbing Activities |
|---|---|---|---|
| **NSO-45** *(ROWA)* | Old Spanish National Historic Trail (50 meters [164 feet]) | | ✓ |

[1] Details of these stipulations are provided in Table B-5, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities.

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022751

| | Table B-2 | | | |
| --- | --- | --- | --- | --- |
| **Summary of Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1]** | | | | |
| **Stipulation Number** | **Protected Resource** | **Fluid Minerals Only** | **All Surface-disturbing Activities** |
| | **Water Resources** | | |
| **CSU-39** | Roan and Carr Creeks ACEC | | ✓ |
| **CSU-3** *(ROWA)* | Definable Streams | | ✓ |
| **CSU-4** *(ROWA)* | Collbran and Mesa/Powderhorn Source Water Protection Areas, and Jerry Creek Watershed | | ✓ |
| | **Soils and Geology** | | |
| **GEOLOGY SOIL CSU CO** | Geology Soil | | ✓ |
| | **Vegetation** | | |
| **PLANT COMMUNITY CSU CO** | Plant Community | | ✓ |
| | **Special Status Species** | | |
| **CSU-9** *(ROWA)* | BLM Sensitive Plant Species Occupied Habitat | | ✓ |
| **CSU-10** *(ROWA)* | Wildlife Habitat | | ✓ |
| **CSU-13** *(ROWA)* | Osprey Nest Sites | | ✓ |
| **CSU-14** *(ROWA)* | Ferruginous Hawk Nest Sites | | ✓ |
| **CSU-15** *(ROWA)* | Red-tailed Hawk Nest Sites | | ✓ |
| **CSU-16** *(ROWA)* | Swainson's Hawk Nest Sites | | ✓ |
| **CSU-17** *(ROWA)* | Peregrine Falcon Nest Sites | | ✓ |
| **CSU-18** *(ROWA)* | Prairie Falcon Nest Sites | | ✓ |
| **CSU-19** *(ROWA)* | Other Raptor Species (accipiters, falcons [except kestrel], buteos, and owls) | | ✓ |
| **CSU-22** *(ROWA)* | Kit Fox Dens | | ✓ |
| **CSU-23** *(ROWA)* | Occupied Prairie Dog Towns | | ✓ |
| | **Fish and Wildlife** | | |
| **CSU-10** *(ROWA)* | Wildlife Habitat | | ✓ |
| **WILDLIFE HABITAT CSU CO** | Wildlife Habitat | | ✓ |
| **CSU-24** *(ROWA)* | Deer and Elk Migration and Movement Corridors | | ✓ |
| | **Cultural Resources** | | |
| **CSU-27** *(ROWA* | Allocation to Scientific Use Category | | ✓ |
| **CSU-28** *(ROWA* | Allocation to Public Use Category | | ✓ |
| **CSU-29** *(ROWA* | Sub-surface Inventory | | ✓ |
| | **Visual Resources** | | |
| **CSU-30** *(ROWA)* | VRM Class II | | ✓ |
| | **Recreation and Visitor Services** | | |
| **CSU-31** *(ROWA)* | Recreation | | ✓ |

BLM_0022752

**Table B-2**
**Summary of Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1]**

| Stipulation Number | Protected Resource | Fluid Minerals Only | All Surface-disturbing Activities |
|---|---|:---:|:---:|
| CSU-32 | Recreation Management Areas | | ✓ |
| **Lands and Realty** | | | |
| DISPOSAL CSU CO | Disposal | | ✓ |
| **Coal** | | | |
| COAL MINE CSU CO | Coal Mine | ✓ | |
| **ACEC** | | | |
| CSU-39 | Roan and Carr Creeks ACEC | | ✓ |
| **National and BLM Byways** | | | |
| CSU-37 | Scenic Byways (805 meters [0.5-mile]) | | ✓ |

[1]Details of these stipulations are provided in Table B-6, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities.

BLM_0022753

**Table B-3**
**Summary of Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities[1]**

| Stipulation Number | Protected Resource | Fluid Minerals Only | All Surface-disturbing Activities |
|---|---|---|---|
| **Special Status Species** | | | |
| **TL-1** *(ROWA)* | Salmonid and Native, Non-salmonid Fishes (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub; mountain whitefish; Paiute and mottled sculpin; and speckled dace) | | ✓ |
| **TL-3** *(ROWA)* | Migratory Bird Habitat | | ✓ |
| **WILDLIFE RAPTOR NESTS TL CO** | Raptor Nests | | ✓ |
| **WILDLIFE SENSITIVE RAPTOR NESTS TL CO** | Sensitive Raptor Nests | | ✓ |
| **TL-13** *(ROWA)* | Golden Eagle Nest Sites | | ✓ |
| **TL-14** *(ROWA)* | Bald Eagle Nest Sites | | ✓ |
| **TL-15** *(ROWA)* | Bald Eagle Winter Roost | | ✓ |
| **TL-16** *(ROWA)* | Occupied Sage-grouse Winter Habitat | | ✓ |
| **TL-17** *(ROWA)* | Sage-grouse Leks (6.4 kilometers [4 miles]) | | ✓ |
| **TL-19** *(ROWA)* | Occupied Prairie Dog Towns | | ✓ |
| **Fish and Wildlife** | | | |
| **TL-1** *(ROWA)* | Salmonid and Native, Non-salmonid Fishes (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub; mountain whitefish; Paiute and mottled sculpin; and speckled dace) | | ✓ |
| **TL-20** *(ROWA)* | Big Game Winter Range | | ✓ |
| **BIG GAME PRODUCTION TL CO** | Big Game Production | | ✓ |
| **TL-22** *(ROWA)* | Pronghorn Wintering Habitat | | ✓ |
| **Wild Horses** | | | |

[1]Details of these stipulations are provided in Table B-7, Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities.

BLM_0022754

| Table B-4 Summary of Lease Notices (LN) Applicable to Fluid Mineral Leasing[1] | |
| --- | --- |
| **Stipulation Number** | **Protected Resource** |
| | Air Resources |
| **CO-56** | Air Resources |
| | Water Resources |
| **LN-1** | Source Water Protection Areas |
| | Special Status Species |
| **LN-3** | Biological Inventories |
| **LN-4** | Threatened and Endangered Species / Colorado Hookless Cactus |
| | Fish and Wildlife |
| **LN-3** | Biological Inventories |
| **LN-5** | Working in Wildlife Habitat |
| | Paleontological Resources |
| **LN-6** | Class 4 and 5 Paleontological Areas |
| | Lands and Realty |
| **LN-7** | Powderhorn Ski Area |

[1] Details of these stipulations are provided in Table B-8, Lease Notices (LN) and Additional Required Conditions of Approval Applicable to Fluid Mineral Leasing.

BLM_0022755

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **Water Resources** |
| **HYDROLOGY RIVER NSO CO**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** No surface occupancy or use is allowed within 400 meters (1312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major river:<br><br>Colorado, Gunnison, and Dolores Rivers<br><br>**On the following lands:**<br>\<LEGAL_DESCRIPTION\><br><br>**PURPOSE:** To protect rivers and adjacent aquatic habitat that provide: a) *special status* or *critical* fish and wildlife species habitat: b) important riparian values: c) water quality/filtering values: d) waterfowl and shorebird production values: e) valuable amphibian habitat: f) 100-year floodplain, and g) high scenic and recreation values of major rivers. Minimizing potential deterioration of water quality, high scenic and recreation values, maintain natural hydrologic function and condition of stream channels, banks, floodplains, and riparian communities, and preserve wildlife habitat including designated critical habitat for federally listed fish species. The buffers are sized to accommodate the rivers' larger floodplains and wider riparian zones.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is required to minimize potential deterioration of water quality, high scenic and recreation values, maintain natural hydrologic function and condition of stream channels, banks, floodplains, and riparian communities, and preserve wildlife habitat including designated critical habitat for federally listed fish species. The buffers are sized to accommodate the rivers' larger floodplains and wider riparian zones. |
| **NSO-2** *(ROWA)*<br><br>**Streams/ Springs Possessing Lotic Riparian Characteristics.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and use and surface-disturbing activities within the riparian zone.<br><br>**PURPOSE:** To protect water quality and aquatic values and prevent channel degradation, as riparian corridors/flood-prone areas are lands adjacent to waterbodies where activities on land are likely to affect water quality.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions, which are subject to CSU (site-specific relocation) stipulations, are as follows:<br>• Necessary site restoration and management as dictated by initial analysis or later |

BLM_0022756

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | evaluation/monitoring.<br>• Essential stream crossings associated with linear transportation, and utility crossings.<br>• For actions requiring individual permits through the USACE, require a Licensed Professional Engineer to approve and stamp project design, implementation, and reclamation plans.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to maintain the natural hydrologic function and condition of mountain and rangeland stream systems. Properly functioning stream channels, stream banks, and floodplains (including the riparian zone) transport and store sediment at a rate which is in balance with each system's typical flow regime. Any alteration of this system can create an imbalance between sediment supply and flow, resulting in accelerated erosion, decreased water quality, and degraded habitat conditions and for special status aquatic wildlife. This stipulation is also essential to protect fish bearing streams in the GJFO. |
| NSO-4 *(ROWA)*<br><br>**Lentic Riparian Areas (including springs, seeps, and fens).**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 100 meters (328 feet) from the mapped extent of perennial, intermittent, and ephemeral streams; riparian areas, fens and/or wetlands; and water impoundments. For streams, the buffer will be measured from ordinary high-water mark (bank-full stage), whereas for wetland features, the buffer will be measured from the edge of the mapped extent.<br><br>**PURPOSE:** To maintain the proper functioning condition, including the vegetation, hydrologic, and geomorphic functionality of wetland features. To protect water quality, riparian zones, fens, fish habitat, and aquatic habitat, and to provide a clean, reliable source of water for downstream users. Buffers are expected to indirectly benefit migratory birds, wildlife habitat, amphibians, and other species.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary because surface disturbance within the minimum 100-meter (328-foot) buffer may impair proper function and condition of springs, seeps, and fens. Source areas (for springs, seeps, and fens) are delicate and susceptible to any alteration of natural flow patterns, soil infiltration rates, or drainages within the contributing watershed. Changes to these variables may dewater lentic riparian areas, greatly impairing the system's ability to properly function. |

BLM_0022757

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO-5**<br><br>**No Surface Occupancy (Palisade and Grand Junction Municipal Watersheds).**<br><br>*BLM surface/ federal minerals:* 900 acres<br><br>*Private or State surface/federal minerals:* 8,300 acres<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and other surface-disturbing activities in the Palisade and Grand Junction municipal watersheds.<br><br>**PURPOSE:** To protect municipal watersheds providing drinking water to local communities.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will require professionally engineered design and construction for a 100-year flood event along strait and stable stream reaches.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to reduce potential for groundwater contamination and/or dewatering of municipal sources. |

BLM_0022758

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number Protected Resource Acres/Miles Affected | Stipulation Description |
|---|---|
| | **Soils and Geology** |
| **GEOLOGY SOIL NSO CO** *BLM surface/federal minerals:* 54,500 acres *Private or state surface/federal minerals:* 3,100 acres ***All Surface-disturbing Activities*** | **STIPULATION:** No surface occupancy or use is allowed on lands with soils, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, with the following special characteristics:<br><br>Baxter/Douglas Pass Slump Area and the Plateau Creek Slump Area.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To minimize the risk of mass wasting and sedimentation; reduce reclamation costs; protect soil productivity, rare, or sensitive biota; minimize risk to water bodies, fisheries, and aquatic species habitats; and protect human health and safety (e.g., from landslides and mass wasting).<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION: JUSTIFICATION:** This stipulation is necessary because accelerated erosion from fragile soils in the GJFO is a major contributor of nonpoint source pollution in rivers and streams. The 25-meter (82-foot) buffer is necessary to adequately protect fragile soils from stormwater runoff and other impacts associated with surface-disturbing actions. |
| **GEOLOGY SLOPE NSO CO** *BLM surface/federal minerals:* 347,700 acres *Private or State surface/federal minerals:* 28,800 acres ***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use on lands with steep slopes greater than 40 percent.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To minimize the risk of mass wasting and sedimentation; reduce reclamation costs; protect soil productivity, rare, or sensitive biota; minimize risk to water bodies, fisheries, and aquatic species habitats; and protect human health and safety (e.g., from landslides and mass wasting).<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary because accelerated erosion from soils on steep slopes in the GJFO can be a major contributor of nonpoint source pollution in rivers and |

BLM_0022759

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number Protected Resource Acres/Miles Affected | Stipulation Description |
|---|---|
| | streams. |

| | **Vegetation** |
|---|---|
| **NSO-2** *(ROWA)* **Streams/ Springs Possessing Lotic Riparian Characteristics.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and use and surface-disturbing activities within the riparian zone. **PURPOSE:** To protect water quality and aquatic values and prevent channel degradation, as riparian corridors/flood-prone areas are lands adjacent to waterbodies where activities on land are likely to affect water quality. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions, which are subject to CSU (site-specific relocation) stipulations, are as follows: • Necessary site restoration and management as dictated by initial analysis or later evaluation/monitoring. • Essential stream crossings associated with linear transportation, and utility crossings. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to maintain the natural hydrologic function and condition of mountain and rangeland stream systems. Properly functioning stream channels, stream banks, and floodplains (including the riparian zone) transport and store sediment at a rate which is in balance with each system's typical flow regime. Any alteration of this system can create an imbalance between sediment supply and flow, resulting in accelerated erosion, decreased water quality, and degraded habitat conditions and for special status aquatic wildlife. This stipulation is also essential to protect fish bearing streams in the GJFO. |
| **NSO-4** *(ROWA)* **Lentic Riparian Areas (including springs, seeps, and fens).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. **PURPOSE:** To protect water quality and aquatic values and prevent channel degradation. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary because surface disturbance within the minimum 100-meter (328-foot) buffer may impair proper function and condition of springs, |

BLM_0022760

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number | |
| --- | --- |
| Protected Resource | Stipulation Description |
| Acres/Miles Affected | |

seeps, and fens. Source areas (for springs, seeps, and fens) are delicate and susceptible to any alteration of natural flow patterns, soil infiltration rates, or drainages within the contributing watershed. Changes to these variables may dewater lentic riparian areas, greatly impairing the system's ability to properly function.

| | Special Status Species |
| --- | --- |
| **HYDROLOGY RIVER NSO CO** | **STIPULATION:** No surface occupancy or use is allowed within 400 meters (1312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major river: |
| *All Surface-disturbing Activities* | Colorado, Gunnison, and Dolores Rivers |

**On the following lands:**
<LEGAL_DESCRIPTION>

**PURPOSE:** To protect rivers and adjacent aquatic habitat that provide: a) *special status* or *critical* fish and wildlife species habitat: b) important riparian values: c) water quality/filtering values: d) waterfowl and shorebird production values: e) valuable amphibian habitat: f) 100-year floodplain, and g) high scenic and recreation values of major rivers. Minimizing potential deterioration of water quality, high scenic and recreation values, maintain natural hydrologic function and condition of stream channels, banks, floodplains, and riparian communities, and preserve wildlife habitat including designated critical habitat for federally listed fish species. The buffers are sized to accommodate the rivers' larger floodplains and wider riparian zones.

**EXCEPTION:** Standard exceptions apply (Section B.2).

**MODIFICATION:** Standard modifications apply (Section B.2).

**WAIVER:** Standard waivers apply (Section B.2).

**JUSTIFICATION:** This stipulation is required to minimize potential deterioration of water quality, high scenic and recreation values, maintain natural hydrologic function and condition of stream channels, banks, floodplains, and riparian communities, and preserve wildlife habitat including designated critical habitat for federally listed fish species. The buffers are sized to accommodate the rivers' larger floodplains and wider riparian zones.

| **NSO-2** *(ROWA)* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and use and surface-disturbing activities within the riparian zone. |
| --- | --- |
| **Streams/ Springs Possessing Lotic Riparian** | |

**PURPOSE:** To protect water quality and aquatic values and prevent channel degradation, as

BLM_0022761

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **Characteristics.**<br><br>*All Surface-disturbing Activities* | riparian corridors/flood-prone areas are lands adjacent to waterbodies where activities on land are likely to affect water quality.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions, which are subject to CSU (site-specific relocation) stipulations, are as follows:<br>• Necessary site restoration and management as dictated by initial analysis or later evaluation/monitoring.<br>• Essential stream crossings associated with linear transportation, and utility crossings.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to maintain the natural hydrologic function and condition of mountain and rangeland stream systems. Properly functioning stream channels, stream banks, and floodplains (including the riparian zone) transport and store sediment at a rate which is in balance with each system's typical flow regime. Any alteration of this system can create an imbalance between sediment supply and flow, resulting in accelerated erosion, decreased water quality, and degraded habitat conditions and for special status aquatic wildlife. This stipulation is also essential to protect fish-bearing streams in the GJFO. |

BLM_0022762

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO-12** (Partial ROWA)<br><br>**ACECs.**<br><br>34,600 acres<br><br>**All Surface-disturbing Activities** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in the following ACECs to protect threatened, proposed, candidate, and sensitive species:<br><br>• Atwell Gulch (2,900 acres);<br>• Badger Wash (2,200 acres);<br>• Pyramid Rock (1,300 acres);<br>• South Shale Ridge (28,200 acres); and<br>• Unaweep Seep (85 acres).<br><br>**PURPOSE:**<br>• Atwell Gulch: To protect threatened and sensitive plants.<br>• Badger Wash: To protect sensitive plants.<br>• Plateau Creek: To protect sensitive fish species.<br>• Pyramid Rock: To protect known threatened, proposed, and sensitive plants.<br>• South Shale Ridge: To protect threatened, proposed, and sensitive plants.<br>• Unaweep Seep: To protect sensitive plants and Great Basin Silverspot Butterfly habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** This stipulation may be modified to include species listed as threatened, endangered, proposed, candidate, or sensitive in the future. This stipulation may also be modified to account for the change in status of species protected in this stipulation.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect critical habitat for threatened, proposed, and sensitive plants. |
| **NSO-13** (ROWA)<br><br>**Current and Historically Occupied Habitat and Critical Habitat of Threatened, Endangered, Proposed, and Candidate Plant and Animal** | **STIPULATION:** Prohibit certain surface uses, as specified below, to protect threatened, endangered, proposed, and candidate plants and animals from indirect impacts, loss of immediately adjacent suitable habitat, or impacts to primary constituent elements of critical habitat as designated by USFWS. Maintain existing buffer distances where pre-existing disturbance exists, and reduce redundancies in roads to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails. In undisturbed environments and ACECs, prohibit new disturbance within 200 meters (656 feet) of current and historically occupied and suitable habitat. This stipulation includes emergency closures of roads where damage to T&E habitat has occurred.<br><br>**PURPOSE:** To protect threatened, endangered, proposed, and candidate species from indirect impacts or loss of immediately adjacent suitable habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO may be altered if |

BLM_0022763

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| **Species.**<br><br>***All Surface-disturbing Activities*** | all of the following conditions are met:<br>1. Section 7 consultation with USFWS on threatened or endangered species has been completed;<br>2. Valid current surveys for protected species have been completed and submitted;<br>3. Mitigation has been applied to avoid adverse impacts to protected species and the proponent will submit monitoring reports; and<br>4. The proposed disturbance will occur in unsuitable habitat.<br><br>Other surface-disturbing activities may be allowed in suitable habitat if conditions 1 through 3 above are met, and the purpose<br><br>or the result of the activity will improve habitat conditions for the protected species.<br><br>Allow occupancy within 200 meters (656 feet) when terrain and topography provide adequate protections<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER**: Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION**: This stipulation is necessary to protect threatened, endangered, proposed, and candidate species and ensure the preservation of their habitat (including plant pollinator habitat). |
| **NSO-23** *(ROWA)*<br><br>**Golden Eagle Nest Sites.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area prior to nest establishment) within 402 meters (0.25-mile) of active golden eagle nest sites and associated alternate nests.<br><br>**PURPOSE:** To protect golden eagle nesting habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect golden eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **NSO-24** *(ROWA)* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area prior to nest establishment) within 402 meters (0.25- |

BLM_0022764

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **Bald Eagle Nest Sites.**<br><br>*All Surface-disturbing Activities* | mile) of active bald eagle nests.<br><br>**PURPOSE:** To protect bald eagle nesting habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect bald eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |

BLM_0022765

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO-25** *(ROWA)*<br><br>**Sage-grouse Leks, Nesting, and Early Brood-rearing Habitat (4 miles).**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 6.4 kilometers (4 miles) of an active lek or within sage-grouse nesting and early brood-rearing habitat.<br><br>**PURPOSE:** To protect breeding, nesting, and brood-rearing habitat for the Gunnison and greater sage-grouse.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending upon the active status of the lek or the geographical relationship of topographical barriers and vegetation to the lek site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to minimize impacts on Greater and Gunnison Sage-Grouse. The four mile buffer is consistent with current scientific research recommendations (The Parachute-Piceance-Roan (PPR) Greater Sage-Grouse Work Group 2008). |
| **NSO-26** *(ROWA)*<br><br>**Canyon Treefrog, Midget Faded Rattlesnake, Northern Leopard Frog, Great Basin Spadefoot, Long-nosed Leopard Lizard, Boreal Toad (no buffer).**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within all identified canyon treefrog, northern leopard frog, midget faded rattlesnake, Great Basin spadefoot, long-nosed leopard lizard (*Gambelia wislizenii*), and boreal toad breeding and denning sites.<br><br>**PURPOSE:** To protect breeding habitat for canyon treefrog, northern leopard frog, midget faded rattlesnake, Great Basin spadefoot, long-nosed leopard lizard, and boreal toad. Note: no midget faded rattlesnake or boreal toad breeding locations are currently identified in the GJFO.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect important breeding habitat for these species. The Northern Leopard Frog has been petitioned for listing under the Endangered Species Act of 1973. |
| **WILDLIFE BAT NSO CO**<br><br>*All Surface-disturbing* | **STIPULATION:** No surface occupancy or use is allowed within a 402 meter (0.25 mile) radius of the entrance of maternity roosts or hibernacula of BLM sensitive bat species, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM. |

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022766

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| *Activities* | <SPECIES> |
| | **On the following lands:** <LEGAL_DESCRIPTION> |
| | **PURPOSE:** To protect sensitive bat species' maternity roosts and hibernacula. |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). |
| | **MODIFICATION:** Standard modifications apply (Section B.2). |
| | **WAIVER:** Standard waivers apply (Section B.2). |
| | **JUSTIFICATION:** This stipulation is necessary to minimize impacts on important bat areas. |
| **NSO-30** *(ROWA)* **Occupied Prairie Dog Towns (no buffer).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area) within active white-tailed prairie dog towns in the Prairie Canyon Wildlife Emphasis Area. |
| | **PURPOSE:** To maintain or improve white-tailed prairie dog habitat and distribution. |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). Additional exception criteria include activities that avoid the center of active towns while maintaining the integrity of the town's social structure. |
| | **MODIFICATION:** Standard modifications apply (Section B.2). |
| | **WAIVER:** Standard waivers apply (Section B.2). |
| | **JUSTIFICATION:** This stipulation is necessary to protect prairie dogs, a keystone species whose population has been declining across the western US. |
| | Fish and Wildlife |
| **NSO-32** *(ROWA)* **Research Sites.** 130 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in approved research sites including, but not limited to, the Ant Research Area (16 Road) and the Owl Banding Station (south of DeBeque). |
| | **PURPOSE:** To maintain the integrity of ongoing research stations. |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will be granted for work to be done in the research areas consistent with the goals and objectives of the research being conducted on the site. |
| | **MODIFICATION:** Standard modifications apply (Section B.2). |
| | **WAIVER:** Standard waivers apply (Section B.2). |

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022767

| **Table B-5** **No Surface Occupancy (NSO) Stipulations Applicable to** **Fluid Mineral Leasing and Other Surface-disturbing Activities** | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| | **JUSTIFICATION:** This stipulation is necessary to protect long-term, ongoing research sites within the GJFO.  If research sites are impacted, they incur the potential for research findings to be negatively affected. |
| **NSO-12** *(Partial ROWA)* **ACECs.** 74,800 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in the following ACECs to protect threatened, proposed, candidate, and sensitive species and habitat: <br>• Atwell Gulch (2,900 acres); <br>• Indian Creek (2,300 acres); <br>• Palisade (32,200 acres); <br>• Rough Canyon (2,800 acres); <br>• Sinbad Valley (6,400 acres); and <br>• South Shale Ridge (28,200 acres). <br><br>**PURPOSE:** <br>• Atwell Gulch: To protect wildlife habitat. <br>• Colorado River Riparian: To protect fisheries values. <br>• Glade Park-Pinyon Mesa: To protect Gunnison Sage-Grouse critical habitat. <br>• Indian Creek: To protect wildlife values. <br>• The Palisade: To protect special status wildlife. <br>• Plateau Creek: To protect fisheries values. <br>• Prairie Canyon: To protect wildlife habitat. <br>• Roan and Carr Creeks: To protect core conservation populations of cutthroat trout. <br>• Rough Canyon: To protect wildlife habitat. <br>• Sinbad Valley: To protect wildlife resources. <br>• South Shale Ridge: To protect wildlife habitat. <br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). <br><br>**MODIFICATION:** This stipulation may be modified to include species listed as threatened, endangered, proposed, candidate, or sensitive in the future. This stipulation may also be modified to account for the change in status of species protected in this stipulation. <br><br>**WAIVER:** Standard waivers apply (Section B.2). <br><br>**JUSTIFICATION:** This stipulation is necessary to protect critical habitat for threatened, proposed, and sensitive plants. |

BLM_0022768

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| **RECREATION PARKS NSO CO** <br><br> *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units: <br> • Horsethief Canyon State Wildlife Area  (1,400 acres) <br> • Jerry Creek Reservoir State Wildlife Area (870 acres) <br> • Plateau Creek State Wildlife Area (1,400 acres) <br> • Highline State Park (350 acres) <br> • Vega State Park (2,000 acres) <br><br> **On the following lands:** <br> <LEGAL_DESCRIPTION> <br><br> **PURPOSE:** To protect the resources of wildlife refuges and park units, such as county parks, state parks, and wildlife areas, and federal parks and wildlife refuges. <br><br> **EXCEPTION:** Standard exceptions apply (Section B.2). <br><br> **MODIFICATION:** Standard modifications apply (Section B.2). <br><br> **WAIVER:** Standard waivers apply (Section B.2). <br><br> **JUSTIFICATION:** This stipulation is necessary to prevent placement of facilities within the state wildlife areas, where BLM manages the fluid mineral rights. |
| **NSO-34** *(ROWA)* <br> **Elk Production Area.** <br><br> *BLM surface/ federal minerals:* 13,100 acres <br><br> *Private or State surface/federal minerals:* 25,100 acres <br><br> *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in elk production areas year-round. <br><br> **PURPOSE:** To protect elk production areas. <br><br> **EXCEPTION:** Standard exceptions apply (Section B.2). <br><br> **MODIFICATION:** Standard modifications apply (Section B.2). <br><br> **WAIVER:** Standard modifications apply (Section B.2). <br><br> **JUSTIFICATION:** This stipulation is necessary to reduce surface disturbance and habitat fragmentation on BLM lands that CPW has identified as elk calving habitat. |
| **WILDLIFE HABITAT** | **STIPULATION:** No surface occupancy or use is allowed within the following wildlife emphasis or priority areas, as identified in the Resource Management Plan: |

BLM_0022769

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO CO**<br><br>*All Surface-disturbing Activities* | • Blue Mesa (wintering habitat for mule deer and elk) (9,300 acres);<br>• Bull Hill (wintering habitat for mule deer and elk) (4,800 acres);<br>• A portion of East Salt Creek (wintering habitat for mule deer and elk) (4,500 acres);<br>• A portion of Prairie Canyon (pronghorn antelope habitat) (5,600 acres);<br>• Sunnyside (wintering and migratory habitat for bighorn sheep, mule deer, elk, and Greater Sage-Grouse) (14,500 acres); and<br>• Timber Ridge (habitat for mule deer, elk, and Gunnison Sage-Grouse) (11,800 acres).<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To protect lands identified in the Resource Management Plan as unique and important wildlife habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect the highest priority wildlife habitat for deer, elk, antelope, bighorn sheep, and sage-grouse. Wildlife emphasis areas were identified in coordination with CPW biologists. |
| **Wild Horses** | |
| **NSO-36** *(ROWA)*<br><br>Little Book Cliffs Wild Horse Range.<br><br>35,200 acres<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities on lands within the LBCWHR.<br><br>**PURPOSE:** To reduce impacts on wild horses in the LBCWHR.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will be granted for gather activities, vegetative treatments, water hauling or the development of springs, catchments, reservoirs, storage tanks, exclosures or fences designed to improve wild horse forage, distribution, containment, or overall management.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard modifications apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to mitigate impacts that could interfere with the protection and management of wild horses in the LBCWHR. |
| **Cultural Resources** | |
| **NSO-37** *(ROWA)* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities, including |

BLM_0022770

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **Allocation to Conservation Use Category.**<br><br>*All Surface-disturbing Activities* | archaeological excavation, within 100 meters (328 feet) around eligible sites allocated to Conservation Use.<br><br>**PURPOSE:** To protect unique scientific information in sites allocated to Conservation Use.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis, taking into account topographical barriers, the design of the proposed action, and the characteristics of the cultural resource site and/or area.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to preserve sites allocated to Conservation Use, where mitigation through data recovery is not an option. This stipulation allows the BLM to mitigate impacts that can cause significant degradation to the site integrity criteria that are applied in the designation of the cultural resource as eligible or potentially eligible for nomination to the NRHP *(36 CFR part 800.5(a)(1))*. |
| **NSO-38** *(ROWA)*<br><br>**Allocation to Traditional Use Category.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 200 meters (656 feet), from the boundary of the following known eligible or potentially eligible sites allocated to Traditional Use. In addition, consider visual impacts that projects may have on sites allocated to this use, and apply appropriate mitigation, which may include redesign.<br><br>**PURPOSE:** To protect values that contribute to sites allocated to Traditional Use.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis after completion and documentation of Native American Consultation, taking into account topographical barriers, the design of the proposed action, and the characteristics of the cultural resource site and/or area.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to address indirect or secondary impacts that can occur to cultural resources that have been identified by the Ute Indian Tribe and Ute Mountain Ute Indian Tribe. This stipulation buffer has been established through consultation conducted with the Ute Indian Tribe for the Orchard GAP (shared CRVFO-GJFO MDP) and during the RMP Ute Ethnohistory project with the Ute Indian Tribe and the Ute Mountain Ute Tribe. Impacts to Traditional Use sites are typically not mitigated through data recovery.  This stipulation allows the BLM to mitigate impacts that can cause significant degradation to the site integrity criteria that are applied in the designation of the cultural resource as eligible or potentially eligible for nomination to the NRHP *(36 CFR part 800.5(a)(1))*. |

BLM_0022771

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO-39** *(ROWA*<br><br>**Cultural Resources (Indian Creek)**.<br>1,700 acres<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in the following areas:<br>• West Indian Creek (520 acres); and<br>• East Indian Creek (1,200 acres).<br><br>**PURPOSE:** To protect cultural resources.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard modifications apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary because data recovery to mitigate adverse effects (for the purposes of compliance with Section 106 of the NHPA) is not an objective for these sites. This stipulation also preserves the site(s) within these areas for long term research projects. |
| Visual Resources | |
| **VISUAL CLASS I NSO CO**<br><br>*All Surface-Disturbing Activities*<br><br>98,700 acres | **STIPULATION:** No surface occupancy or use is allowed in VRM Objective Class I areas, the Goblins, Highway 141 along the Dolores River (55,200 acres), and Unaweep Canyon ROW Corridor (54,000 acres) (Exhibit GJ-IGM).<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To protect the quality of the scenic (visual) values.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard modifications apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to ensure the protection of vital visual features in the GJFO landscape. |
| Lands Managed for Wilderness Characteristics | |
| **LANDS WITH WILDERNESS CHARACTER-ISTICS NSO CO.** | **STIPULATION:** No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan:<br>• Bangs Canyon (19,600 acres);<br>• Maverick (17,800 acres);<br>• Unaweep Canyon (6,700 acres) |

BLM_0022772

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| 44,100 acres<br><br>*All Surface-disturbing Activities* | **On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To protect inventoried wilderness characteristics and their locally, regionally, or nationally significant recreational, social, economic, and environmental values.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard modifications apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to ensure lands with identified wilderness characteristics remain in their current undeveloped state. |
| **Recreation and Visitor Services** | |
| **RECREATION SRMA NSO CO**<br><br>*All Surface-disturbing Activities*<br><br>87,000 acres | **STIPULATION:** No surface occupancy or use is allowed within the following Special Recreation Management Areas (SRMAs) as identified in the Resource Management Plan:<br>• Bangs;<br>• Dolores River Canyon;<br>• North Fruita Desert; and<br>• Palisade Rim.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To protect specific recreation-tourism visitors and/or community customer markets to be served, and maintain the specific setting character and/or service delivery system conditions that are essential to achievement of the experiences and benefits identified in management objectives for the SRMA.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect areas important to recreation users which may also include large facility investments. Protection of RMZs is necessary to meet desired recreation outcomes. |
| **RECREATION PARKS NSO CO** | **STIPULATION:** Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units: |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number  Protected Resource  Acres/Miles Affected | Stipulation Description |
| --- | --- |
| *All Surface-disturbing Activities* | • Horsethief Canyon State Wildlife Area  (1,400 acres)  • Jerry Creek Reservoir State Wildlife Area (870 acres)  • Plateau Creek State Wildlife Area (1,400 acres)  • Highline State Park (350 acres)  • Vega State Park (2,000 acres)  **On the following lands:**  <LEGAL_DESCRIPTION>  **PURPOSE:** To protect the resources of wildlife refuges and park units, such as county parks, state parks, and wildlife areas, and federal parks and wildlife refuges.  **EXCEPTION:** Standard exceptions apply (Section B.2).  **MODIFICATION:** Standard modifications apply (Section B.2).  **WAIVER:** Standard waivers apply (Section B.2).  **JUSTIFICATION:** This stipulation is necessary to prevent placement of facilities within the state wildlife areas, where BLM manages the fluid mineral rights. |
| **Fluid Minerals (Oil and Gas and Geothermal Resources)** | |
| **RECREATION PARKS NSO CO**  *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units:  • Horsethief Canyon State Wildlife Area  (1,400 acres)  • Jerry Creek Reservoir State Wildlife Area (870 acres)  • Plateau Creek State Wildlife Area (1,400 acres)  • Highline State Park (350 acres)  • Vega State Park (2,000 acres)  **On the following lands:**  <LEGAL_DESCRIPTION>  **PURPOSE:** To protect the resources of wildlife refuges and park units, such as county parks, state parks, and wildlife areas, and federal parks and wildlife refuges.  **EXCEPTION:** Standard exceptions apply (Section B.2).  **MODIFICATION:** Standard modifications apply (Section B.2).  **WAIVER:** Standard waivers apply (Section B.2).  **JUSTIFICATION:** This stipulation is necessary to prevent placement of facilities within the |

BLM_0022774

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| Stipulation Number | | |
|---|---|---|
| **Protected Resource** | **Stipulation Description** | |
| **Acres/Miles Affected** | | |

state wildlife areas, where BLM manages the fluid mineral rights.

| ACECs | |
|---|---|
| **NSO-12** *(Partial ROWA)*<br><br>**ACECs.**<br><br>89,800 acres<br><br>*All Surface-disturbing Activities* | **STIPULATION**: Prohibit surface occupancy and use (for fluid minerals only in Alternative A), and prohibit surface occupancy and use and surface-disturbing activities, within the following ACECs:<br><br>• Atwell Gulch (2,900 acres);<br>• Badger Wash (2,200 acres);<br>• Dolores River Riparian (7,400 acres);<br>• Indian Creek (2,300 acres);<br>• Juanita Arch (1,600 acres);<br>• Mt. Garfield (2,400 acres);<br>• Palisade (32,200 acres);<br>• Pyramid Rock (1,300 acres);<br>• Rough Canyon (2,800 acres);<br>• Sinbad Valley (6,400 acres);<br>• South Shale Ridge (28,200 acres); and<br>• Unaweep Seep (85 acres).<br><br>**PURPOSE:** To protect and prevent irreparable damage to resources described in the relevance and importance criteria for which the ACEC was established.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** This stipulation may be waived or reduced in scope if circumstances change, or if the lease can demonstrate that operations can be conducted without causing unacceptable impacts on the concern(s) identified. If this stipulation is waived or reduced in scope, any of the other attached stipulations (if any) may impact operations on this lease.<br><br>**JUSTIFICATION:** This stipulation is necessary to protect areas that contain highly important resources requiring special protections. |

| Wilderness Study Areas | |
|---|---|
| **NSO-43**<br><br>**Wilderness Study Areas.** | **STIPULATION**: Prohibit surface occupancy and use and surface-disturbing activities in WSAs in accordance with BLM Manual 6330, Management of Wilderness Study Areas.<br>• Demaree Canyon (22,700 acres);<br>• Little Book Cliffs (29,300 acres); |

BLM_0022775

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| Table B-5 No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| 96,500 acres *All Surface-disturbing Activities* | • The Palisade (26,700 acres); • Sewemup Mesa (17,800 acres). **PURPOSE:** To preserve wilderness characteristics in WSAs in accordance with non-impairment standards as defined by BLM Manual 6330. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to preserve wilderness characteristics in WSAs in accordance with non-impairment standards as defined by BLM Manual 6330. |
| Wild and Scenic Rivers National Trails | |
| **NSO-45** *(ROWA)* **Old Spanish National Historic Trail (50 meters).** 1,000 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 50 meters (164 feet) either side of the center line of the congressionally designated Old Spanish National Historic Trail. **PURPOSE:** To protect the physical evidence of the trail, associated cultural and historic resources, and integrity of the viewshed associated with the Old Spanish National Historic Trail. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will be granted for actions not resulting in long-term adverse impacts to the trail. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect the cultural and historic resources along this congressionally designated historic trail. |

BLM_0022776

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| Water Resources | |
| **CSU-39** **Roan and Carr Creeks ACEC.** 33,600 acres *All Surface-disturbing Activities* | **STIPULATION:** Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required in the Roan and Carr Creeks ACEC (33,600 acres). **PURPOSE:** To protect and prevent irreparable damage to unique riparian habitats, genetically pure populations of cutthroat trout, and Greater Sage-Grouse habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect areas that contain highly important resources requiring special protections. |
| **CSU-3** *(ROWA)* **Definable Streams.** *All Surface-disturbing Activities* | **STIPULATION:** Surface-disturbing actions within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank-full stage) shall be avoided to the greatest extent practicable and disturbances will be subject to site specific relocation at the discretion of the BLM. **PURPOSE:** To protect watershed resource values and reduce non-point source pollutant contributions to the Colorado River system. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2) **JUSTIFICATION:** This stipulation is necessary to carefully plan and appropriately mitigate disturbances near surface water drainages in order to reduce non-point source pollutant contributions from BLM lands to the Colorado River system. |

BLM_0022777

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
|---|---|
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| **CSU-4** *(ROWA)*<br><br>**Collbran and Mesa/ Powderhorn Source Water Protection Areas, and Jerry Creek Watershed.**<br><br>*BLM surface/ federal minerals:* 148,200 acres<br><br>*Private or State surface/federal minerals:* 30,300 acres<br><br>**All Surface-disturbing Activities** | **STIPULATION:** Require that all ground disturbances within source water protection areas and the Jerry Creek watershed avoid interference with watershed resource values.<br><br>**PURPOSE:** To protect watershed resource values.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2)<br><br>**JUSTIFICATION:** This stipulation is necessary because land management actions can compromise both water quality and quantity if proper locations, mitigation and construction techniques are not utilized. |
| **Soils and Geology** | |
| **GEOLOGY SOIL CSU CO**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Surface occupancy or use may be restricted on lands within mapped soils with the following special characteristics:<br><br>Fragile soils and mapped Mancos shale and saline soils.<br><br>Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/reclamation plan to avoid, minimize and mitigate potential effects to soil productivity.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To improve reclamation potential, maintain soil stability and productivity of sensitive areas, minimize contributions of salinity, selenium and sediments likely to affect downstream water quality, fisheries and other downstream aquatic habitats.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). |

BLM_0022778

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| **Table B-6**<br>**Controlled Surface Use (CSU) Stipulations Applicable to**<br>**Fluid Mineral Leasing and Other Surface-disturbing Activities** | | |
|---|---|---|
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** | |

<table>
<tr><td colspan="2">

**MODIFICATION:** Standard modifications apply (Section B.2).

**WAIVER:** Standard waivers apply (Section B.2).

**JUSTIFICATION:** This stipulation is necessary to decrease potential degradation to soil and watershed resources within the Greater Colorado River Basin. Land use decisions occurring on mapped areas of Mancos Shale (e.g., conversion of native vegetative communities to irrigated hay fields or golf courses) have been documented to mobilize selenium and contaminate ground and surface water resources. The Colorado River Basin Salinity Control Act of 1974 directed the BLM to manage the Colorado River's salinity, including salinity contributed from public lands.

</td></tr>
<tr><td></td><td>Vegetation</td></tr>
<tr><td>

**PLANT COMMUNITY CSU CO**

*All Surface-disturbing Activities*

</td><td>

**STIPULATION:** Surface occupancy or use may be restricted within occupied habitat that meets BLM's criteria, as established in the Resource Management Plan, for significant and/or relict plant communities:

- all old growth forests and woodlands and
- plant communities that meet BLM's criteria for significant plant communities

Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit a plan of development that will demonstrate that habitat will be preserved to maintain the viability of significant or relict plant communities.

**On the following lands:**
<LEGAL_DESCRIPTION>

**PURPOSE:** To conserve significant and/or relict plant communities (e.g., old growth forests and Blue Mountain Deciduous Browse/Aspen Communities and woodlands) that are not otherwise protected.

**EXCEPTION:** Standard exceptions apply (Section B.2).

**MODIFICATION:** Standard modifications apply (Section B.2).

**WAIVER:** Standard waivers apply (Section B.2).

**JUSTIFICATION:** This stipulation is necessary to minimize the loss of old growth trees by adjusting the location of well pads, access roads, and other development; and to limit new disturbance within relic plant communities, thus reducing fragmentation, and the possibility of degradation or loss.

</td></tr>
</table>

BLM_0022779

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| | Special Status Species |
| **CSU-9** *(ROWA)* <br><br> **BLM Sensitive Plant Species Occupied Habitat.** | **STIPULATION:** For plant species listed as sensitive by BLM, special design, construction, and implementation measures within a 100-meter (328 feet) buffer from the edge of occupied habitat may be required. In addition, relocation of operations by more than 200 meters (656 feet) may be required. <br><br> **PURPOSE:** To protect BLM sensitive plant species from direct and indirect impacts, including loss of habitat. The protection buffer reduces dust transport, weed invasion, chemical and produced-water spills and those effects on BLM sensitive plant populations. It also reduces impacts to important pollinators and their habitat. <br><br> **EXCEPTION:** Standard exceptions apply (Section B.2). <br><br> **MODIFICATION:** Standard modifications apply (Section B.2). <br><br> **WAIVER:** Standard waivers apply (Section B.2). <br><br> **JUSTIFICATION:** This stipulation is necessary to reduce direct impacts to sensitive status species by placing disturbances outside of occupied habitat. |
| **CSU-10** *(ROWA)* <br><br> **Wildlife Habitat.** <br><br> *All Surface-disturbing Activities* | **STIPULATION:** Require proponents of surface-disturbing activities to implement specific measures to mitigate impacts of operations on wildlife and wildlife habitat within high-value or essential wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs. <br><br> **PURPOSE:** To reduce impacts of surface disturbing activities and related actions on wildlife and wildlife habitat within high-value or crucial wildlife habitat including, but not limited to, big game winter range and Gunnison and greater sage grouse habitat. <br><br> **EXCEPTION:** Standard exceptions apply (Section B.2). <br><br> **MODIFICATION:** Standard modifications apply (Section B.2). <br><br> **WAIVER:** Standard waivers apply (Section B.2). <br><br> **JUSTIFICATION:** This stipulation is necessary to remain in compliance with current BLM sage grouse direction and allow for protection of essential habitat for wildlife species. |
| **CSU-13** *(ROWA)* <br><br> **Osprey Nest Sites.** <br><br> *All Surface-disturbing* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 402 meters (0.25-mile) of active osprey nest sites. <br><br> **PURPOSE:** To protect osprey habitat and nest sites. <br><br> **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers |

BLM_0022780

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| *Activities* | and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect osprey nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-14** *(ROWA)* **Ferruginous Hawk Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 805 meters (0.5-mile) of active ferruginous hawk nest sites, and associated alternate nests. **PURPOSE:** To protect ferruginous hawk nesting habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect ferruginous hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-15** *(ROWA)* **Red-tailed Hawk Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 531 meters (0.33-mile) of active red-tailed hawk nest sites, and associated alternate nests. **PURPOSE:** To protect red-tailed hawk nesting habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect red-tailed hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |

BLM_0022781

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| **CSU-16** *(ROWA)* **Swainson's Hawk Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 402 meters (0.25-mile) of active Swainson's hawk nest sites and associated alternate nests. **PURPOSE:** To protect ferruginous hawk nesting habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect Swainson's hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-17** *(ROWA)* **Peregrine Falcon Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 805 meters (0.5-mile) of active peregrine falcon nest sites. **PURPOSE:** To protect peregrine falcon nesting habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect peregrine falcon nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-18** *(ROWA)* **Prairie Falcon Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 805 meters (0.5-mile) of active prairie falcon nest sites. **PURPOSE:** To protect prairie falcon nesting habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect prairie falcon nesting habitat per |

BLM_0022782

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| | CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-19** *(ROWA)* **Other Raptor Species (accipiters, falcons [except kestrel], buteos, and owls).** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 201 meters (0.125-mile) of an active nest site of all accipiters, falcons (except kestrel), buteos, and owls not listed in other CSU stipulations. Raptors that are listed and protected by the Endangered Species Act of 1973 and the Bald and Golden Eagle Protection Act are addressed separately. **PURPOSE:** To protect nesting habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect raptor nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2002). |
| **CSU-22** *(ROWA)* **Kit Fox Dens.** *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to, and require mitigation and minimization measures (as determined by the BLM biologist) of, surface occupancy and use and surface-disturbing activities within 200 meters (656 feet) of active kit fox dens. **PURPOSE:** To protect breeding kit fox. Note: there are currently no known breeding locations for kit fox in the GJFO. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect breeding kit fox, which have become increasingly rare in Colorado and appear to be significantly more susceptible to disturbance than other canids in the GJFO. |
| **CSU-23** *(ROWA)* **Occupied Prairie Dog Towns.** *All Surface-disturbing* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within white-tailed prairie dog towns. Locate permanent above-ground structures outside of prairie dog towns. **PURPOSE:** To maintain white-tailed prairie dog habitat and distribution. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending upon the type of activity and existing disturbance within or adjacent to white-tailed |

BLM_0022783

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** | |
| **Protected Resource** | **Stipulation Description** |
| **Acres/Miles Affected** | |
| *Activities* | prairie dog towns. |
| | **MODIFICATION:** Standard modifications apply (Section B.2). |
| | **WAIVER:** Standard waivers apply (Section B.2). |
| | **JUSTIFICATION:** This stipulation is necessary to protect prairie dogs, a keystone species whose population has been declining in the GJFO and across the western US. This stipulation will help to minimize total abandonment of towns by prairie dog colonies due to disturbance. |
| | Fish and Wildlife |
| **CSU-10** *(ROWA)* **Wildlife Habitat.** *All Surface-disturbing Activities* | **STIPULATION:** Require proponents of surface-disturbing activities to implement specific measures to mitigate impacts of operations on wildlife and wildlife habitat within high-value or crucial wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs. |
| | **PURPOSE:** To reduce impacts of surface disturbing activities and related actions on wildlife and wildlife habitat within high-value or crucial wildlife habitat including, but not limited to, big game winter range and Gunnison and greater sage grouse habitat. |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). |
| | **MODIFICATION:** Standard modifications apply (Section B.2). |
| | **WAIVER:** Standard waivers apply (Section B.2). |
| | **JUSTIFICATION:** This stipulation is necessary to remain in compliance with current BLM sage grouse direction and allow for protection of essential habitat for wildlife species. |
| **WILDLIFE HABITAT CSU CO** *All Surface-disturbing Activities* | **STIPULATION:** Surface occupancy or use may be restricted within the following wildlife emphasis or priority areas, as identified in the Resource Management Plan: <ul><li>Beehive (habitat for mule deer and elk) (4,700 acres);</li><li>A portion of East Salt Creek (habitat for mule deer and elk) (20,500 acres);</li><li>Glade Park (habitat for Gunnison Sage-Grouse, mule deer, and elk) (27,200 acres);</li><li>A portion of Prairie Canyon (long billed curlew, long eared owl, pronghorn antelope, white-tailed prairie dog, kit fox, and burrowing owl habitat) (16,500 acres);</li><li>A portion of Rapid Creek (wintering and migratory habitat for mule deer and elk) (26,900 acres); and</li><li>Winter Flats (deer and elk wintering grounds) (3,500 acres).</li></ul> Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. A plan of development may be required to |

BLM_0022784

| Table B-6<br>Controlled Surface Use (CSU) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| | demonstrate how potential adverse impacts to wildlife habitat will be mitigated.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To protect lands identified in the Resource Management Plan as unique and important wildlife habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect the highest priority wildlife habitat for deer, elk, antelope, bighorn sheep, and sage-grouse, Wildlife emphasis areas were identified in coordination with CPW biologists. |
| **CSU-24** *(ROWA)*<br><br>**Deer and Elk Migration and Movement Corridors.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within migration and movement corridors for deer and elk.<br><br>**PURPOSE:** To protect deer and elk migration and movement corridors.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to ensure connectivity between summer and winter ranges for deer and elk.  Fragmentation is an increasing problem in deer and elk habitat and this stipulation will help to maintain existing corridors on BLM lands. |
| Wild Horses<br>Cultural Resources | |
| **CSU-27** *(ROWA)*<br><br>**Allocation to Scientific Use Category.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to certain surface uses, as specified below, except archaeological documentation and excavation, within 100 meters (328 feet) around eligible or potentially eligible sites allocated to Scientific Use.<br><br>**PURPOSE:** To protect unique scientific information in sites that may be damaged from inadvertent or unauthorized uses.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis, taking into account topographical barriers, the nature of the proposed |

BLM_0022785

| Table B-6<br>Controlled Surface Use (CSU) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| | action, and the nature of the cultural resource site and/or area.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to address indirect or secondary impacts that can occur to cultural resources. Indirect and secondary impacts are typically not mitigated through data recovery by the proponent. Managing properties by addressing only direct impacts can lead to adverse effect and the loss of the resource. This stipulation allows the BLM to mitigate impacts that can cause significant degradation to the site integrity criteria that are applied in the<br><br>designation of the cultural resource as eligible or potentially eligible for nomination to the NRHP *(36 CFR part 800.5(a)(1))*. |
| **CSU-28** *(ROWA)*<br><br>**Allocation to Public Use Category.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to certain surface uses, as specified below, within 100 meters (328 feet) around sites allocated to Public Use. In addition, consider factors such as integrity of setting, recreation opportunity, or visual impacts that projects may have on sites allocated to this use.<br><br>**PURPOSE:** To protect the values that contribute to sites allocated to Public Use.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis, taking into account topographical barriers, the nature of the proposed action, and the nature of the cultural resource site and/or area.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect sites allocated to Public Use, including those that may not meet the criteria for the NRHP but are important for heritage tourism as a visual resource of a rural landscape. |
| **CSU-29** *(ROWA)*<br><br>**Sub-surface Inventory.**<br><br>53,500 acres<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Require sub-surface inventory for deep sub-surface-disturbing activities and buried ROW in the following locations and in additional areas where high potential for subsurface resources may be identified in the future:<br><br>• Grand Mesa Slopes (16,000 acres);<br>• Indian Creek (20,200 acres); and<br>• Sunnyside (17,300 acres).<br><br>**PURPOSE:** To protect cultural resources. |

BLM_0022786

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| Table B-6<br>Controlled Surface Use (CSU) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | | |
|---|---|---|
| Stipulation Number | Stipulation Description | |
| Protected Resource | | |
| Acres/Miles Affected | | |

**EXCEPTION:** Standard exceptions apply (Section B.2).

**MODIFICATION:** Standard modifications apply (Section B.2).

**WAIVER:** Standard waivers apply (Section B.2).

**JUSTIFICATION:** This stipulation is needed to protect buried cultural resources within areas of high potential for sub-surface activities.

| Visual Resources | |
|---|---|
| **CSU-30** *(ROWA)*<br>**VRM Class II.**<br>392,400 acres<br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within all areas designated as VRM Class II. Require that surface-disturbing activities meet the objectives of VRM Class II.<br><br>**PURPOSE:** To protect visual resources.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, an exception could be granted for bond projects within scenic byways to ensure that visual and reclamation objectives are achieved. Facility design shall incorporate viewshed analysis and modeling to minimize impacts to visual resources. Special mitigation measures such as facility placement and color selection have been proposed to reduce impacts to visual resources.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is needed to maintain the visual integrity within designated Class II VRM areas. A CSU will allow placement of facilities and disturbances outside of the critical view sheds. |

BLM_0022787

| Table B-6<br>Controlled Surface Use (CSU) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| Recreation and Visitor Services | |
| **CSU-31** *(ROWA)*<br><br>**Recreation.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to surface occupancy and use and surface-disturbing activities to minimize conflicts with developed (and future) recreation sites and to mapped (and future) national/regional trails, local system trails that connect communities, and trailheads and interpretive sites with exceptional recreation values or significant public interest.<br><br>Apply this stipulation to the following sites that lie outside of designated RMAs:<br>• Low Gap Recreation Site;<br>• North Soda Recreation Site;<br>• Miracle Rock Recreation Site;<br>• Mud Springs Campground; and<br>• West Creek Picnic Site.<br><br>**PURPOSE:** To minimize conflicts with developed (and future) recreation sites and to mapped (and future) national/regional trails, local system trails that connect communities, and trailheads and interpretive sites with exceptional recreation values or significant public interest.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to assure significant public investment and desired recreation opportunities are protected from surface-disturbing occupancy. |
| **CSU-32**<br><br>**Recreation Management Areas.**<br><br>227,100 acres<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions in the following RMAs:<br>• Grand Valley OHV SRMA (9,700 acres)<br>• Barrel Spring ERMA (24,700 acres)<br>• Gateway ERMA (78,100 acres)<br>• Grand Valley Shooting Ranges ERMA (750 acres)<br>• Gunnison River Bluffs ERMA (800 acres)<br><br>• Horse Mountain ERMA (5,100 acres)<br>• North Desert ERMA (107,900 acres)<br><br>**PURPOSE:** To protect recreation outcomes and setting prescriptions.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2). |

BLM_0022788

| **Table B-6** **Controlled Surface Use (CSU) Stipulations Applicable to** **Fluid Mineral Leasing and Other Surface-disturbing Activities** | | |
|---|---|---|
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** | |
| | **WAIVER:** Standard waivers apply (Section B.2). | |
| | **JUSTIFICATION:** This stipulation is necessary to protect areas important to recreation users which may also include large facility investments. Protection of RMZs is necessary to meet desired recreation outcomes. | |
| **Lands and Realty** | | |
| **DISPOSAL CSU CO** *All Surface- disturbing Activities* | **STIPULATION:** Surface occupancy or use may be restricted due to lands identified for disposal in the Resource Management Plan. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. **PURPOSE:**  To preserve the value of disposal tracts and/or protect facilities or uses for which these tracts of land were identified for disposal. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to preserve the value of disposal tracts and/or protect facilities or uses for which these tracts of land were identified for disposal. | |
| **Coal** | | |
| **COAL MINE CSU CO** 9,000 acres *Fluid Minerals Only* | **STIPULATION:** Surface occupancy or use (for fluid minerals only) may be restricted due to surface or underground coal mines. Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Operations proposed within the area of an approved surface or underground coal mine will be relocated outside the area to be mined or to accommodate room and pillar mining operations. **PURPOSE:**  To protect surface or underground coal mines. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to allow underground coal operations within oil and gas leases while reducing safety concerns. | |

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022789

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
|---|---|
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| **ACEC** | |
| **CSU-39** **Roan and Carr Creeks ACEC.** 33,600 acres *All Surface-disturbing Activities* | **STIPULATION:** Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required in the Roan and Carr Creeks ACEC (33,600 acres). **PURPOSE:** To protect and prevent irreparable damage to unique riparian habitats, genetically pure populations of cutthroat trout, and Greater Sage-Grouse habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). |
| **Wild and Scenic Rivers** **National Trails** | |
| **CSU-37** **Scenic Byways (0.5-mile).** 32,500 acres *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within 805 meters (0.5-mile) of either side of centerline of the following scenic byways: <ul><li>Dinosaur Diamond Prehistoric Highway (National Scenic Byway and All American Road) (14,300 acres);</li><li>Grand Mesa Scenic and Historic Byway (1,200 acres); and</li><li>Unaweep-Tabeguache Scenic and Historic Byway (17,000 acres).</li></ul> **PURPOSE:** To protect the quality of the scenic (visual) values of scenic, historic, or backcountry byways. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, an exception could be granted if: (a) a viewshed analysis indicates minimal impairment of the visual resources from the driving corridor; or (b) the action is determined to be consistent and compatible with protection or enhancement of the resource values, or the use will provide suitable opportunities for public enjoyment of these resources. An exception could also be granted for bond projects within scenic byways to ensure that visual and reclamation objectives are achieved. Facility design shall incorporate viewshed analysis and modeling to minimize impacts to visual resources. Special mitigation measures such as facility placement and color selection have been proposed to reduce impacts to visual resources. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to place surface-disturbing activities along scenic byways in areas that do not affect values associated with the identified scenic byway. |

BLM_0022790

| Table B-7 Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| Special Status Species | |
| **TL-1** *(ROWA)* <br><br> **Salmonid and Native Non-salmonid Fishes (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub; mountain whitefish; Paiute and mottled sculpin; and speckled dace).** <br><br> *All Surface-disturbing Activities* | **STIPULATION:** Prohibit in-channel stream work in all occupied streams during fish spawning, egg incubation, and fry emerging seasons.  Fish spawning, egg incubation, and fry emerging seasons vary by elevation and temperatures; however, the following intervals generally apply in Colorado: <br>• Cutthroat trout (various subspecies): May 1-September 1 <br>• Rainbow trout: March 1-June 15 <br>• Brown trout: October 1-May 1 <br>• Brook trout: August 15-May 1 <br>• Sculpin: May 1-July 31 <br>• Bluehead sucker: May 1-July 15 <br>• Flannelmouth sucker: April 1-July 1 <br>• Roundtail chub: May 15-July 15 <br>• Speckled dace: May 1-August 31 <br>• Mountain whitefish: October 1-November 30 <br><br> **PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry of native fish populations. <br><br> **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling and does not apply to operations and maintenance. If competing species are involved, the BLM may select to implement species-specific dates for native fish versus nonnative species. <br><br> **MODIFICATION:** Standard modifications apply (Section B.2). <br><br> **WAIVER:** Standard waivers apply (Section B.2). <br><br> **JUSTIFICATION:** This stipulation is necessary to protect important native and game fish breeding. |
| **TL-3** *(ROWA)* <br><br> **Migratory Bird Habitat.** <br><br> *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities, including vegetation-removal projects, in migratory bird habitat during nesting season when nesting birds are present. <br><br> May 15 to July 15 or as site-specific analysis dictates. <br><br> **MODIFICATION:** Standard modifications apply (Section B.2). <br><br> **WAIVER:** Standard waivers apply (Section B.2). <br><br> **JUSTIFICATION:** This stipulation is necessary to protect migratory bird habitat and ensure compliance with the Migratory Bird Treaty Act (Information Bulletin No. 2010-110); BLM |

BLM_0022791

| **Table B-7**<br>**Timing Limitation (TL) Stipulations Applicable to**<br>**Fluid Mineral Leasing and Other Surface-disturbing Activities** | |
|---|---|
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| | Memorandum of Understanding with US Fish and Wildlife Service). |
| **WILDLIFE RAPTOR NESTS TL CO**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** No surface use is allowed within a 402 meter (0.25-mile) radius of active raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:<br>• Osprey nests: April 1 to August 31.<br>• Red-tailed hawk nests, including any alternate nests: February 15 to July 15.<br>• Swainson's hawk nests and associated alternate nests: April 1 to July 15.<br>• Burrows or burrowing owl nest sites: March 1 to August 15.<br>• Great horned owl nests: February 1 to August 15.<br>• Other owls and raptors: March 1 to August 15.<br>• Cooper's hawk, sharp shinned hawk, and northern harrier nests: April 1 to August 15.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To prevent disruption of reproductive activity of raptors during the production period.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **WILDLIFE SENSITIVE RAPTOR NESTS TL CO**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** No surface use is allowed within an 805 meter (0.5-mile) radius of active or inactive raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:<br>• Ferruginous hawk nests, including any alternate nests: February 1 to July 15.<br>• Goshawk nest sites: March 1 to September 30.<br>• Peregrine and prairie falcon nest cliff(s): March 15 to July 31.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION> |

BLM_0022792

| Table B-7<br>Timing Limitation (TL) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| | **PURPOSE:** To prevent disruption of reproductive activity of raptors during the production period.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect ferruginous hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-13** *(ROWA)*<br><br>**Golden Eagle Nest Sites.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit human encroachment within an 805-meter (0.5-mile) radius of active golden eagle nests and associated alternate nests, as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, during the following time period, or until fledging and dispersal of young: December 15 to July 15.<br><br>**PURPOSE:** To prevent disruption of reproductive activity of golden eagles.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect golden eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-14** *(ROWA)*<br><br>**Bald Eagle Nest Sites.**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit human encroachment within an 805-meter (0.5-mile) radius of active bald eagle nests from November 15 to July 31.<br><br>**PURPOSE:** To prevent disruption of reproductive activity of bald eagles.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling, and does not apply to operations and maintenance. The TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2). |

BLM_0022793

| Table B-7 Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| | **JUSTIFICATION:** This stipulation is necessary to protect bald eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-15** *(ROWA)* **Bald Eagle Winter Roost.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit activity within 402 meters (0.25-mile) of bald eagle winter roosts from November 15 to March 15. Additional restrictions may be necessary within 805 meters (0.5-mile) of active bald eagle winter roosts if there is a direct line of sight from the roost to the activities. **PURPOSE:** To protect bald eagles from human impacts that could affect winter survival. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the roost site or the geographical relationship of topographic barriers and vegetation screening to the roost site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect bald eagle winter roosts per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-16** *(ROWA)* **Occupied Sage-grouse Winter Habitat.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities in occupied sage-grouse winter habitat from December 1 to March 15. **PURPOSE:** To protect sage-grouse (Gunnison and greater) from human impacts that could affect winter survival. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect sage-grouse from disturbance in a time of year when the added stress from disturbance can lead to death. |
| **TL-17** *(ROWA)* **Sage-grouse Leks (4** | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities within 6.4 kilometers (4 miles) of sage-grouse leks from March 1 to June 30. **PURPOSE:** To protect breeding and nesting sage-grouse (Gunnison and greater) from human |

BLM_0022794

| Table B-7 Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| miles). **All Surface-disturbing Activities** | impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending upon the active status of the lek or the geographical relationship of topographical barriers and vegetation to the lek site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect breeding and nesting sage-grouse per current research recommendations (Parachute-Piceance-Roan Greater Sage-grouse Work Group 2008). |
| **TL-19** *(ROWA)* **Occupied Prairie Dog Towns.** **All Surface-disturbing Activities** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within active white-tailed prairie dog towns from April 1 to July 15. **PURPOSE:** To avoid impacts to white-tailed prairie dogs during the pupping season. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect prairie dogs during the breeding season to allow for distribution of young. |
| | Fish and Wildlife |
| **TL-1** *(ROWA)* **Sport and Native Fish (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub;** | **STIPULATION:** Prohibit in-channel stream work in all occupied streams during appropriate spring and fall spawning periods. Rainbow and cutthroat trout, bluehead and flannelmouth sucker, roundtail chub, and Paiute and mottled sculpin (April 1 to August 1); brown and brook trout (October 1 to November 30). **PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect important native and game fish |

BLM_0022795

| Table B-7<br>Timing Limitation (TL) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | |
| --- | --- |
| **Stipulation Number**<br><br>**Protected Resource**<br><br>**Acres/Miles Affected** | **Stipulation Description** |
| **mountain whitefish; Paiute and mottled sculpin; and speckled dace).**<br><br>*All Surface-disturbing Activities* | breeding. |
| **TL-20** *(ROWA)*<br><br>**Big Game Winter Range.**<br><br>474,500 acres<br><br>*All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities from December 1 to May 1 to protect big game winter range as mapped by the CPW. Certain areas and/or routes within big game winter range may be closed to foot, horse, motorized, and/or mechanized travel from December 1 to May 1.<br><br>**PURPOSE:** To reduce disruption of big game during the winter season.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g., producing wells) and range administration. An exception will be granted only when the proposed action will not cause unacceptable harm to big game based on the following factors:<br>1. Winter conditions (such as snow cover and crusting) at the project site and vicinity;<br>2. Predictable, short-term (1 week) storm forecasts for the project area;<br>3. Period of winter in which the exception is requested (e.g., after April 15, before December 15, or the heart of winter);<br>4. Project site location relative to the size and spatial configuration of delineated critical winter range, open roads and trails, and other background disturbance;<br>5. Length of time that activities will encroach on the period of the winter range stipulation;<br>6. Number of vehicle trips per day in and out of the work site;<br>7. Time of day that activity occurs (after dark generally prohibited);<br>8. Actual big game use of the area;<br>9. Cumulative impacts on big game (such as other activities in the area); and<br>10. Additional site-specific or general concerns, as appropriate.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect big game winter habitat from surface-disturbing and major human activities during the periods of the year when the habitat is occupied. This habitat is critical to the viability of big game herds.  These areas will be managed |

BLM_0022796

| Table B-7 Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | |
|---|---|
| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
| | by BLM to reflect CPW most current big game winter range maps. |
| **BIG GAME PRODUCTION TL CO** *All Surface-disturbing Activities* | **STIPULATION:** No surface use is allowed during the following time period(s) in big game production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM: Prohibit activities, including motorized travel, in elk production areas from May 15 to June 15; in antelope production areas from April 15 to June 30; in Rocky Mountain bighorn sheep production areas from April 15 to June 30; in Moose production areas from April 15 to June 30; and in desert bighorn sheep production areas from February 1 to May 1. **On the following lands:** <LEGAL_DESCRIPTION> **PURPOSE:** To reduce disruption of big game during parturition and young rearing period. **EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation provides for protection of big game production areas from disturbance and displacement by human activities during critical periods. |
| **TL-22** *(ROWA)* **Pronghorn Wintering Habitat.** 23,500 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities in pronghorn wintering habitat from January 1 to March 31. **PURPOSE:** To improve pronghorn antelope habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g., producing wells) and range administration (Section B.1). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect pronghorn winter habitat from surface-disturbing and major human activities during the periods of the year when the habitat is occupied. This habitat is critical to the viability of pronghorn herds. These areas will be managed by BLM to reflect CPW most current pronghorn winter range maps. |

BLM_0022797

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval**
**Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number Protected Resource Acres/Miles Affected | Stipulation Description |
|---|---|
| Air Resources | |
| **CO-56** **Air Resources.** | Due to potential air quality concerns, supplementary air quality analysis may be required for any proposed development of this lease.  This may include preparing a comprehensive emissions inventory, performing air quality modeling, and initiating interagency consultation with affected land managers and air quality regulators to determine potential mitigation options for any predicted significant impacts from the proposed development.  Potential mitigation may include limiting the time, place, and pace of any proposed development, as well as providing for the best air quality control technology and/or management practices necessary to achieve area-wide air resource protection objectives.   Mitigation measures will be analyzed through the appropriate level of NEPA analysis to determine effectiveness, and will be required or implemented as a permit condition of approval (COA).  At a minimum, all projects and permitted uses implemented under this lease will comply with all applicable National Ambient Air Quality Standards and ensure Air Quality Related Values are protected in nearby Class I or Sensitive Class II areas that are afforded additional air quality protection under the Clean Air Act (CAA). <br><br> On the lands described below: <br><br> <LEGAL_DESCRIPTION> |
| Water Resources | |
| **LN-1** **Source Water Protection Areas.** | The lease is within source water protection areas, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities and comply with applicable municipal watershed plans. <br><br> **JUSTIFICATION:** This lease notification is necessary because leases within source water protection areas require extensive protection measures to ensure protection of water quality and human health. |
| Special Status Species | |
| **LN-3** **Biological Inventories.** | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, sage-grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited. |

BLM_0022798

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval**
**Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **JUSTIFICATION:** This lease notice is necessary to identify current plant and animal populations in order to reduce or avoid impacts to those species. |
| **LN-4**<br><br>**Threatened and Endangered Species** | **_Threatened and Endangered Species_**<br><br>This lease contains habitat for threatened and endangered species. Prior to undertaking any activity on the lease, including surveying and staking of well locations, the lessee may be required to perform botanical inventories on the lease. Special design and construction measures may also be required in order to minimize impacts to threatened and endangered species habitat from drilling and producing operations. This applies to the lands described below: <LEGAL_DESCRIPTIONS>.<br><br>**EXCEPTION:** An exception may be granted depending on current usage of the site or on the geographical relationship to topographic barriers and vegetation screening.<br><br>**MODIFICATION:** Changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)<br><br>**JUSTIFICATION:** This lease notice is necessary to identify current cactus populations and habitat in order to reduce or avoid impacts to cactus habitat. |
| | Fish and Wildlife |
| **LN-3**<br><br>**Biological Inventories.** | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, sage-grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited.<br><br>**JUSTIFICATION:** This lease notice is necessary to identify current plant and animal populations in order to reduce or avoid impacts to those species. |
| **LN-5**<br><br>**Working in Wildlife Habitat.** | Require operators to establish and submit to the GJFO a set of operating procedures for employees and contractors working in important wildlife habitats. Design such procedures to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures may address, but are not limited to, items such as working in bear or snake country, controlling dogs, and understanding and abiding by hunting and firearms |

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022799

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval**
**Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number<br><br>Protected Resource<br><br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | regulations. |
| | Paleontological Resources |
| **LN-6**<br><br>**Class 4 and 5 Paleontological Areas.** | Have a permitted paleontologist approved by the Authorized Officer perform an inventory of surface-disturbing activities in Class 4 and 5 paleontological areas per Instruction Memorandum No. 2008-009: Potential Fossil Yield Classification (PFYC) System for Paleontological Resources on Public Lands.<br><br>**JUSTIFICATION:** This lease notice is necessary to ensure an adequate paleontologist is present during surface disturbing activities to protect paleontological resources from direct impacts. |
| | Lands and Realty |
| **LN-7**<br><br>**Powderhorn Ski Area.** | If drilling operations are proposed, the lessee is hereby notified that there are concerns about ski lift structures, other facilities, and ski runs within the Powderhorn ski area. The lessee is hereby notified that special design, construction, and scheduling measures may be required in order to minimize the impacts of drilling and production operations. Proposed drilling and production facilities and operations will be relocated and rescheduled as needed to avoid physical interference with ski area facilities and recreation use. This can include relocations of more than 200 meters (656 feet) or seasonal closures of more than 60 days. This applies to the lands described below: <LEGAL_DESCRIPTIONS>.<br><br>**JUSTIFICATION:** This lease notification is necessary to protect recreation facilities at Powderhorn Ski Area. |

BLM_0022800

This page intentionally left blank.

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022801

# Appendix C
## Wild and Scenic Rivers Suitability Report

BLM_0022802

BLM_0022803

Table of Contents

Chapter                                                                                                   Page

**EXECUTIVE SUMMARY**..................................................................................................**ES-1**

**1. INTRODUCTION** ........................................................................................................ **1-1**

    1.1    Wild and Scenic Rivers Study Process...................................................................1-4
        1.1.1    Eligibility Phase....................................................................................................1-4
        1.1.2    Suitability Phase...................................................................................................1-4

**2. METHODOLOGY** ....................................................................................................... **2-1**

    2.1    Suitability Criteria Used to Evaluate River and Stream Segments ...................2-1
    2.2    Data Sources and Methodology .............................................................................2-3
        2.2.1    Geographic Information Systems.....................................................................2-3
        2.2.2    BLM Resource Interdisciplinary Team...........................................................2-3
        2.2.3    Informational Sources.......................................................................................2-4
        2.2.4    Other Agencies...................................................................................................2-4
        2.2.5    Public Input.........................................................................................................2-4
    2.3    Suitability Determinations .........................................................................................2-6
    2.4    Interim Management of Suitable Segments..........................................................2-6
    2.5    Proposed RMP Management for Non-Suitable Segments................................2-7

**3. SUITABILITY CRITERIA-BASED DATA AND DETERMINATIONS** ..................................... **3-1**

    3.1    Colorado River............................................................................................................3-2
        3.1.1    Colorado River Segment 1 ..............................................................................3-2
        3.1.2    Colorado River Segment 2..............................................................................3-10
        3.1.3    Colorado River Segment 3..............................................................................3-16
    3.2    Dolores River Watershed .........................................................................................3-26
        3.2.1    Dolores River .....................................................................................................3-26
        3.2.2    North Fork Mesa Creek ...................................................................................3-36
        3.2.3    Blue Creek............................................................................................................3-39
        3.2.4    Gunnison River Segment 2 ..............................................................................3-44
    3.3    Roan Creek....................................................................................................................3-50
    3.4    Carr Creek .....................................................................................................................3-54
    3.5    Rough Canyon Creek .................................................................................................3-59
    3.6    Unaweep Canyon Complex .....................................................................................3-62
        3.6.1    East Creek ............................................................................................................3-62
        3.6.2    West Creek ..........................................................................................................3-66
        3.6.3    North Fork of West Creek ...............................................................................3-72
        3.6.4    Ute Creek.............................................................................................................3-76

**4. LIST OF PREPARERS**.................................................................................................. **4-1**

**5. REFERENCES** .............................................................................................................. **5-1**

BLM_0022804

# TABLES
Page

ES-1   Summary of Suitability Determinations...................................................................................3
1-1    Eligible Stream Segments Studied for Suitability..................................................................1-5
2-1    Interim Protection for Candidate Wild and Scenic Rivers................................................2-6
2-2    Select Overlapping Management for Nonsuitable Segments in Approved RMP ......................2-10

# FIGURES
Page

1-1 Project Area .................................................................................................................................1-2
1-2 Eligible Segments within the GJFO...........................................................................................1-3

BLM_0022805

## ACRONYMS AND ABBREVIATIONS

Full Phrase

| | |
|---|---|
| ACEC | area of critical environmental concern |
| BLM | United States Department of the Interior, Bureau of Land Management |
| cfs | cubic feet per second |
| CPW | Colorado Department of Natural Resources, Parks and Wildlife |
| CWCB | Colorado Water Conservation Board |
| EIS | environmental impact statement |
| ESA | Endangered Species Act |
| GJFO | Grand Junction Field Office |
| NCA | National Conservation Area |
| NWSRS | National Wild and Scenic Rivers System |
| ORV | outstandingly remarkable value |
| RMP | resource management plan |
| SRMA | special recreation management area |
| US | United States |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| US BOR | United States Department of the Interior, Bureau of Reclamation |
| US Forest Service | United States Department of Agriculture, National Forest Service |
| VRM | visual resource management |
| WSA | wilderness study area |
| WSR | wild and scenic river |
| WSR Act | Wild and Scenic Rivers Act of 1968 |

BLM_0022806

This page intentionally left blank.

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022807

# EXECUTIVE SUMMARY

In March 2009, the United States (US) Department of the Interior, Bureau of Land Management (BLM), Grand Junction Field Office (GJFO) completed the eligibility phase of a wild and scenic rivers (WSR) evaluation as part of the resource management plan (RMP) revision process (BLM 2009a). The eligibility study identified 20 segments within the GJFO as eligible for inclusion in the National Wild and Scenic Rivers System (NWSRS).

On March 30, 2009, after the release of the eligibility findings, Congress designated the Dominguez-Escalante National Conservation Area (NCA), which includes the Dominguez Canyon Wilderness. All or portions of five segments identified as eligible fall within the Dominguez-Escalante NCA (Dominguez Creek, Big Dominguez Creek, Little Dominguez Creek Segments 1 and 2, and Gunnison River Segment 1). These segments will be considered for suitability during the development of the RMP for the Dominguez-Escalante NCA. Further, Little Dolores was removed from further consideration due to land status that was verified through an updated cadastral survey. This was addressed in an amendment to the Eligibility Report. As such, a total of 14 eligible segments are studied for suitability in this report.

The next step in the WSR process is evaluating eligible segments for suitability. The purpose of the suitability phase of the study process is to determine whether eligible rivers would be appropriate additions to the national system by considering tradeoffs between corridor development and river protection. This report describes the methodology, data considered, and determinations made during the suitability phase. All eligible segments were assessed for suitability.

### Project Area
The project area for this suitability study includes all BLM-managed river segments that have been determined to meet the WSR eligibility criteria within the RMP decision area. The GJFO manages approximately 1.2 million acres of BLM lands in Delta, Mesa, Montrose, and Garfield counties in northwest Colorado. This WSR suitability study also includes the eligible segment of the Colorado River that passes through the McInnis Canyons NCA as the Colorado River is not considered part of the NCA. All other aspects of the McInnis Canyons NCA were evaluated in

BLM_0022808

the McInnis Canyons NCA (BLM 2004) RMP and are not considered as part of this RMP revision process.

### Suitability Phase

The purpose of the suitability phase of the study process is to determine whether eligible rivers would be appropriate additions to the NWSRS. The suitability analysis examines various approaches for maintaining the outstanding remarkable values (ORV) identified during the eligibility determination, and weighs protection of those values against other potential uses of the stream segment. The suitability evaluation does not result in actual designation but only a suitability determination for designation. The BLM cannot administratively designate a stream via a planning decision or other agency decision into the NWSRS, and no segment studied is designated or will be automatically designated as part of the NWSRS. Only Congress can designate a WSR. In some instances, the Secretary of the Interior may designate a WSR when the governor of a state, under certain conditions, petitions for a river to be designated. Members of Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water-protection strategies and measures to meet the purposes of the Wild and Scenic Rivers Act of 1968 will be the responsibility of Congress in any legislation proposed. Rivers found not suitable by the managing agency conducting the suitability study would be dropped from further consideration and managed according to the objectives and specific management prescriptions outlined in the RMP.

### Suitability Determinations

**Table ES-1**, Summary of Suitability Determinations, shows the suitability determination for each segment. Of the 14 stream segments determined to be eligible and studied for suitability in this report, the BLM determined that one portion of the Dolores River is suitable for WSR designation.

BLM_0022809

**Table ES-1**
**Summary of Suitability Determinations**

| River or Creek | Segment | Total Segment Length (miles) | Length on BLM Land (miles) | Suitability Determination | Proposed Classification |
|---|---|---|---|---|---|
| Colorado River | Total of three segments | 78.91 (total) | 27.77 (total) | | |
| | Segment 1 | 17.76 | 7.32 | Not Suitable | Recreational |
| | Segment 2 | 40.24 | 1.31 | Not Suitable | Recreational |
| | Segment 3 | 20.91 | 19.14 | Not Suitable | Scenic |
| Dolores River Watershed | Total of three segments | 45.42 (total) | 30.75 (total) | | |
| *Dolores River* | One segment | 32.01 | 18.62 | | Recreational |
| | | | *10.38* | *Suitable* | |
| | | | *8.24* | *Not Suitable* | |
| *North Fork Mesa Creek* | One segment | 2.05 | 2.05 | Not Suitable | Scenic |
| *Blue Creek* | One segment | 11.36 | 10.08 | Not Suitable | Scenic |
| Gunnison River Segment 2 | One Segment | 16.63 | 3.85 | Not Suitable | Recreational |
| Roan Creek | One segment | 17.04 | 6.47 | Not Suitable | Scenic |
| Carr Creek | One segment | 15.10 | 5.06 | Not Suitable | Scenic |
| Rough Canyon | One segment | 4.21 | 4.21 | Not Suitable | Scenic |
| Unaweep Canyon Complex | Total of four segments | 56.50 (total) | 21.39 (total) | | |
| *East Creek* | One segment | 20.26 | 8.96 | Not Suitable | Recreational |
| *West Creek* | One segment | 23.56 | 4.93 | Not Suitable | Recreational |
| *North Fork of West Creek* | One segment | 8.46 | 3.31 | Not Suitable | Wild |
| *Ute Creek* | One segment | 4.22 | 4.19 | Not Suitable | Scenic |

BLM_0022810

This page intentionally left blank.

BLM_0022811

# CHAPTER 1
# INTRODUCTION

In March 2009, the United States (US) Department of the Interior, Bureau of Land Management (BLM), Grand Junction Field Office (GJFO) completed the eligibility phase of a wild and scenic rivers (WSR) evaluation as part of the resource management plan (RMP) revision process (BLM 2009a). The eligibility study identified 20 segments within the GJFO as eligible for inclusion in the National Wild and Scenic Rivers System (NWSRS).

The GJFO manages approximately 1.2 million acres of BLM lands in Delta, Mesa, Montrose, and Garfield counties in northwest Colorado (**Figure 1-1**, Project Area). A separate planning process was conducted for the McInnis Canyons National Conservation Area (NCA) (BLM 2004); therefore the GJFO RMP revision will not consider lands within the NCA boundary and will not determine the eligibility or suitability of watercourses within the NCA boundary. However, the Colorado River is not considered part of the NCA and was therefore included in the GJFO WSR eligibility study and will be considered for suitability.

On March 30, 2009, after the release of the eligibility findings, Congress designated the Dominguez-Escalante NCA, which includes the Dominguez Canyon Wilderness. All or portions of five segments identified as eligible fall within the Dominguez-Escalante NCA (Dominguez Creek, Big Dominguez Creek, Little Dominguez Creek Segments 1 and 2, and Gunnison River Segment 1). These segments will be considered for suitability during the development of the RMP for the Dominguez-Escalante NCA.

This report describes the outstandingly remarkable values (ORVs), suitability factors, and suitability determination data on each of the segments which have been determined to meet the WSR eligibility criteria. **Figure 1-2** (Eligible Segments within the GJFO) displays the 14 segments being studied as part of this WSR suitability analysis.

BLM_0022812

1-1 Project Area



**Wild and Scenic Rivers Project Area**

Source: BLM 2010a

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.

BLM Grand Junction Field Office Resource Management Plan

Figure 1-1

1-2 Eligible Segments within the GJFO



Figure 1-2

## 1.1   WILD AND SCENIC RIVERS STUDY PROCESS

A WSR study process is composed of two main components: the eligibility phase and the suitability phase. At this point, the GJFO has completed the eligibility phase and is completing the suitability phase. The eligibility and suitability phases were conducted in accordance with BLM Manual 8351, *Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management* (BLM 1992), *The Wild and Scenic River Study Process Technical Report* (Interagency Wild and Scenic Rivers Coordinating Council 1999), and with the Wild and Scenic Rivers Act of 1968 (WSR Act).

### 1.1.1   Eligibility Phase

The eligibility phase was completed for the GJFO in March 2009. A determination of eligibility includes identifying the river segment's ORVs, free-flowing nature, and preliminary classification. For a complete description of the segments analyzed and methodology used, see the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a).

A summary of segments identified as eligible in the GJFO and that are evaluated for suitability in this report is provided in **Table 1-1**, Eligible Stream Segments Studied for Suitability.

### 1.1.2   Suitability Phase

The purpose of the suitability phase of the study process is to determine whether eligible segments would be appropriate additions to the NWSRS by considering tradeoffs between corridor development and river protection. The suitability evaluation does not result in actual designation but only a suitability determination for designation. The BLM cannot administratively designate a stream via a planning decision or other agency decision into the NWSRS, and no segment studied is designated or will be automatically designated as part of the NWSRS. Only Congress can designate a WSR. In some instances, the Secretary of the Interior may designate a WSR when the governor of a state, under certain conditions, petitions for a river to be designated. Members of Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water-protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed. Rivers found not suitable by the managing agency conducting the suitability study would be dropped from further consideration and managed according to the objectives and specific management prescriptions outlined in the land management plan. A summary of segments identified as eligible in the GJFO and that were evaluated for suitability in this report is provided in **Table 1-1**.

BLM_0022815

**Table 1-1**
**Eligible Stream Segments Studied for Suitability**

| River or Creek | Segment | Total Segment Length (miles) | Length on BLM Land (miles) | Tentative Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|
| Colorado River | Total of three segments | 78.91 (total) | 27.77 (total) | | |
| | Segment 1 | 17.76 | 7.32 | Recreational | Scenic, Fish, Wildlife |
| | Segment 2 | 40.24 | 1.31 | Recreational | Fish |
| | Segment 3 | 20.91 | 19.14 | Scenic | Scenic, Recreation, Fish, Wildlife, Geologic, Historic |
| Dolores River Watershed | Total of three segments | 45.42 (total) | 30.75 (total) | | |
| *Dolores River* | One segment | 32.01 | 18.62 | Recreational | Scenic, Recreation, Geologic, Paleontological, Fish |
| *North Fork Mesa Creek* | One segment | 2.05 | 2.05 | Scenic | Vegetation |
| *Blue Creek* | One segment | 11.36 | 10.08 | Scenic | Scenic, Fish, Cultural |
| Gunnison River Segment 2 | One Segment | 16.63 | 3.85 | Recreational | Fish, Historic |
| Roan Creek | One segment | 17.04 | 6.47 | Scenic | Fish |
| Carr Creek | One segment | 15.10 | 5.06 | Scenic | Fish |
| Rough Canyon | One segment | 4.21 | 4.21 | Scenic | Scenic, Wildlife, Geologic |
| Unaweep Canyon Complex | Total of four segments | 56.50 (total) | 21.39 (total) | | |
| *East Creek* | One segment | 20.26 | 8.96 | Recreational | Geologic |
| *West Creek* | One segment | 23.56 | 4.93 | Recreational | Scenic, Wildlife, Geologic, Vegetation |
| *North Fork of West Creek* | One segment | 8.46 | 3.31 | Wild | Scenic |
| *Ute Creek* | One segment | 4.22 | 4.19 | Scenic | Scenic, Vegetation |

Source: BLM 2009a

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022816

This page intentionally left blank.

BLM_0022817

# CHAPTER 2
# METHODOLOGY

This section describes the methodology implemented to evaluate eligible segments for suitability. The criteria used to evaluate eligible river and stream segments are those described in BLM Manual 8351, *Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management* (BLM 1992) and recommendations from the Interagency Wild and Scenic Rivers Coordinating Council (1999).

## 2.1   SUITABILITY CRITERIA USED TO EVALUATE RIVER AND STREAM SEGMENTS

The purpose of the suitability phase of the study process is to determine whether eligible rivers would be appropriate additions to the NWSRS by considering tradeoffs between corridor development and river protection. Suitability considerations include the environment and economic consequences of designation and the manageability of a river if it were designated by Congress.

A suitability study is designed to answer these questions:

1.  Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?

2.  Will the river's free-flowing character, water quality, and ORVs be protected through designation? Is designation the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered?

3.  Is there a demonstrated commitment to protect the river by any nonfederal entities that may be partially responsible for implementing protective management?

With the above guidance from the Interagency Wild and Scenic Rivers Coordinating Council (1999) in mind, the following 11 suitability criteria factors, identified in BLM Manual Section 8351 (BLM 1992), were applied to each eligible river segment in the suitability study:

1.  Characteristics which do or do not make the area a worthy addition to the NWSRS.

---

BLM_0022818

2. Status of land ownerhip, minerals (surface and subsurface), use in the area, including the amount of private land involved, and associated or incompatible uses. Jurisdictional consideration (administrative role and/or presence) must be taken into account to the extent that management would be affected. In situations where there is limited public lands (shoreline and adjacent lands) administered by the BLM within an identified river study area, it may be difficult to ensure those identified outstandingly remarkable values could be properly maintained and afforded adequate management protection over time. Accordingly, for those situations where the BLM is unable to protect or maintain any identified outstandingly remarkable values, or through other mechanisms (existing or potential), river segments may be determined suitable only if the entity with land use planning responsibility supports the finding and commits to assisting the BLM in protecting the identified river values. An alternative method to consider these segments is for state, local governments, or private citizens to initiate efforts for designation under Section 2(a)(iii), or a joint study under Section 5(c) of the WSR Act. In certain cases, there might be existing or future opportunities for the BLM to acquire river shoreline or where landowners are willing to donate, exchange, transfer, assign, sell, or sign an easement. Wherever appropriate, the BLM shall encourage the state, responsible federal agency or other entities to evaluate segments where the BLM lacks sufficient jurisdictional control and the BLM shall provide technical assistance concerning the WSR river studies, as well as information concerning public lands within the study corridor. The BLM shall continue to protect and, wherever possible, enhance any outstandingly remarkable values identified in the RMP process which are associated with lands under the BLM's jurisdiction.

3. Reasonably foreseeable potential uses of the land and related waters which would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and the values which could be foreclosed or diminished if the area is not protected as part of the NWSRS.

4. Federal, public, state, tribal, local, or other interests in designation or nondesignation of the river, including the extent to which the administration of the river, including the costs thereof, may be shared by state, local, or other agencies and individuals. Also, the federal agency that will administer the area should it be added to the National System.

5. Estimated cost, if necessary, of acquiring lands, interests in lands, and administering the area if it is added to the NWSRS. Section 6 of the WSR Act outlines policies and limitations of acquiring lands or interests in land by donation, exchange, consent of owners, easement, transfer, assignment of rights, or condemnation within and outside established river boundaries.

6. Ability of the agency to manage and/or protect the river area or segment as a WSR river, or other mechanisms (existing and potential) to protect identified values other than WSR designation.

7. Historical or existing rights which could be adversely affected. In determining suitability, consideration of any valid existing rights must be afforded under applicable laws (including the WSR Act), regulations, and policies.

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022819

8. Other issues and concerns, if any.

In addition to the criteria described above, three additional suitability factors were considered, as suggested by the Interagency Wild and Scenic Rivers Coordinating Council (1999):

1. Adequacy of local zoning and other land use controls in protecting the rivers ORVs by preventing incompatible development. This evaluation may result in a formal finding that the local zoning fulfills Section 6(c)'s requirements, which in turn preempts the federal government's ability to acquire land through eminent domain if the river is designated.

2. Consistency of designation with other agency plans, programs, or policies and in meeting regional objectives. Designation may help or impede the "goals" of other tribal, federal, state, or local agencies. For example, designation of a river may contribute to state or regional protection objectives for fish and wildlife resources. Similarly, adding a river which includes a limited recreation activity or setting to the National System may help meet statewide recreation goals. Designation might, however, limit irrigation and/or flood control measures in a manner inconsistent with regional socioeconomic goals.

3. Contribution to a river system watershed or basin integrity. This factor reflects the benefits of a "systems" approach (i.e., expanding the designated portion of a river in the National System or developing a legislative proposal for an entire river system [headwaters to mouth] or watershed). Numerous benefits are likely to result from managing an entire river or watershed, including the ability to design a holistic protection strategy in partnership with other agencies and the public.

In the suitability analysis, water resource development issues are generally considered under criterion three and seven from BLM Manual Section 8351 (BLM 1992).

## 2.2 DATA SOURCES AND METHODOLOGY

The BLM relied on several sources, including geographic information systems data, GJFO resource specialists, informational sources, other agencies, and public input. The result was a compilation of data applicable to the suitability criteria. This data was then used to determine the suitability of a particular segment.

### 2.2.1 Geographic Information Systems

The US Geological Survey National Hydrography Dataset was used to select all perennial stream segments for the eligibility study. Streams and stream sections were removed that did not fall within GJFO jurisdiction. In addition to US Geological Survey data, the BLM also used its corporate Geographic Information Systems data for all associated resources.

### 2.2.2 BLM Resource Interdisciplinary Team

The BLM interdisciplinary team consisted of resource specialists from the GJFO. The interdisciplinary team provided information pertaining to the suitability criteria factors and also reviewed data from additional sources, such as agency and public input, for accuracy. Once all available data were compiled, the team evaluated each segment and made a suitability determination.

BLM_0022820

### 2.2.3   Informational Sources

The BLM used a number of informational sources and publications to evaluate segments for suitability. These sources included:

- BLM Manual Section 6400;

- US Geological Survey Minerals Maps;

- US Geological Survey stream gage data;

- Land Status Maps;

- Agreements with other agencies;

- Other Agency management plans;

- Land use planning and zoning documents for local and county governments;

- Descriptions of current and proposed water projects provided by water management agencies;

- Published books;

- River guides;

- Tabulations of water rights; and

- Input from Cooperating Agencies and stakeholders.

### 2.2.4   Other Agencies

Additional information was gathered from other federal and state agencies from scoping letters, stakeholder outreach, and existing documents. The following other agencies were contacted in order to assess suitability:

- Colorado Department of Natural Resources, Parks and Wildlife (CPW) databases;

- US Department of Agriculture, National Forest Service [Forest Service], where segments originate or continue onto Forest Service land;

- Environmental organizations;

- Land owners;

- Water users;

- Municipalities;

- Counties; and

- State entities.

### 2.2.5   Public Input

**Eligibility Phase**

Public involvement for the GJFO WSR evaluation process began during the eligibility phase as part of initial scoping for the RMP from October 15, 2008 through January 9, 2009. Public outreach during the scoping period included: 1) a newsletter mailed to over 600 agency officials,

organizations, and members of the public; 2) three scoping open houses in December 2008 in Grand Junction and Collbran, Colorado, and in Moab, Utah; and 3) a public Web site, http://www.blm.gov/co/st/en/fo/gjfo/rmp, which provides access to materials distributed at scoping meetings, as well as information on the public involvement process. The BLM presented the results of its initial identification efforts, provided educational materials regarding the WSR process, and solicited comments from the public and government agencies.

The public was invited to submit comments via US mail, facsimile, and/ or electronic mail and comments were accepted until January 9, 2009. The BLM received 36 discreet comments in seven letters related to WSR during scoping. Comments were analyzed and incorporated as appropriate into the eligibility study. More detailed information on public involvement during the eligibility phase can be found in the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a) and the *Resource Management Plan Revision Scoping Summary Report* (BLM 2009b).

**Suitability Phase**
In late-March of 2009 at the beginning of the suitability phase of the evaluation process Colorado River District convened a stakeholders group. Letters were mailed to potential stakeholders soliciting data on the segments being studied for suitability. Stakeholders were specifically asked to provide data related to the suitability criteria in **Section 2.1**. Letters to potential stakeholders were sent on March 31, 2009, and included a list of the suitability criteria, a question and answer on WSRs analysis and water rights/water projects overview, and a WSRs guide for riverfront property owners. Data received were analyzed and incorporated into the suitability evaluation.

During stakeholder outreach for suitability, the BLM received *23* comment letters. Comments pertained to a range of topics from the eligibility of certain segments to opinions on the suitability of eligible segments. As intended, the stakeholders provided valuable information related to the suitability criteria, which was incorporated into the evaluation when applicable.

A stakeholder group, named the Lower Colorado River Wild and Scenic Stakeholder Collaborative, formed independently of BLM's public outreach process. This stakeholder group included representatives from state government, local governments, conservation districts, water districts, organizations representing agricultural interests, and organizations representing environmental interests. The stakeholder group also included several private landowners. The objective adopted by the group was to provide collaboratively-developed management recommendations to the BLM that would support the identified ORVs on specific stream segments while also supporting stakeholder uses and values that exist along certain stream segments. At the request of the group, BLM provided information concerning the WSR Act, the BLM planning process, and stream-related natural resource values. The BLM did not participate in the group as a stakeholder, nor did BLM participate in decisions made by the group concerning management recommendations. The group sent a letter signed by all the parties conveying its recommendations to BLM. These letters are incorporated as part of the public comment record for the BLM planning effort. Stakeholder group recommendations are more fully discussed in the following sections on specific stream segments.

BLM_0022822

All comments received were considered and analyzed. Only those comments that pointed out errors or omissions in BLM's eligibility resulted in changes to the eligibility analysis. Those changes are explained in a March 2010 amendment to the eligibility report.

## 2.3 SUITABILITY DETERMINATIONS

Each of the 15 individual eligible segments was evaluated to assess whether or not it would be suitable for inclusion in the NWSRS. The determination was made based on the suitability criteria factors described previously. Based on the evaluation described in this report, one segment of the Dolores River has been determined suitable for designation into the National Wild and Scenic Rivers System.

## 2.4 INTERIM MANAGEMENT OF SUITABLE SEGMENTS

The WSR Act and BLM guidance require that interim management be developed and followed to protect the free-flowing nature, ORVs, and recommended tentative classification of suitable segments until congressional action regarding designation is taken. Interim protections for suitable segments are provided administratively by the management agency and are not legislative protection under the WSR Act. Legislative protection is provided only by formal designation by Congress. Guidelines for management of Section 5(d)(1) suitable rivers, as adapted by the Interagency Wild and Scenic Rivers Coordinating Council from the WSR Act, are included in **Table 2-1**. Once final determinations have been made, the BLM will draft protective management measures for each suitable segment.

**Table 2-1**
**Interim Protection for Candidate Wild and Scenic Rivers**

| Issue | Management Prescription/Action |
|---|---|
| Study Boundary | Minimum of 0.25-mile from ordinary high-water mark |
| | Boundary may include adjacent areas needed to protect identified values |
| Preliminary Classification (Section 2(b) of WSR Act) | 3 classes: wild, scenic, recreational (defined by statute) |
| | Criteria for tentative classification described in Interagency Guidelines |
| | Manage at recommended tentative classification |
| Study Report Review Procedures | Notice of study report/Draft EIS published in *Federal Register* |
| | Comments/response from federal, state, and local agencies, and the public included in the study report/Final EIS transmitted to the President and Congress |
| Private Land:<br>• Administration<br>• Acquisition | Affect private land uses through voluntary partnership with state/local governments and landowners |
| | No regulatory authority |
| | Typically an evaluation of the adequacy of local zoning and land use controls is a component of suitability determination[1] |
| | No ability to acquire interest in land under the Act's authority prior to designation |

BLM_0022823

**Table 2-1**
**Interim Protection for Candidate Wild and Scenic Rivers**

| Issue | Management Prescription/Action |
|---|---|
| Water Resources Project | River's free-flowing condition protected to the extent of other agency authorities; not protected under the WSR Act |
| Land Disposition | Agency discretion to retain lands within river corridor in federal ownership |
| Mining and Mineral Leasing | Protect free flow, water quality, and ORVs through other agency authorities |
| Actions of Other Agencies | Affect actions of other agencies through voluntary partnership. |
| Protect Outstandingly Remarkable Values | No regulatory authority conferred by the WSR Act; agency protects through other authorities |
| | Section 11(b)1: Limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources[2] |

[1] For an agency-identified study river that includes private lands there is often the need to evaluate existing state and local land use controls and, if necessary, assess the willingness of state and local government to protect river values.

[2] Section 11(b)1 authorizes the Secretary of the Interior and secretary of Agriculture, or the head of any other federal agency, to provide for "limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources." This authority "applies within or outside a federally administered area and applies to rivers which are components of the National system and to other rivers." The recipients of federal assistance include states or their political subdivisions, landowners, private organizations, or individuals. Some examples of assistance under this section include, but are not limited to, riparian restoration, riparian fencing to protect water quality and riparian vegetation, of vegetative screening to enhance scenery/recreation experience.

**Source**: Interagency Wild and Scenic Rivers Coordinating Council 1999

## 2.5   APPROVED RMP MANAGEMENT FOR NON-SUITABLE SEGMENTS

Specific management actions are not proposed for segments not found suitable for inclusion in the NWSRS. However, ORVs for these segments would be afforded protection via management actions for other programs, including the following stipulations that overlap some or all of the stream segments:

| **Segment** | **Stipulation or ACEC Overlap** |
|---|---|
| Blue Creek | • Closed to fluid mineral leasing (Maverick lands with wilderness characteristics unit) |
| | • LANDS WITH WILDERNESS CHARACTERISTICS NSO CO (Maverick lands with wilderness characteristics unit) |
| | • CSU-30: VRM Class II |
| | • CSU-32: Recreation Management Areas (Gateway ERMA) |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |

BLM_0022824

| **Segment** | **Stipulation or ACEC Overlap** |
|---|---|
| Carr Creek | • GEOLOGY SOIL CSU CO |
| | • CSU-30: VRM Class II |
| | • CSU-39: Roan and Carr Creeks ACEC |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Colorado River 1 | • HYDROLOGY RIVER NSO CO |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Colorado River 2 | • HYDROLOGY RIVER NSO CO |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Colorado River 3 | • Closed to fluid mineral leasing (McInnis Canyon NCA) |
| | • HYDROLOGY RIVER NSO CO |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Dolores River | • Closed to fluid mineral leasing (Dolores River Canyon SRMA) |
| | • HYDROLOGY RIVER NSO CO |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| East Creek | • Highway 141 |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Gunnison River 2 | • HYDROLOGY RIVER NSO CO |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| North Fork Mesa Creek | • CSU-30: VRM Class II |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| North Fork West Creek | • Closed to fluid mineral leasing (The Palisade WSA) |
| | • NSO-43: Wilderness Study Area (The Palisade WSA) |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Roan Creek | • GEOLOGY SOIL CSU CO |
| | • CSU-30: VRM Class II |
| | • CSU-39: Roan and Carr Creeks ACEC |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Rough Canyon Creek | • Closed to fluid mineral leasing (Bangs Canyon SRMA; Rough Canyon ACEC) |
| | • NSO-12: ACECs (Rough Canyon ACEC) |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |

BLM_0022825

| Segment | Stipulation or ACEC Overlap |
|---|---|
| Ute Creek | • Closed to fluid mineral leasing (Unaweep Canyon lands with wilderness characteristics unit) |
| | • LANDS WITH WILDERNESS CHARACTERISTICS NSO CO (Unaweep Canyon lands with wilderness characteristics unit) |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| West Creek | • Closed to fluid mineral leasing (Dolores River Canyon SRMA) |
| | • RECREATION SRMA NSO CO (Dolores River Canyon SRMA) |
| | • NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |

These stipulations that overlap a stream segment would also protect ORVs by limiting or prohibiting fluid mineral development and/or all surface-disturbing activities. The total acreage of mapped stipulations that overlap nonsuitable stream segments is provided in Table 2-2, below. In addition, management actions such as those which support ACECs or other special designations would protect ORVs on stream segments that overlap the special designation (see **Table 2-2**, Select Overlapping Management for Nonsuitable Segments). One example is the Roan and Carr Creek ACEC that overlaps both streams and limits surface-disturbing activities, thereby protecting the Fish ORV on both stream segments. A second example is the overlap between Rough Canyon ACEC and Rough Canyon Creek that provides additional protection to the Scenic, Wildlife, and Geologic ORVs for that stream segment. Managing lands for wilderness characteristics can also provide supplemental protections for nonsuitable stream segments. The Proposed RMP would manage the Unaweep unit to protect its wilderness characteristics; the Scenic and Vegetation ORVs for Ute Creek, located within the Unaweep unit's boundaries, would be protected by the actions which protect wilderness characteristics. There would be similar protections for the Scenic, Fish, and Cultural ORVs along Blue Creek, which overlaps the Maverick lands with wilderness characteristics unit. Other actions, such as the management of VRM classifications, can limit activities that may diminish ORVs. Table 2-2, below, displays the acreages of each VRM class that overlap nonsuitable segments; a lower VRM class (i.e., VRM Class I and II) would be expected to better protect ORVs, especially Scenic ORVs. A more thorough discussion of these actions and their impacts is provided in Section 4.5.3.

BLM_0022826

**Table 2-2**
**Select Overlapping Management for Nonsuitable Segments under in Approved RMP**

| Segment | ORVs | Stipulation (acres) | | | VRM Class (acres) | | | | ROW | | Closed to Fluid Mineral Leasing (acres) | Petitioned for Withdrawal from Locatable Mineral Entry (acres) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | NSO | CSU | TL | I | II | III | IV | Exclusion | Avoidance | | |
| *Nonsuitable* | | | | | | | | | | | | |
| Blue Creek | Scenic, Fish, Cultural | 1,600 | 1,700 | 2,700 | 0 | 2,800 | 0 | 0 | 800 | 2,000 | 800 | 0 |
| Carr Creek | Fish | 1,100 | 600 | 100 | 0 | 0 | 1,700 | 0 | 0 | 1,700 | 0 | 0 |
| Colorado River Segment 1 | Scenic, Fish, Wildlife | 2,200 | 1,200 | 1,600 | 0 | 2,000 | 0 | 200 | 0 | 2,100 | 0 | 0 |
| Colorado River Segment 2 | Fish | 100 | 100 | 0 | 0 | 100 | 0 | 0 | 0 | 100 | 40 | 0 |
| Dolores River | Scenic, Fish, Recreation, Geologic, Paleontological | 2,700 | 2,100 | 2,700 | 100 | 2,600 | 0 | 0 | 2,400 | 300 | 2,700 | 1,200 |
| East Creek | Geologic | 1,900 | 1,500 | 1,900 | 0 | 0 | 1,900 | 0 | 0 | 1,900 | 100 | 0 |
| Gunnison River Segment 2 | Fish, Historic | 1,000 | 500 | 500 | 0 | 600 | 400 | 0 | 400 | 500 | 900 | 0 |
| North Fork Mesa Creek | Vegetation | 300 | 400 | 300 | 0 | 700 | 0 | 0 | 0 | 700 | 0 | 0 |

BLM_0022827

**Table 2-2**
**Select Overlapping Management for Nonsuitable Segments under in Approved RMP**

| Segment | ORVs | Stipulation (acres) | | | VRM Class (acres) | | | | ROW | | Closed to Fluid Mineral Leasing (acres) | Petitioned for Withdrawal from Locatable Mineral Entry (acres) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | NSO | CSU | TL | I | II | III | IV | Exclusion | Avoidance | | |
| North Fork West Creek | Scenic | 1,100 | 100 | 500 | 900 | 200 | 0 | 0 | 900 | 100 | 1,100 | 100 |
| Roan Creek | Fish | 500 | 1,400 | 1,700 | 0 | 0 | 1,900 | 0 | 0 | 2,000 | 0 | 0 |
| Rough Canyon Creek | Scenic, Wildlife, Geologic | 1,200 | 800 | 1,200 | 0 | 1,200 | 0 | 0 | 1,000 | 200 | 1,200 | 0 |
| Ute Creek | Scenic, Vegetation | 1,400 | 500 | 800 | 50 | 1,100 | 200 | 0 | 1,100 | 200 | 1,400 | 0 |
| West Creek | Scenic, Wildlife, Geologic, Vegetation | 1,700 | 600 | 1,700 | 600 | 100 | 1,000 | 0 | 600 | 1,100 | 1,700 | 300 |
| **Total** | | **20,000** | **13,200** | **18,100** | **2,600** | **13,500** | **7,500** | **200** | **9,500** | **13,800** | **12,900** | **1,600** |

Source: BLM 2010a

BLM_0022828

This page intentionally left blank.

BLM_0022829

# CHAPTER 3
# SUITABILITY CRITERIA-BASED DATA AND DETERMINATIONS

The purpose of the suitability phase is to determine whether eligible river segments are suitable or not suitable for inclusion in the NWSRS, per the criteria from the WSR Act. The suitability evaluation does not result in actual designation but only a suitability determination for designation. The BLM may or may not recommend a stream segment for designation into the NWSRS by transmitting its suitability determinations to Congress and the President. No stream segment studied is designated or will be automatically designated as part of the NWSRS. Only Congress can designate a WSR. In some instances, the Secretary of the Interior may designate a WSR when the governor of a state, under certain conditions, petitions for a river to be designated. Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed. Rivers found nonsuitable will be dropped from further consideration and managed according to the objectives outlined in the RMP.

Impacts that would occur from designating or not designating the suitable river segments will be analyzed in the EIS associated with the RMP. Public review and comment on suitability determinations included in the Draft RMP were considered before the BLM made final suitability determinations. Maps have been included only for those segments preliminarily determined suitable. Maps of all eligible segments were included in the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a).

This section contains a discussion of 11 suitability factors in relation to each of the 15 river and stream segments within the RMP planning area determined to be eligible in the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a). The criteria described in **Section 2.1** are presented as follows:

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

BLM_0022830

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

4. Federal, state, tribal, local, public, or other interest in designating or not designating the river.

5. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

6. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

7. Historical or existing rights that could be adversely affected with designation.

8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

9. Consistency of designation with other agency plans, programs, or policies.

10. Contribution to a river system watershed or basin integrity.

11. Other issues and concerns, if any.

## 3.1 COLORADO RIVER

### 3.1.1 Colorado River Segment 1

| | | | |
|---|---|---|---|
| **Description:** | From the eastern boundary of the planning area northeast of De Beque to the Grand Valley Diversion Dam, northeast of Palisade. | | |
| **Total Segment Length:** | 17.76 miles | **Total Segment Area:** | 5,635.55 acres |
| **Length on BLM Land :** | 7.32 miles | **Area on BLM Land:** | 2,587.82 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Scenic, Fish, Wildlife | | |

*Suitability Factor Assessment*

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment has outstandingly remarkable scenic, fish, and wildlife values, which would make the segment a worthy addition to the NWSRS if designated. On the other hand, this segment has other characteristics that detract from its value as an addition to the NWSRS. The tentative classification for this segment is recreational due to Interstate 70 and railroad, both of which run parallel to and are readily apparent from the river.

This segment has outstandingly remarkable scenic values. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery,

BLM_0022831

scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). This segment flows through De Beque Canyon: a wide, relatively gentle sloped canyon through the Mesa Verde formation, formed by the down cutting of the Colorado River. The majestic views from and along the river are composed of stair-stepped brownish sandstone cliffs intermixed with lightly vegetated slopes of the canyon in sharp contrast to the riparian vegetation and varied colors near the river. The river drops several hundred feet through the canyon, with extensive views at the upper end of the canyon before opening up again at the bottom to views of the Grand Valley near Palisade.

This segment also has outstandingly remarkable fish values. The entire segment is designated critical habitat by the US Department of the Interior, Fish and Wildlife Service (USFWS) for the federally endangered Colorado pikeminnow (*Ptychocheilus lucius*) and the Razorback sucker (*Xyrauchen texanus*) (59 Fed. Reg. 13,374). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is the largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico.

Lastly, this segment has outstandingly remarkable wildlife values. Specifically, the segment contains important winter habitat for bald eagles *(Haliaeetus leucocephalus)*, a State Threatened Species in Colorado (CPW 2008). The USFWS also recently discovered a nesting site along this segment. Bald eagles no longer receive protection under the Endangered Species Act (ESA). The USFWS delisted bald eagles in June 2007 because their populations have recovered sufficiently. Nevertheless, bald eagles still receive protection under the Bald and Golden Eagle Protection Act.

There are also characteristics that are unrelated to ORVs that affect the suitability of this segment. Numerous water diversions exist along this segment, including several conditional water rights. If made absolute, these water rights could result in additional depletions and additional water development and diversion structures along the private land in the corridor. A portion of this segment overlaps the city limits of De Beque. Future population growth and expansion of De Beque and associated development, particularly along the riverfront, have the potential to change the setting found in this segment. Interstate 70 runs adjacent to the segment but gives drivers the opportunity to view the scenic landscape. A railroad and power lines are visible throughout the segment as well. Future expansion of the interstate, railroad, and transmission lines also have the potential to change the setting found in this segment. These characteristics somewhat detract from the value of the segment as an addition to the NWSRS.

2. The status of land ownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 17.76-mile segment is a combination of federal (BLM and US Department of the Interior, Bureau of Reclamation [US BOR]) and private. The BLM manages

BLM_0022832

shoreline along 7.32 miles (41.2 percent) of the segment. Within the 5,635.55-acre segment corridor, the BLM manages 2,587.82 acres (45.9 percent). Another 3,016.15 acres (53.5 percent) are privately owned. The US BOR manages the remaining land within the study corridor (31.58 acres; less than one percent).

The area is leased for oil and gas exploration and there are four active wells within the study corridor. Nearly all of the BLM-managed lands within the segment corridor are under lease for oil and gas development. The BLM-managed lands in the segment corridor northeast of De Beque have high oil and gas potential; while the remaining BLM-managed lands in the segment corridor generally have low oil and gas potential. There are no mining claims within the segment.

The BLM does not have authority over maintenance, operation, and construction activities associated with the highway and railroad. Activities associated with the highway and railroad are not likely to adversely impact the ORVs. The Department of Transportation, pursuant to the Federal-Aid Highway Act and section 4(f) of the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3.  <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>

WSR designation has the potential to impact future water development along this segment. With designation, BLM would obtain authority to place terms and conditions on or deny approval for any proposed projects on BLM lands that would be incompatible or potentially degrade to ORVs for this segment. Other federal agencies that consider proposed projects that require federal permits, licenses, or funds would be required to evaluate the potential effects on the segment's ORVs, and prevent significant impacts to ORVs, free-flowing nature, or water quality. However, the Colorado Statewide Water Supply Initiative concluded that Mesa County would be able to meet estimated demand for water in the Colorado River basin through 2030 by utilizing existing supplies, agricultural transfers, Ruedi and Wolford Reservoir contracts, and Jerry Creek Reservoir. (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004)

Several conditional storage water rights have the potential to impact values along this segment. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The combined volume of conditional storage rights in the Colorado River basin in Colorado totals almost 3 million acre-

BLM_0022833

feet. Water District 70 alone (Roan Creek Basin) has approximately 560,000 acre-feet of conditional storage rights. The majority of which have priority dates ranging from 1960-1980, with some as early as 1940-1960 (SWSI). The development of conditional water rights both along the segment and upstream from the segment has the potential to impact the fish values along this segment.

Presently, there are no state-based instream flow water rights in this reach to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flows derive from required deliveries to downstream senior water rights, contractual water deliveries from Green Mountain, Ruedi, and Wolford Mountain Reservoirs, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9). The USFWS has developed flow recommendations for the Colorado River to benefit endangered fish. Flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth and survival of young fish. Although there is no instream-flow right along this segment, USFWS flow recommendations provide a layer of protection for the ORVs.

The scenic and wildlife values along this segment likely would not be diminished or foreclosed if the segment was not designated. Other management requirements and tools (discussed under Criterion 6) provide a layer of protection for these values. These mechanisms will apply regardless of whether the segment receives WSR designation by Congress.

The Colorado River Recovery Program functions to insure that adequate flow regimes exist to support the four threatened and endangered fish species in the Colorado River as further water development proceeds. In addition, the program implements programs to improve fish habitat and reduce competition from non-native species. These measures are likely to maintain the fish ORV. Designation of this reach into the NWSRS, which would include a federal reserved water right, is unlikely to provide greater protection. The federal reserved water right would be very junior, and could not be used to prevent the exercise of previously decreed conditional or absolute water rights.

4. <u>Federal, state, tribal, local, public, or other interest in designating or not designating the river.</u>
The State of Colorado, water districts, user groups, and individuals have expressed concern about the impact of designating this segment on current and future upstream and downstream water projects. However, they also recognize that this segment supports a high number of ORVs and that some special management provisions are warranted to protect and support these values. Mesa County Board of Commissioners recommends that no river or stream segment in Mesa County be found suitable.

BLM_0022834

5.   Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

Designation of the segment would not likely increase the cost of administering the segment for the protection of the ORVs. There is some potential for cost to increase due to the need for additional facilities to accommodate increased visitation. However as discussed below, the fish and wildlife ORVs already require special management practices pursuant to other federal statutes. The cost of administering this area pursuant to the WSRA is likely to be similar to the cost of administering these other management practices.

The BLM would not pursue land acquisition from willing sellers. Because the majority of the land within the segment corridor is privately owned, it would be difficult for the BLM to acquire enough additional land to affect the manageability of the segment. No detailed cost analysis or estimate was prepared as part of this study.

6.   Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM's land management authorities can adequately protect the federal lands in the river corridor, but BLM does not have the authority to protect ORVs on private lands in the corridor, nor does it have authority to protect the stream flows necessary to support the ORVs. Designation would provide a comprehensive framework for working with local governments to protect against land uses that are incompatible with the ORVs, and designation would also provide a federal water right that would assist with flow protection.

The makeup of this segment hinders the BLM's ability to manage it effectively as a WSR. First, the BLM-managed portions of the segment are somewhat fragmented. The BLM manages roughly a quarter-mile portion at the upstream end of the segment and another roughly quarter-mile portion after the river flows through a little over a mile of private lands. Then, the river flows another six miles through private lands before reaching the lower half of the segment, where the majority of the segment corridor is BLM-managed. Second, the majority of the shoreline and the segment corridor fall under private ownership. The BLM does not control uses or activities on private lands, making effective management of this segment difficult.

Mechanisms and management tools other than WSR designation can protect the segment's ORVs. The BLM's RMP revision process addresses protection of scenic values. The BLM also must comply with federal statutes, other than the WSRA, that address protection of the fish and wildlife values.

The BLM manages approximately 2,048 acres within the segment corridor as Visual Resource Management (VRM) Class II (De Beque Canyon). The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. This management prescription protects the scenic values along this segment.

Mechanisms are already in place that will adequately protect the wildlife values (bald eagles) in this segment. In 2007, the USFWS removed the bald eagle from the endangered species list

BLM_0022835

because its populations had recovered sufficiently. Nevertheless, the bald eagle still receives federal protection under the Bald and Golden Eagle Protection Act. Regulations issued under this Act establish a permit system to limit "take" of bald eagles, similar to the ESA. These regulations provide that take will only be authorized where it is compatible with the preservation of either of the eagle species—where take is consistent with the goal of stable or increasing breeding populations—or where take cannot be practicably avoided. Further, the Colorado Division of Wildlife recommends buffer zones and seasonal restrictions that apply to management actions occurring near bald eagle habitat. These include: (1) a year-round closure to surface occupancy within a quarter-mile radius of a nest; (2) a restriction on human encroachment from November 15 through July 31 within a half-mile radius of a nest; and (3) a restriction on activity within a quarter-mile radius of winter roosts between November 15 and March 15. The combination of these measures will prevent the foreclosure or diminishment of the wildlife values present in this segment.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow and the razorback sucker. Areas designated as critical habitat receive protection under Section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely on the provisions of the Colorado Endangered Fish Recovery Program to protect the Fish ORV.

2. BLM should continue to rely upon the special recreation management area (SRMA) designation to protect the scenic ORV. In addition, BLM should adopt VRM Level 2 restriction to protect the scenic ORV in the revised RMP.

3. BLM should use its authority to control land development along the river corridor to protect the wildlife ORV.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

BLM_0022836

7. Historical or existing rights that could be adversely affected with designation.

This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. Numerous absolute water rights exist along the Colorado River. Historical operation, maintenance, and access practices would be allowed to continue. While these rights would not be affected by designation of the segment, the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. A small portion of the segment is within the Planned Unit Development district. The Planned Unit Development district is intended to encourage innovative land planning and site design concepts that implement and are consistent with the Mesa County Master Plan (Mesa County 2008). The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008).

The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

9. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

10. Consistency of designation with other agency plans, programs, or policies.

The Colorado pikeminnow and razorback sucker are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b).

The Colorado River Valley and Kremmling Field Offices (Colorado) have found the Colorado River from the gauging station near the mouth of Gore Canyon within the Kremmling Field

BLM_0022837

Office to approximately one mile east of No Name Creek within the Colorado River Valley Field Office to be preliminary suitable for inclusion in the NWSRS in its draft plan and EIS.

In coordination with the Colorado River Valley Field Office, the White River National Forest has found two segments in Glenwood Canyon to be suitable for inclusion in the NWSRS in its draft plans and EIS.

The Moab Field Office (Utah) found the segment of the Colorado River from the Colorado/Utah border to Westwater Canyon not-suitable for inclusion in the NWSRS. However, it found the Colorado River from Westwater Canyon to the Boundary of Canyonlands National Park (approximately 91 river miles, 65.5 on BLM land) to be suitable for inclusion in the NWSRS (BLM 2008).

Designation of this segment would be consistent with the goals of the recovery plan and with the suitable segments listed above.

***Other Protections for Segment***

| Colorado River Segment 1 | |
| --- | --- |
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Fish, Wildlife | NSO (2,200 acres), CSU (1,200 acres), TL (1,600 acres), VRM Class II (2,000 acres), ROW Avoidance (2,100 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable**. The majority of lands in this segment corridor are privately owned, and the BLM has no control over activities on private lands. Further, the BLM-managed lands are fragmented within the segment. Mesa County zoning does not prevent development that is incompatible with WSR designation. The Agricultural, Forestry, Transitional district allows extractive uses (either as of right or conditionally) that have the potential to change the landscape and setting found along this segment. The city limits of De Beque also lie within the segment corridor. As the city expands, the possibility of development along this part of the corridor increases. The fish ORV in this segment appears to be sufficiently protected by the provisions of the ESA and by the Colorado River Recovery Program. The wildlife ORV appears to be sufficiently protected by the Bald and Golden Eagle Protection Act. The BLM concludes that this segment is not readily manageable as a Wild and Scenic River because of the land ownership pattern and county zoning. In addition, the ORVs are sufficiently protected by existing law.

### 3.1.2   Colorado River Segment 2

| | |
|---|---|
| **Description:** | BLM sections of the Colorado River downstream from the Grand Valley Diversion Dam to the Loma Boat Launch. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 40.24 miles | **Total Segment Area:** | 12,897.11 acres |
| **Length on BLM Land :** | 1.31 miles | **Area on BLM Land:** | 533.25 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Fish | | |

*Suitability Factor Assessment*

1.   <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment has outstandingly remarkable fish values, which would make the segment a worthy addition to the NWSRS if designated. On the other hand, this segment has other characteristics that detract from its value as an addition to the NWSRS. The tentative classification for this segment is recreational due to Interstate 70 and a railroad, both of which run parallel to and are readily apparent from the river.

This segment has outstandingly remarkable fish values. The entire segment is USFWS-designated critical habitat for the federally endangered Colorado pikeminnow *(Ptychocheilus lucius)* and the Razorback sucker *(Xyrauchen texanus)* (59 Fed. Reg. 13,374). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico.

The James M. Robb Colorado River State Park is within the segment. Even though recreation was not determined to be an ORV within this segment, the park provides multiple opportunities for recreation, including camping, fishing, hiking, biking, and swimming.

The Grand Valley Project Diversion Dam forms the upstream terminus of the segment and diverts water from the Colorado River to irrigate approximately 33,368 acres of land in the Grand Valley (US BOR, no date). In addition to irrigation, project water is used for the generation of power. The Orchard Mesa Power Plant has produced power from its two 3,000 k/w generators since 1933, and the Cameo Power Plant, built by Public Service Company in the late 1950s, has used project water for cooling since it was constructed.

There are also characteristics that are unrelated to ORVs that affect the suitability of this segment. Numerous water diversions exist along this segment, including several conditional water rights. If made absolute, these water rights could result in additional depletions and additional water development and diversion structures along the private land in the corridor. Portions of the study area for this segment overlap the city limits of Palisade, Grand Junction,

BLM_0022839

and Fruita. The future population growth, expansion, and associated development of these communities, particularly along the riverfront, have the potential to change the setting found in this segment. Interstate 70 runs adjacent to the segment, and a railroad and power lines also are visible throughout the segment. Future expansion of the interstate, railroad, and transmission lines also have the potential to change the setting found in this segment. These characteristics somewhat detract from the value of the segment as an addition to the NWSRS.

2. <u>The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.</u>

Land ownership for this 40.24-mile segment is a combination of federal (BLM), state, and private. The BLM manages shoreline along 1.31 miles (3.3 percent) of the segment. Within the 12,897.11-acre study corridor, the BLM manages 533.25 acres (4.1 percent). Another 11,052.63 acres (53.8 percent) are privately owned. The State of Colorado manages the remaining 1311.23 acres within the segment corridor. The Colorado Division of State Parks manages the James M. Robb Colorado River State Park. The Colorado Division of Wildlife manages various state wildlife areas (Horsethief, Tillman Bishop, and Walker).

Most of the BLM-managed lands in the study area are leased for oil and gas exploration, but there are no active wells within the study corridor. The mineral potential in this segment corridor is low to very low. There are no active mining claims in this segment corridor.

The BLM does not have authority over maintenance, operation, and construction activities associated with the highway and railroad. Activities associated with the highway and railroad are not likely to adversely impact the ORVs. The Department of Transportation, pursuant to the Federal-Aid Highway Act and section 4(f) of the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3. <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>

WSR designation has the potential to impact future water development along this segment. With designation, BLM would obtain authority to place terms and conditions on or deny approval for any proposed projects on BLM lands that would be incompatible or potentially degrade to ORVs for this segment. Other federal agencies that consider proposed projects that require federal permits, licenses, or funds would be required to evaluate the potential effects on the segment's ORVs, and prevent significant impacts to ORVs, free-flowing nature, or water quality. However, the Colorado Statewide Water Supply Initiative concluded that Mesa County would be able to meet estimated demand for water in the Colorado River basin through 2030 by utilizing existing supplies, agricultural transfers, Ruedi and Wolford Reservoir contracts, and Jerry Creek Reservoir. (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004)

BLM_0022840

Several conditional storage water rights have the potential to impact values along this segment. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The combined volume of conditional storage rights in the Colorado River basin in Colorado totals almost 3 million acre-feet. Water District 70 alone (Roan Creek Basin) has approximately 560,000 acre-feet of conditional storage rights. The majority of which have priority dates ranging from 1960-1980, with some as early as 1940-1960 (SWSI). The development of conditional water rights both along the segment and upstream from the segment has the potential to impact the fish values along this segment.

Presently, there are no state-based instream flow water rights in this reach to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flows derive from required deliveries to downstream senior water rights, contractual water deliveries from Green Mountain, Ruedi, and Wolford Mountain Reservoirs, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9). The USFWS has developed flow recommendations for the Colorado River to benefit endangered fish. Flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth and survival of young fish. Although there is no instream-flow right along this segment, USFWS flow recommendations provide a layer of protection for the ORVs.

The Colorado River Recovery Program functions to insure that adequate flow regimes exist to support the four threatened and endangered fish species in the Colorado River as further water development proceeds. In addition, the program implements programs to improve fish habitat and reduce competition from non-native species. These measures are likely to maintain the fish ORV. Designation of this reach into the NWSRS, which would include a federal reserved water right, is unlikely to provide greater protection. The federal reserved water right would be very junior, and could not be used to prevent the exercise of previously decreed conditional or absolute water rights.

4. <u>Federal, state, tribal, local, public, or other interest in designating or not designating the river.</u>

The State of Colorado, water districts, user groups, and individuals have expressed concern about the impact of designating this segment on current and future upstream and downstream water projects. However, they also recognize that this segment supports a high number of

BLM_0022841

ORVs and that some special management provisions are warranted to protect and support these values. Mesa County has not made a formal indication to the BLM as to whether it is interested in supporting designation.

5. <u>Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.</u>

The vast majority of land in this segment is privately owned. The BLM would not pursue land acquisition from willing sellers, as it is not feasible to acquire enough land to affect its ability to manage the segment. Designation of the segment would not likely increase the cost of administering the segment for the protection of the ORV. The cost of administering the area pursuant to the WSRA would likely be similar to the current cost of administering the area under the ESA for the endangered fish species. No detailed cost analysis or estimate was prepared as part of this study.

6. <u>Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.</u>

The BLM's land management authorities can adequately protect the federal lands in the river corridor, but the BLM does not have the authority to protect ORVs on private lands in the corridor, nor does it have authority to protect the stream flows necessary to support the ORVs. Designation would provide a comprehensive framework for working with local governments to protect against land uses that are incompatible with the ORVs. Designation also would provide a federal water right that would assist with flow protection.

The makeup of this segment hinders the BLM's ability to manage it effectively as a WSR. As stated above, the BLM manages a very small percentage of the shoreline along this segment (3.3 percent) and a very small percentage of the land in the segment corridor (4.1 percent). The BLM-managed lands in the segment corridor are extremely scattered as well. Some are located are the upstream end of the segment, and the remainder are located at the downstream end of the segment, with the urban corridor of Palisade, Grand Junction, and Fruita in between. The scattered nature and small proportion of BLM-managed lands in this segment corridor make it difficult for the BLM to exercise effective management control over this segment.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow and the razorback sucker. Areas designated as critical habitat receive protection under section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir

BLM_0022842

enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely on the provisions of the Colorado Endangered Fish Recovery Program to protect the Fish ORV.

Based on this recommendation, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

7. <u>Historical or existing rights that could be adversely affected with designation.</u>
This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. Numerous absolute water rights exist along the Colorado River. Historical operation, maintenance, and access practices would be allowed to continue. While these rights would not be affected by designation of the segment, the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
This segment is within Mesa County. The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORV.

9. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4

BLM_0022843

10. <u>Consistency of designation with other agency plans, programs, or policies.</u>
The Colorado pikeminnow and razorback sucker are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b).

The Colorado River Valley and Kremmling Field Offices (Colorado) have found the Colorado River from the gauging station near the mouth of Gore Canyon within the Kremmling Field Office to approximately one mile east of No Name Creek within the Colorado River Valley Field Office to be preliminarily suitable for inclusion in the NWSRS in the Draft Plan and EIS.

In coordination with the Colorado River Valley Field Office, the White River National Forest has found two segments in Glenwood Canyon to be preliminarily suitable for inclusion in the NWSRS.

The Moab Field Office (Utah) found the segment of the Colorado River from the Colorado/Utah border to Westwater Canyon not-suitable for inclusion in the NWSRS. However, it found the Colorado River from Westwater Canyon to the Boundary of Canyonlands National Park (approximately 91 river miles, 65.5 on BLM land) to be suitable for inclusion in the NWSRS (BLM 2008).

Designation of this segment would be consistent with the goals of the recovery plan and with the suitable segments listed above.

***Other Protections for Segment***

| Colorado River Segment 2 | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish | NSO (100 acres), CSU (100 acres), VRM Class II (100 acres), ROW Avoidance (100 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable**. The vast majority of lands in this segment corridor are not managed by the BLM (over 90 percent), and the BLM has no control over activities on private lands. With management control over such small portion of the lands in this segment corridor, it would be difficult for the BLM to effectively manage this segment as a WSR. For example, Mesa County zoning does not prevent development that is incompatible with WSR designation. The Agricultural, Forestry, Transitional district allows extractive uses (either as of right or conditionally) that have the potential to change the landscape and setting found along this segment. This segment flows through the growing urban corridor of the Grand Valley. The city limits of Palisade, Grand Junction, and Fruita overlap the segment corridor. As these cities continue to grow, the potential for incompatible development in the segment corridor will correspondingly increase. There are also numerous diversions along this segment. Designation of this segment could affect the ability of water users to make changes to existing

BLM_0022844

water rights.. The fish ORV in this segment appears to be sufficiently protected by the provisions of the ESA and by the Colorado River Recovery Program. The BLM concludes that this segment is not readily manageable as a Wild and Scenic River because of the land ownership pattern and county zoning. In addition, the ORVs are sufficiently protected by existing law.

### 3.1.3  Colorado River Segment 3

| | |
|---|---|
| **Description:** | BLM sections of the Colorado River from the Loma Boat Launch to the Colorado/Utah border. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 20.91 miles | **Total Segment Area:** | 6,798.10 acres |
| **Length on BLM Land :** | 19.14 miles | **Area on BLM Land:** | 5,771.92 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Scenic, Recreation, Fish, Wildlife, Geologic, Historic | | |

*Suitability Factor Assessment*

1.  <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment has outstanding scenic, recreational (floatboating and biking), fish, wildlife, geologic, and historical values. This combination of values is similar to other major rivers segments in the western US that have been designated into the NWSRS. Each of these values is discussed below. The tentative classification of this segment is scenic. There are a few private in-holdings with developments, several access points to the river via dirt roads, and a mostly inconspicuous stretch of railroad runs through Ruby Canyon.

This segment has outstandingly remarkable scenic values. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). The Colorado River provides remarkable views of the shear walls of Ruby and Horsethief Canyons and the many side canyons, alcoves, pinnacles, amphitheaters, and other unique sandstone formations formed by the erosional forces of the river. The many different exposed layers show a wealth of geologic history and offer a variety of different colors and textures throughout the canyons. The segment also offers opportunities to view rare species and examine petroglyphs.

This segment has outstandingly remarkable recreational values. The stretch of river is popular for overnight flat-water boating and attracts rafters, kayakers, and canoeists from across Colorado and from nearby states. Water levels are sufficient to permit water recreation throughout the year, an uncommonly long season for watercourses in this region. This segment also contains a trailhead for Kokopelli's Trail, a popular mountain bike route that runs to Moab, Utah. This trail runs above the Colorado River along the top of the wall that forms the inner part of Horsethief Canyon. It recognized worldwide for its spectacular views of the river and surrounding areas. The Mack Ridge mountain bike area contains additional trails with sections running above the canyon walls and immediately above the river.

BLM_0022845

This segment has a history of significant use by sportsmen and sportswomen who utilize this area. The Loma Boat Ramp, which provides primary access to this segment, is a CPW facility. Power boats have been in use on this segment prior to rafting becoming a popular sport. PUC permits were issued in the 50s and 60's specifically for tourist transport and hunting by motorboat on this water way. This water way is a navigable waterway for motorized traffic and has historically been so.

This segment also has outstandingly remarkable fish values. The entire segment is USFWS-designated critical habitat for the federally endangered Colorado pikeminnow *(Ptychocheilus lucius)* and the Razorback sucker *(Xyrauchen texanus)* (59 Fed. Reg. 13,374). The section from Black Rocks to the Colorado/Utah border is also designated critical habitat for humpback chub *(Gila cypha)* and bonytail chub *(Gila elegans)*, also federally endangered species (59 Federal Register 54 [21 March 1994], pp. 13374-13399). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. A site near the Colorado/Utah border has been identified as a spawning site for this species. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico. The humpback chub owes its name and striking, unusual appearance to a pronounced hump located behind its head. It historically inhabited the canyons of the Colorado River, can live for more than thirty years, and can grow up to nearly twenty inches. The bonytail chub is the rarest of the endangered fish species in the Colorado River. They can grow to twenty-two inches or more and can live for nearly fifty years. The Black Rock section of the river is a spawning ground for both species of chub and is an important study site where the USFWS have recorded both species.

This segment has outstandingly remarkable wildlife values. Specifically, the segment contains important winter habitat and nests for several pairs of bald eagles *(Haliaeetus leucocephalus)*, a State Threatened Species in Colorado (CPW 2008). Bald eagles no longer receive protection under the ESA. The USFWS delisted bald eagles in June 2007 because their populations have recovered sufficiently. Nevertheless, bald eagles still receive some protection under the Bald and Golden Eagle Protection Act. River otters *(Lontra Canadensis)*, a state threatened species in Colorado, are also frequently observed along this segment.

This segment has outstandingly remarkable historical values as well. The Denver and Rio Grande Railroad (now part of Union Pacific) runs parallel to the segment. This came as a result of the rerouting the Grand Junction to Salt Lake City line and the replacement of a southern route from Denver to Salt Lake City through Montrose. The importance of the railroad in developing the West makes this site eligible for inclusion in the National Register of Historic Places and a site of national, regional, and local significance.

Lastly, this segment is outstandingly remarkable for its geological values. The steep and deep canyons along this segment expose an unusually extensive series of rocks from the recent

BLM_0022846

Mancos Shale to the extremely old Precambrian formations (overlaid by the Chinle formation as an unconformity). There are also several examples of faults that are free of vegetation that allow visitors to clearly view evidence of geologic processes.

Although the river is not located within the boundaries of the McInnis Canyons NCA (formerly known as the Colorado Canyons NCA), the NCA is located on both sides of the river above the line of the 100-year floodplain. In addition, the Black Ridge Canyons Wilderness is visible from the south bank of the river. Congress designated the NCA in 2000 "to conserve, protect, and enhance for the benefit and enjoyment of present and future generations the unique and nationally important values … including geological, cultural, paleontological, natural, scientific, recreational, environmental, biological, wildlife education, and scenic resources of such public lands." The legislation also directed BLM to manage the river in a manner consistent with the protecting the values recognized by Congress for lands within the NCA.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 20.91-mile segment is a combination of federal (BLM), CPW, and private. The BLM manages shoreline along 19.14 miles (91.5 percent) of the segment. Within the 6,798.10-acre study corridor, the BLM manages 5,771.92 acres (84.9 percent). Another 792.96 acres (11.7 percent) are privately owned. CPW manages the remaining land within the study corridor as part of the Horsethief State Wildlife Area (168.12 acres; 2.5 percent).

The Colorado Canyons National Conservation Area and Black Ridge Canyons Wilderness Act of 2000 (Public Law 106-353 [October 24, 2000]) formally withdrew all BLM lands within the segment study area from location, entry, and patent under the mining laws, and operation of the mineral leasing, mineral materials, and geothermal leasing laws. The withdrawal recognizes valid existing rights (those leases or operations existing prior to October 24, 2000). There are no known valid existing rights related to mining in the segment corridor.

Livestock grazing occurs on the private parcels within the segment corridor, as well as on some BLM parcels. Grazing appears to be commensurate with the protection of the ORVs.

The BLM does not have authority over maintenance, operation, and construction activities associated with the highway and railroad. Activities associated with the highway and railroad are not likely to adversely impact the ORVs. The Department of Transportation, pursuant to the Federal-Aid Highway Act and section 4(f) of the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

This segment flows through McInnis Canyons NCA and borders Black Ridge Canyon Wilderness. Designation of this segment would provide permanent protection and management

BLM_0022847

direction for BLM lands along the river corridor that are not presently within the NCA. Congress designated the NCA to conserve, protect, and enhance its geological, recreational, biological, wilderness, and scenic values, among others. These values parallel the ORVs found in this segment: scenic, recreation, fish, wildlife, geologic, and historic. Designation of this segment would provide complementary protective management.

WSR designation has the potential to foreclose or curtail future water development along this segment. With designation, BLM would obtain authority to deny or place terms and conditions on proposed projects located on BLM lands that would be incompatible or would potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the designated river segments.

This segment contains undeveloped conditional water rights, including some large water rights for industrial and commercial uses, but there are no known conditional water rights for municipal water supply or agricultural water supply purposes. The Colorado Statewide Water Supply Initiative concluded that Mesa County would be able to meet estimated demand for water in the Colorado River basin through 2030 by utilizing existing supplies, agricultural transfers, Ruedi and Wolford Reservoir contracts, and Jerry Creek Reservoir (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004).

Conditional storage water rights upstream from this segment have the potential to affect the flow rates that support the ORVs in this segment. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The combined volume of conditional storage rights in the Colorado River basin in Colorado totals almost 3 million acre-feet. Water District 70 alone (Roan Creek Basin) has approximately 560,000 acre-feet of conditional storage rights, the majority of which have priority dates ranging from 1960-1980, with some as early as 1940-1960 (SWSI).

Interstate compacts place limitations on water use in Colorado. The Colorado River Compact of 1922 divides the Colorado River Basin into the Lower Basin and the Upper Basin. Colorado lies in the Upper Basin; the water available to the Upper Basin is further allocated among Colorado, Utah, Wyoming, and New Mexico by the Upper Colorado River Compact of 1948. The State of Colorado's right to consumptive use of water under the Compacts ranges from 3.079 million AF to 3.855 million AF. Colorado currently consumes an average of 2.3 million AFY with facilities in place to use up to 2.6 million AFY (SWSI 4-4). A draft water availability study conducted by the Colorado Water Conservation Board (CWCB) includes estimates that the volume of water remaining for future development within Colorado from the Colorado River system ranges from 0 acre feet to 1 million acre feet annually, depending upon future climatic conditions (CWCB 2010). However, this study does not allocate or estimate the specific volume available for future development on the Colorado River, as opposed to other

BLM_0022848

Colorado River tributaries, such as the Yampa River or White River. Accordingly, it reasonable to expect that substantial water deliveries to downstream states will continue through this segment, but it is not possible to accurately estimate the long-term flow rates that can be expected.

This segment lies immediately upstream of the Colorado/Utah border. It is downstream from the majority of senior water rights in the state. Because of these two circumstances, it represents an opportunity to develop and divert unused water allocated to Colorado under the Compacts before it leaves the state. For example, Phase II of the Statewide Water Supply Initiative analyzed the concept and feasibility of such a major diversion, calling it the Colorado River Return Project (CRRP). The CRRP would consist of a diversion from the Colorado River near the Utah state line downstream of Grand Junction for delivery to multiple basins in Colorado (areas in the headwater of the Colorado River and the Front Range). The water would be diverted under a new water appropriation. The CRRP identified and evaluated three levels of water diversion: 250,000, 500,000, and 750,000 AFY. The CRRP identified two potential diversion areas, both of which lie within this segment corridor: (1) at the confluence of the Colorado River and Salt Creek in Horsethief Canyon and (2) at the upstream end of Horsethief Canyon near the existing Loma Boat Launch. The CRRP was only a reconnaissance-level investigation, and as such, it not assumed to be a reasonably foreseeable potential use of the land at this time. Nevertheless, the CRRP serves as an example of the potential for additional future depletions of water from this segment. While any similar project would have to comply with the requirements of the ESA and similar statutory requirements, there is still the potential for reduced flow and impacts on this segment's ORVs. This type of project likely would be curtailed or foreclosed if the segment was designated.

Presently, there are no state-based instream flow water rights in this segment to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flow rates are the result of required deliveries to senior irrigation water rights located in the Grand Valley and the substantial return flows that accrue to this stream segment from those irrigation systems. Flow rates are also influenced by contractual water deliveries from Green Mountain, Ruedi, and Wolford Mountain Reservoirs to water users in this segment, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9).

The USFWS has developed flow recommendations for the Colorado River to benefit endangered fish, and these recommendations provide a substantial layer of protection for the ORVs in this segment. The flow recommendations are administered at the US Geological Survey gage near the Utah-Colorado border, which is located within this segment. The flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth

BLM_0022849

and survival of young fish. Any proposed water development project within the segment that would require a federal permit, such as land use authorization from BLM and/or a dredge and fill permit from the US Army Corps of Engineers, would be required to go through an ESA Section 7 consultation with the USFWS. The USFWS consultation process would insure that the proposed project would not significantly impact the State of Colorado's ability to meet the flow recommendations for this stream reach.

4.  Federal, state, tribal, local, public, or other interest in designating or not designating the river.
The State of Colorado, water districts, user groups, and individuals have expressed concern about the impact of designating this segment on current and future upstream water projects. However, they also recognize that this segment supports a number of ORVs and that some special management provisions are warranted to protect and support these values. Mesa County has not made a formal indication to the BLM as to whether it is interested in supporting designation.

5.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.
The cost of administering the area if designated would not likely increase above current levels because the management, and thus the associated costs, of administering the area pursuant to the NWSRS would be similar to the current administration of the area. For example, recreational use of the segment is already high. The BLM already conducts regular ranger patrols and maintains campsites within this segment to accommodate the level of usage. The cost of maintaining and administering these facilities would continue regardless of designation.

The BLM would pursue land acquisition only from willing sellers as funds and opportunities arise in order to better manage the area for the protection of the ORVs. Designation of the segment would likely enhance the BLM's ability to obtain funding for such acquisitions, and acquisitions would enhance the BLM's ability to manage the segment. No detailed cost analysis or estimate was prepared as part of this study.

6.  Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.
The BLM's land management authorities can adequately protect the federal lands in the river corridor, but BLM does not have the authority to protect ORVs on private lands in the corridor, nor does it have authority to protect the stream flows necessary to support the ORVs. However, the BLM is the majority landowner for this segment (9.15 percent of the shoreline and 84.9 percent of land in the segment corridor, which would facilitate effective and cohesive management of the segment if designated. Designation would provide a comprehensive framework for working with local governments agencies, state agencies, and other federal government agencies to protect against proposed land use and project that are incompatible with the ORVs. Designation would provide a federal water right that would assist with flow protection, but the water right would be an extremely junior water right. Accordingly, the water right would have limited effectiveness in insuring that flow rates through the segment are sufficient for the ORVs, but it would provide the BLM with an opportunity to object to new

BLM_0022850

water rights and changes in water rights that would substantially impact the flow rates available to protect the ORVs.

This segment runs through the McInnis Canyons NCA and Black Ridge Canyons Wilderness and management of the NCA and Wilderness is commensurate with protection of the ORVs. BLM wilderness areas are managed according to BLM Manual 8560, *Management of Designated Wilderness Areas* (BLM 1983). Wilderness areas allow for continued use of valid existing rights (i.e., rights or activities that existed when the area became a wilderness study area [WSA]).

The BLMs VRM system provides a mechanism to protect the scenic values along this segment. The BLM manages the river corridor VRM Class I on the south side of the river and VRM Class II on the north side of the river (BLM 2004). The objective of VRM Class I is to preserve the existing character of the landscape. The level of change to the characteristic landscape should be very low and must not attract attention. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. This management prescription protects the scenic values along this segment and also provides some indirect protection of the geologic values.

Historical values associated with the river segment are protected and regulated by a number of laws, regulations, executive orders, programmatic agreements, and other requirements. The principal federal law addressing cultural resources is the NHPA, and it's implementing regulations (36 CFR 800). These regulations, commonly referred to as the Section 106 process, describe the procedures for identifying and evaluating historic properties, for assessing the effects of federal actions on historic properties, and for project proponents consulting with appropriate agencies to avoid, reduce, or minimize adverse effects.

Mechanisms are already in place that will adequately protect the wildlife values (bald eagles) in this segment. In 2007, the USFWS removed the bald eagle from the endangered species list because its populations had recovered sufficiently. Nevertheless, the bald eagle still receives federal protection under the Bald and Golden Eagle Protection Act. Regulations issued under this Act establish a permit system to limit "take" of bald eagles, similar to the ESA. These regulations provide that take will only be authorized where it is compatible with the preservation of either of the eagle species—where take is consistent with the goal of stable or increasing breeding populations—or where take cannot be practicably avoided. Further, the Colorado Division of Wildlife recommends buffer zones and seasonal restrictions that apply to management actions occurring near bald eagle habitat. These include: (1) a year-round closure to surface occupancy within a quarter-mile radius of a nest; (2) a restriction on human encroachment from November 15 through July 31 within a half-mile radius of a nest; and (3) a restriction on activity within a quarter-mile radius of winter roosts between November 15 and March 15. The combination of these measures will prevent the foreclosure or diminishment of the wildlife values present in this segment.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow, razorback sucker, bonytail chub, and

BLM_0022851

humpback chub. Areas designated as critical habitat receive protection under section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. Congress should implement amendments to the existing legislation that created the McInnis Canyons NCA, so that the legislation better protects ORVs associated with the Colorado River. The legislation should specifically address boundary adjustments that are needed to better manage the river corridor for recreation and administrative access. The legislation should also permanently release this segment from future consideration under the WSR Act.

2. Retain the current mineral withdrawal associated with the NCA, and implement VRM Level 1 restrictions in the revised RMP to protect the scenic ORV and geological ORV.

3. Implement recreational permitting and enforcement, along with limiting recreation travel to designated roads and trails, to protect the recreational ORV.

4. Continue to work with the Upper Colorado River Endangered Fish Recovery Program to protect the fish ORV.

5. Continue to use the National Historic Preservation Act to protect the historical ORV.

The McInnis Canyons NCA boundary changes proposed by the stakeholder group have not yet been implemented.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

7.  <u>Historical or existing rights that could be adversely affected with designation.</u>
This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct

BLM_0022852

new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. Numerous senior, absolute water rights exist along the Colorado River. While these rights would not be affected by designation of the segment, the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
This segment is within Mesa County. The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

9. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4.

10. <u>Consistency of designation with other agency plans, programs, or policies.</u>
The Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b).

The Colorado River Valley and Kremmling Field Offices (Colorado) have found the Colorado River from the gauging station near the mouth of Gore Canyon within the Kremmling Field Office to approximately one mile east of No Name Creek within the Colorado River Valley Field Office to be preliminarily suitable for inclusion in the NWSRS, as part of the draft RMP (BLM 2011).

In coordination with the Colorado River Valley Field Office, the White River National Forest has found two segments in Glenwood Canyon to be preliminarily suitable for inclusion in the NWSRS (U.S. Forest Service 2011).

BLM_0022853

The Moab Field Office (Utah) found the segment of the Colorado River from the Colorado/Utah border to Westwater Canyon not-suitable for inclusion in the NWSRS. However, it found the Colorado River from Westwater Canyon to the Boundary of Canyonlands National Park (approximately 91 river miles, 65.5 on BLM land) to be suitable for inclusion in the NWSRS (BLM 2008).

Designation of this segment would be consistent with the goals of the recovery plan and with the suitable segments listed above.

***Other Protections for Segment***

| Colorado River Segment 3 | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Recreation, Fish, Geological, Wildlife, Historic | VRM Class I and II, Withdrawn from Mineral Entry, Wilderness, NCA Management |

***Suitability Determination***
The determination for this segment is **not suitable**. Only about 11 percent of the land in the segment corridor is privately owned, so there is limited potential for development that would be incompatible with the ORVs. Flows receive substantial protection from the Colorado River Recovery Program despite the lack of a state-based instream flow water right. Despite the existence of conditional water rights in the segment, the land use plan management prescriptions for BLM lands both within and outside McInnis Canyons NCA would prohibit BLM from authorizing water development projects that would dam the segment or export major volumes of water from the segment. The presence of the McInnis Canyons NCA along both sides of the river provides substantial protection to the ORVs that are reliant upon lands adjacent to the river, such as scenic and recreation. For lands along this river corridor that are not presently within the NCA boundaries, proposed management prescriptions in the RMP revision would be sufficient to protect the geological, scenic, recreation, and historical ORVs. The Fish ORV can be successfully managed by continued cooperation and compliance with the Colorado River Endangered Fish Recovery Program. The BLM concludes that land management prescriptions in this RMP revision, combined with land management prescriptions in the McInnis Canyons NCA approved RMP, are sufficient to protect the ORVs that occur in the river corridor. In addition, the BLM concludes that flows in this segment, along with the fish ORV, are already protected by the Endangered Species, working through the Colorado River Recovery Program.

BLM_0022854

## 3.2  DOLORES RIVER WATERSHED

### 3.2.1  Dolores River

| | |
|---|---|
| **Description:** | Sections of the Dolores River on BLM land from where the river enters the GJFO at the southwest border and then running parallel to Highway 141, through Gateway, until the river reaches the Colorado/Utah border. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 32.01 miles | **Total Segment Area:** | 9,918.91 acres |
| **Length on BLM Land :** | 18.62 miles | **Area on BLM Land:** | 7,041.19 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Scenic, Fish, Recreation, Geologic, Paleontological | | |

*Suitability Factor Assessment*

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
The Dolores River has outstandingly remarkable scenic, recreational, geological, and paleontological values. Each of these ORVs are discussed in detail below. The tentative classification for this segment is recreational because Highway 141 parallels the river and is fairly obvious along stretches of the river corridor.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). The Dolores River has formed a spectacular canyon, with cliffs sometimes up to 2000 feet higher than the river, with many geologic layers exposed. The variety of different colors including deep reds, purples, and lighter earth tones are in stark contrast to the green riparian vegetation along the river. The cottonwoods along the river and the river itself change color seasonally adding to the scenic beauty. Portions of the segment adjacent to the Sewemup Mesa Wilderness Study Area and The Palisade Wilderness Study are heavily influenced by the stunning uplift of canyon walls and cliffs from the river corridor.

This segment has outstandingly remarkable recreational value. The scenic and geologic values readily visible from the river make this segment of the Dolores a popular boating destination. During the spring runoff and the summer, the segment is popular with canoeists, kayakers, and rafters. This segment parallels Highway 141, part of the Unaweep-Tabeguache Scenic and Historic Byway, offering opportunities for vehicular recreation, picnicking, camping, and viewing of the wildlife and geologic features of the river canyon. Though the Dolores River receives less use than the Gunnison River and Colorado River Segment 3, the segment is seeing an increase in recreational use. The segment offers challenging whitewater rapids between late April and early June during high water years. Flows are affected by releases from the McPhee Reservoir and are sometimes unpredictable. There are no official boat launches along the segment on BLM land, though on unofficial boat launch is located at the county highway property on Highway 141

BLM_0022855

near Gateway. The launch is suitable for trailer and raft use, although the most traffic is by kayak or canoe.

This segment also has outstandingly remarkable geologic value. The Dolores River has exposed and extensive sequence of rocks including additional layers not found farther north along the Colorado River. Additional Permian and Triassic layers including the Cutler and Moenkopi formations are found between the Precambrian bedrock (not exposed) and the Chinle formation. This wide range allows one to examine many of the important layers for the Colorado Plateau.

This segment has outstandingly remarkable paleontological value. Along this segment of the Dolores River are rock slabs containing dinosaur and ancient mammal footprints. Although full surveys have not been completed, there are hundreds of fossilized footprints and track ways, and there likely may be more than 1000 tracks along the river.

The segment has outstandingly remarkable fishery value. Colorado Division of Wildlife (currently Colorado Parks and Wildlife) provided the BLM with additional data following the completion of the Eligibility Study that the Dolores River supports a native fish population that meets the guidelines for evaluating ORVs as described in the BLM Manual 8351.

Overall, this segment is unique and exemplary among streams in the Colorado Plateau region because it supports a high number of outstandingly remarkable values. Wild and Scenic River designation is a framework that can be effectively used to management multiple ORVs in a comprehensive and integrated manner, and it provides comprehensive standards for preventing degradation to the ORVs.

This segment also possesses characteristics in addition to its ORVs that would add to its value as a component of the NWSRS, if designated by Congress. The river segment generally borders, and the study area, which extends 0.25-mile on either side of the river, includes portions of two WSAs: The Palisade (170.66 acres) and Sewemup Mesa (930.99 acres). The segment study area also includes a portion of two areas of critical environmental concern (ACECs): The Palisade Outstanding Natural Area/ACEC (70.02 acres) and the Dolores River Riparian ACEC (3170 acres). The BLM has proposed to expand The Palisade outstanding natural area and ACEC to provide special management attention for its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values. The BLM has proposed the Dolores River Riparian ACEC to provide special management attention to its fish (bluehead sucker), wildlife (peregrine falcon), scenic, and riparian habitat values.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 32.01-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 18.62 miles (58.1 percent) of the segment. Within the 9,918.91-acre study corridor, the BLM manages 7,041.19 acres (70.1 percent). The remaining 2,877.72 acres (29.9 percent) are privately owned.

The percentage of lands under federal ownership is the highest in the portions of the river segment that are adjacent to the Sewemup Mesa WSA (9% private, 91% BLM) and The Palisade

BLM_0022856

WSA (26% private, 74% BLM).  In these portions of the segment, the river corridor is characterized by a low level of development and largely natural conditions, with the exception of roads and highways along the river.

In the middle of the segment, from approximately the confluence with Cottonwood Canyon to 2.5 miles northwest of Gateway, the percentage of private land ownership exceeds 75% (55% private, 45% BLM). In this portion of the segment, land use is dominated by low intensity agriculture, low-density residential development, and the small community of Gateway.  Under the Mesa County zoning for these private lands, development can occur that may be incompatible with maintenance of the outstandingly remarkable values.  See Factor #7 for a full discussion of county zoning.

The BLM-managed lands west of The Palisade WSA are leased for oil and gas development. There are no active wells in the segment corridor. There is no oil and gas potential on the BLM-managed lands in the segment corridor. There are several active mining claims in the segment corridor.

3.  <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or to impose terms and conditions on any proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segments values. Water diversion and conveyance structures that are already in existence on BLM lands could continue to operate historical operation, maintenance, and access practices. Increased water demands in this segment, such as demand associated with the expansion of Gateway Canyons resort, appear to be small in volume relative to the volume of water available in the river. It is unknown whether future water supply projects associated with Gateway Canyons would require BLM land use authorization or federal permits.

Recreational uses within the segment are not likely to be affected by designation under a tentative "recreational" classification. The tentative "recreational" classification would allow development on BLM lands within the corridor that is consistent with the recreation ORV, such as trails, boat ramps, campgrounds, and interpretive kiosks.

Agricultural uses on private lands within the river are not likely to be significantly affected by designation. Designation would not give BLM authority to manage agricultural and other land use practices on private lands, because such as authority would remain under local government control. If agricultural users require a federal permit to implement a project on private lands, such as a dredge and fill permit from the US Army Corps of Engineers, the project would have to be compatible with the ORVs identified for this segment. Since the tentative classification of the segment is "recreational," a broad variety of development projects could be considered as compatible with the ORVs.

BLM_0022857

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as recreational, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

As discussed below, existing mechanisms and management tools would reduce the potential for adverse effects on the ORVs in this segment if it were not designated.

4.  <u>Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.</u>

There is likely to be some increased cost of administering the area if designated. Currently, there are no recreation facilities designed to meet the needs of users. Additional infrastructure and maintenance resources would be required to accommodate the increased visitation that would likely result from designation.  Facilities that may be required on BLM lands include boat ramps, campgrounds, interpretation sites, trailheads, and trails. However, increased usage that is already occurring within the river corridor will require BLM to expend resources to provide facilities and manage use to minimize impacts on resources. Given that increased visibility for the Gateway area has already increased visitation, it is impossible to accurately predict the volume and timing of increased visitation.  However, it is likely that designation would result in additional funding to address current and future recreation demands.

The BLM would pursue land acquisition from willing sellers as funds and opportunities arise in order to better manage the area for the protection of the ORVs. Designation of the segment would enhance the BLM's ability to obtain funding for such acquisitions, and acquisitions would enhance the BLM's ability to manage the segment. At this time, BLM does not consider any land acquisitions as essential for the management of a designated river corridor, so no detailed cost analysis or estimate was prepared as part of this study.

5.  <u>Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.</u>

Two of the identified ORVs, recreation and fish, are highly dependent on adequate flow rates for the continued existence and quality of the ORVs. Flow rates in this river segment are driven primarily by water operations on two upstream river segments. The segment receives flows from the San Miguel River, which is largely unregulated and has a natural flow regime. During much of the year, flows from the San Miguel River provide the majority of the flow within this segment. Flows in this segment are also affected by releases from McPhee Reservoir, located on the upper Dolores River near Cortez, Colorado. This project diverts approximately two thirds of the flow of the upper Dolores River out of the basin. The upper Dolores River contributes significantly to flows in this segment when spills occur, typically during snowmelt runoff, but it contributes only small percentages of flow, typically ranging from 20 to 78 cubic feet per second (cfs), when the reservoir is releasing water from its conservation pool.

At the present time, there is no state-based instream flow protection for this river segment. However, in March 2014, the Colorado Water Conservation Board (CWCB) voted to make an appropriation of an instream flow water right, based upon flow rate recommendations developed by the BLM and Colorado Parks and Wildlife. In January 2015, after an extended public comment period, the CWCB is scheduled to vote on whether to finalize this

BLM_0022858

appropriation and direct the Colorado Attorney General to file a water right application with the Colorado water court system for an instream flow right.

If the water court decrees the timing, flow rates, and locations appropriated by the CWCB at its March 2014 board meeting, the BLM would have assurance that the flow rates needed for continued existence of the fishery values would continue. In addition, the BLM has determined that the appropriated flow rates are sufficient to continue to support the recreational ORV, even though the appropriated flow rates were based upon flow needs for fish populations. Finally, the 2015 priority date associated with the CWCB appropriation is likely to be more senior than a federal reserved water right associated with a designated segment. The CWCB right would be more senior because the federal reserved water right would not be created until Congress designates the segment into the National Wild and Scenic River System, which may not occur or may not occur for many years.

Recreation management is challenging, because there are no facilities designed to meet the activity demands of the users. Additional infrastructure and maintenance resources would be required to meet the additional recreation demand created by residents and travelers. Designation of the river corridor would assist BLM in competing for funds to manage the presently high level or recreational usage and additional recreational use that could occur with designation.

The high percentage of BLM-managed land in the portions of the segment adjacent to Sewemup WSA and The Palisade WSA would facilitate recreational management of the segment as a WSR, because there is unlikely to be conflicts with private landowners associated with access to the river and adjacent lands. However, the middle section of the segment, between Cottonwood Canyon and 2.5 miles northwest of Gateway, would present more challenges for access management because of the intermix of private and public lands.  In the middle section, there is potential for cooperation between private and public land owners to manage increased recreational use, but there is no guarantee that all private landowners would be interested in cooperative management measures. As mentioned above, designation of the river segment would likely provide additional resources to the BLM to create designated access points and to provide information to users about avoiding trespass on private lands.

Paleontological values associated with the river segment are protected and regulated by the BLM primarily under the Paleontological Resources Preservation Act, the Federal Land Policy and Management Act of 1976, the National Environmental Policy Act of 1969, other federal regulations, and BLM orders. Pursuant to the Federal Land Policy and Management Act of 1976, the BLM has issued regulations that provide additional protection. Section 8365.1-5 of Title 43 of the CFR prohibits removing any scientific resource or natural object without authorization. There are exceptions to this prohibition for small quantities of common invertebrate fossils and petrified wood. The BLM manages paleontological resources for their scientific, educational, and recreational values and to ensure that any impacts are mitigated. The primary objective of managing paleontological resources is scientific research. Paleontological resources may only be disturbed or removed in conjunction with scientific research and only upon the issuance of prior written authorization of the disturbance or removal activity. BLM Manual Section 8270, *Paleontological Resource Management* (BLM 1998), provides specific guidance.

BLM_0022859

The portion of the segment corridor upstream from Gateway overlaps the Dolores River Riparian ACEC. Also, the portion of the segment corridor downstream from Gateway overlaps the Palisade ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. Management actions of the Dolores River Riparian ACEC include: (1) manage as VRM Class II; (2) only allow vegetation treatments for the benefit of the identified relevant and important values (riparian, hydrology, scenic, paleontological, and special status species); (3) designate as ROW avoidance area; and (4) open to livestock grazing. Management actions of the Palisade ACEC include: (1) no allowable timber harvest; (2) designate as a ROW avoidance area (including renewable energy sites such as solar, wind, hydro, and biomass development); (3) open to livestock grazing; (4) withdraw from mineral entry, close to mineral material sales, and classify as unsuitable for coal leasing; and (5) withdraw from mineral location, close to mineral material sales, and classify as unsuitable for coal leasing. These ACECs would provide some protection for the ORVs on this segment if it were not designated.

The administrative designations along this segment would provide some limited protection for the ORVs if the segment was not designated. Portions of this segment overlap two WSAs. The uppermost thirteen miles (approximate) of this segment flows along the boundary of Sewemup Mesa WSA. About five miles of the segment near its downstream terminus also flows along the Palisade WSA. The BLM manages WSAs according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012). The goal of this policy is to manage WSAs to not impair their suitability for preservation as wilderness, until Congress designates them as wilderness, or until they are released from further wilderness consideration. This "non-impairment" management standard is more stringent than the BLM's management direction for Recreational WSRs. But if the area is not designated as wilderness and the WSA designation is removed, protection of the area would be limited to RMP management measures.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment.  The management recommendations did not include any specific recommendations to the BLM regarding whether the segment should be determined as suitable or nonsuitable for designation.  Specifically, the stakeholder collaborative recommended:

1. A large stakeholder group should be convened, comprised of representatives from throughout the entire Dolores River watershed, to discuss suitability, flow management, and other issues associated with river management. The CWCB should convene the larger stakeholder group. In early 2014, the Colorado Water Conservation Board and Colorado River Water Conservation District convened a meeting of stakeholders from throughout the entire Dolores River watershed. Since that meeting occurred, the BLM has not received any consensus recommendations from the large stakeholder group regarding suitability, flow management, or other issues associated with river management.

2. Implement VRM Class II prescriptions along the river corridor to protect scenic and geological ORVs.

BLM_0022860

3. Implement ACECs to protect fish, scenic, geological, and paleontological ORVs.

4. Establish controlled surface use or no surface occupancy stipulations to proposed land uses to protect all ORVs within ¼ mile of the river, and establish controlled surface use restrictions to protect the scenic ORVs within the viewshed of the scenic byway.

5. Establish an SRMA to protect the recreation ORV.

6. Work with the CWCB to establish and instream flow water right to maintain seasonal variability of flow for protection of the fish ORV and work to encourage voluntary flow management in support of the fish ORV.

Based on these considerations, the stakeholder collaborative did not make any recommendation concerning a suitability determination for this stream segment. Instead, the stakeholder collaborative suggested suitability issues should be addressed on a larger scale by stakeholder group with representatives from the entire watershed.

6.   <u>Historical or existing rights that could be adversely affected with designation.</u>
This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, the amount and timing of water to support the ORVs would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system. New projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. No significant new water supply or water storage projects have been proposed for this stream segment, but additional storage and diversion projects are under consideration for portions of the San Miguel River located upstream from this segment.

Numerous absolute water rights exist along this segment of the Dolores River. While these rights would not be affected by designation of the segment, the development of new water projects on BLM lands, as described in sections 7(b) and 7(c) of the WSR Act, would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated.

7.   <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
This segment is within Mesa and Montrose Counties. A small portion of the segment corridor in Mesa County is within the Planned Unit Development district. The Planned Unit Development district is intended to encourage innovative land planning and site design concepts that implement and are consistent with the Mesa County Master Plan (Mesa County 2008). The majority of the area on private land in the segment corridor in Mesa County is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008).

BLM_0022861

The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

Zoning does not represent a significant issue in Montrose County as only a small portion of the segment (0.31 acres) is on private land.

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Local governments, state governments, and other interested parties participated in the Lower Colorado River Wild and Scenic River Stakeholder Collaborative.  This group did not provide specific recommendations regarding suitability to BLM, but did provide a variety of other management recommendations. Refer to Criterion 5 for details.

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>
The Dolores River flows through lands managed by four separate BLM offices, and each of those offices has either completed or in the process of completing Wild and Scenic Rivers analysis.

The upper part of the river, downstream to approximately Bedrock, is managed by the San Juan Public Lands Center. The Draft Land Management Plan and Draft EIS for the San Juan Public lands Center identified 109.02 miles of the Dolores River from McPhee to Bedrock to be suitable for inclusion in the NWSRS (BLM and US Forest Service 2007). The final decision on suitability will be made in the record of decision.

The segment of the river from approximately Bedrock to Roc Creek is managed by BLM's Uncompahgre Field Office. The Uncompahgre Field Office found 11.5 miles of the Dolores River eligible for inclusion in the NWSRS. In addition, the Uncompahgre Field Office found 17.2 miles of the San Miguel River, immediately upstream from its confluence with the Dolores River, as eligible for inclusion in the NWSRS.  In its Draft Suitability Report, the Uncompahgre Field Office has found 14.0 miles of the Dolores River as suitable for designation (This mileage includes 5.3 miles downstream from Bedrock and 8.7 miles upstream from Bedrock that formerly had been analyzed by the San Juan Public Center. The Uncompahgre Field Office also found that 2.1 miles of the San Miguel River, immediately upstream from its confluence with the Dolores River, is suitable for designation.

The segment of the river from Roc Creek to the Utah-Colorado boundary is within the GJFO planning area and is the subject of this suitability report.

The BLM Moab Field Office found 35.73 miles of the Dolores River on BLM land from the Colorado/Utah border to the confluence with the Colorado River to be suitable for inclusion in the NWSRS (BLM 2008).

BLM_0022862

In 1979, the U.S. Department of Interior, acting through the National Park Service and Bureau of Outdoor Recreation, completed a Wild and Scenic Rivers Study of the Dolores River, pursuant to 1975 amendment to the Wild and Scenic Rivers Act.  That study recommended that the portion of the Dolores River from Gateway to the Utah border be designated into the National Wild and Scenic Rivers system.  Although more than 30 years have elapsed since this study, BLM finds that conditions along the portion of the river corridor between Gateway and the Utah border have not changed substantially.

10. <u>Contribution to a river system watershed or basin integrity.</u>
This segment of the Dolores River provides a critical connection between numerous aquatic habitats that are important for sensitive fish, including the flannelmouth sucker, bluehead sucker, and roundtail chub. These fish are year-round residents throughout the study segment and in the San Miguel River immediately upstream from the study segment. In addition, the sensitive species also utilize tributaries of the Dolores River for spawning purposes, including Mesa Creek, Roc Creek, and Blue Creek. Together with these tributaries, the lower Dolores River provides one of the few places in Colorado with largely natural flow regime timing at low elevations. The lower Dolores River, along with these tributaries, provides a very important interconnected aquatic habitat that insures the continued viability and genetic diversity of these populations.

***Other Protections for Segment***

| Dolores River | |
| --- | --- |
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Recreational, Fish, Geological, Paleontological | *(10.38 miles suitable for inclusion in the NWSRS)* NSO (3,200 acres), TL (2,400 acres), CSU (1,700 acres), VRM Class I (900 acres), VRM Class II (2,000 acres), ROW Exclusion (2,300 acres), ROW Avoidance (900 acres), Closed to Fluid Mineral Leasing |

***Suitability Determination***
The BLM determines that one portion of the Dolores River within the Grand Junction Field Office is **suitable** for designation into the National Wild and Scenic Rivers System.  This segment is described as follows:

- From point on the river closest to the southern boundary of the Sewemup Mesa Wilderness Study Area to the BLM-private land boundary in Section 24, T50N R19W, New Mexico P.M. a distance of approximately 10.38 miles.

The tentative classification for the suitable segment is **recreational.**

The BLM determines that the following portions of the Dolores River within the Grand Junction Field Office are **not suitable** for designation into the National Wild and Scenic River System:

BLM_0002863

BLM-private boundary in Section 24, T. 50 N., R.19 W., New Mexico P.M. to the Colorado-Utah border, a distance of 8.24 miles. The rationale for the BLM suitability determination is as follows:

- Consistency with State Law, Regulations, Policies, and Programs - In its comments, the State of Colorado expressed significant concern about having a suitable segment on the Dolores River located at the Utah-Colorado border (Sections 17 and 18, T. 15 S., R. 104 W., 6th P.M.). If this river segment at the state boundary were to be designated into the National Wild and Scenic Rivers System, the designation would include a federal reserved water right. The federal reserved water right would entail certain flow rate requirements to maintain the outstandingly remarkable values identified by the BLM. The State of Colorado expressed concern that the federal reserved water right requirements at the state boundary could conflict with the state's water obligation deliveries to downstream states pursuant to the Colorado River Compact, and could conflict with the state's ability to fully develop its water entitlement under the compact. The BLM concluded that this potential conflict with state plans and objectives was significant enough to warrant a change from "suitable" to "not suitable." To maintain the river-related values identified for the state boundary segment, the BLM intends to manage this segment under an Area of Critical Environmental Concern designation and under Special Recreation Management Area designation. The BLM has crafted the ACEC and SRMA designations to have similar management objectives as the management standards that are associated with a "suitable" determination.

- Optimal Management for ORVs Under Partnership Approach – The BLM determined that the Dolores River segment adjacent to the Sewemup Mesa Wilderness Study Area is suitable because a "suitable" provides for optimal management of the ORVs. The BLM believes that the strict land management standards associated with a suitability determination, combined with a state-based instream flow water right to support flow-dependent values, will assure long-term maintenance of the ORVs. To support this long-term partnership approach, BLM's suitable determination includes the following finding: If the Colorado water court system decrees an instream flow water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

- Consistency – The lands found suitable for designation share similar qualities with portions of the river found suitable in neighboring BLM field offices.  These qualities include five or more ORVs, a high percentage of federal land ownership, minimal conflicts with competing land uses, significant and growing recreational use, and conditions little changed from the previous Wild and Scenic Rivers analysis performed in 1979.

- Management Opportunities – Designation would provide BLM with additional resources to manage recreational use that is already growing. Designation would

BLM_0022864

provide a permanent standard for managing growing public use in a manner that does not degrade the ORVs.

- Minimize Conflicts With Private Lands – By determining that the middle portion of the reach, from Cottonwood Canyon to 2.5 miles northwest of Gateway, is **not suitable**, BLM minimizes potential conflicts between private landowners and the protective provisions of the Wild and Scenic Rivers Act.  Specifically, the need to analyze projects proposed on private lands for potential impacts to Wild and Scenic River values would be minimized.  Such consultation occurs when a private landowner seek a federal permit or funding from other federal agencies, such as Army Corps of Engineers or National Resource Conservation Service. The need for consultation would be limited to projects on private land where the impacts of the proposed project stretch to upstream or downstream locations on federal lands. Projects with impacts limited strictly to private lands would not require detailed analysis for impacts to Wild and Scenic River values.  Projects on private lands that do not require a federal permit or federal agency funding would be exempt from any consultation requirements.

### 3.2.2   North Fork Mesa Creek

| | |
|---|---|
| **Description:** | BLM sections of North Fork Mesa Creek from the GJFO boundary with the Uncompahgre National Forest on the east, and flowing southwest to the boundary with the BLM, Uncompahgre Field Office. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 2.05 miles | **Total Segment Area:** | 699.96 acres |
| **Length on BLM Land :** | 2.05 miles | **Area on BLM Land:** | 699.96 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Vegetation | | |

*Suitability Factor Assessment*

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u> North Fork Mesa Creek is outstandingly remarkable for its vegetation. The tentative classification for this segment is scenic because there is an inconspicuous dirt road with multiple access points running parallel to the lower sections of the creek.

This segment contains sections of a type of Narrowleaf Cottonwood Riparian Forest *(Populus angustifolia/salix ligulfolia-Shepherdia argentea* woodland). This community is classified as critically imperiled globally (G1) and vulnerable statewide (S3) by the Colorado Natural Heritage Program (Colorado Natural Heritage Program 2009). A G1 conservation status rank indicates that a species or community is at very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors. Likewise, an S3 conservation status rank indicates that a species or community is imperiled in the state because of rarity due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors making it very vulnerable to extirpation from the state. The rarity and conservation value of this plant community would make this segment a worthy addition to the NWSRS.

BLM_0022865

There are only two active diversions along North Fork Mesa Creek from its headwaters to its confluence with the Dolores River. Both of these diversions are for irrigation purposes and have the potential to provide return flows. The CWCB also holds an instream flow right along this segment for the purpose of preserving the natural environment to a reasonable degree.

2.  <u>The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.</u>
The entire segment corridor flows through and is on BLM land; approximately 150 acres of the segment corridor at the downstream end of the segment are within the Uncompahgre Field Office planning area. In the past, uranium mining took place in the surrounding area, but most operations are closed or temporarily suspended as uranium mining is not currently as economically viable as other energy materials. The entire area is leased for oil and gas exploration, but there are no active wells. There is no oil and gas potential in the segment corridor. Two active mining claims overlap the segment corridor.

3.  <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>
WSR designation has the potential to foreclose or curtail future water development along this segment. With designation, BLM would obtain conditioning authority to control any proposed projects that would be incompatible or potentially degrading to the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds to evaluate the potential effects on the segment's values.

If designated, valid mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

If this segment is not designated, there is the potential for its vegetation values to diminish. The BLM does not have any management measures in place to protect the rare plant community found along this segment. Additional depletions of water from the creek could also diminish these values.

4.  <u>Federal, state, tribal, local, public, or other interest in designating or not designating the river.</u>
Neither support for nor has opposition to designation of this segment been expressed.

5.  <u>Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.</u>
The BLM manages all lands within this segment; acquisition of additional lands is not necessary. It is unlikely that the BLM would incur additional costs to manage the area if designated, partially due to the remote location of the segment. Nevertheless, designation of the segment would enhance the BLM's ability to obtain funding for the management of the segment. No detailed cost analysis or estimate was prepared as part of this study.

BLM_0022866

6. <u>Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.</u>

The BLM manages the entire segment corridor and could effectively manage this segment as a WSR. Additionally, the CWCB holds an instream flow right along this segment from Long Canyon to Cedar Tree Ditch. There are varying levels of instream flow appropriations throughout the year for the entire segment. Between April 1 and May 31, the appropriated instream flow is 2.75 cfs. It drops to 0.5 cfs between June 1 and February 29, and rises to 1.9cfs between March 1 and March 31. The instream flow right provides some additional protection for the vegetation values along this segment.

7. <u>Historical or existing rights that could be adversely affected with designation.</u>

There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>

The entire segment corridor is managed by the BLM.

9. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>

Refer to criterion #4.

10. <u>Consistency of designation with other agency plans, programs, or policies.</u>

The BLM Uncompahgre Field Office manages North Fork Mesa Creek downstream from this segment until it reaches the Dolores River. The Uncompahgre Field Office found North Fork Mesa Creek eligible with a vegetation ORV.

The Uncompahgre National Forest found the portion of North Fork Mesa Creek upstream of the BLM segment not eligible for inclusion in the NWSRS during the eligibility study for the Grand Mesa, Uncompahgre, and Gunnison National Forests land management plan revision process (US Forest Service 2006). The Uncompahgre National Forest manages the area surrounding North Fork Mesa Creek for livestock grazing and according to the following general principles: improve rangeland through vegetation and soil restoration practices, improved livestock management, and regulation of other resource activities; provide semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities; and use vegetation treatments to enhance plant and animal diversity. These management guidelines are generally consistent with BLM management that would occur with designation.

The Uncompahgre National Forest's 2007 proposed forest plan would manage this area as "backcountry—motorized trails." This management would be relatively passive and emphasize natural features of landscapes. Resource management activities would occur, but natural ecological processes and patterns would normally predominate. This management prescription

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022867

allows water development as a suitable use. (US Forest Service 2007) However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule. Management by the US Forest Service as backcountry—motorized trails has the potential to be inconsistent with designation (if the 2007 proposed plan becomes final) to the extent that future water development reduces stream flow or adversely affects the cottonwood communities downstream.

11. <u>Contribution to a river system watershed or basin integrity.</u>
North Fork Mesa Creek is a tributary to the Dolores River.

***Other Protections for Segment***

| North Fork Mesa Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Vegetation | NSO (300 acres), CSU (400 acres), TL (300 acres), VRM Class II (700 acres), ROW Avoidance (700 acres) |

***Suitability Determination***
BLM determined that this segment is **not suitable**, because stipulations and land use prescriptions in the Proposed RMP, along with an existing instream flow water right held by the CWCB, are adequate to protect the ORVs.

### 3.2.3   Blue Creek

| | |
|---|---|
| **Description:** | BLM sections of Blue Creek from the GJFO boundary with the Uncompahgre National Forest on the east, and flowing west to the confluence with the Dolores River. |
| **Total Segment Length:** | 11.36 miles   **Total Segment Area:**   3,335.98 acres |
| **Length on BLM Land :** | 10.08 miles   **Area on BLM Land:**   2,975.48 acres |
| **Tentative Classification:** | Scenic |
| **ORVs:** | Scenic, Fish, Cultural |

***Suitability Factor Assessment***

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
Blue Creek has outstandingly remarkable scenic, fish, and cultural values that would make it a worthy addition to the NWSRS, if designated by Congress. The tentative classification for this segment is scenic. There is an inconspicuous dirt road with multiple access points running parallel to the creek, in addition to some development and grazing in the creek corridor.

This segment has outstandingly remarkable scenic values. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery,

BLM_0022868

scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Blue Creek drops steeply off the Uncompahgre Plateau carving a canyon through the deep red sandstone of the area. This spectacular drop has formed a remarkable canyon with spectacular views of the Uncompahgre Plateau and Dolores River Canyon. The canyon as a whole is distinctive and rare in the region.

This segment also has remarkably outstanding fish values. Water flow in the segment is sufficient to maintain fish populations such as the bluehead sucker (Catostomus discobolus). The bluehead sucker is a BLM sensitive species (BLM 2000). The management objective for BLM sensitive species that are not federally listed as endangered or threatened is to initiate protective conservation measures that reduce or eliminate threats to minimize the likelihood of and need for listing of these species under the ESA. The CPW has also identified the bluehead sucker as a species of greatest conservation need in its Comprehensive Wildlife Conservation Strategy (CPW 2006).

This segment also has remarkably outstanding cultural values. Blue Creek contains important Native American sites from the formative period of cultures in this region and is important for current Native American concerns. Research from these sites has the potential to yield additional discoveries about the development of agriculture in the area. This creek canyon is a known transportation corridor with game trails used by Ute Tribes, later used as a pack trail to the Uranium mines, and as an early stock driveway that is still in use today.

The lower 3 miles lie within the Gateway SRMA. The lower 1.5 miles lie within the Dolores River Riparian ACEC. The BLM has proposed the Dolores River Riparian ACEC to provide special management attention to its fish (bluehead sucker), wildlife (peregrine falcon), scenic, and riparian habitat values.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 11.36-mile segment is a combination of federal (BLM and US Forest Service) and private. The BLM manages shoreline along 10.08 miles (89.9 percent) of the segment. Within the 3,335.98-acre study corridor, the BLM manages 2,975.48 acres (89.2 percent). The remaining 293.55 acres (8.8 percent) are privately owned. The US Forest Service manages the remaining land in the segment corridor (66.9 acres; 2 percent).

Most of the segment corridor upstream from Calamity Creek is leased for oil and gas development but there are no active wells. There is no oil and gas potential in this area. Active mining claims overlap a small portion of the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or place terms and condition on any proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

BLM_0022869

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, the BLM may allow new mining claims or mineral leases, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

4.   Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering the area for protection of the ORVs would be minimal. The segment is comprised mostly of BLM lands, and BLM is pursuing the acquisition of the private parcel along this segment at this time through a land exchange. Since the creek is small and many portions of the creek are not easily accessible, BLM would not expect visitation to the creek to increase dramatically. Designation of the segment would enhance the BLM's ability to obtain funding for management of this segment.

5.   Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

Under the Approved RMP, BLM will manage the stream corridor under VRM Class II, which will provide vigorous protection for the Scenic ORV. In addition, the lower portions of the stream corridor would fall within the Dolores River Riparian ACEC and within the Maverick Lands with Wilderness Characteristics area. These two designations would provide further protection of the scenic ORV by prohibiting development that would be inconsistent with riparian values and wilderness characteristics.

The CWCB holds an instream flow right on two different reaches of Blue Creek: from Massey Branch to Calamity Creek and from Calamity Creek to Tom Watkins Ditch. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, instream flow rights provide a measure of flow protection that supports the ORVs (especially fish) found on this segment. The decreed flow levels vary seasonally. Between the upper end of the segment and the confluence with Calamity Creek on private land (roughly 5.5 miles), the amounts are as follows: 5.5 cfs (April 15 to May 14); 2.1 cfs (March 15 to April 14 and (May 15 and June 14); and 0.5 cfs (June 15 to March 14). From the confluence with Calamity Creek on private land to the headgate of Tom Watkins Ditch (3.0 miles), the amounts are 3.5 cfs (April 15 to May 14), 1.0 cfs (March 15 to April 14 and May 15 to June 14), and 0.5 cfs (June 15 to March 14).

Cultural resources and historic values associated with the river segment are protected and regulated by a number of laws, regulations, executive orders, programmatic agreements, and other requirements. The principal federal law addressing cultural resources is the NHPA, and its implementing regulations (36 CFR 800). These regulations, commonly referred to as the Section 106 process, describe the procedures for identifying and evaluating historic properties, for assessing the effects of federal actions on historic properties, and for project proponents consulting with appropriate agencies to avoid, reduce, or minimize adverse effects.

The primary objective of managing cultural resources is the protection of the resource from damage or destruction. To the extent consistent with protection, the BLM also manages cultural resources for scientific research, public education and enjoyment. Any interpretation of these sites for public benefit must be compatible with the protection of cultural resources.

BLM_0022870

Management of the river to protect identified ORVs would include direct and indirect protection of cultural resources in the river corridor.

BLM is a signatory to the Rangewide Conservation Agreement for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker (Utah Department of Natural Resources, 2006). The strategy outlines conservation guidelines for habitat maintenance and protection, non-native fish control, population viability, and conservation genetics. This agreement and strategy will provide a layer of protection for the fish values along this segment even if it is not designated.

The bluehead sucker is also a BLM sensitive species and receives special management attention as a result. The BLM manages sensitive species and their habitats to minimize or eliminate threats affecting the status of the species or to improve the condition of the species habitat. The BLM achieves this through a variety of measures, including (1) ensuring that BLM activities are carried out consistently with species management objectives, (2) monitoring populations and habitats to determine whether species management objectives are being met, (3) working with partners and stakeholders to develop species-specific or ecosystem-based conservation strategies, (4) prioritizing Bureau sensitive species and their habitats for conservation action, and others.

6.   <u>Historical or existing rights that could be adversely affected with designation.</u>
There are only two active water diversions on Blue Creek and one active diversion on Calamity Creek (a tributary to Blue Creek); all divert water for irrigation purposes and have the potential to provide return flows. The ability to make changes to these water rights and to appropriate new water rights upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs.

7.   <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
This segment is within Mesa County. The area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. Mineral and extractive uses require 100-foot setback from the 100-year floodway. Nevertheless, these industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

8.   <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4.

BLM_0022871

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>

The Uncompahgre National Forest found the portion of Blue Creek upstream of the BLM segment not eligible for inclusion in the NWSRS during the eligibility study for the Grand Mesa, Uncompahgre, and Gunnison National Forests land management plan revision process (US Forest Service 2006). The Uncompahgre National Forest manages the area surrounding Blue Creek as "big game winter range in non-forest areas" and according to the following general prescriptions: (1) provide semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities; (2) manage motorized recreation prevent unacceptable stress on big game animals during primary big game use season; use vegetation treatments to enhance plant and animal diversity; and (3) manage livestock grazing to favor wildlife habitat.

The Uncompahgre National Forest's 2007 proposed forest plan would manage this area as backcountry. However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule. If the area was managed as backcountry, management would be relatively passive and emphasize natural features of landscapes. Resource management activities would occur, but natural ecological processes and patterns would normally predominate (US Forest Service 2007). Management by the US Forest Service either to provide big game habitat or as backcountry is unlikely to have an adverse effect on this segment's ORVs and is generally consistent with BLM management that would occur with designation.

The Colorado Division of Wildlife is a party to a multi-state conservation agreement specific to the bluehead sucker and two other fish species (Utah Department of Natural Resources, 2006). The purpose of this agreement is to expedite implementation of conservation measures to ensure the persistence of bluehead sucker populations throughout its range. Designation of this segment is generally consistent with this agreement.

10. <u>Contribution to a river system watershed or basin integrity.</u>

Blue Creek is a tributary to the Dolores River.

**Other Protections for Segment**

| Blue Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Fish, Cultural | NSO (1,600 acres), CSU (1,700 acres), TL (2,700 acres), VRM Class II (2,800 acres), ROW Exclusion (800 acres), ROW Avoidance (2,000 acres), Closed to Fluid Mineral Leasing (800 acres), ACEC overlap (100 acres), lands with wilderness characteristics overlap (800 acres) |

**Suitability Determination**

The suitability determination for this segment is **not suitable.** The fish ORV is protected by an existing instream flow water right, by BLM's commitment to manage for this sensitive species under multi-state conservation agreement, and by the appearance of the fish species on BLM

BLM_0022872

sensitive species list, which restricts management actions that could harm the species. The cultural ORV is protected by the provisions of the National Historic Preservation Act. The Scenic ORV will be protected by the proposed VRM Class II and by the Maverick Lands with Wilderness Characteristics prescription.

### 3.2.4   Gunnison River Segment 2

| | |
|---|---|
| **Description:** | Sections of the Gunnison River west of Highway 50 on BLM land from Whitewater to the Redlands Dam, south of Grand Junction and the Gunnison Rivers' confluence with the Colorado River. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 16.63 miles | **Total Segment Area:** | 5,273.45 acres |
| **Length on BLM Land :** | 3.85 miles | **Area on BLM Land:** | 1,375.21 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Fish, Historic | | |

*Suitability Factor Assessment*

1.   <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment contains outstandingly remarkable fish and historical values. The tentative classification of this segment is recreational because of a railroad and development above the canyon walls that are readily apparent from the river.

This segment has outstandingly remarkable fish values. The entire segment is USFWS-designated critical habitat for the federally endangered Colorado pikeminnow *(Ptychocheilus lucius)* and the Razorback sucker *(Xyrauchen texanus)* (59 Fed. Reg. 13,374). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico.

This segment also has outstandingly remarkable historical values. The Denver and Rio Grande Railroad (now part of Union Pacific) runs parallel to the segment and was the first line connecting Denver to Grand Junction, reaching the Grand Valley in 1882. The line then connected to Salt Lake City forming a narrow gauge transcontinental railroad link. The importance of the railroad in developing the West makes this site eligible for inclusion in the National Register of Historic Places. The BLM-managed portions of the segment study area lie within the Bangs Canyon SRMA.

This segment also has characteristics that may create significant management issues, if the segment were to be designated as part of the NWSRS. There are many upstream diversions along the Gunnison River and numerous diversions within this segment (roughly fifteen). The

BLM_0022873

diversions within this segment are generally for irrigation, industrial, commercial, and municipal purposes. Several of the diversions within this segment have conditional water rights. If made absolute, these water rights could result in additional depletions and additional water development and diversion structures along the river corridor. The community of Whitewater lies along this segment of the river and portions of the segment corridor overlap the Grand Junction city limits. Future population growth, expansion, and the associated development of these communities, particularly along the riverfront, have the potential to change the setting found in this segment.

2.  The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.
The BLM manages 1,375.21 acres (26.1 percent) of the land within the 5,273.45-acre study corridor and 3.85 miles (23.2 percent) of the segment shoreline. The remaining land status consists of 3,899.24 acres (73.9 percent) in private ownership. The segment corridor is not leased for oil and gas development. There is no oil and gas potential for the BLM-managed lands in the segment corridor, and there are no active mining claims in the segment corridor.

The BLM does not have authority over maintenance, operation, and construction activities associated with the railroad, though activities associated with it are not likely to impact the ORVs. The Department of Transportation, pursuant to the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.
WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or to impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other agencies to evaluate the potential effects on the segment's values.

BLM is not aware of any major proposed water supply projects within this segment. The Colorado Statewide Water Supply Initiative concluded that Delta and Mesa Counties would be able to meet nearly all of the estimated demand for water in the Gunnison River basin through 2030 by utilizing Tri-County Water Conservancy District water rights, existing supplies, agricultural transfers, and an Uncompahgre Project Water Right. (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004)

Several conditional storage water rights along and upstream from this segment have the potential to affect the identified ORVs. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the

water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The volume of conditional storage rights in the Gunnison River Basin totals over 2 million acre-feet. Water District 40 (North Fork Gunnison/Gunnison Rivers) accounts for approximately 290,000 acre-feet of conditional storage rights. The majority of these rights which have priority dates ranging from 1960-1980, with some as early as 1900-1920 (SWSI). The development of conditional water rights both along the segment and upstream from the segment has the potential to affect the fish values along this segment.

Presently, there are no state-based instream flow water rights in this reach to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flows rates are the result of required deliveries to senior water rights within and downstream from this segment, water releases from US BOR's Aspinall Unit Reservoirs (Blue Mesa, Morrow Point, and Crystal) and Ridgeway Reservoirs, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9).

The USFWS has developed flow recommendations for the Gunnison River to benefit endangered fish. In addition, the US BOR is currently undergoing an EIS process regarding reoperation of the Aspinall Unit, in which flow regimes would be modified to support threatened and endangered fish species. Flow recommendations are not absolute values and may be revised from time to time include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth and survival of young fish. Although there is no instream-flow right along this segment, USFWS flow recommendations provide a layer of protection for the ORVs.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The majority of land in this segment is privately owned. The BLM would not pursue land acquisition, as it is not feasible to acquire enough land to affect its ability to manage the segment. The cost of administering this area (protecting and enhancing the ORVs) would likely remain roughly the same if designated. The BLM already incurs costs associated with the protection of the ORVs through its administration of other statutory requirements (the ESA and the National Historic Preservation Act).

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM's land management authorities can adequately protect the federal lands in the river corridor. However, the BLM does not have authority over private lands in the corridor, nor

BLM_0022875

does it have authority to protect the stream flows necessary to support the ORVs. Designation would provide a comprehensive framework for cooperating with local governments to encourage land uses that are compatible with the ORVs, and designation would provide a federal water right that would assist with flow protection.

The makeup of this segment hinders the BLM's ability to manage it effectively as a WSR. The majority of the shoreline and the segment corridor falls under private ownership. The BLM only manages roughly a quarter of the lands within the segment corridor. The BLM does not control uses or activities on private lands, making effective management of this segment difficult. Further, the downstream end of the segment overlaps the Grand Junction city limits, and the upstream end of the segment neighbors the community of Whitewater. As these communities continue to grow, it will become increasingly difficult to manage this segment as a WSR and to prevent incompatible development on private lands.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow, Razorback sucker, bonytail chub, and humpback chub. Areas designated as critical habitat receive protection under section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

Historical values associated with the river segment are protected and regulated by a number of laws, regulations, executive orders, programmatic agreements, and other requirements. The principal federal law addressing cultural resources is the NHPA, and its implementing regulations (36 CFR 800). These regulations, commonly referred to as the Section 106 process, describe the procedures for identifying and evaluating historic properties, for assessing the effects of federal actions on historic properties, and for project proponents consulting with appropriate agencies to avoid, reduce, or minimize adverse effects.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1.  BLM should continue to rely on the provisions of the Colorado Endangered Fish Recovery Program. Including the designation of critical habitat along this stream reach, to protect the Fish ORV.

BLM_0022876

2. The railroad right-of-way that forms the basis for the historical ORV is not at risk.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

6. <u>Historical or existing rights that could be adversely affected with designation.</u>
This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs.

Numerous absolute water rights exist along this segment of the Gunnison River. Under designation, historical operation, maintenance, and access activities on federal lands can continue. While these historical rights would not be affected by designation of the segment, changes to these water rights and the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
This segment is within Mesa County. The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area. The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs.

A small portion of the study area is within the Residential-Single-Family (RSF-4) district. This district is primarily intended to accommodate medium density, single family residential development (Mesa County 2008). Because such a small portion of the study area is within the RSF-4 district, it is unlikely that the zoning would adversely impact the ORVs.

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4.

BLM_0022877

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>
The Colorado pikeminnow and razorback sucker are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b). Designation would be consistent with this program.

The National Park Service determined that a 12-mile segment of the Gunnison River (as it flows through the Black Canyon of the Gunnison National Park) is suitable for inclusion in the NWSRS. The tentative classification for this segment is a combination of Wild and Scenic. Designation of this segment would be consistent with the previous National Park Service determination.

The BLM Uncompahgre Field Office determined that a 16–mile segment of the Gunnison River (as it flows through the Gunnison Gorge NCA) is suitable for inclusion in the NWSRS. The tentative classification for this segment is a combination of Wild and Recreational (Record of Decision, Gunnison Gorge National Conservation Area Resource Management Plan and Final Environmental Impact Statement, 2004). The Uncompahgre Field Office also determined two other segments of the Gunnison River as eligible. These include a 17.48-mile segment immediately upstream from the Grand Junction planning area boundary and a 0.41-mile segment on BLM-managed lands northeast of Delta. The BLM will make suitability determinations on these segments as part of the Uncompahgre RMP revision and the Dominguez-Escalante NCA planning process. Designation would be consistent with the determinations of the Uncompahgre Field Office; it is not known at this time whether the eligible segments of the Gunnison River upstream from the GJFO will be determined suitable.

10. <u>Contribution to a river system watershed or basin integrity.</u>
The Gunnison River is a tributary of the Colorado River.

***Other Protections for Segment***

| Gunnison River Segment 2 | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish, Historic | NSO (1,000 acres), CSU (500 acres), TL (500 acres), VRM Class II (600 acres), ROW Exclusion (400 acres), ROW Avoidance (500 acres), Closed to Fluid Mineral Leasing (900 acres), lands with wilderness characteristics overlap (400 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable.** The Colorado River Recovery Program, designation of critical habitat by the USFWS, and the USFWS flow recommendations for the Gunnison River flow provide sufficient for the fish ORV. Current federal laws and authorities provide sufficient protection for the historical ORV.

BLM_0022878

The makeup of this segment would make effective management as a WSR challenging. The BLM only manages about a quarter of the shoreline and lands in the segment corridor. Mesa County zoning does not prevent development that is incompatible with WSR designation. The Agricultural, Forestry, Transitional district allows extractive uses (either as of right or conditionally) that have the potential to change the landscape and setting found along this segment. Also, this segment overlaps the city limits of Grand Junction and the community of Whitewater. As these communities continue to grow, the potential for incompatible development in the segment corridor will correspondingly increase.

## 3.3   ROAN CREEK

| | | | |
|---|---|---|---|
| **Description:** | From the headwaters in the northern part of the GJFO to the confluence with Carr Creek. | | |
| **Total Segment Length:** | 17.04 miles | **Total Segment Area:** | 4,960.38 acres |
| **Length on BLM Land :** | 6.47 miles | **Area on BLM Land:** | 2,563.97 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Fish | | |

*Suitability Factor Assessment*

1.   <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment contains outstandingly remarkable fish values. The tentative classification for this segment is scenic due to access via a dirt road.

The creek contains a core conservation population of Colorado River cutthroat trout *(Oncorhynchus clarki pleuriticus)* (CRCT Conservation Team 2006), a BLM sensitive species (BLM 2000) and a Colorado species of special concern (CPW 2007). However, recent genetic work suggests that this population is more closely related to greenback cutthroat trout *(Oncorhynchus clarki stomias)*, a federally threatened species. Although Carr Creek is outside of what is considered the "native range" of greenback cutthroat, the USFWS considers this population greenback cutthroat for the purposes of the ESA.

The cutthroat trout is the most diverse trout species in North America, and its historical distribution covers the broadest range of any stream-dwelling trout in the Western Hemisphere. Today, they exist in only about 5 percent of their original range. Their numbers have declined due to over-fishing, stocking of rainbow, brook, brown, and Yellowstone cutthroat trout in their habitat, and loss of high-quality trout stream habitat due to logging, livestock over-grazing, water diversions and municipal and industrial pollution.

In a 2004 landscape health assessment, Roan Creek was rated as functioning-at-risk because of insufficient stream bank vegetation resulting from heavy livestock use. Road encroachment and crossings are keeping banks unstable. Current beaver ponds are unstable because of the lack of large-diameter materials.

Grazing is permitted throughout the study corridor and occurs on both BLM and private land. Overgrazing and poor management practices are disrupting the riparian ecosystem.

BLM_0022879

The Roan and Carr Creeks ACEC in the Approved RMP overlaps with nearly all of the BLM-managed lands in this study area. The public and the BLM have proposed this ACEC to provide special management attention to the area's riparian habitat, fish, wildlife, and plant values.

There are five active water diversions within the segment study area and several more diversions outside the study area that affect flows in Roan Creek. Diversions are primarily for irrigation purposes and have the potential to provide return flows to Roan Creek.

2.  The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 17.04-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 6.47 miles (38.0 percent) of the segment. Within the 4,960.38-acre study corridor, the BLM manages 2,563.97 acres (51.7 percent). The remaining 2,396.41 acres in the segment corridor (48.3 percent) are in private ownership.

Nearly all of the BLM-managed lands in the segment corridor are leased for oil and gas exploration, and there are eight active wells within the segment corridor. Additionally, there are several active wells outside of the study corridor on both BLM and private land. There are no active mining claims in the segment corridor.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

As discussed below, existing mechanisms and management tools would reduce the potential for adverse effects on the fish values in this segment if it were not designated.

4.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

If designated, it is possible that the cost of administering the area to protect and enhance the cutthroat trout would increase because of the mandate to do such. The BLM would/would not pursue land acquisition along this segment at this time. A detailed cost analysis was not done as part of this study.

BLM_0022880

5.  Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM only manages 38.0 percent of the shoreline of this segment and about half of the land in the segment corridor. The BLM's limited ownership of the shoreline would make management of this segment as a WSR challenging. However, other mechanisms are in place that will protect the fish values on this segment.

The greenback cutthroat trout receives protection under the ESA, while the Colorado River cutthroat trout receives protection by virtue of appearing on the BLM's official sensitive species list. The USFWS has advised the BLM to treat the fish population as though it were threatened greenback cutthroat trout, despite the current genetic uncertainty surrounding this population. Accordingly, the BLM will determine the effects on these fish from any actions it funds, authorizes, or undertakes. The BLM will initiate ESA consultation if it determines that an action may affect these fish. If the fish population turns out be Colorado River cutthroat trout, the BLM sensitive species manual guidance specifies that the population should be managed in a fashion similar to species that are listed under the ESA.

The "Greenback Cutthroat Trout Recovery Plan" (USFWS 1998) provides a framework for maintaining and enhancing current known populations of greenback cutthroat trout and for creating new populations of the species where feasible. Involved parties include the BLM, US Forest Service, USFWS, National Park Service, and CPW. The BLM, consistent with the position of the USFWS, intends to manage this segment in accordance with the conservation agreement.

The BLM is capable of managing for the protection of the cutthroat trout through incorporation of protective measures in its RMP. For example, the BLM will manage the area as an ACEC to protect the greenback cutthroat trout. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. Management actions of this ACEC include: (1) only allow vegetation treatments for the benefit of the identified relevant and important values (i.e., fish); (2) classify as closed to unauthorized motorized travel activities, including over-the-snow travel; (3) issue no special recreation permits for special or competitive events; and (4) close to mineral material sales and withdraw from coal leasing.

The CWCB holds an instream flow right on Roan Creek. There are varying levels of instream flow appropriations throughout the year for the entire segment. Between April 1 and October 31, the appropriated instream flow is 1.75 cfs. For the remainder of the year, the appropriated instream flow is 1.25 cfs. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORV found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

BLM_0022881

1. BLM should continue to rely upon the appearance of cutthroat trout species on its sensitive species list as mechanism to insure that fish needs are considered in BLM plans and actions.

2. BLM should continue to rely upon the existence of an instream right held by the CWCB to protect the fish ORV.

3. BLM should continue to rely upon the inaccessibility of the creek as a method to protect the Fish ORV.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

6. <u>Historical or existing rights that could be adversely affected with designation.</u>
There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
Roan Creek is in Garfield County and is zoned as Resource Lands. The Resource Lands zone has limited potential to prevent development that is incompatible with protection of the ORV. Land types and uses within the Resource Lands zone include irrigated agriculture, grazing, farm and ranch residences, meadow hay land, and waste land (Garfield County 2008). Also, conditional uses in the Resources Lands zone include mineral extraction, forestry, mineral waste disposal, oil and gas drilling, and utility lines. The allowable uses along this segment include numerous forms of industrial development and resource extraction. These uses may result in development that is incompatible with the protection of this segment's ORV.

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4.

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>
In order for the greenback cutthroat trout to be considered recovered and delisted from the federally threatened and endangered species list, populations meeting a certain criteria must be documented in its native range, which is Arkansas and South Platte drainages on the Colorado Front Range (USFWS 1998). Thus, while designation for the protection of the greenback cutthroat trout would support the recovery of the species, it would not contribute to its delisting.

10. <u>Contribution to a river system watershed or basin integrity.</u>
Roan Creek is a tributary to the Colorado River.

BLM_0022882

*Other Protections for Segment*

| Roan Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish | NSO (500 acres), CSU (1,400 acres), TL (1,700 acres), VRM Class III, ACEC overlap (1,900 acres), ROW Avoidance (2,000 acres), closed to mineral material sales (1,900 acres) |

### Suitability Determination

The suitability determination for this segment is **not suitable**. The ORV for this segment is for greenback cutthroat trout that are present. Mechanisms other than WSR designation can adequately protect these fish. The Roan and Carr Creeks ACEC, if chosen, would provide special management attention, limit allowable uses, and direct management actions to protect this fish population. The cutthroat trout are protected as special status species regardless of designation.

Other factors would make management of this segment in the NWSRS challenging and not the most effective use of the BLM's limited funds and management resources. The BLM manages only about a third of the shoreline and just over half of the land in the segment corridor. A cohesive and comprehensive management approach to this segment is difficult because the makeup of the segment is scattered and fragmented. In several places, the BLM manages only one side of the shoreline. The longest contiguous section of land in this segment where the BLM manages both sides of the shoreline is only two miles. As stated above, an ACEC overlaps some of the segment (roughly uppermost three-quarters), but this special management does not apply to the private lands in that section or to the remainder of the segment.

Additionally, there are oil and gas leases on nearly all of the BLM land in the corridor, and there are eight active wells in the corridor. BLM's permits for authorization to drill wells contain stipulations designed to protect the cutthroat trout population. Finally, the CWCB holds an instream flow water right on this creek that is designed to provide flow rates that support the fish population. This water right is a viable alternative to the federal reserved water right that would come with designation as a Wild and Scenic River.

## 3.4 CARR CREEK

| | |
|---|---|
| **Description:** | From the headwaters in the northern part of the GJFO to the confluence with Roan Creek. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 15.10 miles | **Total Segment Area:** | 4,916.51 acres |
| **Length on BLM Land :** | 5.06 miles | **Area on BLM Land:** | 2,289.73 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Fish | | |

### Suitability Factor Assessment

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment contains outstandingly remarkable fish values. The tentative classification for this segment is scenic due to access via a dirt road.

The creek contains a core conservation population of Colorado River cutthroat trout (*Oncorhynchus clarki pleuriticus*) (CRCT Conservation Team 2006), a BLM sensitive species (BLM 2000) and a Colorado species of special concern (CPW 2007). However, recent genetic work suggests that this population is more closely related to greenback cutthroat trout *(Oncorhynchus clarki stomias)*, a federally threatened species. (Colorado Parks and Wildlife, 2011, "Native cutthroat trout populations displaying the lineage GB genotype identified west of the Continental Divide.") Although Carr Creek is outside of what is considered the "native range" of greenback cutthroat, the USFWS considers this population greenback cutthroat for the purposes of the ESA.

The cutthroat trout is the most diverse trout species in North America, and its historical distribution covers the broadest range of any stream-dwelling trout in the Western Hemisphere. Today, they exist in only about five percent of their original range. Their numbers have declined due to over-fishing, stocking of rainbow, brook, brown, and Yellowstone cutthroat trout in their habitat, and loss of high-quality trout stream habitat due to logging, livestock over-grazing, water diversions and municipal and industrial pollution.

The area is permitted for livestock grazing though the permittee does not graze the land. A locked gate on private land downstream of the segment prevents public access to the segment.

The Roan and Carr Creeks ACEC overlaps roughly four miles of the uppermost portion this segment. The public and the BLM have proposed this ACEC to provide special management attention to the area's riparian habitat, fish, wildlife, and plant values.

There are approximately a dozen active water diversions along this segment and several more diversions lie outside the study area but have the potential to affect flows in the creek. Diversions in this area are primarily for irrigation purposes and have the potential to provide return flows to the creek.

2. <u>The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.</u>
Land ownership for this 15.10-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 5.06 miles (33.5 percent) of the segment. Within the 4,916.51-acre study corridor, the BLM manages 2,289.73 acres (46.6 percent). The remaining land status is composed of 2,626.78 acres (53.4 percent) in private ownership.

The segment corridor is leased for oil and gas exploration along roughly the downstream most 3.5 miles. There are 6 active wells within the study corridor (all on private land). The oil and gas potential on BLM lands is low along roughly the upstream most 5 miles of the segment. The oil and gas potential is moderate along the remaining BLM lands in the segment corridor. There are no active mining claims in the segment corridor.

BLM_0022884

3. <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

As discussed below, existing mechanisms and management tools would reduce the potential for adverse effects on the fish values in this segment if it were not designated.

4. <u>Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.</u>

The cost of administering the area would not likely increase over current levels because public access to the segment is limited. The majority of land in this segment corridor is privately owned. The BLM would not pursue land acquisition, as it is not feasible to acquire enough land to affect its ability to manage the segment.

5. <u>Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.</u>

The Greenback Cutthroat Trout receives protection under the ESA, while the Colorado River Cutthroat Trout receives protection by virtue of appearing on the BLM's official sensitive species list. The USFWS has advised the BLM to treat the fish population as though it were threatened greenback cutthroat trout, despite the current genetic uncertainty surrounding this population. Accordingly, the BLM will determine the effects on these fish from any actions it funds, authorizes, or undertakes. The BLM will initiate ESA consultation if it determines that an action may affect these fish. If the fish population turns out be Colorado River Cutthroat Trout, the BLM sensitive species manual guidance specifies that the population should be managed in a fashion similar to species that are listed under the ESA.

The "Greenback Cutthroat Trout Recovery Plan" (USFWS 1998) provides a framework for maintaining and enhancing current known populations of greenback cutthroat trout and for creating new populations of the species where feasible. Involved parties include the BLM, US Forest Service, USFWS, National Park Service, and CPW. The BLM, consistent with the position of the USFWS, intends to manage this segment in accordance with the conservation agreement.

The BLM is capable of managing for the protection of the cutthroat trout through incorporation of protective measures in its RMP. For example, the BLM will manage the upper portion of the area as an ACEC to protect cutthroat trout. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural

BLM_0022885

systems or processes. Management actions of this ACEC include: (1) only allow vegetation treatments for the benefit of the identified relevant and important values (i.e., fish); (2) classify as closed to unauthorized motorized travel activities, including over-the-snow travel; (3) issue no special recreation permits for special or competitive events; and (4) close to mineral material sales and withdraw from coal leasing.

The CWCB holds an instream flow right on Carr Creek. There are varying levels of instream flow appropriations throughout the year for the entire segment. Between April 1 and August 31, the appropriated instream flow is 2.0 cfs. It drops to 1.0 cfs between September 1 and October 31, and again to 0.5 cfs between November 1 and March 31. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORV found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely upon the appearance of cutthroat trout species on its sensitive species list as mechanism to insure that fish needs are considered in BLM plans and actions.

2. BLM should continue to rely upon the existence of an instream right held by the CWCB to protect the fish ORV.

3. BLM should continue to rely upon the inaccessibility of the creek as a method to protect the Fish ORV.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.
There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.
Carr Creek is in Garfield County and is zoned as Resource Lands. The Resource Lands zone has limited potential to prevent development that is incompatible with protection of the ORV. Land types and uses within the Resource Lands zone include irrigated agriculture, grazing, farm and ranch residences, meadow hay land, and waste land (Garfield County 2008). Also, conditional uses in the Resources Lands zone include mineral extraction, forestry, mineral waste disposal, oil and gas drilling, and utility lines. The allowable uses along this segment include numerous

BLM_0022886

forms of industrial development and resource extraction. These uses may result in development that is incompatible with the protection of this segment's ORV.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.
Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.
In order for the greenback cutthroat trout to be considered recovered and delisted from the federally threatened and endangered species list, populations meeting a certain criteria must be document in its native range, which is Arkansas and South Platte drainages on the Colorado Front Range (USFWS 1998). Thus, while designation for the protection of cutthroat trout may support the recovery of the species, it would not contribute to delisting.

10. Contribution to a river system watershed or basin integrity.
Carr Creek is a tributary to Roan Creek, which flows into the Colorado River near De Beque.

**Other Protections for Segment**

| Carr Creek | |
| --- | --- |
| **Outstandingly Remarkable Values** | **Protections** |
| Fish | NSO (1,100 acres), CSU (600 acres), TL (100 acres), ROW Avoidance (1,700 acres), ACEC overlap (1,700 acres) |

**Suitability Determination**
The suitability determination for this segment is **not suitable**. The ORV for this segment is for greenback cutthroat trout that are present. Mechanisms other than WSR designation can adequately protect these fish. The Roan and Carr Creeks ACEC will provide special management attention, limit allowable uses, and direct management actions to protect this fish population. The cutthroat trout are protected as special status species regardless of designation.

Other factors would make management of this segment in the NWSRS challenging and not the most effective use of the BLM's limited funds and management resources. The BLM is a minority landowner on this segment. It only manages a third of the shoreline and less than half of land in the segment corridor. As stated above, an ACEC overlaps the upper portion of the segment (roughly uppermost four miles) where the BLM manages the entire shoreline and all of the surrounding land in the corridor. However, the special management afforded by the ACEC does not apply to the remainder of the segment where land ownership is fragmented.

Additionally, there are oil and gas leases on nearly all of the BLM land in the corridor, and there are eight active wells in the corridor. BLM's permits for authorization to drill wells contain stipulations designed to protect the cutthroat trout population. Finally, the CWCB holds an instream flow water right on this creek that is designed to provide flow rates that support the

fish population. This water right is a viable alternative to the federal reserved water right that would come with designation as a Wild and Scenic River.

## 3.5   ROUGH CANYON CREEK

| | | | |
|---|---|---|---|
| **Description:** | Sections of Rough Canyon Creek on BLM land located south of Grand Junction in the Bangs Canyon SRMA. | | |
| **Total Segment Length:** | 4.21 miles | **Total Segment Area:** | 1,356.52 acres |
| **Length on BLM Land :** | 4.21 miles | **Area on BLM Land:** | 1,248.06 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Scenic, Wildlife, Geologic | | |

*Suitability Factor Assessment*

1.  <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u> Rough Canyon Creek is an intermittent stream and contains outstandingly remarkable scenic, geologic, and wildlife values. The tentative classification of this segment is scenic due to an inconspicuous dirt road that runs parallel to the creek for most of its extent.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Deep canyons exposing multiple layers of rock as old as the Precambrian create outstandingly remarkable scenery. A classic faulted monocline next to the creek adds to the unusual and spectacular scenery.

This segment has outstandingly remarkable geologic value. The faulted monocline within Rough Canyon is readily visible from the creek and provides a textbook example of the feature. The exposed fault has provided evidence of the formation of the Uncompahgre Plateau.

This segment has outstandingly remarkable wildlife value. Rough Canyon Creek is an important Canyon Tree Frog *(Hyla arenicolor)* breeding area with many breeding pools found in surveys of this area. The Canyon Tree Frog is a BLM sensitive species (BLM 2000). The management objective for BLM sensitive species that are not federally listed as endangered or threatened is to initiate protective conservation measures that reduce or eliminate threats to minimize the likelihood of and need for listing of these species under the ESA. The CPW identified the Canyon Tree Frog as a species of greatest conservation need in its Comprehensive Wildlife Conservation Strategy (CPW 2006).

This segment has characteristics in addition to its ORVs that add to its value as a potential addition to the NWSRS. The majority of the study area (4.09 miles, 874.61 acres) is within the Rough Canyon research natural area and ACEC. The BLM has proposed to expand this existing ACEC to provide special management attention to its plant, fish and wildlife, scenic, cultural, and geologic values. The study corridor is also within the Bangs Canyon SRMA. While the SRMA is available for a wide-range of activities, Rough Canyon is protected from surface-disturbing

BLM_0022888

activities and the canyon floor is open to foot and equestrian traffic only. The Tabeguache Trail follows the eastern rim of the canyon and is a motorized trail. Lastly, there are no active diversions along Rough Canyon Creek.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

The shoreline for this 4.21-mile segment is entirely managed by BLM. Within the 1,356.52-acre study corridor, the BLM manages 1,248.06 acres (92.0 percent), and the remaining 108.46 acres (8.0 percent) are privately owned. The segment corridor is not leased for oil and gas development; there are no active wells in the corridor; and the oil and gas potential is very low.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect water development along this segment. However, the potential for future water development is very low due to the intermittent nature of the creek and its remote location. If designated, it is expected that management practices would be similar to existing management practices. Hiking in the canyon could increase with designation and threaten the ORVs, particularly the canyon treefrog habitat. The values along this segment likely would not diminish if the segment was not designated because other management tools provide adequate protection, as discussed below.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering this area is not likely to increase substantially if designated. The BLM already devotes funding to this area for its management of the Bangs Canyon SRMA and the Rough Canyon ACEC.

The acquisition of private lands is not essential for management for the protection of the ORVs because the BLM manages nearly all of the lands within the segment corridor. Nevertheless, the BLM would pursue acquisition of private parcels from willing sellers. No detailed cost estimate was prepared as part of this study.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM could manage this segment effectively as a WSR. The BLM manages all of the shoreline along this segment and 92 percent of the acres in the segment corridor. Other means also exist to protect the identified values other than WSR designation.

The BLM currently manages the segment corridor as part of the Rough Canyon research natural area and ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. This provides a layer of protection for the scenic, wildlife, and geologic ORVs.

The BLM also manages the segment corridor as part of the Bangs Canyon SRMA. Braided routes on the canyon floor and a lack of interpretive educational efforts put the identified ORVs,

BLM_0022889

specifically the canyon treefrog, at risk. However, increased efforts by the BLM to educate users and close trails would minimize adverse impacts.

The BLM's VRM system provides some protection for the scenic values of this segment. The segment corridor is managed as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. Class II protection also provides some protection against visual disturbance which could indirectly protect the geologic value by minimizing the possibility of significant development in the area.

6. <u>Historical or existing rights that could be adversely affected with designation.</u>
No historical or existing rights have been identified for this segment.

7. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
This segment is within Mesa County. There are parcels of private land within the watershed but not directly located on the creek. The private lands are within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

The Mesa Land Trust holds a conservation easement on a very small portion of the private land at the upstream end of the segment corridor (about 20 acres). Conservation easements are voluntary, perpetually binding documents that restrict development of a property. Conservation easements have the general purposes of conserving agricultural productivity, open space character, wildlife habitat, and scenic qualities, and for preventing any uses that will impair or interfere with the conservation values of the property (such as industrial uses). With regard to water use, conservation easements allow the maintenance of existing water systems and the development of new water sources, provided that such maintenance or development does not substantially diminish the conservation values of the property.

In sum, even though Mesa County zoning may allow incompatible development, the private lands in the segment corridor make up such a small percentage (8 percent) that adverse effects to ORVs from incompatible development is unlikely.

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>

Refer to criterion #4.

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>

Designation to protect the canyon treefrog would be consistent with the CPW initiative to protect the species.

10. <u>Contribution to a river system watershed or basin integrity.</u>

Because the creek is intermittent, the Gunnison River does not rely upon a contribution from Rough Canyon Creek to meet average flow levels.

11. <u>Other issues and concerns, if any.</u>

None.

***Other Protections for Segment***

| Rough Canyon Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Wildlife, Geological | NSO and TL (1,200 acres), CSU (800 acres), VRM Class II (1,200 acres), ROW Exclusion (1,000 acres), ROW Avoidance (200 acres), Closed to Fluid Mineral Leasing (1,200 acres), ACEC overlap (900 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. The BLM can adequately protect the ORVs along this segment with other administrative protections. The increased visitation that would likely accompany designation has the potential to have an adverse effect on the wildlife (canyon tree frog habitat) value of the segment. As such, the BLM will protect the ORVs of this segment utilizing existing means other than designation. For example, the BLM's VRM system provides a layer of protection for the scenic and geologic values. The BLM manages this area as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape.

The Rough Canyon ACEC also provides special management attention to values in this area (geologic, wildlife habitat, archaeological, and plants) that parallel the ORVs of this segment. For these reasons, the BLM determines that this segment is not suitable for inclusion in the NWSRS.

## 3.6   UNAWEEP CANYON COMPLEX

### 3.6.1   East Creek

BLM_0022891

**Description:**                    Sections of East Creek on BLM land running parallel to
                                    Highway 141 from the Unaweep Divide to East Creek's
                                    confluence with the Gunnison River near Whitewater.

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 20.26 miles | **Total Segment Area:** | 6,220.63 acres |
| **Length on BLM Land :** | 8.96 miles | **Area on BLM Land:** | 3,601.84 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Geologic | | |

*Suitability Factor Assessment*

1.  <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment has outstanding geologic value. The tentative classification for this segment is
recreational because Highway 141 runs parallel to the creek. Frequent traffic and transmission
lines are readily apparent. With regard to its geologic value, East Creek flows east from the
Unaweep Divide, through Unaweep Canyon, to the Gunnison River. West Creek flows west
from Unaweep Divide and into the Dolores River. These creeks originate in the canyon and do
not have a source large enough to create a canyon of such magnitude. It is hypothesized that
Unaweep Canyon was carved by one or both of the modern day Gunnison or Colorado Rivers.
The second uplift of the Uncompahgre Plateau probably rerouted one or both of these rivers.
This has led to the exposure of multiple layers of rock, including the Precambrian basement
layer of the Uncompahgre Plateau, and high canyon walls of up to 1000 feet. The divide located
in the middle of the canyon separating East and West Creeks is rare (Foutz 1994) and Unaweep
Canyon is the only known canyon in the world with a divide in the middle and a creek flowing
out of each end (Ikenberry 2002). Approximately one-third of the study area (1,929.99 acres) is
within the Bangs Canyon SRMA. Also, a small portion of the study area lies within the
Dominguez-Escalante NCA. Congress designated the Dominguez-Escalante NCA to:

> "[C]onserve and protect for the benefit and enjoyment of present and future
> generations--(1) the unique and important resources and values of the land, including
> the geological, cultural, archaeological, paleontological, natural, scientific, recreational,
> wilderness, wildlife, riparian, historical, educational, and scenic resources of the public
> land; and (2) the water resources of area streams, based on seasonally available flows,
> that are necessary to support aquatic, riparian, and terrestrial species and communities."
> (Public Law No. 111-11).

In a 2007 landscape health assessment, East Creek was rated as functioning-at-risk because of
insufficient bank vegetation and streambed disturbance related to recreational use along the
banks and off-highway vehicle use.

There are seven active diversions within the study area. These diversions are primarily for
irrigation purposes and have the potential to provide return flows to the creek.

2.  <u>The status of landownership, minerals (surface and subsurface) use in the area, including the
    amount of private land involved and associated or incompatible uses.</u>
Land ownership for this 20.26-mile segment is a combination of federal (BLM) and private. The
BLM manages shoreline along 8.96 miles (44.2 percent) of the segment. Within the 6,220.63-

BLM_0022892

acre segment corridor, the BLM manages 3,601.84 acres (57.9 percent). The remaining land status is composed of 4,014.64 acres (42.1 percent) in private ownership.

The BLM-managed lands in the segment corridor to the southeast of Highway 141 lie within the Dominguez-Escalante NCA (approximately 25 percent of this study area for this segment). The Omnibus Public Land Management Act of 2009 withdrew all BLM-managed lands in the Dominguez-Escalante NCA from "location, entry, and patent under the mining laws; and operation of the mineral leasing, mineral materials, and geothermal leasing laws." (Public Law No. 111-11) There is very low oil and gas potential on the remaining BLM lands in the segment corridor. There are no active oil and gas wells, oil and gas leases, or mining claims in this area.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

The geologic value of this segment likely would not be foreclosed or diminished if the segment was not designated. As discussed above, Unaweep Canyon is thought to have been formed by either the Gunnison or Colorado Rivers. Then, the second uplift of the Uncompahgre Plateau rerouted one or both of these rivers. This value does not depend directly on flows in East Creek, and administrative provisions in the BLM land use plan will prevent outstanding expressions of the geologic value from being inappropriately developed.

4.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

If designated, it is unlikely that the cost of administering the area would increase dramatically over the current level, as the area already sees a moderate amount of activity from scenic drivers and because the highway serves as a corridor to the Gateway area and Southwest Colorado. BLM has already developed turnouts, signage, and other recreational infrastructure along the segment to accommodate the existing use. Further, the protection of this segment's geologic value does not require the active management that an ecosystem-based ORV, such as wildlife or fish, would. The BLM would not pursue land acquisition along this segment at this time.

5.  Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM manages less than half of the shoreline of this segment and only 57.1 percent of the lands in the segment corridor, making effective management of the segment as a WSR challenging.

Other administrative management tools provide some protection for this segment's ORV. Almost half of the study area (2,748.66 acres) is managed as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to

BLM_0022893

the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. Class II protection provides some protection against visual disturbance which could indirectly protect the geologic value by minimizing the possibility of substantial development in the area. This segment flows along the boundary of the Dominguez-Escalante NCA which was designated to conserve and protect, among other resources, its geological values. Nearly 25 percent of the study area (1,438.97 acres) is protected by the NCA.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1.   BLM should establish a geological ACEC to protect the geological ORV.

2.   BLM should carefully manage access routes and recreational use areas to prevent damage to the geological ORV.

3.   BLM should continue to rely upon the inaccessibility of the creek as a method to protect the Fish ORV.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6.   <u>Historical or existing rights that could be adversely affected with designation.</u>
There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions on BLM lands would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7.   <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORV.

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022894

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4.

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>
No other agency plans, programs, or policies were identified for this segment.

10. <u>Contribution to a river system watershed or basin integrity.</u>
East Creek is a tributary to the Gunnison River.

***Other Protections for Segment***

| East Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Geological | NSO (1,900 acres), CSU (1,500 acres), TL (1,900 acres), VRM Class II (1,900 acres), ROW Avoidance (1,900 acres), lands with wilderness characteristics overlap (400 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable**. The ORV for this segment is its unique geologic value. The BLM's VRM system provides a layer of protection for this value. VRM Class II protection provides protection against visual disturbance, and could indirectly protect the geologic value by minimizing the possibility of substantial development in the area.

Since there is a large percentage of private land in this segment, management as a Wild and Scenic River could be challenging and resource-intensive. Current zoning in the area could allow developments that could detract from the visual observation and interpretation of the geologic values.

Creation of a federal reserved water right with designation does not appear essential for managing the geologic ORV. Maintenance of the geologic ORV is not highly flow-dependent. In addition, the Colorado Water Conservation appropriated an instream flow water right for this stream this reach during 2014, based upon a recommendation from the BLM.

Because of the factors discussed above, management of this segment as suitable for inclusion in the NWSRS is not the most effective use of the BLM's limited funds and management resources.

### 3.6.2   West Creek

| | |
|---|---|
| **Description:** | Sections of West Creek on BLM land running parallel to Highway 141 from the Unaweep Divide to West Creek's confluence with the Dolores River near Gateway. |
| **Total Segment Length:** | 23.56 miles   **Total Segment Area:**   6,926.06 acres |

BLM_0022895

| **Length on BLM Land :** | 4.93 miles | **Area on BLM Land:** | 2,490.99 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Scenic, Wildlife, Geologic, Vegetation | | |

*Suitability Factor Assessment*

1.   <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
West Creek contains outstandingly remarkable scenic, geologic, wildlife, and vegetative values. The tentative classification for this segment is recreational as Highway 141 runs parallel to the creek and its traffic is readily apparent from the creek.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Colorado State Highway 141, running through Unaweep Canyon and paralleling West Creek, is part of the Unaweep-Tabeguache Scenic and Historic Byway designated by Congress in 1980. The steep canyon walls formed by a rerouted ancient river have resulted in cliffs up to 1000 feet high in a magnificent canyon. Cottonwoods abound along the watercourse and provide a striking contrast to the variety of different colors of the multitude of rock layers exposed on the canyon walls. Sections of the canyon are very narrow and intimate while others are very wide and open up to provide fantastic views.

This segment has outstandingly remarkable geologic value. East Creek flows east from the Unaweep Divide, through Unaweep Canyon, to the Gunnison River. West Creek flows west from Unaweep Divide and into the Dolores River. These creeks originate in the canyon and do not have a source large enough to create a canyon of such magnitude. It is hypothesized that Unaweep Canyon was carved by one or both of the modern day Gunnison or Colorado Rivers. The second uplift of the Uncompahgre Plateau probably rerouted one or both of these rivers. This has led to the exposure of multiple layers of rock, including the Precambrian basement layer of the Uncompahgre Plateau, and high canyon walls of up to 1000 feet. The divide located in the middle of the canyon separating East and West Creeks is rare (Foutz 1994) and Unaweep Canyon is the only known canyon in the world with a divide in the middle and a creek flowing out of each end (Ikenberry 2002). This segment has outstandingly remarkable wildlife and vegetation values. The study area contains nearly all of Unaweep Seep ACEC/research natural area, designated to protect the area's outstanding biologic diversity. The BLM is carrying forward this existing ACEC its fish and wildlife, plant, riparian habitat and hydrologic values. This area contains around twenty seeps in a contiguous area harboring an unusually high species diversity and density. The Great Basin silverspot butterfly (*Speyeria n. Nokomis*), a BLM sensitive species, is also found here. The management objective for BLM sensitive species that are not federally listed as endangered or threatened is to initiate protective conservation measures that reduce or eliminate threats to minimize the likelihood of and need for listing of these species under the ESA. Unaweep Seep is also a designated Important Bird Area (Audubon 2008). The Unaweep Seep ACEC is also among the highest in the GJFO in terms of plant diversity. Included in this assemblage is the helleborine orchid *(Epipactis gigantea)*, ranked by CNHP as S2 (state

BLM_0022896

imperiled). An S2 rank indicates that the species is imperiled in the state because of rarity due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors making it very vulnerable to extirpation from the nation or state.

The study area for this segment is partially within the Palisade outstanding natural area and ACEC (2.18 miles, 625.77 acres). The BLM has proposed to expand the existing Palisade outstanding natural area and ACEC to provide special management attention to its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values. A small portion of this segment and study area overlaps The Palisade WSA (0.03 miles, 561.54 acres).

There are numerous active water diversions along West Creek (approximately two dozen). These diversions are primarily for irrigation purposes, which have the potential to provide return flows to the creek. Some diversions are for stock and domestic purposes. The CWCB holds an instream flow right for 15 cfs on West Creek from its headwaters to its confluence with the Dolores River.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 20.26-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 4.93 miles (20.9 percent) of the segment. Within the 6,926.06-acre study corridor, the BLM manages 2,490.99 acres (36.0 percent). The remaining land status is composed of 4,435.07 acres (64.0 percent) in private ownership.

A small portion of the segment corridor downstream from the confluence of Ute Creek is leased for oil and gas exploration but there are no active wells in the area. There is an active mining claim in the segment corridor where West Creek flows into the Dolores River. There is no oil and gas potential in this area.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

The geologic value of this segment likely would not be foreclosed or diminished if the segment was not designated. As discussed above, Unaweep Canyon is thought to have been formed by either the Gunnison or Colorado Rivers. Then, the second uplift of the Uncompahgre Plateau rerouted one or both of these rivers. This value does not depend on flows in East Creek or require protective management by the BLM.

BLM_0022897

4. Underline: Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

If designated, it is unlikely that the cost of administering the area would increase over the current level. The area already sees a moderate amount of activity from scenic drivers, and the highway serves as a corridor to the Gateway area and southwest Colorado. Further, the BLM already devotes funding to its management of particular areas within this segment, such as the Unaweep Seep and the Palisade ACECs.

The BLM would not pursue land acquisition along this segment at this time. The majority of land in this segment is privately owned. It is not feasible for the BLM to acquire enough land to appreciably affect its ability to manage the segment.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM manages only 20.9 percent of the shoreline of this segment and only 36.0 percent of the lands in the segment corridor, making effective management of the segment as a WSR challenging.

A portion of this segment flows through the Palisade WSA. The Palisade WSA is managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012). The goal of this policy is to manage WSAs to not impair their suitability for preservation as wilderness, until Congress designates them as wilderness, or until they are released from further wilderness consideration. This "non-impairment" management standard is more stringent than the BLM's management direction for Recreational WSRs. But if the area is not designated as wilderness and the WSA designation is removed, protection of the area would be limited to RMP management measures.

Portions of the study area are also currently managed as part of the Palisade outstanding natural area and ACEC and the Unaweep Seep ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. The Unaweep Seep ACEC has been successful at protecting the Great Basin silverspot butterfly as well as the plant diversity of the area. Continuation of these ACECs would help protect the ORVs.

Management actions for the Unaweep Seep ACEC include: (1) classify as closed to unauthorized motorized travel activities, including over-the-snow travel; (2) closed to mechanized travel, wood collecting, fossil collecting and camping; (3) designate as ROW exclusion area; and (4) withdraw from mineral location, close to mineral material sales, and classify as unsuitable for coal leasing.

The BLM's VRM system provides some protection for the scenic values of this segment. The segment corridor is managed as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. Class II protection also

BLM_0022898

provides some protection against visual disturbance which could indirectly protect the geologic value by minimizing the possibility of significant development in the area.

The CWCB holds an instream flow right on West Creek for 15 cfs year-round from its headwaters to its confluence with the Dolores River. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORVs found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should utilize protections associated with existing WSAs and protections associated with the proposed lands with wilderness characteristics management prescription to protect the ORVs.

2. BLM should rely upon the existing instream flow water right held by the CWCB to assist in protecting the scenic, wildlife, and vegetation ORVs.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6. <u>Historical or existing rights that could be adversely affected with designation.</u>
There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>
The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

BLM_0022899

The Mesa Land Trust holds conservation easements on private lands at the upstream end of the segment corridor (approximately 500 acres). In large part, these conservation easements will protect the river's ORVs and prevent incompatible development. Conservation easements are voluntary, perpetually binding documents that restrict development of a property. Conservation easements have the general purposes of conserving agricultural productivity, open space character, wildlife habitat, and scenic qualities, and for preventing any uses that will impair or interfere with the conservation values of the property (such as industrial uses). With regard to water use, conservation easements allow the maintenance of existing water systems and the development of new water sources, provided that such maintenance or development does not substantially diminish the conservation values of the property.

In sum, even though Mesa County zoning may allow incompatible development, conservation easements on private lands in the segment corridor provide more stringent land use controls and generally will prevent incompatible development.

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>
Refer to criterion #4.

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>
The Uncompahgre National Forest issued a proposed Forest Plan Revision in conjunction with the Gunnison National Forest in March 2007. The US Forest Service deferred its determination on West Creek as it flows through Unaweep Canyon (called Unaweep Creek in the US Forest Service document) until the BLM completed its eligibility determination (US Forest Service 2006). However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule.

10. <u>Contribution to a river system watershed or basin integrity.</u>
West Creek is a tributary of the Dolores River.

***Other Protections for Segment***

| **West Creek** | |
| --- | --- |
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Wildlife, Geological, Vegetation | NSO and TL (1,700 acres), CSU (600 acres), VRM Class I (600 acres), ROW Exclusion (600 acres), ROW Avoidance (1,100 acres), Closed to Fluid Mineral Leasing (1,700 acres), Petition for Withdrawal from Mineral Entry (300 acres), ACEC overlap (900 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable**. Management of this segment as a WSR would be challenging based on the amount of private land and, therefore, not the most effective use of the BLM's limited funds and management resources. The BLM manages only about a third of the land in the segment corridor and only about twenty percent of the

BLM_0022900

shoreline. The CWCB holds an instream flow right along West Creek, and this water right appears to be supporting the ORVs in this segment. Other administrative mechanisms can protect the ORVs along this segment without designation. As discussed above, the BLM's VRM system provides a layer of protection for the segment's scenic and geologic values. The Unaweep Seep ACEC provides special management attention to the wildlife and vegetation values of the area. For these reasons, the BLM determines that this segment is not suitable.

### 3.6.3   North Fork of West Creek

| | |
|---|---|
| **Description:** | Sections of the North Fork of West Creek on BLM land from Pinon Mesa running through the Palisade WSA to the confluence with West Creek east of Gateway along Highway 141. |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 8.46 miles | **Total Segment Area:** | 2,751.86 acres |
| **Length on BLM Land :** | 3.31 miles | **Area on BLM Land:** | 1,080.11 acres |
| **Tentative Classification:** | Wild | | |
| **ORVs:** | Scenic | | |

*Suitability Factor Assessment*

1.   <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
The North Fork of West Creek has outstandingly remarkable scenic value. The tentative classification for this segment is Wild because the segment flows through the Palisade WSA and there is little development along the stream corridor. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). The North Fork of West Creek drops steeply from Pinon Mesa and forms a rugged narrow canyon through the Palisade WSA. In this area, the dark grey Precambrian bedrock is overlaid with deep red sandstone. Therefore, the canyon possesses mostly dark grey cliffs with upper cliff bands of dark red. In addition, the more mesic environment along the creek allows Ponderosa Pines and other higher elevation species to exist the entire length of the creek down to the confluence with West Creek. These features, in combination with the relatively high perennial stream flow and remote environment make the North Fork of West an outstandingly remarkable scenic area.

Grazing occurs within the segment study corridor but does not detract from the scenic nature of the area.

A portion of the segment and study area study area is within the Palisade WSA (2.85 miles, 916.46 acres) and the Palisade outstanding natural area and ACEC (2.96 miles, 917.00 acres). The BLM has proposed to expand The Palisade outstanding natural area and ACEC to provide special management attention for its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values.

BLM_0022901

The study area for the portion of this segment on BLM-managed lands lies within the Gateway SRMA.

There are no active diversions along the North Fork of West Creek. The CWCB holds an instream flow right from Y Gulch to its confluence with West Creek.

2.  The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Within this 8.46-mile segment, the BLM manages the shoreline along 3.31 miles (39.1 percent). Within the 2,751.86-acre study corridor, the BLM manages 1,080.11 acres (39.3 percent). The northern portion of the study area 1671.75 acres (60.7 percent) is on private land. There are no active mining claims, no oil and gas leases, and no oil and gas wells in the segment corridor. There is no oil and gas potential in the area.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment and in areas located upstream from this segment. With designation, BLM would obtain authority to deny or place terms and conditions on any proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other agencies to evaluate the potential effects on the segment's values.

The scenic values likely would not diminish if the segment were not designated. The segment flows through the Palisade WSA, which is subject to stringent protective management, as discussed below.

4.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

Any additional cost of administering the area for protection of its ORVs if designated would be minimal. First, public access to the area is limited. Second, the BLM already incurs some costs specific to this area in order to manage the area according to its Interim Management Policy for Lands Under Wilderness Review. The BLM also already devotes some funds to the area in order to manage the Palisade ACEC. The BLM would not pursue land acquisition along this segment at this time. Because the BLM-managed lands in the segment corridor form a contiguous block along the downstream end of the canyon, the BLM can effectively protect the scenic value of this segment without acquiring additional lands.

5.  Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM can effectively manage this segment as a WSR. Minimal management is currently required to protect the scenic nature of the area as access is challenging due to dense vegetation and the steep slopes of the canyon walls. However, other means can protect the ORVs in the absence of WSR designation.

BLM_0022902

A portion of this segment flows through the Palisade WSA. The Palisade WSA is managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012). The goal of this policy is to manage WSAs in such a manner to not impair their suitability for preservation as wilderness, until Congress designates them as wilderness, or until they are released from further wilderness consideration. This "non-impairment" management standard is similar to the BLM's management direction for Wild WSRs. But if the area is not designated as wilderness and the WSA designation is removed, protection of the area would be limited to RMP management measures.

Portions of the study area are also currently managed as part of the Palisade outstanding natural area and ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. Continuation of this ACEC would help protect the scenic ORV.

The BLM manages the WSA and ACEC as VRM Class I, which also provides protection for the scenic ORV. The goal of VRM Class I is to preserve the existing character of the landscape. It requires the level of change to the characteristic landscape to be very low and to not attract attention.

The CWCB holds an instream flow right on the North Fork of West Creek from Y Gulch to its confluence with West Creek. There are varying levels of instream flow appropriations throughout the year for the segment, the most being between April 1 and June 30 for 3.7 cfs. The appropriation drops to between 0.4 and 0.8 cfs for the remainder of the year. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORVs found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1.  BLM should utilize protections associated with existing WSAs and protections associated with the proposed lands with wilderness characteristics management prescription to protect the ORV.

2.  BLM should rely upon the existing instream flow water right held by the CWCB to assist in protecting the scenic ORV.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6.   <u>Historical or existing rights that could be adversely affected with designation.</u>
There are a limited number of private water rights located with and upstream from this segment. Designation would not affect the ability to operate these rights as they have been historically operated. However, if the owners desire to change those water rights, the changes

BLM_0022903

would be subject to the federal reserved water right that would be associated with the designated segment.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

The Mesa Land Trust holds a conservation easement on some of the private lands in the upstream end of the segment corridor (approximately 300 acres). This conservation easement will protect the river's ORV and prevent incompatible development. Conservation easements are voluntary, perpetually binding documents that restrict development of a property. Conservation easements have the general purposes of conserving agricultural productivity, open space character, wildlife habitat, and scenic qualities, and for preventing any uses that will impair or interfere with the conservation values of the property (such as industrial uses). With regard to water use, conservation easements allow the maintenance of existing water systems and the development of new water sources, provided that such maintenance or development does not substantially diminish the conservation values of the property.

In sum, even though Mesa County zoning may allow incompatible development. Only private lands with conservation easements (and thus more stringent land use controls) in the segment corridor will prevent incompatible development.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

No other agency plans, programs, or policies were identified for this segment.

10. Contribution to a river system watershed or basin integrity.

North Fork of West Creek is a tributary of West Creek, which contributes to the Dolores River.

11. Other issues and concerns, if any.

None.

BLM_0022904

*Other Protections for Segment*

| North Fork of West Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic | NSO (1,100 acres), TL (500 acres), VRM Class I (900 acres), VRM Class II (200 acres), ROW Exclusion (900 acres), ROW Avoidance (100 acres), Closed to Fluid Mineral Leasing (1,100 acres) |

*Suitability Determination*

The suitability determination for this segment is **not suitable.** The upstream five miles and uppermost sixty percent of the segment corridor are on private land. Existing management of the BLM lands in the corridor can adequately protect the scenic value and tentative classification of this segment. However, protection of the ORVs on the upper part of the segment, which consists primarily of private lands, would be challenging. Management of this segment as suitable for inclusion in the NWSRS is not the most effective use of the BLM's limited funds and management resources.

The portion of the segment on BLM land flows through a WSA. The BLM manages WSAs to not impair their suitability for preservation as wilderness. This will protect the tentative Wild classification of the segment as it flows through BLM land. Pursuant to this management objective, WSAs are managed as VRM Class I. The goal of VRM Class I is to preserve the existing character of the landscape, which will protect the scenic value of the segment as it flows through BLM land.

Neither of these protections discussed above apply to private lands. Only about 300 acres of the segment corridor are conserved under a conservation easement with the Mesa Land Trust. The remaining private lands in the corridor are only subject to the restrictions of the Mesa County Agricultural, Forestry, Transitional zoning district. As discussed above, this zoning district has the potential to allow development that is incompatible with this segment's scenic value and tentative Wild classification (i.e., a road within the corridor).

### 3.6.4   Ute Creek

| | |
|---|---|
| **Description:** | From North Berg Mesa near the northern extent of the Uncompahgre Plateau to the confluence with West Creek east of Gateway. |
| **Total Segment Length:** | 4.22 miles |
| **Length on BLM Land :** | 4.19 miles |
| **Tentative Classification:** | Scenic |
| **ORVs:** | Scenic, Vegetation |

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 4.22 miles | **Total Segment Area:** | 1,441.12 acres |
| **Length on BLM Land :** | 4.19 miles | **Area on BLM Land:** | 1,362.63 acres |

BLM_0022905

***Suitability Factor Assessment***

1.  <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
Ute Creek has outstandingly remarkable scenic and vegetative values. The tentative classification for this segment is Scenic due to limited access via a dirt road along this segment.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Ute Creek has formed a narrow canyon that rarely opens up to create a wider canyon bottom. The narrow, steep canyon walls form interesting overhangs and features, and the addition of a healthy cottonwood community provides for a unique, pristine watercourse in a region where riparian areas are frequently impacted by humans. When the canyon does open up, it reveals spectacular views of the Dolores River valley and the Palisade.

This segment also has outstandingly remarkable vegetative value. The cottonwood communities along the segment contain a gallery forest with cottonwoods of all age classes, composing one of the best examples of a "potentially natural community" in the GJFO (BLM 1993). A small portion of the segment and study area lies within the Palisade WSA (46.12 acres) and the Palisade outstanding natural area and ACEC (0.07 miles, 84.06 acres). The BLM has proposed to expand The Palisade outstanding natural area and ACEC to provide special management attention for its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values.

The segment area is almost entirely within the Gateway SRMA.

There are no active diversions from Ute Creek. However, there are a series (about five) of developed stock ponds on US Forest Service land upstream.

2.  <u>The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.</u>
Land ownership for this 4.22-mile segment is primarily federal (BLM and US Forest Service) with a small area of private ownership. The BLM manages shoreline along 4.19 miles (99.5 percent) of the segment. Within the 1,441.12-acre study corridor, the BLM manages 1,362.63 acres (94.6 percent). The US Forest Service manages 68.54 acres (4.1 percent) at the upstream end of the segment corridor. The remaining land status consists of 18.59 acres (along Highway 141; 1.3 percent) in private ownership.

There is no oil and gas potential in this area, and there are no active wells in this area. However, roughly 165 acres of the segment corridor near Ute Creek's confluence with West Creek is leased for oil and gas exploration. There are no active mining claims in the segment corridor.

BLM_0022906

3. <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>

While WSR designation has the potential to affect future water development along this segment, there currently are no active water diversions along Ute Creek, and additional water development is not anticipated.

If designated, valid mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment. As discussed below, the ORVs in this segment are not likely to diminish if the segment is not designated.

Grazing use of this segment, including the use of the trail along the segment to move livestock, would likely not be affected by designation. The tentative scenic classification would allow for continued use and maintenance of the trail, and the existing livestock use is not expected to significantly impact the scenic and vegetation ORVs.

4. <u>Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.</u>

The cost of administering the area for protection of the ORVs would be minimal as public access to the area is limited. Regardless, designation of the segment would enhance the BLM's ability to obtain funding for the management of the area.

The acquisition of private lands is not essential for management for the protection of the ORVs because the BLM manages nearly all of the lands within the segment corridor. Nevertheless, the BLM would pursue acquisition from of private parcels from willing sellers. No detailed cost estimate was prepared as part of this study.

5. <u>Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.</u>

The BLM could effectively manage this segment as a WSR because it manages nearly all of the lands in the segment corridor (94.6 percent). Because of the limited access, the BLM is able to protect the vegetation ORV with minimal management. The scenic ORV is largely dependent upon management actions related to potential mineral extraction and related development in the vicinity. Again, because the corridor itself is difficult to access, it is unlikely that the corridor would be developed for mineral extraction.

The BLM's VRM system also provides some protection for the scenic values of this segment. The BLM manages the segment corridor as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape.

BLM_0022907

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1.  BLM should utilize protections associated with the proposed lands with wilderness characteristics management prescription to protect the ORVs.

2.  BLM should establish a riparian ACEC, combined with surface use stipulations, to protect to the scenic and vegetation ORVs.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6.  Historical or existing rights that could be adversely affected with designation.
No historical or existing rights have been identified for this segment.

7.  Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.
The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). Local zoning is not a major concern for this segment as private lands constitute only one percent of the segment corridor.

8.  Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.
Refer to criterion #4.

9.  Consistency of designation with other agency plans, programs, or policies.
The Uncompahgre National Forest found the portion of Ute Creek upstream of the BLM segment not eligible for inclusion in the NWSRS during the eligibility study for the Grand Mesa, Uncompahgre, and Gunnison National Forests land management plan revision process (US Forest Service 2006). The portion of Ute Creek in the National Forest serves as the boundary between two management areas: big game winter range in non-forest areas and big game winter range in forested areas. The US Forest Service manages these areas according to the following general prescriptions: (1) provide semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities; (2) manage motorized recreation prevent unacceptable stress on big game animals during primary big game use season; use vegetation treatments to enhance plant and animal diversity; (3) manage livestock grazing to favor wildlife habitat; and (4) (in forested areas only) use timber harvest to improve winter range. Management by the US Forest Service to provide big game habitat is unlikely to have an adverse effect on this segment's ORVs, with the exception of some types of timber harvest (such as clearcutting). Nevertheless, management by the US Forest Service as to provide big game habitat is generally consistent with BLM management that would occur with designation.

BLM_0022908

The Uncompahgre National Forest's 2007 proposed forest plan would manage this area as recommended wilderness. The US Forest Service would manage the area to protect its wilderness characteristics until Congressional action is taken. (US Forest Service 2007) Natural processes with little or no human intervention would influence ecosystems. However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule. Management by the US Forest Service as recommended wilderness is generally consistent with BLM management that would occur with designation.

10. Contribution to a river system watershed or basin integrity.
The segment is a tributary of West Creek, which contributes to the Dolores River.

11. Other issues and concerns, if any.
None.

**Other Protections for Segment**

| Ute Creek | |
| --- | --- |
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Vegetation | NSO (1,400 acres), CSU (500 acres), TL (800 acres), VRM Class I (50 acres), VRM Class II (1,100 acres), ROW Exclusion (1,100 acres), ROW Avoidance (200 acres), Closed to Fluid Mineral Leasing (1,400 acres), lands with wilderness characteristics overlap (1,100 acres) |

**Suitability Determination**
The suitability determination for this segment is **not suitable,** BLM has proposed managing lands along the creek corridor, within the Ute Creek watershed, and within the viewshed of the creek, as lands with wilderness characteristics. This is a highly restrictive management prescription that would prevent actions that could degrade the scenic and vegetation ORVs. In addition, the Colorado Water Conservation Board appropriated an instream flow water right on Ute Creek during 2014, based upon a recommendation from the BLM.

BLM_0022909

# CHAPTER 4
# LIST OF PREPARERS

| Name | Role |
|------|------|
| **BLM, Colorado State Office** | |
| Roy Smith | Water Rights, Wild and Scenic Rivers |
| **BLM, Grand Junction Field Office** | |
| Matt Anderson | Planning and Environmental Coordinator |
| Michelle Capp | Assistant Field Manager (Cultural and Recreation) |
| Peter Benduha | Recreation Technician |
| Janny Choy | Hydrologist |
| Julia Christiansen | Natural Resource Specialist |
| Douglas Diekman | Geographic Information Systems |
| Nathan Dieterich | Hydrologist |
| Jim Dollerschell | Range Management Specialist |
| Robert Fowler | Range Management Specialist |
| Tom Fresques | Fisheries Biologist |
| Scott Gerwe | Geologist |
| Chris Hamm | Supervisory Outdoor Recreation Planner |
| Mike Jones | Park Ranger |
| Robin Lacy | Realty Specialist |
| Aline LaForge | Archaeologist |
| Alissa Leavitt-Reynolds | Archaeologist |
| David Lehmann | Supervisory Natural Resource Specialist |
| Anna Lincoln | Ecologist |

BLM_0022910

| Name | Role |
|------|------|
| Heidi Plank | Wildlife Biologist |
| Christina Stark | Planning and Environmental Coordinator |
| *Ken Straley* | *Supervisory Outdoor Recreation Planner* |
| Mark Taber | Range Management Specialist |
| *Aaron Young* | *Geographic Information Systems* |
| *Environmental Management and Planning Solutions, Inc. (EMPSi), RMP Contractor* | |
| Kevin Sampson | Geographic Information Systems |
| Marcia Rickey | Geographic Information Systems |
| Kate Krebs | Wild and Scenic Rivers |
| Drew Vankat | Project Manager |

*Italicized text denotes former GJFO staff member*

# CHAPTER 5
# REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 1983. Manual 8560. Management of Designated Wilderness Areas. Release 8-22, April 27, 1983.

_____. 1984. Manual 8400: Visual Resource Management. Rel. 8-24, April 5, 1984. BLM, Washington, DC.

_____. 1986. Handbook H-8410-1: Visual Resource Inventory. Rel. 8-28, January 17, 1986. BLM, Washington, DC.

_____. 1987. Grand Junction Resource Management Plan and Record of Decision. BLM, Grand Junction Field Office, Grand Junction, Colorado. January 1987.

_____. 1992. Manual 8351: Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management. Rel. 8-61, May 19, 1992. BLM, Washington, DC.

_____. 1993. Blue Creek Ecological Site Inventory Report. BLM, Grand Junction Colorado.

_____. 1998. Manual 8270: Paleontological Resource Management. July 13, 1998.

_____. 2000. Colorado BLM State Director's Sensitive Species List (Animals and Plants). Internet Web site: http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html. Updated June 2000. Accessed June 22, 2009.

_____. 2004. Resource Management Plan and Record of Decision for the Colorado Canyons National Conservation Area and Black Ridge Canyons Wilderness. BLM, Grand Junction Field Office, Grand Junction, Colorado. September 2004.

_____. 2008. Record of Decision and Approved Resource Management Plan for Bureau of Land Management, Moab Field Office. BLM, Moab Field Office, Moab, Utah. October 2008.

BLM_0022912

_____. 2009a. Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office. BLM, Grand Junction Field Office, Grand Junction, Colorado. March 24, 2009. 77pp.

_____. 2009b. Resource Management Plan Revision Scoping Summary Report. BLM, Grand Junction Field Office, Grand Junction, Colorado. April 2009. 204pp.

_____. 2009c. Visual Resource Inventory. Prepared for the BLM, Grand Junction Field Office, Grand Junction, CO, by Otak, Inc., Carbondale, CO. September 2009.

_____. 2012. Manual 6330: Management of Wilderness Study Areas. Rel. 6-134. BLM, Washington, DC. July 13, 2012.

BLM (US Department of the Interior, Bureau of Land Management) and US Forest Service (US Department of Agriculture, National Forest Service). 2007. San Juan Public Lands Draft Land Management Plan and Draft Environmental Impact Statement. BLM Dolores, Columbine, and Pagosa Field Offices. US Forest Service – Region 2, San Juan National Forest. December 2007.

Colorado Natural Heritage Program. 2009. Colorado Tracked Natural Plant Communities. Internet Web site: http://cnhp.colostate.edu/tracking/communities.html. Updated April 3, 2009. Accessed June 24, 2009.

CPW (Colorado Parks and Wildlife). 2006. Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans. November 2, 2006.

_____. 2007. Threatened and Endangered List. Internet Web site: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/ThreatenedEndangeredList/ListOfThreatenedAndEndangeredSpecies.htm. Updated October 15, 2007. Accessed June 23, 2009.

CRCT Conservation Team. 2006. Range-wide Status of Colorado River cutthroat trout *(Orcorhynchus clarkii pleuriticus)*: 2005. March 2006. 200pp.

CRCT Coordination Team. 2006. Conservation strategy for Colorado River cutthroat trout *(Oncorhynchus clarki pleuriticus)* in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins. 24pp.

CWCB. 2010. Draft Colorado River Water Availability Study. Phase I Report Draft. March 22, 2010.

Foutz, Dell R. 1994. *Geology of Colorado Illustrated.* Your Geologist, Grand Junction, Colorado. 181 pp.

Garfield County. 2008. Garfield County Unified Land Use Resolution. Article III: Zoning. September 2008.

Ikenberry, Donna Lynn. 2002. *Wild Colorado: A Guide to Fifty-one Roadless Recreation Areas.* 1st Ed. Falcon Guide, Guilford, Connecticut. 353 pp

Interagency Wild and Scenic Rivers Coordinating Council. 1999. The Wild and Scenic Rivers Study Process, Technical Report. Washington, DC.

BLM_0022913

Mesa County. 1996. Mesa Countywide Land Use Plan: From Issues to Actions. Mesa County, Colorado. October 1996.

_____. 2008. Land Development Code. Mesa County, Colorado. Effective May 2000, last revised November 2008.

USFWS (US Department of the Interior, Fish and Wildlife Service). 1998. Greenback cutthroat trout recovery plan. US Fish and Wildlife Service, Denver, Colorado.

_____. 2002a. Colorado pikeminnow *(Ptychocheilus lucius)* Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan. US Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

_____. 2002b. Razorback sucker (*Xyrauchen texanus*) Recovery Goals: amendment and supplement to the Razorback Sucker Recovery Plan. US Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

US BOR (US Department of the Interior, Bureau of Reclamation). No date. Grand Valley Project, Colorado. Internet Web site: http://www.usbr.gov/dataweb/html/grandvalley.html. Accessed June 22, 2009.

US Forest Service (US Department of Agriculture, National Forest Service). 2006. Comprehensive Assessments for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Appendix W-2: Rivers Reviewed. US Forest Service, Grand Mesa, Uncompahgre, and Gunnison National Forests, Colorado. July 17, 2006.

Utah Department of Natural Resources. 2006. Range-wide Conservation Agreement and Strategy for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker. Publication Number 06-18. Salt Lake City, Utah. September 2006.

BLM_0022914

This page intentionally left blank.

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022915

# Appendix D

## Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

BLM_0022916

BLM_0022917

# TABLE OF CONTENTS

Section                                                                                                          Page

**D.**  **SUMMARY OF AREAS OF CRITICAL ENVIRONMENTAL CONCERN REPORT
       ON THE APPLICATION OF RELEVANCE AND IMPORTANCE CRITERIA ........................ D-1**

     D.1     Relevance ................................................................................................................ D-1
     D.2     Importance ............................................................................................................. D-2
     D.3     Evaluation Process ................................................................................................. D-2
     D.4     Findings .................................................................................................................... D-3
     D.5     References ............................................................................................................... D-46

# TABLES

                                                                                                                 Page

D-1     ACECs Found to Meet the Relevance and Importance Criteria .................................................... D-4
D-2     Relevance and Importance Criteria Evaluation for Existing, Proposed, and Approved ACECs   D-5

BLM_0022918

This page intentionally left blank.

BLM_0022919

# APPENDIX D
# SUMMARY OF AREAS OF CRITICAL ENVIRONMENTAL CONCERN REPORT ON THE APPLICATION OF RELEVANCE AND IMPORTANCE CRITERIA

This appendix provides summary information about the Areas of Critical Environmental Concern (ACEC) evaluation process. The Areas of Critical Environmental Concern Report on the Application of the Relevance and Importance Criteria (BLM 2010) provides more detail on the process. As part of the process for developing the Grand Junction Resource Management Plan (RMP) revision, the Grand Junction Field Office (GJFO) Interdisciplinary Team reviewed all BLM-managed lands in the planning areas to determine whether any areas should be considered for designation as ACECs. ACECs are defined in the Federal Land Policy and Management Act Section 103(a) (43 United States Code 1702) and in 43 Code of Federal Regulations 1601.0-5(a) as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." The areas found to meet both the relevance and importance criteria as defined below will be identified as potential ACECs and will be fully considered for designation and management in the RMP (BLM Manual 1613.2.21 [BLM 1988]).

## D.1    RELEVANCE

There shall be present a significant historic, cultural, or scenic value, a fish or wildlife resource or other natural system or process, or natural hazard. An area meets the relevance criterion if it contains one or more of the following:

BLM_0022920

Case No. 1:20-cv-02484-MSK   Document 33   filed 04/27/21   USDC Colorado   pg 199 of 270

Appendix D. Summary of Areas of Critical Environmental Concern Report on the
Application of Relevance and Importance Criteria

1. A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archaeological resources and religious or cultural resources important to Native Americans).

2. A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity).

3. A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).

4. Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs. A hazard caused by human action might meet the relevance criterion if it is determined, through the resource management planning process, to have become part of a natural process.

## D.2   IMPORTANCE

An area meets the importance criterion if it meets one or more of the following:

1. Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3. Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA.

4. Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare.

5. Poses a significant threat to human life and safety or to property.

## D.3   EVALUATION PROCESS

In compiling a list of areas to be analyzed, the BLM interdisciplinary teams followed the guidance set forth in BLM Manual 1613, Areas of Critical Environmental Concern (BLM 1988), and considered:

1. Existing ACECs;

2. Areas recommended for ACEC consideration (external and internal nominations);

BLM_0022921

Case No. 1:20-cv-02484-MSK   Document 33   filed 04/27/21   USDC Colorado   pg 200 of 270

Appendix D. Summary of Areas of Critical Environmental Concern Report on the
Application of Relevance and Importance Criteria

3. Areas identified through inventory and monitoring; and

4. Adjacent designations of other federal and state agencies.

ACECs may be nominated by BLM staff, other agencies, or members of the public at any time. During the RMP revision scoping process, the GJFO solicited nominations and comments from the public and other agencies. A map of special designation areas was distributed at the scoping meetings and made available on the RMP website: *http://www.blm.gov/co/st/en/fo/gjfo/rmp.html.*

As part of the formal outreach process, the BLM received nominations from the Colorado Natural Heritage Program (CNHP) and the Center for Native Ecosystems. The BLM staff also reviewed information from BLM inventories, Colorado Parks and Wildlife (CPW) species of concern data, and other reports to ensure that all potentially relevant and important values with in the planning areas were considered.

## D.4   FINDINGS

The Interdisciplinary Team analyzed 52 ACECs (existing, internally, and externally proposed) and found that 24 met the relevance and importance criteria, for a total of 167,369 acres (**Table D-1**, Proposed ACECs Found to Meet the Relevance and Importance Criteria).

Maps of ACECs recommended for analysis in the Draft RMP and additional information are included in The Areas of Critical Environmental Concern Report on the Application of the Relevance and Importance Criteria (BLM 2010). The size and management prescriptions for each ACEC may vary by alternative to reflect a balance between the goals and objectives of the alternative and values being protected (BLM Manual 1613.2.22.B.1-2). **Table D-2**, Relevance and Importance Criteria Evaluation for existing and new ACECs, summarizes the Approved ACECs evaluated, the values assessed, and whether the criteria were met (including supporting information).

BLM_0022922

**Table D-1
ACECs Found to Meet the
Relevance and Importance Criteria**

| ACEC | Acres |
|---|---|
| Atwell Gulch (staff and public proposed) | 6,135 |
| Badger Wash ACEC (existing) | 1,891 |
| *Badger Wash ACEC Alternative (staff proposed)* | *355* |
| Colorado River Riparian (staff proposed) | 879 |
| Coon Creek (staff and public proposed) | 110 |
| Coon Hollow/South Shale Ridge (staff and public proposed) | 27,345 |
| Dolores River Riparian (staff proposed) | 7,433 |
| Glade Park-Piñon Mesa (public proposed) | 27,056 |
| Gunnison River Riparian (staff proposed) | 457 |
| Hawxhurst Creek (staff and public proposed) | 864 |
| Indian Creek (staff proposed) | 1,746 |
| John Brown Canyon (public proposed) | 1,416 |
| Juanita Arch (staff and public proposed) | 1,624 |
| Mt. Garfield (staff proposed) | 5,695 |
| Nine-mile Hill Boulders (staff proposed) | 87 |
| The Palisade ACEC/Outstanding Natural Area (ONA) (existing) | 26,951 |
| *The Palisade ACEC/ONA Expansion (staff proposed)* | *5,330* |
| Plateau Creek (staff proposed) | 223 |
| Prairie Canyon (public proposed) | 6,866 |
| Pyramid Rock ACEC/Research Natural Area (RNA) (existing) | 551 |
| *Pyramid Rock ACEC/RNA Expansion (staff proposed)* | *706* |
| Reeder Mesa (staff and public proposed) | 474 |
| Roan and Carr Creeks (staff and public proposed) | 33,694 |
| Rough Canyon ACEC/RNA (existing) | 2,737 |
| *Rough Canyon ACEC/RNA Expansion (staff proposed)* | *41* |
| Sinbad Valley (public proposed) | 6,399 |
| Unaweep Seep ACEC/RNA (existing) | 78 |
| *Unaweep Seep ACEC/RNA Expansion (public proposed)* | *6* |
| **Total** | **167,149** |

BLM_0022923

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| 4A Ridge *Public Proposed* | Riparian Habitat | 3 | 2 | No | Included in staff proposed Roan and Carr Creeks boundary. Areas to the south and west appear to contain an even greater amount of the Piceance bladderpod (*Lesquerella parviflora*). | 0 | 19,082 | *See Roan and Carr Creeks ACEC.* |
| | Plants | 3 | 2 | | | | | |
| | Wildlife | 2 | None | | | | | |
| | Plants | 3 | None | | | | | |
| Atwell Gulch *Staff and Public Proposed* | Wildlife | 2 | 2 | **Yes** *with modified boundaries* | Meets the relevance criteria for Cultural and scenic values, fish and wildlife resources, and a natural system supporting rare plants. | 0 | 26,450 | (6,135) 2,900 |
| | Plants | 3 | 1 and 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | Cultural | 1 | 1 and 2 | | The importance criteria for more than locally significant qualities for plants and has qualities that make it sensitive, rare and vulnerable to adverse change. | | | |
| | | | | | BLM sensitive and federally listed rare plant species: Colorado hookless cactus, DeBeque milkvetch, and Naturita milkvetch. Four different monitoring sites are established for DeBeque milkvetch and Colorado hookless cactus. Atwell Gulch contains the largest known concentration of DeBeque milkvetch in the GJFO. | | | |
| | | | | | This area provides year-round range and an important migratory corridor for a significant portion | | | |

BLM_0022924

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | of the native bighorn sheep *(Ovis canadensis)* in the area. Additionally, it is also winter range and severe winter range for mule deer *(Odocoileus hemionus)*. | | | |
| | | | | | This area has the presence of significant cultural resources and the potential for additional sites to be identified, especially those associated with the Ute period, is high. The ACEC lies between two historic trails/roads, the DeBeque Cutoff Road and the Sunnyside Road and surveys have demonstrated a high density of cultural resources. This area has the potential to contain a regionally important trail. | | | |
| Badger Wash ACEC *Existing Staff Proposed* | Hydrological | 3 | 2 | Yes | Meets the relevance criteria for a natural system and importance criteria for sensitive plants and to satisfy national priority concerns. | 1,700 | 2,848 | (2,200) 2,200 |
| | Plants | 3 | 1 and 2 | | | | | |
| | Wildlife | 2 and 3 | 2 | | The revised boundary creates improved management for the ACEC. The ACEC meets the relevance and importance criteria for a natural system that supports sensitive plants and ongoing hydrologic research. Rare plants include grand buckwheat *(Eriogonum contortum)* and | | | |

BLM_0022925

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Ferron's milkvetch *(Astragalus musiniensis)*. Also contains rare plant species cliffdweller's cryptantha *(Cryptantha elata)* and Gardner's saltbrush/salina wildrye *(Atriplex gardneri/Elymus slaina)*. Also contains the Great Basin silverspot butterfly *(Speyeria nokomis)*. | | | |
| | | | | | The Badger Wash watershed was withdrawn for experimental purposes, scientific research, and studies by Executive Order 10355 in 1952. The Badger Wash ACEC was put in place to protect these values, particularly the hydrologic studies examining the effects of grazing on runoff, sediment, and salinity on this Mancos Shale landscape prevalent in western Colorado and Utah. Studies have occurred since 1953 and published reports are available. Cooperative hydrologic studies are ongoing, supported by the BLM, US Geological Survey, and US Bureau of Reclamation. Meets the relevance criteria for a natural system and importance criteria for sensitive plants and to satisfy national priority concerns. | | | |

BLM_0022926

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Badger Wash Potential  *Public Proposed* | Fish | None | None | No | Meets the relevance criteria for rare plants in isolated areas and wildlife supporting habitat for burrowing owls. As proposed the site did not meet the importance criteria because it is overly broad and all areas contained within the proposal are not considered unique compared to other habitat within the range of the species. A portion of this site (355 acres) was carried forward in the Badger Wash ACEC expansion.  The area contains designated release sites for the Mesa County Prairie Dog Relocation project; however these sites do not meet the relevance and importance criteria.  The area does not meet the relevance or importance criteria for fish bearing streams or bald eagles (*Haliaeetus leucocephalus*) as the areas do not contain fish bearing habitat. | | | |
| Bangs Canyon and Dominguez North  *Public Proposed* | Cultural | I | None | No | The area as originally proposed is now split by the Dominguez – Escalante NCA, forming two small polygons on the west side of Highway 141 along East Creek. | | | |

BLM_0022927

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | It is within Area 6 of the Bangs Canyon Special Recreation Management Area (SRMA). | | | |
| | | | | | Meets the relevance criteria for the presence of significant cultural resources. Does not meet importance criteria because these resources do not have more than locally significant qualities. | | | |
| | | | | | Sites that are culturally affiliated with the Ute within this area may best be managed for Traditional or Public Use with a management goal of long term protection and interpretation. | | | |
| Buzzard Creek Potential *Public Proposed* | Fish | 2 | None | No | Meets the relevance criteria for fish and wildlife resource providing habitat for lynx *(Lynx Canadensis)* and boreal toad *(Bufo boreas)* as well as fish bearing streams. In addition, the area may meet the relevance criteria by providing habitat for the foothills riparian shrubland, and narrowleaf cottonwood riparian forest plant communities.

Does not meet importance criteria because the area consists of several very small parcels of BLM-managed land that do not significantly contribute to the | 0 | 2,520 | 0 |
| | Wildlife | 2 | None | | | | | |
| | Plants | 3 | None | | | | | |

BLM_0022928

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | conservation of the species and are therefore not regionally significant. | | | |
| Cactus Park *Public Proposed* | Paleontological | N/A | N/A | N/A | ACEC is within the Dominguez-Escalante NCA; therefore it is beyond the scope of this planning effort. | 0 | 139 | 0 |
| | Plants | N/A | N/A | | | | | |
| Colorado River Riparian (Palisade to DeBeque) | Fish | 2 and 3 | 2 | Yes | Meets the relevance criteria for scenic, threatened, and endangered fish resources and a natural system. The importance criteria for qualities that is sensitive and vulnerable to adverse change for riparian habitat supporting stream bank stability and designated critical habitat for threatened and endangered fish species. The area was surveyed by CNHP and found to contain Global Rank G2 Rio Grande cottonwood/skunkbrush *(Populus deltoides ssp. wislizenil/Rhus trilobata)* riparian forest and Global Rank G3 roundtail chub. The US Fish and Wildlife Service designated the Colorado River up to its 100 year floodplain as critical habitat for the Colorado pikeminnow *(Ptychocheilus lucius)* (federally endangered, state | 0 | 1,195 | (879) 0 |
| | Wildlife | 2 and 3 | 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | Riparian Habitat | 3 | 1 and 2 | | | | | |
| | Plants | 3 | None | | | | | |

BLM_0022929

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | threatened), razorback sucker (*Xyrauchen texanus*) (federally and state endangered), bonytail chub (*Gila elegans*) (federally and state endangered), and humpback chub (*Gila cypha*) (federally endangered, state threatened). Native, non-listed fish species sympatric with the listed fish species include the flannelmouth sucker (*Catostomas latipinnis*), bluehead sucker (*Catostomus discobolus*), roundtail chub (designated a state Species of Special Concern), and speckled dace (*Rhinichthys osculus*). | | | |
| | | | | | The Colorado River is designated critical habitat for threatened and endangered fish species and roost/nesting habitat for bald eagles and great blue herons (*Ardea herodias*). | | | |
| | | | | | Peregrine Falcons probably won't nest in the riparian area, they are attracted to riparian areas for their productivity of prey and prefer nesting close to them. | | | |
| | | | | | While the proposed ACEC contains significant cottonwood/willow communities that are extremely important to wildlife and riparian values, the | | | |

BLM_0022930

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | ACEC is not known to contain any rare plant species. | | | |
| Coon Creek *Staff Proposed* | Fish | 1 | 1, 2 | Yes | Meets the relevance criteria for fish. Meets the importance criteria for having more than locally significant qualities and qualities that make it fragile, sensitive, rare, exemplary, and vulnerable to adverse change. The creek contains a population of rare native cutthroat trout (*Oncorhynchus clarkii*). | 0 | 110 | (110) 0 |
| Coon Hollow/South Shale Ridge *Staff and Public Proposed* | Plants | 3 | 1 and 2 | Yes | Meets the relevance criteria for wildlife resources, natural system supporting plants, and significant scenic values. Meets the importance criteria for more than locally significant importance to plants and has qualities that make it fragile, sensitive, irreplaceable, threatened, and vulnerable to adverse change. The area has known populations of Colorado hookless cactus, Naturita milkvetch, adobe thistle, and DeBeque phacelia, as well as critical winter range for deer and elk. | 0 | 59,701 | (28,200) 27,800 |
| | Scenic | 1 | 2 | | | | | |
| | Wildlife | 2 | 1 | | | | | |
| Cow Ridge | Wildlife | 2 | None | No | Meets the relevance criteria for | 0 | 25,777 | 0 |

BLM_0022931

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Potential *Public Proposed* | Rare Plants | 3 | None | | natural processes or systems because it supports multiple A-ranked (excellent quality) occurrences of two BLM sensitive plants, Piceance bladderpod and Roan Cliffs blazingstar *(Mentzelia rhizomata)* and provides potential habitat for Greater Sage-Grouse *(Centrocercus urophasianus)*, a BLM sensitive species. Does not meet the importance criteria because it is not unique when compared to other sage-grouse habitat located within the Parachute-Piceance-Roan population. While approximately 4 of the 50+ isolated parcels that compose the ACEC contain A-ranked (CNHP) occurrences of bladderpod and blazingstar, the proposed ACEC in its entirety does not meet the importance criteria. | | | |
| Dolores River Canyon-Sewemup Mesa Potential ACEC *Public Proposed* | Fish | 2 and 3 | 1 and 2 | No | Meets the relevance criteria for wildlife resource and a natural system. Meets the importance criteria having potential for more than locally significant wildlife qualities making the area sensitive for rare plants and are vulnerable to adverse change. | 0 | 33,308 | *See Dolores River Riparian, Sinbad Valley, and Juanita Arch ACECs* |
| | Wildlife | 2 and 3 | 1 and 2 | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |

BLM_0022932

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Area does not meet the relevance and importance criteria since it does not contain lynx habitat, though it may provide a movement corridor into the forests of Utah although there is no evidence supporting use of the area by lynx. | | | |
| | | | | | Several peregrine falcon *(Falco peregrinus)* eyries occur along the Dolores River with densities of eyries suggesting the area is more than locally significant. The area along the Dolores River meets the relevance and importance criteria for the peregrine falcon; however these areas are more accurately covered by the Dolores River riparian proposal. | | | |
| | | | | | Multiple BLM sensitive plants (Kachina daisy *[Erigeron kachinensis]*, Eastwood's monkeyflower *[Mimulus eastwoodiae]*, San Rafael milkvetch, Dolores River skeleton plant, horseshoe milkvetch, Grand Junction milkvetch, and Gypsum cateye) occur in the area. Most areas containing sensitive plants are covered in the Dolores River Riparian and Sinbad Valley | | | |

BLM_0022933

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | ACECs. | | | |
| Dolores River Riparian *Staff Proposed* | Fish | 2 and 3 | 2 | Yes | The area meets the relevance and importance criteria for wildlife because CDOW considers the bluehead sucker population within this stretch of river outstanding on a regional scale. Several peregrine falcon eyries occur along the Dolores River the density of eyries suggests the area is more than locally significant. | 0 | 3,635 | (7,400) 7,400 |
| | Wildlife | 2 and 3 | 1 and 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | Riparian Habitat | 3 | 1 and 2 | | | | | |
| | Plants | 3 | 1 and 2 | | Multiple BLM sensitive plants (Kachina daisy, Eastwood's monkeyflower, San Rafael milkvetch, Dolores River skeleton plant, horseshoe milkvetch, Grand Junction milkvetch, and Gypsum cateye) occur in the area. Rare plant communities, including the Rio Grande cottonwood riparian forest community, Foothills riparian shrubland community, and the New Mexico privet community. | | | |
| Dominguez North-Bangs Canyon ONA *Public Proposed* | Cultural | 1 | None | No | Does not meet the relevance and importance criteria for ACEC designation since part of the area is not within the planning area. This area is within both the | 0 | 109,975 | *See existing Rough Canyon ACEC and expansion* |
| | Recreation | None | None | | | | | |
| | Wildlife | 2 | 1 and 2 | | | | | |

BLM_0022934

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Dominguez–Escalante NCA and Bangs Canyon SRMA. Recreational values identified will be analyzed in the Recreation section of the Draft Environmental Impact Statement. The areas' most critical to wildlife and cultural are included in the Rough Canyon ACEC and expansion. | | | |
| East Salt Creek Potential ACEC *Public Proposed* | Fish | 2 | 2 | No | The areas within this proposal that meet the relevance and importance criteria are included in the Roan and Carr Creeks. | 0 | 21,046 | *See Roan and Carr Creeks and Sinbad Valley ACECs* |
| | Wildlife | 2 | 1 and 2 | | | | | |
| | Plants | 3 | 1 | | Meets the relevance criteria for a natural process or system which supports the BLM sensitive plant species Piceance bladderpod. The area contains A-ranked (excellent quality) occurrences of the bladderpod. In addition to the bladderpod, the site also contains hanging garden sullivantia *(Sullivantia hapemanii var. pupusii)* and narrowleaf cottonwood/skunkbrush *(Populus angustifolia/Rhus trilobata)* communities. Meets the importance criteria because the bladderpod is vulnerable to | | | |

BLM_0022935

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | adverse change. | | | |
| | | | | | Meets the relevance criteria for wildlife resource (sage-grouse) because it contains occupied, potential, and vacant/unknown Greater Sage-Grouse habitat. Does not meet importance criteria because these areas are small portions of the currently occupied range of the Parachute-Piceance-Roan population of the Greater Sage-Grouse and are not locally significant. | | | |
| | | | | | The proposed ACEC does not contain lynx habitat. | | | |
| | | | | | Upper Roan and Carr creeks meet the relevance and importance criteria for rare native cutthroat trout because they contain populations of the species. However, these areas are included in the Roan and Carr Creeks ACEC. | | | |
| Fruita Paleontological Site ACEC/RNA *From 1987 RMP Public proposed* | Geologic | N/A | N/A | N/A | Former ACEC is within the McInnis Canyon NCA; therefore it is beyond the scope of this planning effort. | 280 | 280 | 0 |

BLM_0022936

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Gateway  *Public Proposed* | Plants | 3 | I and 2 | No | Meets the relevance criteria for fish and wildlife and a natural system. Meets the importance criteria having qualities that are more than locally significant and vulnerable to adverse change.  Wildlife values are analyzed in proposed John Brown Canyon, Palisade ONA Expansion, and Dolores River Riparian ACECs.  Plant values are analyzed in Palisade ACEC/ONA expansion. | 0 | 11,675 | *See Palisade ONA Expansion, and Dolores River Riparian ACECs* |
|  | Fish | 2 | I and 2 |  |  |  |  |  |
|  | Wildlife | 2 | 2 |  |  |  |  |  |
| Glade Park-Piñon Mesa  *Public Proposed* | Fish | None | None | **Yes** *with modified boundaries* | Meets the relevance criteria for wildlife resource (Gunnison Sage-Grouse). Meets the importance criteria for sensitive and vulnerable to adverse change.  The proposed ACEC does not contain lynx or bald eagle habitat. Contains a significant portion of occupied and potential habitat for the Piñon Mesa population of the Gunnison Sage-Grouse.  The proposed ACEC is not known to contain any rare plants. | 0 | 19,942 | (27,200) 0 |
|  | Wildlife | 2 and 3 | 2 |  |  |  |  |  |
|  | Plants | None | None |  |  |  |  |  |

BLM_0022937

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Granite Creek *Public Proposed* | None | None | None | No | There were no specific values associated with this ACEC proposal, but was recommended for ACEC designation as: *Granite Creek is definitely worthy of immediate protection and oversight, as subtle incursions into that area portend an impending loss of natural values.* | 0 | 8,147 | 0 |
| Greater Demaree SRMA *Proposed by public as a Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values for ACEC designation* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area contain wilderness characteristics (Spring Canyon, Spink Canyon, East Demareee units). | 0 | 81,512 | 0 |
| Greater Granite Creek SRMA *Proposed by public as a* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, | 0 | 42,673 | 0 |

BLM_0022938

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| *Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values for ACEC designation* | | | | | recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area are included in other areas that do meet the criteria for ACEC designation (The Palisade, Glade Park-Pinyon Mesa proposed ACECs); for SRMA designation (Dolores River Canyon SRMA/ERMA); or contain wilderness characteristics (Lumsden Canyon unit). | | | |
| Gunnison Gravels ACEC/RNA *Existing* | Geologic | N/A | N/A | N/A | ACEC is within the Dominguez-Escalante NCA; therefore it is beyond the scope of this planning effort. | 40 | 40 | 0 |

BLM_0022939

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Gunnison River Potential ACEC *Public Proposed* | Fish | 2 and 3 | 2 | No | Meets the relevance criteria for threatened and endangered fish and wildlife resources and a natural system. The importance criteria for qualities that is sensitive and vulnerable to adverse change for riparian habitat supporting stream bank stability and designated critical habitat for threatened and endangered fish species. The areas of this proposal that meet the relevance and importance criteria for listed fish are covered by the staff proposed Gunnison River Riparian ACEC. | 0 | 42,066 | *(See proposed Gunnison River Riparian ACEC)* 0 |
| | Wildlife | 2 | 2 | | | | | |
| | Plants | 3 | 2 | | | | | |
| Gunnison River Riparian *Staff Proposed* | Fish | 2 and 3 | I and 2 | Yes | Meets the relevance criteria for threatened and endangered fish and wildlife resources and a natural system. The importance criteria for qualities that is sensitive and vulnerable to adverse change for riparian habitat supporting stream bank stability and designated critical habitat for threatened and endangered fish species. Part of the ACEC is within the Dominguez-Escalante NCA, which is beyond the scope of this planning effort.. | 0 | 1,962 | (457) 0 |
| | Riparian Habitat | 3 | 2 | | | | | |
| | Plants | 3 | 2 | | | | | |
| | Wildlife | 2 | 2 | | | | | |

BLM_0022940

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | The Colorado hookless cactus (federally threatened) is known to inhabit the alluvial benches of the Gunnison River. Results from a rare plant inventory (which is currently in progress), will determine the importance of this area. | | | |
| | | | | | The CDOW manages the lower Gunnison and Colorado Rivers within the planning area for native, listed, and non-listed aquatic species. The area contains roundtail chub, which has a CNHP Global Rank of G3. | | | |
| | | | | | The US Fish and Wildlife Service designates this segment of the Gunnison River as critical habitat for the Colorado pikeminnow (federally endangered, state threatened), razorback sucker (federally and state endangered), bonytail chub (federally and state endangered), and humpback chub (federally endangered, state threatened). Native and non-listed fish species sympatric with the listed fish species include the flannelmouth sucker, bluehead sucker, roundtail chub (designated a state Species of | | | |

BLM_0022941

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Special Concern), and speckled dace. | | | |
| | | | | | The area provides roosting habitat and connectivity to river habitats upstream for bald eagles and blue herons. | | | |
| Hawxhurst Creek *Staff Proposed* | Fish | 1 | 1, 2 | Yes | Meets the relevance criteria for fish. Meets the importance criteria for having more than locally significant qualities and qualities that make it fragile, sensitive, rare, exemplary, and vulnerable to adverse change. | 0 | 864 | (864) 0 |
| | | | | | The creek contains a population of rare native cutthroat trout (*Oncorhynchus clarkii*) | | | |
| Indian Creek *Staff Proposed* | Cultural | 1 and 3 | 1 and 2 | Yes | Meets the relevance criteria for the presence of significant cultural resource values and the presence of a natural process or system. The importance criteria for more than locally significant qualities and qualities that make it fragile, sensitive, unique, and vulnerable to adverse change. | 0 | 1,747 | (2,300) 2,300 |
| | | | | | This area straddles approximately three miles of Indian Creek, a tributary to the Gunnison River that has both significant preservation of Holocene to Late | | | |

BLM_0022942

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

## Table D-2
## Relevance and Importance Criteria Evaluation for Existing and New ACECs

| Name of ACEC Existing, Proposed, and Approved | Values Assessed | Relevance Criteria see Section II for Relevance Criterion | Importance Criteria see Section II for Importance Criterion | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] includes acres from 1987 RMP | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Pleistocene deposits that have yielded Paleoindian artifacts and an accessible yet relatively undisturbed area that provides a unique geomorphological research area. These are eligible for nomination to the National Register of Historic Places under criterion "d," as sites that have yielded and should continue to yield significant information on the prehistory and history of the area. Distinct stratified deposits representing the full range of human occupation are present with an emphasis on Late Paleoindian, Middle Archaic, and Ute cultures, and climate research (paleoenvironmental) indicates that these deposits correspond to regional periods of increased moisture. Kit fox inhabit the area. | | | |

BLM_0022943

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| John Brown Canyon *Public Proposed* | Wildlife | 2 | 1 | Yes | Meets the relevance criteria for fish and wildlife resource. Meets the importance criteria for qualities that are sensitive. Ponderosa pine *(Pinus ponderosa)* stands (located at the head of John Brown Canyon and extending somewhat north and south from there) constitute the northern most range of the Grace's warbler *(Dendroica graciae)*. Habitat for this warbler is scarce within the planning area. | 0 | 1,417 | (1,416) 0 |
| Juanita Arch *Staff and Public Proposed* | Geologic | 3 | 2 | Yes | Meets the relevance criteria for geologic and plants for a natural process. Meets the importance criteria for having more than locally significant qualities and qualities that make it rare, irreplaceable, exemplary, and unique. Juanita arch is classified as the only natural bridge in the state of Colorado, thus making this a unique geologic feature to the region. The rare plants, Grand Junction milkvetch and San Rafael milkvetch, also occur in this area. | 0 | 1,950 | (1,600)1,600 |
| | Plants | 3 | 1 | | | | | |

BLM_0022944

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Knight/Owens Hadrosaurid Locality *Staff Proposed* | Paleontological | No | No | No | Does not meet the relevance criteria for a natural process or system, and does not have significant paleontological values. Does not meet the importance criteria for more than locally significant qualities as a World Class Paleontological Research and publicly interpreted visitation location. A disarticulated juvenile Hadrosaur was collected and studied in the late 1980s. There were also fossilized remains of a Pliosaur and Mosasaurs as well as Pyritized inverts and large concretions nearby this site. However, a BLM survey was conducted recently and no fossils were found. | 0 | 40 | 0 |
| Logan Wash *Public Proposed* | Fish | 2 and 3 | None | No | Meets the relevance criteria for a natural system containing sensitive habitat for plants. Meets the importance criteria for having more than locally significant qualities and qualities of sensitive and rare plants. The area does not contain lynx habitat. The southern tip of the proposed ACEC contains a portion of the | 0 | 14,514 | *(See proposed Colorado River Riparian ACEC)* 0 |
| | Wildlife | 2 and 3 | None | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |

BLM_0022945

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | critical habitat designated for the four listed fish species on the Colorado River; however this area is small and surrounded by private land and not carried forward for further analysis. | | | |
| | | | | | The proposed ACEC is adjacent to Roan Creek, a fish bearing stream, however BLM segments are small and do not meet the relevance and importance criteria. | | | |
| | | | | | The proposed ACEC contains some potential and occupied Greater Sage-Grouse habitat; however the amount of occupied habitat included in the proposed ACEC is not significant for the Parachute-Piceance-Roan population and therefore does not meet the importance criteria. | | | |
| | | | | | The area meets the criteria for both relevance and importance by containing numerous BLM sensitive plants, one federally threatened plant, and possibly two federal candidate species. The rare plant species found within this landscape include, but are not limited to: DeBeque milkvetch, adobe thistle, Naturita milkvetch, Roan Cliffs blazingstar, | | | |

BLM_0022946

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Colorado hookless cactus (threatened), Parachute penstemon *(Penstemon debilis)* (candidate), and DeBeque phacelia (candidate). The majority of the known plants are vulnerable to adverse change. The proposed ACEC area is heavily fragmented by energy development infrastructure. | | | |
| Mt. Garfield *Staff Proposed* | Scenic | 1 | 1 and 2 | Yes | Meets the relevance criteria for scenic and importance criteria as irreplaceable (locally significant qualities/meaning). Meets the importance criteria for having more than locally significant qualities and fragile qualities. Mt. Garfield is an iconic land feature within the Grand Valley region of the field office, often used as a symbolic feature of Grand Junction. The Mt. Garfield area was designated in the 1987 RMP as VRM Class 1. | 0 | 5,695 | (5,695) 2,400 |
| Nine-mile Hill Boulders *Staff Proposed* | Paleontological | 3 | 2 | Yes | Meets the relevance criteria for a natural process or system, and has significant paleontological values. Meets the importance criteria for qualities sensitive and exemplary as a World Class Paleontological Research and | 0 | 87 | (87) 0 |

BLM_0022947

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC Existing, Proposed, and Approved | Values Assessed | Relevance Criteria see Section II for Relevance Criterion | Importance Criteria see Section II for Importance Criterion | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] includes acres from 1987 RMP | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | publicly interpreted visitation location. | | | |
| | | | | | Pull-off areas between guard railings have a well-preserved theropod femur mold and other bone molds from the Burro Canyon Formation. There are also petrified wood stumps and impressions of other dinosaur bones nearby. | | | |
| North Desert Public Proposed | Wildlife | 2 | None | No | Meets the relevance criteria for wildlife resources and a natural system. Does not meet importance criteria because wildlife habitat is not regionally significant. | 0 | 2,407 | 0 |
| | Plants | 3 | None | | These areas provide habitat for the burrowing owl; however they are not regionally significant. | | | |
| | | | | | The boundary proposed was fragmented into four distinct areas, making management difficult. | | | |
| | | | | | Meets the relevance criteria, but does not meet the importance criteria for rare plants. While the BLM special status plant species grand buckwheat may occur in the proposed ACEC, records indicate that very little buckwheat | | | |

BLM_0022948

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | has been recorded in this area. | | | |
| The Palisade ACEC/ONA and Expansion *Existing Staff Proposed* | Plants | 3 | 1 and 2 | Yes | Meets the relevance criteria for scenic values and a natural system supporting rare plants. Meets the importance criteria for more than locally significant qualities and has qualities that make it fragile, irreplaceable, and vulnerable to adverse change. | 26,951 | 32,334 | (32,200) 32,200 |
| | Wildlife | 2 | 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | | | | | Recent plant inventories completed by CNHP have recorded rare plants around the base of the Palisade, and across the Dolores River. A larger area is needed to cover newly discovered plants, and to provide protection should the Wilderness Study Area designation change. Plants known to occur around the base of the Palisade, and across the Dolores River include: Dolores River skeleton plant *(Lygodesmia doloresensis)*, San Rafael milkvetch *(Astragalus rafaelensis)*, horseshoe milkvetch *(Astragalus equisolensis)*, Fisher Tower's milkvetch *(Astragalus piscator)*, tufted green gentian *(Frasera paniculata)*, and osterhouts catseye *(Cryptantha osterhoutii)*. | | | |

BLM_0022949

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Expanded area would protect nesting areas for peregrine falcons. | | | |
| Persigo Wash Potential *Public Proposed* | Fish | None | None | No | The criteria for relevance have not been met for cultural resources, fish and wildlife resources and a natural system. The criteria for importance have not been met, since the habitat within the proposed ACEC area is not of regional significance or has qualities of sensitivity. | 0 | 5,532 | 0 |
| | Wildlife | None | None | | | | | |
| | Plants | None | None | | | | | |
| | Cultural | None | None | | Previous cultural surveys have not indicated the presence of significant historic or cultural values nor are there cultural resources present of significant quality compared to similar resources in GJFO. | | | |
| | | | | | The area does not contain any fish bearing streams. The area contains artificial kit fox structures and includes the area with the last known den for kit fox in the field office, however these areas do not meet the importance criteria because kit fox have not been documented using the artificial structures nor have they been documented in | | | |

BLM_0022950

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | the area in the past 10 years. Prairie dog release sites for the Mesa County Prairie Dog Relocation group occur in the area but they are not regionally significant for the species and therefore do not meet the importance criteria. | | | |
| | | | | | While some grand buckwheat is known to occur in the Mancos shale 'badlands' north to the town of Fruita, this area does not represent an outstanding occurrence, in size or quality. | | | |
| Plateau Creek *Staff Proposed* | Fish | 2 | 1, 2, 3 | Yes | Meets Relevance and Importance Criteria for BLM sensitive fish species.  Protection would help implement the Range-Wide Conservation Agreement and Strategy to avoid federal listing under Endangered Species Act. | N/A | 223 | (223) 0 |
| Prairie and South Canyons *Public Proposed* | Wildlife | None | None | No | The proposed ACEC does not contain lynx habitat. The area contains several fragmented pieces, which makes potential management difficult. | 0 | 6,081 | 0 |
| Prairie Canyon (renamed from Baxter Ridge) *Public Proposed* | Wildlife | 2 and 3 | 2 | **Yes** *with modified boundaries* | Meets the relevance criteria for wildlife resources and a natural system supporting breeding habitat for a variety of species and core wildlife habitat that is also | 0 | 19,853 | (6,866) 0 |
| | Plants | 3 | 1 | | | | | |

BLM_0022951

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC Existing, Proposed, and Approved | Values Assessed | Relevance Criteria see Section II for Relevance Criterion | Importance Criteria see Section II for Importance Criterion | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] includes acres from 1987 RMP | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | included in the Prairie Canyon Wildlife Emphasis Area. Meets the importance criteria for supporting a unique assemblage of species that is of more than local significance and qualities that make it fragile and vulnerable to adverse change to rare plants. | | | |
| | | | | | The area provides a breeding habitat for the burrowing owl *(Athene cunicularia)*, long-billed curlew *(Numenius americanus)*, sage sparrow *(Amphispiza belli)*, kit fox *(Vulpes macrotis)*, long-eared owl *(Asio otus)*, Scott's oriole *(Icterus parisorum)*, and white-tailed prairie dog *(Cynomys leucums)*. | | | |
| | | | | | The proposed boundary was very large and has been modified to include only core habitat for the species. The entire area could be considered for wildlife emphasis management. | | | |
| | | | | | The area contains habitat for grand buckwheat, a rare plant within the planning area. | | | |
| Pyramid Rock | Plants | 3 | 1 and 2 | **Yes** | Meets the relevance criteria for | 551 | 1,265 | (1,300) 1,300 |

BLM_0022952

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| ACEC/RNA *Existing Staff Proposed* | Cultural | 1 | 1 and 2 | | the presence of significant cultural resource values that are important to Native Americans and the presence of a natural process or system that protects these resources. Meets the importance criteria because it has more than locally significant qualities compared to other resources in the planning area and these resources are rare, exemplary, unique, and vulnerable to adverse change. | | | |
| | | | | | The expansion makes the boundary of the existing ACEC more clearly defined by using existing roads or natural landform features. It also increases the area to accommodate better management and adequately protect sensitive plants and cultural resources. | | | |
| | | | | | Rare plants known to occur within the existing ACEC are: Colorado hookless cactus (formerly Uinta Basin hookless cactus) (*Sclerocactus glaucus*), DeBeque phacelia (*Phacelia scopulina* var. *submutica*), DeBeque milkvetch (*Astragalus debequaeus*), Naturita milkvetch (*Astragalus* | | | |

BLM_0022953

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | *naturitensis),* adobe thistle *(Cirsium perplexans),* and aromatic Indian breadroot. The existing ACEC is a research site for Denver Botanic Gardens. | | | |
| Rabbit Valley-Rattlesnake Canyon Potential ACEC *Public Proposed* | Fish | N/A | N/A | N/A | ACEC is within the McInnis Canyon NCA; therefore it is beyond the scope of this planning effort. | 0 | 18,276 | 0 |
| | Wildlife | N/A | N/A | | | | | |
| | Plants | N/A | N/A | | | | | |
| Rapid Creek (renamed from Orchard Mesa Potential ACEC) *Public Proposed* | Fish | 2 and 3 | 1 and 2 | No | During BLM's initial review of the area, it was believed that the portion of the proposed ACEC that includes Rapid Creek contained rainbow trout *(Oncorhynchus mykiss),* cutthroat trout *(Oncorhynchus clarki),* and roundtail chub *(Gila robusta).* The boundary was modified to encompass Rapid Creek without the other outlying areas of the original proposal. Upon further analysis and sampling it was determined that Rapid Creek does not contain these species. Therefore the proposed ACEC does not meet the relevance or importance criteria for fish. A portion of the proposed ACEC near Vincent Reservoir contains a small portion of potential lynx | 0 | 13,392 | (220) 0 |
| | Wildlife | None | None | | | | | |
| | Plants | 3 | None | | | | | |

BLM_0022954

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | habitat, however these parcels are not significant for the species and | | | |
| | | | | | therefore do not meet the importance criteria. | | | |
| | | | | | While Horse Mountain, and the Orchard Mesa Potential Conservation Area contain recorded cacti locations, so few have been recorded in this area that it is not considered significant for the Colorado hookless cactus, and thus does not meet the importance criteria. The BLM special status plant species, narrowstem gilia *(Gilia stenothysra)*, is also known to occur at the base of the Bookcliffs; however the known population size in this area is not considered significant. | | | |
| Rattlesnake Canyon *Public Proposed* | Plants | N/A | N/A | N/A | ACEC is within the McInnis Canyon NCA; therefore it is beyond the scope of this planning effort. | 0 | 4,628 | 0 |
| Reeder Mesa *Staff and Public Proposed* | Plants | 3 | 2 | Yes | The portion of the proposed ACEC which includes Reeder Mesa contains a Colorado hookless cactus study site. The cactus is thought to have crossed | 0 | 474 | (474) 0 |

BLM_0022955

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | with smallfower fishhook cactus *(Sclerocactus parviflorus)* resulting in a hooked central spine. Genetic studies are ongoing. This area of the proposed ACEC meets the importance criteria. | | | |
| Roan and Carr Creeks *Staff and Public Proposed* | Riparian Habitat | 3 | 2 | Yes | Meets the relevance criteria for fish and wildlife resource and a natural system. Meets the importance criteria for having more than locally significant qualities and qualities that make it fragile, sensitive, rare, exemplary, and vulnerable to adverse change.<br><br>CDOW manages and designates portions of Roan and Carr Creek drainages for genetically pure native cutthroat trout. Therefore the area meets the relevance and importance criteria for fish.<br><br>CDOW performs successful spawn-take operations in these drainages, utilizing such to develop hatchery broodstock. Successful rearing of these fish in the hatchery results in stocking pure cutthroat trout in other waters in Colorado.<br><br>BLM sensitive plant Piceance bladderpod and the sun-loving meadowrue *(Thalictrum* | 0 | 40,722 | (33,600) 33,600 |
| | Fish | 2 and 3 | 1 and 2 | | | | | |
| | Wildlife | None | None | | | | | |
| | Plants | 2 | None | | | | | |

BLM_0022956

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | *heliophilum*) occur with the area; however, the proposed ACEC boundary does not contain the largest, nor most robust, bladderpod populations in the planning area. | | | |
| Rough Canyon ACEC/RNA *Existing Staff Proposed* | Plants | 3 | 1 | Yes | Meets the relevance criteria for the presence of significant cultural resources and resources important to Native Americans, wildlife resources, a natural system, and natural hazards. Meets the importance criteria for more than locally significant with cultural resources that are unique and vulnerable to adverse change. | 2,737 | 2,778 | (2,800) 2,800 |
| | Wildlife | 2 | 1 and 2 | | | | | |
| | Scenic | 1 | None | | | | | |
| | Cultural | 1 | 1 and 2 | | | | | |
| | Geologic | 1 | 1 and 2 | | | | | |
| | | | | | Expansion makes the boundary of this ACEC clearly defined by existing roads or natural landform features, increases area to accommodate better management of Gunnison Sage-Grouse *(Centrocercus minimus)* and adequately protect cultural resources. | | | |
| | | | | | BLM sensitive Grand Junction milkvetch *(Astragalus linifolius)* are found within the area (Grand Junction milkvetch). The rare plant Eastwood's desertparsley *(Lomatium eastwoodiae)* also | | | |

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0022957

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | occurs in the area. | | | |
| | | | | | This area has some of the highest cultural densities in the planning area. The expansion would complement the management of cultural resources in the existing Rough Canyon ACEC. | | | |
| | | | | | The area has unique and complex geologic structure displaying a large monocline and fault zones. | | | |
| Sinbad Valley *Staff and Public Proposed* | Geologic | 3 | 2 | Yes | Meets the relevance criteria for significant cultural values, historic landscape values and a natural system supporting rare plants. Meets the importance criteria for more than locally significant qualities and qualities that are sensitive, rare, and unique. | 0 | 7,184 | (6,399)6,399 |
| | Scenic | 1 | None | | | | | |
| | Cultural | 1 | 2 | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |
| | | | | | Portions of Sinbad Valley that occur on BLM property contain a broad oval depression that is the exposed core of a breached anticline. As the salt (halite) layer in the center of the anticline was exposed to weathering and quickly dissolved, the entire structure collapsed on itself, leaving a valley floor ringed by faults and inward-facing | | | |

BLM_0022958

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | escarpments on the valley rim. Rocks exposed in Sinbad Valley range in age from Pennsylvanian in the lower slopes and valley floor, to Lower Cretaceous in the upper part of the outer rim. The rim includes dramatic exposures of Wingate and Entrada sandstones. | | | |
| | | | | | Recent rare plant surveys have mapped populations of the newly described and extremely rare Gypsum cateye *(Cryptantha gypsophila)*. This area meets the relevance criteria for the presence of significant cultural resources, historic landscape values, and resources important to Native Americans. | | | |
| | | | | | Cultural Resource surveys within Sinbad Valley have resulted in recording sites important to the Ute Tribe, including wickiup camps and trails. Alignment and local historical accounts make it likely that the Ute trail, unique because of distinctive travois tread, continues into the proposed ACEC. Plant resources important to the Ute are also present in a high density that may | | | |

BLM_0022959

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | be attributable to historic cultural practices. Traditional use and heritage resources are more than locally significant and give this area special meaning to the Native Americans who traditionally used the area. Ute trails are exemplary to connecting modern visitors to this historic landscape. | | | |
| Sinbad Valley SRMA *Proposed by public as a Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values for ACEC designation* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area do meet the criteria for ACEC designation (Sinbad Valley, Dolores River Riparian, John Brown Canyon proposed ACECs), or SRMA designation (Dolores River Canyon SRMA/ERMA) | 0 | 42,731 | 0 |
| South Shale Ridge-Cow Ridge RNA *Public Proposed* | Recreation | None | None | No | Portions of this proposal are included in the Coon Hollow/South Shale Ridge and Pyramid Rock ACECs and are | 0 | 59,702 | *See South Shale Ridge and Pyramid Rock ACECs* |

BLM_0022960

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | being carried forward for further analysis. Areas in the Cow Ridge region are not being carried forward for further analysis because they do not meet the relevance and importance criteria. | | | |
| South Shale Ridge Potential ACEC *Public Proposed* | Wildlife | 2 | 1 | No | Portions of this proposal are included in the Coon Hollow/South Shale Ridge and Pyramid Rock ACECs and are being carried forward for further analysis. Areas in the Cow Ridge region are not being carried forward for further analysis because they do not meet the relevance and importance criteria. | 0 | 47,341 | *See South Shale Ridge and Pyramid Rock ACECs* |
| | Plants | 3 | 1 and 2 | | | | | |
| Unaweep-Maverick Canyon SRMA *Proposed by public as a Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs. Portions of the area do meet the criteria for ACEC designation (Dolores River Riparian, Juanita Arch proposed ACECs); for SRMA designation (Dolores River Canyon | 0 | 29,917 | 0 |

BLM_0022961

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| *for ACEC designation* | | | | | SRMA/ERMA); or contain wilderness characteristics (Unaweep and Maverick units). | | | |
| Unaweep Seep ACEC/RNA *Public Proposed* | Fish and Wildlife | 2 and 3 | 2 | Yes | Meets the relevance criteria for wildlife and a natural system that supports the Unaweep fritillary butterfly *(Speyeria nokomis)*. The importance criteria for more than locally significant qualities and the wetland complex is fragile, sensitive, rare, irreplaceable, unique, and very vulnerable to adverse change for wildlife and rare plants. | 78 | 84 | (85) 85 |
| | Plants | 3 | 1 and 2 | | | | | |
| | Riparian Habitat | 3 | 1 and 2 | | | | | |
| | Hydrologic | 3 | 2 | | | | | |
| | | | | | The Unaweep Seep is an existing natural area recognized by the State of Colorado that possesses habitat for the Unaweep fratillary butterfly, which depends on a unique wetland complex comprised of twenty seeps occurring in concentration on a hillside in Unaweep Canyon and a research location for giant helleborine *(Epipactus gigantea)*. Large wetland complexes are extremely rare within the GJFO, particularly undisturbed sites such as this that support a large diversity of plants and animals. | | | |
| Unaweep Seep | Wildlife | 2 | 2 | No | Portions of the proposed ACEC | 78 | 23,108 | *See existing Unaweep* |

BLM_0022962

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| Potential ACEC *Public Proposed* | Hydrologic | 3 | 2 | | are within both the existing Unaweep Seep and Palisade ACEC and are being analyzed separately. Areas outside of the existing ACECs do not meet the relevance and importance criteria and are not being carried forward for further analysis. | | | *Seep and Palisade ACECs* |

[1]Acreages include proposed expansions.

BLM_0022963

Case No. 1:20-cv-02484-MSK  Document 33  filed 04/27/21  USDC Colorado  pg 242 of 270

Appendix D. Summary of Areas of Critical Environmental Concern Report on the
Application of Relevance and Importance Criteria

## D.5     REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 1988. Manual 1613: Areas of
     Critical Environmental Concern. Rel. 1-1541. BLM, Washington, DC. September 29, 1988. 22
     pp.

_____. Areas of Critical Environmental Concern Report on the Application of the Relevance and
     Importance Criteria. BLM, Grand Junction Field Office, Grand Junction, Colorado. January 2010.
     84 pp.

BLM_0022964

# Appendix E

BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado

BLM_0022965

BLM_0022966

# APPENDIX E
# BLM STANDARDS FOR PUBLIC LAND HEALTH AND GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT IN COLORADO

## STANDARDS FOR PUBLIC LAND HEALTH

Standards describe conditions needed to sustain public land health, and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape.

### Standard 1

Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

#### Indicators

- Expression of rills, soil pedestals is minimal.
- Evidence of actively-eroding gullies (incised channels) is minimal.
- Canopy and ground cover are appropriate.
- There is litter accumulating in place and is not sorted by normal overland water flow.
- There is appropriate organic matter in soil.
- There is diversity of plant species with a variety of root depths.
- Upland swales have vegetation cover or density greater than that of adjacent uplands.
- There are vigorous, desirable plants.

BLM_0022967

## Standard 2

Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

### Indicators

- Vegetation is dominated by an appropriate mix of native or desirable introduced species.

- Vigorous, desirable plants are present.

- There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.

- Streambank vegetation is present and is comprised of species and communities that have root systems capable of withstanding high streamflow events.

- Plant species present indicate maintenance of riparian moisture characteristics.

- Stream is in balance with the water and sediment being supplied by the watershed (e.g., no headcutting, no excessive erosion or deposition).

- Vegetation and free water indicate high water tables.

- Vegetation colonizes point bars with a range of age classes and successional stages.

- An active floodplain is present.

- Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.

- Stream channels with size and meander pattern appropriate for the stream's position in the landscape, and parent materials.

- Woody debris contributes to the character of the stream channel morphology.

## Standard 3

Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

### Indicators

- Noxious weeds and undesirable species are minimal in the overall plant community.

BLM_0022968

- Native plant and animal communities are spatially distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.

- Plants and animals are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations.

- Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.

- Photosynthetic activity is evident throughout the growing season.

- Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.

- Appropriate plant litter accumulates and is evenly distributed across the landscape.

- Landscapes composed of several plant communities that may be in a variety of successional stages and patterns.

## Standard 4

Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

### Indicators

- All the indicators associated with the plant and animal communities standard apply.

- There are stable and increasing populations of endemic and protected species in suitable habitat.

- Suitable habitat is available for recovery of endemic and protected species.

## Standard 5

The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

### Indicators

- Appropriate populations of macroinvertebrates, vertebrates, and algae are present.

- Surface and ground waters only contain substances (e.g. sediment, scum, floating debris, odor, heavy metal precipitates on channel

BLM_0022969

substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the Water Quality Standards established by the State of Colorado (5 CCR 1002-8).

## GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT

Guidelines are the management tools, methods, strategies, and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the standards. Currently, the only guidelines for BLM Colorado that have been developed in concert with the Resource Advisory Councils are livestock grazing management guidelines.

1. Grazing management practices promote plant health by providing for one or more of the following:

   - periodic rest or deferment from grazing during critical growth periods;

   - adequate recovery and regrowth periods;

   - opportunity for seed dissemination and seedling establishment.

2. Grazing management practices address the kind, numbers, and class of livestock, season, duration, distribution, frequency and intensity of grazing use and livestock health.

3. Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion, to assist in maintaining appropriate soil infiltration and permeability, and to buffer temperature extremes. In riparian areas, vegetation dissipates energy, captures sediment, recharges ground water, and contributes to stream stability.

4. Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity. Where reseeding is required, on land treatment efforts, emphasis will be placed on using native plant species. Seeding of non-native plant species will be considered based on local goals, native seed availability and cost, persistence of non-native plants and annuals and noxious weeds on the site, and composition of non-natives in the seed mix.

5. Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts to other resources or uses of riparian/wetland and upland sites.

6. Grazing management will occur in a manner that does not encourage the establishment or spread of noxious weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds.

BLM_0022970

7. Natural occurrences such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape, including the maintenance, restoration, or enhancement of habitat to promote and assist the recovery and conservation of threatened, endangered, or other special status species, by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, and thus minimizing habitat fragmentation.

8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

BLM_0022971

This page intentionally left blank.

BLM_0022972

# Appendix F
## Wilderness Characteristics Inventory

BLM_0022973

BLM_0022974

# APPENDIX F
# WILDERNESS CHARACTERISTICS INVENTORY AND PLANNING

## INTRODUCTION

The BLM, GJFO, in accordance with the BLM policy on conducting wilderness characteristics inventories on BLM lands under Section 201 of the FLPMA (BLM Manual 6310, Conducing Wilderness Characteristics Inventory on BLM Lands), has updated its inventory of lands with wilderness character found within the GJFO planning area. This document highlights the findings of this inventory. The complete inventory report is available on the RMP Web site at http://www.blm.gov/co/st/en/fo/gjfo/rmp.html.

The original wilderness characteristics Inventory was conducted in 1979, resulting in the establishment of current wilderness study areas (WSAs) found in the GJFO. Some of the units analyzed as part of this inventory were part of the original inventory of 1979, or a supplemental inventory in 1999.

### Process for Identifying Wilderness Character Inventory Units

In an effort to conduct the most thorough analysis of lands with wilderness characteristics, the GJFO established a process for identification of wilderness character inventory units. This process included identification of units through two avenues; 1) Citizens' Wilderness Proposals (CWPs), and 2) Internal identification:

1) Citizens' Wilderness Proposals: Between 2001 and 2009, the Colorado Environmental Coalition submitted CWPs for 14 units within the planning area. These proposals included inventory reports conducted by non-BLM personnel. Several organizations referenced these CWPs in their comments during scoping for the GJFO Resource Management plan revision. The portions of the CWP identified units that are not within existing WSAs were carried forward for this inventory.

BLM_0022975

2) In addition to CWPs, GJFO staff identified areas that may possess wilderness characteristics based on their field knowledge. Then during the inventory process, the BLM Washington Office issued IM 2011-154, Requirement to Conduct and Maintain Inventory Information for Wilderness Characteristics and to Consider Lands with Wilderness Characteristics in Land Use Plans. This guidance included a document titled "Policy on Conducting Wilderness Characteristics Inventory on BLM Lands." Guidance in the IM was later published in BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands.

In accordance with the new policy document, the GJFO completed a spatial data analysis to identify all areas in the GJFO which hosted 5,000 or more roadless acres of land. This analysis used the GJFO route inventory data set. A comprehensive route inventory had been compiled through years of field inventory for use in travel management planning. The analysis for identifying potential lands with wilderness characteristics utilized this data, seeking out certain route classes (not including single track or ATV trails) in determining the roadless areas. The initial boundaries of the units potentially containing wilderness characteristics were formed using land status and Route Inventory data. This process proved effective as evidenced by the fact that the results of the analysis pointed to all existing WSAs and all previously identified inventory units including CWPs as areas that may include over 5,000 roadless acres. The additional units identified by the spatial analysis provided the starting point for field inventory.

## Process for Conducting Wilderness Character Inventory

The process defined above identified 31 units (in addition to existing WSAs), totaling approximately 400,000 acres to be inventoried for the presence or absence of wilderness characteristics. The inventory was conducted using the process identified in BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands. The field inventory identified the presence or absence of the following characteristics:

- size;

- apparent naturalness;

- opportunities for solitude;

- opportunities for primitive or unconfined recreation; and

- supplemental values found for the unit.

The findings of past inventories (where applicable), including those provided in CWPs were compared to the current state of the units, analyzing changes in the landscape and levels of human impact, and were either confirmed or refuted

BLM_0022976

based on the analysis. The inventory write up for each unit also included a summary of major human uses, including valid existing rights (e.g., fluid mineral leases and mining claims), which could affect wilderness characteristics in the future.

This inventory was conducted between 2009 and 2011, and in some cases involved validating previous inventories. Therefore specific descriptions (e.g., condition of a trail and acreage of the unit currently leased for fluid minerals) may no longer be exact but offer a snapshot of conditions at the time of the inventory.

**Table F-1**, Summary of Findings, provides details for each wilderness characteristics inventory unit (WCIU). **Figure F-1**, Wilderness Characteristics Inventory, shows a map of all the units and the defining characteristics of each.

## Procedures for Considering Lands with Wilderness Characteristics in Land Use Planning

BLM Manual 6320, Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process provides BLM Field Offices guidance for considering lands with wilderness characteristics in the land use planning process. In accordance with this guidance, the GJFO RMP alternatives considered a full range of reasonable alternatives for management of lands with wilderness characteristics. The alternatives ranged from no specific protections for lands with wilderness characteristics, to an alternative that set specific protections for all of the units with wilderness characteristics.

The alternatives were developed considering manageability and resource values and uses. The alternatives also included a range of management prescriptions for WSAs, should they be released from wilderness consideration by Congress. This range included the management of the WSA areas for their wilderness characteristics.

The RMP allocates three lands with wilderness characteristics units to be managed for their wilderness characteristics.

- Bangs Canyon (Bangs): A series of shallow to moderately deep canyons drain northeasterly from the edge of Piñon Mesa (a part of the Uncompahgre Plateau) into the Gunnison River. Bang's Canyon, West Bang's Canyon, and the canyon of North East Creek. Critically sensitive from a cultural resource standpoint, the area was utilized as long ago as 10,000 years - first by the paleo Indian culture and successively by the cultures commonly referenced as the archaic, Fremont and Ute. Recreational activities include mountain biking, hiking, backpacking, hunting, driving off-highway vehicles, and horseback riding. A short segment of the 142-mile Tabeguache Trail, an extension of the Colorado Plateau Mountain Bike Trail System, traverses the inventory unit.

**Table F-1**
**Summary of Findings**

| Unit Identifier | WCIU Name | Total Acreage of WCIU | WCIU Identified by External Proponent | WCIU Identified by BLM | WCIU Found to have Wilderness Character | Acres Found to Have Wilderness Character |
|---|---|---|---|---|---|---|
| 1 | Bang's Canyon | 20,434 | • | • | • | 20,434 |
| 2 | Bang's West | 6,879 | | • | | |
| 3 | Barrel Spring | 10,169 | | • | | |
| 4 | Brush Mountain | 5,310 | | • | | |
| 5 | Buck Canyon | 5,009 | | • | | |
| 6 | Buttermilk Canyon | 14,086 | | • | | |
| 7 | County Line | 7,380 | | • | | |
| 8 | Cow Ridge | 15,721 | • | | | |
| 9 | East Demaree | 4,796 | • | • | • | 4,796 |
| 10 | East Salt Creek | 18,303 | | • | • | 17,008 |
| 11 | Granite Creek | 14,048 | • | | | |
| 12 | Horse Mountain | 10,303 | | • | | |
| 13 | Hunter Canyon | 32,700 | • | | • | 32,228 |
| 14 | Kings Canyon | 9,606 | • | • | • | 9,606 |
| 15 | Lipan Wash | 15,373 | | • | | |
| 16 | Little Bookcliffs WSA Expansion | 1,580 | • | | | |
| 17 | Little Horsethief Creek | 5,732 | | • | | |
| 18 | Lumsden Canyon | 13,764 | | • | • | 10,072 |
| 19 | Main Canyon | 12,613 | | • | | |
| 20 | Maverick | 20,401 | • | • | • | 20,401 |
| 21 | Munger Creek | 23,801 | | • | | |
| 22 | Payne Wash | 8,153 | | • | | |
| 23 | Prairie Canyon | 17,569 | • | | | |
| 24 | Sagebrush Pillows | 5,127 | • | | | |
| 25 | Sewemup Mesa | 23,551 | • | | | |
| 26 | South Shale Ridge | 27,540 | • | • | • | 27,540 |
| 27 | Spink Canyon | 13,081 | | • | • | 13,081 |
| 28 | Spring Canyon | 14,009 | | • | • | 8,848 |
| 29 | The Blowout | 5,105 | | • | | |
| 30 | Unaweep | 9,494 | • | • | • | 7,154 |
| 31 | West Creek | 111 | • | • | • | 111 |

BLM_0022978

**Figure F-1**
**Wilderness Characteristics Inventory**



BLM_0022979

- Maverick: A five-canyon complex and unique roadless area with outstanding opportunities for solitude given the topography, vegetation, and unique feature of Juanita Arch, which is the only natural bridge in Colorado. Mining claims are present at the boundaries of the unit but there has been no development of the claims. While there are existing oil and gas leases, the area is not within the area of current known potential for conventional or shale gas development and no past exploration or development for oil and gas has occurred.

- Unaweep: This area has outstanding opportunities for solitude and primitive and unconfined recreation with the unit primarily affected by the forces of nature. It includes the 1,000-foot-deep Ute Creek Canyon with the sheer granite cliffs of Unaweep Canyon. There are no right-of-way conflicts, and no current mining claims. While there are approximately 100 acres of existing oil and gas leases, the area is not within the area of current known potential for conventional or shale gas development and no past exploration or development for oil and gas has occurred.

The remaining nine areas fall within the portion of the GJFO with known potential for natural gas development, and are largely leased for oil and gas development; or provide motorized and mechanized use opportunities. Under the Preferred Alternative and its corresponding travel management plan the manageability of these areas for wilderness characteristics would be compromised by valid existing rights, and/or motorized and mechanized use and these areas would be managed for other resources and resource uses. The impacts of the management alternatives on lands with wilderness characteristics can be found in Chapter 4 of the Proposed RMP/Final EIS.

BLM_0022980

# Appendix G
## Comprehensive Air Resource Protection Protocol

BLM_0022982

**February 2014**



# COLORADO BUREAU OF LAND MANAGEMENT

## COMPREHENSIVE AIR RESOURCE PROTECTION PROTOCOL (CARPP)

Version Date:  February 2014

BLM_0022983

# TABLE OF CONTENTS

Section Page

**COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL**

Section I – Purpose, Scope, and Responsibilities ...................................................................3
Section II – Interagency Air Resources Collaboration .........................................................4
Section III – Actions to Analyze & Protect Air Quality.........................................................4
III.A Monitoring..................................................................................................................5
III.B Emissions Inventories.................................................................................................6
III.C Modeling.....................................................................................................................6
III.D Permitting ...................................................................................................................8
III.E Mitigation ...................................................................................................................9
Section IV – Adaptive Management Processes for Air Resources.................................... 10
Section V – Annual Summary Report ................................................................................... 13
Section VI – Oil and Gas Development Emissions Reduction Strategies & BMPs........................ 13

BLM_0022984

# COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL (CARPP)

## SECTION I – PURPOSE, SCOPE, AND RESPONSIBILITIES

This Comprehensive Air Resources Protection Protocol (CARPP) describes the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality within the state of Colorado. This protocol also outlines specific measures that may be taken to address BLM-approved activities with the potential to cause significant adverse impacts to air resources (via the generation of significant quantities of air emissions) within any planning area (as determined on a case by case basis). Further, the purposes of this protocol are to address air quality issues identified by the Bureau of Land Management (BLM), or public scoping, in its analysis of potential impacts on air resources for BLM Colorado Resource Management Plans and Environmental Impact Statements (RMP/EIS); and clarify the mechanisms and procedures that BLM will use to achieve the air resources goals, objectives, and management actions set forth in BLM Colorado RMPs.

### I.A     CARPP Scope

The CARPP is not a decision document, but rather a strategy to address air quality concerns throughout BLM-managed lands and resources in Colorado. Because the CARPP is not a field office specific management tool, it may be modified as necessary to comport or comply with changing laws, regulations, BLM policy, or to address new information and changing circumstances without maintaining or amending any specific Field Office RMP (see reference version date on the cover page).

However, changes to the goals, objectives, or management actions set forth in any Colorado Field Office RMP/EIS as a result of the changes in the CARPP (or more specifically, any subsequent analysis based on such changes) would require an amendment of the specific RMP being affected.

### I.B     BLM Responsibilities under FLMPA and MLA

The BLM has the authority and responsibility under the Federal Land Policy and Management Act (FLPMA) to manage public lands in a manner that will protect the quality of air and atmospheric values [FLPMA Sec. 102(a)(8)]. The FLPMA also provides that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands and includes provisions for implementing the Mining and Minerals Policy Act of 1970 [FLPMA Sec. 102(a)(12)]. The BLM has the responsibility under the Mineral Leasing Act (MLA) to implement the decisions of any RMP/EIS in a manner that recognizes valid and existing lease rights[1].

---

[1] H-1601-1 - LAND USE PLANNING HANDBOOK: A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval. When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

BLM_0022985

Further, the FLPMA provides that "In the development and revision of land use plans, the Secretary shall provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;" [FLPMA Sec. 202(c)(8)][2].

# SECTION II – INTERAGENCY AIR RESOURCES COLLABORATION

The Bureau of Land Management is firmly committed to working with federal, state, tribal, and local air resource management partners to address complex and often cross-jurisdictional air quality issues.  As a federal agency, we have a role to provide leadership in addressing known air quality issues within our authority and domain, while upholding our responsibility to manage the public lands for multiple-use under the FLPMA.  We also recognize that the State of Colorado, specifically the Colorado Department of Public Health and Environment (CDPHE), has the primary responsibility and authority delegated by the EPA to regulate and maintain air quality standards within Colorado in accordance with the Clean Air Act.   Interagency collaboration is the key to management of air quality, as no single agency has all the necessary tools to solve these complex issues alone.  We must act together.

To that end the BLM will work collaboratively with other local, state, federal, and tribal agencies involved in the management of air resources to develop a comprehensive strategy to protect air resources from potentially significant adverse impacts resulting from BLM approved activities in Colorado.

## II.A     National Air Quality MOU

When making oil and gas implementation decisions, the BLM will consider or apply, as appropriate, the provisions of the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

# SECTION III – ACTIONS TO ANALYZE & PROTECT AIR QUALITY

The following sections describe actions the BLM will take to ensure an adequate analysis and subsequent protection for air quality resources within Colorado.  Appropriate air resources protection requires the BLM to manage its authorized activities and actions at broad spatial and temporal scales that are dynamic and thus subject to change.  The BLM will accomplish this through an adaptive management approach, which includes establishing baseline conditions, monitoring, reevaluation, and adjustment as necessary.  Adaptive management therefore

---

[2] Note:  Where sources of air pollution emissions are regulated by an entity/agency (Federal, State, Tribal, Local), the BLM shall not craft alternatives with features or conditions that interfere with a proponents ability to comply with such laws or standards. IBLA has held that the meaning of "providing for compliance" does not require that the BLM has any obligation to ensure compliance where another agency holds such responsibility [*Wyoming Outdoor Council, et al* 176 IBLA 15, 27 (2008); Powder River Basin Resource Council, 183 IBLA 83, 94-95 (2012)]. However, the BLM should appropriately analyze such sources (as well as non-regulated sources) within the applicable NEPA context to disclose potential impacts, determine significance, and provide for mitigation as necessary and within our authority for any specific finding.

BLM_0022986

contemplates regular review and adjustment of management approaches during the authorization of emissions generating activities commensurate with changing circumstances.

## III.A  MONITORING

Ambient air monitoring provides valuable data for determining current and background concentrations of air pollutants, describing long term trends in air pollutant concentrations, and evaluating the effectiveness of air control strategies. The BLM's comprehensive air resource protection protocol includes the ambient air monitoring measures described in this section.

### III.A.1 – Air Monitoring Network

The BLM will participate in a cooperative effort with industry, CDPHE, Forest Service, National Park Service, EPA, local counties, and other entities as appropriate, to establish, operate, and maintain a comprehensive air monitoring network within the planning areas where a need for monitoring has been identified (contingent upon available funding). The BLM will cooperate in the sharing of air monitoring data collected by the air monitoring network with other agencies and the public.

### III.A.2 – Pre-Construction Air Monitoring

The BLM may request proponents of projects with the potential to generate significant air emissions, to submit pre-construction air monitoring data from a site within or adjacent to the proposed development area. The purpose of this air monitoring is to determine baseline air quality conditions prior to development at the site. The need for monitoring will be determined by the BLM based on the availability or absence of existing representative air monitoring data and the factors listed in Section III.D of this protocol. If the BLM determines that pre-construction monitoring is necessary, the project proponent must provide a minimum of one year of representative ambient air monitoring data for the pollutants of concern. The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

### III.A.3 – Life of Project Air Monitoring

The BLM may require proponents or operators of Federal mineral development projects, or proponents of other potentially significant emission generating projects, to conduct air monitoring for the life of the project based on the availability or absence of representative air monitoring data and the factors listed in Section III.D of this protocol. The purpose of this air monitoring is to measure impacts potentially attributable to the project over time and to determine the effectiveness of emissions control measures required for the project. The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

BLM_0022987

### III.A.4 – Monitoring Data Transparency

Project-specific monitoring data may be used by the BLM in subsequent NEPA analysis required for project approvals.  Thus public disclosure of such data is assured via the NEPA process, if used.  Additionally, the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol.

## III.B   EMISSIONS INVENTORIES

The BLM will request the proponent of an oil and gas development activity (as proposed in a permit application, plan of development, or Master Development Plan) to submit a comprehensive inventory of anticipated direct and indirect emissions associated with the proposed project.  The emissions inventory will include estimated emissions of regulated air pollutants from all sources related to the proposed activity, including fugitive emissions and greenhouse gas emissions, for each year or distinct project phase over the life of the project.  The BLM will review the emissions inventory to determine its completeness and accuracy.  In most cases the BLM will accept inventory data reported to other agencies for the purposes of meeting this requirement.  For example BLM would accept copies of actual emissions data for criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases that are submitted to CDPHE as required for applicable air permitting or APEN requirements, or submittals to COGCC in the form of drilling and production data reports, and data to EPA under the Greenhouse Gas Reporting Rule (40 CFR Part 98 Subpart W) for the authorized action.

## III.C   MODELING

Air dispersion and photochemical grid models are useful tools for predicting project-specific impacts on air quality, predicting the potential effectiveness of control measures and strategies, and forecasting trends in regional concentrations of air pollutants.  The BLM will use regional air modeling and project-specific modeling, in conjunction with other air analysis tools, to develop air resource protection strategies consistent with our responsibilities under FLPMA.  Further, the BLM will provide appropriate disclosure for any modeling of direct, indirect, and cumulative impacts of proposed actions during the required NEPA analysis.

### III.C.I – Project-specific Modeling

The BLM may require project-specific air quality modeling, consistent with the Air Resources MOU to analyze potential impacts from a proposed Federal mineral development project or other proposed activity that has the potential to emit significant quantities of a regulated air pollutant and the effectiveness of any air emission control measures.  Project proponents may submit results from other modeling analyses that include activities similar to the proposed project for BLM's review and approval, and if approved, those modeling results may be used in lieu of new project-specific modeling.  The decision as to whether to require air quality modeling will be based on factors listed in Section III.D of this protocol.  The BLM will not require an air modeling analysis when it can be

BLM_0022988

demonstrated that the project will not cause a substantial increase in emissions of the pollutants of concern.

## III.C.2 – Modeling Protocol

The BLM will determine the parameters required for a project-specific modeling analysis through the development of a modeling protocol for each analysis. When conducting a regional model or EIS level project specific oil and gas air modeling analysis, the BLM will adhere to the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

## III.C.3 – Regional Air Modeling

The BLM will support and participate in regional modeling efforts through multi-state and/or multi-agency organizations such as Western Governors' Association – Western Regional Air Partnership (WRAP) and the Federal Leadership Forum (FLF).  In addition, BLM will, contingent upon available funding, conduct and facilitate regional air modeling as needed.  Currently, the BLM is facilitating the Colorado Air Resources Management Modeling Study (CARMMS).  CARMMS is a BLM funded regional air quality modeling study of expected impacts on air quality from projected increases in oil and gas development across Colorado and certain upwind adjacent states.

- The CARMMS modeling protocol/study will be developed by the BLM with involvement from appropriate local, state, federal, and tribal agencies involved in the management of air resources and the authorization and regulation of oil and gas development.

- The CARMMS results will include the predicted impacts from all projected federal and non-federal oil and gas development within the region.

- The CARMMS results and analysis will be made available to the public.

## III.C.4 – Evaluation of Modeling Results

The BLM will cooperate in an interagency process to develop a comprehensive strategy to manage air quality impacts from future oil and gas development within the region. As part of that strategy, the local, state, federal, and Tribal agencies involved in the regulation of air quality and the authorization of oil and gas development would evaluate modeling results from CARMMS or other future modeling studies and identify potential air quality concerns and necessary reductions in air emissions.  If the modeling predicts significant impacts, these agencies would use their respective authorities to implement appropriate enhanced emission control strategies, operating limitations, equipment standards, and/or pacing of development.

BLM_0022989

### III.C.5 – Future Modeling Studies

Future iterations of the CARMMS, or a similar regional modeling study of expected impacts from oil and gas development, may be conducted through a collaborative interagency management mechanism and interagency / industry funding mechanism.

## III.D   PERMITTING

As part of the NEPA process and prior to the authorization of any Federal mineral development activity the BLM will conduct an air analysis to determine the potential impacts on air quality based on the estimated emissions from the activity being authorized.  The BLM may conduct such an analysis for other authorized activities with the potential to generate significant emissions of a regulated pollutant.  The BLM will consider the following factors to identify pollutants of concern and make decisions regarding the appropriate level of air analysis, monitoring, and reporting requirements for the proposed activity.

- magnitude of potential air emissions from the proposed activity

- duration of proposed activity and distinct phase considerations

- proximity to a federally mandated Class I area, sensitive Class II area (as identified on a case-by-case basis by CDPHE or a federal land management or tribal agency), population center, or other sensitive receptor
- location within or adjacent to a non-attainment or maintenance area

- meteorological and geographic conditions

- existing air quality conditions including measured exceedances of NAAQS or CAAQS and measured adverse impacts  on air quality related values (AQRVs) at Class I and sensitive Class II areas

- intensity of existing and projected development in the area

- issues identified during project scoping

### III.D.I – Statewide Lease Notice

The following Lease Notice language will be incorporated into all new leases.

*Due to potential air quality concerns, supplementary air quality analysis may be required for any proposed development of this lease.  This may include preparing a comprehensive emissions inventory, performing air quality modeling, and initiating interagency consultation with affected land managers and air quality regulators to determine potential mitigation options for any predicted significant impacts from the proposed development.  Potential mitigation may include limiting the time, place, and pace of any proposed development, as well as providing for the best air quality control technology and/or management practices necessary to achieve area-wide air resource protection objectives.  Mitigation measures would be analyzed through the appropriate level of NEPA analysis to determine effectiveness, and will be required or implemented*

BLM_0022990

*as a permit condition of approval (COA).  At a minimum, all projects and permitted uses implemented under this lease will comply with all applicable National Ambient Air Quality Standards and ensure Air Quality Related Values are protected in nearby Class I or Sensitive Class II areas that are afforded additional air quality protection under the Clean Air Act (CAA).*

## III.E  MITIGATION

Many activities that the BLM authorizes, permits, or allows generate air pollutant emissions that have the potential to adversely impact air quality.  The primary mechanism to reduce air quality impacts is to reduce emissions via project design features and mitigation.  Appropriate emission reduction measures are best identified and required at the project authorization stage, when the temporal and spatial characteristics and technological specifications of the proposed action have been defined.  The project-specific information available at that stage allows for the development of an emissions inventory and impact analysis that can be used to identify effective mitigation options for predicted adverse impacts.  Section IV, Emissions Reduction Strategies and Best Management Practices, provides some emission reduction technologies and strategies as an example.  The list in Table VI-1 is not intended to be all inclusive or preclude the use of other effective air pollution control technologies that may be proposed.

The BLM will ensure implementation of reasonable mitigation, control measures, and design features through appropriate mechanisms, including lease stipulations identified in RMPs, notices to lessees, and conditions of approval (permit terms and conditions) as provided for by law and consistent with lease rights and obligations.  In the absence of, or in addition to effective control technologies, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals and objectives as defined under any applicable RMP.

### III.E.1 – Emissions Reduction Planning / Minimizing Air Emissions

The BLM will request proponents of oil and gas development projects that have the potential to significantly adversely  impact air quality or predicted to exceed an air quality standard to provide an emissions reduction plan where air quality has been identified as a resource of concern in applicable NEPA analysis.  Plans shall include a detailed description of operator committed measures to reduce project related air pollutant emissions including greenhouse gases and fugitive dust.  All projects are required to comply with all applicable state and federal regulations.

### III.E.2 – Project-specific Mitigation

If the project-specific air quality analysis predicts future impacts on NAAQS or CAAQS (i.e. exceedances) or adverse impacts to AQRVs in Class I or sensitive Class II areas, the BLM will analyze air quality mitigation measures for emission sources. Further, if the regional air quality modeling study conducted under Section III.C.3 predicts significant cumulative impacts on air resources from expected oil and gas development in the region, the BLM may require the

BLM_0022991

proponent of an oil and gas development project to apply reasonable mitigation including but not limited to best management practices (see Section VI), emissions offsets, and other control technologies or strategies identified in the project-specific air quality analyses.

Where identified and analyzed mitigation measures cannot be reasonably implemented for a particular proposed action due to the overall project design, or substantial technical or economic barriers, the BLM will work with project proponents during the NEPA process to develop operator-committed measures or acceptable emissions offsets that would be included as conditions of approval (COA). Any operator committed measures would be required to provide an air quality benefit sufficient in type, scale, location, and timing to avoid the anticipated adverse impact or at a minimum, to reduce it to an acceptable level for the specific area and pollutant(s) analyzed.

### III.F    Protocol Implementation

The BLM will ensure that air resource protection strategies and mitigation measures are implemented by including project-specific COAs (operator-committed and/or required mitigation) for each authorized action. Any COAs applied to projects as a result of this process shall be clearly consistent with the applicable RMP management decisions and/or subsequent analysis of new or previously unavailable information upon which the BLM can reasonably rely.

## SECTION IV – ADAPTIVE MANAGEMENT PROCESSES FOR AIR RESOURCES

Adaptive management incorporates the principles of monitoring current conditions, predicting future impacts, and adapting management strategies to account for changing conditions. An adaptive management strategy for air quality resources allows the BLM to comply with NEPA and complete an appropriate analysis to ensure that activities approved by the BLM minimize adverse impacts to air quality; while allowing for development of important domestic energy resources.

The BLM will implement an adaptive management strategy to account for changing air quality conditions and to minimize adverse impacts to air resources from BLM-authorized activities. The strategy includes evaluating air quality on an on-going basis, and if necessary, implementing appropriate mitigation measures to meet the identified objectives and targets for any applicable Colorado RMP. The adaptive management strategy is intended to be transparent and as such the process includes an annual reporting component that will be made available to the public, as well as case by case incorporation of specific plan elements within individual project approvals. Components of this adaptive management strategy include the following:

### IV.A    Establish Baseline Air Quality Conditions

Existing air quality conditions will be established and continuously updated on an annual basis. To establish a periodic baseline, data must be compiled and analyzed such that air quality value trends (NAAQS & AQRVs for Class I and sensitive Class II areas) can be established or evaluated for the purpose of predicting future impacts from BLM-authorized activities. Sources of data for this analysis may include raw air quality

BLM_0022992