near DeBeque, Colorado. The total known distribution includes approximately 625.9 acres within an area 19 miles long and 11 miles wide (76 FR 45054) at elevations ranging from 5,000 to 7,150 feet (1,525 to 2,180 meters; Service 2013). This species was listed as threatened on July 27, 2011 (76 FR 45054). The final listing rule provides a thorough review of the species' status. Critical habitat for the species was designated on August 13, 2012 (77 FR 48367).

The number of plants varies widely from year to year depending on climatic conditions. The fluctuation in numbers indicates that many seeds remain dormant in the seed bank during unfavorable years for germination. As such, it is difficult to estimate the total population size. Upper counts from surveys over the past 30 years estimated a total of 68,731 individuals (Service 2013). The final listing rule provides a thorough and up-to-date review of the status of the species.

*Habitat*

DeBeque phacelia is endemic to clay badland soils derived from the Atwell Gulch and Shire members of the Wasatch formation. It occurs in small patches (1 to 100 m$^2$) on uniquely textured soils that differ in an as yet unquantified way from adjacent soils. Preliminary results from studies conducted by the United States Geological Survey (USGS) indicate that soils in occupied habitat have higher clay content than adjacent unoccupied soils. Soil color ranges from chocolate to purple brown to gray or tan and are alkaline (pH 7 to 8.9), highly erosive, and exhibit dramatic shrink-swell activity due to their high clay content. They are especially susceptible to compaction when wet (76 FR 45054; 76 FR 45078).

The badlands occupied by DeBeque phacelia support stands of salt desert scrub and big sagebrush shrubland within pinyon-juniper woodland. Cover of other plant species is typically less than 10 percent. Associates include *Grindelia fastigiata, Eriogonum gordonii, Monolepis nuttalliana, Oenothera caespitosa*, and *Bromus tectorum*. Occurrences are typically located on moderately steep slopes, benches, and ridge tops adjacent to valley floors at elevations ranging from 5,000 to 7,150 feet (1,524 to 2,179 meters) above mean sea level (76 FR 45054; 76 FR 45078).

*Species Description and Life History*

DeBeque phacelia is a low-growing spring annual establishing from a thin tap root. Stems reach 0.8 to 3 inches (2 to 7.6 cm) in length, and typically branch at the base, with most branches held low to the ground in a rosette pattern. The tubular flowers are hermaphroditic, yellowish-white, and very small in size, with petals generally not exceeding 0.19 inches (4 to 5 mm) in length (76 FR 45054). Preliminary results from a breeding system study indicate that breeding occurs by self-pollination within individual flowers, without the need for an insect vector (Langton 2011, in litt.). The blooming period is from late April to late June, with fruits maturing from mid-May through early July, and seed dispersal complete by early July.

Once the plants have set fruit, they dry in the summer heat and are dislodged or disintegrate, often leaving no trace. Seed dispersal appears to be by gravity and possibly dislodged plants. It is thought that this species depends upon cracks in the soil surface to provide a favorable

BLM_0023825

environment for seed germination. Germination cues remain unknown, but based on research on other rare desert annuals (Levine et al. 2008) may involve interactions between temperature and moisture (76 FR 45054).

DeBeque phacelia depends on its seed bank for long-term survival. By storing viable genetic stock in the ground, individuals can "wait out" unfavorable environmental conditions. The buffering effect of a seed bank depends upon seed and germinant survival rates and how these factors are affected by environmental variation (Doak et al. 2002; Meyer et al. 2006). Seed bank vital rates remain unknown for this species. Given the importance of the seed bank to species health, preventing damage to or destruction of the seed bank is an important management consideration for DeBeque phacelia. Identifying occupied habitat can be challenging since plants may remain dormant underground during certain years and because emerged plants often disappear shortly after the growth period.

*Abundance and Viability*

New occurrences of this species have been found as recently as 2011. The estimated total number of plants range-wide varies between 7,767 and 68,371 per year. Of the 22 occurrences in the CNHP database, 7 have been ranked as A or B (two of these were ranked as B-C). These seven occurrences account for 66 percent of the known individuals based on counts recorded in good years in which germination rates were high (76 FR 45054).

*Critical Habitat*

The Service designated 25,484 acres of critical habitat within nine critical habitat units covering Federal, State, and private lands (77 FR 48367). Critical habitat was defined primarily by a minimum convex polygon around all known and historic populations, plus a 100-meter buffer outside of the polygons. The critical habitat units are identified as: Sulphur Gulch, Pyramid Rock, Roan Creek, DeBeque, Mount Logan, Ashmead Draw, Baugh Reservoir, Horsethief Mountain, and Anderson Gulch.

The Final Rule identifies the following Primary Constituent Elements for critical habitat:

1. Suitable soils and geology: Within the Atwell Gulch and Shire members of the Wasatch formation, areas 1 to 100 $m^2$ in size on colorful exposures of chocolate to purple brown to gray or tan soils. These areas have a higher clay content and different texture than adjacent soils. Areas include clay soils that shrink and swell dramatically, and are alkaline, with a pH between 7 and 8.9.
2. Topography: Moderately steep slopes (2 to 42 degrees), benches, and ridge tops adjacent to valley floors.
3. Elevation and climate: Elevations ranging from 4,600 to 7,450 feet, and climatic conditions similar to those around DeBeque, Colorado.
4. Plant community: Barrens from 1 to 100 $m^2$ in size with less than 20 percent plant cover in the least vegetated portions of the site. Clay badlands occurring in patches of salt desert scrub and big sagebrush shrubland within pinyon-juniper woodland. Associates include *Grindelia fastigiata, Eriogonum gordonii, Monolepis nuttalliana, Oenothera caespitosa*, and nonnatives such as *Bromus tectorum*.

21

5. Maintenance of the seed bank and appropriate disturbance levels: Within suitable soils and geology, undisturbed areas, and areas with light disturbance when dry, and no disturbance when wet.

**Gunnison Sage-grouse**

*Species Description*

Sage-grouse are the largest grouse in North America. Sage-grouse (both greater and Gunnison) are most easily identified by their large size, dark brown color, distinctive black bellies, long pointed tails, and association with sagebrush habitats. They are dimorphic in size, with females being smaller. Both sexes have yellow-green eye combs, which are less prominent in females. Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and ''dance'' to attract a mate. During the breeding season, males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts (Schroeder et al. 1999 in 79 FR 69192). Gunnison sage-grouse are smaller in size, have more white barring in their tail feathers, and have more filoplumes than greater sage-grouse.

*Life History*

Gunnison and greater sage-grouse depend on a variety of shrub-steppe habitats throughout their life cycle and are considered obligate users of several species of sagebrush (Patterson 1952, p.42; Braun et al. 1976; Schroeder et al. 1999; Connelly et al. 2000; Connelly et al. 2004, Miller et al. in press). Dietary requirements of the two species are also similar, being composed of nearly 100 percent sagebrush in the winter, and forbs and insects as well as sagebrush in the remainder of the year (Wallestad et al. 1975, p. 21; Schroeder et al. 1999, p. 5; Young et al. 2000, p. 452). Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore, lack the ability to grind and digest seeds (Leach and Hensley 1954, p. 389). In addition to serving as a primary year-round food source, sagebrush also provides cover for nests and chicks (Connelly et al. 2000). Thus, sage-grouse distribution is strongly correlated with the distribution of sagebrush habitats (Schroeder et al. 2004, p. 364). Connelly et al. (2000) segregated habitat requirements into four seasons: (1) breeding (2) summer - late brood rearing (3) fall and (4) winter. Depending on habitat availability and proximity, some seasonal habitats may be indistinguishable. The Gunnison Sage-grouse Rangewide Steering Committee (GSRSC) (2005, p. 27-31) segregated habitat requirements into three seasons: (1) breeding (2) summer–late fall and (3) winter. For purposes of this finding, the seasons referenced in GSRSC (2005) are used because that publication deals specifically with GUSG. Sage-grouse exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats, which includes breeding, nesting, brood rearing, and wintering areas, even when the area is no longer of value Connelly et al. 2004, p. 3-1). Adult sage-grouse rarely switch among these habitats once they have been selected, limiting their adaptability to changes. Sage-grouse distribution is associated with sagebrush (Schroeder et al. 2004 p. 364), although sagebrush is more widely distributed than sage-grouse because sagebrush does not always provide suitable habitat due to fragmentation and degradation (Schroeder et al. 2004, pp. 369, 372).

22

BLM_0023827

*Status and Distribution*

The Service listed the GUSG as an endangered species on November 20, 2014 (79 FR 69192). Concurrently, the Service designated 1,429,551 million acres of critical habitat for the species in nine southwestern Colorado counties and two southeastern Utah counties (79 FR 69312). Following is a brief description of the current distribution of the species' range-wide population and trends. A detailed discussion of GUSG taxonomy, the species description, historical distribution, habitat, and life-history characteristics can be found in the Service's 12-month finding for the GUSG (75 FR 59804).

Based on historical records, museum specimens, and potential sage grouse habitat, Schroeder et al. (2004) concluded that GUSG historically occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southeastern Utah. Accounts of GUSG in Kansas and Oklahoma, as suggested by Young et al. (2000), are not supported with museum specimens and Schroeder et al. (2004) did not consider those two states within the historic range of GUSG. The GUSG historical (presettlement) range is estimated to have been 55,350 square kilometers (km2) (21,370 square miles [mi2]) (GSRSC 2005).

Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 3,795 square kilometers (km2) (1,511 square miles [mi2]) (GSRSC 2005; CDOW 2009a). The seven populations are Gunnison Basin, San Miguel Basin, Monticello–Dove Creek, Piñon Mesa, Crawford, Cerro Summit–Cimarron–Sims Mesa, and Poncha Pass (FR 69192). Population trends over the last 12 years indicate that six of the populations are in decline, with some increasing since 2011. The largest population, the Gunnison Basin population, while showing variation over the years, has been relatively stable through the period (CDOW 2010; CPW 2012). Six of the populations are very small and fragmented (all with less than 40,500 hectares (ha) (100,000 acres [ac]) of habitat likely used by grouse and, with the exception of the San Miguel population, less than 50 males counted on leks (communal breeding areas)) (CDOW 2009b; CPW 2012). The San Miguel population is the second largest and comprises six fragmented subpopulations.

## ENVIRONMENTAL BASELINE

Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed State or Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State of private actions which are contemporaneous with the consultation process. The implementing regulations for section 7(a)(2) define the "action area" as all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action (50 CFR 402.02).

## Colorado Hookless Cactus

23

*Status of the Species in the Action Area*

Within the action area, the Colorado hookless cactus occurs primarily near DeBeque, Colorado, (north and south of Interstate 70) and in the Whitewater, Colorado, area. The Denver Botanic Gardens, in collaboration with the BLM, conducts on-going cactus monitoring of several populations within the action area west of DeBeque and north of Mesa. Monitoring data indicate the species is stable throughout its range (DePrenger-Levin and Kao 2013).

On November 15, 2012, the Service issued BO number ES/GJ-6-CO-12-F-006. The opinion evaluated the effects of livestock grazing on the Colorado hookless cactus, DeBeque phacelia, and the clay-loving wild buckwheat on three BLM Field Offices including the GJFO. The 2012 BO found that grazing activities would cause adverse effects to the Colorado hookless cactus, but that these activities would not jeopardize the continued survival of the cactus. The BLM does not anticipate additional effects to the Colorado Hookless cactus caused by the grazing program.

*Past and Present Impacts*

The primary threats to Colorado hookless cactus are (Service 2010):
- Natural gas exploration and production
- Pipelines, utilities, and other rights-of-way (ROWs)
- Off-highway vehicle activity
- Livestock grazing and trampling
- Herbicides and pesticides
- Hybridization
- Illegal human collection
- Potential water developments
- Climate change

Threats to the species within the GJFO include habitat degradation as a result of livestock trampling and grazing, non-native halogeton and cheatgrass encroachment, energy development, recreation, and unauthorized collection. Predation by rabbits and cactus-borer beetle (*Moneilema semipunctatum*) may also be a significant source of mortality (Service 2010). Of the 3,200 acres of habitat for the Colorado hookless cactus, 2,700 acres are currently under existing leases.

## DeBeque Phacelia

*Status of the Species in the Action Area*

There are 19,600 acres of critical habitat within the action area. Of the nine designated critical habitat units (CHUs), unit 2 (Pyramid Rock) is the largest at approximately 17,321 acres located west of the town of DeBeque, Colorado.

On November 15, 2012, the Service issued BO number ES/GJ-6-CO-12-F-006. The opinion evaluated the effects of livestock grazing on the Colorado hookless cactus, DeBeque phacelia,

BLM_0023829

and the clay-loving wild buckwheat on three BLM Field Offices including the GJFO. The 2012 BO found that grazing activities would cause adverse effects to the DeBeque phacelia and its critical habitat, but that these activities would not jeopardize the continued existence of the species. Further, the Service found that the grazing program will not result in the destruction or adverse modification of critical habitat for DeBeque phacelia.

*Past and Present Impacts*

The primary threats to DeBeque phacelia are as follows (Service 2013):
- Oil and gas development
- Utility and energy corridors
- Livestock use and trampling
- OHV use
- Invasive nonnative plants
- Water reservoirs
- Climate change and drought

DeBeque phacelia is especially vulnerable to habitat loss by virtue of being restricted to the barren and semi-barren habitat of specific members of the Wasatch geological formation that has a limited distribution within the Piceance Basin (Ladyman 2003). Its habitat coincides with high potential natural gas reserves and has historically been affected by activities associated with resource extraction. Activities that lead to significant soil disturbance, or progressive soil erosion, eliminate or sharply reduce the seed bank, which appears to be the mechanism by which populations survive. Additionally, surface-disturbing activities can introduce and spread weeds resulting in altered plant communities that threaten DeBeque phacelia. Impacts on DeBeque phacelia have also been documented from OHV use and livestock trampling (Service 2013). Of the 19,600 acres of critical habitat designated for the DeBeque Phacelia, 19,400 acres are currently under existing leases.

**Gunnison sage-grouse**

*Status of the Species within the Action Area*

The action area for the proposed RMP encompasses lands within the GJFO including GUSG habitat defined as "occupied," and "unoccupied" as described in the final rule (79 FR 69312). Within the GJFO, GUSG occur on the Glade Park/Pinon Mesa and northern Uncompahgre Plateau areas in the southwestern part of the Field Office Planning Area.

Piñon Mesa Population—The Piñon Mesa population occurs on the northwestern end of the Uncompahgre Plateau in Mesa County, Colorado about 35 km (22 mi) southwest of Grand Junction, Colorado. Gunnison sage-grouse likely occurred historically in all suitable sagebrush habitat in the Piñon Mesa area, including the Big Dominguez watershed area of the Uncompahgre Plateau, southeast of Piñon Mesa proper (Rogers 1964). Their current distribution is approximately 18,080 ha (44,678 ac) (GSRSC 2005) which, based on a comparison of potential presettlement distribution, is approximately six percent of presettlement habitat on the northern portion of the Uncompahgre Plateau in Mesa County, Colorado, and Grand County,

25

Utah. The 2014 population estimate was 182 birds (CPW 2014a), much greater than the 2012 estimate of 54 birds. This increase is likely due to the transplanting of 93 grouse to Piñon Mesa population between the fall of 2012 and spring of 2014 (CPW 2014b and the discovery of two additional leks in 2012 (CPW 2012). Population estimates from 1996 to 2014 are below the population target of 200 breeding birds (based on a 10-year average) for the Piñon Mesa population, as set forth by the RCP (CPW 2014a; GSRSC 2005). Of 12 known leks, only 4 were active in 2012 (CPW 2012).

*Threats*

The primary threats to the GUSG within the GJFO include:

- Habitat Loss, degradation and Fragmentation from Residential, Commercial and Agricultural conversion and urbanization
- Fire
- Invasive species
- Recreation

**EFFECTS OF THE ACTION**

Effects of the action refer to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated and interdependent with that action that will be added to the environmental baseline. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration. Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur.

**Colorado hookless cactus and DeBeque phacelia**

As stated in the consultation history, the Service concurred with the determination of may affect, not likely to adversely affect the Colorado hookless cactus and the DeBeque phacelia for the IWMP. In addition, the Service addressed the adverse effects to the Colorado hookless cactus and the DeBeque phacelia caused by livestock grazing on the GJFO in BO number ES/GJ-6-CO-12-F-006 (Tails: 06E24100-2012-F-0020). The proposed action (revised RMP) will not cause additional effects from grazing or weed management. Therefore, the effects of grazing and weed management have been fully considered and the section 7 requirement has been satisfied for the Colorado hookless cactus and the DeBeque phacelia. Adverse effects to these plant species may result from implementation of vegetation management, comprehensive travel and transportation management under the proposed action. Specifically, the designation of routes within the GJFO is likely to result in negative effects to these species. In addition, adverse effects to the plant are likely to occur from the presence of wild horses and the issuance of permits to drill on existing leased lands.

Actions that affect listed plant species may result in the following general effects:

26

BLM_0023831

Direct mortality - Mortality can result from crushing, trampling, or physically removing plants. Contact with herbicides or other chemicals, can also cause direct mortality. Where occurrences of a plant are small, loss of a portion of the plants can compromise its viability. Loss of occurrences can compromise species viability due to reduced genetic diversity and a reduced ability to withstand natural or man-made disturbances.

Loss of vigor or reduced reproductive success - Trampling and coming in contact with chemicals may not always result in mortality. However, exposure to these impacts can reduce vigor, which affects the plant's ability to reproduce and sustain the population. The consumption of flowers, seeds, stems, and foliage of special status plants (herbivory) can reduce reproductive success, or in some cases result in death. Dust deposited on special status plants may reduce their photosynthetic ability, or the ability of pollinators to transfer pollen between plants.

Direct loss of potential or occupied habitat - Direct habitat loss results when habitat is physically destroyed or converted to a form that is unsuitable for the impacted species. Direct habitat loss can be short term or permanent. Surface-disturbing activities, such as construction and use of roads, trails, parking lots, buildings, power poles, wind turbines, and ponds, may result in permanent loss of occupied or potentially occupied habitat. This would reduce the total habitat capable of supporting listed plant populations and fragment remaining populations.

Short-term, temporary habitat loss can occur with habitat improvement projects, such as those addressing encroaching junipers in sagebrush or salt desert shrub habitats. Closure or reclamation of disturbed areas may eventually restore lost habitat. However, disturbance can require years or decades for recovery to pre-disturbance condition. If reclamation does not result in habitat suitable for sustaining special status plants, habitat may be permanently lost.

Changes in habitat structure - A canopy cover of shrubs offers habitat characteristics that appear to be favorable for several special status plant species, such as Colorado hookless cactus, to germinate and become established. Shrubs may protect some special status plants from herbivory or trampling and may provide improved moisture availability or reduced moisture loss under the canopy. Surface-disturbing activities that significantly reduce the percent canopy cover of shrubs may allow increased herbivory or moisture loss, resulting in decreased vigor or mortality of special status plants.

Competition - Changes in species composition also affect listed plant populations. Proliferation of noxious weeds or other invasive plants may render habitat unsuitable by outcompeting listed plants for water and nutrients or by preventing seedling germination and establishment. Occupied Colorado hookless cactus habitat that is dominated by cheatgrass appears to inhibit seedling cactus germination, thereby threatening the long-term viability of this population. In some cases, increases in canopy cover and density of native species, particularly grasses, can compete with listed plants for limited water and nutrients.

Other species, such as DeBeque phacelia thrive in environments where vegetation is sparse and competition is low. Increases in vegetation cover (following disturbances, such as fire or seeding) may cause competition with special status plants, resulting in decreased vigor or mortality.

27

Loss of pollinators or pollinator habitat - Actions that disturb pollinators or that destroy their habitat can have a detrimental effect on plant species. Long-term loss of pollinators can reduce the reproductive ability of these plant species and affect maintenance and genetic diversity of populations.

Habitat fragmentation - Habitat becomes fragmented when contiguous habitat is broken into smaller blocks by surface- disturbing activities and distances between suitable habitat patches increase. Because pollinators fly only limited distances, they are less likely to use small and isolated patches of habitat. Habitat fragmentation can effectively isolate pollinators from special status plants. Smaller populations receive fewer pollinator visits, so seed production is lower in small populations.

Small population size decreases reproductive success and increases inbreeding and loss of genetic variation. As a result, fragmentation may lower population viability and increase local population extinction risk (Kolb 2008). Herbivory does not decrease with population size. Instead, it enforces fragmentation by further reducing the number of flowering individuals (Kolb 2008). Closure and rehabilitation of roads in listed plant habitat may benefit the long-term survival of populations by decreasing habitat fragmentation.

Soil compaction - Soil compaction resulting from heavy equipment or vehicle travel may reduce soil pore size, inhibit water infiltration, and restrict root penetration, thereby inhibiting maintenance and establishment of special status plants.

Erosion or sedimentation - Special status plants may be washed away or their roots may be exposed by erosion from surface-disturbing activities, such as blading or bulldozing for roads. Special status plants may be buried by sedimentation resulting from disturbances upslope of special status plant populations.

Alteration of hydrologic conditions - Some special status plant species (such as Ute ladies'-tresses orchid), which are dependent on seasonally flooded environments, sub-irrigated soils, or seeps, may be negatively affected by changes in surface or groundwater flow.

Changes in fire regime - Changes in species composition, either in special status plant habitat or in adjacent plant communities, may alter the natural fire regime to which the plants are adapted. Cheatgrass, a highly flammable annual grass, may drastically increase the fire frequency in special status plant habitat, affecting the survivability and viability of the population.

Habitat restoration - This can result from vegetation management projects, hydrologic function restoration, invasive species removal, historic fire regimes restoration, grazing management alteration, or other methods. However, any habitat restoration project for special status plants must be designed specifically for the individual plant species and its specific habitat and site conditions. Generalized habitat restoration projects that do not focus on special status plant needs can have negative effects on these species.

Comprehensive Travel and Transportation Management

BLM_0023833

The BA assumes that certain distances between an activity/action and federally listed plants or habitats, trigger an effect to the species. However, the magnitude of the effect was not defined in the document. We contacted the BLM to confirm that an activity/action within 200 meters of a federally listed plant or plant population triggered a may affect conclusion with regard to that activity/action. If the activity/action occurs within 20 meters of a plant or plant population, the action would cause adverse effects to the plants. An additional assumption is that in some situations, route designations under the revised RMP may fall within 20 meters of unknown locations of federally listed plants, plant populations, and critical habitat (if applicable), causing adverse effects.

As stated above, the proposed RMP designates 126,200 acres closed to motorized use; 925,200 acres closed to cross-country travel, with travel authorized on designated routes, and retains 10,200 acres of open (cross-country) motorized use. The change in management from open cross-country motorized travel to restricting motorized travel to designated routes represents a significant reduction in potential direct and indirect effects to federally listed plants. However, the restriction of motorized use to designated routes is still likely to result in adverse effects to listed plants in proximity to the designated routes.

Direct effects on listed plants from recreation include surface disturbing activities, such as construction of developed recreation facilities, motorized or off-road vehicle (OHV) use, and foot or horse travel. Dispersed recreation off existing roads or trails can result in direct mortality of listed plant species from crushing, trampling, or uprooting. Indirect effects may also occur from recreational use, such as soil compaction, changes in vegetation composition and structure, and loss of vegetative cover; all of which may degrade habitat. Additionally, increased disturbance can result in the spread and establishment of noxious weed populations. The levels of impact are related to the duration, intensity, and expanse of recreation, and are expected to increase with increased visitation. The risk of impacts is greatest in areas where concentrated human activity, such as Special Recreation Management Areas (SRMAs) and Extensive Recreation Management Areas (ERMAs), overlap with habitat for listed plant species. In general, SRMAs, and ERMAs would avoid much of the currently occupied habitats for special status plant species; however, in some areas the BLM will employ adaptive management to protect special status species if impacts occur. Impacts would be more likely to occur in areas that have not been previously inventoried (i.e. unknown occurrences). Travel routes would be planned to avoid known occurrences.

Oil and Gas Development

Direct impacts associated with oil and gas development include habitat disturbance, fragmentation, and destruction; as well as direct mortality from construction equipment, land clearing activities, and vehicle use. The construction of access roads, well pads, pipelines, buildings, holding tanks, and other infrastructure associated with oil and gas development can fragment or degrade habitat, and result in indirect effects such as erosion, sedimentation, and establishment of noxious weeds.

BLM_0023834

**Colorado Hookless Cactus**

Under the proposed RMP, 56.4 miles of routes open to the public are located within 200 meters of known Colorado hookless cactus occurrences. Approximately 11 miles of open routes are county maintained where the BLM has limited discretion. Approximately 48 miles of existing routes are proposed for closure and rehabilitation. Approximately 4 miles of routes will be designated within 20 meters of known Colorado hookless cactus occurrences, thus causing adverse effects as described above, and 1.1 miles of routes would be restricted to administrative and permitted use. There will be 5.8 miles of routes within 20 meters of known occurrences proposed for closure and rehabilitation. The BLM also anticipates impacts to plants, in the form of trampling, caused by cross-country foot and horse travel.

As stated above, approximately 2,700 acres of Colorado hookless cactus habitat is currently under existing leases. Since the conservation framework in the revised RMP cannot affect currently leased lands in any meaningful way, we anticipate a full spectrum of impacts described above may occur, including the potential loss of cactus plants. We further anticipate that BLM will work with any applicant and the Service to minimize negative effects to the plants to the maximum extent practicable through conditions of approval for applications for permits to drill.

Wild Horses

Under the revised RMP, the BLM will continue to manage the 35,200-acre Little Book Cliffs Wild Horse Range (LBCWHR) located northwest of Palisade, CO. Colorado hookless cactus occurrences have been recorded in this area, and may be trampled and/or habitat degradation may occur. The LBCWHR will be managed at an appropriate management level, currently identified as 90-150 wild horses, although this number may be adjusted if warranted by range conditions.

At this broad programmatic scale, it is not possible to quantify the loss of plants impacted by implementation of the proposed action. The conservation measures for listed species within the revised RMP should significantly reduce impacts to federally listed plants and critical habitat (as appropriate). We anticipate a low level of mortality of plants relative to the populations of Colorado hookless cactus within the GJFO.

**DeBeque phacelia**

The BLM stated that numerous actions, stipulations, BMPs and other measures section 4.2.1 (in the BA) would be implemented under the RMP to protect the DeBeque phacelia and its habitat throughout the planning area. However, their determination indicated that adverse effects from livestock grazing and travel management are still anticipated.

The BLM identified 1.4 miles of designated routes within 200 meters of known DeBeque phacelia populations, including 0.9 miles of county- maintained roads where the BLM may lack discretion, and did not identify any routes occurring within 20 meters of known occurrences. However, consistent with our assumption, unknown individuals or populations, and critical

BLM_0023835

habitat may occur within 20 meters of designated routes. Thus, these routes are likely to cause adverse effects the species and critical habitat.

The RMP will retain the 1,300-acre Pyramid Rock ACEC and designate the 28,200-acre South Shale Ridge ACEC, which both contain critical habitat for the DeBeque phacelia, specifically the Pyramid Rock and Sulphur Gulch CH Units. The Pyramid Rock ACEC contains only a small portion of the Pyramid Rock CH Unit, but the South Shale Ridge ACEC includes all of the Sulphur Gulch CH Unit. Stipulation NSO-12 (ACECs) prohibits surface occupancy and surface-disturbing activities within each ACEC. All nine critical habitat units will be subject to Stipulations CSU-9 (Sensitive Plant Species Occupied Habitat), NSO-13 (Critical Habitat), LN-3 (Biological Inventories in known or suspected habitat) and LN-4 (Botanical Inventories in known habitat of T & E plant species).

As stated above, approximately 19,400 acres of DeBeque phacelia habitat is currently under existing leases. Since the conservation framework in the revised RMP cannot affect currently leased lands in any meaningful way, we anticipate a full spectrum of impacts described above may occur, including the potential loss of these plants. We further anticipate that BLM will work with any applicant and the Service to minimize negative effects to the plants to the maximum extent practicable through conditions of approval for applications for permits to drill.

At this broad programmatic scale, it is not possible to quantify the loss of plants impacted by implementation of the proposed action. The conservation measures for listed species and critical habitat within the revised RMP should significantly reduce, and may eliminate future impacts to federally listed plants and critical habitat (as appropriate). We anticipate a low level of mortality of plants relative to the populations within the GJFO.

**Gunnison sage-grouse**

*Factors to be Considered*

Gunnison sage-grouse depend on sagebrush for their survival and persistence, and the historic and current distribution of the GUSG closely matches that of sagebrush (Patterson 1952; Braun 1987; Schroeder et al. 2004, and references therein). Habitat fragmentation resulting from human development patterns is especially detrimental to GUSG because of their dependence on large expanses of sagebrush (Patterson 1952; Connelly et al. 2004; Connelly et al. 2011) and more contiguous sagebrush habitats (Rogers 1964; Wisdom et al. 2011). In addition, female Gunnison and greater sage-grouse exhibit strong site fidelity to nesting locations (Connelly et al. 1988; Young 1994; Lyon 2000, Connelly et al. 2004, Holloran and Anderson 2005). Sage-grouse often will continue to return to altered breeding habitats (leks, nesting areas, and early brood-rearing areas), despite any past failures in nesting or productivity (Rogers 1964; Wiens and Rotenberry 1985; Young 1994; Lyon 2000, Connelly et al. 2004; Holloran and Anderson 2005). Consequently, there may be lags in the response of GUSG to development or habitat changes, similar to those observed in other sagebrush obligate birds (Wiens and Rotenberry 1985).

BLM_0023836

The distribution of sage-grouse habitat is naturally disconnected due to the presence of unsuitable habitats such as forests, deserts, and canyons across the landscape (Rogers 1964). However, the onset of Euro-American settlement in the 1800s resulted in significant human alterations to sagebrush ecosystems throughout North America, primarily as a result of urbanization, agricultural conversion, and irrigation projects (West and Young 2000; Miller et al. 2011). Areas in Colorado that supported basin big sagebrush were among the first sagebrush community types converted to agriculture because their soils and topography are well-suited for agriculture (Rogers 1964). Decreases in the abundance of sage-grouse paralleled the loss of range (Braun 1998), and a gradual but marked decrease in sage-grouse distribution and numbers in Colorado had begun around 1910 (Rogers 1964).

Sagebrush habitats within the range of GUSG are becoming increasingly fragmented as a result of various changes in land uses and the expansion in the density and distribution of invasive plant species (Oyler-McCance et al. 2001; Schroeder et al. 2004). Based on spatial modeling, a variety of human developments including roads, energy development, residential development, and other factors known to cause habitat decline were correlated with historical loss of range and extirpation of Gunnison and greater sage-grouse (Wisdom et al. 2011). The model indicated that no secure areas (areas where the risk of extirpation appears low) of occupied range are evident for GUSG (Wisdom et al. 2011). Landscapes containing large and contiguous sagebrush patches and sagebrush patches in close proximity had an increased likelihood of sage-grouse persistence (Wisdom et al. 2011).

The degree to which habitat fragmentation prevents a species' movement across the landscape depends, in part, on that species' ability to move large distances and thereby adjust to changes on the landscape. Sage-grouse are wide-ranging and capable of making large seasonal movements, because they require a diversity of seasonal habitats (Connelly et al. 2000, and references therein). Movements as great as 56 km (35 mi) have been documented in the Gunnison Basin (Phillips 2013). In contrast, the maximum recorded movement distance of GUSG in the Monticello population is 8.2 km (5.1 mi), associated with winter movement (Ward 2007). Prather (2010) noted that such behavior may be due to the presence of large areas of piñon -juniper (i.e. less suitable habitats) which bracket currently occupied habitat in the Monticello population area. Population dynamics of greater sage-grouse in northwestern Colorado functioned at much smaller scales than expected for a species capable of moving large distances (Thompson 2012), suggesting that large expanses of contiguous sagebrush habitat may not be necessary for sage-grouse survival. The majority of juvenile dispersal was intra-population movement (within one breeding population), with only one inter-population movement (between separate breeding populations) observed during the study (Thompson 2012). As a result, juvenile recruitment into home breeding ranges ranged between 98 and 100 percent (Thompson 2012). Based on observed bird dispersal in that study, gene flow and connectivity can likely be maintained for populations within 5 to 10 km (most dispersals were less than 10 km) and possibly as far as 20 km (the maximum dispersal distance of birds studied) in greater sage-grouse (Thompson 2012). Because bird movements likely vary by population and area, their susceptibility to habitat loss and degradation may also differ. We expect that where habitat is already more limited (quantity and quality) and isolated, such as in the six satellite populations, habitat loss and decline will have more serious consequences in terms of population fitness and survival. Where habitat is already severely limited or degraded, or where sage-grouse

32

BLM_0023837

populations are small, any loss of habitat may impact those populations. In addition, habitat loss impacts are expected to be greater in important seasonal habitats, such as areas used during moderate to severe winters, or in lekking, nesting, or brood-rearing habitats (GSRSC 2005).

The decline or loss of lek and brood-rearing habitats can have serious consequences for sage-grouse population viability by reducing reproductive success and recruitment (survival of young to breeding age). Limitations in the quality and quantity of nesting and early brood-rearing habitats, in particular, are especially important because GUSG population dynamics are most sensitive during these life-history stages (GSRSC 2005). Juvenile recruitment is one of the most important demographic factors influencing or limiting sage-grouse population growth rates and viability (Connelly et al. 2004, GSRSC 2005).

Roads

Impacts to GUSG from roads may include direct habitat loss, direct mortality, barriers to migration corridors or seasonal habitats, facilitation of predation and spread of invasive vegetative species, and other indirect influences such as noise (Forman and Alexander 1998).

Roads have been shown to fragment GUSG habitat, with road avoidance by birds presumably to limit exposure to human activity and predation (Oyler-McCance et al. 2001). The probability of GUSG habitat occupancy (presence based on pellet surveys or sage-grouse observation) was positively correlated with distance to roads and habitat patch size (Oyler-McCance et al. 1999).

Gunnison sage-grouse may avoid road areas because of noise, visual disturbance, pollutants, and predators moving along roads, which further reduces the amount of available habitat. An unpublished study by Western State Colorado University and CPW in the Gunnison Basin found that anthropogenic noise was significantly higher at leks closer to roads and human activity centers than leks farther from those sources (Piquette et al. 2013). Leks with higher noise levels were associated with lower GUSG male counts and attendance (Piquette et al. 2013). The landscape-scale spatial model predicting GUSG nest site selection showed strong avoidance of areas with high road densities of roads classed 1 through 4 (primary paved highways through primitive roads with 2-wheel drive sedan clearance) within 6.4 km (4 mi) of nest sites (Aldridge et al. 2012). Nest sites also decreased with increased proximity to primary and secondary paved highways (roads classes 1 and 2) (Aldridge et al. 2012). Male greater sage-grouse lek attendance was shown to decline within 3 km (1.9 mi) of a deep seam natural gas well haul road where traffic volume exceeded one vehicle per day (Holloran 2005). If noise from roads interferes with mating displays, and thereby female attendance, younger males will not be drawn to the lek and eventually leks will become inactive (Amstrup and Phillips 1977; Braun 1986). However, other information (CPW 2013) suggests GUSG in the Gunnison Basin may be fairly tolerant of roads, even the more heavily used highways and county routes, and the potential direct or indirect effects of those roads.

The presence of roads increases human access and resulting disturbance effects in remote areas (Forman and Alexander 1998; Forman 2000; Connelly et al. 2004). In addition, roads can provide corridors for predators to move into previously unoccupied areas. Some mammalian species known to prey on sage-grouse, such as red fox (*Vulpes vulpes*), raccoons (*Procyon lotor*),

33

and striped skunks (*Mephitis mephitis*), have greatly increased their distribution by dispersing along roads (Forman and Alexander 1998; Forman 2000; Frey and Conover 2006). Corvids (Family Corvidae: crows, ravens, magpies, etc.) also use linear features such as primary and secondary roads as travel routes (Bui 2009), expanding their movements into previously unused regions (Knight and Kawashima 1993; Connelly et al. 2004). Corvids are significant sage-grouse nest predators and were responsible for more than 50 percent of nest predations in Nevada (Coates 2007).

The expansion of road networks also contributes to exotic plant invasions via introduced road fill, vehicle transport, and road maintenance activities (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003; Knick et al. 2003; Connelly et al. 2004). Invasive species are not limited to roadsides, but also encroach into surrounding habitats (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003). Upgrading unpaved four-wheel-drive roads to paved roads resulted in increased cover of exotic plant species within the interior of adjacent plant communities (Gelbard and Belnap 2003). This effect was associated with road construction and maintenance activities and vehicle traffic, and not with differences in site characteristics. The incursion of exotic plants into native sagebrush systems can negatively affect GUSG through habitat losses and conversions.

Powerlines

Depending on the infrastructure design, size, location, and site-specific factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998; Connelly et al. 2000) and can have indirect effects by decreasing lek recruitment (Braun et al. 2002, Walker et al. 2007), increasing predation (Connelly et al. 2004), fragmenting habitat (Braun 1998), and facilitating the invasion of exotic annual plants (Knick et al. 2003; Connelly et al. 2004).

In areas where vegetation is low and the terrain relatively flat, power poles provide an attractive hunting, roosting, and nesting perch for many species of raptors and corvids, known predators of GUSG (Steenhof et al. 1993; Connelly et al. 2000; Manville 2002; Vander Haegen et al. 2002). Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof et al. 1993; Manville 2002), thereby increasing the likelihood of predation where sage-grouse occur. Golden eagle (*Aquila chryrsaetos*) predation on sage-grouse on leks increased from 26 to 73 percent of the total predation after completion of a transmission line within 200 meters (m) (220 yards (yd)) of an active sage-grouse lek in northeastern Utah (Ellis 1985). The lek was eventually abandoned, and Ellis (1985) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and caused fragmentation of the habitat.

Powerlines may negatively impact sage-grouse habitats even if raptors are not present. The use of otherwise suitable habitat by sage-grouse near powerlines increased as distance from the powerline increased for up to 600 m (660 yd) (Braun 1998), indicating sage-grouse avoidance of powerlines. Based on those unpublished data, Braun (1998) reported that the presence of powerlines may limit Gunnison and greater sage-grouse use within 1 km (0.6 mi) in otherwise

34

suitable habitat. Based on spatial modeling, sage-grouse extirpation appears to be correlated to the presence of powerlines (Wisdom et al. 2011).

Livestock Grazing

Livestock management and domestic grazing have the potential to degrade GUSG habitat. Grazing can adversely impact nesting and brood-rearing habitat by decreasing vegetation available for concealment from predators. Decreases in vegetation may result in failures in nesting or reduced or lost productivity. Grazing also has been shown to compact soils, decrease herbaceous abundance, increase erosion, and increase the probability of invasion of exotic plant species (GSRSC 2005). The impacts of livestock operations on GUSG depend upon stocking levels and season of use.

We know that grazing can have negative impacts to sagebrush and consequently to GUSG at local scales. Impacts to sagebrush plant communities as a result of grazing are occurring on a large portion of the range of the species. Given the widespread nature of grazing within the range of GUSG, the potential for population-level impacts exists.

Livestock grazing may also have positive effects on sage-grouse under some habitat conditions. Sage-grouse use grazed meadows significantly more during late summer than ungrazed meadows because grazing had stimulated the regrowth of forbs (Evans 1986). Greater sage-grouse sought out and used openings in meadows created by cattle grazing in northern Nevada (Klebenow 1981). Also, both sheep and goats have been used to control invasive weeds (Mosley 1996 in Connelly et al. 2004; Merritt et al. 2001; Olsen and Wallander 2001) and woody plant encroachment (Riggs and Urness 1989) in sage-grouse habitat.

Fences

Effects of fencing on sage-grouse include direct mortality through collisions, creation of raptor and corvid perch sites, the potential creation of predator corridors along fences (particularly if a road is maintained next to the fence), incursion of exotic species along the fencing corridor, and habitat decline (Call and Maser 1985; Braun 1998; Connelly et al. 2000; Beck et al. 2003; Knick et al. 2003; Connelly et al. 2004). However, fences can also benefit GUSG by facilitating the management of livestock forage use and distribution to achieve desired habitat objectives (GSRSC 2005).

Sage-grouse frequently fly low and fast across sagebrush flats, and fences can create a collision hazard resulting in direct mortality (Call and Maser 1985; Christiansen 2009). Not all fences present the same mortality risk to sage-grouse. Mortality risk appears to be dependent on a combination of factors including design of fencing, landscape topography, and spatial relationship with seasonal habitats (Christiansen 2009).

Although we expect the impacts of fences to GUSG are similar to those observed in greater sage-grouse, studies on fence strike-related mortality in GUSG are more limited. However, in 10 years of tracking and studying over 1,000 radio-collared sage-grouse in Colorado, CPW has documented only two strike-related mortalities in GUSG due to fences (one confirmed case in

BLM_0023840

Poncha Pass attributed to bird release methods; and one unconfirmed case in the Gunnison Basin).

Fence posts create perching places for raptors and corvids, which may increase the ability of these birds to prey on sage-grouse (Braun 1998; Oyler-McCance et al. 2001; Connelly et al. 2004). This impact is potentially significant for sage-grouse reproduction because corvids were responsible for more than 50 percent of greater sage-grouse nest predations in Nevada (Coates 2007). Greater sage-grouse avoidance of habitat adjacent to fences, presumably to minimize the risk of predation, effectively results in habitat fragmentation even if the actual habitat is not removed (Braun 1998). Because of similarities in behavior and habitat use, the response of GUSG should be similar to that observed in greater sage-grouse.

We recognize that the stipulations, controlled surface uses, and timing limitations include exceptions, modifications, and waivers. For the purposes of this BO, we assume that the BLM granting of exceptions, modifications, or waivers, to stipulations or controlled surface uses, or timing restrictions within critical habitat for the GUSG will be extremely rare and requires separate section 7 consultation. We make this assumption for the purpose of a simplified effects analysis. It is not possible for to anticipate use of exceptions, modifications, or waivers, therefore it is not possible for us to reasonably predict the negative effects to GUSG or their critical habitat associated with their use. The use of exceptions, modifications, and waivers within critical habitat for the GUSG may require reinitiation of section 7 consultation.

*Analysis of Effects of the Action*

The BA concluded that implementation of the RMP where the following resources or issues occur will not affect the GUSG or its critical habitat: air and climate; wild horses; cultural resources; paleontological; visual water; wild and scenic rivers; lands with wilderness characteristics; forestry, national trails; national, State, and BLM byways; wilderness study areas; Native American tribal uses; public health and safety; socioeconomic; and environmental justice. These issues will not be further addressed within this BO.

Vegetation Management

Vegetation management and protection would impact GUSG. Management to improve and protect vegetation conditions throughout the planning area would improve vegetative cover, reduce the likelihood for erosion and sedimentation, and maintain seed banks. Most vegetation treatments would not directly affect GUSG, as a timing limitation would be applied to avoid impacts during sensitive periods. Vegetation treatments would improve habitat for GUSG in the long-term by providing more opportunities for lekking, nesting, brood-rearing, wintering, cover, and foraging. However, in the short-term, vegetation treatments may remove habitat or increase the potential for weed spread. In addition, human disturbance and noise associated with the use of heavy equipment for vegetation removal could temporarily displace GUSG from foraging, breeding, nesting, and wintering habitats.

Gunnison sage-grouse habitat would be improved and maintained through vegetation treatments, prioritizing winter sage-grouse habitat for treatment and restoration, developing restoration plans

BLM_0023841

in non-functioning habitat, reducing pinyon-juniper encroachments, increasing habitat connectivity, and managing for age class diversity. Actions to reduce pinyon-juniper woodland invasion of upper elevation sagebrush communities would benefit GUSG that require open sage parks. Monitoring after vegetation treatments would occur to evaluate success in meeting objectives. These actions would help support GUSG habitats, and are consistent with the conservation measures identified in the Piñon Mesa Conservation Plan (Piñon Mesa Gunnison Sage Grouse Working Group 2000).

Habitat Improvement

Public land management agencies should continue to improve the quality of sagebrush communities on public land through grazing management, fencing, re-seeding, fuels management, and other treatment projects (GSRSC 2005). The RMP anticipates habitat restoration and improvement, and projects will focus on removal of pinyon-juniper encroachment into sage grouse habitats and on restoration of degraded sage-grouse habitats. Some of the methods used during habitat restoration or improvement may cause short-term negative effects to GUSG. For example, use of fencing to keep livestock out of areas being rested from grazing pressure may provide perches for predators, potentially resulting in avoidance of the area by GUSG.

Weed Management

Noxious and invasive weeds are generally lower in cover and forage value to wildlife and degrade habitat by displacing and reducing optimal cover or food. The RMP goal and objectives call for control and reduction of weeds. Objective VW-O2 requires weed prevention on appropriate actions authorized within the planning area. Action VW-A3 states: Implement preventative measures for activities associated with oil and gas operations; ROWs; range developments; special recreation permits (SRP); and construction and mechanical vegetation treatment activities as authorized in contracts and permits.

Fish and Wildlife Management

The BLM would establish ten wildlife emphasis areas on 150,000 acres to protect areas with high wildlife value and significance, focusing on protecting habitat for big game, cutthroat trout, and sage-grouse. This strategy would allow the BLM to focus their wildlife management efforts in the areas that would be most effective to preserve and protect fish and wildlife, including GUSG. The Timber Ridge and Glade Park wildlife emphasis areas will be of particular benefit to the GUSG, as these boundaries would overlap with occupied habitat for the species and a recently discovered lek in the Timber Ridge area. These wildlife emphasis areas encompass approximately 96 percent of occupied critical habitat and approximately 49 percent of unoccupied critical habitat on BLM-administered lands. The Glade Park emphasis area encompasses 10,100 acres of GUSG occupied critical habitat; this accounts for the majority (95 percent) of occupied proposed critical habitat on BLM-administered lands. Examples of management actions that will be applied in wildlife emphasis areas include stipulations on surface-disturbing activities and recreation restrictions, as well as ROW avoidance and exclusion areas, travel closures, and seasonal restrictions to maintain existing unfragmented habitat and

37

meet wildlife objectives. Approximately 27,200 acres of the Glade Park wildlife emphasis area will be subject to the CO-CSU-Wildlife Habitat stipulation, which would benefit GUSG by restricting surface occupancy or use within this area.

Wildland Fire Management

Wildland fire, fire suppression, and wildland fire management activities have the potential to impact GUSG through loss of sagebrush habitats, erosion, human presence, noise, habitat avoidance, weed invasion, (of particular concern is cheatgrass). These impacts could affect lekking, nesting, brood-rearing, wintering, or foraging behavior. Fire management in the RMP will allow for wildfire suppression in and near GUSG habitat, and emergency stabilization and rehabilitation treatments. Prescribed fire and fuel treatment actions will be considered in vulnerable to catastrophic wildfire events to lessen the likelihood or severity of such events impacting GUSG.

The BLM intends to avoid planned and unplanned fire in low elevation cheatgrass-infested communities, which would help protect adjacent sagebrush habitats used by GUSG. However, prescribed fire, if applied at an appropriate scale, is a viable management tool for protecting Gunnison sagebrush habitats from catastrophic wildfires (GSGRSC 2005). Using a variety of fuel treatments would have short-term effects on GUSG and habitats through vegetation removal, increased likelihood of erosion and sedimentation, human presence, and the potential for habitat avoidance. In the long term, these activities would reduce the likelihood of uncharacteristically large or intense wildfires that could damage large expanses of habitat or kill or displace wildlife. In addition, the condition of upland vegetation would be improved. Cheatgrass recolonization in prescribed burned areas is a notable concern, and reseeding efforts may be necessary to reduce the potential for invasive weeds (GSRSC 2005).

Fire management in occupied and unoccupied critical sage-grouse habitat will continue to focus on immediate suppression in sagebrush habitat, but may impact GUSG habitat in the suppression effort. We cannot predict where and when these impacts may occur, but wildlife suppression activities that impact GUSG habitats will occur under emergency consultation procedures.

Grazing

The RMP includes a number of management actions to incorporate GUSG habitat objectives and management considerations into livestock grazing management. Such measures will help to improve vegetation condition of rangeland areas and could reduce the likelihood of nonnative invasive species introduction or spread. In addition, removing, modifying, or marking fences in high risk areas will help to reduce the likelihood of injury or mortality to GUSG.

The majority of critical habitat is currently meeting land health standards (see Table 4-1 in BA). However, 28 percent of occupied habitat and 9 percent of unoccupied habitat is categorized as meeting the standards with problems, or not meeting the standards. Despite the management actions described above, reductions in herbaceous cover that fall below the Rangewide Conservation Plan habitat guidelines (GSRSC 2005) are likely to continue to occur at times.

BLM_0023843

Adverse effects from trampling of eggs or nests may also occur. This is thought to be rare but the impact is not discountable.

Our conclusion regarding the effects of grazing Federal lands within the GJFO is that, in general, implementation of the grazing program may result in minimal effects to GUSG. We conclude that substantial localized negative effects may occur from over-utilization of forage. However, we believe that on-going monitoring of range conditions will result in the appropriate modification of stocking rate, timing, duration and intensity of grazing in those areas over-utilized by livestock.

As stated above, trampling of nests, or nest abandonment may occur due to the presence of livestock. In addition, flushing of hens from active nests may result in predation of eggs. We believe there is potential for these events to occur on active allotments, but we do not have any means to meaningfully detect or measure these effects, primarily due to low sage-grouse population numbers within the GJFO. In addition, the mere presence of livestock in an area known to be occupied by GUSG may not necessarily result in exposure of the birds to these effects.

Grazing management improvement actions such as fences, corrals, windmills, and stock pond development may result in substantial negative effects to GUSG. Fences may expose grouse to increased predation risk from avian predators and collisions. The RMP provides guidance for removal, modification, and marking of livestock fences. Implementation of this guidance will likely reduce the collision risk for GUSG, but is unlikely to eliminate fence collisions. However, the mere presence of a fence within occupied habitat does not necessarily means collisions will occur.

Water developments may alter existing habitat by congregating livestock use in previously unused upland habitat or by lowering water tables associated with riparian areas. Although water developments can be used to improve overall riparian habitat condition by drawing livestock and wild ungulates away from previously degraded areas, GUSG may be exposed to mosquitoes that may carry West Nile virus, which has been known to cause population declines in wild bird populations, including sage-grouse (GSRSC 2005). We are aware of three mortalities of captive bred GUSG, so it is reasonable to assume that they are susceptible to West Nile virus based on infection and mortality in greater sage-grouse. The revised plan promotes minimizing the likelihood of providing breeding sites for mosquitoes the transmit West Nile virus. However, we conclude that in situations where ponds are developed to provide for livestock water, there is a risk for production of mosquitoes that transmit West Nile virus, resulting in the possible infection, and mortality to GUSG associated with water development project within and near grouse habitat.

Recreation and Travel Management

Habitat loss, degradation, and fragmentation from roads are a major threat to GUSG (79 FR 69162). Recreation, particularly motorized and mechanized, on or off existing roads and trails can cause disturbance to GUSG at sensitive times of the year, particularly during lekking, nesting early brood-rearing and winter. The road and motorized trail system in motorized suitable areas

39

will generally not be considered for expansion or substantial alteration of the transportation system. The proposed action eliminates cross-country motorized use in most of the planning area, except in a limited area. The decision to restrict motorized access to existing roads and trails is generally considered beneficial, because the risk of flushing nesting grouse and other behavioral impacts or destruction of a nest from cross-country travel will be effectively reduced or eliminated.

Under the RMP, within proposed occupied habitat, 18.4 miles of routes will be open to public use (including 1.1 miles of county-maintain roads), and 12.3 miles of routes will be restricted to administrative and permitted use only. Four tenths of a mile of existing routes will be closed and rehabilitated. Within unoccupied habitat, 68.8 miles of routes will be open to public use (including 14.7 miles of county-maintained roads), and 29.6 miles of routes will be restricted to administrative and permitted use. Up to 19.9 miles of routes will be closed and rehabilitated. Habitat loss, degradation, and fragmentation from roads are a major threat to GUSG (79 FR 69162). The collective influences of fragmentation and disturbance from roads reduces the effective habitat as they are avoided by sage-grouse (Knick et al 2011; 79 FR 69162). Impacts related to behavior disruption may occur, particularly along routes occurring in occupied habitat. However, seasonal limitations and route closures within 4 miles of leks will reduce impacts. In addition, the Timber Ridge Wildlife Emphasis Area will be limited to foot and horseback use, which is expected to reduce potential impacts to the lek in this area.

Recreation on Pinon Mesa primarily consists of hunting and mountain biking. Recreation in the area is limited to existing roads and trails. In the winter a minimal number of small game hunters use the area. In late spring and summer, mountain biking occurs within the area. Mountain biking use is not considered to be high, or to have any measurable influence on sage-grouse use in the area. Impacts from big game hunting primarily consist of temporary displacement of individuals flushed by hunters. Big game hunting is not considered a threat to GUSG. Off highway vehicles (OHV) are limited to existing roads and trails. Limited use by OHVs is expected to continue with the primary impact to grouse being disturbance. In the Pinon Mesa area, recreation is limited to areas with public access, and much of the public land is isolated from public road access points, or is often too steep for OHV use. Due to limited access to BLM lands in the area there is very low likelihood for impacts from recreation related activities.

Lands and Realty

Construction and operation of ROW facilities, such as pipelines, roads, and transmission lines, may result in habitat loss, fragmentation, and degradation. Surface disturbance during construction removes vegetation and important habitat components for GUSG and, in most cases, renders the habitat unsuitable. Rights of way, such as those for roads and industrial facilities, may lead to permanent loss of GUSG habitat. Other ROWs, such as those for pipelines or buried power lines, may lead to a more short-term loss of habitat if the area were reclaimed after construction. However, following natural succession regimes, sagebrush communities would take 20 to 30 years to return to preconstruction conditions. In addition to removing vegetation, long-term occupancy of structures and facilities leads to direct habitat loss.

40

BLM_0023845

Rights-of-way may also lead to habitat fragmentation and degradation. Right of way projects can reduce patch size and increase edge habitats. Since GUSG require large blocks of intact habitat, linear disturbances reduce habitat quality. Surface disturbance can also lead to new weed infestations and spread weeds where infestations already occur. Noxious and invasive weeds are often of lower value to wildlife, and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. The loss and degradation of sagebrush habitat can reduce the carrying capacity of local breeding populations of GUSG, especially in areas where high quality sagebrush habitat is limited (Braun 1998; Connelly et al. 2000). As such, there would likely be more impacts on GUSG and their habitat in areas where ROWs are permitted compared to areas where ROWs are excluded or avoided.

Both the construction and operation phases of ROW projects can lead to disruption impacts. Noise and an increase in human presence during construction may displace GUSG into lower quality habitat and may disrupt breeding and nesting (Holloran 2005). Although construction impacts are generally short term, many impacts would continue during routine maintenance and operation of the ROWs. Gunnison sage-grouse would likely avoid habitat in the vicinity of infrastructure (Holloran et al. 2010), resulting in indirect habitat loss. In addition, noise and an increase in traffic during ROW operation and maintenance would disturb and likely displace GUSG (Lyon and Anderson 2003; Holloran 2005). Avoidance of habitat would be most prevalent during levels of high human activity, such as ROW construction. Gunnison sage-grouse may avoid otherwise suitable habitat as the density of roads and infrastructure increases (Holloran 2005). Avian predators, particularly raptors and corvids (i.e., crows, ravens, and magpies), are attracted to overhead utility lines because they provide perches for various activities, including hunting (Avian Power Line Interaction Committee 2006). Increased predation and harassment of GUSG may occur from new ROW projects involving power lines or other tall structures (Connelly et al. 2004). However, the RMP includes management to remove or modify raptor perches, thereby reducing this threat. In addition, road ROWs may increase mammalian predator densities. Construction and operation of ROW facilities may also lead to direct mortality of GUSG. The potential for GUSG mortality from project construction would be low and likely limited to nesting hens or young chicks that have limited mobility. Direct mortality may occur from collisions with turbines, power lines, or meteorological towers or their supporting infrastructure, such as guy wires (Connelly et al. 2004; Beck et al. 2006). In addition, an increase of traffic on roads from ROW maintenance and operations can lead to direct mortality through vehicle collisions.

The RMP includes ROW exclusion areas, which are any areas within a 0.6-mile radius of any sage-grouse lek. Additionally, all occupied sage-grouse habitat and areas within a 4-mile radius of sage-grouse leks are identified as ROW avoidance areas. These measures would reduce or eliminate the above described impacts on GUSG and their habitat by restricting new ROWs.

Lands

41

Renewal of existing authorizations will incorporate sage-grouse conservation measures to the extent possible with the existing use. Some authorizations may necessitate the removal of GUSG habitat and may cause other indirect effects. There is no reasonable means available to predict the timing or location of rights-of-way requests, and we are unable to meaningfully predict an approximate habitat impact from such requests. However, we believe that the revised RMP directs the BLM to reduce the negative impacts of such requests, and is unlikely to result in significant losses of GUSG habitat within the planning area. This allows the BLM to require retrofitting of existing power lines with raptor perch deterrents when reauthorizing ROW permits. In addition, NSO stipulations will limit new disturbances within GUSG habitat by requiring co-location of infrastructure within existing ROW.

Energy and Mineral Development

No fluid mineral development potential occurs within or near established GUSG populations in the GJFO planning area, and no existing fluid mineral leases overlap with designated critical habitat. All occupied GUSG habitat (currently 10,600 acres) will be closed to leasing. As stated in the BA, no energy or mineral development is expected within critical habitat in the Glade Park/Pinon Mesa area. Therefore, we do not anticipate negative effects to GUSG or its critical habitat to result from energy and mineral development within the analysis area.

*Species Response to Proposed Action*

The nature of such a broad reaching programmatic analysis makes evaluating the species response to the proposed action difficult if not impossible to predict. The revised RMP contains direction to minimize impacts to the GUSG thus reducing the potential for adverse effects. However, project level decisions will occur within occupied habitat for GUSG habitat that will result in some of the effects detailed above. Implementation of the revised RMP is likely to result in low levels of adverse effects to GUSG, primarily as indirect effects from project level decisions. However, given the uncertainty of the timing, location, size, and extent of future actions it is not possible to meaningfully predict adverse effects caused by implementation of the revised RMP at this programmatic scale. All subsequent actions that affect GUSG will be subject to future section 7 analysis and consultation requirements.

**CUMULATIVE EFFECTS**

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this BO. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

The majority of the planning area occurs within Mesa County, Colorado which has experienced significant population growth since 1987, and population forecasts expect the growth trend will continue (Colorado Division of Local Government, State Demography Office 2013). As such, continued use and development within the planning area is expected to continue. Past, present, and reasonably foreseeable future actions and conditions on non-Federal lands in the action area that will likely continue to affect Gunnison Sage-Grouse are as follows:

42

- Mineral exploration and development
- Agricultural development
- ROW and infrastructure development
- Livestock grazing
- Recreation
- Road construction
- Weed invasion and spread
- Wildland fires
- Drought
- Farming

We are not aware of any specific non-Federal actions within the action area that are reasonably certain to occur that will negatively affect GUSG.

## CONCLUSION

### Colorado Hookless Cactus

After reviewing the current status of the Colorado hookless cactus, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's BO that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the Colorado hookless cactus. The Service's rationale is presented below.

Implementation of the revised RMP, including the conservation measures, will reduce multiple threats to the Colorado hookless cactus by, significantly curtailing off-road and off-trail mechanized and motorized travel; implementing standard operating procedures and best management practices for soil disturbances; applying No Surface Occupancy (NSO) stipulations on steep slopes, and NSO 2 on riparian zones; incorporating conservation measures contained in the programmatic grazing BA/BO of November 15, 2012 (BLM, 2012; Service BO number ES/GJ-6-CO-12-F-006); designation of ROW exclusion and avoidance areas; and, the designation of the Pyramid Rock and Atwell ACECs.

The biggest change in the proposed action is the specific designation of routes for motorized travel. Cross-country motorized travel will not be allowed under the proposed action. Off-route motorized travel will be restricted to two specific designated areas with the GJFO, totaling 10,200 acres, a significant reduction form the 445,400 acres of cross-country travel authorized in the 1987 RMP. In addition, the GJFO proposes to close and rehabilitate 47.9 miles of existing routes within GJFO that are within 200 meters of known occurrences of the cactus.

We anticipate a low level of adverse effects to Colorado hookless cactus, but the majority of these effects will be widely distributed across cactus habitat in the GJFO and likely of low intensity and severity. Any subsequent action implemented under the revised RMP that may affect the Colorado hookless cactus or future critical habitat designations must go through separate section 7 consultation.

43

BLM_0023848

**DeBeque Phacelia**

After reviewing the current status of the DeBeque phacelia, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's BO that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the DeBeque phacelia. The Service's rationale is presented below.

Implementation of the RMP, including the conservation measures, will reduce multiple threats to the DeBeque phacelia by significantly curtailing off-road and off-trail mechanized and motorized travel; implementing standard operating procedures and best management practices for soil disturbances; applying NSO stipulations on steep slopes; designation of ROW exclusion and avoidance areas; and, the designation of the Pyramid Rock and South Shale Ridge ACESs. Fluid minerals development will require surveys and inventories of listed plants; significant avoidance measures and stipulations are available to avoid direct impacts for most activities. In our opinion, these conservation measures are adequate to protect DeBeque phacelia from most effects & impacts. However, the BLM anticipated continuing or new adverse impacts from livestock grazing and travel management (motorized and mechanized travel).

In localized areas where DeBeque phacelia is found, 1.4 miles of routes open to public use (including 0.9 miles of county- maintained roads) occur within 200 meters of known DeBeque phacelia populations; no routes occur within 20 meters of known occurrences. Given the limited extent of nearby routes, and the general restrictions on off-road/trail motorized and mechanized travel, we expect travel related impacts on DeBeque phacelia to be lower under the RMP than previously.

The RMP will retain the 1,300 acre Pyramid Rock ACEC and designate the 28,200 acre South Shale Ridge ACEC; both contain critical habitat for the DeBeque phacelia, specifically the Pyramid Rock and Sulphur Gulch CH Units. (The Pyramid Rock ACEC contains only a small portion of the Pyramid Rock CH Unit, but the South Shale Ridge ACEC includes all of the Sulphur Gulch CH Unit.) Stipulation NSO-12 (ACECs) prohibits surface occupancy and surface-disturbing activities within each ACEC. All nine critical habitat units will be subject to Stipulations CSU-9 (Sensitive Plant Species Occupied Habitat), NSO-13 (Critical Habitat), LN-3 (Biological Inventories in known or suspected habitat) and LN-4 (Botanical Inventories in known habitat of T & E plant species).

With the travel restrictions and ACECs in place, we believe that implementation of the RMP will not jeopardize the existence of the DeBeque phacelia.

**DeBeque phacelia Critical Habitat**

After reviewing the current status of the critical habitat for the DeBeque phacelia, the environmental baseline for the action area, the effects of the proposed action, and any cumulative effects, it is the Service's BO that the BLM's proposed action to revise the RMP is not likely to result in destruction or adverse modification of critical habitat for DeBeque phacelia. We conclude that critical habitat will likely maintain its functionality to serve the intended conservation role for DeBeque phacelia. The proposed action will not appreciably diminish the value of critical habitat for both the survival and recovery of DeBeque phacelia.

BLM_0023849

We anticipate a low level of adverse effects to DeBeque phacelia, but the majority of these effects will be widely distributed across DeBeque phacelia habitat in the GJFO and usually of low intensity and severity. Any subsequent action implemented under the revised RMP that may affect the DeBeque phacelia or its critical habitat must go through separate section 7 consultation.

### Gunnison Sage-grouse

After reviewing the current status of the GUSG, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's BO that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the GUSG. The Service's rationale is presented below.

Implementation of the RMP, including the conservation measures and use stipulations, will reduce multiple threats to the GUSG and could restore the species to formerly occupied range through proposed habitat improvement projects. Designation of the Glade Park and Timber Ridge Wildlife Emphasis Areas will help ensure GUSG needs are considered in site-specific management decisions. However, we anticipate some low level of adverse effects to GUSG, but the majority of these effects would be widely distributed across GUSG habitat in the GJFO and likely be of low intensity and severity. Any subsequent actions implemented under the revised plan that may affect the GUSG or critical habitat must go through separate section 7 consultations.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

### A. Amount or Extent of Take Anticipated

The "Effects of the Action" section above includes findings that implementation of the proposed action has the potential to cause biological effects to the GUSG that conform to the regulatory definition of take. However, the mere potential for take is not a legitimate basis for a take exemption. The Service must provide a reasoned basis for a likelihood of take in order to anticipate and exempt it. At this broad programmatic level, the best information available is not

BLM_0023850

sufficient to determine any specific level of anticipated take. However, project specific section 7 consultation analyses, subsequent to the proposed action, will reexamine this issue. Since the best information available does not permit us to determine a specific level of take, we are not exempting any take associated with implementation of the proposed action. Therefore, no reasonable and prudent measures and terms and conditions are provided below. If take is anticipated during authorization of a project level action, we will exempt such take at the project level as appropriate.

## B. Effect of the Take

Not applicable

## C. Reasonable and Prudent Measures and Terms and Conditions

Because there are no take exemptions provided under section 7(o) of the Act in the Opinion, the Service is not providing Reasonable and Prudent Measures or Terms and Conditions

## F. Conservation Recommendations

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

We envision recovery for the Colorado hookless cactus includes sizable, stable populations maintained on conserved suitable habitat, with acceptable levels of connectivity between subpopulations for pollinator movement, gene flow, and seed dispersal. Populations will be maintained to provide sufficient representation, resiliency, and redundancy to ensure a high probability of survival for the foreseeable future. Meeting these goals will require that threats be sufficiently understood and abated. Range-wide monitoring will be necessary.

The Recovery outline for the Colorado hookless cactus is as follows:

Recovery needs for Colorado hookless cactus include: (1) survey to accurately document populations and suitable habitat; (2) protect and restore habitat including pollinator habitat and corridors to provide connectivity; and (3) protect individual plants and populations from direct and indirect threats. Specific actions include:

### Surveys and Monitoring

- Completion of a comprehensive survey throughout the species' range. This would include areas that are not likely to be disturbed. Survey results will provide an accurate population estimate and allow us to identify core population areas so we can more effectively protect the species. This will require evaluation of habitat components likely to support Colorado hookless cactus.

46

BLM_0023851

- Surveys also should more accurately delineate the Colorado hookless cactus range relative to other *Sclerocactus* species.

- Locate possible population connectivity corridors.

- Continue ongoing monitoring efforts and expand monitoring to include a larger and more representative sample of occupied sites. This data should improve our understanding of trends.

**Threats Abatement**

- Identify sites in urgent need of habitat protection, set protection priorities, and implement protective measures. In the long run, land management agencies should establish formal land management designations to provide for long-term protection of important populations and habitat.

- Oil and gas leasing and other mineral extraction activities should avoid occupied sites and other important habitat.

- Develop and implement standard conservation measures to minimize future project and use impacts.

- Coordinate with land management agencies, project proponents, and other partners early in the planning process to limit direct and indirect impacts of planned activities.

- Prevent the collection of Colorado hookless cactus plants from natural populations.

**Research**

- Resolve the taxonomic status of Colorado hookless cactus regarding the species relationship with *S. parviflorus*. Secondarily, this study would assess genetic differences between Colorado hookless cactus populations.

- Continue research into Colorado hookless cactus life history and ecology, including pollinators.

- Study population dynamics and conduct a population viability analysis.

- Encourage investigations that project *Sclerocactus* species' vulnerability and response to climate change.

- Improve our understanding of livestock and native (e.g., rodent) grazing impacts.

- Monitor cactus-borer beetle (*Moneilema semipunctatum*) infestations, and study the relationship of episodic infestations with drought and other environmental factors.

Monitor changes in invasive species prevalence and impacts on Colorado hookless cactus. Additionally, continue to explore approaches to minimize the risk posed by invasives and associated remediation actions.

*DeBeque phacelia*

DeBeque phacelia is listed as threatened throughout its range. Conservation efforts should be to develop and implement proactive conservation measures that reduce threats to the species to the point that it no longer requires the protections of the Act and may be removed from the Federal

47

List of Endangered and Threatened Wildlife and Plants (delisted). Recovery efforts will focus primarily on Federal lands, since over 86.6 percent of the species' habitat occurs on these lands. By priority number, we envision recovery for DeBeque phacelia to include:

Potential criteria #1: Protect and maintain all extant populations

Potential criteria #2: Prevent or minimize habitat-disturbing threats

Potential criteria #3: Develop and implement rangewide monitoring

*Gunnison Sage-grouse*

The GJFO should consider full implementation of the conservation strategy presented in the GUSG Rangewide Plan. The purpose of the RCP is to identify measures and strategies to achieve the goal of protecting, enhancing, and conserving GUSG and their habitats.

Range-wide Conservation planning strategies, include, but are not limited to, the following:

1) Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to grouse.

2) Coordinate with CPW in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in historically occupied habitats which are evaluated and deemed suitable.

3) Improve habitat within currently occupied and adjacent potential habitats.

4) Protect from permanent loss historically used habitats that are not currently occupied by grouse.

Additional recommendations are as follows:

- Any activity that results in the permanent loss of proposed critical habitat should include mitigation of offset such losses.
- Extend the timing restrictions on disturbances to breeding activities within areas from 0.6 to 4 miles from March 1 to July15 to protect lekking, nesting, and early brood rearing.
- Recreation - Only allow special recreation permits that have neutral or beneficial affects to occupied habitat areas.
- Lands/Realty – Retain public ownership of proposed critical habitat. Subject to valid, existing rights, co-locate new rights-of-way within existing ROWs
- Range Management - Within proposed critical habitat, incorporate GUSG habitat objectives and management considerations into all BLM grazing allotments through allotment management plans or permit renewals. Work cooperatively on integrated ranch

48

planning within GUSG habitat so operations with deeded/BLM allotments can be planned as single units. Design any new structural range improvements and location of supplements (i.e. salt or protein blocks) to conserve, enhance, or restore GUSG habitat through an improved grazing management system relative to GUSG objectives. When developing or modifying water developments, use best management practices to mitigate potential impacts from West Nile virus.

- Fluid Minerals - When permitting Application for Permit to Drill (APDs) on existing leases that are not yet developed, consider the development of disturbance caps to limit impacts to GUSG proposed critical habitat at local scales (e.g. within habitat units), unless compensatory mitigation demonstrates an offset of resulting habitat loss. Consider full implementation of the suggested management practices listed in RCP, Appendix L for all APD decisions.

- Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).

Instruction Memorandum No. CO-2013-033 provides a surface disturbance avoidance buffer for unmapped winter habitat within 4-miles of a lek. Consistent with the RCP, we recommend a 6-mile avoidance area around a lek for unmapped winter habitat.

## G. Reinitiation-Closing Statement

This concludes formal consultation for the potential effects of the implementation of the revised RMP. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action (50 CFR §402.16).

We appreciate your efforts to ensure the conservation of endangered, threatened, and candidate species. If you have questions regarding this letter or your responsibilities under the Act, please contact Kurt Broderdorp at the letterhead address or phone 970-628-7186.

## LITERATURE CITED

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial nesting habitat for GUSG: a spatially explicit hierarchical approach. Journal of Wildlife Management 76:391-406.

Amstrup, S.C. and R.L. Phillips. 1977. Effects of coal extraction and related development on wildlife populations: Effects of coal strip mining on habitat use, activities and population trends of sharp-tailed grouse (*Pedioecetes phasianellus*). Annual progress report. Denver Wildlife Research Center. U.S. Fish and Wildlife Service. Denver, CO. 37 pp.

BLM_0023854

Beck, J.L., D.L. Mitchell, and B.D. Maxfield. 2003. Changes in the distribution and status of sage-grouse in Utah. Western North American Naturalist 63:203-214.

Beck, J. L., K. P. Reese, J. W. Connelly, and M. B. Lucia. 2006. Movements and survival of juvenile greater sage-grouse in southeastern Idaho. Wildlife Society Bulletin 34:1070-1078.

BIO-Logic, Inc. 2008. Tri-State Generation and Transmission Association. Delta County Transmission Improvement Project Colorado Hookless Cactus Conservation Plan. November 25, 2008. Montrose, CO.

BIO-Logic, Inc. 2009. Wells Gulch Evap, Inc. Wells Gulch Water Treatment and Impoundment System Project. Survey for the Federally Threatened Colorado Hookless Cactus. September 21, 2009. Montrose, CO.

Braun, C.E. 1986. Changes in sage grouse lek counts with advent of surface coalmining. Proc. Issues and Technology in the Management of Impacted Western Wildlife 2:227-231.

Braun, C.E. 1987. Current issues in sage grouse management. Proceedings of Western Association of Fish and Wildlife Agencies 67:134-144.

Braun, C.E. 1998. Sage grouse declines in western North America: What are the problems? Proceedings of Western Association of Fish and Wildlife Agencies 78:139-156.

Braun, C.E., M.F. Baker, R.L. Eng, J.W. Gashwiler, and M.H. Schroeder. 1976. Conservation committee report on effects of alteration of sagebrush communities on the associated avifauna. The Wilson Bulletin 88:165-171.

Braun, C.E., O.O. Oedekoven, and C.L. Aldridge. 2002. Oil and gas development in western North America: Effects on sagebrush steppe avifauna with particular emphasis on sage-grouse. Transactions of the North American Wildlife Natural Resources Conference 67. 19 pp.

Bui, T.D. 2009. The effects of nest and brood predation by common ravens (*Corvus corax*) on greater sage-grouse (*Centrocercus urophasianus*) in relation to land use in western Wyoming. M.S. Thesis, University of Washington. 48 pp.

Bureau of Land Management (BLM). 1997. Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. U.S. Department of the Interior, Bureau of Land Management. 186 pp.

Bureau of Land Management, Uncompahgre Field Office (BLM). 2002. North Delta Land Health Assessment. 2001-2002. Montrose, CO. 110 pp.

Bureau of Land Management, Uncompahgre Field Office (BLM). 2009. Sclerocactus glaucus Monitoring Projects and Trends in the BLM Uncompahgre Field Office, 1978-2009.

BLM_0023855

(Unpublished report prepared by Charlie Sharp in support of the U.S. Fish and Wildlife Service's Revision of the Species Recovery Plan, December 15, 2009.) Montrose, CO. 13 pp.

Bureau of Land Management 2012. Programmatic Biological Assessment, Effects on Listed Plant Species from the Bureau of Land Management Livestock Grazing Program: Colorado hookless cactus (Sclerocactus glaucus), Clay-loving wild buckwheat (Eriogonum pelinophilum), Debeque phacelia (Phacelia submutica).

Call, M.W. and C. Maser. 1985. Wildlife habitats in managed rangelands - The Great Basin of southeastern Oregon sage grouse. General Technical Report PNW-187, U.S. Department of Agriculture, Forest Service, La Grande, OR. 30 pp.

Christiansen, T. in litt. 2009. Fence marking to reduce greater sage-grouse (*Centrocercus urophasianus*) collisions and mortality near Farson, Wyoming - summary of interim results. Wyoming Game and Fish Department. Unpublished data. 3 pp.

CNHP (Colorado Natural Heritage Program). 2014. *Sclerocactus glaucus* Element Global Rank Report 44168. Fort Collins, Colorado.

Coates, P.S. 2007. Greater sage-grouse (*Centrocercus urophasianus*) nest predation and incubation behavior. Ph.D. Thesis, Idaho State University, Boise, ID. 191 pp.

Colorado Division of Wildlife (CDOW). 2009a. Spreadsheet summarizing land ownership by Gunnison sage-grouse population and status. Submittal to the Service. 5 pp.

Colorado Division of Wildlife (CDOW). 2009b. 2009 CDOW Statewide summary information request. Submittal to the Service. 157 pp.

Colorado Division of Wildlife (CDOW). 2010. Spreadsheet summarizing rangewide Gunnison sage-grouse high male counts 2001-2010. Submittal to the Service. 3 pp.

Colorado Parks and Wildlife (CPW). 2012. Spreadsheet summarizing 2012 rangewide Gunnison sage-grouse high male counts and estimated population size. Submittal to the Service. 3 pp.

Colorado Parks and Wildlife (CPW). 2013. Comments on the proposed rule to list Gunnison sage-grouse as endangered. Submittal to the Service. 26 pp.

Colorado Parks and Wildlife (CPW). 2014a. Excel spreadsheet of Gunnison sage-grouse summary Rangewide and by population 1996-2014. 8 pp.

Colorado Parks and Wildlife (CPW). 2014b. 2014 Colorado Parks and Wildlife Statewide Summary. July 2014. 13 pp.

51

Colorado Sage Grouse Working Group (CSGWG). 1997. Gunnison sage grouse conservation plan – Gunnison Basin – Colorado. June 1997. 113 pp.

Connelly, J. W., H. W. Browers and R. J. Gates. 1988. Seasonal movements of sage grouse in southeastern Idaho. Journal of Wildlife Management 52: 116-182.

Connelly, J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun. 2000a. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28:967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies. www.wafwa.org.

Connelly, J. W., E.T. Rinkes, and C.E. Braun. 2011. Characteristics of greater sage-grouse habitats: a landscape species at micro and macro scales. Pp. 69-83 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Conner, S. 2011. Personal communication from Shawn Conner (BIO-Logic) to Alison Graff (BIO-Logic) regarding vegetative budding in Colorado hookless cactus and dramatic shifts in population sizes.

DePrenger-Levin, M., R.H. Kao. 2013. Demographic monitoring of Sclerocactus glaucus, an endemic species of western Colorado. Population Monitoring 2007-2013, Technical Report to Bureau of Land Management, U.S. Department of Interior, Colorado State Office.

Doak, D.F., Thomson, D., and E.S. Jules. 2002. PVA for plants: understanding the demographic consequences of seed banks for population persistence and management. In: S.R. Beissinger and D.R. McCullough, editors. Population Viability Analysis. Chicago: University of Chicago Press.

Ellis, K.L. 1985. Effects of a new transmission line on distribution and aerial predation of breeding male sage grouse. Final report, Deseret Generation and Transmission Cooperative, Sandy, UT. 28 pp.

Evans, C.C. 1986. The relationship of cattle grazing to sage grouse use of meadow habitat on the Sheldon National Wildlife Refuge. MS Thesis, University of Nevada, Reno, NV. 92 pp.

Forman, R.T.T. 2000. Estimate of the area affected ecologically by the road system in the United States. Conservation Biology 14:31-35.

Forman, R.T.T. and L.E. Alexander. 1998. Roads and their major ecological effects. Annual Review of Ecology and Systematics 29:207-231 plus C2.

52

BLM_0023857

Frey, N. S. and M. R. Conover. 2006. Habitat use by meso-predators in a corridor environment. Journal of Wildlife Management 70: 1111-1118.

Gelbard, J.L. and J. Belnap. 2003. Roads as conduits for exotic plant invasions in a semiarid landscape. Conservation Biology 17:420-432.

Gunnison Sage-grouse Rangewide Steering Committee (GSRSC). 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Heil, K.D. and J.M. Porter. 1994. Sclerocactus (Cactaceae): A revision. Haseltonia 2:20-46.

Heil, K.D. and J.M. Porter. 2004. Sclerocactus in Flora of North America. Online at: http://www.efloras.org/florataxon.aspx?flora_id=1&taxon_id=129764. Accessed Dec. 6, 2011.

Holloran, M.J., and S.H. Anderson. 2005. Spatial distribution of greater sage-grouse nests in relatively contiguous sagebrush habitats. The Condor 107:742-752.

Holloran, M.J., R.C. Kaiser, and W.A. Hubert. 2010. Yearling greater sage-grouse response to energy development in Wyoming. Journal of Wildlif3e Management 74: 65-72

Klebenow, D.A. 1981. Livestock grazing interactions with sage grouse. Proceedings of the Wildlife-Livestock Relationship Symposium. 113-123 pp.

Knick, S.T., D.S. Dobkin, J.T. Rotenberry, M.A. Schroeder, W.M. Vander Haegen, and C. Van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Knick, S.T., S.E. Hanser, R.F. Miller, D.A. Pyke, M.J. Wisdom, S.P. Finn, E.T. Rinkes, and C.J. Henny. 2011. Ecological influence and pathways of land use in sagebrush. Studies in Avian Biology. 162 pp. Pp. 203–251 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Knight, R.L. and J.Y. Kawashima. 1993. Responses of raven and red-tailed hawk populations to linear right-of-ways. Journal of Wildlife Management 57:266-271.

Ladyman, J. 2003. Phacelia scopulina (A. Nels) J.T. Howell var. submutica (J.T. Howell) Halse (Debeque phacelia): A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project. Centennial, CO.

Levine, J.M., McEachern, A.K., and C. Cowan. 2008. Rainfall effects on rare annual plants. Journal of Ecology 96:795-806.

BLM_0023858

Lyon, A.G. 2000. The potential effects of natural gas development on sage grouse (*Centrocercus urophasianus*) near Pinedale, Wyoming. M.S. Thesis, University of Wyoming, Laramie, WY. 129 pp.

Lyon, A.G. and S.H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. Wildlife Society Bulletin 31:486-491.

Manville, A.M. 2002. Bird strikes and electrocutions at power lines, communication towers, and wind turbines: State of the art and state of the science – next steps toward mitigation. International Partners in Flight Conference, Monterey, CA. 28 pp.

Merritt, S., C. Prosser, K. Sedivec, and D. Bangsund. 2001. Multi-species grazing and leafy spurge. U.S.D.A.–ARS Team Leafy Spurge Area-Wide IPM Program, Sidney, Montana. 28 pp.

Meyer, S.E., Quinney, D., and J. Weaver. 2006. A stochastic population model for Lepidium papilliferum (Brassicaceae), a rare desert ephemeral with a persistent seed bank. American Journal of Botany 93:891-902.

Miller, R.F., S.T. Knick, D.A. Pyke, C.W. Meinke, S.E. Hanser, M.J. Wisdom, and A.L. Hild. 2011. Characteristics of sagebrush habitats and limitations to long-term conservation. Pp. 145–184 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Olsen, B. E., and R. T. Wallander. 2001. Sheep grazing spotted knapweed and Idaho fescue. Journal of Range Management 54:25-30.

Oyler-McCance, S.J. 1999. Genetic and habitat factors underlying conservation strategies for Gunnison sage-grouse. Ph.D. Dissertation, Colorado State University, Fort Collins, CO. 162 pp.

Oyler-McCance, S.J., K.P. Burnham, and C.E. Braun. 2001. Influence of changes in sagebrush on Gunnison sage grouse in southwestern Colorado. Southwestern Naturalist 46:323-331.

Patterson, R.L. 1952. The sage grouse in Wyoming. Wyoming Game and Fish Commission, Sage Books Inc., Denver, CO. 344 pp.

Phillips, M. 2013. Peer review of Gunnison sage-grouse proposed listing as endangered and proposed critical habitat rule. Submittal to the Service. 9 pp.

Piñon Mesa Gunnison Sage-grouse Working Group. 2000. Gunnison sage-grouse conservation plan Pinon Mesa, Colorado. 37 pp.

BLM_0023859

Piquette D., D.A. Keck, N. Seward, B. Magee, and P. Magee. 2013. Anthropogenic noise assessment around Gunnison sage-grouse leks within the Gunnison Basin, Colorado. Unpublished data. 20 pp.

Prather, P.R. 2010. Factors affecting Gunnison sage-grouse (*Centrocercus minimus*) conservation in San Juan County, Utah. Ph.D. Dissertation, Utah State University, Logan, Utah. 138 pp.

Riggs, R.A. and P.J. Urness. 1989. Effects of goat browsing on gambel oak communities in northern Utah. Journal of Range Management 42:354-360.

Rogers, G.E. 1964. Sage grouse investigations in Colorado. Technical Publication Number 16, Project W-37-R, Federal Aid in Wildlife Restoration. Game Research Division, Colorado Game, Fish and Parks Department. 132 pp.

Schroeder, M.A., J.R. Young, and C.E. Braun. 1999. Sage grouse (*Centrocercus urophasianus*). 28 pages In Poole, A. and F. Gill, eds. The Birds of North America, No. 425. The Birds of North America, Inc., Philadelphia, Pennsylvania.

Schroeder, M.A., C.L. Aldridge, A.D. Apa, J.R. Bohne, C.E. Braun, S.D. Bunnell, J.W. Connelly, P.A. Deibert, S.C. Gardner, M.A. Hilliard, G.D. Kobriger, S.M. McAdam, C.W. McCarthy, J.J. McCarthy, D.L. Mitchell, E.V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. Condor 106:363-376.

Steenhof, K., M. N. Kochert, and J. A. Roppe. 1993. Nesting by raptors and common ravens on electrical transmission line towers. Journal of Wildlife Management 57:271-281.

Thompson, T. R. 2012. Dispersal ecology of Greater Sage-Grouse in Northwestern Colorado: Evidence from Demographic and Genetic Methods. Ph.D. Dissertation, University of Idaho, Moscow, Idaho. 378pp.

US Fish and Wildlife Service. 2010. Recovery Outline for the Colorado Hookless Cactus (*Sclerocactus glaucus*). Colorado Ecological Services Field Office. 17pp.

US Fish and Wildlife Service. 2013. Recovery Outline for the DeBeque phacilia (*Phacelia submutica*). Colorado Ecological Services Field Office. 23pp.

Vander Haegen, W. M., M. A. Schroeder, and R. M. DeGraaf. 2002. Predation on real and artificial nests in shrubsteppe landscapes fragmented by agriculture. Condor 104:496-506.

Walker, B.L., D.E. Naugle, and K.E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71:2644-2654.

Ward, S. 2007. Gunnison sage-grouse winter and summer ecology in San Juan County, Utah. Masters Thesis. Utah State University, Logan, Utah. 85 pp.

BLM_0023860

West, N.E. and J.A. Young. 2000. Intermountain valleys and lower mountain slopes. Pp. 255-284 in M. G. Barbour, and W. D. Billings (editors). North American terrestrial vegetation. 2nd Edition. Cambridge University Press, Cambridge, UK.

Wiens, J.A. and J.T. Rotenberry. 1985. Response of breeding passerine birds to rangeland alteration in a North American shrubsteppe locality. Journal of Applied Ecology 22:655-668.

Wisdom, M.J., C.W. Meinke, S.T. Knick, and M.A. Schroeder. 2011. Factors associated with extirpation of sage-grouse. Pp. 451–472 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Young, J. R. 1994. The influence of sexual selection on phenotypic and genetic divergence among sage grouse populations. Dissertation, Purdue University, West Lafayette, Indiana, USA.

Young, J.R., C.E. Braun, S.J. Oyler-McCance, J.W. Hupp, and T.W. Quinn. 2000. A new species of sage-grouse (Phasianidae: Centrocercus) from southwestern Colorado. Wilson Bulletin 112:445-453.

### *Federal Register Documents*

75 FR 59804. Endangered and Threatened Wildlife and Plants; Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species. September 28, 2010.

79 FR 69162. Endangered and Threatened Wildlife and plants; Threatened Status for Gunnison sage-grouse; Final Rule.

79 FR 69312. Endangered and Threatened and Plants; Designation of Critical Habitat for Gunnison sage-grouse; Final Rule.

BLM_0023861



*Director's Protest Resolution Report*

# Grand Junction (Colorado) Proposed Resource Management Plan and Final Environmental Impact Statement

August 10, 2015



BLM_0023863

## *Table of Contents*

Reader's Guide ................................................................................................................. 3
List of Commonly Used Acronyms ................................................................................ 4
Protesting Party Index .................................................................................................... 5
Issue Topics and Responses ........................................................................................... 7
Clean Air Act .................................................................................................................. 7
    Energy Policy Act ...................................................................................................... 10
    Federal Land Policy Management Act ....................................................................... 13
    Wild and Scenic Rivers Act ....................................................................................... 15
    Endangered Species Act ............................................................................................. 17
    NEPA – Climate Change ............................................................................................ 18
    NEPA – Recreation Impacts Analysis ....................................................................... 21
    NEPA – Oil & Gas Impacts Analysis ........................................................................ 22
    NEPA – Response to comments ................................................................................. 26
    NEPA – Significant New Information ........................................................................ 29
    Areas of Critical Environmental Concern Policy ...................................................... 33
    Fluid Minerals Policy – Valid Existing Rights ......................................................... 34
    Master Leasing Plan Policy ....................................................................................... 38
    Lands with Wilderness Characteristics Policy .......................................................... 39

BLM_0023864

### *Reader's Guide*

*How do I read the Report?*
The Director's Protest Resolution Report is divided into sections, each with a topic heading, excerpts from individual protest letters, a summary statement (as necessary), and the Bureau of Land Management's (BLM) response to the summary statement.

**Report Snapshot**



*How do I find my Protest Issues and Responses?*
1. Find your submission number on the protesting party index which is organized alphabetically by protester's last name.
2. In Adobe Reader search the report for your name, organization or submission number (do not include the protest issue number). Key word or topic searches may also be useful.



BLM_0023865

## *List of Commonly Used Acronyms*

| | |
|---|---|
| **ACEC** | Area of Critical Environmental Concern |
| **BA** | Biological Assessment |
| **BLM** | Bureau of Land Management |
| **BMP** | Best Management Practice |
| **BO** | Biological Opinion |
| **CAA** | Clean Air Act |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **COA** | Condition of Approval |
| **CSP** | Concentrated Solar Power |
| **CSU** | Controlled Surface Use |
| **CWA** | Clean Water Act |
| **DEIS** | Draft Environmental Impact Statement |
| **DM** | Departmental Manual (Department of the Interior) |
| **DOI** | Department of the Interior |
| **EA** | Environmental Assessment |
| **EIR** | Environmental Impact Report |
| **EIS** | Environmental Impact Statement |
| **EO** | Executive Order |
| **EPA** | Environmental Protection Agency |
| **ESA** | Endangered Species Act |
| **FEIS** | Final Environmental Impact Statement |
| **FEIS** | Final Environmental Impact Statement |
| **FLPMA** | Federal Land Policy and Management Act of 1976 |
| **FO** | Field Office (BLM) |
| **FWS** | U.S. Fish and Wildlife Service |
| **GIS** | Geographic Information Systems |
| **HRV** | Historic Range of Variability |

| | |
|---|---|
| **IB** | Information Bulletin |
| **IM** | Instruction Memorandum |
| **KOP** | Key Observation Points |
| **LRMP** | Land and Resource Management Plan |
| **MOU** | Memorandum of Understanding |
| **NEPA** | National Environmental Policy Act of 1969 |
| **NHPA** | National Historic Preservation Act of 1966, as amended |
| **NOA** | Notice of Availability |
| **NOI** | Notice of Intent |
| **NRHP** | National Register of Historic Places |
| **NSO** | No Surface Occupancy |
| **NTT** | National Technical Team |
| **OHV** | Off-Highway Vehicle (has also been referred to as ORV, Off Road Vehicles) |
| **ORV** | Outstandingly Remarkable Value |
| **PA** | Preliminary Assessment |
| **PPA** | Power Purchase Agreement |
| **RFDS** | Reasonably Foreseeable Development Scenario |
| **RMP** | Resource Management Plan |
| **ROD** | Record of Decision |
| **ROW** | Right-of-Way |
| **SO** | State Office (BLM) |
| **T&E** | Threatened and Endangered |
| **USC** | United States Code |
| **USGS** | U.S. Geological Survey |
| **VRM** | Visual Resource Management |
| **WA** | Wilderness Area |
| **WSA** | Wilderness Study Area |
| **WSR** | Wild and Scenic River(s) |

4

BLM_0023866

*Protesting Party Index*

| Protester | Organization | Submission Number | Determination |
|---|---|---|---|
| Jason Oates | Encana Oil & Gas | PP-CO-GrandJunction-15-01 | Denied / Issues and Comments |
| Scott Jones/D.E.Riggle/ Randall Miller | COHVCO/Trails Preservation Alliance/CO Snowmobile Association | PP-CO-GrandJunction-15-02 | Dismissed / Comments only |
| William Sparks/Theresa Sauer | Beatty & Wozniak, PC on behalf of Black Hills Exploration & Production and Black Hills Plateau Production | PP-CO-GrandJunction-15-03 | Denied / Issues and Comments |
| Kathleen Sgamma/David Ludlam | Western Energy Alliance/West Slope COGA | PP-CO-GrandJunction-15-04 | Denied / Issues and Comments |
| Chris Clark | Oxy USA, Inc. | PP-CO-GrandJunction-15-05 | Denied / Issues and Comments |
| Karen Sjoberg | Citizens for Clean Air | PP-CO-GrandJunction-15-06 | Denied / Issues and Comments |
| Nathan T. Fey | American Whitewater Affiliation | PP-CO-GrandJunction-15-07 | Denied / Issues and Comments |
| James Solomon | Motorcycle Trail Riding Association | PP-CO-GrandJunction-15-08 | Dismissed / Comments Only |
| Steve Martin / Frank Lillo | Motorcycle Trail Riding Association / Bookcliff Rattlers Motorcycle Club | PP-CO-GrandJunction-15-09 | Dismissed / Comments Only |
| Dan Antonelli / Kris Cox | Colorado Plateau Mountain Bike Trail Association | PP-CO-GrandJunction-15-10 | Dismissed / Comments Only |
| Wendy Park, et. al | Center for Biological Diversity | PP-CO-GrandJunction-15-11 | Denied / Issues and Comments |
| Nada Culver / Luke Schafer / Rein van West | The Wilderness Society / Conservation Colorado / Western Colorado Congress | PP-CO-GrandJunction-15-12 | Denied / Issues and Comments |
| Joan Woodward | Individual | PP-CO-GrandJunction-15-13 | Denied / Issues and Comments |

5

BLM_0023867

| Larry Martinez | Individual | PP-CO-GrandJunction-15-14 | Dismissed / Comments Only |
| Bill Hamann | Individual | PP-CO-Grandjunction-15-15 | Dismissed / Comments Only |
| Janice Shepherd / Dave Reed | Quiet Trails Group / Western Colorado Congress | PP-CO-Grandjunction-15-16 | Denied/Issues and Comments |
| Rose Pugliese / John Justman / Scott McInnis | Mesa County Commissioners | PP-CO-Grandjunction-15-17 | Denied/Issues and Comments |
| Mark Hellman | Individual | PP-CO-Grandjunction-15-18 | Dismissed / Comments Only |
| Brandon Siegfried | Individual | PP-CO-Grandjunction-15-19 | Dismissed / Comments Only |

6

## Issue Topics and Responses

## Clean Air Act

**Issue Number:** PP-CO-GJ-15-01-36
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

**Issue Excerpt Text:** The BLM improperly attempts to exercise authority to regulate air quality and air emissions in the Proposed Grand Junction RMP. The BLM sets as its objectives in the Proposed Grand Junction RMP Air Quality Section to "limit air quality degradation from authorized activities on BLM-administered lands," to "manage air resources within the GJFO in accordance with the CARPP," and to "minimize emissions, within the scope of BLM's authority, from activities that cause or contribute to air quality impairment, visibility degradation, atmospheric deposition, or climate variability" (Proposed Grand Junction RMP, pgs. 2-25, 2-27). Although Encana supports the BLM's laudable goal of protecting air quality, the BLM does not, as a matter of clear and unequivocal Federal law, have the authority to impose air emissions standards, ensure that air quality standards are maintained, or protect visibility within the Grand Junction Field Office.

**Issue Number:** PP-CO-GJ-15-01-38
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

**Issue Excerpt Text:** With respect to potential visibility impacts, the BLM's authority is also limited by existing federal law. Under the CAA, a federal land manager's authority is strictly limited to considering whether a "proposed major emitting facility will have an adverse impact" on visibility within designated Class I areas [42 U.S.C. § 7475(d )(2)(B) (2012)]. Oil and gas operations do not meet the definition of a major emitting facility. Further, under the CAA, the regulation of potential impacts to visibility and authority over air quality in general rests with the CDPHE. The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that were recently approved. 42 U.S.C. § 7410(a)(2)(J); 77 Fed. Reg. 76,871 (Dec. 31, 2012). Although federal land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no such jurisdiction in the Grand Junction Planning Area [42 U.S.C. §§ 7491 -7492 (2012)]. Accordingly, the BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations i n Colorado, particularly if the overall goal is to reduce potential visibility impacts.

**Issue Number:** PP-CO-GJ-15-01-39
**Organization:** Western Energy Alliance, Public Lands Advocacy
**Protestor:** Kathleen Sgamma/Claire Moseley

**Issue Excerpt Text:** Given the restrictions on BLM 's authority over air quality, the BLM lacks authority to impose any of the emissions to measure controls listed in Table 2-1. See Proposed Grand J unction RMP, pgs. 2-25 0 2-28. For example, the Proposed Grand Junction RMP would require all operators to use "green completion" technology, and would require "all drilling and completion engines used on public lands or used to access federal minerals" to be in conformance with the CARPP, which allows the BLM to require Tier IV diesel engines, natural gas fired engines, or electric engines. Proposed Grand Junction RMP, pgs.2-27 - 2-28; see Proposed Grand J unction RMP app. G, pg. 15. These restrictions and potential restrictions are entirely

7

BLM_0023869

inappropriate and beyond the BLM's authority. Under the CAA, the regulation of reciprocating internal combustion engines and other mobile sources is exclusively within the jurisdiction of the EPA, not the BLM. The EPA, using its authority under the CAA, has issued regulations regarding non-road diesel engines and fuels such as those typically used for drilling and development operations. For these reasons, in its Record of Decision, the BLM must remove and eliminate all of its proposed actions requiring drilling and completion engines, as well as its requirement that all wells be completed using green completions.

**Issue Number** PP-CO-GJ-15-03-34
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** BLM does not have the statutory or regulatory authority to regulate air quality or enforce air quality laws. Under the Clean Air Act (CAA), each state has been delegated the primary responsibility for assuring air quality within non-tribal areas of the state. In Colorado, the Colorado Department of Public Health and the Environment (CDPHE) has primary jurisdiction over air quality by delegation from the Environmental Protection Agency (EPA). See Colorado Revised Statute § 25-7-1309.

The BLM's authority to develop land use plans and otherwise manage federal land under FLPMA does not usurp the air quality authority granted to CDPHE. FLPMA simply requires BLM to "provide for" compliance with federal air quality standards in federal land use plans. To provide for compliance with the CAA in the RMP, BLM simply has to provide lease stipulations or notices that ensure that Applications for Permits to Drill and other

site-specific project authorizations include a measure or condition of approval that a lessee must obtain all applicable air permits from the appropriate jurisdictional authority, here CDPHE. To fulfill its legal obligations under NEPA and FLPMA, BLM must analyze and disclose impacts to air (e.g., NAAQS) in NEPA documents. BLM, however, is not the regulating agency to ensure that oil and gas operations comply with the CAA. Nor does BLM have the authority to impose emission controls. The NEPA process for federal land use planning cannot be used as a surrogate for the Clean Air Act.

**Issue Number:** PP-CO-GJ-15-03-36
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Records of Decision for RMPs and related NEPA documents do not themselves authorize any activity capable of emitting air pollutants. At the site-specific project level, companies must obtain a permit and authorization from CDPHE before constructing any regulated emission source that is analyzed in a project-specific NEPA document and approved by a BLM decision. Companies must also comply with applicable air regulations once operations commence. Applications for Permits to Drill (APD) are issued with conditions of approval that require operators comply with all applicable laws. But this does not provide a legal basis for BLM to regulate air quality standards. CDPHE has sole jurisdictional authority to process and issue air permits for oil and gas operations and to ensure that operators comply with those permits and the CAA.
Colorado's air standards require regulated entities to prevent venting from tanks, establish stringent requirements for capture and control of emissions from tanks, dehydrators and other sources, impose

8

requirements for instrument-based inspection for fugitive emissions of both volatile organic compounds (VOCs) and methane, require prompt repair of leaks, and require management of liquids unloading events. That is also the case for regulations established by the Colorado Oil and Gas Conservation Commission that reduce air emission and odor.

In sum, the GJFO RMP/FEIS fails to adequately explain BLM's proper, and limited, role in protecting and regulating air quality. BLM must remove any restrictions contained in the RMP that attempt to regulate air quality.

**Issue Number:** PP-CO-GJ-15-03-37
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** The RMP/FEIS improperly includes imposition and implementation of the Comprehensive Air Resource Protection Protocol (CARPP). The BLM does not have the legal authority under the Clean Air Act, FLPMA, or NEPA to impose and implement CARPP. Indeed, this imposition exceeds and violates BLM's legal authority and jurisdiction because it attempts to provide BLM with the means to require project proponents to conduct wide-ranging air modeling as well as the

imposition of ill-conceived mitigation measures through the use of COAs. Black Hills protests BLM's failure to analyze and consider the technical viability and economic feasibility of the CARPP on the oil and gas industry.

**Issue Number:** PP-CO-GJ-15-04-11
**Organization:** Western Energy Alliance/West Slope COGA
**Protestor:** Kathleen Sgamma/David Ludlam

**Issue Excerpt Text:** BLM lacks authority to impose controls and limitations beyond those adopted by the state and EPA. The associations also protest BLM's requirements on glycol dehydrators and tank controls in Table 2-1, Record No. 11 which are clearly outside of its jurisdictional authority. CDPHE and EPA both have regulations in place that address glycol dehydrators and tanks. Furthermore, BLM cannot impose an emission threshold, as it conflicts with the state's regulatory primacy. Any emission reductions achieved on these below-threshold targets will be highly expensive and likely negated by emissions associated with additional construction, fuel and transportation activities required for compliance. This proposed rule would result in significant economic cost with no measurable environmental benefits.

**Summary:**
The BLM is in violation of the Clean Air Act by proposing strict emissions restrictions on natural gas operations in Colorado and through including the use of the Comprehensive Air Resource Protection Protocol (CARPP).

**Response:**
The PRMP/FEIS does not exceed the BLM's statutory authority by proposing area-wide restrictions for activities that impact air quality, nor does the PRMP/FEIS purport to create new authority for the BLM to regulate air quality. As discussed in the PRMP/FEIS:

The BLM manages public lands in the best interest of the public in accordance with the Federal Land Policy and Management Act (FLPMA). In addition to providing direction on developing

9

resources for the public, the act contains direction on the protection of resources. Section 102(8) of the act states in part that 'the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.' Section 302(b) of the act states 'in managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.'

Under NEPA, the BLM is required 'to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment…' and to 'use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment…' (40 CFR 1500.2) NEPA also requires analysis of potential mitigation measures and implementation and monitoring of selected mitigation measures. In addition, the BLM must ensure that projects on public lands meet or comply with all local, state, federal, and tribal plans, standards, and regulations.

Thus, the BLM must manage the public lands in a manner that appropriately protects air quality and its related values. Through its RMPs, the BLM establishes desired outcomes for air quality and the "area wide restrictions" needed to meet those outcomes (BLM Handbook H-1601-1, p. C-2). In the case of the Grand Junction PRMP/FEIS, the BLM conducted air quality analyses to determine impacts from specific federal actions anticipated under the PRMP/FEIS, and then developed emission control strategies and mitigation measures to address those impacts and achieve desired outcomes for air quality. This does not mean the BLM is writing new regulations, nor is the BLM establishing itself as a regulatory agency or establishing mitigation measures that are intended to supersede the agencies with regulatory authority over air quality. Rather, the BLM is responding to estimated impacts from the PRMP/FEIS and complying with direction under NEPA, FLPMA, and the Clean Air Act (Grand Junction PRMP/FEIS, p. 1-14, p. 3.2).

### *Energy Policy Act*

**Issue Number:** PP-CO-GJ-15-03-20
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Under the Energy Policy Act of 2005, Section 363 provides that lease stipulations may only be "only as restrictive as necessary to protect the resource for which the stipulations are provided." 42 U.S.C. § 15922(b)(3)(C); see also BLM's Manual 1601 on Land Use Planning, and Manual 1624 on Planning for Fluid Minerals at App. C. II. In the GJFO RMP/FEIS, BLM must utilize the least restrictive management practices with respect to oil and gas development, and document how it complied with these mandates and how the least-restrictive lease stipulation that would offer adequate protection of a resource was selected. See BLM Handbook H-1601-1, App. C. II. The GJFO RMP/FEIS does not include this analysis. Further, the GJFO RMP/FEIS does not analyze or substantiate the imposition of virtually all of the proposed stipulations for oil and gas which BLM indicates will be applied as COAs on existing leases. The GJFO RMP/FEIS

10

provides no basis for these expanded restrictions. Nor does BLM even attempt to analyze the detrimental and significant negative impact that these restrictions would have on development of oil and gas resources, either individually or cumulatively.

**Issue Number:** PP-CO-GJ-03-23
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Under preferred Alternative B, BLM proposes use of NSO stipulations within 200 meters of "current and historically occupied and suitable habitat for threatened, endangered, proposed, and candidate plant species." G.TFO RMP/FEIS Section 4.3.6 at 4-199. The stated purpose of the NSO stipulations is to protect certain species from "indirect impacts or loss of immediately adjacent suitable habitat." BLM provides no scientific justification for mandating these buffers year-round or at these distances. Further, the GJFO DRMP/DEIS proposes CSU stipulations for lands surrounding BLM sensitive plant species, including protections up to 200 meters from the edge of occupied habitat GJFO RMP/FEIS Section 4.3.6 at 4-199. BLM continues to fail to provide appropriate scientific support to justify these species restrictions.

**Issue Number:** PP-CO-GJ-15-03-25
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** BLM's continued proposal to impose NSO and CSU stipulations that outright bar oil and gas development on unoccupied DeBeque phacelia habitat is unjustifiable in light of

FWS's determination, when designating critical habitat, that "conservation efforts will allow for oil and gas development on Federal lands" and therefore are not expected to infringe on valid existing lease rights. Further, FWS stated that it is "committed to working with project proponents to implement a series of conservation efforts to protect the plants and their habitat, while allowing oil and gas development projects to move forward." FWS stated that oil and gas development will be available on occupied lands following Section 7 consultation; so too should oil and gas development be available on unoccupied lands.

With respect to the Colorado hookless cactus, FWS has not designated critical habitat. Instead, the GJFO RMP/FEIS proposes, through Preferred Alternative B, to impose NSO stipulations for lands within 200 meters of current and historically occupied and suitable habitat for the species. BLM cannot designate de facto critical habitat where FWS fails to do so. Further, BLM has not, and cannot, justify restricting oil and gas development on currently unoccupied habitat.

**Issue Number:** PP-CO-GJ-15-03-27
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** BLM must ensure that its stipulations for the protection of fish and wildlife provide reasonable opportunity for a lessee to conduct exploration and development activities upon its leases while protecting wildlife resources. Further, BLM's stipulations must be consistent with, and not exceed, state limitations. Instead, the GJFO RMP/FEIS incorporates stipulations such as NSO 34, which prohibits surface

11

occupancy and use and surface-disturbing activities in elk production areas year round despite current herd population calculations. GJFO RMP/FEIS Table B-5 at B-51. Black Hills protests inclusion of this stipulation in the RMP.

**Issue Number:** PP-CO-GJ-04-5
**Organization:** Western Energy Alliance/West Slope
**Protestor:** Kathleen Sgamma/David Ludlam

**Issue Excerpt Text:** Lack of Justification for Excessive Restrictions: Pursuant to the Energy Policy Act 2005, the stipulations for oil and natural gas leases within the Grand Junction PRMP/FEIS should not be onerous or more restrictive than necessary. In the PRMP, however, BLM has not provided justification for imposing prohibitive NSO and CSU stipulations. In fact, Preferred Alternative B proposes to apply 670,300 acres of land with NSO stipulations and 642,400 acres of land with CSU stipulations. An additional 526,400 acres are proposed for TL stipulations. While many of these lands overlap, BLM has clearly added overly burdensome restrictions on access to oil and gas resources.

Section 363 of Energy Policy Act of 2005 requires the Secretary of the Interior and the Secretary of Agriculture to enter into a Memorandum of Understanding regarding oil and natural gas leasing and to ensure that lease stipulations are applied consistently, coordinated between agencies, and "only as restrictive as necessary to protect the resources for which the stipulations are applied." Here, however, BLM instead proposes to adopt stipulations that are far more restrictive when compared to existing management.

**Issue Number:** PP-CO-GJ-15-05-21
**Organization:** Oxy USA, Inc
**Protestor:** Chris Clark

**Issue Excerpt Text:** Further, the BLM policy directs the agency to show that "the least restrictive constraint to meet the resource protection objection [is] used." See BLM Handbook H-1601-1, App. C.II.H. at 24. The BLM makes no such showing in the Proposed RMP and FEIS and arbitrarily imposes an unduly and unnecessarily restrictive management practice.

**Issue Number:** PP-CO-GJ-15-17-13
**Organization:** Mesa County Commissioners
**Protestor:** Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** Mesa County protests the BLM's failure to provide adequate support for its management decisions. The BLM is required to utilize the least-restrictive management practices with respect to oil and gas development. Pursuant to Section 363 of the Energy Policy Act of 2005, lease restrictions should be "only as restrictive as necessary to protect the resource for which the stipulations are provided." 42 USC § 1 5922(b)(3)(C). With respect to oil and gas resources, the BLM 's Manu al 1601 on Land Use Planning, and Manual 1624 on Planning for Fluid Minerals, both specifically direct the BLM to not only identify which areas would be subject to different categories of restrictions as included in the RMPA/FEIS, but also to show that "the least restrictive constraint to meet the resource protection objection [is] used." See BLM Hand book H-1601-1, App. C.II.H. at 24.

12

BLM_0023874

**Summary:**
The PRMP/FEIS violates the Energy Policy Act of 2005 by failing to apply the least restrictive stipulations for oil and gas leasing.

**Response:**
Section 363 of the Energy Policy Act of 2005 requires that the Secretaries of the Interior and Agriculture establish a memorandum of understanding regarding oil and gas leasing on public lands. One of the subjects of the MOU was to ensure that oil and gas lease stipulations be "only as restrictive as necessary to protest the resource for which the stipulations are applied" [42 U.S.C. § 15922(b)(3)(C)].

In order to mitigate impacts to other resources, the BLM appropriately proposes and analyzes restrictions on potential oil and gas leasing through oil and gas lease stipulations. The BLM policy requires RMPs to identify and consider areas subject to both moderate and major constraints for oil and gas leasing and identify specific lease stipulations that will be employed to accomplish resource condition objectives (BLM Handbook H-1601-1, p. C-23 to C-24). Accordingly, each alternative analyzed in the PRMP/FEIS presents a set of oil and gas lease stipulations necessary to meet the goals and objectives for each resource and resource use in the planning area.

Appendix B of the PRMP/FEIS contains detailed information for all of the stipulations presented as management actions in Chapter 2 (Table 2-2), including the stipulation, area included in the stipulation, the purpose, and exception, modification and waiver criteria. In some cases the stipulation may be the same for more than one alternative, but may vary in the exception, modification, and waiver language.

Based on current resource conditions, there are many reasons why the number of acres subject to major or moderate lease stipulations is proposed to increase when compared to current management. For example, one reason is an increase in acreage subject to major or moderate lease stipulations for the protection of Special Status Species, such as the Greater Sage-Grouse, as well as sensitive vegetation. Differing levels of protection were analyzed among alternatives (Grand Junction PRMP/FEIS, Table 2-5).

The PRMP/FEIS fully analyzed the impacts of the lease stipulations (see Chapter 4 of the PRMP/FEIS) for each alternative. Based on the impacts analysis performed, the BLM determined that the stipulations considered are not overly restrictive, and are necessary to meet the goals and objectives of the PRMP/FEIS.

## *Federal Land Policy Management Act*

**Issue Number:** PP-CO-GJ-15-03-6
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** As explained in the Comment Letter, BLM fails to comply with FLPMA, by which BLM is required to manage public lands under the principles of multiple use and sustained yield, and in

13

BLM_0023875

accordance with applicable land use plans, to meet the needs of present and future generations. 43 U.S.C. § 170l(a)(7), (8) & (12); 43 U.S.C. § 1732(a) & (b); 43 C.P.R.§ 1610.5-3.

**Issue Number:** PP-CO-GJ-15-05-4
**Organization:** Oxy Usa, Inc.
**Protestor:** Chris Clark

**Issue Excerpt Text**: The preferred alternative is inconsistent with the BLM's multiple use and sustained yield mandate. The BLM suggests it seeks to "provide an overall balance between the protection, restoration, and enhancement of natural and cultural values, while allowing resource use and development in existing or reasonable locations," but the Proposed RMP would more than double the amount of acreage currently unavailable for oil and gas leasing. Furthermore, the BLM proposes to impose restrictive stipulations on those areas that remain open for leasing and many areas in and around federal and private leasehold interests that may impact access to those leases. Oxy respectfully requests the BLM re-evaluate the extent to which the BLM proposes to eliminate access to these important local, national, and international resources.

**Issue Number:** PP-CO-GJ-15-03-15
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Discussion of Wilderness Study Areas and Lands with Wilderness Characteristics
Black Hills protests BLM's proposal to manage the Bangs, Maverick and Unaweep lands with wilderness characteristics units (WICU) to protect their wilderness characteristics.  BLM lacks the authority to

protect lands with wilderness characteristics solely to protect "wilderness" as wilderness and "wilderness characteristics" are not a use of public lands, but mere designations of public lands. See 43 U.S.C. §§ 1782, 1702(1) (wilderness characteristics are not a stated use of public lands).  BLM's authority to inventory public lands does not provide any specific authority to designate and protect lands for wilderness "characteristics." BLM's authority to designate wilderness study areas ended over 20 years ago. Thus, BLM's preferred alternative to protect lands solely for the preservation of wilderness value violates FLPMA's mandate to manage public lands for multiple use and sustained yield.

**Issue Number:** PP-CO-GJ-15-12-70
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/Rein VanWest

**Issue Excerpt Text:** The Grand Junction Proposed RMP fails to balance conservation with development across the planning area. While we appreciate that BLM proposes to manage some lands to protect wilderness characteristics, and that BLM would ascribe a variety of administrative designations and other conservation management to some lands and resources in the Grand Junction Field Office, the proposed plan would still protect only 4% of the public lands for wilderness characteristics and would designate 2,375 miles of motorized routes. This does not represent balanced management for the multiple uses of our public lands, which include wilderness and wildlife values in addition to primitive recreation experiences.

14

**Summary:**
Grand Junction RMP/FEIS Violates FLPMA's Multiple Use mandate by which BLM is required to manage public lands under the principles of multiple use and sustained yield, and in accordance with applicable land use plans, to meet the needs of present and future generations.

- the Proposed RMP would more than double the amount of acreage currently unavailable for oil and gas leasing and impose restrictive stipulations on those areas that remain open for leasing and many areas in and around federal and private leasehold interests that may impact access to those leases
- The Proposed RMP would still protect only 4% of the public lands for wilderness characteristics and would designate 2,375 miles of motorized routes

**Response:**
Section 102(a)(7) of FLPMA declares that it is the policy of the United States that management of the public lands be on the basis of "multiple use" and "sustained yield". Section 103(c) defines "multiple use" as the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. Accordingly, the BLM is responsible for the complicated task of striking a balance among the many competing uses of public land. The BLM's multiple-use mandate does not require that all uses be allowed on all areas of the public lands. Through the land use planning process, the BLM evaluates and chooses an appropriate balance of resource uses which involves tradeoffs between competing uses.

While currently about 445,000 acres of BLM-managed lands within the planning area are open to cross-country motorized use, the Proposed RMP would leave no areas open to cross-country motozied use, in order to address resource conflicts (Grand Junction PRMP/FEIS, p. 2-7). In addition, while currently about 35,300 acres of BLM-managed lands within the planning are closed to motorized use, the Proposed RMP would increase this closure to 126,200 acres in order to address resource conflicts (Grand Junction PRMP/FEIS, p. 2-7).

While FLPMA does identify mineral exploration and development as a "principal or major use," Section 102 (8) of FLPMA also states that BLM "where appropriate, will preserve and protect certain public lands in their natural condition." Accordingly, the Grand Junction PRMP/FEIS restricts oil and gas activities on certain public lands and applies various restrictions appropriate for the protection of other resource uses and values, such as recreational opportunities, state wildlife areas, and wilderness characteristics.

## *Wild and Scenic Rivers Act*

**Issue Number:** PP-CO-GJ-15-07-2
**Organization:** American Whitewater
**Protestor:** Nathan T. Fey

**Issue Excerpt Text**: The Bureau of Land Management's decision to find 8.24 miles of the Dolores River, from BLM-private boundary in Section 24, T50N R19W, New Mexico P.M to the Colorado-Utah border, NOT SUITABLE for designation is inconsistent with the National Wild and Scenic Rivers Act.

15

BLM_0023087

**Issue Number:** PP-CO-GJ-15-07-4
**Organization:** American Whitewater
**Protestor:** Nathan T. Fey

**Issue Excerpt Text**: The Bureau of Land Management's decision to find 8.24 miles of the Dolores River, from BLM-private boundary in Section 24 to the Colorado-Utah border, NOT SUITABLE for designation is inconsistent with the National Wild and Scenic Rivers Act. In the Proposed Resource Management Plan/Final Environmental Impact Statement the BLM made the non-suitable determination in response to concerns of the State of Colorado that "if this river segment...were to be designated into the National Wild and Scenic Rivers System, the designation would include a federal reserved water right." While the State of Colorado believes that designation under the WSRA automatically grants a Federal Reserve water right, in practice federal reserved water rights have not always been claimed if alternative means are adequate for protecting the waterway. Speculation over future development of water rights is unconstitutional under Colorado Law, and should not be the basis for eliminating the suitability determination for the Dolores River.

**Summary:**
The Bureau of Land Management's decision to find 8.24 miles of the Dolores River, from BLM-private boundary in Section 24 to the Colorado-Utah border, NOT SUITABLE for designation is inconsistent with the National Wild and Scenic Rivers Act because the BLM misapplied criteria.

**Response:**
The Grand Junction PRMP correctly applied the criteria for suitability determination as described in Appendix C, Wild and Scenic Rivers Suitability Report. The purpose of the suitability phase of the study process is to determine whether eligible segments would be appropriate additions to the NWSRS by considering tradeoffs between corridor development and river protection. The PRMP's Wild and Scenic River suitability study and non-suitability decision for this 8.24-mile segment of the Dolores River are also in compliance with BLM Manual 6400, which the PRMP cites as an informational source in evaluating segments for suitability (Grand Junction PRMP/FEIS, Appendix C, p. 2-4).

The 1976 and 1979 Dolores River Wild and Scenic Study Reports were created in response to Congressional direction to study the Dolores River under Section 5A of the Wild and Scenic Rivers Act. Rivers studied under Section 5A receive interim management protection for only three years from the data of the study report. Once that three year period passes, determinations made in a Section 5A study report do not control the findings that BLM may make when subsequently conducting a study under Section 5D of the Wild and Scenic Rivers Act.

The State of Colorado expressed concerns regarding potential federal reserved water rights for the approximately 1-mile segment of the Dolores River at the Utah-Colorado border (6th P.M., T. 15 S., R. 104., secs, 17 and 18 ). By law, designated rivers always include a federal reserved water right, even if in practice the managing agencies have not quantified, adjudicated, and enforced that water right. In addition, the federal reserved water right is created even in segments that are subject to interstate water allocation compacts, and this segment of the Dolores River is subject to the existing Colorado River interstate compact. Therefore, the BLM correctly

16

BLM_0023878

analyzed the State of Colorado concern regarding potential federal reserved water rights for this approximately 1-mile segment, concluding that if the river is designated by Congress, the federal reserved water right that comes with designation could create water delivery obligations for the State of Colorado, depending upon how the Colorado River Compact is administered. Specifically, the State of Colorado was concerned that a water delivery obligation in this location might restrict the state's ability to utilize water within the Dolores River basin that would be available to the state under the interstate compact. The PRMP/FEIS Appendix C, Wild and Scenic Rivers Suitability Report, explains the BLM's suitability/non-suitability determination for various segments of the Dolores River. Appendix C explains on page 3-36 that the BLM assessed that a "not suitable" determination for certain other portions of this 8.24 mile segment of the Dolores River would minimize potential conflicts between private landowners and the protective provisions of the Wild and Scenic Rivers Act.

## *Endangered Species Act*

**Issue Number:** PP-CO-GJ-15-11-4
**Organization:** Center for Biological Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text:** The FEIS suggests that BLM and the Service plan to rely on the 2008 "Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River" (PBO) instead of completing a formal consultation regarding the effects of the PRMP's water depletion effects on the endangered fish. FEIS 6-195 The Reasonably Foreseeable development scenario in the RMP does not exceed the amount of water depletions consulted on in the Programmatic Biological Opinion." The Service and BLM cannot reasonably rely on the PBO, because it did not anticipate the full scope of water use required by the PRMP and other fluid mineral development activities in the Upper Colorado River Basin. In addition, the PRMP lacks adequate measures to reduce the increased risk of spills and leaks that the PRMP poses to endangered fish and their habitat in the Upper Colorado Basin, as well as effective measures that will reduce the risk of selenium contamination from increased surface disturbance. Before

approving the PRMP, the Service and BLM must (1) formally consult or reinitiate formal consultation regarding the PRMP's water depletion effects on the endangered fish; (2) complete formal consultation regarding the increased risk of spills and leaks from oil and gas development on the endangered fish; and (3) formally consult over the PRMP's selenium contamination impacts on the endangered fish.

**Issue Number:** PP-CO-GJ-15-11-6
**Organization:** Center for Biological Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text:** In the alternative, the Service and BLM must reinitiate formal consultation regarding the water depletion impacts of all Upper Colorado Basin fluid mineral development on the endangered fish. "Re-initiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 CFR § 402.16(b). New information

17

BLM_0023879

reveals that horizontal drilling, hydraulic fracturing, and other related infrastructure projects in the GJFO planning area will require water depletions "to an extent not previously considered."

**Issue Number:** PP-CO-GJ-15-11-4
**Organization:** Center for Biological Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text:** BLM Must Provide the Public an Opportunity to Review the Biological Assessment for the PRMP and the Service's Consultation.
Once BLM and the Service complete formal consultation, the agencies must provide the public an opportunity to review the agencies' analyses and conclusions. Thus far, the public has had no opportunity for meaningful input into the consultation process between BLM and Fish and Service

regarding the PRMP's effects on various listed species. The CEQ regulations provide: "To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the… Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.)…." § 40 C.F.R. § 1502.25(a). Yet, the FEIS still does not include BLM's Biological Assessment or any studies prepared by the Service. Rather, "copies of the Biological Assessment and the USFWS's Biological Opinion will be provided as appendices to the Approved RMP/Record of Decision." FEIS 5-3. To ensure that the public has a fair chance to review the Biological Assessment and Biological Opinion, BLM must allow the public an opportunity to comment on these documents in a recirculated SEIS.

**Summary:**
The USFWS and BLM cannot reasonably rely on the Programmatic Biological Opinion because it did not anticipate the full scope of water use required by the PRMP and other fluid mineral development activities in the Upper Colorado River Basin.

**Response:**
The BLM worked with USFWS to develop a Biological Assessment based on the PRMP/FEIS. That Biological Assessment - based on the PRMP/FEIS - was formally submitted to USFWS October 3, 2014. USFWS provided input on planning issues, data collection and review, and alternatives development including the scope of water use and other fluid mineral development activities in the Upper Colorado River Basin. USFWS has formulated a Biological Opinion for this PRMP/FEIS effort. Copies of the Biological Assessment and the USFWS Biological Opinion will be provided as appendices to the Approved RMP/Record of Decision.

The BLM is in compliance with the Endangered Species Act (ESA), specifically Section 7(c), which requires Federal agencies to consult with USFWS to ensure that its actions are not likely to jeopardize the continued existence of any listed species (Section 5.2.3).

## NEPA – Climate Change

**Issue Number:** PP-CO-GJ-15-06-5
**Organization:** Citizens for Clean Air
**Protestor:** Karen Sjoberg

**Issue Excerpt Text:**

18

Here, the agency violated NEPA by relying on analysis that partially disclosed the amount of GHG pollution from foreseeable oil and gas development, but failed to take the essential next step: disclosing the costs and impacts that such pollution would have. An economic cost-benefit must be performed before the agency authorizes the proposed development. At the very least, failing to provide any cost-benefit analysis is impermissible according to the agency's multiple legal obligations, including NEPA, EO 12866, as well as BLM's own policy IM No. 2013-131.

**Issue Number:** PP-CO-GJ-15-11-23
**Organization:**  Center for Biological Diversity
**Protestor:**  Wendy Park, et al.

<u>**Issue Excerpt Text:**</u> The EIS Must Analyze the PRMP's Indirect Impacts, Including the Effect of Increased Carbon Dioxide and Methane Emissions on Climate.  The EIS fails to provide any analysis of the consequences of carbon emissions that would result from the PRMP's implementation**.**

**Issue Number:** PP-CO-GJ-15-11-25
**Organization:**  Center for Biological Diversity
**Protestor** Wendy Park, et al.

<u>**Issue Excerpt Text:**</u>  BLM does have tools available to provide one approximation of external costs, and is required to at least provide a reasonable justification should it elect to not use those tools. Perfect accuracy is not required: "reasonable forecasting and speculation is implicit in NEPA." Scientists' Inst. For Pub. Info, Inc. v. Atomic Energy Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973).  BLM has previously performed such analyses in prior environmental reviews.95

Its own internal memo identifies one available analytical tool: "For federal agencies the authoritative estimates of [social cost of carbon] are provided by the 2013 technical report of the Interagency Working Group on Social Cost of Carbon, which was convened by the Council of Economic Advisers and the Office of Management and Budget."

**Issue Number:** PP-CO-GJ-15-11-27
**Organization:**  Center for Biological Diversity
**Protestor:**  Wendy Park, et al**.**

<u>**Issue Excerpt Text**</u> The EIS must be revised to provide a full accounting of the PRMP's climate change impacts, when analytical tools are available to assess these impacts.

**Issue Number:** PP-CO-GJ-15-13-2
**Organization:**  Individual
**Protestor:**  Joan Woodward

<u>**Issue Excerpt Text:**</u>  In addition, there is the elephant in the room: climate change. This is an absolutely urgent matter. We cannot delay action on the grounds that other countries are doing so. We must move forward (and away from fossil fuels) as rapidly as possible, to minimize what are likely to be catastrophic consequences of inaction. The fear of economic consequences for our oil and gas industry workers are not only unfounded (alternative energy can supply other jobs), but cruelly oblivious to the deadly consequences which will befall poorer nations if emissions are allowed to continue to grow. BLM has totally failed to consider this vital issue in its "cost-benefit" analysis. See NEPA, EO 12866 and BLM's IM No. 2013-131.

BLM_0023881

**Summary:**
- The analysis failed to account for the full lifecycle of oil and gas production on greenhouse gas (GHG) emissions, to consider oil and gas development in the planning area from the cumulative impacts of the oil and gas sector on GHG emissions.

- The BLM failed to address the uncertainties associated with methane's warming impacts and, as a consequence, failed to ensure that potentially significant impacts are not underestimated or ignored.

**Response:**
The BLM adequately analyzed the impacts of climate change in accordance with NEPA and the DOI policy. DOI Secretarial Order 3226 (January 19, 2001), which was reinstated by DOI Secretarial Order 3289 (February 22, 2010), calls on each DOI Bureau and office to consider and analyze potential climate change impacts when undertaking long-range planning exercises. The GJFO PRMP/FEIS analyzed potential climate change impacts on Colorado and Regional Resources in Sections 3.2.2 and 4.3.1, including a discussion of current conditions, trends and predictions. Because specific climate change predictions are not readily available for most of the GJFO analysis area, climate change trends were summarized for western Colorado (GJFO PRMP/FEIS, 2014, p. 3-20). This PRMP/FEIS met the requirements to analyze climate change in long-range planning exercises.

Section 4.3.1 of the GJFO PRMP/FEIS analyzes the potential impacts on climate change associated with management activities proposed for each of the alternatives. The BLM included qualitative and quantitative evaluations of potential contributing factors to climate change within the planning area where appropriate and practicable. Noting that the primary activities that generate GHG emissions within the planning are construction and operation of oil and gas facilities, the BLM included a quantitative analysis of GHG emissions from such oil and gas projects (GJFO PRMP/FEIS, 2015, Table 4-2).

Furthermore, while the BLM identified the uncertainties and assumptions associated with the analysis and acknowledges that the assessment of climate changing pollutant emissions and climate change is in its formative phase, the analysis stated that methane emissions from oil and gas activities—primarily as fugitive emissions from natural gas production and gas venting during well completion—would have the greatest global warming impact of the three GHGs, notwithstanding total estimated carbon dioxide emissions being the greatest in absolute quantity of the three GHGs emitted (GJFO PRMP/FEIS, 2015, pp. 4-42 – 4-56). The BLM provided for best management practices and a Comprehensive Air Resources Protection Protocol (CARPP) for oil and gas development, identified in Appendix H and Appendix G of the GJFO PRMP/FEIS respectively, as potential measures that may reduce or capture methane and other GHG emissions. The BLM also noted that the continuous implementation of the CARPP would allow for ongoing air quality analysis to ensure that impacts are within the expected range evaluated in this PRMP/FEIS (GJFO PRMP/FEIS, 2015 p. 4-16).

To put the GHG emissions into context for the public and the decision maker, the analysis presents estimates of national GHG emissions and the contributions to these national emissions by major economic sector, identifies oil and gas development and operations as the primary

20

activities within the planning area that generate GHG emissions, and compares the quantitative estimates of GHG emissions from oil and gas activities under each alternative with state and national GHG emissions estimates (GJFO PRMP/FEIS, 2015, pp. 4-42 – 4-56).

## *NEPA – Recreation Impacts Analysis*

**Issue Number:** PP-CO-GJ-15-16-6
**Organization:** Quiet Trails Group, Western Colorado Congress
**Protestor:** Janice Shepherd/Dave Reed

**Issue Excerpt Text:** The BLM appears not to have considered the impacts on natural soundscape of the noise from target shooting. The PRMP refers repeatedly to the impacts of the noise from motorized use and from oil/gas drilling and production, but the PRMP does not mention the much louder impact of target shooting, which is typically in the range of 150 to 170 decibels (http://www.freehearingtest.com/hia gunfirenoise.shtml ).

**Issue Number:** PP-CO-GJ-15-16-8

**Organization:** Quiet Trails Group, Western Colorado Congress
**Protestor:** Janice Shepherd/Dave Reed

**Issue Excerpt Text:** The noise impacts from target shooting were not considered in the PRMP for target shooting within the Bangs SRMA Zone 4 and the overlapping Bangs LWC. Management objectives and plans for Bangs SRMA Zone 4 and the Bangs LWC are inconsistent with excessive human produced noise. Comments were made pointing out that excessive noise is in conflict with the enjoyment of a quiet experience. Therefore target shooting should be prohibited in Bangs SRMA and Bangs LWC.

**Summary:**
The Grand Junction PRMP/FEIS violates NEPA by failing to adequately analyze the impacts of noise related to recreational target shooting.

**Response:**
NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)).

Sections 3.6.2 and 4.4.3 of the GJFO PRMP/FEIS  provide a general analysis of impacts from target shooting.  A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad rather than on site-specific actions or activities. Noise impacts from recreational target shooting are very short-term and highly localized in nature.  As most recreational target shooting is concentrated in a few areas (see Grand Junction PRMP/FEIS, p. 3-245 to 3-247), it is not expected that noise impacts from recreational target shooting would be widespread or ongoing throughout the planning area, and therefore, was not discussed in detail.

21

## *NEPA – Oil & Gas Impacts Analysis*

**Issue Number:** PP-CO-GJ-15-03-31
**Organization:** Beatty & Wozniak on behalf
of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** This significantly
reduced window for exploration and
development activities concentrates
environmental impacts to a short period of
time, which could result in more, and not
less, impacts upon wildlife. Moreover, from
an economic impact standpoint, this reduced
operational window would result in less
development, less investment, and less full-
time meal jobs and economic benefits for
the local communities. The RMPA does not
analyze or address any of the potential
economic impacts, or the environmental
impacts of these restrictive and narrow
development time-frames.   To comply with
FLPMA and NEPA, and to provide for
informed decision-making, the RMPA/FEIS
needs to analyze the cumulative impacts of
management prescriptions, stipulations, and
access restrictions upon minerals
management and development, including
both the economic and environmental
impacts from these narrow operational
windows.

**Issue Number:** PP-CO-GJ-15-11-11
**Organization:** Center for Biological
Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text:** The EIS Fails to
Disclose the PRMP's Water Depletion
Impacts. The EIS's discussion of the amount
of freshwater that fluid mineral development
will consume in the GJFO planning area is
wholly inadequate. It essentially notes that
"with more companies recycling water and
utilizing this water to fracture wells, it is
difficult to get exact amounts of freshwater

used." FEIS 6-199. NEPA requires,
however, that if "incomplete information
relevant to reasonably foreseeable
significant adverse impacts is essential to a
reasoned choice among alternatives and the
overall costs of obtaining it are not
exorbitant, the agency shall include the
information in the environmental impact
statement" [40 C.F.R. 1502.22(a)]. Here, the
EIS does not explain why this information is
not obtainable, much less show that "the
overall costs of obtaining it" are
"exorbitant." Indeed, BLM can easily obtain
this information.  Public comment requested
a description of how much water will be
required by increased drilling in the plan
area, including hydraulic fracturing.

**Issue Number:** PP-CO-GJ-15-11-13
**Organization:** Center for Biological
Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text:** Even if BLM cannot
project water use because "the overall costs
of obtaining it are exorbitant or the means to
obtain it are not known," BLM must still
include in the EIS:
(1) A statement that such information is
incomplete or unavailable;
(2) a statement of the relevance of the
incomplete or unavailable information to
evaluating reasonably foreseeable
significant adverse impacts on the human
environment;
(3) a summary of existing credible scientific
evidence which is relevant to evaluating the
reasonably foreseeable significant adverse
impacts on the human environment, and
(4) the agency's evaluation of such impacts
based upon theoretical approaches or
research methods generally accepted in the
scientific community 40 C.F.R. §
1502.22(b)(1).

22

**Issue Number:** PP-CO-GJV-15-11-15
**Organization:** Center for Biological Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text** Without providing any systematic review of the various causes of leaks and spills throughout the GJFO planning area, the EIS fails to inform whether these spills can actually be mitigated, much less provide an adequate discussion of mitigation measures and whether those measures will be effective in preventing accidental releases.

**Issue Number:** PP-CO-GJ-15-11-17
**Organization:** Center for Biological Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text :** The EIS also fails to discuss the effectiveness of mitigation measures to reduce the impacts of spills. This includes groundwater monitoring, secondary containment, FEIS 4-89, buffer zones, id. 6-280, and other BMPs identified in Appendix H. Id. 6-207; see also FEIS 6-276.

**Issue Number:** PP-CO-GJ-15-11-19
**Organization:** Center for Biological Diversity
**Protestor:** Wendy Park, et al.

**Issue Excerpt Text:** The EIS provides no sense of the risk and severity of public health impacts that could potentially result from increased natural gas drilling and hydraulic fracturing operations throughout the GJFO planning area. Ample scientific evidence indicates that well development and well stimulation activities have been linked to an array of adverse human health effects, including carcinogenic, developmental, reproductive, and endocrine disruption effects. The EIS's cursory discussion of public health impacts does not amount to a "hard look" at the health risks posed by oil and gas development, including hydraulic fracturing. In sum, the EIS must be revised to fully disclose the adverse human health impacts of increased oil and gas drilling and hydraulic fracturing.

**Issue Number:** PP-CO-GJ-15-17-2
**Organization:** Mesa County Commissioners
**Protestor:** Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** There is an absence of an analysis of the negative socio-economic impacts and public safety concerns to Mesa County and the surrounding region by as a result of such drastically reduced areas designated for "Open" OHV use.

**Issue Number:** PP-CO-GJ-15-17-7
**Organization:** Mesa County Commissioners
**Protestor:** Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** BLM fails to adequately consider the effects its proposed management strategy will have on current and future oil and gas exploration and development activities, and the associated socio-economic impact on Mesa County, its local communities, and the State of Colorado. Both the Federal Land Policy and Management Act ("FLPMA") and NEPA require the BLM to include a sufficient economic analysis as part of its decision-making process for land use planning decisions. The absence of a detailed analysis of the potential fiscal impacts of each alternative attributable to reductions or changes in the number and distribution of new oil and gas wells ignores the important role that oil and gas property tax revenues, Federal Mineral Leasing Tax payments and Colorado State Severance tax payment to

23

BLM_0023885

local counties play in the financing of local government services, and it ignores the resultant negative impacts on the quality of life for residents within Mesa County and surrounding counties.

**Summary:**

The Grand Junction PRMP/FEIS failed to analyze impacts related to fluid minerals management including:

- Socioeconomic impacts
- impacts to water resources;
- impacts to wildlife;
- impacts from spills; and
- Impacts to public health.

The Grand Junction PRMP/FEIS also failed to adequately analyze socioeconomic impacts related to travel management.

**Response:**

*Fluid minerals – socioeconomic impacts:*

The Grand Junction PRMP/FEIS provides an adequate discussion of the environmental consequences of the Proposed Resource Management Plan and alternatives with regard to socioeconomic impacts. As required by 40 CFR § 1502.16, the PRMP/FEIS provides a discussion of "the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented." The Grand Junction PRMP/FEIS presented the decision-maker with sufficiently detailed information to aid in determining whether to proceed with the proposed plan or make a reasoned choice among the other alternatives in a manner such that the public could have an understanding of the environmental consequences associated with the alternatives. The Grand Junction PRMP/FEIS also analyzes the potential tax impacts of each alternative with regard to natural gas development (see Table 4-105 through Table 4-111).

*Fluid minerals - impacts from restrictions:*

The BLM analyzed the impacts to fluid minerals management in Section 4.4.5 of the Grand Junction PRMP/FEIS. The Grand Junction PRMP/FEIS specifically acknowledges impacts to oil and gas development opportunities: "Potential lessees should take into account the possibility that such a lease may not allow for maximum extraction and transport of the mineral resources. Potential lessees considering development of leases should consider whether the restrictions can be dealt with through technical or special engineering means. These would both protect the resource or value of concern for a given stipulation and would economically and efficiently produce the mineral resource. Portions of restricted leases may be more costly to develop and produce, and in some cases may not be feasible to develop…Large quantities of oil and gas may not be recoverable from federal mineral estate, depending on the restrictions that apply to the alternative" (Grand Junction PRMP/FEIS, p. 4-370).

24

BLM_0023886

*Fluid minerals – impacts to water resources:*
The BLM disclosed impacts to water resources and the possibility of spills from fluid minerals activity on p. 4-91 through p. 4-92: "Direct and indirect negative impacts on water resources from fluid minerals development can occur during the drilling, completion, or operational phases of wells…" Detailed data regarding future water use is not available for use in the Grand Junction PRMP/FEIS as stated: "Variables such as proximity to water recycling plants or other wells make a difference in the volume of fresh water used in hydraulic fracturing. Fresh water is typically only necessary when drilling surface casings while water used during the fracking operation can be recycled. The amount of available water is difficult to ascertain. The State and water courts, not the BLM, implement the water rights program for Colorado. Entities can exercise their water rights according to prior appropriation doctrine. Oil and gas operators are no different. However, with more companies recycling water and utilizing this water to fracture wells, it is difficult to get exact amounts of freshwater used" (Grand Junction PRMP/FEIS, p. 6-199).

*Fluid minerals – impacts to wildlife:*
Section 4.3.3 of the GJFO PRMP/FEIS discusses the impacts to wildlife.  The PRMP would establish 10 wildlife emphasis areas on 149,700 acres in order to protect areas with high wildlife value and significance.  This strategy would allow the BLM to focus wildlife management efforts in areas that would be most effective to preserve and protect wildlife and to reduce fragmentation (Grand Junction PRMP/FEIS, pp. 4-165, 4-166).  Table 2-2 of the GJFO PRMP/FEIS summarizes the decisions associated with wildlife in the PRMP, including lease stipulations that call for minimization and mitigation of impacts to wildlife and wildlife habitat as determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs (Grand Junction PRMP/FEIS, pp. 2-93 through 2-125).

The BLM worked with USFWS to develop a Biological Assessment based on the PRMP. That Biological Assessment - based on the PRMP - was formally submitted to USFWS October 3, 2014. USFWS provided input on planning issues, data collection and review, and alternatives development including the scope of water use and other fluid mineral development activities in the Upper Colorado River Basin. Copies of the Biological Assessment and the USFWS Biological Opinion will be provided as appendices to the Approved RMP/Record of Decision.

*Fluid minerals – impacts on public health:*
The BLM disclosed impacts to public health from fluid mineral activity on p. 4-442: "Lands that are open for fluid mineral leasing have the potential for future health and safety risks related to oil, gas, and geothermal exploration, development, operation, and decommissioning. The number of acres open for leasing is considered to be proportional to the potential for long-term, direct health and safety impacts…"

The Grand Junction PRMP/FEIS discloses that "emissions of hazardous air pollutants could potentially result in localized increased risk of impacts on human health" (Grand Junction PRMP/FEIS, p. 4-24). However, given the low level of Hazardous Air Pollutants anticipated related to BLM management activities (167 tons/year in Year 10 and 190 tons/year in Year 20) (Grand Junction PRMP/FEIS, p. 4-31) and the fact that "the EPA has not established ambient air

25

quality standards for hazardous air pollutants" (Grand Junction PRMP/FEIS, p. 3-6), it was not necessary to do a detailed cost-benefit analysis of the socioeconomic impacts of air quality.

*Travel management – socioeconomic impacts:*
Under the Proposed RMP, the BLM anticipates a 1% increase in motorized (including OHV), mechanized, and non-mechanized recreation over current recreation levels (Grand Junction PRMP/FEIS, Table 4-90). Using the IMPLAN model, the BLM determined that total spending related to recreation would increase under the Proposed RMP when compared to current recreation related spending (see Table 4-92 through Table 4-94). The Grand Junction PRMP/FEIS also discloses the adverse impacts of crowding: "On GJFO land, for example, population growth drives increasing use by local and out of area visitors. One consequence is that the nature of recreation experiences has changed…from less crowded to more crowded" and that "the crowding might further contribute to [adverse] cumulative affects if it alters the mix of recreational activities or discourages participation in recreation activities" (Grand Junction PRMP/FEIS, p. 4-495).

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

## NEPA – Response to comments

**Issue Number:** PP-CO-GJ-15-03-3
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Black Hills timely submitted comments on June 24, 2013 addressing the adequacy and merits of the DRMP/DEIS. Black Hills commented on multiple, specific issues in the DRMP/DEIS, including: (1) BLM's failure to utilize scientifically acceptable methods of analysis, (2) the DRMP/DEIS's proposed unlawful infringement on valid existing rights, (3) the DRMP/DEIS's failure to rely on a valid and accurate reasonable foreseeable development (RFD) scenario, (4) BLM's proposed overreach in protecting threatened, endangered and special status species and their habitat, (5) the DRMP/DEIS's failure to utilize least restrictive lease stipulations for oil and gas leases and conditions on permits for oil and gas development, (6) BLM's improper proposed designation of South Shale Ridge as an area of critical environmental concern (ACEC), (7) BLM's overreach in attempting to regulate air quality, private lands and waters, (8) the DRMP/DEIS's failure to follow the National Historic Preservation Act, and (9) the DRMP/DEIS's improper proposal to add visual resource management restrictions to existing leases.
Under the National Environmental Policy Act (NEPA), the BLM is required to fully and substantively respond to all relevant public comments. 40 C.P.R. § 1503.4. In the GJFO RMP/FEIS, BLM failed to sufficiently address the majority of the above-listed comments. BLM failed to meet its regulatory obligations to adequately address Black Hills' comments.

**Issue Number:** PP-CO-GJ-15-05-17

26

**Organization:** Oxy USA, Inc.
**Protestor:** Chris Clark

**Issue Excerpt Text:** Despite clear directives and policy, through the Proposed RMP, the BLM fails to show whether it utilized any science or data to support such a restrictive buffer as 4 miles from leks.

**Issue Number:** PP-CO-GJ-15-12-11
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/Rein van West

**Issue Excerpt Text:** Exhibit G of this protest includes 200 comments submitted by the public addressing resources, values and management considerations for various LWC units. These comments are not acknowledged or responded to in the Proposed RMP, specifically in the Chapter 6 Response to Comments. Thus, BLM has not fulfilled its obligations under NEPA to respond to substantive comments.

**Issue Number:** PP-CO-GJ-15-12-12
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/Rein van West

**Issue Excerpt Text:** BLM must document and respond to all public comments received on the Draft RMP/EIS in compliance with NEPA. BLM's failure to do so with respect to hundreds of substantive comments addressing lands with wilderness characteristics and travel management is evidence that the agency did not give meaningful consideration to: modify alternatives including the proposed action; develop and evaluate alternatives not previously given serious consideration by the agency; supplement, improve, or modify

its analyses; or make factual corrections based on public comments. BLM also did not explain why the comments do not warrant further agency response. BLM must supplement its analysis of these two resource areas using the information submitted by the public during the comment period on the Draft RMP/EIS, consider making changes to the proposed action based on that information, make changes where appropriate, and explain why changes are not being made where that is the decision.

**Issue Number:** PP-CO-GJ-15-12-4
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/Rein van West

**Issue Excerpt Text:** Our organizations and members of the public submitted many substantive comments during the public comment period on the Draft RMP/EIS that BLM did not respond to in the Proposed RMP/FEIS. This is most evident in reviewing Chapter 6 of the Proposed RMP/FEIS, BLM's Response to Comments on the Draft RMP/EIS, and the 2015 Route Designation Reports. However, it is also evident in the fact that BLM did not modify alternatives or analyses based on these comments.

**Issue Number:** PP-CO-GJ-15-12-5
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/Rein van West

**Issue Excerpt Text:** We, the protestants, conducted field inventory of lands with wilderness characteristics (LWC) in the Grand Junction Field Office and submitted

27

BLM_0023889

our comprehensive inventory with our comments on the Draft RMP/EIS. (See Exhibits E and F). Our 220-page inventory addressed 23 LWC units covering more than 400,000 acres, was compliant with BLM Manual 6310, and included specific comments on BLM's inventory information, maps, photo documentation, and comments on specific routes. Yet not a single comment included in that inventory is acknowledged or responded to in the Proposed RMP. Chapter 6 of the Proposed RMP/FEIS lists and responds to specific comments on individual LWC units, and BLM neither reprints our comments nor responds to our comments in the Proposed RMP/FEIS.

**Issue Number:** PP-CO-GJ-15-12-9
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/Rein van West

**Issue Excerpt Text:** This is just one example out of 220 pages of detailed inventory comments we submitted during the public comment period on the Draft RMP/EIS that are not acknowledged or responded to in the Proposed RMP/FEIS. There are numerous other instances where our substantive comments have been ignored.

**Summary:**
The BLM did not respond to comments received on the Grand Junction DRMP/DEIS. The BLM did not modify alternatives or analyses based on comments received on the Grand Junction DRMP/DEIS.

**Response:**
The BLM is required to assess, consider, and respond to all substantive comments received (40 CFR 1503.4). Substantive comments are those that reveal new information, missing information, or flawed analysis that would substantially change conclusions (BLM Handbook H-1601-1, p. 23-24).

In compliance with NEPA, the BLM considered all public comments submitted on the Draft Grand Junction RMP/EIS. The BLM complied with 40 CFR 1503.4 by performing a detailed comment analysis that assessed and considered all substantive comments received. Chapter 6 of the Grand Junction PRMP/FEIS presents the BLM's responses to all substantive comments. The BLM summarized the issues raised by each comment letter and provided a meaningful response. The BLM's response identifies any modifications to the alternatives, improvements to the impacts analysis, or factual corrections made as a result of public comment. The BLM's response also explains why certain public comments did not warrant further agency response. The BLM is not required to make modifications to alternatives based on public comment if such changes are not warranted.

It is important for the public to understand that BLM's comment response process does not treat public comments as if they were a vote for a particular action. The comment response process ensures that every comment is considered at some point when preparing the Grand Junction PRMP/FEIS.

BLM_0023890

The BLM considered information regarding lands with wilderness characteristics that was received during comment period on the Grand Junction DRMP/DEIS (Grand Junction PRMP/FEIS, p. 6-128 through 6-138). As discussed in the PRMP/FEIS, "BLM staff is continuing to ground-truth these areas. Inventories are used to guide the decision maker and are updated as information becomes available. If, as inventories are updated through the life of the RMP, new areas are found to have wilderness characteristics, the decision maker will have that information available to them at that time and can choose a new course of action. The BLM is considering options for continuing to update this inventory and provide a mechanism for future decision making. To ensure compatibility with agency policy, the BLM revisited the inventory for several high priority areas" (Grand Junction PRMP/FEIS, p. 6-130). In response to the re-inventory and information provided in public comments, the Bangs lands with wilderness characteristics unit from Alternative C in the Draft RMP/EIS was carried forward in the PRMP/FEIS. See pages 2-152 and 4-292 of the PRMP/FEIS.

## *NEPA – Significant New Information*

**Issue Number:** PP-CO-GJ-15-01-11
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

**Issue Excerpt Text:** Encana did not have a meaningful opportunity to review or submit comments regarding the Shale Ridge and Canyons M LP before the MLP was proposed for the very first time i n the Final EIS. As noted above, the BLM specifically indicated in the Draft Grand Junction RMP's Appendix P that the agency would not designate the Shale Ridge and Canyons MLP as part of the amendment process. Draft Grand Junction RMP a pp. P, pg. P-27. In addition, it is wholly inappropriate under NEPA for the BLM to introduce concepts and procedures in the Final EIS for the Grand Junction RMP that were explicitly rejected in the Draft EIS, especially given the limited ability for companies such as Encana to submit comments or react to the new measures once a proposed RM P has been issued. The BLM should have issued a supplemental draft EIS prior to adding the MLP to the Proposed Grand Junction RMP.

**Issue Number:** PP-CO-GJ-15-01-17
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

**Issue Excerpt Text** Further, the BLM's inclusion of the Shale Ridge and Canyons MLP in the Proposed RMP violates FLPMA because the public was not provided a meaningful opportunity to comment upon the Shale Ridge and Canyons MLP. The BLM 's planning regulations require the public to be provided an opportunity to meaningfully participate i n and comment upon preparation of land use plans. The BLM's own planning handbook unequivocally requires the agency to issue a supplement to either the draft or final EIS when "substantial changes to the proposed action, or significant new information/circumstances collected during the com men t period" are presented. BLM Land Use Planning Handbook H-1610-1, III.A.I 0, pg. 24 (Rei. 1-1693 03/11 /05).

**Issue Number:** PP-CO-GJ-15-01-19
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

**Issue Excerpt Text:** The BLM's inclusion of the CARPP in the Proposed Grand Junction RMP violates both NEPA and FLPMA because it was not included in the Draft Grand Junction RMP and because BLM did not allow the public an

29

BLM_0023891

oppo1tunity to meaningfully comment on the CARPP.

**Issue Number:** PP-CO-GJ-15-01-21
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

<u>Issue Excerpt Text:</u> The CARPP's provisions were not reasonably included within the range of alternatives presented in the Draft Grand Junction RMP. As such, the BLM should have issued a supplemental draft EIS. 40 C.F.R. § 1502.9(c); BLM Land Use Planning Handbook 1-1-1610-1 , II I.A. II , pg. 24 (Rei. 1-1693 03/11 /05).

**Issue Number:** PP-CO-GJ-15-01-22
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

<u>Issue Excerpt Text:</u> Further, the BLM 's inclusion of the CARPP in the Proposed Grand Junction RMP violates FLPMA because the public was not provided a meaningful opportunity to comment upon it. The BLM's planning regulations require the public to be provided an opportunity to meaningfully participate in and comment upon the preparation of land use plans. The BLM's own planning handbook requires the agency to issue a supplement to either the draft or final EIS when "substantial changes to the proposed action, or significant new information/circumstances collected during the comment period" are presented (BLM Land Use Planning Handbook 1-1-1610-1, III.A. I 0, pg. 24). Because the CARPP is unquestionably a "substantial change" when compared to the alternatives included in the Draft Grand Junction RMP, the BLM should have prepared and released for comment a supplement to the Draft Grand Junction RMP.

**Issue Number:** PP-CO-GJ-15-01-4
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

<u>Issue Excerpt Text:</u> Encana protests substantial changes made between the draft and Proposed Grand Junction RMP without notice and an opportunity for public comment. In particular, Encana protests the unexpected adoption of the Shale Ridge and Canyons Master Leasing Plan (Shale Ridge and Canyons MLP), Proposed Grand J unction RMP, pgs. 2-380-2-408, Maps 3-21 -3-22, 4-1 -4-8; and the promulgation of the Comprehensive Air Resources Protection Protocol (CAR PP), Proposed Grand Junction RMP app. G.

These proposed changes violate both NEPA and FLPMA because they were not included or were rejected in the Draft Grand J unction RMP and because BLM did not allow the public an opportunity to meaningfully comment on these provisions.

**Issue Number:** PP-CO-GJ-15-16-2
**Organization:** Quiet Trails Group/Western Colorado Congress
**Protestor:** Janice Shepherd/Dave Reed

<u>Issue Excerpt Text:</u> Changing the north-east section of Zone 3 within the Bangs SRMA from foot and horse emphasis to motorized emphasis was not within the range of alternatives in the DRMP nor requested by a public comment.

**Issue Number:** PP-CO-GJ-15-16-4
**Organization:** Quiet Trails Group/Western Coloraodo Congress
**Protestor:** Janice Shepherd/Dave Reed

<u>Issue Excerpt Text:</u> As no alternative in the DRMP had West Horse Mesa and the surrounding slopes in a motorized emphasis area, no analysis was done of the environmental effects of that motorized emphasis. Page 1-26 in the PRMP incorrectly states that the analysis was completed under Alt A in the DRMP. Alt A

BLM_0023892

in the DRMP and PRMP has West Horse Mesa in a "primitive backcountry area."

**Issue Number:** PP-CO-GJ-15-17-16
**Organization:** Mesa County Commissioners
**Protestor:** Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** Additionally, the BLM's inclusion of Comprehensive Air Resources Protection Protocol ("CARPP") violates NEPA and FLPMA. CARPP was not included in the DRMP, and as a result, the public did not have an opportunity to comment on CARPP and its relationship to the DRMP. The DRMP included the Air Resources Management Plan, which was replaced by CARPP in the PRMP. The change from the use of the Air Resources Management Plan in the DRMP to CARPP in the PRMP was a significant and substantial change which clearly warrants further public review and input, or the amendment of the PRMP to reflect the use of the Air Resources Management Plan.

**Issue Number:** PP-CO-GJ-15-17-18
**Organization:** Mesa County Commissioners
**Protestor:** Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** The inclusion of the MLP in the PRMP deprived the public and local governments of the required

opportunity to make public comment on the MLP.

**Issue Number:** PP-CO-GJ-15-17-4
**Organization:** Mesa County Commissioners
**Protestor:** Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** The PRMP/FEIS fails to consider a full and reasonable range of alternatives for acres open to various uses as required by the National Environmental Policy Act ("NEPA") [CFR § 46.420 (b) and (c)]. For example, acreage analyzed as open to motorized use i s very limited: 12,500 acres in Alternative A, zero acres for Alternative C, and I 0,200 acres in Alternatives B and D. The PRMP/FEIS fails to address the negative socio-economic impacts of anticipated crowded and unsafe trail use that would result from such a reduction of acres open to motorized use, as required by NEPA (42 U.S.C. § 4332). The cumulative impacts of OHV recreational opportunities in Section 4.4.3 are not quantified and are merely vague qualitative statements which fail to include a rigorous comparison of impacts by each alternative. Shrinking, rather than increasing, the overall open areas in the GJFO will lead to crowding, safety issues, and negative socio-economic impacts.

**Summary:**
The BLM failed to comply with NEPA because the Grand Junction PRMP/FEIS includes new decisions and information not discussed in the Grand Junction DRMP/DEIS, including:
- the Shale Ridges and Canyons Master Leasing Plan (MLP);
- the Comprehensive Air Resources Protection Plan (CARPP); and
- management emphasis in the Bangs Special Recreation Management Area (SRMA) and the West Horse Mesa area.

31

**Response:**
NEPA requires agencies to prepare supplements to either a draft or final EIS if the agency makes substantial changes to the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 CFR 1502.9(c)). "Substantial changes" in the proposed action relevant to environmental concerns are changes that would result in significant effects outside the range of effects analyzed in the draft or final EIS (BLM Handbook H-1790-1, p. 29). A supplemental EIS may also be required when a new alternative is added that is outside the spectrum of alternatives already analyzed and not a variation of an alternative, or a combination of alternatives already analyzed (BLM Handbook H-1790-1, p. 29).

The Grand Junction PRMP/FEIS describes the Master Leasing Plan (MLP) policy and the changes between the DRMP/DEIS and the PRMP/FEIS in Chapter 1, (1.12 and 1.13). While the Shale Ridges and Canyons MLP is new terminology first found in the Grand Junction PRMP/FEIS, the Shale Ridges and Canyons MLP does not differ substantially from management presented in the Grand Junction DRMP/DEIS. The land use plan decisions associated with the Shale Ridges and Canyons Master Leasing Plan (MLP) can be found within the range of alternatives considered in the Grand Junction DRMP/DEIS. For example, no new oil and gas lease stipulations (e.g. No Surface Occupancy, Controlled Surface Use, or Timing Limitations) would be applied to areas within the Shale Ridges and Canyons MLP in a manner that was not analyzed in one alternative of the DRMP/DEIS.

While the Comprehensive Air Resources Protection Protocol (CARPP) is a new appendix included in the Grand Junction PRMP/FEIS, it does not establish any changes to the proposed action in terms of land use plan decisions nor provide any new information. As stated in Appendix G of the PRMP/FEIS, "the CARPP is not a decision document, but rather a strategy to address air quality concerns throughout BLM-managed lands and resources in Colorado. Because the CARPP is not a field office specific management tool, it may be modified as necessary to comport or comply with changing laws, regulation, BLM policy, or to address new information and changing circumstances without maintaining or amending any specific Field Office RMP" (Grand Junction PRMP/FEIS, Appendix G, p. 3). As such, the CARPP is not part of the land use plan decision that will be made in the Grand Junction RMP Record of Decision, but an appendix that was included to "clarify the mechanisms and procedures that BLM will use to achieve the air resources goals, objectives, and management actions set forth in BLM Colorado RMPs" (Grand Junction PRMP/FEIS, Appendix G, p. 3).

The BLM is proposing to manage the Bangs Canyon SRMA using four Recreation Management Zones (RMZs).  Specific management objectives are identified for each RMZ.  The four RMZs, and their associated management objectives, were analyzed in the GJFO DRMP/DEIS and are being carried forward with boundary adjustments between RMZ 2 and RMZ 3.  The boundary adjustments were incorporated to create more logical and definable boundaries (e.g. existing roads), and to facilitate achievement of the identified RMZ objectives.

The BLM has made no substantial changes to the proposed plan relevant to environmental concerns in the Grand Junction PRMP/FEIS, and therefore is not required to prepare a Supplemental EIS.

32

BLM_0023894

## *Areas of Critical Environmental Concern*

**Issue Number:** PP-CO-GJ-15-03-10
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks & Theresa Sauer

**Issue Excerpt Text:** The South Shale Ridge ACEC does not meet the relevance and importance criteria under the BLM regulations and BLM Manual 1613 for ACECs. Under BLM Manual 1613, ACEC designations highlight significant resources where special management measures are needed to prevent irreparable damage. The ACEC designation enables land managers to specifically address the relevant and important value and formulate a prescription to manage it. To that end, NSO-12, which is specific to ACECs, states that it is needed to prohibit surface-disturbing activities on the South Shale Ridge in order to protect special status plant species such as the Colorado hookless cactus. GJFO DRMP/DEIS Table 2-2 at 2-69. However, the GJFO DRMP/DEIS already manages for the values it expresses a desire to protect with the South Shale Ridge ACEC designation. For example, NSO-13 protects the occupied habitat of special status species as well as provides surrounding buffer zones for further protection. The NSO stipulation designed specifically for the ACEC is duplicative. ACECs are not to be used as a substitute for wilderness character or wilderness designations. See BLM ACEC Manual at .06. The proposed South Shale Ridge ACEC overlaps the exact boundary of BLM's South Shale Ridge Wilderness Unit. BLM may not utilize the ACEC process to protect this area as a wilderness. The resources deemed necessary for protection through ACEC designation in South Shale Ridge are already sufficiently protected by

alternate protective measures identified in the GJFO RMP/FEIS. There is no need for ACEC designation, and additionally no need for additional NSO stipulations to protect resources within these lands.

**Issue Number:** PP-CO-GJ-15-03-8
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks & Theresa Sauer

**Issue Excerpt Text:** The purpose of ACEC designation is to protect small, isolated areas that need special designation and management based on substantial values of national significance. As reflected by FLPMA, 43 U.S.C. § 1702(a), and expressly stated in FLPMA's implementing regulations and BLM policy, "to qualify for consideration of the ACEC designation, such values must have substantial significance and value, with qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern." BLM IM No. 2003-275 (emphasis added); see 43 C.P.R. § 1610.7(a)(2). BLM's land-use planning regulations expressly state that with respect to ACECs, "substantial significance and values ... requires more than local significance and special worth, consequence, distinctiveness, or cause for concern.").

BLM identifies the South Shale Ridge designation as for the protection of "wildlife and scenic values, in addition to special status plants." GJFO RMP/FEIS Section 6.2.7.9 at 6-316. However, only one species identified in the South Shale Ridge proposed designation is listed under the ESA: the Colorado hookless cactus (GJFO RMP/FEIS

33

BLM_0023895

Table D-2 at D-11).  Despite its "threatened" designation, the Colorado hookless cactus is widespread. Additionally, the species is already sufficiently protected through the FWS's consultation process, NSO, timing, and other stipulations in place for the protection of special status species. ACEC designation is inappropriate.

**Summary:**
The BLM violates the ACEC policy by:
- Incorrectly applying relevance and importance criteria to South Shale Ridge
- Proposing to use ACEC process to protect areas for wilderness character or to designate wilderness

**Response:**
The process for considering ACEC, described in 43 CFR 1610.7-2, was correctly considered during the GJFO resource management planning process.  The GJFO initially considered  59,071 acres for relevance and importance for the Coon Hollow/South Shale Ridge proposed ACEC and 27,345 acres met the relevance criteria for wildlife resources, natural system supporting plants, and significant scenic values.  The Coon Hollow/South Shale Ridge proposed ACEC meets the importance criteria for more than locally significant importance to plants and has qualities that make it fragile, sensitive, irreplaceable, threatened, and vulnerable to adverse change. The area has known populations of Colorado hookless cactus, Naturita milkvetch, adobe thistle, as well as critical winter range for deer and elk.   Details of the Coon Hollow/South Shale Ridge proposed ACEC can be found in Appendix D, ACEC Report.

The BLM appropriately considered criteria for ACECs and provides a distinction between ACECs and managing for wilderness characteristics. "  The stipulations in the GJFO PRMP for the proposed Coon Hollow/South Shale Ridge ACEC were developed specifically for the protection of the resources for which the ACEC is being carried forward, including sensitive plant and wildlife habitat and significant scenic values.

As the GJFO PRMP/FEIS explains in Chapter 2 (2.6), designation of additional WSAs was not considered in the alternatives because the BLM's authority for establishing WSAs ended in 1993.

## *Fluid Minerals Policy – Valid Existing Rights*

**Issue Number:**  PP-CO-GJ-15-1-26
**Organization:**  Encana
**Protestor:**  Jason Oates

**Issue Excerpt Text:** The proposed addition of new restrictions, such as NSO, CSU, and TL stipulations, to existing leases is impermissible because it exceeds the BLM's legal authority under FLPMA.

**Issue Number:**  PP-CO-GJ-15-1-28
**Organization:**  Encana
**Protestor:**  Jason Oates

**Issue Excerpt Text:** BLM cannot deprive Encana of its valid and existing lease rights either directly or indirectly through the RMP revision. When it enacted FLPM A, Congress made it clear that nothing within the statute, or in the land use plans

34

BLM_0023896

developed under FLPMA, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 170 I.

**Issue Number:** PP-CO-GJ-15-01-30
**Organization:** Encana
**Protestor:** Jason Oates

**Issue Excerpt Text:** In order to ensure the protection of existing lease rights as federal law requires, the BLM promulgated policies regarding the contractual rights granted in an oil and gas lease. First, the BLM 's Planning Manual mandates the protection of existing lease rights.  All decisions made in land use plans, and subsequent implementation decisions, will be subject to valid existing rights. This includes, but is not limited to, valid existing rights associated with oil and gas leases. .. " See BLM Manual 1 60 I - Land Use Planning, 160 1.06.G (Rei. 1-1666 I I /22/00). The BLM must com ply with the provisions of its planning hand book and recognize existing rights. Any attempts to modify Encana's existing rights would violate the terms of its leases with the BLM and the BLM's own policies.

**Issue Number:** PP-CO-GJ-15-01-32
**Organization:** Encana
**Protestor:** Jason Oates

**Issue Excerpt Text:** The BLM cannot modify Encana's valid existing rights by imposing blanket restrictions such as NSO, CSU, and TL stipulations on existing leases through COAs. Proposed Grand Junction RMP, pgs. 2-384 - 2-385. Encana encourages the BLM Director to remove any suggestion that the BLM may impose new restrictions on existing leases from the Proposed Grand Junction RMP, especially on those areas where stipulations are not justified by science.

**Issue Number:** PP-CO-GJ-15-01-34
**Organization:** Encana
**Protestor:** Jason Oates

**Issue Excerpt Text:** Encana protests the BLM 's indication it will apply new Visual Resource Management (VRM) prescriptions even on existing leases. Grand Junction Proposed RMP, pgs. 2-138, 2-145, Map 2-6. In particular, Encana is concerned by the BLM's blatant admission that it intends to impose COAs on all new permits to ensure that its new VRM classifications will be met, even on existing leases. The BLM states that "existing leases would retain their rights to access the minerals in the lease, but any new facilities for existing leases would be required to meet VRM objectives."

**Issue Number:** PP-CO- GJ-15-03-12
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Black Hills Leases in South Shale Ridge Cannot be Amended to add Additional Lease Stipulations or Other Restrictions Black Hills owns valid existing leases in or adjacent to the South Shale Ridge WCIU and/or ACEC (e.g. COC-69072, COC-69082, COC-69083, COC-69086). These leases cannot be amended to add additional lease stipulations or other restrictions based on land management decisions made in the GJFO RMP/FEIS for South Shale Ridge.

**Issue Number:** PP-CO- GJ-15-03-14
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** BLM cannot use this RMP process and BLM's land management decisions for South Shale Ridge to add additional lease stipulations or other

35

restrictions to Black Hills' valid existing lease rights. BLM should document that it has complied with the Court's decision in Wisely, and properly consulted with the FWS over impacts to hookless cactus.

**Issue Number:** PP-CO- GJ-15-03-5
**Organization:** Beatty & Wozniak on behalf of Black Hills Exploration & Production
**Protestor:** William Sparks/Theresa Sauer

**Issue Excerpt Text:** Despite Black Hills' and numerous other comments on the DRMP/DEIS, BLM continues to include management prescriptions that may impair, block access to, or otherwise render uneconomic, leased federal oil and gas resources. BLM failed to analyze potential impacts on oil and gas resources to ensure that valid existing leases are not imposed upon or otherwise provide for exception, waiver and modification criteria to afford both regulatory flexibility for BLM, and operational flexibility for operators. BLM must revise the GJFO RMP/FEIS to appropriately recognize its inability to constrain valid existing lease rights such as Black Hills' leases within the GJFO Planning Area.

**Issue Number:** PP-CO- GJ-15-04-2
**Organization:** Western Energy Alliance/West Slope COGA
**Protestor:** Kathleen Sgamma/David Ludlam

**Issue Excerpt Text:** Valid Existing Lease Rights: The PRMP stands to impede lessees from exercising their valid existing rights, particularly through the imposition of overly restrictive stipulations and Conditions of Approval (COA). FLPMA requires BLM to ensure that valid existing lease rights are unequivocally protected. In the PRMP, however, BLM proposes new onerous lease stipulations to be attached to the new leases,

and clearly intends to require the terms of the stipulations as COAs on valid existing leases during the permitting process, including no-surface occupancy (NSO), controlled surface use (CSU),and timing limitations (TL).

**Issue Number:** PP-CO- GJ-15-04-3
**Organization:** Western Energy Alliance/West Slope COGA
**Protestor:** Kathleen Sgamma/David Ludlam

**Issue Excerpt Text:** BLM makes it clear that timing limitations will be imposed on all oil and natural gas activities within the Grand Junction Field Office regardless of site-specific analysis, and that waivers, exceptions, and modifications will only be granted subject to new disturbance thresholds that did not exist at the time the leases were issued.  Such a result is not permissible; as explicitly stated in FLPMA, "All actions...under this Act shall be subject to valid existing rights." The statute does not leave any room whatsoever for discretionary actions that would be contrary to existing terms and stipulations.

**Issue Number:** PP-CO- GJ-15-05-8
**Organization:** Oxy USA, Inc.
**Protestor:** Chris Clark

**Issue Excerpt Text:** Nonetheless, in the Proposed RMP and FEIS, the BLM proposes to apply restrictive stipulations, actions, and a range of COAs that could significantly impede or impair the Oxy Leases as well as Oxy ROWs used to access both its federal and private leases if the BLM applies the stipulations outlined in the Proposed RMP to lands covering, surrounding, or near Oxy's Leases and ROWs. For example, the BLM proposes a broad application of the NSO stipulation, which would apply to 670,300 acres of

36

BLM-managed lands and would specifically cover areas where Oxy holds existing leases and ROWs. See Proposed RMP, Figure 2-43. Where, as here, Oxy does not hold private lands adjacent to many of its leases, Oxy could be unable to access an Oxy Lease and thus its resources within an area designated as NSO. By way of another example, the Proposed RMP proposes to restrict oil and gas operations near domestic water supplies using a groundwater well or spring water (Action W-A11) and avoid and mitigate disturbance to biologic soil crusts which are determined to be key in sustaining proper function and condition of upland soil health (Action S-A4). Neither of these are stipulations; however, each of these could impair Oxy's ability to develop its valid existing rights if imposed on Oxy's Leases or ROWs. Such a result is impermissible because Oxy's leases and ROWs are valid existing rights with which the BLM may not be unreasonably interfere.

**Issue Number:**  PP-CO- GJ-15-17-11
**Organization:**  Mesa County Commissioners
**Protestor:**   Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** The BLM cannot use the RMP process to revise or restrict valid existing lease rights through creation and imposition of new lease stipulations in the form of COAs for drilling permits on valid existing leases. Colorado Environmental Coalition, 165 IBLA 221, 228 (2005).

Specifically, The BLM cannot impose new NSO stipulations or COAs on existing leases that differ from those entered under the original contractual terms.

**Issue Number:**  PP-CO- GJ-15-17-11
**Organization:**  Mesa County Commissioners
**Protestor:**   Rose Pugliese/John Justman/Scott McInnis

**Issue Excerpt Text:** Despite statutory and regulatory direction under FLPMA, the PRMP/FEIS proposes unduly burdensome restrictions on oil and gas development, and chooses to manage certain lands for uses to the exclusion of oil and gas development, even where there are conflicts with valid existing lease rights. For example, ACECs and areas identified for management of wilderness characteristics already contain numerous oil and gas leases, yet the BLM proposes to restrict an operator's ability to develop its valid existing lease rights. Mesa County protests BLM's decision-making wherein management prescriptions would preclude development of valid existing l eases and ultimately result in financial loss to Mesa County and its local communities. The BLM must revise the PRMP to recognize its multiple-use mandate in a manner which includes a recognition of the Nation's need for domestic mineral development, and preserve the economic viability of the oil and gas industry in Mesa County.

**Summary:**
The PRMP/FEIS violates valid existing rights by proposing to modify stipulations on existing oil and gas leases.

**Response:**
An oil and gas lease is a valid, existing right, which cannot be modified through the land use planning process (FLPMA, Section 701(h)). Lease stipulations proposed in the Grand Junction FO PRMP would not be applied to existing oil and gas leases.

37

The BLM may restrict development of an existing oil and gas lease through Conditions of Approval (COA). However, while COAs may be described generally in the land use planning process; application of COAs at a site-specific level only take place after a project has been proposed and site-specific environmental analyses has been completed. When making a decision regarding discrete surface-disturbing activities [e.g. Application for Permit to Drill] following site-specific environmental review, BLM has the authority to impose reasonable measures as COAs to minimize impacts on other resource values, including restricting the siting or timing of lease activities (43 CFR 3100; 43 CFR 3160; IBLA 2006-213, 2006-226; IBLA 2008-197, 2008-200). In its RMPs, the BLM may identify "general/typical conditions of approval and best management practices" that may be employed in the planning area (BLM Handbook H-1601-1, p. C-24).

The Grand Junction PRMP does not modify existing oil and gas leases, and recognizes valid existing lease rights. All management direction and/or actions developed as part of the BLM planning process are subject to valid existing rights and must meet the objectives of BLM's multiple-use management mandate and responsibilities (FLPMA Section 202[c] and [e]). Valid existing rights include all valid lease, permit, patent, ROWs, or other land use rights or authorizations in effect on the date of approval of this RMP.

## *Master Leasing Plan Policy*

**Issue Number:** PP-CO-GJ-15-01-7
**Organization:** Encana Oil and Gas
**Protestor:** Jason Oates

**Issue Excerpt Text:** Although this MLP will apply y to over half of the total federal mineral acreage in the Grand Junction Planning Area, the BLM unexpectedly included it in the Proposed Grand Junction RMP after explicitly stating in the Draft Grand Junction R M P that the recommended M LP did not meet the requirements of Instruction Memorandum 2010-117.

**Issue Number:** PP-CO-GJ-15-04-8
**Organization:** Western Energy Alliance/West Slope COGA
**Protestor:** Kathleen Sgamma/David Ludlam

**Issue Excerpt Text:** The MLP process is duplicative of the RMP process and is an unnecessary tool and restriction on oil and gas leasing. BLM already provides sufficient environmental analysis of every oil and gas location prior to any development through the RMP process, decision to lease process, and site-specific NEPA analysis.

**Summary:**
The Master Leasing Plan included in the PRMP is duplicative of the RMP process and is included despite the fact that it fails to comply with Instruction Memorandum 2010-117.

**Response:**
The master leasing plan (MLP) process addresses oil and gas leasing at a more focused level than the broader analysis typically conducted for an RMP (but less site-specific than a master development plan for an operator proposed development). The intention of the process is to

BLM_0023900

identify oil and gas decisions to apply to future leasing and development (BLM Planning for Fluid Mineral Resources Handbook H-1624-1 Chapter 5). Resource protections such as riparian and habitat protections and required Best Management Practices identified for the MLP area facilitate resolution of conflicts but also enable "bidders to better identify the resource protection costs associated with development of the lease parcels" (BLM Handbook-1624-1).

The preparation of an MLP is required when criteria outlined in Instruction Memorandum 2010-117 are met MLP and may also be completed under other circumstances at the discretion of the Field Manager, District Manager, or State Director.

The MLP should enable field offices to (1) evaluate in-field considerations, such as optimal parcel configurations and potential development scenarios; (2) identify and address potential resource conflicts and environmental impacts from development; (3) develop mitigation strategies; and (4) consider a range of new constraints, including prohibiting surface occupancy or closing areas to leasing.

## *Lands with Wilderness Characteristics Policy*

**Issue Number:** PP-CO-GJ-15-12-15
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** Several of the boundaries BLM utilized for both Bangs Canyon and the Bangs West units do not meet the above criteria for a Wilderness Inventory Road and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO-GJ-15-12-17
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** Because BLM has drawn a boundary to separate the Bangs West and Bangs Canyon units that does not actually exist on the ground. These two units should be combined into one. As a single potential LWC unit instead of two individual ones, the wilderness characteristics of all

27,300 acres should be documented and analyzed together. In this case, the wilderness characteristics that were found by BLM to exist in Bangs Canyon also exist in Bangs West, because no qualifying boundary feature separates the two.

**Issue Number:** PP-CO-GJ-15-12-20
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** BLM's 2012 LWC Inventory found around 20,400 acres of the Bangs Canyon unit to meet the criteria for LWC. At the same time, the BLM determined that the Bangs West unit did not meet those criteria because of a lack of outstanding opportunities for solitude and primitive and/or unconfined recreation. However, as shown above, the Bangs West and Bangs Canyon unit were divided by arbitrary boundaries that do not meet the criteria for boundary delineation features as laid out in BLM Manual 6310. Because of this fact, both of these units should be

39

BLM_0023901

analyzed as one, and any wilderness characteristics found in one unit exist in the other.

**Issue Number:** PP-CO-GJ-15-12-21
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** Besides the fact that Bangs West and Bangs are actually a single unit, the area analyzed by BLM as the Bangs West unit has wilderness characteristics of its own. However, BLM cites the frequent use of Ladder and Mine canyons as well as the "lack of topographical variety" on the "flat" mesa tops as the rationale for determining that the Bangs West unit does not provide outstanding opportunities for solitude. BLM states that "the best opportunities for solitude [in the unit are found in] Ladder Canyon and Rough Canyon" but then cites the popularity of these canyons as the reason that they do not provide outstanding opportunities for solitude. This ignores the bulk of the Bangs West unit to the south, where outstanding opportunities for solitude are easily found in the many narrow side canyons and the gently sloping pinyon and juniper covered ramps that lead up to the high mesa tops.

**Issue Number:** PP-CO-GJ-15-12-23
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** The areas identified in BLM's 2012 LWC Inventory as the Bangs Canyon and Bangs West units are actually adjacent and in several locations are not separated by features which qualify as

boundary delineation features according to BLM's own guidance. Bangs Canyon and Bangs West should be inventoried as a single unit and any decisions made on areas within this unit that are determined not to contain wilderness characteristics should be documented with photographs and narrative rationale. The entirety of the combined Bangs Canyon/Bangs West unit is natural, contains outstanding opportunities for solitude and primitive and unconfined recreation, and has numerous supplemental values that contribute to its wilderness characteristics.

**Issue Number:** PP-CO- GJ-15-12-25
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** Several of the boundaries BLM utilized for the Barrel Spring unit do not meet the above criteria for Wilderness Inventory Roads and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-28
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** If BLM had taken the time to conduct route determinations according to Appendix C in Manual6310, it would likely have determined that many of these boundary routes do not meet the criteria for Wilderness Inventory Roads or other qualifying features, and thus cannot be used as boundaries for this unit. Because the unit is much larger than the "narrow configuration" drawn by BLM without

40

BLM_0023902

supporting documentation, this should not be used as a disqualifying feature for the area's outstanding opportunities for solitude.

**Issue Number:** PP-CO- GJ-15-12-30
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** The area identified in BLM's 2012 LWC Inventory as the Barrel Spring unit is defined by boundaries that do not meet the criteria for Wilderness Inventory Roads or other qualifying boundary features. Because of this, the area analyzed in BLM's inventory is only part of the complete picture for this area.

**Issue Number:** PP-CO- GJ-15-12-36
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** The area identified in BLM's inventory as the County Line unit is defined by boundaries that do not meet the criteria for Wilderness Inventory Roads or other qualifying boundary features. Because of this, the area analyzed in BLM's 2012 LWC Inventory is only part of the complete picture for this area.

**Issue Number:** PP-CO- GJ-15-12-39
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** Several of the boundaries BLM has proposed for the Cow Ridge unit do not meet the criteria for a

Wilderness Inventory Road and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-41
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** The area identified in BLM's 2012 LWC Inventory as the Cow Ridge unit is defined by boundaries that do not meet the criteria for Wilderness Inventory Roads or other qualifying boundary features. Because of this, the area analyzed in the BLM's draft inventory report is only part of the complete picture for this area.

**Issue Number:** PP-CO- GJ-15-12-44
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** Several of the boundaries BLM has proposed for the East Salt Creek unit do not meet the above criteria for a Wilderness Inventory Road and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-44
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text:** One of the boundaries BLM utilized for the Horse Mountain unit do not meet the above criteria for a Wilderness Inventory Road and thus should

41

be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-48
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

<u>**Issue Excerpt Text:**</u> Several of the boundaries BLM utilized for the Hunter Canyon unit do not meet the criteria for a Wilderness Inventory Road and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-51
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

<u>**Issue Excerpt Text:**</u> Several of the boundaries BLM utilized for the Lipan Wash unit do not meet the criteria for Wilderness Inventory Roads and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-53
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

<u>**Issue Excerpt Text**</u> The area identified in BLM's 2012 LWC Inventory as the Lipan Wash unit is defined by boundaries that do not meet the criteria for Wilderness Inventory Roads or other qualifying boundary features. Because of this, the area analyzed in the BLM's draft inventory report

is only part of the complete picture for this area.

**Issue Number:** PP-CO- GJ-15-12-56
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

<u>**Issue Excerpt Text**</u> Several of the boundaries BLM utilized for the Main Canyon unit do not meet the criteria for a Wilderness Inventory Road and thus should be moved to roads or impacts that do meet the criteria.

**Issue Number:** PP-CO- GJ-15-12-58
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

<u>**Issue Excerpt Text**</u> The area identified in BLM's 2012 LWC Inventory as the Main Canyon unit is defined by boundaries that do not meet the criteria for Wilderness Inventory Roads or other qualifying boundary features. Because of this, the area analyzed in BLM's inventory report is only part of the complete picture for this area.

**Issue Number:** PP-CO- GJ-15-12-61
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress
**Protestor:** Nada Culver/Luke Schafer/ReinVan West

<u>**Issue Excerpt Text**</u> BLM Manual6310 states that the size criteria for a Lands with Wilderness Characteristics can be met for areas less than 5,000 acres in size if they are contiguous with lands which have been formally determined to have wilderness or

42

BLM_0023904

potential wilderness values" including BLM WSAs. BLM Manual 6310 at .06(C)(2)(a)(i)(2)(a). Our inventory of the Little Bookcliffs WSA and surrounding lands shows that BLM failed to identify or analyze several such areas surrounding the unit.

**Issue Number:** PP-CO- GJ-15-12-64
**Organization:** The Wilderness Society/Conservation Colorado/Western Colorado Congress

**Protestor:** Nada Culver/Luke Schafer/ReinVan West

**Issue Excerpt Text** Several of the routes surrounding the Little Bookcliffs WSA do not meet the criteria for Wilderness Inventory Roads and thus should not be considered as boundaries to WSA-adjacent parcels.

**Summary:**
The BLM failed to comply with Manual 6310 for delineating boundaries of areas containing wilderness characteristics by:
- Inaccurately applying wilderness inventory road definition
- Inaccurately applying other boundary delineations.

**Response:**
The BLM Colorado accurately interpreted lands with wilderness characteristics policy.
As articulated in Section 201 of the FLPMA, the Secretary of Interior (through the BLM), "shall prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values…this inventory shall be kept current so as to reflect changes and conditions and to identify new and emerging resources and other values." From 6310 manual: A wilderness characteristics inventory is the process of determining the presence or absence of wilderness characteristics. The BLM must document existing conditions as opposed to potential future conditions. The BLM may conduct the inventory using available information (e.g., existing maps, photos, records related to range projects, monitoring data) and will field check the information as necessary. This wilderness characteristics inventory process directive does not mean that the BLM must conduct a completely new inventory and disregard the inventory information that it already has for a particular area. Rather, the BLM must ensure that its inventory is maintained. The Grand Junction RMP properly analyzed this inventory as part of the land use planning process, and identified decisions that would protect or preserve the wilderness characteristics within the area (BLM Land Use Planning Handbook H-1601-1, Appendix C, p. 12).

BLM staff continues to update the inventories of lands with wilderness characteristics, and to field check the data analyses for areas, in accordance with guidance provided in BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands. Inventories are used to guide the decision maker and are updated as information becomes available. If, as inventories are updated through the life of the RMP, new areas are found to have wilderness characteristics, the decision maker will have that information available to them at that time and can choose a new course of action.

43

BLM_0023905

The BLM did identify and analyze an area smaller than 5,000 acres in size that is adjacent to the Little Bookcliffs WSA. The area is identified in Appendix F of the PRMP/FEIS as the Little Bookcliffs WSA Expansion area.   The BLM is continuing to evaluate additional areas of less than 5,000 acres adjacent to WSAs, and will continue to update its inventory accordingly.

With respect to the Bangs Canyon, when making determinations whether or not to manage lands possessing wilderness character for that character, the BLM is given discretion to consider both the effective manageability of the unit and other resources/resource-values that may be present (BLM Manual 6320.06.A.1.a). In all cases, the determination to emphasize other multiple uses as a priority over protecting some areas that possess wilderness characteristics does not preclude the BLM from analyzing impacts to wilderness characteristics in subsequent implementation-level analysis, as required by NEPA.

44

BLM_0023906

# Record of Decision

## FOR

# Approved
# Resource Management Plan

## and

## Approved Travel Management Plan

### for the

# Bureau of Land Management
# Grand Junction Field Office

## BLM/CO/PL-15/016

Prepared by

United States Department of the Interior
Bureau of Land Management
Grand Junction Field Office
Grand Junction, Colorado

**August 2015**

BLM_0023907

This page is intentionally left blank.

BLM_0023908

# TABLE OF CONTENTS

*Page*

LIST OF FIGURES AND TABLES.......................................................................................iii

LIST OF ACRONYMS AND ABBREVIATIONS ............................................................iv

CHAPTER 1.  GRAND JUNCTION FIELD OFFICE RECORD OF DECISION .......1

   1.1.  INTRODUCTION ............................................................................................1

      1.1.1  Purpose and Need for the RMP Revision .............................................1

      1.1.2  Lands within the GJFO Administrative Boundary ..............................2

   1.2.  ALTERNATIVES..............................................................................................3

      1.2.1  Draft RMP/Draft EIS ..........................................................................4

      1.2.2  Proposed RMP/Final EIS.....................................................................4

      1.2.3  Alternatives Considered, But Not Further Analyzed ...........................4

      1.2.4  Alternatives Considered in Detail........................................................5

   1.3.  NOTICE OF CLARIFICATIONS AND MODIFICATIONS...........................7

      1.3.1.  Notice of Clarifications to the Proposed RMP and Adopted by
      this ROD and Approved RMP .......................................................................7

         1.3.1.1.  Editorial and Technical Changes to the Approved RMP and
         Appendices...........................................................................................7

   1.4.  DECISIONS IN THE RESOURCE MANAGEMENT PLAN .........................9

      1.4.1.  Types of Land Use Plan Decisions......................................................9

      1.4.2.  Implementation Decisions ................................................................13

      1.4.3.  Valid Existing Rights.........................................................................15

   1.5.  MITIGATION MEASURES ...........................................................................15

   1.6.  RMP AMENDMENTS, EVALUATION, MAINTENANCE, AND
   MONITORING...................................................................................................16

BLM_0023909

1.6.1. RMP Amendments ............................................................................... 16

1.6.2. RMP Monitoring ................................................................................. 16

1.6.3 RMP Evaluation .................................................................................. 17

1.6.4. RMP Maintenance .............................................................................. 17

1.7. THE PLANNING PROCESS ........................................................................ 18

1.7.1. Policies and Legislative Constraints ................................................... 18

1.7.2. Master Leasing Plans .......................................................................... 18

1.7.3. Relationship to the Northwest Colorado BLM Greater
Sage-Grouse Plan Amendment and EIS ........................................................ 19

1.8. PUBLIC INVOLVEMENT IN THE PLANNING PROCESS ......................... 19

1.8.1. Public Scoping .................................................................................... 19

1.8.2. Trails and Routes Data-Collection Workshops.................................... 20

1.8.3. Issue Identification .............................................................................. 20

1.8.4. Public Review of, and Comment on, the Draft RMP/EIS ................... 20

1.8.5 Results of the Protest Period and Governor's Consistency
Review.................................................................................................................20

1.8.5.1 Results of the Protest Period.........................................20

1.8.5.2 Results of the Governor's Consistency Review...............21

1.9. COORDINATION AND CONSULTATIONS ................................................. 21

1.9.1. Cooperating Agencies ......................................................................... 21

1.9.2. Tribal Consultation and Indian Trust Assets ...................................... 22

1.9.3. Consultation Efforts with the Colorado State Historic
Preservation Officer ...................................................................................... 22

1.9.4. Resource Advisory Council ................................................................ 23

1.9.5. U.S. Fish and Wildlife Service Consultation ...................................... 24

BLM_0023910

1.10.  CONSIDERATIONS IN SELECTING THE GRAND JUNCTION FIELD OFFICE RESOURCE MANAGEMENT PLAN ......................................................24

    1.10.1.  Management in Accordance with FLPMA under the Principles of Multiple Use and Sustained Yield................................................................24

    1.10.2.  Consistency with Existing Plans and Policies of Local, State, and Federal Agencies and Local Native American Tribes ............................25

1.11.  AVAILABILITY OF THE GRAND JUNCTION FIELD OFFICE RESOURCE MANAGEMENT PLAN ........................................................................25

1.12.  PLAN IMPLEMENTATION ..........................................................................25

1.13.  APPROVAL ..................................................................................................25

# LIST OF FIGURES AND TABLES

Figure 1.1.  Location of Grand Junction Field Office..............................................................3

Table 1.1.  Acres by Surface Land Status within the Grand Junction Field Office Administrative Boundary...........................................................................................3

Table 1.4. Route Designations in Miles..............................................................................14

Table 1.2. Cooperating Agencies.........................................................................................21

BLM_0023911

## LIST OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **ACEC** | Area of critical environmental concern |
| **APD** | Application for permit to drill (oil and gas) |
| **BLM** | United States Department of the Interior, Bureau of Land Management |
| **BLM lands** | Surface acres administered by the Bureau of Land Management |
| **BMP** | Best management practice |
| **BOR** | United States Department of the Interior, Bureau of Reclamation |
| **CDOW** | Colorado Division of Wildlife (In 2011, this agency changed its name to Colorado Parks and Wildlife (CPW).) |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **COA** | Condition of approval |
| **CPW** | Colorado Parks and Wildlife (formerly CDOW -- Colorado Division of Wildlife.) |
| **CSU** | Controlled surface use |
| **GJFO** | Grand Junction Field Office |
| **DOE** | United States Department of Energy |
| **DOI** | United States Department of the Interior |
| **EA** | Environmental assessment |
| **EIS** | Environmental impact statement |
| **EO** | Executive order |
| **EPA** | United States Environmental Protection Agency |
| **FLPMA** | Federal Land Policy and Management Act of 1976, as amended |
| **FS** | United States Department of Agriculture, Forest Service |
| **FR** | *Federal Register* |
| **GIS** | Geographic information system |
| **GJFO** | Grand Junction Field Office |

BLM_0023912

| | |
|---|---|
| **IBLA** | Interior Board of Land Appeals |
| **IDT** | Interdisciplinary team |
| **IM** | Instruction memorandum |
| **LUP** | Land use plan |
| **MDP** | Master development plan |
| **NEPA** | National Environmental Policy Act of 1969, as amended |
| **NHPA** | National Historic Preservation Act of 1966 |
| **NOA** | Notice of availability |
| **NOI** | Notice of intent |
| **NSO** | No surface occupancy or surface-disturbing activities |
| **NWSRS** | National Wild and Scenic Rivers System |
| **RAC** | Resource advisory council |
| **RMP** | Resource management plan |
| **RMPA** | Resource management plan amendment |
| **ROD** | Record of decision |
| **ROW** | Right-of-way (lands and realty) |
| **RSC** | Recreation setting characteristics |
| **SHPO** | State Historic Preservation Office |
| **SRMA** | Special recreation management area |
| **T&E** | Threatened and endangered |
| **U.S .** | United States |
| **U.S.C.** | United States Code |
| **USDA** | United States Department of Agriculture |
| **USDOI** | United States Department of the Interior |
| **USFS** | United States Department of Agriculture, Forest Service |
| **USFWS** | United States Department of the Interior, Fish and Wildlife Service |
| **WSA** | Wilderness study area |
| **WSR** | Wild and scenic river |

BLM_0023913

This page is intentionally left blank.

BLM_0023914

## 1.1 INTRODUCTION

This Record of Decision (ROD) and Approved Resource Management Plan (Approved RMP) were prepared by the Bureau of Land Management (BLM) Grand Junction Field Office (GJFO) in Grand Junction, Colorado. These documents are the culmination of a multi-year planning effort to revise the 1987 Grand Junction Resource Area RMP, as amended. BLM prepared these documents in accordance with the National Environmental Policy Act of 1969, as amended (NEPA), the Federal Land Policy and Management Act of 1976, as amended (FLPMA), implementing regulations, the BLM's Land Use Planning Handbook (H-1601-1), and other applicable law and policy. The management of BLM lands and Federal mineral estate administered by BLM within the GJFO boundaries (from this point forward referred to as the GJFO) is the subject of this document. This ROD documents the approval of the attached Grand Junction RMP, which provides overall direction for management of all resources on BLM lands and Federal mineral estate within the GJFO.

### 1.1.1 Purpose and Need for the RMP Revision

The purpose of this RMP revision is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. This will be accomplished by establishing desired goals, objectives, allowable uses, and management actions needed to achieve the desired conditions for resources and resource uses. The RMP incorporates new data, addresses land use issues and conflicts, specifies where and under what circumstances particular activities would be allowed on BLM-administered lands, and incorporates the mandate of multiple uses in accordance with the FLPMA. The RMP does not describe how particular programs or projects would be implemented or prioritized; rather, those decisions are deferred to more detailed implementation-level planning.

The FLPMA requires that the BLM "develop, maintain, and, when appropriate, revise land use plans" (43 USC 1712 [a]). The BLM-administered lands within the GJFO planning area are currently managed in accordance with the decisions in the 1987 Grand Junction RMP (BLM 1987). The BLM has completed approximately 50 maintenance actions and 12 RMP amendments since the 1987 Record of Decision (ROD) was signed. There is a need to revise the GJFO RMP due to new issues that have arisen since the original plan was prepared. Major issues contributing to the RMP revision include the following (additional planning issues identified for this plan are outlined in Section 1.6.1):

- Management of BLM-administered land to support numerous wildlife species and their habitats
- Management of BLM-administered lands containing both wilderness character and oil and gas potential, including areas not designated as Wilderness Study Areas (WSAs)
- Management of energy and mineral resources, including identifying areas and conditions in which mineral development can occur

BLM_0023915

- Management of increased visitation by way of off-highway vehicle (OHV) use and nonmotorized uses (e.g., mountain biking and hiking) that have led to increased concerns regarding resource protection and conflicting uses
- Completion of Wild and Scenic River (WSR) eligibility and suitability studies on river segments within the GJFO planning area
- Consideration of opportunities for land tenure adjustment to improve public land manageability
- Expansion of communities and the urban interface
- Consideration of right-of-way (ROW) exclusion areas and corridors
- The needs of local government and citizens to be heard on an array of issues regarding both traditional and emerging uses of BLM-administered land and their potential social and economic effects on local communities and values

In addition, new resource assessments and scientific information was available to help the GJFO in revising previous decisions. Specifically, there was a need to evaluate management prescriptions and resource allocations to address the increase in uses and demands on BLM-administered lands (such as natural gas development and recreation), as well as the interest in protecting natural and cultural resources. The revised RMP also provides updated BLM management direction, guidance, and policy. Land use plan decisions included in the Approved RMP may only be changed through the amendment or revision process.

## 1.1.2  Lands within the GJFO Administrative Boundary

The GJFO is located in north-central Colorado and is an administrative unit in BLM Colorado's Northwest District (Figure 1.1).  The GJFO administrative boundary comprises lands managed by the BLM; the USFS; the United States Department of the Interior (USDOI) National Park Service (NPS); the USDOI Bureau of Reclamation (BOR); the United States Department of Energy (DOE); and the State of Colorado. The GJFO also includes private land. Together, the Federal, State, and private lands within the GJFO include over 2.9 million acres. Table 1.1 shows acres of surface land ownership within the GJFO administrative boundary.

BLM_0023916

**Figure 1.1. Location of Grand Junction Field Office**



**Table 1.1. Acres by Surface Land Status within the Grand Junction Field Office Administrative Boundary**

| Land Status | Acres | Percentage of Area |
|---|---|---|
| BLM | 1,061,400 | 50% |
| USFS | 380,000 | 20% |
| BOR | 7,900 | <1% |
| State Wildlife Areas and State Recreation Areas (Colorado Parks and Wildlife [CPW]) | 1,400 | <1% |
| Local (State, County, and City) | 3,400 | <1% |
| Private | 714,100 | 30% |
| Other | 370 | < 1% |
| **TOTAL** | 2,168,600 | 100% |

## 1.2 ALTERNATIVES

NEPA requires the development and consideration of a reasonable range of management

alternatives, including a No Action Alternative, to analyze impacts and guide decision makers in developing and selecting Approved RMP. All alternatives must be viable and reasonable.

## 1.2.1 Draft RMP/Draft EIS

Four management alternatives were developed for the Draft RMP/Draft EIS to fulfill the purpose and need, to meet the multiple use mandates of the FLPMA; (43 U.S.C. 1716), and to address identified planning issues. Each action alternative was designed to respond to the planning issues differently, providing a range of possible management approaches that the BLM could implement. That difference between alternatives was created by varying possible goals, objectives, allowable use, and management action decisions, and to a lesser degree, by varying implementation decisions such as travel route designations. Each alternative stood alone as a potential RMP.

## 1.2.2 Proposed RMP/Final EIS

Based on substantive comments from other governmental agencies and the public on the Draft RMP/Draft EIS, the BLM prepared a Final EIS, which includes identification of a Proposed RMP. The Preferred Alternative (Alternative B) in the Draft RMP/Draft EIS was revised as the result of evaluating comments received on the Draft RMP/Draft EIS, and was identified as the Proposed RMP (Alternative B). The Final EIS also incorporated the other alternatives (Alternatives A, C, and D) analyzed in the Draft RMP/Draft EIS, with editorial changes, technical changes, and factual corrections made as appropriate. The BLM also added supplemental information to the affected environment section (Chapter 3), and improved the analysis of alternatives (Chapter 4) based on external and internal comments. Planning decisions only apply to BLM managed surface and subsurface estate.

## 1.2.3 Alternatives Considered, But Not Further Analyzed

The following alternatives and management options described in Volume 1 of the Proposed RMP (PRMP) on pages 2-17 through 2-20 were considered as possible ways of resolving resource management issues and conflicts but were eliminated from detailed analysis because they were unreasonable or not practical for technical, legal, or policy reasons. Specific alternatives considered but not carried forward for detailed analysis are as follows:

- Implement Exclusive Use or Protection

- Designate Entire Decision Area as either Open or Closed to Off-Highway Vehicle Use

- No Oil and Gas Leasing for the Entire Decision Area

- No Herbicide Use

- Designate Additional Wilderness Study Areas

- Close Entire Decision Area to Livestock Grazing

BLM_0023918

- Complete Inclusion of the Greater Sage-Grouse National Technical Team Report Recommendation

## 1.2.4 Alternatives Considered in Detail

The basic goal of developing alternatives is to prepare different combinations of resource uses and protections to address the identified major planning issues, enhance or expand resources or resource uses, and resolve conflicts among resources and resource uses. Alternatives must meet the purpose and need; be reasonable; provide a mix of resource protection, management use, and development; be responsive to the issues; meet the established planning criteria; and meet federal laws, regulations, policies, and standards, including the multiple use mandates of the FLPMA.

Following the close of the public scoping period in January 2009, the BLM began developing alternatives by assembling an interdisciplinary team of BLM resource specialists in the GJFO. The BLM's Northwest Colorado Resource Advisory Council chartered a subgroup in August 2008, whereby they appointed 11 members of the public to provide advice on developing a reasonable range of alternatives that adequately reflect public concern. The BLM coordinated with cooperating agencies and the Northwest Resource Advisory Council subgroup beginning in August 2008 and continuing throughout the planning process. Between June 2009 and February 2010, the BLM interdisciplinary team developed management goals and objectives and management actions to meet those goals and objectives. Four management alternatives were developed to fulfill the purpose and need, to meet the multiple use mandates of the FLPMA, and to address the 17 planning issues. The four alternatives included the following: the No Action Alternative (Alternative A) and three action alternatives, Alternatives B, C, and D. The following sections provide some key components of the alternatives. The alternatives offered a range of management options that address the issues identified in the scoping process and other outreach activities, including, but not limited to: input from Cooperating Agencies, the Northwest Resource Advisory Council subgroup, visitor studies, focus groups, informal interviews, and reports, such as the Wild and Scenic River eligibility study (BLM 2009c) and Wild and Scenic River suitability study, ACECs evaluation (BLM 2010b), and Visual Resource Inventory study (Otak 2009).

The Proposed RMP and alternatives proposed direction for resource programs based on the development of specific goals, objectives, and management actions. Specific direction influencing land management with an emphasis on different combinations of resource uses and protections, allowable uses, and restoration measures to address issues and to resolve user conflicts were included in each alternative. Resource program goals were met in varying degrees across alternatives. Resources or resource uses not tied to planning issues or mandated by laws and regulations often contain few or no differences in management between alternatives. Alternatives may also result in different long-term conditions.

Based on substantive comments from other governmental agencies and the public on the Draft RMP/EIS, the BLM prepared a Final EIS which included identification of a Proposed RMP. The Preferred Alternative (Alternative B in the Draft RMP/EIS) was

BLM_0023919

revised as the result of evaluating comments received, and was identified as the Proposed RMP (Alternative B). The Proposed RMP included elements of all alternatives analyzed in the Draft RMP/EIS. The Proposed RMP/Final EIS also included the other alternatives (Alternatives A, C, and D) analyzed in the Draft RMP/EIS, and incorporated editorial changes, technical changes, and factual corrections as appropriate. Summaries of the management alternatives from the Final EIS are presented below. A complete description of all decisions proposed for each alternative was included in Chapter 2 of the Proposed RMP.

Alternative A (No Action Alternative)

The "No Action" alternative, Alternative A, is the continuation of present management direction and current prevailing conditions based on existing planning decisions and amendments. This alternative meets the requirements of the NEPA (40 CFR Part 1502.14) that a no-action alternative be considered. "No action" means that current management practices, based on the existing GJFO RMP (BLM 1987), RMP amendments, and activity- or implementation-level plans, would continue. Goals and objectives for BLM land resources and resource uses would be based on the existing GJFO RMP, RMP amendments, and activity- or implementation-level plans. The emphasis would be on maintaining the existing land management direction for physical, biological, cultural, and historic resource values along with recreational, social, and economic land uses.

Direction contained in laws, regulations, and BLM policies superseding provisions of the existing RMP and amendments would be implemented.

The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing) would stay the same. There would be no change in goals, objectives, allowable uses, or management actions that are allowed, restricted, or prohibited on BLM lands and mineral estate. The BLM would not establish additional criteria or change present criteria to guide the identification of site-specific use levels for implementation activities.

Alternative B (Proposed RMP)

Alternative B (the Proposed RMP) uses the Alternative B (Preferred Alternative) from the Draft RMP/EIS as its foundation. It carries forward the same theme as the Preferred Alternative found in the Draft RMP/EIS, but also includes elements of the other four alternatives analyzed in the Draft RMP/EIS. Alternative B seeks to allocate limited public land resources among competing human interests, land uses, and the conservation of natural and cultural resources. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. Management direction would be broad to accommodate a variety of values and uses. Decisions under this alternative would seek to provide an overall balance between the protection, restoration, and enhancement of natural and cultural values, while allowing resource use and development in existing or properly analyzed locations. The Proposed RMP contains the Shale Ridges and Canyons Master Leasing Plan.

BLM_0023920

Alternative C
Alternative C emphasizes non-consumptive use and management of resources through protection, restoration, and enhancement, while also providing for multiple uses, including livestock grazing and mineral development. This alternative would establish the greatest number of special designation areas, with specific measures to protect or enhance resource values within these areas. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations.

Management direction would generally be ecologically based; existing uses would be recognized but would likely be limited to ensure the protection of natural and cultural values, including intangible Native American landscape values encompassing plant communities, wildlife, viewsheds, air, and water. The appropriate development scenarios for allowable uses, such as mineral leasing, locatable mineral development, recreation, and livestock grazing, are contingent on meeting the essential conditions of natural and heritage resources.

Alternative D
This alternative emphasizes active management for natural resources, commodity production, and public use opportunities. Resource uses, such as recreation, livestock grazing, mineral leasing and development, would be emphasized. Management direction would recognize and give precedence to existing uses and accommodate new uses to the greatest extent possible while maintaining resource conditions. The appropriate development scenarios for allowable uses would emphasize social and economic outcomes while protecting land health.

## 1.3  NOTICE OF CLARIFICATIONS AND MODIFICATIONS

### 1.3.1  Notice of Clarifications to the Proposed RMP and Adopted by this ROD and Approved RMP

The following clarifications and modifications are made to the information included in the Proposed RMP/Final EIS. The clarifications and modifications are reflected in the attached Approved RMP.

#### 1.3.1.1  Editorial and Technical Changes to the Approved RMP and Appendices

Geographic information systems (GIS) information (e.g., acreage and the associated quantifications, route data) were checked and updated. Editorial changes were made to improve clarity and technical changes were made to correct inaccuracies and inconsistencies. For example:

- Management Action SSS-SG-A19 (SSS-SGR-MA-19) was rephrased to include Timber Ridge wildlife emphasis area that is also being managed for Gunnison Sage-Grouse.

BLM_0023921

- Allowable Use REC-AU6 (REC-AU-06) and Management Action REC-A13 (REC-MA-13) were updated to remove the West Creek Picnic Site. This recreation site is located within the Dolores River SRMA and management of the SRMA would adequately protect this site.
- The second bullet was removed from REC-SRMA-AU40 (REC-SRMA-AU-40) to make this allowable use consistent with CTTM-A-19 (TRV-MA-18) which is the intended management that allows for over-the-snow travel on the Tabeguache Trail.
- Updated CTTM-A2 (TRV-MA-03) to list the Tabeguache OHV Play Area, which is an existing authorized open area carried forward in the Approved RMP. This action is also described in REC-SRMA-AU-22 and was included in the Proposed RMP.
- Travel management actions CTTM-A27– CTTM-A35 (TRV-MA-25 - TRV-MA-33) were revised to be consistent with the actions in the cultural resource section that were updated prior to the release of the PRMP. This change was intended to be completed in the PRMP.
- Management Action CTTM-A14 was updated to reflect the correct acres from the GIS and mapping from the PRMP. The PRMP incorrectly states that 3,900 acres is limited to designated routes, which is the entire RMZ 1 and the Gunnison River Bluffs ERMA. The limitation only applies to 1,400 acres in RMZ 1. The Gunnison River Bluffs ERMA was mistakenly omitted from this action. The language in the Approved RMP was revised to the following for TRV-MA-13, "Limit equestrian travel to designated routes in the following areas (2,200 acres) (Refer to Appendix M for route designations in limited areas):
  o Bangs SRMA (part of RMZ 1 - 1,400 acres)
  o Gunnison River Bluffs ERMA (800 acres)
- Management Action CTTM-A15 was updated to reflect the correct acres from the GIS and mapping for the PRMP. The PRMP incorrectly stated that 3,900 acres was limited to designated routes for foot and horse. Only a portion of RMZ 1 in the Bangs SRMA is limited to designated routes for foot and horse. The correction also affects the acreage for the open designation for foot and horse travel. The language for this action in the Approved RMP for TRV-MA-14 was updated to the following, "Designate foot travel in the GJFO as follows (Figure 2-23, Appendix A):
  o Open: 1,057,800 acres
  o Closed: 1,300 acres
  o Limited to designated routes: 2,200 acres
- Management Action CTTM-A18 was updated to reflect the acres and mapping in the PRMP Bangs SRMA (Part of Recreation Management Zone 1) and Gunnison River Bluffs ERMA that is limited to designated routes for foot and horse. This correction also affects the acreage for the open designation for foot and horse

BLM_0023922

travel. The language in the PRMP was revised to the following for TRV-MA-17, " Limit foot travel to designated routes in the following areas (2,200 acres) (Refer to Appendix M for route designations in limited areas):

- o   Bangs SRMA (Part of RMZ 1 - 1,400 acres)

- o   Gunnison River Bluffs ERMA (800 acres)

- A modification to decision number F&W-TRW-AU-03 (FW-TW-AU3 in PRMP) in the Approved RMP was completed to provide the updated name for the South Shale Ridge Wildlife Emphasis Area that was changed to the Winter Flats Wildlife Emphasis Area in the PRMP. The name of this area was changed in the PRMP to reduce potential confusion with the adjacent South Shale Ridge Area of Critical Environmental Concern.

- A modification to decision number VIS-AU-03 (V-AU3 in PRMP) in the Approved RMP was completed to correct an error in the list of areas that are covered under the visual resource management (VRM) NSO stipulation. Highway 141 along the Dolores River and Unaweep Canyon were added to NSO-1 from Alternative A in the PRMP. This action was also shown as applying to Alternative B, which was not correct. The listing of Highway 141 along the Dolores River and Unaweep Canyon were included in VIS-AU-03 in the Approved RMP.

- A modification was made to decision number ACEC-MA-03 (ACEC-A4) to updated the acres for closure to livestock grazing to match the mapped acres in the PRMP. This decision stated that 1800 acres were closed to livestock grazing in this area in the PRMP. The correctly mapped closure is 186 acres.

- Designations for 219 miles of routes identified by Mesa County as having high recreation concern were deferred. A portion of the deferred routes consisting of 189 miles will be managed as undesignated, and the remaining 30 miles will be managed under the existing designations from the 1987 RMP.

## 1.4  DECISIONS IN THE RESOURCE MANAGEMENT PLAN

### 1.4.1  Types of Land Use Plan Decisions

Land use plan decisions for BLM fall into two categories: 1) desired outcomes (goals and objectives), and 2) allowable (including restricted or prohibited) uses and actions anticipated to achieve desired outcomes.

1. Desired Outcomes
Land use plans must identify desired outcomes expressed in terms of specific goals and objectives. Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4 (b)); and other resource or social needs.

*Goals* are broad statements of desired outcomes that usually are not quantifiable.

BLM_0023923

*Objectives* identify specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established time frames for achievement (as appropriate).

2. Allowable Uses and Management Actions

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

*Allowable Uses.*  Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values.  Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values.

*Management Actions.* Land use plans also identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health.  These actions include proactive as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System).

Major decisions for resources and resource uses included in the Approved RMP include the following:

**FLUID MINERALS**

The GJFO administers 1,231,300 acres of subsurface federal mineral estate. The Approved RMP provides the following guidance for the fluid mineral estate:

- Adoption of the Shale Ridges and Canyons Master Leasing Plan (700,900 acres) and manage 646,300 acres as open to fluid mineral development and 54,600 acres as closed to fluid mineral development;
- Manage 935,600 acres of federal mineral estate as open to fluid mineral leasing and geophysical exploration;
- Manage 295,600 acres of BLM surface/federal mineral estate as closed to fluid mineral leasing and geophysical exploration;
- Manage 29,800 acres of split estate private and state surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration;
- Manage 424,500 acres that are open to fluid mineral leasing with no surface occupancy stipulations;
- Manage 74,100 acres that are open to fluid mineral leasing with controlled surface use stipulations; and
- Manage 383,800 acres with timing limitations.

BLM_0023924

## RECREATION

Designate the following five Special Recreation Management Areas (SRMAs) for the protection of the recreation setting and outcomes (87,200 acres):

- Bangs (47,800 acres)
- Dolores River Canyon (16,100 acres)
- Grand Valley OHV (9,700 acres)
- North Fruita Desert (11,600 acres)
- Palisade Rim (2,000 acres);

Designate the following six Extensive Recreation Management Areas (ERMAs) to sustain the principal recreation activities and associated qualities and conditions (217,400 acres):

- Barrel Springs (24,700 acres)
- Gateway (78,100 acres)
- Grand Valley Shooting Ranges (750 acres)
- Gunnison River Bluffs (810 acres)
- Horse Mountain (5,100 acres)
- North Desert (107,900 acres);

Approve recreational target shooting for approximately 1,013,700 acres, and prohibit recreational target shooting on approximately 49,000 acres;

## AREAS OF CRITICAL ENVIROMENTAL CONCERN

The Approved RMP designates the following areas as ACECs (123,000 acres):

- Atwell Gulch (2,900 acres);
- Badger Wash (2,200 acres);
- Indian Creek (2,300 acres);
- Juanita Arch (1,600 acres);
- Mt. Garfield (2,400 acres);
- The Palisade (32,200);
- Pyramid Rock (1,300 acres);
- Roan and Carr Creeks (33,600 acres);
- Rough Canyon (2,800 acres);
- Sinbad Valley (6,400 acres);
- South Shale Ridge (27,800);
- Unaweep Seep (85 acres);

## TRAVEL MANAGEMENT

Decisions in the Approved RMP regarding transportation and access include the

BLM_0023925

following designations for motorized travel in the GJFO:

- Open: 10,200 acres (Grand Valley OHV SRMA, 18 Road Open Area, and Horse Mountain ERMA (RMZ2));
- Closed: 126,200 acres;
- Limited to Designated Routes: 925,200 acres (includes 105,200 acres with seasonal limitations);

## WILDERNESS STUDY AREAS

The Approved RMP provides management guidance for four Wilderness Study Areas (WSAs) (96,500 acres) in accordance with the Management of WSAs policies found in the FLPMA and in BLM Manual 6330, which includes the following areas:

- Demaree Canyon  (22,700 acres);
- Little Book Cliffs (29,300 acres);
- The Palisade (26,700 acres);
- Sewemup Mesa (17,800 acres);

## WILDLIFE EMPHASIS AREAS

The Approved RMP identifies 10 areas as Wildlife Emphasis Areas that provide specific management guidance and protection of areas with high habitat value for multiple species, including but not limited to sage-grouse, elk, mule deer, antelope, bighorn sheep, prairie dogs, and kit fox.

- Beehive (4,700 acres) – wintering and migratory habitat for mule deer and elk;
- Blue Mesa (9,300 acres) – wintering habitat for mule deer and elk;
- Bull Hill (4,800 acres) – wintering habitat for mule deer and elk;
- East Salt Creek (25,000 acres) – wintering habitat for mule deer and elk;
- Glade Park (27,200 acres) – Gunnison Sage-Grouse, mule deer and elk habitat;
- Prairie Canyon (22,200 acres) – long billed curlew, long eared owl, pronghorn antelope, white-tailed prairie dog, kit fox, Scott's oriole, gray vireo, and burrowing owl habitat;
- Rapid Creek (27,000 acres) – wintering and migratory habitat for mule deer and elk;
- Winter Flats (3,200 acres) – deer and elk wintering grounds;
- Sunnyside (14,500 acres) – bighorn sheep, mule deer, and Greater Sage-Grouse;
- Timber Ridge (11,800 acres) – mule deer, elk, and Sage Grouse.

## LANDS WITH WILDERNESS CHARACTERISTICS

The Approved RMP identifies three areas totaling 44,100 acres to be managed to protect wilderness characteristics.

- Bangs (19,600)

BLM_0023926

- Maverick (17,800)
- Unaweep (6,700)

The Approved RMP also commits to maintaining an ongoing inventory (WIL-MA-07) and working with partners and cooperators to comply with current BLM guidance (WIL-MA-08). Consistent with applicable policies for lands with wilderness characteristics, including BLM Manuals 6310 and 6320, the GJFO will continue to update and complete inventories for lands with wilderness characteristics after the ROD is signed in areas not inventoried during this planning process or where new information in the form a citizen's wilderness inventory has been received. The GJFO will post the results of these inventories to the GJFO website and notify the original submitters of the updates to the inventory resulting from the review of their information.

Areas that were not inventoried during this planning process that are subsequently found to have wilderness characteristics through later inventories will be evaluated through project-level NEPA analysis. The GJFO Field Manager will determine if additional land use planning decisions are warranted to address resource conflicts or if existing protections adequately address resource issues.

Prior to approval of any surface disturbing activities with the potential to impact wilderness characteristics, the wilderness characteristics inventory will be reviewed and updated in accordance with BLM Manual 6310. Individual projects proposed within areas identified as possessing wilderness characteristics will be evaluated during the NEPA process for impacts to wilderness characteristics. Mitigation measures to protect wilderness characteristics will be applied as appropriate and consistent with the management direction provided in the Approved RMP.

## 1.4.2  Implementation Decisions

Implementation decisions take action to implement land use plan decisions and are generally appealable to the Interior Board of Land Appeals (IBLA) under 43 CFR 4.410. BLM is using this decision document to approve the RMP (land use plan decisions) as well as the identified implementation actions (e.g., travel route designations).

Major implementation decisions included in the Approved RMP and TMP include the following for travel management route designations:

BLM_0023927

Table 1.4 Route Designations in Miles

| Designation | Miles | Miles Following Mitigation |
|---|---|---|
| Limited to under 50" Only | 37 | 48 |
| Limited to under 50" Only with Seasonal Limitation | 7 | 7 |
| Limited to Bicycle Only | 1 | 1 |
| County Maintained | 309 | 309 |
| Limited to Foot and Bicycle Only | 6 | 8 |
| Limited to Foot Only | 7 | 7 |
| Limited to Foot and Horse Only | 47 | 54 |
| Limited to Foot, Horse, Bicycle and Motorcycle Only | 89 | 84 |
| Limited to Foot, Horse, Bicycle and Motorcycle with Seasonal Limitation | 3 | 3 |
| Limited to Foot, Horse and Bicycle Only | 99 | 101 |
| Limited to Foot, Horse and Bicycle Only with Seasonal Limitation | 14 | 14 |
| Open to all uses | 871 | 1,004 |
| Open with a Seasonal Limitation | 235 | 237 |
| Open (in open areas) | 291 | 291 |
| Undesignated (Zone L) | 545 | 545 |
| Undesignated Deferred (Mesa County important recreation routes) | 189 | 189 |
| Limited to Administrative and Permitted Uses Only (332 miles with no public access before mitigation) | 524 | 330 |
| Closed (94 miles with no public access before mitigation) | 723 | 763 |
| **Total*** | **3,997** | **3,995** |

* Totals vary slightly due to rounding error.

During the structured analysis process, sensitive resources were identified requiring mitigation measures that would minimize effects to resources.

Generally, the alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures were defined and may be achieved by reroute, maintenance, additional resource surveys, remedying a safety issue or securing public access. Some routes may change designation following the completion of prescribed mitigation. Routes with proposed designation changes are shown in column two of Table 1.4.

The TMP implementation level decisions may be appealed to the Interior Board of Land

BLM_0023928

Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4. Public notification of this decision will be considered to have occurred on the date that the NOA is published in the federal register. Within 30 days of this decision, a notice of appeal must be filed in the office of the Authorized Officer at 2850 Youngfield Street, Lakewood, Colorado 80215. The last day to file an appeal is 30 days after the signature of the ROD. If a statement of reasons for the appeal is not included with the notice, it must be filed with the Interior Board of Land Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy St., Suite 300, Arlington, VA 22203 within 30 days after the notice of appeal is filed with the Authorized Officer.

### 1.4.3  Valid Existing Rights

Because of the long history of public land management, there are numerous rights and privileges that have been established on public lands under law, regulation, or planning decisions. The decisions included in this ROD and Approved RMP supersede the 1987 Grand Junction RMP and its subsequent amendments. Beyond the revised decisions in the Approved RMP, all BLM lands and Federal mineral estate within the GJFO remain subject to valid existing rights as well as subject to the stipulations and conditions of approval (COAs) associated with the given right at the time it was granted, including the right of reasonable access to surface and sub-surface parcels leased for the development of the mineral interest.

Oil and gas lease stipulations and lease notices in the Approved RMP would be applied to all new leases and to expired leases that are reissued. On existing leases, the BLM would seek voluntary compliance or would develop COAs for applications for permits to drill (APDs) or other authorizations, consistent with valid existing rights, to achieve resource objectives of lease stipulations contained in this RMP.

## 1.5  MITIGATION MEASURES

All practicable means to avoid or minimize environmental harm, commensurate to the landscape-level of planning, are included in the Approved RMP and appendices. In developing the alternatives, BLM used a variety of management methods and tools, including the identification of allowable uses, temporal, spatial, and/or methodological restrictions on uses, where specific uses would be prohibited, and specific actions that are needed to achieve the goals and objectives. Restrictions on land uses include seasonal closures, stipulations on surface disturbances, and the application of best management practices (BMPs).

Appendix H provides a list of BMPs that are applicable to land use activities authorized by the GJFO. Best management practices are state-of-the-art mitigation measures that may be applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts of land use activities. The BMPs included in this RMP are not intended to be a complete list but are displayed to show land use project proponents examples of commonly used practices the GJFO may require to reduce

BLM_0023929

impacts of surface-disturbing activities, use or occupancy. More explicit BMPs based on local conditions and resource-specific concerns could be developed once a specific proposal is being evaluated through the environmental analysis process. Additional BMPs can be proposed by project applicants for activities on BLM lands.

## 1.6  RMP AMENDMENTS, EVALUATION, MAINTENANCE AND MONITORING

### 1.6.1  RMP Amendments

RMP decisions are subsequently changed through either a plan amendment or another RMP revision. The process for conducting plan amendments is basically the same as the land use planning process used in developing or revising RMPs. The primary difference is that circumstances may allow for completing a plan amendment through the environmental assessment (EA) process, rather than through an EIS. Plan amendments (43 CFR 1610.5-5) change one or more of the terms, conditions, or decisions of an approved land use plan. Plan amendments are most often prompted by the need to consider a proposal or action that does not conform to the plan; implement new or revised policy that changes land use plan decisions; respond to new, intensified, or changed uses on BLM land; and consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

### 1.6.2  RMP Monitoring

Land-use plan decision monitoring is a continuous process occurring over the life of the RMP. The aim is to maintain a dynamic RMP. Monitoring data are collected, examined, and used to draw conclusions on (1) whether planned actions have been implemented in the manner prescribed by the RMP (implementation monitoring), (2) whether RMP allowable use and management action decisions and the resultant implementation actions are effective in achieving program specific objectives or desired outcomes (effectiveness monitoring), and (3) calculating the cost of delivering a service or product (efficiency monitoring by program elements). Conclusions are then used to make recommendations on whether to continue current management or determine what changes need to be made to implementation practices to better achieve RMP decisions. Indicators, methods, locations, units of measures, frequency, and action triggers can be established by national policy guidance, in RMPs, or by technical specialists in order to address specific issues.

Based on staffing and funding levels, monitoring is annually prioritized consistent with the goals and objectives of the RMP. BLM may work in cooperation with local, State, and other Federal agencies or use data collected by other agencies and sources when appropriate and available.

BLM_0023930

### 1.6.3  RMP Evaluation

In accordance with the BLM's *Land Use Planning Handbook* (H-1601-1), the approved RMP will be evaluated periodically to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented effectively. More specifically, the RMP will be evaluated to determine if (1) the decisions remain relevant to current issues, (2) decisions are effective in achieving or making progress toward achieving the desired outcomes specified in the plan, (3) any decisions in need of revision, (4) any decisions that need to be dropped from further considerations, and (5) any areas requiring new decisions.

In making these determinations, the evaluation will consider whether mitigation measures, such as those presented in the Approved RMP are satisfactory, whether there are significant changes in the related plans of other entities, and whether there is significant new information.

In addition to periodic evaluations, special evaluations may also be required to review unexpected management actions or significant changes in the related plans of Native American tribes, other Federal agencies, and State and local governments, or to evaluate legislation or litigation that has the potential to trigger an amendment or revision to the RMP. Evaluations may identify resource needs and means for correcting deficiencies and addressing issues through plan maintenance, amendments, or revisions. They should also identify where new and emerging issues and other values have surfaced.

### 1.6.4  RMP Maintenance

During the life of the RMP, the BLM expects that new information gathered from field inventories and assessments, other agency studies, and other sources will update geographic information system (GIS) data and BMPs. To the extent that this new information or actions address issues covered in the plan, the BLM will integrate the data through plan maintenance. BLM regulations in 43 CFR 1610.5-4 provide that RMP decisions and supporting actions can be maintained to reflect minor changes in data. Maintenance is limited to further refining, documenting, or clarifying a previously approved decision incorporated in the plan. Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved RMP. For example, adjusting the parameters of special status species habitat based on new inventory information or adjusting fire management polygons due to changes in fuel source or urban interface patterns would be reasonable maintenance actions.

Maintenance may be especially necessary to update acreage figures presented throughout the RMP. Acreages are based on GIS data, which is subject to constant refinement. Any potential discrepancies within the acreage figures or future refinements in the data may be corrected or updated in the RMP through plan maintenance.

BLM_0023931

## 1.7  THE PLANNING PROCESS

### 1.7.1  Policies and Legislative Constraints

FLPMA is the primary authority for the BLM to manage public lands. This law establishes provisions for land use planning, land acquisition and disposition, administration, rangeland management, rights-of-way, and designated management areas, and for the repeal of certain laws and statutes. NEPA provides the basic national charter for environmental responsibility, and requires the consideration and public availability of information on the environmental impacts of major Federal actions significantly affecting the quality of the human environment. In concert, FLPMA and NEPA provide the overarching guidance for all activities on BLM lands.

RMPs are the primary mechanism for guiding BLM activities so that the mission and goals outlined in the BLM Strategic Plan are achieved. See the BLM's *Land Use Planning Handbook* (H-1601-1) for program-specific guidance. RMPs ensure that BLM lands are managed in accordance with the intent of Congress as stated in the FLPMA, under the principles of multiple use and sustained yield.

As required by the FLPMA, as well as by BLM policies and guidelines, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; and that, where appropriate, will:

- preserve and protect certain public lands in their natural condition;
- provide food and habitat for fish, wildlife, and domestic animals;
- provide for outdoor recreation and human occupancy and use; and
- recognize the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands [Sec. 102 43 U.S.C. 1701 (a)(3)].

In addition to FLPMA and NEPA (and their associated regulations), the BLM must comply with the mandate and intent of all applicable laws, regulations, guidelines, and policies that apply to BLM-administered lands and Federal mineral estate. The planning process is intended to develop RMP decisions that resolve conflicts between program priorities, policies and guidelines and that meet the multiple use and sustained yield mandate of FLPMA.

### 1.7.2  Master Leasing Plans

Another aspect of the planning process in areas with the potential for leasing of Federal fluid minerals is the Master Leasing Plan (MLP) concept, introduced in *Washington Office Leasing Reform Instruction Memorandum (IM) 2010-117.* In August 2010, the Wilderness Society and the Center for Native Ecosystems submitted recommendations that the BLM GJFO prepare a Shale Ridges and Canyons MLP. This proposal encompasses 908,600 acres, including 640,700 acres of BLM-administered surface land and 700,900 acres of federal mineral estate. The externally recommended MLP is within

BLM_0023932

the GJFO boundary and overlaps with most of the northern half of the RMP planning area. The GJFO found that this proposal did not meet the main criteria for development of an MLP, however, they determined based on public comment that the area warranted analysis through an MLP incorporated into the Final Environmental Impact Statement (FEIS). The decisions associated with the MLP are adopted as part of this ROD and Approved RMP.

### 1.7.3   Relationship to the Northwest Colorado BLM Greater Sage-Grouse Plan Amendment and EIS

The BLM is also considering management of greater-sage grouse *(Centrocercus urophasianus)* in the GJFO planning area in a concurrent plan amendment process. The BLM is preparing the Northwest Colorado BLM Greater Sage-Grouse Plan Amendment and EIS, which includes a full analysis of all applicable greater sage-grouse conservation measures as directed by BLM Instruction Memorandum No, 2012-044. The BLM expects to issue a comprehensive set of management decisions for greater-sage grouse when it issues the final Northwest Colorado BLM Greater Sage-Grouse Plan Amendment. In the interim period between issuance of the GJFO ROD and the Northwest Colorado BLM Greater Sage-Grouse Plan Amendment, the GJFO intends to act consistent with the BLM policy set forth in the BLM Instruction Memorandum No. 2012-043 and any other applicable guidance.

## 1.8  PUBLIC INVOLVEMENT IN THE PLANNING PROCESS

The BLM decision making process is conducted in accordance with the requirements of the Council on Environmental Regulations (CEQ) regulations implementing NEPA, and the USDOI and BLM policies and procedures implementing NEPA. NEPA and the associated regulatory and policy framework require Federal agencies involve the interested public in their decision making. The GJFO has made open, public dialogue integral to this RMP revision planning process. In doing so the GJFO recognized the interests of a wide range of public, private, and governmental representatives in the management of BLM lands and Federal mineral estate. The various opportunities for public input are identified below.

### 1.8.1  Public Scoping

The formal scoping period began with publication of the (Notice of Intent) NOI in the *Federal Register* on October 15, 2008, and ended January 9, 2009. The Scoping Report documented the results of scoping by summarizing the individual comments received and describing the issues that were raised, and is incorporated here by reference. Three RMP public scoping meetings were held in the planning area in 2008: Grand Junction, Colorado on December 2, Moab, Utah on December 3, and Collbran, Colorado on December 4. The BLM provided the local media with timely press releases announcing the time, location, and purpose of the meetings. The format for the scoping meetings featured informal, one-on-one discussions between BLM representatives and members of the public.

BLM_0023933

### 1.8.2  Trails and Routes Data-Collection Workshops

The GJFO also hosted six trails and routes data-collection workshops in February 2009. The workshops were held separately from the scoping meetings. The workshops were held to (1) allow the public to review the BLM's inventory for accuracy and completeness, (2) provide information on routes that are missing from the BLM's inventory, and (3) offer suggestions for reroutes or new trail sections that would complement the existing route system. The comment period for route and trail data collection was open until March 20, 2009. A second comment period was held from July 20 to August 21st that focused on gathering information about public's desired future condition for the travel route system.

### 1.8.3  Public Review of, and Comment on, the Draft RMP/Draft EIS

BLM published the NOA for the GJFO Draft RMP/EIS in the *Federal Register* on January 25, 2013. Initially, the BLM set an extended 90-day public comment period that lasted until April 25, 2013. Before the end of the comment period, BLM had received multiple requests to extend the comment period. BLM extended the comment period to June 24, 2013. The total comment period encompassed 151 days.

The BLM also hosted five open house meetings to provide the public with opportunities to ask questions about the project and planning process, to meet the RMP team members, and to offer comments.

### 1.8.4  Public Review and Protest of the Proposed RMP/Final EIS

Pursuant to BLM's planning regulations at 43 CFR 1610.5-2, any person who participated in the GJFO RMP revision planning process and has an interest that may be adversely affected by the planning decisions may protest the proposed planning decisions within 30 days from the date the NOA is published in the *Federal Register* by the EPA. The 30-day protest period ended May 11, 2015.  BLM received 19 protest letters that were subsequently denied, or dismissed by the BLM Director, whose decision constitutes final agency action for the USDI.  Issues raised by protestors included significant new information, recreation, socioeconomic impacts, lands with wilderness characteristics inventory, response to comments, air resources, Master Leasing Plan policy and valid and existing rights.

### 1.8.5  Results of the Protest Period and Governor's Consistency Review
#### 1.8.5.1  Results of the Protest Period
Pursuant to BLM's planning regulations at 43 CFR 1610.5-2, any person who participated in the GJFO RMP revision planning process and has an interest that may be adversely affected by the planning decisions may protest the proposed planning decisions within 30 days from the date the Notice of Availability is published in the *Federal Register* by the United States Environmental Protection Agency (EPA).  The 30-day protest period ended May 11, 2015.

BLM_0023934

The BLM received 19 protest letters with standing during the 30-day protest period provided on the proposed land use plan decisions contained in the GJFO Proposed RMP/Final EIS in accordance with 43 CFR 1610.5-2. Issues raised by protestors included significant new information, recreation, socioeconomic impacts, lands with wilderness characteristics inventory, response to comments, air resources, Master Leasing Plan policy and valid and existing rights.

The BLM Director and his staff at the BLM Washington Office appropriately reviewed and resolved all proposed planning decisions protested by the public.

The BLM Director concluded that the BLM Colorado State Director followed the applicable laws, regulations, and policies and considered all relevant resource information and public input in developing the Proposed RMP. The BLM Director resolved the protests without making significant changes to the Proposed RMP.

### 1.8.5.2  Results of the Governor's Consistency Review

The BLM regulations in 43 CFR 1610.3- 2 (e) require a 60-day Governor's consistency review period for the Proposed RMP/Final EIS to ensure consistency with State government plans or policies. The BLM initiated the Colorado Governor's Consistency Review by letter from the BLM State Director dated April 10, 2015. The consistency review period concluded June 8, 2015. The Governor did not identify any inconsistencies with approved state or local plans, policies, or programs.

## 1.9  COORDINATION AND CONSULTATIONS

### 1.9.1  Cooperating Agencies

To integrate the special expertise and jurisdiction by law of these and other agencies, BLM invited local, State, Federal, and tribal representatives to participate as Cooperating Agencies for the RMP revision. These organizations were incorporated into the planning process as their jurisdiction and expertise warranted, resulting in their direct contribution to and improvement of the planning effort and the resultant RMP. The agencies that agreed to participate as formal cooperating agencies for the GJFO RMP revision and that signed a Memorandum of Understanding (MOU) are listed in Table 1.3.

**Table 1.2. Cooperating Agencies**

| Federal Agencies |
|---|
| USDA Forest Service |
| State Agencies |
| Colorado River Water Conservation District |

BLM_0023935

| Local Agencies | |
|---|---|
| City of Fruita | City of Grand Junction |
| Town of Collbran | Town of De Beque |
| Town of Palisade | Garfield County |
| Mesa County | |

BLM also coordinated with the following agencies: Colorado Department of Natural Resources and the Bureau of Reclamation.

## 1.9.2  Tribal Consultation  and Indian Trust Assets

Tribal consultation regarding the GJFO RMP revisions began in February 2007. American Indian tribes and organizations consulted to date are as follows:

- Southern Ute Indian Tribe
- Ute Mountain Ute Tribe
- Ute Indian Tribe of the Uintah and Ouray Reservation (Ute Indian Tribe)

On August 30, 2010, the GJFO sent letters to 14 tribal governments (other than the three Ute tribes), to assess their interest in participating the RMP process. None of the 14 tribes expressed interested in participating.

American Indian trust resources are legal interests in assets held in trust by the Federal government for federally recognized Indian tribes or nations or for individual Indians. These assets can be real property, physical assets, or intangible property rights. Examples are lands, minerals, water rights, hunting and fishing rights, other natural resources, money, or claims. The BLM has no trust administration responsibilities in the GJFO.

## 1.9.3 Consultation Efforts with the Colorado State Historic Preservation Officer interested Native American Tribes

The BLM relies on the 2012 National Programmatic Agreement entered into between the BLM, Advisory Council on Historic Preservation, and National Conference of State Historic Preservation Officers, and the Colorado State Protocol for compliance with the requirements of Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108, and its regulations at 36 CFR Part 800.  The National Programmatic Agreement and the Colorado State Protocol set forth the alternative process and stipulations for satisfying Section 106, including a required process for State Historic Preservation Officer (SHPO) involvement during the development stage and all subsequent phases of land use planning in accordance with 43 CFR 1610.3 and Colorado State Protocol at Section V (Oct. 2014).  The Colorado State Protocol also provides for a process of engaging Native American tribes and other consulting parties.  In 2010 the BLM invited 17 tribal governments to participate in the RMP revision. Three of the tribes

BLM_0023936

that were invited accepted the invitation.  The BLM coordinated with SHPO on the Draft RMP/Draft EIS.  A copy of the Draft RMP/Draft EIS and Proposed RMP/Final EIS was sent to the SHPO for review and comment. The BLM sought information from the three tribal agencies regarding cultural resources of importance, and integrated the information into the development of the Proposed RMP. The BLM also requested information from local governmental entities and the public. The Proposed RMP revision includes the information received from all interested parties and will inform future review and consideration of implementation-level decisions.

With respect to the BLM's travel and transportation management planning (TMP) decisions (Appendix M), the BLM is following the alternative procedures for compliance with Section 106 of the NHPA as set forth in Attachment F of the 2014 Colorado State Protocol.  This procedure establishes a phased process for compliance with Section 106 for TMPs, beginning with three phased steps for identifying historic properties.  As described in Appendix M of the Proposed RMP/Final EIS, the BLM utilized existing cultural resource information to determine potential cultural resource concerns on a route-by-route basis during planning, which was included in the Route Designation Reports.  The TMP only provides designations for existing routes; it does not open new routes or provide locations for new camping or staging areas, thus the use of a phased process without completing Class III surveys is appropriate pursuant with Attachment F of the 2014 State Protocol. The BLM consulted with the SHPO and interested Native American tribes during the planning process, and incorporated comments received into the proposed RMP.  Following this ROD, the BLM will follow the implementation plan for completing the phased identified process for priority areas that require Class III cultural resource inventories pursuant to Attachment F of the 2014 Colorado State Protocol.  Consultation with Native American tribes and other interested parties on the TMP (Appendix M) is ongoing and will follow the process in Attachment F of the 2014 Colorado State Protocol.  The BLM GJFO will continue to work with the SHPO consistent with Attachment F of the 2014 Colorado State Protocol.  If adverse effects are identified, mitigation measures, including avoidance, will be considered in consultation with the SHPO, Native American tribes, and other consulting parties to avoid, minimize or mitigate the effects pursuant to Attachment F of the 2014 Colorado State Protocol.

## 1.9.4  Resource Advisory Council

A Resource Advisory Council (RAC) is a committee established by the Secretary of the Interior to provide advice or recommendations to BLM management (BLM Land Use Planning Handbook H-1601-1). A RAC is generally composed of 15 members of the public representing different areas of expertise. The Colorado Northwest RAC includes members appointed to represent constituent public land users and provides input on public management issues to the BLM's Northwest RAC Designated Federal Officers. Recommendations are based on consensus-building and collaboration.

The Colorado Northwest RAC was involved in developing the preliminary planning issues for the GJFO RMP. In addition, a RAC subcommittee was established to participate in the planning process, and in particular to assist the BLM with creating a range of reasonable alternatives for the EIS. To date, 17 meetings of the RAC

BLM_0023937

subcommittee have been held at the GJFO. On November 3, 2011 the RAC subcommittee approved the range of alternatives as a reasonable range, at the next Northwest RAC meeting (December 1, 2011) the RAC disbanded the subcommittee because their task was fulfilled.

### 1.9.5   U.S. Fish and Wildlife Service Consultation

To comply with Section 7(c) of the Endangered Species Act of 1973 as amended (16 U.S.C 1531 et. seq.), the GJFO consulted the U.S. Fish and Wildlife Service (USFWS) throughout the RMP revision planning process. The USFWS provided input on planning issues, data collection and review, and alternatives development.

BLM worked with the USFWS to develop a Draft Biological Assessment (BA) following release of the Draft RMP/Draft EIS. The USFWS provided preliminary comments that were used to prepare the BA. As part of consultation efforts with the USFWS on the Proposed RMP/Final EIS, a BA was provided to the USFWS for review and comment on October 3, 2014. The USFWS responded with a concurrence letter on BLM's effects determinations on April 27, 2015.

If new information becomes available, new species are listed, or there are any changes to the Approved RMP that alter its implementation or the extent of anticipated impacts from those described in the Final BA, then the BLM would re-initiate Section 7 consultation with the FWS.

## 1.10   CONSIDERATIONS IN SELECTING THE GRAND JUNCTION FIELD OFFICE RESOURCE MANAGEMENT PLAN

### 1.10.1 Management in Accordance with FLPMA Under the Principles of Multiple Use and Sustained Yield

The Approved RMP seeks the best combination of management decisions to meet the purpose and need for a land use plan in consideration of the planning issues and management concerns identified through the planning process. It is prepared to ensure that the public lands in the GJFO are managed in accordance with FLPMA under the principles of multiple use and sustained yield. Section 103 (c) of FLPMA defines "multiple use" as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. . . ." The combination of planning decisions is driven by the diverse resources values on the public lands and how to best realize the broad spectrum of available opportunities. This combination of decisions also recognizes the limits of the ecosystems' sustainability and is within the constraints of applicable laws and regulations.

BLM's allocation of uses, often perceived as contrary to its multiple use mandate, is specifically provided for under FLPMA, which further defines multiple use as the "most judicious use of the land for some or all of these resources . . ." and "the use of some land

BLM_0023938

for less than all of the resources . . . ." The trade-offs resulting from the allocation of resources were fully analyzed and disclosed in the Final EIS, providing for an informed decision that acknowledges their consequences on the human environment.

Another important component of multiple use under FLPMA is accounting for "the long-term needs of future generations for renewable and non-renewable resources . . . ." These needs will be provided for through decisions included in the Approved RMP designed to meet the RMP's goals and objectives for sustainable productivity of renewable resources and healthy ecosystems, habitat, and waters.

### 1.10.2   Consistency with Existing Plans and Policies of Local, State, and Federal Agencies and Local Native American Tribes.

Management decisions in the Approved RMP are made compatible and consistent with the existing plans and policies of adjacent local, State, and Federal agencies and local Native American tribes to the extent consistent with the purposes, policies, and programs of Federal law and regulations applicable to BLM lands and Federal mineral estate. No formal comments were received from Federal or State agencies or tribal governments indicating the Proposed RMP was inconsistent with other existing plans or policies.

The Governor's Office did not identify any inconsistencies concerning State or local plans, policies, and programs following the 60-day Governor's Consistency Review of the GJFO Proposed RMP/Final EIS.

## 1.11   AVAILABILITY OF THE GRAND JUNCTION FIELD OFFICE RESOURCE MANAGEMENT PLAN

Electronic copies on DVD of the approved RMP are available by request at the BLM GJFO at 2815 H Road in Grand Junction, Colorado 81506. The approved RMP is also available online at http://www.blm.gov/co/st/en/fo/gjfo.html.

## 1.12   PLAN IMPLEMENTATION

The Approved RMP will be implemented as funding and workforce allow. The BLM will develop an implementation strategy to identify and prioritize the work needed to meet the goals and objectives of the RMP. Most of the land use plan decisions are effective upon approval of this document. However, some decisions will take a number of years to implement on the ground. Implementation monitoring will track which decisions have been implemented and when.

## 1.13   APPROVAL

The Approved RMP carries forward the land use planning decisions presented as Alternative B in the Proposed RMP and FEIS released to the public on April 10, 2015

BLM_0023939

with few minor revisions. Specific management decisions for public lands under the jurisdiction of the GJFO are presented by resource in Chapter 2 of the Approved RMP and in Appendices A through Q. The Approved RMP makes substantive revisions to management under the previous land use plan prepared in 1987, particularly with its decisions regarding the resources, programs, and opportunities.

The decision is hereby made to approve the attached Approved RMP and associated TMP for the GJFO. This ROD serves as the final decision for the decisions in the Approved RMP and associated TMP, and the Approved RMP/TMP become effective on the date this ROD is signed.

BLM_0023940

**FIELD OFFICE MANAGER RECOMMENDATION**

Having considered a full range of alternatives, associated impacts, and public and agency input, I recommend the adoption and implementation of the Grand Junction Field Office Approved Resource Management Plan, which includes a comprehensive Travel Management Plan.

Recommended:

AUG 1 0 2015

Katie Stevens                                                Date
Field Office Manager
Grand Junction Field Office


**DISTRICT MANAGER CONCURRENCE**

I concur with the adoption and implementation of the Grand Junction Field Office Resource Management Plan and associated Travel Management Plan.

Concurrence:

AUG 1 0 2015

Joseph F. Meyer                                             Date
District Manager
Northwest District Office


**STATE DIRECTOR APPROVAL**

In consideration of the foregoing, I approve the Grand Junction Field Office Approved Resource Management Plan, and the associated Travel Management Plan implementation decisions.

Approved:

8-10-15

Ruth Welch                                                  Date
Colorado State Director

Grand Junction Field Office Resource Management Plan Record of Decision

BLM_0023941

This page is intentionally left blank.

BLM_0023942

**U.S. Department of the Interior**
**Bureau of Land Management**

# Grand Junction Field Office

# Approved Resource Management Plan



BLM

Grand Junction Field Office ● COLORADO

**August 2015**

**BLM/CO/PL-15/016**



BLM_0023943

---

**BLM Mission**

To sustain the health, diversity, and productivity of America's public lands
for the use and enjoyment of present and future generations.

---

BLM/CO/PL-15/016

Cover photo by Bob Wick, Wilderness, Wild and Scenic River, and Visual Resources Program Lead, Washington Office

BLM_0023944

# Approved
# Resource Management Plan

## and

# Approved Travel Management Plan

## for the

# Bureau of Land Management
# Grand Junction Field Office

## BLM/CO/PL-15/016

### Prepared by

United States Department of the Interior
Bureau of Land Management
Grand Junction Field Office
Grand Junction, Colorado

## August 2015

BLM_0023945

This page is intentionally left blank.

BLM_0023946

# TABLE OF CONTENTS

*Page*

**LIST OF FIGURES AND TABLES**.................................................................................iii

**LIST OF ACRONYMS AND ABBREVIATIONS**..........................................................iv

1.1.  RESOURCE MANAGEMENT PLAN DECISIONS .......................................1

    1.1.1.  Decisions........................................................................................1

    1.1.2.  Maps and Appendices......................................................................3

    1.1.3.  Decisions by Category .....................................................................6

        I.  RESOURCES ................................................................................6

           AIR.........................................................................................6

           WATER ..................................................................................9

           SOILS ..................................................................................14

           VEGETATION .....................................................................16

           SPECIAL STATUS SPECIES..............................................28

           FISH AND WILDLIFE .........................................................46

           WILD HORSES....................................................................61

           CULTURAL RESOURCES ...................................................63

           PALEONTOLOGICAL RESOURCES..................................70

           VISUAL RESOURCES.........................................................72

           WILDLAND FIRE MANAGEMENT ...................................77

           LANDS MANAGED FOR THE PROTECTION OF WILDERNESS CHARACTERISTICS..................................80

        II.  RESOURCE USES ....................................................................84

           FORESTRY ..........................................................................84

BLM_0023947

LIVESTOCK GRAZING .......................................................87

RECREATION AND VISITOR SERVICES.........................93

COMPREHENSIVE TRAILS AND TRAVEL
MANAGEMENT..................................................................154

LANDS AND REALTY........................................................169

COAL....................................................................................179

MINERALS – Fluid Minerals ...............................................181

MINERALS – Oil Shale........................................................184

MINERALS – Shale Ridges and Canyons Master Leasing
Plan ......................................................................................185

MINERALS – Solid Minerals (Locatable, Salable, and
Non-Energy Leasable) ..........................................................196

III.  SPECIAL DESIGNATIONS .....................................................200

AREAS OF CRITICAL ENVIRONMENTAL
CONCERN ...........................................................................200

WILDERNESS STUDY AREAS..........................................209

WILD AND SCENIC RIVERS.............................................213

NATIONAL TRAILS............................................................215

NATIONAL, STATE, AND BLM BYWAYS.......................217

IV.  SUPPORT..................................................................................219

INTERPRETATION AND ENVIRONMENTAL
EDUCATION .......................................................................219

TRANSPORTATION FACILITIES ......................................220

APPENDICES. GRAND JUNCTION FIELD OFFICE APPROVED RESOURCE
MANAGEMENT PLAN ...................................................................................220

APPENDIX A.  Maps................................................................................A

BLM_0023948

APPENDIX B.  Stipulations Applicable to Fluid Mineral Development, Surface-Disturbing Activities, Surface Use, and Occupancy ....................................B

APPENDIX C.  Wild and Scenic River Suitability Report .......................................Online

APPENDIX D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria................................................Online

APPENDIX E. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado ............................................................Online

APPENDIX F. Wilderness Characteristics Inventory and Planning .........................Online

APPENDIX G.  Colorado Air Resources Protection Protocol ..................................Online

APPENDIX H.  Best Management Practices and Conservation Measures ...............H

APPENDIX I.  Cultural Resources..........................................................................Online

APPENDIX J.  Allotments and Allotment Levels.....................................................J

APPENDIX K.  Recreation and Visitor Services Management Framework for Special and Extensive Recreation Management Areas ........................................K

APPENDIX L.  Special Recreation Permit Program Overview ................................L

APPENDIX M. Travel Management......................................................................M

APPENDIX N. Coal Screening Criteria .................................................................N

APPENDIX O. Air Emissions Inventory.................................................................Online

APPENDIX P. BLM Biologic Assessment .............................................................Online

APPENDIX Q. Fish and Wildlife Service Biologic Opinion ....................................Online

## LIST OF FIGURES AND TABLES

Table 1.1.  Program Categories and Abbreviations .............................................1

Table 1.2.  List of Appendices .............................................................................3

Table 2.3.  GJFO Cultural Use Allocations ..........................................................62

BLM_0023949

# LIST OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **4WD or 4x4** | Four-wheel drive vehicle |
| **ACEC** | Area of critical environmental concern |
| **AML** | Abandoned mine land |
| **APD** | Application for permit to drill (oil and gas) |
| **ATV** | All-terrain vehicle |
| **ASQ** | Allowable sale quantity |
| **AUM** | Animal-unit month |
| **BLM** | United States Department of the Interior, Bureau of Land Management |
| **BLM lands** | Surface acres administered by the Bureau of Land Management |
| **BMP** | Best management practice |
| **BOR** | United States Department of the Interior, Bureau of Reclamation |
| **CARPP** | Comprehensive Air Resources Protection Protocol |
| **CDOT** | Colorado Department of Transportation |
| **CFR** | Code of Federal Regulations |
| **CNHP** | Colorado Natural Heritage Program |
| **COA** | Condition of approval |
| **COGCC** | Colorado Oil and Gas Conservation Commission |
| **CPW** | Colorado Parks and Wildlife (formerly CDOW -- Colorado Division of Wildlife.) |
| **CSU** | Controlled surface use |
| **CTTM** | Comprehensive trails and travel management |
| **DOI** | United States Department of the Interior |
| **EA** | Environmental assessment |
| **EIS** | Environmental impact statement |
| **ERMA** | Extensive Recreation Management Area |
| **ESA** | Endangered Species Act of 1973 |
| **FEIS** | Final environmental impact statement |
| **FLPMA** | Federal Land Policy and Management Act of 1976, as amended |

*iv*

BLM_0023950

| | |
|---|---|
| **GHG** | Greenhouse gas |
| **GIS** | Geographic information system |
| **GJFO** | Grand Junction Field Office |
| **COGA** | Colorado Oil and Gas Association |
| | |
| **IBLA** | Interior Board of Land Appeals |
| **IDT** | Interdisciplinary team |
| **IM** | Instruction memorandum |
| | |
| **LN** | Lease notice (oil and gas) |
| | |
| **NEPA** | National Environmental Policy Act of 1969, as amended |
| **NHPA** | National Historic Preservation Act of 1966 |
| **NRHP** | National Register of Historic Places |
| **NSO** | No surface occupancy or surface-disturbing activities |
| **NWSRS** | National Wild and Scenic Rivers System |
| | |
| **OHV** | Off-highway vehicle |
| **ORV** | Outstandingly remarkable value |
| | |
| **PFC** | Properly functioning condition (land health) |
| **PFYC** | Potential fossil yield classification |
| | |
| **R&VS** | Recreation and visitor services |
| **RMA** | Recreation management area |
| **RMP** | Resource management plan |
| **RMZ** | Recreation management zone |
| **ROD** | Record of decision |
| **ROW** | Right-of-way (lands and realty) |
| | |
| **SHPO** | State Historic Preservation Office |
| **SRMA** | Special recreation management area |
| **SRP** | Special recreation permit |
| | |
| **T&E** | Threatened and endangered |

BLM_0023951

| | |
|---|---|
| **TL** | Timing limitation (seasonal restriction) |
| | |
| **U.S.** | United States |
| **USFWS** | United States Department of the Interior, Fish and Wildlife Service |
| | |
| **VRM** | Visual resource management |
| | |
| **WSA** | Wilderness study area |
| **WSR** | Wild and scenic river |
| **WUI** | Wildland urban interface |

*vi*

BLM_0023952

## 1.1 RESOURCE MANAGEMENT PLAN DECISIONS

### 1.1.1 Decisions

The GJFO Approved RMP describes goals, objectives, allowable use and management action decisions, as well as some implementation-level decisions established for BLM lands and Federal mineral estate managed by the BLM's GJFO. The decisions are detailed by program in section 2.1.3 under four category headings: Resources, Resource Uses, Special Designations, and Support (see Table 2.1 below).

**Table 1.1. Program Categories and Abbreviations**

| I. Resources | |
| --- | --- |
| Air | AIR |
| Soils | SOIL |
| Water | WTR |
| Vegetation General | VEG |
| Vegetation – Desired Plant Community | VEG-DPC |
| Vegetation – Forest/Woodlands | VEG-FOR |
| Vegetation – Riparian | VEG-RPN |
| Vegetation – Adaptive Drought Management | VEG-ADM |
| Vegetation – Weeds | VEG-WDS |
| Fish and Wildlife | F&W |
| Fish and Wildlife – Fisheries and Aquatic Wildlife | F&W-FAW |
| Fish and Wildlife – Terrestrial Wildlife | F&W-TRW |
| Fish and Wildlife – Big Game Species (Deer, Elk, Moose, and Bighorn Sheep) | F&W-BGS |
| Fish and Wildlife – Pronghorn Antelope | F&W-PHA |
| Fish and Wildlife – Wildlife Emphasis Area | F&W-WEA |
| Special Status Species | SSS |
| Special Status Species – Fish | SSS-FIS |
| Special Status Species – Plants and Terrestrial Wildlife | SSS-PTW |
| Special Status Species – Plants | SSS-PLN |
| Special Status Species – Migratory Birds | SSS-MIG |
| Special Status Species – Yellow-billed Cuckoo | SSS-YBC |
| Special Status Species – Raptors | SSS-RPT |
| Special Status Species – Bald and Golden Eagles | SSS-EGL |
| Special Status Species – Waterfowl and Shorebirds | SSS-WSB |

BLM_0023953

*Approved Resource Management Plan*

| | |
|---|---|
| Special Status Species – Gunnison and Greater Sage-Grouse | SSS-SGR |
| Special Status Species – Reptiles and Amphibians | SSS-R&A |
| Special Status Species – Bats | SSS-BAT |
| Special Status Species – River Otter | SSS-RVO |
| Special Status Species – Canada Lynx | SSS-LYN |
| Special Status Species – Kit Fox | SSS-KIT |
| Special Status Species – White-Tailed Prairie Dog | SSS-WTP |
| Cultural Resources | CUL |
| Paleontological Resources | PAL |
| Visual Resources | VIS |
| Wildland Fire Management | WFM |
| Lands Proposed for the Protection of Wilderness Characteristics | WIL |
| Wild Horses | WHS |

## II. Resource Uses

| | |
|---|---|
| Forestry | FOR |
| Livestock Grazing | GRZ |
| Recreation and Visitor Services | REC |
| Special Recreation Management Areas | REC-SRMA |
| Extensive Recreation Management Areas | REC-ERMA |
| Comprehensive Trails and Travel Management | TRV |
| Lands and Realty | L&R |
| Lands and Realty – Renewable Energy | L&R-REN |
| Coal | COA |
| Fluid Minerals and Geothermal | MIN |
| Fluid Minerals and Geothermal – Oil Shale | MIN-OIL |
| Fluid Minerals and Geothermal – Shale Ridges and Canyon Master Leasing Plan | MIN-MLP |
| Solid Minerals (Locatable, Salable/Mineral Material, Non-Energy Leasable) | SOL |
| Solid Minerals – Locatable Minerals | LOC |
| Solid Minerals – Salable Minerals/Mineral Materials | SAL |
| Solid Minerals – Non-Energy Solid Leasable Minerals | NEL |

## III. Special Designations

| | |
|---|---|
| Areas of Critical Environmental Concern | ACEC |

BLM_0023954

| Wilderness Study Areas | WSA |
| Wild and Scenic Rivers | WSR |
| National Trails | NTR |
| National, State, and BLM Byways | BYW |

**IV.  Support**

| Interpretation and Environmental Education | IEE |
| Transportation Facilities | TRN |

For ease of identifying decisions, each decision is numbered.  The numbering sequences for the decisions are by program.  Each program has an identified abbreviation (Table 2.1) and each decision in that program is numbered in coordination with the program abbreviation, type of decision and decision number.  Some examples are as follows:

**AIR-GOAL-01:** First air program goal
    **AIR-OBJ-01:** First air program objective
        **AIR-MA-01:** Firs air program management action or allowable use decision
        **AIR-MA-02:** Second air program management action or allowable use decision
            **AIR-IMP-01:** First air program implementation decision

Please note that all acreages and maps presented in the Approved RMP are estimations based on current data.  Updating these data is considered plan maintenance, which will occur over time as the Approved RMP is implemented, additional surveys are completed, and information is revised.

## 1.1.2  Maps and Appendices

Table 1.2 lists supporting information for the decisions contained in the Approved RMP. Maps depicting resource information, stipulations applicable to surface-disturbing activities, and travel management route designations in the Approved RMP are provided in Appendix A. Appendices that are not included in the printed copy (as indicated below as "Available Online") of the Approved RMP are available on the GJFO web page. Appendices B through P contain supporting information for decisions outlined in the Approved RMP. This document and appendices are also available on the GJFO website: http://www.blm.gov/co/st/en/fo/gjfo.html

**Table 1.2.  List of Appendices**

| Appendix A | This appendix contains all of the maps (figures) for resources, allocations, designations, stipulations, and the Master Leasing Plan. |
|---|---|
| Appendix B | Stipulations Applicable to Surface-Disturbing Activities, Surface Use and Occupancy.  This appendix lists stipulations for fluid minerals leasing referred to in the Approved RMP. |

BLM_0023955

| | These stipulations will also apply, where appropriate to achieve their purpose, to all surface-disturbing activities and surface occupancy associated with land use authorizations, permits, and leases issued on BLM lands. |
|---|---|
| Appendix C (Available Online) | Wild and Scenic River Suitability Report. This report contains detailed information for the suitability assessment for each eligible river segment. |
| Appendix D (Available Online) | Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria. This appendix provides summary information about the Areas of Critical Environmental Concern (ACEC) evaluation process. |
| Appendix E (Available Online) | BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. Description of the conditions that are needed to sustain public land health related to livestock grazing. Supporting information to livestock grazing decisions in the Approved RMP is provided in this appendix. |
| Appendix F (Available Online) | Management and Setting Prescriptions for Lands Managed to Protect Wilderness Characteristics. Management and setting prescriptions are intended to protect these values along with wilderness characteristics (e.g., naturalness and outstanding opportunities for solitude or primitive recreation). |
| Appendix G (Available Online) | Colorado Air Resources Protection Protocol. This appendix describes the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality within the state of Colorado. |
| Appendix H | Best Management Practices and Conservation Measures. This appendix provides a list of best management practices that are applicable to land use activities authorized by the GJFO. |
| Appendix I (Available Online) | Cultural Resource Allocation to Use Categories. Allocations to Use Categories for individual properties and classes of properties. |
| Appendix J | Allotment and Allotment Management Levels. This appendix provides a summary of the closed allotments and the evaluation criteria for future closures. It also provides a summary of the management on all of the allotments in the field office. |
| Appendix K | Recreation and Visitor Services Management Framework For Special and Extensive Recreation Management Areas. This appendix provides supporting information to recreation and |

BLM_0023956

| | visitor services decisions in the Approved RMP. |
|---|---|
| Appendix L | Special Recreation Permit Program Overview. This appendix provides the evaluation criteria for special recreation permits. |
| Appendix M | Travel Management Plan: Includes the designated System Roads and Maintenance Levels.  This appendix provides supporting information to transportation facilities decisions in the Approved RMP including maintenance intensity levels. Includes the travel management maps. |
| Appendix N | Coal Screening Criteria for the Grand Junction Field Office. This appendix provides a summary of the coal management decisions and documents the unsuitability criteria applied to potential coal lands for future development. |
| Appendix O (Available Online) | Air Emission Inventory. This appendix provides a summary of the air emissions inventory for development and production activities within the Grand Junction Field Office. |
| Appendix P (Available Online) | Bureau of Land Management Biologic Assessment for the Grand Junction Field Office. This appendix includes the Biologic Assessment for the RMP and TMP that was submitted to the Fish and Wildlife Service as part of the consultation process for determining impacts to threatened and endangered species. |
| Appendix Q (Available Online) | Fish and Wildlife Service Biologic Opinion. This appendix includes the Biologic Opinion that was issued for the Grand Junction Field Office RMP and TMP. |

BLM_0023957

### 1.1.3 Decisions by Category

See Table 1.1 in section 1.1.1 above for a summary of the categories in this section.

## I. RESOURCES

## AIR

**AIR-GOAL-01**:
*Minimize impacts on air quality from BLM management actions in accordance with the Clean Air Act and the NEPA.*

---

**AIR-OBJ-01:**
*Limit air quality degradation from authorized activities on BLM-administered lands by providing appropriate analyses for compliance with applicable Colorado and National Ambient Air Quality Standards, applicable federal, state, and local air quality laws, rules, regulations, and implementation plans, and applicable federal land management guidance documents (e.g., FLAG 2010). Protect air resources from adverse impacts associated with BLM authorized and permitted actions in accordance with the methodology and provisions outlined in the Comprehensive Air Resource Protection Protocol (CARPP) (**Appendix G**).*

---

**AIR-MA-01:**
Develop COAs for project-specific surface-disturbing activities to prevent BLM-permitted activities from causing or contributing to exceedances of ambient air quality standards or causing significant adverse impacts on air quality related values.

---

**AIR-AU-01:**
**LEASE NOTICE** LN-8: *Air Quality.* This lease notice is attached to new oil and gas leasing agreements to provide notice to operators of analysis and mitigation requirements that will be determined on a case by case basis at the permitting/development stage.

---

**AIR-MA-02:**
Participate in, conduct, or require air modeling analyses as described in the CARPP (see **Appendix G**) as part of a comprehensive strategy to prevent BLM permitted activities from causing or contributing to violations of ambient air quality standards or causing significant adverse impacts on air quality related values.

---

**AIR-MA-03:**
Work cooperatively with local, state, and federal agencies and Tribal governments to enhance air monitoring efforts in order to provide a broader measure of spatially distributed air pollutant concentrations for the purposes of evaluating atmospheric conditions with respect to ambient air quality standards and air quality related values.

*Approved Resource Management Plan – AIR*

**AIR-MA-04:**
Manage prescribed fire in accordance with the State of Colorado Department of Public Health and Environment Smoke Management Program and Regulation Number 9 (5 CCR 1001-11). Prescribed burns will be timed during favorable meteorological conditions so as to minimize smoke impacts.

**AIR-GOAL-02**:
*Manage BLM-administered lands in a manner that protects the quality or air and atmospheric values as directed under the FLPMA.*

**AIR-OBJ-02:**
*Manage air resources within the GJFO in accordance with the CARPP (Appendix G).*

**AIR-MA-05:**
Implement the adaptive management strategy for protecting air resources to include the actions above as well as, tracking project specific emissions for comparison against the most recent regional air quality model results to provide cumulative context for any analyzed contemporaneous development period, and providing an annual activity and air quality summary report of BLM activities as described in the CARPP.

**AIR-OBJ-03:**
*Minimize emissions, within the scope of BLM's authority, from activities that cause or contribute to air quality impairment, visibility degradation, atmospheric deposition, or climate variability.*

**AIR-MA-06:**
Require all drilling and completion engines used on public lands or used to access federal minerals to be in conformance with information and guidance provided by the Colorado Air Resources Management Modeling Study (CARMMS) modeling and CARPP protocol for engine type requirements.

**AIR-MA-07:**
Require that oil and gas operators use reduced emission completion technology (i.e., "green" completion) as defined in COGCC Rule 805 and the New Source Performance Standards for Crude Oil and Natural Gas Production at 40 CFR Part 63 Subpart OOOO at all wells on BLM-administered lands and wells that access federal minerals. An exemption may be granted on a case-by-case basis.

**AIR-MA-08:**
Require flaring of natural gas during well completions that are exempted from green completion technology. Prohibit venting of natural gas except during emergency situations.

**AIR-MA-09:**

BLM_0023959

*Approved Resource Management Plan – AIR*

Minimize emissions of greenhouse gases from BLM-authorized actions in accordance with state and federal regulations, executive and secretarial orders, and BLM policy.

**AIR-MA-10:**
Require proper road design, construction, and surfacing on BLM authorized roads to reduce particulate matter emissions.

**AIR-MA-11:**
Open areas and designated routes may be closed during wind events (e.g., during National Weather Service high wind warning) to reduce fugitive dust emissions.

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0023960

# WATER

**WTR-GOAL-01:**
*Protect, preserve, and enhance watershed functions in the capture, retention, and release of water in quantity, quality, and time to meet ecosystem and human needs.*

**WTR-OBJ-01:**
*Manage public land activities to maintain or contribute to the long term improvement of surface and ground water quality and minimize or control elevated levels of salt, sediment, and selenium contribution from federal lands to water resources in the planning area.*

**WTR-MA-01:**
Promote the delisting of impaired water bodies (303d listed) by monitoring actions including but not limited to grazing, travel management, and other surface disturbing actions and implementing appropriate management change.

**WTR-MA-02:**
Remove nonfunctional structures such as sediment basins, ponds, and associated structures and implement additional erosion control/soil stabilization measures as necessary.

**WTR-OBJ-02:**
*Ensure streams on BLM lands are in geomorphic balance (e.g., stream channel size, sinuosity, slope, and substrate are appropriate for its landscape setting and geology) with the water and sediment being supplied by the watershed (e.g., no accelerated erosion, deposition, or head-cutting) and ensure that land use does not impede the natural hydrograph (e.g., allows timing, magnitude and duration of peak, high and low flow events by minimizing surface disturbance, erosion, and sedimentation of streams).*

**WTR-AU-01:**
Close the river corridors of the three major rivers (Colorado, Dolores, and Gunnison) to mineral material disposal and non-energy solid mineral leasing and development.

**WTR-AU-02:**
Classify the Colorado River corridor as unsuitable for coal leasing.

**WTR-MA-03:**
While maintaining access, close routes with multiple stream crossings and/or identify mitigation including reroutes and proper design, construction, and maintenance plans in accordance with BLM manual handbook guidance.

**WTR-AU-03:**
**STIPULATION** *HYDROLOGY RIVER NSO CO:* No surface occupancy or use is

BLM_0023961

allowed within 400 meters (1312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers: Colorado, Dolores, and Gunnison. Standard exceptions apply; see Appendix B.

**WTR-AU-04:**

**STIPULATION** CSU-39: *Roan and Carr Creeks ACEC.* Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within the Roan and Carr Creek ACEC. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**WTR-AU-05:**

Identify areas with lentic and lotic riparian characteristics as ROW avoidance area.

**WTR-AU-06:**

**STIPULATION** NSO-2: *Streams/Springs Possessing Lotic Riparian Characteristics.* Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and surface-disturbing activities within the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

**WTR-AU-07:**

**STIPULATION** CSU-3: *Definable Streams.* Surface disturbing actions within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank-full stage) should be avoided to the greatest extent practicable and disturbances will be subject to site specific relocation at the discretion of the BLM (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

**WTR-AU-08:**

**STIPULATION** NSO-4: *Lentic Riparian Areas (including springs, seeps, and fens).* Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**WTR-MA-04:**

Restrict the use of subsurface explosives and vibroseis buggies within 0.25-mile of all spring sources and perennial streams. This restriction does not apply to oil and gas well operations (e.g., well perforating).

**WTR-MA-05:**

For actions requiring individual permits through the US Army Corps of Engineers, require a licensed Professional Engineer to approve and stamp the project design,

BLM_0023962

construction, and reclamation plans to mitigate to the fullest extent practicable riparian resource damage associated with the proposed action.

### WTR-MA-06:
Manage the Badger Wash ACEC as a hydrologic study area. Refer to the ACEC Section for Badger Wash ACEC management actions.

## WTR-OBJ-03:
*Provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian, wetland, aquatic, and upland systems.*

### WTR-MA-07:
Secure adequate water rights for point sources on BLM lands from the State of Colorado on springs/seeps and wells necessary to preserve, protect, and enhance ecological diversity and sustainability within planning area watersheds. Uses for which BLM will apply for water rights include, but are not limited to, livestock, wildlife watering, wildlife habitat, wild horses, recreation, and fire suppression.

### WTR-MA-08:
Acquire private stream-side and river-side parcels from willing sellers that are contained within or adjacent to public land (i.e., West, East, Roan, and Carr Creeks, and the Colorado, Gunnison, and Dolores Rivers) and display important riparian values.

Consider acquisition of stream-side and river-side parcels that contain wetland areas as defined in Executive order 1190, dated May 24,1977, and/or located in floodplain areas (100-year) as defined in Executive Order 11988, dated May 24, 1977, from willing sellers that are contained within or adjacent to public land.

## WTR-OBJ-04:
*Protect municipal watersheds and source water protection areas on public land that provide drinking water to local communities.*

### WTR-MA-09:
Reduce point and non-point source contributions of water quality contaminants from public lands by reducing disturbance footprints associated with travel infrastructure and other surface disturbing actions while also maintaining access and meeting resource use objectives.

### WTR-AU-09:
Manage the high sensitivity zone of the Palisade municipal watershed as ROW exclusion area.

### WTR-AU-10:

BLM_0023963

Close the Palisade and Grand Junction municipal watersheds, and the Mesa/Powderhorn and Collbran source water protection areas to non-energy solid leasing and development.

**WTR-AU-11:**
**No Leasing**: *Watersheds.* Close the Palisade and Grand Junction municipal watersheds to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12 in Appendix A.

**WTR-AU-12:**
Classify the Palisade and Grand Junction municipal watersheds as unacceptable for coal leasing.

Classify the Collbran and Mesa/Powderhorn source water protection areas, Jerry Creek watershed, and Cabin Reservoir as unsuitable for coal leasing.

**WTR-AU-13:**
**STIPULATION** NSO-5: *No Surface Occupancy (Palisade and Grand Junction Municipal Watersheds).* Prohibit surface occupancy and other surface-disturbing activities in the Palisade and Grand Junction municipal watersheds. (Refer to Appendix B.) See Figure 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**WTR-AU-14:**
**STIPULATION** CSU-4: *Collbran and Mesa/Powderhorn Source Water Protection Areas, and Jerry Creek Watershed.* Require that all ground disturbances within source water protection areas and the Jerry Creek Watershed avoid interference with watershed resource values. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

**WTR-AU-15:**
**LEASE NOTICE** LN-1: *Source Water Protection Areas.* The lease is within source water protection areas, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities and comply with applicable municipal watershed plans. (Refer to Appendix B.)

**WTR-MA-10:**
Within *Water Intake Zone 3*, restrict the storage and use of hazardous chemicals, require green completions and green fracking fluids, and restrict oil and gas pits. Apply additional site specific mitigation measures as appropriate to minimize risk of water quality degradation. See Figure 2-32 in Appendix A.

**WTR-MA-11:**
Oil and gas operations near domestic water supplies using a groundwater well or spring will be restricted. Siting of oil and gas operations may be permitted following NEPA analysis conducted for a specific location, and the application of

BLM_0023964

protections that may include conditions of approval, mitigation and design features developed in the NEPA analysis, and the regulations at 43 CFR 3101.1-2.

**WTR-MA-12:**
Conduct gain/loss studies of local streams to characterize natural flow regimes and identify locally important recharge/discharge zones. Characterize groundwater movement (locally and regionally), and groundwater interaction with surface water especially for springs and fen areas. Prioritize study locations based on potential use/alteration of surface and groundwater resources given reasonably foreseeable resource use potential. Coordinate studies with private entities as well as other government agencies to ensure land/resource management actions outside BLM jurisdiction are incorporated in studies. Utilize information gained through studies to modify, develop, and effectively implement appropriate BMPs necessary to protect water resources while allowing development of other natural resources (e.g., coal, uranium, natural gas, gravel, and related infrastructure).

**WTR-OBJ-05:**
*Characterize, monitor, maintain, and/or restore surface/groundwater quality and quantity to sustain designated beneficial uses in cooperation with other federal, local, and state agencies and private entities.*

**WTR-MA-13:**
Monitor morphology and channel stability of streams with concerns identified through land health or PFC assessments or inventories, or streams that could be impacted, to determine appropriate management action. Improve dysfunctional streams caused by unnatural factors. Modify management practices (e.g., grazing systems, recreational uses) and/or stream restoration techniques (e.g., native planting, fencing, energy dissipation structures, bank protection, and drainage structures) as appropriate to address causal factors.

**WTR-GOAL-02:**
*Maintain and protect the quantity and quality of groundwater, as well as aquifer properties.*

**WTR-OBJ-06:**
*Manage public lands to maintain functioning condition of all parameters within the hydrologic cycle including groundwater quantity and quality. Ensure the consumption of water resources on public lands resulting from federal actions do not jeopardize the sustainability of water resources or associated riparian/wetland habitats.*

**WTR-MA-14:**
Identify, monitor, and evaluate the condition of important aquifers and recharge/discharge areas within the planning area. Assess aquifer properties and groundwater quality on BLM lands and work with stakeholders to prioritize and develop management plans and site-specific actions to maintain groundwater quality within the identified aquifers.

BLM_0023965

# SOILS

**SOIL-GOAL-01**:

*Ensure that upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, minimizes surface runoff (Land Health Standard 1), and minimizes soil erosion.*

**SOIL-OBJ-01:**

*1. Minimize or control elevated levels of salt, sediment, and selenium contribution from federal lands to river systems in the planning area.*

*2. Maintain or improve soil productivity, including retention of topsoil quality and reestablishing soil capability, potential, and functionality when disturbed.*

*3. Preserve proper function and condition of upland soils.*

*4. Ensure surface disturbances do not cause accelerated erosion (e.g., rills, soil pedestals, actively eroding gullies) on a watershed scale (e.g., 6th hydrologic unit code scale).*

**SOIL-MA-01:**

Implement appropriate management techniques, guidelines or practices, outlined in Appendix H, to limit soil loss to an amount that does not affect its long term quality, productivity or hydrological function.

**SOIL-MA-02:**

In areas designated as *open* to OHVs, monitor and identify thresholds for evaluating vulnerability to erosional processes and utilize best available science to limit erosion and sedimentation/salt loading to the Colorado River.

**SOIL-MA-03:**

Identify those biologic soil crusts in the planning area which are key to sustaining proper function and condition of upland soil health as determined by BLM Land Health Assessments and/or onsite evaluation. Avoid and mitigate disturbance to biologic soil crusts which are determined to be key in sustaining proper function and condition of upland soil health.

**SOIL-AU-01:**

Manage fragile soils, mapped Mancos shale areas, and saline soils areas as ROW avoidance areas.

**SOIL-MA-04:**

Protect watershed health and water quality by limiting motorized travel over fragile soils during seasonally wet periods. Allow management officials the authority to modify closure dates based on seasonal climate variability.

BLM_0023966

**SOIL-MA-05:**

In high disturbance areas, utilize best available science to model sediment loss relative to natural rates. Based on model results, modify land uses including travel infrastructure to minimize resource damage while maintaining resource and resource use sustainability on public lands.

**SOIL-MA-06:**

While maintaining access, eliminate duplicative or redundant routes in areas of fragile soils, Mancos Shale areas, slump areas, and on slopes exceeding 40 percent (Public Land Health Standard 1).

**SOIL-AU-02:**

**STIPULATION** *GEOLOGY SOIL NSO CO:* No surface occupancy or use is allowed on lands with soils, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, with the following special characteristics: Baxter/Douglas Pass Slump Area and the Plateau Creek Slump Area. Standard exceptions apply; see Appendix B.

**SOIL-AU-03:**

**STIPULATION** *GEOLOGY SOIL CSU CO:* Surface occupancy or use may be restricted on lands within mapped soils with the following special characteristics: Fragile Soils and Mapped Mancos Shale and Saline Soils. Standard exceptions apply; see Appendix B.

**SOIL-AU-04:**

**STIPULATION** *GEOLOGY SLOPE NSO CO:* Prohibit surface occupancy and use (for fluid minerals only) on lands with steep slopes greater than 40 percent. Standard exceptions apply; see Appendix B.

**SOIL-MA-04:**

Restrict surface-disturbing actions when soil is saturated. On a case-by-case basis, allow construction actions to occur when soils are frozen and such actions will result in reduced environmental impacts. See **STIPULATION** *GEOLOGY SOIL NSO CO.* See Figure 2-13 in Appendix A.

BLM_0023967

*Approved Resource Management Plan – VEGETATION*

## VEGETATION

### Vegetation – *General (VEG)*

**VEG-GOAL-01**:
*Restore and maintain healthy, productive plant communities of native and other desirable species at self-sustaining population levels commensurate with the species' and habitats' potentials. Ensure plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes (based on Land Health Standard 3).*

**VEG-OBJ-01:**
*Manage for a healthy diversity of successional-stage plant communities.*

**VEG-MA-01:**
Restore natural disturbance regimes such as fire, and use vegetative treatments to accomplish biodiversity objectives in resilient plant communities. Avoid prescribed fire and fires managed for resource benefit in black brush and salt desert shrub communities.

**VEG-MA-02:**
Use new fire starts and prescribed fire where suitable to meet resource objectives as deemed appropriate by Land Health Assessments, Ecological Site Inventories, Emergency Stabilization & Rehabilitation monitoring, and prescribed fire monitoring.

**VEG-OBJ-02:**
*Provide the public with native plant materials through the sale of wilding permits (e.g., live plants and plant material products exceeding personal use amounts), commercial seed-collecting permits, and free use permits (consistent with 43 CFR 8365.1-5, IM No. 2013-176 Seed Collection Permitting and Pricing Policy within the Bureau of Land Management, and BLM Manual 5500 [Nonsale Disposals]), while protecting other resources.*

**VEG-MA-03:**
Make 830,500 acres available for wilding permits. Issue commercial seed permits on a case-by-case basis. Close the following areas to wilding permits:

- WSAs;
- ACECs;
- SRMAs:
  - o  Bangs and
  - o  North Fruita Desert;
- Lands managed for wilderness characteristics;
- Occupied threatened and endangered plant habitat; and

BLM_0023968

- Occupied special status plant species habitat.

*Note: Occupied threatened and endangered plant habitat, and special status plant species is not included in total acreage. Plants that are identified by a Tribe as important for traditional, religious or ceremonial purposes and are not widely available will not be offered as wilding plants for the general public.*

## Vegetation – *Desired Plant Communities (VEG-DPC)*

**VEG-DPC-GOAL-01**:
*Manage pinyon-juniper, upper and lower elevation sagebrush, salt desert shrub, forests and woodlands, and riparian areas (the dominant plant communities of the GJFO planning area) as desired plant communities or to emphasize native vegetation, wildlife habitat, watershed health, and biodiversity.*

**VEG-DPC-OBJ-01:**
*Manage vegetation to meet BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (Appendix E) while taking in to account site potential as determined by ecological site inventories, Range/Ecological Site Descriptions, Soils, completed Land Health Assessments, and site-specific management objectives.*

**VEG-DPC-MA-01:**
Use native plant material and restoration techniques to establish desired plant communities focusing on native communities and intact ecosystems. Allow non-native species on a case-by-case basis, only if:
- Suitable native species are not available;
- The natural biological diversity of the proposed management area will not be diminished;
- Exotic and naturalized species can be confined within the proposed management area;
- Analysis of ecological site inventory information indicates that a site will not support reestablishment of a species that historically was part of the natural environment; and,
- Resource management objectives cannot be met with native species.
- (see BLM's Integrated Vegetation Management Handbook, Chapter 8, H-1740-2)

**VEG-DPC-MA-02:**
Reduce redundancies in routes to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails on relic vegetation communities. Identify mitigation where open routes are negatively effecting significant plant communities or relic vegetation.

BLM_0023969

*Approved Resource Management Plan – VEGETATION*

**VEG-DPC-OBJ-02:**
*Manage vegetation to meet BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (Appendix E) while taking in to account site potential as determined by ecological site inventories, Range/Ecological Site Descriptions, Soils, completed Land Health Assessments, and site-specific management objectives.*

**VEG-DPC-MA-03:**
Defer or exclude livestock grazing, where necessary, for a minimum of two growing seasons (longer than 18 months) on disturbed areas (e.g., a fire event, reclamation of disturbed lands, seedings, surface-disturbing vegetation treatments) or until site-specific analysis and/or monitoring data indicates that vegetative cover, species composition, and litter accumulation are adequate to support and protect watershed values, meet vegetation objectives, and sustain grazing use.

**VEG-DPC-MA-04:**
Maintain or restore vegetative communities to provide soil stability and resistance to erosion. Use vegetative treatments to improve diversity, reduce noxious and invasive species, and restore native plant communities to support wildlife and livestock. Ensure that managed activities (grazing, recreation, energy development, etc.) are not leading to degraded conditions.

**VEG-DPC-MA-05:**
Reduce redundancies in routes to minimize fragmentation, and minimize direct impacts on sensitive vegetation species from motorized and mechanized users of roads, routes and trails. Identify mitigation where open routes are negatively affecting habitat.

**VEG-DPC-OBJ-03:**
*In lower-elevation vegetation, occupied by the potential natural community, manage for a late- or mid-seral stage as the desired plant community.*

**VEG-DPC-MA-06:**
Maintain present composition of late- to mid-seral plant communities providing suitable habitat for wildlife. Minimize activities that will result in a persistent early-seral stage in the lower elevations.

## *SALT DESERT SHRUB COMMUNITIES*

**VEG-DPC-GOAL-02**:
*Manage the salt desert shrub communities to maintain viable populations of kit fox (Vulpes macrotis), burrowing owl (Athene cunicularia), white-tailed prairie dog (Cynomys leucurus), and other obligate species. Preserve undisturbed patches of salt desert shrub communities with little to no cheatgrass (Bromus tectorum), halogeton*

BLM_0023970

*(Halogeton glomeratus), or other exotic species. Identify and initiate restoration and rehabilitation of unhealthy areas.*

**VEG-DPC-OBJ-04:**
*Manage the salt desert shrub community to improve vigor, composition, diversity, and cover of native understory species and biological soil crusts.*

**VEG-DPC-MA-07:**
Suppress all fires in Salt Desert Shrub communities to protect these communities that are not adapted to fire and to minimize potential cheatgrass invasion and conversion.

**VEG-DPC-MA-08:**
In the lower desert setting, manage grazing to allow the recovery of native perennials. Ensure utilization levels are sustainable, provide periods of rest as needed, and adjust season of use to ensure adequate soil moisture levels post grazing (for plant growth).

**VEG-DPC-MA-09:**
In greasewood *(Sarcobatus vermiculatus)* communities where head-cutting is just beginning, consider management actions to arrest continued erosion (e.g., armoring, wattles). Stop erosion with armoring and wattles before extensive head-cutting occurs.

**VEG-DPC-MA-10:**
As advances in cheatgrass-control methods are made, prioritize vegetation treatments to treat cheatgrass and to restore native perennials in the North Desert, Grand Mesa Slopes, and other degraded areas in the lower desert (excluding OHV open areas).

**VEG-DPC-MA-11:**
To reduce the spread of cheatgrass and noxious weeds, reduce duplicative and redundant routes in areas with susceptibility to cheatgrass or invasive and noxious weed infestations.

### Lower-elevation Sagebrush (< 7,500 feet) Desired Plant Community

**VEG-DPC-GOAL-03:**
*Manage the sagebrush (Artemisia spp.) biome to maintain viable populations of sagebrush-obligate species. Identify and initiate restoration and rehabilitation of sagebrush habitat, while maintaining a mosaic of canopy cover and successional stages. Maintain or improve Sage-Grouse winter habitat.*

**VEG-DPC-OBJ-05:**

BLM_0023971

*Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities. Restore the species composition and diversity of seral stages of sagebrush communities.*

### VEG-DPC-MA-12:

Implement treatments designed to replenish the native seed bank and control noxious and invasive species.

### VEG-DPC-OBJ-06:

*Sustain, restore, and rehabilitate the integrity of the sagebrush biome to provide the amount, continuity, and quality of habitat that is necessary to maintain sustainable populations of sagebrush-obligate species.*

### VEG-DPC-MA-13:

Inventory lower-elevation sagebrush to identify non-functioning habitat and develop restoration plans within priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.

Prioritize management of lower-elevation sagebrush in the following order:

1. Greater Sage-Grouse *(Centrocercus urophasianus)* and Gunnison Sage-Grouse *(Centrocercus minimus)* important winter habitat.
2. Critical and severe big-game winter range.
3. Areas not meeting land health.

### VEG-DPC-MA-14:

Avoid natural and prescribed fire in low-elevation sagebrush communities infested with or susceptible to cheatgrass. Ground disturbing mechanical treatments completed in low-elevation sagebrush may require seeding.

### VEG-DPC-MA-15:

Inventory low-elevation sagebrush to identify non-functioning habitat. Develop restoration plans that prioritize efforts to achieve specific species and habitat goals. Habitat goals include but are not limited to increased patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.

### VEG-DPC-MA-16:

Prioritize the following Greater Sage-Grouse and Gunnison Sage-Grouse winter areas for treatment and restoration:

- Winter habitat areas in need of enhancement;
- Areas that pose a fire risk to key winter habitats; and
- Areas to meet habitat condition objectives (e.g., Sunny Side and Wagon Track Ridge).

BLM_0023972

## Upper-elevation Sagebrush (≥7,500 feet) Desired Plant Community

**VEG-DPC-GOAL-04:**
*Manage the sagebrush biome to maintain viable populations of Greater and Gunnison Sage-Grouse and other sagebrush-obligate species. Identify and initiate restoration and rehabilitation of sagebrush habitat while maintaining a mosaic of canopy cover and successional stages.*

**VEG-DPC-OBJ-07:**
*Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities. Restore the species composition and diversity of successional stages of sagebrush communities.*

**VEG-DPC-MA-17:**
Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought.

**VEG-DPC-OBJ-08:**
*Prioritize the following areas for Land Health Assessments, vegetation restoration efforts, and protection of existing intact environments: 1-4. Restoration plans will emphasize increasing patch size and connectivity through vegetation treatments. Disturbances should also be consolidated through BMPs to reduce disturbance and maintain sagebrush-obligate species.*

**VEG-DPC-MA-18:**
Inventory upper-elevation sagebrush to identify non-functioning habitat and develop restoration plans within priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.
Prioritize management of upper-elevation sagebrush in the following order:
1. Greater and Gunnison Sage-Grouse important habitat, including but not limited to designated critical habitat, Brush Mountain, and 4A Mountain.
2. Critical and severe big-game winter range.
3. Areas not meeting land health.
4. Areas that pose a fire risk to key habitats.

**VEG-DPC-MA-19:**
Reduce the encroachment of juniper (*Juniperus* spp.) and other woody tree species in sagebrush habitat. Sites should have evidence of past sagebrush plant communities as evidenced by residual native plants or soils that support a rangeland not a woodland ecological site.

**VEG-DPC-MA-20:**

BLM_0023973

Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation.

**VEG-DPC-MA-21:**
Remove sagebrush to create small openings in continuous or dense sagebrush to create a mosaic of multiple age classes and associated understory diversity across the landscape to benefit many sagebrush-dependent species. Factors that help determine the mosaic are soil types, topography, aspect, climate and local weather patterns, and current and potential plant communities.

## *Mountain Shrub*

**VEG-DPC-GOAL-05:**
*Manage mountain shrub communities to maintain vigorous stands of deciduous shrubs.*

**VEG-DPC-OBJ-09:**
*Emphasize perpetuating late- to mid-seral plant communities that provide suitable habitat for wildlife.*

**VEG-DPC-MA-22:**
Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought.

**VEG-DPC-MA-23:**
Use prescribed fire, natural ignitions, and mechanical treatments to create openings within dense stands.

## Vegetation – *Forest/Woodlands (VEG-FOR)*

**VEG-FOR-GOAL-01:**
*Maintain and restore pinyon-juniper woodlands to meet requirements for land health and to supply wildlife habitat, livestock forage, and consumer products (e.g., posts, poles, firewood, biomass).*

**VEG-FOR-OBJ-01:**
*Manage for pinyon (Pinus edulis) and juniper with a balance of seral stages.*

**VEG-FOR-MA-01:**
Maintain current acreage of old growth pinyon and juniper except in area of high wildfire hazard in the wildland urban interface.

BLM_0023974

**VEG-FOR-MA-02:**
Manage past and future treatment areas in pinyon and juniper with an emphasis on creating a mosaic of pinyon and juniper age classes and forage producing sites. Allow additional forage/habitat producing treatments on pinyon and juniper woodland sites.

---

**VEG-FOR-AU-01:**
**STIPULATION** *PLANT COMMUNITY CSU CO:* Surface occupancy or use may be restricted within occupied habitat that meets BLM's criteria, as established in the Resource Management Plan, for significant and/or relict plant communities. Standard exceptions apply; see Appendix B. See Figure 2-14.

---

**VEG-FOR-GOAL-02:**
*Maintain forests and woodlands for a healthy mix of successional stages within the natural range of variation that incorporates diverse structure and composition.*

---

**VEG-FOR-OBJ-02:**
*Manage ponderosa pine (Pinus ponderosa), Douglas-fir (Pseudotsuga menziesii), aspen (Populus tremuloides), and spruce/fir to mimic natural stand conditions and natural regeneration.*

---

**VEG-FOR -MA-03:**
Use prescribed fire and mechanical, chemical, and biological treatments as necessary to reduce the risk of disease vectors and to increase the resilience to beetles and disease.

---

**VEG-FOR -MA-04:**
Use silvicultural methods, including mechanized and non-mechanized thinning, prescribed burns, and commercial harvesters to maintain and develop natural patch sizes, shapes, connectivity, and species composition and age-class diversity.

---

**VEG-FOR -MA-05:**
Conserve mature riparian forests (e.g., cottonwood *[Populus deltoides wislizeni]* galleries) in suitable habitat to maintain their integrity for use as bald eagle *(Haliaeetus leucocephalus)* nesting, roosting, or perching substrate.

## Vegetation – *Riparian Vegetation (VEG-RPN)*

**VEG-RPN-GOAL-01:**
*Manage riparian habitat in compliance with the Land Health Standard 2: Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment and provides forage habitat and biodiversity; water quality is improved or maintained; and stable soils store and release water.*

## VEG-RPN-OBJ-01:
*Protect and restore riparian areas/wetlands through sound management practices.*

### VEG-RPN-MA-01:
Mitigate to reduce impacts to riparian areas:

- Monitor cattle and wildlife grazing impacts in riparian zones and adjust grazing allocations, season of use, and rest rotations as necessary to ensure PFC is achieved and maintained;

- Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas;

- Monitor recreational use on riparian areas. Where adverse impacts are determined to not meet land health standards for riparian habitats, modify recreation management to improve camping opportunities outside of riparian areas; require the use of designated camping sites; install fencing, energy dissipation structures, and bank protection features as appropriate.

### VEG-RPN-MA-02:
Mitigate to reduce impacts to riparian areas:

- Where necessary, control recreational use by changing location or kind of activity, season, intensity, distribution and/or duration;

- Prohibit firewood harvest, except where appropriate to allow for removal of undesirable invasive species; and

- Close the river corridors of the three major rivers (Colorado, Dolores, and Gunnison) to mineral material disposal and non-energy solid mineral leasing and development.

### VEG-RPN-AU-01:
**STIPULATION** NSO-2: *Streams/Springs Possessing Lotic Riparian Characteristics.* Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and surface-disturbing activities within the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

### VEG-RPN-AU-02:
**STIPULATION** NSO-4: *Lentic Riparian Areas (including springs, seeps, and fens).* Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

BLM_0023976

*Approved Resource Management Plan – VEGETATION*

**VEG-RPN-AU-03:**
Identify areas with lentic and lotic riparian characteristics as ROW avoidance areas.

**VEG-RPN-MA-03:**
Give priority for riparian management to areas identified as special status species habitat and those riparian areas not meeting Proper Functioning Condition (e.g., Roan, Carr, Hawxhurst, Coon Creek, and Plateau Creeks; the Gunnison, Colorado, and Dolores Rivers; and Unaweep Seep).

**VEG-RPN-MA-04:**
In priority management areas and in areas not meeting Proper Functioning Condition, use the Multiple Indicator Method for monitoring to the extent feasible. Tailor the monitoring method to the objectives determined for each stream.

**VEG-RPN-MA-05:**
Consider the following management actions for improvement or protection of riparian values: riparian grazing pastures, exclosures, land acquisition, adjustments to grazing management, stream structures, and plantings.

**VEG-RPN-MA-06:**
Where conditions are appropriate, allow removal of tamarisk *(Tamarix* spp*.)*, non-native elms *(Ulmus* spp*.)*, and Russian olive *(Elaeagnus angustifolia)* material for biomass or personal use.

**VEG-RPN-MA-07:**
Reduce duplicative and redundant routes in riparian areas, especially those identified as not functioning or functioning at risk. Identify mitigation where open routes are contributing to problems with riparian function.

**VEG-RPN-MA-08:**
Reduce duplicative and redundant routes in riparian areas or that run parallel to riparian areas, especially in areas identified as not functioning or functioning at risk. Identify mitigation where open routes are contributing to problems with riparian function.

## Vegetation – *Adaptive Drought Management (VEG-ADM)*

**VEG-ADM-GOAL-01:**
*Develop management prescriptions for all surface-disturbing resource uses during times of extended drought.*

**VEG-ADM-OBJ-01:**
*Establish criteria for restricting activities during drought.*

**VEG-ADM-MA-01:**

BLM_0023977

Implement the following measures/parameters for restricting activities during drought (Refer to Table 2-3, Drought Severity Classification):

*Severe (D2):*

- Send drought letters to grazing permittees and other permitted land users requesting coordination with BLM.
- Coordinate with CPW for big game herd management.
- Prepare local seasonal precipitation graphs.
- Suspend or limit seed-collecting activities.

*Extreme (D3):*

- Prohibit new surface-disturbing activities in areas with sensitive soils, subject to valid existing rights or actions associated with other valid permitted activities.
- Base changes in livestock use on site-specific data on those allotments that are affected by drought.
- Temporarily close OHV open areas and designated routes as needed during periods of drought and wind events to reduce particulate matter.
- Require additional erosion-control techniques/BMPs for surface-disturbing activities (e.g., hydromulching).
- Limit prescribed burns and vegetation treatments (exceptions: pile burning and hand thinning).

*Exceptional (D4):*

- Base changes in livestock use on site-specific data on those allotments that are affected by drought.
- Prohibit new surface-disturbing activities, subject to valid existing rights or actions associated with other valid permitted activities.
- Consider closing areas to public entry.

## Vegetation – *Weeds (VEG-WDS)*

**VEG-WDS-GOAL-01:**
*Reduce the occurrence of noxious and invasive species through the use of an Integrated Pest Management Program across the planning area.*

**VEG-WDS-OBJ-01:**
*Apply integrated control methods (physical, cultural, biological, chemical, fire) to noxious and invasive pest populations.*

**VEG-WDS-MA-01:**
Prioritize treatment areas for priority noxious and invasive species based on the following criteria:

BLM_0023978

- Current state, county, and BLM priority weed lists;
- Appropriate time of year for the most effective treatment; and
- River restoration projects.

**VEG-WDS-MA-02:**
Continue early detection of new infestations, and a rapid treatment response (National Early Detection and Rapid Response Strategy).

**VEG-WDS-OBJ-02:**
*Require weed prevention on appropriate actions authorized within the planning area.*

**VEG-WDS-MA-03:**
Implement preventative measures for activities associated with oil and gas operations; ROWs; range developments; special recreation permits (SRP); and construction and mechanical vegetation treatment activities as authorized in contracts and permits.

BLM_0023979

# SPECIAL STATUS SPECIES

**SSS-GOAL-1:**
*Manage special status species habitats to provide for their conservation and restoration as part of an ecologically healthy system.*

**SSS-OBJ-01:**
*Maintain or improve the quality of listed (i.e., threatened or endangered) and sensitive species habitat by managing public land activities to support species recovery and the benefit of those species.*

**SSS-AU-01:**
**STIPULATION** CSU-9: *BLM Sensitive Plant Species Occupied Habitat.* For plant species listed as sensitive by BLM, special design, construction, and implementation measures within a 100-meter (328 feet) buffer from the edge of occupied habitat may be required. In addition, relocation of operations by more than 200 meters (656 feet) may be required. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

**SSS-AU-02:**
**STIPULATION** CSU-10: *Wildlife Habitat.* Require proponents of surface-disturbing activities to implement specific measures to mitigate impacts of operations on wildlife and wildlife habitat within high-value or essential wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs (Appendix H). (Refer to Appendix B.) See Figures 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

**SSS-AU-03:**
**LEASE NOTICE** LN-3: *Biological Inventories.* The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, Sage-Grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy on that area is prohibited. (Refer to Appendix B.)

## Special Status Species - *Fish*

**SSS-FSH-OBJ-01:**

*Maintain or improve the quality of listed (threatened or endangered) fish and sensitive fish habitat by managing public land activities to support species recovery and the benefit of those species.*

**SSS-FSH-MA-01:**
Identify limiting habitat factors based on site characteristics and habitat capabilities using channel type and geology classifications (e.g., Rosgen). Upon identification of limiting factors, prioritize and implement proven river, stream, lake, and riparian practices (e.g., in-channel habitat structures to create pools, riparian plantings) or by changing management of other program activities (e.g., changing livestock grazing season use) to achieve desired future condition.

**SSS-FSH-MA-02:**
Designate the following ACECs to protect habitat for unique, sensitive, and listed fish (see ACECs section for management prescriptions):

- Dolores River Riparian ACEC: flannelmouth *(Catostomus latipinnis)* and bluehead sucker *(Catostomus discobolus)*; and
- Roan and Carr Creeks: cutthroat trout *(Oncorhynchus clarkii)*.

**SSS-FSH-MA-03:**
While maintaining desired levels of access, identify and reroute or close and rehabilitate redundant, duplicative, or poorly constructed routes to reduce point sources of erosion and resulting sedimentation and turbidity impacts within watersheds containing known pure populations of cutthroat trout. Focus on routes within closest proximity to occupied streams.

**SSS-FSH-AU-01:**
**STIPULATION** TL-1: *Salmonid and Native, Non-Salmonid Fishes.* Prohibit in-channel stream work in all occupied streams during fish spawning, egg incubation, and fry emerging seasons. Fish spawning, egg incubation, and fry emerging seasons vary by elevation and temperatures; however the following intervals generally apply in Colorado:

- Cutthroat trout (various subspecies): May 1-September 1
- Rainbow trout: March 1-June 15
- Brown trout: October 1-May 1
- Brook trout: August 15-May 1
- Sculpin: May 1-July 31
- Bluehead sucker: May 1-July 15
- Flannelmouth sucker: April 1-July 1
- Roundtail chub: May 15-July 15
- Speckled dace: May 1-August 31
- Mountain whitefish: October 1-November 30

BLM_0023981

*Approved Resource Management Plan – SPECIAL STATUS SPECIES*

Exception Criteria: This stipulation only applies to construction and drilling and does not apply to operations and maintenance. If competing species are involved, the BLM may select to implement species-specific dates for native fish versus nonnative species.

Specific exceptions apply; see Appendix B. See Figures 2-15 in Appendix A.

### SSS-FSH-AU-02:

**STIPULATION** *HYDROLOGY RIVER NSO CO:* No surface occupancy or use is allowed within 400 meters (1312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers: Colorado, Dolores, and Gunnison. See Figure 2-13. Standard exceptions apply; see Appendix B.

### SSS-FSH-AU-03:

**STIPULATION** NSO-2: *Streams/Springs Possessing Lotic Riparian Characteristics.* Prohibit surface occupancy and surface disturbing activities with a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and surface disturbing activities within the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

### SSS-FSH-AU-04:

Manage the Roan and Carr Creeks ACEC as a ROW avoidance area to protect special status fish species' habitat.

## Special Status Species – *Plants and Terrestrial Wildlife*

### SSS-PTW-GOAL-01:

*Manage special status species habitats to provide for their conservation and restoration as part of an ecologically healthy system.*

### SSS-PTW-OBJ-01:

*To conserve plants and animals (and their habitats) listed by federal and Colorado governments as threatened, endangered, sensitive or species of concern, and to conserve plants and animals that are candidates for these lists with the overall objective of improving their populations so that they can be removed from these lists.*

### SSS-PTW-MA-01:

Manage threatened and endangered species' habitat as ROW avoidance areas. Relocate ROWs if a determination is made that the relocation action will benefit and promote recovery and will not further impact a threatened and endangered species.

BLM_0023982

**SSS-PTW-MA-02:**
Avoid authorizing 2920 permits (such as site facilities and commercial filming) within known threatened and endangered species' habitat. Allow permits only when there are shown to be no effects on threatened and endangered species habitat.

**SSS-PTW-AU-01:**
Manage the following ACECs as ROW exclusion areas to protect threatened and endangered species' habitat:

- Atwell Gulch (except for ROWs to existing oil and gas leases issues under the 1987 RMP without NSO lease stipulations);
- Pyramid Rock; and
- South Shale Ridge (except for ROWs to existing oil and gas leases issues under the 1987 RMP without NSO lease stipulations).

**SSS-PTW-AU-02:**
Manage the following ACECs as ROW exclusion areas to protect special status species' habitat:

- A portion (1,800 acres) of Badger Wash;
- Juanita Arch;
- Rough Canyon; and
- Unaweep Seep.

**SSS-PTW-MA-03:**
Protect and maintain unique ecological values for the following habitat locations to improve the habitat for unique, sensitive, threatened, and endangered plants and animals (See ACECs section for specific management of ACECs).

- Atwell Gulch ACEC: Colorado hookless cactus, DeBeque milkvetch, and Naturita milkvetch *(Astragalus naturitensis)*;
- Badger Wash ACEC: grand buckwheat, Ferron's milkvetch, cliffdweller's cryptantha, and Gardner's saltbrush/salina wildrye;
- Dolores River Riparian ACEC: peregrine falcon *(Falco peregrinus),* bald eagle, Kachina daisy *(Erigeron kachinensis),* Eastwood's monkeyflower, *(Mimulus eastwoodiae)*, San Rafael milkvetch, Dolores River skeleton plant, horseshoe milkvetch, Grand Junction milkvetch, and Gypsum catseye *(Oreocarya revealii);*
- Juanita Arch ACEC: Grand Junction milkvetch;
- The Palisade ACEC: peregrine falcon, bald eagle, Dolores River skeleton plant, San Rafael milkvetch, horseshoe milkvetch, Fisher Tower's milkvetch, tufted green gentian, and Osterhout's catseye;
- Pyramid Rock ACEC: Colorado hookless cactus, DeBeque phacelia, DeBeque milkvetch, Naturita milkvetch, adobe thistle, and aromatic Indian breadroot;

- Rough Canyon ACEC: canyon treefrog, Gunnison Sage-Grouse, Grand Junction milkvetch, and Eastwood's desert parsley;
- Sinbad Valley ACEC: Gypsum catseye;
- South Shale Ridge ACEC: Colorado hookless cactus, DeBeque phacelia, Naturita milkvetch, and adobe thistle; and
- Unaweep Seep ACEC: Great Basin silverspot butterfly and giant helleborine.

**SSS-PTW-MA-04:**
Pursue land tenure adjustments to facilitate the conservation or recovery of special status species. Avoid the disposal of occupied special status species' habitat.

**SSS-PTW-AU-03:**
**LEASE NOTICE** LN-4 *Threatened and Endangered Species*. This lease contains habitat for threatened and endangered species. Prior to undertaking any activity on the lease, including surveying and staking of well locations, the lessee may be required to perform botanical inventories on the lease. Special design and construction measures may also be required in order to minimize impacts on threatened and endangered species habitat from drilling and producing operations. (Refer to Appendix B.)

## Special Status Species – *Plants*

**SSS-PLT-OBJ-01:**
*Promote maintenance and recovery of federally listed, proposed, and candidate plant species by protecting occupied habitat. Protect occupied habitat for all BLM sensitive plant species and significant plant communities as defined and tracked by CNHP.*

**SSS-PNT-MA-01:**
Identify the following areas as core conservation populations for special status plant species:

- Atwell Gulch;
- Logan Wash Mine;
- Pyramid Rock ACEC;
- South Shale Ridge;
- Sunnyside; and
- Reeder Mesa.

Manage identified habitat to maintain the population. Management tools include but are not limited to weed treatments, inter-seeding, route closures, fencing, and managing timing and intensity of grazing.

BLM_0023984

Identify additional areas as populations are identified and species of concern are modified.

Limit new road construction in Reeder Mesa, Sunnyside, Logan Wash Mine, and South Shale Ridge, and designate new roads associated with authorized uses as administrative (e.g., oil and gas and ROWs). Rehab and close roads associated with authorized uses when no longer needed.

**SSS-PLT-MA-02:**
Monitor special status plant populations to determine trends, impacts, and guide future management, with an emphasis on areas near surface-disturbing activities. Utilize monitoring data to determine and modify NSO stipulations applicable to current and historically occupied habitat of threatened, endangered, proposed, and candidate plants.

**SSS-PLT-MA-03:**
Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts to listed plant species habitat, and occupied habitat from motorized and mechanized users of roads, routes and trails. Identify mitigation where open routes are negatively effecting designated critical habitat.

**SSS-PLT-MA-04:**
Reduce as much as practicable route density (miles/square mile) within 200 meters of known Threatened and Endangered plant occurrences throughout the field office. If occurrences are identified in the future that conflict with route designations, implement reroutes.

**SSS-PLT-AU-01:**
**STIPULATION** NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities in the following ACECs to protect threatened, proposed, candidate, and sensitive plants. (Refer to Appendix B.)

See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.
Alternative B:

- Atwell Gulch (threatened and sensitive plants);
- Badger Wash (sensitive plants);
- Pyramid Rock (threatened and sensitive plants);
- South Shale Ridge (threatened and sensitive plants); and
- Unaweep Seep (sensitive plants).

Alternative C:

- Atwell Gulch (threatened and sensitive plants);
- Badger Wash (sensitive plants);
- Plateau Creek (fish);

- Pyramid Rock (threatened and sensitive plants);
- South Shale Ridge (threatened and sensitive plants); and
- Unaweep Seep (sensitive plants).

Alternative D:
- Badger Wash (sensitive plants);
- Pyramid Rock (threatened and sensitive plants); and
- Unaweep Seep (sensitive plants).

**SSS-PLT-AU-02:**
**STIPULATION** NSO-13: *Current and Historically Occupied and Critical Habitat of Threatened, Endangered, Proposed, and Candidate Plant and Animal Species.* Prohibit certain surface uses, as specified in Appendix B, to protect threatened, endangered, proposed, and candidate plants and animals from indirect impacts, loss of immediately adjacent suitable habitat, or impacts to primary constituent elements of critical habitat as designated by USFWS. Maintain existing buffer distances where pre-existing disturbance exists, and reduce redundancies in roads to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails. In undisturbed environments and ACECs, prohibit new disturbance within 200 meters (656 feet) of current and historically occupied and suitable habitat. This stipulation includes emergency closures of roads where damage to T&E habitat has occurred. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-PLT-AU-03:**
**STIPULATION** *PLANT COMMUNITY CSU CO:* Surface occupancy or use may be restricted within occupied habitat that meets BLM's criteria, as established in the Resource Management Plan, for significant and/or relict plant communities. Standard exceptions apply; see Appendix B. See Figure 2-14.

## Special Status Species – *Migratory Birds*

**SSS-MIG-OBJ-01:**
*Protect breeding habitats of migratory birds with emphasis on avoiding impacts to nesting birds to comply with the Migratory Bird Treaty Act.*

**SSS-MIG-MA-01:**
Use adaptive management strategies to conserve and avoid impacts to populations of Birds of Conservation Concern, Partners In Flight priority species, and other species of concern.

**SSS-MIG-AU-01:**

BLM_0023986

**STIPULATION** TL-3: *Migratory Bird Habitat*. Prohibit surface occupancy and surface-disturbing activities, including vegetation-removal projects, in migratory bird habitat during nesting season (May 15 to July 15 or as site-specific analysis dictates) when nesting birds are present. (Refer to Appendix B.) See Figure 2-15 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Special Status Species - *Yellow-billed Cuckoo*

### SSS-YBC-OBJ-01:
*Maintain and improve BLM lands for yellow-billed cuckoo habitat as outlined in the species recovery plan (expected to be published by the USFWS in 2015).*

#### SSS-YBC-MA-01:
Where large stands of cottonwoods occur, manage for restoration or improvement of cuckoo habitat and increase canopy cover and mid-story tree and shrub cover. According to the species recovery plan (not yet released).

#### SSS-YBC-AU-01:
**STIPULATION** *HYDROLOGY RIVER NSO CO:* No surface occupancy or use is allowed within 400 meters (1,312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers: Colorado, Dolores, and Gunnison. See Figure 2-43. Standard exceptions apply; see Appendix B.
 According to the species recovery plan (not yet release).

#### SSS-YBC-AU-02:
**STIPULATION** NSO-2: *Streams/Springs Possessing Lotic Riparian Characteristics*. Prohibit surface occupancy and surface disturbing activities with a minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and surface disturbing activities within the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Special Status Species – *Raptors*

### SSS-RPT-OBJ-01:
*Maintain and improve BLM lands for raptor nesting and fledging habitat.*

#### SSS-RPT-MA-01:
Provide healthy and productive habitat for a variety of raptor species by protecting nest sites, and maintaining important raptor nesting habitat including old-growth pinyon-juniper woodlands.

**SSS-RPT-AU-01:**

**STIPULATION** *WILDLIFE RAPTOR NESTS TL CO:* No surface use is allowed within a 402 meter (.25 mile) radius of active raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:

- Osprey nests: April 1 to August 31.
- Red-tailed hawk nests, including any alternate nests: February 15 to July 15.
- Swainson's hawk nests and associated alternate nests: April 1 to July 15.
- Burrows or burrowing owl nest sites: March 1 to August 15.
- Great horned owl nests: February 1 to August 15.
- Other owls and raptors: March 1 to August 15.
- Cooper's hawk, sharp shinned hawk, and northern harrier nests: April 1 to August 15.

Standard and special exceptions apply; see Appendix B.

**SSS-RPT-AU-02:**

**STIPULATION** *WILDLIFE SENSITIVE RAPTOR NESTS TL CO:* No surface use is allowed within an 805 meter (0.5 mile) radius of active or inactive raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:

- Ferruginous hawk nests, including any alternate nests: February 1 to July 15.
- Goshawk nest sites: March 1 to September 30.
- Peregrine and prairie falcon nest cliff(s): March 15 to July 31.

Standard and special exceptions apply; see Appendix B.

*The following stipulations are taken from the most recent CPW raptor recommendations; stipulations should be updated as species knowledge and raptor recommendations are updated.*

**SSS-RPT-AU-03:**

**STIPULATION** CSU-13: *Osprey Nest Sites.* Apply CSU (site-specific relocation) restrictions within 0.25-mile of active osprey *(Pandion haliaetus)* nest sites. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-RPT-AU-04:**

BLM_0023988

**STIPULATION** CSU-14: *Ferruginous Hawk Nest Sites.* Apply CSU (site-specific relocation) restrictions within 0.5-mile of active ferruginous hawk *(Buteo regalis)* nest sites and associated alternate nests. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-RPT-AU-05:**
**STIPULATION** CSU-15: *Red-tailed Hawk Nest Sites.* Apply CSU (site-specific relocation) restrictions within 0.33-mile of active red-tailed hawk *(Buteo jamaicensis)* nest sites and associated alternate nests. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-RPT-AU-06:**
**STIPULATION** CSU-16: *Swainson's Hawk Nest Sites.* Apply CSU (site-specific relocation) restrictions within 0.25-mile of active Swainson's hawk *(Buteo swainsoni)* nest sites and associated alternate nests. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-RPT-MA-02:**
Due to propensity of peregrine falcons to relocate nest sites, sometimes up to 0.5-mile along cliff faces, it is more appropriate to designate a cliff nesting complex that encompass the cliff system and a 0.5-mile buffer around the cliff nesting complex. Nesting areas have not been designated at this time but may be in the future where high densities of nesting peregrines occur.

**SSS-RPT-AU-07:**
**STIPULATION** CSU-17: *Peregrine Falcon Nest Sites.* Apply CSU (site-specific relocation) restrictions within 0.5-mile of active peregrine falcon nest sites. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-RPT-AU-08:**
**STIPULATION** CSU-18: *Prairie Falcon Nest Sites.* Apply CSU (site-specific relocation) restrictions within 0.5-mile of active prairie falcon nest sites. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-RPT-AU-09:**
**STIPULATION** CSU-19: *Other Raptor Species (accipiters, falcons [except kestrel], buteos, and owls).* Apply CSU (site-specific relocation) restrictions within 0.125-mile of an active nest site of all accipiters, falcons (except kestrel), buteos, and owls not listed in other CSU stipulations. Raptors that are listed and protected by the Endangered Species Act of 1973 (ESA) and the Bald and Golden Eagle Protection Act are addressed separately. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

BLM_0023989

## Special Status Species – *Bald and Golden Eagles*

### SSS-EGL-OBJ-01:
*Maintain and improve BLM lands for eagle nesting, fledging, foraging and roosting habitat. Protect the bald and golden eagle concentration, nesting, and nest buffer areas by prohibiting activities during certain times of the year consistent with CPW's most recent raptor recommendations.*

#### SSS-EGL-AU-01:
**STIPULATION** NSO-23: *Golden Eagle Nest Sites.* Prohibit surface occupancy and surface-disturbing activities (beyond that which historically occurred in the area prior to nest establishment) within 0.25-mile of active golden eagle nest sites and associated alternate nests. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

#### SSS-EGL-AU-02:
**STIPULATION** TL-13: *Golden Eagle Nest Sites.* Prohibit human encroachment within 0.5-mile of active golden eagle nests and associated alternate nests from December 15 to July 15. (Refer to Appendix B.) See Figure 2-15 (Alternative B) in Appendix A. Standard and special exceptions apply; see Appendix B.

#### SSS-EGL-AU-03:
**STIPULATION** NSO-24: *Bald Eagle Nest Sites.* Prohibit surface occupancy and surface-disturbing activities (beyond that which historically occurred in the area prior to nest establishment) within 0.25-mile of active bald eagle nests. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

#### SSS-EGL-AU-04:
**STIPULATION** TL-14: *Bald Eagle Nest Sites.* Prohibit human encroachment within 0.5-mile of active bald eagle nests from November 15 to July 31. (Refer to Appendix B.) See Figures 2-15 in Appendix A. Standard and special exceptions apply; see Appendix B.

#### SSS-EGL-AU-05:
**STIPULATION** TL-15: *Bald Eagle Winter Roost.* Prohibit activity within 0.25-mile of bald eagle winter roosts from November 15 to March 15. Additional restrictions may be necessary within 0.5-mile of active bald eagle winter roosts if there is a direct line of sight from the roost to the activities. (Refer to Appendix B.) See Figures 2-15 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Special Status Species – *Waterfowl and Shorebirds*

**SSS-WSB-OBJ-01:**
*Provide healthy and productive habitat for waterfowl and shorebirds.*

**SSS-WSB-MA-01:**
Protect migratory pathways of waterfowl and shorebirds (see major river corridor stipulation).

**SSS-WSB-MA-02:**
Protect known breeding sites of upland nesting shorebirds, such as the long billed curlew.

## Special Status Species – *Gunnison and Greater Sage-Grouse*

**SSS-SGR-OBJ-01:**
*Advance the conservation of Gunnison and Greater Sage-Grouse and their habitat in accordance with current national, state, and local working group recommendations and policy as well as the most current scientific literature and research.*

**SSS-SGR-MA-01:**
Consistent with current guidance for sagebrush-dependent species, improve areas of poor quality nesting habitat by implementing the following actions, including but not limited to:
- In areas where species diversity is low seed area with grasses and forbs, with an emphasis on forbs if brood-rearing occurs in the area, accompanied by light disking and interseeding, or drill seeding.
- Where sage is decadent and does not meet habitat objectives, conduct thinning by roller-chopping, light disking, Dixie Harrow, Lawson Aerator or other methods.
- Conduct vegetation treatments to retain residual cover through fall and winter into nesting season.

**SSS-SGR-MA-02:**
When reseeding roads, primitive roads and trails, use appropriate seed mixes (appropriate for Sage-Grouse ecological conditions) and consider the use of transplanted sagebrush.

**SSS-SGR-MA-03:**
Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sage brush parks.

**SSS-SGR-MA-04:**
Improve brood-rearing habitats by implementing the following action:

BLM_0023991

*Approved Resource Management Plan – SPECIAL STATUS SPECIES*

- Restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting mosquito breeding habitat at elevations below 8,000 feet.

**SSS-SGR-MA-05:**
Improve lek areas by mechanically treating historic lek areas where sagebrush density has increased.

**SSS-SGR-MA-06:**
To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and/or within 4 miles of a lek.

**SSS-SGR-MA-07:**
Remove/modify raptor perches, in Gunnison and Greater Sage-Grouse habitat (trees, fences, dry-hole markers, and power poles).

**SSS-SGR-MA-08:**
Monitor measureable objectives and evaluate grazing management to assure that management actions are achieving Sage-Grouse habitat objectives.

**SSS-SGR-MA-09:**
Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to Sage-Grouse objectives. Structural range improvements, in this context, include but are not limited to: cattleguards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments.

**SSS-SGR-MA-10:**
To reduce Sage-Grouse strikes and mortality, remove, modify, or mark fences in high risk areas. When fences are necessary, require a Sage-Grouse-safe design.

**SSS-SGR-MA-11:**
Locate supplements (salt or protein blocks) in a manner designed to conserve, enhance, or restore Sage-Grouse habitat.

**SSS-SGR-MA-12:**
Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat.

**SSS-SGR-MA-13:**
Apply TL-16 (Occupied Sage-Grouse Winter Habitat) or TL-17 (Sage-Grouse Leks) to vegetation management treatments according to the type of seasonal habitats present in a priority area.

BLM_0023992

**SSS-SGR-MA-14:**
Monitor after vegetation treatments for success in meeting objectives and monitor and control invasive vegetation after vegetation treatments in Sage-Grouse habitat.

**SSS-SGR-MA-15:**
Apply post-vegetation treatment management and monitoring to ensure long term persistence of seeded native plants. Outline temporary or long-term changes in livestock grazing, wild horse and burro, and travel management, etc., to achieve and maintain vegetation management objectives to benefit Sage-Grouse and their habitats.

**SSS-SGR-MA-16:**
Design vegetation treatments in Sage-Grouse habitats to strategically reduce wildfire threats in the greatest area. This may involve spatially arranging new vegetation treatments with past treatments, vegetation with fire-resistant seral stages, natural barriers, and roads in order to constrain fire spread and growth. This may require vegetation treatments to be implemented in a more linear versus block design.

**SSS-SGR-MA-17:**
Include Sage-Grouse habitat parameters such as those defined by Connelly et al. (2000), Hagen et al. (2007) or if available, state and federal Sage-Grouse conservation and recovery plans and appropriate local information in habitat restoration objectives. Make maintaining these objectives within priority Sage-Grouse habitat areas a high restoration priority.

**SSS-SGR-MA-18:**
Choose native plant seeds for vegetation treatments based on availability, adaptation (site potential), probability for success, and the vegetation management objectives for the area covered by the treatment. Where probability of success or native seed availability is low, use species that meet soil stability and hydrologic function objectives as well as vegetation and Sage-Grouse habitat objectives.

**SSS-SGR-MA-19:**
Manage the following areas to benefit Sage-Grouse habitat:

- Wildlife Emphasis Areas:
  - Glade Park
  - Sunnyside and
  - Timber Ridge.
- ACECs:
  - Roan and Carr Creek

**SSS-SGR-AU-01:**
Identify the following as ROW exclusion areas:

*Approved Resource Management Plan – SPECIAL STATUS SPECIES*

- Within a 0.6-mile radius of Sage-Grouse leks.

**SSS-SGR-AU-02:**
Allowable use (SSS-SG-AU2):
Identify the following as ROW avoidance areas:

- Sage-Grouse occupied habitat and
- Within a 4-mile radius of Sage-Grouse leks.

**SSS-SGR-AU-03:**
**No Leasing:** *Sage-Grouse.* Close all occupied Gunnison Sage-Grouse critical habitat (currently 65,000 acres) and Greater Sage-Grouse habitat within one mile of an active lek to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12 in Appendix A.

**SSS-SGR-AU-04:**
**No Leasing:** *Split-estate.* Manage 16,500 acres of Private and State surface/federal fluid mineral estate in Greater Sage-Grouse habitat within one mile of an active lek and Gunnison Sage-Grouse critical habitat as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12 in Appendix A.

**SSS-SGR-AU-05:**
**STIPULATION** TL-16: *Occupied Sage-Grouse Winter Habitat.* Prohibit surface occupancy and surface-disturbing activities in occupied Sage-Grouse winter habitat from December 16 to March 15. (Refer to Appendix B.) See Figures 2-15 in Appendix A. Standard exceptions apply; see Appendix B.

**SSS-SGR-AU-06:**
**STIPULATION** NSO-25: *Sage-Grouse Leks, Nesting, and Early Brood-rearing Habitat.* Prohibit surface occupancy and surface-disturbing activities within 4 miles of an active lek or within Sage-Grouse nesting and early brood-rearing habitat. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

**SSS-SGR-AU-07:**
**STIPULATION** TL-17: Sage-Grouse Leks. Prohibit surface occupancy and surface-disturbing activities within 4 miles of Sage-Grouse leks from March 1 to June 30. (Refer to Appendix B.) See Figure 2-15 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Special Status Species – *Reptiles and Amphibians*

**SSS-R&A-OBJ-01:**
*Maintain and improve BLM lands for priority reptile and amphibian habitat.*

BLM_0023994

**SSS-R&A-MA-01:**
Identify important areas for key species such as canyon tree frog, great basin spadefoot *(Spea intermontana)*, northern leopard frog *(Rana pipiens)*, boreal toad *(Anaxyrus boreas boreas)*, long-nosed leopard lizard (*Gambelia wislizenii*), and midget faded rattlesnake *(Crotalus oreganus concolor)*. Protect habitat by avoiding impacts during critical seasons and maintain integrity and species accessibility of these areas.

**SSS-R&A-AU-01:**
**STIPULATION** NSO-26: *Canyon Treefrog, Midget Faded Rattlesnake, Northern Leopard Frog, Great Basin Spadefoot, Long-nosed Leopard Lizard, Boreal Toad.* Prohibit surface occupancy and surface-disturbing activities within all identified canyon treefrog, northern leopard frog, midget faded rattlesnake, Great Basin spadefoot, long-nosed leopard lizard, and boreal toad breeding and denning sites. (Refer to Appendix B.) See Figure 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

## Special Status Species - *Bats*

**SSS-BAT-OBJ-01:**
*Maintain and improve BLM lands for bat roosting, maternity sites and winter hibernacula.*

**SSS-BAT-MA-01:**
Identify and protect important areas for bat roosting (including maternity roosts) and hibernacula, such as the Pup Tent Mine, and take appropriate action to protect resources as identified, such as recreational closures, mineral withdrawals, and mine closures with bat gates.

**SSS-BAT-AU-01:**
**STIPULATION** *WILDLIFE BAT NSO CO:* No surface occupancy or use is allowed within a 402 meter (0.25 mile) radius of the entrance of maternity roosts or hibernacula of BLM sensitive bat species, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM. Standard exceptions apply; see Appendix B.

**SSS-BAT-MA-02:**
Where bat roosting, maternity sites and winter hibernacula occur, bat gates will be required for closing abandon mine lands.

**SSS-BAT-MA-03:**
To reduce potential for vandalism of bat gates and associated disturbance to bats, minimize motorized access to gated sites.

BLM_0023995

## Special Status Species – *River Otters*

### SSS-RVO-OBJ-01:
*Maintain and improve BLM lands for river otter (Lontra canadensis) habitat.*

#### SSS-RVO-MA-01:
Within occupied river otter habitat, protect potential den sites such as hollow trunks of large trees, beaver dens, hollow logs, log jams, or drift piles.

## Special Status Species – *Canada Lynx*

### SSS-LNX-OBJ-01:
*Maintain and improve BLM-managed portions of Lynx Analysis Units for Lynx habitat.*

#### SSS-LNX-MA-01:
Within lynx *(Lynx canadensis)* habitat in Lynx Analysis Units:

- Manage timber harvest consistent with the August 2013 Lynx Conservation Assessment and Strategy and
- Limit the expansion of consistent snow compaction unless it serves to consolidate use and improve lynx habitat.

## Special Status Species – *Kit Fox*

### SSS-KIT-OBJ-01:
*Maintain and improve BLM lands for kit fox habitat.*

#### SSS-KIT-AU-01:
**STIPULATION** CSU-22: *Kit Fox Dens.* Apply CSU (site-specific relocation) restrictions to, and require mitigation and minimization measures (as determined by the BLM biologist) of, surface occupancy and surface-disturbing activities within 200 meters (656 feet) of active kit fox dens. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

## Special Status Species – *White-tailed Prairie Dog*

### SSS-WTP-OBJ-01:
*Maintain or improve white-tailed prairie dog habitat and distribution (Figure 2-73, Appendix A).*

#### SSS-WTP-AU-01:

BLM_0023996

**STIPULATION** CSU-23: *Occupied Prairie Dog Towns.* Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within white-tailed prairie dog towns. Locate permanent above ground structures outside of prairie dog towns. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard and special exceptions apply; see Appendix B.

Except for Prairie Canyon Wildlife Emphasis Area, apply NSO-30 (*Occupied Prairie Dog Towns (no buffer).*

**SSS-WTP-MA-01:**
Allow prairie dog relocation activities in existing, occupied, or historic prairie dog complexes where consistent with other management and ecosystem objectives, in areas where plague is not a concern, and in coordination with CPW and Mesa County.

BLM_0023997

# FISH AND WILDLIFE

### F&W-GOAL-01:
*Minimize the spread of invasive fish and wildlife species and fish and wildlife diseases where management for these species does not conflict with management of special status fish as discussed above.*

#### F&W-OBJ-01:
*Reduce or eliminate invasive species and focus on maintaining healthy and productive habitat or improving habitat for native species.*

##### F&W-MA-01:
To prevent the spread of whirling disease, New Zealand mud snails *(Potamopyrgus antipodarum)*, zebra mussels *(Dreissena polymorpha)*, quagga mussels *(Dreissena bugensis)*, and other nuisance aquatic organisms, treat all equipment associated with actions permitted by the BLM, included but not limited to SRPs, to be conducted within or near perennial water sources equipment previously used in water bodies with known invasive species, with accepted disinfection practices prior to construction/launch. Firefighting and other emergency equipment will follow appropriate policy as noted in relevant chapters of the current Interagency Standards for Fire and Fire Aviation Operations (Red Book) (US DOI and US Forest Service).

##### F&W-MA-02:
Caves and other structures utilized by bats may be closed to public access in the event of a White Nose Syndrome outbreak or other transmittable diseases that threaten bats, as needed to avoid the risk of humans transmitting the disease.

##### F&W-MA-03:
Remove aquatic competitors (such as bullfrogs) from active native aquatic breeding grounds.

##### F&W-MA-04:
Support USFWS and CPW efforts to remove predatory nonnative fishes (such as smallmouth bass, Largemouth bass, and northern pike) from critical habitat for listed and non-listed native fishes of the Colorado/Gunnison Rivers.

## Fisheries and Aquatic Wildlife

### F&W-FAW-GOAL-01:
*Provide for aquatic, riparian, and wetland habitats for abundance and diversity of fish and wildlife with self-sustaining populations.*

#### F&W-FAW-OBJ-01:

*Maintain and improve BLM lands for priority habitat requirements for highly valued species such as, but not limited to, coldwater sport fishes, including rainbow, brown, and brook trout where management for these species does not conflict with management of special status fish as discussed above.*

**F&W-FAW-MA-01:**
Identify and manage the following as priority habitats: perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters.

**F&W-FAW-AU-01:**
**STIPULATION** TL-1: *Salmonid and Native, Non-Salmonid Fishes.* Prohibit in-channel stream work in all occupied streams during fish spawning, egg incubation, and fry emerging seasons. Fish spawning, egg incubation, and fry emerging seasons vary by elevation and temperatures; however the following intervals generally apply in Colorado:

- Cutthroat trout (various subspecies): May 1-September 1
- Rainbow trout: March 1-June 15
- Brown trout: October 1-May 1
- Brook trout: August 15-May 1
- Sculpin: May 1-July 31
- Bluehead sucker: May 1-July 15
- Flannelmouth sucker: April 1-July 1
- Roundtail chub: May 15-July 15
- Speckled dace: May 1-August 31
- Mountain whitefish: October 1-November 30

Exception Criteria: This stipulation only applies to construction and drilling and does not apply to operations and maintenance. If competing species are involved, the BLM may select to implement species-specific dates for native fish versus nonnative species.

Specific exceptions apply; see Appendix B. See Figures 2-15in Appendix A.

**F&W-FAW-AU-02:**
**STIPULATION** *HYDROLOGY RIVER NSO CO:* No surface occupancy or use is allowed within 400 meters (1312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers: Colorado, Dolores, and Gunnison. Standard exceptions apply; see Appendix B. See Figure 2-13.

**F&W-FAW-AU-03:**
**STIPULATION** NSO-2: *Streams/Springs Possessing Lotic Riparian Characteristics.* Prohibit surface occupancy and surface disturbing activities with a

BLM_0023999

minimum distance of 100 meters (328 feet) from the edge of the ordinary high-water mark (bank-full stage). Where the riparian corridor width is greater than 100 meters (328 feet) from bank-full, prohibit surface occupancy and surface disturbing activities within the riparian zone. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Terrestrial Wildlife

**F&W-TRW-GOAL-01:**
*Provide for aquatic, riparian, and wetland habitats for abundance and diversity of fish and wildlife with self-sustaining populations.*

**F&W-TRW-OBJ-01:**
*Maintain and improve BLM lands for priority habitat requirements for the following high-value species:*

- *Critical and severe winter range, winter concentration areas, intact security areas, production areas, and big game migrations corridors for big games species (e.g., mule deer (Odocoileus hemionus), elk (Cervus canadensis), antelope (Antilocapra americana), bighorn sheep (Ovis canadensis), moose (Alces alces); and*

- *Proper functioning condition riparian and wetland habitat for all species (see Vegetation—Riparian section).*

*Habitat standards and desired wildlife populations levels are determined by CPW and USFWS species-specific plans and strategies in order to meet BLM Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997a).*

**F&W-TRW-MA-01:**
Actively manage the following areas, placing management emphasis on conserving, restoring, maintaining or enhancing intact and unfragmented habitats that provide security and escape habitat for the key species shown:

- Atwell Gulch ACEC: mule deer and rocky mountain bighorn sheep;

- Dolores River Riparian ACEC: riparian obligate bird species;

- Indian Creek ACEC: deer and elk;

- The Palisade ACEC: riparian obligate birds and mule deer;

- Roan and Carr Creeks ACEC: cutthroat trout and Greater Sage-Grouse;

- Rough Canyon ACEC: Gunnison Sage-Grouse;

- Sinbad Valley ACEC: mule deer and elk;

- Beehive Wildlife Emphasis Area: mule deer and elk;

- Blue Mesa Wildlife Emphasis Area: mule deer and elk;

BLM_0024000

- Bull Hill Wildlife Emphasis Area: mule deer and elk;
- East Salt Creek Wildlife Emphasis Area: mule deer and elk;
- Glade Park Wildlife Emphasis Area: Gunnison Sage-Grouse, mule deer, and elk;
- Prairie Canyon Wildlife Emphasis Area: long billed curlew, long eared owl, pronghorn antelope, white-tailed prairie dog, kit fox, and burrowing owl;
- Rapid Creek Wildlife Emphasis Area: mule deer and elk;
- Winter Flats Wildlife Emphasis Area: deer and elk;
- Sunnyside Wildlife Emphasis Area: mule deer, elk, and Greater Sage-Grouse; and
- Timber Ridge Wildlife Emphasis Area: mule deer, elk, and Gunnison Sage-Grouse.

**F&W-TRW-AU-01:**

**LEASE NOTICE** LN-3: *Biological Inventories.* The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, Sage-Grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy on that area is prohibited. (Refer to Appendix B.)

**F&W-TRW-AU-02:**

**STIPULATION** CSU-10: *Wildlife Habitat.* Require proponents of surface-disturbing activities to implement specific measures to minimize and mitigate impacts of operations on wildlife and wildlife habitat within high-value or essential wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs (Appendix H). (Refer to Appendix B.) See Figures 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

**F&W-TRW-AU-03:**

**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within the following wildlife emphasis or priority areas, as identified in the Resource Management Plan:

- Beehive (habitat for mule deer and elk) (4,700 acres);
- A portion of East Salt Creek (habitat for mule deer and elk) (20,500 acres);
- Glade Park (habitat for Gunnison sage-grouse, mule deer, and elk) (27,200 acres);

BLM_0024001

*Approved Resource Management Plan – FISH AND WILDLIFE*

- A portion of Prairie Canyon (long billed curlew, long eared owl, pronghorn antelope, white-tailed prairie dog, kit fox, and burrowing owl habitat) (16,500 acres);
- A portion of Rapid Creek (wintering and migratory habitat for mule deer and elk) (26,900 acres); and
- Winter Flats (deer and elk wintering grounds) (3,500 acres).

Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. A plan of development may be required to demonstrate how potential adverse impacts to wildlife habitat will be mitigated.

**F&W-TRW-AU-04:**
**STIPULATION** LN-5: *Working in Wildlife Habitat.* Require operators to establish and submit to the GJFO a set of operating procedures for employees and contractors working in important wildlife habitats. Design such procedures to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures may address items such as working in bear or snake country, controlling dogs, not feeding wildlife, and understanding and abiding by hunting and firearms regulations. (Refer to Appendix B.)

**F&W-TRW-OBJ-02:**
*Maintain the integrity of ongoing biological research locations.*

**F&W-TRW-MA-02:**
Manage the Ant Research Site as a ROW exclusion area.

**F&W-TRW-MA-03:**
To preserve the integrity of the ant research site (120 acres) designate the area as closed to motorized and mechanized travel.

**F&W-TRW-MA-04:**
Manage the Owl Banding Station as a ROW avoidance area.

**F&W-TRW-AU-05:**
**STIPULATION** NSO-32: *Research Sites.* Prohibit surface occupancy and surface-disturbing activities in approved research sites including, but not limited to, the Ant Research Area (16 Road) and the Owl Banding Station (south of DeBeque). (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Big Game Species (deer, elk, moose, and bighorn sheep)

**F&W-BGS-OBJ-1:**

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024002

*Approved Resource Management Plan – FISH AND WILDLIFE*

*Provide sufficient forage, cover, and protection from disturbance for large ungulates (deer, elk, bighorn sheep, pronghorn antelope, and moose) to maintain healthy viable populations across the landscape commensurate with BLM Colorado's Standards for Public Land Health (BLM 1997a).*

**F&W-BGS-MA-01:**
Deer and elk habitat will be managed to meet BLM Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management.

**F&W-BGS-MA-02:**
Use COAs listed in Appendix B and standard operating procedures and BMPs listed in Appendix H in designing wildlife projects.

**F&W-BGS-AU-01:**
Implement the following seasonal travel limitations for motorized and mechanized travel from December 1 to May 1 in the following areas:
- Beehive;
- Blue Mesa;
- Chalk Mountain;
- Coal Canyon;
- Demaree Canyon outside of the WSA;
- Garvey Canyon;
- Grand Mesa Slopes;
- Howard Canyon Flats;
- Indian Point; and
- Post/Lapham Canyons.

Seasonal limitations may be extended to include mechanized use in areas where monitoring indicates mechanized use is causing excessive disturbance to wildlife.

Seasonal limitation periods may be reduced based on coordination with CPW (e.g., mild winters, late hunting seasons, etc.).

**F&W-BGS-AU-02:**
**STIPULATION** NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13 in Appendix A. Standard exceptions apply; see Appendix B.
- Atwell Gulch;
- Indian Creek;
- The Palisade;
- Rough Canyon;
- Sinbad Valley; and

BLM_0024003

- South Shale Ridge.

**F&W-BGS-AU-03:**
**STIPULATION** TL-20: *Big Game Winter Range*. Prohibit surface occupancy and surface-disturbing activities from December 1 to May 1 to protect big game winter range as mapped by the CPW. Certain areas and/or routes within big game winter range may be closed to foot, horse, motorized, and/or mechanized travel from December 1 to May 1. (Refer to Appendix B.) See Figures 2-15 in Appendix A. Standard and special exceptions apply; see Appendix B.

**F&W-BGS-OBJ-02:**
*Protect state wildlife areas from surface occupancy and surface-disturbing activities to protect the values for which they were established.*

**F&W-BGS-AU-04:**
**STIPULATION** *RECREATION PARKS NSO CO:* Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units:

- Horsethief Canyon State Wildlife Area (1,400 acres)
- Jerry Creek Reservoir State Wildlife Area (870 acres)
- Plateau Creek State Wildlife Area (1,400 acres)
- Highline State Park (350 acres)
- Vega State Park (2,000 acres)

See Figure 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**F&W-BGS-OBJ-03:**
*Minimize habitat fragmentation and restore habitat connectivity on big game winter ranges, winter concentration areas, severe winter ranges, and movement corridors.*

**F&W-BGS-MA-03:**
Reduce habitat fragmentation by reducing road density (focusing primarily on duplicative or redundant routes) in production areas and winter ranges, (bighorn sheep, mule deer, elk, pronghorn antelope, and moose) to provide protection of big game production areas from disturbance and displacement by human activities during critical periods. Strive to reduce route densities to less than 2 miles of route per square mile in these areas.

**F&W-BGS-AU-05:**
**STIPULATION** CSU-24: *Deer and Elk Migration and Movement Corridors*. Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within migration and movement corridors for deer and elk. (Refer to Appendix B.) See Figures 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

BLM_0024004

*Approved Resource Management Plan – FISH AND WILDLIFE*

**F&W-BGS-MA-04:**
Prohibit domestic sheep grazing on allotments within occupied bighorn sheep habitat.

**F&W-BGS-MA-05:**
Allow for permitting of domestic sheep grazing on allotments outside of occupied bighorn sheep habitat on a case-by-case basis per the following criteria:

- Presence of topographic features (e.g., natural barriers, rivers) to separate domestic and bighorn sheep;
- Adequate separation zones between domestic and bighorn sheep (WAFWA 2010);
- Current bighorn sheep management plan direction;
- The need to protect potential habitat;
- Local and national research results;
- Risk assessments from wildlife agencies or BLM;
- Timing of domestic sheep grazing; or
- Monitoring results indicating conflicts.

**F&W-BGS-AU-06:**
**STIPULATION** NSO-34: *Elk Production Area.* Prohibit surface occupancy and surface-disturbing activities in elk production areas year-round. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**F&W-BGS-AU-07:**
**STIPULATION** *BIG GAME PRODUCTION AREAS TL CO.* No surface use is allowed during the following time period(s) in big game production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM: Prohibit activities, including motorized travel, elk production areas from May 15 to June 15; in antelope production areas from April 15 to June 30; in Rocky Mountain bighorn sheep production areas from April 15 to June 30; in Moose production areas from April 15 to June 30; and in desert bighorn sheep production areas from February 1 to May 1. Standard and special exceptions apply; see Appendix B.

## Pronghorn Antelope

**F&W-PHA-OBJ-1:**
*Improve pronghorn antelope habitat on BLM lands.*

**F&W-PHA-MA-01:**
Prioritize habitat improvement projects to increase habitat quality in pronghorn antelope range, including projects that improve fawning cover, reduce cheatgrass,

BLM_0024005

increase in native forage including warm season grasses, and improve water availability.

**F&W-PHA-MA-02:**
Within pronghorn range, minimize the number of fences, construct fences to accommodate passage by pronghorn, and replace existing fence that do not accommodate pronghorn passage.

**F&W-PHA-AU-01:**
**STIPULATION** TL-22: *Pronghorn Wintering Habitat.* Prohibit surface occupancy and surface-disturbing activities in pronghorn wintering habitat from January 1 to March 31. (Refer to Appendix B.) See Figures 2-15 in Appendix A. Standard and special exceptions apply; see Appendix B.

---

*Wildlife Emphasis Areas*
An emphasis area is an area of high wildlife value and significance for wildlife species including but not limited to Sage-Grouse, pronghorn antelope, mule deer, elk, bighorn sheep, prairie dog, and kit fox. Fire rehabilitation efforts and vegetation treatments to improve land health and/or wildlife habitat are not considered ground disturbance, as described in the actions under each emphasis area below. Wildlife emphasis areas are not designations, but rather polygons where more management emphasis is placed on protection and enhancement of the wildlife resource.

---

**F&W-WEA-OBJ-01:**
*Emphasis areas meet BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (BLM 1997a). Prioritize those areas that do not meet land health standards as management action areas where actions are taken to work toward meeting land health standards.*

**F&W-WEA-MA-01:**
In wildlife emphasis areas not managed as ROW exclusion or avoidance areas, apply BMPs to consolidate ROWs in existing disturbance and to avoid fragmentation of unfragmented habitat.

**F&W-WEA-MA-02:**
Consolidate surface occupancy and surface-disturbing activities within existing disturbance to avoid fragmentation.

**F&W-WEA-MA-03:**
Reduce habitat fragmentation by reducing road density (focusing primarily on duplicative or redundant routes) in wildlife emphasis areas. Route density of less than 0.5 miles of road per square mile preferred, where this cannot be achieved implement winter closures if feasible to seasonally limit route related disturbance in the most critical months.

**F&W-WEA-MA-04:**

BLM_0024006

Give priority to wildlife emphasis areas in carrying out actions to improve land health.

**F&W-WEA-MA-05:**
Focus management in emphasis areas on wildlife. Adopt additional management actions deemed necessary by the BLM (such as closing additional roads to maintain effective habitat patch size).

## *Beehive Wildlife Emphasis Area*

### F&W-WEA-OBJ-02:
*Maintain or improve wildlife habitat in the Beehive wildlife emphasis area (4,700 acres) with an emphasis on wintering and migratory habitat for mule deer and elk (Figure 2-1, Appendix A).*

**F&W-WEA-MA-06:**
Maintain the winter closure gate and enforce closure from December 1 to May 1 annually.

**F&W-WEA-AU-01:**
Implement seasonal travel limitations for motorized and mechanized travel from December 1 to May 1. Seasonal limitation periods may be adjusted based on coordination with CPW (e.g., mild winters, late hunting seasons, etc.).

**F&W-WEA-MA-07:**
Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-AU-02:**
**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within the wildlife emphasis area. (Refer to Appendix B.) See Figure 2-47 in Appendix A. Standard exceptions apply; see Appendix B.

## *Blue Mesa Wildlife Emphasis Area*

### F&W-WEA-OBJ-03:
*Maintain or improve wildlife habitat in the Blue Mesa wildlife emphasis area (9,300 acres) with an emphasis on wintering habitat for mule deer and elk (Figure 2-1, Appendix A).*

**F&W-WEA-MA-08:**
Maintain the winter closure gate and enforce closure from December 1 to May 1 annually.

**F&W-WEA-AU-03:**

Implement seasonal travel limitations for motorized and mechanized travel from December 1 to May 1. Seasonal limitation periods may be adjusted based on coordination with CPW (e.g., mild winters, late hunting seasons, etc.).

**F&W-WEA-MA-09:**

Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-AU-04:**
**STIPULATION** *WILDLIFE HABITAT NSO CO:* No surface occupancy or use is allowed within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## Bull Hill Wildlife Emphasis Area

**F&W-WEA-OBJ-04:**
*Maintain or improve wildlife habitat in the Bull Hill wildlife emphasis area (4,800 acres) with an emphasis on wintering habitat for mule deer and elk (Figure 2-1, Appendix A).*

**F&W-WEA-MA-10:**

Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-AU-05:**
**STIPULATION** *WILDLIFE HABITAT NSO CO:* No surface occupancy or use is allowed within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## East Salt Creek Wildlife Emphasis Area

**F&W-WEA-OBJ-05:**
*Maintain or improve wildlife habitat in the East Salt Creek wildlife emphasis area (25,000 acres with an emphasis on wintering habitat for mule deer and elk (Figure 2-1Appendix A).*

**F&W-WEA-MA-11:**
Maintain existing closure gates and enforce closure from December 1 to May 1 annually.

**F&W-WEA-AU-06:**
Implement seasonal travel limitations for motorized and mechanized travel from December 1 to May 1. Seasonal limitation periods may be adjusted based on coordination with CPW (e.g., mild winters, late hunting seasons, etc.).

**F&W-WEA-MA-12:**

BLM_0024008

Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-MA-13:**
Manage the area east of the Demaree Canyon WSA (4,100 acres) as a ROW exclusion area to maintain the existing unfragmented habitat.

**F&W-WEA-MA-14:**
Designate the area between the Demaree Canyon WSA and Highway 139 as closed to motorized vehicles to maintain the existing unfragmented habitat.

**F&W-WEA-AU-07:**
**STIPULATION** *WILDLIFE HABITAT NSO CO:* No surface occupancy or use is allowed within a portion (4,500 acres) of the wildlife emphasis area. Standard exceptions apply; see Appendix B.

**F&W-WEA-AU-08:**
**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within a portion (20,500 acres) of the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## *Glade Park Wildlife Emphasis Area*

**F&W-WEA-OBJ-06:**
*Maintain or improve wildlife habitat in the Glade Park wildlife emphasis area (27,200 acres) with an emphasis on Gunnison Sage-Grouse, mule deer, and elk habitat (Figure 2-1, Appendix A).*

**F&W-WEA-MA-15:**
Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-AU-09:**
**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## *Prairie Canyon Wildlife Emphasis Area*

**F&W-WEA-OBJ-07:**
*Maintain or improve wildlife habitat in the Prairie Canyon wildlife emphasis area (22,200 acres) with an emphasis on long billed curlew, long eared owl, pronghorn antelope, white-tailed prairie dog, kit fox, Scott's oriole, gray vireo, and burrowing owl habitat (Figure 2-1, Appendix A).*

BLM_0024009

**F&W-WEA-MA-16:**

Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-MA-17:**

Manage the pronghorn antelope migratory corridor as a ROW avoidance area for above-ground facilities (including renewable energy sites such as solar, wind, hydro, and biomass development).

**F&W-WEA-AU-10:**

**STIPULATION** *WILDLIFE HABITAT NSO CO:* No surface occupancy or use is allowed within a portion (5,600 acres) of the wildlife emphasis area. Standard exceptions apply; see Appendix B.

**F&W-WEA-AU-11:**

**STIPULATION** NSO-30: *Occupied Prairie Dog Towns (no buffer).* Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area) within active white-tailed prairie dog towns. (Refer to Appendix B.) See Figure 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

**F&W-WEA-MA-18:**

Within the area designated for pronghorn migration, seek to avoid additional disturbance and apply WILDLIFE HABITAT CSU CO (Alternative B) or CSU-25 (Wildlife Emphasis Areas; Alternative C) to avoid consolidate disturbance and minimize potential impacts to migrating pronghorn.

**F&W-WEA-AU-12:**

**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within a portion (16,500 acres) of the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## Rapid Creek Wildlife Emphasis Area

**F&W-WEA-OBJ-08:**

*Maintain or improve wildlife habitat in the Rapid Creek wildlife emphasis area (27,000 acres) with an emphasis on wintering and migratory habitat for mule deer and elk (Figure 2-1], Appendix A).*

**F&W-WEA-MA-19:**

Install and maintain winter closure gates for a portion of the area (23,500 acres).

**F&W-WEA-AU-13:**

Implement seasonal travel limitations for motorized and mechanized travel in a portion of the area (23,500 acres) from December 1 to May 1 Seasonal limitation

BLM_0024010

periods may be adjusted based on coordination with CPW (e.g., mild winters, late hunting seasons, etc.).

**F&W-WEA-MA-20:**
Manage a portion of the area (25,200 acres) as *limited* to designated routes for motorized and mechanized travel (including 23,500 acres with a winter seasonal limitation).

**F&W-WEA-MA-21:**
Manage a portion of the area (1,700 acres) as *closed* to motorized and mechanized travel.

**F&W-WEA-MA-22:**
Areas within big game winter range may be closed to foot, horse, motorized, and/or mechanized travel from December 1 to May 1.

**F&W-WEA-MA-23:**
Manage the portion of the wildlife emphasis area that is currently undisturbed as a ROW avoidance area (including renewable energy sites such as solar, wind, hydro, and biomass development). See Figure 2-9 (Appendix A).

**F&W-WEA-MA-24:**
Seek to avoid disturbance and apply WILDLIFE HABITAT CSU CO to avoid fragmenting the roadless area in the currently roadless, undisturbed section of the emphasis area that is ROW avoidance.

**F&W-WEA-AU-14:**
**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## Winter Flats Wildlife Emphasis Area

**F&W-WEA-OBJ-09:**
*Maintain or improve wildlife habitat quality and quantity in the Winter Flats wildlife emphasis area (3,200 acres) with an emphasis on deer and elk wintering grounds (Figure 2-1, Appendix A).*

**F&W-WEA-MA-25:**
Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-AU-15:**
**STIPULATION** *WILDLIFE HABITAT CSU CO:* Surface occupancy or use may be restricted within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

BLM_0024011

*Approved Resource Management Plan – FISH AND WILDLIFE*

## Sunnyside Wildlife Emphasis Area

**F&W-WEA-OBJ-10:**
*Maintain or improve wildlife habitat in the Sunnyside wildlife emphasis area (14,500 acres) with an emphasis on bighorn sheep, mule deer, elk, and Greater Sage-Grouse (Figure 2-1, Appendix A).*

**F&W-WEA-MA-26:**
Classify as *limited to designated routes* for motorized and mechanized travel.

**F&W-WEA-MA-27:**
Manage the portions of the wildlife emphasis area that are not contained in the West-wide Energy Corridor as a ROW avoidance area for above-ground facilities (including renewable energy sites such as solar, wind, hydro, and biomass development).

**F&W-WEA-AU-16:**
**STIPULATION** *WILDLIFE HABITAT NSO CO:* No surface occupancy or use is allowed within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

## Timber Ridge Wildlife Emphasis Area

**F&W-WEA-OBJ-11:**
*Maintain or improve wildlife habitat in the Timber Ridge wildlife emphasis area (11,800 acres) with an emphasis on habitat for mule deer, elk, and Sage-Grouse (Figure 2-1, Appendix A).*

**F&W-WEA-MA-28:**
Close to motorized and mechanized travel. Allow for non-motorized game retrieval carts.

**F&W-WEA-AU-17:**
Manage the wildlife emphasis area as a ROW avoidance area, except along 9.8 Road.

**F&W-WEA-AU-18:**
**STIPULATION** *WILDLIFE HABITAT NSO CO:* No surface occupancy or use is allowed within the wildlife emphasis area. Standard exceptions apply; see Appendix B.

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024012

## WILD HORSES

**WHS-GOAL-01:**
*Manage the administratively designated Little Book Cliffs Wild Horse Range (LBCWHR) to sustain a healthy viable wild horse population while maintaining a thriving natural ecological balance of resources and uses. (Figure 2-4, Appendix A).*

**WHS-OBJ-01:**
*Emphasize protection of wild horses in the LBCWHR and minimize impacts to their population and habitat.*

**WHS-MA-01:**
Continue to prohibit livestock grazing within the LBCWHR.

**WHS-MA-02:**
While maintaining access for administration and public viewing, reduce the number of duplicative and redundant routes in the Little Book Cliffs Wild Horse herd area.

**WHS-OBJ-02:**
*Emphasize management of wild horses in the LBCWHR.*

**WHS-MA-03:**
Manage the LBCWHR (35,200 acres) at an appropriate management level (AML), currently identified as a range of 90 to 150 wild horses. The appropriate management level is a dynamic number that will be adjusted as range conditions warrant and in accordance with BLM policy.

**WHS-MA-04:**
Utilize periodic removals and/or fertility control to maintain the appropriate management level.

**WHS-MA-05:**
Monitor and maintain genetic diversity within the LBCWHR by implementing the following actions, including but not limited to:

- Based on genetic analysis, periodically introduce wild horses from other wild horse areas into the LBCWHR and
- Periodically conduct a genetic analysis for the wild horse population.

**WHS-OBJ-03:**
*Manage vegetative communities within the LBCWHR to maintain a forage base to support the established appropriate management level.*

**WHS-MA-06:**

BLM_0024013

Utilize prescribed or wildfire and mechanized, biological, and chemical treatments to maintain the vegetative types in a state advantageous to wild horse use while meeting land health standards.

**WHS-OBJ-04:**

*Protect wild horses in the LBCWHR by limiting activities which disturb or harass wild horses during critical time periods.*

**WHS-MA-07:**

Prohibit target shooting in the Coal Canyon and Main Canyon areas.

**WHS-MA-08:**

Close the LBCWHR to motorized over-snow travel.

**WHS-AU-01:**

Close Coal Canyon to motorized and mechanized travel from December 1 to May 1.

**WHS-MA-09:**

Maintain and construct range improvements to ensure that the horses are confined to the LBCWHR and have adequate water and forage.

**WHS-AU-02:**

**STIPULATION** NSO-36: *Little Book Cliffs Wild Horse Range.* Prohibit surface occupancy and surface-disturbing activities in the LBCWHR. (Refer to Appendix B.) See Figures 2-13 in Appendix A.

Standard and special exceptions apply; see Appendix B.

**WHS-AU-03:**

Manage the LBCWHR as a ROW avoidance area outside of the Little Book Cliffs WSA.

BLM_0024014

# CULTURAL RESOURCES

**CUL-GOAL-01:**
*Identify, preserve, and protect significant cultural resources in order to ensure they are available for appropriate uses by present and future generations (i.e., for research, education, and preservation of cultural heritage).*

**CUL-OBJ-01:**
*Allocate all cultural resources currently recorded, or projected to occur on the basis of existing data synthesis, to use allocations according to their nature and relative preservation value (BLM Manual Section 8110.42 and Planning Handbook H-1601-1 [Appendix C]). Cultural Use Allocations include:*

| Use Category Allocation | Management Action | Desired Outcome |
|---|---|---|
| a. Scientific Use | Permit appropriate research including data recovery | Preserved until research or data recovery potential is realized |
| b. Conservation for Future Use | Propose protective measures/designation | Preserve until conditions for use are met |
| c. Traditional Use | Consult with tribes, determine limitations | Long-term preservation |
| d. Public Use | Determine permitted use | Long-term preservation, on-site interpretation |
| e. Experimental Use | Determine nature of experiment | Protected until used |
| f. Discharge from Management | Remove protective measures | No use after recordation; not preserved |

**CUL-MA-01:**
Allocate all cultural resources currently recorded in Appendix I to category use allocations.

**CUL-MA-02:**
Assign use category allocations to discovered cultural resource sites and/or areas and apply appropriate management actions to achieve the desired outcome.

**CUL-MA-03:**
Use category allocations may be revised in response to changing site conditions or as additional data and information are obtained. Criteria allowing for revising allocation includes: 1) environmental change or human caused impacts that alter the significance or scientific potential; 2) through changes brought about by mitigation and/or data recovery; 3) new discovery that adds to the sites potential and changes its eligibility to the National Register of Historic Places; 4) new information or techniques that reveal a new scientific value that was not previously recognized; and 5) new information shared through Native American consultation.

BLM_0024015

**CUL-OBJ-02:**

*Assign existing cultural resource sites and/or areas to (a) the Scientific Use category. These cultural resources generally meet National Register of Historic Places criterion D; they will yield significant archaeological information about prehistory and history. These cultural resources are available for permitted research and study (Appendix I).*

**CUL-AU-01:**

**STIPULATION** CSU-27: *Allocation to Scientific Use Category.* Prohibit surface occupancy and surface-disturbing activities, except archaeological documentation and excavation, within 100 meters (328 feet) around eligible or potentially eligible sites allocated to Scientific Use. (Refer to Appendix B.) See Figures 2-14  in Appendix A. Standard exceptions apply; see Appendix B.

**CUL-MA-04:**

Prioritize Scientific Use sites and/or areas for listing on the National Register of Historic Places and develop a cultural resource management plan for Scientific Use sites that outlines specific management objectives and actions for protection.

**CUL-OBJ-03:**

*Assign existing cultural resource sites and/or areas to (b) the Conservation for Future Use category. These cultural resources generally meet any of the criteria of the National Register of Historic Places. They are set aside for long-term preservation because of their national and regional significance to prehistory and history (Appendix I).*

**CUL-AU-02:**

**STIPULATION** NSO-37: *Allocation to Conservation Use Category.* Prohibit surface occupancy and surface-disturbing activities, including archaeological excavation, within 100 meters (328 feet) around eligible sites allocated to Conservation Use. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**CUL-MA-05:**

Prioritize Conservation Use sites for listing on the National Register of Historic Places and within two years from the listing, develop a cultural resource management plan for Conservation Use sites that will outline specific management objectives and actions for protection.

**CUL-OBJ-04:**

*Assign existing cultural resource sites and/or areas to (c) the Traditional Use category. These cultural resources generally meet any of the significance criteria of the National Register of Historic Places and are identified as traditional cultural properties, sacred sites, or areas identified as important to the Tribes in consultation. They are set aside for long-term preservation because of their cultural and religious value to Native American Tribes (Appendix I).*

BLM_0024016

**CUL-AU-03:**
**STIPULATION** NSO-38: *Allocation to Traditional Use Category.* Prohibit surface occupancy and surface-disturbing activities within 200 meters (656 feet) around eligible or potentially eligible sites allocated to Traditional Use. In addition, consider visual impacts that projects may have on sites allocated to this use, and apply appropriate mitigation, which may include redesign. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**CUL-OBJ-05:**
*Assign existing cultural resource sites and/or areas to (d) the Public Use Category. Public Use sites are set aside for their educational and interpretive value to the public. These cultural resources may meet any of the significance criteria of the National Register of Historic Places, or they may not be eligible for nomination to the National Register of Historic Places but hold a local or regionally recognized visual value (e.g., historic cabins, railroad grades, roads and trails, mine ruins and mine workings) (Appendix I).*

**CUL-AU-04:**
**STIPULATION** CSU-28: *Allocation to Public Use Category.* Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) around sites allocated to Public Use. In addition, consider factors such as integrity of setting, recreation opportunity, or visual impacts that projects may have on sites allocated to this use. (Refer to Appendix B.) See Figures 2-14 Appendix A.

**CUL-MA-06:**
Allocate historical sites on the uranium mesas (e.g., Tenderfoot, Calamity, Outlaw, Blue Mesa, Hubbard, and Dolores Point); Rough Canyon sites for environmental heritage education; historical buildings that may be suitable for adaptive use, historical roads and trails (e.g., Old Spanish National Historic Trail, Tabeguache Trail, Old Mill Road); and select rock art sites (e.g., Site 5ME4947 on the slopes of the Grand Mesa) to Public Use.

**CUL-OBJ-06:**
*Promote public awareness and education.*

**CUL-MA-07:**
Prioritize Public Use sites and as demand for use of these sites for heritage tourism or other public uses is proposed develop cultural resource management plans (CRMP) that develop site specific management actions for those Public Use sites. CRMPs include outlines for specific management objectives and actions for Heritage Tourism including retrieval of scientific information, hardening for public use, interpretation and long-term protection strategies.

**CUL-MA-08:**

BLM_0024017

Manage, protect, and use cultural resources allocated to Public Use, including traditional cultural properties or areas identified as important to the tribes with a secondary allocation to Public Use by implementing the following actions, including but not limited to:

- Developing heritage tourism at sites designated to Public Use using BMPs;
- Interpreting sites; and
- Organizing and conducting ongoing educational programs for tribal groups, the public, school groups, vocational archaeology groups, project proponents, permittees, contractors, and others about cultural resource ethics, and encouraging their assistance in reporting new discoveries and vandalism incidents.

**CUL-OBJ-07:**

*Assign existing cultural resource sites and/or areas to (e) the Experimental Use category. These cultural resources may meet criterion D of the National Register of Historic Places but will not have a primary allocation to the Conservation, Traditional or Public Use categories. They are set aside for studying such problems as natural or human caused deterioration and may be damaged or destroyed in the process of experimentation or mitigation (scientific excavation of inadvertent discovery).*

**CUL-MA-09:**

Prioritize the Experimental use sites focusing on sites allocated to this use in the Sunnyside, Grand Mesa Slopes, and Indian Creek areas. As permitted activities are authorized that may affect these sites develop cultural resource management plans for allowable use on all Experimental Use sites in the Sunnyside, Grand Mesa Slopes, and Indian Creek areas to outline research objectives and identify experimental parameters.

**CUL-AU-05:**

**STIPULATION** CSU-29: *Sub-surface Inventory.* Require sub-surface inventory for deep sub-surface-disturbing activities and buried ROW in the following locations and in additional areas where high potential for subsurface resources may be identified in the future. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

- Indian Creek (20,200 acres);
- Grand Mesa Slopes (16,000 acres); and
- Sunnyside (17,300 acres).

**CUL-OBJ-08:**

*Assign existing cultural resource sites assigned to (f) the Discharged from Management category. These cultural resources generally are not eligible for the National Register of Historic Places and are not assigned to other use allocations. They are not protected from other resource uses.*

BLM_0024018

**CUL-MA-10:**
On an annual basis develop a list of sites to allocate to the Discharge Use category, reevaluate as needed and compile supporting documentation, and submit for consultation with the State Historic Preservation Officer (SHPO).

**CUL-OBJ-09:**
*Manage areas with scientifically and publicly valuable archaeological and cultural resources through documentation and nomination to the National Register of Historic Places and completion of Cultural Resource Management Plans.*

**CUL-MA-11:**
Develop a cultural resource management plan to guide research and long term protection of two cultural properties associated with the Indian Creek Area:

- West Area (730 acres) and
- East Area (1,700 acres).

**CUL-AU-06:**
**STIPULATION** NSO-39: *Indian Creek.* Prohibit surface occupancy and surface-disturbing activities in the following areas to protect cultural resources. See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

- West Indian Creek (520 acres) and
- East Indian Creek (1,200 acres).

**CUL-GOAL-02:**
*Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA Sec. 103(c), National Historic Preservation Act (NHPA) 106, 110 (a) (2)) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106.*

**CUL-OBJ-10:**
*Allocate all cultural resources recorded to use allocations according to their nature and relative preservation value (BLM Manual Section 8110.42 and Planning Handbook H-1601-1 [Appendix C]) as part of the evaluation and determination of eligibility process.*

**CUL-MA-12:**
Manage the integrity of cultural resources that are not included in sensitive site areas and mitigate impacts based on maintaining the integrity of the desired outcome of the cultural resource Use Category Allocations. This may require redesign of proposed projects or mitigation.

**CUL-MA-13:**
To minimize ongoing or potential impacts to cultural resources that are eligible or potentially eligible to the National Register of Historic Places (NRHP) or are listed

BLM_0024019

on the NRHP, close and/or re-route routes that are inside, pass through, or lead directly to these sites, or identify mitigation to protect sites.

**CUL-MA-14:**
To minimize the potential for impacts to sites, reduce density of routes in areas known to be of high expected cultural resource density or areas of high value to the cultural program or Tribes.

**CUL-MA-15:**
Use VRM and recreation (or management) objectives to minimize impacts to site integrity (maintaining the visual, audible, and setting characteristics of sites).

**CUL-MA-16:**
To minimize ongoing or potential impacts to historic trails identified as eligible or potentially eligible for listing on the NRHP, identify mitigation or protect the historic integrity of routes, if necessary.

**CUL-GOAL-03:**
*Uphold Native American trust responsibilities and accommodate traditional uses. The GJFO is part of the Ute traditional homeland where physical remains of their occupation will be protected and preserved. Maintain and, where possible, improve natural and cultural resource conditions to enhance opportunities to exercise Native American use of cultural landscapes and cultural properties in their traditional homeland.*

**CUL-OBJ-11:**
*Continue the Ute Ethnohistory Project to compile information regarding traditional cultural properties, sacred sites, traditional uses, and cultural landscapes.*

**CUL-MA-17:**
Accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and to avoid adversely affecting the physical integrity of sacred sites.

**CUL-MA-18:**
Manage recorded traditional cultural properties or areas and natural resources of importance to the Ute Tribes to enhance opportunities to exercise Native American use of these resources.

**CUL-MA-19:**
The following sites of concern have been identified through consultation and will be a priority for nomination to the National Register of Historic Places and development of cultural resource management plans that will outline specific management objectives and actions for protection:

- Wickiup camps and open camps with definitive Ute occupation (associated to Ute rock art, artifact assemblages and/or trails);
- Isolated rock art;

BLM_0024020

- Culturally Modified Trees (includes Scarred and Prayer Trees); and
- Ceremonial features (e.g., eagle traps, vision circles, and special structures).

This list is in no way intended to be a comprehensive list and may continue to grow through consultation.

**CUL-MA-20:**
In cooperation with the recreation program, manage Unaweep Canyon/West and East Creek as a Ute heritage area, rename the West and East Creek Day Use areas in consultation with the Ute Tribes. With local partners and Ute tribal members interpret Ute Cultural Heritage for the public at this location.

**CUL-MA-21:**
Identify tribal plant gathering needs and establish tribal protocol for gathering materials for cultural and religious purposes. Do not charge members of federally recognized Tribes fees for the collection of non-commercial or personal-use quantities of plants or minerals used for food, medicine, utilitarian items, traditional use items, or items necessary for traditional, religious or ceremonial purposes. Threatened, endangered, candidate, proposed, or sensitive plants are not included as authorized for collection. Plants that are identified by a Tribe as important for traditional, religious or ceremonial purposes and are not widely available will not be offered as wilding plants for the general public.

**CUL-MA-22:**
In coordination with the recreation resource management objectives, collaborate with Ute tribal cultural departments and members to identify, allocate to appropriate Use Category, reestablish and interpret traditionally used trails.

# PALEONTOLOGICAL RESOURCES

## PAL-GOAL-01:

*Provide for the identification, protection, and management of paleontological resources for the preservation, interpretation and scientific uses by present and future generations.*

### PAL-OBJ-01:

*Manage paleontological resource to protect significant paleontological values.*

#### PAL-MA-01:

Enhance, promote, and protect the dinosaur resources of the Dinosaur Diamond Prehistoric Highway (National Scenic Byway and All American Road).

#### PAL-MA-02:

To reduce ongoing damage to known paleontological sites, close routes that are inside or pass through sensitive paleontological sites, or identify mitigation necessary to protect sites.

#### PAL-MA-03:

To reduce the potential for vandalism or collection, reduce number of routes in proximity to known paleontological localities.

### PAL-OBJ-02:

*Identify and protect priority geographic areas.*

#### PAL-MA-04:

Conduct field inventories and document highly sensitive paleontological sites.

#### PAL-MA-05:

Manage paleontological resources according to their Potential Fossil Yield Classification (Figure 2-25, Appendix A).

*Class 1* - Xb Biotitic Gneiss, Schist, Migmatite, Yg Granitic Rocks of 1400 m.y., Xg *Granitic Rocks of 1700 m.y., YXg *Granitic Rocks of 1400 and 1700 m.y.

*Class 2* - Pennh Hermosa

*Class 3* - Pc Cutler, TRm Moenkopi, JTRgc *Glen Canyon Group, TRwc *Wingate, TRkc *Kayenta, JTRgc *Navajo, Jmwe *Entrada, Jmse *Summerville, KJdw *Burro Canyon Sandstone, Kd *Dakota Sandstone, Km *Mancos Shale, Kmv Mesaverde Group (Undivided), Kmvu Hunter Canyon, Kmvl Mount Garfield, Kh Sego Sandstone, Two Ohio Creek Formation, Tgl Green River Fm., Lower Part, Tgp Green River Fm., Parachute Creek Member, Tg Green River (Undivided), Tu Uinta, Q Quaternary deposits (Undifferentiated)

*Class 4–5* - TRc *Chinle, Jmwe *Morrison, Two Wasatch (De Beque)

BLM_0024022

**PAL-AU-01:**

**LEASE NOTICE:** LN-6: *Class 4 and 5 Paleontological Areas.* Have a permitted paleontologist approved by the BLM's Authorized Officer perform an inventory of surface-disturbing activities in Class 4 and 5 paleontological areas. (Refer to Appendix B.)

BLM_0024023

# VISUAL RESOURCES

**VIS-GOAL-01:**
*Manage public lands in a manner that protects the quality of scenic values, specifically protecting those areas of cultural significance and highly valued scenic resources.*

**VIS-OBJ-01:**
*Maintain visual quality and integrity in accordance with VRM Classes.*

- *Class I Objective: To preserve the existing character of the landscape. The level of change to the characteristic landscape should be very low and must not attract attention*
- *Class II Objective: To retain the existing character of the landscape. The level of change to the characteristic landscape should be low*
- *Class III Objective: To partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate.*
- *Class IV Objective: To provide for management activities which require major modification of the existing character of the landscape. The level of change to the characteristic landscape can be high.*

**VIS-MA-01:**
Manage visual resources on BLM-administered land according to the objectives for each class as follows (Figure 2-6, Appendix A):

- VRM I = 98,700 acres
- VRM II = 392,400 acres
- VRM III = 396,800 acres
- VRM IV = 173,700 acres

Manage visual resources on BLM land according to the objectives for each class.

**VIS-MA-02:**
Manage 98,700 acres of BLM lands according to VRM Class I objectives, including the following areas:

- WSAs:
  - Demaree Canyon;
  - Little Book Cliffs;
  - The Palisade; and
  - Sewemup Mesa
- ACECs:
  - Mt. Garfield (except for Coal Canyon corridor) and
  - A portion of The Palisade (26,700 acres within The Palisade WSA).

**VIS-AU-01:**
Manage VRM Class I areas as ROW exclusion areas.

**VIS-MA-03:**
To preserve the visual character of the existing landscape, limit or reduce the number of routes in areas managed as VRM Class I. The level of change to the visual landscape should be very low and must not attract attention.

**VIS-MA-04:**
Manage 392,400 acres of BLM lands according to VRM Class II objectives, including the following areas:

- ACECs:
    - Atwell Gulch;
    - A portion of the Palisade (5,500 acres outside of the Palisade WSA);
    - A portion of Dolores River Riparian (7,100 acres);
    - Juanita Arch;
    - Indian Creek;
    - Pyramid Rock;
    - Roan and Carr Creeks
    - Rough Canyon;
    - South Shale Ridge;
    - Sinbad Valley; and
    - Unaweep Seep.
- Lands managed for wilderness characteristics
- SRMAs:
    - Bangs;
    - A portion of Dolores River Canyon (13,600 acres);
    - North Fruita Desert; and
    - Palisade Rim.
- Byways:
    - A portion of Dinosaur Diamond Prehistoric Highway (from the Bookcliffs north);
    - Grand Mesa Scenic and Historic Byway; and
    - Unaweep-Tabeguache Scenic and Historic Byway (The ROW corridors are designated as VRM III).
- Other VRM Class II areas
    - Includes the following:
        - Bangs, Rough, Ladder and Northeast Creek Canyons;
        - Cliffs of Unaweep Canyon (outside of ROW corridor);

BLM_0024025

- Eastern Cliffs of Hunter Canyon;
- Colorado River corridor
- Gunnison river corridor (southwest side);
- Foreground of Interstate 70;
- Cliffs adjacent to Mt. Garfield;
- Dolores River corridor (except for 75 meters corridor along Highway 141); and
- Juanita Arch.

**VIS-MA-05:**

To retain the visual character of the existing landscape and minimize the level of change, limit or reduce the number of routes in areas managed as VRM Class II. The level of change to the visual landscape should be low. Changes should repeat the basic elements found in the natural features of the landscape – form, line, color and texture. Routes may be seen but should not attract the attention of the casual observer.

**VIS-MA-06:**

Manage 396,800 acres of BLM lands according to VRM Class III objectives, including, but not limited to, the following areas:

- Wildlife Emphasis Areas:
  - Timber Ridge
- ACECs:
  - Badger Wash; and
  - A portion of Dolores River Riparian (300 acres).
- SRMAs:
  - A portion of Dolores River Canyon (2,400 acres).
- Byways:
  - A portion of Dinosaur Diamond Prehistoric Highway (from the Bookcliffs south).
- Old Spanish National Historic Trail.
- Other VRM Class III areas:
  - West Salt Creek corridor;
  - Coal Canyon corridor;
  - Highway 141 along the Dolores River; and
  - Unaweep Canyon.

**VIS-MA-07:**

To partially retain the visual character of the existing landscape and to moderate the level of change to the existing environment, carefully consider the designation of routes or design/construction of new routes in areas managed as VRM Class III.

BLM_0024026

Routes may attract attention, but should not dominate the view of the casual observer. To the extent possible, routes should repeat the basic elements found in the natural landscape – form, line, color and texture.

---

**VIS-MA-08:**
Manage 1736,700 acres of BLM lands according to VRM Class IV objectives, including the following areas:

- Grand Valley OHV SRMA (9,700 acres);
- All other areas not identified as VRM Class I, II, or III.

---

**VIS-MA-09:**
In areas managed under VRM Class IV objectives, allow transportation/access routes that require major modification of the visual landscape. The level of change can be high and routes may dominate the view of the casual observer. To the extent possible, routes should repeat the basic elements found in the natural landscape – form, line, color and texture.

---

**VIS-OBJ-02:**
*Protect the visual integrity of the landscape by managing all project proposals to meet or exceed objectives of the prescribed VRM classes by incorporating visual design BMPs (Appendix H).*

---

**VIS-MA-10:**
Ecosystem restoration projects will ensure that visual impacts are minimized in the short term (5 years) and that VRM objectives in the project area are met in the long term (life of the project) when such projects are a) considered essential for public safety, achieving desired future conditions, or reducing fuels buildups; and b) expected to be visually prominent.

---

**VIS-OBJ-03:**
*Minimize impacts to dark night sky conditions from permitted activities and other human caused disturbances on public lands.*

---

**VIS-AU-02:**
Prohibit permanent outdoor lighting in VRM Class I areas.

---

**VIS-MA-11:**
Prevent or reduce impacts to dark night skies by using BMPs that reduce skyward projection of lighting, minimizing illumination and off-site projection of lighting, and by designing required lighting to be downward directing (see BMPs V-3 and FWS-24 in Appendix H).

---

**VIS-AU-03:**
**STIPULATION** *VISUAL CLASS I NSO CO:* No surface occupancy or use is allowed in

- VRM Objective Class I areas;

- the Goblins;
-  Highway 141 along the Dolores River; and
- Unaweep Canyon.

Standard exceptions apply; see Appendix B.

---

**VIS-AU-04:**
**STIPULATION** CSU-30: *VRM Class II.* Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within all areas designated as VRM Class II. Require that surface-disturbing activities meet the objectives of VRM Class II. (Refer to Appendix B.) See Figures 2-14 (in Appendix A. Specific exceptions apply; see Appendix B.

---

BLM_0024028

## WILDLAND FIRE MANAGEMENT

### WFM-GOAL-01:
*Providing for firefighter and public safety, manage fire to maximize ecological health benefits.*

#### WFM-OBJ-01:
*Use a full range of wildfire management strategies, from full suppression to resource benefit on unplanned ignitions. Multiple strategies can be applied to different areas of the same fire.*

##### WFM-MA-01:
Utilize wildfires on 857,400 acres as identified in Figure 2-26 in Appendix A to manage diversity in desired plant communities.

##### WFM-MA-02:
Suppress all fires in Salt Desert Shrub communities to protect these communities that are not adapted to fire and to reduce cheatgrass invasion.

#### WFM-OBJ-02:
*Work to restore Fire Regime Condition Classes 2 and 3 towards Class 1, and maintain areas of Fire Regime Condition Class 1.*

##### WFM-MA-03:
Implement fuels treatments actions that may include, but are not limited to:

- Mechanical treatments, including mowing, weed-whacking, chopping (roller chopper), chipping, grinding (hydro-ax), chaining, tilling, and cutting.
- Manual treatments, including hand cutting (chainsaw/handsaw) and hand-piling.
- Prescribed fire, including pile and broadcast burning.
- Chemical spraying or biological treatments, such as insects or goats.
- Seeding, including aerial or ground application.
- Commercial stewardship projects.

#### WFM-OBJ-03:
*Integrate fire and fuels management to meet Land Health Standards, WUI, and natural and cultural resource objectives across all levels of government and jurisdictional boundaries.*

##### WFM-MA-04:
Use a combination of planned and unplanned fire along with fuels treatments including mechanical, manual, chemical, and seeding to meet resource objectives. The priority will be using any of the above treatments based on strategic goals for site-specific projects.

BLM_0024029

**WFM-MA-05:**
Prioritize vegetation treatments that are designed to strategically reduce wildfire threat in areas of high fire risk rather than where the probability of fire is low and the potential for natural post-fire recovery is high.

**WFM-OBJ-04:**
*For the Emergency Stabilization (ES) program, determine the need to prescribe and implement emergency treatments to minimize threats to life or property or to stabilize and prevent unacceptable degradation to natural and cultural resources from the effects of a wildfire.*

**WFM-MA-06:**
Design ES treatment actions based on the severity of the wildfire impacts. ES priorities include, but are not limited to, areas where:

- Life, safety, or property requires protection.
- Unique or sensitive cultural resources are at risk.
- Soils are highly susceptible to accelerated erosion or water quality protection is required.
- Perennial grasses and forbs are not expected to provide soil and watershed protection within two years.
- Unacceptable vegetation, such as noxious weeds, may invade and become established.
- It is necessary to quickly restore threatened, endangered, or special species habitat populations to prevent adverse impacts.
- Stabilization and rehabilitation are necessary to meet RMP resource objectives.

**WFM-OBJ-05:**
*The Burned Area Rehabilitation (BAR) Program objectives are: 1) To evaluate actual and potential long-term post-fire impacts to critical cultural and natural resources and identify those areas unlikely to recover naturally from severe wildfire damage; 2) To develop and implement cost-effective plans to emulate historical or pre-fire ecosystem structure, function, diversity, and dynamics consistent with RMP objectives, or, if that is infeasible, restore or establish a healthy, stable ecosystem in which native species are well represented; and 3) To repair or replace minor facilities damaged by wildfire.*

**WFM-MA-07:**
Design BAR treatment actions based on the severity of wildfire impacts. BAR priorities include, but are not limited to:

- Repairing or improving lands unlikely to recover naturally.
- Implementing weed treatments to remove invasive weeds and planting native or non-natives to restore or establish healthy ecosystems.
- Planting to reestablish native trees.

BLM_0024030

- Repairing or replacing minor facilities (e.g., fences, campgrounds, interpretive signs, shelters, wildlife guzzlers, etc.)

**WFM-OBJ-06:**
*In partnership with local, state, and federal partners, conduct fire mitigation and fire-prevention activities to reduce human-caused wildfire ignition and improve public safety.*

**WFM-MA-08:**
Use signage, mass media, personal contacts, assistance with Community Wildfire Protection Plans, and other associated activities to reduce human ignition and other threats from wildfire.

**WFM-MA-09:**
Coordinate fire restrictions closely with state, county and local partners while considering economic and social effect to local communities.

BLM_0024031

# LANDS MANAGED FOR THE PROTECTION OF WILDERNESS CHARACTERISTICS

**WIL-GOAL-01:**
*Manage lands to protect wilderness characteristics (e.g., appearance of naturalness, outstanding opportunities for primitive and unconfined recreation or solitude) while considering competing resource demands and manageability, such as valid and existing rights, mineral potential, proximity to residential and other development, existing and potential recreation uses.*

**WIL-OBJ-01:**
*Where wilderness characteristics are managed for protection:*

- *Minimize surface disturbing activities such that the natural quality of the area is maintained;*
- *Maintain opportunities for solitude and primitive recreation where they occur in the areas.*

**WIL-MA-01:**
Manage 44,100 acres to protect wilderness characteristics in the following areas:

- Bangs (19,600 acres);
- Maverick (17,800 acres); and
- Unaweep (6,700 acres).

See Figure 2-4 in Appendix A.

**WIL-MA-02:**
Protect wilderness characteristics according to management actions and allowable uses for each individual unit, described below.

**WIL-MA-03:**
Reduce route density in areas where long-term management is designed to protect wilderness characteristics.

## Bangs

**WIL-OBJ-02:**
*Manage the Bangs Lands with Wilderness Characteristics Area for the protection of outstanding opportunities for solitude, primitive and unconfined recreation, and undisturbed landscapes compatible with zone objectives in the Bangs SRMA and with special attention to the protection of wildlife habitat and cultural resources.*

**WIL-MA-04:**

BLM_0024032

*Approved Resource Management Plan – LANDS MANAGED FOR PROTECTION OF WILDERNESS CHARACTERISTICS*

Protect wilderness characteristics by applying the following management:

- Issue Class I-II Commercial and Organized Event SRPs that meet area objectives.
- Limited to designated routes for motorized and mechanized travel, including over-snow travel (except for administrative access to range improvements).
- Close to wood product sales, including Christmas tree cutting.
- Manage as a ROW exclusion area.
- Close to mineral material disposal.
- Close to non-energy leasable mineral exploration and/or development.
- In response to wildfire, use Minimum Impact Suppression Tactics (MIST) to limit impacts on wilderness characteristics. Only allow ground-disturbing mechanical tactics (e.g., bulldozers) if life and/or property are threatened.
- Manage as VRM Class II, except manage existing range improvements as VRM Class III.
- Manage consistently with the overlapping portions of the Bangs SRMA.

**WIL-AU-01:**
**No Leasing**: Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figures 2-12, Appendix A.

**WIL-AU-02:**
**STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO:* No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan.

## Maverick

**WIL-OBJ-03:**
*Manage the Maverick Lands with Wilderness Characteristics Area to protect outstanding opportunities for solitude, undisturbed landscapes, and unique geologic features. A five-canyon complex and unique roadless area with outstanding opportunities for solitude given the topography, vegetation, and unique feature of Juanita Arch, which is the only natural bridge in Colorado.*

**WIL-MA-05:**
Protect wilderness characteristics by applying the following management:

Issue no SRPs for competitive events.

- Close to motorized over-snow travel.

BLM_0024033

- Close the portion (1,600 acres) that overlaps the Juanita Arch ACEC to motorized and mechanized travel.
- A portion (16,200 acres) is limited to designated routes for motorized and mechanized travel.
- Close to wood product sales and/or harvest.
- Issue non-commercial Christmas tree cutting permits as long as monitoring indicates that naturalness of the unit is not being impacted.
- Manage as a ROW exclusion area.
- Close to mineral material disposal.
- Close to non-energy leasable mineral exploration and/or development.
- Manage as VRM Class II.
- In response to wildfire, use MIST to limit impacts on wilderness characteristics. Only allow ground-disturbing mechanical tactics (e.g., bulldozers) if life and/or property are threatened.

**WIL-AU-03:**
**No Leasing**: Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figures 2-12, Appendix A.

**WIL-AU-04:**
**STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO:* No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan.

## Unaweep

**WIL-OBJ-04:**
*Manage the Unaweep Lands with Wilderness Characteristics Area to protect outstanding opportunities for solitude, primitive and unconfined recreation, and undisturbed landscapes with emphasis on wildlife, visual resources, range management, critical headwaters, and natural processes.*

**WIL-MA-06:**
Protect wilderness characteristics by applying the following management:

- Issue no SRPs for competitive events.
- Limited to designated routes for motorized and mechanized travel, including over-snow travel.
- Allow for administrative access to range improvements and livestock management.
- Close to wood product sales and/or harvest.

BLM_0024034

- Manage as a ROW exclusion area.
- Close to mineral material disposal.
- Close to non-energy leasable mineral exploration and/or development.
- Manage as VRM Class II.
- In response to wildfire use MIST to limit impacts on wilderness characteristics. Only allow ground-disturbing mechanical tactics (e.g., bulldozer) if life and/or property are threatened.
- Allow for the placement of range improvements in locations that meet the naturalness and setting of the area.
- Close and restore unauthorized routes that affect naturalness.

**WIL-AU-05:**

**No Leasing**: Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figures 2-12, Appendix A.

**WIL-AU-06:**

**STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO:* No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan.

**WIL-GOAL-02:**

*Provide appropriate levels of protection to preserve inventoried wilderness characteristics of areas determined to possess wilderness characteristics (e.g., appearance of naturalness, outstanding opportunities for primitive and unconfined recreation or solitude) while considering competing resource demands and manageability.*

**WIL-OBJ-05:**

*Through project analysis analyze and disclose impacts to lands with wilderness characteristics in lands inventoried and found to have those values.*

**WIL-MA-07:**

Maintain an ongoing up to date inventory of lands with wilderness characteristics.

**WIL-OBJ-06:**

*As appropriate, develop a continual evaluation process for lands with wilderness characteristics.*

**WIL-MA-08:**

Work with partners and cooperators to comply with current BLM guidance on maintenance of inventory data for lands with wilderness characteristics.

BLM_0024035

## II. RESOURCE USES

### FORESTRY

**FOR-GOAL-01**:
*Manage for healthy woodlands while providing for use of forest and woodland products.*

#### FOR-OBJ-01:
*Use a variety of silvicultural techniques and harvest systems to manage for healthy forests and woodlands while offering a variety of forest products and meeting other resource objectives for the following forestry and woodland types:*

- *Pinyon/Juniper;*
- *Ponderosa Pine;*
- *Douglas-fir;*
- *Aspen; and*
- *Spruce/Fir.*

#### FOR-MA-01:
Allow harvest of forest and woodland products in portions of the following forestry zones that are determined suitable for harvest in activity-level plans or site-specific analyses:

- Pinyon-juniper:
  - Bangs Canyon (59,100 acres)
  - Glade Park (67,100 acres);
  - Gateway (194,300 acres);
  - Book Cliffs (214,300 acres);
  - Plateau Valley (66,800 acres);
  - Grand Mesa Slopes (60,700 acres); and
  - Roan Creek (243,300 acres).
- Aspen:
  - Roan Creek (243,300 acres).
  - Book Cliffs (214,300 acres);
  - Plateau Valley (66,800 acres);
  - Grand Mesa Slopes (60,700 acres); and
  - Glade Park (67,100 acres).
- Spruce
  - Book Cliffs (214,300 acres);
  - Plateau Valley (66,800 acres);
  - Grand Mesa Slopes (60,700 acres); and

BLM_0024036

*Approved Resource Management Plan – VEGETATION- FORESTRY*

        o  Roan Creek (243,300 acres).
- Douglas fir
  - o  Book Cliffs (214,300 acres); and
  - o  Roan Creek (243,300 acres).

**FOR-MA-02:**

Close the following areas (approximately 239,400 acres) to wood product sales and/or harvest (not including Christmas tree harvest). (Figure 2-27, Appendix A). Additional areas may be found as unsuitable for harvest in the site specific forest/woodland management plans:

- The Palisade municipal watershed;
- Known lynx habitat;
- VRM Class I areas;
- WSAs;
- Lands managed for wilderness characteristics; and
- ACECs.

Exception: Allow wood product sales and/or harvest to meet desired resource conditions.

**FOR-MA-03:**

Allow Christmas tree cutting in annually delineated tree cutting areas.

Close the following areas to Christmas tree cutting, except when tree removal supports the objectives of the following areas:

- Areas identified as being over harvested;
- ACECs;
- Lands managed for wilderness characteristics; and
- WSAs.

**FOR-MA-04:**

Where conditions are appropriate, allow removal of tamarisk, non-native elms, and Russian olive material for biomass or personal use.

**FOR-MA-05:**

In the LBCWHR, limit fuelwood sales to 30 acres or less and to commercial operators only. Design fuelwood sales to meet management objectives for wild horses.

**FOR-MA-06:**

Discourage clear cuts in small, isolated, and tall conifer stands and/or mature pinyon-juniper woodlands under 160 acres, unless such practices meet other resource objectives.

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024037

*Approved Resource Management Plan – VEGETATION- FORESTRY*

**FOR-MA-07:**
Allow treatments of aspen stands to stimulate regeneration through either mechanical or fuels projects. Allow fuelwood cutting of dead and down aspen only in areas identified for allowable harvest, while leaving adequate standing dead trees in place for wildlife habitat.

**FOR-MA-08:**
Based upon tribal and public demand, allow collection of unconventional forest products. Limit permitted use of vegetal collection of commonly available renewable resources (e.g., seeds, cones, wildlings, berries, mushrooms, nuts) for non-commercial use to the following amounts consistent with other resource goals/objectives:

- Boughs, All Coniferous Species: 50 pounds per person per year
- Cones – Ornamental: two bushels per person per year (one bushel is equal to 9 gallons or 35 liters)
- Cones – Nuts: one bushel per person per year
- Medicinal: one bushel per person per year (collection prohibited within WSAs and ACECs)
- Mushrooms: five gallons per species per person per year
- Wildings: 15 meters (50 feet) per species per person per year (collection prohibited within WSAs, ACECs and certain SRMAs)
- Traditional, religious, or ceremonial plants that are not widely available may be harvested for personal use by Native American tribal members and will not be offered as wilding plants for the general public.

**FOR-MA-09:**
Maintain motorized access to firewood, post and pole gathering, and Christmas tree cutting areas.

BLM_0024038

## LIVESTOCK GRAZING

**GRZ-GOAL-01:**

*Provide adequate forage for livestock while attaining healthy rangelands, in accordance with land health standards and in balance with other resources and uses, to contribute to local economies, ranching livelihoods, and the rural western character integral to many communities.*

**GRZ-OBJ-01:**

*Meet the forage demands of livestock operations based on current active preference (animal unit-months [AUMs]) while meeting the BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (BLM 1997a) (Appendix E).*

**GRZ-MA-01:**

Manage livestock grazing in accordance with the BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (BLM 1997a) (Appendix E).

**GRZ-MA-02:**

Periodically evaluate current active preference and adjust as needed based on land health assessments, vegetative inventories, riparian monitoring, rangeland monitoring data, or other pertinent information. Allocate increases or decreases in forage availability to meet the greatest need (e.g., livestock, wildlife, watershed health).

**GRZ-MA-03:**

Make up to 960,500 acres available for livestock grazing. Provide up to 60,716 AUMs of livestock forage commensurate with public land health standards (BLM 1997a) (Appendix J). These acres may change if the cooperatively managed allotments (3,800 acres) are managed by the GJFO in the future. (Figure 2-5, Appendix A.)

**GRZ-MA-04:**

Make 66,600 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unalloted land. The purpose includes steep slopes, conflict with BLM recreation sites, or avoidance of sensitive resources such as those described in the *Areas of Critical Environmental Concern* section. Refer to Appendix J, Livestock Grazing Allotments.

**GRZ-MA-05:**

Close the following allotments to livestock use (see Appendix J):

- Baldridge Mesa;
- Bevan;
- Boulder Canyon;

BLM_0024039

*Approved Resource Management Plan – LIVESTOCK GRAZING*

- Browns Place;
- Brush Creek;
- Charlesworth;
- Clifton;
- Clover Gulch;
- Coon Creek;
- Dead Horse;
- Dry Kimball;
- Eby Point;
- Erven;
- Etcheverry;
- Fetters;
- Heely;
- Hight;
- Horizon;
- Hunter;
- LBCWHR:
- Logan Wash;
- Parkes Place;
- Plateau Creek;
- Red Mountain;
- Sewemup Mesa;
- Webber;
- Webb Isolated Tracts; and
- Whitewater Hill.

**GRZ-MA-06:**

In open allotments, close the following areas to livestock use:

- Ant Research Area;
- Badger Wash ungrazed paired plots or designated no grazing areas as defined in the study objectives;
- Miracle Rock picnic area;
- Mud Springs Campground;
- North Fruita Desert developed campground;
- Pyramid Rock ACEC;
- Study area exclosures; and
- West Creek picnic area.

BLM_0024040

- Eastern portion of the Palisade Municipal Watershed in the High Sensitivity area of the watershed.

**GRZ-MA-07:**
Allow for continuation of cooperatively managed grazing allotments by adjacent BLM field offices in accordance with Interoffice Agreements. Cooperative management of grazing allotments will be completed in accordance with Colorado Land Health Standards and under the guidance of this RMP. Cooperatively managed grazing allotments include, but are not limited to the following areas:

- Bar X (Moab FO): 8,330 acres;
- San Arroyo (Moab FO): 12,981 acres;
- Buckhorn (Moab FO): 1,400 acres; and
- Cathedral Bluffs (White River FO): 2,100 acres.

**GRZ-MA-08:**
Periodically evaluate whether to close other allotments or portions of allotments to livestock grazing, and implement with project level analysis, based on the following criteria:

- Areas identified as BLM disposal tracts;
- Lack of administrative access to public land;
- Small percentage of forage in allotment is contributed by BLM lands in allotment (less than 15 percent);
- Areas not accessible to livestock grazing (e.g., steep slopes);
- "C" category allotments that are relinquished and determined to be impractical for the administration of livestock grazing by the Authorized Officer;
- Major impact to sensitive resources such as wildlife or threatened and endangered species (e.g., competition for forage, winter range, Sage-Grouse habitat), or sensitive fish habitat, as determined by data analysis;
- Public health and safety;
- High intensity recreation areas/ facilities;
- Resource objectives for municipal watersheds;
- Impacts to cultural resources; and
- Conflicts with adjoining private lands (development).

**GRZ-MA-09:**
Work cooperatively with permittees, lessees, and other landowners to develop grazing management strategies that integrate both public and private lands into single management units.

**GRZ-MA-10:**

BLM_0024041

Identify appropriate utilization levels based on allotment or site-specific management practices, such as season-of-use, grazing intensity and duration, and utilization patterns, as well as vegetative conditions, riparian conditions, the presence or absence of range improvements, and resource issues or concerns. Use utilization levels and distribution of use as an indicator to evaluate if current grazing use is within the capacity of the land and appropriate to meet resource objectives for the area.

**GRZ-MA-11:**
Implement changes in livestock use through allotment management plans, grazing use agreements, and terms and conditions on grazing permits for priority allotments based on the current prioritization process and/or land health issues.

**GRZ-MA-12:**
Allow modification of allotment boundaries to correspond with fence lines and natural features, and allow consolidation of allotments and pastures into a new allotment.

**GRZ-MA-13:**
Construct range improvement projects on allotments to implement changes in grazing management to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users.

**GRZ-MA-14:**
Implement vegetation treatments, including mechanical, chemical, and fire, on priority allotments to improve rangeland health or reduce conflicts with other resources or public land users.

**GRZ-MA-15:**
Maintain a minimum of administrative access to range improvement projects, study sites, and to areas necessary to properly administer grazing permits.

**GRZ-MA-16:**
In some cases limit public access to protect range improvements from potential damage.

**GRZ-OBJ-02:**
*Provide periodic rest during active growth periods of forage plants to maintain or improve plant vigor and health.*

**GRZ-MA-17:**
When deemed necessary by the BLM's Authorized Officer, defer or exclude livestock grazing for a minimum of two growing seasons on disturbed areas (e.g., a fire event, reclamation of disturbed lands, seedings, surface-disturbing vegetation treatments) or until site-specific analysis and/or monitoring data indicates that vegetative cover, species composition, and litter accumulation are adequate to

BLM_0024042

support and protect watershed values, meet vegetation objectives, and sustain grazing use.

**GRZ-MA-18:**
Include periodic rest during the active growing season as part of authorized grazing use on Improve (I) category allotments.

**GRZ-MA-19:**
In limited precipitation zones (below 6,000 feet) of the Grand Valley and Kannah Creek management areas (176,800 acres), limit the grazing use period to October 1 to April 15, unless otherwise specified in an allotment management plan or grazing use agreement (Figure 2-5, Appendix A).

The change in the grazing use period could be phased in over a three-year period.

**GRZ-OBJ-03:**
*Manage livestock grazing to maintain and/or improve Sage-Grouse habitat.*

**GRZ-MA-20:**
Authorize new water developments for diversions from spring or seep source only when priority Sage-Grouse habitat will benefit on both upland and riparian habitat from the development or there are no negative impacts to Sage-Grouse. This includes developing new water sources for livestock as part of an AMP/conservation plan to improve sage-grouse habitat.

**GRZ-MA-21:**
Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to Sage-Grouse objectives. Structural range improvements, in this context, include but are not limited to: cattleguards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments.

**GRZ-MA-22:**
To reduce Sage-Grouse strikes and mortality, remove, modify, or mark fences in high risk areas. When fences are necessary, require a Sage-Grouse-safe design.

**GRZ-MA-23:**
Locate supplements (salt or protein blocks) in a manner designed to conserve, enhance, or restore Sage-Grouse habitat.

**GRZ-MA-24:**
Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat.

BLM_0024043

**GRZ-MA-25:**
When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat.

**GRZ-MA-26:**
Pursue the opportunity to establish grass banks from unallotted grazing allotments to provide management options on other allotments (e.g., fire, drought, vegetation treatments, and allotments not meeting land health).

**GRZ-OBJ-04:**
*Manage allotments to protect bighorn sheep with an emphasis on reducing the potential of disease transmission between domestic livestock and bighorn sheep.*

**GRZ-MA-27:**
Prohibit domestic sheep grazing on allotments within occupied bighorn sheep habitat.

**GRZ-MA-28:**
Allow for permitting of domestic sheep grazing on allotments outside of occupied bighorn sheep habitat on a case-by-case basis per NEPA analysis and the following criteria:

- Presence of topographic features (e.g., natural barriers, rivers) to separate domestic and bighorn sheep;
- Allow for permitting of domestic sheep grazing on allotments outside of occupied bighorn sheep habitat on a case-by-case basis per NEPA analysis and the following criteria: Adequate separation zones between domestic and bighorn sheep (WAFWA 2010);
- Current bighorn sheep management plan direction;
- The need to protect potential habitat;
- Local and national research results;
- Risk assessments from wildlife agencies;
- Timing of domestic sheep grazing; or
- Monitoring results indicating conflicts.

BLM_0024044

# RECREATION AND VISITOR SERVICES

*Note: Many of the proactive management measures and approaches that set vision and encourage work with partners and communities are found in Appendix H, Best Management Practices, as well as Appendix K, Recreation Appendix. This section of Chapter 2 should be read in combination with those appendices.*

## REC-GOAL-01:

*Produce a diversity of quality recreational opportunities that support outdoor-oriented lifestyles and add to participants' quality of life, enhance the quality of local communities, and foster protection of natural and cultural resources.*

*Note: Many of the proactive management measures and approaches that set vision and encourage work with partners and communities are found in Appendix H, Best Management Practices, as well as Appendix K, Recreation Appendix. This section of Chapter 2 should be read in combination with those appendices.*

### REC-OBJ-01 *(Field Office-Wide Resource Protection Objective)*:
*Increase awareness, understanding, and a sense of stewardship in recreational activity participants so their conduct safeguards cultural and natural resources as defined by Colorado Standards for Public Land Health (see Appendix E) or area-specific objectives (e.g. ACEC, Wild and Scenic Rivers).*

### REC-AU-01:
*Camping Limits.* Unless otherwise posted, implement a 14-day camping limit in areas open to camping and overnight use on BLM-managed lands. A limit of less than 14 days or greater than 14 days may be applied in certain areas if applicable due to resource and social impacts.

### REC-AU-02:
Allow undeveloped camping where not specifically restricted. Undeveloped camping may be seasonally restricted, sites may be designated or closed as impacts or environmental conditions warrant.

### REC-AU-03:
*Camping/Campfire Closures.* Close the following BLM-managed lands to camping and campfires:

- 18 Road Open OHV Area within the North Desert ERMA
- Bangs SRMA (certain areas, see SRMA section below);
- Gunnison River Bluffs ERMA (with an exception for special events, see ERMA section below);
- Horse Mountain ERMA (certain areas, see ERMA section below);
- Palisade Rim SRMA;
- Pyramid Rock ACEC;
- Unaweep Seep ACEC; and
- Within 100 meters of standing historic structures to include but not limited to Calamity Camp and New Verde Mine, unless administratively permitted.

BLM_0024045

If BLM determines there is a public health and safety issue or resource concern with a cultural resource or historic structure, the site may be closed to camping and overnight use.

**REC-AU-04:**
*Day-use Only.* Close the following BLM-managed lands to overnight use (sunset to sunrise):

- 34 and C Roads (certain areas outside of, but adjacent to, the Horse Mountain ERMA)
- Grand Valley Shooting Ranges (with an exception for authorized training exercises);
- Horse Mountain ERMA (certain areas, see ERMA section below);
- Redlands Dam area along the Gunnison River; and
- The Potholes on the Little Dolores River off of 9.8 Road in the Glade Park area.

**REC-MA-01:**
Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, direct visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs will be applied where appropriate.

**REC-MA-02:**
All new SRP proposals will be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits.

**REC-MA-03:**
Special Recreation Permits: Develop and implement an allocation system for SRPs. This will include criteria for numbers of events and types of events (i.e., community-focused) that will be considered for authorization through SRPs. Monitoring will identify effectiveness of permit classification system and adjustments will be made if it is determined that recreation goals and objectives are not being met.

**REC-MA-04:**
All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns.

**REC-MA-05:**
Prohibit cross-country motorized/mechanized travel for big game retrieval, except in open areas (e.g. Grand Valley OHV SRMA). Allow hand-held non-motorized/non-mechanized wheeled game retrieval carts.

**REC-MA-06:**
Provide recreational travel routes that are compatible with other resource objectives and connect the following areas:

- West side of North Desert ERMA to Rabbit Valley (within the McInnis Canyon NCA) and Utah Rims SRMA (within the Moab FO);
- Palisade Rim SRMA to Horse Mountain ERMA; and
- Grand Mesa to Palisade Rim SRMA and Horse Mountain ERMA.

**REC-MA-07:**
In balance with other resource considerations, retain or provide access to difficult to reach parcels of public land for hunting, fishing, and other recreation activities.

**REC-MA-08:**
Consider route features, quality user experience, and route connectivity to determine appropriate route use type (e.g. open, mechanized, ATV, UTV, foot, etc.).

**REC-MA-09:**
In balance with other resource considerations, provide access to undeveloped campsites that exist along dead-end spur roads.

**REC-MA-10:**
Work closely with Mesa and Garfield counties to maintain public access to areas identified as important for recreation.

**REC-OBJ-02 (***Field Office-Wide Community Partnership and Service Provider Objective***):**
*Increase collaboration and cooperation with community partners and other service providers to help communities produce greater well—being and socioeconomic health and deliver outstanding recreation experiences to visitors while sustaining the distinctive character of public lands recreation settings.*

*Note: See also the BMP appendix (Appendix H), which provides important guidance to meet this objective.*

**REC-MA-11:**
Coordinate with Dominguez-Escalante NCA, CDOT, Mesa County, Unaweep-Tabeguache Scenic and Historic Byway Association, and other stakeholders (e.g., Western Colorado Climbers' Coalition) to design and construct parking/trailhead facilities and a campground along Highway 141 on Ninemile Hill.

**REC-OBJ-03 (***Field Office-Wide Public Health and Safety Objective***):**
*Limit visitor exposure to unhealthy or unsafe human-created conditions (defined by a repeat incident in the same year, of the same type, in the same location, due to the same cause).*

BLM_0024047

**REC-MA-12:**

Continue to manage the existing developed recreation sites:

- Miracle Rock; and
- Mud Spring.

**REC-MA-13:**

Continue to actively manage and maintain existing developed recreation sites within the planning area, including ERMA and SRMA facilities and the following sites outside of designated RMAs:

- Low Gap Recreation Site;
- North Soda Recreation Site;
- Miracle Rock Recreation Site; and
- Mud Springs Campground.

**REC-AU-05:**

At designated sites allow overnight camping and campfires at Miracle Rock Recreation Site (prohibit camping outside of designated sites).

**REC-MA-14:**

If monitoring indicates a need for additional camping opportunities in the Miracle Rock area, redesign/reconfigure the Miracle Rock Recreation Site to better accommodate overnight camping.

**REC-AU-06:**

**STIPULATION** CSU-31: *Recreation.* Apply CSU (site-specific relocation) restrictions to surface occupancy and surface-disturbing activities to minimize conflicts with developed (and future) recreation sites and to mapped (and future) national/regional trails, local system trails that connect communities, and trailheads and interpretive sites with exceptional recreation values or significant public interest. (Refer to Appendix B.) See Figures 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

Apply this stipulation to the following sites that lie outside of designated RMAs:

- Low Gap Recreation Site;
- North Soda Recreation Site;
- Miracle Rock Recreation Site; and
- Mud Springs Campground.

**REC-AU-07:**

The discharge of firearms for recreational target shooting is permitted on BLM lands, outside of areas with firearm use restrictions, provided that the firearm is discharged toward a proper backstop sufficient to stop the projectile's forward progress beyond the intended target. Targets shall be constructed of wood,

BLM_0024048

cardboard, paper, or similar non-breakable materials. Clay targets and similar aerial targets shall be allowed. All targets, clays and shells are considered litter after use and must be removed and properly discarded.

Notify the public if areas are closed or restricted from recreational target shooting where monitoring or related data suggest that recreational shooting is causing or will cause considerable adverse impacts to public safety, or other sensitive resources (e.g., areas adjacent to a new housing development). Hunting in accordance with state regulations will continue to be allowed.

**REC-AU-08:**
*Firearm Use.* Allow the discharge of firearms for recreational target shooting on 1,013,700 acres. See Figure 2-28 Appendix A.

**REC-AU-09:**
*Firearm Use Restrictions.* In the following areas, prohibit recreational target shooting that uses any devices to propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns on 49,000 acres (Figure 2-28, Appendix A).

- Bangs SRMA RMZs 1, 2, and 3 (15,500 acres);
- Coal Canyon and Main Canyon areas (4,000 acres);
- Developed recreation sites;
- Grand Valley OHV SRMA (9,700 acres);
- Gunnison River Bluffs ERMA (810 acres);
- Horse Mountain ERMA, including RMZ 2 and adjacent areas west of Sink Creek and areas adjacent to residences at the east end of C Road (1,500 acres).
- Mt. Garfield ACEC (2,400 acres);
- North Desert ERMA, 18 Road Open area (170 acres);
- North Fruita Desert SRMA (11,600 acres);
- Palisade Rim SRMA (2,000 acres); and
- Pyramid Rock ACEC (1,300 acres).

The purpose of the restriction is to protect public safety by minimizing potential for accidental shootings and/or to protect sensitive resources (43 CFR 8364.1). This does not apply to the lawful taking of game.

**REC-OBJ-04 (***Field Office-Wide Recreation User Interaction Objective***):**
*Maximize positive interactions between a wide range of recreation users to protect a variety of recreation opportunities (Marcouiller 2008). Note: See BMP Appendix H for important guidance related to this objective.*

**REC-MA-15:**

BLM_0024049

Designate and manage recreation management areas (ERMAs, SRMAs) to provide and protect a wide variety of recreation opportunities, using approaches including (but not limited to) the following:

- Work with managing partners and service providers to create informational materials that help visitors match their expectations with appropriate recreation areas and opportunities available throughout the GJFO and adjoining public lands.

- In SRMAs, work with recreation users and other stakeholders to ensure protection of targeted activities, experiences and outcomes.

- In ERMAs managed for multiple activities, consider separating incompatible recreation uses in either time or space if monitoring indicates that negative user interactions are occurring and warrants the change (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.).

- In areas managed for multiple activities, support cooperative efforts by recreation users and other stakeholders that develop strategies promoting compatible interactions between recreation users (e.g., multi-user/interdisciplinary working groups).

**REC-AU-10:**
In SRMAs and ERMAs, establish specific Trail Management Objectives for primary recreation routes.

**REC-OBJ-05 (*De Beque Area Recreation Objective*):**
*If feasible, provide for recreation opportunities near the town of De Beque that enhance and protect sensitive cultural and biological resources, while providing a diverse mix of recreation activities and experiences, including intermediate to expert level singletrack motorcycling and mountain biking, and motorcycle trials riding utilizing the area's unique natural topography and scenery to enhance users' experiences. To a secondary extent, provide for shared compatible uses such as 4x4 and ATV touring, hiking, and horseback riding. Note: See BMP Appendix H for important guidance related to this objective.*

**REC-MA-16:**
Further evaluate and assess resource values within the area southwest of De Beque (bounded by South Shale Ridge, the Colorado River, and the Little Book Cliffs WSA).

**REC-MA-17:**
Use the following process to determine if a recreation management area or areas (ERMA and/or SRMA) that meet resource objectives can be identified:

1. Develop the resource evaluation consultation with Tribes, SHPO, and USFWS;

BLM_0024050

2. Evaluate the feasibility and costs of the assessment process, working together with the public and other partners;

3. Determine potential RMA boundaries if the resource evaluation, process feasibility, and cost assessment support completion of this step, working together with the public and other partners.

4. Conduct NEPA analysis of any ERMA and/or SRMA designation proposal resulting from completion of the previous steps.

5. Define specific thresholds of acceptable change that can be used in monitoring protocols.

6. Construct a carefully designed trail system that supports recreation objectives while protecting sensitive resources, working together with the public and other partners.

Current known management guidance/considerations in the De Beque area:

- High value cultural resources, Tribal concerns and sensitive plants in the area require avoidance or other mitigation.

- Sensitive plants in the area require avoidance or other mitigation.

- Oil and gas exploration and development is prevalent in the area.

- Recreationists desire a diverse mix of recreation activities and experiences, including intermediate to expert level singletrack motorcycling and mountain biking, motorcycle trials riding, 4x4 and ATV touring, utilizing the area's unique natural topography and scenery to enhance users' experiences. To a secondary extent and if possible, provide for shared compatible uses such as 4x4 and ATV touring, hiking, and horseback riding.

## Special Recreation Management Areas

*(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAS AND SRMA BMPs)*

The SRMAs are administrative units where the existing or proposed recreation opportunities and desired recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation.

*Management Focus.* The SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. The SRMAs may be subdivided into recreation management zones (RMZ) to further delineate specific recreation opportunities. Within SRMAs, R&VS management is recognized as the predominant land management focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis.

*Requirements.* The SRMAs/RMZs must have measurable outcome-focused objectives. Supporting management actions and allowable use decisions are required to: 1) sustain or

BLM_0024051

enhance recreation objectives, 2) protect the desired recreation setting characteristics, and 3) constrain uses, including non-compatible recreation activities that are detrimental to meeting recreation or other critical resource objectives (e.g. cultural or threatened and endangered species).

**REC-SRMA-OBJ-01:**
*Through the life of the plan, provide high quality recreation opportunities that result in improved quality of life for individuals and communities. Designate and manage individual SRMAs to provide for targeted recreation, activities, settings and associated outcomes.*

**REC-SRMA-MA-01:**
Designate five SRMAs for the protection of the prescribed recreation outcomes and settings (87,200 acres) (Figure 2-7, Appendix A):

- Bangs (47,800 acres);
- Dolores River Canyon (16,100 acres);
- Grand Valley OHV (9,700 acres);
- North Fruita Desert (11,600 acres); and
- Palisade Rim (2,000 acres).

**REC-SRMA-MA-02:**
Manage travel management within each SRMA/RMZ to support SRMA/RMZ objectives.

**REC-SRMA-AU-01:**
**No Leasing**: *Special Recreation Management Areas.* Close the following SRMAs to fluid mineral leasing. (Refer to Appendix B.) See Figure 2-12, Appendix A:

- Bangs;
- Dolores River Canyon; and
- Palisade Rim.

**REC-SRMA-AU-02:**
Geophysical exploration:
Close the following SRMAs to geophysical exploration:

- Bangs;
- Dolores River Canyon;
- North Fruita Desert; and
- Palisade Rim.

**REC-SRMA-AU-03:**
Mineral Materials:

BLM_0024052

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

Close the following SRMAs to mineral material sales:

- Bangs (with an exception for the Community Bentonite Pit on Little Park Road);
- Dolores River Canyon (with an exception for the pit along the Niche Road);
- Grand Valley OHV;
- North Fruita Desert; and
- Palisade Rim.

---

**REC-SRMA-AU-04:**
Non-Energy Solid Leasable Minerals:

Close all SRMAs to non-energy solid leasable minerals.

---

**REC-SRMA-AU-05:**
**STIPULATION** CSU-32: *Recreation Management Areas.* Apply CSU (site-specific relocation) restrictions in the Grand Valley OHV SRMA. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

---

**REC-SRMA-AU-06:**
**STIPULATION** *RECREATION SRMA NSO CO:* No surface occupancy or use is allowed within the following Special Recreation Management Areas (SRMAs) as identified in the Resource Management Plan:

- Bangs;
- Dolores River Canyon;
- North Fruita Desert; and
- Palisade Rim.

Standard exceptions apply; see Appendix B.

---

**REC-SRMA-MA-03:**
Utilize current best management practices (Appendix H) and the "Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado" to reduce or eliminate impacts from recreation to the other natural and cultural resources listed in the SRMA/RMZ objectives (except for the Grand Valley OHV SRMA). Appendix H describes BMPs current at the time of the RMP planning process. BMPs will likely evolve over the life of the plan. Implementation of management actions should be based on the most current BMPs.

**Bangs SRMA - 47,800 Acres**
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)

**Supporting Information for SRMA Allocation**

BLM_0024053

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

The Bangs SRMA has four distinct recreation management zones (RMZs). Overall, the Bangs SRMA provides opportunities for: mountain biking, hiking and trail running on world class singletrack trails; OHV use on a network of motorcycle, ATV, 4X4 and rock crawling routes; discovering and learning about the area's natural and cultural history; and exploring primitive undeveloped canyon country on foot or horseback. This SRMA includes the Tabeguache (Lunch Loops), Little Park, Bangs Canyon, and Ribbon Trailheads. The area has scenic views of the Colorado National Monument, Grand Valley, Grand Mesa, and Book Cliffs. The area is in close proximity to the population center of the Grand Valley, which makes it an important community resource for local recreation and quality of life, well as tourism. Portions of the SRMA are managed in partnership with the City of Grand Junction, with shared responsibility for access and facilities.

### Goal SRMA-Wide
*The Bangs SRMA, through recreation program management and stakeholder involvement, will produce a diversity of quality recreational opportunities that will continue to add to area residents' quality of life by contributing to the local economy and enhancing stewardship and protection of the area's natural and cultural resources.*

### Objective SRMA-Wide
*The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.*

### REC-SRMA-MA-04 (Bangs SRMA):
Manage the Tabeguache Trail from Little Park Road to Highway 141 as a high-clearance full-sized 4-wheel drive route to provide long-distance OHV recreation opportunities spanning portions of the Bangs SRMA, Dominguez-Escalante NCA, and Uncompahgre National Forest.

---

**Bangs SRMA RMZ 1 Lunch Loops Community Recreation Area**
**3,900 ACRES** (SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAS *AND SRMA BMPs*)

---

### REC-SRMA-OBJ-02 (Bangs SRMA RMZ 1):
*Through the life of the plan, manage RMZ 1 targeting a local/regional market, providing non-motorized mixed-use trail opportunities, accommodating a range of skill levels (beginner, intermediate and advanced). Encourage community-based recreation that can be marketed as an urban interface recreation asset of the Grand Valley. Manage the zone for the following targeted recreation activities and outcomes:*

*Activities: The targeted activities of the RMZ are mountain bicycling, trail running, dog walking, and hiking.*

*Outcomes and Experiences:*

    *1.  Visitors experience or seek to experience frequent access to outdoor physical activity, often in groups of friends and family, for fitness and stress reduction, to*

BLM_0024054

*increase endurance, and to develop outdoor skills and abilities through recreation in this zone.*

2. *Visitors realize personal benefits of easy access to the outdoors, improved fitness and health maintenance (physical and mental), development of technical competence (e.g., mountain biking skills), and development of stronger social bonds with friends and family.*

3. *The local community benefits from improved quality of life with higher levels of public land stewardship, stronger community relationships and a healthier community.*

4. *The area economy is strengthened through recreation-related revenue and increased desirability of the community as a place to live.*

**Resource Values:**
*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), Grand Junction Milk Vetch (Astragalus linifolius), water quality (non-point source erosion/sedimentation into the Colorado River), soils, paleontological resources, and cultural resources.*

**Resource Uses:**
*Minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: lands and realty.*

---

**REC-SRMA-MA-05 (Bangs SRMA RMZ 1):**
Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**
*Physical (remoteness, naturalness, facilities)*: This is a non-motorized, urban interface zone that is bounded by county and city roads. The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails, houses and other man-made developments. Due to topography and area scenery, the natural landscape is mostly retained despite the density of trails and proximity to the City of Grand Junction. The recreation facilities at trailheads may include, but are not limited to, vault toilets, informational kiosks and shade shelters. Throughout the unit, a designated singletrack trail system with a spectrum of trails (varied level of difficulty) is marked and maintained to achieve defined trail

BLM_0024055

management objectives that support overall RMZ objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than15 other groups on designated trails. Groups are generally small to medium-sized (1-8 people) with occasional encounters with larger groups. Sights, sounds, and tracks of other targeted users are frequent throughout the RMZ, but more prominent near trailheads. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Non-motorized singletrack trails with easy access from several trailheads in close proximity to the Grand Valley. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, City of Grand Junction, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve RMZ objectives. Management presence prominent at trailheads, and less prominent away from trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.).

### REC-SRMA-AU-07 (Bangs SRMA RMZ 1):
VRM Class:

Manage the RMZ under VRM Class II objectives.

### REC-SRMA-AU-08 (Bangs SRMA RMZ 1):
Minerals:

Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales, with the exception of the community bentonite pit on Little Park Road.
- Non-energy leasable mineral exploration and/or development.

### REC-SRMA-AU-09 (Bangs SRMA RMZ 1):
ROW:
Designate as a ROW avoidance area.

### REC-SRMA-MA-06 (Bangs SRMA RMZ 1):
Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

### REC-SRMA-AU-10 (Bangs SRMA RMZ 1):

BLM_0024056

Forestry and Vegetation:
Close the RMZ to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

---

**REC-SRMA-AU-11 (Bangs SRMA RMZ 1):**
Camping restrictions:
Close the RMZ to overnight camping and campfires to reduce impacts to this intensively used area that lies in close proximity to private residences.

---

**REC-SRMA-AU-12 (Bangs SRMA RMZ 1):**
Firearm use restrictions:
Prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns due to the high volume of use and density of designated routes in this area. This does not apply to the lawful taking of game.

---

**REC-SRMA-AU-13 (Bangs SRMA RMZ 1):**
Special Recreation Permits:

- Issue Class I, II and III Commercial, Competitive, and Organized Group SRPs that are consistent with zone objectives.
- Prohibit Class IV SRPs.
- Only issue event permits that support and celebrate Grand Valley communities. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.
- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the RMZ.

---

**REC-SRMA-AU-14 (Bangs SRMA RMZ 1):**
Comprehensive Trails and Travel Management:

- Close the RMZ to motorized travel, with the exception of trailhead access and administrative access to range improvements and other facilities.
- Limit mechanized travel to designated routes throughout the RMZ with the exception of small designated corridors where open travel is allowed (e.g., Free Lunch Trail play areas).
- Limit foot and horse travel to designated routes north of Little Park Road and Andy's Loop (core Lunch Loop trail system - see travel maps) due to the high volume of use and density of designated routes in this area.

---

**REC-SRMA-MA-07 (Bangs SRMA RMZ 1):**
Comprehensive Trails and Travel Management:

BLM_0024057

- Construct new system trails to accommodate activity-specific trails (e.g., limited to hiking).
- Connect/reroute routes to make loop opportunities that help achieve RMZ objectives. Reroute/repair unsustainable and eroding routes.
- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

---

**REC-SRMA-MA-08 (Bangs SRMA RMZ 1):**
Special Recreation Permits:
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

---

**Bangs SRMA RMZ 2 Magellan – Tabeguache OHV Trails**
**10,600 ACRES** (SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)

---

**REC-SRMA-OBJ-03 (Bangs SRMA RMZ 2):**
*Through the life of this plan, manage RMZ 2 targeting a local/regional market, and providing a broad range of motorized OHV trail opportunities, accommodating a range of skill levels (beginner, intermediate and advanced) for varying distances, including route connections that create long-distance OHV recreation opportunities spanning portions of the Bangs SRMA, Dominguez-Escalante NCA, and Uncompahgre National Forest. Encourage community-based recreation that can be marketed as an urban interface recreation asset to the Grand Valley. Manage the zone for the following targeted recreation activities, experiences and outcomes:*

*Activities: The targeted activities for the RMZ are motorized OHV trail riding (motorcycles, ATV/UTV, 4x4 full-size vehicles, rock crawling).*

*Outcomes and Experiences:*

1. *Visitors experience or seek to experience easy access to adventure and exploration with family and friends in a natural landscape. Visitors also value the opportunity to test their equipment and driving/riding skills.*
2. *Visitors generally realize personal benefits of having easy access to outdoor recreation in a natural environment, development of technical competence (driving/riding skills), and development of stronger social bonds with friends and family.*
3. *The community benefits from improved quality of life with higher levels of public land stewardship, stronger community relationships and a healthier populous.*
4. *The area economy is strengthened through recreation-related revenue and increased desirability of the community as a place to live.*

BLM_0024058

**Resource Values:**
*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), Grand Junction Milk Vetch (Astragalus linifolius), Canyon Tree Frog (Hyla arenicolor), Northern Leopard Frog (Rana pipiens), desert bighorn sheep, deer and elk winter range, water quality (non-point source erosion/sedimentation into the Gunnison and Colorado Rivers), soils, riparian resources, paleontological resources, and cultural (historic and prehistoric) resources.*

**Resource Uses:**
*Through the life of the plan, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: livestock grazing.*

---

**REC-SRMA-MA-09 (Bangs SRMA RMZ 2):**
Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**
*Physical (remoteness, naturalness, facilities):* This area is moderately remote in character with singletrack, ATV, and jeep trails that offer motorized recreation opportunities bound by state and county roads. The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails, houses and other man-made developments. Due to the topography, vegetative screening and area scenery, the natural-appearing landscape is retained despite the proximity to the City of Grand Junction. The recreation facilities at trailheads may include, but are not limited to, vault toilets, informational kiosks and other signs. Throughout the unit, a designated trail system with a range of trail opportunities (variety of use designations and varied levels of difficulty) is marked and maintained to achieve defined trail management objectives that support overall RMZ objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than six other groups on designated routes. Groups are generally small to medium-sized (3-6 people) with occasional encounters with larger groups. Sights, sounds, and tracks of other targeted users are relatively

BLM_0024059

infrequent throughout the RMZ, but more prominent near trailheads. Other users are more likely to be heard than seen due to the focus on motorized recreation. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* This RMZ is focused on motorized OHV use with trails and trailheads designed specifically for motorcycles, ATVs and full-size 4x4 vehicles. Access on the Tabeguache Trail through this zone, and continuing through RMZ 4, provides long-distance riding opportunities by linking the Tabeguache Trail through the Bangs SRMA, Dominguez-Escalante NCA and Uncompahgre National Forest. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local OHV businesses, City of Grand Junction, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve RMZ objectives. Management presence is prominent at trailheads, and less prominent away from trailheads. Rules, regulations, and land-use ethics are clearly posted at trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.).

**REC-SRMA-AU-15 (Bangs SRMA RMZ 2):**
VRM Class:

Manage the RMZ under VRM Class II objectives.

**REC-SRMA-AU-16 (Bangs SRMA RMZ 2):**
Minerals:

Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales.
- Non-energy leasable mineral exploration and/or development.

**REC-SRMA-AU-17 (Bangs SRMA RMZ 2):**
ROW:
Designate as a ROW avoidance area.

**REC-SRMA-MA-10 (Bangs SRMA RMZ 2):**
Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

**REC-SRMA-AU-18 (Bangs SRMA RMZ 2):**

BLM_0024060

Forestry and Vegetation:

Allow harvest of forest and woodland products if the RMZ is determined suitable for harvest. Close the RMZ to collection of vegetative material under a wilding permit.

### REC-SRMA-AU-19 (Bangs SRMA RMZ 2):
Camping restrictions:

- Allow camping and campfires only in designated sites in the portion of the RMZ north of the drainage at the bottom of Rough Canyon. In this portion of the RMZ, require the use of firepans and portable toilet systems, and prohibit firewood collection, to minimize camping impacts.
- Allow undeveloped camping and campfires in the portion of the RMZ south of the drainage at the bottom of Rough Canyon. In this portion of the RMZ, allow collection of only dead and down wood for campfires.

### REC-SRMA-AU-20 (Bangs SRMA RMZ 2):
Firearm use restrictions:

Prohibit the discharge of firearms (including any devices that propel a projectile, including but not limited to, bow and arrow, sling shots, paint ball guns and air guns) for recreational target shooting within the RMZ for the safety of other recreation users in this area of concentrated trail use. This does not apply to the lawful taking of game.

### REC-SRMA-AU-21 (Bangs SRMA RMZ 2):
Special Recreation Permits:

- Issue Class I, II and III Commercial, Competitive, and Organized Group SRPs that are consistent with zone objectives.
- Prohibit Class IV Commercial and Competitive SRPs.
- Only issue event permits that support and celebrate Grand Valley communities. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.
- Allow non-motorized events that have been coordinated with, and endorsed by, local OHV organizations, and do not significantly interfere with the SRMA's targeted activities, experiences and outcomes.
- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the RMZ.

### REC-SRMA-AU-22 (Bangs SRMA RMZ 2):
Comprehensive Trails and Travel Management:

BLM_0024061

- Limit motorized and mechanized travel to designated routes throughout the RMZ with the exception of small designated corridors where open travel is allowed (e.g., Tabeguache Rough Canyon slickrock play area.)
- Manage that part of the Tabeguache Trail that is south of the zone, to Highway 141 as a high clearance full-sized 4-wheel drive route. This action is outside of the Magellan-Tabeguache OHV Zone (RMZ 2) but provides an essential trail link through the adjacent Bangs Primitive Backcountry Zone (RMZ 4) for meeting the RMZ 2 objective for long-distance OHV opportunities.

**REC-SRMA-MA-11 (Bangs SRMA RMZ 2):**
Comprehensive Trails and Travel Management:

- Work with stakeholders/partners to design and construct new system trails to create additional motorized OHV recreation opportunities that help achieve RMZ objectives.
- Work with stakeholders to create new access points and trailheads if necessary to accommodate increased use, and/or achieve RMZ objectives.
- Connect/reroute routes to make loop opportunities that help achieve RMZ objectives.
- Reroute/repair unsustainable and eroding routes.
- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

**REC-SRMA-MA-12 (Bangs SRMA RMZ 1):**
Special Recreation Permits:
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

**REC-SRMA-AU-23 (Bangs SRMA RMZ 2):**
Prohibit new trail development in the portion of the RMZ which overlaps the Rough Canyon ACEC unless impacts to ACEC relevance and importance criteria can be mitigated.

**Bangs SRMA RMZ 3 Mica Mine/Rough Canyon Outdoor Classroom**
**1,100 ACRES** (SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)

*REC-SRMA-OBJ-04 (Bangs SRMA RMZ 3):*
*Through the life of this plan, manage RMZ 3 targeting a local/regional market, providing hiking and educational outdoor classroom learning opportunities consistent with Rough Canyon ACEC management objectives to enhance the appreciation and protection of those values (geology, wildlife habitat, sensitive plants and cultural*

BLM_0024062

*resources). Encourage community-based use of the area as an outdoor classroom. Manage the zone for the following targeted recreation activities, experiences and outcomes:*

**Activities:** *The targeted activities for the RMZ are hiking/walking and experiential learning.*

**Outcomes and Experiences:**

1. *Visitors experience or seek to experience the enjoyment and appreciation of the area's wildlife, scenery, views and aesthetics while learning more about the area's history, ecology and geology.*
2. *Visitors realize personal benefits of a closer relationship with the natural world.*
3. *The community benefits from an increased awareness and protection of natural landscapes and cultural resources on a community-wide basis.*

**Resource Values:**
*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), Grand Junction Milk Vetch (Astragalus linifolius), Significant plant communities: West Slope Pinyon Woodland (Pinus edulis-Juniperus osteosperma/Coleogyne ramosisima Woodland); Canyon Tree Frog (Hyla arenicolor), Northern Leopard Frog (Rana pipiens), desert bighorn sheep, deer and elk winter range, water quality (non-point source erosion/sedimentation into the Gunnison and Colorado Rivers), soils, riparian resources, paleontological resources, and cultural (historic and prehistoric) resources.*

**Resource Uses:**
*Minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: mineral collecting, livestock grazing, lands and real estate.*

---

**REC-SRMA-MA-13 (Bangs SRMA RMZ 3):**
Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**
*Physical (remoteness, naturalness, facilities):* This is a non-motorized/ non-

BLM_0024063

mechanized zone with easy access from Grand Junction via Little Park Road. The character of the landscape is mostly natural in appearance with few modifications that detract from naturalness. Evidence of past mining activities and developments are present in portions of Rough Canyon and Ladder Canyon. Due to topography, vegetative screening and area scenery, the natural landscape is mostly retained. The recreation facilities at trailheads may include, but are not limited to, vault toilets, informational kiosks and other signs. Trails in the zone are designed and maintained to facilitate defined experiential learning objectives. Interpretive and educational displays can be expected at trailheads and along primary trails.

*Social (contacts with other groups, group size, evidence of use):* On developed trails (Mica mine, Rough Canyon trails), visitors are likely to encounter multiple groups per day with a fairly high potential of seeing large groups like school groups and scouts. Throughout the rest of the unit, encounters with other groups are infrequent. On developed trails, the sounds of other people are frequently heard. In the rest of the unit, depending on location in the zone and proximity to trailheads, the sounds of other people are infrequent. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Non-motorized/non-mechanized trails provide easy access from the Bangs Trailhead which lies in close proximity to the Grand Valley. The large trailhead accommodates buses that transport school groups to the area. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, Mesa County School District 51, Colorado Mesa University, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve RMZ objectives. Management presence prominent at trailheads, and less prominent away from trailheads. Staff or volunteer trail hosts or guides may be on primary trails providing education/interpretation services. Rules, regulations, and land-use ethics are clearly posted at trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.).

**REC-SRMA-AU-24 (Bangs SRMA RMZ 3):**
VRM Class:

Manage the RMZ under VRM Class II objectives.

**REC-SRMA-AU-25 (Bangs SRMA RMZ 3):**
Minerals:

Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales.
- Non-energy leasable mineral exploration and/or development.

BLM_0024064

**REC-SRMA-AU-26 (Bangs SRMA RMZ 3):**
ROW:
Designate as a ROW exclusion area with an exception to allow consideration of ROW applications for access to private inholdings within the RMZ.

**REC-SRMA-MA-14 (Bangs SRMA RMZ 3):**
Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

**REC-SRMA-AU-27 (Bangs SRMA RMZ 3):**
Forestry and Vegetation:

Close the RMZ to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

**REC-SRMA-AU-28 (Bangs SRMA RMZ 3):**
Camping restrictions:

Close the RMZ to overnight camping and campfires to reduce impacts to sensitive biological and cultural resources.

**REC-SRMA-AU-29 (Bangs SRMA RMZ 3):**
Firearm use restrictions:

For the safety of other recreation users and protection of sensitive resources, prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball, guns and air guns. This does not apply to the lawful taking of game.

**REC-SRMA-AU-30 (Bangs SRMA RMZ 3):**
Rock Climbing:

- Allow technical rock climbing to continue where it does not create conflicts with targeted recreation uses and outcomes.
- With partners (climbing clubs, retail service providers, etc.), close climbing routes that are causing resource concerns; identify and improve primary access trails to and between climbing routes to protect biological and cultural resources.
- To reduce resource impacts on the top of routes, encourage placement of permanent rappel anchors.

BLM_0024065

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

- To protect visual resources, require all permanent anchors to match the color of the rock surface (fixtures, hardware and webbing, etc.).

**REC-SRMA-MA-15 (Bangs SRMA RMZ 3):**
To protect the learning opportunities associated with the area's mica and quartz mining history, develop educational messages that encourage visitors to leave mica and quartz onsite. If monitoring shows significant loss of mica and quartz from the area, implement collection restrictions (e.g., prohibit collection of mica and quartz, requiring special permits for the collection of small quantities for classroom study).

**REC-SRMA-AU-31 (Bangs SRMA RMZ 3):**
Special Recreation Permits:
Issue Class I – II Commercial, Competitive and Organized group SRPs that are consistent with RMZ objectives. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.

**REC-SRMA-AU-32 (Bangs SRMA RMZ 3):**
Comprehensive Trails and Travel Management:

- Close the RMZ to motorized and mechanized travel.
- Close the Mica Mine trail and Rough Canyon trail to equestrian use to protect sensitive biological and cultural resources. Equestrian use is allowed elsewhere in the RMZ.

**REC-SRMA-MA-16 (Bangs SRMA RMZ 3):**
Comprehensive Trails and Travel Management:

- Work with stakeholders to design and construct any new system trails, access points or facilities identified as necessary for achievement of RMZ objectives.
- Connect/reroute routes to make loop opportunities that help achieve RMZ objectives.
- Reroute/repair unsustainable and eroding routes.

**REC-SRMA-MA-17 (Bangs SRMA RMZ 3):**
Special Recreation Permits:
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

---

**Bangs SRMA RMZ 4 Bangs Primitive Backcountry Zone**
**32,200 ACRES** (SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)

---

*REC-SRMA-OBJ-05 (Bangs SRMA RMZ 4):*

BLM_0024066

*Through the life of this plan, manage RMZ 4 targeting local/regional visitors, providing primitive backcountry hiking, horseback riding, hunting, and wildlife viewing opportunities in a largely undeveloped natural setting. Manage the zone for the following targeted recreation activities, experiences and outcomes:*

*Activities: The targeted activities for the RMZ are primitive cross-country hiking, horseback riding, hunting and wildlife viewing.*

**Outcomes and Experiences:**

1. *Visitors experience or seek to experience quiet adventures to enjoy the area's wildlife, scenery, views and undeveloped natural landscapes while exploring the area by foot or horseback.*

2. *Visitors generally realize personal benefits of physical exercise, stress reduction, and a closer relationship with the natural world.*

3. *The community benefits from an increased awareness and stewardship of natural landscapes on a community-wide basis.*

**Resource Values:**

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/ mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), deer and elk winter range, water quality (non-point source erosion/ sedimentation into the Colorado River), soils, paleontological resources, and cultural (historic and prehistoric) resources.*

**Resource Uses:**

*Minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: livestock grazing.*

---

**REC-SRMA-MA-18 (Bangs SRMA RMZ 4):**

Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**

*Physical (remoteness, naturalness, facilities):* This is a remote backcountry zone bisected by the Tabeguache Trail which provides a through route for motorized and mechanized users to traverse the area between Bangs RMZ 1 and Highway 141. Apart from the Tabeguache Trail there are few signs of man-made developments in

BLM_0024067

the interior of this zone. Developments of man are visible in the distance from parts of the zone, and are more prominent near the perimeter of the zone. There are no developed recreation facilities in the zone with the exception of the Tabeguache Trail.

*Social (contacts with other groups, group size, evidence of use):* Except along the Tabeguache Trail, visitors to this zone can expect contacts with other groups to be infrequent (0-3 per day) and group sizes are small (1-6 people.) Evidence of other recreation activities is minimal. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Motorized and mechanized vehicle access is limited to the perimeter of the zone, and the Tabeguache Trail that bisects the zone. Foot and horse travel and camping utilizes primitive, undeveloped trails, or cross-country route-finding employing Leave No Trace travel and camping principles. Visitor services and management presence are minimal. There are no developed/maintained trails, with the exception of the Tabeguache Trail. Basic signs showing rules, regulations and land-use ethics may be posted at primary access points. BLM staff or volunteer field patrols in this zone are generally infrequent.

---

**REC-SRMA-AU-33 (Bangs SRMA RMZ 4):**
Allow motorized and mechanized vehicle use on the Tabeguache Trail through RMZ 4.

---

**REC-SRMA-MA-19 (Bangs SRMA RMZ 4):**
Lands with Wilderness Characteristics:

Manage the portion of the RMZ which overlaps the Bangs Canyon LWC unit consistently with the LWC unit management objectives. This includes the management actions and allowable uses shown below for the RMZ in addition to the following:

Allowable Use: **STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO.* No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan. Standard exceptions apply; see Appendix B.

---

**REC-SRMA-AU-34 (Bangs SRMA RMZ 4):**
VRM Class:

Manage the RMZ under VRM Class II objectives.

---

**REC-SRMA-AU-35 (Bangs SRMA RMZ 4):**

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

Minerals:

Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales.
- Non-energy leasable mineral exploration and/or development.

**REC-SRMA-AU-36 (Bangs SRMA RMZ 4):**
ROW:

Manage as a ROW exclusion area with an exception to allow consideration of ROW applications for access to private inholdings within the RMZ.

**REC-SRMA-MA-20 (Bangs SRMA RMZ 4):**
Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

**REC-SRMA-AU-37 (Bangs SRMA RMZ 4):**
Forestry and Vegetation:

Close the RMZ to the following:

- Timber harvest, fire wood cutting, and special forest product harvest.
- Collection of vegetative material under a wilding permit.

**REC-SRMA-AU-38 (Bangs SRMA RMZ 4):**
Camping restrictions:

Allow overnight camping and campfires using Leave No Trace camping principles.

**REC-SRMA-AU-39 (Bangs SRMA RMZ 4):**
Special Recreation Permits:

- Issue Class I and II Commercial and Organized Group SRPs that are consistent with zone objectives.
- Prohibit Competitive SRPs except on the Tabeguache Trail.

**REC-SRMA-AU-40 (Bangs SRMA RMZ 4):**
Comprehensive Trails and Travel Management:

- Limited to designated routes for motorized and mechanized travel.
- Limited to designated routes for motorized over-the-snow travel.

**REC-SRMA-MA-21 (Bangs SRMA RMZ 4):**
Special Recreation Permits:

BLM_0024069

All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

**REC-SRMA-MA-22 (Bangs SRMA RMZ 4):**
If monitoring indicates that foot or horse travel in the zone is causing resource damage, consider limiting recreation use and/or limited trail development/maintenance to address the resource concern. Trail work, including but not limited to, signage/marking, reroutes, construction, should only be considered after other adaptive management strategies (group size limits, permitting, area closures, etc.) have been implemented to resolve resource concerns.

## Dolores River SRMA -  16,100 Acres
### (SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)

### Supporting Information for SRMA Allocation
The Dolores River Canyons SRMA encompasses scenic canyon country along the lower Dolores River west to the Utah Border, portions of West Creek, and lands adjacent to the Town of Gateway. It also includes a portion of the Unaweep-Tabeguache Scenic and Historic Byway. This SRMA will be directly affected by the development of the Gateway Canyons Resort and their partnership with BLM.

### Goal SRMA-Wide
Dolores River Canyons SRMA, through recreation program management and stakeholder involvement, will produce a diversity of quality recreational opportunities that will continue to add to area residents' quality of life by contributing to the local economy and enhancing stewardship and protection of the area's natural and cultural resources.

### Objective SRMA-Wide
The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

*REC-SRMA-OBJ-06 (Dolores River SRMA):*
*Through the life of this plan, manage the Dolores River Canyons SRMA targeting a regional, national and international market providing educational opportunities for visitors to experience the history, culture, geology and scenic diversity of this region. Encourage stewardship and environmental and cultural appreciation through education and experiential learning. Manage the zone for the following targeted recreation activities, experiences and outcomes:*

*Activities: The targeted activities for the RMZ are automobile/motorized scenic touring, mountain biking, day hiking, float boating (canoes, kayaks, rafts), and environmental learning.*

BLM_0024070

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

**Outcomes and Experiences:**

1. *Visitors experience or seek to experience the area's wildlife, scenery, views, aesthetics and culture by learning about this area during self-exploration or guided tours.*

2. *Visitors generally realize personal benefits of gaining greater appreciation of the area's natural and cultural heritage through education and improved mental well-being.*

3. *The community benefits by having an enhanced appreciation of public lands and the associated economic benefits of a more robust tourism market.*

4. *Visitor experiences will likely result in enhanced resource stewardship of the area's natural, scenic and cultural resources.*

**Resource Values:**

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: rare plants, including Kachina daisy (Erigeron kachinensis), Eastwood's monkeyflower (Mimulus eastwooodiae), San Rafael milkvetch (Astragalus rafaelensis), Fisher milkvetch (Astragalus piscator),Dolores River skeleton plant (Lygodesmia doloresensis), horseshoe milkvetch (Astragalus equisolensis), Grand Junction milkvetch (Astragalus linifolius), Tufted frasera (Frasera paniculatum), Osterhout's cryptantha (Cryptantha osterhoutii), and Gypsum catseye; Significant plant communities: Foothills Riaprian Shrubland (Forestiera pubescens shrubland), Narrowleaf Cottonwood Riparian Forest (Acer negundo – Populus angustifolia/ Celtis reticulate Forest); (Cryptantha gypsophila); invasive non-native vegetation including Russian knapweed (Acroptilon repens) and tamarisk(Tamarix spp.); bald eagle (Haliaeetus leucocephalus); peregrine falcon (Falco peregrinus); deer and elk winter range; riparian resources, visual resources, paleontological resources, and cultural (historic and prehistoric) resources.*

**Resource Uses:**

*Minimize impacts from other resource uses to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: gold prospecting, lands and realty (ROW corridor), livestock grazing. In the portions of this RMZ that overlap the ROW corridor, manage recreation to achieve management objectives for the ROW corridor.*

---

**REC-SRMA-MA-23 (Dolores River SRMA):**

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024071

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**

*Physical (remoteness, naturalness, facilities):* This area is a corridor along Colorado State Highway 141, which is also a state scenic and historic byway (Unaweep-Tabeguache) and along county dirt roads paralleling the Dolores River. Despite its proximity to the highway, ranching development, and the small town of Gateway, this unit remains largely natural in appearance due to the area's topography and scenic integrity. Few facilities currently exist, but trailheads and other interpretive exhibits will likely be developed over time.

*Social (contacts with other groups, group size, evidence of use):* The majority of visitors use the scenic byway to explore this unit, with a smaller percentage of visitors floating the river or using the trails. Contacts with other groups are moderate to high (15-25) along the highway, and low (3-6) on the river and trails. Group sizes for all activities are variable. The evidence of use is low in regards to alteration of the natural landscapes, but sights and sounds of other users are common along the highway, and less prominent along the river, county roads, and trails. Use is highest during the spring, summer and fall months.

*Operational (access, visitor services, management controls):* Rural highway auto, truck and motorcycle traffic is characteristic in the majority of this unit. The highway affords easy access to the river and trails. Information and environmental education are prevalent along the highway corridor and at trailheads. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, Town of Gateway, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve RMZ objectives. BLM staff or volunteers may occasionally be onsite, but most visitor use is supported by services in Gateway, or is self-guided, relying on signage or web-based information. Regulatory and educational information and use ethics are clearly signed to educate visitors and reduce resource damage.

**REC-SRMA-AU-41 (Dolores River SRMA):**
VRM Class:
Manage a portion of the SRMA under VRM Class II objectives (13,600 acres) and a portion under VRM Class III objectives (2,400 acres).

**REC-SRMA-AU-42 (Dolores River SRMA):**
Minerals:
Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales (exception for area near Niche Road).
- Non-energy leasable mineral exploration and/or development.

**REC-SRMA-AU-43 (Dolores River SRMA):**

BLM_0024072

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

ROW:
Designate as a ROW avoidance area.

**REC-SRMA-MA-24 (Dolores River SRMA):**
Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

**REC-SRMA-AU-44 (Dolores River SRMA):**
Camping restrictions:

Limit camping and campfires to designated developed campgrounds and designated undeveloped campsites. Require the use of firepans and portable toilet systems at undeveloped campsites.

**REC-SRMA-AU-45 (Dolores River SRMA):**
Special Recreation Permits:

- Prohibit Class III and IV Commercial and Competitive SRPs. Allow an exception for historical, reoccurring events (e.g., Gateway Dynamite Shoot).
- Only issue vending permits in conjunction with event SRPs.

**REC-SRMA-AU-46 (Dolores River SRMA):**
Comprehensive Trails and Travel Management:

Limit motorized and mechanized travel to designated routes.

**REC-SRMA-MA-25 (Dolores River SRMA):**
Comprehensive Trails and Travel Management:

Work with Colorado Department of Transportation and the Unaweep-Tabeguache Scenic and Historic Byway to design and develop access from Highway 141 to interpretive sites and other recreation sites along the Dolores River.

**REC-SRMA-AU-47 (Dolores River SRMA):**
Special Recreation Permits:

- Issue Class I and II Commercial, Competitive, and Organized Group SRPs that are consistent with SRMA objectives.
- Allow only SRPs that support management objectives of BLM and stakeholders (e.g., environmental and cultural education).

**REC-SRMA-MA-26 (Dolores River SRMA):**
Special Recreation Permits:
All SRPs will be evaluated using Permit Evaluation Factors and Permit

BLM_0024073

Classification System (see Appendix L).

**REC-SRMA-MA-27 (Dolores River SRMA):**
Connect/reroute routes to make loop opportunities that help achieve SRMA objectives. Reroute/repair unsustainable and eroding routes.

## Grand Valley OHV SRMA - 9,700 Acres
**(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)**

**Supporting Information for SRMA Allocation**
The Grand Valley OHV SRMA is located northeast of the Grand Junction Regional Airport and encompasses approximately 15 square miles of desert-like terrain bounded by 27 ¼ Road on the west, the 32 Road alignment on the east, and the Little Book Cliffs on the northeast. The barren hills of Mancos shale offer challenging rides for all types of vehicles and all rider skill levels. 27 ¼ Road and 29 Road provide relatively easy access from the Grand Valley, and offer opportunities for development of recreation support facilities such as parking/unloading areas, informational signage, restrooms, campsites, and event venues. Existing roads, property boundaries and prominent topographic features provide distinct area boundaries that could be signed and/or fenced to clearly define the areas open for cross-country OHV travel.

**Goal SRMA-Wide**
The Grand Valley OHV SRMA, through recreation program management and stakeholder involvement, will produce opportunities for visitors to experience the freedom to participate in a variety of motorized OHV recreation activities which lead to a variety of beneficial recreation and economic outcomes for participants and Grand Valley communities.

**Objective SRMA-Wide**
The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

*REC-SRMA-OBJ-07 (Grand Valley OHV SRMA):*
*Through the life of this plan, manage the SRMA to provide local and regional visitors the freedom to participate in unconfined motorized OHV recreation activities in close proximity to the urban amenities of the Grand Valley. Manage the zone for the following targeted recreation activities, experiences and outcomes:*

*Activities: The targeted activities for the RMZ are* are all forms of motorized OHV recreation, and undeveloped camping.

### Outcomes and Experiences:

1. *Visitors experience or seek to experience the freedom of cross-country riding and risk-taking adventure while testing their equipment and building their skills often in groups of friends and family.*

2. *Visitors generally realize personal benefits of a greater sense of adventure that tests their endurance and equipment, and an improved capacity to engage in motorized OHV recreation.*

3. *The Grand Valley community benefits from increased local tourism and tax revenue, and an enhanced sense of community ownership in the area's recreation resources.*

### Resource Values:

*Manage this area to minimize recreation impacts in areas adjacent to the SRMA, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), Grand Junction suncup (Camissonia eastwoodiae), Grand Junction buckwheat (Eriogonum contortum), water quality (salinity, non-point source erosion/sedimentation into the Colorado River), Mancos soils.*

### Resource Uses:

*Minimize impacts from other resource uses to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: lands and realty (ROW corridor, land acquisitions, private property trespass) and livestock grazing. In the portions of this SRMA that overlap the ROW corridor, manage recreation to achieve management objectives for the ROW corridor.*

---

**REC-SRMA-MA-28 (Grand Valley OHV SRMA):**

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**

*Physical (remoteness, naturalness, facilities):* The area's proximity to the Grand Valley, Interstate 70 and the Grand Junction Regional Airport creates an urban interface setting at the primary access points, with more remote settings available in the interior of the area. The character of the natural landscape has been largely altered by nearby development and cross country travel that has been the dominant use of the area for many years. Developed recreation facilities currently do not exist, but will likely be prominent in the future along the perimeter of the SRMA to

BLM_0024075

direct and focus use within the open area. The recreation facilities at primary access points may include, but are not limited to, parking/staging areas that accommodate OHV-hauling rigs, OHV loading/ unloading ramps, vault toilets, informational kiosks and shade shelters. Additional recreation facility developments within the area may include event/festival/ vending areas, and OHV race tracks (e.g., motocross track).

*Social (contacts with other groups, group size, evidence of use):* This SRMA is generally a busy place, with other people constantly in view, traveling or congregating in large groups at trailheads and throughout the unit. Large disturbed areas are present, with sights, sounds, and tracks of other targeted users prominent throughout the SRMA, but more prominent near staging areas. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Access to the southern and western periphery of the area is on regularly-maintained paved or gravel roads. Access into the interior of the SRMA is unrestricted by vehicle size or type. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local OHV businesses, City of Grand Junction, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. Maps, signs and physical barriers (e.g., fences) delineate area boundaries. Management presence prominent at trailheads, and less prominent away from trailheads. Federal, state and local personnel are frequently present for information, education and law enforcement efforts. Portions of the area are designated for camping, festivals, equipment demonstrations, food vendors, and motorized events and competitions. Visitor use fees may be charged to support infrastructure and services (staging/event/camping area facilities, field patrols, EMS, law enforcement, maps, information, etc.).

---

**REC-SRMA-AU-48 (Grand Valley OHV SRMA):**
VRM Class:
Manage the SRMA under VRM Class IV objectives with the exception of the portion of the SRMA along the face of the Little Book Cliffs managed under VRM Class II objectives.

---

**REC-SRMA-AU-49 (Grand Valley OHV SRMA):**
Minerals:
Close the RMZ to the following:

Mineral material sales.

---

**REC-SRMA-AU-50 (Grand Valley OHV SRMA):**
ROW:

Designate as a ROW avoidance area except for existing ROW corridor.

BLM_0024076

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

**REC-SRMA-MA-29 (Grand Valley OHV SRMA):**
Lands and Realty:

- Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the SRMA that enhance public access and recreation opportunities consistent with SRMA objectives.
- Adjust SRMA boundary to match future land tenure adjustments related to expansion of the Grand Junction Regional Airport.

**REC-SRMA-AU-51 (Grand Valley OHV SRMA):**
Camping restrictions:

- Allow dispersed undeveloped camping throughout the SRMA as long as it does not interfere with frequently used OHV routes.
- Camping emphasis areas may be designated to direct and focus camping activities in areas that reduce interference with OHV use, and/or provide desirable camping opportunities.

**REC-SRMA-AU-52 (Grand Valley OHV SRMA):**
Firearm use restrictions:
Prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

**REC-SRMA-AU-53 (Grand Valley OHV SRMA):**
Special Recreation Permits:

- Issue Class I, II, III and IV Commercial, Competitive and Organized Group SRPs that are consistent with SRMA objectives.
- Throughout the year, issue vending SRPs that achieve SRMA objectives and support local outdoor recreation businesses or organizations.
- In association with permitted competitive events, issue vending SRPs to vendors that support the authorized event.
- Do not issue vending SRPs for alcohol sales in the SRMA.
- Actively promote this area for motorized OHV events and activities.
- Allow non-motorized events that have been coordinated and endorsed by local OHV organizations, and do not significantly interfere with the SRMA's targeted activities, experiences and outcomes.

**REC-SRMA-AU-54 (Grand Valley OHV SRMA):**
Comprehensive Trails and Travel Management:

Allow unrestricted travel for all types of use within the SRMA, with the exception

BLM_0024077

of small designated camping areas, special use areas (e.g., motocross track) and vending/event areas.

### REC-SRMA-AU-55 (Grand Valley OHV SRMA):
Comprehensive Trails and Travel Management:

To provide navigational assistance to visitors, consider providing directional signing on some primary arterial routes that traverse the SRMA and access primary staging areas.

### REC-SRMA-MA-30 (Grand Valley OHV SRMA):
Special Recreation Permits:
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

### REC-SRMA-MA-31 (Grand Valley OHV SRMA):
Clearly identify OHV open area boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to contain use along portions of an open OHV area boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.

### REC-SRMA-MA-32 (Grand Valley OHV SRMA):
Continue to comply with the Federal Pollution Control Act regulations to minimize point sources of pollutants to navigable waters by obtaining (or requiring project proponents through conditions of approval to obtain) National Pollutant Discharge Elimination System (NPDES) permits where necessary to reduce impacts from stormwater runoff.

## North Fruita Desert SRMA - 11,600 Acres
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAs *AND SRMA BMPs*)

**Supporting Information for SRMA Allocation**
The North Fruita Desert SRMA is located at the base of the Book Cliffs north of the City of Fruita and encompasses a singletrack trail network that has gained international attention as a mountain bike riding destination. The trail system, and associated camping opportunities, provides a variety of unique opportunities for visitors to experience the diverse terrain of the desert environment along the base of the Book Cliffs. The area's close proximity to the City of Fruita makes it an important community resource for local recreation as well as tourism.

**Goal SRMA-Wide**
The North Fruita Desert SRMA, through recreation program management and stakeholder involvement, will produce a diversity of quality mountain bicycling

BLM_0024078

opportunities that add visitors' quality of life while contributing to the local economy and fostering stewardship of natural and cultural resources.

**Objective SRMA-Wide**

The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

---

*REC-SRMA-OBJ-08 (North Fruita Desert SRMA):*

*Through the life of this plan, manage the SRMA to be a tourism-based recreation area, providing singletrack bicycling trail opportunities accommodating a range of skill levels (beginner, intermediate and advanced) that can be marketed by stakeholders and partners as a family-focused mountain biking destination with close proximity to camping. Manage the SRMA for the following targeted recreation activities, experiences and outcomes:*

*Activities: The targeted activities for the SRMA are mountain bicycling and camping.*

*Outcomes and Experiences:*

1. *Visitors experience or seek to experience the closeness of family and friends while developing their riding skills and abilities.*
2. *Visitors realize personal benefits of easy access to the outdoors, improved fitness and health maintenance (physical and mental), development of technical competence (i.e., mountain biking and camping skills), and development of stronger social bonds with friends and family.*
3. *The community benefits from improved quality of life with higher levels of public land stewardship, stronger community relationships and a healthier community.*
4. *The area economy is strengthened through recreation-related tourism revenue and increased desirability of the community as a place to live.*

*Resource Values:*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: mule deer and elk winter range, water quality (non-point source erosion/sedimentation into the Colorado River) and soils.*

*Resource Uses:*

*Minimize impacts from other resource uses to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: livestock grazing.*

---

**REC-SRMA-MA-33 (*North Fruita Desert SRMA*):**

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to

BLM_0024079

more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**

*Physical (remoteness, naturalness, facilities):* This is primarily a singletrack mountain biking trail network that is easily accessed from county roads, developed trailheads and campgrounds. More remote settings are available in the interior of the area. The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails, campground facilities, fences, livestock developments and other man-made structures. Due to topography and area scenery, the natural landscape is mostly retained despite the density of trails. The recreation facilities at trailheads and campgrounds may include, but are not limited to, parking lots, vault toilets, picnic tables, fire grates, informational kiosks and shade shelters. Throughout the unit, a designated singletrack trail system with a spectrum of trails (varied level of difficulty) is marked and maintained to achieve defined trail management objectives that support overall SRMA objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than 15 other groups on designated trails, and 25 or more other groups in developed campgrounds during peak seasons. Groups are generally small to medium-sized (1-8 people) with occasional encounters with larger groups. Sights, sounds, and tracks of other targeted users are frequent throughout the area, but more prominent near trailheads and camping areas. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Mountain bicycle singletrack trails provide easy access from trailheads off of county roads. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local bicycle shops, City of Fruita, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. Portions of the area are designated for camping, festivals, mountain bike events and races. Maps, signs and physical barriers (e.g., fences) delineate area boundaries. Management presence prominent at trailheads and camping areas, and less prominent away from trailheads. Campground host onsite at campground during peak seasons. Visitor use fees may be charged to support infrastructure and services (trailhead, campground and event facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.).

**REC-SRMA-AU-56 (*North Fruita Desert SRMA*):**

BLM_0024080

VRM Class:

Manage the SRMA under VRM Class II objectives.

---

**REC-SRMA-AU-57 (*North Fruita Desert SRMA*):**

Minerals:

Close the SRMA to the following:

- Mineral material sales
- Non-energy leasable mineral exploration and/or development.

---

**REC-SRMA-AU-58 (*North Fruita Desert SRMA*):**

ROW:

Designate as a ROW exclusion area, with an exception for recreation projects requiring electric or water utilities, or for minimally intrusive access/utility ROWs to private inholdings within the SRMA.

---

**REC-SRMA-MA-34 (*North Fruita Desert SRMA*):**

Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the SRMA that enhance public access and recreation opportunities consistent with SRMA objectives.

---

**REC-SRMA-AU-59 (*North Fruita Desert SRMA*):**

Forestry and Vegetation:

Close the SRMA to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

---

**REC-SRMA-AU-60 (*North Fruita Desert SRMA*):**

Camping restrictions:

To reduce resource impacts and conflicting user interactions:

- Limit camping to designated campgrounds and campsites.
- Limit the number of people and/or vehicles allowed at each campsite.
- Require the use of portable toilet systems and firepans at designated undeveloped sites.

---

**REC-SRMA-AU-61 (*North Fruita Desert SRMA*):**

Firearm use restrictions:

For the safety of trail users and campers, prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and

BLM_0024081

arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

**REC-SRMA-AU-62 (*North Fruita Desert SRMA*):**
Special Recreation Permits:

- Issue Class I – IV Commercial, Competitive and Organized Group SRPs that are consistent with SRMA objectives.
- In association with Competitive events, issue vending SRPs to vendors that support the authorized event.
- Do not issue vending SRPs for alcohol sales in the SRMA.

**REC-SRMA-AU-63 (*North Fruita Desert SRMA*):**
Comprehensive Trails and Travel Management:

Limit motorized and mechanized travel to designated routes throughout the SRMA.

**REC-SRMA-AU-64 (*North Fruita Desert SRMA*):**
Comprehensive Trails and Travel Management:

- Work with stakeholders to design and construct any new system trails, access points or facilities identified as necessary for achievement of SRMA objectives, including promotion of the area as a regional, national and international mountain biking tourism destination.

**REC-SRMA-MA-35 (*North Fruita Desert SRMA*):**
Comprehensive Trails and Travel Management:

Design and construct an event staging area and trail system to accommodate large-scale mountain bike races/events.

**REC-SRMA-MA-36 (*North Fruita Desert SRMA*):**
Comprehensive Trails and Travel Management:

- Construct new system trails to accommodate activity-specific trails (e.g., mountain bike racing, directional travel trails, constructed technical trail features).

**REC-SRMA-MA-37 (*North Fruita Desert SRMA*):**
Comprehensive Trails and Travel Management:

- Connect/reroute routes to make loop opportunities that help achieve SRMA objectives. Reroute/repair unsustainable and eroding routes.

**REC-SRMA-MA-38 (*North Fruita Desert SRMA*):**
Comprehensive Trails and Travel Management:

- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations

BLM_0024082

(allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

**REC-SRMA-MA-39 (*North Fruita Desert SRMA*):**
Construct additional developed camping opportunities to address camping demand.

**REC-SRMA-MA-40 (*North Fruita Desert SRMA*):**
Special Recreation Permits:

Special Recreation Permits:
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

## Palisade Rim SRMA - 2,000 Acres
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF SRMAS *AND SRMA BMPS*)

### Supporting Information for SRMA Allocation
The Palisade Rim SRMA encompasses the rim and bench lands east of the Town of Palisade. Public lands and trails in the area are popular close-to-home recreation destinations for the community of Palisade, neighboring communities and seasonal tourism. The area offers outstanding views of the Grand Valley, the Colorado River, the Little Book Cliffs and the Grand Mesa. It also contains significant cultural and wildlife resources.

### Goal SRMA-Wide
The Palisade Rim SRMA, through recreation program management and stakeholder involvement, will produce quality recreation and learning opportunities that will continue to enhance area residents' quality of life, contribute to the local economy, and provide stewardship and protection of natural and cultural resources. The area's close proximity to the Town of Palisade makes it an important community resource for local recreation as well as tourism.

### Objective SRMA-Wide
The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

*REC-SRMA-OBJ-09 (Palisade Rim SRMA):*
*Through the life of this plan, manage the SRMA to be a community-based recreation area, providing intermediate to advanced non-motorized trail-based recreation with an emphasis on the area's scenery, cultural heritage educational opportunities and stewardship of cultural and natural resources. Manage the SRMA for the following targeted recreation activities, experiences and outcomes:*

*Activities: The targeted activities for the SRMA are hiking, dog walking, trail running, mountain biking and horseback riding.*

BLM_0024083

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

**Outcomes and Experiences:**

1. *Visitors experience or seek to experience outdoor physical activity for fitness and stress reduction, as well as experiencing and learning about the area's scenic vistas, wildlife and cultural resources, often in small groups of family members and/or friends.*

2. *Visitors realize personal benefits of having recreation, outstanding scenery, cultural appreciation opportunities and wildlife viewing opportunities close to home. Individuals also benefit from improved fitness and health maintenance (physical and mental), development of technical competence (e.g., mountain biking skills), and development of stronger social bonds with friends and family.*

3. *The community benefits from improved quality of life with higher levels of public land stewardship, increased awareness of the area's natural, historic and cultural resources, stronger community relationships and a healthier community.*

4. *The area economy is strengthened through recreation-related tourism revenue and increased desirability of the community as a place to live.*

**Resource Values:**

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: deer and elk winter range, Colorado Hookless Cactus (Sclerocactus glaucus), water quality (non-point source erosion/sedimentation into the Colorado River), soils, paleontological resources, and cultural resources.*

**Resource Uses:**

*Minimize impacts from other resource uses to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: lands and realty (access across BOR withdrawal parcel), land acquisition, private property trespass). In the portions of the SRMA that overlap the ROW corridor, manage recreation to achieve ROW corridor management objectives.*

---

**REC-SRMA-MA-41 (*Palisade Rim SRMA*):**
Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 in Appendix K.

**Desired Recreation Setting Characteristics:**
*Physical (remoteness, naturalness, facilities):* The character of the landscape is

---

BLM_0024084

largely natural in appearance, with some viewsheds that include roads, trails railroads, canals, houses, farms and other man-made developments. Due to topography and area scenery, the natural landscape is mostly retained despite the area's proximity to the Town of Palisade, Interstate 70 and the Grand Valley. The recreation facilities at trailheads (adjacent to the SRMA on CDOT property) may include, but are not limited to, vault toilets, informational/interpretive kiosks and shade shelters. Throughout the unit, a designated singletrack trail system is marked and maintained to achieve defined trail management objectives that support overall SRMA objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than seven other groups on designated trails. Groups are generally small to medium-sized (1-8 people) with occasional encounters with larger groups. Sights and sounds of other targeted users are moderately frequent throughout the SRMA, but more frequent near the trailhead. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Non-motorized singletrack trails and use are predominant with primary access from a single trail and trailhead on non-BLM land (CDOT and BOR withdrawal). Bicycles may access the SRMA starting from locations in the nearby Town of Palisade. Secondary access from adjacent BLM, Forest Service and municipal lands to the south and east (depending on potential future development of connector trails.) A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, Town of Palisade, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. Management presence is moderate at trailheads, and less prominent away from trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.).

## REC-SRMA-AU-65 (*Palisade Rim SRMA*):
VRM Class:
Manage the SRMA under VRM Class II objectives.

## REC-SRMA-AU-66 (*Palisade Rim SRMA*):
Minerals:
Close the SRMA to the following:

- Fluid mineral leasing and geophysical exploration;
- Mineral material sales;
- Non-energy leasable mineral exploration and/or development.

## REC-SRMA-AU-67 (*Palisade Rim SRMA*):

BLM_0024085

ROW:

Designate as a ROW avoidance area with the exception of the ROW corridor that crosses the SRMA. Recognize and grant priority status to utility developments in the ROW corridor. Utilize BMPs to minimize impacts to targeted recreation activities.

### REC-SRMA-MA-42 (*Palisade Rim SRMA*):
Lands and Realty:

Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the SRMA that enhance public access and recreation opportunities consistent with SRMA objectives.

### REC-SRMA-AU-68 (*Palisade Rim SRMA*):
Forestry and Vegetation:
Close the SRMA to the following:
Timber harvest, fire wood cutting and special forest product harvest.

### REC-SRMA-AU-69 (*Palisade Rim SRMA*):
Camping restrictions:

Close the SRMA to overnight camping and campfires to reduce impacts to this intensively used area that lies in close proximity to private residences.

### REC-SRMA-AU-70 (*Palisade Rim SRMA*):
Firearm use restrictions:
Prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

### REC-SRMA-AU-71 (*Palisade Rim SRMA*):
Special Recreation Permits:

- Prohibit all Class III and IV SRPs.
- Only issue event permits that support and celebrate Grand Valley communities. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.
- Prohibit vending permits.

### REC-SRMA-AU-72 (*Palisade Rim SRMA*):
Comprehensive Trails and Travel Management:

BLM_0024086

- Close the SRMA to motorized travel.
- Limit mechanized travel to designated routes throughout the SRMA.
- With partners (e.g., user groups, local municipalities, retail shops, service providers) develop connective trails to adjoining BLM lands, and the Horse Mountain ERMA, that are consistent with SRMA objectives.
- Limit new trail development to the minimum necessary to achieve SRMA objectives.

**REC-SRMA-AU-73 (*Palisade Rim SRMA*):**
Comprehensive Trails and Travel Management:

- Work with stakeholders to design and construct any new system trails, access points or facilities identified as necessary for achievement of SRMA objectives.
- Reroute, repair, or close and restore unsustainable and eroding routes.
- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

**REC-SRMA-AU-74 (*Palisade Rim SRMA*):**
Special Recreation Permits:

- Issue Class I and II Commercial, Competitive, and Organized Group SRPs that are consistent with SRMA objectives.
- Require organized group SRPs for groups exceeding 12 participants
- All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

## Extensive Recreation Management Areas (ERMAs)

*Extensive Recreation Management Areas are recreation areas* that are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. ERMA management is commensurate and considered in context with the management of other resources and resource uses. *The following general approaches apply to protect activities within the ERMAs designated in this RMP:*

- *Management.* In ERMAs, new recreation facilities (e.g., trails, trailheads, restrooms) to effectively address demand for identified recreation activity created by growing communities and recreation-tourism will be considered if: 1) the proposal is consistent with interdisciplinary land use plan objectives; and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or managing partners, visitor fees, or other sources.

- *Funding.* In ERMAs, BLM funding and staff will be prioritized toward effectively addressing visitor health and safety and user interaction issues and resource protection issues created by recreation activities.

BLM_0024087

- *Visitor Services.* In ERMAs, visitor services (e.g., visitor information/maps, directional signage, facilities, on-the-ground staff presence) will generally be provided at the level to maintain activity participation opportunities and achieve ERMA objectives.
- *Access.* In ERMAs, recreation access will be maintained to and through BLM lands by creating route connectivity and/or by creating loop trails, and by maintaining and developing appropriate trails and trailhead facilities to achieve ERMA objectives and facilitate targeted recreation activities.
- *Partnerships.* For ERMAs, the BLM will focus on partnerships to maintain recreation activity opportunities (e.g., partner with the business community to encourage collaborative efforts on BLM lands, partner with ATV and mountain biking groups where appropriate).
- *Information/Education.* For ERMAs, information boards, web-based materials, brochures, etc. will be used to explain conditions of use for recreation participants and encourage stewardship.
- *Information.* For ERMAs, the BLM will partner with local chambers of commerce, tourism boards and private service providers to communicate appropriate recreation information (e.g., accurate recreation opportunity information, user ethics, distinctiveness of the area and use/user expectations).*Monitoring.* In ERMAs, the BLM will monitor visitor use, visitor safety, and resource conditions through BLM staff, volunteers and recreation-tourism partnerships (e.g., towns, outfitters, recreation organizations, CPW). Monitoring methods include direct visitor contact, electronic traffic counters, visitor/community assessments, and physical resource condition measurements
- *Best Management Practices.*

  1. Utilize current best management practices (Appendix H) to balance targeted recreation activities with other resource uses. Appendix H describes BMPs current at the time of the RMP planning process. BMPs will likely evolve over the life of the plan. Implementation of management actions should be based on the most current BMPs.

  2. Utilize current best management practices (Appendix H) and the "Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado" to reduce or eliminate impacts from recreation to the other natural and cultural resources listed in the ERMA objectives. Appendix H describes BMPs current at the time of the RMP planning process. BMPs will likely evolve over the life of the plan. Implementation of management actions should be based on the most current BMPs.

## REC-ERMA-OBJ-01:

*Through the life of the plan, protect opportunities to participate in identified recreation activities and associated qualities and conditions in ERMAs.*

### REC-ERMA-MA-01:

Designate the following ERMAs to address local recreation management issues (217,400 acres). (Figure 2-6, Appendix A):

BLM_0024088

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

- Barrel Spring (24,700 acres);
- Gateway (78,100 acres);
- Grand Valley Shooting Ranges (750 acres);
- Gunnison River Bluffs (810 acres);
- Horse Mountain (5,100 acres); and
- North Desert (107,900 acres).

**REC-ERMA-AU-01:**
**STIPULATION** *CSU-32: Recreation Management Areas.* Apply CSU (site-specific relocation) restrictions in the following ERMAs:

- Barrel Spring ERMA
- Gateway ERMA
- Grand Valley Shooting Ranges ERMA
- Gunnison River Bluffs ERMA
- Horse Mountain ERMA
- North Desert ERMA

(Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

**REC-ERMA-AU-02:**
Mineral Material*s:*
Close the Gunnison River Bluffs ERMA to mineral material sales.

### Barrel Springs ERMA – 24,700 acres
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)

**REC-ERMA-OBJ-02:**
*Through the life of the plan, provide visitors with opportunities to participate in long-distance ATV/UTV riding/touring activities, and big game hunting in the upper East Salt Creek and Barrel Spring Creek drainages, with access from 16 Road. The ERMA provides a recreation setting with a relatively unchanged, natural-appearing landscape.*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: fluid mineral leasing, livestock grazing, lands and realty.*

**REC-ERMA-AU-03 (Barrel Springs ERMA):**
VRM Class:
Manage the ERMA under VRM Class III objectives.

BLM_0024089

**REC-ERMA-AU-04 (Barrel Springs ERMA):**
ROW:
Designate as a ROW avoidance area.

**REC-ERMA-AU-05 (Barrel Springs ERMA):**
Forestry and Vegetation:
Allow timber harvest, fire wood cutting, and special forest product harvest if the ERMA is determined suitable for harvest.

**REC-ERMA-AU-06 (Barrel Springs ERMA):**
Special Recreation Permits:

- Issue Class I-II Commercial and Organized Event SRPs that meet ERMA objectives.
- Do not issue Competitive SRPs in the ERMA.

**REC-ERMA-AU-07 (Barrel Springs ERMA):**
Comprehensive Trails and Travel Management:

- Maintain public access for ATVs and UTVs from 16 Road to the upper East Salt Creek and Barrel Spring Creek drainages.
- Limit motorized and mechanized travel to designated routes.

**REC-ERMA-MA-02 (Barrel Springs ERMA):**
To achieve recreation outcomes under Comprehensive Trails and Travel Management:

- Establish specific Trail Management Objectives for primary recreation routes.
- Work with partners to repair/reroute/close and maintain travel routes to reduce resource impacts and achieve ERMA objectives.
- Mark trail system route intersections with signs showing trail names/numbers, and allowable uses. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

**REC-ERMA-OBJ-03:**
*Through the life of the plan, manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: deer and elk winter range, fragile and slumping soils, riparian habitat, paleontological resources, rare plants - Piceance Bladderpod (Lesquerella parviflora), and the following Significant plant communities: Montane Riparian Woodland (Populus balsamifera Woodland), Emergent Wetlands (Eleocharis rostellata Herbaceous Vegetation), Foothills Riparian Shrubland (Betula occidentalis / Maianthemum stellatum Shrubland).*

BLM_0024090

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

**REC-ERMA-AU-08 (Barrel Springs ERMA):**
Close to motorized and mechanized vehicles the portion of the ERMA within designated big game winter range from December 1 to April 30 (TL - 20).

**Gateway ERMA – 78,100 acres**
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAS AND ERMA BMPS)

**REC-ERMA-OBJ-04:**
*Through the life of the plan, provide visitors with opportunities to participate in motorized exploration, scenic touring and heritage tourism along the Mesas and side canyons surrounding the Dolores River and the town of Gateway. Visitors to the ERMA have the opportunity to explore and connect to other public lands managed by Grand Junction Field Office, Uncompahgre Field Office and Moab Field Office, as well as the Uncompahgre National Forest and Manti-La Sal National Forest. The ERMA provides a recreation setting with a relatively unchanged, natural-appearing landscape.*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: scenic values; wilderness characteristics; geological features; plant species of concern - Gypsum Valley cateye (Cryptantha gypsophila), San Rafael milkvetch (Astragalus rafaelensis), Naturita milkvetch (Astragalus naturitensis), Grand Junction milkvetch (Astragalus linifolius); two Significant Plant Communities - Fremont's Cottonwood Riparian Forests (Populus deltoides ssp. wislizeni /Rhus trilobata Woodland), and Emergent Wetlands (Eleocharis rostellata Herbaceous Vegetation); deer and elk winter range; cliff-nesting raptors; cultural resources; and paleontological resources. The resources listed above are also identified for special management and protection in one or more of the following areas that the ERMA overlaps, or is immediately adjacent to: Palisade WSA, Sewemup WSA , Maverick LWC unit, Unaweep Canyon LWC unit, Dolores River Riparian ACEC, Juanita Arch ACEC, The Palisade ACEC, Sinbad Valley ACEC, Unaweep Seep ACEC, Blue Mesa wildlife emphasis area, Bull Hill wildlife emphasis area, Calamity Camp National Historic Register site, and Dolores River Riparian SRMA.*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: uranium exploration and mining, mineral material sales, livestock grazing.*

**REC-ERMA-AU-09 (Gateway ERMA):**
VRM Class:
Manage the ERMA under VRM Class II and III objectives (as described in the VRM section).

**REC-ERMA-AU-10 (Gateway ERMA):**
ROW:

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024091

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

Designate as a ROW avoidance area.

**REC-ERMA-MA-03 (Gateway ERMA):**
Lands and Realty:
Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the ERMA that enhance public access and recreation opportunities consistent with ERMA objectives.

**REC-ERMA-AU-11 (Gateway ERMA):**
Forestry and Vegetation:
Allow timber harvest, fire wood cutting, and special forest product harvest if the ERMA is determined suitable for harvest.

**REC-ERMA-AU-12 (Gateway ERMA):**
Special Recreation Permits:
Issue only Class I, II, and III SRPs in the ERMA.

**REC-ERMA-AU-13 (Gateway ERMA):**

Comprehensive Trails and Travel Management:
Limit motorized and mechanized travel to designated routes.

**REC-ERMA-MA-04 (Gateway ERMA):**
Comprehensive Trails and Travel Management:

- Establish specific Trail Management Objectives for primary recreation routes.
- Work with stakeholders to identify opportunities to connect/reroute routes to create loop opportunities that help achieve ERMA objectives.
- Work with partners to repair/reroute/close and maintain travel routes to reduce resource impacts and achieve ERMA objectives.
- Mark trail system route intersections with signs showing trail names/numbers, and allowable uses. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

**REC-ERMA-AU-14 (Gateway ERMA):**
Special Recreation Permits:
Issue Class I-III Commercial, Competitive, and Organized Group SRPs that are consistent with ERMA objectives.

## Grand Valley Shooting Ranges ERMA - 750 acres
**(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)**

**REC-ERMA-OBJ-05:**

BLM_0024092

*Through the life of the plan, provide visitors with opportunities to participate in recreational target shooting at a developed shooting range in close proximity to Grand Junction. The ERMA provides a recreation setting with a significantly altered natural landscape.*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), water quality (lead contamination, non-point source erosion/sedimentation into the Colorado River).*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: livestock grazing, fluid mineral leasing.*

**REC-ERMA-MA-05 (Grand Valley Shooting Ranges ERMA):**
Physically delineate the boundaries of the ERMA using signage, fencing and other appropriate markers/barriers.

**REC-ERMA-MA-06 (Grand Valley Shooting Ranges ERMA):**
Develop run-on/run-off control plan to mitigate lead contamination to surface and ground water.

**REC-ERMA-MA-07 (Grand Valley Shooting Ranges ERMA):**
Develop a regular lead recovery program to mitigate soil and water contamination.

**REC-ERMA-AU-15 (Grand Valley Shooting Ranges ERMA):**
VRM Class:
Manage the ERMA under VRM Class IV objectives.

**REC-ERMA-AU-16 (Grand Valley Shooting Ranges ERMA ERMA):**
ROW:
Designate as a ROW avoidance area.

**REC-ERMA-MA-08 (Grand Valley Shooting Ranges ERMA):**
Lands and Realty:
Identify area for disposal to stakeholder(s) who will manage the area with similar objectives.

**REC-ERMA-AU-17 (Grand Valley Shooting Ranges ERMA):**
Camping restrictions:
Close the ERMA to overnight use and campfires from sunset to sunrise to reduce occurrences of vandalism to recreation facilities. Exceptions to this restriction may be granted in order to accommodate training exercises or other special events.

**REC-ERMA-AU-18 (Grand Valley Shooting Ranges ERMA):**
Special Recreation Permits:

BLM_0024093

- Do not issue Class IV SRPS in the ERMA.
- Allow vending SRPs only in conjunction with event SRPs.

---

**REC-ERMA-AU-19 (Grand Valley Shooting Ranges ERMA):**

Comprehensive Trails and Travel Management:
Allow travel within the ERMA only for the placement and retrieval of targets.
Motorized and mechanized vehicles must remain on designated routes.

---

**REC-ERMA-MA-09 (Grand Valley Shooting Ranges ERMA):**
Comprehensive Trails and Travel Management:

Work with stakeholders to maintain adequate access to shooting range facilities, consistent with ERMA objectives.

---

**REC-ERMA-AU-20 (Grand Valley Shooting Ranges ERMA):**
Special Recreation Permits:
Issue Class I – III Commercial, Competitive and Organized Group SRPs that are compatible with ERMA objectives.

---

## Gunnison River Bluffs ERMA – 800 Acres
### (SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)

**REC-ERMA-OBJ-06 (Gunnison River Bluffs ERMA):**
*Through the life of the plan, support local community partnerships to protect and promote trail-based hiking, dog walking, trail running, mountain bicycling, horseback riding and other non-motorized recreation activities between Orchard Mesa and Whitewater along the Gunnison River bluffs. The ERMA provides an urban interface recreation setting with a moderately altered natural landscape.*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), cliff-nesting raptors, paleontological resources, and cultural resources.*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: livestock grazing, lands and realty.*

---

**REC-ERMA-MA-10 (Gunnison River Bluffs ERMA):**
Lands and Realty:

With partners (Mesa County, private landowners, Old Spanish Trail Association and City of Grand Junction), work to improve public access into and through the area. Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the ERMA

BLM_0024094

that enhance public access and recreation opportunities consistent with ERMA objectives.

**REC-ERMA-AU-21 (Gunnison River Bluffs ERMA):**
Comprehensive Trails and Travel Management:

Close the ERMA to motorized travel. Limit all other travel (including foot and horse) to designated routes in order to accommodate targeted recreation activities in a concentrated urban interface area while protecting sensitive biological and cultural resources.

**REC-ERMA-AU-22 (Gunnison River Bluffs ERMA):**
Firearm use restrictions:
Prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

**REC-ERMA-OBJ-07 (Gunnison River Bluffs ERMA):**
*Through community partnerships, protect the scenic views of the Gunnison River and Pinyon Mesa, support trail connectivity between communities and public land resources, and provide opportunities to learn about the Old Spanish National Historic Trail.*

**REC-ERMA-MA-11 (Gunnison River Bluffs ERMA):**
Partnerships:

- Work with partners (Mesa County, private landowners, Old Spanish Trail Association (OSTA) and City of Grand Junction) to connect/reroute routes to make loop and/or through-route trail opportunities as necessary; reroute or close and naturalize unsustainable and eroding routes.
- Work with partners (OSTA, Mesa County, City of Grand Junction) to create and/or support education/interpretation of Old Spanish Trail resources.

**REC-ERMA-AU-23 (Gunnison River Bluffs ERMA):**
VRM Class:

- Manage the ERMA under VRM Class III objectives.
- Landscapes in the viewshed to the south and west of the ERMA lie within the Bangs Canyon SRMA and are managed under VRM Class II objectives.

**REC-ERMA-AU-24 (Gunnison River Bluffs ERMA):**
Minerals:
Close the ERMA to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales.
- Non-energy leasable mineral exploration and/or development.

BLM_0024095

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

**REC-ERMA-AU-25 (Gunnison River Bluffs ERMA):**
ROW:
Designate as a ROW avoidance area.

**REC-ERMA-AU-26 (Gunnison River Bluffs ERMA):**
Camping restrictions:
- Close the ERMA to overnight camping and campfires to reduce impacts to this intensively used area that lies in close proximity to private residences.
- Allow exceptions for overnight camping and campfires only when those activities support the ERMA objectives (e.g., historical reenactments.)

**REC-ERMA-AU-27 (Gunnison River Bluffs ERMA):**
Special Recreation Permits:

- Issue Class I, II and III Commercial, Competitive, and Organized Group SRPs that are consistent with ERMA objectives (i.e., support partnership efforts).
- Prohibit Class IV SRPs.
- Only issue event permits that have been coordinated with the local community and that result in minimal displacement of regular recreation use.
- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the ERMA.

## Horse Mountain ERMA - 5,100 Acres
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)

**REC-ERMA-MA-12 (Horse Mountain ERMA):**
The Horse Mountain ERMA has three distinct recreation management zones (RMZs). Those zones include: the Horse Mountain Trails RMZ (RMZ 1) featuring opportunities to participate in mountain biking, hiking, trail running, motorcycle riding, ATV riding and 4x4 vehicle driving; the C Road OHV Open Area (RMZ 2) offering an open OHV play area; and the C Road Target Shooting Area (RMZ 3) offering recreational target shooting opportunities. Overall, the ERMA provides a diverse mix of recreation activity opportunities in the urban interface zone along the eastern edge of the Grand Valley. The specific management objectives and actions for each RMZ are described below.

## Horse Mountain ERMA RMZ 1 – Horse Mountain Trails – 4,700 Acres
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)

**REC-ERMA-OBJ-08 (Horse Mountain RMZ 1):**

BLM_0024096

*Through the life of the plan, support local community partnerships to plan, develop and promote a trail system for a variety of motorized and non-motorized trail-based recreation activities. The trail system should provide easy access to the Horse Mountain area, and trail connectivity to/from the Town of Palisade, East Orchard Mesa, the Palisade Rim SRMA and other BLM-managed lands along the Grand Mesa Slopes. Targeted activities include, but are not limited to, hiking, dog walking, trail running, mountain bicycling, horseback riding, ATV riding and motorcycle riding. The RMZ provides a recreation setting with a moderately to significantly altered natural landscape.*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), water quality (non-point source erosion/sedimentation into the Colorado River).*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. Consider the following resource uses: fluid mineral leasing and livestock grazing. In the portions of this RMZ that overlap the ROW corridor and Wind Energy Emphasis Area, manage recreation to achieve management objectives for those designations.*

**REC-ERMA-AU-28 (Horse Mountain RMZ 1):**
VRM Class:
Manage the eastern portion of the RMZ under VRM Class III objectives, and the western portion under VRM Class IV objectives (See VRM section.)

**REC-ERMA-MA-13 (Horse Mountain RMZ 1):**
Lands and Realty:

- Recognize and grant priority status to utility developments in the ROW corridor and the Wind Energy Emphasis area that overlap the RMZ. Utilize BMPs to minimize impacts to targeted recreation activities.
- With managing partners (Town of Palisade, Mesa County, City of Grand Junction, private landowners), work to improve public access into and through the area. Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.
- Work with adjacent landowners, including the City of Grand Junction to minimize recreation conflicts and/or trespass on private property.

**REC-ERMA-AU-29 (Horse Mountain RMZ 1):**
Camping restrictions:
Close the RMZ to overnight camping and campfires to reduce impacts to this intensively used area that lies in close proximity to private residences.

BLM_0024097

**REC-ERMA-AU-30 (Horse Mountain RMZ 1):**
Close the portion of the RMZ west of Sink Creek to overnight use (sunset to sunrise) to reduce occurrences of vandalism and resource damage.

**REC-ERMA-AU-31 (Horse Mountain RMZ 1):**
Firearm use restrictions:
Close to recreational target shooting the portion of the RMZ west of Sink Creek for the safety of adjacent residents, and recreationists using the C Road OHV Open Area, the C Road Target Shooting Area, and the connector trails leading to Horse Mountain.

**REC-ERMA-AU-32 (Horse Mountain RMZ 1):**
Special Recreation Permits:

- Only issue event permits that have been coordinated with the local community and that result in minimal displacement of regular recreation use.
- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the RMZ.

**REC-ERMA-AU-33 (Horse Mountain RMZ 1):**
Comprehensive Trails and Travel Management:
Limit motorized and mechanized travel to designated routes.

**REC-ERMA-MA-14 (Horse Mountain RMZ 1):**
Comprehensive Trails and Travel Management:

If monitoring indicates conflicting interactions between recreation users, promote positive interactions between visitors by implementing strategies that separate incompatible recreation uses in either time or space (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.)

**REC-ERMA-AU-34 (Horse Mountain RMZ 1):**
Special Recreation Permits:
Issue Class I, II and III Commercial, Competitive, and Organized Group SRPs that are consistent with RMZ objectives (i.e., support partnership efforts).

**Horse Mountain ERMA RMZ 2 – C Road Open Area – 180 Acres**
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAS AND ERMA BMPS)

**REC-ERMA-OBJ-09 (Horse Mountain RMZ 2):**
*Through the life of the plan, this RMZ will provide visitors with opportunities to participate in unconfined day-use motorized OHV recreation activities in close proximity to the urban amenities of the Grand Valley. The RMZ will also provide an OHV practice/play area serving as a gateway to the designated route system on adjoining public lands to the east. The RMZ provides a recreation setting with a*

BLM_0024098

*significantly altered natural landscape due to intensive motorized OHV use, and nearby residential and agricultural development.*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), water quality (non-point source erosion/sedimentation into the Colorado River).*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: lands and realty (ROW corridor), fluid mineral leasing. In the portions of this RMZ that overlap the ROW corridor, manage recreation to achieve management objectives for the ROW corridor.*

**REC-ERMA-MA-15 (Horse Mountain RMZ 2):**
Physically delineate the boundaries of the RMZ using signage, fencing and other appropriate markers/barriers.

**REC-ERMA-AU-35 (Horse Mountain RMZ 2):**
VRM Class:
Manage under VRM Class IV objectives.

**REC-ERMA-AU-36 (Horse Mountain RMZ 2):**
Lands and Realty:

- Recognize and grant priority status to utility developments in the ROW corridor that overlaps the RMZ. Utilize BMPs to minimize impacts to targeted recreation activities.
- Work with adjacent landowners to minimize recreation conflicts and/or trespass on private property.

**REC-ERMA-AU-37 (Horse Mountain RMZ 2):**
Camping restrictions:
Designate the RMZ as a day-use only area. Close the RMZ to overnight use and campfires from sunset to sunrise to reduce occurrences of vandalism, dumping, resource damage and disturbance of nearby residents.

**REC-ERMA-AU-38 (Horse Mountain RMZ 2):**
Firearm use restrictions:
Close the RMZ to recreational target shooting for the safety of adjacent residents, recreationists using the OHV area and recreationists using the connector trails leading to Horse Mountain.

**REC-ERMA-AU-39 (Horse Mountain RMZ 2):**
Special Recreation Permits:

BLM_0024099

Do not issue SRPs in this RMZ. Exception: Allow event staging in the RMZ for events outside of the RMZ.

**REC-ERMA-AU-40 (Horse Mountain RMZ 2):**

Comprehensive Trails and Travel Management:

- Allow unrestricted travel for all types of motorized OHV use within the RMZ.
- Ensure connectivity between the RMZ and the Horse Mountain Trails RMZ (RMZ 1).

**Horse Mountain ERMA RMZ 3 – Target Shooting – 240 Acres**
(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)

**REC-ERMA-OBJ-10 (Horse Mountain RMZ 3):**
*Through the life of the plan, provide visitors with opportunities to participate in day-use recreational target shooting in close proximity to Grand Junction, Clifton and Palisade, while protecting the property and personal safety of private residences in the area. The RMZ provides a recreation setting with a significantly altered natural landscape due to intensive recreation use in the area.*

*Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (Sclerocactus glaucus), water quality (lead contamination, non-point source erosion/sedimentation into the Colorado River).*

*Manage recreation in this area to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: fluid mineral leasing, livestock grazing. In the portions of this RMZ that overlap the ROW corridor, manage recreation to achieve management objectives for the ROW corridor.*

**REC-ERMA-MA-16 (Horse Mountain RMZ 3):**
Physically delineate the boundaries of the RMZ using signage, fencing and other appropriate markers/barriers.

**REC-ERMA-MA-17 (Horse Mountain RMZ 3):**
Clearly identify BLM-managed lands adjacent to the RMZ that are closed to target shooting (900 acres) for the protection of the property and personal safety of nearby private residences in the area.

**REC-ERMA-AU-41 (Horse Mountain RMZ 3):**
VRM Class:
Manage under VRM Class IV objectives.

**REC-ERMA-AU-42 (Horse Mountain RMZ 3:**

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

Lands and Realty:

- Recognize and grant priority status to utility developments in the ROW corridor that overlaps the RMZ. Utilize BMPs to minimize impacts to targeted recreation activities.
- Work with adjacent landowners to minimize recreation conflicts and/or trespass on private property.
- Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

**REC-ERMA-AU-43 (Horse Mountain RMZ 3):**
Camping restrictions:
Designate the RMZ as a day-use only area. Close the RMZ to overnight use and campfires from sunset to sunrise to reduce occurrences of vandalism, dumping, resource damage and disturbance of nearby residents.

**REC-ERMA-AU-44 (Horse Mountain RMZ 3):**
Special Recreation Permits:

- Issue Class I, II and III Commercial, Competitive and Organized Group SRPs that provide financial or in-kind support for ongoing maintenance of the RMZ facilities.
- Do not issue Class IV SRPS in the ERMA.
- Allow vending SRPs only in conjunction with event SRPs.
- Do not issue vending SRPs for alcohol sales in the RMZ.

**REC-ERMA-AU-45 (Horse Mountain RMZ 3):**
Comprehensive Trails and Travel Management:
Allow travel within the RMZ only for the placement and retrieval of targets. Motorized and mechanized vehicles must remain on designated routes.

**REC-ERMA-AU-46 (Horse Mountain RMZ 3):**
Work with stakeholders to maintain adequate access to facilities, consistent with RMZ objectives.

## North Desert ERMA - 107,900 Acres
**(SEE APPENDICES K AND H FOR FULL DESCRIPTIONS OF ERMAs AND ERMA BMPs)**

**REC-ERMA-OBJ-11 (North Desert ERMA):**
*Through the life of the plan, provide visitors with opportunities to participate in motorized OHV recreation (motorcycle, ATV, UTV, full-sized 4x4 vehicles) on a variety routes designated for different motorized uses (e.g., motorcycle, ATV/UTV, full-size vehicles) that link the desert terrain on the north side of the Grand Valley*

*Approved Resource Management Plan – RECREATION AND VISITOR SERVICES*

*from Grand Junction and Fruita to Rabbit Valley and the Utah Rims trails and
provide multiple long-distance motorized loop opportunities. The ERMA will provide
a recreation setting with a moderately altered natural landscape.*

*Manage this area to minimize recreation impacts to other resources, with special
consideration given to protection/mitigation of the following resources: Colorado
Hookless Cactus (Sclerocactus glaucus), Grand Junction buckwheat (Eriogonum
contortum), Grand Junction suncup (Camissonia eastwoodiae), Dolores River
skeletonplant (Lygodesmia doloresensis); Significant plant communities: Saline
Bottomland Shrublands (Sarcobatus vermiculatus / Suaeda moquinii Shrubland),
Western Slope Grasslands (Achnatherum hymenoides Shale Barren Herbaceous
Vegetation), Cold Desert Shrublands (Atriplex confertifolia / Achnetherum
hymenoides Shrubland), Gardner's Mat Saltbush Shrublands (Atriplex gardneri /
Leymus salinus Dwarf-shrubland), Skunkbrush Riparian Shrubland (Rhus triloblata
Shrubland); water quality (non-point source erosion/sedimentation into the Colorado
River), Mancos Shale, saline soils, deer and elk winter range, pronghorn.*

*Manage recreation in this area to ensure a balance between protecting targeted
recreation activities and settings with other resource uses. In this area, consider the
following resource uses: coal leasing, mineral material sales, fluid mineral leasing
and livestock grazing. In the portions of this ERMA that overlap the ROW corridor
and Solar Energy Emphasis Areas (Mitchell Road and 21 Road), manage recreation
to achieve management objectives for those designations.*

**REC-ERMA-AU-47 (North Desert ERMA):**
VRM Class:

Manage the ERMA under VRM Class II, III and IV objectives (See VRM section.)
The majority of the ERMA is VRM Class IV.

**REC-ERMA-MA-18 (North Desert ERMA):**
Lands and Realty:

- Designate as a ROW avoidance area with the exception of the ROW
  corridor that crosses the ERMA.

- Recognize and grant priority status to utility developments in the ROW
  corridor and Solar Energy Emphasis areas that overlap the ERMA (Mitchell
  Road and 21 Road). Utilize BMPs to minimize impacts to targeted
  recreation activities.

- With managing partners (City of Fruita, Mesa County, City of Grand
  Junction, private landowners), work to improve public access into and
  through the area. Pursue opportunities with landowners, either through
  purchase or exchange, for acquisition of private properties or easements
  within or adjacent to the ERMA that enhance public access and recreation
  opportunities consistent with ERMA objectives.

- Work with adjacent landowners to minimize recreation conflicts and/or
  trespass on private property.

BLM_0024102

**REC-ERMA-AU-48 (North Desert ERMA):**
Camping Restrictions:

- Allow camping and campfires in the ERMA where it does not interfere with targeted OHV recreation opportunities, and is compatible with the management of other resources and resource uses.
- Close the 18 Road Open OHV area to overnight camping.
- Allow collection of only dead and down wood for campfires.

**REC-ERMA-MA-19 (North Desert ERMA):**
Camping Management:

If monitoring indicates unacceptable impacts from camping and campfires, implement progressive measures to mitigate those impacts. Mitigation measures may include, but are not limited to: requiring the use of firepans and portable toilet systems; prohibiting firewood collection; limiting portions of the ERMA to designated campsites only; closing portions of the ERMA to camping and campfires.)

**REC-ERMA-AU-49 (North Desert ERMA):**
Firearm use restrictions:

Close the 18 Road OHV Open area to recreational target shooting for the safety of OHV recreationists in this intensively used portion of the ERMA.

**REC-ERMA-AU-50 (North Desert ERMA):**
Special Recreation Permits:

- Issue Class I – IV Competitive Special Recreation Permits that achieve ERMA objectives.
- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the ERMA.

**REC-ERMA-AU-51 (North Desert ERMA):**
Comprehensive Trails and Travel Management:
- Limit motorized and mechanized travel to designated routes.

**REC-ERMA-MA-20 (North Desert ERMA):**
Comprehensive Trails and Travel Management:

- Work with stakeholders/partners to plan, develop and maintain a route system that helps achieve ERMA objectives while mitigating impacts to the area's sensitive resources and resource uses (listed in the objectives). This includes identifying appropriate existing routes, repairing or rerouting unsustainable routes, constructing connecting routes, and closing redundant routes.

BLM_0024103

**REC-ERMA-AU-52 (North Desert ERMA):**
Comprehensive Trails and Travel Management:

- Designate the 18 Road Open OHV area (330 acres).

**REC-ERMA-MA-21 (North Desert ERMA):**
**Comprehensive Trails and Travel Management:**

- Ensure route connectivity between the ERMA and the Rabbit Valley area of McInnis Canyons National Conservation Area and the Utah Rims SRMA in Utah.

**REC-ERMA-MA-22 (North Desert ERMA):**
Comprehensive Trails and Travel Management:

Ensure route connectivity between the ERMA and the Grand Valley OHV SRMA. To provide a transition zone between the high-use urban interface area directly north of Grand Junction, allow higher route density along the ERMA's interface with the Grand Valley OHV SRMA at 27¼ Road, with route density generally decreasing as the trail system extends to the northwest toward 25 Road and 21 Road (travel management Zone L.)

**REC-ERMA-MA-23 (North Desert ERMA):**
Comprehensive Trails and Travel Management:

- Identify a multi-use singletrack trail on BLM-managed lands that connects the City of Fruita to the North Fruita Desert SRMA. If monitoring indicates the need to separate uses to ensure visitor safety, construct a bicycle-only trail through the ERMA that directly connects from the City of Fruita to the North Fruita Desert SRMA.

**REC-ERMA-MA-24 (North Desert ERMA):**
Comprehensive Trails and Travel Management:

- Identify a multi-use singletrack trail on BLM-managed lands that connects Highline State Park to the North Fruita Desert SRMA. If monitoring indicates the need to separate uses to ensure visitor safety, construct a bicycle-only trail through the ERMA that directly connects from Highline State Park to the North Fruita Desert SRMA.

**REC-ERMA-MA-25 (North Desert ERMA):**
Comprehensive Trails and Travel Management:

Work with stakeholders to create new access points and trailheads if necessary to accommodate increased use, and/or achieve ERMA objectives.

- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations

BLM_0024104

(allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

- Promote positive interactions between recreation users by implementing strategies that separate conflicting uses. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc.

**REC-ERMA-AU-53 (North Desert ERMA):**

Special Recreation Permits:
- Issue Class I, II and III Commercial and Organized Group SRPs that achieve ERMA objectives.

**REC-ERMA-AU-54 (North Desert ERMA):**

Special Recreation Permits:
- Develop an event staging area in the ERMA that helps achieve ERMA objectives.

BLM_0024105

# COMPREHENSIVE TRAILS AND TRAVEL MANAGEMENT

## TRV-GOAL-01:
*Manage the travel system to support the BLM mission, achieve resource management goals and objectives, and provide for appropriate public and administrative access.*

### TRV-OBJ-01:
*Maintain a comprehensive travel network that best meets the full range of public, resource management, and administrative access needs.*

#### TRV-MA-01:
Off-highway vehicle and off road vehicles are synonymous with motorized travel and will be regulated consistent with 43 CFR 8340.

#### TRV-MA-02:
Designate motorized travel in the GJFO as follows (Figure 2-8, Appendix A):

- Open: 10,200 acres
- Closed: 126,200 acres
- Limited to designated routes: 925,200 acres (includes 105,200 acres with seasonal limitations)

#### TRV-MA-03:
Manage 10,200 acres as *open* to motorized recreational travel.

- Grand Valley OHV SRMA, including Skinny Ridge (9,700 acres);
- 18 Road Open Area (330 acres);
- Horse Mountain ERMA (RMZ 2 [180 acres]); and
- Tabeguache OHV Play Area (2 acres).

#### TRV-MA-04:
Manage the Grand Valley Open Area SRMA as a ROW avoidance area (except for areas in delineated ROW corridors.

#### TRV-MA-05:
Manage 126,200 acres as *closed* to motorized travel (administrative and permitted vehicular access only):

- WSAs
- ACECs:
  - Atwell Gulch;
  - Juanita Arch;
  - Mt. Garfield;
  - A portion of the Palisade (26,700 acres);

- o  Pyramid Rock;
- o  A portion of Rough Canyon (600 acres); and
- o  Unaweep Seep
- Lands managed for wilderness characteristics:
  - o  A portion of Maverick (1,600 acres)
- Critical Habitat and Research Areas:
  - o  Ant Research Area; and
  - o  Reeder Mesa Cactus Study Site
- Wildlife Emphasis Areas:
  - o  Timber Ridge (deer/elk/sage-grouse);
  - o  A portion of East Salt between Demaree Canyon WSA and Highway 139) (deer/elk/kit fox); and
  - o  A portion of Rapid Creek (deer/elk)
- SRMAs
  - o  Bangs (RMZ 1 and 3), with the exception of trailhead access and the Tabeguache Trail;
  - o  Palisade Rim
- ERMAs
  - o  Gunnison River Bluffs.

**TRV-MA-06:**
Manage motorized travel on the remaining portion of the GJFO as limited to designated routes (820,000 acres); acreage does not include seasonal limitations. Refer to BLM's Travel Management Plan (Appendix M) for route designations in limited areas.

**TRV-AU-01:**
Implement the following seasonal travel limitations for motorized and mechanized travel from December 1 to May 1 (105,200 acres):

- Big game winter range;
- Little Book Cliffs Wild Horse Range;
- Beehive;
- Blue Mesa;
- Chalk Mountain;
- Coal Canyon;
- Demaree Canyon outside of the WSA;
- Garvey Canyon;
- Grand Mesa Slopes;
- Howard Canyon Flats;

BLM_0024107

- Indian Point;
- Post/Lapham Canyons;
- Rapid Creek;
- SRMAs:
  - A portion of the North Fruita Desert SRMA (4,300 acres).

These areas will be managed by BLM to reflect CPW's most current big game winter range maps. Seasonal limitation periods may be adjusted based on coordination with CPW (e.g., mild winters, late hunting seasons, etc.).

**TRV-MA-07:**
Designate mechanized travel in the GJFO as follows (Figure 2-8, Appendix A):

- Open: 10,200 acres
- Closed: 119,500 acres
- Limited to designated routes:
  931,900 acres (includes 105,200 acres with seasonal limitations)

**TRV-MA-08:**
Manage 119,500 acres as *closed* to mechanized travel:

- WSAs
- ACECs:
  - Atwell Gulch;
  - Juanita Arch
  - Mt. Garfield;
  - Pyramid Rock;
  - A portion of Rough Canyon (600 acres); and
  - Unaweep Seep
- Wildlife Emphasis Areas:
  - Timber Ridge (deer/elk/sage-grouse);
  - A portion of Rapid Creek (1,700 acres); and
- SRMAs
  - Bangs (RMZ 3) except for the Tabeguache Trail
- Lands managed for wilderness characteristics:
  - A portion of Maverick (1,600 acres).

**TRV-MA-09:**
Manage mechanized travel on the remaining portion of the GJFO as limited to designated routes (826,700 acres); acreage does not include seasonal limitations. Refer to BLM's Travel Management Plan (Appendix M) for route designations in limited areas.

**TRV-MA-10:**
Designate equestrian travel in the GJFO as follows (Figure 2-8, Appendix A):

- Open: 1,056,100 acres
- Closed: 1,300 acres
- Limited to designated routes: 2,200 acres.

**TRV-MA-11:**
Manage 1,056,100 acres as *open* to equestrian travel.

**TRV-MA-12:**
Manage 1,300 acres as *closed* to equestrian travel:

- Pyramid Rock ACEC
- And the Mica Mine Trail and Rough Canyon Trail

**TRV-MA-13:**
Limit equestrian travel to designated routes in the following areas (2,200 acres) (Refer to Appendix M for route designations in limited areas):
- Bangs SRMA (part of RMZ 1 – 1,400 acres)
- Gunnison River Bluffs (800 acres)

**TRV-MA-14:**
Designate foot travel in the GJFO as follows (Figure 2-8, Appendix A):

- Open: 1,057,800 acres
- Closed: 1,300 acres
- Limited to designated routes: 2,200 acres

**TRV-MA-15:**
Manage 1,056,100 acres as *open* to foot travel.

**TRV-MA-16:**
Manage 1,300 acres as *closed* to foot travel.

- Pyramid Rock ACEC.

**TRV-MA-17:**
Limit foot travel to designated routes in the following areas (2,200 acres) (Refer to Appendix M for route designations in limited areas):

- Bangs SRMA (part of RMZ 1 - 1,400 acres)
- Gunnison river Bluffs ERMA (800 acres)

**TRV-MA-18:**

BLM_0024109

*Approved Resource Management Plan – COMPREHENSIVE TRAILS AND TRAVEL MANAGEMENT*

Manage the following areas as *closed* to over-snow motorized travel:

- LBCWHR (closed to mechanized and motorized over-snow travel)
- Lands managed for wilderness characteristics, except for Unaweep and the Tabeguache Trail in the Bangs LWC area.
- ACECs:
  - Atwell Gulch;
  - Mount Garfield;
  - Pyramid Rock; and
  - Unaweep Seep.
- SRMAs:
  - Bangs (RMZ 4).

---

**TRV-MA-19:**
Within lynx (Lynx Canadensis) habitat, limit the expansion of consistent snow compaction unless it serves to consolidate use and improve lynx habitat.

---

**TRV-IMP-01:**
*Route Designations.* Designate travel on routes as follows (see Appendix M for maps):

- Limited to vehicles under 50 inches wide only: 37 miles (1 percent of total routes)
- Limited to vehicles under 50 inches wide only with a seasonal limitation: 7 miles (<1 percent of all routes)
- Limited to bicycle travel only: 1 miles (<1 percent of total routes)
- County roads: 309 miles (8 percent of total routes)
- Limited to foot and bicycle travel only: 6 miles (<1 percent of total routes)
- Limited to foot travel only: 7 miles (<1 percent of total routes)
- Limited to foot and horse travel only: 47 miles (1 percent of total routes)
- Limited to foot, horse, bicycle, and motorcycle travel only: 89 miles (2 percent of total routes)
- Limited to foot, horse, bicycle, and motorcycle travel only with a winter seasonal limitation: 3 miles (<11 percent of all routes)
- Limited to foot, horse, and bicycle travel only: 99 miles (2 percent of total routes)
- Limited to foot, horse, and bicycle travel only with a seasonal limitation: 14 miles (<1 percent of all routes)
- Open to all uses: 871 miles (22 percent of all routes)
- Open to all uses with a seasonal limitation: 235 miles (6 percent of all routes)
- Undesignated (Zone L): 545 miles (14 percent of all routes)

- Open to all uses (in OHV open areas): 291 miles (7 percent of all routes)
- Limited to administrative and permitted uses only: 524 miles (13 percent of all routes), includes 332 miles of routes with no legal public access
- Closed: 723 miles (18 percent of all routes)
- Total open to non-motorized travel only: 174 miles (4 percent of all routes), sum of non-motorized categories
- Total open to motorized travel: 2,576 miles (64 percent of all routes), sum of motorized categories and included routes with deferred designations
- **Approximate total all routes: 3996 miles**

## TRV-GOAL-02:

*To manage a comprehensive travel and transportation management system that allows for diverse recreational use of motorized and nonmotorized interests; promotes the safety of all users; minimizes conflicts among federal land uses; communicates with the public about available opportunities, and monitors the effects of use.*

### TRV-OBJ-02:

*Seek to effectively manage new modes of travel that cannot be foreseen through this planning effort.*

#### TRV-MA-20:

Manage new modes of travel in a manner that is consistent with resource protection and resource use goals, objectives, and restrictions until appropriate use areas and designations are determined.

## TRV-GOAL-03:

*To manage a comprehensive travel and transportation management system that minimizes damage to natural and cultural resources (historical and archeological sites, traditional cultural properties and natural resources of importance to Native Americans, soil, water, air, vegetation, scenic values, etc.) and minimizes harassment of wildlife and/or significant disruption of wildlife habitats.*

### TRV-OBJ-03:

*Manage travel consistent with outcomes defined by resource programs.*

#### TRV-MA-21:

Prohibit cross-country motorized/mechanized travel for big game retrieval, except in open areas (i.e. OHV open areas). Allow hand-held non-motorized/non-mechanized wheeled game retrieval carts.

#### TRV-MA-22:

BLM_0024111

Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, public health and safety concerns, or road and trail damage as necessary.

**TRV-MA-23:**
Open areas and designated roads and trails may be closed during severe droughts and wind events to reduce particulate matter (e.g., during National Weather Service high wind warning).

**TRV-MA-24:**
Require proper road design, construction, and/or surfacing on BLM authorized roads to reduce fugitive dust emissions.

**TRV-MA-25:**
To minimize ongoing or potential impacts to cultural resources that are eligible or potentially eligible to the National Register of Historic Places (NRHP) or are listed on the NRHP, close and/or re-route routes that are inside, pass through, or lead directly to these sites, or identify mitigation necessary to protect sites.

**TRV-MA-26:**
To minimize potential impacts to sites, reduce density of routes in areas known to be high expected cultural resource density or areas of high value to the cultural program or Tribes.

**TRV-MA-27:**
Use VRM and recreation (or management) objectives to minimize impacts to site integrity (maintaining the visual, audible, and setting characteristics of sites).

**TRV-MA-28:**
To minimize ongoing or potential impacts to historic trails identified as eligible or potentially eligible for listing on the NRHP, identify mitigation to protect the historic integrity of routes, if necessary.

**TRV-MA-29:**
Maintain administrative access to active oil and gas wells, but limit public access to provide for public safety at active well sites.

**TRV-MA-30:**
Maintain administrative access to active mines.

**TRV-MA-31:**
To facilitate proper reclamation in compliance with pipeline stipulations on rights of way grants and to protect shallow pipeline infrastructure, maintain administrative (but close public) access over pipeline facilities, unless pipelines are placed along existing routes or impacts pipelines and reclamation are not a concern.

BLM_0024112

**TRV-MA-32:**
Maintain motorized access to firewood, post and pole gathering, and Christmas tree cutting areas.

**TRV-MA-33:**
Consider whether parcels are identified for disposal in determining long-term access needs.

**TRV-MA-34:**
Consider whether parcels are identified for management by another entity in determining long-term access needs.

**TRV-MA-35:**
During route designations, pursue easements in areas where enhanced public access is desired and interest is expressed by willing sellers.

**TRV-MA-36:**
Maintain a minimum of administrative access to rights-of-way, other land use authorizations, and utility corridors.

**TRV-MA-37:**
Reduce trespass from routes that dead-end onto private property by closing routes, managing as administrative, or by signing property boundaries. Allow for landowner access on closed routes through administrative designation and right-of-way grants.

**TRV-MA-38:**
Maintain a minimum of administrative access to range improvement projects, study sites, and to areas necessary to properly administer grazing permits.

**TRV-MA-39:**
In some cases limit public access to protect range improvements from potential damage.

**TRV-MA-40:**
Reduce route density in areas where long-term management is designed to protect wilderness characteristics.

**TRV-MA-41:**
To reduce ongoing damage to known paleontological sites, close routes that are inside or pass through eligible cultural sites, or identify mitigation necessary to protect sites.

**TRV-MA-42:**
To reduce the potential for vandalism or collection, reduce number of routes in proximity to known paleontological localities.

BLM_0024113

*Approved Resource Management Plan – COMPREHENSIVE TRAILS AND TRAVEL MANAGEMENT*

**TRV-MA-43:**
Within each individual SRMA/RMZ, clearly prescribe travel management allowable uses and implementation actions that help achieve SRMA/RMZ objectives.

**TRV-MA-44:**
In balance with other resource considerations, provide access to undeveloped campsites that exist along dead-end spur roads.

**TRV-MA-45:**
In balance with other resource considerations, retain or provide access to difficult to reach parcels of public land for hunting, fishing, and other recreation activities.

**TRV-MA-46:**
Consider route features, quality user experience, and route connectivity to determine appropriate route use type (i.e. open, mechanized, ATV, UTV, foot, etc.)

**TRV-MA-47:**
Work closely with Mesa and Garfield counties to maintain public access to areas identified as important for recreation.

**TRV-MA-48:**
Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements that enhance public access and recreation opportunities consistent with recreation and resource program objectives.

**TRV-MA-49:**
In high disturbance areas, utilize best available science to model sediment loss relative to natural rates. Based on model results, modify land uses including travel infrastructure to minimize resource damage while maintaining resource and resource use sustainability on public lands.

**TRV-MA-50:**
While maintaining access, eliminate duplicative or redundant routes in areas of fragile soils, Mancos Shale areas, slump areas, and on slopes exceeding 40 percent. (Public Land Health Standard 1).

**TRV-MA-51:**
While maintaining access for administration and public viewing, reduce the number of duplicative and redundant routes in the Little Book Cliffs Wild Horse herd area.

**TRV-MA-52:**
To protect and maintain unique ecological values for which the ACEC was designated, limit or reduce the number of routes within ACECs that are managed as limited to designated routes for motorized and mechanized travel.

BLM_0024114

**TRV-MA-53:**
To preserve the visual character of the existing landscape, limit or reduce the number of routes in areas managed as VRM Class I. The level of change to the visual landscape should be very low and must not attract attention.

**TRV-MA-54:**
To retain the visual character of the existing landscape and minimize the level of change, limit or reduce the number of routes in areas managed as VRM Class II. The level of change to the visual landscape should be low. Changes should repeat the basic elements found in the natural features of the landscape – form, line, color and texture. Routes may be seen but should not attract the attention of the casual observer.

**TRV-MA-55:**
To partially retain the visual character of the existing landscape and to moderate the level of change to the existing environment, carefully consider the designation of routes or design/construction of new routes in areas managed as VRM Class III. Routes may attract attention, but should not dominate the view of the casual observer. To the extent possible, routes should repeat the basic elements found in the natural landscape – form, line, color and texture.

**TRV-MA-56:**
In areas managed under VRM Class IV objectives, allow transportation/access routes that require major modification of the visual landscape. The level of change can be high and routes may dominate the view of the casual observer. To the extent possible, routes should repeat the basic elements found in the natural landscape – form, line, color and texture.

**TRV-MA-57:**
To reduce impairment of wilderness characteristics, generally close routes in WSAs. Routes may be left open in WSAs if they were documented at the time of the original wilderness inventory, and adequate documentation exists to indicate that they continue to be used in the same manner and degree as they were at the time of the inventory so as to not impair wilderness characteristics.

**TRV-MA-58:**
Reduce redundancies in routes to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails on relic vegetation communities and sensitive plant species.

**TRV-MA-59:**
Identify mitigation where open routes are negatively effecting significant plant communities, relic vegetation, and ensure that Land Health Standard 4 is being achieved or progress is being made towards meeting this Standard.

BLM_0024115

**TRV-MA-60:**
To reduce the spread of cheatgrass and noxious weeds, reduce duplicative and redundant routes in areas with susceptibility to cheatgrass or invasive and noxious weed infestations.

**TRV-MA-61:**
Reduce duplicative and redundant routes in riparian areas, especially those identified as not functioning or functioning at risk. Identify mitigation where open routes are contributing to problems with riparian function.

**TRV-MA-62:**
Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails on listed species and in designated critical habitat for threatened and endangered plants. Identify mitigation where open routes are negatively effecting listed species and/or designated critical habitat, and ensure that Land Health Standard 4 is being achieved or progress is being made towards meeting this Standard.

**TRV-MA-63:**
While maintaining access, close routes with multiple stream crossings and/ or identify mitigation including reroutes and proper design, construction, and maintenance plans in accordance with BLM manual handbook guidance.

**TRV-MA-64:**
Reduce point and non-point source contributions of water quality contaminants from public lands by reducing disturbance footprints associated with travel infrastructure and other surface disturbing actions while also maintaining access and meeting resource use objectives.

**TRV-MA-65:**
Promote the delisting of impaired water bodies (303d listed) by monitoring actions including but not limited to grazing, travel management, and other surface disturbing actions and implementing appropriate management change.

**TRV-MA-66:**
Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sage brush parks, with an emphasis on routes that bisect sage brush parks.

**TRV-MA-67:**
Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation.

**TRV-MA-68:**

BLM_0024116

To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek.

**TRV-MA-69:**
Reduce habitat fragmentation by reducing road density (focusing primarily on duplicative or redundant routes) in production areas, (bighorn sheep, mule deer, elk, pronghorn antelope, moose) To provide protection of big game production areas from disturbance and displacement by human activities during critical periods.

**TRV-AU-02:**
**STIPULATION** *BIG GAME PRODUCTION AREAS TL CO*. No surface use is allowed during the following time period(s) in big game production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM: Prohibit activities, including motorized travel, in elk production areas from May 15 to June 15; in antelope production areas from April 15 to June 30; in Rocky Mountain bighorn sheep production areas from April 15 to June 30; in Moose production areas from April 15 to June 30; and in desert bighorn sheep production areas from February 1 to May 1. Standard and special exceptions apply; see Appendix B.

**TRV-MA-70:**
To preserve the integrity of long term research study sites close areas consistent with current management.

**TRV-AU-03:**
**STIPULATION** NSO-32: *Research Sites*. Prohibit surface occupancy and surface-disturbing activities in approved research sites including, but not limited to, the Ant Research Area (120 acres) located near 16 Road, and the Owl Banding Station located south of De Beque; see Appendix B.

**TRV-MA-71:**
Reduce habitat fragmentation by reducing road density (focusing primarily on duplicative or redundant routes) in wildlife emphasis areas. Route density of less than 0.5 km of road per square km preferred, where this cannot be achieved implement winter seasonal limitations if feasible to seasonally limit route related disturbance in the most critical months.

**TRV-MA-72:**
Within wildlife emphasis areas consolidate surface occupancy and surface-disturbing activities within existing disturbance to avoid fragmentation.

**TRV-MA-73:**
Focus management in wildlife emphasis areas on wildlife. Adopt additional management actions deemed necessary by the BLM (such as closing additional

BLM_0024117

roads to maintain effective habitat patch size).

**TRV-MA-74:**
While maintaining desired levels of access, identify and reroute or close and rehabilitate redundant, duplicative, or poorly constructed routes to reduce point sources of erosion and resulting sedimentation and turbidity impacts within watersheds containing known pure populations of cutthroat trout. Focus on routes within closest proximity to occupied streams.

**TRV-MA-75:**
Reduce disturbance at known golden eagle nesting sites by closing routes permanently or seasonally where possible, with an emphasis on routes that result in disturbance above the nest (at the top of a cliff nest). Disturbance above a nest has been shown to cause greater likelihood of nest abandonment

**TRV-MA-76:**
To reduce potential for vandalism of bat gates and associated disturbance to bats minimize motorized access to gated sites.

**TRV-MA-77:**
In accordance with 43 CFR 8341.2, where monitoring or related data suggest that OHVs are causing or would cause considerable adverse impacts, areas may be closed or restricted from OHV use. The public will be notified. The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing unacceptable disturbance to the soil, wildlife habitat, special status species habitat, cultural or vegetative resources, or other sensitive resources, especially by off-road travel in an area that is limited to designated routes.

**TRV-MA-78:**
There are a number of locations throughout the GJFO that are commonly known and consistently used for aircraft landing and departure activities that, through such casual use, have evolved into backcountry airstrips (the definition contained in Section 345 of Public Law 106-914, the Interior and Related Agencies Appropriation Act of 2001). In accordance with that law, require full public notice, consultation with local and state government officials, the Federal Aviation Administration, and compliance with all applicable laws, including NEPA, when considering any closure of an aircraft landing strip.

**TRV-OBJ-04:**
*Manage nonmotorized travel consistent with outcomes defined by resource programs.*

**TRV-MA-79:**
Where monitoring or related data suggest that mechanized travel, horseback use or nonmechanized, cross-country travel are causing or would cause considerable adverse impacts, areas may be closed or travel restricted. The public will be

BLM_0024118

notified. The BLM could impose limitations on types of use allowed on specific designated routes or areas if monitoring indicates that a particular type of use is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources.

**TRV-MA-80:**
Limit nonmechanized/nonmotorized travel to designated roads and trails in specific areas to protect resource values, provide for public safety, and/or maintain an identified opportunity. These areas include urban interface and high density use areas. Refer to Appendix M for nonmechanized/nonmotorized route designations.

## Travel Management Zone L

**TRV-OBJ-05:**
*Manage travel through route designations within Zone L to be consistent with the following recreation and resource objectives:*

*Watershed and Soils*
- *Manage to maintain or contribute to long term improvement of surface and groundwater quality.*
- *Promote geomorphic balance.*
- *Meet Public Land Heath Standard 1 for soils and 5 for water quality*
- *Minimize salt and sediment production to natural background rates.*
- *Preserve and promote soil productivity.*

*Special Status Species (Plants)*
- *Meet Public Land Heath Standard 3 for plant communities and 4 for Special Status and Threatened & Endangered species and their habitats.*
- *Promote maintenance and recovery of federally listed, proposed, and candidate plant species by protecting occupied habitat. Protect occupied habitat for all BLM sensitive plant species and significant plant communities as defined and tracked by CNHP*

*Vegetation*
- *Manage vegetation to meet BLM Standards for Public Land Health while taking into account site potential, and site-specific management objectives. Ensure vegetation resources are managed to achieve balance in soil and watershed protection, wildlife habitat, livestock grazing, forestry, and biodiversity values, while maintaining or enhancing special status species habitat.*

*Recreation*
- *Ensure route connectivity between the North Desert ERMA and the Grand Valley OHV SRMA. To provide a transition zone between the high-use urban interface area directly north of Grand Junction, allow higher route density along the ERMA's interface with the Grand Valley OHV SRMA at 27 ¼ Road, with route density generally decreasing as the trail system extends to the*

BLM_0024119

*Approved Resource Management Plan – COMPREHENSIVE TRAILS AND TRAVEL MANAGEMENT*

*northwest toward 25 Road and 21 Road (Travel Management Zone L.)*

**TRV-MA-81:**

Develop a route system in Zone L (outside of the open area) through cooperation with key stakeholders that utilizes screening measures identified in Appendix M specific to this area within 5 years of approving the Travel Management Plan.

**TRV-MA-82:**

Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails on listed species. Identify mitigation where open routes are negatively effecting listed species.

**TRV-MA-83:**

To reduce the spread of cheatgrass and noxious weeds, reduce duplicative and redundant routes in areas with susceptibility to cheatgrass or invasive and noxious weed infestations.

**TRV-AU-04:**

**STIPULATION** NSO-13: *Current and Historically Occupied Habitat of Threatened, Endangered, Proposed, and Candidate Species.* Prohibit certain surface uses, as specified in Appendix B, to protect threatened, endangered, proposed, and candidate plants and animals from indirect impacts, loss of immediately adjacent suitable habitat, or impacts to primary constituent elements of critical habitat as designated by USFWS. Maintain existing buffer distances where pre-existing disturbance exists, and reduce redundancies in roads to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails. In undisturbed environments and ACECs, prohibit new disturbance within 200 meters (656 feet) of current and historically occupied and suitable habitat. This stipulation includes emergency closures of roads where damage to T&E habitat has occurred. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

BLM_0024120

## LANDS AND REALTY

**L&R-GOAL-01:**
*Meet resource needs while providing public use authorizations such as Rights-of-Way (ROWs), renewable energy sources, permits, and leases.*

**L&R-OBJ-01:**
*Provide for the development and operation of transportation systems, pipelines, transmission lines, communication sites, renewable energy resources, and other land use authorizations in an environmentally responsible and timely manner.*

**L&R-AU-01:**
ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development): Manage 210,000 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-9, Appendix A):

- ACECs:
  - A portion of Atwell Gulch (2,600 acres);
  - A portion of Badger Wash (1,800 acres);
  - Indian Creek;
  - Juanita Arch;
  - Mt. Garfield (excluding the Coal Canyon Corridor);
  - Pyramid Rock;
  - Rough Canyon;
  - South Shale Ridge (except for ROWs to existing oil and gas leases issued under the 1987 RMP without NSO stipulations); and
  - Unaweep Seep
- Ant Study Area
- LBCWHR (22,800 acres inside WSA)
- Lands managed for wilderness characteristics
- Parachute penstemon occupied habitat
- SRMAs:
  - Bangs (RMZs 3 and 4);
  - North Fruita Desert.
- VRM Class I
- Wildlife emphasis areas:
  - A portion of East Salt Creek (west of Highway 139 [4,100 acres])
- Within a 0.4-mile radius of Sage-Grouse leks

BLM_0024121

*Approved Resource Management Plan – LANDS AND REALTY*

- WSAs (allow for ROWs to existing leases without an NSO stipulation issued under the 1987 RMP)
- High sensitivity zone of the Palisade municipal watershed, except for the Lands End Communication Site.

**L&R-AU-02:**
ROW Avoidance Areas: Manage 789,400 acres as ROW avoidance areas (Figure 2-9, Appendix A) (see Appendix B):

- ACECs:
  - A portion of Atwell Gulch (260 acres)
  - A portion of Badger Wash (400 acres)
  - Dolores River Riparian
  - The Palisade
  - Roan and Carr Creeks
  - Sinbad Valley
- Administrative sites (e.g., study sites, monitoring plots, range exclosures)
- Developed recreation sites
- Disposal parcels
- Fragile soils
- Floodplains
- National Historic, Scenic, and Recreation Trails (e.g., Old Spanish National Historic Trail)
- LBCWHR (6,500 acres outside of WSA)
- Mapped Mancos shale areas
- OHV open areas (except for areas in delineated ROW corridors)
- Owl banding station
- Sage-Grouse: occupied habitat
- Sage-Grouse: within a 4-mile radius of leks
- Scenic byways (except for areas within corridors)
- SRMAs:
  - Bangs (RMZs 1 and 2, exception for Little Park Road and Monument Road [75-meter setback])
  - Dolores River Canyon
  - Grand Valley OHV
  - Palisade Rim
- Special status species occupied and suitable habitat
- Steep slopes greater than or equal to 40 percent
- Streams/springs possessing lotic/lentic riparian characteristics

BLM_0024122

- Segment suitable for inclusion in the NWSRS:
  - Dolores River
- Areas designated as VRM Class II
- Wetlands, springs, seeps, and riparian areas.
- Wildlife Emphasis Areas:
  - Prairie Canyon antelope migratory corridor;
  - Rapid Creek (except for West-wide Energy Corridor);
  - Sunnyside (outside of West-wide Energy Corridor); and
  - Timber Ridge (exception along 9.8 Road).
- Wildlife habitat treatments
- Old growth forests and woodlands.

**L&R-AU-03:**
Manage the remaining public land not identified as ROW exclusion or avoidance areas as suitable for consideration for public utilities.

**L&R-AU-04:**
**STIPULATION** CSU-29: *Sub-surface Inventory*. Require sub-surface inventory for deep sub-surface-disturbing activities and buried ROW in the following locations. (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

- Indian Creek (20,200 acres);
- Grand Mesa Slopes (16,000 acres); and
- Sunnyside (17,300 acres).

**L&R-MA-01:**
Maintain a minimum of administrative access to rights-of-way, other land use authorizations, and utility corridors.

**L&R-MA-02:**
Communication Sites: Work with applicants to prioritize co-locating communication site facilities and use existing sites, as feasible. Consider new communication sites if these requirements cannot be met.

**L&R-OBJ-02:**
*Manage corridors for public utilities and other facilities, and establish new corridors in an environmentally responsible manner as necessary to meet future demands and protect sensitive resources.*

**L&R-AU-05:**
Consider the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing

BLM_0024123

*Approved Resource Management Plan – LANDS AND REALTY*

facilities, as consistent with other resource values.

**L&R-MA-03:**
Manage five corridors (96,000 acres) (widths are approximate) for public utilities and other facilities, including:

- Coal Canyon
  - Telephone/fiber optic and power lines (wood poles only, or material and designs that look natural or similar to wood poles)
  - 0.5-mile wide
- Highway 139
  - All facilities
  - 0.5-mile wide
- Unaweep Canyon
  - Telephone/fiber optic and power lines (wood poles only, or material and designs that look natural or similar to wood poles)
  - 0.5-mile wide
- West Salt Creek
  - All facilities
  - 0.5-mile wide
- West-wide Energy Corridor
  - All facilities
  - 1 to 5 miles wide

**L&R-AU-06:**
Consider increased bonding for projects within the Unaweep and Highway 139 Corridors to ensure that reclamation, visual, and other objectives are met.

**L&R-OBJ-03:**
*Provide for the development and operation of actions for leases, permits, and easements authorized under 43 CFR 2920 (such as site facilities and commercial filming) in an environmentally responsible and timely manner.*

**L&R-MA-04:**
Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback.

**L&R-MA-05:**
Limit applications for filming permits and still photography involving motorized, mechanized, or other intensive uses to existing highways and pullouts; designated routes, roads, and trails; and previously disturbed or cleared areas. Issue permits

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024124

without requiring any NEPA analysis only if the following criteria of minimal impact are met. Prior to permit approval, filming projects that do not meet these criteria will be subject to site-specific NEPA analysis, or use of programmatic NEPA documents, including EAs that may be developed on a local, state, or BLM-wide basis.

- Project will not impact sensitive habitat or species.
- Project will not impact cultural resources or traditional cultural properties and natural resources of importance to Native Americans.
- Project will not involve use of pyrotechnics.
- Project will not involve more than minimum impacts to land, air, or water. (Minimum is defined as temporary impact only and does not include permanent impacts or surface disturbance that cannot be raked out or rehabilitated so that there is no sign of activity at the end of the filming).
- Project will not involve use of explosives.
- Project will not involve use of exotic plant or animal species that could cause danger of introduction into the area.
- Project will not involve WSAs or lands managed for wilderness characteristics.
- Project will not involve adverse impacts to sensitive surface resource values including paleontological sites; sensitive soils; relict environments; wetlands or riparian areas; or ACECs.
- Project will not involve substantial restriction of public access.
- Project will not involve substantial use of domestic livestock.
- Project will not involve 10 production vehicles within sensitive areas.
- Project will not involve 60 or more people within sensitive areas.
- Filming activity within sensitive areas will not continue in excess of 10 days.
- Refueling will not occur within sensitive areas.
- Aircraft use in area with wildlife concerns is not proposed during crucial wildlife periods.
- Aircraft use in area with no wildlife concerns is proposed for no more than two days and does not exceed frequency of three projects per 30-day period.
- Use of aircraft is not proposed within 0.5-mile of a designated campground located within a sensitive area, and the number of low-elevation passes will not exceed four passes per day.
- Filming activities are not proposed in developed recreation sites on weekends or during times of anticipated high use.

**L&R-OBJ-04:**
*Resolve trespass uses as they are identified and prioritized.*

**L&R-MA-06:**
Monitor for trespass actions and manage as appropriate through ROW authorization or trespass procedures for removal and site restoration.

## Renewable Energy

**L&R-MA-07:**
Encourage applications for both small scale (less than 20 megawatts) and large scale (greater than 20 megawatts) development in solar and wind emphasis areas.

Manage 8,700 acres as emphasis areas for solar energy development and operation, and 2,400 acres as emphasis areas for wind energy development and operation (Figure 2-87, Appendix A). Manage additional areas as identified and determined suitable for development in an environmentally responsible and economically feasible manner. ROW avoidance and exclusion areas apply. Allow for competitive leasing in identified renewable energy emphasis areas, and in new emphasis areas as identified in the future. All ROWs and other realty authorizations shall be relocated to avoid sensitive resources. Special stipulations shall also be applied to protect sensitive resources in avoidance areas.

**L&R-MA-08:**
Upon receipt of application for development and subsequent approval within solar and wind emphasis areas (Figures 2-29, Appendix A), consider modification of route designations and/or route relocation to accommodate wind energy development.

## Land Tenure

**L&R-GOAL-02:**
*Adjust BLM land ownership patterns and implement other realty actions (e.g., withdrawals and easements) to meet resource and community needs.*

**L&R-OBJ-05:**
*Consolidate the BLM's land ownership patterns through land tenure adjustments for improved management efficiency, and acquire from willing sellers suitable private land with special resource values.*

**L&R-AU-07:**
*Disposals.* Identify 10,200 acres as available for disposal through exchanges, state selections, boundary adjustments, R&PP Act leases and patents, leases under Section 302 of FLPMA, sales under Sections 203 and 209 of FLPMA, and sales authorized by other Congressional Acts and special legislation. (Figure 2-10, Appendix A).

Disposal lands must meet one or more of the following criteria:

BLM_0024126

- Lands suitable for public purposes adjacent to or of special importance to local communities and to state or federal agencies for purposes such as community expansion, extended community services, or economic development.

- Isolated parcels that are small or so located as to make effective and efficient management impractical.

- Lands identified for the Grand Junction Regional Airport expansion (2,100 acres).*

- Unintentional occupancy trespasses in existence prior to 2010.

- Parcels containing or integral to significant habitat for special status species may be disposed of only if the habitat for the species of concern can be maintained and if the USFWS and CPW concur.

- Parcels containing or integral to NRHP eligible cultural resources may be disposed of only if the resources can be mitigated through data recovery and if the SHPO concurs with the proposed mitigation.

- Additional lands may be identified for disposal in urbanizing areas on a case-by-case basis to meet community expansion needs and where the public interest will be well served.

- Lands managed as recreational target shooting areas (e.g., 27¼ Road in the Grand Valley Shooting Areas ERMA), if lands will be managed with similar objectives to current use.

- Lands without legal public access.

* Lands identified for the Grand Junction Regional Airport expansion may be reclassified as retention lands if a future update to the Airport Master Plan determines that the lands are not needed for airport expansion.

---

**L&R-MA-09:**
Dispose isolated tracts of public lands not presently shown on the base map (Alternative A) that become known in the future and that are not required to meet other resource objectives. See Figure 2-10, in Appendix A.

---

**L&R-MA-10:**
Reserve public access in patents where it will benefit the public.

---

**L&R-AU-08:**
Identify 20 tracts totaling 5,200 acres for cooperative management (Figure 2-10, Appendix A). Offer these tracts to qualified agencies or entities for management, transfer, or exchange. Tracts that are not in the process of being transferred or do not have a cooperative management agreement in place within 10 years of signing of the record of decision for this RMP may become available for disposal.

---

**L&R-MA-11:**
*Retention Areas.* Retain for long-term management the remaining public lands (not identified for disposal), totaling 1,051,900 acres (Figure 2-10, Appendix A).

---

BLM_0024127

**L&R-MA-12:**

Consider land exchanges in retention areas on a case-by-case basis in order to meet resource objectives if the exchange is in the public interest and will: 1) improve management efficiency; or 2) result in the acquisition of private property with high resource values.

**L&R-MA-13:**

Consider applications in retention areas to meet community or organization needs under the R&PP Act in accordance with resource objectives.

**L&R-AU-09:**

**STIPULATION** *DISPOSAL CSU CO.* Surface occupancy or use may be restricted due to lands identified for disposal in the Resource Management Plan. Standard exceptions apply; see Appendix B.

**L&R-MA-14:**

Consider whether parcels are identified for disposal or for management by another entity in determining long-term access needs and route designations.

**L&R-OBJ-06:**

*Acquire lands or interests in lands through exchanges, purchases, easements, or donations to facilitate resource goals and objectives.*

**L&R-MA-15:**

Consider acquisition of lands that meet the following criteria:

- Lands within or adjacent to WSAs;
- Lands adjacent to NCAs;
- Lands needed for management of Wild and Scenic Rivers;
- National cultural, historic, or scenic trails and byways;
- Areas for cultural, paleontological, or natural history designation;
- Lands within or adjacent to ACECs;
- Habitat for species of concern (including, but not limited to, special status species);
- Lands that will help conserve, enhance, or restore Sage-Grouse habitat;
- Lands within or adjacent to lands managed for wilderness characteristics;
- Lands within or adjacent to the LBCWHR;
- Lands within or adjacent to SRMAs;
- Lands that provide public or administrative access;
- Lands that consolidate BLM ownership and improve management efficiency;

*Approved Resource Management Plan – LANDS AND REALTY*

- Lands that meet the intent of the Land and Water Conservation Fund or other Congressional Acts and special legislation;
- Wetland areas as defined in Executive Order 11990, dated May 24, 1977;
- Floodplain areas (100-year) as defined in Executive Order 11988, dated May 24, 1977; and
- Other lands for other administrative purposes.

**L&R-MA-16:**
Manage lands or interests in acquired lands in a manner consistent with management of other public lands in the surrounding area.

**L&R-MA-17:**
Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements that enhance public access and recreation opportunities consistent with recreation and resource program objectives.

**L&R-MA-18:**
To facilitate proper reclamation in compliance with pipeline stipulations and COAs (on rights-of-way grants and APDs) and to protect shallow pipeline infrastructure, maintain administrative (but close to the public) access over pipeline facilities, unless pipelines are placed along existing routes or impacts pipelines and reclamation are unlikely.

**L&R-OBJ-07:**
*Withdraw lands from the public land laws or mining laws where necessary to meet resource and other management objectives of the BLM or other Federal agencies.*

**L&R-MA-19:**
Continue to manage approximately 23,300 acres as withdrawn from mineral entry (Figure 2-16, Appendix A):

- Badger Wash Study Area (3,100 acres)
- Mack Mesa Reservoir (40 acres)
- Sieber Canyon (200 acres)
- West Creek and the Unaweep Seep (1,500 acres)
- Rough Canyon ACEC (2,700 acres)
- Pup Tent Mine (1 acre)
- Developed recreation sites
  - Mud Springs (40 acres)
  - Miracle Rock (50 acres)
- Department of Energy uranium withdrawal (5,800 acres)
- Existing Bureau of Reclamation (BOR) withdrawals (7,900 acres[1])

Also see Locatable Minerals section.

BLM_0024129

*Approved Resource Management Plan – LANDS AND REALTY*

[1] Of the 7,900 acres of BOR withdrawals, 4,900 surface acres are managed by BOR, 3,000 surface acres are managed by BLM.

**L&R-MA-20:**

Review withdrawals, as needed, and recommend their renewal, continuation, or termination. Continue all existing withdrawals initiated by other agencies unless the initiating agency requests that the withdrawal be terminated. Following revocation of a withdrawal and issuance of an opening order, manage the lands in a manner consistent with adjacent or comparable public land within the planning area.

Existing BOR withdrawals include:

- Grand Valley Project (5A Withdrawal; approximately 3,100 acres);
- Grand Valley Salinity Unit, Colorado River Basin Salinity Control Project (5A Withdrawal; 500 acres);
- Collbran Project (5A Withdrawal; 1,300 acres); and
- Dominguez Project (5B Withdrawal; 3,000 acres)*

*Project not authorized for construction.

**L&R-MA-21:**

Recommend revocation of the Dominguez Project withdrawal (3,000 acres) as requested by the BOR. Following revocation of the withdrawal and issuance of an opening order, manage the lands in a manner consistent with adjacent or comparable public land within the planning area.

**L&R-MA-22:**

Consider disposal of any withdrawn lands only upon concurrence by the holding agency and revocation or modification of the withdrawal.

*Approved Resource Management Plan – COAL*

## COAL

**COA-GOAL-01:**
*Provide opportunities for environmentally sound exploration and development of coal resources.*

**COA-OBJ-01:**
*Maintain coal leasing, exploration, and development within the planning area while minimizing impacts to other resource values.*

**COA-AU-01:**
Within the coal resource development potential area, manage 252,100 acres[*] as acceptable for further coal leasing and development per Screens 1 and 3, set forth in 43 CFR 3420.1. See Figure 2-35, Appendix A.

*Acreage based off a maximum development depth of 2,500 feet.

**COA-AU-02:**
Manage areas identified in Screen 2 criteria, set forth in 43 CFR 3461.5, as acceptable for further consideration for coal leasing but unsuitable for surface mining or surface mining operations, and subject to the resource objectives outlined in the RMP (Appendix N, Coal Screening Criteria in the GJFO).

**COA-AU-03:**
Manage 57,400 acres in the coal resource development potential area as <u>unacceptable</u> for further consideration of leasing and development per Screen 3, set forth in 43 CFR 3420.1 (Appendix N, Coal Screening Criteria in the GJFO). See Figure 2-11 in Appendix A):

- Unacceptable areas include the following:
  - Colorado River Corridor;
  - Demaree Canyon WSA;
  - Little Book Cliffs WSA;
  - Pyramid Rock ACEC;
  - A portion of Roan and Carr Creeks ACEC (700 acres); and
  - The Grand Junction and Palisade municipal watersheds.

**COA-AU-04:**
Apply special conditions that must be met during more-detailed planning, lease sale, or post-lease activities, including measures required to protect other resource values, as outlined in Appendix B (Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities) and Appendix H (Best Management Practices and Standard Operating Procedures). Provide special conditions as recommended stipulations during post-lease activities and mine plan permitting processes.

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024131

**COA-AU-05:**

**STIPULATION** *COAL MINE CSU CO:* ***(Fluid Minerals Only)*** Surface occupancy or use (for fluid minerals only) may be restricted due to surface or underground coal mines. Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Operations proposed within the area of an approved surface or underground coal mine will be relocated outside the area to be mined or to accommodate room and pillar mining operations. Standard exceptions apply; see Appendix B.

BLM_0024132

# FLUID MINERALS (OIL AND GAS, OIL SHALE, AND GEOTHERMAL RESOURCES)

**MIN-GOAL-01:**
*Provide opportunities for leasing, exploration, and development of fluid minerals using balanced multiple-use management to meet local and national energy needs.*

## Oil and Gas and Geothermal Resources

**MIN-OBJ-01:**
*Facilitate orderly, economic, and environmentally sound exploration and development of oil and gas resources (including coalbed natural gas and geothermal), using the best available technology.*

**MIN-MA-01:**
Lease Notices (all Lease Notices): Use a Lease Notice to alert oil and gas and geothermal lessees of special inventory requirements or reporting requirements in certain areas to protect resources (See Appendix B).

**MIN-MA-02:**
Apply lease stipulations and lease notices to all new leases.

**MIN-MA-03:**
BLM has the discretion to modify surface operations to change or add specific mitigation measures when supported by scientific analysis. All mitigation/conservation measures not already required as stipulations will be analyzed in a site-specific NEPA document, and be incorporated, as appropriate, into COAs of the permit, plan of development, and/or other use authorizations.

**MIN-MA-04:**
Develop and apply COAs for authorizations such as, but not limited to, applications for permit to drill, sundry notices, and geophysical exploration to supplement regulation and policy, provided the COAs are consistent with lease rights granted.

**MIN-MA-05:**
In areas being actively developed, the operator will be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.

BLM_0024133

**MIN-MA-06:**
Resource condition objectives identified in this RMP will guide reclamation activities in areas that are currently under development and areas to be developed prior to their abandonment.

**MIN-AU-01:**
**Leasing:** Manage 935,600 acres of the federal mineral estate as open to fluid mineral leasing and geophysical exploration:
- BLM surface/federal minerals: 790,700 acres (Figure 2-12, Appendix A)
- Private and State surface/federal fluid mineral estate: 144,900 acres.

**MIN-AU-02:**
**No Leasing:** *BLM surface/federal minerals.* Manage 295,600 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12 in Appendix A:

- No leasing areas include the following:
  - Gunnison Sage-Grouse critical habitat;
  - ACECs:
    - Badger Wash (1,700 acres)
    - Dolores River Riparian (7,400 acres)
    - Juanita Arch (1,600 acres)
    - The Palisade (32,200 acres)
    - Rough Canyon (2,800 acres)
    - Sinbad Valley (6,400 acres)
    - Unaweep Seep (85 acres)
  - Lands managed for wilderness characteristics (44,100 acres)
  - SRMAs:
    - Bangs (47,800 acres)
    - Dolores River Canyon (16,100 acres)
    - Palisade Rim (2,000 acres)
  - Watersheds:
    - Grand Junction (1,900 acres)
    - Palisade (5,200 acres)
  - BOR withdrawals where surface estate is managed by the BLM (3,000 acres)
  - WSAs:
    - Demaree Canyon (22,700 acres )
    - Little Book Cliffs (29,300 acres)
    - The Palisade (26,700)
    - Sewemup Mesa (17,800 acres)

BLM_0024134

**MIN-AU-03:**
**No Leasing:** *Split-estate.* Manage 29,800 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12 in Appendix A:

- City of Grand Junction Municipal Watershed (1,300 acres);
- Palisade Municipal Watershed (7,100 acres);
- Gunnison Sage-Grouse critical habitat (16,500 acres); and
- BOR withdrawals where the surface is managed by BOR (4,900 acres).

**MIN-AU-04:**
**STIPULATION** *LN-16 (Alternative A)*/LN-7 (Alternatives B and D)*: Powderhorn Ski Area*. If drilling operations are proposed, the lessee is hereby notified that there are concerns about ski lift structures, other facilities, and ski runs within the Powderhorn ski area. The lessee is hereby notified that special design, construction, and scheduling measures may be required in order to minimize the impacts of drilling and production operations. Proposed drilling and production facilities and operations shall be relocated and rescheduled as needed to avoid physical interference with ski area facilities and recreation use. This can include relocations of more than 200 meters (656 feet) or seasonal closures of more than 60 days (See Appendix B).

**MIN-AU-05:**
**STIPULATION** *RECREATION PARKS NSO CO*: Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units:

- Horsethief Canyon State Wildlife Area  (1,400 acres)
- Jerry Creek Reservoir State Wildlife Area (870 acres)
- Plateau Creek State Wildlife Area (1,400 acres)
- Highline State Park (350 acres)
- Vega State Park (2,000 acres)

(Refer to Appendix B.) See Figure 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

**MIN-AU-06:**
Where drainage in areas closed to leasing is likely, the BLM may issue new leases with an NSO stipulation with appropriate exception, waiver, and modification criteria.

**MIN-AU-07:**
**STIPULATION** *NSO* (all NSOs): Apply major constraints (NSO/no surface-disturbing activities) to 424,500 acres that are open to fluid mineral leasing and geophysical exploration. Lease areas with fluid minerals NSO stipulations to protect resources (Refer to Appendix B):

BLM_0024135

- BLM surface/federal minerals: 371,500 acres (Figure 2-13, Appendix A)
- Private and State surface/federal fluid mineral estate: 53,800 acres..

### MIN-AU-08:

**STIPULATION** *CSU* (all CSUs): Apply constraints (CSUs) to 501,700 acres that are open to fluid mineral leasing and geophysical exploration. Lease areas with CSU stipulations to protect resources (Refer to Appendix B):

- BLM surface/federal minerals: 481,800 acres (Figure 2-14, Appendix A)
- Private and State surface/federal fluid mineral estate: 19,900 acres.

### MIN-AU-09:

**STIPULATION** *TL* (all TLs): Apply constraints (TLs) to 383,800 acres that are open to fluid mineral leasing and geophysical exploration. Lease areas with TL stipulations to protect resources (Refer to Appendix B):

- BLM surface/federal minerals: 342,200 acres (Figure 2-15, Appendix A)
- Private and State surface/federal fluid mineral estate: 41,600 acres.

### MIN-MA-07:

Maintain administrative access to active oil and gas wells, but limit public access to provide for public safety at active well sites.

### Oil Shale

### MIN-OSH-OBJ-01:

*Maintain opportunities to lease oil shale with further NEPA analysis while minimizing impacts to other resources.*

### MIN-OIL-AU-01:

Accept applications to lease oil shale on 560 acres of the federal mineral estate within the GJFO, as identified in the *Approved Resource Management Plan Amendments/ROD for Oil Shale and Tar Sands Resources to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic Environmental Impact Statement* (BLM 2008c). See Figure 2-90 in Appendix A. Other decisions related to oil shale leasing made in the *Oil Shale and Tar Sands PEIS* (BLM 2008) are also incorporated here by reference. These decisions are currently being revisited by the BLM in a programmatic planning process and any additional decisions will be adopted by this RMP, as applicable.

### MIN-OIL-AU-02:

Applications for commercial leases using surface mining technologies shall not be permitted.

### MIN-OIL-MA-01:

BLM_0024136

Accept applications for commercial leasing using underground mining technologies. The BLM will then publish a notice in the Federal Register. Prior to making any leasing decision, the BLM will conduct site specific NEPA analysis and assess the conformance of leasing with this RMP. If the application is not in conformance with the RMP, then a plan amendment will be required.

**MIN-OIL-MA-02:**
Consider and give priority to the use of land exchanges, where appropriate and feasible, to consolidate land ownership and mineral interests within the oil shale basins to facilitate development pursuant to Section 369(n) of the Energy Policy Act of 2005.

## Shale Ridges and Canyons Master Leasing Plan

*Shale Ridges and Canyons Master Leasing Plan (MLP) Vision:*
*Facilitate the exploration and development of oil and gas resources in the Shale Ridges and Canyons MLP area, while resolving possible conflicts with future leasing and development, and ensuring protection of the area's resources and resource uses, including, but not limited to: air quality; soils; water; riparian; fish and wildlife (including Wildlife Emphasis Areas); Special Status Species; recreation; and ACECs.*

**MIN-MLP-OBJ-01:**
*Promote a proactive approach to planning for oil and gas development in the proposed Shale Ridges and Canyons Master Leasing Plan area based on known resource values and reasonably foreseeable oil and gas development. Manage oil and gas operations in the Shale Ridges and Canyons MLP area to prevent degradation of sensitive soils, special status species, and other resources. All management objectives, goals, and actions are the same for the MLP and the entire GJFO decision area unless otherwise stated.*

**MIN-MLP-AU-01:**
Approximately 183,400 acres of Federal mineral estate in the Shale Ridges and Canyons MLP analysis area that are currently unleased will be open to oil and gas leasing and development. Approximately 37,600 acres of Federal mineral estate in the Shale Ridges and Canyons MLP analysis area that are currently unleased will be closed to oil and gas leasing and geophysical exploration.

- Apply NSO, CSU, and TL leasing stipulations in the Shale Ridges and Canyons MLP analysis area to protect resources.
- Apply major constraints (NSO) to about 328,700 acres of Federal mineral estate that are open to fluid minerals leasing. (See Figure 4-2).
- Apply moderate constraints (CSU) to about 362,500 acres of Federal mineral estate that are open to fluid minerals leasing. (See Figure 4-3)
- Apply moderate constraints (TL) to about 237,500 acres of Federal mineral estate that are open to fluid minerals leasing. (See Figure 4-4)

BLM_0024137

*Chapter 2 - Approved Resource Management Plan – FLUID MINERALS*

The following energy and minerals, reclamation, livestock grazing, and transportation and access Conditions of Approval (COAs) from Appendix H will be analyzed at the development stage and may be applied consistent with environmental analysis and existing lease rights. Additional resource-specific COAs are listed under each resource subheading below.

- Minerals and Energy (M&E) 1-100
- Reclamation (R) 1-17
- Livestock Grazing (LG) 11, 12, 14, and 15
- Transportation and Access (TA) 2

## Master Leasing Plan – Air Quality

**MIN-MLP-OBJ-02:**
*Limit air quality degradation within the MLP analysis area by ensuring that land use activities are in compliance with Federal, State, and local regulations.*

**MIN-MLP-AU-02:**
Require that oil and gas operators use reduced emission completion technology (i.e., "green" completion) as defined in COGCC Rule 805 and the New Source Performance Standards for Crude Oil and Natural Gas
Production at 40 CFR Part 63 Subpart OOOO at all wells on BLM-administered lands and wells that access federal minerals. An exemption may be granted on a case-by-case basis. The following COAs also may be applied to development proposals:

- Air Quality (A) 1-28 and 30-32

Refer to the Air Quality section for other air quality management actions that will be applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Water Resources

**MIN-MLP-OBJ-03:**
*Manage and protect surface water and groundwater in order to maintain or contribute to the long term improvement of surface and ground water quality and minimize or control elevated levels of salt, sediment, and selenium contributions to water resources. All streams on public lands in the MLP Analysis Area that meet or exceed State water quality standards, and that have acceptable channel stability, will be maintained in the present condition through limited management. Streams not meeting State standards, or having unstable channels, will be improved in order to meet minimum standards through intensive management.*

**MIN-MLP-AU-03:**
Apply the following stipulations on future oil and gas leases in the Shale Ridges

*Grand Junction Field Office Approved Resource Management Plan*

BLM_0024138

and Canyons MLP analysis area to protect water quality. See Appendix B for a detailed description of stipulations.

Hydrology:

- NSO-2 Streams/Springs Possessing Lotic Riparian Characteristics (See Figure 4-2)
- NSO-3 Definable Streams (See Figure 4-2)
- NSO-4 Lentic Riparian Areas (including springs, seeps, and fens) (See Figure 4-2)
- CSU-3 Definable Streams (See Figure 4-3)
- HYDROLOGY RIVER NSO CO (See Figure 4-2)

The following COAs from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Water Resources (H) 1-12, 14-41, and 43-50

Refer to the Water Resources section for other water resources management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Soil Resources

**MIN-MLP-OBJ-04:**
*Ensure that surface disturbances do not cause accelerated erosion (such as rills, soil pedestals, and actively eroding gullies) on a watershed scale (e.g., 6th hydrologic unit code scale). Minimize or control elevated levels of salt, sediment, and selenium contribution from public lands to rivers. Maintain or improve soil productivity, preserve proper function and condition of uplands, and ensure that surface disturbances do not cause accelerated erosion.*

**MIN-MLP-AU-04:**
Apply the following stipulations on future oil and gas leases in the Shale Ridges and Canyons MLP analysis area to protect soils. See Appendix B for a detailed description of stipulations.

- GEOLOGY SLOPE NSO CO (See Figure 4-2)
- GEOLOGY SOIL NSO CO (See Figure 4-2)
- GEOLOGY SOIL CSU CO (See Figure 4-3)

The following Condition of Approval (COA) from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Soils (S) 1-23

Refer to the Soil Resources section for other soil resources management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

BLM_0024139

| Master Leasing Plan – Vegetation |
| --- |

### MIN-MLP-OBJ-05:
*Manage for a healthy diversity of successional-stage plant communities and properly functioning riparian zones within the MLP analysis area.*

#### MIN-MLP-AU-05:
Apply the following stipulations and conservation measures on future oil and gas leases within the Shale Ridges and Canyons MLP analysis area to protect vegetation communities: See Appendix B for a detailed description of stipulations.

Stipulations:

- NSO-2 Streams/Springs Possessing Lotic Riparian Characteristics (See Figure 4-2)
- NSO-3 Definable Streams (See Figure 4-2)
- NSO-4 Lentic Riparian Areas (including springs, seeps, and fens) (See Figure 4-2)
- PLANT COMMUNITY CSU CO (See Figure 4-3)
- The following Conditions of Approval (COAs) from Appendix H will be analyzed at the development stage and may be applied to development proposals:
- Vegetation Rangeland (VR): 1-3, and 4-13
- Vegetation Riparian Habitat and Wetlands (VRW): 1-5, 9-11, 13-14, and 24
- Noxious and Invasive Weed Prevention (WEED): 1-29

Refer to the Vegetation section for other vegetation management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area

| Master Leasing Plan – Special Status Species |
| --- |

### MIN-MLP-OBJ-06:
*Protect occupied and suitable habitat for federal proposed, candidate, and threatened or endangered species, and protect occupied habitat for BLM sensitive species necessary for:*

- *Maintenance and recovery of proposed, candidate, and threatened or endangered species and*
- *Support of BLM sensitive species and significant plant communities, consistent with BLM policy on special status species management (BLM manual 6840, BLM 2008o).*

**MIN-MLP-AU-06:**   Apply the following stipulations and conservation measures on future oil and gas leases within the Shale Ridges and Canyons MLP analysis area to protect Special Status Species: See Appendix B for a detailed description of restrictions.

Stipulations:

- NSO-12 ACECs (See Figure 4-2)
- NSO-13 Current and Historically Occupied Habitat and Critical Habitat of Threatened, Endangered, Proposed, and Candidate Plant and Animal Species (See Figure 4-2)
- NSO-23 Golden Eagle Nest Sites (See Figure 4-2)
- NSO-24 Bald Eagle Nest Sites (See Figure 4-2)
- NSO-25: Sage-Grouse Leks, Nesting, and Early Brood-rearing Habitat (4 miles) (See Figure 4-2)
- NSO-26 Canyon Treefrog, Midget Faded Rattlesnake, Northern Leopard Frog, Great Basin Spadefoot, Long-nosed Leopard Lizard, Boreal Toad (See Figure 4-2)
- NSO-30: Occupied Prairie Dog Towns in Prairie Canyon WEA (See Figure 4-2)
- WILDLIFE BAT NSO CO (See Figure 4-2)
- CSU-9 BLM Sensitive Plant Species Occupied Habitat (See Figure 4-3)
- CSU-13: Osprey Nests (See Figure 4-3)
- CSU-14: Ferruginous Hawk Nest Sites (See Figure 4-3)
- CSU-15: Red-tailed Hawk Nest Sites (See Figure 4-3)
- CSU-16: Swainson's Hawk Nest Sites (See Figure 4-3)
- CSU-17: Peregrine Falcon Nest Sites (See Figure 4-3)
- CSU-18: Prairie Falcon Nest Sites (See Figure 4-3)
- CSU-19: Other Raptor Species (See Figure 4-3)
- CSU-23: Occupied Prairie Dog Towns (See Figure 4-3)
- CSU-39 Roan and Carr Creeks ACEC (See Figure 4-3)
- TL-1 Salmonid and Native, Non-salmonid Fishes (See Figure 4-4)
- TL-3 Migratory Bird Habitat (See Figure 4-4)
- TL-7 Red-tailed Hawk Nests (See Figure 4-4)
- TL-13 Golden Eagle Nest Sites (See Figure 4-4)
- TL-15 Bald Eagle Winter Roost (See Figure 4-4)
- TL-16: Sage-Grouse Leks, Nesting, and Early Brood-rearing Habitat (0.6 mile) (See Map See Figure 4-4)

BLM_0024141

*Chapter 2 - Approved Resource Management Plan – FLUID MINERALS*

- WILDLIFE RAPTOR NESTS TL CO (See Figure 4-4)
- SENSITIVE WILDLIFE RAPTOR NESTS TL CO (See Figure 4-4)
- LN-3: Biologic Inventories
- LN-4: Threatened and Endangered Species

The following COAs from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Fish and Wildlife Management and Special Status Species (FWS) 1, 4-21, 23-26, and 28-55
- Wildlife Damage Management (WDM) 7 and 9

Refer to the Special Status Species section for other special status species management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Greater Sage-Grouse

### MIN-MLP-OBJ-07:

*Sustain the integrity of the sagebrush biome in order to provide the amount, continuity, and quality of habitat that is necessary to maintain sustainable populations of Greater Sage-Grouse and other sagebrush-dependent species.*

### MIN-MLP-AU-07:

Apply the following stipulations and mitigation measures on future oil and gas leases to protect Greater Sage-Grouse habitat. See Appendix B for a detailed description of restrictions.

Stipulations:

- NSO-12 ACECs (See Figure 4-2)
- NSO-13 Current and Historically Occupied Habitat and Critical Habitat of Threatened, Endangered, Proposed, and Candidate Plant and Animal Species (See Figure 4-2)
- CSU-39 Roan and Carr Creeks ACEC (See Figure 4-3)
- TL-16: Occupied Sage-Grouse Winter Habitat (See Figure 4-4)
- TL-17 Sage-Grouse Leks (4 mile) (See Figure 4-4)

Mitigation Measures:
Measures to mitigate impacts to Greater Sage-Grouse, including leasing stipulations, may be applied to future oil and gas leases in the MLP Analysis Area upon publication of the Northwest Colorado BLM Greater Sage-Grouse Record of Decision (ROD).

Refer to the Special Status Species section for other Greater Sage-Grouse management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

BLM_0024142

## Master Leasing Plan – Fish and Wildlife

**MIN-MLP-OBJ-08:**

*Maintain and improve BLM lands for priority habitat requirements for the following high-value species: Critical and severe winter range, winter concentration areas, production areas, and big game migrations corridors for big games species (e.g., mule deer (Odocoileus hemionus), elk (Cervus canadensis), antelope (Antilocapra americana), bighorn sheep (Ovis canadensis), and moose (Alces alces).*

*Maintain and improve lands for priority habitat requirements for highly valued species such as, but not limited to, cold water sport fishes including rainbow, brown, and brook trout.*

*Protect state wildlife areas from unnecessary surface occupancy and surface disturbing activities.*

**MIN-MLP-AU-08:**

Designate the following areas in the Shale Ridges and Canyons MLP analysis area as Wildlife Emphasis Areas. Wildlife Emphasis Areas are areas of high habitat value.

Two areas in Garfield County:

- East Salt Creek: 25,000 acres
- A portion of Prairie Canyon: 1,400 acres

Nine areas in Mesa County:

- Beehive: 4,700 acres
- Blue Mesa: 9,300 acres
- Bull Hill: 4,800 acres
- Glade Park: 27,200 acres
- Prairie Canyon (a portion): 20,800 acres
- Rapid Creek: 27,000 acres
- Sunnyside: 14,500 acres
- Timber Ridge: 11,800 acres
- Winter Flats: 3,200 acres

Apply the following stipulations on future oil and gas leases in the Shale Ridges and Canyons MLP analysis area to protect big game, raptors, and fish. See Appendix B for a detailed description of stipulations.

- NSO-32 Research Sites (See Figure 4-2)
- NSO-34 Elk Production Area (See Figure 4-2)
- WILDLIFE HABITAT NSO CO (See Figure 4-2)
- RECREATION PARKS NSO CO (See Figure 4-2)
- CSU-10 Wildlife Habitat (See Figure 4-3)

BLM_0024143

- CSU-24 Deer and Elk Migration and Movement Corridors (See Figure 4-3)
- WILDLIFE HABITAT CSU CO (See Figure 4-3)
- TL-19 Occupied Prairie Dog Towns (See Figure 4-4)
- TL-20 Big Game Winter Range (See Figure 4-4)
- TL-22 Pronghorn Wintering Habitat (See Figure 4-4)
- BIG GAME PRODUCTION AREAS TL CO (See Figure 4-4)
- LN-3 Biologic Inventories
- LN-5 Working in Wildlife Habitat

Fisheries and Aquatic:
- NSO-12 ACECs (See Figure 4-2)
- WILDLIFE HABITAT NSO CO (See Figure 4-2)
- CSU-39 Roan and Carr Creeks ACEC (See Figure 4-3)
- WILDLIFE HABITAT CSU CO (See Figure 4-3)
- TL-1 Salmonid and Native, Non-salmonid Fishes (See Figure 4-4)

The following Conditions of Approval (COAs) from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Fish and Wildlife Management and Special Status Species (FWS) 1, 4-21, 23-26, and 28-55
- Wildlife Damage Management (WDM) 7 and 9

Refer to the Fish and Wildlife and Special Status Species sections for other big game, raptor, and fish management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Wild Horses

### MIN-MLP-OBJ-09:
*Emphasize protection of wild horses in the LBCWHR and minimize impacts to their population and habitat.*

### MIN-MLP-AU-09:
Apply the following stipulations and mitigation measures on future oil and gas leases to protect wild horses and the wild horse range. See Appendix B for a detailed description of restrictions.

Stipulations:

- NSO-36 Little Book Cliffs Wild Horse Range (See Figure 4-2)

The following COAs from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Wild Horses (WH) 1-11

BLM_0024144

Refer to the Wild Horses section for other wild horse management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Cultural and Paleontological Resources

**MIN-MLP-OBJ-10:**
*Protect cultural resources within the MLP Area and manage them according to their Use Category Allocation of one of the following: scientific, conservation, traditional, public, or experimental use. Manage paleontological resources in the MLP analysis area to protect sensitive sites and geologic formations of Class PFYC 4 and 5 potential.*

**MIN-MLP-AU-10:**
Apply the following stipulations and mitigation measures on future oil and gas leases to protect cultural resources. See Appendix B for a detailed description of restrictions.

Stipulations:

- NSO-37 Allocation to Conservation Use Category (See Figure 4-2)
- NSO-38 Allocation to Traditional Use Category (See Figure 4-2)
- NSO-39 Cultural Resources (Indian Creek) (See Figure 4-2)
- CSU-27 Allocation to Scientific Use Category (See Figure 4-3)
- CSU-28 Allocation to Public Use Category (See Figure 4-3)
- CSU-29 Sub-surface Inventory (See Figure 4-3)
- LN-6: Paleontology

The following COAs from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Cultural Resources (CR) 1-7 and 10-13
- Tribal Consultation (TC) 1-6 and 8-10
- Paleontology (P) 1-6

Refer to the Cultural and Paleontological Resources sections for other cultural and paleontological resources management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Visual Resources

**MIN-MLP-OBJ-11:**
*Manage visual resources within the MLP analysis area according to VRM*

BLM_0024145

*classifications. Protect the visual integrity of the landscape by managing all project proposals to meet or exceed objectives of the prescribed VRM classes by incorporating visual design BMPs and COAs.*

**MIN-MLP-AU-11:**

Apply the following stipulations and mitigation measures on future oil and gas leases to protect visual resources. See Appendix B for a detailed description of restrictions.

Stipulations:

- VISUAL CLASS I NSO CO (See Figure 4-2)
- CSU-30: VRM Class II (See Figure 4-3)

The following COAs from Appendix H will be analyzed at the development stage and may be applied to development proposals:

- Visual Resources (V) 1-20

Refer to the Visual Resources section for other visual resources management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Recreation and Visitor Services

**MIN-MLP-OBJ-12:**

*Provide for a focus on meeting recreation goals and objectives in RMAs to reduce conflict between users and oil and gas development.*

**MIN-MLP-AU-12:**

Apply the following stipulations on future oil and gas leases in the Shale Ridges and Canyons MLP analysis area to protect recreation outcomes and settings. See Appendix B for a detailed description of restrictions.

- RECREATION SRMA NSO CO (See Figure 4-2)
- RECREATION MANAGEMENT AREAS CSU CO (See Figure 4-3)

Designate the following areas in the Shale Ridges and Canyons MLP area as ERMAs to address local recreation issues:

- North Desert (107,900 acres)
- Grand Valley Ranges (750 acres)
- Barrel Spring (24,700 acres)

Apply the following stipulation on future oil and gas leases in the Shale Ridges and Canyons MLP analysis area to address local recreation issues. See Appendix B for a detailed description of restrictions.

- RECREATION MANAGEMENT AREAS CSU CO (See Figure 4-3)

Other:

BLM_0024146

*Chapter 2 - Approved Resource Management Plan – FLUID MINERALS*

- CSU-31 Recreation (See Figure 4-3)
- RECREATION PARK NSO CO (See Figure 4-2)

Refer to the Recreation and Visitor Services section for other recreation and visitor services management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

## Master Leasing Plan – Areas of Critical Environmental Concern

**MIN-MLP-OBJ-13:**
*Provide for protection of ACEC resource values by reducing impacts from oil and gas development in these areas.*

**MIN-MLP-AU-13:**
Apply the following stipulations on future oil and gas leases in the Shale Ridges and Canyons MLP analysis area to protect the relevant and important characteristics of ACECs. See Appendix B for a detailed description of restrictions.

- NSO-12 ACECs (See Figure 4-2)
- CSU-39 Roan and Carr Creeks ACEC (See Figure 4-3)

Refer to the ACEC section for other ACEC management actions that are applied throughout the RMP decision area, including the Shale Ridges and Canyons MLP analysis area.

# SOLID MINERALS (LOCATABLE MINERALS, SALABLE MINERALS/MINERAL MATERIALS, AND NON-ENERGY LEASABLE MINERALS)

## SOL-GOAL-02:
*Provide opportunities to develop locatable minerals, mineral materials, and non-energy leasable minerals consistent with other resource goals and uses to meet local and national energy and mineral needs.*

## Locatable Minerals

### LOC-OBJ-01:
*Facilitate environmentally responsible exploration and development of locatable minerals subject to BLM policies, laws, and regulations.*

#### LOC-MA-01:
Allow mineral exploration and development (locatable minerals) under the General Mining Law of 1872 on all BLM-administered lands unless it is proposed for administrative withdrawal or wilderness designation. Regulate locatable mineral exploration and development on BLM land under 43 CFR 3800. Open all surface estate (1,061,400 acres), except the withdrawn areas identified below, to location of mining claims activity (Figure 2-16, Appendix A).

#### LOC-AU-01:
Maintain the following areas (23,300 acres) as withdrawn from mineral entry, per the Secretary of the Interior:

- Badger Wash Study Area (3,100 acres)
- Mack Mesa Reservoir (40 acres)
- Calamity Camp (40 acres)
- Sieber Canyon (200 acres)
- West Creek and the Unaweep Seep (1,500 acres)
- Rough Canyon ACEC (2,700 acres)
- Pup Tent Mine (1 acre)
- Developed recreation sites
    - Mud Springs (40 acres)
    - Miracle Rock (50 acres)
- Existing BOR withdrawals (7,900 acres)

Also see Lands and Realty section.

#### LOC-AU-02:
Petition to the Secretary of the Interior for withdrawal of the following areas (20,600 acres) from mineral entry (Figure 2-17, Appendix A):

BLM_0024148

- ACECs:
  Priority 1:
  - o Sinbad Valley;
  Priority 2:
  - o Badger Wash;
  - o Juanita Arch;
  - o Mt. Garfield;
  - o A portion of The Palisade (5,600 acres);
  - o Pyramid Rock;
- Recreation sites:
  - o Campgrounds;
  - o Developed target shooting zones (Grand Valley Shooting Ranges ERMA);
  - o Trailheads/picnic areas; and
- Logan Wash Mine Site.

**LOC-MA-02:**
Petition lands for withdrawal from locatable mineral development on a case-by-case basis for the protection of important resource values. The size of any mineral withdrawal are commensurate with what is desirable to protect the values requiring the withdrawal.

**LOC-MA-03:**
Maintain administrative access to active mines.

## Salable Minerals/Mineral Materials

**SAL-OBJ-01:**
*Manage mineral material (salable minerals) resources to provide for the needs of individuals, municipalities, and businesses while ensuring compatibility with other resource objectives.*

**SAL-MA-01:**
Identify additional common use areas in locations and sizes to meet the existing and reasonably foreseeable demand for the commodity(ies) available at each site, where compatible with resource objectives.

**SAL-MA-02:**
Prohibit commercial sales of petrified wood products due to limited availability of such resources.

**SAL-MA-03:**

BLM_0024149

Permit future common use areas where compatible with resource objectives. Establish sites in appropriate locations and with sufficient capacity while avoiding a proliferation of sites for similar materials in a given area.

**SAL-MA-04:**
Maintain designated bentonite common use area on Little Park Road.

**SAL-AU-01:**
Identify 783,800 acres as open for consideration for mineral material disposal on a case-by-case basis. (Figure 2-18, Appendix A).

**SAL-AU-02:**
Close 277,700 acres to mineral material disposal (Figure 2-18, Appendix A):
- Colorado, Dolores, and Gunnison River Corridors;
- WSAs;
- ACECs;
- Lands managed for wilderness characteristics;
- Gunnison River Bluffs ERMA
- SRMAs:
    - Bangs (except for the Little Park Road bentonite mine);
    - Dolores River (exception for area near Niche Road); and
    - North Fruita Desert.

## Non-Energy Solid Leasable Minerals

**NEL-OBJ-01:**
*Provide opportunities for non-energy leasable exploration and/or development subject to standard stipulations (e.g., NSO, CSU, TL).*

**NEL-AU-01:**
Identify 518,600 acres as open for consideration of non-energy leasable mineral exploration and/or development (e.g., potash), subject to stipulations in Appendix B (Figure 2-62, Appendix A).

**NEL-AU-02:**
Close 542,800 acres in the following areas to non-energy leasable mineral exploration and/or development (Figure 2-19, Appendix A):
- WSAs
- ACECs
- Gunnison Sage-Grouse critical habitat
- Lands managed for wilderness characteristics
- LBCWHR

BLM_0024150

- SRMAs
- Wildlife Emphasis Areas:
    - Blue Mesa
    - Bull Hill
    - Glade Park
    - Timber Ridge
- Watersheds:
    - Grand Junction
    - Palisade
- VRM Class I and II areas

---

**NEL-MA-01:**

Issue prospecting permits in areas where potash values are not known, which could lead to issuance of a preference right lease.

---

BLM_0024151

## III.  SPECIAL DESIGNATIONS

### AREAS OF CRITICAL ENVIRONMENTAL CONCERN

**ACEC-GOAL-01:**
*Manage ACECs to protect significant resource values and prevent damage to important natural, biological, cultural, recreational, or scenic resources and values, or to protect life and safety from natural hazards.*

**ACEC-OBJ-01:**
*Continue to manage those areas within the GJFO that require some special management and that meet the criteria for ACEC designation.*

**ACEC-MA-01:**
Designate the following areas as ACECs (123,000 acres). (Figure 2-20, Appendix A):

- Atwell Gulch (2,900 acres);
- Badger Wash (2,200 acres);
- Dolores River Riparian (7,400 acres);
- Indian Creek (2,300 acres);
- Juanita Arch (1,600 acres);
- Mt. Garfield (2,400 acres);
- The Palisade (32,200 acres);
- Pyramid Rock (1,300 acres);
- Roan and Carr Creeks (33,600 acres);
- Rough Canyon (2,800 acres);
- Sinbad Valley (6,400 acres);
- South Shale Ridge (27,800 acres); and
- Unaweep Seep (85 acres).

**ACEC-AU-01:**
Close all ACECs to mineral material disposal and non-energy solid leasable mineral exploration and development.

**ACEC-AU-02:**
To protect and maintain unique ecological values for which ACECs are designated, limit or reduce the number of routes within ACECs that are managed as *limited to designated routes* for motorized and mechanized travel.

**ACEC-AU-03:**
Prohibit surface occupancy and use, and prohibit surface occupancy and use and

BLM_0024152

surface-disturbing activities within the following ACECs:

- Atwell Gulch (2,900 acres);
- Badger Wash (2,200 acres);
- Dolores River Riparian (7,400 acres);
- Indian Creek (2,300 acres);
- Juanita Arch (1,600 acres);
- Mt. Garfield (2,400 acres);
- Palisade (32,200 acres);
- Pyramid Rock (1,300 acres);
- Rough Canyon (2,800 acres);
- Sinbad Valley (6,400 acres);
- South Shale Ridge (27,800 acres); and
- Unaweep Seep (85 acres).

Standard exceptions apply; see Appendix B.

## Atwell Gulch Area of Critical Environmental Concern

**ACEC-MA-02:**
Designate the Atwell Gulch ACEC (2,900 acres) to protect rare plants, cultural resources, scenic values, and wildlife habitat. Management actions include the following:

- Manage as VRM Class II.
- Close to motorized travel, including over-snow motorized travel.
- Close to mechanized travel.
- Issue no SRPs for competitive events.
- Close 2,600 acres to livestock grazing (approximately 250 acres will remain unallotted).
- Manage 2,600 acres as a ROW exclusion area (except allow for ROWs to existing oil and gas
- leases issued under the 1987 RMP without NSO stipulations).
- Manage 260 acres as a ROW avoidance area for natural gas pipelines, water pipelines, and produced water pipelines.
- Allowable Use: Only allow vegetation treatments for the benefit of the identified relevant and important values.
- Close to fossil collection.
- Allowable Use:

BLM_0024153

**STIPULATION** NSO-12: *ACECs*. Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Badger Wash Area of Critical Environmental Concern

### ACEC-MA-03:

Designate the Badger Wash ACEC (2,200 acres) to protect rare plants and use as a hydrologic study area. Management actions include the following:

- Manage as VRM Class III.
- Classify motorized and mechanized travel as *limited to designated routes*.
- Issue no SRPs for competitive events.
- Close to grazing in the paired study watersheds (186 acres).
- Open to grazing outside of the paired watersheds in accordance with watershed study objectives (400 acres).
- Manage the paired watersheds (1,800 acres) as a ROW exclusion area.
- Manage 400 acres as ROW avoidance areas.
- Petition to the Secretary of the Interior for withdrawal from mineral entry.
- **No Leasing:** *ACECs*. Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39, Appendix A.
- Allowable Use:

   **STIPULATION**: NSO-12: *ACECs*. Prohibit surface occupancy and surface-disturbing activities. See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Dolores River Riparian Area of Critical Environmental Concern

### ACEC-MA-04:

Designate the Dolores River Riparian ACEC (7,400 acres) to protect riparian, hydrology, scenic and paleontological resources, and special status species. Management actions include the following:

- Manage a portion under VRM Class II (7,100 acres) and a portion under VRM Class III (300 acres).
- Manage as ROW avoidance area.
- Allowable Use: Only allow vegetation treatments that do not negatively impact the identified relevant and important values.
- Classify motorized and mechanized travel as *limited to designated routes*.
- Only allow camping in designated sites.

BLM_0024154

- Close to recreational placer mining outside of active mining claims.
- **No Leasing:** *ACECs.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12, Appendix A.
- Allowable Use:

  STIPULATION NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Indian Creek Area of Critical Environmental Concern

**ACEC-MA-05:**
Designate the Indian Creek ACEC (2,300 acres) to preserve research and cultural values. Management actions include the following:

- Manage as VRM Class II.
- Manage as a ROW exclusion area.
- Classify motorized and mechanized travel as *limited to designated routes.*
- Allowable Use:

  STIPULATION NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

## Juanita Arch Area of Critical Environmental Concern

**ACEC-MA-06:**
Designate the Juanita Arch ACEC (1,600 acres) to protect rare plants and geologic values. Management actions include the following:

- Manage as VRM Class II.
- Close to motorized and mechanized travel.
- Manage as a ROW exclusion area.
- Petition to the Secretary of the Interior for withdrawal from mineral entry.
- **No Leasing:** *ACECs.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39, Appendix A.
- Allowable Use:

  STIPULATION NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Mt. Garfield Area of Critical Environmental Concern

BLM_0024155

**ACEC-MA-07:**
Designate the Mt. Garfield ACEC (2,400 acres) to protect its scenic values. Management actions include the following:

- Manage as VRM Class I.
- Close to motorized travel, including over-snow motorized travel.
- Prohibit target shooting.
- Manage as a ROW exclusion area.
- Close to fossil collection.
- Petition to the Secretary of the Interior for withdrawal from mineral entry.
- Classify as unsuitable for coal leasing.
- Allowable Use:

  **STIPULATION** NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## The Palisade Area of Critical Environmental Concern

**ACEC-MA-08:**
Designate the Palisade ACEC (32,200 acres) to protect rare plant populations and special status wildlife. Management actions include the following:

- Manage 5,500 acres as VRM Class II.
- Classify 26,700 acres as *closed* and 5,500 acres as *limited to designated routes* for motorized and mechanized travel.
- Issue no SRPs for competitive events.
- Manage as a ROW avoidance area.
- Allowable Use: Only allow vegetation treatments that do not negatively impact relevant and important values.
- **No Leasing:** *ACECs.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12, Appendix A.
- Allowable Use:

  **STIPULATION** NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Pyramid Rock Area of Critical Environmental Concern

**ACEC-MA-09:**
Designate the Pyramid Rock ACEC (1,300 acres) to preserve habitat for rare plant species and to protect paleontological and cultural resources:

BLM_0024156

- Manage as VRM Class II.
- Close to motorized, mechanized, equestrian, and foot travel, including over-snow motorized travel.
- Prohibit target shooting.
- Issue no SRPs for competitive events.
- Close to camping.
- Close to livestock grazing.
- Manage as a ROW exclusion area.
- Close to all types of collection (e.g., fossil, vegetation, rocks, etc.), except for permitted collection for scientific research.
- Petition to the Secretary of the Interior for withdrawal from mineral entry.
- Require permit and agreement to allow research activities that support the objectives of the ACEC.
- Allowable Use:

  STIPULATION NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Roan and Carr Creeks Area of Critical Environmental Concern

**ACEC-MA-10:**

Designate the Roan and Carr Creeks ACEC (33,600 acres) to protect unique riparian habitats, genetically pure populations of cutthroat trout, and Greater Sage-Grouse habitat. Management actions include the following:

- Manage as VRM Class II.
- Allowable Use: Only allow vegetation treatments for the benefit of the identified relevant and important values.
- Limit motorized and mechanized travel to designated routes.
- Manage as ROW avoidance area.
- Close to mechanized travel.
- Classify the portion of the ACEC (700 acres) within the coal resource development potential area as unacceptable for coal leasing.
- Allowable Use:

  STIPULATION CSU-12: Roan and Carr Creeks *ACEC.* Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within the Roan and Carr Creek ACEC. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

- Allowable Use:

  STIPULATION NSO-25: *Sage-Grouse Leks, Nesting, and Early Brood-rearing Habitat.* Prohibit surface occupancy and surface-disturbing

activities within 4 miles of an active lek or within Sage-Grouse nesting and early brood-rearing habitat. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard and special exceptions apply; see Appendix B.

## Rough Canyon Area of Critical Environmental Concern

**ACEC-MA-11:**
Designate the Rough Canyon ACEC (2,800 acres) to protect geologic, wildlife habitat, cultural resources, and plants. Management actions include the following:

- Manage as VRM Class II.
- Classify a portion of the ACEC (2,200 acres) for motorized and mechanized travel as *limited to designated routes.*
- Classify a portion of the ACEC (600 acres) for motorized and mechanized travel as *closed.*
- Prohibit new trail development in those portions of Bangs Canyon RMZ 2 that are located within the ACEC, unless impacts on the ACEC relevance and importance criteria can be mitigated.
- Manage as a ROW exclusion area.
- Withdrawn from mineral entry.
- **No Leasing:** *ACECs.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12, Appendix A.
- Allowable Use:

  **STIPULATION** NSO-13: *Current and Historically Occupied Habitat of Threatened, Endangered, Proposed, and Candidate Species.* Prohibit certain surface uses, as specified in Appendix B, to protect threatened, endangered, proposed, and candidate plants and animals from indirect impacts, loss of immediately adjacent suitable habitat, or impacts to primary constituent elements of critical habitat as designated by USFWS. Maintain existing buffer distances where pre-existing disturbance exists, and reduce redundancies in roads to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails. In undisturbed environments and ACECs, prohibit new disturbance within 200 meters (656 feet) of current and historically occupied and suitable habitat. This stipulation includes emergency closures of roads where damage to T&E habitat has occurred. Standard exceptions apply; see Appendix B.

- Allowable Use:

  **STIPULATION** NSO-37: *Allocation to Conservation Use Category.* Prohibit surface occupancy and surface-disturbing activities, including archaeological excavation, within 100 meters (328 feet) around eligible sites allocated to Conservation Use. (Refer to Appendix B.) See Figure 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

BLM_0024158

## Sinbad Valley Area of Critical Environmental Concern

### ACEC-MA-12:

Designate the Sinbad Valley ACEC (6,400 acres) to protect rare plants, wildlife, cultural resources, geologic and scenic values. Management actions include the following:

- Manage as VRM Class II.
- Classify motorized and mechanized travel as *limited to designated routes.*
- Manage as a ROW avoidance area.
- Petition to the Secretary of the Interior for withdrawal from mineral entry.
- **No Leasing:** *ACECs.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figures 2-12, Appendix A.
- Allowable Use:

  **STIPULATION** NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## South Shale Ridge Area of Critical Environmental Concern

### ACEC-MA-13:

Designate the South Shale Ridge ACEC (27,800 acres) to protect rare plants, wildlife habitat, and scenic values. Management actions include the following:

- Issue no SRPs for competitive events.
- Classify motorized and mechanized travel as *limited to designated routes.*
- Manage as VRM Class II
- Manage as a ROW exclusion area (except allow for ROWs to existing oil and gas leases issued under the 1987 RMP without NSO stipulations).
- Allowable Use:

  **STIPULATION** NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

## Unaweep Seep Area of Critical Environmental Concern

### ACEC-MA-14:

Designate the Unaweep Seep ACEC (85 acres) to protect habitat for the rare Great Basin silverspot butterfly, rare plants, riparian habitat, and hydrologic values. Management actions include the following:

- Manage as VRM Class II.

BLM_0024159

- Close to unauthorized motorized travel activities, including over-snow travel (see 43 CFR 8342.1).
- Closed to mechanized travel.
- Issue no SRPs for competitive events.
- Prohibit commercial wood product sales, harvesting forest and woodland products, and Christmas tree cutting.
- Prohibit camping.
- Manage as a ROW exclusion area.
- Close to fossil collection.
- Open to livestock grazing.
- Withdrawn from mineral entry.
- Close to mineral material disposal.
- **No Leasing:** *ACECs.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-12, Appendix A.
- Allowable Use:

  STIPULATION NSO-12: *ACECs.* Prohibit surface occupancy and surface-disturbing activities. (Refer to Appendix B.) See Figure 2-13, Appendix A. Standard exceptions apply; see Appendix B.

BLM_0024160

# WILDERNESS STUDY AREAS

## WSA-GOAL-01:
*Preserve the wilderness character of WSAs.*

### WSA-OBJ-01:
*Preserve wilderness characteristics in WSAs in accordance with non-impairment standards as defined under BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012i), until Congress either designates these lands as wilderness or releases them for other purposes.*

#### WSA-MA-01:
Manage the four WSAs (96,500 acres) under BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012i), pending congressional action on wilderness recommendations (Figure 2-21, Appendix A):

- Demaree Canyon (22,700 acres)
- Little Book Cliffs (29,300 acres)
- The Palisade (26,700 acres)
- Sewemup Mesa (17,800 acres)

#### WSA-MA-02:
Manage all WSAs as VRM Class I.

#### WSA-MA-03:
Manage all WSAs as closed to motorized and mechanized travel. Travel required for valid existing rights and grandfathered uses will be allowed.

#### WSA-AU-01:
**STIPULATION** NSO-43: *Wilderness Study Areas.* Prohibit surface occupancy and surface-disturbing activities in WSAs in accordance with BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012i)). (Refer to Appendix B.) See Figures 2-13, in Appendix A. Standard exceptions apply; see Appendix B.

#### WSA-MA-04:
In the event Congress designates any of the WSAs as Wilderness, management direction will be adapted to the actions defined in the designating legislation in a manner consistent with the 1964 Wilderness Act, until an activity plan is developed detailing management direction for the area(s).

## WSA-GOAL-02:
*Implement management strategies for lands within WSAs, should Congress release one or more of these areas from wilderness consideration.*

### WSA-OBJ-02:

*If Congress releases one or more WSAs from wilderness consideration, manage those lands consistent with land use designations and resource objectives described below.*

**WSA-MA-05**:
If Congress releases one or more WSAs from wilderness consideration, update the wilderness characteristics inventory for lands that were formerly WSAs (FLPMA Section 201).

**WSA-MA-06**:
If Congress Releases WSAs from wilderness consideration, reconsider acceptability for further coal leasing using the Coal Screening Criteria (**Appendix N**).

## Sewemup Mesa

**WSA-OBJ-03:**
*If the Sewemup Mesa WSA is released from Wilderness consideration, manage the lands for the following resource values where present: cultural and visual resources, wilderness characteristics, and un-fragmented wildlife habitat.*

**WSA-MA-07**:
If Congress releases Sewemup Mesa WSA from Wilderness consideration, manage the area to protect wilderness characteristics by applying the following management:

- Issue no SRPs for competitive events.
- Close to motorized and mechanized travel, including over-snow motorized travel.
- Close to wood product sales and/or harvest (including Christmas tree harvest).
- Manage as a ROW exclusion area.
- Close to mineral material disposal
- Close to non-energy leasable mineral exploration and/or development
- Manage as VRM Class II.
- **No Leasing**: *Lands with wilderness characteristics outside WSAs*. Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figures 2-12 in Appendix A.
- Allowable Use:

    **STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO*. No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

BLM_0024162

## Little Book Cliffs

### WSA-OBJ-04:
*If the Little Book Cliffs WSA is released from Wilderness consideration, manage the lands for the following resource values where present: wild horses and wild horse viewing, big horn sheep, and the Colorado hookless cactus.*

### WSA-MA-08:
If Congress releases Little Book Cliffs WSA from Wilderness consideration, manage the portion of the WSA within LBCWHR in accordance with the Alternative B management prescriptions for the LBCWHR. For the remainder of the WSA:

- Consider SRPs for competitive events.
- Limit motorized and mechanized travel to designated routes.
- Manage as ROW avoidance area.
- Manage as VRM Class III.
- Allowable Use:

  **STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO.* No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan. (Refer to Appendix B.) See Figures 2-13 in Appendix A. Standard exceptions apply; see Appendix B.

## Demaree Canyon

### WSA-OBJ-05:
*If the Demaree Canyon WSA is released from Wilderness consideration, manage the lands for the following resource values where present: Kit Fox habitat and sage brush flats (within critical deer/elk winter range.*

### WSA-MA-09:
If Congress releases Demaree Canyon WSA from Wilderness consideration:

- Consider SRPs for competitive events.
- Limit motorized and mechanized travel to designated routes.
- Manage as ROW avoidance area.
- Manage a portion as VRM Class II and a portion as VRM Class III.
- Allowable Use:
- **STIPULATION** NSO-29: *Active Kit Fox Dens.* Prohibit surface occupancy and surface-disturbing activities within 200 meters (656 feet) of active kit fox dens. (Refer to Appendix B.) See Figures 2-43 (Alternative

BLM_0024163

B) 2-44 (Alternative C) in Appendix A. Standard exceptions apply; see Appendix B.

- Allowable Use:

   **STIPULATION** CSU-10: *Wildlife Habitat.* Require proponents of surface-disturbing activities to implement specific measures to mitigate impacts of operations on wildlife and wildlife habitat within high-value or essential wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs (Appendix H). (Refer to Appendix B.) See Figure 2-14 in Appendix A. Standard exceptions apply; see Appendix B.

## The Palisade Wilderness Study Area

**WSA-OBJ-06:**
*If The Palisade WSA is released from Wilderness consideration, manage the lands for the following resource values where present: rare plants, water quality/fish habitat (e.g., North Fork), cliff nesting habitat, lands with wilderness characteristics, and recreation activities.*

**WSA-MA-10**:
If Congress releases The Palisade WSA from Wilderness consideration, manage in accordance with the Alternative B management prescriptions for The Palisade ACEC with the following exceptions:

- Close to motorized travel, including over-snow motorized travel.
- Close most portions of the area to motorized travel, including over-snow motorized travel.
- Manage portions of the perimeter of the area that provide important hunting access as limited to designated routes for motorized travel. Limit mechanized travel to designated routes
- Manage as VRM Class II.

BLM_0024164

*Approved Resource Management Plan – WILD AND SCENIC RIVERS*

## WILD AND SCENIC RIVERS (CONGRESSIONAL DESIGNATION)

**WSR-GOAL-01:**

*Evaluate eligible river segments and identify suitable segments for inclusion in the NWSRS, protecting them in accordance with the Wild and Scenic River Act and BLM Manual 6400 – Wild and Scenic Rivers.*

**WSR-OBJ-01:**

*Implement interim protective management of each suitable segment by protecting its tentative classification, free-flowing condition, water quality, and ORV(s), pending Congressional action or for the duration of the RMP (Figures 2-22 , Appendix A).*

**WSR-MA-01:**

Determine all eligible stream segments as not suitable for inclusion in the NWSRS, except for the Dolores River (see action below), and release them from interim management protections afforded eligible segments. This concludes the suitability study phase for these segments. See Table 3-44, Summary of Wild and Scenic River Study Segments, for total segment lengths and segment study corridor acreages, as well as segment lengths on BLM land and segment study corridor acreages on BLM land (a description of each segment is provided in Appendix C)..

**WSR-MA-02:**

Determine that 10.38 miles of the Dolores River are suitable for inclusion in the NWSRS (tentative recreational classification; ORVs are Scenic, Fish, Recreation, Geologic, Paleontological). Manage the suitable stream miles according to interim protective management guidelines for suitable stream segments until Congressional action occurs. Determine that 8.24 miles are not suitable for inclusion in the NWSRS. Release stream miles determined not suitable from interim management protection afforded to eligible segments. Refer to Wild and Scenic River Suitability Analysis (Appendix C) for exact description of the stream miles determined to be suitable and not suitable.

**WSR-MA-03**:

In addition to the actions described in Alternative A, establish the following interim protective management guidelines for segments of the Dolores River determined suitable. All interim protective management is subject to valid existing rights. In addition to actions described in Alternative A:

- Manage as VRM Class II.
- Manage as ROW avoidance area.
- Allowable Use:

   **STIPULATION** *HYDROLOGY RIVER NSO CO:* No surface occupancy or use is allowed within 400 meters (1312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers:

BLM_0024165

Colorado, Dolores, and Gunnison. Standard exceptions apply; see Appendix B. See Figure 2-13.

BLM_0024166

## NATIONAL TRAILS (CONGRESSIONAL DESIGNATION)

### NTR-GOAL-01:
*Enhance, promote, and protect the scenic, natural, recreational, and cultural resource values associated with current and future designated National Scenic and Historic Trails.*

#### NTR-OBJ-01:
*Manage the congressionally designated Old Spanish National Historic Trail in consideration of the BLM and National Park Service (NPS) jointly developed trail-wide comprehensive plan and in coordination with the NPS (Figure 2-31, Appendix A). Identify the nature and purposes of the Old Spanish National Historic Trail, and, to the greatest extent possible, manage the trail in a manner so as to safeguard the nature and purpose of the trail and in a manner that protects the values for which the trail was designated. The interim nature and purpose of the trail is to afford the public the opportunity to connect to the trail resources and the trail story. This nature and purposes statement may be refined with completion of the trailwide comprehensive plan, and updates to the nature and purposes statement within this RMP will occur through plan maintenance.*

#### NTR-MA-01:
Manage the 50-meter wide National Trail Management Corridor for the Old Spanish Trail. After additional cultural resource Class III inventories are conducted revise the corridor as necessary. The congressionally designated Old Spanish Trail route (currently 6.9 miles on BLM lands within the GJFO planning area) is not based on completed field inventories. Where extant portions of the Old Spanish Trail may exist, complete Class III cultural resource inventories on all BLM parcels. Pursue partners for grant funding where practical to conduct surveys on adjacent lands with land owner's permission. The National Historic Trail designation allows for small location changes without congressional authorization. If the location of the trail changes as a result of Class III inventory the management actions in this RMP will apply to the newly mapped location(s) and may be modified to better address the findings of the inventory. That land no longer identified as trail location, as proven through the archaeological survey, will be managed for similar purposes and with similar VRM class to the adjacent public land.

#### NTR-MA-02:
Establish collaborative partnerships with the Old Spanish Trail Association, academic institutions, professional and non-profit organizations, individual scholars, tribes, and other entities to perform research on Old Spanish Trail-related topics and highway-related auto-tourism interpretive opportunities (e.g., roadside kiosks, brochures, etc.). Coordinate with partner groups, interest groups, interested individuals, local communities, and other stakeholders on Old Spanish Trail issues and projects.

#### NTR-MA-03:

BLM_0024167

Recreation opportunities will be provided consistent with the Old Spanish Trail comprehensive plan objectives. Facilities will be developed and placed outside the trail corridor when feasible to protect resource values, provide for visitor safety, and support selected use opportunities. Facilities will be developed within the trail corridor only when needed to protect trail integrity and resources, or to establish an Old Spanish Trail recreation retracement route.

**NTR-MA-04**:
Scientific and historical studies of cultural landscapes, sites, historic trails, and other resources, including excavation, will be allowed by qualified researchers on a case-by-case basis within the Old Spanish Trail corridor with written authorization.

**NTR-MA-05**:
Retain or cooperatively manage BLM-administered lands to assure long-term use, protection, and access to areas along the Old Spanish Trail.

**NTR-MA-06**:
Manage the Old Spanish Trail as VRM Class III (50 meter buffer on either side of the center line).

Manage newly located sections of the trail according to their VRI classification.

**NTR-MA-07**:
Manage 50 meters on both sides of the Old Spanish Trail as a ROW avoidance area.

**NTR-AU-01**:
**STIPULATION** NSO-45: *Old Spanish National Historic Trail.* Prohibit surface occupancy and surface-disturbing activities within a 50-meter (164-foot) buffer from the center line. (Refer to Appendix B.) See Figure 2-13 (Alternative B) in Appendix A. Standard and special exceptions apply; see Appendix B.

**NTR-MA-08**:
Seek to acquire legal access for full-size vehicles along the Tabeguache Trail from Little Park Road to Colorado State Highway 141 near Whitewater.

BLM_0024168

# NATIONAL, STATE, AND BLM BYWAYS (ADMINISTRATIVE DESIGNATION)

**BYW-GOAL-01:**

*Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated byways.*

**BYW-OBJ-01:**

*Support efforts of corridor management plans for the designated byways and provide assistance, where feasible, in the development of byway facilities consistent with other decisions of the RMP (Figures 2-31 , Appendix A).*

**BYW-MA-01:**

Support efforts of corridor management plans for the Grand Mesa Scenic and Historic Byway; provide assistance, where feasible, in the development of byway facilities consistent with other decisions of the RMP.

**BYW-MA-02:**

Support efforts of corridor management plans for the Dinosaur Diamond Prehistoric Highway (National Scenic Byway and All American Road); provide assistance, where feasible, in the development of byway facilities consistent with other decisions of the RMP.

**BYW-MA-03**:

Support efforts of corridor management plans for the Unaweep-Tabeguache Scenic and Historic Byway (Colorado Scenic and Historic Byway); provide assistance, where feasible, in the development of byway facilities consistent with other decisions of the RMP.

**BYW-MA-04**:

Manage the following byways as VRM Class II:

- A portion of Dinosaur Diamond Prehistoric Highway (from the Bookcliffs north);
- Grand Mesa Scenic and Historic Byway; and
- Unaweep-Tabeguache Scenic and Historic Byway.

**BYW-MA-05**:

Manage a portion of Dinosaur Diamond Prehistoric Highway (from the Bookcliffs south) as VRM Class III.

**BYW-AU-01**:

**STIPULATION** CSU-37: *Scenic Byways*. Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within 0.5-mile of either side of centerline of scenic byways. (Refer to Appendix B.) See

BLM_0024169

Figures 2-14 , in Appendix A. Standard and special exceptions apply; see Appendix B.

BLM_0024170

# IV. SUPPORT

## INTERPRETATION AND ENVIRONMENTAL EDUCATION

### IEE-GOAL-01:
*Provide interpretation, education, and information that promote the health of the land, the appreciation and protection of cultural and natural resources to foster greater community stewardship; and enhance users' experience and safety.*

### IEE-OBJ-01:
*Increase outreach efforts and provide the public with environmental education opportunities.*

### IEE-MA-01:
Develop an interpretive and information services plan that outlines partnership development, product and service delivery methods (media), key messages or themes, and associated markets (audience).

### IEE-MA-02:
Seek to develop partnerships with local education institutions, visitor centers, tribes, field institutes, museums, visitor centers, and cooperators.

### IEE-MA-03:
Provide opportunities for tribal participation in developing key messages and themes.

### IEE-MA-04:
Pursue multicultural interpretation and environmental education opportunities for outreach, development, and implementation programs. Apply learning modalities and incorporate various learning styles in program design and delivery. Encourage the use of multiple intelligence or other theories for program presentations.

### IEE-MA-05:
Establish repository of photographs and images that illustrate BLM's mission, including digital photographs and slides for program design.

### IEE-MA-06:
Allow interpretation signs, facilities, and other delivery methods that address key messages, themes, or program/resource goals and objectives, including those for recreation, travel management, cultural resources, wildlife, and others.

BLM_0024171

# TRANSPORTATION FACILITIES

**TRN-GOAL-01:**
*Provide a transportation system that is manageable, maintainable, and meets the needs, as defined by the goals and objectives, for resources and resource uses.*

**TRN-OBJ-01:**
*Maintain BLM roads and trails to identified maintenance intensity levels (appropriate intensity, frequency, and type of maintenance) consistent with public safety and land use plan objectives.*

### TRN-MA-01:
All system roads and trails will be given a unique road/trail number to aid in public navigation, safety, Emergency Medical Services, and maintenance.

### TRN-MA-02:
Acquire public or administrative access to public lands as opportunities become available.

### TRN-MA-03:
Use and improve designated roads where feasible.

BLM_0024172

# APPENDICES

## GRAND JUNCTION FIELD OFFICE
## APPROVED RESOURCE MANAGEMENT PLAN

This page is intentionally left blank.

BLM_0024174

# Appendix A

## Figures

BLM_0024175

BLM_0024176

# APPENDIX A

# FIGURES

1-1      Project Planning Area
A-1      Wildlife Emphasis Areas
A-2      Little Book Cliffs Wild Horse Range
A-3      Visual Resource Management
A-4      Lands Managed for Wilderness Characteristics Outside Existing WSAs
A-5      Grazing Allotments
A-6      Extensive Recreation Management Areas
A-7      Special Recreation Management Areas
A-8      Comprehensive Travel and Transportation Management
A-9      Right-of-Way Corridors, Exclusion and Avoidance Areas
A-10     Land Tenure Adjustments
A-11     Coal Leasing
A-12     Fluid Minerals
A-13     No Surface Occupancy or Surface-disturbing Activities
A-14     Controlled Surface Use
A-15     Timing Limitations
A-16     Lands Withdrawn from Mineral Entry
A-17     Locatable Minerals
A-18     Mineral Materials
A-19     Non-energy Leasable Minerals
A-20     Areas of Critical Environmental Concern
A-21     Wilderness Study Areas
A-22     Segments Suitable for Inclusion in the National Wild and Scenic Rivers System
A-23     Water Intake Zone 3
A-24     Prairie Dog Towns
A-25     Surface Geology
A-26     Wildland Fire Management
A-27     Forest Management
A-28     Target Shooting Closures
A-29     Solar and Wind Energy Development Emphasis Areas
A-30     Oil Shale
A-31     National Scenic, Historic, and Recreational Trails and State and BLM Byways
A3-1     Steep Slopes

BLM_0024177

A3-2    Fragile and Slumping Soils
A3-3    Saline Soils
A3-4    Local Geologic Formations Affecting Water Quality
A3-5    Municipal Watersheds and Source Water Protection Areas
A3-6    Ecoregions
A3-7    Major Vegetation Groups
A3-8    Noxious Weeds: All Species Surveyed Since 2000
A3-9    Elk Range
A3-10   Mule Deer Range
A3-11   Sage-grouse Habitat
A3-12   Biomass Energy Potential
A3-13   BLM Land Health Assessments
A3-14   Land Health Assessment Below 6,000 Feet
A3-15   Oil and Gas – Leases and Wells
A3-16   Geothermal Energy Potential
A3-17   Solar Energy Potential
A3-18   Wind Energy Potential
A3-19   Developed Recreation Sites
A3-20   Right-of-Way Locations
A3-21   Master Leasing Plan Surface Management and Split Estate
A3-22   Master Leasing Plan Oil and Gas Leases
A3-23   Bighorn Sheep
A3-24   Pronghorn Antelope
A4-1    Master Leasing Plan Oil and Gas Potential
A4-2    Master Leasing Plan No Surface Occupancy
A4-3    Master Leasing Plan Controlled Surface Use
A4-4    Master Leasing Plan Timing Limitations
A4-5    Master Leasing Plan ACECs and Wildlife Emphasis Areas
A4-6    Master Leasing Plan Recreation Management Areas
A4-7    Master Leasing Plan VRM Classes
A4-8    Current Oil and Gas Leases and Proposed Fluid Minerals Leasing

*Grand Junction Field Office*
*Approved Resource Management Plan*

BLM_0024178