Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 1 of 499

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **Characteristics.**<br>***All Surface-disturbing Activities*** | riparian corridors/flood-prone areas are lands adjacent to waterbodies where activities on land are likely to affect water quality.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions, which are subject to CSU (site-specific relocation) stipulations, are as follows:<br>• Necessary site restoration and management as dictated by initial analysis or later evaluation/monitoring.<br>• Essential stream crossings associated with linear transportation, and utility crossings.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to maintain the natural hydrologic function and condition of mountain and rangeland stream systems. Properly functioning stream channels, stream banks, and floodplains (including the riparian zone) transport and store sediment at a rate which is in balance with each system's typical flow regime. Any alteration of this system can create an imbalance between sediment supply and flow, resulting in accelerated erosion, decreased water quality, and degraded habitat conditions and for special status aquatic wildlife. This stipulation is also essential to protect fish-bearing streams in the GJFO. |

BLM_0024267

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 2 of 499

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO-12** *(Partial ROWA)*<br>**ACECs.**<br>34,600 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in the following ACECs to protect threatened, proposed, candidate, and sensitive species:<br>• Atwell Gulch (2,900 acres);<br>• Badger Wash (2,200 acres);<br>• Pyramid Rock (1,300 acres);<br>• South Shale Ridge (28,200 acres); and<br>• Unaweep Seep (85 acres).<br>**PURPOSE:**<br>• Atwell Gulch: To protect threatened and sensitive plants.<br>• Badger Wash: To protect sensitive plants.<br>• Plateau Creek: To protect sensitive fish species.<br>• Pyramid Rock: To protect known threatened, proposed, and sensitive plants.<br>• South Shale Ridge: To protect threatened, proposed, and sensitive plants.<br>• Unaweep Seep: To protect sensitive plants and Great Basin Silverspot Butterfly habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** This stipulation may be modified to include species listed as threatened, endangered, proposed, candidate, or sensitive in the future. This stipulation may also be modified to account for the change in status of species protected in this stipulation.<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect critical habitat for threatened, proposed, and sensitive plants. |
| **NSO-13** *(ROWA)*<br>**Current and Historically Occupied Habitat and Critical Habitat of Threatened, Endangered, Proposed, and Candidate Plant and Animal** | **STIPULATION:** Prohibit certain surface uses, as specified below, to protect threatened, endangered, proposed, and candidate plants and animals from indirect impacts, loss of immediately adjacent suitable habitat, or impacts to primary constituent elements of critical habitat as designated by USFWS. Maintain existing buffer distances where pre-existing disturbance exists, and reduce redundancies in roads to minimize fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes and trails. In undisturbed environments and ACECs, prohibit new disturbance within 200 meters (656 feet) of current and historically occupied and suitable habitat. This stipulation includes emergency closures of roads where damage to T&E habitat has occurred.<br>**PURPOSE:** To protect threatened, endangered, proposed, and candidate species from indirect impacts or loss of immediately adjacent suitable habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO may be altered if |

BLM_0024268

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| **Species.**<br>***All Surface-disturbing Activities*** | all of the following conditions are met:<br>1. Section 7 consultation with USFWS on threatened or endangered species has been completed;<br>2. Valid current surveys for protected species have been completed and submitted;<br>3. Mitigation has been applied to avoid adverse impacts to protected species and the proponent will submit monitoring reports; and<br>4. The proposed disturbance will occur in unsuitable habitat.<br>Other surface-disturbing activities may be allowed in suitable habitat if conditions 1 through 3 above are met, and the purpose<br>or the result of the activity will improve habitat conditions for the protected species.<br>Allow occupancy within 200 meters (656 feet) when terrain and topography provide adequate protections<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER**: Standard waivers apply (Section B.2).<br>**JUSTIFICATION**: This stipulation is necessary to protect threatened, endangered, proposed, and candidate species and ensure the preservation of their habitat (including plant pollinator habitat). |
| **NSO-23** *(ROWA)*<br>**Golden Eagle Nest Sites.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area prior to nest establishment) within 402 meters (0.25-mile) of active golden eagle nest sites and associated alternate nests.<br>**PURPOSE:** To protect golden eagle nesting habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect golden eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **NSO-24** *(ROWA)* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area prior to nest establishment) within 402 meters (0.25- |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
|---|---|
| **Bald Eagle Nest Sites.** ***All Surface-disturbing Activities*** | mile) of active bald eagle nests.<br>**PURPOSE:** To protect bald eagle nesting habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect bald eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| **Stipulation Number**<br>**Protected Resource**<br>**Acres/Miles Affected** | **Stipulation Description** |
|---|---|
| **NSO-25** *(ROWA)*<br>**Sage-grouse Leks, Nesting, and Early Brood-rearing Habitat (4 miles).**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 6.4 kilometers (4 miles) of an active lek or within sage-grouse nesting and early brood-rearing habitat.<br>**PURPOSE:** To protect breeding, nesting, and brood-rearing habitat for the Gunnison and greater sage-grouse.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending upon the active status of the lek or the geographical relationship of topographical barriers and vegetation to the lek site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to minimize impacts on Greater and Gunnison Sage-Grouse. The four mile buffer is consistent with current scientific research recommendations (The Parachute-Piceance-Roan (PPR) Greater Sage-Grouse Work Group 2008). |
| **NSO-26** *(ROWA)*<br>**Canyon Treefrog, Midget Faded Rattlesnake, Northern Leopard Frog, Great Basin Spadefoot, Long-nosed Leopard Lizard, Boreal Toad (no buffer).**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within all identified canyon treefrog, northern leopard frog, midget faded rattlesnake, Great Basin spadefoot, long-nosed leopard lizard (*Gambelia wislizenii*), and boreal toad breeding and denning sites.<br>**PURPOSE:** To protect breeding habitat for canyon treefrog, northern leopard frog, midget faded rattlesnake, Great Basin spadefoot, long-nosed leopard lizard, and boreal toad. Note: no midget faded rattlesnake or boreal toad breeding locations are currently identified in the GJFO.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect important breeding habitat for these species. The Northern Leopard Frog has been petitioned for listing under the Endangered Species Act of 1973. |
| **WILDLIFE BAT NSO CO**<br>***All Surface-disturbing*** | **STIPULATION:** No surface occupancy or use is allowed within a 402 meter (0.25 mile) radius of the entrance of maternity roosts or hibernacula of BLM sensitive bat species, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM. |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| ***Activities*** | <SPECIES><br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To protect sensitive bat species' maternity roosts and hibernacula.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to minimize impacts on important bat areas. |
| **NSO-30** *(ROWA)*<br><br>**Occupied Prairie Dog Towns (no buffer).**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities (beyond that which historically occurred in the area) within active white-tailed prairie dog towns in the Prairie Canyon Wildlife Emphasis Area.<br><br>**PURPOSE:** To maintain or improve white-tailed prairie dog habitat and distribution.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). Additional exception criteria include activities that avoid the center of active towns while maintaining the integrity of the town's social structure.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect prairie dogs, a keystone species whose population has been declining across the western US. |
| | **Fish and Wildlife** |
| **NSO-32** *(ROWA)*<br><br>**Research Sites.**<br><br>130 acres<br><br>***All Surface-disturbing Activities*** | **STIPULATION**: Prohibit surface occupancy and use and surface-disturbing activities in approved research sites including, but not limited to, the Ant Research Area (16 Road) and the Owl Banding Station (south of DeBeque).<br><br>**PURPOSE:** To maintain the integrity of ongoing research stations.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will be granted for work to be done in the research areas consistent with the goals and objectives of the research being conducted on the site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2). |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **JUSTIFICATION:** This stipulation is necessary to protect long-term, ongoing research sites within the GJFO. If research sites are impacted, they incur the potential for research findings to be negatively affected. |
| **NSO-12** *(Partial ROWA)*<br><br>**ACECs.**<br><br>74,800 acres<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in the following ACECs to protect threatened, proposed, candidate, and sensitive species and habitat:<br>• Atwell Gulch (2,900 acres);<br>• Indian Creek (2,300 acres);<br>• Palisade (32,200 acres);<br>• Rough Canyon (2,800 acres);<br>• Sinbad Valley (6,400 acres); and<br>• South Shale Ridge (28,200 acres).<br><br>**PURPOSE:**<br>• Atwell Gulch: To protect wildlife habitat.<br>• Colorado River Riparian: To protect fisheries values.<br>• Glade Park-Pinyon Mesa: To protect Gunnison Sage-Grouse critical habitat.<br>• Indian Creek: To protect wildlife values.<br>• The Palisade: To protect special status wildlife.<br>• Plateau Creek: To protect fisheries values.<br>• Prairie Canyon: To protect wildlife habitat.<br>• Roan and Carr Creeks: To protect core conservation populations of cutthroat trout.<br>• Rough Canyon: To protect wildlife habitat.<br>• Sinbad Valley: To protect wildlife resources.<br>• South Shale Ridge: To protect wildlife habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** This stipulation may be modified to include species listed as threatened, endangered, proposed, candidate, or sensitive in the future. This stipulation may also be modified to account for the change in status of species protected in this stipulation.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect critical habitat for threatened, proposed, and sensitive plants. |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| **Stipulation Number**<br>**Protected Resource**<br>**Acres/Miles Affected** | **Stipulation Description** |
|---|---|
| **RECREATION PARKS NSO CO**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units:<br>• Horsethief Canyon State Wildlife Area (1,400 acres)<br>• Jerry Creek Reservoir State Wildlife Area (870 acres)<br>• Plateau Creek State Wildlife Area (1,400 acres)<br>• Highline State Park (350 acres)<br>• Vega State Park (2,000 acres)<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect the resources of wildlife refuges and park units, such as county parks, state parks, and wildlife areas, and federal parks and wildlife refuges.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to prevent placement of facilities within the state wildlife areas, where BLM manages the fluid mineral rights. |
| **NSO-34** *(ROWA)*<br>**Elk Production Area.**<br>*BLM surface/ federal minerals:* 13,100 acres<br>*Private or State surface/federal minerals:* 25,100 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in elk production areas year-round.<br>**PURPOSE:** To protect elk production areas.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard modifications apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to reduce surface disturbance and habitat fragmentation on BLM lands that CPW has identified as elk calving habitat. |
| **WILDLIFE HABITAT** | **STIPULATION:** No surface occupancy or use is allowed within the following wildlife emphasis or priority areas, as identified in the Resource Management Plan: |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO CO**<br>***All Surface-disturbing Activities*** | • Blue Mesa (wintering habitat for mule deer and elk) (9,300 acres);<br>• Bull Hill (wintering habitat for mule deer and elk) (4,800 acres);<br>• A portion of East Salt Creek (wintering habitat for mule deer and elk) (4,500 acres);<br>• A portion of Prairie Canyon (pronghorn antelope habitat) (5,600 acres);<br>• Sunnyside (wintering and migratory habitat for bighorn sheep, mule deer, elk, and Greater Sage-Grouse) (14,500 acres); and<br>• Timber Ridge (habitat for mule deer, elk, and Gunnison Sage-Grouse) (11,800 acres).<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect lands identified in the Resource Management Plan as unique and important wildlife habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect the highest priority wildlife habitat for deer, elk, antelope, bighorn sheep, and sage-grouse. Wildlife emphasis areas were identified in coordination with CPW biologists. |
| | Wild Horses |
| **NSO-36** *(ROWA)*<br>Little Book Cliffs Wild Horse Range.<br>35,200 acres<br>***All Surface-disturbing Activities*** | **STIPULATION**: Prohibit surface occupancy and use and surface-disturbing activities on lands within the LBCWHR.<br>**PURPOSE:** To reduce impacts on wild horses in the LBCWHR.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will be granted for gather activities, vegetative treatments, water hauling or the development of springs, catchments, reservoirs, storage tanks, exclosures or fences designed to improve wild horse forage, distribution, containment, or overall management.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard modifications apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to mitigate impacts that could interfere with the protection and management of wild horses in the LBCWHR. |
| | Cultural Resources |
| **NSO-37** *(ROWA)* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities, including |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **Allocation to Conservation Use Category.**<br>***All Surface-disturbing Activities*** | archaeological excavation, within 100 meters (328 feet) around eligible sites allocated to Conservation Use.<br>**PURPOSE:** To protect unique scientific information in sites allocated to Conservation Use.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis, taking into account topographical barriers, the design of the proposed action, and the characteristics of the cultural resource site and/or area.<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to preserve sites allocated to Conservation Use, where mitigation through data recovery is not an option. This stipulation allows the BLM to mitigate impacts that can cause significant degradation to the site integrity criteria that are applied in the designation of the cultural resource as eligible or potentially eligible for nomination to the NRHP *(36 CFR part 800.5(a)(1))*. |
| **NSO-38** *(ROWA)*<br>**Allocation to Traditional Use Category.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 200 meters (656 feet), from the boundary of the following known eligible or potentially eligible sites allocated to Traditional Use. In addition, consider visual impacts that projects may have on sites allocated to this use, and apply appropriate mitigation, which may include redesign.<br>**PURPOSE:** To protect values that contribute to sites allocated to Traditional Use.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis after completion and documentation of Native American Consultation, taking into account topographical barriers, the design of the proposed action, and the characteristics of the cultural resource site and/or area.<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to address indirect or secondary impacts that can occur to cultural resources that have been identified by the Ute Indian Tribe and Ute Mountain Ute Indian Tribe. This stipulation buffer has been established through consultation conducted with the Ute Indian Tribe for the Orchard GAP (shared CRVFO-GJFO MDP) and during the RMP Ute Ethnohistory project with the Ute Indian Tribe and the Ute Mountain Ute Tribe. Impacts to Traditional Use sites are typically not mitigated through data recovery. This stipulation allows the BLM to mitigate impacts that can cause significant degradation to the site integrity criteria that are applied in the designation of the cultural resource as eligible or potentially eligible for nomination to the NRHP *(36 CFR part 800.5(a)(1))*. |

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **NSO-39** *(ROWA*<br>**Cultural Resources (Indian Creek).**<br>1,700 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities in the following areas:<br>• West Indian Creek (520 acres); and<br>• East Indian Creek (1,200 acres).<br>**PURPOSE:** To protect cultural resources.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard modifications apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary because data recovery to mitigate adverse effects (for the purposes of compliance with Section 106 of the NHPA) is not an objective for these sites. This stipulation also preserves the site(s) within these areas for long term research projects. |
| | **Visual Resources** |
| **VISUAL CLASS I NSO CO**<br>***All Surface-Disturbing Activities***<br>98,700 acres | **STIPULATION:** No surface occupancy or use is allowed in VRM Objective Class I areas, the Goblins, Highway 141 along the Dolores River (55,200 acres), and Unaweep Canyon ROW Corridor (54,000 acres) (Exhibit GJ-IGM).<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect the quality of the scenic (visual) values.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard modifications apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to ensure the protection of vital visual features in the GJFO landscape. |
| | **Lands Managed for Wilderness Characteristics** |
| **LANDS WITH WILDERNESS CHARACTER-ISTICS NSO CO.** | **STIPULATION:** No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan:<br>• Bangs Canyon (19,600 acres);<br>• Maverick (17,800 acres);<br>• Unaweep Canyon (6,700 acres) |

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| 44,100 acres<br>***All Surface-disturbing Activities*** | **On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect inventoried wilderness characteristics and their locally, regionally, or nationally significant recreational, social, economic, and environmental values.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard modifications apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to ensure lands with identified wilderness characteristics remain in their current undeveloped state. |
| | Recreation and Visitor Services |
| **RECREATION SRMA NSO CO**<br>***All Surface-disturbing Activities***<br>87,000 acres | **STIPULATION:** No surface occupancy or use is allowed within the following Special Recreation Management Areas (SRMAs) as identified in the Resource Management Plan:<br>• Bangs;<br>• Dolores River Canyon;<br>• North Fruita Desert; and<br>• Palisade Rim.<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect specific recreation-tourism visitors and/or community customer markets to be served, and maintain the specific setting character and/or service delivery system conditions that are essential to achievement of the experiences and benefits identified in management objectives for the SRMA.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect areas important to recreation users which may also include large facility investments. Protection of RMZs is necessary to meet desired recreation outcomes. |
| **RECREATION PARKS NSO CO** | **STIPULATION:** Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units: |

B-32 Grand Junction Field Office Approved Resource Management Plan August 2015

BLM_0024278

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| ***All Surface-disturbing Activities*** | • Horsethief Canyon State Wildlife Area (1,400 acres)<br>• Jerry Creek Reservoir State Wildlife Area (870 acres)<br>• Plateau Creek State Wildlife Area (1,400 acres)<br>• Highline State Park (350 acres)<br>• Vega State Park (2,000 acres)<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect the resources of wildlife refuges and park units, such as county parks, state parks, and wildlife areas, and federal parks and wildlife refuges.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to prevent placement of facilities within the state wildlife areas, where BLM manages the fluid mineral rights. |
| | Fluid Minerals (Oil and Gas and Geothermal Resources) |
| **RECREATION PARKS NSO CO**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use within the boundaries of the following county parks, state parks, state wildlife areas, federal wildlife refuges, and/or National Park Service units:<br>• Horsethief Canyon State Wildlife Area (1,400 acres)<br>• Jerry Creek Reservoir State Wildlife Area (870 acres)<br>• Plateau Creek State Wildlife Area (1,400 acres)<br>• Highline State Park (350 acres)<br>• Vega State Park (2,000 acres)<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect the resources of wildlife refuges and park units, such as county parks, state parks, and wildlife areas, and federal parks and wildlife refuges.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to prevent placement of facilities within the |

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | state wildlife areas, where BLM manages the fluid mineral rights. |
| | ACECs |
| **NSO-12** *(Partial ROWA)*<br>**ACECs.**<br>89,800 acres<br>***All Surface-disturbing Activities*** | **STIPULATION**: Prohibit surface occupancy and use (for fluid minerals only in Alternative A), and prohibit surface occupancy and use and surface-disturbing activities, within the following ACECs:<br>• Atwell Gulch (2,900 acres);<br>• Badger Wash (2,200 acres);<br>• Dolores River Riparian (7,400 acres);<br>• Indian Creek (2,300 acres);<br>• Juanita Arch (1,600 acres);<br>• Mt. Garfield (2,400 acres);<br>• Palisade (32,200 acres);<br>• Pyramid Rock (1,300 acres);<br>• Rough Canyon (2,800 acres);<br>• Sinbad Valley (6,400 acres);<br>• South Shale Ridge (28,200 acres); and<br>• Unaweep Seep (85 acres).<br><br>**PURPOSE:** To protect and prevent irreparable damage to resources described in the relevance and importance criteria for which the ACEC was established.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** This stipulation may be waived or reduced in scope if circumstances change, or if the lease can demonstrate that operations can be conducted without causing unacceptable impacts on the concern(s) identified. If this stipulation is waived or reduced in scope, any of the other attached stipulations (if any) may impact operations on this lease.<br>**JUSTIFICATION:** This stipulation is necessary to protect areas that contain highly important resources requiring special protections. |
| | Wilderness Study Areas |
| **NSO-43**<br>**Wilderness Study Areas.** | **STIPULATION**: Prohibit surface occupancy and use and surface-disturbing activities in WSAs in accordance with BLM Manual 6330, Management of Wilderness Study Areas.<br>• Demaree Canyon (22,700 acres);<br>• Little Book Cliffs (29,300 acres); |

B-34 Grand Junction Field Office Approved Resource Management Plan August 2015

BLM_0024280

**Table B-5**
**No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| 96,500 acres<br>***All Surface-disturbing Activities*** | • The Palisade (26,700 acres);<br>• Sewemup Mesa (17,800 acres).<br>**PURPOSE:** To preserve wilderness characteristics in WSAs in accordance with non-impairment standards as defined by BLM Manual 6330.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to preserve wilderness characteristics in WSAs in accordance with non-impairment standards as defined by BLM Manual 6330. |
| | Wild and Scenic Rivers<br>National Trails |
| **NSO-45** *(ROWA)*<br>**Old Spanish National Historic Trail (50 meters).**<br>1,000 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within 50 meters (164 feet) either side of the center line of the congressionally designated Old Spanish National Historic Trail.<br>**PURPOSE:** To protect the physical evidence of the trail, associated cultural and historic resources, and integrity of the viewshed associated with the Old Spanish National Historic Trail.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, exceptions will be granted for actions not resulting in long-term adverse impacts to the trail.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect the cultural and historic resources along this congressionally designated historic trail. |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | Water Resources |
| **CSU-39**<br>**Roan and Carr Creeks ACEC.**<br>33,600 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required in the Roan and Carr Creeks ACEC (33,600 acres).<br>**PURPOSE:** To protect and prevent irreparable damage to unique riparian habitats, genetically pure populations of cutthroat trout, and Greater Sage-Grouse habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect areas that contain highly important resources requiring special protections. |
| **CSU-3** *(ROWA)*<br>**Definable Streams.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Surface-disturbing actions within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank-full stage) shall be avoided to the greatest extent practicable and disturbances will be subject to site specific relocation at the discretion of the BLM.<br>**PURPOSE:** To protect watershed resource values and reduce non-point source pollutant contributions to the Colorado River system.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2)<br>**JUSTIFICATION:** This stipulation is necessary to carefully plan and appropriately mitigate disturbances near surface water drainages in order to reduce non-point source pollutant contributions from BLM lands to the Colorado River system. |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **CSU-4** *(ROWA)*<br>**Collbran and Mesa/ Powderhorn Source Water Protection Areas, and Jerry Creek Watershed.**<br>*BLM surface/ federal minerals:* 148,200 acres<br>*Private or State surface/federal minerals:* 30,300 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Require that all ground disturbances within source water protection areas and the Jerry Creek watershed avoid interference with watershed resource values.<br>**PURPOSE:** To protect watershed resource values.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2)<br>**JUSTIFICATION:** This stipulation is necessary because land management actions can compromise both water quality and quantity if proper locations, mitigation and construction techniques are not utilized. |
| | Soils and Geology |
| **GEOLOGY SOIL CSU CO**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Surface occupancy or use may be restricted on lands within mapped soils with the following special characteristics:<br>Fragile soils and mapped Mancos shale and saline soils.<br>Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/reclamation plan to avoid, minimize and mitigate potential effects to soil productivity.<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To improve reclamation potential, maintain soil stability and productivity of sensitive areas, minimize contributions of salinity, selenium and sediments likely to affect downstream water quality, fisheries and other downstream aquatic habitats.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| | **MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to decrease potential degradation to soil and watershed resources within the Greater Colorado River Basin. Land use decisions occurring on mapped areas of Mancos Shale (e.g., conversion of native vegetative communities to irrigated hay fields or golf courses) have been documented to mobilize selenium and contaminate ground and surface water resources. The Colorado River Basin Salinity Control Act of 1974 directed the BLM to manage the Colorado River's salinity, including salinity contributed from public lands. |
| | Vegetation |
| **PLANT COMMUNITY CSU CO**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Surface occupancy or use may be restricted within occupied habitat that meets BLM's criteria, as established in the Resource Management Plan, for significant and/or relict plant communities:<br><br>• all old growth forests and woodlands and<br>• plant communities that meet BLM's criteria for significant plant communities<br><br>Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit a plan of development that will demonstrate that habitat will be preserved to maintain the viability of significant or relict plant communities.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To conserve significant and/or relict plant communities (e.g., old growth forests and Blue Mountain Deciduous Browse/Aspen Communities and woodlands) that are not otherwise protected.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to minimize the loss of old growth trees by adjusting the location of well pads, access roads, and other development; and to limit new disturbance within relic plant communities, thus reducing fragmentation, and the possibility of degradation or loss. |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| **Stipulation Number** **Protected Resource** **Acres/Miles Affected** | **Stipulation Description** |
|---|---|
| | Special Status Species |
| **CSU-9** *(ROWA)* **BLM Sensitive Plant Species Occupied Habitat.** | **STIPULATION:** For plant species listed as sensitive by BLM, special design, construction, and implementation measures within a 100-meter (328 feet) buffer from the edge of occupied habitat may be required. In addition, relocation of operations by more than 200 meters (656 feet) may be required.<br>**PURPOSE:** To protect BLM sensitive plant species from direct and indirect impacts, including loss of habitat. The protection buffer reduces dust transport, weed invasion, chemical and produced-water spills and those effects on BLM sensitive plant populations. It also reduces impacts to important pollinators and their habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to reduce direct impacts to sensitive status species by placing disturbances outside of occupied habitat. |
| **CSU-10** *(ROWA)* **Wildlife Habitat.** ***All Surface-disturbing Activities*** | **STIPULATION:** Require proponents of surface-disturbing activities to implement specific measures to mitigate impacts of operations on wildlife and wildlife habitat within high-value or essential wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs.<br>**PURPOSE:** To reduce impacts of surface disturbing activities and related actions on wildlife and wildlife habitat within high-value or crucial wildlife habitat including, but not limited to, big game winter range and Gunnison and greater sage grouse habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to remain in compliance with current BLM sage grouse direction and allow for protection of essential habitat for wildlife species. |
| **CSU-13** *(ROWA)* **Osprey Nest Sites.** ***All Surface-disturbing*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 402 meters (0.25-mile) of active osprey nest sites.<br>**PURPOSE:** To protect osprey habitat and nest sites.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| ***Activities*** | and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect osprey nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-14** *(ROWA)*<br>**Ferruginous Hawk Nest Sites.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 805 meters (0.5-mile) of active ferruginous hawk nest sites, and associated alternate nests.<br>**PURPOSE:** To protect ferruginous hawk nesting habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect ferruginous hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-15** *(ROWA)*<br>**Red-tailed Hawk Nest Sites.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 531 meters (0.33-mile) of active red-tailed hawk nest sites, and associated alternate nests.<br>**PURPOSE:** To protect red-tailed hawk nesting habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect red-tailed hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **CSU-16** *(ROWA)*<br><br>**Swainson's Hawk Nest Sites.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 402 meters (0.25-mile) of active Swainson's hawk nest sites and associated alternate nests.<br><br>**PURPOSE:** To protect ferruginous hawk nesting habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect Swainson's hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-17** *(ROWA)*<br><br>**Peregrine Falcon Nest Sites.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 805 meters (0.5-mile) of active peregrine falcon nest sites.<br><br>**PURPOSE:** To protect peregrine falcon nesting habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect peregrine falcon nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-18** *(ROWA)*<br><br>**Prairie Falcon Nest Sites.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 805 meters (0.5-mile) of active prairie falcon nest sites.<br><br>**PURPOSE:** To protect prairie falcon nesting habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect prairie falcon nesting habitat per |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **CSU-19** *(ROWA)*<br>**Other Raptor Species (accipiters, falcons [except kestrel], buteos, and owls).**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 201 meters (0.125-mile) of an active nest site of all accipiters, falcons (except kestrel), buteos, and owls not listed in other CSU stipulations. Raptors that are listed and protected by the Endangered Species Act of 1973 and the Bald and Golden Eagle Protection Act are addressed separately.<br>**PURPOSE:** To protect nesting habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect raptor nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2002). |
| **CSU-22** *(ROWA)*<br>**Kit Fox Dens.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to, and require mitigation and minimization measures (as determined by the BLM biologist) of, surface occupancy and use and surface-disturbing activities within 200 meters (656 feet) of active kit fox dens.<br>**PURPOSE:** To protect breeding kit fox. Note: there are currently no known breeding locations for kit fox in the GJFO.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect breeding kit fox, which have become increasingly rare in Colorado and appear to be significantly more susceptible to disturbance than other canids in the GJFO. |
| **CSU-23** *(ROWA)*<br>**Occupied Prairie Dog Towns.**<br>***All Surface-disturbing*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within white-tailed prairie dog towns. Locate permanent above-ground structures outside of prairie dog towns.<br>**PURPOSE:** To maintain white-tailed prairie dog habitat and distribution.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the CSU area may be altered depending upon the type of activity and existing disturbance within or adjacent to white-tailed |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| ***Activities*** | prairie dog towns.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect prairie dogs, a keystone species whose population has been declining in the GJFO and across the western US. This stipulation will help to minimize total abandonment of towns by prairie dog colonies due to disturbance. |
| | Fish and Wildlife |
| **CSU-10** *(ROWA)*<br><br>**Wildlife Habitat.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Require proponents of surface-disturbing activities to implement specific measures to mitigate impacts of operations on wildlife and wildlife habitat within high-value or crucial wildlife habitat. Measures will be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs.<br><br>**PURPOSE:** To reduce impacts of surface disturbing activities and related actions on wildlife and wildlife habitat within high-value or crucial wildlife habitat including, but not limited to, big game winter range and Gunnison and greater sage grouse habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to remain in compliance with current BLM sage grouse direction and allow for protection of essential habitat for wildlife species. |
| **WILDLIFE HABITAT CSU CO**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Surface occupancy or use may be restricted within the following wildlife emphasis or priority areas, as identified in the Resource Management Plan:<br>• Beehive (habitat for mule deer and elk) (4,700 acres);<br>• A portion of East Salt Creek (habitat for mule deer and elk) (20,500 acres);<br>• Glade Park (habitat for Gunnison Sage-Grouse, mule deer, and elk) (27,200 acres);<br>• A portion of Prairie Canyon (long billed curlew, long eared owl, pronghorn antelope, white-tailed prairie dog, kit fox, and burrowing owl habitat) (16,500 acres);<br>• A portion of Rapid Creek (wintering and migratory habitat for mule deer and elk) (26,900 acres); and<br>• Winter Flats (deer and elk wintering grounds) (3,500 acres).<br><br>Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. A plan of development may be required to |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | demonstrate how potential adverse impacts to wildlife habitat will be mitigated.<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To protect lands identified in the Resource Management Plan as unique and important wildlife habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect the highest priority wildlife habitat for deer, elk, antelope, bighorn sheep, and sage-grouse, Wildlife emphasis areas were identified in coordination with CPW biologists. |
| **CSU-24** *(ROWA)*<br>**Deer and Elk Migration and Movement Corridors.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to surface-disturbing activities within migration and movement corridors for deer and elk.<br>**PURPOSE:** To protect deer and elk migration and movement corridors.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to ensure connectivity between summer and winter ranges for deer and elk. Fragmentation is an increasing problem in deer and elk habitat and this stipulation will help to maintain existing corridors on BLM lands. |
| | Wild Horses<br>Cultural Resources |
| **CSU-27***(ROWA)*<br>**Allocation to Scientific Use Category.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to certain surface uses, as specified below, except archaeological documentation and excavation, within 100 meters (328 feet) around eligible or potentially eligible sites allocated to Scientific Use.<br>**PURPOSE:** To protect unique scientific information in sites that may be damaged from inadvertent or unauthorized uses.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis, taking into account topographical barriers, the nature of the proposed |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number / Protected Resource / Acres/Miles Affected | Stipulation Description |
|---|---|
| | action, and the nature of the cultural resource site and/or area.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to address indirect or secondary impacts that can occur to cultural resources. Indirect and secondary impacts are typically not mitigated through data recovery by the proponent. Managing properties by addressing only direct impacts can lead to adverse effect and the loss of the resource. This stipulation allows the BLM to mitigate impacts that can cause significant degradation to the site integrity criteria that are applied in the<br><br>designation of the cultural resource as eligible or potentially eligible for nomination to the NRHP *(36 CFR part 800.5(a)(1))*. |
| **CSU-28** *(ROWA)*<br><br>**Allocation to Public Use Category.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to certain surface uses, as specified below, within 100 meters (328 feet) around sites allocated to Public Use. In addition, consider factors such as integrity of setting, recreation opportunity, or visual impacts that projects may have on sites allocated to this use.<br><br>**PURPOSE:** To protect the values that contribute to sites allocated to Public Use.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** The BLM's Authorizing Officer may modify the site-protection boundary on a case-by-case basis, taking into account topographical barriers, the nature of the proposed action, and the nature of the cultural resource site and/or area.<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect sites allocated to Public Use, including those that may not meet the criteria for the NRHP but are important for heritage tourism as a visual resource of a rural landscape. |
| **CSU-29** *(ROWA)*<br><br>**Sub-surface Inventory.**<br><br>53,500 acres<br><br>***All Surface-disturbing Activities*** | **STIPULATION**: Require sub-surface inventory for deep sub-surface-disturbing activities and buried ROW in the following locations and in additional areas where high potential for subsurface resources may be identified in the future:<br>• Grand Mesa Slopes (16,000 acres);<br>• Indian Creek (20,200 acres); and<br>• Sunnyside (17,300 acres).<br><br>**PURPOSE:** To protect cultural resources. |

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 26 of 499

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is needed to protect buried cultural resources within areas of high potential for sub-surface activities. |
| | Visual Resources |
| **CSU-30** *(ROWA)*<br>**VRM Class II.**<br>392,400 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within all areas designated as VRM Class II. Require that surface-disturbing activities meet the objectives of VRM Class II.<br>**PURPOSE:** To protect visual resources.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, an exception could be granted for bond projects within scenic byways to ensure that visual and reclamation objectives are achieved. Facility design shall incorporate viewshed analysis and modeling to minimize impacts to visual resources. Special mitigation measures such as facility placement and color selection have been proposed to reduce impacts to visual resources.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is needed to maintain the visual integrity within designated Class II VRM areas. A CSU will allow placement of facilities and disturbances outside of the critical view sheds. |

BLM_0024292

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | Recreation and Visitor Services |
| **CSU-31** *(ROWA)*<br>**Recreation.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to surface occupancy and use and surface-disturbing activities to minimize conflicts with developed (and future) recreation sites and to mapped (and future) national/regional trails, local system trails that connect communities, and trailheads and interpretive sites with exceptional recreation values or significant public interest.<br>Apply this stipulation to the following sites that lie outside of designated RMAs:<br>• Low Gap Recreation Site;<br>• North Soda Recreation Site;<br>• Miracle Rock Recreation Site;<br>• Mud Springs Campground; and<br>• West Creek Picnic Site.<br>**PURPOSE:** To minimize conflicts with developed (and future) recreation sites and to mapped (and future) national/regional trails, local system trails that connect communities, and trailheads and interpretive sites with exceptional recreation values or significant public interest.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to assure significant public investment and desired recreation opportunities are protected from surface-disturbing occupancy. |
| **CSU-32**<br>**Recreation Management Areas.**<br>227,100 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions in the following RMAs:<br>• Grand Valley OHV SRMA (9,700 acres)<br>• Barrel Spring ERMA (24,700 acres)<br>• Gateway ERMA (78,100 acres)<br>• Grand Valley Shooting Ranges ERMA (750 acres)<br>• Gunnison River Bluffs ERMA (800 acres)<br>• Horse Mountain ERMA (5,100 acres)<br>• North Desert ERMA (107,900 acres)<br>**PURPOSE:** To protect recreation outcomes and setting prescriptions.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2). |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect areas important to recreation users which may also include large facility investments. Protection of RMZs is necessary to meet desired recreation outcomes. |
| | Lands and Realty |
| **DISPOSAL CSU CO**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Surface occupancy or use may be restricted due to lands identified for disposal in the Resource Management Plan.<br>Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required.<br>**PURPOSE:** To preserve the value of disposal tracts and/or protect facilities or uses for which these tracts of land were identified for disposal.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to preserve the value of disposal tracts and/or protect facilities or uses for which these tracts of land were identified for disposal. |
| | Coal |
| **COAL MINE CSU CO**<br>9,000 acres<br>***Fluid Minerals Only*** | **STIPULATION:** Surface occupancy or use (for fluid minerals only) may be restricted due to surface or underground coal mines. Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Operations proposed within the area of an approved surface or underground coal mine will be relocated outside the area to be mined or to accommodate room and pillar mining operations.<br>**PURPOSE:** To protect surface or underground coal mines.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to allow underground coal operations within oil and gas leases while reducing safety concerns. |

**Table B-6**
**Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | ACEC |
| **CSU-39**<br>**Roan and Carr Creeks ACEC.**<br>33,600 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required in the Roan and Carr Creeks ACEC (33,600 acres).<br>**PURPOSE:** To protect and prevent irreparable damage to unique riparian habitats, genetically pure populations of cutthroat trout, and Greater Sage-Grouse habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2). |
| | Wild and Scenic Rivers<br>National Trails |
| **CSU-37**<br>**Scenic Byways (0.5-mile).**<br>32,500 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within 805 meters (0.5-mile) of either side of centerline of the following scenic byways:<br>• Dinosaur Diamond Prehistoric Highway (National Scenic Byway and All American Road) (14,300 acres);<br>• Grand Mesa Scenic and Historic Byway (1,200 acres); and<br>• Unaweep-Tabeguache Scenic and Historic Byway (17,000 acres).<br>**PURPOSE:** To protect the quality of the scenic (visual) values of scenic, historic, or backcountry byways.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, an exception could be granted if: (a) a viewshed analysis indicates minimal impairment of the visual resources from the driving corridor; or (b) the action is determined to be consistent and compatible with protection or enhancement of the resource values, or the use will provide suitable opportunities for public enjoyment of these resources. An exception could also be granted for bond projects within scenic byways to ensure that visual and reclamation objectives are achieved. Facility design shall incorporate viewshed analysis and modeling to minimize impacts to visual resources. Special mitigation measures such as facility placement and color selection have been proposed to reduce impacts to visual resources.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to place surface-disturbing activities along scenic byways in areas that do not affect values associated with the identified scenic byway. |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | Special Status Species |
| **TL-1** *(ROWA)*<br><br>**Salmonid and Native Non-salmonid Fishes (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub; mountain whitefish; Paiute and mottled sculpin; and speckled dace).**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit in-channel stream work in all occupied streams during fish spawning, egg incubation, and fry emerging seasons. Fish spawning, egg incubation, and fry emerging seasons vary by elevation and temperatures; however, the following intervals generally apply in Colorado:<br>• Cutthroat trout (various subspecies): May 1-September 1<br>• Rainbow trout: March 1-June 15<br>• Brown trout: October 1-May 1<br>• Brook trout: August 15-May 1<br>• Sculpin: May 1-July 31<br>• Bluehead sucker: May 1-July 15<br>• Flannelmouth sucker: April 1-July 1<br>• Roundtail chub: May 15-July 15<br>• Speckled dace: May 1-August 31<br>• Mountain whitefish: October 1-November 30<br><br>**PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry of native fish populations.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling and does not apply to operations and maintenance. If competing species are involved, the BLM may select to implement species-specific dates for native fish versus nonnative species.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect important native and game fish breeding. |
| **TL-3** *(ROWA)*<br><br>**Migratory Bird Habitat.**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities, including vegetation-removal projects, in migratory bird habitat during nesting season when nesting birds are present.<br><br>May 15 to July 15 or as site-specific analysis dictates.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect migratory bird habitat and ensure compliance with the Migratory Bird Treaty Act (Information Bulletin No. 2010-110); BLM |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | Memorandum of Understanding with US Fish and Wildlife Service). |
| **WILDLIFE RAPTOR NESTS TL CO**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** No surface use is allowed within a 402 meter (0.25-mile) radius of active raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:<br>• Osprey nests: April 1 to August 31.<br>• Red-tailed hawk nests, including any alternate nests: February 15 to July 15.<br>• Swainson's hawk nests and associated alternate nests: April 1 to July 15.<br>• Burrows or burrowing owl nest sites: March 1 to August 15.<br>• Great horned owl nests: February 1 to August 15.<br>• Other owls and raptors: March 1 to August 15.<br>• Cooper's hawk, sharp shinned hawk, and northern harrier nests: April 1 to August 15.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To prevent disruption of reproductive activity of raptors during the production period.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **WILDLIFE SENSITIVE RAPTOR NESTS TL CO**<br><br>***All Surface-disturbing Activities*** | **STIPULATION:** No surface use is allowed within an 805 meter (0.5-mile) radius of active or inactive raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:<br>• Ferruginous hawk nests, including any alternate nests: February 1 to July 15.<br>• Goshawk nest sites: March 1 to September 30.<br>• Peregrine and prairie falcon nest cliff(s): March 15 to July 31.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION> |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **PURPOSE:** To prevent disruption of reproductive activity of raptors during the production period.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect ferruginous hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-13** *(ROWA)*<br>**Golden Eagle Nest Sites.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit human encroachment within an 805-meter (0.5-mile) radius of active golden eagle nests and associated alternate nests, as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, during the following time period, or until fledging and dispersal of young: December 15 to July 15.<br>**PURPOSE:** To prevent disruption of reproductive activity of golden eagles.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect golden eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-14** *(ROWA)*<br>**Bald Eagle Nest Sites.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit human encroachment within an 805-meter (0.5-mile) radius of active bald eagle nests from November 15 to July 31.<br>**PURPOSE:** To prevent disruption of reproductive activity of bald eagles.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling, and does not apply to operations and maintenance. The TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2). |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **JUSTIFICATION:** This stipulation is necessary to protect bald eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-15** *(ROWA)*<br>**Bald Eagle Winter Roost.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit activity within 402 meters (0.25-mile) of bald eagle winter roosts from November 15 to March 15. Additional restrictions may be necessary within 805 meters (0.5-mile) of active bald eagle winter roosts if there is a direct line of sight from the roost to the activities.<br>**PURPOSE:** To protect bald eagles from human impacts that could affect winter survival.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the roost site or the geographical relationship of topographic barriers and vegetation screening to the roost site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect bald eagle winter roosts per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). |
| **TL-16** *(ROWA)*<br>**Occupied Sage-grouse Winter Habitat.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities in occupied sage-grouse winter habitat from December 1 to March 15.<br>**PURPOSE:** To protect sage-grouse (Gunnison and greater) from human impacts that could affect winter survival.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect sage-grouse from disturbance in a time of year when the added stress from disturbance can lead to death. |
| **TL-17** *(ROWA)*<br>**Sage-grouse Leks (4** | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities within 6.4 kilometers (4 miles) of sage-grouse leks from March 1 to June 30.<br>**PURPOSE:** To protect breeding and nesting sage-grouse (Gunnison and greater) from human |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **miles).**<br>***All Surface-disturbing Activities*** | impacts that could affect nest success.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending upon the active status of the lek or the geographical relationship of topographical barriers and vegetation to the lek site.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect breeding and nesting sage-grouse per current research recommendations (Parachute-Piceance-Roan Greater Sage-grouse Work Group 2008). |
| **TL-19** *(ROWA)*<br>**Occupied Prairie Dog Towns.**<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within active white-tailed prairie dog towns from April 1 to July 15.<br>**PURPOSE:** To avoid impacts to white-tailed prairie dogs during the pupping season.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect prairie dogs during the breeding season to allow for distribution of young. |
| | **Fish and Wildlife** |
| **TL-1** *(ROWA)*<br>**Sport and Native Fish (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub;** | **STIPULATION:** Prohibit in-channel stream work in all occupied streams during appropriate spring and fall spawning periods.<br>Rainbow and cutthroat trout, bluehead and flannelmouth sucker, roundtail chub, and Paiute and mottled sculpin (April 1 to August 1); brown and brook trout (October 1 to November 30).<br>**PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry.<br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect important native and game fish |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| **mountain whitefish; Paiute and mottled sculpin; and speckled dace).**<br>***All Surface-disturbing Activities*** | breeding. |
| **TL-20** *(ROWA)*<br>**Big Game Winter Range.**<br>474,500 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities from December 1 to May 1 to protect big game winter range as mapped by the CPW. Certain areas and/or routes within big game winter range may be closed to foot, horse, motorized, and/or mechanized travel from December 1 to May 1.<br>**PURPOSE:** To reduce disruption of big game during the winter season.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g., producing wells) and range administration. An exception will be granted only when the proposed action will not cause unacceptable harm to big game based on the following factors:<br>1. Winter conditions (such as snow cover and crusting) at the project site and vicinity;<br>2. Predictable, short-term (1 week) storm forecasts for the project area;<br>3. Period of winter in which the exception is requested (e.g., after April 15, before December 15, or the heart of winter);<br>4. Project site location relative to the size and spatial configuration of delineated critical winter range, open roads and trails, and other background disturbance;<br>5. Length of time that activities will encroach on the period of the winter range stipulation;<br>6. Number of vehicle trips per day in and out of the work site;<br>7. Time of day that activity occurs (after dark generally prohibited);<br>8. Actual big game use of the area;<br>9. Cumulative impacts on big game (such as other activities in the area); and<br>10. Additional site-specific or general concerns, as appropriate.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect big game winter habitat from surface-disturbing and major human activities during the periods of the year when the habitat is occupied. This habitat is critical to the viability of big game herds. These areas will be managed |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities**

| **Stipulation Number**<br>**Protected Resource**<br>**Acres/Miles Affected** | **Stipulation Description** |
|---|---|
| | by BLM to reflect CPW most current big game winter range maps. |
| **BIG GAME PRODUCTION TL CO**<br>***All Surface-disturbing Activities*** | **STIPULATION:** No surface use is allowed during the following time period(s) in big game production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM:<br>Prohibit activities, including motorized travel, in elk production areas from May 15 to June 15; in antelope production areas from April 15 to June 30; in Rocky Mountain bighorn sheep production areas from April 15 to June 30; in Moose production areas from April 15 to June 30; and in desert bighorn sheep production areas from February 1 to May 1.<br>**On the following lands:**<br><LEGAL_DESCRIPTION><br>**PURPOSE:** To reduce disruption of big game during parturition and young rearing period.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation provides for protection of big game production areas from disturbance and displacement by human activities during critical periods. |
| **TL-22** *(ROWA)*<br>**Pronghorn Wintering Habitat.**<br>23,500 acres<br>***All Surface-disturbing Activities*** | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities in pronghorn wintering habitat from January 1 to March 31.<br>**PURPOSE:** To improve pronghorn antelope habitat.<br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g., producing wells) and range administration (Section B.1).<br>**MODIFICATION:** Standard modifications apply (Section B.2).<br>**WAIVER:** Standard waivers apply (Section B.2).<br>**JUSTIFICATION:** This stipulation is necessary to protect pronghorn winter habitat from surface-disturbing and major human activities during the periods of the year when the habitat is occupied. This habitat is critical to the viability of pronghorn herds. These areas will be managed by BLM to reflect CPW most current pronghorn winter range maps. |

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **Air Resources** |
| **CO-56**<br><br>**Air Resources.** | Due to potential air quality concerns, supplementary air quality analysis may be required for any proposed development of this lease. This may include preparing a comprehensive emissions inventory, performing air quality modeling, and initiating interagency consultation with affected land managers and air quality regulators to determine potential mitigation options for any predicted significant impacts from the proposed development. Potential mitigation may include limiting the time, place, and pace of any proposed development, as well as providing for the best air quality control technology and/or management practices necessary to achieve area-wide air resource protection objectives. Mitigation measures will be analyzed through the appropriate level of NEPA analysis to determine effectiveness, and will be required or implemented as a permit condition of approval (COA). At a minimum, all projects and permitted uses implemented under this lease will comply with all applicable National Ambient Air Quality Standards and ensure Air Quality Related Values are protected in nearby Class I or Sensitive Class II areas that are afforded additional air quality protection under the Clean Air Act (CAA).<br><br>On the lands described below:<br><br><LEGAL_DESCRIPTION> |
| | **Water Resources** |
| **LN-1**<br><br>**Source Water Protection Areas.** | The lease is within source water protection areas, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities and comply with applicable municipal watershed plans.<br><br>**JUSTIFICATION:** This lease notification is necessary because leases within source water protection areas require extensive protection measures to ensure protection of water quality and human health. |
| | **Special Status Species** |
| **LN-3**<br><br>**Biological Inventories.** | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, sage-grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited. |

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | **JUSTIFICATION:** This lease notice is necessary to identify current plant and animal populations in order to reduce or avoid impacts to those species. |
| **LN-4**<br>**Threatened and Endangered Species** | ***Threatened and Endangered Species***<br>This lease contains habitat for threatened and endangered species. Prior to undertaking any activity on the lease, including surveying and staking of well locations, the lessee may be required to perform botanical inventories on the lease. Special design and construction measures may also be required in order to minimize impacts to threatened and endangered species habitat from drilling and producing operations. This applies to the lands described below: <LEGAL_DESCRIPTIONS>.<br>**EXCEPTION:** An exception may be granted depending on current usage of the site or on the geographical relationship to topographic barriers and vegetation screening.<br>**MODIFICATION:** Changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)<br>**JUSTIFICATION:** This lease notice is necessary to identify current cactus populations and habitat in order to reduce or avoid impacts to cactus habitat. |
| | Fish and Wildlife |
| **LN-3**<br>**Biological Inventories.** | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, sage-grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited.<br>**JUSTIFICATION:** This lease notice is necessary to identify current plant and animal populations in order to reduce or avoid impacts to those species. |
| **LN-5**<br>**Working in Wildlife Habitat.** | Require operators to establish and submit to the GJFO a set of operating procedures for employees and contractors working in important wildlife habitats. Design such procedures to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures may address, but are not limited to, items such as working in bear or snake country, controlling dogs, and understanding and abiding by hunting and firearms |

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number<br>Protected Resource<br>Acres/Miles Affected | Stipulation Description |
|---|---|
| | regulations. |
| | Paleontological Resources |
| **LN-6**<br><br>**Class 4 and 5 Paleontological Areas.** | Have a permitted paleontologist approved by the Authorized Officer perform an inventory of surface-disturbing activities in Class 4 and 5 paleontological areas per Instruction Memorandum No. 2008-009: Potential Fossil Yield Classification (PFYC) System for Paleontological Resources on Public Lands.<br><br>**JUSTIFICATION:** This lease notice is necessary to ensure an adequate paleontologist is present during surface disturbing activities to protect paleontological resources from direct impacts. |
| | Lands and Realty |
| **LN-7**<br><br>**Powderhorn Ski Area.** | If drilling operations are proposed, the lessee is hereby notified that there are concerns about ski lift structures, other facilities, and ski runs within the Powderhorn ski area. The lessee is hereby notified that special design, construction, and scheduling measures may be required in order to minimize the impacts of drilling and production operations. Proposed drilling and production facilities and operations will be relocated and rescheduled as needed to avoid physical interference with ski area facilities and recreation use. This can include relocations of more than 200 meters (656 feet) or seasonal closures of more than 60 days. This applies to the lands described below: <LEGAL_DESCRIPTIONS>.<br><br>**JUSTIFICATION:** This lease notification is necessary to protect recreation facilities at Powderhorn Ski Area. |

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 40 of 499

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

This page intentionally left blank.

B-60 *Grand Junction Field Office Approved Resource Management Plan* August 2015

BLM_0024306

# Appendix C
## Wild and Scenic Rivers Suitability Report

BLM_0024307

BLM_0024308

Table of Contents

Chapter Page

**EXECUTIVE SUMMARY** ..... **ES-1**

**1. INTRODUCTION** ..... **1-1**

1.1 Wild and Scenic Rivers Study Process ..... 1-4
1.1.1 Eligibility Phase ..... 1-4
1.1.2 Suitability Phase ..... 1-4

**2. METHODOLOGY** ..... **2-1**

2.1 Suitability Criteria Used to Evaluate River and Stream Segments ..... 2-1
2.2 Data Sources and Methodology ..... 2-3
2.2.1 Geographic Information Systems ..... 2-3
2.2.2 BLM Resource Interdisciplinary Team ..... 2-3
2.2.3 Informational Sources ..... 2-4
2.2.4 Other Agencies ..... 2-4
2.2.5 Public Input ..... 2-4
2.3 Suitability Determinations ..... 2-6
2.4 Interim Management of Suitable Segments ..... 2-6
2.5 Proposed RMP Management for Non-Suitable Segments ..... 2-7

**3. SUITABILITY CRITERIA-BASED DATA AND DETERMINATIONS** ..... **3-1**

3.1 Colorado River ..... 3-2
3.1.1 Colorado River Segment 1 ..... 3-2
3.1.2 Colorado River Segment 2 ..... 3-10
3.1.3 Colorado River Segment 3 ..... 3-16
3.2 Dolores River Watershed ..... 3-26
3.2.1 Dolores River ..... 3-26
3.2.2 North Fork Mesa Creek ..... 3-36
3.2.3 Blue Creek ..... 3-39
3.2.4 Gunnison River Segment 2 ..... 3-44
3.3 Roan Creek ..... 3-50
3.4 Carr Creek ..... 3-54
3.5 Rough Canyon Creek ..... 3-59
3.6 Unaweep Canyon Complex ..... 3-62
3.6.1 East Creek ..... 3-62
3.6.2 West Creek ..... 3-66
3.6.3 North Fork of West Creek ..... 3-72
3.6.4 Ute Creek ..... 3-76

**4. LIST OF PREPARERS** ..... **4-1**

**5. REFERENCES** ..... **5-1**

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 44 of 499

## TABLES

Page

ES-1 Summary of Suitability Determinations....3
1-1 Eligible Stream Segments Studied for Suitability....1-5
2-1 Interim Protection for Candidate Wild and Scenic Rivers....2-6
2-2 Select Overlapping Management for Nonsuitable Segments in Approved RMP ....2-10

## FIGURES

Page

1-1 Project Area.... **Error! Bookmark not defined.**
1-2 Eligible Segments within the GJFO .... **Error! Bookmark not defined.**

BLM_0024310

## ACRONYMS AND ABBREVIATIONS

| | Full Phrase |
|---|---|
| ACEC | area of critical environmental concern |
| BLM | United States Department of the Interior, Bureau of Land Management |
| cfs | cubic feet per second |
| CPW | Colorado Department of Natural Resources, Parks and Wildlife |
| CWCB | Colorado Water Conservation Board |
| EIS | environmental impact statement |
| ESA | Endangered Species Act |
| GJFO | Grand Junction Field Office |
| NCA | National Conservation Area |
| NWSRS | National Wild and Scenic Rivers System |
| ORV | outstandingly remarkable value |
| RMP | resource management plan |
| SRMA | special recreation management area |
| US | United States |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| US BOR | United States Department of the Interior, Bureau of Reclamation |
| US Forest Service | United States Department of Agriculture, National Forest Service |
| VRM | visual resource management |
| WSA | wilderness study area |
| WSR | wild and scenic river |
| WSR Act | Wild and Scenic Rivers Act of 1968 |

Table of Contents

This page intentionally left blank.

iv *Grand Junction Field Office* August 2015
*Approved Resource Management Plan*

BLM_0024312

# EXECUTIVE SUMMARY

In March 2009, the United States (US) Department of the Interior, Bureau of Land Management (BLM), Grand Junction Field Office (GJFO) completed the eligibility phase of a wild and scenic rivers (WSR) evaluation as part of the resource management plan (RMP) revision process (BLM 2009a). The eligibility study identified 20 segments within the GJFO as eligible for inclusion in the National Wild and Scenic Rivers System (NWSRS).

On March 30, 2009, after the release of the eligibility findings, Congress designated the Dominguez-Escalante National Conservation Area (NCA), which includes the Dominguez Canyon Wilderness. All or portions of five segments identified as eligible fall within the Dominguez-Escalante NCA (Dominguez Creek, Big Dominguez Creek, Little Dominguez Creek Segments 1 and 2, and Gunnison River Segment 1). These segments will be considered for suitability during the development of the RMP for the Dominguez-Escalante NCA. Further, Little Dolores was removed from further consideration due to land status that was verified through an updated cadastral survey. This was addressed in an amendment to the Eligibility Report. As such, a total of 14 eligible segments are studied for suitability in this report.

The next step in the WSR process is evaluating eligible segments for suitability. The purpose of the suitability phase of the study process is to determine whether eligible rivers would be appropriate additions to the national system by considering tradeoffs between corridor development and river protection. This report describes the methodology, data considered, and determinations made during the suitability phase. All eligible segments were assessed for suitability.

***Project Area***

The project area for this suitability study includes all BLM-managed river segments that have been determined to meet the WSR eligibility criteria within the RMP decision area. The GJFO manages approximately 1.2 million acres of BLM lands in Delta, Mesa, Montrose, and Garfield counties in northwest Colorado. This WSR suitability study also includes the eligible segment of the Colorado River that passes through the McInnis Canyons NCA as the Colorado River is not considered part of the NCA. All other aspects of the McInnis Canyons NCA were evaluated in

the McInnis Canyons NCA (BLM 2004) RMP and are not considered as part of this RMP revision process.

***Suitability Phase***

The purpose of the suitability phase of the study process is to determine whether eligible rivers would be appropriate additions to the NWSRS. The suitability analysis examines various approaches for maintaining the outstanding remarkable values (ORV) identified during the eligibility determination, and weighs protection of those values against other potential uses of the stream segment. The suitability evaluation does not result in actual designation but only a suitability determination for designation. The BLM cannot administratively designate a stream via a planning decision or other agency decision into the NWSRS, and no segment studied is designated or will be automatically designated as part of the NWSRS. Only Congress can designate a WSR. In some instances, the Secretary of the Interior may designate a WSR when the governor of a state, under certain conditions, petitions for a river to be designated. Members of Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water-protection strategies and measures to meet the purposes of the Wild and Scenic Rivers Act of 1968 will be the responsibility of Congress in any legislation proposed. Rivers found not suitable by the managing agency conducting the suitability study would be dropped from further consideration and managed according to the objectives and specific management prescriptions outlined in the RMP.

***Suitability Determinations***

**Table ES-1**, Summary of Suitability Determinations, shows the suitability determination for each segment. Of the 14 stream segments determined to be eligible and studied for suitability in this report, the BLM determined that one portion of the Dolores River is suitable for WSR designation.

**Table ES-1**
**Summary of Suitability Determinations**

| River or Creek | Segment | Total Segment Length (miles) | Length on BLM Land (miles) | Suitability Determination | Proposed Classification |
|---|---|---|---|---|---|
| Colorado River | Total of three segments | 78.91 (total) | 27.77 (total) | | |
| | Segment 1 | 17.76 | 7.32 | Not Suitable | Recreational |
| | Segment 2 | 40.24 | 1.31 | Not Suitable | Recreational |
| | Segment 3 | 20.91 | 19.14 | Not Suitable | Scenic |
| Dolores River Watershed | Total of three segments | 45.42 (total) | 30.75 (total) | | |
| *Dolores River* | One segment | 32.01 | 18.62 | | Recreational |
| | | | *10.38* | *Suitable* | |
| | | | *8.24* | *Not Suitable* | |
| *North Fork Mesa Creek* | One segment | 2.05 | 2.05 | Not Suitable | Scenic |
| *Blue Creek* | One segment | 11.36 | 10.08 | Not Suitable | Scenic |
| Gunnison River Segment 2 | One Segment | 16.63 | 3.85 | Not Suitable | Recreational |
| Roan Creek | One segment | 17.04 | 6.47 | Not Suitable | Scenic |
| Carr Creek | One segment | 15.10 | 5.06 | Not Suitable | Scenic |
| Rough Canyon | One segment | 4.21 | 4.21 | Not Suitable | Scenic |
| Unaweep Canyon Complex | Total of four segments | 56.50 (total) | 21.39 (total) | | |
| *East Creek* | One segment | 20.26 | 8.96 | Not Suitable | Recreational |
| *West Creek* | One segment | 23.56 | 4.93 | Not Suitable | Recreational |
| *North Fork of West Creek* | One segment | 8.46 | 3.31 | Not Suitable | Wild |
| *Ute Creek* | One segment | 4.22 | 4.19 | Not Suitable | Scenic |

Executive Summary

This page intentionally left blank.

ES-4 *Grand Junction Field Office Approved Resource Management Plan* August 2015

BLM_0024316

# 1. Introduction

Do not delete this page from MS Word file.

1. Introduction

Do not delete this page from MS Word file.

1-2 *Grand Junction Field Office*
*Approved Resource Management Plan* August 2015

BLM_0024318

# CHAPTER 1
# INTRODUCTION

In March 2009, the United States (US) Department of the Interior, Bureau of Land Management (BLM), Grand Junction Field Office (GJFO) completed the eligibility phase of a wild and scenic rivers (WSR) evaluation as part of the resource management plan (RMP) revision process (BLM 2009a). The eligibility study identified 20 segments within the GJFO as eligible for inclusion in the National Wild and Scenic Rivers System (NWSRS).

The GJFO manages approximately 1.2 million acres of BLM lands in Delta, Mesa, Montrose, and Garfield counties in northwest Colorado (**Figure 1-1**, Project Area). A separate planning process was conducted for the McInnis Canyons National Conservation Area (NCA) (BLM 2004); therefore the GJFO RMP revision will not consider lands within the NCA boundary and will not determine the eligibility or suitability of watercourses within the NCA boundary. However, the Colorado River is not considered part of the NCA and was therefore included in the GJFO WSR eligibility study and will be considered for suitability.

On March 30, 2009, after the release of the eligibility findings, Congress designated the Dominguez-Escalante NCA, which includes the Dominguez Canyon Wilderness. All or portions of five segments identified as eligible fall within the Dominguez-Escalante NCA (Dominguez Creek, Big Dominguez Creek, Little Dominguez Creek Segments 1 and 2, and Gunnison River Segment 1). These segments will be considered for suitability during the development of the RMP for the Dominguez-Escalante NCA.

This report describes the outstandingly remarkable values (ORVs), suitability factors, and suitability determination data on each of the segments which have been determined to meet the WSR eligibility criteria. **Figure 1-2** (Eligible Segments within the GJFO) displays the 14 segments being studied as part of this WSR suitability analysis.



Wild and Scenic Rivers Project Area
Source: BLM 2010a
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.
0 2.5 5 10 15 20
Miles
Figure 1-1
BLM Grand Junction Field Office Resource Management Plan
Administered Land
Bureau of Land Management
Bureau of Reclamation
National Park Service
US Forest Service
State of Colorado
National Conservation Area
Private
Project Area Boundary
State Boundary
Town
Colorado
De Beque
Collbran
Mesa
Mack
Loma
Fruita
Palisade
Grand Junction
Whitewater
Glade Park
Delta
Gateway
Colorado River
Gunnison River
Dolores River
McInnis Canyons NCA
(Not included in RMP Revision)
Dominguez-Escalante NCA
(Not included in RMP Revision)
139
70
330
65
50
141
348

BLM_0024320



Carr Creek
Roan Creek
Colorado River, Segment 1
Colorado River, Segment 3
Colorado River, Segment 2
Colorado River
Gunnison River, Segment 2
Gunnison River
Rough Canyon Creek
East Creek
North Fork West Creek
West Creek
Ute Creek
Blue Creek
North Fork Mesa Creek
Dolores River
De Beque
Collbran
Mesa
Loma
Fruita
Palisade
Grand Junction
Whitewater
Delta
Gateway
Location of Project Area in Colorado
Administered Land
Bureau of Land Management
Bureau of Reclamation
National Park Service
US Forest Service
State of Colorado
National Conservation Area
Private
Eligible Segments
Project Area Boundary
State Boundary
Town
Source: BLM 2010a
Wild and Scenic Rivers Eligible Segments
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Grand Junction Field Office, Bureau of Land Management, Grand Junction, CO.
0 2.5 5 10 15 20
Miles
Figure 1-2
BLM Grand Junction Field Office Resource Management Plan

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 56 of 499

## 1.1 Wild and Scenic Rivers Study Process

A WSR study process is composed of two main components: the eligibility phase and the suitability phase. At this point, the GJFO has completed the eligibility phase and is completing the suitability phase. The eligibility and suitability phases were conducted in accordance with BLM Manual 8351, *Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management* (BLM 1992), *The Wild and Scenic River Study Process Technical Report* (Interagency Wild and Scenic Rivers Coordinating Council 1999), and with the Wild and Scenic Rivers Act of 1968 (WSR Act).

### 1.1.1 Eligibility Phase

The eligibility phase was completed for the GJFO in March 2009. A determination of eligibility includes identifying the river segment's ORVs, free-flowing nature, and preliminary classification. For a complete description of the segments analyzed and methodology used, see the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a).

A summary of segments identified as eligible in the GJFO and that are evaluated for suitability in this report is provided in **Table 1-1**, Eligible Stream Segments Studied for Suitability.

### 1.1.2 Suitability Phase

The purpose of the suitability phase of the study process is to determine whether eligible segments would be appropriate additions to the NWSRS by considering tradeoffs between corridor development and river protection. The suitability evaluation does not result in actual designation but only a suitability determination for designation. The BLM cannot administratively designate a stream via a planning decision or other agency decision into the NWSRS, and no segment studied is designated or will be automatically designated as part of the NWSRS. Only Congress can designate a WSR. In some instances, the Secretary of the Interior may designate a WSR when the governor of a state, under certain conditions, petitions for a river to be designated. Members of Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water-protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed. Rivers found not suitable by the managing agency conducting the suitability study would be dropped from further consideration and managed according to the objectives and specific management prescriptions outlined in the land management plan. A summary of segments identified as eligible in the GJFO and that were evaluated for suitability in this report is provided in **Table 1-1**.

BLM_0024322

**Table 1-1**
**Eligible Stream Segments Studied for Suitability**

| River or Creek | Segment | Total Segment Length (miles) | Length on BLM Land (miles) | Tentative Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|
| Colorado River | Total of three segments | 78.91 (total) | 27.77 (total) | | |
| | Segment 1 | 17.76 | 7.32 | Recreational | Scenic, Fish, Wildlife |
| | Segment 2 | 40.24 | 1.31 | Recreational | Fish |
| | Segment 3 | 20.91 | 19.14 | Scenic | Scenic, Recreation, Fish, Wildlife, Geologic, Historic |
| Dolores River Watershed | Total of three segments | 45.42 (total) | 30.75 (total) | | |
| *Dolores River* | One segment | 32.01 | 18.62 | Recreational | Scenic, Recreation, Geologic, Paleontological, Fish |
| *North Fork Mesa Creek* | One segment | 2.05 | 2.05 | Scenic | Vegetation |
| *Blue Creek* | One segment | 11.36 | 10.08 | Scenic | Scenic, Fish, Cultural |
| Gunnison River Segment 2 | One Segment | 16.63 | 3.85 | Recreational | Fish, Historic |
| Roan Creek | One segment | 17.04 | 6.47 | Scenic | Fish |
| Carr Creek | One segment | 15.10 | 5.06 | Scenic | Fish |
| Rough Canyon | One segment | 4.21 | 4.21 | Scenic | Scenic, Wildlife, Geologic |
| Unaweep Canyon Complex | Total of four segments | 56.50 (total) | 21.39 (total) | | |
| *East Creek* | One segment | 20.26 | 8.96 | Recreational | Geologic |
| *West Creek* | One segment | 23.56 | 4.93 | Recreational | Scenic, Wildlife, Geologic, Vegetation |
| *North Fork of West Creek* | One segment | 8.46 | 3.31 | Wild | Scenic |
| *Ute Creek* | One segment | 4.22 | 4.19 | Scenic | Scenic, Vegetation |

Source: BLM 2009a

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 58 of 499

This page intentionally left blank.

BLM_0024324

## 2. METHODOLOGY

Do not delete this page from MS Word file.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 60 of 499

2. Methodology

Do not delete this page from MS Word file.

2-2 *Grand Junction Field Office*
*Approved Resource Management Plan* August 2015

BLM_0024326

# CHAPTER 2
# METHODOLOGY

This section describes the methodology implemented to evaluate eligible segments for suitability. The criteria used to evaluate eligible river and stream segments are those described in BLM Manual 8351, *Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management* (BLM 1992) and recommendations from the Interagency Wild and Scenic Rivers Coordinating Council (1999).

## 2.1 SUITABILITY CRITERIA USED TO EVALUATE RIVER AND STREAM SEGMENTS

The purpose of the suitability phase of the study process is to determine whether eligible rivers would be appropriate additions to the NWSRS by considering tradeoffs between corridor development and river protection. Suitability considerations include the environment and economic consequences of designation and the manageability of a river if it were designated by Congress.

A suitability study is designed to answer these questions:

1. Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?
2. Will the river's free-flowing character, water quality, and ORVs be protected through designation? Is designation the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered.
3. Is there a demonstrated commitment to protect the river by any nonfederal entities that may be partially responsible for implementing protective management?

With the above guidance from the Interagency Wild and Scenic Rivers Coordinating Council (1999) in mind, the following 11 suitability criteria factors, identified in BLM Manual Section 8351 (BLM 1992), were applied to each eligible river segment in the suitability study:

1. Characteristics which do or do not make the area a worthy addition to the NWSRS.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 62 of 499

2. Status of land ownerhip, minerals (surface and subsurface), use in the area, including the amount of private land involved, and associated or incompatible uses. Jurisdictional consideration (administrative role and/or presence) must be taken into account to the extent that management would be affected. In situations where there is limited public lands (shoreline and adjacent lands) administered by the BLM within an identified river study area, it may be difficult to ensure those identified outstandingly remarkable values could be properly maintained and afforded adequate management protection over time. Accordingly, for those situations where the BLM is unable to protect or maintain any identified outstandingly remarkable values, or through other mechanisms (existing or potential), river segments may be determined suitable only if the entity with land use planning responsibility supports the finding and commits to assisting the BLM in protecting the identified river values. An alternative method to consider these segments is for state, local governments, or private citizens to initiate efforts for designation under Section 2(a)(iii), or a joint study under Section 5(c) of the WSR Act. In certain cases, there might be existing or future opportunities for the BLM to acquire river shoreline or where landowners are willing to donate, exchange, transfer, assign, sell, or sign an easement. Wherever appropriate, the BLM shall encourage the state, responsible federal agency or other entities to evaluate segments where the BLM lacks sufficient jurisdictional control and the BLM shall provide technical assistance concerning the WSR river studies, as well as information concerning public lands within the study corridor. The BLM shall continue to protect and, wherever possible, enhance any outstandingly remarkable values identified in the RMP process which are associated with lands under the BLM's jurisdiction.
3. Reasonably foreseeable potential uses of the land and related waters which would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and the values which could be foreclosed or diminished if the area is not protected as part of the NWSRS.
4. Federal, public, state, tribal, local, or other interests in designation or nondesignation of the river, including the extent to which the administration of the river, including the costs thereof, may be shared by state, local, or other agencies and individuals. Also, the federal agency that will administer the area should it be added to the National System.
5. Estimated cost, if necessary, of acquiring lands, interests in lands, and administering the area if it is added to the NWSRS. Section 6 of the WSR Act outlines policies and limitations of acquiring lands or interests in land by donation, exchange, consent of owners, easement, transfer, assignment of rights, or condemnation within and outside established river boundaries.
6. Ability of the agency to manage and/or protect the river area or segment as a WSR river, or other mechanisms (existing and potential) to protect identified values other than WSR designation.
7. Historical or existing rights which could be adversely affected. In determining suitability, consideration of any valid existing rights must be afforded under applicable laws (including the WSR Act), regulations, and policies.

BLM_0024328

8. Other issues and concerns, if any.

In addition to the criteria described above, three additional suitability factors were considered, as suggested by the Interagency Wild and Scenic Rivers Coordinating Council (1999):

1. Adequacy of local zoning and other land use controls in protecting the rivers ORVs by preventing incompatible development. This evaluation may result in a formal finding that the local zoning fulfills Section 6(c)'s requirements, which in turn preempts the federal government's ability to acquire land through eminent domain if the river is designated.
2. Consistency of designation with other agency plans, programs, or policies and in meeting regional objectives. Designation may help or impede the "goals" of other tribal, federal, state, or local agencies. For example, designation of a river may contribute to state or regional protection objectives for fish and wildlife resources. Similarly, adding a river which includes a limited recreation activity or setting to the National System may help meet statewide recreation goals. Designation might, however, limit irrigation and/or flood control measures in a manner inconsistent with regional socioeconomic goals.
3. Contribution to a river system watershed or basin integrity. This factor reflects the benefits of a "systems" approach (i.e., expanding the designated portion of a river in the National System or developing a legislative proposal for an entire river system [headwaters to mouth] or watershed). Numerous benefits are likely to result from managing an entire river or watershed, including the ability to design a holistic protection strategy in partnership with other agencies and the public.

In the suitability analysis, water resource development issues are generally considered under criterion three and seven from BLM Manual Section 8351 (BLM 1992).

## 2.2 Data Sources and Methodology

The BLM relied on several sources, including geographic information systems data, GJFO resource specialists, informational sources, other agencies, and public input. The result was a compilation of data applicable to the suitability criteria. This data was then used to determine the suitability of a particular segment.

### 2.2.1 Geographic Information Systems

The US Geological Survey National Hydrography Dataset was used to select all perennial stream segments for the eligibility study. Streams and stream sections were removed that did not fall within GJFO jurisdiction. In addition to US Geological Survey data, the BLM also used its corporate Geographic Information Systems data for all associated resources.

### 2.2.2 BLM Resource Interdisciplinary Team

The BLM interdisciplinary team consisted of resource specialists from the GJFO. The interdisciplinary team provided information pertaining to the suitability criteria factors and also reviewed data from additional sources, such as agency and public input, for accuracy. Once all available data were compiled, the team evaluated each segment and made a suitability determination.

### 2.2.3 Informational Sources

The BLM used a number of informational sources and publications to evaluate segments for suitability. These sources included:

- BLM Manual Section 6400;
- US Geological Survey Minerals Maps;
- US Geological Survey stream gage data;
- Land Status Maps;
- Agreements with other agencies;
- Other Agency management plans;
- Land use planning and zoning documents for local and county governments;
- Descriptions of current and proposed water projects provided by water management agencies;
- Published books;
- River guides;
- Tabulations of water rights; and
- Input from Cooperating Agencies and stakeholders.

### 2.2.4 Other Agencies

Additional information was gathered from other federal and state agencies from scoping letters, stakeholder outreach, and existing documents. The following other agencies were contacted in order to assess suitability:

- Colorado Department of Natural Resources, Parks and Wildlife (CPW) databases;
- US Department of Agriculture, National Forest Service [Forest Service], where segments originate or continue onto Forest Service land;
- Environmental organizations;
- Land owners;
- Water users;
- Municipalities;
- Counties; and
- State entities.

### 2.2.5 Public Input

***Eligibility Phase***

Public involvement for the GJFO WSR evaluation process began during the eligibility phase as part of initial scoping for the RMP from October 15, 2008 through January 9, 2009. Public outreach during the scoping period included: 1) a newsletter mailed to over 600 agency officials,

organizations, and members of the public; 2) three scoping open houses in December 2008 in Grand Junction and Collbran, Colorado, and in Moab, Utah; and 3) a public Web site, http://www.blm.gov/co/st/en/fo/gjfo/rmp, which provides access to materials distributed at scoping meetings, as well as information on the public involvement process. The BLM presented the results of its initial identification efforts, provided educational materials regarding the WSR process, and solicited comments from the public and government agencies.

The public was invited to submit comments via US mail, facsimile, and/ or electronic mail and comments were accepted until January 9, 2009. The BLM received 36 discreet comments in seven letters related to WSR during scoping. Comments were analyzed and incorporated as appropriate into the eligibility study. More detailed information on public involvement during the eligibility phase can be found in the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a) and the *Resource Management Plan Revision Scoping Summary Report* (BLM 2009b).

***Suitability Phase***

In late-March of 2009 at the beginning of the suitability phase of the evaluation process Colorado River District convened a stakeholders group. Letters were mailed to potential stakeholders soliciting data on the segments being studied for suitability. Stakeholders were specifically asked to provide data related to the suitability criteria in **Section 2.1**. Letters to potential stakeholders were sent on March 31, 2009, and included a list of the suitability criteria, a question and answer on WSRs analysis and water rights/water projects overview, and a WSRs guide for riverfront property owners. Data received were analyzed and incorporated into the suitability evaluation.

During stakeholder outreach for suitability, the BLM received *23* comment letters. Comments pertained to a range of topics from the eligibility of certain segments to opinions on the suitability of eligible segments. As intended, the stakeholders provided valuable information related to the suitability criteria, which was incorporated into the evaluation when applicable.

A stakeholder group, named the Lower Colorado River Wild and Scenic Stakeholder Collaborative, formed independently of BLM's public outreach process. This stakeholder group included representatives from state government, local governments, conservation districts, water districts, organizations representing agricultural interests, and organizations representing environmental interests. The stakeholder group also included several private landowners. The objective adopted by the group was to provide collaboratively-developed management recommendations to the BLM that would support the identified ORVs on specific stream segments while also supporting stakeholder uses and values that exist along certain stream segments. At the request of the group, BLM provided information concerning the WSR Act, the BLM planning process, and stream-related natural resource values. The BLM did not participate in the group as a stakeholder, nor did BLM participate in decisions made by the group concerning management recommendations. The group sent a letter signed by all the parties conveying its recommendations to BLM. These letters are incorporated as part of the public comment record for the BLM planning effort. Stakeholder group recommendations are more fully discussed in the following sections on specific stream segments.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 66 of 499

All comments received were considered and analyzed. Only those comments that pointed out errors or omissions in BLM's eligibility resulted in changes to the eligibility analysis. Those changes are explained in a March 2010 amendment to the eligibility report.

## 2.3 Suitability Determinations

Each of the 15 individual eligible segments was evaluated to assess whether or not it would be suitable for inclusion in the NWSRS. The determination was made based on the suitability criteria factors described previously. Based on the evaluation described in this report, one segment of the Dolores River has been determined suitable for designation into the National Wild and Scenic Rivers System.

## 2.4 Interim Management of Suitable Segments

The WSR Act and BLM guidance require that interim management be developed and followed to protect the free-flowing nature, ORVs, and recommended tentative classification of suitable segments until congressional action regarding designation is taken. Interim protections for suitable segments are provided administratively by the management agency and are not legislative protection under the WSR Act. Legislative protection is provided only by formal designation by Congress. Guidelines for management of Section 5(d)(1) suitable rivers, as adapted by the Interagency Wild and Scenic Rivers Coordinating Council from the WSR Act, are included in **Table 2-1**. Once final determinations have been made, the BLM will draft protective management measures for each suitable segment.

**Table 2-1**
**Interim Protection for Candidate Wild and Scenic Rivers**

| Issue | Management Prescription/Action |
|---|---|
| Study Boundary | Minimum of 0.25-mile from ordinary high-water mark<br><br>Boundary may include adjacent areas needed to protect identified values |
| Preliminary Classification (Section 2(b) of WSR Act) | 3 classes: wild, scenic, recreational (defined by statute)<br><br>Criteria for tentative classification described in Interagency Guidelines<br><br>Manage at recommended tentative classification |
| Study Report Review Procedures | Notice of study report/Draft EIS published in *Federal Register*<br><br>Comments/response from federal, state, and local agencies, and the public included in the study report/Final EIS transmitted to the President and Congress |
| Private Land:<br>• Administration<br>• Acquisition | Affect private land uses through voluntary partnership with state/local governments and landowners<br><br>No regulatory authority<br><br>Typically an evaluation of the adequacy of local zoning and land use controls is a component of suitability determination[1]<br><br>No ability to acquire interest in land under the Act's authority prior to designation |

BLM_0024332

**Table 2-1**
**Interim Protection for Candidate Wild and Scenic Rivers**

| Issue | Management Prescription/Action |
|---|---|
| Water Resources Project | River's free-flowing condition protected to the extent of other agency authorities; not protected under the WSR Act |
| Land Disposition | Agency discretion to retain lands within river corridor in federal ownership |
| Mining and Mineral Leasing | Protect free flow, water quality, and ORVs through other agency authorities |
| Actions of Other Agencies | Affect actions of other agencies through voluntary partnership. |
| Protect Outstandingly Remarkable Values | No regulatory authority conferred by the WSR Act; agency protects through other authorities<br><br>Section 11(b)1: Limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources[2] |

[1] For an agency-identified study river that includes private lands there is often the need to evaluate existing state and local land use controls and, if necessary, assess the willingness of state and local government to protect river values.

[2] Section 11(b)1 authorizes the Secretary of the Interior and secretary of Agriculture, or the head of any other federal agency, to provide for "limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources." This authority "applies within or outside a federally administered area and applies to rivers which are components of the National system and to other rivers." The recipients of federal assistance include states or their political subdivisions, landowners, private organizations, or individuals. Some examples of assistance under this section include, but are not limited to, riparian restoration, riparian fencing to protect water quality and riparian vegetation, of vegetative screening to enhance scenery/recreation experience.

**Source**: Interagency Wild and Scenic Rivers Coordinating Council 1999

## 2.5 Approved RMP Management for Non-Suitable Segments

Specific management actions are not proposed for segments not found suitable for inclusion in the NWSRS. However, ORVs for these segments would be afforded protection via management actions for other programs, including the following stipulations that overlap some or all of the stream segments:

| **Segment** | **Stipulation or ACEC Overlap** |
|---|---|
| Blue Creek | • Closed to fluid mineral leasing (Maverick lands with wilderness characteristics unit)<br>• LANDS WITH WILDERNESS CHARACTERISTICS NSO CO (Maverick lands with wilderness characteristics unit)<br>• CSU-30: VRM Class II<br>• CSU-32: Recreation Management Areas (Gateway ERMA)<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |

| Segment | Stipulation or ACEC Overlap |
|---|---|
| Carr Creek | • GEOLOGY SOIL CSU CO<br>• CSU-30: VRM Class II<br>• CSU-39: Roan and Carr Creeks ACEC<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Colorado River 1 | • HYDROLOGY RIVER NSO CO<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Colorado River 2 | • HYDROLOGY RIVER NSO CO<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Colorado River 3 | • Closed to fluid mineral leasing (McInnis Canyon NCA)<br>• HYDROLOGY RIVER NSO CO<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Dolores River | • Closed to fluid mineral leasing (Dolores River Canyon SRMA)<br>• HYDROLOGY RIVER NSO CO<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| East Creek | • Highway 141<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Gunnison River 2 | • HYDROLOGY RIVER NSO CO<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| North Fork Mesa Creek | • CSU-30: VRM Class II<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| North Fork West Creek | • Closed to fluid mineral leasing (The Palisade WSA)<br>• NSO-43: Wilderness Study Area (The Palisade WSA)<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Roan Creek | • GEOLOGY SOIL CSU CO<br>• CSU-30: VRM Class II<br>• CSU-39: Roan and Carr Creeks ACEC<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| Rough Canyon Creek | • Closed to fluid mineral leasing (Bangs Canyon SRMA; Rough Canyon ACEC)<br>• NSO-12: ACECs (Rough Canyon ACEC)<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |

| <u>**Segment**</u> | <u>**Stipulation or ACEC Overlap**</u> |
|---|---|
| Ute Creek | • Closed to fluid mineral leasing (Unaweep Canyon lands with wilderness characteristics unit)<br>• LANDS WITH WILDERNESS CHARACTERISTICS NSO CO (Unaweep Canyon lands with wilderness characteristics unit)<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |
| West Creek | • Closed to fluid mineral leasing (Dolores River Canyon SRMA)<br>• RECREATION SRMA NSO CO (Dolores River Canyon SRMA)<br>• NSO-2: Streams/Springs Possessing Lotic Riparian Characteristics |

These stipulations that overlap a stream segment would also protect ORVs by limiting or prohibiting fluid mineral development and/or all surface-disturbing activities. The total acreage of mapped stipulations that overlap nonsuitable stream segments is provided in Table 2-2, below. In addition, management actions such as those which support ACECs or other special designations would protect ORVs on stream segments that overlap the special designation (see **Table 2-2**, Select Overlapping Management for Nonsuitable Segments). One example is the Roan and Carr Creek ACEC that overlaps both streams and limits surface-disturbing activities, thereby protecting the Fish ORV on both stream segments. A second example is the overlap between Rough Canyon ACEC and Rough Canyon Creek that provides additional protection to the Scenic, Wildlife, and Geologic ORVs for that stream segment. Managing lands for wilderness characteristics can also provide supplemental protections for nonsuitable stream segments. The Proposed RMP would manage the Unaweep unit to protect its wilderness characteristics; the Scenic and Vegetation ORVs for Ute Creek, located within the Unaweep unit's boundaries, would be protected by the actions which protect wilderness characteristics. There would be similar protections for the Scenic, Fish, and Cultural ORVs along Blue Creek, which overlaps the Maverick lands with wilderness characteristics unit. Other actions, such as the management of VRM classifications, can limit activities that may diminish ORVs. Table 2-2, below, displays the acreages of each VRM class that overlap nonsuitable segments; a lower VRM class (i.e., VRM Class I and II) would be expected to better protect ORVs, especially Scenic ORVs. A more thorough discussion of these actions and their impacts is provided in Section 4.5.3.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 70 of 499

**Table 2-2**
**Select Overlapping Management for Nonsuitable Segments under in Approved RMP**

| Segment | ORVs | Stipulation (acres) | | | VRM Class (acres) | | | | ROW | | Closed to Fluid Mineral Leasing (acres) | Petitioned for Withdrawal from Locatable Mineral Entry (acres) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | NSO | CSU | TL | I | II | III | IV | Exclusion | Avoidance | | |
| *Nonsuitable* | | | | | | | | | | | | |
| Blue Creek | Scenic, Fish, Cultural | 1,600 | 1,700 | 2,700 | 0 | 2,800 | 0 | 0 | 800 | 2,000 | 800 | 0 |
| Carr Creek | Fish | 1,100 | 600 | 100 | 0 | 0 | 1,700 | 0 | 0 | 1,700 | 0 | 0 |
| Colorado River Segment 1 | Scenic, Fish, Wildlife | 2,200 | 1,200 | 1,600 | 0 | 2,000 | 0 | 200 | 0 | 2,100 | 0 | 0 |
| Colorado River Segment 2 | Fish | 100 | 100 | 0 | 0 | 100 | 0 | 0 | 0 | 100 | 40 | 0 |
| Dolores River | Scenic, Fish, Recreation, Geologic, Paleontological | 2,700 | 2,100 | 2,700 | 100 | 2,600 | 0 | 0 | 2,400 | 300 | 2,700 | 1,200 |
| East Creek | Geologic | 1,900 | 1,500 | 1,900 | 0 | 0 | 1,900 | 0 | 0 | 1,900 | 100 | 0 |
| Gunnison River Segment 2 | Fish, Historic | 1,000 | 500 | 500 | 0 | 600 | 400 | 0 | 400 | 500 | 900 | 0 |
| North Fork Mesa Creek | Vegetation | 300 | 400 | 300 | 0 | 700 | 0 | 0 | 0 | 700 | 0 | 0 |

BLM_0024336

**Table 2-2**
**Select Overlapping Management for Nonsuitable Segments under in Approved RMP**

| Segment | ORVs | Stipulation (acres) | | | VRM Class (acres) | | | | ROW | | Closed to Fluid Mineral Leasing (acres) | Petitioned for Withdrawal from Locatable Mineral Entry (acres) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | NSO | CSU | TL | I | II | III | IV | Exclusion | Avoidance | | |
| North Fork West Creek | Scenic | 1,100 | 100 | 500 | 900 | 200 | 0 | 0 | 900 | 100 | 1,100 | 100 |
| Roan Creek | Fish | 500 | 1,400 | 1,700 | 0 | 0 | 1,900 | 0 | 0 | 2,000 | 0 | 0 |
| Rough Canyon Creek | Scenic, Wildlife, Geologic | 1,200 | 800 | 1,200 | 0 | 1,200 | 0 | 0 | 1,000 | 200 | 1,200 | 0 |
| Ute Creek | Scenic, Vegetation | 1,400 | 500 | 800 | 50 | 1,100 | 200 | 0 | 1,100 | 200 | 1,400 | 0 |
| West Creek | Scenic, Wildlife, Geologic, Vegetation | 1,700 | 600 | 1,700 | 600 | 100 | 1,000 | 0 | 600 | 1,100 | 1,700 | 300 |
| **Total** | | **20,000** | **13,200** | **18,100** | **2,600** | **13,500** | **7,500** | **200** | **9,500** | **13,800** | **12,900** | **1,600** |

Source: BLM 2010a

BLM_0024338

This page intentionally left blank.

BLM_0024339

BLM_0024340

## 3. SUITABILITY CRITERIA-BASED DATA AND DETERMINATIONS

Do not delete this page from MS Word file.

Do not delete this page from MS Word file.

# CHAPTER 3
# SUITABILITY CRITERIA-BASED DATA AND DETERMINATIONS

The purpose of the suitability phase is to determine whether eligible river segments are suitable or not suitable for inclusion in the NWSRS, per the criteria from the WSR Act. The suitability evaluation does not result in actual designation but only a suitability determination for designation. The BLM may or may not recommend a stream segment for designation into the NWSRS by transmitting its suitability determinations to Congress and the President. No stream segment studied is designated or will be automatically designated as part of the NWSRS. Only Congress can designate a WSR. In some instances, the Secretary of the Interior may designate a WSR when the governor of a state, under certain conditions, petitions for a river to be designated. Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed. Rivers found nonsuitable will be dropped from further consideration and managed according to the objectives outlined in the RMP.

Impacts that would occur from designating or not designating the suitable river segments will be analyzed in the EIS associated with the RMP. Public review and comment on suitability determinations included in the Draft RMP were considered before the BLM made final suitability determinations. Maps have been included only for those segments preliminarily determined suitable. Maps of all eligible segments were included in the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a).

This section contains a discussion of 11 suitability factors in relation to each of the 15 river and stream segments within the RMP planning area determined to be eligible in the *Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office* (BLM 2009a). The criteria described in **Section 2.1** are presented as follows:

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.
3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.
4. Federal, state, tribal, local, public, or other interest in designating or not designating the river.
5. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.
6. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.
7. Historical or existing rights that could be adversely affected with designation.
8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.
9. Consistency of designation with other agency plans, programs, or policies.
10. Contribution to a river system watershed or basin integrity.
11. Other issues and concerns, if any.

## 3.1 COLORADO RIVER

### 3.1.1 Colorado River Segment 1

| | | | |
|---|---|---|---|
| **Description:** | From the eastern boundary of the planning area northeast of De Beque to the Grand Valley Diversion Dam, northeast of Palisade. | | |
| **Total Segment Length:** | 17.76 miles | **Total Segment Area:** | 5,635.55 acres |
| **Length on BLM Land :** | 7.32 miles | **Area on BLM Land:** | 2,587.82 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Scenic, Fish, Wildlife | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

This segment has outstandingly remarkable scenic, fish, and wildlife values, which would make the segment a worthy addition to the NWSRS if designated. On the other hand, this segment has other characteristics that detract from its value as an addition to the NWSRS. The tentative classification for this segment is recreational due to Interstate 70 and railroad, both of which run parallel to and are readily apparent from the river.

This segment has outstandingly remarkable scenic values. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery,

scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). This segment flows through De Beque Canyon: a wide, relatively gentle sloped canyon through the Mesa Verde formation, formed by the down cutting of the Colorado River. The majestic views from and along the river are composed of stair-stepped brownish sandstone cliffs intermixed with lightly vegetated slopes of the canyon in sharp contrast to the riparian vegetation and varied colors near the river. The river drops several hundred feet through the canyon, with extensive views at the upper end of the canyon before opening up again at the bottom to views of the Grand Valley near Palisade.

This segment also has outstandingly remarkable fish values. The entire segment is designated critical habitat by the US Department of the Interior, Fish and Wildlife Service (USFWS) for the federally endangered Colorado pikeminnow (*Ptychocheilus lucius*) and the Razorback sucker (*Xyrauchen texanus*) (59 Fed. Reg. 13,374). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is the largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico.

Lastly, this segment has outstandingly remarkable wildlife values. Specifically, the segment contains important winter habitat for bald eagles *(Haliaeetus leucocephalus)*, a State Threatened Species in Colorado (CPW 2008). The USFWS also recently discovered a nesting site along this segment. Bald eagles no longer receive protection under the Endangered Species Act (ESA). The USFWS delisted bald eagles in June 2007 because their populations have recovered sufficiently. Nevertheless, bald eagles still receive protection under the Bald and Golden Eagle Protection Act.

There are also characteristics that are unrelated to ORVs that affect the suitability of this segment. Numerous water diversions exist along this segment, including several conditional water rights. If made absolute, these water rights could result in additional depletions and additional water development and diversion structures along the private land in the corridor. A portion of this segment overlaps the city limits of De Beque. Future population growth and expansion of De Beque and associated development, particularly along the riverfront, have the potential to change the setting found in this segment. Interstate 70 runs adjacent to the segment but gives drivers the opportunity to view the scenic landscape. A railroad and power lines are visible throughout the segment as well. Future expansion of the interstate, railroad, and transmission lines also have the potential to change the setting found in this segment. These characteristics somewhat detract from the value of the segment as an addition to the NWSRS.

2.   The status of land ownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 17.76-mile segment is a combination of federal (BLM and US Department of the Interior, Bureau of Reclamation [US BOR]) and private. The BLM manages

BLM_0024345

shoreline along 7.32 miles (41.2 percent) of the segment. Within the 5,635.55-acre segment corridor, the BLM manages 2,587.82 acres (45.9 percent). Another 3,016.15 acres (53.5 percent) are privately owned. The US BOR manages the remaining land within the study corridor (31.58 acres; less than one percent).

The area is leased for oil and gas exploration and there are four active wells within the study corridor. Nearly all of the BLM-managed lands within the segment corridor are under lease for oil and gas development. The BLM-managed lands in the segment corridor northeast of De Beque have high oil and gas potential; while the remaining BLM-managed lands in the segment corridor generally have low oil and gas potential. There are no mining claims within the segment.

The BLM does not have authority over maintenance, operation, and construction activities associated with the highway and railroad. Activities associated with the highway and railroad are not likely to adversely impact the ORVs. The Department of Transportation, pursuant to the Federal-Aid Highway Act and section 4(f) of the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to impact future water development along this segment. With designation, BLM would obtain authority to place terms and conditions on or deny approval for any proposed projects on BLM lands that would be incompatible or potentially degrade to ORVs for this segment. Other federal agencies that consider proposed projects that require federal permits, licenses, or funds would be required to evaluate the potential effects on the segment's ORVs, and prevent significant impacts to ORVs, free-flowing nature, or water quality. However, the Colorado Statewide Water Supply Initiative concluded that Mesa County would be able to meet estimated demand for water in the Colorado River basin through 2030 by utilizing existing supplies, agricultural transfers, Ruedi and Wolford Reservoir contracts, and Jerry Creek Reservoir. (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004)

Several conditional storage water rights have the potential to impact values along this segment. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The combined volume of conditional storage rights in the Colorado River basin in Colorado totals almost 3 million acre-

feet. Water District 70 alone (Roan Creek Basin) has approximately 560,000 acre-feet of conditional storage rights. The majority of which have priority dates ranging from 1960-1980, with some as early as 1940-1960 (SWSI). The development of conditional water rights both along the segment and upstream from the segment has the potential to impact the fish values along this segment.

Presently, there are no state-based instream flow water rights in this reach to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flows derive from required deliveries to downstream senior water rights, contractual water deliveries from Green Mountain, Ruedi, and Wolford Mountain Reservoirs, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9). The USFWS has developed flow recommendations for the Colorado River to benefit endangered fish. Flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth and survival of young fish. Although there is no instream-flow right along this segment, USFWS flow recommendations provide a layer of protection for the ORVs.

The scenic and wildlife values along this segment likely would not be diminished or foreclosed if the segment was not designated. Other management requirements and tools (discussed under Criterion 6) provide a layer of protection for these values. These mechanisms will apply regardless of whether the segment receives WSR designation by Congress.

The Colorado River Recovery Program functions to insure that adequate flow regimes exist to support the four threatened and endangered fish species in the Colorado River as further water development proceeds. In addition, the program implements programs to improve fish habitat and reduce competition from non-native species. These measures are likely to maintain the fish ORV. Designation of this reach into the NWSRS, which would include a federal reserved water right, is unlikely to provide greater protection. The federal reserved water right would be very junior, and could not be used to prevent the exercise of previously decreed conditional or absolute water rights.

4. Federal, state, tribal, local, public, or other interest in designating or not designating the river.

The State of Colorado, water districts, user groups, and individuals have expressed concern about the impact of designating this segment on current and future upstream and downstream water projects. However, they also recognize that this segment supports a high number of ORVs and that some special management provisions are warranted to protect and support these values. Mesa County Board of Commissioners recommends that no river or stream segment in Mesa County be found suitable.

5. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

Designation of the segment would not likely increase the cost of administering the segment for the protection of the ORVs. There is some potential for cost to increase due to the need for additional facilities to accommodate increased visitation. However as discussed below, the fish and wildlife ORVs already require special management practices pursuant to other federal statutes. The cost of administering this area pursuant to the WSRA is likely to be similar to the cost of administering these other management practices.

The BLM would not pursue land acquisition from willing sellers. Because the majority of the land within the segment corridor is privately owned, it would be difficult for the BLM to acquire enough additional land to affect the manageability of the segment. No detailed cost analysis or estimate was prepared as part of this study.

6. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM's land management authorities can adequately protect the federal lands in the river corridor, but BLM does not have the authority to protect ORVs on private lands in the corridor, nor does it have authority to protect the stream flows necessary to support the ORVs. Designation would provide a comprehensive framework for working with local governments to protect against land uses that are incompatible with the ORVs, and designation would also provide a federal water right that would assist with flow protection.

The makeup of this segment hinders the BLM's ability to manage it effectively as a WSR. First, the BLM-managed portions of the segment are somewhat fragmented. The BLM manages roughly a quarter-mile portion at the upstream end of the segment and another roughly quarter-mile portion after the river flows through a little over a mile of private lands. Then, the river flows another six miles through private lands before reaching the lower half of the segment, where the majority of the segment corridor is BLM-managed. Second, the majority of the shoreline and the segment corridor fall under private ownership. The BLM does not control uses or activities on private lands, making effective management of this segment difficult.

Mechanisms and management tools other than WSR designation can protect the segment's ORVs. The BLM's RMP revision process addresses protection of scenic values. The BLM also must comply with federal statutes, other than the WSRA, that address protection of the fish and wildlife values.

The BLM manages approximately 2,048 acres within the segment corridor as Visual Resource Management (VRM) Class II (De Beque Canyon). The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. This management prescription protects the scenic values along this segment.

Mechanisms are already in place that will adequately protect the wildlife values (bald eagles) in this segment. In 2007, the USFWS removed the bald eagle from the endangered species list

because its populations had recovered sufficiently. Nevertheless, the bald eagle still receives federal protection under the Bald and Golden Eagle Protection Act. Regulations issued under this Act establish a permit system to limit "take" of bald eagles, similar to the ESA. These regulations provide that take will only be authorized where it is compatible with the preservation of either of the eagle species—where take is consistent with the goal of stable or increasing breeding populations—or where take cannot be practicably avoided. Further, the Colorado Division of Wildlife recommends buffer zones and seasonal restrictions that apply to management actions occurring near bald eagle habitat. These include: (1) a year-round closure to surface occupancy within a quarter-mile radius of a nest; (2) a restriction on human encroachment from November 15 through July 31 within a half-mile radius of a nest; and (3) a restriction on activity within a quarter-mile radius of winter roosts between November 15 and March 15. The combination of these measures will prevent the foreclosure or diminishment of the wildlife values present in this segment.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow and the razorback sucker. Areas designated as critical habitat receive protection under Section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely on the provisions of the Colorado Endangered Fish Recovery Program to protect the Fish ORV.
2. BLM should continue to rely upon the special recreation management area (SRMA) designation to protect the scenic ORV. In addition, BLM should adopt VRM Level 2 restriction to protect the scenic ORV in the revised RMP.
3. BLM should use its authority to control land development along the river corridor to protect the wildlife ORV.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

7. Historical or existing rights that could be adversely affected with designation.

This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. Numerous absolute water rights exist along the Colorado River. Historical operation, maintenance, and access practices would be allowed to continue. While these rights would not be affected by designation of the segment, the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. A small portion of the segment is within the Planned Unit Development district. The Planned Unit Development district is intended to encourage innovative land planning and site design concepts that implement and are consistent with the Mesa County Master Plan (Mesa County 2008). The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008).

The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

9. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

10. Consistency of designation with other agency plans, programs, or policies.

The Colorado pikeminnow and razorback sucker are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b).

The Colorado River Valley and Kremmling Field Offices (Colorado) have found the Colorado River from the gauging station near the mouth of Gore Canyon within the Kremmling Field

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 85 of 499

Office to approximately one mile east of No Name Creek within the Colorado River Valley Field Office to be preliminary suitable for inclusion in the NWSRS in its draft plan and EIS.

In coordination with the Colorado River Valley Field Office, the White River National Forest has found two segments in Glenwood Canyon to be suitable for inclusion in the NWSRS in its draft plans and EIS.

The Moab Field Office (Utah) found the segment of the Colorado River from the Colorado/Utah border to Westwater Canyon not-suitable for inclusion in the NWSRS. However, it found the Colorado River from Westwater Canyon to the Boundary of Canyonlands National Park (approximately 91 river miles, 65.5 on BLM land) to be suitable for inclusion in the NWSRS (BLM 2008).

Designation of this segment would be consistent with the goals of the recovery plan and with the suitable segments listed above.

***Other Protections for Segment***

| **Colorado River Segment 1** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Fish, Wildlife | NSO (2,200 acres), CSU (1,200 acres), TL (1,600 acres), VRM Class II (2,000 acres), ROW Avoidance (2,100 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. The majority of lands in this segment corridor are privately owned, and the BLM has no control over activities on private lands. Further, the BLM-managed lands are fragmented within the segment. Mesa County zoning does not prevent development that is incompatible with WSR designation. The Agricultural, Forestry, Transitional district allows extractive uses (either as of right or conditionally) that have the potential to change the landscape and setting found along this segment. The city limits of De Beque also lie within the segment corridor. As the city expands, the possibility of development along this part of the corridor increases. The fish ORV in this segment appears to be sufficiently protected by the provisions of the ESA and by the Colorado River Recovery Program. The wildlife ORV appears to be sufficiently protected by the Bald and Golden Eagle Protection Act. The BLM concludes that this segment is not readily manageable as a Wild and Scenic River because of the land ownership pattern and county zoning. In addition, the ORVs are sufficiently protected by existing law.

BLM_0024351

### 3.1.2 Colorado River Segment 2

| | | | |
|---|---|---|---|
| **Description:** | BLM sections of the Colorado River downstream from the Grand Valley Diversion Dam to the Loma Boat Launch. | | |
| **Total Segment Length:** | 40.24 miles | **Total Segment Area:** | 12,897.11 acres |
| **Length on BLM Land :** | 1.31 miles | **Area on BLM Land:** | 533.25 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Fish | | |

***Suitability Factor Assessment***

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>

This segment has outstandingly remarkable fish values, which would make the segment a worthy addition to the NWSRS if designated. On the other hand, this segment has other characteristics that detract from its value as an addition to the NWSRS. The tentative classification for this segment is recreational due to Interstate 70 and a railroad, both of which run parallel to and are readily apparent from the river.

This segment has outstandingly remarkable fish values. The entire segment is USFWS-designated critical habitat for the federally endangered Colorado pikeminnow *(Ptychocheilus lucius)* and the Razorback sucker *(Xyrauchen texanus)* (59 Fed. Reg. 13,374). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico.

The James M. Robb Colorado River State Park is within the segment. Even though recreation was not determined to be an ORV within this segment, the park provides multiple opportunities for recreation, including camping, fishing, hiking, biking, and swimming.

The Grand Valley Project Diversion Dam forms the upstream terminus of the segment and diverts water from the Colorado River to irrigate approximately 33,368 acres of land in the Grand Valley (US BOR, no date). In addition to irrigation, project water is used for the generation of power. The Orchard Mesa Power Plant has produced power from its two 3,000 k/w generators since 1933, and the Cameo Power Plant, built by Public Service Company in the late 1950s, has used project water for cooling since it was constructed.

There are also characteristics that are unrelated to ORVs that affect the suitability of this segment. Numerous water diversions exist along this segment, including several conditional water rights. If made absolute, these water rights could result in additional depletions and additional water development and diversion structures along the private land in the corridor. Portions of the study area for this segment overlap the city limits of Palisade, Grand Junction,

and Fruita. The future population growth, expansion, and associated development of these communities, particularly along the riverfront, have the potential to change the setting found in this segment. Interstate 70 runs adjacent to the segment, and a railroad and power lines also are visible throughout the segment. Future expansion of the interstate, railroad, and transmission lines also have the potential to change the setting found in this segment. These characteristics somewhat detract from the value of the segment as an addition to the NWSRS.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 40.24-mile segment is a combination of federal (BLM), state, and private. The BLM manages shoreline along 1.31 miles (3.3 percent) of the segment. Within the 12,897.11-acre study corridor, the BLM manages 533.25 acres (4.1 percent). Another 11,052.63 acres (53.8 percent) are privately owned. The State of Colorado manages the remaining 1311.23 acres within the segment corridor. The Colorado Division of State Parks manages the James M. Robb Colorado River State Park. The Colorado Division of Wildlife manages various state wildlife areas (Horsethief, Tillman Bishop, and Walker).

Most of the BLM-managed lands in the study area are leased for oil and gas exploration, but there are no active wells within the study corridor. The mineral potential in this segment corridor is low to very low. There are no active mining claims in this segment corridor.

The BLM does not have authority over maintenance, operation, and construction activities associated with the highway and railroad. Activities associated with the highway and railroad are not likely to adversely impact the ORVs. The Department of Transportation, pursuant to the Federal-Aid Highway Act and section 4(f) of the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to impact future water development along this segment. With designation, BLM would obtain authority to place terms and conditions on or deny approval for any proposed projects on BLM lands that would be incompatible or potentially degrade to ORVs for this segment. Other federal agencies that consider proposed projects that require federal permits, licenses, or funds would be required to evaluate the potential effects on the segment's ORVs, and prevent significant impacts to ORVs, free-flowing nature, or water quality. However, the Colorado Statewide Water Supply Initiative concluded that Mesa County would be able to meet estimated demand for water in the Colorado River basin through 2030 by utilizing existing supplies, agricultural transfers, Ruedi and Wolford Reservoir contracts, and Jerry Creek Reservoir. (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004)

Several conditional storage water rights have the potential to impact values along this segment. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The combined volume of conditional storage rights in the Colorado River basin in Colorado totals almost 3 million acre-feet. Water District 70 alone (Roan Creek Basin) has approximately 560,000 acre-feet of conditional storage rights. The majority of which have priority dates ranging from 1960-1980, with some as early as 1940-1960 (SWSI). The development of conditional water rights both along the segment and upstream from the segment has the potential to impact the fish values along this segment.

Presently, there are no state-based instream flow water rights in this reach to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flows derive from required deliveries to downstream senior water rights, contractual water deliveries from Green Mountain, Ruedi, and Wolford Mountain Reservoirs, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9). The USFWS has developed flow recommendations for the Colorado River to benefit endangered fish. Flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth and survival of young fish. Although there is no instream-flow right along this segment, USFWS flow recommendations provide a layer of protection for the ORVs.

The Colorado River Recovery Program functions to insure that adequate flow regimes exist to support the four threatened and endangered fish species in the Colorado River as further water development proceeds. In addition, the program implements programs to improve fish habitat and reduce competition from non-native species. These measures are likely to maintain the fish ORV. Designation of this reach into the NWSRS, which would include a federal reserved water right, is unlikely to provide greater protection. The federal reserved water right would be very junior, and could not be used to prevent the exercise of previously decreed conditional or absolute water rights.

4. <u>Federal, state, tribal, local, public, or other interest in designating or not designating the river.</u>

The State of Colorado, water districts, user groups, and individuals have expressed concern about the impact of designating this segment on current and future upstream and downstream water projects. However, they also recognize that this segment supports a high number of

ORVs and that some special management provisions are warranted to protect and support these values. Mesa County has not made a formal indication to the BLM as to whether it is interested in supporting designation.

5. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The vast majority of land in this segment is privately owned. The BLM would not pursue land acquisition from willing sellers, as it is not feasible to acquire enough land to affect its ability to manage the segment. Designation of the segment would not likely increase the cost of administering the segment for the protection of the ORV. The cost of administering the area pursuant to the WSRA would likely be similar to the current cost of administering the area under the ESA for the endangered fish species. No detailed cost analysis or estimate was prepared as part of this study.

6. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM's land management authorities can adequately protect the federal lands in the river corridor, but the BLM does not have the authority to protect ORVs on private lands in the corridor, nor does it have authority to protect the stream flows necessary to support the ORVs. Designation would provide a comprehensive framework for working with local governments to protect against land uses that are incompatible with the ORVs. Designation also would provide a federal water right that would assist with flow protection.

The makeup of this segment hinders the BLM's ability to manage it effectively as a WSR. As stated above, the BLM manages a very small percentage of the shoreline along this segment (3.3 percent) and a very small percentage of the land in the segment corridor (4.1 percent). The BLM-managed lands in the segment corridor are extremely scattered as well. Some are located are the upstream end of the segment, and the remainder are located at the downstream end of the segment, with the urban corridor of Palisade, Grand Junction, and Fruita in between. The scattered nature and small proportion of BLM-managed lands in this segment corridor make it difficult for the BLM to exercise effective management control over this segment.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow and the razorback sucker. Areas designated as critical habitat receive protection under section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir

enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely on the provisions of the Colorado Endangered Fish Recovery Program to protect the Fish ORV.

Based on this recommendation, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

7. Historical or existing rights that could be adversely affected with designation.

This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. Numerous absolute water rights exist along the Colorado River. Historical operation, maintenance, and access practices would be allowed to continue. While these rights would not be affected by designation of the segment, the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORV.

9. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4

10. Consistency of designation with other agency plans, programs, or policies.
The Colorado pikeminnow and razorback sucker are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b).

The Colorado River Valley and Kremmling Field Offices (Colorado) have found the Colorado River from the gauging station near the mouth of Gore Canyon within the Kremmling Field Office to approximately one mile east of No Name Creek within the Colorado River Valley Field Office to be preliminarily suitable for inclusion in the NWSRS in the Draft Plan and EIS.

In coordination with the Colorado River Valley Field Office, the White River National Forest has found two segments in Glenwood Canyon to be preliminarily suitable for inclusion in the NWSRS.

The Moab Field Office (Utah) found the segment of the Colorado River from the Colorado/Utah border to Westwater Canyon not-suitable for inclusion in the NWSRS. However, it found the Colorado River from Westwater Canyon to the Boundary of Canyonlands National Park (approximately 91 river miles, 65.5 on BLM land) to be suitable for inclusion in the NWSRS (BLM 2008).

Designation of this segment would be consistent with the goals of the recovery plan and with the suitable segments listed above.

***Other Protections for Segment***

| **Colorado River Segment 2** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish | NSO (100 acres), CSU (100 acres), VRM Class II (100 acres), ROW Avoidance (100 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable**. The vast majority of lands in this segment corridor are not managed by the BLM (over 90 percent), and the BLM has no control over activities on private lands. With management control over such small portion of the lands in this segment corridor, it would be difficult for the BLM to effectively manage this segment as a WSR. For example, Mesa County zoning does not prevent development that is incompatible with WSR designation. The Agricultural, Forestry, Transitional district allows extractive uses (either as of right or conditionally) that have the potential to change the landscape and setting found along this segment. This segment flows through the growing urban corridor of the Grand Valley. The city limits of Palisade, Grand Junction, and Fruita overlap the segment corridor. As these cities continue to grow, the potential for incompatible development in the segment corridor will correspondingly increase. There are also numerous diversions along this segment. Designation of this segment could affect the ability of water users to make changes to existing

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 92 of 499

water rights.. The fish ORV in this segment appears to be sufficiently protected by the provisions of the ESA and by the Colorado River Recovery Program. The BLM concludes that this segment is not readily manageable as a Wild and Scenic River because of the land ownership pattern and county zoning. In addition, the ORVs are sufficiently protected by existing law.

### 3.1.3 Colorado River Segment 3

| | | | |
|---|---|---|---|
| **Description:** | BLM sections of the Colorado River from the Loma Boat Launch to the Colorado/Utah border. | | |
| **Total Segment Length:** | 20.91 miles | **Total Segment Area:** | 6,798.10 acres |
| **Length on BLM Land :** | 19.14 miles | **Area on BLM Land:** | 5,771.92 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Scenic, Recreation, Fish, Wildlife, Geologic, Historic | | |

***Suitability Factor Assessment***

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
This segment has outstanding scenic, recreational (floatboating and biking), fish, wildlife, geologic, and historical values. This combination of values is similar to other major rivers segments in the western US that have been designated into the NWSRS. Each of these values is discussed below. The tentative classification of this segment is scenic. There are a few private in-holdings with developments, several access points to the river via dirt roads, and a mostly inconspicuous stretch of railroad runs through Ruby Canyon.

This segment has outstandingly remarkable scenic values. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). The Colorado River provides remarkable views of the shear walls of Ruby and Horsethief Canyons and the many side canyons, alcoves, pinnacles, amphitheaters, and other unique sandstone formations formed by the erosional forces of the river. The many different exposed layers show a wealth of geologic history and offer a variety of different colors and textures throughout the canyons. The segment also offers opportunities to view rare species and examine petroglyphs.

This segment has outstandingly remarkable recreational values. The stretch of river is popular for overnight flat-water boating and attracts rafters, kayakers, and canoeists from across Colorado and from nearby states. Water levels are sufficient to permit water recreation throughout the year, an uncommonly long season for watercourses in this region. This segment also contains a trailhead for Kokopelli's Trail, a popular mountain bike route that runs to Moab, Utah. This trail runs above the Colorado River along the top of the wall that forms the inner part of Horsethief Canyon. It recognized worldwide for its spectacular views of the river and surrounding areas. The Mack Ridge mountain bike area contains additional trails with sections running above the canyon walls and immediately above the river.

BLM_0024358

This segment has a history of significant use by sportsmen and sportswomen who utilize this area. The Loma Boat Ramp, which provides primary access to this segment, is a CPW facility. Power boats have been in use on this segment prior to rafting becoming a popular sport. PUC permits were issued in the 50s and 60's specifically for tourist transport and hunting by motorboat on this water way. This water way is a navigable waterway for motorized traffic and has historically been so.

This segment also has outstandingly remarkable fish values. The entire segment is USFWS-designated critical habitat for the federally endangered Colorado pikeminnow *(Ptychocheilus lucius)* and the Razorback sucker *(Xyrauchen texanus)* (59 Fed. Reg. 13,374). The section from Black Rocks to the Colorado/Utah border is also designated critical habitat for humpback chub *(Gila cypha)* and bonytail chub *(Gila elegans)*, also federally endangered species (59 Federal Register 54 [21 March 1994], pp. 13374-13399). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. A site near the Colorado/Utah border has been identified as a spawning site for this species. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico. The humpback chub owes its name and striking, unusual appearance to a pronounced hump located behind its head. It historically inhabited the canyons of the Colorado River, can live for more than thirty years, and can grow up to nearly twenty inches. The bonytail chub is the rarest of the endangered fish species in the Colorado River. They can grow to twenty-two inches or more and can live for nearly fifty years. The Black Rock section of the river is a spawning ground for both species of chub and is an important study site where the USFWS have recorded both species.

This segment has outstandingly remarkable wildlife values. Specifically, the segment contains important winter habitat and nests for several pairs of bald eagles *(Haliaeetus leucocephalus)*, a State Threatened Species in Colorado (CPW 2008). Bald eagles no longer receive protection under the ESA. The USFWS delisted bald eagles in June 2007 because their populations have recovered sufficiently. Nevertheless, bald eagles still receive some protection under the Bald and Golden Eagle Protection Act. River otters *(Lontra Canadensis)*, a state threatened species in Colorado, are also frequently observed along this segment.

This segment has outstandingly remarkable historical values as well. The Denver and Rio Grande Railroad (now part of Union Pacific) runs parallel to the segment. This came as a result of the rerouting the Grand Junction to Salt Lake City line and the replacement of a southern route from Denver to Salt Lake City through Montrose. The importance of the railroad in developing the West makes this site eligible for inclusion in the National Register of Historic Places and a site of national, regional, and local significance.

Lastly, this segment is outstandingly remarkable for its geological values. The steep and deep canyons along this segment expose an unusually extensive series of rocks from the recent

Mancos Shale to the extremely old Precambrian formations (overlaid by the Chinle formation as an unconformity). There are also several examples of faults that are free of vegetation that allow visitors to clearly view evidence of geologic processes.

Although the river is not located within the boundaries of the McInnis Canyons NCA (formerly known as the Colorado Canyons NCA), the NCA is located on both sides of the river above the line of the 100-year floodplain. In addition, the Black Ridge Canyons Wilderness is visible from the south bank of the river. Congress designated the NCA in 2000 "to conserve, protect, and enhance for the benefit and enjoyment of present and future generations the unique and nationally important values … including geological, cultural, paleontological, natural, scientific, recreational, environmental, biological, wilderness, wildlife education, and scenic resources of such public lands." The legislation also directed BLM to manage the river in a manner consistent with the protecting the values recognized by Congress for lands within the NCA.

2. <u>The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.</u>

Land ownership for this 20.91-mile segment is a combination of federal (BLM), CPW, and private. The BLM manages shoreline along 19.14 miles (91.5 percent) of the segment. Within the 6,798.10-acre study corridor, the BLM manages 5,771.92 acres (84.9 percent). Another 792.96 acres (11.7 percent) are privately owned. CPW manages the remaining land within the study corridor as part of the Horsethief State Wildlife Area (168.12 acres; 2.5 percent).

The Colorado Canyons National Conservation Area and Black Ridge Canyons Wilderness Act of 2000 (Public Law 106-353 [October 24, 2000]) formally withdrew all BLM lands within the segment study area from location, entry, and patent under the mining laws, and operation of the mineral leasing, mineral materials, and geothermal leasing laws. The withdrawal recognizes valid existing rights (those leases or operations existing prior to October 24, 2000). There are no known valid existing rights related to mining in the segment corridor.

Livestock grazing occurs on the private parcels within the segment corridor, as well as on some BLM parcels. Grazing appears to be commensurate with the protection of the ORVs.

The BLM does not have authority over maintenance, operation, and construction activities associated with the highway and railroad. Activities associated with the highway and railroad are not likely to adversely impact the ORVs. The Department of Transportation, pursuant to the Federal-Aid Highway Act and section 4(f) of the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3. <u>Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.</u>

This segment flows through McInnis Canyons NCA and borders Black Ridge Canyon Wilderness. Designation of this segment would provide permanent protection and management

direction for BLM lands along the river corridor that are not presently within the NCA. Congress designated the NCA to conserve, protect, and enhance its geological, recreational, biological, wilderness, and scenic values, among others. These values parallel the ORVs found in this segment: scenic, recreation, fish, wildlife, geologic, and historic. Designation of this segment would provide complementary protective management.

WSR designation has the potential to foreclose or curtail future water development along this segment. With designation, BLM would obtain authority to deny or place terms and conditions on proposed projects located on BLM lands that would be incompatible or would potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the designated river segments.

This segment contains undeveloped conditional water rights, including some large water rights for industrial and commercial uses, but there are no known conditional water rights for municipal water supply or agricultural water supply purposes. The Colorado Statewide Water Supply Initiative concluded that Mesa County would be able to meet estimated demand for water in the Colorado River basin through 2030 by utilizing existing supplies, agricultural transfers, Ruedi and Wolford Reservoir contracts, and Jerry Creek Reservoir (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004).

Conditional storage water rights upstream from this segment have the potential to affect the flow rates that support the ORVs in this segment. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The combined volume of conditional storage rights in the Colorado River basin in Colorado totals almost 3 million acre-feet. Water District 70 alone (Roan Creek Basin) has approximately 560,000 acre-feet of conditional storage rights, the majority of which have priority dates ranging from 1960-1980, with some as early as 1940-1960 (SWSI).

Interstate compacts place limitations on water use in Colorado. The Colorado River Compact of 1922 divides the Colorado River Basin into the Lower Basin and the Upper Basin. Colorado lies in the Upper Basin; the water available to the Upper Basin is further allocated among Colorado, Utah, Wyoming, and New Mexico by the Upper Colorado River Compact of 1948. The State of Colorado's right to consumptive use of water under the Compacts ranges from 3.079 million AF to 3.855 million AF. Colorado currently consumes an average of 2.3 million AFY with facilities in place to use up to 2.6 million AFY (SWSI 4-4). A draft water availability study conducted by the Colorado Water Conservation Board (CWCB) includes estimates that the volume of water remaining for future development within Colorado from the Colorado River system ranges from 0 acre feet to 1 million acre feet annually, depending upon future climatic conditions (CWCB 2010). However, this study does not allocate or estimate the specific volume available for future development on the Colorado River, as opposed to other

Colorado River tributaries, such as the Yampa River or White River. Accordingly, it reasonable to expect that substantial water deliveries to downstream states will continue through this segment, but it is not possible to accurately estimate the long-term flow rates that can be expected.

This segment lies immediately upstream of the Colorado/Utah border. It is downstream from the majority of senior water rights in the state. Because of these two circumstances, it represents an opportunity to develop and divert unused water allocated to Colorado under the Compacts before it leaves the state. For example, Phase II of the Statewide Water Supply Initiative analyzed the concept and feasibility of such a major diversion, calling it the Colorado River Return Project (CRRP). The CRRP would consist of a diversion from the Colorado River near the Utah state line downstream of Grand Junction for delivery to multiple basins in Colorado (areas in the headwater of the Colorado River and the Front Range). The water would be diverted under a new water appropriation. The CRRP identified and evaluated three levels of water diversion: 250,000, 500,000, and 750,000 AFY. The CRRP identified two potential diversion areas, both of which lie within this segment corridor: (1) at the confluence of the Colorado River and Salt Creek in Horsethief Canyon and (2) at the upstream end of Horsethief Canyon near the existing Loma Boat Launch. The CRRP was only a reconnaissance-level investigation, and as such, it not assumed to be a reasonably foreseeable potential use of the land at this time. Nevertheless, the CRRP serves as an example of the potential for additional future depletions of water from this segment. While any similar project would have to comply with the requirements of the ESA and similar statutory requirements, there is still the potential for reduced flow and impacts on this segment's ORVs. This type of project likely would be curtailed or foreclosed if the segment was designated.

Presently, there are no state-based instream flow water rights in this segment to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flow rates are the result of required deliveries to senior irrigation water rights located in the Grand Valley and the substantial return flows that accrue to this stream segment from those irrigation systems. Flow rates are also influenced by contractual water deliveries from Green Mountain, Ruedi, and Wolford Mountain Reservoirs to water users in this segment, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9).

The USFWS has developed flow recommendations for the Colorado River to benefit endangered fish, and these recommendations provide a substantial layer of protection for the ORVs in this segment. The flow recommendations are administered at the US Geological Survey gage near the Utah-Colorado border, which is located within this segment. The flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 97 of 499

and survival of young fish. Any proposed water development project within the segment that would require a federal permit, such as land use authorization from BLM and/or a dredge and fill permit from the US Army Corps of Engineers, would be required to go through an ESA Section 7 consultation with the USFWS. The USFWS consultation process would insure that the proposed project would not significantly impact the State of Colorado's ability to meet the flow recommendations for this stream reach.

4. Federal, state, tribal, local, public, or other interest in designating or not designating the river.

The State of Colorado, water districts, user groups, and individuals have expressed concern about the impact of designating this segment on current and future upstream water projects. However, they also recognize that this segment supports a number of ORVs and that some special management provisions are warranted to protect and support these values. Mesa County has not made a formal indication to the BLM as to whether it is interested in supporting designation.

5. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering the area if designated would not likely increase above current levels because the management, and thus the associated costs, of administering the area pursuant to the NWSRS would be similar to the current administration of the area. For example, recreational use of the segment is already high. The BLM already conducts regular ranger patrols and maintains campsites within this segment to accommodate the level of usage. The cost of maintaining and administering these facilities would continue regardless of designation.

The BLM would pursue land acquisition only from willing sellers as funds and opportunities arise in order to better manage the area for the protection of the ORVs. Designation of the segment would likely enhance the BLM's ability to obtain funding for such acquisitions, and acquisitions would enhance the BLM's ability to manage the segment. No detailed cost analysis or estimate was prepared as part of this study.

6. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM's land management authorities can adequately protect the federal lands in the river corridor, but BLM does not have the authority to protect ORVs on private lands in the corridor, nor does it have authority to protect the stream flows necessary to support the ORVs. However, the BLM is the majority landowner for this segment (9.15 percent of the shoreline and 84.9 percent of land in the segment corridor, which would facilitate effective and cohesive management of the segment if designated. Designation would provide a comprehensive framework for working with local governments agencies, state agencies, and other federal government agencies to protect against proposed land use and project that are incompatible with the ORVs. Designation would provide a federal water right that would assist with flow protection, but the water right would be an extremely junior water right. Accordingly, the water right would have limited effectiveness in insuring that flow rates through the segment are sufficient for the ORVs, but it would provide the BLM with an opportunity to object to new

BLM_0024363

water rights and changes in water rights that would substantially impact the flow rates available to protect the ORVs.

This segment runs through the McInnis Canyons NCA and Black Ridge Canyons Wilderness and management of the NCA and Wilderness is commensurate with protection of the ORVs. BLM wilderness areas are managed according to BLM Manual 8560, *Management of Designated Wilderness Areas* (BLM 1983). Wilderness areas allow for continued use of valid existing rights (i.e., rights or activities that existed when the area became a wilderness study area [WSA]).

The BLMs VRM system provides a mechanism to protect the scenic values along this segment. The BLM manages the river corridor VRM Class I on the south side of the river and VRM Class II on the north side of the river (BLM 2004). The objective of VRM Class I is to preserve the existing character of the landscape. The level of change to the characteristic landscape should be very low and must not attract attention. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. This management prescription protects the scenic values along this segment and also provides some indirect protection of the geologic values.

Historical values associated with the river segment are protected and regulated by a number of laws, regulations, executive orders, programmatic agreements, and other requirements. The principal federal law addressing cultural resources is the NHPA, and it's implementing regulations (36 CFR 800). These regulations, commonly referred to as the Section 106 process, describe the procedures for identifying and evaluating historic properties, for assessing the effects of federal actions on historic properties, and for project proponents consulting with appropriate agencies to avoid, reduce, or minimize adverse effects.

Mechanisms are already in place that will adequately protect the wildlife values (bald eagles) in this segment. In 2007, the USFWS removed the bald eagle from the endangered species list because its populations had recovered sufficiently. Nevertheless, the bald eagle still receives federal protection under the Bald and Golden Eagle Protection Act. Regulations issued under this Act establish a permit system to limit "take" of bald eagles, similar to the ESA. These regulations provide that take will only be authorized where it is compatible with the preservation of either of the eagle species—where take is consistent with the goal of stable or increasing breeding populations—or where take cannot be practicably avoided. Further, the Colorado Division of Wildlife recommends buffer zones and seasonal restrictions that apply to management actions occurring near bald eagle habitat. These include: (1) a year-round closure to surface occupancy within a quarter-mile radius of a nest; (2) a restriction on human encroachment from November 15 through July 31 within a half-mile radius of a nest; and (3) a restriction on activity within a quarter-mile radius of winter roosts between November 15 and March 15. The combination of these measures will prevent the foreclosure or diminishment of the wildlife values present in this segment.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow, razorback sucker, bonytail chub, and

humpback chub. Areas designated as critical habitat receive protection under section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. Congress should implement amendments to the existing legislation that created the McInnis Canyons NCA, so that the legislation better protects ORVs associated with the Colorado River. The legislation should specifically address boundary adjustments that are needed to better manage the river corridor for recreation and administrative access. The legislation should also permanently release this segment from future consideration under the WSR Act.
2. Retain the current mineral withdrawal associated with the NCA, and implement VRM Level I restrictions in the revised RMP to protect the scenic ORV and geological ORV.
3. Implement recreational permitting and enforcement, along with limiting recreation travel to designated roads and trails, to protect the recreational ORV.
4. Continue to work with the Upper Colorado River Endangered Fish Recovery Program to protect the fish ORV.
5. Continue to use the National Historic Preservation Act to protect the historical ORV.

The McInnis Canyons NCA boundary changes proposed by the stakeholder group have not yet been implemented.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

7. Historical or existing rights that could be adversely affected with designation.
This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct

new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. Numerous senior, absolute water rights exist along the Colorado River. While these rights would not be affected by designation of the segment, the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

9. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

10. Consistency of designation with other agency plans, programs, or policies.

The Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b).

The Colorado River Valley and Kremmling Field Offices (Colorado) have found the Colorado River from the gauging station near the mouth of Gore Canyon within the Kremmling Field Office to approximately one mile east of No Name Creek within the Colorado River Valley Field Office to be preliminarily suitable for inclusion in the NWSRS, as part of the draft RMP (BLM 2011).

In coordination with the Colorado River Valley Field Office, the White River National Forest has found two segments in Glenwood Canyon to be preliminarily suitable for inclusion in the NWSRS (U.S. Forest Service 2011).

The Moab Field Office (Utah) found the segment of the Colorado River from the Colorado/Utah border to Westwater Canyon not-suitable for inclusion in the NWSRS. However, it found the Colorado River from Westwater Canyon to the Boundary of Canyonlands National Park (approximately 91 river miles, 65.5 on BLM land) to be suitable for inclusion in the NWSRS (BLM 2008).

Designation of this segment would be consistent with the goals of the recovery plan and with the suitable segments listed above.

***Other Protections for Segment***

| **Colorado River Segment 3** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Recreation, Fish, Geological, Wildlife, Historic | VRM Class I and II, Withdrawn from Mineral Entry, Wilderness, NCA Management |

***Suitability Determination***

The determination for this segment is **not suitable**. Only about 11 percent of the land in the segment corridor is privately owned, so there is limited potential for development that would be incompatible with the ORVs. Flows receive substantial protection from the Colorado River Recovery Program despite the lack of a state-based instream flow water right. Despite the existence of conditional water rights in the segment, the land use plan management prescriptions for BLM lands both within and outside McInnis Canyons NCA would prohibit BLM from authorizing water development projects that would dam the segment or export major volumes of water from the segment. The presence of the McInnis Canyons NCA along both sides of the river provides substantial protection to the ORVs that are reliant upon lands adjacent to the river, such as scenic and recreation. For lands along this river corridor that are not presently within the NCA boundaries, proposed management prescriptions in the RMP revision would be sufficient to protect the geological, scenic, recreation, and historical ORVs. The Fish ORV can be successfully managed by continued cooperation and compliance with the Colorado River Endangered Fish Recovery Program. The BLM concludes that land management prescriptions in this RMP revision, combined with land management prescriptions in the McInnis Canyons NCA approved RMP, are sufficient to protect the ORVs that occur in the river corridor. In addition, the BLM concludes that flows in this segment, along with the fish ORV, are already protected by the Endangered Species, working through the Colorado River Recovery Program.

BLM_0024367

## 3.2 Dolores River Watershed

### 3.2.1 Dolores River

| | | | |
|---|---|---|---|
| **Description:** | Sections of the Dolores River on BLM land from where the river enters the GJFO at the southwest border and then running parallel to Highway 141, through Gateway, until the river reaches the Colorado/Utah border. | | |
| **Total Segment Length:** | 32.01 miles | **Total Segment Area:** | 9,918.91 acres |
| **Length on BLM Land :** | 18.62 miles | **Area on BLM Land:** | 7,041.19 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Scenic, Fish, Recreation, Geologic, Paleontological | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

The Dolores River has outstandingly remarkable scenic, recreational, geological, and paleontological values. Each of these ORVs are discussed in detail below. The tentative classification for this segment is recreational because Highway 141 parallels the river and is fairly obvious along stretches of the river corridor.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). The Dolores River has formed a spectacular canyon, with cliffs sometimes up to 2000 feet higher than the river, with many geologic layers exposed. The variety of different colors including deep reds, purples, and lighter earth tones are in stark contrast to the green riparian vegetation along the river. The cottonwoods along the river and the river itself change color seasonally adding to the scenic beauty. Portions of the segment adjacent to the Sewemup Mesa Wilderness Study Area and The Palisade Wilderness Study are heavily influenced by the stunning uplift of canyon walls and cliffs from the river corridor.

This segment has outstandingly remarkable recreational value. The scenic and geologic values readily visible from the river make this segment of the Dolores a popular boating destination. During the spring runoff and the summer, the segment is popular with canoeists, kayakers, and rafters. This segment parallels Highway 141, part of the Unaweep-Tabequache Scenic and Historic Byway, offering opportunities for vehicular recreation, picnicking, camping, and viewing of the wildlife and geologic features of the river canyon. Though the Dolores River receives less use than the Gunnison River and Colorado River Segment 3, the segment is seeing an increase in recreational use. The segment offers challenging whitewater rapids between late April and early June during high water years. Flows are affected by releases from the McPhee Reservoir and are sometimes unpredictable. There are no official boat launches along the segment on BLM land, though on unofficial boat launch is located at the county highway property on Highway 141

near Gateway. The launch is suitable for trailer and raft use, although the most traffic is by kayak or canoe.

This segment also has outstandingly remarkable geologic value. The Dolores River has exposed and extensive sequence of rocks including additional layers not found farther north along the Colorado River. Additional Permian and Triassic layers including the Cutler and Moenkopi formations are found between the Precambrian bedrock (not exposed) and the Chinle formation. This wide range allows one to examine many of the important layers for the Colorado Plateau.

This segment has outstandingly remarkable paleontological value. Along this segment of the Dolores River are rock slabs containing dinosaur and ancient mammal footprints. Although full surveys have not been completed, there are hundreds of fossilized footprints and track ways, and there likely may be more than 1000 tracks along the river.

The segment has outstandingly remarkable fishery value. Colorado Division of Wildlife (currently Colorado Parks and Wildlife) provided the BLM with additional data following the completion of the Eligibility Study that the Dolores River supports a native fish population that meets the guidelines for evaluating ORVs as described in the BLM Manual 8351.

Overall, this segment is unique and exemplary among streams in the Colorado Plateau region because it supports a high number of outstandingly remarkable values. Wild and Scenic River designation is a framework that can be effectively used to management multiple ORVs in a comprehensive and integrated manner, and it provides comprehensive standards for preventing degradation to the ORVs.

This segment also possesses characteristics in addition to its ORVs that would add to its value as a component of the NWSRS, if designated by Congress. The river segment generally borders, and the study area, which extends 0.25-mile on either side of the river, includes portions of two WSAs: The Palisade (170.66 acres) and Sewemup Mesa (930.99 acres). The segment study area also includes a portion of two areas of critical environmental concern (ACECs): The Palisade Outstanding Natural Area/ACEC (70.02 acres) and the Dolores River Riparian ACEC (3170 acres). The BLM has proposed to expand The Palisade outstanding natural area and ACEC to provide special management attention for its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values. The BLM has proposed the Dolores River Riparian ACEC to provide special management attention to its fish (bluehead sucker), wildlife (peregrine falcon), scenic, and riparian habitat values.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 32.01-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 18.62 miles (58.1 percent) of the segment. Within the 9,918.91-acre study corridor, the BLM manages 7,041.19 acres (70.1 percent). The remaining 2,877.72 acres (29.9 percent) are privately owned.

The percentage of lands under federal ownership is the highest in the portions of the river segment that are adjacent to the Sewemup Mesa WSA (9% private, 91% BLM) and The Palisade

WSA (26% private, 74% BLM). In these portions of the segment, the river corridor is characterized by a low level of development and largely natural conditions, with the exception of roads and highways along the river.

In the middle of the segment, from approximately the confluence with Cottonwood Canyon to 2.5 miles northwest of Gateway, the percentage of private land ownership exceeds 75% (55% private, 45% BLM). In this portion of the segment, land use is dominated by low intensity agriculture, low-density residential development, and the small community of Gateway. Under the Mesa County zoning for these private lands, development can occur that may be incompatible with maintenance of the outstandingly remarkable values. See Factor #7 for a full discussion of county zoning.

The BLM-managed lands west of The Palisade WSA are leased for oil and gas development. There are no active wells in the segment corridor. There is no oil and gas potential on the BLM-managed lands in the segment corridor. There are several active mining claims in the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or to impose terms and conditions on any proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segments values. Water diversion and conveyance structures that are already in existence on BLM lands could continue to operate historical operation, maintenance, and access practices. Increased water demands in this segment, such as demand associated with the expansion of Gateway Canyons resort, appear to be small in volume relative to the volume of water available in the river. It is unknown whether future water supply projects associated with Gateway Canyons would require BLM land use authorization or federal permits.

Recreational uses within the segment are not likely to be affected by designation under a tentative "recreational" classification. The tentative "recreational" classification would allow development on BLM lands within the corridor that is consistent with the recreation ORV, such as trails, boat ramps, campgrounds, and interpretive kiosks.

Agricultural uses on private lands within the river are not likely to be significantly affected by designation. Designation would not give BLM authority to manage agricultural and other land use practices on private lands, because such as authority would remain under local government control. If agricultural users require a federal permit to implement a project on private lands, such as a dredge and fill permit from the US Army Corps of Engineers, the project would have to be compatible with the ORVs identified for this segment. Since the tentative classification of the segment is "recreational," a broad variety of development projects could be considered as compatible with the ORVs.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as recreational, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

As discussed below, existing mechanisms and management tools would reduce the potential for adverse effects on the ORVs in this segment if it were not designated.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

There is likely to be some increased cost of administering the area if designated. Currently, there are no recreation facilities designed to meet the needs of users. Additional infrastructure and maintenance resources would be required to accommodate the increased visitation that would likely result from designation. Facilities that may be required on BLM lands include boat ramps, campgrounds, interpretation sites, trailheads, and trails. However, increased usage that is already occurring within the river corridor will require BLM to expend resources to provide facilities and manage use to minimize impacts on resources. Given that increased visibility for the Gateway area has already increased visitation, it is impossible to accurately predict the volume and timing of increased visitation. However, it is likely that designation would result in additional funding to address current and future recreation demands.

The BLM would pursue land acquisition from willing sellers as funds and opportunities arise in order to better manage the area for the protection of the ORVs. Designation of the segment would enhance the BLM's ability to obtain funding for such acquisitions, and acquisitions would enhance the BLM's ability to manage the segment. At this time, BLM does not consider any land acquisitions as essential for the management of a designated river corridor, so no detailed cost analysis or estimate was prepared as part of this study.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

Two of the identified ORVs, recreation and fish, are highly dependent on adequate flow rates for the continued existence and quality of the ORVs. Flow rates in this river segment are driven primarily by water operations on two upstream river segments. The segment receives flows from the San Miguel River, which is largely unregulated and has a natural flow regime. During much of the year, flows from the San Miguel River provide the majority of the flow within this segment. Flows in this segment are also affected by releases from McPhee Reservoir, located on the upper Dolores River near Cortez, Colorado. This project diverts approximately two thirds of the flow of the upper Dolores River out of the basin. The upper Dolores River contributes significantly to flows in this segment when spills occur, typically during snowmelt runoff, but it contributes only small percentages of flow, typically ranging from 20 to 78 cubic feet per second (cfs), when the reservoir is releasing water from its conservation pool.

At the present time, there is no state-based instream flow protection for this river segment. However, in March 2014, the Colorado Water Conservation Board (CWCB) voted to make an appropriation of an instream flow water right, based upon flow rate recommendations developed by the BLM and Colorado Parks and Wildlife. In January 2015, after an extended public comment period, the CWCB is scheduled to vote on whether to finalize this

appropriation and direct the Colorado Attorney General to file a water right application with the Colorado water court system for an instream flow right.

If the water court decrees the timing, flow rates, and locations appropriated by the CWCB at its March 2014 board meeting, the BLM would have assurance that the flow rates needed for continued existence of the fishery values would continue. In addition, the BLM has determined that the appropriated flow rates are sufficient to continue to support the recreational ORV, even though the appropriated flow rates were based upon flow needs for fish populations. Finally, the 2015 priority date associated with the CWCB appropriation is likely to be more senior than a federal reserved water right associated with a designated segment. The CWCB right would be more senior because the federal reserved water right would not be created until Congress designates the segment into the National Wild and Scenic River System, which may not occur or may not occur for many years.

Recreation management is challenging, because there are no facilities designed to meet the activity demands of the users. Additional infrastructure and maintenance resources would be required to meet the additional recreation demand created by residents and travelers. Designation of the river corridor would assist BLM in competing for funds to manage the presently high level or recreational usage and additional recreational use that could occur with designation.

The high percentage of BLM-managed land in the portions of the segment adjacent to Sewemup WSA and The Palisade WSA would facilitate recreational management of the segment as a WSR, because there is unlikely to be conflicts with private landowners associated with access to the river and adjacent lands. However, the middle section of the segment, between Cottonwood Canyon and 2.5 miles northwest of Gateway, would present more challenges for access management because of the intermix of private and public lands. In the middle section, there is potential for cooperation between private and public land owners to manage increased recreational use, but there is no guarantee that all private landowners would be interested in cooperative management measures. As mentioned above, designation of the river segment would likely provide additional resources to the BLM to create designated access points and to provide information to users about avoiding trespass on private lands.

Paleontological values associated with the river segment are protected and regulated by the BLM primarily under the Paleontological Resources Preservation Act, the Federal Land Policy and Management Act of 1976, the National Environmental Policy Act of 1969, other federal regulations, and BLM orders. Pursuant to the Federal Land Policy and Management Act of 1976, the BLM has issued regulations that provide additional protection. Section 8365.1-5 of Title 43 of the CFR prohibits removing any scientific resource or natural object without authorization. There are exceptions to this prohibition for small quantities of common invertebrate fossils and petrified wood. The BLM manages paleontological resources for their scientific, educational, and recreational values and to ensure that any impacts are mitigated. The primary objective of managing paleontological resources is scientific research. Paleontological resources may only be disturbed or removed in conjunction with scientific research and only upon the issuance of prior written authorization of the disturbance or removal activity. BLM Manual Section 8270, *Paleontological Resource Management* (BLM 1998), provides specific guidance.

The portion of the segment corridor upstream from Gateway overlaps the Dolores River Riparian ACEC. Also, the portion of the segment corridor downstream from Gateway overlaps the Palisade ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. Management actions of the Dolores River Riparian ACEC include: (1) manage as VRM Class II; (2) only allow vegetation treatments for the benefit of the identified relevant and important values (riparian, hydrology, scenic, paleontological, and special status species); (3) designate as ROW avoidance area; and (4) open to livestock grazing. Management actions of the Palisade ACEC include: (1) no allowable timber harvest; (2) designate as a ROW avoidance area (including renewable energy sites such as solar, wind, hydro, and biomass development); (3) open to livestock grazing; (4) withdraw from mineral entry, close to mineral material sales, and classify as unsuitable for coal leasing; and (5) withdraw from mineral location, close to mineral material sales, and classify as unsuitable for coal leasing. These ACECs would provide some protection for the ORVs on this segment if it were not designated.

The administrative designations along this segment would provide some limited protection for the ORVs if the segment was not designated. Portions of this segment overlap two WSAs. The uppermost thirteen miles (approximate) of this segment flows along the boundary of Sewemup Mesa WSA. About five miles of the segment near its downstream terminus also flows along the Palisade WSA. The BLM manages WSAs according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012). The goal of this policy is to manage WSAs to not impair their suitability for preservation as wilderness, until Congress designates them as wilderness, or until they are released from further wilderness consideration. This "non-impairment" management standard is more stringent than the BLM's management direction for Recreational WSRs. But if the area is not designated as wilderness and the WSA designation is removed, protection of the area would be limited to RMP management measures.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in Section 2.2.5 (Public Input) of this report, provided management recommendations for this stream segment. The management recommendations did not include any specific recommendations to the BLM regarding whether the segment should be determined as suitable or nonsuitable for designation. Specifically, the stakeholder collaborative recommended:

1. A large stakeholder group should be convened, comprised of representatives from throughout the entire Dolores River watershed, to discuss suitability, flow management, and other issues associated with river management. The CWCB should convene the larger stakeholder group. In early 2014, the Colorado Water Conservation Board and Colorado River Water Conservation District convened a meeting of stakeholders from throughout the entire Dolores River watershed. Since that meeting occurred, the BLM has not received any consensus recommendations from the large stakeholder group regarding suitability, flow management, or other issues associated with river management.
2. Implement VRM Class II prescriptions along the river corridor to protect scenic and geological ORVs.

3. Implement ACECs to protect fish, scenic, geological, and paleontological ORVs.
4. Establish controlled surface use or no surface occupancy stipulations to proposed land uses to protect all ORVs within ¼ mile of the river, and establish controlled surface use restrictions to protect the scenic ORVs within the viewshed of the scenic byway.
5. Establish an SRMA to protect the recreation ORV.
6. Work with the CWCB to establish and instream flow water right to maintain seasonal variability of flow for protection of the fish ORV and work to encourage voluntary flow management in support of the fish ORV.

Based on these considerations, the stakeholder collaborative did not make any recommendation concerning a suitability determination for this stream segment. Instead, the stakeholder collaborative suggested suitability issues should be addressed on a larger scale by stakeholder group with representatives from the entire watershed.

6. <u>Historical or existing rights that could be adversely affected with designation.</u>

This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, the amount and timing of water to support the ORVs would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system. New projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs. No significant new water supply or water storage projects have been proposed for this stream segment, but additional storage and diversion projects are under consideration for portions of the San Miguel River located upstream from this segment.

Numerous absolute water rights exist along this segment of the Dolores River. While these rights would not be affected by designation of the segment, the development of new water projects on BLM lands, as described in sections 7(b) and 7(c) of the WSR Act, would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated.

7. <u>Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.</u>

This segment is within Mesa and Montrose Counties. A small portion of the segment corridor in Mesa County is within the Planned Unit Development district. The Planned Unit Development district is intended to encourage innovative land planning and site design concepts that implement and are consistent with the Mesa County Master Plan (Mesa County 2008). The majority of the area on private land in the segment corridor in Mesa County is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008).

The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

Zoning does not represent a significant issue in Montrose County as only a small portion of the segment (0.31 acres) is on private land.

8. <u>Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.</u>

Local governments, state governments, and other interested parties participated in the Lower Colorado River Wild and Scenic River Stakeholder Collaborative. This group did not provide specific recommendations regarding suitability to BLM, but did provide a variety of other management recommendations. Refer to Criterion 5 for details.

9. <u>Consistency of designation with other agency plans, programs, or policies.</u>

The Dolores River flows through lands managed by four separate BLM offices, and each of those offices has either completed or in the process of completing Wild and Scenic Rivers analysis.

The upper part of the river, downstream to approximately Bedrock, is managed by the San Juan Public Lands Center. The Draft Land Management Plan and Draft EIS for the San Juan Public lands Center identified 109.02 miles of the Dolores River from McPhee to Bedrock to be suitable for inclusion in the NWSRS (BLM and US Forest Service 2007). The final decision on suitability will be made in the record of decision.

The segment of the river from approximately Bedrock to Roc Creek is managed by BLM's Uncompahgre Field Office. The Uncompahgre Field Office found 11.5 miles of the Dolores River eligible for inclusion in the NWSRS. In addition, the Uncompahgre Field Office found 17.2 miles of the San Miguel River, immediately upstream from its confluence with the Dolores River, as eligible for inclusion in the NWSRS. In its Draft Suitability Report, the Uncompahgre Field Office has found 14.0 miles of the Dolores River as suitable for designation (This mileage includes 5.3 miles downstream from Bedrock and 8.7 miles upstream from Bedrock that formerly had been analyzed by the San Juan Public Center. The Uncompahgre Field Office also found that 2.1 miles of the San Miguel River, immediately upstream from its confluence with the Dolores River, is suitable for designation.

The segment of the river from Roc Creek to the Utah-Colorado boundary is within the GJFO planning area and is the subject of this suitability report.

The BLM Moab Field Office found 35.73 miles of the Dolores River on BLM land from the Colorado/Utah border to the confluence with the Colorado River to be suitable for inclusion in the NWSRS (BLM 2008).

In 1979, the U.S. Department of Interior, acting through the National Park Service and Bureau of Outdoor Recreation, completed a Wild and Scenic Rivers Study of the Dolores River, pursuant to 1975 amendment to the Wild and Scenic Rivers Act. That study recommended that the portion of the Dolores River from Gateway to the Utah border be designated into the National Wild and Scenic Rivers system. Although more than 30 years have elapsed since this study, BLM finds that conditions along the portion of the river corridor between Gateway and the Utah border have not changed substantially.

10. Contribution to a river system watershed or basin integrity.
This segment of the Dolores River provides a critical connection between numerous aquatic habitats that are important for sensitive fish, including the flannelmouth sucker, bluehead sucker, and roundtail chub. These fish are year-round residents throughout the study segment and in the San Miguel River immediately upstream from the study segment. In addition, the sensitive species also utilize tributaries of the Dolores River for spawning purposes, including Mesa Creek, Roc Creek, and Blue Creek. Together with these tributaries, the lower Dolores River provides one of the few places in Colorado with largely natural flow regime timing at low elevations. The lower Dolores River, along with these tributaries, provides a very important interconnected aquatic habitat that insures the continued viability and genetic diversity of these populations.

***Other Protections for Segment***

| **Dolores River** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Recreational, Fish, Geological, Paleontological | *(10.38 miles suitable for inclusion in the NWSRS)* NSO (3,200 acres), TL (2,400 acres), CSU (1,700 acres), VRM Class I (900 acres), VRM Class II (2,000 acres), ROW Exclusion (2,300 acres), ROW Avoidance (900 acres), Closed to Fluid Mineral Leasing |

***Suitability Determination***
The BLM determines that one portion of the Dolores River within the Grand Junction Field Office is **suitable** for designation into the National Wild and Scenic Rivers System. This segment is described as follows:

- From point on the river closest to the southern boundary of the Sewemup Mesa Wilderness Study Area to the BLM-private land boundary in Section 24, T50N R19W, New Mexico P.M. a distance of approximately 10.38 miles.

The tentative classification for the suitable segment is **recreational.**

The BLM determines that the following portions of the Dolores River within the Grand Junction Field Office are **not suitable** for designation into the National Wild and Scenic River System:

BLM-private boundary in Section 24, T. 50 N., R.19 W., New Mexico P.M. to the Colorado-Utah border, a distance of 8.24 miles.The rationale for the BLM suitability determination is as follows:

- Consistency with State Law, Regulations, Policies, and Programs - In its comments, the State of Colorado expressed significant concern about having a suitable segment on the Dolores River located at the Utah-Colorado border (Sections 17 and 18, T. 15 S., R. 104 W., 6th P.M.). If this river segment at the state boundary were to be designated into the National Wild and Scenic Rivers System, the designation would include a federal reserved water right. The federal reserved water right would entail certain flow rate requirements to maintain the outstandingly remarkable values identified by the BLM. The State of Colorado expressed concern that the federal reserved water right requirements at the state boundary could conflict with the state's water obligation deliveries to downstream states pursuant to the Colorado River Compact, and could conflict with the state's ability to fully develop its water entitlement under the compact. The BLM concluded that this potential conflict with state plans and objectives was significant enough to warrant a change from "suitable" to "not suitable." To maintain the river-related values identified for the state boundary segment, the BLM intends to manage this segment under an Area of Critical Environmental Concern designation and under Special Recreation Management Area designation. The BLM has crafted the ACEC and SRMA designations to have similar management objectives as the management standards that are associated with a "suitable" determination.
- Optimal Management for ORVs Under Partnership Approach – The BLM determined that the Dolores River segment adjacent to the Sewemup Mesa Wilderness Study Area is suitable because a "suitable" provides for optimal management of the ORVs. The BLM believes that the strict land management standards associated with a suitability determination, combined with a state-based instream flow water right to support flow-dependent values, will assure long-term maintenance of the ORVs. To support this long-term partnership approach, BLM's suitable determination includes the following finding: If the Colorado water court system decrees an instream flow water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.
- Consistency – The lands found suitable for designation share similar qualities with portions of the river found suitable in neighboring BLM field offices. These qualities include five or more ORVs, a high percentage of federal land ownership, minimal conflicts with competing land uses, significant and growing recreational use, and conditions little changed from the previous Wild and Scenic Rivers analysis performed in 1979.
- Management Opportunities – Designation would provide BLM with additional resources to manage recreational use that is already growing. Designation would

provide a permanent standard for managing growing public use in a manner that does not degrade the ORVs.

- Minimize Conflicts With Private Lands – By determining that the middle portion of the reach, from Cottonwood Canyon to 2.5 miles northwest of Gateway, is **not suitable**, BLM minimizes potential conflicts between private landowners and the protective provisions of the Wild and Scenic Rivers Act. Specifically, the need to analyze projects proposed on private lands for potential impacts to Wild and Scenic River values would be minimized. Such consultation occurs when a private landowner seek a federal permit or funding from other federal agencies, such as Army Corps of Engineers or National Resource Conservation Service. The need for consultation would be limited to projects on private land where the impacts of the proposed project stretch to upstream or downstream locations on federal lands. Projects with impacts limited strictly to private lands would not require detailed analysis for impacts to Wild and Scenic River values. Projects on private lands that do not require a federal permit or federal agency funding would be exempt from any consultation requirements.

### 3.2.2 North Fork Mesa Creek

| | | | |
|---|---|---|---|
| **Description:** | BLM sections of North Fork Mesa Creek from the GJFO boundary with the Uncompahgre National Forest on the east, and flowing southwest to the boundary with the BLM, Uncompahgre Field Office. | | |
| **Total Segment Length:** | 2.05 miles | **Total Segment Area:** | 699.96 acres |
| **Length on BLM Land :** | 2.05 miles | **Area on BLM Land:** | 699.96 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Vegetation | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

North Fork Mesa Creek is outstandingly remarkable for its vegetation. The tentative classification for this segment is scenic because there is an inconspicuous dirt road with multiple access points running parallel to the lower sections of the creek.

This segment contains sections of a type of Narrowleaf Cottonwood Riparian Forest *(Populus angustifolia/salix ligulfolia-Shepherdia argentea* woodland). This community is classified as critically imperiled globally (G1) and vulnerable statewide (S3) by the Colorado Natural Heritage Program (Colorado Natural Heritage Program 2009). A G1 conservation status rank indicates that a species or community is at very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors. Likewise, an S3 conservation status rank indicates that a species or community is imperiled in the state because of rarity due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors making it very vulnerable to extirpation from the state. The rarity and conservation value of this plant community would make this segment a worthy addition to the NWSRS.

BLM_0024378

There are only two active diversions along North Fork Mesa Creek from its headwaters to its confluence with the Dolores River. Both of these diversions are for irrigation purposes and have the potential to provide return flows. The CWCB also holds an instream flow right along this segment for the purpose of preserving the natural environment to a reasonable degree.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

The entire segment corridor flows through and is on BLM land; approximately 150 acres of the segment corridor at the downstream end of the segment are within the Uncompahgre Field Office planning area. In the past, uranium mining took place in the surrounding area, but most operations are closed or temporarily suspended as uranium mining is not currently as economically viable as other energy materials. The entire area is leased for oil and gas exploration, but there are no active wells. There is no oil and gas potential in the segment corridor. Two active mining claims overlap the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to foreclose or curtail future water development along this segment. With designation, BLM would obtain conditioning authority to control any proposed projects that would be incompatible or potentially degrading to the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds to evaluate the potential effects on the segment's values.

If designated, valid mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

If this segment is not designated, there is the potential for its vegetation values to diminish. The BLM does not have any management measures in place to protect the rare plant community found along this segment. Additional depletions of water from the creek could also diminish these values.

4. Federal, state, tribal, local, public, or other interest in designating or not designating the river.

Neither support for nor has opposition to designation of this segment been expressed.

5. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The BLM manages all lands within this segment; acquisition of additional lands is not necessary. It is unlikely that the BLM would incur additional costs to manage the area if designated, partially due to the remote location of the segment. Nevertheless, designation of the segment would enhance the BLM's ability to obtain funding for the management of the segment. No detailed cost analysis or estimate was prepared as part of this study.

6. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM manages the entire segment corridor and could effectively manage this segment as a WSR. Additionally, the CWCB holds an instream flow right along this segment from Long Canyon to Cedar Tree Ditch. There are varying levels of instream flow appropriations throughout the year for the entire segment. Between April 1 and May 31, the appropriated instream flow is 2.75 cfs. It drops to 0.5 cfs between June 1 and February 29, and rises to 1.9cfs between March 1 and March 31. The instream flow right provides some additional protection for the vegetation values along this segment.

7. Historical or existing rights that could be adversely affected with designation.

There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

8. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

The entire segment corridor is managed by the BLM.

9. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

10. Consistency of designation with other agency plans, programs, or policies.

The BLM Uncompahgre Field Office manages North Fork Mesa Creek downstream from this segment until it reaches the Dolores River. The Uncompahgre Field Office found North Fork Mesa Creek eligible with a vegetation ORV.

The Uncompahgre National Forest found the portion of North Fork Mesa Creek upstream of the BLM segment not eligible for inclusion in the NWSRS during the eligibility study for the Grand Mesa, Uncompahgre, and Gunnison National Forests land management plan revision process (US Forest Service 2006). The Uncompahgre National Forest manages the area surrounding North Fork Mesa Creek for livestock grazing and according to the following general principles: improve rangeland through vegetation and soil restoration practices, improved livestock management, and regulation of other resource activities; provide semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities; and use vegetation treatments to enhance plant and animal diversity. These management guidelines are generally consistent with BLM management that would occur with designation.

The Uncompahgre National Forest's 2007 proposed forest plan would manage this area as "backcountry—motorized trails." This management would be relatively passive and emphasize natural features of landscapes. Resource management activities would occur, but natural ecological processes and patterns would normally predominate. This management prescription

allows water development as a suitable use. (US Forest Service 2007) However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule. Management by the US Forest Service as backcountry—motorized trails has the potential to be inconsistent with designation (if the 2007 proposed plan becomes final) to the extent that future water development reduces stream flow or adversely affects the cottonwood communities downstream.

11. Contribution to a river system watershed or basin integrity.
North Fork Mesa Creek is a tributary to the Dolores River.

***Other Protections for Segment***

| North Fork Mesa Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Vegetation | NSO (300 acres), CSU (400 acres), TL (300 acres), VRM Class II (700 acres), ROW Avoidance (700 acres) |

***Suitability Determination***
BLM determined that this segment is **not suitable**, because stipulations and land use prescriptions in the Proposed RMP, along with an existing instream flow water right held by the CWCB, are adequate to protect the ORVs.

### 3.2.3 Blue Creek

**Description:** BLM sections of Blue Creek from the GJFO boundary with the Uncompahgre National Forest on the east, and flowing west to the confluence with the Dolores River.

| | | | |
|---|---|---|---|
| **Total Segment Length:** | 11.36 miles | **Total Segment Area:** | 3,335.98 acres |
| **Length on BLM Land :** | 10.08 miles | **Area on BLM Land:** | 2,975.48 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Scenic, Fish, Cultural | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.
Blue Creek has outstandingly remarkable scenic, fish, and cultural values that would make it a worthy addition to the NWSRS, if designated by Congress. The tentative classification for this segment is scenic. There is an inconspicuous dirt road with multiple access points running parallel to the creek, in addition to some development and grazing in the creek corridor.

This segment has outstandingly remarkable scenic values. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery,

scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Blue Creek drops steeply off the Uncompahgre Plateau carving a canyon through the deep red sandstone of the area. This spectacular drop has formed a remarkable canyon with spectacular views of the Uncompahgre Plateau and Dolores River Canyon. The canyon as a whole is distinctive and rare in the region.

This segment also has remarkably outstanding fish values. Water flow in the segment is sufficient to maintain fish populations such as the bluehead sucker *(Catostomus discobolus)*. The bluehead sucker is a BLM sensitive species (BLM 2000). The management objective for BLM sensitive species that are not federally listed as endangered or threatened is to initiate protective conservation measures that reduce or eliminate threats to minimize the likelihood of and need for listing of these species under the ESA. The CPW has also identified the bluehead sucker as a species of greatest conservation need in its Comprehensive Wildlife Conservation Strategy (CPW 2006).

This segment also has remarkably outstanding cultural values. Blue Creek contains important Native American sites from the formative period of cultures in this region and is important for current Native American concerns. Research from these sites has the potential to yield additional discoveries about the development of agriculture in the area. This creek canyon is a known transportation corridor with game trails used by Ute Tribes, later used as a pack trail to the Uranium mines, and as an early stock driveway that is still in use today.

The lower 3 miles lie within the Gateway SRMA. The lower 1.5 miles lie within the Dolores River Riparian ACEC. The BLM has proposed the Dolores River Riparian ACEC to provide special management attention to its fish (bluehead sucker), wildlife (peregrine falcon), scenic, and riparian habitat values.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 11.36-mile segment is a combination of federal (BLM and US Forest Service) and private. The BLM manages shoreline along 10.08 miles (89.9 percent) of the segment. Within the 3,335.98-acre study corridor, the BLM manages 2,975.48 acres (89.2 percent). The remaining 293.55 acres (8.8 percent) are privately owned. The US Forest Service manages the remaining land in the segment corridor (66.9 acres; 2 percent).

Most of the segment corridor upstream from Calamity Creek is leased for oil and gas development but there are no active wells. There is no oil and gas potential in this area. Active mining claims overlap a small portion of the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or place terms and condition on any proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, the BLM may allow new mining claims or mineral leases, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering the area for protection of the ORVs would be minimal. The segment is comprised mostly of BLM lands, and BLM is pursuing the acquisition of the private parcel along this segment at this time through a land exchange. Since the creek is small and many portions of the creek are not easily accessible, BLM would not expect visitation to the creek to increase dramatically. Designation of the segment would enhance the BLM's ability to obtain funding for management of this segment.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

Under the Approved RMP, BLM will manage the stream corridor under VRM Class II, which will provide vigorous protection for the Scenic ORV. In addition, the lower portions of the stream corridor would fall within the Dolores River Riparian ACEC and within the Maverick Lands with Wilderness Characteristics area. These two designations would provide further protection of the scenic ORV by prohibiting development that would be inconsistent with riparian values and wilderness characteristics.

The CWCB holds an instream flow right on two different reaches of Blue Creek: from Massey Branch to Calamity Creek and from Calamity Creek to Tom Watkins Ditch. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, instream flow rights provide a measure of flow protection that supports the ORVs (especially fish) found on this segment. The decreed flow levels vary seasonally. Between the upper end of the segment and the confluence with Calamity Creek on private land (roughly 5.5 miles), the amounts are as follows: 5.5 cfs (April 15 to May 14); 2.1 cfs (March 15 to April 14 and (May 15 and June 14); and 0.5 cfs (June 15 to March 14). From the confluence with Calamity Creek on private land to the headgate of Tom Watkins Ditch (3.0 miles), the amounts are 3.5 cfs (April 15 to May 14), 1.0 cfs (March 15 to April 14 and May 15 to June 14), and 0.5 cfs (June 15 to March 14).

Cultural resources and historic values associated with the river segment are protected and regulated by a number of laws, regulations, executive orders, programmatic agreements, and other requirements. The principal federal law addressing cultural resources is the NHPA, and its implementing regulations (36 CFR 800). These regulations, commonly referred to as the Section 106 process, describe the procedures for identifying and evaluating historic properties, for assessing the effects of federal actions on historic properties, and for project proponents consulting with appropriate agencies to avoid, reduce, or minimize adverse effects.

The primary objective of managing cultural resources is the protection of the resource from damage or destruction. To the extent consistent with protection, the BLM also manages cultural resources for scientific research, public education and enjoyment. Any interpretation of these sites for public benefit must be compatible with the protection of cultural resources.

Management of the river to protect identified ORVs would include direct and indirect protection of cultural resources in the river corridor.

BLM is a signatory to the Rangewide Conservation Agreement for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker (Utah Department of Natural Resources, 2006). The strategy outlines conservation guidelines for habitat maintenance and protection, non-native fish control, population viability, and conservation genetics. This agreement and strategy will provide a layer of protection for the fish values along this segment even if it is not designated.

The bluehead sucker is also a BLM sensitive species and receives special management attention as a result. The BLM manages sensitive species and their habitats to minimize or eliminate threats affecting the status of the species or to improve the condition of the species habitat. The BLM achieves this through a variety of measures, including (1) ensuring that BLM activities are carried out consistently with species management objectives, (2) monitoring populations and habitats to determine whether species management objectives are being met, (3) working with partners and stakeholders to develop species-specific or ecosystem-based conservation strategies, (4) prioritizing Bureau sensitive species and their habitats for conservation action, and others.

6. Historical or existing rights that could be adversely affected with designation.

There are only two active water diversions on Blue Creek and one active diversion on Calamity Creek (a tributary to Blue Creek); all divert water for irrigation purposes and have the potential to provide return flows. The ability to make changes to these water rights and to appropriate new water rights upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. The area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. Mineral and extractive uses require 100-foot setback from the 100-year floodway. Nevertheless, these industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.
The Uncompahgre National Forest found the portion of Blue Creek upstream of the BLM segment not eligible for inclusion in the NWSRS during the eligibility study for the Grand Mesa, Uncompahgre, and Gunnison National Forests land management plan revision process (US Forest Service 2006). The Uncompahgre National Forest manages the area surrounding Blue Creek as "big game winter range in non-forest areas" and according to the following general prescriptions: (1) provide semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities; (2) manage motorized recreation prevent unacceptable stress on big game animals during primary big game use season; use vegetation treatments to enhance plant and animal diversity; and (3) manage livestock grazing to favor wildlife habitat.

The Uncompahgre National Forest's 2007 proposed forest plan would manage this area as backcountry. However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule. If the area was managed as backcountry, management would be relatively passive and emphasize natural features of landscapes. Resource management activities would occur, but natural ecological processes and patterns would normally predominate (US Forest Service 2007). Management by the US Forest Service either to provide big game habitat or as backcountry is unlikely to have an adverse effect on this segment's ORVs and is generally consistent with BLM management that would occur with designation.

The Colorado Division of Wildlife is a party to a multi-state conservation agreement specific to the bluehead sucker and two other fish species (Utah Department of Natural Resources, 2006). The purpose of this agreement is to expedite implementation of conservation measures to ensure the persistence of bluehead sucker populations throughout its range. Designation of this segment is generally consistent with this agreement.

10. Contribution to a river system watershed or basin integrity.
Blue Creek is a tributary to the Dolores River.

***Other Protections for Segment***

| **Blue Creek** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Fish, Cultural | NSO (1,600 acres), CSU (1,700 acres), TL (2,700 acres), VRM Class II (2,800 acres), ROW Exclusion (800 acres), ROW Avoidance (2,000 acres), Closed to Fluid Mineral Leasing (800 acres), ACEC overlap (100 acres), lands with wilderness characteristics overlap (800 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable.** The fish ORV is protected by an existing instream flow water right, by BLM's commitment to manage for this sensitive species under multi-state conservation agreement, and by the appearance of the fish species on BLM

sensitive species list, which restricts management actions that could harm the species. The cultural ORV is protected by the provisions of the National Historic Preservation Act. The Scenic ORV will be protected by the proposed VRM Class II and by the Maverick Lands with Wilderness Characteristics prescription.

### 3.2.4 Gunnison River Segment 2

| | | | |
|---|---|---|---|
| **Description:** | Sections of the Gunnison River west of Highway 50 on BLM land from Whitewater to the Redlands Dam, south of Grand Junction and the Gunnison Rivers' confluence with the Colorado River. | | |
| **Total Segment Length:** | 16.63 miles | **Total Segment Area:** | 5,273.45 acres |
| **Length on BLM Land :** | 3.85 miles | **Area on BLM Land:** | 1,375.21 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Fish, Historic | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.
This segment contains outstandingly remarkable fish and historical values. The tentative classification of this segment is recreational because of a railroad and development above the canyon walls that are readily apparent from the river.

This segment has outstandingly remarkable fish values. The entire segment is USFWS-designated critical habitat for the federally endangered Colorado pikeminnow *(Ptychocheilus lucius)* and the Razorback sucker *(Xyrauchen texanus)* (59 Fed. Reg. 13,374). Critical habitat is the specific area or areas that possess physical or biological features that are essential to the conservation of the species and that may require special management considerations or protections. The Colorado pikeminnow is largest minnow in North America and one of the largest in the world. At one time, individuals may have lived more than fifty years, growing to nearly six feet in length and weighing up to 80 pounds. The razorback sucker is one of the largest suckers in North America. Individuals can live for more than forty years and can grow to up to thirteen pounds in weight and to three feet in length. These species were once widespread throughout most of the Colorado River Basin from Wyoming to Mexico.

This segment also has outstandingly remarkable historical values. The Denver and Rio Grande Railroad (now part of Union Pacific) runs parallel to the segment and was the first line connecting Denver to Grand Junction, reaching the Grand Valley in 1882. The line then connected to Salt Lake City forming a narrow gauge transcontinental railroad link. The importance of the railroad in developing the West makes this site eligible for inclusion in the National Register of Historic Places. The BLM-managed portions of the segment study area lie within the Bangs Canyon SRMA.

This segment also has characteristics that may create significant management issues, if the segment were to be designated as part of the NWSRS. There are many upstream diversions along the Gunnison River and numerous diversions within this segment (roughly fifteen). The

diversions within this segment are generally for irrigation, industrial, commercial, and municipal purposes. Several of the diversions within this segment have conditional water rights. If made absolute, these water rights could result in additional depletions and additional water development and diversion structures along the river corridor. The community of Whitewater lies along this segment of the river and portions of the segment corridor overlap the Grand Junction city limits. Future population growth, expansion, and the associated development of these communities, particularly along the riverfront, have the potential to change the setting found in this segment.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

The BLM manages 1,375.21 acres (26.1 percent) of the land within the 5,273.45-acre study corridor and 3.85 miles (23.2 percent) of the segment shoreline. The remaining land status consists of 3,899.24 acres (73.9 percent) in private ownership. The segment corridor is not leased for oil and gas development. There is no oil and gas potential for the BLM-managed lands in the segment corridor, and there are no active mining claims in the segment corridor.

The BLM does not have authority over maintenance, operation, and construction activities associated with the railroad, though activities associated with it are not likely to impact the ORVs. The Department of Transportation, pursuant to the Department of Transportation Act of 1966, must consult with the Department of the Interior so that its plans and programs include measures to maintain or enhance the natural beauty of the lands traversed. These statutes also permit the Department of Transportation to approve a program or project using public park and recreation lands, wildlife and waterfowl refuges, or historic sites only if there is no feasible and prudent alternative and it has used all possible planning to minimize harm to these lands.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or to impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other agencies to evaluate the potential effects on the segment's values.

BLM is not aware of any major proposed water supply projects within this segment. The Colorado Statewide Water Supply Initiative concluded that Delta and Mesa Counties would be able to meet nearly all of the estimated demand for water in the Gunnison River basin through 2030 by utilizing Tri-County Water Conservancy District water rights, existing supplies, agricultural transfers, and an Uncompahgre Project Water Right. (Colorado Water Conservation Board, Statewide Water Supply Initiative Reports, 2004)

Several conditional storage water rights along and upstream from this segment have the potential to affect the identified ORVs. A conditional water right is a water right where the water has not been placed to a beneficial use. It gives the holder time to complete a project, provided that the holder pursues its completion with due diligence. Once the holder has put the

water to beneficial use, the conditional right will be decreed as an absolute water right. Some of these conditional storage rights have priority dates senior to existing absolute junior rights and therefore could affect junior water right holders if made absolute. These conditional storage rights could result in additional depletions and change the flow regime along this segment. The volume of conditional storage rights in the Gunnison River Basin totals over 2 million acre-feet. Water District 40 (North Fork Gunnison/Gunnison Rivers) accounts for approximately 290,000 acre-feet of conditional storage rights. The majority of these rights which have priority dates ranging from 1960-1980, with some as early as 1900-1920 (SWSI). The development of conditional water rights both along the segment and upstream from the segment has the potential to affect the fish values along this segment.

Presently, there are no state-based instream flow water rights in this reach to ensure sufficient flow to preserve the natural environment to a reasonable degree. Rather, flows rates are the result of required deliveries to senior water rights within and downstream from this segment, water releases from US BOR's Aspinall Unit Reservoirs (Blue Mesa, Morrow Point, and Crystal) and Ridgeway Reservoirs, and by water deliveries that are made as part of the Upper Colorado River Endangered Fish Recovery Program (see Criteria 9).

The USFWS has developed flow recommendations for the Gunnison River to benefit endangered fish. In addition, the US BOR is currently undergoing an EIS process regarding reoperation of the Aspinall Unit, in which flow regimes would be modified to support threatened and endangered fish species. Flow recommendations are not absolute values and may be revised from time to time to include the results of research. The goal of the recommendations is to provide the flow patterns to enhance populations of the endangered fishes and to allow Colorado the full ability to develop its compact entitlements. The flow recommendations consist of peak flow recommendations and base flow recommendations. Peak flow recommendations are based on historical river flows during spring runoff to provide spawning cues and to restore and maintain in-channel and flood plain habitats. Base flow recommendations are designed to allow fish movement among river segments and to provide maximum amounts of warm, quiet-water habitats to enhance growth and survival of young fish. Although there is no instream-flow right along this segment, USFWS flow recommendations provide a layer of protection for the ORVs.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.
The majority of land in this segment is privately owned. The BLM would not pursue land acquisition, as it is not feasible to acquire enough land to affect its ability to manage the segment. The cost of administering this area (protecting and enhancing the ORVs) would likely remain roughly the same if designated. The BLM already incurs costs associated with the protection of the ORVs through its administration of other statutory requirements (the ESA and the National Historic Preservation Act).

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.
The BLM's land management authorities can adequately protect the federal lands in the river corridor. However, the BLM does not have authority over private lands in the corridor, nor

does it have authority to protect the stream flows necessary to support the ORVs. Designation would provide a comprehensive framework for cooperating with local governments to encourage land uses that are compatible with the ORVs, and designation would provide a federal water right that would assist with flow protection.

The makeup of this segment hinders the BLM's ability to manage it effectively as a WSR. The majority of the shoreline and the segment corridor falls under private ownership. The BLM only manages roughly a quarter of the lands within the segment corridor. The BLM does not control uses or activities on private lands, making effective management of this segment difficult. Further, the downstream end of the segment overlaps the Grand Junction city limits, and the upstream end of the segment neighbors the community of Whitewater. As these communities continue to grow, it will become increasingly difficult to manage this segment as a WSR and to prevent incompatible development on private lands.

The ESA provides protection for the fish values present along this segment. This entire segment is designated critical habitat for the Colorado pikeminnow, Razorback sucker, bonytail chub, and humpback chub. Areas designated as critical habitat receive protection under section 7 of the ESA with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires Federal agencies to consult on and insure that such actions are not likely to destroy or adversely modify critical habitat. These fish species also receive special management as part of the Upper Colorado River Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery strategies include conducting research, improving river habitat, providing adequate stream flows, managing non-native fish, and raising endangered fish in hatcheries for stocking. Program partners cooperatively manage water resources in accordance with the ESA, state water law, individual water rights, and interstate compacts. Program partners utilize a variety of management tools: leases and contracts for water supplies; coordinated water releases from upstream reservoirs; participation in reservoir enlargements, efficiency improvements to irrigation systems to reduce water diversions; and re-operation of federal dams and reservoirs. These mechanisms will protect the fish values along this segment.

Historical values associated with the river segment are protected and regulated by a number of laws, regulations, executive orders, programmatic agreements, and other requirements. The principal federal law addressing cultural resources is the NHPA, and its implementing regulations (36 CFR 800). These regulations, commonly referred to as the Section 106 process, describe the procedures for identifying and evaluating historic properties, for assessing the effects of federal actions on historic properties, and for project proponents consulting with appropriate agencies to avoid, reduce, or minimize adverse effects.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely on the provisions of the Colorado Endangered Fish Recovery Program. Including the designation of critical habitat along this stream reach, to protect the Fish ORV.

2. The railroad right-of-way that forms the basis for the historical ORV is not at risk.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.

This segment is downstream from current water projects and diversions that are designed to provide water for the State of Colorado. The ability to change existing projects and construct new projects upstream could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new projects and changes to existing projects would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORVs.

Numerous absolute water rights exist along this segment of the Gunnison River. Under designation, historical operation, maintenance, and access activities on federal lands can continue. While these historical rights would not be affected by designation of the segment, changes to these water rights and the development of new water projects as described in sections 7(b) and 7(c) of the WSR Act would be permitted only if they did not have a direct and adverse effect on the values for which the river segment was designated. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. The majority of the area on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area. The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs.

A small portion of the study area is within the Residential-Single-Family (RSF-4) district. This district is primarily intended to accommodate medium density, single family residential development (Mesa County 2008). Because such a small portion of the study area is within the RSF-4 district, it is unlikely that the zoning would adversely impact the ORVs.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.
The Colorado pikeminnow and razorback sucker are part of the Upper Colorado River Endangered Fish Recovery Program, a partnership of private and public organizations working to conserve a collection of fish species while maintaining water development. Recovery plans and goals have been issued by the USFWS (USFWS 2002a and USFWS 2002b). Designation would be consistent with this program.

The National Park Service determined that a 12-mile segment of the Gunnison River (as it flows through the Black Canyon of the Gunnison National Park) is suitable for inclusion in the NWSRS. The tentative classification for this segment is a combination of Wild and Scenic. Designation of this segment would be consistent with the previous National Park Service determination.

The BLM Uncompahgre Field Office determined that a 16–mile segment of the Gunnison River (as it flows through the Gunnison Gorge NCA) is suitable for inclusion in the NWSRS. The tentative classification for this segment is a combination of Wild and Recreational (Record of Decision, Gunnison Gorge National Conservation Area Resource Management Plan and Final Environmental Impact Statement, 2004). The Uncompahgre Field Office also determined two other segments of the Gunnison River as eligible. These include a 17.48-mile segment immediately upstream from the Grand Junction planning area boundary and a 0.41-mile segment on BLM-managed lands northeast of Delta. The BLM will make suitability determinations on these segments as part of the Uncompahgre RMP revision and the Dominguez-Escalante NCA planning process. Designation would be consistent with the determinations of the Uncompahgre Field Office; it is not known at this time whether the eligible segments of the Gunnison River upstream from the GJFO will be determined suitable.

10. Contribution to a river system watershed or basin integrity.
The Gunnison River is a tributary of the Colorado River.

***Other Protections for Segment***

| **Gunnison River Segment 2** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish, Historic | NSO (1,000 acres), CSU (500 acres), TL (500 acres), VRM Class II (600 acres), ROW Exclusion (400 acres), ROW Avoidance (500 acres), Closed to Fluid Mineral Leasing (900 acres), lands with wilderness characteristics overlap (400 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable.** The Colorado River Recovery Program, designation of critical habitat by the USFWS, and the USFWS flow recommendations for the Gunnison River flow provide sufficient for the fish ORV. Current federal laws and authorities provide sufficient protection for the historical ORV.

The makeup of this segment would make effective management as a WSR challenging. The BLM only manages about a quarter of the shoreline and lands in the segment corridor. Mesa County zoning does not prevent development that is incompatible with WSR designation. The Agricultural, Forestry, Transitional district allows extractive uses (either as of right or conditionally) that have the potential to change the landscape and setting found along this segment. Also, this segment overlaps the city limits of Grand Junction and the community of Whitewater. As these communities continue to grow, the potential for incompatible development in the segment corridor will correspondingly increase.

## 3.3 Roan Creek

| | | | |
|---|---|---|---|
| **Description:** | From the headwaters in the northern part of the GJFO to the confluence with Carr Creek. | | |
| **Total Segment Length:** | 17.04 miles | **Total Segment Area:** | 4,960.38 acres |
| **Length on BLM Land :** | 6.47 miles | **Area on BLM Land:** | 2,563.97 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Fish | | |

### *Suitability Factor Assessment*

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

This segment contains outstandingly remarkable fish values. The tentative classification for this segment is scenic due to access via a dirt road.

The creek contains a core conservation population of Colorado River cutthroat trout *(Oncorhynchus clarki pleuriticus)* (CRCT Conservation Team 2006), a BLM sensitive species (BLM 2000) and a Colorado species of special concern (CPW 2007). However, recent genetic work suggests that this population is more closely related to greenback cutthroat trout *(Oncorhynchus clarki stomias)*, a federally threatened species. Although Carr Creek is outside of what is considered the "native range" of greenback cutthroat, the USFWS considers this population greenback cutthroat for the purposes of the ESA.

The cutthroat trout is the most diverse trout species in North America, and its historical distribution covers the broadest range of any stream-dwelling trout in the Western Hemisphere. Today, they exist in only about 5 percent of their original range. Their numbers have declined due to over-fishing, stocking of rainbow, brook, brown, and Yellowstone cutthroat trout in their habitat, and loss of high-quality trout stream habitat due to logging, livestock over-grazing, water diversions and municipal and industrial pollution.

In a 2004 landscape health assessment, Roan Creek was rated as functioning-at-risk because of insufficient stream bank vegetation resulting from heavy livestock use. Road encroachment and crossings are keeping banks unstable. Current beaver ponds are unstable because of the lack of large-diameter materials.

Grazing is permitted throughout the study corridor and occurs on both BLM and private land. Overgrazing and poor management practices are disrupting the riparian ecosystem.

The Roan and Carr Creeks ACEC in the Approved RMP overlaps with nearly all of the BLM-managed lands in this study area. The public and the BLM have proposed this ACEC to provide special management attention to the area's riparian habitat, fish, wildlife, and plant values.

There are five active water diversions within the segment study area and several more diversions outside the study area that affect flows in Roan Creek. Diversions are primarily for irrigation purposes and have the potential to provide return flows to Roan Creek.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 17.04-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 6.47 miles (38.0 percent) of the segment. Within the 4,960.38-acre study corridor, the BLM manages 2,563.97 acres (51.7 percent). The remaining 2,396.41 acres in the segment corridor (48.3 percent) are in private ownership.

Nearly all of the BLM-managed lands in the segment corridor are leased for oil and gas exploration, and there are eight active wells within the segment corridor. Additionally, there are several active wells outside of the study corridor on both BLM and private land. There are no active mining claims in the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

As discussed below, existing mechanisms and management tools would reduce the potential for adverse effects on the fish values in this segment if it were not designated.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

If designated, it is possible that the cost of administering the area to protect and enhance the cutthroat trout would increase because of the mandate to do such. The BLM would/would not pursue land acquisition along this segment at this time. A detailed cost analysis was not done as part of this study.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM only manages 38.0 percent of the shoreline of this segment and about half of the land in the segment corridor. The BLM's limited ownership of the shoreline would make management of this segment as a WSR challenging. However, other mechanisms are in place that will protect the fish values on this segment.

The greenback cutthroat trout receives protection under the ESA, while the Colorado River cutthroat trout receives protection by virtue of appearing on the BLM's official sensitive species list. The USFWS has advised the BLM to treat the fish population as though it were threatened greenback cutthroat trout, despite the current genetic uncertainty surrounding this population. Accordingly, the BLM will determine the effects on these fish from any actions it funds, authorizes, or undertakes. The BLM will initiate ESA consultation if it determines that an action may affect these fish. If the fish population turns out be Colorado River cutthroat trout, the BLM sensitive species manual guidance specifies that the population should be managed in a fashion similar to species that are listed under the ESA.

The "Greenback Cutthroat Trout Recovery Plan" (USFWS 1998) provides a framework for maintaining and enhancing current known populations of greenback cutthroat trout and for creating new populations of the species where feasible. Involved parties include the BLM, US Forest Service, USFWS, National Park Service, and CPW. The BLM, consistent with the position of the USFWS, intends to manage this segment in accordance with the conservation agreement.

The BLM is capable of managing for the protection of the cutthroat trout through incorporation of protective measures in its RMP. For example, the BLM will manage the area as an ACEC to protect the greenback cutthroat trout. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. Management actions of this ACEC include: (1) only allow vegetation treatments for the benefit of the identified relevant and important values (i.e., fish); (2) classify as closed to unauthorized motorized travel activities, including over-the-snow travel; (3) issue no special recreation permits for special or competitive events; and (4) close to mineral material sales and withdraw from coal leasing.

The CWCB holds an instream flow right on Roan Creek. There are varying levels of instream flow appropriations throughout the year for the entire segment. Between April 1 and October 31, the appropriated instream flow is 1.75 cfs. For the remainder of the year, the appropriated instream flow is 1.25 cfs. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORV found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely upon the appearance of cutthroat trout species on its sensitive species list as mechanism to insure that fish needs are considered in BLM plans and actions.
2. BLM should continue to rely upon the existence of an instream right held by the CWCB to protect the fish ORV.
3. BLM should continue to rely upon the inaccessibility of the creek as a method to protect the Fish ORV.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.

There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

Roan Creek is in Garfield County and is zoned as Resource Lands. The Resource Lands zone has limited potential to prevent development that is incompatible with protection of the ORV. Land types and uses within the Resource Lands zone include irrigated agriculture, grazing, farm and ranch residences, meadow hay land, and waste land (Garfield County 2008). Also, conditional uses in the Resources Lands zone include mineral extraction, forestry, mineral waste disposal, oil and gas drilling, and utility lines. The allowable uses along this segment include numerous forms of industrial development and resource extraction. These uses may result in development that is incompatible with the protection of this segment's ORV.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

In order for the greenback cutthroat trout to be considered recovered and delisted from the federally threatened and endangered species list, populations meeting a certain criteria must be documented in its native range, which is Arkansas and South Platte drainages on the Colorado Front Range (USFWS 1998). Thus, while designation for the protection of the greenback cutthroat trout would support the recovery of the species, it would not contribute to its delisting.

10. Contribution to a river system watershed or basin integrity.

Roan Creek is a tributary to the Colorado River.

***Other Protections for Segment***

| **Roan Creek** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish | NSO (500 acres), CSU (1,400 acres), TL (1,700 acres), VRM Class III, ACEC overlap (1,900 acres), ROW Avoidance (2,000 acres), closed to mineral material sales (1,900 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. The ORV for this segment is for greenback cutthroat trout that are present. Mechanisms other than WSR designation can adequately protect these fish. The Roan and Carr Creeks ACEC, if chosen, would provide special management attention, limit allowable uses, and direct management actions to protect this fish population. The cutthroat trout are protected as special status species regardless of designation.

Other factors would make management of this segment in the NWSRS challenging and not the most effective use of the BLM's limited funds and management resources. The BLM manages only about a third of the shoreline and just over half of the land in the segment corridor. A cohesive and comprehensive management approach to this segment is difficult because the makeup of the segment is scattered and fragmented. In several places, the BLM manages only one side of the shoreline. The longest contiguous section of land in this segment where the BLM manages both sides of the shoreline is only two miles. As stated above, an ACEC overlaps some of the segment (roughly uppermost three-quarters), but this special management does not apply to the private lands in that section or to the remainder of the segment.

Additionally, there are oil and gas leases on nearly all of the BLM land in the corridor, and there are eight active wells in the corridor. BLM's permits for authorization to drill wells contain stipulations designed to protect the cutthroat trout population. Finally, the CWCB holds an instream flow water right on this creek that is designed to provide flow rates that support the fish population. This water right is a viable alternative to the federal reserved water right that would come with designation as a Wild and Scenic River.

## 3.4 CARR CREEK

| | | | |
|---|---|---|---|
| **Description:** | From the headwaters in the northern part of the GJFO to the confluence with Roan Creek. | | |
| **Total Segment Length:** | 15.10 miles | **Total Segment Area:** | 4,916.51 acres |
| **Length on BLM Land :** | 5.06 miles | **Area on BLM Land:** | 2,289.73 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Fish | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

This segment contains outstandingly remarkable fish values. The tentative classification for this segment is scenic due to access via a dirt road.

The creek contains a core conservation population of Colorado River cutthroat trout (*Oncorhynchus clarki pleuriticus*) (CRCT Conservation Team 2006), a BLM sensitive species (BLM 2000) and a Colorado species of special concern (CPW 2007). However, recent genetic work suggests that this population is more closely related to greenback cutthroat trout *(Oncorhynchus clarki stomias)*, a federally threatened species. (Colorado Parks and Wildlife, 2011, "Native cutthroat trout populations displaying the lineage GB genotype identified west of the Continental Divide.") Although Carr Creek is outside of what is considered the "native range" of greenback cutthroat, the USFWS considers this population greenback cutthroat for the purposes of the ESA.

The cutthroat trout is the most diverse trout species in North America, and its historical distribution covers the broadest range of any stream-dwelling trout in the Western Hemisphere. Today, they exist in only about five percent of their original range. Their numbers have declined due to over-fishing, stocking of rainbow, brook, brown, and Yellowstone cutthroat trout in their habitat, and loss of high-quality trout stream habitat due to logging, livestock over-grazing, water diversions and municipal and industrial pollution.

The area is permitted for livestock grazing though the permittee does not graze the land. A locked gate on private land downstream of the segment prevents public access to the segment.

The Roan and Carr Creeks ACEC overlaps roughly four miles of the uppermost portion this segment. The public and the BLM have proposed this ACEC to provide special management attention to the area's riparian habitat, fish, wildlife, and plant values.

There are approximately a dozen active water diversions along this segment and several more diversions lie outside the study area but have the potential to affect flows in the creek. Diversions in this area are primarily for irrigation purposes and have the potential to provide return flows to the creek.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 15.10-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 5.06 miles (33.5 percent) of the segment. Within the 4,916.51-acre study corridor, the BLM manages 2,289.73 acres (46.6 percent). The remaining land status is composed of 2,626.78 acres (53.4 percent) in private ownership.

The segment corridor is leased for oil and gas exploration along roughly the downstream most 3.5 miles. There are 6 active wells within the study corridor (all on private land). The oil and gas potential on BLM lands is low along roughly the upstream most 5 miles of the segment. The oil and gas potential is moderate along the remaining BLM lands in the segment corridor. There are no active mining claims in the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

As discussed below, existing mechanisms and management tools would reduce the potential for adverse effects on the fish values in this segment if it were not designated.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering the area would not likely increase over current levels because public access to the segment is limited. The majority of land in this segment corridor is privately owned. The BLM would not pursue land acquisition, as it is not feasible to acquire enough land to affect its ability to manage the segment.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The Greenback Cutthroat Trout receives protection under the ESA, while the Colorado River Cutthroat Trout receives protection by virtue of appearing on the BLM's official sensitive species list. The USFWS has advised the BLM to treat the fish population as though it were threatened greenback cutthroat trout, despite the current genetic uncertainty surrounding this population. Accordingly, the BLM will determine the effects on these fish from any actions it funds, authorizes, or undertakes. The BLM will initiate ESA consultation if it determines that an action may affect these fish. If the fish population turns out be Colorado River Cutthroat Trout, the BLM sensitive species manual guidance specifies that the population should be managed in a fashion similar to species that are listed under the ESA.

The "Greenback Cutthroat Trout Recovery Plan" (USFWS 1998) provides a framework for maintaining and enhancing current known populations of greenback cutthroat trout and for creating new populations of the species where feasible. Involved parties include the BLM, US Forest Service, USFWS, National Park Service, and CPW. The BLM, consistent with the position of the USFWS, intends to manage this segment in accordance with the conservation agreement.

The BLM is capable of managing for the protection of the cutthroat trout through incorporation of protective measures in its RMP. For example, the BLM will manage the upper portion of the area as an ACEC to protect cutthroat trout. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural

systems or processes. Management actions of this ACEC include: (1) only allow vegetation treatments for the benefit of the identified relevant and important values (i.e., fish); (2) classify as closed to unauthorized motorized travel activities, including over-the-snow travel; (3) issue no special recreation permits for special or competitive events; and (4) close to mineral material sales and withdraw from coal leasing.

The CWCB holds an instream flow right on Carr Creek. There are varying levels of instream flow appropriations throughout the year for the entire segment. Between April 1 and August 31, the appropriated instream flow is 2.0 cfs. It drops to 1.0 cfs between September 1 and October 31, and again to 0.5 cfs between November 1 and March 31. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORV found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should continue to rely upon the appearance of cutthroat trout species on its sensitive species list as mechanism to insure that fish needs are considered in BLM plans and actions.
2. BLM should continue to rely upon the existence of an instream right held by the CWCB to protect the fish ORV.
3. BLM should continue to rely upon the inaccessibility of the creek as a method to protect the Fish ORV.

Based on these recommendations, the stakeholder collaborative also recommended that BLM determine that this stream segment is not suitable for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.

There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

Carr Creek is in Garfield County and is zoned as Resource Lands. The Resource Lands zone has limited potential to prevent development that is incompatible with protection of the ORV. Land types and uses within the Resource Lands zone include irrigated agriculture, grazing, farm and ranch residences, meadow hay land, and waste land (Garfield County 2008). Also, conditional uses in the Resources Lands zone include mineral extraction, forestry, mineral waste disposal, oil and gas drilling, and utility lines. The allowable uses along this segment include numerous

forms of industrial development and resource extraction. These uses may result in development that is incompatible with the protection of this segment's ORV.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

In order for the greenback cutthroat trout to be considered recovered and delisted from the federally threatened and endangered species list, populations meeting a certain criteria must be document in its native range, which is Arkansas and South Platte drainages on the Colorado Front Range (USFWS 1998). Thus, while designation for the protection of cutthroat trout may support the recovery of the species, it would not contribute to delisting.

10. Contribution to a river system watershed or basin integrity.

Carr Creek is a tributary to Roan Creek, which flows into the Colorado River near De Beque.

***Other Protections for Segment***

| **Carr Creek** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Fish | NSO (1,100 acres), CSU (600 acres), TL (100 acres), ROW Avoidance (1,700 acres), ACEC overlap (1,700 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. The ORV for this segment is for greenback cutthroat trout that are present. Mechanisms other than WSR designation can adequately protect these fish. The Roan and Carr Creeks ACEC will provide special management attention, limit allowable uses, and direct management actions to protect this fish population. The cutthroat trout are protected as special status species regardless of designation.

Other factors would make management of this segment in the NWSRS challenging and not the most effective use of the BLM's limited funds and management resources. The BLM is a minority landowner on this segment. It only manages a third of the shoreline and less than half of land in the segment corridor. As stated above, an ACEC overlaps the upper portion of the segment (roughly uppermost four miles) where the BLM manages the entire shoreline and all of the surrounding land in the corridor. However, the special management afforded by the ACEC does not apply to the remainder of the segment where land ownership is fragmented.

Additionally, there are oil and gas leases on nearly all of the BLM land in the corridor, and there are eight active wells in the corridor. BLM's permits for authorization to drill wells contain stipulations designed to protect the cutthroat trout population. Finally, the CWCB holds an instream flow water right on this creek that is designed to provide flow rates that support the

fish population. This water right is a viable alternative to the federal reserved water right that would come with designation as a Wild and Scenic River.

## 3.5 ROUGH CANYON CREEK

| | | | |
|---|---|---|---|
| **Description:** | Sections of Rough Canyon Creek on BLM land located south of Grand Junction in the Bangs Canyon SRMA. | | |
| **Total Segment Length:** | 4.21 miles | **Total Segment Area:** | 1,356.52 acres |
| **Length on BLM Land :** | 4.21 miles | **Area on BLM Land:** | 1,248.06 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Scenic, Wildlife, Geologic | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.
Rough Canyon Creek is an intermittent stream and contains outstandingly remarkable scenic, geologic, and wildlife values. The tentative classification of this segment is scenic due to an inconspicuous dirt road that runs parallel to the creek for most of its extent.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Deep canyons exposing multiple layers of rock as old as the Precambrian create outstandingly remarkable scenery. A classic faulted monocline next to the creek adds to the unusual and spectacular scenery.

This segment has outstandingly remarkable geologic value. The faulted monocline within Rough Canyon is readily visible from the creek and provides a textbook example of the feature. The exposed fault has provided evidence of the formation of the Uncompahgre Plateau.

This segment has outstandingly remarkable wildlife value. Rough Canyon Creek is an important Canyon Tree Frog *(Hyla arenicolor)* breeding area with many breeding pools found in surveys of this area. The Canyon Tree Frog is a BLM sensitive species (BLM 2000). The management objective for BLM sensitive species that are not federally listed as endangered or threatened is to initiate protective conservation measures that reduce or eliminate threats to minimize the likelihood of and need for listing of these species under the ESA. The CPW identified the Canyon Tree Frog as a species of greatest conservation need in its Comprehensive Wildlife Conservation Strategy (CPW 2006).

This segment has characteristics in addition to its ORVs that add to its value as a potential addition to the NWSRS. The majority of the study area (4.09 miles, 874.61 acres) is within the Rough Canyon research natural area and ACEC. The BLM has proposed to expand this existing ACEC to provide special management attention to its plant, fish and wildlife, scenic, cultural, and geologic values. The study corridor is also within the Bangs Canyon SRMA. While the SRMA is available for a wide-range of activities, Rough Canyon is protected from surface-disturbing

activities and the canyon floor is open to foot and equestrian traffic only. The Tabeguache Trail follows the eastern rim of the canyon and is a motorized trail. Lastly, there are no active diversions along Rough Canyon Creek.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

The shoreline for this 4.21-mile segment is entirely managed by BLM. Within the 1,356.52-acre study corridor, the BLM manages 1,248.06 acres (92.0 percent), and the remaining 108.46 acres (8.0 percent) are privately owned. The segment corridor is not leased for oil and gas development; there are no active wells in the corridor; and the oil and gas potential is very low.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect water development along this segment. However, the potential for future water development is very low due to the intermittent nature of the creek and its remote location. If designated, it is expected that management practices would be similar to existing management practices. Hiking in the canyon could increase with designation and threaten the ORVs, particularly the canyon treefrog habitat. The values along this segment likely would not diminish if the segment was not designated because other management tools provide adequate protection, as discussed below.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering this area is not likely to increase substantially if designated. The BLM already devotes funding to this area for its management of the Bangs Canyon SRMA and the Rough Canyon ACEC.

The acquisition of private lands is not essential for management for the protection of the ORVs because the BLM manages nearly all of the lands within the segment corridor. Nevertheless, the BLM would pursue acquisition of private parcels from willing sellers. No detailed cost estimate was prepared as part of this study.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM could manage this segment effectively as a WSR. The BLM manages all of the shoreline along this segment and 92 percent of the acres in the segment corridor. Other means also exist to protect the identified values other than WSR designation.

The BLM currently manages the segment corridor as part of the Rough Canyon research natural area and ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. This provides a layer of protection for the scenic, wildlife, and geologic ORVs.

The BLM also manages the segment corridor as part of the Bangs Canyon SRMA. Braided routes on the canyon floor and a lack of interpretive educational efforts put the identified ORVs,

specifically the canyon treefrog, at risk. However, increased efforts by the BLM to educate users and close trails would minimize adverse impacts.

The BLM's VRM system provides some protection for the scenic values of this segment. The segment corridor is managed as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. Class II protection also provides some protection against visual disturbance which could indirectly protect the geologic value by minimizing the possibility of significant development in the area.

6. Historical or existing rights that could be adversely affected with designation.

No historical or existing rights have been identified for this segment.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

This segment is within Mesa County. There are parcels of private land within the watershed but not directly located on the creek. The private lands are within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

The Mesa Land Trust holds a conservation easement on a very small portion of the private land at the upstream end of the segment corridor (about 20 acres). Conservation easements are voluntary, perpetually binding documents that restrict development of a property. Conservation easements have the general purposes of conserving agricultural productivity, open space character, wildlife habitat, and scenic qualities, and for preventing any uses that will impair or interfere with the conservation values of the property (such as industrial uses). With regard to water use, conservation easements allow the maintenance of existing water systems and the development of new water sources, provided that such maintenance or development does not substantially diminish the conservation values of the property.

In sum, even though Mesa County zoning may allow incompatible development, the private lands in the segment corridor make up such a small percentage (8 percent) that adverse effects to ORVs from incompatible development is unlikely.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

Designation to protect the canyon treefrog would be consistent with the CPW initiative to protect the species.

10. Contribution to a river system watershed or basin integrity.

Because the creek is intermittent, the Gunnison River does not rely upon a contribution from Rough Canyon Creek to meet average flow levels.

11. Other issues and concerns, if any.

None.

***Other Protections for Segment***

| **Rough Canyon Creek** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Wildlife, Geological | NSO and TL (1,200 acres), CSU (800 acres), VRM Class II (1,200 acres), ROW Exclusion (1,000 acres), ROW Avoidance (200 acres), Closed to Fluid Mineral Leasing (1,200 acres), ACEC overlap (900 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. The BLM can adequately protect the ORVs along this segment with other administrative protections. The increased visitation that would likely accompany designation has the potential to have an adverse effect on the wildlife (canyon tree frog habitat) value of the segment. As such, the BLM will protect the ORVs of this segment utilizing existing means other than designation. For example, the BLM's VRM system provides a layer of protection for the scenic and geologic values. The BLM manages this area as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape.

The Rough Canyon ACEC also provides special management attention to values in this area (geologic, wildlife habitat, archaeological, and plants) that parallel the ORVs of this segment. For these reasons, the BLM determines that this segment is not suitable for inclusion in the NWSRS.

## 3.6 Unaweep Canyon Complex

### 3.6.1 East Creek

| | | | |
|---|---|---|---|
| **Description:** | Sections of East Creek on BLM land running parallel to Highway 141 from the Unaweep Divide to East Creek's confluence with the Gunnison River near Whitewater. | | |
| **Total Segment Length:** | 20.26 miles | **Total Segment Area:** | 6,220.63 acres |
| **Length on BLM Land :** | 8.96 miles | **Area on BLM Land:** | 3,601.84 acres |
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Geologic | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

This segment has outstanding geologic value. The tentative classification for this segment is recreational because Highway 141 runs parallel to the creek. Frequent traffic and transmission lines are readily apparent. With regard to its geologic value, East Creek flows east from the Unaweep Divide, through Unaweep Canyon, to the Gunnison River. West Creek flows west from Unaweep Divide and into the Dolores River. These creeks originate in the canyon and do not have a source large enough to create a canyon of such magnitude. It is hypothesized that Unaweep Canyon was carved by one or both of the modern day Gunnison or Colorado Rivers. The second uplift of the Uncompahgre Plateau probably rerouted one or both of these rivers. This has led to the exposure of multiple layers of rock, including the Precambrian basement layer of the Uncompahgre Plateau, and high canyon walls of up to 1000 feet. The divide located in the middle of the canyon separating East and West Creeks is rare (Foutz 1994) and Unaweep Canyon is the only known canyon in the world with a divide in the middle and a creek flowing out of each end (Ikenberry 2002). Approximately one-third of the study area (1,929.99 acres) is within the Bangs Canyon SRMA. Also, a small portion of the study area lies within the Dominguez-Escalante NCA. Congress designated the Dominguez-Escalante NCA to:

> "[C]onserve and protect for the benefit and enjoyment of present and future generations--(1) the unique and important resources and values of the land, including the geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, and scenic resources of the public land; and (2) the water resources of area streams, based on seasonally available flows, that are necessary to support aquatic, riparian, and terrestrial species and communities." (Public Law No. 111-11).

In a 2007 landscape health assessment, East Creek was rated as functioning-at-risk because of insufficient bank vegetation and streambed disturbance related to recreational use along the banks and off-highway vehicle use.

There are seven active diversions within the study area. These diversions are primarily for irrigation purposes and have the potential to provide return flows to the creek.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 20.26-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 8.96 miles (44.2 percent) of the segment. Within the 6,220.63-

acre segment corridor, the BLM manages 3,601.84 acres (57.9 percent). The remaining land status is composed of 4,014.64 acres (42.1 percent) in private ownership.

The BLM-managed lands in the segment corridor to the southeast of Highway 141 lie within the Dominguez-Escalante NCA (approximately 25 percent of this study area for this segment). The Omnibus Public Land Management Act of 2009 withdrew all BLM-managed lands in the Dominguez-Escalante NCA from "location, entry, and patent under the mining laws; and operation of the mineral leasing, mineral materials, and geothermal leasing laws." (Public Law No. 111-11) There is very low oil and gas potential on the remaining BLM lands in the segment corridor. There are no active oil and gas wells, oil and gas leases, or mining claims in this area.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other federal agencies to evaluate the potential effects on the segment's values.

The geologic value of this segment likely would not be foreclosed or diminished if the segment was not designated. As discussed above, Unaweep Canyon is thought to have been formed by either the Gunnison or Colorado Rivers. Then, the second uplift of the Uncompahgre Plateau rerouted one or both of these rivers. This value does not depend directly on flows in East Creek, and administrative provisions in the BLM land use plan will prevent outstanding expressions of the geologic value from being inappropriately developed.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

If designated, it is unlikely that the cost of administering the area would increase dramatically over the current level, as the area already sees a moderate amount of activity from scenic drivers and because the highway serves as a corridor to the Gateway area and Southwest Colorado. BLM has already developed turnouts, signage, and other recreational infrastructure along the segment to accommodate the existing use. Further, the protection of this segment's geologic value does not require the active management that an ecosystem-based ORV, such as wildlife or fish, would. The BLM would not pursue land acquisition along this segment at this time.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM manages less than half of the shoreline of this segment and only 57.1 percent of the lands in the segment corridor, making effective management of the segment as a WSR challenging.

Other administrative management tools provide some protection for this segment's ORV. Almost half of the study area (2,748.66 acres) is managed as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to

the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. Class II protection provides some protection against visual disturbance which could indirectly protect the geologic value by minimizing the possibility of substantial development in the area. This segment flows along the boundary of the Dominguez-Escalante NCA which was designated to conserve and protect, among other resources, its geological values. Nearly 25 percent of the study area (1,438.97 acres) is protected by the NCA.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should establish a geological ACEC to protect the geological ORV.
2. BLM should carefully manage access routes and recreational use areas to prevent damage to the geological ORV.
3. BLM should continue to rely upon the inaccessibility of the creek as a method to protect the Fish ORV.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.

There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions on BLM lands would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORV.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

No other agency plans, programs, or policies were identified for this segment.

10. Contribution to a river system watershed or basin integrity.

East Creek is a tributary to the Gunnison River.

***Other Protections for Segment***

| East Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Geological | NSO (1,900 acres), CSU (1,500 acres), TL (1,900 acres), VRM Class II (1,900 acres), ROW Avoidance (1,900 acres), lands with wilderness characteristics overlap (400 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. The ORV for this segment is its unique geologic value. The BLM's VRM system provides a layer of protection for this value. VRM Class II protection provides protection against visual disturbance, and could indirectly protect the geologic value by minimizing the possibility of substantial development in the area.

Since there is a large percentage of private land in this segment, management as a Wild and Scenic River could be challenging and resource-intensive. Current zoning in the area could allow developments that could detract from the visual observation and interpretation of the geologic values.

Creation of a federal reserved water right with designation does not appear essential for managing the geologic ORV. Maintenance of the geologic ORV is not highly flow-dependent. In addition, the Colorado Water Conservation appropriated an instream flow water right for this stream this reach during 2014, based upon a recommendation from the BLM.

Because of the factors discussed above, management of this segment as suitable for inclusion in the NWSRS is not the most effective use of the BLM's limited funds and management resources.

### 3.6.2 West Creek

**Description:** Sections of West Creek on BLM land running parallel to Highway 141 from the Unaweep Divide to West Creek's confluence with the Dolores River near Gateway.

**Total Segment Length:** 23.56 miles **Total Segment Area:** 6,926.06 acres

| **Length on BLM Land :** | 4.93 miles | **Area on BLM Land:** | 2,490.99 acres |
|---|---|---|---|
| **Tentative Classification:** | Recreational | | |
| **ORVs:** | Scenic, Wildlife, Geologic, Vegetation | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

West Creek contains outstandingly remarkable scenic, geologic, wildlife, and vegetative values. The tentative classification for this segment is recreational as Highway 141 runs parallel to the creek and its traffic is readily apparent from the creek.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Colorado State Highway 141, running through Unaweep Canyon and paralleling West Creek, is part of the Unaweep-Tabeguache Scenic and Historic Byway designated by Congress in 1980. The steep canyon walls formed by a rerouted ancient river have resulted in cliffs up to 1000 feet high in a magnificent canyon. Cottonwoods abound along the watercourse and provide a striking contrast to the variety of different colors of the multitude of rock layers exposed on the canyon walls. Sections of the canyon are very narrow and intimate while others are very wide and open up to provide fantastic views.

This segment has outstandingly remarkable geologic value. East Creek flows east from the Unaweep Divide, through Unaweep Canyon, to the Gunnison River. West Creek flows west from Unaweep Divide and into the Dolores River. These creeks originate in the canyon and do not have a source large enough to create a canyon of such magnitude. It is hypothesized that Unaweep Canyon was carved by one or both of the modern day Gunnison or Colorado Rivers. The second uplift of the Uncompahgre Plateau probably rerouted one or both of these rivers. This has led to the exposure of multiple layers of rock, including the Precambrian basement layer of the Uncompahgre Plateau, and high canyon walls of up to 1000 feet. The divide located in the middle of the canyon separating East and West Creeks is rare (Foutz 1994) and Unaweep Canyon is the only known canyon in the world with a divide in the middle and a creek flowing out of each end (Ikenberry 2002). This segment has outstandingly remarkable wildlife and vegetation values. The study area contains nearly all of Unaweep Seep ACEC/research natural area, designated to protect the area's outstanding biologic diversity. The BLM is carrying forward this existing ACEC its fish and wildlife, plant, riparian habitat and hydrologic values. This area contains around twenty seeps in a contiguous area harboring an unusually high species diversity and density. The Great Basin silverspot butterfly (*Speyeria n. Nokomis*), a BLM sensitive species, is also found here. The management objective for BLM sensitive species that are not federally listed as endangered or threatened is to initiate protective conservation measures that reduce or eliminate threats to minimize the likelihood of and need for listing of these species under the ESA. Unaweep Seep is also a designated Important Bird Area (Audubon 2008). The Unaweep Seep ACEC is also among the highest in the GJFO in terms of plant diversity. Included in this assemblage is the helleborine orchid *(Epipactis gigantea)*, ranked by CNHP as S2 (state

imperiled). An S2 rank indicates that the species is imperiled in the state because of rarity due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors making it very vulnerable to extirpation from the nation or state.

The study area for this segment is partially within the Palisade outstanding natural area and ACEC (2.18 miles, 625.77 acres). The BLM has proposed to expand the existing Palisade outstanding natural area and ACEC to provide special management attention to its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values. A small portion of this segment and study area overlaps The Palisade WSA (0.03 miles, 561.54 acres).

There are numerous active water diversions along West Creek (approximately two dozen). These diversions are primarily for irrigation purposes, which have the potential to provide return flows to the creek. Some diversions are for stock and domestic purposes. The CWCB holds an instream flow right for 15 cfs on West Creek from its headwaters to its confluence with the Dolores River.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 20.26-mile segment is a combination of federal (BLM) and private. The BLM manages shoreline along 4.93 miles (20.9 percent) of the segment. Within the 6,926.06-acre study corridor, the BLM manages 2,490.99 acres (36.0 percent). The remaining land status is composed of 4,435.07 acres (64.0 percent) in private ownership.

A small portion of the segment corridor downstream from the confluence of Ute Creek is leased for oil and gas exploration but there are no active wells in the area. There is an active mining claim in the segment corridor where West Creek flows into the Dolores River. There is no oil and gas potential in this area.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment. With designation, BLM would obtain authority to deny or impose terms and conditions on proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds to evaluate the potential effects on the segment's values.

If designated, valid mining claims and mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment.

The geologic value of this segment likely would not be foreclosed or diminished if the segment was not designated. As discussed above, Unaweep Canyon is thought to have been formed by either the Gunnison or Colorado Rivers. Then, the second uplift of the Uncompahgre Plateau rerouted one or both of these rivers. This value does not depend on flows in East Creek or require protective management by the BLM.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

If designated, it is unlikely that the cost of administering the area would increase over the current level. The area already sees a moderate amount of activity from scenic drivers, and the highway serves as a corridor to the Gateway area and southwest Colorado. Further, the BLM already devotes funding to its management of particular areas within this segment, such as the Unaweep Seep and the Palisade ACECs.

The BLM would not pursue land acquisition along this segment at this time. The majority of land in this segment is privately owned. It is not feasible for the BLM to acquire enough land to appreciably affect its ability to manage the segment.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM manages only 20.9 percent of the shoreline of this segment and only 36.0 percent of the lands in the segment corridor, making effective management of the segment as a WSR challenging.

A portion of this segment flows through the Palisade WSA. The Palisade WSA is managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012). The goal of this policy is to manage WSAs to not impair their suitability for preservation as wilderness, until Congress designates them as wilderness, or until they are released from further wilderness consideration. This “non-impairment” management standard is more stringent than the BLM’s management direction for Recreational WSRs. But if the area is not designated as wilderness and the WSA designation is removed, protection of the area would be limited to RMP management measures.

Portions of the study area are also currently managed as part of the Palisade outstanding natural area and ACEC and the Unaweep Seep ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. The Unaweep Seep ACEC has been successful at protecting the Great Basin silverspot butterfly as well as the plant diversity of the area. Continuation of these ACECs would help protect the ORVs.

Management actions for the Unaweep Seep ACEC include: (1) classify as closed to unauthorized motorized travel activities, including over-the-snow travel; (2) closed to mechanized travel, wood collecting, fossil collecting and camping; (3) designate as ROW exclusion area; and (4) withdraw from mineral location, close to mineral material sales, and classify as unsuitable for coal leasing.

The BLM’s VRM system provides some protection for the scenic values of this segment. The segment corridor is managed as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer’s attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape. Class II protection also

provides some protection against visual disturbance which could indirectly protect the geologic value by minimizing the possibility of significant development in the area.

The CWCB holds an instream flow right on West Creek for 15 cfs year-round from its headwaters to its confluence with the Dolores River. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORVs found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should utilize protections associated with existing WSAs and protections associated with the proposed lands with wilderness characteristics management prescription to protect the ORVs.
2. BLM should rely upon the existing instream flow water right held by the CWCB to assist in protecting the scenic, wildlife, and vegetation ORVs.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.

There are current water diversions along this segment. The ability to change existing diversions and to appropriate new diversion of water could be affected if the segment were designated and included a federal reserved water right. With a federally reserved water right in place, new diversions and changes to existing diversions would be allowed to the extent that sufficient flow remains in the river segment to support the identified ORV. The amount and timing of water to support the ORVs in the federal reserved water right would be established by scientific studies completed by the BLM and confirmed by the Colorado water court system.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

The Mesa Land Trust holds conservation easements on private lands at the upstream end of the segment corridor (approximately 500 acres). In large part, these conservation easements will protect the river's ORVs and prevent incompatible development. Conservation easements are voluntary, perpetually binding documents that restrict development of a property. Conservation easements have the general purposes of conserving agricultural productivity, open space character, wildlife habitat, and scenic qualities, and for preventing any uses that will impair or interfere with the conservation values of the property (such as industrial uses). With regard to water use, conservation easements allow the maintenance of existing water systems and the development of new water sources, provided that such maintenance or development does not substantially diminish the conservation values of the property.

In sum, even though Mesa County zoning may allow incompatible development, conservation easements on private lands in the segment corridor provide more stringent land use controls and generally will prevent incompatible development.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

The Uncompahgre National Forest issued a proposed Forest Plan Revision in conjunction with the Gunnison National Forest in March 2007. The US Forest Service deferred its determination on West Creek as it flows through Unaweep Canyon (called Unaweep Creek in the US Forest Service document) until the BLM completed its eligibility determination (US Forest Service 2006). However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule.

10. Contribution to a river system watershed or basin integrity.

West Creek is a tributary of the Dolores River.

***Other Protections for Segment***

| **West Creek** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Wildlife, Geological, Vegetation | NSO and TL (1,700 acres), CSU (600 acres), VRM Class I (600 acres), ROW Exclusion (600 acres), ROW Avoidance (1,100 acres), Closed to Fluid Mineral Leasing (1,700 acres), Petition for Withdrawal from Mineral Entry (300 acres), ACEC overlap (900 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable**. Management of this segment as a WSR would be challenging based on the amount of private land and, therefore, not the most effective use of the BLM's limited funds and management resources. The BLM manages only about a third of the land in the segment corridor and only about twenty percent of the

shoreline. The CWCB holds an instream flow right along West Creek, and this water right appears to be supporting the ORVs in this segment. Other administrative mechanisms can protect the ORVs along this segment without designation. As discussed above, the BLM's VRM system provides a layer of protection for the segment's scenic and geologic values. The Unaweep Seep ACEC provides special management attention to the wildlife and vegetation values of the area. For these reasons, the BLM determines that this segment is not suitable.

### 3.6.3 North Fork of West Creek

| | | | |
|---|---|---|---|
| **Description:** | Sections of the North Fork of West Creek on BLM land from Pinon Mesa running through the Palisade WSA to the confluence with West Creek east of Gateway along Highway 141. | | |
| **Total Segment Length:** | 8.46 miles | **Total Segment Area:** | 2,751.86 acres |
| **Length on BLM Land :** | 3.31 miles | **Area on BLM Land:** | 1,080.11 acres |
| **Tentative Classification:** | Wild | | |
| **ORVs:** | Scenic | | |

***Suitability Factor Assessment***

1. <u>Characteristics that do or do not make the river a worthy addition to the NWSRS.</u>
The North Fork of West Creek has outstandingly remarkable scenic value. The tentative classification for this segment is Wild because the segment flows through the Palisade WSA and there is little development along the stream corridor. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). The North Fork of West Creek drops steeply from Pinon Mesa and forms a rugged narrow canyon through the Palisade WSA. In this area, the dark grey Precambrian bedrock is overlaid with deep red sandstone. Therefore, the canyon possesses mostly dark grey cliffs with upper cliff bands of dark red. In addition, the more mesic environment along the creek allows Ponderosa Pines and other higher elevation species to exist the entire length of the creek down to the confluence with West Creek. These features, in combination with the relatively high perennial stream flow and remote environment make the North Fork of West an outstandingly remarkable scenic area.

Grazing occurs within the segment study corridor but does not detract from the scenic nature of the area.

A portion of the segment and study area study area is within the Palisade WSA (2.85 miles, 916.46 acres) and the Palisade outstanding natural area and ACEC (2.96 miles, 917.00 acres). The BLM has proposed to expand The Palisade outstanding natural area and ACEC to provide special management attention for its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values.

The study area for the portion of this segment on BLM-managed lands lies within the Gateway SRMA.

There are no active diversions along the North Fork of West Creek. The CWCB holds an instream flow right from Y Gulch to its confluence with West Creek.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Within this 8.46-mile segment, the BLM manages the shoreline along 3.31 miles (39.1 percent). Within the 2,751.86-acre study corridor, the BLM manages 1,080.11 acres (39.3 percent). The northern portion of the study area 1671.75 acres (60.7 percent) is on private land. There are no active mining claims, no oil and gas leases, and no oil and gas wells in the segment corridor. There is no oil and gas potential in the area.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

WSR designation has the potential to affect future water development along this segment and in areas located upstream from this segment. With designation, BLM would obtain authority to deny or place terms and conditions on any proposed projects on BLM lands that would be incompatible or potentially degrade the ORVs for this segment. The BLM would review proposed projects that require federal permits, licenses, or funds from other agencies to evaluate the potential effects on the segment's values.

The scenic values likely would not diminish if the segment were not designated. The segment flows through the Palisade WSA, which is subject to stringent protective management, as discussed below.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

Any additional cost of administering the area for protection of its ORVs if designated would be minimal. First, public access to the area is limited. Second, the BLM already incurs some costs specific to this area in order to manage the area according to its Interim Management Policy for Lands Under Wilderness Review. The BLM also already devotes some funds to the area in order to manage the Palisade ACEC. The BLM would not pursue land acquisition along this segment at this time. Because the BLM-managed lands in the segment corridor form a contiguous block along the downstream end of the canyon, the BLM can effectively protect the scenic value of this segment without acquiring additional lands.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM can effectively manage this segment as a WSR. Minimal management is currently required to protect the scenic nature of the area as access is challenging due to dense vegetation and the steep slopes of the canyon walls. However, other means can protect the ORVs in the absence of WSR designation.

A portion of this segment flows through the Palisade WSA. The Palisade WSA is managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012). The goal of this policy is to manage WSAs in such a manner to not impair their suitability for preservation as wilderness, until Congress designates them as wilderness, or until they are released from further wilderness consideration. This "non-impairment" management standard is similar to the BLM's management direction for Wild WSRs. But if the area is not designated as wilderness and the WSA designation is removed, protection of the area would be limited to RMP management measures.

Portions of the study area are also currently managed as part of the Palisade outstanding natural area and ACEC. An ACEC is an administrative designation that the BLM uses to provide special management attention is to protect and prevent irreparable damage to important historical, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes. Continuation of this ACEC would help protect the scenic ORV.

The BLM manages the WSA and ACEC as VRM Class I, which also provides protection for the scenic ORV. The goal of VRM Class I is to preserve the existing character of the landscape. It requires the level of change to the characteristic landscape to be very low and to not attract attention.

The CWCB holds an instream flow right on the North Fork of West Creek from Y Gulch to its confluence with West Creek. There are varying levels of instream flow appropriations throughout the year for the segment, the most being between April 1 and June 30 for 3.7 cfs. The appropriation drops to between 0.4 and 0.8 cfs for the remainder of the year. The purpose of an instream flow right is to preserve the natural environment to a reasonable degree. As such, this instream flow right provides a measure of flow protection that supports the ORVs found on this segment.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should utilize protections associated with existing WSAs and protections associated with the proposed lands with wilderness characteristics management prescription to protect the ORV.
2. BLM should rely upon the existing instream flow water right held by the CWCB to assist in protecting the scenic ORV.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6. <u>Historical or existing rights that could be adversely affected with designation.</u>
There are a limited number of private water rights located with and upstream from this segment. Designation would not affect the ability to operate these rights as they have been historically operated. However, if the owners desire to change those water rights, the changes

would be subject to the federal reserved water right that would be associated with the designated segment.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). The Agricultural, Forestry, Transitional district has limited potential to prevent development that is incompatible with protection of the ORVs. The allowable uses along this segment include various forms of industrial development and resource extraction. For example, the Agricultural, Forestry, Transitional district allows oil and gas drilling and commercial forestry as of right. The Agricultural, Forestry, Transitional district also allows some conditional uses that could have an adverse effect on ORVs, such as sand and gravel storage or excavation, waste transfer, solid waste disposal and other mining. These industrial uses may result in development that is incompatible with the protection of this segment's ORVs, particularly its scenic values.

The Mesa Land Trust holds a conservation easement on some of the private lands in the upstream end of the segment corridor (approximately 300 acres). This conservation easement will protect the river's ORV and prevent incompatible development. Conservation easements are voluntary, perpetually binding documents that restrict development of a property. Conservation easements have the general purposes of conserving agricultural productivity, open space character, wildlife habitat, and scenic qualities, and for preventing any uses that will impair or interfere with the conservation values of the property (such as industrial uses). With regard to water use, conservation easements allow the maintenance of existing water systems and the development of new water sources, provided that such maintenance or development does not substantially diminish the conservation values of the property.

In sum, even though Mesa County zoning may allow incompatible development. Only private lands with conservation easements (and thus more stringent land use controls) in the segment corridor will prevent incompatible development.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

No other agency plans, programs, or policies were identified for this segment.

10. Contribution to a river system watershed or basin integrity.

North Fork of West Creek is a tributary of West Creek, which contributes to the Dolores River.

11. Other issues and concerns, if any.

None.

***Other Protections for Segment***

| North Fork of West Creek | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic | NSO (1,100 acres), TL (500 acres), VRM Class I (900 acres), VRM Class II (200 acres), ROW Exclusion (900 acres), ROW Avoidance (100 acres), Closed to Fluid Mineral Leasing (1,100 acres) |

***Suitability Determination***

The suitability determination for this segment is **not suitable.** The upstream five miles and uppermost sixty percent of the segment corridor are on private land. Existing management of the BLM lands in the corridor can adequately protect the scenic value and tentative classification of this segment. However, protection of the ORVs on the upper part of the segment, which consists primarily of private lands, would be challenging. Management of this segment as suitable for inclusion in the NWSRS is not the most effective use of the BLM's limited funds and management resources.

The portion of the segment on BLM land flows through a WSA. The BLM manages WSAs to not impair their suitability for preservation as wilderness. This will protect the tentative Wild classification of the segment as it flows through BLM land. Pursuant to this management objective, WSAs are managed as VRM Class I. The goal of VRM Class I is to preserve the existing character of the landscape, which will protect the scenic value of the segment as it flows through BLM land.

Neither of these protections discussed above apply to private lands. Only about 300 acres of the segment corridor are conserved under a conservation easement with the Mesa Land Trust. The remaining private lands in the corridor are only subject to the restrictions of the Mesa County Agricultural, Forestry, Transitional zoning district. As discussed above, this zoning district has the potential to allow development that is incompatible with this segment's scenic value and tentative Wild classification (i.e., a road within the corridor).

### 3.6.4 Ute Creek

| | | | |
|---|---|---|---|
| **Description:** | From North Berg Mesa near the northern extent of the Uncompahgre Plateau to the confluence with West Creek east of Gateway. | | |
| **Total Segment Length:** | 4.22 miles | **Total Segment Area:** | 1,441.12 acres |
| **Length on BLM Land :** | 4.19 miles | **Area on BLM Land:** | 1,362.63 acres |
| **Tentative Classification:** | Scenic | | |
| **ORVs:** | Scenic, Vegetation | | |

***Suitability Factor Assessment***

1. Characteristics that do or do not make the river a worthy addition to the NWSRS.

Ute Creek has outstandingly remarkable scenic and vegetative values. The tentative classification for this segment is Scenic due to limited access via a dirt road along this segment.

This segment has outstandingly remarkable scenic value. Scenic quality is a measure of the visual appeal of a tract of land. The BLM uses a scenic quality rating process to assign public lands an A, B, or C rating based on seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. In a recent visual resources inventory, this area was determined to have a scenic quality rating of A (BLM 2009c). Ute Creek has formed a narrow canyon that rarely opens up to create a wider canyon bottom. The narrow, steep canyon walls form interesting overhangs and features, and the addition of a healthy cottonwood community provides for a unique, pristine watercourse in a region where riparian areas are frequently impacted by humans. When the canyon does open up, it reveals spectacular views of the Dolores River valley and the Palisade.

This segment also has outstandingly remarkable vegetative value. The cottonwood communities along the segment contain a gallery forest with cottonwoods of all age classes, composing one of the best examples of a "potentially natural community" in the GJFO (BLM 1993). A small portion of the segment and study area lies within the Palisade WSA (46.12 acres) and the Palisade outstanding natural area and ACEC (0.07 miles, 84.06 acres). The BLM has proposed to expand The Palisade outstanding natural area and ACEC to provide special management attention for its vegetation (rare plant species), wildlife (peregrine falcon), and scenic values.

The segment area is almost entirely within the Gateway SRMA.

There are no active diversions from Ute Creek. However, there are a series (about five) of developed stock ponds on US Forest Service land upstream.

2. The status of landownership, minerals (surface and subsurface) use in the area, including the amount of private land involved and associated or incompatible uses.

Land ownership for this 4.22-mile segment is primarily federal (BLM and US Forest Service) with a small area of private ownership. The BLM manages shoreline along 4.19 miles (99.5 percent) of the segment. Within the 1,441.12-acre study corridor, the BLM manages 1,362.63 acres (94.6 percent). The US Forest Service manages 68.54 acres (4.1 percent) at the upstream end of the segment corridor. The remaining land status consists of 18.59 acres (along Highway 141; 1.3 percent) in private ownership.

There is no oil and gas potential in this area, and there are no active wells in this area. However, roughly 165 acres of the segment corridor near Ute Creek's confluence with West Creek is leased for oil and gas exploration. There are no active mining claims in the segment corridor.

3. Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area were not designated.

While WSR designation has the potential to affect future water development along this segment, there currently are no active water diversions along Ute Creek, and additional water development is not anticipated.

If designated, valid mineral leases would remain in effect. Because the segment is preliminarily classified as Scenic, new mining claims or mineral leases may be allowed, subject to reasonable access and stipulations that minimize surface disturbance, water sedimentation, pollution, and visual impairment. As discussed below, the ORVs in this segment are not likely to diminish if the segment is not designated.

Grazing use of this segment, including the use of the trail along the segment to move livestock, would likely not be affected by designation. The tentative scenic classification would allow for continued use and maintenance of the trail, and the existing livestock use is not expected to significantly impact the scenic and vegetation ORVs.

4. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated.

The cost of administering the area for protection of the ORVs would be minimal as public access to the area is limited. Regardless, designation of the segment would enhance the BLM's ability to obtain funding for the management of the area.

The acquisition of private lands is not essential for management for the protection of the ORVs because the BLM manages nearly all of the lands within the segment corridor. Nevertheless, the BLM would pursue acquisition from of private parcels from willing sellers. No detailed cost estimate was prepared as part of this study.

5. Ability of the agency to manage and protect the river area or segment as a WSR, or other means to protect the identified values other than WSR designation.

The BLM could effectively manage this segment as a WSR because it manages nearly all of the lands in the segment corridor (94.6 percent). Because of the limited access, the BLM is able to protect the vegetation ORV with minimal management. The scenic ORV is largely dependent upon management actions related to potential mineral extraction and related development in the vicinity. Again, because the corridor itself is difficult to access, it is unlikely that the corridor would be developed for mineral extraction.

The BLM's VRM system also provides some protection for the scenic values of this segment. The BLM manages the segment corridor as VRM Class II. The objective of VRM Class II is to retain existing landscape character. This class permits only low levels of change to the characteristic landscape. It provides that management activities may be seen but should not attract a casual observer's attention. Any changes must repeat the basic elements of line, form, color, and texture found in the predominant natural features of the characteristic landscape.

The Lower Colorado River Wild and Scenic River Stakeholder Collaborative, described in **Section 2.2.5** (Public Input) of this report, provided management recommendations for this stream segment. Specifically, the stakeholder collaborative recommended:

1. BLM should utilize protections associated with the proposed lands with wilderness characteristics management prescription to protect the ORVs.
2. BLM should establish a riparian ACEC, combined with surface use stipulations, to protect to the scenic and vegetation ORVs.

The stakeholder collaborative was unable to reach consensus on whether this stream segment should be determined suitable or not suitable by BLM for designation under the WSR Act.

6. Historical or existing rights that could be adversely affected with designation.

No historical or existing rights have been identified for this segment.

7. Adequacy of local zoning and other land use controls in protecting the river's ORVs by preventing incompatible development.

The segment is in Mesa County and the small portion of land within the segment study corridor on private land is within the Agricultural, Forestry, Transitional district. The Agricultural, Forestry, Transitional district is primarily intended to accommodate agricultural operations and very low-density single-family residential development within the rural planning area (Mesa County 2008). Local zoning is not a major concern for this segment as private lands constitute only one percent of the segment corridor.

8. Support or opposition of local governments, state governments, and stakeholders to designation under the WSRA.

Refer to criterion #4.

9. Consistency of designation with other agency plans, programs, or policies.

The Uncompahgre National Forest found the portion of Ute Creek upstream of the BLM segment not eligible for inclusion in the NWSRS during the eligibility study for the Grand Mesa, Uncompahgre, and Gunnison National Forests land management plan revision process (US Forest Service 2006). The portion of Ute Creek in the National Forest serves as the boundary between two management areas: big game winter range in non-forest areas and big game winter range in forested areas. The US Forest Service manages these areas according to the following general prescriptions: (1) provide semi-primitive non-motorized, semi-primitive motorized, and roaded natural recreation opportunities; (2) manage motorized recreation prevent unacceptable stress on big game animals during primary big game use season; use vegetation treatments to enhance plant and animal diversity; (3) manage livestock grazing to favor wildlife habitat; and (4) (in forested areas only) use timber harvest to improve winter range. Management by the US Forest Service to provide big game habitat is unlikely to have an adverse effect on this segment's ORVs, with the exception of some types of timber harvest (such as clearcutting). Nevertheless, management by the US Forest Service as to provide big game habitat is generally consistent with BLM management that would occur with designation.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 156 of 499

The Uncompahgre National Forest's 2007 proposed forest plan would manage this area as recommended wilderness. The US Forest Service would manage the area to protect its wilderness characteristics until Congressional action is taken. (US Forest Service 2007) Natural processes with little or no human intervention would influence ecosystems. However, the proposed forest plan is not final and has been suspended because of litigation over the US Forest Service's 2005 planning rule. Management by the US Forest Service as recommended wilderness is generally consistent with BLM management that would occur with designation.

10. Contribution to a river system watershed or basin integrity.
The segment is a tributary of West Creek, which contributes to the Dolores River.

11. Other issues and concerns, if any.
None.

***Other Protections for Segment***

| **Ute Creek** | |
|---|---|
| **Outstandingly Remarkable Values** | **Protections** |
| Scenic, Vegetation | NSO (1,400 acres), CSU (500 acres), TL (800 acres), VRM Class I (50 acres), VRM Class II (1,100 acres), ROW Exclusion (1,100 acres), ROW Avoidance (200 acres), Closed to Fluid Mineral Leasing (1,400 acres), lands with wilderness characteristics overlap (1,100 acres) |

***Suitability Determination***
The suitability determination for this segment is **not suitable,** BLM has proposed managing lands along the creek corridor, within the Ute Creek watershed, and within the viewshed of the creek, as lands with wilderness characteristics. This is a highly restrictive management prescription that would prevent actions that could degrade the scenic and vegetation ORVs. In addition, the Colorado Water Conservation Board appropriated an instream flow water right on Ute Creek during 2014, based upon a recommendation from the BLM.

BLM_0024422

3. Suitability Criteria-based Data and Determinations (Ute Creek)

This page intentionally left blank.

August 2015 *Grand Junction Field Office* *Approved Resource Management Plan* 3-81

BLM_0024423

BLM_0024424

# 4. List of Preparers

**DO NOT DELETE THIS PAGE** from the MS Word file, as this is what marks Heading 1 for the table of contents. (Do delete this page later from the Adobe Acrobat [pdf] file.)

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 160 of 499

4. List of Preparers

THROW THIS PAGE AWAY & DELETE FROM PDF

4-2 *Grand Junction Field Office Approved Resource Management Plan* August 2015

BLM_0024426

# CHAPTER 4
# LIST OF PREPARERS

| Name | Role |
|---|---|
| *BLM, Colorado State Office* | |
| Roy Smith | Water Rights, Wild and Scenic Rivers |
| *BLM, Grand Junction Field Office* | |
| *Matt Anderson* | *Planning and Environmental Coordinator* |
| Michelle Capp | Assistant Field Manager (Cultural and Recreation) |
| *Peter Benduha* | *Recreation Technician* |
| *Janny Choy* | *Hydrologist* |
| Julia Christiansen | Natural Resource Specialist |
| Douglas Diekman | Geographic Information Systems |
| *Nathan Dieterich* | *Hydrologist* |
| Jim Dollerschell | Range Management Specialist |
| *Robert Fowler* | *Range Management Specialist* |
| Tom Fresques | Fisheries Biologist |
| Scott Gerwe | Geologist |
| *Chris Hamm* | *Supervisory Outdoor Recreation Planner* |
| Mike Jones | Park Ranger |
| Robin Lacy | Realty Specialist |
| *Aline LaForge* | *Archaeologist* |
| Alissa Leavitt-Reynolds | Archaeologist |
| *David Lehmann* | *Supervisory Natural Resource Specialist* |
| Anna Lincoln | Ecologist |

| Name | Role |
|---|---|
| Heidi Plank | Wildlife Biologist |
| Christina Stark | Planning and Environmental Coordinator |
| *Ken Straley* | *Supervisory Outdoor Recreation Planner* |
| Mark Taber | Range Management Specialist |
| *Aaron Young* | *Geographic Information Systems* |
| *Environmental Management and Planning Solutions, Inc. (EMPSi), RMP Contractor* | |
| Kevin Sampson | Geographic Information Systems |
| Marcia Rickey | Geographic Information Systems |
| Kate Krebs | Wild and Scenic Rivers |
| Drew Vankat | Project Manager |

*Italicized text denotes former GJFO staff member*

# 5. References

**DO NOT DELETE THIS PAGE** from the MS Word file, as this is what marks Heading 1 for the table of contents. (Do delete this page later from the Adobe Acrobat [pdf] file.)

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 164 of 499

5. References

THROW THIS PAGE AWAY & DELETE FROM PDF

5-2 *Grand Junction Field Office*
*Approved Resource Management Plan* August 2015

BLM_0024430

# CHAPTER 5
# REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 1983. Manual 8560. Management of Designated Wilderness Areas. Release 8-22, April 27, 1983.

______. 1984. Manual 8400: Visual Resource Management. Rel. 8-24, April 5, 1984. BLM, Washington, DC.

______. 1986. Handbook H-8410-1: Visual Resource Inventory. Rel. 8-28, January 17, 1986. BLM, Washington, DC.

______. 1987. Grand Junction Resource Management Plan and Record of Decision. BLM, Grand Junction Field Office, Grand Junction, Colorado. January 1987.

______. 1992. Manual 8351: Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management. Rel. 8-61, May 19, 1992. BLM, Washington, DC.

______. 1993. Blue Creek Ecological Site Inventory Report. BLM, Grand Junction Colorado.

______. 1998. Manual 8270: Paleontological Resource Management. July 13, 1998.

______. 2000. Colorado BLM State Director's Sensitive Species List (Animals and Plants). Internet Web site: http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html. Updated June 2000. Accessed June 22, 2009.

______. 2004. Resource Management Plan and Record of Decision for the Colorado Canyons National Conservation Area and Black Ridge Canyons Wilderness. BLM, Grand Junction Field Office, Grand Junction, Colorado. September 2004.

______. 2008. Record of Decision and Approved Resource Management Plan for Bureau of Land Management, Moab Field Office. BLM, Moab Field Office, Moab, Utah. October 2008.

______. 2009a. Wild and Scenic River Eligibility Report for Bureau of Land Management, Grand Junction Field Office. BLM, Grand Junction Field Office, Grand Junction, Colorado. March 24, 2009. 77pp.

______. 2009b. Resource Management Plan Revision Scoping Summary Report. BLM, Grand Junction Field Office, Grand Junction, Colorado. April 2009. 204pp.

______. 2009c. Visual Resource Inventory. Prepared for the BLM, Grand Junction Field Office, Grand Junction, CO, by Otak, Inc., Carbondale, CO. September 2009.

______. 2012. Manual 6330: Management of Wilderness Study Areas. Rel. 6-134. BLM, Washington, DC. July 13, 2012.

BLM (US Department of the Interior, Bureau of Land Management) and US Forest Service (US Department of Agriculture, National Forest Service). 2007. San Juan Public Lands Draft Land Management Plan and Draft Environmental Impact Statement. BLM Dolores, Columbine, and Pagosa Field Offices. US Forest Service – Region 2, San Juan National Forest. December 2007.

Colorado Natural Heritage Program. 2009. Colorado Tracked Natural Plant Communities. Internet Web site: http://cnhp.colostate.edu/tracking/communities.html. Updated April 3, 2009. Accessed June 24, 2009.

CPW (Colorado Parks and Wildlife). 2006. Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans. November 2, 2006.

______. 2007. Threatened and Endangered List. Internet Web site: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/ThreatenedEndangeredList/ListOfThreatenedAndEndangeredSpecies.htm. Updated October 15, 2007. Accessed June 23, 2009.

CRCT Conservation Team. 2006. Range-wide Status of Colorado River cutthroat trout *(Orcorhynchus clarkii pleuriticus)*: 2005. March 2006. 200pp.

CRCT Coordination Team. 2006. Conservation strategy for Colorado River cutthroat trout *(Oncorhynchus clarki pleuriticus)* in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins. 24pp.

CWCB. 2010. Draft Colorado River Water Availability Study. Phase I Report Draft. March 22, 2010.

Foutz, Dell R. 1994. *Geology of Colorado Illustrated.* Your Geologist, Grand Junction, Colorado. 181 pp.

Garfield County. 2008. Garfield County Unified Land Use Resolution. Article III: Zoning. September 2008.

Ikenberry, Donna Lynn. 2002. *Wild Colorado: A Guide to Fifty-one Roadless Recreation Areas*. 1st Ed. Falcon Guide, Guilford, Connecticut. 353 pp

Interagency Wild and Scenic Rivers Coordinating Council. 1999. The Wild and Scenic Rivers Study Process, Technical Report. Washington, DC.

BLM_0024432

Mesa County. 1996. Mesa Countywide Land Use Plan: From Issues to Actions. Mesa County, Colorado. October 1996.

______. 2008. Land Development Code. Mesa County, Colorado. Effective May 2000, last revised November 2008.

USFWS (US Department of the Interior, Fish and Wildlife Service). 1998. Greenback cutthroat trout recovery plan. US Fish and Wildlife Service, Denver, Colorado.

______. 2002a. Colorado pikeminnow *(Ptychocheilus lucius)* Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan. US Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

______. 2002b. Razorback sucker (*Xyrauchen texanus*) Recovery Goals: amendment and supplement to the Razorback Sucker Recovery Plan. US Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

US BOR (US Department of the Interior, Bureau of Reclamation). No date. Grand Valley Project, Colorado. Internet Web site: http://www.usbr.gov/dataweb/html/grandvalley.html. Accessed June 22, 2009.

US Forest Service (US Department of Agriculture, National Forest Service). 2006. Comprehensive Assessments for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Appendix W-2: Rivers Reviewed. US Forest Service, Grand Mesa, Uncompahgre, and Gunnison National Forests, Colorado. July 17, 2006.

Utah Department of Natural Resources. 2006. Range-wide Conservation Agreement and Strategy for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker. Publication Number 06-18. Salt Lake City, Utah. September 2006.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 168 of 499

5. References

This page intentionally left blank.

5-4 *Grand Junction Field Office*
*Approved Resource Management Plan* August 2015

BLM_0024434

# Appendix D

## Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

BLM_0024436

## TABLE OF CONTENTS

Section Page

**D. SUMMARY OF AREAS OF CRITICAL ENVIRONMENTAL CONCERN REPORT ON THE APPLICATION OF RELEVANCE AND IMPORTANCE CRITERIA ........................ D-1**

D.1 Relevance ........................ D-1
D.2 Importance ........................ D-2
D.3 Evaluation Process ........................ D-2
D.4 Findings ........................ D-3
D.5 References ........................ D-46

## TABLES

Page

D-1 ACECs Found to Meet the Relevance and Importance Criteria ........................ D-4
D-2 Relevance and Importance Criteria Evaluation for Existing, Proposed, and Approved ACECs D-5

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 172 of 499

This page intentionally left blank.

BLM_0024438

# APPENDIX D
# SUMMARY OF AREAS OF CRITICAL ENVIRONMENTAL CONCERN REPORT ON THE APPLICATION OF RELEVANCE AND IMPORTANCE CRITERIA

This appendix provides summary information about the Areas of Critical Environmental Concern (ACEC) evaluation process. The Areas of Critical Environmental Concern Report on the Application of the Relevance and Importance Criteria (BLM 2010) provides more detail on the process. As part of the process for developing the Grand Junction Resource Management Plan (RMP) revision, the Grand Junction Field Office (GJFO) Interdisciplinary Team reviewed all BLM-managed lands in the planning areas to determine whether any areas should be considered for designation as ACECs. ACECs are defined in the Federal Land Policy and Management Act Section 103(a) (43 United States Code 1702) and in 43 Code of Federal Regulations 1601.0-5(a) as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." The areas found to meet both the relevance and importance criteria as defined below will be identified as potential ACECs and will be fully considered for designation and management in the RMP (BLM Manual 1613.2.21 [BLM 1988]).

## D.1 RELEVANCE

There shall be present a significant historic, cultural, or scenic value, a fish or wildlife resource or other natural system or process, or natural hazard. An area meets the relevance criterion if it contains one or more of the following:

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 174 of 499

1. A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archaeological resources and religious or cultural resources important to Native Americans).
2. A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity).
3. A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).
4. Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action might meet the relevance criterion if it is determined, through the resource management planning process, to have become part of a natural process.

## D.2 Importance

An area meets the importance criterion if it meets one or more of the following:

1. Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.
2. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.
3. Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA.
4. Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare.
5. Poses a significant threat to human life and safety or to property.

## D.3 Evaluation Process

In compiling a list of areas to be analyzed, the BLM interdisciplinary teams followed the guidance set forth in BLM Manual 1613, Areas of Critical Environmental Concern (BLM 1988), and considered:

1. Existing ACECs;
2. Areas recommended for ACEC consideration (external and internal nominations);

BLM_0024440

3. Areas identified through inventory and monitoring; and
4. Adjacent designations of other federal and state agencies.

ACECs may be nominated by BLM staff, other agencies, or members of the public at any time. During the RMP revision scoping process, the GJFO solicited nominations and comments from the public and other agencies. A map of special designation areas was distributed at the scoping meetings and made available on the RMP website: *http://www.blm.gov/co/st/en/fo/gjfo/rmp.html*.

As part of the formal outreach process, the BLM received nominations from the Colorado Natural Heritage Program (CNHP) and the Center for Native Ecosystems. The BLM staff also reviewed information from BLM inventories, Colorado Parks and Wildlife (CPW) species of concern data, and other reports to ensure that all potentially relevant and important values with in the planning areas were considered.

## D.4 Findings

The Interdisciplinary Team analyzed 52 ACECs (existing, internally, and externally proposed) and found that 24 met the relevance and importance criteria, for a total of 167,369 acres (**Table D-1**, Proposed ACECs Found to Meet the Relevance and Importance Criteria).

Maps of ACECs recommended for analysis in the Draft RMP and additional information are included in The Areas of Critical Environmental Concern Report on the Application of the Relevance and Importance Criteria (BLM 2010). The size and management prescriptions for each ACEC may vary by alternative to reflect a balance between the goals and objectives of the alternative and values being protected (BLM Manual 1613.2.22.B.1-2). **Table D-2**, Relevance and Importance Criteria Evaluation for existing and new ACECs, summarizes the Approved ACECs evaluated, the values assessed, and whether the criteria were met (including supporting information).

**Table D-1**
**ACECs Found to Meet the**
**Relevance and Importance Criteria**

| ACEC | Acres |
|---|---|
| Atwell Gulch (staff and public proposed) | 6,135 |
| Badger Wash ACEC (existing) | 1,891 |
| *Badger Wash ACEC Alternative (staff proposed)* | *355* |
| Colorado River Riparian (staff proposed) | 879 |
| Coon Creek (staff and public proposed) | 110 |
| Coon Hollow/South Shale Ridge (staff and public proposed) | 27,345 |
| Dolores River Riparian (staff proposed) | 7,433 |
| Glade Park-Piñon Mesa (public proposed) | 27,056 |
| Gunnison River Riparian (staff proposed) | 457 |
| Hawxhurst Creek (staff and public proposed) | 864 |
| Indian Creek (staff proposed) | 1,746 |
| John Brown Canyon (public proposed) | 1,416 |
| Juanita Arch (staff and public proposed) | 1,624 |
| Mt. Garfield (staff proposed) | 5,695 |
| Nine-mile Hill Boulders (staff proposed) | 87 |
| The Palisade ACEC/Outstanding Natural Area (ONA) (existing) | 26,951 |
| *The Palisade ACEC/ONA Expansion (staff proposed)* | *5,330* |
| Plateau Creek (staff proposed) | 223 |
| Prairie Canyon (public proposed) | 6,866 |
| Pyramid Rock ACEC/Research Natural Area (RNA) (existing) | 551 |
| *Pyramid Rock ACEC/RNA Expansion (staff proposed)* | *706* |
| Reeder Mesa (staff and public proposed) | 474 |
| Roan and Carr Creeks (staff and public proposed) | 33,694 |
| Rough Canyon ACEC/RNA (existing) | 2,737 |
| *Rough Canyon ACEC/RNA Expansion (staff proposed)* | *41* |
| Sinbad Valley (public proposed) | 6,399 |
| Unaweep Seep ACEC/RNA (existing) | 78 |
| *Unaweep Seep ACEC/RNA Expansion (public proposed)* | *6* |
| **Total** | **167,149** |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| 4A Ridge *Public Proposed* | Riparian Habitat | 3 | 2 | No | Included in staff proposed Roan and Carr Creeks boundary. Areas to the south and west appear to contain an even greater amount of the Piceance bladderpod *(Lesquerella parviflora)*. | 0 | 19,082 | *See Roan and Carr Creeks ACEC.* |
| | Plants | 3 | 2 | | | | | |
| | Wildlife | 2 | None | | | | | |
| | Plants | 3 | None | | | | | |
| Atwell Gulch *Staff and Public Proposed* | Wildlife | 2 | 2 | **Yes** *with modified boundaries* | Meets the relevance criteria for Cultural and scenic values, fish and wildlife resources, and a natural system supporting rare plants.<br>The importance criteria for more than locally significant qualities for plants and has qualities that make it sensitive, rare and vulnerable to adverse change.<br>BLM sensitive and federally listed rare plant species: Colorado hookless cactus, DeBeque milkvetch, and Naturita milkvetch. Four different monitoring sites are established for DeBeque milkvetch and Colorado hookless cactus. Atwell Gulch contains the largest known concentration of DeBeque milkvetch in the GJFO.<br>This area provides year-round range and an important migratory corridor for a significant portion | 0 | 26,450 | (6,135) 2,900 |
| | Plants | 3 | 1 and 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | Cultural | 1 | 1 and 2 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | of the native bighorn sheep *(Ovis canadensis)* in the area. Additionally, it is also winter range and severe winter range for mule deer *(Odocoileus hemionus)*.<br>This area has the presence of significant cultural resources and the potential for additional sites to be identified, especially those associated with the Ute period, is high. The ACEC lies between two historic trails/roads, the DeBeque Cutoff Road and the Sunnyside Road and surveys have demonstrated a high density of cultural resources. This area has the potential to contain a regionally important trail. | | | |
| Badger Wash ACEC<br>*Existing*<br>*Staff Proposed* | Hydrological | 3 | 2 | **Yes** | Meets the relevance criteria for a natural system and importance criteria for sensitive plants and to satisfy national priority concerns.<br>The revised boundary creates improved management for the ACEC. The ACEC meets the relevance and importance criteria for a natural system that supports sensitive plants and ongoing hydrologic research. Rare plants include grand buckwheat *(Eriogonum contortum)* and | 1,700 | 2,848 | (2,200) 2,200 |
| | Plants | 3 | 1 and 2 | | | | | |
| | Wildlife | 2 and 3 | 2 | | | | | |

BLM_0024444

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | Ferron's milkvetch *(Astragalus musiniensis)*. Also contains rare plant species cliffdweller's cryptantha *(Cryptantha elata)* and Gardner's saltbrush/salina wildrye *(Atriplex gardneri/Elymus slaina)*. Also contains the Great Basin silverspot butterfly *(Speyeria nokomis)*.<br><br>The Badger Wash watershed was withdrawn for experimental purposes, scientific research, and studies by Executive Order 10355 in 1952. The Badger Wash ACEC was put in place to protect these values, particularly the hydrologic studies examining the effects of grazing on runoff, sediment, and salinity on this Mancos Shale landscape prevalent in western Colorado and Utah. Studies have occurred since 1953 and published reports are available. Cooperative hydrologic studies are ongoing, supported by the BLM, US Geological Survey, and US Bureau of Reclamation. Meets the relevance criteria for a natural system and importance criteria for sensitive plants and to satisfy national priority concerns. | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| Badger Wash Potential *Public Proposed* | Fish | None | None | No | Meets the relevance criteria for rare plants in isolated areas and wildlife supporting habitat for burrowing owls. As proposed the site did not meet the importance criteria because it is overly broad and all areas contained within the proposal are not considered unique compared to other habitat within the range of the species. A portion of this site (355 acres) was carried forward in the Badger Wash ACEC expansion. The area contains designated release sites for the Mesa County Prairie Dog Relocation project; however these sites do not meet the relevance and importance criteria. The area does not meet the relevance or importance criteria for fish bearing streams or bald eagles *(Haliaeetus leucocephalus)* as the areas do not contain fish bearing streams or bald eagle habitat. | | | |
| Bangs Canyon and Dominguez North *Public Proposed* | Cultural | I | None | No | The area as originally proposed is now split by the Dominguez – Escalante NCA, forming two small polygons on the west side of Highway 141 along East Creek. | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | It is within Area 6 of the Bangs Canyon Special Recreation Management Area (SRMA).<br>Meets the relevance criteria for the presence of significant cultural resources. Does not meet importance criteria because these resources do not have more than locally significant qualities.<br>Sites that are culturally affiliated with the Ute within this area may best be managed for Traditional or Public Use with a management goal of long term protection and interpretation. | | | |
| Buzzard Creek Potential<br>*Public Proposed* | Fish | 2 | None | No | Meets the relevance criteria for fish and wildlife resource providing habitat for lynx *(Lynx Canadensis)* and boreal toad *(Bufo boreas)* as well as fish bearing streams. In addition, the area may meet the relevance criteria by providing habitat for the foothills riparian shrubland, and narrowleaf cottonwood riparian forest plant communities.<br>Does not meet importance criteria because the area consists of several very small parcels of BLM-managed land that do not significantly contribute to the | 0 | 2,520 | 0 |
| | Wildlife | 2 | None | | | | | |
| | Plants | 3 | None | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | conservation of the species and are therefore not regionally significant. | | | |
| Cactus Park *Public Proposed* | Paleontological | N/A | N/A | N/A | ACEC is within the Dominguez-Escalante NCA; therefore it is beyond the scope of this planning effort. | 0 | 139 | 0 |
| | Plants | N/A | N/A | | | | | |
| Colorado River Riparian (Palisade to DeBeque) | Fish | 2 and 3 | 2 | **Yes** | Meets the relevance criteria for scenic, threatened, and endangered fish resources and a natural system. The importance criteria for qualities that is sensitive and vulnerable to adverse change for riparian habitat supporting stream bank stability and designated critical habitat for threatened and endangered fish species. The area was surveyed by CNHP and found to contain Global Rank G2 Rio Grande cottonwood/ skunkbrush *(Populus deltoides ssp. wislizeni/Rhus trilobata)* riparian forest and Global Rank G3 roundtail chub. The US Fish and Wildlife Service designated the Colorado River up to its 100 year floodplain as critical habitat for the Colorado pikeminnow *(Ptychocheilus lucius)* (federally endangered, state | 0 | 1,195 | (879) 0 |
| | Wildlife | 2 and 3 | 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | Riparian Habitat | 3 | 1 and 2 | | | | | |
| | Plants | 3 | None | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | threatened), razorback sucker *(Xyrauchen texanus)* (federally and state endangered), bonytail chub *(Gila elegans)* (federally and state endangered), and humpback chub *(Gila cypha)* (federally endangered, state threatened). Native, non-listed fish species sympatric with the listed fish species include the flannelmouth sucker *(Catostomas latipinnis)*, bluehead sucker *(Catostomus discobolus)*, roundtail chub (designated a state Species of Special Concern), and speckled dace *(Rhinichthys osculus)*.<br><br>The Colorado River is designated critical habitat for threatened and endangered fish species and roost/nesting habitat for bald eagles and great blue herons *(Ardea herodias)*.<br><br>Peregrine Falcons probably won't nest in the riparian area, they are attracted to riparian areas for their productivity of prey and prefer nesting close to them.<br><br>While the proposed ACEC contains significant cottonwood/willow communities that are extremely important to wildlife and riparian values, the | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | ACEC is not known to contain any rare plant species. | | | |
| Coon Creek *Staff Proposed* | Fish | 1 | 1, 2 | **Yes** | Meets the relevance criteria for fish. Meets the importance criteria for having more than locally significant qualities and qualities that make it fragile, sensitive, rare, exemplary, and vulnerable to adverse change. The creek contains a population of rare native cutthroat trout *(Oncorhynchus clarkii)*. | 0 | 110 | (110) 0 |
| Coon Hollow/South Shale Ridge *Staff and Public Proposed* | Plants | 3 | 1 and 2 | **Yes** | Meets the relevance criteria for wildlife resources, natural system supporting plants, and significant scenic values. Meets the importance criteria for more than locally significant importance to plants and has qualities that make it fragile, sensitive, irreplaceable, threatened, and vulnerable to adverse change. The area has known populations of Colorado hookless cactus, Naturita milkvetch, adobe thistle, and DeBeque phacelia, as well as critical winter range for deer and elk. | 0 | 59,701 | (28,200) 27,800 |
| | Scenic | 1 | 2 | | | | | |
| | Wildlife | 2 | 1 | | | | | |
| Cow Ridge | Wildlife | 2 | None | No | Meets the relevance criteria for | 0 | 25,777 | 0 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| Potential<br>*Public Proposed* | Rare Plants | 3 | None | | natural processes or systems because it supports multiple A-ranked (excellent quality) occurrences of two BLM sensitive plants, Piceance bladderpod and Roan Cliffs blazingstar *(Mentzelia rhizomata)* and provides potential habitat for Greater Sage-Grouse *(Centrocercus urophasianus)*, a BLM sensitive species.<br>Does not meet the importance criteria because it is not unique when compared to other sage-grouse habitat located within the Parachute-Piceance-Roan population. While approximately 4 of the 50+ isolated parcels that compose the ACEC contain A-ranked (CNHP) occurrences of bladderpod and blazingstar, the proposed ACEC in its entirety does not meet the importance criteria. | | | |
| Dolores River Canyon-Sewemup Mesa Potential ACEC<br>*Public Proposed* | Fish | 2 and 3 | 1 and 2 | No | Meets the relevance criteria for wildlife resource and a natural system. Meets the importance criteria having potential for more than locally significant wildlife qualities making the area sensitive for rare plants and are vulnerable to adverse change. | 0 | 33,308 | *See Dolores River Riparian, Sinbad Valley, and Juanita Arch ACECs* |
| | Wildlife | 2 and 3 | 1 and 2 | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |

BLM_0024451

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Area does not meet the relevance and importance criteria since it does not contain lynx habitat, though it may provide a movement corridor into the forests of Utah although there is no evidence supporting use of the area by lynx.<br>Several peregrine falcon *(Falco peregrinus)* eyries occur along the Dolores River with densities of eyries suggesting the area is more than locally significant. The area along the Dolores River meets the relevance and importance criteria for the peregrine falcon; however these areas are more accurately covered by the Dolores River riparian proposal.<br>Multiple BLM sensitive plants (Kachina daisy *[Erigeron kachinensis]*, Eastwood's monkeyflower *[Mimulus eastwoodiae]*, San Rafael milkvetch, Dolores River skeleton plant, horseshoe milkvetch, Grand Junction milkvetch, and Gypsum cateye) occur in the area. Most areas containing sensitive plants are covered in the Dolores River Riparian and Sinbad Valley | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | ACECs. | | | |
| Dolores River Riparian *Staff Proposed* | Fish | 2 and 3 | 2 | **Yes** | The area meets the relevance and importance criteria for wildlife because CDOW considers the bluehead sucker population within this stretch of river outstanding on a regional scale. Several peregrine falcon eyries occur along the Dolores River the density of eyries suggests the area is more than locally significant. Multiple BLM sensitive plants (Kachina daisy, Eastwood's monkeyflower, San Rafael milkvetch, Dolores River skeleton plant, horseshoe milkvetch, Grand Junction milkvetch, and Gypsum cateye) occur in the area. Rare plant communities, including the Rio Grande cottonwood riparian forest community, Foothills riparian shrubland community, and the New Mexico privet community. | 0 | 3,635 | (7,400) 7,400 |
| | Wildlife | 2 and 3 | 1 and 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |
| | Riparian Habitat | 3 | 1 and 2 | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |
| Dominguez North-Bangs Canyon ONA *Public Proposed* | Cultural | 1 | None | No | Does not meet the relevance and importance criteria for ACEC designation since part of the area is not within the planning area. This area is within both the | 0 | 109,975 | *See existing Rough Canyon ACEC and expansion* |
| | Recreation | None | None | | | | | |
| | Wildlife | 2 | 1 and 2 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | Dominguez–Escalante NCA and Bangs Canyon SRMA.<br>Recreational values identified will be analyzed in the Recreation section of the Draft Environmental Impact Statement.<br>The areas' most critical to wildlife and cultural are included in the Rough Canyon ACEC and expansion. | | | |
| East Salt Creek Potential ACEC *Public Proposed* | Fish | 2 | 2 | No | The areas within this proposal that meet the relevance and importance criteria are included in the Roan and Carr Creeks.<br>Meets the relevance criteria for a natural process or system which supports the BLM sensitive plant species Piceance bladderpod. The area contains A-ranked (excellent quality) occurrences of the bladderpod. In addition to the bladderpod, the site also contains hanging garden sullivantia *(Sullivantia hapemanii var. pupusii)* and narrowleaf cottonwood/skunkbrush *(Populus angustifolia/Rhus trilobata)* communities. Meets the importance criteria because the bladderpod is vulnerable to | 0 | 21,046 | *See Roan and Carr Creeks and Sinbad Valley ACECs* |
| | Wildlife | 2 | 1 and 2 | | | | | |
| | Plants | 3 | 1 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | adverse change.<br>Meets the relevance criteria for wildlife resource (sage-grouse) because it contains occupied, potential, and vacant/unknown Greater Sage-Grouse habitat. Does not meet importance criteria because these areas are small portions of the currently occupied range of the Parachute-Piceance-Roan population of the Greater Sage-Grouse and are not locally significant.<br>The proposed ACEC does not contain lynx habitat.<br>Upper Roan and Carr creeks meet the relevance and importance criteria for rare native cutthroat trout because they contain populations of the species. However, these areas are included in the Roan and Carr Creeks ACEC. | | | |
| Fruita Paleontological Site ACEC/RNA<br>*From 1987 RMP Public proposed* | Geologic | N/A | N/A | N/A | Former ACEC is within the McInnis Canyon NCA; therefore it is beyond the scope of this planning effort. | 280 | 280 | 0 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| Gateway<br>*Public Proposed* | Plants | 3 | 1 and 2 | No | Meets the relevance criteria for fish and wildlife and a natural system. Meets the importance criteria having qualities that are more than locally significant and vulnerable to adverse change.<br>Wildlife values are analyzed in proposed John Brown Canyon, Palisade ONA Expansion, and Dolores River Riparian ACECs.<br>Plant values are analyzed in Palisade ACEC/ONA expansion. | 0 | 11,675 | *See Palisade ONA Expansion, and Dolores River Riparian ACECs* |
| | Fish | 2 | 1 and 2 | | | | | |
| | Wildlife | 2 | 2 | | | | | |
| Glade Park-Piñon Mesa<br>*Public Proposed* | Fish | None | None | **Yes** *with modified boundaries* | Meets the relevance criteria for wildlife resource (Gunnison Sage-Grouse). Meets the importance criteria for sensitive and vulnerable to adverse change.<br>The proposed ACEC does not contain lynx or bald eagle habitat. Contains a significant portion of occupied and potential habitat for the Piñon Mesa population of the Gunnison Sage-Grouse.<br>The proposed ACEC is not known to contain any rare plants. | 0 | 19,942 | (27,200) 0 |
| | Wildlife | 2 and 3 | 2 | | | | | |
| | Plants | None | None | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| Granite Creek<br>*Public Proposed* | None | None | None | No | There were no specific values associated with this ACEC proposal, but was recommended for ACEC designation as: *Granite Creek is definitely worthy of immediate protection and oversight, as subtle incursions into that area portend an impending loss of natural values.* | 0 | 8,147 | 0 |
| Greater Demaree SRMA<br>*Proposed by public as a Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values for ACEC designation* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area contain wilderness characteristics (Spring Canyon, Spink Canyon, East Demareee units). | 0 | 81,512 | 0 |
| Greater Granite Creek SRMA<br>*Proposed by public as a* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, | 0 | 42,673 | 0 |

BLM_0024457

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| *Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values for ACEC designation* | | | | | recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area are included in other areas that do meet the criteria for ACEC designation (The Palisade, Glade Park-Pinyon Mesa proposed ACECs); for SRMA designation (Dolores River Canyon SRMA/ERMA); or contain wilderness characteristics (Lumsden Canyon unit). | | | |
| Gunnison Gravels ACEC/RNA *Existing* | Geologic | N/A | N/A | N/A | ACEC is within the Dominguez-Escalante NCA; therefore it is beyond the scope of this planning effort. | 40 | 40 | 0 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| Gunnison River Potential ACEC *Public Proposed* | Fish | 2 and 3 | 2 | No | Meets the relevance criteria for threatened and endangered fish and wildlife resources and a natural system. The importance criteria for qualities that is sensitive and vulnerable to adverse change for riparian habitat supporting stream bank stability and designated critical habitat for threatened and endangered fish species.<br>The areas of this proposal that meet the relevance and importance criteria for listed fish are covered by the staff proposed Gunnison River Riparian ACEC. | 0 | 42,066 | *(See proposed Gunnison River Riparian ACEC) 0* |
| | Wildlife | 2 | 2 | | | | | |
| | Plants | 3 | 2 | | | | | |
| Gunnison River Riparian *Staff Proposed* | Fish | 2 and 3 | 1 and 2 | **Yes** | Meets the relevance criteria for threatened and endangered fish and wildlife resources and a natural system. The importance criteria for qualities that is sensitive and vulnerable to adverse change for riparian habitat supporting stream bank stability and designated critical habitat for threatened and endangered fish species. Part of the ACEC is within the Dominguez-Escalante NCA, which is beyond the scope of this planning effort.. | 0 | 1,962 | (457) 0 |
| | Riparian Habitat | 3 | 2 | | | | | |
| | Plants | 3 | 2 | | | | | |
| | Wildlife | 2 | 2 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | The Colorado hookless cactus (federally threatened) is known to inhabit the alluvial benches of the Gunnison River. Results from a rare plant inventory (which is currently in progress), will determine the importance of this area.<br><br>The CDOW manages the lower Gunnison and Colorado Rivers within the planning area for native, listed, and non-listed aquatic species. The area contains roundtail chub, which has a CNHP Global Rank of G3.<br><br>The US Fish and Wildlife Service designates this segment of the Gunnison River as critical habitat for the Colorado pikeminnow (federally endangered, state threatened), razorback sucker (federally and state endangered), bonytail chub (federally and state endangered), and humpback chub (federally endangered, state threatened). Native and non-listed fish species sympatric with the listed fish species include the flannelmouth sucker, bluehead sucker, roundtail chub (designated a state Species of | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Special Concern), and speckled dace. The area provides roosting habitat and connectivity to river habitats upstream for bald eagles and blue herons. | | | |
| Hawxhurst Creek *Staff Proposed* | Fish | 1 | 1, 2 | **Yes** | Meets the relevance criteria for fish. Meets the importance criteria for having more than locally significant qualities and qualities that make it fragile, sensitive, rare, exemplary, and vulnerable to adverse change. The creek contains a population of rare native cutthroat trout *(Oncorhynchus clarkii)* | 0 | 864 | (864) 0 |
| Indian Creek *Staff Proposed* | Cultural | 1 and 3 | 1 and 2 | **Yes** | Meets the relevance criteria for the presence of significant cultural resource values and the presence of a natural process or system. The importance criteria for more than locally significant qualities and qualities that make it fragile, sensitive, unique, and vulnerable to adverse change. This area straddles approximately three miles of Indian Creek, a tributary to the Gunnison River that has both significant preservation of Holocene to Late | 0 | 1,747 | (2,300) 2,300 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Pleistocene deposits that have yielded Paleoindian artifacts and an accessible yet relatively undisturbed area that provides a unique geomorphological research area. These are eligible for nomination to the National Register of Historic Places under criterion "d," as sites that have yielded and should continue to yield significant information on the prehistory and history of the area. Distinct stratified deposits representing the full range of human occupation are present with an emphasis on Late Paleoindian, Middle Archaic, and Ute cultures, and climate research (paleoenvironmental) indicates that these deposits correspond to regional periods of increased moisture.<br>Kit fox inhabit the area. | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| John Brown Canyon<br>*Public Proposed* | Wildlife | 2 | 1 | **Yes** | Meets the relevance criteria for fish and wildlife resource. Meets the importance criteria for qualities that are sensitive.<br>Ponderosa pine *(Pinus ponderosa)* stands (located at the head of John Brown Canyon and extending somewhat north and south from there) constitute the northern most range of the Grace's warbler *(Dendroica graciae)*. Habitat for this warbler is scarce within the planning area. | 0 | 1,417 | (1,416) 0 |
| Juanita Arch<br>*Staff and Public Proposed* | Geologic | 3 | 2 | **Yes** | Meets the relevance criteria for geologic and plants for a natural process. Meets the importance criteria for having more than locally significant qualities and qualities that make it rare, irreplaceable, exemplary, and unique.<br>Juanita arch is classified as the only natural bridge in the state of Colorado, thus making this a unique geologic feature to the region.<br>The rare plants, Grand Junction milkvetch and San Rafael milkvetch, also occur in this area. | 0 | 1,950 | (1,600)1,600 |
| | Plants | 3 | 1 | | | | | |

Appendix D. Summary of Areas of Critical Environmental Concern Report on the Application of Relevance and Importance Criteria

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| Knight/Owens Hadrosaurid Locality<br>*Staff Proposed* | Paleontological | No | No | No | Does not meet the relevance criteria for a natural process or system, and does not have significant paleontological values. Does not meet the importance criteria for more than locally significant qualities as a World Class Paleontological Research and publicly interpreted visitation location.<br>A disarticulated juvenile Hadrosaur was collected and studied in the late 1980s. There were also fossilized remains of a Pliosaur and Mosasaurs as well as Pyritized inverts and large concretions nearby this site. However, a BLM survey was conducted recently and no fossils were found. | 0 | 40 | 0 |
| Logan Wash<br>*Public Proposed* | Fish | 2 and 3 | None | No | Meets the relevance criteria for a natural system containing sensitive habitat for plants. Meets the importance criteria for having more than locally significant qualities and qualities of sensitive and rare plants.<br>The area does not contain lynx habitat.<br>The southern tip of the proposed ACEC contains a portion of the | 0 | 14,514 | *(See proposed Colorado River Riparian ACEC) 0* |
| | Wildlife | 2 and 3 | None | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |

D-26 *Grand Junction Field Office Approved Resource Management Plan* August 2015

BLM_0024464

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | critical habitat designated for the four listed fish species on the Colorado River; however this area is small and surrounded by private land and not carried forward for further analysis.<br>The proposed ACEC is adjacent to Roan Creek, a fish bearing stream, however BLM segments are small and do not meet the relevance and importance criteria.<br>The proposed ACEC contains some potential and occupied Greater Sage-Grouse habitat; however the amount of occupied habitat included in the proposed ACEC is not significant for the Parachute-Piceance-Roan population and therefore does not meet the importance criteria.<br>The area meets the criteria for both relevance and importance by containing numerous BLM sensitive plants, one federally threatened plant, and possibly two federal candidate species. The rare plant species found within this landscape include, but are not limited to: DeBeque milkvetch, adobe thistle, Naturita milkvetch, Roan Cliffs blazingstar, | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Colorado hookless cactus (threatened), Parachute penstemon *(Penstemon debilis)* (candidate), and DeBeque phacelia (candidate). The majority of the known plants are vulnerable to adverse change. The proposed ACEC area is heavily fragmented by energy development infrastructure. | | | |
| Mt. Garfield *Staff Proposed* | Scenic | 1 | 1 and 2 | **Yes** | Meets the relevance criteria for scenic and importance criteria as irreplaceable (locally significant qualities/meaning). Meets the importance criteria for having more than locally significant qualities and fragile qualities. Mt. Garfield is an iconic land feature within the Grand Valley region of the field office, often used as a symbolic feature of Grand Junction. The Mt. Garfield area was designated in the 1987 RMP as VRM Class 1. | 0 | 5,695 | (5,695) 2,400 |
| Nine-mile Hill Boulders *Staff Proposed* | Paleontological | 3 | 2 | **Yes** | Meets the relevance criteria for a natural process or system, and has significant paleontological values. Meets the importance criteria for qualities sensitive and exemplary as a World Class Paleontological Research and | 0 | 87 | (87) 0 |

BLM_0024466

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | publicly interpreted visitation location.<br>Pull-off areas between guard railings have a well-preserved theropod femur mold and other bone molds from the Burro Canyon Formation. There are also petrified wood stumps and impressions of other dinosaur bones nearby. | | | |
| North Desert<br>*Public Proposed* | Wildlife | 2 | None | No | Meets the relevance criteria for wildlife resources and a natural system. Does not meet importance criteria because wildlife habitat is not regionally significant.<br>These areas provide habitat for the burrowing owl; however they are not regionally significant.<br>The boundary proposed was fragmented into four distinct areas, making management difficult.<br>Meets the relevance criteria, but does not meet the importance criteria for rare plants. While the BLM special status plant species grand buckwheat may occur in the proposed ACEC, records indicate that very little buckwheat | 0 | 2,407 | 0 |
| | Plants | 3 | None | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | has been recorded in this area. | | | |
| The Palisade ACEC/ONA and Expansion<br>*Existing*<br>*Staff Proposed* | Plants | 3 | 1 and 2 | **Yes** | Meets the relevance criteria for scenic values and a natural system supporting rare plants. Meets the importance criteria for more than locally significant qualities and has qualities that make it fragile, irreplaceable, and vulnerable to adverse change.<br>Recent plant inventories completed by CNHP have recorded rare plants around the base of the Palisade, and across the Dolores River. A larger area is needed to cover newly discovered plants, and to provide protection should the Wilderness Study Area designation change. Plants known to occur around the base of the Palisade, and across the Dolores River include: Dolores River skeleton plant *(Lygodesmia doloresensis)*, San Rafael milkvetch *(Astragalus rafaelensis)*, horseshoe milkvetch *(Astragalus equisolensis)*, Fisher Tower's milkvetch *(Astragalus piscator)*, tufted green gentian *(Frasera paniculata)*, and osterhouts catseye *(Cryptantha osterhoutii)*. | 26,951 | 32,334 | (32,200) 32,200 |
| | Wildlife | 2 | 2 | | | | | |
| | Scenic | 1 | 2 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | Expanded area would protect nesting areas for peregrine falcons. | | | |
| Persigo Wash Potential *Public Proposed* | Fish | None | None | No | The criteria for relevance have not been met for cultural resources, fish and wildlife resources and a natural system. The criteria for importance have not been met, since the habitat within the proposed ACEC area is not of regional significance or has qualities of sensitivity.<br>Previous cultural surveys have not indicated the presence of significant historic or cultural values nor are there cultural resources present of significant quality compared to similar resources in GJFO.<br><br>The area does not contain any fish bearing streams. The area contains artificial kit fox structures and includes the area with the last known den for kit fox in the field office, however these areas do not meet the importance criteria because kit fox have not been documented using the artificial structures nor have they been documented in | 0 | 5,532 | 0 |
| | Wildlife | None | None | | | | | |
| | Plants | None | None | | | | | |
| | Cultural | None | None | | | | | |

BLM_0024469

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | the area in the past 10 years. Prairie dog release sites for the Mesa County Prairie Dog Relocation group occur in the area but they are not regionally significant for the species and therefore do not meet the importance criteria.<br>While some grand buckwheat is known to occur in the Mancos shale 'badlands' north to the town of Fruita, this area does not represent an outstanding occurrence, in size or quality. | | | |
| Plateau Creek *Staff Proposed* | Fish | 2 | 1, 2, 3 | Yes | Meets Relevance and Importance Criteria for BLM sensitive fish species. Protection would help implement the Range-Wide Conservation Agreement and Strategy to avoid federal listing under Endangered Species Act. | N/A | 223 | (223) 0 |
| Prairie and South Canyons *Public Proposed* | Wildlife | None | None | No | The proposed ACEC does not contain lynx habitat. The area contains several fragmented pieces, which makes potential management difficult. | 0 | 6,081 | 0 |
| Prairie Canyon (renamed from Baxter Ridge) *Public Proposed* | Wildlife | 2 and 3 | 2 | **Yes** *with modified boundaries* | Meets the relevance criteria for wildlife resources and a natural system supporting breeding habitat for a variety of species and core wildlife habitat that is also | 0 | 19,853 | (6,866) 0 |
| | Plants | 3 | 1 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | included in the Prairie Canyon Wildlife Emphasis Area. Meets the importance criteria for supporting a unique assemblage of species that is of more than local significance and qualities that make it fragile and vulnerable to adverse change to rare plants.<br>The area provides a breeding habitat for the burrowing owl *(Athene cunicularia)*, long-billed curlew *(Numenius americanus)*, sage sparrow *(Amphispiza belli)*, kit fox *(Vulpes macrotis)*, long-eared owl *(Asio otus)*, Scott's oriole *(Icterus parisorum)*, and white-tailed prairie dog *(Cynomys leucums)*.<br>The proposed boundary was very large and has been modified to include only core habitat for the species. The entire area could be considered for wildlife emphasis management.<br><br>The area contains habitat for grand buckwheat, a rare plant within the planning area. | | | |
| Pyramid Rock | Plants | 3 | 1 and 2 | **Yes** | Meets the relevance criteria for | 551 | 1,265 | (1,300) 1,300 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| ACEC/RNA<br>*Existing*<br>*Staff Proposed* | Cultural | 1 | 1 and 2 | | the presence of significant cultural resource values that are important to Native Americans and the presence of a natural process or system that protects these resources. Meets the importance criteria because it has more than locally significant qualities compared to other resources in the planning area and these resources are rare, exemplary, unique, and vulnerable to adverse change.<br>The expansion makes the boundary of the existing ACEC more clearly defined by using existing roads or natural landform features. It also increases the area to accommodate better management and adequately protect sensitive plants and cultural resources.<br>Rare plants known to occur within the existing ACEC are: Colorado hookless cactus (formerly Uinta Basin hookless cactus) (*Sclerocactus glaucus*), DeBeque phacelia (*Phacelia scopulina* var. *submutica*), DeBeque milkvetch (*Astragalus debequaeus*), Naturita milkvetch (*Astragalus* | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | *naturitensis*), adobe thistle (*Cirsium perplexans*), and aromatic Indian breadroot. The existing ACEC is a research site for Denver Botanic Gardens. | | | |
| Rabbit Valley-Rattlesnake Canyon Potential ACEC *Public Proposed* | Fish | N/A | N/A | N/A | ACEC is within the McInnis Canyon NCA; therefore it is beyond the scope of this planning effort. | 0 | 18,276 | 0 |
| | Wildlife | N/A | N/A | | | | | |
| | Plants | N/A | N/A | | | | | |
| Rapid Creek (renamed from Orchard Mesa Potential ACEC) *Public Proposed* | Fish | 2 and 3 | 1 and 2 | No | During BLM's initial review of the area, it was believed that the portion of the proposed ACEC that includes Rapid Creek contained rainbow trout (*Oncorhynchus mykiss*), cutthroat trout (*Oncorhynchus clarki*), and roundtail chub (*Gila robusta*). The boundary was modified to encompass Rapid Creek without the other outlying areas of the original proposal. Upon further analysis and sampling it was determined that Rapid Creek does not contain these species. Therefore the proposed ACEC does not meet the relevance or importance criteria for fish. A portion of the proposed ACEC near Vincent Reservoir contains a small portion of potential lynx | 0 | 13,392 | (220) 0 |
| | Wildlife | None | None | | | | | |
| | Plants | 3 | None | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | habitat, however these parcels are not significant for the species and therefore do not meet the importance criteria. While Horse Mountain, and the Orchard Mesa Potential Conservation Area contain recorded cacti locations, so few have been recorded in this area that it is not considered significant for the Colorado hookless cactus, and thus does not meet the importance criteria. The BLM special status plant species, narrowstem gilia *(Gilia stenothysra)*, is also known to occur at the base of the Bookcliffs; however the known population size in this area is not considered significant. | | | |
| Rattlesnake Canyon *Public Proposed* | Plants | N/A | N/A | N/A | ACEC is within the McInnis Canyon NCA; therefore it is beyond the scope of this planning effort. | 0 | 4,628 | 0 |
| Reeder Mesa *Staff and Public Proposed* | Plants | 3 | 2 | **Yes** | The portion of the proposed ACEC which includes Reeder Mesa contains a Colorado hookless cactus study site. The cactus is thought to have crossed | 0 | 474 | (474) 0 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | with smallfower fishhook cactus (*Sclerocactus parviflorus)* resulting in a hooked central spine. Genetic studies are ongoing. This area of the proposed ACEC meets the importance criteria. | | | |
| Roan and Carr Creeks *Staff and Public Proposed* | Riparian Habitat | 3 | 2 | **Yes** | Meets the relevance criteria for fish and wildlife resource and a natural system. Meets the importance criteria for having more than locally significant qualities and qualities that make it fragile, sensitive, rare, exemplary, and vulnerable to adverse change. CDOW manages and designates portions of Roan and Carr Creek drainages for genetically pure native cutthroat trout. Therefore the area meets the relevance and importance criteria for fish. CDOW performs successful spawn-take operations in these drainages, utilizing such to develop hatchery broodstock. Successful rearing of these fish in the hatchery results in stocking pure cutthroat trout in other waters in Colorado. BLM sensitive plant Piceance bladderpod and the sun-loving meadowrue *(Thalictrum* | 0 | 40,722 | (33,600) 33,600 |
| | Fish | 2 and 3 | 1 and 2 | | | | | |
| | Wildlife | None | None | | | | | |
| | Plants | 2 | None | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | *heliophilum)* occur with the area; however, the proposed ACEC boundary does not contain the largest, nor most robust, bladderpod populations in the planning area. | | | |
| Rough Canyon ACEC/RNA *Existing* *Staff Proposed* | Plants | 3 | 1 | **Yes** | Meets the relevance criteria for the presence of significant cultural resources and resources important to Native Americans, wildlife resources, a natural system, and natural hazards. Meets the importance criteria for more than locally significant with cultural resources that are unique and vulnerable to adverse change. Expansion makes the boundary of this ACEC clearly defined by existing roads or natural landform features, increases area to accommodate better management of Gunnison Sage-Grouse *(Centrocercus minimus)* and adequately protect cultural resources. BLM sensitive Grand Junction milkvetch *(Astragalus linifolius)* are found within the area (Grand Junction milkvetch). The rare plant Eastwood's desertparsley *(Lomatium eastwoodiae)* also | 2,737 | 2,778 | (2,800) 2,800 |
| | Wildlife | 2 | 1 and 2 | | | | | |
| | Scenic | 1 | None | | | | | |
| | Cultural | 1 | 1 and 2 | | | | | |
| | Geologic | 1 | 1 and 2 | | | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | occurs in the area.<br>This area has some of the highest cultural densities in the planning area. The expansion would complement the management of cultural resources in the existing Rough Canyon ACEC.<br><br>The area has unique and complex geologic structure displaying a large monocline and fault zones. | | | |
| Sinbad Valley<br>*Staff and Public Proposed* | Geologic | 3 | 2 | **Yes** | Meets the relevance criteria for significant cultural values, historic landscape values and a natural system supporting rare plants. Meets the importance criteria for more than locally significant qualities and qualities that are sensitive, rare, and unique.<br>Portions of Sinbad Valley that occur on BLM property contain a broad oval depression that is the exposed core of a breached anticline. As the salt (halite) layer in the center of the anticline was exposed to weathering and quickly dissolved, the entire structure collapsed on itself, leaving a valley floor ringed by faults and inward-facing | 0 | 7,184 | (6,399)6,399 |
| | Scenic | 1 | None | | | | | |
| | Cultural | 1 | 2 | | | | | |
| | Plants | 3 | 1 and 2 | | | | | |

BLM_0024477

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | escarpments on the valley rim. Rocks exposed in Sinbad Valley range in age from Pennsylvanian in the lower slopes and valley floor, to Lower Cretaceous in the upper part of the outer rim. The rim includes dramatic exposures of Wingate and Entrada sandstones.<br><br>Recent rare plant surveys have mapped populations of the newly described and extremely rare Gypsum cateye *(Cryptantha gypsophila)*. This area meets the relevance criteria for the presence of significant cultural resources, historic landscape values, and resources important to Native Americans.<br><br>Cultural Resource surveys within Sinbad Valley have resulted in recording sites important to the Ute Tribe, including wickiup camps and trails. Alignment and local historical accounts make it likely that the Ute trail, unique because of distinctive travois tread, continues into the proposed ACEC. Plant resources important to the Ute are also present in a high density that may | | | |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** *Existing, Proposed, and Approved* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres[1]** *includes acres from 1987 RMP* | **Acres (Analyzed) Approved[1]** |
|---|---|---|---|---|---|---|---|---|
| | | | | | be attributable to historic cultural practices. Traditional use and heritage resources are more than locally significant and give this area special meaning to the Native Americans who traditionally used the area. Ute trails are exemplary to connecting modern visitors to this historic landscape. | | | |
| Sinbad Valley SRMA *Proposed by public as a Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values for ACEC designation* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area do meet the criteria for ACEC designation (Sinbad Valley, Dolores River Riparian, John Brown Canyon proposed ACECs), or SRMA designation (Dolores River Canyon SRMA/ERMA) | 0 | 42,731 | 0 |
| South Shale Ridge-Cow Ridge RNA *Public Proposed* | Recreation | None | None | No | Portions of this proposal are included in the Coon Hollow/South Shale Ridge and Pyramid Rock ACECs and are | 0 | 59,702 | *See South Shale Ridge and Pyramid Rock ACECs* |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| Name of ACEC *Existing, Proposed, and Approved* | Values Assessed | Relevance Criteria *see Section II for Relevance Criterion* | Importance Criteria *see Section II for Importance Criterion* | Carried Forward for Analysis? | Comments | 1987 RMP Acres | Proposed Acres[1] *includes acres from 1987 RMP* | Acres (Analyzed) Approved[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | being carried forward for further analysis. Areas in the Cow Ridge region are not being carried forward for further analysis because they do not meet the relevance and importance criteria. | | | |
| South Shale Ridge Potential ACEC *Public Proposed* | Wildlife | 2 | 1 | No | Portions of this proposal are included in the Coon Hollow/South Shale Ridge and Pyramid Rock ACECs and are being carried forward for further analysis. Areas in the Cow Ridge region are not being carried forward for further analysis because they do not meet the relevance and importance criteria. | 0 | 47,341 | *See South Shale Ridge and Pyramid Rock ACECs* |
| | Plants | 3 | 1 and 2 | | | | | |
| Unaweep-Maverick Canyon SRMA *Proposed by public as a Special Recreation Management Area (SRMA). Proposal did not include any information regarding relevant and important values* | Recreation | None | None | No | Does not meet the relevance and importance criteria for ACEC designation. Does not meet the criteria for SRMA designation (recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses and resource protection needs). Portions of the area do meet the criteria for ACEC designation (Dolores River Riparian, Juanita Arch proposed ACECs); for SRMA designation (Dolores River Canyon | 0 | 29,917 | 0 |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** *for ACEC designation* | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | SRMA/ERMA); or contain wilderness characteristics (Unaweep and Maverick units). | | | |
| Unaweep Seep ACEC/RNA *Public Proposed* | Fish and Wildlife | 2 and 3 | 2 | **Yes** | Meets the relevance criteria for wildlife and a natural system that supports the Unaweep fritillary butterfly *(Speyeria nokomis)*. The importance criteria for more than locally significant qualities and the wetland complex is fragile, sensitive, rare, irreplaceable, unique, and very vulnerable to adverse change for wildlife and rare plants. The Unaweep Seep is an existing natural area recognized by the State of Colorado that possesses habitat for the Unaweep fratillary butterfly, which depends on a unique wetland complex comprised of twenty seeps occurring in concentration on a hillside in Unaweep Canyon and a research location for giant helleborine *(Epipactus gigantea)*. Large wetland complexes are extremely rare within the GJFO, particularly undisturbed sites such as this that support a large diversity of plants and animals. | 78 | 84 | (85) 85 |
| | Plants | 3 | 1 and 2 | | | | | |
| | Riparian Habitat | 3 | 1 and 2 | | | | | |
| | Hydrologic | 3 | 2 | | | | | |
| Unaweep Seep | Wildlife | 2 | 2 | No | Portions of the proposed ACEC | 78 | 23,108 | *See existing Unaweep* |

**Table D-2**
**Relevance and Importance Criteria Evaluation for Existing and New ACECs**

| **Name of ACEC** ***Existing, Proposed, and Approved*** | **Values Assessed** | **Relevance Criteria** *see Section II for Relevance Criterion* | **Importance Criteria** *see Section II for Importance Criterion* | **Carried Forward for Analysis?** | **Comments** | **1987 RMP Acres** | **Proposed Acres**[1] *includes acres from 1987 RMP* | **Acres (Analyzed) Approved**[1] |
|---|---|---|---|---|---|---|---|---|
| Potential ACEC *Public Proposed* | Hydrologic | 3 | 2 | | are within both the existing Unaweep Seep and Palisade ACEC and are being analyzed separately. Areas outside of the existing ACECs do not meet the relevance and importance criteria and are not being carried forward for further analysis. | | | *Seep and Palisade ACECs* |

[1]Acreages include proposed expansions.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 217 of 499

## D.5 REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 1988. Manual 1613: Areas of Critical Environmental Concern. Rel. 1-1541. BLM, Washington, DC. September 29, 1988. 22 pp.

______. Areas of Critical Environmental Concern Report on the Application of the Relevance and Importance Criteria. BLM, Grand Junction Field Office, Grand Junction, Colorado. January 2010. 84 pp.

BLM_0024483

BLM_0024484

# Appendix E

## BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado

BLM_0024486

# APPENDIX E
# BLM STANDARDS FOR PUBLIC LAND HEALTH AND GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT IN COLORADO

## STANDARDS FOR PUBLIC LAND HEALTH

Standards describe conditions needed to sustain public land health, and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape.

### Standard 1

Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

#### *Indicators*

- Expression of rills, soil pedestals is minimal.
- Evidence of actively-eroding gullies (incised channels) is minimal.
- Canopy and ground cover are appropriate.
- There is litter accumulating in place and is not sorted by normal overland water flow.
- There is appropriate organic matter in soil.
- There is diversity of plant species with a variety of root depths.
- Upland swales have vegetation cover or density greater than that of adjacent uplands.
- There are vigorous, desirable plants.

**Standard 2**

Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

***Indicators***

- Vegetation is dominated by an appropriate mix of native or desirable introduced species.
- Vigorous, desirable plants are present.
- There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.
- Streambank vegetation is present and is comprised of species and communities that have root systems capable of withstanding high streamflow events.
- Plant species present indicate maintenance of riparian moisture characteristics.
- Stream is in balance with the water and sediment being supplied by the watershed (e.g., no headcutting, no excessive erosion or deposition).
- Vegetation and free water indicate high water tables.
- Vegetation colonizes point bars with a range of age classes and successional stages.
- An active floodplain is present.
- Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.
- Stream channels with size and meander pattern appropriate for the stream's position in the landscape, and parent materials.
- Woody debris contributes to the character of the stream channel morphology.

**Standard 3**

Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

***Indicators***

- Noxious weeds and undesirable species are minimal in the overall plant community.

- Native plant and animal communities are spatially distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.
- Plants and animals are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations.
- Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.
- Photosynthetic activity is evident throughout the growing season.
- Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.
- Appropriate plant litter accumulates and is evenly distributed across the landscape.
- Landscapes composed of several plant communities that may be in a variety of successional stages and patterns.

**Standard 4**

Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

***Indicators***

- All the indicators associated with the plant and animal communities standard apply.
- There are stable and increasing populations of endemic and protected species in suitable habitat.
- Suitable habitat is available for recovery of endemic and protected species.

**Standard 5**

The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

***Indicators***

- Appropriate populations of macroinvertabrates, vertebrates, and algae are present.
- Surface and ground waters only contain substances (e.g. sediment, scum, floating debris, odor, heavy metal precipitates on channel

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 224 of 499

substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the Water Quality Standards established by the State of Colorado (5 CCR 1002-8).

## Guidelines for Livestock Grazing Management

Guidelines are the management tools, methods, strategies, and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the standards. Currently, the only guidelines for BLM Colorado that have been developed in concert with the Resource Advisory Councils are livestock grazing management guidelines.

1. Grazing management practices promote plant health by providing for one or more of the following:
   - periodic rest or deferment from grazing during critical growth periods;
   - adequate recovery and regrowth periods;
   - opportunity for seed dissemination and seedling establishment.

2. Grazing management practices address the kind, numbers, and class of livestock, season, duration, distribution, frequency and intensity of grazing use and livestock health.

3. Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion, to assist in maintaining appropriate soil infiltration and permeability, and to buffer temperature extremes. In riparian areas, vegetation dissipates energy, captures sediment, recharges ground water, and contributes to stream stability.

4. Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity. Where reseeding is required, on land treatment efforts, emphasis will be placed on using native plant species. Seeding of non-native plant species will be considered based on local goals, native seed availability and cost, persistence of non-native plants and annuals and noxious weeds on the site, and composition of non-natives in the seed mix.

5. Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts to other resources or uses of riparian/wetland and upland sites.

6. Grazing management will occur in a manner that does not encourage the establishment or spread of noxious weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds.

BLM_0024490

7. Natural occurrences such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape, including the maintenance, restoration, or enhancement of habitat to promote and assist the recovery and conservation of threatened, endangered, or other special status species, by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, and thus minimizing habitat fragmentation.

8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

Appendix E. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado

This page intentionally left blank.

E-6 *Grand Junction Field Office Approved Resource Management Plan* August 2015

BLM_0024492

# Appendix F
## Wilderness Characteristics Inventory

BLM_0024493

BLM_0024494

# APPENDIX F
# WILDERNESS CHARACTERISTICS INVENTORY AND PLANNING

## INTRODUCTION

The BLM, GJFO, in accordance with the BLM policy on conducting wilderness characteristics inventories on BLM lands under Section 201 of the FLPMA (BLM Manual 6310, Conducing Wilderness Characteristics Inventory on BLM Lands), has updated its inventory of lands with wilderness character found within the GJFO planning area. This document highlights the findings of this inventory. The complete inventory report is available on the RMP Web site at http://www.blm.gov/co/st/en/fo/gjfo/rmp.html.

The original wilderness characteristics Inventory was conducted in 1979, resulting in the establishment of current wilderness study areas (WSAs) found in the GJFO. Some of the units analyzed as part of this inventory were part of the original inventory of 1979, or a supplemental inventory in 1999.

### Process for Identifying Wilderness Character Inventory Units

In an effort to conduct the most thorough analysis of lands with wilderness characteristics, the GJFO established a process for identification of wilderness character inventory units. This process included identification of units through two avenues; 1) Citizens' Wilderness Proposals (CWPs), and 2) Internal identification:

1) Citizens' Wilderness Proposals: Between 2001 and 2009, the Colorado Environmental Coalition submitted CWPs for 14 units within the planning area. These proposals included inventory reports conducted by non-BLM personnel. Several organizations referenced these CWPs in their comments during scoping for the GJFO Resource Management plan revision. The portions of the CWP identified units that are not within existing WSAs were carried forward for this inventory.

2) In addition to CWPs, GJFO staff identified areas that may possess wilderness characteristics based on their field knowledge. Then during the inventory process, the BLM Washington Office issued IM 2011-154, Requirement to Conduct and Maintain Inventory Information for Wilderness Characteristics and to Consider Lands with Wilderness Characteristics in Land Use Plans. This guidance included a document titled "Policy on Conducting Wilderness Characteristics Inventory on BLM Lands." Guidance in the IM was later published in BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands.

   In accordance with the new policy document, the GJFO completed a spatial data analysis to identify all areas in the GJFO which hosted 5,000 or more roadless acres of land. This analysis used the GJFO route inventory data set. A comprehensive route inventory had been compiled through years of field inventory for use in travel management planning. The analysis for identifying potential lands with wilderness characteristics utilized this data, seeking out certain route classes (not including single track or ATV trails) in determining the roadless areas. The initial boundaries of the units potentially containing wilderness characteristics were formed using land status and Route Inventory data. This process proved effective as evidenced by the fact that the results of the analysis pointed to all existing WSAs and all previously identified inventory units including CWPs as areas that may include over 5,000 roadless acres. The additional units identified by the spatial analysis provided the starting point for field inventory.

**Process for Conducting Wilderness Character Inventory**

The process defined above identified 31 units (in addition to existing WSAs), totaling approximately 400,000 acres to be inventoried for the presence or absence of wilderness characteristics. The inventory was conducted using the process identified in BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands. The field inventory identified the presence or absence of the following characteristics:

- size;
- apparent naturalness;
- opportunities for solitude;
- opportunities for primitive or unconfined recreation; and
- supplemental values found for the unit.

The findings of past inventories (where applicable), including those provided in CWPs were compared to the current state of the units, analyzing changes in the landscape and levels of human impact, and were either confirmed or refuted

based on the analysis. The inventory write up for each unit also included a summary of major human uses, including valid existing rights (e.g., fluid mineral leases and mining claims), which could affect wilderness characteristics in the future.

This inventory was conducted between 2009 and 2011, and in some cases involved validating previous inventories. Therefore specific descriptions (e.g., condition of a trail and acreage of the unit currently leased for fluid minerals) may no longer be exact but offer a snapshot of conditions at the time of the inventory.

**Table F-1**, Summary of Findings, provides details for each wilderness characteristics inventory unit (WCIU). **Figure F-1**, Wilderness Characteristics Inventory, shows a map of all the units and the defining characteristics of each.

### Procedures for Considering Lands with Wilderness Characteristics in Land Use Planning

BLM Manual 6320, Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process provides BLM Field Offices guidance for considering lands with wilderness characteristics in the land use planning process. In accordance with this guidance, the GJFO RMP alternatives considered a full range of reasonable alternatives for management of lands with wilderness characteristics. The alternatives ranged from no specific protections for lands with wilderness characteristics, to an alternative that set specific protections for all of the units with wilderness characteristics.

The alternatives were developed considering manageability and resource values and uses. The alternatives also included a range of management prescriptions for WSAs, should they be released from wilderness consideration by Congress. This range included the management of the WSA areas for their wilderness characteristics.

The RMP allocates three lands with wilderness characteristics units to be managed for their wilderness characteristics.

- Bangs Canyon (Bangs): A series of shallow to moderately deep canyons drain northeasterly from the edge of Piñon Mesa (a part of the Uncompahgre Plateau) into the Gunnison River. Bang's Canyon, West Bang's Canyon, and the canyon of North East Creek. Critically sensitive from a cultural resource standpoint, the area was utilized as long ago as 10,000 years - first by the paleo Indian culture and successively by the cultures commonly referenced as the archaic, Fremont and Ute. Recreational activities include mountain biking, hiking, backpacking, hunting, driving off-highway vehicles, and horseback riding. A short segment of the 142-mile Tabeguache Trail, an extension of the Colorado Plateau Mountain Bike Trail System, traverses the inventory unit.

**Table F-1**
**Summary of Findings**

| Unit Identifier | WCIU Name | Total Acreage of WCIU | WCIU Identified by External Proponent | WCIU Identified by BLM | WCIU Found to have Wilderness Character | Acres Found to Have Wilderness Character |
|---|---|---|---|---|---|---|
| 1 | Bang's Canyon | 20,434 | • | • | • | 20,434 |
| 2 | Bang's West | 6,879 | | • | | |
| 3 | Barrel Spring | 10,169 | | • | | |
| 4 | Brush Mountain | 5,310 | | • | | |
| 5 | Buck Canyon | 5,009 | | • | | |
| 6 | Buttermilk Canyon | 14,086 | | • | | |
| 7 | County Line | 7,380 | | • | | |
| 8 | Cow Ridge | 15,721 | • | | | |
| 9 | East Demaree | 4,796 | • | • | • | 4,796 |
| 10 | East Salt Creek | 18,303 | | • | • | 17,008 |
| 11 | Granite Creek | 14,048 | • | | | |
| 12 | Horse Mountain | 10,303 | | • | | |
| 13 | Hunter Canyon | 32,700 | • | | • | 32,228 |
| 14 | Kings Canyon | 9,606 | • | • | • | 9,606 |
| 15 | Lipan Wash | 15,373 | | • | | |
| 16 | Little Bookcliffs WSA Expansion | 1,580 | • | | | |
| 17 | Little Horsethief Creek | 5,732 | | • | | |
| 18 | Lumsden Canyon | 13,764 | | • | • | 10,072 |
| 19 | Main Canyon | 12,613 | | • | | |
| 20 | Maverick | 20,401 | • | • | • | 20,401 |
| 21 | Munger Creek | 23,801 | | • | | |
| 22 | Payne Wash | 8,153 | | • | | |
| 23 | Prairie Canyon | 17,569 | • | | | |
| 24 | Sagebrush Pillows | 5,127 | • | | | |
| 25 | Sewemup Mesa | 23,551 | • | | | |
| 26 | South Shale Ridge | 27,540 | • | • | • | 27,540 |
| 27 | Spink Canyon | 13,081 | | • | • | 13,081 |
| 28 | Spring Canyon | 14,009 | | • | • | 8,848 |
| 29 | The Blowout | 5,105 | | • | | |
| 30 | Unaweep | 9,494 | • | • | • | 7,154 |
| 31 | West Creek | 111 | • | • | • | 111 |

Appendix F. Wilderness Characteristics Inventory

**Figure F-1**
**Wilderness Characteristics Inventory**

Wilderness Characteristics Inventory
BLM
National Forest
National Monument
Private
State
Field Office Boundary
NCA Boundary
Wilderness
Wilderness Study Area
Inventoried lands without wilderness characteristics
Inventoried lands with wilderness characteristics
Miles
Inventory Units
1 Bangs Canyon
2 Bangs West
3 Barrel Spring
4 Brush Mountain
5 Buck Canyon
6 Buttermilk Canyon
7 County Line
8 Cow Ridge
9 East Demaree
10 East Salt Creek
11 Granite Creek
12 Horse Mountain
13 Hunter Canyon
14 Kings Canyon
15 Lipan Wash
16 Little Bookcliffs
17 Little Horsethief Creek
18 Lumsden Canyon
19 Main Canyon
20 Maverick
21 Munger Creek
22 Payne Wash
23 Prairie Canyon
24 Sagebrush Pillows
25 Sewemup Mesa
26 South Shale Ridge
27 Spink Canyon
28 Spring Canyon
29 The Blowout (Palisade)
30 Unaweep
31 West Creek
Utah
Colorado
Rio Blanco County
Garfield County
Mesa County
DeBeque
Fruita
Grand Junction
Palisade
McInnis Canyons NCA
Grand Mesa National Forest
Dominguez-Escalante NCA
Uncompahgre National Forest
Delta County
Delta
Gateway
Montrose County

August 2015 | *Grand Junction Field Office Approved Resource Management Plan* | F-5

BLM_0024499

- Maverick: A five-canyon complex and unique roadless area with outstanding opportunities for solitude given the topography, vegetation, and unique feature of Juanita Arch, which is the only natural bridge in Colorado. Mining claims are present at the boundaries of the unit but there has been no development of the claims. While there are existing oil and gas leases, the area is not within the area of current known potential for conventional or shale gas development and no past exploration or development for oil and gas has occurred.
- Unaweep: This area has outstanding opportunities for solitude and primitive and unconfined recreation with the unit primarily affected by the forces of nature. It includes the 1,000-foot-deep Ute Creek Canyon with the sheer granite cliffs of Unaweep Canyon. There are no right-of-way conflicts, and no current mining claims. While there are approximately 100 acres of existing oil and gas leases, the area is not within the area of current known potential for conventional or shale gas development and no past exploration or development for oil and gas has occurred.

The remaining nine areas fall within the portion of the GJFO with known potential for natural gas development, and are largely leased for oil and gas development; or provide motorized and mechanized use opportunities. Under the Preferred Alternative and its corresponding travel management plan the manageability of these areas for wilderness characteristics would be compromised by valid existing rights, and/or motorized and mechanized use and these areas would be managed for other resources and resource uses. The impacts of the management alternatives on lands with wilderness characteristics can be found in Chapter 4 of the Proposed RMP/Final EIS.



# Appendix G
## Comprehensive Air Resource Protection Protocol

BLM_0024501

BLM_0024502

February 2014

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

# COLORADO BUREAU OF LAND MANAGEMENT

## COMPREHENSIVE AIR RESOURCE PROTECTION PROTOCOL (CARPP)

Version Date: February 2014

BLM_0024503

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 238 of 499

# TABLE OF CONTENTS

Section Page

**COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL**

Section I – Purpose, Scope, and Responsibilities ........ 3
Section II – Interagency Air Resources Collaboration ........ 4
Section III – Actions to Analyze & Protect Air Quality ........ 4
III.A Monitoring ........ 5
III.B Emissions Inventories ........ 6
III.C Modeling ........ 6
III.D Permitting ........ 8
III.E Mitigation ........ 9
Section IV – Adaptive Management Processes for Air Resources ........ 10
Section V – Annual Summary Report ........ 13
Section VI – Oil and Gas Development Emissions Reduction Strategies & BMPs ........ 13

BLM_0024504

# COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL (CARPP)

## SECTION I – PURPOSE, SCOPE, AND RESPONSIBILITIES

This Comprehensive Air Resources Protection Protocol (CARPP) describes the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality within the state of Colorado. This protocol also outlines specific measures that may be taken to address BLM-approved activities with the potential to cause significant adverse impacts to air resources (via the generation of significant quantities of air emissions) within any planning area (as determined on a case by case basis). Further, the purposes of this protocol are to address air quality issues identified by the Bureau of Land Management (BLM), or public scoping, in its analysis of potential impacts on air resources for BLM Colorado Resource Management Plans and Environmental Impact Statements (RMP/EIS); and clarify the mechanisms and procedures that BLM will use to achieve the air resources goals, objectives, and management actions set forth in BLM Colorado RMPs.

### I.A CARPP Scope

The CARPP is not a decision document, but rather a strategy to address air quality concerns throughout BLM-managed lands and resources in Colorado. Because the CARPP is not a field office specific management tool, it may be modified as necessary to comport or comply with changing laws, regulations, BLM policy, or to address new information and changing circumstances without maintaining or amending any specific Field Office RMP (see reference version date on the cover page).

However, changes to the goals, objectives, or management actions set forth in any Colorado Field Office RMP/EIS as a result of the changes in the CARPP (or more specifically, any subsequent analysis based on such changes) would require an amendment of the specific RMP being affected.

### I.B BLM Responsibilities under FLMPA and MLA

The BLM has the authority and responsibility under the Federal Land Policy and Management Act (FLPMA) to manage public lands in a manner that will protect the quality of air and atmospheric values [FLPMA Sec. 102(a)(8)]. The FLPMA also provides that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands and includes provisions for implementing the Mining and Minerals Policy Act of 1970 [FLPMA Sec. 102(a)(12)]. The BLM has the responsibility under the Mineral Leasing Act (MLA) to implement the decisions of any RMP/EIS in a manner that recognizes valid and existing lease rights[1].

[1] H-1601-1 - LAND USE PLANNING HANDBOOK: A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval. When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

Further, the FLPMA provides that "In the development and revision of land use plans, the Secretary shall provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;" [FLPMA Sec. 202(c)(8)][2].

## SECTION II – INTERAGENCY AIR RESOURCES COLLABORATION

The Bureau of Land Management is firmly committed to working with federal, state, tribal, and local air resource management partners to address complex and often cross-jurisdictional air quality issues. As a federal agency, we have a role to provide leadership in addressing known air quality issues within our authority and domain, while upholding our responsibility to manage the public lands for multiple-use under the FLPMA. We also recognize that the State of Colorado, specifically the Colorado Department of Public Health and Environment (CDPHE), has the primary responsibility and authority delegated by the EPA to regulate and maintain air quality standards within Colorado in accordance with the Clean Air Act. Interagency collaboration is the key to management of air quality, as no single agency has all the necessary tools to solve these complex issues alone. We must act together.

To that end the BLM will work collaboratively with other local, state, federal, and tribal agencies involved in the management of air resources to develop a comprehensive strategy to protect air resources from potentially significant adverse impacts resulting from BLM approved activities in Colorado.

### II.A National Air Quality MOU

When making oil and gas implementation decisions, the BLM will consider or apply, as appropriate, the provisions of the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

## SECTION III – ACTIONS TO ANALYZE & PROTECT AIR QUALITY

The following sections describe actions the BLM will take to ensure an adequate analysis and subsequent protection for air quality resources within Colorado. Appropriate air resources protection requires the BLM to manage its authorized activities and actions at broad spatial and temporal scales that are dynamic and thus subject to change. The BLM will accomplish this through an adaptive management approach, which includes establishing baseline conditions, monitoring, reevaluation, and adjustment as necessary. Adaptive management therefore

---

[2] <u>Note:</u> Where sources of air pollution emissions are regulated by an entity/agency (Federal, State, Tribal, Local), the BLM shall not craft alternatives with features or conditions that interfere with a proponents ability to comply with such laws or standards. IBLA has held that the meaning of "providing for compliance" does not require that the BLM has any obligation to ensure compliance where another agency holds such responsibility [*Wyoming Outdoor Council, et al* 176 IBLA 15, 27 (2008); Powder River Basin Resource Council, 183 IBLA 83, 94-95 (2012)]. However, the BLM should appropriately analyze such sources (as well as non-regulated sources) within the applicable NEPA context to disclose potential impacts, determine significance, and provide for mitigation as necessary and within our authority for any specific finding.

contemplates regular review and adjustment of management approaches during the authorization of emissions generating activities commensurate with changing circumstances.

## III.A MONITORING

Ambient air monitoring provides valuable data for determining current and background concentrations of air pollutants, describing long term trends in air pollutant concentrations, and evaluating the effectiveness of air control strategies. The BLM's comprehensive air resource protection protocol includes the ambient air monitoring measures described in this section.

### III.A.1 – Air Monitoring Network

The BLM will participate in a cooperative effort with industry, CDPHE, Forest Service, National Park Service, EPA, local counties, and other entities as appropriate, to establish, operate, and maintain a comprehensive air monitoring network within the planning areas where a need for monitoring has been identified (contingent upon available funding). The BLM will cooperate in the sharing of air monitoring data collected by the air monitoring network with other agencies and the public.

### III.A.2 – Pre-Construction Air Monitoring

The BLM may request proponents of projects with the potential to generate significant air emissions, to submit pre-construction air monitoring data from a site within or adjacent to the proposed development area. The purpose of this air monitoring is to determine baseline air quality conditions prior to development at the site. The need for monitoring will be determined by the BLM based on the availability or absence of existing representative air monitoring data and the factors listed in Section III.D of this protocol. If the BLM determines that pre-construction monitoring is necessary, the project proponent must provide a minimum of one year of representative ambient air monitoring data for the pollutants of concern. The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

### III.A.3 – Life of Project Air Monitoring

The BLM may require proponents or operators of Federal mineral development projects, or proponents of other potentially significant emission generating projects, to conduct air monitoring for the life of the project based on the availability or absence of representative air monitoring data and the factors listed in Section III.D of this protocol. The purpose of this air monitoring is to measure impacts potentially attributable to the project over time and to determine the effectiveness of emissions control measures required for the project. The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

#### III.A.4 – Monitoring Data Transparency

Project-specific monitoring data may be used by the BLM in subsequent NEPA analysis required for project approvals. Thus public disclosure of such data is assured via the NEPA process, if used. Additionally, the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol.

### III.B EMISSIONS INVENTORIES

The BLM will request the proponent of an oil and gas development activity (as proposed in a permit application, plan of development, or Master Development Plan) to submit a comprehensive inventory of anticipated direct and indirect emissions associated with the proposed project. The emissions inventory will include estimated emissions of regulated air pollutants from all sources related to the proposed activity, including fugitive emissions and greenhouse gas emissions, for each year or distinct project phase over the life of the project. The BLM will review the emissions inventory to determine its completeness and accuracy. In most cases the BLM will accept inventory data reported to other agencies for the purposes of meeting this requirement. For example BLM would accept copies of actual emissions data for criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases that are submitted to CDPHE as required for applicable air permitting or APEN requirements, or submittals to COGCC in the form of drilling and production data reports, and data to EPA under the Greenhouse Gas Reporting Rule (40 CFR Part 98 Subpart W) for the authorized action.

### III.C MODELING

Air dispersion and photochemical grid models are useful tools for predicting project-specific impacts on air quality, predicting the potential effectiveness of control measures and strategies, and forecasting trends in regional concentrations of air pollutants. The BLM will use regional air modeling and project-specific modeling, in conjunction with other air analysis tools, to develop air resource protection strategies consistent with our responsibilities under FLPMA. Further, the BLM will provide appropriate disclosure for any modeling of direct, indirect, and cumulative impacts of proposed actions during the required NEPA analysis.

#### III.C.1 – Project-specific Modeling

The BLM may require project-specific air quality modeling, consistent with the Air Resources MOU to analyze potential impacts from a proposed Federal mineral development project or other proposed activity that has the potential to emit significant quantities of a regulated air pollutant and the effectiveness of any air emission control measures. Project proponents may submit results from other modeling analyses that include activities similar to the proposed project for BLM's review and approval, and if approved, those modeling results may be used in lieu of new project-specific modeling. The decision as to whether to require air quality modeling will be based on factors listed in Section III.D of this protocol. The BLM will not require an air modeling analysis when it can be

demonstrated that the project will not cause a substantial increase in emissions of the pollutants of concern.

### III.C.2 – Modeling Protocol

The BLM will determine the parameters required for a project-specific modeling analysis through the development of a modeling protocol for each analysis. When conducting a regional model or EIS level project specific oil and gas air modeling analysis, the BLM will adhere to the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

### III.C.3 – Regional Air Modeling

The BLM will support and participate in regional modeling efforts through multi-state and/or multi-agency organizations such as Western Governors' Association – Western Regional Air Partnership (WRAP) and the Federal Leadership Forum (FLF). In addition, BLM will, contingent upon available funding, conduct and facilitate regional air modeling as needed. Currently, the BLM is facilitating the Colorado Air Resources Management Modeling Study (CARMMS). CARMMS is a BLM funded regional air quality modeling study of expected impacts on air quality from projected increases in oil and gas development across Colorado and certain upwind adjacent states.

- The CARMMS modeling protocol/study will be developed by the BLM with involvement from appropriate local, state, federal, and tribal agencies involved in the management of air resources and the authorization and regulation of oil and gas development.
- The CARMMS results will include the predicted impacts from all projected federal and non-federal oil and gas development within the region.
- The CARMMS results and analysis will be made available to the public.

### III.C.4 – Evaluation of Modeling Results

The BLM will cooperate in an interagency process to develop a comprehensive strategy to manage air quality impacts from future oil and gas development within the region. As part of that strategy, the local, state, federal, and Tribal agencies involved in the regulation of air quality and the authorization of oil and gas development would evaluate modeling results from CARMMS or other future modeling studies and identify potential air quality concerns and necessary reductions in air emissions. If the modeling predicts significant impacts, these agencies would use their respective authorities to implement appropriate enhanced emission control strategies, operating limitations, equipment standards, and/or pacing of development.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 244 of 499

#### III.C.5 – Future Modeling Studies

Future iterations of the CARMMS, or a similar regional modeling study of expected impacts from oil and gas development, may be conducted through a collaborative interagency management mechanism and interagency / industry funding mechanism.

### III.D Permitting

As part of the NEPA process and prior to the authorization of any Federal mineral development activity the BLM will conduct an air analysis to determine the potential impacts on air quality based on the estimated emissions from the activity being authorized. The BLM may conduct such an analysis for other authorized activities with the potential to generate significant emissions of a regulated pollutant. The BLM will consider the following factors to identify pollutants of concern and make decisions regarding the appropriate level of air analysis, monitoring, and reporting requirements for the proposed activity.

- magnitude of potential air emissions from the proposed activity
- duration of proposed activity and distinct phase considerations
- proximity to a federally mandated Class I area, sensitive Class II area (as identified on a case-by-case basis by CDPHE or a federal land management or tribal agency), population center, or other sensitive receptor
- location within or adjacent to a non-attainment or maintenance area
- meteorological and geographic conditions
- existing air quality conditions including measured exceedances of NAAQS or CAAQS and measured adverse impacts on air quality related values (AQRVs) at Class I and sensitive Class II areas
- intensity of existing and projected development in the area
- issues identified during project scoping

#### III.D.1 – Statewide Lease Notice

The following Lease Notice language will be incorporated into all new leases.

*Due to potential air quality concerns, supplementary air quality analysis may be required for any proposed development of this lease. This may include preparing a comprehensive emissions inventory, performing air quality modeling, and initiating interagency consultation with affected land managers and air quality regulators to determine potential mitigation options for any predicted significant impacts from the proposed development. Potential mitigation may include limiting the time, place, and pace of any proposed development, as well as providing for the best air quality control technology and/or management practices necessary to achieve area-wide air resource protection objectives. Mitigation measures would be analyzed through the appropriate level of NEPA analysis to determine effectiveness, and will be required or implemented*

BLM_0024510

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 245 of 499

*as a permit condition of approval (COA). At a minimum, all projects and permitted uses implemented under this lease will comply with all applicable National Ambient Air Quality Standards and ensure Air Quality Related Values are protected in nearby Class I or Sensitive Class II areas that are afforded additional air quality protection under the Clean Air Act (CAA).*

## III.E MITIGATION

Many activities that the BLM authorizes, permits, or allows generate air pollutant emissions that have the potential to adversely impact air quality. The primary mechanism to reduce air quality impacts is to reduce emissions via project design features and mitigation. Appropriate emission reduction measures are best identified and required at the project authorization stage, when the temporal and spatial characteristics and technological specifications of the proposed action have been defined. The project-specific information available at that stage allows for the development of an emissions inventory and impact analysis that can be used to identify effective mitigation options for predicted adverse impacts. Section IV, Emissions Reduction Strategies and Best Management Practices, provides some emission reduction technologies and strategies as an example. The list in Table VI-1 is not intended to be all inclusive or preclude the use of other effective air pollution control technologies that may be proposed.

The BLM will ensure implementation of reasonable mitigation, control measures, and design features through appropriate mechanisms, including lease stipulations identified in RMPs, notices to lessees, and conditions of approval (permit terms and conditions) as provided for by law and consistent with lease rights and obligations. In the absence of, or in addition to effective control technologies, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals and objectives as defined under any applicable RMP.

### III.E.1 – Emissions Reduction Planning / Minimizing Air Emissions

The BLM will request proponents of oil and gas development projects that have the potential to significantly adversely impact air quality or predicted to exceed an air quality standard to provide an emissions reduction plan where air quality has been identified as a resource of concern in applicable NEPA analysis. Plans shall include a detailed description of operator committed measures to reduce project related air pollutant emissions including greenhouse gases and fugitive dust. All projects are required to comply with all applicable state and federal regulations.

### III.E.2 – Project-specific Mitigation

If the project-specific air quality analysis predicts future impacts on NAAQS or CAAQS (i.e. exceedances) or adverse impacts to AQRVs in Class I or sensitive Class II areas, the BLM will analyze air quality mitigation measures for emission sources. Further, if the regional air quality modeling study conducted under Section III.C.3 predicts significant cumulative impacts on air resources from expected oil and gas development in the region, the BLM may require the

BLM_0024511

proponent of an oil and gas development project to apply reasonable mitigation including but not limited to best management practices (see Section VI), emissions offsets, and other control technologies or strategies identified in the project-specific air quality analyses.

Where identified and analyzed mitigation measures cannot be reasonably implemented for a particular proposed action due to the overall project design, or substantial technical or economic barriers, the BLM will work with project proponents during the NEPA process to develop operator-committed measures or acceptable emissions offsets that would be included as conditions of approval (COA). Any operator committed measures would be required to provide an air quality benefit sufficient in type, scale, location, and timing to avoid the anticipated adverse impact or at a minimum, to reduce it to an acceptable level for the specific area and pollutant(s) analyzed.

### III.F Protocol Implementation

The BLM will ensure that air resource protection strategies and mitigation measures are implemented by including project-specific COAs (operator-committed and/or required mitigation) for each authorized action. Any COAs applied to projects as a result of this process shall be clearly consistent with the applicable RMP management decisions and/or subsequent analysis of new or previously unavailable information upon which the BLM can reasonably rely.

## SECTION IV – ADAPTIVE MANAGEMENT PROCESSES FOR AIR RESOURCES

Adaptive management incorporates the principles of monitoring current conditions, predicting future impacts, and adapting management strategies to account for changing conditions. An adaptive management strategy for air quality resources allows the BLM to comply with NEPA and complete an appropriate analysis to ensure that activities approved by the BLM minimize adverse impacts to air quality; while allowing for development of important domestic energy resources.

The BLM will implement an adaptive management strategy to account for changing air quality conditions and to minimize adverse impacts to air resources from BLM-authorized activities. The strategy includes evaluating air quality on an on-going basis, and if necessary, implementing appropriate mitigation measures to meet the identified objectives and targets for any applicable Colorado RMP. The adaptive management strategy is intended to be transparent and as such the process includes an annual reporting component that will be made available to the public, as well as case by case incorporation of specific plan elements within individual project approvals. Components of this adaptive management strategy include the following:

### IV.A Establish Baseline Air Quality Conditions

Existing air quality conditions will be established and continuously updated on an annual basis. To establish a periodic baseline, data must be compiled and analyzed such that air quality value trends (NAAQS & AQRVs for Class I and sensitive Class II areas) can be established or evaluated for the purpose of predicting future impacts from BLM-authorized activities. Sources of data for this analysis may include raw air quality

monitoring station data, air quality monitoring reports prepared by others (CDPHE, EPA, NPS or USFS), and/or appropriate regional modeling results.

In addition to monitored or predicted background data, regional emissions inventories will be continuously or periodically updated to reflect the annual mass of pollutants added to the atmosphere. The data will provide an understanding between mass emissions and monitored/modeled air quality conditions and provide a reasonable basis from which to evaluate impacts from future projects or actions.

The last component of the baseline analysis includes providing a brief synopsis of the current meteorological conditions that exist for any planning area such that exceptional events and historical deviations in atmospheric values can be documented to provide additional context for the observed/reported air quality values.

## IV.B Emissions Tracking

To provide for the periodic baseline the BLM will use the project-specific information used in its NEPA analyses as a mechanism to track emissions of criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases from BLM authorized oil and gas activities within each field office planning area. (NOTE: the BLM may incorporate emissions inventories for other authorized activities with significant emissions to provide for an appropriate cumulative inventory, where such sources are not already included as a Colorado Air Pollution Emissions Notice, or National Emissions Inventory component). The BLM will use emissions data from APDs to inform iterative elements of our adaptive management strategy, including modeling inputs and any subsequent prescriptive or comparative project tiering from any applicable modeling results.

## IV.C Prescriptive Model Validation

Prescriptive model validation includes comparing the annual NEPA emissions data from BLM authorized oil and gas activities within the planning areas to emission levels analyzed in the CARMMS modeling study (or the most recent BLM or interagency air impacts analysis conducted in accordance with the provisions of the modeling Section III above). Emissions data will include specific oil and gas indicators, such as the number of wells drilled, number of producing wells, production data, compressor stations installed, centralized liquids gathering stations, and gas treatment facilities constructed. The actual emissions levels and new baseline air quality observations will be correlated against the modeled parameters to determine the reasonableness of the model for predicting impacts and its continued appropriateness as a reference for any subsequent project analysis.

If during the course of our annual analysis it is determined that the model has not demonstrated a reasonable correlation of predicted impacts (for modeled emissions inventory levels) compared against the actual emissions recorded for a planning area, the BLM will investigate the potential sources of the discrepancy to determine a potential cause, such as meteorological factors (ex: winter time ozone, which cannot be modeled at this time), or fee mineral development (i.e. non-BLM authorized actions). If a probable cause for the discrepancy cannot be established, then the BLM will initiate

interagency coordination with our regulatory partners to determine if a new modeling analysis is potentially warranted.

## IV.D Responding to Monitored Exceedances of the NAAQS

If during the course of a year a Federal Reference or Equivalent air monitor within any planning area records a validated exceedance of any NAAQS (excluding any non-attainment areas) the BLM will review the available data to determine if any BLM authorized activity caused or significantly contributed to the exceedance event. The review will encompass the following steps.

### IV.D.1– QA/QC

The BLM will ensure the validity of the monitored data by: (a) reviewing Quality Assurance/Quality Control (QA/QC) metadata to ensure against false high readings, and (b) reviewing meteorological data to determine if an exceptional atmospheric event such as stratospheric ozone intrusion occurred. The BLM may contact CDPHE for technical consultation and concurrence regarding possible exceptional events.

### IV.D.2 – Screening Analysis

If the monitoring data are validated, the BLM will conduct a screening analysis to determine the likely cause, source, or origin of the exceedance and whether any BLM authorized source(s) within or adjacent to the planning area caused or contributed to the monitored exceedance. If the screening analysis indicates BLM-authorized sources did NOT cause or significantly contribute to the exceedance, then no further action will be taken by the BLM. The data, analysis, and conclusions will be included in the annual public report described under I.C above.

### IV.D.3 – Enforcement

Should the results of the screening analysis indicate that a BLM authorized source(s) caused or significantly contributed to the monitored exceedance, the BLM will review the COA from the authorization for the source(s) to determine if all the COA were implemented as required. Where it is determined that operators did not comply with the conditions of approval for their authorized activities, and did not submit an appropriate sundry notice for approved deviations from such conditions, BLM may issue a notice of incident of noncompliance or take other appropriate enforcement action.

### IV.D.4 – Contingency Planning

If, after review the BLM determines that an authorized source(s) caused or significantly contributed to the monitored exceedance, the BLM will initiate consultation with CDPHE, EPA, and any other applicable local, state, federal, and tribal agencies with responsibility for managing air resources to address appropriate responses to the monitored exceedances. Responses to monitored exceedances may include employing more stringent mitigation measures within

the agencies' respective authority to reduce projected future emissions and performing additional modeling and analysis to determine the overall effectiveness of such mitigation measures.

Additionally, the BLM may implement reasonable temporary measures that have been included in a project specific authorization as conditions of approval, which could limit drilling operations, completions or well stimulations, blowdowns, or other non-essential operations during specified time periods (i.e. a timing limitation). Other actions the Bureau may take would include limiting the number of annual APD approvals issued for the affected area until such time that updated regional modeling can be conducted to provide an appropriate assessment of the expected impacts from a reasonable level of development.

### IV.E Evaluating Projected Future Development/Emissions

Periodically, but not less than every three years, the BLM will evaluate the available or reasonably foreseeable oil and gas development projections for each planning area for the following three to five year period, and compare these projected levels to the level of predicted future development analyzed in the CARMMS modeling study (or the most recent BLM or interagency air impacts analysis conducted under the provisions of the modeling section(s) III.C.3 or III.C.5 above). The BLM will use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses.

## Section V – Annual Summary Report

Annually, the BLM will prepare a comprehensive summary report (from actual project data and analysis). This report will be made available to the public. The BLM will use this annual review to evaluate whether current air resources protection strategies are meeting the goals and objectives established within the BLM Colorado RMPs. If the analysis shows that the strategies are not achieving our defined air resource protection goals, the BLM will collaborate with CDPHE and the EPA to develop or modify air resource protection strategies as necessary to effectively protect air resources within any deficient planning area. Should this result in changes to RMP goals and objectives, additional planning level analyses will be required.

## Section VI – Oil and Gas Development Emissions Reduction Strategies & BMPs

Table VI-1 displays some emission reduction measures, their potential environmental benefits and liabilities, and feasibility. The table is not meant to be exhaustive in terms of available or acceptable emissions reduction/control technologies or techniques, but provides a baseline or starting point from which to construct design features and mitigation options for project specific or regional analyses.

**Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| **Control Strategies for Drilling and Compression** | | | |
| Multi-well pad directional or horizontal drilling. | When compared to single pad vertical drilling, reduces construction related emissions, decreases surface disturbance, reduces trip frequencies, and reduces habitat fragmentation. | Could result in higher air impacts in one area with longer sustained drilling times. | Depends on geological strata, topography, and other physical constraints. |
| Improved engine technology (Tier 2 or 4) for diesel drill rig engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers and, potentially differentials in cost for small operators.. |
| Selective Catalytic Reduction (SCR) for drill rig engines and/or compressors. | $NO_x$ emissions reduction, potential decreased formation of visibility impairing compounds and ozone. NOx control efficiency of 95% achieved on drill rig engines. NOx emission rate of 0.1 g/hp-hr achieved for compressors. | Potential NH3 emissions and formation of visibility impairing ammonium nitrate. Regeneration/disposal of catalyst can produce hazardous waste. | Not applicable to 2-stroke engines. |
| Non-selective catalytic reduction (NSCR) for drill rig engines and/or compressors. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. NOx control efficiency of 80-90% achieved for drill rig engines. NOx emission rate of 0.7 g/hp-hr achieved for compressor engines greater than 100 hp. | Regeneration/disposal of catalysts can produce hazardous waste. | Not applicable to lean burn or 2-stroke engines. |

**Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Natural Gas fired drill rig engines. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. | May require construction of infrastructure (pipelines and/or gas treatment equipment). May require onsite gas storage. May require additional engines to supplement needed torque. | Requires onsite processing of field gas. |
| Electrification of drill rig engines and/or compressors | Decreased emissions at the source. Transfers emissions to more efficiently controlled source (EGU). | Displaces emissions to EGU. Temporary increase in emissions with construction of power lines. | Depends on availability of power and transmission lines. |
| Improved engine technology (Tier 2, 3 or 4) for all mobile and non-road diesel engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers. |
| Reduced emission (a.k.a. "green") completions. | Reduction in VOC and CH4 emissions. Reduces or eliminate flaring and venting and associated emissions. Reduces or eliminates open pits and associated evaporative emissions. Increased recovery of gas to pipeline rather than atmosphere. | Temporary increase in truck traffic and associated emissions due to delivery of onsite equipment or due to construction of infrastructure. | Need adequate pressure and flow. Need onsite infrastructure (tanks/dehydrator). Availability of sales line. Green completion required where feasible per COGCC Rule 805(b)(3) and NSPS 40 CFR 63 OOOO. |
| Flaring of completion emissions | Reduces methane, VOC, and some HAP emissions. Converts CH4 to CO2. | | |
| Minimize/eliminate venting and/or use closed loop process where possible during "blow downs". | Reduces methane, VOC, and some HAP emissions | | |

**Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Eliminate evaporation pits for drilling fluids. | Reduces VOC and GHG emissions. Reduces potential for soil and water contamination. Reduces odors. | May increase truck traffic and associated emissions. May increase pad size. | Requires tank and/or pipeline infrastructure. |
| Electrification of wellhead compression/ pumping. | Reduces local emissions of fossil fuel combustion and transfers to more easily controlled source. | Displaces emissions to EGU. | Depends on availability of power and transmission lines. |
| Wind (or other renewable) generated power for compressors. | Low or no emissions. | May require construction of infrastructure. Visual impacts. Potential wildlife impacts. | Depends on availability of power and transmission lines. |
| Compressor seals – replace wet with dry or use mechanical seal. | Reduce gas venting (VOC and GHG emissions). | | May be costly or not mechanically feasible. |
| Compressor rod packing system – use monitoring and replacement system. | Reduce gas leaks (VOC and GHG emissions). | | Requires establishing a monitoring system and doing replacements. |
| **Control Strategies Utilizing Centralized Systems** | | | |
| Centralization (or consolidation) of gas processing facilities (e.g., separation, dehydration, sweetening). | Reduces vehicle miles traveled (truck traffic) and associated emissions. Reduced VOC and GHG emissions from individual dehydration/ separator units. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure, infeasible for highly dispersed or exploratory wells. |
| Liquids Gathering systems (for condensate and produced water). | Reduces vehicle miles traveled and associated emissions. Reduced VOC and GHG emissions from tanks, truck loading/unloading, and multiple production facilities. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure . May be infeasible for highly dispersed or exploratory wells, difficult terrain, or patchy surface ownership. |

**Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Water and/or fracturing liquids delivery system. | Reduced long term truck traffic and associated emissions. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure. May be infeasible for highly dispersed or exploratory wells, difficult terrain, or patchy surface ownership. |
| **Control Strategies for Tanks, Separators, and Dehydrators** | | | |
| Eliminate use of open top tanks. | Reduced VOC and GHG emissions. | | |
| Capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units. | Reduces VOC and GHG emissions. | Pressure buildup on older tanks can lead to uncontrolled rupture. | |
| Capture and control of produced water, crude oil, and condensate tank emissions. | Reduces VOC and GHG emissions. | | 95% VOC control required by COGCC in some areas and by CDPHE statewide with applicability thresholds |
| Capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion. | Reduces VOC, HAP, and GHG emissions. | | 90% VOC control required by COGCC in some areas and by CDPHE statewide with applicability thresholds |
| Use zero emissions dehydrators or use desiccants dehydrators. | Reduces VOC, HAP, and GHG emissions. | Requires desiccants (salt tablets and forms a brine solution that must be disposed of. | Can be as effective as Triethylene glycol (TEG) dehydration. |
| **Control Strategies for Misc. Fugitive VOC Emissions** | | | |
| Install plunger lift systems to reduce well blow downs. | Reduces VOC and GHG emissions. | | Can be more efficient at fluids removal than other methods; must have adequate pressure. |
| Install and maintain low VOC emitting seals, valves, hatches on production equipment. | Reduces VOC and GHG emissions. | | |

**Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Initiate equipment leak detection and repair program (e.g., including use of FLIR infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection). | Reduction in VOC and GHG emissions. | | |
| Install or convert gas operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Use "low" or "no bleed" gas operated pneumatic devices/controllers. | Reduces VOC and GHG emissions. | | Required by COGCC and by CDPHE in non-attainment areas. |
| Use closed loop system or thermal combustion for gas operated pneumatic pump emissions. | Reduces VOC and GHG emissions. | | |
| Install or convert gas operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Install vapor recovery on truck loading/unloading operations at tanks. | Reduces emissions of VOC and GHG emissions. | Pressure build up on older tanks can lead to uncontrolled rupture. | |
| **Control Strategies for Fugitive Dust and Vehicle Emissions** | | | |
| Unpaved surface treatments including watering, chemical suppressants, and gravel. | 20% - 80% control of fugitive dust (particulates) from vehicle traffic. | Potential impacts to water and vegetation from runoff of suppressants. | |
| Use remote telemetry and automation of wellhead equipment. | Reduces vehicle traffic and associated emissions. | | Not possible in some terrain. |
| Speed limit restrictions on unpaved roads. | Reduction of fugitive dust emissions. | | |

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 255 of 499

**Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative work schedules, or work camps. | Reduced combustion emissions, reduced fugitive dust emissions, reduced ozone formation, reduced impacts to visibility. | | |
| **Miscellaneous Control Strategies** | | | |
| Use of ultra-low sulfur diesel (e.g., in engines, compressors, construction equipment). | Reduces emissions of particulates and sulfates. | | Fuel not readily available in some areas. |
| Reduce unnecessary vehicle idling. | Reduced combustion emissions, reduced ozone formation, reduced impacts to visibility, reduced fuel consumption. | | |
| Reduced pace of (phased) development. | Peak emissions of all pollutants reduced. | Emissions generated at a lower rate but for a longer period. LOP, duration of impacts is longer. | May not be economically viable or feasible if multiple mineral interests. |

BLM_0024521

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 256 of 499

This page intentionally left blank.

BLM_0024522

# Appendix H

## Best Management Practices and Standard Operating Procedures

BLM_0024524

# APPENDIX H
# BEST MANAGEMENT PRACTICES AND STANDARD OPERATING PROCEDURES

## INTRODUCTION

This appendix provides a list of common standard operating procedures (SOPs) and best management practices (BMPs) for the resource management plan (RMP). Standard operating procedures are established guidelines that are followed by the BLM in carrying out management activities. While the list of SOPs is complete, the list is not intended to be comprehensive; additional SOPs could be developed and implemented to support achieving resource objectives.

Best management practices are state-of-the-art mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are applied to management actions to aid in achieving desired outcomes for safe, environmentally responsible resource development by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. Best management practices can also be proposed by project applicants for activities on BLM-administered lands (e.g., for gas drilling). Best management practices not incorporated into the permit application by the applicant may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or stipulations. Standard conditions of approval and stipulations are also provided in this appendix, as appropriate. Additional BMPs, conditions of approval, and stipulations could be developed to meet resource objectives based on local conditions and resource-specific concerns.

*Master Leasing Plan*

Best management practices and SOPs that will be analyzed at the development stage and may be applied consistent with environmental analysis and existing lease rights are denoted by "**(MLP)**" in this appendix.

## AIR QUALITY (A)

Air quality standards are governed by the Clean Air Act of 1990 (as amended) (42 United States [US] Code Chapter 85). The US Environmental Protection Agency is charged with setting National Ambient Air Quality Standards (US Environmental Protection Agency 2009). At the state level, the Colorado Department of Public Health and Environment (2009) has established its standards.

### Standard Operating Procedures

**A-1**: The BLM has the authority and responsibility under the Federal Land Policy and Management Act of 1976 to manage public lands in a manner that will protect the quality of air and atmospheric values. Therefore, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals.

**A-2**: The proponent of a project will be required to minimize air pollutant emissions by complying with all applicable state and federal regulations (including application of best available control technology) and may be required to apply mitigation including but not limited to BMPs and other control technologies or strategies identified by the BLM or Colorado Department of Public Health and Environment in accordance with delegated regulatory authority.

### Best Management Practices

**A-3**: The BLM may require proponents of oil and gas development projects to conduct preconstruction air monitoring within or adjacent to the proposed development area. The purpose of this monitoring is to establish baseline air quality conditions prior to development at the site. The requirement for monitoring will be determined by the BLM based on the absence of existing monitoring; existing air quality conditions; magnitude of potential air emissions from the project or activity; magnitude of existing emission sources in the area; proximity to a federally mandated Class I area, sensitive Class II area, or population center; location within a nonattainment or maintenance area; meteorological or geographic conditions; project duration; or issues identified during project scoping. The project proponent will be required to provide a minimum of one year of baseline ambient air monitoring data for any pollutant(s) of concern as determined by BLM. If BLM determines that baseline monitoring is required, this pre-analysis data must meet Colorado Department of Public Health and Environment air monitoring standards, be obtained from a site within 50 kilometers of the project boundary, and cover the year immediately prior to the proposed project submittal. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

**A-4**: The BLM may require proponents of oil and gas development projects to conduct air monitoring for the life of the oil and gas development project depending on the magnitude of potential air emissions from the project or

activity; proximity to a federally mandated Class I area, sensitive Class II area, or population center; location within a nonattainment or maintenance area; meteorological or geographic conditions; existing air quality conditions; magnitude of existing development in the area; or issues identified during project scoping. The purpose of this air monitoring is to determine impacts attributable to the project over time. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

**A-5**: The BLM may require a project proponent to conduct air quality modeling for any pollutant(s) of concern in the absence of sufficient data to ensure compliance with laws and regulations or to determine the effectiveness of mitigation options, unless the project proponent can demonstrate that the project will result in no net increase in emissions of the pollutant(s) of concern. The requirement for modeling will be based on existing air quality conditions; magnitude of potential air emissions from the project or activity; magnitude of existing emission sources in the area; proximity to a federally mandated Class I area, sensitive Class II area, an area expected to exceed a National Ambient Air Quality Standard or Prevention of Significant Deterioration increment, population center, location within a nonattainment or maintenance area; meteorological or geographic conditions; project duration; or issues identified during project scoping. The BLM, in cooperation with an interagency review team, will determine the parameters for the modeling analysis through the development of a project-specific modeling protocol.

**A-6**: The BLM may require proponents of oil and gas development projects to submit a contingency plan that provides for reduced operations in the event of an air quality episode. Specific operations and pollutants to be addressed in the contingency plan will be determined by the BLM on a case-by-case basis taking into account existing air quality and project-emitted pollutants.

**A-7**: Implement directional drilling techniques to reduce construction-related emissions (dust and vehicle and construction equipment emissions).

**A-8**: **(MLP)** Improve engine technology (Tier 2 or better) for diesel drill rig engines to reduce nitrogen oxides (NOx), particulate matter (PM), carbon monoxide (CO), and volatile organic compound (VOC) emissions.

**A-9**: Utilize natural gas-fired drill rig engines to reduce NOx emissions and reduce formation of visibility impairing compounds and ozone.

**A-10**: Improve engine technology (Tier 2 or better) for all mobile and non-road diesel engines to reduce NOx, PM, CO, and VOC emissions.

**A-11**: Utilize "Green completion" (also known as closed loop or flareless) technology to reduce VOC and methane emissions. This would also reduce or eliminate open pits and associated evaporative emissions.

**A-12**: Utilize "Green workovers" to reduce VOC and methane emissions. This would also reduce or eliminate open pits and associated evaporative emissions.

**A-13**: Eliminate evaporation pits for drilling fluids to reduce VOC and greenhouse gas emissions.

**A-14**: Electrification of wellhead compression/pumping to reduce local emissions of fossil fuel combustion and transfers to a more easily controlled source.

**A-15**: Utilize renewable power sources to provide energy for compressors, monitoring equipment, or pumps.

**A-16**: Replace wet compressor seals with dry seals or use mechanical seals to reduce gas venting (VOC and greenhouse gas emissions).

**A-17**: Centralize or consolidate gas processing facilities, liquids gathering systems (condensate and produced water), water and/or fracturing liquids delivery systems, to reduce VOC and greenhouse gas emissions from individual dehydration/separator units and to reduce vehicle emissions.

**A-18**: Eliminate the use of open top tanks to reduce VOC and greenhouse gas emissions.

**A-19**: Improve capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units.

**A-20**: Improve capture and control of produced water, crude oil, and condensate tank emissions to reduce VOC and greenhouse gas emissions.

**A-21**: Improve capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion to reduce VOC, hazardous air pollutants, and greenhouse gas emissions.

**A-22**: Use zero-emissions dehydrators or use desiccants dehydrators to reduce VOC, hazardous air pollutants, and greenhouse gas emissions.

**A-23**: Reduce miscellaneous fugitive VOC emissions by:

a) Installing plunger lift systems to reduce well blow downs

b) Installing and maintaining low VOC-emitting seals, valves, and hatches on production equipment

c) Initiating equipment leak detection and repair program (e.g., including use of infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection)

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 263 of 499

d) Installing or converting gas-operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers

e) Using "low" or "no bleed" gas-operated pneumatic devices/controllers

f) Using closed-loop system or thermal combustion for gas-operated pneumatic pump emissions

g) Installing or converting gas-operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps

h) Install vapor recovery on truck loading/unloading operations at tanks

**A-24**: Utilize dust suppression techniques on unpaved surfaces, including watering, chemical suppressants, and gravel.

**A-25**: Utilize remote telemetry and automation of wellhead equipment to reduce vehicle traffic and associated emissions.

**A-26**: Post and enforce speed limits to reduce airborne fugitive dust from vehicular traffic on unpaved roads.

**A-27**: Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative work schedules, or work camps.

**A-28**: Use ultra-low sulfur diesel (e.g., in engines, compressors, and construction equipment) to reduce emissions of particulates and sulfates.

**A-29**: Utilize best available technology and methods to degasify coal seams prior to mining. Capture methane gas from coal seams to obtain a market income. Modify methane drainage over time to ensure capture is optimal.

**A-30**: Reduce unnecessary vehicle idling to reduce combustion emissions, ozone formation, visibility impacts, and fuel consumption.

**A-31**: Reduce the pace of (phased) development to reduce the peak emissions of all pollutants.

**A-32**: Restrict surface disturbing activities to periods when wind speeds are less than 25 miles per hour.

**A-33**: Keep soil and coal refuse moist while loading into dump trucks.

**A-34**: Keep soil and coal refuse loads below the freeboard of the truck.

**A-35**: Minimize drop heights when loaders dump soil and coal refuse into trucks.

BLM_0024529

**A-36**: Tighten gate seals on dump trucks.

**A-37**: Cover dump trucks before traveling on public roads.

**A-38**: Cover construction materials, stockpiled soils, and stockpiled coal refuse if they are a source of fugitive dust.

**A-39**: Train workers to handle construction materials and debris to reduce fugitive emissions.

**A-40**: Employ water injection or rotoclones on all overburden drills.

**A-41**: Use chutes, drapes, or other means to enclose conveyor transfer points, screens, and crushers; cover all conveyors.

**A-42**: Suppress and extinguish spoil and coal fires as soon as is reasonable and safely possible.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2009. Air Quality BMPs – Best Management Practices for Fluid Minerals. Internet Web site: www.blm.gov/bmp.

Colorado Department of Public Health and Environment. 2011. Air Quality Control Commission Regulations. Internet Web site: http://www.cdphe.state.co.us/regulations/airregs. Accessed on May 21, 2011.

US Environmental Protection Agency. 2009. National Ambient Air Quality Standards. Internet Web site: http://www.epa.gov/air/criteria.html. Accessed on October 14, 2009.

## Soils (S)

### Standard Operating Procedures

**S-1**: All routes shall be built and maintained to BLM Manual 9113 (BLM 2011a) standards for road shape and drainage features or where appropriate BLM Manual 9115 (BLM 2012a) standards for primitive roads. For drainage crossings, culverts should be sized for the 50-year storm event with no static head and to pass a 100-year event without failing. Site-specific conditions may warrant BLM to require designs for larger events (e.g., 75- to 100-year storm events). Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**S-2**: When saturated soil conditions exist on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 265 of 499

soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads, and locations.

**S-3**: Topsoil shall not be placed while in a frozen or muddy condition, when the subgrade is excessively wet, or in a condition that may otherwise be detrimental to proper grading or proposed sodding or seeding.

**S-4**: Topsoil shall only be used for reclamation and shall not be used as fill or to bed or pad the pipe during backfilling.

**S-5**: Topsoil stripping will include all growth medium present at a site (e.g., following initial clearing of large trees), as indicated by color or texture. Stripping and storage depth may be specified during the onsite inspection. All stripped topsoil/growth medium will be salvaged, segregated, and stored in a manner that extends biological viability and protects it from loss. Topsoil and all growth medium will be replaced prior to seedbed preparation. No topsoil will be stripped or segregated when soils are saturated or frozen below the stripping depth.

**S-6**: A Winter Construction Plan will be submitted and approved by the BLM Authorized Officer before a Notice to Proceed will be authorized for construction activities in frozen soils.

**S-7**: Prohibit placing fill on a frozen foundation.

**S-8**: Slopes shall not be created so close to property lines as to endanger adjoining properties without adequate protection against sedimentation, erosion, slippage, settlement, subsidence, or other related damages.

**S-9**: Surface-disturbing actions will be sensitive to natural resource protection. When surface disturbance in sensitive areas is unavoidable, it will be minimized to the greatest extent practicable, especially near drainage features and on soils mapped as being saline (see **Glossary**).

**S-10**: Surface-disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book) (BLM 2007).

**S-11**: As detailed in the site plan for surface water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales, or catchments.

BLM_0024531

**S-12**: Standard secondary containment shall hold 110 percent of the capacity the largest single tank it contains and be impervious to any oil, glycol, produced water, or other toxic fluid for 72 hours. Earthen berms will be compacted and of fine material that will prevent seepage of any spill to surrounding area.

**S-13**: All tanks with a capacity of ten barrels or greater shall be labeled or posted with the following information: A. Name of operator; B. Operator's emergency contact telephone number; C. Tank capacity; D. Tank contents; and E. National Fire Protection Association label. Smaller chemical storage shall be labeled with contents and National Fire Protection Association label.

**S-14**: Interim and final reclamation procedures shall utilize best available science and technology to protect natural resources from undue degradation.

**S-15**: Use BLM GJFO Trail Design Criteria along with BLM Handbooks H-9113-2 (BLM 2011b) and H-9115-2 (BLM 2012b) to evaluate road conditions for maintenance and mitigation.

**Best Management Practices**

**S-16**: To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes, and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**S-17**: Consider site-specific soil and vegetative characteristics and reclamation potential in project design and layout.

**S-18**: Native vegetation and soils will be protected, and disturbance to them will be minimized.

**S-19**: Cleared vegetation smaller than 4 inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than 4 inches in diameter will be scattered over disturbed areas to accomplish reclamation objectives. Excessive vegetation larger than 4 inches in diameter may be removed from BLM-administered land or shredded in place to be salvaged with topsoil. A wood-cutting permit may be purchased from BLM for material removed from the site.

**S-20**: Windrowing of Topsoil. [Use where appropriate based on topography – may not be appropriate for pads in steep areas or where pad size should be minimized.] Topsoil shall be windrowed around the perimeter of surface disturbance to create a berm that limits and redirects stormwater runoff and extends the viability of the topsoil per BLM Topsoil Best Management Practices (BLM 2009 PowerPoint presentation available upon request from the Grand Junction Field Office). Topsoil shall also be windrowed, segregated, and stored along disturbed surfaces or linear features for later spreading across the

disturbed corridor during final reclamation. Topsoil berms shall be promptly seeded to maintain soil microbial activity, reduce erosion, and minimize weed establishment.

**S-21**: Where applicable, entrances to construction locations will be covered by gravel "track pads" to prevent sediment and weed seeds from being tracked in and out of the site.

**S-22**: In areas where all weather access is necessary, the operator will construct and maintain all-weather routes per BLM Manual 9113 (BLM 2011a) standards. Graveling or other appropriate surfacing material will be required to reduce environmental resource damage and provide safe all-weather access.

**S-23**: Specialized low surface impact equipment (e.g., wide- or balloon-tired vehicles and all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**S-24**: Standard secondary containment shall include a study corrugated metal wall to create a basin, be lined with a heavy impervious poly liner, and be protected with a gravel surface. Small plastic hoppers shall be installed at all loadout connections to catch drips and small leaks.

**References**

BLM (US Department of the Interior, Bureau of Land Management). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

______. 2009. Handbook H-9112-1—Bridges and Major Culverts Handbook. BLM, Washington, DC.

______. 2011a. Manual 9113—Roads Manual. BLM, Washington, DC.

______. 2011b. Handbook H-9113-2—Roads National Inventory and Condition Assessment Guidance and Instructions. BLM, Washington, DC.

______. 2011c. Handbook H-9113-1—Road Design Handbook. BLM, Washington, DC.

______. 2012a. Manual 9115—Primitive Roads Manual. BLM, Washington, DC.

______. 2012b. Handbook H-9115-2—Primitive Roads Inventory and Condition Assessment Guidance and Instructions. BLM, Washington, DC.

______. 2012c. Handbook H-9115-1—Primitive Roads Design. BLM, Washington, DC.

US Department of the Interior and US Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

## WATER RESOURCES (H)

### Standard Operating Procedures

**H-1**: The operator/permittee shall adhere to all requirements under the Federal Water Pollution Control Act, as amended through Public Law 107-303, November 27, 2002.

**H-2**: For surface-disturbing activities exceeding 1 acre, develop and implement Stormwater Pollution Prevention Plans to include site-specific design, systematic site monitoring, installation of run-on/off controls such as ditches or berms, and installation of adaptive BMPs to reduce potential erosion and sediment production and transport. Stormwater will be dispersed to stabilized areas to slow velocity, prevent erosion, and support infiltration into soils. Stormwater BMPs identified in the State-approved Storm Water Pollution Prevention Plan shall be in place prior to any earth-disturbing activity. Additional BMPs will be installed if determined necessary by the BLM. All measures shall be maintained in good, functional condition. All temporary BMPs shall be removed once site stabilization and reclamation efforts have been deemed successful by the BLM.

**H-3**: For actions requiring individual permits through the US Army Corps of Engineers, require a licensed Professional Engineer to approve and stamp the project design, construction, and reclamation plans to mitigate to the fullest extent practicable riparian resource damage associated with the proposed action.

**H-4**: Spoil material from clearing, grubbing, and channel excavation shall be disposed of in a manner that will not interfere with the function of the channel and in accordance with all local, state, and federal laws and regulations.

**H-5**: Surface-disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book) (BLM 2007).

**H-6**: Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan for establishing positive management of surface water drainage and to reduce erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance, and reporting. BMPs may include run-on/run-off controls such as surface pocking or revegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

**H-7**: The operator will reduce potential for contaminating water resources where spills of drilling fluids are most vulnerable. Areas of vulnerability will include a 0.25-mile buffer around the following: mapped alluvial, colluvial, and glacial deposits; springs and perennial water sources; Source Water Protection Areas; and Municipal Watersheds. In these areas, the operator will:

a) Utilize closed-loop drilling systems

b) Utilize gas-blocker additives during the cementing process

c) Contain flowback and stimulation fluids in tanks on well pad with secondary containment mats/blankets (or equivalent)

d) Install containment devices beneath and around crude oil, condensate, and produced water storage tanks

e) Collect baseline water quality data from downstream fresh water sources prior to drilling, mining, or storing potentially harmful substances. Parameters to be analyzed will be determined on a site-specific basis based on the nature of the proposed action. The operator will be responsible for submitting a list of parameters to BLM for approval prior to sampling.

f) Provide notification of potentially impacted Public Water Systems 15 miles downstream

g) Develop an emergency spill and response program to be reviewed and approved by BLM prior to surface-disturbing activities

**H-8**: Protection of drinking water supply sources within surface water supply areas (leased or made available for leasing) will concur with Colorado Oil and Gas Conservation Commission rule 317B and subsequent updates.

**H-9**: All routes shall be built and maintained to BLM Manual 9113 (BLM 2011a) standards for road shape and drainage features or where appropriate BLM Manual 9115 (BLM 2012a) standards for primitive roads. For drainage crossings, culverts should be sized for the 50-year storm event with no static head and to pass a 100-year event without failing. Site-specific conditions may warrant BLM to require designs for larger events (e.g., 75- to 100-year storm events). Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**H-10**: Erosion control features shall be maintained through periodic inspection and maintenance, including cleaning dips and cross-drains, repairing ditches, marking culvert inlets to aid in location, and clearing debris from culverts.

**H-11**: Surface discharges shall comply with all regulatory requirements outlined in the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act), as amended through Public Law 107-303, November 27, 2002.

Additionally, surface discharges should be made to well-defined channels away from major erosional features. Furthermore, discharges should be limited to a volume less than or equal to the naturally occurring mean annual peak flow (which is roughly equivalent to a peak generated by a 2-year 24-hour storm event) and that can be handled by the natural channel under anticipated conditions.

**H-12**: To protect water quality, anti-backflow devices shall be utilized while drafting fresh water from streams, springs, reservoirs, and wells.

**H-13**: Range improvements will conform to BLM Manual H-1740-2 and subsequent updates (BLM 2008).

**H-14**: Discharge of surface and groundwater to surface drainages will comply with the Federal Water Pollution Control Act (as amended through Public Law 107-303, November 27, 2002), will be pre-approved by BLM, and will meet the following criteria:

a) Discharge operations will not negatively impact downstream beneficial uses

b) Discharge soil/water interactions will not facilitate the movement of water quality contaminants (e.g., salt, selenium [typically associated with Mancos shale-derived soils], sediment, and metals) above natural rates in surface and/or groundwater

c) Water discharge shall be limited to well-defined major channels to reduce potential of discharged water dissolving and transporting salts from the stream channel and to reduce concentration of salts in alluvium

d) Discharges will be limited to a volume that can be handled by the natural channel and less than or equal to the naturally occurring mean annual peak flow (roughly equivalent to a 2-year, 24-hour storm peak)

e) Discharge points will be located in stable channels or reservoirs away from any downstream head-cuts or other major erosional features (as determined by BLM). Outfall design may include discharge aprons and downstream stabilization of channel side slopes to prevent erosion and provide energy dissipation.

f) Subject to BLM approval, water quality thresholds for both surface and groundwater will be set and monitored during discharge operations in order that they will cease if thresholds were exceeded

g) Surface and groundwater quantity and quality will be monitored during all discharge operations. Monitoring locations will be subject to BLM approval. Monitoring activities will continue for at least two water years following cessation of discharge.

**H-15**: Hazardous substances will not be used in drilling, testing, or completion operations, or introduced at any time into the reserve or cuttings pit. Fluids will be confined to pits or tanks and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

**H-16**: Pits will be constructed so that water will not run into them. Fluid levels will be maintained below 2 feet of the lowest point of containment.

**H-17**: Interim and final reclamation procedures shall utilize best available science and technology to protect natural resources from undue degradation.

**Best Management Practices**

**H-18**: **(MLP)** To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes, and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**H-19**: Provide energy dissipaters (e.g., rock piles and logs) where necessary at the downstream end of ditch relief culverts to reduce the erosion energy of the emerging water.

**H-20**: The face of cut or fill slopes shall not be subject to any concentrated flows of surface water, such as from natural drainage ways, graded swales, and downspouts.

**H-21**: Provide subsurface drainage where necessary to intercept seepage that would otherwise adversely affect slope stability or create excessively wet site conditions.

**H-22**: Grade road surfaces only as often as necessary to maintain a stable running surface and to retain the original surface drainage.

**H-23**: Avoid cutting the toe of cut slopes when grading roads or pulling ditches.

**H-24**: The operator will be responsible for keeping road inlet and outlet ditches, catch-basins, and culverts free of obstructions, particularly before and during spring runoff. Routine machine-cleaning of ditches shall be kept to a minimum during wet weather. Leave the disturbed area in a condition that provides drainage with no additional maintenance.

**H-25**: Remove all temporary stream crossings immediately after use, and cross-ditch the ends of routes or rights-of-way to mitigate erosion from disturbed areas.

**H-26**: When designing protective/mitigation measures, consider the changes that may occur in the watershed hydrology and sedimentation over the design life of the measure. Moreover, design and construct roads that are self-maintaining and consider using road surfacing, such as gravel when year-long access may be necessary.

**H-27**: Design and construct stream crossings at right angles, in straight sections of stable reaches to handle (at a minimum) the 100-year flood, and consider culvert and bridge designs that facilitate aquatic life passage.

**H-28**: Where the access road crosses small drainages and intermittent streams not requiring culverts, low water crossings shall be used. The road will dip to the original streambed elevation of the drainage and the crossing will prevent any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

**H-29**: For pipeline crossings of drainage ways: Pipelines crossing at the surface must be constructed high enough to remain above the highest possible flood flows at each crossing. Pipeline crossings below the surface must be buried deep enough to remain undisturbed by scour and fill processes typically associated with passage of peak flows. A hydraulic analysis should be completed during the pipeline design phase to avoid repeated maintenance of such crossings and eliminate costly repairs and potential environmental degradation associated with pipeline breaks at stream crossings (US Department of the Interior 2007). Utilize horizontal-directional boring techniques under perennial water bodies and/or wetland complexes when environmental circumstances allow.

**H-30**: Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles and heavy machinery.

**H-31**: Time work in wetlands and watercourses to occur during low-flow season when conditions are driest. High flows occur during late summer early fall as a result of high-intensity convective thunderstorm events. Work in these areas must also be done in a manner consistent with BMPs for biological resources.

**H-32**: Exclude livestock and vehicles from spring sources and riparian areas where on-site evaluation and/or monitoring data indicate degrading conditions or potential to degrade spring or riparian function.

**H-33**: Avoid alteration of natural hydrologic function and condition in source areas for springs, seeps, fens, or other water developments. Relocate surface-disturbing activities away from these sensitive areas as site conditions warrant.

**H-34**: Limit consumptive water use from federal point source water rights on BLM-administered lands that are not sustainable and/or would jeopardize discharge to streams, springs, seeps, fens, or downstream senior water rights.

**H-35**: Manage and manipulate invasive stands of brush and weeds on forest, range, pasture land by mechanical, chemical, or biological means or by prescribed burning to improve watershed function and condition.

**H-36**: Limit surface disturbance near drainage features and minimize surface disturbance on steep slopes, fragile soils, saline soils, and Mancos shale-derived soils.

**H-37**: When activity in streams, wetlands, or riparian areas is unavoidable, the operator will first employ best available technology such as eco-Matting to reduce impacts. The operator would then restore modified or damaged areas as close as practicable to natural conditions to protect banks and wetlands and to re-establish riparian vegetation.

**H-38**: Maintain to the greatest extent practicable natural flow rates and chemical and physical properties of surface and groundwater during work within stream channels, floodplains, and/or riparian areas.

**H-39**: Oil and gas drilling operations within municipal watersheds, source water protection areas, or locally important fresh water aquifers should utilize methods and materials that will prevent degradation of the underlying groundwater. This may include practices such as surface and intermediate casing through potential fresh water zones, gas blocker additives to cement jobs, the use of green fracturing fluids, pitless drilling, and closed loop drilling. The use of "green" fracturing fluids will be documented in the form of Material Safety Data Sheets, which will be reviewed by the operator for compliance prior to use. Material Safety Data Sheets will remain on site at all times such chemicals are present.

**H-40**: Water from well production tests (water wells) or hydrostatic testing of pipelines shall be filtered of sediments prior to discharge into wetlands. Energy dissipating methods (e.g., straw-bails, waddles, and vegetative buffers) shall be in place prior to discharge of production water or water used for hydrostatic testing.

**H-41**: Within portions of municipal watersheds and source water protection areas available for fluid minerals development, the operator should develop and implement a watershed protection plan. This plan would include characterization and monitoring of baseline hydrologic/hydrogeologic conditions

such as, but not limited to, water quality, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater. The operator should collaborate with all watershed stakeholders in development and implementation of the watershed protection plan.

**H-42**: Livestock feeding and salting shall be done in a manner to protect water quality. When possible, these developments or practices should be done at least 550 meters from riparian zones.

**H-43**: Maintain appropriate vegetative/riparian buffers around water features to slow runoff and trap sediments and protect water quality. A minimum buffer distance should be 200 meters or greater where site conditions warrant.

**H-44**: Surface-disturbing actions should not permanently impair floodplain function.

**H-45**: No operations using chemical processes (except for vegetation management) or other pollutants in their activities will be allowed within 200 feet of any water bodies. This includes staging equipment for refueling, as well as equipment maintenance.

**H-46**: Fill material will not be cast over hilltops or into drainages.

**H-47**: All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support federal or state-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe and remotely-actuated block or check valves on both sides of the stream may be used.

**H-48**: Baseline information of channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

**H-49**: Direct overflow from water developments back to the original natural drainage in a way that does not accelerate erosion or modify riparian habitats.

**H-50**: Avoid soil compaction or surface-disturbing activities in recharge areas that could impair natural function of springs and/or seeps.

## References

US Department of the Interior and US Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

______. 2008. Handbook H-1740-2—Integrated Vegetation Management Handbook. BLM, Washington, DC. Internet Web site: http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.59510.File.dat/H-1740-2.pdf. Accessed on May 18, 2012.

BLM (US Department of the Interior, Bureau of Land Management). 2009. Handbook H-9112-1—Bridges and Major Culverts Handbook. BLM, Washington, DC.

______. 2011a. Manual 9113—Roads Manual. BLM, Washington, DC.

______. 2011b. Handbook H-9113-1—Road Design Handbook. BLM, Washington, DC.

______. 2012a. Manual 9115—Primitive Roads Manual. BLM, Washington, DC.

US Department of the Interior. 2007. Hydraulic considerations for pipelines crossing stream channels. Technical Note 423. BLM/ST/ST-07/007+2880. BLM, National Science and Technology Center, Denver, CO. Internet Web site: http://www.blm.gov/nstc/library/techno2.htm. Accessed on May 18, 2012.

## VEGETATION: RANGELAND (VR)

Guidance may come from various sources. See individual resources.

### Standard Operating Procedures

**VR-1**: When making decisions about proposed projects/actions in known sagebrush habitat, existing plans and guidance will be used by interdisciplinary teams and considered in the decision-making process. This guidance includes the conservation actions/guidelines identified in the Western Association of Fish and Wildlife Agencies – Conservation Assessment of Greater Sage-Grouse and Sagebrush habitats (Connelly et al. 2004), and local working group population plans (Pinion Mesa population of Gunnison Sage-Grouse and Parachute-Piceance-Roan Population of Greater Sage-Grouse).

**VR-2**: Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

### Best Management Practices

**VR-3**: Close and rehabilitate roads quickly once they are no longer needed.

**VR-4**: Close selected routes to protect special status species and significant plant communities.

BLM_0024541

**VR-5**: Build roads to the appropriate standard, no higher than necessary for use and safety, and utilize primitive or two-track roads rather than newly constructed roads where feasible.

**VR-6**: Pipelines (and electrical power lines when possible) shall be placed within road corridors to minimize disturbance.

**VR-7**: Minimize disturbance to soil and native vegetation as much as possible.

**VR-8**: Stockpile topsoil for use in final reclamation. Topsoil shall be stored separately from other fill materials.

**VR-9**: When timely natural regeneration of the native plant community is not likely to occur, carefully select species that will not compete with or exclude botanical resources for revegetation efforts. Bare sites shall be seeded as soon as appropriate to prevent establishment of undesirable plant species.

**VR-10**: Ensure that seed used for revegetation as well as straw and hay bales used for erosion control are certified free of noxious weeds.

**VR-11**: Monitor revegetation sites to ensure successful establishment of desired species.

**VR-12**: Monitor the long-term success of revegetation efforts to ensure successful establishment of desired species and detect any noxious weed infestations. If revegetation is unsuccessful, continue efforts to establish desired species in disturbed sites.

**VR-13**: In Salt Desert Shrub communities with biological soil crusts, require reclamation that includes, but is not limited to, broadcasting bacterial inoculants; planting native grass, forbs, and shrubs seedlings; and installing exclosure fences.

## References

BLM (US Department of the Interior, Bureau of Land Management). 2007. Final Vegetation Treatment Using Herbicides on BLM Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

Connelly, J.W., S.T. Knick, M.A. Schroeder, and S.J. Stiver. 2004. Conservation Assessment of Greater Sage-Grouse and Sagebrush Habitat. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, WY.

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare

Plant Conservation Initiative for the National Fish and Wildlife Foundation.

## VEGETATION: RIPARIAN HABITAT AND WETLANDS (VRW)

### Standard Operating Procedures

**VRW-1**: Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**VRW-2**: Utilize the techniques and processes for protection of floodplains as identified in Executive Order 11988, Floodplain Management.

**VRW-3**: Road crossings that will be used for longer than one year on perennial streams will be engineered and approved by the BLM Authorized Officer.

**VRW-4**: Do not locate roads or other facilities immediately parallel to streams. Where roads or facilities must cross streams, cross perpendicularly and immediately exit the buffer zone.

**VRW-5**: **(MLP)** Armor low-water stream crossings, place properly sized culverts, or span streams as appropriate to protect the riparian zone.

**VRW-6**: Maintain a minimum of six-inch stubble height at the end of October or winter grazing rotation on streambank (lotic) riparian. If stability of riparian system is dependent upon riparian grasses and forbs, maintain adequate stubble height to dissipate energy from spring runoff.

**VRW-7**: Maintain a minimum of four-inch stubble height at the end of October on wet meadows (lentic) systems.

**VRW-8**: Roads and trails (off-highway vehicle, horse, bicycle, and hiking) will avoid wetlands and if avoidance is not possible will be designed and constructed in accordance with Technical Reference 2E22A68-NPS, Off-highway Vehicle Management (Meyer 2002).

### Best Management Practices

**VRW-9**: Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles, heavy machinery, and facilities (e.g., pipelines).

**VRW-10**: Locate residue piles (e.g., sawdust, field chipping residue, and disposal ponds) away from drainages where runoff may wash residue into water bodies or wetlands.

**VRW-11**: Maintain appropriate vegetative/riparian buffers from ground disturbing or heavy use activities of at least 200 meters around riparian and wetland areas to protect and enhance the health and function of these systems.

**VRW-12**: Manage vegetation in riparian areas to provide wildlife habitat, adequate shade, sediment control, bank stability, and recruitment of wood into stream channels.

**VRW-13**: Locate project staging areas for refueling, maintenance equipment, materials, operating supplies, and boring in areas not designated as riparian and/or wetland areas.

**VRW-14**: Minimize surface disturbance within riparian areas and in wetlands.

**VRW-15**: Avoid late summer or early fall grazing in areas with declining willow populations. If grazing during these time periods must occur, allow for at least one full year of rest between grazing rotations.

**VRW-16**: Utilize riparian pastures as appropriate to manage grazing activities in riparian areas. Vary the timing, duration, and frequency of grazing in riparian pastures.

**VRW-17**: Create off-stream watering facilities when possible (e.g., stock tanks, stock ponds, and nose pumps). Place grazing stock tanks and other watering facilities at least 550 meters from riparian zones.

**VRW-18**: Actively move cattle to and from riparian pastures or pastures containing riparian habitat. Do not allow for cattle to drift between pastures (Leonard et al., p. 33-34).

**VRW-19**: Low-stress stockmanship methods should be used to encourage cattle grazing away from riparian areas. Cattle should be turned out away from riparian areas when enter new pastures or allotments. Cattle should also be guided to appropriate bedding areas.

**VRW-20**: Cull cattle from the herd that congregate or preferentially graze riparian areas for extended periods of time.

**VRW-21**: Place salt, hay, grain, molasses, and other supplements on uplands at least 550 meters away from riparian and wetland areas to encourage cattle to graze uplands and move out of riparian areas. Supplementation sites should be at least 1,100 meters (1,200 yards) apart.

**VRW-22**: Phase the size and timing of vegetation removal treatments within riparian areas. Phasing treatments sizes and timing to reduce soil and water temperatures, maintain bank and soil stability, and retain adequate wildlife habitat for cover and nesting.

**VRW-23**: Phase the size and timing of vegetation-removal treatments on uplands immediately adjacent to riparian areas, and buffer treatment boundaries away from riparian areas to reduce sedimentation and erosion in riparian zones.

Allow for at least one year between vegetation removal treatments in uplands and in riparian or wetland areas.

**VRW-24**: Relocate existing roads away from riparian areas as feasible during requested permitting or authorization of these routes. Reclaim abandoned portions of relocated roads back to natural conditions. Recontour routes back to natural slopes as feasible, rip compacted soils (except for in close proximity to desirable trees), and seed disturbed areas.

**VRW-25**: Fences should not be placed immediately on the edge of riparian areas. Place fences away from riparian or wetland areas to decrease impacts from trailing along fences.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2007. Final Vegetation Treatment Using Herbicides on BLM Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

Meyer, K. 2002. Managing degraded off-highway vehicle trails in wet, unstable, and sensitive environments. Technical Reference 2E22A68-NPS: Off-highway Vehicle Management. US Department of Agriculture, Forest Service, Technology and Development Program.

Leonard, S., G. Kinch, V. Elsbernd, M. Borman, and S. Swanson. 1997. Riparian Area Management Technical Reference 1737-14—Grazing Management for Riparian-Wetland Areas. BLM (US Department of the Interior, Bureau of Land Management) and US Department of Agriculture, Forest Service, Denver, CO. 80pp.

## Noxious and Invasive Weed Prevention (WEED)

This list incorporates many suggested practices under various land uses and is designed to allow managers to choose those practices that are most applicable to and feasible for each situation. SOPs established by policy or law are identified as such.

### Site-Disturbing Projects

#### *Pre-project Planning*

**WEED-1**: Environmental analyses for projects and maintenance programs should assess weed risks, analyze high-risk sites for potential weed establishment and spread, and identify prevention practices.

**WEED-2**: Determine site-specific restoration and monitoring needs and objectives at the onset of project planning.

**WEED-3**: Learn to recognize noxious and invasive weeds.

**WEED-4**: Inventory all proposed projects for weeds prior to ground-disturbing activities. If weeds are found, they should be treated (if the timing is appropriate) or removed (if seeds are present) to limit weed seed production and dispersal.

**WEED-5**: Be cognizant of moving equipment and machinery from weed-contaminated areas to uncontaminated areas.

**WEED-6**: Locate and use weed-free project staging areas. Avoid or minimize travel through weed-infested areas, or restrict travel to periods when spread of disseminules is least likely.

**WEED-7**: Identify sites where equipment can be cleaned. Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts should be collected and incinerated when possible.

**WEED-8**: If certified weed-free gravel pits become available in the county, the use of certified weed-free gravel will be required wherever gravel is applied to BLM-administered lands (e.g., roads). **(SOP)**

**WEED-9**: Maintain stockpiled, non-infested material in a weed-free condition. Topsoil stockpiles should be promptly revegetated to maintain soil microbial health and reduce the potential for weeds.

**WEED-10**: Use competitive seed mixes when practical. A certified seed laboratory shall test each lot according to the Association of Official Seed Analysts standards (which include an all-state noxious weed list) and provide documentation of the seed inspection test. The seed shall contain no noxious, prohibited, or restricted weed seeds and shall contain no more than 0.5 percent by weight of other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended. **(SOP)**

***Project Implementation***

**WEED-11**: Minimize soil disturbance. To the extent practicable, native vegetation should be retained in and around project activity areas, and soil disturbance should be kept to a minimum.

**WEED-12**: If a disturbed area must be left bare for a considerable length of time, cover the area with weed barrier until revegetation is possible.

***Post-project Actions***

**WEED-13**: Clean all equipment before leaving the project site when operating in weed-infested areas.

**WEED-14**: Inspect, remove, and properly dispose of weed seed and plant parts found on clothing and equipment. Proper disposal means bagging and incinerating seeds and plant parts or washing equipment in an approved containment area.

**WEED-15**: Revegetate disturbed soil where appropriate to optimize plant establishment for that specific site. Define revegetation objectives for each site. Revegetation may include topsoil replacement, planting, seeding, fertilization, and certified weed-free mulching as necessary. Use native material where appropriate and feasible.

**WEED-16**: Monitor sites where seed, hay, straw, or mulch has been applied. Eradicate weeds before they form seed. In contracted projects, contract specifications could require that the contractor control weeds for a specified length of time.

**WEED-17**: Inspect and document all ground-disturbing activities in noxious weed-infested areas for at least three growing seasons following project completion. For ongoing projects, continue to monitor until reasonably certain that no weeds are present. Plan for follow-up treatments based on inspection results.

### Roads and Utilities

***Pre-project Planning***

**WEED-18**: Communicate with contractors, local weed districts, or weed management areas about projects and BMPs for prevention.

**WEED-19**: Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts shall be collected and incinerated when practical, or washed off in an approved containment area. **(SOP)**

**WEED-20**: Avoid acquiring water for road dust abatement where access to water is through weed-infested sites.

**WEED-21**: Treat weeds on travel rights-of-way before seed formation so that construction equipment does not spread weed seed.

**WEED-22**: Schedule and coordinate blading or pulling of noxious weed-infested roadsides or ditches in consultation with the local weed specialist. When it is necessary to blade weed-infested roadsides or ditches, schedule the activity when disseminules are least likely to be viable.

***Project Implementation***

**WEED-23**: Retain shade to suppress weeds by minimizing the removal of trees and other roadside vegetation during construction, reconstruction, and maintenance, particularly on south aspects.

**WEED-24**: Do not blade or pull roadsides and ditches infested with noxious weeds unless doing so is required for public safety or protection of the roadway. If the ditch must be pulled, ensure that weeds remain onsite. Blade from least-infested to most-infested areas.

***Post-project Actions***

**WEED-25**: Power or high-pressure clean all equipment of all mud, dirt, and plant parts before leaving the project site if operating in areas infested with weeds. Seeds and plant parts shall be collected and incinerated when possible.

**WEED-26**: When seeding has been specified for construction and maintenance activities, seed all disturbed soil (except travel route) soon after work is completed.

**WEED-27**: Use a certified weed-free seed mix suitable for local environmental conditions that includes fast, early growing (preferably native) species to provide quick revegetation. Consider applying weed-free mulch with seeding. **(SOP)**

**WEED-28**: Periodically inspect roads and rights-of-way for noxious weeds. Train staff to recognize weeds and report locations to the local weed specialist. Follow-up with treatment when needed.

**WEED-29**: When reclaiming roads, treat weeds before roads are made impassable. Inspect and follow up based on initial inspection and documentation.

**WEED-30**: To avoid weed infestations, create and maintain healthy plant communities whenever possible, including utility rights-of-way, roadsides, scenic overlooks, trailheads, and campgrounds.

**Recreation Activities**

**WEED-31**: Inspect and clean mechanized trail vehicles of weeds and weed seeds.

**WEED-32**: Wash boots and socks before hiking into a new area. Inspect and clean packs, equipment, and bike tires.

**WEED-33**: Avoid hiking through weed infestations whenever possible.

**WEED-34**: Keep dogs and other pets free of weed seeds.

**WEED-35**: Avoid picking unidentified "wildflowers" and discarding them along trails or roadways.

**WEED-36**: Maintain trailheads, campgrounds, visitor centers, boat launches, picnic areas, roads leading to trailheads, and other areas of concentrated public use in a weed-free condition. Consider high-use recreation areas as high-priority sites for weed eradication.

**WEED-37**: Sign trailheads and access points to educate visitors about noxious and invasive weeds and the consequences of their activities.

**WEED-38**: In areas susceptible to weed invasion, limit vehicles to designated, maintained travel routes. Inspect and document travel corridors for weeds, and treat as necessary.

**WEED-39**: Encourage use of pelletized feed for backcountry horsemen and hunters. Pelletized feed is unlikely to contain weed seed.

### Watershed Management

**WEED-40**: Frequently and systematically inspect and document riparian areas and wetlands for noxious weed establishment and spread. Eradicate new infestations immediately because effective tools for riparian-area weed management are limited.

**WEED-41**: Promote dense growth of desirable vegetation in riparian areas (where appropriate) to minimize the availability of germination sites for weed seeds or propagules transported from upstream or upslope areas.

**WEED-42**: Address the risk of invasion by noxious weeds and other invasive species in watershed restoration projects and water quality management plans.

### Grazing Management

**WEED-43**: Consider prevention practices and cooperative management of weeds in grazing allotments. Prevention practices may include:

a) Altering season of use
b) Minimizing ground disturbance
c) Excluding livestock grazing
d) Preventing weed seed transportation
e) Maintaining healthy vegetation
f) Revegetating areas
g) Inspecting areas
h) Educating permittees and users
i) Reporting

**WEED-44**: Provide certified weed-free supplemental feed in a designated area so that new weed infestations can be detected and treated immediately. Pelletized feed is unlikely to contain viable weed seed.

**WEED-45**: If livestock may contribute to seed spread in a weed-infested area, schedule livestock use prior to seed-set or after seed has fallen.

**WEED-46**: If livestock were transported from a weed-infested area, annually inspect and treat entry units for new weed infestations.

**WEED-47**: Consider closing infested pastures to livestock grazing when grazing will either continue to exacerbate the condition or contribute to weed seed spread. Designate those pastures as unsuitable range until weed infestations are controlled.

**WEED-48**: Manage the timing, intensity (utilization), duration, and frequency of livestock activities to maintain the competitive ability of desirable plants and retain litter cover. The objective is to prevent grazers from selectively removing desirable plant species and leaving undesirable species.

**WEED-49**: Exclude livestock grazing on newly seeded areas with fencing to ensure that desired vegetation is well established, usually after two to three growing seasons. **(SOP)**

**WEED-50**: Reduce ground disturbance, including damage to biological soil crusts. Consider changes in the timing, intensity, duration, or frequency of livestock use; location and changes in salt grounds; restoration or protection of watering sites; and restoration of yarding/loafing areas, corrals, and other areas of concentrated livestock use.

**WEED-51**: Inspect areas of concentrated livestock use, especially watering locations and other sensitive areas that may be particularly susceptible to invasion, for weed invasion. Inventory and manage new infestations.

**WEED-52**: Defer livestock grazing in burned areas until vegetation is successfully established, usually after two to three growing seasons. **(SOP)**

**Outfitting / Recreation Pack and Saddle Stock Use**

**WEED-53**: Allow only certified weed-free hay/feed on BLM-administered lands. **(SOP)**

**WEED-54**: Inspect, brush, and clean animals (especially hooves and legs) before entering BLM-administered land. Inspect and clean tack and equipment.

**WEED-55**: Regularly inspect trailheads and other staging areas for backcountry travel. Bedding in trailers and hay fed to pack and saddle animals may contain weed seed or propagules.

**WEED-56**: Tie or contain stock in ways that minimize soil disturbance and prevent loss of desirable native species.

**WEED-57**: Authorized trail sites for tying pack animals should be monitored several times per growing season to quickly identify and eradicate new weeds. Trampling and permanent damage to desired plants is likely. Tie-ups shall be located away from water and in shaded areas where the low light helps suppress weed growth.

**WEED-58**: Educate outfitters to look for and report new weed infestations.

**Wildlife**

**WEED-59**: Periodically inspect and document areas where wildlife concentrate in the winter and spring and cause excess soil disturbance.

**WEED-60**: Use weed-free materials for all wildlife management activities.

**WEED-61**: Incorporate weed prevention into all wildlife habitat improvement project designs.

**Fire**

***Fire Management Plans***

**WEED-62**: Prescribed fire plans should include pre-burn invasive weed inventory and risk assessment components, as well as post-burn mitigation components.

**WEED-63**: Integrate prescribed fire and other weed-management techniques to achieve best results. This may involve post-burn herbicide treatment or other practices that require careful timing.

**WEED-64**: Include weed prevention and follow-up monitoring in all prescribed fire activities. Include in burn plans the possibility for post-burn weed treatment.

***Incident Planning***

**WEED-65**: Increase weed awareness and weed prevention by providing training to new and/or seasonal fire staff on invasive weed identification and prevention.

**WEED-66**: For prescribed burns, inventory the project area and evaluate potential weed spread with regard to the fire prescription. Areas with moderate to high weed cover should be managed for at least two years prior to the prescribed burn to reduce the number of weed seeds in the soil. Continue weed management after the burn.

**WEED-67**: On wildfires or prescribed burns in or near weed-infested areas, ensure that a Qualified Resource Advisor familiar with weeds issues or who has

access to the relevant information is assigned. Include a discussion of weed-prevention operational practices in all fire briefings.

**WEED-68**: Use operational practices (e.g., avoiding weed infestations when locating fire lines) to reduce weed spread.

**WEED-69**: Identify and periodically inspect potential helispots, staging areas, incident command posts, and base camps and maintain a weed-free condition. Encourage network airports and helibases to do the same.

**WEED-70**: Develop a burned area integrated weed-management plan, including a monitoring component to detect and eradicate new weeds early.

***Fire-fighting***

**WEED-71**: Ensure that all equipment (including borrowed or rental equipment) is free of weed seed and propagules before entering incident location.

**WEED-72**: When possible, use fire-suppression tactics that reduce disturbances to soil and vegetation, especially when creating fire lines.

**WEED-73**: Use wet or scratch-lines where possible instead of fire breaks made with heavy equipment.

**WEED-74**: Given the choice of strategies, avoid ignition and burning in areas at high risk for weed establishment or spread.

**WEED-75**: Hose off vehicles on site if they have traveled through infested areas.

**WEED-76**: Inspect clothing for weed seeds if foot travel occurred in infested areas.

**WEED-77**: When possible, establish incident bases, fire operations staging areas, and aircraft landing zones in areas that have been inspected and are verified to be free of invasive weeds.

**WEED-78**: Cover weed-infested cargo areas and net-loading areas with tarps if weeds exist and cannot be removed or avoided.

**WEED-79**: Flag high-risk weed infestations in areas of concentrated activity, and show weeds on facility maps.

**WEED-80**: If fire operations involve travel or work in weed-infested areas, a power wash station should be staged at or near the incident base and helibase. Wash all vehicles and equipment upon arrival from and departure to each incident. This includes fuel trucks and aircraft service vehicles.

**WEED-81**: Identify areas affected by suppression activities that may be vulnerable to weed invasion, and utilize suppression funds to repair.

***Post-fire Rehabilitation***

**WEED-82**: Have a weed specialist review burned area rehabilitation reports to ensure that proper and effective weed prevention and management is addressed.

**WEED-83**: Thoroughly clean the undercarriage and tires of vehicles and heavy equipment before entering a burned area.

**WEED-84**: Treat weeds in burned areas. Weeds can recover as quickly as two weeks following a fire.

**WEED-85**: Schedule inventories one month and one year post-fire to identify and treat infestations. Eradicate or contain newly emerging infestations.

**WEED-86**: Restrict travel to established roads to avoid compacting soil that could hinder the recovery of desired plants.

**WEED-87**: Determine soon after a fire whether revegetation is necessary to speed recovery of a native plant community, or whether desirable plants in the burned area will recover naturally. Consider the severity of the burn and the proportion of weeds to desirable plants on the land before it burned. In general, more severe burns and higher pre-burn weed populations increase the necessity of revegetation. Use a certified weed-free seed mix. **(SOP)**

**WEED-88**: Inspect and document weed infestations on fire access roads, equipment cleaning sites, and staging areas. Control infestations to prevent spread within burned areas.

**WEED-89**: Seed and straw mulch to be used for burn rehabilitation (e.g., for wattles, straw bales, and dams) shall be certified weed-free. **(SOP)**

**WEED-90**: Replace soil and vegetation right side up (i.e., any uprooted plants still in a clump of soil are replaced upward) when rehabilitating fire line.

## FISH AND WILDLIFE MANAGEMENT AND SPECIAL STATUS SPECIES (FWS)

### Standard Operating Procedures

**FWS-1**: To minimize the spread of aquatic nuisance species, including, but not limited to, zebra mussels, New Zealand mud snails, quagga mussels, rusty crayfish, and whirling disease vectors, personnel working in water will:

a) Before leaving a particular water, inspect and clean gear used in the water, including watercraft (e.g., boats, canoes, kayaks, and rafts), trailers, oars, nets, waders, wading boots, sandals, and life jackets.

Remove vegetation, mud, grit, algae, and the like, and drain water from boats and other gear.

b) Prior to entering another water body, clean gear by spraying with 409 or a similar soap or bleach solution, and let equipment dry in the hot sun for several hours, or use hot tap water that drains onto the ground, not down a drain or into another water course.

**FWS-2**: Constructed fences will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989). Current standards for fencing cattle out in deer and elk range is a 4-strand fence 40 inches high with a spacing of wires from ground to top of 60 inches (smooth bottom wire), 6 inches (second wire barbed), 6 inches (third wire barbed), and 12 inches (top wire preferably smooth, but it may need to be barbed in areas of intense cattle use).

**FWS-3**: The GJFO will consult agency species management plans and other conservation plans as appropriate to guide management and devise mitigation measures when needed. Examples of these plans include, but are not limited to, the Colorado Wildlife Action Plan; Colorado Sagebrush: A Conservation Assessment and Strategy; National, Rangewide, statewide, and local working group conservation plans for Gunnison and Greater Sage-Grouse; Sharing the land with pinyon-juniper birds; Birds in a sagebrush sea: managing sagebrush habitats for bird communities; North American Landbird Conservation Plan; North American Waterbird conservation Plan; National and Colorado Partners in Flight Bird Conservation Plans; and Colorado Gunnison's and White-tailed Prairie Dog Conservation Strategy and Recovery plans for federally listed species.

**FWS-4**: Lessees will be notified that a lease parcel contains potential habitat for threatened, endangered, proposed, candidate, and BLM sensitive plants, fish, and wildlife.

**FWS-5**: Existing plant location records will be consulted and site inventories will be conducted to identify suitable habitat[1] for these plants. Surveys for occupied suitable habitat will be performed prior to any ground disturbance. Surveys will take place when the plants can be positively identified during the appropriate flowering periods. Surveys will be performed by qualified field botanists/biologists who will provide documentation of their qualifications, experience, and knowledge of the species prior to starting work.

**FWS-6**: In complex linear or split-estate actions, early coordination with private landowners will facilitate the process the BLM must complete prior to authorizing the action. To comply with the Endangered Species Act, the BLM must consider the effects to listed species on private land that result from a federal action, such as linear rights-of-way or constructing a well pad on private land to drill to federal lease. Before an applicant can contract a biological survey,

BLM_0024554

the private surface owner must allow the biological consultant access. Projects can be authorized without completing biological surveys on private lands, but this may lead to lengthy delays while the BLM completes consultation.

**FWS-7**: For Colorado hookless cactus and other threatened, endangered, proposed, and candidate species, surface-disturbing activities will be avoided within 200 meters of occupied plant habitat[1] wherever possible and where geography and other resource concerns allow[2]. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

**FWS-8**: For BLM sensitive species, surface-disturbing activities will be avoided within 100 meters of occupied plant habitat[1] wherever possible and where geography and other resource concerns allow[2]. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

**FWS-9**: Where development is allowed within 100 meters of occupied habitat for threatened, endangered, proposed, and candidate species or BLM sensitive species, unauthorized disturbance of plant habitat will be avoided by on-site guidance from a biologist, and by fencing the perimeter of the disturbed area, or such other method as agreed to by US Fish and Wildlife Service. In such instances, a monitoring plan approved by US Fish and Wildlife Service will be implemented for the duration of the project to assess impacts to the plant population or seed bank. If detrimental effects are detected through monitoring, corrective action will be taken through adaptive management.

**FWS-10**: Surface disturbance closer than 20 meters to a listed plant will be considered an adverse effect. Mitigating measures within this narrow buffer are important and helpful to individual plants, but not all adverse effects can be fully mitigated within this distance. Some adverse effects due to dust, dust suppression, loss of pollinator habitat, and toxic spills will likely remain. There are two possible exceptions to this rule: 1) the new disturbance is no closer to a listed plant than preexisting disturbance, and no new or increased impacts to the listed plant are expected; or 2) the listed plant is screened from the proposed disturbance (e.g., tall, thick vegetation, or a berm acts as a screen or effective barrier to fugitive dust and other potential impacts).

[1] Occupied habitat includes areas historically or currently supporting plants and/or soils containing a viable seed bank. Suitable habitat is defined as an area that contains or exhibits the specific components or constituents necessary for plant persistence, as determined by existing maps plus field inspection and/or surveys. It may or may not be occupied by plants or a seed bank. Potential habitat is defined as an area that satisfies the broad criteria of the species' habitat description. It is usually determined by preliminary in-house assessment.

[2] An avoidance buffer helps to minimize dust transport, weed invasion, unauthorized vehicular activities, and chemical and produced-water spills, and also helps protect pollinator habitat.

**FWS-11**: Transplantation of potentially affected plants will not be used as a rationale to defend a "not likely to adversely affect" or a "no effect" determination for listed plant species.

**FWS-12**: For drilling pads and other installations, surveys will extend beyond the edge of disturbance by at least 200 meters for threatened, endangered, proposed, and candidate species. For linear features such as roads and pipelines, surveys will extend at least 100 meters beyond the edge of the proposed ground disturbance along each side of the right-of-way. If special status plants are found within the survey area, the contractor will determine the complete extent of the occurrence and the approximate number of individuals within it.

**FWS-13**: Documentation will include individual plant locations and suitable habitat distributions. Prior to conducting plant surveys, the operator will provide the BLM maps (as hard copy and Geographic Information System files) of all proposed areas of disturbance. Maps will include existing and proposed roads, pipelines, well pads, pits, parking lots, and all other work areas. Post-construction or as-built maps will also be submitted to account for any deviations from pre-project maps. Specific polygons where rare plant surveys have been conducted will be included, along with the results of those surveys (positive or negative). The locations of any monitoring plots established to measure the status of rare plants and habitat in the vicinity of project activities will be displayed.

**FWS-14**: Protect pollinator species for endangered or threatened species by incorporating the SOPs found in the Final Programmatic Environmental Impact Statement for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**FWS-15**: Conduct development on existing or previously disturbed surface locations to reduce impacts on undisturbed areas and minimize impact on wildlife habitat.

**FWS-16**: To protect nesting raptors, raptor surveys shall be conducted prior to activities that could impact nesting activities. Based on the survey results, the following mitigation measures may be applied:

- **a)** Protect nest sites from human disturbances by implementing Colorado Parks and Wildlife and US Fish and Wildlife Service recommended buffers around known nest sites.
- **b)** Provide perching and nesting structures as mitigation where disturbances are impacting raptors.
- **c)** Apply guidance from Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 2006 (Avian Power Line Interaction Committee 2006) and Avian Protection Plan Guidelines (Avian Power Line Interaction Committee and US Fish and Wildlife

Service 2005) or most current guidance for new power line construction (including upgrades and reconstruction) to prevent electrocution of raptors.

**FWS-17**: **(MLP)** Implement drilling technology improvements, such as horizontal drilling, to maximize resource recovery and minimize environmental impacts.

**FWS-18**: **(MLP)** Install pipelines adjacent to roads wherever possible.

**FWS-19**: **(MLP)** Strategically apply fugitive dust-control measures to reduce coating of vegetation and deposition in water sources, including enforcing established speed limits on BLM-administered and private roads.

**FWS-20**: Ensure that ponds containing mining or other wastes that are potentially hazardous to fish and wildlife are enclosed to exclude birds, bats, and other wildlife attracted to the water.

**FWS-21**: When placing culverts on streams containing fish or amphibians, design culverts to maintain or improve aquatic organism passage.

**FWS-22**: In wildland fire situations work with Fire Resource Advisors during suppression efforts in the GJFO when considering dipping water from ponds, reservoirs, and lakes throughout the Grand Valley. Select reservoirs, ponds, and lakes harbor native and/or endangered fishes and should be avoided if at all possible. If these waters must be used, screen water intakes with 0.25-inch mesh to avoid fish entrainment.

**FWS-23**: When obtaining water from any live stream or river, the following actions should be taken:

a) The best method to avoid fish entrainment is to pump from off-channel locations (e.g., ponds, lakes, and diversion ditches) not directly connected to the mainstem rivers even during high spring flows;

b) If the pump head must be located in the river channel where larval fish are known to occur:

   1. Do not situate the pump in a low-flow or no-flow area, as these habitats tend to concentrate larval or young-of-year fishes. Instead, place the pump into fast moving/riffle habitat.

   2. Limit the amount of pumping, to the greatest extent possible, during that period of the year when larval fish may be present (June 1 to August 15).

3. Avoid pumping, to the greatest extent possible, during the pre-dawn hours (two hours prior to sunrise), as larval fish drift studies indicate that this is a period of greatest daily activity.

c) Screen all pump intakes with 0.25-inch or finer mesh material.

d) Report any fish impinged on any intake screens to US Fish and Wildlife Service (970-243-2778) or Colorado Parks and Wildlife:

Northwest Region
711 Independent Avenue, Grand Junction, CO 81505
Phone: (970) 255-6100

Southwest Region
415 Turner Drive, Durango, CO 81303
Phone: (970) 375-6700

**Best Management Practices**

**FWS-24**: Design lighting required for recreation, oil and gas, and other programs to be directing downward using shielded lights and only the minimum illumination required. Utilize green lights in areas that require illumination at night and prevent skyward projection of lighting that may disorient night migrating birds. Sodium vapor lights, widely used for streetlights and security lighting, should not be used because they have been shown to attract night-flying birds.

**FWS-25**: Limit flaring operations when well pads are within 100 meters of occupied threatened, endangered, proposed, candidate, and sensitive species habitat.

**FWS-26**: Control noxious weeds using integrated techniques. Limit chemical control in areas with rare plant species to avoid damage to non-target species. Mechanical or chemical control in and near rare plant habitat shall only be implemented by personnel familiar with the rare plants.

**FWS-27**: Prohibit collection of rare plants or plant parts, except as permitted by the BLM Authorized Officer for scientific research.

**FWS-28**: The use of deicers and dust suppressants within 100 meters of road-side occurrences of special status plant species will require prior approval from the BLM.

**FWS-29**: Herbicide application shall be kept at least 200 meters from known plant populations, except in instances where weed populations threaten habitat integrity or plant populations. Great care shall be used to avoid pesticide drift in those cases.

**FWS-30**: Use temporary water delivery lines laid on the surface of the ground to reduce truck traffic.

**FWS-31**: Retain existing snags for wildlife use in places where they will not create a human hazard.

**FWS-32**: Where linear disturbance is proposed, edges of vegetation shall be feathered to avoid long linear edges of habitat and allow for greater habitat complexity for wildlife.

**FWS-33**: Protect existing temporary pools to providing breeding and hibernating habitat for amphibians.

**FWS-34**: Avoid fragmentation of wildlife habitat, especially in wildlife migration and movement corridors.

**FWS-35**: **(MLP)** Encourage the use of a variety of BMPs, as defined by the most recent version of "Best Management Practices for Oil and Gas Development on Public Lands," http://www.blm.gov/bmp/.

**FWS-36**: Identify in-channel features (e.g., culverts and water-diversion structures) that block aquatic organism movement and/or impair stream connectivity and replace, modify, or remove these impediments as they are identified and as opportunities allow. Consider and address aquatic organism passage and appropriate life-stage requirements when designing new or modifying existing stream crossings.

**FWS-37**: Where construction of in-channel barriers will benefit aquatic species by limiting access from competitive species and/or disease vectors, consider barriers as a management tool on a site-specific basis.

**FWS-38**: In critical and sever winter range for deer and elk, avoid recurring transportation activity within two hours before and after sunrise and sunset to avoid disturbing wintering wildlife between December 1 and May 1 (excluding emergencies).

**FWS-39**: For intensive activities within winter range for wildlife, use carpooling for activities like crew rotations and shift changes.

**FWS-40**: For intensive activities within winter range for wildlife, monitor and enforce speed limits.

**FWS-41**: For intensive activities within winter range for wildlife, prohibit pets and possession of fire arms on the site by employees or contractors.

**FWS-42**: Implement closed-loop drilling systems on all active rigs, using only a small cuttings mixing area on each location.

**FWS-43**: Optimize completion operations to minimize impact. Techniques include:

a) Simultaneous drilling and completion operations minimize the operating time on the well pad, where space and safety restrictions permit the use of this technique.

b) Remote completion operations using nearby existing well pads minimize overall surface disturbance.

**FWS-44**: Reuse water whenever possible for drilling and completion activities. Recycle all water used in completion activities to meet water needs for completion of subsequent wells on location; this will reduce fresh water consumption and reduce truck traffic.

**FWS-45**: Expand the water-distribution system to efficiently move water in pipelines, thereby reducing truck traffic for drilling and completion activities.

**FWS-46**: Reduce visits to well sites through remote monitoring (i.e., supervisory control and data acquisition) and the use of multi-function contractors.

**FWS-47**: **(MLP)** Use solar panels as an alternative energy source for on location production equipment to limit trips to the location for production maintenance.

**FWS-48**: Use dual-fuel natural gas/diesel systems, thereby reducing diesel delivery to the well site by as much as 70 percent.

**FWS-49**: **(MLP)** Use existing roads instead of new construction segments wherever feasible.

**FWS-50**: **(MLP)** Seed all access roads and facilities other than well pads in a timely manner after construction has been completed. Seed all topsoil from pad construction.

**FWS-51**: Noise-reduction techniques and designs will be used to reduce noise from compressors or other motorized equipment.

**FWS-52**: Where new roads are constructed, seasonal restrictions on public vehicular access will be evaluated where there are wildlife conflict or road damage/maintenance issues.

**FWS-53**: Install multiple pipelines in a single trench to minimize disturbance.

**FWS-54**: Install trench plugs (sloped to allow wildlife or livestock to exit the trench should they enter) at known wildlife or livestock trails to allow safe crossing on long spans of open trench.

**FWS-55**: Coordinate with Colorado Parks and Wildlife about BLM projects and BLM-authorized projects that are proposed within 0.5-mile of a small-

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 295 of 499

capacity water development and 2.0 miles of a large-capacity wildlife water development. Projects determined to have a detrimental effect on wildlife using wildlife water developments will be avoided or rerouted if possible.

**FWS-56**: Coordinate with Colorado Parks and Wildlife about migratory bird inventories when migratory bird inventories are proposed by BLM or required of third parties.

### References

Avian Power Line Interaction Committee. 2006. Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 1996. Edison Electric Institute, Avian Power Line Interaction Committee and California Energy Commission, Washington, DC, and Sacramento, CA.

Avian Power Line Interaction Committee and US Fish and Wildlife Service. 2005. Avian Protection Plan Guidelines, April 2005. Washington, DC.

BLM (US Department of the Interior, Bureau of Land Management). 1989. Handbook H-1741-1—Fencing. BLM, Washington, DC. 58pp.

______. 2007. Final Vegetation Treatment Using Herbicides on BLM Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

BLM (US Department of the Interior, Bureau of Land Management) and US Fish and Wildlife Service. 2008. Recommendations for Avoiding Adverse Effects on Threatened, Endangered, Proposed, Candidate, and BLM Sensitive Plants on BLM Lease Lands in Colorado. Draft. July 25, 2008.

US Department of Agriculture, Forest Service. 2007. Designing for Aquatic Organism Passage at Road-Stream Crossings.

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

## Wildlife Damage Management (WDM)

### Standard Operating Procedures

**WDM-1**: Control activities conducted by the US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services will be coordinated with the GJFO on an annual basis, including review of authorized control areas and annual submittal of control activities on BLM-administered lands.

BLM_0024561

**WDM-2**: US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services will notify the GJFO before any damage control activity is implemented within the restricted area(s), and exceptions will be approved on a case-by-case basis.

**WDM-3**: All US Environmental Protection Agency use restrictions and requirements for toxicants are to be followed where control devices are employed on BLM-administered lands. The GJFO must be notified before any toxicants are deployed, and a map of the treatment area must be provided. Adequate signage must be provided and maintained.

**WDM-4**: All aerial control activities in the wild horse area must be conducted in compliance with all applicable Colorado State Statutes, the provisions of the 1971 Wild and Free-Roaming Horses and Burros Act, as amended, and its associated regulations (43 Code of Federal Regulations [CFR] 4700). No harassment of wild horses and burros is permitted under these provisions; maliciously or negligently causing the injury of a wild horse or burro is also expressly prohibited.

**WDM-5**: Any aerial control activities in the wild horse area will require notification of and prior approval from the GJFO.

**WDM-6**: During the foaling season (March 1 to June 30), a flyover survey to determine whether wild horses are present will be conducted prior to commencing any wildlife damage management activities. This survey will be conducted at a minimum of 500 feet above ground level. If wild horses are determined to be present, flyover surveys will be adjusted as needed to prevent any disturbance or harassment of the animals present, and wildlife damage activities that would result in disturbance or harassment of these animals will not occur.

**WDM-7**: All persons involved with wildlife damage management activities shall be briefed on the regulations and penalties relating to harassment of wild horses prior to commencing animal-control operations.

**WDM-8**: The GJFO will identify through the US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services annual work plan process areas of BLM-administered lands considered special resource use areas on which control activities be avoided except as requested by Colorado Parks and Wildlife, or other protective restrictions may apply. Examples may include special status species habitats (e.g., sage-grouse leks and nesting areas and bald eagle nests).

**WDM-9**: Interim Management Policies (BLM 2012) must be adhered to at all times in Wilderness Study Areas (WSAs), and the GJFO must be notified before any wildlife damage management activity is implemented. Wildlife damage management activities in WSAs must be directed at the offending animal. Aerial

hunting may be allowed in WSAs as long as those actions do not impair wilderness characteristics.

#### References

BLM (US Department of the Interior, Bureau of Land Management). 2012. Manual 6330—Management of Wilderness Study Areas. Rel. 6-134. BLM, Washington, DC. July 13, 2012.

## Wild Horses (WH)

#### Standard Operating Procedures

**WH-1**: Wild Horse and/or Burro Gathers SOPs.

**WH-2**: Wild Horse Fertility Control Treatment SOPs.

**WH-3**: All new or reconstructed exclosures within herd management areas will follow the horse fencing standards.

**WH-4**: Any new facilities shall be a minimum of 0.25-mile from water sources to avoid hindrance of use by wild horses.

**WH-5**: Any new facilities shall be designed to avoid injury to horses or fenced to prevent wild horse access.

**WH-6**: Require rebar to be welded between the rails of cattle guards if the cattle guard or similar device is to be installed in or near herd management areas to decrease the risk of wild horse and/or burro entrapment.

**WH-7**: All new or reconstructed fences on the perimeter of the wild horse range will be comprised of materials (e.g., wooden poles and smooth wire) that would reduce injury to wild horses.

**WH-8**: Seed mixes for projects within the wild horse range shall benefit wild horses (emphasis on palatable grasses) while meeting land health standards.

**WH-9**: If a project involves heavy or sustained traffic, require road signs for safety and protection of wild horses.

**WH-10**: Above-ground facilities requiring painting will be designed to blend in with local environment.

**WH-11**: Disturbed areas will be contoured to blend with the natural topography. Blending is defined as reducing form, line, and color contrast associated with the surface disturbance.

**WH-12**: Still or motion picture photography for personal use is permitted; however, photography for commercial purposes may require a permit. Contact the local BLM office.

**WH-13**: Feed weed-free certified hay or pellet feed (refer to www.weedfreefeed.com for more information).

**WH-14**: For guide/outfitters and recreationists: The permittee shall inform all staff and clients that wild horses protected by federal law and will prevent harassment of wild horses from permitted activities. Prohibited acts include, but are not limited to, maliciously injuring or harassing a wild horse, chasing wild horses, removing or attempting to remove a wild horse from BLM-administered lands, destroying a wild horse, selling or attempting to sell a wild horse, and commercially exploiting a wild horse. Crimes are punishable by fine and/or imprisonment. Examples of violations include harassment by all-terrain vehicle, injury or death by a bullet or arrow, and illegal capture.

**Best Management Practices**

**WH-15**: Adequate water for livestock and dogs may not be available for recreationists. Springs and other water sources identified on maps may be dry at any time.

**WH-16**: Bring a sufficient quantity of drinking water for riding stock (15 gallons or more per day, per animal)

**WH-17**: Secure riding stock adequately (use portable panels or corrals).

**WH-18**: Ensure that domestic riding stocks are current with annual vaccinations.

**WH-19**: Do not bring sick or diseased riding animals into herd management areas. Wild horses on the range are not vaccinated against any diseases.

**WH-20**: Do not drive across, camp on, or stake riding stock out to graze on riparian areas.

**WH-21**: Water riding stock only at springs or streams with stable banks and dry soils.

**WH-22**: Keep riding stock secured away from dispersed camp sites and spread manure before leaving.

**WH-23**: Explore the area prior to hauling in a trailer to assess access. Pulling horse or other trailers off of State- or County-designated roads shall only be done with prior operator knowledge of the road. Many roads are narrow, rough, steep, or impassable. Turning around may be difficult or impossible, especially with a trailer.

**WH-24**: In the event that a foaling mare or newborn foal is encountered, every effort shall be made to stay away from that location. Do not attempt to help the mare or foal.

**WH-25**: Stay at least 100 feet away from wild horses.

**WH-26**: Try not to place yourself between members of a wild horse band or between adjoining bands.

**WH-27**: Observe wild horses quietly so wild behavior is not disrupted.

**WH-28**: If you are approached by wild horses while riding horseback, stay calm, maintain control of your animal, and leave the area as soon as possible. Ride with others whenever possible.

**WH-29**: Mares, especially if in season, may attract wild stud horses to you or your camp. Keep domestic horses secure at all times. Ride with others who are experienced and skilled at resolving unwanted wild horse or burro interactions.

**WH-30**: Do not feed or try to attract animals towards you.

**WH-31**: Keep dogs under control so they do not disturb or chase wild horses.

**WH-32**: Report sick or injured animals, or violations, to the BLM.

**WH-33**: Please do not attempt to assist or handle sick or injured animals.

## Cultural Resources (CR)

### Standard Operating Procedures

**CR-1**: Evaluation of all BLM activities and BLM-authorized activities shall be made in compliance with BLM Manual 8100, The Foundations for Managing Cultural Resources (BLM 2004a) and subsequent 8100 series (BLM 2004b, 2004c, 2004d, 2004e, 2004f, 2004g, and 2004h); Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources (BLM 1998); and the current State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office.

**CR-2**: In complex linear or split-estate actions, early coordination with private landowners will facilitate the process the BLM must complete prior to authorizing the action. To comply with the National Historic Preservation Act, the BLM must consider the effects to cultural resources on private land that result from a federal action, such as linear rights-of-way or constructing a well pad on private land to drill to federal lease. Before an applicant can contract a cultural survey, the private surface owner must allow the cultural consultant access. Projects can be authorized without completing cultural surveys on private lands, but this may lead to lengthy delays while the BLM completes consultation.

**CR-3**: The holder of a BLM authorization to carry out land use activities on federal lands, including all leases and permits, must notify the BLM, by telephone

and written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony (43 CFR 10.4[g]). Activities must stop in the immediate vicinity of the discovery. The discovery must be protected from the authorized activity for a period of 30 days or unless otherwise notified by the BLM (43 CFR 10.4[c] and [d]).

**CR-4**: The National Historic Preservation Act, as amended, requires that if newly discovered historic or archaeological materials or other cultural resources are identified during project implementation, work in that area must stop and the BLM Authorized Officer must be notified immediately. Within five working days, the BLM Authorized Officer will inform the proponent as to:

a) Whether the materials appear eligible for the National Register of Historic Places;

b) The mitigation measures the proponent will likely have to undertake before the site could be used (assuming in situ preservation is not practicable) (36 CFR 800.13); and

c) A timeframe for the BLM Authorized Officer to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Office, that the BLM Authorized Officer's findings were correct and mitigation was appropriate.

**CR-5**: A standard Education/Discovery stipulation for cultural resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that federal laws protect cultural resources and they will be subject to prosecution for disturbing or destroying any historic or archaeological sites, or collecting any cultural objects, prehistoric or historic from federal lands.

**CR-6**: Strict adherence to the confidentiality of information concerning the nature and location of archeological resources will be required of any company issued a land use authorization and all of their subcontractors (Archaeological Resource Protection Act, 16 US Code 470hh).

**CR-7**: When a National Environmental Policy Act of 1969 (NEPA) document specifically stipulates the need for an archaeological monitor during construction or a project is located in areas that require an archaeological monitor to be present (see conditions of approval polygons for Sunnyside, Grand Mesa Slopes, and Indian Creek), it is the applicant's responsibility to contract an archaeological consultant holding a current Colorado BLM permit and authorized to work in the GJFO. Fieldwork authorizations are required prior to any cultural resource monitoring where resources are present or reasonably expected is permitted only when the ground surface is free of snow, unfrozen, and dry.

**CR-8**: A cultural resource must be allocated to public use prior to:

a) authorizing or implementing any Heritage Tourism project;
b) issuing Special Recreation Permits that will use a cultural resource; or
c) a BLM recreation project is proposed that involves the use or interpretation of a cultural resource.

**Best Management Practices**

**CR-9**: BLM specialists shall complete a File Search Request form and submit to the GJFO Archaeologist as soon as there is proposed BLM activity or BLM-authorized activity that will require preparation of a NEPA document. This will provide the specialist with immediate information as to the need for Class III inventory, whether that will be contracted or in-house, or the presence of cultural resources that may preclude or impede the project.

**CR-10**: Once it has been determined that a project will require contracted cultural inventory, the BLM specialists shall complete a Request for Cultural Resource Compliance form *(find at S:\blm share\CRM_for_FO\ CR Compliance)* and submit it to the GJFO Archaeologist as soon as a final design for a BLM-proposed project or activity is complete.

**CR-11**: When possible, locate projects in areas that are previously disturbed. To comply with the National Historic Preservation Act, the BLM must identify significant cultural resources. Under the current regulations and guidelines, the BLM may decide that no inventory needs to be conducted because the proposed action is located in an environment where ground disturbance has modified the surface so extensively that the likelihood of finding intact cultural resources is negligible.

**CR-12**: Where proposed projects or development will adversely affect a cultural resource, testing, data recovery, or full excavation to recover scientific information may be required as mitigation. The applicant or operator bears the full cost of mitigation and is encouraged to consider avoiding adverse effects through project relocation or redesign rather than mitigating adverse effects.

**CR-13**: **(MLP)** A File Search Request form must be submitted to the GJFO Archaeologist identifying the site and the proposed use so the allocation to public use can be confirmed.

**References**

BLM (US Department of the Interior, Bureau of Land Management). 1998. Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources. BLM, Colorado State Office, Lakewood, CO. Revised 2007.

______. 2004a. Manual 8100—The Foundations for Managing Cultural Resources. Release 8-72. BLM, Washington, DC. December 3, 2004.

______. 2004b. Manual 8110—Identifying and Evaluating Cultural Resources. Release 8-73. BLM, Washington, DC. December 3, 2004.

______. 2004c. Manual 8120—Tribal Consultation under Cultural Resources. Release 8-74. BLM, Washington, DC. December 3, 2004.

______. 2004d. Manual 8120-1—General Procedural Guidance for Native American Consultation. Release 8-75. BLM, Washington, DC. December 3, 2004.

______. 2004e. Manual 8130—Planning for Uses of Cultural Resources. Release 8-76. BLM, Washington, DC. December 3, 2004.

______. 2004f. Manual 8140—Protecting Cultural Resources. Release 8-77. BLM, Washington, DC. December 3, 2004.

______. 2004g. Manual 8150—Permitting Uses of Cultural Resources. Release 8-78. BLM, Washington, DC. December 3, 2004.

______. 2004h. Manual 8170—Interpreting Cultural Resources for the Public. Release 8-79. BLM, Washington, DC. December 3, 2004.

## Tribal Consultation (TC)

### Standard Operating Procedures

**TC-1**: The BLM has a responsibility to develop a government-to-government relationship with the tribes: the formal relationship that exists between the federal government and tribal governments under US laws. Tribal governments are considered dependent domestic sovereignties with primary and independent jurisdiction (in most cases) over tribal lands. Concerning proposed BLM plans and actions, at least the level of consideration and consistency review provided to state governments must be afforded to tribal governments.

**TC-2**: The BLM is responsible for consultation under General Authorities defined as "laws, executive orders, and regulations that are not considered cultural resource authorities." The regulations implementing both the Federal Land Policy and Management Act of 1976 and NEPA require Native American consultation. The American Indian Religious Freedom Act and the Indian Sacred sites order (Executive Order 13007) pertain to the free exercise clause of the First Amendment (BLM Manual 8120-1, Guidelines for Conducting Tribal Consultation [BLM 2004b], Federal Land Policy and Management Act of 1976 Title II, NEPA Section 102 (40 CFR 1501.2 and 1501.7)

**TC-3**: Tribes must be consulted whenever other governmental entities or the public are formally involved in the BLM's environmental review process in any NEPA documentation that entails public involvement or initial discussions with local or state governments (BLM Handbook H-1790-1, National Environmental Policy Act [BLM 2008]).

**TC-4**: National Historic Preservation Act Section 106 consultations for cultural resources that are significant to Indian tribes. Consultation with an Indian tribe must recognize the government-to-government relationship between the federal government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government. Consultation shall be conducted in a manner sensitive to the concerns and needs of the Indian tribe. (36 CFR 800.2[c][2][ii][C]).

**Best Management Practices**

**TC-5**: Notification is conducted by simple, one-way written means. Consultation is generally construed to mean direct, two-way communication.

**TC-6**: When publishing notices or open letters to the public indicating that the BLM is contemplating an action and that comments are welcome, BLM managers shall send individual letters by certified mail or delivery confirmation to tribes requesting their input on actions being considered. If this is an opening dialogue, prior to having developed a strong working relationship with the tribe, if a timely response is not received, the BLM manager shall follow up with personal telephone calls.

**TC-7**: For the benefit of both parties, BLM managers are encouraged to strive for the most efficient and effective method of consultation. Whatever method is chosen, all consultation activities shall be carefully documented in the official record.

**TC-8**: Consultation roles can be facilitated but may not be transferred to others. Cultural resource consulting firms working for land use applicants cannot negotiate, make commitments, or otherwise give the appearance of exercising the BLM's authority in consultations.

**TC-9**: Owing to their status as self-governing entities, tribes shall be notified and invited to participate at least as soon as (if not earlier than) the Governor, state agencies, local governments, and other federal agencies.

**TC-10**: Tribal consultation means dialogue between a BLM manager and an American Indian Tribe. The BLM managers are encouraged to visit tribal councils and appropriate tribal leaders on a recurring basis. This face-to-face meeting helps to develop relationships that can reduce the time and effort spent in later consultation or individual projects. This government-to-government consultation shall be treated with appropriate respect and dignity of position.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2004a. Manual 8120—Tribal Consultation under Cultural Resources. Release 8-74. BLM, Washington, DC. December 3, 2004.

______. 2004b. Manual 8120-1—General Procedural Guidance for Native American Consultation. Release 8-75. BLM, Washington, DC. December 3, 2004.

______. 2008. Handbook H-1790-1—National Environmental Policy Act. BLM, Washington, DC. January 2008.

## PALEONTOLOGY (P)

### Standard Operating Procedures

**P-1**: Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.

**P-2**: Prior to any surface-disturbing activities, an inventory of paleontological resources (fossils) may be required. Mitigation may be required upon the discovery of any vertebrate fossil or other scientifically important paleontological resource. Mitigation of scientifically important paleontological resources may include avoidance, monitoring, collection, excavation, or sampling. Mitigation of discovered scientifically important paleontological resources may require the relocation of the disturbance over 100 meters. This and any subsequent mitigation work shall be conducted by a BLM-permitted paleontologist.

**P-3**: The lessee/operator shall bear all costs for inventory and mitigation (BLM 2008).

**P-4**: The lessee is prohibited from surface occupancy and surface-disturbing activities within 100 meters around all known scientifically important paleontological resources.

(Locality-specific name)

This stipulation is to protect scientific information that may be damaged from inadvertent or authorized uses.

*Exception:* The BLM Authorized Officer may: (1) allow for paleontological excavation and (2) change the protection boundary on a case-by-case basis, taking into account topographical barriers, the design of the proposed action, and the characteristics of the paleontological resource.

*Modification:* None

*Waiver:* Destruction of all the physical characteristics of a paleontological resource.

**P-5**: A standard Education/Discovery stipulation for paleontological resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that federal laws protect paleontological resources, and they will be subject to prosecution for disturbing or destroying any vertebrate fossils or paleontological sites, or collecting any fossilized bones, tracks, or any other vertebrate trace fossils from federal lands.

**P-6**: The Paleontological Resources Preservation Act [16 US Code 470aaa] requires the lessee/operator to immediately suspend activities in the vicinity of a vertebrate fossil discovery, protect the discovery from damage, and notify the BLM Authorized Officer of any paleontological resources discovered as a result of operations under this authorization. The BLM Authorized Officer will evaluate, or will have evaluated, such discoveries as soon as possible, but not later than 10 working days after being notified. Appropriate measures to mitigate adverse effects to significant paleontological resources will be determined by the BLM Authorized Officer after consulting with the operator. Within 10 days, the operator will be allowed to continue construction through the site, or will be given the choice of either: (1) following the BLM Authorized Officer's instructions for stabilizing the fossil resource in place and avoiding further disturbance to the fossil resource; or (2) following the BLM Authorized Officer's instructions for mitigating impacts to the fossil resource prior to continuing construction through the project area.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2008. Instruction Memorandum 2009-011—Assessment and Mitigation of Potential Impacts to Paleontological Resources. BLM, Washington, DC. October 10, 2008.

## Visual Resources (V)

### Standard Operating Procedures

**V-1**: All new surface-disturbing projects or activities, regardless of size or potential impact, will incorporate visual design considerations during project design as a reasonable attempt to meet the Visual Resource Management class objectives for the area and minimize the visual impacts of the proposal. Visual design considerations will be incorporated by:

a) Using the Visual Resource Management contrast rating process (required for proposed projects in highly sensitive areas, high impact projects, or for other projects where it appears to be the most effective design or assessment tool).

b) Providing a brief narrative visual assessment for all other projects that require an environmental assessment or environmental impact statement.

c) Measures to mitigate potential visual impacts could include the use of natural materials, screening, painting, project design, location, or restoration (BLM Handbook H-8431-1, Visual Resource Contrast Rating [BLM 1986]; or online at http://www.blm.gov/nstc/VRM/8431.html, for information about the contrast rating process).

**V-2**: All new roads will be designed and constructed to a safe and appropriate standard, "no higher than necessary" to accommodate intended vehicular use. Roads will follow the contour of the land where practical. Existing oil and gas roads that are in eroded condition or contribute to other resource concerns will be brought to BLM standards within a reasonable period of time.

**Best Management Practices**

**V-3**: Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA-level review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

**V-4**: Any facilities authorized will use the best technology available to minimize light emissions.

**V-5**: Any new permits/authorizations, including renewals, will be stipulated to use the best technology available to minimize light emissions, as compatible with public health and safety.

**V-6**: Restrict visual intrusion in Visual Resource Management Class I and II areas and within 0.25-mile of historic trails.

**V-7**: Screening facilities from view and avoiding placement of production facilities on steep slopes, hilltops, and ridgelines.

**V-8**: Paint all facilities a color that best allows the facility to blend with the background (operator-committed BMP).

**V-9**: Gravel of road color shall be similar to adjacent dominant soil colors.

**V-10**: Reduce impacts on Visual Resource Management Class II and III areas.

**V-11**: Bury distribution power lines and flow lines in or adjacent to access roads.

**V-12**: Repeat form, line, color, and texture elements to blend facilities with the surrounding landscape.

**V-13**: All aboveground facilities, including power boxes, building doors, roofs, and any visible equipment, will be painted a color selected from the latest national color charts that best allows the facility to blend into the background.

**V-14**: Perform final reclamation recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography.

**V-15**: To the extent opportunities are practicable, extreme visual contrast created by past management practices or human activities will be minimized. Examples include right-of-way amendments, mineral material sites, abandoned mines, and areas impacted by unauthorized off-road driving.

**V-16**: Reclaim unused well pads within one year.

**V-17**: Final reclamation of all oil and gas disturbance will involve recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas.

**V-18**: The use of submersible pumps will be strongly encouraged, especially in Visual Resource Management Class I, II, or III areas or any area visible by the visiting public.

**V-19**: The use of partial or completely below-grade wellheads will be strongly encouraged in high visibility areas as well as VRM Class I, II, or III areas.

**V-20**: The placement of production facilities on hilltops and ridgelines will be prohibited where they are highly visible.

### References

BLM (US Department of the Interior, Bureau of Land Management). 1986. BLM Handbook H-8431-1—Visual Resource Contrast Rating. BLM, Washington, DC. January 17, 1986.

## Wildland Fire Ecology and Management (WFM)

### Standard Operating Procedures

***Fire Suppression***

**WFM-1**: Resource Advisors and other applicable specialists shall be utilized to advise the Incident Commander and suppression resources on the natural resource values during the suppression effort.

**WFM-2**: Avoid applying fire retardant in or near drinking water sources.

**WFM-3**: Avoid the application of retardant or foam within 300 feet of a waterway or stream channel. Deviations from this procedure are acceptable if life or property is threatened.

**WFM-4**: Fire lines will not be constructed by heavy equipment within riparian stream zones. If construction is necessary due to threats to life or property, control lines shall terminate at the edge of the riparian zone at a location determined appropriate to meet fire-suppression objectives based on fire behavior, vegetation/fuel types, and fire fighter safety.

**WFM-5**: For streams currently occupied by cutthroat trout or other aquatic special status species, extractions of water from ponds or pools shall not be allowed if stream inflow is minimal and water extraction will lower the existing pond or pool level.

**WFM-6**: Lands will be temporarily closed to other uses in areas where fire suppression is being implemented.

**WFM-7**: Stream flow shall not be impounded or diverted by heavy equipment in order to facilitate extraction of water from the stream for fire-suppression efforts.

**WFM-8**: If it is determined that use of retardant or surfactant foam within 300 feet of a waterway or stream channel is appropriate due to threats to life or property; alternative line construction tactics are not feasible because of terrain constraints, congested areas, or lack of ground personnel; or potential damage to natural resources outweighs possible loss of aquatic life, then the unit administrator shall determine whether there have been any adverse effects to federally listed species. If the action agency determines that adverse effects were incurred by federally listed species or their habitats, then the action agency must consult with US Fish and Wildlife Service, as required by 50 CFR 402.05, as soon as practicable.

**WFM-9**: Avoid whenever possible burning out unburned islands of native vegetation, specifically sagebrush communities.

**WFM-10**: Minimize/mitigate impacts to cultural resources and pristine vegetative communities.

**WFM-11**: Prior to use on BLM-administered lands, thoroughly rinse to remove mud and debris from all fire-suppression equipment from off-district or out of state and used to extract water from lakes, ponds, streams, or spring sources. Examples of this equipment are helicopter buckets, draft hoses, and screens. After cleaning the equipment, disinfect it to prevent the spread of invasive aquatic species. Do not rinse equipment with disinfectant solutions within 100 feet of natural water sources. GJFO suppression equipment used to extract water from sources known to be contaminated with invasive aquatic species, as

identified by US Fish and Wildlife Service and Colorado Parks and Wildlife, also shall be disinfected beforehand on GJFO BLM-administered lands.

**WFM-12**: Vehicle and equipment shall be washed before being assigned to fires to minimize the spread of noxious weeds. Larger fires with incident management teams assigned may need to have a weed wash station.

***Emergency Stabilization, Burned Area Rehabilitation, and Suppression Repair***

Treatments from these three programs include the following:

**WFM-13**: Stabilize areas that have low potential to naturally revegetate and that have high wind and soil erosion potential. Treatments include the following:

a) Installing water bars and other drainage diversions, culverts along fire roads, dozer lines, and other cleared areas;

b) Seeding and planting to provide vegetative cover;

c) Spreading mulch to protect bare soil and discourage runoff;

d) Repairing damaged roads and drainage facilities;

e) Clearing stream channels of structures or debris that is deposited by suppression activities;

f) Installing erosion control structures;

g) Installing channel-stabilization structures;

h) Fencing or restricting areas to livestock and wild horse and burro grazing to promote success of natural revegetation or establishment of seeded species;

i) Temporarily closing lands to other uses during emergency stabilization and rehabilitation practices if activities inhibit treatment;

j) Repairing or replacing range improvements and facilities; and

k) Monitoring emergency stabilization and rehabilitation treatments.

## Best Management Practices

***Fuels Management***

**WFM-14**: Construct fuel breaks or green strips to protect wildland-urban interface communities and provide for firefighter safety by using mechanical, chemical, biological, and prescribed fire treatment methods.

**WFM-15**: Construct fuel breaks and green strips in areas containing a good understory of native perennials in order to successfully compete with and deter the establishment and spread of annual species.

**WFM-16**: Seed fuels treatments in areas that do not have a good understory of desirable native perennials that can successfully compete with annual weed species.

**WFM-17**: Where practicable, use large-scale landscape planning to connect fuel treatments and avoid small, piecemeal projects.

**WFM-18**: Plan for maintenance cycles and maintain fuel treatments to ensure effectiveness.

**WFM-19**: Prevent seeded species from being grazed during the first two growing seasons (more than 18 months) following seeding, or until site-specific analysis and/or monitoring data indicates that vegetation cover, species composition, and litter accumulation are adequate to support and protect watershed values, meet vegetation objectives, and sustain grazing use

**WFM-20**: Provide fire prevention and mitigation outreach information and education to communities within the GJFO.

## Wilderness, Wilderness Study Areas, and Lands with Wilderness Characteristics (WSA)

### Standard Operating Procedure

**WSA-1**: All WSAs will be managed in accordance with BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012).

### References

BLM (US Department of the Interior, Bureau of Land Management). 2012. Manual 6330—Management of Wilderness Study Areas. Release 6-134. BLM, Washington, DC. July 13, 2012. 56pp.

## Forestry (F)

### Standard Operating Procedures

**F-1**: No fuel wood cutting of live trees will be allowed for cottonwood, willow, or alder, unless resource objectives allow otherwise.

**F-2**: No forestry harvest or collection of products will be allowed during the winter closure timing restraints (November 30 to May 1).

**F-3**: Trees marked for wildlife protection and/or "Seed Tree Do Not Fall" will not be allowed to be harvested for any type of forestry products.

**F-4**: Harvest plans will be completed on all commercial sales within woodlands and forests, showing access roads, decks, and skid trail locations. Approval of these plans by the BLM Authorized Officer is required before harvest can start.

### Best Management Practices

**F-5**: The closure of new roads will be considered and planned for during sale preparation in accordance with existing policy.

**F-6**: Clear cuts will be considered for use in the pinyon-juniper and aspen types in critical big game winter ranges and other areas where economically feasible.

**F-7**: Clear cuts will be considered for use in restoring aspen sites.

**F-8**: Cuts that thin the pinyon-juniper canopy cover to 20 percent or less will be favored for use in bighorn sheep ranges. These cuts will focus on the smaller trees in the stand,

**F-9**: Large conifer seed trees (three to seven trees per acre) will be left where practical as wildlife shelter on south-facing slopes of big game winter ranges to ensure the succession of quality snags.

**F-10**: An average of three to seven trees per acre of the largest nonhazardous snags, particularly those adjacent to openings and open water, will be left on commercial sale areas.

**F-11**: Sale areas with less than 15 percent ground cover in the understory on critical deer and elk winter ranges will be seeded using a mixture of grasses, forbs, and shrubs and will be paid for with wildlife funds.

**F-12**: A minimum of 180-year rotation will be allowed for pinyon-juniper stands. Other species will be managed on a rotation of sufficient length to produce cavity trees for flickers and small owls.

**F-13**: A minimum 50-foot buffer will be maintained along all riparian areas.

**F-14**: Snags with existing cavities or nests will be priority for retention.

**F-15**: Snag diameter for retention will be the largest class on site and will be retained in clusters if possible.

**F-16**: If site potential allows, retain five to seven snags per acre, preferably in a clumped configuration.

**F-17**: If possible, retain at least 15 live trees per acre for future snag recruitment. Recruitment snags will not have to be structurally superior; live tree with forked and broken tops may be preferred.

**F-18**: Do not disturb or destroy active or inactive nests of raptors that are reused.

**F-19**: Avoid heavy equipment use in stands of cottonwood, willow, and alder. If heavy equipment use is necessary, allow on a case-by-case basis and mitigate for adverse impacts.

**F-20**: Allow dead and down collection of cottonwood for personal use.

**F-21**: Protect seed and important wildlife habitat trees in pinyon-juniper stands.

**F-22**: Allow removal of pinyon-juniper encroachment utilizing mechanical, biological, and chemical treatments. Allow tree harvesting for Christmas trees and transplants other woodland products and biomass reduction.

**F-23**: Minimize disturbance to the soil such that surface runoff does not result in sediment transport into waterbodies. Concentrate skidding on as few skid trails as needed.

**F-24**: Limit primary skid trails to 10 percent of the total working area.

**F-25**: Avoid widespread or random skidding patterns with repeated passes.

**F-26**: Minimize placement and use of skid trails in ephemeral drainages. If skid trails must be within or cross an ephemeral drainage, additional BMPs are needed to protect water quality.

**F-27**: Minimize the extent of gouges or trenches upon the ground surface that are created by the skidding of trees or logs.

**F-28**: On sloping terrain, skid trails shall follow along the land contours and shall be kept to 25 percent grade or less when practical.

**F-29**: Establish decks at locations where soil disturbance is minimized.

**F-30**: Maintain as close to normal (pre-construction) streamflow by maintaining depth, width, gradient, and capacity of the stream channel at the crossing.

**F-31**: Perform construction, installation, and removal work during low-water flow if circumstances allow.

**F-32**: Stabilize the approachways and/or stream crossing locations so sediment is not transported into the stream.

**F-33**: Approaches to the stream are relatively flat to better control runoff.

**F-34**: The crossing can be installed at a right (90-degree) angle to the stream channel so crossing distance is minimized.

**F-35**: Any trees removed during these processes will be purchased by the applicant prior to construction. The applicant is responsible for a per-cord fee.

#### *Guidelines for Christmas Tree and Firewood Harvesting*

**F-36**: Vehicle use is restricted to existing roads and trails. Do not drive off road.

**F-37**: Do not damage adjacent trees.

**F-38**: When cutting down standing trees, cut the stump 12 inches or less, or as close to the ground as possible.

**F-39**: Scatter lopped branches at least 50 feet from the stump.

**F-40**: Do not top a larger tree to obtain a Christmas tree.

**F-41**: Do not harvest any trees within 100 feet of a spring or creek unless trees are identified for selective removal to meet resource objectives.

**F-42**: Pack out personal trash, as well as trash left by others.

**F-43**: Do not harvest when soils are saturated to a depth of 3 inches to prevent damage to roads.

**F-44**: The GJFO closes annually to firewood harvesting on November 30. Firewood harvesting reopens in the spring based on road conditions.

## LIVESTOCK GRAZING

### Standard Operating Procedures

**LG-1**: Follow the Grazing Guidelines established along with the Colorado Standards for Rangeland Health.

**LG-2**: Protect seedings from grazing for one full year and through the growing season of the second year. Some seedings established during adverse weather cycles may need protection for a longer period.

**LG-3**: New fences shall be constructed to BLM standards allowing for the appropriate wildlife passage. Fences constructed will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989).

**LG-4**: Bird and wildlife ramps shall be installed in all troughs.

**LG-5**: Access routes to functioning range improvements shall be retained to allow for periodic maintenance and prevent cross-country travel.

**LG-6**: Continue to maintain range-improvement projects to support proper livestock management including optimal distribution.

**LG-7**: Rangeland and vegetation monitoring will be conducted to detect changes in grazing use, trend, and range conditions. These data will be used to support and direct grazing management decisions. These efforts will help ensure that livestock grazing meets objectives for rangeland health and resolves conflicts with wildlife or other resources.

**LG-8**: Grazing management decisions will be based on inventory and monitoring data, both short-term and long-term, which will be jointly developed by grazing permittees and the appropriate federal land-management agency.

**LG-9**: All water-development activities for livestock grazing use that exceed the minimum depletion level established by US Fish and Wildlife Service must comply with all US Fish and Wildlife Service fees and prescribed mitigations to offset water depletion in the Colorado River.

**LG-10**: Surface-disturbing activities will be coordinated with livestock grazing permittees to minimize the effects of the surface disturbance on other approved operations. To the maximum extent practicable, this effort will include consulting on scheduling of operations to mutually minimize effects.

**LG-11**: Any damage to the function of range improvements (e.g., fence damage, cattle guard cleaning, and livestock loss) from other approved operations will be repaired immediately or remedied by the operator causing the damage.

**LG-12**: Well pads, pits, and other facilities that could be hazardous to livestock will be fenced to keep livestock out and the fences maintained in functioning condition.

### Best Management Practices

**LG-13**: Development of springs and seeps or other projects affecting water and associated resources shall be designed to maintain the associated riparian area and assure attainment of standards.

**LG-14**: Disturbance to established rangeland study sites shall be avoided to provide for the continuation of monitoring efforts, which involves comparisons of data to previous records of that site.

**LG-15**: Facilities shall be constructed a minimum of 0.125-mile from livestock gathering spots, such as water sources and gathering facilities, to prevent disruption of the use of these facilities and potential damage to the facility by livestock.

**LG-16**: Exclosures may be established in areas where the vegetative potential of the area is questionable or to compare the effectiveness of grazing management.

**LG-17**: Livestock grazing could be used as an intensively managed prescriptive grazing practice to control cheatgrass and noxious or invasive weeds.

**LG-18**: Use grazing systems that contain rotation, deferment, and rest to produce a mosaic of habitat patches and increases the density, height, and distribution of native plants.

**LG-19**: Rotate livestock use areas year to year; avoid grazing in the same place at the same time each year.

**LG-20**: Avoid re-grazing the same plants in one growing season.

**LG-21**: Adjust grazing seasons to benefit both warm- and cool-season grass species by providing periodic rest from grazing for each type.

**LG-22**: Avoid grazing an area during the spring and fall period in one year's time.

**LG-23**: Allow for adequate litter cover following grazing use to protect soil surface and enhance soil moisture retention.

**LG-24**: During spring grazing, ensure livestock are removed early enough so that sufficient soil moisture remains for plant recovery.

**LG-25**: Allow for rest/recovery periods before or after grazing during critical growth periods. Recovery shall include the production of seed to allow for the regeneration of desirable plant species.

**LG-26**: Occasional grazing use during the dormant season will provide rest during the growing season and will allow plants to recover.

**LG-27**: Adjust intensity, timing, and/or duration of grazing during periods of drought.

**LG-28**: Manage livestock grazing, including dormant season use, to ensure adequate residual grass cover remains when soil moisture or wildlife habitat is of concern.

**LG-29**: Proper utilization allows stubble for root and crown protection, litter accumulation for organic matter contribution to the soil, cover and habitat for wildlife, and forage availability for grazing animals utilizing the area. Generally, utilization levels shall be based upon recovery periods and other resource objectives. Suggested utilization guidelines are:

a) In areas not meeting land health standards where cattle grazing is a causative factor, limit utilization on key species to 30 percent during the critical growth period and 40 percent during the dormant season

b) In areas meeting land health standards, limit utilization on key species to 40 percent during the critical growth period and 50 percent during the dormant season

c) If wildlife/livestock conflicts exist, annual utilization would be read before the next seasons growth begins to account for all uses and demands on the plants

d) The exception to these guidelines is if the permittee can convince the BLM Authorized Officer that they have the knowledge, ability, and commitment to implement a grazing system that should result in improvements to the ecosystem

**LG-30**: Limit use in areas of valuable woody plants during times when they are selected.

**LG-31**: Avoid the following grazing management practices:

a) Long seasonal use with no recovery time

b) Heavy use that stresses plants

c) Little or no re-growth before winter (i.e., little stubble for root crown protection)

d) Use at the same time every year (i.e., repeating the stress)

e) No rest or growing season recovery (i.e., little recovery with long seasons of use)

f) Little or ineffective herding

g) Salt placed in the same locations year after year

h) Livestock left behind after pasture moves

i) Grazing during the critical growth period year after year

**LG-32**: When using livestock to control noxious or invasive weeds, match animal dietary preference or tolerance to the target species.

**LG-33**: Use the target weed's phenology when developing a grazing strategy.

**LG-34**: Manage heavy grazing on target weed species to account for any intermixed desirable species.

***Vegetation/Riparian Zone Grazing Management Guidelines***

**LG-35**: To reduce negative impacts to grazing, determine the critical period(s) of a riparian site, and then limit grazing during the critical period(s) to no more often than once every three or four years. Critical periods and impacts are likely to be either in late spring/early summer when streambanks are more easily broken down by trampling, or late summer/early fall, when excessive browsing man damage vegetation. Each site has its own critical period that shall be

individually determined. Important critical period variables are soil moisture, plant species composition, and animal behavior patterns. Site may be grazed every year if use does not occur during the critical period(s). Extended periods of rest or deferment from grazing may be needed to enable recovery of badly degraded sites. Graze earlier in the season when cattle use uplands (Mosley et al. 1997).

**LG-36**: To maintain streambank stability, limit cattle access to surface water when adjacent streambanks and shorelines are overly wet and susceptible to trampling and sloughing. Streambank trampling can often be reduced by capitalizing on the natural foraging behavior of cattle. Cattle generally avoid grazing excessively wet sites or in cold-air pockets. Cattle seek out wind-swept ridges, and they graze on upland forage when it is more palatable than forage in riparian areas. Avoid hot season grazing of riparian areas (Mosley et al. 1997).

**LG-37**: To graze a site more than once per growing season, moisture and temperature conditions shall be conducive to plant growth. For such sites, allow a recovery period of at least 30 to 60 days, depending on vegetation type, before re-grazing within the same growing season. Grazing more often and for shorter periods (i.e., three weeks or less at a time) is preferable to fewer and longer grazing periods (Mosley et al. 1997).

**LG-38**: To control the timing, frequency, and intensity of cattle grazing, consider creating smaller riparian pastures with similar or homogenous features. Adjusting timing, frequency, and intensity of grazing in individual pasture units is more important than adopting a formalized grazing season (Mosley et al. 1997).

**LG-39**: To protect streambanks, prevent cattle from congregation near surface waters; fencing, supplemental feeding, and herding methods work best. Provide remote watering systems for cattle. Manage the riparian area as a separate and unique pasture. Inappropriate cattle grazing will usually first be evidenced by excessive physical disturbance to streambanks and shorelines (Mosley et al. 1997).

**LG-40**: On riparian areas that are determined to be non-functioning or functioning at risk as a result of livestock grazing impacts, limits of bank disturbance will be determined and included within the Terms and Conditions of the grazing permit.

**LG-41**: In general, utilization standards in riparian areas should be no more than 30 percent use of current the year's growth on woody species, and a minimum of 4 inches of stubble height shall remain at the end of the grazing period.

**LG-42**: To protect streambanks, discourage trailing up and down the channel by placing logs across trails, perpendicular to the stream channel.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 318 of 499

**LG-43**: Adjust intensity, timing, and/or duration of grazing during periods of drought.

### References

BLM (US Department of the Interior, Bureau of Land Management). 1989. Handbook H-1741-1—Fencing. BLM, Washington, DC. 58pp.

Mosley, J.C., P.C. Cook, A.J. Griffis, and J. O'Laughlin. 1997. Guidelines for Managing Cattle Grazing in Riparian Areas to Protect Water Quality: Review of Research and Best Management Practices Policy. Report No. 15. University of Idaho, Moscow, ID. December 1997.

## RECREATION (REC)

### Standard Operating Procedures and Best Management Practices

GJFO recreation management relies heavily on community partnerships and employs the basic concept of the four E's:- Engineering, Education, Enforcement, and Evaluation. Partnerships and the four E's provide an effective recreation management framework. The following SOPs and BMPs are categorized using that framework. The following SOPs and BMPs are arranged to correspond with those four general categories.

#### *Partnerships*

**REC-1**: Develop and maintain partnerships with recreation-based organizations and service providers. These partnerships should engage partners in the planning, implementation, and monitoring of recreation opportunities and facilities on BLM-administered lands.

**REC-2**: Administer Extensive Recreation Management Areas (ERMAs) and Special Recreation Management Areas (SRMAs) (and associated Recreation Management Zones [RMZs]) cooperatively through partnership agreements (example memorandum of understanding) between managing partners (e.g., recreation organizations and municipal governments) and the BLM GJFO that outline administrative roles and responsibilities.

**REC-3**: Consider administering specific recreation facilities (e.g., campgrounds) cooperatively through partnership agreements with partner organizations or businesses.

**REC-4**: With community partners (local governments, recreation related businesses, clubs, and organizations), utilize community and visitor assessments to determine demand for regional recreation resources and opportunities.

**REC-5**: Develop and maintain partnerships with local and regional municipalities, recreation organizations, businesses, and other community partners to assist in the maintenance and enhancement of recreation routes, signs, facilities, and visitor services that help achieve recreation management

BLM_0024584

objectives. Visitor use fees may be charged to support infrastructure and services (e.g., campgrounds, campsites, trailhead facilities, trail construction and maintenance, trail patrols, emergency medical services, law enforcement, maps, and information).

**REC-6**: Coordinate with adjoining public land management units (i.e., Dominguez-Escalante National Conservation Area, McInnis Canyon National Conservation Area, BLM Colorado River Valley Field Office, BLM Moab Field Office, BLM Uncompahgre Field Office, BLM White River Field Office, Colorado National Monument, US Bureau of Reclamation parcels, Colorado Parks and Wildlife parcels, and County and city parcels) to establish consistent recreation management actions.

***Recreation Facilities and Trails (Engineering)***

**REC-7**: Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve recreation and other resource use objectives, while protecting natural and cultural resources (BLM 2005, 2014).

**REC-8**: Reroute or close trails that create resource damage and/or trespass on private property.

**REC-9**: For recreation facility development, utilize the BLM Guidelines for a Quality Built Environment manual (BLM 2010).

**REC-10**: Develop and maintain recreation visitor use data monitoring systems to track visitor use trends.

**REC-11**: Work with targeted recreation users and managing partners to protect and enhance targeted recreation opportunities in ERMAs and SRMAs.

**REC-12**: Work with partners (e.g., recreation organizations and municipal governments) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.

**REC-13**: In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., camping near stock ponds.)

**REC-14**: In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.

**REC-15**: In SRMAs, locate new developments for other resource uses to mitigate impacts to targeted recreation resources.

**REC-16**: Develop recreation facilities at primary access points that may include, but are not limited to, parking/staging areas that accommodate targeted users, vault toilets, informational kiosks, and shade shelters.

**REC-17**: Work with private landowners and recreationists to avoid trespass issues where public and private lands interface.

**REC-18**: Work with community partners and utility permit applicants to minimize the impact to recreation from utility developments in right-of-way corridors and/or Renewable Energy Emphasis areas (wind and solar) that overlap ERMAs and SRMAs.

**REC-19**: Use guidance from Best Management Practices for Lead at Outdoor Shooting Ranges (US Environmental Protection Agency 2005) in areas where intensive recreational target shooting occurs.

**REC-20**: Utilize Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado (BLM 2000).

**REC-21**: Utilize current BMPs and the Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado (BLM 2000) to reduce or eliminate impacts from recreation to the other natural and cultural resources listed in the objective above. This appendix describes BMPs current at the time of the RMP planning process. BMPs will likely evolve over the life of the RMP. Implementation of management actions should be based on the most current BMPs.

**REC-22**: In areas managed for multiple activities, support cooperative efforts by recreation users and other stakeholders that develop strategies promoting compatible interactions between recreation users (e.g., multi-user/interdisciplinary working groups).

***Recreation Information and Education***

**REC-23**: Provide clear, consistent, and standardized messaging to the public regarding recreation opportunities and regulations on BLM-administered lands. This messaging should be included in digital communications (e.g., websites and social media), print media (e.g., brochures and kiosk displays), signage, and personal contacts with recreation customers (e.g., office visits, phone calls, and field contacts).

**REC-24**: Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about targeted recreation opportunities in ERMAs and SRMAs.

**REC-25**: Clearly identify primary access points to recreation areas both onsite (e.g., signs and developed recreation facilities) and offsite (e.g., digital and print media and recreation service providers.)

**REC-26**: In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.

**REC-27**: Work with cooperators and partners to provide visitor information and education resources that help achieve area recreation management objectives and the objectives of adjoining or overlapping designations (e.g., WSAs, lands with wilderness characteristics units, Areas of Critical Environmental Concern (ACECs), wildlife emphasis areas, and recreation management areas [RMAs]).

**REC-28**: Work with managing partners (e.g., local clubs, businesses, and municipalities) to develop appropriate marketing strategies and informational materials (e.g., maps and brochures) that help achieve specific recreation management objectives.

**REC-29**: Clearly identify RMA/RMZ boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least-obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to contain use along portions of an RMZ boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.

**REC-30**: In areas where intensive recreational target shooting occurs, work with volunteers and managing partners to develop and communicate shooting range safety rules, etiquette, and stewardship messages.

**REC-31**: Promote the seven standard principles of Leave No Trace (www.lnt.org) outdoor ethics through print and electronic media and through personal communications with recreationists participating in non-motorized recreation activities on BLM-administered lands.

**REC-32**: Promote the principles of Tread Lightly (www.treadlightly.org) outdoor ethics, including the Respected Access campaign, through print and electronic media and through personal communications with recreationists participating in recreation activities on BLM- administered lands.

***Recreation Monitoring (Enforcement and Evaluation)***

**REC-33**: Special recreation permits will contain noxious weed management stipulations (e.g., pre-event inventories to avoid infested areas; event management to avoid or isolate activities that could cause weed introduction or spread, monitoring, and treatment of infestations exacerbated by the activity; and other appropriate noxious weed management stipulations).

**REC-34**: Lands may be temporarily closed to other uses during recreation events performed under special recreation permit (e.g., equestrian endurance rides or motorcycle events).

**REC-35**: In SRMAs, monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and recreation setting characteristics (RSCs) annually during the primary use season of mid-April through October.

**REC-36**: Manage recreation to minimize or prevent adverse effects to biological and cultural resources using the Recreation Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado (BLM 2000).

**REC-37**: Ensure all recreation management actions in areas overlapping ACECs help protect the relevance and importance criteria of those ACECs. Conduct social and physical monitoring to determine if recreation use is consistent with specific ACEC goals, objectives, and resource protection measures. Promote stewardship of ACEC resources by providing opportunities for visitors to learn about those resources.

**REC-38**: Adapt specific recreation regulations (e.g., camping stay limits) if monitoring indicates that recreation use is causing unacceptable resource damage or is compromising achievement of recreation or other resource use objectives.

**REC-39**: Coordinate with partner groups to complete resource monitoring requirements.

***Special Recreation Management Areas***

**REC-40**: In SRMAs, work with recreation users and other stakeholders to ensure protection of targeted activities, experiences, and outcomes.

**Bangs SRMA**

**Bangs RMZ 1** – Lunch Loops Community Recreation Area

**REC-41**: (Resource objective): Through the life of the RMP, manage the Bangs SRMA, RMZ 1, to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources:

Colorado hookless cactus (*Sclerocactus glaucus*), Grand Junction milkvetch (*Astragalus linifolius*), water quality (non-point source erosion/sedimentation into the Colorado River), soils, paleontological resources, and cultural resources.

**REC-42**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the Bangs SRMA, RMZ 1, during the planning process: lands and realty.

**REC-43**: Partnerships: Develop and maintain partnerships with local and regional recreation organizations and other community partners to assist in the maintenance and enhancement of RMZ routes, signs, facilities, and visitor services.

**REC-44**: BMPs for the Bangs SRMA, RMZ 1, (for both resource and resource use objectives) include, but are not limited to, the following:

- Work with stakeholders to create additional access to the RMZ.
- Work with stakeholders to acquire adjacent lands to be managed consistently with the RMZ and to increase targeted recreational opportunities.
- Work with partners (e.g., City of Grand Junction and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve RMZ objectives.
- Administer the RMZ cooperatively through a partnership agreement (example memorandum of understanding) between the City of Grand Junction and BLM GJFO that outlines administrative roles and responsibilities.
- Work with partners, local tourism groups, local businesses, and the City of Grand Junction to tailor information and maps to the needs and wants of local customers. Provide information at local outlets and onsite locations only.
- In SRMAs, locate new developments for other resource uses to mitigate impacts to recreation resources.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and

recreation setting characteristics (RSCs) annually during the primary use season of mid-April through October.

**Bangs RMZ 2**: Magellan – Tabeguache OHV Trails

**REC-45**: (Resource objective): Through the life of the RMP, manage the Bangs SRMA, RMZ 2, to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*), Grand Junction milkvetch (*Astragalus linifolius*), canyon tree frog (*Hyla arenicolor*), northern leopard frog (*Rana pipiens*), desert bighorn sheep, deer and elk winter range, water quality (non-point source erosion/sedimentation into the Gunnison and Colorado Rivers), soils, riparian resources, paleontological resources, and cultural (historic and prehistoric) resources.

**REC-46**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the Bangs SRMA, RMZ 2, during the planning process: livestock grazing.

**REC-47**: Partnerships: Develop and maintain partnerships with local and regional OHV organizations and other community partners to assist in the maintenance and enhancement of RMZ routes, signs, facilities and visitor services.

**REC-48**: BMPs for the Bangs SRMA, RMZ 2, (for both resource and resource use objectives) include, but are not limited to, the following:

- Work with stakeholders to create additional access to the RMZ.
- Work with stakeholders to acquire adjacent lands to be managed consistently with the RMZ and to increase targeted recreational opportunities.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create a sustainable recreational route system that helps achieve RMZ objectives.
- Work with partners, local tourism groups, local OHV clubs, local businesses, and the City of Grand Junction to develop appropriate marketing materials that meet RMZ management objectives.
- In cooperation with partner groups, monitor motorized routes through canyons (e.g., Billings Canyon) on an annual basis.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and

BLM_0024590

RSCs annually during the primary use season of mid-April through October.

**Bangs RMZ 3**: Mica Mine/Rough Canyon Outdoor Classroom

**REC-49**: (Resource objective): Through the life of the RMP, manage the Bangs SRMA, RMZ 3, to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*); Grand Junction milkvetch (*Astragalus linifolius*); significant plant communities, including West Slope Pinyon Woodland (*Pinus edulis-Juniperus osteosperma/Coleogyne ramosisima* Woodland); canyon tree frog (*Hyla arenicolor*); northern leopard frog (*Rana pipiens*); desert bighorn sheep; deer and elk winter range; water quality (non-point source erosion/sedimentation into the Gunnison and Colorado Rivers); soils; riparian resources; paleontological resources; and cultural (historic and prehistoric) resources.

**REC-50**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the Bangs SRMA, RMZ 3, during the planning process: mineral collecting, livestock grazing, and lands and real estate.

**REC-51**: Partnerships: Develop and maintain partnerships with local schools and community partner organizations to assist in the development, implementation, and maintenance of educational opportunities and facilities in the RMZ.

**REC-52**: BMPs for the Bangs SRMA, RMZ 3, (for both resource and resource use objectives) include, but are not limited to, the following:

- Ensure all management actions in the RMZ help protect the relevance and importance criteria of the Rough Canyon ACEC. Promote stewardship of the ACEC resources by providing opportunities for visitors to learn about those resources.
- Work with cooperators, partners, and local schools to provide curriculum-based, educational opportunities in this zone consistent with the management objectives of the RMZ and ACEC.
- Develop an interpretation and environmental education plan to enhance outdoor classroom opportunities in cooperation with local schools and visitors to the area.
- Conduct social and physical monitoring to determine if recreation use is consistent with the Rough Canyon ACEC goals, objectives, and resource-protection measures.

- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve RMZ and ACEC objectives.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

**Bangs RMZ 4** – Bangs Primitive Backcountry Zone:

**REC-53**: (Resource objective): Through the life of the RMP, manage the Bangs SRMA, RMZ 4, to minimize recreation impacts to other resources, with special consideration given to protection/ mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*), deer and elk winter range, water quality (non-point source erosion/ sedimentation into the Colorado River), soils, paleontological resources, and cultural (historic and prehistoric) resources.

**REC-54**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource use to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the Bangs SRMA, RMZ 4, during the planning process: livestock grazing.

**REC-55**: Partnerships: Develop and maintain partnerships with local and regional recreation organizations and other community partners to assist in the oversight and monitoring of the RMZ.

**REC-56**: BMPs for the Bangs SRMA, RMZ 4, (for both resource and resource use objectives) include, but are not limited to, the following:

- Work with stakeholders to acquire adjacent lands to be managed consistently with the RMZ and to increase targeted recreational opportunities.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

**Dolores River Canyons SRMA**

**REC-57**: (Resource objective): Through the life of the RMP, manage the Dolores River Canyons SRMA to minimize recreation impacts to other

resources, with special consideration given to protection/mitigation of the following resources: rare plants, including Kachina daisy (*Erigeron kachinensis*), Eastwood's monkeyflower (*Mimulus eastwooodiae*), San Rafael milkvetch (*Astragalus rafaelensis*), Fisher milkvetch (*Astragalus piscator*), Dolores River skeleton plant (*Lygodesmia doloresensis*), horseshoe milkvetch (*Astragalus equisolensis*), Grand Junction milkvetch (*Astragalus linifolius*), tufted frasera (*Frasera paniculatum*), Osterhout's cryptantha (*Cryptantha osterhoutii*), and Gypsum catseye; significant plant communities, including Foothills Riparian Shrubland (*Forestiera pubescens shrubland*) and Narrowleaf Cottonwood Riparian Forest (*Acer negundo – Populus angustifolia/ Celtis reticulate* Forest); (*Cryptantha gypsophila*); invasive non-native vegetation including Russian knapweed (*Acroptilon repens*) and tamarisk (*Tamarix* spp.); bald eagle (*Haliaeetus leucocephalus*); peregrine falcon (*Falco peregrinus*); deer and elk winter range; riparian resources; visual resources; paleontological resources; and cultural (historic and prehistoric) resources.

**REC-58**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource use to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the Dolores River Canyons SRMA during the planning process: gold prospecting, lands and realty (right-of-way corridor), and livestock grazing. In the portions of this RMZ that overlap the right-of-way corridor, manage recreation to achieve management objectives for the right-of-way corridor.

**REC-59**: Partnerships

- Develop and maintain partnerships with local and regional recreation organizations and other community partners to assist in the oversight and monitoring of the SRMA.
- Coordinate education and interpretation efforts to ensure consistency with Unaweep-Tabeguache Scenic and Historic Byway objectives and actions.

**REC-60**: BMPs for the Dolores River Canyons SRMA (for both resource and resource use objectives) include, but are not limited to, the following:

- Ensure all management actions in the SRMA help protect the relevance and importance criteria of the Dolores River Riparian ACEC and The Palisade ACEC. Promote stewardship of ACEC resources by providing opportunities for visitors to learn about those resources.
- Work with cooperators and partners to provide educational opportunities in the area that are consistent with the management objectives of the SRMA and ACECs.

- Develop an interpretation and environmental education plan to enhance educational/interpretive opportunities in cooperation with managing partners and visitors to the area.
- Conduct social and physical monitoring to determine if recreation use is consistent with ACEC goals, objectives, and resource protection measures.
- Work with community partners, and utility permit applicants to minimize the impact to recreation from utility developments in the right-of-way corridor.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve SRMA and ACEC objectives.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

**Grand Valley OHV SRMA**

**REC-61**: (Resource objective): Through the life of the RMP, manage the Grand Valley OHV SRMA to minimize recreation impacts in areas adjacent to the SRMA, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*), Grand Junction suncup (*Camissonia eastwoodiae*), Grand Junction buckwheat (*Eriogonum contortum*), water quality (salinity and non-point source erosion/sedimentation into the Colorado River), and Mancos soils.

**REC-62**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource use to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in the Grand Valley OHV SRMA during the planning process: lands and realty (right-of-way corridor, land acquisitions, and private property trespass) and livestock grazing. In the portions of this SRMA that overlap the right-of-way corridor, manage recreation to achieve management objectives for the right-of-way corridor.

**REC-63**: Partnerships

- Develop and maintain partnerships with local and regional recreation organizations, businesses, and other community partners to assist in the maintenance and enhancement of SRMA routes, signs, facilities, and visitor services identified as necessary for achievement of SRMA objectives.

- Coordinate with local governments, businesses, and other recreation tourism partners to develop and implement strategies for protecting water quality by reducing non-point sources of pollutants from the SRMA.

**REC-64**: BMPs for the Grand Valley OHV SRMA (for both resource and resource use objectives) include, but are not limited to, the following:

- Clearly identify primary access points to the SRMA both onsite (e.g., signs and developed recreation facilities) and offsite (e.g., digital and print media and recreation service providers.)
- Work with stakeholders to create additional access to the SRMA.
- Work with stakeholders to acquire adjacent lands to be managed consistently with the SRMA and to increase targeted recreational opportunities.
- Work with partners (e.g., State of Colorado, City of Grand Junction, and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.
- Work with partners, local tourism groups, local businesses, and municipalities to develop appropriate marketing information and maps to promote SRMA objectives.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

**North Fruita Desert SRMA**

**REC-65**: (Resource objective): Through the life of the RMP, manage the North Fruita Desert RMZ to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: mule deer and elk winter range, water quality (non-point source erosion/sedimentation into the Colorado River), and soils.

**REC-66**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the North Fruita Desert RMZ during the planning process: livestock grazing.

**REC-67**: Partnerships: Develop and maintain partnerships with local and regional recreation organizations and other community partners to assist in the

maintenance and enhancement of SRMA routes, signs, facilities, and visitor services.

**REC-68**: BMPs for the North Fruita Desert RMZ (for both resource and resource use objectives) include, but are not limited to, the following:

- Work with stakeholders to acquire adjacent lands to be managed consistently with the SRMA and to increase targeted recreational opportunities.
- Work with partners (e.g., Colorado Plateau Mountain Bike Trail Association, City of Fruita, and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create a sustainable recreational route system that helps achieve SRMA objectives.
- Reroute trails that create resource damage and/or trespass on private property.
- Consider administering portions of the SRMA (e.g., campground) cooperatively through partnership agreements with partner organizations or businesses.
- Work with local, regional, national, and international chambers of commerce, tourism groups, and businesses to provide accurate recreation information, user ethics, and use/user expectations, with an emphasis on promotional marketing.
- If monitoring indicates long-term camping is displacing targeted SRMA visitors, implement a seven-day camping limit.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

### Palisade Rim SRMA

**REC-69**: (Resource objective): Through the life of the RMP, manage the Palisade Rim SRMA to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: deer and elk winter range, Colorado hookless cactus (*Sclerocactus glaucus*), water quality (non-point source erosion/sedimentation into the Colorado River), soils, paleontological resources, and cultural resources.

**REC-70**: (Resource use objective): Through the life of the RMP, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in the Palisade Rim SRMA during the planning process: lands and realty (access across US Bureau of Reclamation withdrawal parcel), land acquisition, private property trespass). In the portions of the SRMA that overlap the right-of-way corridor, manage recreation to achieve right-of-way corridor management objectives.

**Rec-71**: Partnerships

- Develop and maintain partnerships with local and regional recreation organizations and other community partners to assist in the maintenance and enhancement of SRMA routes, signs, facilities, and visitor services.
- Coordinate with Town of Palisade, Orchard Mesa Irrigation District, US Bureau of Reclamation, and Colorado Department of Transportation to develop and/or maintain necessary recreation facilities and access.
- Coordinate with Town of Palisade and other service providers to appropriately market the SRMA to achieve SRMA objectives.

**REC-72**: BMPs for the Palisade Rim SRMA (for both resource and resource use objectives) include, but are not limited to, the following:

- Work with stakeholders to improve existing access and create additional access to the SRMA.
- Work with stakeholders to acquire adjacent lands to be managed consistently with the SRMA and to increase targeted recreational opportunities.
- Work with partners (e.g., Town of Palisade and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create a sustainable recreational route system that helps achieve SRMA objectives.
- Reroute, or close and naturalize trails that create resource damage and/or trespass on private property.
- Administer the SRMA cooperatively through partnership agreements (example memorandum of understanding) between the Town of Palisade, US Bureau of Reclamation, and Colorado

Department of Transportation, Orchard Mesa Irrigation District, and BLM GJFO that outline administrative roles and responsibilities.

- Work with partners, local tourism groups, local businesses and municipalities (Town of Palisade) to develop appropriate marketing information and maps to promote SRMA objectives.
- Monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

***Extensive Recreation Management Areas***

**REC-73**: In ERMAs managed for multiple activities, consider separating incompatible recreation uses in either time or space if conflict arises and warrants the change (e.g., different uses on different trails on different days and designating directional travel on system trails).

**REC-74**: Develop and maintain partnerships as appropriate with local residents, local and regional recreation organizations, businesses, local government agencies, and other community partners to assist in the maintenance and enhancement of routes, signs, facilities, monitoring, and visitor services that help achieve recreation objectives in ERMAs/RMZs.

**Barrel Springs ERMA**

**REC-75:** (Resource objective): Through the life of the plan, manage the Barrel Springs ERMA to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: deer and elk winter range, fragile and slumping soils, riparian habitat, paleontological resources, rare plants - Piceance Bladderpod (*Lesquerella parviflora*), and the following Significant plant communities: Montane Riparian Woodland (*Populus balsamifera* Woodland), Emergent Wetlands (*Eleocharis rostellata* Herbaceous Vegetation), Foothills Riparian Shrubland (*Betula occidentalis / Maianthemum stellatum* Shrubland).

**REC-76**: (Resource use objective): Through the life of the RMP, manage recreation in the Barrel Springs ERMA to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: fluid mineral leasing, livestock grazing, and lands and realty.

**REC-77**: BMPs for the Barrel Springs ERMA (for both resource and resource use objectives) include, but are not limited to, the following:

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management

strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.

- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the RMA's targeted recreation opportunities.
- In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., camping near stock ponds.)
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve ERMA objectives.
- Work with targeted recreation users and Colorado Parks and Wildlife to protect and enhance hunting opportunities in the ERMA.

**Gateway ERMA**

**REC-78**: (Resource objective): Through the life of the RMP, manage the Gateway ERMA to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: scenic values; wilderness characteristics; geological features; plant species of concern, including Gypsum Valley cateye (*Cryptantha gypsophila*), San Rafael milkvetch (*Astragalus rafaelensis*), Naturita milkvetch (*Astragalus naturitensis*), Grand Junction milkvetch (*Astragalus linifolius*); two significant plant communities, including Fremont's Cottonwood Riparian Forests (*Populus deltoides ssp. wislizeni / Rhus trilobata* Woodland) and Emergent Wetlands (*Eleocharis rostellata* herbaceous vegetation); deer and elk winter range; cliff-nesting raptors; cultural resources; and paleontological resources. The resources listed above are also identified for special management and protection in one or more of the following areas that the ERMA overlaps or is immediately adjacent to: Palisade WSA, Sewemup WSA , Maverick lands with wilderness characteristics unit, Unaweep Canyon lands with wilderness characteristics unit, Dolores River Riparian ACEC, Juanita Arch ACEC, The Palisade ACEC, Sinbad Valley ACEC, Unaweep Seep ACEC, Blue Mesa wildlife emphasis area, Bull Hill wildlife emphasis area, Calamity Camp National Historic Register site, and Dolores River Riparian SRMA.

**REC-79**: (Resource use objective): Through the life of the RMP, manage recreation in the Gateway ERMA to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: uranium exploration and mining, mineral material sales, and livestock grazing.

**REC-80**: BMPs for the Gateway ERMA (for both resource and resource use objectives) include, but are not limited to, the following:

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.
- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the ERMA's targeted recreation opportunities.
- In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., camping near stock ponds and parking on or near cultural sites.)
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.
- Work with partners (e.g., Museum of Western Colorado and Gateway Canyon Resort) to focus interpretive media and other educational efforts on cultural heritage tourism and the stewardship of natural and cultural resources.
- Work with cooperators and partners to provide educational opportunities in the area that are consistent with the management objectives of the ERMA and adjoining or overlapping WSAs, lands with wilderness characteristics units, ACECs, wildlife emphasis areas and SRMAs.
- Ensure all management actions in the ERMA help protect the relevance and importance criteria of the Dolores River Riparian ACEC, Juanita Arch ACEC, The Palisade ACEC, and Sinbad Valley ACEC. Promote stewardship of ACEC resources by providing opportunities for visitors to learn about those resources.
- Develop an interpretation and environmental education plan to enhance educational/interpretive opportunities in cooperation with managing partners and visitors to the area.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 335 of 499

- Work with managing partners to develop appropriate marketing strategies that help achieve the ERMA's objectives.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve ERMA objectives.

**Grand Valley Shooting Ranges ERMA**

**REC-81**: (Resource use objective): Through the life of the RMP, manage the Grand Valley Shooting Ranges ERMA to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*) and water quality (lead contamination and non-point source erosion/sedimentation into the Colorado River).

**REC-82**: (Resource use objective): Through the life of the RMP, manage recreation in the Grand Valley Shooting Ranges ERMA to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: livestock grazing and fluid mineral leasing.

**REC-83**: Partnerships

- Coordinate with community (Mesa County), state (Colorado Parks and Wildlife), and national (National Rifle Association) partners to maintain shooting range access, facilities (e.g., parking areas, fences/barriers, backstops, shade shelters, shooting benches, and chronograph pads), and visitor services (e.g., volunteer range stewards) that help achieve ERMA objectives.
- Work with partners to post conditions of use and facilitate activity participation.

**REC-84**: BMPs for the Grand Valley Shooting Ranges ERMA (for both resource and resource use objectives) include, but are not limited to, the following:

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.
- In ERMAs, Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education,

BLM_0024601

and enforcement patrols) to inform recreation participants about the RMA's targeted recreation opportunities.

- Use guidance from the Best Management Practices for Lead at Outdoor Shooting Ranges (US Environmental Protection Agency 2005)
- Locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.
- Work with volunteers and managing partners to develop and communicate shooting range safety rules, etiquette, and stewardship messages.

**Gunnison River Bluffs ERMA**

**REC-85**: (Resource objective): Through the life of the RMP, manage the Gunnison River Bluffs ERMA to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*), cliff-nesting raptors, paleontological resources, and cultural resources.

**REC-86**: (Resource use objective) Through the life of the RMP, manage recreation in the Gunnison River Bluffs ERMA to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: livestock grazing and lands and realty.

**REC-87**: BMPs for the Gunnison River Bluffs ERMA (for both resource and resource use objectives) include, but are not limited to, the following:

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.
- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the ERMA's targeted recreation opportunities.
- Work with partners (e.g., City of Grand Junction and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 337 of 499

- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve ERMA objectives.
- Administer the ERMA cooperatively through partnership agreements (example memorandum of understanding) between managing partners (e.g., Old Spanish Trail Association and Mesa County) and BLM GJFO that outline administrative roles and responsibilities.
- In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., trails near livestock developments or private residences.)
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.

**Horse Mountain ERMA**

**RMZ 1** – Horse Mountain Trails

**REC-88**: (Resource objective): Through the life of the RMP, manage the Horse Mountain ERMA, RMZ 1, to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*) and water quality (non-point source erosion/sedimentation into the Colorado River).

**REC-89**: (Resource use objective): Through the life of the RMP, manage recreation in the Horse Mountain ERMA, RMZ 1, to ensure a balance between protecting targeted recreation activities and settings with other resource uses. Consider the following resource uses: fluid mineral leasing and livestock grazing. In the portions of this RMZ that overlap the right-of-way corridor and Wind Energy Emphasis Area, manage recreation to achieve management objectives for those designations.

**REC-90**: Partnerships: Work with community partners (e.g., Town of Palisade, Mesa County, City of Grand Junction, local businesses, and private landowners) to plan and develop a trail system that helps achieve RMZ objectives.

**REC-91**: BMPs for the Horse Mountain ERMA, RMZ 1, (for both resource and resource use objectives) include, but are not limited to, the following:

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation

BLM_0024603

behavior that mitigates impacts to operations and facilities of other resource uses.

- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the RMZ's targeted recreation opportunities.
- Work with community partners, and utility permit applicants to minimize the impact to recreation from utility developments in the right-of-way corridor and Wind Energy Emphasis area that overlap the RMZ.
- Work with partners (e.g., Town of Palisade, City of Grand Junction and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve RMZ objectives.
- Administer the RMZ cooperatively through partnership agreements (example memorandum of understanding) between managing partners (e.g., Town of Palisade) and BLM GJFO that outline administrative roles and responsibilities.
- In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., trails near livestock developments or private residences.)
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.

**RMZ 2** – C Road OHV Open Area

**REC-92**: (Resource objective): Through the life of the RMP, manage the Horse Mountain SRMA, RMZ 2, to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*) and water quality (non-point source erosion/sedimentation into the Colorado River).

**REC-93**: (Resource use objective): Through the life of the RMP, manage recreation in the Horse Mountain SRMA, RMZ 2, to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: lands and realty (right-of-way corridor) and fluid mineral leasing. In the portions of this RMZ that overlap the

right-of-way corridor, manage recreation to achieve management objectives for the right-of-way corridor.

**REC-94**: BMPs for the Horse Mountain SRMA, RMZ 2, (for both resource and resource use objectives) include, but are not limited to, the following:

- Clearly identify OHV open area boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least-obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to contain use along portions of an open OHV area boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.
- Develop recreation facilities at primary access points that may include, but are not limited to, parking/staging areas that accommodate OHV-hauling rigs, OHV loading/unloading ramps, vault toilets, informational kiosks, and shade shelters.
- Clearly identify primary access points to the RMZ both onsite (e.g., signs and developed recreation facilities) and offsite (e.g., digital and print media and recreation service providers.)
- Work with partners, local businesses and municipalities to tailor information and maps to promote RMZ objectives.
- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.
- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the RMZ's targeted recreation opportunities.
- Work with adjoining landowners and users to minimize conflicts with private property.
- Work with community partners, and utility permit applicants to minimize the impact to recreation from utility developments in the right-of-way corridor where it overlaps the RMZ.

- Administer the RMZ cooperatively through partnership agreements (example memorandum of understanding) between managing partners and BLM GJFO that outline administrative roles and responsibilities.
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.

**RMZ 3** – Target Shooting

**REC-95**: (Resource objective): Through the life of the RMP, manage the Horse Mountain SRMA, RMZ 3, to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*) and water quality (lead contamination and non-point source erosion/sedimentation into the Colorado River).

**REC-96**: (Resource use objective): Through the life of the RMP, manage recreation in the Horse Mountain SRMA, RMZ 3, to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: fluid mineral leasing and livestock grazing. In the portions of this RMZ that overlap the right-of-way corridor, manage recreation to achieve management objectives for the right-of-way corridor.

**REC-97**: Partnerships

- Coordinate with community partners to maintain access and facilities (e.g., access roads, parking areas, fences/barriers, and signage), and visitor services (e.g., volunteers) that help achieve RMZ objectives.
- Work with partners to post conditions of use and facilitate activity participation.
- Work with adjoining landowners and users to minimize conflicts with private property.

**REC-98**: BMPs for the Horse Mountain SRMA, RMZ 3, (for both resource and resource use objectives) include, but are not limited to, the following:

- Clearly identify RMZ boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least-obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to

contain use along portions of the RMZ boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.
- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the RMA's targeted recreation opportunities.
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.
- Work with area residents, volunteers and managing partners to develop and communicate shooting safety rules, etiquette, and stewardship messages.

**North Desert ERMA**

**REC-99**: (Resource objective): Through the life of the RMP, manage the North Desert ERMA to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*), Grand Junction buckwheat (*Eriogonum contortum*), Grand Junction suncup (*Camissonia eastwoodiae*), Dolores River skeletonplant (*Lygodesmia doloresensis*); significant plant communities, including Saline Bottomland Shrublands (*Sarcobatus vermiculatus / Suaeda moquinii* Shrubland), Western Slope Grasslands (*Achnatherum hymenoides* Shale Barren Herbaceous Vegetation), Cold Desert Shrublands (*Atriplex confertifolia / Achnetherum hymenoides* Shrubland), Gardner's Mat Saltbush Shrublands (*Atriplex gardneri / Leymus salinus* Dwarf-shrubland), and Skunkbrush Riparian Shrubland (*Rhus trilobata* Shrubland); water quality (non-point source erosion/sedimentation into the Colorado River); Mancos Shale; saline soils; deer and elk winter range; and pronghorn.

**REC-100**: (Resource use objective): Through the life of the RMP, manage recreation in the North Desert ERMA to ensure a balance between protecting targeted recreation activities and settings with other resource uses. In this area, consider the following resource uses: coal leasing, mineral material sales, fluid mineral leasing, and livestock grazing. In the portions of this RMZ that overlap the right-of-way corridor and Solar Energy Emphasis Areas (Mitchell Road and 21 Road), manage recreation to achieve management objectives for those designations.

**REC-101**: Develop and maintain partnerships with local and regional OHV recreation organizations and other community partners to assist in the maintenance and enhancement of ERMA routes, signs, facilities, and visitor services.

**REC-102**: BMPs for the North Desert ERMA (for both resource and resource use objectives) include, but are not limited to, the following:

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.
- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (i.e., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about the ERMA's targeted recreation opportunities.
- Work with community partners, and utility permit applicants to minimize the impact to recreation from utility developments in the right-of-way corridor and Solar Energy Emphasis areas that overlap the ERMA.
- Work with partners (e.g., City of Fruita, City of Grand Junction, and Mesa County) to develop connectivity to adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.
- Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see **Appendix M**) to create and maintain a sustainable recreational route system that helps achieve ERMA objectives.
- Administer the ERMA cooperatively through partnership agreements (example memorandum of understanding) between managing partners (e.g., City of Fruita, City of Grand Junction, and Mesa County) and BLM GJFO that outline administrative roles and responsibilities.
- In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., trails near livestock developments or private residences.)
- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2000. Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado. BLM, Colorado State Office, Lakewood, CO. Internet Web site: http://www.blm.gov/co/st/en/BLM_Information/ newsroom/2000/recguidefnr/guide_final.html.

______. 2005. Trail Design Criteria. BLM, Grand Junction Field Office, Grand Junction, CO.

______. 2010. Guidelines for a Quality Built Environment, First Edition. December 2010.

______. 2014. Trail Development Process. (in progress). Unpublished report. BLM, Grand Junction Field Office, Grand Junction, CO.

US Environmental Protection Agency. 2005. Best Management Practices for Lead at Outdoor Shooting Ranges, EPA-902-B-01-001 Revised June 2005. US Environmental Protection Agency, Region 2, Denver, CO.

## Lands and Realty (LR)

### Standard Operating Procedures

**LR-1**: Power lines shall be constructed in accordance to standards outlined in Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996 (Avian Power Line Interaction Committee 2006). Right-of-way applicants shall assume the burden and expense of proving that proposed pole designs not shown in the above publication are "raptor safe." Such proof shall be provided by a raptor expert approved by the BLM Authorized Officer.

**LR-2**: Rights-of-way and other lands and realty authorizations, including power lines, pipelines, transmission corridors, energy development sites and related development, and gravel pits, will contain noxious and invasive plant management terms or stipulations for all ground-disturbing actions. These will include conducting a pre-disturbance noxious weed inventory, designing to avoid or minimize vegetation removal and weed introduction or spread, managing weeds during the life of the right-of-way or authorization to prevent or minimize weed introduction or spread, abandoning the right-of-way or authorization to establish competitive vegetation on bare ground areas, and monitoring revegetation success and weed prevention and control for a reasonable number of years.

**LR-3**: Rights-of-way will be constructed to avoid physical damage to range improvements and rangeland study areas.

BLM_0024609

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 344 of 499

**LR-4**: The right-of-way holder shall notify the BLM Authorized Officer at least 48 hours prior to the commencement construction, reclamation, maintenance, or any surface-disturbing activities under this grant.

**LR-5**: Copies of the right-of-way grant with the stipulations shall be kept on site during construction and maintenance activities. All construction personnel shall review the grant and stipulations before working on the right-of-way or permitted area.

**LR-6**: All facilities shall be labeled with the authorization number, operator, and contact information.

**LR-7**: No signs or advertising devices shall be placed on the premises or on adjacent BLM-administered lands, except those posted by or at the direction of the BLM Authorized Officer.

**LR-8**: The Holder shall promptly remove and dispose of all waste caused by its activities. The term "waste" as used herein means all discarded matter including, but not limited to, human waste, trash, garbage, refuse, petroleum products, ashes, and equipment. No burning of trash, trees, brush, or any other material shall be allowed.

**LR-9**: The Proponent (applying for new right-of-way) shall notify all existing right-of-way holders in the project area prior to beginning any surface-disturbance or construction activities. The Holder shall obtain an agreement with any existing right-of-way holders or other parties with authorized facilities that cross or are adjacent to those of the holder to assure that no damage to an existing right-of-way or authorized facility will occur. The agreement(s) shall be obtained prior to any use of the right-of-way or existing facility.

**LR-10**: The Holder shall participate in the formation of a Road User's Association for the road if new rights-of-way are granted for use of the existing road. All new users will be required to join the association.

**LR-11**: The Holder will provide a performance bond for the authorized facility, acceptable to the BLM Authorized Officer, in the amount of $(_) that must be maintained in effect until restoration of the right-of-way has been accepted by the BLM Authorized Officer. The bond shall be furnished by the holder within 30 days of signing the grant (_) and shall be applied to all additional authorizations associated with the project as necessary.

**LR-12**: Incorporate conditions of approval and mitigation measures from the Final Programmatic EIS on Wind Energy Development on BLM-administered Lands in the Western US (BLM 2005), as applicable.

**LR-13**: Incorporate conditions of approval and mitigation measures from the Solar Energy Programmatic EIS, as applicable (BLM 2012).

BLM_0024610

**LR-14**: All construction activities shall be confined to the minimum area necessary. The exterior boundaries of the construction area shall be clearly flagged prior to any surface-disturbing activities.

**LR-15**: Existing roads will be used wherever possible. Additional roads shall be kept to the minimum. Route locations must be approved by the BLM prior to construction.

**LR-16**: When blasting is necessary, the following precautions will be used:

a) In areas of human use, blasting blankets will be used.

b) Landowners or tenants in close proximity to the blasting will be notified in advance of the blasting so that livestock and other property can be adequately protected.

c) Access to the blasting area will be restricted by construction personnel stationed at each end of the area to be blasted.

d) Blasting within 0.25-mile of federally owned or controlled springs and flowing water wells must be approved in writing by the area manager.

e) No blasting will be permitted within 0.25-mile of historic trails, natural areas, identified archaeological sites, and recreation areas.

f) Powder magazines will be located out of sight or at least 0.5-mile from roads. Loaded shot holes will not be left unattended. Approval from the area manager will be obtained for the magazine locations.

**LR-17**: **(MLP)** Roads will be constructed and maintained to BLM road standards [BLM Manual 9113 (BLM 2011a)]. All vehicle travel will be within the approved driving surface.

***Standard Operating Procedures for Pipeline Projects***

**LR-18**: A preconstruction field conference shall be requested by the grantee at least five working days prior to any construction activities unless otherwise agreed upon by the BLM Authorized Officer.

**LR-19**: Once the pipeline is constructed, the grantee/operator shall restore the existing roadway to meet or exceed conditions prior to construction. The preconstruction width of the driving surface shall also be restored and erosion-control structure installed subject to approval of the BLM Authorized Officer. The grantee/operator shall be responsible for road maintenance from the beginning to completion of operations. This may include, but not be limited to, blading the roadway, cleaning ditches and drainage facilities, dust abatement, or other requirements as directed by the BLM Authorized Officer.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 346 of 499

**LR-20**: Construction width shall include the existing road. The pipeline shall be located two to three feet from the edge of the ditch along the existing road. The existing road shall be on the working side of the trench.

**LR-21**: The grantee shall accomplish the crossing of the pipeline owned by (company name) in accordance with an agreement between the grantee/operator.

**LR-22**: Pipeline location warning signs shall be installed within five days of construction completion. Each sign shall be permanently marked with the right-of-way serial number.

***Standard Operating Procedures for Geophysical Exploration***

**LR-23**: The operator will furnish a map with the Notice of Intent showing approximate line to be used. A map will also be filed with the Notice of Completion showing the completed line. The map will be of a minimum scale of 0.5-inch equals 1.0 mile.

**LR-24**: Rehabilitation of disturbed areas is to be done concurrent with the geophysical operations.

**LR-25**: Blasting or vibrating within 0.25-mile of federally-owned or controlled springs and flowing water wells or cultural resource sites must be approved in writing by the area manager.

**LR-26**: Plugging of drill holes will conform to the Colorado Reclamation Standards Abandoned Drill Holes Act. Drill hole cuttings will be returned to the hole.

**LR-27**: No blading or other dirt work will be allowed without written permission from the area manager.

**LR-28**: Adhere to Standard Terms and Conditions described in BLM Handbook H-3150-1: Onshore Oil and Gas Geophysical Exploration Surface Management Requirements (BLM 1994).

### Best Management Practices

**LR-29**: Coordinate with the Colorado Parks and Wildlife early in the sale process on proposals to sell BLM-administered land encumbered by a small-capacity wildlife water development.

### References

Avian Power Line Interaction Committee. 2006. Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996. Edison Electric Institute, Avian Power Line Interaction Committee, and the California Energy Commission. Washington, DC, and Sacramento, CA.

BLM (US Department of the Interior, Bureau of Land Management). 1994. Handbook H-3150-1—Onshore Oil and Gas Geophysical Exploration Surface Management Requirements. BLM, Washington, DC. Revised 2007.

______. 2005. Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western US. BLM, Washington, DC. June 2005.

______. 2011a. Manual 9113—Roads Manual. BLM, Washington, DC.

______. 2011b. Handbook H-9113-1—Road Design Handbook. BLM, Washington, DC.

______. 2012. Approved Resource Management Plan Amendments/Record of Decision for Solar Energy Development in Six Southwestern States. BLM, Washington, DC. October 2012.

## Minerals and Energy (M&E)

Actions involving minerals and energy are governed by:

- Minerals Leasing Act of 1920 (30 US Code 181 et seq.);
- Federal Oil and Gas Royalty Management Act (30 US Code 1718[b]);
- Federal Onshore Oil and Gas Leasing Reform Act (30 US Code 226[g]);
- 43 CFR 8900 et seq.
- Federal On Shore Orders 1-7
- 43 CFR 3809 regulations (Locatable Minerals Management)

### Standard Operating Procedures

SOPs are measures that are required in most circumstances. Some are based on laws and policy, while others are specific to the planning area to achieve resource management objectives.

#### *Geophysical Exploration*

**M&E-1**: If operations open an existing fence, temporary gates will be installed for use during the course of operations, or the fence will be immediately repaired. On completion of operations, fences will be restored to their original condition or better.

**M&E-2**: When saturated soil conditions exist on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads, and locations.

**M&E-3**: For geophysical operations, specialized low surface impact equipment (e.g., wide- or balloon-tired vehicles or all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**M&E-4**: Prohibit the use of subsurface explosives and vibrosis buggies within 0.25-mile of all spring sources and perennial streams.

**M&E-5**: Powder magazines will be located at least 1.0 mile from traveled roads, unless otherwise authorized after analysis or review. Loaded shot holes and charges will be attended at all times.

**M&E-6**: Materials or equipment related to project activities (e.g., trash, flagging, and lath) will be removed to an authorized disposal site.

**M&E-7**: Project materials which could be a hazard to public health, safety, or resource values will be stored in appropriate secondary containment. No oil or lubricants will be drained onto the ground surface.

**M&E-8**: Shot-hole cuttings will be returned to the hole, or an alternative plan will be submitted for BLM approval.

***Reducing Fluid Mineral Development Footprint***

**M&E-9**: Surface-disturbing actions will be sensitive to natural resource protection. When surface disturbance in sensitive areas is unavoidable, they will be minimized to the greatest extent practicable, especially near drainage features and on soils mapped as being saline (see **Glossary**).

**M&E-10**: Utilities such as gas and water lines, power lines, and roads will be located in common corridors where practicable.

***Administrative / General and Planning***

**M&E-11**: **(MLP)** Consider site specific soil and vegetative characteristics and reclamation potential in project design and layout.

**M&E-12**: **(MLP)** Design and construct energy service roads to a safe and appropriate standard, no higher than necessary to accommodate their intended use.

**M&E-13**: **(MLP)** Locate and construct roads and other linear facilities to follow the contour of the landform or mimic lines in the vegetation.

**M&E-14**: **(MLP)** A pre-construction meeting will be held with the BLM before and to facilitate implementation of plans and ensure compliance with stipulations or conditions of approval. The BLM will be notified at least 48 hours prior to construction or reclamation work.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 349 of 499

**M&E-15**: By November 1 each year, companies will provide georeferenced spatial data depicting as-built locations of all facilities, wells, roads, pipelines, power lines, reservoirs, discharge points, and other related facilities to the BLM for all Master Development Plans where construction and development have been completed.

**M&E-16**: Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game.

**M&E-17**: Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan (storm water management plan) for establishing positive management of surface water drainage, to reduce erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance and reporting. BMPs may include run-on/run-off controls such as surface pocking or revegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

**M&E-18**: **(MLP)** Before surface disturbance, agreements will be obtained with all existing rights-of-way holders, authorized users and pipeline operators affected by permitted activities. If agreement cannot be reached, the operator will comply with the law or regulations.

**M&E-19**: Disclosure of hydraulic fracture fluids per Colorado Oil and Gas Conservation Commission rule 205A will be done using www.FracFocus.org 30 days following the conclusion of the hydraulic fracturing treatment and in no case later than 90 days after the commencement of such hydraulic fracturing treatment.

***Pre-Construction***

**M&E-20**: Stakes, snow fence, or flagging will be installed to mark boundaries of permitted areas of disturbance, including pre-construction BMPs and soils storage areas, and be maintained in place until final construction cleanup is completed.

**M&E-21**: **(MLP)** Pre-construction drainage BMPs will be installed as appropriate, per the approved surface/storm drainage water management plan to protect stream drainages and to reduce erosion and sediment transport.

**M&E-22**: **(MLP)** Surveys for raptor nests, sensitive plant, and animal species and cultural resources will be conducted prior to construction activities following BLM survey standards. Survey results will be submitted to the BLM for analysis and recommendations before project approval.

BLM_0024615

***Construction***

**M&E-23**: **(MLP)** All routes shall be built and maintained to BLM Manual 9113 (BLM 2011a) standards for road shape and drainage features or where appropriate BLM Manual 9115 (BLM 2012a) standards for primitive roads. For drainage crossings, culverts should be sized for the 50-year storm event with no static head and to pass a 100-year event without failing. Site specific conditions may warrant BLM to require designs for larger events (e.g., 75- to 100-year storm events). Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009a). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**M&E-24**: As detailed in the site plan for surface/storm water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales, or catchments.

**M&E-25**: **(MLP)** Topsoil stripping will include all growth medium present at a site (e.g., following initial clearing of large trees), as indicated by color or texture. Stripping and storage depth may be specified during the onsite inspection. All stripped topsoil /growth medium will be salvaged, segregated, and stored in a manner that extends biological viability and protects it from loss. Topsoil and all growth medium will be replaced prior to seedbed preparation. No topsoil will be stripped or segregated when soils are saturated or frozen below the stripping depth.

**M&E-26**: **(MLP)** Access roads requiring construction with cut-and-fill will minimize surface disturbance and consider the character of the landform's contours, visual contrasts, the cut materials, the depth of cut, where the fill material will be deposited, and other resource concerns.

**M&E-27**: **(MLP)** Fill material will not be cast over hilltops or into drainages without BLM approval.

**M&E-28**: **(MLP)** When saturated soil conditions existing on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads, and locations.

**M&E-29**: **(MLP)** Construction activities at drainage crossings (e.g., burying pipelines and installing culverts) will be timed to avoid high-flow conditions. Construction activities that affect stream flow will consist of either a piped stream diversion or the use of a coffer dam and pump to divert flow around the disturbed area.

**M&E-30**: **(MLP)** When activity in a wetland is unavoidable, the operator will reduce impacts through the use of oak or high-density polyethylene (HDP) mats and will restore all temporarily disturbed wetlands or riparian areas, consulting with the BLM to determine appropriate mitigation, including verification of native plant species to be used in restoration.

**M&E-31**: **(MLP)** All stream crossings affecting perennial streams or streams supporting riparian habitat shall be professionally engineered (design, construction, and maintenance).

**M&E-32**: **(MLP)** Where the access road crosses small drainages and intermittent streams not requiring culverts, low-water crossings shall be used. The road will dip to the original streambed elevation of the drainage and the crossing will prevent any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

**M&E-33**: **(MLP)** All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support federal or state-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe and remotely-actuated block or check valves on both sides of the stream may be used.

**M&E-34**: **(MLP)** Water from hydrostatic testing of pipelines will be filtered of sediments prior to discharge. Energy dissipating methods such as straw-bales, wattles, and vegetative buffers will be in place before any discharge of water.

**M&E-35**: **(MLP)** Baseline information of channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

***Drilling***

**M&E-36**: **(MLP)** Pits that may contain liquid, such as reserve pits, produced water pits, frac-water pits, cuttings trenches (if covered by water/fluid), and evaporation pits, will install and maintain netting to prevent entry or use by migratory birds. They will be fenced on three sides before drilling activity and closed off on the fourth side after drilling is completed.

**M&E-37**: If any pit that may contain liquid is constructed with a slope steeper than 3:1, or if the pit is lined, escape ramps will be installed every 50 feet along the pit slope and at each corner to allow escape by livestock and wildlife.

**M&E-38**: Fluids will be confined to pits and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

**M&E-39**: Pits will be constructed so that water will not run into them. Fluid levels will be maintained below two feet of the lowest point of containment.

***Utilization and Production***

**M&E-40**: Operations will not damage, disrupt or interfere with water flows and/or improvements associated with springs, wells, or impoundments.

**M&E-41**: Regularly scheduled road maintenance will include, but not be limited to, crown or slope reconstruction, clean-out of ditches, culverts and catchments, replacement of the road surface, and dust abatement.

**M&E-42**: Well pads and facilities will be kept free of unnecessary equipment, trash, and other materials not in current use.

**M&E-43**: Pits will be promptly drained, tested, closed, and reclaimed according to local state and federal regulations.

**M&E-44**: Dust from vehicular traffic, equipment operations, or wind events will be controlled as needed. No application of surfactants or dust agents will proceed without BLM approval. In areas with soils mapped as Mancos shale, application of water on native road surfaces will be limited to minimize mobilization of selenium. In such areas, alternate dust-abatement measures such as proper road surfacing and maintenance, and speed limits will be used, subject to BLM approval.

**M&E-45**: Noise will be minimized by methods such as closed compressor buildings to comply with Colorado Oil and Gas Conservation Commission standards for noise.

**M&E-46**: **(MLP)** Pipeline warning signs permanently marked with the operator's and owner's names (emergency contact) and purpose (product) of the pipeline will be installed within five days of construction completion and before use of the pipeline for transportation of product.

**M&E-47**: All production equipment with a chimney, vent, or stack shall be fitted with a device to prevent birds from entering or perching on the chimney, such as an excluder cone or equivalent.

**M&E-48**: Production facilities will be located and arranged to facilitate safety and maximize areas to be reclaimed.

**M&E-49**: **(MLP)** All above-ground facilities should be painted a natural color selected from the BLM Standard Environmental Color Chart to minimize contrast with adjacent vegetation and/or rock outcrops. Color(s) should be selected in the field at the proposed project location and should be planned for the season with the greatest number of viewers. Selected color(s) should be one to two shades darker than those naturally occurring in the background

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 353 of 499

landscape (this will also help with the effects of fading over time). The operator may need to paint drill rig anchors and those minor working tips and edges of production facilities that are subject to Occupational Safety and Health Administration safety requirements a red, yellow, or orange color.

**M&E-50**: Standard secondary containment shall hold 110 percent of the capacity the largest single tank it contains and be impervious to any oil, glycol, produced water, or other toxic fluid for 72 hours. Earthen berms must be compacted and of fine material that will prevent seepage of any spill to surrounding area.

**M&E-51**: All tanks with a capacity of ten barrels or greater shall be labeled or posted with the following information: A. Name of operator; B. Operator's emergency contact telephone number; C. Tank capacity; D. Tank contents; and E. National Fire Protection Association label. Smaller chemical storage shall be labeled with contents and National Fire Protection Association label.

**M&E-52**: All liquids management hoses will be stored inside secondary containment when not in use.

**M&E-53**: **(MLP)** All open top tanks, catchments or secondary containment vessels will be equipped with sturdy metal screening to prevent access to wildlife of all sizes to prevent entrapment and drowning of small wildlife.

***Site Stabilization, Reclamation and Monitoring***

**M&E-54**: Road and pipeline reclamation, including seedbed preparation and seeding of temporarily disturbed areas, will be completed within 30 days following completion of construction.

**M&E-55**: **(MLP)** Following completion of pad construction, topsoil storage piles, stormwater control features, and cut-and-fill slopes will be temporarily seeded to stabilize the materials, maintain biotic soil activities, and minimize weed infestations. When this is not feasible, disturbed surfaces must be stabilized using other methods like hydro-mulch or erosion matting while vegetation is establishing. Seedbed preparation is not generally required for topsoil storage piles or other areas of temporary seeding.

**M&E-56**: Interim reclamation includes recontouring and revegetating the entire portion of the disturbed area, except that part of the well pad needed for production activities.

a) It will be completed within six months following completion of the last well planned for the pad or after a year has passed with no new wells drilled on the pad. All areas unnecessary to production activities will be revegetated, including the area within the remaining rig anchors. In special cases, an exception to this will be requested.

BLM_0024619

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 354 of 499

b) Before interim reclamation is scheduled, the operator will meet with BLM to inspect the disturbed area, review the existing reclamation plan, and agree upon any revisions to it.

c) All parts of the area unnecessary for long-term operations will be reshaped to blend with natural topography, covered evenly with topsoil, and a seedbed prepared.

d) For cut-and-fill slopes, initial reclamation will typically consist of moving fill material back into cuts, back-filling, and reshaping to achieve the configuration specified in the reclamation plan. Compacted areas will be well ripped in two passes at perpendicular directions. In fragile or loose soils, compaction techniques such as tread-walking may be necessary to prevent high erosion hazard. Topographic contours will be reshaped to blend with natural topography. These may include berms and swales to manage water drainage, support revegetation, mitigate visual impacts, and maximize natural appearances.

**M&E-57**: Seedbed Preparation. Good seedbed preparation is key to soil stabilization, moisture infiltration, and improving the chances for revegetation success.

a) Following contouring, backfilled or ripped surfaces will be covered evenly with topsoil.

b) Within 24 hours of broadcast seeding, the spread topsoil will be roughened by a method such as pitting, raking, or harrowing before seeding to break up any crust that has formed and ensure good seed-to-soil contact.

c) To control erosion and enhance vegetative establishment on slopes steeper than 3:1, or to create a more natural looking landscape in areas of visual sensitivity, seedbed preparation may include pocking or pitting the soil material to form microbasins scaled to the site and materials. These microbasins will be constructed in irregularly spaced and irregularly aligned rows with an orientation perpendicular to the natural flow of runoff down a slope.

d) Requests to use soil amendments, including fertilizer and soil conditioners, will be submitted to the BLM for approval. Submittal will include basic information on the amendment and the purpose of its use.

**M&E-58**: Seed Mixes. Seed mixes will typically consist of native, early-succession species, or species with the ability to establish quickly in disturbed soil areas. Non-native species considered desirable under special circumstances, such as sterile non-native grasses, will be submitted to the BLM for approval before use.

BLM_0024620

a)  Seed mix composition will be calculated based on the number of Pure Live Seed per pound rather than percentage by weight. Seeding rate in pounds per acre will be based on the total number of Pure Live Seeds per square foot.

b)  Weed free seed will be used. It will contain no noxious, prohibited, or restricted weed seeds and no more than 0.5 percent by weight of any other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended. To maintain quality, purity, germination, and yield, only tested, certified seed for the current year, with a minimum germination rate of 80 percent and a minimum purity of 90 percent, will be used unless otherwise approved by BLM in advance of purchase. Seed shall be viability-tested in accordance with state law(s) and within nine months before purchase.

c)  Seed mixes for temporary use may contain one or more sterile hybrid grasses or other non-native cover crop in addition to native perennial species, if pre-approved by BLM.

d)  For private surfaces, BLM-approved seed mixes will be recommended, but the surface landowner has ultimate authority over the seed mix to be used in reclamation.

e)  Seed tags or other official documentation of the seed mix will be supplied to the BLM for approval at least 14 days before the date of proposed seeding. Seed that does not meet the above criteria will not be applied to BLM-administered lands. A Sundry Notice describing the completed work, the weed-free certification, and the seed tag(s) will be submitted BLM within 30 days after seeding.

**M&E-59**: Seeding Procedures

a)  Seeding will be conducted no more than 24 hours following completion of final seedbed preparation (see Seedbed Preparation).

b)  Where practical, seed will be planted by drill-seeding to a depth of 0.25- to 0.5-inch along the contour of the site. Drill seeding will be followed by culti-paction to enhance seed-to-soil contact and prevent losses of both. Where drill-seeding is impracticable, seed may be installed by broadcast-seeding at twice the drill-seeding rate, followed by raking or harrowing to provide 0.25- to 0.5-inch of soil cover. Hydro-seeding and hydro-mulching may be used in temporary seeding or in areas where drill-seeding or broadcast-seeding/ raking are impracticable. Hydro-seeding and hydro-mulching must be conducted in two separate applications to ensure adequate seed-to-soil contact.

c) If interim revegetation is unsuccessful, reseedings will be repeated annually until satisfactory vegetative cover has been achieved. Requirements for reseeding of temporary areas will be considered on a case-by-case basis. Seeding will be considered successful when the site is protected from erosion and revegetated with a vigorous, self-sustaining, and diverse cover of native (or otherwise approved) plant species. The BLM shall not require reseeding during periods that have proven less than optimal.

**M&E-60**: Mulch

a) Mulch will be applied within 24 hours following completion of seeding. Where areas have been drill- or broadcast-seeded and raked, certified weed-free straw or certified weed-free native grass hay mulch will be crimped into the soil. Hydro-mulching may be used in areas of interim reclamation where crimping is impractical, in areas of interim reclamation that were hydroseeded, and in areas of temporary seeding regardless of seeding method.

b) Mulch will not be applied in areas where erosion potential necessitates use of a biodegradable erosion-control blanket (straw matting).

**M&E-61**: Cut-and-fill slopes will be protected against erosion by contour grading, microbasins, or other measures approved by the BLM. Well-anchored BMPs such as biodegradable matting, weed-free bales, or wattles may also be used on cut-and-fill slopes and along drainages to protect against soil movement.

**M&E-62**: The reclaimed pad will be protected from disturbance by a fence to exclude livestock grazing for the first two growing seasons or until seeded species are firmly established, whichever comes later. Seeded species will be considered firmly established when perennial grass and forb species are at least 80 percent cover of that of the surrounding or reference area.

**M&E-63**: Monitoring. Because weed and reclamation management activities are components of a long-term process, monitoring and reporting are integral to and long-term commitment to land health.

a) All sites considered as "operator reclamation in progress" will be routinely monitored for reclamation success. Reports will be submitted to the BLM by December 1 of each year. Annual reports will include whether accomplishment of objectives appears likely and of not, what corrective actions are proposed.

b) All sites will be routinely monitored for the presence of noxious weeds or other undesirable plant species as set forth in the joint BLM/US Department of Agriculture, Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators.

Pesticide use proposals will be approved by the BLM before application of herbicides. Annual weed monitoring reports shall be submitted to the BLM by December 1. They will include weed species found (listed by common names), total acres infested with weeds, total acres treated, treatment methods, and total pounds of active ingredient of pesticides applied. All Noxious Weed Inventory and Pesticide Application records for that year will be included with the report.

**M&E-64**: Visual Resources

a) Every proposal will include a detailed, site-specific description and plan of how it will meet the Visual Resource Management Class of the area where it is proposed. As much as possible all proposed features will be located and placed to avoid or minimize visibility from travel corridors, residential areas, and other sensitive observation points.

b) To the extent practical, existing vegetation shall be preserved when clearing and grading for pads, roads, and pipelines. Cleared trees and rocks may be salvaged for redistribution over reshaped cut-and-fill slopes or along linear features.

c) Above-ground facilities will be painted a non-reflective natural color selected to minimize contrast with adjacent vegetation or rock outcrops. Colors may be specified by the BLM on a project-by-project basis.

d) Adaptive management techniques may be applied before or after construction to mitigate straight-line visual contrast effects of pad margins, cut-and-fill slopes, pipeline alignments, or other cleared vegetation. This could include additional tree removal along contrasting edges to create irregularly shaped openings or more natural-looking mosaic patterns, or treating surfaces to mitigate visual contrasts in color or surface texture.

### Best Management Practices

BMPs are adaptive state-of-the-art mitigation measures applied on a site-specific basis to reduce, prevent, or avoid adverse environmental or social impacts. Numerous BMPs for oil and gas development are also incorporated into the general oil and gas development requirements. These include minimizing the number and size of pads through use of multiple well designs and directional drilling, centralizing hydraulic fracturing and water management, minimizing road footprints, centralizing support facilities such as tank batteries, collocating utilities and pipelines in common corridors and aligning them along roadways, and implementing intensive interim reclamation practices. The BLM encourages applicants to include in their proposals BMPs such as those identified. If not, BLM will likely require them. Actual BMPs proposed or required during the

permitting process to mitigate impacts are expected to vary according to technologies and site-specific needs. BMPs will also be expected to change over the life of a project, being adaptively updated in response to monitoring and changing project conditions. Additional practices could be required, withdrawn, or modified in response to changing activities or future planning. Such adaptive changes to BMPs may generally be implemented without further review or land use planning, but will be analyzed during the NEPA analysis associated with the permitting process. Monitoring and adaptive management practices will help to refine and clarify needed BMPs, consistent with the goals and objectives of this RMP.

The listed BMPs are not intended to be complete, but rather to offer operators and resource staff examples of commonly used methods to reduce impacts that sometimes result when fluid mineral development occurs. More fluid mineral development BMPs can be found at www.blm.gov/bmp.

***Geophysical Exploration***

**M&E-65**: Specialized low surface impact equipment (e.g., wide- or balloon-tired vehicles or all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**M&E-66**: **(MLP)** Pre-mobilization inspection will be performed to insure that all construction equipment and vehicles are clean and free of weeds, weed seed, soil, and vegetative material prior to moving onto BLM-administered lands. Driving through or parking on noxious weed infestations will be avoided.

***Reducing Fluid Mineral Development Footprint***

**M&E-67**: **(MLP)** The operator will co-locate multiple wells on well pads and use directional drilling to reduce the number of pads and roads.

**M&E-68**: **(MLP)** The operator will use centralize completions to reduce the number of truck trips, expense, exhaust emissions, and fugitive dust.

**M&E-69**: **(MLP)** To minimize construction disturbance, truck traffic, dust, and other impacts to air quality, soils, and wildlife, centralized production facilities will be used for all natural gas liquids and produced water.

**M&E-70**: **(MLP)** Telemetry will be used to remotely monitor producing wells and facilities to reduce vehicular traffic. During winter closures, unavoidable monitoring and or maintenance activities will be conducted between 9 a.m. and 3 p.m., to the extent practical.

***Administrative / General and Planning***

**M&E-71**: **(MLP)** To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes, and side cuts across steep

slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**M&E-72**: **(MLP)** Drilling will be done with closed-loop systems as much as possible, particularly in areas where water resources are most vulnerable, including soils mapped as alluvial, colluvial, and glacial deposits; near springs and perennial water sources; in important groundwater recharge areas; and within municipal watersheds.

**M&E-73**: **(MLP)** Chemicals used in the fracturing process will be biodegradable, non-toxic, pH neutral, residual free, non-corrosive, non-polluting, and non-hazardous in the forms and concentrations being used. Documentation in the form of Material Safety Data Sheets will be reviewed by operator for compliance prior to use, and Material Safety Data Sheets will remain on site at all times such chemicals are present.

**M&E-74**: **(MLP)** In municipal watersheds, the operator will develop and implement a Watershed Protection Plan. This plan will characterize baseline hydrologic and hydrogeologic conditions such as, but not limited to, water chemistry, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater. The operator will collaborate with all watershed stakeholders in development of the plan.

**M&E-75**: **(MLP)** Adopt BMPs per the BLM and US Department of Agriculture, Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM and US Department of Agriculture, Forest Service 2007).

**M&E-76**: Incorporate BMPs and conditions of approval from the Final Programmatic EIS for Geothermal Leasing in the Western US (BLM and US Department of Agriculture, Forest Service 2008), as applicable.

***Pre-Construction***

**M&E-77**: **(MLP)** Pre-mobilization inspections will be performed to ensure that all construction equipment and vehicles are clean and free of soils, weeds, weed seed, and vegetative material prior to moving onto BLM-administered lands. Driving through or parking on noxious weed infestations will be avoided.

***Construction***

**M&E-78**: **(MLP)** Surface-disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book) (BLM 2007b).

**M&E-79**: **(MLP)** Where feasible, entrances to construction locations will be covered by gravel "track pads" to prevent sediment and weed seeds from being tracked in and out of the site.

**M&E-80**: **(MLP)** In areas of mapped Mancos Shale, saline soils, or fragile soils, groundwater will not be discharged to surface water drainages to minimize mobilization and transport of selenium, salts, and sediment within the Colorado River Basin.

**M&E-81**: **(MLP)** Where linear disturbance is proposed, edges of vegetation removal will be feathered to avoid long linear habitat edges and support habitat complexity for wildlife. Additional trees will be removed along such edges to create irregularly shaped openings and more natural mosaic habitat.

**M&E-82**: **(MLP)** Cleared vegetation smaller than four inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than four inches in diameter will be scattered over disturbed areas to accomplish reclamation objectives. Excessive vegetation larger than four inches in diameter may be removed from BLM-administered land or shredded in place to be salvaged with topsoil. A wood cutting permit will be purchased from BLM for material removed from the site.

**M&E-83**: **(MLP)** Windrowing of Topsoil. [Use where appropriate based on topography – may not be appropriate for pads in steep areas or where pad size should be minimized.] Topsoil shall be windrowed around the perimeter of surface disturbance to create a berm that limits and redirects stormwater runoff and extends the viability of the topsoil per BLM Topsoil Best Management Practices (BLM 2009b PowerPoint presentation available upon request from the Grand Junction Field Office). Topsoil shall also be windrowed, segregated, and stored along disturbed surfaces or linear features for later spreading across the disturbed corridor during final reclamation. Topsoil berms shall be promptly seeded to maintain soil microbial activity, reduce erosion, and minimize weed establishment.

**M&E-84**: **(MLP)** Cattle guards will be installed and maintained whenever access roads intersect existing gates or fences.

***Drilling***

**M&E-85**: **(MLP)** Catalytic converters will be installed on all internal combustion engines to minimize emissions to Tier 3 levels.

**M&E-86**: Hazardous substances will not be used in drilling, testing, or completion operations or introduced at any time into the reserve or cuttings pit.

***Utilization and Production***

**M&E-87**: **(MLP)** Secondary containment shall include a study corrugated metal wall to create a basin, be lined with a heavy impervious poly liner, and be protected with a gravel surface. Small hoppers or drip pans shall be installed at all loadout connections to catch drips and small leaks.

**M&E-88**: When special resource values are at risk, such as crucial wildlife areas, companies controlling access into these areas will gate and lock roads or restrict use to authorized users.

**M&E-89**: Speed control measures will be in place on all project-related unpaved roads to reduce fugitive dust.

**M&E-90**: **(MLP)** Use enclosed tanks instead of open tanks or pits to reduce fugitive VOC emissions.

**M&E-91**: **(MLP)** Use vapor recovery units on oil, condensate, and produced water storage tanks to reduce fugitive VOCs and recovers British thermal unit-rich vapors for sale or use on site.

**M&E-92**: **(MLP)** Use and maintain proper hatches, seals, and valves to minimize VOC emissions.

**M&E-93**: **(MLP)** Optimize glycol circulation and install flash tank separator to capture methane and reduce VOC emissions on glycol dehydrators.

**M&E-94**: **(MLP)** Replace wet seals with dry seals in centrifugal compressors. Centrifugal wet seal compressor emissions from the seal oil degassing vent can be reduced by the replacement of wet seals with dry seals that emit less methane and have lower power requirements.

**M&E-95**: Reduce gas leaks and emissions from reciprocating compressors by the economic replacement of rod packing at frequent intervals.

**M&E-96**: Reduce methane and VOC emissions by installing or replacing high-bleed pneumatic devices with low-bleed pneumatic devices.

**M&E-97**: Reduce methane emissions by installing plunger lifts and smart automation systems which monitor well production parameters.

**M&E-98**: Implement a Direct Inspection and Monitoring Program that identifies and cost effectively fixes fugitive gas leaks using leak detection, infrared camera, organic vapor analyzer, soap solution, ultrasonic leak detectors, measurement, calibrated bagging, rotameters, and/or high volume samplers.

***Site Stabilization, Reclamation and Monitoring***

**M&E-99**: **(MLP)** During interim reclamation, contour land forming will be used to create a visual barrier to the permanent structures location on the site.

**M&E-100**: **(MLP)** Re-topsoil and revegetate access road cut-and-fill slopes, backslopes and road shoulders, and borrow ditches. Also, revegetate the travel surface of surfaced roads and turnarounds, where practical. With low-traffic roads, this will result in a hardpan, two-track road that is stable and requires less maintenance.

### References

BLM (US Department of the Interior, Bureau of Land Management). 1992. Handbook H-3042-1—Solid Minerals Reclamation. Release 3-275. BLM, Washington, DC. February 2, 1992. 104 pp.

______. 2002. Handbook H-3600-1—Mineral Materials Disposal. Release 3-315. BLM, Washington, DC. February 22, 2002. 171 pp.

______. 2009a. Handbook H-9112-1—Bridges and Major Culverts Handbook. BLM, Washington, DC.

______. 2009b. Topsoil Best Management Practices. Microsoft PowerPoint presentation. Unpublished report. BLM, Grand Junction Field Office, Grand Junction, CO.

______. 2011a. Manual 9113—Roads Manual. BLM, Washington, DC.

______. 2011b. Handbook H-9113-1—Road Design Handbook. BLM, Washington, DC.

______. 2012a. Manual 9115—Primitive Roads Manual. BLM, Washington, DC.

BLM (US Department of the Interior, Bureau of Land Management) and US Department of Agriculture, National Forest Service. 2007a. Noxious and Invasive Weed Management Plan for Oil and Gas Operators: Grand Junction Field Office and Grand Valley Ranger District. BLM, Grand Junction Field Office, Grand Junction, CO. March 2007.

______. 2007b. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

______. 2008. Record of Decision, Programmatic Environmental Impact Statement for Geothermal Leasing in the Western US – Appendix B. BLM, Washington Office, Washington, DC. December 2008.

## RENEWABLE ENERGY (RE)

### Standard Operating Procedures

**RE-1**: Authorize rights-of-way by applying appropriate BMPs from the BLM Record of Decision for Implementation of a Wind Energy Development Program (BLM 2005), land use restrictions, stipulations, and mitigation measures.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2005. Record of Decision for Implementation of a Wind Energy Development

BLM_0024628

Program and Associated Land Use Plan Amendments. BLM, Washington, DC. December 15, 2005.

## TRANSPORTATION AND ACCESS (TA)

### Standard Operating Procedures

**TA-1**: Continue coordination with counties and other agency road entities to promote utilization of BMPs for road maintenance they perform within GJFO boundaries. Maintain an inventory of existing road and trail systems.

**TA-2**: **(MLP)** BLM Manual 9113 (BLM 2011a) and BLM Handbook 9113-2 (BLM 2011b) will be used to guide all maintenance and road construction designs and requirements. Include definitions for functional road classification and maintenance levels for BLM roads.

**TA-3**: All highway rights-of-way and other road authorizations will contain noxious and invasive weed stipulations that include prevention, inventory, treatment, and revegetation or rehabilitation. Road abandonment will include at least three years of post-abandonment monitoring and treatment.

**TA-4**: All travel management decisions will concur with the BLM GJFO Travel Management Plan (see **Appendix M**).

### Best Management Practices

**TA-5**: In order to ensure public access and safety, the GJFO shall continue an active road maintenance program employing the use of redesign, blading, brush removal for sight distance as appropriate, scarification, graveling, water barring, low water crossings, spur ditching, seeding, and installation/cleaning of culverts.

**TA-6**: NEPA Requirements. No new NEPA analysis will be required for road maintenance activities within the defined maintenance disturbance/easement footprint, which is defined as previously disturbed or maintained. Disturbance outside of the defined maintenance disturbance/easement footprint or road realignment will be subject to additional NEPA compliance.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2011a. Manual 9113—Roads Manual. BLM, Washington, DC.

______. 2011b. Handbook H-9113-2—Roads National Inventory and Condition Assessment Guidance and Instructions. BLM, Washington, DC.

______. 2011c. Handbook H-9113-1—Road Design Handbook. BLM, Washington, DC.

## RECLAMATION (R)

The objectives of interim reclamation are to restore vegetative cover and a portion of the landform sufficient to maintain healthy, biologically active topsoil; control erosion; and minimize loss of habitat, forage, and visual resources during the life of the well or facilities.

The long-term objective of final reclamation is to return the land to a condition approximating that which existed prior to disturbance. This includes restoration of the landform and natural vegetative community, hydrologic systems, visual resources, and wildlife habitats. To ensure that the long-term objective will be reached through human and natural processes, standards will be enforced to meet objectives for site stability, visual quality, hydrological function, and vegetative productivity.

### Standard Operating Procedures

**R-1**: A reclamation plan will be provided to the BLM with the original proposed action or when activities are needed. The plan will follow the BLM Colorado Northwest District Template for Reclamation Plans (BLM 2012). Reclamation plans will discuss interim and final reclamation activities. The plan will include provisions for:

a) Reclamation timeline

b) Pre-disturbance planning recommendations if applicable

c) Vegetation monitoring plan

d) Stabilization and stormwater

e) Dust abatement

f) Vegetation clearing

g) Topsoil management

h) Pit closures, if applicable

i) Recontouring and seedbed preparation

j) Application of topsoil and revegetation

k) Fencing

l) Management of invasive, noxious, and non-native species

### Best Management Practices

**R-2**: Trees and vegetation will be left along the edges of the pads whenever feasible to provide screening.

**R-3**: **(MLP)** To help mitigate the contrast of recontoured slopes, reclamation will include measures to feather cleared lines of vegetation and to save and redistribute cleared trees, debris, and rock over recontoured cut-and-fill slopes.

**R-4**: To reduce the view of production facilities from visibility corridors and private residences, facilities will not be placed in visually exposed locations (such as ridgelines and hilltops).

**R-5**: Production facilities will be clustered and placed away from cut-and-fill slopes to allow the maximum recontouring of cut-and-fill slopes.

**R-6**: **(MLP)** All long-term above ground structures will be painted [Covert Green] (from the BLM Supplemental Environmental Colors chart) to blend with the natural color of the late summer landscape background.

**R-7**: Projects should be located to take advantage of existing vertical features, such as landforms or existing stands of vegetation to provide visually screening.

**R-8**: **(MLP)** Projects should not be located in visually exposed locations, such as ridgelines and hilltops.

**R-9**: **(MLP)** Projects should be located in areas that will minimize the amount of cut-and-fill needed to meet natural grade.

**R-10**: **(MLP)** Linear disturbances (roads and pipelines) should follow the natural contours of the landscape as much as possible.

**R-11**: Project design should take into consideration any existing vegetation surrounding the project that can be used for visual screening. Care should be taken to preserve the integrity of the vegetation, and the vegetation should remain standing and undamaged when the cut-and-fill slopes are recontoured.

**R-12**: **(MLP)** Thinning and feathering of existing vegetation may also be used in areas where clearing within dense vegetation is required. Thinning and feathering will reduce the hard line between new construction and existing vegetation and will emulate the forms of natural clearings.

**R-13**: **(MLP)** Production facilities should be placed to maximize recontouring of the cut-and-fill slopes and interim reclamation. Facilities should be oriented in the direction that is least visually obtrusive and should be clustered to reduce the overall impact and the area that will need to be visually mitigated. Facilities should be located away from the cut-and-fill slopes and, if possible, near the access road or entrance to the pad to maximize the total surface area that can be reclaimed.

**R-14**: **(MLP)** Cut-and-fill slopes should be recontoured to the approximate original contour or consistent with the adjacent topography so that the reclaimed landscape features blend into the natural surroundings.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 366 of 499

**R-15**: **(MLP)** Berms may be utilized to provide visual screening but should be used only when viewing the surrounding natural environment and should blend with the adjacent topography.

**R-16**: **(MLP)** Cleared vegetation and rocks salvaged during construction should be salvaged and redistributed over reshaped cut-and-fill slopes or along linear features to emulate the color and texture closer to that of the natural landscape and to help create microclimates to encourage vegetation growth. The material should be placed so that it appears to be naturally deposited.

**R-17**: **(MLP)** Above-ground facilities should be painted a natural color selected from the BLM Standard Environmental Color Chart to minimize contrast with adjacent vegetation and/or rock outcrops. Color(s) should be selected in the field at the proposed project location and should be planned for the season with the greatest number of viewers. Selected color(s) should be one to two shades darker than those naturally occurring in the background landscape (this will also help with the effects of fading over time).

**References**

BLM (US Department of the Interior, Bureau of Land Management). 2012. Draft BLM Colorado Northwest District Template for Reclamation Plans. Unpublished report.

BLM_0024632

# Appendix I
## Cultural Resource Allocation to Use Categories

BLM_0024633

BLM_0024634

# APPENDIX I
# CULTURAL RESOURCES ALLOCATION TO USE CATEGORIES

Allocations to Use Categories are made in land use plans and may be applied to both individual properties and classes of properties. Categorizing cultural resources according to their potential uses is a result of the identification process and a tool for protection and utilization decisions. The following tables identify the suitable uses for cultural properties by considering the properties' characteristics, condition, setting, location, and accessibility, and their perceived values and potential uses. This allocation list is based on available cultural information used to prepare the Class I Cultural Resource Overview and as such is a "snap-shot", where the data record was current to March 2009.

**Table I-1**, Relationship Among Use Categories, National Register Eligibility, and Preservation/National Register Nomination, serves as a general guide to consider the relationship between National Register evaluation and allocation to use categories. In addition each category includes a description of the criteria used to evaluate the sites. As previously recorded sites are reevaluated and newly recorded sites are received these criteria will be use to assign allocation. Previous allocations may be reevaluated and revised using these, as appropriate, when circumstances change or new data become available thus precluding the need for a plan amendment (BLM Manual 8110, Identifying and Evaluating Cultural Resources, Section .41, Allocation to Use Categories [BLM 2004]).

The following defines use categories for sites in the Grand Junction Field Office RMP planning area. Italicized sections are quoted from BLM Manual 8110, Identifying and Evaluating Cultural Resources (BLM 2004).

**Table I-1**
**Relationship Among Use Categories, National Register Eligibility, and Preservation/National Register Nomination**

| Cultural Resource Use Category | National Register Eligibility | Preservation/National Register Nomination |
|---|---|---|
| Scientific Use | Usually eligible | Long-term preservation not critical; medium National Register nomination priority |
| Conservation for Future Use | Always eligible | Long-term preservation is required; highest nomination priority |
| Traditional Use | May be eligible | Long-term preservation is desirable; nomination priority is determined in consultation with the appropriate cultural group(s). |
| Public Use | Usually eligible | Long-term preservation is desirable; high nomination priority |
| Experimental Use | May be eligible | Long-term preservation is not anticipated; low nomination priority. |
| Discharged from Management | Not eligible | Long-term preservation and management are not considerations; nomination is inappropriate |

Source: BLM 2004

## I.1 Scientific Use

*This category applies to any cultural property determined to be available for consideration as the subject of scientific or historical study at the present time, using currently available research techniques. Study includes methods that would result in the property's physical alteration or destruction. This category applies almost entirely to prehistoric and historic archaeological properties, where the method of use is generally archaeological excavation, controlled surface collection, and/or controlled recordation (data recovery). Recommendations to allocate individual properties to this use must be based on documentation of the kinds of data the property is thought to contain and the data's importance for pursuing specified research topics. Properties in this category need not be conserved in the face of a research or data recovery (mitigation) proposal that would make adequate and appropriate use of the property's research importance.*

Additional criteria can be applied in consideration of assigning Isolated Finds to this category. Unless otherwise determined at the time of submitting a project to the SHPO IFs will be allocated to Scientific use. When allocating IFs recorded in the past one should consider the following:

- Some isolated finds represent a period in prehistory where little is known, in the RMPPA this applies to Paleoindian artifacts.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 371 of 499

- IFs have been recorded where the environmental setting is conducive to a prehistoric ground surface being preserved, where the site is actually at a depth not discernible by surface inventory and the few artifacts recorded on the surface as an IF are the result of mechanical or biological displacement. These isolates may actually represent sites and therefore may be included in this category. These cultural resources would require sub-surface inventory (trench or other surface disturbing construction monitoring) as mitigation for any surface disturbing projects or evaluative testing for proposed actions that would remove them from federal ownership (e.g. lease or exchanges).
- In the past some isolated prehistoric features or historic sites, were recorded as Isolated Finds when they should have been recorded as sites. These need to be reevaluated if they are in the Area of Potential Effect or if they meet a particular research proposal.

One thousand five hundred seventy-four (1,574) cultural resources are allocated to this category which includes 27 isolated features/isolated finds (see **Table I-2**, Scientific Use Sites, at the end of this appendix).

## I.2 Conservation for Future Use

*This category is reserved for any unusual cultural property which, because of scarcity, a research potential that surpasses the current state of the art, singular historic importance, cultural importance, architectural interest, or comparable reasons, is not currently available for consideration as the subject of scientific or historical study that would result in its physical alteration. A cultural property included in this category is deemed worthy of segregation from all other land or resource uses, including cultural resource uses, that would threaten the maintenance of its present condition or setting, as pertinent, and will remain in this use category until specified provisions are met in the future. No additional criteria were applied.*

Four (4) cultural resources are allocated to this category as a primary allocation and three sites with this use allocation as a secondary use (see **Table I-3**, Conservation for Future Use Sites, at the end of this appendix).

## I.3 Traditional Use

*This category is to be applied to any cultural resource known to be perceived by a specified social and/or cultural group as important in maintaining the cultural identity, heritage, or well being of the group. Cultural properties assigned to this category are to be managed in ways that recognize the importance ascribed to them and seek to accommodate their continuing traditional use. Although a few cultural resources have been attributed to Shoshone and Navajo in the Grand Junction Field Office, most protohistoric and historic Native American Indian sites are affiliated to the Ute. The Ute have a generalized concept of spiritual significance that is not easily transferred to Western models or definitions. As such the BLM recognizes that they have identified sites that are of concern because of their association with Ute occupation of the area*

BLM_0024637

*as part of their traditional lands. These sites include wickiup camps and open camps with definitive Ute occupation (associated to Ute rock art, artifact assemblages and/or trails), isolated Ute rock art, Culturally Modified Trees (e.g. scarred and prayer trees) and Ceremonial features (e.g. eagle traps, vision circles, and special structures). This list is in no way intended to be a comprehensive list and may continue to grow through consultation.*

Traditional Use sites with known associated burials will have a secondary allocation to Conservation Use, precluding the disturbance of these sites or the option of mitigation of these sites through data recovery. Other sites that are identified through consultation as inappropriate for Scientific or Public Use would also have a secondary allocation to Conservation Use to further emphasize the protection of the site. Consultation would be required to assign a secondary use prior to authorizing actions at a Traditional Use. Examples of this situation would be secondary allocation to Public use in response to a request to use a site for a heritage tourism or recreation opportunity (e.g. rock art or trails) or secondary allocation to Scientific use and a request to conduct any evaluative testing (excavation of small test units that are under the threshold that would require consultation under an ARPA permit) or using a rock art site to conduct a field school to teach rock art recording. At the current time there are no anticipated projects that would qualify a secondary use allocation of Experimental Use at a Traditional Use site. If there is such a proposal in the future it would require consultation and unless it was something proposed or approved by a tribe it would not be authorized.

One hundred thirty-five (135) cultural resources are allocated to this category (see **Table I-4**, Traditional Use Sites, at the end of this appendix).

## I.4 PUBLIC USE

*This category may be applied to any cultural property found to be appropriate for use as an interpretive exhibit in place, or for related educational and recreational uses by members of the general public. The category may also be applied to buildings suitable for continued use or adaptive use, for example as staff housing or administrative facilities at a visitor contact or interpretive site, or as shelter along a cross-country ski trail.*

Sites allocated to public use often require the completion of scientific investigation and preparation and accommodations for public health and safety prior to being made available for public use. Their allocation to this category is only the first step in this process. In many cases sites may not meet National Register criteria but they are part of the historic landscape and may be important to residents and for heritage tourism.

Prehistoric and historic routes, trails, abandoned railroad grades, and roads, may be assigned to Public Use category. Where these segments are accessible to the public and could be used or are currently used for travel/transportation the method of use will be appropriate to their National Register eligibility, the effect

of the proposed use (is it consistent with the historical use of the property?) and will be designated through Travel Management. Active railroads are assigned to this category. Historic mining sites are allocated to this use as a primary use. Visual integrity needs to be considered when projects are proposed by the Abandoned Mine Lands program where reclamation for public health and safety is the priority. The criterion of visual historic landscape for Public Use allocation is also applied to cabins, homesteads, and other ranching/agricultural sites. Also included in this category are sites that as an overall site type may not be appropriate for "use by the general public". One example of this type of allocation is the functioning irrigation ditches, canals, and other water control features. As a whole the irrigation systems are what made the settlement and agricultural development of areas in the RMPPA possible, and they contribute to the development of the historic landscape, but alone we may be managing only a segment of ditch across an isolated BLM parcel. They are interpretable and in some locations may even be appropriate for on-site information; this is the rationale for their designation to Public Use.

Ninety-five (95) cultural resources are allocated to this category (see **Table I-5**, Public Use Sites, at the end of this appendix).

## I.5 Experimental Use

*This category may be applied to a cultural property judged well suited for controlled experimental study, to be conducted by BLM or others concerned with the techniques of managing cultural properties, which would result in the property's alteration, possibly including loss of integrity and destruction of physical elements. Committing cultural properties or the data they contain to loss must be justified in terms of specific information that would be gained and how it would aid in the management of other cultural properties. Experimental study should aim toward understanding the kinds and rates of natural or human caused deterioration, testing the effectiveness of protection measures, or developing new research or interpretation methods and similar kinds of practical management information. It should not be applied to cultural properties with strong research potential, traditional cultural importance, or good public use potential, if it would significantly diminish those uses.*

A group of sites that have been officially determined not eligible to the National Register have been allocated to this use through the plan. They are located in a variety of environments and represent sites that have been affected by grazing, mechanical vegetation treatments, wildland fire, and recreation development. If there are new research proposals outside of studying the effects of these impacts, or proposals where these sites would not meet the research needs a research plan would be required. Other conditions for archaeological research may apply. In the past it was common to completely surface collect sites, leaving no visible trace of the site. Decades later these sites may have new surface evidence. Another case is where there are sites in depositional environments where the setting is conducive to a prehistoric ground surface being preserved, where the site is actually at a depth not discernible by surface inventory and the

few artifacts on the surface are the result of mechanical or biological displacement. A cultural management plan needs to be prepared to identify sites that would fit this experimental category with a secondary use of Scientific. Findings would result in a reallocation based on the site's new determined potential.

Seventy-nine (79) cultural resources are allocated to this category (see **Table I-6**, Experimental Use Sites, at the end of this appendix).

## I.6 Discharged from Management

*This category is assigned to cultural properties that have no remaining identifiable use. Most often these are prehistoric and historic archaeological properties, such as small surface scatters of artifacts or debris, whose limited research potential is effectively exhausted as soon as they have been documented. Also, more complex archaeological properties that have had their salient information collected and preserved through mitigation or research may be discharged from management, as should cultural properties destroyed by any natural event or human activity. Properties discharged from management remain in the inventory, but they are removed from further management attention and do not constrain other land uses. Particular classes of unrecorded cultural properties may be named and described in advance as dischargeable upon documentation, but specific cultural properties must be inspected in the field and recorded before they may be discharged from management.*

Archives (site record, cultural plat, database entry, and curation if applicable) continue to be maintained for all Discharge Use category sites. Isolated Finds are not automatically allocated to this category. This category should not be used to retire an assigned site number based on a lack of information in the original site recording. It should be used as a management decision for sites that the BLM has managed in the past that now meet the following criteria: 1) they have been removed from federal ownership either through land exchange, lease patent, or removal of a patent reservation; 2) they have been totally excavated; 3) they are destroyed to a point that no physical evidence remains (e.g. a wooden fence is burned in a fire or a flood removes all traces of a site). This is not meant to be an exhaustive list of events that could lead to this allocation but is meant to guide future decisions for discharge use. Justification should always become part of the record for a discharge use site.

Seven (7) cultural resources are allocated to this category (see **Table I-7**, Sites Discharged from Management, at the end of this appendix).

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5GF.1051 | | Mining | Need data (F) | Book Cliffs | |
| 5GF.1055 | Sheltered camp | | Not eligible (F) | Book Cliffs | |
| 5GF.1056 | | Habitation/ homestead | Not eligible (F) | Grand Valley | |
| 5GF.1063 | Open camp | | Not Eligible (O) | Book Cliffs | |
| 5GF.1065 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5GF.1067 | Isolated feature-hearth | | Not eligible (F) | Roan Creek | |
| 5GF.1068 | Isolated feature-hearth | | Not eligible (O) | Roan Creek | |
| 5GF.1074 | Sheltered camp | | Need data (F) | Book Cliffs | |
| 5GF.1075 | | Habitation/ homestead | Not eligible (F) | Book Cliffs | |
| 5GF.1076 | | Habitation/ homestead | Need data (F) | Book Cliffs | |
| 5GF.1077 | Open camp | | Not eligible (F) | Roan Creek | |
| 5GF.1079 | Sheltered camp | | Need data (F) | Book Cliffs | |
| 5GF.1081 | Open lithic | | Need data (F) | Roan Creek | |
| 5GF.1082 | Open lithic | | Need data (F) | Roan Creek | |
| 5GF.1083 | Open camp | | Need data (F) | Roan Creek | |
| 5GF.1084 | Isolated find – Paleoindian | | Not Eligible (F) | Grand Valley | |
| 5GF.1124 | Open lithic | | Need data (F) | Roan Creek | |
| 5GF.1127 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5GF.1130 | | Farm/ranch | Not eligible (F) | Book Cliffs | |
| 5GF.114 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1152 | | Isolated feature | Not eligible (F) | Book Cliffs | |
| 5GF.1155 | | Farm/ranch | Not eligible (F) | Book Cliffs | |
| 5GF.116 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1171 | Open camp | | Need data (F) | Grand Valley | |
| 5GF.1204 | Open camp | | Eligible (F) | Book Cliffs | |
| 5GF.1223 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5GF.1335 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5GF.1336 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1337 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5GF.1340 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1341 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1342 | Open lithic | | Need data (F) | Book Cliffs | |
| 5GF.1343 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1344 | Open lithic | | Need data (F) | Book Cliffs | |
| 5GF.1345 | Open lithic | | Need data (F) | Book Cliffs | |
| 5GF.1346 | Open camp | | Need data (F) | Book Cliffs | |
| 5GF.1347 | Sheltered camp | | Need data (F) | Book Cliffs | |
| 5GF.1348 | Sheltered camp | | Need data (F) | Book Cliffs | |
| 5GF.1349 | Sheltered camp | | Need data (F) | Book Cliffs | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5GF.1443 | | Isolated feature | Not eligible (F) | Roan Creek | |
| 5GF.1444 | | Isolated feature | Not eligible (F) | Roan Creek | |
| 5GF.1459 | Open camp | | No assessment | Book Cliffs | |
| 5GF.1475 | | Camp | Not eligible (F) | Grand Valley | |
| 5GF.1550 | | Farm/ranch | Not Eligible (O) | Book Cliffs | |
| 5GF.157 | Sheltered lithic | | Not eligible (F) | Book Cliffs | |
| 5GF.1589.1 | | Road | Not Eligible (O) | Roan Creek | |
| 5GF.174 | Open lithic | | Eligible (F) | Roan Creek | |
| 5GF.183 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5GF.221 | | Trash scatter/ dump | Not eligible (F) | Book Cliffs | |
| 5GF.222 | | Camp | Not Eligible (O) | Book Cliffs | |
| 5GF.223 | | Camp | Not eligible (F) | Book Cliffs | |
| 5GF.224 | Open camp | | Not eligible (F) | Book Cliffs | |
| 5GF.225 | Open camp | | Need data (F) | Grand Valley | |
| 5GF.226 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5GF.2292 | Open camp | | Eligible (O) | Grand Valley | |
| 5GF.2293 | Open camp | | Eligible (O) | Grand Valley | |
| 5GF.2701 | Open camp | | Eligible (F) | Grand Valley | |
| 5GF.271 | Sheltered lithic | Trash scatter/ dump | Not Eligible (O) | Book Cliffs | |
| 5GF.274 | Open camp | | Not eligible (F) | Book Cliffs | |
| 5GF.2785 | | Trash scatter/ dump | Not Eligible (O) | Roan Creek | |
| 5GF.2797 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5GF.283 | | Farm/ranch | Not eligible (F) | Book Cliffs | |
| 5GF.284 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5GF.2947 | | Rock feature | Not eligible (F) | Roan Creek | |
| 5GF.3101 | Isolated find – Paleoindian | | Not Eligible (F) | Book Cliffs | |
| 5GF.3183 | Open camp | | Eligible (O) | Roan Creek | |
| 5GF.3184 | Open camp | | Eligible (O) | Roan Creek | |
| 5GF.3234 | | Isolated feature | Not eligible (F) | Roan Creek | |
| 5GF.345 | Open lithic | | No assessment | Roan Creek | |
| 5GF.3577 | Open lithic | | Need data (O) | Book Cliffs | |
| 5GF.3579 | Open lithic | | Not Eligible (O) | Book Cliffs | |
| 5GF.3672 | | Habitation/ homestead | Not Eligible (O) | Roan Creek | |
| 5GF.3876 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5GF.3877 | Open lithic | Farm/ranch | Not eligible (F) | Grand Valley | |
| 5GF.3878 | Open lithic | | Eligible (F) | Grand Valley | |
| 5GF.3879 | Open camp | | Eligible (F) | Grand Valley | |
| 5GF.3880 | Open camp | | Eligible (F) | Grand Valley | |
| 5GF.395 | | Building | Not Eligible (O) | Book Cliffs | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5GF.3951 | Open lithic | | Not eligible (F) | Book Cliffs | |
| 5GF.399 | | Camp | Not eligible (F) | Book Cliffs | |
| 5GF.403 | | Camp | Not eligible (F) | Grand Valley | |
| 5GF.4048 | Open camp | | Not eligible (F) | Roan Creek | |
| 5GF.4049 | Open camp | | Need data (F) | Roan Creek | |
| 5GF.4230 | Open camp | | Eligible (F) | Roan Creek | |
| 5GF.4243 | Open architectural | Brush Fence | Not Eligible (O) | East Salt Creek, Book Cliffs | Public Use |
| 5GF.4244 | Isolated feature | | Eligible (F) | Grand Valley | |
| 5GF.435 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5GF.442 | Open lithic | | Need data (F) | Roan Creek | |
| 5GF.443 | Open camp | | Need data (F) | Roan Creek | |
| 5GF.454 | Open lithic | | Not eligible (F) | Book Cliffs | |
| 5GF.487 | | Habitation/ homestead | Not eligible (F) | Roan Creek | |
| 5GF.622 | | Inscription | Need data (F) | Book Cliffs | |
| 5GF.640 | | Farm/ranch | Eligible (O) | Book Cliffs | |
| 5GF.641 | | Rock feature | Not eligible (F) | Book Cliffs | Public Use |
| 5GF.741 | Sheltered camp | | Need data (O) | Book Cliffs | |
| 5GF.745 | | Logging | Not eligible (F) | Roan Creek | |
| 5GF.826 | | Camp | Not eligible (F) | Roan Creek | |
| 5GF.841 | Open camp | | Need data (F) | Roan Creek | |
| 5GF.954 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5GF.959 | Open camp | Trash scatter/ dump | Eligible (O) | Roan Creek | |
| 5GF.960 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5GF.962 | Isolated feature | | Need data (O) | Roan Creek | |
| 5GF.966 | | Farm/ranch | Not eligible (F) | Roan Creek | |
| 5GF.967 | | Farm/ranch | Not Eligible (O) | Roan Creek | |
| 5GF.969 | Open camp | | Need data (F) | Roan Creek | |
| 5GF.986 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.1004 | Quarry | | Not eligible (F) | Plateau Valley | |
| 5ME.1019 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1056 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.1059 | Open lithic | | Need data (F) | Grand Mesa Slopes | |
| 5ME.106 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.1062 | Open camp | | Eligible (O) | Grand Valley | |
| 5ME.1063 | Open architectural | Camp | Not eligible (F) | Grand Valley | |
| 5ME.1066 | Open lithic | | Need data (F) | Gateway | |
| 5ME.110 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.11033 | Open lithic | | Need data (F) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.11034 | | | Need data (F) | Glade Park | |
| 5ME.11037 | Open camp | | Need data (F) | Book Cliffs | |
| 5ME.11044 | Open lithic | | Eligible (O) | Glade Park | |
| 5ME.11065 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.11085 | Open camp | Habitation/ homestead | Eligible (O) | Gateway | |
| 5ME.111 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.112 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.11223 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11224 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11225 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11265 | | Camp | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11266 | | Trash scatter/ dump | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11269 | Open camp | | Need data (O) | Gateway | |
| 5ME.11270 | Open camp | | Need data (O) | Gateway | |
| 5ME.113 | Open camp | | No assessment | Plateau Valley | Public Use |
| 5ME.11367 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.11373 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.11383 | Open camp | | Eligible (O) | Gateway | |
| 5ME.11387 | Open camp | | Eligible (O) | Gateway | |
| 5ME.11390 | Open camp | | Eligible (O) | Gateway | |
| 5ME.11391 | Open camp | Trash scatter/ dump | Eligible (O) | Glade Park | |
| 5ME.11396 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.11400 | Sheltered camp | | Eligible (O) | Glade Park | |
| 5ME.11451 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.11469 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1148 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.11526 | Open lithic | | Need data (O) | Grand Mesa Slopes | |
| 5ME.11527 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11534 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1155 | Sheltered camp | | Need data (O) | Bangs Canyon | |
| 5ME.1156 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.1157 | Sheltered camp | Rock feature | Need data (F) | Bangs Canyon | |
| 5ME.11576 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.11579 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.1158 | Sheltered camp | Camp | Need data (F) | Bangs Canyon | |
| 5ME.11580 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.11588 | | Mining | Eligible (O) | Bangs Canyon | |
| 5ME.11590 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11608 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11609 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11610 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11611 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11612 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11613 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11614 | | Mining | Not Eligible (O) | Grand Valley | |
| 5ME.11615 | | Camp | Not Eligible (O) | Grand Valley | |
| 5ME.11616 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11617 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11618 | | Trash scatter/ dump | Not Eligible (O) | Book Cliffs | |
| 5ME.11619 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.11624 | | Farm/ranch | Not eligible (F) | Grand Valley | |
| 5ME.11626 | | Isolated feature | Not eligible (F) | Grand Valley | |
| 5ME.1163 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.11630 | | Isolated feature | Not eligible (F) | Grand Valley | |
| 5ME.11636 | | Isolated feature | Not eligible (F) | Book Cliffs | |
| 5ME.11639 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.1164 | | Building | Not eligible (F) | Gateway | |
| 5ME.11652 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.11660 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11661 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11662 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11663 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.11667 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1167 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.11670 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11671 | Open camp | Trash scatter/ dump | Eligible (O) | Grand Mesa Slopes | |
| 5ME.11673 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11674 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.11675 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11679 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1168 | | Habitation/ homestead | Not eligible (F) | Grand Valley | |
| 5ME.11692 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11693 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.11714 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.11717 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.11720 | Open lithic | | Need data (O) | Gateway | |
| 5ME.11721 | Open lithic | | Need data (O) | Gateway | |
| 5ME.11723 | Open lithic | | Eligible (O) | Gateway | |
| 5ME.11724 | Open camp | | Eligible (O) | Gateway | |
| 5ME.11725 | Open lithic | | Eligible (O) | Gateway | |
| 5ME.1178 | | Mining | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1179 | Unknown | | No assessment | Grand Valley | |
| 5ME.11793 | | Camp | Not Eligible (O) | Grand Valley | |
| 5ME.118 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.11801 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.11852 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.11894 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.11918 | Open camp | | Eligible (O) | Bangs Canyon | |
| 5ME.1192 | Open camp | | Eligible (F) | Gateway | |
| 5ME.11920 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.11922 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.11923 | | Trash scatter/ dump | Not Eligible (O) | Bangs Canyon | |
| 5ME.11976 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.11977 | Open lithic | Trash scatter/ dump | Not Eligible (O) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.11997 | Isolated find – Early Archaic | | Not Eligible (F) | Glade Park | |
| 5ME.12000 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12001 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12022 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.12024 | Sheltered camp | | Not Eligible (O) | Glade Park | |
| 5ME.12026 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.12027 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12028 | Sheltered architectural | | Eligible (O) | Glade Park | |
| 5ME.1203 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.12030 | Sheltered camp | | Eligible (O) | Glade Park | |
| 5ME.12051 | Isolated find-Paleoindian | | Not Eligible (F) | Glade Park | |
| 5ME.1207 | Open lithic | Camp | Need data (F) | Grand Mesa Slopes | |
| 5ME.1210 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.1211 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.1214 | Open camp | | Need data (F) | Grand Valley | |
| 5ME.12142 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.12143 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.12146 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.12147 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.1215 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.1217 | Open architectural | Trash scatter/ dump | Need data (F) | Grand Valley | |
| 5ME.12207 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12208 | | Trash scatter/ dump | Not Eligible (O) | Bangs Canyon | |
| 5ME.12217 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.12218 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.12219 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.12243 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12249 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.12250 | Sheltered camp | | Eligible (O) | Bangs Canyon | |
| 5ME.12280 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.123 | Open lithic | | Need data (F) | Glade Park | |
| 5ME.1232 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12357 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.12362 | Open camp | | Eligible (F) | Gateway | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.12363 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12365 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12366 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12368 | Open lithic | | Eligible (F) | Gateway | |
| 5ME.12373 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.12374 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.12377 | Open lithic | | Eligible (F) | Gateway | |
| 5ME.12378 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.12379 | | Rock feature | Not eligible (F) | Gateway | |
| 5ME.12383 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.12384 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12385 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12387 | Open lithic | | Not eligible (F) | Gateway | Scientific |
| 5ME.12388 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12390 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12395 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12397 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12398 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.12399 | Open lithic | | Eligible (F) | Gateway | |
| 5ME.12401 | Open lithic | | Eligible (F) | Gateway | |
| 5ME.12402 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12405 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.1241 | Open camp | Camp | Eligible (F) | Grand Mesa Slopes | |
| 5ME.12410 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12412 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.12413 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12414 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12415 | Open camp | | Eligible (F) | Gateway | |
| 5ME.12417 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.12418 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.12419 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.1242 | Open camp | | Need data (F) | Grand Mesa Slopes | |
| 5ME.12420 | Open lithic | | Eligible (F) | Gateway | |
| 5ME.12422 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.12423 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.1243 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.1244 | Open camp | | No assessment | Bangs Canyon | |
| 5ME.12482 | | Building | Within Potential District-Contributing | Roan Creek | |
| 5ME.12485 | | Habitation/ homestead | Within Potential District-Contributing | Roan Creek | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.12497 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.12500 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.12501 | Sheltered camp | | Need data (O) | Roan Creek | |
| 5ME.12517 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12526 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12527 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12534 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12548 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12562 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12565 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12567 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5ME.12568 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5ME.12569 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5ME.12641 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.12642 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.12645 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12646 | Sheltered camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12647 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12648 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12662 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.12736 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12737 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12738 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12739 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12740 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12741 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12742 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.12743 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12744 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12745 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12746 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12747 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12748 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.12749 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12750 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12751 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12752 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12753 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12754 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12755 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12756 | Open camp | | Not Eligible (O) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.12757 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12759 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.12760 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12761 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12762 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12763 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.12764 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12765 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12766 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12767 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12768 | Open camp | | Not eligible (F) | Glade Park | |
| 5ME.12786 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12788 | Open camp | | Need data (O) | Gateway | |
| 5ME.12789 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12790 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12792 | Open camp | | Need data (O) | Gateway | |
| 5ME.12793 | Open camp | | Need data (O) | Gateway | |
| 5ME.12794 | Open camp | | Need data (O) | Gateway | |
| 5ME.12795 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12796 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12797 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12798 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12799 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12800 | Open camp | | Eligible (O) | Gateway | |
| 5ME.12802 | Open camp | | Need data (O) | Gateway | |
| 5ME.12804 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12806 | Open camp | Trash scatter/ dump | Eligible (O) | Gateway | |
| 5ME.12808 | Open camp | Trash scatter/ dump | Need data (O) | Gateway | |
| 5ME.12809 | | Camp | Not Eligible (O) | Plateau Valley | |
| 5ME.12810 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.12811 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.12812 | Open camp | | Need data (O) | Glade Park | |
| 5ME.12813 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.12860 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.12872 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12873 | Open camp | | Need data (O) | Gateway | |
| 5ME.12875 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12879 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12883 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12886 | Open camp | | Need data (O) | Gateway | |
| 5ME.12893 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12894 | Open camp | | Not Eligible (O) | Gateway | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.12895 | Open camp | | Need data (O) | Gateway | |
| 5ME.12896 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12897 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12898 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12899 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12916 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12917 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12918 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12919 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.12920 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12921 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.12961 | | Farm/ranch | Not Eligible (O) | Bangs Canyon | |
| 5ME.12970 | Open camp | Camp | Need data (O) | Bangs Canyon | |
| 5ME.12971 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12972 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12973 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12978 | Open camp | Camp | Need data (O) | Bangs Canyon | |
| 5ME.12979 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.1298 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.12980 | Open camp | | Eligible (O) | Bangs Canyon | |
| 5ME.12981 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.12982 | Open camp | Camp | Need data (O) | Bangs Canyon | |
| 5ME.12983 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.12984 | Open lithic | | Need data (O) | Bangs Canyon | |
| 5ME.12985 | Open lithic | | Need data (O) | Bangs Canyon | |
| 5ME.12991 | | Trash scatter/ dump | Not eligible (F) | Bangs Canyon | |
| 5ME.12992 | | Trash scatter/ dump | Not eligible (F) | Bangs Canyon | |
| 5ME.12993 | | Trash scatter/ dump | Not eligible (F) | Bangs Canyon | |
| 5ME.13007 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.13008 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.13009 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.13018 | | Trash scatter/ dump | Not eligible (F) | Bangs Canyon | |
| 5ME.13023 | Open camp | Camp | Need data (O) | Bangs Canyon | |
| 5ME.13040 | | Inscription | Not eligible (F) | Bangs Canyon | |
| 5ME.13042 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.13075 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13076 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13077 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.13078 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.13079 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.131 | Open lithic | | Need data (F) | Bangs Canyon | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.13101 | Isolated find – Paleoindian | | Not Eligible (F) | Glade Park | |
| 5ME.13108 | Isolated find – Paleoindian | | Not Eligible (F) | Glade Park | |
| 5ME.13127 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.13131 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.13136 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.13140 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.13143 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.13186 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.13191 | Sheltered camp | | Eligible (O) | Bangs Canyon | |
| 5ME.13192 | | Building | Not Eligible (O) | Bangs Canyon | |
| 5ME.13193 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.13196 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.13233 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.13236 | Open lithic | Trash scatter/ dump | Not Eligible (O) | Bangs Canyon | |
| 5ME.13237 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.13239 | | Trash scatter/ dump | Not Eligible (O) | Roan Creek | |
| 5ME.13240 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.13241 | Sheltered camp | | Eligible (O) | Roan Creek | |
| 5ME.13310 | Open camp | | Need data (O) | Book Cliffs | |
| 5ME.13313 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.13314 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.13315 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13323 | Isolated find – Paleoindian | | Not Eligible (F) | Glade Park | |
| 5ME.13328 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.13353 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.1339 | Open lithic | | No assessment | Roan Creek | |
| 5ME.13422 | | Trash scatter/ dump | Not Eligible (O) | Bangs Canyon | |
| 5ME.1348 | Open camp | | Eligible (F) | Roan Creek | |
| 5ME.1357 | Open camp | | Eligible (F) | Gateway | |
| 5ME.1358 | Open camp | | Eligible (F) | Glade Park | |
| 5ME.1360 | Open camp | Camp | Not Eligible (O) | Glade Park | |
| 5ME.1362 | Open lithic | | Need data (F) | Gateway | |
| 5ME.13656 | Open lithic | | Eligible (O) | Plateau Valley | |
| 5ME.13658 | Sheltered camp | | Eligible (O) | Glade Park | |
| 5ME.13661 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.13664 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.13665 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.13666 | Open camp | Trash scatter/ dump | Not Eligible (O) | Glade Park | |

BLM_0024652

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.13668 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.13694 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.13695 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.13707 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13708 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13709 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.1371 | Open camp | Isolated feature | Need data (O) | Glade Park | |
| 5ME.13710 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13711 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13712 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13713 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13714 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13715 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13716 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13717 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.1373 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.1374 | | Habitation/ homestead | Need data (O) | Roan Creek | |
| 5ME.1375 | | Trash scatter/ dump | Not eligible (F) | Roan Creek | |
| 5ME.1376 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.13797 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.13798 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.13800 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.13801 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.13802 | Open camp | | Need data (O) | Grand Mesa Slopes | |
| 5ME.13828 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.13829 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.1385 | | | Not eligible (F) | Roan Creek | |
| 5ME.1386 | Open lithic | | Need data (F) | Grand Valley | |
| 5ME.13886 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1389 | Open camp | | Eligible (F) | Plateau Valley | |

BLM_0024653

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 388 of 499

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.13894 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5ME.13897 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.13898 | Open camp | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13899 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13900 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.13960 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.13961 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.13962 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.13963 | Open architectural | | Not Eligible (O) | Plateau Valley | |
| 5ME.13964 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.13965 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.13966 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.13969 | | Camp | Not eligible (F) | Plateau Valley | |
| 5ME.14002 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.14009 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.14045 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.14049 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.14093 | | Trash scatter/ dump | Not Eligible (O) | Plateau Valley | |
| 5ME.14102 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.14105 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.1412 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.14123 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.14132 | Open camp | | Need data (O) | Glade Park | |
| 5ME.14133 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.1414 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.14141 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5ME.14142 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.14143 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.14144 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.14148 | | | Not eligible (F) | Roan Creek | |
| 5ME.1419 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5ME.1420 | Open camp | Trash scatter/ dump | No assessment | Grand Valley | |
| 5ME.14208 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.14221 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.14222 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.1424 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.1425 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.14261 | Sheltered camp | | Need data (O) | Bangs Canyon | Experimental |

BLM_0024654

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.14264 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14265 | | Camp | Not Eligible (O) | Bangs Canyon | |
| 5ME.14266 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14267 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14268 | Open camp | | Eligible (O) | Bangs Canyon | |
| 5ME.14269 | | Camp | Not Eligible (O) | Bangs Canyon | |
| 5ME.14270 | Open camp | | Eligible (O) | Bangs Canyon | |
| 5ME.14271 | Sheltered camp | | Need data (O) | Bangs Canyon | |
| 5ME.14272 | Open camp | | Eligible (O) | Bangs Canyon | |
| 5ME.14273 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14274 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14275 | Sheltered lithic | | Need data (O) | Bangs Canyon | |
| 5ME.14276 | Sheltered camp | | Need data (O) | Bangs Canyon | |
| 5ME.14277 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14278 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14279 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14280 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14282 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14283 | Sheltered camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.14284 | Sheltered camp | | Need data (O) | Bangs Canyon | |
| 5ME.14287 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.1429 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.1430 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.14301 | Open camp | | Eligible (O) | Gateway | |
| 5ME.14303 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14304 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14308 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14309 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14310 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.1433 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.1434 | Open camp | | No assessment | Plateau Valley | |
| 5ME.14341 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.14342 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.14352 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.14353 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.14356 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.14361 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.14362 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.1437 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.14370 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.14371 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.1438 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.14383 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.14385 | Open lithic | | Not Eligible (O) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.14424 | Open camp | | Eligible (O) | Gateway | |
| 5ME.14425 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14426 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14427 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14428 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14429 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14438 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14439 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14440 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14441 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14442 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.14443 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14444 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14449 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14450 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.14455 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.1446 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1448 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1449 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1450 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.14507 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.14515 | Open lithic | Camp, road | Not Eligible (O) | Plateau Valley | |
| 5ME.1457 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.1458 | Isolated find – Early Archaic | | Not Eligible (F) | Grand Mesa Slopes | |
| 5ME.1459 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.146 | Open camp | | Need data (F) | Gateway | |
| 5ME.1462 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1463 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1465 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1471 | Open camp | | No assessment | Plateau Valley | |
| 5ME.1472 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.1476 | Open lithic | Camp | No assessment | Grand Mesa Slopes | |
| 5ME.1478 | Isolated find – Paleoindian | | Not Eligible (F) | Grand Valley | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.148 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.1486 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.1489 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.149 | Open camp | | Need data (F) | Gateway | |
| 5ME.1491 | Open lithic | | No assessment | Roan Creek | |
| 5ME.15005 | | Camp | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.15006 | | Camp | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.15007 | | Camp | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1501 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.1506 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.15105 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.15106 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.15107 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.1512 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.1514 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.15148 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.1515 | Open lithic | | No assessment | Plateau Valley | |
| 5ME.15157 | Open camp | | Eligible (O) | Gateway | |
| 5ME.15159 | Open lithic | | Eligible (O) | Gateway | |
| 5ME.15198 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.1520 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.15215 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.1523 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.1525 | | Camp | Eligible (F) | Plateau Valley | |
| 5ME.1526 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.1527 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.15305 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.15306 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.15307 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.15371 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.15375 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5ME.15397 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.15398 | Open lithic | | Eligible (O) | Grand Valley | |
| 5ME.1545 | Open camp | | No assessment | Glade Park | |
| 5ME.15456 | | Pole cache | Not Eligible (O) | Plateau Valley | |
| 5ME.15457 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.1546 | Open lithic | | Need data (F) | Gateway | |
| 5ME.15462 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.15464 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.15468 | | Pole cache | Not Eligible (O) | Plateau Valley | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.15470 | Open lithic | | Need data (O) | Plateau Valley | |
| 5ME.15498 | | Trash scatter/ dump | Not Eligible (O) | Grand Valley | |
| 5ME.15503 | Open lithic | | Need data (O) | Grand Mesa Slopes | |
| 5ME.15505 | Open lithic | | Need data (O) | Grand Mesa Slopes | |
| 5ME.15506 | Open lithic | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.1553 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.1554 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.1555 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.15568 | | Mining | Eligible (F) | Bangs Canyon | |
| 5ME.15589 | Open lithic | | Need data (O) | Bangs Canyon | |
| 5ME.15592 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.15594 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.15596 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.15597 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.15599 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.1561 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.15631 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.15636 | Sheltered camp | | Eligible (O) | Plateau Valley | |
| 5ME.1566 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.1567 | Open lithic | | Eligible (F) | Plateau Valley | |
| 5ME.15709 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15710 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15716 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15717 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15718 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15719 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.15721 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15722 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15723 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15724 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15725 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.15726 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.1574 | Open lithic | | Need data (F) | Roan Creek | |
| 5ME.15765 | Open camp | | Eligible (O) | Gateway | |
| 5ME.15769 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.15770 | Sheltered camp | | Eligible (O) | Gateway | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.15771 | Sheltered camp | | Eligible (O) | Gateway | |
| 5ME.15772 | | Isolated feature | Not Eligible (O) | Gateway | |
| 5ME.15786 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.15787 | | Camp, rock feature | Not Eligible (O) | Roan Creek | |
| 5ME.15795 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.1580 | Open camp | | No assessment | Roan Creek | |
| 5ME.1581 | Sheltered camp | | Not eligible (F) | Roan Creek | |
| 5ME.1588 | | Farm/ranch | Not eligible (F) | Roan Creek | |
| 5ME.15908 | Open camp | | Eligible (O) | Gateway | |
| 5ME.15909 | Open camp | | Eligible (O) | Gateway | |
| 5ME.15910 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.15912 | Open camp | | Eligible (F) | Gateway | |
| 5ME.15913 | Open camp | | Eligible (O) | Gateway | |
| 5ME.15930 | Open lithic | | Need data (O) | Bangs Canyon | |
| 5ME.15931 | Open lithic | | Eligible (F) | Bangs Canyon | |
| 5ME.15932 | Open lithic | | Eligible (O) | Bangs Canyon | |
| 5ME.15934 | Open lithic | | Eligible (O) | Bangs Canyon | |
| 5ME.15935 | Open lithic | | Eligible (O) | Bangs Canyon | |
| 5ME.16051 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16052 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16096 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.16098 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.16100 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.16101 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.16102 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.16103 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.16138 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16141 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16142 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16143 | Isolated feature | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16144 | Open lithic | Camp | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16145 | Open lithic | Trash scatter/ dump | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16147 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16148 | | Camp | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16149 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 394 of 499

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.16150 | Quarry | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16151 | Quarry | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16152 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16153 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.16154 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.16257 | | Trail | Not Eligible (O) | Bangs Canyon | |
| 5ME.16258 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.16295 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16296 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16297 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16298 | Isolated feature | | Eligible (F) | Bangs Canyon | |
| 5ME.16299 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.16300 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16301 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16302 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16303 | Sheltered lithic | | Need data (F) | Bangs Canyon | Public Use |
| 5ME.16304 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16305 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16306 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16307 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16308 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16309 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16310 | Sheltered lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16311 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16312 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16313 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16314 | Sheltered camp | | Need data (F) | Bangs Canyon | Public Use |
| 5ME.16315 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16316 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16317 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16318 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16319 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16321 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16322 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16323 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16324 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16324 | Sheltered camp | | Eligible (O) | Bangs Canyon | |
| 5ME.16325 | Sheltered camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16326 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16327 | Open lithic | | Not eligible (F) | Bangs Canyon | |

BLM_0024660

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.16328 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16329 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16330 | | | Need data (F) | Bangs Canyon | |
| 5ME.16332 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16334 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16335 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16336 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16337 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16338 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16339 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16340 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16341 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16342 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16343 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16344 | Open lithic | | Eligible (F) | Bangs Canyon | |
| 5ME.16345 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16346 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16347 | Sheltered camp | | Not eligible (F) | Bangs Canyon | |
| 5ME.16348 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16349 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16350 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16351 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16352 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16353 | | Trash scatter/ dump | Not eligible (F) | Bangs Canyon | |
| 5ME.16354 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16355 | | Trash scatter/ dump | Not eligible (F) | Bangs Canyon | |
| 5ME.16356 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16357 | Open lithic | | Not eligible (F) | Bangs Canyon | Public Use |
| 5ME.16358 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16359 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.16360 | | Camp | Not eligible (F) | Bangs Canyon | |
| 5ME.16361 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.16362 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.16380 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.16381 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.16409 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.16411 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.1642 | Open camp | | Need data (F) | Gateway | |
| 5ME.16426 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.1643 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.16437 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.1644 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.16466 | Open lithic | | Not eligible (F) | Plateau Valley | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.16501 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.16525 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.16547 | | Habitation/ homestead | Not eligible (F) | Plateau Valley | |
| 5ME.16552 | Open camp | | Eligible (F) | Gateway | |
| 5ME.16553 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.16576 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.16577 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.16578 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.166 | Quarry | | Need data (F) | Gateway | |
| 5ME.16640 | Open lithic | Camp | Not eligible (F) | Gateway | |
| 5ME.16642 | Open lithic | | Eligible (F) | Bangs Canyon | |
| 5ME.16643 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16644 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16645 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.16679 | | Water control feature | Eligible (F) | Grand Valley | |
| 5ME.16680 | | Water control feature | Eligible (F) | Grand Valley | |
| 5ME.16681 | | Water control feature | Eligible (F) | Grand Valley | |
| 5ME.16781 | | | | Roan Creek | |
| 5ME.169 | Sheltered camp | | No assessment | Gateway | |
| 5ME.170 | Quarry | | Need data (F) | Gateway | |
| 5ME.171 | Sheltered camp | | Need data (F) | Gateway | |
| 5ME.172 | Sheltered camp | | Need data (F) | Gateway | |
| 5ME.177 | Open lithic | | Need data (F) | Gateway | |
| 5ME.205 | | Camp | Need data (F) | Grand Valley | |
| 5ME.214 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.265 | Open camp | Farm/ranch | Eligible (O) | Grand Mesa Slopes | |
| 5ME.269 | Open lithic | Trash scatter/ dump | Eligible (O) | Grand Mesa Slopes | |
| 5ME.270 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.271 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.272 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.274 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.275 | Open lithic | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.276 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.277 | Open camp | | Eligible (F) | Plateau Valley | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.278 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.280 | Sheltered camp | | Eligible (F) | Plateau Valley | |
| 5ME.283 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.284 | Open camp | Trash scatter/dump | Eligible (F) | Grand Mesa Slopes | |
| 5ME.285 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.286 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.288 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.289 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.293 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.295 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.303 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.306 | Open camp | | Need data (F) | Grand Valley | |
| 5ME.311 | Open lithic | | Need data (F) | Gateway | |
| 5ME.312 | Open camp | | Need data (F) | Glade Park | |
| 5ME.322 | Open lithic | | Eligible (F) | Bangs Canyon | |
| 5ME.323 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.324 | Open camp | | Eligible (F) | Bangs Canyon | |
| 5ME.326 | Open lithic | | Eligible (F) | Bangs Canyon | |
| 5ME.327 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.333 | Open camp | | Eligible (O) | Bangs Canyon | |
| 5ME.334 | Open architectural | | Eligible (F) | Glade Park | |
| 5ME.338 | Open camp | | Need data (F) | Glade Park | |
| 5ME.339 | Open camp | | Need data (F) | Glade Park | |
| 5ME.340 | Open camp | | Eligible (F) | Glade Park | |
| 5ME.341 | Open camp | | Need data (F) | Glade Park | |
| 5ME.342 | Open camp | | Need data (F) | Glade Park | |
| 5ME.343 | Open camp | | Need data (F) | Glade Park | |
| 5ME.344 | Open lithic | | Need data (F) | Glade Park | |
| 5ME.346 | Open camp | | Need data (F) | Gateway | |
| 5ME.3647 | Open lithic | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.3648 | Open lithic | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.3649 | Open lithic | Trash scatter/ dump | Eligible (O) | Grand Mesa Slopes | |
| 5ME.3650 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.3651 | Open lithic | | Need data (F) | Roan Creek | |
| 5ME.3663 | Open camp | | No assessment | Bangs Canyon | |
| 5ME.3668 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.3670 | Open lithic | | Need data (F) | Plateau Valley | |

BLM_0024663

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.3671 | Open camp, quarry | | Need data (F) | Plateau Valley | |
| 5ME.3672 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.3673 | Open lithic | | Eligible (F) | Plateau Valley | |
| 5ME.3685 | Sheltered camp | | Need data (F) | Plateau Valley | |
| 5ME.3686 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.3687 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3688 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3689 | Quarry | | Not eligible (F) | Plateau Valley | |
| 5ME.3690 | Open lithic | Trash scatter/ dump | Need data (F) | Plateau Valley | |
| 5ME.3693 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.3695 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.3696 | Open lithic, quarry | | Not Eligible (O) | Plateau Valley | |
| 5ME.3698 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.3709 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3710 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3711 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3712 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3713 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3714 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3716 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3728 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3730 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.3732 | | Farm/ranch | Not eligible (F) | Roan Creek | |
| 5ME.3733 | Isolated feature | | Not eligible (F) | Roan Creek | |
| 5ME.3735 | | | Not eligible (F) | Roan Creek | |
| 5ME.3771 | Open camp | | Need data (F) | Glade Park | |
| 5ME.3775 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3776 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.3783 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3788 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3789 | Open architectural | Habitation/ homestead | Need data (F) | Bangs Canyon | |
| 5ME.3802 | Open camp | | Not eligible (F) | Grand Valley | |
| 5ME.3803 | Open camp | Mining | Not eligible (F) | Grand Valley | |
| 5ME.3806 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.3807 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.3808 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.3809 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.3810 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.3818 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.3819 | | Trash scatter/ dump | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.3824 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.3825 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.3837 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.3839 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.3840 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.3844 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.3845 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.3859 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.386 | | Habitation/ homestead | Eligible (F) | Grand Mesa Slopes | |
| 5ME.3860 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.3861 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.3863 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.3864 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.3865 | Sheltered camp | | Not eligible (F) | Roan Creek | |
| 5ME.3866 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.3874 | | Fence | Not eligible (F) | Roan Creek | |
| 5ME.3876 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.388 | | Water control feature | Eligible (F) | Grand Mesa Slopes | |
| 5ME.3880 | Open lithic | Trash scatter/ dump | Need data (F) | Grand Valley | |
| 5ME.3886 | Open lithic | | No assessment | Glade Park | |
| 5ME.389 | Open lithic | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.3895 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.3899 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.390 | Open lithic | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.3907 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.391 | Open lithic | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.3911 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.3912 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.3915 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.3916 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.3917 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.392 | Open lithic | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.3921 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.3924 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3925 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3929 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.393 | Open lithic | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.3930 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3932 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3933 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3935 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3937 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3939 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.394 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.3941 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3942 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3943 | | Camp | No assessment | Grand Valley | |
| 5ME.3944 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3945 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3946 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3947 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3948 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5ME.3949 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.3950 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.396 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.397 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.3970 | Open camp | Water control feature | Need data (F) | Roan Creek | |
| 5ME.3971 | | Camp | Not eligible (F) | Roan Creek | |
| 5ME.3977 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.3978 | Sheltered camp | | Not Eligible (O) | Roan Creek | |
| 5ME.399 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.400 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.4000 | | Farm/ranch | Not eligible (F) | Roan Creek | |
| 5ME.401 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.4010 | | Farm/ranch | Not eligible (F) | Roan Creek | |
| 5ME.4011 | Sheltered camp | | Need data (O) | Roan Creek | |
| 5ME.4018 | Open camp | | Need data (F) | Glade Park | |
| 5ME.402 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.4020 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4021 | | Farm/ranch | Eligible (O) | Roan Creek | |
| 5ME.4031 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4032 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4033 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4034 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4044 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4045 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.4046 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4047 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4048 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4049 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.405 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.4050 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4051 | Open lithic | | Need data (F) | Grand Mesa Slopes | |
| 5ME.4052 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.4053 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.4054 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4055 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4056 | Open lithic | | No assessment | Grand Mesa Slopes | |
| 5ME.4057 | | Habitation/ homestead | Need data (F) | Gateway | |
| 5ME.4058 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4059 | Open camp | | Need data (F) | Gateway | |
| 5ME.4060 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.4061 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4064 | Open architectural | | Not Eligible (O) | Gateway | |
| 5ME.408 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.4082 | Sheltered camp | Camp | Need data (O) | Bangs Canyon | |
| 5ME.4083 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4084 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.4085 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4086 | Open lithic | | Need data (F) | Bangs Canyon | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4087 | Sheltered camp | Camp | Need data (F) | Bangs Canyon | |
| 5ME.4088 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4089 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.409 | | Fence | Eligible (F) | Plateau Valley | |
| 5ME.4090 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4092 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4093 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4094 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4095 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4096 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4097 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.4098 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4099 | Open camp | | Need data (O) | Bangs Canyon | |
| 5ME.410 | Open lithic | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.4100 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4104 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.4105 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.4106 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.4107 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.4108 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4109 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.411 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4116 | | Water control feature | Not Eligible (O) | Grand Valley | |
| 5ME.412 | Open architectural | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.413 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.414 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.415 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.418 | Open camp | | Eligible (F) | Grand Valley | |
| 5ME.419 | Open lithic | | Eligible (F) | Grand Valley | |
| 5ME.420 | Open camp | | Need data (O) | Grand Valley | |
| 5ME.4200 | Isolated find – Paleoindian | | Not Eligible (F) | Book Cliffs | |
| 5ME.4201 | Open camp | | Need data (F) | Book Cliffs | |
| 5ME.4206 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4207 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4208 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4209 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4210 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4211 | Open lithic | | Need data (F) | Bangs Canyon | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4212 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4213 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4214 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4215 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4216 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4217 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4218 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4219 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.422 | Open camp | | Eligible (O) | Grand Valley | |
| 5ME.4220 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.4221 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4222 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4223 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.423 | Open lithic | | Need data (F) | Grand Valley | |
| 5ME.4232 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4234 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4235 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4236 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4237 | Sheltered camp | | Need data (F) | Glade Park | |
| 5ME.4238 | Open camp | | Not eligible (F) | Glade Park | |
| 5ME.4239 | Open camp | | No assessment | Glade Park | |
| 5ME.4240 | Open camp | | Not eligible (F) | Glade Park | |
| 5ME.4241 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4242 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4243 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.4244 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.4245 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4246 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4247 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4248 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4249 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4250 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4251 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4252 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4253 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4254 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.4255 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4256 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4257 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4258 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4259 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4260 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4261 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4262 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4263 | Open lithic | | Need data (F) | Bangs Canyon | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4264 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4265 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4266 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4267 | Open lithic | | No assessment | Bangs Canyon | |
| 5ME.4268 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4269 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.427 | Open lithic, quarry | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4270 | Open lithic | | No assessment | Bangs Canyon | |
| 5ME.4271 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4272 | Quarry | | Not eligible (F) | Bangs Canyon | |
| 5ME.4273 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4274 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4275 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4276 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4277 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4278 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4279 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4280 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4297 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4298 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4299 | Sheltered camp | | Need data (F) | Roan Creek | |
| 5ME.4300 | Open camp | | Need data (F) | Grand Valley | |
| 5ME.4301 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4302 | Open camp | | Not eligible (F) | Grand Valley | |
| 5ME.4303 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.4318 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4333 | Open camp | Camp | Need data (F) | Roan Creek | |
| 5ME.4334 | Open lithic | | Need data (F) | Grand Valley | |
| 5ME.4335 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4336 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.4337 | Open lithic | | Need data (F) | Grand Valley | |
| 5ME.4338 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.4339 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.4340 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.4341 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.4342 | Open camp | | Not eligible (F) | Bangs Canyon | |
| 5ME.4343 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.4344 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4349 | | Habitation/ homestead | Need data (F) | Roan Creek | |
| 5ME.4350 | Open lithic | | Need data (F) | Roan Creek | |
| 5ME.4355 | Sheltered lithic | | Not Eligible (O) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4385 | Sheltered lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4386 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4387 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.4392 | Open lithic | | Need data (F) | Roan Creek | |
| 5ME.4395 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.4396 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.4413 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.4416 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.4419 | | | Need data (F) | Roan Creek | |
| 5ME.4420 | Open camp | | Eligible (F) | Roan Creek | |
| 5ME.4421 | | Habitation/ homestead | Not eligible (F) | Roan Creek | Public Use |
| 5ME.4422 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.4423 | Isolated feature-hearth | | Not eligible (F) | Roan Creek | |
| 5ME.4424 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.4429 | Open lithic | | Need data (F) | Roan Creek | |
| 5ME.4431 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.4432 | Sheltered camp | | Eligible (O) | Roan Creek | |
| 5ME.4434 | Sheltered camp | | Not eligible (F) | Roan Creek | |
| 5ME.4435 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.4437 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.4438 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.4439 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.4440 | Open camp | | Eligible (F) | Roan Creek | |
| 5ME.4441 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.4452 | Open camp | | Not eligible (F) | Grand Valley | |
| 5ME.4453 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4454 | Open camp | | Eligible (F) | Grand Valley | |
| 5ME.4455 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5ME.4456 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4479 | Open camp | | Not eligible (F) | Grand Valley | |
| 5ME.4488 | | Mining | Eligible (F) | Book Cliffs | |
| 5ME.4491 | Quarry | | Need data (F) | Bangs Canyon | |
| 5ME.4492 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4494 | Quarry | | Need data (F) | Bangs Canyon | |
| 5ME.4495 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4497 | Open camp | Camp | Eligible (F) | Roan Creek | |
| 5ME.4500 | Isolated find – Paleoindian | | Not Eligible (F) | Grand Mesa Slopes | |
| 5ME.4503 | Sheltered camp | | Not eligible (F) | Plateau Valley | |
| 5ME.4509 | | Mining | Need data (F) | Book Cliffs | |
| 5ME.4510 | | Mining | Need data (F) | Roan Creek | |
| 5ME.4512 | | Mining | Need data (F) | Book Cliffs | |
| 5ME.4513 | | Mining | Need data (F) | Book Cliffs | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4514 | | Mining | Not eligible (F) | Book Cliffs | |
| 5ME.4519 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5ME.4521 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.456 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.4632 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.4634 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.4635 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.4638 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.4643 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.4644 | Open lithic | | Not Eligible (O) | Book Cliffs | |
| 5ME.4646 | Open camp | | Not Eligible (O) | Plateau Valley | |
| 5ME.4648 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.4649 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.4663 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.4664 | | Camp | Not eligible (F) | Grand Valley | |
| 5ME.4684 | | | Not eligible (F) | Grand Valley | |
| 5ME.4699 | Sheltered camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.4702 | Open lithic | | Need data (F) | Grand Mesa Slopes | |
| 5ME.4705 | Sheltered lithic | | Need data (F) | Bangs Canyon | |
| 5ME.4709 | Open lithic | | Need data (F) | Gateway | |
| 5ME.471 | Open camp | Farm/ranch | Not Eligible (O) | Plateau Valley | |
| 5ME.4710 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4713 | Open camp | | Not eligible (F) | Plateau Valley | |
| 5ME.4719 | Open lithic | | Need data (F) | Glade Park | |
| 5ME.472 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.4725 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.473 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.4732 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4733 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4735 | Open camp | | Eligible (F) | Book Cliffs | |
| 5ME.4736 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4737 | Open camp | | Not eligible (F) | Grand Valley | |
| 5ME.4738 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4739 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5ME.474 | Open lithic | | Eligible (F) | Plateau Valley | |
| 5ME.4740 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4741 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5ME.4742 | Open camp | | Not Eligible (O) | Grand Valley | |
| 5ME.4743 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.4765 | Open lithic | | No assessment | Bangs Canyon | |
| 5ME.4776 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4778 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4779 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.4780 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.480 | Open camp | | Need data (F) | Gateway | |
| 5ME.4805 | Isolated find – Paleoindian | | Not Eligible (F) | Plateau Valley | |
| 5ME.481 | Open lithic | | Need data (F) | Gateway | |
| 5ME.4812 | | Farm/ranch | Not eligible (F) | Glade Park | |
| 5ME.482 | | Water control feature | Eligible (F) | Plateau Valley | |
| 5ME.4830 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4833 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.4836 | Open lithic | | No assessment | Glade Park | |
| 5ME.4837 | | Building | No assessment | Glade Park | |
| 5ME.4838 | Sheltered camp | | No assessment | Glade Park | |
| 5ME.4847 | Open lithic | | No assessment | Bangs Canyon | |
| 5ME.4851 | | Camp | Not Eligible (O) | Bangs Canyon | |
| 5ME.4857 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4862 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.4889 | Open lithic | | Not Eligible (O) | Grand Valley | |
| 5ME.4890 | Open camp | | Eligible (O) | Grand Valley | |
| 5ME.4891 | Open lithic | | Need data (F) | Grand Valley | |
| 5ME.4892 | Isolated find – Early Archaic | | Not Eligible (F) | Grand Valley | |
| 5ME.4917 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.4919 | | Habitation/ homestead | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4926 | | Water control feature | Eligible (O) | Grand Mesa Slopes | |
| 5ME.4928 | | Mining | Not Eligible (O) | Roan Creek | |
| 5ME.4941 | Sheltered camp | | Need data (F) | Bangs Canyon | Public Use |
| 5ME.4942 | Sheltered camp | | Not eligible (F) | Bangs Canyon | |
| 5ME.4943 | Sheltered lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4944 | Sheltered lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.4955 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.4959 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.4961 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.4962 | Open lithic | Camp | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4963 | | Camp | Eligible (F) | Grand Mesa Slopes | |
| 5ME.4972 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.4973 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4974 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.4981 | | | Not eligible (F) | Plateau Valley | |
| 5ME.5119 | Open camp | | Not Eligible (O) | Gateway | |
| 5ME.5140 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.5148 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.5163 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.5165 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.5168 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.5175 | Isolated find – Paleoindian | | Not Eligible (F) | Roan Creek | |
| 5ME.5178 | Sheltered architectural | | Need data (O) | Bangs Canyon | |
| 5ME.5214 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.5215 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.5216 | | Mining | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.5227 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.5228 | Open camp | Building | Not eligible (F) | Gateway | |
| 5ME.5231 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.5233 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.5234 | | | Not eligible (F) | Plateau Valley | |
| 5ME.5240 | Open lithic | | Need data (F) | Bangs Canyon | |
| 5ME.5243 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.5244 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.5249 | Open camp | | No assessment | Grand Mesa Slopes | |
| 5ME.5260 | Quarry | | Not eligible (F) | Grand Valley | |
| 5ME.5261 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.5262 | Sheltered camp | | Need data (F) | Bangs Canyon | |
| 5ME.5296 | Isolated find – Paleoindian | | Not Eligible (F) | Grand Valley | |
| 5ME.5381 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.548 | Open camp | | Eligible (F) | Gateway | |
| 5ME.549 | Open camp | | Need data (F) | Gateway | |
| 5ME.550 | Open camp | | Need data (F) | Bangs Canyon | |
| 5ME.5762 | Isolated find – Paleoindian | | Not Eligible (F) | Grand Mesa Slopes | |
| 5ME.5829 | | | Not eligible (F) | Bangs Canyon | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.5866 | Open camp | | Not eligible (F) | Glade Park | |
| 5ME.5867 | Open camp | | Not eligible (F) | Bangs Canyon | |
| 5ME.5898 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.5903 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.5905 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.5936 | Open camp | | Eligible (O) | Gateway | |
| 5ME.5979 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.6010 | Open lithic | | Need data (O) | Bangs Canyon | |
| 5ME.6011 | Open lithic, quarry | | Need data (O) | Bangs Canyon | |
| 5ME.6012 | Open camp | | Not Eligible (O) | Bangs Canyon | |
| 5ME.6015 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.6016 | Open lithic | | Not Eligible (O) | Bangs Canyon | |
| 5ME.6017 | Open lithic | | Need data (O) | Bangs Canyon | |
| 5ME.6019 | Open lithic, quarry | | Need data (O) | Bangs Canyon | |
| 5ME.6021 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.6023 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.6028 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.6029 | Open lithic | | Not eligible (F) | Grand Valley | |
| 5ME.6031 | Open lithic | Camp | Not eligible (F) | Grand Valley | |
| 5ME.6073 | | Trash scatter/ dump | Not eligible (F) | Grand Valley | |
| 5ME.617 | Open lithic | | Not eligible (F) | Plateau Valley | |
| 5ME.6170 | Open lithic | Farm/ranch | Not Eligible (O) | Gateway | |
| 5ME.6173 | Open camp | | Eligible (O) | Gateway | |
| 5ME.6217 | Sheltered lithic | | Need data (O) | Bangs Canyon | |
| 5ME.625 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.628 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.632 | | Habitation/ homestead | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.633 | | Farm/ranch | Eligible (F) | Grand Mesa Slopes | |
| 5ME.634 | Sheltered camp | | Eligible (F) | Plateau Valley | |
| 5ME.6346 | Open camp | | Eligible (F) | Glade Park | |
| 5ME.6347 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.6348 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.6349 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.635 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.6350 | Sheltered camp | | Eligible (F) | Glade Park | |
| 5ME.6351 | Sheltered camp | | Eligible (F) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.6352 | Open camp | | Eligible (F) | Glade Park | |
| 5ME.6356 | Isolated find – Paleoindian | | | | |
| 5ME.636 | Open camp | | Need data (F) | Grand Valley | |
| 5ME.6360 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.6370 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6379 | Open camp | | Need data (O) | Glade Park | |
| 5ME.6383 | Open lithic | | Eligible (O) | Plateau Valley | |
| 5ME.6384 | Open lithic | | Eligible (O) | Plateau Valley | |
| 5ME.6385 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6386 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6388 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6389 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6390 | Open lithic | | Eligible (O) | Plateau Valley | |
| 5ME.6391 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6392 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6393 | Open lithic | | Eligible (O) | Plateau Valley | |
| 5ME.6394 | Open lithic | | Eligible (O) | Plateau Valley | |
| 5ME.6395 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6396 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6397 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6398 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6399 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.640 | Sheltered camp | | Need data (F) | Plateau Valley | |
| 5ME.6400 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.6401 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.642 | | Building | Eligible (O) | Plateau Valley | |
| 5ME.6436 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5ME.6443 | Sheltered camp | | Eligible (F) | Roan Creek | |
| 5ME.6444 | Open camp | | Eligible (F) | Roan Creek | |
| 5ME.6445 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.6458 | Open lithic | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.6459 | Open lithic | Water control feature | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.6460 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6461 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.6472 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.6474 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.6475 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5ME.6478 | Open camp | | Not Eligible (O) | Gateway | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.6479 | Open lithic | | Not Eligible (O) | Gateway | |
| 5ME.6480 | Isolated find – Early Archaic | | Not Eligible (F) | Gateway | |
| 5ME.6484 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.6485 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.6494 | Open lithic | | Need data (O) | Grand Mesa Slopes | |
| 5ME.6495 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6538 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.6540 | Open camp | | Not Eligible (O) | Roan Creek | |
| 5ME.6541 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.6543 | Open lithic | | Not Eligible (O) | Roan Creek | |
| 5ME.6659 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6660 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6661 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6662 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.6674 | | Camp | Eligible (O) | Plateau Valley | |
| 5ME.6693 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6694 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6702 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6703 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6704 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6705 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6706 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.6707 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6708 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6709 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.6713 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6715 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.6716 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.6717 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6729 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6730 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.6731 | Open camp | Habitation/ homestead | Eligible (O) | Grand Mesa Slopes | |
| 5ME.6744 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6759 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6760 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6773 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6774 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.6778 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.682 | | Camp | Not eligible (F) | Roan Creek | |
| 5ME.6828 | | Habitation/ homestead | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.684 | Open lithic | | Need data (F) | Gateway | |
| 5ME.6844 | | Mining | Not Eligible (O) | Bangs Canyon | |
| 5ME.6845 | | Mining | Not Eligible (O) | Bangs Canyon | |
| 5ME.6846 | | Mining | Not Eligible (O) | Bangs Canyon | |
| 5ME.686 | Open lithic | | Need data (F) | Gateway | |
| 5ME.689 | Open lithic | | No assessment | Roan Creek | |
| 5ME.691 | Unknown | | No assessment | Roan Creek | |
| 5ME.692 | Unknown | | No assessment | Roan Creek | |
| 5ME.693 | Unknown | | No assessment | Roan Creek | |
| 5ME.6934 | Isolated find – Paleoindian | | Not Eligible (F) | Grand Valley | |
| 5ME.6938 | Sheltered camp | | Need data (O) | Plateau Valley | |
| 5ME.6939 | Sheltered camp | | Need data (O) | Plateau Valley | |
| 5ME.6942 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.6951 | Open camp | | Need data (O) | Plateau Valley | |
| 5ME.6960 | Open lithic | | Need data (O) | Plateau Valley | |
| 5ME.697 | Open lithic | | Not eligible (F) | Glade Park | |
| 5ME.699 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.7004 | Open camp | Trash scatter/ dump | Eligible (O) | Roan Creek | |
| 5ME.7005 | Open camp | | Need data (O) | Roan Creek | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.701 | Open lithic | | Need data (F) | Gateway | |
| 5ME.7030 | Open camp | | Need data (O) | Bangs Canyon | Public Use |
| 5ME.708 | Sheltered camp | | No assessment | Roan Creek | |
| 5ME.7121 | Open camp | | Need data (O) | Roan Creek | |
| 5ME.714 | Sheltered camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.715 | Open lithic | | Need data (F) | Plateau Valley | |
| 5ME.716 | Open lithic | | Need data (F) | Grand Mesa Slopes | |
| 5ME.717 | | Camp | Need data (O) | Roan Creek | |
| 5ME.720 | Open camp | | Need data (F) | Gateway | |
| 5ME.7297 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.7298 | Open lithic | | Not Eligible (O) | Plateau Valley | |
| 5ME.7305 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.7306 | Open camp | | Eligible (O) | Plateau Valley | |
| 5ME.7308 | Sheltered camp | | Eligible (O) | Plateau Valley | |
| 5ME.7326 | Open lithic | | Eligible (O) | Grand Valley | |
| 5ME.7327 | Open lithic | | Eligible (O) | Grand Valley | |
| 5ME.7328 | Open lithic | | Eligible (O) | Grand Valley | |
| 5ME.734 | Open camp | | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.7352 | Sheltered camp, open camp | | Eligible (O) | Plateau Valley | |
| 5ME.7354 | Open lithic | | Not eligible (F) | Roan Creek | |
| 5ME.7355 | Open camp | | Not eligible (F) | Roan Creek | |
| 5ME.736 | Open lithic | | No assessment | Roan Creek | |
| 5ME.737 | | Mining | No assessment | Roan Creek | |
| 5ME.7372 | | Mining | Not Eligible (O) | Bangs Canyon | |
| 5ME.7373 | | Mining | Not Eligible (O) | Bangs Canyon | |
| 5ME.738 | Unknown | | No assessment | Roan Creek | |
| 5ME.752 | | Farm/ranch | Not Eligible (O) | Roan Creek | |
| 5ME.753 | | Habitation/ homestead | No assessment | Roan Creek | |
| 5ME.757 | | Habitation/ homestead | No assessment | Plateau Valley | |
| 5ME.760 | | Farm/ranch | Eligible (O) | Grand Mesa Slopes | |
| 5ME.770 | | Water control feature | Need data (F) | Grand Mesa Slopes | |
| 5ME.7740 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.7741 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.7742 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.776 | | | No assessment | Roan Creek | |
| 5ME.782 | Open lithic | | No assessment | Roan Creek | |
| 5ME.787 | Open camp | | Need data (F) | Roan Creek | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.788 | Sheltered camp | | Need data (F) | Roan Creek | |
| 5ME.789 | Open camp | | No assessment | Glade Park | |
| 5ME.790 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.791 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.7961 | Open camp | | Eligible (O) | Roan Creek | |
| 5ME.7963 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.7964 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.7965 | Open camp | | Need data (O) | Glade Park | |
| 5ME.7966 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.7967 | Open camp | | Need data (O) | Glade Park | |
| 5ME.7968 | Sheltered camp | | Eligible (F) | Glade Park | |
| 5ME.7969 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.797 | Open camp | | Need data (F) | Roan Creek | |
| 5ME.7970 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.7971 | Open camp | | Need data (O) | Glade Park | |
| 5ME.7972 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.7973 | Open camp | | Need data (O) | Glade Park | |
| 5ME.7974 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.7975 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.7976 | Sheltered camp | | Eligible (O) | Glade Park | |
| 5ME.7977 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.7978 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.7979 | Open camp | | Eligible (O) | Glade Park | |
| 5ME.7980 | Open camp | | Need data (O) | Glade Park | |
| 5ME.7982 | Open camp | | Need data (O) | Glade Park | |
| 5ME.799 | Open lithic | | Need data (F) | Glade Park | |
| 5ME.8005 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8006 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.8033 | Open camp | | Eligible (F) | Grand Mesa Slopes | |
| 5ME.8035 | | Road | Not eligible (F) | Grand Mesa Slopes | |
| 5ME.8037 | Open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.8042 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8047 | Rock art, open camp | | Eligible (O) | Grand Mesa Slopes | |
| 5ME.8048 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8049 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.8057 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8058 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8059 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8060 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8061 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8072 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8073 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8074 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8075 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8076 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8077 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.8078 | Open camp | | Not Eligible (O) | Grand Mesa Slopes | |
| 5ME.808 | Sheltered camp | | Need data (F) | Roan Creek | |
| 5ME.809 | Sheltered camp | | Need data (F) | Roan Creek | |
| 5ME.811 | Open lithic | | Eligible (F) | Gateway | Public Use |
| 5ME.816 | | Farm/ranch | No assessment | Gateway | |
| 5ME.819 | Open lithic | | Need data (F) | Gateway | |
| 5ME.820 | Open camp | Trash scatter/ dump | Need data (F) | Gateway | |
| 5ME.822 | Open lithic | | Need data (F) | Gateway | |
| 5ME.823 | Open lithic | | Need data (F) | Gateway | |
| 5ME.824 | Open camp | | Not eligible (F) | Gateway | |
| 5ME.825 | Open lithic | | Need data (F) | Gateway | |
| 5ME.826 | Open lithic | | Need data (F) | Gateway | |
| 5ME.827 | Open lithic | | Need data (F) | Gateway | |
| 5ME.828 | Open lithic | | Need data (F) | Gateway | |
| 5ME.829 | Open lithic | | Not eligible (F) | Gateway | |
| 5ME.83 | Sheltered lithic | | No assessment | Roan Creek | |
| 5ME.837 | Open camp | Isolated feature | Eligible (F) | Roan Creek | |
| 5ME.839 | Sheltered architectural | | No assessment | Bangs Canyon | |
| 5ME.842 | Open camp | | Eligible (F) | Glade Park | |
| 5ME.843 | Open lithic | | Need data (F) | Gateway | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.844 | Sheltered camp | | Not eligible (F) | Plateau Valley | |
| 5ME.845 | Sheltered camp | | Not eligible (F) | Plateau Valley | |
| 5ME.846 | Sheltered camp | | Need data (F) | Plateau Valley | |
| 5ME.854 | Unknown | | No assessment | Bangs Canyon | |
| 5ME.857 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.858 | Open lithic | | Not eligible (F) | Bangs Canyon | |
| 5ME.859 | Open camp | | Need data (F) | Glade Park | |
| 5ME.863 | Open lithic | | No assessment | Roan Creek | |
| 5ME.8669 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.8670 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8671 | Open camp | | Need data (O) | Glade Park | |
| 5ME.8672 | Open lithic | Habitation/ homestead | Need data (O) | Glade Park | |
| 5ME.8674 | Open camp | | Need data (O) | Glade Park | |
| 5ME.8676 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8677 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8679 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8680 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8681 | Open camp | | Need data (O) | Glade Park | |
| 5ME.8682 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8683 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8685 | Open camp | | Need data (O) | Glade Park | |
| 5ME.8689 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8690 | Open camp | | Need data (O) | Glade Park | |
| 5ME.8691 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8692 | Open camp | | Not Eligible (O) | Glade Park | |
| 5ME.8693 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.8694 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8695 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8696 | | Trash scatter/ dump | Not Eligible (O) | Glade Park | |
| 5ME.8697 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8698 | Open lithic | Camp | Need data (O) | Glade Park | |
| 5ME.8699 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8700 | | Habitation/ homestead | Not Eligible (O) | Glade Park | |
| 5ME.8701 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8703 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8704 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8705 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.8706 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8707 | Open lithic | | Need data (O) | Glade Park | |
| 5ME.8708 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8709 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8711 | Open camp | | Not Eligible (O) | Glade Park | |

**Table I-2**
**Scientific Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.8712 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.8767 | Open lithic | | Not Eligible (O) | Glade Park | |
| 5ME.930 | | Habitation/ homestead | Need data (F) | Bangs Canyon | |
| 5ME.931 | | Water control feature | Not eligible (F) | Roan Creek | |
| 5ME.934 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.939 | Open camp | Habitation/ homestead | Eligible (F) | Plateau Valley | |
| 5ME.944 | Open camp | Farm/ranch, trash scatter | Need data (F) | Plateau Valley | |
| 5ME.946 | | Farm/ranch | Need data (F) | Plateau Valley | |
| 5ME.948 | Open lithic | | Eligible (F) | Plateau Valley | |
| 5ME.949 | Open camp | | Eligible (F) | Plateau Valley | |
| 5ME.950 | Open camp | | Need data (F) | Plateau Valley | |
| 5ME.954 | Sheltered camp | | Need data (F) | Roan Creek | |
| 5ME.970 | | | Not eligible (F) | Plateau Valley | |
| 5ME.973 | | | Not eligible (F) | Plateau Valley | |
| 5ME.975 | | | Not eligible (F) | Plateau Valley | |
| 5MN.2143 | Open camp | | Need data (F) | Gateway | |
| 5MN.2144 | Open lithic | | Need data (F) | Gateway | |
| 5MN.2145 | Open lithic | | Need data (F) | Gateway | |
| 5MN.3734 | Open camp | | Eligible (O) | Gateway | |
| 5MN.3735 | Open lithic | | Not Eligible (O) | Gateway | |
| 5MN.5381 | Open camp | | Eligible (O) | Gateway | |
| 5MN.5382 | Open camp | | Not Eligible (O) | Gateway | |
| 5MN.6236 | Open camp | | Eligible (O) | Gateway | |
| 5MN.6850 | Open lithic | | No assessment | Gateway | |
| 5MN.7956 | Open lithic | Habitation/ homestead | Not eligible (F) | Gateway | |
| 5MN.805 | Open camp | | Need data (F) | Gateway | |

**Table I-3**
**Conservation for Future Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.82 | DeBeque Rock Shelter - Sheltered camp | | Eligible (O) | Plateau Valley | |
| 5ME.213 | Watershed Rockshelter -Rock art, sheltered camp | Camp | Eligible (O) | Grand Mesa Slopes | |
| 5ME.465 | Rock art | | Eligible (O) | Glade Park | Traditional Use |
| 5ME.12851 | Rock art, sheltered camp | | Eligible (O) | Bangs Canyon | Traditional Use |

**Table I-4**
**Traditional Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.15376 | Burial | | Eligible (O) | Roan Creek | Conservation Use |
| 5ME.16500 | Ceremonial | Mining | Eligible (F) | Gateway | Scientific Use |
| 5ME.14046 | Culturally scarred tree | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.14047 | Culturally scarred tree | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.16646 | Culturally scarred tree | | Eligible (F) | Gateway | Scientific Use |
| 5ME.6060 | Culturally scarred tree | | Not eligible (F) | Grand Valley | Scientific Use |
| 5ME.6018 | Culturally scarred tree, open camp | | Need data (O) | Bangs Canyon | Scientific Use |
| 5GF.1080 | Open architectural | | Need data (F) | Roan Creek | Scientific Use |
| 5GF.1128 | Open architectural | | Eligible (F) | Grand Valley | Scientific Use |
| 5GF.115 | Open architectural | | Eligible (F) | Book Cliffs | Scientific Use |
| 5GF.1217 | Open architectural | | Need data (F) | Roan Creek | Scientific Use |
| 5GF.327 | Open architectural | | Need data (F) | Grand Valley | Scientific Use |
| 5GF.4251 | Open architectural | | Eligible (F) | Roan Creek | Scientific Use |
| 5ME.11726 | Open architectural | | Eligible (O) | Gateway | Scientific Use |
| 5ME.12031 | Open architectural | | Not Eligible (O) | Glade Park | Scientific Use |
| 5ME.12407 | Open architectural | | Eligible (F) | Gateway | Scientific Use |
| 5ME.13062 | Open architectural | | Eligible (O) | Gateway | Scientific Use |
| 5ME.13959 | Open architectural | | Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.14071 | Open architectural | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.14103 | Open architectural | | Eligible (O) | Roan Creek | Scientific Use |
| 5ME.14104 | Open architectural | | Eligible (O) | Roan Creek | Scientific Use |
| 5ME.14198 | Open architectural | Brush Fence | ONE | Plateau Valley | Public Use |
| 5ME.14199 | Open architectural | | Need data (O) | Plateau Valley | Scientific Use |

**Table I-4**
**Traditional Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.14302 | Open architectural | | Eligible (O) | Gateway | Scientific Use |
| 5ME.14307 | Open architectural | | Eligible (O) | Gateway | Scientific Use |
| 5ME.1524 | Open architectural | | Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.15309 | Open architectural | | Eligible (O) | Roan Creek | Scientific Use |
| 5ME.15325 | Open architectural | | Eligible (O) | Roan Creek | Scientific Use |
| 5ME.15461 | Open architectural | | Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.15827.1 | Open architectural | Brush Fence | OND | Plateau Valley | Public Use |
| 5ME.16331 | Open architectural | | Eligible (F) | Bangs Canyon | Scientific Use |
| 5ME.176 | Open architectural | | Need data (F) | Gateway | Scientific Use |
| 5ME.244 | Open architectural | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.325 | Open architectural | | Eligible (O) | Bangs Canyon | Scientific Use |
| 5ME.330 | Open architectural | | Eligible (O) | Bangs Canyon | Scientific Use |
| 5ME.332 | Open architectural | | Eligible (O) | Bangs Canyon | Scientific Use |
| 5ME.3910 | Open architectural | Camp | Need data (F) | Grand Mesa Slopes | Scientific Use |
| 5ME.4651 | Open architectural | | Not Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.470 | Open architectural | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.4734 | Open architectural | | Not Eligible (O) | Grand Valley | Scientific Use |
| 5ME.5226 | Open architectural | | Not eligible (F) | Grand Mesa Slopes | Scientific Use |
| 5ME.6022 | Open architectural | Trash scatter/ dump | Eligible (F) | Grand Valley | Scientific Use |
| 5ME.6387 | Open architectural | | Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.694 | Open architectural | | No assessment | Plateau Valley | Scientific Use |
| 5ME.719 | Open architectural | | No assessment | Roan Creek | Scientific Use |
| 5ME.807 | Open architectural | Ute Trail | No assessment | Roan Creek | Public Use |
| 5ME.84 | Open architectural | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.8667 | Open architectural | | Not Eligible (O) | Bangs Canyon | Scientific Use |
| 5MN.6235 | Open architectural | | Eligible (O) | Gateway | Scientific Use |
| 5GF.1460 | Open architectural, ceremonial | | Eligible (F) | Book Cliffs | Scientific Use |
| 5ME.5962 | Open architectural, culturally scarred trees | | Eligible (O) | Gateway | Scientific Use |
| 5ME.3768 | Open architectural, rock art | | Eligible (F) | Grand Mesa Slopes | Scientific Use |
| 5ME.7089 | Open camp | | Eligible (O) | Roan Creek | Scientific Use |
| 5ME.974 | Open camp, culturally scarred trees | | Eligible (F) | Plateau Valley | Scientific Use |
| 5GF.1078 | Rock art | | Not eligible (F) | Book Cliffs | Scientific Use |
| 5GF.1436 | Rock art | | Not eligible (F) | Book Cliffs | Scientific Use |
| 5GF.168 | Rock art | Inscription | Eligible (F) | Book Cliffs | Scientific Use |
| 5GF.332 | Rock art | Inscription | Not eligible (F) | Book Cliffs | Scientific Use |
| 5GF.333 | Rock art | | Not eligible (F) | Book Cliffs | Scientific Use |

**Table I-4**
**Traditional Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5GF.342 | Rock art | | Need data (F) | Book Cliffs | Scientific Use |
| 5GF.518 | Rock art | | Not eligible (F) | Book Cliffs | Scientific Use |
| 5GF.742 | Rock art | | Eligible (O) | Book Cliffs | Scientific Use |
| 5ME.11361 | Rock art | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.11376 | Rock art | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.11380 | Rock art | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.11399 | Rock art | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.1637 | Rock art | | No assessment | Bangs Canyon | Public Use |
| 5ME.165 | Rock art | | Need data (F) | Gateway | Scientific Use |
| 5ME.237 | Rock art | | No assessment | Gateway | Scientific Use |
| 5ME.279 | Rock art | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.398 | Rock art | | Eligible (F) | Grand Mesa Slopes | Scientific Use |
| 5ME.459 | Rock art | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.4661 | Rock art | | Not eligible (F) | Gateway | Scientific Use |
| 5ME.6218 | Rock art | | Need data (O) | Bangs Canyon | Scientific Use |
| 5ME.705 | Rock art | | Eligible (O) | Gateway | Scientific Use |
| 5ME.706 | Rock art | | No assessment | Gateway | Scientific Use |
| 5ME.729 | Rock art | | No assessment | Gateway | Scientific Use |
| 5ME.786 | Rock art | | No assessment | Glade Park | Scientific Use |
| 5ME.79 | Rock art | | No assessment | Plateau Valley | Scientific Use |
| 5ME.8673 | Rock art | | Not Eligible (O) | Glade Park | Scientific Use |
| 5ME.8686 | Rock art | Inscription | Eligible (O) | Glade Park | Public Use |
| 5ME.1550 | Rock art | | Eligible (O) | Roan Creek | Scientific Use |
| 5ME.450 | Rock art, open camp | | Eligible (F) | Glade Park | Scientific Use |
| 5ME.4502 | Rock art, open camp | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.15720 | Rock art, open lithic | | Eligible (F) | Plateau Valley | Conservation Use |
| 5ME.328 | Rock art, open lithic | | Eligible (O) | Bangs Canyon | Scientific Use |
| 5ME.329 | Rock art, open lithic | | Eligible (O) | Bangs Canyon | Public Use |
| 5GF.1509 | Rock art, sheltered camp | | Eligible (O) | Book Cliffs | Scientific Use |
| 5GF.931 | Rock art, sheltered camp | | Need data (O) | Book Cliffs | Scientific Use |
| 5ME.11250 | Rock art, sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.11368 | Rock art, sheltered camp | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.11369 | Rock art, sheltered camp | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.11377 | Rock art, sheltered camp | | Eligible (O) | Glade Park | Scientific Use |

**Table I-4**
**Traditional Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.1548 | Rock art, sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.1635 | Rock art, sheltered camp | | Need data (F) | Roan Creek | Scientific Use |
| 5ME.168 | Rock art, sheltered camp | | Need data (F) | Gateway | Scientific Use |
| 5ME.3731 | Rock art, sheltered camp | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.4091 | Rock art, sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.468 | Rock art, sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.4947 | Rock art, sheltered camp | | Eligible (O) | Grand Mesa Slopes | Public Use |
| 5ME.718 | Rock art, sheltered camp | | Eligible (O) | Bangs Canyon | Scientific Use |
| 5ME.11334 | Rock art, sheltered camp | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.6026 | Sheltered architectural | | Eligible (F) | Grand Valley | Scientific Use |
| 5GF.1147 | Sheltered architectural, rock art | | Eligible (O) | Book Cliffs | Scientific Use |
| 5ME.241 | Sheltered architectural, rock art | | Eligible (O) | Bangs Canyon | Scientific Use |
| 5GF.341 | Sheltered camp | | Need data (F) | Book Cliffs | Scientific Use |
| 5GF.768 | Sheltered camp | | Need data (O) | Book Cliffs | Scientific Use |
| 5ME.1053 | Sheltered camp | | Need data (F) | Glade Park | Scientific Use |
| 5ME.11374 | Sheltered camp | | Eligible (O) | Glade Park | Scientific Use |
| 5ME.11669 | Sheltered camp | Camp | Eligible (O) | Grand Mesa Slopes | Scientific Use |
| 5ME.11800 | Sheltered camp | | Eligible (F) | Glade Park | Scientific Use |
| 5ME.13659 | Sheltered camp | Inscription | Eligible (O) | Glade Park | Scientific Use |
| 5ME.13958 | Sheltered camp | | Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.245 | Sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.268 | Sheltered camp | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.281 | Sheltered camp | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.317 | Sheltered camp | | No assessment | Plateau Valley | Scientific Use |
| 5ME.3838 | Sheltered camp | | Not Eligible (O) | Plateau Valley | Scientific Use |
| 5ME.395 | Sheltered camp | | Listed NR | Bangs Canyon | Scientific Use |
| 5ME.4009 | Sheltered camp | | Not eligible (F) | Roan Creek | Scientific Use |
| 5ME.404 | Sheltered camp | | Eligible (F) | Grand Mesa Slopes | Scientific Use |

**Table I-4**
**Traditional Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Secondary Allocation |
|---|---|---|---|---|---|
| 5ME.406 | Sheltered camp | | Eligible (F) | Grand Mesa Slopes | Scientific Use |
| 5ME.407 | Sheltered camp | | Eligible (F) | Plateau Valley | Scientific Use |
| 5ME.4433 | Sheltered camp | | Eligible (F) | Roan Creek | Scientific Use |
| 5ME.4698 | Sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.4716 | Sheltered camp | | Not eligible (F) | Glade Park | Scientific Use |
| 5ME.6341 | Sheltered camp | | Need data (F) | Bangs Canyon | Scientific Use |
| 5ME.687 | Sheltered camp | | Eligible (F) | Glade Park | Scientific Use |
| 5ME.99 | Sheltered camp | | Need data (F) | Glade Park | Scientific Use |
| 5GF.608 | Sheltered camp, open camp | | Not Eligible (O) | Book Cliffs | Scientific Use |
| 5ME.7307 | Sheltered camp, open camp | | Eligible (O) | Plateau Valley | Scientific Use |
| 5MN.1144 | Sheltered camp, open camp | | Eligible (F) | Gateway | Scientific Use |
| 5ME.504 | Trail | Trail | No assessment | Gateway | Public Use |
| 5MN.1170 | Trail | Mining | Need data (F) | Gateway | Scientific Use |
| 5MN.7955 | Trail | | Need data (F) | Gateway | Public Use |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5GF.11859 | | Water control | Not Eligible (O) | Plateau Valley | Bluestone Valley Ditch, functioning ditch, mostly private |
| 5GF.1510 | | Cadastral marker | Not Eligible (O) | Roan Creek | 1924 cadastral monument |
| 5GF.1511 | | Water control and a road | Not Eligible (O) | Roan Creek | This needs to be reevaluated and recorded as two distinct sites. The segment of the Gibler Ditch is on Clear Creek, the road is to the east. |
| 5GF.1588 | | Road | Not Eligible (O) | Roan Creek | Conn Creek Road, modern use of historic alignment |
| 5GF.2778 | | Water control feature | Not Eligible (O) | Big Salt Wash | Middle Camp Ditch No. 1, must be abandoned, current plot shows it in wash |
| 5GF.282 | | Road | Not eligible (F) | Book Cliffs | Trail Canyon Trail, extant trail/road along modern alignment of Douglas Pass Road |
| 5GF.3889 | | Communication | Need data (F) | Book Cliffs-Grand Valley | Two segments of abandoned telegraph line recorded on BLM |
| 5GF.3982 | | Water control | Need data (F) | Roan Creek | Newman Ditch, functioning ditch, mostly private |
| 5GF.4110 | | Water control | Not Eligible (F) | Roan Creek | Conwell Ditch, abandoned historic irrigation system |
| 5GF.4220 | | Water control feature | Need data (O) | Clear Creek | Himebaugh Ditch - abandoned and possible active segments, mostly on Private |
| 5GF.4221 | | Water control | Need data (F) | Roan Creek | Clear Creek Ditch, functioning ditch, mostly private |
| 5GF.4222 | | Water control | Need data (F) | Roan Creek | Roan Ck. Ditch No.3, functioning ditch, mostly private |
| 5GF.4224 | | Road | Not Eligible (F) | Roan Creek | Clear Creek Road, modern use of historic alignment |
| 5GF.4245 | | Cadastral marker | Not eligible (F) | Grand Valley | Abandoned cadastral marker, documents error in Township Survey |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5GF.4259 | | Road | Not Eligible (F) | Roan Creek | Bowdish Gulch Pack Trail-modern use of historic alignment |
| 5GF.621 | | Historic Wagon Road | Need data (O) | Baxter Pass | Baxter Pass - Roan Divide Wagon Road? abandoned. This alignment mapped at smaller scale by GLO in late 1800's |
| 5GF.642 | | Railroad | Need data (F) | Book Cliffs | Historic Uintah railroad grade and Baxter Pass Road in Garfield County and associated sites (Atchee on private) |
| 5GF.879 | | Water control feature | Not eligible (O) | East Salt Creek - Book Cliffs | Davenport Ditch - East Salt Creek abandoned irrigation ditch off |
| 5GF.881 | | Fence | Not eligible (F) | Demaree WSA | Range fence at the end of the Demaree Cherry stem, assoc. with historic road 5GF.882 |
| 5GF.882 | | Road | No assessment | Grand Valley | Demaree cherry stem, portions of the historic alignment appear on aerial, modern use on remaining |
| 5ME.1018 | | Mining | Need data (F) | Gateway | Loading chute on Hwy 141 near Gateway |
| 5ME.11086 | | Mining | Not Eligible (O) | Gateway | Upper North Larsen Canyon Uranium Camp Historic mining on Tenderfoot Mesa |
| 5ME.11696 | | Road | Eligible (O) | Grand Valley | Abandoned historic road assoc. with D&RGW abandoned RR grade at Utah border |
| 5ME.11803 | | Road | Listed NR | Plateau Valley | Colorado River Bridge - CDOT No. G-04-A |
| 5ME.11853 | | Road | Not Eligible (O) | Plateau Valley | Abandoned historic road south of Moffatt Gulch |
| 5ME.1187 | | Trail | Not Eligible (F) | Grand Mesa Slopes | Two track road on BLM at USFS boundary |
| 5ME.1194 | | Mining | Not Eligible (O) | Gateway | Outlaw Mines-Within Potential NRHP District- |
| 5ME.1196 | | Mining | Not Eligible (O) | Gateway | Peach Mines Within Potential NRHP District- |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5ME.12225 | Sheltered camp | | Eligible (O) | Bangs Canyon | Experimental Use |
| 5ME.12288 | | Mining | Eligible (F) | Gateway | Bonanza Claim Century Tunnel -Within Potential District-Contributing |
| 5ME.12289 | | Mining | Not eligible (F) | Gateway | Newhiesel Mine- Within Potential District-Contributing |
| 5ME.12480 | Sheltered camp | | Not Eligible (O) | Bangs Canyon | Experimental Use |
| 5ME.12483 | | Water control feature | Within Potential District-Contributing | Roan Creek | Associated with Grand Valley Diversion Dam on the Colorado River |
| 5ME.12484 | | Habitation/ homestead | Within Potential District-Contributing | Roan Creek | Associated with Grand Valley Diversion Dam on the Colorado River |
| 5ME.12566 | Open lithic | Mining | Not Eligible (O) | Gateway | Arrowhead Mine Landscape Within Potential NRHP District- |
| 5ME.13044 | | Road | Eligible (F) | Unaweep Canyon | Highway 141 modern use in original alignment |
| 5ME.13124 | | Mining | Eligible (O) | Gateway | Historic Mining landscape associated with the Climax Mines on Outlaw Mesa Within Potential NRHP District- |
| 5ME.14048 | | Water control | Not Eligible (O) | Glade Park - Mud Springs | Fruita Aqueduct - abandoned segment of water supply pipe |
| 5ME.14281 | | Rock feature | Not Eligible (O) | Bangs Canyon | Cadastral marker |
| 5ME.14306 | | Mining | Not Eligible (O) | Gateway | Historic mining associated with the Maverick Mines Within Potential NRHP District- |
| 5ME.15160 | Open lithic | Mining | Not Eligible (O) | Gateway | Historic mining in the Blue Mesa area Within Potential NRHP District- |
| 5ME.15161 | Open lithic | Mining | Not Eligible (O) | Gateway | Historic mining in the Blue Mesa area Within Potential NRHP District- |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5ME.15176 | Open lithic | Mining | Not Eligible (O) | Gateway | Historic mining associated with the Maverick Mines Within Potential NRHP District- |
| 5ME.15177 | | Mining | Not Eligible (O) | Gateway | Maverick Mines-Within Potential NRHP District- |
| 5ME.15178 | Open camp | Mining | No assessment | Gateway | Arrowhead Mine Landscape Within Potential NRHP District- |
| 5ME.15179 | | Mining | Not Eligible (O) | Gateway | Historic mining associated with the Calamity Mines |
| 5ME.15370 | | Trail | Not Eligible (O) | Bangs Canyon | Historic abandoned trail-Rough Canyon ACEC |
| 5ME.15463 | | Road | Not Eligible (O) | Plateau Valley | Horse Canyon Road, modern use of historic alignment |
| 5ME.15499 | | Water control feature | Need data (O) | Grand Valley | Salinity Control Project retention dam in the N. Fruita Desert |
| 5ME.15500 | | Road | Eligible (F) | Grand Valley | Hwy 139 - modern use in original alignment |
| 5ME.1556 | | Brush Fence | Not Eligible (F) | Dolores Point | This historic sites needs to be reevaluated, recorded as a site, and photographed |
| 5ME.15590.1 | | Water control | Not Eligible (F) | Grand Mesa Slopes | Laurent Ditch -functioning ditch, BLM & private |
| 5ME.15882 | | Water control feature | Not Eligible (F) | south of the town of DeBeque | Abandoned irrigation ditch off an unnamed drainage |
| 5ME.16136.1 | | Water control | Not Eligible (F) | Grand Mesa Slopes | Extension of the Bauer Ditch, abandoned ditch, mostly BLM in this segment |
| 5ME.16137.1 | | Water control | Eligible (F) | Grand Mesa Slopes | Kannah Creek Aqueduct - buried historic water pipe, still in use |
| 5ME.16155 | | Fence -Stone | Not Eligible (F) | Grand Mesa Slopes | Associated with cleared field at historic homestead |
| 5ME.16535 | | Road | Not Eligible (F) | Grand Mesa Slopes | Lands End CCC Trail segment, abandoned section of Lands End Road near USFS boundary |
| 5ME.16587.1 | | Historic powerline | Not Eligible (O) | DeBeque cut-off road | Abandoned powerline |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5ME.301 | | Water control feature | Listed NR | Colorado River DeBeque Canyon | Grand Valley Diversion Dam on the Colorado River |
| 5ME.4022 | | Fence | Not eligible (F) | Roan Creek | Log fence, recorded as possible homestead boundary fence, on private BLM boundary |
| 5ME.4436 | | Fence | Not Eligible (O) | Roberts Canyon Bunkwater Ridge | Range fence |
| 5ME.4676 | | Water control feature | Eligible (O) | Grand Valley | Government Highline Canal, ditch and associated features, mostly on private land |
| 5ME.4677 | | Water control feature | Eligible (O) | Grand Mesa Slopes | Old Mill Road aka in this location as Tabeguache Trail. Historic road, modern recreation use |
| 5ME.4680 | segment .3 is private and .15 is on BLM | Water control | Within District (Not Contributing) | Grand Valley | Kiefer Extention Canal, functioning ditch, mostly private |
| 5ME.4846 | | Road | No assessment | Bangs Canyon | Historic road house associated with Unaweep Canyon wagon road |
| 5ME.511 | | Mining | No assessment | Gateway | Copper Rivet Mine - Within Potential NRHP District- |
| 5ME.513 | | Mining | No assessment | Gateway | Pyramid Copper Mine and Mills-Within Potential NRHP District- |
| 5ME.5265 | Open lithic | Mining | Eligible (O) | Gateway | Calamity Camp Within Potential NRHP District- |
| 5ME.644 | | Historic Wagon Road | Eligible (O) with non contributing segments | Una Valley to Collbran | DeBeque & Upper Plateau County Wagon Road, abandoned wagon road |
| 5ME.6840 | | Road | Not Eligible (O) | Grand Mesa Slopes | Abandoned historic spur road to the historic Hogback Road (5ME.923) |
| 5ME.7022 | | Mining | Eligible (O) | Gateway | Rajah 30 Mine-Within Potential NRHP District- |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5ME.7023 | | Mining | Not Eligible (O) | Gateway | Rajah 30 Mine (Area B)-Within Potential District- |
| 5ME.7024 | | Mining | Eligible (O) | Gateway | Cherokee Camp Within Potential NRHP District- |
| 5ME.7025 | | Mining | Eligible (O) | Gateway | Pack Rat Mine - Within Potential NRHP District- |
| 5ME.7026 | | Mining | Need Data (O) | Gateway | Hubbard Mine - Within Potential NRHP District- |
| 5ME.7028 | | Mining | Not Eligible (O) | Gateway | New Verde Mine Within Potential NRHP District- |
| 5ME.7351 | | Railroad | Eligible (O) | Grand Valley | Abandoned railroad grade, Dener & Rio Grande Western |
| 5ME.7415.1 | | Historic Wagon Road | Not Eligible (O) | Plateau Valley | Plateau Creek Wagon Road, abandoned road, plotted segment is mostly on private |
| 5ME.7428 | | Mining | Not Eligible (O) | Gateway | Liberty Bell No. 2 Mine Within Potential NRHP District- |
| 5ME.7429 | | Mining | Not Eligible (O) | Gateway | Protector/Lincoln Mine Within Potential NRHP District- |
| 5ME.751 | | Habitation/ homestead | Not eligible (F) | Roan Creek | Latham Cabin - Historic homestead |
| 5ME.764 | | Water control feature | Eligible (O) | Grand Mesa Slopes | Redlands Hydroelectric Power Comples & Dam on the Gunnison River |
| 5ME.767 | | Railroad | Eligible (O) | Grand Valley | Uintah RR grade along Mesa County Road 4 |
| 5ME.768 | | Railroad | Need data (O) | Grand Valley | Carpentar Railroad grade |
| 5ME.8044 | | Water control | Not Eligible (O) | Grand Mesa Slopes | Lander Extension Ditch - abandoned historic ditch, private & BLM |
| 5ME.8079 | | Water control | | Grand Mesa Slopes | Long Mesa Ditch-abandoned historic ditch, this segment recorded on BLM |
| 5ME.815 | Trail | Road | Not eligible (F) | Plateau Valley | Scientific Use - Historic abandoned trail-this site needs a reevaluation to correct errors in the record |

**Table I-5**
**Public Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Description *(and secondary allocation if any)* |
|---|---|---|---|---|---|
| 5ME.821 | | Mining | Not eligible (F) | Gateway | Chado Mines- Within Potential NRHP District- |
| 5ME.923 | | Road | Eligible (F) | Palisade to Mesa, up Rapid Creek down Nate Creek | Hogback Road-modern use of historic alignment, no public access |
| 5ME.924 | | Historic Road | | Colorado River DeBeque Canyon | Roan Ck. Toll, functioning ditch, mostly private |
| 5ME16588.1 | | Water control feature | | DeBeque cut-off road | Abandoned irrigation ditch off an unnamed drainage |
| 5ME775 | | Historic Routes | No assessment | Plateau Valley, Grand Valley, Grand Mesa Slopes | Needs reevaluation. This one number records five historic routes, the Whitman, Gunnison, and Pattie surveys, the N. Branch of the Old Spanish Trail (a Designated National Historic Trail), and the Salt Lake Wagon Road. |
| 5MN.1171 | | Historic Trail | | Dolores River Canyon - Sewemup Mesa | McCarty Canyon Trail, abandoned trail associated with local historic figure, |
| 5MN.6048 | | Road | Eligible (F) | Gateway | Highway 141 modern use in original alignment |

**Table I-6**
**Experimental Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Allocation (Secondary) |
|---|---|---|---|---|---|
| 5ME.13337 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13338 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13339 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13340 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13341 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13342 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13343 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13344 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13345 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13346 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13347 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13348 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13349 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13350 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13351 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13352 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13354 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13355 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.13356 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.11933 | Open lithic | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12785 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12787 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12791 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12801 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12803 | Open lithic | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12805 | Open lithic | | Not Eligible (O) | Gateway | Scientific |
| 5ME.12807 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.15158 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.5116 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.5117 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.5902 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.11975 | Open lithic | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12002 | Open lithic | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12023 | Open lithic | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12025 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12029 | Open lithic | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12519 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12520 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12523 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12528 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12530 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12531 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12532 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12533 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12536 | Open camp | | Not Eligible (O) | Glade Park | Scientific |

**Table I-6**
**Experimental Use Sites**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Allocation (Secondary) |
|---|---|---|---|---|---|
| 5ME.12545 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12555 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12556 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12557 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12558 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.12559 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.13657 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.13660 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.13662 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.13663 | Open camp | | Not Eligible (O) | Glade Park | Scientific |
| 5ME.15502 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | Scientific |
| 5ME.15504 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | Scientific |
| 5ME.15507 | Open lithic | | Not Eligible (O) | Grand Mesa Slopes | Scientific |
| 5ME.6027 | Open lithic | | Not Eligible (O) | Grand Valley | Scientific |
| 5ME.6785 | Open lithic | | Not Eligible (O) | Grand Valley | Scientific |
| 5ME.4781 | | Farm/ranch | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.14944 | | Farm/ranch | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.4954 | Open lithic | | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.14089 | Open lithic | | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.4864 | Open lithic | | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.4865 | Open lithic | | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.14947 | Open lithic | | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.14948 | Open lithic | | Not Eligible (O) | Plateau Valley | Scientific |
| 5ME.11722 | Open lithic | | Not Eligible (O) | Gateway | Scientific |
| 5ME.14423 | Open camp | | Not Eligible (O) | Gateway | Scientific |
| 5ME.14435 | Open lithic | | Not Eligible (O) | Gateway | Scientific |
| 5ME.14436 | Open lithic | | Not Eligible (O) | Gateway | Scientific |
| 5ME.11919 | Open camp | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.11921 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.14285 | | Camp | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.14262 | Open lithic | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.14263 | | Camp | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.12926 | Open camp | | Not Eligible (O) | Bangs Canyon | Scientific |
| 5ME.14286 | | Camp | Not Eligible (O) | Bangs Canyon | Scientific |

**Table I-7**
**Sites Discharged from Management**

| Site No. | Prehistoric Site Type | Historic Site Type | Eligibility | RMP Planning Area | Justification |
|---|---|---|---|---|---|
| 5ME.4715 | wooden fence | | Not eligible (O) 2000 | Gateway | burned in Cone Mountain Fire |
| 5ME.239 | Rock Art | | Not eligible (O) 2008 | Gateway | not relocated, likely destroyed by Hwy. construction |
| 5GF.322 | Open lithic | | Not eligible (O) 2009 | Roan Creek | destroyed by construction |
| 5ME.3998 | Open lithic | | Not eligible (O) 2010 | Glade Park | land exchange, retained in patent reservation, released by data recovery |
| 5ME.5997 | Open camp | Homestead | Not eligible (O) 2010 | Glade Park | land exchange, retained in patent reservation, released by data recovery |
| 5ME.6141 | Open camp | | Not eligible (O) 2010 | Glade Park | land exchange, retained in patent reservation, released by data recovery |
| 5ME.6144 | Open camp | | Not eligible (O) 2010 | Glade Park | land exchange, retained in patent reservation, released by data recovery |

## I.7 References

BLM. 2004. BLM Manual 8110: Identifying and Evaluating Cultural Resources. Rel. 8-73. BLM, Washington, DC. December 3, 2004. 42pp.

# Appendix J
## Allotments and Allotment Management Levels

BLM_0024699

BLM_0024700

# APPENDIX J
# ALLOTMENTS AND ALLOTMENT MANAGEMENT LEVELS

Additional detail regarding management actions and allowable uses for the livestock grazing program are provided in the Approved Resource Management Plan.

The following allotments are closed to livestock grazing:

- Baldridge Mesa: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Bevan: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Boulder Canyon: Category M allotment, conflicts with unfenced developed private land, recreation issues;
- Browns Place: Category C allotment, conflicts with unfenced developed private land;
- Brush Creek: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Charlesworth: Category C allotment with a small amount of isolated public land;
- Clifton: Category C allotment, conflicts with unfenced developed private land;
- Clover Gulch: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Coon Creek: Category C allotment with a small amount of public land, wildlife issues;

- Dead Horse: Category C allotment, conflicts with unfenced developed private land;
- Dry Kimball: Category C allotment with a small amount of public land, wildlife issues;
- Eby Point: Category C allotment with a small amount of public land, unsuitable for livestock;
- Erven; Category C allotment with a small amount of public land and riparian issues;
- Etcheverry: Category C allotment with a small amount of isolated public land, unsuitable for livestock;
- Fetters: Category C allotment with a small amount of isolated public land;
- Heely: Land Health and threatened and endangered species issues;
- Hight: Category C allotment with a small amount of public land;
- Horizon: Category C allotment with a small amount of public land;
- Hunter: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Logan Wash: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Parkes Place: Category C allotment with a small amount of isolated public land;
- Plateau Creek: Category C allotment with a small amount of public land and riparian issues;
- Red Mountain: Category C allotment with a small amount of public land;
- Webber: Category C allotment with a small amount of isolated public land, unsuitable for livestock, wildlife issues;
- Webb Isolated Tracts: Category C allotment with a small amount of isolated public land; and
- Whitewater Hill: Category C allotment, conflicts with unfenced developed private land.

Under the Approved RMP, the following criteria will be used to periodically evaluate whether to close other allotments or portions of allotments to livestock grazing:

- Areas identified as BLM disposal tracts;
- Lack of administrative access to public land;

- Small percentage of forage in allotment is contributed by BLM lands in allotment (less than 15 percent);
- Areas not accessible to livestock grazing (e.g., steep slopes);
- "C" category allotments that are relinquished and determined to be impractical for the administration of livestock grazing by the Authorized Officer;
- Major impact to wildlife or threatened and endangered species (e.g., competition for forage, winter range, sage-grouse habitat), or sensitive fish habitat, as determined by data analysis;
- Public health and safety;
- High intensity recreation areas or facilities;
- Resource objectives for municipal watersheds;
- Impacts to cultural resources; and
- Conflicts with adjoining private lands (development).

The following table provides a complete list of all allotments managed by the Grand Junction Field Office; their permitted AUMs, type of livestock, season of use, acreage, and management category.

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| 28 Hole | 06126 | 56 | Cattle | 11/10 | 1/20 | 663 | 0 | 663 | I |
| | | | | 4/10 | 6/7 | | | | |
| 4-A Individual | 06756 | 22 | Cattle | 9/1 | 9/30 | 206 | 1 | 206 | C |
| 4-A Mountain | 06725 | 308 | Cattle | 6/16 | 10/15 | 926 | 1,039 | 926 | M |
| | | | Horse | 6/16 | 10/15 | | | | |
| 4-A Place | 06755 | 12 | Cattle | 9/1 | 9/30 | 91 | 197 | 91 | C |
| Ames | 06413 | 21 | Cattle | 1/15 | 4/1 | 257 | 318 | 257 | C |
| B. Hawkins | 16825 | 45 | Cattle | 2/1 | 2/28 | 87 | 273 | 87 | C |
| | | | | 3/1 | 4/30 | | | | |
| Badger Wash | 06601 | 429 | Cattle | 3/1 | 4/30 | 7,688 | 289 | 7,688 | I |
| | | | | 12/2 | 12/30 | | | | |
| Baker Canyon | 06731 | 10 | Cattle | 4/25 | 5/24 | 171 | 0 | 171 | C |
| | | | | 11/15 | 12/15 | | | | |
| Bald Hill Common | 16802 | 100 | Cattle | 6/15 | 7/3 | 781 | 15 | 781 | M |
| Baldridge Mesa | 06851 | 0 | Cattle | 04/10 | 2/12 | 766 | 792 | 0 | C |
| Bangs | 06116 | 1,563 | Cattle | 3/1 | 5/29 | 23,072 | 875 | 23,072 | I |
| | | | | 11/1 | 2/28 | | | | |
| Bar-X[3] | 05808 | | | | | 8,667 | | | |
| Battleship | 06167 | 19 | Cattle | 5/20 | 6/20 | 1,090 | 2,572 | 1,090 | C |
| | | | | 10/25 | 12/1 | | | | |
| Bear Gulch | 06701 | 58 | Cattle | 5/25 | 7/20 | 1,163 | 1,672 | 1,163 | C |
| | | | | 10/16 | 11/20 | | | | |
| Beaver Mesa | 06404 | 40 | Cattle | 11/25 | 1/18 | 1,026 | 85 | 1,026 | I |
| Beehive | 16807 | 177 | Cattle | 5/16 | 6/30 | 3,932 | 382 | 3,932 | I |
| | | | | 10/1 | 10/8 | | | | |
| | | 321 | Cattle | 5/16 | 6/30 | | | | |
| | | | | 10/1 | 10/8 | | | | |
| Beeman | 06432 | 33 | Cattle | 4/16 | 5/31 | 853 | 807 | 853 | C |
| | | | | 10/16 | 11/15 | | | | |
| Beezer | 06165 | 251 | Cattle | 5/1 | 6/1 | 1,126 | 12 | 1,126 | I |
| | | | | 11/16 | 11/30 | | | | |
| Berg's North Mesa | 06424 | 202 | Cattle | 5/10 | 11/16 | 1,704 | 616 | 1,704 | M |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| Berry Homestead | 06702 | 108 | Cattle | 5/1 | 5/31 | 2,913 | 124 | 2,913 | I |
| | | | | 11/15 | 12/31 | | | | |
| | | 73 | Cattle | 5/1 | 5/31 | | | | |
| | | | | 11/15 | 12/31 | | | | |
| | | 37 | Cattle | 5/1 | 5/31 | | | | |
| | | | | 11/15 | 12/31 | | | | |
| Berthod Place | 06848 | 19 | Cattle | 7/10 | 9/18 | 162 | 166 | 162 | C |
| Bevan | 16816 | 0 | Cattle | 6/15 | 9/15 | 196 | 1,007 | 0 | C |
| Big Park | 06843 | 759 | Cattle | 4/15 | 6/10 | 11,658 | 8,088 | 11,658 | M |
| Big Salt | 16501 | 1,299 | Cattle | 3/1 | 5/5 | 27,117 | 2,906 | 27,117 | I |
| | | | | 5/1 | 11/15 | | | | |
| | | | | 11/15 | 2/28 | | | | |
| Blue Mesa | 06406 | 1,114 | Cattle | 3/1 | 5/31 | 41,878 | 375 | 41,878 | I |
| | | | | 11/1 | 02/28 | | | | |
| Boulder Canyon | 06157 | 0 | Cattle | 5/16 | 6/15 | 2,473 | 10 | 0 | I |
| Brink Pedigo Gulch | 6703 | 111 | Cattle | 4/26 | 6/25 | 5,621 | 2,626 | 5,621 | I |
| | | | | 11/20 | 12/30 | | | | |
| Browns Place | 06850 | 0 | Cattle | 3/28 | 4/27 | 810 | 643 | 0 | C |
| Brush Creek | 06708 | 0 | Cattle | 4/1 | 5/1 | 856 | 3,253 | 0 | C |
| Brush Mountain Comm. | 06705 | 624 | Cattle | 7/1 | 9/30 | 1,869 | 86 | 1,869 | I |
| | | 15 | Cattle | 7/1 | 9/30 | | | | |
| Buckhorn[3] | 05863 | | | | | 2,438 | | | |
| Bull Draw Comm. | 06402 | 100 | Cattle | 4/26 | 5/26 | 4,857 | 121 | 4,857 | I |
| | | | | 11/1 | 11/15 | | | | |
| Bull Hill-Mav Comm. | 06407 | 564 | Cattle | 5/5 | 5/27 | 14,611 | 0 | 14,611 | I |
| | | | | 10/16 | 11/15 | | | | |
| Burdick E. of Ranch | 06706 | 90 | Cattle | 11/1 | 11/30 | 1,284 | 125 | 1,284 | I |
| Burdick Homestead | 06707 | 21 | Cattle | 6/27 | 11/1 | 75 | 714 | 75 | C |
| Burford Individual | 06153 | 29 | Cattle | 6/20 | 7/14 | 493 | 838 | 493 | C |
| Carbon | 06722 | 415 | Cattle | 5/31 | 10/31 | 1,363 | 912 | 1,363 | M |
| Carns Point | 06149 | 10 | Cattle | 6/1 | 6/7 | 50 | 37 | 50 | C |
| | | | | 10/15 | 10/21 | | | | |
| Carr Creek | 06709 | 145 | Cattle | 10/1 | 12/14 | 614 | 732 | 614 | C |

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 440 of 499

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| Casto-Lines Comm. | 06408 | 105 | Cattle | 4/16 | 5/15 | 1,694 | | 1,694 | I |
| | | | | 11/1 | 12/30 | | | | |
| | | 28 | Cattle | 11/1 | 12/31 | | | | |
| | | | | 4/16 | 5/24 | | | | |
| Cathedral Bluffs[4] | | | | | | | | | |
| Chalk Mountain | 06845 | 70 | Cattle | 5/20 | 10/31 | 1,588 | 0 | 1,588 | C |
| Charlesworth Iso. Tra. | 06855 | 0 | Cattle | 4/16 | 7/30 | 117 | 0 | 0 | C |
| Clarks Bench | 06122 | 106 | Cattle | 5/9 | 6/15 | 2,467 | 603 | 2,467 | I |
| Clifton | 06817 | 0 | Cattle | 4/16 | 5/15 | 490 | 1,207 | 0 | C |
| | | | Cattle | 1/1 | 1/31 | | | | |
| Clover Gulch | 06827 | 0 | Cattle | 4/16 | 6/16 | 714 | | 0 | C |
| Coal Gulch | 16502 | 303 | Cattle | 6/15 | 10/15 | 23,528 | 160 | 23,528 | I |
| Coates Creek | 06161 | 26 | Cattle | 5/1 | 5/10 | 378 | 252 | 378 | C |
| | | | | 11/15 | 11/22 | | | | |
| Collier[5] | 06839 | 121 | Cattle | 6/8 | 6/30 | 945 | 249 | 945 | C |
| | | | | 10/1 | 10/14 | | | | |
| Conn Creek/McCurdy | 06710 | 136 | Cattle | 5/1 | 5/30 | 1,643 | 349 | 1,643 | I |
| Conn Mtn Common | 06711 | 70 | Cattle | 6/1 | 10/31 | 166 | | 166 | C |
| | | 10 | Cattle | 5/16 | 10/15 | | | | |
| | | 10 | Cattle | 6/1 | 10/30 | | | | |
| Cook Canyon | 06159 | 18 | Cattle | 4/1 | 12/31 | 126 | 112 | 126 | C |
| Coon Creek | 16804 | 0 | Cattle | 5/25 | 6/18 | 357 | 18 | 0 | C |
| Coon Hollow Common | 06712 | 120 | Cattle | 4/15 | 6/10 | 19,219 | 1,059 | 17,965 | I |
| | | 100 | Cattle | 4/15 | 6/10 | | | | |
| Corcoran Wash | 06704 | 1,296 | Cattle | 5/1 | 6/15 | 9,972 | 1,357 | 9,972 | I |
| | | | | 10/16 | 12/31 | | | | |
| Cottonwood | 06431 | 222 | Cattle | 3/1 | 5/10 | 2,649 | 316 | 2,649 | C |
| | | | | 1/11 | 2/28 | | | | |
| Cow Mountain | 06751 | 686 | Cattle | 6/16 | 9/30 | 1,992 | 523 | 1,992 | I |
| Davis | 16818 | 35 | Cattle | 5/1 | 5/15 | 483 | 207 | 483 | C |
| | | | | 9/25 | 10/9 | | | | |
| Davis Amp | 06201 | 290 | Cattle | 4/15 | 5/20 | 4,274 | 1,134 | 4,274 | I |
| | | | | 12/4 | 1/13 | | | | |
| Dead Horse | 16119 | 0 | Cattle | 1/1 | 1/30 | 1,202 | 0 | 0 | C |

BLM_0024706

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| Dierich Ranch | 16112 | 54 | Cattle | 5/20 | 5/23 | 1,388 | 1,345 | 1,388 | C |
| | | | | 11/10 | 11/19 | | | | |
| Dolores Point[6] | 06429 | 821 | Cattle | 5/1 | 6/20 | 7,590 | 37 | 7,590 | I |
| | | | | 10/17 | 10/31 | | | | |
| | | | | 11/1 | 12/20 | | | | |
| | | | | 12/20 | 12/31 | | | | |
| Dolores River | 06411 | 160 | Cattle | 4/16 | 5/25 | 3,535 | 437 | 3,535 | I |
| | | | | 11/25 | 1/5 | | | | |
| Dougherty Gulch | 06714 | 140 | Cattle | 6/1 | 11/2 | 3,384 | 1,261 | 3,384 | I |
| Dry Canyon-Demaree | 16608 | 272 | Cattle | 1/1 | 2/28 | 10,419 | 591 | 10,419 | M |
| Dry Fork | 06715 | 564 | Cattle | 3/1 | 2/28 | 10,941 | 3,180 | 10,941 | M |
| Dry Kimball | 16834 | 0 | Cattle | 5/26 | 6/15 | 830 | 212 | 0 | C |
| Dugway | 06403 | 296 | Cattle | 4/15 | 5/9 | 6,097 | 41 | 6,097 | I |
| | | | | 11/20 | 1/19 | | | | |
| Duval | 16127 | 57 | Cattle | 10/24 | 11/7 | 658 | 0 | 658 | M |
| Duvall Bottom | 02777 | 29 | Cattle | 4/10 | 6/15 | 1,173 | 0 | 1,173 | C |
| | | | | 10/15 | 2/28 | | | | |
| East End Cow Mtn | 06716 | 101 | Cattle | 6/1 | 7/30 | 386 | 31 | 386 | M |
| East of Collbran | 6854 | 84 | Cattle | 5/1 | 11/30 | 642 | | 642 | C |
| East Salt[7] | 16602 | 3,852 | Cattle | 3/1 | 2/28 | 110,366 | 6,137 | 110,366 | I |
| East Toms Can Comm. | 16106 | 137 | Cattle | 4/20 | 6/2 | 3,681 | 211 | 3,681 | I |
| | | | | 11/15 | 12/9 | | | | |
| | | 68 | Cattle | 5/1 | 5/31 | | | | |
| | | | | 10/9 | 10/17 | | | | |
| Eby Gulch | 06717 | 32 | Cattle | 5/6 | 5/16 | 1,546 | 172 | 1,546 | C |
| | | | | 12/1 | 12/30 | | | | |
| Eby Point | 06719 | 0 | Cattle | 6/16 | 10/14 | 639 | 8 | 0 | C |
| EHL | 06423 | 1 | Cattle | 2/1 | 2/28 | 193 | 123 | 193 | C |
| Erven | 16819 | 0 | Cattle | 5/1 | 10/31 | 24 | 0 | 0 | C |
| Etcheverry | 06720 | 0 | Cattle | 2/1 | 2/28 | 572 | 1,970 | 0 | C |
| Fessler | 16113 | 63 | Cattle | 5/1 | 6/1 | 888 | 166 | 888 | C |
| Fetters[8] | 16821 | 0 | Cattle | 5/1 | 10/30 | 44 | 306 | 0 | C |
| Fish Canyon | 06164 | 180 | Cattle | 5/1 | 5/31 | 3,659 | 24 | 3,659 | I |
| | | | | 12/1 | 12/31 | | | | |
| Flat Rock | 06139 | 114 | Cattle | 7/1 | 11/1 | 705 | 1,455 | 705 | C |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| G-M-L Allotment | 06420 | 132 | Cattle | 3/1 | 3/31 | 3,381 | 14 | 3,381 | M |
| | | | | 12/1 | 12/31 | | | | |
| Gapter | 06820 | 84 | Cattle | 5/1 | 6/15 | 576 | 49 | 576 | C |
| | | | | 10/16 | 11/30 | | | | |
| Garr Mesa | 16503 | 334 | Cattle | 3/1 | 5/1 | 6,224 | 3,932 | 6,224 | M |
| | | | | 10/21 | 2/28 | | | | |
| Grassy Gulch Common | 16803 | 17 | Cattle | 6/1 | 6/15 | 431 | 9 | 431 | M |
| | | 25 | Cattle | 6/1 | 6/15 | | | | |
| | | 17 | Cattle | 6/1 | 6/15 | | | | |
| Guthrie Place | 16814 | 18 | Cattle | 6/1 | 7/31 | 143 | 123 | 143 | C |
| Halfway House | 16823 | 54 | Cattle | 5/1 | 5/31 | 964 | 261 | 964 | M |
| Hall | 06162 | 15 | Cattle | 5/1 | 6/19 | 73 | 18 | 73 | C |
| Hamilton | 06433 | 49 | Cattle | 1/1 | 3/15 | 635 | 207 | 635 | M |
| Hawxhurst Common | 16805 | 166 | Cattle | 5/20 | 6/8 | 3,818 | 1,595 | 3,818 | M |
| | | 89 | Cattle | 5/20 | 7/4 | | | | |
| | | 54 | Cattle | 5/20 | 7/4 | | | | |
| Head of Carr Creek | 06721 | 250 | Cattle | 6/16 | 11/1 | 4,115 | 2,140 | 4,115 | I |
| Heely | 16837 | 0 | Cattle | 4/20 | 5/31 | 2,327 | 214 | 0 | I |
| Henderson Ridge Comm. | 06723 | 81 | Cattle | 6/16 | 10/30 | 1,153 | 385 | 1,153 | M |
| | | 39 | Cattle | 6/16 | 10/13 | | | | |
| | | 99 | Cattle | 6/16 | 10/30 | | | | |
| Hight | 16828 | 0 | Cattle | 6/1 | 7/30 | 39 | | 0 | C |
| Highway 50 | 16204 | 77 | Cattle | 5/20 | 5/25 | 885 | 308 | 885 | C |
| | | | | 11/15 | 12/7 | | | | |
| Hill Creek-Flats | 06166 | 710 | Cattle | 6/1 | 7/10 | 5,470 | 597 | 5,470 | I |
| | | | | 11/1 | 11/15 | | | | |
| Hittle Place Ind. | 06841 | 75 | Cattle | 5/16 | 10/15 | 433 | 20 | 433 | C |
| Homestead | 06740 | 210 | Cattle | 5/10 | 7/1 | 4,566 | 739 | 4,566 | M |
| Horizon | 16830 | 0 | | 5/16 | 9/30 | 118 | | 0 | C |
| Horse Mountain | 06726 | 100 | Cattle | 6/16 | 10/15 | 556 | 339 | 556 | M |
| Hubbard[6] | 06419 | 621 | Cattle | 4/1 | 11/1 | 25,183 | 5,297 | 25,183 | I |
| Hunter | 16829 | 0 | Cattle | 6/1 | 9/15 | 143 | 1 | 0 | C |
| Hunter Wash | 16504 | 1,411 | Cattle | 3/1 | 5/3 | 13,042 | 710 | 13,042 | I |
| | | | | 12/1 | 2/28 | | | | |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| I.A.E. of Ranch | 06727 | 147 | Cattle | 5/1 | 5/30 | 1,821 | 519 | 1,821 | M |
| | | | | 11/1 | 12/15 | | | | |
| J.L. | 06422 | 37 | Cattle | 3/1 | 5/15 | 165 | 164 | 165 | C |
| | | | | 12/31 | 2/28 | | | | |
| Jerry Gulch | 06847 | 151 | Cattle | 5/1 | 6/30 | 1,472 | 950 | 1,472 | I |
| Kannah Creek Common | 16202 | 2,349 | Cattle | 5/1 | 6/30 | 20,158 | 4,466 | 20,158 | I |
| | | | | 10/15 | 11/30 | | | | |
| | | | | 12/15 | 1/15 | | | | |
| | | | | 1/16 | 1/23 | | | | |
| | | 664 | Cattle | 5/1 | 6/30 | | | | |
| | | | | 10/1 | 12/30 | | | | |
| | | 690 | Cattle | 5/1 | 6/30 | | | | |
| | | | | 10/1 | 12/30 | | | | |
| Kannah Creek Indiv. | 06207 | 105 | Cattle | 9/1 | 2/28 | 952 | 1,992 | 952 | C |
| Kelly Individual | 06169 | 13 | Cattle | 8/1 | 9/2 | 226 | 0 | 226 | C |
| Kimball Creek | 06724 | 193 | Cattle | 3/1 | 5/30 | 13,876 | 9,413 | 13,876 | M |
| | | | | 11/1 | 11/30 | | | | |
| Kimball Foothill Comm. | 06728 | 31 | Cattle | 5/15 | 6/13 | 433 | 266 | 433 | C |
| | | 18 | Cattle | 5/15 | 6/14 | | | | |
| Kimball Mtn. | 06729 | 200 | Cattle | 6/1 | 10/31 | 695 | 8,158 | 695 | M |
| King-Rogers | 16118 | 121 | Cattle | 6/17 | 10/31 | 895 | 14,345 | 895 | C |
| Kings Gap | 16104 | 25 | Cattle | 4/1 | 4/30 | 453 | 510 | 453 | C |
| Kinney | 16833 | 79 | Cattle | 6/21 | 6/30 | 1,448 | 4 | 1,448 | C |
| | | | | 10/1 | 10/3 | | | | |
| Ladder Canyon | 06158 | 142 | Cattle | 2/15 | 5/15 | 3,388 | 1,790 | 3,388 | I |
| Landini | 16120 | 161 | Cattle | 3/14 | 5/1 | 2,166 | | 2,166 | M |
| Lapham-Post | 16506 | 604 | Cattle | 5/2 | 11/15 | 8,052 | 863 | 8,052 | I |
| Leon | 16832 | 85 | Cattle | 6/15 | 10/15 | 291 | 1,439 | 291 | C |
| Leslie-Bays | 16131 | 48 | Cattle | 6/1 | 6/15 | 961 | 5,144 | 961 | C |
| | | | | 12/1 | 2/1 | | | | |
| Little Dolores River | 06134 | 85 | Cattle | 6/15 | 11/15 | 1,638 | 4,733 | 1,638 | C |
| Little Salt | 16507 | 2,734 | Cattle | 3/1 | 5/31 | 29,262 | 1,349 | 29,262 | I |
| | | | | 12/1 | 2/28 | | | | |
| Lloyd | 16835 | 113 | Cattle | 5/22 | 10/31 | 1,879 | 3,013 | 1,879 | M |
| Logan End Common | 06732 | 86 | Cattle | 6/1 | 10/31 | 1,653 | 2,913 | 1,653 | M |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| Logan Gulch | 06733 | 255 | Cattle | 5/5 | 6/18 | 3,471 | 398 | 3,471 | I |
| | | 169 | Cattle | 5/5 | 6/18 | | | | |
| | | 84 | Cattle | 5/5 | 6/18 | | | | |
| Logan Wash | 06734 | 0 | Cattle | 4/5 | 5/31 | 1,560 | 423 | 0 | M |
| Long | 16836 | 45 | Cattle | 5/16 | 6/30 | 279 | 1,037 | 279 | C |
| Lorimor | 16838 | 20 | Cattle | 6/1 | 9/1 | 167 | 152 | 167 | C |
| Lower 4-A | 06738 | 488 | Cattle | 6/6 | 10/30 | 1,855 | 1,189 | 1,855 | I |
| Lower Brush Mtn. Ind. | 06735 | 128 | Cattle | 6/16 | 10/15 | 477 | 4,072 | 477 | C |
| Lower Carr Creek | 06736 | 30 | Cattle | 5/3 | 6/2 | 303 | 1,004 | 303 | C |
| | | | | 10/1 | 10/31 | | | | |
| Lower Rapid-Cottonwood | 06844 | 168 | Cattle | 4/15 | 5/14 | 4,087 | 32 | 4,087 | M |
| | | | | 10/1 | 11/15 | | | | |
| Lower Roan Creek Comm. | 06737 | 57 | Cattle | 5/15 | 6/5 | 2,709 | 1,278 | 2,709 | I |
| | | | | 11/1 | 11/15 | | | | |
| | | 104 | Cattle | 6/1 | 6/15 | | | | |
| | | | | 10/16 | 10/22 | | | | |
| Lyons/Anderson | 16811 | 218 | Cattle | 5/1 | 6/14 | 1,963 | 157 | 1,963 | I |
| | | | | 10/16 | 11/30 | | | | |
| Mabie | 06160 | 10 | Cattle | 6/1 | 10/31 | 65 | 729 | 65 | C |
| Malone | 16107 | 5 | Cattle | 12/1 | 4/30 | 86 | 394 | 86 | C |
| Massey | 06437 | 29 | Cattle | 3/1 | 5/31 | 691 | 372 | 691 | C |
| | | | | 12/1 | 2/28 | | | | |
| McKay Fork | 06746 | 985 | Cattle | 6/13 | 9/30 | 10,505 | 2,339 | 10,505 | I |
| Meinhart | 16150 | 80 | Cattle | 8/1 | 9/30 | 2,144 | 1,695 | 2,144 | M |
| Milholland | 06840 | 27 | Cattle | 5/1 | 6/15 | 272 | 464 | 272 | C |
| Mogensen | 16508 | 67 | Cattle | 4/20 | 5/20 | 1,397 | 160 | 1,397 | M |
| Molina Place | 06853 | 30 | Cattle | 4/1 | 5/31 | 93 | 148 | 93 | C |
| Moore | 06140 | 48 | Yrling Cattle | 6/1 | 9/27 | 336 | 1,031 | 336 | C |
| Mormon Mesa[8] | 06857 | 18 | Cattle | 5/11 | 5/15 | 198 | | 198 | C |
| | | 11 | Cattle | 6/1 | 6/14 | | | | |
| Mountain Island[9] | 06154 | 1,612 | Cattle | 3/1 | 2/28 | 35,046 | 8,495 | 35,046 | I |
| Mt. Garfield | 16509 | 1,000 | Cattle | 3/1 | 4/30 | 26,124 | 4,549 | 26,124 | I |
| | | | | 12/1 | 2/28 | | | | |
| Mule Trail Draw | 06421 | 8 | Cattle | 12/11 | 1/10 | 180 | 195 | 180 | C |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| N.E. Spear | 06718 | 517 | Cattle | 4/16 | 5/31 | 6,411 | 1,316 | 6,411 | I |
| | | | | 11/16 | 2/15 | | | | |
| | | 29 | Cattle | 4/16 | 5/31 | | | | |
| Nelson | 06428 | 175 | Cattle | 4/25 | 7/1 | 2,386 | 2,449 | 2,386 | M |
| | | | | 10/1 | 1/5 | | | | |
| North Creek | 06416 | 99 | Cattle | 5/1 | 5/30 | 1,215 | 0 | 1,215 | C |
| | | | | 12/1 | 1/15 | | | | |
| North East Creek | 06156 | 81 | Cattle | 5/1 | 5/15 | 3,183 | 245 | 3,183 | M |
| | | | | 11/1 | 12/16 | | | | |
| North Fork | 06146 | 60 | Cattle | 6/1 | 11/14 | 1,259 | 1,531 | 1,259 | C |
| North Fork Kannah Cr | 06209 | 125 | Cattle | 4/20 | 6/1 | 2,022 | 338 | 2,022 | I |
| | | | | 12/1 | 1/15 | | | | |
| Notch Spring | 16121 | 271 | Cattle | 5/9 | 9/9 | 3,467 | 237 | 3,467 | M |
| | | | | 11/1 | 11/9 | | | | |
| O. Hawkins | 16826 | 46 | Cattle | 7/7 | 9/19 | 164 | 245 | 164 | C |
| Paddock | 06742 | 245 | Cattle | 5/15 | 10/13 | 1,723 | 717 | 1,723 | M |
| Palisade Flats | 16401 | 400 | Cattle | 10/21 | 2/28 | 8,962 | 383 | 8,962 | I |
| Palisade Point | 06145 | 91 | Cattle | 5/10 | 6/11 | 1,962 | 140 | 1,962 | M |
| Parkes Place | 06743 | 0 | Cattle | 5/16 | 6/15 | 106 | | 0 | C |
| | | | | 10/16 | 10/31 | | | | |
| Payne Wash | 16132 | 26 | Cattle | 6/16 | 6/25 | 2,408 | 1,117 | 2,408 | C |
| | | | | 11/16 | 12/5 | | | | |
| Pineridge | 06151 | 93 | Cattle | 5/25 | 10/31 | 1,237 | 663 | 1,237 | C |
| Plateau Creek | 16810 | 0 | Cattle | 6/1 | 9/15 | 117 | 39 | 0 | C |
| Prairie Canyon[6] | 16616 | 318 | Cattle | 6/1 | 11/25 | 23,957 | 1,131 | 23,957 | I |
| Red Mountain | 16813 | 0 | Cattle | 5/1 | 10/31 | 428 | 199 | 0 | C |
| Red Rock | 06745 | 832 | Cattle | 4/25 | 6/25 | 12,421 | | 12,421 | I |
| | | | | 10/1 | 11/30 | | | | |
| Reservation | 06133 | 154 | Cattle | 4/10 | 5/9 | 2,944 | 141 | 2,944 | I |
| | | | | 12/18 | 2/22 | | | | |
| Roan Creek | 06744 | 290 | Cattle | 6/7 | 11/1 | 9,275 | 3,315 | 9,275 | I |
| Robbins | 06846 | 61 | Cattle | 5/15 | 6/15 | 542 | 177 | 542 | C |
| Round Knob | 06152 | 342 | Cattle | 5/1 | 5/31 | 3,746 | 300 | 3,746 | M |
| | | | | 1/1 | 1/31 | | | | |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| S.E. Spear | 06739 | 320 | Cattle | 4/16 | 5/31 | 6,225 | 294 | 6,225 | I |
| | | | | 11/1 | 12/15 | | | | |
| Salt Creek Comm. | 16806 | 79 | Cattle | 5/15 | 6/15 | 2,372 | 522 | 2,372 | M |
| Salt Wash | 06430 | 55 | Cattle | 3/1 | 5/15 | 1,358 | | 1,358 | C |
| | | | | 12/1 | 2/28 | | | | |
| San Arroyo[3] | 05845 | | | | | 13,510 | | | |
| Sewemup[10] | N/A | | | | | | | | |
| Sinbad Valley Comm. | 06409 | 459 | Cattle | 3/1 | 5/15 | 10,099 | 2,369 | 10,099 | I |
| | | | | 10/20 | 2/28 | | | | |
| | | 93 | Cattle | 3/1 | 4/1 | | | | |
| | | | | 1/15 | 2/28 | | | | |
| Skinner | 06128 | 107 | Cattle | 5/1 | 6/29 | 1,498 | 2,218 | 1,498 | M |
| | | | | 11/1 | 11/13 | | | | |
| Snyder Flats | 16129 | 415 | Cattle | 4/24 | 6/15 | 3,223 | 2,099 | 3,223 | I |
| | | | | 9/17 | 11/1 | | | | |
| South of the Road | 16105 | 66 | Cattle | 4/20 | 5/17 | 1,329 | 697 | 1,329 | M |
| | | | | 11/15 | 11/30 | | | | |
| Spring Creek[6] | 16115 | 381 | Cattle | 5/20 | 7/2 | 5,779 | | 5,779 | I |
| | | | | 8/15 | 10/1 | | | | |
| Stoner-Walker | 06749 | 204 | Cattle | 5/6 | 6/15 | 5,763 | 1,969 | 5,763 | I |
| | | | | 10/1 | 11/21 | | | | |
| Sunnyside Common | 06801 | 121 | Cattle | 4/16 | 5/31 | 5,723 | 810 | 5,723 | I |
| | | | | 12/22 | 1/27 | | | | |
| | | 103 | Cattle | 4/16 | 5/31 | | | | |
| | | | | 12/22 | 1/27 | | | | |
| | | 78 | Cattle | 5/1 | 5/31 | | | | |
| Swamp Hill | 06412 | 220 | Cattle | 4/1 | 5/15 | 3,916 | 3 | 3,916 | M |
| | | | | 12/1 | 1/15 | | | | |
| Tater Hills | 06747 | 177 | Cattle | 5/10 | 6/9 | 1,654 | 386 | 1,654 | I |
| Thompson | 06148 | 54 | Cattle | 5/20 | 6/20 | 5,282 | 1,138 | 5,282 | M |
| | | | | 10/20 | 11/21 | | | | |
| Timber Ridge | 06137 | 222 | Cattle | 6/15 | 7/14 | 1,391 | 27 | 1,391 | I |
| | | | | 11/15 | 1/22 | | | | |
| Tom Casto | 06415 | 6 | Cattle | 3/1 | 4/30 | 79 | 49 | 79 | C |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| Turner Gulch | 06427 | 60 | Cattle | 4/25 | 7/10 | 1,188 | 277 | 1,188 | C |
| | | | | 10/5 | 12/31 | | | | |
| Unaweep | 06425 | 23 | Cattle | 3/1 | 5/31 | 404 | 534 | 404 | C |
| | | | | 12/1 | 2/28 | | | | |
| Unaweep North Side | 06417 | 60 | Cattle | 4/1 | 5/15 | 3,369 | 1,657 | 3,369 | C |
| | | | | 10/1 | 10/31 | | | | |
| Unaweep South Side | 06418 | 51 | Cattle | 4/1 | 5/31 | 1,092 | 2,636 | 1,092 | C |
| | | | | 10/17 | 11/30 | | | | |
| Upper Brush Mtn. | 06748 | 196 | Cattle | 6/10 | 10/10 | 741 | 2,467 | 741 | M |
| | | | Horse | 6/10 | 10/10 | | | | |
| Ute Creek Comm. | 06410 | 260 | Cattle | 4/26 | 5/26 | 6,944 | 97 | 6,944 | M |
| | | | | 10/16 | 10/30 | | | | |
| Van Loan Individual | 06194 | 25 | Cattle | 4/1 | 6/1 | 347 | 303 | 347 | C |
| | | | | 10/1 | 1/1 | | | | |
| Webb Isolated Tracts | 16815 | 0 | Cattle | 4/16 | 9/30 | 185 | | 0 | C |
| Webber | 06750 | 0 | Cattle | 5/1 | 5/30 | 171 | | 0 | C |
| | | | | 11/1 | 11/30 | | | | |
| West Creek | 06414 | 1 | Cattle | 3/1 | 3/31 | 131 | | 131 | C |
| West Logan Wash | 06752 | 28 | Cattle | 5/25 | 5/30 | 427 | 38 | 427 | M |
| West Salt Common | 16603 | 8,099 | Cattle | 3/1 | 8/31 | 74,971 | 12,063 | 74,971 | I |
| | | | | 9/1 | 2/28 | | | | |
| | | 159 | Cattle | 7/1 | 11/1 | | | | |
| West Spears | 06753 | 470 | Cattle | 5/1 | 6/13 | 6,594 | 679 | 6,594 | I |
| | | | | 11/1 | 12/15 | | | | |
| West Toms Canyon | 06163 | 110 | Cattle | 5/1 | 5/31 | 3,481 | 6 | 3,481 | I |
| | | | | 12/1 | 12/31 | | | | |
| White Mountain | 16808 | 402 | Cattle | 4/16 | 6/15 | 3,111 | 167 | 3,111 | I |
| | | | | 5/2 | 6/30 | | | | |
| Whitewater Common | 16203 | 651 | Cattle | 4/20 | 6/1 | 22,499 | 10,351 | 22,499 | I |
| | | | | 12/1 | 1/15 | | | | |
| | | 79 | Cattle | 4/20 | 6/1 | | | | |
| | | | | 12/1 | 1/15 | | | | |
| | | 1,692 | Cattle | 4/20 | 6/1 | | | | |
| | | | | 12/1 | 1/15 | | | | |

| Allotment Name | Allotment Number | Permitted AUMs[1] | Type of Livestock | Begin Date | End Date | Public Acres | Private Acres | Public Acres Available[1] | Management Category[2] |
|---|---|---|---|---|---|---|---|---|---|
| Whitewater Hill | 16205 | 0 | Cattle | 5/1 | 5/30 | 980 | 2,512 | 0 | C |
| | | | | 12/1 | 12/30 | | | | |
| Wildhorse[10] | 06799 | | | | | | | | |
| Wild Country | 16809 | 177 | Cattle | 4/15 | 6/15 | 9,180 | 3,234 | 9,180 | I |
| | | 351 | Cattle | 4/15 | 6/15 | | | | |
| | | 100 | Cattle | 4/15 | 6/15 | | | | |
| | | 131 | Cattle | 5/10 | 6/15 | | | | |
| Winter Flats- Deer Pk | 06713 | 575 | Cattle | 4/15 | 6/10 | 31,777 | 1,859 | 31,777 | I |
| | | | | 11/15 | 1/28 | | | | |
| Wiretrap[11] | 00017 | 16 | Cattle | 12/1 | 1/14 | 510 | | 510 | C |
| Woodring | 26304 | 75 | Cattle | 5/5 | 6/1 | 1,110 | 1,013 | 1,110 | M |
| | | | | 10/15 | 11/15 | | | | |
| Woods | 06124 | 120 | Cattle | 7/1 | 10/20 | 402 | 943 | 402 | C |
| | | | Sheep | 7/10 | 7/19 | | | | |
| Wright Draw | 06405 | 138 | Cattle | 4/24 | 5/24 | 4,094 | 15 | 4,094 | I |
| | | | | 10/16 | 12/31 | | | | |
| **Total** | | 60,716 | | | | | | 960,500 | |

Dark gray shading indicates allotment acres and AUMs available for livestock grazing are are currently unallotted.

1 Portions of certain allotments are outside of the planning area, either within the BLM White River Field Office, McInnis Canyon NCA, the Dominguez-Escalante NCA or the BLM Moab Field Office of Utah. Where this occurs, the AUMs or acres for the allotment represents the AUMs and acres covered under this RMP.

2 Maintain (M), Improve (I), or Custodial (C).

3 Allotment is within the GJFO planning area but is managed and covered under the BLM, Moab Field Office RMP regarding grazing.

4 Allotment is within the GJFO planning area but is managed and covered under the BLM, White River Field Office RMP regarding grazing.

5 Combined with Collier Creek allotment.

6 Involved in Interdistrict Agreement with Moab Field Office.

7 East Salt allotment combined East Salt, Corral Canyon and Sphinx-Mitchell allotments.

8 On Bureau of Reclamation land; not included in total.

9 Mountain Island allotment is a consolidation of Brush Hole, Fish Park, Haystack, Little Dolores Canyon, Longshore Above Rims, Longshore Below Rims, Lost Horse, McKenzie, and Sieber Canyon allotments. Fish Park is part of Interdistrict Agreement with Moab Field office.

10 The Little Book Cliffs Wild Horse Range (Wildhorse Allotment) and Sewemup are closed to livestock grazing.

11 Formerly a pasture of Files allotment.

# Appendix K
## Recreation and Visitor Services Management Framework

BLM_0024715

BLM_0024716

# TABLE OF CONTENTS

Section Page

**INTRODUCTION ....................................................................................................K-1**

Key Recreation Planning Terms and Definitions.................................................K-1
Special Recreation Management Area (SRMA)...............................................K-1
Extensive Recreation Management Area (ERMA) ............................................K-2
Supporting Management Action and Allowable Use Decisions.........................K-3
Implementation-level Decisions Included in this RMP Revision. ........................K-3
Best Management Practices to Guide Implementation-level Management...........K-3
Recreation Setting Characteristics ....................................................................K-5

**BANGS SPECIAL RECREATION MANAGEMENT AREA ..............................................K-7**

Supporting Information for SRMA Allocation.....................................................K-7
Goal SRMA-Wide..............................................................................................K-7
Objective SRMA-Wide.......................................................................................K-7
Bangs SRMA RMZ 1 – Lunch Loops Community Recreation Area ......................K-8
Bangs Canyon SRMA RMZ 2 – Magellan-Tabeguache OHV Trails.......................K-12
Bangs Canyon SRMA RMZ 3 – Mica Mine/Rough Canyon Outdoor Classroom.......K-17
Bangs Canyon SRMA RMZ 4 – Bangs Primitive Backcountry Zone......................K-21

**DOLORES RIVER CANYONS SPECIAL RECREATION MANAGEMENT AREA ......................K-26**

Supporting Information for SRMA Allocation.....................................................K-25
Goal SRMA-Wide..............................................................................................K-25
Objective SRMA-Wide.......................................................................................K-25

**GRAND VALLEY OHV SPECIAL RECREATION MANAGEMENT AREA...............................K-31**

Supporting Information for SRMA Allocation.....................................................K-31
Goal SRMA-Wide..............................................................................................K-31
Objective SRMA-Wide.......................................................................................K-31

**NORTH FRUITA DESERT SPECIAL RECREATION MANAGEMENT AREA ...........................K-37**

Supporting Information for SRMA Allocation.....................................................K-37
Goal SRMA-Wide..............................................................................................K-37
Objective SRMA-Wide.......................................................................................K-37

**PALISADE RIM SPECIAL RECREATION MANAGEMENT AREA ........................................K-43**

Supporting Information for SRMA Allocation.....................................................K-43
Goal SRMA Wide ..............................................................................................K-43
Objective SRMA Wide .......................................................................................K-43

**BARREL SPRINGS EXTENSIVE RECREATION MANAGEMENT AREA.................................K-49**

**GATEWAY EXTENSIVE RECREATION MANAGEMENT AREA ..........................................K-51**

**GRAND VALLEY SHOOTING RANGES EXTENSIVE RECREATION MANAGEMENT AREA .........K-55**

**GUNNISON RIVER BLUFFS EXTENSIVE RECREATION MANAGEMENT AREA .........................K-57**

**HORSE MOUNTAIN EXTENSIVE RECREATION MANAGEMENT AREA ..................................K-61**

Horse Mountain ERMA RMZ 1 – Horse Mountain Trails ......................................K-61

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 452 of 499

Horse Mountain ERMA RMZ 2 – C Road OHV Open Area ........ K-63
Horse Mountain ERMA RMZ 3 – Target Shooting ........ K-65

**NORTH DESERT EXTENSIVE RECREATION MANAGEMENT AREA ........ K-67**

## TABLES

Page

1 Summary of RMA/RMZ Designations ........ K-3
2 Recreation Setting Characteristics Matrix ........ K-5

BLM_0024718

# Acronyms and Abbreviations

| Acronyms and Abbreviations | Full Phrase |
| --- | --- |
| ACEC | area of critical environmental concern |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| ERMA | extensive recreation management area |
| GJFO | Grand Junction Field Office |
| IRMA | intensive recreation management area |
| NEPA | National Environmental Policy Act of 1969 |
| OHV | off-highway vehicle |
| R&VS | Recreation & Visitor Services |
| RMA | recreation management area |
| RMP | resource management plan |
| RMZ | recreation management zone |
| ROS | recreation opportunity setting |
| ROW | right-of-way |
| RSC | recreation setting characteristics |
| SRMA | special recreation management area |
| SRP | special recreation permit |
| VRM | Visual Resource Management |
| WSA | Wilderness Study Area |

Table of Contents

This page intentionally left blank.

K-iv *Grand Junction Field Office*
*Approved Resource Management Plan* August 2015

BLM_0024720

# INTRODUCTION

This appendix presents the SRMA and ERMA designations and supporting information for the Approved Resource Management Plan (RMP).

## KEY RECREATION PLANNING TERMS AND DEFINITIONS

### Special Recreation Management Area (SRMA)

*Definition.* The SRMAs are administrative units where the existing or proposed recreation opportunities and desired recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation.

*Management Focus.* The SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. The SRMAs may be subdivided into recreation management zones (RMZ) to further delineate specific recreation opportunities. Within SRMAs, R&VS management is recognized as the predominant land management focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis.

*Requirements.* The SRMAs/RMZs must have measurable outcome-focused objectives. Supporting management actions and allowable use decisions are required to: 1) sustain or enhance recreation objectives, 2) protect the desired recreation setting characteristics, and 3) constrain uses, including non-compatible recreation activities that are detrimental to meeting recreation or other critical resource objectives (e.g. cultural or threatened and endangered species).

***Supporting Information (Rationale for SRMA Designation)***

Documentation of the rationale for inclusion of the SRMA in the Approved RMP.

***SRMA/RMZ Outcome Objective***

The outcome objective is a ***clear, measurable, and agreed-upon guide for decision making and evaluation of management effectiveness.*** SRMA/RMZ objectives must define the specific recreation opportunities (i.e. activities, experiences and benefits derived from those experiences) which become the focus of R&VS management.

***Recreation Outcomes***

Recreation outcomes consist of experiences and benefits and are defined as:

*Experiences:*

Recreation experiences are immediate states-of-mind resulting from participation in recreation opportunities that result in benefits.

*Benefits:*

Recreation benefits accrue from having a satisfying recreation experience that leads to (a) an improved condition or (b) maintenance of a desired condition. These accrue from recreation participation, are both short- and long-term, and are realized on and off site. Benefits are identified in one of four categories and are described as:

- Personal/Individual Benefits: Recreation and leisure contributes to personal well-being and human development. It contributes to better physical and mental health for all individuals.
- Social/Community Benefits: Recreation contributes to the quality of life within communities by encouraging positive lifestyles choices, building social skills, reducing crime, and fostering a sense of community pride.
- Economic Benefits: Investments in recreation represent an investment in our economies through diversifying our economies, by attracting new businesses and by generating employment opportunities.
- Environmental Benefits: Participation in recreation and outdoor education programs can help protect the quality of the environment through improved understanding and stewardship of our natural, cultural, and historic resources.

**Extensive Recreation Management Area (ERMA)**

*Definition.* The ERMAs are administrative units that require specific management consideration in order to address recreation use, demand, or R&VS program investments.

*Management Focus.* The ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Management of ERMAs is commensurate with the management of other resources and resource uses.

*Requirements*. The ERMAs must have measurable objectives. Supporting management actions and allowable use decisions must facilitate the visitors' ability to participate in outdoor recreation activities and protect the associated qualities and conditions. Non-compatible uses, including some recreation activities, may be restricted or constrained to achieve interdisciplinary objectives.

***ERMA Objective***

ERMA objectives must define the recreation activities and the associated qualities and conditions that become the focus for R&VS management.

**Supporting Management Action and Allowable Use Decisions**

Management actions and allowable use decisions are generally described as land use plan level decisions needed to achieve program objectives or constrain non-compatible land uses. Supporting management action and allowable use decisions are selected in terms of their ability to help achieve the recreation objectives (i.e., recreation opportunities), maintain or enhance the recreation settings, or guide recreation implementation.

**Implementation-level Decisions Included in this RMP Revision.**

Implementation decisions allow site-specific (on-the-ground) actions needed to achieve land use plan decisions (see Land Use Planning Handbook H-1601-1, p. 30-31). If implementation-level decisions are included in the land use planning document to achieve R&VS program objectives, they must be clearly distinguished as implementation decisions that are appealable to the Interior Board of Land Appeals.

**Best Management Practices to Guide Implementation-level Management**

Recreation management areas with complex implementation issues may require a subsequent implementation-level recreation area management plan tiered to land use plan decisions. Subsequent site-specific National Environmental Policy Act (NEPA) analysis will be required to implement some types of actions. Other actions that involve education, information, interpretation, and monitoring may not require site-specific NEPA analysis. The subsequent best management practices for implementation-level planning guidance is presented to illustrate opportunities for active stakeholder collaboration and to provide a suite of possible implementation-level actions that could be adaptively performed to ensure management effectiveness in meeting recreation and visitor services goals and objectives.

**Table 1**
**Summary of RMA/RMZ Designations**

| RMA/RMZ Name | RMA/RMZ acreage |
|---|---|
| **SRMAs** | |
| Bangs SRMA | 47,800 |
| RMZ 1 – Lunch Loop Community Recreation Area | 3,900 |
| RMZ 2 – Magellan-Tabeguache OHV Trails | 10,600 |
| RMZ 3 – Mica Mine/Rough Canyon Outdoor Classroom | 1,100 |
| RMZ 4 – Bangs Primitive Backcountry Zone | 32,200 |
| Dolores River SRMA | 16,100 |
| Grand Valley OHV SRMA | 9,700 |
| North Fruita Desert SRMA | 11,600 |
| Palisade Rim SRMA | 2,000 |
| **ERMAs** | |
| Barrel Springs ERMA | 24,700 |
| Gateway ERMA | 78,100 |
| Grand Valley Shooting Ranges ERMA | 750 |
| Gunnison River Bluffs ERMA | 800 |
| Horse Mountain ERMA | 5,100 |
| RMZ 1 – Horse Mountain Trails | 4,700 |
| RMZ 2 – C Road OHV Open Area | 180 |
| RMZ 3 – Target Shooting Zone | 240 |
| North Desert ERMA | 107,900 |

## RECREATION SETTING CHARACTERISTICS

### Table 2
### Recreation Setting Characteristics Matrix

PHYSICAL – Qualities of the Landscape

| | Primitive | Back Country | Middle Country | Front Country | Rural | Urban |
|---|---|---|---|---|---|---|
| Remoteness (approx. distance from routes) | More than ½ mile from any kind of a man-made trail | More than ½ mile from any kind of a man-made ATV or full-sized vehicle route | More than ½ mile from improved gravel roads | More than ½ mile from paved roads and railroad tracks. | More than ½ mile from municipal streets or roads within towns or cities. | Municipal street and roads within towns or cities. |
| Naturalness (modifications to the landscape) | Undisturbed natural landscape. | Natural landscape with any modifications in harmony with surroundings and not visually obvious or evident (e.g. stock ponds, trails). | Character of the natural landscape retained. A few modifications contrast with character of the landscape (e.g. fences, primitive roads). | Character of the natural landscape partially modified but none overpower natural landscape (e.g. roads, structures, utilities). | Character of the natural landscape considerably modified (agriculture, residential or industrial). | Urbanized developments dominate landscape. |
| Visitor Facilities | No structures. Foot/horse trails only. | Developed trails made mostly of native materials such as log bridges. Structures are rare and isolated. | Maintained and marked trails, simple trailhead developments and basic toilets. | Rustic facilities such as campsites, restrooms, trailheads, and interpretive displays. | Modern facilities such as campgrounds, group shelters, boat launches, and occasional exhibits. | Elaborate full-service facilities such as laundry, restaurants, and groceries. |

SOCIAL – Qualities Associated with Use

| | Primitive | Back Country | Middle Country | Front Country | Rural | Urban |
|---|---|---|---|---|---|---|
| Contacts (avg. with any other group) | Fewer than 3 encounters/day at camp sites and fewer than 6 encounters/day on travel routes. | 3-6 encounters/day off travel routes (e.g., campsites) and 7-15 encounters/day on travel routes. | 7-14 encounters/day off travel routes (e.g., staging areas) and 15-29 encounters/ day en route | 15-29 encounters/day off travel routes (e.g., campgrounds) and 30 or more encounters/day in route. | People seem to be generally everywhere. | Busy place with other people constantly in view. |
| Group Size (average - other than you own) | Fewer than or equal to 3 people per group. | 4-6 people per group. | 7-12 people per group | 13-25 people per group. | 26-50 people per group. | Greater than 50 people per group. |
| Evidence of Use | No alteration of the natural terrain. Footprints only observed. Sounds of people rare. | Areas of alteration uncommon. Little surface vegetation wear observed. Sounds of people infrequent. | Small areas of alteration. Surface vegetation showing wear with some bare soils. Sounds of people occasionally heard. | Small areas of alteration prevalent. Surface vegetation gone with compacted soils observed. Sounds of people regularly heard. | A few large areas of alteration. Surface vegetation absent with hardened soils. Sounds of people frequently heard. | Large areas of alteration prevalent. Some erosion. Constantly hear people. |

OPERATIONAL – Conditions Created by Management and Controls over Recreation Use

| | Primitive | Back Country | Middle Country | Front Country | Rural | Urban |
|---|---|---|---|---|---|---|
| Access (types of travel allowed) | All travel is restricted to foot and horse travel. | Mountain bikes and perhaps other mechanized use, but all is non-motorized. | Four-wheel drives, all-terrain vehicles, dirt bikes, or snowmobiles in addition to non-motorized, mechanized use. | Two-wheel drive vehicles predominant, but also four wheel drives and non-motorized, mechanized use. | Ordinary highway auto and truck traffic is characteristic. | Wide variety of street vehicles and highway traffic is ever-present. |
| Visitor Services (and info) | None is available. Staff rarely present. | Basic maps, staff infrequently present (e.g. seasonally, high use periods) to provide on-site assistance | Area brochures and maps, staff occasionally (e.g. most weekends) present to provide on-site assistance. | Information materials describe recreation areas & activities, staff periodically present (e.g. weekdays & weekends). | Information described to the left, plus experience and benefit descriptions, staff regularly present (e.g. almost daily). | Information described to the left, plus regularly scheduled on-site outdoor demonstrations and clinics. |
| Management Controls | No visitor regulations or ethics signing on-site. No use restrictions. | Basic user regulations at key access points. Minimum use restrictions | Some regulatory and ethics signing. Moderate use restrictions. (e.g. camping, human waste). | Rules, regulations and ethics clearly posted. Use restrictions, limitations and/or closures. | Regulations strict and ethics prominent. Use may be limited by permit, reservation, etc. | Enforcement in addition to rules to reduce conflicts, hazards, and resource damage. |

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 460 of 499

This page intentionally left blank.

BLM_0024726

# BANGS SPECIAL RECREATION MANAGEMENT AREA

## SUPPORTING INFORMATION FOR SRMA ALLOCATION

The Bangs SRMA has four distinct recreation management zones (RMZs). Overall, the Bangs SRMA provides opportunities for: mountain biking, hiking and trail running on world class singletrack trails; OHV use on a network of motorcycle, ATV, 4X4 and rock crawling routes; discovering and learning about the area's natural and cultural history; and exploring primitive undeveloped canyon country on foot or horseback. This SRMA includes the Tabeguache (Lunch Loops), Little Park, Bangs Canyon, and Ribbon Trailheads. The area has scenic views of the Colorado National Monument, Grand Valley, Grand Mesa, and Book Cliffs. The area is in close proximity to the population center of the Grand Valley, which makes it an important community resource for local recreation and quality of life, well as tourism. Portions of the SRMA are managed in partnership with the City of Grand Junction, with shared responsibility for access and facilities.

## GOAL SRMA-WIDE

The Bangs SRMA, through recreation program management and stakeholder involvement, will produce a diversity of quality recreational opportunities that will continue to add to area residents' quality of life by contributing to the local economy and enhancing stewardship and protection of the area's natural and cultural resources.

## OBJECTIVE SRMA-WIDE

The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

***Action (Rec-SRMA-A4)***

Manage the Tabeguache Trail from Little Park Road to Highway 141 as a high-clearance full-sized 4-wheel drive route to provide long-distance OHV recreation opportunities spanning portions of the Bangs SRMA, Dominguez-Escalante NCA, and Uncompahgre National Forest.

### Bangs SRMA RMZ 1 – Lunch Loops Community Recreation Area

***3,900 acres***

***Objective (REC-SRMA-O2)***

Through the life of the plan, manage RMZ 1 targeting a local/regional market, providing non-motorized mixed-use trail opportunities, accommodating a range of skill levels (beginner, intermediate and advanced). Encourage community-based recreation that can be marketed as an urban interface recreation asset of the Grand Valley. Manage the zone for the following targeted recreation activities and outcomes:

*Activities*: The targeted activities of the RMZ are mountain bicycling, trail running, dog walking, and hiking.

*Outcomes and Experiences:*

1. Visitors experience or seek to experience frequent access to outdoor physical activity, often in groups of friends and family, for fitness and stress reduction, to increase endurance, and to develop outdoor skills and abilities through recreation in this zone.

2. Visitors realize personal benefits of easy access to the outdoors, improved fitness and health maintenance (physical and mental), development of technical competence (e.g., mountain biking skills), and development of stronger social bonds with friends and family.

3. The local community benefits from improved quality of life with higher levels of public land stewardship, stronger community relationships and a healthier community.

4. The area economy is strengthened through recreation-related revenue and increased desirability of the community as a place to live.

*Resource Values*

Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (*Sclerocactus glaucus*), Grand Junction Milk Vetch (*Astragalus linifolius*), water quality (non-point source erosion/sedimentation into the Colorado River), soils, paleontological resources, and cultural resources.

*Resource Uses*
Minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: lands and realty.

***Action (REC-SRMA-A5)***
Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities)*: This is a non-motorized, urban interface zone that is bounded by county and city roads. The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails, houses and other man-made developments. Due to topography and area scenery, the natural landscape is mostly retained despite the density of trails and proximity to the City of Grand Junction. The recreation facilities at trailheads may include, but are not limited to, vault toilets, informational kiosks and shade shelters. Throughout the unit, a designated singletrack trail system with a spectrum of trails (varied level of difficulty) is marked and maintained to achieve defined trail management objectives that support overall RMZ objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than15 other groups on designated trails. Groups are generally small to medium-sized (1-8 people) with occasional encounters with larger groups. Sights, sounds, and tracks of other targeted users are frequent throughout the RMZ, but more prominent near trailheads. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Non-motorized singletrack trails with easy access from several trailheads in close proximity to the Grand Valley. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite

staff and/or volunteers, local businesses, City of Grand Junction, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve RMZ objectives. Management presence prominent at trailheads, and less prominent away from trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.)

***Allowable Use (REC-SRMA-AU7)***

*VRM Class:* Manage the RMZ under VRM Class II objectives.

***Allowable Use (REC-SRMA-AU8)***

*Minerals:* Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales, with the exception of the community bentonite pit on Little Park Road.
- Non-energy leasable mineral exploration and/or development.

***Allowable Use (REC-SRMA-AU9)***

*ROW:* Designate as a ROW avoidance area.

***Action (REC-SRMA-A6)***

*Lands and Realty:* Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

***Allowable Use (REC-SRMA-AU10)***

*Forestry and Vegetation:* Close the RMZ to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

***Allowable Use (REC-SRMA-AU11)***

*Camping restrictions:* Close the RMZ to overnight camping and campfires to reduce impacts to this intensively used area that lies in close proximity to private residences.

***Allowable Use (REC-SRMA-AU12)***

*Firearm use restrictions:* Prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns due to the high volume of use and

density of designated routes in this area. This does not apply to the lawful taking of game.

***Allowable Use (REC-SRMA-AU13)***

*Special Recreation Permits*

- Issue Class I, II and III Commercial, Competitive, and Organized Group SRPs that are consistent with zone objectives.
- Prohibit Class IV SRPs.
- Only issue event permits that support and celebrate Grand Valley communities. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.
- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the RMZ.

***Allowable Use (REC-SRMA-AU14)***

*Comprehensive Trails and Travel Management*

- Close the RMZ to motorized travel, with the exception of trailhead access and administrative access to range improvements and other facilities.
- Limit mechanized travel to designated routes throughout the RMZ with the exception of small designated corridors where open travel is allowed (e.g., Free Lunch Trail play areas).
- Limit foot and horse travel to designated routes north of Little Park Road and Andy's Loop (core Lunch Loop trail system - see travel maps) due to the high volume of use and density of designated routes in this area.

.

***Action (REC-SRMA-A8)***

*Comprehensive Trails and Travel Management*

- Construct new system trails to accommodate activity-specific trails (e.g., limited to hiking).
- Connect/reroute routes to make loop opportunities that help achieve RMZ objectives. Reroute/repair unsustainable and eroding routes.
- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management

designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

***Action (REC-SRMA-A9)***

*Special Recreation Permits*
All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

### Bangs Canyon SRMA RMZ 2 – Magellan-Tabeguache OHV Trails

***10,600 acres***

***RMZ Objective (REC-SRMA-O3)***
Through the life of this plan, manage RMZ 2 targeting a local/regional market, and providing a broad range of motorized OHV trail opportunities, accommodating a range of skill levels (beginner, intermediate and advanced) for varying distances, including route connections that create long-distance OHV recreation opportunities spanning portions of the Bangs SRMA, Dominguez-Escalante NCA, and Uncompahgre National Forest. Encourage community-based recreation that can be marketed as an urban interface recreation asset to the Grand Valley. Manage the zone for the following targeted recreation activities, experiences and outcomes:

*Activities*: The targeted activities for the RMZ are motorized OHV trail riding (motorcycles, ATV/UTV, 4x4 full-size vehicles, rock crawling).

*Outcomes and Experiences*
1. Visitors experience or seek to experience easy access to adventure and exploration with family and friends in a natural landscape. Visitors also value the opportunity to test their equipment and driving/riding skills.

2. Visitors generally realize personal benefits of having easy access to outdoor recreation in a natural environment, development of technical competence (driving/riding skills), and development of stronger social bonds with friends and family.

3. The community benefits from improved quality of life with higher levels of public land stewardship, stronger community relationships and a healthier populous.

4. The area economy is strengthened through recreation-related revenue, and increased desirability of the community as a place to live.

*Resource Values*

Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (*Sclerocactus glaucus*), Grand Junction Milk Vetch (Astragalus linifolius), Canyon Tree Frog (*Hyla arenicolor*), Northern Leopard Frog (*Rana pipiens*), desert bighorn sheep, deer and elk winter range, water quality (non-point source erosion/sedimentation into the Gunnison and Colorado Rivers), soils, riparian resources, paleontological resources, and cultural (historic and prehistoric) resources.

*Resource Uses*

Through the life of the plan, minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: livestock grazing.

***Action (REC-SRMA-A10)***

Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics:*

*Physical (remoteness, naturalness, facilities):* This area is moderately remote in character with singletrack, ATV, and jeep trails that offer motorized recreation opportunities bound by state and county roads. The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails, houses and other man-made developments. Due to the topography, vegetative screening and area scenery, the natural-appearing landscape is retained despite the proximity to the City of Grand Junction. The recreation facilities at trailheads may include, but are not limited to, vault toilets, informational kiosks and other signs. Throughout the unit, a designated trail system with a range of trail opportunities (variety of use designations and varied levels of difficulty) is marked and maintained to achieve defined trail management objectives that support overall RMZ objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than six other groups on designated routes. Groups are generally small to medium-sized (3-6 people) with occasional encounters with larger groups. Sights, sounds, and tracks of other targeted users are relatively infrequent throughout the RMZ, but more prominent near trailheads. Other users are more likely to be heard than seen due to the focus on motorized recreation. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* This RMZ is focused on motorized OHV use with trails and trailheads designed specifically for motorcycles, ATVs and full-size 4x4 vehicles. Access on the Tabeguache Trail through this zone, and continuing through RMZ 4, provides long-distance riding opportunities by linking the Tabeguache Trail through the Bangs SRMA, Dominguez-Escalante NCA and Uncompahgre National Forest. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local OHV businesses, City of Grand Junction, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve RMZ objectives. Management presence is prominent at trailheads, and less prominent away from trailheads. Rules, regulations, and land-use ethics are clearly posted at trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.)

***Allowable Use (REC-SRMA-AU15)***

*VRM Class:* Manage the RMZ under VRM Class II objectives.

***Allowable Use (REC-SRMA-AU16)***

*Minerals:* Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales.
- Non-energy leasable mineral exploration and/or development.

***Allowable Use (REC-SRMA-AU17)***

*ROW:* Designate as a ROW avoidance area.

***Action (REC-SRMA-A11)***

*Lands and Realty:* Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or

adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

***Allowable Use (REC-SRMA-AU18)***

*Forestry and Vegetation:* Allow harvest of forest and woodland products if the RMZ is determined suitable for harvest. Close the RMZ to collection of vegetative material under a wilding permit.

***Allowable Use (REC-SRMA-AU19)***

*Camping restrictions*

- Allow camping and campfires only in designated sites in the portion of the RMZ north of the drainage at the bottom of Rough Canyon. In this portion of the RMZ, require the use of firepans and portable toilet systems, and prohibit firewood collection, to minimize camping impacts.
- Allow undeveloped camping and campfires in the portion of the RMZ south of the drainage at the bottom of Rough Canyon. In this portion of the RMZ, allow collection of only dead and down wood for campfires.

***Allowable Use (REC-SRMA-AU20)***

*Firearm use restrictions:* Prohibit the discharge of firearms (including any devices that propel a projectile, including but not limited to, bow and arrow, sling shots, paint ball guns and air guns) for recreational target shooting within the RMZ for the safety of other recreation users in this area of concentrated trail use. This does not apply to the lawful taking of game.

***Allowable Use (REC-SRMA-AU21)***

*Special Recreation Permits*

- Issue Class I, II and III Commercial, Competitive, and Organized Group SRPs that are consistent with zone objectives.
- Prohibit Class IV Commercial and Competitive SRPs.
- Only issue event permits that support and celebrate Grand Valley communities. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.
- Allow non-motorized events that have been coordinated with, and endorsed by, local OHV organizations, and do not significantly interfere with the SRMA's targeted activities, experiences and outcomes.

- Only issue vending SRPs in conjunction with Competitive Event SRPs.
- Do not issue vending SRPs for alcohol sales in the RMZ.

***Allowable Use (REC-SRMA-AU22)***

*Comprehensive Trails and Travel Management*

- Limit motorized and mechanized travel to designated routes throughout the RMZ with the exception of small designated corridors where open travel is allowed (e.g., Tabeguache Rough Canyon slickrock play area.)
- Manage that part of the Tabeguache Trail that is south of the zone, to Highway 141 as a high clearance full-sized 4-wheel drive route. This action is outside of the Magellan-Tabeguache OHV Zone (RMZ 2) but provides an essential trail link through the adjacent Bangs Primitive Backcountry Zone (RMZ 4) for meeting the RMZ 2 objective for long-distance OHV opportunities.

***Action (REC-SRMA-A13)***

*Comprehensive Trails and Travel Management*

- Work with stakeholders/partners to design and construct new system trails to create additional motorized OHV recreation opportunities that help achieve RMZ objectives.
- Work with stakeholders to create new access points and trailheads if necessary to accommodate increased use, and/or achieve RMZ objectives.
- Connect/reroute routes to make loop opportunities that help achieve RMZ objectives.
- Reroute/repair unsustainable and eroding routes.
- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

***Action (REC-SRMA-A14)***

*Special Recreation Permits:* All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

***Action (REC-SRMA-A15)***

No similar action.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 471 of 499

***Allowable Use (REC-SRMA-AU23)***
Prohibit new trail development in the portion of the RMZ which overlaps the Rough Canyon ACEC unless impacts to ACEC relevance and importance criteria can be mitigated.

**Bangs Canyon SRMA RMZ 3 – Mica Mine/Rough Canyon Outdoor Classroom**

***1,100 acres***

***Zone Objective (REC-SRMA-O4)***
Through the life of this plan, manage RMZ 3 targeting a local/regional market, providing hiking and educational outdoor classroom learning opportunities consistent with Rough Canyon ACEC management objectives to enhance the appreciation and protection of those values (geology, wildlife habitat, sensitive plants and cultural resources). Encourage community-based use of the area as an outdoor classroom. Manage the zone for the following targeted recreation activities, experiences and outcomes:

*Activities*: The targeted activities for the RMZ are hiking/walking and experiential learning.

*Outcomes and Experiences*

1. Visitors experience or seek to experience the enjoyment and appreciation of the area's wildlife, scenery, views and aesthetics while learning more about the area's history, ecology and geology.

2. Visitors realize personal benefits of a closer relationship with the natural world.

3. The community benefits from an increased awareness and protection of natural landscapes and cultural resources on a community-wide basis.

*Resource Values*
Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (*Sclerocactus glaucus*), Grand Junction Milk Vetch (*Astragalus linifolius*), Significant plant communities: West Slope Pinyon Woodland (*Pinus edulis-Juniperus osteosperma/Coleogyne ramosisima* Woodland); Canyon Tree Frog (*Hyla arenicolor*), Northern Leopard Frog (*Rana pipiens*), desert bighorn sheep, deer and elk winter range, water quality (non-point source erosion/sedimentation into the Gunnison and Colorado Rivers), soils, riparian resources, paleontological resources, and cultural (historic and prehistoric) resources.

*Resource Uses*
Minimize impacts from other resource uses to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified

BLM_0024737

for management consideration in this RMZ during the planning process: mineral collecting, livestock grazing, lands and real estate.

***Action (REC-SRMA-A16)***
Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities):* This is a non-motorized/non-mechanized zone with easy access from Grand Junction via Little Park Road. The character of the landscape is mostly natural in appearance with few modifications that detract from naturalness. Evidence of past mining activities and developments are present in portions of Rough Canyon and Ladder Canyon. Due to topography, vegetative screening and area scenery, the natural landscape is mostly retained. The recreation facilities at trailheads may include, but are not limited to, vault toilets, informational kiosks and other signs. Trails in the zone are designed and maintained to facilitate defined experiential learning objectives. Interpretive and educational displays can be expected at trailheads and along primary trails.

*Social (contacts with other groups, group size, evidence of use):* On developed trails (Mica mine, Rough Canyon trails), visitors are likely to encounter multiple groups per day with a fairly high potential of seeing large groups like school groups and scouts. Throughout the rest of the unit, encounters with other groups would be infrequent. On developed trails, the sounds of other people are frequently heard. In the rest of the unit, depending on location in the zone and proximity to trailheads, the sounds of other people are infrequent. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Non-motorized/non-mechanized trails provide easy access from the Bangs Trailhead which lies in close proximity to the Grand Valley. The large trailhead accommodates buses that transport school groups to the area. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, Mesa County School District 51, Colorado Mesa University, local clubs/organizations, and

enforcement patrols) provide information and services that help visitors achieve RMZ objectives. Management presence prominent at trailheads, and less prominent away from trailheads. Staff or volunteer trail hosts or guides may be on primary trails providing education/interpretation services. Rules, regulations, and land-use ethics are clearly posted at trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.)

***Action (REC-SRMA-A17): ACECs***

Manage the portion of the RMZ which overlaps the Rough Canyon ACEC consistently with the ACEC management objectives.

***Allowable Use (REC-SRMA-AU24)***

*VRM Class:* Manage the RMZ under VRM Class II objectives.

***Allowable Use (REC-SRMA-AU25)***

*Minerals:* Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales
- Non-energy leasable mineral exploration and/or development.

***Allowable Use (REC-SRMA-AU26)***

*ROW:* Designate as a ROW exclusion area with an exception to allow consideration of ROW applications for access to private inholdings within the RMZ.

***Action (REC-SRMA-A18)***

*Lands and Realty:* Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

***Allowable Use (REC-SRMA-AU27)***

*Forestry and Vegetation:* Close the RMZ to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

***Allowable Use (REC-SRMA-AU28)***

*Camping restrictions:* Close the RMZ to overnight camping and campfires to reduce impacts to sensitive biological and cultural resources.

***Allowable Use (REC-SRMA-AU29)***

*Firearm use restrictions:* For the safety of other recreation users and protection of sensitive resources, prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

***Allowable Use (REC-SRMA-AU30)***

*Rock Climbing*
- Allow technical rock climbing to continue where it does not create conflicts with targeted recreation uses and outcomes.
- With partners (climbing clubs, retail service providers, etc.), close climbing routes that are causing resource concerns; identify and improve primary access trails to and between climbing routes to protect biological and cultural resources.
- To reduce resource impacts on the top of routes, encourage placement of permanent rappel anchors.
- Develop education program with partners to teach climbing resource ethics (LNT for climbing.)
- To protect visual resources, require all permanent anchors to match the color of the rock surface (fixtures, hardware and webbing, etc.)

***Management Action (REC-SRMA-A19)***
To protect the learning opportunities associated with the area's mica and quartz mining history, develop educational messages that encourage visitors to leave mica and quartz onsite. If monitoring shows significant loss of mica and quartz from the area, implement collection restrictions (e.g., prohibit collection of mica and quartz, requiring special permits for the collection of small quantities for classroom study).

***Allowable Use (REC-SRMA-AU31)***

*Special Recreation Permits:* Issue Class I-II Commercial, Competitive and Organized group SRPs that are consistent with RMZ objectives. Event permits should be coordinated with the local community and should result in minimal displacement of regular recreation use.

***Allowable Use (REC-SRMA-AU32)***

*Comprehensive Trails and Travel Management*

- Close the RMZ to motorized and mechanized travel.
- Close the Mica Mine trail and Rough Canyon trail to equestrian use to protect sensitive biological and cultural resources. Equestrian use is allowed elsewhere in the RMZ.

***Action (REC-SRMA-A21)***

*Comprehensive Trails and Travel Management*

- Work with stakeholders to design and construct any new system trails, access points or facilities identified as necessary for achievement of RMZ objectives.
- Connect/reroute routes to make loop opportunities that help achieve RMZ objectives.
- Reroute/repair unsustainable and eroding routes.

***Action (REC-SRMA-A22)***

*Special Recreation Permits:* All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

**Bangs Canyon SRMA RMZ 4 – Bangs Primitive Backcountry Zone**

***32,200 acres***

***Zone Objective (REC-SRMA-O5)***

Through the life of this plan, manage RMZ 4 targeting local/regional visitors, providing primitive backcountry hiking, horseback riding, hunting, and wildlife viewing opportunities in a largely undeveloped natural setting. Manage the zone for the following targeted recreation activities, experiences and outcomes:

*Activities:* The targeted activities for the RMZ are primitive cross-country hiking, horseback riding, hunting and wildlife viewing.

*Outcomes and Experiences*

1. Visitors experience or seek to experience quiet adventures to enjoy the area's wildlife, scenery, views and undeveloped natural landscapes while exploring the area by foot or horseback.
2. Visitors generally realize personal benefits of physical exercise, stress reduction, and a closer relationship with the natural world.
3. The community benefits from an increased awareness and stewardship of natural landscapes on a community-wide basis.

*Resource Values*
Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/ mitigation of the following resources: Colorado Hookless Cactus (*Sclerocactus glaucus*), deer and elk winter range, water quality (non-point source erosion/ sedimentation into the Colorado River), soils, paleontological resources, and cultural (historic and prehistoric) resources.

*Resource Uses*
Minimize impacts from other resource use to recreation to ensure those uses support RMZ recreation objectives. The following resource uses were identified for management consideration in this RMZ during the planning process: livestock grazing.

***Action (REC-SRMA-A23)***
Manage the desired recreation setting characteristics described below to support RMZ outcome objectives. If monitoring indicates RMZ outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of RMZ outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA/RMZ objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities):* This is a remote backcountry zone bisected by the Tabeguache Trail which provides a through route for motorized and mechanized users to traverse the area between Bangs RMZ 1 and Highway 141. Apart from the Tabeguache Trail there are few signs of man-made developments in the interior of this zone. Developments of man are visible in the distance from parts of the zone, and are more prominent near the perimeter of the zone. There are no developed recreation facilities in the zone with the exception of the Tabeguache Trail.

*Social (contacts with other groups, group size, evidence of use):* Except along the Tabeguache Trail, visitors to this zone can expect contacts with other groups to be infrequent (0-3 per day) and group sizes are small (1-6 people.) Evidence of other recreation activities is minimal. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Motorized and mechanized vehicle access is limited to the perimeter of the zone, and the Tabeguache Trail that bisects the zone. Foot and horse travel and camping

utilizes primitive, undeveloped trails, or cross-country route-finding employing Leave No Trace travel and camping principles. Visitor services and management presence are minimal. There are no developed/maintained trails, with the exception of the Tabeguache Trail. Basic signs showing rules, regulations and land-use ethics may be posted at primary access points. BLM staff or volunteer field patrols in this zone are generally infrequent.

***Allowable Use (REC-SRMA-AU33)***

Allow motorized and mechanized vehicle use on the Tabeguache Trail through RMZ 4.

***Action (REC-SRMA-A24)***

*Lands with Wilderness Characteristics:* Manage the portion of the RMZ which overlaps the Bangs Canyon LWC unit consistently with the LWC unit management objectives. This includes the management actions and allowable uses shown below for the RMZ in addition to the following:

***Allowable Use***

**STIPULATION** *LANDS WITH WILDERNESS CHARACTERISTICS NSO CO*. No surface occupancy or use is allowed on identified lands being managed to protect inventoried wilderness characteristics, in accordance with the Resource Management Plan. Standard exceptions apply; see Appendix B.

***Allowable Use (REC-SRMA-AU34)***

*VRM Class:* Manage the RMZ under VRM Class II objectives.

***Allowable Use (REC-SRMA-AU35)***

*Minerals:* Close the RMZ to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales.
- Non-energy leasable mineral exploration and/or development.

***Allowable Use (REC-SRMA-AU36)***

Manage as a ROW exclusion area with an exception to allow consideration of ROW applications for access to private inholdings within the RMZ.

***Action (REC-SRMA-A25)***

*Lands and Realty:* Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the RMZ that enhance public access and recreation opportunities consistent with RMZ objectives.

### Allowable Use (REC-SRMA-AU37)

*Forestry and Vegetation:* Close the RMZ to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

### Allowable Use (REC-SRMA-AU38)

*Camping restrictions:* Allow overnight camping and campfires using Leave No Trace camping principles.

### Allowable Use (REC-SRMA-AU39)

*Special Recreation Permits*

- Issue Class I and II Commercial and Organized Group SRPs that are consistent with zone objectives.
- Prohibit Competitive SRPs except on the Tabeguache Trail.

### Allowable Use (REC-SRMA-AU40)

*Comprehensive Trails and Travel Management:*

- Limited to designated routes for motorized and mechanized travel.
- Limited to designated routes for motorized over-the-snow travel.

### Action (REC-SRMA-A26)

*Special Recreation Permits:* All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

### Action (REC-SRMA-A27)

If monitoring indicates that foot or horse travel in the zone is causing resource damage, consider limiting recreation use and/or limited trail development/maintenance to address the resource concern. Trail work, including but not limited to, signage/marking, reroutes, construction, should only be considered after other adaptive management strategies (group size limits, permitting, area closures, etc.) have been implemented to resolve resource concerns.

# DOLORES RIVER CANYONS SPECIAL RECREATION MANAGEMENT AREA

## SUPPORTING INFORMATION FOR SRMA ALLOCATION

The Dolores River Canyons SRMA encompasses scenic canyon country along the lower Dolores River west to the Utah Border, portions of West Creek, and lands adjacent to the Town of Gateway. It also includes a portion of the Unaweep-Tabeguache Scenic and Historic Byway. This SRMA will be directly affected by the development of the Gateway Canyons Resort and their partnership with BLM.

## GOAL SRMA-WIDE

Dolores River Canyons SRMA, through recreation program management and stakeholder involvement, will produce a diversity of quality recreational opportunities that will continue to add to area residents' quality of life by contributing to the local economy and enhancing stewardship and protection of the area's natural and cultural resources.

## OBJECTIVE SRMA-WIDE

The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

***Objective (REC-SRMA-O7)***

Through the life of this plan, manage the Dolores River Canyons SRMA targeting a regional, national and international market providing educational opportunities for visitors to experience the history, culture, geology and scenic diversity of this region. Encourage stewardship and environmental and cultural appreciation through education and experiential learning. Manage the zone for the following targeted recreation activities, experiences and outcomes:

*Activities*: The targeted activities for the SRMA are automobile/motorized scenic touring, mountain biking, day hiking, float boating (canoes, kayaks, rafts), and environmental learning.

*Outcomes and Experiences*

1. Visitors experience or seek to experience the area's wildlife, scenery, views, aesthetics and culture by learning about this area during self-exploration or guided tours.

2. Visitors generally realize personal benefits of gaining greater appreciation of the area's natural and cultural heritage through education and improved mental well-being.

3. The community benefits by having an enhanced appreciation of public lands and the associated economic benefits of a more robust tourism market.

4. Visitor experiences will likely result in enhanced resource stewardship of the area's natural, scenic and cultural resources.

*Resource Values*

Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: rare plants, including Kachina daisy (*Erigeron kachinensis*), Eastwood's monkeyflower (*Mimulus eastwooodiae*), San Rafael milkvetch (*Astragalus rafaelensis*), Fisher milkvetch (*Astragalus piscator*),Dolores River skeleton plant (*Lygodesmia doloresensis*), horseshoe milkvetch (*Astragalus equisolensis*), Grand Junction milkvetch (*Astragalus linifolius*), Tufted frasera (*Frasera paniculatum*), Osterhout's cryptantha (*Cryptantha osterhoutii*), and Gypsum catseye; Significant plant communities: Foothills Riaprian Shrubland (*Forestiera pubescens shrubland*), Narrowleaf Cottonwood Riparian Forest (*Acer negundo – Populus angustifolia/ Celtis reticulate* Forest); (*Cryptantha gypsophila*); invasive non-native vegetation including Russian knapweed (*Acroptilon repens*) and tamarisk(*Tamarix spp*.); bald eagle (*Haliaeetus leucocephalus*); peregrine falcon (*Falco peregrinus*); deer and elk winter range; riparian resources, visual resources, paleontological resources, and cultural (historic and prehistoric) resources.

*Resource Uses*

Minimize impacts from other resource use to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: gold prospecting, lands and realty (ROW corridor), livestock grazing. In the portions of this SRMA that overlap the ROW corridor, manage recreation to achieve management objectives for the ROW corridor.

***Action (REC-SRMA-A30)***

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 481 of 499

not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities):* This area is a corridor along Colorado State Highway 141, which is also a state scenic and historic byway (Unaweep-Tabeguache) and along county dirt roads paralleling the Dolores River. Despite its proximity to the highway, ranching development, and the small town of Gateway, this unit remains largely natural in appearance due to the area's topography and scenic integrity. Few facilities currently exist, but trailheads and other interpretive exhibits will likely be developed over time.

*Social (contacts with other groups, group size, evidence of use):* The majority of visitors use the scenic byway to explore this unit, with a smaller percentage of visitors floating the river or using the trails. Contacts with other groups are moderate to high (15-25) along the highway, and low (3-6) on the river and trails. Group sizes for all activities are variable. The evidence of use is low in regards to alteration of the natural landscapes, but sights and sounds of other users are common along the highway, and less prominent along the river, county roads, and trails. Use is highest during the spring, summer and fall months.

*Operational (access, visitor services, management controls):* Rural highway auto, truck and motorcycle traffic is characteristic in the majority of this unit. The highway affords easy access to the river and trails. Information and environmental education are prevalent along the highway corridor and at trailheads. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, Town of Gateway, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. BLM staff or volunteers may occasionally be onsite, but most visitor use is supported by services in Gateway, or is self-guided, relying on signage or web-based information. Regulatory and educational information and use ethics are clearly signed to educate visitors and reduce resource damage.

BLM_0024747

***Allowable Use (REC-SRMA-AU45)***

*VRM Class:* Manage a portion of the SRMA under VRM Class II objectives (13,600 acres) and a portion under VRM Class III objectives (2,400 acres).

***Allowable Use (REC-SRMA-AU46)***

*Minerals:* Close the SRMA to the following:

- Fluid mineral leasing and geophysical exploration.
- Mineral material sales (exception for area near Niche Road).
- Non-energy leasable mineral exploration and/or development.

***Allowable Use (REC-SRMA-AU47)***

*ROW:* Designate as a ROW avoidance area.

***Allowable Use (REC-SRMA-AU48)***

Consider increased bonding for projects within the Unaweep Corridor and along the Dolores River to ensure that reclamation, visual, and other objectives are met.

***Action (REC-SRMA-A31)***

*Lands and Realty:* Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the SRMA that enhance public access and recreation opportunities consistent with SRMA objectives.

***Allowable Use (REC-SRMA-AU49)***

*Camping restrictions:* Limit camping and campfires to designated developed campgrounds and designated undeveloped campsites. Require the use of firepans and portable toilet systems at undeveloped campsites.

***Allowable Use (REC-SRMA-AU50)***

*Special Recreation Permits*

- Prohibit Class III and IV Commercial and Competitive SRPs. Allow an exception for historical, reoccurring events (e.g., Gateway Dynamite Shoot).
- Only issue vending permits in conjunction with event SRPs.

***Allowable Use (REC-SRMA-AU51)***

*Comprehensive Trails and Travel Management:* Limit motorized and mechanized travel to designated routes.

***Action (REC-SRMA-A32)***

*Comprehensive Trails and Travel Management:* Work with Colorado Department of Transportation and the Unaweep-Tabeguache Scenic and Historic Byway to design and develop access from Highway 141 to interpretive sites and other recreation sites along the Dolores River.

***Allowable Use (REC-SRMA-AU52)***

*Special Recreation Permits*

- Issue Class I and II Commercial, Competitive, and Organized Group SRPs that are consistent with SRMA objectives.
- Allow only SRPs that support management objectives of BLM and stakeholders (e.g., environmental and cultural education).

***Action (REC-SRMA-A33)***

*Special Recreation Permits:* All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

***Action (REC-SRMA-A34)***

Work with stakeholders to design and construct any new system trails, access points or facilities identified as necessary for achievement of SRMA objectives.

***Action (REC-SRMA-A35)***

Connect/reroute routes to make loop opportunities that help achieve SRMA objectives. Reroute/repair unsustainable and eroding routes.

BLM_0024749

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 484 of 499

Dolores River Canyons Special Recreation Management Area

This page intentionally left blank.

K-30 *Grand Junction Field Office Approved Resource Management Plan* August 2015

BLM_0024750

# GRAND VALLEY OHV SPECIAL RECREATION MANAGEMENT AREA

## SUPPORTING INFORMATION FOR SRMA ALLOCATION

The Grand Valley OHV SRMA is located northeast of the Grand Junction Regional Airport and encompasses approximately 15 square miles of desert-like terrain bounded by 27 ¼ Road on the west, the 32 Road alignment on the east, and the Little Book Cliffs on the northeast. The barren hills of Mancos shale offer challenging rides for all types of vehicles and all rider skill levels. 27 ¼ Road and 29 Road provide relatively easy access from the Grand Valley, and offer opportunities for development of recreation support facilities such as parking/unloading areas, informational signage, restrooms, campsites, and event venues. Existing roads, property boundaries and prominent topographic features provide distinct area boundaries that could be signed and/or fenced to clearly define the areas open for cross-country OHV travel.

## GOAL SRMA-WIDE

The Grand Valley OHV SRMA, through recreation program management and stakeholder involvement, will produce opportunities for visitors to experience the freedom to participate in a variety of motorized OHV recreation activities which lead to a variety of beneficial recreation and economic outcomes for participants and Grand Valley communities.

## OBJECTIVE SRMA-WIDE

The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

***Objective (REC-SRMA-O8)***

Through the life of this plan, manage the SRMA to provide local and regional visitors the freedom to participate in unconfined motorized OHV recreation

activities in close proximity to the urban amenities of the Grand Valley. Manage the zone for the following targeted recreation activities, experiences and outcomes:

*Activities*: The targeted activities for the SRMA are all forms of motorized OHV recreation, and undeveloped camping

*Outcomes and Experiences*

1. Visitors experience or seek to experience the freedom of cross-country riding and risk-taking adventure while testing their equipment and building their skills often in groups of friends and family.

2. Visitors generally realize personal benefits of a greater sense of adventure that tests their endurance and equipment, and an improved capacity to engage in motorized OHV recreation.

3. The Grand Valley community benefits from increased local tourism and tax revenue, and an enhanced sense of community ownership in the area's recreation resources.

*Resource Values*

Manage this area to minimize recreation impacts in areas adjacent to the SRMA, with special consideration given to protection/mitigation of the following resources: Colorado Hookless Cactus (*Sclerocactus glaucus*), Grand Junction suncup (*Camissonia eastwoodiae*), Grand Junction buckwheat (*Eriogonum contortum*), water quality (salinity, non-point source erosion/sedimentation into the Colorado River), Mancos soils.

*Resource Uses*

Minimize impacts from other resource use to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: lands and realty (ROW corridor, land acquisitions, private property trespass) and livestock grazing. In the portions of this SRMA that overlap the ROW corridor, manage recreation to achieve management objectives for the ROW corridor.

***Action (REC-SRMA-A36)***

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like group size limits, issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities):* The area's proximity to the Grand Valley, Interstate 70 and the Grand Junction Regional Airport creates an urban interface setting at the primary access points, with more remote settings available in the interior of the area. The character of the natural landscape has been largely altered by nearby development and cross country travel that has been the dominant use of the area for many years. Developed recreation facilities currently do not exist, but will likely be prominent in the future along the perimeter of the SRMA to direct and focus use within the open area. The recreation facilities at primary access points may include, but are not limited to, parking/staging areas that accommodate OHV-hauling rigs, OHV loading/ unloading ramps, vault toilets, informational kiosks and shade shelters. Additional recreation facility developments within the area may include event/festival/ vending areas, and OHV race tracks (e.g., motocross track).

*Social (contacts with other groups, group size, evidence of use):* This SRMA is generally a busy place, with other people constantly in view, traveling or congregating in large groups at trailheads and throughout the unit. Large disturbed areas are present, with sights, sounds, and tracks of other targeted users prominent throughout the SRMA, but more prominent near staging areas. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Access to the southern and western periphery of the area is on regularly-maintained paved or gravel roads. Access into the interior of the SRMA is unrestricted by vehicle size or type. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local OHV businesses, City of Grand Junction, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. Maps, signs and physical barriers (e.g., fences) delineate area boundaries. Management presence prominent at trailheads, and less prominent away from trailheads. Federal, state and local personnel are frequently present for information, education and law enforcement efforts. Portions of the area are designated for camping, festivals, equipment demonstrations, food vendors, and motorized events and competitions. Visitor use fees may be charged to support infrastructure and services (staging/event/camping area facilities, field patrols, EMS, law enforcement, maps, information, etc.)

***Allowable Use (REC-SRMA-AU53)***

*VRM Class:* Manage the SRMA under VRM Class IV objectives with the exception of the portion of the SRMA along the face of the Little Book Cliffs managed under VRM Class II objectives.

***Allowable Use (REC-SRMA-AU54)***

*Minerals:* Close the SRMA to the following:

- Mineral material sales.

***Allowable Use (REC-SRMA-AU55)***

*ROW:* Designate as a ROW avoidance area except for existing ROW corridor.

***Action (REC-SRMA-A37)***

*Lands and Realty*

- Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the SRMA that enhance public access and recreation opportunities consistent with SRMA objectives.
- Adjust SRMA boundary to match future land tenure adjustments related to expansion of the Grand Junction Regional Airport.

***Allowable Use (REC-SRMA-AU56)***

*Camping restrictions*

- Allow dispersed undeveloped camping throughout the SRMA as long as it does not interfere with frequently used OHV routes.
- Camping emphasis areas may be designated to direct and focus camping activities in areas that reduce interference with OHV use, and/or provide desirable camping opportunities.

***Allowable Use (REC-SRMA-AU57)***

*Firearm use restrictions:* Prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

***Allowable Use (REC-SRMA-AU58)***

*Special Recreation Permits*

- Issue Class I, II, III and IV Commercial, Competitive and Organized Group SRPs that are consistent with SRMA objectives.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 489 of 499

- Throughout the year, issue vending SRPs that achieve SRMA objectives and support local outdoor recreation businesses or organizations.
- In association with permitted competitive events, issue vending SRPs to vendors that support the authorized event.
- Do not issue vending SRPs for alcohol sales in the SRMA.
- Actively promote this area for motorized OHV events and activities.
- Allow non-motorized events that have been coordinated and endorsed by local OHV organizations, and do not significantly interfere with the SRMA's targeted activities, experiences and outcomes.

***Allowable Use (REC-SRMA-AU59)***

*Comprehensive Trails and Travel Management:* Allow unrestricted travel for all types of use within the SRMA, with the exception of small designated camping areas, special use areas (e.g., motocross track) and vending/event areas.

***Action (REC-SRMA-A38)***

*Comprehensive Trails and Travel Management:* To provide navigational assistance to visitors, consider providing directional signing on some primary arterial routes that traverse the SRMA and access primary staging areas.

***Action (REC-SRMA-A40)***

*Special Recreation Permits:* All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

***Action (REC-SRMA-A41)***
Clearly identify OHV open area boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to contain use along portions of an open OHV area boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.

BLM_0024755

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 490 of 499

***Action (REC-SRMA-A42)***

Continue to comply with the Federal Pollution Control Act regulations to minimize point sources of pollutants to navigable waters by obtaining (or requiring project proponents through conditions of approval to obtain) National Pollutant Discharge Elimination System (NPDES) permits where necessary to reduce impacts from stormwater runoff.

BLM_0024756

# NORTH FRUITA DESERT SPECIAL RECREATION MANAGEMENT AREA

## SUPPORTING INFORMATION FOR SRMA ALLOCATION

The North Fruita Desert SRMA is located at the base of the Book Cliffs north of the City of Fruita and encompasses a singletrack trail network that has gained international attention as a mountain bike riding destination. The trail system, and associated camping opportunities, provides a variety of unique opportunities for visitors to experience the diverse terrain of the desert environment along the base of the Book Cliffs. The area's close proximity to the City of Fruita makes it an important community resource for local recreation as well as tourism.

## GOAL SRMA-WIDE

The North Fruita Desert SRMA, through recreation program management and stakeholder involvement, will produce a diversity of quality mountain bicycling opportunities that add visitors' quality of life while contributing to the local economy and fostering stewardship of natural and cultural resources.

## OBJECTIVE SRMA-WIDE

The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

***Objective (REC-SRMA-O10)***

Through the life of this plan, manage the SRMA to be a tourism-based recreation area, providing singletrack bicycling trail opportunities accommodating a range of skill levels (beginner, intermediate and advanced) that can be marketed by stakeholders and partners as a family-focused mountain biking destination with close proximity to camping. Manage the SRMA for the following targeted recreation activities, experiences and outcomes:

*Activities:* The targeted activities for the SRMA are mountain bicycling and camping.

*Outcomes and Experiences*

1. Visitors experience or seek to experience the closeness of family and friends while developing their riding skills and abilities.

2. Visitors realize personal benefits of easy access to the outdoors, improved fitness and health maintenance (physical and mental), development of technical competence (i.e., mountain biking and camping skills), and development of stronger social bonds with friends and family.

3. The community benefits from improved quality of life with higher levels of public land stewardship, stronger community relationships and a healthier community.

4. The area economy is strengthened through recreation-related tourism revenue, and increased desirability of the community as a place to live.

*Resource Values*

Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: mule deer and elk winter range, water quality (non-point source erosion/sedimentation into the Colorado River) and soils.

*Resource Uses*

Minimize impacts from other resource use to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: livestock grazing.

***Action (REC-SRMA-A45)***

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

BLM_0024758

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 493 of 499

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities):* This is primarily a singletrack mountain biking trail network that is easily accessed from county roads, developed trailheads and campgrounds. More remote settings are available in the interior of the area. The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails, campground facilities, fences, livestock developments and other man-made structures. Due to topography and area scenery, the natural landscape is mostly retained despite the density of trails. The recreation facilities at trailheads and campgrounds may include, but are not limited to, parking lots, vault toilets, picnic tables, fire grates, informational kiosks and shade shelters. Throughout the unit, a designated singletrack trail system with a spectrum of trails (varied level of difficulty) is marked and maintained to achieve defined trail management objectives that support overall SRMA objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than15 other groups on designated trails, and 25 or more other groups in developed campgrounds during peak seasons. Groups are generally small to medium-sized (1-8 people) with occasional encounters with larger groups. Sights, sounds, and tracks of other targeted users are frequent throughout the area, but more prominent near trailheads and camping areas. Use is generally be highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Mountain bicycle singletrack trails provide easy access from trailheads off of county roads. A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local bicycle shops, City of Fruita, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. Portions of the area are designated for camping, festivals, mountain bike events and races. Maps, signs and physical barriers (e.g., fences) delineate area boundaries. Management presence prominent at trailheads and camping areas, and less prominent away from trailheads. Campground host onsite at campground during peak seasons. Visitor use fees may be charged to support infrastructure and services (trailhead, campground and event facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.)

***Allowable Use (REC-SRMA-AU66)***

*VRM Class:* Manage the SRMA under VRM Class II objectives.

***Allowable Use (REC-SRMA-AU67)***

*Minerals:* Close the SRMA to the following:

BLM_0024759

- Mineral material sales
- Non-energy leasable mineral exploration and/or development.

***Allowable Use (REC-SRMA-AU68)***

*ROW:* Designate as a ROW exclusion area, with an exception for recreation projects requiring electric or water utilities, or for minimally intrusive access/utility ROWs to private inholdings within the SRMA.

***Action (REC-SRMA-A46)***

*Lands and Realty:* Pursue opportunities with landowners, either through purchase or exchange, for acquisition of private properties or easements within or adjacent to the SRMA that enhance public access and recreation opportunities consistent with SRMA objectives.

***Allowable Use (REC-SRMA-AU69)***

*Forestry and Vegetation:* Close the SRMA to the following:

- Timber harvest, fire wood cutting and special forest product harvest.
- Collection of vegetative material under a wilding permit.

***Allowable Use (REC-SRMA-AU70)***

*Camping restrictions:* To reduce resource impacts and conflicting user interactions,

- Limit camping to designated campgrounds and campsites.
- Limit the number of people and/or vehicles allowed at each campsite.
- Require the use of portable toilet systems and firepans at designated undeveloped sites.

***Allowable Use (REC-SRMA-AU71)***

*Firearm use restrictions:* For the safety of trail users and campers, prohibit recreational target shooting using any devices that propel a projectile, including but not limited to, firearms, bow and arrow, sling shots, paint ball guns and air guns. This does not apply to the lawful taking of game.

***Allowable Use (REC-SRMA-AU72)***

*Special Recreation Permits*

- Issue Class I – IV Commercial, Competitive and Organized Group SRPs that are consistent with SRMA objectives.

- In association with Competitive events, issue vending SRPs to vendors that support the authorized event.
- Do not issue vending SRPs for alcohol sales in the SRMA.

***Allowable Use (REC-SRMA-AU73)***

*Comprehensive Trails and Travel Management:* Limit motorized and mechanized travel to designated routes throughout the SRMA.

***Action (REC-SRMA-A48)***

*Comprehensive Trails and Travel Management*

- Work with stakeholders to design and construct any new system trails, access points or facilities identified as necessary for achievement of SRMA objectives, including promotion of the area as a regional, national and international mountain biking tourism destination.

***Action (REC-SRMA-A49)***

*Comprehensive Trails and Travel Management*

- Design and construct an event staging area and trail system to accommodate large-scale mountain bike races/events.

***Action (REC-SRMA-A50)***

*Comprehensive Trails and Travel Management*

- Construct new system trails to accommodate activity-specific trails (e.g., mountain bike racing, directional travel trails, constructed technical trail features).

***Action (REC-SRMA-A51)***

*Comprehensive Trails and Travel Management*

- Connect/reroute routes to make loop opportunities that help achieve SRMA objectives. Reroute/repair unsustainable and eroding routes.

***Action (REC-SRMA-A52)***

*Comprehensive Trails and Travel Management*

- Mark trail system route intersections with signs showing trail names, allowable uses, and difficulty ratings. Travel management designations (allowable uses) only need to be displayed at intersections where the allowable uses change from one route to another.

Case No. 1:20-cv-02484-MSK Document 33-6 filed 04/27/21 USDC Colorado pg 496 of 499

***Action (REC-SRMA-A53)***

Construct additional developed camping opportunities to address camping demand.

***Action (REC-SRMA-A54)***

*Special Recreation Permits:* All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix L).

BLM_0024762

# PALISADE RIM SPECIAL RECREATION MANAGEMENT AREA

### SUPPORTING INFORMATION FOR SRMA ALLOCATION

The Palisade Rim SRMA encompasses the rim and bench lands east of the Town of Palisade. Public lands and trails in the area are popular close-to-home recreation destinations for the community of Palisade, neighboring communities and seasonal tourism. The area offers outstanding views of the Grand Valley, the Colorado River, the Little Book Cliffs and the Grand Mesa. It also contains significant cultural and wildlife resources.

### GOAL SRMA WIDE

The Palisade Rim SRMA, through recreation program management and stakeholder involvement, will produce quality recreation and learning opportunities that will continue to enhance area residents' quality of life, contribute to the local economy, and provide stewardship and protection of natural and cultural resources. The area's close proximity to the Town of Palisade makes it an important community resource for local recreation as well as tourism.

### OBJECTIVE SRMA WIDE

The objective is that participants in visitor/community assessments report an average of 4.0 realization of the targeted experience and benefit outcomes listed below. (4.0 on a probability scale where 1 = not at all realized to 5 = totally realized). Visitor assessments will be administered as funding allows.

***Objective (REC-SRMA-O12)***

Through the life of this plan, manage the SRMA to be a community-based recreation area, providing intermediate to advanced non-motorized trail-based recreation with an emphasis on the area's scenery, cultural heritage educational opportunities and stewardship of cultural and natural resources. Manage the

SRMA for the following targeted recreation activities, experiences and outcomes:

*Activities:* The targeted activities for the SRMA are hiking, dog walking, trail running, mountain biking and horseback riding.

*Outcomes and Experiences*

1. Visitors experience or seek to experience outdoor physical activity for fitness and stress reduction, as well as experiencing and learning about the area's scenic vistas, wildlife and cultural resources, often in small groups of family members and/or friends.

2. Visitors realize personal benefits of having recreation, outstanding scenery, cultural appreciation opportunities and wildlife viewing opportunities close to home. Individuals also benefit from improved fitness and health maintenance (physical and mental), development of technical competence (e.g., mountain biking skills), and development of stronger social bonds with friends and family.

3. The community benefits from improved quality of life with higher levels of public land stewardship, increased awareness of the area's natural, historic and cultural resources, stronger community relationships and a healthier community.

4. The area economy is strengthened through recreation-related tourism revenue, and increased desirability of the community as a place to live.

*Resource Values*

Manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: deer and elk winter range, Colorado Hookless Cactus (*Sclerocactus glaucus*), water quality (non-point source erosion/sedimentation into the Colorado River), soils, paleontological resources, and cultural resources.

*Resource Uses*

Minimize impacts from other resource use to recreation to ensure those uses support SRMA recreation objectives. The following resource uses were identified for management consideration in this SRMA during the planning process: lands and realty (access across BOR withdrawal parcel), land acquisition, private property trespass). In the portions of the SRMA that overlap the ROW corridor, manage recreation to achieve ROW corridor management objectives.

***Action (REC-SRMA-A56)***

Manage the desired recreation setting characteristics described below to support SRMA outcome objectives. If monitoring indicates SRMA outcomes are not being achieved, settings will be incrementally adapted to facilitate

achievement of SRMA outcomes. For example, begin with visitor education, then, if necessary, progress to more intensive measures like use and timing limitations (e.g., different uses on different trails on different days, designating directional travel on system trails, etc.), issuance of permits, law enforcement patrols, etc. Only implement adaptive management measures if: 1) they are consistent with SRMA objectives and 2) sufficient funding and long-term management commitments are secured from internal BLM sources and/or external managing partners.

See Table 2 above.

*Desired Recreation Setting Characteristics*

*Physical (remoteness, naturalness, facilities):* The character of the landscape is largely natural in appearance, with some viewsheds that include roads, trails railroads, canals, houses, farms and other man-made developments. Due to topography and area scenery, the natural landscape is mostly retained despite the area's proximity to the Town of Palisade, Interstate 70 and the Grand Valley. The recreation facilities at trailheads (adjacent to the SRMA on CDOT property) may include, but are not limited to, vault toilets, informational/interpretive kiosks and shade shelters. Throughout the unit, a designated singletrack trail system is marked and maintained to achieve defined trail management objectives that support overall SRMA objectives.

*Social (contacts with other groups, group size, evidence of use):* Visitors generally directly encounter fewer than seven other groups on designated trails. Groups are generally small to medium-sized (1-8 people) with occasional encounters with larger groups. Sights and sounds of other targeted users are moderately frequent throughout the SRMA, but more frequent near the trailhead. Use is generally highest during the spring and fall seasons, with lighter use during summer and winter months.

*Operational (access, visitor services, management controls):* Non-motorized singletrack trails and use are predominant with primary access from a single trail and trailhead on non-BLM land (CDOT and BOR withdrawal). Bicycles may access the SRMA starting from locations in the nearby Town of Palisade. Secondary access from adjacent BLM, Forest Service and municipal lands to the south and east (depending on potential future development of connector trails.) A variety of communication tools (e.g., information/education kiosks, brochures, maps, signs, web content) and service providers (i.e., onsite staff and/or volunteers, local businesses, Town of Palisade, local clubs/organizations, and enforcement patrols) provide information and services that help visitors achieve SRMA objectives. Management presence is moderate at trailheads, and less prominent away from trailheads. Visitor use fees may be charged to support infrastructure and services (trailhead facilities, trail construction and maintenance, trail patrols, EMS, law enforcement, maps, information, etc.)