| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | | | | | |
|---|---|---|---|---|---|
| **Stipulation Number** (*Existing*/**New**)[1] | | **Alternative** | | | |
| **Protected Resource** | **Stipulation Description** | **A** | **B** | **C** | **D** |
| **Acres/Miles Affected** | | | | | |
| | **MODIFICATION:** Standard modifications apply (Section B.2). | | | | |
| | **WAIVER:** Standard waivers apply (Section B.2). | | | | |
| | **JUSTIFICATION:** This stipulation is necessary to preserve the value of disposal tracts and/or protect facilities or uses for which these tracts of land were identified for disposal. | | | | |
| | Coal | | | | |
| **COAL MINE CSU CO** 9,000 acres *Fluid Minerals Only* | **STIPULATION:** Surface occupancy or use (for fluid minerals only) may be restricted due to surface or underground coal mines. Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Operations proposed within the area of an approved surface or underground coal mine will be relocated outside the area to be mined or to accommodate room and pillar mining operations. | | | • | |
| | **PURPOSE:** To protect surface or underground coal mines. | | | | |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). | | | | |
| | **MODIFICATION:** Standard modifications apply (Section B.2). | | | | |
| | **WAIVER:** Standard waivers apply (Section B.2). | | | | |
| | **JUSTIFICATION:** This stipulation is necessary to allow underground coal operations within oil and gas leases while reducing safety concerns. | | | | |
| **CSU-34** *(CSU CO-25)* **Federally Leased Coal.** 9,000 acres *Fluid Minerals Only* | **STIPULATION:** Where applicable, apply CSU (site-specific relocation) restrictions to new oil and gas leases and operations within the area of federally leased coal. Relocate oil and gas operations outside the area to be mined or locate to accommodate room and pillar mining operations. | | | • | • |
| | **PURPOSE:** To protect federally leased coal lands. | | | | |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). | | | | |
| | **MODIFICATION:** Standard modifications apply (Section B.2). | | | | |
| | **WAIVER:** Standard waivers apply (Section B.2). | | | | |
| | **JUSTIFICATION:** This stipulation is necessary to allow underground coal operations within oil and gas leases while reducing safety concerns. | | | | |

BLM_0025210

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| Table B-6<br>Controlled Surface Use (CSU) Stipulations Applicable to<br>Fluid Mineral Leasing and Other Surface-disturbing Activities | | | | | |
|---|---|---|---|---|---|
| Stipulation Number<br>(*Existing*/**New**)[1] | | | Alternative | | |
| Protected Resource<br>Acres/Miles Affected | Stipulation Description | A | B | C | D |
| **ACEC** | | | | | |
| **CSU-39**<br>**Roan and Carr Creeks ACEC.**<br>33,600 acres<br>*All Surface-disturbing Activities* | **STIPULATION:** Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required in the Roan and Carr Creeks ACEC (33,600 acres).<br><br>**PURPOSE:** To protect and prevent irreparable damage to unique riparian habitats, genetically pure populations of cutthroat trout, and Greater Sage-Grouse habitat.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2).<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2). | | • | | |
| **Wild and Scenic Rivers** | | | | | |
| **CSU-35** *(ROWA)*<br>**WSR Study Segments Classified as Scenic and Recreational.**<br>22,980 acres<br>*All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions within 402 meters (0.25-mile) on either side of the ordinary high-water mark or other preliminary or final boundary of identified eligible or suitable WSR study corridors, as defined in the WSR Suitability Report, of the following segments classified as "Scenic" or "Recreational."<br><br>Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required.<br><br>• Colorado River Segment 1 (2,200 acres);<br>• Colorado River Segment 2 (120 acres);<br>• Dolores River (5,900 acres);<br>• North Fork Mesa Creek (700 acres);<br>• Blue Creek (2,900 acres);<br>• Gunnison River Segment 2 (970 acres);<br>• Roan Creek (2,000 acres);<br>• Carr Creek (1,800 acres);<br>• Rough Canyon Creek (1,200 acres);<br>• East Creek (1,900 acres);<br>• West Creek (1,700 acres); and<br>• Ute Creek (1,400 acres).<br><br>**PURPOSE:** To protect WSR outstandingly remarkable values, free-flowing nature, and water quality of eligible or suitable river | | | | • |

BLM_0025211

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | | | | | |
|---|---|---|---|---|---|
| Stipulation Number (*Existing*/**New**)[1] | | Alternative | | | |
| Protected Resource Acres/Miles Affected | Stipulation Description | A | B | C | D |

|  | segments and their consequent recreational, social, economic, and environmental significance. | | | | |
|  | **EXCEPTION:** Standard exceptions apply (Section B.2). | | | | |
|  | **MODIFICATION:** Standard modifications apply (Section B.2). | | | | |
|  | **WAIVER:** Standard waivers apply (Section B.2). | | | | |
|  | **JUSTIFICATION:** This stipulation is necessary to protect ORVs associated with WSR segments, and allow BLM to place disturbances 402 meters (0.25-mile) away from the identified segment. | | | | |
| **National Trails** | | | | | |
| **CSU-36** **Old Spanish National Historic Trail.** 3,400 acres *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within 805 meters (0.5-mile) of either side of the Old Spanish National Historic Trail. **PURPOSE:** To protect visual resources associated with the trail. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect to protect visual resources along this congressionally designated historic trail. |  |  | • |  |
| **CSU-37** **Scenic Byways (0.5-mile).** 32,500 acres *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within 805 meters (0.5-mile) of either side of centerline of the following scenic byways: <br> • Dinosaur Diamond Prehistoric Highway (National Scenic Byway and All American Road) (14,300 acres); <br> • Grand Mesa Scenic and Historic Byway (1,200 acres); and <br> • Unaweep-Tabeguache Scenic and Historic Byway (17,000 acres). <br> **PURPOSE:** To protect the quality of the scenic (visual) values of |  | • | • |  |

BLM_0025212

| Stipulation Number (*Existing*/**New**)[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| Protected Resource Acres/Miles Affected | | A | B | C | D |
| | scenic, historic, or backcountry byways. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, an exception could be granted if: (a) a viewshed analysis indicates minimal impairment of the visual resources from the driving corridor; or (b) the action is determined to be consistent and compatible with protection or enhancement of the resource values, or the use would provide suitable opportunities for public enjoyment of these resources. An exception could also be granted for bond projects within scenic byways to ensure that visual and reclamation objectives are achieved. Facility design should incorporate viewshed analysis and modeling to minimize impacts to visual resources. Special mitigation measures such as facility placement and color selection have been proposed to reduce impacts to visual resources. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to place surface-disturbing activities along scenic byways in areas that do not affect values associated with the identified scenic byway. | | | | |
| **CSU-38** **Scenic Byways (0.25-mile).** 29,500 acres *All Surface-disturbing Activities* | **STIPULATION:** Apply CSU (site-specific relocation) restrictions to fluid mineral leasing and other surface-disturbing activities within 402 meters (0.25-mile) of the following scenic byways: <br>• Lands' End (540 acres); <br>• John Brown Canyon (1,800 acres); <br>• Dinosaur Diamond Prehistoric Highway (National Scenic Byway and All American Road) (7,000 acres); <br>• Grand Mesa Scenic and Historic Byway (860 acres); <br>• Unaweep-Tabeguache Scenic and Historic Byway (7,700 acres); <br>• Niche to Blue Mesa (3,800 acres); and <br>• Winter Flats Road (7,800 acres). <br>**PURPOSE:** To protect scenic views in driving corridors. <br>**EXCEPTION:** Standard exceptions apply (Section B.2). In | | | | • |

BLM_0025213

| Table B-6 Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | | | | | |
|---|---|---|---|---|---|
| **Stipulation Number** (*Existing*/**New**)[1] | | | **Alternative** | | |
| **Protected Resource** | **Stipulation Description** | **A** | **B** | **C** | **D** |
| **Acres/Miles Affected** | | | | | |
| | addition, an exception could be granted if: (a) a viewshed analysis indicates minimal impairment of the visual resources from the driving corridor; or (b) the action is determined to be consistent and compatible with protection or enhancement of the resource values, or the use would provide suitable opportunities for public enjoyment of these resources. An exception could also be granted for bond projects within scenic byways to ensure that visual and reclamation objectives are achieved. Facility design should incorporate viewshed analysis and modeling to minimize impacts to visual resources. Special mitigation measures such as facility placement and color selection have been proposed to reduce impacts to visual resources.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to ensure surface-disturbing activities do not affect values associated with the identified scenic byway. | | | | |

[1]Existing stipulations currently in effect in Alternative A, current management, are noted in italics and are from the current RMP (BLM 1987).

BLM_0025214

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| | Special Status Species | | | | |
| **TL-1** (*ROWA*) **Salmonid and Native Non-salmonid Fishes (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub; mountain whitefish; Paiute and mottled sculpin; and speckled dace).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit in-channel stream work in all occupied streams during fish spawning, egg incubation, and fry emerging seasons. Fish spawning, egg incubation, and fry emerging seasons vary by elevation and temperatures; however, the following intervals generally apply in Colorado: <br>• Cutthroat trout (various subspecies): May 1-September 1 <br>• Rainbow trout: March 1-June 15 <br>• Brown trout: October 1-May 1 <br>• Brook trout: August 15-May 1 <br>• Sculpin: May 1-July 31 <br>• Bluehead sucker: May 1-July 31 <br>• Flannelmouth sucker: April 1-July 1 <br>• Roundtail chub: May 15-July 15 <br>• Speckled dace: May 1-August 31 <br>• Mountain whitefish: October 1-November 30 <br>**PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry of native fish populations. <br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling and does not apply to operations and maintenance. If competing species are involved, the BLM may select to implement species-specific dates for native fish versus nonnative species. <br>**MODIFICATION:** Standard modifications apply (Section B.2). <br>**WAIVER:** Standard waivers apply (Section B.2). <br>**JUSTIFICATION:** This stipulation is necessary to protect important native and game fish breeding. | | ● | ● | |
| **TL-2** (*ROWA*) **Occupied Cutthroat Trout Waters.** *All Surface-disturbing* | **STIPULATION:** Prohibit in-channel work in all occupied cutthroat trout streams during spring spawning periods of April 1 to August 1. <br>**PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry. <br>**EXCEPTION:** Standard exceptions apply (Section B.2). | | | | ● |

*Grand Junction Field Office*
*Internal Proposed RMP/Final EIS*

BLM_0025215

| Table B-7 Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities | | | | | |
|---|---|---|---|---|---|
| Stipulation Number (*Existing/***New**)[1] | Stipulation Description | **Alternative** | | | |
| Protected Resource Acres/Miles Affected | | A | B | C | D |
| *Activities* | **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect important native fish species, including a USFWS-listed species. | | | | |
| **TL-3** *(ROWA)* **Migratory Bird Habitat.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities, including vegetation-removal projects, in migratory bird habitat during nesting season when nesting birds are present. Alternative B: May 15 to July 15 or as site-specific analysis dictates. Alternative C: April 15 to July 31 or as site-specific analysis dictates. **PURPOSE:** To minimize disruption of migratory bird nesting activity. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling, and does not apply to operations and maintenance. The TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect migratory bird habitat and ensure compliance with the Migratory Bird Treaty Act (Information Bulletin No. 2010-110); BLM Memorandum of Understanding with US Fish and Wildlife Service). | | ● | ● | |
| **TL-4** *(ROWA)* **Birds of Conservation Concern's Habitat.** | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities, including vegetation-altering projects, in birds of conservation concern's habitat (USFWS 2008) during nesting season (May 15 to July 15 or as site-specific analysis dictates) when nesting birds are present. **PURPOSE:** To protect nesting osprey from human disturbance | | | | ● |

BLM_0025216

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| *All Surface-disturbing Activities* | that could affect nest success.<br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.<br><br>**MODIFICATION:** Standard modifications apply (Section B.2).<br><br>**WAIVER:** Standard waivers apply (Section B.2).<br><br>**JUSTIFICATION:** This stipulation is necessary to protect osprey nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008) and ensure compliance with the Migratory Bird Treaty Act (Information Bulletin No. 2010-110); BLM Memorandum of Understanding with US Fish and Wildlife Service). | | | | |
| **WILDLIFE RAPTOR NESTS TL CO**<br><br>*All Surface-disturbing Activities* | **STIPULATION:** No surface use is allowed within a 402 meter (0.25-mile) radius of active raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young:<br><br>• Osprey nests: April 1 to August 31.<br>• Red-tailed hawk nests, including any alternate nests: February 15 to July 15.<br>• Swainson's hawk nests and associated alternate nests: April 1 to July 15.<br>• Burrows or burrowing owl nest sites: March 1 to August 15.<br>• Great horned owl nests: February 1 to August 15.<br>• Other owls and raptors: March 1 to August 15.<br>• Cooper's hawk, sharp shinned hawk, and northern harrier nests: April 1 to August 15.<br><br>**On the following lands:**<br><LEGAL_DESCRIPTION><br><br>**PURPOSE:** To prevent disruption of reproductive activity of raptors during the production period. | | | • | |

BLM_0025217

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | **EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. | | | | |
| | **MODIFICATION:** Standard modifications apply (Section B.2). | | | | |
| | **WAIVER:** Standard waivers apply (Section B.2). | | | | |
| | **JUSTIFICATION:** This stipulation is necessary to protect nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | | |
| **WILDLIFE SENSITIVE RAPTOR NESTS TL CO** *All Surface-disturbing Activities* | **STIPULATION:** No surface use is allowed within an 805 meter (0.5-mile) radius of active or inactive raptor nests, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period(s), or until fledging and dispersal of young: • Ferruginous hawk nests, including any alternate nests: February 1 to July 15. • Goshawk nest sites: March 1 to September 30. • Peregrine and prairie falcon nest cliff(s): March 15 to July 31. **On the following lands:** <LEGAL_DESCRIPTION> **PURPOSE:** To prevent disruption of reproductive activity of raptors during the production period. **EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect ferruginous hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | • | | |

BLM_0025218

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| **TL-5** *(ROWA)* **Osprey Nests.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 402 meters (0.25-mile) of active osprey nests from April 1 to August 31. **PURPOSE:** To protect nesting osprey from human disturbance that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect osprey nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | • | • |
| **TL-6** *(ROWA)* **Ferruginous Hawk Nests.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 402 meters (0.25-mile) (Alternatives C and D) of active ferruginous hawk nests, including any alternate nests, from February 1 to July 15. **PURPOSE:** To protect ferruginous hawks from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect ferruginous hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | • | • |

BLM_0025219

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| **TL-7** *(ROWA)* **Red-tailed Hawk Nests.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 531 meters (0.33-mile) of active red-tailed hawk nests, including any alternate nests, from February 15 to July 15. **PURPOSE:** To protect nesting red-tailed hawks from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect red-tailed hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | • | • |
| **TL-8** *(ROWA)* **Swanson's Hawk Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 402 meters (0.25-mile) of active Swainson's hawk nests and associated alternate nests from April 1 to July 15. **PURPOSE:** To protect nesting Swainson's hawks from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect Swainson's hawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | • | • |

BLM_0025220

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| *TL-14 (ROWA)* *(Exhibit GJ-14EB)* *(BLM 1987)* **Threatened and Endangered Seasonal Habitat (Peregrine Falcon Habitat).** *Fluid Minerals Only* | **STIPULATION:** In order to protect important seasonal habitat of threatened or endangered animal species, any lease operations (fluid minerals only) which may affect these species will be allowed only during the following period: Occupancy is allowed <BEGIN_DATE> to <END_DATE> on the lands described below: <LEGAL_DESCRIPTIONS>. **PURPOSE:** To protect bald eagle habitat. **EXCEPTION:** Exceptions to this limitation in any particular year may be specifically approved in writing by the Authorized Officer. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). | ● | | | |
| **TL-9 (ROWA)** **Peregrine and Prairie Falcon Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 805 meters (0.5-mile) of active peregrine and prairie falcon nest cliff(s) from March 15 to July 31. **PURPOSE:** To protect nesting peregrine and prairie falcons from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect peregrine and prairie falcon nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | ● | ● |

BLM_0025221

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **TL-10** *(ROWA)* **Goshawk Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities that may affect nesting success within 805 meters (0.5-mile) of active goshawk nest sites from March 1 to September 30. **PURPOSE:** To protect nesting goshawks from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect goshawk nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | • | • |
| **TL-11** *(ROWA)* **Burrowing Owl Burrows and Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 402 meters (0.25-mile) of active burrows or burrowing owl nest sites from March 1 to August 15. **PURPOSE:** To protect nesting burrowing owls from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect nesting burrowing owls. | | | • | • |

BLM_0025222

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **TL-12** (*ROWA*) **Other Raptor Species (accipiters, falcons [except kestrel], buteos, and owls).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface disturbing activities, and intensive human activities that may affect nesting success within 402 meters (0.25-mile) of active nests from February 1 to August 15 (great horned owl), March 1 to August 15 (other owls and raptors), and April 1 to August 15 (Cooper's hawk, sharp shinned hawk, and northern harrier). **PURPOSE:** To protect reproductive activity at active nest sites. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect raptor species per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | ● | ● |
| **TL-13** (*ROWA*) **Golden Eagle Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit human encroachment within an 805-meter (0.5-mile [Alternative B]) or 402-meter (0.25-mile [Alternatives C and D]) radius of active golden eagle nests and associated alternate nests, as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, during the following time period, or until fledging and dispersal of young: December 15 to July 15. **PURPOSE:** To prevent disruption of reproductive activity of golden eagles. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect golden eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | ● | ● | ● |

*Grand Junction Field Office*
*Internal Proposed RMP/Final EIS*

BLM_0025223

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| *TL-14 (ROWA)* (*Exhibit GJ-14EA*) (*BLM 1987*) **Threatened and Endangered Seasonal Habitat (Bald Eagle Habitat).** *Fluid Minerals Only* | **STIPULATION:** In order to protect important seasonal habitat of threatened or endangered animal species, any lease operations (fluid minerals only) which may affect these species will be allowed only during the following period: Occupancy is allowed <BEGIN_DATE> to <END_DATE> on the lands described below: <LEGAL_DESCRIPTIONS>. **PURPOSE:** To protect bald eagle habitat. **EXCEPTION:** Exceptions to this limitation in any particular year may be specifically approved in writing by the Authorized Officer. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). | • | | | |
| **TL-14** *(ROWA)* **Bald Eagle Nest Sites.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit human encroachment within an 805-meter (0.5-mile) radius of active bald eagle nests from November 15 to July 31. **PURPOSE:** To prevent disruption of reproductive activity of bald eagles. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this stipulation only applies to construction and drilling, and does not apply to operations and maintenance. The TL area may be altered depending on the status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect bald eagle nesting habitat per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | • | • | • |
| **TL-15** *(ROWA)* **Bald Eagle Winter Roost.** *All Surface-* | **STIPULATION:** Prohibit activity within 402 meters (0.25-mile) of bald eagle winter roosts from November 15 to March 15. Additional restrictions may be necessary within 805 meters (0.5-mile) of active bald eagle winter roosts if there is a direct line of sight from the roost to the activities. | | • | • | • |

BLM_0025224

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| *disturbing Activities* | **PURPOSE:** To protect bald eagles from human impacts that could affect winter survival. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the TL area may be altered depending on the status of the roost site or the geographical relationship of topographic barriers and vegetation screening to the roost site. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect bald eagle winter roosts per CPW's *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors* (CPW 2008). | | | | |
| **TL-16** *(ROWA)* **Occupied Sage-grouse Winter Habitat.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities in occupied sage-grouse winter habitat from December 1 to March 15. **PURPOSE:** To protect sage-grouse (Gunnison and greater) from human impacts that could affect winter survival. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect sage-grouse from disturbance in a time of year when the added stress from disturbance can lead to death. | | ● | ● | |
| **TL-17** *(ROWA)* **Sage-grouse Leks (4 miles).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities within 6.4 kilometers (4 miles) of sage-grouse leks from March 1 to June 30. **PURPOSE:** To protect breeding and nesting sage-grouse (Gunnsion and greater) from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, the NSO area may be altered depending upon the active status of the lek or the geographical relationship of | | ● | | |

BLM_0025225

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| | topographical barriers and vegetation to the lek site. MODIFICATION: Standard modifications apply (Section B.2). WAIVER: Standard waivers apply (Section B.2). JUSTIFICATION: This stipulation is necessary to protect breeding and nesting sage-grouse per current research recommendations (Parachute-Piceance-Roan Greater Sage-grouse Work Group 2008). | | | | |
| **TL-18** (*ROWA*) **Sage-grouse Leks, Nesting, and Early Brood-rearing Habitat (0.6-mile).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities from March 1 to June 30 within 966 meters (0.6-mile) of the lek or within sage-grouse nesting and early brood-rearing habitat. **PURPOSE:** To protect breeding and nesting sage-grouse (Gunnsion and greater) from human impacts that could affect nest success. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect greater and Gunnison sage-grouse breeding habitat. | | | | • |
| **TL-19** (*ROWA*) **Occupied Prairie Dog Towns.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use and surface-disturbing activities within active white-tailed prairie dog towns from April 1 to July 15. **PURPOSE:** To avoid impacts to white-tailed prairie dogs during the pupping season. **EXCEPTION:** Standard exceptions apply (Section B.2). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect prairie dogs during the breeding season to allow for distribution of young. | | | ⊡ | • |

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

BLM_0025226

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | Fish and Wildlife | | | | |
| **TL-1** (*ROWA*) **Sport and Native Fish (brown, brook, rainbow, and cutthroat trout; bluehead and flannelmouth sucker; roundtail chub; mountain whitefish; Paiute and mottled sculpin; and speckled dace).** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit in-channel stream work in all occupied streams during appropriate spring and fall spawning periods. <br><br>Alternative B: Rainbow and cutthroat trout, bluehead and flannelmouth sucker, roundtail chub, and Paiute and mottled sculpin (April 1 to August 1); brown and brook trout (October 1 to November 30). <br><br>Alternative C: Cutthroat trout (May 1-September 1), Rainbow trout (March 1-June 30), Brown trout (October 1-May 1), Brook trout (August 1-May 1), Sculpin (May 1-July 31), Bluehead sucker (May 1-July 31), Flannelmouth sucker (April 1-July 1), Roundtail chub (May 1-July 31), Speckled dace (May 1-August 31), Mountain whitefish (October 1-November 30). <br><br>**PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry. <br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). <br><br>**MODIFICATION:** Standard modifications apply (Section B.2). <br><br>**WAIVER:** Standard waivers apply (Section B.2). <br><br>**JUSTIFICATION:** This stipulation is necessary to protect important native and game fish breeding. | | • | • | |
| **TL-2** (*ROWA*) **Occupied Cutthroat Trout Waters.** *All Surface-disturbing Activities* | **STIPULATION:** Prohibit in-channel work in all occupied cutthroat trout streams during spring spawning periods of April 1 to August 1. <br><br>**PURPOSE:** To protect redds (egg masses) in the gravel and emerging fry. <br><br>**EXCEPTION:** Standard exceptions apply (Section B.2). <br><br>**MODIFICATION:** Standard modifications apply (Section B.2). <br><br>**WAIVER:** Standard waivers apply (Section B.2). <br><br>**JUSTIFICATION:** This stipulation is necessary to protect important native fish species, including a USFWS-listed species. | | | | • |

BLM_0025227

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| *TL-12 (ROWA)* (BLM 1987) **Deer and Elk Winter Range.** 262,800 acres *Fluid Minerals Only* | **STIPULATION:** Lease activities such as exploration, drilling, and other development (for fluid minerals only) will be allowed only during the period from May 1 to December1 on the following portions of this lease: <LEGAL_DESCRIPTION>. **PURPOSE:** To protect important seasonal wildlife habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to maintenance and operation of producing wells and range management. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** This stipulation may be waived or reduced in scope if circumstances change or if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on the concerns(s) identified. | ● | | | |
| *TL-20 (ROWA)* **Big Game Winter Range.** 474,500 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities from December 1 to May 1 to protect big game winter range as mapped by the CPW. Certain areas and/or routes within big game winter range may be closed to foot, horse, motorized, and/or mechanized travel from December 1 to May 1. **PURPOSE:** To reduce disruption of big game during the winter season. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g., producing wells) and range administration. An exception will be granted only when the proposed action would not cause unacceptable harm to big game based on the following factors: 1. Winter conditions (such as snow cover and crusting) at the project site and vicinity; 2. Predictable, short-term (1 week) storm forecasts for the project area; 3. Period of winter in which the exception is requested (e.g., after April 15, before December 15, heart of winter); 4. Project site location relative to the size and spatial configuration of delineated critical winter range, open | | ● | ● | ● |

BLM_0025228

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | roads and trails, and other background disturbance; 5. Length of time that activities would encroach on the period of the winter range stipulation; 6. Number of vehicle trips per day in and out of the work site; 7. Time of day that activity occurs (after dark generally prohibited); 8. Actual big game use of the area; 9. Cumulative impacts on big game (such as other activities in the area); and 10. Additional site-specific or general concerns, as appropriate. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect big game winter habitat from surface-disturbing and major human activities during the periods of the year when the habitat is occupied. This habitat is critical to the viability of big game herds.  These areas will be managed by BLM to reflect CPW most current big game winter range maps. | | | | |
| *TL-9 (ROWA)* *(BLM 1987)* **Bighorn Seasonal Stipulation.** *Fluid Minerals Only* | **STIPULATION:** Lease activities such as exploration, drilling, and other development (for fluid minerals only) will be allowed only during the period from May 1 to December 1 on the following portions of this lease: <LEGAL_DESCRIPTION>. **PURPOSE:** To protect important seasonal bighorn habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g., producing wells) and range administration. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** This stipulation may be waived or reduced in scope if circumstances change or if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on the concern(s) identified. | ● | | | |

BLM_0025229

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| *TL-4 (ROWA)* *(BLM 1987)* **Elk Calving Area.** 3,400 acres *Fluid Minerals Only* | **STIPULATION:** Lease activities such as exploration, drilling, and other development (for fluid minerals only) will be allowed only during the period from June 15 to May 15 on the following portions of this lease. **PURPOSE:** To protect important seasonal elk calving habitat. **EXCEPTION:** This limitation does not apply to maintenance and operation of producing wells and range management. In addition, no surface-disturbing activity will be allowed on elk calving sites. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). | • | | | |
| **BIG GAME PRODUCTION TL CO** *All Surface-disturbing Activities* | **STIPULATION:** No surface use is allowed during the following time period(s) in big game production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM: Prohibit activities, including motorized travel, in elk production areas from May 15 to June 15; in antelope production areas from April 15 to June 30; in Rocky Mountain bighorn sheep production areas from April 15 to June 30; in Moose production areas from April 15 to June 30; and in desert bighorn sheep production areas from February 1 to May 1. **On the following lands:** <LEGAL_DESCRIPTION> **PURPOSE:** To reduce disruption of big game during parturition and young rearing period. **EXCEPTION:** Standard exceptions apply (Section B.2). This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation provides for protection of big game production areas from disturbance and displacement by human activities during critical periods. | | | • | |

BLM_0025230

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **TL-21** *(ROWA)* **Big Game Production Areas.** 13,100 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit activities, including motorized travel, in elk production areas from May 15 to June 15; in antelope production areas from April 15 to June 30; in Rocky Mountain bighorn sheep production areas from April 15 to June 30; in Moose production areas from April 15 to June 30; and in desert bighorn sheep production areas from February 1 to May 1. **PURPOSE:** To protect important seasonal big game production habitat, and reduce disruption of big game during parturition and young rearing period. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g. producing wells) and range administration (Section B.1). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation provides for protection of big game production areas from disturbance and displacement by human activities during critical periods. | | | • | |
| **TL-22** *(ROWA)* **Pronghorn Wintering Habitat.** 23,500 acres *All Surface-disturbing Activities* | **STIPULATION:** Prohibit surface occupancy and use, surface-disturbing activities, and intensive human activities in pronghorn wintering habitat from January 1 to March 31. **PURPOSE:** To improve pronghorn antelope habitat. **EXCEPTION:** Standard exceptions apply (Section B.2). In addition, this limitation does not apply to essential maintenance and operation of facilities (e.g. producing wells) and range administration (Section B.1). **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** Standard waivers apply (Section B.2). **JUSTIFICATION:** This stipulation is necessary to protect pronghorn winter habitat from surface-disturbing and major human activities during the periods of the year when the habitat is occupied. This habitat is critical to the viability of pronghorn herds. These areas will be managed by BLM to reflect CPW most current pronghorn winter range maps. | • | • | | • |

BLM_0025231

**Table B-7**
**Timing Limitation (TL) Stipulations Applicable to**
**Fluid Mineral Leasing and Other Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
| --- | --- | --- | --- | --- | --- |
| | | A | B | C | D |
| **Wild Horses** | | | | | |
| *TL-10 (ROWA) (BLM 1987)* **Wild Horse Winter Range.** *Fluid Minerals Only* | **STIPULATION:** Lease activities such as exploration, drilling, and other development (for fluid minerals only) will be allowed only during the period from May 1 to December 1 on the following portions of this lease: <LEGAL_DESCRIPTION>. **PURPOSE:** To protect important wild horse habitat. **EXCEPTION:** This limitation does not apply to maintenance and operation of producing wells and range management. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** This stipulation may be waived or reduced in scope if circumstances change or if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on the concerns(s) identified. | ● | | | |
| *TL-11 (ROWA) (BLM 1987)* **TL-23** **Wild Horse Foaling Area.** *Alternative A: Fluid Minerals Only* *Alternative D: All Surface-disturbing Activities* | **STIPULATION:** Lease activities such as exploration, drilling, and other development will be allowed only during the period from July 1 to March 1 on the following portions of this lease: <LEGAL_DESCRIPTION>. **PURPOSE:** To protect important seasonal wild horse habitat. **EXCEPTION:** This limitation does not apply to maintenance and operation of producing wells and range management. **MODIFICATION:** Standard modifications apply (Section B.2). **WAIVER:** This stipulation may be waived or reduced in scope if circumstances change or if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on the concerns(s) identified. | ● | | | ● |

[1]Existing stipulations currently in effect in Alternative A, current management, are noted in italics and are from the current RMP (BLM 1987).

BLM_0025232

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval**
**Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Air Resources | | | | | |
| **CO-56** **Air Resources.** | This lease notice is attached to new oil and gas leasing agreements to provide notice to operators of analysis and mitigation requirements that would be determined on a case by case basis at the permitting/development stage. | | • | | |
| Water Resources | | | | | |
| *LN-17* **Palisade Municipal Watershed.** | This lease contains privately owned surface of the Town of Palisade that is within the Town's designated municipal watershed and is covered by a Watershed Protection Ordinance. This applies to the lands described below: <LEGAL_DESCRIPTIONS>. | • | | | |
| **LN-1** **Source Water Protection Areas.** | The lease is within source water protection areas, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities and comply with applicable municipal watershed plans. **JUSTIFICATION:** This lease notification is necessary because leases within source water protection areas require extensive protection measures to ensure protection of water quality and human health. | | • | | |
| **LN-2** **Municipal Watersheds and Source Water Protection Areas.** | The lease is within a municipal watershed or source water protection area, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities and comply with applicable municipal watershed plans. **JUSTIFICATION:** This lease notification is necessary because leases within municipal watersheds and source water protection areas require extensive protection measures to ensure protection of water quality and human health. | | | | • |
| Special Status Species | | | | | |
| *LN-13* (*BLM 1987*) **Threatened and Endangered Species Habitat.** | The lessee/operator is required to submit to the BLM's Authorized Officer a plan for avoidance or mitigation of impacts on the identified species. This may require completion of an intensive inventory by a qualified biologist. The plan must be approved prior to any surface disturbance. The Authorized Officer may require additional mitigation measures, such as relocation of proposed roads, drilling sites, or other facilities. | • | | | |

BLM_0025233

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited. <br> • Black-footed ferret *(Exhibit GJ-13EC)*; <br> • Spineless hedgehog cactus *(Exhibit GJ-13ED)*; and <br> • Colorado hookless cactus (formerly Uinta Basin hookless cactus) *(Exhibit GJ-13EE)*. | | | | |
| **LN-3** <br><br> **Biological Inventories.** | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, sage-grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited. <br><br> **JUSTIFICATION:** This lease notice is necessary to identify current plant and animal populations in order to reduce or avoid impacts to those species. | | • | • | • |
| **LN-4** <br><br> **Threatened and Endangered Species (Alternative B) / Colorado Hookless Cactus (Alternatives C and D)** | Alternative B: ***Threatened and Endangered Species*** <br><br> This lease contains habitat for threatened and endangered species. Prior to undertaking any activity on the lease, including surveying and staking of well locations, the lessee may be required to perform botanical inventories on the lease. Special design and construction measures may also be required in order to minimize impacts to threatened and endangered species habitat from drilling and producing operations. This applies to the lands described below: <LEGAL_DESCRIPTIONS>. <br><br> Alternatives C and D: ***Colorado Hookless Cactus*** <br><br> This lease contains habitat for the Colorado hookless cactus *(Sclerocactus glaucus)*. Prior to undertaking any activity on the lease, including surveying and staking of well locations, the lessee may be required to perform botanical inventories on the | | • | • | • |

BLM_0025234

**Table B-8**
**Lease Notices (LN) and Additional Required Conditions of Approval**
**Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | lease. Special design and construction measures may also be required in order to minimize impacts to Colorado hookless cactus habitat from drilling and producing operations.<br><br>**EXCEPTION:** An exception may be granted depending on current usage of the site or on the geographical relationship to topographic barriers and vegetation screening.<br><br>**MODIFICATION:** Changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)<br><br>**JUSTIFICATION:** This lease notice is necessary to identify current cactus populations and habitat in order to reduce or avoid impacts to cactus habitat. | | | | |
| **Fish and Wildlife** | | | | | |
| **LN-3**<br><br>**Biological Inventories.** | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as but not limited to raptor nests, sage-grouse leks, or significant natural plant communities. The operator, in coordination with the BLM, shall use the inventory to prepare mitigating measures to reduce the impacts on affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads and other facilities and fencing operations or habitat. Where impacts cannot be mitigated to the satisfaction of the BLM's Authorized Officer, surface occupancy and use on that area is prohibited.<br><br>**JUSTIFICATION:** This lease notice is necessary to identify current plant and animal populations in order to reduce or avoid impacts to those species. | ● | ● | ● | |
| **LN-5**<br><br>**Working in Wildlife Habitat.** | Require operators to establish and submit to the GJFO a set of operating procedures for employees and contractors working in important wildlife habitats. Design such procedures to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures may address, but are not limited to, items such as working in bear | ● | ● | | |

BLM_0025235

Appendix B. Stipulations Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities

**Table B-8**

**Lease Notices (LN) and Additional Required Conditions of Approval
Applicable to Authorized Ground-disturbing Activities**

| Stipulation Number (*Existing*/**New**)[1] Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | or snake country, controlling dogs, and understanding and abiding by hunting and firearms regulations. | | | | |
| **Paleontological Resources** | | | | | |
| **LN-6** **Class 4 and 5 Paleontological Areas.** | Have a permitted paleontologist approved by the Authorized Officer perform an inventory of surface-disturbing activities in Class 4 and 5 paleontological areas per Instruction Memorandum No. 2008-009: Potential Fossil Yield Classification (PFYC) System for Paleontological Resources on Public Lands. JUSTIFICATION: This lease notice is necessary to ensure an adequate paleontologist is present during surface disturbing activities to protect paleontological resources from direct impacts. | • | • | • | • |
| **Lands and Realty** | | | | | |
| *LN-16*/**LN-7** **Powderhorn Ski Area.** | If drilling operations are proposed, the lessee is hereby notified that there are concerns about ski lift structures, other facilities, and ski runs within the Powderhorn ski area. The lessee is hereby notified that special design, construction, and scheduling measures may be required in order to minimize the impacts of drilling and production operations. Proposed drilling and production facilities and operations will be relocated and rescheduled as needed to avoid physical interference with ski area facilities and recreation use. This can include relocations of more than 200 meters (656 feet) or seasonal closures of more than 60 days. This applies to the lands described below: <LEGAL_DESCRIPTIONS>. JUSTIFICATION: This lease notification is necessary to protect recreation facilities at Powderhorn Ski Area. | • | • | | • |

[1]Existing stipulations currently in effect in Alternative A, current management, are noted in italics and are from the current RMP (BLM 1987). Proposed new stipulations under Alternatives B, C, and/or D are noted in bold-face, non-italics.

BLM_0025236

# APPENDIX H
# BEST MANAGEMENT PRACTICES AND
# STANDARD OPERATING PROCEDURES

## INTRODUCTION

This appendix provides a list of common standard operating procedures (SOPs) and best management practices (BMPs) that are applicable to all alternatives in the resource management plan. Standard operating procedures are established guidelines that are followed by the BLM in carrying out management activities. While the list of standard operating procedures is complete, the list is not intended to be comprehensive; additional standard operating procedures could be developed and implemented to support achieving resource objectives.

Best management practices are state-of-the-art mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are applied to management actions to aid in achieving desired outcomes for safe, environmentally responsible resource development, by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. Best management practices can also be proposed by project applicants for activities on public lands (e.g., for gas drilling). Best management practices not incorporated into the permit application by the applicant may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or stipulations. Standard conditions of approval and stipulations are also provided in this appendix as appropriate. Additional best management practices, conditions of approval, and stipulations could be developed to meet resource objectives based on local conditions and resource specific concerns.

*Master Leasing Plan*
BMPs and SOPs that will be analyzed at the development stage and may be applied consistent with environmental analysis and existing lease rights are denoted by "**(MLP)**" in this appendix.

---

BLM_0025237

# AIR QUALITY (A)

Air quality standards are governed by the Clean Air Act of 1990 (as amended) (42 United States [US] Code Chapter 85). The US Environmental Protection Agency is charged with setting National Ambient Air Quality Standards, currently found at http://www.epa.gov/air/criteria.html (US Environmental Protection Agency 2009). At the state level, the Colorado Department of Public Health and Environment has established its standards (Colorado Department of Public Health and Environment 2009).

## Standard Operating Procedures

**A-1**: The BLM has the authority and responsibility under the Federal Land Policy and Management Act to manage public lands in a manner that will protect the quality of air and atmospheric values. Therefore, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals.

**A-2**: The proponent of a project will be required to minimize air pollutant emissions by complying with all applicable state and federal regulations (including application of best available control technology) and may be required to apply mitigation including but not limited to best management practices, and other control technologies or strategies identified by the BLM or CDPHE in accordance with delegated regulatory authority.

## Best Management Practices

**A-3**: The BLM may require project proponents for oil and gas development projects to conduct pre-construction air monitoring within or adjacent to the proposed development area. The purpose of this monitoring is to establish baseline air quality conditions prior to development at the site. The requirement for monitoring will be determined by BLM based on the absence of existing monitoring; existing air quality conditions; magnitude of potential air emissions from the project or activity; magnitude of existing emission sources in the area; proximity to a federally mandated Class I area, sensitive Class II area, or population center; location within a non-attainment or maintenance area; meteorological or geographic conditions; project duration; or issues identified during project scoping. The project proponent will be required to provide a minimum of one year of baseline ambient air monitoring data for any pollutant(s) of concern as determined by BLM. If BLM determines that baseline monitoring is required, this pre-analysis data must meet CDPHE air monitoring standards, be obtained from a site within 50 km of the project boundary, and cover the year immediately prior to the proposed project submittal. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

**A-4**: The BLM may require project proponents for oil and gas development projects to conduct air monitoring for the life of the oil and gas development project depending on the magnitude of potential air emissions from the project or activity, proximity to a federally mandated Class I area, sensitive Class II area,

BLM_0025238

or population center, location within a non-attainment or maintenance area, meteorological or geographic conditions, existing air quality conditions, magnitude of existing development in the area, or issues identified during project scoping. The purpose of this air monitoring is to determine impacts attributable to the project over time. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

**A-5**: The BLM may require a project proponent to conduct air quality modeling for any pollutant(s) of concern in the absence of sufficient data to ensure compliance with laws and regulations or to determine the effectiveness of mitigation options, unless the project proponent can demonstrate that the project will result in no net increase in emissions of the pollutant(s) of concern. The requirement for modeling will be based on existing air quality conditions; magnitude of potential air emissions from the project or activity; magnitude of existing emission sources in the area; proximity to a federally mandated Class I area, sensitive Class II area, an area expected to exceed a NAAQs or PDS increment, population center, location within a non-attainment or maintenance area; meteorological or geographic conditions; project duration; or issues identified during project scoping. The BLM, in cooperation with an interagency review team, will determine the parameters for the modeling analysis through the development of a project specific modeling protocol.

**A-6**: The BLM may require project proponents for oil and gas development projects to submit a contingency plan that provides for reduced operations in the event of an air quality episode. Specific operations and pollutants to be addressed in the contingency plan will be determined by the BLM on a case-by-case basis taking into account existing air quality and pollutants emitted by the project.

**A-7**: Implement directional drilling techniques to reduce construction related emissions (dust and vehicle and construction equipment emissions).

**A-8**: **(MLP)** Improve engine technology (Tier 2 or better) for diesel drill rig engines to reduce NOx, PM, CO, and VOC emissions.

**A-9**: Utilize natural gas fired drill rig engines to reduce NOx emissions and reduce formation of visibility impairing compounds and ozone.

**A-10**: Improve engine technology (Tier 2 or better) for all mobile and non-road diesel engines to reduce NOx, PM, CO, and VOC emissions.

**A-11**: Utilize "Green completion" (a.k.a. closed loop or flareless) technology to reduce VOC and CH4 emissions.  This would also reduce or eliminate open pits and associated evaporative emissions.

**A-12**: Utilize "Green workovers" to reduce VOC and CH4 emissions.  This would also reduce or eliminate open pits and associated evaporative emissions.

BLM_0025239

**A-13**: Eliminate evaporation pits for drilling fluids to reduce VOC and GHG emissions.

**A-14**: Electrification of wellhead compression/pumping to reduce local emissions of fossil fuel combustion and transfers to a more easily controlled source.

**A-15**: Utilize renewable power sources to provide energy for compressors, monitoring equipment, or pumps.

**A-16**: Replace wet compressor seals with dry seals or use mechanical seals to reduce gas venting (VOC and GHG emissions).

**A-17**: Centralize or consolidate gas processing facilities, liquids gathering systems (condensate and produced water), water and/or fracturing liquids delivery systems, to reduce VOC and GHG emissions from individual dehydration/separator units and to reduce vehicle emissions.

**A-18**: Eliminate the use of open top tanks to reduce VOC and GHG emissions.

**A-19**: Improve capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units.

**A-20**: Improve capture and control of produced water, crude oil, and condensate tank emissions to reduce VOC and GHG emissions.

**A-21**: Improve capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion to reduce VOC, HAP, and GHG emissions.

**A-22**: Use zero emissions dehydrators or use desiccants dehydrators to reduce VOC, HAP, and GHG emissions.

**A-23**: Reduce miscellaneous fugitive VOC emissions by

    **a)** Installing plunger lift systems to reduce well blow downs

    **b)** Install and maintain low VOC emitting seals, valves, and hatches on production equipment.

    **c)** Initiate equipment leak detection and repair program (e.g., including use of FLIR infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection).

    **d)** Install or convert Gas operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers.

    **e)** Use "low" or "no bleed" gas operated pneumatic devices/controllers.

BLM_0025240

**f)** Use closed loop system or thermal combustion for gas operated pneumatic pump emissions.

**g)** Install or convert gas operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps.

**h)** Install vapor recovery on truck loading/unloading operations at tanks.

**A-24**: Utilize dust suppression techniques on unpaved surfaces including watering, chemical suppressants, and gravel.

**A-25**: Utilize remote telemetry and automation of wellhead equipment to reduce vehicle traffic and associated emissions.

**A-26**: Post and enforce speed limits to reduce air borne fugitive dust from vehicular traffic on unpaved roads.

**A-27**: Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative work schedules, or work camps.

**A-28**: Use ultra-low sulfur diesel (e.g. in engines, compressors, construction equipment) to reduce emissions of particulates and sulfates.

**A-29**: Utilize best available technology and methods to degasify coal seams prior to mining.  Capture methane gas from coal seams to obtain a market income. Modify methane drainage over time to ensure capture is optimal.

**A-30**: Reduce unnecessary vehicle idling to reduce combustion emissions, ozone formation, visibility impacts, and fuel consumption.

**A-31**: Reduce the pace of (phased) development to reduce the peak emissions of all pollutants.

**A-32**: Restrict surface disturbing activities to periods when wind speeds are less than 25 mph.

**A-33**: Keep soil and coal refuse moist while loading into dump trucks.

**A-34**: Keep soil and coal refuse loads below the freeboard of the truck.

**A-35**: Minimize drop heights when loaders dump soil and coal refuse into trucks.

**A-36**: Tighten gate seals on dump trucks.

**A-37**: Cover dump trucks before traveling on public roads.

BLM_0025241

**A-38**: Cover construction materials, stockpiled soils, and stockpiled coal refuse if they are a source of fugitive dust.

**A-39**: Train workers to handle construction materials and debris to reduce fugitive emissions.

**A-40**: Employ water injection or rotoclones on all overburden drills.

**A-41**: Use chutes, drapes, or other means to enclose conveyor transfer points, screens, and crushers; cover all conveyors.

**A-42**: Suppress and extinguish spoil and coal fires as soon as is reasonable and safely possible.

### References

Colorado Department of Public Health and Environment. 2011. Air Quality Control Commission Regulations. Internet Web site: http://www.cdphe.state.co.us/regulations/airregs. Accessed on May 21, 2011.

Bureau of Land Management. 2009. Air Quality BMPs-Best Management Practices for Fluid Minerals. Updated 8-24-2009. Internet Web site: www.blm.gov/bmp.

US Environmental Protection Agency. 2009. National Ambient Air Quality Standards. Internet Web site: http://www.epa.gov/air/criteria.html. Accessed on October 14, 2009.

## SOILS (S)

### Standard Operating Procedures

**S-1**: All routes shall be built and maintained to BLM Manual Section 9113 standards for road shape and drainage features (BLM 2011a) or where appropriate BLM Manual Section 9115 standards for primitive roads (BLM 2012). For drainage crossings, culverts should be sized for the 50 year storm event with no static head and to pass a 100-year event without failing. Site specific conditions may warrant BLM to require designs for larger events (e.g. 75-100 year storm events). Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**S-2**: When saturated soil conditions existing on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads and locations.

**S-3**: Topsoil shall not be placed while in a frozen or muddy condition, when the subgrade is excessively wet, or in a condition that may otherwise be detrimental to proper grading or proposed sodding or seeding.

**S-4**: Topsoil shall only be used for reclamation and shall not be used as fill or to bed or pad the pipe during backfilling.

**S-5**: Topsoil stripping will include all growth medium present at a site (following initial clearing of large trees, etc.), as indicated by color or texture. Stripping and storage depth may be specified during the onsite inspection. All stripped topsoil/growth medium will be salvaged, segregated and stored in a manner that extends biological viability and protects it from loss.  Topsoil and all growth medium will be replaced prior to seedbed preparation. No topsoil will be stripped or segregated when soils are saturated or frozen below the stripping depth.

**S-6**: A Winter Construction Plan will be submitted and approved by the BLM Authorized Officer before a Notice to Proceed will be authorized for construction activities in frozen soils.

**S-7**: Prohibit placing fill on a frozen foundation.

**S-8**: Slopes shall not be created so close to property lines as to endanger adjoining properties without adequate protection against sedimentation, erosion, slippage, settlement, subsidence or other related damages.

**S-9**: Surface disturbing actions will be sensitive to natural resource protection. When surface disturbance in sensitive areas is unavoidable, they will be minimized to the greatest extent practicable, especially near drainage features and on soils mapped as being saline (see Glossary).

**S-10**: Surface disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book )(BLM 2007b).

**S-11**: As detailed in the site plan for surface water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales or catchments.

**S-12**: Standard secondary containment shall hold 110 percent of the capacity the largest single tank it contains and be impervious to any oil, glycol, produced water, or other toxic fluid for 72 hours.  Earthen berms must be compacted and of fine material that will prevent seepage of any spill to surrounding area.

BLM_0025243

**S-13**: All tanks with a capacity of ten (10) barrels or greater shall be labeled or posted with the following information: A. Name of operator; B. Operator's emergency contact telephone number; C. Tank capacity; D. Tank contents; and E. National Fire Protection Association (NFPA) Label. Smaller chemical storage shall be labeled with contents and NFPA label.

**S-14**: Interim and final reclamation procedures shall utilize best available science and technology to protect natural resources from undue degradation.

**S-15**: Use BLM-GJFO Trail Design Criteria along with BLM Manual handbooks 9113-2 (Roads National Inventory & Condition Assessment Guidance & Instructions) and 9115-2 (Primitive Roads National Inventory & Condition Assessment Guidance & Instructions) to evaluate road conditions for maintenance and mitigation.

## Best Management Practices

**S-16**: To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**S-17**: Consider site specific soil and vegetative characteristics and reclamation potential in project design and layout.

**S-18**: Native vegetation and soils will be protected and disturbance to them will be minimized.

**S-19**: Cleared vegetation smaller than four inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than four inches in diameter will be scattered over disturbed areas to accomplish reclamation objectives. Excessive vegetation larger than four inches in diameter may be removed from public land or shredded in place to be salvaged with topsoil. A wood cutting permit may be purchased from BLM for material removed from the site.

**S-20**: Windrowing of Topsoil. [Use where appropriate based on topography – may not be appropriate for pads in steep areas or where pad size should be minimized.] Topsoil shall be windrowed around the perimeter of surface disturbance to create a berm that limits and redirects stormwater runoff and extends the viability of the topsoil per BLM Topsoil Best Management Practices (BLM 2009 PowerPoint presentation available upon request from the Grand Junction Field Office). Topsoil shall also be windrowed, segregated, and stored along disturbed surfaces or linear features for later spreading across the disturbed corridor during final reclamation. Topsoil berms shall be promptly seeded to maintain soil microbial activity, reduce erosion, and minimize weed establishment.

BLM_0025244

**S-21**: Where applicable, entrances to construction locations will be covered by gravel "track pads" to prevent sediment and weed seeds from being tracked in and out of the site.

**S-22**: In areas where all weather access is necessary, the operator would construct and maintain all-weather routes per BLM Manual Section 9113 standards. Graveling or other appropriate surfacing material would be required to reduce environmental resource damage and provide safe all-weather access.

**S-23**: Specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**S-24**: Standard secondary containment shall include a study corrugated metal wall to create a basin, be lined with a heavy impervious poly liner and be protected with a gravel surface. Small plastic hoppers shall be installed at all loadout connections to catch drips and small leaks.

## References

BLM. 2009. H-9112-1 Bridges and Major Culverts Handbook. Bureau of Land Management, Washington, D.C.

BLM. 2011a. H-9113-1 Road Design Handbook. Bureau of Land Management, Washington, D.C.

BLM. 2012g. H-9115 Primitive Roads Manual. Bureau of Land Management, Washington, D.C.

United States Department of the Interior and United States Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

## WATER RESOURCES (H)

### Standard Operating Procedures

**H-1**: The operator/permittee shall adhere to all requirements under the Federal Water Pollution Control Act, as amended through P.L. 107-303, November 27, 2002.

**H-2**: For surface disturbing activities exceeding one acre in size, develop and implement Stormwater Pollution Prevention Plans to include site-specific design, systematic site monitoring, installation of run-on/off controls such as ditches or berms and installation of adaptive BMPs to reduce potential erosion and sediment production and transport. Stormwater will be dispersed to stabilized areas to slow velocity, prevent erosion and support infiltration into soils.

BLM_0025245

Stormwater BMPs identified in the State approved Storm Water Pollution Prevention Plan shall be in place prior to any earth-disturbing activity. Additional BMPs will be installed if determined necessary by the BLM. All measures shall be maintained in good, functional condition. All temporary BMPs shall be removed once site stabilization and reclamation efforts have been deemed successful by the BLM.

**H-3**: For actions requiring individual permits through the US Army Corps of Engineers, require a licensed Professional Engineer to approve and stamp the project design, construction, and reclamation plans to mitigate to the fullest extent practicable riparian resource damage associated with the proposed action.

**H-4**: Spoil material from clearing, grubbing, and channel excavation shall be disposed of in a manner that will not interfere with the function of the channel and in accordance with all local, state, and federal laws and regulations.

**H-5**: Surface disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book BLM 2007b).

**H-6**: Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan for establishing positive management of surface water drainage, to reduce erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance and reporting. BMPs may include run-on/run-off controls such as surface pocking or re-vegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

**H-7**: The operator will reduce potential for contaminating water resources where spills of drilling fluids are most vulnerable. Areas of vulnerability will include a 0.25-mile buffer around the following: mapped alluvial, colluvial, and glacial deposits; springs and perennial water sources, Source Water Protection Areas, and Municipal Watersheds. In these areas, the operator will:

   a)  Utilize closed loop drilling systems.

   b)  Utilize gas-blocker additives during the cementing process.

   c)  Contain flowback and stimulation fluids in tanks on well pad with secondary containment mats/blankets (or equivalent).

   d)  Install containment devices beneath and around crude oil, condensate and produced water storage tanks.

   e)  Collect baseline water quality data from downstream fresh water sources prior to drilling, mining, or storage of potentially harmful substances. Parameters to be analyzed will be determined on a site

BLM_0025246

specific basis based on the nature of the proposed action. The operator will be responsible for submitting a list of parameters to BLM for approval prior to sampling.

**f)** Provide notification of potentially impacted Public Water Systems 15 miles downstream.

**g)** Develop an emergency spill and response program to be reviewed and approved by BLM prior to surface-disturbing activities.

**H-8**: Protection of drinking water supply sources within surface water supply areas (leased or made available for leasing) will concur with Colorado Oil and Gas Conservation Commission rule 317B and subsequent updates.

**H-9**: All routes shall be built and maintained to BLM Manual Section 9113 standards for road shape and drainage features (BLM 2011a) or where appropriate BLM Manual Section 9115 standards for primitive roads (BLM 2012b). For drainage crossings, culverts should be sized for the 50 year storm event with no static head and to pass a 100-year event without failing.   Site specific conditions may warrant BLM to require designs for larger events (e.g. 75-100 year storm events).   Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**H-10**: Erosion control features shall be maintained through periodic inspection and maintenance, including cleaning dips and cross-drains, repairing ditches, marking culvert inlets to aid in location, and clearing debris from culverts.

**H-11**: Surface discharges shall comply with all regulatory requirements outlined in the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act), as amended through P.L. 107-303, November 27, 2002 Clean Water Act.   Additionally, surface discharges should be made to well defined channels away from major erosional features. Furthermore, discharges should be limited to a volume less than or equal to the naturally occurring mean annual peak flow (which is roughly equivalent to a peak generated by a 2-year 24-hour storm event) and that can be handled by the natural channel under anticipated conditions.

**H-12**: To protect water quality, anti-backflow devices shall be utilized while drafting fresh water from streams, springs, reservoirs and wells.

**H-13**: Range improvements will conform to BLM Manual H 1740-2 and subsequent updates (BLM 2008).

**H-14**: Discharge of surface and groundwater to surface drainages will comply with the Federal Water Pollution Control Act (as amended through P.L. 107–

BLM_0025247

303, November 27, 2002) and will be pre-approved by BLM and will meet the following criteria:

a) Discharge operations will not negatively impact downstream beneficial uses.

b) Discharge soil/water interactions will not facilitate the movement of water quality contaminants [e.g., salt, selenium (typically associated with Mancos shale derived soils), sediment, metals] above natural rates in surface and/or groundwater.

c) Water discharge shall be limited to well-defined major channels, to reduce potential of discharged water dissolving and transporting salts from the stream channel and to reduce concentration of salts in alluvium.

d) Discharges will be limited to a volume that can be handled by the natural channel and less than or equal to the naturally occurring mean annual peak flow (roughly equivalent to a two-year, 24-hour storm peak).

e) Discharge points will be located in stable channels or reservoirs away from any downstream head-cuts or other major erosional features (as determined by BLM). Outfall design may include discharge aprons and downstream stabilization of channel side slopes to prevent erosion and provide energy dissipation.

f) Subject to BLM approval, water quality thresholds for both surface and groundwater will be set and monitored during discharge operations in order that they will cease if thresholds were exceeded.

g) Surface and groundwater quantity and quality will be monitored during all discharge operations. Monitoring locations will be subject to BLM approval. Monitoring activities will continue for at least two water years following cessation of discharge.

**H-15**: Hazardous substances will not be used in drilling, testing, or completion operations, nor introduced at any time into the reserve or cuttings pit. Fluids will be confined to pits or tanks and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

**H-16**: Pits will be constructed so that water will not run into them. Fluid levels will be maintained below 2 feet of the lowest point of containment.

**H-17**: Interim and final reclamation procedures shall utilize best available science and technology to protect natural resources from undue degradation.

## Best Management Practices

**H-18: (MLP)** To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**H-19**: Provide energy dissipaters (e.g., rock piles and logs) where necessary at the downstream end of ditch relief culverts to reduce the erosion energy of the emerging water.

**H-20**: The face of cut or fill slopes shall not be subject to any concentrated flows of surface water such as from natural drainage ways, graded swales, and downspouts.

**H-21**: Provide subsurface drainage where necessary to intercept seepage that would otherwise adversely affect slope stability or create excessively wet site conditions.

**H-22**: Grade road surfaces only as often as necessary to maintain a stable running surface and to retain the original surface drainage.

**H-23**: Avoid cutting the toe of cut slopes when grading roads or pulling ditches.

**H-24**: The operator will be responsible for keeping road inlet and outlet ditches, catch-basins, and culverts free of obstructions, particularly before and during spring runoff. Routine machine-cleaning of ditches shall be kept to a minimum during wet weather. Leave the disturbed area in a condition that provides drainage with no additional maintenance.

**H-25**: Remove all temporary stream crossings immediately after use and cross-ditch the ends of routes or rights-of-way to mitigate erosion from disturbed areas.

**H-26**: When designing protective/mitigation measures, consider the changes that may occur in the watershed hydrology and sedimentation over the design life of the measure. Moreover, design and construct roads that are self-maintaining and consider using road surfacing, such as gravel when year-long access may be necessary.

**H-27**: Design and construct stream crossings at right angles, in straight sections of stable reaches to handle (at a minimum) the 100-year flood, and consider culvert and bridge designs that facilitate aquatic life passage.

**H-28**: Where the access road crosses small drainages and intermittent streams not requiring culverts, low water crossings shall be used. The road will dip to the original streambed elevation of the drainage and the crossing will prevent

BLM_0025249

any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

**H-29**: For pipeline crossings of drainage ways: Pipelines crossing at the surface must be constructed high enough to remain above the highest possible floodflows at each crossing. Pipeline crossings below the surface must be buried deep enough to remain undisturbed by scour and fill processes typically associated with passage of peak flows. A hydraulic analysis should be completed during the pipeline design phase to avoid repeated maintenance of such crossings and eliminate costly repairs and potential environmental degradation associated with pipeline breaks at stream crossings (DOI 2007). Utilize horizontal directional boring techniques under perennial water bodies and/or wetland complexes when environmental circumstances allow.

**H-30**: Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles and heavy machinery.

**H-31**: Time work in wetlands and watercourses to occur during low flow season when conditions are driest. High flows occur during late summer early fall as a result of high intensity convective thunderstorm events. Work in these areas must also be done in a manner consistent with BMPs for biological resources.

**H-32**: Exclude livestock and vehicles from spring sources and riparian areas where on-site evaluation and/or monitoring data indicate degrading conditions or potential to degrade spring or riparian function.

**H-33**: Avoid alteration of natural hydrologic function and condition in source areas for springs, seeps, fens, or other water developments. Relocate surface-disturbing activities away from these sensitive areas as site conditions warrant.

**H-34**: Limit consumptive water use from Federal point source water rights on public lands that are not sustainable and/or would jeopardize discharge to streams, springs, seeps, fens, or downstream senior water rights.

**H-35**: Manage and manipulate invasive stands of brush and weeds on forest, range, pasture land by mechanical, chemical, or biological means or by prescribed burning to improve watershed function and condition.

**H-36**: Limit surface disturbance near drainage features and minimize surface disturbance on steep slopes, fragile soils, saline soils, and Mancos shale derived soils.

**H-37**: When activity in streams, wetlands, or riparian areas is unavoidable, the operator will first employ best available technology such as eco-Matting to reduce impacts. The operator would then restore modified or damaged areas

BLM_0025250

as close as practicable to natural conditions to protect banks, wetlands and to re-establish riparian vegetation.

**H-38**: Maintain to the greatest extent practicable natural flow rates and chemical and physical properties of surface and groundwater during work within stream channels, floodplains, and/or riparian areas.

**H-39**: Oil and gas drilling operations within municipal watersheds, source water protection areas, or locally important fresh water aquifers should utilize methods and materials that will prevent degradation of the underlying groundwater. This may include practices such as surface and intermediate casing through potential fresh water zones, gas blocker additives to cement jobs, the use of green fracturing fluids, and pitless drilling - closed loop drilling.  The use of "Green" fracturing fluids will be documented in the form of Material Safety Data Sheets which will be reviewed by the operator for compliance prior to use.  Material Safety Data Sheets will remain on site at all times such chemicals are present.

**H-40**: Water from well production tests (water wells) or hydrostatic testing of pipelines shall be filtered of sediments prior to discharge into wetlands. Energy dissipating methods (e.g., straw-bails, waddles, vegetative buffers) shall be in place prior to discharge of production water or water used for hydrostatic testing.

**H-41**: Within portions of municipal watersheds and sourcewater protection areas available for fluid minerals development, the operator should develop and implement a watershed protection plan. This plan would include characterization and monitoring of baseline hydrologic/hydrogeologic conditions such as but not limited to: water quality, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater.  The operator should collaborate with all watershed stakeholders in development and implementation of the watershed protection plan.

**H-42**: Livestock feeding, and salting, shall be done in a manner to protect water quality.  When possible, these developments or practices should be done at least 550 meters from riparian zones.

**H-43**: Maintain appropriate vegetative/riparian buffers around water features to slow runoff and trap sediments and protect water quality.  A minimum buffer distance should be 200 meters or greater where site conditions warrant.

**H-44**: Surface disturbing actions should not permanently impair floodplain function.

**H-45**: No operations using chemical processes (except for vegetation management) or other pollutants in their activities will be allowed to occur

BLM_0025251

within 200 feet of any water bodies. This includes staging equipment for refueling, and equipment maintenance.

**H-46**: Fill material will not be cast over hilltops or into drainages.

**H-47**: All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support Federal or State-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe, and remotely-actuated block or check valves on both sides of the stream may be used.

**H-48**: Baseline information of channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

**H-49**: Direct overflow from water developments back to the original natural drainage in a way that does not accelerate erosion or modify riparian habitats.

**H-50**: Avoid soil compaction or surface disturbing activities in recharge areas that could impair natural function of springs and/or seeps.

### References

Federal Water Pollution Control Act, as amended through P.L. 107-303, November 27, 2002

United States Department of the Interior and United States Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

BLM. 2009. H-9112-1 Bridges and Major Culverts Handbook. Bureau of Land Management, Washington, D.C.

BLM. 2011a. H-9113-1 Road Design Handbook. Bureau of Land Management, Washington, D.C.

BLM. 2012f. H-9115 Primitive Roads Manual. Bureau of Land Management, Washington, D.C.

BLM. 2008. H-1740-2 Integrated Vegetation Management Handbook. Bureau of Land Management, Washington, D.C. Internet Web site: http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Man agement/policy/blm_handbook.Par.59510.File.dat/H-1740-2.pdf. Accessed on May 18, 2012.

U.S. Department of the Interior. 2007. Hydraulic considerations for pipelines crossing stream channels. Technical Note 423. BLM/ST/ST-

BLM_0025252

07/007+2880. Bureau of Land Management, National Science and Technology Center, Denver, CO. Internet Web site: http://www.blm.gov/nstc/library/techno2.htm. Accessed on May 18, 2012.

## VEGETATION: RANGELAND (VR)

Guidance may come from various sources. See individual resources.

### Standard Operating Procedures

**VR-1**: When making decisions about proposed projects/actions in known sagebrush habitat, existing plans and guidance will be used by interdisciplinary teams and considered in the decision making process. This guidance includes the conservation actions/guidelines identified in the Western Association of Fish and Wildlife Agencies – Conservation Assessment of Greater Sage-grouse and Sagebrush habitats (2004), and local working group population plans (Pinion Mesa population of Gunnison Sage Grouse and Parachute Piance Roan Population of Greater Sage Grouse).

**VR-2**: Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

### Best Management Practices

**VR-3**: Close and rehabilitate roads quickly once they are no longer needed.

**VR-4**: Close selected routes to protect special status species and significant plant communities.

**VR-5**: Build roads to the appropriate standard, no higher than necessary for use and safety, and utilize primitive or two-track roads rather than newly constructed roads where feasible.

**VR-6**: Pipelines (and electrical power lines when possible) shall be placed within road corridors to minimize disturbance.

**VR-7**: Minimize disturbance to soil and native vegetation as much as possible.

**VR-8**: Stockpile topsoil for use in final reclamation. Topsoil shall be stored separately from other fill materials.

**VR-9**: When timely natural regeneration of the native plant community is not likely to occur, carefully select species that will not compete with or exclude botanical resources for revegetation efforts. Bare sites shall be seeded as soon as appropriate to prevent establishment of undesirable plant species.

**VR-10**: Ensure that seed used for revegetation as well as straw and hay bales used for erosion control are certified free of noxious weeds.

BLM_0025253

**VR-11**: Monitor revegetation sites to ensure successful establishment of desired species.

**VR-12**: Monitor the long-term success of revegetation efforts to ensure successful establishment of desired species and detect any noxious weed infestations. If revegetation is unsuccessful, continue efforts to establish desired species in disturbed sites.

**VR-13**: In Salt Desert Shrub communities with biological soil crusts, require reclamation that includes but is not limited to: broadcasting bacterial inoculants, planting native grass, forbs, and shrubs seedlings, and exclosure fences.

### References

BLM (US Department of Interior, Bureau of Land Management). 2007. Final Vegetation Treatment Using Herbicides on Bureau of Land Management Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

Connelly, J.W., S.T. Knick, M.A. Schroeder, and S.J. Stiver. 2004. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitat. Western Association of Fish and Wildlife Agencies. Unpublished Report. Cheyenne, Wyoming.

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

## VEGETATION: RIPARIAN HABITAT AND WETLANDS (VRW)

### Standard Operating Procedures

**VRW-1**: Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**VRW-2**: Utilize the techniques and processes for protection of floodplains as identified in Executive Order 11988 – Floodplain Management.

**VRW-3**: Road crossings that will be used for longer than one year on perennial streams will be engineered and approved by the BLM Authorized Officer.

**VRW-4**: Do not locate roads or other facilities immediately parallel to streams. Where roads or facilities must cross streams, cross perpendicularly and immediately exit the buffer zone.

*Grand Junction Field Office*
*Internal Proposed RMP/Final EIS*

BLM_0025254

**VRW-5**: **(MLP)** Armor low water stream crossings, place properly sized culverts, or span streams as appropriate to protect the riparian zone.

**VRW-6**: Maintain a minimum of six inch stubble height at the end of October or winter grazing rotation on stream bank (lotic) riparian.  If stability of riparian system is depend upon riparian grasses and forbs maintain adequate stubble height to dissipate energy from spring runoff.

**VRW-7**: Maintain a minimum of four inch stubble height at the end of October on wet meadows (lentic) systems.

**VRW-8**: Roads and trails (off-highway vehicle, horse, bicycle, hiking) will avoid wetlands and if avoidance is not possible will be designed and constructed in accordance with Technical Reference 2E22A68-NPS, Off-highway Vehicle Management.

## Best Management Practices

**VRW-9**: Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles, heavy machinery, and facilities (e.g. pipelines).

**VRW-10**: Locate residue piles (e.g., sawdust, field chipping residue, disposal ponds) away from drainages where runoff may wash residue into water bodies or wetlands.

**VRW-11**: Maintain appropriate vegetative/riparian buffers from ground disturbing or heavy use activities of at least 200 meters around riparian and wetland areas to protect and enhance the health and function of these systems.

**VRW-12**: Manage vegetation in riparian areas to provide wildlife habitat, adequate shade, sediment control, bank stability, and recruitment of wood into stream channels.

**VRW-13**: Locate project staging areas for refueling, maintenance equipment, materials, operating supplies, and boring in areas not designated as riparian and/or wetland areas.

**VRW-14**: Minimize surface disturbance within riparian areas and in wetlands.

**VRW-15**: Avoid late summer or early fall grazing in areas with declining willow populations.  If grazing during these time periods must occur allow for at least one full year of rest between grazing rotations.

**VRW-16**: Utilize riparian pastures as appropriate to manage grazing activities in riparian areas.  Vary the timing, duration, and frequency of grazing in riparian pastures.

BLM_0025255

**VRW-17**: Create off stream watering facilities when possible (e.g. stock tanks, stock ponds, nose pumps, etc.). Place grazing stock tanks and other watering facilities at least 550 meters from riparian zones.

**VRW-18**: Actively move cattle to and from riparian pastures or pastures containing riparian habitat. Do not allow for cattle to drift between pastures (BLM TR-1737-14 p. 33-34).

**VRW-19**: Low stress stockmanship methods should be used to encourage cattle grazing away from riparian areas. Cattle should be turned out away from riparian areas when enter new pastures or allotments. Cattle should also be guided to appropriate bedding areas.

**VRW-20**: Cull cattle from the herd that congregate or preferentially graze riparian areas for extended periods of time.

**VRW-21**: Place salt, hay, grain, molasses, and other supplements on uplands at least 550 meters away from riparian and wetland areas to encourage cattle to graze uplands and move out of riparian areas. Supplementation sites should be at least 1,100 meters (1,200 yards) apart.

**VRW-22**: Phase the size and timing of vegetation removal treatments within riparian areas. Phasing treatments sizes and timing to reduce soil and water temperatures, maintain bank and soil stability, and retain adequate wildlife habitat for cover and nesting.

**VRW-23**: Phase the size and timing of vegetation removal treatments on uplands immediately adjacent to riparian areas, and buffer treatment boundaries away from riparian areas to reduce sedimentation and erosion in riparian zones. Allow for at least one 1 year between vegetation removal treatments in uplands and in riparian or wetland areas.

**VRW-24**: Relocate existing roads away from riparian areas as feasible during requested permitting or authorization of these routes. Reclaim abandoned portions of relocated roads back to natural conditions. Recontour routes back to natural slopes as feasible, rip compacted soils (except for in close proximity to desirable trees), and seed disturbed areas.

**VRW-25**: Fences should not be placed immediately on the edge of riparian areas. Place fences away from riparian or wetland areas to decrease impacts from trailing along fences.

## References

BLM (US Department of Interior, Bureau of Land Management). 2007. Final Vegetation Treatment Using Herbicides on Bureau of Land Management Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

BLM_0025256

National Riparian Service Team. Riparian Area Management. Technical Reference 1737-20.Grazing Management Processes and Strategies for Riparian-Wetland Areas. 2006.

## NOXIOUS AND INVASIVE WEED PREVENTION (WEED)

This list incorporates many suggested practices under various land uses, and is designed to allow managers to pick and choose those practices that are most applicable and feasible for each situation. Standard Operating Procedures (**SOP**s) as established by policy or law are identified as such.

### Site-Disturbing Projects

#### Pre-project Planning

**WEED-1**: Environmental analyses for projects and maintenance programs should assess weed risks, analyze high-risk sites for potential weed establishment and spread, and identify prevention practices.

**WEED-2**: Determine site-specific restoration and monitoring needs and objectives at the onset of project planning.

**WEED-3**: Learn to recognize noxious and invasive weeds.

**WEED-4**: Inventory all proposed projects for weeds prior to ground-disturbing activities. If weeds are found, they should be treated (if the timing is appropriate) or removed (if seeds are present) to limit weed seed production and dispersal.

**WEED-5**: Be cognizant of moving equipment and machinery *from* weed-contaminated areas *to* non-contaminated areas.

**WEED-6**: Locate and use weed-free project staging areas. Avoid or minimize travel through weed infested areas, or restrict travel to periods when spread of disseminules is least likely.

**WEED-7**: Identify sites where equipment can be cleaned. Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts should be collected and incinerated when possible.

**WEED-8**: If certified weed-free gravel pits become available in the county, the use of certified weed-free gravel will be required wherever gravel is applied to public lands (e.g., roads). **(SOP)**

**WEED-9**: Maintain stockpiled, non-infested material in a weed-free condition. Topsoil stockpiles should be promptly revegetated to maintain soil microbial health and reduce the potential for weeds.

**WEED-10**: Use competitive seed mixes when practical. A certified seed laboratory shall test each lot according to the Association of Official Seed

BLM_0025257

Analysts standards (which include an all-state noxious weed list) and provide documentation of the seed inspection test. The seed shall contain no noxious, prohibited, or restricted weed seeds and shall contain no more than 0.5 percent by weight of other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended. **(SOP)**

*Project Implementation*
**WEED-11**: Minimize soil disturbance. To the extent practicable, native vegetation should be retained in and around project activity areas, and soil disturbance kept to a minimum.

**WEED-12**: If a disturbed area must be left bare for a considerable length of time, cover the area with weed barrier until revegetation is possible.

*Post-project*
**WEED-13**: Clean all equipment before leaving the project site when operating in weed infested areas.

**WEED-14**: Inspect, remove, and properly dispose of weed seed and plant parts found on clothing and equipment. Proper disposal means bagging and incinerating seeds and plant parts or washing equipment in an approved containment area.

**WEED-15**: Revegetate disturbed soil where appropriate to optimize plant establishment for that specific site. Define revegetation objectives for each site. Revegetation may include topsoil replacement, planting, seeding, fertilization, and certified weed-free mulching as necessary. Use native material where appropriate and feasible.

**WEED-16**: Monitor sites where seed, hay, straw, or mulch has been applied. Eradicate weeds before they form seed. In contracted projects, contract specifications could require that the contractor control weeds for a specified length of time.

**WEED-17**: Inspect and document all ground-disturbing activities in noxious weed infested areas for at least three growing seasons following completion of the project. For ongoing projects, continue to monitor until reasonably certain that no weeds are present. Plan for follow-up treatments based on inspection results.

BLM_0025258

## Roads and Utilities

### Pre-project Planning

**WEED-18**: Communicate with contractors, local weed districts or weed management areas about projects and best management practices for prevention.

**WEED-19**: Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts shall be collected and incinerated when practical, or washed off in an approved containment area. **(SOP)**

**WEED-20**: Avoid acquiring water for road dust abatement where access to water is through weed-infested sites.

**WEED-21**: Treat weeds on travel rights-of-ways before seed formation so construction equipment doesn't spread weed seed.

**WEED-22**: Schedule and coordinate blading or pulling of noxious weed-infested roadsides or ditches in consultation with the local weed specialist. When it is necessary to blade weed-infested roadsides or ditches, schedule the activity when disseminules are least likely to be viable.

### Project Implementation

**WEED-23**: Retain shade to suppress weeds by minimizing the removal of trees and other roadside vegetation during construction, reconstruction, and maintenance; particularly on south aspects.

**WEED-24**: Do not blade or pull roadsides and ditches infested with noxious weeds unless doing so is required for public safety or protection of the roadway. If the ditch must be pulled, ensure weeds remain onsite. Blade from least infested to most infested areas.

### Post-project

**WEED-25**: Clean all equipment (power or high-pressure cleaning) of all mud, dirt, and plant parts before leaving the project site if operating in areas infested with weeds. Seeds and plant parts shall be collected and incinerated when possible.

**WEED-26**: When seeding has been specified for construction and maintenance activities, seed all disturbed soil (except travel route) soon after work is completed.

**WEED-27**: Use a certified weed-free seed mix suitable for local environmental conditions that includes fast, early growing (preferably native) species to provide quick revegetation. Consider applying weed-free mulch with seeding. **(SOP)**

BLM_0025259

**WEED-28**: Periodically inspect roads and rights-of-way for noxious weeds. Train staff to recognize weeds and report locations to the local weed specialist. Follow-up with treatment when needed.

**WEED-29**: When reclaiming roads, treat weeds before roads are made impassable. Inspect and follow up based on initial inspection and documentation.

**WEED-30**: To avoid weed infestations, create and maintain healthy plant communities whenever possible, including utility rights-of-ways, roadsides, scenic overlooks, trailheads, and campgrounds.

## Recreation Activities

**WEED-31**: Inspect and clean mechanized trail vehicles of weeds and weed seeds.

**WEED-32**: Wash boots and socks before hiking into a new area. Inspect and clean packs, equipment, and bike tires.

**WEED-33**: Avoid hiking through weed infestations whenever possible.

**WEED-34**: Keep dogs and other pets free of weed seeds.

**WEED-35**: Avoid picking unidentified "wildflowers" and discarding them along trails or roadways.

**WEED-36**: Maintain trailheads, campgrounds, visitor centers, boat launches, picnic areas, roads leading to trailheads, and other areas of concentrated public use in a weed-free condition. Consider high-use recreation areas as high priority sites for weed eradication.

**WEED-37**: Sign trailheads and access points to educate visitors on noxious and invasive weeds and the consequences of their activities.

**WEED-38**: In areas susceptible to weed invasion, limit vehicles to designated, maintained travel routes. Inspect and document travel corridors for weeds and treat as necessary.

**WEED-39**: Encourage use of pelletized feed for backcountry horsemen and hunters. Pelletized feed is unlikely to contain weed seed.

## Watershed Management

**WEED-40**: Frequently and systematically inspect and document riparian areas and wetlands for noxious weed establishment and spread. Eradicate new infestations immediately since effective tools for riparian-area weed management are limited.

BLM_0025260

**WEED-41**: Promote dense growth of desirable vegetation in riparian areas (where appropriate) to minimize the availability of germination sites for weed seeds or propagules transported from upstream or upslope areas.

**WEED-42**: Address the risk of invasion by noxious weeds and other invasive species in watershed restoration projects and water quality management plans.

### Grazing Management

**WEED-43**: Consider prevention practices and cooperative management of weeds in grazing allotments. Prevention practices may include:

- **a)** Altering season of use
- **b)** Minimizing ground disturbance
- **c)** Exclusion
- **d)** Preventing weed seed transportation
- **e)** Maintaining healthy vegetation
- **f)** Revegetation
- **g)** Inspection
- **h)** Education
- **i)** Reporting

**WEED-44**: Provide certified weed-free supplemental feed in a designated area so new weed infestations can be detected and treated immediately. Pelletized feed is unlikely to contain viable weed seed.

**WEED-45**: If livestock may contribute to seed spread in a weed-infested area, schedule livestock use prior to seed-set or after seed has fallen.

**WEED-46**: If livestock were transported from a weed-infested area, annually inspect and treat entry units for new weed infestations.

**WEED-47**: Consider closing infested pastures to livestock grazing when grazing will either continue to exacerbate the condition or contribute to weed seed spread. Designate those pastures as unsuitable range until weed infestations are controlled.

**WEED-48**: Manage the timing, intensity (utilization), duration, and frequency of livestock activities to maintain the competitive ability of desirable plants and retain litter cover. The objective is to prevent grazers from selectively removing desirable plant species and leaving undesirable species.

**WEED-49**: Exclude livestock grazing on newly seeded areas with fencing to ensure that desired vegetation is well established, usually after 2-3 growing seasons. **(SOP)**

BLM_0025261

**WEED-50**: Reduce ground disturbance, including damage to biological soil crusts. Consider changes in the timing, intensity, duration, or frequency of livestock use; location and changes in salt grounds; restoration or protection of watering sites; and restoration of yarding/loafing areas, corrals, and other areas of concentrated livestock use.

**WEED-51**: Inspect areas of concentrated livestock use for weed invasion, especially watering locations and other sensitive areas that may be particularly susceptible to invasion. Inventory and manage new infestations.

**WEED-52**: Defer livestock grazing in burned areas until vegetation is successfully established, usually after 2-3 growing seasons. **(SOP)**

**Outfitting / Recreation Pack and Saddle Stock Use**

**WEED-53**: Allow only certified weed-free hay/feed on BLM lands. **(SOP)**

**WEED-54**: Inspect, brush, and clean animals (especially hooves and legs) before entering public land. Inspect and clean tack and equipment.

**WEED-55**: Regularly inspect trailheads and other staging areas for backcountry travel. Bedding in trailers and hay fed to pack and saddle animals may contain weed seed or propagules.

**WEED-56**: Tie or contain stock in ways that minimize soil disturbance and prevent loss of desirable native species.

**WEED-57**: Authorized trail sites for tying pack animals should be monitored several times per growing season to quickly identify and eradicate new weeds. Trampling and permanent damage to desired plants are likely. Tie-ups shall be located away from water and in shaded areas where the low light helps suppress weed growth.

**WEED-58**: Educate outfitters to look for and report new weed infestations.

**Wildlife**

**WEED-59**: Periodically inspect and document areas where wildlife concentrate in the winter and spring and cause excess soil disturbance.

**WEED-60**: Use weed-free materials for all wildlife management activities.

**WEED-61**: Incorporate weed prevention into all wildlife habitat improvement project designs.

## Fire

### Fire Management Plans

**WEED-62**: Prescribed fire plans should include pre-burn invasive weed inventory and risk assessment components as well as post-burn mitigation components.

**WEED-63**: Integrate prescribed fire and other weed management techniques to achieve best results. This may involve post-burn herbicide treatment or other practices that require careful timing.

**WEED-64**: Include weed prevention and follow-up monitoring in all prescribed fire activities. Include in burn plans the possibility for post-burn weed treatment.

### Incident Planning

**WEED-65**: Increase weed awareness and weed prevention by providing training to new and/or seasonal fire staff on invasive weed identification and prevention.

**WEED-66**: For prescribed burns, inventory the project area and evaluate potential weed spread with regard to the fire prescription. Areas with moderate to high weed cover should be managed for at least 2 years prior to the prescribed burn to reduce the number of weed seeds in the soil. Continue weed management after the burn.

**WEED-67**: Ensure that a weed specialist is included on a Fire Incident Management Team when wildfire or prescribed operations occur in or near a weed-infested area. Include a discussion of weed prevention operational practices in all fire briefings.

**WEED-68**: Use operational practices to reduce weed spread (e.g., avoid weed infestations when locating fire lines).

**WEED-69**: Identify and periodically inspect potential helispots, staging areas, incident command posts, and base camps and maintain a weed-free condition. Encourage network airports and helibases to do the same.

**WEED-70**: Develop a burned-area integrated weed management plan, including a monitoring component to detect and eradicate new weeds early.

### Fire-fighting

**WEED-71**: Ensure that all equipment (including borrowed or rental equipment) is free of weed seed and propagules before entering incident location.

**WEED-72**: When possible, use fire suppression tactics that reduce disturbances to soil and vegetation, especially when creating fire lines.

BLM_0025263

**WEED-73**: Use wet or scratch-lines where possible instead of fire breaks made with heavy equipment.

**WEED-74**: Given the choice of strategies, avoid ignition and burning in areas at high risk for weed establishment or spread.

**WEED-75**: Hose off vehicles on site if they have traveled through infested areas.

**WEED-76**: Inspect clothing for weed seeds if foot travel occurred in infested areas.

**WEED-77**: When possible, establish incident bases, fire operations staging areas, and aircraft landing zones in areas that have been inspected and are verified to be free of invasive weeds.

**WEED-78**: Cover weed infested cargo areas and net-loading areas with tarps if weeds exist and can't be removed or avoided.

**WEED-79**: Flag off high-risk weed infestations in areas of concentrated activity and show weeds on facility maps.

**WEED-80**: If fire operations involve travel or work in weed infested areas, a power wash station should be staged at or near the incident base and helibase. Wash all vehicles and equipment upon arrival from and departure to each incident. This includes fuel trucks and aircraft service vehicles.

**WEED-81**: Identify the need for possible fire rehab to prevent or mitigate weed invasion during fire incident and apply for funding during the incident.

*Post-fire Rehabilitation*

**WEED-82**: Have a weed specialist review burned area rehabilitation reports to ensure proper and effective weed prevention and management is addressed.

**WEED-83**: Thoroughly clean the undercarriage and tires of vehicles and heavy equipment before entering a burned area.

**WEED-84**: Treat weeds in burned areas. Weeds can recover as quickly as 2 weeks following a fire.

**WEED-85**: Schedule inventories 1 month and 1 year post-fire to identify and treat infestations. Eradicate or contain newly emerging infestations.

**WEED-86**: Restrict travel to established roads to avoid compacting soil that could hinder the recovery of desired plants.

**WEED-87**: Determine soon after a fire whether revegetation is necessary to speed recovery of a native plant community, or whether desirable plants in the

BLM_0025264

burned area will recover naturally. Consider the severity of the burn and the proportion of weeds to desirable plants on the land before it burned. In general, more severe burns and higher pre-burn weed populations increase the necessity of revegetation. Use a certified weed-free seed mix. **(SOP)**

**WEED-88**: Inspect and document weed infestations on fire access roads, equipment cleaning sites, and staging areas. Control infestations to prevent spread within burned areas.

**WEED-89**: Seed and straw mulch to be used for burn rehabilitation (e.g., for wattles, straw bales, dams) shall be certified weed-free. **(SOP)**

**WEED-90**: Replace soil and vegetation right side up when rehabbing fire line.

# FISH AND WILDLIFE MANAGEMENT AND SPECIAL STATUS SPECIES (FWS)

## Standard Operating Procedures

**FWS-1**: To minimize the spread of aquatic nuisance species including but not limited to zebra mussels, New Zealand mud snails, quagga mussels, rusty crayfish, and whirling disease vectors, personnel working in water will do the following:

a) Before leaving a particular water, inspect and clean gear used in the water, including watercraft (boats, canoes, kayaks, rafts, etc.), trailers, oars, nets, waders, wading boots, sandals, and life jackets. Remove vegetation, mud, grit, algae, etc. and drain water from boats and other gear.

b) Prior to entering another water body, clean your gear by spraying with 409 or a similar soap or bleach solution and let equipment dry in the hot sun for several hours, or use hot tap water that drains onto the ground, not down a drain or into another water course.

**FWS-2**: Fences constructed will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989). Current standards for fencing cattle out in deer and elk range is a four strand fence, 40 inches high with a spacing of wires from ground to top of 60"(smooth bottom wire), 6" (second wire barbed), 6" (third wire barbed), 12" (top wire preferably smooth but may need to be barbed in areas of intense cattle use).

**FWS-3**: The GJFO will consult agency species management plans and other conservation plans as appropriate to guide management and devise mitigation measures when needed. Examples of these plans include but are not limited to the Colorado Wildlife Action Plan, Colorado Sagebrush: A Conservation Assessment and Strategy, National, Rangewide, statewide and local working group conservation plans for Gunnison and greater sage grouse, Sharing the land with pinyon-juniper birds, Birds in a sagebrush sea: managing sagebrush habitats

BLM_0025265

for bird communities, North American Landbird Conservation Plan, North American Waterbird conservation Plan, National and Colorado Partners in flight Bird Conservation Plans, Colorado Gunnison's and White-tailed Prairie Dog Conservation Strategy and Recovery plans for federally listed species.

**FWS-4**: Lessees will be notified that a lease parcel contains potential habitat for threatened (T), endangered (E), proposed (P), candidate (C) and BLM sensitive (S) plants, fish and wildlife.

**FWS-5**: Existing plant location records will be consulted and site inventories will be conducted to identify suitable habitat[1] for these plants. Surveys for occupied suitable habitat will be performed prior to any ground disturbance. Surveys will take place when the plants can be positively identified, during the appropriate flowering periods. Surveys will be performed by qualified field botanists/biologists who will provide documentation of their qualifications, experience and knowledge of the species prior to starting work.

**FWS-6**: In complex linear or split-estate actions early coordination with private landowners will facilitate the process the BLM must complete prior to authorizing the action. To comply with the Endangered Species Act, the BLM must consider the effects to listed species on private land that result from a Federal action, such as linear rights-of-way or constructing a well pad on private land to drill to federal lease. Before an applicant can contract a biological survey, the private surface owner must allow the biological consultant access. Projects can be authorized without completing biological surveys on private lands but this may lead to lengthy delays while the BLM completes consultation.

**FWS-7**: For Colorado hookless cactus and other T, E, P, and C species surface-disturbing activities will be avoided within 200 meters of occupied plant habitat[1] wherever possible and where geography and other resource concerns allow[2]. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

**FWS-8**: For BLM sensitive species surface-disturbing activities will be avoided within 100 meters of occupied plant habitat[1] wherever possible and where geography and other resource concerns allow[2]. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

---

[1] Occupied habitat includes areas historically or currently supporting plants and/or soils containing a viable seed bank. Suitable habitat is defined as an area that contains or exhibits the specific components or constituents necessary for plant persistence, as determined by existing maps plus field inspection and/or surveys. It may or may not be occupied by plants or a seed bank. Potential habitat is defined as an area that satisfies the broad criteria of the species' habitat description. It is usually determined by preliminary in-house assessment.

[2] An avoidance buffer helps to minimize dust transport, weed invasion, unauthorized vehicular activities, chemical and produced-water spills; and helps to protect pollinator habitat.

BLM_0025266

**FWS-9**: Where development is allowed within 100 meters of occupied habitat for T, E, P and C species or BLM sensitive species, unauthorized disturbance of plant habitat will be avoided by on-site guidance from a biologist, and by fencing the perimeter of the disturbed area, or such other method as agreed to by the Fish and Wildlife Service. In such instances, a monitoring plan approved by the Service will be implemented for the duration of the project to assess impacts to the plant population or seed bank. If detrimental effects are detected through monitoring, corrective action will be taken through adaptive management.

**FWS-10**: Surface disturbance closer than 20 meters to a listed plant will be considered an adverse effect. Mitigating measures within this narrow buffer are very important and helpful to individual plants, but we do not expect that all adverse effects can be fully mitigated within this distance. Some adverse effects due to dust, dust suppression, loss of pollinator habitat, and toxic spills will likely remain. There are two possible exceptions to this rule of thumb: 1) The new disturbance is no closer to a listed plant than preexisting disturbance and no new or increased impacts to the listed plant are expected; or 2) the listed plant is screened from the proposed disturbance (e.g., tall, thick vegetation or a berm acts as a screen or effective barrier to fugitive dust and other potential impacts).

**FWS-11**: Transplantation of potentially affected plants will not be used as a rationale to defend a "not likely to adversely affect" or a "no effect" determination for listed plant species.

**FWS-12**: For drilling pads and other installations, surveys will extend beyond the edge of disturbance by at least 200 meters for T, E, P and C species. For linear features such as roads and pipelines, surveys will extend at least 100 meters beyond the edge of the proposed ground disturbance along each side of the right of way. If special status plants are found within the survey area, the contractor will endeavor to determine the complete areal extent of the occurrence and the approximate number of individuals within the occurrence.

**FWS-13**: Documentation will include individual plant locations and suitable habitat distributions. Prior to conducting plant surveys, the operator will provide maps (as hard-copy and Geographic Information System files) of all proposed areas of disturbance to BLM. Maps will include existing and proposed roads, pipelines, well pads, pits, parking lots, and all other work areas. Post-construction or as-built maps will also be submitted to account for any deviations from pre-project maps. Specific polygons where rare plant surveys have been conducted will be included, along with the results of those surveys (positive or negative). The locations of any monitoring plots established to measure the status of rare plants and habitat in the vicinity of project activities will also be displayed.

**FWS-14**: Protect pollinator species for endangered or threatened species by incorporating the standard operating procedures found in the Final

BLM_0025267

Programmatic Environmental Impact Statement for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**FWS-15**: Conduct development on existing or previously disturbed surface locations to reduce impacts on undisturbed areas and minimize impact on wildlife habitat.

**FWS-16**: To protect nesting raptors, raptor surveys shall be conducted prior to activities that could impact nesting activities. Based on the survey results the following mitigation measures may be applied:

    **a)** Protect nest sites from human disturbances by implementing CPW and USFWS recommended buffers around known nest sites.

    **b)** Provide perching and nesting structures as mitigation where disturbances are impacting raptors.

    **c)** Apply guidance from *Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 2006* (Avian Power Line Interaction Committee 2006) and *Avian Protection Plan (APP) Guidelines* (Avian Power Line Interaction Committee and US Fish and Wildlife Service 2005) or most current guidance for new power line construction (including upgrades and reconstruction) to prevent electrocution of raptors.

**FWS-17**: **(MLP)** Implement drilling technology improvements, such as horizontal drilling, to maximize resource recovery and minimize environmental impacts.

**FWS-18**: **(MLP)** Install pipelines adjacent to roads wherever possible.

**FWS-19**: **(MLP)** Strategically apply fugitive dust control measures to reduce coating of vegetation and deposition in water sources, including enforcing established speed limits on BLM and private roads.

**FWS-20**: Ensure that ponds containing mining or other wastes that are potentially hazardous to fish and wildlife are enclosed to exclude birds, bats, and other wildlife attracted to the water.

**FWS-21**: When placing culverts on streams containing fish or amphibians, design culverts to maintain or improve aquatic organism passage.

**FWS-22**: In wildland fire situations work with Fire Resource Advisors during suppression efforts in the GJFO when considering dipping water from ponds, reservoirs, and lakes throughout the Grand Valley. Select reservoirs, ponds, and lakes harbor native and/or endangered fishes and should be avoided if at all possible. If these waters must be used, screen water intakes with ¼ inch mesh to avoid entrainment of fish.

BLM_0025268

**FWS-23**: When obtaining water from any live stream or river the following actions should be taken:

a) The best method to avoid entrainment of fish is to pump from off-channel locations (e.g., ponds, lakes, and diversion ditches), not directly connected to the mainstem rivers even during high spring flows;

b) If the pump head must be located in the river channel where larval fish are known to occur, the following measures apply:

   1. Do not situate the pump in a low-flow or no-flow area as these habitats tend to concentrate larval or young-of-year fishes. Instead place the pump into fast moving/riffle habitat;

   2. limit the amount of pumping, to the greatest extent possible, during that period of the year when larval fish may be present (June 1 to August 15); and

   3. avoid pumping, to the greatest extent possible, during the pre-dawn hours (two hours prior to sunrise) as larval fish drift studies indicate that this is a period of greatest daily activity.

c) Screen all pump intakes with ¼-inch or finer mesh material.

d) Report any fish impinged on any intake screens to the Fish and Wildlife Service (970.243.2778) or the Colorado Division of Wildlife:

**Northwest Region**

711 Independent Ave., Grand Junction, CO 81505

Phone: (970) 255-6100

**Southwest Region**

415 Turner Dr., Durango, CO 81303

Phone: (970) 375-6700

**Best Management Practices**

**FWS-24**: Design lighting required for recreation, oil and gas, and other programs to be directing downward, using shielded lights, and only the minimum illumination required, utilize green lights in areas that require illumination at night and prevent skyward projection of lighting that may disorient night migrating birds. Sodium vapor lights, widely used for streetlights and security lighting, should not be used because they have been shown to attract night-flying birds.

**FWS-25**: Limit flaring operations when well pads are within 100 m of occupied T, E, C, P and sensitive species habitat.

BLM_0025269

**FWS-26**: Control noxious weeds using integrated techniques. Limit chemical control in areas with rare plant species to avoid damage to non-target species. Mechanical or chemical control in and near rare plant habitat shall only be implemented by personnel familiar with the rare plants.

**FWS-27**: Prohibit collection of rare plants or plant parts, except as permitted by the BLM Authorized Officer for scientific research.

**FWS-28**: The use of deicers and dust suppressants within 100 meters (328 feet) of road-side occurrences of special status plant species will require prior approval from the BLM.

**FWS-29**: Herbicide application shall be kept at least 200 meters from known plant populations, except in instances where weed populations threaten habitat integrity or plant populations. Great care shall be used to avoid pesticide drift in those cases.

**FWS-30**: Use temporary water delivery lines laid on the surface of the ground to reduce truck traffic.

**FWS-31**: Retain existing snags for wildlife use in places where they will not create a human hazard.

**FWS-32**: Where linear disturbance is proposed edges of vegetation shall be feathered to avoid long linear edges of habitat and allow for greater habitat complexity for wildlife.

**FWS-33**: Protect existing temporary pools to providing breeding and hibernating habitat for amphibians.

**FWS-34**: Avoid fragmentation of wildlife habitat especially in wildlife migration and movement corridors.

**FWS-35**: **(MLP)** Encourage the use of a variety of BMPs, as defined by the most recent version of "Best Management Practices for Oil and Gas Development on Public Lands," http://www.blm.gov/bmp/.

**FWS-36**: Identify in-channel features (e.g., culverts, water diversion structures) that block aquatic organism movement and/or impair stream connectivity and replace, modify, or remove these impediments as they are identified and as opportunities allow. Consider and address aquatic organism passage and appropriate life-stage requirements when designing new or modifying existing stream crossings.

**FWS-37**: Where construction of in-channel barriers will benefit aquatic species by limiting access from competitive species and/or disease vectors, consider barriers as a management tool on a site-specific basis.

**FWS-38**: In critical and sever winter range for deer and elk avoid recurring transportation activity within two hours before and after sunrise and sunset to avoid disturbing wintering wildlife between Dec1 and May1 (excluding emergencies).

**FWS-39**: For intensive activities within winter range for wildlife use carpooling for activities like crew rotations and shift changes.

**FWS-40**: For intensive activities within winter range for wildlife monitor and enforce speed limits

**FWS-41**: For intensive activities within winter range for wildlife prohibit pets and possession of fire arms on the site by employees or contractors.

**FWS-42**: Implement closed-loop drilling systems on all active rigs, using only a small cuttings mixing area on each location.

**FWS-43**: Optimize completion operations to minimize impact.   Techniques include:

   **a)** Simultaneous drilling and completion operations minimize the operating time on the well pad, where space and safety restrictions permit the use of this technique.

   **b)** Remote completion operations using nearby existing well pads minimize overall surface disturbance.

**FWS-44**: Reuse water whenever possible for drilling and completion activities. Recycle all water used in completion activities to meet water needs for completion of subsequent wells on location; this will reduce fresh water consumption and reduce truck traffic.

**FWS-45**: Expand the water distribution system to efficiently move water in pipelines, reducing truck traffic for drilling and completion activities.

**FWS-46**: Reduce visits to well sites through remote monitoring (i.e. SCADA) and the use of multi-function contractors.

**FWS-47**: **(MLP)** Use solar panels as an alternative energy source for on location production equipment, to limit trips to the location for production maintenance.

**FWS-48**: Use dual-fuel natural gas/diesel systems, reducing diesel delivery to the well site by as much as 70 percent.

**FWS-49**: **(MLP)** Use existing roads instead of new construction segments wherever feasible.

BLM_0025271

**FWS-50**: **(MLP)** Seed all access roads and facilities other than well pads in a timely manner after construction has been completed. Seed all topsoil from pad construction.

**FWS-51**: Noise reduction techniques and designs will be used to reduce noise from compressors or other motorized equipment.

**FWS-52**: Where new roads are constructed seasonal restrictions on public vehicular access will be evaluated where there are wildlife conflict or road damage/maintenance issues.

**FWS-53**: Install multiple pipelines in a single trench, to minimize disturbance.

**FWS-54**: Install trench plugs (sloped to allow wildlife or livestock to exit the trench should they enter) at known wildlife or livestock trails to allow safe crossing on long spans of open trench.

**FWS-55**: Coordinate with the Colorado Parks and Wildlife (CPW) on BLM projects and BLM-authorized projects that are proposed within 0.5-mile of a small capacity water development and 2.0-mile of a large capacity wildlife water development. Projects determined to have a detrimental effect on wildlife using wildlife water developments will be avoided or rerouted if possible.

**FWS-56**: Coordinate with CPW on migratory bird inventories when migratory bird inventories are proposed by BLM or required of third parties.

## References

Avian Power Line Interaction Committee. 2006. Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 1996. Edison Electric Institute, Avian Power Line Interaction Committee, and the California Energy Commission. Washington, DC, and Sacramento, CA.

Avian Power Line Interaction Committee and US Fish and Wildlife Service. 2005. Avian Protection Plan (APP) Guidelines, April 2005. Washington, DC.

BLM (United States Department of the Interior, Bureau of Land Management). 1989. Handbook H-1741-1: Fencing. Release 1-1572. BLM, Washington, DC. December 6, 1989. 58pp.

_____. 2007. Final Vegetation Treatment Using Herbicides on Bureau of Land Management Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

US Fish and Wildlife Service and BLM Recommendations for Avoiding Adverse Effects on Threatened, Endangered, Proposed, Candidate and BLM Sensitive Plants on BLM Lease Lands in Colorado; Draft. July 25, 2008.

BLM_0025272

USDA Forest Service. Designing for Aquatic Organism Passage at Road-Stream Crossings. 2007.

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

## WILDLIFE DAMAGE MANAGEMENT (WDM)

### Standard Operating Procedures

**WDM-1**: Control activities conducted by the US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services will be coordinated with the GJFO on an annual basis, including review of authorized control areas and annual submittal of control activities on GJFO lands.

**WDM-2**: US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services will notify the GJFO before any damage control activity is implemented within the restricted area(s), and exceptions will be approved on a case-by-case basis.

**WDM-3**: All US Environmental Protection Agency use restrictions and requirements for toxicants are to be followed where control devices are employed on public lands. The GJFO must be notified before any toxicants are deployed and a map of the treatment area must be provided. Adequate signage must be provided and maintained.

**WDM-4**: All aerial control activities in the wild horse area must be conducted in compliance with all applicable Colorado State Statutes, the provisions of the 1971 Wild and Free-Roaming Horses and Burros Act, as amended, and its associated regulations (43 Code of Federal Regulations 4700). No harassment of wild horses and burros is permitted under these provisions; maliciously or negligently causing the injury of a wild horse or burro is also expressly prohibited.

**WDM-5**: Any aerial control activities in the wild horse area will require notification of and prior approval from the GJFO.

**WDM-6**: During the foaling season (March 1-June 30), a flyover survey to determine whether wild horses are present will be conducted prior to commencing any wildlife damage management activities. This survey will be conducted at a minimum of 500 feet above ground level. If wild horses are determined to be present, flyover surveys will be adjusted as needed to prevent any disturbance or harassment of the animals present, and wildlife damage

BLM_0025273

activities that would result in disturbance or harassment of these animals will not take place.

**WDM-7**: All persons involved with wildlife damage management activities shall be briefed on the regulations and penalties relating to harassment of wild horses prior to commencing animal control operations.

**WDM-8**: The GJFO will identify through the US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services annual work plan process areas of public lands considered special resource use areas on which control activities be avoided except as requested by CPW, or other protective restrictions may apply. Examples may include special status species habitats (e.g., sage-grouse leks and nesting areas, and bald eagle nests).

**WDM-9**: Interim Management Policies must be adhered to at all times in Wilderness Study Areas and the GJFO must be notified before any wildlife damage management activity is implemented. Wildlife damage management activities in Wilderness Study Areas must be directed at the offending animal. Aerial hunting may be allowed in Wilderness Study Areas as long as those actions do not impair wilderness characteristics.

## WILD HORSES (WH)

### Standard Operating Procedures

**WH-1**: Wild Horse and/or Burro Gathers Standard Operating Procedures.

**WH-2**: Wild Horse Fertility Control Treatment Standard Operating Procedures.

**WH-3**: All new or reconstructed exclosures within herd management areas will follow the horse fencing standards.

**WH-4**: Any new facilities shall be a minimum of 0.25-mile from water sources to avoid hindrance of use by wild horses.

**WH-5**: Any new facilities shall be designed to avoid injury to horses or fenced to prevent wild horse access.

**WH-6**: Require rebar to be welded between the rails of cattle guards if the cattle guard or similar device is to be installed in or near herd management areas to decrease the risk of wild horse and/or burro entrapment.

**WH-7**: All new or reconstructed fences on the perimeter of the wild horse range will be comprised of materials that would reduce injury to wild horses. (e.g., wooden poles, smooth wire)

BLM_0025274

**WH-8**: Seed mixes for projects within the wild horse range shall benefit wild horses (emphasis on palatable grasses) while meeting land health standards.

**WH-9**: If a project involves heavy or sustained traffic; require road signs for safety and protection of wild horses.

**WH-10**: Above ground facilities requiring painting will be designed to blend in with local environment.

**WH-11**: Disturbed areas will be contoured to blend with the natural topography. Blending is defined as reducing form, line, and color contrast associated with the surface disturbance.

**WH-12**: Still or motion picture photography for personal use is permitted; however, photography for commercial purposes may require a permit. Contact the local BLM office.

**WH-13**: Feed weed-free certified hay or pellet feed (refer to www.weedfreefeed.com for more information).

**WH-14**: For guide/outfitters and recreationists: The permittee shall inform all staff and clients that wild horses protected by federal law and will prevent harassment of wild horses from permitted activities. Prohibited acts include but are not limited to: maliciously injuring or harassing a wild horse; chasing wild horses, removing or attempting to remove a wild horse from public lands; destroying a wild horse; selling or attempting to sell a wild horse; and, commercially exploiting a wild horse. Crimes are punishable by fine and/or imprisonment. Examples of violations might include harassment by all-terrain vehicle, injury or death by a bullet or arrow, and illegal capture.

## Best Management Practices

**WH-15**: Adequate water for livestock and dogs may not be available along your route. Springs and other water sources identified on maps may be dry at any time.

**WH-16**: Bring a sufficient quantity of drinking water for your riding stock (15 gallons or more per day, per animal)

**WH-17**: Secure your riding stock adequately (use portable panels or corrals).

**WH-18**: Be sure your domestic riding stocks are current with annual vaccinations.

**WH-19**: Do not bring sick or diseased riding animals into herd management areas. Wild horses on the range are not vaccinated against any diseases.

**WH-20**: Do not drive across, camp on, or stake riding stock out to graze on riparian areas.

BLM_0025275

**WH-21**: Water riding stock only at springs or streams with stable banks and dry soils.

**WH-22**: Keep riding stock secured away from dispersed camp sites and spread manure before leaving.

**WH-23**: Explore the area prior to hauling in a trailer to assess access. Pulling horse or other trailers off of State or County designated roads shall only be done with prior operator knowledge of the road. Many roads are narrow, rough, steep, or impassable. Turning around may be difficult or impossible, especially with a trailer.

**WH-24**: In the event that a foaling mare or newborn foal is encountered, every effort shall be made to stay away from that location. Do not attempt to help the mare or foal.

**WH-25**: Stay at least 100 feet away from wild horses.

**WH-26**: Try not to place yourself between members of a band or between adjoining bands.

**WH-27**: Observe wild horses quietly so wild behavior is not disrupted.

**WH-28**: If you are approached by wild horses while riding horseback, stay calm, maintain control of your animal, and leave the area as soon as you can. Ride with others whenever possible.

**WH-29**: Mares, especially if in season, may attract wild stud horses to you or your camp. Keep domestic horses secure at all times. Ride with others who are experienced and skilled at resolving unwanted wild horse or burro interactions.

**WH-30**: Do not feed or try to attract animals towards you.

**WH-31**: Keep dogs under control so they do not disturb or chase wild horses.

**WH-32**: Report sick or injured animals, or violations, to the BLM.

**WH-33**: Please do not attempt to assist or handle sick or injured animals.

## CULTURAL RESOURCES (CR)

### Standard Operating Procedures

**CR-1**: Evaluation of all BLM activities and BLM authorized activities shall be made in compliance with BLM Manual 8100, The Foundations for Managing Cultural Resources (BLM 2004a), and subsequent 8100 series (BLM 2004b, 2004c, 2004d, 2004e, 2004f, 2004g, and 2004h); Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources (BLM

1998, rev. 2007); and the current State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office.

**CR-2**: In complex linear or split-estate actions early coordination with private landowners will facilitate the process the BLM must complete prior to authorizing the action. To comply with the National Historic Preservation Act, the BLM must consider the effects to cultural resources on private land that result from a Federal action, such as linear rights-of-way or constructing a well pad on private land to drill to federal lease. Before an applicant can contract a cultural survey, the private surface owner must allow the cultural consultant access. Projects can be authorized without completing cultural surveys on private lands but this may lead to lengthy delays while the BLM completes consultation.

**CR-3**: The holder of a BLM authorization to carry out land use activities on Federal lands, including all leases and permits, must notify the BLM, by telephone and written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony (43 Code of Federal Regulations [CFR] 10.4(g)). Activities must stop in the immediate vicinity of the discovery. The discovery must be protected from the authorized activity for a period of 30 days or unless otherwise notified by the (43 CFR 10.4(c) and (d)).

**CR-4**: The National Historic Preservation Act, as amended, requires that if newly discovered historic or archaeological materials or other cultural resources are identified during project implementation, work in that area must stop and the BLM Authorized Officer must be notified immediately. Within five working days the BLM Authorized Officer will inform the proponent as to:

a) Whether the materials appear eligible for the National Register of Historic Places;

b) The mitigation measures the proponent will likely have to undertake before the site could be used (assuming in situ preservation is not practicable), (36 CFR 800.13); and

c) A timeframe for the BLM Authorized Officer to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Office, that the BLM Authorized Officer's findings were correct and mitigation was appropriate.

**CR-5**: A standard Education/Discovery stipulation for cultural resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that Federal laws protect cultural resources and they will be subject to prosecution for disturbing or destroying any historic or archaeological sites, or collecting any cultural objects, prehistoric or historic from federal lands.

BLM_0025277

**CR-6**: Strict adherence to the confidentiality of information concerning the nature and location of archeological resources will be required of any company issued a land use authorization and all of their subcontractors (Archaeological Resource Protection Act, 16 US Code 470hh).

**CR-7**: When a NEPA document specifically stipulates the need for an archaeological monitor during construction or a project is located in areas that require an archaeological monitor to be present (see conditions of approval polygons for Sunnyside, Grand Mesa Slopes, and Indian Creek) it is the applicant's responsibility to contract an archaeological consultant holding a current Colorado BLM permit and authorized to work in the GJFO. Fieldwork authorizations are required prior to any construction monitoring Cultural Resource monitoring where resources are present or reasonably expected is permitted only when the ground surface is free of snow, unfrozen, and dry.

**CR-8**: A cultural resource must be allocated to public use prior to:

    **a)** authorizing or implementing any Heritage Tourism project;

    **b)** when Special Recreation Permits are issued that will use a cultural resource; or

    **c)** a BLM recreation project is proposed that involves the use or interpretation of a cultural resource.

## Best Management Practices

**CR-9**: BLM specialists shall complete a File Search Request form and submit to the Field Office Archaeologist as soon as there is proposed BLM activity or BLM authorized activity that will require preparation of a NEPA document. This will provide the specialist with immediate information as to the need for Class III inventory, whether that will be contracted or in-house, or the presence of Cultural Resources that may preclude or impede their project.

**CR-10**: Once it has been determined that a project will require contracted cultural inventory the BLM specialists shall complete a *Request for CR Compliance* form *(find at S:\blm share\CRM_for_FO\ CR Compliance)* and submit to the Field Office Archaeologist as soon as they have a final design for a BLM proposed project or activity.

**CR-11**: When possible, locate projects in areas that are previously disturbed. To comply with the National Historic Preservation Act the BLM must identify significant cultural resources. Under the current regulations and guidelines the BLM may decide that no inventory needs to be conducted because the proposed action is located in an environment where ground disturbance has modified the surface so extensively that the likelihood of finding intact cultural resources is negligible.

BLM_0025278

**CR-12**: Where proposed projects or development will adversely affect a cultural resource, testing, data recovery or full excavation to recover scientific information may be required as mitigation. The applicant or operator bears the full cost of mitigation and is encouraged to consider avoiding adverse effects through project relocation or redesign rather than mitigating adverse effects.

**CR-13**: **(MLP)** A *File Search Request* form must be submitted to the Field Office Archaeologist identifying the site and the proposed use so the allocation to public use can be confirmed.

## References

BLM (United States Department of the Interior, Bureau of Land Management). 1998. Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources. Rev. 2007. BLM, Colorado State Office, Lakewood, CO.

_____. 2004a. Manual 8100: The Foundations for Managing Cultural Resources. Release 8-72. BLM, Washington, DC. December 3, 2004.

_____. 2004b. Manual 8110: Identifying and Evaluating Cultural Resources. 8-73. BLM, Washington, DC. December 3, 2004.

_____. 2004c. Manual 8120: Tribal Consultation Under Cultural Resources. 8-74. BLM, Washington, DC. December 3, 2004.

_____. 2004d. Manual 8120-1: General Procedural Guidance for Native American Consultation. 8-75. BLM, Washington, DC. December 3, 2004.

_____. 2004e. Manual 8130: Planning for Uses of Cultural Resources. 8-76. BLM, Washington, DC. December 3, 2004.

_____. 2004f. Manual 8140: Protecting Cultural Resources. 8-77. BLM, Washington, DC. December 3, 2004.

_____. 2004g. Manual 8150: Permitting Uses of Cultural Resources. 8-78. BLM, Washington, DC. December 3, 2004.

_____. 2004h. Manual 8170: Interpreting Cultural Resources for the Public. 8-79. BLM, Washington, DC. December 3, 2004.

# TRIBAL CONSULTATION (TC)

## Standard Operating Procedures

**TC-1**: The BLM has a responsibility to develop a government-to-government relationship with the tribes: the formal relationship that exists between the Federal Government and tribal governments under United State laws. Tribal

BLM_0025279

governments are considered dependent domestic sovereignties with primary and independent jurisdiction (in most cases) over tribal lands. Concerning proposed BLM plans and actions, at least the level of consideration and consistency review provided to State governments must be afforded to tribal governments.

**TC-2**: The BLM is responsible for consultation under General Authorities defined as "laws, executive orders, and regulations that are not considered "cultural resource authorities". The regulations implementing both Federal Land Policy and Management Act and NEPA require Native American consultation. The American Indian Religious Freedom Act and the Indian Sacred sites order (Executive Order 13007) pertain to the free exercise clause of the First Amendment (BLM Manual 8120-1 Guidelines for Conducting Tribal Consultation [BLM 2004], Federal Land Policy and Management Act Title II, NEPA Section 102, 40 CFR 1501.2 and 1501.7)

**TC-3**: Tribes must be consulted whenever other governmental entities or the public are formally involved in the BLM's environmental review process in any NEPA documentation that entails public involvement or initial discussions with local or state governments (BLM Handbook H-1790-1, National Environmental Policy Act [BLM 2008]).

**TC-4**: NHPA Section 106 consultations for cultural resources that are significant to Indian tribes. Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government. Consultation shall be conducted in a manner sensitive to the concerns and needs of the Indian tribe. (36 CFR 800.2(c)(2)(ii)(C).

## Best Management Practices

**TC-5**: Notification is conducted by simple one-way written means. Consultation is generally construed to mean direct, two-way communication.

**TC-6**: When publishing notices or open letters to the public indicating that the BLM is contemplating an action and that comments are welcome, managers shall send individual letters, certified mail or delivery confirmed to tribes requesting their input on actions being considered. If this is an opening dialogue, prior to having developed a strong working relationship with the tribe, if a timely response is not received the manager shall follow up with personal telephone calls.

**TC-7**: For the benefit of both parties, managers are encouraged to strive for the most efficient and effective method of consultation. Whatever method is chosen, all consultation activities shall be carefully documented in the official record.

BLM_0025280

**TC-8**: Consultation roles can be facilitated but may not be transferred to others. Cultural resource consulting firms working for land use applicants cannot negotiate, make commitments, or otherwise give the appearance of exercising the BLM's authority in consultations.

**TC-9**: Owing to their status as self-governing entities, tribes shall be notified and invited to participate at least as soon as (if not earlier than) the Governor, state agencies, local governments, and other federal agencies.

**TC-10**: Tribal consultation means dialogue between a BLM manager and an American Indian Tribe. The BLM managers are encouraged to visit tribal councils and appropriate tribal leaders on a recurring basis. This face-to-face meeting helps to develop relationships that can reduce the time and effort spent in later consultation or individual projects. This government-to-government consultation shall be treated with appropriate respect and dignity of position.

## References

BLM (United States Department of the Interior, Bureau of Land Management). 2004. Manual 8120: Tribal Consultation Under Cultural Resources. 8-74. BLM, Washington, DC. December 3, 2004.

_____. 2004. Manual 8120-1: General Procedural Guidance for Native American Consultation. 8-75. BLM, Washington, DC. December 3, 2004.

_____. 2008. Handbook H-1790-1: National Environmental Policy Act. Washington, DC. January 2008.

## PALEONTOLOGY (P)

### Standard Operating Procedures

**P-1**: Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.

**P-2**: Prior to any surface disturbing activities, an inventory of paleontological resources (fossils) may be required. Mitigation may be required upon the discovery of any vertebrate fossil or other scientifically-important paleontological resource. Mitigation of scientifically important paleontological resources may include avoidance, monitoring, collection, excavation, or sampling. Mitigation of discovered scientifically important paleontological resources might require the relocation of the disturbance over 100 meters. This and any subsequent mitigation work shall be conducted by a BLM-permitted paleontologist.

**P-3**: The lessee/operator shall bear all costs for inventory and mitigation (WO IM-2009-011).

BLM_0025281

**P-4**: The lessee is prohibited from surface occupancy and surface-disturbing activities within 100 meters around all known scientifically important paleontological resources.

(Locality-specific name)

This stipulation is to protect scientific information that may be damaged from inadvertent or authorized uses.

*Exception:* The Authorizing Officer may: (1) allow for paleontological excavation and (2) change the protection boundary on a case-by-case basis, taking into account topographical barriers, the design of the proposed action, and the characteristics of the paleontological resource.

*Modification:* None

*Waiver:* Destruction of all the physical characteristics of a paleontological resource.

**P-5**: A standard Education/Discovery stipulation for paleontological resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that Federal laws protect paleontological resources and they will be subject to prosecution for disturbing or destroying any vertebrate fossils or paleontological sites, or collecting any fossilized bones, tracks or any other vertebrate trace fossils from federal lands.

**P-6**: The Paleontological Resources Preservation Act (PRPA) [16 U.S.C. 470aaa] requires the lessee/operator to immediately suspend activities in the vicinity of a vertebrate fossil discovery, protect the discovery from damage and notify the BLM Authorized Officer of any paleontological resources discovered as a result of operations under this authorization. The Authorized Officer will evaluate, or will have evaluated, such discoveries as soon as possible, but not later than 10 working days after being notified. Appropriate measures to mitigate adverse effects to significant paleontological resources will be determined by the Authorized Officer after consulting with the operator. Within 10 days, the operator will be allowed to continue construction through the site, or will be given the choice of either (1) following the Authorized Officer's instructions for stabilizing the fossil resource in place and avoiding further disturbance to the fossil resource, or (2) following the Authorized Officer's instructions for mitigating impacts to the fossil resource prior to continuing construction through the project area.

## VISUAL RESOURCES (V)

### Standard Operating Procedures

**V-1**: All new surface-disturbing projects or activities, regardless of size or potential impact, will incorporate visual design considerations during project design as a reasonable attempt to meet the Visual Resource Management (VRM)

BLM_0025282

class objectives for the area and minimize the visual impacts of the proposal. Visual design considerations will be incorporated by:

**a)** Using the VRM contrast rating process (required for proposed projects in highly sensitive areas, high impact projects, or for other projects where it appears to be the most effective design or assessment tool), or by

**b)** Providing a brief narrative visual assessment for all other projects that require an environmental assessment or environmental impact statement.

**c)** Measures to mitigate potential visual impacts could include the use of natural materials, screening, painting, project design, location, or restoration (See Appendix H; BLM Handbook H-8431-1, Visual Resource Contrast Rating; or online at http://www.blm.gov/nstc/VRM/8431.html, for information about the contrast rating process).

**V-2**: All new roads will be designed and constructed to a safe and appropriate standard, "no higher than necessary" to accommodate intended vehicular use. Roads will follow the contour of the land where practical. Existing oil and gas roads that are in eroded condition or contribute to other resource concerns will be brought to BLM standards within a reasonable period of time.

## Best Management Practices

**V-3**: Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA level review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

**V-4**: Any facilities authorized will use the best technology available to minimize light emissions

**V-5**: Any new permits/authorizations, including renewals, will be stipulated to use the best technology available to minimize light emissions as compatible with public health and safety.

**V-6**: Restrict visual intrusion in VRM Class I and II areas and within 0.25-mile of historic trails.

**V-7**: Screening facilities from view and avoiding placement of production facilities on steep slopes, hilltops, and ridgelines.

**V-8**: Paint all facilities a color that best allows the facility to blend with the background (Operator-committed BMP).

BLM_0025283

**V-9**: Gravel of road color shall be similar to adjacent dominant soil colors.

**V-10**: Reduce impacts on visual resource management class II and class III areas.

**V-11**: Bury distribution powerlines and flow lines in or adjacent to access roads.

**V-12**: Repeat form, line, color, and texture elements to blend facilities with the surrounding landscape

**V-13**: All aboveground facilities including power boxes, building doors, roofs, and any visible equipment will be painted a color selected from the latest national color charts that best allows the facility to blend into the background.

**V-14**: Perform final reclamation recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography.

**V-15**: To the extent opportunities are practicable, extreme visual contrast created by past management practices or human activities will be minimized. Examples include right-of-way amendments, mineral material sites, abandoned mines, and areas impacted by unauthorized off-road driving.

**V-16**: Reclaim unused well pads within one year.

**V-17**: Final reclamation of all oil and gas disturbance will involve re-contouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas

**V-18**: The use of submersible pumps will be strongly encouraged, especially in VRM Class I, II or III areas or any area visible by the visiting public.

**V-19**: The use of partial or completely below-grade wellheads will be strongly encouraged in high visibility areas as well as VRM Class I, II or III areas.

**V-20**: The placement of production facilities on hilltops and ridgelines will be prohibited where they are highly visible.

## WILDLAND FIRE ECOLOGY AND MANAGEMENT (WFM)

### Standard Operating Procedures

#### Fire Suppression
**WFM-1**: Resource Advisors and other applicable specialists shall be utilized to advise the Incident Commander and suppression resources on the natural resource values during the suppression effort.

**WFM-2**: Avoid applying fire retardant in or near drinking water sources.

BLM_0025284

**WFM-3**: Avoid the application of retardant or foam within 300 feet of a waterway or stream channel. Deviations from this procedure are acceptable if life or property is threatened.

**WFM-4**: Fire lines will not be constructed by heavy equipment within riparian stream zones. If construction is necessary due to threats to life or property, control lines shall terminate at the edge of the riparian zone at a location determined appropriate to meet fire suppression objectives based on fire behavior, vegetation/fuel types, and fire fighter safety.

**WFM-5**: For streams currently occupied by Cutthroat Trout or other aquatic special status species, extractions of water from ponds or pools shall not be allowed if stream inflow is minimal and extraction of water will lower the existing pond or pool level.

**WFM-6**: Lands will be temporarily closed to other uses in areas where fire suppression is being implemented.

**WFM-7**: Stream flow shall not be impounded or diverted by mechanical means in order to facilitate extraction of water from the stream for fire suppression efforts.

**WFM-8**: If it is determined that use of retardant or surfactant foam within 300 feet of a waterway or stream channel is appropriate due to threats to life or property; alternative line construction tactics are not feasible because of terrain constraints, congested areas, or lack of ground personnel; or potential damage to natural resources outweighs possible loss of aquatic life, the unit administrator shall determine whether there have been any adverse effects to federally listed species. If the action agency determines that adverse effects were incurred by federally listed species or their habitats, then the action agency must consult with the Service, as required by 50 CFR 402.05, as soon as practicable.

**WFM-9**: Avoid whenever possible burning out unburned islands of native vegetation, specifically sagebrush communities.

**WFM-10**: Minimize/mitigate impacts to cultural resources and pristine vegetative communities.

**WFM-11**: Prior to use on BLM-administered lands, thoroughly rinse to remove mud and debris from all fire suppression equipment from off-district or out of state and used to extract water from lakes, ponds, streams, or spring sources. Examples of this equipment are helicopter buckets, draft hoses, and screens. After cleaning the equipment, disinfect it to prevent the spread of invasive aquatic species. Do not rinse equipment with disinfectant solutions within 100 feet of natural water sources. GJFO suppression equipment used to extract water from sources known to be contaminated with invasive aquatic species, as

BLM_0025285

identified by the US Fish and Wildlife Service and Colorado Parks and Wildlife, also shall be disinfected beforehand on lands administered by the GJFO.

**WFM-12**: Vehicle and equipment shall be washed before being assigned to fires to minimize the spread of noxious weeds. Larger fires with incident management teams assigned may need to have a weed wash station.

### Emergency Stabilization and Rehabilitation

**WFM-13**: Stabilize areas that have low potential to naturally revegetate and that have high wind and soil erosion potential. Treatments include the following:

a) Installing water bars and other drainage diversions, culverts along fire roads, dozer lines, and other cleared areas;

b) Seeding and planting to provide vegetative cover;

c) Spreading mulch to protect bare soil and discourage runoff;

d) Repairing damaged roads and drainage facilities;

e) Clearing stream channels of structures or debris that is deposited by suppression activities;

f) Installation of erosion control structures;

g) Installation of channel stabilization structures;

h) Fence or restrict areas to livestock and wild horse and burro grazing to promote success of natural revegetation or establishment of seeded species;

i) Lands may be temporarily closed to other uses during emergency stabilization and rehabilitation practices if activities inhibit treatment;

j) Repair or replace range improvements and facilities; and

k) Monitor emergency stabilization and rehabilitation treatments.

## Best Management Practices

### Fuels Management

**WFM-14**: Construct fuel breaks or green strips to protect wildland-urban interface communities and provide for firefighter safety by using mechanical, chemical, biological, and prescribed fire treatment methods.

**WFM-15**: Construct fuel breaks and green strips in areas containing a good understory of native perennials in order to successfully compete with and deter the establishment and spread of annual species.

**WFM-16**: Seed fuels treatments in areas that do not have a good understory of desirable native perennials that can successfully compete with annual weed species.

BLM_0025286

**WFM-17**: Where practicable, use large-scale landscape planning to connect fuel treatments and avoid small piecemeal projects.

**WFM-18**: Plan for maintenance cycles and maintain fuel treatments to ensure effectiveness.

**WFM-19**: Prevent seeded species from being grazed during the first two growing seasons (>18 months) following seeding, or until site-specific analysis and/or monitoring data indicates that vegetation cover, species composition and litter accumulation are adequate to support and protect watershed values, meet vegetation objectives and sustain grazing use

**WFM-20**: Provide fire prevention and mitigation outreach information and education to communities within the GJFO.

## WILDERNESS, WILDERNESS STUDY AREAS, AND LANDS WITH WILDERNESS CHARACTERISTICS (WSA)

### Standard Operating Procedure

**WSA-1**: All Wilderness Study Areas will be managed in accordance with BLM Handbook H-8550-1, Interim Management Policy and Guidelines for Lands Under Wilderness Review (BLM 1995).

### References

BLM (United States Department of the Interior, Bureau of Land Management). 1995. Handbook H-8550-1. Interim Management Policy and Guidelines for Lands Under Wilderness Review. Release 8-66. BLM, Washington, DC. July 5, 1995. 74 pp.

## FORESTRY (F)

### Standard Operating Procedures

**F-1**: No fuel wood cutting of live trees will be allowed for cottonwood, willow, alder; unless resource objectives allow otherwise.

**F-2**: No forestry harvest or collection of products will be allowed during the winter closure timing restraints (November 30 – May 1).

**F-3**: Trees marked for wildlife protection and/or "Seed Tree Do Not Fall" will not be allowed to be harvested for any type of forestry products.

**F-4**: Harvest plans will be completed on all commercial sales within woodlands and forests, showing access roads, decks and skid trail locations. Approval of these plans by the BLM Authorized Officer is required before harvest can start.

BLM_0025287

**Best Management Practices**

**F-5**: The closure of new roads will be considered and planned for during sale preparation in accordance with existing policy.

**F-6**: Clear cuts will be considered for use in the pinyon-juniper and aspen types in critical big game winter ranges and other areas where economically feasible.

**F-7**: Clear cuts will be considered for use in restoring aspen sites.

**F-8**: Cuts that thin the pinyon-juniper canopy cover to 20 percent or less will be favored for use in bighorn sheep ranges. These cuts will focus on the smaller trees in the stand,

**F-9**: Large conifer seed trees (three to seven trees per acre) will be left where practical as wildlife shelter on south facing slopes of big game winter ranges to ensure the succession of quality snags.

**F-10**: An average of three to seven trees per acre of the largest nonhazardous snags, particularly those adjacent to openings and open water will be left on commercial sale areas.

**F-11**: Sale areas with less than 15 percent ground cover in the understory on critical deer and elk winter ranges will be seeded using a mixture of grasses, forbs, and shrubs and will be paid for with wildlife funds.

**F-12**: Minimum of 180 year rotation will be allowed for pinyon-juniper stands. Other species will be managed on a rotation of sufficient length to produce cavity trees for flickers and small owls.

**F-13**: A minimum 50 foot buffer will be maintained along all riparian areas.

**F-14**: Snags with existing cavities or nests will be priority for retention.

**F-15**: Snag diameter for retention will be the largest class on site and will be retained in clusters if possible.

**F-16**: If site potential allows, will retain 5-7 snags per acre, preferably in a clumped configuration.

**F-17**: If possible, will retain at least 15 live trees per acre for future snag recruitment. Recruitment snags will not have to be structurally superior; live tree with forked and broken tops may be preferred.

**F-18**: Do not disturb or destroy active or inactive nests of raptors which are reused.

BLM_0025288

**F-19**: Avoid heavy equipment use in stands of cottonwood, willow, and alder. If heavy equipment use is necessary, allow on a case by case basis and mitigate for adverse impacts.

**F-20**: Allow dead and down collection of cottonwood for personal use.

**F-21**: Protect seed and important wildlife habitat trees in pinyon-juniper stands.

**F-22**: Allow removal of pinyon-juniper encroachment utilizing mechanical, biological, and chemical treatments. Allow tree harvesting for Christmas trees and transplants other woodland products and biomass reduction.

**F-23**: Minimize disturbance to the soil such that surface runoff does not result in sediment transport into waterbodies. Concentrate skidding on as few skid trails as needed.

**F-24**: Limit primary skid trails to 10 percent of the total working area.

**F-25**: Avoid widespread or random skidding patterns with repeated passes.

**F-26**: Minimize placement and use of skid trails in ephemeral drainages. If skid trails must be within or cross an ephemeral drainage, additional BMPs are needed to protect water quality.

**F-27**: Minimize the extent of gouges or trenches upon the ground surface that are created by the skidding of trees or logs.

**F-28**: On sloping terrain, skid trails shall follow along the land contours and shall be kept to 25 percent grade or less when practical.

**F-29**: Establish decks at locations where soil disturbance is minimized.

**F-30**: Maintain as close to normal (pre-construction) streamflow by maintaining depth, width, gradient and capacity of the stream channel at the crossing.

**F-31**: Perform construction, installation, and removal work during low-water flow if circumstances allow.

**F-32**: Stabilize the approachways and/or stream crossing locations so sediment is not transported into the stream.

**F-33**: Approaches to the stream are relatively flat to better control runoff.

**F-34**: The crossing can be installed at a right-angle (90 degrees) to the stream channel so crossing distance is minimized.

**F-35**: Any trees removed during these processes will be purchased by the applicant prior to construction. The applicant is responsible for a per-cord fee.

BLM_0025289

### *Guidelines for Christmas Tree and Firewood Harvesting*

**F-36**: Vehicle use is restricted to existing roads and trails. Do not drive off road.

**F-37**: Do not damage adjacent trees.

**F-38**: When cutting down standing trees, cut the stump 12 inches or less, or as close to the ground as possible.

**F-39**: Scatter lopped branches at least 50 feet from the stump.

**F-40**: Do not top a larger tree to obtain a Christmas tree.

**F-41**: Do not harvest any trees within 100 feet of a spring or creek unless trees are identified for selective removal to meet resource objectives.

**F-42**: Please pack out your trash as well as trash left by others.

**F-43**: No harvesting when soils are saturated to a depth of 3 inches to prevent damage to roads.

**F-44**: The GJFO closes annually to firewood harvesting on November 30. Firewood harvesting reopens in the spring based on road conditions.

## LIVESTOCK GRAZING

### Standard Operating Procedures

**LG-1**: Follow the Grazing Guidelines established along with the Colorado Standards for Rangeland Health.

**LG-2**: Protect seedings from grazing for one full year and through the growing season of the second year. Some seedings established during adverse weather cycles may need protection for a longer period.

**LG-3**: New fences shall be constructed to BLM standards allowing for the appropriate wildlife passage. Fences constructed will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989).

**LG-4**: Bird and wildlife ramps shall be installed in all troughs.

**LG-5**: Access routes to functioning range improvements shall be retained to allow for periodic maintenance and prevent cross country travel.

**LG-6**: Continue to maintain range improvement projects to support proper livestock management including optimal distribution.

BLM_0025290

**LG-7**: Rangeland and vegetation monitoring will be conducted to detect changes in grazing use, trend, and range conditions. These data will be used to support and direct grazing management decisions. These efforts will help ensure that livestock grazing meets objectives for rangeland health and resolves conflicts with wildlife or other resources.

**LG-8**: Grazing management decisions will be based on inventory and monitoring data, both short-term and long-term, which will be jointly developed by grazing permittees and the appropriate federal land management agency.

**LG-9**: All water development activities for livestock grazing use that exceed the minimum depletion level established by US Fish and Wildlife Service must comply with all US Fish and Wildlife Service fees and prescribed mitigations to offset water depletion in the Colorado River.

**LG-10**: Surface-disturbing activities will be coordinated with livestock grazing permittees to minimize the effects of the surface disturbance on other approved operations. To the maximum extent practicable, this effort will include consulting on scheduling of operations to mutually minimize effects.

**LG-11**: Any damage to the function of range improvements (e.g., fence damage, cattle guard cleaning, livestock loss) from other approved operations will be repaired immediately or remedied by the operator causing the damage.

**LG-12**: Well pads, pits, and other facilities that could be hazardous to livestock will be fenced to keep livestock out and the fences maintained in functioning condition.

## Best Management Practices

**LG-13**: Development of springs and seeps or other projects affecting water and associated resources shall be designed to maintain the associate riparian area and assure attainment of standards.

**LG-14**: Disturbance to established rangeland study sites shall be avoided to provide for the continuation of monitoring efforts which involves comparisons of data to previous records of that site.

**LG-15**: Facilities shall be constructed a minimum of 0.125-mile from livestock gathering spots such as water sources and gathering facilities to prevent disruption of the use of these facilities and potential damage to the facility by livestock.

**LG-16**: Exclosures may be established in areas where the vegetative potential of the area is questionable or to compare the effectiveness of grazing management.

**LG-17**: Livestock grazing could be used as an intensively managed prescriptive grazing practice to control cheatgrass and noxious or invasive weeds.

BLM_0025291

**LG-18**: Use grazing systems that contain rotation, deferment, and rest to produce a mosaic of habitat patches and increases the density, height and distribution of native plants.

**LG-19**: Rotate livestock use areas year to year – avoid grazing in the same place at the same time each year.

**LG-20**: Avoid re-grazing the same plants in one growing season.

**LG-21**: Adjust grazing seasons to benefit both warm and cool season grass species by providing periodic rest from grazing for each type.

**LG-22**: Avoid grazing an area during the spring and fall period in one year's time.

**LG-23**: Allow for adequate litter cover following grazing use to protect soil surface and enhance soil moisture retention.

**LG-24**: For spring grazing ensure livestock are removed early enough so that sufficient soil moisture remains for plant recovery.

**LG-25**: Allow for rest/recovery periods before or after grazing during critical growth periods. Recovery shall include the production of seed to allow for the regeneration of desirable plant species.

**LG-26**: Occasional grazing use during the dormant season will provide rest during the growing season and will allow plants to recover.

**LG-27**: Adjust intensity, timing and/or duration of grazing during periods of drought.

**LG-28**: Manage livestock grazing, including dormant season use, to ensure adequate residual grass cover remains when soil moisture or wildlife habitat is of concern.

**LG-29**: Proper utilization allows stubble for root and crown protection, litter accumulation for organic matter contribution to the soil, cover and habitat for wildlife and forage availability for grazing animals utilizing the area. Generally utilization levels shall be based upon recovery periods and other resource objectives. Suggested utilization guidelines would be:

    **a)** In areas Not Meeting Land Health Standards and cattle grazing is a causative factor, limit utilization on key species to 30 percent during the critical growth period and 40percent during the dormant season.

**b)** In areas Meeting Land Health Standards limit utilization on key species to 40 percent during the critical growth period and 50 percent during the dormant season.

**c)** If wildlife/livestock conflicts exist annual utilization would be read before the next seasons growth begins to account for all uses and demands on the plants.

**d)** The exception to these guidelines is if the permittee can convince the authorized officer that they have the knowledge, ability and commitment to implement a grazing system that should result in improvements to the ecosystem.

**LG-30**: Limit use in areas of valuable woody plants during times when they are selected.

**LG-31**: Avoid the following grazing management practices:

**a)** Long seasonal use with no recovery time;

**b)** Heavy use that stresses plants;

**c)** Little or no re-growth before winter - little stubble for root crown protection;

**d)** Use at the same time every year - repeating the stress;

**e)** No rest or growing season recovery - little recovery with long seasons of use;

**f)** Little or ineffective herding;

**g)** Salt placed in the same locations year after year;

**h)** Livestock left behind after pasture moves; and

**i)** Grazing during the critical growth period year after year.

**LG-32**: When using livestock to control noxious or invasive weeds, match animal dietary preference or tolerance to the target species.

**LG-33**: Use the target weed's phenology when developing a grazing strategy.

**LG-34**: Manage heavy grazing on target weed species to account for any intermixed desirable species.

***Vegetation/Riparian Zone Grazing Management Guidelines***
**LG-35**: To reduce negative impacts to grazing, determine the critical period(s) of a riparian site, and then limit grazing during the critical period(s) to no more often than once every three or four years. Critical periods and impacts are likely to be either in late spring-early summer, when stream banks are more easily broken down by trampling; or late summer-early fall, when excessive browsing man damage vegetation. Each site has its own critical period that shall be

BLM_0025293

individually determined. Important critical period variables are soil moisture, plant species composition, and animal behavior patterns. Site may be grazed every year if use does not occur during the critical period(s). Extended periods of rest or deferment from grazing may be needed to enable recovery of badly degraded sites. Graze earlier in the season when cattle use uplands (Mosley et al. 1997)

**LG-36**: To maintain stream bank stability, limit cattle access to surface water when adjacent stream banks and shorelines are overly wet and susceptible to trampling and sloughing. Stream bank trampling can often be reduced by capitalizing on the natural foraging behavior of cattle. Cattle generally avoid grazing excessively wet sites or in cold-air pockets. Cattle seek out wind-swept ridges, and they graze on upland forage when it is more palatable than forage in riparian areas. Avoid hot season grazing of riparian areas. (Mosley et al. 1997)

**LG-37**: To graze a site more than once per growing season, moisture and temperature conditions shall be conducive to plant growth. For such sites, allow a recovery period of at least 30 to 60 days, depending on vegetation type, before re-grazing within the same growing season. Grazing more often and for shorter periods-that is, 3 weeks or less at a time-is preferable to fewer and longer grazing periods. (Mosley et al. 1997)

**LG-38**: To control the timing, frequency, and intensity of cattle grazing, consider creating smaller riparian pastures with similar, or homogonous, features. Adjusting timing, frequency, and intensity of grazing in individual pasture units is more important than adopting a formalized grazing season. (Mosley et al. 1997)

**LG-39**: To protect stream banks, prevent cattle from congregation near surface waters; fencing, supplemental feeding, and herding methods work best. Provide remote watering systems for cattle. Manage the riparian area as a separate and unique pasture. Inappropriate cattle grazing will usually first be evidenced by excessive physical disturbance to stream banks and shorelines (Mosley et al. 1997)

**LG-40**: On riparian areas that are determined to be non-functioning or functioning at risk as a result of livestock grazing impacts, limits of bank disturbance will be determined and included within the *Terms and Conditions* of the Grazing Permit.

**LG-41**: In general, utilization standards in riparian areas should be no more than 30 percent use of current the year's growth on woody species and a minimum of 4 inches of stubble height shall remain at the end of the grazing period.

**LG-42**: To protect stream banks, discourage trailing up and down the channel by placing logs across trails, perpendicular to the stream channel.

BLM_0025294

**LG-43**: Adjust intensity, timing and/or duration of grazing during periods of drought.

**References**

BLM Handbook H-1741-1, Fencing (BLM 1989)

Mosley, J.C., P.C. Cook, A.J. Griffis, and J. O'Laughlin. 1997. Guidelines for Managing Cattle Grazing in Riparian Areas to Protect Water Quality: Review of Research and Best Management Practices Policy. Report No. 15. University of Idaho, Moscow, ID. December 1997.

# RECREATION (REC)

## Standard Operating Procedures and Best Management Practices

GJFO recreation management relies heavily on community partnerships and employs the basic concept of the four E's - Engineering, Education, Enforcement and Evaluation. Partnerships and the four E's provide an effective recreation management framework. The following SOPs and BMPs are categorized using that framework. The following SOPs and BMPs are arranged to correspond with those four general categories.

### Partnerships

**REC-1**: Develop and maintain partnerships with recreation-based organizations and service providers. These partnerships should engage partners in the planning, implementation and monitoring of recreation opportunities and facilities on BLM-managed public lands.

**REC-2:** Administer ERMAs and SRMAs (and associated RMZs) cooperatively through partnership agreements (example memorandum of understanding) between managing partners (e.g. recreation organizations, municipal governments) and the BLM GJFO that outline administrative roles and responsibilities.

**REC-3:** Consider administering specific recreation facilities (e.g. campgrounds) cooperatively through partnership agreements with partner organizations or businesses.

### Recreation Facilities and Trails (Engineering)

**REC-4:** Utilize current GJFO "Trail Development Process" and "Trail Design Criteria" guidance (see Appendix M) to create and maintain a sustainable recreational route system that helps achieve recreation and other resource use objectives while protecting natural and cultural resources. (BLM 2014 and 2005).

**REC-5:** Reroute or close trails that create resource damage and/or trespass on private property.

**REC-6:** For recreation facility development utilize the BLM Guidelines for a Quality Built Environment manual (BLM 2010)

**REC-7**: Develop and maintain recreation visitor use data monitoring systems to track visitor use trends.

**REC-8:** Work with targeted recreation users and managing partners to protect and enhance targeted recreation opportunities in ERMAs and SRMAs.

**REC-9:** Work with partners (e.g., recreation organizations, municipal governments) to develop connectivity to adjoining urban trails to provide safe access to public lands, alternative transportation options, and improved recreational opportunities.

**REC-10:** In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g. camping near stock ponds.)

**REC-11:** In ERMAs, locate new recreation facility developments so as to mitigate recreation impacts on other resource uses and developments.

**REC-12:** In SRMAs, locate new developments for other resource uses so as to mitigate impacts to targeted recreation resources.

**REC-13:** Develop recreation facilities at primary access points that may include, but are not limited to, parking/staging areas that accommodate targeted users, vault toilets, informational kiosks and shade shelters.

**REC-14:** Work with private landowners and recreationists to avoid trespass issues where public and private lands interface.

**REC-15:** Work with community partners, and utility permit applicants to minimize the impact to recreation from utility developments in ROW corridors and/or Renewable Energy Emphasis areas (wind and solar) that overlap ERMAs and SRMAs.

**REC-16:** Use guidance from EPA "Best Management Practices for Lead at Outdoor Shooting Ranges" (EPA 2005) in areas where intensive recreational target shooting occurs.

**Recreation Information and Education**

**REC-17:** Provide clear, consistent, and standardized messaging to the public regarding recreation opportunities and regulations on BLM-managed public lands. This messaging should be included in digital communications (websites,

BLM_0025296

social media), print media (brochures, kiosk displays), signage, and personal contacts with recreation customers (office visits, phone calls, field contacts).

**REC-18:** Utilize information portals (e.g. information/education kiosks, signs, brochures, maps, websites) and management strategies (i.e. onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about targeted recreation opportunities in ERMAs and SRMAs.

**REC-19:** Clearly identify primary access points to recreation areas both onsite (signs and developed recreation facilities) and offsite (digital and print media, recreation service providers.)

**REC-20:** In ERMAs, utilize information portals (e.g. information/education kiosks, signs, brochures, maps, websites) and management strategies (e.g. onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area, and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.

**REC-21:** Work with cooperators and partners to provide visitor information and education resources that help achieve area recreation management objectives and the objectives of adjoining or overlapping designations (e.g. WSAs, LWC units, ACECs, wildlife emphasis areas and RMAs).

**REC-22:** Work with managing partners (local clubs, businesses and municipalities) to develop appropriate marketing strategies and informational materials (e.g. maps, brochures) that help achieve specific recreation management objectives.

**REC-23:** Clearly identify RMA/RMZ boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to contain use along portions of an RMZ boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.

**REC-24 :** In areas where intensive recreational target shooting occurs, work with volunteers and managing partners to develop and communicate shooting range safety rules, etiquette and stewardship messages.

**REC-25:** Promote the seven standard principles of Leave No Trace (www.lnt.org) outdoor ethics through print and electronic media, and through

BLM_0025297

personal communications with recreationists participating in non-motorized recreation activities on BLM-managed public lands.

**REC-26**: Promote the principles of Tread Lightly (www.treadlightly.org) outdoor ethics through print and electronic media, and through personal communications with recreationists participating in recreation activities on BLM-managed public lands.

## Recreation Monitoring (Enforcement and Evaluation)

**REC-27**: Special Recreation Permits will contain noxious weed management stipulations (e.g., pre-event inventories to avoid infested areas, event management to avoid or isolate activities that could cause weed introduction or spread, monitoring and treatment of infestations exacerbated by the activity, and other appropriate noxious weed management stipulations).

**REC-28**: Lands may be temporarily closed to other uses during recreation events performed under special recreation permit (e.g., equestrian endurance rides or motorcycle events).

**REC-29**: In SRMAs, monitor outcome attainment and preferences through customer assessments (e.g. focus group interviews of visitor studies) on five year intervals or as funding allows. Monitor activity participation and RSCs annually during the primary use season of mid-April through October.

**REC-30**: Manage recreation to minimize or prevent adverse effects to biological and cultural resources using the Recreation Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado (BLM 2000).

**REC-31**: Ensure all recreation management actions in areas overlapping ACECs help protect the relevance and importance criteria of those ACECs. Conduct social and physical monitoring to determine if recreation use is consistent with specific ACEC goals, objectives and resource protection measures. Promote stewardship of ACEC resources by providing opportunities for visitors to learn about those resources.

**REC-32**: Adapt specific recreation regulations (e.g. camping stay limits) if monitoring indicates that recreation use is causing unacceptable resource damage or is compromising achievement of recreation or other resource use objectives.

**REC-33**: Coordinate with partner groups to complete resource monitoring requirements.

BLM_0025298

### References

BLM. 2000. Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado. Lakewood, CO. Bureau of Land Management. December 2000. Available online at: http://www.blm.gov/co/st/en/BLM_Information/newsroom/2000/recguidefnr/guide_final.html)

BLM. 2005.Grand Junction Field Office. "Trail Design Criteria."

BLM. 2010. Guidelines for a Quality Built Environment, First Edition, December 2010

BLM. Grand Junction Field Office, 2014. "Trail Development Process." (in progress)

United States Environmental Protection Agency. 2005. Best Management Practices for Lead at Outdoor Shooting Ranges, EPA-902-B-01-001 Revised June 2005 Region 2

## LANDS AND REALTY (LR)

### Standard Operating Procedures

**LR-1**: Power lines shall be constructed in accordance to standards outlined in "Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996" (Avian Power Line Interaction Committee 2006). Right-of-way applicants shall assume the burden and expense of proving that proposed pole designs not shown in the above publication are "raptor safe." Such proof shall be provided by a raptor expert approved by the BLM Authorized Officer.

**LR-2**: Rights-of-way and other lands and realty authorizations, including power lines, pipelines, transmission corridors, energy development sites and related development, and gravel pits, will contain noxious and invasive plant management terms or stipulations for all ground-disturbing actions. These will include conducting a pre-disturbance noxious weed inventory, designing to avoid or minimize vegetation removal and weed introduction or spread, managing weeds during the life of the right-of-way or authorization to prevent or minimize weed introduction or spread, abandoning the right-of-way or authorization to establish competitive vegetation on bare ground areas, and monitoring revegetation success and weed prevention and control for a reasonable number of years.

**LR-3**: Rights-of-way will be constructed to avoid physical damage to range improvements and rangeland study areas.

BLM_0025299

**LR-4**: The right-of-way holder shall notify the BLM Authorized Officer at least 48 hours prior to the commencement construction, reclamation, maintenance, or any surface-disturbing activities under this grant. LR

**LR-5**: Copies of the right-of-way grant with the stipulations shall be kept on site during construction and maintenance activities. All construction personnel shall review the grant and stipulations before working on the right-of-way or permitted area.

**LR-6**: All facilities shall be labeled with the authorization number, operator, and contact information.

**LR-7**: No signs or advertising devices shall be placed on the premises or on adjacent public lands, except those posted by or at the direction of the BLM Authorized Officer.

**LR-8**: The Holder shall promptly remove and dispose of all waste caused by its activities. The term "waste" as used herein means all discarded matter including, but not limited to, human waste, trash, garbage, refuse, petroleum products, ashes, and equipment. No burning of trash, trees, brush, or any other material shall be allowed.

**LR-9**: The Proponent (applying for new ROW) shall notify all existing right-of-way holders in the project area prior to beginning any surface-disturbance or construction activities. The Holder shall obtain an agreement with any existing right-of-way holders or other parties with authorized facilities that cross or are adjacent to those of the holder to assure that no damage to an existing right-of-way or authorized facility will occur. The agreement(s) shall be obtained prior to any use of the right-of-way or existing facility.

**LR-10**: The Holder shall participate in the formation of a Road User's Association for the road if new rights-of-way are granted for use of the existing road. All new users will be required to join the association.

**LR-11**: The Holder will provide a performance bond for the authorized facility, acceptable to the BLM Authorized Officer, in the amount of $(__) that must be maintained in effect until restoration of the right-of-way has been accepted by the BLM Authorized Officer. The bond shall be furnished by the holder within 30 days of signing the grant (____) and shall be applied to all additional authorizations associated with the project as necessary.

**LR-12**: Incorporate conditions of approval and mitigation measures from the Final Programmatic EIS on Wind Energy Development on BLM-administered Lands in the Western US, as applicable (BLM 2005).

**LR-13**: Incorporate conditions of approval and mitigation measures from the Solar Energy PEIS, as applicable (*pending completion of Solar PEIS*).

BLM_0025300

**LR-14**: All construction activities shall be confined to the minimum area necessary. The exterior boundaries of the construction area shall be clearly flagged prior to any surface-disturbing activities.

**LR-15**: Existing roads will be used wherever possible. Additional roads shall be kept to the minimum. Route locations must be approved by the BLM prior to construction.

**LR-16**: When blasting is necessary, the following precautions will be used:

    **a)** In areas of human use, blasting blankets will be used.

    **b)** Landowners or tenants in close proximity to the blasting will be notified in advance of the blasting so that livestock and other property can be adequately protected.

    **c)** Access to the blasting area will be restricted by construction personnel stationed at each end of the area to be blasted.

    **d)** Blasting within 0.25-mile of federally-owned or controlled springs and flowing water wells must be approved in writing by the area manager.

    **e)** No blasting will be permitted within 0.25-mile of historic trails, natural areas, identified archaeological sites, and recreation areas.

    **f)** Powder magazines will be located out of sight or at least 0.5-mile from roads. Loaded shot holes will not be left unattended. Approval from the area manager will be obtained for the magazine locations.

**LR-17**: **(MLP)** Roads will be constructed and maintained to BLM road standards [BLM Manual 9113 (BLM 2011a)]. All vehicle travel will be within the approved driving surface.

***Standard Operating Procedures for Pipeline Projects***

**LR-18**: A preconstruction field conference shall be requested by the grantee at least five working days prior to any construction activities unless otherwise agreed upon by the BLM Authorized Officer.

**LR-19**: Once the pipeline is constructed, the grantee/operator shall restore the existing roadway to meet or exceed conditions prior to construction. The preconstruction width of the driving surface shall also be restored and erosion control structure installed subject to approval of the BLM Authorized Officer. The grantee/operator shall be responsible for road maintenance from the beginning to completion of operations. This may include, but not be limited to, blading the roadway, cleaning ditches and drainage facilities, dust abatement, or other requirements as directed by the BLM Authorized Officer.

BLM_0025301

**LR-20**: Construction width shall include the existing road. The pipeline shall be located two to three feet from the edge of the ditch along the existing road. The existing road shall be on the working side of the trench.

**LR-21**: The grantee shall accomplish the crossing of the pipeline owned by (company name) in accordance with an agreement between the grantee/operator.

**LR-22**: Pipeline location warning signs shall be installed within five days of construction completion. Each sign shall be permanently marked with the right-of-way serial number.

### Standard Operating Procedures for Geophysical Exploration

**LR-23**: The operator will furnish a map with the Notice of Intent showing approximate line to be used. A map will also be filed with the Notice of Completion showing the completed line. The map will be of a minimum scale of 0.5-inch equals 1.0 mile.

**LR-24**: Rehabilitation of disturbed areas is to be done concurrent with the geophysical operations.

**LR-25**: Blasting or vibrating within 0.25-mile of federally-owned or controlled springs and flowing water wells or cultural resource sites must be approved in writing by the area manager.

**LR-26**: Plugging of drill holes will conform to the Colorado Reclamation Standards Abandoned Drill Holes Act. Drill hole cuttings will be returned to the hole.

**LR-27**: No blading or other dirt work will be allowed without written permission from the area manager.

**LR-28**: Standard Terms and Conditions described in BLM Handbook H-3150-1: Onshore Oil and Gas Geophysical Exploration Surface Management Requirements (BLM 1994 Rev. 2007).

### Best Management Practices

**LR-29**: Coordinate with the Colorado Parks and Wildlife early in the sale process on proposals to sell public land encumbered by a small capacity wildlife water development.

### References

Avian Power Line Interaction Committee. 2006. Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996. Edison Electric Institute, Avian Power Line Interaction Committee, and the California Energy Commission. Washington, DC, and Sacramento, CA.

BLM_0025302

BLM. 2011a. H-9113-1 Road Design Handbook. Bureau of Land Management, Washington, D.C.

_____. 1994. BLM Handbook H-3150-1: Onshore Oil and Gas Geophysical Exploration Surface Management Requirements. BLM, Washington, DC. Rev. 2007.

_____. 2005. Bureau of Land Management Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States. BLM, Washington, DC. June 2005.

## MINERALS AND ENERGY (M&E)

Actions involving minerals and energy are governed by:

- Minerals Leasing Act of 1920 (30 U.S.C 181 *et seq*);
- Federal Oil and Gas Royalty Management Act (30 U.S.C. 1718(b));
- Federal Onshore Oil and Gas Leasing Reform Act (30 U.S.C. 226(g));
- 43 CFR 8900 et seq.
- Federal On Shore Orders 1-7
- 43 CFR 3809 Regulations (Locatable Minerals Management)

### Standard Operating Procedures

Standard Operating Procedures are measures that are required in most circumstances. Some are based on laws and policy while others are specific to the planning area to achieve resource management objectives.

#### *Geophysical Exploration*

**M&E-1**: If operations open an existing fence, temporary gates will be installed for use during the course of operations, or the fence will be immediately repaired. On completion of operations, fences will be restored to their original condition or better.

**M&E-2**: When saturated soil conditions exist on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads, and locations.

**M&E-3**: For geophysical operations, specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**M&E-4**: Prohibit the use of subsurface explosives and vibrosis buggies within 0.25 miles of all spring sources and perennial streams.

**M&E-5**: Powder magazines will be located at least a mile from traveled roads, unless otherwise authorized after analysis or review. Loaded shot holes and charges will be attended at all times.

**M&E-6**: Materials or equipment related to project activities (e.g., trash, flagging, lath) will be removed to an authorized disposal site.

**M&E-7**: Project materials which could be a hazard to public health, safety or resource values will be stored in appropriate secondary containment. No oil or lubricants will be drained onto the ground surface.

**M&E-8**: Shot-hole cuttings will be returned to the hole, or an alternative plan will be submitted for BLM approval.

***Reducing Fluid Mineral Development Footprint***
**M&E-9**: Surface disturbing actions will be sensitive to natural resource protection. When surface disturbance in sensitive areas is unavoidable, they will be minimized to the greatest extent practicable, especially near drainage features and on soils mapped as being saline (see Glossary).

**M&E-10**: Utilities such as gas and water lines, power lines and roads will be located in common corridors where practicable.

***Administrative / General and Planning***
**M&E-11**: **(MLP)** Consider site specific soil and vegetative characteristics and reclamation potential in project design and layout.

**M&E-12**: **(MLP)** Design and construct energy service roads to a safe and appropriate standard, no higher than necessary to accommodate their intended use.

**M&E-13**: **(MLP)** Locate and construct roads and other linear facilities to follow the contour of the landform or mimic lines in the vegetation.

**M&E-14**: **(MLP)** A pre-construction meeting will be held with the BLM before and to facilitate implementation of plans and ensure compliance with stipulations or conditions of approval. The BLM will be notified at least 48 hours prior to construction or reclamation work.

**M&E-15**: By November 1 each year, companies will provide georeferenced spatial data depicting as-built locations of all facilities, wells, roads, pipelines, power lines, reservoirs, discharge points, and other related facilities to the BLM for all Master Development Plans where construction and development have been completed.

**M&E-16**: Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other

intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game.

**M&E-17**: Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan (storm water management plan) for establishing positive management of surface water drainage, to reduce erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance and reporting. BMPs may include run-on/run-off controls such as surface pocking or revegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

**M&E-18**: **(MLP)** Before surface disturbance, agreements will be obtained with all existing rights-of-way holders, authorized users and pipeline operators affected by permitted activities. If Agreement cannot be reached, the operator will comply with the law or regulations.

**M&E-19**: Disclosure of hydraulic fracture fluids per COGCC rule 205A will be done using FracFocus.org 30 days following the conclusion of the hydraulic fracturing treatment and in no case later than 90 days after the commencement of such hydraulic fracturing treatment.

### Pre-Construction
**M&E-20**: Stakes, snow fence or flagging will be installed to mark boundaries of permitted areas of disturbance, including pre-construction BMPs and soils storage areas and be maintained in place until final construction cleanup is completed.

**M&E-21**: **(MLP)** Pre-construction drainage BMPs will be installed as appropriate, per the approved surface/storm drainage water management, plan to protect stream drainages and to reduce erosion and sediment transport.

**M&E-22**: **(MLP)** Surveys for raptor nests, sensitive plant and animal species and cultural resources will be conducted prior to construction activities following BLM survey standards. Survey results will be submitted to the BLM for analysis and recommendations before project approval.

### Construction
**M&E-23**: **(MLP)** All routes shall be built and maintained to BLM Manual Section 9113 standards for road shape and drainage features (BLM 2011a) or where appropriate BLM Manual Section 9116 standards for primitive roads. For drainage crossings, culverts should be sized for the 50 year storm event with no static head and to pass a 100-year event without failing. Site specific conditions may warrant BLM to require designs for larger events (e.g. 75-100 year storm events). Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009a). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

BLM_0025305

**M&E-24**: As detailed in the site plan for surface/storm water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales or catchments.

**M&E-25**: **(MLP)** Topsoil stripping will include all growth medium present at a site (following initial clearing of large trees, etc.), as indicated by color or texture. Stripping and storage depth may be specified during the onsite inspection. All stripped topsoil /growth medium will be salvaged, segregated and stored in a manner that extends biological viability and protects it from loss. Topsoil and all growth medium will be replaced prior to seedbed preparation. No topsoil will be stripped or segregated when soils are saturated or frozen below the stripping depth.

**M&E-26**: **(MLP)** Access roads requiring construction with cut and fill will minimize surface disturbance and consider the character of the landform's contours, visual contrasts, the cut materials, the depth of cut, where the fill material will be deposited and other resource concerns.

**M&E-27**: **(MLP)** Fill material will not be cast over hilltops or into drainages without BLM approval.

**M&E-28**: **(MLP)** When saturated soil conditions existing on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads and locations.

**M&E-29**: **(MLP)** Construction activities at drainage crossings (e.g., burying pipelines, installing culverts) will be timed to avoid high flow conditions. Construction activities that affect stream flow will consist of either a piped stream diversion or the use of a coffer dam and pump to divert flow around the disturbed area.

**M&E-30**: **(MLP)** When activity in a wetland is unavoidable, the operator will reduce impacts through the use of oak or HDP mats and will restore all temporarily disturbed wetlands or riparian areas, consulting with the BLM to determine appropriate mitigation, including verification of native plant species to be used in restoration.

**M&E-31**: **(MLP)** All stream crossings affecting perennial streams or streams supporting riparian habitat shall be professionally engineered (design, construction, and maintenance).

**M&E-32**: **(MLP)** Where the access road crosses small drainages and intermittent streams not requiring culverts, low water crossings shall be used.

BLM_0025306

The road will dip to the original streambed elevation of the drainage and the crossing will prevent any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

**M&E-33**: **(MLP)** All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support Federal or State-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe, and remotely-actuated block or check valves on both sides of the stream may be used.

**M&E-34**: **(MLP)** Water from hydrostatic testing of pipelines will be filtered of sediments prior to discharge. Energy dissipating methods such as straw-bales, wattles, and vegetative buffers will be in place before any discharge of water.

**M&E-35**: **(MLP)** Baseline information of channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

### Drilling

**M&E-36**: **(MLP)** Pits that may contain liquid, such as reserve pits, produced water pits, frac-water pits, cuttings trenches (if covered by water/fluid), and evaporation pits, will install and maintain netting to prevent entry or use by migratory birds. They will be fenced on three sides before drilling activity and closed off on the fourth side after drilling is completed.

**M&E-37**: If any pit that may contain liquid is constructed with a slope steeper than 3:1, or if the pit is lined, escape ramps will be installed every 50 feet along the pit slope and at each corner to allow escape by livestock and wildlife

**M&E-38**: Fluids will be confined to pits and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

**M&E-39**: Pits will be constructed so that water will not run into them. Fluid levels will be maintained below 2 feet of the lowest point of containment.

### Utilization and Production

**M&E-40**: Operations will not damage, disrupt or interfere with water flows and/or improvements associated with springs, wells, or impoundments.

**M&E-41**: Regularly scheduled road maintenance will include, but not be limited to, crown or slope reconstruction, clean-out of ditches, culverts and catchments, replacement of the road surface and dust abatement.

BLM_0025307

**M&E-42**: Well pads and facilities will be kept free of unnecessary equipment, trash and other materials not in current use.

**M&E-43**: Pits will be promptly drained, tested, closed and reclaimed according to local state and federal regulations.

**M&E-44**: Dust from vehicular traffic, equipment operations, or wind events will be controlled as needed. No application of surfactants or dust agents will proceed without BLM approval. In areas with soils mapped as Mancos shale, application of water on native road surfaces will be limited, to minimize mobilization of selenium. In such areas, alternate dust abatement measures such as proper road surfacing and maintenance, and speed limits will be used, subject to BLM approval.

**M&E-45**: Noise will be minimized by methods such as closed compressor buildings to comply with COGCC standards for noise.

**M&E-46**: **(MLP)** Pipeline warning signs permanently marked with the operator's and owner's names (emergency contact) and purpose (product) of the pipeline will be installed within five days of construction completion and before use of the pipeline for transportation of product.

**M&E-47**: All production equipment with a chimney, vent, or stack shall be fitted with a device to prevent birds from entering or perching on the chimney, such as an excluder cone or equivalent.

**M&E-48**: Production facilities will be located and arranged to facilitate safety and maximize areas to be reclaimed.

**M&E-49**: **(MLP)** All above ground facilities should be painted a natural color selected from the BLM Standard Environmental Color Chart to minimize contrast with adjacent vegetation and/or rock outcrops.  Color(s) should be selected in the field at the proposed project location and should be planned for the season with the greatest number of viewers.  Selected color(s) should be one to two shades darker than those naturally occurring in the background landscape (this will also help with the effects of fading over time). The operator may need to paint drill rig anchors and those minor working tips and edges of production facilities that are subject to OSHA safety requirements a red, yellow, or orange color.

**M&E-50**: Standard secondary containment shall hold 110 percent of the capacity the largest single tank it contains and be impervious to any oil, glycol, produced water, or other toxic fluid for 72 hours.  Earthen berms must be compacted and of fine material that will prevent seepage of any spill to surrounding area.

BLM_0025308

**M&E-51**: All tanks with a capacity of ten (10) barrels or greater shall be labeled or posted with the following information: A. Name of operator; B. Operator's emergency contact telephone number; C. Tank capacity; D. Tank contents; and E. National Fire Protection Association (NFPA) Label. Smaller chemical storage shall be labeled with contents and NFPA label.

**M&E-52**: All liquids management hoses will be stored inside secondary containment when not in use.

**M&E-53**: **(MLP)** All open top tanks, catchments or secondary containment vessels will be equipped with sturdy metal screening to prevent access to wildlife of all sizes to prevent entrapment and drowning of small wildlife.

### Site Stabilization, Reclamation and Monitoring
**M&E-54**: Road and pipeline reclamation, including seedbed prep and seeding of temporarily disturbed areas will be completed within 30 days following completion of construction.

**M&E-55**: **(MLP)** Following completion of pad construction, topsoil storage piles, stormwater control features, and cut-and-fill slopes will be temporarily seeded, to stabilize the materials, maintain biotic soil activities, and minimize weed infestations. When this is not feasible, disturbed surfaces must be stabilized using other methods like hydro-mulch or erosion matting while vegetation is establishing. Seedbed preparation is not generally required for topsoil storage piles or other areas of temporary seeding.

**M&E-56**: Interim reclamation includes recontouring and revegetating the entire portion of the disturbed area except that part of the well pad needed for production activities.

  a)  It will be completed within six months following completion of the last well planned for the pad or after a year has passed with no new wells drilled on the pad. All areas unnecessary to production activities will be revegetated, including the area within the remaining rig anchors. In special cases, an exception to this will be requested.

  b)  Before interim reclamation is scheduled, the operator will meet with BLM to inspect the disturbed area, review the existing reclamation plan, and agree upon any revisions to it.

  c)  All parts of the area unnecessary for long-term operations will be reshaped to blend with natural topography, covered evenly with topsoil and a seedbed prepared.

  d)  For cut-and-fill slopes, initial reclamation will typically consist of moving fill material back into cuts, back-filling and reshaping to achieve the configuration specified in the reclamation plan. Compacted areas will be well ripped in two passes at perpendicular

BLM_0025309

directions. In fragile or loose soils, compaction techniques such as tread-walking may be necessary to prevent high erosion hazard. Topographic contours will be reshaped to blend with natural topography. These may include berms and swales to manage water drainage, support revegetation, mitigate visual impacts and maximize natural appearances.

**M&E-57**: Seedbed Preparation. Good seedbed preparation is key to soil stabilization, moisture infiltration, and improving the chances for revegetation success.

**a)** Following contouring, backfilled or ripped surfaces will be covered evenly with topsoil.

**b)** Within 24 hours of broadcast seeding, the spread topsoil will be roughened by a method such as pitting, raking or harrowing before seeding, to break up any crust that has formed and ensure good seed-to-soil contact.

**c)** To control erosion and enhance vegetative establishment on slopes steeper than 3:1, or to create a more natural looking landscape in areas of visual sensitivity, seedbed preparation may include pocking or pitting the soil material to form microbasins scaled to the site and materials. These microbasins will be constructed in irregularly spaced and irregularly aligned rows with an orientation perpendicular to the natural flow of runoff down a slope.

**d)** Requests to use soil amendments, including fertilizer and soil conditioners, will be submitted to the BLM for approval. Submittal will include basic information on the amendment and the purpose of its use.

**M&E-58**: Seed Mixes. Seed mixes will typically consist of native, early-succession species, or species with the ability to establish quickly in disturbed soil areas. Non-native species considered desirable under special circumstances, such as sterile non-native grasses will be submitted to the BLM for approval before use.

**a)** Seed mix composition will be calculated based on the number of Pure Live Seed per pound rather than percentage by weight. Seeding rate in pounds per acre will be based on the total number of Pure Live Seeds per square foot.

**b)** Weed free seed will be used. It will contain no noxious, prohibited, or restricted weed seeds and no more than 0.5 percent by weight of any other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended. To maintain quality, purity, germination, and

BLM_0025310

yield, only tested, certified seed for the current year, with a minimum germination rate of 80 percent and a minimum purity of 90 percent will be used unless otherwise approved by BLM in advance of purchase. Seed shall be viability-tested in accordance with State law(s) and within nine months before purchase.

**c)** Seed mixes for temporary use may contain one or more sterile hybrid grasses or other non-native cover crop in addition to native perennial species, if pre-approved by BLM.

**d)** For private surfaces, BLM-approved seed mixes will be recommended, but the surface landowner has ultimate authority over the seed mix to be used in reclamation.

**e)** Seed tags or other official documentation of the seed mix will be supplied to the BLM for approval at least 14 days before the date of proposed seeding. Seed that does not meet the above criteria will not be applied to public lands. A Sundry Notice describing the completed work, the weed-free certification, and the seed tag(s) will be submitted BLM within 30 days after seeding.

**M&E-59**: Seeding Procedures

**a)** Seeding will be conducted no more than 24 hours following completion of final seedbed preparation (see Seedbed Prep).

**b)** Where practical, seed will be planted by drill-seeding to a depth of 0.25 to 0.5 inch along the contour of the site. Drill seeding will be followed by culti-paction to enhance seed-to-soil contact and prevent losses of both. Where drill-seeding is impracticable, seed may be installed by broadcast-seeding at twice the drill-seeding rate, followed by raking or harrowing to provide 0.25 to 0.5 inch of soil cover. Hydro-seeding and hydro-mulching may be used in temporary seeding or in areas where drill-seeding or broadcast-seeding/ raking are impracticable. Hydro-seeding and hydro-mulching must be conducted in two separate applications to ensure adequate seed-to-soil contact.

**c)** If interim revegetation is unsuccessful, reseedings will be repeated annually until satisfactory vegetative cover has been achieved. Requirements for reseeding of temporary areas will be considered on a case-by-case basis. Seeding will be considered successful when the site is protected from erosion and revegetated with a vigorous, self-sustaining, and diverse cover of native (or otherwise approved) plant species. BLM shall not require reseeding during periods that have proven less than optimal.

BLM_0025311

**M&E-60**: Mulch

   a) Mulch will be applied within 24 hours following completion of seeding. Where areas have been drill- or broadcast-seeded and raked, certified weed-free straw or certified weed-free native grass hay mulch will be crimped into the soil. Hydro-mulching may be used in areas of interim reclamation where crimping is impractical, in areas of interim reclamation that were hydroseeded, and in areas of temporary seeding regardless of seeding method.

   b) Mulch will not be applied in areas where erosion potential necessitates use of a biodegradable erosion-control blanket (straw matting).

**M&E-61**: Cut and fill slopes will be protected against erosion by contour grading, microbasins or other measures approved by the BLM. Well anchored BMPs such as biodegradable matting, weed-free bales or wattles may also be used on cut-and-fill slopes and along drainages to protect against soil movement.

**M&E-62**: The reclaimed pad will be protected from disturbance by a fence to exclude livestock grazing for the first two growing seasons or until seeded species are firmly established, whichever comes later. Seeded species will be considered firmly established when perennial grass and forb species are at least 80 percent cover of that of the surrounding or reference area.

**M&E-63**: Monitoring. Because weed and reclamation management activities are components of a long-term process, monitoring and reporting are integral to and long-term commitment to land health.

   a) All sites considered as "operator reclamation in progress" will be routinely monitored for reclamation success. Reports will be submitted to the BLM by December 1 of each year. Annual reports will include whether accomplishment of objectives appears likely and of not, what corrective actions are proposed.

   b) All sites will be routinely monitored for the presence of noxious weeds or other undesirable plant species as set forth in the joint BLM/US Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators. Pesticide Use Proposals will be approved by the BLM before application of herbicides. Annual weed monitoring reports shall be submitted to the BLM by December 1. They will include weed species found (listed by common names), total acres infested with weeds, total acres treated, treatment methods, and total pounds of active ingredient of pesticides applied. All Noxious Weed Inventory and Pesticide Application records for that year will be included with the report.

BLM_0025312

**M&E-64**: Visual Resources

a) Every proposal will include a detailed, site-specific description and plan of how it will meet the VRM Class of the area where it is proposed. As much as possible all proposed features will be located and placed to avoid or minimize visibility from travel corridors, residential areas, and other sensitive observation points.

b) To the extent practical, existing vegetation shall be preserved when clearing and grading for pads, roads, and pipelines. Cleared trees and rocks may be salvaged for redistribution over reshaped cut-and-fill slopes or along linear features.

c) Above-ground facilities will be painted a non-reflective natural color selected to minimize contrast with adjacent vegetation or rock outcrops. Colors may be specified by the BLM on a project-by-project basis.

d) Adaptive management techniques may be applied before or after construction to mitigate straight-line visual contrast effects of pad margins, cut and fill slopes, pipeline alignments or other cleared vegetation. This could include additional tree removal along contrasting edges, to create irregularly shaped openings or more natural-looking mosaic patterns, or treating surfaces to mitigate visual contrasts in color or surface texture.

## Best Management Practices

BMPs are adaptive state-of-the-art mitigation measures applied on a site-specific basis to reduce, prevent, or avoid adverse environmental or social impacts. Numerous BMPs for oil and gas development are also incorporated into the general oil and gas development requirements. These include minimizing the number and size of pads through use of multiple well designs and directional drilling; centralizing fracing and water management; minimizing road footprints; centralized support facilities such as tank batteries; collocating utilities and pipelines in common corridors and aligning them along roadways; and implementing intensive interim reclamation practices. The BLM encourages applicants to include in their proposals BMPs such as those identified. If not, BLM will likely require them. Actual BMPs proposed or required during the permitting process to mitigate impacts are expected to vary according to technologies and site-specific needs. BMPs will also be expected to change over the life of a project, being adaptively updated in response to monitoring and changing project conditions. Additional practices could be required or withdrawn, or modified in response to changing activities or future planning. Such adaptive changes to BMPs may generally be implemented without further review or land use planning, but will be analyzed during the NEPA analysis associated with the permitting process. Monitoring and adaptive management practices will help to refine and clarify needed BMPs, consistent with the goals and objectives of this plan.

BLM_0025313

The listed BMPs are not intended to be complete but to simply offer operators and resource staff examples of commonly used methods to reduce impacts that sometimes result when fluid mineral development occurs.  More fluid mineral development BMPs can be found at blm.gov/bmp.

### Geophysical Exploration

**M&E-65**: Specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**M&E-66**: **(MLP)** Pre-mobilization inspection will be performed to insure that all construction equipment and vehicles are clean and free of weeds, weed seed, soil and vegetative material prior to moving onto public lands. Driving through or parking on noxious weed infestations will be avoided.

### Reducing Fluid Mineral Development Footprint

**M&E-67**: **(MLP)** The operator will co-locate multiple wells on well pads and use directional drilling to reduce the number of pads and roads.

**M&E-68**: **(MLP)** The operator will use centralize completions to reduce the number of truck trips, expense, exhaust emissions and fugitive dust.

**M&E-69**: **(MLP)** To minimize construction disturbance, truck traffic, dust and other impacts to air quality, soils and wildlife, centralized production facilities will be used for all natural gas liquids and produced water.

**M&E-70**: **(MLP)** Telemetry will be used to remotely monitor producing wells and facilities to reduce vehicular traffic. During winter closures, unavoidable monitoring and or maintenance activities will be conducted between 9 a.m. and 3 p.m., to the extent practical.

### Administrative / General and Planning

**M&E-71**: **(MLP)** To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**M&E-72**: **(MLP)** Drilling will be done with 'closed loop' systems as much as possible, particularly in areas where water resources are most vulnerable, including: soils mapped as alluvial, colluvial, and glacial deposits; near springs and perennial water sources; in important groundwater recharge areas; and within municipal watersheds.

**M&E-73**: **(MLP)** Chemicals used in the fracturing process will be biodegradable, non-toxic, pH neutral, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used. Documentation

BLM_0025314

in the form of Material Safety Data Sheets will be reviewed by operator for compliance prior to use and Material Safety Data Sheets will remain on site at all times such chemicals are present.

**M&E-74**: **(MLP)** In municipal watersheds, the operator will develop and implement a Watershed Protection Plan. This plan will characterize baseline hydrologic and hydrogeologic conditions such as but not limited to: water chemistry, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater. The operator will collaborate with all watershed stakeholders in development of the plan.

**M&E-75**: **(MLP)** Adopt BMPs per the BLM and US Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM and US Forest Service 2007).

**M&E-76**: Incorporate BMPs and conditions of approval from the Final Programmatic EIS for Geothermal Leasing in the Western US, as applicable (BLM and US Forest Service 2008).

*Pre-Construction*
**M&E-77**: **(MLP)** Pre-mobilization inspections will be performed to be sure that all construction equipment and vehicles are clean and free of soils, weeds, weed seed and vegetative material prior to moving onto public lands. Driving through or parking on noxious weed infestations will be avoided.

*Construction*
**M&E-78**: **(MLP)** Surface disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book) (BLM 2007b).

**M&E-79**: **(MLP)** Where feasable, entrances to construction locations will be covered by gravel "track pads" to prevent sediment and weed seeds from being tracked in and out of the site.

**M&E-80**: **(MLP)** In areas of mapped Mancos Shale, saline soils, or fragile soils, groundwater will not be discharged to surface water drainages, to minimize mobilization and transport of selenium, salts and sediment within the Colorado River Basin.

**M&E-81**: **(MLP)** Where linear disturbance is proposed, edges of vegetation removal will be 'feathered,' to avoid long linear habitat edges and support habitat complexity for wildlife. Additional trees will be removed along such edges to create irregularly shaped openings and more natural mosaic habitat.

BLM_0025315

**M&E-82**: **(MLP)** Cleared vegetation smaller than four inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than four inches in diameter will be scattered over disturbed areas to accomplish reclamation objectives.  Excessive vegetation larger than four inches in diameter may be removed from public land or shredded in place to be salvaged with topsoil. A wood cutting permit will be purchased from BLM for material removed from the site.

**M&E-83**: **(MLP)** Windrowing of Topsoil. [Use where appropriate based on topography – may not be appropriate for pads in steep areas or where pad size should be minimized.] Topsoil shall be windrowed around the perimeter of surface disturbance to create a berm that limits and redirects stormwater runoff and extends the viability of the topsoil per BLM Topsoil Best Management Practices (BLM 2009 PowerPoint presentation available upon request from the Grand Junction Field Office). Topsoil shall also be windrowed, segregated, and stored along disturbed surfaces or linear features for later spreading across the disturbed corridor during final reclamation. Topsoil berms shall be promptly seeded to maintain soil microbial activity, reduce erosion, and minimize weed establishment.

**M&E-84**: **(MLP)** Cattle guards will be installed and maintained whenever access roads intersect existing gates or fences.

*Drilling*
**M&E-85**: **(MLP)** Catalytic converters will be installed on all internal combustion engines to minimize emissions to Tier 3 levels.

**M&E-86**: Hazardous substances will not be used in drilling, testing, or completion operations, nor introduced at any time into the reserve or cuttings pit.

*Utilization and Production*
**M&E-87**: **(MLP)** Secondary containment shall include a study corrugated metal wall to create a basin, be lined with a heavy impervious poly liner and be protected with a gravel surface.  Small hoppers or drip pans shall be installed at all loadout connections to catch drips and small leaks.

**M&E-88**: When special resource values are at risk, such as crucial wildlife areas, companies controlling access into these areas will gate and lock roads or restrict use to authorized users.

**M&E-89**: Speed control measures will be in place on all project related unpaved roads to reduce fugitive dust.

**M&E-90**: **(MLP)** Use enclosed tanks instead of open tanks or pits to reduce fugitive VOC emissions.

BLM_0025316

**M&E-91**: **(MLP)** Use vapor recovery units on oil, condensate, and produced water storage tanks to reduces fugitive VOCs and recovers BTU-rich vapors for sale or use on site.

**M&E-92**: **(MLP)** Use and maintain proper hatches, seals, and valves to minimize VOC emissions.

**M&E-93**: **(MLP)** Optimize glycol circulation and Install Flash Tank Separator (FTS) to capture methane and reduce VOC emissions on glycol dehydrators.

**M&E-94**: **(MLP)** Replace wet seals with dry seals in centrifugal compressors. Centrifugal wet seal compressor emissions from the seal oil degassing vent can be reduced by the replacement of wet seals with dry seals that emit less methane and have lower power requirements.

**M&E-95**: Reduce gas leaks and emissions from reciprocating compressors by the economic replacement of rod packing at frequent intervals.

**M&E-96**: Reduce methane and VOC emissions by installing or replacing high-bleed pneumatic devices with low-bleed pneumatic devices.

**M&E-97**: Reduce methane emissions by installing plunger lifts and smart automation systems which monitor well production parameters.

**M&E-98**: Implement a Direct Inspection & Monitoring Program which identifies and cost effectively fixes fugitive gas leaks using Leak Detection, Infrared Camera, Organic Vapor Analyzer, Soap Solution, Ultrasonic Leak Detectors, Measurement, Calibrated Bagging, Rotameters, and/or High Volume Samplers.

***Site Stabilization, Reclamation and Monitoring***
**M&E-99**: **(MLP)** During interim reclamation contour land forming will be used to create a visual barrier to the permanent structures location on the site.

**M&E-100**: **(MLP)** Re-topsoil and revegetate access road cut & fill slopes, backslopes and road shoulders, and borrow ditches.  Also, revegetating the travel surface of surfaced roads and turnarounds, where practical.  With low traffic roads, this will result in a hardpan, two-track road that is stable and requires less maintenance.

**References**

BLM. 1992. Handbook H-3042-1: Solid Minerals Reclamation. **Release 3-275**. BLM, Washington, DC. February 2, 1992. 104 pp.

_____. 2002. Handbook H-3600-1: Mineral Materials Disposal. Release 3-315. BLM, Washington, DC. February 22, 2002. 171 pp.

_____. 2011a.   H-9113-1  Road  Design  Handbook.   Bureau  of  Land Management, Washington, D.C.

BLM_0025317

BLM and US Forest Service (United States Department of the Interior, Bureau of Land Management, and United States Department of Agriculture, National Forest Service). 2007. Noxious and Invasive Weed Management Plan for Oil and Gas Operators: Grand Junction Field Office and Grand Valley Ranger District. BLM, Grand Junction Field Office, Grand Junction, CO. March 2007.

_____. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

_____. 2008. Record of Decision, Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States – Appendix B. BLM Washington Office. December 2008.

## RENEWABLE ENERGY (RE)

### Standard Operating Procedures

**RE-1**: Authorize rights-of-way by applying appropriate BMPs from the BLM Record of Decision for Implementation of a Wind Energy Development Program (BLM 2005), land use restrictions, stipulations, and mitigation measures.

### References

BLM (United States Department of the Interior, Bureau of Land Management). 2005. Record of Decision for Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments. BLM, Washington, DC. December 15, 2005.

## TRANSPORTATION AND ACCESS (TA)

### Standard Operating Procedures

**TA-1**: Continue coordination with counties and other agency road entities to promote utilization of best management practices for road maintenance they perform within GJFO boundaries.

Maintain an inventory of existing road and trail systems.

**TA-2**: **(MLP)** BLM Manual 9113, Roads (BLM 2011a) and BLM Handbook 9113-2, Roads – Inventory and Maintenance (BLM 2011b) will be used to guide all maintenance and road construction designs and requirements. Include definitions for functional road classification and maintenance levels for BLM roads.

**TA-3**: All highway rights-of-way and other road authorizations will contain noxious and invasive weed stipulations that include prevention, inventory,

BLM_0025318

treatment, and revegetation or rehabilitation. Road abandonment will include at least three years of post-abandonment monitoring and treatment.

**TA-4**: All travel management decisions will concur with the Bureau of Land Management, Grand Junction Field Office Travel Management Plan.

### Best Management Practices

**TA-5**: In order to ensure public access and safety, the GJFO shall continue an active road maintenance program employing the use of redesign, blading, brush removal for sight distance as appropriate, scarification, graveling, water barring, low water crossings, spur ditching, seeding and installation/cleaning of culverts.

**TA-6**: NEPA Requirements – No new NEPA analysis will be required for road maintenance activities within the defined maintenance disturbance/easement footprint, which is defined as previously disturbed or maintained. Disturbance outside of the defined maintenance disturbance/easement footprint or road realignment will be subject to additional NEPA compliance.

### References

BLM. 2011a. H-9113-1 Road Design Handbook. Bureau of Land Management, Washington, D.C.

BLM. Grand Junction Field Office Travel Management Plan (See Appendix M, Travel Management Plan, in the Grand Junction Field Office Proposed RMP/Final EIS)

## RECLAMATION (R)

The objectives of interim reclamation are to restore vegetative cover and a portion of the landform sufficient to maintain healthy, biologically active topsoil; control erosion; and minimize loss of habitat, forage, and visual resources during the life of the well or facilities.

The long-term objective of final reclamation is to return the land to a condition approximating that which existed prior to disturbance. This includes restoration of the landform and natural vegetative community, hydrologic systems, visual resources, and wildlife habitats. To ensure that the long-term objective will be reached through human and natural processes, standards will be enforced to meet objectives for site stability, visual quality, hydrological function, and vegetative productivity.

### Standard Operating Procedures

**R-1**: A reclamation plan will be provided to the BLM with the original proposed action or when activities are needed. The plan will follow the BLM Colorado Northwest District Template for Reclamation Plans (BLM 2012). Reclamation plans will discuss interim and final reclamation activities. The plan will include provisions for

BLM_0025319

**a)**  Reclamation Timeline

**b)**  Pre-disturbance Planning recommendations if applicable

**c)**  Vegetation Monitoring Plan

**d)**  Stabilization and Stormwater

**e)**  Dust Abatement

**f)**  Vegetation Clearing

**g)**  Topsoil Management

**h)**  Pit Closures if applicable

**i)**  Recontouring and Seedbed Preparation

**j)**  Application of Topsoil & Revegetation

**k)**  Fencing

**l)**  Management of Invasive, Noxious, and Non-Native Species

**Best Management Practices**

**R-2:** Trees and vegetation will be left along the edges of the pads whenever feasible to provide screening.

**R-3: (MLP)** To help mitigate the contrast of recontoured slopes, reclamation will include measures to feather cleared lines of vegetation and to save and redistribute cleared trees, debris, and rock over recontoured cut and fill slopes.

**R-4:** To reduce the view of production facilities from visibility corridors and private residences, facilities will not be placed in visually exposed locations (such as ridgelines and hilltops).

**R-5:** Production facilities will be clustered and placed away from cut and fill slopes to allow the maximum recontouring of cut and fill slopes.

**R-6**: **(MLP)** All long-term above ground structures will be painted [Covert Green] (from the BLM "Supplemental Environmental Colors" chart) to blend with the natural color of the late summer landscape background.

**R-7**: Projects should be located to take advantage of existing vertical features, such as landforms or existing stands of vegetation to provide visually screening.

**R-8: (MLP)** Projects should not be located in visually exposed locations, such as ridgelines and hilltops.

**R-9**: **(MLP)** Projects should be located in areas that will minimize the amount of cut-and-fill needed to meet natural grade.

BLM_0025320

**R-10**: **(MLP)** Linear disturbances (roads and pipelines) should follow the natural contours of the landscape as much as possible.

**R-11**: Project design should take into consideration any existing vegetation surrounding the project that can be used for visual screening. Care should be taken to preserve the integrity of the vegetation and the vegetation should remain standing and undamaged when the cut-and-fill slopes are recontoured.

**R-12**: **(MLP)** Thinning and feathering of existing vegetation may also be used in areas where clearing within dense vegetation is required. Thinning and feathering will reduce the hard line between new construction and existing vegetation and will emulate the forms of natural clearings.

**R-13**: **(MLP)** Production facilities should be placed to maximize recontouring of the cut-and-fill slopes and interim reclamation. Facilities should be oriented in the direction that is least visually obtrusive and should be clustered to reduce the overall impact and the area that will need to be visually mitigated. Facilities should be located away from the cut-and-fill slopes and, if possible, near the access road or entrance to the pad to maximize the total surface area that can be reclaimed.

**R-14**: **(MLP)** Cut-and-fill slopes should be recontoured to the approximate original contour or consistent with the adjacent topography so that the reclaimed landscape features blend into the natural surroundings.

**R-15**: **(MLP)** Berms may be utilized to provide visual screening, but should be used only when it makes sense when viewing the surrounding natural environment and should blend with the adjacent topography.

**R-16**: **(MLP)** Cleared vegetation and rocks salvaged during construction should be salvaged and redistributed over reshaped cut-and-fill slopes or along linear features to emulate the color and texture closer to that of the natural landscape and to help create microclimates to encourage vegetation growth. The material should be placed so that it appears to be naturally deposited.

**R-17**: **(MLP)** Above ground facilities should be painted a natural color selected from the BLM Standard Environmental Color Chart to minimize contrast with adjacent vegetation and/or rock outcrops. Color(s) should be selected in the field at the proposed project location and should be planned for the season with the greatest number of viewers. Selected color(s) should be one to two shades darker than those naturally occurring in the background landscape (this will also help with the effects of fading over time).

### References

BLM (United States Department of the Interior, Bureau of Land Management). 1985a. BLM Manual 9113: Roads. Release 9-247. BLM, Washington DC. June 7, 1985. 83 pp.

BLM_0025321

_____. 1985b. BLM Handbook 91 13-2, Roads − Inventory and Maintenance. Release 9-250. BLM, Washington DC. December 19, 1985. 18 pp.

_____. 2012. Draft BLM Colorado Northwest District Template for Reclamation Plans- (Final expected June 2012).

# Appendix Q
## Biologic Opinion for the
## Grand Junction Field Office

BLM_0025323

BLM_0025324



# United States Department of the Interior



## FISH AND WILDLIFE SERVICE

Ecological Services
445 West Gunnison, Suite 240
Grand Junction, Colorado 81501-5711

IN REPLY REFER TO:
ES/GJ-6-CO-15-F-003
TAILS: 06E24100-2015-F-003

April 27, 2015

Memorandum

To:        Field Manager, Grand Junction Field Office, Bureau of Land Management, Grand
           Junction, Colorado

From:      Acting Western Colorado Supervisor, Western Colorado Ecological Services
           Office, Grand Junction, Colorado

Subject:   Biological Opinion – Revision of the Resource Management Plan for the Grand
           Junction Field Office

This responds to your October 3, 2014, submission of a biological assessment (BA), to the US
Fish and Wildlife Service (Service) requesting formal Section 7 consultation on the effect of the
subject project on species and habitats listed under the Endangered Species Act of 1973, as
amended (16 U.S.C. § 1531 et seq.; [Act]).  The project described in your memorandum and the
accompanying BA occurs on the Grand Junction Field Office (GJFO) located in Garfield, Mesa,
and Montrose Counties, Colorado.  We received your request on October 3, 2014.

The Bureau of Land Management (BLM) is proposing a revised Resource Management Plan
(RMP).  The RMP provides direction for managing public lands administered by the BLM's
GJFO in Colorado.  The BA describes the effects caused by implementing the RMP.  The revised
RMP replaces the previous 1987 RMP, and is a refinement of the preferred alternative
(Alternative B) described in the Draft RMP, released on January 25, 2013.

The GJFO determined there are 12 federally listed, and one candidate species affected by the
proposed action.  The species identified by the BLM as potentially affected by the proposed
action are listed in Table 1 below.  Since the BA was originally submitted in October 2014, the
Service listed the Gunnison sage-grouse (*Centrocercus minimus)* (GUSG), as a threatened
species (79 FR 69192), and concurrently designated critical habitat for the GUSG (79 FR
69312).  Therefore, there are 13 federally listed species within the GJFO.

BLM_0025325

**Table 1**
**List of Threatened, Endangered, Proposed and Candidate Species Addressed in Grand Junction Field Office RMP Biological Assessment**

| Common Name | Species Name | Federal Status[1] |
|---|---|---|
| **Listed Species for Potential Consultation** | | |
| <u>Plants</u> | | |
| Colorado hookless cactus | *Sclerocactus glaucus* | T |
| DeBeque phacelia[2] | *Phacelia submutica* | T |
| Parachute penstemon[2] | *Penstemon debilis* | T |
| Ute ladies'-tresses | *Spiranthes diluvialis* | T |
| <u>Fish</u> | | |
| Colorado pikeminnow[2] | *Ptychocheilus lucius* | E |
| Greenback cutthroat trout | *Oncorhynchus clarki stomias* | T |
| Razorback sucker[2] | *Xyrauchen texanus* | E |
| Bonytail[2] | *Gila elegans* | E |
| Humpback chub[2] | *Gila cypha* | E |
| <u>Birds</u> | | |
| Mexican spotted owl | *Strix occidentalis lucida* | T |
| Greater sage-grouse | *Centrocercus urophasianus* | C |
| Gunnison sage-grouse[2] | *Centrocercus minimus* | T |
| Western yellow-billed cuckoo[3] | *Coccyzus americanus* | T |
| <u>Mammals</u> | | |
| Canada lynx | *Lynx canadensis* | T |

[1]Status: E = Endangered; T = Threatened; P = Proposed for listing; C = Candidate for listing
[2]Critical Habitat

[3]Critical habitat proposed


The BLM made the following effects determinations for listed, proposed, or candidate species and critical habitat, where applicable:

**<u>May affect, not likely to adversely affect:</u>**
Parachute penstemon*
Ute ladies'-tresses
Greenback cutthroat trout
Mexican spotted owl
Greater sage-grouse
Gunnison sage-grouse critical habitat
Western yellow-billed cuckoo
Canada lynx


**<u>May affect, likely to adversely affect:</u>**
Colorado hookless cactus
DeBeque phacelia*

BLM_0025326

Colorado pikeminnow*
Razorback sucker*
Bonytail*
Humpback chub*
Gunnison sage-grouse

*Includes critical habitat.

Based on our review of the information provided in your BA, we concur with the determination that the proposed action may affect, but is not likely to adversely affect the Parachute penstemon and its critical habitat, Ute ladies' tresses, greenback cutthroat trout, Canada lynx, Mexican spotted owl, western yellow-billed cuckoo, and may affect, but is not likely to adversely affect critical habitat for Gunnison sage-grouse. While we recognize the direction included in the RMP to conserve the greater sage-grouse and would like to continue working with you on this species' conservation, this is a candidate species and an official determination under section 7 consultation is inappropriate. We will not consider the greater sage-grouse further herein.

We also agree with your determination of may affect, and likely to adversely affect, for the following species: Colorado hookless cactus, DeBeque phacelia, and Gunnison sage-grouse, Colorado pikeminnow, razorback sucker, bonytail, and humpback chub. We address these species in the biological opinion (BO) below.

Section 7 (a) (4) of the Act requires conferencing with the Service when a proposed action is likely to jeopardize the continued existence of a proposed species or destroy or adversely modify proposed critical habitat. Because the BA concluded that the proposed action is not likely to adversely affect proposed critical habitat for the western yellow-billed cuckoo, we assume that BLM's conclusion is that implementation of the revised RMP is not likely to destroy or adversely modify their critical habitat. Since conferencing is not required, critical habitat issues for this species will not be further addressed herein.

## CONSULTATION HISTORY

The consultation history for the proposed action consists of informal discussions with the Northwest Level One Team, and discussion between the Service and the BLM.

The Service issued two programmatic section 7 BOs in western Colorado, analyzing water depletions resulting from the BLM's activities in the Colorado River basin. These consultations include the December 19, 2008, "Programmatic Biological Opinion (PBO) for Water Depletions Associated with the BLM's Fluid Mineral Program within the Upper Colorado River Basin in Colorado" (ES/GJ-6-CO-08-F-006), and the February 25, 2009, "PBO for Water Depletions Associated with BLM's projects (excluding Fluid Mineral Development within the Upper Colorado River Basin in Colorado" (ES/GJ-6-CO-08-F-0010). Both BOs address adverse effects to the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail, and their respective critical habitats, associated with depletions resulting from projects and activities in the revised RMP. Water depletions resulting from oil and gas exploration and development on the

3

GJFO fall under the two respective BLM PBOs.  Therefore, the section 7 consultation requirement for the Colorado River fishes is fulfilled.

On July 27, 2010, the Service provided concurrence of may affect, not likely to adversely affect the Colorado hookless cactus (Tails: 65413-2010-I-0138) for the Integrated Weed Management Plan (IWMP) for the GJFO.  On September 24, 2014, the Service provided concurrence of may affect, not likely to adversely affect the Parachute penstemon and DeBeque phacelia, and their respective critical habitat (06E24100-2014-I-0185) for effects caused by the IWMP.

On November 12, 2012, the Service issued BO number ES/GJ-6-CO-12-F-006 (Tails: 06E24100-2012-F-0020).  This opinion documented the effects of livestock grazing to listed plant species within the GJFO (among other field offices).

This BO is based on the BA prepared for the proposed action, previous programmatic BAs and BOs pertaining to vegetation management and livestock grazing applicable to the GJFO for plant species, listing and critical habitat decision documents, information contained in scientific literature, and other sources of information.  For GUSG the BLM used the GUSG Rangewide Conservation Plan (RCP) (GUSG Rangewide Steering Committee (GSRSC) 2005), our January 11, 2013, proposed rule of endangered status for the GUSG, our January 11, 2013, proposed rule to designate critical habitat, final listing and critical habitat rules of November 20, 2014, information contained in scientific literature, and other sources of information.  A complete administrative record of this consultation is on file in the Service's Western Colorado Office, Grand Junction, Colorado.

# BIOLOGICAL OPINION

## PROPOSED ACTION

The proposed action consists of implementation of the revised RMP for the GJFO of the BLM. The RMP provides strategic guidance for future management of BLM lands managed by the GJFO.  The RMP provides a decision-making framework and guides resource management programs, practices, uses, and projects.  The RMP revision does not include specific project and activity decisions.  Those decisions are made later, after more detailed analysis and further public involvement.

Key Decisions

The proposed RMP revision contains the following key components and decisions that comprise the GJFO's management system.

- The establishment of goals, objectives, actions, allowable uses, allocations, restrictions, and prohibitions.
- The establishment of desired outcomes, including multiple-use goals and objectives. Goals are expressed as desired condition in the form of aspirations for which the BLM's management area direction, objectives and standards and guidelines have been directed.
- The establishment of management requirements, including measures or criteria that will

4

be applied in order to guide day-to-day activities. These are primarily expressed as standards and guidelines.
- The designation of lands managed for their Wilderness Characteristic and other special designations.
- The identification of river segments suitable for inclusion in the National Wild and Scenic Rivers System.
- The establishment of monitoring and evaluation requirements.

The following programs are implemented under the RMP decision framework; their goals and objectives in the RMP are outlined below. These goals and objectives are selected from Table 2-2 on page 2-22 of Volume 1 of the RMP. It is not a complete list of the plan's goals and objectives; the selections were included for their relevance to the proposed RMP's actions, allowable uses, restrictions and prohibitions that are most relevant to the species for which BLM has sought consultation. More information on specific actions and requirements, stipulations, etc., for each objective is contained in Table 2-2 of the RMP. Note that references in the goals and objectives below are to Appendices in the RMP itself, not this BO, unless otherwise noted).

➢ **Areas of Critical Environmental Concern (ACECs)**

- **GOAL (ACEC-G1):** Manage ACECs to protect significant resource values and prevent damage to important natural, biological, cultural, recreational, or scenic resources and values, or to protect life and safety from natural hazards.
- ○ **Objective: (ACEC-O1)** Continue to manage those areas within the GJFO that require some special management and that meet the criteria for ACEC designation.
- ❖ **Action (ACEC-A1):** Designate the following areas as ACECs (123,400 acres). (Figure 2- 66, Appendix A):
  • Atwell Gulch (2,900 acres);
  • Badger Wash (2,200 acres);
  • Dolores River Riparian (7,400 acres);
  • Indian Creek (2,300 acres);
  • Juanita Arch (1,600 acres);
  • Mt. Garfield (2,400 acres)
  • The Palisade (32,200 acres);
  • Pyramid Rock (1,300 acres);
  • Roan and Carr Creeks (33,600 acres);
  • Rough Canyon (2,800 acres);
  • Sinbad Valley (6,400 acres);
  • South Shale Ridge (28,200 acres); and
  • Unaweep Seep (85 acres).

➢ **Comprehensive Travel and Transportation Management Plan**

- **GOAL (CTTM-G1):** Manage the travel system to support the BLM mission, achieve resource management goals and objectives, and provide for appropriate public and administrative access.

5

BLM_0025329

o  Objective (CTTM-O1): Maintain a comprehensive travel network that best meets the full range of public, resource management, and administrative access needs.

- **GOAL (CTTM-G2)**:  To manage a comprehensive travel and transportation management system that allows for diverse recreational use of motorized and non-motorized interests; promotes the safety of all users; minimizes conflicts among Federal land uses; communicates with the public about available opportunities, and monitors the effects of use.

o  Objective (CTTM-O2):  Seek to effectively manage new modes of travel that cannot be foreseen through this planning effort.

o  Objective (CTTM-O3):  Manage motorized travel consistent with outcomes defined by resource programs.

o  Objective (CTTM-O4):  Manage non-motorized travel consistent with outcomes defined by resource programs.

o  Objective (CTTM-O5):  Manage travel through route designations within Zone L to be consistent with the following recreation and resource objectives:

❖ **Watershed and Soils**
  - Manage to maintain or contribute to long term improvement of surface and groundwater quality.
  - Promote geomorphic balance.
  - Meet Public Land Heath Standard 1 for soils and 5 for water quality.
  - Minimize salt and sediment production to natural background rates.
  - Preserve and promote soil productivity.

❖ **Special Status Species (Plants)**
  - Meet Public Land Heath Standard 3 for plant communities and 4 for Special Status and Threatened & Endangered species and their habitats.
  - Promote maintenance and recovery of federally listed, proposed, and candidate plant species by protecting occupied habitat.  Protect occupied habitat for all BLM sensitive plant species and significant plant communities as defined and tracked by Colorado Natural Heritage Program (CNHP).

❖ **Vegetation**
  - Manage vegetation to meet BLM Standards for Public Land Health while taking into account site potential, and site-specific management objectives. Ensure vegetation resources are managed to achieve balance in soil and watershed protection, wildlife habitat, livestock grazing, forestry, and biodiversity values, while maintaining or enhancing special status species habitat.

❖ **Recreation**
  - Ensure route connectivity between the extensive recreation management area (ERMA) and the Grand Valley OHV special recreation management area (SRMA).  To provide a transition zone between the high-use urban interface area directly north of Grand Junction, allow higher route density along the ERMA's interface with the Grand Valley OHV SRMA at 27 ¼ Road, with route density generally decreasing as the trail system extends

6

BLM_0025330

to the northwest toward 25 Road and 21 Road (Travel Management Zone L).

The RMP designates motorized travel areas having existing developed road and/or motorized trail systems that, for the most part, serve current recreation and resource access needs for a particular area. The road and motorized trail system in motorized suitable areas will generally not be considered for expansion or substantial alteration of the transportation system. The RMP designates 126,200 acres closed to motorized use; 925,200 acres are closed to cross-country travel, with travel authorized on designated routes, and retains 10,200 acres of open motorized use (including cross-country travel).

➢ **Fish and Wildlife**

Habitat standards and desired wildlife populations levels are determined by Colorado Parks & Wildlife (CPW) and Service species-specific plans and strategies in order to meet BLM Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).

- **GOAL: (FW-TW-G1) Provide** terrestrial habitats for abundance and diversity of native and desirable nonnative wildlife species to attain or maintain self-sustaining populations.
- o **Objective (FW-TW-O1):** Maintain and improve BLM lands for priority habitat requirements for the following high-value species:
  - •Critical and severe winter range, winter concentration areas, intact security areas, production areas, and big game migrations corridors for big games species (e.g., mule deer *(Odocoileus hemionus)*, elk *(Cervus canadensis)*, pronghorn antelope *(Antilocapra americana)*, bighorn sheep *(Ovis canadensis)*, moose *(Alces alces)*; and
  - •Proper functioning condition riparian and wetland habitat for all species (see Vegetation—Riparian section).
- o **Objective (FW-BG-O1):** Provide sufficient forage, cover, and protection from disturbance for large ungulates (deer, elk, bighorn sheep, pronghorn antelope, and moose) to maintain healthy viable populations across the landscape commensurate with BLM Colorado's Standards for Public Land Health (BLM 1997a).
- o **Objective (FW-BG-O2):** Protect State wildlife areas from surface occupancy and surface disturbing activities to protect the values for which they were established.
- o **Objective (FW-BG-O3):** Minimize habitat fragmentation and restore habitat connectivity on big game winter ranges, winter concentration areas, severe winter ranges, and movement corridors.
- o **Objective (FW-P-O1):** Improve pronghorn antelope habitat on BLM lands.

- *Wildlife Emphasis Areas*

  A Wildlife Emphasis Area (WEA) is an area of high wildlife value and significance for wildlife species including but not limited to both species of sage-grouse, pronghorn antelope, mule deer, elk, bighorn sheep, white-tailed prairie dog *(Cynomys leucurus)*, and kit fox *(Vulpes macrotis)*. Fire rehabilitation efforts and vegetation treatments to improve

7

land health and/or wildlife habitat are not considered ground disturbance, as described in the actions under each emphasis area below. Wildlife emphasis areas are not designations, but rather polygons where more management emphasis is placed on protection and enhancement of the wildlife resource.

- o **Objective (WEA-O1):** Emphasis areas meet BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (BLM 1997). Prioritize those areas that do not meet land health standards as management action areas where actions are taken to work toward meeting land health standards.
- o **Objective (WEA-O7):** Maintain or improve wildlife habitat in the Glade Park wildlife emphasis area (27,200 acres) with an emphasis on GUSG, mule deer, and elk habitat (Figure 2-1, Appendix A in BA).
- o Objective (WEA-O16): Maintain or improve wildlife habitat in the Timber Ridge wildlife emphasis area (11,800 acres) with an emphasis on habitat for mule deer, elk, and [Gunnison] sage-grouse (Figures 2-1 [Alternative B] and 2-2 [Alternative C], Appendix A in BA).

## ➤ Fluid Mineral (Oil and Gas, Geothermal, and Oil Shale Resources)

- • **GOAL (FM-G1):** Provide opportunities for environmentally responsible exploration and development of fluid mineral resources subject to appropriate BLM policies, laws, and regulations.
- o **Objective (FM-O1):** Facilitate orderly, economic, and environmentally sound exploration and development of oil and gas and geothermal resources, using the best available technology.
- o **Objective (OS-O1):** Maintain opportunities to lease oil shale with further National environmental Policy Act (NEPA) analysis while minimizing impacts to other resources.
- o **Objective (MLP-O1):** Promote a proactive approach to planning for oil and gas development in the proposed Shale Ridges and Canyons Master Leasing Plan (MLP) area based on known resource values and reasonably foreseeable oil and gas development. Manage oil and gas operations in the Shale Ridges and Canyons MLP area to prevent degradation of sensitive soils, special status species, and other resources. All management objectives, goals, and actions are the same for the mineral leasing plan (MLP) and the entire GJFO decision area unless otherwise stated.
- o **Objective (MLP-O2):** Limit air quality degradation within the MLP analysis area by ensuring that land use activities are in compliance with Federal, State, and local regulations.
- o **Objective (MLP-O3):** Manage and protect surface water and groundwater in order to maintain or contribute to the long term improvement of surface and ground water quality and minimize or control elevated levels of salt, sediment, and selenium contributions to water resources. All streams on public lands in the MLP Analysis Area that meet or exceed State water quality standards, and that have acceptable channel stability, will be maintained in the present condition through limited management. Streams not meeting State standards, or having unstable channels, will be improved in order to meet minimum standards through intensive management.

8

BLM_0025332

o **Objective (MLP-O4):** Ensure that surface disturbances do not cause accelerated erosion (such as rills, soil pedestals, and actively eroding gullies) on a watershed scale (e.g., sixth hydrologic unit code scale). Minimize or control elevated levels of salt, sediment, and selenium contribution from public lands to rivers. Maintain or improve soil productivity, preserve proper function and condition of uplands, and ensure that surface disturbances do not cause accelerated erosion.

o **Objective (MLP-O5):** Manage for a healthy diversity of successional-stage plant communities and properly functioning riparian zones within the MLP analysis area.

o **Objective (MLP-O6):** Protect occupied and suitable habitat for Federal proposed, candidate, and threatened or endangered species, and protect occupied habitat for BLM sensitive species necessary for:

> o Maintenance and recovery of proposed, candidate, and threatened or endangered species and
>
> o Support of BLM sensitive species and significant plant communities, consistent with BLM policy on special status species management (BLM manual 6840, BLM 2008c, cited in BA).

o **Objective (MLP-O7):** Sustain the integrity of the sagebrush biome in order to provide the amount, continuity, and quality of habitat that is necessary to maintain sustainable populations of Greater sage-grouse and other sagebrush dependent species.

o **Objective (MLP-O8):** Maintain and improve BLM lands for priority habitat requirements for the following high-value species: Critical and severe winter range, winter concentration areas, production areas, and big game migrations corridors for big games species (e.g., mule deer, elk, pronghorn antelope, bighorn sheep, and moose. Maintain and improve lands for priority habitat requirements for highly valued species such as, but not limited to, cold water sport fishes. Protect State wildlife areas from unnecessary surface occupancy and surface disturbing activities.

o **Objective (MLP-O13):** Provide for protection of ACEC resource values by reducing impacts from oil and gas development in these areas.

Table 2 provides statistics for the amount of BLM lands available for oil and gas leasing as well as those available acres where stipulations or other restrictions may apply to future leases.

Table 2.

| Bureau Grand Junction Field Office | Proposed Action |
|---|---|
| Federal Mineral Acres | 1,236,100 |
| Acres Withdrawn from Leasing | 0 |
| Acres Administratively Not Available for Leasing | 243,500 |
| Acres Available for Leasing | 992,600 |
| No Surface Occupancy | 436,600 |
| Timing Limitation | 382,900 |
| Controlled Surface Use | 493,900 |
| Standard Lease Terms | 992,600 |

9

BLM_0025333

The proposed action includes the projection of well pads and access road miles (future leases), and corresponding disturbance acres on the GJFO, for years 2009-2029. The reasonably Foreseeable Development Scenario of Oil and Gas development on existing leases is presumed to follow BLM Instruction Memorandum No. CO-2013-033, dated July 15, 2013, and BLM Instruction Memorandum No. 2014-100.

➢ **Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals**

- **GOAL (LM-G1)**: Provide opportunities to develop locatable minerals, mineral materials, and non-energy leasable minerals consistent with other resource goals and uses to meet local and national energy and mineral needs.
- **Objective (LM-O1)**: Facilitate environmentally responsible exploration and development of locatable minerals subject to BLM policies, laws, and regulations.
- **Objective (MM-O1)**: Manage mineral material (salable minerals) resources to provide for the needs of individuals, municipalities, and businesses while ensuring compatibility with other resource objectives.
- **Objective (NEL-O1)**: Provide opportunities for non-energy leasable exploration and/or development subject to standard stipulations (e.g., NSO, CSU, and TL).

➢ **Forestry**

Under the RMP, the BLM proposes to use a variety of silvicultural techniques and harvest systems to manage for healthy forests and woodlands while offering a variety of forest products and meeting other resource objectives for the following forestry and woodland types: pinyon/juniper, ponderosa pine, Douglas-fir, aspen, spruce/fir.

➢ **Lands and Realty**

- **GOAL (LR-G1)**: Meet resource needs while providing public use authorizations such as Rights-of-Way (ROWs), renewable energy sources, permits, and leases.
- **Objective (LR-O1)**: Provide for the development and operation of transportation systems, pipelines, transmission lines, communication sites, renewable energy resources, and other land use authorizations in an environmentally responsible and timely manner.
- **Objective (LR-O2)**: Manage corridors for public utilities and other facilities, and establish new corridors in an environmentally responsible manner as necessary to meet future demands and protect sensitive resources.
- **Objective (LR-O3)**: Provide for the development and operation of actions for leases, permits, and easements authorized under, 43 CFR 2920 (such as site facilities and commercial filming) in an environmentally responsible and timely manner.
- **Objective (LR-O4)**: Resolve trespass uses as they are identified and prioritized.
- **Objective (LR-O5)**: Consolidate the BLM's land ownership patterns through land tenure adjustments for improved management efficiency, and acquire from willing sellers suitable private land with special resource values.
- **Objective (LR-O6)**: Acquire lands or interests in lands through exchanges, purchases, easements, or donations to facilitate resource goals and objectives.

10

BLM_0025334

o **Objective (LR-O7):** Withdraw lands from the public land laws or mining laws where necessary to meet resource and other management objectives of the BLM or other Federal agencies.

➢ **Livestock Grazing**

The RMP livestock grazing goal is to provide adequate forage for livestock while attaining healthy rangelands, in accordance with land health standards and in balance with other resources and uses, to contribute to local economies, ranching livelihoods, and rural western character integral to many communities. Objectives within the goal relevant to this BO include:

o **Objective LG-01:** Meeting the forage demands of livestock operations based on current active preference animal unit-months (AUMs) while meeting the BLM Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado (BLM 1997a) (Appendix E);

o **Objective LG-02:** Provide periodic rest during active growth periods of forage plants to maintain or improve plant vigor and health; and

o **Objective LG-03:** Manage livestock to maintain and/or improve sage-grouse habitat.

➢ **Recreation and Visitor Services**

• **GOAL REC-G1:** Produce a diversity of quality recreational opportunities that support outdoor-oriented lifestyles and add to participants' quality of life, enhance the quality of local communities, and foster protection of natural and cultural resources.

o **DeBeque Area Recreation Objective (REC-O5):** If feasible, provide for recreation opportunities near the town of DeBeque that enhance and protect sensitive cultural and biological resources, while providing a diverse mix of recreation activities and experiences, including intermediate to expert level singletrack motorcycling and mountain biking, and motorcycle trials riding utilizing the area's unique natural topography and scenery to enhance users' experiences. To a secondary extent, provide for shared compatible uses such as 4x4 and all-terrain vehicle (ATV) touring, hiking, and horseback riding.

o **Grand Valley Shooting Ranges ERMA [Extensive Recreation Management Area] Objective (REC-ERMA-O12):** Through the life of the plan, manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus (*Sclerocactus glaucus*), water quality (lead contamination, non-point source erosion/sedimentation into the Colorado River).

o **Gunnison Bluffs ERMA Objective (REC-ERMA-O16):** Through the life of the plan, manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado hookless cactus, cliff-nesting raptors, paleontological resources, and cultural resources.

o **Horse Mountain ERMA Objective (REC-ERMA-O19):** Through the life of the plan, manage this area to minimize recreation impacts to other resources, with special consideration given to protection/mitigation of the following resources: Colorado

BLM_0025335

hookless cactus, water quality (non-point source erosion/sedimentation into the Colorado
River).

- o **Horse Mountain ERMA RMZ 2 – C Road OHV Open Area 180 acres, Objective
  (REC-ERMA-022:** Through the life of the plan, manage this area to minimize recreation
  impacts to other resources, with special consideration given to protection/mitigation of
  the following resources:  Colorado hookless cactus, water quality (non-point source
  erosion/sedimentation into the Colorado River).

➢ **Soil Resources**

The soil resource goal in the RMP is to ensure upland soils exhibit infiltration and permeability
rates that are appropriate to soil type, climate, land form, and geologic processes.  Adequate soil
infiltration and permeability allows for the accumulation of soil moisture necessary for optimal
plant growth and vigor, minimizes surface runoff (Land Health Standard 1), and minimizes soil
erosion.  Objectives within the goal include relevant to this BO include:

- • **Objective (S-O1):**
  1. Minimize or control elevated levels of salt, sediment, and selenium contribution from
  Federal lands to river systems in the planning area.
  2. Maintain or improve soil productivity, including retention of topsoil quality and
  reestablishing soil capability, potential, and functionality when disturbed.
  3. Preserve proper function and condition of upland soils.
  4. Ensure surface disturbances do not cause accelerated erosion (e.g., rills, soil pedestals,
  actively eroding gullies) on a watershed scale (e.g., sixth hydrologic unit code scale).

➢ **Special Status Species**

- • **GOAL: SSS-G1:**  Manage special status species habitats to provide for their
  conservation and restoration as part of an ecologically healthy system.
- o **Objective (SSS-O1):**  Maintain or improve the quality of listed (i.e., threatened or
  endangered) and sensitive species habitat by managing public land activities to support
  species recovery and the benefit of those species.
- o **Objective SSS – Fish (SSS-F-O1):**  For Fish:  Maintain or improve the quality of listed
  (threatened or endangered) fish and sensitive fish habitat by managing public land
  activities to support species recovery and the benefit of those species.

- ➢ **GOAL 2 SSS** - Plants and Terrestrial Wildlife (PTW-G1):  Manage special status species
  and their habitats to provide for their conservation and restoration as part of an
  ecologically healthy system, and support the goals contained in Standard 4 of the
  Colorado Standards for Public Land Health (BLM 1997) (see Appendix E).
- o **Objective (SSS-PTW-O1):**  To conserve plants and animals (and their habitats) listed by
  Federal and Colorado governments as threatened, endangered, sensitive or species of
  concern, and to conserve plants and animals that are candidates for these lists with the
  overall objective of improving their populations so that they can be removed from these
  lists.

BLM_0025336

- o **Objective (SSS-P-O1):** Promote maintenance and recovery of federally listed, proposed, and candidate plant species by protecting occupied habitat. Protect occupied habitat for all BLM sensitive plant species and significant plant communities as defined and tracked by CNHP.
- o **Objective (SSS-M-O1):** Protect breeding habitats of migratory birds with emphasis on avoiding impacts to nesting birds to comply with the Migratory Bird Treaty Act (MBTA).
- o **Objective (SSS-R-O1):** Maintain and improve BLM lands for raptor nesting and fledging habitat.
- o **Objective (SSS-BGE-O1):** Maintain and improve BLM lands for eagle nesting, fledging, foraging and roosting habitat. Protect the bald and golden eagle concentration, nesting, and nest buffer areas by prohibiting activities during certain times of the year consistent with CPW's most recent raptor recommendations.
- o **Objective (SSS-WS-O1):** Provide healthy and productive habitat for waterfowl and shorebirds.
- o **Objective (SSS-SG-O1):** Advance the conservation of Gunnison and greater sage-grouse and their habitat in accordance with current national, State, and local working group recommendations and policy as well as the most current scientific literature and research.
- o **Objective (SSS-RA-O1):** Maintain and improve BLM lands for priority reptile and amphibian habitat.
- o **Objective (SSS-B-O1):** Maintain and improve BLM lands for bat roosting, maternity sites and winter hibernacula.
- o **Objective (SSS-RO-O1):** Maintain and improve BLM lands for river otter *(Lontra canadensis)* habitat.
- o **Objective (SSS-CL-O1):** Maintain and improve BLM-managed portions of Canada Lynx Analysis Units for Lynx habitat.
- o **Objective (SSS-KF-O1):** Maintain and improve BLM lands for kit fox habitat.
- o **Objective (SSS-PD-O1):** Maintain or improve white-tailed prairie dog habitat and distribution (Figure 2-73, Appendix A).

## ➢ **Vegetation**

The RMP's general vegetation goal is restore and maintain healthy, productive plant communities of native and other desirable species at self-sustaining population levels commensurate with the species' and habitats' potentials. Ensure plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes (based on Land Health Standard 3). Objectives within the goal include relevant to this BO include:

- o **Objective (VG-O1):** Manage for a healthy diversity of successional-stage plant communities.
- o **Objective (VG-O2):** Provide the public with native plant materials through the sale of wilding permits (e.g., live plants and plant material products exceeding personal use amounts), commercial seed-collecting permits, and free use permits (consistent with 43 CFR 8365.1-5, IM No. 2013-176 Seed Collection Permitting and Pricing Policy

13

BLM_0025337

within the BLM, and BLM Manual 5500 [Nonsale Disposals]), while protecting other resources.

➢ **Vegetation – Adaptive Drought Management**

- **GOAL (VADM-G1):** Develop management prescriptions for all surface-disturbing resource uses during times of extended drought.
- ○ **Objective (VADM-O1):** Establish criteria for restricting activities during drought.

➢ **Vegetation – Desired Plant Communities**

- **Goal VDPC-G1:** Manage pinyon-juniper, upper and lower elevation sagebrush, salt desert shrub, forests and woodlands, and riparian areas (the dominant plant communities of the GJFO planning area) as desired plant communities or to emphasize native vegetation, wildlife habitat, watershed health, and biodiversity.
- ○ **Objective VDPC-O1:** Manage vegetation to meet BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado while taking in to account site potential as determined by ecological site inventories, Range/Ecological Site Descriptions, Soils, completed Land Health Assessments, and site specific management objectives.
- ○ **Objective VDPC-O2:** Manage vegetation resources to balance soil and watershed protection, wildlife habitat, livestock grazing, forestry, and biodiversity values, while maintaining or enhancing special status species habitat.
- ○ **Objective VDPC-O3:** In lower-elevation vegetation, occupied by the potential natural community, manage for a late- or mid-seral stage as the desired plant community.

- **Goal VDPC-G2:** Manage the salt desert shrub communities to maintain viable populations of kit fox, burrowing owl (*Athene cunicularia*), white-tailed prairie dog, and other obligate species. Preserve undisturbed patches of salt desert shrub communities with little to no cheatgrass (*Bromus tectorum*), halogeton (*Halogeton glomeratus*), or other exotic species. Identify and initiate restoration and rehabilitation of unhealthy areas.

- **GOAL VDPC-G3:** Manage the sagebrush *(Artemisia* spp.*)* biome to maintain viable populations of sagebrush-obligate species. Identify and initiate restoration and rehabilitation of sagebrush habitat, while maintaining a mosaic of canopy cover and successional stages. Maintain or improve sage-grouse winter habitat.
- ○ **Objective (VDPC-O4):** Manage the salt desert shrub community to improve vigor, composition, diversity, and cover of native understory species and biological soil crusts.
- ○ **Objective (VDPC-O5):** Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities. Restore the species composition and diversity of seral stages of sagebrush communities.
- ○ **Objective (VDPC-O6):** Sustain, restore, and rehabilitate the integrity of the sagebrush biome to provide the amount, continuity, and quality of habitat that is necessary to maintain sustainable populations of sagebrush-obligate species.

14

BLM_0025338

- **GOAL (VDPC-G4):** Manage the sagebrush biome to maintain viable populations of greater and GUSG and other sagebrush-obligate species. Identify and initiate restoration and rehabilitation of sagebrush habitat while maintaining a mosaic of canopy cover and successional stages.
- o **Objective (VDPC-O7):** Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities. Restore the species composition and diversity of successional stages of sagebrush communities.
- o **Objective (VDPC-O8):** Prioritize the following areas for Land Health Assessments, vegetation restoration efforts, and protection of existing intact environments: 1-4. Restoration plans would emphasize increasing patch size and connectivity through vegetation treatments. Disturbances should also be consolidated through BMPs to reduce disturbance and maintain sagebrush-obligate species.

- **GOAL (VDPC-G5):** Manage mountain shrub communities to maintain vigorous stands of deciduous shrubs.
- o **Objective (VDPC-O9):** Emphasize perpetuating late- to mid-seral plant communities that provide suitable habitat for wildlife.

## ➢ **Vegetation – Forestry/Woodlands (VFW)**

- **GOAL VFW-G1:** Maintain and restore pinyon-juniper woodlands to meet requirements for land health and to supply wildlife habitat, livestock forage, and consumer products (e.g., posts, poles, firewood, and biomass).
- o **Objective VFW-O1:** Manage for pinyon pine *(Pinus edulis)* and juniper with a balance of seral stages.

- **GOAL (VFW-G2):** Maintain forests and woodlands for a healthy mix of successional stages within the natural range of variation that incorporates diverse structure and composition.
- o **Objective (VFW-O2):** Manage ponderosa pine (*Pinus ponderosa*), Douglas-fir (*Pseudotsuga menziesii)*, aspen *(Populus tremuloides)*, and spruce/fir to mimic natural stand conditions and natural regeneration.

## ➢ **Vegetation – Riparian**

- **GOAL VR-G1:** Manage riparian habitat in compliance with the Land Health Standard 2: Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment and provides forage habitat and biodiversity. Water quality is improved or maintained. Stable soils store and release water.
- o **Objective (VR-O1):** Protect and restore riparian areas/wetlands through sound management practices.

15

BLM_0025339

➤ **Vegetation – Weeds**

- **GOAL (VW-G1):** Reduce the occurrence of noxious and invasive species through the use of an Integrated Pest Management Program across the planning area.
- **Objective (VW-O1)**: Apply integrated control methods (physical, cultural, biological, chemical, fire) to noxious and invasive pest populations.
- **Objective (VW-O2):** Require weed prevention on appropriate actions authorized within the planning area.

➤ **Water Resources**

The RMP goal for water resources is to protect, preserve, and enhance watershed functions in the capture, retention, and release of water in quantity, quality, and time to meet ecosystem and human needs.

- o **Objective (W-O1):** Manage public land activities to maintain or contribute to the long term improvement of surface and ground water quality and minimize or control elevated levels of salt, sediment, and selenium contribution from Federal lands to water resources in the planning area.
- o **Objective (W-O2):** Ensure streams on BLM lands are in geomorphic balance (e.g., stream channel size, sinuosity, slope, and substrate are appropriate for its landscape setting and geology) with the water and sediment being supplied by the watershed (e.g., no accelerated erosion, deposition, or head-cutting) and ensure that land use does not impede the natural hydrograph (e.g., allows timing, magnitude and duration of peak, high and low flow events by minimizing surface disturbance, erosion, and sedimentation of streams).
- o **Objective (W-O3):** Provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian, wetland, aquatic, and upland systems.
- o **Objective (W-O4):** Protect municipal watersheds and source water protection areas on public land that provide drinking water to local communities.
- o **Objective (W-O5):** Characterize, monitor, maintain, and/or restore surface/groundwater quality and quantity to sustain designated beneficial uses in cooperation with other Federal, local, and State agencies and private entities.
- o **Objective (W-O6):** Manage public lands to maintain functioning condition of all parameters within the hydrologic cycle including groundwater quantity and quality. Ensure the consumption of water resources on public lands resulting from Federal actions do not jeopardize the sustainability of water resources or associated riparian/wetland habitats.

➤ **Wild Horses**

- **GOAL (WH-G1)**: Manage the administratively designated Little Book Cliffs Wild Horse Range (LBCWHR) to sustain a healthy viable wild horse population while maintaining a thriving natural ecological balance of resources and uses. (Figure 2-4, Appendix A).
- o **Objective (WH-O1):** Emphasize protection of wild horses in the LBCWHR and minimize impacts to their population and habitat.

16

BLM_0025340

- o **Objective (WH-O2):** Emphasize management of wild horses in the LBCWHR.
- o **Objective (WH-O3):** Manage vegetative communities within the LBCWHR to maintain a forage base to support the established appropriate management level.
- o **Objective (WH-O3):** Manage vegetative communities within the LBCWHR to maintain a forage base to support the established appropriate management level.
- o **Objective (WH-O4):** Protect wild horses in the LBCWHR by limiting activities which disturb or harass wild horses during critical time periods.

➢ **Wildland Fire Management**

The GJFO proposes to use a full range of wildfire management actions, from full suppression to resource benefits on unplanned ignitions. Actions with implications and potential to adversely affect threatened and endangered species are:

- • **Action WFM-A1:** Allow unplanned fire on 857,400 acres for resource benefit to manage diversity in desired plant communities in those areas identified in Figure 2-76 in Appendix A (RMP), approximately 81 percent of public lands in the GJFO.
- • **Action WFM-A2:** Suppress all fires in Salt Desert Shrub communities to protect these communities that are not adapted to fire and to reduce cheatgrass invasion.
- • **Action WFM-A3:** Implement fuels treatments actions that may include, but are not limited to:
  - ✓ Mechanical treatments, including mowing, weed-whacking, chopping (roller chopper), chipping, grinding (hydro-ax), chaining, tilling, and cutting.
  - ✓ Manual treatments, including hand cutting (chainsaw/handsaw) and hand-piling.
  - ✓ Prescribed fire, including pile and broadcast burning.
  - ✓ Chemical spraying or biological treatments, such as insects or goats.
  - ✓ Seeding, including aerial or ground application.
  - ✓ Commercial stewardship projects.

- • **Action WFM-A4:** Use a combination of planned and unplanned fire along with fuels treatments including mechanical, manual, chemical, and seeding to meet resource objectives.
- • **Action WFM-A5:** Prioritize vegetation treatments that are designed to strategically reduce wildfire threat in areas of high fire risk rather than where the probability of fire is low and the potential for natural post-fire recovery is high.

ACTION AREA

Action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR § 402.02). The action area for the proposed action consists of the BLM's GJFO, the nearly 1.1 million acres of BLM-administered lands and 1.2 million acres of Federal mineral estate within the GJFO planning area. BLM lands within the Dominguez-Escalante and McInnis Canyons National Conservation Areas are covered by separate RMPs and not included in the GJFO RMP revision. The action area includes the area described in BOs ES/GJ-6-CO-08-F-006 and ES/GJ-6-CO-08-F-0010.

17

BLM_0025341

## STATUS OF THE SPECIES

The provided species descriptions, and life histories, and are incorporated herein, where appropriate, by reference.

### Colorado Hookless Cactus

The Unita Basin hookless cactus was listed as a threatened species in 1979 (44 FR 58868). On September 15, 2009, the Service officially recognized the taxonomic split of this species into three distinct species, one of which is the Colorado hookless cactus (*Sclerocactus glaucus*) (74 FR 47112).

Colorado hookless cactus is a small ball or barrel-shaped cactus endemic to Montrose, Delta, Mesa, and Garfield Counties in western Colorado. Current data indicate that this species is currently known from about 98 occurrences totaling approximately 19,000 individuals (FWS 2010). These occurrences cover approximately 1,700 square miles, with an estimated 618,000 · acres of potential habitat (FWS 2010). This species has two population centers, one associated with the Gunnison River and its tributaries near the City of Delta, and the other with the Colorado River and its tributaries near DeBeque, Colorado. Colorado hookless cactus was originally listed as threatened on October 11, 1979 (44 FR 58868), with revised listing due to taxonomic changes published on September 15, 2009 (74 FR 47112). Critical habitat has not been proposed for this species. The *Recovery Outline* (FWS 2010) presents an updated and thorough review of the species' status.

*Habitat*

Colorado hookless cactus grows primarily in the salt desert shrub community on alluvial terraces associated with the Gunnison and Colorado Rivers. Soils are commonly derived from Mancos shale often with a thin over layer of alluvium, and range from fine silty clay to coarse gravel with volcanic cobbles and boulders scattered on the surface. The dominant co-occurring plant species include *Atriplex confertifolia, Artemisia nova, Opuntia* spp., *Echinocereus triglochidiatus, Pleuraphis jamesii,* and *Acnatherum hymenoides*. Populations also occur in big sagebrush and the transition zone with pinyon-juniper woodland. Within these communities, Colorado hookless cactus is often found under small nurse shrubs, especially *Atriplex confertifolia*. In many Colorado hookless cactus populations, exotics occur, especially *Bromus tectorum* and/or *Halogeton glomeratus*, and *Acroptilon repens* along drainages. Typical elevations for the species range from 4,593 to 6,562 feet (1,400 to 2000 meters) above mean sea level (Heil and Porter 2004). According to the North Delta LHA report, BLM considers the Mancos shale communities that the cactus occurs in to have little resilience to disturbance due to soil chemistry and structure and the small amount of available moisture (BLM 2002).

BLM_0025342

*Species Description and Life History*

Colorado hookless cactus grows from a taproot and typically has a single stem that can grow to about 5 inches (12 cm) tall, with large individuals attaining heights of 11 inches (28 cm). Mature stem diameter may reach to 3.5 inches (9 cm) (Heil and Porter 2004), with large individuals growing to 4 or 5 inches (12-13 cm) (in CRVFO, some individuals are 12-13 cm) in girth. Tubercles are arranged into prominent longitudinal ribs. On the apex of each tubercle is an areole from which clusters of spines radiate. The central spine in each cluster is typically hookless. The large, funnel-shaped, pink flowers bloom from late April to May, with the small barrel-shaped fruits maturing in May and June. Flowers are hermaphroditic. Based upon preliminary breeding system studies by Tepedino, this species is believed to be primarily outcrossing (Heil and Porter 1994). Outcrossing presumably requires an insect vector for pollen transfer. Seed longevity in the ground, germination cues, and seed dispersal mechanisms for this species remain unstudied.

In addition to reproducing sexually, Colorado hookless cactus can produce new stems vegetatively by budding. New stem buds appear from beneath the main stem base, and may number from one to many. Field observations indicate that mild to moderate tissue damage, including herbivory by rodents and rabbits and crushing by vehicles, can stimulate budding (Conner 2011, pers. comm.). Presumably if the caudex is sufficiently damaged, no new buds can sprout and an individual dies. Individual cactus stems also appear to be able to sustain physical damage. Partially uprooted cacti and those with apparent herbivore or crushing damage have been observed to heal over and survive (BLM 2009; Conner 2011, pers. comm.).

*Abundance and Viability*

For each occurrence in their database, CNHP assesses the estimated viability of a species or ecological integrity of its community using ranks from A to D for excellent to poor. Of the 98 CNHP occurrences of Colorado hookless cactus, approximately 22 percent are ranked excellent to good (A, B, or BC), 10 percent fair (C), and 6 percent fair to poor (CD or D). The remainder are either considered historic because they have not been confirmed in over 20 years (42 percent, H rank), extirpated (1 percent, E rank), or they could not be ranked for a variety of reasons. The 21 occurrences ranked A or B represent at least 1,000 individuals (FWS 2010).

In addition to the known 98 occurrences recorded by CNHP, more than 6,000 individuals were recently found during surveys for an electric transmission line and a proposed wastewater evaporation pond facility in Delta County (BIO-Logic 2008, 2009). These additional 6,000 plants bring the estimated total individuals range-wide to approximately 19,000 (FWS 2010). Those 6,000 individuals would most likely be ranked A-B by CNHP, with the result that at least 37 percent of the estimated known individuals are in occurrences currently considered viable or ecologically intact.

**DeBeque Phacelia**

DeBeque phacelia (*Phacelia submutica*) is an herbaceous annual currently known from 22 occurrences distributed among nine populations spanning the Mesa and Garfield County line

19

BLM_0025343

near DeBeque, Colorado. The total known distribution includes approximately 625.9 acres within an area 19 miles long and 11 miles wide (76 FR 45054) at elevations ranging from 5,000 to 7,150 feet (1,525 to 2,180 meters; Service 2013). This species was listed as threatened on July 27, 2011 (76 FR 45054). The final listing rule provides a thorough review of the species' status. Critical habitat for the species was designated on August 13, 2012 (77 FR 48367).

The number of plants varies widely from year to year depending on climatic conditions. The fluctuation in numbers indicates that many seeds remain dormant in the seed bank during unfavorable years for germination. As such, it is difficult to estimate the total population size. Upper counts from surveys over the past 30 years estimated a total of 68,731 individuals (Service 2013). The final listing rule provides a thorough and up-to-date review of the status of the species.

*Habitat*

DeBeque phacelia is endemic to clay badland soils derived from the Atwell Gulch and Shire members of the Wasatch formation. It occurs in small patches (1 to 100 m$^2$) on uniquely textured soils that differ in an as yet unquantified way from adjacent soils. Preliminary results from studies conducted by the United States Geological Survey (USGS) indicate that soils in occupied habitat have higher clay content than adjacent unoccupied soils. Soil color ranges from chocolate to purple brown to gray or tan and are alkaline (pH 7 to 8.9), highly erosive, and exhibit dramatic shrink-swell activity due to their high clay content. They are especially susceptible to compaction when wet (76 FR 45054; 76 FR 45078).

The badlands occupied by DeBeque phacelia support stands of salt desert scrub and big sagebrush shrubland within pinyon-juniper woodland. Cover of other plant species is typically less than 10 percent. Associates include *Grindelia fastigiata, Eriogonum gordonii, Monolepis nuttalliana, Oenothera caespitosa,* and *Bromus tectorum.* Occurrences are typically located on moderately steep slopes, benches, and ridge tops adjacent to valley floors at elevations ranging from 5,000 to 7,150 feet (1,524 to 2,179 meters) above mean sea level (76 FR 45054; 76 FR 45078).

*Species Description and Life History*

DeBeque phacelia is a low-growing spring annual establishing from a thin tap root. Stems reach 0.8 to 3 inches (2 to 7.6 cm) in length, and typically branch at the base, with most branches held low to the ground in a rosette pattern. The tubular flowers are hermaphroditic, yellowish-white, and very small in size, with petals generally not exceeding 0.19 inches (4 to 5 mm) in length (76 FR 45054). Preliminary results from a breeding system study indicate that breeding occurs by self-pollination within individual flowers, without the need for an insect vector (Langton 2011, in litt.). The blooming period is from late April to late June, with fruits maturing from mid-May through early July, and seed dispersal complete by early July.

Once the plants have set fruit, they dry in the summer heat and are dislodged or disintegrate, often leaving no trace. Seed dispersal appears to be by gravity and possibly dislodged plants. It is thought that this species depends upon cracks in the soil surface to provide a favorable

BLM_0025344

environment for seed germination. Germination cues remain unknown, but based on research on other rare desert annuals (Levine et al. 2008) may involve interactions between temperature and moisture (76 FR 45054).

DeBeque phacelia depends on its seed bank for long-term survival. By storing viable genetic stock in the ground, individuals can "wait out" unfavorable environmental conditions. The buffering effect of a seed bank depends upon seed and germinant survival rates and how these factors are affected by environmental variation (Doak et al. 2002; Meyer et al. 2006). Seed bank vital rates remain unknown for this species. Given the importance of the seed bank to species health, preventing damage to or destruction of the seed bank is an important management consideration for DeBeque phacelia. Identifying occupied habitat can be challenging since plants may remain dormant underground during certain years and because emerged plants often disappear shortly after the growth period.

*Abundance and Viability*

New occurrences of this species have been found as recently as 2011. The estimated total number of plants range-wide varies between 7,767 and 68,371 per year. Of the 22 occurrences in the CNHP database, 7 have been ranked as A or B (two of these were ranked as B-C). These seven occurrences account for 66 percent of the known individuals based on counts recorded in good years in which germination rates were high (76 FR 45054).

*Critical Habitat*

The Service designated 25,484 acres of critical habitat within nine critical habitat units covering Federal, State, and private lands (77 FR 48367). Critical habitat was defined primarily by a minimum convex polygon around all known and historic populations, plus a 100-meter buffer outside of the polygons. The critical habitat units are identified as: Sulphur Gulch, Pyramid Rock, Roan Creek, DeBeque, Mount Logan, Ashmead Draw, Baugh Reservoir, Horsethief Mountain, and Anderson Gulch.

The Final Rule identifies the following Primary Constituent Elements for critical habitat:

1. Suitable soils and geology: Within the Atwell Gulch and Shire members of the Wasatch formation, areas 1 to 100 $m^2$ in size on colorful exposures of chocolate to purple brown to gray or tan soils. These areas have a higher clay content and different texture than adjacent soils. Areas include clay soils that shrink and swell dramatically, and are alkaline, with a pH between 7 and 8.9.
2. Topography: Moderately steep slopes (2 to 42 degrees), benches, and ridge tops adjacent to valley floors.
3. Elevation and climate: Elevations ranging from 4,600 to 7,450 feet, and climatic conditions similar to those around DeBeque, Colorado.
4. Plant community: Barrens from 1 to 100 $m^2$ in size with less than 20 percent plant cover in the least vegetated portions of the site. Clay badlands occurring in patches of salt desert scrub and big sagebrush shrubland within pinyon-juniper woodland. Associates include *Grindelia fastigiata*, *Eriogonum gordonii*, *Monolepis nuttalliana*, *Oenothera caespitosa*, and nonnatives such as *Bromus tectorum*.

21

BLM_0025345

5. Maintenance of the seed bank and appropriate disturbance levels: Within suitable soils and geology, undisturbed areas, and areas with light disturbance when dry, and no disturbance when wet.

## Gunnison Sage-grouse

### Species Description

Sage-grouse are the largest grouse in North America. Sage-grouse (both greater and Gunnison) are most easily identified by their large size, dark brown color, distinctive black bellies, long pointed tails, and association with sagebrush habitats. They are dimorphic in size, with females being smaller. Both sexes have yellow-green eye combs, which are less prominent in females. Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and ''dance'' to attract a mate. During the breeding season, males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts (Schroeder et al. 1999 in 79 FR 69192). Gunnison sage-grouse are smaller in size, have more white barring in their tail feathers, and have more filoplumes than greater sage-grouse.

### Life History

Gunnison and greater sage-grouse depend on a variety of shrub-steppe habitats throughout their life cycle and are considered obligate users of several species of sagebrush (Patterson 1952, p.42; Braun et al. 1976; Schroeder et al. 1999; Connelly et al. 2000; Connelly et al. 2004, Miller et al. in press). Dietary requirements of the two species are also similar, being composed of nearly 100 percent sagebrush in the winter, and forbs and insects as well as sagebrush in the remainder of the year (Wallestad et al. 1975, p. 21; Schroeder et al. 1999, p. 5; Young et al. 2000, p. 452). Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore, lack the ability to grind and digest seeds (Leach and Hensley 1954, p. 389). In addition to serving as a primary year-round food source, sagebrush also provides cover for nests and chicks (Connelly et al. 2000). Thus, sage-grouse distribution is strongly correlated with the distribution of sagebrush habitats (Schroeder et al. 2004, p. 364). Connelly et al. (2000) segregated habitat requirements into four seasons: (1) breeding (2) summer - late brood rearing (3) fall and (4) winter. Depending on habitat availability and proximity, some seasonal habitats may be indistinguishable. The Gunnison Sage-grouse Rangewide Steering Committee (GSRSC) (2005, p. 27-31) segregated habitat requirements into three seasons: (1) breeding (2) summer–late fall and (3) winter. For purposes of this finding, the seasons referenced in GSRSC (2005) are used because that publication deals specifically with GUSG. Sage-grouse exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats, which includes breeding, nesting, brood rearing, and wintering areas, even when the area is no longer of value Connelly et al. 2004, p. 3-1). Adult sage-grouse rarely switch among these habitats once they have been selected, limiting their adaptability to changes. Sage-grouse distribution is associated with sagebrush (Schroeder et al. 2004 p. 364), although sagebrush is more widely distributed than sage-grouse because sagebrush does not always provide suitable habitat due to fragmentation and degradation (Schroeder et al. 2004, pp. 369, 372).

22

BLM_0025346

*Status and Distribution*

The Service listed the GUSG as an endangered species on November 20, 2014 (79 FR 69192). Concurrently, the Service designated 1,429,551 million acres of critical habitat for the species in nine southwestern Colorado counties and two southeastern Utah counties (79 FR 69312). Following is a brief description of the current distribution of the species' range-wide population and trends. A detailed discussion of GUSG taxonomy, the species description, historical distribution, habitat, and life-history characteristics can be found in the Service's 12-month finding for the GUSG (75 FR 59804).

Based on historical records, museum specimens, and potential sage grouse habitat, Schroeder et al. (2004) concluded that GUSG historically occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southeastern Utah. Accounts of GUSG in Kansas and Oklahoma, as suggested by Young et al. (2000), are not supported with museum specimens and Schroeder et al. (2004) did not consider those two states within the historic range of GUSG. The GUSG historical (presettlement) range is estimated to have been 55,350 square kilometers (km2) (21,370 square miles [mi2]) (GSRSC 2005).

Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 3,795 square kilometers (km2) (1,511 square miles [mi2]) (GSRSC 2005; CDOW 2009a). The seven populations are Gunnison Basin, San Miguel Basin, Monticello–Dove Creek, Piñon Mesa, Crawford, Cerro Summit–Cimarron–Sims Mesa, and Poncha Pass (FR 69192). Population trends over the last 12 years indicate that six of the populations are in decline, with some increasing since 2011. The largest population, the Gunnison Basin population, while showing variation over the years, has been relatively stable through the period (CDOW 2010; CPW 2012). Six of the populations are very small and fragmented (all with less than 40,500 hectares (ha) (100,000 acres [ac]) of habitat likely used by grouse and, with the exception of the San Miguel population, less than 50 males counted on leks (communal breeding areas)) (CDOW 2009b; CPW 2012). The San Miguel population is the second largest and comprises six fragmented subpopulations.

## ENVIRONMENTAL BASELINE

Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed State or Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State of private actions which are contemporaneous with the consultation process. The implementing regulations for section 7(a)(2) define the "action area" as all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action (50 CFR 402.02).

## Colorado Hookless Cactus

23

BLM_0025347

*Status of the Species in the Action Area*

Within the action area, the Colorado hookless cactus occurs primarily near DeBeque, Colorado, (north and south of Interstate 70) and in the Whitewater, Colorado, area. The Denver Botanic Gardens, in collaboration with the BLM, conducts on-going cactus monitoring of several populations within the action area west of DeBeque and north of Mesa. Monitoring data indicate the species is stable throughout its range (DePrenger-Levin and Kao 2013).

On November 15, 2012, the Service issued BO number ES/GJ-6-CO-12-F-006. The opinion evaluated the effects of livestock grazing on the Colorado hookless cactus, DeBeque phacelia, and the clay-loving wild buckwheat on three BLM Field Offices including the GJFO. The 2012 BO found that grazing activities would cause adverse effects to the Colorado hookless cactus, but that these activities would not jeopardize the continued survival of the cactus. The BLM does not anticipate additional effects to the Colorado Hookless cactus caused by the grazing program.

*Past and Present Impacts*

The primary threats to Colorado hookless cactus are (Service 2010):
- Natural gas exploration and production
- Pipelines, utilities, and other rights-of-way (ROWs)
- Off-highway vehicle activity
- Livestock grazing and trampling
- Herbicides and pesticides
- Hybridization
- Illegal human collection
- Potential water developments
- Climate change

Threats to the species within the GJFO include habitat degradation as a result of livestock trampling and grazing, non-native halogeton and cheatgrass encroachment, energy development, recreation, and unauthorized collection. Predation by rabbits and cactus-borer beetle (*Moneilema semipunctatum*) may also be a significant source of mortality (Service 2010). Of the 3,200 acres of habitat for the Colorado hookless cactus, 2,700 acres are currently under existing leases.

## DeBeque Phacelia

*Status of the Species in the Action Area*

There are 19,600 acres of critical habitat within the action area. Of the nine designated critical habitat units (CHUs), unit 2 (Pyramid Rock) is the largest at approximately 17,321 acres located west of the town of DeBeque, Colorado.

On November 15, 2012, the Service issued BO number ES/GJ-6-CO-12-F-006. The opinion evaluated the effects of livestock grazing on the Colorado hookless cactus, DeBeque phacelia,

24

BLM_0025348

and the clay-loving wild buckwheat on three BLM Field Offices including the GJFO. The 2012 BO found that grazing activities would cause adverse effects to the DeBeque phacelia and its critical habitat, but that these activities would not jeopardize the continued existence of the species. Further, the Service found that the grazing program will not result in the destruction or adverse modification of critical habitat for DeBeque phacelia.

*Past and Present Impacts*

The primary threats to DeBeque phacelia are as follows (Service 2013):
- Oil and gas development
- Utility and energy corridors
- Livestock use and trampling
- OHV use
- Invasive nonnative plants
- Water reservoirs
- Climate change and drought

DeBeque phacelia is especially vulnerable to habitat loss by virtue of being restricted to the barren and semi-barren habitat of specific members of the Wasatch geological formation that has a limited distribution within the Piceance Basin (Ladyman 2003). Its habitat coincides with high potential natural gas reserves and has historically been affected by activities associated with resource extraction. Activities that lead to significant soil disturbance, or progressive soil erosion, eliminate or sharply reduce the seed bank, which appears to be the mechanism by which populations survive. Additionally, surface-disturbing activities can introduce and spread weeds resulting in altered plant communities that threaten DeBeque phacelia. Impacts on DeBeque phacelia have also been documented from OHV use and livestock trampling (Service 2013). Of the 19,600 acres of critical habitat designated for the DeBeque Phacelia, 19,400 acres are currently under existing leases.

**Gunnison sage-grouse**

*Status of the Species within the Action Area*

The action area for the proposed RMP encompasses lands within the GJFO including GUSG habitat defined as "occupied," and "unoccupied" as described in the final rule (79 FR 69312). Within the GJFO, GUSG occur on the Glade Park/Pinon Mesa and northern Uncompahgre Plateau areas in the southwestern part of the Field Office Planning Area.

Piñon Mesa Population—The Piñon Mesa population occurs on the northwestern end of the Uncompahgre Plateau in Mesa County, Colorado about 35 km (22 mi) southwest of Grand Junction, Colorado. Gunnison sage-grouse likely occurred historically in all suitable sagebrush habitat in the Piñon Mesa area, including the Big Dominguez watershed area of the Uncompahgre Plateau, southeast of Piñon Mesa proper (Rogers 1964). Their current distribution is approximately 18,080 ha (44,678 ac) (GSRSC 2005) which, based on a comparison of potential presettlement distribution, is approximately six percent of presettlement habitat on the northern portion of the Uncompahgre Plateau in Mesa County, Colorado, and Grand County,

BLM_0025349

Utah. The 2014 population estimate was 182 birds (CPW 2014a), much greater than the 2012 estimate of 54 birds. This increase is likely due to the transplanting of 93 grouse to Piñon Mesa population between the fall of 2012 and spring of 2014 (CPW 2014b and the discovery of two additional leks in 2012 (CPW 2012). Population estimates from 1996 to 2014 are below the population target of 200 breeding birds (based on a 10-year average) for the Piñon Mesa population, as set forth by the RCP (CPW 2014a; GSRSC 2005). Of 12 known leks, only 4 were active in 2012 (CPW 2012).

*Threats*

The primary threats to the GUSG within the GJFO include:

- Habitat Loss, degradation and Fragmentation from Residential, Commercial and Agricultural conversion and urbanization
- Fire
- Invasive species
- Recreation

## EFFECTS OF THE ACTION

Effects of the action refer to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated and interdependent with that action that will be added to the environmental baseline. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration. Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur.

### Colorado hookless cactus and DeBeque phacelia

As stated in the consultation history, the Service concurred with the determination of may affect, not likely to adversely affect the Colorado hookless cactus and the DeBeque phacelia for the IWMP. In addition, the Service addressed the adverse effects to the Colorado hookless cactus and the DeBeque phacelia caused by livestock grazing on the GJFO in BO number ES/GJ-6-CO-12-F-006 (Tails: 06E24100-2012-F-0020). The proposed action (revised RMP) will not cause additional effects from grazing or weed management. Therefore, the effects of grazing and weed management have been fully considered and the section 7 requirement has been satisfied for the Colorado hookless cactus and the DeBeque phacelia. Adverse effects to these plant species may result from implementation of vegetation management, comprehensive travel and transportation management under the proposed action. Specifically, the designation of routes within the GJFO is likely to result in negative effects to these species. In addition, adverse effects to the plant are likely to occur from the presence of wild horses and the issuance of permits to drill on existing leased lands.

Actions that affect listed plant species may result in the following general effects:

26

BLM_0025350

Direct mortality - Mortality can result from crushing, trampling, or physically removing plants. Contact with herbicides or other chemicals, can also cause direct mortality. Where occurrences of a plant are small, loss of a portion of the plants can compromise its viability. Loss of occurrences can compromise species viability due to reduced genetic diversity and a reduced ability to withstand natural or man-made disturbances.

Loss of vigor or reduced reproductive success - Trampling and coming in contact with chemicals may not always result in mortality. However, exposure to these impacts can reduce vigor, which affects the plant's ability to reproduce and sustain the population. The consumption of flowers, seeds, stems, and foliage of special status plants (herbivory) can reduce reproductive success, or in some cases result in death. Dust deposited on special status plants may reduce their photosynthetic ability, or the ability of pollinators to transfer pollen between plants.

Direct loss of potential or occupied habitat - Direct habitat loss results when habitat is physically destroyed or converted to a form that is unsuitable for the impacted species. Direct habitat loss can be short term or permanent. Surface-disturbing activities, such as construction and use of roads, trails, parking lots, buildings, power poles, wind turbines, and ponds, may result in permanent loss of occupied or potentially occupied habitat. This would reduce the total habitat capable of supporting listed plant populations and fragment remaining populations.

Short-term, temporary habitat loss can occur with habitat improvement projects, such as those addressing encroaching junipers in sagebrush or salt desert shrub habitats. Closure or reclamation of disturbed areas may eventually restore lost habitat. However, disturbance can require years or decades for recovery to pre-disturbance condition. If reclamation does not result in habitat suitable for sustaining special status plants, habitat may be permanently lost.

Changes in habitat structure - A canopy cover of shrubs offers habitat characteristics that appear to be favorable for several special status plant species, such as Colorado hookless cactus, to germinate and become established. Shrubs may protect some special status plants from herbivory or trampling and may provide improved moisture availability or reduced moisture loss under the canopy. Surface-disturbing activities that significantly reduce the percent canopy cover of shrubs may allow increased herbivory or moisture loss, resulting in decreased vigor or mortality of special status plants.

Competition - Changes in species composition also affect listed plant populations. Proliferation of noxious weeds or other invasive plants may render habitat unsuitable by outcompeting listed plants for water and nutrients or by preventing seedling germination and establishment. Occupied Colorado hookless cactus habitat that is dominated by cheatgrass appears to inhibit seedling cactus germination, thereby threatening the long-term viability of this population. In some cases, increases in canopy cover and density of native species, particularly grasses, can compete with listed plants for limited water and nutrients.

Other species, such as DeBeque phacelia thrive in environments where vegetation is sparse and competition is low. Increases in vegetation cover (following disturbances, such as fire or seeding) may cause competition with special status plants, resulting in decreased vigor or mortality.

27

BLM_0025351

Loss of pollinators or pollinator habitat - Actions that disturb pollinators or that destroy their habitat can have a detrimental effect on plant species. Long-term loss of pollinators can reduce the reproductive ability of these plant species and affect maintenance and genetic diversity of populations.

Habitat fragmentation - Habitat becomes fragmented when contiguous habitat is broken into smaller blocks by surface- disturbing activities and distances between suitable habitat patches increase. Because pollinators fly only limited distances, they are less likely to use small and isolated patches of habitat. Habitat fragmentation can effectively isolate pollinators from special status plants. Smaller populations receive fewer pollinator visits, so seed production is lower in small populations.

Small population size decreases reproductive success and increases inbreeding and loss of genetic variation. As a result, fragmentation may lower population viability and increase local population extinction risk (Kolb 2008). Herbivory does not decrease with population size. Instead, it enforces fragmentation by further reducing the number of flowering individuals (Kolb 2008). Closure and rehabilitation of roads in listed plant habitat may benefit the long-term survival of populations by decreasing habitat fragmentation.

Soil compaction - Soil compaction resulting from heavy equipment or vehicle travel may reduce soil pore size, inhibit water infiltration, and restrict root penetration, thereby inhibiting maintenance and establishment of special status plants.

Erosion or sedimentation - Special status plants may be washed away or their roots may be exposed by erosion from surface-disturbing activities, such as blading or bulldozing for roads. Special status plants may be buried by sedimentation resulting from disturbances upslope of special status plant populations.

Alteration of hydrologic conditions - Some special status plant species (such as Ute ladies'-tresses orchid), which are dependent on seasonally flooded environments, sub-irrigated soils, or seeps, may be negatively affected by changes in surface or groundwater flow.

Changes in fire regime - Changes in species composition, either in special status plant habitat or in adjacent plant communities, may alter the natural fire regime to which the plants are adapted. Cheatgrass, a highly flammable annual grass, may drastically increase the fire frequency in special status plant habitat, affecting the survivability and viability of the population.

Habitat restoration - This can result from vegetation management projects, hydrologic function restoration, invasive species removal, historic fire regimes restoration, grazing management alteration, or other methods. However, any habitat restoration project for special status plants must be designed specifically for the individual plant species and its specific habitat and site conditions. Generalized habitat restoration projects that do not focus on special status plant needs can have negative effects on these species.

Comprehensive Travel and Transportation Management

BLM_0025352

The BA assumes that certain distances between an activity/action and federally listed plants or habitats, trigger an effect to the species. However, the magnitude of the effect was not defined in the document. We contacted the BLM to confirm that an activity/action within 200 meters of a federally listed plant or plant population triggered a may affect conclusion with regard to that activity/action. If the activity/action occurs within 20 meters of a plant or plant population, the action would cause adverse effects to the plants. An additional assumption is that in some situations, route designations under the revised RMP may fall within 20 meters of unknown locations of federally listed plants, plant populations, and critical habitat (if applicable), causing adverse effects.

As stated above, the proposed RMP designates 126,200 acres closed to motorized use; 925,200 acres closed to cross-country travel, with travel authorized on designated routes, and retains 10,200 acres of open (cross-country) motorized use. The change in management from open cross-country motorized travel to restricting motorized travel to designated routes represents a significant reduction in potential direct and indirect effects to federally listed plants. However, the restriction of motorized use to designated routes is still likely to result in adverse effects to listed plants in proximity to the designated routes.

Direct effects on listed plants from recreation include surface disturbing activities, such as construction of developed recreation facilities, motorized or off-road vehicle (OHV) use, and foot or horse travel. Dispersed recreation off existing roads or trails can result in direct mortality of listed plant species from crushing, trampling, or uprooting. Indirect effects may also occur from recreational use, such as soil compaction, changes in vegetation composition and structure, and loss of vegetative cover; all of which may degrade habitat. Additionally, increased disturbance can result in the spread and establishment of noxious weed populations. The levels of impact are related to the duration, intensity, and expanse of recreation, and are expected to increase with increased visitation. The risk of impacts is greatest in areas where concentrated human activity, such as Special Recreation Management Areas (SRMAs) and Extensive Recreation Management Areas (ERMAs), overlap with habitat for listed plant species. In general, SRMAs, and ERMAs would avoid much of the currently occupied habitats for special status plant species; however, in some areas the BLM will employ adaptive management to protect special status species if impacts occur. Impacts would be more likely to occur in areas that have not been previously inventoried (i.e. unknown occurrences). Travel routes would be planned to avoid known occurrences.

Oil and Gas Development

Direct impacts associated with oil and gas development include habitat disturbance, fragmentation, and destruction; as well as direct mortality from construction equipment, land clearing activities, and vehicle use. The construction of access roads, well pads, pipelines, buildings, holding tanks, and other infrastructure associated with oil and gas development can fragment or degrade habitat, and result in indirect effects such as erosion, sedimentation, and establishment of noxious weeds.

BLM_0025353

**Colorado Hookless Cactus**

Under the proposed RMP, 56.4 miles of routes open to the public are located within 200 meters of known Colorado hookless cactus occurrences. Approximately 11 miles of open routes are county maintained where the BLM has limited discretion. Approximately 48 miles of existing routes are proposed for closure and rehabilitation. Approximately 4 miles of routes will be designated within 20 meters of known Colorado hookless cactus occurrences, thus causing adverse effects as described above, and 1.1 miles of routes would be restricted to administrative and permitted use. There will be 5.8 miles of routes within 20 meters of known occurrences proposed for closure and rehabilitation. The BLM also anticipates impacts to plants, in the form of trampling, caused by cross-country foot and horse travel.

As stated above, approximately 2,700 acres of Colorado hookless cactus habitat is currently under existing leases. Since the conservation framework in the revised RMP cannot affect currently leased lands in any meaningful way, we anticipate a full spectrum of impacts described above may occur, including the potential loss of cactus plants. We further anticipate that BLM will work with any applicant and the Service to minimize negative effects to the plants to the maximum extent practicable through conditions of approval for applications for permits to drill.

Wild Horses

Under the revised RMP, the BLM will continue to manage the 35,200-acre Little Book Cliffs Wild Horse Range (LBCWHR) located northwest of Palisade, CO. Colorado hookless cactus occurrences have been recorded in this area, and may be trampled and/or habitat degradation may occur. The LBCWHR will be managed at an appropriate management level, currently identified as 90-150 wild horses, although this number may be adjusted if warranted by range conditions.

At this broad programmatic scale, it is not possible to quantify the loss of plants impacted by implementation of the proposed action. The conservation measures for listed species within the revised RMP should significantly reduce impacts to federally listed plants and critical habitat (as appropriate). We anticipate a low level of mortality of plants relative to the populations of Colorado hookless cactus within the GJFO.

**DeBeque phacelia**

The BLM stated that numerous actions, stipulations, BMPs and other measures section 4.2.1 (in the BA) would be implemented under the RMP to protect the DeBeque phacelia and its habitat throughout the planning area. However, their determination indicated that adverse effects from livestock grazing and travel management are still anticipated.

The BLM identified 1.4 miles of designated routes within 200 meters of known DeBeque phacelia populations, including 0.9 miles of county- maintained roads where the BLM may lack discretion, and did not identify any routes occurring within 20 meters of known occurrences. However, consistent with our assumption, unknown individuals or populations, and critical

30

BLM_0025354

habitat may occur within 20 meters of designated routes. Thus, these routes are likely to cause adverse effects the species and critical habitat.

The RMP will retain the 1,300-acre Pyramid Rock ACEC and designate the 28,200-acre South Shale Ridge ACEC, which both contain critical habitat for the DeBeque phacelia, specifically the Pyramid Rock and Sulphur Gulch CH Units. The Pyramid Rock ACEC contains only a small portion of the Pyramid Rock CH Unit, but the South Shale Ridge ACEC includes all of the Sulphur Gulch CH Unit. Stipulation NSO-12 (ACECs) prohibits surface occupancy and surface-disturbing activities within each ACEC. All nine critical habitat units will be subject to Stipulations CSU-9 (Sensitive Plant Species Occupied Habitat), NSO-13 (Critical Habitat), LN-3 (Biological Inventories in known or suspected habitat) and LN-4 (Botanical Inventories in known habitat of T & E plant species).

As stated above, approximately 19,400 acres of DeBeque phacelia habitat is currently under existing leases. Since the conservation framework in the revised RMP cannot affect currently leased lands in any meaningful way, we anticipate a full spectrum of impacts described above may occur, including the potential loss of these plants. We further anticipate that BLM will work with any applicant and the Service to minimize negative effects to the plants to the maximum extent practicable through conditions of approval for applications for permits to drill.

At this broad programmatic scale, it is not possible to quantify the loss of plants impacted by implementation of the proposed action. The conservation measures for listed species and critical habitat within the revised RMP should significantly reduce, and may eliminate future impacts to federally listed plants and critical habitat (as appropriate). We anticipate a low level of mortality of plants relative to the populations within the GJFO.

**Gunnison sage-grouse**

*Factors to be Considered*

Gunnison sage-grouse depend on sagebrush for their survival and persistence, and the historic and current distribution of the GUSG closely matches that of sagebrush (Patterson 1952; Braun 1987; Schroeder et al. 2004, and references therein). Habitat fragmentation resulting from human development patterns is especially detrimental to GUSG because of their dependence on large expanses of sagebrush (Patterson 1952; Connelly et al. 2004; Connelly et al. 2011) and more contiguous sagebrush habitats (Rogers 1964; Wisdom et al. 2011). In addition, female Gunnison and greater sage-grouse exhibit strong site fidelity to nesting locations (Connelly et al. 1988; Young 1994; Lyon 2000, Connelly et al. 2004, Holloran and Anderson 2005). Sage-grouse often will continue to return to altered breeding habitats (leks, nesting areas, and early brood-rearing areas), despite any past failures in nesting or productivity (Rogers 1964; Wiens and Rotenberry 1985; Young 1994; Lyon 2000, Connelly et al. 2004; Holloran and Anderson 2005). Consequently, there may be lags in the response of GUSG to development or habitat changes, similar to those observed in other sagebrush obligate birds (Wiens and Rotenberry 1985).

31

BLM_0025355

The distribution of sage-grouse habitat is naturally disconnected due to the presence of unsuitable habitats such as forests, deserts, and canyons across the landscape (Rogers 1964). However, the onset of Euro-American settlement in the 1800s resulted in significant human alterations to sagebrush ecosystems throughout North America, primarily as a result of urbanization, agricultural conversion, and irrigation projects (West and Young 2000; Miller et al. 2011). Areas in Colorado that supported basin big sagebrush were among the first sagebrush community types converted to agriculture because their soils and topography are well-suited for agriculture (Rogers 1964). Decreases in the abundance of sage-grouse paralleled the loss of range (Braun 1998), and a gradual but marked decrease in sage-grouse distribution and numbers in Colorado had begun around 1910 (Rogers 1964).

Sagebrush habitats within the range of GUSG are becoming increasingly fragmented as a result of various changes in land uses and the expansion in the density and distribution of invasive plant species (Oyler-McCance et al. 2001; Schroeder et al. 2004). Based on spatial modeling, a variety of human developments including roads, energy development, residential development, and other factors known to cause habitat decline were correlated with historical loss of range and extirpation of Gunnison and greater sage-grouse (Wisdom et al. 2011). The model indicated that no secure areas (areas where the risk of extirpation appears low) of occupied range are evident for GUSG (Wisdom et al. 2011). Landscapes containing large and contiguous sagebrush patches and sagebrush patches in close proximity had an increased likelihood of sage-grouse persistence (Wisdom et al. 2011).

The degree to which habitat fragmentation prevents a species' movement across the landscape depends, in part, on that species' ability to move large distances and thereby adjust to changes on the landscape. Sage-grouse are wide-ranging and capable of making large seasonal movements, because they require a diversity of seasonal habitats (Connelly et al. 2000, and references therein). Movements as great as 56 km (35 mi) have been documented in the Gunnison Basin (Phillips 2013). In contrast, the maximum recorded movement distance of GUSG in the Monticello population is 8.2 km (5.1 mi), associated with winter movement (Ward 2007). Prather (2010) noted that such behavior may be due to the presence of large areas of piñon -juniper (i.e. less suitable habitats) which bracket currently occupied habitat in the Monticello population area. Population dynamics of greater sage-grouse in northwestern Colorado functioned at much smaller scales than expected for a species capable of moving large distances (Thompson 2012), suggesting that large expanses of contiguous sagebrush habitat may not be necessary for sage-grouse survival. The majority of juvenile dispersal was intra-population movement (within one breeding population), with only one inter-population movement (between separate breeding populations) observed during the study (Thompson 2012). As a result, juvenile recruitment into home breeding ranges ranged between 98 and 100 percent (Thompson 2012). Based on observed bird dispersal in that study, gene flow and connectivity can likely be maintained for populations within 5 to 10 km (most dispersals were less than 10 km) and possibly as far as 20 km (the maximum dispersal distance of birds studied) in greater sage-grouse (Thompson 2012). Because bird movements likely vary by population and area, their susceptibility to habitat loss and degradation may also differ. We expect that where habitat is already more limited (quantity and quality) and isolated, such as in the six satellite populations, habitat loss and decline will have more serious consequences in terms of population fitness and survival. Where habitat is already severely limited or degraded, or where sage-grouse

32

populations are small, any loss of habitat may impact those populations. In addition, habitat loss impacts are expected to be greater in important seasonal habitats, such as areas used during moderate to severe winters, or in lekking, nesting, or brood-rearing habitats (GSRSC 2005).

The decline or loss of lek and brood-rearing habitats can have serious consequences for sage-grouse population viability by reducing reproductive success and recruitment (survival of young to breeding age). Limitations in the quality and quantity of nesting and early brood-rearing habitats, in particular, are especially important because GUSG population dynamics are most sensitive during these life-history stages (GSRSC 2005). Juvenile recruitment is one of the most important demographic factors influencing or limiting sage-grouse population growth rates and viability (Connelly et al. 2004, GSRSC 2005).

Roads

Impacts to GUSG from roads may include direct habitat loss, direct mortality, barriers to migration corridors or seasonal habitats, facilitation of predation and spread of invasive vegetative species, and other indirect influences such as noise (Forman and Alexander 1998).

Roads have been shown to fragment GUSG habitat, with road avoidance by birds presumably to limit exposure to human activity and predation (Oyler-McCance et al. 2001). The probability of GUSG habitat occupancy (presence based on pellet surveys or sage-grouse observation) was positively correlated with distance to roads and habitat patch size (Oyler-McCance et al. 1999).

Gunnison sage-grouse may avoid road areas because of noise, visual disturbance, pollutants, and predators moving along roads, which further reduces the amount of available habitat. An unpublished study by Western State Colorado University and CPW in the Gunnison Basin found that anthropogenic noise was significantly higher at leks closer to roads and human activity centers than leks farther from those sources (Piquette et al. 2013). Leks with higher noise levels were associated with lower GUSG male counts and attendance (Piquette et al. 2013). The landscape-scale spatial model predicting GUSG nest site selection showed strong avoidance of areas with high road densities of roads classed 1 through 4 (primary paved highways through primitive roads with 2-wheel drive sedan clearance) within 6.4 km (4 mi) of nest sites (Aldridge et al. 2012). Nest sites also decreased with increased proximity to primary and secondary paved highways (roads classes 1 and 2) (Aldridge et al. 2012). Male greater sage-grouse lek attendance was shown to decline within 3 km (1.9 mi) of a deep seam natural gas well haul road where traffic volume exceeded one vehicle per day (Holloran 2005). If noise from roads interferes with mating displays, and thereby female attendance, younger males will not be drawn to the lek and eventually leks will become inactive (Amstrup and Phillips 1977; Braun 1986). However, other information (CPW 2013) suggests GUSG in the Gunnison Basin may be fairly tolerant of roads, even the more heavily used highways and county routes, and the potential direct or indirect effects of those roads.

The presence of roads increases human access and resulting disturbance effects in remote areas (Forman and Alexander 1998; Forman 2000; Connelly et al. 2004). In addition, roads can provide corridors for predators to move into previously unoccupied areas. Some mammalian species known to prey on sage-grouse, such as red fox (*Vulpes vulpes*), raccoons (*Procyon lotor*),

33

and striped skunks (*Mephitis mephitis*), have greatly increased their distribution by dispersing along roads (Forman and Alexander 1998; Forman 2000; Frey and Conover 2006). Corvids (Family Corvidae: crows, ravens, magpies, etc.) also use linear features such as primary and secondary roads as travel routes (Bui 2009), expanding their movements into previously unused regions (Knight and Kawashima 1993; Connelly et al. 2004). Corvids are significant sage-grouse nest predators and were responsible for more than 50 percent of nest predations in Nevada (Coates 2007).

The expansion of road networks also contributes to exotic plant invasions via introduced road fill, vehicle transport, and road maintenance activities (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003; Knick et al. 2003; Connelly et al. 2004). Invasive species are not limited to roadsides, but also encroach into surrounding habitats (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003). Upgrading unpaved four-wheel-drive roads to paved roads resulted in increased cover of exotic plant species within the interior of adjacent plant communities (Gelbard and Belnap 2003). This effect was associated with road construction and maintenance activities and vehicle traffic, and not with differences in site characteristics. The incursion of exotic plants into native sagebrush systems can negatively affect GUSG through habitat losses and conversions.

Powerlines

Depending on the infrastructure design, size, location, and site-specific factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998; Connelly et al. 2000) and can have indirect effects by decreasing lek recruitment (Braun et al. 2002, Walker et al. 2007), increasing predation (Connelly et al. 2004), fragmenting habitat (Braun 1998), and facilitating the invasion of exotic annual plants (Knick et al. 2003; Connelly et al. 2004).

In areas where vegetation is low and the terrain relatively flat, power poles provide an attractive hunting, roosting, and nesting perch for many species of raptors and corvids, known predators of GUSG (Steenhof et al. 1993; Connelly et al. 2000; Manville 2002; Vander Haegen et al. 2002). Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof et al. 1993; Manville 2002), thereby increasing the likelihood of predation where sage-grouse occur. Golden eagle (*Aquila chrysaetos*) predation on sage-grouse on leks increased from 26 to 73 percent of the total predation after completion of a transmission line within 200 meters (m) (220 yards (yd)) of an active sage-grouse lek in northeastern Utah (Ellis 1985). The lek was eventually abandoned, and Ellis (1985) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and caused fragmentation of the habitat.

Powerlines may negatively impact sage-grouse habitats even if raptors are not present. The use of otherwise suitable habitat by sage-grouse near powerlines increased as distance from the powerline increased for up to 600 m (660 yd) (Braun 1998), indicating sage-grouse avoidance of powerlines. Based on those unpublished data, Braun (1998) reported that the presence of powerlines may limit Gunnison and greater sage-grouse use within 1 km (0.6 mi) in otherwise

34

suitable habitat. Based on spatial modeling, sage-grouse extirpation appears to be correlated to the presence of powerlines (Wisdom et al. 2011).

Livestock Grazing

Livestock management and domestic grazing have the potential to degrade GUSG habitat. Grazing can adversely impact nesting and brood-rearing habitat by decreasing vegetation available for concealment from predators. Decreases in vegetation may result in failures in nesting or reduced or lost productivity. Grazing also has been shown to compact soils, decrease herbaceous abundance, increase erosion, and increase the probability of invasion of exotic plant species (GSRSC 2005). The impacts of livestock operations on GUSG depend upon stocking levels and season of use.

We know that grazing can have negative impacts to sagebrush and consequently to GUSG at local scales. Impacts to sagebrush plant communities as a result of grazing are occurring on a large portion of the range of the species. Given the widespread nature of grazing within the range of GUSG, the potential for population-level impacts exists.

Livestock grazing may also have positive effects on sage-grouse under some habitat conditions. Sage-grouse use grazed meadows significantly more during late summer than ungrazed meadows because grazing had stimulated the regrowth of forbs (Evans 1986). Greater sage-grouse sought out and used openings in meadows created by cattle grazing in northern Nevada (Klebenow 1981). Also, both sheep and goats have been used to control invasive weeds (Mosley 1996 in Connelly et al. 2004; Merritt et al. 2001; Olsen and Wallander 2001) and woody plant encroachment (Riggs and Urness 1989) in sage-grouse habitat.

Fences

Effects of fencing on sage-grouse include direct mortality through collisions, creation of raptor and corvid perch sites, the potential creation of predator corridors along fences (particularly if a road is maintained next to the fence), incursion of exotic species along the fencing corridor, and habitat decline (Call and Maser 1985; Braun 1998; Connelly et al. 2000; Beck et al. 2003; Knick et al. 2003; Connelly et al. 2004). However, fences can also benefit GUSG by facilitating the management of livestock forage use and distribution to achieve desired habitat objectives (GSRSC 2005).

Sage-grouse frequently fly low and fast across sagebrush flats, and fences can create a collision hazard resulting in direct mortality (Call and Maser 1985; Christiansen 2009). Not all fences present the same mortality risk to sage-grouse. Mortality risk appears to be dependent on a combination of factors including design of fencing, landscape topography, and spatial relationship with seasonal habitats (Christiansen 2009).

Although we expect the impacts of fences to GUSG are similar to those observed in greater sage-grouse, studies on fence strike-related mortality in GUSG are more limited. However, in 10 years of tracking and studying over 1,000 radio-collared sage-grouse in Colorado, CPW has documented only two strike-related mortalities in GUSG due to fences (one confirmed case in

BLM_0025359

Poncha Pass attributed to bird release methods; and one unconfirmed case in the Gunnison Basin).

Fence posts create perching places for raptors and corvids, which may increase the ability of these birds to prey on sage-grouse (Braun 1998; Oyler-McCance et al. 2001; Connelly et al. 2004). This impact is potentially significant for sage-grouse reproduction because corvids were responsible for more than 50 percent of greater sage-grouse nest predations in Nevada (Coates 2007). Greater sage-grouse avoidance of habitat adjacent to fences, presumably to minimize the risk of predation, effectively results in habitat fragmentation even if the actual habitat is not removed (Braun 1998). Because of similarities in behavior and habitat use, the response of GUSG should be similar to that observed in greater sage-grouse.

We recognize that the stipulations, controlled surface uses, and timing limitations include exceptions, modifications, and waivers. For the purposes of this BO, we assume that the BLM granting of exceptions, modifications, or waivers, to stipulations or controlled surface uses, or timing restrictions within critical habitat for the GUSG will be extremely rare and requires separate section 7 consultation. We make this assumption for the purpose of a simplified effects analysis. It is not possible for to anticipate use of exceptions, modifications, or waivers, therefore it is not possible for us to reasonably predict the negative effects to GUSG or their critical habitat associated with their use. The use of exceptions, modifications, and waivers within critical habitat for the GUSG may require reinitiation of section 7 consultation.

*Analysis of Effects of the Action*

The BA concluded that implementation of the RMP where the following resources or issues occur will not affect the GUSG or its critical habitat: air and climate; wild horses; cultural resources; paleontological; visual water; wild and scenic rivers; lands with wilderness characteristics; forestry, national trails; national, State, and BLM byways; wilderness study areas; Native American tribal uses; public health and safety; socioeconomic; and environmental justice. These issues will not be further addressed within this BO.

Vegetation Management

Vegetation management and protection would impact GUSG. Management to improve and protect vegetation conditions throughout the planning area would improve vegetative cover, reduce the likelihood for erosion and sedimentation, and maintain seed banks. Most vegetation treatments would not directly affect GUSG, as a timing limitation would be applied to avoid impacts during sensitive periods. Vegetation treatments would improve habitat for GUSG in the long-term by providing more opportunities for lekking, nesting, brood-rearing, wintering, cover, and foraging. However, in the short-term, vegetation treatments may remove habitat or increase the potential for weed spread. In addition, human disturbance and noise associated with the use of heavy equipment for vegetation removal could temporarily displace GUSG from foraging, breeding, nesting, and wintering habitats.

Gunnison sage-grouse habitat would be improved and maintained through vegetation treatments, prioritizing winter sage-grouse habitat for treatment and restoration, developing restoration plans

BLM_0025360

in non-functioning habitat, reducing pinyon-juniper encroachments, increasing habitat connectivity, and managing for age class diversity. Actions to reduce pinyon-juniper woodland invasion of upper elevation sagebrush communities would benefit GUSG that require open sage parks. Monitoring after vegetation treatments would occur to evaluate success in meeting objectives. These actions would help support GUSG habitats, and are consistent with the conservation measures identified in the Piñon Mesa Conservation Plan (Piñon Mesa Gunnison Sage Grouse Working Group 2000).

Habitat Improvement

Public land management agencies should continue to improve the quality of sagebrush communities on public land through grazing management, fencing, re-seeding, fuels management, and other treatment projects (GSRSC 2005). The RMP anticipates habitat restoration and improvement, and projects will focus on removal of pinyon-juniper encroachment into sage grouse habitats and on restoration of degraded sage-grouse habitats. Some of the methods used during habitat restoration or improvement may cause short-term negative effects to GUSG. For example, use of fencing to keep livestock out of areas being rested from grazing pressure may provide perches for predators, potentially resulting in avoidance of the area by GUSG.

Weed Management

Noxious and invasive weeds are generally lower in cover and forage value to wildlife and degrade habitat by displacing and reducing optimal cover or food. The RMP goal and objectives call for control and reduction of weeds. Objective VW-O2 requires weed prevention on appropriate actions authorized within the planning area. Action VW-A3 states: Implement preventative measures for activities associated with oil and gas operations; ROWs; range developments; special recreation permits (SRP); and construction and mechanical vegetation treatment activities as authorized in contracts and permits.

Fish and Wildlife Management

The BLM would establish ten wildlife emphasis areas on 150,000 acres to protect areas with high wildlife value and significance, focusing on protecting habitat for big game, cutthroat trout, and sage-grouse. This strategy would allow the BLM to focus their wildlife management efforts in the areas that would be most effective to preserve and protect fish and wildlife, including GUSG. The Timber Ridge and Glade Park wildlife emphasis areas will be of particular benefit to the GUSG, as these boundaries would overlap with occupied habitat for the species and a recently discovered lek in the Timber Ridge area. These wildlife emphasis areas encompass approximately 96 percent of occupied critical habitat and approximately 49 percent of unoccupied critical habitat on BLM-administered lands. The Glade Park emphasis area encompasses 10,100 acres of GUSG occupied critical habitat; this accounts for the majority (95 percent) of occupied proposed critical habitat on BLM-administered lands. Examples of management actions that will be applied in wildlife emphasis areas include stipulations on surface-disturbing activities and recreation restrictions, as well as ROW avoidance and exclusion areas, travel closures, and seasonal restrictions to maintain existing unfragmented habitat and

37

meet wildlife objectives. Approximately 27,200 acres of the Glade Park wildlife emphasis area will be subject to the CO-CSU-Wildlife Habitat stipulation, which would benefit GUSG by restricting surface occupancy or use within this area.

Wildland Fire Management

Wildland fire, fire suppression, and wildland fire management activities have the potential to impact GUSG through loss of sagebrush habitats, erosion, human presence, noise, habitat avoidance, weed invasion, (of particular concern is cheatgrass). These impacts could affect lekking, nesting, brood-rearing, wintering, or foraging behavior. Fire management in the RMP will allow for wildfire suppression in and near GUSG habitat, and emergency stabilization and rehabilitation treatments. Prescribed fire and fuel treatment actions will be considered in vulnerable to catastrophic wildfire events to lessen the likelihood or severity of such events impacting GUSG.

The BLM intends to avoid planned and unplanned fire in low elevation cheatgrass-infested communities, which would help protect adjacent sagebrush habitats used by GUSG. However, prescribed fire, if applied at an appropriate scale, is a viable management tool for protecting Gunnison sagebrush habitats from catastrophic wildfires (GSGRSC 2005). Using a variety of fuel treatments would have short-term effects on GUSG and habitats through vegetation removal, increased likelihood of erosion and sedimentation, human presence, and the potential for habitat avoidance. In the long term, these activities would reduce the likelihood of uncharacteristically large or intense wildfires that could damage large expanses of habitat or kill or displace wildlife. In addition, the condition of upland vegetation would be improved. Cheatgrass recolonization in prescribed burned areas is a notable concern, and reseeding efforts may be necessary to reduce the potential for invasive weeds (GSRSC 2005).

Fire management in occupied and unoccupied critical sage-grouse habitat will continue to focus on immediate suppression in sagebrush habitat, but may impact GUSG habitat in the suppression effort. We cannot predict where and when these impacts may occur, but wildlife suppression activities that impact GUSG habitats will occur under emergency consultation procedures.

Grazing

The RMP includes a number of management actions to incorporate GUSG habitat objectives and management considerations into livestock grazing management. Such measures will help to improve vegetation condition of rangeland areas and could reduce the likelihood of nonnative invasive species introduction or spread. In addition, removing, modifying, or marking fences in high risk areas will help to reduce the likelihood of injury or mortality to GUSG.

The majority of critical habitat is currently meeting land health standards (see Table 4-1 in BA). However, 28 percent of occupied habitat and 9 percent of unoccupied habitat is categorized as meeting the standards with problems, or not meeting the standards. Despite the management actions described above, reductions in herbaceous cover that fall below the Rangewide Conservation Plan habitat guidelines (GSRSC 2005) are likely to continue to occur at times.

BLM_0025362

Adverse effects from trampling of eggs or nests may also occur. This is thought to be rare but the impact is not discountable.

Our conclusion regarding the effects of grazing Federal lands within the GJFO is that, in general, implementation of the grazing program may result in minimal effects to GUSG. We conclude that substantial localized negative effects may occur from over-utilization of forage. However, we believe that on-going monitoring of range conditions will result in the appropriate modification of stocking rate, timing, duration and intensity of grazing in those areas over-utilized by livestock.

As stated above, trampling of nests, or nest abandonment may occur due to the presence of livestock. In addition, flushing of hens from active nests may result in predation of eggs. We believe there is potential for these events to occur on active allotments, but we do not have any means to meaningfully detect or measure these effects, primarily due to low sage-grouse population numbers within the GJFO. In addition, the mere presence of livestock in an area known to be occupied by GUSG may not necessarily result in exposure of the birds to these effects.

Grazing management improvement actions such as fences, corrals, windmills, and stock pond development may result in substantial negative effects to GUSG. Fences may expose grouse to increased predation risk from avian predators and collisions. The RMP provides guidance for removal, modification, and marking of livestock fences. Implementation of this guidance will likely reduce the collision risk for GUSG, but is unlikely to eliminate fence collisions. However, the mere presence of a fence within occupied habitat does not necessarily means collisions will occur.

Water developments may alter existing habitat by congregating livestock use in previously unused upland habitat or by lowering water tables associated with riparian areas. Although water developments can be used to improve overall riparian habitat condition by drawing livestock and wild ungulates away from previously degraded areas, GUSG may be exposed to mosquitoes that may carry West Nile virus, which has been known to cause population declines in wild bird populations, including sage-grouse (GSRSC 2005). We are aware of three mortalities of captive bred GUSG, so it is reasonable to assume that they are susceptible to West Nile virus based on infection and mortality in greater sage-grouse. The revised plan promotes minimizing the likelihood of providing breeding sites for mosquitoes the transmit West Nile virus. However, we conclude that in situations where ponds are developed to provide for livestock water, there is a risk for production of mosquitoes that transmit West Nile virus, resulting in the possible infection, and mortality to GUSG associated with water development project within and near grouse habitat.

Recreation and Travel Management

Habitat loss, degradation, and fragmentation from roads are a major threat to GUSG (79 FR 69162). Recreation, particularly motorized and mechanized, on or off existing roads and trails can cause disturbance to GUSG at sensitive times of the year, particularly during lekking, nesting early brood-rearing and winter. The road and motorized trail system in motorized suitable areas

BLM_0025363

will generally not be considered for expansion or substantial alteration of the transportation system. The proposed action eliminates cross-country motorized use in most of the planning area, except in a limited area. The decision to restrict motorized access to existing roads and trails is generally considered beneficial, because the risk of flushing nesting grouse and other behavioral impacts or destruction of a nest from cross-country travel will be effectively reduced or eliminated.

Under the RMP, within proposed occupied habitat, 18.4 miles of routes will be open to public use (including 1.1 miles of county-maintain roads), and 12.3 miles of routes will be restricted to administrative and permitted use only. Four tenths of a mile of existing routes will be closed and rehabilitated. Within unoccupied habitat, 68.8 miles of routes will be open to public use (including 14.7 miles of county-maintained roads), and 29.6 miles of routes will be restricted to administrative and permitted use. Up to 19.9 miles of routes will be closed and rehabilitated. Habitat loss, degradation, and fragmentation from roads are a major threat to GUSG (79 FR 69162). The collective influences of fragmentation and disturbance from roads reduces the effective habitat as they are avoided by sage-grouse (Knick et al 2011; 79 FR 69162). Impacts related to behavior disruption may occur, particularly along routes occurring in occupied habitat. However, seasonal limitations and route closures within 4 miles of leks will reduce impacts. In addition, the Timber Ridge Wildlife Emphasis Area will be limited to foot and horseback use, which is expected to reduce potential impacts to the lek in this area.

Recreation on Pinon Mesa primarily consists of hunting and mountain biking. Recreation in the area is limited to existing roads and trails. In the winter a minimal number of small game hunters use the area. In late spring and summer, mountain biking occurs within the area. Mountain biking use is not considered to be high, or to have any measurable influence on sage-grouse use in the area. Impacts from big game hunting primarily consist of temporary displacement of individuals flushed by hunters. Big game hunting is not considered a threat to GUSG. Off highway vehicles (OHV) are limited to existing roads and trails. Limited use by OHVs is expected to continue with the primary impact to grouse being disturbance. In the Pinon Mesa area, recreation is limited to areas with public access, and much of the public land is isolated from public road access points, or is often too steep for OHV use. Due to limited access to BLM lands in the area there is very low likelihood for impacts from recreation related activities.

Lands and Realty

Construction and operation of ROW facilities, such as pipelines, roads, and transmission lines, may result in habitat loss, fragmentation, and degradation. Surface disturbance during construction removes vegetation and important habitat components for GUSG and, in most cases, renders the habitat unsuitable. Rights of way, such as those for roads and industrial facilities, may lead to permanent loss of GUSG habitat. Other ROWs, such as those for pipelines or buried power lines, may lead to a more short-term loss of habitat if the area were reclaimed after construction. However, following natural succession regimes, sagebrush communities would take 20 to 30 years to return to preconstruction conditions. In addition to removing vegetation, long-term occupancy of structures and facilities leads to direct habitat loss.

BLM_0025364

Rights-of-way may also lead to habitat fragmentation and degradation. Right of way projects can reduce patch size and increase edge habitats. Since GUSG require large blocks of intact habitat, linear disturbances reduce habitat quality. Surface disturbance can also lead to new weed infestations and spread weeds where infestations already occur. Noxious and invasive weeds are often of lower value to wildlife, and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. The loss and degradation of sagebrush habitat can reduce the carrying capacity of local breeding populations of GUSG, especially in areas where high quality sagebrush habitat is limited (Braun 1998; Connelly et al. 2000). As such, there would likely be more impacts on GUSG and their habitat in areas where ROWs are permitted compared to areas where ROWs are excluded or avoided.

Both the construction and operation phases of ROW projects can lead to disruption impacts. Noise and an increase in human presence during construction may displace GUSG into lower quality habitat and may disrupt breeding and nesting (Holloran 2005). Although construction impacts are generally short term, many impacts would continue during routine maintenance and operation of the ROWs. Gunnison sage-grouse would likely avoid habitat in the vicinity of infrastructure (Holloran et al. 2010), resulting in indirect habitat loss. In addition, noise and an increase in traffic during ROW operation and maintenance would disturb and likely displace GUSG (Lyon and Anderson 2003; Holloran 2005). Avoidance of habitat would be most prevalent during levels of high human activity, such as ROW construction. Gunnison sage-grouse may avoid otherwise suitable habitat as the density of roads and infrastructure increases (Holloran 2005). Avian predators, particularly raptors and corvids (i.e., crows, ravens, and magpies), are attracted to overhead utility lines because they provide perches for various activities, including hunting (Avian Power Line Interaction Committee 2006). Increased predation and harassment of GUSG may occur from new ROW projects involving power lines or other tall structures (Connelly et al. 2004). However, the RMP includes management to remove or modify raptor perches, thereby reducing this threat. In addition, road ROWs may increase mammalian predator densities. Construction and operation of ROW facilities may also lead to direct mortality of GUSG. The potential for GUSG mortality from project construction would be low and likely limited to nesting hens or young chicks that have limited mobility. Direct mortality may occur from collisions with turbines, power lines, or meteorological towers or their supporting infrastructure, such as guy wires (Connelly et al. 2004; Beck et al. 2006). In addition, an increase of traffic on roads from ROW maintenance and operations can lead to direct mortality through vehicle collisions.

The RMP includes ROW exclusion areas, which are any areas within a 0.6-mile radius of any sage-grouse lek. Additionally, all occupied sage-grouse habitat and areas within a 4-mile radius of sage-grouse leks are identified as ROW avoidance areas. These measures would reduce or eliminate the above described impacts on GUSG and their habitat by restricting new ROWs.

Lands

41

BLM_0025365

Renewal of existing authorizations will incorporate sage-grouse conservation measures to the extent possible with the existing use. Some authorizations may necessitate the removal of GUSG habitat and may cause other indirect effects. There is no reasonable means available to predict the timing or location of rights-of-way requests, and we are unable to meaningfully predict an approximate habitat impact from such requests. However, we believe that the revised RMP directs the BLM to reduce the negative impacts of such requests, and is unlikely to result in significant losses of GUSG habitat within the planning area. This allows the BLM to require retrofitting of existing power lines with raptor perch deterrents when reauthorizing ROW permits. In addition, NSO stipulations will limit new disturbances within GUSG habitat by requiring co-location of infrastructure within existing ROW.

Energy and Mineral Development

No fluid mineral development potential occurs within or near established GUSG populations in the GJFO planning area, and no existing fluid mineral leases overlap with designated critical habitat. All occupied GUSG habitat (currently 10,600 acres) will be closed to leasing. As stated in the BA, no energy or mineral development is expected within critical habitat in the Glade Park/Pinon Mesa area. Therefore, we do not anticipate negative effects to GUSG or its critical habitat to result from energy and mineral development within the analysis area.

*Species Response to Proposed Action*

The nature of such a broad reaching programmatic analysis makes evaluating the species response to the proposed action difficult if not impossible to predict. The revised RMP contains direction to minimize impacts to the GUSG thus reducing the potential for adverse effects. However, project level decisions will occur with occupied habitat for GUSG habitat that will result in some of the effects detailed above. Implementation of the revised RMP is likely to result in low levels of adverse effects to GUSG, primarily as indirect effects from project level decisions. However, given the uncertainty of the timing, location, size, and extent of future actions it is not possible to meaningfully predict adverse effects caused by implementation of the revised RMP at this programmatic scale. All subsequent actions that affect GUSG will be subject to future section 7 analysis and consultation requirements.

**CUMULATIVE EFFECTS**

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this BO. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

The majority of the planning area occurs within Mesa County, Colorado which has experienced significant population growth since 1987, and population forecasts expect the growth trend will continue (Colorado Division of Local Government, State Demography Office 2013). As such, continued use and development within the planning area is expected to continue. Past, present, and reasonably foreseeable future actions and conditions on non-Federal lands in the action area that will likely continue to affect Gunnison Sage-Grouse are as follows:

42

- Mineral exploration and development
- Agricultural development
- ROW and infrastructure development
- Livestock grazing
- Recreation
- Road construction
- Weed invasion and spread
- Wildland fires
- Drought
- Farming

We are not aware of any specific non-Federal actions within the action area that are reasonably certain to occur that will negatively affect GUSG.

## CONCLUSION

### Colorado Hookless Cactus

After reviewing the current status of the Colorado hookless cactus, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's BO that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the Colorado hookless cactus. The Service's rationale is presented below.

Implementation of the revised RMP, including the conservation measures, will reduce multiple threats to the Colorado hookless cactus by, significantly curtailing off-road and off-trail mechanized and motorized travel; implementing standard operating procedures and best management practices for soil disturbances; applying No Surface Occupancy (NSO) stipulations on steep slopes, and NSO 2 on riparian zones; incorporating conservation measures contained in the programmatic grazing BA/BO of November 15, 2012 (BLM, 2012; Service BO number ES/GJ-6-CO-12-F-006); designation of ROW exclusion and avoidance areas; and, the designation of the Pyramid Rock and Atwell ACECs.

The biggest change in the proposed action is the specific designation of routes for motorized travel. Cross-country motorized travel will not be allowed under the proposed action. Off-route motorized travel will be restricted to two specific designated areas with the GJFO, totaling 10,200 acres, a significant reduction form the 445,400 acres of cross-country travel authorized in the 1987 RMP. In addition, the GJFO proposes to close and rehabilitate 47.9 miles of existing routes within GJFO that are within 200 meters of known occurrences of the cactus.

We anticipate a low level of adverse effects to Colorado hookless cactus, but the majority of these effects will be widely distributed across cactus habitat in the GJFO and likely of low intensity and severity. Any subsequent action implemented under the revised RMP that may affect the Colorado hookless cactus or future critical habitat designations must go through separate section 7 consultation.

BLM_0025367

**DeBeque Phacelia**

After reviewing the current status of the DeBeque phacelia, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's BO that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the DeBeque phacelia. The Service's rationale is presented below.

Implementation of the RMP, including the conservation measures, will reduce multiple threats to the DeBeque phacelia by significantly curtailing off-road and off-trail mechanized and motorized travel; implementing standard operating procedures and best management practices for soil disturbances; applying NSO stipulations on steep slopes; designation of ROW exclusion and avoidance areas; and, the designation of the Pyramid Rock and South Shale Ridge ACESs. Fluid minerals development will require surveys and inventories of listed plants; significant avoidance measures and stipulations are available to avoid direct impacts for most activities. In our opinion, these conservation measures are adequate to protect DeBeque phacelia from most effects & impacts. However, the BLM anticipated continuing or new adverse impacts from livestock grazing and travel management (motorized and mechanized travel).

In localized areas where DeBeque phacelia is found, 1.4 miles of routes open to public use (including 0.9 miles of county- maintained roads) occur within 200 meters of known DeBeque phacelia populations; no routes occur within 20 meters of known occurrences. Given the limited extent of nearby routes, and the general restrictions on off-road/trail motorized and mechanized travel, we expect travel related impacts on DeBeque phacelia to be lower under the RMP than previously.

The RMP will retain the 1,300 acre Pyramid Rock ACEC and designate the 28,200 acre South Shale Ridge ACEC; both contain critical habitat for the DeBeque phacelia, specifically the Pyramid Rock and Sulphur Gulch CH Units. (The Pyramid Rock ACEC contains only a small portion of the Pyramid Rock CH Unit, but the South Shale Ridge ACEC includes all of the Sulphur Gulch CH Unit.) Stipulation NSO-12 (ACECs) prohibits surface occupancy and surface-disturbing activities within each ACEC. All nine critical habitat units will be subject to Stipulations CSU-9 (Sensitive Plant Species Occupied Habitat), NSO-13 (Critical Habitat), LN-3 (Biological Inventories in known or suspected habitat) and LN-4 (Botanical Inventories in known habitat of T & E plant species).

With the travel restrictions and ACECs in place, we believe that implementation of the RMP will not jeopardize the existence of the DeBeque phacelia.

**DeBeque phacelia Critical Habitat**

After reviewing the current status of the critical habitat for the DeBeque phacelia, the environmental baseline for the action area, the effects of the proposed action, and any cumulative effects, it is the Service's BO that the BLM's proposed action to revise the RMP is not likely to result in destruction or adverse modification of critical habitat for DeBeque phacelia. We conclude that critical habitat will likely maintain its functionality to serve the intended conservation role for DeBeque phacelia. The proposed action will not appreciably diminish the value of critical habitat for both the survival and recovery of DeBeque phacelia.

44

BLM_0025368

We anticipate a low level of adverse effects to DeBeque phacelia, but the majority of these effects will be widely distributed across DeBeque phacelia habitat in the GJFO and usually of low intensity and severity. Any subsequent action implemented under the revised RMP that may affect the DeBeque phacelia or its critical habitat must go through separate section 7 consultation.

### Gunnison Sage-grouse

After reviewing the current status of the GUSG, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's BO that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the GUSG. The Service's rationale is presented below.

Implementation of the RMP, including the conservation measures and use stipulations, will reduce multiple threats to the GUSG and could restore the species to formerly occupied range through proposed habitat improvement projects. Designation of the Glade Park and Timber Ridge Wildlife Emphasis Areas will help ensure GUSG needs are considered in site-specific management decisions. However, we anticipate some low level of adverse effects to GUSG, but the majority of these effects would be widely distributed across GUSG habitat in the GJFO and likely be of low intensity and severity. Any subsequent actions implemented under the revised plan that may affect the GUSG or critical habitat must go through separate section 7 consultations.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

### A. Amount or Extent of Take Anticipated

The "Effects of the Action" section above includes findings that implementation of the proposed action has the potential to cause biological effects to the GUSG that conform to the regulatory definition of take. However, the mere potential for take is not a legitimate basis for a take exemption. The Service must provide a reasoned basis for a likelihood of take in order to anticipate and exempt it. At this broad programmatic level, the best information available is not

BLM_0025369

sufficient to determine any specific level of anticipated take. However, project specific section 7 consultation analyses, subsequent to the proposed action, will reexamine this issue. Since the best information available does not permit us to determine a specific level of take, we are not exempting any take associated with implementation of the proposed action. Therefore, no reasonable and prudent measures and terms and conditions are provided below. If take is anticipated during authorization of a project level action, we will exempt such take at the project level as appropriate.

## B. Effect of the Take

Not applicable

## C. Reasonable and Prudent Measures and Terms and Conditions

Because there are no take exemptions provided under section 7(o) of the Act in the Opinion, the Service is not providing Reasonable and Prudent Measures or Terms and Conditions

## F. Conservation Recommendations

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

We envision recovery for the Colorado hookless cactus includes sizable, stable populations maintained on conserved suitable habitat, with acceptable levels of connectivity between subpopulations for pollinator movement, gene flow, and seed dispersal. Populations will be maintained to provide sufficient representation, resiliency, and redundancy to ensure a high probability of survival for the foreseeable future. Meeting these goals will require that threats be sufficiently understood and abated. Range-wide monitoring will be necessary.

The Recovery outline for the Colorado hookless cactus is as follows:

Recovery needs for Colorado hookless cactus include: (1) survey to accurately document populations and suitable habitat; (2) protect and restore habitat including pollinator habitat and corridors to provide connectivity; and (3) protect individual plants and populations from direct and indirect threats. Specific actions include:

### Surveys and Monitoring

- Completion of a comprehensive survey throughout the species' range. This would include areas that are not likely to be disturbed. Survey results will provide an accurate population estimate and allow us to identify core population areas so we can more effectively protect the species. This will require evaluation of habitat components likely to support Colorado hookless cactus.

BLM_0025370

- Surveys also should more accurately delineate the Colorado hookless cactus range relative to other *Sclerocactus* species.

- Locate possible population connectivity corridors.

- Continue ongoing monitoring efforts and expand monitoring to include a larger and more representative sample of occupied sites. This data should improve our understanding of trends.

**Threats Abatement**

- Identify sites in urgent need of habitat protection, set protection priorities, and implement protective measures. In the long run, land management agencies should establish formal land management designations to provide for long-term protection of important populations and habitat.

- Oil and gas leasing and other mineral extraction activities should avoid occupied sites and other important habitat.

- Develop and implement standard conservation measures to minimize future project and use impacts.

- Coordinate with land management agencies, project proponents, and other partners early in the planning process to limit direct and indirect impacts of planned activities.

- Prevent the collection of Colorado hookless cactus plants from natural populations.

**Research**

- Resolve the taxonomic status of Colorado hookless cactus regarding the species relationship with *S. parviflorus*. Secondarily, this study would assess genetic differences between Colorado hookless cactus populations.

- Continue research into Colorado hookless cactus life history and ecology, including pollinators.

- Study population dynamics and conduct a population viability analysis.

- Encourage investigations that project *Sclerocactus* species' vulnerability and response to climate change.

- Improve our understanding of livestock and native (e.g., rodent) grazing impacts.

- Monitor cactus-borer beetle (*Moneilema semipunctatum*) infestations, and study the relationship of episodic infestations with drought and other environmental factors.

Monitor changes in invasive species prevalence and impacts on Colorado hookless cactus. Additionally, continue to explore approaches to minimize the risk posed by invasives and associated remediation actions.

*DeBeque phacelia*

DeBeque phacelia is listed as threatened throughout its range. Conservation efforts should be to develop and implement proactive conservation measures that reduce threats to the species to the point that it no longer requires the protections of the Act and may be removed from the Federal

47

BLM_0025371

List of Endangered and Threatened Wildlife and Plants (delisted). Recovery efforts will focus primarily on Federal lands, since over 86.6 percent of the species' habitat occurs on these lands. By priority number, we envision recovery for DeBeque phacelia to include:

Potential criteria #1: Protect and maintain all extant populations

Potential criteria #2: Prevent or minimize habitat-disturbing threats

Potential criteria #3: Develop and implement rangewide monitoring

*Gunnison Sage-grouse*

The GJFO should consider full implementation of the conservation strategy presented in the GUSG Rangewide Plan. The purpose of the RCP is to identify measures and strategies to achieve the goal of protecting, enhancing, and conserving GUSG and their habitats.

Range-wide Conservation planning strategies, include, but are not limited to, the following:

1) Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to grouse.

2) Coordinate with CPW in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in historically occupied habitats which are evaluated and deemed suitable.

3) Improve habitat within currently occupied and adjacent potential habitats.

4) Protect from permanent loss historically used habitats that are not currently occupied by grouse.

Additional recommendations are as follows:

- Any activity that results in the permanent loss of proposed critical habitat should include mitigation of offset such losses.
- Extend the timing restrictions on disturbances to breeding activities within areas from 0.6 to 4 miles from March 1 to July15 to protect lekking, nesting, and early brood rearing.
- Recreation - Only allow special recreation permits that have neutral or beneficial affects to occupied habitat areas.
- Lands/Realty – Retain public ownership of proposed critical habitat. Subject to valid, existing rights, co-locate new rights-of-way within existing ROWs
- Range Management - Within proposed critical habitat, incorporate GUSG habitat objectives and management considerations into all BLM grazing allotments through allotment management plans or permit renewals. Work cooperatively on integrated ranch

48

planning within GUSG habitat so operations with deeded/BLM allotments can be
planned as single units. Design any new structural range improvements and location of
supplements (i.e. salt or protein blocks) to conserve, enhance, or restore GUSG habitat
through an improved grazing management system relative to GUSG objectives. When
developing or modifying water developments, use best management practices to mitigate
potential impacts from West Nile virus.
- Fluid Minerals - When permitting Application for Permit to Drill (APDs) on existing
leases that are not yet developed, consider the development of disturbance caps to limit
impacts to GUSG proposed critical habitat at local scales (e.g. within habitat units),
unless compensatory mitigation demonstrates an offset of resulting habitat loss. Consider
full implementation of the suggested management practices listed in RCP, Appendix L
for all APD decisions.
- Incorporate "Available Conservation Measures" and "Overarching Conservation
Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).

Instruction Memorandum No. CO-2013-033 provides a surface disturbance avoidance buffer for
unmapped winter habitat within 4-miles of a lek. Consistent with the RCP, we recommend a
6-mile avoidance area around a lek for unmapped winter habitat.

## G. Reinitiation-Closing Statement

This concludes formal consultation for the potential effects of the implementation of the revised
RMP. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where
discretionary Federal agency involvement or control over the action has been retained (or is
authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new
information reveals effects of the agency action that may affect listed species or critical habitat in
a manner or to an extent not considered in this opinion; (3) the action is subsequently modified in
a manner that causes an effect to the listed species or critical habitat not considered in this
opinion; or (4) a new species is listed or critical habitat designated that may be affected by the
action (50 CFR §402.16).

We appreciate your efforts to ensure the conservation of endangered, threatened, and candidate
species. If you have questions regarding this letter or your responsibilities under the Act, please
contact Kurt Broderdorp at the letterhead address or phone 970-628-7186.

## LITERATURE CITED

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial
nesting habitat for GUSG: a spatially explicit hierarchical approach. Journal of Wildlife
Management 76:391-406.

Amstrup, S.C. and R.L. Phillips. 1977. Effects of coal extraction and related development on
wildlife populations: Effects of coal strip mining on habitat use, activities and population
trends of sharp-tailed grouse (*Pedioecetes phasianellus*). Annual progress report.
Denver Wildlife Research Center. U.S. Fish and Wildlife Service. Denver, CO. 37 pp.

49

BLM_0025373

Beck, J.L., D.L. Mitchell, and B.D. Maxfield. 2003. Changes in the distribution and status of sage-grouse in Utah. Western North American Naturalist 63:203-214.

Beck, J. L., K. P. Reese, J. W. Connelly, and M. B. Lucia. 2006. Movements and survival of juvenile greater sage-grouse in southeastern Idaho. Wildlife Society Bulletin 34:1070-1078.

BIO-Logic, Inc. 2008. Tri-State Generation and Transmission Association. Delta County Transmission Improvement Project Colorado Hookless Cactus Conservation Plan. November 25, 2008. Montrose, CO.

BIO-Logic, Inc. 2009. Wells Gulch Evap, Inc. Wells Gulch Water Treatment and Impoundment System Project. Survey for the Federally Threatened Colorado Hookless Cactus. September 21, 2009. Montrose, CO.

Braun, C.E. 1986. Changes in sage grouse lek counts with advent of surface coalmining. Proc. Issues and Technology in the Management of Impacted Western Wildlife 2:227-231.

Braun, C.E. 1987. Current issues in sage grouse management. Proceedings of Western Association of Fish and Wildlife Agencies 67:134-144.

Braun, C.E. 1998. Sage grouse declines in western North America: What are the problems? Proceedings of Western Association of Fish and Wildlife Agencies 78:139-156.

Braun, C.E., M.F. Baker, R.L. Eng, J.W. Gashwiler, and M.H. Schroeder. 1976. Conservation committee report on effects of alteration of sagebrush communities on the associated avifauna. The Wilson Bulletin 88:165-171.

Braun, C.E., O.O. Oedekoven, and C.L. Aldridge. 2002. Oil and gas development in western North America: Effects on sagebrush steppe avifauna with particular emphasis on sage-grouse. Transactions of the North American Wildlife Natural Resources Conference 67. 19 pp.

Bui, T.D. 2009. The effects of nest and brood predation by common ravens (*Corvus corax*) on greater sage-grouse (*Centrocercus urophasianus*) in relation to land use in western Wyoming. M.S. Thesis, University of Washington. 48 pp.

Bureau of Land Management (BLM). 1997. Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. U.S. Department of the Interior, Bureau of Land Management. 186 pp.

Bureau of Land Management, Uncompahgre Field Office (BLM). 2002. North Delta Land Health Assessment. 2001-2002. Montrose, CO. 110 pp.

Bureau of Land Management, Uncompahgre Field Office (BLM). 2009. Sclerocactus glaucus Monitoring Projects and Trends in the BLM Uncompahgre Field Office, 1978-2009.

BLM_0025374

(Unpublished report prepared by Charlie Sharp in support of the U.S. Fish and Wildlife Service's Revision of the Species Recovery Plan, December 15, 2009.) Montrose, CO. 13 pp.

Bureau of Land Management 2012. Programmatic Biological Assessment, Effects on Listed Plant Species from the Bureau of Land Management Livestock Grazing Program: Colorado hookless cactus (Sclerocactus glaucus), Clay-loving wild buckwheat (Eriogonum pelinophilum), Debeque phacelia (Phacelia submutica).

Call, M.W. and C. Maser. 1985. Wildlife habitats in managed rangelands - The Great Basin of southeastern Oregon sage grouse. General Technical Report PNW-187, U.S. Department of Agriculture, Forest Service, La Grande, OR. 30 pp.

Christiansen, T. in litt. 2009. Fence marking to reduce greater sage-grouse (*Centrocercus urophasianus*) collisions and mortality near Farson, Wyoming - summary of interim results. Wyoming Game and Fish Department. Unpublished data. 3 pp.

CNHP (Colorado Natural Heritage Program). 2014. *Sclerocactus glaucus* Element Global Rank Report 44168. Fort Collins, Colorado.

Coates, P.S. 2007. Greater sage-grouse (*Centrocercus urophasianus*) nest predation and incubation behavior. Ph.D. Thesis, Idaho State University, Boise, ID. 191 pp.

Colorado Division of Wildlife (CDOW). 2009a. Spreadsheet summarizing land ownership by Gunnison sage-grouse population and status. Submittal to the Service. 5 pp.

Colorado Division of Wildlife (CDOW). 2009b. 2009 CDOW Statewide summary information request. Submittal to the Service. 157 pp.

Colorado Division of Wildlife (CDOW). 2010. Spreadsheet summarizing rangewide Gunnison sage-grouse high male counts 2001-2010. Submittal to the Service. 3 pp.

Colorado Parks and Wildlife (CPW). 2012. Spreadsheet summarizing 2012 rangewide Gunnison sage-grouse high male counts and estimated population size. Submittal to the Service. 3 pp.

Colorado Parks and Wildlife (CPW). 2013. Comments on the proposed rule to list Gunnison sage-grouse as endangered. Submittal to the Service. 26 pp.

Colorado Parks and Wildlife (CPW). 2014a. Excel spreadsheet of Gunnison sage-grouse summary Rangewide and by population 1996-2014. 8 pp.

Colorado Parks and Wildlife (CPW). 2014b. 2014 Colorado Parks and Wildlife Statewide Summary. July 2014. 13 pp.

BLM_0025375

Colorado Sage Grouse Working Group (CSGWG). 1997. Gunnison sage grouse conservation plan – Gunnison Basin – Colorado. June 1997. 113 pp.

Connelly, J. W., H. W. Browers and R. J. Gates. 1988. Seasonal movements of sage grouse in southeastern Idaho. Journal of Wildlife Management 52: 116-182.

Connelly, J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun. 2000a. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28:967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies. www.wafwa.org.

Connelly, J. W., E.T. Rinkes, and C.E. Braun. 2011. Characteristics of greater sage-grouse habitats: a landscape species at micro and macro scales. Pp. 69-83 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Conner, S. 2011. Personal communication from Shawn Conner (BIO-Logic) to Alison Graff (BIO-Logic) regarding vegetative budding in Colorado hookless cactus and dramatic shifts in population sizes.

DePrenger-Levin, M., R.H. Kao. 2013. Demographic monitoring of Sclerocactus glaucus, an endemic species of western Colorado. Population Monitoring 2007-2013, Technical Report to Bureau of Land Management, U.S. Department of Interior, Colorado State Office.

Doak, D.F., Thomson, D., and E.S. Jules. 2002. PVA for plants: understanding the demographic consequences of seed banks for population persistence and management. In: S.R. Beissinger and D.R. McCullough, editors. Population Viability Analysis. Chicago: University of Chicago Press.

Ellis, K.L. 1985. Effects of a new transmission line on distribution and aerial predation of breeding male sage grouse. Final report, Deseret Generation and Transmission Cooperative, Sandy, UT. 28 pp.

Evans, C.C. 1986. The relationship of cattle grazing to sage grouse use of meadow habitat on the Sheldon National Wildlife Refuge. MS Thesis, University of Nevada, Reno, NV. 92 pp.

Forman, R.T.T. 2000. Estimate of the area affected ecologically by the road system in the United States. Conservation Biology 14:31-35.

Forman, R.T.T. and L.E. Alexander. 1998. Roads and their major ecological effects. Annual Review of Ecology and Systematics 29:207-231 plus C2.

BLM_0025376

Frey, N. S. and M. R. Conover. 2006. Habitat use by meso-predators in a corridor environment. Journal of Wildlife Management 70: 1111-1118.

Gelbard, J.L. and J. Belnap. 2003. Roads as conduits for exotic plant invasions in a semiarid landscape. Conservation Biology 17:420-432.

Gunnison Sage-grouse Rangewide Steering Committee (GSRSC). 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Heil, K.D. and J.M. Porter. 1994. Sclerocactus (Cactaceae): A revision. Haseltonia 2:20-46.

Heil, K.D. and J.M. Porter. 2004. Sclerocactus in Flora of North America. Online at: http://www.efloras.org/florataxon.aspx?flora_id=1&taxon_id=129764. Accessed Dec. 6, 2011.

Holloran, M.J., and S.H. Anderson. 2005. Spatial distribution of greater sage-grouse nests in relatively contiguous sagebrush habitats. The Condor 107:742-752.

Holloran, M.J., R.C. Kaiser, and W.A. Hubert. 2010. Yearling greater sage-grouse response to energy development in Wyoming. Journal of Wildlif3e Management 74: 65-72

Klebenow, D.A. 1981. Livestock grazing interactions with sage grouse. Proceedings of the Wildlife-Livestock Relationship Symposium. 113-123 pp.

Knick, S.T., D.S. Dobkin, J.T. Rotenberry, M.A. Schroeder, W.M. Vander Haegen, and C. Van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Knick, S.T., S.E. Hanser, R.F. Miller, D.A. Pyke, M.J. Wisdom, S.P. Finn, E.T. Rinkes, and C.J. Henny. 2011. Ecological influence and pathways of land use in sagebrush. Studies in Avian Biology. 162 pp. Pp. 203–251 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Knight, R.L. and J.Y. Kawashima. 1993. Responses of raven and red-tailed hawk populations to linear right-of-ways. Journal of Wildlife Management 57:266-271.

Ladyman, J. 2003. Phacelia scopulina (A. Nels) J.T. Howell var. submutica (J.T. Howell) Halse (Debeque phacelia): A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project. Centennial, CO.

Levine, J.M., McEachern, A.K., and C. Cowan. 2008. Rainfall effects on rare annual plants. Journal of Ecology 96:795-806.

BLM_0025377

Lyon, A.G. 2000. The potential effects of natural gas development on sage grouse (*Centrocercus urophasianus*) near Pinedale, Wyoming. M.S. Thesis, University of Wyoming, Laramie, WY. 129 pp.

Lyon, A.G. and S.H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. Wildlife Society Bulletin 31:486-491.

Manville, A.M. 2002. Bird strikes and electrocutions at power lines, communication towers, and wind turbines: State of the art and state of the science – next steps toward mitigation. International Partners in Flight Conference, Monterey, CA. 28 pp.

Merritt, S., C. Prosser, K. Sedivec, and D. Bangsund. 2001. Multi-species grazing and leafy spurge. U.S.D.A.–ARS Team Leafy Spurge Area-Wide IPM Program, Sidney, Montana. 28 pp.

Meyer, S.E., Quinney, D., and J. Weaver. 2006. A stochastic population model for Lepidium papilliferum (Brassicaceae), a rare desert ephemeral with a persistent seed bank. American Journal of Botany 93:891-902.

Miller, R.F., S.T. Knick, D.A. Pyke, C.W. Meinke, S.E. Hanser, M.J. Wisdom, and A.L. Hild. 2011. Characteristics of sagebrush habitats and limitations to long-term conservation. Pp. 145–184 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Olsen, B. E., and R. T. Wallander. 2001. Sheep grazing spotted knapweed and Idaho fescue. Journal of Range Management 54:25-30.

Oyler-McCance, S.J. 1999. Genetic and habitat factors underlying conservation strategies for Gunnison sage-grouse. Ph.D. Dissertation, Colorado State University, Fort Collins, CO. 162 pp.

Oyler-McCance, S.J., K.P. Burnham, and C.E. Braun. 2001. Influence of changes in sagebrush on Gunnison sage grouse in southwestern Colorado. Southwestern Naturalist 46:323-331.

Patterson, R.L. 1952. The sage grouse in Wyoming. Wyoming Game and Fish Commission, Sage Books Inc., Denver, CO. 344 pp.

Phillips, M. 2013. Peer review of Gunnison sage-grouse proposed listing as endangered and proposed critical habitat rule. Submittal to the Service. 9 pp.

Piñon Mesa Gunnison Sage-grouse Working Group. 2000. Gunnison sage-grouse conservation plan Pinon Mesa, Colorado. 37 pp.

BLM_0025378

Piquette D., D.A. Keck, N. Seward, B. Magee, and P. Magee. 2013. Anthropogenic noise assessment around Gunnison sage-grouse leks within the Gunnison Basin, Colorado. Unpublished data. 20 pp.

Prather, P.R. 2010. Factors affecting Gunnison sage-grouse (*Centrocercus minimus*) conservation in San Juan County, Utah. Ph.D. Dissertation, Utah State University, Logan, Utah. 138 pp.

Riggs, R.A. and P.J. Urness. 1989. Effects of goat browsing on gambel oak communities in northern Utah. Journal of Range Management 42:354-360.

Rogers, G.E. 1964. Sage grouse investigations in Colorado. Technical Publication Number 16, Project W-37-R, Federal Aid in Wildlife Restoration. Game Research Division, Colorado Game, Fish and Parks Department. 132 pp.

Schroeder, M.A., J.R. Young, and C.E. Braun. 1999. Sage grouse (*Centrocercus urophasianus*). 28 pages In Poole, A. and F. Gill, eds. The Birds of North America, No. 425. The Birds of North America, Inc., Philadelphia, Pennsylvania.

Schroeder, M.A., C.L. Aldridge, A.D. Apa, J.R. Bohne, C.E. Braun, S.D. Bunnell, J.W. Connelly, P.A. Deibert, S.C. Gardner, M.A. Hilliard, G.D. Kobriger, S.M. McAdam, C.W. McCarthy, J.J. McCarthy, D.L. Mitchell, E.V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. Condor 106:363-376.

Steenhof, K., M. N. Kochert, and J. A. Roppe. 1993. Nesting by raptors and common ravens on electrical transmission line towers. Journal of Wildlife Management 57:271-281.

Thompson, T. R. 2012. Dispersal ecology of Greater Sage-Grouse in Northwestern Colorado: Evidence from Demographic and Genetic Methods. Ph.D. Dissertation, University of Idaho, Moscow, Idaho. 378pp.

US Fish and Wildlife Service. 2010. Recovery Outline for the Colorado Hookless Cactus (*Sclerocactus glaucus*). Colorado Ecological Services Field Office. 17pp.

US Fish and Wildlife Service. 2013. Recovery Outline for the DeBeque phacilia (*Phacelia submutica*). Colorado Ecological Services Field Office. 23pp.

Vander Haegen, W. M., M. A. Schroeder, and R. M. DeGraaf. 2002. Predation on real and artificial nests in shrubsteppe landscapes fragmented by agriculture. Condor 104:496-506.

Walker, B.L., D.E. Naugle, and K.E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71:2644-2654.

Ward, S. 2007. Gunnison sage-grouse winter and summer ecology in San Juan County, Utah. Masters Thesis. Utah State University, Logan, Utah. 85 pp.

BLM_0025379

West, N.E. and J.A. Young. 2000. Intermountain valleys and lower mountain slopes. Pp. 255-284 in M. G. Barbour, and W. D. Billings (editors). North American terrestrial vegetation. 2nd Edition. Cambridge University Press, Cambridge, UK.

Wiens, J.A. and J.T. Rotenberry. 1985. Response of breeding passerine birds to rangeland alteration in a North American shrubsteppe locality. Journal of Applied Ecology 22:655-668.

Wisdom, M.J., C.W. Meinke, S.T. Knick, and M.A. Schroeder. 2011. Factors associated with extirpation of sage-grouse. Pp. 451–472 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Young, J. R. 1994. The influence of sexual selection on phenotypic and genetic divergence among sage grouse populations. Dissertation, Purdue University, West Lafayette, Indiana, USA.

Young, J.R., C.E. Braun, S.J. Oyler-McCance, J.W. Hupp, and T.W. Quinn. 2000. A new species of sage-grouse (Phasianidae: Centrocercus) from southwestern Colorado. Wilson Bulletin 112:445-453.

### *Federal Register Documents*

75 FR 59804. Endangered and Threatened Wildlife and Plants; Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species. September 28, 2010.

79 FR 69162. Endangered and Threatened Wildlife and plants; Threatened Status for Gunnison sage-grouse; Final Rule.

79 FR 69312. Endangered and Threatened and Plants; Designation of Critical Habitat for Gunnison sage-grouse; Final Rule.

BLM_0025380

# Resource Management Plan
## & Record of Decision

BLM

**U.S. Department of Interior
Bureau of Land Management
Colorado Southwest District
Tres Rios Field Office**

BLM_0025381

# BLM MISSION

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

BLM/CO/GI-15/004

BLM_0025382

# RECORD OF DECISION

for the
## Approved Resource Management Plan
for Public Lands Administered by the
## Tres Rios Field Office, Dolores, Colorado

&

for adoption of the
## San Juan National Forest Oil & Gas Leasing Availability Decisions
San Juan National Forest, Colorado

Archuleta, Dolores, Hinsdale, La Plata, Mineral, Montezuma, Montrose, Rio Grande, San Juan, San Miguel Counties, Colorado

| | |
|---|---|
| **Lead Agency:** | USDI Bureau of Land Management |
| **Co-Lead Agency:** | USDA United States Forest Service |
| **Responsible Official:** | Ruth Welch, State Director<br>Bureau of Land Management<br>Colorado State Office<br>2850 Youngfield St.<br>Lakewood, CO 80215 |
| **Recommending Official:** | Connie Clementson<br>Field Manager<br>Tres Rios Field Office<br>29211 Highway 184<br>Dolores, CO 81323 |

**Access the Final Environmental Impact Statement,
Approved Resource Management Plan, and Record of Decision online:**

http://www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html

**Cover Photo:** The Bureau of Land Management Tres Rios Field Office manages about .5 million acres of public lands in southwest Colorado. The middle photograph was shot looking east to Spencer Basin along Mountaineer Creek, by Scot Jackson, BLM Park Ranger. The top and bottom photographs were taken of the Dolores River Canyon, by Lanny Wagner, BLM Law Enforcement Ranger. Since the 1980s, the BLM has managed the Dolores River area, astoundingly rich in natural and cultural resources, as a Special Recreation Management Area. 103 river miles through TRFO lands are also suitable for Wild & Scenic River status, miles well-known to the public for scenic and whitewater boating recreation.

BLM_0025383

*This page intentionally left blank*

BLM_0025384

 **United States Department of the Interior** 

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, CO  80215-7093
http://www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html

In Reply Refer To:
1610 (CO-933)

Dear Reader/Interested Party:

I am pleased to announce that after several years of hard work and collaboration, the Tres Rios Field Office (TRFO) Approved Resource Management Plan (RMP) has been completed. The document will provide guidance for the management of approximately 503,589 acres of federal surface and mineral estate administered by the Bureau of Land Management (BLM) in Archuleta, Dolores, La Plata, Montezuma, Montrose, San Juan, and San Miguel counties in southwest Colorado. The document also serves as the BLM's decision to adopt the Forest Service oil and gas leasing decisions for federal mineral estate administered by the San Juan National Forest in Archuleta, Dolores, La Plata, Mineral, Hinsdale, Montezuma, Rio Grande and San Juan counties.

The attached Record of Decision (ROD) and Approved RMP has been prepared in accordance with the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA). The ROD is available to members of the public and will be sent to pertinent local, State, Tribal, and Federal government entities. The ROD finalizes the proposed decisions presented in the Proposed Land and Resource Management Plan (LRMP)/Final Environmental Impact Statement (FEIS) that was published on September 20, 2013 and subject to an initial 30-day protest period, a period that was subsequently extended until November 7, 2013. All protests received were reviewed by the BLM Director in Washington, D.C. After careful consideration of all points raised in these protests, the BLM Director granted one protest in part, regarding areas of critical environmental concern. Otherwise, the BLM Director concluded the planning team and decision-makers followed all applicable laws, regulations, policies, and pertinent resource considerations in developing the Proposed LRMP/FEIS. Minor adjustments or points of clarification are incorporated into the Approved RMP in response to issues raised in the protest process, during the Governor's Consistency Review, and final BLM review. These minor changes are discussed in the ROD in Section 2.1.2, BLM-Administered Lands, but the protest review did not result in any significant changes from the Proposed LRMP.

The approval of this ROD serves as the final decision for all land use plan decisions described in the Approved RMP for BLM-managed public lands. Future implementation of land use plan decisions will not be undertaken without suitable further NEPA analysis. The approval of this ROD also serves to adopt

BLM_0025385

the USFS decisions outlined in the September 2013 Record of Decision, Oil and Gas Leasing Availability, San Juan National Forest. Implementation decisions are site-specific decisions and are subject to appeal. These decisions and appeal procedures are described in Section 5.1.1 of the attached ROD.

Notification of the approval of this ROD will be announced via local news releases, the Federal Register, and on the BLM website at http://www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html. CD-ROM versions of the ROD may be obtained by contacting the Tres Rios Field Office by phone at (970) 882-7296; by sending a request by email to sborders@blm.gov; or at the following address:

Tres Rios Field Office, 29211 Highway 184, Dolores, Colorado 81323

We greatly appreciate the efforts of all who contributed to completion of this RMP, including the San Juan National Forest, Native American tribal representatives, numerous other County, State and Federal government agencies, and non-governmental organizations that worked closely with us to complete this important effort. We also appreciate the extensive public involvement during this time by local communities, organizations, and individuals. Public input informed and improved this planning document. We look forward to continuing to work with our partners and citizens as we implement the decisions in this RMP.

Sincerely,

Ruth Welch
State Director

# TABLE OF CONTENTS

## PART I Record of Decision

Table of Contents ............................................................................................................................. i

List of Figures ................................................................................................................................ iii

Appendices ................................................................................................................................... iv

List of Acronyms ........................................................................................................................... vi

**CHAPTER 1 Introduction** ......................................................................................................... I-1

**CHAPTER 2 The Decision** ......................................................................................................... I-1

2.1   BLM-Administered Lands ................................................................................................. I-1

2.2   Forest Service-Administered Lands: Oil & Gas Resources on the San Juan National Forest ...... I-9

2.3   Future Planning Efforts .................................................................................................. I-10

**CHAPTER 3 The Alternatives** ................................................................................................. I-11

3.1   Alternatives Considered in Detail .................................................................................. I-11

3.2   Considerations in Selecting the Approved Plan ............................................................ I-12

3.3   Alternatives Considered but Not Analyzed ................................................................... I-12

**CHAPTER 4 Consultation and Coordination** ......................................................................... I-13

4.1   Public Participation ........................................................................................................ I-13

4.2   Cooperating Agencies ................................................................................................... I-14

4.3   Native American Tribes .................................................................................................. I-14

4.4   Agency Consultations ................................................................................................... I-15

**CHAPTER 5 implementation decisions & administrative actions** ........................................ I-16

5.1   Implementation Decisions ............................................................................................. I-16

5.2   Administrative Actions ................................................................................................... I-18

**CHAPTER 6 Mitigation Measures** .......................................................................................... I-18

**CHAPTER 7 Plan Monitoring and Evaluation** ....................................................................... I-18

**CHAPTER 8 Plan Approval** ..................................................................................................... I-19

**Part II - Approved Resource Management Plan**

**CHAPTER 1 – Introduction** ..................................................................................................... II-1

1.1   Purpose of the Plan ....................................................................................................... II-1

1.2   RMP Organization, Content, and Terminology .............................................................. II-3

1.3   Opportunities and Challenges ....................................................................................... II-5

**CHAPTER 2 – Resource Direction** .......................................................................................... II-6

2.1   Tres Rios Field Office Geographic Area ......................................................................... II-6

2.2   Ecological Framework and the Conservation of Species .............................................. II-12

2.3   Terrestrial Ecosystems and Plant Species .................................................................... II-14

2.4   Terrestrial Wildlife ......................................................................................................... II-25

2.5   Riparian Area and Wetland Ecosystems ....................................................................... II-39

BLM_0025387

2.6    Aquatic Ecosystems and Fisheries .................................................................................II-41

2.7    Water Resources ...........................................................................................................II-45

2.8    Livestock and Rangeland Management..........................................................................II-49

2.9    Invasive Species ............................................................................................................II-57

2.10   Timber and Other Forest Products ................................................................................II-58

2.11   Insects and Disease ......................................................................................................II-60

2.12   Fire and Fuels Management ..........................................................................................II-60

2.13   Air Quality......................................................................................................................II-62

2.14   Access and Travel Management ....................................................................................II-65

2.15   Recreation .....................................................................................................................II-79

2.16   Scenery and Visual Resource Management ..................................................................II-94

2.17   Heritage and Cultural Resources ..................................................................................II-98

2.18   Paleontological Resources ..........................................................................................II-100

2.19   Lands and Special Uses .............................................................................................II-101

2.20   Minerals and Energy ...................................................................................................II-110

2.21   Alternative Energy: Geothermal, Wind, Solar, Biomass ..............................................II-122

2.22   Abandoned Mine Lands and Hazardous Materials .....................................................II-123

2.23   Interpretation and Conservation Education .................................................................II-126

**CHAPTER 3 – Area Direction**.............................................................................................II-127

3.1    Wilderness Study Areas...............................................................................................II-129

3.2    Lands Managed for Wilderness Characteristics ..........................................................II-131

3.3    Wild and Scenic Rivers ...............................................................................................II-135

3.4    Scenic, Historic, and Backcountry Byways ..................................................................II-138

3.5    National Recreation and Scenic Trails and National Historic Trails .............................II-138

3.6    Gypsum Valley Area of Critical Environmental Concern ..............................................II-141

3.7    Anasazi Culture Area of Critical Environmental Concern ............................................II-144

3.8    Mesa Verde Escarpment..............................................................................................II-145

3.9    Spring Creek Wild Horse Herd Management Area .......................................................II-148

3.10   Perins Peak Wildlife Management Area .......................................................................II-149

3.11   Willow Creek Wildlife Management Area......................................................................II-150

3.12   Dolores River Canyon ..................................................................................................II-152

3.13   Silverton .......................................................................................................................II-155

**CHAPTER 4 – Monitoring Plans** ........................................................................................II-159

4.1    Tres Rios Field Office Monitoring Plan ........................................................................II-159

**CHAPTER 5 – Literature Cited**...........................................................................................II-191

BLM_0025388

# List of Figures

Figure 1.1……………………………………………………………………………………………II-2
Figure 2.1 Protected Areas. ..........................................................................................................II-11
Figure 2.3 Major Vegetaion Types ...............................................................................................II-24
Figure 2.4.1 Elk Severe Winter Range, Winter Concentration Areas and Production Areas .................II-34
Figure 2.4.2 Mule Deer Sever Winter Range, Winter Concentration Areas and Production Areas. .......II-35
Figure 2.7.1 Lands Suitable and Capable for Cattle Grazing ..............................................................II-54
Figure 2.7.2. Lands Suitable and Capable for Sheep Grazing. ...........................................................II-55
Figure 2.7.3. Available Grazing Allotments and Comparative Stocking Rates. .....................................II-56
Figure 2.14.1 OHV Area Designations ...........................................................................................II-72
Figure 2.14.1a. OHV Area Designations, Priority Area 1: Mancos-Cortez .........................................II-73
Figure 2.14.1b. OHV Area Designations, Priority Area 2: Silverton ...................................................II-74
Figure 2.14.1c. Priority Area 3: Greater Durango Area. ...................................................................II-75
Figure 2.14.1d. Priority Area 4: Dispersed Tres Rios Field Office. ....................................................II-76
Figure 2.14.3. Mud Springs Designated Routes. .............................................................................II-77
Figure 2.14.4. Phil's World Designated Routes. ..............................................................................II-78
Figure 2.15.1. Special Recreation Management Areas, Tres Rios Field Office. ....................................II-90
Figure 2.15.2. Summer Recreation Opportunity Spectrum. ...............................................................II-91
Figure 2.15.3. Winter Recreation Opportunity Spectrum. .................................................................II-92
Figure 2.15.4. Molas Pass Recreation Area. ...................................................................................II-93
Figure 2.16. Scenic Intgrity Objective and Visual Resource Management ...........................................II-97
Figure 2.19.1. Lands Available for Disposal. ..................................................................................II-108
Figure 2.19.2. Designated Utility Corridors, Communication Sites, and Transmission Lines. ..............II-109
Figure 2.20.1. Prospective Hydrocarbon Basins and Hydrocarbon Occurrence Potential ....................II-115
Figure 2.20.2. Areas of Locatable Mineral Potential ........................................................................II-116
Figure 2.20.3. Solid Leasable Minerals. .........................................................................................II-117
Figure 2.20.4. Oil and Gas Leasing Availability and No Surface Occupancy Stipulations. ...................II-118
Figure 2.20.5. Oil and Gas Leasing Availability and Controlled Surface Use Stipulations. ...................II-119
Figure 2.20.6. Oil and Gas Leasing Availability and Timing Limitation Stipulations. ............................II-120
Figure 2.20.7. Perin's Peak and Animas City Mountain Mineral Withdrawl. .......................................II-121
Figure 2.22. Abandoned Mine Lands Repositories. ..........................................................................II-125
Figure 3.1. Special Areas and Designations ...................................................................................II-130
Figure 3.2. Lands Managed for Wilderness Characteristics. .............................................................II-134
Figure 3.3. Suitable Wild and Scenic Rivers. ..................................................................................II-137
Figure 3.6.1. Gypsum Valley Area of Critical Environmental Concern. ...............................................II-143

BLM_0025389

# APPENDICES

The following table shows the appendices for the Tres Rios Field Office Approved RMP and where to locate each file. **The following shaded rows are applicable to Forest Service lands (and can be found in the Final San Juan National Forest Land Management Plan (September, 2013)).**
Appendices A, E, H, L, N, and X are printed in the Approved RMP (see page number) and all others, including those printed (A, E, H, L, N, and X) may be accessed online at the BLM land use planning website and accessible on Compact Disk (CD):
http://www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html#lrmp

| Appendix | Title | Located |
|---|---|---|
| A | BLM Lands Available for Disposal | Printed/Online/CD |
| B | Paleontological Resources | Online/CD |
| C | Roadless Area Inventory and Wilderness Evaluation | N/A - USFS |
| D | Wild and Scenic Rivers Suitability | Online/CD |
| E | Special Recreation Management Areas | Printed/Online/CD |
| F | Projected Activities for Impacts Analysis | N/A - USFS |
| G | Climate Change Trends and Management Strategy for the San Juan National Forest and Tres Rios Field Office Land and Resource Management Plan | Online/CD |
| H | Oil and Gas Leasing Stipulations | Printed/Online/CD |
| I | Vulnerable Watersheds | Online/CD |
| J | Biological Assessment for the San Juan National Forest 2013 Land and Resource Management Plan Revision | N/A - USFS |
| K | Fire Regime and Condition Class | Online/CD |
| L | Bureau of Land Management Grazing Allotment Status and Permitted Animal Unit Months | Printed/Online/CD |
| M | Land and Resource Management Plan Components Related to Terrestrial Wildlife Species | N/A - USFS |
| N | Sage-grouse Best Management Practices | Printed/Online/CD |
| O | BLM Lands with Wilderness Characteristics | Online/CD |

iv

BLM_0025390

| Appendix | Title | Located |
|----------|-------|---------|
| P | Federally Listed Species and Sensitive Species | Online/CD |
| Q | Plan Components Addressing Species Diversity and Population Viability | *N/A - USFS* |
| R | Bureau of Land Management Master Leasing Plan Policy and Description of Leasing Analysis | Online/CD |
| S | Response to Comments on the San Juan/Tres Rios Draft Land and Resource Management Plan and Draft and Supplemental Environmental Impact Statements | Online/CD |
| T | San Juan National Forest Biological Evaluation and Bureau of Land Management Sensitive Species Analysis | Online/CD |
| U | Areas of Critical Environmental Concern | Online/CD |
| V | Final Environmental Impact Statement Maps | Online/CD |
| W | Analysis of Plans and Land-Use Policies of Adjacent Governments and Tribes | Online/CD |
| X | Crosswalk for Maps and Appendices | Printed/Online/CD |
| Y | Biological Opinion | Online/CD |

BLM_0025391

# LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AML | Abandoned Mine Lands |
| AMP | allotment management plan |
| ANC | acid neutralizing capacity |
| APA | Administrative Procedures Act |
| APHIS | Animal Plant Health Inspection Services |
| AQRV | air quality related value |
| ARSG | Animas River Stakeholders Group |
| ATV | all-terrain vehicle |
| AUM | Animal Unit Month |
| BA | Biological Assessment |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| CARPP | Colorado Air Resources Protection Protocol |
| CFR | Code of Federal Regulations |
| $CO_2$ | carbon dioxide |
| CPW | Colorado Parks and Wildlife |
| CRMP | Cultural Resource Management Plan |
| dBA | A-weighted decibel |
| dbh | diameter at breast height |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act of 1973 |
| FAMS | Facilities Asset Management System |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | Fire Management Plan |
| FONSI | Finding of No Significant Impact |
| FRCC | Fire Regime Condition Class |
| FSH | Forest Service Handbook |
| FSM | Forest Service Manual |
| GIS | geographic information system |
| GPRA | Government Performance and Results Act |
| HMA | Herd Management Area |
| HMAP | Herd Management Area Plan |
| HRV | Historical Range of Variability |
| HUC | Hydrologic Unit Code |
| IM | Instruction Memorandum |
| IOPs | interagency operating procedures |
| Infra | Infrastructure database |
| KRCRA | Known Recoverable Coal Resource Area |
| kV | kilovolt |
| LANDFIRE | Landscape, Fire and Resource Management Planning Tools |

BLM_0025392

| | |
|---|---|
| LEED | Leadership in Energy and Environmental Design |
| MA | Management Area |
| MIS | Management Indicator Species |
| MMBF | millions of board feet |
| MMCF | million cubic feet |
| MOU | Memorandum of Understanding |
| MW | megawatt |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NEPA | National Environmental Policy Act |
| NFPORS | National Fire Plan Operations and Reporting System |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NREL | National Renewable Energy Laboratory |
| NRHP | National Register of Historic Places |
| NSO | No Surface Occupancy |
| OHV | off-highway vehicle |
| ORV | outstandingly remarkable value |
| PEIS | Programmatic Environmental Impact Statement |
| PFYC | Potential Fossil Yield Classification |
| ppm | parts per million |
| PRPA | Paleontological Resources Preservation Act |
| PSD | Prevention of Significant Deterioration |
| RAMP | Recreation Area Management Plan |
| RIPS | Rangeland Improvement Project System |
| RMP | Resource Management Plan |
| RMZ | Recreation Management Zone |
| ROS | Recreation Opportunity Spectrum |
| SHPO | State Historic Preservation Office |
| SJNF | San Juan National Forest |
| SRMA | Special Recreation Management Area |
| TMDL | total maximum daily load |
| TRFO | Tres Rios Field Office |
| USC | United States Code |
| USDA | U.S. Department of Agriculture |
| USDI | U.S. Department of the Interior |
| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic River |
| WSRA | Wild and Scenic River Act |
| WUI | wildland urban interface |

BLM_0025393

# PART I  RECORD OF DECISION

## CHAPTER 1 INTRODUCTION

This Record of Decision (ROD) documents the approval of the United States (US) Department of the Interior, Bureau of Land Management's (BLM) proposal to manage the BLM-administered lands in the Tres Rios Field Office (TRFO) and to make available for lease — with the consent of the Forest Service – the federal mineral estate and approve associated operations on lands within the administrative boundaries of the San Juan National Forest. This proposal is presented in the Approved Resource Management Plan (RMP). This Approved RMP, with minor exceptions, was described as Alternative B in the San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan and Final Environmental Impact Statement (Proposed LRMP/FEIS), which was released on September 20, 2013. The ROD applies only to those decisions for management of the public lands and resources within the BLM's Tres Rios Field Office, with the exception of oil and gas leasing decisions. As detailed below, oil and gas leasing on the National Forest System Lands is administered by the BLM, and as a consequence this ROD also applies to the oil and gas leasing decisions made for the San Juan National Forest.

The ROD and Approved RMP, as in the Proposed LRMP, have clarified some of the decisions in the Draft LRMP in order to provide consistency with  terminology used in the BLM Planning Handbook  H-1601-1.

This ROD provides an overview of the decision, including modifications made to the Proposed LRMP and the adoption of the Forest Service oil and gas leasing availability decisions.  The ROD also provides summaries of the alternatives considered, the consultation and coordination process, and an overview of the planning process, including public involvement.

### Planning Area

The planning area, the area encompassing the public lands administered by the Tres Rios Field Office (TRFO) that are subject to the Approved RMP, includes approximately 503,600 surface acres and mineral estate, and more than 300,000 acres of federal mineral estate underlying non-federal lands (split-estate) in Archuleta, Dolores, Hinsdale, La Plata, Montezuma, Montrose, San Juan, and San Miguel counties, Colorado (See Part II, Figure 1.1). The planning area does not include lands in the proclaimed boundary of BLM's Canyons of the Ancients National Monument.   The planning area provides a regional context for management decisions and establishes a framework for collaborative planning with various governmental or tribal jurisdictions and the public.

## CHAPTER 2 THE DECISION

### 2.1  BLM-Administered Lands

BLM is approving Alternative B with modifications as the Approved RMP for the BLM lands administered by the Tres Rios Field Office. The Approved RMP was prepared under the authority and regulations implementing the Federal Land Policy and Management Act (FLPMA) of 1976 (43 Code of Federal Regulations [CFR] 1600), and includes broad land use plan decisions that provide overall direction for management of resources and resource uses within the TRFO. The Approved RMP, with few minor revisions, carries forward land-use planning decisions presented as the Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan and Environmental Impact Statement (LRMP/FEIS), published September 2013. During preparation of the Approved RMP, some changes were made to the Proposed LRMP to correct errors, clarify intent, and address issues raised during the protest period. Furthermore, aspects of the Proposed Plan explicitly and exclusively applicable to USFS lands have been removed. As a result, the management action numbers changed from those

BLM_0025394

used in the Proposed LRMP and Final EIS and subsequently the figure numbers and appendices changed. Appendix X (Maps and Appendices Crosswalk) identifies the figure and appendices number from the Proposed LRMP and the corresponding number in the Approved RMP. The changes made to the Proposed LRMP and hereby approved by this ROD in the Approved RMP are detailed in the following section 2.1.2.

### 2.1.1  Protest Resolution

BLM's planning regulations at 43 CFR 1610.5-2 allow any person who participated in the planning process for the Tres Rios Field Office RMP and has an interest that may be adversely affected by BLM's planning decisions to protest proposed planning decisions within 30 days from the date the Notice of Availability of the RMP/Final EIS was published in the Federal Register.  The BLM Director received 25 letters of protest within the protest period. Of these,14 had standing and included valid protest issues.

Valid protest issues submitted included: protest period extensions, editorial concerns, National Environmental Policy Act (NEPA), the Administrative Procedures Act (APA), Federal Land Policy and Management Act (FLPMA), Areas of Critical Environmental Concern (ACEC), air resources, climate change, special status species, leasable minerals, social and economic interests, travel management, visual resource management (VRM), water and watershed resources, Wild and Scenic Rivers (WSR), lands managed for wilderness characteristics, and Wilderness Study Areas (WSA). Of those issues, the BLM granted in part one protest regarding the 15 potential areas of critical environmental concern that met both the relevance and importance criteria but, due to procedural error, the BLM did not analyze as proposed ACECs in the range of alternatives in the Draft LRMP.  As outlined below in Section 2.3, these areas will be evaluated in a future plan amendment; in the interim, the BLM will protect these areas from impairment of their identified relevant and important values .

The BLM Director's decisions on the protests are summarized in the "Director's Protest Resolution Report, Proposed Tres Rios Field Office Land and Resource Management Plan & Final Environmental Impact Statement," released on February 27, 2015 and available on the BLM Web site. These decisions are final for the Department of the Interior.  With the exception of the granted protest issue, the Director concluded that the BLM Colorado State Director followed the applicable laws, regulations, and policies and considered all relevant resource information and public input in developing the Proposed LRMP. Each protesting party will be notified in writing of the Director's findings and the disposition of their protests. The BLM Director resolved the protests without making significant changes to the Proposed LRMP, though minor clarifications were made and are summarized in the following section.

### 2.1.2  Modifications to the Proposed LRMP

As a result of protests on the Proposed LRMP/Final EIS, the Governor's Consistency Review, and continued internal review, BLM made minor changes to the following sections of the Proposed LRMP:

- *Section 2.3 of the Proposed LRMP. Terrestrial Wildlife*
- *Section 2.5 of the Proposed LRMP. Aquatic Ecosystems and Fisheries*
- *Section 2.7 of the Proposed LRMP. Livestock and Rangeland Management*
- *Section 2.12 of the Proposed LRMP. Air Quality*
- *Section 2.13 of the Proposed LRMP. Access & Travel Management*
- *Section 2.18 of the Proposed LRMP. Lands & Special Uses*
- *Section 3.3 of the Proposed LRMP. Lands Managed for Wilderness Characteristics*
- *Section 3.9 of the Proposed LRMP. Wild & Scenic Rivers*
- *Section 3.12 of the Approved RMP. Willow Creek Habitat Management Area*
- *Section 3.13 of the Proposed LRMP. Gypsum Valley Area of Critical Environmental Concern*
- *Section 3.23 of the Proposed LRMP. Dolores River Canyon*
- *Section 3.24 of the Proposed LRMP. Silverton Area*

BLM_0025395

As described below, these modifications are not considered significant changes. The BLM included the following modifications in the Approved RMP from the Proposed LRMP:

## Chapter 2 - Resource Direction

### Section 2.3 of the Proposed LRMP. Terrestrial Wildlife

This Approved RMP makes slight modifications to several wildlife standards and guidelines.

#### Bats

- The Proposed LRMP standard 2.3.37 is clarified as follows:

    Approved RMP (2.4.26): if abandoned mines are closed *and determined by an agency biologist to be suitable for bat maternity or hibernacula,* surveys will be conducted to determine occupancy.

- The Proposed LRMP standard 2.3.38 is clarified as follows:

    Approved RMP (2.4.27): the identified closure dates to protect bat resources may vary, as determined by the wildlife biologist.

#### Gunnison sage-grouse

- The Proposed LRMP guideline 2.3.71 to limit noise impacts to Gunnison Sage-grouse during the lekking season is corrected as follows:

    Approved RMP (2.4.38): The guideline is made a standard in the consistent with noise standards for other species within the Plan.

    Approved RMP (2.4.38): The dates of the limitation will apply from March 1 to May 15.

#### Raptors

- Finally, Table 2.3.2 of the Proposed LRMP, Raptor Timing and Buffer Zone Distance Standards and Guidelines is modified as follows:

    Approved RMP Table 2.4: For Golden Eagles, the timeframe for protections from disturbance will occur from February 1 to July 15; for Bald Eagles, the timeframe for protections from disturbance will occur from January 15 to July 15.

*Rationale for Changes:*  The above changes provide clarifications for implementation of the standards and guidelines identified in the Proposed LRMP and do not represent a significant change from the proposed management action and analysis. One change corrects the categorization of a management action, formerly included as a guideline, to be included as a standard. The FEIS analysis supports this correction.

#### Terrestrial Wildlife

- The Proposed LRMP guideline 2.3.61 for severe and critical big game winter range and winter concentration areas is modified as follows:

    Conditions-based winter wildlife closures will be implemented in order to protect critical and severe winter range and winter concentrations areas for elk and mule deer. Specific areas of concern are noted below; additional areas may be analyzed for closure on a site-specific basis.

    Durango SRMA (including Animas City Mountain, Grandview,):  Winter closure will occur from Dec 1 to April 15 each year.  The closure may be extended to April 30 if conditions and wildlife needs are warranted.

BLM_0025396

Cortez SRMA:  Critical winter range closure will be placed on Chutes-n-Ladders, Summit and the Aqueduct portions of the SRMA and closure time periods will be analyzed during the site-specific analysis.

Dolores SRMA:  Seasonal closure to motorized travel from Snaggletooth to Disappointment Creek annually from February 1 through May 1 to protect Desert Bighorn Sheep lambing.

*Rationale for Changes:*  The above changes were made based on analysis and additional consultation with Colorado Parks and Wildlife and do not represent a significant change from the proposed management action and analysis.

### Section 2.5 of the Proposed LRMP. Aquatic Ecosystems and Fisheries

- The Approved RMP changes the Proposed LRMP standard 2.5.18 regarding instream flow to a guideline (and re-numbered to Section 2.6, in Approved RMP).  This ROD further emphasizes that the guidelines outlined in Section 2.6 of the Approved RMP are designed to maintain aquatic ecosystems.  As noted in the introduction to Section 2.6, cooperative and collaborative methods will be the preferred approach for meeting these guidelines.  Specifically, the BLM will work with the Colorado Water Conservation Board, pursuant to MOUs established between the federal agencies and the Colorado Department of Natural Resources, to identify potential management options. These potential management options will consider water availability, impacts to water yield, and alternative flow protection programs and tools. When deciding upon an appropriate method for protection of aquatic habitat, the BLM will consider the impacts to water yield that could occur from having both an instream flow water right and bypass flow requirement on the same stream system. [1]

  Where appropriate locations for native or desired non-native fish species occur, or should occur, a minimum level of aquatic habitat shall be maintained by identifying the minimum flow rates required to support that habitat and may consider any of the following options (in no particular order) (see 2.6.19a–2.6.19d) of Section 2.6, Part II.

*Rationale for Changes:* Consultation during the Governor's Consistency Review process and protest period identified the need for this change.  The above change does not represent a significant change to management and is consistent with the analysis found in the EIS.

### Section 2.7 of the Proposed LRMP. Livestock and Rangeland Management

- To address resource concerns, the Approved RMP closes two vacant allotments analyzed for closure in Alternative C of the Proposed LRMP/FEIS: Little Molas/West Needles (#08906) and Minnie Gulch (#08909) allotments, both of which overlap with bighorn sheep range. Furthermore, the Approved RMP carries forward Alternative C for the Spring Creek allotment (#17056), located within the Spring Creek Wild Horse Herd Management Area. Upon permit relinquishment, the BLM will designate livestock grazing as not available (43 CFR 4130.2(a)) in the Spring Creek Allotment (#17056). See the management prescription identified in Table 3.9 of the Approved RMP (Part II).

*Rationale for Changes:* The above changes are consistent with those identified in the range of alternatives. These changes do not represent a departure from the range of alternatives analyzed in the FEIS nor a significant change from the Proposed LRMP.

- The Approved RMP corrects and clarifies Section 2.4.2b of the Proposed LRMP/FEIS, Vol. I regarding the closure of custodial allotments in the Pagosa area; from Alternative B the *twelve* custodial allotments will be no longer available for livestock grazing (43 CFR 4130.2(a)), *if and when*

---

[1] Utilizing both methods may sometimes be necessary to protect stream flow due to the nature of BLM lands being interspersed with private lands.

BLM_0025397

*the permit is reliquishied*, due to the difficulties of managing small parcels of public lands within larger private land parcels undergoing subdivision for non-agriculture uses, and remaining unstocked BLM custodial grazing allotments would be closed to improve program administration efficiency. (Note: any decision to close or stock vacant allotments would be evaluated at the project level.)

To account for these corrections and clarifications, the total AUMs that will be managed on the Tres Rios Field Office now account to 22,720; 20,537 are for cattle, and 2,183 are for sheep.

- Furthermore, the Approved RMP includes as a standard the action to manage public lands according to BLM Colorado Public Land Health Standards (BLM 1997); as noted in the FEIS Section 2.2, these standards applied to all alternatives.  As noted in Section 3.7.1 of the FEIS, these standards apply not only to management of livestock grazing but more generally to management of rangeland.

*Rationale for Changes:* These changes were correctly identified in the Appendix and/or the FEIS, but mistakenly omitted from the Proposed LRMP.  These changes do not represent a departure from the range of alternatives analyzed in the FEIS.

- Furthermore, the Approved RMP clarifies Section 2.4.2b of the Proposed LRMP/FEIS, Vol. I to specify which vacant allotments are to be combined:  Upper Vigil Mesa (#08457) and Vigil Mesa (#08463) will be combined with the active Vigil-Abeyta Mesa (#08456) allotment.

- Finally, this ROD modifies the Proposed LRMP/FEIS Appendix L to reflect the above changes and to clarify which allotments are closed by the RMP; the Proposed LRMP previously only identified those allotments that would remain open. This ROD also modifies Appendix L to include Mt. Elston as an active allotment; it was mistakenly excluded from the Proposed LRMP Appendix L, but is included in Appendix L of the Approved RMP.

*Rationale for Changes:* The above changes are consistent with those identified in the range of alternatives, but provide a greater level of specificity than did the Proposed LRMP.  These changes do not represent a departure from the range of alternatives analyzed in the FEIS.

### Section 2.12 of the Proposed LRMP. Air Quality

- The Approved RMP includes additional language to clarify the applicability of standards and guidelines in Section 2.12 of the Proposed LRMP/FEIS, Vol. II. Based on the results of the 2010 air quality model completed for the plan revision, air quality standards and guidelines were developed to mitigate potential impacts associated with oil and gas development, in particular to reduce levels of NO2, SO2 and impacts to visibility and ecosystem resources. The air quality standards identified as requirements in the Proposed LRMP have been carried forward into the BLM Tres Rios Approved RMP and will be applied as Conditions of Approval to all Applications for Permits to Drill through the NEPA process.  Based on project-level NEPA analysis, some or all of the guidelines may also be applied as Conditions of Approval.

*Rationale for Changes:*  The above solely provides clarification of the BLM's implementation of the standards and guidelines for Air Quality and does not change management decisions found in the Proposed LRMP/FEIS.

- The Approved RMP combines desired conditions 2.12.1 and 2.12.3 of the Proposed LRMP to reduce redundancy, see 2.13.1 of Approved RMP. The Approved RMP also removes objectives 2.12.8 and 2.12.10 of the Proposed LRMP.

*Rationale for Change:* Combining the desired conditions 2.12.1 and 2.12.3 of the Proposed LRMP reduces reduncy in the Approved RMP. Also objectives 2.12.8 and 2.12.10 of the Proposed LRMP were removed because they are pertinent and applicable to Forest Service lands and administration.

BLM_0025398

***Section 2.13 of the Proposed LRMP. Access & Travel Management***

- Section 2.14 of the Approved RMP clarifies  travel management implementation priorities by geographic area. Although travel management planning is subject to the availability of adequate resources, including funding and labor, Table 2.14 identifies the sequence of areas in which TRFO would prioritize travel planning following the release of the Record of Decision for this RMP. Depending upon available resources and subsequent strategy, some of these areas may be combined to more efficiently complete the associated travel management plans.

*Rationale for Change:* The above provides clarification of the intended implementation schedule for travel management in order to be consistent with the Travel and Transportation Management Handbook (H8342-1).

***Section 2.18 of the Proposed LRMP. Lands & Special Uses***

- The Approved RMP includes a new standard, 2.19.12, to clarify intent for travel management on potential future acquisitions. Any land acquired by the BLM over the life of the RMP will be managed under the limited classification criteria as identified in 43 CFR 8342.1. The limited classification criteria specifies that travel will be limited to existing roads and trails until a site determination and travel management plan is completed for the acquisition (43 CFR 8342.2).

*Rationale for Changes:*  The above provides clarification of the BLM's interim travel management strategy for potential future acquisitions and does not change management decisions found in the Proposed LRMP/FEIS.


**Chapter 3 – Area Direction**

***Section 3.1 of the Proposed LRMP. Tres Rios Geographic Area***

Moved to Section 2.1 of the Approved RMP for more logical organization of field office-wide management actions.

***Section 3.3 of the Proposed LRMP. Lands Managed for Wilderness Characteristics***

- The Approved RMP identifies the Coyote Wash unit as available for lease with an NSO stipulation, as analyzed in the Preferred Alternative of the Proposed LRMP/FEIS. The Approved RMP identifies the Snaggletooth unit as not available for lease, as analyzed within Alternative C of the Proposed LRMP/FEIS.

*Rationale for Change:*  The above changes are consistent with those identified in the range of alternatives. These changes do not represent a departure from the range of alternatives analyzed in the FEIS nor a significant change from the Proposed LRMP. The BLM includes the language as a standard in the RMP in order to clarify the management actions analyzed within the FEIS.

***Section 3.9 of the Proposed LRMP. Wild & Scenic Rivers***

- The Approved RMP emphasizes that the suitability determinations outlined in the Proposed LRMP, Section 3.9, are preliminary administrative recommendations that the BLM may forward to the director, Cabinet Department Secretary, and the President for further review, possible modification, and transmission to the U.S. Congress for action.  While these recommendations remain in this preliminary status, the BLM can consider and pursue alternative management direction that may be recommended by other entities and/or individuals that provide appropriate river management and protection for the stream segments determined as suitable. Alternative management approaches that would affect the classification of river segments found suitable, impair or modify the identified

BLM_0025399

outstandingly remarkable values, or alter the suitability determinations, would be subject to the appropriate environmental review and plan modification processes.

- The Approved RMP also corrects Table 3.9.1 of the Proposed LRMP, which incorrectly grouped USFS administered-miles into the BLM-administered miles for the segment of the Dolores River from McPhee to the BLM Uncompagre Field Office/Tres Rios Field Office boundary. As corrected, the Approved RMP, Table 3.3. a total of 103 miles from Bradfield Bridge to BLM Uncompagre Field Office/Tres Rios Field Office boundary will be managed as suitable by the BLM; the miles upstream from Bradfield Bridge are administered by the USFS.  Likewise, the BLM portions of both the Animas River: Bakers Bridge to Sultan Creek segment, as well as Mineral Creek, were not identified in Table 3.9.1 of the Proposed LRMP. As corrected, a total of 1.29 miles and .20 miles of these segments, respectively, will be managed as suitable by the BLM.

*Rationale for Changes:* The above changes provide clarification of the management decisions found in the Proposed LRMP/FEIS and do not alter the proposed management but provide further clarification for implementing these decisions.

### Section 3.12 of the Approved RMP. Willow Creek Habitat Management Area

- The Approved RMP adopts a portion of Alternative C of the Proposed LRMP/FEIS to select Willow Creek for management as a Habitat Management Area. Allowable uses, desired conditions, and program emphases are included in Section 3.11 of the Approved RMP.

*Rationale for change:* This is within the range of alternatives and will provide for increased consistency with Colorado conservation goals in the Gunnison Sage-grouse Rangewide Conservation Plan.

### Section 3.13 of the Proposed LRMP. Gypsum Valley Area of Critical Environmental Concern

- The Approved RMP makes a minor adjustment to the boundary of the Proposed LRMP Gypsum Valley ACEC to minimize conflict from overlapping the ACEC designation with existing uranium mining plan of operation. A revised map is included in the Approved RMP (See Figure 3.6.1). As modified, the ACEC totals 13,135 acres, or approximately 200 acres less than the 13,333 acres identified in the Proposed LRMP.

*Rationale for Change:* The change above does not represent a significant change to the alternatives or analysis but slightly modifies the boundary to provide improved management and consistency with other planning decisions.

### Section 3.23 of the Proposed LRMP. Dolores River Canyon

- The Approved RMP corrects the allowable use within the Dolores River Canyon for fire managed for resource benefit from "restricted", accompanied by suppression for natural and human ignitions, to "allowable". See Table 3.12. Dolores River Canyon Allowable Uses.

*Rationale for change:* The change above does not represent a significant change to the alternatives or analysis, and was originally included in the Draft LRMP.

### Section 3.24 of the Proposed LRMP. Silverton Area

- The Approved RMP corrects an error in the Proposed LRMP, Table 3.24.1, which identified allowable, restricted, and prohibited uses in the Silverton area. For saleable and locatable minerals, the proposed management actions were swapped. See corrected Table 3.13.1 in the Approved RMP.

*Rationale for Changes:* The change does not represent a departure from the range of alternatives analyzed in the FEIS.

BLM_0025400

**Appendices**

Note: Changes to the appendices of the Proposed LRMP will be made to reflect the modifications in the Approved RMP, as noted above. In addition, the Approved RMP approves modifications to the appendices of the Proposed LRMP/FEIS as follows:

***Appendix D of the Proposed LRMP. Wild & Scenic Rivers.***The BLM has corrected an erroneous reference to the La Plata County land-use code on page D-38. The BLM notes that the correct reference is Section 106-151 and the North County Land Use District Plan classifies the majority of this land as large-lot residential.

The BLM corrected Table D.22 of Appendix D of the Proposed LRMP, which incorrectly included Summit Canyon as a suitable segment. The associated text regarding the suitability analysis noted that Summit Canyon was not found suitable for the Proposed LRMP.

***Appendix E of the Proposed LRMP. Special Recreation Management Areas.***

The BLM corrected an erroneous omission of specific management actions from Appendix E for two areas within the Cortez Special Recreation Management Area. As specified in the Decision Notice for the Cortez-Mancos Travel Management Plan, both the Phil's World area and Mud Springs are designated day-use only, with the exception of the non-motorized trails at Phil's World, which would allow use at night. Recreational shooting is prohibited at both Phil's World and Mud Springs.

***Appendix H of the Proposed LRMP. Oil & Gas Leasing Stipulations.***

The BLM eliminated an erroneous inclusion in the Proposed LRMP, Appendix H, of Stipulation 3.4.3, *Controlled Surface Use – Occupied Habitat*, page H-30. For the preferred alternative, the FEIS analyzed the impacts of oil and gas development on Gunnison Sage-grouse habitat with the exclusive use of the NSO stipulation in occupied habitat. The CSU, a less restrictive stipulation, is intended only for unoccupied habitat.

The BLM updated the language in the lease stipulations and removed the word "critical" (Appendix H 3.4.2) for Gunnison sage-grouse habitat to provide consistency with the recent listing as threatened (November 12, 2014). The FEIS analyzed habitat occupancy so this is considered a minor update.

***Appendix U of the Proposed LRMP. Areas of Critical Environmental Concern.***

The BLM has corrected Table U.1 for each of the 15 Areas of Critical Environmental Concern that were found to meet relevance and importance criteria, as noted in Section 2.3 of this ROD, of the original 19 areas identified as meeting relevance and importance criteria in the Draft LRMP, only 4 areas that meet both relevance and importance criteria were included in the alternatives to be analyzed as potential ACECs.  To correct this oversight, the BLM will evaluate the protection of the additional 15 potential ACECs in a future plan amendment. Additionally, a GIS error in the total planning area acreage was corrected for the Gypsum Valley ACEC.

This section concludes the changes from the Proposed LRMP for the Approved RMP for BLM-Administered lands.

## 2.1.3  Consideration of Legislation

Since publication of the Proposed LRMP in September 2013, legislation ("Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015", H.R. 3979) was passed by Congress in December 2014 that affects the management of the BLM Tres Rios planning area.  The legislation (Sec. 3062 Hermosa Creek Watershed Protection) included a mineral withdrawal; a Recreation

BLM_0025401

and Public Purposes Act land conveyance; release of a portion of the West Needles contiguous WSA and creation of the Molas Pass Recreation area (see Figure 2.15.4, ARMP); a transfer of administrative jurisdiction from BLM to U.S. Forest Service for the remaining portion known as West Needles Contiguous WSA; and summarized below:

**Durango Area Mineral Withdrawal (Section 3062 (d)(1)and(2).** "Subject to valid existing rights, the land and mineral interests are withdrawn from all forms of entry, appropriation, and disposal under public land laws; location, entry and patent under the mining laws." The areas are depicted in a map entitled, "Perins Peak & Animas City Mountain, Horse Gulch and Lake Nighthorse Mineral Withdrawal" and dated April 5, 2013.  (Figure 2.20.7)

**Public Purpose Conveyance (Section 3062 (d)(3) and (e)).** "The Secretary of the Interior may convey any portion of land described to the City, the County, or the State pursuant to the Act of June 14, 1926 (Recreation and Public Purposes Act, 43USC 869 et seq) or by exchange land depicted on a map entitled, "La Plata County Grandview Conveyance" and dated May 5, 2014, consisting of approximately 82 acres.

**Molas Pass Recreation Area; Wilderness Study Area Release; Wilderness Study Area Transfer of Administrative Jurisdiction (Section 3062 (f) and (g):**

- **Molas Pass Recreation Area (Section 3062(f)(1) and Section 3062(f)(2)(B)(3)(A).** 461 acres previously part of the West Needles Contiguous Wilderness Study area within San Juan County, Colorado was released and designated (See Figure 3.6.3) as the "Molas Pass Recreation Area."  The Recreation area shall include:  Section 3062(f)(1)(B) use of snowmobiles on designated trails for winter motorized travel and grooming and in designated areas for open motorized travel.  Section 3062(f)(1)(C) includes consideration of other recreational opportunities within the Recreation Area.

- **Molas Pass Wilderness Study Area (Section 3062 (f)(2):**  Transfer of administrative jurisdiction of the that portion remaining of the Federal land generally known as West Needles Contiguous WSA and renamed,  Molas Pass Wilderness Study Area is transferred from the BLM to Forest Service.

## 2.2  Forest Service-Administered Lands: Oil & Gas Resources on the San Juan National Forest

### 2.2.1  The Decision

The BLM adopts the LRMP/FEIS for the USFS decisions outlined in the September 2013 Record of Decision, Oil and Gas Leasing Availability, San Juan National Forest. BLM concurs with the selection of Alternative B as described in the USFS ROD.

The BLM and the USFS jointly prepared the FEIS. The FEIS will be adopted without re-circulating, as the BLM has concluded that its comments and suggestions have been incorporated during the National Environmental Policy Act (NEPA) process (40 CFR 1506.3(c)). Furthermore, the FEIS meets the requirements of the regulations for implementing the Federal Land Policy and Management Act of 1976 (Title 43 CFR, Part 1600).

Alternative B was the selected alternative in the USFS ROD, and BLM concurs in the selection of Alternative B and adopts Alternative B herein. This decision was made in accordance with the National Forest Management Act of 1976 (16 U.S.C. §§ 1600-1614 et seq.) which provides for the multiple use and sustained yield of goods and services from the National Forest System in a way that maximizes long-term net public benefits in an environmental sound manner (36 CFR 219.1(a)). The leasing decision

BLM_0025402

incorporates the lease terms and stipulations determined by the USFS to be necessary and justifiable to mitigate effects to surface resources, based on analysis documented in the FEIS. The USFS and BLM will monitor and enforce these mitigation measures and stipulations in accordance with regulatory requirements at 43 C.F.R. § 3160 et seq. and 36 C.F.R. § 228 et seq.

## 2.2.2 Authorities

As identified in 40 CFR 1506.3(a), "An agency may adopt a Federal draft or final EIS or portion thereof, provided that the statement or portion thereof meets the standards for an adequate statement under their [the CEQ] regulations."

The Mineral Leasing Act of 1920, as amended, provides the Secretary of the Interior the authority to issue oil and gas leases on lands where oil and gas rights are held by the Federal Government. This authority has been delegated to BLM. The issuance of oil and gas leases on National Forest System Lands by BLM requires the consent of the Secretary of Agriculture under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (43 CFR 3101.7-1 (c)). USFS regulations under 26 C.F.R. § 228.102(e) allow the agency to authorize the BLM to lease individual, specific areas of land administratively available for lease and to include the stipulations determined to be necessary. This authority to object or not object to leasing and to require specific conditions for leasing has been delegated to Forest Supervisors for National Forest System lands.

## 2.2.3 Implementation

This decision is to adopt the allocation-level decisions and associated analysis outlined in the USFS Record of Decision regarding lands available for oil and gas leasing. With respect to implementation, the USFS retains the authority at the site-specific, project-level to consent to lease USFS subsurface mineral estate and to condition any such leases. The BLM will forward any parcel nominations to the USFS as received. The USFS will review the parcels nominated and provide consent consistent with the Record of Decision. Following consent, the BLM will determine whether to offer the parcels in a subsequent lease sale and to issue the lease if sold. The BLM will tier to the Final EIS to support subsequent NEPA decisions.

## 2.3 Future Planning Efforts

**Areas of Critical Environmental Concern**

As identified in the Proposed LRMP, Appendix U, and as a result of protests, decisions on Areas of Critical Environmental Concern will be addressed in a future plan amendment. Of the original 19 areas identified as meeting relevance and importance criteria in the Draft LRMP, only 4 areas that meet both relevance and importance criteria were included in the alternatives to be analyzed as potential ACECs. To correct this oversight, the BLM will evaluate the protection of the additional 15 potential ACECs in a future plan amendment.  In order to provide consistency of analysis for the ACECs, the amendment may also address those ACECs carried forward within the Approved RMP.

In the interim, the relevance and importance values identified within these 15 areas are largely protected through specific direction in the Approved RMP.  In addition, protection of identified relevance and importance values will be considered during project-level analysis of any management actions or project proposals.  The BLM will not approve activities in these areas that would impair the potential relevant and important values identified in Appendix U until a determination is made through the plan amendment.

**Gunnison Sage-grouse**

Furthermore, the BLM has committed to completing plan amendments throughout the range of the Gunnison Sage-grouse, in order to increase regulatory certainty that adequate conservation measures are in effect on BLM lands for this species through the Gunnison Sage-grouse Range-wide Plan

BLM_0025403

Amendment. As the TRFO contains occupied and unoccupied Gunnison Sage-grouse habitat, this RMP may be amended through that effort.

# CHAPTER 3 **THE ALTERNATIVES**

NEPA requires the BLM to develop a range of reasonable alternatives during the planning process (40 CFR 1505.1(e)). The basic goal of developing alternatives is to prepare different combinations of management scenarios in order to address all identified issues and resolve conflicts among uses. Alternatives must meet the purpose and need; must be reasonable; must provide a mix of resource protection, use, and development; must be responsive to the issues; and must meet the established planning criteria. Under all of the alternatives, TRFO would manage the public lands in accordance with all applicable laws, regulations, policies, standards, and guidelines.

## 3.1 Alternatives Considered in Detail

In selecting the Approved RMP, the BLM gave careful consideration to a range of management options identified in the alternatives (the three listed below), Alternative B is the selected alternative with modificaions, and evaluated in detail in the FEIS. Each of the alternatives not selected is summarized below, and a rationale is provided for why they were not selected as the Approved RMP.

**Alternative A** represented the continuation of current management direction under the existing San Juan/San Miguel Resource Management Plan (1985). Alternative A met the NEPA requirements that a No Action Alternative be considered (40 CFR 1502.14). The no action alternative, often referred to as the existing management situation, is required by NEPA to serve as a baseline for comparison of the potential environmental effects that could result from each alternative. Resource uses and values would have received emphasis at previous levels, and previous management strategies would have continued to be applied.

Since the need for the RMP revision includes updating the current resource management plan to address changed resource conditions, evolving demands on resources, and new and revised national-level policy, the no action alternative would not have met the purpose and need for the Approved RMP. Nor would the planning issues and management concerns have been resolved.

**Alternative C** —which may be considered the "environmentally-preferred alternative" per 40 CFR 1505.2 (b)— would have provided for a mix of multiple-use activities with a primary emphasis on maintaining the undeveloped character of the planning area. Alternative C would have identified more resources and areas for special designation than the other alternatives and overall would have emphasized the undeveloped areas and non-motorized recreational activities to a greater degree than any of the other alternatives.

Alternative C was not selected as the Preferred Alternative because it lacked a balanced approach to multiple use. Economically valuable extraction would have been widely restricted, and land management tools for the BLM would have been limited. Furthermore, the emphasis on primitive recreation and limited motorized access would run counter to increasing public demand for diverse recreational experiences on the public lands.

**Alternative D** would have provided for a mix of multiple-use activities, with a primary emphasis on energy development and working rangelands in order to produce a higher level of commodity goods and services when compared to the other alternatives. Alternative D would have allocated the least amount of land for special designation. Under Alternative D, production of goods and services would have been greater than that proposed under Alternatives B and C.

Similar to Alternative C, Alternative D was not selected as the Preferred Alternative because it lacked a balanced approach to multiple use. Primary emphasis on increased commodity production would not

BLM_0025404

have enabled BLM to manage sensitive resource values, nor would it have provided for a "combination of balanced and diverse resource uses that takes into account the long-term needs of future generations…" (FLPMA Sec. 103(c)).

## 3.2  Considerations in Selecting the Approved Plan

The alternatives described in the Draft LRMP/Draft EIS and public comment and input provided throughout this planning process were considered in preparing the Proposed LRMP. The Approved RMP is based on the Preferred Alternative B described in the Proposed LRMP (2013), which was based on Alternative B in the Draft LRMP/Draft EIS (BLM 2007).  In developing the Approved RMP, the BLM had the discretion to select an alternative in its entirety or to combine aspects of the various alternatives that were presented in the Draft LRMP/EIS or the Proposed LRMP/FEIS. This included considering management approaches that were presented during the comment period that do not result in significant changes from what the Draft LRMP/EIS considered.

Alternative B, the Preferred Alternative, focuses on balancing the goals of maintaining working forest and rangelands and retaining core, undeveloped lands and providing and maintaining the full diversity of uses and active recreation opportunities. Uses and activities that require roads, such as timber harvesting and oil and gas development, would be mostly focused in areas that already have roads, while the relatively undeveloped areas and areas that currently do not have roads would, for the most part, remain that way.

Alternative B was chosen because it responds best to the major issues while providing for common ground among conflicting opinions and multiple uses of public lands in a sustainable fashion. Four major issues were identified during the scoping process, and confirmed throughout the formal and informal public review of the Draft:

- Issue 1: Balancing management between the ideas of maintaining "working rangelands" and retaining "core undeveloped areas"

- Issue 2: Providing recreation and travel management within a sustainable ecological framework

- Issue 3: Management of special area designations and unique landscapes

- Issue 4: Management of oil and gas leasing and development

Based on the input received during the planning process, there was both support and opposition to many components of the RMP. However, the BLM did not receive comments from federal or state agencies or from tribal governments indicating that the Proposed LRMP/FEIS was inconsistent with existing plans or policies. Inconsistencies with State policy were resolved through the Governor's consistency review; the resulting modifications are noted in the Approved RMP, Section 1.1.1.

Public comments and input received during all stages of planning resulted in fine tuning the RMP. Furthermore, the BLM considered all comments and protests received on the Proposed LRMP and input from the Governor's consistency review. This ROD serves as the final decision for the land use plan decisions in the Approved RMP, which will become effective on the date this ROD is signed. As noted above, the BLM intends to issue a Plan Amendment to address Areas of Critical Environmental Concern and Gunnison Sage-grouse. Further supplements or amendments and their associated analyses may occur in the future and would serve to amend this plan.

## 3.3  Alternatives Considered but Not Analyzed

The following alternatives and management options were considered as possible ways of resolving resource management issues and conflicts but were eliminated from detailed analysis because they were either unreasonable or not practical for technical, legal, or policy reasons in the Final EIS (September 2013). However, many of the suggestions proposed by interested parties and the public were used to develop and shape the analyzed alternatives, even if they were presented in an alternative that

BLM_0025405

was not carried forward in its entirety. Specific alternatives considered but not carried forward for detailed analysis are as follows; the rationale for the alternative's elimination is provided under each heading.

- **Closure of the TRFO to livestock grazing:** This alternative would not have met the purpose and need of the Approved RMP, as FLPMA requires the public lands be managed on a "multiple use and sustained yield basis" (FLPMA Sec. 302(a) and Sec. 102(7) and includes livestock grazing as a principal use of public lands. In addition, NEPA requires that agencies study, develop, and describe appropriate alternatives and recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. Since no issues or conflicts were identified during the planning process which require the complete elimination of grazing within the planning area for their resolution, this alternative would have been arbitrary.

- **No Coalbed Methane Gas Development in the HD Mountains Alternative:** This alternative would prohibit further development of existing oil and gas leases in the HD Mountains. However, this alternative would not be practical, due to valid existing rights. A number of persons also asked that the HD Mountains be recommended for inclusion in the National Wilderness Preservation System and/or be managed as an Forest Service MA 1 (Final EIS, 2013), where natural processes dominate. The USFS HD Mountains Roadless Area was analyzed but was found to not be available for wilderness, due to its high mineral potential, approved plans, and current development of existing oil and gas leases within the area.

  The ROD for the Northern San Juan Basin Coalbed Methane (NSJB-CBM) Development EIS (USFS and BLM 1982) describes how development of current leases would proceed in the HD Mountains. The Final EIS for the current LRMP addresses future management of the HD Mountains, including whether the area should be available for leasing after the current leases expire.

- **Citizens for the Wild San Juan's Alternative:** As presented to the TRFO, this alternative's goal would be to expand large, wild core habitats; return native fish and wildlife species; secure critical landscape connections; and promote living, working, and playing in harmony with native species and wild habitats in the planning area. This alternative, along with similar comments and suggestions from participants in the community study group process, was the primary basis for Alternative C. Many ideas from this alternative would be represented under Alternative B, and, to a lesser extent, Alternative D. The exact alternative was not analyzed in detail because it included wilderness recommendations for some lands that were found not to be capable or available for wilderness and Wild and Scenic River (WSR) recommendations for some stream segments that were found not to be eligible for WSR status.

- **The Citizens' Wilderness Proposal Alternative:** This alternative, originally submitted in 1999 and subsequently updated and resubmitted in December 2005, advocates citizens' proposed wilderness areas for the TRFO. Most of the proposal's wilderness recommendations are represented by Alternative C. The exact citizens' alternative was not analyzed in detail because the BLM does not have the authority to recommend new wilderness areas or create new WSAs. Although the addition of new WSAs, or boundary changes to existing WSAs, was not considered in detail, several of the areas identified in the citizen's wilderness proposal are addressed through the TRFO's inventory of lands with wilderness characteristics, which is discussed in  Appendix O of the Proposed LRMP.

# CHAPTER 4 **CONSULTATION AND COORDINATION**

## 4.1 Public Participation

The Notice of Intent to initiate the planning process for the RMP was published in the Federal Register in September 1999. Of special note for this planning process, the USFS and BLM conducted a broad, thorough, and innovative community-based public input process that far exceeded the typical efforts of a federal lands scoping process. Between January 2005 and January 2006, the agencies coordinated 21 professionally facilitated public meetings with a total of more than 450 registered attendees. These

BLM_0025406

meetings were held in towns throughout the planning area in order to encourage geographically diverse public participation. Open to all participants, these meetings were heavily advertised with local and regional media. More than 3000 comments were collected pertinent to the specific landscapes discussed in each meeting. Other elements of the scoping process included recreation interviews conducted in 2004, public written comments submitted between 1999 and 2006, a Governmental Water Roundtable that included 10 meetings between May 2005 and March 2006, and a workshop in 2004 focused on aspen forest management.

Using the information and the public input generated throughout the scoping period and early planning stages, the USFS and the BLM completed the Draft LRMP/EIS, for which the EPA published a Notice of Availability (NOA) in December 2007. The NOA initiated the 90 day public comment period required for planning actions.

Following the release of the Draft, the USFS and BLM also held a series of 10 public meetings throughout the planning area, with a total attendance of approximately 650 individuals. Furthermore, interviews were conducted with more than 80 recreationists. Based on public comments, the BLM identified the need to prepare a Supplement to the Draft EIS to consider the Reasonable Foreseeable Development potential of oil and gas in the Gothic Shale Gas Play. When the USFS and BLM released the Supplement to the Draft EIS in August 2011, the agencies held additional public meetings in Durango, Norwood, Dove Creek, and Cortez to explain the content and analysis within the Supplement.

The USFS and BLM further refined the Draft LRMP/EIS based upon public comment, and issued the Proposed LRMP/Final EIS in September 2013. As described in Section 2.1.1 and the "Director's Protest Resolution Report, Proposed Tres Rios Field Office Land and Resource Management Plan & Final Environmental Impact Statement, a protest period was provided for the BLM land use plan decisions contained in the Proposed LRMP/Final EIS.  Twenty-five timely letters of protest were received by the BLM's Washington Office, the office responsible for resolving the protests on behalf of the BLM Director. Of the 25 letters, 14 were determined to have standing as participants in the planning process and to contain valid protest issues. The BLM granted one protest in part, resulting in the BLM's commitment to complete a future plan amendment to address additional potential areas of critical environmental concern.

## 4.2  Cooperating Agencies

To integrate a regional land management perspective into the plan, the USFS and BLM invited over 30 local governments, Tribes, and State and Federal agencies to become a Cooperating Agency for the RMP planning process. The Town of Rico and Montezuma County formally agreed to be cooperating agencies during the planning process. Under the provisions of NEPA, these government entities have jurisdiction by law or special expertise with respect to potential impacts (40 CFR 1506.1). These cooperators provided valuable input during periodic meetings and through detailed correspondences that contributed substantially to the quality of the FEIS and the selection of the Approved RMP.

## 4.3  Native American Tribes

Twenty-six tribes have expressed affiliation with the lands located within the planning area. These include the Jicarilla Apache Nation, Kewa Pueblo (formerly Pueblo of Santo Domingo), Navajo Nation, Pueblo of San Ildefonso, Pueblo of Sandia, Pueblo of Santa Ana, Ohkay Owingeh (formerly Pueblo of San Juan), Pueblo of  Acoma, Pueblo of Cochiti, Pueblo of Isleta, Pueblo of Jemez, Pueblo of Laguna, Pueblo of Nambe, Pueblo of Picuris, Pueblo of Pojoaque, Pueblo of San Felipe,  Pueblo of Taos, Pueblo of Tesuque, Pueblo of Zia, Southern Ute Indian Tribe, The Hopi Tribe, Uintah and Ouray Ute Indian Tribe, Ute Mountain Ute Indian Tribe, Ysleta del Sur Pueblo, and the Zuni Tribe. In accordance with NEPA and the NHPA, the USFS and BLM consulted with these 26 tribes since the initiation of the RMP revision, and all tribes were invited to be cooperating agencies. During the course of the planning process, the USFS and the BLM held several face-to-face meetings with the tribes, in addition to sending letters to provide progress updates and invite them to consult. As presented in the FEIS, tribes expressed most concern about the management of Chimney Rock National Monument (managed by USFS), oil and gas leasing and development, management of traditional cultural properties, and a focus on limited ground

BLM_0025407

disturbance. The Tres Rios Field Office will continue consultation with the tribes on a government – to – government basis throughout implementation of the Approved RMP.

**Government to Government Consultation – Ute Mountain Ute**

Since the Proposed Plan was issued on September, 2013, Ute Mountain Ute requested additional consultation regarding aquatic standards and tribal water rights. BLM recognizes it's role and responsibilities to tribal trust within its authorities.

Through consultations it was determined that the provisions of the Approved RMP will not impact or affect the delivery of existing water supplies and water rights decreed to the Ute Mountain Ute Tribe.

The legal authorities relied upon by the BLM to create the Approved RMP do not provide the BLM with authority to direct or affect the Ute Mountain Ute Tribe's water rights secured through the Colorado Ute Indian Water Rights Final Settlement Agreement of December 10, 1986, other applicable laws, Acts of Congress, and Colorado water decrees associated with the use and delivery of the Ute Mountain Ute Tribe's water rights.

The Ute Mountain Ute Tribe's decreed water rights are held in trust by the United States for the benefit of the Tribe. The Department of the Interior has a trust responsibility to protect and maintain these water rights in accordance with applicable laws. Nothing in the ARMP affects this special relationship, which includes BLM's commitment to comply with the letter and spirit of applicable law to protect and maintain the water rights under the 1986 Settlement Agreement.

The legal authorities relied upon by BLM to create the Approved RMP do not provide the BLM with authority to direct or affect the delivery of tribal water supplies from Bureau of Reclamation's Dolores Project or Animas-La Plata Project.   The lack of BLM authority to direct or affect tribal water supplies extends to all water deliveries made pursuant to the Colorado Ute Indian Water Rights Final Settlement Agreement.  The deliveries include all federal reserved water rights exercised by the tribe and all project water deliveries requested by the tribe from existing Reclamation projects.

The Aquatic Habitat Standards-Guidelines in Sections 2.6.18a-d and 2.6.22 of the ARMP do not apply to delivery of tribal water supplies or tribal water allocations in the Dolores Project or the Animas-La Plata Project.  Rather, the standards and guidelines are intended to apply to water facilities that require reauthorization or new land use authorization from BLM.  BLM is not aware of any facilities used for delivery of tribal water supplies that will require new or ongoing authorization from BLM.

The Wild and Scenic Rivers determinations found in Section 3.3 of the ARMP will not affect delivery of tribal water supplies or tribal water allocations in the Dolores Project.  Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable.   Specifically, the identification of roundtail chub, bluehead sucker, and flannelmouth sucker as outstandingly remarkable values on the Dolores River below the Dolores Project will not affect delivery of existing tribal water supplies and water rights decrees from the Dolores Project.

## 4.4  Agency Consultations

### 4.4.1  Endangered Species Act

In accordance with the requirements of Section 7 of the ESA, the BLM consulted with the USFWS to ensure that the BLM's proposed action would not jeopardize the continued existence of any listed threatened, endangered, or proposed species or critical habitat. The BLM prepared a Biological Assessment (BA) to evaluate the potential effects of the RMP on federally listed species and their habitats, as well as the species Gunnison Sage-grouse. The U.S Fish & Wildlife Service (FWS) concurred

BLM_0025408

with the BLM's determinations of effects to species and their habitat in their letter of March 26, 2014 and provided a formal Conference Opinion for the Gunnison Sage-grouse.

On November 12, 2014, the Service announced that it determined the Gunnison sage-grouse, requires the protection of the Endangered Species Act (ESA) as a threatened species.  Subsequently, on December 15, 2014 the FWS adopted the conference opinion of March 26, 2014 for the Tres Rios Approved RMP for the TRFO as the Biological Opinion (BO). The Conference Opinion will be referenced as the BO. The BA, Conference Opinion, BO and associated correspondence are included in Appendix Y.

Accordingly, the RMP "may affect, but is not likely to adversely affect" the Canada lynx, Mexican spotted owl, Southwestern willow flycatcher, Uncompahgre fritillary butterfly, Greenback cutthroat trout, and the Pagosa skyrocket and its designated critical habitat. Furthermore, the BLM reviewed the Canada Lynx Conservation Assessment and Strategy (LCAS) and determined the RMP to be in compliance with the LCAS.

For the Gunnison sage-grouse the formal BO agreed with the BLM's effects determination that the RMP "may affect, is likely to adversely affect" the species and its proposed critical habitat. As noted in Section 2.3 above, the BLM is undertaking a separate planning effort for GUSG habitat throughout occupied habitat in Colorado to incorporate clear and consistent conservation measures into BLM land use plans, for which the BLM published a Notice of Intent on July 18, 2014.

FWS concluded in the BO that the Tres Rios Field Office RMP, as proposed, was not likely to jeopardize the continued existence of the Gunnison sage-grouse species. Likewise, the FWS concluded that the RMP is not likely to result in destruction or adverse modification of proposed critical habitat for Gunnison Sage-grouse, but that RMP implementation will likely maintain the habitat's functionality to serve the intended conservation role for the species. The FWS concluded that the RMP will not appreciably diminish the value of proposed critical habitat for both the survival and recovery of the species.

Because the BO is at a broad programmatic level, the best information available is not sufficient for the FWS to determine any specific level of anticipated take, and so the FWS did not identify any reasonable and prudent measures or terms and conditions for the BLM. Any subsequent action implemented under the RMP that may affect the GUSG or proposed critical habitat must go through separate section 7 consultation, should the species be listed. At that time, the FWS may define incidental take and apply associated terms and conditions for the BLM to follow.

## 4.4.2  National Historic Preservation Act

In accordance with the requirements of Section 106 of the National Historic Preservation Act, the BLM  consulted with and obtained comment from the Colorado State Historic Preservation Office (SHPO) concerning the content of this RMP. These comments have been taken into account in development of the Approved RMP, and further consultation with the SHPO will take place as specific actions implementing the RMP are developed.

# CHAPTER 5 IMPLEMENTATION DECISIONS & ADMINISTRATIVE ACTIONS

## 5.1  Implementation Decisions

Implementation decisions (or activity-level decisions) are management actions tied to a specific location that implement land use plan decisions. Implementation decisions generally constitute the BLM's final approval, allowing on-the-ground actions to proceed and require appropriate site-specific planning and

NEPA analysis. Such decisions may be incorporated into implementation plans (activity or project plans) or may exist as stand-alone decisions.

Unlike land use plan decisions, implementation decisions are not subject to protest under the planning regulations. Instead, implementation decisions are subject to various administrative remedies, particularly appeals to the IBLA (under 43 CFR, 4.410). Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review, as prescribed by the specific resource program regulations after the BLM resolves the protests to land use plan decisions and decides to adopt the management plan. For example, the designation of a specific travel route is an implementation level decision, rather than a land use plan decision; consequently, individual route designations are subject to a separate appeals process.

The Approved RMP hereby incorporates the 2008 Cortez-Mancos Travel Management Plan EA (CO-800-2006-090-EA) by reference. As noted on page 97 of the Proposed LRMP, Vol. II, "…the Mancos-Cortez Travel Management Plan (USFS and BLM 2008) analyzed limiting motorized use to a designated system of roads and trails in the Phil's World and Mud Springs area…This system of routes is carried forward under this [Proposed] LRMP and would further limit mechanized travel to designated routes upon completion and publication of supplemental rules in the Federal Register…"

For the Tres Rios RMP, route designations adopted from the Cortez Travel Management Plan constitute the only implementation-level decisions that would be subject to appeal.

## 5.1.1   Appeal Procedures for Implementation Decisions

Implementation decisions are not subject to protest under the planning regulations. However, any party adversely affected by an implementation decision may appeal such a decision to the Interior Board of Land Appeals after the ROD is signed. The following procedures describe the appeal process for the implementation decisions, which will be available for appeal immediately upon public release of this ROD/Approved RMP.

Any party adversely affected by an implementation decision may appeal within 30 days of receipt of this decision in accordance with the provisions of 43 CFR Part 4.4. The appeal must include a statement of reasons or file a separate statement of reasons, which must be filed within 30 days of filing the appeal. The appeal must state if a stay of the decision is being requested in accordance with 43 CFR 4.21 and must be filed with the Tres Rios Field Manager at the following address:

> Bureau of Land Management
> Field Manager, Tres Rios Field Office
> Dolores Public Lands Office
> 29211 Highway 184
> Dolores, Colorado

A copy of the appeal, statement of reasons, and all other supporting documents shall be sent to the Regional Solicitor at the following address:

> Regional Solicitor
> Rocky Mountain Region
> United States Department of the Interior
> 755 Parfet Street, Suite 151
> Lakewood, Colorado 80215

If the statement of reasons is filed separately, it must be sent to the following address:

> United States Department of the Interior
> Office of Hearings and Appeals

BLM_0025410

Interior Board of Land Appeals
801 N. Quincy Street, Suite 300
Arlington, Virginia 22203

**Request for Stay**

Any party wishing to file a request for stay pending the outcome of an appeal of one or more implementation decisions must show sufficient justification based on the following standards under 43 CFR 4.21:

- o   The relative harm to the party if the stay is granted or denied
- o   The likelihood of the appellant's success on the merits of the stay
- o   The likelihood of immediate and irreparable harm if the stay is not granted
- o   Whether the public interest favors granting the stay

As noted above, the request for stay must be filed with the BLM Field Manager at the address listed above.

## 5.2 Administrative Actions

Although the BLM's intent and commitment to accomplish administrative actions is generally addressed in an EIS, such activities are not management decisions. Administrative actions are day-to-day activities conducted by the BLM, often required by FLPMA, but may not require NEPA analysis or a written decision by a responsible official. Examples of administrative actions include mapping, surveying, conducting inventory or monitoring, scientific research, other studies, partnering and collaborating with partners, developing educational materials, and working with local communities or interest groups.

# CHAPTER 6 **MITIGATION MEASURES**

In developing the alternatives, the BLM used a variety of management methods and tools, including identifying allowable uses, temporal and/or spatial restrictions on uses, where specific uses will be prohibited, and specific actions needed to achieve desired outcomes. Restrictions on uses include seasonal closures, limitations on surface disturbance, and application of best management practices (BMPs).

# CHAPTER 7 **PLAN MONITORING AND EVALUATION**

During the life of the RMP, the BLM expects that new information gathered from field inventories and assessments, research, other agency studies, and other sources will update baseline data or support new management techniques, Best Management Practices (BMPs), and scientific principles. To the extent that such new information or actions address issues covered in the plan, the BLM will integrate the data through plan maintenance. Furthermore, the TRFO will conduct monitoring and evaluation of RMP decisions to measure the effectiveness of the management actions and allowable use decisions in achieving the RMP's goals and objectives. In the event that monitoring indicates the RMP's objectives are not being met, the BLM will consider adjustments of appropriate scope (Adaptive Management: The U.S. DOI Technical Guide). In cases where new information would cause a more significant change in planning direction, a plan amendment and associated environmental analysis may be required.

BLM_0025411

Record of Decision

# CHAPTER 8 **PLAN APPROVAL**

**Field Manager Recommendation**

Having considered a full range of alternatives, associated impacts, and public and agency input, I recommend the adoption and implementation of the Tres Rios Field Office Proposed Resource Management Plan as the Approved Resource Management Plan.  *

Recommended:

_____        _____
Connie Clementson                                                    Date
Field Manager
Tres Rios Field Office

**District Manager Concurrence**

I concur with the adoption and implementation of the Tres Rios Field Office Proposed Resource Management Plan as the Approved Resource Management Plan.  *

Concurrence:

_____        _____
Lori Armstrong                                                         Date
District Manager
Southwest District Office

**State Director Approval**

In consideration of the foregoing, I approve the Tres Rios Field Office Proposed Resource Management Plan as the Approved Resource Management Plan.  *

Approved:

_____        _____
Ruth Welch                                                              Date
Colorado State Director

* Tres Rios Field Office Proposed Resource Management Plan Alternative B with modifications as identified in Chapter 2 previously.

I-19

BLM_0025412

*This page intentionally left blank.*

BLM_0025413

# PART II   RESOURCE MANAGEMENT PLAN

## CHAPTER 1 – INTRODUCTION

### 1.1  Purpose of the Plan

The purpose of this Resource Management Plan (RMP) is to provide strategic guidance for future management of all lands within the Tres Rios Field Office (TRFO) administered by the Bureau of Land Management (BLM), except for those lands included in the proclaimed boundary of BLM's Canyons of the Ancients National Monument. This RMP guides the restoration or maintenance of the health of these lands to promote a sustainable flow of uses, benefits, products, services, and visitor opportunities. It provides a framework for informed decision making, while guiding resource management programs, practices, uses, and projects. It does not include specific project and activity decisions. Those decisions are made later, after more detailed analysis and further public involvement. The RMP is adaptive in that it can be amended to update the management direction based on new knowledge and information.

This RMP is strategic in nature and does not attempt to prescribe detailed management direction to cover every possible situation. While all components necessary for resource protection and restoration are included, the RMP also provides flexibility needed to respond to uncertain or unknown future events and conditions such as fires, floods, climate change, changing economies, and social changes that may be important to consider at the time future decisions are made. Implementation of the RMP is contingent upon future funding and staffing levels.

The RMP has been prepared pursuant to the requirements of the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM's planning regulations at 43 Code of Federal Regulations (CFR) 1600. This RMP is also accompanied by a Final Environmental Impact Statement (FEIS) as required by the regulations used in its development (43 CFR 1601.0–1601.6 and 36 CFR 219.10).

The foundation of this RMP is the result of an extensive joint planning effort between the BLM and the USFS, as described in Part I, Chapter 4.0. The Approved RMP is applicable only to the BLM (See Figure 1.1), so language and actions pertinent only to the Forest Service have been removed subsequent to the publication of the Proposed LRMP.  Additional changes between the Proposed LRMP and the Approved RMP are noted in Part I, Section 2.1.2.

BLM_0025414