*Appendix F  -  Recreation and Visitor Services Management Framework for SRMAs and ERMAs*

## GYPSUM HILLS EXTENSIVE RECREATION MANAGEMENT AREA

### GYPSUM HILLS ERMA AREA MAP



*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026076

### GYPSUM HILLS ERMA
### RECREATION OBJECTIVE

**REC-OBJ-03c (Gypsum Hills ERMA).** In the Gypsum Hills ERMA, the R&VS focus on interdisciplinary travel management and visitor services maintains the existing landscape and supports participation in a variety of established recreation activities (e.g., motorsports, rock crawling, mountain biking for cross-country (XC) type bikes., hiking, hunting and scenic driving) commensurately with other land uses and protecting winter wildlife habitat.

### MANAGEMENT ACTION AND ALLOWABLE USE DECISIONS

**REC-MA-03c (Gypsum Hills ERMA).** Supporting management action and allowable use decisions include:

*Camping Restrictions:*
- In areas open to camping and overnight use, apply a 14-day camping limit on BLM lands from September 1 to March 31. From April 1 to August 31, apply a 7-day camping limit. Campers must relocate at least a 30-mile radius away and may not return within 30 days to a previous campsite.

*Special Recreation Permits:*
- The CRVFO would evaluate the need for new SRPs or new uses on existing permits every 5 years.
- SRPs are issued as a discretionary action for activities that:
  - are consistent with resource/program objectives *(e.g., SRPs may not be authorized/amended if desired use levels are meeting or projected to exceed desired levels of RMAs or recreation sites)*
  - are within budgetary/workload constraints *(e.g., If the CRVFO is unable to fulfill or complete all the necessary steps of issuing and managing an SRP, then an SRP may not be issued)*
  - would satisfy a public demand that the applicant can factually demonstrate is not being met *(e.g., SRPs may not be authorized/amended if a similar service is being offered in an area and there is no market research, demand analysis, recreation monitoring, or staff knowledge indicating a public demand exists)*
  - would not cause public health and safety issues or create user conflicts *(e.g., An SRP may not be issued if BLM lands together with projected public use levels are insufficient to accommodate the proposed use).*
- Vending permits are prohibited except for special events.

*Firearm Use Restriction:*
- The discharge of firearms for recreational target shooting is prohibited in developed recreation sites.

BLM_0026077

*Appendix F  -  Recreation and Visitor Services Management Framework for SRMAs and ERMAs*

*Fuels/Fire Management and Vegetation Treatments:*
- Allow fuels/vegetation treatments within the ERMA provided that the natural character and other recreation values on BLM land are not impacted over the long-term (5 years).

*Forestry:*
- The ERMA is open to timber harvest, firewood cutting and special forest product harvest that can be implemented without affecting the recreation objective.

*Lands and Realty:*
- ROW avoidance areas are applied to developed recreation sites.
- The ERMA is retained for long-term management.

*Stipulations for Fluid Mineral Leasing and Other Surface-Disturbing Activities:*
- Apply stipulation CRVFO-CSU-11 which constrains: surface use, occupancy, and surface disturbing activities in ERMAs.

*Comprehensive Trails and Travel Management:*
- The area is classified as limited to designated routes (All modes and types of over-land public travel, except foot and horse travel is limited to designated routes).
- Over-snow travel is prohibited on portions of the ERMA.

*Note: A site-specific travel network of roads and trails available for public use and any limitations placed on that use are included in the Approved RMP to the extent practical. The final travel management network of trails would be determined through RMP implementation.*


## GYPSUM HILLS ERMA
## BEST MANAGEMENT PRACTICES

*Management:*
- Consider designating separate trails for different uses when safety and recreation conflicts become an issue.
- Construct new routes on an interdisciplinary-basis in concert with other resources/resource programs. The focus of new routes should be to: form loop routes, link existing routes, create route connections to new access points, construct new motorized single track loops (estimated 14-18 miles), and reduce conflicts (e.g., recreation, trespass on private property, resource).
- Develop new recreation developments (e.g., trails, trailheads, restrooms) to effectively address recreation activity demand created by growing communities and recreation-tourism if: 1) the proposal is consistent with interdisciplinary land use plan objectives; and 2) sufficient funding and long-term management commitments are secured from managing partners.

*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026078

- BLM funding (sometimes substantial when circumstances require it) and staff would be directed toward effectively addressing visitor health and safety, use/user conflict and resource protection issues created by recreation activities.
- If future monitoring indicates visitor health and safety issues exist, resource damage is occurring or user conflicts need to be addressed, the CRVFO may implement additional visitor use restrictions for private and commercial recreation use.

*Administration:*
- Administrative use authorizations for motorized access are granted on a case-by-case basis.

*Information and Education:*
- Work with local chambers of commerce, tourism groups clubs, and businesses to provide definitive recreation information (i.e, accurate recreation information, user ethics, and use/user expectations) as opposed to promotional marketing.
- Provide visitor services and information (e.g., visitor brochures/maps, web-based materials, directional and informational signage, facilities, on-the-ground staff presence) sufficient to maintain activity participation, achieve ERMA objectives and reach resource stewardship goals.

*Monitoring:*
- Monitor: visitor use, visitor health and safety, resource conditions, and the physical qualities of the landscape with the help of recreation-tourism partnerships (e.g., towns, user groups, recreation-tourism organizations, outfitters, CDOW).

BLM_0026079

*Appendix F  -  Recreation and Visitor Services Management Framework for SRMAs and ERMAs*

## NEW CASTLE EXTENSIVE RECREATION MANAGEMENT AREA

### NEW CASTLE ERMA AREA MAP



BLM_0026080

## NEW CASTLE ERMA
### RECREATION OBJECTIVE

**REC-OBJ-03d (New Castle ERMA).** In the New Castle ERMA, cooperative management with the Town of New Castle and partners maintains adjacent BLM lands as open space which supports participation in a variety of day-use, non-motorized recreation activities (e.g., mountain biking for cross-country (XC) type bikes, walking/hiking and river-related) commensurately with other land uses.

## NEW CASTLE ERMA
### MANAGEMENT ACTION AND ALLOWABLE USE DECISIONS

**REC-MA-03d (New Castle ERMA).** Supporting management action and allowable use decisions include:

*Camping Restrictions:*
- Camping and overnight use is prohibited in the Garfield Creek Colorado River Access Site and on surrounding BLM lands in T 6 S., R. 91 W, Sections 7 and 8.
- In areas open to camping and overnight use, apply a 14-day camping limit on BLM lands from September 1 to March 31. From April 1 to August 31, apply a 7-day camping limit. Campers must relocate at least a 30-mile radius away and may not return within 30 days to a previous campsite.

*Special Recreation Permits:*
- The CRVFO would evaluate the need for new SRPs or new uses on existing permits every 5 years.
- SRPs are issued as a discretionary action for activities that:
  - are consistent with resource/program objectives *(e.g., SRPs may not be authorized/amended if desired use levels are meeting or projected to exceed desired levels of RMAs or recreation sites)*
  - are within budgetary/workload constraints *(e.g., If the CRVFO is unable to fulfill or complete all the necessary steps of issuing and managing an SRP, then an SRP may not be issued)*
  - would satisfy a public demand that the applicant can factually demonstrate is not being met *(e.g., SRPs may not be authorized/amended if a similar service is being offered in an area and there is no market research, demand analysis, recreation monitoring, or staff knowledge indicating a public demand exists)*
  - would not cause public health and safety issues or create user conflicts *(e.g., An SRP may not be issued if BLM lands together with projected public use levels are insufficient to accommodate the proposed use).*
- Vending permits are prohibited except for special events.

BLM_0026081

*Firearm Use Restriction:*
- The discharge of firearms for recreational target shooting is prohibited in developed recreation sites.

*Fuels/Fire Management and Vegetation Treatments:*
- Allow fuels/vegetation treatments within the ERMA provided that the natural character and other recreation values on BLM land are not impacted over the long-term (5 years).

*Forestry:*
- The ERMA is closed to timber harvest, firewood cutting and special forest product harvest.

*Lands and Realty:*
- ROW avoidance areas are applied to developed recreation sites.
- The ERMA is retained for long-term management.

*Stipulations for Fluid Mineral Leasing and Other Surface-Disturbing Activities:*
- Apply stipulation CRVFO-CSU-11 which constrains: surface use, occupancy, and surface disturbing activities in ERMAs.

*Comprehensive Trails and Travel Management:*
- The area is classified as limited to designated routes (All modes and types of over-land public travel, except foot and horse travel is limited to designated routes).
- Over-snow travel is prohibited north of New Castle.
- The ERMA, north of New Castle, is closed to motorized and mechanized travel from December 1 to April 15 to protect wintering big game species.

*Note: A site-specific travel network of roads and trails available for public use and any limitations placed on that use are included in the Approved RMP to the extent practical. The final travel management network of trails would be determined through RMP implementation.*

## NEW CASTLE ERMA
## BEST MANAGEMENT PRACTICES

*Management:*
- Construct new non-motorized routes on an interdisciplinary-basis in concert with other resources/resource programs. The focus of new routes should be to: reduce the amount biking on roads, form loop routes, link existing routes, create route connections to new access points and reduce conflicts (e.g., recreation, trespass on private property, resource).
- Downhill bikes are primarily intended for high speed descent. Downhill biking trails would not be constructed.

BLM_0026082

- Develop new recreation developments (e.g., trails, trailheads, restrooms) to effectively address recreation activity demand created by growing communities and recreation-tourism if: 1) the proposal is consistent with interdisciplinary land use plan objectives; and 2) sufficient funding and long-term management commitments are secured from managing partners.
- If future monitoring indicates visitor health and safety issues exist, resource damage is occurring or user conflicts need to be addressed, the CRVFO may implement additional visitor use restrictions for private and commercial recreation use.
- BLM funding (sometimes substantial when circumstances require it) and staff would be directed toward effectively addressing visitor health and safety, use/user conflict and resource protection issues created by recreation activities.

*Administration:*
- Administrative use authorizations for motorized access are granted on a case-by-case basis.

*Information and Education:*
- Work with local chambers of commerce, tourism groups and businesses to provide definitive recreation information (i.e, accurate recreation information, user ethics, and use/user expectations) as opposed to promotional marketing.
- Provide visitor services and information (e.g., visitor brochures/maps, web-based materials, directional and informational signage, facilities, on-the-ground staff presence) sufficient to maintain activity participation, achieve ERMA objectives and reach resource stewardship goals.

*Monitoring:*
- Monitor: visitor use, visitor health and safety, resource conditions, and the physical qualities of the landscape with the help of recreation-tourism partnerships (e.g., towns, user groups, recreation-tourism organizations, outfitters, CDOW).

BLM_0026083

*Appendix F - Recreation and Visitor Services Management Framework for SRMAs and ERMAs*

## SILT MESA EXTENSIVE RECREATION MANAGEMENT AREAS

### SILT MESA ERMA AREA MAP



BLM_0026084

## SILT MESA ERMA
### RECREATION OBJECTIVE

**REC-OBJ-03e (Silt Mesa ERMA).**   In the Silt Mesa ERMA, cooperative management with the Town of Silt maintains close-to-town BLM lands as open space which supports participation in a variety of day-use motorized and non-motorized recreation activities (e.g., motorsports, rock crawling, mountain biking for cross-country (XC) type bikes, hiking, and horseback riding) commensurately with other land uses.

## SILT MESA ERMA
### MANAGEMENT ACTION AND ALLOWABLE USE DECISIONS

**REC-MA-03e (Silt Mesa ERMA).**  Supporting management action and allowable use decisions include:

*Camping Restrictions:*
- Camping and overnight use is prohibited on BLM lands outside of designated campsites and developed campgrounds within the Silt Mesa ERMA (BLM lands south of the crest of the Grand Hogback mountain in (T. 5 S., R. 91 W.; T. 5 S., R. 92 W; T. 6 S., R. 91 W; T. 6 S., R. 92 W).
- In areas open to camping and overnight use, apply a 14-day camping limit on BLM lands from September 1 to March 31. From April 1 to August 31, apply a 7-day camping limit. Campers must relocate at least a 30-mile radius away and may not return within 30 days to a previous campsite.

*Special Recreation Permits:*
- The CRVFO would evaluate the need for new SRPs or new uses on existing permits every 5 years.
- SRPs are issued as a discretionary action for activities that:
  - are consistent with resource/program objectives *(e.g., SRPs may not be authorized/amended if desired use levels are meeting or projected to exceed desired levels of RMAs or recreation sites)*
  - are within budgetary/workload constraints *(e.g., If the CRVFO is unable to fulfill or complete all the necessary steps of issuing and managing an SRP, then an SRP may not be issued)*
  - would satisfy a public demand that the applicant can factually demonstrate is not being met *(e.g., SRPs may not be authorized/amended if a similar service is being offered in an area and there is no market research, demand analysis, recreation monitoring, or staff knowledge indicating a public demand exists)*
  - would not cause public health and safety issues or create user conflicts  *(e.g., An SRP may not be issued if BLM lands together with projected public use levels are insufficient to accommodate the proposed use).*
- Vending permits are prohibited except for special events.

BLM_0026085

*Firearm Use Restriction:*
- The discharge of firearms for recreational target shooting is prohibited in (1) portions of the Silt Mesa ERMA (BLM lands south of the crest of the Grand Hogback mountain in (T. 5 S., R. 91 W.; SW1/4 SW1/4 Sec 28; SW1/4 Sec 29; S1/2 SE1/4 Sec 29; NE1/4 SE1/4 Sec 29; N1/2 SE1/4 Sec30; N1/2 NE1/4 Sec 32; S1/2 Sec 33; S1/2 NE1/4 Sec 33; NW1/4 NW1/4 Sec 33) and (2) developed recreation sites.

*Fuels/Fire Management and Vegetation Treatments:*
- Allow fuels/vegetation treatments within the ERMA provided that the natural character and other recreation values on BLM land are not impacted over the long-term (5 years).

*Forestry:*
- The ERMA is closed to timber harvest, firewood cutting and special forest product harvest.

*Lands and Realty:*
- ROW avoidance areas are applied to developed recreation sites.
- The ERMA is retained for long-term management.

*Stipulations for Fluid Mineral Leasing and Other Surface-Disturbing Activities:*
- Apply stipulation CRVFO-CSU-11 which constrains: surface use, occupancy, and surface disturbing activities in ERMAs.

*Comprehensive Trails and Travel Management:*
- The area is classified as limited to designated routes (All modes and types of over-land public travel, except foot and horse travel is limited to designated routes).

*Note: A site-specific travel network of roads and trails available for public use and any limitations placed on that use are included in the Approved RMP to the extent practical. The final travel management network of trails would be determined through RMP implementation.*

## SILT MESA ERMA
### BEST MANAGEMENT PRACTICES

*Management:*
- Construct new routes on an interdisciplinary-basis in concert with other resources/resource programs. The focus of new routes should be to:, form loop routes, link existing routes, create route connections to new access points and reduce conflicts (e.g., recreation, trespass on private property, resource).
- Downhill bikes are primarily intended for high speed descent. Downhill biking trails would not be constructed.
- Consider designating separate trails for different uses when safety conflicts become an issue.

BLM_0026086

- Develop new recreation developments (e.g., trails, trailheads, restrooms) to effectively address recreation activity demand created by growing communities and recreation-tourism if: 1) the proposal is consistent with interdisciplinary land use plan objectives; and 2) sufficient funding and long-term management commitments are secured from managing partners.
- If future monitoring indicates visitor health and safety issues exist, resource damage is occurring or user conflicts need to be addressed, the CRVFO may implement additional visitor use restrictions for private and commercial recreation use.
- BLM funding (sometimes substantial when circumstances require it) and staff would be directed toward effectively addressing visitor health and safety, use/user conflict and resource protection issues created by recreation activities.

*Administration:*
- Administrative use authorizations for motorized access are granted on a case-by-case basis.

*Information and Education:*
- Work with local chambers of commerce, tourism groups and businesses to provide definitive recreation information (i.e, accurate recreation information, user ethics, and use/user expectations) as opposed to promotional marketing.
- Provide visitor services and information (e.g., visitor brochures/maps, web-based materials, directional and informational signage, facilities, on-the-ground staff presence) sufficient to maintain activity participation, achieve ERMA objectives and reach resource stewardship goals.

*Monitoring:*
- Monitor: visitor use, visitor health and safety, resource conditions, and the physical qualities of the landscape with the help of recreation-tourism partnerships (e.g., towns, user groups, recreation-tourism organizations, outfitters, CDOW).

BLM_0026087

*Appendix F  -  Recreation and Visitor Services Management Framework for SRMAs and ERMAs*

## THOMPSON CREEK EXTENSIVE RECREATION MANAGEMENT AREAS

### THOMPSON CREEK ERMA AREA MAP



BLM_0026088

THOMPSON CREEK ERMA
RECREATION OBJECTIVE

**REC-OBJ-03f (Thompson Creek ERMA).**   In the Thompson Creek ERMA, the R&VS focus on interdisciplinary travel management and visitor services maintains a naturally-appearing landscape that supports participation in a variety of existing recreation activities (e.g., mountain biking for cross-country (XC) type bikes, sport climbing, hiking, horseback riding and motorized access for hunting) while commensurately protecting wilderness characteristics and Thompson Creek ACEC values.

THOMPSON CREEK ERMA
MANAGEMENT ACTION AND ALLOWABLE USE DECISIONS

**REC-MA-03f (Thompson Creek ERMA).**   Supporting management action and allowable use decisions include:

*Camping Restrictions:*
- BLM lands in the Thompson Creek area, within ¼ mile of USFS Road 305, are closed to camping and overnight use outside of designated campsites and developed campgrounds.
- In areas open to camping and overnight use, apply a 14-day camping limit on BLM lands from September 1 to March 31. From April 1 to August 31, apply a 7-day camping limit. Campers must relocate at least a 30-mile radius away and may not return within 30 days to a previous campsite.

*Special Recreation Permits:*
- The CRVFO would evaluate the need for new SRPs or new uses on existing permits every 5 years.
- No new special recreation permits for competitive events, vending, group use, special area use, or new commercial special recreation permits would be issued unless they are necessary for helping people realize the primitive and unconfined recreational values (e.g., upland outfitting service).
- SRPs are issued as a discretionary action for activities that:
  - are consistent with resource/program objectives *(e.g., SRPs may not be authorized/amended if desired use levels are meeting or projected to exceed desired levels of RMAs or recreation sites)*
  - are within budgetary/workload constraints *(e.g., If the CRVFO is unable to fulfill or complete all the necessary steps of issuing and managing an SRP, then an SRP may not be issued)*
  - would satisfy a public demand that the applicant can factually demonstrate is not being met *(e.g., SRPs may not be authorized/amended if a similar service is being offered in an area and there is no market research, demand analysis, recreation monitoring, or staff knowledge indicating a public demand exists)*

BLM_0026089

- would not cause public health and safety issues or create user conflicts *(e.g., An SRP may not be issued if BLM lands together with projected public use levels are insufficient to accommodate the proposed use).*
- When existing commercial SRPs are renewed, the terms and conditions of the SRP would be modified as necessary to comply with the Management and Setting Prescriptions for Lands Managed to Protect Wilderness Characteristics.

*Firearm Use Restriction:*
- The discharge of firearms for recreational target shooting is prohibited in developed recreation sites.

*Fuels/Fire Management and Vegetation Treatments:*
- Allow fuels/vegetation treatments within the ERMA provided that the natural character and other recreation values on BLM land are not impacted over the long-term (5 years) and the treatment is compliant with the Management and Setting Prescriptions for Lands Managed to Protect Wilderness Characteristics.

*Forestry:*
- The ERMA is closed to timber harvest, firewood cutting and special forest product harvest.

*Lands and Realty:*
- ROW avoidance areas are applied to developed recreation sites.
- The ERMA is retained for long-term management.

*Stipulations for Fluid Mineral Leasing and Other Surface-Disturbing Activities:*
- Apply stipulation CRVFO-CSU-11 which constrains: surface use, occupancy, and surface disturbing activities in ERMAs.

*Wilderness Characteristics:*
- Recreation use and management would comply with Management and Setting Prescriptions for Lands Managed to Protect Wilderness Characteristics (Appendix C) intended to protect the values associated with wilderness character along with primitive and unconfined recreation opportunities.

*Comprehensive Trails and Travel Management:*
- The Thompson Creek ACEC is closed to motorized and mechanized use. Outside of the ACEC the ERMA is classified as limited to designated routes (All modes and types of over-land public travel, except foot and horse travel is limited to designated routes).
- Over-snow travel is prohibited.
- The ERMA is closed to motorized and mechanized travel from December 1 to April 15 to protect wintering big game species.

*Note: A site-specific travel network of roads and trails available for public use and any limitations placed on that use are included in the Approved RMP to the extent practical.*

BLM_0026090

*The final travel management network of trails would be determined through RMP implementation.*

## THOMPSON CREEK ERMA
### IMPLEMENTATION DECISIONS

**REC-IMP-03f (Thompson Creek ERMA).** Implementation decisions include:

*Climbing:*
- Re-establishment of old routes and permanent fixed anchors (bolts and pitons) are permitted at the current BLM recognized climbing area (rock fins) only.
- No additional development of bolted routes within the ERMA is permitted.
- Mechanical devices (e.g., power drills) may be used at the current BLM recognized climbing area (rock fins) only.

*Special Recreation Permits:*
- Commercial/educational climbing use is limited to one 4 person group per day including staff.

*Comprehensive Trails and Travel Management:*
- The construction of new permanent or temporary roads would not be allowed in lands managed to protect wilderness characteristics.
- Within the Thompson Creek area: 1) routes 103, 102, and 72 (The Lorax Trail) would be designated as open to mechanized travel; 2) routes 22932, 8275, and 8275B would be designated as open to motorized travel.

## THOMPSON CREEK ERMA
### BEST MANAGEMENT PRACTICES

*Management:*
- Install minimal directional signing.
- If future monitoring indicates visitor health and safety issues exist, resource damage is occurring or user conflicts need to be addressed, the CRVFO may implement additional visitor use restrictions for private and commercial recreation use.
- BLM funding (sometimes substantial when circumstances require it) and staff would be directed toward effectively addressing visitor health and safety, use/user conflict and resource protection issues created by recreation activities.

*Administration:*
- Administrative use authorizations for motorized access are granted on a case-by-case basis.
- No initial limitations on number of users/groups or group size for non-commercial use.

*Information and Education:*

BLM_0026091

- The BLM would employ the principles of Leave No Trace to minimize the impact of climbing, including the removal of ropes and slings from permanent fixed anchors.
- The community and local businesses would not post information about the area on the web or other media outlets.
- Work with local chambers of commerce, tourism groups and businesses to provide definitive recreation information (i.e, accurate recreation information, user ethics, and use/user expectations) as opposed to promotional marketing.
- Provide visitor services and information (e.g., visitor brochures/maps, web-based materials, directional and informational signage, facilities, on-the-ground staff presence) sufficient to maintain activity participation, achieve ERMA objectives and reach resource stewardship goals.

*Monitoring:*
- Monitor: visitor use, visitor health and safety, resource conditions, and the physical qualities of the landscape with the help of recreation-tourism partnerships (e.g., towns, user groups, recreation-tourism organizations, outfitters, CDOW).

BLM_0026092

# APPENDIX G
# Travel Management

BLM_0026093

## G.1. INTRODUCTION

This appendix provides supporting information to travel management decisions in the Approved RMP including considerations and rationale for route designations.

The Approved RMP comprehensively plans for all types of travel (recreational, casual, agricultural, industrial, administrative, etc.) and accompanying modes and conditions of travel, including motorized, mechanized, and non-mechanized (muscle-powered) uses. Travel management is a comprehensive approach to on-the-ground management and administration of roads, primitive roads, trails, and areas. Travel management consists of providing access to and across BLM lands for a wide variety of uses (e.g., recreational, traditional, authorized, commercial, educational), as well as all forms of motorized and non-motorized access or use, such as foot, pack stock or animal-assisted travel, mountain bike, off-highway vehicle, and other forms of transportation.

**Land Use Planning Decisions for Off-Highway Vehicles.** The following decisions are required under the land use planning process pursuant to the regulations found in 43 CFR Part 1600.

*Designation of Off-highway Vehicle (OHV) Management Areas.* All public lands are required to have OHV area designations (see 43 CFR §8342.1). Areas must be designated as open, limited, or closed to motorized travel activities. Open, limited, and closed areas are defined in 43 CFR §8340.0-5, (f), (g) and (h) respectively. Criteria for open, limited, and closed area designations are established in 43 CFR §8342.1 (a-d). The OHV area designations for WSAs must comply with BLM Manual 6330 – Management of Wilderness Study Areas.

   Open - Existing laws, proclamations, regulations, or Executive Orders may limit the use of the open area designation or impose additional requirements relating to travel and transportation planning and management in specific circumstances. Technological advances in OHVs and the volume of motorized recreation on public lands have required a shift in policy, where the designation or retention of large areas open to unregulated cross-country travel is no longer a viable management strategy.

   Open areas will be limited to a size that can be effectively managed and geographically identifiable to offer a quality OHV opportunity for participants. Expansive open areas allowing cross-country travel, without a corresponding and identified user need or demand, will not be designated in RMP revisions or new travel management plans.

   Limited - At a minimum, a limited area must have specific road, primitive road, and trail designations (i.e., limited to designated routes). Consideration must be given to a range of alternatives pursuant to NEPA and to a range of route specific limitations. These specific road, primitive road, and trail designations will be done as part of an implementation-level decision making process. More than one limitation may apply beyond the specific

BLM_0026094

road, primitive road, and trail designations, including travel routes that will be limited to specific types or modes of travel, such as foot, equestrian, bicycle, and motorized, limited to time or season of use, limited to certain types of vehicles (street legal vehicles, motorcycles, all-terrain vehicles, over-snow vehicles, or high clearance vehicles), limited to authorized or permitted vehicles or users, limited to BLM administrative use only, or other types of limitations (e.g., hunting access, game retrieval, and pull-out camping). The implementation level decisions also must provide specific guidance about the process for managing motorized vehicle access for authorized, permitted, or otherwise approved vehicles for those specific categories of motorized vehicle uses that are exempt from a limited designation (see 43 CFR §8340.0-5(a)(1-5)).

It is Colorado BLM policy (CO-IM-2007-20) to restrict all off-highway vehicle use within limited areas to designated routes.

<u>Closed</u> - Motorized vehicle travel is prohibited in a closed area. Access by means other than motorized vehicle, such as mechanized or non-motorized use, is permitted. Areas are designated closed if closure to all vehicular use is necessary to protect resources, promote visitor safety, or reduce use conflicts.

Except as otherwise provided by law, congressionally designated wilderness areas are statutorily closed to motorized and mechanized use. Routes in these areas need to be identified, along with their mode of travel.

*Route Designations in WSAs.* Information Bulletin No. 99-181 (BLM) directs BLM to comply with the wilderness nonimpairment mandate (FLPMA, Section 603(c)). BLM must monitor and regulate the activities of off-highway vehicles in the WSAs to assure that their use does not compromise these areas by impairing their suitability for designation as wilderness. The BLM's Off Road Vehicle Regulations (43 CFR 8342.1) require that BLM establish off-road vehicle designations of areas and routes that meet the non-impairment mandate. It is the BLM's policy that cross-country vehicle use in the WSAs does cause the impairment of wilderness suitability. Thus, the BLM should establish off-road vehicle designations in WSAs that limit vehicular access to boundary roads, or ways existing inside a WSA that were identified during the inventory phase of the wilderness review.

*Emergency Uses.* By regulation, any fire, military, emergency or law enforcement vehicle when used for emergency purposes is exempted from OHV decisions. Emergency uses in WSAs are covered under BLM Manual 6330 - Management of BLM Wilderness Study Areas.

*Administrative Access and Use.* Administrative use authorizations would allow motorized access for: BLM, tribal members and permitted users of BLM lands for an administrative purpose on designated routes or off designated routes (e.g., access to private property, operation or maintenance activities).

BLM_0026095

- Grant administrative use authorizations on a case-by-case basis with approval from the BLM authorized officer.
- For all authorizations that allow off-route motorized/mechanized travel, specify the following: what type of use is allowed and for what purpose, times, dates or seasons of access; and where motorized/ mechanized vehicle travel off designated routes is allowed.
- Recognizing resource concerns provide administrative access on designated routes to tribal cultural departments and tribal members for the collection of appropriate natural resources needed to maintain traditional lifeways.

## G.2. CULTURAL RESOURCES

BLM is satisfying the requirements of Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, for the travel and transportation management decisions relating to the Colorado River Valley Field Office Resource Management Plan pursuant to Addendum 1 to the Colorado State Protocol Agreement (Protocol) between the Colorado State Historic Preservation Officer (SHPO) and BLM. The Protocol, which supplements the National Programmatic Agreement between BLM, Advisory Council on Historic Preservation (ACHP), and the National Conference of State Historic Preservation Officers, adopts an alternate procedure for compliance with Section 106 of the NHPA as allowed under 36 C.F.R. § 800.14(b). Addendum 1 recognizes that BLM's designation of routes and areas is an undertaking triggering compliance with Section 106 of the NHPA, and that BLM must complete the Section 106 requirements as part of route designation during the planning process. The Addendum specifically outlines how BLM will comply with the requirements for Section 106 for Comprehensive Travel and Transportation Management Planning. As described in the Addendum, "selection of specific route networks and imposition of other use limitations, will avoid impacts on cultural resources where possible. In accordance with 43 CFR 8342, existing cultural resource information must be considered when choosing among the range of alternatives for the design of a planning area travel system, including the potential impacts on cultural resource when determining whether each of the routes or areas in a planning area should be designated as open, limited, or closed." During the designation process, existing cultural resource information is considered when choosing among the range of alternatives for the design of a planning area travel system. A large number of existing routes and areas are designated in these planning efforts (Land Use Plans and Resource Management Plans). "Designation provides a purposefully designed and clearly delineated travel network, reduces the potential for user caused route proliferation, and facilitates travel management law enforcement", all of which are helpful in reducing adverse effects to historic properties.

The steps set forth in the Addendum establish a phased process for the identification, evaluation, and resolution of potential adverse effects to historic properties eligible for or

BLM_0026096

listed on the National Register of Historic Places. The area of potential effect (APE) that is subject to inventory will be determined by the cultural resource specialist as defined by 36 CFR 800.16(d). When defining the APE, the BLM will consider potential direct, indirect, and cumulative effects to historic properties. The Addendum's phased process for identification is broken down into three steps: 1) planning; 2) route development; and 3) route maintenance. During the planning phase, existing cultural resource data along with known areas of higher use or concentration of travel will be used to determine priority areas for Class III cultural resource inventory. The SHPO, interested Native American Tribes, and other consulting parties are consulted during planning and invited to participate in the development and implementation of identification, monitoring, and treatment options according to the Colorado State Protocol in association with the National Programmatic Agreement. During the route development phase when Class III inventory is being completed, if BLM identifies historic properties that are eligible for or listed on the National Register of Historic Places that are affected, BLM will identify ways to avoid, minimize or mitigate such adverse effects, and outline treatment procedures. The types of avoidance, minimization or mitigation may include fencing, site testing or excavation, signing, route realignment, or possibly route limitation or closure. The third phase focuses on conducting Class III inventories, as necessary, for those areas identified during the planning phase as being the lowest priority inventory areas with designated routes.

For the CRVFO RMP travel and transportation management planning process, BLM has identified existing routes throughout the field office and examined the routes to determine appropriate designation based on public need and known natural and cultural resource concerns. BLM utilized current cultural resource inventories and assessments to determine potential cultural resource concerns on a route-by-route basis. The designated routes identify cultural resource concerns along with any other issues or rationale for the route designation, which are reflected in Table G-1. During the CRVFO RMP designation process, the type of use on 142 routes was changed based on cultural resource concerns. BLM has withheld from public disclosure sensitive cultural resources associated with routes even though BLM considered such information during the designation process. During the RMP phase, the CRVFO consulted with the SHPO and interested Native American tribes and incorporated the commented received into our Proposed RMP. Now the RMP is finalized the CRVFO will move into the phased identification process to determine priority areas for Class III cultural resource inventory. A priority list of designated routes that require Class III cultural resource inventory will be completed based on the implementation plan and implementation priorities. The remaining phases will follow the steps of the Addendum as described above. For those routes that BLM determines may have adverse effects impacts on cultural resources eligible for or listed in the National Register of Historic Places, the CRVFO will consult with the SHPO, interested Native American tribes, and other interested parties to determine means to avoid, minimize or mitigate such adverse effects on a case-by-case basis.

BLM_0026097

### G.3. IMPLEMENTATION

Implementation decisions allow site-specific actions to achieve land use plan decisions and generally constitute BLM's final approval allowing on-the-ground actions to proceed. These types of decisions are based on site-specific planning and NEPA analyses and are subject to the administrative remedies set forth in the regulations that apply to each resource management program of the BLM. Implementation decisions are not subject to protest under the planning regulations.

Instead, implementation decisions are subject to various administrative remedies. Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process of other administrative review as prescribed by specific resource program regulations after BLM resolves the protests to land use plan decisions and make a decision to adopt or amend the RMP.

Actual route designations within the limited category can be modified without completing a plan amendment, although NEPA compliance is still required. The federal regulations at 43 CFR 8342.3 state: "The authorized officer shall monitor effect of the use of off-road vehicles. On the basis of information so obtained, and whenever the authorized officer deems it necessary to carry out the objectives of this part, designations may be amended, revised, revoked, or other action taken pursuant to the regulation in this part."

In conducting such NEPA compliance, the factors such as:
- Routes suitable for different categories of OHVs including dirt bikes, ATVs, dune buggies, and 4-wheel-drive touring vehicles, as well as opportunities for joint trail use.
- Needs for parking, trailheads, informational and directional signs, mapping and profiling, and development of brochures or other materials for public dissemination.
- Opportunities to tie into existing or planned route networks.
- Measures needed to avoid onsite and offsite impacts to current and future land uses and important natural resources, among others, issues include noise and air pollution, erodible soils, stream sedimentation, non-point source water pollutions, listed and sensitive species habitats, historic and archeological sites, wildlife, special management areas, grazing operations, fence and gate security, needs of non-motorized recreationists, and recognition of property rights for adjacent landowners.
- Public land roads or trails determined to cause considerable adverse effects or to constitute a nuisance or threat to public safety would be considered for relocation or closure and rehabilitation after appropriate coordination with applicable agencies and partners.

Those areas managed as closed will not be available for new motorized or mechanized route designation or construction (not including maintenance or slight route alterations on existing routes).

BLM_0026098

Regulations at 43 CFR 8342.2 require BLM to monitor the effects of OHV use. Changes should be made to the travel network based on the information obtained through monitoring. Procedures for making changes to route designations after the record of decision (ROD) is signed are established in the RMP.

Site specific NEPA documentation is required to change the route designations (e.g., motorized to non-motorized) for routes designated in this plan.

## G.4.  DEFINITIONS OF KEY TERMS

**Administrative Route.**  Administrative routes do not have public motorized access. These routes are open to public foot/horse travel if legally accessed.

**All-Terrain Vehicle.**  A wheeled vehicle other than a snowmobile, which is defined as having a wheelbase and chassis of 50 inches in width or less, handlebars for steering, generally a dryweight of 800 pounds or less, three or more low-pressure tires, and a seat designed to be straddled by the operator.

**Four-wheel Drive Vehicle.**  A passenger vehicle or light truck having power available to all wheels.

**Full-size Vehicle.**  Vehicles that are typically over 50 inches in width and licensed, including passenger cars, high-clearance vehicles, trucks, and other motorized vehicles meeting the width standard. Not all roads can accommodate passenger cars.

**Mechanized Travel.**  Moving by means of mechanical devices such as a bicycle; not powered by a motor (including electric motors of any size). Note: Game retrieval carts are excluded from limitations on mechanized travel in: 1) limited or closed travel area designations and 2) areas that have seasonal limitations to mechanized travel (e.g., winter wildlife closures); outside WSAs.

**Motorcycle.**  Routes designated for motorcycles, which are defined as motorized vehicles with two tires and with a seat designed to be straddled by the operator. Many of these routes are designed more for the off-highway type of motorcycles.

**Motorized Travel.**  Moving by means of vehicles that are propelled by motors or batteries: such as cars, trucks, off-highway vehicles, motorcycles, golf carts, and boats.

**Motorized Vehicle.**  This term is synonymous with off-highway vehicle.  Examples of this type of vehicle include all-terrain vehicles, utility-type vehicles, sport utility vehicles,

BLM_0026099

motorcycles, and snowmobiles.

**Non-motorized Travel.**   Moving by foot, stock or pack animal, boat, or mechanized vehicle such as a bicycle.

**Off-highway Vehicle (OHV).**   OHV is synonymous with Off-road Vehicle (ORV). ORV is defined in 43 CFR 8340.0-5 (a): Off-road vehicle means any motorized/battery-powered vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: 1) Any nonamphibious registered motorboat; 2) Any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; 3) Any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; 4) Vehicles in official use; and 5) Any combat or combat support vehicle when used in times of national defense emergencies. OHVs generally include dirt motorcycles, dune buggies, sand rails, jeeps, 4-wheel drive vehicles, snowmobiles, and ATVs.

**Over-the-Snow Vehicle.**   An over-snow vehicle is defined as a non-full size motor vehicle (e.g. truck) that is designed or altered (e.g., track kits for motorcycles, ATVs or UTVs) for travel on snow or ice when supported in part by skis, tracks, belts, or cleats.  This does not include machinery authorized for the grooming of snowmobile trails or ski trails.

**Single-track Trail.**   Trails that are wide enough for just one motorcycle or mountain bike at a time, with a maximum tread width of 24 inches.

**Utility-type Vehicle (UTV)**.   A type of off-highway vehicle that travels on 4 or more low-pressure tires, has a steering wheel or tiller, provides side-by-side seating, and is of various widths.

## G.5.  ROUTE DESIGNATIONS

Table G-1 displays route designations including considerations and rationale for the route designations.  The route numbers (often divided into segments) relate to the numbered routes displayed on the travel maps in Appendix A and in CRVFO GIS data.

BLM_0026100

**Table G-1.  Route Designations.**

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|----------|-------------------|---------------------------------------------|
| 8020 | full-size vehicle | Protect ACEC values |
| 8020A | foot/horse only | Protect ACEC values |
| 8020B | foot/horse only | Protect ACEC values |
| 8021A | obliterate | Protect ACEC values |
| 8021 | foot/horse only | Protect ACEC values |
| 8022 | administrative route | No public access |
| 8022B | administrative route | No public access |
| 8023A | administrative route | No public access |
| 8023B | administrative route | No public access |
| 8024 | administrative route | No public access |
| 8024B | administrative route | No public access |
| 8024BA | administrative route | No public access |
| 8025 | administrative route | No public access |
| 8025A | administrative route | No public access |
| 8025AA | administrative route | No public access |
| 8025AB | administrative route | No public access |
| 8025AC | administrative route | No public access |
| 8025AD | administrative route | No public access |
| 8025B | administrative route | No public access |
| 8025BA | administrative route | No public access |
| 8025BB | administrative route | No public access |
| 8025BC | administrative route | No public access |
| 8025BD | administrative route | No public access |
| 8025BE | administrative route | No public access |
| 8025BF | administrative route | No public access |
| 8025BG | administrative route | No public access |
| 8025BI | administrative route | No public access |
| 8025C | administrative route | No public access |
| 8025CA | administrative route | No public access |
| 8025CB | administrative route | No public access |
| 8025CC | administrative route | No public access |
| 8025CD | administrative route | No public access |
| 8025CE | administrative route | No public access |
| 8025CF | administrative route | No public access |
| 8025DB | administrative route | No public access |
| 8025F | administrative route | No public access |
| 8025G | administrative route | No public access |

BLM_0026101

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8025GA | administrative route | No public access |
| 8051 | full-size vehicle | Management objectives do not require change in designation |
| 8060 | administrative route | No public access |
| 8060A | administrative route | No public access |
| 8060B | administrative route | No public access |
| 8060BA | administrative route | No public access |
| 8060BB | administrative route | No public access |
| 8060C | administrative route | No public access |
| 8061 | full-size vehicle | Management objectives do not require change in designation |
| 8062 | administrative route | No public access |
| 8064 | administrative route | No public access |
| 8064A | administrative route | No public access |
| 8065 | administrative route | No public access |
| 8066 | administrative route | No public access |
| 8067 | foot/horse only | Road conditions |
| 8068 | full-size vehicle | Management objectives do not require change in designation |
| 8069 | full-size vehicle | Management objectives do not require change in designation |
| 8069B | obliterate | Parallel route, heritage values |
| 8069C | full-size vehicle | Management objectives do not require change in designation |
| 8069D | obliterate | Parallel route, heritage values |
| 8069E | obliterate | Parallel route, heritage values |
| 8069EA | full-size vehicle | Management objectives do not require change in designation |
| 8069F | full-size vehicle | Reduce trash dumping |
| 8069FA | obliterate | Parallel route, heritage values |
| 8069FB | obliterate | Parallel route, heritage values |
| 8070 | administrative route | No public access |
| 8071 | full-size vehicle | Management objectives do not require change in designation |
| 8071A | full-size vehicle | Management objectives do not require change in designation |
| 8071B | full-size vehicle | Management objectives do not require change in designation |
| 8072 | full-size vehicle | Management objectives do not require change in designation |
| 8072B | foot/horse only | Soil protection |
| 8072A | foot/horse only | Soil protection |

BLM_0026102

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8073 | administrative route | No public access |
| 8073A | administrative route | No public access |
| 8074 | administrative route | No public access |
| 8075 | administrative route | No public access |
| 8076 | administrative route | No public access |
| 8076A | administrative route | No public access |
| 8080 | administrative route | No public access |
| 8080A | administrative route | No public access |
| 8081 | administrative route | No public access |
| 8081A | administrative route | No public access |
| 8082 | administrative route | No public access |
| 8082A | administrative route | No public access |
| 8082B | administrative route | No public access |
| 8082C | administrative route | No public access |
| 8082CA | administrative route | No public access |
| 8083 | foot/horse only | Management objectives do not require change in designation |
| 8083D | administrative route | No public access |
| 8083A | full-size vehicle | Management objectives do not require change in designation |
| 8083B | full-size vehicle | Management objectives do not require change in designation |
| 8083C | full-size vehicle | Management objectives do not require change in designation |
| 8084 | full-size vehicle | Management objectives do not require change in designation |
| 8084A | full-size vehicle | Management objectives do not require change in designation |
| 8084B | full-size vehicle | Management objectives do not require change in designation |
| 8084C | foot/horse only | Fenceline route |
| 8084E | full-size vehicle | Management objectives do not require change in designation |
| 8085 | foot/horse only | Deteriorated route, existing use is foot and horse |
| 8085A | foot/horse only | Deteriorated route, existing use is foot and horse |
| 8085B | foot/horse only | Deteriorated route, existing use is foot and horse |
| 8086 | foot/horse only | Management objectives do not require change in designation |
| 8086B | foot/horse only | Management objectives do not require change in designation |

BLM_0026103

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8086C** | foot/horse only | Management objectives do not require change in designation |
| **8087A** | administrative route | No public access |
| **8087** | ATV/UTV | Road conditions |
| **8087B** | administrative route | No public access |
| **8087BA** | administrative route | No public access |
| **8087BB** | administrative route | No public access |
| **8088** | administrative route | No public access |
| **8089** | administrative route | No public access |
| **8090A** | full-size vehicle | Management objectives do not require change in designation |
| **8090AA** | obliterate | Support management objectives for vegetation and soils |
| **8090B** | full-size vehicle | Management objectives do not require change in designation |
| **8090C** | obliterate | Support management objectives for vegetation and soils |
| **8090D** | full-size vehicle | Management objectives do not require change in designation |
| **8090E** | full-size vehicle | Management objectives do not require change in designation |
| **8090** | full-size vehicle | Management objectives do not require change in designation |
| **8090F** | administrative route | No public access |
| **8090O** | obliterate | Support management objectives for vegetation and soils |
| **8091** | ATV/UTV | ATV/UTV route, management objectives do not require change in designation |
| **8091D** | administrative route | No public access |
| **8091A** | foot/horse only | Support management objectives for vegetation and soils |
| **8091B** | foot/horse only | Support management objectives for vegetation and soils |
| **8091C** | obliterate | Support management objectives for vegetation and soils |
| **8092** | full-size vehicle | Management objectives do not require change in designation |
| **8092D** | administrative route | No public access |
| **8092A** | obliterate | Support management objectives for vegetation and soils |
| **8092B** | full-size vehicle | Management objectives do not require change in designation |
| **8092C** | obliterate | Support management objectives for vegetation and soils |
| **8092CA** | obliterate | Support management objectives for vegetation |

BLM_0026104

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|----------|-------------------|---------------------------------------------|
| | | and soils |
| **8093** | obliterate | Support management objectives for vegetation and soils |
| **8093A** | full-size vehicle | Management objectives do not require change in designation |
| **8093C** | administrative route | No public access |
| **8093D** | obliterate | Support management objectives for vegetation and soils |
| **8094** | full-size vehicle | Management objectives do not require change in designation |
| **8094B** | obliterate | Support management objectives for vegetation and soils |
| **8094A** | obliterate | Support management objectives for vegetation and soils |
| **8095D** | administrative route | No public access |
| **8095** | full-size vehicle | Management objectives do not require change in designation |
| **8095DA** | administrative route | No public access |
| **8095A** | full-size vehicle | Management objectives do not require change in designation |
| **8095B** | full-size vehicle | Management objectives do not require change in designation |
| **8095BB** | obliterate | Support management objectives for vegetation and soils |
| **8095BA** | obliterate | Support management objectives for vegetation and soils |
| **8095C** | full-size vehicle | Management objectives do not require change in designation |
| **8095CA** | obliterate | Support management objectives for vegetation and soils |
| **8096** | full-size vehicle | Management objectives do not require change in designation |
| **8096A** | full-size vehicle | Management objectives do not require change in designation |
| **8096B** | full-size vehicle | Management objectives do not require change in designation |
| **8096BA** | obliterate | Support management objectives for vegetation and soils |
| **8096BB** | obliterate | Support management objectives for vegetation and soils |
| **8096C** | full-size vehicle | Management objectives do not require change in designation |
| **8096CB** | obliterate | Support management objectives for vegetation and soils |
| **8096CA** | obliterate | Support management objectives for vegetation and soils |

BLM_0026105

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8096D** | obliterate | Support management objectives for vegetation and soils |
| **8096O** | obliterate | Support management objectives for vegetation and soils |
| **8097** | full-size vehicle | Management objectives do not require change in designation |
| **8097A** | foot/horse only | Route dead ends on private |
| **8097B** | foot/horse only | Route dead ends on private |
| **8100** | obliterate | No public access, heritage values |
| **8102** | full-size vehicle | No public access, heritage values |
| **8103** | foot/horse only | No public access |
| **8103C** | foot/horse only | No public access |
| **8104** | administrative route | No public access |
| **8104AB** | obliterate | No public access, heritage values |
| **8104A** | administrative route | No public access |
| **8104AA** | administrative route | No public access |
| **8104B** | administrative route | No public access |
| **8104C** | administrative route | No public access |
| **8105** | administrative route | No public access |
| **8106** | administrative route | No public access |
| **8106A** | administrative route | No public access |
| **8106B** | administrative route | No public access |
| **8107** | full-size vehicle | Management objectives do not require change in designation |
| **8107A** | full-size vehicle | Management objectives do not require change in designation |
| **8107B** | administrative route | No public access |
| **8107D** | full-size vehicle | Management objectives do not require change in designation |
| **8108** | full-size vehicle | Management objectives do not require change in designation |
| **8108A** | mechanized | Support management objectives for vegetation and soils, heritage values |
| **8108D** | mechanized | Support objectives for: wildlife, vegetation & erosive soils, heritage |
| **8110** | foot/horse only | Support management objectives for vegetation and soils |
| **8110B** | foot/horse only | Reduce trash dumping |
| **8110A** | foot/horse only | Reduce trash dumping |
| **8111** | foot/horse only | Support management objectives for vegetation and soils |
| **8112** | foot/horse only | Support management objectives for vegetation and soils |

BLM_0026106

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| 8112A | foot/horse only | Support management objectives for vegetation and soils |
| 8112AA | foot/horse only | Support management objectives for vegetation and soils |
| 8112AB | foot/horse only | Support management objectives for vegetation and soils |
| 8112AC | foot/horse only | Support management objectives for vegetation and soils |
| 8112B | foot/horse only | Support management objectives for vegetation and soils |
| 8112BA | foot/horse only | Support management objectives for vegetation and soils |
| 8112BB | foot/horse only | Support management objectives for vegetation and soils |
| 8112BC | foot/horse only | Support management objectives for vegetation and soils |
| 8112C | foot/horse only | Support management objectives for vegetation and soils |
| 8112CA | foot/horse only | Support management objectives for vegetation and soils |
| 8112D | foot/horse only | Support management objectives for vegetation and soils |
| 8112E | foot/horse only | Support management objectives for vegetation and soils |
| 8112F | foot/horse only | Support management objectives for vegetation and soils |
| 8112G | foot/horse only | Support management objectives for vegetation and soils |
| 8114C | foot/horse only | Support management objectives for vegetation and soils |
| 8114 | full-size vehicle | Management objectives do not require change in designation |
| 8114A | foot/horse only | Support management objectives for vegetation and soils |
| 8114A | full-size vehicle | Management objectives do not require change in designation |
| 8114AA | foot/horse only | Support management objectives for vegetation and soils |
| 8114B | foot/horse only | Support management objectives for vegetation and soils |
| 8114E | foot/horse only | Support management objectives for vegetation and soils |
| 8114F | foot/horse only | Support management objectives for vegetation and soils |
| 8114G | full-size vehicle | Management objectives do not require change in designation |
| 8114H | foot/horse only | Support management objectives for vegetation |

BLM_0026107

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | and soils |
| 8114HA | foot/horse only | Support management objectives for vegetation and soils |
| 8114I | foot/horse only | Support management objectives for vegetation and soils |
| 8114J | foot/horse only | Support management objectives for vegetation and soils |
| 8114JA | foot/horse only | Support management objectives for vegetation and soils |
| 8114K | full-size vehicle | Management objectives do not require change in designation |
| 8114L | full-size vehicle | Management objectives do not require change in designation |
| 8115 | foot/horse only | Support management objectives for vegetation and soils |
| 8115A | foot/horse only | Support management objectives for vegetation and soils |
| 8116 | foot/horse only | Support management objectives for vegetation and soils |
| 8117 | administrative route | No public access |
| 8118 | administrative route | No public access |
| 8119 | administrative route | No public access |
| 8120 | full-size vehicle | Support ERMA objectives |
| 8120AC | full-size vehicle | Management objectives do not require change in designation |
| 8120AB | full-size vehicle | Management objectives do not require change in designation |
| 8120F | foot/horse only | Non-motorized recreation opportunities |
| 8120G | foot/horse only | Non-motorized recreation opportunities |
| 8120A | obliterate | Support management objectives for vegetation and soils |
| 8120AA | foot/horse only | Non-motorized recreation opportunities |
| 8120AD | full-size vehicle | Management objectives do not require change in designation |
| 8120AE | full-size vehicle | Management objectives do not require change in designation |
| 8120B | foot/horse only | Non-motorized recreation opportunities |
| 8120D | full-size vehicle | Management objectives do not require change in designation |
| 8120E | foot/horse only | Non-motorized recreation opportunities |
| 8120H | ATV/UTV | Support ERMA objectives |
| 8121BB | obliterate | Support management objectives for vegetation and soils |
| 8121B | foot/horse only | Non-motorized recreation opportunities |

BLM_0026108

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| **8121BA** | foot/horse only | Support management objectives for vegetation and soils |
| **8122** | obliterate | Prevent illegal trash dumping |
| **8123** | administrative route | No public access |
| **8123A** | administrative route | No public access |
| **8123B** | administrative route | No public access |
| **8124** | administrative route | No public access |
| **8125** | full-size vehicle | Management objectives do not require change in designation |
| **8126BB** | foot/horse only | Dead end route |
| **8126** | full-size vehicle | Management objectives do not require change in designation |
| **8126A** | full-size vehicle | Management objectives do not require change in designation |
| **8126B** | foot/horse only | Short spur, dead ends on private |
| **8127** | foot/horse only | Short spur, dead ends on private |
| **8128** | foot/horse only | No public access |
| **8128A** | foot/horse only | No public access |
| **8128B** | administrative route | No public access |
| **8129** | administrative route | No public access |
| **8129A** | foot/horse only | No public access |
| **8130** | full-size vehicle | Management objectives do not require change in designation |
| **8130D** | foot/horse only | Support objectives for heritage values and vegetation |
| **8130A** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8130B** | foot/horse only | Support objectives for heritage values, vegetation |
| **8130BA** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8130C** | foot/horse only | Support objectives for heritage values and vegetation |
| **8131** | full-size vehicle | Management objectives do not require change in designation |
| **8131A** | administrative route | No public access |
| **8131B** | administrative route | No public access |
| **8131C** | foot/horse only | Parallel route |
| **8131D** | foot/horse only | Dead end route, spur |
| **8131E** | foot/horse only | Parallel route, spur |
| **8131J** | administrative route | No public access |
| **8131K** | mechanized | Management objectives do not require change in designation |

BLM_0026109

*Appendix G - Travel Management*

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8131L** | mechanized | Mansfield trail- Management objectives do not require change in designation |
| **8132** | full-size vehicle | Management objectives do not require change in designation |
| **8132A** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132AA** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132AC** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132B** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132BA** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132C** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132D** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132DA** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8132E** | foot/horse only | Support objectives for heritage values, vegetation and erosive soils |
| **8133** | foot/horse only | Primitive trail, complement USFS designations |
| **8133B** | administrative route | No public access |
| **8133A** | administrative route | No public access |
| **8134** | full-size vehicle | Management objectives do not require change in designation |
| **8134A** | foot/horse only | primitive trail; complement FS designations |
| **8135** | administrative route | No public access |
| **8136** | administrative route | No public access |
| **8137** | administrative route | No public access |
| **8137A** | administrative route | No public access |
| **8138** | administrative route | No public access |
| **8140** | foot only | Primitive trail |
| **8141** | foot/horse only | Primitive trail, complement USFS designations |
| **8141B** | administrative route | No public access |
| **8141A** | foot/horse only | Primitive trail, complement USFS designations |
| **8142** | administrative route | No public access |
| **8142A** | administrative route | No public access |
| **8143** | administrative route | No public access |
| **8144A** | administrative route | No public access |
| **8144** | foot/horse only | Keyser creek trail |
| **8145B** | foot/horse only | Route dead ends at private |

BLM_0026110

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8145 | full-size vehicle | Match USFS |
| 8145C | administrative route | No public access |
| 8145A | foot/horse only | Match USFS |
| 8146C | foot/horse only | Complement USFS  travel designation |
| 8146 | full-size vehicle | Complement USFS  travel designation |
| 8146A | foot/horse only | Complement USFS  travel designation |
| 8146B | foot/horse only | Complement USFS  travel designation |
| 8146D | foot/horse only | Complement USFS travel designation |
| 8147A | administrative route | No public access |
| 8148 | administrative route | No public access |
| 8148A | administrative route | No public access |
| 8148AA | administrative route | No public access |
| 8148B | administrative route | No public access |
| 8148C | administrative route | No public access |
| 8148CA | administrative route | No public access |
| 8148D | administrative route | No public access |
| 8149 | full-size vehicle | Management objectives do not require change in designation |
| 8149A | foot/horse only | Management objectives do not require change in designation |
| 8149C | full-size vehicle | Management objectives do not require change in designation |
| 8149D | full-size vehicle | Management objectives do not require change in designation |
| 8149E | foot/horse only | Management objectives do not require change in designation |
| 8149F | full-size vehicle | Management objectives do not require change in designation |
| 8150 | administrative route | No public access |
| 8151 | administrative route | no public access |
| 8151A | administrative route | No public access |
| 8151AA | administrative route | no public access |
| 8152 | administrative route | No public access/heritage values |
| 8153 | administrative route | No public access |
| 8154 | administrative route | No public access |
| 8155A | administrative route | No public access |
| 8155B | administrative route | No public access |
| 8156 | foot/horse only | Match USFS designation |
| 8156A | administrative route | No public access |
| 8156B | foot/horse only | Match USFS designation |
| 8157 | administrative route | No public access |

BLM_0026111

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8157O | obliterate | Soil erosion |
| 8157A | ATV/UTV | Soil erosion |
| 8157B | administrative route | No public access |
| 8157C | administrative route | No public access |
| 8158 | administrative route | No public access |
| 8158A | administrative route | No public access |
| 8158B | administrative route | No public access |
| 8158BD | administrative route | No public access |
| 8158C | administrative route | No public access |
| 8158D | administrative route | No public access |
| 8158DA | administrative route | No public access |
| 8159 | administrative route | No public access |
| 8159B | administrative route | No public access |
| 8159C | administrative route | No public access |
| 8159D | administrative route | No public access |
| 8159E | administrative route | No public access |
| 8162 | administrative route | No public access |
| 8163 | full-size vehicle | Management objectives do not require change in designation |
| 8163A | foot/horse only | Heritage values and fisheries |
| 8164 | administrative route | No public access, heritage values and fisheries |
| 8164A | administrative route | No public access, heritage values and fisheries |
| 8164B | administrative route | No public access, heritage values and fisheries |
| 8165 | full-size vehicle | Management objectives do not require change in designation |
| 8166 | foot/horse only | Heritage values and fisheries |
| 8166A | foot/horse only | Heritage values and fisheries |
| 8166B | foot/horse only | Heritage values and fisheries |
| 8166BC | foot/horse only | Heritage values and fisheries |
| 8167 | full-size vehicle | Management objectives do not require change in designation |
| 8167A | foot/horse only | Heritage values and fisheries |
| 8167B | foot/horse only | Heritage values and fisheries |
| 8168BB | foot/horse only | Heritage values and fisheries |
| 8169A | full-size vehicle | Management objectives do not require change in designation |
| 8169B | full-size vehicle | Management objectives do not require change in designation |
| 8171 | administrative route | No public access |
| 8171A | administrative route | No public access |

BLM_0026112

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8172** | administrative route | No public access |
| **8174** | full-size vehicle | Management objectives do not require change in designation |
| **8174B** | administrative route | No public access |
| **8175** | foot/horse only | Heritage values |
| **8175C** | administrative route | No public access |
| **8175A** | foot/horse only | Heritage values |
| **8175B** | foot/horse only | Heritage values, soils and to match USFS designation |
| **8177** | administrative route | No public access |
| **8177A** | administrative route | No public access |
| **8180** | full-size vehicle | Management objectives do not require change in designation |
| **8180B** | ATV/UTV | Existing route designation |
| **8180A** | ATV/UTV | Existing route designation |
| **8181** | full-size vehicle | Management objectives do not require change in designation |
| **8181B** | full-size vehicle | Management objectives do not require change in designation |
| **8181BA** | administrative route | No public access |
| **8181C** | full-size vehicle | Management objectives do not require change in designation |
| **8181D** | full-size vehicle | Management objectives do not require change in designation |
| **8183** | administrative route | No public access and heritage values |
| **8184** | administrative route | No public access and heritage values |
| **8184A** | administrative route | No public access and heritage values |
| **8184AA** | administrative route | No public access and heritage values |
| **8184AB** | administrative route | No public access and heritage values |
| **8184B** | administrative route | No public access and heritage values |
| **8184BA** | administrative route | No public access and heritage values |
| **8184C** | administrative route | No public access and heritage values |
| **8184D** | administrative route | No public access and heritage values |
| **8184DA** | administrative route | No public access and heritage values |
| **8184F** | administrative route | No public access and heritage values |
| **8185** | full-size vehicle | Heritage values, Management objectives do not require change in designation |
| **8185A** | full-size vehicle | Management objectives do not require change in designation |
| **8185B** | full-size vehicle | Management objectives do not require change in designation |
| **8185C** | full-size vehicle | Management objectives do not require change |

BLM_0026113

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| 8185F | full-size vehicle | Heritage values |
| 8185D | full-size vehicle | Management objectives do not require change in designation |
| 8185E | full-size vehicle | Management objectives do not require change in designation |
| 8186 | ATV/UTV | No public access |
| 8190A | administrative route | No public access |
| 8190 | foot/horse only | Heritage values |
| 8190B | administrative route | No public access |
| 8191 | administrative route | No public access and heritage values |
| 8191A | administrative route | No public access |
| 8191AA | administrative route | No public access |
| 8191B | administrative route | No public access |
| 8191C | administrative route | No public access and heritage values |
| 8191D | administrative route | No public access and heritage values |
| 8191DB | administrative route | No public access and heritage values |
| 8191E | administrative route | No public access and heritage values |
| 8191F | administrative route | No public access and heritage values |
| 8191G | administrative route | No public access |
| 8192A | administrative route | No public access |
| 8193 | administrative route | No public access |
| 8194 | administrative route | No public access |
| 8194B | administrative route | No public access |
| 8194BA | administrative route | No public access |
| 8194BB | administrative route | No public access |
| 8194C | administrative route | No public access |
| 8194CA | administrative route | No public access |
| 8194CB | administrative route | No public access |
| 8194CC | administrative route | No public access |
| 8194E | administrative route | No public access |
| 8194F | administrative route | No public access |
| 8194G | administrative route | No public access |
| 8194H | administrative route | No public access |
| 8194HA | administrative route | No public access |
| 8194HB | administrative route | No public access |
| 8195 | administrative route | No public access |
| 8195A | administrative route | No public access |
| 8195B | administrative route | No public access |

BLM_0026114

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8197 | administrative route | No public access |
| 8197A | administrative route | No public access |
| 8197AA | administrative route | No public access |
| 8200 | full-size vehicle | Match USFS designation |
| 8200C | administrative route | No public access |
| 8200D | administrative route | No public access |
| 8200A | administrative route | No public access |
| 8200B | administrative route | No public access |
| 8203 | full-size vehicle | Match USFS designation |
| 8203B | full-size vehicle | Match USFS designation |
| 8203BA | full-size vehicle | Match USFS designation |
| 8203C | full-size vehicle | Match USFS designation |
| 8203D | administrative route | No public access |
| 8203E | administrative route | No public access |
| 8204 | administrative route | No public access |
| 8204B | administrative route | No public access |
| 8205 | administrative route | No public access |
| 8206 | full-size vehicle | Allows public access from county road |
| 8206B | administrative route | Allows public access from county road |
| 8206A | full-size vehicle | Allows public access from county road |
| 8207 | administrative route | No public access |
| 8207A | administrative route | No public access |
| 8207AA | administrative route | No public access |
| 8207B | administrative route | No public access |
| 8210 | full-size vehicle | Management objectives do not require change in designation |
| 8211 | administrative route | No public access |
| 8211B | administrative route | No public access |
| 8211BA | administrative route | No public access |
| 8211BB | administrative route | No public access |
| 8211C | administrative route | No public access |
| 8211D | administrative route | No public access |
| 8211DA | administrative route | No public access |
| 8211E | administrative route | No public access |
| 8211EA | administrative route | No public access |
| 8211EB | administrative route | No public access |
| 8211EC | administrative route | No public access |
| 8211ED | administrative route | No public access |
| 8211EF | administrative route | No public access |

BLM_0026115

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8211EG | administrative route | No public access |
| 8211F | administrative route | No public access |
| 8211FA | administrative route | No public access |
| 8212 | administrative route | No public access |
| 8212A | administrative route | No public access |
| 8212B | administrative route | No public access |
| 8212CA | administrative route | No public access |
| 8212CB | administrative route | No public access |
| 8212D | administrative route | No public access |
| 8212DB | administrative route | No public access |
| 8213 | administrative route | No public access |
| 8213A | administrative route | No public access |
| 8213AA | administrative route | No public access |
| 8213B | administrative route | No public access |
| 8213C | administrative route | No public access |
| 8214 | full-size vehicle | Management objectives do not require change in designation |
| 8214A | full-size vehicle | Management objectives do not require change in designation |
| 8214B | full-size vehicle | Management objectives do not require change in designation |
| 8214C | full-size vehicle | Management objectives do not require change in designation |
| 8214D | ATV/UTV | Narrow, steep route |
| 8215 | full-size vehicle | Management objectives do not require change in designation |
| 8215A | ATV/UTV | Narrow, steep route |
| 8215B | full-size vehicle | Management objectives do not require change in designation |
| 8215BA | full-size vehicle | Management objectives do not require change in designation |
| 8215C | full-size vehicle | Management objectives do not require change in designation |
| 8215D | full-size vehicle | Management objectives do not require change in designation |
| 8216 | ATV/UTV | ATV/UTV route |
| 8217 | foot/horse only | match State land designation |
| 8217D | foot/horse only | Spur route- dead ends at private property |
| 8217A | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8217B | foot/horse only | Spur route- dead ends at private property |
| 8217C | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8218 | administrative route | No public access |

BLM_0026116

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8218A | administrative route | No public access |
| 8220 | full-size vehicle | Management objectives do not require change in designation |
| 8220A | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8220E | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8220B | foot/horse only | Steep slopes, erosive soils and public safety |
| 8220C | foot/horse only | Heritage values |
| 8220D | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8222 | full-size vehicle | Management objectives do not require change in designation |
| 8222A | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8222AA | foot/horse only | Steep slopes, erosive soils and public safety |
| 8222B | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8222D | foot/horse only | Steep slopes, erosive soils and public safety |
| 8222DB | foot/horse only | Steep slopes, erosive soils and public safety |
| 8222E | full-size vehicle | Management objectives do not require change in designation |
| 8222F | administrative route | No public access |
| 8222FA | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8222G | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8222H | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8223 | full-size vehicle | Management objectives do not require change in designation |
| 8223B | foot/horse only | Match USFS designation |
| 8223A | full-size vehicle | Management objectives do not require change in designation |
| 8223AA | full-size vehicle | Management objectives do not require change in designation |
| 8224D | administrative route | No public access |
| 8224 | foot/horse only | Steep slopes, erosive soils and public safety |
| 8224A | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8224B | foot/horse only | Steep slopes, erosive soils and public safety |
| 8224C | ATV/UTV | Steep slopes, erosive soils and public safety |
| 8226 | foot/horse only | Steep slopes, erosive soils and public safety |
| 8226A | foot/horse only | Steep slopes, erosive soils and public safety |
| 8226AA | foot/horse only | Steep slopes, erosive soils and public safety |
| 8226B | foot/horse only | Steep slopes, erosive soils and public safety |
| 8226C | foot/horse only | Steep slopes, erosive soils and public safety |
| 8226CA | foot/horse only | Steep slopes, erosive soils and public safety |
| 8227 | administrative route | No public access |
| 8230 | full-size vehicle | Management objectives do not require change |

BLM_0026117

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
|         |                   | in designation |
| 8231    | foot/horse only   | Protect riparian vegetation |
| 8232    | full-size vehicle | Management objectives do not require change in designation |
| 8232A   | full-size vehicle | Management objectives do not require change in designation |
| 8233    | full-size vehicle | Management objectives do not require change in designation |
| 8233C   | administrative route | No public access |
| 8233A   | full-size vehicle | Management objectives do not require change in designation |
| 8233B   | administrative route | No public access |
| 8234    | administrative route | No public access |
| 8240    | ATV/UTV           | Steep slopes/erosive soils/safety, Route dead-ends at private property |
| 8240A   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8240AA  | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8240B   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8241    | full-size vehicle | Management objectives do not require change in designation |
| 8241A   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8241AA  | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8241B   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8241C   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8241D   | ATV/UTV           | Public safety and soils (slumping) |
| 8241E   | foot/horse only   | Route dead-ends at private property |
| 8242    | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8243    | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8243C   | foot/horse only   | Route dead-ends at private property |
| 8243A   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8243B   | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8244    | foot/horse only   | Route dead-ends at private property |
| 8244A   | full-size vehicle | Management objectives do not require change in designation |
| 8245C   | administrative route | No public access |
| 8245    | foot/horse only   | Route dead-ends at private property |
| 8245A   | foot/horse only   | Route dead-ends at private property |
| 8245B   | foot/horse only   | Route dead-ends at private property |
| 8246    | administrative route | No public access |
| 8247    | ATV/UTV           | Steep slopes, erosive soils and public safety |
| 8249    | full-size vehicle | Management objectives do not require change |

BLM_0026118

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| **8250** | administrative route | No public access |
| **8250A** | administrative route | No public access |
| **8250B** | administrative route | No public access |
| **8250C** | administrative route | No public access |
| **8250CA** | administrative route | No public access |
| **8250CB** | administrative route | No public access |
| **8250D** | administrative route | No public access |
| **8251** | administrative route | No public access |
| **8251A** | administrative route | No public access |
| **8252** | administrative route | No public access |
| **8252A** | administrative route | No public access |
| **8252B** | administrative route | No public access |
| **8253** | administrative route | No public access |
| **8253A** | administrative route | No public access |
| **8253AA** | administrative route | No public access |
| **8253AB** | administrative route | No public access |
| **8253AC** | administrative route | No public access |
| **8253AD** | administrative route | No public access |
| **8254** | administrative route | No public access |
| **8254A** | administrative route | No public access |
| **8254B** | administrative route | No public access |
| **8254BA** | administrative route | No public access |
| **8254C** | administrative route | No public access |
| **8254CA** | administrative route | No public access |
| **8254CB** | administrative route | No public access |
| **8254D** | administrative route | No public access |
| **8254E** | administrative route | No public access |
| **8254F** | administrative route | No public access |
| **8254FF** | administrative route | No public access |
| **8254G** | administrative route | No public access |
| **8254H** | administrative route | No public access |
| **8260** | administrative route | No public access |
| **8261D** | administrative route | No public access |
| **8261** | administrative route | No public access |
| **8261A** | administrative route | No public access |
| **8261B** | administrative route | No public access |
| **8261C** | administrative route | No public access |
| **8263** | administrative route | No public access |

BLM_0026119

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8264 | administrative route | No public access |
| 8265 | administrative route | No public access |
| 8267 | foot/horse only | Dead end route |
| 8267A | administrative route | No public access |
| 8268 | administrative route | No public access |
| 8269 | full-size vehicle | Management objectives do not require change in designation |
| 8269B | administrative route | No public access |
| 8269A | administrative route | No public access |
| 8270 | foot/horse only | Protect wilderness character |
| 8270A | administrative route | No public access, dead-end spur |
| 8270B | administrative route | No public access, dead-end spur |
| 8271 | full-size vehicle | Management objectives do not require change in designation (North portion of Thompson Creek area) |
| 8275 | full-size vehicle | Maintain hunting access |
| 8275D | foot/horse only | Protect wilderness character |
| 8275A | foot/horse only | Protect wilderness character |
| 8275B | foot/horse only | Management objectives do not require change in designation |
| 8275E | administrative route | No public access, dead-end spur |
| 8275C | foot/horse only | Protect wilderness character |
| 8275CA | obliterate | Heritage values |
| 8276 | mechanized | Support ERMA objectives |
| 8280A | obliterate | Parallel route and spurs |
| 8280 | mechanized | Complement USFS  travel designation, recreation opportunity |
| 8281C | administrative route | No public access, steep slopes |
| 8281 | mechanized | Complement USFS  travel designation, recreation opportunity |
| 8281A | foot/horse only | Public safety and steep slopes |
| 8281AA | foot/horse only | Public safety and steep slopes |
| 8281B | administrative route | No public access, steep slopes |
| 8282 | full-size vehicle | Management objectives do not require change in designation |
| 8282A | mechanized | Complement USFS  travel designation, recreation opportunity |
| 8282B | foot/horse only | Complement USFS  travel designation, recreation opportunity |
| 8283 | full-size vehicle | Management objectives do not require change in designation |
| 8283A | full-size vehicle | Management objectives do not require change |

BLM_0026120

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| 8286 | administrative route | No public access |
| 8286A | administrative route | No public access |
| 8286B | administrative route | No public access |
| 8286C | administrative route | No public access |
| 8286CA | administrative route | No public access |
| 8286D | administrative route | No public access |
| 8286DA | administrative route | No public access |
| 8288 | foot/horse only | Conflicts with private owners |
| 8288A | foot/horse only | Conflicts with private owners |
| 8288B | foot/horse only | Conflicts with private owners |
| 8288C | foot/horse only | Conflicts with private owners |
| 8289 | foot/horse only | Conflicts with private owners |
| 8290 | mechanized | No conflicts- provides mechanized access |
| 8290A | foot/horse only | Spur deadends on private property/Supports management objectives for wildlife |
| 8290B | foot/horse only | Spur deadends on private property/Supports management objectives for wildlife |
| 8290C | mechanized | No conflicts- provides mechanized access |
| 8290D | mechanized | Management objectives do not require change in designation |
| 8290DA | foot/ horse only | Spur route- dead ends on private |
| 8290F | full-size vehicle | Management objectives do not require change in designation |
| 8291 | mechanized | No conflicts- provides mechanized access |
| 8291A | mechanized | No conflicts- provides mechanized access |
| 8292 | foot/horse only | No conflicts- provides motorized access |
| 8292C | mechanized | No conflicts- provides motorized access |
| 8292A | full-size vehicle | No conflicts- provides motorized access |
| 8292AA | foot/horse only | No conflicts- provides motorized access |
| 8292B | full-size vehicle | Management objectives do not require change in designation |
| 8294 | administrative route | No public access |
| 8294B | administrative route | No public access |
| 8294C | administrative route | No public access |
| 8294D | administrative route | No public access |
| 8295 | mechanized | Consistency with SRMA objectives |
| 8295A | mechanized | Consistency with SRMA objectives |
| 8295B | mechanized | Consistency with SRMA objectives |
| 8295C | mechanized | Consistency with SRMA objectives |

BLM_0026121

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8295D | mechanized | Consistency with SRMA objectives |
| 8295E | mechanized | Consistency with SRMA objectives |
| 8295F | mechanized | Consistency with SRMA objectives |
| 8295G | mechanized | Consistency with SRMA objectives |
| 8295H | mechanized | Consistency with SRMA objectives |
| 8295I | mechanized | Consistency with SRMA objectives |
| 8295J | mechanized | Consistency with SRMA objectives |
| 8295O | administrative route | No public access |
| 8295OA | administrative route | No public access |
| 8316 | full-size vehicle | Management objectives do not require change in designation |
| 8317 | administrative route | No public access |
| 8320 | full-size vehicle | Management objectives do not require change in designation |
| 8320E | mechanized | Consistency with SRMA objectives |
| 8320A | full-size vehicle | Management objectives do not require change in designation |
| 8320B | foot/horse only | Parallel routes/reduce density |
| 8320D | mechanized | Consistency with SRMA objectives |
| 8320G | mechanized | Consistency with SRMA objectives |
| 8321 | mechanized | Consistency with SRMA objectives |
| 8321B | mechanized | Consistency with SRMA objectives |
| 8321A | foot/horse only | Dead-end at private property |
| 8322 | motorcycle | Consistency with SRMA objectives |
| 8323 | mechanized | Consistency with SRMA objectives |
| 8323A | foot/horse only | Parallel route |
| 8323B | foot/horse only | Parallel route |
| 8323E | foot/horse only | Dead-end at private property |
| 8323C | mechanized | Consistency with SRMA objectives |
| 8323D | foot/horse only | Dead-end at private property |
| 8323E | foot/horse only | Parallel route |
| 8323F | obliterate | Parallel route |
| 8324FF | foot/horse only | Dead-end at private property/Consistency with SRMA objectives |
| 8324 | full-size vehicle | Motorized vehicle access |
| 8324F | mechanized | Consistency with SRMA objectives |
| 8324 | full-size vehicle | Management objectives do not require change in designation |
| 8324G | foot/horse only | Dead-end at private property |
| 8324A | mechanized | Consistency with SRMA objectives |

BLM_0026122

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|----------|-------------------|---------------------------------------------|
| 8324AA | mechanized | Consistency with SRMA objectives |
| 8324AB | mechanized | Consistency with SRMA objectives |
| 8324AC | mechanized | Consistency with SRMA objectives |
| 8324BB | foot/horse only | Dead-end at private property |
| 8324B | mechanized | Consistency with SRMA objectives |
| 8324BA | mechanized | Dead-end at private property |
| 8324C | mechanized | Consistency with SRMA objectives |
| 8324CB | foot/horse only | Match Pitkin County designation |
| 8324E | mechanized | Consistency with SRMA objectives |
| 8324EA | mechanized | Consistency with SRMA objectives |
| 8325I | foot/horse only | Dead-end at private property |
| 8325J | foot/horse only | Dead-end at private property |
| 8325K | mechanized | Consistency with SRMA objectives |
| 8320C | mechanized | Consistency with SRMA objectives |
| 8325 | mechanized | Consistency with SRMA objectives |
| 8325A | mechanized | Consistency with SRMA objectives |
| 8325E | mechanized | Consistency with SRMA objectives |
| 8325G | foot/horse only | dead-end at private property |
| 8325AA | obliterate | Dead-end at private property |
| 8325AB | obliterate | Dead-end at private property |
| 8325BB | administrative route | No public access |
| 8325H | mechanized | Consistency with SRMA objectives |
| 8325B | foot/horse only | Parallel route |
| 8325C | mechanized | Consistency with SRMA objectives |
| 8325D | motorcycle | Consistency with SRMA objectives |
| 8325CA | foot/horse only | Parallel route |
| 8325F | obliterate | Protect sensitive plants |
| 8326 | mechanized | Consistency with SRMA objectives |
| 8326C | foot/horse only | Dead-end at private property/Consistency with SRMA objectives |
| 8326A | foot/horse only | Parallel route |
| 8326AA | foot/horse only | Parallel route |
| 8326AB | foot/horse only | Parallel route |
| 8326AC | foot/horse only | Parallel route |
| 8326B | foot/horse only | Parallel route |
| 8326BA | foot/horse only | Parallel route |
| 8327B | foot/horse only | Consistency with SRMA objectives |
| 8327 | mechanized | Consistency with SRMA objectives |
| 8327C | obliterate | Parallel route |

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8327A | mechanized | Consistency with SRMA objectives |
| 8328 | administrative route | No public access |
| 8328A | administrative route | No public access |
| 8328AA | administrative route | No public access |
| 8329 | full-size vehicle | Management objectives do not require change in designation |
| 8329A | administrative route | No public access |
| 8329B | administrative route | No public access |
| 8329C | foot/horse only | Dead-end at private property |
| 8329D | administrative route | No public access |
| 8329E | foot/horse only | Dead-end at private property |
| 8330 | full-size vehicle | Management objectives do not require change in designation |
| 8331 | full-size vehicle | Management objectives do not require change in designation |
| 8331A | mechanized | Included based on public comment |
| 8331B | mechanized | Included based on public comment |
| 8332 | full-size vehicle | Management objectives do not require change in designation |
| 8332A | full-size vehicle | Management objectives do not require change in designation |
| 8333 | administrative route | No public access |
| 8333A | administrative route | No public access |
| 8334 | full-size vehicle | Management objectives do not require change in designation |
| 8334A | foot/horse only | Parallel route |
| 8334B | foot/horse only | Parallel route |
| 8334C | full-size vehicle | Management objectives do not require change in designation |
| 8334D | full-size vehicle | Management objectives do not require change in designation |
| 8335 | full-size vehicle | Management objectives do not require change in designation |
| 8335A | foot/horse only | Steep slopes and soils |
| 8335B | foot/horse only | Complement Pitkin CO travel designation |
| 8336 | full-size vehicle | Management objectives do not require change in designation |
| 8336B | full-size vehicle | Management objectives do not require change in designation |
| 8336C | full-size vehicle | Management objectives do not require change in designation |
| 8336CA | obliterate | High density of routes around stock pond, rehabilitate to benefit range and wildlife values |

BLM_0026124

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| 8336CO | obliterate | High density of routes around stock pond, rehabilitate to benefit range and wildlife values |
| 8336D | full-size vehicle | Management objectives do not require change in designation |
| 8338 | mechanized | Complement USFS travel designation |
| 8340 | mechanized | Management objectives do not require change in designation, Match USFS travel designation (Arbaney-Kittle Trail ) |
| 8340B | administrative route | No public access (Williams Hill) |
| 8340A | administrative route | No public access (Williams Hill) |
| 8341 | mechanized | non-motorized opportunity/Match USFS travel designation/current use |
| 8342B | mechanized | Match Pitkin County and USFS designations |
| 8344 | mechanized | Match Pitkin County and USFS designations |
| 8345 | administrative route | No public access |
| 8345B | full-size vehicle | Management objectives do not require change in designation, Seasonal closure managed by USFS (Triangle Peak) |
| 8345A | administrative route | No public access |
| 8345AA | foot/horse only | Access from USFS or Christine SWA |
| 8346 | administrative route | No public access (West Basalt Mountain) |
| 8346A | administrative route | No public access (West Basalt Mountain) |
| 8347 | administrative route | No public access |
| 8348 | full-size vehicle | Management objectives do not require change in designation |
| 8350 | administrative route | No public access |
| 8350A | administrative route | No public access |
| 8350AA | administrative route | No public access |
| 8350AB | administrative route | No public access |
| 8350AC | administrative route | No public access |
| 8350B | administrative route | No public access |
| 8350C | administrative route | No public access |
| 8351 | administrative route | No public access |
| 8351A | administrative route | No public access |
| 8351B | administrative route | No public access |
| 8351C | administrative route | No public access |
| 8351D | administrative route | No public access |
| 8351E | administrative route | No public access |
| 8351F | administrative route | No public access |
| 8351G | foot/horse only | Support management objectives for: soils, plants, fisheries and recreation |

BLM_0026125

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8351H | mechanized | Management objectives do not require change in designation |
| 8352 | administrative route | No public access |
| 8352B | administrative route | No public access |
| 8353 | administrative route | No public access |
| 8354 | administrative route | No public access |
| 8355 | administrative route | No public access |
| 8355A | administrative route | No public access |
| 8356 | full-size vehicle | Management objectives do not require change in designation |
| 8360C | obliterate | Support management objectives for: fisheries, plants and heritage values |
| 8360CA | full-size vehicle | Management objectives do not require change in designation |
| 8361 | ATV/UTV | Support objectives for, fisheries, plants and heritage values |
| 8361A | obliterate | Support objectives for, fisheries, plants and heritage values |
| 8361B | obliterate | Support objectives for, fisheries, plants and heritage values |
| 8362 | motorcycle | Single track opportunity |
| 8362A | motorcycle | Single track opportunity |
| 8363 | full-size vehicle | Management objectives do not require change in designation |
| 8363A | foot/horse only | Support management objectives for: soils, plants and fisheries |
| 8363AB | foot/horse only | Support management objectives for: soils, plants and fisheries |
| 8363AC | foot/horse only | Support management objectives for: soils, plants and fisheries |
| 8363AD | foot/horse only | Support management objectives for: soils, plants and fisheries |
| 8363B | full-size vehicle | Management objectives do not require change in designation |
| 8363C | motorcycle | Single track opportunity |
| 8363D | full-size vehicle | Management objectives do not require change in designation |
| 8363E | foot/horse only | Support management objectives for: wildlife, soils, plants, fisheries |
| 8363EE | foot/horse only | Support management objectives for: wildlife, soils, plants, fisheries |
| 8363F | full-size vehicle | Management objectives do not require change in designation |
| 8363FA | full-size vehicle | Management objectives do not require change in designation |

BLM_0026126

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8363FB** | foot/horse only | Support management objectives for: soils, plants and fisheries |
| **8364** | full-size vehicle | Management objectives do not require change in designation |
| **8364O** | obliterate | Support objectives for fisheries |
| **8364AF** | foot/horse only | Support management objectives for: soils, plants and fisheries |
| **8364A** | full-size vehicle | Management objectives do not require change in designation |
| **8364B** | full-size vehicle | Management objectives do not require change in designation |
| **8364C** | full-size vehicle | Management objectives do not require change in designation |
| **8364CO** | obliterate | Support objectives for fisheries |
| **8364CA** | full-size vehicle | Management objectives do not require change in designation |
| **8364CB** | full-size vehicle | Management objectives do not require change in designation |
| **8364BO** | obliterate | Support objectives for fisheries |
| **8364CC** | ATV/UTV | Support management objectives for: soils, plants,  fisheries and recreation |
| **8364CD** | full-size vehicle | Management objectives do not require change in designation |
| **8364E** | obliterate | Support objectives for fisheries |
| **8364F** | obliterate | Support objectives for fisheries |
| **8366** | full-size vehicle | Management objectives do not require change in designation |
| **8366A** | foot/horse only | Support management objectives for fisheries and plants |
| **8366AA** | foot/horse only | Support management objectives for fisheries and plants |
| **8366B** | obliterate | Support management objectives for: soils, plants and fisheries |
| **8366C** | obliterate | Support management objectives for: soils, plants and fisheries |
| **8367C** | obliterate | Support management objectives for: soils, plants and fisheries |
| **8367** | full-size vehicle | Management objectives do not require change in designation |
| **8367A** | obliterate | Support management objectives for: soils, plants and fisheries |
| **8367AA** | obliterate | Support management objectives for: soils, plants and fisheries |
| **8367B** | obliterate | Support management objectives for: soils, plants and fisheries |
| **8368FA** | foot/horse only | Support objectives for fisheries |

BLM_0026127

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8368** | full-size vehicle | Management objectives do not require change in designation |
| **8368F** | foot/horse only | Support management objectives for: soils, plants, fisheries and recreation |
| **8368A** | foot/horse only | Provide recreation access |
| **8368OA** | obliterate | Heritage values and soils |
| **8368B** | ATV/UTV | Support management objectives for soils, plants, fisheries and recreation |
| **8368BM** | motorcycle | Support management objectives for soils, plants, fisheries and recreation |
| **8368C** | foot/horse only | Support objectives for fisheries |
| **8368F** | foot/horse only | Support objectives for fisheries |
| **8368D** | mechanized | Compliment Town of Gypsum travel designations |
| **8368E** | foot/horse only | Support management objectives for soils, plants, fisheries and recreation |
| **8368G** | foot/horse only | Support objectives for fisheries |
| **8369** | foot/horse only | Route dead-ends at private property, no public access |
| **8369A** | foot/horse only | Route dead-ends at private property, no public access |
| **8369B** | foot/horse only | Support management objectives for fisheries and soils |
| **8369C** | foot/horse only | Support management objectives for fisheries and soils |
| **8369CB** | foot/horse only | Support management objectives for fisheries and soils |
| **8369D** | foot/horse only | Support management objectives for fisheries and soils |
| **8369EA** | foot/horse only | Support management objectives for fisheries and soils |
| **8369EB** | foot/horse only | Support management objectives for fisheries and soils |
| **8370** | full-size vehicle | Management objectives do not require change in designation |
| **8370F** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8370A** | full-size vehicle | Management objectives do not require change in designation |
| **8370B** | full-size vehicle | Management objectives do not require change in designation |
| **8370BC** | administrative route | No public access |
| **8370BA** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8370BB** | foot/horse only | Support management objectives for fisheries and heritage values |

BLM_0026128

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|----------|-------------------|---------------------------------------------|
| **8370C** | full-size vehicle | Management objectives do not require change in designation |
| **8370CA** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8370D** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8370E** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8370EA** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8371** | full-size vehicle | Management objectives do not require change in designation |
| **8371A** | full-size vehicle | Management objectives do not require change in designation |
| **8371B** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8371C** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8371D** | full-size vehicle | Management objectives do not require change in designation |
| **8371E** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8371G** | full-size vehicle | Management objectives do not require change in designation |
| **8371F** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8371FA** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8372** | full-size vehicle | Management objectives do not require change in designation |
| **8372A** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8372B** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8373** | administrative route | Support management objectives for fisheries and heritage values |
| **8373A** | administrative route | Support management objectives for fisheries and heritage values |
| **8374** | administrative route | No public access |
| **8374A** | administrative route | Support management objectives for fisheries and heritage values |
| **8374B** | administrative route | No public access |
| **8375** | foot/horse only | Support management objectives for fisheries and heritage values |
| **8376** | administrative route | No public access |
| **8376A** | administrative route | No public access |

BLM_0026129

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8377 | ATV/UTV | Consistency with SRMA objectives |
| 8377A | foot/horse only | Consistency with SRMA objectives |
| 8377D | ATV/UTV | Consistency with SRMA objectives |
| 8379 | full-size vehicle | Management objectives do not require change in designation |
| 8379A | full-size vehicle | Management objectives do not require change in designation |
| 8379AA | full-size vehicle | Management objectives do not require change in designation |
| 8379AC | full-size vehicle | Management objectives do not require change in designation |
| 8379AD | full-size vehicle | Management objectives do not require change in designation |
| 8379AE | full-size vehicle | Management objectives do not require change in designation |
| 8380 | full-size vehicle | Management objectives do not require change in designation |
| 8380AA | ATV/UTV | Consistency with SRMA objectives |
| 8380A | full-size vehicle | Management objectives do not require change in designation |
| 8380B | foot/horse only | Heritage values, fisheries, trespass, penstemon |
| 8380BA | full-size vehicle | Management objectives do not require change in designation |
| 8380CA | full-size vehicle | Management objectives do not require change in designation |
| 8380CB | full-size vehicle | Management objectives do not require change in designation |
| 8380E | mechanized | Consistency with SRMA objectives |
| 8380M | full-size vehicle | Management objectives do not require change in designation |
| 8380MA | motorcycle | Consistency with SRMA objectives |
| 8380OA | obliterate | Heritage values, fisheries, trespass, penstemon |
| 8380O | obliterate | Consistency with SRMA objectives |
| 8380F | mechanized | Consistency with SRMA objectives |
| 8380I | full-size vehicle | Management objectives do not require change in designation |
| 8381 | full-size vehicle | Management objectives do not require change in designation |
| 8381A | foot/horse only | Heritage values, fisheries, trespass, penstemon |
| 8381D | ATV/UTV | Consistency with SRMA objectives |
| 8381D | foot/horse only | Consistency with SRMA objectives |
| 8381G | full-size vehicle | Management objectives do not require change in designation |
| 8381L | foot/horse only | Consistency with SRMA objectives |

BLM_0026130

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8382A** | full-size vehicle | Management objectives do not require change in designation |
| **8382** | ATV/UTV | Consistency with SRMA objectives |
| **8383** | full-size vehicle | Management objectives do not require change in designation |
| **8383B** | motorcycle | Consistency with SRMA objectives |
| **8383BB** | full-size vehicle | Management objectives do not require change in designation |
| **8383BC** | full-size vehicle | Management objectives do not require change in designation |
| **8383C** | full-size vehicle | Management objectives do not require change in designation |
| **8383D** | full-size vehicle | Management objectives do not require change in designation |
| **8383E** | full-size vehicle | Management objectives do not require change in designation |
| **8383EB** | full-size vehicle | Management objectives do not require change in designation |
| **8383G** | full-size vehicle | Management objectives do not require change in designation |
| **8383H** | full-size vehicle | Management objectives do not require change in designation |
| **8383I** | administrative route | Match USFS designation of decommission (south Hardscrabble area) |
| **8384** | full-size vehicle | Management objectives do not require change in designation |
| **8384O** | obliterate | Heritage values, fisheries, trespass, penstemon |
| **8384AA** | obliterate | Consistency with SRMA objectives |
| **8384AC** | motorcycle | Consistency with SRMA objectives |
| **8384AD** | motorcycle | Consistency with SRMA objectives |
| **8384AE** | motorcycle | Consistency with SRMA objectives |
| **8384B** | full-size vehicle | Management objectives do not require change in designation |
| **8384BM** | motorcycle | Consistency with SRMA objectives |
| **8384BA** | motorcycle | Meet community recreation demand, Consistency with SRMA objectives |
| **8384BB** | foot/horse only | Meet community recreation demand |
| **8384BC** | foot/horse only | Meet community recreation demand |
| **8384BD** | motorcycle | Meet community recreation demand |
| **8384C** | foot/horse only | Match adjacent private |
| **8384D** | motorcycle | Heritage values, fisheries, trespass, penstemon |
| **8384E** | foot/horse only | Consistency with SRMA objectives |
| **8384F** | obliterate | Consistency with SRMA objectives |
| **8384G** | full-size vehicle | Management objectives do not require change |

BLM_0026131

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| **8384H** | mechanized | Meet community recreation demand, Consistency with SRMA objectives |
| **8384HA** | mechanized | Meet community recreation demand, Consistency with SRMA objectives |
| **8385** | full-size vehicle | Meet community recreation demand |
| **8385G** | foot/horse only | Consistency with SRMA objectives |
| **8385H** | motorcycle | Meet community recreation demand |
| **8385O** | obliterate | Meet community recreation demand |
| **8385A** | motorcycle | Meet community recreation demand |
| **8385AO** | obliterate | Meet community recreation demand |
| **8385C** | motorcycle | Meet community recreation demand |
| **8385CO** | obliterate | Meet community recreation demand |
| **8385CP** | Motorcycle | Meet community recreation demand |
| **8385CS** | motorcycle | Meet community recreation demand |
| **8385D** | motorcycle | Meet community recreation demand |
| **8385E** | motorcycle | Meet community recreation demand |
| **8385EA** | Motorcycle | Meet community recreation demand |
| **8385EW** | mechanized | Meet community recreation demand |
| **8385F** | mechanized | Meet community recreation demand |
| **8385FA** | foot/horse only | Consistency with SRMA objectives |
| **8385FB** | mechanized | Meet community recreation demand |
| **8385FC** | mechanized | Meet community recreation demand |
| **8386** | mechanized | Match town of Eagle trails, consistency with SRMA objectives |
| **8387B** | full-size vehicle | Management objectives do not require change in designation |
| **8387C** | full-size vehicle | Management objectives do not require change in designation |
| **8387** | foot/horse only | Match town of Eagle trails |
| **8387A** | mechanized | Management objectives do not require change in designation |
| **8388** | full-size vehicle | Management objectives do not require change in designation |
| **8388C** | obliterate | Protect vegetation cover |
| **8388A** | obliterate | Protect vegetation cover |
| **8388B** | mechanized | Supports management objectives for the protection of ACEC values, Match town of Eagle trails |
| **8388D** | obliterate | Supports management objectives for the protection of ACEC values |
| **8389** | foot/horse only | Management objectives do not require change |

BLM_0026132

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| 8389A | foot/horse only | Supports management objectives for the protection of ACEC values |
| 8389B | foot/horse only | Supports management objectives for the protection of ACEC values |
| 8389C | foot/horse only | Supports management objectives for the protection of ACEC values |
| 8393 | obliterate | Protect vegetation cover |
| 8410 | full-size vehicle | Management objectives do not require change in designation |
| 8410A | mechanized | Consistency with SRMA objectives |
| 8410C | foot/horse only | Management objectives do not require change in designation |
| 8410D | mechanized | Consistency with SRMA objectives |
| 8410E | mechanized | Consistency with SRMA objectives |
| 8410F | foot/horse only | Consistency with SRMA objectives |
| 8410B | mechanized | Consistency with SRMA objectives |
| 8410G | mechanized | Supports management objectives for the protection of ACEC values |
| 8410H | mechanized | Consistency with SRMA objectives |
| 8410J | foot/horse only | Consistency with SRMA objectives |
| 8410K | mechanized | Supports management objectives for the protection of ACEC values |
| 8410L | mechanized | Consistency with SRMA objectives |
| 8412 | ATV/UTV | Recreation conflict |
| 8412B | administrative route | No public access |
| 8412A | mechanized | Consistent with SRMA objectives |
| 8412AA | mechanized | Consistent with SRMA objectives |
| 8412C | ATV/UTV | provide ATV/UTV access |
| 8413 | mechanized | Consistent with SRMA objectives |
| 8413F | mechanized | Consistent with SRMA objectives |
| 8413G | mechanized | Consistent with SRMA objectives |
| 8413A | mechanized | Consistent with SRMA objectives |
| 8413B | mechanized | Consistent with SRMA objectives |
| 8413BA | mechanized | Consistent with SRMA objectives |
| 8413BC | mechanized | Consistent with SRMA objectives |
| 8413D | mechanized | Consistent with SRMA objectives |
| 8413E | mechanized | Consistent with SRMA objectives |
| 8414 | administrative route | No public access |
| 8416 | mechanized | Consistent with SRMA objectives |
| 8417 | administrative route | No public access |

BLM_0026133

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8417A | administrative route | no public access |
| 8418 | administrative route | No public access |
| 8418A | administrative route | No public access |
| 8420 | administrative route | No public access |
| 8421 | administrative route | No public access, erosive soils |
| 8421A | administrative route | No public access, erosive soils |
| 8421B | obliterate | No public access |
| 8423 | administrative route | No public access |
| 8424 | full-size vehicle | Management objectives do not require change in designation |
| 8430 | full-size vehicle | Management objectives do not require change in designation |
| 8430A | foot/horse only | Dead end routes |
| 8431 | foot/horse only | Dead end routes |
| 8431A | foot/horse only | Dead end routes |
| 8431B | foot/horse only | Dead end routes |
| 8432A | foot/horse only | Dead end routes |
| 8432 | full-size vehicle | Management objectives do not require change in designation |
| 8433 | foot/horse only | Dead end routes |
| 8434 | administrative route | No public access |
| 8434A | administrative route | No public access |
| 8435 | administrative route | No public access |
| 8436 | administrative route | No public access |
| 8436A | administrative route | No public access |
| 8440 | mechanized | Change designation to match Existing use |
| 8440A | mechanized | Change designation to match Existing use |
| 8440B | mechanized | Change designation to match Existing use |
| 8441 | mechanized | Heritage values |
| 8442 | administrative route | No public access |
| 8442A | administrative route | No public access |
| 8442B | administrative route | No public access |
| 8442C | administrative route | No public access |
| 8443 | administrative route | No public access |
| 8444 | administrative route | No public access |
| 8444A | foot/horse only | Heritage values |
| 8444B | administrative route | No public access |
| 8444BA | administrative route | No public access |
| 8444BB | administrative route | No public access |
| 8444C | administrative route | No public access |

BLM_0026134

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8444D | administrative route | No public access |
| 8444DA | administrative route | No public access |
| 8445 | ATV/UTV | Provide motorized access |
| 8445A | administrative route | No public access |
| 8445E | ATV/UTV | Provide motorized access |
| 8445EA | ATV/UTV | Provide motorized access |
| 8445F | foot/horse only | Dead end route |
| 8445GA | foot/horse only | Protect wilderness character |
| 8445GB | foot/horse only | Protect wilderness character |
| 8446 | ATV/UTV | Management objectives do not require a change in designation |
| 8446B | foot/horse only | Management objectives do not require a change in designation |
| 8446A | ATV/UTV | Management objectives do not require a change in designation |
| 8447 | foot/horse only | No public access |
| 8447A | foot/horse only | No public access |
| 8447B | foot/horse only | No public access |
| 8447C | foot/horse only | No public access |
| 8447CA | foot/horse only | No public access |
| 8447D | foot/horse only | No public access |
| 8447DA | foot/horse only | No public access |
| 8447E | foot/horse only | No public access |
| 8447F | foot/horse only | No public access |
| 8448 | administrative route | No public access |
| 8448A | administrative route | No public access |
| 8448B | administrative route | No public access |
| 8448BA | administrative route | No public access |
| 8448C | administrative route | No public access |
| 8448CA | administrative route | No public access |
| 8449 | administrative route | No public access |
| 8450 | full-size vehicle | Management objectives do not require change in designation |
| 8450G | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8450AA | full-size vehicle | Management objectives do not require change in designation |
| 8450B | foot/horse only | Protect special status plants |
| 8450BB | foot/horse only | Protect ACEC values |
| 8450C | foot/horse only | Protect special status plants |
| 8450D | full-size vehicle | Management objectives do not require change |

BLM_0026135

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| 8450E | foot/horse only | Dead end route |
| 8450F | foot/horse only | Dead end route |
| 8450FA | full-size vehicle | Management objectives do not require change in designation |
| 8451C | foot/horse only | Protect ACEC values |
| 8451O | obliterate | Protect ACEC values |
| 8451F | foot/horse only | Supports SRMA recreation objectives and heritage values |
| 8451 | full-size vehicle | Management objectives do not require change in designation |
| 8451D | full-size vehicle | Management objectives do not require change in designation |
| 8451E | administrative route | No public access |
| 8451A | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics, Heritage values |
| 8451B | full-size vehicle | Management objectives do not require change in designation |
| 8451G | administrative route | No public access |
| 8452C | foot/horse only | SRMA recreation objectives and heritage values |
| 8452 | full-size vehicle | Management objectives do not require change in designation |
| 8452A | obliterate | Protect ACEC values |
| 8452B | foot/horse only | Protect ACEC values |
| 8452BA | foot/horse only | Protect riparian vegetation |
| 8452BB | foot/horse only | Protect vegetation and soils |
| 8452BC | foot/horse only | Protect vegetation and soils |
| 8453 | full-size vehicle | Management objectives do not require change in designation |
| 8453G | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics, heritage values |
| 8453A | foot/horse only | Protect ACEC values |
| 8453B | foot/horse only | Protect ACEC values |
| 8453C | foot/horse only | Protect ACEC values |
| 8453CA | foot/horse only | Protect ACEC values |
| 8453CB | foot/horse only | Protect ACEC values |
| 8453CC | foot/horse only | Protect ACEC values and soils |
| 8453D | foot/horse only | Protect ACEC values |
| 8453E | full-size vehicle | Management objectives do not require change in designation |
| 8453EA | foot/horse only | Protect ACEC values |

BLM_0026136

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| 8453O | obliterate | Protect ACEC values |
| 8453F | full-size vehicle | Management objectives do not require change in designation |
| 8453FA | foot/horse only | Protect ACEC values |
| 8453FB | foot/horse only | Protect ACEC values |
| 8454 | full-size vehicle | Management objectives do not require change in designation |
| 8454G | foot/horse only | Protect ACEC values |
| 8454H | foot/horse only | Protect ACEC values |
| 8454F | foot/horse only | Wildlife, protect special status plants, reduce habitat fragmentation |
| 8454A | full-size vehicle | Management objectives do not require change in designation |
| 8454B | foot/horse only | Protect ACEC values |
| 8454C | full-size vehicle | Management objectives do not require change in designation |
| 8454D | foot/horse only | Protect ACEC values |
| 8455 | full-size vehicle | Management objectives do not require change in designation |
| 8455A | foot/horse only | Protect special status plants |
| 8455B | obliterate | Protect ACEC values |
| 8455C | administrative route | No public access |
| 8456B | administrative route | No public access |
| 8456 | full-size vehicle | Management objectives do not require change in designation |
| 8456A | administrative route | No public access |
| 8456AA | administrative route | No public access |
| 8457D | administrative route | No public access |
| 8457 | full-size vehicle | Management objectives do not require change in designation |
| 8457A | full-size vehicle | Management objectives do not require change in designation |
| 8457B | full-size vehicle | Management objectives do not require change in designation |
| 8457BA | full-size vehicle | Management objectives do not require change in designation |
| 8457C | full-size vehicle | Management objectives do not require change in designation |
| 8457CA | full-size vehicle | Management objectives do not require change in designation |
| 8457CB | administrative route | No public access |
| 8458 | full-size vehicle | Management objectives do not require change in designation |
| 8459 | administrative route | No public access |

BLM_0026137

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8460 | full-size vehicle | Management objectives do not require change in designation |
| 8460M | motorcycle | Supports ERMA objectives |
| 8460G | foot/horse only | Heritage values and soils |
| 8460O | obliterate | Support management objectives for soils, vegetation and fisheries |
| 8460A | full-size vehicle | Management objectives do not require change in designation |
| 8460H | foot/horse only | Soils |
| 8460I | foot/horse only | Soils |
| 8460AA | foot/horse only | Heritage values, protect special status plant |
| 8460AB | foot/horse only | Heritage values, protect special status plants |
| 8460AC | foot/horse only | Support management objectives for wildlife, heritage, protect special status plants |
| 8460G | full-size vehicle | Management objectives do not require change in designation |
| 8460B | foot/horse only | Management objectives do not require change in designation |
| 8460BA | foot/horse only | Management objectives do not require change in designation |
| 8460BB | foot/horse only | Management objectives do not require change in designation |
| 8460C | full-size vehicle | Management objectives do not require change in designation |
| 8460D | full-size vehicle | Management objectives do not require change in designation |
| 8460E | full-size vehicle | Management objectives do not require change in designation |
| 8460F | full-size vehicle | Management objectives do not require change in designation |
| 8461 | full-size vehicle | Management objectives do not require change in designation |
| 8461F | foot/horse only | Protect special status plants |
| 8461A | full-size vehicle | Management objectives do not require change in designation |
| 8461B | foot/horse only | Heritage values, protect special status plants |
| 8461C | full-size vehicle | Management objectives do not require change in designation |
| 8461CA | foot/horse only | Heritage values |
| 8461CB | foot/horse only | Heritage values |
| 8461CD | foot/horse only | Heritage values |
| 8461AA | ATV/UTV | Support ERMA objectives |
| 8462 | full-size vehicle | Management objectives do not require change in designation |

BLM_0026138

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8462D | ATV/UTV | Support ERMA objectives |
| 8462A | full-size vehicle | Management objectives do not require change in designation |
| 8462AA | full-size vehicle | Management objectives do not require change in designation |
| 8462B | full-size vehicle | Management objectives do not require change in designation |
| 8462C | full-size vehicle | Management objectives do not require change in designation |
| 8462CA | full-size vehicle | Management objectives do not require change in designation |
| 8462CB | full-size vehicle | Management objectives do not require change in designation |
| 8463 | full-size vehicle | Management objectives do not require change in designation |
| 8463C | foot/horse only | Consistency with SRMA objectives |
| 8463A | full-size vehicle | Management objectives do not require change in designation |
| 8463AA | full-size vehicle | Management objectives do not require change in designation |
| 8463AB | full-size vehicle | Management objectives do not require change in designation |
| 8464 | full-size vehicle | Management objectives do not require change in designation |
| 8464A | foot/horse only | Protect special status plants |
| 8464B | full-size vehicle | Management objectives do not require change in designation |
| 8465 | full-size vehicle | Management objectives do not require change in designation |
| 8465A | foot/horse only | Protect special status plant |
| 8466 | full-size vehicle | Management objectives do not require change in designation |
| 8466A | full-size vehicle | Management objectives do not require change in designation |
| 8467 | full-size vehicle | Management objectives do not require change in designation |
| 8468 | full-size vehicle | Management objectives do not require change in designation |
| 8468A | foot/horse only | Heritage values, protect special status plants |
| 8468B | foot/horse only | Heritage values, protect special status plants |
| 8468C | full-size vehicle | Management objectives do not require change in designation |
| 8468D | foot/horse only | Heritage values, protect special status plants |
| 8469 | foot/horse only | Heritage values, protect special status plants |
| 8469A | full-size vehicle | Management objectives do not require change |

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| 8469B | full-size vehicle | Management objectives do not require change in designation |
| 8469BA | full-size vehicle | Management objectives do not require change in designation |
| 8470 | foot/horse only | Heritage values, protect special status plants |
| 8470A | foot/horse only | Heritage values, protect special status plants |
| 8470B | foot/horse only | Heritage values, protect special status plants |
| 8470C | foot/horse only | Heritage values, protect special status plants |
| 8470D | foot/horse only | Heritage values, protect special status plants |
| 8470E | foot/horse only | Protect special status plant - Penstemon, ERMA |
| 8471 | foot/horse only | Heritage values, protect special status plants |
| 8471A | foot/horse only | Heritage values, protect special status plants |
| 8471B | foot/horse only | Heritage values, protect special status plants |
| 8472 | full-size vehicle | Management objectives do not require change in designation |
| 8472A | foot/horse only | Heritage values, protect special status plants |
| 8472B | foot/horse only | Heritage values, protect special status plants |
| 8473 | full-size vehicle | Management objectives do not require change in designation |
| 8473A | full-size vehicle | Management objectives do not require change in designation |
| 8473B | foot/horse only | Heritage values, protect special status plants |
| 8473AA | foot/horse only | Heritage values, protect special status plants |
| 8473AB | foot/horse only | Heritage values, protect special status plants |
| 8473AC | foot/horse only | Heritage values, protect special status plants |
| 8473AD | full-size vehicle | Management objectives do not require change in designation |
| 8473AE | foot/horse only | Heritage values, protect special status plants |
| 8473C | full-size vehicle | Management objectives do not require change in designation |
| 8473D | full-size vehicle | Management objectives do not require change in designation |
| 8474 | full-size vehicle | Support ERMA objectives |
| 8474A | foot/horse only | Heritage values, protect special status plants |
| 8474B | foot/horse only | Heritage values, protect special status plants |
| 8475 | foot/horse only | Heritage values, protect special status plants |
| 8475A | foot/horse only | Heritage values, protect special status plants |
| 8476 | foot/horse only | Heritage values, protect special status plants |
| 8476A | foot/horse only | Heritage values, protect special status plants |
| 8476B | foot/horse only | Heritage values, protect special status plants |

BLM_0026140

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|----------|-------------------|--------------------------------------------|
| 8477 | full-size vehicle | Management objectives do not require change in designation |
| 8477A | full-size vehicle | Support ERMA objectives |
| 8477B | foot/horse only | Heritage values, protect special status plants |
| 8477C | full-size vehicle | Management objectives do not require change in designation |
| 8477CA | full-size vehicle | Management objectives do not require change in designation |
| 8478 | foot/horse only | Protect special status plant - Penstemon |
| 8478E | foot/horse only | Consistency with SRMA objectives |
| 8478D | full-size vehicle | Management objectives do not require change in designation |
| 8478A | foot/horse only | Soils |
| 8478B | foot/horse only | Soils |
| 8478C | foot/horse only | Soils |
| 8479 | full-size vehicle | Management objectives do not require change in designation |
| 8479A | full-size vehicle | Management objectives do not require change in designation |
| 8479B | administrative route | No public access |
| 8479BA | foot/horse only | WSA |
| 8479C | foot/horse only | Spur, WSA |
| 8479D | foot/horse only | Heritage values, protect special status plants |
| 8479L | foot/horse only | Parallel route |
| 8479M | foot/horse only | Spur, WSA |
| 8479O | foot/horse only | Spur, WSA |
| 8479N | foot/horse only | Spur, WSA |
| 8479DA | foot/horse only | Parallel route |
| 8479DB | foot/horse only | Soils |
| 8479E | foot/horse only | Protect special status plant |
| 8479F | foot/horse only | Protect special status plant |
| 8479FA | foot/horse only | Protect special status plant |
| 8479G | foot/horse only | Protect special status plant |
| 8479I | foot/horse only | Fenceline |
| 8479H | full-size vehicle | Management objectives do not require change in designation |
| 8479HA | foot/horse only | Heritage values |
| 8479HB | foot/horse only | Protect special status plant |
| 8479J | foot/horse only | Protect special status plant |
| 8479K | foot/horse only | Protect special status plant |
| 8480 | full-size vehicle | Management objectives do not require change |

BLM_0026141

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| **8480H** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8480I** | full-size vehicle | Management objectives do not require change in designation |
| **8480** | full-size vehicle | Management objectives do not require change in designation |
| **8480A** | foot/horse only | Management objectives do not require change in designation |
| **8480B** | full-size vehicle | Management objectives do not require change in designation |
| **8480BA** | foot/horse only | Heritage values, Protect special status plants |
| **8480C** | full-size vehicle | Management objectives do not require change in designation |
| **8480D** | foot/horse only | Protect special status plant |
| **8480E** | foot/horse only | Heritage values, protect special status plants |
| **8480F** | foot/horse only | Heritage values, protect special status plants |
| **8480G** | foot/horse only | Heritage values, protect special status plants |
| **8481** | full-size vehicle | Management objectives do not require change in designation |
| **8481AA** | foot/horse only | Spur that deadends on private property, Non-motorized route designated in Castle Peak RMP amendment |
| **8481A** | foot/horse only | Management objectives do not require change in designation |
| **8481B** | full-size vehicle | Management objectives do not require change in designation |
| **8481C** | full-size vehicle | Management objectives do not require change in designation |
| **8481D** | full-size vehicle | Management objectives do not require change in designation |
| **8482** | full-size vehicle | Management objectives do not require change in designation |
| **8482A** | foot/horse only | Heritage values, protect special status plants |
| **8483** | full-size vehicle | Management objectives do not require change in designation |
| **8483A** | full-size vehicle | Management objectives do not require change in designation |
| **8484A** | foot/horse only | Protect special status plant - Penstemon |
| **8484** | full-size vehicle | Management objectives do not require change in designation |
| **8485** | full-size vehicle | Management objectives do not require change in designation |
| **8485A** | foot/horse only | Heritage values, protect special status plants |
| **8486R** | full-size vehicle | Support ERMA objectives- jeep route |

BLM_0026142

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| 8486RR | full-size vehicle | Support ERMA objectives- jeep route |
| 8486B | foot/horse only | Protect special status plant and dead end route |
| 8486 | full-size vehicle | Support ERMA objectives |
| 8486A | foot/horse only | Dead ends on private |
| 8487E | foot/horse only | Protect special status plant - Penstemon |
| 8487 | full-size vehicle | Management objectives do not require change in designation |
| 8487C | ATV | Public safety, steep rocky slope |
| 8487A | foot/horse only | Partially obliterated, already closed |
| 8487B | foot/horse only | Protect special status plant - Penstemon |
| 8487D | full-size vehicle | Management objectives do not require change in designation |
| 8488 | full-size vehicle | Management objectives do not require change in designation |
| 8488A | full-size vehicle | Management objectives do not require change in designation |
| 8489 | foot/horse only | Protect special status plant - Penstemon |
| 8489A | foot/horse only | Protect ACEC values |
| 8490A | foot/horse only | Protect ACEC values |
| 8490 | full-size vehicle | Management objectives do not require change in designation |
| 8491B | foot/horse only | Protect ACEC values |
| 8491 | full-size vehicle | Management objectives do not require change in designation |
| 8491A | full-size vehicle | Management objectives do not require change in designation |
| 8491C | foot/horse only | Protect ACEC values |
| 8492 | full-size vehicle | Management objectives do not require change in designation |
| 8493 | full-size vehicle | Management objectives do not require change in designation |
| 8494 | administrative route | No public access |
| 8495 | full-size vehicle | Management objectives do not require change in designation |
| 8495A | full-size vehicle | Management objectives do not require change in designation |
| 8495EB | full-size vehicle | Management objectives do not require change in designation |
| 8496 | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8496A | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8496B | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |

BLM_0026143

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8496E** | full-size vehicle | Management objectives do not require change in designation |
| **8497** | administrative route | No public access |
| **8497A** | administrative route | No public access |
| **8497B** | administrative route | No public access |
| **8500** | full-size vehicle | Management objectives do not require change in designation |
| **8500A** | foot/horse only | Non-motorized route in Castle Peak RMP amendment, deadends on private land |
| **8500B** | foot/horse only | Non-motorized route in Castle Peak RMP amendment, dead end on private land |
| **8501** | motorcycle | Supports management objectives for heritage values and ERMA objectives |
| **8501C** | motorcycle | Supports management objectives for heritage values and ERMA objectives |
| **8502** | full-size vehicle | Management objectives do not require change in designation |
| **8502C** | full-size vehicle | Management objectives do not require change in designation |
| **8502A** | motorcycle | Supports management objectives for heritage values and ERMA objectives |
| **8503** | motorcycle | Supports management objectives for heritage values and ERMA objectives |
| **8504** | full-size vehicle | Management objectives do not require change in designation |
| **8505** | full-size vehicle | Management objectives do not require change in designation |
| **8505A** | foot/horse only | Management objectives do not require change in designation |
| **8506** | admin | No public access |
| **8507** | mechanized | Management objectives do not require change in designation |
| **8508** | mechanized | Management objectives do not require change in designation |
| **8508A** | mechanized | Management objectives do not require change in designation |
| **8508B** | mechanized | Management objectives do not require change in designation |
| **8508C** | mechanized | Management objectives do not require change in designation |
| **8509** | full-size vehicle | Management objectives do not require change in designation |
| **8509A** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8510** | full-size vehicle | Management objectives do not require change in designation |

BLM_0026144

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| **8510E** | foot/horse only | WSA |
| **8510A** | full-size vehicle | Management objectives do not require change in designation |
| **8510F** | foot/horse only | WSA |
| **8510B** | full-size vehicle | Management objectives do not require change in designation |
| **8510C** | full-size vehicle | Management objectives do not require change in designation |
| **8511** | foot/horse only | WSA; range monitoring, supports management objectives for lands managed to protect wilderness characteristics, administrative access for communication site |
| **8510EE** | foot/horse only | WSA |
| **8510D** | full-size vehicle | Management objectives do not require change in designation |
| **8511A** | foot/horse only | WSA |
| **8511B** | foot/horse only | WSA |
| **8511C** | foot/horse only | WSA |
| **8511D** | foot/horse only | Administrative access for communication site |
| **8511E** | foot/horse only | Administrative access for communication site |
| **8511F** | foot/horse only | Administrative access for communication site |
| **8511G** | foot/horse only | WSA |
| **8511H** | foot/horse only | WSA |
| **8511J** | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| **8512** | full-size vehicle | Management objectives do not require change in designation |
| **8512A** | foot/horse only | WSA |
| **8513E** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8513** | full-size vehicle | Management objectives do not require change in designation |
| **8513A** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8513B** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8513C** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8513D** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8514** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| **8514A** | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |

BLM_0026145

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8514B | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8515 | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8516 | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics, WSA |
| 8516A | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8516B | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8517 | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment, supports management objectives for lands managed to protect wilderness characteristics |
| 8517C | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8517D | foot/horse only | Sage grouse, soils |
| 8517A | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8517E | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8517B | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8518 | foot/horse only | WSA |
| 8518B | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8518A | foot/horse only | WSA |
| 8518C | foot/horse only | WSA |
| 8519 | foot/horse only | WSA |
| 8519A | foot/horse only | WSA |
| 8519B | foot/horse only | WSA |
| 8519C | foot/horse only | WSA |
| 8520 | full-size vehicle | Management objectives do not require change in designation |
| 8520AA | mechanized | Supports management objectives for lands managed to protect wilderness characteristics |
| 8520A | full-size vehicle | Management objectives do not require change in designation |
| 8520A | full-size vehicle | change designation - inability to keep closed |
| 8520BB | mechanized | Soil erosion |
| 8520B | full-size vehicle | Management objectives do not require change in designation |
| 8520C | full-size vehicle | Management objectives do not require change in designation |

BLM_0026146

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| 8521 | foot/horse only | WSA |
| 8521A | foot/horse only | WSA |
| 8522 | foot/horse only | WSA |
| 8529 | administrative route | No public access |
| 8530E | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8530 | full-size vehicle | Management objectives do not require change in designation |
| 8530A | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8530B | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8530C | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8530D | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8531 | full-size vehicle | Management objectives do not require change in designation |
| 8531A | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8532 | full-size vehicle | Management objectives do not require change in designation |
| 8532A | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8533 | full-size vehicle | Management objectives do not require change in designation |
| 8534 | full-size vehicle | Management objectives do not require change in designation |
| 8535 | full-size vehicle | Management objectives do not require change in designation |
| 8535A | full-size vehicle | Management objectives do not require change in designation |
| 8536 | full-size vehicle | Management objectives do not require change in designation |
| 8536A | foot/horse only | Supports management objectives for lands managed to protect wilderness characteristics |
| 8537D | administrative route | No public access |
| 8537 | full-size vehicle | Management objectives do not require change in designation |
| 8537A | mechanized | Supports management objectives for lands managed to protect wilderness characteristics |
| 8537B | foot/horse | Supports management objectives for lands managed to protect wilderness characteristics |
| 8537C | mechanized | Management objectives do not require change in designation |
| 8538 | full-size vehicle | Management objectives do not require change |

BLM_0026147

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
|         |                   | in designation |
| 8538A | full-size vehicle | Management objectives do not require change in designation |
| 8538B | full-size vehicle | Management objectives do not require change in designation |
| 8539 | full-size vehicle | Management objectives do not require change in designation |
| 8540 | full-size vehicle | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540AA | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540A | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8540B | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540C | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540D | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540E | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540F | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540G | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540H | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540I | mechanized | Management objectives do not require change in designation (Winter Ridge – Deer Pen) |
| 8540Z | administrative route | No public access- Eby Creek road |
| 8541 | full-size vehicle | Management objectives do not require change in designation |
| 8541AA | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8541C | administrative route | No public access |
| 8541A | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8541B | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8542B | foot/horse only | Non-motorized route designated in Castle Peak RMP amendment |
| 8542 | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8542A | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8543 | mechanized | Management objectives do not require change |

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| | | in designation (Winter Ridge) |
| 8543 | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8543A | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8544C | mechanized | Management objectives do not require change in designation (Winter Ridge) |
| 8544 | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8544D | mechanized | Management objectives do not require change in designation (Winter Ridge) |
| 8544A | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8544B | full-size vehicle | Management objectives do not require change in designation (Winter Ridge) |
| 8547 | administrative route | No public access |
| 8548 | administrative route | No public access |
| 8548A | administrative route | No public access |
| 8549 | mechanized | Consistency with SRMA objectives |
| 8549A | administrative route | No public access |
| 8550 | full-size vehicle | Eagle County Landfill road |
| 8550B | administrative route | No public access |
| 8550A | Administrative route | No public access |
| 8550C | administrative route | No public access |
| 8551 | administrative route | No public access |
| 8551A | administrative route | No public access |
| 8551B | administrative route | No public access |
| 8551C | administrative route | No public access |
| 8552 | administrative route | No public access |
| 8552A | administrative route | No public access |
| 8552AA | administrative route | No public access |
| 8552B | administrative route | No public access |
| 8553 | administrative route | No public access |
| 8554 | full-size vehicle | Management objectives do not require change in designation |
| 8555 | full-size vehicle | Management objectives do not require change in designation |
| 8559 | administrative route | No public access |
| 8560 | foot/horse only | Consistency with SRMA objectives |
| 8560A | administrative route | No public access |
| 8561A | administrative route | No public access |
| 8561 | full-size vehicle | Management objectives do not require change |

BLM_0026149

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
|  |  | in designation |
| 8562 | administrative route | No public access |
| 8563 | foot/horse only | Complement adjacent forest service travel designation |
| 8562A | administrative route | No public access |
| 8562B | administrative route | No public access |
| 8565 | administrative route | No public access |
| 8565E | administrative route | No public access |
| 8565A | administrative route | Management objectives do not require change in designation |
| 8565AA | full-size vehicle | Management objectives do not require change in designation |
| 8565B | full-size vehicle | Management objectives do not require change in designation |
| 8565BA | full-size vehicle | Management objectives do not require change in designation |
| 8565C | full-size vehicle | Management objectives do not require change in designation |
| 8565D | foot/horse only | Support management objectives for: sage grouse, soils |
| 8567 | full-size vehicle | Management objectives do not require change in designation |
| 8567A | full-size vehicle | Management objectives do not require change in designation |
| 8567C | foot/horse only | Spur |
| 8567AA | foot/horse only | Spur |
| 8567AB | full-size vehicle | Management objectives do not require change in designation |
| 8567AC | foot/horse only | Support management objectives for: sage grouse, soils |
| 8567AD | foot/horse only | Spur |
| 8567D | foot/horse only | Spur |
| 8567B | full-size vehicle | Management objectives do not require change in designation |
| 8567E | foot/horse only | Spur |
| 8568 | foot/horse only | Parallel route |
| 8568E | full-size vehicle | Management objectives do not require change in designation |
| 8568A | full-size vehicle | Management objectives do not require change in designation |
| 8568F | foot/horse only | Parallel route |
| 8568B | full-size vehicle | Management objectives do not require change in designation |
| 8568C | full-size vehicle | Management objectives do not require change |

BLM_0026150

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| | | in designation |
| 8568D | foot/horse only | Parallel route |
| 8568G | full-size vehicle | Management objectives do not require change in designation |
| 8569 | full-size vehicle | Management objectives do not require change in designation |
| 8569A | full-size vehicle | Management objectives do not require change in designation |
| 8569B | foot/horse only | Protect ACEC values |
| 8569D | administrative route | No public access, protect ACEC values |
| 8569BA | foot/horse only | Protect ACEC values |
| 8569BB | foot/horse only | Protect ACEC values |
| 8569BC | foot/horse only | Protect ACEC values |
| 8569BD | foot/horse only | Protect ACEC values |
| 8569C | foot/horse only | Protect ACEC values |
| 8570B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8570 | full-size vehicle | Management objectives do not require change in designation |
| 8570A | mechanized | Consistency with King Mountain SRMA objectives |
| 8571 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8571A | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8571B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8571D | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8572 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8572D | administrative route | No public access |
| 8572AD | administrative route | Management objectives do not require change in designation |
| 8572A | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8572AA | mechanized | Management objectives do not require change in designation |
| 8572AB | mechanized | Management objectives do not require change in designation |
| 8572AC | mechanized | Management objectives do not require change in designation |
| 8572B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8572BC | administrative route | No public access |

BLM_0026151

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8572BA** | administrative route | No public access |
| **8572BB** | administrative route | No public access |
| **8572C** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8572E** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8572F** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8572G** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573A** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573B** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573C** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573D** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573EA** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573EB** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573F** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573G** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8573GA** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8574** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8574A** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8574B** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8574BA** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8575** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8575A** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8575AA** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8575B** | foot/horse only | Consistency with King Mountain SRMA objectives |

BLM_0026152

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| **8575BA** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8575BB** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8575C** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8576** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8576C** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8577** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8577A** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8579** | full-size vehicle | Consistency with King Mountain SRMA objectives |
| **8580** | full-size vehicle | Management objectives do not require change in designation |
| **8580G** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580A** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580B** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580C** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580D** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580E** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580F** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580H** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8580I** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8581** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8581A** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8581B** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8581C** | foot/horse only | Consistency with King Mountain SRMA objectives |
| **8582** | mechanized | Management objectives do not require change in designation, consistency with King Mountain SRMA objectives |

BLM_0026153

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8582A | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8582B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8583 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8584 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8585 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8585A | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8585B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8586 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8586A | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8586B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8587 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8588 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8589 | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8589A | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8600OC | obliterate | Dead-end at private property |
| 8600OA | obliterate | Spur; unnecessary route, dead-end at private property |
| 8600FA | full-size vehicle | Management objectives do not require change in designation |
| 8600FB | full-size vehicle | Management objectives do not require change in designation |
| 8600OB | obliterate | Public safety |
| 8600 | motorcycle | Public safety |
| 8600 | motorcycle | Support management objectives for: soils, paleontology, recreation |
| 8600B | foot/horse only | Parallel route |
| 8600 | motorcycle | Consistency with SRMA objectives |
| 8600A | full-size vehicle | Management objectives do not require change in designation |
| 8600B | full-size vehicle | Management objectives do not require change in designation |
| 8601O | obliterate | Dead-end at private property |

BLM_0026154

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---------|-------------------|---------------------------------------------|
| 8601 | motorcycle | Limit trail to existing single track, reroute off private land |
| 8601OA | obliterate | Limit trail to existing single track, reroute off private land |
| 8603A | administrative route | No public access |
| 8603 | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8603C | administrative route | No public access |
| 8603B | motorcycle | Support management objectives for: soils, paleontology, recreation |
| 8603BA | administrative route | No public access |
| 8605 | administrative route | No public access |
| 8606 | administrative route | No public access |
| 8606A | administrative route | No public access |
| 8608 | full-size vehicle | Management objectives do not require change in designation |
| 8609 | administrative route | No public access |
| 8609A | administrative route | No public access |
| 8609B | administrative route | No public access |
| 8610 | foot/horse only | Dead end routes |
| 8611 | administrative route | No public access |
| 8613 | foot/horse only | Consistency with SRMA objectives |
| 8613A | foot/horse only | Consistency with SRMA objectives |
| 8613B | foot/horse only | Consistency with SRMA objectives |
| 8613BA | foot/horse only | Consistency with SRMA objectives |
| 8613C | foot/horse only | Consistency with SRMA objectives |
| 8614 | foot/horse only | Consistency with SRMA objectives |
| 8614A | foot/horse only | Consistency with SRMA objectives |
| 8614B | foot/horse only | Consistency with SRMA objectives |
| 8615 | foot/horse only | Consistency with SRMA objectives |
| 8615A | foot/horse only | Consistency with SRMA objectives |
| 8615B | foot/horse only | Consistency with King Mountain SRMA objectives |
| 8616 | foot/horse only | Consistency with SRMA objectives |
| 8617 | full-size vehicle | Management objectives do not require change in designation |
| 8619A | foot/horse only | Spur; dead ends on private |
| 8619 | motorcycle | Support management objectives for: soils, paleontology, recreation |
| 8619CA | foot/horse only | No public access |
| 8620 | administrative route | No public access |

BLM_0026155

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8620A | administrative route | No public access |
| 8620B | administrative route | No public access |
| 8621 | full-size vehicle | Management objectives do not require change in designation |
| 8621A | full-size vehicle | Management objectives do not require change in designation |
| 8621AA | full-size vehicle | Management objectives do not require change in designation |
| 8621C | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8621D | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8621B | full-size vehicle | Management objectives do not require change in designation |
| 8621BB | full-size vehicle | Management objectives do not require change in designation |
| 8622 | obliterate | Support management objectives for: soils, paleontology, recreation |
| 8624C | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8624 | motorcycle | Support management objectives for: soils, paleontology, recreation |
| 8624A | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8624A | motorcycle | Support management objectives for: soils, paleontology, recreation |
| 8624B | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8624D | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8624E | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8625 | motorcycle | Support management objectives for: soils, paleontology, recreation |
| 8625D | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8625A | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8625B | foot/horse only | Support management objectives for: soils, paleontology, recreation |
| 8626 | full-size vehicle | Management objectives do not require change in designation |
| 8626E | foot/horse only | Parallel route |
| 8626D | foot/horse only | Parallel route |
| 8626A | foot/horse only | Support management objectives for: soils, paleontology, recreation |

BLM_0026156

| Route # | Route Designation | Concern, Issue or Rationale for Designation |
|---|---|---|
| 8626B | motorcycle | Parallel route |
| 8626F | foot/horse only | Parallel route |
| 8626C | full-size vehicle | Management objectives do not require change in designation |
| 8630 | full-size vehicle | Management objectives do not require change in designation |
| 8630A | foot/horse only | Parallel route |
| 8630B | foot/horse only | Spur |
| 8630BA | foot/horse only | Spur |
| 8630C | full-size vehicle | Management objectives do not require change in designation |
| 8630D | full-size vehicle | Management objectives do not require change in designation |
| 8630E | full-size vehicle | Management objectives do not require change in designation |
| 8630F | foot/horse only | Spur |
| 8630G | foot/horse only | Spur |
| 8630H | full-size vehicle | Management objectives do not require change in designation |
| 8630I | full-size vehicle | Management objectives do not require change in designation |
| 8630J | full-size vehicle | Management objectives do not require change in designation |
| 8630K | full-size vehicle | Management objectives do not require change in designation |
| 8630KA | full-size vehicle | Management objectives do not require change in designation |
| 8631 | full-size vehicle | Management objectives do not require change in designation |
| 8631A | full-size vehicle | Management objectives do not require change in designation |
| 8631AA | foot/horse only | Spur |
| 8631B | foot/horse only | Spur |
| 8631C | full-size vehicle | Management objectives do not require change in designation |
| 8634 | full-size vehicle | Management objectives do not require change in designation |
| 8634A | administrative route | No public access |
| 8634AA | administrative route | No public access |
| 8634B | foot/horse only | Parallel |
| 8634C | full-size vehicle | Management objectives do not require change in designation |
| 8634D | full-size vehicle | Management objectives do not require change in designation |

BLM_0026157

| Route  # | Route Designation | Concern, Issue or Rationale for Designation |
|----------|-------------------|---------------------------------------------|
| **8634E** | full-size vehicle | Management objectives do not require change in designation |
| **8637D** | administrative route | No public access |
| **8637** | foot/horse only | Bridge determined to be unsafe for public travel |
| **8637A** | administrative route | No public access |
| **8637B** | administrative route | No public access |
| **8637C** | foot/horse only | Dead end route |
| **8638** | administrative route | No public access |
| **8638A** | administrative route | No public access |
| **8638B** | administrative route | No public access |
| **8640** | full-size vehicle | Management objectives do not require change in designation |
| **8641** | full-size vehicle | Management objectives do not require change in designation |
| **8643** | full-size vehicle | Management objectives do not require change in designation |
| **8643A** | full-size vehicle | Management objectives do not require change in designation |

BLM_0026158

# APPENDIX H
## TRANSPORTATION FACILITIES: SYSTEM ROADS AND MAINTENANCE LEVELS

BLM_0026159

This appendix provides supporting information to transportation facilities decisions in the Approved RMP including maintenance intensity levels.

## MAINTENANCE INTENSITY LEVELS

### Maintenance Intensity Level 0

*Maintenance Description:* Existing routes that will no longer be maintained and no longer be declared a route. Routes identified as Level 0 are identified for removal from the Transportation System entirely.

*Maintenance Objectives:*
- No annual maintenance planned.
- Meet identified environmental needs.
- No preventive maintenance planned.

*Maintenance Funds:* No annual maintenance funds.

### Maintenance Intensity Level 1

*Maintenance Description:* Routes where minimum (low intensity) maintenance is required to protect adjacent lands and resource values. These roads may be impassable for extended periods of time.

*Maintenance Objectives:*
- Low (Minimal) maintenance intensity.
- Emphasis on maintaining drainage and runoff patterns as needed to protect adjacent lands. Grading, brushing, or slide removal not performed unless route bed drainage is being adversely affected, causing erosion.
- Meet identified resource management objectives.
- Maintenance as necessary to protect adjacent lands and resource values.
- No preventive maintenance.
- Planned maintenance activities limited to environmental and resource protection.
- Route surface and other physical features not maintained for regular traffic.

*Maintenance Funds:* Maintenance funds provided to address environmental and resource protection requirements. No maintenance funds provided to perform preventive maintenance.

### Maintenance Intensity Level 2

BLM has reserved this level for possible future use. There is no current description or objective.

BLM_0026160

### Maintenance Intensity Level 3

*Maintenance Description:* Routes requiring moderate maintenance due to low volume use (e.g., seasonally or year-round for commercial, recreation, or administrative access). Maintenance Intensities may not provide year-round access but are intended to generally provide resources appropriate to keep the route in use for the majority of the year.

*Maintenance Objectives:*
- Medium (Moderate) maintenance intensity.
- Drainage structures maintained as needed. Surface maintenance to a reasonable level of riding comfort at prudent speeds for the route conditions and intended use. Brushing as needed to improve sight distance when appropriate for management uses. High priority removal of landslides adversely affecting drainage, otherwise removed on a scheduled basis.
- Meet identified environmental needs.
- Generally maintained for year-round traffic.
- Annual maintenance as necessary to protect adjacent lands and resource values.
- Preventive maintenance as required to generally keep the route in acceptable condition.
- Planned maintenance activities include environmental and resource protection efforts and annual route surfacing.
- Route surface and other physical features maintained for regular traffic.

*Maintenance Funds:* Maintenance funds provided to preserve the route in the current condition, perform planned preventive maintenance activities on a scheduled basis, and address environmental and resource protection requirements.

### Maintenance Intensity Level 4

BLM has reserved this level for possible future use. There is no current description or objective.

### Maintenance Intensity Level 5

*Maintenance Description:* Routes for high (Maximum) maintenance due to year-round needs, high-volume traffic, or significant use. This maintenance intensity level also may include routes identified through management objectives as requiring high intensities of maintenance, or to be maintained open on a year-round basis.

*Maintenance Objectives:*
- High (Maximum) maintenance intensity.
- Entire route maintained at least annually. Problems repaired as discovered. May be closed or have limited access due to weather conditions but generally intended for year-round use.
- Meet identified environmental needs.

BLM_0026161

- Generally maintained for year-round traffic.
- Annual maintenance as necessary to protect adjacent lands and resource values.
- Preventive maintenance as required to generally keep the route in acceptable condition.
- Planned maintenance activities include environmental and resource protection efforts and annual route surfacing.
- Route surface and other physical features maintained for regular traffic.

*Maintenance Funds:* Maintenance funds provided to preserve the route in the present condition, perform planned preventive maintenance activities on a scheduled basis, and address environmental and resource protection requirement.

**Table H-1.  BLM System Roads and Maintenance Levels**

| BLM Route Number | BLM Route Name | Miles | Maintenance Intensity Level |
|---|---|---|---|
| 8072 | HOGBACK COAL MINE | 3 | 1 |
| 8083 | HORSE MTN WEST | 2 | 0 |
| 8084 | HORSE MTN | 2.9 | 1 |
| 8090 | CEDAR MTN LOOP | 8.1 | 1 |
| 8090A | CEDAR MTN LOOP - NORTH | 1.1 | 1 |
| 8092 | CEDAR MTN LOOP - SOUTH | 1 | 1 |
| 8091 | BUTLER CREEK ACCESS | 2.1 | 1 |
| 8092 | WEST CEDAR MOUNTAIN | 1 | 0 |
| 8093 | EAST CEDAR MTN LOOP NORTH | 1.9 | 1 |
| 8094 | EAST CEDAR MTN LOOP SOUTH | 3.6 | 3 |
| 8107 | DRY RIFLE CREEK | 4 | 3 |
| 8108 | DRY RIFLE LOOPS | 3.7 | 3 |
| 8114 | WEST ELK RIDGE | 4.7 | 3 |
| 8115 | TEAKEE MINE | 1.5 | 3 |
| 8120 | SILT MESA | 1.9 | 3 |
| 8126 | HOGBACK TRUCK TRAIL | 1.7 | 1 |
| 8134 | BOILER CREEK | 3.9 | 3 |
| 8149 | TRANSFER TRAIL ROAD | 2 | 3 |
| 8162 | BATTLEMENT CREEK | 1.3 | 1 |
| 8163 | MONUMENT GULCH | 1 | 0 |
| 8166 | DOGHEAD MTN | 0.6 | 0 |
| 8185 | LOWER FLATIRON | 5. | 1 |
| 8203 | MUD HILL-DRY HOLLOW | 4 | 1 |
| 8210 | NEW CASTLE RAMP | 0.2 | 3 |
| 8214 | GIBSON GULCH | 2.3 | 1 |
| 8215 | GIBSON WEST | 1.3 | 1 |
| 8216 | TAR GULCH | 4.3 | 1 |
| 8220 | JUNE CREEK | 5.2 | 1 |

BLM_0026163

| BLM Route Number | BLM Route Name | Miles | Maintenance Intensity Level |
|---|---|---|---|
| 8222 | CORRAL CREEK | 2.1 | 1 |
| 8230 | UNCLE BOB ACCESS | 3.4 | 0 |
| 8231 | CLEAR CREEK | 0.9 | 1 |
| 8232 | UNCLE BOB SPRING | 2 | 1 |
| 8241 | CENTER MOUNTAIN | 4.9 | 1 |
| 8249 | SOUTH CANYON RAMP | 3.8 | 3 |
| 8283 | HUBBARD CAVE | 4.3 | 1 |
| 8320 | THE CROWN | 6.9 | 3 |
| 8323 | THE CROWN NORTH | 1.7 | 0 |
| 8324 | VASTEN | 1.4 | 3 |
| 8334 | LIGHT HILL | 6.8 | 1 |
| 8335 | WEST LIGHT HILL | 3.8 | 1 |
| 8350 | NORTH HARDSCRABBLE ACCESS | 8.8 | 3 |
| 8360 | RED HILL- GYPSUM | 2.3 | 3 |
| 8371 | SPRING GULCH | 1.4 | 1 |
| 8381 | TENDERFOOT GULCH | 7.9 | 1 |
| 8382 | MCHATTEN CREEK | 1.1 | 0 |
| 8383 | HARDSCRABBLE SADDLE | 3.2 | 1 |
| 8384 | ALKALI CREEK | 5.2 | 3 |
| 8386 | LOWER ABRAMS CREEK | 2.1 | 0 |
| 8387 | THIRD GULCH | 2.1 | 3 |
| 8410 | ROAD GULCH | 3.3 | 1 |
| 8413 | BELLYACHE SPRING | 4.2 | 1 |
| 8430 | BELLYACHE RIDGE | 0.8 | 0 |
| 8440 | BURNT TREE RIDGE | 1 | 0 |
| 8451 | WEST FORK SHEEP CREEK | 0.3 | 0 |
| 8452 | SHEEP CREEK MESA | 3.2 | 1 |
| 8455 | HORSE CREEK | 1.4 | 1 |
| 8460 | DRY LAKE TO DOTSERO | 7.9 | 1 |

| BLM Route Number | BLM Route Name | Miles | Maintenance Intensity Level |
|---|---|---|---|
| | CRATER | | |
| 8461 | WEST OF DRY LAKE | 1.4 | 1 |
| 8462 | BLOWOUT MTN | 3.8 | 1 |
| 8463 | WEST HILL LOOP | 4.7 | 1 |
| 8464 | GYPSUM HILLS A | 1.1 | 1 |
| 8465 | GYPSUM HILLS B | 2 | 1 |
| 8466 | GYPSUM HILLS C | 1.7 | 1 |
| 8473 | GYPSUM HILLS D | 5.1 | 1 |
| 8479 | BIG MCCLOSKY | 8 | 3 |
| 8480 | GREEN HORN MTN LOOP | 10 | 1 |
| 8482 | GYPSUM HILLS E | 2.7 | 1 |
| 8485 | GYPSUM HILLS F | 1.6 | 1 |
| 8486 | GYPSUM HILLS G | 1.5 | 1 |
| 8487 | POSEY CREEK | 4 | 1 |
| 8490 | LAVA FLOW RECREATION SITE | 0.5 | 3 |
| 8492 | COMMUNITY RECREATION SITE | 0.5 | 3 |
| 8493 | GYPSUM RECREATION SITE | 1 | 3 |
| 8498 | WOLCOTT RECREATION SITE | 1 | 3 |
| 8500 | EAST CASTLE PEAK | 6.5 | 3 |
| 8501 | BOCCO MOUNTAIN EAST | 0.4 | 1 |
| 8502 | BOCCO MOUNTAIN | 2.2 | 1 |
| 8509 | HORSE MTN AT CASTLE PEAK | 0.8 | 0 |
| 8510 | BLUE LAKE | 1.2 | 3 |
| 8511 | POISON | 1 | 1 |
| 8512 | PICTURE RIDGE | 1.1 | 1 |
| 8513 | DOMANTLE | 3 | 1 |
| 8520 | WINDY POINT | 3.1 | 3 |
| 8521 | WEST STATE BRIDGE | 1 | 0 |

BLM_0026165

*Appendix H - Transportation Facilities*

| BLM Route Number | BLM Route Name | Miles | Maintenance Intensity Level |
|---|---|---|---|
| 8530 | BIG ALKALI CREEK | 5.8 | 3 |
| 8532 | BOORE FLATS | 2.3 | 1 |
| 8535 | PISGAH MOUNTAIN | 4.5 | 1 |
| 8536 | BIG ALKALI CREEK NORTH SPUR | 0.8 | 0 |
| 8537 | BIG ALKALI CREEK EAST SPUR | 0.5 | 0 |
| 8540 | WINTER RIDGE | 4.1 | 3 |
| 8542 | WINTER RIDGE TRAILHEAD | 0.5 | 3 |
| 8543 | WINTER RIDGE SPUR | 1 | 3 |
| 8544 | WINTER RIDGE WEST SPUR | 2 | 3 |
| 8570 | TEPEE CREEK | 2.7 | 1 |
| 8580 | KING MTN. CABIN ROAD | 2 | 3 |
| 8621 | C BAR C | 1.1 | 1 |
| 8630 | CONGER MESA | 6.3 | 1 |
| 8633 | EAST COPPER SPUR | 2.6 | 1 |

BLM_0026166

# APPENDIX I

## UPPER COLORADO RIVER WILD AND SCENIC STAKEHOLDER GROUP MANAGEMENT PLAN

BLM_0026167

# Upper Colorado River
# Wild and Scenic Stakeholder Group
# Management Plan

Prepared on behalf of:

American Whitewater
Aurora Water
Blue Valley Ranch
Colorado River Outfitters Association
Colorado River Water Conservation District
Colorado Springs Utilities
Denver Water
Eagle County
Eagle Park Reservoir Company
Eagle River Water and Sanitation District
Grand County
Middle Park Water Conservancy District
Municipal Subdistrict, Northern Colorado Water Conservancy District
Northern Colorado Water Conservancy District
Northwest Colorado Council of Governments
Summit County
The Wilderness Society
Trout Unlimited
Upper Eagle Regional Water Authority
Vail Associates, Inc.

In consultation with:

Colorado Water Conservation Board
Colorado Parks and Wildlife
U.S. Bureau of Reclamation

For submittal to:

U.S. Bureau of Land Management
U.S. Forest Service

# January 2012

BLM_0026168

Page 2 of 71



BLM_0026169

## EXECUTIVE SUMMARY

The Upper Colorado River Wild and Scenic Stakeholder Group (Stakeholder Group or SG) represents a diverse range of interests who have worked together since 2008 to develop an Upper Colorado River Wild and Scenic Stakeholder Group Management Plan (SG Plan or Plan) to protect the outstandingly remarkable values (ORVs) identified in the U.S. Bureau of Land Management (BLM) and U.S. Forest Service (USFS) Eligibility Reports for Segments 4 through 7 of the Upper Colorado River. All references hereinafter to Segment 7 of the Colorado River are intended to include BLM Segment 7 and USFS Segments 1 and 2 of the Colorado River. The SG Plan is being proposed to BLM and the USFS as a potential Wild and Scenic Rivers management alternative for the resource management plan revision process. The Stakeholder Group's intention for this collaborative Plan is to balance permanent protection of the ORVs, certainty for the stakeholders, water project yield, and flexibility for water users.  A significant benefit of the SG Plan is that through the cooperative and voluntary efforts of interested water users, local governments, and other entities, the ORVs can be protected (and perhaps enhanced) in ways that coordinate with federal agency management.

The SG Plan will use identified Long-Term Protection Measures and voluntary Cooperative Measures of the Stakeholder Group to protect the ORVs.  Examples of the protective measures include the appropriation of Colorado Water Conservation Board (CWCB) Instream Flow (ISF) water rights, delivery of water to senior water demands downstream of Segments 4 through 7, and water deliveries to the 15-Mile Reach in the Grand Valley pursuant to the Upper Colorado River Endangered Fish Recovery Program.

The SG Plan aims to protect all ORVs while focusing on recreational fishing (in Segments 4 through 6) and recreational floatboating (in Segments 4 through 7).  The SG Plan uses two distinct tools – "ORV Indicators" (characterizing the range and quality of the ORVs) which will be used to gage whether the ORVs are being protected; and "Resource Guides" (reflecting ranges for factors such as flow, temperature and water quality) that will be used as a source of information among others to inform SG discussions under the Plan.  Resource Guides are not intended to be used as a test for Plan success nor for use by permitting agencies or entities as the criterion for evaluating a project's effects on the ORVs.  However, nothing in the Plan shall preclude or limit the use of any data regardless of whether such data has been used in the negotiation of the Resource Guides.  The Resource Guides will not create binding requirements that water providers satisfy specific flow levels. The SG Plan's implementation procedures will provide a feedback loop to periodically confirm that the management measures under the SG Plan, in coordination with BLM's and USFS's other land management actions, are protective of all ORVs.  The SG Plan contains mechanisms to address concerns related to impairment of or a significant risk of impairment to the ORVs.

BLM_0026170

This Plan has been formally endorsed by the SG members identified on page one. The effective date of the SG Plan will commence upon issuance of records of decision by BLM and the USFS approving the Plan without material change as the Wild and Scenic Rivers management alternative for Segments 4 through 7 of the Upper Colorado River. Prior to the effective date of the Plan, the stakeholders will carry out the tasks described in Attachment B.

For the first 3-to-5 years of implementation of the SG Plan, provisional ORV Indicators and Resource Guides will be used. During this period (provisional period), the Stakeholder Group will work to gather additional data, learn and refine what is needed for the protection of the ORVs, and develop final ORV Indicators and Resource Guides. The SG Plan includes a Monitoring Plan as well as requirements for periodic reporting to BLM and the USFS. The SG Plan also includes provisions addressing governance, representation, decision-making, funding, and agency coordination. It is anticipated that BLM and the USFS will be non-voting members of the Stakeholder Group. The Plan is contingent upon the agencies deferring but not precluding a suitability determination, and on resolution of the issues under Section III.C.2.c.of this Plan (Poison Pill).

Proponents of new projects that seek federal authorization, funding or assistance could choose to participate in the SG Plan. In such event, a new project proponent would: inform the SG of the proposed project in a timely manner to facilitate SG consideration and comment on the project; formally endorse the Plan and commit to participate in the Cooperative Measures procedures and funding provisions of the Plan; and demonstrate to the appropriate permitting/authorizing agency(ies) that project operations will not unreasonably diminish the ORVs or that operations will be subject to mitigation to avoid unreasonably diminishing the ORVs. The SG intends that permitting or authorizing agency(ies) will conduct their own independent assessment of a project's impacts to the ORVs, if any. Membership as a stakeholder is not intended to serve as project mitigation nor as a means to demonstrate that a project does not unreasonably diminish the ORVs (except as may be agreed between the project proponent and the SG).

BLM_0026171

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................ 2

DEFINITIONS.................................................................................................................... 6

I.    INTRODUCTION .......................................................................................................... 8

II.   DESCRIPTION OF ORVs.......................................................................................... 10

III.  ORV INDICATORS AND RESOURCE GUIDES ........................................................... 13

IV.  MEASURES TO ENSURE PROTECTION OF ORVs ...................................................... 25

V.    MONITORING PLAN ................................................................................................ 32

VI.  GOVERNANCE.......................................................................................................... 33

VII. NEW PROJECTS...................................................................................................... 43

VIII. FUNDING ................................................................................................................ 45

IX.   AGENCY COORDINATION ........................................................................................ 51

LIST OF ATTACHMENTS ...................................................................................................... 52

Attachment A:   Milestones for Implementation of Tier 1 Long-Term Protection Measures and Mechanisms for addressing Changed Circumstances ............................................... 52

Attachment B:   Time Line and Task List .......................................................................... 52

Attachment C:   Existing Flow Conditions ......................................................................... 52

Attachment D:   Provisional Period Monitoring Plan ........................................................... 52

BLM_0026172

## DEFINITIONS

A.     "Effective date" of the Plan will commence upon issuance of records of decision by BLM and the USFS approving this Plan without material change as the management alternative for Segments 4 through 7 of the Upper Colorado River.  Prior to the effective date of the Plan, the stakeholders will carry out the tasks described in Attachment B.

B.     "Stakeholder" refers to an individual person or entity having membership status under the Plan pursuant to section VIII.B., whether or not such person or entity is a member of the Governance Committee.

C.     "Stakeholder Group" is comprised of all stakeholders.  The Stakeholder Group conducts its business and makes decisions through the SG Governance Committee.  The terms "Stakeholder Group", "SG", "Governance Committee", and "GC" are used interchangeably throughout this document.

D.     "Streamflow-influenced ORVs" refer to Outstandingly Remarkable Values which are influenced by streamflow and water quality, as defined in Part II of the Plan.

E.     "ORV Indicators" mean the conditions that characterize the primary streamflow-influenced ORVs as they exist today.  Provisional ORV Indicators are to be used by the Plan until such time as the final ORV Indicators are developed and approved pursuant to the criteria in the Plan.

F.     "Resource Guides" are flow, temperature and water quality ranges specified in Part III of this Plan to inform SG discussions under the Plan.  "Provisional Resource Guides" are identified in Part III of this Plan, subject to the identified qualifications on their use and the procedures for their finalization described in the Plan.

G.     "Cooperative Measures" are voluntary actions that will be explored and may be implemented to assist in protection of the ORVs pursuant to the process described in Section IV.B. of the Plan.

H.     "Long-Term Protection Measures" refer to specific measures described in Part IV.A. of the Plan that are expected to result in ongoing protection of the ORVs, absent a Material Change in Circumstances.  These are supported by the SG and will be pursued pursuant to the Milestones in Attachment A.

I.     "Milestones" contain the requirements for implementation of the Long-Term Protection Measures for protection of the ORVs.  These are described in Part I of Attachment A to this Plan.

BLM_0026173

J.      "Material Change in Circumstance" means a change in circumstance that undermines the value of one of the Long-Term Protection Measures under Section IV.A. of the SG Plan, including but not limited to the examples described in Part II of Attachment A.

K.      "Significant risk of impairment to" an ORV is a determination made by affirmative vote of at least five Interest Groups that one or more of the ORVs is faced with an imminent risk of material diminishment due to circumstances under the control of the Plan.  This may be cause for invoking the dispute resolution and potential Plan termination procedures in Section VI.J.4.

L.      "Provisional period" refers to the first 3-to-5 years of Plan implementation commencing upon the effective date of the Plan.  During this period, the SG will utilize provisional ORV Indicators and provisional Resource Guides, while working cooperatively to implement defined data collection and monitoring efforts and perform additional technical review.  Final ORV Indicators and Resource Guides will be adopted prior to conclusion of the provisional period.

M.      "Consensus", "agreement", "unanimous vote", and "unanimous consent" of the SG or GC all refer to and require the affirmative vote of all Interest Groups. These terms are used interchangeably throughout this document.

N.      "Poison Pill" means the potential withdrawal of the SG Plan under the conditions set forth in Section III.C.2.c. of the Plan.

O.      A "water right" is a right to utilize a certain quantity of water based on the priority of a party's appropriation of water for beneficial use.  An "absolute water right" is a water right that has been put to actual use.  A "conditional water right" is a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is based.

P.      "Simulated Future Flows" – means stream flows that may occur in the future, which are modeled by imposing projected water demands of Front Range and West Slope Colorado River Basin water users, plus anticipated water-system operations, on historical stream flow records.  Simulated Future Flows were evaluated by the SG in the context of negotiation of the Provisional Resource Guides but they are not specifically identified or otherwise incorporated into the SG Plan.

BLM_0026174

# I.   INTRODUCTION

This SG Plan has been developed to monitor and protect the ORVs identified in the BLM and USFS Eligibility Reports for Segments 4 through 7 of the Upper Colorado River.[1]  It is intended to serve as a Wild and Scenic Rivers management alternative for the resource management plan revision process.   A significant benefit of the SG Plan is that through the cooperative and voluntary efforts of interested water users, local governments, and other entities, the ORVs can be protected (and perhaps enhanced) in ways that coordinate with federal agency management.

Stakeholders have participated in the development of the SG Plan based on the premise that Cooperative Measures under the Plan are voluntary and cooperative. This SG Plan will be implemented in accordance with the following Guiding Principles:

**Purpose of the Plan**:  The Stakeholder Group's intention for this collaborative Plan is to balance permanent protection of the ORVs, certainty for the stakeholders, water project yield, and flexibility for water users.

**Cooperative Measures**:  The SG acknowledges that under the SG Plan, cooperative actions that would impair water providers' ability to meet their water supply commitments will not be undertaken.

**Provisional Resource Guides**:  During the provisional period, the SG will work cooperatively to gather additional data, learn and refine what is needed for the protection of the ORVs, and develop a long-term Monitoring Plan to guide the protection of the ORVs.  During the provisional period, the Resource Guides will be used as a source of information among others to inform SG discussions under the Plan.  The Resource Guides are not intended to be used as a test for Plan success nor for use by permitting agencies or entities as the criterion for evaluating a project's effects on the ORVs.  However, nothing in the Plan shall preclude or limit the use of any data regardless of whether such data has been used in the negotiation of the Resource Guides.  The Resource Guides do not create any binding requirements that water providers satisfy specific flow levels. The SG will use the data and knowledge gained during the provisional period to develop final ORV Indicators, and Resource Guides that recognize long-term hydrologic variability, which may or may not resemble the provisional Resource Guides.

---

[1] The USFS is involved with BLM in the assessment of Wild and Scenic management along the Colorado River, and is the federal managing agency with respect to USFS Segments 1 and 2 (within BLM Segment 7) covering portions of the Upper Colorado River through Glenwood Canyon.

BLM_0026175

**Resource Priorities:**  Under both the provisional period and subsequent to adoption of final Resource Guides and ORV Indicators, the SG acknowledges that the Cooperative Measures can have a limited ability to significantly influence the higher flow levels contemplated by the Resource Guides, particularly during low-flow periods.  The SG is committed to work together to prioritize the use of Cooperative Measures among the various ORVs in a manner consistent with the intent of the SG Plan.

**Project Permits**:  The SG acknowledges that the Municipal Subdistrict, Northern Colorado Water Conservancy District (Municipal Subdistrict) and Denver Water's continued participation in the SG Plan is contingent upon completion of all NEPA and related environmental permitting for the Municipal Subdistrict's Windy Gap Firming Project and Denver Water's Moffat Collection System Project (Projects), and upon Denver Water and the Subdistrict's election to proceed with the permitted Projects.  The SG also acknowledges that the SG Plan is contingent upon the non-exercise of Paragraph III.C.2.c. of the SG Plan (Poison Pill).  Prior to expiration of the period for exercise of the Poison Pill, members of the SG would continue to contribute annual funding to the SG Plan, but shall not be required to contribute endowment funding as anticipated pursuant to Section VIII.A. of the Plan.

**Suitability Determination and Agency Coordination**:  The SG Plan is contingent upon the neutral deferral of a suitability determination under the Wild and Scenic Rivers Act by BLM/USFS. The SG Plan will not become effective or will terminate if either agency enters formal findings that Segments 4, 5, 6 or 7 of the Upper Colorado River are suitable or not suitable.  The SG supports the position that BLM/USFS defer a determination of suitability until and unless there is a determination by the SG that the Plan should be terminated by BLM/USFS, and/or that it should no longer be used as a Wild and Scenic Rivers management alternative.  The SG agrees to revisit this position on deferral at the end of the provisional period.  If the Plan is determined to have failed, the BLM/USFS will be charged with considering a suitability determination.  The SG encourages adoption by the BLM/USFS of a streamlined NEPA process that would, under such circumstances, allow the opportunity to provide comment and feedback to the agencies on the merits of suitability including comments expressing opposition to or support of a finding of suitability. The SG believes that interagency agreements/MOUs are important to the success of the Plan if suitability is deferred.  The SG will work with BLM, USFS, and other federal agencies to encourage the adoption of appropriate MOUs that describe how the federal agencies' actions will relate to the SG Plan.

**Elevation/Referral Process:**  The SG recommends including the BLM and USFS as non-voting members of the SG.  As property managers, BLM and USFS are actually stakeholders in resource management issues and should be included when the elevation process triggers discussion among the SG (see Tier 3 process, Paragraph IV.C. of the Plan).  Tier 3 includes the assessment of data

BLM_0026176

gathered, evaluation of the status of the resources, and exploration of voluntary cooperative efforts as described in the SG Plan; the BLM and USFS would participate in the SG discussions to provide resources and potential guidance on the issues and the data.  As recognized in these Principles, the Plan will be successful as long as the SG is working together to protect the ORVs.  After attempts at resolution have been explored by the SG, the SG will consider mediation or referral to a policy-level group within the SG in efforts to address unresolved material concerns.  If, after all cooperative efforts have been explored and concerns remain that the ORVs are being impaired, the SG may by a 5/6 vote of the SG Interest Groups determine that the local process is no longer working and that the SG Plan should be terminated.

## II.   DESCRIPTION OF ORVs

A.   Identification of ORVs.

The BLM and USFS Eligibility Reports identify the following ORVs that are the subject of this Plan:

| Segment | Reach | ORVs | Preliminary Classification |
|---------|-------|------|----------------------------|
| Segment 4 | Colorado River from top of Gore Canyon to the Pumphouse recreational site (5.36 miles) | Scenic (canyon, cliffs)<br><br>Recreational (fishing - DOW Wild Trout waters; floatboating - Class V whitewater boating; scenic driving)<br><br>Geological<br><br>Wildlife (bald eagle nesting and winter habitat; river otter habitat)<br><br>Historic (Moffat Rd.; early hydroelectric projects; WWII German POW camp) | Recreational |

BLM_0026177

| | | | |
|---|---|---|---|
| Segment 5 | Colorado River from the Pumphouse Recreational Site down to State Bridge (15.26 miles) | Scenic (Little Gore Canyon & Red Gorge)<br><br>Recreational (fishing - same as Segment 4; floatboating - Class II/III run; scenic driving)<br><br>Geological<br><br>Wildlife (same as above)<br><br>Historic (early hydroelectric projects; early copper mining; Brass Balls Mine/Cable Rapids Cabin; State Bridge; historic Moffat Road)<br><br>Paleontological (fossils). | Recreational |
| Segment 6 | Colorado River from State Bridge to Dotsero (18.02 miles) | Scenic<br><br>Recreational (fishing; floatboating; scenic driving)<br><br>Wildlife (river otter habitat)<br><br>Botanical (riparian plant communities) | Recreational |
| Segment 7 | Colorado River from Dotsero to ½ mile east of No Name Creek/ Glenwood Canyon (15.78 miles) | Scenic<br><br>Recreational (floatboating)<br><br>Geological | Recreational |
| USFS Segment 1 | Colorado River from National Forest boundary on the east end of Glenwood Canyon to the upstream end of the Shoshone Dam (4 miles) | (same as Segment 7 above) | Recreational |
| USFS Segment 2 | Colorado River from the Shoshone power plant to the National Forest boundary on the west end of Glenwood Canyon (5 miles) | (same as Segment 7 above) | Recreational |

B. <u>Nature of and Factors Influencing ORVs</u>.

This Plan aims to monitor and protect all ORVs while focusing on the primary streamflow-influenced ORVs identified in subsection (1) below. The SG Plan's implementation procedures provide a feedback loop to periodically assess and confirm that the management measures under the

Page 11 of 71

BLM_0026178

Plan, in coordination with the BLM and USFS other land management actions, are protective of all ORVs.

1.    The primary streamflow-influenced ORVs are:
- Recreational Fishing
- Recreational Floatboating

2.    Other streamflow-influenced ORVs are:
- Wildlife
- Botanical
- Scenic

3.    Additional ORVs are:
- Geological
- Historical
- Paleontological

C.    <u>Context of ORVs - Existing Conditions</u>.

1.    Existing Flow Conditions

Figure 1 (see Attachment C) shows the range of historical streamflows at the Colorado River near Kremmling stream gage (USGS #9058000) for the period 1983 – 2006.  This period of record generally represents the level of flows in existence at the time that BLM and USFS identified the ORVs.  The streamflows shown in Figure 1 will be used to inform discussions of the SG under Sections III and IV.

Figure 2 (see Attachment C) shows the range of historical streamflows at the Colorado River near Dotsero stream gage (USGS #9070500) for the period 1983 – 2006.  This period of record generally represents the level of flows in existence at the time that BLM and USFS identified the ORVs.  The streamflows shown in Figure 2 will be used to inform discussions of the SG under Sections III and IV.

Figure 3 (see Attachment C) compares the median annual flow at Kremmling for the periods 1904 – 1918 (pre-Moffat and C-BT systems) and 1962 – 1984 (pre-1984 Operating Rules for Green Mountain Reservoir and pre-Windy Gap) and 1985 – 2006 (post-Windy Gap).

BLM_0026179

2.  Existing Temperature Conditions

At the 2010 Rulemaking on 5 CCR 1002-93, the State of Colorado determined that existing conditions for stream temperature in the reach of the Colorado River that comprises Segments 4 through 7 meet current Daily Maximum (DM) and Maximum Weekly Average Temperature (MWAT) stream temperature standards.  See Provisional Period Monitoring Plan Exhibit 1 (Attachment D).

3.  Existing Water Quality Conditions

In 2008, the State of Colorado determined that existing water quality conditions for the reach of the Colorado River that comprises Segments 4 through 7 meet current water quality standards for the protection of recreation and aquatic life.  See Provisional Period Monitoring Plan Exhibit 1 (Attachment D).

## III.  ORV INDICATORS AND RESOURCE GUIDES

A.  <u>Definition and Use of ORV Indicators and Resource Guides</u>.

This Plan aims at monitoring and protecting the ORVs using two distinct tools – "ORV Indicators" and "Resource Guides" – as follows:

1.  ORV Indicators

In the first 3-to-5 years of implementation of this Plan, the Stakeholder Group will gather necessary data and develop specific indicators which will be used to gage whether the ORVs are being protected.  These indicators are referred to in the Plan as "ORV Indicators."  Failure to meet the criteria related to the provisional or final ORV Indicators would be cause for elevation and potential termination of this Plan pursuant to Section IV.C.-D. and VI.J.

2.  Resource Guides

Streamflow-influenced ORVs may be affected by factors such as flows, temperature and water quality.  This Plan establishes ranges for these factors, referred to as "Resource Guides," which are described in Part III of the Plan.  Not all stakeholders endorse these Resource Guides or believe that the ranges they represent are necessary to support the ORVs.  Nevertheless, the SG has negotiated the provisional Resource Guides as one source of

BLM_0026180

information among others for informing SG discussions under the Plan. The Resource Guides are not intended to be used as a test for Plan success, nor for use by permitting agencies or entities as the criterion for evaluating a project's effects on the ORVs. However, nothing in the Plan shall preclude or limit the use of any data regardless of whether such data has been used in the negotiation of the Resource Guides.[2]

B. <u>Establishment of Provisional ORV Indicators</u>.

Until such time as final ORV Indicators are developed, the Plan will use the following provisional ORV Indicators:

1. *RECREATIONAL FISHING* (Segments 4 through 6):

Recreational Fishing ORV Indicators for the Upper Colorado River from Gore Canyon to Red Dirt Creek.[3]

| Type[4] | Name | Current level (if available) |
|---|---|---|
| Fishery[3] | Quality Trout | 24 fish over 14" per acre |
| Fishery[3] | Biomass | 90 pounds/acre |
| Fishery[3] | Species Diversity (SD) | 14 species of fish |
| Recreational Fishing[5] | Total Fishing Effort (TFE) | TBD |
| Recreational Fishing[4] | Catch/Unit Effort (CPUE) | TBD |

The Stakeholder Group currently has insufficient information to describe the range and variability of the provisional recreational fishing ORV Indicators over time. The SG will monitor available information during the provisional period to

---

[2] For further information regarding Resource Guides and their use, see Section VII.B.3. of this Plan.

[3] Existing Colorado Parks and Wildlife (CPW) fishery data suggests that the quality of the recreational coldwater fishery in the reach of the Colorado River downstream of its confluence with Red Dirt Creek may not be as high as in the reach above. The provisional ORV Indicators will apply to that portion of Segment 6 upstream of the Colorado River's confluence with Red Dirt Creek. During the provisional period, the SG will gather data, as appropriate, and evaluate whether there is a need to develop specific ORV Indicators for the lower portion of Segment 6.

[4] Note: These Provisional ORV Indicators were developed using levels of Quality Trout, Biomass, and SD collected by CPW personnel in 2008. Data collected by CPW personnel in 2010 yielded 46 trout per acre 14" or larger, with a total biomass of 121 pounds per acre. The CPW plans to collect additional fishery data within BLM Segment 5 every other year.

[5] Note: A creel census will be required to quantify TFE and CPUE. The current estimated annual cost of the creel census will be approximately $25,000. CPW has no current plans to conduct a creel census within BLM Segments 4, 5, or 6 of the Colorado River; therefore, this cost, and supervision of the creel census, will likely be the responsibility of the Stakeholder Group.

BLM_0026181

evaluate, and revise if necessary, the provisional ORV Indicators above as described in the Monitoring Plan, Part V. During the provisional period, the SG will evaluate any instance where the individual ORV Indicator values for recreational fishing shown in Table III.B.1 are not met in a given year.  In the event that subsequent data for such instances does not exhibit an improving trend toward meeting the provisional Indicator values in each subsequent year, the SG may invoke the SG elevation procedures in Section VI.J.4 of the Plan.  It is recognized that the ORV Indicators for total fishing effort and catch/unit effort are not yet determined and that this is needed for a better understanding of the status of the recreational fishing ORV.

    *2.*    *RECREATIONAL FLOATBOATING* (Segments 4 through 7*):*

Narrative standard:  Protect the existing range and quality of the outstanding floatboating opportunities.[6]  This narrative standard does not imply mirroring any specific hydrology.

**C.**    <u>Establishment of Provisional Resource Guides</u>.

Factors which may influence or affect the condition of the primary streamflow-influenced ORVs include flow levels, temperature, and water quality.  Provisional Resource Guides[7] are established for each of these factors as part of this Plan.  These guides are subject to the qualifications on their use described in Section III.A.2. and Section VII.B.3. of this Plan.

---

[6] The intent of the SG is to develop and incorporate objective criteria into the final recreational floatboating ORV Indicator.

[7] These provisional Resource Guides have been negotiated and are the result of compromise among the SG participants to inform SG discussions during the first 3-to-5 years of Plan implementation and may be replaced by final Guides that will be developed as a result of monitoring and data collection under the Plan.

BLM_0026182

1.   *RECREATIONAL FISHING* (Segments 4 through 6):

    a.    Seasonal flows:

| Season | Number of Days in Season | Month | Seasonal Fish Flow Range and Midpoint (cfs) |
|---|---|---|---|
| 1 | 91 | April | 800-1000 900 midpoint |
| | | May | |
| | | June | |
| 2 | 92 | July | 600-1000 800 midpoint |
| | | August | |
| | | September | |
| 3 | 61 | October | 400-800 600 midpoint |
| | | November | |
| 4 | 122 | December | 400-600 500 midpoint |
| | | January | |
| | | February | |
| | | March | |

The provisional Resource Guides contained in the Table above represent the seasonal ranges of flow for the recreational fishing ORV.  The SG will use the mid-point value as a reference flow and compare it to the 5-year rolling average under each season for purposes of discussion under the Plan.[8]  Analysis of both historical and simulated future flow data shows that flow conditions in Segments 4, 5, and 6 can be expected to continue to be highly variable and that flow levels will sometimes lie above or below the ranges of the seasonal flow guides.  While this could be addressed through the use of criteria addressing a specified frequency of meeting these guides, such implementation criteria has not been established for purposes of the Plan.  The SG may develop such criteria in the future, but the Plan is designed to operate in the absence of such criteria.

    b.    Flushing flows:  The SG has not achieved consensus on a definition or amount of a flushing flow in Segments 4, 5 and 6 but will continue to work toward consensus during the provisional period.  For purposes of the provisional period,

---

[8] For the provisional period, the 5-year rolling average will include the data from the previous 4 years.

BLM_0026183

the SG has negotiated the following provisional Resource Guide for a periodic high flow[9]:

> A daily average flow of at least 2,000 cfs maintained for three consecutive days with a frequency of occurrence of once in two years on average.

During the provisional period, the SG will monitor substrate, stream flows and other conditions in Segments 4, 5 and 6 to evaluate the adequacy of this provisional Resource Guide. The SG acknowledges there are achievability issues regarding the frequency of occurrence of periodic high flows during the historical period and under simulated future stream flow conditions.  Under these circumstances the SG will explore voluntary cooperative efforts to protect the fishing ORV.

c.     Channel maintenance flows:  During the provisional period, the SG agrees to study the extent to which channel maintenance flow guides will be incorporated in the Plan. Discussions during the provisional period may result in the decision that no channel maintenance flow guides will be included in the Plan.

2.     *RECREATIONAL FLOATBOATING:*

The Stakeholder Group will develop final flow guides protective of the recreational floatboating ORV as soon as possible but in no event later than 3 years after approval of this Plan by BLM and USFS, absent extension of such time period by action of the Stakeholder Group.  In the interim, this Plan adopts the following numeric and narrative criteria as provisional recreational floatboating flow guides.  The numeric criteria describe the number of boatable days ("Usable Days") within the recreational floatboating season of April 1 to September 30, expressed as a range from minimum to median and maximum under each floatboating experience category and year type.

In addition to developing and tracking Resource Guides as described in this subsection, the SG will utilize forecasts of undepleted flows during the beginning of each Wild & Scenic water year to anticipate flow conditions for the year.  These anticipated flow conditions will be used to inform the SG's decisions regarding

---

[9] The SG believes that this periodic high flow should mobilize substrate in riffle areas in Segments 4 and 5, and also in Segment 6 with consideration of tributary inflow.

BLM_0026184

cooperative measures that might assist in achieving the Guides. Refer to Section IV.B.2 (Cooperative Measures) for details.

a.    Segments 4 through 6

For purposes of this provisional flow guide for Segments 4, 5, and 6, flows between 700 cfs and 1300 cfs are presumed to provide a low water experience ("Green"); flows between 1300 cfs and 4000 cfs are presumed to provide a standard experience ("Blue"); and flows above 4000 cfs are presumed to provide a high water experience ("Black").  Flows through Segments 4, 5, and 6 less than 700 cfs or more than 7400 cfs are not considered by some stakeholders in the Stakeholder Group to provide Usable Days under these provisional flow guides, and therefore are not counted.

The following chart reflects the water year type, total median Usable Days, and the range of Usable Days within each floatboating experience category that will serve as the provisional flow guides.

Number of Usable Days: Segments 4 through 6 [*minimum (median) maximum*]

|  | Total Usable Days | Green Opportunities 700 – 1300 cfs | Blue Opportunities 1300 – 4000 cfs | Black Opportunities 4000 – 7400 cfs |
|---|---|---|---|---|
| Wettest 25% Years | 115 (161) 180 | 38 (74) 121 | 39 (72) 79 | 4 (22) 28 |
| Wet Typical 25% Years | 120 (153) 169 | 68 (108) 119 | 19 (57) 79 | 0 (0) 5 |
| Dry Typical 25% Years | 74 (115) 141 | 69 (106) 127 | 0 (14) 33 | 0 (0) 0 |
| Driest 25% Years | 62 (80) 96 | 53 (73) 87 | 0 (1) 25 | 0 (0) 0 |

It is anticipated that the SG will review the number of floatboating Usable Days for each boating season.  The year-type for this review will be based on the annual measured flows (aka the depleted flows) at the Kremmling gage (USGS gage number 09058000) as of March 31.  Any preliminary reviews done prior to March 31 will be based upon estimated annual measured flows at the Kremmling gage, and where necessary preliminary stream flow data will be used. The year types for Segments 4, 5 and 6 are defined as follows:

BLM_0026185

| Year Type | Annual Kremmling Gage Flows |
|---|---|
| Wettest 25% Year | More than 769,500 AF |
| Wet Typical Year | 525,500 – 769,500 AF |
| Dry Typical Year | 454,500 – 525,500 AF |
| Driest 25% Year | Less than 454,500 AF |

The numeric criteria shown in the above chart are based on simulated future streamflow conditions modeled by imposing future demands and system operations on past undepleted stream flow (simulated future flows) instead of existing streamflow conditions. It is recognized, based on an analysis of both historical and simulated future flow data, that flow conditions can be expected to continue to be highly variable and that flow levels will at times lie outside the ranges of these guides.  While this could be addressed through the use of criteria addressing a specified frequency of meeting these guides, such implementation criteria has not been established for purposes of the Plan.  The SG may develop such criteria in the future, but the Plan is designed to operate in the absence of such criteria.

Some stakeholders (including those representing the floatboating recreation community) maintain that the use of simulated future flows for the provisional flow guides is not protective of the ORVs.  The entire Stakeholder Group agrees to implement the Cooperative Measures process (considering available resources and protection of the other ORVs) in efforts to increase the number of Usable Days for each floatboating experience category, within each year type.

It is anticipated that stakeholders will bring their specific preferences and goals to the Cooperative Measures planning process and to the negotiation of final recreational floatboating flow guides.  The use of simulated future flows as part of these provisional flow guides does not reflect agreement among the stakeholders whether simulated future flows or historical stream flows should be used to develop the final flow guides (even if Section III.C.2.c. of this Plan is not exercised).  Nothing in these provisional flow guides implies agreement by the stakeholders on use of the Usable Day concept, floatboating experience categories, nor year types for purposes of development of final flow guides.

BLM_0026186

b.     Segment 7

The following chart  presents the year type, total Usable Days (i.e., the total number of days between April 1 and September 30 when the flow at the Dotsero gage is between 1,200 to 8,600 cfs), and the range of Usable Days within each floatboating experience category that will serve as the provisional Resource Guides for Segment 7.

Number of Usable Days: Segment 7 [*minimum (median) maximum*]

| Year Type | Total  Usable Days | Green Opportunities 1200/1250[10] - 1800 cfs | Blue Opportunities 1800 - 5500 cfs | Black Opportunities 5500-8600 cfs |
|---|---|---|---|---|
| Wettest 25% Years | 120 (156) 169 | 33 (57) 83 | 49 (68) 77 | 21 (29) 42 |
| Wet Typical 25% Years | 126 (164) 172 | 44 (68) 102 | 39 (75) 110 | 1 (13) 33 |
| Dry Typical 25% Years | 138 (161) 178 | 75 (86) 121 | 40 (61) 91 | 0 (2) 11 |
| Driest 25% Years | 136 (159) 177 | 88 (126) 137 | 10 (32) 63 | 0 (0) 6 |

It is anticipated that the SG will review the number of floatboating Usable Days for each boating season. The year-type for this review will be based on the annual measured flows (aka the depleted flows) at the Dotsero gage (USGS gage number 09070500) as of March 31.  Any preliminary reviews done prior to March 31 will be based upon estimated annual measured flows at the Dotsero gage, and where necessary preliminary stream flow data will be used. The year types for Segment 7 are defined as follows:

---

[10] The stakeholders do not agree on the specific flow rate for the Green floatboating category; however, during the provisional period, the number of usable days in the Green floatboating category will be based on a flow rate of 1200 – 1800 cfs.  The Stakeholder Group agrees that nothing in these provisional Resource Guides has any effect on the operation of the Shoshone Hydro Power Plant or the water rights for the Shoshone Hydro Power Plant.  Moreover, nothing in this SG Plan shall be interpreted as a waiver of any party's position with respect to the appropriate flow rate for the Green floatboating category, or on any existing or future agreements regarding the operation of the Shoshone Hydro Power Plant and its associated water rights.

BLM_0026187

| Year Type | Annual Dotsero Gage Flows |
|-----------|---------------------------|
| Wettest 25% Year | More than 1,519,500 AF |
| Wet Typical Year | 1,234,000 – 1,519,500 AF |
| Dry Typical Year | 1,029,500 – 1,234,000 AF |
| Driest 25% Year | Less than 1,029,500 AF |

It is recognized, based on an analysis of both historical and simulated future flow data, that flow conditions can be expected to continue to be highly variable and that flow levels will at times lie outside the ranges of these guides. While this could be addressed through the use of criteria addressing a specified frequency of meeting these guides, such implementation criteria has not been established for purposes of the Plan. The SG may develop such criteria in the future, but the Plan is designed to operate in the absence of such criteria.

c.      Poison Pill. It is recognized that the SG does not currently have the information it needs to set final floatboating flow guides at this time and that the setting of those guides will be informed by information about the resource and water uses. The provisional floatboating flow guides, as set forth in Paragraph III.C.2. of the Plan, were negotiated using historical data and an assumed future hydrology. Some stakeholders have expressed serious concern with such an approach because they maintain that it will result in a reduction of usable floatboating days from what occurs under existing hydrology. However, these stakeholders have agreed to include the provisional floatboating flow guides in the Plan, subject to the negotiation of protective measures within the context of the permitting for the Windy Gap Firming Project and the Moffat Collection System Project ("Projects") that will address consistency of the Projects with the streamflow-influenced ORVs. If the outcome of those negotiations or final permitting precludes continued support of the Plan by any stakeholder (including a Project proponent), that stakeholder shall provide written notification of such position to the SG and the SG will withdraw the Plan from consideration by BLM and USFS as a locally supported Wild and Scenic management plan alternative. To clarify, the net effect of such withdrawal will be that the BLM and USFS will be left to determine the appropriate Wild and Scenic determinations and protective

Page 21 of 71

BLM_0026188

measures for Segments 4, 5, 6 and 7, if any, without taking into account the SG Plan alternative. Written notification to the SG by the objecting stakeholder must occur no later than six (6) months after the issuance of required permits for the Windy Gap Firming Project[11] and the Moffat System Improvement Project[12], at which time the SG will convene a special meeting. Notification of Plan withdrawal to BLM and USFS must occur within 60 days after notification to the SG, unless a longer time period is agreed to by the SG.

The SG agrees that if, upon the deadlines set forth above, the Plan is not withdrawn: (1) protection measures established through negotiations or permitting provide the means for the Windy Gap Firming Project and the Moffat System Improvement Project to be operated in a manner consistent with protection of the ORVs; (2) the Projects will not be subject to the requirements of Part VII (New Projects); (3) the Projects will fall under IV.D.2. of the Plan; and (4) the Plan may not be withdrawn pursuant to the withdrawal provisions of this section III.C.2.c.

3. *WATER QUALITY* (Segments 4 through 7):

The Resource Guides for water quality are the Colorado Department of Public Health and Environment (CDPHE) water quality standards for cold water aquatic life and recreation uses for the portion of the stream segment that CDPHE has designated COUCUC03 (Mainstem of the Colorado River from the outlet of Granby Reservoir to the confluence with the Roaring Fork River) that is within Wild and Scenic Segments 4 through 7.[13]

---

[11] The anticipated permits and approvals for the Windy Gap Firming Project are: a Clean Water Act Section 404 permit from the U.S. Army Corps of Engineers; special use permit or license, and revised amendatory carriage contract, from U.S. Bureau of Reclamation; 401 certification from the Colorado Water Quality Control Division; state fish and wildlife mitigation plan; and, without waiving any party's rights, Grand County 1041 and special use permit amendments, if such are required. The requirements of NEPA, FWCA and ESA would be addressed as part of the above federal permits.

[12] The anticipated permits for the Moffat System Improvement Project are: a Clean Water Act Section 404 permit from the U.S. Army Corps of Engineers; license amendment by FERC; Section (4) conditions and special use permit from the U.S. Forest Service; 401 certification from the Colorado Water Quality Control Division; and Boulder County 1041 permit, if one is required.

[13] 40 C.F.R. 131.20 provides that each State must specify appropriate water uses to be achieved and protected. The classification of the waters must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation. In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States.

BLM_0026189

4.    *TEMPERATURE* (Segments 4 through 7):

The Resource Guides for temperature are the CDPHE stream temperature water quality standards for Daily Maximum (DM) and Maximum Weekly Average Temperature (MWAT) for the portion of the stream segment that CDPHE has designated COUCUC03 (Mainstem of the Colorado River from the outlet of Granby Reservoir to the confluence with the Roaring Fork River) that is within Wild and Scenic Segments 4 through 7.[14]

D.    Refinement of Provisional Resource Guides.

The provisional Resource Guides will be evaluated and may be adjusted as a result of defined data collection, monitoring efforts, and technical review as part of the 3-to-5 year study effort described in the Monitoring Plan in Part V.  It is anticipated that information such as that developed in Phase 3 of the Grand County Stream Management Plan, Colorado Parks and Wildlife (CPW) studies to develop a proposed ISF, and estimations of future water availability by stakeholders, etc. will be used to help finalize these Resource Guides during this period.

At the end of the provisional period: (1) final Resource Guides will be adopted by unanimous consent; or (2) absent unanimous consent, the provisional guides would persist until such time as they are changed/finalized in the future by unanimous consent; or (3) if an Interest Group withdraws, the then existing guides would become permanently fixed for purposes of continuation of the Plan (pursuant to Section VI.K.).

E.    Existing Water Rights.

The SG members recognize that existing water rights, including absolute and decreed conditional water rights in existence as of the date of adoption of the Plan (existing water rights), have been exercised or may be exercised in the Colorado River basin in the future at times when the river flows in Segments 4 through 7 are both inside and outside the flow guide ranges.  The SG members agree that the flow guides herein have been negotiated as one source of information among others for informing SG discussions under the Plan, but the implementation of the Plan shall

---

[14] 40 C.F.R. 131.20 provides that each State must specify appropriate water uses to be achieved and protected.  The classification of the waters must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation.  In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States.

BLM_0026190

not affect the legal operation of water rights pursuant to state law. Nothing in the Plan shall be deemed or construed to create any obligation on any SG member to operate facilities or exercise water rights in any particular manner.  However, nothing herein shall be interpreted to override the provisions of Section VII regarding the opt-in of new projects. Likewise nothing in the Plan shall be deemed or construed to preclude any SG member from participating in any water rights litigation.

F.      Eagle River MOU Project.

The 1997 Eagle River MOU between the Cities of Aurora and Colorado Springs, the Colorado River Water Conservation District, the Vail Consortium consisting of the Eagle River Water and Sanitation District, Upper Eagle Regional Water Authority, and Vail Associates, Inc. ("Vail Consortium"), and Cyprus Climax Metals Co., provides for the development of the Eagle River MOU Joint Use Water Project (ERMOU Project) as a phased joint-use project to provide water supply for East Slope and West Slope water users.  The ERMOU Project has been cooperatively configured to avoid or minimize environmental concerns and will be constructed as an alternative to the federally permitted Homestake II Project.  Successful implementation of the ERMOU Project is important to meet the current and future water needs of both East Slope and West Slope ERMOU parties.

The SG has discussed how to address the ERMOU Project in the SG Plan.  Consistent with the intent of the SG to develop a Plan to balance the permanent protection of the ORVs, certainty for the stakeholders, water project yield, and flexibility for water users, the ERMOU Project is recognized in the SG Plan.

Aurora, Colorado Springs, the Eagle Park Reservoir Company, and the Vail Consortium support the SG Plan as the preferred management plan alternative and will continue to participate in good faith in the SG subject to the following:

1.      The Guiding Principles shall continue to guide the development and implementation of the SG Plan;

2.      The SG supports the neutral deferral of a suitability determination by the BLM and USFS in accordance with the Guiding Principles;

3.      The modeling or other assumptions underlying the Segment 7 Resource guides or other implementing documents for the SG Plan

BLM_0026191

will incorporate the depletions from the ERMOU Project, which will not exceed an annual average of 30,000 acre feet;

4. During the provisional period, the SG will continue to evaluate voluntary "cooperative measures" that could be implemented for Segment 7, and will consider in good faith how such cooperative measures are consistent with the ORV protection goals of the SG Plan; and

5. During the provisional period, the SG will continue to evaluate the effects of completion of the MOU Project within Segment 7, and will consider in good faith whether such effects advance the ORV protection goals of the SG Plan.

## IV.    MEASURES TO ENSURE PROTECTION OF ORVs

This Plan adopts the following tiered system for implementation of management measures for the protection of the ORVs.

Tier 1   Implementation of Long-Term Protection Measures.  These measures, described in Section IV.A. below, are supported by the Stakeholder Group and will be pursued pursuant to identified Milestones in Attachment A to this Plan.

Tier 2   Implementation of additional Cooperative Measures.  These will complement the Tier 1 measures.  These may serve to maintain or enhance the ORVs, assist in achieving provisional or final Resource Guides, and/or address a Material Change in Circumstances.  Section IV.B. of this Plan mandates a specific process to ensure timely and periodic consideration of data pertaining to the ORV Indicators and Resource Guides and to assess the need and available opportunities for implementing additional measures.

Tier 3   SG Elevation Process.  This Plan incorporates an elevation and evaluation process by the Stakeholder Group for purposes of addressing unresolved concerns of SG members material to implementation of the Plan or the status of the ORVs.  That elevation process is summarized in Section IV.C. below.

Tier 4   Termination of Plan.  The Plan provides that the SG may terminate this Plan in accordance with Section VI.J.4. subsequent to

BLM_0026192

completion of the dispute resolution procedures specified in that section.

A.       **Tier 1** Long-Term Protection Measures.

These are measures that are expected to provide significant protection of the ORVs, unless a Material Change in Circumstances occurs.

The Long-Term Protection Measures are summarized below.  The Long-Term Protection Measures will be pursued in accordance with the Milestones in Attachment A.

1.    *Appropriation of CWCB instream flow right*:  The Stakeholder Group has expressed support for a CWCB ISF water right or water rights for base flows in the subject stream segments.  An ISF water right can protect stream flows between two points on a stream from future water rights appropriations in accordance with the State's prior appropriation system.  ISF water rights are held exclusively by the CWCB for minimum stream flows to preserve the natural environment to a reasonable degree, and are adjudicated and administered within the State's water right priority system.

2.    *Delivery of water to a downstream demand*:  Water released from storage or otherwise made available from upstream sources can be delivered to downstream demands.  Such deliveries can be "shepherded" (i.e., protected) through the subject stream segments. A primary example is the release of water from Green Mountain Reservoir pursuant to the 1984 Green Mountain Reservoir Operating Policy for delivery to irrigation demands in the Grand Valley near Grand Junction.

3.    *Existing senior water rights*:  The Shoshone and Cameo groups of senior water rights generally control the administrative call within the Colorado River Basin.  These water rights are located downstream of the subject stream reaches; therefore, an administrative call during dry or average conditions by these water rights can curtail diversions from upstream junior water rights or require the release of water from storage to replace those junior diversions.  This administrative call generally results in stream flow through the subject stream segments in amounts greater than would exist in the absence of the administrative call.

4.    *Upper Colorado River Endangered Species Program*:  This is an existing mechanism by which water is released or bypassed from upstream reservoirs for the benefit of the endangered fish species

BLM_0026193

in the Grand Valley on a temporary basis.  The water deliveries are protected through the subject stream segments downstream through the 15-Mile Reach of the Colorado River.  During peak runoff, bypasses from upstream reservoirs can provide peak flushing flows through the subject stream segments.  During dry periods in late summer or early fall, releases from upstream storage to supplement low flows in the 15-Mile Reach can significantly supplement flows in the subject stream segments.

Material Change in Circumstances:  The Plan includes mechanisms to address a Material Change in Circumstances that could impact the effectiveness of these long-term measures in protecting the ORVs.  These are included as part of the detailed Milestones in Part II of Attachment A to this Plan.

B.     **Tier 2**  Cooperative Measures.

As a complement to the Long-Term Protection Measures, the following voluntary Cooperative Measures strategies will be implemented under the terms of this Plan.

1.     The Stakeholder Group commits to rigorously explore potential Cooperative Measures that would achieve provisional or final ORV Indicators and/or Resource Guides pursuant to the procedures specified in this Section.

2.     Cooperative Measures will take into account the predicted nature of the hydrologic year (i.e., wettest, wet typical, dry typical or driest) as defined below.

It is anticipated that the SG will use forecasts of April through July undepleted (aka natural) flows at Kremmling and Dotsero to guide cooperative efforts for Segments 4-6 and Segment 7, respectively.  The forecasts are provided by the Colorado Basin River Forecast Center (CBRFC) early in the months of January, February, March, April, May and June.  The forecasted year type may be different than the actual year type.  In conjunction with the CBRFC forecasts, the SG will use the following table to predict the year type:

BLM_0026194

For Segments 4, 5, and 6

| Year Type | April – July Kremmling Undepleted Flow |
|-----------|------------------------------------------|
| Wettest 25% Year | More than 1,007,000 AF |
| Wet Typical Year | 812,500 – 1,007,000 AF |
| Dry Typical Year | 607,000 – 812,500 AF |
| Driest 25% Year | Less than 607,000 AF |

For Segment 7

| Year Type | April – July Dotsero Undepleted Flow |
|-----------|----------------------------------------|
| Wettest 25% Year | More than 1,757,500 AF |
| Wet Typical Year | 1,362,500 – 1,757,500 AF |
| Dry Typical Year | 1,007,000 – 1,362,500 AF |
| Driest 25% Year | Less than 1,007,000 AF |

SG discussions shall also be informed by and take into consideration other factors, including external conditions such as those related to any extended drought, fire, climate change, or other conditions outside the control of the Plan.

3.   The Stakeholder Group or a subcommittee appointed by the SG will meet quarterly, or more frequently as determined necessary, to assure a timely and periodic assessment of the need for, focus of, and available opportunities for implementation of these Cooperative Measures.  A record will be kept of the concepts discussed at these meetings.  Progress in implementing Cooperative Measures shall be an agenda item on the meetings of the Stakeholder Group.

4.   It is recognized that the availability of certain Cooperative Measures will be opportunistic in nature, and that certain measures may be implemented without full coordination of the Stakeholder Group.  In that event, they shall be reported on at the next ensuing meeting of the Stakeholder Group or its subcommittee.

5.   Cooperative Measures will respect the priority system and the operations of water right holders, and will take into account impacts of implementation of the Cooperative Measures on other segments of the Colorado River and its tributaries.  It is understood that under the SG Plan, Cooperative Measures that would impair water providers' ability to meet their water supply commitments will not be undertaken, in accordance with the Guiding Principles.

BLM_0026195

6.      It is recognized that it may not be possible to implement Cooperative Measures in every year.

7.      Possible Cooperative Measures may include but are not necessarily limited to:

a.      *Acquisition of water rights for ISF purposes.*

The CWCB could enter into an agreement with a water user under which it would acquire water, water rights or an interest in water to use to preserve or improve the natural environment to a reasonable degree through the reaches of the river subject to this Plan.  The CWCB could explore the potential for securing instream flows for large seasonal or flushing flows under its acquisition authority.  Depending on the conditions of the agreement, such acquisition could result in long-term protection of flows in higher amounts than the new ISF appropriation made under Section IV.A.1.  The SG and the CWCB are continuing to explore options for protection of flows pursuant to such voluntary arrangements.  Because attempting to decree an ISF water right for higher flows could slow down the new ISF water right appropriation process pursuant to Section IV.A.1., the protection of higher flows could be achieved via a water acquisition implemented through a separate water right decree.

b.      *Strategic timing of reservoir releases to meet winter storage elevations.*

Several major reservoirs upstream of the stream segments have winter season storage target levels that require the release of previously stored water in anticipation of spring runoff.  The coordinated timing/scheduling of late summer and early fall reservoir releases to meet annual reservoir target elevations can help to satisfy late season flow demands.  Such measures would take into account needs and effects during other seasons.

BLM_0026196

c.   *Storage and subsequent release of historical consumptive use and return flows.*

The Stakeholder Group will not encourage the dry-up of agricultural land.  However, as development occurs in the area, some agricultural land and associated water rights will be taken out of production.  On an "if and when/excess capacity" basis, the historical consumptive use and, in some cases, the historical return flow of the water rights can be placed into storage in upstream reservoirs for later release for a variety of purposes (both consumptive and non-consumptive).  The timing of such releases may benefit the ORVs.  Potential examples of such arrangements include the Red Top Valley Ditch, the Vail Ditch, and the Moser/Water Trust transaction.

d.   *Use of Windy Gap system.*

Depending on the hydrology, operations, agreements, and other circumstances, the Municipal Subdistrict may be able to allow the use of excess capacity in the Windy Gap system for the diversion and storage of water for the benefit of the ORVs.  For example, favorable circumstances existed in 2008 through 2010 which allowed Grand County to reimburse the Municipal Subdistrict for the pumping costs to pump as much as 5,000 acre feet of Windy Gap water into Granby Reservoir.  Pursuant to contract, the Windy Gap water was then released downstream between August and October for consumptive uses in the Grand Valley, benefitting in-channel resources enroute.

e.   *Spring peak enhancement.*

Spring flushing flows could be enhanced through the coordinated bypass of reservoir inflow during the spring runoff.  Close coordination and cooperation with the State Engineer's Office to protect the annual fill of reservoirs would help to implement this strategy.

BLM_0026197

f.      *Cooperative flow management.*

Voluntary flow management programs provide a water management tool that can be used for maintaining and enhancing flow-related values within a given stream reach, while meeting downstream demands such as those for the endangered fish species, through the collaborative operation of water facilities and other cooperative efforts.

g.      *Water Rights Acquisition.*

The SG could explore opportunities to acquire water rights for the purpose of maintaining and enhancing flow-related values in Segments 4 through 7, provided any acquisition is on a willing seller/willing buyer basis and the SG agrees to not encourage dry-up of agricultural lands.

C.      **Tier 3  Stakeholder Group Elevation Process**.

Any stakeholder may elevate an issue to the Stakeholder Group for purposes of addressing unresolved concerns material to implementation of the Plan or to the status of the ORVs.  Prior to elevation, that concern shall be summarized in writing, together with an explanation of any "competing views" on the issue and the efforts to date to resolve the matter.  Data pertinent to the Stakeholder Group's deliberations shall be summarized or compiled.  Elevation shall be triggered by submitting a written request, accompanied by the above materials, for the Stakeholder Group to convene a meeting (or add an agenda item to a previously set meeting). The Stakeholder Group shall address such issue in accordance with its Governance protocols in Part VI.

D.      **Tier 4  Plan Termination**.

1.      The SG may terminate this Plan pursuant to Section VI.J. following completion of the non-binding dispute resolution procedures specified in that section.  Formal notification of such termination will be provided to BLM and USFS which details the issues, relevant data, and steps undertaken in efforts to address the concerns which led to termination of the Plan.

BLM_0026198

2.     It is the intent of this Plan that termination of the Plan or any
modification of the Plan by BLM and/or USFS would not by itself
constitute grounds for reopening of federal authorizations or
funding for new projects predating BLM and USFS approval of this
Plan, or for reopening of federal authorizations or funding for other
projects that include and are in compliance with terms, conditions
or mitigation measures protective of the ORVs independent from
the operation of the Plan.

# V.     MONITORING PLAN

A.     <u>Monitoring Plan</u>.

The purpose of this Monitoring Plan is to establish a protocol to monitor
ORV Indicators and Resource Guides to assist in implementation of the
SG Plan.  The Provisional Period Monitoring Plan is provided in
Attachment D.  Data and information generated from this Provisional
Period Monitoring Plan will be used in the following manner:

1.     *Provisional Period Monitoring Plan*:  During the 3-to-5 year
provisional period, participants will collect and analyze data
specified in the Monitoring Plan to monitor, evaluate, and revise if
necessary the provisional ORV Indicators and Resource Guides to
assist in implementation of the SG Plan.  Data gathered during the
provisional period will also help characterize existing conditions for
many parameters.

2.     *Long-Term Monitoring Plan*: The SG will use the results from the
Provisional Period Monitoring Plan to develop final ORV Indicators
and Resource Guides.  The Provisional Period Monitoring Plan will
be revised, if necessary, to prescribe monitoring measures for the
ORV Indicators and Resource Guides under the Long-Term
Monitoring Plan to assist in implementation of the Plan.

3.     *Reporting*: The Stakeholder Group will gather the data prescribed in
the Monitoring Plan and prepare an annual Monitoring Report for
the Stakeholder Group (including the BLM and the USFS).

4.     *Funding*: Funding needed for the Monitoring Plan, including data
gathering and analysis, will be provided through the Stakeholder
Group's funding mechanisms provided in Part VIII.

BLM_0026199

B.    <u>Provisional Monitoring Parameters</u>.

| ORV INDICATORS | ORV RESOURCE GUIDES |
|---|---|
| **Recreational Fishing**: | **Recreational Fishing**: |
| - Quality Trout | -  Flow guides |
| - Biomass | - Flushing Flow |
| - Species Diversity | |
| - Total Fishing Effort | |
| - Catch/Unit Effort | **Recreational Floatboating**: |
| | - Usable Days |
| **Recreational Floatboating**: | |
| - Narrative during provisional period | **Water Quality:** |
| | - CDPHE existing water quality standards for cold water aquatic life and recreation uses |
| | **Temperature:** |
| | - CDPHE existing water quality standards for temperature |

# VI.    GOVERNANCE

During the provisional period, the stakeholders will develop either (a) a comprehensive Memorandum of Understanding among the participating stakeholders (or other form of agreement); (b) a formal legal entity (e.g., corporation, joint venture, partnership, etc.); or (c) both, that will govern the overall administration of the Plan.

A.    <u>Governance Committee</u>.  The SG will conduct its business and make decisions through the SG Governance Committee (GC).

B.    <u>Non-Delegable Responsibilities</u>.  It is recognized that the signatories to this Plan may have statutory or other organizationally established responsibilities that cannot be delegated.  This cooperative Plan is not intended to abrogate any signatory's non-delegable responsibilities.

C.    <u>Purposes of the GC</u>.  The purposes of the GC include, but are not necessarily limited to, the following:

1.    Implement the Plan.
2.    Make management decisions under the Plan.
3.    Conduct annual reporting to the BLM and USFS.
4.    Finalize ORV Indicators and Resource Guides.
5.    Make financial decisions.
6.    Establish rules and bylaws.
7.    Hold meetings open to the public.

BLM_0026200

8. Seek funding.
9. Coordinate with other entities gathering data, studies, information, or conducting cooperative efforts.
10. Elect officers.
11. Establish committees.
12. Approve budgets and expenses.
13. Conduct monitoring and research efforts.
14. Review ORV Indicators and Resource Guides.
15. Evaluate protection of ORVs in accordance with the Plan.
16. Coordinate with water users to recommend and learn about cooperative efforts to include in annual report.
17. Recommend and fund efforts to protect and enhance ORVs.
18. Evaluate whether Material Changes in Circumstances exist as defined under the Plan and recommend strategies to address Material Changes in Circumstances.
19. Discuss new projects and new members.
20. Amend the Plan, as necessary, pursuant to procedures under the Plan.
21. Pursue agreements with state and federal entities to further goals of the Plan.

D. <u>Representation</u>.  The GC should reflect a fair representation of different interests and expertise.

1. Voting Committee Members.  There shall be a total of six Interest Groups consisting of three GC members from each Interest Group. The Interest Groups[15] shall consist of the following:

   a. West Slope Water Conservancy/Conservation Districts and Landowners/Water Users.
   b. Local Government.
   c. Trans-Mountain Diverters.
   d. Conservation/Environmental/Fishing.
   e. Recreational Floatboating.
   f. State Interests (e.g., CWCB, CPW, and State or Division Engineer).

2. Ex Officio members.  The SG requests that BLM and USFS personnel serve as *ex officio* non-voting members of the GC.

3. Charter/Protocol.  Each Interest Group will establish a "charter/protocol" that sets forth the process and procedure for

---

[15] It is anticipated that the Eagle River entities (Vail Associates, Inc., Upper Eagle Regional Water Authority, Eagle River Water and Sanitation District, and Eagle Park Reservoir Company) will be included within Interest Group category 1.a or 1.b above.

BLM_0026201

inclusion in the Interest Group and for the selection of its representatives.  The protocols for Interest Groups 1.d and 1.e above shall include a procedure for designating the representative to the Review Committee for those two Interest Groups pursuant to Section VI.J.4.b.

4.  Alternates.  For each primary representative chosen, an alternate will also be designated to cover the contingency that the primary representative may not be available.   In the absence of the primary representative, the alternate will have full GC Voting Committee member status.

5.  Terms.  For initial appointments, each Interest Group will appoint one GC member to a one-year term, the second to a two-year term, and the third to a three-year term.  Subsequent terms for each appointment will be for full three-year terms.

6.  Replacement.  A GC member or alternate may be replaced by the respective Interest Group in accordance with its charter/protocol.

7.  Indemnity – TBD prior to effective date of Plan.

8.  Officers.  The GC will appoint a Chair and Vice-Chair, who shall serve in the Chair's absence, for the purpose of organizing and supervising meetings.  The GC shall appoint a Secretary, who need not be a member of the GC, to prepare minutes and to maintain the official records for the GC.  Officers shall serve one-year terms.  Officers that are members of the GC shall have full voting rights.

E.  Meetings of the GC.

1.  *Annual Meeting*.  The GC shall have an annual meeting that shall occur in March each year, or as otherwise determined by the GC.  The agenda for the annual meeting shall include election of officers, a review of the bylaws, and reports on the status of the SG's annual activities and finances.  Written notice of the annual meeting stating the place, day and time of the meeting, along with the meeting agenda, shall be delivered to GC members not less than 14 nor more than 60 days before the date of the annual meeting.

2.  *Regular Meetings*.  Regular meetings of the GC shall occur at least quarterly, unless otherwise determined by the members.  The day, time, and location of the next regular meeting shall be scheduled before the end of the current regular meeting, whenever possible.  Written notice of the next regular meeting stating the place, day,

BLM_0026202

and time of the meeting, along with the meeting agenda, shall be delivered to GC members not less than 14 nor more than 30 days before the date of any meeting.

3.   *Special Meetings.*  Special meetings shall be called as soon as practicable by the Chair upon the request of five or more GC members; provided, however, that if the purpose for calling the special meeting is to determine whether impairment or a significant risk of impairment exists to the ORVs then (a) the special meeting may be called upon the request of any one GC member, and (b) shall be held no later than 15 days from the initial GC member request.  The special meeting request will provide a suggested date, time, and place of meeting, along with a proposed agenda of items to be discussed.  Members shall be notified at least four days prior to a special meeting.

4.   *Meeting Notice.*

   a.   Written notice stating the place, day and time of the meeting along with the meeting agenda shall be delivered either personally, by mail, or by e-mail, at the direction of the Chair, to each GC member (and alternates).  Written notice shall be delivered personally or by e-mail for any special meetings that are called.

   b.   Notice must be delivered on or before established deadlines contained herein for annual, regular, or special meetings.  If mailed, such notice shall be deemed to be delivered as to any GC member (or alternate) after being deposited in the United States mail, addressed to the GC member at its address as it appears on in the records for the GC, with postage thereon prepaid.  If e-mailed, such notice shall be deemed delivered as to any GC member (or alternate) on the day of such e-mail transmission.  Such electronic transmission may be corroborated by a printout showing the electronic address from which transmitted, the electronic address to which transmitted, the date, and the time of such transmission.

5.   *Open Meetings and Public Participation.*

   a.   All annual, regular, and special meetings of the GC shall be open to the public.  The GC shall maintain an agenda item during each regular or special meeting devoted to written and oral public comment.

BLM_0026203

b. Reasonable public notice of the time and place designated for all annual, regular, and special meetings shall be posted in public locations approved by the GC.  At a minimum, public notice for regular and special meetings will be posted at approved locations in Grand, Summit, Eagle, and Garfield Counties and via an e-mail distribution list to interested stakeholders.  The GC may also provide public notice for meetings using an approved internet website and/or postings in widely distributed newspapers (e.g., Denver Post, Summit Daily News, etc.).  Such notices shall remain posted through the date of the meeting, and shall be changed in the event that the time or place of such regular meetings is changed.

6. *Meeting Location.*

a. Regular and special meetings shall be held at a time and in a place to be designated by the GC.  Meetings will generally be held in Grand, Summit, Eagle, or Garfield Counties. Meeting rooms shall have reasonable teleconferencing capability to meet the participation needs of any GC member.

b. The GC may approve meetings to be held in other locations, as circumstances warrant, provided that adequate notice is provided to GC members and the public.

7. *Meeting Agenda.*

a. Agenda Formulation.  Agenda items for annual or regular meetings should be submitted to the Chair within a reasonable time prior to the next scheduled meeting.

b. Amendment of Agenda.  The agenda for any meeting may be amended the day of the meeting by the GC through the voting procedures set forth below.

8. *Telephonic/Electronic Participation.*  GC members may participate in and hold a meeting by means of conference telephone, video teleconference, webinar, or similar communications equipment. Participation in such a meeting by the methods described above shall constitute attendance and presence in person at such meeting.

BLM_0026204

F.    Quorum Required.

    1.    All business of the SG shall be conducted at meetings of the GC at which a quorum is present.

    2.    A quorum consists of at least 12 of the 18 GC members reflecting at least 5 of the 6 Interest Groups.

    3.    No proxies are allowed.

    4.    If a quorum is not present at any meeting, the GC members shall continue the meeting to a date and time certain not later than 15 days from the original meeting.

G.    SG Decisions Made by Consensus.

    1.    The preference and goal of the SG is that the GC make consensus decisions based on give and take among members, with each participant:

        a.    listening carefully to the views of others;
        b.    attempting to verbalize the needs of an Interest Group with which they might disagree; and
        c.    proposing solutions and decisions that accommodate all or most of the Interest Groups.

H.    Voting.

    1.    The unanimous consent of all Interest Groups present at a meeting is required for the approval of any measure considered by the GC, except as provided in Paragraph VI.J.4., below.  Unanimous consent is the general rule and will be required for, among other things, any amendment to the Plan and any changes to the ORV Indicators and Resource Guides.

    2.    Each Interest Group receives one vote on each measure.

    3.    Within the respective Interest Groups, the affirmative vote of those representatives attending the meeting, as set forth in the Table below, is required to approve/disapprove any measure.

BLM_0026205

| VOTING WITHIN INTEREST GROUPS | |
|---|---|
| Number of Interest Group GC Members Present at Meeting | Affirmative Votes required to pass Measure within Interest Group |
| 3 | 2 of 3 |
| 2 | 2 of 2 |
| 1 | 1 |

4.  No GC vote can commit the rights, authorities, resources, finances, or operations of any SG member without that member's approval.

5.  Votes of the GC shall be recorded by the Secretary in the minutes of the SG, regardless of whether the measure is approved. Dissenting votes within individual Interest Groups shall be noted in the minutes.

I.  <u>Failure to Reach Consensus</u>.

1.  Any Interest Group may request that a dissenting Interest Group provide a written summary regarding the disputed issue within 10 days.  The written summary shall set forth the issue, explain the competing views, and identify options that may be available to resolve the disagreement.

2.  At the request of any Interest Group following provision of a written summary, the GC shall revisit the issue and the specific proposal at the next GC meeting.

3.  After the actions in paragraphs VI.I.1. and VI.I.2. are undertaken, and upon the request of any Interest Group, the GC may by unanimous vote determine that the unresolved concern should be addressed in accordance with the provisions of paragraph VI.J.4. below.  In evaluating the matter, the GC shall seek and take into consideration the views of the appropriate federal agency(ies) (BLM and/or USFS) through their participation as non-voting members of the SG.   The SG deliberations shall also be informed by and take into consideration other relevant factors, including external conditions such as those related to any extended drought, fire, climate change, or other conditions outside the control of the Plan.

4.  A written summary on measures that fail to achieve consensus after the actions in paragraphs VI.I.1. and VI.I.2. are undertaken shall be included in the SG's annual report to BLM and USFS.  The written summary may include majority and minority reports.

BLM_0026206

J.   **GC Consideration of Long-Term Protection Measures, ORV Impairment, Significant Risk of Impairment, and Matters Referred by Consensus.**

1.   Failure to meet a Milestone.

If final decrees for CWCB instream flow applications in Cases No. 11CW159, 11CW160, and 11CW161 are not entered by the date anticipated in Attachment A, and assuming the Plan is effective, the GC will discuss the cause of the delay[16]. The GC will determine whether the delay causes any material adverse impact to the purpose of the Long-Term Protection Measures. If, by unanimous consent, the GC determines that a material adverse impact is found, the GC will determine the appropriate management activities to reasonably mitigate the material adverse impact. If the GC is unable to reach consensus on how to mitigate the material adverse impact, the GC will follow the Governance procedures in Paragraph VI.J.4(4) below.

2.   Material Change in Circumstance.

Any member of the GC may assert a Material Change in Circumstance, as defined in the Definitions Section, in the implementation of one of the Long-Term Protection Measures by submitting a written request for the GC to convene a meeting (or add an agenda item to a previously set meeting) pursuant to the procedures in Section IV.C. of the Plan. The GC will determine whether a Material Change in Circumstances exists. If the GC determines by unanimous consent that a Material Change in Circumstance exists, it will then decide how to address the material change. If the GC is unable to reach consensus on how to address the material change, the GC will follow the procedures in Paragraph VI.J.4(4) below.

3.   Significant Risk of Impairment.

If, during any meeting called in part for the purpose of determining whether a significant risk of impairment exists (as contemplated in the Definitions Section and Section IV.C. of the Plan), the GC cannot reach unanimous consensus on a determination of that matter, the GC shall immediately follow the procedures set forth in paragraph VI.J.4, below.

---

[16] The Task List in Attachment B describes the stakeholder response in the event of failure to meet this Milestone prior to the effective date of the Plan.

BLM_0026207

4.      Procedures for Mediation.

The following actions shall be taken by the GC upon (1) the vote of at least five Interest Groups that there is a significant risk of impairment to an ORV; (2 ) the data affirmatively demonstrating that an ORV has been impaired by virtue of an ORV Indicator not being met pursuant to the criteria established in the SG Plan, absent a vote of at least five Interest Groups that further action is not warranted at that time; (3) a unanimous consensus decision of the GC made following the procedures contemplated by paragraph VI.I.3, above; or (4) the failure of the GC to reach consensus on how to address a missed Milestone or a Material Change in Circumstance:

a.      Absent a unanimous vote to skip mediation, the issue will be referred to a mediator to facilitate consideration of non-binding options toward resolution for a period of 45 days to further efforts to reach consensus on the disputed issue.

b.      Within 30 days of the termination of the mediation process (or a unanimous vote to skip the mediation process), the disputed issue will be referred to a Review Committee.  The Review Committee will consist of:  a member of the Board of Directors of the Colorado River Water Conservation District, a member of the Board of Directors of either NCWCD or DWB, the Director of the Colorado Department of Natural Resources, and a member of the Board of Directors of a conservation or recreation Interest Group member.  The Review Committee shall meet to consider the disputed issue and shall provide non-binding guidance to the GC within 15 days of the date of referral.

c.      Subsequent to the Review Committee's guidance to the GC, and upon the request of any Interest Group, the GC may terminate the SG's Plan upon the affirmative vote of at least five Interest Groups.  Any such GC vote regarding termination of the SG Plan shall occur no later than 90 days following the meeting referred to in paragraph VI.J.4.b., above. Should the Plan not terminate, the underlying causes for the vote shall be made an agenda item for the next regular or special called meeting, at which time appropriate follow-up actions shall be determined.

BLM_0026208

       d.     The GC may agree to shorten or lengthen the timeframes provided above by consensus, upon the good faith request of any GC member.  An example of a good faith request may be to allow additional time for the internal study or technical/scientific review of an alleged significant risk or to shorten the applicable timeframes when reasonable evidence exists of an existing or imminent substantial risk to an ORV.

K.  <u>Withdrawal from the Plan</u>.

Each stakeholder reserves its right to withdraw from participation in the Plan at any time.

1.  <u>Withdrawal Procedure</u>:  Before withdrawing from the Plan, a stakeholder or Interest Group shall provide written notice to the Governance Committee, at which time the Committee shall call a special meeting for the purposes of discussing the reasons for withdrawal and potential alternatives.

2.  <u>Effect</u>:

    a.     Withdrawal from the Plan by one Interest Group or individual stakeholder(s) does not terminate the Plan.  However, subsequent to any withdrawal, the remaining SG may choose to take action to terminate the Plan.

    b.     Withdrawal of an Interest Group from the Plan will result in the automatic adoption of the ORV Indicators and Resource Guides in effect at the time of the Interest Group's withdrawal as permanent for purposes of the Plan, unless otherwise agreed to by the withdrawing Interest Group.

    c.     Following the withdrawal of one Interest Group, Section VI.F.2. of the Plan shall automatically be revised to read as follows:  "A quorum consists of at least 10 of the 15 GC members, reflecting all 5 of the Interest Groups."  The voting requirements under the Plan shall stay the same.

    d.     Withdrawal of more than one Interest Group will terminate the Plan.

BLM_0026209

L.     Reimbursement of Funds.

In the event of withdrawal by a single Interest Group or individual stakeholder (the Withdrawer), the Withdrawer shall not be entitled to a refund of any annual dues that support the Plan activities and shall make any contributions required to be paid to the Plan for costs which have been obligated prior to the effective date of the withdrawal.  The Withdrawer will be reimbursed for monies then remaining out of the original monies contributed to an Endowment Fund (except as otherwise provided by the terms of any contract or permit), but with no consideration for accrued interest associated with such contribution to the Endowment Fund.  The remaining Interest Groups shall amend the Plan as necessary to reflect changes in the cost and revenue allocations.

In the event the Plan is terminated in accordance with Sections K.2.a. and K.2.d., any unexpended and uncommitted funds shall be distributed proportionately to those Interest Groups remaining in the Plan at the time of termination based on each party's percentage share of the original contribution.

## VII.   NEW PROJECTS

A.     This section applies to new projects or facilities that require federal authorization, funding, or assistance (regardless of whether any water rights to be exercised by the new project pre-date the Plan), including changes to existing projects undergoing federal permitting or requesting federal funding or other federal assistance.

B.     Proponents of new projects may choose to include ("opt-in") the project in the Plan as provided below.

To opt-in a new project, the proponent shall:

1.     Inform the SG of the proposed project and provide pertinent information in a timely manner sufficient to allow the SG to provide written comments on the proposed project within any applicable public comment period.  The SG will review the proposed project and will consider the impact of the proposed project on the ORVs in Segments 4 through 7 with consideration of the provisions of VII.B.2. and VII.B.3., below.  The SG will provide timely SG comments and recommendations thereon to the permitting agencies upon unanimous consent of the SG.   Individual

BLM_0026210

stakeholders may submit separate comments on an opt-in project's impacts to ORVs in Segments 4 through 7 provided they have first attempted to develop consensus comments and recommendations inclusive of their views as a member of the SG.  However, this requirement shall not apply to the State.

2.      Formally endorse the Plan and commit to participate in the Cooperative Measures procedures in Section IV.B. and the Funding provisions in Part VIII; and

3.      Formally commit to meet either subparagraph a. or b. below:

   a.      Demonstrate that project operations will not unreasonably diminish the ORVs; or

   b.      Demonstrate that project operations will be subject to mitigation to avoid unreasonably diminishing the ORVs.

Satisfaction of the criteria set forth in paragraph VII.B.3., above, shall be determined by the permitting or authorizing agency(ies) through the agencies' standard approval procedures.  The Resource Guides are not intended to be used by agencies or entities as the criterion for evaluating a project's effects on the ORVs, regardless of whether the project has or has not opted-in to the Plan.  If a SG member uses or promotes the guides for evaluating project effects or as permitting criterion during current or future project permitting, any Interest Group may terminate the Plan following consultation with the full SG.  This requirement does not preclude individual stakeholders from submitting comments regarding compliance with State regulatory standards applicable to aspects of a project separate from the ORVs.  Moreover, nothing herein shall be interpreted to preclude or limit the use of any data regardless of whether such data has been used in the negotiation of the Resource Guides.

The SG intends that permitting agencies will conduct their own independent assessment of a project's impacts to the ORVs, if any. Membership as a stakeholder is not intended to be used as criterion for determining whether a project proponent has addressed potential ORV impacts, if any, of a proposed project; nor shall it be used as a component of any demonstration that project operations will not unreasonably diminish the ORVs (except as may otherwise be agreed between the project proponent and the SG).

BLM_0026211

After permit issuance, the SG will not oppose or administratively or judicially challenge an opted-in new project on the basis of project impacts to ORVs in Segments 4 through 7, and any individual stakeholder seeking to do so shall be required to withdraw from participation in the SG Plan prior to taking such action. An opt-in project proponent seeking to challenge a permit decision or permit conditions related to project impacts to ORVs in Segments 4 through 7 shall likewise be required to withdraw from participation in the SG Plan prior to taking such action. Subsequent participation in the SG Plan by the withdrawing stakeholder shall require unanimous approval of the SG. It is the SG's intent that withdrawal of a stakeholder from the Plan pursuant to this paragraph shall not trigger reconsideration of any prior agency determinations with regard to that stakeholder's own project effects on ORVs unless participation in the Plan is a condition of that project's permit. The exercise of State or local government statutorily mandated review or approval authorities with respect to a proposed opt-in project shall not constitute an opposition or challenge warranting that entity's withdrawal from participation in the SG Plan pursuant to this paragraph. Nothing in the Plan shall be deemed or construed to preclude any SG member from participating in any water rights litigation.

C.     Additional Incentives for Opt-in

The SG will consider further incentives for a project proponent to opt-in to the Plan on a case-by-case basis.

# VIII.  FUNDING

A.     Endowment Fund.

1.     *Creation of an Endowment Fund.* Within three years after the effective date of the Plan, the SG will seek to create an endowment fund of at least $1.5 million, which will also be called the corpus. It is the goal of the SG that each member shall make a financial contribution to the endowment fund, in an amount that takes into consideration each member's financial ability to contribute. Awards or grants from governmental and private entities can be accepted as part of a member's contribution to the endowment fund. The endowment fund shall be created and expended consistent with the requirements to qualify and maintain status as a 501(c)(3) entity. The SG's intent is to preserve the corpus to be used for protecting and enhancing ORVs, rather than for administrative and routine

BLM_0026212

operation costs, which will be funded by other mechanisms described below.

2. *Trustee Appointment*.   Within three years after the effective date of the Plan, the GC will appoint a trustee for the endowment fund. The trustee shall have all the necessary powers within the law to invest, maintain and manage the endowment fund.  These powers shall include accepting donations, applying for grants, bequests, loans, or undertaking other financial transactions to maintain or enhance the endowment fund.  Powers also include contracting with banks or other depositories for the funds and lawfully depositing and withdrawing money from the fund.  In addition, the trustee shall be responsible for ensuring that all distributions are in accordance with the restrictions placed on endowment contributions.

   a. The GC shall adopt a Statement of Investment Policy and Objectives (Statement) in order to establish a clear understanding on the part of the GC and the trustee of the investment objectives and guidelines for the endowment fund.  The Statement will also provide the GC a basis for evaluation of the trustee's performance.

   b. The Statement might provide that the primary investment goal is the preservation of the principal after taking into account inflation.  A secondary objective could be to earn the highest possible rate of return consistent with prudent standards for preservation of capital.

3. *Endowment Fund Spending*.  The GC may allocate funds to projects or other associated efforts which, in its view, will further the preservation, protection, or enhancement of the ORVs.  If a primary goal of the investment is to preserve the principal, the GC may decide to have a goal to limit the spending, to the extent it can, to just the interest earned.  The GC may instruct the trustee to contract with any receiving entity for the completion of projects or other associated efforts, including requirements for escrows, inspection, bonding, collateral, or other guarantees of project or associated effort completion.  Such efforts may require the Trust to hire staff, purchase or rent facilities, equipment, or other property, and contract for goods and services necessary to further its purposes.

BLM_0026213

*Purpose of Endowment Fund*.  The purpose of the endowment fund is to provide supplemental resources to protect and enhance the ORVs in the Colorado River between Kremmling and the confluence of No Name Creek also known as BLM Segments 4 through 7.  Funding is limited to the ORVs identified in those respective segments described in Part II of this Plan.

4.  *Specific Limitations on Use of Endowment Funds*.  In addition to the general restrictions on the use of funds described below, the following specific limitations will apply to the use of the endowment funds.

   a.  *Protection of Corpus*.  The GC shall at all times endeavor to maintain the corpus of the endowment.  However, it is recognized that opportunities may arise where the benefits of using some portion of the corpus significantly outweigh its diminishment.  Specifically, where the opportunity exists to match in-kind or financial contributions on a one-to-one or greater basis for a project or program meeting the allocation guidelines, the GC shall be empowered to authorize expenditure of no more than 15% of the corpus during any fiscal year.  Such expenditure shall require the unanimous consent of all Interest Groups.  Any funds expended under this provision shall be credited towards the endowment contribution requirements.

   b.  *Administrative Costs*.  No more than 15% of expenditures within any calendar year shall be used for administrative costs.  This limitation does not apply to non-discretionary expenses such as responding to IRS audits or litigation, financing, repairs or reimbursements caused by accident, unanticipated damage and acts of God.

   c.  *Not for Operations and Maintenance*.  The GC shall generally restrict its expenditures to projects and associated efforts that further the protection and enhancement of the ORVs within BLM Segments 4 through 7.  Generally, expenditures should not be made for ongoing operations and maintenance of such projects.

B.  <u>Funding Assessment</u>.  In addition to other funding sources, the Plan will establish and rely on memberships to help fund administrative and operating costs and associated efforts under the Plan.  The GC shall maintain a list, updated at least annually, of such members.  The GC shall issue to every participating member of the Plan a letter of membership that will evidence that member's participation in the Plan.  Membership

BLM_0026214

participation shall be open to any person, natural or corporate, upon contribution to the endowment fund and payment of appropriate assessments so long as the participant "opts in" in accordance with Part VII of this Plan.

1.  *Classes of Membership.*  Members of the Plan will be issued a letter of membership based on the member's classification as determined by the GC.  Each member shall be included in only one of the following classes, which conform to the Interest Groups and have equal voting rights:

    a.  West Slope Water Conservancy/Conservation Districts and Landowners/Water Users.
    b.  Local Government.
    c.  Trans-Mountain Diverters.
    d.  Conservation/Environmental/Fishing.
    e.  Recreational Floatboating.
    f.  State Interests (e.g., CWCB, CPW, and State or Division Engineer).

2.  *Assessments.*  Annual assessments will be levied to each Interest Group in amounts sufficient in total to meet the administrative and operating costs and any debt service requirements as identified by the GC. The first year after the effective date of the Plan, the SG anticipates an assessment of $10,000 levied to each Interest Group.  Assessments are expected to vary in accordance with actual costs, and will be established by the GC on an annual basis.[17]

    Nonpayment of annual assessments shall be cause (with ameliorating circumstances being taken into account) for an Interest Group to lose its voting privileges during the period of non-payment.

3.  *In-kind contributions.* In-kind contributions from stakeholders may be accepted as part of a member's contribution to the annual assessment.

4.  *Unspent funds.*  At the end of each fiscal year, unspent operating funds in excess of $50,000 may be re-allocated to the Endowment Fund, as determined by the GC.

---

[17] Assessments to governmental entities would be subject to annual appropriation.

BLM_0026215

C.   <u>Funding from Grants</u>.  The SG will actively seek grants from federal, state, local and private entities to fund projects and efforts that enhance and protect the ORVs.  The use of funds from these grants will comply with underlying specifications and requirements of those grants.

D.   <u>Leverage of Funding with BLM</u>.  In addition to the funding described above in Sections VIII.A.-C., the SG will cooperate and coordinate with the BLM to leverage funds through the BLM's Challenge Cost Share program, the BLM's Recreation Resource Management program, and other similar types of BLM programs to be used on specific projects that protect and enhance the ORVs.

E.   <u>State of Colorado Wild and Scenic Rivers Fund</u>.  In addition to the funding described above in Sections VIII.A.-D., the SG will request funds from the Wild and Scenic Rivers Fund created as part of Senate Bill 09-125, codified in C.R.S. § 37-60-122.3.  The request for funds will be made in accordance with the underlying legislation and the criteria/guidelines for these funds called the *Terms and Conditions Developed by the Colorado Water Conservation Board for the Allocation of Funds from the Wild and Scenic Alternatives Fund*, approved at the CWCB meeting January 26-27, 2010.

F.   <u>General Limitations on Use of Funds</u>.

1.   *GC Control*.  The GC shall control all use of the funds, and all restrictions herein apply to the GC.

2.   *Effect on ORVs*.  Grants, loans or other disbursements shall be made only for protection, preservation, or enhancement of the ORVs within BLM Segments 4 through 7.

3.   *No Political Spending*.  No funds shall be used for any political purpose, including but not limited to contribution to political parties or causes, contributions to or promotion of candidates for public office, publication or contribution to flyers, brochures or other printed materials supporting issues or candidates, lobbying, or contributing to materials to be used for lobbying.

4.   *No Opposition to Water Development*.  No funds shall be used to directly challenge or oppose water development or water operations.

BLM_0026216

5.     *Consideration of All ORVs.*  When considering funding a project, the GC shall weigh the harms and benefits to all ORVs.  Funds shall not be used for a project that would unduly harm one ORV to benefit another.

6.     *Public Meetings.*  The GC shall grant funding only in meetings open to the public.  Notice of public meetings will be provided in accordance with Section VI.E. of this Plan.

7.     *Public Benefit.*  The GC shall grant funding only for projects and associated efforts that are accessible to and/or benefit the public. No funds shall create improvements on private property that would significantly enhance the value of the property unless the property is leased to a public entity and the improvement serves the public purpose of that entity.

G.     <u>Distribution of Assets Upon Dissolution</u>.  Upon dissolution or final liquidation of the SG or any successor entity created by the SG, all of its assets remaining after payment or provision for all its liabilities shall be paid over or transferred to a corporation or governmental entity established to fulfill the same purposes (in whole or in part) for which [the SG entity] was established.  If no such entity is created for that purpose, the assets may be distributed or conveyed to one or more governmental units within the meaning of Section 170 (b)(1)(A)(v) of the Internal Revenue Code or to Colorado Parks and Wildlife for the benefit of wildlife habitat within or without the State of Colorado, or if such a transfer is not possible or practical, the assets may be distributed to and among one or more exempt organizations described in Section 501(c)(3) of the Internal Revenue Code for exclusively public purposes.  The organizations or governmental units to receive such property, and their respective shares and interests, shall be determined by the GC.  Any such assets not disposed of shall be disposed of by the appropriate court of the county in which the principal office of the SG or any successor entity created by the SG is then located exclusively for such purposes or to such organization or organizations as said court shall determine are organized and operated exclusively for exempt purposes.

BLM_0026217

## IX.   AGENCY COORDINATION

A.   <u>Coordination with BLM and the USFS</u>.

1.   Coordination between BLM, USFS, and the SG is important to the successful implementation of the SG Plan.  The SG proposes that BLM and the USFS become non-voting members of the SG's Governance Committee and fully participate in the Committee's activities.

2.   The Governance  Committee will provide an annual report to BLM and USFS summarizing efforts and activities related to implementation of the Plan including, but not limited to, status and results of monitoring efforts, status of ORV Indicators, Cooperative Measures, funding, and other pertinent information.

3.   The Governance Committee recommends that the BLM and USFS provide notification to the GC of any federal activity that may affect Segments 4 through 7 of the Colorado River.

4.   The Governance Committee will notify BLM and the USFS within 30 days if monitoring indicates that an ORV Indicator has not been met.

B.   <u>Interagency Coordination</u>.

1.   Coordination with and the cooperation of other federal agencies whose decisions may affect the ORVs is important.  The SG proposes the development of an MOU between BLM and the USFS and other federal agencies, including but not limited to the U.S. Army Corps of Engineers, the Bureau of Reclamation, the U.S. Fish and Wildlife Service, and the Federal Energy Regulatory Commission, which describes how their actions will relate to the SG Plan.

2.   Elements of the MOU should include, but not be limited to, acknowledgment of the SG Plan as the management alternative adopted by BLM and the USFS for Segments 4 through 7 of the Colorado River; data sharing; notification of federal agency activity that may affect these segments; recognition that the Resource Guides are to be used solely for purposes internal to operation of the Plan; and appropriate coordination and consultation procedures.

BLM_0026218

# LIST OF ATTACHMENTS

Attachment A:      Milestones for Implementation of Tier 1 Long-Term Protection Measures and Mechanisms for addressing Changed Circumstances

Attachment B:      Time Line and Task List

Attachment C:      Existing Flow Conditions

Attachment D:      Provisional Period Monitoring Plan

BLM_0026219

# Attachment A

## Milestones for Implementation of Tier 1 Long-Term Protection Measures, and Mechanisms for Addressing Changed Circumstances in Long-Term Protection Measures

I.      <u>Milestones for Implementation of Tier 1 Long-Term Protection Measures</u>.

   A.      *Measure 1*:  Appropriation of a CWCB Instream Flow(s).  Refer to section IV.A.1. of the Plan.

      1.      The SG will make a written recommendation for appropriation of instream flow(s) (ISF) to the CWCB on or prior to April 15, 2011. The SG's recommendation will include results of the most recent data collection available[18].

      2.      CWCB will declare its intent to appropriate ISF(s) prior to May 31, 2011, which initiates the notice and comment procedure under Rule 5 of the Rules Concerning the Colorado Instream Flow and Natural Lake Level Program.  The SG will participate in the process to support an ISF appropriation(s) that is(are) consistent with the SG's recommendation to the CWCB[19].

      3.      CWCB will file a water court application to adjudicate an instream flow(s), on or prior to December 31, 2011.  This date will set the administrative priority of the instream flow with respect to junior water rights[20].

      4.      Entry of final decrees for CWCB's instream flow applications should occur prior to December 31, 2015.  Individual participants in the SG will consider participating in the CWCB ISF adjudication process in support of the CWCB's instream flow applications.

   B.      *Measure 2*: Delivery of water to downstream demands.  Refer to section IV.A.2. of the Plan.

      1.      This is an existing feature of Colorado's stream administration and

---

[18] The SG made a written recommendation for appropriation of instream flows to the CWCB on June 30, 2011, which recommendation included results of the most recent data collection available.

[19] CWCB declared its intent to appropriate ISFs on July 12, 2011, which initiated the notice and comment procedure under Rule 5 of the Rules Concerning the Colorado Instream Flow and Natural Lake Level Program.

[20] CWCB filed water court applications in Cases No. 11CW159, 11CW160, and 11CW161 ("CWCB's instream flow applications") to adjudicate instream flows, on November 30, 2011.

BLM_0026220

operations on the Colorado River that delivers previously stored water through the subject stream segments to downstream demands.  No milestones are necessary to implement this existing Long-Term Protection Measure.

C.      *Measure 3*: Existing water rights administration.  Refer to section IV.A.3. of the Plan.

1.      This is an existing feature of Colorado's stream administration and operations on the Colorado River that operates to curtail diversions (or require the replacement of such diversions) from upstream junior water users to provide water through the subject stream segments for delivery to downstream senior water rights.  No milestones are necessary to implement this existing Long-Term Protection Measure.

D.      *Measure 4*: Delivery of water to the 15-Mile Reach in the Grand Valley pursuant to the Upper Colorado River Recovery Program.  Refer to section IV.A.4. of the Plan.

1.      This is an existing mechanism by which water is delivered from upstream reservoirs for the benefit of the endangered fish species in the Grand Valley on a temporary basis.  The water deliveries are protected through the subject stream segments downstream through the 15-Mile Reach of the Colorado River.  The SG recognizes that negotiations are currently proceeding in a separate forum to develop alternative sources of supply for the water users' portion (10,825 acre feet) of water delivered to the endangered fish.  The water users' portion has historically averaged (1998 – 2008) approximately 9.1% of the total amount of water delivered to the fish, and 12.8% of the water delivered to the fish from sources above Kremmling (Table A.1.).  The SG recognizes that a portion of the water users' obligation likely will cease to be delivered from points above Kremmling, and instead will be made from sources of water downstream of Segments 4 through 7.  Significant releases of water to the endangered fish can be expected to continue to be made from Green Mountain Reservoir pursuant to the Recovery Program and the operation of the Green Mountain Reservoir Rule Curve established in the Orchard Mesa Check Decree, Case No. 91CW247, Water Division 5.  No milestones are necessary to implement this existing Long-Term Protection Measure.

BLM_0026221

II.   Mechanisms for Addressing Changed Circumstances in Long-Term Protection Measures

    A.   Examples of Changed Circumstances that Trigger Action of the SG.

        1.   *Measure 1*: Examples of a Material Change in Circumstances include, but are not limited to: the CWCB's appropriation of an ISF that is not consistent with the SG's recommendation to the CWCB; a significant new water right appropriation upstream of or within the subject stream reaches that is senior to the CWCB's anticipated ISF(s); the CWCB's determination to abandon its instream flow water right or to allow the inundation of part of the instream flow right; or an administrative or judicial reduction of the instream flow right.

        2.   *Measure 2*: Examples of a Material Change in Circumstances include, but are not limited to, a change in the operating procedures by which previously stored water is released from Green Mountain Reservoir under the 1984 Operating Policy and the terms of the Orchard Mesa Check Decree, Case No. 91CW247, Water Division 5.

        3.   *Measure 3*: Examples of a Material Change in Circumstances include, but are not limited to, a reduction, elimination, or other significant change from historical practice in the operation of the administrative call of the Shoshone Power Right, except for (1) the changes from historical practice expressly set forth in the Agreement Concerning Reduction of Shoshone Call between Xcel Energy and the Denver Water Board, which has a term from January 1, 2007 to February 28, 2032 (2007 Shoshone Agreement); and (2) any longer period of relaxation pursuant to paragraph 5 of the 2007 Shoshone Agreement agreed to between the Denver Water Board and the Colorado River Water Conservation District. Other examples of a Material Change in Circumstance would be an abandonment, material reduction, or material change in the manner of operation of the Cameo group of water rights.

        4.   *Measure 4*: As discussed above, the SG expects a non-material change in the methods by which water will be delivered to the endangered fish in the 15-Mile Reach. Examples of a Material Change in Circumstances related to implementation of Measure 4 include, but are not limited to: (A) the currently-proposed 5,412.5 acre-feet of Granby Reservoir releases are no longer provided; (B) the first enlargement of Wolford Mountain Reservoir (decreed in

BLM_0026222

Case No. 95CW281, Water Division No. 5, is no longer available for release for delivery to the 15-Mile Reach for endangered fish species purposes; or (C) the mechanism for the release of Historic Users Pool "Surplus" water as provided in the Orchard Mesa Check Decree, Case No. 91CW247, Water Division 5 is no longer available.

BLM_0026223

TABLE A.1.
ANNUAL SUMMARY OF HISTORICAL RECOVERY PROGRAM RELEASES (Acre Feet)

| Year | Green Mtn HUP Surplus | Ruedi Fish Pools | FISH POOL RELEASES Wolford Water Users | FISH POOL RELEASES Wolford USFWS Pool | FISH POOL RELEASES Williams Fk Reservoir Water Users | DISCRETIONARY RELEASES Green Mtn Reservoir | DISCRETIONARY RELEASES Wolford Mtn Reservoir | DISCRETIONARY RELEASES Dillon Reservoir | DISCRETIONARY RELEASES Williams Fk Reservoir | DISCRETIONARY RELEASES Granby Reservoir | DISCRETIONARY RELEASES Willow Ck Reservoir | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 31,736 | 20,803 | 0 | 6,000 | 0 | 0 | 5,516 | 0 | 0 | 0 | 0 | 64,055 | |
| 1999 | 35,564 | 20,418 | 0 | 4,939 | 0 | 0 | 0 | 11,479 | 1,825 | 26,914 | 3,382 | 104,521 | |
| 2000 | 47,187 | 19,064 | 5,409 | 6,000 | 3,858 | 0 | 0 | 0 | 0 | 0 | 0 | 81,518 | |
| 2001 | 34,657 | 21,345 | 5,413 | 3,078 | 5,369 | 0 | 0 | 0 | 0 | 0 | 0 | 69,862 | |
| 2002 | 0 | 10,975 | 0 | 300 | 3,757 | 0 | 0 | 0 | 0 | 0 | 0 | 15,032 | |
| 2003 | 47,526 | 20,434 | 0 | 286 | 3,757 | 0 | 0 | 0 | 0 | 0 | 0 | 72,003 | |
| 2004 | 119 | 15,981 | 0 | 0 | 2,678 | 0 | 0 | 0 | 0 | 0 | 0 | 18,778 | |
| 2005 | 31,200 | 17,163 | 1,000 | 0 | 3,814 | 0 | 0 | 0 | 0 | 0 | 0 | 53,177 | |
| 2006 | 25,358 | 19,680 | 5,413 | 5,233 | 5,412 | 0 | 0 | 0 | 0 | 0 | 0 | 61,096 | |
| 2007 | 32,745 | 14,273 | 4,339 | 0 | 2,394 | 0 | 2,500 | 0 | 0 | 0 | 0 | 56,251 | |
| 2008 | 61,433 | 20,423 | 5,413 | 3,189 | 5,367 | 0 | 1,829 | 0 | 0 | 0 | 0 | 97,654 | |
| Mean (98 - 08) | 31,593 | 18,233 | 2,453 | 2,639 | 3,310 | 0 | 895 | 1,044 | 166 | 2,447 | 307 | 63,086 | |
| Water Users (98 - 08) | | | 2,453 | | 3,310 | | | | | | | 5,763 | 9.1% |

**IF HISTORICAL DISCRETIONARY RELEASES ARE CONSIDERED AND ASSUMED TO CONTINUE**

| | Green Mtn HUP Surplus | Ruedi Fish Pools | Wolford Water Users | Wolford USFWS Pool | Williams Fk Reservoir Water Users | Green Mtn Reservoir | Wolford Mtn Reservoir | Dillon Reservoir | Williams Fk Reservoir | Granby Reservoir | Willow Ck Reservoir | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Historical Releases above Kremmling Total Releases | 31,593 | N/A | 2,453 | 2,639 | 3,310 | 0 | 895 | 1,044 | 166 | 2,447 | 307 | 44,853 | |
| Water Users Portion | | | 2,453 | | 3,310 | | | | | | | 5,763 | 12.8% |
| Estimated Future Releases above Kremmling Total Releases | 31,593 | N/A | 0 | 2,639 | 0 | 0 | 895 | 1,044 | 166 | 7,859 | 307 | 44,502 | |
| Water Users Portion | | | 0 | | 0 | | | | | 5,412 | | 5,412 | 12.2% |
| REDUCTION IN TOTAL DELIVERIES ABOVE KREMMLING = | | | | | | | | | | | | 351 | 0.8% |

**IF HISTORICAL DISCRETIONARY RELEASES ARE ASSUMED TO NOT CONTINUE**

| | Green Mtn HUP Surplus | Ruedi Fish Pools | Wolford Water Users | Wolford USFWS Pool | Williams Fk Reservoir Water Users | Green Mtn Reservoir | Wolford Mtn Reservoir | Dillon Reservoir | Williams Fk Reservoir | Granby Reservoir | Willow Ck Reservoir | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Historical Releases above Kremmling Total Releases | 31,593 | N/A | 2,453 | 2,639 | 3,310 | 0 | 0 | 0 | 0 | 0 | 0 | 39,995 | |
| Water Users Portion | | | 2,453 | | 3,310 | | | | | | | 5,763 | 14.4% |
| Estimated Future Releases above Kremmling Total Releases | 31,593 | N/A | 0 | 2,639 | 0 | 0 | 0 | 0 | 0 | 5,412 | 0 | 39,644 | |
| Water Users Portion | | | 0 | | 0 | | | | | 5,412 | | 5,412 | 13.7% |
| REDUCTION IN TOTAL DELIVERIES ABOVE KREMMLING = | | | | | | | | | | | | 351 | 0.9% |

BLM_0026224

**Attachment B**

## Timeline and Task List

1.  <u>Period Prior to Submittal of an Endorsed Plan.</u>

    A.  SG to come to resolution on amount of recommended ISF by April 15, 2011 or come to alternative resolution on how the CWCB process will proceed prior to endorsement of Plan.

    B.  SG to finalize language for definition of year-types for inclusion in Plan based on conceptual agreement to use Colorado Basin River Forecast Center forecasts of undepleted flow to predict the year type prior to the recreation season for informing the upcoming year's discussion about Cooperative Measures, and to use measured/depleted flows at the end of the wild and scenic year for evaluation of post-recreation season comparison to the boating Resource Guides.

    C.  SG to consider whether to include more detailed description of simulated future flows.

    D.  Prior to endorsement on April 30, 2011, the SG intends that any contact with press about this Plan should be handled through Rob Buirgy, Project Manager; or the BLM/USFS.

2.  <u>Period Following Submittal of an Endorsed Plan until Effective Date</u> (i.e., before BLM/USFS approve the Plan as the alternative in the ROD).

    A.  Decisions made in this period are all by unanimous consensus of all stakeholders, continuing the current process of negotiation and compromise.

    B.  Provide formal SG Endorsement of Plan to BLM/USFS no later than April 30, 2011.

    C.  Begin monitoring:
        (1)  Gather data collected by others (e.g., CPW fish biomass).
        (2)  SG fund and gather data (e.g., conduct creel surveys, recreation surveys) if SG unanimously agrees to funding of such efforts.
        (3)  Evaluate monitoring data compared to provisional Resource Guides and provisional ORV Indicators.
        (4)  Prepare Annual Monitoring Report.

BLM_0026225

D.    No SG Plan funding assessments (Section VIII.B.2.) to be levied during this period.[21]

E.    Stakeholders will engage in a good faith effort toward reaching agreement on final Resource Guides and ORV Indicators; outline studies and data collection to be done in the provisional period.  By unanimous consensus among all stakeholders, ORV Indicators and Resource Guides could be finalized during this period and would become effective upon the effective date of the Plan.

F.    Explore Cooperative Measures in accordance with the process set forth in the Plan.

G.    Conduct discussions and make written recommendation to CWCB for the base flow in-stream flow pursuant to C.R.S. §37-92-102 in accordance with Section IV.A.1. of the Plan.

If final decrees for the CWCB instream flow applications are not entered by the date anticipated in Attachment A, and the Plan has not become effective, the stakeholders will discuss the cause of the delay.  The stakeholders will determine whether the delay causes any material adverse impact to the purpose of the Long-Term Protection Measures.  If it is determined by unanimous consent of all stakeholders that a material adverse impact exists, the stakeholders may decide to implement management activities to reasonably mitigate the material adverse impact.

H.    Continue discussions on commitments to the Plan on behalf of the Windy Gap Firming Enterprise, Northern Water and Denver Water pursuant to Section III.C.2.c. of the Plan (Poison Pill).

I.    Hold full SG meetings (quarterly or semiannually) and prepare annual report/update; make any changes/refinements to the Plan agreed upon by all stakeholders.

J.    Develop MOU among SG members for provisional period of Plan.  A long-term MOU or legal entity would be entered into subsequent to sunset of the Poison Pill.

K.    Begin discussions and review relevant data to determine the extent to which channel maintenance flows may be incorporated into the Plan.

---

[21] Prior to expiration of the period for exercise of the Poison Pill, members of the SG would continue to contribute annual funding to the SG Plan, but shall not be required to contribute endowment funding under the Plan.  The Homestake Partners will also only contribute annual (not endowment) funding to the SG Plan unless or until the ERMOU Project is "opted in" as a new project.

BLM_0026226

L.     By unanimous consensus of all stakeholders, other tasks can be performed as needed.

3.     <u>BLM/USFS Adoption of Plan without Material Changes – Plan becomes Effective</u>

A.     Provisional Period:  First 3-to-5 years of Plan Implementation

(1)     Within 3 years or sooner, develop final Resource Guides and ORV Indicators by unanimous consent (6/6) of Interest Groups.

(2)     Execute MOU among SG members for provisional period of Plan. A long-term MOU or legal entity would be entered into subsequent to sunset of the Poison Pill.  Develop long-term MOU.

(3)     Interest Groups develop protocol for selection of representatives and procedure for inclusion, and designate alternates and appoint members.

(4)     GC appoints Chair, Vice Chair and Secretary.

(5)     Within 3 years after Plan is effective, create an endowment fund and appoint trustee (per Section VIII.A. of the Plan).

(6)     Begin Provisional Period Monitoring Plan (per Section V and Attachment D of Plan):

a.     Gather data collected by others (e.g., CPW fish biomass).
b.     SG fund and gather data (e.g., conduct creel surveys, recreation surveys).
c.     Evaluate monitoring data compared to provisional Resource Guides and provisional ORV Indicators.
d.     Prepare Annual Monitoring Report.

(7)     Study the extent to which channel maintenance flows may be incorporated into the Plan.

(8)     Resolve Project permit issues; notify BLM/USFS if Plan is withdrawn or has continued support, and modify Plan to confirm that Projects fall under Reopener Clause of Plan (Section IV.D.2.).

(9)     Implement Tier 1 Long-Term Protection Measures (per Section IV.A. and Attachment A of the Plan).

BLM_0026227

(10)  Implement voluntary Tier 2 Cooperative Measures process (per Section IV.B. of the Plan) and hold quarterly meetings (or more frequently, as determined necessary) to assess need for, focus of, and availability of Cooperative Measures (per Section IV.B.3.).

(11)  Hold SG meetings (annual, regular, and special) (per Section VI.E.).

(12)  Perform other tasks determined by unanimous consensus of the SG.

B.  At End of Provisional Period

Implement SG Plan, including, but not limited to:

(1)  Revise Plan for final Resource Guides (potentially including implementation criteria) and ORV Indicators.

(2)  Go through Mediation protocol if final Resource Guides, Indicators and potential implementation criteria are not unanimously agreed upon.

(3)  Revisit recommendation to defer a determination of suitability per the Guiding Principle.

(4)  Using results from the provisional period monitoring, develop and implement Long-Term Monitoring Plan (per Section V.A.2.).

(5)  Execute long-term MOU among stakeholders or legal entity.

(6)  Continue Tier 1 Long-Term Protection Measures.

(7)  Continue with voluntary Tier 2 Cooperative Measures process.

(8)  Continue holding SG meetings (annual, regular, and special).

(9)  Perform other tasks determined by unanimous consensus of the SG.

BLM_0026228

## Attachment C

## Existing Flow Conditions: Colorado River near Kremmling



**Figure 1**
**Colorado River near Kremmling (USGS #9058000)**
**Daily Streamflow Conditions**
**(1983-2006)**

BLM_0026229

# Existing Flow Conditions: Colorado River near Dotsero



**Figure 2**
**Colorado River near Dotsero (USGS #9070500)**
**Daily Streamflow Conditions**
**(1983-2006)**

BLM_0026230

# Existing Flow Conditions: Colorado River near Kremmling



**Figure 3**
**Colorado River near Kremmling (USGS #9058000)**
**Median Daily Streamflow**
**(1904-2006)**

Note: Colorado River near Kremmling streamflow data is not available from 1919 to 1961 and 1971.

BLM_0026231

## Attachment D

## Provisional Period Monitoring Plan

### ORV INDICATORS

**Recreational Fishing – *Quality Trout*** = <u>24 fish over 14" per acre</u>.  Note:  Current levels of Quality Trout, Biomass, and Species Diversity were collected by CPW personnel in 2008.[22]  The CPW plans to collect additional fishery data within BLM Segment 5 every other year.

<u>Sample site selection</u>:
<u>Sample collection</u>:
      Where
      Who
      Frequency
<u>Sample analysis</u>:
<u>Data management outliers, housing</u>:
<u>Data analysis</u>:
<u>Funding</u>:

**Recreational Fishing – *Biomass*** = 2008 data collected by CPW showed <u>90 lbs. per acre</u>.[23]

<u>Sample site selection</u>:
<u>Sample collection</u>:
      Where
      Who
      Frequency
<u>Sample analysis</u>:
<u>Data management outliers, housing</u>:
<u>Data analysis</u>:
<u>Funding</u>:

**Recreational Fishing – *Species Diversity*** = <u>14 species of fish.</u>

<u>Sample site selection</u>:
<u>Sample collection</u>:
      Where
      Who

---

[22] CPW data collected in 2010 showed 46 fish over 14" per acre.

[23] CPW data collected in 2010 showed 121 lbs. per acre.

BLM_0026232

Frequency
<u>Sample analysis</u>:
<u>Data management outliers, housing</u>:
<u>Data analysis</u>:
<u>Funding</u>:

**Recreational Fishing – *Trout Fishing Effort*** = <u>N/A</u>.  Note: A creel census will be required to quantify Total Fishing Effort and Catch/Unit Effort.   The current estimated annual cost of the creel census will be approximately $25,000.  CPW has no current plans to conduct a creel census within BLM Segments 4, 5, or 6 of the Colorado River; therefore, this cost, and supervision of the creel census, will likely be the responsibility of the Stakeholder Group.

<u>Sample site selection</u>:
<u>Sample collection</u>:
Where
Who
Frequency
<u>Sample analysis</u>:
<u>Data management outliers, housing</u>:
<u>Data analysis</u>:
<u>Funding</u>:

**Recreational Fishing – *Catch/Unit Effort*** = <u>N/A.</u>

<u>Sample site selection</u>:
<u>Sample collection</u>:
Where
Who
Frequency
<u>Sample analysis</u>:
<u>Data management outliers, housing</u>:
<u>Data analysis</u>:
<u>Funding</u>:

**Recreational Floatboating**

<u>Sample site selection</u>:  During the Provisional Period the Stakeholder Group has defined a narrative Recreational Floatboating ORV indicator.
<u>Sample collection</u>:
Where
Who
Frequency
<u>Sample analysis</u>:
<u>Data management outliers, housing</u>:

BLM_0026233

Data analysis:
Funding:

## ORV RESOURCE GUIDES

**Recreational Fishing – _Flow Guides_** = (Insert Provisional Flow Guide Table when final).

Sample site selection: The Stakeholder Group has identified the USGS stream flow gage at Kremmling as the appropriate flow measuring device to monitor the Fishing Resource Guides for Segments 4, 5 and 6.
Sample collection:
Where: USGS gage 09058000 Colorado River near Kremmling.
Who:  USGS.
Frequency: per USGS.
Sample analysis: USGS or Not Applicable.
Data management outliers, housing: USGS.
Data analysis: The Stakeholder Group will use USGS flow data to compare with the Resource Guide 5-year running average review described in Section III.C.1.
Funding:

**Water Quality**

Sample site selection: Utilize the Colorado Water Quality Control Division (WQCD) Triennial Review Process for compliance with water quality standards protective of aquatic life and recreational uses.[24]
Sample collection: No new water quality sampling is proposed for this effort. The WQCD utilizes most sources of data made available to them to make their assessment of water quality.  Typically this assessment is based on the most recent 5 to 8 years of data.
Where
Who
Frequency
Sample analysis: Not applicable.
Data management: The WQCD's template for summarizing water quality conditions is descriptive and adequate for the Stakeholder Group's purposes.

---

[24] 40 C.F.R. 131.20 provides that each State must specify appropriate water uses to be achieved and protected.  The classification of the waters must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation.  In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States.

BLM_0026234

This document is available to the general public.  The 2013 WQCD assessment should be compared with the previous assessment done in 2008.

<u>Data analysis:</u> If degradation of water quality is reported by the WQCD the reported exceedances of water quality standards may be evaluated by the Stakeholder Group.  For purposes of the Monitoring Report, the Stakeholder Group should report:

- Was the exceedance for a standard protective of aquatic life or recreation use?
- Were the data indicating exceedance of standards collected from the reach of interest to the SG?

<u>Existing Conditions:</u> Existing Conditions for water quality are characterized  by the WQCD 4-10-08 summary of Upper Colorado River Segment 03 developed for the Triennial Review of WQCC Regulation #33 (See Exhibit 1).

<u>Funding</u>:


**Temperature**

<u>Sample site selection:</u> During the Provisional Period, temperature monitoring[25] will be conducted on the mainstem of the Colorado River through the use of temperature loggers located at:

- Colorado River at Dotsero (SG site).
- Colorado River at State Bridge (SG site); a logger is also placed at this location about 5 meters above the river for ambient air temperature.
- Colorado River at Pumphouse (BLM site WS-CO-002).
- Colorado River at Hwy 9 Bridge (DWB site WS-CO-004).

<u>Sample collection:</u> Tidbit or HOBO loggers, deployed in the stream current and protected in PVC pipe with holes.

> <u>Where</u>: Detailed descriptions of locations including photos are recorded. *(see TU example, would be included as attachment to these monitoring protocols.)*
>
> <u>Who</u>:  Deployment and collection of data loggers has been done by staff from the River District, NWCCOG and TU.
>
> <u>Frequency</u>: Deploy temperature loggers after peak runoff, approximately late July, and maintain through early fall. Temperature loggers are set to record at 15-minute intervals.

<u>Sample analysis:</u> Down load data from logger directly to Excel spreadsheets.

<u>Data management</u>:  Currently the River District is holding this data.

<u>Data analysis:</u> Spreadsheet is developed that allows for computation of MWAT and DM statistic.  Daily air temperature and streamflows should be plotted with

---

[25] 40 C.F.R. 131.20 provides that each State must specify appropriate water uses to be achieved and protected.  The classification of the waters must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation.  In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States.

BLM_0026235

MWAT and DM for data records that approach or exceed these standards for assessment of the role of these two parameters on stream temperature.

<u>Existing Conditions</u>:  Existing temperature conditions for the Colorado River from Kremmling to Glenwood Springs were evaluated as part of the WQCC Rulemaking for Regulation #93 (303d list) in 2009.  Based on available representative data, no exceedances of stream temperature standards were found for this portion of the river.

<u>Funding</u>:

**Recreational Floatboating – *Usable Days*** = (Insert Provisional Usable Days Table when final)

<u>Sample site selection</u>: The Stakeholder Group has identified the USGS stream flow gage at Kremmling as the appropriate flow measuring device to monitor Recreational Floatboating Resource Guides for Segments 4, 5 and 6, and the USGS gage at Dotsero for Segment 7.

<u>Sample collection</u>: USGS
<u>Where</u>:  USGS gage 09058000 Colorado River near Kremmling (Segments 4, 5 and 6); USGS gage 09070500 Colorado River near Dotsero (Segment 7).
<u>Who</u>:   USGS
<u>Frequency</u>:  per USGS
<u>Sample analysis</u>: NA.
<u>Data management outliers, housing</u>: USGS.
<u>Data analysis</u>:  The Stakeholder Group will analyze data for comparison with the provisional Resource Guide.
<u>Funding</u>:

BLM_0026236

# Exhibit 1 to Provisional Period Monitoring Plan

## Upper Colorado River Basin Regulation No. 33 Triennial Rulemaking Rationale 4-10-08

**Segment WBID:** *COUCUC03*

**Segment Description:** 3. Mainstem of the Colorado River from the outlet of Lake Granby to the confluence of the Roaring Fork River.

**Designation:** Reviewable

**Classifications:** Aquatic Life Cold I
Recreation ~~1a~~ E
Water Supply
Agriculture

**Stream Length:** 134.4 miles

**Proposed Changes 2008:** Basin-wide changes: Delete f. coli standards, change As(ac)=50(Trec) to As(ac)=340, add As(ch)=0.02(Trec), and add a temperature standard of cold stream tier II. Add a sculpin-based zinc standard.

**Rationale for Changes 2008:** The deletion of f. coli, and changes to recreation nomenclature, arsenic standards, TVS cadmium standards, and TVS zinc standards are basin-wide changes that correspond with decisions made by the Commission in the June 2005 Basic Standards Rulemaking Hearing (31.44). The Commission changed the recreation use nomenclature so that Recreation 1a waters are now Recreation E (31.44 G.). A sculpin-based zinc standard was added because CPW records indicate that mottled sculpin are present in this segment and hardness drops below 113 mg/l (31.44 J.). Temperature standards were added to correspond with decisions made by the Commission in the January 2007 Rulemaking Hearing (31.45). Colorado Parks and Wildlife

| Water Quality Data – COUCUC03 | | | |
|---|---|---|---|
| | **Colorado River blw Lake Granby** | | |
| Parameter | TVS | NCWCD/RW/ USGS/WQCD All Sites 2001-2007 | n |
| pH, s.u. | 6.5-9.0 | 7.86-8.53 | 349 |
| D.O., mg/L | 6 | 7.95 | 317 |
| Hardness*, mg/L | NA | 109.6 | 339 |
| E. coli, #/100 mL | 126 | 3 | 120 |
| As-D**, µg/L | 0.02 | **0.36** | 106 |
| Cd-D, µg/L | 0.45 | 0.00 | 221 |
| Cu-D, µg/L | 9.68 | 1.30 | 247 |
| Fe-D, µg/L | 300 | 171 | 215 |
| Fe-Trec, µg/L | 1000 | 215 | 189 |
| Pb-D, µg/L | 2.78 | 0.00 | 156 |
| Mn-D, µg/L | 50.0 | **60.1** | 209 |
| Se-D, µg/L | 4.60 | 0.13 | 167 |
| Ag-D, µg/L | 0.09 | 0.00 | 80 |
| Zn-D, µg/L | 128.4 | 6.7 | 192 |
| U-D**, µg/L | 30 | 1.00 | 44 |
| NH₃, mg/L | TVS | 0.030 | 199 |
| NO₅, mg/L | 10 | 0.023 | 139 |
| SO₄, mg/L | 250 | 54.6 | 187 |

\*  Hardness measured as $CaCO_3$ mg/L
\*\* Standard is Trec

(CPW) records indicate that cold stream tier II fish are present in this segment. Temperature data from the most recent 7 years from all available stations in the segment were compared to the fish-based temperature standards to assess the attainability of those standards (see tables below). Sufficient temperature data (minimum 3 evenly spaced samples per day) were not available to assess attainment of the MWAT, so only the attainability of the DM standard was assessed.
This assessment indicates that the cold stream tier II DM standards are attainable.

**Aquatic Life:** CPW records indicate brown and rainbow trout; northern pike; roundtail chub; mountain whitefish; speckled and longnose dace; mottled sculpin; and bluehead, flannelmouth, longnose, mountain, and white suckers are present in the mainstem Colorado.

BLM_0026237

**Recreation:** This segment is intensively used for rafting and kayaking.

**Water Supply**: The Town of Hot Sulphur Springs diverts water from the Colorado River for its municipal water supply. Hot Sulphur Springs Resort draws from an alluvial well.

**Agriculture**: Livestock operations have been and continue to be active in the Upper Colorado River basin, although fewer such operations remain as ranchland is converted to urban land use. Crops in the upper basin are limited to irrigated and non-irrigated hay. Farther downriver alfalfa, and spring and winter wheat are cultivated.

**Point Sources:** Domestic wastewater treatment facilities operated by the Town of Hot Sulphur Springs, Ouray Ranch, Colorado Parks and Wildlife (Windy Gap Reservoir Visitor's Center), and the Colorado Department of Transportation (Grizzly Creek and Hanging Lake Rest Areas and Bair Ranch) discharge to this segment. The Town of Hot Sulphur Springs also operates a water treatment plant that discharges filter backwash. Rayners Trailer Court discharges to alluvial groundwater. Glenwood Hot Springs, Rock Gardens Campground, Pitkin Iron Corporation (Redstone well), and Shorefox Subdivision also discharge to this segment.

**Water Quality:** Water quality data were collected in this segment by WQCD, USGS, Northern Colorado Water Conservancy District, and River Watch (RW). WQCD collected samples at Colorado River near Dotsero (WQCD #46), Colorado River upstream of Roaring Fork River (WQCD #12100), Colorado River upstream of State Bridge at Highway 131 (WQCD #12103), Colorado River below Granby Reservoir at Highway 34 (WQCD #12105), and North Fork Colorado River at Highway 34 (WQCD #12106). USGS collected samples at Colorado River below Lake Granby, CO (USGS # 9019000), Colorado River near Granby, CO (USGS # 9019500), Colorado River at Windy Gap, near Granby, CO (USGS # 9034250), Colorado River near Kremmling, CO (USGS # 9058000), Colorado River near Dotsero, CO (USGS # 9070500), Colorado River above Glenwood Springs, CO (USGS # 9071750), Colorado River at Bond, CO (USGS # 395306106415601). Northern Colorado Water Conservancy District collected samples at the Colorado River above Fraser River Confluence (CR-WGU). River Watch collected samples at Colorado River at Hot Sulphur Springs (RW #203), Colorado River at Windy Gap (RW #543), and Colorado River at Pedestrian Bridge (RW #46).

**Exceedances:** In Colorado River below Granby Reservoir at Highway 34 (WQCD #12105) there was an exceedance of the acute dissolved cadmium, dissolved copper and dissolved zinc standards, North Fork Colorado River at Highway 34 (WQCD #12106) there was an exceedance of the acute dissolved copper standard, Colorado River below Lake Granby, CO (USGS # 9019000) there was an exceedance of the chronic dissolved zinc sculpin standard and chronic total recoverable arsenic standard, Colorado River at Windy Gap, near Granby, CO (USGS # 9034250) there was an exceedance of the maximum pH standard, chronic dissolved manganese standard, and chronic total recoverable arsenic standard, at the Colorado River near Kremmling, CO (USGS # 9058000) there was an exceedance of the chronic dissolved manganese standard and chronic total recoverable arsenic standard, and in Colorado River above Fraser River Confluence (CR-WGU) there was an exceedance of the chronic dissolved manganese standard.

BLM_0026238

# APPENDIX J
## MONITORING AND EVALUATION

BLM_0026239

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 2 |
| RELATIONSHIP OF IMPLEMENTATION AND MONITORING TO ADAPTIVE MANAGEMENT | 2 |
| TABLE 1 - IMPLEMENTATION-LEVEL MONITORING | 4 |
| Air Resources | 4 |
| Water | 4 |
| Vegetation | 4 |
| Fisheries and Other Aquatic Wildlife | 6 |
| Terrestrial Wildlife | 7 |
| Special Status Species - Fish and Other Aquatic Wildlife | 7 |
| Special Status Species - Plants | 8 |
| Special Status Species - Terrestrial Wildlife | 9 |
| Cultural Resources | 10 |
| Paleontology | 10 |
| Visual Resource Management | 10 |
| Wildland Fire Management | 11 |
| Lands Managed for the Protection of Wilderness Characteristics | 11 |
| Cave and Karst Resources | 11 |
| Forestry | 12 |
| Livestock Grazing | 12 |
| Recreation and Visitor Services | 13 |
| Comprehensive Trails and Travel Management | 14 |
| Lands and Realty | 14 |
| Solid Minerals (Locatable Minerals, Salable Minerals/Mineral Materials, and Non-Energy Leasable Minerals) | 14 |
| Areas of Critical Environmental Concern | 15 |
| Wilderness Study Areas | 15 |
| Wild and Scenic Rivers | 15 |
| Transportation Facilities | 17 |
| Health and Safety | 17 |

BLM_0026240

**INTRODUCTION**

This appendix provides an overview of the CRVFO monitoring and evaluation protocols.

**RELATIONSHIP OF IMPLEMENTATION AND MONITORING TO ADAPTIVE MANAGEMENT**

Adaptive management is a structured, iterative process for continually improving implementation practices based on achieving goals and objectives established in the resource management plan (RMP).  Adaptive management is not possible without effective monitoring and evaluation because monitoring data shows if progress is being made toward achieving RMP objectives.  If not, implementation practices are adjusted and improved.

Since accrued monitoring data is used to improve future implementation actions, monitoring is continual and never completed.  The cyclic process includes four phases: planning/designing, implementation, monitoring, and evaluation.

**PHASE 1 - PLANNING**

The RMP is a set of decisions that establish management direction for BLM land and Federal mineral estate within an administrative area of a Field Office.

*RMP Amendments.*  RMP decisions are subsequently changed through either a plan amendment or another RMP revision.  The process for conducting plan amendments is basically the same as the land use planning process used in developing RMPs. The primary difference is that circumstances may allow for completing a plan amendment through the environmental assessment (EA) process, rather than through an EIS.  Plan amendments (43 CFR 1610.5-5) change one or more of the terms, conditions, or decisions of an approved land use plan.  Plan amendments are most often prompted by the need to consider a proposal or action that does not conform to the plan; implement new or revised policy that changes land use plan decisions; respond to new, intensified, or changed uses on BLM land; and consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

*RMP Maintenance.*  During the life of the RMP, the BLM expects that new information gathered from field inventories and assessments, other agency studies, and other sources will update geographic information system data, best management practices, and scientific principles.  To the extent that such new information or actions address issues covered in the plan, the BLM will integrate the data through plan maintenance. BLM regulations in 43 CFR 1610.5-4 provide that RMP decisions and supporting actions can be maintained to reflect minor changes in data. Maintenance is limited to further refining, documenting, or clarifying a previously approved decision incorporated in the plan. Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved RMP.

BLM_0026241

## PHASE 2 - PLAN IMPLEMENTATION

Implementation of the RMP begins once the Record of Decision for the approved RMP is signed.  Decisions made through the RMP planning process are implemented over the life of the plan.  Some of the decisions are immediate and go into effect with the Record of Decision.   Certain decisions would be implemented after site-specific environmental review or NEPA process is completed such as development of recreation sites, vegetation management treatments, or approval of an application for permit to drill a natural gas well. In addition, specific programs have requirements that must be taken in order to make certain decisions effective.   An example of a land use plan decision that requires an additional action for implementation would be a recommendation to withdraw lands from entry under the mining laws.  Formal action requiring Secretarial-level review and decision making would follow if the BLM planning process results in a withdrawal recommendation and the applicable regulations in 43 CFR 2300 are followed.

Any future proposals or management actions will be reviewed against the RMP to determine if the proposal is in conformance with the RMP.  While the Final EIS for the CRVFO RMP provides the compliance with NEPA for the broad-scale decisions that are made in the Record of Decision, it does not replace the requirement to comply with NEPA for most implementation actions.

## PHASE 3 - IMPLEMENTATION AND EFFECTIVENESS MONITORING

RMP monitoring is a continuous process occurring over the life of the land use plan. The goal is to maintain a dynamic RMP that is adapted or amended as necessary.  Monitoring data is collected, examined and used to draw conclusions on: 1) whether RMP decisions and planned activities have been implemented in the manner prescribed by the RMP (Implementation monitoring); 2) whether plan decisions and implementation-level actions are effective in achieving stated objectives or desired outcomes (Effectiveness monitoring); and 3) calculating the cost of delivering a service or product (i.e., BLM program elements). Conclusions are then used to make recommendations on whether to continue current management or what changes need to be made to implementation practices to better achieve resource management plan goals and objectives.

Indicators, methods, locations, units of measures, frequency and action triggers can be established by national policy guidance, in resource management plans, or by technical specialists in order to address specific issues.  Table 1 (below) displays implementation monitoring protocols by program anticipated to be performed by the CRVFO.  Due to staffing and funding levels monitoring is annually prioritized consistent with the goals and objectives of the RMP.  BLM may work in cooperation with local, state, and other federal agencies or use data collected by other agencies/ sources when appropriate and available.

BLM_0026242

### PHASE 4 - RESOURCE MANAGEMENT PLAN EVALUATION

RMP evaluation is the process of periodically reviewing the RMP to determine whether the land use plan decisions and NEPA analysis are still valid and whether the RMP is being implemented as planned.   RMPs are evaluated to determine if: (1) decisions remain relevant to current issues, (2) decisions are effective in achieving (or making progress toward achieving) desired outcomes, (3) any decisions need to be revised, (4) any decisions need to be dropped from further consideration, and (5) any areas require new decisions. The RMP is evaluated in accordance with Colorado BLM schedules.  Plan evaluations are also completed prior to any plan revisions and for major plan amendments.  Evaluations will follow the protocols established by the BLM Land Use Planning Handbook H-1601-1 in effect at the time the evaluation is initiated.

BLM_0026243

*Appendix J - Monitoring and Evaluation*

**Table 1. Implementation-level Monitoring Protocols by Program**

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|

**I. Resources**

**Air Resources**

| Monitor air quality and climatic conditions (Program Element 1010-MI). | Mechanized rain gauge. | Sweetwater, CO. In the future sites will be Field Office-wide. | Inches of precipitation. | Continuous recording of precipitation. Data is compiled monthly. | Climatic trends and drought conditions. | Directs grazing related changes due to drought conditions. |
|---|---|---|---|---|---|---|

In accordance with the CARPP, conduct reviews of air quality monitoring data and BLM approved activities which could impact air quality. Cooperate with federal, state and local environmental agencies to implement a comprehensive ambient air quality monitoring network. The trigger for action is approaching or an exceedances of the National or Colorado Ambient Air Quality Standards (NAAQS or CAAQS).

**Water**

| Monitor water resources (Program Element 1010-MU). | Physically collected through direct field measurements. | Field Office-wide. | Numerous water quality parameters – field collected or laboratory analyzed. | As needed in conjunction with LHA follow-up work or site specific project needs. | Changes in water quality or impairments. | |
|---|---|---|---|---|---|---|
| Monitor stream /riparian habitat (Program Element 1010-MO). | Physically collected through direct field measurement. | Field Office-wide. | Miles of stream monitored for physical stream habitat and riparian vegetation parameters. | As needed in conjunction with LHA follow-up work or site specific project needs. | Changes in physical stream habitat condition and riparian functionality. | |

Surface and ground water monitoring related to natural gas development – Conduct baseline and post-project surface water quality monitoring in sensitive streams such as drinking water sources or habitat for endangered species.

Conduct baseline and post-project groundwater quality monitoring for drinking water wells within ¼ mile of a well bore or in areas determined to be sensitive or at risk of contamination.

Cooperate with COGCC in the protection of water resources including water sampling and monitoring protocols for ground and surface water sampling and public water system protection.

**Vegetation**

| Trend (Program Element - ML). | BLM approved monitoring methods (e.g., | Field Office-wide – key areas. | Variables: cover, frequency, | Every 6 to10 years. | Vegetation change from the baseline or | |
|---|---|---|---|---|---|---|

*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026244

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| | Daubenmire, Line-intercept, Assessment, Inventory, and Monitoring Strategy). | | species composition and density. | | moving away from desired ecological status. | |
| Vegetation Change. | Photo plots/points. | Area-wide - key areas. | Representative sample of vegetation type. | Every 3 to 10 years. | Used in conjunction with other methods to detect both desirable and undesirable changes occurring to vegetation as a result of land uses. | |
| Vegetation Treatments (Program Elements - MQ, MX). | BLM approved monitoring methods (Daubenmire, Line-intercept, Nested Frequency, Photo plots, etc). | All Vegetation Treatments. | Species composition, shrub canopy cover, or other applicable measure. | Annually for 3-5 years post-treatment. | Vegetation objectives not being met (e.g. increase in noxious weeds, shrub regeneration below desired levels). | If vegetation objectives are not being met, adaptive management will be used to design future vegetation treatments. |
| Precipitation. | Weather stations. | Upper Colorado River site and others to be determined to provide representative sample of local precipitation patterns. | Inches and timing of precipitation. | Monthly and annually. | Insufficient precipitation for meeting desired vegetation conditions. | |
| Significant Plant Communities. | Site visits or remote sensing. | At mapped significant plant communities throughout Field Office. | Evidence of surface disturbance; evidence of invasive species. | Every 2-4 years. | Detection of noxious weeds; loss of species or habitat due to surface disturbance. | |
| Noxious Weed Inventory (Program | Site visits or remote sensing. | Priority areas as described in Chapter 2, | Acres and species of noxious weeds. | Continuously. | Detection of Colorado Weed List A species | |

BLM_0026245

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|-----------|--------------------|----------|-----------------|-----------|-----------------|-------------------|
| Element - BS). | | Table 2-2. | | | and spreading or establishment of List B or C weed species in new areas. | |
| Evaluate Weed Treatments (Program Element - MK). | Treatment Area Visits – Ocular assessment. | Field Office-wide. | Acres. | Annually. | Treatment Effectiveness, Follow-up Needs. | |
| Wetland/riparian Condition (Program Elements - BU, BV, MN, MO). | Proper Functioning Condition (PFC). | Area-wide. | Stream miles rated PFC, FAR or NF. | At permit renewal or as concerns arise with periodic site visits. | Downward trend or not meeting Colorado Land Health Standards. | |
| Riparian Area Condition (Program Element - MO). | Multiple Indicator Monitoring (MIM), Vegetation Cross-section Composition (Winward). | Priority stream reaches. | Indicators applicable to riparian area being monitored. | Frequency depends on site-specific objectives. | Change in Greenline composition, Percent streambank alteration, or other trigger depending on site-specific objectives. | |
| **Fisheries and Other Aquatic Wildlife** | | | | | | |
| Monitor Stream Habitat (Program Element 1120-MO). | Physically collected through direct field measurement. | Field Office-wide. | Miles of stream monitored to determine and document habitat condition for stream and river aquatic species given management decisions in place and to determine if objectives are being met. | Some is done each year but frequency by stream varies depending on site specific actions or projects. | Aquatic habitat conditions for desired biological communities not meeting Colorado Land Health Standards, or below potential. | |
| Species | Physically | Field Office- | Populations | This type of | Populations are | |

BLM_0026246

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| Populations (Program Element 1120-MR). | collected through direct field measurement (BLM or other agency data). | wide. | monitored to determine if population trends are stable, declining or increasing. | monitoring is done yearly in select locations but varies in frequency by stream depending on site specific actions or projects. | declining or are below determined carrying capacity. | |
| BMP and other mitigation or minimization measures monitoring effectiveness. | Visual inspection of project sites through field verification. | Field Office-wide. | Mitigation or minimization measures to determine effectiveness. | Yearly on a case-by-case basis. | Mitigation or minimization measures are not working as intended. | Use Adaptive Management by identifying other BMP's to use should initial efforts be found ineffective. |
| **Terrestrial Wildlife** | | | | | | |
| Terrestrial Habitat (Program Element 1110-MQ). | Collected through field measurements. | Field Office-wide. | Acres monitored to determine if terrestrial habitat treatments have been implemented and implementation objectives are being met. | Yearly. | Terrestrial habitat conditions for desired biological communities not meeting Colorado Land Health Standards. | |
| Species Populations (Program Element 1110-MR). | Collected through surveys or estimated from BLM or other agency data. | Field Office-wide. | Populations monitored to determine if population trends are stable, declining or increasing. | Yearly. | Populations are declining. | |
| **Special Status Species - Fish and Other Aquatic Wildlife** | | | | | | |
| Monitor Stream Habitat (Program Element 1120- | Physically collected through direct field measurement. | Field Office-wide. | Miles of stream monitored to determine and | Some is done each year but frequency by stream varies | Aquatic habitat conditions for desired biological | |

BLM_0026247

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| MO). | | | document habitat condition for stream and river aquatic species given management decisions in place and to determine if objectives are being met. | depending on site specific actions or projects. | communities not meeting Colorado Land Health Standards, or below potential. | |
| Species Populations (Program Element 1120-MR). | Physically collected through direct field measurement (BLM or other agency data). | Field Office-wide. | Populations monitored to determine if population trends are stable, declining or increasing. | This type of monitoring is done yearly in select locations but varies in frequency by stream depending on site specific actions or projects. | Populations are declining or are below determined carrying capacity. | |
| BMP and other mitigation or minimization measures monitoring effectiveness . | Visual inspection of project sites through field verification. | Field Office-wide. | Mitigation or minimization measures to determine effectiveness. | Yearly on a case-by-case basis. | Mitigation or minimization measures are not working as intended. | Use Adaptive Management by identifying other BMP's to use should initial efforts be found ineffective. |
| **Special Status Species - Plants** | | | | | | |
| Monitor Terrestrial Habitat (Program Element - MQ). | Ocular assessment of species' habitat parameters. | Special Status plant habitats. | Acres monitored meeting desired condition. | Annually for priority species and habitats; every 3-5 years for other special status species. | Presence/ increase in noxious weeds or other invasive species; evidence of human or livestock-caused physical disturbance to habitat; decline in vigor of plant | |

BLM_0026248

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| | | | | | community. | |
| Monitor Species Populations – Colorado hookless cactus (Program Element - MR). | Physically collected measurements on permanently marked individuals . | All known locations for Colorado hookless cactus. | Multiple: # live/dead individuals(evidence of recruitment or mortality); plant dimensions; phenology; form (age class). | Annually (as funding allows). | Long-term declining trend in populations accompanied by loss or degradation of habitat. | |
| Monitor Species Populations – Parachute penstemon (Program Element - MR) | Statistically valid sample of quadrats within macroplot. | Anvil Points population (Roan Plateau Planning Area). | Number of live stems; phenology. | Annually. | Long-term declining trend in populations accompanied by loss or degradation of habitat. | |
| Monitor Species Populations – DeBeque phacelia (Program Element - MR) | Actual count of number of individuals. | Known sites within CRVFO. | Number of individuals. | Annually in years when germination is evident. | Long-term declining trend in populations accompanied by loss or degradation of habitat. | |
| Monitor Species Populations – Ute ladies'-tresses (Program Element - MR) | Actual count of individuals. | Known sites within CRVFO. | Number of individuals. | Annually. | Long-term declining trend in populations accompanied by loss or degradation of habitat. | |
| Monitor Species Populations – BLM sensitive species (Program Element - MR) | Statistically valid sample of quadrats within macroplot. | Representative sample of populations. | Number of individuals; phenology. | Every 1-5 years. | Long-term declining trend in populations accompanied by loss or degradation of habitat. | |
| **Special Status Species - Terrestrial Wildlife** | | | | | | |
| Terrestrial Habitat (Program | Collected through field measurements. | Field Office-wide. | Acres monitored to determine if | Yearly. | Terrestrial habitat conditions for | |

BLM_0026249

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| Element 1150-MQ) | | | terrestrial habitat treatments have been implemented and implementation objectives are being met. | | desired biological communities not meeting Colorado Land Health Standards. | |
| Species Populations (Program Element 1150-MR) | Collected through surveys or estimated from BLM or other agency data. | Field Office-wide. | Populations monitored to determine if population trends are stable, declining or increasing. | Yearly. | Populations are declining. | |
| **Cultural Resources** | | | | | | |
| Monitor Non-Sec 106 Cultural Properties (Program Element 1050-MY). | Visually examined through an on-the-ground visit. | Previously recorded significant sites within the CRVFO. | Number of individual cultural properties visited. | Prioritize sensitive sites and monitor periodically every 1-5 years based on perceived threats/impacts. | When site conditions change based on previously documented conditions or perceived threats/impacts. | |
| **Paleontology** | | | | | | |
| Significant paleontological resources. | Inspection or remote sensing. | Field Office-wide. | Change over time. | Prioritize areas and monitor higher priority areas every 1-3 years and lower priority areas every 2-4 years. | When change is causing undue or unnecessary degradation of the site or area. | |
| Monitor Paleontological Localities (Program Element 1050-MY). | Visually examined through an on-the-ground visit. | Previously recorded paleontological localities within the CRVFO. | Number of individual paleontological localities visited. | Prioritize sensitive localities and monitor periodically every 1-5 years based on | When site conditions change based on previously documented conditions or perceived | This program element will be used along with a four-digit "PALE" project code to denote paleontological |

BLM_0026250

*Appendix J  -  Monitoring and Evaluation*

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| | | | | perceived threats/impacts. | threats/impacts. | localities monitored. |
| **Visual Resource Management** | | | | | | |
| Intrusions. | Remote sensing or site visit. | Class I and II areas. | Impacts of an individual intrusion. | Ongoing. | Intrusion that exceeds the definition of the classification. | |
| **Wildland Fire Management** | | | | | | |
| Fuel Loading. | Visual or fixed photo plot. | Field Office-wide. | Tons/acre. | Set Number of Years Post Treatment Usually Year 1, 3, 5 and 10. | Follow up or maintenance treatment to reduce hazard of wildfire. | |
| Fire Danger Indices. | Use of System of Remote Automated Weather Stations(RAWS). | Rifle, Storm King, Crown, Gypsum, Hangman. | Temperture Relative Humdtity Precipitation Wind. | Daily. | Fire. | These are used to derive fire danger indices such as Energy Release Component and Burning Index.  Part of the fire danger operating plan. |
| Live Fuels Moisture. | Clip, Weigh, Dry in oven. | Field Office-wide. | % live fuel moisture. | Twice a month from Oct through October. | Fire danger. | Use for making fire management decision such as fire restrictions and requests for severity resources. |
| **Lands Managed for the Protection of Wilderness Characteristics** | | | | | | |
| Resource Condition. | Site visit or remote sensing. | Lands with wilderness characteristics area. | Amount of degradation or loss of resources. | Every 1-5 years. | Undue or unnecessary degradation or loss of resources as a result of human or natural causes. | Degradation usually occurs through motorized or mechanized use off of designated routes or through litter and dumping in the area. |

*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026251

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| **Cave and Karst Resources** | | | | | | |
| Resource Condition. | Monitoring Reports associated with permit; site visits or remote sensing. | Cave or karst area. | Damage to cave formations, trash, disturbances seen off trail, amount of degradation or loss of resources. | LaSunder Cave monitored every permitted trip (at least once per year if trips occur that year); other cave and karst resources monitored as resources allow. | Undue or unnecessary degradation or loss of resources as a result of human or natural causes, or not meeting LaSunder Cave Management Plan goals and objectives. | |
| Bat Monitoring. | Site visits or remote sensing. | Cave or karst area. | Populations monitored to determine if population trends are stable, declining or increasing; and what kind of bat use is occurring in the area. | As resources allow with cooperation with Colorado Parks and Wildlife. Goal is to monitor each known cave every 5 years. | Populations are declining or evidence of White Nose Syndrome occurs within a cave or karst area. | |

## II.  Resource Uses

| **Forestry** |
|---|
| - Conduct periodic regeneration surveys to monitor for adequacy of regeneration of all reproduction-method-treatment areas. If adequate regeneration is not present or anticipated within 15 years, then artificially regenerate the area. |
| - Conduct periodic stand examinations and forest inventories to monitor forest stand conditions. Thinning or other timber stand improvement projects may be monitored by periodic re-measurement of permanently marked plots that compare treated plots with untreated control plots.  If inadequate stand health is indicated through monitoring or objectives are not being met, then other silvicultural prescriptions will be considered. |

| **Livestock Grazing** | | | | | | |
|---|---|---|---|---|---|---|
| Monitor Grazing Allotments (Program Element - ML). | Various- See Glenwood Springs Resource Monitoring plan, March 2003 (as updated). | Field Office-wide. | Grazing Allotment. | Various- Between 1-10 years depending on allotment categorization. | Permit terms and conditions or Allotment Management Plan (AMP) objectives. | |
| Evaluate | Interdisciplinary | Field Office- | Grazing | Various- | Land Health | |

BLM_0026252

*Appendix J  -  Monitoring and Evaluation*

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| Rangeland Health (Program Element - MJ). | Evaluation of existing data. | wide. | Allotment. | Between 1-10 years depending on allotment categorization. | Standards. | |
| Inspect Grazing Allotments for Compliance (Program Element - NA). | Allotment Visits. | Field Office-wide. | Grazing Authorization. | Various-Between 1-10 years depending on allotment categorization. | Non-compliance. | |
| Evaluate Weed Treatments (Program Element - MK). | Treatment Area Visits. | Field Office-wide. | Acres. | Annually. | Treatment Effectiveness, Follow-up needs. | |
| Complete Ecological Site Inventory (Program Element - BQ). | Inventory and Monitoring Technical Reference 1734-7. | Field Office-wide. | Acres. | As Needed. | Permit terms and conditions or Allotment Management Plan (AMP) objectives. | |
| **Recreation and Visitor Services** | | | | | | |
| Undesignated areas. | Field visits for on-site monitoring. | Field Office-wide. | Acres. | Ongoing. | Visitor use, visitor health and safety, use and user conflicts, and resource conditions. | |
| Recreation opportunities. | Customer assessments (e.g., focus group interviews or visitor studies). Field visits for on-site monitoring. | ERMAs. | RMP objectives and other decision guidance. | Every 5 years or as funding allows for customer assessments. | Not meeting recreation objectives or not in compliance with other management decisions. | Monitor activity participation , the qualities and conditions of the landscape, visitor health and safety, use and user conflicts, resource conditions; during the primary use season with the help of recreation- |

*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026253

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| | | SRMAs. | | | | tourism partnerships. |
| Recreation opportunities. | Customer assessments (e.g., focus group interviews or visitor studies). Field visits for on-site monitoring. | SRMAs. | RMP objectives and other decision guidance. | Every 5 years or as funding allows monitor recreation objectives, recreation setting characteristics, and management decisions through customer assessments. | 1) Not meeting recreation objectives, 2) desired recreation setting characteristics do not exist, and 3) not in compliance with other management decisions. | Monitor activity participation , visitor health and safety, use and user conflicts, resource conditions; during the primary use season with the help of recreation-tourism partnerships. |
| **Comprehensive Trails and Travel Management** | | | | | | |
| Routes. | Route inspection through on-site field visits. | Field Office-wide. | Miles. | Ongoing. | Conditions represent a hazard to visitor safety, resource damage, or causes use and user conflicts. | |
| **Lands and Realty** | | | | | | |
| Rights-of-way compliance (Program Element - NH). | Site inspections. | Field Office-wide. | Site. | Annually. | Non-compliance or non-use. | |
| Fluid Minerals (Oil and Gas, Oil Shale, and Geothermal Resources) | | | | | | |
| Reclamation Implement-ation. | Site inspections and operator annual reports. | Field Office-wide. | Site. | Within first year following end of site disturbance. | Ground disturbing activities. | |
| Reclamation Effectiveness. | Site inspections and operator annual reports | Field Office-wide | Ocular Estimate of % of cover of native species | Every 2 years, or as needed. | Ground disturbing activities. | |
| Noxious Weed Treatment Implement- | Site inspections and operator annual reports. | Field Office-wide. | Site. | Annually or as Needed. | Ground disturbing activities. | |

*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026254

*Appendix J – Monitoring and Evaluation*

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| ation. | | | | | | |
| **Solid Minerals (Locatable Minerals, Salable Minerals/Mineral Materials, and Non-Energy Leasable Minerals)** | | | | | | |
| Monitor and maintain AML physical safety closures (Program Element 1990-LB). | Visual observation. | Field Office-wide. | Adequacy of closure. | Annually or as needed. | Maintenance of closures for public safety. | |

### III. Special Designations

| Areas of Critical Environmental Concern | | | | | | |
|---|---|---|---|---|---|---|
| Resource Condition: (i.e. scenic, cultural, geological, paleontological, ecological, special status plants, caves, bats (as applicable). | Site Inspections or remote sensing. | All ACECs. | Evidence of surface disturbance; evidence of invasive species; numbers and species of bats. | Every 1 to 5 years. | Evidence of human-caused surface disturbance above and beyond baseline; Evidence of illegal collection of paleo or T&E plants; Detection of noxious weeds; Loss of special status plant species or habitat due to disturbance. Bat populations are declining or evidence of white nose syndrome. | |
| **Wilderness Study Areas** | | | | | | |
| Ensure continued suitability for designation as wilderness. | Site visit or remote sensing. | WSAs. | Compliance with non-impairment standard per Manual 6330. | Once per month during the months the area is accessible by the public. | Violation of the regulations applicable to the use of WSAs, unauthorized | Unauthorized impacts usually include motorized or mechanized use in the WSA, or |

BLM_0026255

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| | | | | | impacts. | litter and dumping. |
| **Wild and Scenic Rivers** | | | | | | |
| *Water quality and quantity.* Alteration of water quality or river/stream conditions inconsistent with objectives. | Physically collected through direct field measurement. | Colorado River Segment 6 and 7; Deep Creek 2b and 3. | Water quality parameters, flow measurements, or habitat condition. | Ongoing. | Changes in water quality and quantity. | |
| *Scenic Values.* Alteration of landform, vegetation, or river condition inconsistent with visual quality objectives within the viewshed as seen from the river and high-use areas. | Maintain viewshed consistent with VRM objectives. | Colorado River Segment 6 and 7; Deep Creek 2b and 3. | Impacts of an individual intrusion. | Ongoing. | Intrusion that exceeds the definition of the classification. | |
| *Recreational Values.* Management Framework for SRMA. | Customer assessments (e.g., focus group interviews or visitor studies).<br><br>Field visits for on-site monitoring. | Colorado River Segment 6 and 7. | RMP objectives and other decision guidance. | Every 5 years or as funding allows monitor recreation objectives, recreation setting characteristics, and management decisions through customer assessments. | 1) Not meeting recreation objectives, 2) desired recreation setting characteristics do not exist, and 3) not in compliance with other management decisions. | Monitor activity participation , visitor health and safety, use and user conflicts, resource conditions; during the primary use season with the help of recreation-tourism partnerships. |
| *Geologic Values.* Alteration of landform or river condition | Review of proposed projects; site visits and remote sensing. | Colorado River Segment 7; Deep Creek Segments 2b and 3. | Impacts to geologic formations or natural processes that | LaSunder Cave monitored every permitted trip (at least once per year if | Undue or unnecessary degradation or loss of resources or | |

BLM_0026256

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| inconsistent with the geologic integrity of Glenwood Canyon and Deep Creek Canyon. | | | form geologic formations (see cave and karst monitoring section for Deep Creek Canyon). | trips occur that year); other cave and karst resources monitored as resources allow; Glenwood Canyon monitored as needed with new information. | ORVs as a result of human or natural causes, or not meeting LaSunder Cave Management Plan goals and objectives. | |
| *Botanical and Ecological Values.* Physical disturbance or changes in plant community composition. | Periodic site inspections or remote sensing. | Colorado River Segment 6; Deep Creek Segments 2b and 3. | Evidence of surface disturbance; evidence of invasive species. | Every 2-4 years. | Detection of noxious weeds; loss of species or habitat due to surface disturbance. | |
| *Ecological Values.* Bat monitoring. | Site visits or remote sensing. | Cave or karst area within Deep Creek Segments 2b and 3. | Populations monitored to determine if population trends are stable, declining or increasing; and what kind of bat use is occurring in the area. | As resources allow with cooperation with Colorado Parks and Wildlife.  Goal is to monitor each known cave every 5 years. | Populations are declining or evidence of White Nose Syndrome occurs within a cave or karst area. | |
| *Wildlife Values.* River otter monitoring. | Surveys and observation forms. | Colorado River Segment 6. | Populations and utilized range of river otters monitored. | Cooperation with Colorado Parks and Widlife. | Populations status, trends, and recovery criteria. | |

## IV. Support

| Transportation Facilities | | | | | | |
|---|---|---|---|---|---|---|
| Routes. | Route inspection through on-site inspection. | Field Office-wide. | Miles. | Ongoing by all resources. | Conditions represent a hazard to visitor | |

*Colorado River Valley Field Office Approved Resource Management Plan*

BLM_0026257

| Indicator | Method or Technique | Location | Unit of Measure | Frequency | Action Triggers | Other Information |
|---|---|---|---|---|---|---|
| | | | | | safety, resource damage, use and user conflicts. | |
| **Health and Safety** | | | | | | |
| Monitor and maintain AML, Hazmat & NRDAR sites (Program Element 1640-MG). | Visual observation or soil/water sampling. | Field Office - wide. | Site safety. | Annually or as needed. | Maintenance of sites for public health and safety. | |

BLM_0026258

# APPENDIX K
## BEST MANAGEMENT PRACTICES AND CONSERVATION MEASURES

BLM_0026259

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **BEST MANAGEMENT PRACTICES** | |
| AIR QUALITY | 3 |
| SOILS | 6 |
| WATER RESOURCES | 9 |
| VEGETATION: RANGELAND | 15 |
| VEGETATION: RIPARIAN AND WETLAND HABITATS | 16 |
| NOXIOUS AND INVASIVE WEED PREVENTION AND CONTROL | 18 |
| FISH AND WILDLIFE MANAGEMENT | 24 |
| SPECIAL STATUS SPECIES | 30 |
| CULTURAL RESOURCES | 44 |
| TRIBAL CONSULTATION | 46 |
| PALEONTOLOGY | 47 |
| VISUAL RESOURCES | 48 |
| WILDLAND FIRE ECOLOGY AND MANAGEMENT | 50 |
| LANDS MANAGED TO PROTECT WILDERNESS CHARACTERISTICS | 52 |
| CAVE AND KARST RESOURCES | 52 |
| WILD AND SCENIC RIVERS | 52 |
| WILDERNESS STUDY AREAS | 52 |
| FORESTRY | 52 |
| LIVESTOCK GRAZING | 55 |
| RECREATION | 59 |
| LANDS AND REALTY | 59 |
| MINERALS AND ENERGY | 62 |
| RENEWABLE ENERGY | 73 |
| TRANSPORTATION AND ACCESS | 73 |
| RECLAMATION | 74 |
| **CONSERVATION MEASURES FOR FEDERALLY-LISTED SPECIES** | 77 |

BLM_0026260

**INTRODUCTION**

This appendix provides a list of best management practices (BMPs) that are applicable to land use activities authorized by the Colorado River Valley Field Office (CRVFO). Best management practices are state-of-the-art mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts of land use activities. The BMPs included in this resource management plan are not intended to be a complete list but are displayed to show land use project proponents examples of commonly used practices the CRVFO will use to reduce impacts of surface-disturbing activities, use or occupancy. More explicit best management practices based on local conditions and resource-specific concerns could be developed once a specific proposal is being evaluated through the environmental analysis process. Additional best management practices can be proposed by project applicants for activities on BLM lands.

BMP's are intended to be implemented in a timely manner and maintained as appropriate to ensure effectiveness. Monitoring will help to refine and clarify whether the BMPs are achieving the goals and objectives of this resource management plan. If through inspection or routine maintenance a BMP is found to not be working as intended the BLM can consider other BMP's to achieve the planned desired results of the land use action.

BMPs may also adaptively change overtime, being updated in response to monitoring or changing resource conditions. As new technologies and methodologies arise, the BMP list may expand to provide for additional proven means of reducing impacts. Conversely, if shown to be ineffective select BMP's may not be implemented.

BLM_0026261

## BEST MANAGEMENT PRACTICES FOR THE COLORADO RIVER VALLEY FIELD OFFICE

### AIR QUALITY

Air quality standards are governed by the Clean Air Act of 1990 (as amended) (42 United States [US] Code Chapter 85). The US Environmental Protection Agency is charged with setting National Ambient Air Quality Standards, currently found at http://www.epa.gov/air/criteria.html (US Environmental Protection Agency 2009). The EPA's voluntary STAR program keeps a comprehensive list of air quality BMPs related to oil and gas development on the website http://www.epa.gov/gasstar/index.html. At the state level, the Colorado Department of Public Health and Environment has established its standards (Colorado Department of Public Health and Environment 2009). The Intermountain Oil and Gas BMP Project is based in Colorado and the website contains comprehensive BMPs including air quality BMPs http://www.oilandgasbmps.org/ browse.php?cat=1.

**AIR-1**:  The BLM has the authority and responsibility under the Federal Land Policy and Management Act to manage public lands in a manner that will protect the quality of air and atmospheric values. Therefore, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals.

**AIR-2**:  The proponent of a project will be required to minimize air pollutant emissions by complying with all applicable state and federal regulations (including application of best available control technology) and may be required to apply mitigation including but not limited to best management practices, and other control technologies or strategies identified by the BLM or CDPHE in accordance with delegated regulatory authority.

**AIR-3**:  The BLM may require project proponents for oil and gas development projects to conduct pre-construction air monitoring within or adjacent to the proposed development area. The purpose of this monitoring is to establish baseline air quality conditions prior to development at the site. The requirement for monitoring will be determined by BLM based on the absence of existing monitoring; existing air quality conditions; magnitude of potential air emissions from the project or activity; magnitude of existing emission sources in the area; proximity to a federally mandated Class I area, sensitive Class II area, or population center; location within a non-attainment or maintenance area; meteorologic or geographic conditions; project duration; or issues identified during project scoping. The project proponent will be required to provide a minimum of one year of baseline ambient air monitoring data for any pollutant(s) of concern as determined by BLM. If BLM determines that baseline monitoring is required, this pre-analysis data must meet CDPHE air monitoring standards, be obtained from a site within 50 km of the project boundary, and cover the year immediately prior to the proposed project submittal. The project proponent will be responsible for siting, installing, operating, and maintaining any required air monitoring.

**AIR-4**:  The BLM may require project proponents for oil and gas development projects to conduct air monitoring for the life of the oil and gas development project depending on the magnitude of potential air emissions from the project or activity, proximity to a federally mandated Class I area, sensitive Class II area, or population center, location within a non-attainment or maintenance area, meteorologic or geographic conditions, existing air quality conditions, magnitude of existing development in the area, or issues identified during project scoping. The purpose of this air monitoring is to determine impacts attributable to the project over time. The project proponent will be responsible for siting, installing, operating, and maintaining

BLM_0026262

any required air monitoring.

**AIR-5**: The BLM may require a project proponent to conduct air quality modeling for any pollutant(s) of concern in the absence of sufficient data to ensure compliance with laws and regulations or to determine the effectiveness of mitigation options, unless the project proponent can demonstrate that the project will result in no net increase in emissions of the pollutant(s) of concern. The requirement for modeling will be based on existing air quality conditions; magnitude of potential air emissions from the project or activity; magnitude of existing emission sources in the area; proximity to a federally mandated Class I area, sensitive Class II area, an area expected to exceed a NAAQs or PDS increment, population center, location within a non-attainment or maintenance area; meteorologic or geographic conditions; project duration; or issues identified during project scoping. The BLM, in cooperation with an interagency review team, will determine the parameters for the modeling analysis through the development of a project specific modeling protocol.

**AIR-6**: The BLM may require project proponents for oil and gas development projects to submit a contingency plan that provides for reduced operations in the event of an air quality episode. Specific operations and pollutants to be addressed in the contingency plan will be determined by the BLM on a case-by-case basis taking into account existing air quality and pollutants emitted by the project.

**AIR -7**: Implement directional drilling techniques to reduce construction related emissions (dust and vehicle and construction equipment emissions).

**AIR -8**: Improve engine technology (Tier 2 or better) for diesel drill rig engines to reduce $NO_x$, PM, CO, and VOC emissions.

**AIR -9**: Utilize natural gas fired drill rig engines to reduce $NO_x$ emissions and reduce formation of visibility impairing compounds and ozone.

**AIR-10**: Improve engine technology (Tier 2 or better) for all mobile and non-road diesel engines to reduce $NO_x$, PM, CO, and VOC emissions.

**AIR -11**: Utilize "Green completion" (a.k.a. closed loop or flareless) technology to reduce VOC and CH4 emissions. This would also reduce or eliminate open pits and associated evaporative emissions.

**AIR -12**: Utilize "Green workovers" to reduce VOC and CH4 emissions. This would also reduce or eliminate open pits and associated evaporative emissions.

**AIR -13**: Eliminate evaporation pits for drilling fluids to reduce VOC and GHG emissions.

**AIR -14**: Electrification of wellhead compression/pumping to reduce local emissions of fossil fuel combustion and transfers to a more easily controlled source.

**AIR -15**: Utilize renewable power sources to provide energy for compressors, monitoring equipment, or pumps.

**AIR -16**: Replace wet compressor seals with dry seals or use mechanical seals to reduce gas venting (VOC and GHG emissions).

BLM_0026263

**AIR -17**: Centralize or consolidate gas processing facilities, liquids gathering systems (condensate and produced water), water and/or fracturing liquids delivery systems, to reduce VOC and GHG emissions from individual dehydration/separator units and to reduce vehicle emissions.

**AIR -18**: Eliminate the use of open top tanks to reduce VOC and GHG emissions.

**AIR-19**: Improve capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units.

**AIR -20**: Improve capture and control of produced water, crude oil, and condensate tank emissions to reduce VOC and GHG emissions.

**AIR -21**: Improve capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion to reduce VOC, HAP, and GHG emissions.

**AIR -22**: Use zero emissions dehydrators or use desiccants dehydrators to reduce VOC, HAP, and GHG emissions.

**AIR -23**: Reduce miscellaneous fugitive VOC emissions by
   a. Installing plunger lift systems to reduce well blow downs
   b. Install and maintain low VOC emitting seals, valves, and hatches on production equipment.
   c. Initiate equipment leak detection and repair program (e.g., including use of FLIR infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection).
   d. Install or convert Gas operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers.
   e. Use "low" or "no bleed" gas operated pneumatic devices/controllers.
   f. Use closed loop system or thermal combustion for gas operated pneumatic pump emissions.
   g. Install or convert gas operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps.
   h. Install vapor recovery on truck loading/unloading operations at tanks.

**AIR -24**: Utilize dust suppression techniques on unpaved surfaces including watering, chemical suppressants, and gravel.

**AIR -25**: Utilize remote telemetry and automation of wellhead equipment to reduce vehicle traffic and associated emissions.

**AIR -26**: Post and enforce speed limits to reduce air borne fugitive dust from vehicular traffic on unpaved roads.

**AIR -27**: Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative work schedules, or work camps.

**AIR -28**: Use ultra-low sulfer diesel (e.g. in engines, compressors, construction equipment) to reduce emissions of particulates and sulfates.

**AIR -29**: Utilize best available technology and methods to degasify coal seams prior to mining.

BLM_0026264

Capture methane gas from coal seams to obtain a market income. Modify methane drainage over time to ensure capture is optimal.

**AIR -30**: Reduce unnecessary vehicle idling to reduce combustion emissions, ozone formation, visibility impacts, and fuel consumption.

**AIR -31**: Reduce the pace of (phased) development to reduce the peak emissions of all pollutants.

**AIR -32**: Restrict surface disturbing activities to periods when wind speeds are less than 25 mph.

**AIR -33**: Keep soil and coal refuse moist while loading into dump trucks.

**AIR -34**: Keep soil and coal refuse loads below the freeboard of the truck.

**AIR -35**: Minimize drop heights when loaders dump soil and coal refuse into trucks.

**AIR -36**: Tighten gate seals on dump trucks.

**AIR -37**: Cover dump trucks before traveling on public roads.

**AIR -38**: Cover construction materials, stockpiled soils, and stockpiled coal refuse if they are a source of fugitive dust.

**AIR -39**: Train workers to handle construction materials and debris to reduce fugitive emissions.

**AIR -40**: Employ water injection or rotoclones on all overburden drills.

**AIR -41**: Use chutes, drapes, or other means to enclose conveyor transfer points, screens, and crushers; cover all conveyors.

**AIR -42**: Suppress and extinguish spoil and coal fires as soon as is reasonable and safely possible.

References:

Colorado Department of Public Health and Environment. 2011. Air Quality Control Commission Regulations. Internet Web site: http://www.cdphe.state.co.us/regulations/airregs. Accessed on May 21, 2011.

Bureau of Land Management. 2009. Air Quality BMPs-Best Management Practices for Fluid Minerals. Updated 8-24-2009. www.blm.gov/bmp.

US Environmental Protection Agency. 2009. National Ambient Air Quality Standards. Internet Web site: http://www.epa.gov/air/criteria.html. Accessed on October 14, 2009.

## SOILS

**SOI-1**: All routes shall be built and maintained to BLM Manual Section 9113 standards for road shape and drainage features (BLM 2012) or where appropriate BLM Manual Section 9115

BLM_0026265

standards for primitive roads (BLM 2012b). For drainage crossings, culverts should be sized for the 50 year storm event with no static head and to pass a 100-year event without failing. Site specific conditions may warrant BLM to require designs for larger events (e.g. 75-100 year storm events). Large culverts and bridges shall be designed and constructed per **BLM Manual 9112** (large culverts and bridges) (BLM 2009). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**SOI-2**: When saturated soil conditions existing on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads and locations.

**SOI -3**: Topsoil shall not be placed while in a frozen or muddy condition, when the subgrade is excessively wet, or in a condition that may otherwise be detrimental to proper grading or proposed sodding or seeding.

**SOI -4**: Topsoil shall only be used for reclamation and shall not be used as fill or to bed or pad the pipe during backfilling.

**SOI -5**: Topsoil stripping will include all growth medium present at a site (following initial clearing of large trees, etc,...), as indicated by color or texture. Stripping and storage depth may be specified during the onsite inspection. All stripped topsoil /growth medium will be salvaged, segregated and stored in a manner that extends biological viability and protects it from loss. Topsoil and all growth medium will be replaced prior to seedbed preparation. No topsoil will be stripped or segregated when soils are saturated or frozen below the stripping depth.

**SOI -6**: A Winter Construction Plan will be submitted and approved by the BLM Authorized Officer before a Notice to Proceed will be authorized for construction activities in frozen soils.

**SOI -7**: Prohibit placing fill on a frozen foundation.

**SOI -8**: Slopes shall not be created so close to property lines as to endanger adjoining properties without adequate protection against sedimentation, erosion, slippage, settlement, subsidence or other related damages.

**SOI -9**: Surface disturbing actions will be sensitive to natural resource protection. When surface disturbance in sensitive areas is unavoidable, they will be minimized to the greatest extent practicable, especially near drainage features and on soils mapped as being saline.

**SOI -10**: Surface disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book )(BLM 2007b).

**SOI -11**: As detailed in the site plan for surface water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales or catchments.

**SOI -12**: Standard secondary containment shall hold 110% of the capacity the largest single tank it contains and be impervious to any oil, glycol, produced water, or other toxic fluid for 72

BLM_0026266

hours. Earthen berms must be compacted and of fine material that will prevent seepage of any spill to surrounding area.

**SOI -13**: All tanks with a capacity of ten (10) barrels or greater shall be labeled or posted with the following information: A. Name of operator; B. Operator's emergency contact telephone number; C. Tank capacity; D. Tank contents; and E. National Fire Protection Association (NFPA) Label. Smaller chemical storage shall be labeled with contents and NFPA label.

**SOI -14**: Interim and final reclamation procedures shall utilize best available science and technology to protect natural resources from undue degradation.

**SOI -15**: To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**SOI -16**: Consider site specific soil and vegetative characteristics and reclamation potential in project design and layout.

**SOI -17**: Native vegetation and soils will be protected and disturbance to them will be minimized.

**SOI -18**: Cleared vegetation smaller than four inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than four inches in diameter will be scattered over disturbed areas to accomplish reclamation objectives. Excessive vegetation larger than four inches in diameter may be removed from public land or shredded in place to be salvaged with topsoil. A wood cutting permit may be purchased from BLM for material removed from the site.

**SOI -19**: Windrowing of Topsoil. *[Use where appropriate based on topography – may not be appropriate for pads in steep areas or where pad size should be minimized.] T*opsoil shall be windrowed around the perimeter of surface disturbance to create a berm that limits and redirects stormwater runoff and extends the viability of the topsoil. Topsoil shall also be windrowed, segregated, and stored along disturbed surfaces or linear features for later spreading across the disturbed corridor during final reclamation. Topsoil berms shall be promptly seeded to maintain soil microbial activity, reduce erosion, and minimize weed establishment.

**SOI -20**: Where applicable, entrances to construction locations will be covered by gravel "track pads" to prevent sediment and weed seeds from being tracked in and out of the site.

**SOI -21**: In areas where all weather access is necessary, the operator would construct and maintain all-weather routes per BLM Manual Section 9113 standards. Graveling or other appropriate surfacing material would be required to reduce environmental resource damage and provide safe all-weather access.

**SOI -22**: Specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**SOI -23**: Standard secondary containment shall include a study corrugated metal wall to create a basin, be lined with a heavy impervious poly liner and be protected with a gravel surface. Small plastic hoppers shall be installed at all loadout connections to catch drips and small leaks.

**SOI -24**:  Oil and gas pads will be tear-dropped in shape to maximize interim reclamation and minimize bare soils.  Infrastructure must be clustered appropriately on the pad to facilitate the smallest disturbance footprint possible.

References:

BLM.  2009.  H-9112-1 Bridges and Major Culverts Handbook.  Bureau of Land Management, Washington, D.C.

BLM.  2012.  H-9113-1 Road Design Handbook.  Bureau of Land Management, Washington, D.C. On-line: http://web.blm.gov/nstc/eat/pdf/Final%20H-9113-1.pdf

BLM. 2012b.   H-9115 Primitive Roads Manual.  Bureau of Land Management, Washington, D.C.

United States Department of the Interior and United States Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

## WATER RESOURCES

**WTR-1**:   The operator/permittee shall adhere to all requirements under the Federal Water Pollution Control Act, as amended through P.L. 107-303, November 27, 2002.

**WTR-2**:  For surface disturbing activities exceeding one acre in size, develop and implement Stormwater Pollution Prevention Plans to include site-specific design, systematic site monitoring, installation of run-on/off controls such as ditches or berms and installation of adaptive BMPs to reduce potential erosion and sediment production and transport.  Stormwater will be dispersed to stabilized areas to slow velocity, prevent erosion and support infiltration into soils.  Stormwater BMPs identified in the State approved Storm Water Pollution Prevention Plan shall be in place prior to any earth-disturbing activity.  Additional BMPs will be installed if determined necessary by the BLM.  All measures shall be maintained in good, functional condition.  All temporary BMPs shall be removed once site stabilization and reclamation efforts have been deemed successful by the BLM.

**WTR-3**:  All stream crossings affecting perennial streams or streams supporting riparian habitat shall be professionally engineered (design, construction, and maintenance).

**WTR-4**:  Spoil material from clearing, grubbing, and channel excavation shall be disposed of in a manner that will not interfere with the function of the channel and in accordance with all local, state, and federal laws and regulations.

**WTR-5**:  Surface disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book BLM 2007b).

**WTR-6**: Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan for establishing positive management of surface water drainage, to reduce

BLM_0026268

erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance and reporting. BMPs may include run-on/run-off controls such as surface pocking or re-vegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

**WTR-7**:  The operator will reduce potential for contaminating water resources where spills of drilling fluids are most vulnerable.  Areas of vulnerability will include a 0.25 mile buffer around the following: mapped alluvial, colluvial, and glacial deposits; springs and perennial water sources, Source Water Protection Areas, and Municipal Watersheds).  In these areas, the operator will utilize:
    a. Closed loop drilling systems.
    b. Gas-blocker additives will utilized during the cementing process.
    c. Flowback and stimulation fluids will be contained in tanks on well pad with secondary containment mats/blankets (or equivalent).
    d. Containment devices shall be installed beneath and around crude oil, condensate and produced water storage tanks.
    e. The operator will collect baseline water quality data from downstream fresh water sources prior to drilling, mining, or storage of potentially harmful substances. Parameters to be analyzed will be determined on a site specific basis based on the nature of the proposed action. The operator will be responsible for submitting a list of parameters to BLM for approval prior to sampling.
    f. Notification of potentially impacted Public Water Systems 15 miles downstream.
    g. Emergency spill and response program shall be developed, reviewed, and approved by BLM prior to surface-disturbing activities.

**WTR-8**:  Protection of drinking water supply sources within surface water supply areas (leased or made available for leasing) will concur with Colorado Oil and Gas Conservation Commission rule 317B and subsequent updates.

**WTR-9**:  All routes shall be built and maintained to BLM Manual Section 9113 standards for road shape and drainage features (BLM 2012) or where appropriate BLM Manual Section 9115 standards for primitive roads (BLM 2012b). For drainage crossings, culverts should be sized for the 50 year storm event with no static head and to pass a 100-year event without failing.  Site specific conditions may warrant BLM to require designs for larger events (e.g. 75-100 year storm events).  Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009).  Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**WTR-10**:  Erosion control features shall be maintained through periodic inspection and maintenance, including cleaning dips and cross-drains, repairing ditches, marking culvert inlets to aid in location, and clearing debris from culverts.

**WTR-11**:  Surface discharges shall comply with all regulatory requirements outlined in the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act), as amended through P.L. 107-303, November 27, 2002 Clean Water Act.  Additionally, surface discharges should be made to well defined channels away from major erosional features. Furthermore, discharges should be limited to a volume less than or equal to the naturally occurring mean annual peak flow (which is roughly equivalent to a peak generated by a 2-year 24-hour storm event) and that can be handled by the natural channel under anticipated conditions.

**WTR-12**:  To protect water quality, anti-backflow devices shall be utilized while drafting fresh

BLM_0026269

water from streams, springs, reservoirs and wells.

**WTR-13**:  Range improvements will conform to BLM Manual H 1740-2 and subsequent updates (BLM 2008).

**WTR -14**:  Discharge of surface and groundwater to surface drainages will comply with the Federal Water Pollution Control Act (as amended through P.L. 107–303, November 27, 2002) and will be pre-approved by BLM and will meet the following criteria:
   a. Discharge operations will not negatively impact downstream beneficial uses.
   b. Discharge soil/water interactions will not facilitate the movement of water quality contaminants (e.g., salt, selenium (typically associated with Mancos shale derived soils), sediment, metals) above natural rates in surface and/or groundwater.
   c. Water discharge shall be limited to well-defined major channels, to reduce potential of discharged water dissolving and transporting salts from the stream channel and to reduce concentration of salts in alluvium.
   d. Discharges will be limited to a volume that can be handled by the natural channel and less than or equal to the naturally occurring mean annual peak flow (roughly equivalent to a two-year, 24-hour storm peak).
   e. Discharge points will be located in stable channels or reservoirs away from any downstream head-cuts or other major erosional features (as determined by BLM). Outfall design may include discharge aprons and downstream stabilization of channel side slopes to prevent erosion and provide energy dissipation.
   f. Subject to BLM approval, water quality thresholds for both surface and groundwater will be set and monitored during discharge operations in order that they will cease if thresholds were exceeded.
   g. Surface and groundwater quantity and quality will be monitored during all discharge operations. Monitoring locations will be subject to BLM approval. Monitoring activities will continue for at least two water years following cessation of discharge.

**WTR -15**:  Hazardous substances will not be used in drilling, testing, or completion operations, nor introduced at any time into the reserve or cuttings pit. Fluids will be confined to pits or tanks and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

**WTR -16**:  Pits will be constructed so that water will not run into them. Fluid levels will be maintained below 2 feet of the lowest point of containment.

**WTR -17**:  Interim and final reclamation procedures shall utilize best available science and technology to protect natural resources from undue degradation.

**WTR-18**:  To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**WTR-19**:  Provide energy dissipaters (e.g., rock piles and logs) where necessary at the downstream end of ditch relief culverts to reduce the erosion energy of the emerging water.

**WTR-20**:  The face of cut or fill slopes shall not be subject to any concentrated flows of surface water such as from natural drainage ways, graded swales, and downspouts.

BLM_0026270

**WTR-21**:   Provide subsurface drainage where necessary to intercept seepage that would otherwise adversely affect slope stability or create excessively wet site conditions.

**WTR-22**:   Grade road surfaces only as often as necessary to maintain a stable running surface and to retain the original surface drainage.

**WTR-23**:   Avoid cutting the toe of cut slopes when grading roads or pulling ditches.

**WTR-24**:   The operator will be responsible for keeping road inlet and outlet ditches, catch-basins, and culverts free of obstructions, particularly before and during spring runoff. Routine machine-cleaning of ditches shall be kept to a minimum during wet weather. Leave the disturbed area in a condition that provides drainage with no additional maintenance.

**WTR -25**:   Remove all temporary stream crossings immediately after use and cross-ditch the ends of routes or rights-of-way to mitigate erosion from disturbed areas.

**WTR -26**:   When designing protective/mitigation measures, consider the changes that may occur in the watershed hydrology and sedimentation over the design life of the measure. Moreover, design and construct roads that are self-maintaining and consider using road surfacing, such as gravel when year-long access may be necessary.

**WTR -27**:   Design and construct stream crossings at right angles, in straight sections of stable reaches to handle (at a minimum) the 100-year flood, and consider culvert and bridge designs that ensure aquatic organism passage.

**WTR -28**:   Where the access road crosses small drainages and intermittent streams not requiring culverts, low water crossings shall be used. The road will dip to the original streambed elevation of the drainage and the crossing will prevent any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

**WTR -29**:   For pipeline crossings of drainage ways: Pipelines crossing at the surface must be constructed high enough to remain above the highest possible floodflows at each crossing. Pipeline crossings below the surface must be buried deep enough to remain undisturbed by scour and fill processes typically associated with passage of peak flows. A hydraulic analysis should be completed during the pipeline design phase to avoid repeated maintenance of such crossings and eliminate costly repairs and potential environmental degradation associated with pipeline breaks at stream crossings (DOI, 2007). Utilize horizontal directional boring techniques under perennial water bodies and/or wetland complexes when environmental circumstances allow.

**WTR -30**:   Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles and heavy machinery.

**WTR-31**:   Time working in wetlands and watercourses should occur only during low flow conditions. High flows occur during late summer early fall as a result of high intensity convective thunderstorm events.  Work in these areas must also be done in a manner consistent with BMPs for biological resources.

**WTR-32**:   Exclude livestock and vehicles from spring sources and riparian areas where on-site evaluation and/or monitoring data indicate degrading conditions or potential to degrade spring or

BLM_0026271

riparian function.

**WTR-33**:  Avoid alteration of natural hydrologic function and condition in source areas for springs, seeps, fens, or other water developments. Relocate surface-disturbing activities away from these sensitive areas as site conditions warrant.

**WTR-34**:  Limit consumptive water use from Federal point source water rights on public lands that are not sustainable and/or would jeopardize discharge to streams, springs, seeps, fens, or downstream senior water rights.

**WTR-35**:  Manage and manipulate invasive stands of brush and weeds on forest, range, pasture land by mechanical, chemical, or biological means or by prescribed burning to improve watershed function and condition.

**WTR-36**:  Limit surface disturbance near drainage features and minimize surface disturbance on steep slopes, fragile soils, saline soils, and Mancos shale derived soils.

**WTR-37**:  When activity in streams, wetlands, or riparian areas is unavoidable, the operator will first employ best available technology such as eco-Matting to reduce impacts.  The operator would then restore modified or damaged areas as close as practicable to natural conditions to protect banks, wetlands and to re-establish riparian vegetation.

**WTR -38**:  Maintain to the greatest extent practicable natural flow rates and chemical and physical properties of surface and groundwater during work within stream channels, floodplains, and/or riparian areas.

**WTR -39**:  Oil and gas drilling operations within municipal watersheds, source water protection areas, or locally important fresh water aquifers should utilize methods and materials that will prevent degradation of the underlying groundwater. This may include practices such as surface and intermediate casing through potential fresh water zones, gas blocker additives to cement jobs, the use of green fracturing fluids, and pitless drilling - closed loop drilling.  The use of "Green" fracturing fluids will be documented in the form of Material Safety Data Sheets which will be reviewed by the operator for compliance prior to use.  Material Safety Data Sheets will remain on site at all times such chemicals are present.

**WTR-40**:  Water from well production tests (water wells) or hydrostatic testing of pipelines shall be filtered of sediments prior to discharge into wetlands. Energy dissipating methods (e.g., straw bales, waddles, vegetative buffers) shall be in place prior to discharge of production water or water used for hydrostatic testing.

**WTR-41**:  Within portions of municipal watersheds and source water protection areas available for fluid minerals development, the operator should develop and implement a watershed protection plan. This plan would include characterization and monitoring of baseline hydrologic/hydrogeologic conditions such as but not limited to: water quality, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater.  The operator should collaborate with all watershed stakeholders in development and implementation of the watershed protection plan.

**WTR-42**:  Livestock feeding, and salting, shall be done in a manner to protect water quality. When possible, these developments or practices should be done at least 400 meters from riparian zones. (Livestock feeding on public land is not authorized by regulation, unless approved by the

BLM_0026272

authorized officer. CFR4140.1(a)(3).)

**WTR-43**:  Maintain appropriate vegetative/riparian buffers around water features to slow runoff and trap sediments and protect water quality.  A minimum buffer distance should be between 325-500ft or greater where site conditions warrant.

**WTR-44**:  Surface disturbing actions should not permanently impair floodplain function.

**WTR-45**:  No operations using chemical processes (except for vegetation management) or other pollutants in their activities will be allowed to occur within 200 feet of any water bodies.  This includes staging equipment for refueling, and equipment maintenance.

**WTR-46**:  Fill material will not be cast over hilltops or into drainages.

**WTR-47**:  All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support Federal or State-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe, and remotely-actuated block or check valves on both sides of the stream may be used.

**WTR-48**:  Baseline information of channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

**WTR-49**:  Direct overflow from water developments back to the original natural drainage in a way that does not accelerate erosion or modify riparian habitats.

**WTR-50**:  Avoid soil compaction or surface disturbing activities in recharge areas that could impair natural function of springs and/or seeps.

<u>References</u>:
Federal Water Pollution Control Act, as amended through P.L. 107-303, November 27, 2002
United States Department of the Interior and United States Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

BLM.  2009.  H-9112-1 Bridges and Major Culverts Handbook.  Bureau of Land Management, Washington, D.C.

BLM.  2012.  H-9113-1 Road Design Handbook.  Bureau of Land Management, Washington, D.C. On-line: http://web.blm.gov/nstc/eat/pdf/Final%20H-9113-1.pdf

BLM.  2012b.   H-9115 Primitive Roads Manual.  Bureau of Land Management, Washington, D.C.

BLM.  2008.  H-1740-2 Integrated Vegetation Management Handbook.  Bureau of Land Management,            Washington,            D.C.            On-line: http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm _handbook.Par.59510.File.dat/H-1740-2.pdf

U.S. Department of the Interior. 2007. Hydraulic considerations for pipelines crossing stream channels. Technical Note 423. BLM/ST/ST-07/007+2880. Bureau of Land Management, National   Science   and   Technology   Center,   Denver,   CO.   *http://www.blm.gov/nstc/*

BLM_0026273

*library/techno2.htm*

## VEGETATION: RANGELAND

**VEG-RAN-1**:  When making decisions about proposed projects/actions in known sagebrush habitat, existing plans and guidance will be used by interdisciplinary teams and considered in the decision making process. This guidance includes the conservation actions/guidelines identified in the Western Association of Fish and Wildlife Agencies – Conservation Assessment of Greater Sage-grouse and Sagebrush habitats (2004), and local working group population plans (North Eagle-Southern Routt Population of Greater Sage-grouse and Parachute Piceance Roan Population of Greater Sage Grouse) or the most recent guidance.

**VEG-RAN-2**:  Prepare a reclamation plan and weed management plan prior to ground-disturbing activities.  Realize that seeding or planting native plants may need to be repeated until deemed successful.

**VEG-RAN-3**:  Develop vegetation objectives that include desired plant composition, canopy and ground cover prior to conducting vegetation treatments or revegetation efforts.

**VEG-RAN-4**:  Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**VEG-RAN-5**:  Close and rehabilitate roads quickly when they are no longer needed.

**VEG-RAN-6**:  Build roads to the appropriate standard, no higher than necessary for use and safety, and utilize primitive or two-track roads rather than constructing new roads where feasible.

**VEG-RAN-7**:  Pipelines (and electrical power lines when possible) shall be placed within road corridors to minimize disturbance.

**VEG-RAN-8**:  Minimize disturbance to soil and native vegetation as much as possible.

**VEG-RAN-9**:  Stockpile topsoil for use in final reclamation. Topsoil shall be stored separately from other fill materials.

**VEG-RAN-10**:  When timely natural regeneration of the native plant community is not likely to occur, carefully select species that will not compete with or exclude botanical resources for revegetation efforts. Bare sites shall be seeded as soon as appropriate to prevent establishment of undesirable plant species.

**VEG-RAN-11**:  Utilize appropriate sagebrush species/subspecies and important understory plants relative to site potential in seedings.

**VEG-RAN-12**:  Ensure that seed used for revegetation as well as straw and hay bales used for erosion control are certified free of noxious weeds.

**VEG-RAN-13**:   Monitor the long-term success of revegetation efforts (according to the Reclamation Plan or Vegetation Objectives of the vegetation treatment plan) to ensure successful

BLM_0026274

establishment of desired species and detect any noxious weed infestations. If revegetation is unsuccessful, continue efforts to establish desired species in disturbed sites.

**VEG-RAN-14**:  In Salt Desert Shrub communities with biological soil crusts, require reclamation that includes, but is not limited to: broadcasting bacterial inoculants, planting native grass, forbs, and shrubs seedlings, and exclosure fences.

References:

BLM (US Department of Interior, Bureau of Land Management). 2007. Final Vegetation Treatment Using Herbicides on Bureau of Land Management Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

Connelly, J.W., S.T. Knick, M.A. Schroeder, and S.J. Stiver. 2004. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitat. Western Association of Fish and Wildlife Agencies. Unpublished Report. Cheyenne, Wyoming.

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

## VEGETATION: RIPARIAN AND WETLAND HABITATS

**VEG-RIP-1**:  Utilize the techniques and methods for vegetation treatments identified in the Record of Decision for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**VEG-RIP-2**:  Utilize the techniques and processes for protection of floodplains as identified in Executive Order 11988 – Floodplain Management.

**VEG-RIP-3**:  Road crossings that will be used for longer than one year on perennial streams will be engineered and approved by the BLM Authorized Officer.

**VEG-RIP-4**:  Do not locate roads or other facilities immediately parallel to streams. Where roads or facilities must cross streams, cross perpendicularly and immediately exit the buffer zone.

**VEG-RIP-5**:  Armor low water stream crossings, place properly sized culverts, or span streams as appropriate to protect the riparian zone.

**VEG-RIP-6**:  Maintain a minimum of six inch stubble height for the key specie(s) of that riparian area by the end of October or winter grazing rotation on stream bank (lotic) riparian.  If riparian system stability is dependent upon key riparian grasses and forbs, maintain adequate stubble height to dissipate energy from spring runoff.

**VEG-RIP-7**:  Maintain a minimum of four inch stubble height on key species at the end of October on wet meadows (lentic) systems.

BLM_0026275

**VEG-RIP-8**:  Roads and trails (off-highway vehicle, horse, bicycle, hiking) will avoid wetlands and if avoidance is not possible will be designed and constructed in accordance Technical Reference 2E22A68-NPS, Off-highway Vehicle Management.

**VEG-RIP-9**:  Minimize crossing of streams (intermittent and perennial) and wetlands with vehicles, heavy machinery, and facilities (e.g. pipelines).

**VEG-RIP-10**:  Locate residue piles (e.g., sawdust, field chipping residue, disposal ponds) away from drainages where runoff may wash residue into water bodies or wetlands.

**VEG-RIP-11**:  Manage vegetation in riparian areas to provide wildlife habitat, adequate shade, sediment control, bank stability, and recruitment of wood into stream channels.

**VEG-RIP-12**:  Locate project staging areas for refueling, maintenance equipment, materials, operating supplies, and boring in areas not designated as riparian and/or wetland areas.

**VEG-RIP-13**:  Minimize surface disturbance within riparian areas and in wetlands.

**VEG-RIP-14**:  Avoid late summer or early fall grazing in areas with declining willow populations.  If grazing during these time periods must occur allow for at least one full year of rest between grazing rotations.

**VEG-RIP-15**:  Utilize riparian pastures as appropriate to manage grazing activities in riparian areas.  Vary the timing, duration, and frequency of grazing in riparian pastures.

**VEG-RIP-16**:  Create off-stream watering facilities when possible (e.g. stock tanks, stock ponds, nose pumps, etc.). Where feasible, place grazing stock tanks and other watering facilities at least 400 meters (1/4 mile) from riparian zones and on closely the same elevation.

**VEG-RIP-17**:  Actively move cattle to and from riparian pastures or pastures containing riparian habitat.  Do not allow for cattle to drift between pastures (BLM TR-1737-14 p. 33-34).

**VEG-RIP-18**:  Low stress stockmanship (e.g., herding, movements between pastures) methods should be used to encourage cattle grazing away from riparian areas. Cattle should be turned out away from riparian areas when entering new pastures or allotments. Cattle should also be guided to appropriate bedding areas.

**VEG-RIP-19**:  Cull individually identified cattle from the herd that congregate or preferentially graze certain riparian area(s) for extended periods of time.

**VEG-RIP-20**:  Place salt, molasses, and other supplements on uplands at least 400 meters (1/4 mile) away from riparian and wetland areas and on gently sloping land to encourage cattle to graze uplands and move out of riparian areas.  Supplementation sites should be at least 800 meters (1/2 miles) apart. (Supplemental feeding of livestock on public land is not authorized by regulation, unless approved by the authorized officer. CFR4140.1(a)(3).)

**VEG-RIP-21**:  Phase the size and timing of vegetation removal treatments within riparian areas.  Phasing treatments sizes and timing to reduce soil and water temperatures, maintain bank and soil stability, and retain adequate wildlife habitat for cover and nesting.

**VEG-RIP-22**:  Phase the size and timing of vegetation removal treatments on uplands

BLM_0026276

immediately adjacent to riparian areas, and buffer treatment boundaries away from riparian areas to reduce sedimentation and erosion in riparian zones. Allow for at least one 1 year between vegetation removal treatments in uplands and in riparian or wetland areas.

**VEG-RIP-23**:  Relocate existing roads away from riparian areas as feasible during requested permitting or authorization of these routes.  Reclaim abandoned portions of relocated roads back to natural conditions.  Recontour routes back to natural slopes as feasible, rip compacted soils (except for in close proximity to desirable trees), and seed disturbed areas.

**VEG-RIP-24**:  Fences should not be placed immediately on the edge of riparian areas.  Place fences away from riparian or wetland areas to decrease impacts from trailing along fences.

References:
BLM (US Department of Interior, Bureau of Land Management). 2007. Final Vegetation Treatment Using Herbicides on Bureau of Land Management Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

National Riparian Service Team. Riparian Area Management. Technical Reference 1737-20.Grazing Management Processes and Strategies for Riparian-Wetland Areas. 2006.

The Stubble Height Review Team.  2006.  Pp 6. Using Stubble Height to Monitor Riparian Vegetation.  Rangelands. February

## NOXIOUS AND INVASIVE WEED PREVENTION AND CONTROL

### Pre-project Planning:
**WEED-1**:   Environmental analyses for projects, vegetation treatments, and maintenance programs should assess weed risks, analyze high-risk sites for potential weed establishment and spread, and identify prevention practices.

**WEED-2**:  Determine site-specific restoration and monitoring needs and objectives at the onset of project planning.

**WEED-3**:  Inventory all proposed projects for weeds prior to ground-disturbing activities. If weeds are found, they should be treated (if the timing is appropriate) or removed (if seeds are present) to limit weed seed production and dispersal.

**WEED-4**:  Wash vehicles and other equipment to reduce the spread of noxious weeds from weed-contaminated areas to non-contaminated areas.  Portable wash stations would be ideal in areas of heavy oilfield traffic and in areas where noxious weeds are an issue.

**WEED-5**:  Locate and use weed-free project staging areas. Avoid or minimize travel through weed infested areas, or restrict travel to periods when spread of disseminules is least likely.

**WEED-6**:  Identify sites where equipment can be cleaned. Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts should be collected and incinerated when possible.

BLM_0026277

**WEED-7**:  If certified weed-free gravel pits become available in the county, the use of certified weed-free gravel will be required wherever gravel is applied to public lands (e.g., roads).

**WEED-8**:  Maintain stockpiled, non-infested material in a weed-free condition. Topsoil stockpiles should be promptly revegetated to maintain soil microbial health and reduce the potential for weeds.

**WEED-9**:  Use seed mixes appropriate to the ecological site and those species that are demonstrated to be best at inhibiting weed establishment, except when other resource values dictate a less-competitive mix.

**WEED-10**:  A certified seed laboratory shall test each seed lot according to the Association of Official Seed Analysts standards (which include an all-state noxious weed list) and provide documentation of the seed inspection test. The seed shall contain no noxious, prohibited, or restricted weed seeds and shall contain no more than 0.5 percent by weight of other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended.

**Project Implementation:**
**WEED-11**:  Minimize soil disturbance. To the extent practicable, native vegetation should be retained in and around project activity areas, and soil disturbance kept to a minimum.

**WEED-12**:  If a disturbed area must be left bare for a considerable length of time, cover the area with weed barrier until revegetation is possible.

**Post-project:**
**WEED-13**:  Clean all equipment before leaving the project site when operating in weed infested areas.

**WEED-14**:  Inspect, remove, and properly dispose of weed seed and plant parts found on clothing and equipment. Proper disposal means bagging and incinerating seeds and plant parts or washing equipment in an approved containment area.

**WEED-15**:  Revegetate disturbed soil where appropriate to optimize plant establishment for that specific site. Define revegetation objectives for each site. Revegetation may include topsoil replacement, planting, seeding, fertilization, and certified weed-free mulching as necessary. Use native material where appropriate and feasible.

**WEED-16**:  Monitor sites where seed, hay, straw, or mulch has been applied. Eradicate weeds before they form seed. In contracted projects, contract specifications could require that the contractor control weeds for a specified length of time.

**WEED-17**:  Inspect and document all ground-disturbing activities in noxious weed infested areas for at least three growing seasons following completion of the project. For ongoing projects, continue to monitor until reasonably certain that no weeds are present. Plan for follow-up treatments based on inspection results.

**Roads and Utilities - Pre-project Planning:**
**WEED-18**:  Communicate with contractors, local weed districts or weed management areas about projects and best management practices for prevention.

BLM_0026278

**WEED-19**: Remove mud, dirt, and plant parts from project equipment before moving it into a project area. Seeds and plant parts shall be collected and incinerated when practical, or washed off in an approved containment area.

**WEED-20**: Avoid acquiring water for road dust abatement where access to water is through weed-infested sites.

**WEED-21**: Treat weeds on travel rights-of-ways before seed formation so construction equipment doesn't spread weed seed.

**WEED-22**: Schedule and coordinate blading or pulling of noxious weed-infested roadsides or ditches in consultation with the local weed specialist. When it is necessary to blade weed-infested roadsides or ditches, schedule the activity when disseminules are least likely to be viable.

<u>**Roads and Utilities - Project Implementation:**</u>
**WEED-23**: Retain shade to suppress weeds by minimizing the removal of trees and other roadside vegetation during construction, reconstruction, and maintenance; particularly on south aspects.

**WEED-24**: Do not blade or pull roadsides and ditches infested with noxious weeds unless doing so is required for public safety or protection of the roadway. If the ditch must be pulled, ensure weeds remain onsite. Blade from least infested to most infested areas.

<u>**Roads and Utilities - Post-project:**</u>
**WEED-25**: Clean all equipment (power or high-pressure cleaning) of all mud, dirt, and plant parts before leaving the project site if operating in areas infested with weeds. Seeds and plant parts shall be collected and incinerated when possible.

**WEED-26**: When seeding has been specified for construction and maintenance activities, seed all disturbed soil (except travel route) soon after work is completed.

**WEED-27**: Use a certified weed-free seed mix suitable for local environmental conditions that includes fast, early growing (preferably native) species to provide quick revegetation. Consider applying weed-free mulch with seeding.

**WEED-28**: Periodically inspect roads and rights-of-way for noxious weeds. Train staff to recognize weeds and report locations to the local weed specialist. Follow-up with treatment when needed.

**WEED-29**: When reclaiming roads, treat weeds before roads are made impassable. Inspect and follow up based on initial inspection and documentation.

**WEED-30**: To avoid weed infestations, create and maintain healthy plant communities whenever possible, including utility rights-of-ways, roadsides, scenic overlooks, trailheads, and campgrounds.

<u>**Recreation Activities:**</u>
**WEED-31**: Inspect and clean mechanized trail vehicles of weeds and weed seeds.

**WEED-32**: Wash boots and socks before hiking into a new area. Inspect and clean packs, equipment, and bike tires.

**WEED-33**:  Avoid picking unidentified "wildflowers" and discarding them along trails or roadways.

**WEED-34**:  Maintain trailheads, campgrounds, visitor centers, boat launches, picnic areas, roads leading to trailheads, and other areas of concentrated public use in a weed-free condition. Consider high-use recreation areas as high priority sites for weed eradication.

**WEED-35**:  Sign trailheads and access points to educate visitors on noxious and invasive weeds and the consequences of their activities.

**WEED-36**:  In areas susceptible to weed invasion, limit vehicles to designated, maintained travel routes. Inspect and document travel corridors for weeds and treat as necessary.

**WEED-37**:  Encourage use of pelletized feed for backcountry horsemen and hunters. Pelletized feed is unlikely to contain weed seed.

**Outfitting / Recreation Pack and Saddle Stock Use:**
**WEED-38**:  Allow only certified weed-free hay/feed on BLM lands.

**WEED-39**:  Inspect, brush, and clean animals (especially hooves and legs) before entering public land. Inspect and clean tack and equipment.

**WEED-40**:  Regularly inspect trailheads and other staging areas for backcountry travel. Bedding in trailers and hay fed to pack and saddle animals may contain weed seed or propagules.

**WEED-41**:  Tie or contain stock in ways that minimize soil disturbance and prevent loss of desirable native species.

**WEED-42**:  Authorized trail sites for tying pack animals should be monitored several times per growing season to quickly identify and eradicate new weeds. Trampling and permanent damage to desired plants are likely. Tie-ups shall be located away from water and in shaded areas where the low light helps suppress weed growth.

**WEED-43**:  Educate outfitters to look for and report new weed infestations.

**Wildlife Habitat Projects:**
**WEED-44**:  Incorporate weed prevention into all wildlife habitat improvement project designs.

**Watershed Management:**
**WEED-45**:  Frequently and systematically inspect and document riparian areas and wetlands for noxious weed establishment and spread. Eradicate new infestations immediately since effective tools for riparian-area weed management are limited.

**WEED-46**:  Promote dense growth of desirable vegetation in riparian areas (where appropriate) to minimize the availability of germination sites for weed seeds or propagules transported from upstream or upslope areas.

**WEED-47**:  Address the risk of invasion by noxious weeds and other invasive species in watershed restoration projects and water quality management plans.

BLM_0026280

**Grazing Management:**

**WEED-48**: Consider prevention practices and cooperative management of weeds in grazing allotments. Prevention practices may include:

    a. Altering season of use
    b. Minimizing ground disturbance
    c. Exclusion
    d. Preventing weed seed transportation
    e. Maintaining healthy vegetation
    f. Revegetation
    g. Inspection
    h. Education
    i. Reporting

**WEED-49**: When authorized, provide certified weed-free supplemental feed in a designated area so new weed infestations can be detected and treated immediately. Pelletized feed is unlikely to contain viable weed seed. (Supplemental feeding of livestock on public land is not authorized by regulation, unless approved by the authorized officer. CFR4140.1(a)(3).)

**WEED-50**: If livestock may contribute to seed spread in a weed-infested area, schedule livestock use prior to seed-set or after seed has fallen.

**WEED-51**: If livestock were transported from a weed-infested area, annually inspect and treat entry units for new weed infestations.

**WEED-52**: Consider closing infested pastures to livestock grazing when grazing will either continue to exacerbate the condition or contribute to weed seed spread. Designate those pastures as unsuitable range until weed infestations are controlled.

**WEED-53**: Manage the timing, intensity (utilization), duration, and frequency of livestock activities to maintain the competitive ability of desirable plants and retain litter cover. The objective is to prevent grazers from selectively removing desirable plant species and leaving undesirable species.

**WEED-54**: Exclude livestock grazing on newly seeded areas with fencing to ensure that desired vegetation is well established, usually after 2-3 growing seasons.

**WEED-55**: Reduce ground disturbance, including damage to biological soil crusts. Consider changes in the timing, intensity, duration, or frequency of livestock use; location and changes in salt grounds; restoration or protection of watering sites; and restoration of yarding/loafing areas, corrals, and other areas of concentrated livestock use.

**WEED-56**: Inspect areas of concentrated livestock use for weed invasion, especially watering locations and other sensitive areas that may be particularly susceptible to invasion. Inventory and manage new infestations.

**Fire Management Plans:**

**WEED-57**: Prescribed fire plans should include pre-burn invasive weed inventory and risk assessment components as well as post-burn mitigation components.

**WEED-58**: Integrate prescribed fire and other weed management techniques to achieve best results. This may involve post-burn herbicide treatment or other practices that require careful timing.

BLM_0026281

**WEED-59**: Include weed prevention and follow-up monitoring in all prescribed fire activities. Include in burn plans the possibility for post-burn weed treatment.

**WEED-60**: For prescribed burns, inventory the project area and evaluate potential weed spread with regard to the fire prescription. Areas with moderate to high weed cover should be managed for at least 2 years prior to the prescribed burn to reduce the number of weed seeds in the soil. Continue weed management after the burn.

**WEED-61**: Ensure that a weed specialist is included on a Fire Incident Management Team when wildfire or prescribed operations occur in or near a weed-infested area. Include a discussion of weed prevention operational practices in all fire briefings.

**WEED-62**: Use operational practices to reduce weed spread (e.g., avoid weed infestations when locating fire lines).

**WEED-63**: Identify and periodically inspect potential helispots, staging areas, incident command posts, and base camps and maintain a weed-free condition. Encourage network airports and helibases to do the same.

**WEED-64**: Develop a burned-area integrated weed management plan, including a monitoring component to detect and eradicate new weeds early.

**Fire Management:**
**WEED-65**: Ensure that all equipment (including borrowed or rental equipment) is free of weed seed and propagules before entering incident location.

**WEED-66**: When possible, use fire suppression tactics that reduce disturbances to soil and vegetation, especially when creating fire lines.

**WEED-67**: Use wet or scratch-lines where possible instead of fire breaks made with heavy equipment.

**WEED-68**: Given the choice of strategies, avoid ignition and burning in areas at high risk for weed establishment or spread.

**WEED-69**: Hose off vehicles on site if they have traveled through infested areas.

**WEED-70**: Inspect clothing for weed seeds if foot travel occurred in infested areas.

**WEED-71**: When possible, establish incident bases, fire operations staging areas, and aircraft landing zones in areas that have been inspected and are verified to be free of invasive weeds.

**WEED-72**: Cover weed infested cargo areas and net-loading areas with tarps if weeds exist and can't be removed or avoided.

**WEED-73**: Flag off high-risk weed infestations in areas of concentrated activity and show weeds on facility maps.

**WEED-74**: If fire operations involve travel or work in weed infested areas, a power wash station should be staged at or near the incident base and helibase. Wash all vehicles and equipment upon

BLM_0026282

arrival from and departure to each incident. This includes fuel trucks and aircraft service vehicles.

**WEED-75**:  Identify the need for possible fire rehab to prevent or mitigate weed invasion during fire incident and apply for funding during the incident.

**Post-fire Rehabilitation:**
**WEED-76**:  Have a weed specialist review burned area rehabilitation reports to ensure proper and effective weed prevention and management is addressed.

**WEED-77**:  Thoroughly clean the undercarriage and tires of vehicles and heavy equipment before entering a burned area.

**WEED-78**:  Treat weeds in burned areas. Weeds can recover as quickly as 2 weeks following a fire.

**WEED-79**:  Schedule inventories 1 month and 1 year post-fire to identify and treat infestations. Eradicate or contain newly emerging infestations.

**WEED-80**:  Determine soon after a fire whether revegetation is necessary to speed recovery of a native plant community, or whether desirable plants in the burned area will recover naturally. Consider the severity of the burn and the proportion of weeds to desirable plants on the land before it burned. In general, more severe burns and higher pre-burn weed populations increase the necessity of revegetation. Use a certified weed-free seed mix.

**WEED-81**:  Inspect and document weed infestations on fire access roads, equipment cleaning sites, and staging areas. Control infestations to prevent spread within burned areas.

**WEED-82**: Seed and straw mulch to be used for burn rehabilitation (e.g., for wattles, straw bales, dams) shall be certified weed-free.


## FISH AND WILDLIFE MANAGEMENT

**Fish and Wildlife Management – Fisheries and Aquatic Species – General:**
**FWL-AQU-1**:  Consider the following options regarding erosion control to limit sedimentation into perennial, ephemeral, and intermittent drainages:

- Placement of straw waddles
- Construction of silt fencing
- Placement of geo-textile matting/fabrics
- Timely and appropriate reseeding methods and species
- Hydro-mulching
- Topsoil stockpiling
- Recontouring slopes at a minimum of 2:1 to facilitate revegetation
- Hay bales
- Sediment retention dams
- Water dips

**FWL-AQU-2**: Avoid direct discharge of pipeline hydrostatic test water to any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river.

BLM_0026283

**FWL-AQU-3**: When constructing stream crossings or other in-channel structures, divert water around the construction site to minimize sedimentation.

**FWL-AQU-4**: Avoid low water crossings of live streams, but if done, armor crossings with appropriate sized native substrate to limit sedimentation and maintain water depths for fish passage.

**FWL-AQU-5**: For perennial stream crossings use professional engineering to design and consider using bridges or appropriately sized culverts of at least bank-full flow width.

**FWL-AQU-6**: When possible, design road crossings of streams and riparian corridors at right angles and preferably along straight, stable stream reaches to minimize the area and amount of disturbance. However, when needed, place culverts in alignment with natural stream sinuosity.

**FWL-AQU-7**: Address aquatic organism passage and appropriate life-stage requirements of target species when designing new or modifying existing road/stream crossings.

**FWL-AQU-8**: Identify and protect access to ephemeral/temporary pools and ponds to provide breeding, aestivating, and hibernating habitat for amphibians.

**FWL-AQU-9**: To avoid spread of aquatic nuisance species and disease vectors clean and disinfect all equipment and gear used in water by one of the following methods:

- by spraying with 409, bleach, or a similar germicide solution and let equipment thoroughly dry.
- wash/spray equipment and gear with hot tap water > 140 degrees Fahrenheit for 10 minutes and then drain onto the ground, not down a drain or into another water body.

References:
Colorado Division of Wildlife (CDOW). 2008. Actions to Minimize Adverse Impacts to Wildlife. [Online]. Website. www.oilandgasbmps.org/docs/CO27-Coloradofinal BMP1008.doc.

**<u>Fish and Wildlife Management – Terrestrial Species:</u>**
*General:*
**FWL-TER-1**: Conduct development on existing or previously disturbed surface locations to reduce impacts on undisturbed areas and minimize impact on wildlife habitat.

**FWL-TER-2**: Strategically apply fugitive dust control measures to reduce coating of vegetation and deposition in water sources, including enforcing established speed limits on BLM and private roads.

**FWL-TER-3**: Ensure that ponds containing waste water are closed off to exclude birds, bats, amphibians and other wildlife attracted to the water.

**FWL-TER-4**: Coordinate with the Colorado Parks and Wildlife (CPW) on BLM projects and BLM-authorized projects that are proposed within 0.5-mile of a small capacity water development and 2.0-mile of a large capacity wildlife water development. Projects determined to have a detrimental effect on wildlife using wildlife water developments will be avoided or

BLM_0026284

rerouted if possible.

**FWL-TER-5**:  Design lighting required for recreation, oil and gas, and other programs to be directing downward, using shielded lights, and only the minimum illumination required, utilize green lights in areas that require illumination at night and prevent skyward projection of lighting that may disorient night migrating birds. Sodium vapor lights, widely used for streetlights and security lighting, should not be used because they have been shown to attract night-flying birds. Coordinate with CPW on migratory bird inventories when migratory bird inventories are proposed by BLM or required of third parties.

**FWL-TER-6**:  The use of deicers and dust suppressants within 100 meters (328 feet) of road-side occurrences of special status plant species will require prior approval from the BLM.

**FWL-TER-7**:  Use temporary water delivery lines laid on the surface of the ground to reduce truck traffic.

**FWL-TER-8**:  Where linear disturbance is proposed edges of vegetation shall be feathered to avoid long linear edges of habitat and allow for greater habitat complexity for wildlife.

**FWL-TER-9**:  Avoid fragmentation of wildlife habitat especially in wildlife migration and movement corridors.

**FWL-TER-10**:  Encourage the use of a variety of BMPs, as defined by "Best Management Practices for Oil and Gas Development on Public Lands," http://www.blm.gov/bmp/. (These BMPs may be changed over time)

**FWL-TER-11**:  Implement closed-loop drilling systems on all active rigs, using only a small cuttings mixing area on each location.

**FWL-TER-12**:  Optimize completion operations to minimize impact.  Techniques include:
   a. Simultaneous drilling and completion operations minimize the operating time on the well pad, where space and safety restrictions permit the use of this technique.
   b. Remote completion operations using nearby existing well pads minimize overall surface disturbance.

**FWL-TER-13**:  Reuse water whenever possible for drilling and completion activities. Recycle all water used in completion activities to meet water needs for completion of subsequent wells on location; this will reduce fresh water consumption and reduce truck traffic.

**FWL-TER-14**:  - Expand the water distribution system to efficiently move water in pipelines, reducing truck traffic for drilling and completion activities.

**FWL-TER-15**:  Use existing roads instead of new construction segments wherever feasible.

**FWL-TER-16**:  Seed all access roads and facilities other than well pads in a timely manner after construction has been completed. Seed all topsoil from pad construction.

**FWL-TER-17**:  Noise reduction techniques and designs will be used to reduce noise from compressors or other motorized equipment.

**FWL-TER-18**:  - Where new roads are constructed seasonal restrictions on public vehicular

BLM_0026285

access will be evaluated where there are wildlife conflict or road damage/maintenance issues.

**FWL-TER-19**: Install multiple pipelines in a single trench, to minimize disturbance.

**FWL-TER-20**: Limit flaring operations when well pads are within 100 m of occupied special status species habitat. Control activities conducted by the US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services will be coordinated with the CRVFO on an annual basis, including review of authorized control areas and annual submittal of control activities on CRVFO lands.

**FWL-TER-21**: US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services will notify the CRVFO before any damage control activity is implemented within the restricted area(s), and exceptions will be approved on a case-by-case basis.

**FWL-TER-22**: All persons involved with wildlife damage management activities shall be briefed on the regulations and penalties relating to harassment of wild horses prior to commencing animal control operations.

**FWL-TER-23**: The CRVFO will identify through the US Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services annual work plan process areas of public lands considered special resource use areas on which control activities be avoided except as requested by CPW, or other protective restrictions may apply. Examples may include special status species habitats (e.g., sage-grouse leks and nesting areas, and bald eagle nests).

**FWL-TER-24**: Management Policies must be adhered to at all times in Wilderness Study Areas and the CRVFO must be notified before any wildlife damage management activity is implemented. Wildlife damage management activities in Wilderness Study Areas must be directed at the offending animal. Aerial hunting may be allowed in Wilderness Study Areas as long as those actions do not impair wilderness characteristics.

**FWL-TER-25**: All US Environmental Protection Agency use restrictions and requirements for toxicants are to be followed where control devices are employed on public lands. The CRVFO must be notified before any toxicants are deployed and a map of the treatment area must be provided. Adequate signage must be provided and maintained.

**FWL-TER-26**: Retain existing snags for wildlife use in places where they will not create a human hazard.

**FWL-TER-27**: Co-located rights-of-ways (pipelines, roads, powerlines) whenever feasible to reduce ground disturbance

**Fish and Wildlife Management – Terrestrial Species – Bats:**
**FWL-TER-28**: Consult with CPW regarding locations of known bat roost sites.

**FWL-TER-29**: Apply national and state response strategies (USFWS 2011, BLM 2010 and CDOW 2011) for the prevention and management of White-nose Syndrome.

Colorado Division of Wildlife (CDOW). 2011. White-Nose Syndrome in Bats Response Plan. [Online]. Website. http://www.whitenosesyndrome.org/sites/default/files/resource/cdow_ wnsresponseplanjan2011fmal.pdf.

BLM_0026286

US Fish and Wildlife Service (CDOW). 2011.  A National Plan for Assisting States, Federal Agencies, and Tribes in Managing White-Nose Syndrome in Bats. [Online].  Website. http://whitenosesyndrome.org/sites/default/files/white-nose_syndrome_national_plan _may_2011.pdf

**Fish and Wildlife Management – Terrestrial Species – Big Game Species:**
**FWL-TER-30**:  Fences constructed will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989). Current standards for fencing cattle out in deer and elk range is a four strand fence, 40 inches high with a spacing of wires from ground to top of 60"(smooth bottom wire), 6" (second wire barbed), 6" (third wire barbed), 12" (top wire preferably smooth but may need to be barbed in areas of intense cattle use).

*Fluid Minerals:*
**FWL-TER-31**:  In critical and severe winter range for deer and elk avoid recurring transportation activity within two hours before and after sunrise and sunset to avoid disturbing wintering wildlife between Dec1 and May1 (excluding emergencies).

**FWL-TER-32**:   For intensive activities within winter range for wildlife use carpooling for activities like crew rotations and shift changes.

**FWL-TER-33**:   For intensive activities within winter range for wildlife monitor and enforce speed limits

**FWL-TER-34**:   - Reduce visits to well sites through remote monitoring (i.e. SCADA) and the use of multi-function contractors.

**FWL-TER-35**:   Use solar panels as an alternative energy source for on location production equipment, to limit trips to the location for production maintenance.

**Fish and Wildlife Management – Terrestrial Species – Bighorn Sheep:**
**FWL-TER-36**:   Consult with CPW regarding big game seasonal restrictions on wintering or production areas.

**FWL-TER-37**:   Avoid low elevation (below 500 feet altitude) helicopter overflights within 1 mile radius of bighorn sheep winter range during seasonal restrictions.

**FWL-TER-38**:   Avoid low elevation (below 500 feet altitude) helicopter overflights within 1 mile radius of bighorn sheep production areas during seasonal restrictions.

**FWL-TER-39**:  Gate single-purpose roads to reduce traffic disruptions to wildlife.

**FWL-TER-40**:  Close and immediately reclaim all roads that are redundant, not used regularly, or have been abandoned to the maximum extent possible to minimize disturbance and habitat fragmentation.

**FWL-TER-41**:  Identify critical habitat types and adjust development sites to avoid these areas.

**FWL-TER-42**:  Restrict post-development well site visitations to the hours of 10:00 a.m. to 3:00 p.m. and reduce well site visitations during winter months.

BLM_0026287

References:
Colorado Division of Wildlife (CDOW). 2008. Actions to Minimize Adverse Impacts to Wildlife. [Online]. Website. www.oilandgasbmps.org/docs/CO27-Coloradofinal BMP1008.doc.

**Fish and Wildlife Management – Terrestrial Species – Black Bear:**
**FWL-TER-43:** Identify, avoid and protect climax mast producing vegetation that annually provides a significant source of fall forage for black bear, especially those areas that can be identified as being consistently frost-free and that provide mast when unfavorable conditions exist elsewhere.

**FWL-TER-44:** Initiate a food and waste/refuse management program that uses bear-proof food storage containers and trash receptacles.

**FWL-TER-45:** Establish policy to prohibit keeping food and trash in sleeping quarters.

**FWL-TER-46:** Establish policy to support enforcement of state prohibition on feeding of black bear.

**FWL-TER-47:** Report bear conflicts immediately to CPW.

References:
Colorado Division of Wildlife (CDOW). 2008. Actions to Minimize Adverse Impacts to Wildlife. [Online]. Website. www.oilandgasbmps.org/docs/CO27-Coloradofinal BMP1008.doc.

**Fish and Wildlife Management – Terrestrial Species – Migratory Birds/Raptors:**
**FWL-TER-48:** Coordinate with FWS and CPW at the onset of project planning and apply national and state recovery and conservation plans.

**FWL-TER-49:** Where disturbance cannot be avoided, the scale and the length of time of disturbance may be considered mitigating circumstances.

**FWL-TER-50:** Inspect and clear an area for migratory bird nesting. These clearances could be performed by BLM or other qualified personnel. Factors to weigh in considering this option include vegetation type, vegetation density, timing and cost.

**FWL-TER-51:** To protect nesting raptors, raptor surveys shall be conducted prior to activities that could impact nesting activities. Apply mitigation measures based on the survey results.

References:
Bureau of Land Management (BLM). 2007. Migratory Bird Treaty Act Interim Management Guidance. Instruction Memorandum No. 2008-050. [Online]. Website: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_in struction/20080/im_2008-050__migratory.html.

Gillihan, S. W. 2006. Sharing the land with pinyon-juniper birds. Partners in Flight Western Working Group. Salt Lake City, Utah. 39pp. [Online]. Website: http://www.partnersinflight.org/pif/pub/PJ manual Nov 08 low-res.pdf

BLM_0026288

Paige, C. and S. A. Ritter. 1999. Birds in a sagebrush sea: managing sagebrush habitats for bird communities. Partners in Flight Western Working Group. Boise , ID. 52 pp. [Online]. Website: http://www.partnersinflight.org/wwg/sagebrush.pdf.

## Special Status Species

### Special Status Species – General:

#### *Fluid Minerals:*
**SSS-GEN-1:** The CRVFO will consult agency species management plans and other conservation plans as appropriate to guide management and devise mitigation measures when needed. Examples of these plans include, but are not limited, to the Colorado Wildlife Action Plan, Colorado Sagebrush: A Conservation Assessment and Strategy, National, range-wide, statewide and local working group conservation plans for Gunnison and greater sage grouse, Sharing the land with pinyon-juniper birds, Birds in a sagebrush sea: managing sagebrush habitats for bird communities, North American Landbird Conservation Plan, North American Waterbird conservation Plan, National and Colorado Partners in flight Bird Conservation Plans, Colorado Gunnison's and White-tailed Prairie Dog Conservation Strategy and Recovery plans for federally listed species, and Colorado Rare Plant Conservation Initiative's Recommended Best Management Practices for Plants of Concern.

**SSS-GEN-2:** Lessees will be notified when a lease parcel contains potential habitat for threatened, endangered, proposed, candidate or BLM sensitive plants, fish and wildlife.

**SSS-GEN-3:** Limit flaring operations when well pads are within 100 m of occupied special status species habitat.

### Special Status Species – Plants:
#### *General:*
**SSS-PLT-1:** Prior to approving any ground-disturbing activities, suitable habitat for special status plants will be identified based on existing plant location records, soil or geological mapping, USFWS Section 7 range maps, aerial photos, and/or site inventories. In areas identified as suitable habitat, surveys for special status species will be performed prior to conducting any ground disturbance. Surveys will take place when the plants can be positively identified, usually during the appropriate flowering periods. Surveys will be performed by qualified field botanists/biologists who will provide documentation of their qualifications, experience and knowledge of the species prior to starting work.

**SSS-PLT-2:** For surface-disturbing activities with the potential to affect special status species, surveys in core habitat for T&E species will generally extend at least 200 meters (656 feet) beyond the edge of disturbance and at least 100 meters (328 feet) beyond the edge of disturbance outside of core habitat. For linear features such as roads and pipelines, surveys will extend at least 100 meters (328 feet) beyond the edge of the proposed ground disturbance along each side of the right of way. If special status plants are found within the survey area, the contractor will endeavor to determine the complete areal extent of the occurrence and the approximate number of individuals within the occurrence.

**SSS-PLT-3:** For Colorado hookless cactus and other federally listed, proposed or candidate plant species, surface-disturbing activities will be avoided within 200 meters of current or historically

BLM_0026289

occupied plant habitat wherever possible and where geography and other resource concerns allow. (Historically occupied habitat is habitat where plants were known to occur within the past 15-20 years and a viable seedbank may remain). Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

**SSS-PLT-4**:  For BLM sensitive species surface-disturbing activities will be avoided within 100 meters of occupied plant habitat wherever possible and where geography and other resource concerns allow. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

**SSS-PLT-5**:  Where surface-disturbing activities are allowed within 100 meters of occupied habitat for special status plant species, unauthorized disturbance of plant habitat will be avoided by on-site guidance from a biologist, and by fencing the perimeter of the disturbed area, or such other method as agreed to by the Fish and Wildlife Service. In such instances, a monitoring plan approved by the Service will be implemented for the duration of the project to assess impacts to the plant population or seed bank. If detrimental effects are detected through monitoring, corrective action will be taken through adaptive management.

**SSS-PLT-6**:  Surface disturbance closer than 20 meters to a listed plant will be considered an adverse effect. Mitigating measures within this narrow buffer are very important and helpful to individual plants, but it is unlikely that all adverse effects can be fully mitigated within this distance. Some adverse effects due to dust, dust suppression, loss of pollinator habitat, and toxic spills will likely remain. There are two possible exceptions to this rule of thumb: 1) The new disturbance is no closer to a listed plant than preexisting disturbance and no new or increased impacts to the listed plant are expected; or 2) the listed plant is screened from the proposed disturbance (e.g., tall, thick vegetation or a berm acts as a screen or effective barrier to fugitive dust and other potential impacts).

**SSS-PLT-7**:  Transplantation of potentially affected plants will not be used as a rationale to defend a "not likely to adversely affect" or a "no effect" determination for listed plant species.

**SSS-PLT-8**:  Protect pollinator species for endangered or threatened species by incorporating the standard operating procedures found in the Final Programmatic Environmental Impact Statement for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

**SSS-PLT-9**:  Prepare a reclamation plan and weed management plan prior to ground-disturbing activities.  Reclamation seeding within special status plant habitat should consist of native species only. If possible, seeds will be from locally collected genotypes. Realize that seeding or planting native plants may need to be repeated until deemed successful by the Authorized Officer.

**SSS-PLT-10**:  Rigorously monitor and control all infestations of noxious weeds and other non-native invasive plant species in and adjacent to occupied habitat for special status plants.

**SSS-PLT-11**:  Control noxious weeds using integrated techniques.  Limit chemical control in areas with special plant species to avoid damage to non-target species.  Mechanical or chemical control in and near special status plant habitat shall only be implemented by personnel familiar with the rare plants.

BLM_0026290

**SSS-PLT-12**:  Broadcast spraying of herbicides, either by ground or aerial methods, shall comply with the Conservation Measures from the Biological Assessment for the Vegetation EIS.   The conservation measures are specific to the herbicide to be used, the desired mode of application, and the conditions of the site.  Manual spot treatment of undesirable vegetation can occur within the listed buffer zones if it is determined by local biologists that this method of herbicide application would not pose risks to listed or proposed plant species in the vicinity.   Additional precautions during spot treatment of vegetation within these buffers shall be employed to avoid pesticide drift in those cases.

**SSS-PLT-13**:  Prevent plumes of dust and particulate matter from impacting special status plants. While new roads should not be built within 200 meters of special status plants, preexisting roads with an expected increase in traffic should be graveled (or paved) in these areas.  The operator is encouraged to apply water for dust abatement to such areas during the flowering period. Magnesium chloride should not be used in special status plant habitat.

**SSS-PLT-14**:  The use of deicers and dust suppressants, other than water, within 100 meters of roadside occurrences of special status plant species will require prior approval from the BLM.

**SSS-PLT-15**:  Prohibit collection of rare plants or plant parts, except as permitted by the BLM Authorized Officer for scientific research.

**SSS-PLT-16**:  When not needed for other resource uses, close and reclaim roads that are directly or indirectly impacting special status plant species to minimize disturbance, habitat fragmentation, and loss of pollinator habitat.

**SSS-PLT-17**:   Surface disturbances (including wildfire and prescribed fires) within lower-elevation salt desert shrub and pinyon-juniper woodland habitat should review the need for cheatgrass control and/or restoration seeding.  Seeding should emphasize locally-adapted native species (or locally collected ecotypes, when available) that will not outcompete the special status plants.

***Fluid Minerals:***
**SSS-PLT-18**:  Limit flaring operations when well pads are within 100m of occupied special status plant habitat.


References:
BLM (United States Department of the Interior, Bureau of Land Management). 1989. Handbook H-1741-1: Fencing. Release 1-1572. BLM, Washington, DC. December 6, 1989. 58pp.

BLM.  2007. Final Vegetation Treatment Using Herbicides on Bureau of Land Management Lands in 17 Western States, Programmatic Environmental Impact Statement. BLM, Nevada State Office, Reno, NV. June 2007.

US Fish and Wildlife Service and BLM Recommendations for Avoiding Adverse Effects on Threatened, Endangered, Proposed, Candidate and BLM Sensitive Plants on BLM Lease Lands in Colorado; Draft. July 25, 2008.

Elliott, B.A., S. Spackman Panjabi, B. Kurzel, B. Neely, R. Rondeau, and M. Ewing. 2009. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished

BLM_0026291

report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation.

**Special Status Species – Fish Species:**

**SSS-AQU-1**: Minimize the spread of aquatic nuisance species including but not limited to zebra mussels, New Zealand mud snails, quagga mussels, and rusty crayfish, as well as disease vectors including whirling disease, and chytrid fungus when working in water and do the following:

- Before leaving a particular water or entering a new water body, inspect and clean equipment and gear used in the water, including heavy equipment, watercraft (boats, canoes, kayaks, rafts, etc.), trailers, oars, nets, waders, wading boots, sandals, and life jackets. Remove vegetation, mud, grit, algae, etc. and drain water from boats and other gear.

*Fire Management:*
**SSS-AQU-2**: In wildland fire situations work with the Fire Resource Advisor(s) during suppression efforts in the CRVFO to address water use and spread of aquatic nuisance species and disease vectors:

- If possible, avoid the use of these water sources for use in fire suppression actions (i.e., helicopter bucket dips, water pumps, etc.). If these waters are used for fire suppression, screen water pump intakes with ¼ inch mesh to avoid entrainment of fish.

- Clean and disinfect all fire suppression equipment including water hoses, water pumps, pumpkins, blivets, helicopter buckets, etc. between suppression incidents to avoid the transfer of aquatic nuisance species and disease vectors into the Colorado River and ponds, reservoirs, and lakes within 0.5 miles of the river.

- Do not release unused water from water tenders, fire engines, or aircraft into the Colorado River or ponds, reservoirs, or lakes within 0.5 miles of the river. Discharge unused water on upland habitats away from these water sources to avoid possible spread of aquatic nuisance species and disease vectors.

**SSS-AQU-3**: Avoid dropping fire retardant or foam within 300 feet of water bodies and avoid locating staging, fire retardant chemicals, refueling sites, or other chemicals within 300 feet of these waters.

**SSS-AQU-4**: Working with Resource Advisors, when fighting fires within drainages containing conservation populations of cutthroat trout, use water located from within the drainage area for all suppression efforts conducted within 300 feet of the occupied stream/lake.

**SSS-AQU-5**: When obtaining water from the Colorado River the following actions should be taken:

- The best method to avoid entrainment of fish is to pump from off-channel locations (e.g., ponds, lakes, and diversion ditches), not directly connected to the mainstem streams or rivers even during high spring flows.

BLM_0026292

- If the pump head must be located in the river channel where larval fish are known to occur, the following measures apply:

  a) do not situate the pump in a low-flow or no-flow area as these habitats tend to concentrate larval or young-of-year fishes. Instead place the pump into fast moving/riffle habitat;
  b) limit the amount of pumping, to the greatest extent possible, during that period of the year when larval fish may be present (June 1 to August 15); and
  c) avoid pumping, to the greatest extent possible, during the pre-dawn hours (two hours prior to sunrise) as larval fish drift studies indicate that this is a period of greatest daily activity.
  d) Screen all pump intakes with ¼" or finer mesh material.
  e) Report any fish impinged on any intake screens to the Fish and Wildlife Service (970.243.2778) or the Colorado Parks & Wildlife Department:

    Northwest Region
    711 Independent Ave., Grand Junction, CO 81505
    Phone: (970.255.6100)

**SSS-AQU-6**: Require spill Prevention Plans for all pipeline companies and fluid mineral companies and their sub-contractors who haul or transport hazardous substances.

**SSS-AQU-7**: Require Spill Contingency Plans for all pipeline companies and fluid mineral companies and their sub-contractors who haul or transport hazardous substances.

**SSS-AQU-8**: When developing or improving water sources, consider development designs such as water wells and guzzlers, rather than surface impoundments, to minimize impacts to surface water hydrology resulting from attenuation of flood peaks and evaporative loss.

References:
Colorado Division of Wildlife (CDOW). 2008. Actions to Minimize Adverse Impacts to Wildlife. [Online]. Website. www.oilandgasbmps.org/docs/CO27-Coloradofinal BMP1008.doc.

**Special Status Species - Terrestrial Species – Fringed Myotis and Townsend's Big-eared Bats:**

**SSS-TER-19:** Consult with CPW regarding locations of known special status bat species roost sites.

**SSS-TER-20**: Apply national and state response strategies (USFWS 2011, BLM 2010 and CPW 2011) for the prevention and management of White-nose Syndrome.

References:
Bureau of Land Management. 2010. Bureau of Land Management White-nose Syndrome Interim Response Strategy. [Online]. Website. http://www.blm.gov/style/ medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2010.Par.102 18.File.dat/IM2010-181_att1.pdf

Colorado Division of Wildlife. 2008. Actions to Minimize Adverse Impacts to Wildlife.

BLM_0026293

[Online]. Website. www.oilandgasbmps.org/docs/CO27-ColoradofinalBMP1008.doc.

Colorado Division of Wildlife. 2011. White-Nose Syndrome in Bats Response Plan. [Online]. Website. http://www.whitenosesyndrome.org/sites/default/files/resource/cdow_wnsresponseplanjan2011final.pdf.

US Fish and Wildlife Service. 2011. A National Plan for Assisting States, Federal Agencies, and Tribes in Managing White-Nose Syndrome in Bats. [Online]. Website. http://whitenosesyndrome.org/sites/default/files/white-nose_syndrome_national_plan_may_2011.pdf

### Special Status Species - Terrestrial Species – Greater Sage-Grouse:

*General:*

**SSS-TER-21:** Apply conservation measures and guidance from the Colorado Greater Sage-grouse Conservation Plan and local work group plans (North Eagle, South Route) and Connelly Guidelines.

*Fire Management:*

**SSS-TER-22:** Develop state-specific sage-grouse reference information and resource materials containing maps, a list of resource advisors, contact information, local guidance, and other relevant information.

**SSS-TER-23:** Provide localized maps to dispatch offices and extended attack incident commanders for use in prioritizing wildfire suppression resources and designing suppression tactics.

**SSS-TER-24:** Assign a sage-grouse resource advisor to all extended attack fires in or near key sage-grouse habitat areas. Prior to the fire season, provide training to sage-grouse resource advisors on wildfire suppression organization, objectives, tactics, and procedures to develop a cadre of qualified individuals.

**SSS-TER-25:** During periods of multiple fires, ensure line officers are involved in setting priorities.

**SSS-TER-26:** Locate wildfire suppression facilities (i.e., base camps, spike camps, drop points, staging areas, and heli-bases) in areas where physical disturbance to sage-grouse habitat can be minimized. These include disturbed areas, grasslands, near roads/trails or in other areas where there is existing disturbance or minimal sagebrush cover.

**SSS-TER-27:** Power-wash all firefighting vehicles, including engines, water tenders, personnel vehicles, and ATVs prior to deploying in or near sage-grouse habitat areas to minimize noxious weed spread.

**SSS-TER-28:** Minimize unnecessary cross-country vehicle travel during fire operations in sage-grouse habitat.

**SSS-TER-29:** Minimize burnout operations in key sage-grouse habitat areas by constructing direct fireline whenever safe and practical to do so.

**SSS-TER-30:** Utilize retardant and mechanized equipment to minimize burned acreage during

BLM_0026294

initial attack.

**SSS-TER-31:** As safety allows, conduct mop-up where the black adjoins unburned islands, dog legs, or other habitat features to minimize sagebrush loss.

**SSS-TER-32:** Apply conservation measures and guidance from the Colorado Greater Sage-grouse Conservation Plan, local work group plans (North Eagle, South Route), Connelly Guidelines, the BLM National Sage-grouse Habitat Conservation Strategy (2004) and Western Association of Fish and Wildlife Agencies, when appropriate.

**SSS-TER-33:** Consult with CPW at the earliest stage of development to review detailed maps of greater sage-grouse seasonal habitats and to help select development sites.

**SSS-TER-34:** Identify seasonal habitats and migratory patterns of sage-grouse. Map all seasonal habitats using CPW habitat selection models as they become available.

*Reclamation:*
**SSS-TER-35:** In greater sage-grouse habitat treat waste water pits and any associated pit containing water that provides a medium for breeding mosquitos with Bti (*Bacillus thuringiensis v. israelensis*) or take other effective action to control mosquito larvae that may spread West Nile Virus to wildlife, especially grouse.

**SSS-TER-36:** In consultation with CPW, replace any permanently impacted, disturbed, or altered greater sage-grouse seasonal habitats by enhancing marginal sagebrush steppe communities (big sagebrush and related communities) and grasslands within or immediately adjacent to mapped seasonal Gunnison or greater sage-grouse habitat.

**SSS-TER-37:** Use early and effective reclamation techniques, including an aggressive interim reclamation program, to return habitat to use by greater sage-grouse as quickly as possible.

**SSS-TER-38:** Reclaim/restore greater sage-grouse habitats with native grasses, forbs, and shrubs conducive to optimal greater sage-grouse habitat and other wildlife appropriate to the ecological site.

**SSS-TER-39:** Use high diversity (10 species or more) reclamation seed mixes in greater sage-grouse habitat.

**SSS-TER-40:** Avoid aggressive non-native grasses in greater sage-grouse habitat reclamation.

**SSS-TER-41:** Restore disturbed sagebrush sites with the appropriate sagebrush species or subspecies on disturbed sagebrush sites. Use locally collected seed for reseeding where possible.

**SSS-TER-42:** Reclaim mapped summer habitat with a substantially higher percentage of forbs (> 15 percent cover post establishment) than used in other areas.

**SSS-TER-43:** Utilize native and select non-native forbs and legumes in seed mixes as they are a vital component of brood-rearing habitat.

*Lands and Realty:*
**SSS-TER-44:** In priority habitat areas (PHA) evaluate and take advantage of opportunities to remove or modify existing power lines within priority sage-grouse habitat areas. When possible,

BLM_0026295

require perch deterrents on existing or new overhead facilities.

**SSS-TER-45**: In PHA where existing leases or ROWs have had some level of development (road, fence, well, etc.) and are no longer in use, reclaim the site by removing these features and restoring the habitat. Within designated priority habitat, reclaim by removing these features and restoring the habitat of these ROW that are no longer in use.

**SSS-TER-46**: In PHA - Disposal Criteria: There is mixed ownership, and land exchanges would allow for additional or more contiguous federal ownership patterns within the priority sage-grouse habitat area.

**SSS-TER-47**: Disposal Considerations: Under priority sage-grouse habitat areas with minority federal ownership, include an additional, effective mitigation agreement for any disposal of federal land. As final preservation measures consider identifying and pursuing off-site compensation/ mitigation or the establishment of a conservation easement.

**SSS-TER-48**: In PHA where suitable conservation actions cannot be achieved, seek to acquire state and private lands with intact subsurface mineral estate by donation, purchase or exchange in order to best conserve, enhance or restore sage-grouse habitat.

*Fluid Minerals:*
**SSS-TER-49**: Reduce well site visitations to portions of the day between 9:00 a.m. and 4:00 p.m. during the lekking season (March 1 to May 15).

**SSS-TER-50**: Establish company guidelines to minimize wildlife mortality from vehicle collisions on roads.

**SSS-TER-51**: Minimize surface disturbance and fragmentation of greater sage-grouse habitat through use of the smallest facility footprints possible.

**SSS-TER-52**: Locate facilities in vegetation types other than sagebrush to avoid impacts to sage-grouse breeding and wintering habitat.

**SSS-TER-53**: Use drill mats if possible to prevent habitat loss or disturbance and reduce reclamation costs.

**SSS-TER-54**: Use noise reduction equipment on compressors and other development and production equipment.

**SSS-TER-55**: Use topographical features to provide visual concealment of facilities from known lek locations and as a noise suppressant.

**SSS-TER-56**: Muffle or otherwise control exhaust noise from pump jacks and compressors so that operational noise will not exceed 49 dB measured at 30 feet from the source.

**SSS-TER-57**: Design tanks and other facilities with structures such that they do not provide perches or nest substrates for raptors, crows and ravens.

**SSS-TER-58**: Install raptor perch deterrents on equipment, fences, cross arms and pole tops in greater sage-grouse habitat.

BLM_0026296

**SSS-TER-59:** Remove all unnecessary infrastructure.

**SSS-TER-60:** Where feasible, bury new power lines and retrofit existing power lines by burying them or installing perch guards to prevent their use as raptor perches.

**SSS-TER-61:** Design wastewater pits to minimize retention of stagnant surface water.

**SSS-TER-62:** In priority habitat areas (PHA) in cases where Federal oil and gas leases have been issued without adequate stipulations for the protection of sage-grouse or their habitats, consider the inclusion of conditions of approval (COAs) when approving exploration and development activities.

**SSS-TER-63:** When additional mitigation is necessary, conduct it in priority sage-grouse habitat areas when possible or, if that is not possible, in general sage-grouse habitat with the ability to increase sage-grouse populations.

**SSS-TER-64:** When additional mitigation is necessary, conduct it within the same population area where the impact occurs if possible or, if that is not possible, within the same Management Zone as the impact.

**SSS-TER-65:** Require a full reclamation bond specific to the site and sufficient to cover costs required for full reclamation (Connelly et al. 2000, Hagen et al. 2007).

**SSS-TER-66:** Use only closed-loop systems for drilling operations, with no reserve pits.

**SSS-TER-67:** Limit noise to less than 10 decibels (dbA) above ambient measures (typically 20 to 24 dBA) from 2 hours before until 2 hours after at sunrise at the perimeter of a lek during active lek season (Patricelli et al. 2010, Blickley et al. *in preparation*).

**SSS-TER-68:** Require noise shields when drilling during the lek, nesting, brood-rearing, and wintering seasons.

**SSS-TER-69:** When fences are necessary, require a sage-grouse-safe design.

**SSS-TER-70:** Require proper containment and prompt removal of refuse to avoid attracting predators (Bui et al. 2011).

**SSS-TER-71:** In PHA locate roads to avoid important areas and habitats.

**SSS-TER-72:** Coordinate road construction and use among Federal fluid mineral lessees and ROW holders.

**SSS-TER-73:** Establish slow speed limits on BLM-administered roads or design roads for slower vehicle speeds to reduce sage-grouse mortality.

**SSS-TER-74:** Apply dust abatement on roads, well pads, and other surface disturbances.

**SSS-TER-75:** Close and rehabilitate duplicate roads by restoring original landform and establishing desirable vegetation.

**SSS-TER-76:** Use remote monitoring techniques for production facilities and develop a plan to

BLM_0026297

reduce the frequency of vehicle use (Lyon and Anderson 2003).

**SSS-TER-77:** Restrict the construction of tall facilities, distribution powerlines, and fences to the minimum number and amount needed.

**SSS-TER-78:** In PHA site and/or minimize linear ROWs to reduce disturbance and fragmentation of sagebrush habitats.

**SSS-TER-79:** In PHA bury new distribution power lines except when an existing line is already in place.

**SSS-TER-80:** Cover all fluid-containing pits and open tanks with netting (maximum 1.5-inch mesh size).

**SSS-TER-81:** In PHA equip tanks and other above-ground facilities with structures or devices that discourage nesting of ravens and raptors.

**SSS-TER-82:** In PHA maximize the area of interim reclamation on long-term access roads and well pads, including reshaping, topsoiling, and revegetating cut-and-fill slopes.

**SSS-TER-83:** In PHA restore disturbed areas at final reclamation to the pre-disturbance landforms and desired plant community.

**SSS-TER-84:** In PHA implement irrigation during interim or final reclamation for sites where establishment of seedlings has been shown or is expected to be difficult due to dry conditions.

**SSS-TER-85:** In PHA use mulching, soil amendments, and/or erosion blankets to expedite reclamation and to protect soils.

***Locatable Minerals:***
**SSS-TER-86:** Make any existing claims within the withdrawal area subject to validity exams. Include claims that have been subsequently determined to be null and avoid in the proposed withdrawal (see 43 CFR 3809.100).

**SSS-TER-87:** In plans of operations required prior to any proposed surface disturbing activities include as appropriate the following: Additional, effective mitigation in perpetuity for conservation. In accordance with existing policy, WO IM 2008-204. Example purchase private land and mineral rights within the priority area and deed to US Government. WO IM 2008-204 IM provides guidance for instances where onsite mitigation is not an option.

**SSS-TER-88:** Consider seasonal restrictions if deemed effective.

**SSS-TER-89:** Require sage-grouse-safe fences around sumps.

**SSS-TER-90:** Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs.

***Salable Minerals:***
**SSS-TER-91:** Restore saleable mineral pits no longer in use to meet sage-grouse habitat conservation objectives. Emphasis needs to be given to reclamation/restoration of sage grouse habitat as a viable long term goal to improve the sage grouse habitat.

BLM_0026298

**SSS-TER-92**:  Where the federal government owns the mineral estate, and the surface is non-federal ownership, apply the same conservation measures as applied on public land.   The conservation measures must be consistent with the surface owner's rights.   A solicitor review may be required.

*Coal:*
**SSS-TER-93**:  Recommend minimization of surface-disturbing or disrupting activities (including operations and maintenance) where needed to reduce the impacts of human activities on important seasonal sage-grouse habitats.  Apply these measures during activity level planning.

*Livestock Grazing:*
**SSS-TER-94**:   Within PHA, Incorporate sage grouse habitat objectives and management considerations into all BLM grazing allotments through AMPs or permit renewals.

**SSS-TER-95**:   Establish measurable objectives related to sage-grouse habitat from baseline monitoring data, ecological site descriptions, or land health assessments/evaluations.

**SSS-TER-96**:   In PHA utilize the reference state in ecological site descriptions as the site potential benchmark (and not just standards of range land heath or proper function condition objectives) when conducting land health assessments to determine if standards of range-land health related to sage-grouse habitat are being met.

**SSS-TER-97**:   Manage riparian areas and wet meadows to achieve or maintain diverse species richness that includes a component of perennial forbs in conjunction with desirable riparian sedges, rushes, bulrushes and grasses.

**SSS-TER-98**:   Manage hot season grazing on riparian and meadow complexes to promote recovery or maintenance of appropriate vegetation and water quality.   Utilize fencing/herding techniques or seasonal use or livestock distribution changes to reduce pressure on riparian or wet meadow vegetation used by sage-grouse in the hot season (summer).

**SSS-TER-99**:   Work cooperatively with permittees, leases and other landowners to develop grazing management strategies that integrate both public and private lands into single management units.

**SSS-TER-100**:  Monitor measureable objectives and evaluate grazing management to assure that management actions are achieving sage-grouse habitat objectives.

**SSS-TER-101**:  In PHA authorize new water development for diversion from spring or seep source only when sage-grouse habitat would benefit on both upland and riparian habitat from the development or there are no negative impacts to sage grouse. This includes developing new water sources for livestock as part of an AMP/conservation plan to improve sage-grouse habitat.

**SSS-TER-102**:  In PHA modify existing springs, seeps developments, and associated pipelines as necessary to maintain the continuity of the predevelopment riparian habitat.

**SSS-TER-103**:  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to sage-grouse populations and habitat.

**SSS-TER-104**:  Design any new structural range improvements to conserve, enhance, or restore

BLM_0026299

sage-grouse habitat through an improved grazing management system relative to sage-grouse objectives. Structural range improvements, in this context, include but are not limited to: cattleguards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments.

**SSS-TER-105**:  In PHA to reduce sage-grouse strikes and mortality, remove, modify or mark fences in high risk areas.

**SSS-TER-106**:  In PHA design all range projects in a manner that minimizes potential for invasive species establishment.  Monitor for, and treat invasive species associated with existing range improvements.

**SSS-TER-107**:  Locate supplements (salt or protein blocks) in a manner designed to conserve, enhance or restore sage-grouse habitat.

**SSS-TER-108**:  Retire grazing preference on a case by case basis when the advantage to sage grouse habitat warrants, and a permittee or lessee voluntarily relinquishes their grazing preference in a specific grazing allotment.

**SSS-TER-109**:  Offer temporary use on a case by case basis in allotments where grazing preference has been relinquished or non –use warrants, to rest other allotments that include important sage-grouse habitat.

**SSS-TER-110**:  In PHA during drought periods, prioritize evaluating effects of the drought in sage-grouse habitat relative to their needs for food and cover.  Since there is a lag in vegetation recovery following drought (Thurow and Taylor 1999, Cagney et.al. 2010), ensure that post-drought management allows for vegetation recovery that meets sage-grouse needs in priority habitat areas.

*Travel Management:*
**SSS-TER-111**:  In PHA use existing roads, or realignments to access valid existing rights that are not yet developed.  If valid existing rights cannot be accessed via existing roads, build any new road constructed to the absolute minimum standard necessary, and add the surface disturbance to the total disturbance in the priority area.  If that disturbance exceeds 3% for that area, then make additional, effective mitigation necessary to offset the resulting loss of sage-grouse habitat.

**SSS-TER-112**:  In PHA conduct restoration of roads, primitive roads and trails not designated in travel management plans.  This also includes primitive route/roads that were not designated in wilderness study areas and with wilderness characteristics that have been selected for protection.

**SSS-TER-113**:  In PHA when reseeding roads, primitive roads and trails, use appropriate seed mixes (appropriate for sage-grouse ecological conditions) and consider the use of transplanted sagebrush.

*Vegetation Management:*
**SSS-TER-114**:  Implement vegetative treatments that focus on controlling cheatgrass, providing appropriate range of sagebrush densities and age-classes and an herbaceous understory with appropriate species diversity and cover to sustain sagebrush-obligate species.

**SSS-TER-115**:    Avoid   prescribed   fire   in   low-elevation   cheatgrass-infested   sage-brush

BLM_0026300

communities. Mechanical treatments in low-elevation sage may require seeding.

**SSS-TER-116**:   Implement   treatments   designed   to   reduce   pinyon-juniper   and   conifer encroachment.

**SSS-TER-117**:  Utilize appropriate sagebrush species/subspecies and important understory plants relative to site potential in seedings.

**SSS-TER-118**:  Evaluate the role of existing seedings that are currently composed of primarily introduced perennial grasses in and adjacent to priority sage-grouse habitats to determine if they should be restored to sagebrush or habitat of higher quality for sage-grouse.  If these seedings are part of an AMP/Conservation Plan, or if they provide value in conserving or enhancing the rest of the priority habitats, then no restoration would be necessary. Assess the compatibility of these seedings for sage-grouse habitat or as a component of a grazing system during land health assessments (Davies et al. 2011).  For example, some introduced grass seedings are an integral part of a livestock management plan and reduce grazing pressure in important sagebrush habitats, or serve as a strategic fuels management area.

**SSS-TER-119**:   Apply   appropriate   seasonal   restrictions   for   implementing   vegetation management treatments according to the type of seasonal habitats present in a PHAs.

**SSS-TER-120**:  Do not use fire to treat sagebrush in less than 12-inch precipitation zones (e.g., Wyoming big sagebrush or other xeric sagebrush species; Connelly et al. 2000, Hagen et al. 2007, Beck et al. 2009). However, if as a last resort and after all other treatment opportunities have been explored, and site specific variables allow, the use of prescribed fire that would disrupt fuel continuity or enhance land health could be considered where cheatgrass is a very minor component in the understory (Brown 1982).

**SSS-TER-121**:   Choose native plant seeds for vegetation treatments based on availability, adaptation (site potential), probability for success, and the vegetation management objectives for the area covered by the treatment (Richards et al. 1998).  Where probability of success or native seed availability is low, use species that meet soil stability and hydrologic function objectives as well as vegetation and sage-grouse habitat objectives (Pyke 2011).

**SSS-TER-122**:  Reestablish appropriate sagebrush species/subspecies and important understory plants relative to site potential.  Identify priority plant species and collect seed of understory plants and sagebrush subspecies important to sage-grouse.  Establish seed harvest areas that are managed for seed production (Armstrong 2007) and are a priority for protection from outside disturbances.

**SSS-TER-123**:  Apply post vegetation treatment management and monitoring to ensure long -term persistence of seeded native plants.  Outline temporary or long-term changes in livestock grazing, wild horse and burro, and travel management, etc., to achieve and maintain vegetation management objectives to benefit sage-grouse and their habitats (Eiswerth and Shonkwiler 2006).

**SSS-TER-124**:  Design vegetation treatments in sage-grouse habitats to strategically reduce wildfire threats in the greatest area.  This may involve spatially arranging new vegetation treatments with past treatments, vegetation with fire-resistant serial stages, natural barriers, and roads in order to constrain fire spread and growth.  This may require vegetation treatments to be implemented in a more linear versus block design (Launchbaugh et al. 2007).

BLM_0026301

**SSS-TER-125:** Prioritize implementation of restoration projects based on environmental variables that improve chances for project success in areas most likely to benefit sage-grouse (Meinke et al. 2009).

**SSS-TER-126:** Prioritize native seed allocation for use in priority sage-grouse habitat in years when preferred native seed is in short supply.

**SSS-TER-127:** Identify and work with partners to increase native seed availability and work with plant material centers to develop new plant materials, especially the forbs needed to restore sage-grouse habitat.

**SSS-TER-128:** Consider potential changes in climate (Miller at al. 2011) when proposing seedings using native plants. Consider seed collections from the warmer component within a species' current range for selection of native seed. (Kramer and Havens 2009).

**SSS-TER-129:** During vegetation management project design, consider the utility of using livestock to strategically reduce fine fuels (Diamond et al. 2009), and implement grazing management that will accomplish this objective (Davies et al. 2011, Launchbaugh et al. 2007). Consult with ecologists to minimize impacts to native perennial grasses.

**SSS-TER-130:** Ensure that proposed sagebrush treatments are planned with interdisciplinary input from BLM and /or state wildlife agency biologist and that treatment acreage is conservative in the context of surrounding sage-grouse seasonal habitats and landscape.

**SSS-TER-131:** Remove standing and encroaching trees within at least 100 meters of occupied sage-grouse leks and other habitats (e.g., nesting, wintering, and brood rearing) to reduce the availability of perch sites for avian predators.

**SSS-TER-132:** Strategically place and maintain pre-treated strips/areas (e.g., mowing, herbicide application, and strictly managed grazed strips) to aid in controlling wildfire should wildfire occur near key habitats or important restoration areas (such as where investments in restoration have already been made).

*West Nile Virus:*
**SSS-TER-133:** Increase the size of freshwater ponds to accommodate a greater volume of water than is discharged.

**SSS-TER-134:** Line the channel where discharge water flows into the pond with crushed rock, or use a horizontal pipe to discharge inflow directly into existing open water, thus precluding shallow surface inflow and accumulation of sediment that promotes aquatic vegetation.

**Special Status Species - Terrestrial Species – Bald Eagle:**
*General:*
**SSS-TER-135:** Avoid unnecessary tree cutting within ¼ mile of known roost trees.

*Wildland Fire Management:*
**SSS-TER-136:** In order to minimize effects, both direct and indirect, to potential nesting bald eagles, avoid the aerial application of retardant or foam within 300 feet of any body of water including lakes, rivers, streams and ponds whether or not they contain aquatic life.

References:

BLM_0026302

Sage-grouse National Technical Team. 2011. A Report on National Greater Sage-Grouse Conservation Measures. [Online]. Website. http://www.blm.gov/pgdata/etc/ medialib/blm /wo/Information_Resources_Management/policy/im_attachments/2012.Par.52415.File.dat/I M%202012-044%20Att%201.pdf.

## CULTURAL RESOURCES

**CUL-1**: Evaluation of all BLM activities and BLM authorized activities shall be made in compliance with BLM Manual 8100, The Foundations for Managing Cultural Resources (BLM 2004a), and subsequent 8100 series (BLM 2004b, 2004c, 2004d, 2004e, 2004f, 2004g, and 2004h); Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources (BLM 1998, rev. 2011); and the current State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office.

**CUL-2**: The holder of a BLM authorization to carry out land use activities on Federal lands, including all leases and permits, must notify the BLM, by telephone and written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony (43 Code of Federal Regulations [CFR] 10.4(g)). Activities must stop in the immediate vicinity of the discovery. The discovery must be protected from the authorized activity for a period of 30 days or unless otherwise notified by the (43 CFR 10.4(c) and (d)).

**CUL-3**: The National Historic Preservation Act, as amended, requires that if newly discovered historic or archaeological materials or other cultural resources are identified during project implementation, work in that area must stop and the BLM Authorized Officer must be notified immediately. Within five working days the BLM Authorized Officer will inform the proponent as to:

    a. Whether the materials appear eligible for the National Register of Historic Places;
    b. The mitigation measures the proponent will likely have to undertake before the site could be used (assuming in situ preservation is not practicable), (36 CFR 800.13); and
    c. A timeframe for the BLM Authorized Officer to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Office, that the BLM Authorized Officer's findings were correct and mitigation was appropriate.

**CUL-4**: A standard Education/Discovery stipulation for cultural resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that Federal laws protect cultural resources and they will be subject to prosecution for disturbing or destroying any historic or archaeological sites, or collecting any cultural objects, prehistoric or historic from federal lands.

**CUL-5**: Strict adherence to the confidentiality of information concerning the nature and location of archeological resources will be required of any company issued a land use authorization and all of their subcontractors (Archaeological Resource Protection Act, 16 US Code 470hh).

**CUL-6**: Prior to the commencement of fieldwork, consultants must perform a records search of the area to be surveyed, including a sufficient buffer area around the APE, to provide an interpretive context for the Previous Work and Expected Results sections of the final report. A Field Work Authorization is required for all projects before work takes place. A Field Work Authorization will be presented for signature at the time of the records search and must include a 7.5' map showing the extent of the project.

BLM_0026303

**CUL-7**: When a NEPA document specifically stipulates the need for an archaeological monitor during construction or a project is located in areas that require an archaeological monitor to be present it is the applicant's responsibility to contract an archaeological consultant holding a current Colorado BLM permit and authorized to work in the CRVFO. Fieldwork authorizations are required prior to any Cultural Resource monitoring where resources are present or reasonably expected and is permitted only when the ground surface is free of snow, unfrozen, and dry.

**CUL-8**: Where proposed projects or development will adversely affect a cultural resource, mitigation through testing, data recovery, or full excavation to recover scientific information, may be required. The applicant or operator accepts the full cost of mitigation and is encouraged to consider avoiding adverse effects through project relocation or redesign rather than mitigating adverse effects.

**CUL-9**: In complex linear or split-estate actions early coordination with private landowners will facilitate the process the BLM must complete prior to authorizing the action. To comply with the National Historic Preservation Act, the BLM must consider the effects to cultural resources on private land that result from a Federal action, such as linear rights-of-way or constructing a well pad on private land to drill to federal lease. Before an applicant can contract a cultural survey, private surface owners must be contacted and access requested to allow the cultural consultant access. If private land access is denied, projects can be authorized without completing cultural surveys on private land but this may lead to lengthy delays while the BLM completes consultation.

**CUL-10**: A cultural resource must be allocated to public use prior to:
a. authorizing or implementing any Heritage Tourism project;
b. when Special Recreation Permits are issued that will use a cultural resource; or
c. a BLM recreation project is proposed that involves the use or interpretation of a cultural resource.

**CUL-11**: When possible, locate projects in areas that are previously disturbed. To comply with the National Historic Preservation Act the BLM must identify significant cultural resources. Under the current regulations and guidelines the BLM may decide that no inventory needs to be conducted because the proposed action is located in an environment where ground disturbance has modified the surface so extensively that the likelihood of finding intact cultural resources is negligible.

References:
Bureau of Land Management. 1998. Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources. Rev. 2007. BLM, Colorado State Office, Lakewood, CO.

_____. 2004a. Manual 8100: The Foundations for Managing Cultural Resources. Release 8-72. BLM, Washington, DC. December 3, 2004.

_____. 2004b. Manual 8110: Identifying and Evaluating Cultural Resources. 8-73. BLM, Washington, DC. December 3, 2004.

_____. 2004c. Manual 8120: Tribal Consultation Under Cultural Resources. 8-74. BLM, Washington, DC. December 3, 2004.

BLM_0026304

_____. 2004d. Manual 8120-1: General Procedural Guidance for Native American Consultation. 8-75. BLM, Washington, DC. December 3, 2004.

_____. 2004e. Manual 8130: Planning for Uses of Cultural Resources. 8-76. BLM, Washington, DC. December 3, 2004.

_____. 2004f. Manual 8140: Protecting Cultural Resources. 8-77. BLM, Washington, DC. December 3, 2004.

_____. 2004g. Manual 8150: Permitting Uses of Cultural Resources. 8-78. BLM, Washington, DC. December 3, 2004.

_____. 2004h. Manual 8170: Interpreting Cultural Resources for the Public. 8-79. BLM, Washington, DC. December 3, 2004.

## TRIBAL CONSULTATION

**TBL-1:** The BLM has a responsibility to develop a government-to-government relationship with the tribes: the formal relationship that exists between the Federal Government and tribal governments under United State laws. Tribal governments are considered dependent domestic sovereignties with primary and independent jurisdiction (in most cases) over tribal lands. Concerning proposed BLM plans and actions, at least the level of consideration and consistency review provided to State governments must be afforded to tribal governments.

**TBL-2:** The BLM is responsible for consultation under General Authorities defined as laws, executive orders, and regulations that are not considered "cultural resource authorities". The regulations implementing both Federal Land Policy and Management Act and NEPA require Native American consultation. The American Indian Religious Freedom Act and the Indian Sacred sites order (Executive Order 13007) pertain to the free exercise clause of the First Amendment (BLM Manual 8120-1 Guidelines for Conducting Tribal Consultation [BLM 2004], Federal Land Policy and Management Act Title II, NEPA Section 102, 40 CFR 1501.2 and 1501.7).

**TBL-3:** Tribes must be consulted whenever other governmental entities or the public are formally involved in the BLM's environmental review process in any NEPA documentation that entails public involvement or initial discussions with local or state governments (BLM Handbook H-1790-1, National Environmental Policy Act [BLM 2008]).

**TBL-4:** NHPA Section 106 consultations for cultural resources which are significant to Indian tribes. Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government. Consultation shall be conducted in a manner sensitive to the concerns and needs of the Indian tribe (36 CFR 800.2(c)(2)(ii)(C)).

**TBL-5:** Notification is conducted by simple one-way written means. Consultation is generally construed to mean direct, two-way communication.

**TBL-6:** When publishing notices or open letters to the public indicating that the BLM is

BLM_0026305

contemplating an action and that comments are welcome, managers shall send individual letters, certified mail or delivery confirmed to tribes requesting their input on actions being considered. If this is an opening dialogue and a timely response is not received the manager shall follow up with personal telephone calls.

**TBL-7:** For the benefit of both parties, managers are encouraged to strive for the most efficient and effective method of consultation. Whatever method is chosen, all consultation activities shall be carefully documented in the official record.

**TBL-8:** Consultation roles can be facilitated but may not be transferred to others. Cultural resource consulting firms working for land use applicants cannot negotiate, make commitments, or otherwise give the appearance of exercising the BLM's authority in consultations.

**TBL-9:** Owing to their status as self-governing entities, tribes shall be notified and invited to participate at least as soon as (if not earlier than) the Governor, state agencies, local governments, and other federal agencies.

**TBL-10:** Tribal consultation means dialogue between a BLM manager and an American Indian Tribe. The BLM managers are encouraged to visit tribal councils and appropriate tribal leaders on a recurring basis. This face-to-face meeting helps to develop relationships that can reduce the time and effort spent in later consultation or individual projects. This government-to-government consultation shall be treated with appropriate respect and dignity of position.

References:

Bureau of Land Management. 2004. Manual 8120: Tribal Consultation Under Cultural Resources. 8-74. BLM, Washington, DC. December 3, 2004.

_____. 2004. Manual 8120-1: General Procedural Guidance for Native American Consultation. 8-75. BLM, Washington, DC. December 3, 2004.

_____. 2008. Handbook H-1790-1: National Environmental Policy Act. Washington, DC. January 2008.

## PALEONTOLOGY

**PAL-1:** Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.

**PAL-2:** Prior to any surface disturbing activities, an inventory of paleontological resources (fossils) may be required. Mitigation may be required upon the discovery of any vertebrate fossil or other scientifically-important paleontological resource. Mitigation of scientifically important paleontological resources may include avoidance, monitoring, collection, excavation, or sampling. Mitigation of discovered scientifically important paleontological resources might require the relocation of the disturbance over 100 meters. This and any subsequent mitigation work shall be conducted by a BLM-permitted paleontologist.

**PAL-3:** The lessee/operator shall bear all costs for inventory and mitigation (WO IM-2009-011).

**PAL-4:** A standard Education/Discovery stipulation for paleontological resource protection shall

be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that Federal laws protect paleontological resources and they will be subject to prosecution for disturbing or destroying any vertebrate fossils or paleontological sites, or collecting any fossilized bones, tracks or any other vertebrate trace fossils from federal lands.

**PAL-5:** The Paleontological Resources Preservation Act (PRPA) [16 U.S.C. 470aaa] requires the lessee/operator to immediately suspend activities in the vicinity of a vertebrate fossil discovery, protect the discovery from damage and notify the BLM Authorized Officer of any paleontological resources discovered as a result of operations under this authorization. The Authorized Officer will evaluate, or will have evaluated, such discoveries as soon as possible, but not later than 10 working days after being notified. Appropriate measures to mitigate adverse effects to significant paleontological resources will be determined by the Authorized Officer after consulting with the operator. Within 10 days, the operator will be allowed to continue construction through the site, or will be given the choice of either (1) following the Authorized Officer's instructions for stabilizing the fossil resource in place and avoiding further disturbance to the fossil resource, or (2) following the Authorized Officer's instructions for mitigating impacts to the fossil resource prior to continuing construction through the project area.

## VISUAL RESOURCES

**VRM-1:** All new surface-disturbing projects or activities, regardless of size or potential impact, will incorporate visual design considerations during project design as a reasonable attempt to meet the Visual Resource Management (VRM) class objectives for the area and minimize the visual impacts of the proposal. Visual design considerations will be incorporated by:
   a. Using the VRM contrast rating process (required for proposed projects in highly sensitive areas, high impact projects, or for other projects where it appears to be the most effective design or assessment tool), or by
   b. Providing a brief narrative visual assessment for all other projects that require an environmental assessment or environmental impact statement.
   c. Measures to mitigate potential visual impacts could include the use of natural materials, screening, painting, project design, location, or restoration (See Appendix H; BLM Handbook H-8431-1, Visual Resource Contrast Rating; or online at http://www.blm.gov/nstc/VRM/8431.html, for information about the contrast rating process).

**VRM-2:** All new roads will be designed and constructed to a safe and appropriate standard, "no higher than necessary" to accommodate intended vehicular use. Roads will follow the contour of the land where practical. Existing oil and gas roads that are in eroded condition or contribute to other resource concerns will be brought to BLM standards within a reasonable period of time.

**VRM-3:** Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA level review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

**VRM-4:** Any facilities authorized will use the best technology available to minimize light emissions

BLM_0026307

**VRM-5:** Any new permits/authorizations, including renewals, will be stipulated to use the best technology available to minimize light emissions as compatible with public health and safety.

**VRM-6:** Restrict visual intrusion in VRM Class I and II areas and within 0.25-mile of historic trails.

**VRM-7:** Screening facilities from view and avoiding placement of production facilities on steep slopes, hilltops, and ridgelines.

**VRM-8:** Paint all facilities a color that best allows the facility to blend with the background (Operator-committed BMP).

**VRM-9:** Gravel of road color shall be similar to adjacent dominant soil colors.

**VRM-10:** Reduce impacts on visual resource management class II and class III areas.

**VRM-11:** Bury distribution powerlines and flow lines in or adjacent to access roads.

**VRM-12:** Repeat form, line, color, and texture elements to blend facilities with the surrounding landscape

**VRM-13:** All aboveground facilities including power boxes, building doors, roofs, and any visible equipment will be painted a color selected from the latest national color charts that best allows the facility to blend into the background.

**VRM-14:** Perform final reclamation recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography.

**VRM-15:** To the extent opportunities are practicable, extreme visual contrast created by past management practices or human activities will be minimized. Examples include right-of-way amendments, mineral material sites, abandoned mines, and areas impacted by unauthorized off-road driving.

**VRM-16:** Reclaim unused well pads within one year.

**VRM-17:** Final reclamation of all oil and gas disturbance will involve re-contouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas

**VRM-18:** The use of submersible pumps will be strongly encouraged, especially in VRM Class I, II or III areas or any area visible by the visiting public.

**VRM-19:** The use of partial or completely below-grade wellheads will be strongly encouraged in high visibility areas as well as VRM Class I, II or III areas.

**VRM-20:** The placement of production facilities on hilltops and ridgelines will be prohibited where they are highly visible.

BLM_0026308

## WILDLAND FIRE ECOLOGY AND MANAGEMENT

*Fire Suppression*

**WFM-1:**   Resource Advisors and other applicable specialists shall be utilized to advise the Incident Commander and suppression resources on the natural resource values during the suppression effort.

**WFM-2**:  Avoid applying fire retardant in or near drinking water sources.

**WFM-3:**   Avoid the application of retardant or foam within 300 feet of a waterway or stream channel. Deviations from this procedure are acceptable if life or property is threatened.

**WFM-4:**   Fire lines will not be constructed by heavy equipment within riparian stream zones. If construction is necessary due to threats to life or property, control lines shall terminate at the edge of the riparian zone at a location determined appropriate to meet fire suppression objectives based on fire behavior, vegetation/fuel types, and fire fighter safety.

**WFM-5:**   For streams currently occupied by Greenback Cutthroat Trout, Colorado River Cutthroat Trout or other aquatic special status species, extractions of water from ponds or pools shall not be allowed if stream inflow is minimal and extraction of water will lower the existing pond or pool level.

**WFM-6:**   Lands will be temporarily closed to other uses in areas where fire suppression is being implemented.

**WFM-7:**   Stream flow shall not be impounded or diverted by mechanical means in order to facilitate extraction of water from the stream for fire suppression efforts.

**WFM-8:**   If it is determined that use of retardant or surfactant foam within 300 feet of a waterway or stream channel is appropriate due to threats to life or property; alternative line construction tactics are not feasible because of terrain constraints, congested areas, or lack of ground personnel; or potential damage to natural resources outweighs possible loss of aquatic life, the unit administrator shall determine whether there have been any adverse effects to federally listed species. If the action agency determines that adverse effects were incurred by federally listed species or their habitats, then the action agency must consult with the Service, as required by 50 CFR 402.05, as soon as practicable.

**WFM-9:**   Avoid whenever possible burning out unburned islands of native vegetation, specifically sagebrush communities.

**WFM-10:**   Minimize/mitigate impacts to cultural resources and pristine vegetative communities.

**WFM-11:**   Prior to use on BLM-CRVFO administered lands, thoroughly rinse to remove mud and debris from all fire suppression equipment from off-district or out of state and used to extract water from lakes, ponds, streams, or spring sources. Examples of this equipment are helicopter buckets, draft hoses, and screens. After cleaning the equipment, disinfect it to prevent the spread of invasive aquatic species. Do not rinse equipment with disinfectant solutions within 100 feet of natural water sources. CRVFO suppression equipment used to extract water from sources known to be contaminated with invasive aquatic species, as identified by the US Fish and Wildlife Service and Colorado Parks and Wildlife, also shall be disinfected beforehand on lands

BLM_0026309

administered by the CRVFO.

**WFM-12:**   Vehicle and equipment shall be washed before being assigned to fires to minimize the spread of noxious weeds.  Larger fires with incident management teams assigned may need to have a weed wash station.

**WFM-13:**   The use of motorized vehicles off designated routes and mechanical ground disturbing equipment (e.g., dozers) requires approval of the authorized officer.  When lives or homes are nearby and in imminent danger of being lost, the fire management officer may authorize vehicle use off designated routes and the use of ground disturbing equipment.

**Emergency Stabilization and Rehabilitation:**
**WFM-14:**   Stabilize areas that have low potential to naturally revegetate and that have high wind and soil erosion potential. Treatments include the following:
    a. Installing water bars and other drainage diversions, culverts along fire roads, dozer lines, and other cleared areas;
    b. Seeding and planting to provide vegetative cover;
    c. Spreading mulch to protect bare soil and discourage runoff;
    d. Repairing damaged roads and drainage facilities;
    e. Clearing stream channels of structures or debris that is deposited by suppression activities;
    f. Installation of erosion control structures;
    g. Installation of channel stabilization structures;
    h. Fence or restrict areas to livestock and wild horse and burro grazing to promote success of natural revegetation or establishment of seeded species;
    i. Lands may be temporarily closed to other uses during emergency stabilization and rehabilitation practices if activities inhibit treatment;
    j. Repair or replace range improvements and facilities; and
    k. Monitor emergency stabilization and rehabilitation treatments.

**Fuels Management:**
**WFM-15:**  Construct fuel breaks or green strips to protect wildland-urban interface communities and provide for firefighter safety by using mechanical, chemical, biological, and prescribed fire treatment methods.

**WFM-16:**  Construct fuel breaks and green strips in areas containing a good understory of native perennials in order to successfully compete with and deter the establishment and spread of annual species.

**WFM-17:**  Seed fuels treatments in areas that do not have a good understory of desirable native perennials that can successfully compete with annual weed species.

**WFM-18:**  Where practicable, use large-scale landscape planning to connect fuel treatments and avoid small piecemeal projects.

**WFM-19:**  Plan for maintenance cycles and maintain fuel treatments to ensure effectiveness.

**WFM-20:**  Prevent seeded species from being grazed during the first two growing seasons (>18 months) following seeding, or until site-specific analysis and/or monitoring data indicates that vegetation cover, species composition and litter accumulation are adequate to support and protect watershed values, meet vegetation objectives and sustain grazing use

BLM_0026310

**WFM-21**:  Provide fire prevention and mitigation outreach information and education to communities within the CRVFO.

## LANDS MANAGED TO PROTECT WILDERNESS CHARACTERISTICS

See best management practices listed in Appendix C - Proposed Management and Setting Prescriptions for Lands with Wilderness Characteristics.

## CAVE AND KARST RESOURCES

See best management practices listed in Appendix D - Management and Setting Prescriptions for Caves.

## WILD AND SCENIC RIVERS

**WSR-1**:  To the extent possible under existing legal authorities (e.g., FLPMA, Clean Water Act, Endnagered Species Act, and Archaeological Resources Protection Act), the BLM's policy goal for eligible and suitable rivers is to manage their free-flowing condition, water quality, tentative classification, and any outstandingly remarkable values to assure a decision on suitability can be made for eligible rivers; or in the case of suitable rivers, until Congress designates the river or releases it for other uses.  All eligible and suitable rivers will be managed in accordance with BLM BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management (BLM 2012).

## WILDERNESS STUDY AREAS

**WSA-1**:  All Wilderness Study Areas will be managed in accordance with BLM Manual 6330 – Management of Wilderness Study Areas.

References:
Bureau of Land Management. 2012. Management of Wilderness Study Areas, Manual 6330. BLM. July 2012.

## FORESTRY

**FOR-1**:  No fuel wood cutting of live trees will be allowed for cottonwood, willow, alder; unless resource objectives allow otherwise.

**FOR-2**:  No forestry harvest or collection of products will be allowed during the winter closure timing restraints (November 30 – May 1).

**FOR-3**:  Trees marked for wildlife protection and/or "Seed Tree Do Not Fall" will not be allowed to be harvested for any type of forestry products.

**FOR-4**:  Harvest plans will be completed on all commercial sales within woodlands and forests,

BLM_0026311

showing access roads, decks and skid trail locations. Approval of these plans by the BLM Authorized Officer is required before harvest can start.

**FOR-5**:  The closure of new roads will be considered and planned for during sale preparation in accordance with existing policy.

**FOR -6**:  Clear cuts will be considered for use in the pinyon-juniper and aspen types in critical big game winter ranges and other areas where economically feasible.

**FOR -7**:  Clear cuts will be considered for use in restoring aspen sites.

**FOR -8**:  Cuts that thin the pinyon-juniper canopy cover to 20 percent or less will be favored for use in bighorn sheep ranges. These cuts will focus on the smaller trees in the stand,

**FOR -9**:  Large conifer seed trees (three to seven trees per acre) will be left where practical as wildlife shelter on south facing slopes of big game winter ranges to ensure the succession of quality snags.

**FOR -10**:  An average of three to seven trees per acre of the largest nonhazardous snags, particularly those adjacent to openings and open water will be left on commercial sale areas.

**FOR-11**:  Sale areas with less than 15 percent ground cover in the understory on critical deer and elk winter ranges will be seeded using a mixture of grasses, forbs, and shrubs and will be paid for with wildlife funds.

**FOR-12**:  Minimum of 180 year rotation will be allowed for pinyon-juniper stands. Other species will be managed on a rotation of sufficient length to produce cavity trees for flickers and small owls.

**FOR-13**:  A minimum 50 foot buffer will be maintained along all riparian areas.

**FOR-14**:  Snags with existing cavities or nests will be priority for retention.

**FOR-15**:  Snag diameter for retention will be the largest class on site and will be retained in clusters if possible.

**FOR-16**:  If site potential allows, will retain 5-7 snags per acre, preferably in a clumped configuration.

**FOR-17**:  If possible, will retain at least 15 live trees per acre for future snag recruitment. Recruitment snags will not have to be structurally superior; live tree with forked and broken tops may be preferred.

**FOR-18**:  Do not disturb or destroy active or inactive nests of raptors which are reused.

**FOR-19**:  Avoid heavy equipment use in stands of cottonwood, willow, alder. If heavy equipment use is necessary, allow on a case by case basis and mitigate for adverse impacts.

**FOR-20**:  Allow dead and down collection of cottonwood for personal use.

**FOR-21**:  Protect seed and important wildlife habitat trees in pinyon-juniper stands.

**FOR-22**:  Allow removal of pinyon-juniper encroachment utilizing mechanical, biological, and chemical treatments. Allow tree harvesting for Christmas trees and transplants other woodland products and biomass reduction.

**FOR-23**:  Minimize disturbance to the soil such that surface runoff does not result in sediment transport into waterbodies. Concentrate skidding on as few skid trails as needed.

**FOR-24**:  Limit primary skid trails to 10 percent of the total working area.

**FOR-25**:  Avoid widespread or random skidding patterns with repeated passes.

**FOR-26**:  Minimize placement and use of skid trails in ephemeral drainages. If skid trails must be within or cross an ephemeral drainage, additional BMPs are needed to protect water quality.

**FOR-27**:  Minimize the extent of gouges or trenches upon the ground surface that are created by the skidding of trees or logs.

**FOR-28**:  On sloping terrain, skid trails shall follow along the land contours and shall be kept to 25 percent grade or less when practical.

**FOR-29**:  Establish decks at locations where soil disturbance is minimized.

**FOR-30**:  Maintain as close to normal (pre-construction) streamflow by maintaining depth, width, gradient and capacity of the stream channel at the crossing.

**FOR-31**:  Perform construction, installation, and removal work during low-water flow if circumstances allow.

**FOR-32**:  Stabilize the approachways and/or stream crossing locations so sediment is not transported into the stream.

**FOR-33**:  Approaches to the stream are relatively flat to better control runoff.

**FOR-34**:  The crossing can be installed at a right-angle (90 degrees) to the stream channel so crossing distance is minimized.

**FOR-35**:  Any trees removed during these processes will be purchased by the applicant prior to construction. The applicant is responsible for a per-cord fee.

**<u>Guidelines for Christmas Tree and Firewood Harvesting:</u>**
**FOR-36**:  Vehicle use is restricted to existing roads and trails. Do not drive off road.

**FOR-37**:  Do not damage adjacent trees.
**FOR-38**:  When cutting down standing trees, cut the stump 12 inches or less, or as close to the ground as possible.

**FOR-39**:  Scatter lopped branches at least 50 feet from the stump.

**FOR-40**:  Do not top a larger tree to obtain a Christmas tree.

BLM_0026313

**F-41**:  Do not harvest any trees within 100 feet of a spring or creek unless trees are identified for selective removal to meet resource objectives.

**FOR-42**:  Please pack out your trash as well as trash left by others.

**FOR-43**:  No harvesting when soils are saturated to a depth of 3 inches to prevent damage to roads.

**FOR-44**:  CRVFO closed to firewood harvesting on November 30. Firewood harvesting reopens in the spring based on road conditions.


## LIVESTOCK GRAZING

**GRZ-1**:  Follow the Grazing Guidelines established along with the Colorado Standards for Rangeland Health.

**GRZ-2**:  Usually it is necessary to protect seedings from grazing for one full year  and through the growing season of the second year. Some seedings established during adverse weather cycles may need protection for a longer period.

**GRZ-3**:  New fences shall be constructed to BLM standards allowing for the appropriate wildlife passage.  Fences constructed will comply with applicable wildlife fence standards, such as those described in BLM Handbook H-1741-1, Fencing (BLM 1989).

**GRZ-4**:  Bird and wildlife ramps shall be installed in all troughs.

**GRZ-5**:  Access routes to functioning range improvements shall be retained to allow for periodic maintenance and prevent cross country travel.

**GRZ-6**:   Continue to maintain range improvement projects to support proper livestock management including optimal distribution.

**GRZ-7**:  Rangeland and vegetation monitoring will be conducted to detect changes in grazing use, trend, and range conditions. These data will be used to support and direct grazing management decisions. These efforts will help ensure that livestock grazing meets objectives for rangeland health and resolves conflicts with wildlife or other resources.

**GRZ-8**:  Grazing management decisions will be based on inventory and monitoring data, both short-term and long-term, which will be jointly developed by grazing permittees and the appropriate federal land management agency.

**GRZ-9**:  All water development activities for livestock grazing use that exceed the minimum depletion level established by US Fish and Wildlife Service must comply with all US Fish and Wildlife Service fees and prescribed mitigations to offset water depletion in the Colorado River.

**GRZ-10**:  Surface-disturbing activities will be coordinated with livestock grazing permittees to minimize the effects of the surface disturbance on other approved operations. To the maximum extent practicable, this effort will include consulting on scheduling of operations to mutually minimize effects.

BLM_0026314

**GRZ-11:** Any damage to the function of range improvements (e.g., fence damage, cattle guard cleaning, livestock loss) from other approved operations will be repaired immediately or remedied by the operator causing the damage.

**GRZ-12:** Well pads, pits, and other facilities that could be hazardous to livestock will be fenced to keep livestock out and the fences maintained in functioning condition.

**GRZ-13:** Development of springs and seeps or other projects affecting water and associated resources shall be designed to maintain the associate riparian area and assure attainment of standards.

**GRZ-14:** Disturbance to established rangeland study sites shall be avoided to provide for the continuation of monitoring efforts which involves comparisons of data to previous records of that site.

**GRZ-15:** Facilities shall be constructed a minimum of 0.125-mile from livestock gathering spots such as water sources and gathering facilities to prevent disruption of the use of these facilities and potential damage to the facility by livestock.

**GRZ-16:** Exclosures may be established in areas where the vegetative potential of the area is questionable or to compare the effectiveness of grazing management.

**GRZ-17:** Livestock grazing could be used as an intensively managed prescriptive grazing practice to control cheatgrass and noxious or invasive weeds.

**GRZ-18:** Use grazing systems that contain rotation, deferment, and rest to produce a mosaic of habitat patches and increases the density, height and distribution of native plants.

**GRZ-19:** Rotate livestock use areas year to year – avoid grazing in the same place at the same time each year.

**GRZ-20:** Avoid re-grazing the same plants in one growing season.

**GRZ-21:** Adjust grazing seasons to benefit both warm and cool season grass species by providing periodic rest from grazing for each type.

**GRZ-22:** Avoid grazing an area during the spring and fall period in one year's time.

**GRZ-23:** Allow for adequate litter cover following grazing use to protect soil surface and enhance soil moisture retention.

**GRZ-24:** For spring grazing ensure livestock are removed early enough so that sufficient soil moisture remains for plant recovery.

**GRZ-25:** Allow for rest/recovery periods before or after grazing during critical growth periods. Recovery shall include the production of seed to allow for the regeneration of desirable plant species.

**GRZ-26:** Occasional grazing use during the dormant season will provide rest during the growing season and will allow plants to recover.

BLM_0026315

**GRZ-27:**  Adjust intensity, timing and/or duration of grazing during periods of drought.

**GRZ-28:**  Manage livestock grazing, including dormant season use, to insure adequate residual grass cover remains when soil moisture or wildlife habitat are concerns.

**GRZ-29:**  Proper utilization allows stubble for root and crown protection, litter accumulation for organic matter contribution to the soil, cover and habitat for wildlife and forage availability for grazing animals utilizing the area.  Generally utilization levels shall be based upon recovery periods and other resource objectives.  Suggested utilization guidelines would be:

   a.  In areas Not Meeting Land Health Standards and cattle grazing is a causative factor, limit utilization on key species to 30% during the critical growth period and 40% during the dormant season.
   b.  In areas Meeting Land Health Standards limit utilization on key species to 40% during the critical growth period and 50% during the dormant season.
   c.  If wildlife/livestock conflicts exist annual utilization would be read before the next seasons growth begins to account for all uses and demands on the plants.
   d.  The exception to these guidelines is if the permittee can convince the authorized officer that they have the knowledge, ability and commitment to implement a grazing system that should result in improvements to the ecosystem.

**GRZ-30:**  Limit use in areas of valuable woody plants during times when they are selected.

**GRZ-31:**  Avoid the following grazing management practices:
   a.  Long seasonal use with no recovery time
   b.  Heavy use - stresses plants,
   c.  Little or no re-growth before winter - little stubble for root crown protection
   d.  Use at the same time every year - repeating the stress
   e.  No rest or growing season recovery - little recovery with long seasons of use
   f.  Little or ineffective herding
   g.  Salt placed in the same locations year after year
   h.  Livestock left behind after pasture moves
   i.  Grazing during the critical growth period year after year

**GRZ-32:**  When using livestock to control noxious or invasive  weeds,  match  animal  dietary preference or tolerance to the target species.

**GRZ-33:**  Use the target weed's phenology when developing a grazing strategy.

**GRZ-34:**  Manage heavy grazing on target weed species to account for any        intermixed desirable species.

**Vegetation/Riparian Zone Grazing Management Guidelines:**
**GRZ-35:**  To reduce negative impacts to grazing, determine the critical period(s) of a riparian site, and then limit grazing during the critical period(s) to no more often than once every three or four years. Critical periods and impacts are likely to be either in late spring-early summer, when stream banks are more easily broken down by trampling; or late summer-early fall, when excessive browsing can damage vegetation. Each site has its own critical period that shall be individually determined. Important critical period variables are soil moisture, plant species composition, animal behavior patterns. Site may be grazed every year if use does not occur

BLM_0026316

during the critical period(s). Extended periods of rest or deferment from grazing may be needed to enable recovery of badly degraded sites. Graze earlier in the season when cattle use uplands. (Mosley et al. 1997)

**GRZ-36:**  To maintain stream bank stability, limit cattle access to surface water when adjacent stream banks and shorelines are overly wet and susceptible to trampling and sloughing. Stream bank trampling can often be reduced by capitalizing on the natural foraging behavior of cattle. Cattle generally avoid grazing excessively wet sites or in cold-air pockets. Cattle seek out wind-swept ridges, and they graze on upland forage when it is more palatable than forage in riparian areas. Avoid hot season grazing of riparian areas. (Mosley et al. 1997)

**GRZ-37:**  To graze a site more than once per growing season, moisture and temperature conditions shall be conducive to plant growth. For such sites, allow a recovery period of at least 30 to 60 days, depending on vegetation type, before re-grazing within the same growing season. Grazing more often and for shorter periods-that is, 3 weeks or less at a time-is preferable to fewer and longer grazing periods. (Mosley et al. 1997)

**GRZ-38:** To control the timing, frequency, and intensity of cattle grazing, consider creating smaller riparian pastures with similar, or homogenous, features. Adjusting timing, frequency, and intensity of grazing in individual pasture units is more important than adopting a formalized grazing season. (Mosley et al. 1997)

**GRZ-39:**  To protect stream banks, prevent cattle from congregating near surface waters. Fencing, salting, and herding work best. Provide remote watering systems for cattle. Manage the riparian area as a separate and unique pasture. Inappropriate cattle grazing will usually first be evidenced by excessive physical disturbance to stream banks and shorelines. (Mosley et al. 1997)

**GRZ-40:** On riparian areas that are determined to be non-functioning or functioning at risk as a result of livestock grazing impacts, limits of bank disturbance will be determined and included within the *Terms and Conditions* of the Grazing Permit.

**GRZ-41:**  In general, utilization standards in riparian areas should be no more than 30% use of current year's growth on woody species and a minimum of 4 inches of stubble height on key species shall remain at the end of the grazing period.

**GRZ-42:**  To protect stream banks, discourage trailing up and down the channel by placing logs across trails, perpendicular to the stream channel.

**GRZ-43:**  Adjust intensity, timing and/or duration of grazing during periods of drought.

References:
BLM Handbook H-1741-1, Fencing (BLM 1989)

Mosley, J.C., P.C. Cook, A.J. Griffis, and J. O`Laughlin. 1997. Guidelines for Managing Cattle Grazing in Riparian Areas to Protect Water Quality: Review of Research and Best Management Practices Policy. Report No. 15. University of Idaho, Moscow, ID. December 1997.

BLM_0026317

## RECREATION

**REC-1**:  Special Recreation Permits will contain noxious weed management stipulations (e.g., pre-event inventories to avoid infested areas, event management to avoid or isolate activities that could cause weed introduction or spread, monitoring and treatment of infestations exacerbated by the activity, and other appropriate noxious weed management stipulations).

**REC-2**:  Promote the seven standard principles of Leave No Trace outdoor ethics through print and electronic media, and through personal communications with recreationists participating in non-motorized recreation activities on BLM-managed public lands.  (www.lnt.org)

**REC-3**:  Promote the principles of Tread Lightly outdoor ethics through print and electronic media, and through personal communications with recreationists participating in recreation activities on BLM-managed public lands. (www.treadlightly.org)

**REC-4:** Apply *Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado.* Website: http://www.blm.gov/co/st/en/BLM_Information/newsroom/2000/recguidefnr /guide_fmal.html.

**REC-5:** Apply *Guidelines for a Quality Built Environment*.  Website: http://www.blm.gov/style /medialib/blm/wo/Planning_and_Renewable_Resources/recreation_images/national_programs/V RM.Par.62809.File.dat/GQBE_WEB.pdf.

**REC-6:** Route design, construction and maintenance will follow: BLM guidelines, guidelines established in the Gold Book (BLM 2007) and technical recommendations of partner groups (e.g. International Mountain Bicycling Association (IMBA), Volunteers for Outdoor Colorado - Crew Leader Manual, Backcountry Horsemen, National Off-Highway Vehicle Conservation Council (NOHVCC)).

## LANDS AND REALTY

**RLT-1**:  Power lines shall be constructed in accordance to standards outlined in "Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996" (Avian Power Line Interaction Committee 2006). Right-of-way applicants shall assume the burden and expense of proving that proposed pole designs not shown in the above publication are "raptor safe." Such proof shall be provided by a raptor expert approved by the BLM Authorized Officer.

**RLT-2**:  Rights-of-way and other lands and realty authorizations, including power lines, pipelines, transmission corridors, energy development sites and related development, and gravel pits, will contain noxious and invasive plant management terms or stipulations for all ground-disturbing actions. These will include conducting a pre-disturbance noxious weed inventory, designing to avoid or minimize vegetation removal and weed introduction or spread, managing weeds during the life of the right-of-way or authorization to prevent or minimize weed introduction or spread, abandoning the right-of-way or authorization to establish competitive vegetation on bare ground areas, and monitoring revegetation success and weed prevention and control for a reasonable number of years.

**RLT-3**:  Rights-of-way will be constructed to avoid physical damage to range improvements and

BLM_0026318

rangeland study areas.

**RLT-4**:  The Holder shall notify the BLM Authorized Officer at least 48 hours prior to the commencement construction, reclamation, maintenance, or any surface-disturbing activities under this grant. LR

**RLT-5**:  Copies of the right-of-way grant with the stipulations shall be kept on site during construction and maintenance activities. All construction personnel shall review the grant and stipulations before working on the right-of-way or permitted area.

**RLT-6**:  All facilities shall be labeled with the authorization number, operator, and contact information.

**RLT-7**:  No signs or advertising devices shall be placed on the premises or on adjacent public lands, except those posted by or at the direction of the BLM Authorized Officer.

**RLT-8**:  The Holder shall promptly remove and dispose of all waste caused by its activities. The term "waste" as used herein means all discarded matter including, but not limited to, human waste, trash, garbage, refuse, petroleum products, ashes, and equipment. No burning of trash, trees, brush, or any other material shall be allowed.

**RLT-9**:  The Proponent shall notify all existing right-of-way holders in the project area prior to beginning any surface-disturbance or construction activities. The Holder shall obtain an agreement with any existing right-of-way holders or other parties with authorized facilities that cross or are adjacent to those of the holder to assure that no damage to an existing right-of-way or authorized facility will occur. The agreement(s) shall be obtained prior to any use of the right-of-way or existing facility.

**RLT-10**:  The Holder shall participate in the formation of a Road User's Association for the road if new rights-of-way are granted for use of the existing road. All new users will be required to join the association.

**RLT-11**:  The Holder will provide a performance bond for the authorized facility, acceptable to the BLM Authorized Officer, in the amount of $(__) that must be maintained in effect until restoration of the right-of-way has been accepted by the BLM Authorized Officer. The bond shall be furnished by the holder within 30 days of signing the grant (__) and shall be applied to all additional authorizations associated with the project as necessary.

**RLT-12**:  Incorporate conditions of approval and mitigation measures from the Final Programmatic EIS on Wind Energy Development on BLM-administered Lands in the Western US, as applicable (BLM 2005).

**RLT-13**:  Incorporate conditions of approval and mitigation measures from the Solar Energy PEIS, as applicable (*pending completion of Solar PEIS*).

**RLT-14**:  All construction activities shall be confined to the minimum area necessary. The exterior boundaries of the construction area shall be clearly flagged prior to any surface-disturbing activities.

**RLT-15**:  Existing roads will be used wherever possible. Additional roads shall be kept to the minimum. Route locations must be approved by the BLM prior to construction.

BLM_0026319

**RLT-16**:  When blasting is necessary, the following precautions will be used:
   a.  In areas of human use, blasting blankets will be used.
   b.  Landowners or tenants in close proximity to the blasting will be notified in advance of the blasting so that livestock and other property can be removed adequately protected.
   c.  Access to the blasting area will be restricted by construction personnel stationed at each end of the area to be blasted.
   d.  Blasting within 0.25-mile of federally-owned or controlled springs and flowing water wells must be approved in writing by the area manager.
   e.  No blasting will be permitted within 0.25-mile of historic trails, natural areas, identified archaeological sites, and recreation areas.
   f.  Powder magazines will be located out of sight or at least 0.5-mile from roads. Loaded shot holes will not be left unattended. Approval from the area manager will be obtained for the magazine locations.

**RLT-17**:  Roads will be constructed and maintained to BLM road standards (BLM Manual 9113 [BLM 2012]). All vehicle travel will be within the approved driving surface.
*Best Management Practices for Pipeline Projects*

**RLT-18**:  A preconstruction field conference shall be requested by the grantee at least five working days prior to any construction activities unless otherwise agreed upon by the BLM Authorized Officer.

**RLT-19**:  Once the pipeline is constructed, the grantee/operator shall restore the existing roadway to meet or exceed conditions prior to construction. The preconstruction width of the driving surface shall also be restored and erosion control structure installed subject to approval of the BLM Authorized Officer. The grantee/operator shall be responsible for road maintenance from the beginning to completion of operations. This may include, but not be limited to, blading the roadway, cleaning ditches and drainage facilities, dust abatement, or other requirements as directed by the BLM Authorized Officer.

**RLT-20**:  Construction width shall include the existing road. The pipeline shall be located two to three feet from the edge of the ditch along the existing road. The existing road shall be on the working side of the trench.

**RLT-21**:  The grantee shall accomplish the crossing of the pipeline owned by (company name) in accordance with an agreement between the grantee/operator.

**RLT-22**:  Pipeline location warning signs shall be installed within five days of construction completion. Each sign shall be permanently marked with the right-of-way serial number.
*Geophysical Exploration*

**RLT-23**:  The operator will furnish a map with the Notice of Intent showing approximate line to be used. A map will also be filed with the Notice of Completion showing the completed line. The map will be of a minimum scale of 0.5-inch equals 1.0 mile.

**RLT-24**:  Rehabilitation of disturbed areas is to be done concurrent with the geophysical operations.

**RLT-25**:  Blasting or vibrating within 0.25-mile of federally-owned or controlled springs and flowing water wells or cultural resource sites must be approved in writing by the area manager.

BLM_0026320

**RLT-26**:  Plugging of drill holes will conform to the Colorado Reclamation Standards Abandoned Drill Holes Act. Drill hole cuttings will be returned to the hole. LR

**RLT-27**:  No blading or other dirt work will be allowed without written permission from the area manager.

**RLT-28**:  Standard Terms and Conditions described in BLM Handbook H-3150-1: Onshore Oil and Gas Geophysical Exploration Surface Management Requirements (BLM 1994 Rev. 2007).

**RLT-29**:  Coordinate with the Colorado Parks and Wildlife early in the sale process on proposals to sell public land encumbered by a small capacity wildlife water development.

References:
BLM.  2012.  H-9113-1 Road Design Handbook.  Bureau of Land Management, Washington, D.C.On-line: http://web.blm.gov/nstc/eat/pdf/Final%20H-9113-1.pdf.

BLM. 1994. BLM Handbook H-3150-1: Onshore Oil and Gas Geophysical Exploration Surface Management Requirements. BLM, Washington, DC. Rev. 2007.

BLM. 2005. Bureau of Land Management Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States. BLM, Washington, DC. June 2005.

Avian Power Line Interaction Committee. 2006. Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996. Edison Electric Institute, Avian Power Line Interaction Committee, and the California Energy Commission. Washington, DC, and Sacramento, CA.


**MINERALS AND ENERGY**

Actions involving minerals and energy are governed by:
- Minerals Leasing Act of 1920 (30 U.S.C 181 *et seq*);
- Federal Oil and Gas Royalty Management Act (30 U.S.C. 1718(b));
- Federal Onshore Oil and Gas Leasing Reform Act (30 U.S.C. 226(g));
- 43 CFR 8900 et seq.
- Federal On Shore Orders 1-7
- 43 CFR 3809 Regulations (Locatable Minerals Management)

The Intermountain Oil and Gas BMP project's web site presents current BMPs specific to Colorado http://www.oilandgasbmps.org/index.php.

**Geophysical Exploration:**
**MIN-1**:  If operations open an existing fence, temporary gates will be installed for use during the course of operations, or the fence will be immediately repaired. On completion of operations, fences will be restored to their original condition or better.

**MIN-2**:  When saturated soil conditions existing on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen

BLM_0026321

sufficiently for construction to proceed without undue damage and erosion to soils, roads and locations.

**MIN-3**:   For geophysical operations, specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and/or other resource values.

**MIN-4**:  Prohibit the use of subsurface explosives and vibrosis buggies within 0.25 miles of all spring sources and perennial streams.

**MIN-5**:  Powder magazines will be located at least a mile from traveled roads, unless otherwise authorized after analysis or review. Loaded shot holes and charges will be attended at all times.

**MIN-6**:  Materials or equipment related to project activities (e.g., trash, flagging, lath) will be removed to an authorized disposal site. General Surface Uses

**MIN-7**:  Project materials which could be a hazard to public health, safety or resource values will be stored in appropriate secondary containment. No oil or lubricants will be drained onto the ground surface. General Surface Uses

**MIN-8**:  Shot-hole cuttings will be returned to the hole, or an alternative plan will be submitted for BLM approval.

*Reducing Fluid Mineral Development Footprint*
**MIN-9**:  Surface disturbing actions will be sensitive to natural resource protection.  When surface disturbance in sensitive areas is unavoidable, they will be minimized to the greatest extent practicable, especially near drainage features and on soils mapped as being saline (> 8 mmhos/cm).

**MIN-10**:  Utilities such as gas and water lines, power lines and roads will be located in common corridors where practicable.

**<ins>Administrative / General and Planning:</ins>**
**MIN-11**:  Consider site specific soil and vegetative characteristics and reclamation potential in project design and layout.

**MIN-12**:  Design and construct energy service roads to a safe and appropriate standard, no higher than necessary to accommodate their intended use.

**MIN-13**:  Locate and construct roads and other linear facilities to follow the contour of the landform or mimic lines in the vegetation.

**MIN-14**:   A pre-construction meeting will be held with the BLM before and to facilitate implementation of plans and ensure compliance with stipulations or conditions of approval.  The BLM will be notified at least 48 hours prior to construction or reclamation work.

**MIN-15**:  By November 1 each year, companies will provide georeferenced spatial data depicting as-built locations of all facilities, wells, roads, pipelines, power lines, reservoirs, discharge points, and other related facilities to the BLM for all Master Development Plans where construction and development have been completed.

BLM_0026322

**MIN-16**: Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game.

**MIN-17**: Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan (storm water management plan) for establishing positive management of surface water drainage, to reduce erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance and reporting. BMPs may include run-on/run-off controls such as surface pocking or revegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

**MIN-18**: Before surface disturbance, agreements will be obtained with all existing rights-of-way holders, authorized users and pipeline operators affected by permitted activities. If Agreement cannot be reached, the operator will comply with the law or regulations.

**MIN-19**: Disclosure of hydraulic fracture fluids per COGCC rule 205A will be done using FracFocus.org 30 days following the conclusion of the hydraulic fracturing treatment and in no case later than 90 days after the commencement of such hydraulic fracturing treatment.

**Pre-Construction:**
**MIN-20**: Stakes, snow fence or flagging will be installed to mark boundaries of permitted areas of disturbance, including pre-construction BMPs and soils storage areas and be maintained in place until final construction cleanup is completed.

**MIN-21**: Pre-construction drainage BMPs will be installed as appropriate, per the approved surface/storm drainage water management, plan to protect stream drainages and to reduce erosion and sediment transport.

**MIN-22**: Surveys for raptor nests, sensitive plant and animal species and cultural resources will be conducted prior to construction activities following BLM survey standards. Survey results will be submitted to the BLM for analysis and recommendations before project approval.

**Construction:**
**MIN-23**: All routes shall be built and maintained to BLM Manual Section 9113 standards for road shape and drainage features (BLM 2009b) or where appropriate BLM Manual Section 9116 standards for primitive roads. For drainage crossings, culverts should be sized for the 50 year storm event with no static head and to pass a 100-year event without failing. Site specific conditions may warrant BLM to require designs for larger events (e.g. 75-100 year storm events). Large culverts and bridges shall be designed and constructed per BLM Manual 9112 (large culverts and bridges) (BLM 2009a). Large culverts and bridges shall be designed to pass a 100-year storm event (minimum).

**MIN-24**: As detailed in the site plan for surface/storm water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales or catchments.

**MIN-25**: Topsoil stripping will include all growth medium present at a site (following initial clearing of large trees, etc.), as indicated by color or texture. Stripping and storage depth may be

BLM_0026323

specified during the onsite inspection. All stripped topsoil /growth medium will be salvaged, segregated and stored in a manner that extends biological viability and protects it from loss. Topsoil and all growth medium will be replaced prior to seedbed preparation. No topsoil will be stripped or segregated when soils are saturated or frozen below the stripping depth.

**MIN-26**: Access roads requiring construction with cut and fill will minimize surface disturbance and consider the character of the landform's contours, visual contrasts, the cut materials, the depth of cut, where the fill material will be deposited and other resource concerns.

**MIN-27**: Fill material will not be cast over hilltops or into drainages without BLM approval.

**MIN-28**: When saturated soil conditions existing on access roads or location, or when road rutting becomes deeper than 3 inches, construction shall be halted until soil material dries out or is frozen sufficiently for construction to proceed without undue damage and erosion to soils, roads and locations.

**MIN-29**: Construction activities at drainage crossings (e.g., burying pipelines, installing culverts) will be timed to avoid high flow conditions. Construction activities that affect stream flow will consist of either a piped stream diversion or the use of a coffer dam and pump to divert flow around the disturbed area.

**MIN-30**: When activity in a wetland is unavoidable, the operator will reduce impacts through the use of oak or HDP mats and will restore all temporarily disturbed wetlands or riparian areas, consulting with the BLM to determine appropriate mitigation, including verification of native plant species to be used in restoration.

**MIN-31**: All stream crossings affecting perennial streams or streams supporting riparian habitat shall be professionally engineered (design, construction, and maintenance).

**MIN-32**: Where the access road crosses small drainages and intermittent streams not requiring culverts, low water crossings shall be used. The road will dip to the original streambed elevation of the drainage and the crossing will prevent any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

**MIN-33**: All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support Federal or State-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe, and remotely-actuated block or check valves on both sides of the stream may be used

**MIN-34**: Water from hydrostatic testing of pipelines will be filtered of sediments prior to discharge. Energy dissipating methods such as straw-bales, wattles, and vegetative buffers will be in place before any discharge of water.

**MIN-35**: Baseline information on channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

***Drilling:***
**MIN-36**: Pits that may contain liquid, such as reserve pits, produced water pits, frac-water pits, cuttings trenches (if covered by water/fluid), and evaporation pits, will install and maintain

BLM_0026324

netting to prevent entry or use by migratory birds. They will be fenced on three sides before drilling activity and closed off on the fourth side after drilling is completed.

**MIN-37**: If any pit that may contain liquid is constructed with a slope steeper than 3:1, or if the pit is lined, escape ramps will be installed every 50 feet along the pit slope and at each corner to allow escape by livestock and wildlife

**MIN-38**: Fluids will be confined to pits and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

**MIN-39**: Pits will be constructed so that water will not run into them. Fluid levels will be maintained below 2 feet of the lowest point of containment.

**Utilization and Production:**
**MIN-40**: Operations will not damage, disrupt or interfere with water flows and/or improvements associated with springs, wells, or impoundments.

**MIN-41**: Regularly scheduled road maintenance will include, but not be limited to, crown or slope reconstruction, clean-out of ditches, culverts and catchments, replacement of the road surface and dust abatement.

**MIN-42**: Well pads and facilities will be kept free of unnecessary equipment, trash and other materials not in current use.

**MIN-43**: Pits will be promptly drained, tested, closed and reclaimed according to local state and federal regulations.

**MIN-44**: Dust from vehicular traffic, equipment operations, or wind events will be controlled as needed. No application of surfactants or dust agents will proceed without BLM approval. In areas with soils mapped as Mancos shale, application of water on native road surfaces will be limited, to minimize mobilization of selenium. In such areas, alternate dust abatement measures such as proper road surfacing and maintenance, and speed limits will be used, subject to BLM approval.

**MIN-45**: Noise will be minimized by methods such as closed compressor buildings to comply with COGCC standards for noise.

**MIN-46**: Pipeline warning signs permanently marked with the operator's and owner's names (emergency contact) and purpose (product) of the pipeline will be installed within five days of construction completion and before use of the pipeline for transportation of product.

**MIN-47**: All production equipment with a chimney, vent, or stack shall be fitted with a device to prevent birds from entering or perching on the chimney, such as an excluder cone or equivalent.

**MIN-48**: Production facilities will be located and arranged to facilitate safety and maximize areas to be reclaimed.

**MIN-49**: All above ground facilities should be painted a natural color selected from the BLM Standard Environmental Color Chart to minimize contrast with adjacent vegetation and/or rock outcrops. Color(s) should be selected in the field at the proposed project location and should be planned for the season with the greatest number of viewers. Selected color(s) should be one to

BLM_0026325

two shades darker than those naturally occurring in the background landscape (this will also help with the effects of fading over time). The operator may need to paint drill rig anchors and those minor working tips and edges of production facilities that are subject to OSHA safety requirements a red, yellow, or orange color.

**MIN-50**:  Standard secondary containment shall hold 110% of the capacity the largest single tank it contains and be impervious to any oil, glycol, produced water, or other toxic fluid for 72 hours.  Earthen berms must be compacted and of fine material that will prevent seepage of any spill to surrounding area.

**MIN-51**:  All tanks with a capacity of ten (10) barrels or greater shall be labeled or posted with the following information:  A. Name of operator;  B. Operator's emergency contact telephone number; C. Tank capacity; D. Tank contents; and E. National Fire Protection Association (NFPA) Label. Smaller chemical storage shall be labeled with contents and NFPA label.

**MIN-52**:  All liquids management hoses will be stored inside secondary containment when not in use.

**MIN-53**:  All open top tanks, catchments or secondary containment vessels will be equipped with sturdy metal screening to prevent access to wildlife of all sizes to prevent entrapment and drowning of small wildlife.

### Site Stabilization, Reclamation and Monitoring:
**MIN-54**:  Road and pipeline reclamation, including seedbed prep and seeding of temporarily disturbed areas will be completed within 30 days following completion of construction.

**MIN-55**:  Following completion of pad construction, topsoil storage piles, stormwater control features, and cut-and-fill slopes will be temporarily seeded, to stabilize the materials, maintain biotic soil activities, and minimize weed infestations. When this is not feasible, disturbed surfaces must be stabilized using other methods like hydro-mulch or erosion matting while vegetation is establishing. Seedbed preparation is not generally required for topsoil storage piles or other areas of temporary seeding.

**MIN-56**:  Interim reclamation includes recontouring and revegetating the entire portion of the disturbed area except that part of the well pad needed for production activities.
   a. It will be completed within six months following completion of the last well planned for the pad or after a year has passed with no new wells drilled on the pad. All areas unnecessary to production activities will be revegetated, including the area within the remaining rig anchors. In special cases, an exception to this will be requested.
   b. Before interim reclamation is scheduled, the operator will meet with BLM to inspect the disturbed area, review the existing reclamation plan, and agree upon any revisions to it.
   c. All parts of the area unnecessary for long-term operations will be reshaped to blend with natural topography, covered evenly with topsoil and a seedbed prepared.
   d. For cut-and-fill slopes, initial reclamation will typically consist of moving fill material back into cuts, back-filling and reshaping to achieve the configuration specified in the reclamation plan. Compacted areas will be well ripped in two passes at perpendicular directions. In fragile or loose soils, compaction techniques such as tread-walking may be necessary to prevent high erosion hazard. Topographic contours will be reshaped to blend with natural topography. These may include berms and swales to manage water drainage, support revegetation, mitigate visual impacts and maximize natural appearances.

BLM_0026326

**MIN-57**:   Seedbed Preparation. Good seedbed preparation is key to soil stabilization, moisture infiltration, and improving the chances for revegetation success.

    a. Following contouring, backfilled or ripped surfaces will be covered evenly with topsoil.

    b. Within 24 hours of broadcast seeding, the spread topsoil will be roughened by a method such as pitting, raking or harrowing before seeding, to break up any crust that has formed and ensure good seed-to-soil contact.

    c. To control erosion and enhance vegetative establishment on slopes steeper than 3:1, or to create a more natural looking landscape in areas of visual sensitivity, seedbed preparation may include pocking or pitting the soil material to form microbasins scaled to the site and materials. These microbasins will be constructed in irregularly spaced and irregularly aligned rows with an orientation perpendicular to the natural flow of runoff down a slope.

    d. Requests to use soil amendments, including fertilizer and soil conditioners, will be submitted to the BLM for approval. Submittal will include basic information on the amendment and the purpose of its use.

**MIN-58**:   Seed Mixes. Seed mixes will typically consist of native, early-succession species, or species with the ability to establish quickly in disturbed soil areas. Non-native species considered desirable under special circumstances, such as sterile non-native grasses will be submitted to the BLM for approval before use.

    a. Seed mix composition will be calculated based on the number of Pure Live Seed per pound rather than percentage by weight. Seeding rate in pounds per acre will be based on the total number of Pure Live Seeds per square foot.

    b. Weed free seed will be used. It will contain no noxious, prohibited, or restricted weed seeds and no more than 0.5 percent by weight of any other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended. To maintain quality, purity, germination, and yield, only tested, certified seed for the current year, with a minimum germination rate of 80 percent and a minimum purity of 90 percent will be used unless otherwise approved by BLM in advance of purchase. Seed shall be viability-tested in accordance with State law(s) and within nine months before purchase.

    c. Seed mixes for temporary use may contain one or more sterile hybrid grasses or other non-native cover crop in addition to native perennial species, if pre-approved by BLM.

    d. For private surfaces, BLM-approved seed mixes will be recommended, but the surface landowner has ultimate authority over the seed mix to be used in reclamation.

    e. Seed tags or other official documentation of the seed mix will be supplied to the BLM for approval at least 14 days before the date of proposed seeding. Seed that does not meet the above criteria will not be applied to public lands. A Sundry Notice describing the completed work, the weed-free certification, and the seed tag(s) will be submitted BLM within 30 days after seeding.

**MIN-59**:   Seeding Procedures:

    a. Seeding will be conducted no more than 24 hours following completion of final seedbed preparation (see Seedbed Prep).

    b. Where practical, seed will be planted by drill-seeding to a depth of 0.25 to 0.5 inch along the contour of the site. Drill seeding will be followed by culti-paction to enhance seed-to-soil contact and prevent losses of both. Where drill-seeding is impracticable, seed may be installed by broadcast-seeding at twice the drill-seeding rate, followed by raking or harrowing to provide 0.25 to 0.5 inch of soil cover. Hydro-seeding and hydro-

BLM_0026327

mulching may be used in temporary seeding or in areas where drill-seeding or broadcast-seeding/ raking are impracticable. Hydro-seeding and hydro-mulching must be conducted in two separate applications to ensure adequate seed-to-soil contact.

c. If interim revegetation is unsuccessful, reseedings will be repeated annually until satisfactory vegetative cover has been achieved. Requirements for reseeding of temporary areas will be considered on a case-by-case basis. Seeding will be considered successful when the site is protected from erosion and revegetated with a vigorous, self-sustaining, and diverse cover of native (or otherwise approved) plant species. BLM shall not require reseeding during periods that have proven less than optimal.

**MIN-60**:  Mulch:

a. Mulch will be applied within 24 hours following completion of seeding. Where areas have been drill- or broadcast-seeded and raked, certified weed-free straw or certified weed-free native grass hay mulch will be crimped into the soil. Hydro-mulching may be used in areas of interim reclamation where crimping is impractical, in areas of interim reclamation that were hydroseeded, and in areas of temporary seeding regardless of seeding method.

b. Mulch will not be applied in areas where erosion potential necessitates use of a biodegradable erosion-control blanket (straw matting).

**MIN-61**:  Cut and fill slopes will be protected against erosion by contour grading, microbasins or other measures approved by the BLM. Well anchored BMPs such as biodegradable matting, weed-free bales or wattles may also be used on cut-and-fill slopes and along drainages to protect against soil movement.

**MIN-62**:  The reclaimed pad will be protected from disturbance by a fence to exclude livestock grazing for the first two growing seasons or until seeded species are firmly established, whichever comes later. Seeded species will be considered firmly established when perennial grass and forb species are at least 80% cover of that of the surrounding or reference area.

**MIN-63**:  Monitoring. Because weed and reclamation management activities are components of a long-term process, monitoring and reporting are integral to and long-term commitment to land health.

a. All sites considered as "operator reclamation in progress" will be routinely monitored for reclamation success. Reports will be submitted to the BLM by December 1 of each year. Annual reports will include whether accomplishment of objectives appears likely and of not, what corrective actions are proposed.

b. All sites will be routinely monitored for the presence of noxious weeds or other undesirable plant species as set forth in the joint BLM/US Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators. Pesticide Use Proposals will be approved by the BLM before application of herbicides. Annual weed monitoring reports shall be submitted to the BLM by December 1. They will include weed species found (listed by common names), total acres infested with weeds, total acres treated, treatment methods, and total pounds of active ingredient of pesticides applied. All Noxious Weed Inventory and Pesticide Application records for that year will be included with the report.

**MIN-64**:  Visual Resources:

a. Every proposal will include a detailed, site-specific description and plan of how it will meet the VRM Class of the area where it is proposed. As much as possible all proposed features will be located and placed to avoid or minimize visibility from travel corridors, residential areas, and other sensitive observation points.

BLM_0026328

    b.  To the extent practical, existing vegetation shall be preserved when clearing and grading for pads, roads, and pipelines. Cleared trees and rocks may be salvaged for redistribution over reshaped cut-and-fill slopes or along linear features.

    c.  Above-ground facilities will be painted a non-reflective natural color selected to minimize contrast with adjacent vegetation or rock outcrops. Colors may be specified by the BLM on a project-by-project basis.

    d.  Adaptive management techniques may be applied before or after construction to mitigate straight-line visual contrast effects of pad margins, cut and fill slopes, pipeline alignments or other cleared vegetation. This could include additional tree removal along contrasting edges, to create irregularly shaped openings or more natural-looking mosaic patterns, or treating surfaces to mitigate visual contrasts in color or surface texture.

**Geophysical Exploration:**

**MIN-65**:  Specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

**MIN-66**:  Pre-mobilization inspection will be performed to insure that all construction equipment and vehicles are clean and free of weeds, weed seed, soil and vegetative material prior to moving onto public lands. Driving through or parking on noxious weed infestations will be avoided.
*Reducing Fluid Mineral Development Footprint*

**MIN-67**:  The operator will co-locate multiple wells on well pads and use directional drilling to reduce the number of pads and roads.

**MIN-68**:  The operator will use centralize completions to reduce the number of truck trips, expense, exhaust emissions and fugitive dust.

**MIN-69**:  To minimize construction disturbance, truck traffic, dust and other impacts to air quality, soils and wildlife, centralized production facilities will be used for all natural gas liquids and produced water.

**MIN-70**:  Telemetry will be used to remotely monitor producing wells and facilities to reduce vehicular traffic. During winter closures, unavoidable monitoring and or maintenance activities will be conducted between 9 a.m. and 3 p.m., to the extent practical.

**Administrative / General and Planning:**

**MIN-71**:  To limit surface disturbance and associated impacts to natural resources, all actions will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

**MIN-72**:  Drilling will be done with 'closed loop' systems as much as possible, particularly in areas where water resources are most vulnerable, including: soils mapped as alluvial, colluvial, and glacial deposits; near springs and perennial water sources; in important groundwater recharge areas; and within municipal watersheds.

**MIN-73**:  Chemicals used in the fracturing process will be biodegradable, non-toxic, pH neutral, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used. Documentation in the form of Material Safety Data Sheets will be reviewed by operator for compliance prior to use and Material Safety Data Sheets will remain on site at all

BLM_0026329

times such chemicals are present.

**MIN-74**:   In municipal watersheds, the operator will develop and implement a Watershed Protection Plan. This plan will characterize baseline hydrologic and hydrogeologic conditions such as but not limited to: water chemistry, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater. The operator will collaborate with all watershed stakeholders in development of the plan.

**MIN-75**:   Adopt BMPs per the BLM and US Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM and US Forest Service 2007).

**MIN-76**:   Incorporate BMPs and conditions of approval from the Final Programmatic EIS for Geothermal Leasing in the Western US, as applicable (BLM and US Forest Service 2008).
*Pre-Construction*

**MIN-77**:   Pre-mobilization inspections will be performed to be sure that all construction equipment and vehicles are clean and free of soils, weeds, weed seed and vegetative material prior to moving onto public lands. Driving through or parking on noxious weed infestations will be avoided.

**<u>Construction:</u>**
**MIN-78**:   Surface disturbing actions associated with development of fluid minerals will follow Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book )(BLM 2007b).

**MIN-79**:   Where feasible, entrances to construction locations will be covered by gravel "track pads" to prevent sediment and weed seeds from being tracked in and out of the site.

**MIN-80**:   In areas of mapped Mancos Shale, saline soils, or fragile soils, groundwater will not be discharged to surface water drainages, to minimize mobilization and transport of selenium, salts and sediment within the Colorado River Basin.

**MIN-81**:   Where linear disturbance is proposed, edges of vegetation removal will be 'feathered,' to avoid long linear habitat edges and support habitat complexity for wildlife. Additional trees will be removed along such edges to create irregularly shaped openings and more natural mosaic habitat.

**MIN-82**:   Cleared vegetation smaller than four inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than four inches in diameter will be scattered over disturbed areas to accomplish reclamation objectives.  Excessive vegetation larger than four inches in diameter may be removed from public land or shredded in place to be salvaged with topsoil. A wood cutting permit will be purchased from BLM for material removed from the site.

**MIN-83**:   Windrowing of Topsoil. *[Use where appropriate based on topography – may not be appropriate for pads in steep areas or where pad size should be minimized.] T*opsoil shall be windrowed around the perimeter of surface disturbance to create a berm that limits and redirects stormwater runoff and extends the viability of the topsoil. Topsoil shall also be windrowed, segregated, and stored along disturbed surfaces or linear features for later spreading across the disturbed corridor during final reclamation. Topsoil berms shall be promptly seeded to maintain soil microbial activity, reduce erosion, and minimize weed establishment.

BLM_0026330

**MIN-84**:  Cattle guards will be installed and maintained whenever access roads intersect existing gates or fences.

**Drilling:**
**MIN-85**:  Catalytic converters will be installed on all internal combustion engines to minimize emissions to Tier 3 levels.

**MIN-86**:  Hazardous substances will not be used in drilling, testing, or completion operations, nor introduced at any time into the reserve or cuttings pit.

**Utilization and Production:**
**MIN-87**:  Secondary containment shall include a study corrugated metal wall to create a basin, be lined with a heavy impervious poly liner and be protected with a gravel surface.  Small hoppers or drip pans shall be installed at all loadout connections to catch drips and small leaks.

**MIN-88**:  When special resource values are at risk, such as crucial wildlife areas, companies controlling access into these areas will gate and lock roads or restrict use to authorized users.

**MIN-89**:  Speed control measures will be in place on all project related unpaved roads to reduce fugitive dust.

**MIN-90**:  Use enclosed tanks instead of open tanks or pits to reduce fugitive VOC emissions.

**MIN-91**:  Use vapor recovery units on oil, condensate, and produced water storage tanks to reduces fugitive VOCs and recovers BTU-rich vapors for sale or use on site.

**MIN-92**:  Use and maintain proper hatches, seals, and valves to minimize VOC emissions.

**MIN-93**:  Optimize glycol circulation and Install Flash Tank Separator (FTS) to capture methane and reduce VOC emissions on glycol dehydrators.

**MIN-94**:  Replace wet seals with dry seals in centrifugal compressors. Centrifugal wet seal compressor emissions from the seal oil degassing vent can be reduced by the replacement of wet seals with dry seals that emit less methane and have lower power requirements.

**MIN-95**:  Reduce gas leaks and emissions from reciprocating compressors by the economic replacement of rod packing at frequent intervals.

**MIN-96**:  Reduce methane and VOC emissions by installing or replacing high-bleed pneumatic devices with low-bleed pneumatic devices.

**MIN-97**:  Reduce methane emissions by installing plunger lifts and smart automation systems which monitor well production parameters.

**MIN-98**:  Implement a Direct Inspection & Monitoring Program which identifies and cost effectively fixes fugitive gas leaks using Leak Detection, Infrared Camera, Organic Vapor Analyzer, Soap Solution, Ultrasonic Leak Detectors, Measurement, Calibrated Bagging, Rotameters, and/or High Volume Samplers.

**Site Stabilization, Reclamation and Monitoring:**
**MIN-99**:  During interim reclamation contour land forming will be used to create a visual barrier

BLM_0026331

to the permanent structures location on the site.

**MIN-100**: Re-topsoil and revegetate access road cut & fill slopes, backslopes and road shoulders, and borrow ditches. Also, revegetating the travel surface of surfaced roads and turnarounds, where practical. With low traffic roads, this will result in a hardpan, two-track road that is stable and requires less maintenance.

References:
BLM. 2012. H-9113-1 Road Design Handbook. Bureau of Land Management, Washington, D.C. On-line: http://web.blm.gov/nstc/eat/pdf/Final%20H-9113-1.pdf

_____. 1992. Handbook H-3042-1: Solid Minerals Reclamation. Release 3-275. BLM, Washington, DC. February 2, 1992. 104 pp.

_____. 2002. Handbook H-3600-1: Mineral Materials Disposal. Release 3-315. BLM, Washington, DC. February 22, 2002. 171 pp.

_____. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

_____. 2008. Record of Decision, Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States – Appendix B. BLM Washington Office. December 2008.

## RENEWABLE ENERGY

**REN-1**: Authorize rights-of-way by applying appropriate BMPs from the BLM Record of Decision for Implementation of a Wind Energy Development Program (BLM 2005), land use restrictions, stipulations, and mitigation measures.

Reference:
BLM (United States Department of the Interior, Bureau of Land Management). 2005. Record of Decision for Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments. BLM, Washington, DC. December 15, 2005.

## TRANSPORTATION AND ACCESS

**TRN-1**: Continue coordination with counties and other agency road entities to promote utilization of best management practices for road maintenance they perform within CRVFO boundaries.
Maintain an inventory of existing road and trail systems.

**TRN-2**: BLM Manual 9113, Roads (BLM 2012) and BLM Handbook 9113-2, Roads – Inventory and Maintenance (BLM 2012) will be used to guide all maintenance and road construction designs and requirements. Include definitions for functional road classification and maintenance levels for BLM roads.

**TRN-3**: All highway rights-of-way and other road authorizations will contain noxious and

BLM_0026332

invasive weed stipulations that include prevention, inventory, treatment, and revegetation or rehabilitation. Road abandonment will include at least three years of post-abandonment monitoring and treatment.

**TRN-4**: All travel management decisions will concur with the Bureau of Land Management, Colorado River Valley Field Office travel management planning.

**TRN-5**: In order to ensure public access and safety, the CRVFO shall continue an active road maintenance program employing the use of redesign, blading, brush removal for sight distance as appropriate, scarification, graveling, water barring, low water crossings, spur ditching, seeding and installation/cleaning of culverts.

**TRN-6**: NEPA Requirements – No new NEPA analysis will be required for road maintenance activities within the defined maintenance disturbance/easement footprint, which is defined as previously disturbed or maintained. Disturbance outside of the defined maintenance disturbance/easement footprint or road realignment will be subject to additional NEPA compliance.

Reference:
BLM. 2012. H-9113-1 Road Design Handbook. Bureau of Land Management, Washington, D.C. On-line: http://web.blm.gov/nstc/eat/pdf/Final%20H-9113-1.pdf_BLM.

### RECLAMATION

The objectives of interim reclamation are to restore vegetative cover and a portion of the landform sufficient to maintain healthy, biologically active topsoil; control erosion; and minimize loss of habitat, forage, and visual resources.

The long-term objective of final reclamation is to return the land to a condition approximating that which existed prior to disturbance. This includes restoration of the landform and natural vegetative community, hydrologic systems, visual resources, and wildlife habitats. To ensure that the long-term objective will be reached through human and natural processes, standards will be enforced to meet objectives for site stability, visual quality, hydrological function, and vegetative productivity.

**Fluid Minerals:**
**R-1**: Apply the Draft Template for the Northwest District Surface Reclamation Planning for Oil and Gas Operations Objectives and Performance Standards.

Reference:
Bureau of Land Management (BLM). 2012. Plans for Reclamation of the Surface Draft Template Northwest District. [Online]. Website: http://www.blm.gov/style/medialib/blm/co/field_offices/white_river_field/Documents.Par.80 559.File.dat/Reclamation%20Plan%20Template%20-%20Draft%205-10-12.pdf. [Last update September 21, 2012].

**General:**
**RCM-1**: A reclamation plan will be provided to the BLM with the original proposed action or when activities are needed. Reclamation plans will discuss interim and final reclamation

activities.  The plan will include provisions for

    a.  Reclamation Timeline
    b.  Pre-disturbance Planning recommendations if applicable
    c.  Vegetation Monitoring Plan
    d.  Stabilization and Stormwater
    e.  Dust Abatement
    f.  Vegetation Clearing
    g.  Topsoil Management
    h.  Recontouring and Seedbed Preparation
    i.  Application of Topsoil & Revegetation
    j.  Fencing
    k.  Management of Invasive, Noxious, and Non-Native Species

**RCM -2**:  Trees and vegetation will be left along the edge of surface disturbance whenever feasible to provide screening.

**RCM -3**:  To help mitigate the contrast of recontoured slopes, reclamation will include measures to feather cleared lines of vegetation and to save and redistribute cleared trees, debris, and rock over recontoured cut and fill slopes.

**RCM -4**:  To reduce the view of project facilities from visibility corridors and private residences, facilities will not be placed in visually exposed locations (such as ridgelines and hilltops).

**RCM -5**:  Project facilities will be clustered and placed away from cut slopes and fill slopes to allow the maximum recontouring of cut and fill slopes.

**RCM -6**:  All long-term above ground structures will be painted in a non-reflective finish to blend with the environment.  Colors will be selected (from the BLM "Standard Environmental Colors") in the field at the proposed project location, considering viewer's likely observation points and the time of year with the greatest number of viewers.  Selected colors will be one to shades darker than those naturally occurring in the background landscape.

**RCM -7**:  Projects should be located to take advantage of existing vertical features, such as landforms or existing stands of vegetation to provide visually screening.

**RCM -8**:  Projects should not be located in visually exposed locations, such as ridgelines and hilltops.

**RCM -9**:  Projects should be located in areas that will minimize the amount of cut-and-fill needed to meet natural grade.

**RCM -10**:  Linear disturbances (roads and pipelines) should follow the natural contours of the landscape as much as possible.

**RCM -11**:  Project design should take into consideration any existing vegetation surrounding the project that can be used for visual screening.  Care should be taken to preserve the integrity of the vegetation and the vegetation should remain standing and undamaged when the cut-and-fill slopes are recontoured.

**RCM -12**:  Thinning and feathering of existing vegetation may also be used in areas where

BLM_0026334

clearing within dense vegetation is required. Thinning and feathering will reduce the hard line between new construction and existing vegetation and will emulate the forms of natural clearings.

**RCM -13**: Project facilities should be placed to maximize recontouring of the cut-and-fill slopes and interim reclamation. Facilities should be oriented in the direction that is least visually obtrusive and should be clustered to reduce the overall impact and the area that will need to be visually mitigated. Facilities should be located away from the cut-and-fill slopes and, if possible, near a road to maximize the total surface area that can be reclaimed.

**RCM -14**: Cut-and-fill slopes should be recontoured to the approximate original contour or consistent with the adjacent topography so that the reclaimed landscape features blend into the natural surroundings.

**RCM -15**: Berms may be utilized to provide visual screening, but should be used only when it makes sense when viewing the surrounding natural environment and should blend with the adjacent topography.

**RCM -16**: Cleared vegetation and rocks salvaged during construction should be salvaged and redistributed over reshaped cut-and-fill slopes or along linear features to emulate the color and texture closer to that of the natural landscape and to help create microclimates to encourage vegetation growth. The material should be placed so that it appears to be naturally deposited.

References:

BLM (United States Department of the Interior, Bureau of Land Management). 1985a. BLM Manual 9113: Roads. Release 9-247. BLM, Washington DC. June 7, 1985. 83 pp.

_____. 1985b. BLM Handbook 9113-2, Roads – Inventory and Maintenance. Release 9-250. BLM, Washington DC. December 19, 1985. 18 pp.

BLM_0026335

**CONSERVATION MEASURES FOR FEDERALLY-LISTED SPECIES**

The following actions would be standard operating procedures for protection of species listed as threatened or endangered under the Endangered Species Act to help fulfill BLM's obligations under Section 7 of the Endangered Species Act.

*Fluid Minerals:*
**T&E-GEN-1:** The CRVFO will consult agency species management plans and other conservation plans as appropriate to guide management and devise mitigation measures when needed. Examples of these plans include, but are not limited, to the Colorado Wildlife Action Plan, Colorado Sagebrush: A Conservation Assessment and Strategy, National, range-wide, statewide and local working group conservation plans for greater sage grouse, North American Landbird Conservation Plan, North American Waterbird Conservation Plan, National and Colorado Partners in Flight Bird Conservation Plans, and the Colorado Rare Plant Conservation Initiative's Recommended Best Management Practices for Plants of Concern.

**Federally-Listed Plant Species:**
*General:*
**T&E-PLT-1:** Surface disturbances (including wildfire and prescribed fires) within potential habitat for listed or proposed plant species (i.e. salt desert shrub and Wyoming big sagebrush habitat west of Rifle) should review the need for cheatgrass control and/or seeding. Seeding should emphasize locally-adapted native species (or locally collected ecotypes, when available) that will not outcompete the special status plants.

*Fluid Minerals Management:*
**T&E-PLT-2:** Prior to approving any ground-disturbing activities, suitable habitat[1] for special status plants will be identified based on existing plant location records, soil or geological mapping, aerial photos, and/or site inventories. In areas identified as suitable habitat, surveys for special status species will be performed prior to conducting any ground disturbance. Surveys will take place when the plants can be positively identified, usually during the appropriate flowering periods. Surveys will be performed by qualified field botanists/biologists who will provide documentation of their qualifications, experience and knowledge of the species prior to starting work.

**T&E-PLT-3:** For Colorado hookless cactus and other federally listed, proposed or candidate plant species, surface-disturbing activities will be avoided within 200 meters of occupied plant habitat[1] wherever possible and where geography and other resource concerns allow[2]. Fragmentation of existing populations and identified areas of suitable habitat will be avoided wherever possible.

**T&E-PLT-4:** Where development is allowed within 100 meters of occupied habitat for listed, proposed, candidate or BLM sensitive species, unauthorized disturbance of plant habitat will be avoided by on-site guidance from a biologist, and by fencing the perimeter of the disturbed area, or such other method as agreed to by the Fish and Wildlife Service. In such instances, a monitoring plan approved by the Service will be implemented for the duration of the project to assess impacts to the plant population or seed bank. If detrimental effects are detected through monitoring, corrective action will be taken through adaptive management.

**T&E-PLT-5:** Surface disturbance closer than 20 meters to a listed plant will be considered an adverse effect. Mitigating measures within this narrow buffer are very important and helpful to

BLM_0026336

individual plants, but we do not expect that all adverse effects can be fully mitigated within this distance. Some adverse effects due to dust, dust suppression, loss of pollinator habitat, and toxic spills will likely remain. There are two possible exceptions to this rule of thumb: 1) The new disturbance is no closer to a listed plant than preexisting disturbance and no new or increased impacts to the listed plant are expected; or 2) the listed plant is screened from the proposed disturbance (e.g., tall, thick vegetation or a berm acts as a screen or effective barrier to fugitive dust and other potential impacts).

**T&E-PLT-6**:  Transplantation of potentially affected plants will not be used as a rationale to defend a "not likely to adversely affect" or a "no effect" determination for listed plant species.

**T&E-PLT-7**:  Protect pollinator species for endangered or threatened species by incorporating the standard operating procedures found in the Final Programmatic Environmental Impact Statement for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (BLM 2007).

*Travel Management:*
**T&E-PLT-8**: When not needed for other resource uses, close and reclaim roads that are directly or indirectly impacting special status plant species to minimize disturbance, habitat fragmentation, and loss of pollinator habitat.

*Weed Management:*
**T&E-PLT-9:**  All weed management actions will comply with the Conservation Measures from the Biological Assessment for the Final Programmatic Environmental Impact Statement for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (June 2007).

*Wildland Fire Management:*
**T&E-PLT-10:**  Within mapped occupied and suitable habitat for Colorado hookless cactus, DeBeque phacelia or Parachute penstemon, wildland fire management actions will be conducted in the following manner:
- Minimize surface disturbance by using retardant, water, engines/wet lines, etc in known habitat rather than dozers or hand crews.
- Unless firefighter safety is jeopardized, construct fire line outside the perimeter of known cactus populations.
- Avoid cross-country use of motorized vehicles and mechanical equipment within known populations of federally listed or proposed plants.

**Federally-Listed Fish Species:**
**T&E-AQU-1**: Utuilize boring techniques to place pipelines used to convey anything other than fresh water under the Colorado River from the Highway 13 bridge crossing in Rifle, Colorado downstream to the Field Office boundary.

**T&E-AQU-2**: Use double-walled pipe and the placement of automatic shut-off valves on pipelines crossing the Colorado River to help reduce risk of effects associated with potential pipeline breaks or leaks.

**T&E-AQU-3**: Avoid drilling for fluid minerals in critical habitat for ESA listed fish (Colorado River and its 100-year floodplain from the Highway 13 Bridge crossing downstream to the Field Office boundary.  If avoidance is not possible, use Closed Loop Drilling practices to eliminate the need for a reserve pit.

BLM_0026337

**T&E-AQU-4**: BLM will continue to abide by the Programmatic Biological Opinion (PBO)(ES/GJ-6-CO-08-F-0006), and (PBO)(#ES/GJ-6-CO-08-F-0010) for Colorado River water depletions. For emerging technologies such as Horizontal Drilling, the CRVFO will individually track water use associated with this drilling methodology and account for and report all water used.

**T&E-AQU-5**: As a member of the greenback cutthroat trout recovery team, BLM will continue to monitor and improve habitat, and work cooperatively with partner agencies to remove the threatened greenback cutthroat trout from the list of Threatened and Endangered Species.

*Wildland Fire Management:*
**T&E-AQU-6**: Avoid the dropping of fire retardant or foam within 300 feet of all water bodies and avoid locating staging, fire retardant chemicals, refueling sites, or other chemicals within 300 feet of water bodies.

**T&E-AQU-7**: Coordinate fire line placement and construction with Resource Advisors/Fish Biologists/Hydrologists to minimize erosion potential, and rehabilitate constructed fire lines where erosion potential is high.

**<u>Federally Listed Terrestrial Wildlife Species – Canada Lynx:</u>**
*General:*
**T&E-TER-1**:  Implement applicable conservation and restoration measures identified in the *Canada Lynx Conservation Assessment and Strategy* (Ruediger et al.  2000).

**T&E-TER-2**:  Consult with Colorado Parks and Wildlife (CPW) regarding lynx use and report all lynx sightings to CPW.

**T&E-TER-3**:  Avoid locating facilities within lynx breeding habitat (spruce-fir forest south of Interstate 70 above 9,000 feet in elevation and with slopes greater than 25%).

**T&E-TER-4**:  Prior to development, establish baseline vegetation condition and inventory and to provide a basis for post-development habitat restoration.

**T&E-TER-5**:  Identify, avoid, and protect vegetation used by snowshoe hares.

*Wildland Fire Management:*
**T&E-TER-6**: Wildland fire management within mapped potential Canada lynx habitats will be performed in a manner consistent with conservation measures outlined in the Canada Lynx Conservation Assessment and Strategy - Chapter 7 – Pages 7-6, 7-7 and 7-8. Considerations include:

- Attempts will be made to keep linear openings (fire line, access routes and escape routes) out of mapped potential habitat and away from key components such as denning areas.
- When managing wildland fire, minimize the creation of linear openings (fire line, access routes and escape routes) that could result in permanent travel ways for competitors and humans.
- Obliterate and reclaim linear openings (fire line, access routes and escape routes) associated with wildland fire management constructed within lynx habitat in order to deter future human and competitive species use.

BLM_0026338

- Avoid constructing permanent firebreaks on ridges or saddles in lynx habitat.

***Fluid Minerals:***
**T&E-TER-7:** Apply stipulations during programmatic planning stage for oil and gas that limit occupancy, control surface use or control timing of activities in lynx habitats.

**T&E-TER-8:** Utilize remote monitoring of sites that are located in lynx habitat, to reduce disturbance from well visitation.

**T&E-TER-9:** Establish company guidelines to minimize wildlife mortality from vehicle collisions on roads.

**T&E-TER-10:** Minimize traffic in occupied lynx habitat between 3:00 p.m. and 7:00 a.m.

**T&E-TER-11:** Reclaim newly constructed pipelines immediately following construction and do not allow any motorized vehicles access to pipeline (i.e., install barriers, boulders etc.).

**T&E-TER-12:** Encourage developers to pipe produced water to a central site for transport, in order to reduce truck traffic to each well pad site.

**T&E-TER-13**: Minimize upgrading of roads used to access oil/gas developments or transmission pipelines in lynx habitat or linkage areas.

**T&E-TER-14:** Develop a reclamation plan (e.g. road reclamation and vegetation rehabilitation) for abandoned well sites to restore suitable habitat for lynx.

***Travel Management:***
**T&E-TER-15:** On projects where over-the-snow access is required, restrict use to designated routes.

**T&E-TER-16**: Restrict public access on single purpose roads during project activities.

**T&E-TER-17**: Close and immediately reclaim all roads that are redundant, not used regularly, or have been abandoned to the maximum extent possible to minimize disturbance and habitat fragmentation.

**T&E-TER-18:** Minimize snow compaction when authorizing and monitoring developments.

References:
Ruediger et al. 2000. Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and UDSI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT. 142 pp.

BLM_0026339

**February 2014**



# COLORADO BUREAU OF LAND MANAGEMENT

## COMPREHENSIVE AIR RESOURCE PROTECTION PROTOCOL (CARPP)

BLM_0026340

# TABLE OF CONTENTS

**COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL**

SECTION 1 – PURPOSE, SCOPE, AND RESPONSIBILITIES
SECTION II – INTERAGENCY AIR RESOURCES COLLABORATION
SECTION III – ACTIONS TO ANALYZE & PROTECT AIR QUALITY
III.A     MONITORING
III.B     EMISSIONS INVENTORIES
III.C     MODELING
III.D     PERMITTING
III.E     MITIGATION
SECTION IV – ADAPTIVE MANAGEMENT PROCESSES FOR AIR RESOURCES
SECTION V – ANNUAL SUMMARY REPORT
SECTION VI – OIL AND GAS DEVELOPMENT EMISSIONS REDUCTION STRATEGIES & BMPS

BLM_0026341

# CARPP CHANGE HISTORY

| SECTION | REVISION | DATE |
|---------|----------|------|
| III.D.1 | Amended paragraph to reflect final approved LN language. | 2/11/2014 |

BLM_0026342

# COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL (CARPP)

## SECTION 1 – PURPOSE, SCOPE, AND RESPONSIBILITIES

This Comprehensive Air Resources Protection Protocol (CARPP) describes the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality within the state of Colorado.  This protocol also outlines specific measures that may be taken to address BLM-approved activities with the potential to cause significant adverse impacts to air resources (via the generation of significant quantities of air emissions) within any planning area (as determined on a case by case basis).  Further, the purposes of this protocol are to address air quality issues identified by the Bureau of Land Management (BLM), or public scoping, in its analysis of potential impacts on air resources for BLM Colorado Resource Management Plans and Environmental Impact Statements (RMP/EIS); and clarify the mechanisms and procedures that BLM will use to achieve the air resources goals, objectives, and management actions set forth in BLM Colorado RMPs.

### I.A        CARPP Scope

The CARPP is not a decision document, but rather a strategy to address air quality concerns throughout BLM-managed lands and resources in Colorado.  Because the CARPP is not a field office specific management tool, it may be modified as necessary to comport or comply with changing laws, regulations, BLM policy, or to address new information and changing circumstances without maintaining or amending any specific Field Office RMP (see reference version date on the cover page).

However, changes to the goals, objectives, or management actions set forth in any Colorado Field Office RMP/EIS as a result of the changes in the CARPP (or more specifically, any subsequent analysis based on such changes) would require an amendment of the specific RMP being affected.

### I.B        BLM Responsibilities under FLMPA and MLA

The BLM has the authority and responsibility under the Federal Land Policy and Management Act (FLPMA) to manage public lands in a manner that will protect the quality of air and atmospheric values [FLPMA Sec. 102(a)(8)].  The FLPMA also provides that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands and includes provisions for implementing the Mining and Minerals Policy Act of 1970 [FLPMA Sec. 102(a)(12)].  The BLM has the responsibility under the Mineral Leasing Act (MLA) to implement the decisions of any RMP/EIS in a manner that recognizes valid and existing lease rights[1].

Further, the FLPMA provides that "In the development and revision of land use plans, the Secretary shall provide for compliance with applicable pollution control laws, including State and Federal air,

---

[1] H-1601-1 – LAND USE PLANNING HANDBOOK:  A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval.  When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

BLM_0026343

water, noise, or other pollution standards or implementation plans;" [FLPMA Sec. 202(c)(8)][2].

SECTION II – INTERAGENCY AIR RESOURCES COLLABORATION

The Bureau of Land Management is firmly committed to working with federal, state, tribal, and local air resource management partners to address complex and often cross-jurisdictional air quality issues. As a federal agency, we have a role to provide leadership in addressing known air quality issues within our authority and domain, while upholding our responsibility to manage the public lands for multiple-use under the FLPMA. We also recognize that the State of Colorado, specifically the Colorado Department of Public Health and Environment (CDPHE), has the primary responsibility and authority delegated by the EPA to regulate and maintain air quality standards within Colorado in accordance with the Clean Air Act. Interagency collaboration is the key to management of air quality, as no single agency has all the necessary tools to solve these complex issues alone. We must act together.

To that end the BLM will work collaboratively with other local, state, federal, and tribal agencies involved in the management of air resources to develop a comprehensive strategy to protect air resources from potentially significant adverse impacts resulting from BLM approved activities in Colorado.

### II.A        National Air Quality MOU

When making oil and gas implementation decisions, the BLM will consider or apply, as appropriate, the provisions of the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

SECTION III – ACTIONS TO ANALYZE & PROTECT AIR QUALITY

The following sections describe actions the BLM will take to ensure an adequate analysis and subsequent protection for air quality resources within Colorado. Appropriate air resources protection requires the BLM to manage its authorized activities and actions at broad spatial and temporal scales that are dynamic and thus subject to change. The BLM will accomplish this through an adaptive management approach, which includes establishing baseline conditions, monitoring, reevaluation, and adjustment as necessary. Adaptive management therefore contemplates regular review and adjustment of management approaches during the authorization of emissions generating activities commensurate with changing circumstances.

### III.A        MONITORING

Ambient air monitoring provides valuable data for determining current and background

---

[2] Note: Where sources of air pollution emissions are regulated by an entity/agency (Federal, State, Tribal, Local), the BLM shall not craft alternatives with features or conditions that interfere with a proponents ability to comply with such laws or standards. IBLA has held that the meaning of "providing for compliance" does not require that the BLM has any obligation to ensure compliance where another agency holds such responsibility [*Wyoming Outdoor Council, et al*176 IBLA 15, 27 (2008); Powder River Basin Resource Council, 183 IBLA 83, 94–95 (2012)]. However, the BLM should appropriately analyze such sources (as well as non-regulated sources) within the applicable NEPA context to disclose potential impacts, determine significance, and provide for mitigation as necessary and within our authority for any specific finding.

BLM_0026344

concentrations of air pollutants, describing long term trends in air pollutant concentrations, and evaluating the effectiveness of air control strategies.  The BLM's comprehensive air resource protection protocol includes the ambient air monitoring measures described in this section.

### III.A.1 – Air Monitoring Network

The BLM will participate in a cooperative effort with industry, CDPHE, Forest Service, National Park Service, EPA, local counties, and other entities as appropriate, to establish, operate, and maintain a comprehensive air monitoring network within the planning areas where a need for monitoring has been identified (contingent upon available funding). The BLM will cooperate in the sharing of air monitoring data collected by the air monitoring network with other agencies and the public.

### III.A.2 – Pre-Construction Air Monitoring

The BLM may request proponents of projects with the potential to generate significant air emissions, to submit pre-construction air monitoring data from a site within or adjacent to the proposed development area.  The purpose of this air monitoring is to determine baseline air quality conditions prior to development at the site.  The need for monitoring will be determined by the BLM based on the availability or absence of existing representative air monitoring data and the factors listed in Section III.D of this protocol.  If the BLM determines that pre-construction monitoring is necessary, the project proponent must provide a minimum of one year of representative ambient air monitoring data for the pollutants of concern. The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

### III.A.3 – Life of Project Air Monitoring

The BLM may require proponents or operators of Federal mineral development projects, or proponents of other potentially significant emission generating projects, to conduct air monitoring for the life of the project based on the availability or absence of representative air monitoring data and the factors listed in Section III.D of this protocol.  The purpose of this air monitoring is to measure impacts potentially attributable to the project over time and to determine the effectiveness of emissions control measures required for the project.   The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

### III.A.4 – Monitoring Data Transparency

Project-specific monitoring data may be used by the BLM in subsequent NEPA analysis required for project approvals.  Thus public disclosure of such data is assured via the NEPA process, if used.  Additionally, the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol.

### III.B     EMISSIONS INVENTORIES

The BLM will request the proponent of an oil and gas development activity (as proposed in a permit

BLM_0026345

application, plan of development, or Master Development Plan) to submit a comprehensive inventory of anticipated direct and indirect emissions associated with the proposed project. The emissions inventory will include estimated emissions of regulated air pollutants from all sources related to the proposed activity, including fugitive emissions and greenhouse gas emissions, for each year or distinct project phase over the life of the project. The BLM will review the emissions inventory to determine its completeness and accuracy. In most cases the BLM will accept inventory data reported to other agencies for the purposes of meeting this requirement. For example BLM would accept copies of actual emissions data for criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases that are submitted to CDPHE as required for applicable air permitting or APEN requirements, or submittals to COGCC in the form of drilling and production data reports, and data to EPA under the Greenhouse Gas Reporting Rule (40 CFR Part 98 Subpart W) for the authorized action.

## III.C   MODELING

Air dispersion and photochemical grid models are useful tools for predicting project-specific impacts on air quality, predicting the potential effectiveness of control measures and strategies, and forecasting trends in regional concentrations of air pollutants. The BLM will use regional air modeling and project-specific modeling, in conjunction with other air analysis tools, to develop air resource protection strategies consistent with our responsibilities under FLPMA. Further, the BLM will provide appropriate disclosure for any modeling of direct, indirect, and cumulative impacts of proposed actions during the required NEPA analysis.

### III.C.1 – Project–specific Modeling

The BLM may require project-specific air quality modeling, consistent with the Air Resources MOU to analyze potential impacts from a proposed Federal mineral development project or other proposed activity that has the potential to emit significant quantities of a regulated air pollutant and the effectiveness of any air emission control measures. Project proponents may submit results from other modeling analyses that include activities similar to the proposed project for BLM's review and approval, and if approved, those modeling results may be used in lieu of new project-specific modeling. The decision as to whether to require air quality modeling will be based on factors listed in Section III.D of this protocol. The BLM will not require an air modeling analysis when it can be demonstrated that the project will not cause a substantial increase in emissions of the pollutants of concern.

### III.C.2 – Modeling Protocol

The BLM will determine the parameters required for a project-specific modeling analysis through the development of a modeling protocol for each analysis. When conducting a regional model or EIS level project specific oil and gas air modeling analysis, the BLM will adhere to the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

### III.C.3 – Regional Air Modeling

The BLM will support and participate in regional modeling efforts through multi-state and/or multi-agency organizations such as Western Governors' Association – Western Regional Air

BLM_0026346

Partnership (WRAP) and the Federal Leadership Forum (FLF). In addition, BLM will, contingent upon available funding, conduct and facilitate regional air modeling as needed. Currently, the BLM is facilitating the Colorado Air Resources Management Modeling Study (CARMMS). CARMMS is a BLM funded regional air quality modeling study of expected impacts on air quality from projected increases in oil and gas development across Colorado and certain upwind adjacent states.

- The CARMMS modeling protocol/study will be developed by the BLM with involvement from appropriate local, state, federal, and tribal agencies involved in the management of air resources and the authorization and regulation of oil and gas development.

- The CARMMS results will include the predicted impacts from all projected federal and non-federal oil and gas development within the region.

- The CARMMS results and analysis will be made available to the public.

### III.C.4 – Evaluation of Modeling Results

The BLM will cooperate in an interagency process to develop a comprehensive strategy to manage air quality impacts from future oil and gas development within the region. As part of that strategy, the local, state, federal, and Tribal agencies involved in the regulation of air quality and the authorization of oil and gas development would evaluate modeling results from CARMMS or other future modeling studies and identify potential air quality concerns and necessary reductions in air emissions. If the modeling predicts significant impacts, these agencies would use their respective authorities to implement appropriate enhanced emission control strategies, operating limitations, equipment standards, and/or pacing of development.

### III.C.5 – Future Modeling Studies

Future iterations of the CARMMS, or a similar regional modeling study of expected impacts from oil and gas development, may be conducted through a collaborative interagency management mechanism and interagency / industry funding mechanism.

### III.D   PERMITTING

As part of the NEPA process and prior to the authorization of any Federal mineral development activity the BLM will conduct an air analysis to determine the potential impacts on air quality based on the estimated emissions from the activity being authorized. The BLM may conduct such an analysis for other authorized activities with the potential to generate significant emissions of a regulated pollutant. The BLM will consider the following factors to identify pollutants of concern and make decisions regarding the appropriate level of air analysis, monitoring, and reporting requirements for the proposed activity.

- magnitude of potential air emissions from the proposed activity

- duration of proposed activity and distinct phase considerations

- proximity to a federally mandated Class I area, sensitive Class II area (as identified on a case-by-case basis by CDPHE or a federal land management or tribal agency), population center, or other sensitive receptor

- location within or adjacent to a non-attainment or maintenance area

BLM_0026347

- meteorological and geographic conditions

- existing air quality conditions including measured exceedances of NAAQS or CAAQS and measured adverse impacts  on air quality related values (AQRVs) at Class I and sensitive Class II areas

- intensity of existing and projected development in the area

- issues identified during project scoping

### III.D.1 – Statewide Lease Notice

The following Lease Notice language will be incorporated into all new leases.

*Due to potential air quality concerns, supplementary air quality analysis may be required for any proposed development of this lease.  This may include preparing a comprehensive emissions inventory, performing air quality modeling, and initiating interagency consultation with affected land managers and air quality regulators to determine potential mitigation options for any predicted significant impacts from the proposed development.  Potential mitigation may include limiting the time, place, and pace of any proposed development, as well as providing for the best air quality control technology and/or management practices necessary to achieve area-wide air resource protection objectives.  Mitigation measures would be analyzed through the appropriate level of NEPA analysis to determine effectiveness, and will be required or implemented as a permit condition of approval (COA).  At a minimum, all projects and permitted uses implemented under this lease will comply with all applicable National Ambient Air Quality Standards and ensure Air Quality Related Values are protected in nearby Class I or Sensitive Class II areas that are afforded additional air quality protection under the Clean Air Act (CAA).*

### III.E    MITIGATION

Many activities that the BLM authorizes, permits, or allows generate air pollutant emissions that have the potential to adversely impact air quality.  The primary mechanism to reduce air quality impacts is to reduce emissions via project design features and mitigation.  Appropriate emission reduction measures are best identified and required at the project authorization stage, when the temporal and spatial characteristics and technological specifications of the proposed action have been defined.  The project-specific information available at that stage allows for the development of an emissions inventory and impact analysis that can be used to identify effective mitigation options for predicted adverse impacts.  Section VI, Emissions Reduction Strategies and Best Management Practices, provides some emission reduction technologies and strategies as an example.  The list in Table VI-1 is not intended to be all inclusive or preclude the use of other effective air pollution control technologies that may be proposed.

The BLM will ensure implementation of reasonable mitigation, control measures, and design features through appropriate mechanisms, including lease stipulations identified in RMPs, notices to lessees, and conditions of approval (permit terms and conditions) as provided for by law and consistent with lease rights and obligations.  In the absence of, or in addition to effective control technologies, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals and objectives as defined under any applicable RMP.

BLM_0026348

### III.E.1 – Emissions Reduction Planning / Minimizing Air Emissions

The BLM will request proponents of oil and gas development projects that have the potential to significantly adversely impact air quality or predicted to exceed an air quality standard to provide an emissions reduction plan where air quality has been identified as a resource of concern in applicable NEPA analysis. Plans shall include a detailed description of operator committed measures to reduce project related air pollutant emissions including greenhouse gases and fugitive dust. All projects are required to comply with all applicable state and federal regulations.

### III.E.2 – Project-specific Mitigation

If the project-specific air quality analysis predicts future impacts on NAAQS or CAAQS (i.e. exceedances) or adverse impacts to AQRVs in Class I or sensitive Class II areas, the BLM will analyze air quality mitigation measures for emission sources. Further, if the regional air quality modeling study conducted under Section III.C.3 predicts significant cumulative impacts on air resources from expected oil and gas development in the region, the BLM may require the proponent of an oil and gas development project to apply reasonable mitigation including but not limited to best management practices (see Section VI), emissions offsets, and other control technologies or strategies identified in the project-specific air quality analyses.

Where identified and analyzed mitigation measures cannot be reasonably implemented for a particular proposed action due to the overall project design, or substantial technical or economic barriers, the BLM will work with project proponents during the NEPA process to develop operator-committed measures or acceptable emissions offsets that would be included as conditions of approval (COA). Any operator committed measures would be required to provide an air quality benefit sufficient in type, scale, location, and timing to avoid the anticipated adverse impact or at a minimum, to reduce it to an acceptable level for the specific area and pollutant(s) analyzed.

### III.F    Protocol Implementation

The BLM will ensure that air resource protection strategies and mitigation measures are implemented by including project-specific COAs (operator-committed and/or required mitigation) for each authorized action. Any COAs applied to projects as a result of this process shall be clearly consistent with the applicable RMP management decisions and/or subsequent analysis of new or previously unavailable information upon which the BLM can reasonably rely.

## SECTION IV – ADAPTIVE MANAGEMENT PROCESSES FOR AIR RESOURCES

Adaptive management incorporates the principles of monitoring current conditions, predicting future impacts, and adapting management strategies to account for changing conditions. An adaptive management strategy for air quality resources allows the BLM to comply with NEPA and complete an appropriate analysis to ensure that activities approved by the BLM minimize adverse impacts to air quality; while allowing for development of important domestic energy resources.

The BLM will implement an adaptive management strategy to account for changing air quality conditions

BLM_0026349

and to minimize adverse impacts to air resources from BLM-authorized activities. The strategy includes evaluating air quality on an on-going basis, and if necessary, implementing appropriate mitigation measures to meet the identified objectives and targets for any applicable Colorado RMP. The adaptive management strategy is intended to be transparent and as such the process includes an annual reporting component that will be made available to the public, as well as case by case incorporation of specific plan elements within individual project approvals. Components of this adaptive management strategy include the following:

### IV.A        Establish Baseline Air Quality Conditions

Existing air quality conditions will be established and continuously updated on an annual basis. To establish a periodic baseline, data must be compiled and analyzed such that air quality value trends (NAAQS & AQRVs for Class I and sensitive Class II areas) can be established or evaluated for the purpose of predicting future impacts from BLM-authorized activities. Sources of data for this analysis may include raw air quality monitoring station data, air quality monitoring reports prepared by others (CDPHE, EPA, NPS or USFS), and/or appropriate regional modeling results.

In addition to monitored or predicted background data, regional emissions inventories will be continuously or periodically updated to reflect the annual mass of pollutants added to the atmosphere. The data will provide an understanding between mass emissions and monitored/modeled air quality conditions and provide a reasonable basis from which to evaluate impacts from future projects or actions.

The last component of the baseline analysis includes providing a brief synopsis of the current meteorological conditions that exist for any planning area such that exceptional events and historical deviations in atmospheric values can be documented to provide additional context for the observed/reported air quality values.

### IV.B        Emissions Tracking

To provide for the periodic baseline the BLM will use the project-specific information used in its NEPA analyses as a mechanism to track emissions of criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases from BLM authorized oil and gas activities within each field office planning area. (NOTE: the BLM may incorporate emissions inventories for other authorized activities with significant emissions to provide for an appropriate cumulative inventory, where such sources are not already included as a Colorado Air Pollution Emissions Notice, or National Emissions Inventory component). The BLM will use emissions data from APDs to inform iterative elements of our adaptive management strategy, including modeling inputs and any subsequent prescriptive or comparative project tiering from any applicable modeling results.

### IV.C        Prescriptive Model Validation

Prescriptive model validation includes comparing the annual NEPA emissions data from BLM authorized oil and gas activities within the planning areas to emission levels analyzed in the CARMMS modeling study (or the most recent BLM or interagency air impacts analysis conducted in accordance with the provisions of the modeling Section III above). Emissions data will include specific oil and gas indicators, such as the number of wells drilled, number of producing wells, production data, compressor stations installed, centralized liquids gathering stations, and gas treatment facilities constructed. The actual emissions levels and new baseline air quality observations will be correlated against the modeled parameters to determine the reasonableness

BLM_0026350

of the model for predicting impacts and its continued appropriateness as a reference for any subsequent project analysis.

If during the course of our annual analysis it is determined that the model has not demonstrated a reasonable correlation of predicted impacts (for modeled emissions inventory levels) compared against the actual emissions recorded for a planning area, the BLM will investigate the potential sources of the discrepancy to determine a potential cause, such as meteorological factors (ex: winter time ozone, which cannot be modeled at this time), or fee mineral development (i.e. non-BLM authorized actions).  If a probable cause for the discrepancy cannot be established, then the BLM will initiate interagency coordination with our regulatory partners to determine if a new modeling analysis is potentially warranted.

## IV.D    Responding to Monitored Exceedances of the NAAQS

If during the course of a year a Federal Reference or Equivalent air monitor within any planning area records a validated exceedance of any NAAQS (excluding any non-attainment areas) the BLM will review the available data to determine if any BLM authorized activity caused or significantly contributed to the exceedance event.  The review will encompass the following steps.

### IV.D.1 – QA/QC

The BLM will ensure the validity of the monitored data by: (a) reviewing Quality Assurance/Quality Control (QA/QC) metadata to ensure against false high readings, and (b) reviewing meteorological data to determine if an exceptional atmospheric event such as stratospheric ozone intrusion occurred.  The BLM may contact CDPHE for technical consultation and concurrence regarding possible exceptional events.

### IV.D.2 – Screening Analysis

If the monitoring data are validated, the BLM will conduct a screening analysis to determine the likely cause, source, or origin of the exceedance and whether any BLM authorized source(s) within or adjacent to the planning area caused or contributed to the monitored exceedance.  If the screening analysis indicates BLM-authorized sources did NOT cause or significantly contribute to the exceedance, then no further action will be taken by the BLM.  The data, analysis, and conclusions will be included in the annual public report described under I.C above.

### IV.D.3 – Enforcement

Should the results of the screening analysis indicate that a BLM authorized source(s) caused or significantly contributed to the monitored exceedance, the BLM will review the COA from the authorization for the source(s) to determine if all the COA were implemented as required.  Where it is determined that operators did not comply with the conditions of approval for their authorized activities, and did not submit an appropriate sundry notice for approved deviations from such conditions, BLM may issue a notice of incident of noncompliance or take other appropriate enforcement action.

### IV.D.4    – Contingency Planning

BLM_0026351

If, after review the BLM determines that an authorized source(s) caused or significantly contributed to the monitored exceedance, the BLM will initiate consultation with CDPHE, EPA, and any other applicable local, state, federal, and tribal agencies with responsibility for managing air resources to address appropriate responses to the monitored exceedances. Responses to monitored exceedances may include employing more stringent mitigation measures within the agencies' respective authority to reduce projected future emissions and performing additional modeling and analysis to determine the overall effectiveness of such mitigation measures.

Additionally, the BLM may implement reasonable temporary measures that have been included in a project specific authorization as conditions of approval, which could limit drilling operations, completions or well stimulations, blowdowns, or other non-essential operations during specified time periods (i.e. a timing limitation). Other actions the Bureau may take would include limiting the number of annual APD approvals issued for the affected area until such time that updated regional modeling can be conducted to provide an appropriate assessment of the expected impacts from a reasonable level of development.

## IV.E    Evaluating Projected Future Development/Emissions

Periodically, but not less than every three years, the BLM will evaluate the available or reasonably foreseeable oil and gas development projections for each planning area for the following three to five year period, and compare these projected levels to the level of predicted future development analyzed in the CARMMS modeling study (or the most recent BLM or interagency air impacts analysis conducted under the provisions of the modeling section(s) III.C.3 or III.C.5 above). The BLM will use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses.

## Section V – Annual Summary Report

Annually, the BLM will prepare a comprehensive summary report (from actual project data and analysis). This report will be made available to the public. The BLM will use this annual review to evaluate whether current air resources protection strategies are meeting the goals and objectives established within the BLM Colorado RMPs. If the analysis shows that the strategies are not achieving our defined air resource protection goals, the BLM will collaborate with CDPHE and the EPA to develop or modify air resource protection strategies as necessary to effectively protect air resources within any deficient planning area. Should this result in changes to RMP goals and objectives, additional planning level analyses will be required.

## Section VI – Oil and Gas Development Emissions Reduction Strategies & BMPs

Table VI-1 displays some emission reduction measures, their potential environmental benefits and liabilities, and feasibility. The table is not meant to be exhaustive in terms of available or acceptable emissions reduction/control technologies or techniques, but provides a baseline or starting point from which to construct design features and mitigation options for project specific or regional analyses.

| Table VI-1 Best |
| --- |

BLM_0026352

Management Practices and Air Emission Reduction Strategies for Oil and Gas Development

| Table VI-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development | | | |
|---|---|---|---|
| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
| Control Strategies for Drilling and Compression | | | |
| Multi-well pad directional or horizontal drilling. | When compared to single pad vertical drilling, reduces construction related emissions, decreases surface disturbance, reduces trip frequencies, and reduces habitat fragmentation. | Could result in higher air impacts in one area with longer sustained drilling times. | Depends on geological strata, topography, and other physical constraints. |
| Improved engine technology (Tier 2 or 4) for diesel drill rig engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers and, potentially differentials in cost for small operators.. |
| Selective Catalytic Reduction (SCR) for drill rig engines and/or compressors. | $NO_x$ emissions reduction, potential decreased formation of visibility impairing compounds and ozone. NOx control efficiency of 95% achieved on drill rig engines. NOx emission rate of 0.1 g/hp-hr achieved for compressors. | Potential NH3 emissions and formation of visibility impairing ammonium nitrate. Regeneration/disposal of catalyst can produce hazardous waste. | Not applicable to 2-stroke engines. |
| Non-selective catalytic reduction (NSCR) for drill rig engines and/or | NOx emissions reduction, potential decreased formation of | Regeneration/disposal of catalysts can produce hazardous | Not applicable to lean burn or 2-stroke engines. |

BLM_0026353

| compressors. | visibility impairing compounds, and ozone. NOx control efficiency of 80-90% achieved for drill rig engines. NOx emission rate of 0.7 g/hp-hr achieved for compressor engines greater than 100 hp. | waste. | |
|---|---|---|---|
| Natural Gas fired drill rig engines. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. | May require construction of infrastructure (pipelines and/or gas treatment equipment). May require onsite gas storage. May require additional engines to supplement needed torque. | Requires onsite processing of field gas. |
| Electrification of drill rig engines and/or compressors | Decreased emissions at the source. Transfers emissions to more efficiently controlled source (EGU). | Displaces emissions to EGU. Temporary increase in emissions with construction of power lines. | Depends on availability of power and transmission lines. |
| Improved engine technology (Tier 2, 3 or 4) for all mobile and non-road diesel engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers. |
| Reduced emission (a.k.a. "green") completions. | Reduction in VOC and CH4 emissions. Reduces or eliminate flaring and venting and associated emissions. Reduces or eliminates open pits and associated evaporative emissions. Increased recovery of gas to pipeline rather than atmosphere. | Temporary increase in truck traffic and associated emissions due to delivery of onsite equipment or due to construction of infrastructure. | Need adequate pressure and flow. Need onsite infrastructure (tanks/dehydrator). Availability of sales line. Green completion required where feasible per COGCC Rule 805(b)(3) and NSPS 40 CFR 63 OOOO. |
| Flaring of completion emissions | Reduces methane, VOC, and some HAP emissions. Converts CH4 to CO2. | | |
| Minimize/eliminate | Reduces methane, VOC, | | |

BLM_0026354

| venting and/or use closed loop process where possible during "blow downs". | and some HAP emissions | | |
|---|---|---|---|
| Eliminate evaporation pits for drilling fluids. | Reduces VOC and GHG emissions. Reduces potential for soil and water contamination. Reduces odors. | May increase truck traffic and associated emissions. May increase pad size. | Requires tank and/or pipeline infrastructure. |
| Electrification of wellhead compression/ pumping. | Reduces local emissions of fossil fuel combustion and transfers to more easily controlled source. | Displaces emissions to EGU. | Depends on availability of power and transmission lines. |
| Wind (or other renewable) generated power for compressors. | Low or no emissions. | May require construction of infrastructure. Visual impacts. Potential wildlife impacts. | Depends on availability of power and transmission lines. |
| Compressor seals – replace wet with dry or use mechanical seal. | Reduce gas venting (VOC and GHG emissions). | | May be costly or not mechanically feasible. |
| Compressor rod packing system – use monitoring and replacement system. | Reduce gas leaks (VOC and GHG emissions). | | Requires establishing a monitoring system and doing replacements. |
| **Control Strategies Utilizing Centralized Systems** | | | |
| Centralization (or consolidation) of gas processing facilities (e.g., separation, dehydration, sweetening). | Reduces vehicle miles traveled (truck traffic) and associated emissions. Reduced VOC and GHG emissions from individual dehydration/ separator units. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure, infeasible for highly dispersed or exploratory wells. |
| Liquids Gathering systems (for condensate and produced water). | Reduces vehicle miles traveled and associated emissions. Reduced VOC and GHG emissions from tanks, truck loading/unloading, and multiple production facilities. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure . May be infeasible for highly dispersed or exploratory wells, difficult terrain, or patchy surface ownership. |
| Water and/or fracturing liquids delivery system. | Reduced long term truck traffic and associated emissions. | Temporary increase in construction associated emissions. Higher potential for | Requires pipeline infrastructure. May be infeasible for highly dispersed or |

BLM_0026355

| | | pipe leaks/groundwater impacts. | exploratory wells, difficult terrain, or patchy surface ownership. |
|---|---|---|---|
| **Control Strategies for Tanks, Separators, and Dehydrators** | | | |
| Eliminate use of open top tanks. | Reduced VOC and GHG emissions. | | |
| Capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units. | Reduces VOC and GHG emissions. | Pressure buildup on older tanks can lead to uncontrolled rupture. | |
| Capture and control of produced water, crude oil, and condensate tank emissions. | Reduces VOC and GHG emissions. | | 95% VOC control required by COGCC in some areas and by CDPHE statewide with applicability thresholds |
| Capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion. | Reduces VOC, HAP, and GHG emissions. | | 90% VOC control required by COGCC in some areas and by CDPHE statewide with applicability thresholds |
| Use zero emissions dehydrators or use desiccants dehydrators. | Reduces VOC, HAP, and GHG emissions. | Requires desiccants (salt tablets and forms a brine solution that must be disposed of. | Can be as effective as Triethylene glycol (TEG) dehydration. |
| **Control Strategies for Misc. Fugitive VOC Emissions** | | | |
| Install plunger lift systems to reduce well blow downs. | Reduces VOC and GHG emissions. | | Can be more efficient at fluids removal than other methods; must have adequate pressure. |
| Install and maintain low VOC emitting seals, valves, hatches on production equipment. | Reduces VOC and GHG emissions. | | |
| Initiate equipment leak detection and repair | Reduction in VOC and GHG emissions. | | |

BLM_0026356

| | | | |
|---|---|---|---|
| program (e.g., including use of FLIR infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection). | | | |
| Install or convert gas operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Use "low" or "no bleed" gas operated pneumatic devices/controllers. | Reduces VOC and GHG emissions. | | Required by COGCC and by CDPHE in non-attainment areas. |
| Use closed loop system or thermal combustion for gas operated pneumatic pump emissions. | Reduces VOC and GHG emissions. | | |
| Install or convert gas operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Install vapor recovery on truck loading/unloading operations at tanks. | Reduces emissions of VOC and GHG emissions. | Pressure build up on older tanks can lead to uncontrolled rupture. | |
| **Control Strategies for Fugitive Dust and Vehicle Emissions** | | | |
| Unpaved surface treatments including watering, chemical suppressants, and gravel. | 20% – 80% control of fugitive dust (particulates) from vehicle traffic. | Potential impacts to water and vegetation from runoff of suppressants. | |
| Use remote telemetry and automation of wellhead equipment. | Reduces vehicle traffic and associated emissions. | | Not possible in some terrain. |
| Speed limit restrictions on unpaved roads. | Reduction of fugitive dust emissions. | | |
| Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative | Reduced combustion emissions, reduced fugitive dust emissions, reduced ozone | | |

BLM_0026357

| | | | |
|---|---|---|---|
| work schedules, or work camps. | formation, reduced impacts to visibility. | | |
| **Miscellaneous Control Strategies** | | | |
| Use of ultra-low sulfur diesel (e.g., in engines, compressors, construction equipment). | Reduces emissions of particulates and sulfates. | | Fuel not readily available in some areas. |
| Reduce unnecessary vehicle idling. | Reduced combustion emissions, reduced ozone formation, reduced impacts to visibility, reduced fuel consumption. | | |
| Reduced pace of (phased) development. | Peak emissions of all pollutants reduced. | Emissions generated at a lower rate but for a longer period. LOP, duration of impacts is longer. | May not be economically viable or feasible if multiple mineral interests. |

BLM_0026358



**Bureau of Land Management**
**Colorado River Valley Field Office**
**2300 River Frontage Road**
**Silt, Colorado 81652**

**Phone: 970-876-9000**

**Website: http://www.blm.gov/co/st/en/fo/crvfo.html**

BLM_0026359

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

| Release |
| 1-1782 |
| Date |
| 12/22/2016 |

MANUAL TRANSMITTAL SHEET

Subject

MS-1794 – MITIGATION (P)

1. <u>Explanation of Material Transmitted</u>: This Manual Section is the foundational policy guidance for the Bureau of Land Management when considering mitigation in advance of anticipated public land uses and applying mitigation to address impacts to resources from public land uses.

2. <u>Reports Required</u>: None

3. <u>Material Superseded</u>: Instruction Memorandum 2013-142 issued on June 13, 2013, which transmitted the interim Manual Section 1794, is superseded.

4. <u>Filing Instructions</u>:  File as directed below.


REMOVE                           INSERT

None                             All of MS-1794
                                 (Total: 29 sheets)



*Kristin Bail*

Assistant Director,
Resources and Planning

MS-1794 – MITIGATION (P)

## Table of Contents

1.1. **PURPOSE** ........................................................................................... 1
1.2. **OBJECTIVES** .................................................................................... 1
1.3. **AUTHORITY** ..................................................................................... 1
1.4. **RESPONSIBILITIES** ........................................................................ 2
1.5. **REFERENCES** ................................................................................... 3
1.6. **POLICY** ............................................................................................. 4
A. **Principles for Mitigation in the BLM** ............................................... 4
  1. Mitigation ........................................................................................ 5
  2. Landscape-Scale Approach ............................................................. 7
  3. Best Management Practices ............................................................ 8
  4. Durability ........................................................................................ 9
  5. Mitigation Measures' Outcomes and Performance Standards ......... 10
  6. Implementation (Compliance) and Effectiveness Monitoring ......... 10
  7. Adaptive Management .................................................................... 13
  8. Reporting ........................................................................................ 13
  9. Responsible Parties ........................................................................ 13
  10. Best Available Science ................................................................. 14
  11. Communication ........................................................................... 14
B. **Implementing the Mitigation Hierarchy** .......................................... 15
C. **Advance Consideration of Mitigation: Mitigation Strategies** ........ 15
D. **Advance Consideration of Mitigation: Land Use Planning (interim)** ... 16
E. **Mitigation of Public Land Uses** ........................................................ 17
  1. NEPA for Public Land Uses .......................................................... 17
  2. Denying Proposed Public Land Uses ............................................. 17
  3. Unnecessary or Undue Degradation ............................................... 18
F. **Policy Limitations** .............................................................................. 18
  1. Previously Approved Land Use Authorizations ............................. 18
  2. Renewal or Amendment of Land Use Authorizations .................... 18
  3. Valid Existing Rights and Limited Discretion Decisions ............... 18
  4. Land Use Authorizations on Split Estate Lands ............................. 19
  5. Operations Authorized by the Mining Law of 1872 ....................... 19
  6. Additional Mitigation Obligations ................................................. 20
1.7. **FILE AND RECORDS MAINTENANCE** ......................................... 20
**GLOSSARY** ............................................................................................... 1

BLM_0026361

MS-1794 – MITIGATION (P)

1

## 1.1. Purpose

**A.** The purpose of this policy guidance is to support the Bureau of Land Management's (BLM) multiple use and sustained yield mission by providing policies to:

**1.** Implement consistent principles and procedures for mitigation in the BLM's authorization of public land uses.

**2.** Consider mitigation well in advance of making decisions about anticipated public land uses by identifying opportunities for mitigation in mitigation strategies and incorporating mitigation into land use plans and programmatic or large geographic-scale NEPA analyses.

**3.** Apply mitigation to address reasonably foreseeable impacts to resources (and their values, services, and/or functions)[1] from public land uses.

## 1.2. Objectives

The objectives of this Manual Section are to provide guidance to BLM managers and staff when determining what the appropriate mitigation requirements should be as conditions for authorization of a proposed public land use, including mitigation in advance of anticipated public land uses, and applying mitigation to address impacts to resources from public land uses.

## 1.3. Authority

**A.** Principal authorities that relate to or compel the need for mitigation in the BLM include:

**1.** Federal Land Policy and Management Act (FLPMA), 43 USC 1701 et seq.

**2.** National Environmental Policy Act (NEPA), 42 USC 4321 et seq.

**3.** Mineral Leasing Act of 1920, 30 USC 181 et seq.; Mineral Leasing Act for Acquired Lands, 30 U.S.C. 351 et seq.

**4.** Mining Law of 1872, 30 USC 22 et seq.

**5.** Endangered Species Act, 7 USC 136, 16 USC 1531 et seq.

**6.** National Landscape Conservation System Act, 16 USC 7201 et seq.

**7.** National Historic Preservation Act, 54 USC 300101 et seq.

---

[1] For brevity, in this policy, the term "resources (and their values, services, and/or functions)" is also referred to in this manual simply as "resources."

BLM_0026362

MS-1794 – MITIGATION (P)

2

8. The Wyden Amendment, 16 USC 1011.

9. Council on Environmental Quality (CEQ) NEPA Regulations, 40 CFR 1500 et seq.

10. DOI NEPA Regulations, 43 CFR Part 46.

11. BLM Planning Regulations, 43 CFR Part 1600.

12. Mitigation provisions in other applicable BLM regulations (e.g., BLM's Minerals Management Regulations, 43 CFR Subchapter C)

B. Several additional authorities address specific resources on the public lands, including, but not limited to, the Bald and Golden Eagle Protection Act, Clean Water Act, Clean Air Act, Federal Cave Resources Protection Act, Fish and Wildlife Coordination Act, and the Migratory Bird Treaty Act.

C. In addition to the guidance provided in this policy, the BLM should consider individual land use authorization applications in the context of the laws that apply to each application. The applicable law may provide additional or limiting authority for identifying, considering, and requiring mitigation. Also, the terms and conditions of existing land use authorizations may limit the type or amount of mitigation that BLM may require.

## 1.4.  Responsibilities

A. It is the responsibility of the Director and Deputy Directors to provide for the overall management of the agency, including the implementation of this policy.

B. It is the responsibility of the Assistant Directors to:

1. Provide for program development and support to state offices to implement this policy consistently.

2. Coordinate with other Federal agencies, and Tribal and State governments, as appropriate, when implementing this policy.

C. It is the responsibility of the State Directors to:

1. Implement this policy within offices under their authority.

2. Provide for state-wide program development, technical management assistance, and support to district and field offices to implement this policy across the state.

3. Coordinate with other State Directors, other Federal agencies, and Tribal and State governments, as appropriate, when implementing this policy.

BLM_0026363

MS-1794 – MITIGATION (P)

3

4. Support the development and implementation of Mitigation Strategies and the incorporation of mitigation into land use plans and public land uses, consistent with applicable law.

5. Support the development of compensatory mitigation mechanisms (e.g., mitigation banks, mitigation exchanges, mitigation funds), to the extent appropriate, practicable, and consistent with applicable law.

D. It is the responsibility of the District Managers and Field Managers to:

1. Implement this policy within offices under their authority.

2. Provide for district office and field office program development, technical management assistance, and support to implement this policy across the offices.

3. Coordinate with other District Managers and Field Managers, other Federal agencies, and Tribal, State, and local governments, as appropriate, when implementing this policy.

4. Support the development and implementation of Mitigation Strategies and incorporation of mitigation into land use plans.

5. Support the development of compensatory mitigation mechanisms (e.g., mitigation banks, mitigation exchanges, mitigation funds), to the extent appropriate, practicable and consistent with applicable law.

6. Identify and analyze mitigation, including best management practices, to address reasonably foreseeable impacts to resources from public land uses, identify any required mitigation in decision documents, and include any required mitigation in land use authorizations.

7. Ensure any required mitigation is implemented consistent with applicable law, decision documents, and land use authorizations.

8. Fulfill the reporting requirements identified in this policy.

E. It is the responsibility of the National Operations Center Director to:

1. Provide for technical management assistance to implement this policy.

2. Implement this policy with respect to File and Records Maintenance.

1.5. **References**

A. Principal references for this guidance are:

MS-1794 – MITIGATION (P)

4

1. Presidential Executive Order 13604, Improving Performance of Federal Permitting and Review of Infrastructure Projects, March 22, 2012.

2. Presidential Memorandum, Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, Procedures, May 17, 2013.

3. Presidential Memorandum, Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investments, November 3, 2015.

4. Council on Environmental Quality's January 14, 2011 Memorandum: Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact.

5. Secretary of the Interior, Order 3330: Improving Mitigation Policies and Practices of the Department of the Interior (DOI), October 31, 2013.

6. A Strategy for Improving the Mitigation Policies and Practices of the Department of the Interior, DOI Energy and Climate Change Task Force, April, 2014.

7. DOI Departmental Manual 600 DM 5, Standards for Federal Lands Boundary Evidence

8. DOI Departmental Manual 600 DM 6, Landscape-Scale Mitigation Policy.

9. DOI Departmental Manual 522 DM 1, Adaptive Management Implementation Policy.

10. BLM Handbook H-1601-1, Land Use Planning.

11. BLM Handbook H-1790-1, National Environmental Policy Act.

12. Mitigation provisions in other applicable BLM Handbooks.

## 1.6. Policy

### A. Principles for Mitigation in the BLM

When evaluating the mitigation of impacts to resources (and their values, services, and/or functions), consistent with applicable law, the BLM will consider the full mitigation hierarchy, described below, and implement mitigation, as appropriate, at all relevant scales, while incorporating best management practices. Effective mitigation is durable, defined by outcomes, implemented and monitored for effectiveness, considered within an adaptive management framework, reported upon, managed by a responsible party, guided by the best available science, and developed through effective, early, and frequent communication with the public land user, cooperating agencies, and other stakeholders, including the public.

## 1. Mitigation

The BLM will identify, consider, and, as appropriate, require mitigation to address reasonably foreseeable impacts to resources from public land uses (BLM-proposed and externally proposed (i.e., proposed by a party outside of the BLM)).

   a. The Council on Environmental Quality (CEQ) has defined mitigation in its regulations at 40 CFR 1508.20 to include:

- avoiding the impacts by not taking a certain action or parts of an action,
- minimizing impacts by limiting the degree or magnitude of the action and its implementation,
- rectifying the impact by repairing, rehabilitating, or restoring the affected environment,
- reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action, and
- compensating for the impact by replacing or providing substitute resources or environments (see Handbook Chapter 2).

Collectively, the five aspects of mitigation (avoid, minimize, rectify, reduce/eliminate, compensate) are referred to as the mitigation hierarchy because they are generally applied in a hierarchical manner (600 DM 6.4.B) (Manual Section 1.6.B). As explained in the Department Manual (600 DM 6.4.A) all five aspects of mitigation can, as a practical matter, be summarized as avoidance, minimization, and compensation. In this handbook, when referring to mitigation, the full five-prong mitigation hierarchy is implied.

   b. Mitigation addresses the adverse direct and indirect impacts to the baseline conditions of resources (including consideration of the quantity, quality, and characteristics of those resources) from public land uses. The assessment of cumulative impacts provides a broader context for understanding the direct and indirect impacts.[2] When assessing impacts of authorizing a public land use, the BLM should use, as appropriate, consistent and transparent methods and consider the full life-cycle of a public land use. Whenever possible, the same or compatible methods, including metrics, as used to identify resource objectives (e.g., in a land use plan) should be used to measure the reasonably foreseeable impacts (as compared to baseline conditions) of a proposed public land use, and should be used to design and monitor mitigation measures.

   c. The BLM identifies and considers mitigation to address impacts to resources in NEPA analyses for proposed public land uses, and, as appropriate, requires mitigation to address impacts to resources in the associated decision documents and land use authorizations (Handbook Chapter 5 and Handbook Chapter 6). The

---

[2] See definitions of direct, indirect, and cumulative impacts in 40 CFR 1508.7-8.

MS-1794 – MITIGATION (P)

6

BLM will identify, consider, and, as appropriate, require mitigation, to address reasonably foreseeable impacts, whether or not the impacts are "significant" (as defined by 40 CFR 1508.27). The BLM has authority to require appropriate mitigation under a variety of authorities, including FLPMA (Manual Section 1.3).

d. The BLM will, through the land use planning process, for resources that are considered important, scarce, sensitive, or have a protective legal mandate, identify mitigation standards. As appropriate and through application of the mitigation hierarchy, mitigation standards should seek to achieve a no net loss or net benefit outcome for such resources. In some cases, mitigation standards are identified in law and therefore should be incorporated into land use plans, as appropriate. When identified in a land use plan, the BLM will adhere to these or more protective mitigation standards for any applicable public land use, consistent with the law(s) under which BLM authorizes the land use (Handbook Chapter 4.1.A).

If a mitigation standard has not yet been identified in a land use plan, the BLM may identify mitigation standards for resources that are considered important, scarce, sensitive, or have a protective legal mandate, as appropriate, in other decision documents supported by appropriate NEPA analysis.

The BLM may also identify mitigation standards for resources that are considered important, scarce, sensitive, or have a protective legal mandate in mitigation strategies (Handbook Chapter 3.4), if mitigation standards have not already been identified by the BLM for those resources. If the mitigation strategy is not incorporated in a decision document, supported by adequate NEPA analysis, then the BLM should consider the findings and recommendations that are contained in the mitigation strategy through future decision-making processes.

e. The need for, type of, and amount of avoidance, minimization, rectification, and reduction or elimination over time should be based on applicable mitigation standards, what is appropriate and practicable, and should also include other considerations, such as the resource's importance, scarcity, or sensitivity, at all relevant scales, and whether the resource for which adverse impacts will be mitigated has legal, regulatory, land use plan, or policy protections that limit or prevent certain types of impacts (Handbook Chapter 2).

Existing legal authorities contain additional protections for some resources that are of such irreplaceable character that minimization and compensatory mitigation measures may not be adequate or appropriate, and therefore avoidance is the only appropriate form of mitigation, consistent with applicable law. The BLM will seek to avoid, to the greatest extent practicable, reasonably foreseeable impacts to the National Park System, National Wildlife Refuge System, National Landscape Conservation System (National Conservation Lands), Areas of

BLM_0026367

MS-1794 – MITIGATION (P)

7

Critical Environmental Concern, and other special status areas (Handbook Chapter 2.1.D).

f.  The need for compensatory mitigation should be based on applicable mitigation standards, and what is appropriate for each individual proposed public land use, taking into consideration applicable law, policies, land use plans, and mitigation strategies (Handbook Chapter 2.5.B). In general, the BLM should seek to identify compensatory mitigation measures that will appropriately mitigate the reasonably foreseeable residual effects that warrant compensatory mitigation, after first considering and applying, as appropriate, the first four mitigation approaches in the five-prong mitigation hierarchy, and achieve the maximum benefit to the impacted resources within the context of the conditions and trends of those resources, at all relevant scales. All compensatory mitigation obligations should be commensurate with the impacts from the public land uses (Handbook Chapter 2.5.F.1). Additionally, the BLM's general preference is to achieve compensatory mitigation outcomes in advance of public land uses' impacts (Handbook Chapter 2.5.F.2).

## 2. Landscape-Scale Approach

Mitigation should be considered and implemented on a landscape-scale. A landscape-scale approach considers baseline conditions, reasonably foreseeable impacts, including impacts that extend beyond the BLM's administrative boundaries, and the application of the mitigation hierarchy in the context of the conditions and trends of resources, at all relevant scales, consistent with applicable law.

a.  A landscape-scale approach facilitates the mitigation of impacts to resources within the relevant geographic area of those resources, however narrow or broad.

b.  Application of the mitigation hierarchy at a landscape-scale may involve multiple stakeholders and tradeoffs among a broad range of resources.

c.  The BLM should consider the management responsibilities and interests of other Federal agencies, Tribal, State, and/or local governments with the relevant landscape.

d.  A landscape-scale approach paired with the mitigation hierarchy process allows for the identification of the most appropriate combination of mitigation measures across all relevant scales to provide the maximum benefit to the impacted resources. For example, in cooperation with other land managers, this could include development of common reclamation and restoration standards, or landscape-wide surface disturbance limitations to reduce impacts to wide-ranging species and their migratory routes and seasonal habitat.

e.  A landscape-scale approach also allows for identification of the most effective compensatory mitigation sites without implying a preference for siting

compensatory mitigation closer to or farther away from the impacted site or implying a preference for Federally managed lands. The lack of preference for Federally managed lands in siting compensatory mitigation is due, in some instances, to the BLM's interest in benefiting specific impacted public land resources.

The maximum benefit to the impacted resource might be achieved at a compensatory mitigation site either geographically close or geographically far from the impacted site, so long as the mitigation at that site has a reasonable relationship to benefiting the public land resources where the resource impact is expected to occur or is occurring. The site that provides the maximum benefit to the public land resources does not need to be near the site where the resource impact occurred. Compensatory mitigation measures sited on non-BLM-managed lands, which may include lands managed by other land management agencies, will require the consent of the landowner or manager.

For example, this could include identifying a compensatory mitigation site near the impacted site for a locally important species, such as a scarce and locally endemic plant, that may decline due to the impact of the impact of the public land use. Or, it may include identifying a compensatory mitigation site far from the site of the public land use and potentially on non-public lands (with a willing landowner), where the species may have a more pressing ecological need (such as scarce breeding grounds), as long as a reasonable relationship is maintained between the impacts of the public land use and the compensatory mitigation measure(s) implemented at that site.

f.   Compensatory mitigation may be appropriate even if the compensatory mitigation measures are sited outside the boundaries of the lease, grant, mining plan of operations, etc., as long as a reasonable relationship is maintained between the impacts of the public land use and the compensatory mitigation measure(s) being implemented at that site. The use of compensatory mitigation does not mean that BLM may approve public land uses that cause unnecessary or undue degradation to the public lands (see Manual Section 1.6.E.3).

g.   The BLM may also develop landscape-scale mitigation strategies (Handbook Chapter 3), in addition to implementing the landscape approach in land use plans (Handbook Chapter 4) and when authorizing public land uses (Handbook Chapter 5 and Handbook Chapter 6).

3.   **Best Management Practices**

As applicable to mitigation, best management practices (BMPs) are state-of-the-art, efficient, appropriate, and practicable mitigation measures for avoiding, minimizing, rectifying, and reducing or eliminating impacts over time. The BLM should identify, consider, and, as appropriate, require the use of BMPs to address reasonably foreseeable impacts to resources, rather than routinely relying on past practices.

BLM_0026369

MS-1794 – MITIGATION (P)

Depending on the public land use, BLM may seek an applicant's voluntary commitment to follow BMPs or require BMPs as a condition of authorization if allowed under existing legal authority.

**4. Durability**

The BLM should identify, consider, and, as appropriate, require mitigation that is durable, i.e., it will be effective for the duration of the impacts resulting from the associated public land use.

a. Durability includes three types of considerations for mitigation measures and for compensatory mitigation sites: resource, administrative, and financial.

    i. Resource considerations for durability include, but are not limited to, ensuring that mitigation measures and/or compensatory mitigation sites achieve and maintain their required outcomes, including being resilient to changing circumstances (e.g., climate change, fire, invasive species), for the duration of the impacts

    ii. Administrative considerations for durability include, but are not limited to, restricting incompatible uses on mitigation sites (e.g., through the use of a conservation easement on private land), or permitting land uses that are supportive of the mitigation sites (e.g. additional restoration projects), through permit terms and conditions, land use planning, or legal designations.

    iii. Financial considerations for durability include, but are not limited to, ensuring there will be financing sufficient to maintain, monitor, and adaptively manage mitigation measures and/or compensatory mitigation sites for the duration of the impacts from the public land use (Handbook Chapter 6.2).

b. The duration of the impact is the time that resource impacts (including direct and indirect effects) from a public land use persist, even if this time period extends beyond the expiration of the public land use. The duration of *some* impacts may be in perpetuity, such as the construction of a new transmission line or a county road. The BLM should use the best available science to estimate the duration of the impact. For compensatory mitigation measures and sites, the BLM should consider the duration of the residual effects to be at least until the residual effects have been restored.

c. As appropriate, the BLM should ensure that the responsible party is obligated to maintain the mitigation's durability and correct any loss of durability (i.e., a reversal), unless the outcome is not achieved due to a force majeure event. If the loss of durability is not corrected, the BLM will take appropriate follow-up

BLM_0026370

MS-1794 – MITIGATION (P)

actions, including enforcement actions, consistent with applicable law and as provided for in applicable regulations (see Handbook Chapter 6.3).

d.  Details about tools to achieve (degrees of) durability for compensatory mitigation sites on BLM-managed lands and private lands are described in Handbook Appendix 1.

**5. Mitigation Measures' Outcomes and Performance Standards**

When developing mitigation measures, the BLM should establish clearly defined and measurable outcomes for those measures through regulation, land use planning, or in another decision document, as appropriate, although it may also be necessary to establish minimum actions (i.e., outputs) that the responsible party must take to achieve those outcomes. The BLM should also develop performance standards through regulations, land use planning, or in another decision document, as appropriate, as part of the mitigation requirements that the BLM will use to monitor and assess the effectiveness of compensatory mitigation measures.

a.  Mitigation measures should be defined by outcomes, and may also include specific outputs.

  i.  Mitigation measures' outcomes should support the applicable land use plan's resource objectives, and/or the objectives of other Federal agencies, Tribal, State and/or local governments, consistent with applicable law.

  ii.  In general, the BLM should anticipate the need to adapt the mitigation measures to meet the required mitigation outcomes by analyzing different adaptive scenarios in the NEPA analysis for those mitigation measures. For externally proposed public land uses, the BLM should ensure that adaptive, outcome-based mitigation is adequately described in the land use authorization (Handbook Chapter 6).

b.  The BLM should use performance standards to monitor and assess the effectiveness of the mitigation measure in achieving the required outcome. The BLM should use the same or compatible methods, including metrics, that it used to identify resource objectives (e.g., in a land use plan) and/or that it used to measure the reasonably foreseeable impacts (as compared to baseline conditions) of a proposed public land use (Manual Section 1.6.A.1.b), when designing these performance standards to be able to best measure the effectiveness of the mitigation measures for those impacts.

**6. Implementation (Compliance) and Effectiveness Monitoring**

BLM_0026371

MS-1794 – MITIGATION (P)

The BLM should ensure that mitigation measures are implemented (i.e., complied with) and monitored for effectiveness, as provided for in land use authorizations, and consistent with applicable law and regulation.[3]

For some land uses, applicable regulations provide that the BLM may require the public land user to monitor the effectiveness of its compliance with applicable mitigation measures. For example, the BLM's regulations require operators who file a mining plan of operations under 43 CFR 3809 to include a proposed plan for monitoring the effect of their mining operations. The applicable regulation, 43 CFR 3809.401(b)(4), requires operators to design monitoring plans to demonstrate compliance with the plan of operations (which would include any mitigation measures required under the plan), provide early detection of potential problems, and supply information to assist in directing corrective action, if necessary.

In other instances, the BLM may have the discretion to require a public land user to monitor the effectiveness of mitigation measures without express regulatory provisions.  Under other circumstances, the BLM may have to conduct the monitoring (e.g., an existing lease where neither applicable regulations nor the terms of the lease provide for monitoring). If the BLM has questions about how to provide for monitoring, it should consult with the Office of the Solicitor.

The BLM will take appropriate follow-up actions, including enforcement actions, consistent with applicable law and as provided for in applicable regulations, as necessary, if the mitigation measures are not implemented as designed or if the mitigation measures are not effective in achieving the required mitigation outcomes, based on effectiveness monitoring (see Handbook Chapter 6.3), unless the outcome is not achieved due to a force majeure event.

  a.  Implementation (Compliance). The BLM should conduct regular compliance inspections for the duration of the land use authorization to verify that mitigation measures are being implemented as required in the land use authorization.

  b.  Effectiveness Monitoring. Consistent with applicable law, the BLM should verify that the public land user is achieving the required outcomes and/or implementing the appropriate adaptive management measures.

     i.  Consistent with applicable law, the BLM should apply the rule of reason when identifying the type, extent, and duration of effectiveness monitoring for mitigation measures, as guided by the degree of uncertainty associated with a mitigation measure, the amount and type of the mitigation measure, and the potential need for adaptive management.

---

[3] For additional guidance on monitoring and mitigation, please refer to:  Executive Office of the President, Council on Environmental Quality's *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact* January 14, 2011.